# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

## SUPPLEMENTAL DECLARATION OF MICHAEL ARTZ

I, Michael Artz, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1. I am Associate General Counsel of the American Federation of State, County & Municipal Employees, AFL-CIO ("**AFSCME**"), and I submit this supplemental declaration in support of *The Michigan Council 25 Of The American Federation Of State, County & Municipal Employees, AFL-CIO And Sub-Chapter 98, City Of Detroit Retirees' Pre-Trial Brief Regarding The City Of Detroit's Eligibility To Obtain Relief Under Chapter 9 of The Bankruptcy Code* (the "**Pretrial Brief**").

2. Attached to my Declaration are the following Exhibits referenced in the Pretrial Brief:

| Exhibit A | A copy of a transcript of the deposition testimony given by Richard Baird on October 10, 2013. |
|---|---|
| Exhibit B | A copy of a transcript of the deposition testimony given by Treasurer Andrew Dillon on October 10, 2013. |
| Exhibit C | A copy of a transcript of the deposition testimony given by Mayor David Bing on October 14, 2013. |

Executed on this 17th day of October, 2013          /s/ *Michael Artz*_____
                                                    Michael Artz, Esq.

# EXHIBIT A

*In Re: City of Detroit, Debtor*

---

*Richard Baird*

*October 10, 2013*

---

*Moretti Group*

*471 W. South Street*

*Suite 41B*

*Kalamazoo, MI 49007*

*800-536-0804*



Original File 101013RB.TXT

Min-U-Script® with Word Index

## Page 1

```
 1          UNITED STATES BANKRUPTCY COURT
         FOR THE EASTERN DISTRICT OF MICHIGAN
 2            SOUTHERN DIVISION - DETROIT
   ------------------------------------
 3  In re:                      Chapter 9

 4  CITY OF DETROIT, MICHIGAN,   Case No. 13-53846

 5         Debtor,        Hon. Steven W. Rhodes
   ------------------------------------
 6  V I D E O T A P E D   D E P O S I T I O N   O F

 7  WITNESS:   RICHARD BAIRD

 8  LOCATION:  Dickinson Wright, PLLC
              215 South Washington Street, Suite 200
 9            Lansing, Michigan  48933

10  DATE:      Thursday, October 10, 2013
              1:56 p.m.
11

12  APPEARANCES:
   FOR PLAINTIFFS FLOWERS:
13
              LAW OFFICE OF WILLIAM A. WERTHEIMER
14            30515 Timberbrook Lane
              Bingham Farms, Michigan  48025
15            248.644.9200
              billwertheimer@gmail.com
16            BY: WILLIAM A. WERTHEIMER  (P26275)

17  FOR INTERNATIONAL UNION, UAW:

18            COHEN, WEISS and SIMON, LLP
              330 West 42nd Street
19            New York, New York  10036-6976
              212.563.4100
20            pdechiara@cwsny.com
              BY: PETER D. DeCHIARA, ESQUIRE
21
   FOR THE RETIREES COMMITTEE:
22
              DENTONS US LLP
23            1221 Avenue of the Americas
              New York, New York  10020-1089
24            212.768.6881
              arthur.ruegger@dentons.com
25            BY: ARTHUR H. RUEGGER, ESQUIRE
```

## Page 2

```
 1  APPEARANCES, CONTINUING:

 2  FOR AFSCME, AMERICAN FEDERATION OF STATE, COUNTY and
   MUNICIPAL EMPLOYEES, AFL-CIO:
 3
              LOWENSTEIN SANDLER, LLP
 4            65 Livingston Avenue
              Roseland, New Jersey  07068
 5            973.597.2538
              jsherwood@lowenstein.com
 6            BY: JOHN K. SHERWOOD, ESQUIRE

 7
   FOR GENERAL RETIREMENT SYSTEM; CITY OF DETROIT POLICE AND
 8  FIRE RETIREMENT SYSTEM:

 9            CLARK HILL
              212 E. Grand River Avenue
10            Lansing, Michigan  48906
              517.318.3060
11            sgallagher@clarkhill.com
              BY: SEAN PATRICK GALLAGHER  (P73108)
12
              CLARK HILL
13            500 Woodward Avenue, Suite 3500
              Detroit, Michigan  48226
14            313.965.8274
              jgreen@clarkhill.com
15            BY: JENNIFER K. GREEN  (P69019)

16  FOR THE FINANCIAL GUARANTY INSURANCE CORPORATION:

17            WILLIAMS WILLIAMS RATTNER &
              PLUNKETT, PC
18            380 North Old Woodward Avenue
              Suite 300
19            Birmingham, Michigan  48009
              248.642.0333
20            eje@wwrplaw.com
              BY: ERNEST J. ESSAD, JR.  (P32572)
21
   FOR THE CITY OF DETROIT:
22
              JONES DAY
23            51 Louisiana Avenue, NW
              Washington, D.C.  20001-2113
24            202.879.3939
              gshumaker@jonesday.com
25            BY: GREGORY M. SHUMAKER, ESQUIRE
```

## Page 3

```
 1  APPEARANCES, CONTINUING:

 2  FOR THE STATE OF MICHIGAN:

 3            OFFICE OF THE GOVERNOR-LEGAL DIVISION
              George W. Romney Building
 4            111 South Capitol Avenue
              P.O. Box 30013
 5            Lansing, Michigan  48909
              517.241.5630
 6            gadolam@michigan.gov
              BY: MICHAEL F. GADOLA  (P43960)
 7
              DICKINSON WRIGHT, PLLC
 8            215 South Washington Square, Suite 200
              Lansing, Michigan  48933-1816
 9            517.487.4710
              pellsworth@dickinsonwright.com
10            BY: PETER H. ELLSWORTH  (P23657)

11
   VIDEO BY:    Tim Reitman, Reitman Video Specialists
12
   REPORTED BY:  Laurel A. Jacoby, CSR-5059, RPR
13
```

## Page 4

```
 1              I N D E X

 2  WITNESS: RICHARD BAIRD              PAGE NO.

 3  Examination by Mr. DeChiara              7

 4  Examination by Mr. Wertheimer           68

 5  Examination by Mr. Sherwood             80
```

```
12           E X H I B I T   I N D E X

13  EXHIBIT NO.        DESCRIPTION         PAGE NO.

14  Exhibit 1   Jones Day Presentation to the

15            City of Detroit; Detroit, Michigan

16            Jan. 29, 2013

17            (Bates Nos. DTMI 000128731-805)     13

18  Exhibit 2   Jan. 30, 2013 email

19            Subject:  Your call

20            (Bates No. JD-RD 0000113)      21

21  Exhibit 3   Jan. 31, 2013 email

22            Subject: D

23            (Bates No. JD-RD 0000303)      24
```

Page 5

```
              E X H I B I T   I N D E X
EXHIBIT NO.            DESCRIPTION           PAGE NO.
Exhibit 4    Feb. 11, 2013 email
             Subject: Revised (Final) Schedule
             for Kevyn Orr Monday, Feb. 11
             (Bates No. JD-RD 0000327)           27
Exhibit 5    Feb. 20, 2013 email
             Subject: Message from
             RUP0026732F87D1
             (Bates Nos. JD-RD 0000216 and 218)  31
Exhibit 6    Feb. 22, 2013 email
             Subject: 11 Point Plan
             (Bates Nos. JD-RD 0000459-463)      38
Exhibit 7    July 8, 2013 email
             Subject: Detroit
             (Bates No. SOM 20003601)            60
Exhibit 8    July 9, 2013 email
             Subject: Detroit
             (Bates No. SOM 20003657)            65
Exhibit 9    Outline: Is the Emergency Manager
             Moving Fast Enough?
             (Bates Nos. DTMI 00113909-910)      67
```

Page 6

```
              E X H I B I T   I N D E X
EXHIBIT NO.            DESCRIPTION           PAGE NO.
Exhibit 10   Jan. 31, 2013 email
             Subject: D
             (Bates Nos. JD-RD 0000300-301)     104


             (Exhibits attached to transcript.)
                       -   -   -
```

Page 7

1                  October 10, 2013

2                  Lansing, Michigan

3                  1:56 p.m.

4                  - - -

5     VIDEO TECHNICIAN: Today's date is October

6 the 10th, 2013, and we're on the record at 1:56 p.m.

7     This is the video deposition of

8 Mr. Richard Baird and we're at 211 South Washington

9 Street in Lansing, Michigan.

10     Can the witness be sworn, please.

11     -RICHARD BAIRD-

12 called as a witness, being first duly sworn, was

13 examined and testified as follows:

14     EXAMINATION

15 BY MR. DeCHIARA:

16 Q.  Good afternoon, Mr. Baird. My name is Peter

17     DeChiara. I'm a lawyer with the law firm of Cohen,

18     Weiss and Simon LLP. We represent the United Auto

19     Workers International Union in this case.

20     Did you prepare in any manner for this

21     deposition?

22 A.  Yes.

23 Q.  What did you do?

24 A.  I reviewed emails, reviewed other depositions and

25     discussed with my attorneys.

Page 8

1 Q.  What depositions did you review?

2 A.  I reviewed the depositions for Kevyn Orr and for

3     Governor Snyder and my own deposition from a case

4     brought by Robert Davis.

5 Q.  Okay. That was the May 24th, 2013 deposition?

6 A.  I don't recall the exact date.

7 Q.  Okay. It was in Davis versus Local Emergency

8     Financial Assistance Loan Board?

9 A.  Yes.

10 Q.  And it was in the spring of this year?

11 A.  Yes.

12 Q.  Other than your attorneys, did you speak to anyone

13     else in preparation for this deposition?

14 A.  No.

15 Q.  Other than the deposition that you gave in the Davis

16     case, have you given any other depositions in 2013?

17 A.  No.

18 Q.  What about in 2012?

19 A.  No.

20 Q.  Are you familiar with an organization called MI

21     Partners?

22 A.  Yes.

23 Q.  What is MI Partners?

24 A.  It's actually MI Partners LLC, a limited liability

25     corporation, which is owned by me.

Page 9

1  Q.  Okay.  Are you an employee of MI Partners LLC?
2  A.  I am.
3  Q.  And what's your position?
4  A.  I am its president.
5  Q.  Are there any other employees?
6  A.  No.
7  Q.  Are there any other owners?
8  A.  No.
9  Q.  What business is MI Partners in?
10 A.  Provides consulting services, mainly organizational,
11     talent, strategy.
12 Q.  And how many clients does MI Partners have?
13 A.  One.
14 Q.  And who is that or what is that?
15 A.  It is the New Energy to Reinvent and Diversify.
16 Q.  And what services does MI Partners provide to New
17     Energy to Reinvest and Diversify?
18 A.  New Energy to Reinvent and Diversify is --
19 Q.  I'm sorry, is it Reinvent or Reinvest?
20 A.  Reinvent.
21 Q.  I'm sorry, Reinvent.
22 A.  Is the fund which covers my fees.  My services are
23     provided to the Governor, his executive office and
24     his extended leadership team.
25 Q.  Do you receive any monies -- do you or do MI

Page 10

1      Partners receive any monies directly from the State?
2  A.  No.
3  Q.  Does New Energy to Reinvent and Diversify receive
4      any monies from the State?
5  A.  I don't know.
6  Q.  Okay.  Do you know whether -- I'm just going to
7      refer -- so I don't have to keep repeating that
8      name, I'm just going to refer to it as NERD,
9      N-E-R-D.  Is that okay?  Do you understand what I'm
10     talking about?
11 A.  I will know the fund you're referring to.
12 Q.  Does NERD receive any monies from any of the
13     creditors in the Detroit bankruptcy case?
14 A.  I don't know.
15 Q.  Okay.  Do you know whether NERD receives any monies
16     from the Jones Day law firm?
17 A.  I don't know.
18 Q.  Do you know whether it receives any monies from
19     Kevyn Orr?
20 A.  I don't know.
21 Q.  Do you know who or what finances NERD?
22 A.  I don't know the donors.  I've been advised that
23     they are private donors, but I have no way of
24     knowing who they are.
25 Q.  And for how long has this arrangement existed

Page 11

1      whereby NERD pays MI Partners for you to provide
2      consulting services to the Governor and his staff?
3  A.  Since January of 2011.
4  Q.  Apart from the arrangement I just mentioned, do you
5      have any other paid employment?
6  A.  Employment, no.
7  Q.  Do you have any other paid consultancy work that you
8      perform?
9  A.  No.
10 Q.  Are you an employee of the State of Michigan?
11 A.  No.
12 Q.  Okay.  But you have a Michigan government email
13     address?
14 A.  Yes.
15 Q.  Okay.  And do you have -- do you or MI Partners have
16     offices out of which you work?
17 A.  I have an office out of which I work at Romney and I
18     have an office off premise in Michigan.
19 Q.  Do you or MI Partners pay rent for your office in
20     the Romney Building?
21 A.  No.
22 Q.  Have you played any -- as part of your consultancy
23     for the Governor and his staff, did you play or have
24     you played any role in connection with the
25     restructuring of the City of Detroit?

Page 12

1  A.  Define restructuring.
2  Q.  The efforts by the City of Detroit to get its
3      economic house in order beginning before the
4      bankruptcy, from whenever it began doing that, up
5      and through to today.
6  A.  I have not consulted with the City of Detroit on its
7      restructuring directly.
8  Q.  Okay.  Have you worked -- in your consultancy for
9      the Governor, has part of your work for the Governor
10     been in connection with the -- Detroit's
11     restructuring efforts?
12 A.  No.  Again, I have been involved in talent
13     identification assessment but not in the direct
14     restructuring efforts for the City of Detroit.
15 Q.  Okay.  Other than talent identification, have you
16     performed any other work that had to do with or that
17     related in some way to Detroit?
18 A.  I would -- I have been part of meetings where if
19     asked an opinion, I would provide an opinion.  If I
20     saw an area where I had some experience or value, I
21     would render that opinion.  But in terms of specific
22     services of a restructuring nature, no.
23 Q.  Do you as a regular matter as part of your work for
24     the Governor and his staff attend official meetings
25     of the Governor and his staff?

1 A. Yes.

2 Q. Okay. And how frequently do you do that?

3 A. Define frequently. Every day?

4 Q. Well, why don't you just tell me how often you do

5      it.

6 A. Well, every day I'm probably in some meetings with

7      members of his staff.

8 Q. Would it be fair to say you work intimately with the

9      Governor and his staff?

10 A. Sure.

11 Q. Did you attend a meeting on January 29, 2013, at

12      which various law firms were making a pitch to be

13      hired as restructuring counsel by the City of

14      Detroit?

15 A. I don't recall the exact date, but it was toward the

16      end of January.

17 Q. Okay. I'd like to show you a document which I'll

18      mark as Exhibit 1.

19

20        (Deposition Exhibit 1 was marked.)

21

22 BY MR. DeCHIARA:

23 Q. And for the record, I'll identify Exhibit 1 as a

24      document that on the first page says Presentation to

25      the City of Detroit; Detroit, Michigan; January 29,

1      2013, and it's Bate stamped the first page at the

2      bottom DTMI 00128731.

3        Mr. Baird, looking at Exhibit 1, does that

4      refresh your recollection of the date of what I'll

5      call the pitch meeting?

6 A. Well, the document's dated January 29th. If it was

7      delivered the same day then I was there.

8 Q. Okay. Who else besides you on behalf of the State

9      was at that meeting?

10 A. I'm not sure I recall everyone, but Andy Dillon was

11      there, and Tom Saxton from Treasury were there.

12      Those would be the only ones I recall from the State

13      right now.

14 Q. Do you have a recollection of what was -- do you

15      have a recollection of the meeting?

16 A. Yes.

17 Q. Okay. And Jones Day was one of the law firms that

18      made a pitch?

19 A. Correct.

20 Q. Do you have any recollection of what the people from

21      Jones Day said at the meeting?

22 A. I mean, that was eight, nine months ago but a

23      directional recollection, yes.

24 Q. What's the best of your recollection?

25 A. My recollection is that Jones Day -- well, first of

1      all, let me say that this was not a formal pitch.

2      This meeting was set up to provide the City, the

3      emergency -- I'm sorry, the program management

4      director and the CFO with some parameters associated

5      with what needs to be going into an RFP that had yet

6      to be completed.

7        So this was simply bringing together a

8      number of law firms with relevant experience to

9      discuss things that the City should contemplate

10      keeping in mind for a future RFP.

11 Q. Okay. Before I -- I have a -- I had asked you a

12      question about what was said by the Jones Day

13      people, but before I ask you that, let me ask you do

14      you know whether Jones Day provided any services

15      paid or unpaid or legal advice to the State prior --

16      at any time prior to this meeting?

17 A. I don't know. I was not aware of any such services

18      provided.

19 Q. Okay. All right. So what's the best of your

20      recollection of what the Jones Day people said at

21      the meeting?

22 A. Well, they went through this presentation.

23 Q. You're referring to Exhibit 1?

24 A. Exhibit 1.

25 Q. Okay.

1 A. They introduced themselves. They talked about their

2      background and their qualifications. They talked

3      about experience that they had in Detroit and in

4      Michigan. They discussed the fact that out-of-court

5      solutions are absolutely preferred, and they talked

6      about their experience in out-of-court

7      restructuring.

8        And then they talked about various -- the

9      experience that they had both in out-of-court

10      restructurings and in-court restructurings.

11 Q. Did they say anything about a potential bankruptcy

12      filing by the City of Detroit?

13 A. I don't recall specifically, but certainly they

14      indicated a continuum of potential proceeding

15      depending on what transpired prior to the last

16      resort, which would be a Chapter 9 filing.

17 Q. That's what they said? They said that would be a

18      last resort?

19 A. I don't recall if they said that specifically, but

20      members of our team made it very clear that it was

21      our intent to stay out of the courts.

22 Q. When you say our team, who are you referring to?

23 A. Mainly Treasury, and I think that would be shared by

24      the City leadership that were put in place under the

25      consent agreement, the CFO and the program

1 management director.

2 Q. Okay. Do you recall whether Kevyn Orr spoke at the
3 meeting?

4 A. Yes, he did.

5 Q. And do you recall what he said?

6 A. He talked about his background and credentials. He
7 talked about his experience with Chrysler. He
8 talked about his broad restructuring expertise. He
9 talked about his ties to Detroit. His mother was a
10 professor at University of Michigan. He had
11 relatives that continued to have ties in Michigan.
12 He recalled even elements of his education where he
13 spent a fair amount of time in Detroit.

14 It was clear that -- I was impressed by the
15 fact that he had a passion for the City, and I was
16 very impressed by his knowledge of Michigan and the
17 City from his years as an undergrad and law school
18 student.

19 Q. At the meeting, did you speak to Mr. Orr one-on-one?

20 At the meeting or after the meeting. When I say

21 after, I mean that day.

22 A. I did not speak to -- if you mean one-on-one, did
23 the two of us have a one-on-one conversation.

24 Q. Right. Did you break off and have a one-on-one?

25 A. No. No, I did not.

1 Q. Okay. Let me ask you also, did either Jones Day or
2 Mr. Orr at that meeting say anything about Detroit's
3 pensions or pension liability?

4 A. I don't recall.

5 Q. Let me turn your attention to page 41 of Exhibit 1.

6 A. Did I just lose my mic?

7 VIDEO TECHNICIAN: Yeah, you did.

8 THE WITNESS: What page was that, 41?

9 BY MR. DeCHIARA:

10 Q. Right. And I'd like to draw your attention in
11 particular to the very last line on page 41. I'll
12 read it for the record. It says "If needed,
13 Chapter 9 could be used as a means to further cut
14 back or compromise "accrued financial benefits"
15 otherwise protected under the Michigan
16 Constitution."

17 Do you recall any spoken statements by the
18 people from Jones Day along the lines of what's --
19 what I just read?

20 A. I do not.

21 Q. Did you get a copy of what's been marked as
22 Exhibit 1?

23 A. I believe I did.

24 Q. And did you -- after the meeting, did you share it
25 with anybody?

1 A. No.

2 Q. Now, the day after the meeting, you called Jones
3 Day; isn't that correct?

4 A. I did.

5 Q. Okay. And why did you call Jones Day?

6 A. Specifically, I called Stephen Brogan, the managing
7 partner for Jones Day, and I asked him for
8 permission to speak with Kevyn Orr about the
9 potential of an emergency manager position if, in
10 fact, Detroit were found to be in emergency
11 financial distress and the Governor found it
12 necessary to recommend to the ELB an EM candidate.

13 Q. So you were as of January 30th interested in Mr. Orr
14 as a potential candidate to be EM?

15 A. I was interested in Mr. Orr after seeing him and his
16 background and experience. I was very impressed,
17 and that's why I made the call the next day.

18 Q. Right, but is it fair to say you were interested in
19 him as a potential candidate for EM?

20 A. Yes.

21 Q. And before you made the call, did you speak to the
22 Governor about your interest in Mr. Orr?

23 A. I don't recall. I don't think so.

24 Q. Did you speak to Mr. Dillon?

25 A. Yes.

1 Q. And what did you and Mr. Dillon -- can you recount
2 what you said to Mr. Dillon and what he said to you?

3 A. I spoke to Mr. Dillon at the close of the same day,
4 which according to this was January 29th, and I
5 indicated to him that I was very impressed with
6 Mr. Orr and that I was going to call Mr. Brogan the
7 next day and see if there was any potential that I
8 could talk to Mr. Orr.

9 Q. And what did Mr. Dillon say, if anything, in
10 response to that?

11 A. My recollection is that he said I don't think you
12 could ever get him, but he would be an extremely
13 quality candidate.

14 Q. Okay. Other than the reasons you've already
15 testified to today, are there any other reasons you
16 were interested in Mr. Orr as a potential candidate
17 for EM?

18 A. Yeah. Really two. One is that it was always our
19 intent to see if we could not solve the incredible
20 financial problems by avoiding a Chapter 9 filing,
21 and to be honest it was that meeting where it became
22 clear to me that somebody who knew their way around
23 the courts would actually stand a much better chance
24 of keeping us out of the courts in terms of our
25 negotiations with creditors and other stakeholders.

Page 21

1  Q.  I think you said there were two.
2  A.  Yeah.
3  Q.  Was that --
4  A.  That was one.  I'm sorry.
5  Q.  What was the second?
6  A.  The second one was that he was -- I didn't learn
7      this then, but in my first conversation with him I
8      learned that he was the son of a teacher and he was
9      also the son of a minister, and as part of the
10     conversation I had with him going forward I felt
11     that the man's character was exactly what we would
12     be looking for.  If we could convince him to do this
13     role he'd do it for the right reasons.
14  Q.  I'd like to show you a document I'll mark as
15     Exhibit 2.
16
17         (Deposition Exhibit 2 was marked.)
18
19  BY MR. DeCHIARA:
20  Q.  And it's a one-page document which is stamped at the
21     bottom JD-RD 0000113.
22         Mr. Baird, if I can refer your attention to
23     the bottom of Exhibit 2, is that an email you wrote
24     to Corinne Ball on January 30th, 2013?
25  A.  Yes.

Page 22

1  Q.  And does this refresh your recollection about the
2      date on which you called Steve Brogan?
3  A.  Yes.  It was the day after this date, yes.
4  Q.  Right.  So -- well, the email is dated January 30th,
5      and the email says in the second sentence "Was on
6      phone with Steve Brogan."
7         So is it accurate that you called Steve
8      Brogan on January 30th?
9  A.  As I testified, I called Steve Brogan on
10     January 30th.
11  Q.  Okay.  So the meeting at which Jones Day made a
12     presentation the day before was January 29th?
13  A.  Correct.
14  Q.  What did Steve Brogan say when you spoke to him?
15  A.  Steve said that you're killing me, I just asked this
16     man to be the managing partner of our Miami office.
17     He also said we would not stand in the way of
18     anything that any of our partners wanted to do, but
19     frankly, I think the chances of your getting him
20     would be highly unlikely.
21         With that said, I would give you permission
22     to talk to him, and I made it -- no, I take that
23     back.  It's not that I would give you permission to
24     talk to him.  I retract that.  He said I will talk
25     to him, and if there is an interest in him speaking

Page 23

1      with you I will ask that he call you.
2         At that time I thanked Steve and I told him
3      that I want you to know whether he talks to us or
4      not, you will -- Jones Day will neither be hurt nor
5      helped if there's any further discussions about
6      Kevyn in this particular role.
7  Q.  Hurt or helped in what regard?
8  A.  With regard to their bid -- potential bid to do work
9      for the City of Detroit.
10  Q.  And were you in a position to make that commitment
11     to Jones Day as to what the decisionmaking of the
12     City of Detroit would be?
13  A.  Actually, on reflection, no.
14  Q.  But you made it anyway.
15  A.  I did.
16  Q.  Okay.  Did Mr. Brogan tell you why he thought it
17     was highly unlikely that you'd be able to get
18     Kevyn Orr?
19  A.  He said he had two young children, a wife who was a
20     surgeon at Johns Hopkins and the fact that he'd just
21     committed to do the Miami deal, and he thought this
22     would be too much of a deviation from those plans.
23  Q.  Did you speak to Mr. Orr that day, January 30th,
24     2013?
25  A.  I don't recall.

Page 24

1  Q.  Let me show you a document that may help your
2      recollection.  I'm going to mark it as Exhibit 3.
3
4         (Deposition Exhibit 3 was marked.)
5
6  BY MR. DeCHIARA:
7  Q.  Mr. Baird, is Exhibit 3 an email --
8  A.  Well --
9  Q.  Well, can you identify the top email on Exhibit 3?
10        MR. SHERWOOD: Is this the document 303 at
11     the end?
12  BY MR. DeCHIARA:
13  Q.  Yes.  I'm sorry, let me read the Bate stamp.  It's
14     stamped at the bottom JD-RD 000303.
15  Q.  Okay.  First of all, you asked me if I spoke to
16     Kevyn Orr on the same day as I spoke to Stephen
17     Brogan --
18  Q.  Right.
19  A.  -- and I said I did not recall.
20        And according to this email which you've
21     handed me it appears that I spoke to Kevyn Orr the
22     very next day, the 31st.
23  Q.  Okay.  So this refreshes your recollection that you
24     spoke to him the next day?
25  A.  Yes.

1 Q. Okay. And what did you -- was it just you and
2    Mr. Orr on the phone when you spoke to him on
3    January 31st, 2013?
4 A. I believe so.
5 Q. And to the best of your recollection tell us what
6    you said and what he said in that discussion.
7 A. I'm going to finish reading this --
8 Q. Sure.
9 A. -- for a moment.
10 Q. Feel free to do that.
11 A. Okay. Your question?
12 Q. So apart from the document, although feel free to
13    look at the document, what is your recollection of
14    what you said and what he said in the telephone call
15    you had with him on January 31st?
16 A. My recollection is I told him that we were very
17    impressed with his presentation, I was very
18    impressed with his background and experience and
19    that I'd asked Steve Brogan for permission to talk
20    to him.
21       I said that we did not know whether or not
22    Detroit would have to have an emergency manager
23    recommended and appointed, but in the event that
24    such were the case would he under any circumstances
25    be willing to consider I think I called it joining

1    the Governor's irrational act club.
2 Q. What did he say?
3 A. He shut it down pretty summarily. And he indicated
4    the reasons I'd already mentioned, that he had young
5    children, you know, his schedule -- the scheduling
6    protocol with a surgeon wife made the situation
7    already difficult, he'd just agreed to take the
8    Miami job, and he said he really didn't see under
9    any circumstances how this might work.
10       And I said did you talk to your wife about
11    it? He said well, no, not yet. And I said well,
12    let me just tell you a little bit about other
13    members of the team, let me tell you a little bit
14    about what we've learned about Detroit, and let me
15    ask if you would at least take a night and sleep on
16    it and talk to your wife about this because,
17    frankly, this is the kind of a situation that, you
18    know, a lot of people would not be able to step up
19    to, but I firmly think that you are one who could.
20 Q. Was there any discussion in the conversation about a
21    potential filing for bankruptcy by the City of
22    Detroit?
23 A. No, I don't think so.
24 Q. Okay. Let me now show you a document I'll mark as
25    Exhibit 4.

1
2       (Deposition Exhibit 4 was marked.)
3
4 BY MR. DeCHIARA:
5 Q. For the record, it's one-page document. Exhibit 4
6    is a one-page document stamped at the bottom JD-RD
7    0000327. In the bottom portion of Exhibit 4 there's
8    an email.
9       Mr. Baird, is that an email that you wrote
10    to the various people identified in the email?
11 A. Yes, I recall -- I recall writing this.
12 Q. Okay. And it refers, does it not, to a schedule
13    for Mr. Orr to meet with various people on
14    February 11th?
15 A. Correct.
16 Q. And it refers to a schedule for a 2:30 p.m. meeting
17    with the Governor and with yourself, correct?
18 A. Correct.
19 Q. Did that meeting take place on February 11th?
20 A. I believe it did.
21 Q. And was anyone else present for that meeting other
22    than the three of you; Mr. Orr, yourself and the
23    Governor?
24 A. No.
25 Q. And do you recall what was discussed in that

1    meeting?
2 A. Kevyn's background was discussed, the Governor's
3    passion and commitment for Detroit was discussed. A
4    fair amount of discussion around the two of them and
5    their law school experiences being a year apart was
6    discussed, and that's -- again, most of it was spent
7    talking about Kevyn and his background and
8    experience and some was reminiscing about Michigan
9    law school days.
10 Q. Was there any discussion of a potential bankruptcy
11    filing by the City of Detroit?
12 A. I don't recall; however, in the process of talking
13    with Kevyn, it would have been -- we would have
14    discussed the fact that we need to do everything
15    possible to fix the problem, and the courts should
16    be avoided, but if they can't be avoided then it
17    would have been -- it would have been misleading to
18    suggest that wasn't a possibility.
19 Q. When you say -- who is the we in that sentence?
20 A. Well, you asked me about a specific meeting. It
21    would have been Governor Snyder and me.
22 Q. So it's the two -- the Governor and yourself who
23    were saying what you just said in the prior
24    sentence?
25 A. Yes.

Page 29

1 Q. In your prior answer?

2 A. Yes.

3 Q. Okay.

4 A. You have to understand, in general, it's difficult
5 to talk about the financial way forward and the
6 operating way forward for Detroit without
7 contemplating all of the avenues of rescue
8 available. Restructuring is clearly the optimum,
9 but in the absence of proper movement or ability to
10 negotiate, you can't have a discussion about the
11 future without looking at all of the options.

12 And, of course, the actual discussion with
13 Kevyn at this point was simply an option because we
14 didn't know if the review would ultimately find
15 Detroit in a state of emergency at this point. What
16 we did know by this point is that there were several
17 areas under the consent agreement that were falling
18 short of what had been agreed.

19 Q. In the February 11th meeting with you and the
20 Governor and Mr. Orr, did any of the three of you
21 talk about pensions or pension liability in Detroit?

22 A. No, I don't believe so.

23 Q. Did you have meetings or discussions with Mr. Orr
24 between the -- well, actually, let me back up.

25 Was the January 31 telephone call that you

Page 30

1 had with Mr. Orr the first time you had a
2 conversation with him?

3 A. Except for the public back and forth on the 29th.

4 Q. Okay. So between the 31st of January and this
5 February 11th meeting, did you have additional
6 discussions with Mr. Orr?

7 A. I don't recall explicitly, but I'm sure that I did.

8 Q. Okay. Do you recall whether in any of those
9 discussions you talked about Detroit's pensions or
10 pension liability?

11 A. I don't believe so.

12 Q. Okay. Did you talk about the prospect of or a
13 possibility of Detroit filing for bankruptcy?

14 A. I don't recall.

15 Q. Now, Mr. Orr was appointed as EM, correct?

16 A. He was recommended by the Governor to the Emergency
17 Loan Board, and the Emergency Loan Board appointed
18 him as EM, yes.

19 Q. And do you know the date that that appointment
20 became effective?

21 A. I don't remember the exact date. It was around mid
22 March.

23 Q. Now, is it correct that before Mr. Orr was appointed
24 as EM, emergency manager, he had earlier been
25 appointed under a prior statute, PA 72, as the EFM,

Page 31

1 the emergency financial manager?

2 A. I think that is correct.

3 Q. And when did -- when did he become -- when was he
4 appointed as EFM?

5 A. I don't recall the exact date.

6 Q. Do you recall the ballpark in relation to mid March?
7 Was it -- actually, let me strike that.

8 In relation to the mid March effective date
9 of Mr. Orr's appointment as EM, was his appointment
10 as EFM days before or weeks before? Do you have
11 some order of magnitude?

12 A. My recollection is it was days before PA 72 was in
13 effect when he was appointed and then 436 came into
14 effect I think a matter of days thereafter.

15 Q. Okay. So he was -- is it fair to say he was
16 appointed as EFM in early to mid March?

17 A. Again, I remember mid March. That's all I remember.

18 Q. Okay. I'd like to show you a document I'll mark as
19 Exhibit 5.

20

21 (Deposition Exhibit 5 was marked.)

22

23 BY MR. DeCHIARA:

24 Q. And for the record, I'll identify it as a three-page
25 document that's stamped at the bottom. The stamp on

Page 32

1 the first page is JD-RD 0000216.

2 MR. WERTHEIMER: That's five you said?

3 MR. DeCHIARA: Yes.

4 BY MR. DeCHIARA:

5 Q. Mr. Baird, if you could look at the email at the
6 bottom half of Exhibit 5. If you want to take the
7 time to look at the whole document, why don't you do
8 that.

9 A. Well, I'll let you know if I need to.

10 Q. All right.

11 A. I recall the document.

12 Q. Okay. All right. So is it accurate that the email
13 at the bottom of Exhibit 5 is an email that you
14 wrote to Kevyn Orr on February 20th, 2013?

15 A. I believe so.

16 Q. What were you -- what was the reference in the first
17 sentence to the summary of partnership?

18 A. Mayor Bing crafted a document that he described as a
19 working arrangement or working partnership or
20 something, I forget exactly -- summary of
21 partnership perhaps is what he called it, and he
22 gave that to me in a meeting. We discussed it.

23 I told him that if, in fact, there was to
24 be an emergency manager for Detroit that this would
25 be something that he or she would have to review. I

1    also said that this would be a good aspirational
2    document but that it would be imprudent to bind a
3    future emergency manager to something that he or she
4    had not developed.
5  Q.  Had the emergency manager at that point been chosen?
6  A.  No.
7  Q.  Let me refer you to the second -- the second
8    sentence of your email. It says "Told him that
9    there were certain things I would not think we could
10    agree to without your review, assessment and
11    determination (such as keeping the executive team in
12    its entirety)."
13  A.  Uh-huh.
14  Q.  Now, the you in that -- the your in that sentence
15    refers to Mr. Orr, correct?
16  A.  Correct.
17  Q.  So is it -- am I reading this correctly that what
18    you're saying to Mr. Orr in this sentence is that
19    unless Mr. Orr agreed to certain things that you
20    spell out in this sentence -- or you were saying
21    that Mr. Orr's agreement to certain things that you
22    refer to in this sentence were necessary.
23  A.  No. I don't think that would be correct.
24        What I intended is that Kevyn Orr had not
25    yet agreed if recommended to serve in this capacity.

1    He was still doing his own due diligence determining
2    if he could separate from his firm, a number of
3    other issues. What he did say to me is that if he
4    were, in fact, to go forward it would be important
5    to him that he have a working relationship with the
6    Mayor. And that's actually where this document came
7    from because I'd mentioned to the Mayor that that
8    would be important. At this point, the Mayor didn't
9    know who Kevyn Orr was.
10        So the purpose of writing this to Kevyn was
11    that so he could have an understanding of where the
12    Mayor's thought process was and so that he could use
13    this information in the event that he and the Mayor
14    met, which we had been discussing doing because of
15    the fact that he wanted a strong working
16    relationship with the Mayor.
17  Q.  Okay. In the sentence it's -- I'll quote part of
18    the sentence. It says "...I would not think we
19    could agree to without your review, assessment and
20    determination."
21        Who is the we in that sentence?
22  A.  I think I used a poor choice of words. I was
23    referring to myself, looking at this, and having
24    some difficulty with a few of the issues here. And
25    so I think the we would be certainly me, and I may

1    have been thinking at the time of what I thought the
2    chief of staff and/or the Governor might be
3    thinking, but I don't recall who my we was other
4    than me.
5  Q.  Let me read the third sentence. It says "Will
6    broker a meeting via note between you and the
7    Mayor's personal assistant who is not FOIAble."
8    That's F-O-I-A-b-l-e.
9  A.  Uh-huh.
10  Q.  Did you attempt to broker a meeting -- did you
11    broker a meeting between Mr. Orr and the Mayor's
12    personal assistant?
13  A.  I brokered a connection via note.
14  Q.  And when did you do that?
15  A.  I don't recall, but it would have been fairly soon
16    after this.
17  Q.  Okay. And can you explain what you mean by broker a
18    meeting by a note?
19  A.  That I would introduce them to one another, provide
20    their contact information, and step back and ask
21    them to work out when and where they would meet to
22    determine the kind of relationship they might seek
23    to have.
24  Q.  Were there other candidates for EM who were still
25    being considered as of February 20th, 2013?

1  A.  Yes.
2  Q.  Did you broker a meeting between the Mayor's
3    personal assistant and those other candidates?
4  A.  No.
5  Q.  Did you write an email similar to this one to the
6    other candidates where you said I would not think we
7    could agree to without your review, assessment and
8    determination?
9  A.  No.
10  Q.  Do you know whether Mr. Bing -- I'm sorry, Mr. Orr
11    met with the Mayor's personal assistant?
12  A.  I don't know.
13  Q.  Okay. What did you mean by the phrase who is not
14    FOIAble?
15  A.  The Mayor and Kevyn wished to meet privately, and so
16    the person who was going to set that up was someone
17    the Mayor had recommended set it up because she, I
18    believe, was not a City employee.
19  Q.  Oh, so the Mayor's personal assistant was not a City
20    employee?
21  A.  I believe when I said personal, it was personal
22    assistant.
23  Q.  And why did you tell Mr. Orr in this email that the
24    personal assistant was not FOIAble?
25  A.  Because she was not -- it was my understanding she

Page 37

1 was not a City employee.
2 Q. Why did you think that was something -- that she was
3 not FOIAble, why did you think that was something
4 worth mentioning to Mr. Orr in this email? What did
5 it matter?
6 A. Because the Mayor wished for a private meeting, not
7 a meeting that would be publicly disclosed.
8 Q. Did Mr. Orr say anything about whether he wanted a
9 private meeting?
10 A. I don't recall. He said he wanted a meeting. I
11 don't recall him saying he wanted a private meeting.
12 Q. Okay. So who was it that wanted the meeting or was
13 it both? The Mayor or Mr. Orr?
14 A. Mayor Bing wanted to meet the potential candidate,
15 and Mr. Orr wanted to assess a potential working
16 relationship with Mayor Bing as one of the
17 conditions for success in the event he accepted the
18 recommendation.
19 Q. How did Mr. Bing know that Mr. Orr was a candidate?
20 A. I told him.
21 Q. Okay. Did you tell him who the other candidates
22 were?
23 A. No. And I didn't tell him Mr. Orr's name until such
24 time as he -- the two of them expressed a desire to
25 meet.

Page 38

1 Q. Okay. I'd like to mark as Exhibit 6 another
2 document which I'll have the court reporter show
3 you.
4
5 (Deposition Exhibit 6 was marked.)
6
7 BY MR. DeCHIARA:
8 Q. And for the record, I'll identify it as a multipage
9 document. The first page is stamped at the bottom
10 JD-RD 0000459.
11 Mr. Baird, let me refer your attention to
12 the email that's in the middle of the first page of
13 Exhibit 6. Is that an email that you wrote to Kevyn
14 Orr on February 22nd, 2013?
15 A. Is that the one timed 11:35 a.m.?
16 Q. I'm looking at the one that says 11:41 a.m.
17 A. Okay.
18 Q. That's sort of smack in the middle. Or at least the
19 date code is sort of right in the middle of --
20 A. Yes, I believe I sent that.
21 Q. Okay. And do you recall this email?
22 A. Vaguely I recall it.
23 Q. It says "Kevyn, about to be in a car for several
24 hours so I thought I would send this to you prior to
25 hearing back from the G a final time."

Page 39

1 The G is the Governor?
2 A. Yes.
3 Q. Okay. And then it continues "If you agree with what
4 I have done to the doc based on everyone's input,
5 and agree that you should be the one to provide it
6 to the Mayor as fully endorsed by the Governor and
7 the Treasurer (and you), then I think that clearly
8 establishes that you are already behaving as an
9 agent of the State committed to getting Detroit back
10 on track."
11 What was the doc? And I assume that was
12 short for document?
13 A. Yes.
14 Q. What was the document you were referring to?
15 A. It would have been the summary of partnership that
16 the original draft had been provided by Mayor Bing.
17 Q. Okay. So you were showing -- in this email you were
18 showing Mr. Orr certain modifications you had made
19 to the document; is that correct?
20 A. Yes.
21 Q. And were you looking for his input?
22 A. I was looking for input and/or agreement.
23 Q. From Mr. Orr?
24 A. Yes.
25 Q. Okay. Did you -- this is two days after the

Page 40

1 document we were discussing in Exhibit 5.
2 Were there still other candidates for the
3 EM position as of February 22nd, 2013?
4 A. There was one other candidate.
5 Q. Okay. Did you send that other candidate an email
6 like this looking for the other candidate's input
7 and agreement to the document you refer to in
8 Exhibit 6?
9 A. No.
10 Q. Okay. Did Mr. Orr give you his input and/or
11 agreement?
12 A. I believe he did.
13 Q. Okay. And did his giving the input or agreement
14 clearly establish to you that he was already
15 behaving as an agent of the State?
16 A. No. The use of the term agent of the State was my
17 attempt at continuing the recruiting pressure on
18 Kevyn Orr because he was clearly not an agent of the
19 State.
20 Q. But nonetheless you wrote to him saying that if he
21 did what you were asking, he -- that would clearly
22 establish that he was already behaving as an agent
23 of the State.
24 Am I reading what you wrote there
25 correctly?

1  A.  The man had not formally committed to the role, and
2      I was attempting to recruit him.  And it was in that
3      context that I put that statement, which now would
4      appear to be a little presumptuous on my part.
5  Q.  Just to be clear, at this point Mr. Orr was still a
6      partner at the Jones Day law firm?
7  A.  I believe so.
8  Q.  Okay.  Well, in fact, he didn't cease to be a
9      partner until he became EM -- or EFM; is that
10     correct?
11 A.  I never saw his withdrawal from the partnership, so
12     you'd have to talk to them about that.
13 Q.  Okay.  Do you have a general understanding about
14     when he severed his ties with the firm?
15 A.  My understanding is he was no longer a partner when
16     he became the EM.
17 Q.  Was he a partner when he became the EFM?
18 A.  No.  Well, I don't know, but my understanding was
19     that he was not.
20 Q.  Are you familiar with a provision of the Michigan
21     State Constitution, Article 9 Section 24, that
22     refers to pensions?
23 A.  I am.
24 Q.  What's your understanding of that provision?
25 A.  Would you like to read it?

1  Q.  No, I just want to know what your general
2      understanding is of the provision.
3  A.  Well, I'm not an attorney so I'm not going to give a
4      legal interpretation.
5  Q.  And just for the record, I'm not seeking one.
6  A.  Okay.  Good.
7  Q.  But you do have some idea what the provision is
8      about?
9  A.  I've read the provision.
10 Q.  Okay.  What's your understanding of it?
11 A.  My understanding of it is that the Constitution
12     protects pensions to the extent that they are fully
13     accrued and then they cannot be altered.
14          There is some degree of difference of
15     opinion about whether a fully-funded pension has the
16     same protection under the Constitution as one that
17     is not fully funded.
18 Q.  And do you have a view on that subject?
19 A.  No.
20 Q.  Have you ever discussed Article 9 Section 24 with
21     anybody?
22 A.  Yes.
23 Q.  With whom have you discussed it?
24 A.  I don't recall.  Various people.
25 Q.  Have you ever discussed it with Kevyn Orr?

1  A.  Yes.
2  Q.  And on one occasion or more than one occasion?
3  A.  One occasion.
4  Q.  What occasion was that?
5  A.  It was early on in our conversation where I
6      indicated to him that I was aware of the existence
7      of the article and that he should be aware of it as
8      well.  He said he was aware of it.  And that was our
9      discussion.
10 Q.  And was this -- can you locate this conversation in
11     time?  Was it, for example, before the February 11th
12     meeting that you and Mr. Orr and the Governor had?
13 A.  No, sir, I can't.  During the course of a
14     recruitment you cover an awful lot of ground and you
15     answer a lot of questions and you raise lots of
16     issues, and you do the best you can to help an
17     individual get to the best answer as it relates to
18     an opportunity like this.
19 Q.  Okay.  Was it -- the conversation before Mr. Orr
20     became EM?
21 A.  Yes.  I believe it was.
22 Q.  It was while you were recruiting him, correct?
23 A.  Yes.
24 Q.  Okay.  So you -- just so I understand, you on one
25     occasion brought up to him, Mr. Orr, the subject of

1      Article 9 Section 24?
2  A.  I brought up to him the fact that the Michigan
3      Constitution has a provision as it relates to
4      pensions and he should be aware of it.
5  Q.  And what did he respond?
6  A.  He said he was aware of it.
7  Q.  Did you have any further discussion about Article 9
8      Section 24?
9  A.  No.
10 Q.  Okay.  Other than Mr. Orr -- well, strike that.
11          Did you ever speak to the Governor about
12     Article 9 Section 24?
13          MR. ELLSWORTH: Object to the extent that
14     it may call for lawyer-client privileged
15     information.
16 BY MR. DeCHIARA:
17 Q.  Okay.  I'm going to modify my question to ask you to
18     exclude occasions on which you spoke to the Governor
19     in the presence of counsel.
20 A.  The answer would be no.
21 Q.  Did you ever speak to Mr. Dillon about Article 9
22     Section 24 with the same caveat as to not in front
23     of counsel?
24 A.  I don't think so.
25 Q.  Do you recall speaking to anyone at Jones Day about

1   Article 29 -- Article 9 Section 24 of the Michigan
2   Constitution?
3   MR. ELLSWORTH: Same objection.
4   MR. DeCHIARA: Okay.
5   BY MR. DeCHIARA:
6   Q.   Let me modify it to say before Jones Day was
7   retained by the City, did you speak to anyone at
8   Jones Day about Article 9 Section 24?
9   A.   No, I don't believe so.
10  Q.   Did you ever speak to the Attorney General of the
11  State of Michigan about Article 9 Section 24?
12  A.   No.
13  MR. ELLSWORTH: Objection; attorney-client.
14  BY MR. DeCHIARA:
15  Q.   Did you ever speak to Mr. Orr about what could or
16  should be done about Detroit's pension liability?
17  A.   No.
18  Q.   Outside of the presence of counsel, did you ever
19  have a discussion on that subject with the Governor?
20  A.   No.
21  Q.   What about with Mr. Dillon?
22  A.   No.
23  Q.   What about with anyone else on the staff of Mr. Orr
24  or on the staff of the Governor or the staff of
25  Mr. Dillon, again, outside the presence of counsel?

1   Q.   And who -- did you ask Mr. Orr for this data?
2   A.   I asked Mr. Orr to see if the data could be obtained
3   because I thought it was relevant.
4   Q.   And what would it be relevant to in your -- why did
5   you think it was relevant?
6   A.   At the time I was wondering if it was possible for
7   the State to consider legislation that would provide
8   an incremental safety net to those at the lower end
9   of the spectrum.
10  Q.   And you said you thought that was relevant. What
11  did you think it was relevant to?
12  A.   Well, it was relevant to a question I had, and I
13  didn't know the answer so I asked to get the data.
14  Q.   What was the question you had?
15  A.   My question was whether or not there were other
16  avenues to provide relief to those pensioners that
17  conceivably could be impacted at the lower end of
18  the continuum.
19       And that was not based on discussions with
20  anybody else, it was simply a question that I had
21  because I didn't know the answer.
22  Q.   And the question you had, when you say the person --
23  the pensioners who would be impacted, were you
24  thinking impacted in that their accrued pension
25  benefits might be reduced?

1   A.   I recall one conversation where I requested some
2   analytics on the distribution of pensioner income,
3   so instead of dealing with averages I could see the
4   distribution between those at the low end, those at
5   the high end and where it all fell so I could at
6   least have some understanding of what any impact
7   would be in the event of pension reduction.
8   Q.   Who did you have that conversation with?
9   A.   I know I had it with Kevyn Orr once and I believe I
10  had it with Andy Dillon once.
11  Q.   When was your conversation with Mr. Orr on the
12  subject?
13  A.   It would have been after he was the emergency
14  manager, but I don't recall how long he'd been in
15  that role.
16  Q.   Okay. Was it before the bankruptcy filing?
17  A.   I don't believe so.
18  Q.   You think it was after the bankruptcy filing?
19  A.   I think it was.
20  Q.   Okay. And did you say that you requested data on
21  pensions from somebody?
22  A.   I requested data on -- whether the data existed on
23  the distribution by pension amount, numbers of
24  pensioners and pension amount, for the current
25  roughly 20,000 pensioners.

1   A.   Yes.
2   Q.   And did Mr. Orr provide you the data you requested?
3   A.   No.
4   Q.   Did he -- when you asked him for it, what did he
5   say, if anything?
6   A.   He said it was a good question and he'd get back to
7   me. But to the best of my recollection, he didn't.
8   Q.   Did you ever follow up?
9   A.   I honestly can't remember.
10  Q.   Okay. Did he say anything other than it's a good
11  question?
12  A.   Nope.
13  Q.   You said you had a conversation with Andy Dillon on
14  the same subject. When was your conversation with
15  him on this subject?
16  A.   It would have been about the same time. This was
17  after the bankruptcy had already been filed and
18  there was a lot of noise about whether pensions
19  would be impacted, and I was trying to ascertain the
20  practical implications if they were.
21  Q.   And did you ask Mr. Dillon for the data on the
22  distribution of the number of pensioners and --
23  A.   No.
24  Q.   -- the amount of pensions?
25  A.   No. I asked -- I actually told him that I'd ask

1    Kevyn, that I'd made that question to Kevyn.
2  Q.  And did Mr. Dillon say anything in response when you
3      told him that?
4  A.  Good question.
5  Q.  Did he ever -- did he or anyone on his staff ever
6      get back to you with the data you were looking for?
7  A.  Not that I recall.
8  Q.  Did you speak to anyone about your idea to have
9      legislation that would provide an incremental safety
10     net for the people on the low end of the spectrum?
11 A.  I spoke with Dennis Muchmore about it, the
12     Governor's chief of staff, and he's the only one.
13 Q.  And what did he say, if anything?
14 A.  He didn't know.  He said I don't know what the
15     appetite for that would be, but it's a good
16     question.
17 Q.  Now, were you -- when you spoke to Mr. Muchmore,
18     were you proposing that Mr. Muchmore take steps to
19     see if such legislation could be enacted?
20 A.  No.  I was asking a question about in the event that
21     pensions were impacted what is the practical
22     implication to those depending on the money every
23     month.  I wanted to know.
24 Q.  And do you know now as you sit here today?  Have you
25     ever seen that data?

1  A.  No, I have not.
2  Q.  Okay.  But did you speak to Mr. Muchmore about the
3      idea of the legislation you described?
4  A.  I just mentioned to him -- I asked him the question
5      what do you think the appetite would be, and he said
6      he didn't know.
7  Q.  Okay.  Do you know whether there had been any
8      discussions by the Governor and his staff about the
9      legislation you described?
10 A.  No, I don't.
11 Q.  Have you ever followed up?
12 A.  Not on that, no.
13 Q.  Do you have any sense without having seen the data
14     of what the practical impact would be on the
15     individuals at the low end of the spectrum if their
16     accrued pension benefits were reduced?
17 A.  Only anecdotal.
18 Q.  And what's your anecdotal knowledge?
19 A.  Anecdotal knowledge is that the majority of the
20     pensioners are at the lower end of the spectrum and
21     so the implications of a pension reduction probably
22     couldn't be directed toward the higher end of the
23     spectrum at a sufficient level to make it feasible.
24 Q.  So your understanding is that -- to make what
25     feasible?

1  A.  Let me back up.  I'm a numbers guy.  I wanted to
2      know of the 20,000 pensioners that exist, where do
3      they fall along a distribution continuum.
4      What I was looking to see is whether the
5      distribution, the standard deviation was such that
6      if there was a reduction that the number -- would
7      the numbers be material if that reduction were
8      weighted toward the larger pension earners versus
9      the lower pension earners.
10     And, anecdotally, I was told that the
11     number of pension earners are at the lower end and
12     that the standard deviation is not very great.
13 Q.  So in order for there to be a meaningful savings to
14     the City if it reduced pensions, it would have to
15     reduce the pensions of many of those people who are
16     at the low end of the spectrum; is that -- am I
17     understanding that correctly?
18 A.  Anecdotally, that's my understanding.
19 Q.  Okay.  And did you have any practical -- I'm
20     sorry -- did you have any sense, anecdotally or
21     otherwise, of what the real world impact would be on
22     those individuals on the low end of the spectrum if
23     their pensions were reduced?
24 A.  No, because the data never materialized for me.
25 Q.  Do you have any sense whether if pensions of those

1      people at the low end of the spectrum were reduced
2      it would be difficult for those individuals to make
3      ends meet?
4  A.  I don't know.
5          MR. ELLSWORTH: I wasn't sure he heard your
6      question because he was retrieving his microphone.
7  BY MR. DeCHIARA:
8  Q.  Did you hear my question?
9  A.  Would you repeat it?
10 Q.  Sure.  Do you have any sense whether if the pensions
11     of those people at the low end of the spectrum were
12     reduced, would it be difficult for those individuals
13     to make ends meet?
14 A.  I would have no way of knowing in the absence of
15     real data.
16 Q.  Are you familiar with a letter that the Governor
17     signed on July 18th, 2013, in which he purported to
18     authorize the filing of the bankruptcy of the City
19     of Detroit?
20 A.  I know that that letter existed.
21 Q.  Okay.  Did you see the letter in any draft or
22     nonfinal forms before the Governor signed it?
23 A.  No.
24 Q.  Did you participate in any way in the preparation of
25     that letter?

Page 53

1  A.  No.
2  Q.  Did the Governor speak to you about the preparation
3      of that letter?
4  A.  No.
5  Q.  Did he speak to you about the contents of the letter
6      before he signed the letter?
7  A.  No.
8  Q.  Did you have anything at all to do with that letter?
9  A.  No.
10 Q.  Okay. You're aware, are you not, that a couple days
11     before the Governor signed that letter that Mr. Orr
12     had sent the Governor a letter in which Mr. Orr
13     requested permission to file for bankruptcy, right?
14 A.  I am aware. I don't recall having seen that letter
15     but I am aware one was sent.
16 Q.  Have you ever seen that letter?
17 A.  I don't think so.
18 Q.  Did Mr. Orr ever speak to you about that letter
19     before he sent it?
20 A.  He spoke to me, yes.
21 Q.  And was it on one or more than one occasion?
22 A.  No, just on one occasion.
23 Q.  Let me represent to you the letter was dated
24     July 16th, 2013.
25         When did you speak to Mr. Orr about the

Page 54

1      letter?
2  A.  I don't recall, but it would have been very near
3      when it was sent.
4  Q.  Near before or near after?
5  A.  Maybe right at the time it was sent. I recall a
6      conversation with Kevyn where he said I'm going to
7      do this.
8  Q.  Okay. What else, if anything, do you recall about
9      that conversation?
10 A.  The reason I recall it is because he had asked me to
11     circle back to members of the consulting
12     restructuring team to talk to them about their scope
13     and service and fees because it was -- these were
14     conversations he had planned to have but hadn't had
15     a chance, and so I did that.
16 Q.  So about the time that -- I just want to see if I'm
17     understanding your testimony.
18         About the time that Mr. Orr sent his
19     July 16th letter to the Governor requesting
20     permission to file for bankruptcy, he spoke to you
21     about the letter?
22 A.  I believe he did.
23 Q.  Okay. Did he call you?
24 A.  I don't recall.
25 Q.  Did he initiate the contact?

Page 55

1  A.  I don't recall.
2  Q.  Was it a face-to-face meeting or a telephone call?
3  A.  I believe it was telephone.
4  Q.  And to the best of your recollection, can you
5      recount what you said and what he said in that
6      telephone call?
7  A.  I honestly don't recall other than he said I haven't
8      completed my conversations with the restructuring
9      team relative to their scope and services and fee
10     projections, and I agreed to do that on his behalf.
11 Q.  Who was the restructuring team?
12 A.  These would have been the principals associated with
13     Conway MacKenzie, Ernst and Young, Jones Day, and
14     Miller Buckfire.
15 Q.  And Mr. Orr said he wanted to complete a
16     conversation with those individuals you just
17     mentioned about their fees?
18 A.  Yeah. He had been engaged with them around putting
19     a fine point on their fee estimates as opposed to a
20     broad -- you know, sort of broad here's what we
21     think it might cost, but he hadn't had the, you
22     know, detailed discussions and so he asked if I
23     would do that.
24 Q.  And did you do that?
25 A.  I did.

Page 56

1  Q.  And what, if anything, did that have to do with the
2      July 16th letter that Mr. Orr sent to the Governor
3      to request permission to file for bankruptcy?
4  A.  I think it was important because the fees and the
5      scope once the filing had been completed would not
6      have been subject to much in the way of reduction.
7  Q.  Did you have any other -- was that the extent of
8      your conversation with Mr. Orr on that occasion?
9  A.  Yes.
10 Q.  And did you have any other discussions with Mr. Orr
11     about his July 16th letter before he sent the
12     letter?
13 A.  No.
14 Q.  Do you -- are you aware that in the Governor's
15     letter, the July 18th, 2013 letter, the Governor
16     said that he was not going to impose contingencies
17     on the filing? Are you familiar with that?
18 A.  No, I don't recall actually having ever seen the
19     letter.
20 Q.  Okay. Are you aware that there were certain state
21     court lawsuits that were filed prior to the
22     bankruptcy filing concerning issues related to
23     Article 29 Section 24 of the Michigan Constitution?
24         MR. WERTHEIMER: Article 9.
25         MR. DeCHIARA: Thank you.

1  BY MR. DeCHIARA:
2  Q.  Article 9 Section 24 of the Michigan Constitution?
3  A.  No.
4  Q.  Did you ever discuss with the Governor the timing of
5      the bankruptcy filing, meaning outside of the scope
6      of counsel, did you ever discuss with the Governor
7      when it would be best to -- for the City of Detroit
8      to file for bankruptcy?
9  A.  No.
10 Q.  Are you aware that the State or at least the
11     Governor's office had prepared a schedule that
12     indicated that the bankruptcy filing was to occur on
13     July 19th, 2013, but it actually occurred the prior
14     day?  Are you aware of that?
15 A.  I'm aware of a communications schedule that had the
16     19th I think as the date.
17 Q.  And are you aware that the filing actually occurred
18     the day before?
19 A.  I was aware of the filing when it occurred, which
20     occurred the day before.
21 Q.  Okay.  Do you have any understanding or knowledge as
22     to why it occurred the day before it had been
23     planned to occur?
24 A.  No.
25 Q.  Did you ever -- outside of the presence of legal

1      counsel, did you ever discuss that with the
2      Governor?
3  A.  No.
4  Q.  Okay.  Did you speak with the Governor outside of
5      the presence of legal counsel since he had his
6      deposition taken yesterday?
7  A.  Yes.
8  Q.  Did you speak about his deposition?
9  A.  No.
10 Q.  I'd like to show you a document -- well, are you
11     aware of a document that Mr. Orr presented to
12     creditors on January 14th, 2013 called --
13         MR. WERTHEIMER: June 14th.
14         MR. DeCHIARA: Thank you.
15 BY MR. DeCHIARA:
16 Q.  June 14th, 2013 called Proposal for Creditors?
17 A.  May I see it?
18 Q.  Yes.
19 A.  Yes, I am familiar with this document.
20 Q.  Okay.  And did you participate in its preparation?
21 A.  No.
22 Q.  Did you comment on it before it was in its final
23     form?
24 A.  No.
25 Q.  Were you asked to review it before it was made

1      final?
2  A.  No.  Well, not that I recall.
3  Q.  Not that you recall?
4  A.  Yeah.  If somebody asked me, it's an email I never
5      saw because I didn't review it.
6  Q.  Okay.  Okay.  Did you speak to the Governor outside
7      of the presence of legal counsel about the
8      June 14th, 2013 proposal?
9  A.  I don't believe so.
10 Q.  Did you speak to Mr. Dillon?
11 A.  Yes.
12 Q.  Outside of the presence of legal counsel about the
13     June 14th, 2013 proposal?
14 A.  No.
15 Q.  You spoke to him, but it was in the presence of
16     legal counsel?
17 A.  Yes.
18 Q.  Okay.  Did you speak to anyone on the Governor's
19     staff or Mr. Dillon's staff outside of legal counsel
20     about the June 14th, 2013 proposal?
21 A.  No.
22 Q.  Did you speak to Mr. Orr about his proposal at any
23     time on or before June 14th, 2013?
24 A.  No.
25 Q.  Did you speak to him about -- did you speak to

1      Mr. Orr outside of the presence of legal counsel
2      about the proposal after June 14th, 2013?
3  A.  I attended that meeting and told him I thought he
4      did a good job in its presentation.
5  Q.  By that meeting you mean the June 14th, 2013
6      meeting?
7  A.  Yes.
8  Q.  Okay.  Do you recall Mr. Orr at the June 14th, 2013
9      meeting saying words to the effect to the people who
10     were in attendance that this was not a negotiation?
11 A.  No.
12 Q.  Are you denying he said it or you just don't
13     remember if he said it or not?
14 A.  I don't recall him using those words.
15 Q.  Okay.  Is it true that those in attendance on
16     June 14th, 2013 in order to be able to speak had to
17     fill out a card and have the card read by someone?
18 A.  I don't know.
19 Q.  I'd like to show you a document which I'll mark as
20     Exhibit 7.
21
22         (Deposition Exhibit 7 was marked.)
23
24 BY MR. DeCHIARA:
25 Q.  For the record, it's a one-page document stamped at

Page 61

1     the bottom SOM 20003601.
2          MR. WERTHEIMER: Seven?
3          MR. DeCHIARA: Yes.
4     BY MR. DeCHIARA:
5  Q.  Do you recall receiving this email from Mr. Dillon
6     on July 18th -- on July 8th, 2013?
7  A.  Let me just finish reading it.
8  Q.  Please.
9  A.  I believe I've seen this before, yes.
10 Q.  In the first sentence Mr. Dillon refers to the
11    Detroit consultants.
12         Do you know who he's referring to?
13 A.  No. I mean, when he says weekly call with the
14    Detroit consultants, that generally includes Jones
15    Day, Miller Buckfire, Ernst and Young, Conway
16    MacKenzie, and at times Milliman.
17 Q.  In the second paragraph it says "We met with the
18    consultants to get briefed on the pension issue this
19    afternoon. I invited Baird and Tedder to join."
20         Did you just that briefing?
21 A.  I don't believe so, but I don't recall.
22 Q.  Next sentence says "Bottom line, the situation is
23    not good and the view of the consultants is that
24    current pensions have to be cut significantly."
25         Did you have any conversations with

Page 62

1     Mr. Dillon about that view that current pensions
2     have to be cut significantly outside of the presence
3     of legal counsel?
4  A.  I don't recall. I've had -- I have had discussions
5     with Andy relative to the funding levels of pensions
6     and have had discussions with him about the 13th
7     Check, but I do not recall a specific discussion
8     around the pensions have to be cut significantly.
9  Q.  Do you have a view yourself -- or strike that.
10         As of the time of this email, July 8th,
11    2013, at that period of time did you have a view
12    yourself as to whether current pensions had to be
13    cut significantly?
14 A.  My view of what's been reported publicly is that the
15    pension funding is not sustainable for the current
16    obligations and future obligations.
17 Q.  What do you mean the pension funding?
18 A.  The funding level of the pension -- the pension
19    funds.
20 Q.  When you say the funding, do you mean the
21    contributions that are being made are not
22    sufficient?
23 A.  That's correct.
24 Q.  Okay. And have you -- and, therefore, is it your
25    view because the funding is insufficient that the

Page 63

1     pensions that are being paid out of the funds need
2     to be cut significantly?
3  A.  I'm not an actuary, and I don't know the answer to
4     that question.
5  Q.  But do you have a view on that question or an
6     opinion?
7  A.  I have an opinion.
8  Q.  What's your opinion?
9  A.  My opinion is that underfunded -- significantly
10    underfunded pensions are not sustainable long-term
11    for current workers or for workers who are more than
12    just a few years away from retirement.
13 Q.  Therefore, is it your view that the Detroit
14    pension -- accrued pension liabilities need to be
15    reduced?
16 A.  No. It's my view that there's not enough money for
17    the current pension obligations and the future
18    pension obligations. It's not my call whether they
19    get reduced or not.
20 Q.  Well, whether it's your call or not, I'm just asking
21    do you have a view as to whether or not --
22 A.  My view --
23         MR. ELLSWORTH: I object to the form, and
24    he's already answered the question.
25 BY MR. DeCHIARA:

Page 64

1  Q.  Can you answer the question, Mr. Baird?
2         Do you have a personal view as to whether
3     or not Detroit's accrued pension liabilities need to
4     be reduced?
5  A.  My view is that if the pensions are underfunded that
6     there will come a time when the obligations cannot
7     be met, and you can't create money out of nothing.
8         It's not my place to ascertain where the
9     money comes from. It is my place to say to you I
10    have an opinion that the current pension funds are
11    not sustainable in the current model.
12 Q.  Okay. But you're aware, are you not, that whether
13    or not -- the question of whether or not Detroit's
14    pension liabilities should be cut is a matter that's
15    been a matter of sharp debate in Detroit over the
16    course of the last few months?
17 A.  I'm aware there's been a lot of debate around this
18    issue.
19 Q.  Okay. And have you ever spoken to the Governor
20    outside of the presence of legal counsel about this
21    issue, about this debate?
22 A.  Not that I recall.
23 Q.  Okay. Have you ever spoken to anyone on the
24    Governor's staff outside of legal counsel on this --
25    about this debate?

Page 65

1 A. Not that I recall.

2 Q. Same question for Mr. Dillon and Mr. Dillon's staff.

3 A. Generally speaking, I know we've had discussions but

4 nothing explicit or a course of action forward.

5 Q. What's your best recollection of the discussions

6 you've had with Mr. Dillon --

7 A. Very --

8 Q. -- outside of the presence of legal counsel?

9 A. Very general discussions around the sustainability

10 of the current model and whether it can survive.

11 Q. Did Mr. Dillon ever say to you words to the effect

12 that he believed that the pension liabilities of the

13 City of Detroit need to be reduced?

14 A. No, I don't recall him ever saying that. I recall

15 him saying that the issues are significant.

16 Q. Have you ever spoken to Mr. Orr or his -- anyone on

17 his staff outside the presence of legal counsel

18 about this subject?

19 A. No.

20 Q. I'd like to show you a document I'll mark as

21 Exhibit 8.

22

23 (Deposition Exhibit 8 was marked.)

24

25 MR. SHERWOOD: What's the bates number?

Page 66

1 BY MR. DeCHIARA:

2 Q. It's a one-page document that's stamped SOM

3 20003657.

4 A. Okay.

5 Q. Do you recall receiving this email from Andy Dillon

6 on July 9th, 2013?

7 A. No.

8 Q. Have you ever seen this email before?

9 A. I don't recall seeing this email before. I get

10 hundreds of emails every day and I don't look at all

11 of them.

12 Q. If you look at the second paragraph of the email,

13 let me just read it. It says "On Thursday, we

14 expect to receive financials that will help us

15 better understand the potential negative impact on

16 pensions and what options may be available to us to

17 avoid them."

18 A. Uh-huh.

19 Q. Did you ever speak to Mr. Dillon outside of the

20 presence of legal counsel about what options might

21 be available to avoid the potential negative impact

22 on pensions?

23 A. No.

24 Q. Let me read the last sentence of the email. It says

25 "I have some thoughts as to how you could address

Page 67

1 some pointed questions if you were interested in

2 hearing them."

3 I believe the you in there is -- well,

4 actually, I don't know who the you in there is. The

5 email was sent -- oh, I guess it's addressed to the

6 Governor. So I assume the you in that email is the

7 Governor.

8 But let me nonetheless ask you, Mr. Baird,

9 did Mr. Dillon ever share any thoughts he had with

10 you outside of the presence of legal counsel

11 regarding thoughts he had about issues related to

12 Detroit's pension liability other than what you've

13 testified to already today?

14 A. No, not outside presence of legal counsel.

15 Q. I'd like to show you a document I'll mark as

16 Exhibit 9.

17

18 (Deposition Exhibit 9 was marked.)

19

20 BY MR. DeCHIARA:

21 Q. It's a two-page document that's stamped at the

22 bottom DTMI 00113909.

23 My question on this document, Mr. Baird, is

24 simply can you identify this document?

25 A. I'm not sure. Some of the content appears familiar,

Page 68

1 but this format of the document is not familiar to

2 me.

3 Q. Okay. So you're not -- can you testify where this

4 document came from or what it is?

5 A. I couldn't tell you that, no.

6 MR. DeCHIARA: I have no further questions.

7 Thank you for your time, Mr. Baird.

8 THE WITNESS: Thank you.

9 MR. WERTHEIMER: I've got a few questions.

10 Want to take a break?

11 VIDEO TECHNICIAN: Off the record 3:31 p.m.

12 (A brief recess was taken.)

13 VIDEO TECHNICIAN: We're back on the record

14 at 3:46 p.m.

15 EXAMINATION

16 BY MR. WERTHEIMER:

17 Q. Mr. Baird, my name is Bill Wertheimer. I represent

18 what we've been calling the Flowers plaintiffs,

19 which are a group of Detroit retirees who filed one

20 of the lawsuits that preceded the bankruptcy, and

21 I'm going to ask you a few questions.

22 You testified about a conversation you had

23 with Kevyn Orr right around the time that he sent

24 the letter to the Governor seeking authorization for

25 bankruptcy. Do you recall that?

1 A. I do.
2 Q. Did he in any way indicate why he was going to make
3     the request at that time?
4 A. No. Well, I don't recall that he did.
5 Q. Do you recall asking him anything about that, you
6     know, why now Kevyn or what's happening or --
7 A. No.
8 Q. Do you recall whether you were surprised about it;
9     that is the timing, not the act?
10    Or put another way had you had any kind of
11    a warning or anything going on that would lead you
12    to think that --
13 A. I had seen a communications document that had
14    Friday, the -- I don't remember the exact date, but
15    Friday, might have been the 19th?
16 Q. Right. Friday was the 19th.
17 A. Right, Friday the 19th as the date that it appeared
18    we'd go forward.
19 Q. Had you seen that document before the conversation
20    with Orr?
21 A. No.
22 Q. After?
23 A. After.
24 Q. Okay. Is the document you saw what was marked at
25    the Governor's deposition as Exhibit 6 or something

1     like it?
2 A. Yes.
3 Q. Okay. And do you remember how you came to see that
4     document? Was it emailed to you, were you talking
5     to somebody about it?
6 A. No, I believe it was emailed to me.
7 Q. Do you remember by who?
8 A. I don't.
9 Q. Do you remember whether you talked to anybody about
10    it between its issuance and the actual filing?
11 A. Talked about the communications plan?
12 Q. Well, broader than the communications plan but just
13    the fact that it was going to be -- the bankruptcy
14    was going to occur.
15 A. No.
16 Q. Now, you also testified that you had had
17    conversations or a conversation I think you said
18    with Orr where you asked him a question about the
19    distribution of the income of retirees?
20 A. Yes.
21 Q. And you also talked to the Governor's is it chief of
22    staff, Mr. Muchmore?
23 A. Yes.
24 Q. About that same issue, not asking a question but
25    about --

1 A. I related my conversation with Kevyn to Dennis.
2 Q. Can you put a time frame on these conversations?
3     Can you tell us approximately when they occurred?
4 A. I believe it was after the filing because of all of
5     the public consternation around pensions, and I --
6     as I testified earlier, I wanted to know what the
7     practical impact of any action would be.
8 Q. And if I understand it right, the reason you wanted
9     to know is that was kind of the germ of an idea for
10    maybe some legislation that might be able to at
11    least in some way ameliorate the condition or the
12    problem?
13 A. Correct. I was thinking unilaterally, which I'm
14    known to do.
15 Q. I understand. Well, you anticipated my next
16    question.
17    At the point you had these conversations,
18    was it your understanding that it was the Governor's
19    position that the State was not going to be putting
20    any money into Detroit at least as it would relate
21    to the retiree issue?
22 A. I don't recall if I would know whether that was the
23    Governor's position, but I was well aware that the
24    legislative appetite for funding to Detroit was
25    highly -- was very low.

1 Q. Okay. Okay. Had you had any conversations up to
2     that point with the Governor where -- excluding
3     conversations with counsel present -- where you
4     discussed that fact; that is, we're not going to be
5     able to get legislation through to do anything about
6     that?
7 A. No, not explicitly.
8 Q. Implicitly.
9 A. Not even implicitly. I don't recall any
10    conversations with the Governor talking about a
11    strategy where funds would be appropriated for
12    Detroit.
13 Q. Do you recall as of the point that you made this
14    inquiry of Orr and had the conversation with
15    Muchmore that the Governor publicly was taking the
16    position that although the State might be willing to
17    assist relative to services for residents of the
18    City, it would not be willing to put money in for
19    pensions or anything other than services for the
20    City?
21 A. I wasn't part of those conversations --
22 Q. Okay.
23 A. -- if they existed.
24 Q. All right. You were shown -- well, it's your
25    deposition, Exhibit No. 1. This is the Jones Day --

Page 73

1 A. Uh-huh.

2 Q. -- pitch from January 31st.

3 A. Yep. Yep.

4 Q. The pages you were shown, and I'm going to show them
5 to you again, where there's these ref -- one or more
6 references to pensions is in part four of the
7 written presentation entitled Components and
8 Considerations for Restructuring Plan.

9 MR. ELLSWORTH: Do you have a page number,
10 Mr. Wertheimer?

11 MR. WERTHEIMER: Yeah, that's page 34.

12 MR. ELLSWORTH: Thank you.

13 MR. WERTHEIMER: Sure.

14 BY MR. WERTHEIMER:

15 Q. Do you recall who from Jones Day was presenting this
16 part of the pitch? And, again, I'm assuming it was
17 actually presented to you. This isn't just a
18 writing that they handed out.

19 A. That's correct.

20 Q. Okay. Go ahead, then.

21 A. I believe it was Bruce Bennett.

22 Q. Did Mr. Orr make any part of the presentation?

23 A. He did.

24 Q. What part did he make?

25 A. His was predominantly a presentation around his

Page 74

1 background, credentials, experience, and his ties to
2 Michigan.

3 Q. Not as to any of the specific parts unless there's
4 some reference to Orr and his background in this
5 document?

6 A. That's correct.

7 Q. Okay. Now, I think if you take a look at page 43, I
8 think that's what counsel showed you before, you'll
9 see the bottom line literally on page 43 reads
10 "Chapter 9 could be used or threatened..." -- I'm
11 sorry, let me let you get there.

12 A. Okay.

13 Q. Take a look at the bottom line. "Chapter 9 could be
14 used or threatened as a means to accomplish a
15 compromise of benefit cost rejecting or compromising
16 claims." Do you see that?

17 A. I do see it.

18 Q. Do you recall the presentation including that point?

19 A. I do not recall that specific point, and I note that
20 these are speaker notes which may or may not have
21 been articulated.

22 Q. Well, that's one of the reasons I'm asking.

23 A. Because this is the first time I've seen -- I don't
24 have a version --

25 Q. In this form. I understand.

Page 75

1 A. -- like this.

2 Q. I understand. And I think you were -- I had
3 misspoke before. You were not shown that page by
4 previous counsel.

5 You were shown I think if you turn to page
6 41 the question referenced it. Again, the bottom
7 line, "If needed, Chapter 9 could be used as a means
8 to further cut back or compromise accrued financial
9 benefits otherwise protected under the Michigan
10 Constitution."

11 Do you recall that point even in a general
12 way being made in the presentation?

13 A. This was back in January.

14 Q. Right.

15 A. And I don't recall the specific point, but every one
16 of those firms would have discussed all of the
17 various approaches, strategies, options and whatever
18 their background and experience had them -- had
19 taught them from other municipal situations.

20 So generally, it could have been made, but
21 I don't recall it.

22 Q. All right. Do you recall that by the time all those
23 pitches were made that you were of the understanding
24 that the lawyers, whether Jones Day or one of the
25 other firms, were of the view that Chapter 9 could

Page 76

1 be used as a means to cut back these Michigan --
2 these benefits that are otherwise covered by this
3 Michigan constitutional provision?

4 A. No, I am not. Not explicitly.

5 I do recall discussions around Chapter 9
6 but not as it pertains specifically to any Michigan
7 Constitution article.

8 Q. Do you recall -- and I think the time frame is May,
9 I could find it somewhere, but Kevyn Orr was already
10 emergency manager, he was interviewed by the Detroit
11 Free Press and rather publicly, and in a way that
12 ended up getting spread around publicity wise,
13 talked about the fact that in a Chapter 9 filing the
14 pension rights of retirees could be trumped, was the
15 word he used, by federal law.

16 Do you recall generally the Emergency
17 Manager making that point at around that point in
18 time?

19 A. I've made it a practice to not read the Detroit
20 newspapers these days.

21 Q. All right. I'll accept that. Do you recall that at
22 least by that point in time you knew that, in fact,
23 that Orr was taking that position; that is, that he
24 was using Chapter 9 -- I don't want to use
25 pejorative terms --

1   A.   No.
2   Q.   -- but that he was using the possibility of a
3        Chapter 9 as a way to try and convince people to sit
4        down and talk with him --
5   A.   What I --
6   Q.   -- particularly retirees?
7   A.   Right.
8   Q.   Go ahead.
9            MR. ELLSWORTH: Just let him get his
10       question out before you answer.
11           THE WITNESS: Yeah. No, no, I got it.
12       You'll have to ask Kevyn Orr, but were I he, I would
13       use every possible means to get people to the table
14       before petitioning The Court, and I believe he was
15       doing exactly that.
16  BY MR. WERTHEIMER:
17  Q.   Okay, fair enough.
18           At the point he filed bankruptcy, do you
19       have an understanding as to whether there was any
20       way that the City could deal with the problem of
21       pensions without going into bankruptcy?
22  A.   Repeat the question.
23  Q.   As of let's say the time the bankruptcy was filed,
24       as of that time, did you have an understanding that
25       bankruptcy was going to be the only way that the

1        City could deal with its pension problem without
2        asking for State assistance, State assistance that
3        you knew you'd have -- that the Governor would have
4        difficulty getting?
5   A.   I had not contemplated it in terms of the City's
6        pension problem. I have contemplated it in terms of
7        $18 billion in liability and bondings that couldn't
8        be paid and debt service that it was becoming clear
9        to me that in the absence of any negotiated
10       agreements with any of the major constituencies that
11       bankruptcy was becoming more and more evident with
12       each passing month.
13  Q.   You had mentioned that you had a -- when I say you
14       mentioned, you testified in response to earlier
15       counsel's questions that you do recall having one
16       conversation with Orr about the issue of this
17       state constitutional provision that protects
18       pensions.
19           Do you recall that?
20  A.   I do.
21  Q.   Okay. Can you put a time frame on that at all?
22  A.   It was back during the early interaction with Kevyn.
23       I had gotten in the habit of carrying a small
24       Constitution with me because I was referring to it
25       on a regular basis across many things, and so I knew

1        the article was there and I said to Kevyn, are you
2        aware of this? He said we're aware.
3   Q.   He didn't go beyond that at all. He didn't suggest
4        in any way, shape or form how he intended to deal
5        with it?
6   A.   No, not to me.
7   Q.   Okay. And do you have a memory as to what triggered
8        you to talk to him about it at that point in time
9        other than that you had the Constitution in your
10       pocket?
11  A.   No, sir, other than -- you asked about the trigger.
12           During the recruitment process, we covered
13       a lot of ground, and that ground included all the
14       reasons you should do this and all the reasons you
15       shouldn't do it. And it was a discussion that took
16       place over a few weeks, and I don't recall any
17       specific trigger other than an old T square saying
18       here are the pros and the cons and the things you
19       ought to be thinking about it.
20  Q.   All right. It's part of you giving him information?
21  A.   Yes, that's fair.
22  Q.   That you are hoping will be helpful to him?
23  A.   That would be a fair characterization.
24           MR. WERTHEIMER: Okay. All right. I have
25       nothing further. Thank you.

1            EXAMINATION
2   BY MR. SHERWOOD:
3   Q.   Good afternoon, Mr. Baird. I'm Jack Sherwood from
4        Lowenstein Sandler, and we represent AFSCME in the
5        City's bankruptcy. I have a few questions. I'll
6        try not to go over ground that's already been
7        covered.
8            Let me just go back to your engagement by
9        the Governor. In reviewing your testimony from the
10       prior case, did that start in January 2011?
11  A.   It did.
12  Q.   And I think you also testified that the EM selection
13       process began in October or November 2012; is that
14       right?
15  A.   I would not characterize it as a selection process,
16       but I would characterize it as I began thinking
17       about planning for the future in a substantive way
18       about that time.
19  Q.   And I think you said that you were looking for
20       sources and candidates. Does that sound right?
21  A.   Yes. I would through my own network or the network
22       of people that I knew and trusted, I would look for
23       individuals that had characteristics, and then I
24       would talk to them about either their potential for
25       a role like this or whether they knew of

Page 81

1    individuals.
2         So that's what I meant by sources or
3    candidates.
4 Q.  Right.  So a source is someone who isn't necessarily
5    a candidate but might refer someone, a candidate, to
6    you, correct?
7 A.  They could be both.
8 Q.  Okay.  Was Jones Day or anyone from Jones Day a
9    source that you contacted?
10 A.  Prior to meeting Steve Brogan, no.
11 Q.  And when did you meet Steve Brogan?
12 A.  January 29th, it appears.
13 Q.  So prior to that, no sources from Jones Day.  How
14    about Miller Buckfire source?
15 A.  Yes.  Ken Buckfire was a source.
16 Q.  I want to talk a little bit about NERD.  We'll use
17    that acronym again.  They pay your bills, correct?
18 A.  They pay my fees, yes.
19 Q.  And that's been the case since January of 2011?
20 A.  Correct.
21 Q.  Can you just give me a little more detail on how
22    that came about?
23 A.  Do you have specific questions, because I've
24    testified already.
25 Q.  I -- yeah.  I'd like to know how it came about.

Page 82

1 A.  Okay.  My original agreement with Governor Snyder
2    was once we pulled the cabinet and his direct
3    reports together after he was elected during the
4    transition period that I would be returning to my
5    home at that time in Illinois.
6         On the first day after his inauguration,
7    the first working day, he asked me if I would
8    consider staying on for a year, and I said I would.
9    And he said -- I said but I don't make for a very
10    good bureaucrat or government employee, and he said
11    if you would make me -- if you would make, you know,
12    the team your exclusive client, how much would it
13    cost?  And I gave him a very cut rate amount, and he
14    said we could cover that out of this fund to further
15    good government at non-taxpayer expense.
16 Q.  And would you describe the fund as a lobbyist fund?
17 A.  A lobbyist?
18 Q.  Yeah.
19 A.  What would a lobbyist fund be?
20 Q.  I don't know.  I guess you're --
21 A.  If you tell me what a lobbyist fund is, I'll tell
22    you if I think it's a lobbyist fund.
23 Q.  Well, is --
24         MR. WERTHEIMER: It's not good.
25    BY MR. SHERWOOD:

Page 83

1 Q.  Would you describe the New Energy to Reinvent and,
2    what is it, Diversify?
3 A.  Yes.
4 Q.  Would you describe that as an entity that engages in
5    lobbying?
6 A.  No.
7 Q.  And do you know who manages NERD?
8 A.  No.
9 Q.  And you don't know who is on the board?  You don't
10    know who the officers, directors are --
11 A.  No.
12 Q.  -- or trustees?
13 A.  Nope.
14 Q.  You just know the name of the person who signs your
15    check; is that right?
16 A.  I do.  I know who I submit the invoice to and I know
17    who signs the check.  Outside of that, I don't know
18    anything else.
19 Q.  You don't know who any of their backers are?
20 A.  Don't know a single donor.
21 Q.  Okay.  The January 29th meeting -- a couple more
22    questions -- was Mr. Buckfire there?
23 A.  He was.
24 Q.  And what role did he play in organizing the meeting?
25 A.  Ken advised Andy, Chris Andrews and Jack Martin, the

Page 84

1    City's CFO at the time, on considerations and
2    capabilities of firms that specialized in
3    restructuring.
4         And so he identified the firms that he
5    thought had significant expertise in the areas that
6    would be of greatest interest to the City, and he
7    said these are the firms that we should bring in to
8    help you understand how to construct a request for
9    proposal to a broader variety of firms.
10 Q.  Did he devise some type of scoring system for the
11    firms at that meeting?
12 A.  Not that I saw, no.
13 Q.  How about afterwards?
14 A.  No.  I'm trying to recall, and I don't think I ever
15    saw any sort of a scoring mechanism for any of these
16    firms.
17 Q.  Did you have any role in the selection of Jones Day
18    as the City's counsel?
19 A.  I did not.
20 Q.  Did you express any preference to the City as to who
21    should be retained as counsel?
22 A.  I believe Jack Martin asked my opinion from what I
23    thought at that meeting and from my prior experience
24    with firms when I was with Price Waterhouse Coopers,
25    and I believe that I gave him my opinion at the

Page 85

1 time.
2 And my opinion was that I didn't think he
3 would go wrong with several of the firms, but that I
4 thought Jones Day by and large had more of the fire
5 power in the various areas that the firm -- that the
6 City was looking for than the others did.
7 Q. During the Jones Day presentation -- hold it. Let
8 me step back.
9 I think you said something like one of the
10 reasons you chose Jones Day was that they have --
11 they'd do a better job of keeping Detroit out of
12 bankruptcy.
13 Do you remember testifying to that?
14 A. No, I don't believe I testified to that. I do
15 recall what I intended to say if that wasn't it.
16 Q. What did you intend to say? Did you think Jones Day
17 had offered the City a better chance to stay out of
18 Chapter 9?
19 A. I don't know that Jones Day as a firm had -- I don't
20 have an opinion whether Jones Day as a firm is --
21 would help the City stay out of Chapter 9 or not.
22 It was my contention that in the
23 recommendation of Kevyn Orr as a great candidate for
24 the emergency manager, that his background and
25 experience would serve as a significant reminder to

Page 86

1 folks that they should negotiate in good faith to
2 stay out of the courts because here is a man who
3 understood exactly how to navigate the courts.
4 Q. But isn't it true that Mr. Orr and Jones Day were of
5 the view at all times that it would be extremely
6 difficult to keep the City of Detroit out of
7 Chapter 9?
8 MR. ELLSWORTH: I object to foundation.
9 THE WITNESS: I don't know that.
10 BY MR. SHERWOOD:
11 Q. Can you look at page 13 of the presentation?
12 A. Uh-huh.
13 Q. And if you look at the end of it, basically you'd
14 agree that this slide talks about out-of-court
15 solutions being preferred, but the conclusion at the
16 end is that they are extremely difficult to achieve
17 in practice. Do you see that?
18 A. I do see it.
19 Q. Did anyone from Jones Day convey this message to the
20 group at the meeting on January 29th?
21 A. I don't recall explicitly, no.
22 Q. And if you look at the next page, page 14, you know
23 even for the speaker notes it says an out-of-court
24 solution requires consensus or near consensus of
25 affected constituencies. This is extremely hard to

Page 87

1 achieve in practice.
2 Do you recall as part of the oral
3 presentation someone from Jones Day saying that the
4 idea that the City of Detroit is going to avoid
5 Chapter 9 is pretty farfetched?
6 A. I don't recall anyone saying that the idea was
7 farfetched.
8 Q. Well, do you recall them using words like that?
9 A. No, I don't.
10 Q. You don't recall words like extremely difficult, as
11 it says on the slide?
12 A. Well, I don't recall those words, but I wouldn't
13 dispute them.
14 Q. Do you recall words like -- do you recall Mr. Orr
15 having conversations with you wherein he suggested
16 that it would be extremely difficult to achieve an
17 out-of-court solution to Detroit's fiscal problems?
18 MR. ELLSWORTH: Objection to the extent
19 that it would disclose lawyer-client conversations.
20 BY MR. SHERWOOD:
21 Q. Do you recall any such conversations outside the
22 presence of counsel?
23 A. Again, which conversations? That achieving success
24 out of court is difficult?
25 Q. Right.

Page 88

1 A. Yes, I do recall those conversations.
2 Q. Do you recall those conversations with Mr. Orr
3 outside of the presence of counsel, correct?
4 A. No, not with Mr. Orr.
5 Q. With who?
6 A. With the principals at McKenna Long.
7 Q. Is that a law firm?
8 A. Yes.
9 Q. And who do they represent?
10 A. We asked them for -- I guess when I say we, Andy
11 Dillon asked them for their best rationale on how to
12 keep us out of the courts and what the implications,
13 you know, of going into the courts were, to educate
14 the team on our resolve to stay out of the courts.
15 MR. ELLSWORTH: Excuse me. Was that
16 another presenter, just to clarify this.
17 BY MR. SHERWOOD:
18 Q. Was McKenna Long making a presentation?
19 A. They were one of the firms in presence at this
20 meeting.
21 Q. Did they have that conversation with you at that
22 meeting or is that something that occurred before or
23 after that meeting?
24 A. It occurred before.
25 Q. How long before?

Page 89

1   A.   I don't recall.

2   Q.   And at the time, McKenna Long wasn't retained by the

3       City as its counsel?

4   A.   No, they weren't retained by anyone.

5   Q.   Okay. What was their view on the prospects for

6       keeping the City of Detroit out of Chapter 9, if you

7       remember?

8   A.   I don't think they opined on the prospects.

9   Q.   What did they opine on?

10   A.   They opined on all of the benefits associated with

11       staying out. They were part of the education

12       process for why you should stay out of the courts.

13   Q.   And but just to be clear, did they opine on the --

14       on the likelihood that Detroit would be able to stay

15       out of bankruptcy and still resolve its financial

16       issues in sort of an out-of-court restructuring?

17   A.   No.

18   Q.   They never opined on that?

19   A.   No.

20   Q.   Getting back to Jones Day, did you recall them

21       making a presentation at the January 28th meeting

22       where they stressed the importance of making a

23       record of good faith negotiations?

24   A.   It was the 29th, now that I've been educated.

25   Q.   Okay. I'm sorry. The 29th meeting.

Page 90

1       Did they -- at that meeting did they stress

2       the importance of making a record of negotiations

3       with creditors?

4   A.   Did Jones Day stress the importance of making a

5       record of negotiations?

6   Q.   Right.

7   A.   I don't recall that explicitly.

8   Q.   Now, if we can look at B-5 -- I call it Baird 5.

9       Can you get that one, sir? I'm really not asking

10      about this document, but it's February of 2013, and

11      the email from you to Kevyn Orr on February 20th

12      talks about brokering a meeting between Mr. Orr and

13      the Mayor.

14       Was it important from your perspective to

15      broker peace between the Mayor and Mr. Orr?

16   A.   It was my belief that a good working relationship

17      between the two of them would be in the best

18      interest of the City.

19   Q.   What about the City Council? Did you have the same

20      view towards the relationship between Mr. Orr and

21      the City Council for the City of Detroit?

22   A.   If your question is do I believe that a good

23      relationship between Kevyn Orr and the City Council

24      would be in the City's best interest, the answer

25      would be yes.

Page 91

1   Q.   I guess the question is given that, right, did you

2      try to broker some type of meeting between Mr. Orr

3      and the City Council?

4   A.   No.

5   Q.   Why not?

6   A.   Because I did not think that it was possible.

7   Q.   There were members of the City Council that

8      supported Mr. Orr; were there not?

9   A.   I don't know.

10   Q.   And I know that certain members of the City Council

11      were very vocal against him or any other emergency

12      manager; is that right?

13   A.   I read the papers, and there were arguments against

14      it that came from members of Council that I recall,

15      yes.

16   Q.   Ultimately, were you able to broker a working

17      relationship between Mr. Orr and the Mayor?

18   A.   You'd have to ask Mr. Orr and the Mayor.

19   Q.   From your perspective, do you think --

20   A.   I can't opine. I testified that Kevyn Orr thought

21      it important to meet the Mayor and to determine if

22      they could work together if he were to accept the

23      Governor's recommendation. The Mayor indicated the

24      same about Kevyn Orr.

25       We did the best to articulate a framework

Page 92

1      under which that working relationship could exist,

2      and you'll have to talk to those two men as to how

3      successful that arrangement turned out to be.

4   Q.   Now, in February of 2013, I guess we'll use B-5 just

5      for time purposes. I think you testified that there

6      was one other candidate that still was sort of in

7      the running at that point in time?

8   A.   There was a candidate that we had agreed -- we

9      meaning the Governor and his Chief of Staff and

10      Treasurer, that we had agreed had the requisite

11      capabilities and had indicated a willingness to do

12      the job, but we wished to continue the vetting of

13      Kevyn to determine whether he would be a better

14      candidate.

15   Q.   Had you determined at this point that Mr. Orr was

16      the top candidate February 2013?

17   A.   I don't -- I believe I was still doing due diligence

18      at this particular time, I think, but I was

19      cautiously optimistic that Kevyn might be the better

20      candidate.

21   Q.   And at this time, again, February 20th, 2013, do you

22      know whether the Governor shared that view?

23   A.   I don't recall on the timetable if that were the

24      case or not.

25   Q.   What about Mr. Dillon?

Page 93

1 A. I think Mr. Dillon, you'd have to ask him as to
2 whether he thought Kevyn was the better of the two
3 candidates.
4 Q. Did Mr. Dillon express to you who he thought was the
5 better of the two candidates?
6 A. At some point after Kevyn had indicated that he
7 could work his way clear of a withdrawal from his
8 firm and that if nominated by the Governor he would
9 be in a position to accept an appointment by the
10 ELB, yes, I think Andy indicated to me at that time
11 that he thought Kevyn was the better of the two
12 candidates.
13 Q. Now, was the other candidate an attorney?
14 A. No.
15 Q. Was the other candidate a man or a woman?
16 A. A man.
17 Q. Was the other candidate local?
18 A. Define local.
19 Q. A Detroit resident?
20 A. No.
21 Q. A surrounding area of Detroit resident?
22 A. I don't -- I won't dance here. I'll tell you he
23 was -- his residence was south but he had been a
24 Detroit resident.
25 Q. Did the person have restructuring experience?

Page 94

1 A. He did.
2 MR. WERTHEIMER: I'm sorry, did you say he
3 was a Detroit resident?
4 THE WITNESS: He had been a Detroit
5 resident, but he was not at the time that I had
6 discussed with him.
7 MR. WERTHEIMER: I just missed it. Thank
8 you.
9 BY MR. SHERWOOD:
10 Q. I'd like to ask you to look again at Exhibits 7 and
11 8. If you could get those and look at 7 first.
12 You got this email, Exhibit 7; is that
13 correct?
14 A. Yeah, I'm looking at 7.
15 Q. I'm looking at the second paragraph and it appears
16 that Mr. Dillon is reporting to the Governor and
17 others including yourself when he says he "...met
18 with the consultants to get briefed on the pension
19 issue this afternoon", which consultant -- do you
20 know what consultants he's referring to?
21 A. No. I testified earlier that there are weekly
22 consultant meetings, and I gave you the names of who
23 were on those calls but I don't recall who he
24 specifically is referring to here.
25 Q. Do you know if they were the consultants for the

Page 95

1 City or some other consultants?
2 A. I don't.
3 Q. And he concluded that the situation was not good and
4 that current pensions had to be cut significantly,
5 correct?
6 A. Well, I mean, I'm reading this. It says "Bottom
7 line the situation's not good and the view of the
8 consultants is that current pensions have to be cut
9 significantly." I don't know which consultants he's
10 referring to.
11 Q. Okay. So if you look at -- so at least at some
12 point as of this date certain consultants were
13 telling Mr. Dillon and Governor Snyder that the
14 pensions had to be cut significantly.
15 Can we agree on that?
16 A. I can agree that I'm reading the same line that
17 you're reading.
18 Q. Okay. Let's look at B --
19 MR. ELLSWORTH: Were you finished with your
20 answer, Rich?
21 THE WITNESS: Yes.
22 MR. SHERWOOD: I'm sorry.
23 BY MR. SHERWOOD:
24 Q. Let's look at the next, Exhibit 8. And this exhibit
25 also deals with the issue of pension liability.

Page 96

1 Would you agree?
2 A. It would appear so.
3 Q. And in this email Mr. Dillon reports that in
4 Mr. Orr's discussion with the pension, he is not
5 going to translate the underfunded amount into an
6 impact on retirees or employees vested rights.
7 Do you see that?
8 A. I do.
9 Q. When you read this email on July 9th, the day after
10 you got Exhibit 7, did you ask Mr. Dillon or the
11 Governor why Mr. Orr is refusing to send a message
12 on the underfunding amount to the representatives of
13 the pensions?
14 A. I don't recall asking that question, no.
15 Q. Did it appear to you that Mr. Orr was not being
16 candid with the pensions by not reporting the fact
17 that they had to be cut significantly?
18 A. I'm sorry, say that again.
19 Q. Did it occur to you that Mr. Orr might not be being
20 candid with the pensions by not reporting to them
21 the fact that the pensions had to be cut
22 significantly?
23 A. That would be pure speculation on my part.
24 Q. But this situation didn't cause you to make any
25 recommendations to Mr. Dillon or the Governor or

1     Mr. Orr; is that your testimony?
2  A.  Yes.  I get copied on a lot of emails but I've
3     testified that pension liability, pension models are
4     frankly outside of my wheelhouse, and that's not my
5     area of focus in consulting to the Governor or his
6     team.
7  Q.  You testified that one of the things you did in the
8     pensions is look at the practical impact on the
9     people losing their pensions.
10         Do you remember that testimony?
11  A.  I testified that I was -- it was desirable for me to
12     see what that impact was but that I never received
13     the data to actually understand the impact.
14  Q.  And but you said you talked to the Governor about
15     that and I think Mr. Orr and Mr. Dillon and they all
16     said that that was a good question.
17         Do you recall that testimony?
18  A.  I don't recall talking to the Governor about that.
19     I recall talking to Mr. Orr about that.  And I
20     recall saying to Andy that I had that conversation
21     with Mr. Orr.
22  Q.  And is it -- am I right -- or tell me why you
23     thought that was important.
24  A.  I'm a curious guy.  I don't know what to tell you.
25     I thought it was important because I did not

1     understand -- this would be the third time I've
2     testified to this.  I did not understand what the
3     distribution of those 20,000 pensioners was and what
4     it meant in real dollars and real lives, and that
5     was a question that I wanted to know the answer to,
6     and so I was looking for the data set to ascertain
7     that.
8  Q.  And the pensioners whose benefits are being cut, you
9     understand, do you not, that they don't have a
10     safety net like people in private industry do?
11         MR. ELLSWORTH:  Objection as to the form.
12     Go ahead and answer, Rich.
13         THE WITNESS:  Which pensioners are being
14     cut?
15  BY MR. SHERWOOD:
16  Q.  Well, to the extent pensioners are being cut, they
17     don't have a safety net like the PBGC, right?
18  A.  Well, I know that they don't have a PBGC; that's
19     correct.
20  Q.  Are you aware of any other safety net that they
21     might have?
22  A.  I'm only aware of safety nets that exist for all
23     citizens once they get below a certain poverty line.
24  Q.  But they don't relate to their pension, do they?
25  A.  I believe that certain benefits are contingent upon

1     what your income is, and whether that income comes
2     from a pension or some other form it's your income.
3  Q.  So you're suggesting that these other government
4     programs act as a safety net in lieu of the PBGC for
5     lost pension benefits?
6  A.  No, I think you're suggesting that.
7  Q.  I'm just trying to understand what you're saying.
8     I'm not trying to argue with you.  I'm just trying
9     to --
10  A.  What question is it you would like me to answer?
11  Q.  I'd like to know why -- whether you consider the
12     fact -- in your investigation of the practical
13     impact on people, were you doing that investigation
14     out of concern for the people who were losing or
15     stood to lose their pensions because they didn't
16     have a safety net?  That's what I want to know.
17  A.  Okay.  I am not aware of what safety net does or
18     doesn't exist for them currently.  I was interested
19     in what the practical implications of material
20     savings would be against the distribution of those
21     receiving pensions.
22         And it was the answer to that question that
23     led me to ask another question which is whether or
24     not there might be an appetite for legislative
25     remedy in the absence of safety net.

1         Is that sufficiently clear?
2  Q.  Let me read it.  And in terms of appetite for
3     legislative remedy, your prior testimony was that
4     your understanding was that that appetite was very
5     low and that's why the inquiries kind of stopped
6     there?
7  A.  My understanding is that the appetite for a large
8     scale appropriation to Detroit was pretty low.
9         I didn't have an opinion about whether or
10     not there was an appetite for incremental safety net
11     for impacted pensioners were they to be impacted.  I
12     was simply asking the question.
13  Q.  The June 14th meeting, you were at the meeting and I
14     think you testified something like that you
15     indicated that you thought Mr. Orr did a good job
16     presenting the June 14th proposal.
17         Do you remember that topic?
18  A.  Yes, I do.
19  Q.  Do you know whether at that meeting Mr. Orr or
20     anyone on behalf of the City of Detroit requested
21     that the parties there provide counterproposals to
22     the proposal that was being made on June 14th?
23  A.  I don't recall the term counterproposal, but I do
24     recall an invitation being put out to the group that
25     says once you've digested this financial information

1 and you understand the wherewithal what exists, to
2 the extent that you want to sit down and negotiate
3 in good faith now is not the time to do that, but
4 there will be that time and here's the information
5 that you need in order to interact intelligibly.
6      I do recall that.
7 Q. And that meeting was approximately a month before
8 the bankruptcy filing.
9      Were there follow-up -- were you present at
10 any follow-up meetings after the June 14th meeting?
11 A. With creditors?
12 Q. Right.
13 A. No.
14 Q. Did anyone report to you on the status of follow-up
15 meetings with creditors that occurred after the
16 June 14th meeting?
17 A. With counsel, yes.
18 Q. What about without counsel?
19 A. Not that I recall.
20 Q. And what was said?
21      MR. ELLSWORTH: Well, I -- I object to the
22 extent that would call for disclosure of
23 lawyer-client conversations.
24      I think Mr. Baird said that the
25 conversations that he had were with counsel present.

1 He can clarify if I heard that wrong.
2      THE WITNESS: No, that's correct. Counsel
3 was present.
4 BY MR. SHERWOOD:
5 Q. But counsel was -- was counsel reporting back on how
6 the negotiations were going with the creditor
7 groups?
8 A. No.
9 Q. Who was making that report?
10 A. Kevyn Orr.
11 Q. What did he say?
12      MR. ELLSWORTH: Well, I object again. If
13 counsel was present during that discussion then
14 that's subject to the attorney-client privilege and
15 I object.
16      MR. SHERWOOD: Are you instructing him not
17 to answer --
18      MR. ELLSWORTH: Yes.
19      MR. SHERWOOD: -- a conversation between
20 Mr. Orr and him --
21      MR. ELLSWORTH: If it was a one-on-one
22 conversation.
23      MR. SHERWOOD: -- reporting on what
24 happened at negotiations with creditors? I just
25 want to make sure.

1      MR. ELLSWORTH: It was --
2      THE WITNESS: This was not a one-on-one.
3      MR. ELLSWORTH: Was counsel present?
4      THE WITNESS: Yes.
5      MR. ELLSWORTH: I object, and I'm
6 instructing him not to answer.
7 BY MR. SHERWOOD:
8 Q. Were you involved in any negotiations or did anyone
9 report to you on negotiations with the bondholder
10 creditors of the City of Detroit?
11      MR. ELLSWORTH: Again, to the extent that
12 would require a disclosure of lawyer-client
13 privileged conversations, I object.
14      MR. SHERWOOD: I just want a yes or no. I
15 mean, I don't want the content.
16      MR. ELLSWORTH: That's fine.
17      THE WITNESS: Updates of those discussions
18 were provided with counsel present.
19 BY MR. SHERWOOD:
20 Q. And none of that happened outside the presence of
21 counsel?
22 A. No.
23 Q. During your discussions with Mr. Orr prior to his
24 appointment, did he ever say to you that the
25 appointment of an emergency manager and the filing

1 of a Chapter 9 provides political cover for the
2 Governor and/or the Mayor in regard to the process
3 of making the tough decisions that face the City of
4 Detroit in the context of the restructuring?
5 A. He never said that to me.
6 Q. Did anyone ever say that in your presence?
7 A. Say it, no.
8 Q. Write it?
9 A. I saw an email where it was written, so I know that
10 somebody said it.
11 Q. Okay. I think I might have a copy of that email.
12 Maybe I'll show it to you. Let's look at this one.
13
14      (Deposition Exhibit 10 was marked.)
15
16 BY MR. SHERWOOD:
17 Q. We've marked this as Baird 10. You haven't seen it
18 yet though, huh?
19 A. Okay. Is this one where I need to start at the
20 bottom and read it through? This doesn't look like
21 any that I've ever seen before.
22 Q. Yeah, it's really just two pages. If you start on
23 the second page -- actually, you are referred to in
24 this, so why don't we take a second to go through
25 this and start with the --

1      MR. ELLSWORTH: Rich, do you need a chance
2  to read it?
3      THE WITNESS: Yeah, I need to read this.
4  BY MR. SHERWOOD:
5  Q.  Okay.  Tell me when you're done.
6  A.  Okay, I've completed reading it.
7  Q.  Let's start with the email on page 301, which is the
8      second page.  And Corinne Ball is talking to Kevyn,
9      and she talks about the Bloomberg Foundation and
10     whether we should talk to you, Mr. Baird, about
11     financial support for the project and the EM.  And
12     then she refers to Harry Wilson from the Auto Task
13     Force told me about the Foundation and its interest.
14     I can ask Harry for contact info.  This kind of
15     support in ways nationalizes the issue and the
16     project.  Do you see that?
17 A.  I do.
18 Q.  Do you know whether the Bloomberg Foundation and
19     Harry Wilson, whether they were ever brought to your
20     attention by anyone at Jones Day?
21 A.  They were not.
22 Q.  So this is the first you're hearing of this?
23 A.  No.  I've seen not this entire string of email, but
24     I have seen -- from some emails that were provided
25     in discovery to me, I've seen this, the 1-31-13

1      8:10 a.m., and I have seen all the way up through
2      the 1-31 11:01 a.m. from Kevyn Orr to Dan Moss, but
3      I have not seen this last piece which is from
4      Dan Moss to Kevyn Orr.
5  Q.  And by this last piece, you're referring to really
6      the top of the email string, correct?
7  A.  The top of the email string, right.  The most recent
8      string of this.
9  Q.  So as of January 31st, 2013, do you know who
10     Dan Moss is?
11 A.  I believe -- I don't know exactly who he is, but I
12     know he's a colleague of Kevyn Orr's at Jones Day.
13     That's all I know.  I've heard the name.
14 Q.  As of January 31st, 2013, did Mr. Orr suggest to you
15     that Chapter 9 would be the best solution for the
16     City of Detroit for political reasons?
17 A.  No, he did not.
18 Q.  Did he suggest to you that Chapter 9 would not be an
19     alternative as of January 31st, 2013?
20 A.  I don't believe he placed any priority of any sort
21     on Chapter 9 to me in any conversation or
22     communication.
23 Q.  During the course of your discussions with Mr. Orr,
24     did he emphasize the need to have the unqualified
25     support from the Governor during the -- during his

1      tenure as emergency manager?
2  A.  I'm not sure I would use the term unqualified
3      support, but I certainly would testify that he
4      believed that support from the Governor for the
5      undertaking at hand was going to be an important
6      consideration.
7  Q.  Did he say why that was important?
8  A.  Yes, he did.  That he recognized that this was going
9      to be a thankless job, a job where he would probably
10     be vilified and called a traitor to his race and to
11     his Democrat background, and that it would require a
12     great deal of resolve to overcome the difficulties
13     of the past decades that have gotten Detroit to
14     where it is today.
15 Q.  Did he also seek the support of the Financial
16     Advisory Board?
17 A.  At the -- well, yes, but not during the recruitment
18     process.
19 Q.  When did he make the request that the Financial
20     Advisory Board should provide him with support and
21     oversight?
22 A.  You'd have to --
23 Q.  If he ever did.
24 A.  Well, I have heard from members of the Financial
25     Advisory Board that he has made those overtures, but

1      you'd have to ask him as to when and context.
2  Q.  But he never had any discussions with you about
3      whether it would be beneficial to get support from
4      the Financial Advisory Board and how he was going to
5      go about that?
6  A.  In general, Counselor, I think he -- we had a lot of
7      discussions about he was going to need all the
8      support he could get from every corner he could get
9      it from including the FAB and City Council.
10 Q.  All right.  Can I have one second?  I think I'm done
11     but I don't want to close the record until I'm sure.
12     I just need one second.
13     (A pause was had in the proceedings)
14     MR. SHERWOOD: All right.  I think that's
15 all.  Thank you.  I appreciate it.
16     THE WITNESS: Okay.  Thank you.
17     MR. ELLSWORTH: Anybody else?
18     VIDEO TECHNICIAN: Deposition's concluded
19 at 4:49 p.m.
20     (Deposition concluded at 4:49 p.m.)
21     - - -
22
23
24
25

1                        CERTIFICATE

2   STATE OF MICHIGAN        )
                             ) SS:
3   COUNTY OF OAKLAND        )

4

5           I, LAUREL A. JACOBY, Certified Shorthand

6   reporter, a Notary Public, hereby certify that I recorded

7   in shorthand the examination of RICHARD BAIRD, the

8   deponent in the foregoing deposition; and that prior to

9   the taking of said deposition the deponent was first duly

10  sworn, and that the foregoing is a true, correct and

11  complete transcript of the testimony of said deponent.

12          I further certify that no request was made for

13  submission of the transcript to the deponent for reading

14  and signature and that no such submission was made.

15          I also certify that I am not a relative or

16  employee of a party or an attorney for a party; or

17  financially interested in the action.

18

19

20  _____
    LAUREL A. JACOBY, CSR-5059, RPR
21

22  Notary Public, Oakland County, Michigan

23  My commission expires: 9/1/18

24  Dated:  This 13th day of October, 2013.

25

**$**

**$18 (1)**
78:7

**A**

**ability (1)**
29:9
**able (7)**
23:17;26:18;60:16;
71:10;72:5;89:14;
91:16
**absence (4)**
29:9;52:14;78:9;
99:25
**absolutely (1)**
16:5
**accept (3)**
76:21;91:22;93:9
**accepted (1)**
37:17
**accomplish (1)**
74:14
**according (2)**
20:4;24:20
**accrued (7)**
18:14;42:13;47:24;
50:16;63:14;64:3;75:8
**accurate (2)**
22:7;32:12
**achieve (3)**
86:16;87:1,16
**achieving (1)**
87:23
**acronym (1)**
81:17
**across (1)**
78:25
**act (3)**
26:1;69:9;99:4
**action (2)**
65:4;71:7
**actual (2)**
29:12;70:10
**actually (14)**
8:24;20:23;23:13;
29:24;31:7;34:6;
48:25;56:18;57:13,17;
67:4;73:17;97:13;
104:23
**actuary (1)**
63:3
**additional (1)**
30:5
**address (2)**
11:13;66:25
**addressed (1)**
67:5
**advice (1)**
15:15
**advised (2)**

**10:22;83:25**
**Advisory (4)**
107:16,20,25;108:4
**affected (1)**
86:25
**AFSCME (1)**
80:4
**afternoon (4)**
7:16;61:19;80:3;
94:19
**afterwards (1)**
84:13
**Again (14)**
12:12;28:6;31:17;
45:25;73:5,16;75:6;
81:17;87:23;92:21;
94:10;96:18;102:12;
103:11
**against (3)**
91:11,13;99:20
**agent (5)**
39:9;40:15,16,18,22
**ago (1)**
14:22
**agree (9)**
33:10;34:19;36:7;
39:3,5;86:14;95:15,16;
96:1
**agreed (7)**
26:7;29:18;33:19,
25;55:10;92:8,10
**agreement (8)**
16:25;29:17;33:21;
39:22;40:7,11,13;82:1
**agreements (1)**
78:10
**ahead (3)**
73:20;77:8;98:12
**along (2)**
18:18;51:3
**altered (1)**
42:13
**alternative (1)**
106:19
**although (2)**
25:12;72:16
**always (1)**
20:18
**ameliorate (1)**
71:11
**amount (8)**
17:13;28:4;46:23,
24;48:24;82:13;96:5,
12
**analytics (1)**
46:2
**and/or (4)**
35:2;39:22;40:10;
104:2
**Andrews (1)**
83:25
**Andy (9)**
14:10;46:10;48:13;

**62:5;66:5;83:25;**
88:10;93:10;97:20
**anecdotal (3)**
50:17,18,19
**anecdotally (3)**
51:10,18,20
**answered (1)**
63:24
**anticipated (1)**
71:15
**Apart (3)**
11:4;25:12;28:5
**appear (3)**
41:4;96:2,15
**appeared (1)**
69:17
**appears (4)**
24:21;67:25;81:12;
94:15
**appetite (8)**
49:15;50:5;71:24;
99:24;100:2,4,7,10
**appointed (8)**
25:23;30:15,17,23,
25;31:4,13,16
**appointment (6)**
30:19;31:9,9;93:9;
103:24,25
**appreciate (1)**
108:15
**approaches (1)**
75:17
**appropriated (1)**
72:11
**appropriation (1)**
100:8
**approximately (2)**
71:3;101:7
**area (3)**
12:20;93:21;97:5
**areas (3)**
29:17;84:5;85:5
**argue (1)**
99:8
**arguments (1)**
91:13
**around (13)**
20:22;28:4;30:21;
55:18;62:8;64:17;
65:9;68:23;71:5;
73:25;76:5,12,17
**arrangement (4)**
10:25;11:4;32:19;
92:3
**Article (16)**
41:21;42:20;43:7;
44:1,7,12,21;45:1,1,8,
11;56:23,24;57:2;
76:7;79:1
**articulate (1)**
91:25
**articulated (1)**
74:21

**ascertain (3)**
48:19;64:8;98:6
**aspirational (1)**
33:1
**assess (1)**
37:15
**assessment (4)**
12:13;33:10;34:19;
36:7
**assist (1)**
72:17
**Assistance (3)**
8:8;78:2,2
**assistant (7)**
35:7,12;36:3,11,19,
22,24
**associated (3)**
15:4;55:12;89:10
**assume (2)**
39:11;67:6
**assuming (1)**
73:16
**attempt (2)**
35:10;40:17
**attempting (1)**
41:2
**attend (2)**
12:24;13:11
**attendance (2)**
60:10,15
**attended (1)**
60:3
**attention (5)**
18:5,10;21:22;
38:11;105:20
**attorney (3)**
42:3;45:10;93:13
**attorney-client (2)**
45:13;102:14
**attorneys (1)**
7:25;8:12
**authorization (1)**
68:24
**authorize (1)**
52:18
**Auto (2)**
7:18;105:12
**available (3)**
29:8;66:16,21
**avenues (1)**
29:7;47:16
**averages (1)**
46:3
**avoid (3)**
66:17,21;87:4
**avoided (2)**
28:16,16
**avoiding (1)**
20:20
**aware (25)**
15:17;43:6,7,8;44:4,
6;53:10,14,15;56:14,
20;57:10,14,15,17,19;

**58:11;64:12,17;71:23;**
79:2,2;98:20,22;99:17
**away (1)**
63:12
**awful (1)**
43:14

**B**

**B-5 (2)**
90:8;92:4
**back (20)**
18:14;22:23;29:24;
30:3;35:20;38:25;
39:9;48:6;49:6;51:1;
54:11;68:13;75:8,13;
76:1;78:22;80:8;85:8;
89:20;102:5
**backers (1)**
83:19
**background (11)**
16:2;17:6;19:16;
25:18;28:2,7;74:1,4;
75:18;85:24;107:11
**Baird (19)**
7:8,16;14:3;21:22;
24:7;27:9;32:5;38:11;
61:19;64:1;67:8,23;
68:7,17;80:3;90:8;
101:24;104:17;105:10
**BAIRD- (1)**
7:11
**Ball (2)**
21:24;105:8
**ballpark (1)**
31:6
**bankruptcy (29)**
10:13;12:4;16:11;
26:21;28:10;30:13;
46:16,18;48:17;52:18;
53:13;54:20;56:3,22;
57:5,8,12;68:20,25;
70:13;77:18,21,23,25;
78:11;80:5;85:12;
89:15;101:8
**based (2)**
39:4;47:19
**basically (1)**
86:13
**basis (1)**
78:25
**Bate (2)**
14:1;24:13
**bates (1)**
65:25
**became (6)**
20:21;30:20;41:9,
16,17;43:20
**become (1)**
31:3
**becoming (1)**
78:8,11
**began (3)**

12:4;80:13,16
**beginning (1)**
12:3
**behalf (3)**
14:8;55:10;100:20
**behaving (3)**
39:8;40:15,22
**belief (1)**
90:16
**below (1)**
98:23
**beneficial (1)**
108:3
**benefit (1)**
74:15
**benefits (9)**
18:14;47:25;50:16;
75:9;76:2;89:10;98:8,
25;99:5
**Bennett (1)**
73:21
**besides (1)**
14:8
**best (14)**
14:24;15:19;25:5;
43:16,17;48:7;55:4;
57:7;65:5;88:11;
90:17,24;91:25;106:15
**better (9)**
20:23;66:15;85:11,
17;92:13,19;93:2,5,11
**beyond (1)**
79:3
**bid (2)**
23:8,8
**Bill (1)**
68:17
**billion (1)**
78:7
**bills (1)**
81:17
**bind (1)**
33:2
**Bing (6)**
32:18;36:10;37:14,
16,19;39:16
**bit (3)**
26:12,13;81:16
**Bloomberg (2)**
105:9,18
**Board (8)**
8:8;30:17,17;83:9;
107:16,20,25;108:4
**bondholder (1)**
103:9
**bondings (1)**
78:7
**both (3)**
16:9;37:13;81:7
**bottom (18)**
14:2;21:21,23;
24:14;27:6,7;31:25;
32:6,13;38:9;61:1,22;

67:22;74:9,13;75:6;
95:6;104:20
**break (2)**
17:24;68:10
**brief (1)**
68:12
**briefed (2)**
61:18;94:18
**briefing (1)**
61:20
**bring (1)**
84:7
**bringing (1)**
15:7
**broad (3)**
17:8;55:20,20
**broader (2)**
70:12;84:9
**Brogan (12)**
19:6;20:6;22:2,6,8,9,
14;23:16;24:17;25:19;
81:10,11
**broker (8)**
35:6,10,11,17;36:2;
90:15;91:2,16
**brokered (1)**
35:13
**brokering (1)**
90:12
**brought (4)**
8:4;43:25;44:2;
105:19
**Bruce (1)**
73:21
**Buckfire (5)**
55:14;61:15;81:14,
15;83:22
**Building (1)**
11:20
**bureaucrat (1)**
82:10
**business (1)**
9:9

**C**

**cabinet (1)**
82:2
**call (17)**
14:5;19:5,17,21;
20:6;23:1;25:14;
29:25;44:14;54:23;
55:2,6;61:13;63:18,20;
90:8;101:22
**called (12)**
7:12;8:20;19:2,6;
22:2,7,9;25:25;32:21;
58:12,16;107:10
**calling (1)**
68:18
**calls (1)**
94:23
**came (7)**

31:13;34:6;68:4;
70:3;81:22,25;91:14
**Can (24)**
7:10;20:1;21:22;
24:9;35:17;43:10,16;
55:4;64:1;65:10;
67:24;68:3;71:2,3;
78:21;81:21;86:11;
90:8,9;95:15,16;102:1;
105:14;108:10
**candid (2)**
96:16,20
**candidate (20)**
19:12,14,19;20:13,
16;37:14,19;40:4,5;
81:5,5;85:23;92:6,8,
14,16,20;93:13,15,17
**candidates (10)**
35:24;36:3,6;37:21;
40:2;80:20;81:3;93:3,
5,12
**candidate's (1)**
40:6
**capabilities (2)**
84:2;92:11
**capacity (1)**
33:25
**car (1)**
38:23
**card (2)**
60:17,17
**carrying (1)**
78:23
**case (8)**
7:19;8:3,16;10:13;
25:24;80:10;81:19;
92:24
**cause (1)**
96:24
**cautiously (1)**
92:19
**caveat (1)**
44:22
**cease (1)**
41:8
**certain (9)**
33:9,19,21;39:18;
56:20;91:10;95:12;
98:23,25
**certainly (3)**
16:13;34:25;107:3
**CFO (3)**
15:4;16:25;84:1
**chance (4)**
20:23;54:15;85:17;
105:1
**chances (1)**
22:19
**Chapter (20)**
16:16;18:13;20:20;
74:10,13;75:7,25;76:5,
13,24;77:3;85:18,21;
86:7;87:5;89:6;104:1;

106:15,18,21
**character (1)**
21:11
**characteristics (1)**
80:23
**characterization (1)**
79:23
**characterize (2)**
80:15,16
**Check (3)**
62:7;83:15,17
**chief (4)**
35:2;49:12;70:21;
92:9
**children (2)**
23:19;26:5
**choice (1)**
34:22
**chose (1)**
85:10
**chosen (1)**
33:5
**Chris (1)**
83:25
**Chrysler (1)**
17:7
**circle (1)**
54:11
**circumstances (2)**
25:24;26:9
**citizens (1)**
98:23
**City (51)**
11:25;12:2,6,14;
13:13,25;15:2,9;16:12,
24;17:15,17;23:9,12;
26:21;28:11;36:18,19;
37:1;45:7;51:14;
52:18;57:7;65:13;
72:18,20;77:20;78:1;
84:6,20;85:6,17,21;
86:6;87:4;89:3,6;
90:18,19,21,21,23;
91:3,7,10;95:1;100:20;
103:10;104:3;106:16;
108:9
**City's (5)**
78:5;80:5;84:1,18;
90:24
**claims (1)**
74:16
**clarify (2)**
88:16;102:1
**clear (8)**
16:20;17:14;20:22;
41:5;78:8;89:13;93:7;
100:1
**clearly (5)**
29:8;39:7;40:14,18,
21
**client (1)**
82:12
**clients (1)**

9:12
**close (2)**
20:3;108:11
**club (1)**
26:1
**code (1)**
38:19
**Cohen (1)**
7:17
**colleague (1)**
106:12
**comment (1)**
58:22
**commitment (2)**
23:10;28:3
**committed (3)**
23:21;39:9;41:1
**communication (1)**
106:22
**communications (4)**
57:15;69:13;70:11,
12
**complete (1)**
55:15
**completed (4)**
15:6;55:8;56:5;
105:6
**Components (1)**
73:7
**compromise (3)**
18:14;74:15;75:8
**compromising (1)**
74:15
**conceivably (1)**
47:17
**concern (1)**
99:14
**concerning (1)**
56:22
**concluded (3)**
95:3;108:18,20
**conclusion (1)**
86:15
**condition (1)**
71:11
**conditions (1)**
37:17
**connection (3)**
11:24;12:10;35:13
**cons (1)**
79:18
**consensus (1)**
86:24,24
**consent (2)**
16:25;29:17
**consider (4)**
25:25;47:7;82:8;
99:11
**consideration (1)**
107:6
**Considerations (2)**
73:8;84:1
**considered (1)**

35:25
**consternation (1)**
71:5
**constituencies (2)**
78:10;86:25
**Constitution (12)**
18:16;41:21;42:11,
16;44:3;45:2;56:23;
57:2;75:10;76:7;
78:24;79:9
**constitutional (2)**
76:3;78:17
**construct (1)**
84:8
**consultancy (3)**
11:7,22;12:8
**consultant (2)**
94:19,22
**consultants (11)**
61:11,14,18,23;
94:18,20,25;95:1,8,9,
12
**consulted (1)**
12:6
**consulting (4)**
9:10;11:2;54:11;
97:5
**contact (3)**
35:20;54:25;105:14
**contacted (1)**
81:9
**contemplate (1)**
15:9
**contemplated (2)**
78:5,6
**contemplating (1)**
29:7
**content (2)**
67:25;103:15
**contention (1)**
85:22
**contents (1)**
53:5
**context (3)**
41:3;104:4;108:1
**contingencies (1)**
56:16
**contingent (1)**
98:25
**continue (1)**
92:12
**continued (1)**
17:11
**continues (1)**
39:3
**continuing (1)**
40:17
**continuum (3)**
16:14;47:18;51:3
**contributions (1)**
62:21
**conversation (28)**
17:23;21:7,10;

26:20;30:2;43:5,10,19;
46:1,8,11;48:13,14;
54:6,9;55:16;56:8;
68:22;69:19;70:17;
71:1;72:14;78:16;
88:21;97:20;102:19,
22;106:21
**conversations (19)**
54:14;55:8;61:25;
70:17;71:2,17;72:1,3,
10,21;87:15,19,21,23;
88:1,2;101:23,25;
103:13
**convey (1)**
86:19
**convince (2)**
21:12;77:3
**Conway (2)**
55:13;61:15
**Coopers (1)**
84:24
**copied (1)**
97:2
**copy (2)**
18:21;104:11
**Corinne (1)**
21:24;105:8
**corner (1)**
108:8
**corporation (1)**
8:25
**correctly (3)**
33:17;40:25;51:17
**cost (3)**
55:21;74:15;82:13
**Council (8)**
90:19,21,23;91:3,7,
10,14;108:9
**counsel (39)**
13:13;44:19,23;
45:18,25;57:6;58:1,5;
59:7,12,16,19;60:1;
62:3;64:20,24;65:8,17;
66:20;67:10,14;72:3;
74:8;75:4;84:18,21;
87:22;88:3;89:3;
101:17,18,25;102:2,5,
5,13;103:3,18,21
**Counselor (1)**
108:6
**counsel's (1)**
78:15
**counterproposal (1)**
100:23
**counterproposals (1)**
100:21
**couple (2)**
53:10;83:21
**course (5)**
29:12;43:13;64:16;
65:4;106:23
**court (4)**
38:2;56:21;77:14;

87:24
**courts (10)**
16:21;20:23,24;
28:15;86:2,3;88:12,13,
14;89:12
**cover (3)**
43:14;82:14;104:1
**covered (3)**
76:2;79:12;80:7
**covers (1)**
9:22
**crafted (1)**
32:18
**create (1)**
64:7
**credentials (2)**
17:6;74:1
**creditor (1)**
102:6
**creditors (9)**
10:13;20:25;58:12,
16;90:3;101:11,15;
102:24;103:10
**curious (1)**
97:24
**current (12)**
46:24;61:24;62:1,
12,15;63:11,17;64:10,
11;65:10;95:4,8
**currently (1)**
99:18
**cut (18)**
18:13;61:24;62:2,8,
13;63:2;64:14;75:8;
76:1;82:13;95:4,8,14;
96:17,21;98:8,14,16

**D**

**Dan (3)**
106:2,4,10
**dance (1)**
93:22
**data (15)**
46:20,22,22;47:1,2,
13;48:2,21;49:6,25;
50:13;51:24;52:15;
97:13;98:6
**date (15)**
7:5;8:6;13:15;14:4;
22:2,3;30:19,21;31:5,
8;38:19;57:16;69:14,
17;95:12
**dated (3)**
14:6;22:4;53:23
**Davis (3)**
8:4;7,15
**Day (63)**
10:16;13:3,6;14:7,
17,21,25;15:12,14,20;
17:21;18:1,18;19:2,3,
5,7,17;20:3,7;22:3,11,
12;23:4,11,23;24:16,

22,24;41:6;44:25;45:6,
8;55:13;57:14,18,20,
22;61:15;66:10;72:25;
73:15;75:24;81:8,8,13;
82:6,7,84:17;85:4,7,
10,16,19,20;86:4,19;
87:3;89:20;90:4;96:9;
105:20;106:12
**days (7)**
28:9;31:10,12,14;
39:25;53:10;76:20
**deal (5)**
23:21;77:20;78:1;
79:4;107:12
**dealing (1)**
46:3
**deals (1)**
95:25
**debate (4)**
64:15,17,21,25
**debt (1)**
78:8
**decades (1)**
107:13
**DeCHIARA (28)**
7:15,17;13:22;18:9;
21:19;24:6,12;27:4;
31:23;32:3,4;38:7;
44:16;45:4,5,14;52:7;
56:25;57:1;58:14,15;
60:24;61:3,4;63:25;
66:1;67:20;68:6
**decisionmaking (1)**
23:11
**decisions (1)**
104:3
**Define (3)**
12:1;13:3;93:18
**degree (1)**
42:14
**delivered (1)**
14:7
**Democrat (1)**
107:11
**Dennis (2)**
49:11;71:1
**denying (1)**
60:12
**depending (2)**
16:15;49:22
**deposition (21)**
7:7,21;8:3,5,13,15;
13:20;21:17;24:4;
27:2;31:21;38:5;58:6,
8;60:22;65:23;67:18;
69:25;72:25;104:14;
108:20
**depositions (4)**
7:24;8:1,2,16
**Deposition's (1)**
108:18
**describe (3)**
82:16;83:1,4

**described (3)**
32:18;50:3;9
**desirable (1)**
97:11
**desire (1)**
37:24
**detail (1)**
81:21
**detailed (1)**
55:22
**determination (3)**
33:11;34:20;36:8
**determine (3)**
35:22;91:21;92:13
**determined (1)**
92:15
**determining (1)**
34:1
**Detroit (57)**
10:13;11:25;12:2,6,
14,17;13:14,25,25;
16:3,12;17:9,13;19:10;
23:9,12;25:22;26:14,
22;28:3,11;29:6,15,21;
30:13;32:24;39:9;
52:19;57:7;61:11,14;
63:13;64:15;65:13;
68:19;71:20,24;72:12;
76:10,19;85:11;86:6;
87:4;89:6,14;90:21;
93:19,21,24;94:3,4;
100:8,20;103:10;
104:4;106:16;107:13
**Detroit's (8)**
12:10;18:2;30:9;
45:16;64:3,13;67:12;
87:17
**developed (1)**
33:4
**deviation (3)**
23:22;51:5,12
**devise (1)**
84:10
**difference (1)**
42:14
**difficult (9)**
26:7;29:4;52:2,12;
86:6,16;87:10,16,24
**difficulties (1)**
107:12
**difficulty (2)**
34:24;78:4
**digested (1)**
100:25
**diligence (2)**
34:1;92:17
**Dillon (33)**
14:10;19:24;20:1,2,
3,9;44:21;45:21,25;
46:10;48:13,21;49:2;
59:10;61:5,10;62:1;
65:2,6,11;66:5,19;
67:9;88:11;92:25;

93:1,4;94:16;95:13;
96:3,10,25;97:15
**Dillon's (2)**
59:19;65:2
**direct (2)**
12:13;82:2
**directed (1)**
50:22
**directional (1)**
14:23
**directly (2)**
10:1;12:7
**director (2)**
15:4;17:1
**directors (1)**
83:10
**disclose (1)**
87:19
**disclosed (1)**
37:7
**disclosure (2)**
101:22;103:12
**discovery (1)**
105:25
**discuss (4)**
15:9;57:4,6;58:1
**discussed (14)**
7:25;16:4;27:25;
28:2,3,6,14;32:22;
42:20,23,25;72:4;
75:16;94:6
**discussing (2)**
34:14;40:1
**discussion (13)**
25:6;26:20;28:4,10;
29:10,12;43:9;44:7;
45:19;62:7;79:15;
96:4;102:13
**discussions (19)**
23:5;29:23;30:6,9;
47:19;50:8;55:22;
56:10;62:4,6;65:3,5,9;
76:5;103:17,23;
106:23;108:2,7
**dispute (1)**
87:13
**distress (1)**
19:11
**distribution (9)**
46:2,4,23;48:22;
51:3,5;70:19;98:3;
99:20
**Diversify (5)**
9:15,17,18;10:3;
83:2
**doc (2)**
39:4,11
**document (44)**
13:17,24;21:14,20;
24:1,10;25:12,13;
26:24;27:5,6;31:18,25;
32:7,11,18;33:2;34:6;
38:2,9;39:12,14,19;

40:1,7;58:10,11,19;
60:19,25;65:20;66:2;
67:15,21,23,24;68:1,4;
69:13,19,24;70:4;74:5;
90:10
**document's (1)**
14:6
**dollars (1)**
98:4
**done (4)**
39:4;45:16;105:5;
108:10
**donor (1)**
83:20
**donors (2)**
10:22,23
**down (3)**
26:3;77:4;101:2
**draft (2)**
39:16;52:21
**draw (1)**
18:10
**DTMI (1)**
14:2;67:22
**due (2)**
34:1;92:17
**duly (1)**
7:12
**During (11)**
43:13;78:22;79:12;
82:3;85:7;102:13;
103:23;106:23,25,25;
107:17

# E

**earlier (4)**
30:24;71:6;78:14;
94:21
**early (3)**
31:16;43:5;78:22
**earners (3)**
51:8,9,11
**economic (1)**
12:3
**educate (1)**
88:13
**educated (1)**
89:24
**education (2)**
17:12;89:11
**effect (2)**
31:13,14;60:9;65:11
**effective (2)**
30:20;31:8
**efforts (3)**
12:2,11,14
**EFM (6)**
30:25;31:4,10,16;
41:9,17
**eight (1)**
14:22
**either (2)**

18:1;80:24
**ELB (2)**
19:12;93:10
**elected (1)**
82:3
**elements (1)**
17:12
**ELLSWORTH (24)**
44:13;45:3,13;52:5;
63:23;73:9,12;77:9;
86:8;87:18;88:15;
95:19;98:11;101:21;
102:12,18,21;103:1,3,
5,11,16;105:1;108:17
**else (8)**
8:13;14:8;27:21;
45:23;47:20;54:8;
83:18;108:17
**EM (15)**
19:12,14,19;20:17;
30:15,18,24;31:9;
35:24;40:3;41:9,16;
43:20;80:12;105:11
**email (42)**
11:12;21:23;22:4,5;
24:7,9,20;27:8,9,10;
32:5,12,13;33:8;36:5,
23;37:4;38:12,13,21;
39:17;40:5;59:4;61:5;
62:10;66:5,8,9,12,24;
67:5,6;90:11;94:12;
96:3,9;104:9,11;105:7,
23;106:6,7
**emailed (2)**
70:4,6
**emails (4)**
7:24;66:10;97:2;
105:24
**Emergency (20)**
8:7;15:3;19:9,10;
25:22;29:15;30:10,17,
24;31:1;32:24;33:3,5;
46:13;76:10,16;85:24;
91:11;103:25;107:1
**emphasize (1)**
106:24
**employee (6)**
9:1;11:10;36:18,20;
37:1;82:10
**employees (2)**
9:5;96:6
**employment (2)**
11:5,6
**enacted (1)**
49:19
**end (17)**
13:16;24:11;46:4,5;
47:8,17;49:10;50:15,
20,22;51:11,16,22;
52:1,11;86:13,16
**ended (1)**
76:12
**endorsed (1)**

39:6
**ends (2)**
52:3,13
**Energy (5)**
9:15,17,18;10:3;
83:1
**engaged (1)**
55:18
**engagement (1)**
80:8
**engages (1)**
83:4
**enough (2)**
63:16;77:17
**entire (1)**
105:23
**entirety (1)**
33:12
**entitled (1)**
73:7
**entity (1)**
83:4
**Ernst (2)**
55:13;61:15
**establish (2)**
40:14,22
**establishes (1)**
39:8
**estimates (1)**
55:19
**even (4)**
17:12;72:9;75:11;
86:23
**event (5)**
25:23;34:13;37:17;
46:7;49:20
**everyone (1)**
14:10
**everyone's (1)**
39:4
**evident (1)**
78:11
**exact (5)**
8:6;13:15;30:21;
31:5;69:14
**exactly (5)**
21:11;32:20;77:15;
86:3;106:11
**EXAMINATION (3)**
7:14;68:15;80:1
**examined (1)**
7:13
**example (1)**
43:11
**Except (1)**
30:3
**exclude (1)**
44:18
**excluding (1)**
72:2
**exclusive (1)**
82:12
**Excuse (1)**

88:15
**executive (2)**
9:23;33:11
**Exhibit (41)**
13:18,20,23;14:3;
15:23,24;18:5,22;
21:15,17,23;24:2,4,7,
9;26:25;27:2,5,7;
31:19,21;32:6,13;38:1,
5,13;40:1,8;60:20,22;
65:21,23;67:16,18;
69:25;72:25;94:12;
95:24,24;96:10;104:14
**Exhibits (1)**
94:10
**exist (4)**
51:2;92:1;98:22;
99:18
**existed (4)**
10:25;46:22;52:20;
72:23
**existence (1)**
43:6
**exists (1)**
101:1
**expect (1)**
66:14
**expense (1)**
82:15
**experience (14)**
12:20;15:8;16:3,6,9;
17:7;19:16;25:18;
28:8;74:1;75:18;
84:23;85:25;93:25
**experiences (1)**
28:5
**expertise (2)**
17:8;84:5
**explain (1)**
35:17
**explicit (1)**
65:4
**explicitly (5)**
30:7;72:7;76:4;
86:21;90:7
**express (2)**
84:20;93:4
**expressed (1)**
37:24
**extended (1)**
9:24
**extent (8)**
42:12;44:13;56:7;
87:18;98:16;101:2,22;
103:11
**extremely (6)**
20:12;86:5,16,25;
87:10,16

# F

**FAB (1)**
108:9

face (1)
104:3
face-to-face (1)
55:2
fact (17)
16:4;17:15;19:10;
23:20;28:14;32:23;
34:4,15;41:8;44:2;
70:13;72:4;76:13,22;
96:16,21;99:12
fair (8)
13:8;17:13;19:18;
28:4;31:15;77:17;
79:21,23
fairly (1)
35:15
faith (3)
86:1;89:23;101:3
fall (1)
51:3
falling (1)
29:17
familiar (7)
8:20;41:20;52:16;
56:17;58:19;67:25;
68:1
farfetched (2)
87:5,7
feasible (2)
50:23,25
February (14)
27:14,19;29:19;
30:5;32:14;35:25;
38:14;40:3;43:11;
90:10,11;92:4,16,21
federal (1)
76:15
fee (2)
55:9,19
Feel (2)
25:10,12
fees (5)
9:22;54:13;55:17;
56:4;81:18
fell (1)
46:5
felt (1)
21:10
few (7)
34:24;63:12;64:16;
68:9,21;79:16;80:5
file (4)
53:13;54:20;56:3;
57:8
filed (5)
48:17;56:21;68:19;
77:18,23
filing (21)
16:12,16;20:20;
26:21;28:11;30:13;
46:16,18;52:18;56:5,
17,22;57:5,12,17,19;
70:10;71:4;76:13;

101:8;103:25
fill (1)
60:17
final (3)
38:25;58:22;59:1
finances (1)
10:21
Financial (14)
8:8;18:14;19:11;
20:20;29:5;31:1;75:8;
89:15;100:25;105:11;
107:15,19,24;108:4
financials (1)
66:14
find (2)
29:14;76:9
fine (2)
55:19;103:16
finish (2)
25:7;61:7
finished (1)
95:19
fire (1)
85:4
firm (10)
7:17;10:16;34:2;
41:6,14;85:5,19,20;
88:7;93:8
firmly (1)
26:19
firms (14)
13:12;14:17;15:8;
75:16,25;84:2,4,7,9,11,
16,24;85:3;88:19
first (17)
7:12;13:24;14:1,25;
21:7;24:15;30:1;32:1,
16;38:9,12;61:10;
74:23;82:6,7;94:11;
105:22
fiscal (1)
87:17
five (1)
32:2
fix (1)
28:15
Flowers (1)
68:18
focus (1)
97:5
FOIAble (4)
35:7;36:14,24;37:3
F-O-I-A-b-l-e (1)
35:8
folks (1)
86:1
follow (1)
48:8
followed (1)
50:11
follows (1)
7:13
follow-up (3)

101:9,10,14
Force (1)
105:13
forget (1)
32:20
form (6)
58:23;63:23;74:25;
79:4;98:11;99:2
formal (1)
15:1
formally (1)
41:1
format (1)
68:1
forms (1)
52:22
forth (1)
30:3
forward (6)
21:10;29:5,6;34:4;
65:4;69:18
found (2)
19:10,11
foundation (4)
86:8;105:9,13,18
four (1)
73:6
frame (3)
71:2;76:8;78:21
framework (1)
91:25
frankly (3)
22:19;26:17;97:4
free (1)
25:10,12;76:11
frequently (2)
13:2,3
Friday (4)
69:14,15,16,17
front (1)
44:22
fully (3)
39:6;42:12,17
fully-funded (1)
42:15
fund (8)
9:22;10:11;82:14,
16,16,19,21,22
funded (1)
42:17
funding (7)
62:5,15,17,18,20,25;
71:24
funds (4)
62:19;63:1;64:10;
72:11
further (7)
18:13;23:5;44:7;
68:6;75:8;79:25;82:14
future (6)
15:10;29:11;33:3;
62:16;63:17;80:17

G

gave (5)
8:15;32:22;82:13;
84:25;94:22
general (7)
29:4;41:13;42:1;
45:10;65:9;75:11;
108:6
generally (4)
61:14;65:3;75:20;
76:16
germ (1)
71:9
given (2)
8:16;91:1
giving (2)
40:13;79:20
Good (22)
7:16;33:1;42:6;48:6,
10;49:4,15;60:4;
61:23;80:3;82:10,15,
24;86:1;89:23;90:16,
22;95:3,7;97:16;
100:15;101:3
government (4)
11:12;82:10,15;99:3
Governor (62)
8:3;9:23;11:2,23;
12:9,9,24,25;13:9;
19:11,22;27:17,23;
28:21,22;29:20;30:16;
35:2;39:1,6;43:12;
44:11,18;45:19,24;
50:8;52:16,22;53:2,11,
12;54:19;56:2,15;57:4,
6;58:2,4;59:6;64:19;
67:6,7;68:24;72:2,10,
15;78:3;80:9;82:1;
92:9,22;93:8;94:16;
95:13;96:11,25;97:5,
14,18;104:2;106:25;
107:4
Governor's (12)
26:1;28:2;49:12;
56:14;57:11;59:18;
64:24;69:25;70:21;
71:18,23;91:23
great (3)
51:12;85:23;107:12
greatest (1)
84:6
ground (4)
43:14;79:13,13;80:6
group (3)
68:19;86:20;100:24
groups (1)
102:7
guess (5)
67:5;82:20;88:10;
91:1;92:4
guy (2)

51:1;97:24

H

habit (1)
78:23
half (1)
32:6
hand (1)
107:5
handed (2)
24:21;73:18
happened (2)
102:24;103:20
happening (1)
69:6
hard (1)
86:25
Harry (3)
105:12,14,19
hear (1)
52:8
heard (4)
52:5;102:1;106:13;
107:24
hearing (1)
38:25;67:2;105:22
help (5)
24:1;43:16;66:14;
84:8;85:21
helped (2)
23:5,7
helpful (1)
79:22
here's (2)
55:20;101:4
high (1)
46:5
higher (1)
50:22
highly (3)
22:20;23:17;71:25
hired (1)
13:13
hold (1)
85:7
home (1)
82:5
honest (1)
20:21
honestly (2)
48:9;55:7
hoping (1)
79:22
Hopkins (1)
23:20
hours (1)
38:24
house (1)
12:3
huh (1)
104:18
hundreds (1)

66:10
**hurt (2)**
23:4,7

# I

**idea (6)**
42:7;49:8;50:3;71:9;
87:4,6
**identification (2)**
12:13,15
**identified (2)**
27:10;84:4
**identify (5)**
13:23;24:9;31:24;
38:8;67:24
**Illinois (1)**
82:5
**impact (11)**
46:6;50:14;51:21;
66:15,21;71:7;96:6;
97:8,12,13;99:13
**impacted (7)**
47:17,23,24;48:19;
49:21;100:11,11
**implication (1)**
49:22
**implications (4)**
48:20;50:21;88:12;
99:19
**Implicitly (2)**
72:8,9
**importance (3)**
89:22;90:2,4
**important (9)**
34:4,8;56:4;90:14;
91:21;97:23,25;107:5,
7
**impose (1)**
56:16
**impressed (6)**
17:14,16;19:16;
20:5;25:17,18
**imprudent (1)**
33:2
**inauguration (1)**
82:6
**included (1)**
79:13
**includes (1)**
61:14
**including (3)**
74:18;94:17;108:9
**income (5)**
46:2;70:19;99:1,1,2
**in-court (1)**
16:10
**incredible (1)**
20:19
**incremental (3)**
47:8;49:9;100:10
**indicate (1)**
69:2

**indicated (10)**
16:14;20:5;26:3;
43:6;57:12;91:23;
92:11;93:6,10;100:15
**individual (1)**
43:17
**individuals (7)**
50:15;51:22;52:2,
12;55:16;80:23;81:1
**industry (1)**
98:10
**info (1)**
105:14
**information (6)**
34:13;35:20;44:15;
79:20;100:25;101:4
**initiate (1)**
54:25
**input (6)**
39:4,21,22;40:6,10,
13
**inquiries (1)**
100:5
**inquiry (1)**
72:14
**instead (1)**
46:3
**instructing (1)**
102:16;103:6
**insufficient (1)**
62:25
**intelligibly (1)**
101:5
**intend (1)**
85:16
**intended (3)**
33:24;79:4;85:15
**intent (2)**
16:21;20:19
**interact (1)**
101:5
**interaction (1)**
78:22
**interest (6)**
19:22;22:25;84:6;
90:18,24;105:13
**interested (6)**
19:13,15,18;20:16;
67:1;99:18
**International (1)**
7:19
**interpretation (1)**
42:4
**interviewed (1)**
76:10
**intimately (1)**
13:8
**into (6)**
15:5;31:13;71:20;
77:21;88:13;96:5
**introduce (1)**
35:19
**introduced (1)**

16:1
**investigation (2)**
99:12,13
**invitation (1)**
100:24
**invited (1)**
61:19
**invoice (1)**
83:16
**involved (2)**
12:12;103:8
**irrational (1)**
26:1
**issuance (1)**
70:10
**issue (9)**
61:18;64:18,21;
70:24;71:21;78:16;
94:19;95:25;105:15
**issues (7)**
34:3,24;43:16;
56:22;65:15;67:11;
89:16

# J

**Jack (3)**
80:3;83:25;84:22
**January (29)**
11:3;13:11,16,25;
14:6;19:13;20:4;
21:24;22:4,8,10,12;
23:23;25:3,15;29:25;
30:4;58:12;73:2;
75:13;80:10;81:12,19;
83:21;86:20;89:21;
106:9,14,19
**JD-RD (5)**
21:21;24:14;27:6;
32:1;38:10
**job (7)**
26:8;60:4;85:11;
92:12;100:15;107:9,9
**Johns (1)**
23:20
**join (2)**
61:19,20
**joining (1)**
25:25
**Jones (41)**
10:16;14:17,21,25;
15:12,14,20;18:1,18;
19:2,5,7;22:11;23:4,
11;41:6;44:25;45:6,8;
55:13;61:14;72:25;
73:15;75:24;81:8,8,13;
84:17;85:4,7,10,16,19,
20;86:4,19;87:3;
89:20;90:4;105:20;
106:12
**July (12)**
52:17;53:24;54:19;
56:2,11,15;57:13;61:6,

6;62:10;66:6;96:9
**June (15)**
58:13,16;59:8,13,20,
23;60:2,5,8,16;100:13,
16,22;101:10,16

# K

**keep (3)**
10:7;86:6;88:12
**keeping (5)**
15:10;20:24;33:11;
85:11;89:6
**Ken (2)**
81:15;83:25
**Kevyn (46)**
8:2;10:19;17:2;19:8;
23:6,18;24:16,21;28:7,
13;29:13;32:14;33:24;
34:9,10;36:15;38:13,
23;40:18;42:25;46:9;
49:1,1;54:6;68:23;
69:6;71:1;76:9;77:12;
78:22;79:1;85:23;
90:11,23;91:20,24;
92:13,19;93:2,6,11;
102:10;105:8;106:2,4,
12
**Kevyn's (1)**
28:2
**killing (1)**
22:15
**kind (6)**
26:17;35:22;69:10;
71:9;100:5;105:14
**knew (3)**
20:22;76:22;78:3,
25;80:22,25
**knowing (2)**
10:24;52:14
**knowledge (4)**
17:16;50:18,19;
57:21
**known (1)**
71:14

# L

**Lansing (2)**
7:2,9
**large (2)**
85:4;100:7
**larger (1)**
51:8
**last (7)**
15:16,18;18:11;
64:16;66:24;106:3,5
**law (11)**
7:17;10:16;13:12;
14:17;15:8;17:17;
28:5,9;41:6;76:15;
88:7
**lawsuits (2)**

56:21;68:20
**lawyer (1)**
7:17
**lawyer-client (4)**
44:14;87:19;101:23;
103:12
**lawyers (1)**
75:24
**lead (1)**
69:11
**leadership (2)**
9:24;16:24
**learn (1)**
21:6
**learned (2)**
21:8;26:14
**least (8)**
26:15;38:18;46:6;
57:10;71:11,20;76:22;
95:11
**led (1)**
99:23
**legal (17)**
15:15;42:4;57:25;
58:5;59:7,12,16,19;
60:1;62:3;64:20,24;
65:8,17;66:20;67:10,
14
**legislation (7)**
47:7;49:9,19;50:3,9;
71:10;72:5
**legislative (3)**
71:24;99:24;100:3
**letter (24)**
52:16,20,21,25;53:3,
5,6,8,11,12,14,16,18,
23;54:1,19,21;56:2,11,
12,15,15,19;68:24
**level (2)**
50:23;62:18
**levels (1)**
62:5
**liabilities (4)**
63:14;64:3,14;65:12
**liability (9)**
8:24;18:3;29:21;
30:10;45:16;67:12;
78:7;95:25;97:3
**lieu (1)**
99:4
**likelihood (1)**
89:14
**limited (1)**
8:24
**line (8)**
18:11;61:22;74:9,
13;75:7;95:7,16;98:23
**lines (1)**
18:18
**literally (1)**
74:9
**little (5)**
26:12,13;41:4;

81:16,21
**lives (1)**
98:4
**LLC (2)**
8:24;9:1
**LLP (1)**
7:18
**Loan (2)**
8:8;30:17,17
**lobbying (1)**
83:5
**lobbyist (5)**
82:16,17,19,21,22
**Local (3)**
8:7;93:17,18
**locate (1)**
43:10
**long (6)**
10:25;46:14;88:6,
18,25;89:2
**longer (1)**
41:15
**long-term (1)**
63:10
**look (20)**
25:13;32:5,7;66:10,
12;74:7,13;80:22;
86:11,13,22;90:8;
94:10,11;95:11,18,24;
97:8;104:12,20
**looking (15)**
14:3;21:12;29:11;
34:23;38:16;39:21,22;
40:6;49:6;51:4;80:19;
85:6;94:14,15;98:6
**lose (2)**
18:6;99:15
**losing (2)**
97:9;99:14
**lost (1)**
99:5
**lot (8)**
26:18;43:14,15;
48:18;64:17;79:13;
97:2;108:6
**lots (1)**
43:15
**low (10)**
46:4;49:10;50:15;
51:16,22;52:1,11;
71:25;100:5,8
**Lowenstein (1)**
80:4
**lower (5)**
47:8,17;50:20;51:9,
11

## M

**MacKenzie (2)**
55:13;61:16
**magnitude (1)**
31:11

**mainly (2)**
9:10;16:23
**major (1)**
78:10
**majority (1)**
50:19
**making (9)**
13:12;76:17;88:18;
89:21,22;90:2,4;102:9;
104:3
**man (5)**
22:16;41:1;86:2;
93:15,16
**management (2)**
15:3;17:1
**manager (14)**
19:9;25:22;30:24;
31:1;32:24;33:3,5;
46:14;76:10,17;85:24;
91:12;103:25;107:1
**manages (1)**
83:7
**managing (2)**
19:6;22:16
**manner (1)**
7:20
**man's (1)**
21:11
**many (3)**
9:12;51:15;78:25
**March (5)**
30:22;31:6,8,16,17
**mark (9)**
13:18;21:14;24:2;
26:24;31:18;38:1;
60:19;65:20;67:15
**marked (13)**
13:20;18:21;21:17;
24:4;27:2;31:21;38:5;
60:22;65:23;67:18;
69:24;104:14,17
**Martin (2)**
83:25;84:22
**material (2)**
51:7;99:19
**materialized (1)**
51:24
**matter (5)**
12:23;31:14;37:5;
64:14,15
**May (9)**
8:5;24:1;34:25;
44:14;58:17;66:16;
74:20,20;76:8
**Maybe (3)**
54:5;71:10;104:12
**Mayor (21)**
32:18;34:6,7,8,13,
16;36:15,17;37:6,13,
14,16;39:6,16;90:13,
15;91:17,18,21,23;
104:2
**Mayor's (6)**

34:12;35:7,11;36:2,
11,19
**McKenna (3)**
88:6,18;89:2
**mean (11)**
14:22;17:21,22;
35:17;36:13;60:5;
61:13;62:17,20;95:6;
103:15
**meaning (2)**
57:5;92:9
**meaningful (1)**
51:13
**means (5)**
18:13;74:14;75:7;
76:1;77:13
**meant (2)**
81:2;98:4
**mechanism (1)**
84:15
**meet (9)**
27:13;35:21;36:15;
37:14,25;52:3,13;
81:11;91:21
**meeting (62)**
13:11;14:5,9,15,21;
15:2,16,21;17:3,19,20,
20;18:2,24;19:2;
20:21;22:11;27:16,19,
21;28:1,20;29:19;
30:5;32:22;35:6,10,11,
18;36:2;37:6,7,9,10,
11,12;43:12;55:2;60:3,
5,6,9;81:10;83:21,24;
84:11,23;86:20;88:20,
22,23;89:21,25;90:1,
12;91:2;100:13,13,19;
101:7,10,16
**meetings (7)**
12:18,24;13:6;
29:23;94:22;101:10,15
**members (8)**
13:7;16:20;26:13;
54:11;91:7,10,14;
107:24
**memory (1)**
79:7
**men (1)**
92:2
**mentioned (7)**
11:4;26:4;34:7;50:4;
55:17;78:13,14
**mentioning (1)**
37:4
**message (2)**
86:19;96:11
**met (5)**
34:14;36:11;61:17;
64:7;94:17
**MI (11)**
8:20,23,24;9:1,9,12,
16,25;11:1,15,19
**Miami (3)**

22:16;23:21;26:8
**mic (1)**
18:6
**Michigan (23)**
7:2,9;11:10,12,18;
13:25;16:4;17:10,11,
16;18:15;28:8;41:20;
44:2;45:1,11;56:23;
57:2;74:2;75:9;76:1,3,
6
**microphone (1)**
52:6
**mid (5)**
30:21;31:6,8,16,17
**middle (3)**
38:12,18,19
**might (15)**
26:9;35:2,22;47:25;
55:21;66:20;69:15;
71:10;72:16;81:5;
92:19;96:19;98:21;
99:24;104:11
**Miller (3)**
55:14;61:15;81:14
**Milliman (1)**
61:16
**mind (1)**
15:10
**minister (1)**
21:9
**misleading (1)**
28:17
**missed (1)**
94:7
**misspoke (1)**
75:3
**model (2)**
64:11;65:10
**models (1)**
97:3
**modifications (1)**
39:18
**modify (2)**
44:17;45:6
**moment (1)**
25:9
**money (6)**
49:22;63:16;64:7,9;
71:20;72:18
**monies (6)**
9:25;10:1,4,12,15,18
**month (3)**
49:23;78:12;101:7
**months (2)**
14:22;64:16
**more (9)**
43:2;53:21;63:11;
73:5;78:11,11;81:21;
83:21;85:4
**Moss (3)**
106:2,4,10
**most (2)**
28:6;106:7

**mother (1)**
17:9
**movement (1)**
29:9
**much (4)**
20:23;23:22;56:6;
82:12
**Muchmore (6)**
49:11,17,18;50:2;
70:22;72:15
**multipage (1)**
38:8
**municipal (1)**
75:19
**myself (1)**
34:23

## N

**name (6)**
7:16;10:8;37:23;
68:17;83:14;106:13
**names (1)**
94:22
**nationalizes (1)**
105:15
**nature (1)**
12:22
**navigate (1)**
86:3
**near (4)**
54:2,4,4;86:24
**necessarily (1)**
81:4
**necessary (2)**
19:12;33:22
**need (13)**
28:14;32:9;63:1,14;
64:3;65:13;101:5;
104:19;105:1,3;
106:24;108:7,12
**needed (1)**
18:12;75:7
**needs (1)**
15:5
**negative (2)**
66:15,21
**negotiate (3)**
29:10;86:1;101:2
**negotiated (1)**
78:9
**negotiation (1)**
60:10
**negotiations (8)**
20:25;89:23;90:2,5;
102:6,24;103:8,9
**neither (1)**
23:4
**NERD (7)**
10:8,12,15,21;11:1;
81:16;83:17
**N-E-R-D (1)**
10:9

**net (10)**
47:8;49:10;98:10,
17,20;99:4,16,17,25;
100:10
**nets (1)**
98:22
**network (2)**
80:21,21
**New (5)**
9:15,16,18;10:3;
83:1
**newspapers (1)**
76:20
**next (8)**
19:17;20:7;24:22,
24;61:22;71:15;86:22;
95:24
**night (1)**
26:15
**nine (1)**
14:22
**noise (1)**
48:18
**nominated (1)**
93:8
**none (1)**
103:20
**nonetheless (2)**
40:20;67:8
**nonfinal (1)**
52:22
**non-taxpayer (1)**
82:15
**Nope (2)**
48:12;83:13
**nor (1)**
23:4
**note (4)**
35:6,13,18;74:19
**notes (2)**
74:20;86:23
**November (1)**
80:13
**number (7)**
15:8;34:2;48:22;
51:6,11;65:25;73:9
**numbers (3)**
46:23;51:1,7

**O**

**Object (8)**
44:13;63:23;86:8;
101:21;102:12,15;
103:5,13
**objection (4)**
45:3,13;87:18;98:11
**obligations (5)**
62:16,16;63:17,18;
64:6
**obtained (1)**
47:2
**occasion (8)**

43:2,2,3,4,25;53:21,
22;56:8
**occasions (1)**
44:18
**occur (4)**
57:12,23;70:14;
96:19
**occurred (9)**
57:13,17,19,20,22;
71:3;88:22,24;101:15
**October (3)**
7:1,5;80:13
**off (3)**
11:18;17:24;68:11
**offered (1)**
85:17
**office (6)**
9:23;11:17,18,19;
22:16;57:11
**officers (1)**
83:10
**offices (1)**
11:16
**official (1)**
12:24
**often (1)**
13:4
**old (1)**
79:17
**once (6)**
46:9,10;56:5;82:2;
98:23;100:25
**One (40)**
9:13;14:17;20:18;
21:4,6;26:19;35:19;
36:5;37:16;38:15,16;
39:5;40:4;42:5,16;
43:2,2,3,24;46:1;
49:12;53:15,21,21,22;
68:19;73:5;74:22;
75:15,24;78:15;85:9;
88:19;90:9;92:6;97:7;
104:12,19;108:10,12
**one-on-one (6)**
17:19,22,23,24;
102:21;103:2
**one-page (5)**
21:20;27:5,6;60:25;
66:2
**ones (1)**
14:12
**only (5)**
14:12;49:12;50:17;
77:25;98:22
**operating (1)**
29:6
**opine (3)**
89:9,13;91:20
**opined (3)**
89:8,10,18
**opinion (14)**
12:19,19,21;42:15;
63:6,7,8,9;64:10;

84:22,25;85:2,20;
100:9
**opportunity (1)**
43:18
**opposed (1)**
55:19
**optimistic (1)**
92:19
**optimum (1)**
29:8
**option (1)**
29:13
**options (4)**
29:11;66:16,20;
75:17
**oral (1)**
87:2
**order (5)**
12:3;31:11;51:13;
60:16;101:5
**organization (1)**
8:20
**organizational (1)**
9:10
**organizing (1)**
83:24
**original (2)**
39:16;82:1
**Orr (114)**
8:2;10:19;17:2,19;
18:2;19:8,13,15,22;
20:6,8,16;23:18,23;
24:16,21;25:2;27:13,
22;29:20,23;30:1,6,15,
23;32:14;33:15,18,19,
24;34:9;35:11;36:10,
23;37:4,8,13,15,19;
38:14;39:18,23;40:10,
18;41:5;42:25;43:12,
19,25;44:10;45:15,23;
46:9,11;47:1,2;48:2;
53:11,12,18,25;54:18;
55:15;56:2,8,10;58:11;
59:22;60:1,8;65:16;
68:23;69:20;70:18;
72:14;73:22;74:4;
76:9,23;77:12;78:16;
85:23;86:4;87:14;
88:2,4;90:11,12,15,20,
23;91:2,8,17,18,20,24;
92:15;96:11,15,19;
97:1,15,19,21;100:15,
19;102:10,20;103:23;
106:2,4,14,23
**Orr's (5)**
31:9;33:21;37:23;
96:4;106:12
**others (2)**
85:6;94:17
**otherwise (4)**
18:15;51:21;75:9;
76:2
**ought (1)**

79:19
**out (27)**
11:16,17;16:21;
20:24;33:20;35:21;
60:17;63:1;64:7;
73:18;77:10;82:14;
85:11,17,21;86:2,6;
87:24;88:12,14;89:6,
11,12,15;92:3;99:14;
100:24
**out-of-court (7)**
16:4,6,9;86:14,23;
87:17;89:16
**Outside (22)**
45:18,25;57:5,25;
58:4;59:6,12,19;60:1;
62:2;64:20,24;65:8,17;
66:19;67:10,14;83:17;
87:21;88:3;97:4;
103:20
**over (3)**
64:15;79:16;80:6
**overcome (1)**
107:12
**oversight (1)**
107:21
**overtures (1)**
107:25
**own (3)**
8:3;34:1;80:21
**owned (1)**
8:25
**owners (1)**
9:7

**P**

**PA (2)**
30:25;31:12
**page (20)**
13:24;14:1;18:5,8,
11;32:1;38:9,12;73:9,
11;74:7,9;75:3,5;
86:11,22,22;104:23;
105:7,8
**pages (2)**
73:4;104:22
**paid (5)**
11:5,7;15:15;63:1;
78:8
**papers (1)**
91:13
**paragraph (3)**
61:17;66:12;94:15
**parameters (1)**
15:4
**part (16)**
11:22;12:9,18,23;
21:9;34:17;41:4;
72:21;73:6,16,22,24;
79:20;87:2;89:11;
96:23
**participate (2)**

52:24;58:20
**particular (3)**
18:11;23:6;92:18
**particularly (1)**
77:6
**parties (1)**
100:21
**partner (6)**
19:7;22:16;41:6,9,
15,17
**Partners (12)**
8:21,23,24;9:1,9,12,
16;10:1;11:1,15,19;
22:18
**partnership (5)**
32:17,19,21;39:15;
41:11
**parts (1)**
74:3
**passing (1)**
78:12
**passion (2)**
17:15;28:3
**past (1)**
107:13
**pause (1)**
108:13
**pay (3)**
11:19;81:17,18
**pays (1)**
11:1
**PBGC (3)**
98:17,18;99:4
**peace (1)**
90:15
**pejorative (1)**
76:25
**pension (39)**
18:3;29:21;30:10;
42:15;45:16;46:7,23,
24;47:24;50:16,21;
51:8,9,11;61:18;62:15,
17,18,18;63:14,14,17,
18;64:3,10,14;65:12;
67:12;76:14;78:1,6;
94:18;95:25;96:4;
97:3,3;98:24;99:2,5
**pensioner (1)**
46:2
**pensioners (12)**
46:24,25;47:16,23;
48:22;50:20;51:2;
98:3,8,13,16;100:11
**pensions (41)**
18:3;29:21;30:9;
41:22;42:12;44:4;
46:21;48:18,24;49:21;
51:14,15,23,25;52:10;
61:24;62:1,5,8,12;
63:1,10;64:5;66:16,22;
71:5;72:19;73:6;
77:21;78:18;95:4,8,14;
96:13,16,20,21;97:8,9;

99:15,21
**people (20)**
14:20;15:13,20;
18:18;26:18;27:10,13;
42:24;49:10;51:15;
52:1,11;60:9;77:3,13;
80:22;97:9;98:10;
99:13,14
**perform (1)**
11:8
**performed (1)**
12:16
**perhaps (1)**
32:21
**period (2)**
62:11;82:4
**permission (7)**
19:8;22:21,23;
25:19;53:13;54:20;
56:3
**person (4)**
36:16;47:22;83:14;
93:25
**personal (9)**
35:7,12;36:3,11,19,
21,21,24;64:2
**perspective (2)**
90:14;91:19
**pertains (1)**
76:6
**Peter (1)**
7:16
**petitioning (1)**
77:14
**phone (2)**
22:6;25:2
**phrase (1)**
36:13
**piece (2)**
106:3,5
**pitch (6)**
13:12;14:5,18;15:1;
73:2,16
**pitches (1)**
75:23
**place (5)**
16:24;27:19;64:8,9;
79:16
**placed (1)**
106:20
**plaintiffs (1)**
68:18
**plan (3)**
70:11,12;73:8
**planned (2)**
54:14;57:23
**planning (1)**
80:17
**plans (1)**
23:22
**play (2)**
11:23;83:24
**played (2)**

11:22,24
**please (2)**
7:10;61:8
**pm (7)**
7:3,6;27:16;68:11,
14;108:19,20
**pocket (1)**
79:10
**point (23)**
29:13,15,16;33:5;
34:8;41:5;55:19;
71:17;72:2,13;74:18,
19;75:11,15;76:17,17,
22;77:18;79:8;92:7,
15;93:6;95:12
**pointed (1)**
67:1
**political (2)**
104:1;106:16
**poor (1)**
34:22
**portion (1)**
27:7
**portion (9)**
9:3;19:9;23:10;40:3;
71:19,23;72:16;76:23;
93:9
**possibility (3)**
28:18;30:13;77:2
**possible (4)**
28:15;47:6;77:13;
91:6
**potential (15)**
16:11,14;19:9,14,19;
20:7,16;23:8;26:21;
28:10;37:14,15;66:15,
21;80:24
**poverty (1)**
98:23
**power (1)**
85:5
**practical (8)**
48:20;49:21;50:14;
51:19;71:7;97:8;
99:12,19
**practice (3)**
76:19;86:17;87:1
**preceded (1)**
68:20
**predominantly (1)**
73:25
**preference (1)**
84:20
**preferred (2)**
16:5;86:15
**premise (1)**
11:18
**preparation (4)**
8:13;52:24;53:2;
58:20
**prepare (1)**
7:20
**prepared (1)**

57:11
**presence (21)**
44:19;45:18,25;
57:25;58:5;59:7,12,15;
60:1;62:2;64:20;65:8,
17;66:20;67:10,14;
87:22;88:3,19;103:20;
104:6
**present (8)**
27:21;72:3;101:9,
25;102:3,13;103:3,18
**Presentation (15)**
13:24;15:22;22:12;
25:17;60:4;73:7,22,25;
74:18;75:12;85:7;
86:11;87:3;88:18;
89:21
**presented (2)**
58:11;73:17
**presenter (1)**
88:16
**presenting (2)**
73:15;100:16
**president (1)**
9:4
**Press (1)**
76:11
**pressure (1)**
40:17
**presumptuous (1)**
41:4
**pretty (3)**
26:3;87:5;100:8
**previous (1)**
75:4
**Price (1)**
84:24
**principals (2)**
55:12;88:6
**prior (15)**
15:15,16;16:15;
28:23;29:1;30:25;
38:24;56:21;57:13;
80:10;81:10,13;84:23;
100:3;103:23
**priority (1)**
106:20
**private (5)**
10:23;37:6,9,11;
98:10
**privately (1)**
36:15
**privilege (1)**
102:14
**privileged (2)**
44:14;103:13
**probably (3)**
13:6;50:21;107:9
**problem (5)**
28:15;71:12;77:20;
78:1,6
**problems (2)**
20:20;87:17

proceeding (1)
16:14
**proceedings (1)**
108:13
**process (8)**
28:12;34:12;79:12;
80:13,15;89:12;104:2;
107:18
**professor (1)**
17:10
**program (2)**
15:3;16:25
**programs (1)**
99:4
**project (2)**
105:11,16
**projections (1)**
55:10
**proper (1)**
29:9
**Proposal (9)**
58:16;59:8,13,20,22;
60:2;84:9;100:16,22
**proposing (1)**
49:18
**pros (1)**
79:18
**prospect (1)**
30:12
**prospects (2)**
89:5,8
**protected (2)**
18:15;75:9
**protection (1)**
42:16
**protects (2)**
42:12;78:17
**protocol (1)**
26:6
**provide (12)**
9:16;11:1;12:19;
15:2;35:19;39:5;47:7,
16;48:2;49:9;100:21;
107:20
**provided (6)**
9:23;15:14,18;
39:16;103:18;105:24
**Provides (2)**
9:10;104:1
**provision (8)**
41:20,24;42:2,7,9;
44:3;76:3;78:17
**public (2)**
30:3;71:5
**publicity (1)**
76:12
**publicly (4)**
37:7;62:14;72:15;
76:11
**pulled (1)**
82:2
**pure (1)**
96:23

**purported (1)**
52:17
**purpose (1)**
34:10
**purposes (1)**
92:5
**put (7)**
16:24;41:3;69:10;
71:2;72:18;78:21;
100:24
**putting (2)**
55:18;71:19

## Q

**qualifications (1)**
16:2
**quality (1)**
20:13
**quote (1)**
34:17

## R

**race (1)**
107:10
**raise (1)**
43:15
**rate (1)**
82:13
**rather (1)**
76:11
**rationale (1)**
88:11
**read (16)**
18:12,19;24:13;
35:5;41:25;42:9;
60:17;66:13,24;76:19;
91:13;96:9;100:2;
104:20;105:2,3
**reading (6)**
25:7;33:17;40:24;
61:7;95:6,16,17;105:6
**reads (1)**
74:9
**real (4)**
51:21;52:15;98:4,4
**Really (5)**
20:18;26:8;90:9;
104:22;106:5
**reason (2)**
54:10;71:8
**reasons (9)**
20:14,15;21:13;
26:4;74:22;79:14,14;
85:10;106:16
**recall (106)**
8:6;13:15;14:10,12;
16:13,19;17:2,5;18:4,
17;19:23;23:25;24:19;
27:11,11,25;28:12;
30:7,8,14;31:5,6;
32:11;35:3,15;37:10,

11;38:21,22;42:24;
44:25;46:1,14;49:7;
53:14;54:2,5,8,10,24;
55:1,7;56:18;59:2,3;
60:8,14;61:5,21;62:4,
7;64:22;65:1,14,14;
66:5,9;68:25;69:4,5,8;
71:22;72:9,13;73:15;
74:18,19;75:11,15,21,
22;76:5,8,16,21;78:15,
19;79:16;84:14;85:15;
86:21;87:2,6,8,10,12,
14,14,21;88:1,2;89:1,
20;90:7;91:14;92:23;
94:23;96:14;97:17,18,
19,20;100:23,24;
101:6,19
**recalled (1)**
17:12
**receive (5)**
9:25;10:1,3,12;
66:14
**received (1)**
97:12
**receives (2)**
10:15,18
**receiving (3)**
61:5;66:5;99:21
**recent (1)**
106:7
**recess (1)**
68:12
**recognized (1)**
107:8
**recollection (19)**
14:4,14,15,20,23,24,
25;15:20;20:11;22:1;
24:2,23;25:5,13,16;
31:12;48:7;55:4;65:5
**recommend (1)**
19:12
**recommendation (3)**
37:18;85:23;91:23
**recommendations (1)**
96:25
**recommended (4)**
25:23;30:16;33:25;
36:17
**record (14)**
7:6;13:23;18:12;
27:5;31:24;38:8;42:5;
60:25;68:11,13;89:23;
90:2,5;108:11
**recount (2)**
20:1;55:5
**recruit (1)**
41:2
**recruiting (2)**
40:17;43:22
**recruitment (3)**
43:14;79:12;107:17
**reduce (1)**
51:15

**reduced (10)**
47:25;50:16;51:14,
23;52:1,12;63:15,19;
64:4;65:13
**reduction (5)**
46:7;50:21;51:6,7;
56:6
**ref (1)**
73:5
**refer (8)**
10:7,8;21:22;33:7,
22;38:11;40:7;81:5
**reference (2)**
32:16;74:4
**referenced (1)**
75:6
**references (1)**
73:6
**referred (1)**
104:23
**referring (11)**
10:11;15:23;16:22;
34:23;39:14;61:12;
78:24;94:20,24;95:10;
106:5
**refers (6)**
27:12,16;33:15;
41:22;61:10;105:12
**reflection (1)**
23:13
**refresh (2)**
14:4;22:1
**refreshes (1)**
24:23
**refusing (1)**
96:11
**regard (3)**
23:7,8;104:2
**regarding (1)**
67:11
**regular (2)**
12:23;78:25
**Reinvent (7)**
9:15,18,19,20,21;
10:3;83:1
**Reinvest (2)**
9:17,19
**rejecting (1)**
74:15
**relate (2)**
71:20;98:24
**related (4)**
12:17;56:22;67:11;
71:1
**relates (2)**
43:17;44:3
**relation (2)**
31:6,8
**relationship (9)**
34:5,16;35:22;
37:16;90:16,20,23;
91:17;92:1
**relative (3)**

55:9;62:5;72:17
**relatives (1)**
17:11
**relevant (7)**
15:8;47:3,4,5,10,11,
12
**relief (1)**
47:16
**remedy (2)**
99:25;100:3
**remember (13)**
30:21;31:17,17;
48:9;60:13;69:14;
70:3,7,9;85:13;89:7;
97:10;100:17
**reminder (1)**
85:25
**reminiscing (1)**
28:8
**render (1)**
12:21
**rent (1)**
11:19
**repeat (2)**
52:9;77:22
**repeating (1)**
10:7
**report (3)**
101:14;102:9;103:9
**reported (1)**
62:14
**reporter (1)**
38:2
**reporting (5)**
94:16;96:16,20;
102:5,23
**reports (2)**
82:3;96:3
**represent (5)**
7:18;53:23;68:17;
80:4;88:9
**representatives (1)**
96:12
**request (4)**
56:3;69:3;84:8;
107:19
**requested (6)**
46:1,20,22;48:2;
53:13;100:20
**requesting (1)**
54:19
**require (2)**
103:12;107:11
**requires (1)**
86:24
**requisite (1)**
92:10
**rescue (1)**
29:7
**residence (1)**
93:23
**resident (5)**
93:19,21,24;94:3,5

**residents (1)**
72:17
**resolve (2)**
88:14;89:15;107:12
**resort (2)**
16:16,18
**respond (1)**
44:5
**response (3)**
20:10;49:2;78:14
**restructuring (18)**
11:25;12:1,7,11,14,
22;13:13;16:7;17:8;
29:8;54:12;55:8,11;
73:8;84:3;89:16;
93:25;104:4
**restructurings (2)**
16:10,10
**retained (4)**
45:7;84:21;89:2,4
**retiree (1)**
71:21
**retirees (5)**
68:19;70:19;76:14;
77:6;96:6
**retirement (1)**
63:12
**retract (1)**
22:24
**retrieving (1)**
52:6
**returning (1)**
82:4
**review (8)**
8:1;29:14;32:25;
33:10;34:19;36:7;
58:25;59:5
**reviewed (3)**
7:24,24;8:2
**reviewing (1)**
80:9
**RFP (2)**
15:5,10
**Rich (3)**
95:20;98:12;105:1
**Richard (2)**
7:8,11
**right (38)**
14:13;15:19;17:24;
18:10;19:18;21:13;
22:4;24:18;32:10,12;
38:19;53:13;54:5;
68:23;69:16,17;71:8;
72:24;75:14,22;76:21;
77:7;79:20,24;80:14,
20;81:4;83:15;87:25;
90:6;91:1,12;97:22;
98:17;101:12;106:7;
108:10,14
**rights (2)**
76:14;96:6
**Robert (1)**
8:4

**role (8)**
11:24;21:13;23:6;
41:1;46:15;80:25;
83:24;84:17
**Romney (2)**
11:17,20
**roughly (1)**
46:25
**running (1)**
92:7

## S

**safety (11)**
47:8;49:9;98:10,17,
20,22;99:4,16,17,25;
100:10
**same (13)**
14:7;20:3;24:16;
42:16;44:22;45:3;
48:14,16;65:2;70:24;
90:19;91:24;95:16
**Sandler (1)**
80:4
**savings (2)**
51:13;99:20
**saw (7)**
12:20;41:11;59:5;
69:24;84:12,15;104:9
**Saxton (1)**
14:11
**saying (13)**
28:23;33:18,20;
37:11;40:20;60:9;
65:14,15;79:17;87:3,6;
97:20;99:7
**scale (1)**
100:8
**schedule (5)**
26:5;27:12,16;
57:11,15
**scheduling (1)**
26:5
**school (3)**
17:17;28:5,9
**scope (4)**
54:12;55:9;56:5;
57:5
**scoring (2)**
84:10,15
**second (3)**
21:5,6;22:5;33:7,7;
61:17;66:12;94:15;
104:23,24;105:8;
108:10,12
**Section (11)**
41:21;42:20;44:1,8,
12,22;45:1,8,11;56:23;
57:2
**seeing (2)**
19:15;66:9
**seek (2)**
35:22;107:15

**seeking (2)**
42:5;68:24
**selection (3)**
80:12,15;84:17
**send (3)**
38:24;40:5;96:11
**sense (4)**
50:13;51:20,25;
52:10
**sent (11)**
38:20;53:12,15,19;
54:3,5,18;56:2,11;
67:5;68:23
**sentence (16)**
22:5;28:19,24;
32:17;33:8,14,18,20,
22;34:17,18,21;35:5;
61:10,22;66:24
**separate (1)**
34:2
**serve (2)**
33:25;85:25
**service (2)**
54:13;78:8
**services (10)**
9:10,16,22;11:2;
12:22;15:14,17;55:9;
72:17,19
**set (4)**
15:2;36:16,17;98:6
**Seven (1)**
61:2
**several (3)**
29:16;38:23;85:3
**severed (1)**
41:14
**shape (1)**
79:4
**share (2)**
18:24;67:9
**shared (2)**
16:23;92:22
**sharp (1)**
64:15
**SHERWOOD (22)**
24:10;65:25;80:2,3;
82:25;86:10;87:20;
88:17;94:9;95:22,23;
98:15;102:4,16,19,23;
103:7,14,19;104:16;
105:4;108:14
**short (2)**
29:18;39:12
**show (12)**
13:17;21:14;24:1;
26:24;31:18;38:2;
58:10;60:19;65:20;
67:15;73:4;104:12
**showed (1)**
74:8
**showing (2)**
39:17,18
**shown (4)**

**72:24;73:4;75:3,5**
**shut (1)**
26:3
**signed (4)**
52:17,22;53:6,11
**significant (3)**
65:15;84:5;85:25
**significantly (11)**
61:24;62:2,8,13;
63:2,9;95:4,9,14;
96:17,22
**signs (2)**
83:14,17
**similar (1)**
36:5
**Simon (1)**
7:18
**simply (5)**
15:7;29:13;47:20;
67:24;100:12
**single (1)**
83:20
**sit (3)**
49:24;77:3;101:2
**situation (5)**
26:6,17;61:22;95:3;
96:24
**situations (1)**
75:19
**situation's (1)**
95:7
**sleep (1)**
26:15
**slide (2)**
86:14;87:11
**smack (1)**
38:18
**small (1)**
78:23
**Snyder (4)**
8:3;28:21;82:1;
95:13
**solution (3)**
86:24;87:17;106:15
**solutions (2)**
16:5;86:15
**solve (1)**
20:19
**SOM (2)**
61:1;66:2
**somebody (5)**
20:22;46:21;59:4;
70:5;104:10
**someone (5)**
36:16;60:17;81:4,5;
87:3
**somewhere (1)**
76:9
**son (2)**
21:8,9
**soon (1)**
35:15
**sorry (12)**

**9:19,21;15:3;21:4;**
24:13;36:10;51:20;
74:11;89:25;94:2;
95:22;96:18
**sort (7)**
38:18,19;55:20;
84:15;89:16;92:6;
106:20
**sound (1)**
80:20
**source (4)**
81:4,9,14,15
**sources (3)**
80:20;81:2,13
**South (2)**
7:8;93:23
**speak (28)**
8:12;17:19,22;19:8,
21,24;23:23;44:11,21;
45:7,10,15;49:8;50:2;
53:2,5,18,25;58:4,8;
59:6,10,18,22,25,25;
60:16;66:19
**speaker (2)**
74:20;86:23
**speaking (3)**
22:25;44:25;65:3
**specialized (1)**
84:2
**specific (8)**
12:21;28:20;62:7;
74:3,19;75:15;79:17;
81:23
**specifically (5)**
16:13,19;19:6;76:6;
94:24
**spectrum (9)**
47:9;49:10;50:15,
20,23;51:16,22;52:1,
11
**speculation (1)**
96:23
**spell (1)**
33:20
**spent (2)**
17:13;28:6
**spoke (14)**
17:2;20:3;22:14;
24:15,16,21,24;25:2;
44:18;49:11,17;53:20;
54:20;59:15
**spoken (4)**
18:17;64:19,23;
65:16
**spread (1)**
76:12
**spring (1)**
8:10
**square (1)**
79:17
**staff (20)**
11:2,23;12:24,25;
13:7,9;35:2;45:23,24,

**24;49:5,12;50:8;59:19,**
19;64:24;65:2,17;
70:22;92:9
**stakeholders (1)**
20:25
**stamp (2)**
24:13;31:25
**stamped (9)**
14:1;21:20;24:14;
27:6;31:25;38:9;
60:25;66:2;67:21
**stand (2)**
20:23;22:17
**standard (2)**
51:5,12
**start (5)**
80:10;104:19,22,25;
105:7
**State (22)**
10:1,4;11:10;14:8,
12;15:15;29:15;39:9;
40:15,16,19,23;41:21;
45:11;47:7;56:20;
57:10;71:19;72:16;
78:2,2,17
**statement (1)**
41:3
**statements (1)**
18:17
**status (1)**
101:14
**statute (1)**
30:25
**stay (7)**
16:21;85:17,21;
86:2;88:14;89:12,14
**staying (2)**
82:8;89:11
**step (3)**
26:18;35:20;85:8
**Stephen (2)**
19:6;24:16
**steps (1)**
49:18
**Steve (10)**
22:2,6,7,9,14,15;
23:2;25:19;81:10,11
**still (7)**
34:1;35:24;40:2;
41:5;89:15;92:6,17
**stood (1)**
99:15
**stopped (1)**
100:5
**strategies (1)**
75:17
**strategy (2)**
9:11;72:11
**Street (1)**
7:9
**stress (1)**
90:1,4
**stressed (1)**

**89:22**
**strike (3)**
31:7;44:10;62:9
**string (4)**
105:23;106:6,7,8
**strong (1)**
34:15
**student (1)**
17:18
**subject (9)**
42:18;43:25;45:19;
46:12;48:14,15;56:6;
65:18;102:14
**submit (1)**
83:16
**substantive (1)**
80:17
**success (2)**
37:17;87:23
**successful (1)**
92:3
**sufficient (2)**
50:23;62:22
**sufficiently (1)**
100:1
**suggest (4)**
28:18;79:3;106:14,
18
**suggested (1)**
87:15
**suggesting (2)**
99:3,6
**summarily (1)**
26:3
**summary (3)**
32:17,20;39:15
**support (9)**
105:11,15;106:25;
107:3,4,15,20;108:3,8
**supported (1)**
91:8
**Sure (11)**
13:10;14:10;25:8;
30:7;52:5,10;67:25;
73:13;102:25;107:2;
108:11
**surgeon (2)**
23:20;26:6
**surprised (1)**
69:8
**surrounding (1)**
93:21
**survive (1)**
65:10
**sustainability (1)**
65:9
**sustainable (3)**
62:15;63:10;64:11
**sworn (2)**
7:10,12
**system (1)**
84:10

## T

**table (1)**
77:13
**talent (3)**
9:11;12:12,15
**talk (18)**
20:8;22:22,24,24;
25:19;26:10,16;29:5,
21;30:12;41:12;54:12;
77:4;79:8;80:24;
81:16;92:2;105:10
**talked (14)**
16:1,2,5,8;17:6,7,8,
9;30:9;70:9,11,21;
76:13;97:14
**talking (8)**
10:10;28:7,12;70:4;
72:10;97:18,19;105:8
**talks (4)**
23:3;86:14;90:12;
105:9
**Task (1)**
105:12
**taught (1)**
75:19
**teacher (1)**
21:8
**team (11)**
9:24;16:20,22;
26:13;33:11;54:12;
55:9,11;82:12;88:14;
97:6
**TECHNICIAN (5)**
7:5;18:7;68:11,13;
108:18
**Tedder (1)**
61:19
**telephone (5)**
25:14;29:25;55:2,3,
6
**telling (1)**
95:13
**tenure (1)**
107:1
**term (3)**
40:16;100:23;107:2
**terms (6)**
12:21;20:24;76:25;
78:5,6;100:2
**testified (19)**
7:13;20:15;22:9;
67:13;68:22;70:16;
71:6;78:14;80:12;
81:24;85:14;91:20;
92:5;94:21;97:3,7,11;
98:2;100:14
**testify (2)**
68:3;107:3
**testifying (1)**
85:13
**testimony (6)**
54:17;80:9;97:1,10,
17;100:3
**thanked (1)**
23:2
**thankless (1)**
107:9
**thereafter (1)**
31:14
**therefore (2)**
62:24;63:13
**thinking (6)**
35:1,3;47:24;71:13;
79:19;80:16
**third (2)**
35:5;98:1
**though (1)**
104:18
**thought (18)**
23:16,21;34:12;
35:1;38:24;47:3,10;
60:3;84:5,23;85:4;
91:20;93:2,4,11;97:23,
25;100:15
**thoughts (3)**
66:25;67:9,11
**threatened (2)**
74:10,14
**three (2)**
27:22;29:20
**three-page (1)**
31:24
**Thursday (1)**
66:13
**ties (4)**
17:9,11;41:14;74:1
**timed (1)**
38:15
**times (2)**
61:16;86:5
**timetable (1)**
92:23
**timing (2)**
57:4;69:9
**today (5)**
12:5;20:15;49:24;
67:13;107:14
**Today's (1)**
7:5
**together (3)**
15:7;82:3;91:22
**told (10)**
23:2;25:16;32:23;
33:8;37:20;48:25;
49:3;51:10;60:3;
105:13
**Tom (1)**
14:11
**took (1)**
79:15
**top (4)**
24:9;92:16;106:6,7
**topic (1)**
100:17

**tough (1)**
104:3
**toward (3)**
13:15;50:22;51:8
**towards (1)**
90:20
**track (1)**
39:10
**traitor (1)**
107:10
**transition (1)**
82:4
**translate (1)**
96:5
**transpired (1)**
16:15
**Treasurer (2)**
39:7;92:10
**Treasury (2)**
14:11;16:23
**trigger (2)**
79:11,17
**triggered (1)**
79:7
**true (2)**
60:15;86:4
**trumped (1)**
76:14
**trusted (1)**
80:22
**trustees (1)**
83:12
**try (3)**
77:3;80:6;91:2
**trying (5)**
48:19;84:14;99:7,8,
8
**turn (2)**
18:5;75:5
**turned (1)**
92:3
**two (14)**
17:23;20:18;21:1;
23:19;28:4,22;37:24;
39:25;90:17;92:2;
93:2,5,11;104:22
**two-page (1)**
67:21
**type (2)**
84:10;91:2

## U

**ultimately (2)**
29:14;91:16
**under (9)**
16:24;18:15;25:24;
26:8;29:17;30:25;
42:16;75:9;92:1
**underfunded (4)**
63:9,10;64:5;96:5
**underfunding (1)**
96:12

**undergrad (1)**
17:17
**understood (1)**
86:3
**undertaking (1)**
107:5
**unilaterally (1)**
71:13
**Union (1)**
7:19
**United (1)**
7:18
**University (1)**
17:10
**unless (2)**
33:19;74:3
**unlikely (2)**
22:20;23:17
**unpaid (1)**
15:15
**unqualified (2)**
106:24;107:2
**up (14)**
12:4;15:2;26:18;
29:24;36:16,17;43:25;
44:2;48:8;50:11;51:1;
72:1;76:12;106:1
**Updates (1)**
103:17
**upon (1)**
98:25
**use (7)**
34:12;40:16;76:24;
77:13;81:16;92:4;
107:2
**used (7)**
18:13;34:22;74:10,
14;75:7;76:1,15
**using (7)**
60:14;76:24;77:2;
87:8

## V

**Vaguely (1)**
38:22
**value (1)**
12:20
**variety (1)**
84:9
**various (7)**
13:12;16:8;27:10,
13;42:24;75:17;85:5
**version (1)**
74:24
**versus (2)**
8:7;51:8
**vested (1)**
96:6
**vetting (1)**
92:12
**via (2)**
35:6,13

**VIDEO (6)**
7:5,7;18:7;68:11,13;
108:18
**view (20)**
42:18;61:23;62:1,9,
11,14,25;63:5,13,16,
21,22;64:2,5;75:25;
86:5;89:5;90:20;
92:22;95:7
**vilified (1)**
107:10
**vocal (1)**
91:11

## W

**warning (1)**
69:11
**Washington (1)**
7:8
**Waterhouse (1)**
84:24
**way (16)**
10:23;12:17;20:22;
22:17;29:5,6;52:14,24;
56:6;69:2,10;71:11;
75:12;76:11;77:3,20,
25;79:4;80:17;93:7;
106:1
**ways (1)**
105:15
**weekly (2)**
61:13;94:21
**weeks (2)**
31:10;79:16
**weighted (1)**
51:8
**Weiss (1)**
7:18
**weren't (1)**
89:4
**WERTHEIMER (16)**
32:2;56:24;58:13;
61:2;68:9,16,17;73:10,
11,13,14;77:16;79:24;
82:24;94:2,7
**what's (13)**
9:3;14:24;15:19;
18:18,21;41:24;42:10;
50:18;62:14;63:8;
65:5,25;69:6
**wheelhouse (1)**
97:4
**whenever (1)**
12:4
**whereby (1)**
11:1
**wherein (1)**
87:15
**wherewithal (1)**
101:1
**whole (1)**
32:7

whose (1)
98:8
wife (4)
23:19;26:6,10,16
willing (3)
25:25;72:16,18
willingness (1)
92:11
Wilson (2)
105:12,19
wise (1)
76:12
wished (3)
36:15;37:6;92:12
withdrawal (2)
41:11;93:7
without (9)
29:6,11;33:10;
34:19;36:7;50:13;
77:21;78:1;101:18
witness (15)
7:10,12;18:8;68:8;
77:11;86:9;94:4;
95:21;98:13;102:2;
103:2,4,17;105:3;
108:16
woman (1)
93:15
wondering (1)
47:6
word (1)
76:15
words (8)
34:22;60:9,14;
65:11;87:8,10,12,14
work (12)
11:7,16,17;12:9,16,
23;13:8;23:8;26:9;
35:21;91:22;93:7
worked (1)
12:8
Workers (3)
7:19;63:11,11
working (9)
32:19,19;34:5,15;
37:15;82:7;90:16;
91:16;92:1
world (1)
51:21
worth (1)
37:4
write (2)
36:5;104:8
writing (3)
27:11;34:10;73:18
written (2)
73:7;104:9
wrong (2)
85:3;102:1
wrote (6)
21:23;27:9;32:14;
38:13;40:20,24

## Y

year (3)
8:10;28:5;82:8
years (2)
17:17;63:12
Yep (2)
73:3,3
yesterday (1)
58:6
young (4)
23:19;26:4;55:13;
61:15

## 0

0000113 (1)
21:21
0000216 (1)
32:1
0000327 (1)
27:7
0000459 (1)
38:10
000303 (1)
24:14
00113909 (1)
67:22
00128731 (1)
14:2

## 1

1 (9)
13:18,20,23;14:3;
15:23,24;18:5,22;
72:25
1:56 (2)
7:3,6
10 (3)
7:1;104:14,17
10th (1)
7:6
11:01 (1)
106:2
11:35 (1)
38:15
11:41 (1)
38:16
11th (5)
27:14,19;29:19;
30:5;43:11
13 (1)
86:11
1-31 (1)
106:2
1-31-13 (1)
105:25
13th (1)
62:6
14 (1)
86:22

14th (16)
58:12,13,16;59:8,13,
20,23;60:2,5,8,16;
100:13,16,22;101:10,
16
16th (4)
53:24;54:19;56:2,11
18th (3)
52:17;56:15;61:6
19th (5)
57:13,16;69:15,16,
17

## 2

2 (3)
21:15,17,23
2:30 (1)
27:16
20,000 (3)
46:25;51:2;98:3
20003601 (1)
61:1
20003657 (1)
66:3
2011 (3)
11:3;80:10;81:19
2012 (2)
8:18;80:13
2013 (37)
7:1,6;8:5,16;13:11;
14:1;21:24;23:24;
25:3;32:14;35:25;
38:14;40:3;52:17;
53:24;56:15;57:13;
58:12,16;59:8,13,20,
23;60:2,5,8,16;61:6;
62:11;66:6;90:10;
92:4,16,21;106:9,14,
19
20th (4)
32:14;35:25;90:11;
92:21
211 (1)
7:8
22nd (2)
38:14;40:3
24 (11)
41:21;42:20;44:1,8,
12,22;45:1,8,11;56:23;
57:2
24th (1)
8:5
28th (1)
89:21
29 (4)
13:11,25;45:1;56:23
29th (9)
14:6;20:4;22:12;
30:3;81:12;83:21;
86:20;89:24,25

## 3

3 (4)
24:2,4,7,9
3:31 (1)
68:11
3:46 (1)
68:14
301 (1)
105:7
303 (1)
24:10
30th (6)
19:13;21:24;22:4,8,
10;23:23
31 (1)
29:25
31st (8)
24:22;25:3,15;30:4;
73:2;106:9,14,19
34 (1)
73:11

## 4

4 (4)
26:25;27:2,5,7
4:49 (2)
108:19,20
41 (4)
18:5,8,11;75:6
43 (2)
74:7,9
436 (1)
31:13

## 5

5 (6)
31:19,21;32:6,13;
40:1;90:8

## 6

6 (5)
38:1,5,13;40:8;
69:25

## 7

7 (7)
60:20,22;94:10,11,
12,14;96:10
72 (2)
30:25;31:12

## 8

8 (4)
65:21,23;94:11;
95:24
8:10 (1)

106:1
8th (2)
61:6;62:10

## 9

9 (33)
16:16;18:13;20:20;
41:21;42:20;44:1,7,12,
21;45:1,8,11;56:24;
57:2;67:16,18;74:10,
13;75:7,25;76:5,13,24;
77:3;85:18,21;86:7;
87:5;89:6;104:1;
106:15,18,21
9th (2)
66:6;96:9

# EXHIBIT  B

*In Re: City of Detroit, Debtor*

---

*Treasurer Andrew Dillon*
*October 10, 2013*

---

*Moretti Group*
*471 W. South Street*
*Suite 41B*
*Kalamazoo, MI 49007*
*800-536-0804*



Original File 101013AD.TXT
Min-U-Script® with Word Index

## Page 1

```
 1          UNITED STATES BANKRUPTCY COURT
        FOR THE EASTERN DISTRICT OF MICHIGAN
 2            SOUTHERN DIVISION - DETROIT
   ----------------------------------
 3 In re:                     Chapter 9
 4 CITY OF DETROIT, MICHIGAN,  Case No. 13-53846
 5        Debtor,            Hon. Steven W. Rhodes
   ----------------------------------
 6 V I D E O T A P E D   D E P O S I T I O N   O F
 7 WITNESS:     TREASURER ANDREW DILLON
 8 LOCATION:    The Treasury Building
 9             430 West Allegan
              Lansing, Michigan  48909
10 DATE:        Thursday, October 10, 2013
              9:17 a.m.
11
12 APPEARANCES:
   FOR PLAINTIFFS FLOWERS:
13
14          LAW OFFICE OF WILLIAM A. WERTHEIMER
            30515 Timberbrook Lane
15          Bingham Farms, Michigan  48025
            248.644.9200
16          billwertheimer@gmail.com
          BY: WILLIAM A. WERTHEIMER  (P26275)
17 FOR INTERNATIONAL UNION, UAW:
18          COHEN, WEISS and SIMON, LLP
            330 West 42nd Street
19          New York, New York  10036-6976
            212.563.4100
20          pdechiara@cwsny.com
          BY: PETER D. DeCHIARA, ESQUIRE
21
   FOR THE RETIREES COMMITTEE:
22
            DENTONS US LLP
23          1221 Avenue of the Americas
            New York, New York  10020-1089
24          212.768.6881
            arthur.ruegger@dentons.com
25          BY: ARTHUR H. RUEGGER, ESQUIRE
```

## Page 2

```
 1 APPEARANCES, CONTINUING:
 2 FOR AFSCME, AMERICAN FEDERATION OF STATE, COUNTY and
   MUNICIPAL EMPLOYEES, AFL-CIO:
 3
 4          LOWENSTEIN SANDLER, LLP
            65 Livingston Avenue
 5          Roseland, New Jersey  07068
            973.597.2538
 6          jsherwood@lowenstein.com
          BY: JOHN K. SHERWOOD, ESQUIRE
 7 FOR GENERAL RETIREMENT SYSTEM; CITY OF DETROIT POLICE AND
   FIRE RETIREMENT SYSTEM:
 8
            CLARK HILL
 9          212 E. Grand River Avenue
            Lansing, Michigan  48906
10          517.318.3060
            sgallagher@clarkhill.com
11          BY: SEAN PATRICK GALLAGHER  (P73108)
12          CLARK HILL
            500 Woodward Avenue, Suite 3500
13          Detroit, Michigan  48226
            313.965.8274
14          jgreen@clarkhill.com
          BY: JENNIFER K. GREEN  (P69019)
15 FOR THE FINANCIAL GUARANTY INSURANCE CORPORATION:
16          WILLIAMS WILLIAMS RATTNER &
            PLUNKETT, PC
17          380 North Old Woodward Avenue
            Suite 300
18          Birmingham, Michigan  48009
            248.642.0333
19          eje@wwrplaw.com
          BY: ERNEST J. ESSAD, JR.  (P32572)
20
21 FOR THE CITY OF DETROIT:
22          JONES DAY
            51 Louisiana Avenue, NW
23          Washington, D.C.  20001-2113
            202.879.3939
24          gshumaker@jonesday.com
          BY: GREGORY M. SHUMAKER, ESQUIRE
25
```

## Page 3

```
 1 APPEARANCES, CONTINUING:
   FOR THE STATE OF MICHIGAN:
 2
 3          MICHIGAN DEPT. OF ATTORNEY GENERAL
            Assistant Attorney General
 4          Solicitor General Bureau
            7th Floor G. Mennen Williams Building
 5          525 West Ottawa Street
            P.O. Box 30212
 6          Lansing, Michigan  48909
            517.373.1124
 7          nelsonm9@michigan.gov
          BY: MARGARET A. NELSON  (P30342)
 8          MICHIGAN DEPT. OF ATTORNEY GENERAL
            Chief Legal Counsel
 9          Executive Division
            7th Floor G. Mennen Williams Building
10          525 West Ottawa Street
            P.O. Box 30212
11          Lansing, Michigan  48909
            517.373.1110
12          schneiderm7@michigan.gov
          BY: MATTHEW SCHNEIDER  (P62190)
13
14          OFFICE OF THE GOVERNOR-LEGAL DIVISION
            George W. Romney Building
15          111 South Capitol Avenue
            P.O. Box 30013
16          Lansing, Michigan  48909
            517.241.5630
17          gadolam@michigan.gov
          BY: MICHAEL F. GADOLA  (P43960)
18          DICKINSON WRIGHT, PLLC
            215 South Washington Square, Suite 200
19          Lansing, Michigan  48933-1816
            517.487.4710
20          pellsworth@dickinsonwright.com
          BY: PETER H. ELLSWORTH  (P23657)
21
22          DEPARTMENT OF TREASURY
            Richard H. Austin Building, 1st Floor
23          430 West Allegan Drive
            Lansing, Michigan  48922
24          BY: FREDERICK HEADEN  (P41197)
25 VIDEO BY:     Tim Reitman, Reitman Video Specialists
   REPORTED BY:  Laurel A. Jacoby, CSR-5059, RPR
```

## Page 4

```
                 I N D E X

WITNESS: TREASURER ANDREW DILLON            PAGE NO.

Examination by Mr. Sherwood                     7

Examination by Mr. Wertheimer                  72

Re-examination by Mr. Sherwood                 97

Examination by Ms. Green                       105

Re-examination by Mr. Sherwood                 121


              E X H I B I T   I N D E X

EXHIBIT NO.         DESCRIPTION             PAGE NO.

Exhibit 1    Bond Buyer Online article         23

Exhibit 2    State Constitution Excerpt

             Article 24                         38

Exhibit 3    July 18, 2013 letter

             Re: Authorization to Commence

             Chapter 9 Bankruptcy Proceeding    43

Exhibit 4    Jan. 31, 2013 email

             (Bates No. JD-RD-0000295)          50

Exhibit 5    July 9, 2013 email

             Subject: Detroit

             (Bates No. SOM 20010234)           68
```

Page 5

```
1        E X H I B I T   I N D E X
2  EXHIBIT NO.    DESCRIPTION         PAGE NO.
3  Exhibit 6      March 1-2, 2012 email chain
4                 Subject: Consent Agreement
5                 (Bates Nos. DTMI 00234878-870)   112
6  Exhibit 7      March 3, 2012 email Re: Detroit-
7                 Email list for status updates
8                 (Bates No. DTMI 00234877)        112
9  Exhibit 8      March 22, 2013 email
10                Subject: Detroit pension info
11                (Bates Nos. SOM 20009920-921)    116
12 Exhibit 9      June 11, 2013 email
13                Subject: Professional fees
14                (Bates Nos. DTMI 00234907-08)    118
15
16
17            (Exhibits attached to transcript.)
18                   -   -   -
19
20
21
22
23
24
25
```

Page 6

```
1                  October 10, 2013
2                  Lansing, Michigan
3                  9:17 a.m.
4                     -   -   -
5           MS. NELSON: This is for purposes of the
6  record of the Governor's deposition that was taken
7  on October 9th.
8           There was a request at the conclusion of
9  the Governor's dep for the production of an email
10 which is the transmission email from the Governor's
11 office to Kevyn Orr of what was marked as Governor's
12 Exhibit 2, which was his July 18th, 2013 letter
13 authorizing the filing of the bankruptcy.
14          I have produced this email and provided it
15 to all counsel that are present today and we have
16 agreed to mark it as Governor's Exhibit 11. The
17 email is dated Thursday, July 18th, 2013. It was
18 transmitted at 3:47 p.m., and the subject is high
19 priority, and the attachment which is identified as
20 2013 0718 155044034 dot pdf is identical to the
21 attachment identified in Governor's Exhibit 10 that
22 was marked at the deposition yesterday.
23          And the subject matter I would point out
24 between Governor's Exhibit 11 and Governor's Exhibit
25 10 is also identical, high priority. So for
```

Page 7

```
1  purposes of the record we're marking this as
2  Governor's Exhibit 11. It is the email that was
3  discussed and is now being produced that was the
4  transmission of the July 18th letter from the
5  Governor's office to Kevyn Orr at 3:47 p.m.
6           And I would also note on the record that
7  the 7-18 letter was attached to the filing that was
8  made with the petition. I believe the time stamp
9  for The Court was 4:06 p.m. for that as well.
10                  -   -   -
11          VIDEO TECHNICIAN: Today's date is October
12 the 10th, 2013 and we're on the record at 9:20 a.m.
13          This is the video deposition of Treasurer
14 Andrew Dillon. We're at the Treasury Building,
15 430 West Allegan in Lansing, Michigan.
16          Can the Secretary be sworn, please.
17                  -   -   -
18          -TREASURER ANDREW DILLON-
19 called as a witness, being first duly sworn, was
20 examined and testified as follows:
21                EXAMINATION
22 BY MR. SHERWOOD:
23 Q. Treasurer Dillon, good morning. My name is
24    Jack Sherwood from Lowenstein Sandler, and we
25    represent AFSCME in the Detroit bankruptcy case.
```

Page 8

```
1  Thanks for being here today.
2           Have you ever been deposed before?
3  A. I believe so.
4  Q. Okay. On how many occasions?
5  A. A couple probably.
6  Q. Okay. Let me just give you some of the ground rules
7     as a reminder.
8           My questions and your answers will be taken
9     down by the court reporter and videotaped. You're
10    under oath so it's like you're testifying in court.
11          Do you understand that?
12 A. Yes.
13 Q. And to the extent that you can wait for me to ask a
14    full question before answering, that would be good,
15    make it easier for the court reporter.
16          Your attorney might object from time to
17    time, and to the extent that she does, obviously,
18    you'll take your advice from her.
19          If you don't know the answer to a question
20    or you don't understand a question, please let me
21    know, and I'll try to clear it up for you.
22          Do you understand those --
23 A. Yes.
24 Q. -- instructions?
25          Is there any reason why you can't testify
```

Page 9

1      truthfully today?
2  A.  No.
3  Q.  And are you taking any medications or suffering from
4      any illnesses or under the care of a doctor --
5  A.  No.
6  Q.  -- for any medical condition at this time?
7  A.  No.
8  Q.  Okay. Can you just briefly -- you are the Treasurer
9      of the State of Michigan; is that right?
10 A.  Yes.
11 Q.  And can you -- how long have you held this post?
12 A.  Since January 1 of '11.
13 Q.  And what did you do before that? Just give me, you
14     know, your previous work history before that.
15 A.  I served in the Michigan Legislature for six years,
16     the last four as the Speaker of the House.
17 Q.  And prior to that?
18 A.  I worked for a private equity fund based out of
19     Chicago.
20 Q.  What was the name of that firm?
21 A.  Wynnchurch Capital.
22 Q.  For how long were you at Wynnchurch?
23 A.  Three years.
24 Q.  And what three years were those? Was it like --
25 A.  '01 to '04.

Page 10

1  Q.  And what was your position there?
2  A.  I was a managing partner. I found opportunities for
3      them to buy -- companies to buy.
4  Q.  And did Wynnchurch specialize in any type of
5      industry or financial products?
6  A.  Middle market companies based in the midwest or
7      Canada was the focus.
8  Q.  And how long have you known Governor Snyder?
9  A.  I met him for the first time when I was in the
10     Legislature, and it was just a brief meeting. I
11     drove to Ann Arbor to meet him because Governor
12     Granholm at the time had announced the 21st Century
13     Jobs Fund plan, and I had a private equity
14     background but not a venture capital background, and
15     his name came to me as someone who understood
16     venture capital.
17         So I asked for a meeting, drove to Ann
18     Arbor. We met for half hour to an hour, and I
19     incorporated his thoughts and ideas into the 21st
20     Century Jobs plan. And I didn't see him after that
21     until he was running for Governor.
22 Q.  And when was that about?
23 A.  Probably 2010.
24 Q.  Did he appoint you as the Treasurer of the State?
25 A.  Yes.

Page 11

1  Q.  And how did that come to pass?
2  A.  Got a phone call in the fall of 2010, I believe it
3      was, and they asked if I would consider the
4      position. Initially, I respectfully declined
5      because I was ready to go back to the private
6      sector. And I reconsidered about two weeks later,
7      called back and said if you haven't filled it, I'll
8      do it.
9  Q.  What was it about the job that excited you?
10 A.  I was having lunch with a friend of mine. He just
11     said, hey, it's a great opportunity, why would you
12     say no to that.
13         And even though I had spent six years in
14     Lansing, I didn't fully appreciate the role of the
15     Treasurer for the State, and it's a fascinating job
16     and fascinating time to have it.
17 Q.  When you say a fascinating time, what do you mean?
18     Is it because of economic challenges facing
19     Michigan?
20 A.  Local units primarily, yes.
21 Q.  Things like school boards and cities and the like?
22 A.  Right.
23 Q.  Did you have, going into the job, discussions with
24     Governor Snyder about your view of the financial
25     situations that existed in the local government

Page 12

1      units here in the State of Michigan?
2  A.  I don't recall. There may have been some high-level
3      discussions in December '10 where we understood that
4      there could be a lot of troubled cities and school
5      districts in the cue, so it was on our radar before
6      we started but nothing about my philosophy, what I
7      would do in this role.
8  Q.  Okay. So when you say high-level discussions, can
9      you tell me what you recall specifically about the
10     high -- or even generally about the high-level
11     discussions?
12 A.  We understood that we would be inheriting some
13     financial crises throughout the state and we thought
14     there was more to come and -- but we never got into,
15     you know, he didn't grill me about what's my
16     philosophy and how would I approach, you know, the
17     challenges that would come our way.
18 Q.  Did you have any relevant experience in your career
19     as a Legislator or Speaker of the House or in your
20     private career that you thought you could bring to
21     bear to address the financial issues facing the
22     local units of government here in the State?
23 A.  A little bit. I have an accounting and a law
24     degree, but I had three jobs that translated some
25     relevance. I'd spent three years with GE Capital.

1  We tended to -- they were called the lender of last
2  resort, so we financed tough credits typically.
3       From there I went to a bankrupt steel mill
4  and helped the owner try to restart that mill, so
5  that was kind of hands-on operational restructuring.
6       And then a lot of the companies we chased
7  at Wynnchurch would either be growth companies or
8  turnarounds, so I would say there was a nine-year
9  window there where I had some experience in the area
10  of turnarounds.
11 Q.  What did you do to prepare for your deposition
12     today?
13 A.  About a month ago I had a meeting.  A couple of
14     Attorney Generals came to -- we didn't know if this
15     deposition was even going to happen because I don't
16     think the judge had ruled yet.  And then last week I
17     had a meeting to prepare, and I think that meeting
18     lasted about two hours.
19 Q.  Who was in that meeting?
20 A.  My friend here to my right and --
21       MR. SCHNEIDER: Matthew Schneider.
22       THE WITNESS: And we have one other.
23       MS. NELSON: Oh, Mark Donnelly, just to
24  refresh his memory.
25  BY MR. SHERWOOD:

1 Q.  So it was Mark Dowling?  Who's he with?
2       MS. NELSON: Mark Donnelly.
3       MR. SHERWOOD: I'm sorry.
4       MS. NELSON: Assistant Attorney General.
5  BY MR. SHERWOOD:
6 Q.  Sorry.  Who else?
7 A.  Just the three and myself.
8 Q.  Matthew Schneider is with who?
9 A.  The Attorney Generals' office.  We had a brief
10     meeting this morning at 8:30.
11 Q.  Same crew?
12 A.  Just the two this morning.
13 Q.  I'd like to start talking a little bit about some of
14     the legislation, the State legislation.
15       Do you know what PA 4 is, correct?
16 A.  Yes.
17 Q.  And my understanding is that was signed into law in
18     March of 2011; is that right?
19 A.  I don't recall the specific date but, generally
20     speaking, I think that's pretty close.
21 Q.  And PA 4, the predecessor to PA 4 was a statute that
22     people call PA 72; is that right?
23 A.  Right.
24 Q.  Can you just generally describe your role in the
25     drafting or passage of either of those statutes?

1 A.  PA 72 is before my time.  I believe it was 1990 give
2     or take.
3       PA 4, we started talking about it during
4  the transition period.  We understood that PA 72 had
5  some limitations.  So there was a few folks during
6  the transition that started looking at what you
7  could do to Public Act 72 to improve it, make it a
8  better tool for the State.
9       So my involvement was on the front end at
10  high level, thematic direction of what would later
11  become --
12       MR. WERTHEIMER: I'm sorry, high level
13  what?
14       THE WITNESS: Thematic.  But in terms of
15  specific language or, you know, getting under the
16  hood of the actual words that were being
17  incorporated into the bills, I had very limited if
18  any role.
19  BY MR. SHERWOOD:
20 Q.  So is it fair to say that PA 4 was passed at the
21     initiative of Governor Snyder?
22 A.  I don't know the mechanics, but I would say -- I
23     mean, we obviously at the administration level were
24     focused on it and we had ideas about it in terms of
25     who -- typically what happens is if the

1  administration wants a law passed they'll work with
2  the Legislature and find a sponsor, and I wasn't
3  part of that but I assume that probably happened
4  here.
5 Q.  And is it fair to say that PA 4 was promoted by the
6     Governor to the Legislature?
7 A.  I believe so.
8 Q.  Okay.  And you talked about PA 4 containing
9     improvements.
10       What was it about PA 72 that needed to be
11  improved?
12 A.  Well, what we found is -- typically for a
13     governmental unit 75 give or take percent of your
14     costs are wages and benefits which leaves you -- if
15     you have a unit that might have a three-year
16     collectively bargained agreement in place, that
17     takes 75 percent of the ability to reduce expenses
18     off the table.  It leaves you 25 percent of the
19     remaining spent.  Typically, in government it's very
20     difficult to increase the revenue side of the
21     equation.
22       So that would be the major theme --
23  thematic difference I think from 72 to Public Act 4.
24 Q.  So let me make sure I'm hearing you right.  Was
25     there something about PA 4 that enabled the State to

1 deal with wage and benefit issues that presented
2 themselves to these local government units?
3 A. Yeah. And I would add also it enabled us to get in
4 earlier because typically if you can get into a
5 situation earlier you might be able to avoid more
6 Draconian or drastic measures that have to be
7 implemented.
8 So I'd say the primary goal of Public Act 4
9 was to allow the State to have an earlier road in
10 the crisis that a particular school district or
11 city's encountering. And then in the law we spent a
12 lot of time on this issue about, you know, the
13 constitutionality of can you modify a CBA. And by
14 the word CBA, I use collectively bargained
15 agreement.
16 But the thought was that we have two
17 conflicting constitutional provisions here. One is
18 the prohibition against impairing of contracts and
19 then the other is the duty of the State to provide
20 for the public health, safety and welfare. So those
21 are your competing constitutional provisions, as I
22 understand it.
23 And where we came out on that, to my
24 memory, is that -- that if you temporarily modify.
25 So the thought wasn't that you just blow up a

1 contract or you permanently change the terms of the
2 contract, but in order to deal with the crisis to
3 protect the public health, safety and welfare, the
4 thought was that the State has the ability to
5 temporarily modify until the crisis or the emergency
6 is over.
7 To me that's the two primary differences
8 between PA 72 and PA 4.
9 Q. And how is it that PA 4 specifically gave the State
10 more power to address those issues?
11 A. On the front end I'd have to review PA 72 and
12 compare it to PA 4 before I would feel comfortable
13 answering that, but PA 72 did not have a provision
14 that allowed for a temporary modification of the
15 CBA.
16 Q. Did PA 72 have a provision for the appointment of an
17 emergency manager?
18 A. Yes.
19 Q. And PA 4 retained that?
20 A. Right. And they had two different terms. I think
21 under 72 it was emergency financial manager, an EFM.
22 Q. Right.
23 A. Under PA 4 it was changed to just an emergency
24 manager.
25 There's another big difference I guess as

1 well which was my memory is that under schools, an
2 EFM could pursue a Chapter 9 without the Governor's
3 consent but not for a city.
4 Q. I'm sorry, I just want to make sure the record's
5 clear. I'm reading it here.
6 Did PA 4 allow a school board to file
7 Chapter 9 without the Governor's consent?
8 A. I don't believe -- well, again, I'd like to look at
9 PA 72 but my memory was --
10 MS. NELSON: He's speaking about PA 4.
11 THE WITNESS: Oh, PA 4.
12 MS. NELSON: His question was to PA 4.
13 THE WITNESS: No, under PA 4 both cities
14 and school districts require the Governor's approval
15 for a filing.
16 BY MR. SHERWOOD:
17 Q. Okay. Now, I assume you're aware that PA 4 during
18 2011 and 2012 was heavily criticized by certain
19 members of the population here in Michigan, correct?
20 A. I recall some of that.
21 Q. And it was referred to as a dictatorship law,
22 undemocratic, emergency managers don't answer to the
23 public. Does that sound familiar to you?
24 A. I have a recollection of that, yes.
25 Q. And, actually, some of that criticism was directed

1 at you, correct?
2 A. Correct.
3 Q. And certainly Governor Snyder as well.
4 Do you think that that was fair criticism?
5 A. I think it's just a harsh reality that when you have
6 a -- whether it be a school district or a city in a
7 severe financial crisis that you've got to have
8 someone that can make decisions. And often times
9 what you'll find is the governance more in cities
10 maybe than school districts is -- makes it very
11 difficult to navigate through a financial crisis.
12 So I understand the criticism but the stark
13 reality is that it's the best path that I'm aware of
14 to solve a financial crisis.
15 Q. Now, PA 4 was submitted for a referendum in November
16 of 2012; is that right?
17 A. I believe so, yeah.
18 Q. And did you take a position with respect to the
19 proposed referendum with respect to PA 4?
20 MS. NELSON: Are you speaking in his
21 official capacity as Treasurer or in his personal,
22 because his personal capacity is privileged.
23 I assume you're speaking in his official
24 capacity as Treasurer did he take a position?
25 MR. SHERWOOD: I never heard of a personal

Page 21

```
 1    capacity of privilege.
 2          MS. NELSON: It's right to vote, his right
 3    to vote.
 4          MR. SHERWOOD: Okay.
 5    BY MR. SHERWOOD:
 6  Q.  In your capacity as Treasurer.
 7  A.  I don't recall.  I do recall that there was six
 8    measures on the ballot and there was really no one
 9    out there advocating in favor of preserving the law,
10    Public Act 4, but I don't recall if we ever issued a
11    statement from the Treasurer's Office defending
12    Public Act 4.
13  Q.  Did you have any conversations with the Governor
14    about this proposed referendum with respect to PA 4?
15  A.  I think we had a few, and I think there was, as I
16    said, six measures and some were deemed -- you know,
17    you can't fight a six-front battle, right, so I
18    think we all thought PA 4 was a necessary law and we
19    hoped it would be preserved.
20          But there was other measures on the ballot,
21    and often times the electorate only has so much
22    attention span, so I think we weren't out there
23    putting a full court press on to preserve the law.
24  Q.  Why did you think -- or when you say we, are you
25    talking about, you the Treasurer, and the Governor?
```

Page 22

```
 1    Why did you think that was a necessary law?
 2  A.  Because in my experience Public Act 72, you know,
 3    wasn't as effective as the residents or the children
 4    in school districts needed, and I thought that
 5    Public Act 4 was a significant improvement.
 6  Q.  One of the other criticisms that I read about that
 7    PA 4 was that it protected bondholders over other
 8    types of creditors.
 9          Are you familiar with that type of
10    criticism being lodged during the referendum
11    process?
12  A.  Not specifically.
13  Q.  What about generally?
14  A.  I just don't recall.  I mean, I'm certain it was
15    probably used as a talking point for those that
16    wanted to repeal PA 4, but I don't have a specific
17    recollection of it.
18  Q.  Do you remember talking to a publication called Bond
19    Buyer Online about the referendum to repeal PA 4?
20  A.  I've spoken to them several times so I don't know
21    the specific interview that you're referring to.
22  Q.  Do you recall saying to Bond Buyer Online that the
23    criticism of PA 4 reflects a lack of understanding
24    of the municipal market?
25  A.  I -- that sounds like something I would say, but I
```

Page 23

```
 1    don't specifically recall saying that.
 2  Q.  Tell me what is it about the municipal market that
 3    PA 4 helped.
 4  A.  Can you restate that?
 5  Q.  What is it -- how does PA 4 help a city or a school
 6    board or a city like the state of Detroit deal with
 7    the municipal market?
 8  A.  Can you read my statement again one more time?
 9  Q.  It says that "Criticism of PA 4 reflects a lack of
10    understanding of the municipal market."
11          Actually, I have a copy of it if that will
12    help.
13  A.  That's fine.  I think if you can go in and address
14    issues you're going to make that particular unit
15    more financially stable, and thus you'll have a
16    healthier community that can provide services and
17    pay its obligations.
18  Q.  I guess we can mark this as Exhibit 1.
19
20          (Deposition Exhibit 1 was marked.)
21
22    BY MR. SHERWOOD:
23  Q.  Sorry about the small type and everything, but it
24    says -- this is just something I pulled off line.
25          It says Critics of Public Act 4 argue that
```

Page 24

```
 1    the law protects bondholders above other creditors,
 2    an argument that Dillon said lacks an understanding
 3    of the municipal market.
 4  A.  Okay, this helps, having read it.
 5  Q.  Okay, sorry.
 6  A.  Often times when a unit gets into financial trouble
 7    they can't access the market on their own.  So the
 8    way that they can access the market is they'll work
 9    with Treasury where we will say, all right, if
10    you're going to borrow money we tell the bond money
11    providers that we will intercept the money, make
12    certain that you get paid first.
13          So if someone wanted to say that an
14    unsecured creditor or a nonbond creditor of a
15    community could be pari passu, on equal footing of
16    an existing bondholder, in that circumstance they'd
17    be misguided because when the bond deal got done for
18    the troubled unit we have an agreement with the
19    trustee typically that will intercept the revenues
20    that come from the State to the unit, pay the debt
21    of the bonds, and then whatever surplus is left goes
22    to the City.
23          So once that deal is put in place, you
24    can't undo it, per se, and then say well, we're just
25    not going to pay the bondholders so we can put more
```

1    money into the City so they can pay their bills.
2        So I think what I'm referring to here is
3    that situation where there's a trustee in place or
4    an intercept agreement where the State has an
5    obligation to make certain that the bond providers
6    are paid first. And once that's in place you can't
7    undo it.
8 Q.  Okay. And by an intercept agreement, you're -- I
9    mean, would that be something like a security
10   interest in a pledged flow of funds from a
11   particular source?
12 A.  Can you restate that?
13 Q.  By intercept agreement that's not a concept I've
14   heard before, but I have heard things like
15   collateral, pledge, assignment, security interest.
16   Is that what you mean?
17 A.  I think you're too narrow. There's several
18   different ways to do this. For example, and this
19   happens in school districts where state aid can be
20   intercepted first.
21       In Detroit, for example, there's a trustee
22   set up that collects the casino revenues before they
23   go to the City, and that trustee then transfers
24   those payments to certain creditors of the City.
25       So sometimes it's a state acting, sometimes

1    it could be a private entity, a trustee, that
2    receives the monies first, and I think there could
3    be a variety of ways these get structured.
4 Q.  Okay. And by saying -- you say "I appreciate Main
5    Street saying everyone should share in the pain, but
6    troubled cities have to structure their deals in a
7    certain way to get access to the market."
8        So you're saying that with respect to
9    creditors that have intercept agreements, they don't
10   have to share the pain with Main Street?
11 A.  It's harder for them to, I think, because they do --
12   if -- they have a -- typically, in this case, and I
13   don't want to overstate it and be too broad here,
14   but when there's an intercept agreement in place I
15   think it effectively serves like a filed lien, like
16   a mortgage on a home.
17       There may be exceptions to that, but
18   generally speaking, yes, and you'll find some older
19   communities before they got in financial trouble
20   they might have gone out and done unsecured
21   borrowing, right? So there's no intercept there.
22   They're then unsecured and in the pool of all the
23   unsecureds.
24       When you have an intercept, you know, I
25   want to be careful not to say every intercept

1    agreement creates a secured, you know, lender but
2    probably most would be effectively a secured lender.
3 Q.  So are you saying that it's your view that to the
4    extent that a bondholder has an intercept agreement
5    in a restructuring, particularly in the
6    restructuring of the City of Detroit, that they
7    don't have to share the pain with the other
8    creditors of the City?
9 A.  I don't think I understand your question because
10   restructuring at what point? I mean, a city can be
11   restructuring before Treasury is even involved so.
12 Q.  Before or after? At any time? I mean, at what
13   point is it appropriate if ever for the bondholders
14   with intercept agreements or other special
15   collateral arrangements to share the pain?
16 A.  Well, it's my -- I mean, some of this calls for a
17   legal -- a lot of this calls for a legal conclusion,
18   but it's my understanding that if you're let's say a
19   revenue bondholder, right, you're a -- typically,
20   you're a secured lender, and you're entitled to the
21   revenue streams that you negotiated at the front end
22   of the deal.
23       So in Detroit's case you have a lot of
24   revenue bondholders that are entitled to revenue
25   streams that come in to pay for water and sewer

1    services. Their collateral is that revenue stream,
2    and if that revenue stream is inadequate to service
3    the debt then they could be in harms's way. And
4    it's my understanding that that's how Chapter 9
5    would deal with revenue bondholders.
6        There's a myriad of different ways. I
7    don't mean to be evasive, but there's a lot of
8    different ways where intercept agreements can get
9    negotiated. I think that the one as it relates to
10   the casino revenues in Detroit is rather unique, and
11   it may not reflect kind of a standard borrowing that
12   may take place going forward.
13       We did a financing a year and a half ago
14   for Detroit. It was $137 million deal and that to
15   my knowledge my staff helped secure that, but that
16   was done with an agreement to intercept State
17   revenue sharings to make certain that that debt was
18   serviced.
19       So if the lenders did their job and got the
20   legal requirements that they need to have the
21   priority their first right to that revenue stream,
22   then they're probably protected. If they have
23   defects in the legal work or they don't have a
24   contractual right to that revenue stream, they
25   probably will be treated like any other creditor.

Page 29

1 Q.  Well -- all right.  So let me just move forward now
2      to the striking down of PA 4 by the voters of the
3      State.  That happened in November of 2012; is that
4      right?
5 A.  Right.
6 Q.  And as State Treasurer, did you have a view on how
7      if at all this would impact Wall Street's view on
8      the subdivisions, the government subdivisions of the
9      State of Michigan and specifically the City of
10     Detroit?
11 A.  At least one and maybe more credit rating agencies
12     said the fact that the State of Michigan had Public
13     Act 4 on the books was a credit positive.  They
14     viewed it as a favorable environment for lending
15     into the State.
16         So when it got repealed, as it relates to
17     at least those one, maybe two credit rating
18     agencies, it would be deemed a credit negative that
19     Michigan now doesn't have that law which they deemed
20     to be a credit positive on the books.
21         And we then reverted back to Public 72
22     which was in my mind, you know, a good start, but it
23     needed some improvements to be effective.
24 Q.  Would the repeal of Public Act 4 have any impact on
25     the credit rating of the State of Michigan?

Page 30

1 A.  Indirectly.  I mean, the State has its own credit
2      rating and its own revenues and expenses and
3      obligations.  Local units are stand-alone and have
4      their own responsibilities and obligations.  So I
5      would only say it's indirectly.
6         I think if -- the rating agencies, I think
7      if they view that a state is mismanaging its local
8      units I think that they would view that negatively
9      on the State, but it doesn't directly provide a
10     commentary on whether or not the State is going to
11     repay its debt.
12 Q.  You said that the markets reflected PA 4 as a credit
13     positive.  What was it about PA 4 based on your
14     experience that had a positive impact on the credit
15     rating of the government subdivisions here in
16     Michigan?
17 A.  Well, I mean, I think we should pull the statements
18     that were issued by the ratings agencies.  I don't
19     remember if it was Moody, Standard or Poor or Fitch.
20     I think it might have been Moody's.  I mean, they
21     issued actually statements saying it's a credit
22     positive.
23         I think they appreciate a state that is
24     proactively managing its finances as well as those
25     of their cities and school districts.

Page 31

1 Q.  So is it the view of Wall Street or the credit
2      markets that where a state has the power to go in
3      and take over or manage a political subdivision,
4      that is positive from the perspective of the
5      markets, based on your experience?
6         MS. NELSON:  Compound question, form,
7      foundation.  Do you want to talk about a takeover?
8      You said take over or manage.
9         MR. SHERWOOD:  You can object.
10        MS. NELSON:  Form, foundation.
11        MR. SHERWOOD:  And --
12        MS. NELSON:  Compound.
13        MR. SHERWOOD:  -- Treasurer Snyder can tell
14     me if he doesn't understand the question.
15        Now, can you read back the question?
16        MR. WERTHEIMER:  Actually, it's Treasurer
17     Dillon.
18        MR. SHERWOOD:  I'm sorry.
19        THE WITNESS:  I got a promotion at the
20     deposition.
21        MR. SHERWOOD:  Hold on.  Let her read back
22     the question.
23        THE WITNESS:  Actually, if I give you a
24     comment maybe you can rephrase it.  That will make
25     it easier, because you're asking me to say what the

Page 32

1      credit markets think, and I'm not the credit
2      markets.
3 BY MR. SHERWOOD:
4 Q.  I understand that, but as State Treasurer and a
5      person with substantial experience both in private
6      life and public life, I think you can give me your
7      perception of why PA 4 was viewed by the credit
8      markets as something that was attractive --
9 A.  Yeah.
10 Q.  -- and I'd like you to do that.
11 A.  Detroit's a good example.  The health of your
12     biggest city has an impact on the health of the
13     State, right, and if you have a city of 700,000
14     folks that don't have access to public safety, kids
15     can't walk safely to school, there's no lights on,
16     that's going to have a negative impact on the
17     State's economy.
18         So my personal opinion is yes, that's a
19     credit positive, that if you have a state that
20     proactively tries to prevent those types of health,
21     safety and wellness crises within their state to
22     have a healthy vibrant city, it's good to make the
23     state healthy and vibrant.
24 Q.  But isn't it in the first instance the job of the
25     city government to fulfill those needs and address

Page 33

1    those concerns?

2  A.  That's how we've set it up.

3  Q.  And are you saying that in the case of Detroit, city

4    government did not fulfill those needs?

5  A.  I think we've found there are circumstances where

6    local units have been unable to provide essential

7    services or gotten themselves too far into debt that

8    it becomes very difficult to navigate out of.

9  Q.  What was your understanding of the repeal of PA 4?

10    How did that operate practically?  Did that mean,

11    based on your understanding, that there was no

12    emergency manager law as of the date of that repeal?

13  A.  My memory is the Attorney General told us that upon

14    the repeal of PA 4, PA 72 was the law that we should

15    follow.

16  Q.  And but didn't -- wasn't that opinion struck down by

17    the Supreme Court of the State of Michigan?

18  A.  I don't recall that.

19  Q.  Okay.  Was that opinion challenged in court?

20  A.  It may have been.  I don't recall.

21  Q.  And you don't know what the result of that legal

22    challenge was?

23  A.  I don't ever remember that PA 72 was not a law that

24    we at Treasury were supposed to rely upon during

25    these windows where PA 4 was repealed and before

Page 34

1    PA 436 took effect.

2  Q.  All right.  So let's turn to PA 436 real quick.

3        Why was PA 436 implemented if PA 72 was in

4    effect?

5  A.  Because the same reason we put PA 4 in place.  We

6    thought PA 72 could be improved upon.  So after the

7    election there's a few meetings where we really did

8    gather what were the criticisms of PA 4 and looked

9    to see if we could improve PA 4 to make it address

10    those concerns.

11        And then as we had worked with PA 4 for a

12    period of time, we identified some areas that we

13    would want to seek improvement, and I'll give you

14    one example.  Often times we would want to give the

15    reigns, the power back to the local electeds, and in

16    order to do that under Public Act 4 you'd have to

17    end the emergency.  And we were uncomfortable about

18    that because we weren't prepared to give -- return the

19    power before we were a hundred percent certain that

20    the financial emergency was over.

21        So if you see in 436 what we did was we put

22    in place something called a Transition Advisory

23    Board, and that allows us to transfer power back to

24    the Mayor and the City Councils without having to

25    terminate the emergency status, so it allows us to

Page 35

1    get out sooner.  That would be something we learned

2    during, you know, using or relying on Public Act 4.

3        We also looked at, you know, various

4    criticisms and we tried to put more local

5    involvement into Public Act 436.  So, for example,

6    you'll see if the locals don't like a decision, a

7    material decision being made by a manager, they're

8    given a chance to come up with a better idea.  And

9    there's various ingredients like that that we added

10    to address some of the criticisms of PA 4.

11  Q.  So in enacting PA 436 after the repeal of PA 4, it

12    was not your view that the Legislature and the

13    Governor were going against the will of the voters?

14  A.  I think we tried to accommodate the criticisms we

15    heard during the campaign.

16  Q.  Well, the voters didn't -- they didn't like the EM

17    law.  They thought it was a dictatorship, they

18    thought it was undemocratic.

19        How specifically did 436 address the

20    concern of, you know, the EM law being a

21    dictatorship?

22  A.  Well, for example, one of the changes were, you

23    know, it wasn't just right to emergency.  We had a

24    path for a consent agreement, we had a path for

25    emergency, we had a path for a restructuring, and

Page 36

1    then the fourth option was an actual Chapter 9 in

2    case someone was really out of cash.

3        So we tried to create options for the local

4    units and we tried to give them a chance to come up

5    with better ideas if they didn't like the plans of

6    the manager.  From the meetings I sat in, I think

7    there was a sincere effort to address that.  And,

8    you know, my memory was that the vote on PA 4 was

9    not a landslide.  It was actually -- there was not

10    anyone advocating for the protection of PA 4, and

11    the vote was pretty close.

12        If -- it wasn't one of six ballot measures

13    and the only one -- I think it was the only one that

14    you wanted a vote the other way.  I forget whether

15    it was yes or no kept the law, but it was the only

16    one where I think you had to vote yes to keep it and

17    all the other ones, you know, required a no vote.

18        So it was a pretty close vote without one

19    advocate out there saying why this law makes sense.

20    And in my experience, I don't know that a lot of

21    people spent a lot of time really reading through PA

22    4 and why it was necessary.

23  Q.  Did any of the changes between PA 4 and PA 436 deal

24    specifically with the ability of the emergency

25    manager to file bankruptcy?

1 A.  I don't recall if there's differences there.

2 Q.  In your discussions with Mr. Orr, did you discuss

3     with him the differences between PA 4 and PA 436?

4 A.  I don't recall.  I do know that we spent time

5     briefing him on how 436 works, and I know he spent a

6     lot of time reading the statutes, and I think he had

7     a good understanding of what 436 was, but in terms

8     of a discussion where we compared the two, I don't

9     recall that.

10 Q.  Give me one second.  Did you have any role -- I'm

11     sorry.  We okay?

12        VIDEO TECHNICIAN: We haven't gone off the

13     record.

14        MR. SHERWOOD: Good.

15 BY MR. SHERWOOD:

16 Q.  Did you have any role in the drafting of PA 436?

17 A.  Not in the drafting, but as I indicated earlier,

18     there was some meetings probably late November,

19     early December about trying to address and improve

20     Public Act 4.

21        So there was some high-level themes that I

22     attended meetings and discussed, but in terms of the

23     actual drafting of language, I didn't have any role

24     in that.

25 Q.  Let's mark this as Exhibit 2.

1

2        (Deposition Exhibit 2 was marked.)

3

4        MS. NELSON: Do you have a copy that I can

5     look at?

6        MR. WERTHEIMER: For the record, all of us

7     have seen this before.

8 BY MR. SHERWOOD:

9 Q.  All right.  So we've marked as D-2 Section 24 of the

10     State Constitution.  It's just an excerpt of the

11     Constitution which says "The accrued financial

12     benefits of each pension plan and retirement system

13     of the State and its political subdivision shall be

14     a contractual obligation thereof which shall not be

15     diminished or impaired thereby."

16        Are you familiar with this provision of the

17     State Constitution?

18 A.  I am aware it existed and I now just read it.

19 Q.  Okay.  Based on your review and understanding of PA

20     436, does PA 436 in any way impact Section 24 of the

21     Michigan Constitution?

22        MS. NELSON: Objection; calls for a legal

23     conclusion.

24 BY MR. SHERWOOD:

25 Q.  I just want your understanding.

1 A.  Can you restate the question?

2 Q.  During your consideration of PA 436 and your

3     discussions about it, did anyone ever come out and

4     say anything like let's try to modify Section 24 of

5     the Constitution?

6 A.  No, but when we did Public Act 4 we had this

7     discussion.

8 Q.  Okay.  And what was said in that discussion?

9 A.  I asked various lawyers that were involved, you

10     know, how does this shake out?  You know, you have

11     these -- you know, can you -- the key item of PA 4

12     that raised a lot of concerns was the ability to

13     temporarily modify CBAs, and I have a different unit

14     too.

15        So we discussed this provision when we

16     drafted PA 4, and the answer I recall getting at the

17     time was that you have these competing provisions;

18     the responsibility to provide for the public, health

19     safety and welfare as well as that you can't impair

20     contracts.

21        And I believe there's a case back in the

22     thirties, and don't hold me to this, but I think

23     there was one case that addressed this issue a long

24     time ago.  So in my mind the issue was resolved for

25     me during the PA 4 discussions, so when 436

1     resurfaced I didn't revisit the discussion but

2     others may have.

3 Q.  Was it your understanding based on your experience

4     and knowledge somehow under the authority of PA 436

5     that the State of Michigan or the City of Detroit

6     could disregard the constitutional provision

7     protecting pension and retirement benefits?

8 A.  I'm sorry, could you read it?

9        MR. SHERWOOD: You can read it back.

10     (Reporter read pending question.)

11        THE WITNESS: Could you read it one more

12     time?

13     (Reporter read record as follows:

14     "Q.  Was it your understanding based on your

15        experience and knowledge somehow under the

16        authority of PA 436 that the State of

17        Michigan or the City of Detroit could

18        disregard the constitutional provision

19        protecting pension and retirement

20        benefits?").

21        THE WITNESS: No, I don't think PA 436 gave

22     you that right.  I think you have economic

23     realities.

24        For example, I have a different unit where

25     their pension fund is funded at less than 10

Page 41

1  percent, and I do recall asking for legal advice
2  about if that thing runs to zero, what happens? And
3  it's a unit that can't afford to raise taxes or
4  service that.
5      And the memory I have is that, yeah, it's
6  still there in the Constitution, but if the unit
7  can't pay the pension they can't pay the pension.
8  So I would say 436 --
9  BY MR. SHERWOOD:
10 Q. Why doesn't that logic also apply to the bondholder
11    creditors of the City of Detroit? If the unit can't
12    pay, doesn't have enough to pay its pension
13    obligations and its obligations to Wall Street, why
14    doesn't that logic also apply?
15     MS. NELSON: Objection; calls for a legal
16  conclusion and for speculation.
17     THE WITNESS: I'm not certain that it
18  doesn't. If the unit doesn't have the money to pay
19  their bondholders, there's a problem, and I guess
20  that's what Chapter 9 is for or some type of effort
21  to resolve it in a different way.
22     We do that all the time working with units
23  to see if we can restructure and help them
24  restructure debts that they may have. But if
25  there's no money to pay, whether it be payroll or a

Page 42

1  pension or a bondholder, there's no money.
2  BY MR. SHERWOOD:
3  Q. But I think you testified earlier that, you know,
4    because certain bondholders have the protection of
5    entitlement to revenue streams that they should have
6    exclusive claims to those streams; is that right?
7  A. I don't know if I said they should have, but I think
8    that if they've done their legal work and they've
9    got the right to that stream, I think the courts
10   will recognize they have the right to that revenue
11   stream.
12 Q. By the same token, the holders of vested pension and
13   retirement benefits have the protection of the
14   Constitution of the State of Michigan which prevents
15   those benefits from being diminished or impaired in
16   any way.
17     Why is it that they have to make sacrifice
18   in the context of the Chapter 9 case but not the
19   bondholders?
20     MS. NELSON: Objection; form, foundation,
21   assumes facts not in evidence. There's no plan
22   that's even been filed that suggests that.
23     MR. SHERWOOD: You can object to form.
24     MS. NELSON: Form, foundation, speculation,
25   improper hypothetical, and assumes facts not in

Page 43

1  evidence.
2      THE WITNESS: Yeah, I mean, I think those
3  are decisions that would be made by a judge at some
4  point.
5  BY MR. SHERWOOD:
6  Q. Well, didn't the Governor make that decision by
7    appointing the emergency manager?
8  A. I don't believe so.
9  Q. Wasn't one of the purposes of 436 to enable an
10   emergency manager to file Chapter 9?
11 A. I -- I mean, it was in PA 72, it was in PA 4, it was
12   in 436. I don't think that PA 436 changed that. In
13   fact, the law we were relying on at the time was
14   PA 72 that allowed for filing of a Chapter 9, so I
15   don't think I accept that premise.
16 Q. Let's -- this has been marked a hundred times, but
17   let's mark this as Dillon 3. It's the July 18th,
18   2013 authorization letter.
19
20     (Deposition Exhibit 3 was marked.)
21
22     MR. WERTHEIMER: It's now Orr 11, Snyder 2
23   and Dillon 3.
24     MR. SHERWOOD: Orr 11, Snyder 2 and
25   Dillon 3, okay.

Page 44

1  BY MR. SHERWOOD:
2  Q. Treasurer Dillon, I assume you've seen Dillon 3
3    before?
4  A. Yes.
5  Q. Okay. Did you review this in preparation for your
6    deposition today?
7  A. I did take a glance at it, yes.
8  Q. Turning to the last page in the contingencies
9    paragraph, that's a reference to PA 436.
10     It says "...my approval of the
11   recommendation to commence a Chapter 9 proceeding
12   may place contingencies on such a filing.... I am
13   choosing not to impose any such contingencies today.
14   Federal law already contains the most important
15   contingency - a requirement that the plan be legally
16   executable."
17     Are you familiar with that language?
18 A. I am.
19 Q. Did you help the Governor draft this letter?
20 A. I did not.
21 Q. Did you see it in draft form before it went out?
22 A. I did not.
23 Q. Okay. In PA 436, do you have an understanding of
24   why that legislation provided that the Governor
25   could place contingencies on a Chapter 9 filing?

Page 45

1 A.    I wasn't part of the drafting of the language, so I
2       don't feel that I can answer that question.
3 Q.    During the time leading up to the issuance of this
4       letter on July 18th, 2013, did you have discussions
5       with anybody about this contingency provision of
6       436?
7 A.    I believe there was a -- yes, I did.
8 Q.    And who did you have those discussions with?
9 A.    I don't recall specifically.  I had -- there was a
10      conference call, I believe, of the Governor's --
11      folks from the Governor's office as well as some
12      from Treasury where we discussed the pros and cons
13      of the issue and that was, you know, days before the
14      Governor's letter came out.
15             And then I had a brief conference call with
16      some Jones Day lawyers about the concept of it as
17      well.
18 Q.   All right.  So I think you talked about two
19      conversations?
20 A.   I believe that's what I recall.
21 Q.   All right.  So let's leave out the Jones Day
22      discussion for now.
23             During the first conversation --
24      discussion, what was said about this provision in PA
25      436 concerning contingencies?

Page 46

1             MS. NELSON: Objection; attorney-client
2       privilege.
3 BY MR. SHERWOOD:
4 Q.    Were attorneys present during that conference?
5             MS. NELSON: You need to answer verbally.
6             THE WITNESS: Oh, yes.  Yes, I believe Mike
7       Gadola was on the conference call.
8 BY MR. SHERWOOD:
9 Q.    Who is Mike Gadola?
10 A.   He's the Governor's general counsel.
11 Q.   And was he there to give legal advice?
12 A.   I assume so.
13 Q.   All right.  But when you were -- when -- you can do
14      nothing but assume he was there.  He was just there?
15      He wasn't there providing legal counsel to the folks
16      on the phone?
17 A.   That was my understanding, that he was the
18      Governor's general counsel and he was advising us on
19      that issue.
20 Q.   Did you view the conversation as one that was
21      confidential and privileged?  Did you say anything
22      that you wouldn't say if a lawyer was in the room?
23             MS. NELSON: Which question would you like
24      him to answer first?  You have two questions there.
25             MR. SHERWOOD: Okay.

Page 47

1 BY MR. SHERWOOD:
2 Q.    Did you view the conversation as confidential?
3 A.    Yes.
4 Q.    Did you say anything that you wouldn't have said if
5       a lawyer was not in the room?
6 A.    I don't believe so.  I don't recall all the
7       specifics of that discussion.
8 Q.    But you do know that the contingency provision of PA
9       436 was discussed on that call, right?
10 A.   Yes.
11 Q.   And then there was a follow-up call which -- when
12      did that call take place?  Can you tell me the date
13      of the call, approximately?
14 A.   No, but it would be within a week of the Governor's
15      letter coming out, I believe.
16 Q.   Okay.  And then the call with Jones Day that you
17      also described, did that happen before, did that
18      happen later?
19 A.   I believe it happened before that conference call.
20 Q.   Okay.  So first there was a conference call where
21      Jones Day participated, and who was on that call?
22 A.   There was -- I don't recall specifically.  The call
23      happened in my office.  I probably had one or two of
24      my staff on the call, and then who was on the other
25      end of Jones Day, I don't recall any names, to be

Page 48

1       honest with you.
2 Q.    Did you ever suggest to the Governor that in
3       authorizing the filing of Chapter 9 the Governor
4       should place a contingency on his authorization that
5       prohibited the emergency manager from violating the
6       constitutional rights of the City's pension and
7       benefit claimants?
8 A.    I don't recall having done that.
9 Q.    Was that your view?
10 A.   I don't believe so.  I mean, I appreciated that we
11      had an issue here, but I didn't tell the Governor
12      hey, you can't do that without having a contingency
13      in this constitutional provision.
14 Q.   Did the Governor ever solicit your point of view
15      with respect to that issue?
16 A.   No.
17 Q.   Did you ever suggest to the Governor that the use of
18      the language that's set forth in D-3 under
19      contingencies, that the use of that language was a
20      way to sort of punt the issue to the federal court?
21 A.   No.  I didn't discuss any of this paragraph with the
22      Governor.
23             VIDEO TECHNICIAN: Secretary Dillon, you're
24      losing your microphone.
25 BY MR. SHERWOOD:

Page 49

1  Q.  So you're not aware of any discussions where the use
2      of this language in D-3 was viewed as a way to avoid
3      having to make a decision as to the constitutional
4      protections for pension benefits and the like?
5  A.  The first time I saw this letter was on freep dot
6      com, so I didn't have discussions with the Governor
7      about this provision.
8  Q.  Did you ever discuss just the idea with the Governor
9      of how it would -- how he would authorize the filing
10     of a Chapter 9 given the constitutional protection
11     for vested pension and retirement benefits?
12 A.  I don't recall any specific discussion in that
13     context.
14 Q.  What about general discussions in that context?
15 A.  Yeah, I don't recall.  I mean, I may have shared
16     with him the advice I got about another unit who I
17     was worried about where I knew that they didn't have
18     any funding in their pension plan and that when the
19     money runs out, you know, the view was that the
20     State was not liable for making up that difference.
21         We may have -- I may have shared that
22     opinion I got from a lawyer, but I don't remember
23     the specific date or time or window when that may
24     have been shared, but I'm pretty certain I probably
25     did share that concept with him.

Page 50

1  Q.  During your conversations with the Governor, did
2      you -- either you or the Governor indicate to one
3      another that you were looking for a way to avoid the
4      constitutional obligation to not impair the rights
5      of vested pensions and benefits?
6          MS. NELSON: Objection; asked and answered.
7      Go ahead.
8          THE WITNESS: Can you read that question
9      back?
10         (Reporter read pending question.)
11         THE WITNESS: We never had a discussion
12     about the desire to circumvent the Constitution in
13     any way.
14         MR. SHERWOOD: Can we take a five-minute
15     break at this point?
16         VIDEO TECHNICIAN: Going off the record at
17     10:21 a.m.
18         (A brief recess was taken.)
19
20         (Deposition Exhibit 4 was marked.)
21
22         VIDEO TECHNICIAN: We're back on the record
23     at 10:30 a.m.
24 BY MR. SHERWOOD:
25 Q.  Okay, Treasurer Dillon, I've showed you what's been

Page 51

1      marked as Dillon 4, and I realize these are emails
2      that you probably have not seen before, but they are
3      emails that were sent by the emergency manager where
4      he describes the new EM law as a "end around the
5      prior initiative that was rejected by the voters in
6      November."
7          MS. NELSON: I'm going to object to your
8      characterization it was sent by the emergency
9      manager.
10         At the date of January 31st, 2013, Kevyn
11     Orr was not the emergency manager.
12         MR. SHERWOOD: Okay.  And you can only
13     object to form and privilege so, please, no more
14     speaking objections.
15 BY MR. SHERWOOD:
16 Q.  Would you agree with Mr. Orr's statement on
17     January 31st, 2013, that the EM law was a "end
18     around the prior initiative that was rejected by the
19     voters in November"?
20 A.  I don't.  I recall sincere meetings where we
21     examined what were the criticisms of the PA 4 and
22     tried to address them in the new legislation.
23 Q.  So you don't agree with his characterization?
24 A.  No.
25 Q.  Do you know -- if you look down to the bottom

Page 52

1      paragraph where Mr. Orr states that "...although the
2      new law provides the thin veneer of a revision it is
3      essentially a redo of the prior rejected law and
4      appears to merely adopt the conditions necessary for
5      a Chapter 9 filing."
6          Do you agree with that statement?
7  A.  No, because I -- we spoke earlier about the tab
8      added, the four options that the locals have, the
9      18-month window for which an EM can serve.
10         So, I mean, those were sincere efforts on
11     the part of the Governor as well as my staff to
12     address issues that were raised during the ballot
13     initiative.
14 Q.  So you disagree with this statement by Mr. Orr as
15     well; is that your testimony?
16 A.  I disagree with his characterization.
17 Q.  Does the new law 436 adopt the conditions necessary
18     for a Chapter 9 filing?
19 A.  I believe it does.  I don't have a legal opinion to
20     that effect, but I think it's -- 72 had it, 4 had it
21     and I believe 436 has it.  So we didn't need 436
22     because we had 72 at the time, so --
23 Q.  Was there any discussion that you were a part of
24     where the start date for Mr. Orr was discussed?
25 A.  Sure.  Yes.

Page 53

1 Q. And was there ever a discussion about sort of
2 coordinating the start date for Mr. Orr with the
3 expiration of the old EM law?
4 A. I don't recall.
5 Q. Do you recall that initially the start date for
6 Mr. Orr was going to be somewhere in mid March of
7 2013?
8 A. I believe -- my memory is his actual start date had
9 more to do with his schedule than ours.
10 Q. Did his start date have anything to do with the
11 expiration of the old EM law and the -- I guess the
12 start date for the new EM law, 436?
13 A. I don't believe so.
14 Q. So you weren't party to any conversations with
15 Mr. Orr or the Governor where it was discussed that
16 the start date for the EM should sort of coincide
17 with either the expiration of the old law or the
18 effective date of the new law?
19 A. I don't recall that discussion. It's not that it
20 didn't happen, I just don't recall it.
21 Q. Yeah, because the effective date of the new law is
22 March 28th, 2013, and I believe that's the same date
23 that he was formally appointed. Isn't that right?
24 A. My memory is he served three days under 72 give or
25 take and then the new law kicked in, so he actually

Page 54

1 served under both is my memory.
2 Q. Okay. Do you -- were you part of the search team
3 for the emergency manager?
4 A. I don't think we had an official search team, but
5 yes, I was involved.
6 Q. Who else was involved with you?
7 A. Primarily Rich Baird.
8 Q. And were you at the meeting on I think it was
9 January 28th, 2013, at the airport in Detroit where
10 the law firms were interviewed?
11 A. Yes.
12 Q. And Mr. Baird was there as well?
13 A. Yes.
14 Q. And I think Mr. Buckfire was there?
15 A. Most likely.
16 Q. Anyone else on the side of the City and the State
17 that you remember?
18 A. I believe Tom Saxton and Brom Stibitz from Treasury
19 were there. I believe Chris Andrews and Jack Martin
20 from the City were there. I believe we may have had
21 some members of the Financial Advisory Board there.
22 There may have been a few others I don't recall.
23 Q. Had you known or heard of Mr. Orr before that
24 meeting?
25 A. No.

Page 55

1 Q. Why was it that people from the State were at a
2 meeting to select counsel for the City of Detroit?
3 A. Well, the City, as you might recall at the time, was
4 under a consent agreement, and we were struggling
5 with that and we were bringing in some professionals
6 to help with the City. And December it involved an
7 investment bank and some restructuring firms; E and
8 Y and Conway MacKenzie, and then the last piece of
9 the puzzle was the law firm.
10 Q. And before that meeting, where did the search for an
11 emergency manager stand? How many candidates -- how
12 many serious candidates did you guys have at that
13 point?
14 A. Before the -- what meeting?
15 Q. Before the meeting at the airport with the law
16 firms.
17 A. At the Jones Day?
18      I don't recall specifically but there
19 wasn't a lot. You know, we -- at that point I would
20 say we thought we had very few candidates that, A,
21 could do it and, B, were willing to do it.
22 Q. And how did it develop that Mr. Orr was identified
23 as a candidate? Did it happen at that meeting or
24 after that meeting?
25 A. I believe it was after that meeting Rich called me,

Page 56

1 Rich Baird called me and said what do you think of
2 Orr? And it was just a phone conversation is how it
3 started is my memory.
4 Q. And before that meeting, your only knowledge of or
5 exposure to Mr. Orr was his being part of the Jones
6 Day pitch team; is that fair to say?
7 A. Right.
8 Q. And your first notice that Mr. Orr was a prospect
9 was -- came from Mr. Baird?
10 A. Right.
11 Q. Do you know whose idea it was to propose Mr. Orr as
12 a candidate?
13 A. I believe it was Mr. Baird.
14 Q. And what was your reaction?
15 A. I was favorably inclined to explore it. We had only
16 met him for -- I forget how long those interviews
17 lasted but give or take an hour. So I had never met
18 him before then, so my experience with him is
19 limited.
20 Q. What was it about Mr. Orr that in your view made him
21 qualified to be the emergency manager?
22 A. There's two primary attributes that I appreciated.
23 One was he had a restructuring background which
24 clearly we needed and we'd been struggling in the
25 City, both from an operational as well as a balance

1  sheet restriction.
2      The other is my experience as Treasurer
3  dealing with emergencies in other cities, it's
4  really important that the manager has the right
5  personality because there's a way to do the job and
6  a way that calms the critics and the community, and
7  there's a way to kind of ruffle feathers. And I
8  liked Mr. Orr's disposition. I thought he would
9  have the ability to communicate a clear message as
10 to the reason why what is being done is being done,
11 and I thought that in many ways that is in large
12 measure probably the most important requirement.
13 Q. Did there come a time when you expressed your
14    support of Mr. Orr as the potential emergency
15    manager?
16 A. Yeah. I had one meeting with him is my memory, and
17    it was a lunch really and it was more social -- as
18    much social as business related, but coming away
19    from that meeting I was impressed and supportive,
20    and I know Rich was doing a lot of the groundwork to
21    vet him as a potential candidate and I trust Rich's
22    judgment.
23 Q. During those meetings with Mr. Orr, did you discuss
24    the path to Chapter 9 for the City of Detroit?
25 A. No. I think it was more us sharing with him what

1  our experience is in dealing with emergencies and
2  how the law works, and in a way I think it was more
3  information coming from Treasury to Orr than the
4  other way around.
5  Q. During the Jones Day legal presentation at the
6     airport on the 28th of January, did Jones Day lay
7     out to the group a path to Chapter 9 for the City of
8     Detroit?
9  A. No.
10 Q. Did they provide a written slide show or
11    presentation that laid out bankruptcy issues and
12    restructuring issues?
13 A. We interviewed six firms that day, I believe. I
14    don't remember the specifics of any particular
15    pitch. I do know that Chapter 9 was a discussion,
16    you know, in probably most all of the firms that we
17    met with, but I don't -- I have zero memory of any
18    discussion about a path.
19 Q. And just for the record, I've been saying the
20    January 28th meeting in the airport. I'm told that
21    it's really January 29th.
22 A. Okay.
23 Q. So, for the record, we're talking about the same
24    meeting.
25     During your discussions with Mr. Orr, did

1  he -- did you or he address the political issues
2  that were confronted by the Governor in terms of the
3  emergency manager statute and treatment of
4  retirement and pension benefits for the City
5  employees?
6  A. I don't recall that.
7  Q. You don't recall that at all?
8  A. I don't recall the specifics of our discussion. I
9     remember the lunch meeting where I think it was, as
10    I said before, more of us sharing with him what the
11    role of an EM is like and less some lessons that
12    were learned by us.
13     It wasn't like -- I don't recall any
14    circumstance where I was with Kevyn and I felt like
15    I was getting a tutorial about how did we get into
16    Chapter 9. I don't have any memory of something
17    like that.
18 Q. But during those discussions certainly you discussed
19    the pension exposure, the exposure to the pension
20    and the obligation to pay retiree benefits and the
21    impact that -- of that on the financial affairs of
22    the City of Detroit, didn't you?
23 A. We would have discussed the City's cash position
24    because that was front and center at the time. You
25    know, do they have enough cash to navigate through

1  the next year was probably the biggest issue.
2      And I suspect we would have high-level
3  discussions about the balance sheet of the City, but
4  there was no discussion about, you know, how do you
5  circumvent any liability and there was no talk about
6  hair cutting bondholders or pensioners or walking
7  away from health care, but there was general
8  discussions I'm sure about the condition of the
9  balance sheet.
10 Q. And you don't recall any specific discussions with
11    Mr. Orr in all of your interaction with him where
12    pension and health care obligations of the City
13    were discussed and plans for dealing with those
14    obligations were discussed?
15     MS. NELSON: I'm going to object to form
16    and foundation. Is there a time frame?
17 BY MR. SHERWOOD:
18 Q. Well, I guess it would be January --
19     MS. NELSON: You said all his
20    conversations. Are you --
21     MR. SHERWOOD: January 28th through the
22    filing date of July 18th.
23     MR. WERTHEIMER: Yeah.
24     THE WITNESS: Yes.
25 BY MR. SHERWOOD:

1  Q.  So you had discussions with him about those issues?
2  A.  Yes.
3  Q.  And what did you say and what did he say?
4         MS. NELSON:  Well, I'm going to object
5      because that will intrude on attorney-client
6      privileged communications, so you're going to have
7      to parse it out.
8  BY MR. SHERWOOD:
9  Q.  Did you have any conversations without counsel
10     present?
11 A.  Yes.
12 Q.  Okay.  And what was said during those?
13 A.  I mean, there was dozens of conversation so it's
14     hard for me to pick out one particular one and have
15     a clear memory of what was said.
16 Q.  Did you talk about the number, how much of -- how
17     much the pension was underfunded with Mr. Orr
18     outside the presence of counsel?
19 A.  There was discussions about what the funding status
20     of the pensions was, and it was and continues to be
21     a bit of a moving target.  So we discussed that yes,
22     there's a study being done to estimate what is the
23     current funding status of the pension funds.
24 Q.  Did you discuss with him outside the presence of
25     counsel the cost of health care to the retired City

1      employees and the impact of that on the City's
2      finances going forward?
3  A.  I'm sure we did.
4  Q.  Did you discuss with him the fact that Section 24 of
5      the State --
6         MR. WERTHEIMER:  Article 9 Section 24.
7  BY MR. SHERWOOD:
8  Q.  Article 9 Section 24 of the Michigan Constitution
9      provided that financial benefits of each pension
10     plan and retirement system shall not be diminished
11     or impaired?
12 A.  There was a general understanding that there was a
13     constitutional protection of pensions that was
14     understood by folks from day one.  So I think it
15     would be a premise of all discussions that were had.
16 Q.  That was something that you understood, right?
17 A.  I understood that there was a constitutional
18     provision, yes.
19 Q.  And based on your discussions with Mr. Orr, did you
20     understand that he understood the constitutional
21     protection?
22 A.  I'm -- I believe he understood there was a provision
23     in the Michigan Constitution that addressed this
24     issue.
25 Q.  And certainly the Governor understood that as well?

1  A.  I believe he did.
2  Q.  And you guys all had that understanding before the
3      bankruptcy was filed, correct?
4  A.  Yes.
5  Q.  And was it your understanding in the course of the
6      restructuring of the City of Detroit that a proposal
7      was made on June 14th to address those liabilities?
8  A.  I attended that and I probably flipped through the
9      book during the presentation, and I believe there
10     was an area that covered that topic, yes.
11 Q.  And would you describe the treatment of the claims
12     of the pensions and retirement systems as being
13     diminished or impaired under that proposal?
14 A.  I'd like to see it before I comment on it.
15 Q.  You'd like to see the proposal?
16 A.  The language in there, yeah.
17 Q.  While they're looking for it, do you know -- if you
18     look at -- and I'm sorry, everybody's seen this, but
19     it has been previously marked as Snyder 3, and this
20     is the June 14th proposal for creditors.
21        And if you turn to page 109 there is a
22     underlined bullet point on treatment of pensions.
23        MR. WERTHEIMER:  Just for the record,
24     that's one or another of us line.  It isn't on the
25     original document.

1         MR. SHERWOOD:  Yeah.
2         THE WITNESS:  I recall this and my memory
3      is that the intent of this document was to lay out
4      the facts for the creditors so that they could
5      understand the financial condition of the City.
6  BY MR. SHERWOOD:
7  Q.  Can I have it back?  Oh, you lost the page.
8  A.  Sorry.
9  Q.  That's okay, I'll find it.
10        But it does say at the bottom of page 109
11     that "Given the underfunding amount, there must be
12     significant cuts in accrued vested pension amounts
13     for both active and currently retired employees",
14     correct?
15 A.  That's what the document says.
16 Q.  And would you -- is it your view that the -- that
17     significant cuts in accrued vested pension amounts
18     for both active and currently retired persons is
19     consistent with the Michigan Constitution,
20     Section 24?
21 A.  That's a legal question that in my mind the courts
22     will decide.
23 Q.  Okay.  But it's really not a legal question.  It's
24     pretty obvious that it is a violation of the
25     Constitution, isn't it?

Page 65

1    A.    I don't agree with that.
2          MS. NELSON: Objection; argumentative.
3    BY MR. SHERWOOD:
4    Q.    And without giving your -- as a Treasurer, as a
5          former Legislator, is it your view or do you agree
6          that the proposed treatment on June 14th, 2013,
7          providing for cuts in accrued vested pension amounts
8          for both active and currently retired persons would
9          be violative of Section 24 of the Michigan
10         Constitution?
11   A.    No, because that doesn't provide for it.  To my
12         mind, and this is how this Governor does business,
13         is he hires good people and lets them do their job.
14         To me that document was laying out the
15         facts for creditors so they could understand the
16         financial condition of City.
17   Q.    So this wasn't a proposal even though it's -- even
18         though the title of the document is proposal for
19         creditors?
20   A.    I think he's just laying out the facts.  This is the
21         economic reality of the City of Detroit.  From
22         there, as you know, there was various meetings with
23         various creditors to discuss can we get this thing
24         settled out of court.
25   Q.    Did you participate in any of those meetings?

Page 66

1    A.    I don't believe so.
2    Q.    Were you given reports by the emergency manager as
3          to how those meetings were going?
4    A.    We typically had a weekly either meeting or call
5          where we were given an update on the status of
6          events.
7    Q.    Who was on the weekly meeting call?
8    A.    It would be Kevyn and some of the members from his
9          team, various members of the Governor's office as
10         well as my office.
11   Q.    And what was reported in terms of the progress that
12         the emergency manager was or wasn't making with the
13         out-of-court negotiations?
14         MS. NELSON: I'm going to object to the
15         extent that it calls for attorney-client
16         communications and instruct him not to answer.
17         That, in fact, is what it calls for.
18   BY MR. SHERWOOD:
19   Q.    Did you have any communications with Mr. Orr outside
20         the presence of counsel --
21   A.    Yes.
22   Q.    -- concerning -- concerning negotiations with
23         creditors before the Chapter 9?
24   A.    Yes.
25   Q.    And what did you say during those communications?

Page 67

1    A.    I was mostly just listening because I was getting an
2          update about how things were going.
3    Q.    What was the -- what did he say?
4    A.    The only specific memory I have would be the one
5          dealing with the SWOPS, discussions with the SWOP
6          providers and whether or not there could be a
7          settlement reached with them.
8    Q.    What did Mr. Orr say about the SWOPS?
9    A.    He reached an agreement with two of the SWOP
10         providers that he could get a discount on the monies
11         owed on the SWOPS, and that's my only memory of a
12         specific -- I knew every week that he was meeting
13         with various creditors, but that's the only one that
14         I remember kind of a specific deliverable for.
15   Q.    And do you recall anything else about those
16         nonprivileged conversations?
17         Did he report that the negotiations were
18         going well, that they were going poorly, that they
19         were not going at all, anything along those lines or
20         do you just recall the specific discussion about the
21         SWOPS?
22   A.    Yeah.  I -- there was, I think, just general
23         comments that they weren't real productive, right,
24         that we weren't making progress.
25   Q.    Did he say why?

Page 68

1    A.    I'm sure he did, but it would require going through
2          each of the various creditors that he met with at
3          the time so I don't have specific memories of each.
4          The only one I have a specific memory right
5          now about would be very difficult discussions with
6          the suretys, the insurance companies, a lot of
7          unwillingness to embrace what the economic realities
8          were, and then a lot of concern about the number of
9          retirees and the unions not wanting to represent the
10         retirees, making it difficult to negotiate for
11         20,000 people.
12   Q.    Did he say it was impossible to negotiate with all
13         of the creditors of the City of Detroit?  Did he
14         reach that conclusion in your presence?
15   A.    I don't recall the specific words he used but
16         clearly he was expressing that it was very difficult
17         to work and negotiate with a pool of creditors that
18         include 20,000 individuals, yes.
19
20         (Deposition Exhibit 5 was marked.)
21
22   BY MR. SHERWOOD:
23   Q.    Treasurer Dillon, we've marked as Dillon 5 an email
24         from you dated July 9th to the Governor and others.
25         Are you familiar with this email?

1 A.  Yes.

2 Q.  And it says that "Kevyn will meet with the Detroit

3  pensions tomorrow after all."

4  I want to ask you about the word after all.

5  Was there a suggestion before you wrote this email

6  that Kevyn was not going to meet with the Detroit

7  pensions?

8 A.  Yeah.  I think before that there was some thought

9  that that meeting was going to get cancelled.

10 Q.  And who was going to cancel it?

11 A.  My memory is Kevyn might have.  There was a lawsuit

12  that was filed that I think caused some

13  consternation about whether or not he should meet

14  with them.

15 Q.  So initially Mr. Orr was considering not meeting

16  with the pensions on July 10th, 2013, and then he

17  changed his mind and decided to meet with them?

18 A.  My memory is there was a plan to meet with them,

19  then some lawsuits got filed which I think he

20  contemplated not going forward with the meeting.

21  And from reading this, apparently he went forward

22  with the meeting.

23 Q.  Going down to the last paragraph it says "Tomorrow's

24  meeting could lead to questions directed to you

25  about your view on this topic."

1  Obviously, you is the Governor, and the

2  Governor's view on this topic, I assume this topic

3  is the Detroit pensions.  Would that -- is that

4  right?  Am I right saying those things?

5 A.  Right.

6 Q.  So and then you -- then you say "...it's too

7  early in the process to respond to hypothetical

8  questions.  We remain in many ways in the

9  informational stage."

10  Does that mean that at this point in time,

11  July 9th, 2013, you were still in the informational

12  stage vis-a-vis the Detroit pensions?

13 A.  We were learning things.  We were learning about an

14  annuity program that the City had offered employees.

15  We were learning that there was alternative

16  investments that were made that were not written

17  down.  We were learning what assumptions the

18  City's actuarial firm was making versus the ones

19  that Milliman was hired to really appreciate and

20  understand what was the level of underfunding.

21  So on that date in question I couldn't tell

22  you that these funds were funded at X percent

23  because there was too many moving pieces to the

24  puzzle.

25 Q.  So your advice to the Governor was in response to

1  questions about his view on the Detroit pensions was

2  to just say it was too early in the process and you

3  were still in the informational stage; is that

4  right?

5 A.  That's right.

6 Q.  And this was before the Governor authorized

7  Chapter 9 filing, correct?

8 A.  Correct.

9 Q.  Did that -- did your view of the Governor's -- what

10  the Governor's position should be change before

11  July 18th, in the next week?

12 A.  No.

13  MR. SHERWOOD: All right.  I'm going to

14  stop here, Treasurer.  Thank you.

15  I reserve the right if we have time to ask

16  a question or two later, but I think as a courtesy

17  to my -- the other lawyers here I'm going to turn

18  over the mic to them.

19  Thank you for your testimony this morning.

20  Should we take a quick break?

21  VIDEO TECHNICIAN: Off the record 11:02

22  a.m.

23  (A brief recess was taken.)

24  VIDEO TECHNICIAN: We're back on the record

25  at 11:06 a.m.

1  EXAMINATION

2 BY MR. WERTHEIMER:

3 Q.  Mr. Dillon, my name is Bill Wertheimer.  We've met

4  off the record.  I'm going to be asking you some

5  questions.

6  I represented and represent what we've

7  called the Flowers Plaintiffs.  That is one of the

8  group of retirees that filed lawsuits in state court

9  before the bankruptcy was filed.

10  You indicated early in your testimony that

11  you were involved in some discussions shortly after

12  you took office as Treasurer about replacing Public

13  Act 72.  Do you recall that?

14 A.  Uh-huh.  Yes.

15 Q.  You need to say your answer.

16 A.  Yes.

17 Q.  And you talked about competing constitutional

18  provisions, one of them being the constitutional

19  provision relating to public health, safety,

20  welfare, correct?

21 A.  Correct.

22 Q.  And as I understand it, your focus at the time had

23  to do with your ability to modify CBAs; is that

24  right?

25 A.  That's right.

1 Q. Would the competing constitutional provision that
2 you were discussing at the time have been the
3 impairment of contracts provision?
4 A. Yes.
5 Q. So it wasn't the provision dealing specifically with
6 pensions?
7 A. Correct.
8 Q. Am I right?
9 A. Right?
10 Q. Okay, that's what I thought.
11 Do you recall any discussions that dealt
12 with the pension provision in those discussions that
13 led up to Public Act 4?
14 A. Not specifically, and if -- it may have been at the
15 time, but when I look back now my memory is really
16 it was the two competing ones were the impairment of
17 contract and the health, safety and welfare.
18 So not that we never discussed nine, but
19 those were really the two that were the focal point
20 for me, and it's very likely that the other
21 Article 9 provision was discussed as well, but I
22 don't have as much memory about that.
23 Q. You don't have a memory about it.
24 When you were talking after the referendum
25 where Public Act 4 went down and you're now talking

1 about a replacement for that, were there any
2 specific discussions relating to the Article 9
3 provision; that is, the one relating to pensions?
4 A. Not to my memory.
5 Q. Do you recall any consideration at all as to whether
6 you should put any kind of contingencies in the
7 statute in -- at that point in the statute where
8 you're giving the emergency manager or the City the
9 ability to file for bankruptcy?
10 A. I was not part of discussions in that regard, and I
11 was not close to the actual drafting and movement of
12 the legislation through the Legislature.
13 Q. Okay. You have been -- would it be fair to say
14 you've been closely involved in the Detroit
15 situation from the time you took office in January
16 of 2011?
17 A. Yes.
18 Q. Could you briefly tell us what your role has been
19 since then and how that role has changed, briefly,
20 from January of 2011 up to date?
21 A. Yeah. To the best I can, because it goes back a
22 long time. There's been a lot of activities in
23 between.
24 Q. I understand. And we've got underlying documents
25 with dates and stuff and titles, but I just want

1 kind of a general framework.
2 A. I mean, just generally speaking, Detroit was on our
3 radar when we came in. We knew it was, you know,
4 potentially in trouble. But the first six months I
5 think that the dealings were rather limited. I
6 recall we had some issues regarding Flint and DPS
7 that predated our more active engagement with
8 Detroit.
9 And then Detroit started to experiencing,
10 you know, cash crunches. And one of the consultants
11 we used at DPS, we asked if he would help with
12 Detroit. That was Gora Mahatra (ph.) from Ernst and
13 Young. And really the focus on the early end was
14 just understanding the City's cash position and
15 making certain that they would be able to meet
16 payroll and their essential obligations.
17 And I had always told the Governor that to
18 me kind of the trigger number was if the City got
19 below 50 million in cash, I would come to him at
20 that point and likely recommend that we begin a
21 review, an emergency review. And that was kind of
22 our benchmark is to -- I didn't want to be in a
23 situation where the City got below 50 and then we're
24 starting a review because it might be too late to
25 help the City at that point.

1 So on the early end it was a partnership
2 with the City and just working with them, and then
3 when the cash got tight, you know, we moved into the
4 initial -- there was two reviews, right, the initial
5 review which I think happened in '11 that led to a
6 consent agreement and --
7 Q. And the consent agreement was when, approximately?
8 A. April, I think of '12 --
9 Q. '12, okay.
10 A. -- is my memory.
11 And so during that, prior to the consent
12 agreement there was a lot of obviously negotiations
13 to get to that point so that we had an understanding
14 and that the City had the ability to address their
15 issues on their own. And then it wasn't until
16 December of '12 where I had a meeting with Chris
17 Andrews, and the City had gone through -- don't hold
18 me to the number -- but tens of millions of dollars
19 of cash from September through December where their
20 disposable cash was eroding rapidly.
21 And immediately after that meeting, I
22 called the Governor and I said I think they're at
23 the $50 million threshold and I think we have to
24 commence another review immediately. I believe that
25 was because the law had changed. So the initial

1   review was no longer valid because it was done under
2   a prior law. So we initiated the new review in
3   December of '12 which led ultimately to the
4   emergency manager's appointment.
5        Once the manager was appointed our
6   day-to-day active role diminished somewhat.
7   Q. Let me ask you a question about that.
8        Do you have one-on-one conversations with
9   Mr. Orr?
10  A. Yes.
11  Q. How often?
12  A. It varies. One-on-ones would be -- it could be
13       twice in a week or it could be zero in a week.
14       Depends what issues are brewing.
15  Q. What about larger discussions with other people
16       ever, either in person or telephone conferences?
17       How often with Mr. Orr since he's been appointed?
18  A. We have a standing meeting on Mondays where it could
19       be face-to-face or it could be over the phone where
20       it's just a briefing on what happened last week,
21       what's happening next week, where are we.
22  Q. Has your role stayed essentially the same from the
23       time Mr. Orr took over or did it at all change when
24       he filed Chapter 9?
25        MS. NELSON: Objection; form, foundation.

1        You said when he took over and then when he filed
2   Chapter 9.
3        MR. WERTHEIMER: Well, there were two
4   different times and I'm just trying to find out
5   whether --
6   BY MR. WERTHEIMER:
7   Q. Go ahead.
8   A. I think it's pretty much the same.
9   Q. Okay.
10  A. When he first came in, we gave him time to find out
11       where the desks were and chairs and gave him time to
12       assemble and then -- but the weekly standing meeting
13       was pretty much a given.
14  Q. At either the weekly meetings or in your one-on-one
15       conversations with Mr. Orr, have you ever discussed
16       with him either the subject of Article 9 Section 24
17       of the Constitution specifically or generally the
18       fact that the State Constitution does have some
19       special protections for pensions?
20        Has that subject matter come up in any of
21       these conversations?
22        MS. NELSON: Objection; attorney-client
23       privilege. If you want to go ahead and establish
24       whether those conversations occurred with or without
25       counsel, then he can appropriately answer.

1   BY MR. WERTHEIMER:
2   Q. I'll ask you to exclude any conversations where your
3       counsel was present, so either the one-on-ones or if
4       in any of these group meetings you did not have
5       attorneys present.
6   A. I don't have any specific memory of a discussion
7       about Article 9 with Mr. Orr.
8   Q. How about discussions about the fact that there was
9       this state provision that protected pensions?
10  A. I'm -- I presume that it was discussed early on and
11       it was understood by people that there was this
12       provision in the Constitution.
13  Q. Including Mr. Orr? That is, I assume you're saying
14       that this came up in some way in your conversations?
15  A. Yes.
16  Q. Okay. Did it also come up in your conversations
17       that the only practical way to deal with this issue
18       absent getting consent from the 20,000 retirees or
19       the unions on their behalf was the filing of a
20       Chapter 9?
21  A. I don't recall that conversation.
22  Q. Isn't that, in fact, your understanding; that is,
23       isn't it your understanding as you sit here that the
24       only practical way that the State could have dealt
25       with the State constitutional provision other than

1   honoring it and the State coming in and making good
2   on the pensions was for a bankruptcy to be filed?
3   A. Not necessarily.
4   Q. How else, as you sit here, do you think it could as
5       a practical matter be dealt with?
6        MS. NELSON: Objection; calls for a legal
7   conclusion.
8   BY MR. WERTHEIMER:
9   Q. Go ahead, Mr. Dillon.
10  A. There's another unit that I referenced earlier that
11       has virtually no funding in their pension fund,
12       right? So, I mean, my understanding is the law is
13       very unsettled here, right?
14  Q. Which law?
15  A. That the law is unsettled.
16  Q. Just the law generally?
17  A. Right.
18  Q. Go ahead.
19  A. So if you have a unit that basically exhausts all of
20       their pension monies and then has no means by which
21       to honor those pension payments, what happens? I
22       can't sit here and tell you, but I've had
23       discussions. I've asked for legal advice on what
24       happens, and the advice I got was --
25        MS. NELSON: It's attorney-client

Page 81

1  privilege.
2       THE WITNESS: Oh, okay.
3  BY MR. WERTHEIMER:
4  Q.  You know as you sit here -- I'm assuming, I'm
5      asking -- that the Attorney General has filed papers
6      in the bankruptcy in which he has said that it's his
7      legal opinion that Article 9 Section 24 applies in
8      the bankruptcy; do you not?
9       MS. NELSON: Objection to form and
10      foundation. As we indicated yesterday, an Attorney
11      General opinion has a specific -- you're saying
12      legal opinion.
13      MR. WERTHEIMER: Margaret.
14      MS. NELSON: You're talking about a brief.
15      MR. WERTHEIMER: Margaret, you are entitled
16      to make an objection. You are not entitled to
17      comment.
18      MS. NELSON: Well, your characterization of
19      a legal opinion is incorrect. So my objection is
20      form, foundation.
21      MR. WERTHEIMER: That's fine.
22      MS. NELSON: And calls for a legal
23      conclusion.
24      MR. WERTHEIMER: Thank you.
25  BY MR. WERTHEIMER:

Page 82

1  Q.  Could you answer?
2  A.  I'm aware that the Attorney General has intervened,
3      but I haven't read his brief and I don't know the
4      position he's taken.
5  Q.  Haven't you read the press reports?
6  A.  Yeah.
7  Q.  And, I mean, you know that the Attorney General's
8      position is, would it be fair to say, not consistent
9      with the position that Emergency Manager Orr has
10      stated publicly to the Detroit Free Press and
11      others?
12  A.  I don't mean to be difficult, but that's an overly
13      broad statement because in my mind -- I haven't read
14      what the Attorney General is saying. He may be
15      acknowledging that this constitutional provision
16      exists, which I assume is one position.
17      How that's dealt with in a Chapter 9
18      proceeding, I don't know if the AG's opined or taken
19      a position on that, so I don't know.
20  Q.  Okay. Has the Attorney General ever communicated to
21      you as the head of Treasury the opinion that
22      Article 9 Section 24 applies in the bankruptcy?
23  A.  I haven't discussed this topic with the Attorney
24      General. And by that I mean the person, Bill
25      Schuette.

Page 83

1  Q.  I understand. That's what I thought you meant.
2       Have you had any one-on-one discussions
3      with the Governor about -- either specifically about
4      Article 9 Section 24 or generally about the fact
5      that there is a state constitutional provision that
6      protects pensions?
7       MS. NELSON: Objection; asked and answered.
8      You can go ahead and answer again.
9       THE WITNESS: No.
10  BY MR. WERTHEIMER:
11  Q.  The subject has never come up between the two of
12      you?
13  A.  Well, you said one-on-one.
14  Q.  You're right, I did say one-on-one.
15       Has it ever come up in group meetings
16      without attorneys present?
17  A.  And what precisely was that again? Can we --
18  Q.  A conversation in which you discussed either the
19      specifics of Article 9 Section 24 or generally the
20      fact that there is a state constitutional provision
21      that protects pensions.
22  A.  I don't recall.
23  Q.  Do you recall that in early July initially two
24      lawsuits were filed against you in your official
25      capacity and against the Governor in his that

Page 84

1      related to what was going on in Detroit and this
2      pension provision we've been asking you about?
3  A.  That rings a bell.
4  Q.  Okay. Did you learn -- do you recall whether you
5      learned about them the day they were filed? And if
6      it helps, they were filed on July 3rd.
7  A.  I don't know the exact number but I think there are
8      give or take a hundred lawsuits against the Governor
9      and I related to this topic, so I'm nervous about
10      saying I have specific memory on any particular one,
11      but --
12  Q.  You mean among these hundred cases you can't
13      differentiate either the Flowers or the Webster case
14      or the case that the pension boards brought that
15      specifically dealt with the ability of the Governor
16      to authorize a bankruptcy in the face of Article 9
17      Section 24? You really can't differentiate?
18  A.  I recall that those suits got filed. The day and
19      the time I got notified, I don't recall.
20  Q.  Okay. Do you recall learning that there was going
21      to be a hearing on requests for injunctive relief
22      that would have in some way precluded the Governor's
23      ability to authorize a bankruptcy and that that
24      hearing was scheduled for July 22nd?
25  A.  I recall that there was a hearing scheduled. I

1    don't recall the specific date.

2 Q.  Okay. But you knew about it before the hearing

3    itself?

4 A.  Yes.

5 Q.  A week, 10 days before?

6 A.  I don't recall.

7 Q.  Did you have any discussions internal at Treasury

8    about the fact that there was going to be this

9    hearing at which a state court judge was going to be

10    asked to issue injunctive relief along the lines

11    I've suggested?

12        MS. NELSON: Objection; attorney-client

13    privilege. If you want to sort that out because he

14    does have as legal counsel Fred Headen.

15 BY MR. WERTHEIMER:

16 Q.  Again, let's exclude any conversations where your

17    attorneys were present for the purpose of either

18    giving advice or potentially giving advice.

19        Did you have any conversations excluding

20    those between the time you learned of the lawsuit

21    and learned that there was going to be a hearing

22    later in July?

23 A.  I don't recall any conversations where a lawyer was

24    not present for that topic.

25 Q.  So you were -- and how many conversations did you

1    have about that subject matter with lawyers present?

2 A.  I don't recall, but I would say three or less.

3 Q.  Okay. Did you at any point learn that the

4    Governor's office planned to -- in conjunction with

5    the Detroit Emergency Manager planned to file

6    bankruptcy the Friday before that Monday hearing or

7    July 19th?

8 A.  I was aware that there was a sequence of events, a

9    time schedule for when things would happen. And my

10    memory was I wasn't -- I don't know if I wasn't in

11    Lansing or I wasn't, you know, having meetings at

12    the Governor's office during that window and right

13    prior to the filing.

14        I wasn't having meetings in those three-

15    and four-day window with them, so I knew there was a

16    schedule and a timeline, but I wasn't having direct

17    discussions with the Governor's office.

18 Q.  Did you know that the plan was to file for

19    bankruptcy before the court hearings?

20 A.  I -- can you restate the question?

21 Q.  Yes. Did you at least know that the plan was that

22    if the plan went forward, the bankruptcy filing

23    would occur before the hearings that were scheduled

24    in the cases that had been filed against you and the

25    Governor?

1 A.  I don't remember the sequence of the dates so -- and

2    I wasn't part of that decision so I --

3 Q.  Okay.

4 A.  I'd have to see some documents to show, yeah, this

5    is the time schedule we discussed on such and such

6    date, and I don't remember the date the hearing was

7    scheduled on the Flowers case.

8 Q.  Let me show you what we marked yesterday at the

9    Governor's deposition Snyder Exhibit 6, and let me

10    just direct your -- I'm going to show it to you but

11    I'm going to direct your attention because there's a

12    lot of information in the document.

13        It looks to me from the upper right as

14    though this is a document created the 17th of July,

15    which would have been the Wednesday, and it's a

16    rollout plan that indicates that the Governor's

17    going to sign the authorization 8 p.m. on Thursday

18    the 18th, and then the filing is going to be the

19    morning of the 19th, and all kinds of events follow

20    that up to and including Fox News Sunday and George

21    Stephanopoulos and Frank Beckman and you name it.

22 A.  Uh-huh.

23 Q.  Let me just ask you have you ever seen that

24    document?

25 A.  I don't have a specific memory of it. I think we

1    met that Monday where the timeline was discussed.

2 Q.  The preceding Monday?

3 A.  Yeah.

4 Q.  Which would have been the 15th? Am I right?

5 A.  I believe so.

6 Q.  Okay.

7 A.  I don't know if this got circulated at that meeting

8    or was just discussed.

9 Q.  Well, does it refresh your memory as to what the

10    plan was?

11 A.  Generally speaking, yes.

12 Q.  Okay. And the plan was to -- the Governor would

13    sign it Thursday night and Orr would file on Friday,

14    right?

15 A.  That's my memory.

16 Q.  Do you recall that the plan changed at the last

17    minute?

18 A.  I believe it may have. Yes. I think it --

19 Q.  Were you involved in any conversations with anyone

20    excluding conversations where attorneys were present

21    for the purpose of giving legal advice where anyone

22    gave a reason for that change of plan?

23 A.  I was not present for any of those discussions.

24 Q.  Did you hear secondhand?

25 A.  No.

Page 89

1 Q.  You never heard why Orr moved it up by a day or it
2      was moved up by a day?
3 A.  No, and, in fact, it was -- I'd like to look at my
4      schedule because I don't know if I was even in
5      Lansing during those dates.
6 Q.  Okay.  But you do -- you have no memory as to ever
7      knowing the reason why it was moved up.  That's just
8      what I want to know about.
9 A.  I've heard speculation on the street.
10 Q.  We're not talking about the street, but if the
11     street includes people at Treasury --
12 A.  No.  No.
13 Q.  -- or people in the Governor's office?
14 A.  No one briefed me on why the date moved.
15 Q.  Okay.  I'm going to show you what we had marked
16     yesterday at the Governor's deposition as Exhibit 8.
17         This is an email from you to the Governor a
18     day before the one that you were previously shown.
19     Could you take a look at that, please.
20         Do you recall sending that email to the
21     Governor?
22 A.  Yes.
23 Q.  And would I be correct I guess in my arithmetic that
24     last Wednesday would have been July 3rd, as you
25     begin last Wednesday.

Page 90

1 A.  That sounds about right.
2 Q.  Okay.  And for the record, that's when the Flowers
3      and Webster's cases were filed, on July 3rd.
4          Is that -- would that have been the
5      reason -- would that be the information you learned
6      on that last Wednesday?
7 A.  I don't believe so.
8 Q.  What was it, if you recall?  There's a reference to
9      Detroit consultants, that's why I am --
10 A.  Yeah.  No, I think this had to do with the level of
11     funding for the pensions, how it was getting
12     measured.  So I was -- the filing of the suit
13     wouldn't tie into this comment about their thought
14     about the impact on the ability to pay pensions.
15         So the number was moving about how well
16     funded the pension plans were, and there were
17     several issues that we were learning about; the
18     annuity program, the failure to write down
19     alternative assets that were on the books, the
20     actuarial assumptions to get to the level of
21     funding, calculus.
22         So there was a lot of activity around the
23     pensions in trying to get our arms around it at that
24     time and --
25 Q.  Do you recall, if you look further down in the first

Page 91

1      paragraph, the sentence that reads "I learned today
2      that due to the pension funds recent suits against
3      you and me...", is that a reference -- can you tell
4      me what that's a reference to?
5 A.  I don't have a specific recollection about if it was
6      the Flowers suit or not.
7 Q.  It may have been?
8 A.  Probably was.
9 Q.  Probably was.  Okay.
10         And in this email you're telling the
11     Governor in the next paragraph that the consultants
12     think that current pensions have to be cut
13     significantly, correct?
14 A.  I expressed the view of the consultants, yes.
15 Q.  Did you agree with that view?
16 A.  To me it was -- there's a lot of -- to value the
17     level of funding of a pension fund requires a lot of
18     assumptions on a lot of different factors, and to me
19     it was very fluid.  And I think there was an earlier
20     email we looked at before where I just -- I think my
21     advice to the Governor was let's -- we're in the
22     informational stage, so I viewed it that way.
23         I was troubled though by, for example, the
24     annuity program which I thought was very damning and
25     damaging to the status of the pension funds.  You

Page 92

1      know, The 13th Checks that go out.  There's a lot of
2      activities that I thought were doing damage to the
3      pension funds, but until I really knew what the
4      funding status was it was hard to form an opinion
5      about what the impact would be on retirees.
6 Q.  Okay.  Did you have any personal conversations with
7      the Governor around these issues at this time or was
8      it just the email -- the two emails?
9 A.  From reading the one email it looks like I called
10     him.
11 Q.  Right.  Do you remember whether you just left a
12     message or you had a substantive conversation?
13 A.  I think we spoke briefly, yeah.
14 Q.  What was the content of that conversation?
15 A.  It was one of these issues that was bubbling up that
16     I wanted to get on his radar so --
17 Q.  Do you remember which one?
18 A.  I'd have to guess, but it would be in this area that
19     I was referring to.  But there was one in
20     particular.
21 Q.  Are you referring to the Flowers, Webster litigation
22     or are you referring to this other litigation you've
23     been talking about?
24 A.  Not litigation.  I think I was referring to the
25     information we were learning about the health of the

1    pension funds.
2  Q.  Okay.  All right.
3        Did you have any conversations with the
4    Governor about the issue of whether Orr should file
5    for bankruptcy say in the couple weeks preceding the
6    filing?
7        MS. NELSON: Again, are you speaking just
8    one-on-one other than attorney-client?
9  BY MR. WERTHEIMER:
10 Q.  One-on-one or in group conversations -- I don't
11   want -- I'm not asking you to violate the
12   attorney-client privilege.  I think you understand
13   what we're getting at here.
14 A.  Yeah.
15 Q.  So my questions you should assume are modified in
16   that respect.
17 A.  Yeah, so can you restate the question?
18       (Reporter read record as follows:
19       "Q.  Did you have any conversations with the
20       Governor about the issue of whether Orr
21       should file for bankruptcy say in the
22       couple weeks preceding the filing?")
23       THE WITNESS: I have a question for my
24   lawyer.
25       MR. WERTHEIMER: That's fine.  If you want

1    to take a break or just go outside.
2        VIDEO TECHNICIAN: Off the record 11:35
3    a.m.
4        (A brief recess was taken.)
5        VIDEO TECHNICIAN: We're back on the record
6    at 11:37 a.m.
7        THE WITNESS: Yeah, I don't recall any
8    conversations with the Governor outside the presence
9    of counsel on that topic.
10 BY MR. WERTHEIMER:
11 Q.  Okay.  If you take a look at the July 9 -- do you
12   have that one in front -- that's five.  This one
13   here.
14 A.  Okay.
15 Q.  And let me direct your attention to the first
16   paragraph.  You're telling the Governor that the
17   emergency manager's going to meet relative to the
18   pensions the next day, and then a couple down
19   sentences down you say he, meaning Orr, will not
20   translate that into an impact on retirees or
21   employees' vested rights or what share of monies
22   available to unsecured creditors would go to the
23   pension plans.
24       What was your understanding of why Orr was
25   not going to do that?  What's the point, and why are

1    you telling the Governor?
2        That's -- your attorney's going to object.
3    That was three questions.
4  A.  Okay.
5        MS. NELSON: Yes, which one would you like
6    him to answer first?
7        MR. WERTHEIMER: He can do it in order or
8    however he'd like.
9        MS. NELSON: Well, I don't know that he's
10   going to remember them all by the time he gets to
11   the last one.
12       THE WITNESS: I mean, to me the building
13   block is what's the funded status.  And that issue
14   was fluid, and I think that's the first issue that
15   if you're going to reach a settlement with your
16   creditors it's important to understand, all right,
17   what's the funding level.  From there you can start
18   to figure out how do you solve this equation going
19   forward.  So I was comfortable with that.
20 BY MR. WERTHEIMER:
21 Q.  Well, isn't there a political reason to not
22   translate it into the impact on retirees because the
23   impact is going to be negative?  All we need to do
24   is look at the June 14th creditors' proposal to know
25   that, don't we?

1        MS. NELSON: Objection; form, foundation,
2    calls for speculation.
3  BY MR. WERTHEIMER:
4  Q.  Go ahead.
5  A.  That wasn't my thinking.  My thinking was until you
6    really know the funding status, it's hard to really
7    understand what the impact may be.
8        So it was more important to understand that
9    first.
10 Q.  Okay.  I have nothing further.  Thank you.
11       MS. NELSON: Is everybody done?
12       MR. SHERWOOD: I have one or two followup,
13   but I'll let you go first.
14       MS. GREEN: You can go.  Do your followup
15   first.  We'll wait.
16       MR. SHERWOOD: Can I use this microphone?
17       MS. NELSON: Well, you're the Retiree
18   Committee and I don't believe you --
19       MR. GALLAGHER: We're not the Committee,
20   we're the Retirement Systems.
21       MS. NELSON: I'm sorry, the Retirement
22   Systems.  You did not subpoena -- did not issue a
23   subpoena to the Treasurer, and it's my understanding
24   the parties that didn't subpoena aren't entitled to
25   question.

1    MR. GALLAGHER: Why would they not be
2  entitled to question?
3    MS. NELSON: Because you didn't subpoena
4  the witness. I thought that was in the judge's
5  order.
6    MR. WERTHEIMER: I've got the judge's
7  order.
8    MS. NELSON: Not the one that we signed.
9  Isn't that in his discovery order, only the parties
10  seeking the discovery?
11    MR. WERTHEIMER: I'm not sure. Let me
12  look. Let me look.
13    MR. SHERWOOD: Do we have to have this on
14  the record?
15    MS. NELSON: No, we don't have to do this
16  on the record.
17    VIDEO TECHNICIAN: Off the record at 11:40
18  a.m.
19    (Discussion held off the record.)
20    VIDEO TECHNICIAN: We're back on the record
21  at 11:43 a.m.
22    RE-EXAMINATION
23  BY MR. SHERWOOD:
24  Q.  Treasurer Dillon, Jack Sherwood again for AFSCME. I
25    have just a few follow-up things. It won't be too

1    much longer, for me anyway. Just following up on
2    the --
3    MS. NELSON: Famous last words of a lawyer.
4  BY MR. SHERWOOD:
5  Q.  Following up on the sequence of events that led to
6    the -- on the bankruptcy filing timeline, you know,
7    there was a -- you talk about this July 18th date
8    and you gave prior testimony that you didn't really
9    know what the impact of Flowers and Webster was on
10    that date.
11    Do you recall that discussion?
12  A.  Yes.
13  Q.  Do you know what drove the filing date of the 18th
14    in the first place? Was there any compelling reason
15    to file on July 18th that you're aware of?
16  A.  We were briefed a few times on the schedule, and
17    the -- just there's a lot of events that have to
18    happen postfiling. So I was briefed on it. I don't
19    recall the specifics other than that the process to
20    go through a nine is lengthy, and there was a desire
21    on the Governor's part if you're going to do this he
22    wants it to be fast and efficient.
23    And so we got briefed on several occasions
24    about a calendar and all the events that would have
25    to follow. So precisely that date, I don't think

1    there was a specific reason other than there's a
2    lengthy process involved with this and it was to
3    deal with that timing.
4  Q.  All right. And I think in one of the exhibits the
5    original date reflected the 19th as the proposed
6    filing date.
7    Do you know when the 19th or the 18th was
8    established as the proposed filing date?
9  A.  I don't recall.
10  Q.  Do you know whether it was before July 1st?
11  A.  It was after July 1st.
12  Q.  So it's your clear recollection that the 18th or the
13    19th was established as the filing date after
14    July 1st? That's your testimony?
15  A.  I don't remember being briefed on a specific date,
16    you know, weeks ahead of time. I remember --
17  Q.  Is it possible that it could have been established
18    as the filing date before July 1st?
19  A.  If it was, no one told me about it.
20  Q.  Are you familiar with the New Energy to Reinvest
21    Diversity Funds a/k/a the NERD Funds?
22  A.  I'm sorry?
23  Q.  Are you familiar with an organization called New
24    Energy to Reinvest Diversity, also known as NERDs?
25  A.  I'm aware that this fund exists.

1  Q.  Do you know what the purpose of the fund is?
2  A.  I don't.
3  Q.  Do you know whether any of the funds from NERDs,
4    N-E-R-D-s, are being used to fund any expenses of
5    the emergency manager?
6  A.  I've read about it in the paper. Rich Baird is
7    closer to that than I am. He may be able to give
8    you more precise information.
9  Q.  Do you know any of the major donors for the NERDs
10    Fund?
11  A.  No.
12  Q.  Do you recall meeting with Al Garrett and Ed McNeil
13    in December of 2012 regarding the City of Detroit?
14  A.  I have met with them several times. I have a vague
15    memory of that.
16  Q.  And for the record, who are Al Garrett and
17    Ed McNeil?
18  A.  Al is the head of AFSCME in Detroit and Ed works for
19    him.
20  Q.  Was the last time you met with them December 2012?
21  A.  I'm not certain but probably. I think I've seen Ed
22    since then, but I don't recall meeting with Al since
23    then.
24  Q.  During that meeting, did you discuss ways to
25    increase revenues for the City of Detroit to satisfy

1     its liabilities?
2  A.  I don't have specific memory of that, but it sounds
3     familiar.
4  Q.  And at that point in time do you recall that there
5     was over $700 million owed to the City by various
6     parties?
7  A.  I recall that and I recall that we looked into it,
8     and the information I got back from my staff is that
9     it's virtually uncollectible.
10  Q.  What did your staff base that conclusion on?
11  A.  I have a Department of Collections here within
12     Treasury so we have some people that are skilled in
13     collections, and they looked at what was available
14     to Detroit, and the view of the world was that over
15     90 percent of these are uncollectible.
16  Q.  Did you provide Mr. Orr with access to your people
17     that worked on collection of this $700 million?
18  A.  Indirectly.  I mean, we made them available to the
19     City.  That might have predated Kevyn.
20  Q.  What is the basis for the conclusion that this money
21     is uncollectible?
22  A.  It'd be a variety of reasons.  Agings, can't find
23     who owes the money.  It would probably be five or
24     six different reasons that make up the vast majority
25     of that conclusion.

1  Q.  In February of 2012, were you involved with an
2     effort to have a tentative agreement with a
3     coalition of unions?
4  A.  No, but --
5        MS. NELSON: That's all you --
6        THE WITNESS: No.
7  BY MR. SHERWOOD:
8  Q.  Did you have any discussions or were you aware that
9     there was a coalition of unions that were working on
10     a tentative agreement in February of 2012?
11  A.  I was aware that the City was working with their
12     unions to negotiate solutions to wage and benefit
13     costs.
14  Q.  What, if any, was your role in connection with that
15     Coalition-City negotiation?
16  A.  My memory is none until they came up with tentative
17     agreements.
18  Q.  What was the view of yourself with respect to the
19     tentative agreements?
20  A.  I had them reviewed by labor experts, and the advice
21     that came back to me is that they were not something
22     that should be agreed to.
23  Q.  Why not?
24  A.  A variety of reasons.  That it -- fundamental issues
25     about management versus, you know, the ability of

1     the City to manage itself with some of the
2     provisions of the agreements were problematic.
3        We had -- I don't remember the number of
4     issues, but there was substantial number of issues
5     that were problematic.
6  Q.  Did you communicate those issues to the coalition of
7     unions?
8  A.  I don't recall.
9  Q.  Who did you communicate those issues to?
10  A.  To the City.  I do recall one meeting I had with
11     Joe Duncan, but that may have been after the fact
12     about this issue.  But our communications would have
13     been with the City itself.
14  Q.  Isn't it true that the tentative agreement that the
15     City and the unions were working on would have saved
16     the City money?
17  A.  I know that they believed it would.
18  Q.  And you didn't agree with them?
19  A.  The advice that I got from the people I had review
20     this for me was that we shouldn't support these
21     tentative agreements because they won't work.  They
22     won't help solve the City's problems.
23  Q.  And, in fact, you didn't -- or the Governor didn't
24     support the tentative agreements; isn't that right?
25  A.  I don't know if the Governor had any role with

1     respect to the tentative agreements.
2  Q.  So that was your decision to make?
3  A.  Yes.
4  Q.  And you decided not to support these tentative
5     agreements with the union, correct?
6  A.  Correct.
7  Q.  Even though those tentative agreements might have
8     saved the City money?
9        MS. NELSON: Objection; asked and answered.
10  BY MR. SHERWOOD:
11  Q.  Do you recall whether health care savings were
12     negotiated as part of that tentative agreement with
13     the unions?
14  A.  I'd have to review them to recall that.
15  Q.  You don't recall whether health care savings for the
16     City was part of the tentative agreement
17     negotiation?
18        MS. NELSON: Asked and answered.
19        THE WITNESS: I don't recall.
20        MR. SHERWOOD: Okay.  I just wanted to make
21     sure.
22  BY MR. SHERWOOD:
23  Q.  What about efforts to use amnesty as a means of
24     collecting funds by the City, has that been
25     explored?

Page 105

1  A.  I believe the City did it.
2  Q.  Was it done in 2012?
3  A.  I -- I don't recall.
4  Q.  Have any -- with respect to $700 million worth of
5      receivables that we talked about, has any effort
6      been used to use amnesty as a means to collect that
7      money?
8  A.  I recall that the City put in place an amnesty
9      program.  Whether any of those receivables in that
10     700 million were collected through that program, I
11     can't answer.
12 Q.  When was the last time the City implemented an
13     amnesty program?
14 A.  I don't know.
15 Q.  Was one -- has one been implemented since December
16     2012?
17 A.  I know that they did one recently.  I don't recall
18     the date.
19 Q.  Okay.  Now I'm really done.  Thank you.
20              EXAMINATION
21     BY MS. GREEN:
22 Q.  Hi, Mr. Dillon.
23 A.  Hello.
24 Q.  I'm Jennifer Green.  I represent the Retirement
25     Systems for the City of Detroit.

Page 106

1          Following up with the prior line of
2      questioning, you said you think you were traveling
3      the day the petition was filed; is that correct?
4  A.  I don't recall.
5  Q.  Do you recall where you were when you first found
6      out the petition was filed?
7  A.  No.
8  Q.  Were you not aware that day that it was going to be
9      filed?
10 A.  I knew from the meeting on the Monday that there was
11     a schedule, and I had no reason to believe that that
12     schedule would change or not change so I was not
13     aware of any changes until after it happened.
14 Q.  So was it a surprise when you found out that the
15     petition had indeed been filed?
16 A.  It wasn't like there was this iron clad schedule
17     that wasn't movable, so I don't think I really gave
18     it a lot of thought.
19 Q.  You mentioned earlier that the first time that you
20     saw the Governor's authorization letter was online
21     on freep dot com.  Do you recall?
22 A.  (Nodding head up and down.)
23          MR. WERTHEIMER:  You need to say your
24     answer.
25          THE WITNESS:  Oh.  Yes.

Page 107

1     BY MS. GREEN:
2  Q.  Do you remember where you were or what time it was
3      that you were reading about this, that the petition
4      had been filed?
5  A.  Vague recollection.  I was in the Detroit area when
6      I read it.  The letter, I believe, was addressed to
7      me so I imagine it came in hard copy, but the first
8      time I read it was online.
9  Q.  Would have been that night, do you recall?
10 A.  I don't recall.
11 Q.  Did you not see the email prior to the filing that
12     had sent the authorization letter?
13 A.  I don't recall.
14 Q.  Do you recall getting the email with the
15     authorization letter?
16 A.  I do not.  In fact, I don't know if it came via hard
17     copy or email.
18 Q.  You testified earlier that you did not have a role
19     in drafting PA 436.  Who was involved in drafting it
20     as far as outside counsel?
21 A.  I guess I want to be -- 436?  I want to be careful.
22     There was meetings let's say late November, early
23     December with me and some folks on my staff as well
24     as the Governor's office where we talked high level
25     about how could we address some of the issues that

Page 108

1      led to the repeal of PA 4.
2          Once those themes were kind of framed out
3      then it would be handed off to folks on my staff as
4      well as the Governor's staff that moved legislation
5      through the Legislature.  And my involvement in any
6      nuance from that point was pretty much over.
7  Q.  So you don't know?
8  A.  I can name some of the people that were part of
9      that.
10 Q.  Oh, okay.  Who would that be?
11 A.  Howard Ryan on my staff, Brom Stibitz, and the
12     Governor's office I can only guess who it was, but,
13     you know, there's someone responsible for dealing
14     with the Legislature.  I assume he was involved.
15 Q.  Who was that?
16 A.  Dick Posthumus.
17 Q.  What about with respect to PA 4; you said you didn't
18     have a role in drafting PA 436 but what about PA 4?
19 A.  It would be the same.  High level, you know,
20     directional and then pretty much the same team I
21     just described would have been the arms and legs on
22     the ground executing the process through the
23     Legislature.
24 Q.  Do you know who outside of the Legislature or
25     outside of the State of Michigan would have been

1 consulted with respect to PA 4?

2 A. Well, during the transition -- if it's lawyers can I

3 disclose lawyers?

4 MS. NELSON: With respect to PA 4, is

5 that --

6 THE WITNESS: Initial formation of PA 4.

7 MS. NELSON: If they're attorney-client

8 privileged communications, no, they're privileged.

9 THE WITNESS: Yeah. So some were lawyers

10 and then some were just people that were on the

11 transition advisory board. Like Bob Daddow was

12 involved, Mark Murray was on the Treasury transition

13 aspect, Brom Stibitz from my staff was involved. I

14 don't recall -- Dick Posthumus, I believe, was

15 involved. I don't recall others that were

16 nonlawyers that were part of the consultants.

17 BY MS. GREEN:

18 Q. What about restructuring consultants? Did you have

19 any restructuring consultants that took part in the

20 process?

21 A. For PA 4?

22 Q. Yes.

23 A. I don't recall that.

24 Q. Isn't it true that Jones Day actually provided you

25 with review and comment of PA 4 at certain times?

1 A. No.

2 Q. Did they write memos to you regarding PA 4 or any of

3 the topics related to the pensions or Chapter 9?

4 A. I don't recall.

5 Q. Were you involved in an RFP process relating to

6 either Chapter 9, the pensions or the emergency

7 manager law in 2011?

8 A. Can you restate the question?

9 Q. Were you involved in an RFP process in 2011 relating

10 to either PA 4 or the emergency manager law?

11 A. We did an RFP process here in Treasury that you

12 could say was related to PA 4 to get a short list of

13 firms that we could work with when we have a crisis.

14 Q. And who were they at that time?

15 A. And there's a list we can provide, and I could name

16 some of the firms that were on it, but not all.

17 Q. Was Jones Day one of the firms that was looked at

18 during the 2011 RFP process?

19 A. No.

20 Q. Is it possible that they would have submitted an RFP

21 related to that and you just didn't know about it?

22 A. It's possible.

23 Q. Do you remember having conversations with Jones Day

24 attorneys relating to PA 4 in 2012?

25 A. No.

1 Q. If there's an email dated 3-2-2012 from Jones Day

2 that just said we spoke to someone in Andy's office,

3 do you recall those types of conversations back in

4 2012?

5 A. Can you show me the --

6 Q. Yeah. I only have one. We just got it a day ago so

7 I apologize, I don't have copies for everyone. We

8 copied some of them.

9 MR. SHERWOOD: Is it Bate stamped?

10 MS. GREEN: It is.

11 MR. WERTHEIMER: Can you identify it?

12 MS. GREEN: Yeah.

13 THE WITNESS: Yeah, the only person I

14 recall knowing prior to 2013 from Jones Day was

15 Corinne Ball.

16 BY MS. GREEN:

17 Q. What about Heather Lennox?

18 A. I don't think I met her prior to 2013.

19 Q. Yeah, can we mark that -- well, the problem is I

20 only have one copy and it has my handwriting on it

21 because we just got the document, but I can state

22 for the record the Bates number if that's

23 appropriate. We can have an agreement on that.

24 The Bates number is DTMI 00234878 to 880 is

25 the last page.

1 MR. SHERWOOD: DTMI 00234.

2 MS. GREEN: 878.

3 MR. WERTHEIMER: Why don't we just mark it

4 and you can identify that it should not include any

5 of the underlining and handwriting.

6 MS. GREEN: That's fine.

7 MS. NELSON: Well, why don't we just have

8 her produce one that doesn't have handwriting on it

9 and mark it.

10 MR. WERTHEIMER: That would be fine too.

11 MS. NELSON: And mark it -- what's the next

12 one, six?

13

14 (Deposition Exhibit 6 marked post deposition.)

15

16 MS. GREEN: I do have copies of the next

17 one, which we can mark as Exhibit 7.

18

19 (Deposition Exhibit 7 was marked.)

20

21 BY MS. GREEN:

22 Q. Do you recognize this email?

23 A. Yeah. Okay. I mean, I forgot about this but I

24 think when we were working on the consent agreement

25 we were seeking advice from Huron Consulting and

Page 113

1  Miller Buckfire.  They used various law firms on
2  occasion.
3      And in this case, I don't know that I ever
4  actually met Heather other than maybe over the
5  phone, but we were -- through Huron or through
6  Miller Buckfire we were getting advice from various
7  law firms, Jones Day being included.
8      They weren't a vendor to the Treasury
9  Department.
10 Q.  And did Jones Day also weigh in on the drafting in
11 preparation of the consent agreement?
12 A.  From my reading of this, they did.
13 Q.  Do you recall receiving a blackline copy from Jones
14 Day at any time relating to the consent agreement
15 between the City and the State?
16 A.  I don't recall.  We may have but we had counsel
17 representing us, and this may have been just
18 friendly free advice, but there's other people that
19 can answer that question more precisely than I.
20 Q.  Do you recall getting any free advice, any memos
21 given to you by Jones Day during this process?
22 A.  I'd have to look in my files to know.
23 Q.  Do you know if any of those memos have been produced
24 by the State of Michigan in this case?
25 A.  I don't know.  I'd have to look.

Page 114

1  Q.  Would you recall if any of those memos were related
2  to Chapter 9 filing or the pension obligations of
3  the City of Detroit?
4  A.  I don't recall any memos covering those topics.
5  Q.  During the vetting process for the City of Detroit's
6  restructuring counsel, were you involved in the
7  interview on the 29th of the law firms?
8  A.  Yes.
9  Q.  I should have restated it.  Were you involved in
10 putting together the list of questions that would be
11 asked of the law firms on the 29th?
12 A.  I don't believe so.
13 Q.  Do you recall the interview topics that were asked
14 of the law firms on the 29th?
15 A.  I don't recall.  I mean, we had a group I described
16 earlier in the deposition who was there.  I think
17 everyone was -- felt free to ask the questions that
18 they had.
19 Q.  Do you know who was responsible for putting together
20 the list of interview topics for the law firms at
21 the 29th meeting?
22 A.  I don't think it was that structured.  I think
23 Miller Buckfire played a significant role in who was
24 invited, and the City worked with them and may have
25 added some names to who was invited.

Page 115

1      I don't remember walking in with any
2  proposed questions to ask.  We did have a huge
3  volume of submissions from each of the firms.
4  Q.  And the State is paying in part the professional
5  fees that are being incurred by the City of Detroit
6  in the Chapter 9 process, correct?
7  A.  We agreed to pay half of the cost up to five million
8  prior to the bankruptcy filing.
9  Q.  And after the bankruptcy filing?
10 A.  Then we suspended contributions.  There may be one
11 exception to that.  I don't recall specifically but
12 there might have been one vendor contract we
13 supported after the filing.
14 Q.  Do you know which one that would have been?
15 A.  I'd have to check.
16 Q.  Were you familiar with an email from the Treasury
17 Department which sent the Milliman report to the
18 local media?
19 A.  Can I see it?
20 Q.  Yeah.  This can be eight.
21      MS. NELSON: Is in your only copy?
22      MS. GREEN: No, there's several in there.
23      MS. NELSON: Are you going to mark it?
24      MS. GREEN: Eight.
25

Page 116

1      (Deposition Exhibit 8 was marked.)
2
3  BY MS. GREEN:
4  Q.  Who is Terry Stanton from the Treasury Department?
5  A.  He works for Treasury.  He's a public information
6  officer.
7  Q.  So he's one of your employees?
8  A.  Yes.
9  Q.  Have you ever seen the email that's in front of you?
10 A.  I don't believe I have.
11 Q.  Were you made aware after the fact that Mr. Stanton
12 had leaked the Milliman report to Mr. Pluta?
13      MS. NELSON: Objection; form, foundation to
14 the term leaked.
15 BY MS. GREEN:
16 Q.  You can still answer.
17 A.  Can you restate the question?
18 Q.  My question was were you aware after the fact that
19 even if you didn't see this email, were you aware
20 that Mr. Stanton had provided the Milliman report to
21 the news media?
22 A.  I imagine he would have advised me that he did this
23 or was going to do it.
24 Q.  So if you read the email it does state that the
25 Milliman report was incomplete at the time that it

Page 117

1  was provided to the media, and it states it's being
2  done solely off the record and it's critical this
3  information is not traced back to the Department
4  because it has not been finalized.
5      Is it the practice of the Treasury
6  Department to allow admittedly incomplete
7  information regarding the pensions to be leaked to
8  the media?
9 A. I would say it's unusual.
10 Q. Why would it be critical, as stated in the email,
11  for the Milliman summary that Mr. Stanton had asked
12  for to be deleted and not in connection to the
13  Treasury Department?
14 A. Does it say deleted in here? Oh, yeah. I see.
15  Okay.
16      I assume he didn't want to -- yeah, he
17  thought it was out there with other news media.
18  Rick Pluta must have been asking about it, so he
19  shared with him that which he thought other media
20  outlets probably already had.
21 Q. You mentioned that there was a cap for the fees that
22  the State would pay in connection with the
23  Chapter 9. Have we reached --
24 A. Actually, you mischaracterized it.
25 Q. I'm sorry, what was your --

Page 118

1 A. We offered to pay 50 percent of consulting fees
2  prior to the filing.
3 Q. Up to five million?
4 A. Up to five million.
5 Q. And so in June of 2013 that would have been prior to
6  the filing and the State was still contributing to a
7  portion of those fees, correct?
8 A. I believe so.
9 Q. We can mark this as Exhibit 9.
10
11      (Deposition Exhibit 9 was marked.)
12
13 BY MS. GREEN:
14 Q. Do you recall sending this email?
15 A. I do.
16 Q. Is it safe to say the five million dollar cap has
17  been maxed out?
18 A. What I was reviewing was both the forecast as well
19  as the historical, so I was looking at more than
20  just the history.
21 Q. So what is the summary of fees that you were
22  referring to?
23 A. We were given an estimate of what the fees were
24  looking like and I reviewed it and wasn't very
25  happy.

Page 119

1 Q. The last question is relating to Exhibit 5 which has
2  already been marked. It's the July 9th email.
3      The email states "Tomorrow's meeting could
4  lead to questions directed to you about your view on
5  this topic." It's relating to the pension issue.
6      Is that a fair characterization of the
7  email?
8 A. Right.
9 Q. "In my view, it's too early in the process to
10  respond to hypothetical questions. We remain in
11  many ways in the informational stage. I have some
12  thoughts as to how you could address some pointed
13  questions if you're interesting in hearing them."
14      What pointed questions were you expecting?
15 A. Anything from -- well, going back in time here, but
16  just obviously the whole gamut of questions
17  regarding what the underfunding status could mean to
18  retirees, and I thought that the situation was not
19  understood enough for the Governor to go on record
20  yet because I couldn't even tell him with any degree
21  of confidence what level of funding these pension
22  funds had, so why should he get in the middle of a
23  debate about this. It's obviously a very charged
24  and sensitive issue, and it was my free political
25  comments to him.

Page 120

1 Q. And this was really just over a week before the
2  filing. That was your stance?
3 A. Yeah. I don't -- yeah, obviously. But I don't -- I
4  think it was in the context of this meeting that
5  Kevyn was going to have with the committee that
6  drove this email.
7 Q. Did anything change between the ninth and the filing
8  on the 18th that changed your opinion regarding what
9  you, I believe, just stated was too early to tell
10  him with any degree of confidence what level of
11  funding the pension funds had I believe is what you
12  just stated.
13 A. Yeah, I have not -- my opinion is pretty much the
14  same.
15 Q. The last sentence of the email says "I have some
16  thoughts as to how you could address some pointed
17  questions if you're interesting in hearing them."
18      What were your ideas for how to answer the
19  questions?
20 A. I don't recall specifically at this point.
21 Q. Did you ever have a conversation with him regarding
22  your thoughts on how to answer the questions?
23 A. No.
24 Q. You mentioned in the email "Because pensions have
25  such a long life there are a lot of creative options

Page 121

1 we can explore to address how they will be treated
2 in restructuring."
3 Q. What were your creative options that you
4 had on the table?
5 A. There's dozens. I mean, I don't have one that I
6 would pick out. But pension funds do have a long
7 life and there's a lot of creative things that can
8 be done, so I -- I don't have one or two that I
9 would just throw out, but I do know that there's a
10 lot of ways to address that issue.
11 Q. Have there been any formal reports or proposals
12 identifying and explaining what you consider to be
13 these creative options?
14 A. No.
15 Q. Were these creative options ever explored with the
16 pension systems directly --
17 A. Not to my knowledge.
18 Q. -- to your knowledge?
19 I don't have any further questions.
20 MR. SHERWOOD: Anybody else have questions?
21 MR. WERTHEIMER: I do not.
22 RE-EXAMINATION
23 BY MR. SHERWOOD:
24 Q. I have one question about D-7, which I hadn't seen
25 before the deposition. It's an email to you from

Page 122

1 Heather Lennox.
2 I just want to know what your understanding
3 of the sentence "Many provisions in here are
4 designed to take advantage of PA 4 while it is still
5 in existence, but this also references other state
6 laws that would buttress the FCB and PCA powers..."
7 What is FCB -- what is your understanding
8 of what FCB and PCA powers, what that means?
9 A. FCB I don't know. She might be referring to
10 Financial Control Board, but as opposed to the FAB
11 I'm surmising.
12 PCA is not ringing a bell either.
13 Q. At this time there was a Financial Control Board in
14 existence, right?
15 A. No, I think that -- well, I think it was part of the
16 financial stability agreement, the creation of the
17 FAB, I think.
18 Q. And PCA, you don't know what that means?
19 A. I'm not recalling offhand, no.
20 Q. Was it -- did you express a desire to buttress the
21 powers of the Financial Control Board and insulate
22 those powers from attack in the event of a repeal?
23 A. Can you restate the question? I'm sorry.
24 Q. Was it -- were you interested at this point in time,
25 in March of 2012, to take steps to buttress the

Page 123

1 power of the Financial Control Board and insulate
2 those powers from being attacked in the event PA 4
3 was repealed?
4 A. I don't know if buttress is the right word. If
5 you're going to put in place all the structuring and
6 negotiate a consent agreement with the City, there's
7 other ways -- other legal basis to do that through
8 interlocal agreements. There's other laws that we
9 could look to that would give us the authority to
10 have this agreement have meaning to it.
11 So the thought was, you know, identify all
12 those legal arguments that would give legal standing
13 to the Financial Advisory Board and the consent
14 agreement is my memory.
15 MR. SHERWOOD: That's all.
16 MS. NELSON: All right, we're done. Thank
17 you.
18 THE WITNESS: Thank you.
19 VIDEO TECHNICIAN: Deposition has concluded
20 at 12:23 p.m.
21 (Deposition concluded at 12:23 p.m.)
22 - - -
23
24
25

Page 124

1 CERTIFICATE
2 STATE OF MICHIGAN )
) SS:
3 COUNTY OF OAKLAND )
4
5 I, LAUREL A. JACOBY, Certified Shorthand
6 reporter, a Notary Public, hereby certify that I recorded
7 in shorthand the examination of TREASURER ANDREW DILLON,
8 the deponent in the foregoing deposition; and that prior
9 to the taking of said deposition the deponent was first
10 duly sworn, and that the foregoing is a true, correct and
11 complete transcript of the testimony of said deponent.
12 I further certify that no request was made for
13 submission of the transcript to the deponent for reading
14 and signature and that no such submission was made.
15 I also certify that I am not a relative or
16 employee of a party or an attorney for a party; or
17 financially interested in the action.
18
19
20
21 LAUREL A. JACOBY, CSR-5059, RPR
22 Notary Public, Oakland County, Michigan
23 My commission expires: 9/1/18
24 Dated: This 13th day of October, 2013.
25

## $

**$137 (1)**
28:14
**$50 (1)**
76:23
**$700 (3)**
101:5,17;105:4

## A

**a/k/a (1)**
99:21
**ability (12)**
16:17;18:4;36:24;
39:12;57:9;72:23;
74:9;76:14;84:15,23;
90:14;102:25
**able (3)**
17:5;75:15;100:7
**above (1)**
24:1
**absent (1)**
79:18
**accept (1)**
43:15
**access (5)**
24:7,8;26:7;32:14;
101:16
**accommodate (1)**
35:14
**accounting (1)**
12:23
**accrued (4)**
38:11;64:12,17;65:7
**acknowledging (1)**
82:15
**Act (18)**
15:7;16:23;17:8;
21:10,12;22:2,5;23:25;
29:13,24;34:16;35:2,5;
37:20;39:6;72:13;
73:13,25
**acting (1)**
25:25
**active (5)**
64:13,18;65:8;75:7;
77:6
**activities (2)**
74:22;92:2
**activity (1)**
90:22
**actual (5)**
15:16;36:1;37:23;
53:8;74:11
**actually (10)**
19:25;23:11;30:21;
31:16,23;36:9;53:25;
109:24;113:4;117:24
**actuarial (2)**
70:18;90:20
**add (1)**

17:3
**added (3)**
35:9;52:8;114:25
**address (19)**
12:21;18:10;23:13;
32:25;34:9;35:10,19;
36:7;37:19;51:22;
52:12;59:1;63:7;
76:14;107:25;119:12;
120:16;121:1,10
**addressed (1)**
39:23;62:23;107:6
**administration (2)**
15:23;16:1
**admittedly (1)**
117:6
**adopt (2)**
52:4,17
**advantage (1)**
122:4
**advice (17)**
8:18;41:1;46:11;
49:16;70:25;80:23,24;
85:18,18;88:21;91:21;
102:20;103:19;
112:25;113:6,18,20
**advised (1)**
116:22
**advising (1)**
46:18
**Advisory (4)**
34:22;54:21;109:11;
123:13
**advocate (1)**
36:19
**advocating (2)**
21:9;36:10
**affairs (1)**
59:21
**afford (1)**
41:3
**AFSCME (3)**
7:25;97:24;100:18
**again (7)**
19:8;23:8;83:8,17;
85:16;93:7;97:24
**against (7)**
17:18;35:13;83:24,
25;84:8;86:24;91:2
**agencies (4)**
29:11,18;30:6,18
**Agings (1)**
101:22
**ago (4)**
13:13;28:13;39:24;
111:6
**agree (7)**
51:16,23;52:6;65:1,
5;91:15;103:18
**agreed (3)**
6:16;102:22;115:7
**agreement (29)**
16:16;17:15;24:18;

25:4,8,13;26:14;27:1,
4;28:16;35:24;55:4;
67:9;76:6,7,12;102:2,
10;103:14;104:12,16;
111:23;112:24;113:11,
14;122:16;123:6,10,14
**agreements (12)**
26:9;27:14;28:8;
102:17,19;103:2,21,
24;104:1,5,7;123:8
**AG's (1)**
82:18
**ahead (8)**
50:7;78:7,23;80:9,
18;83:8;96:4;99:16
**aid (1)**
25:19
**airport (4)**
54:9;55:15;58:6,20
**Al (4)**
100:12,16,18,22
**Allegan (1)**
7:15
**allow (3)**
17:9;19:6;117:6
**allowed (2)**
18:14;43:14
**allows (2)**
34:23,25
**along (2)**
67:19;85:10
**alternative (2)**
70:15;90:19
**although (1)**
52:1
**always (1)**
75:17
**amnesty (4)**
104:23;105:6,8,13
**among (1)**
84:12
**amount (1)**
64:11
**amounts (3)**
64:12,17;65:7
**Andrew (2)**
7:14,18
**Andrews (2)**
54:19;76:17
**Andy's (1)**
111:2
**Ann (2)**
10:11,17
**announced (1)**
10:12
**annuity (3)**
70:14;90:18;91:24
**answered (4)**
50:6;83:7;104:9,18
**apologize (1)**
111:7
**apparently (1)**
69:21

appears (1)
52:4
**applies (2)**
81:7;82:22
**apply (2)**
41:10,14
**appoint (1)**
10:24
**appointed (3)**
53:23;77:5,17
**appointing (1)**
43:7
**appointment (2)**
18:16;77:4
**appreciate (4)**
11:14;26:4;30:23;
70:19
**appreciated (2)**
48:10;56:22
**approach (1)**
12:16
**appropriate (2)**
27:13;111:23
**appropriately (1)**
78:25
**approval (2)**
19:14;44:10
**approximately (2)**
47:13;76:7
**April (1)**
76:8
**Arbor (2)**
10:11,18
**area (4)**
13:9;63:10;92:18;
107:5
**areas (1)**
34:12
**argue (1)**
23:25
**argument (1)**
24:2
**argumentative (1)**
65:2
**arguments (1)**
123:12
**arithmetic (1)**
89:23
**arms (2)**
90:23;108:21
**around (6)**
51:4,18;58:4;90:22,
23;92:7
**arrangements (1)**
27:15
**Article (11)**
62:6,8;73:21;74:2;
78:16;79:7;81:7;
82:22;83:4,19;84:16
**aspect (1)**
109:13
**assemble (1)**
78:12

**assets (1)**
90:19
**assignment (1)**
25:15
**Assistant (1)**
14:4
**assume (12)**
16:3;19:17;20:23;
44:2;46:12,14;70:2;
79:13;82:16;93:15;
108:14;117:16
**assumes (2)**
42:21,25
**assuming (1)**
81:4
**assumptions (3)**
70:17;90:20;91:18
**attached (1)**
7:7
**attachment (2)**
6:19,21
**attack (1)**
122:22
**attacked (1)**
123:2
**attended (2)**
37:22;63:8
**attention (3)**
21:22;87:11;94:15
**attorney (12)**
8:16;13:14;14:4,9;
33:13;81:5,10;82:2,7,
14,20,23
**attorney-client (9)**
46:1;61:5;66:15;
78:22;80:25;85:12;
93:8,12;109:7
**attorneys (6)**
46:4;79:5;83:16;
85:17;88:20;110:24
**attorney's (1)**
95:2
**attractive (1)**
32:8
**attributes (1)**
56:22
**authority (3)**
40:4,16;123:9
**authorization (6)**
43:18;48:4;87:17;
106:20;107:12,15
**authorize (2)**
49:9;84:16,23
**authorized (1)**
71:6
**authorizing (2)**
6:13;48:3
**available (3)**
94:22;101:13,18
**avoid (3)**
17:5;49:2;50:3
**aware (15)**
19:17;20:13;38:18;

49:1;82:2;86:8;98:15;
99:25;102:8,11;106:8,
13;116:11,18,19
**away (2)**
57:18;60:7

## B

**back (22)**
11:5,7;29:21;31:15,
21;34:15,23;39:21;
40:9;50:9,22;64:7;
71:24;73:15;74:21;
94:5;97:20;101:8;
102:21;111:3;117:3;
119:15
**background (3)**
10:14,14;56:23
**Baird (6)**
54:7,12;56:1,9,13;
100:6
**balance (3)**
56:25;60:3,9
**Ball (1)**
111:15
**ballot (4)**
21:8,20;36:12;52:12
**bank (1)**
55:7
**bankrupt (1)**
13:3
**bankruptcy (21)**
6:13;7:25;36:25;
58:11;63:3;72:9;74:9;
80:2;81:6,8;82:22;
84:16,23;86:6,19,22;
93:5,21;98:6;115:8,9
**bargained (2)**
16:16;17:14
**base (1)**
101:10
**based (9)**
9:18;10:6;30:13;
31:5;33:11;38:19;
40:3,14;62:19
**basically (1)**
80:19
**basis (2)**
101:20;123:7
**Bate (1)**
111:9
**Bates (2)**
111:22,24
**battle (1)**
21:17
**bear (1)**
12:21
**Beckman (1)**
87:21
**become (1)**
15:11
**becomes (1)**
33:8

**begin (2)**
75:20;89:25
**behalf (1)**
79:19
**bell (2)**
84:3;122:12
**below (2)**
75:19,23
**benchmark (1)**
75:22
**benefit (3)**
17:1;48:7;102:12
**benefits (12)**
16:14;38:12;40:7,
20;42:13,15;49:4,11;
50:5;59:4,20;62:9
**best (2)**
20:13;74:21
**better (3)**
15:8;35:8;36:5
**big (1)**
18:25
**biggest (2)**
32:12;60:1
**Bill (2)**
72:3;82:24
**bills (2)**
15:17;25:1
**bit (3)**
12:23;14:13;61:21
**blackline (1)**
113:13
**block (1)**
95:13
**blow (1)**
17:25
**board (10)**
19:6;23:6;34:23;
54:21;109:11;122:10,
13,21;123:1,13
**boards (2)**
11:21;84:14
**Bob (1)**
109:11
**Bond (5)**
22:18,22;24:10,17;
25:5
**bondholder (5)**
24:16;27:4,19;
41:10;42:1
**bondholders (10)**
22:7;24:1,25;27:13,
24;28:5;41:19;42:4,
19;60:6
**bonds (1)**
24:21
**book (1)**
63:9
**books (3)**
29:13,20;90:19
**borrow (1)**
24:10
**borrowing (2)**

26:21;28:11
**both (8)**
19:13;32:5;54:1;
56:25;64:13,18;65:8;
118:18
**bottom (2)**
51:25;64:10
**break (3)**
50:15;71:20;94:1
**brewing (1)**
77:14
**brief (8)**
10:10;14:9;45:15;
50:18;71:23;81:14;
82:3;94:4
**briefed (5)**
89:14;98:16,18,23;
99:15
**briefing (2)**
37:5;77:20
**briefly (4)**
9:8;74:18,19;92:13
**bring (1)**
12:20
**bringing (1)**
55:5
**broad (2)**
26:13;82:13
**Brom (3)**
54:18;108:11;
109:13
**brought (1)**
84:14
**bubbling (1)**
92:15
**Buckfire (4)**
54:14;113:1,6;
114:23
**Building (2)**
7:14;95:12
**bullet (1)**
63:22
**business (2)**
57:18;65:12
**buttress (4)**
122:6,20,25;123:4
**buy (2)**
10:3,3
**Buyer (2)**
22:19,22

## C

**calculus (1)**
90:21
**calendar (1)**
98:24
**call (17)**
11:2;14:22;45:10,
15;46:7;47:9,11,12,13,
16,19,20,21,22,24;
66:4,7
**called (11)**

7:19;11:7;13:1;
22:18;34:22;55:25;
56:1;72:7;76:22;92:9;
99:23
**calls (9)**
27:16,17;38:22;
41:15;66:15,17;80:6;
81:22;96:2
**calms (1)**
57:6
**came (12)**
10:15;13:14;17:23;
45:14;56:9;75:3;
78:10;79:14;102:16,
21;107:7,16
**campaign (1)**
35:15
**Can (73)**
7:16;8:13;9:8,11;
12:8;14:24;17:4,13;
20:8;23:4,8,13,16,18;
24:8,25;25:1,12,19;
27:10;28:8;31:9,13,15,
24;32:6;38:4;39:1,11;
40:9;41:23;42:23;
45:2;46:13;47:12;
50:8,14;51:12;52:9;
64:7;65:23;74:21;
78:25;83:8,17;86:20;
91:3;93:17;95:7,17;
96:14,16;108:8,12;
109:2;110:8,15;111:5,
11,19,21,23;112:4,17;
113:19;115:19,20;
116:16,17;118:9;
121:1,7;122:23
**Canada (1)**
10:7
**cancel (1)**
69:10
**cancelled (1)**
69:9
**candidate (1)**
55:23;56:12;57:21
**candidates (3)**
55:11,12,20
**cap (2)**
117:21;118:16
**capacity (6)**
20:21,22,24;21:1,6;
83:25
**Capital (4)**
9:21;10:14,16;12:25
**care (6)**
9:4;60:7,12;61:25;
104:11,15
**career (2)**
12:18,20
**careful (2)**
26:25;107:21
**case (13)**
7:25;26:12;27:23;
33:3;36:2;39:21,23;

42:18;84:13,14;87:7;
113:3,24
**cases (3)**
84:12;86:24;90:3
**cash (9)**
36:2;59:23,25;
75:10,14,19;76:3,19,
20
**casino (2)**
25:22;28:10
**caused (1)**
69:12
**CBA (3)**
17:13,14;18:15
**CBAs (3)**
39:13;72:23
**center (1)**
59:24
**Century (2)**
10:12,20
**certain (14)**
19:18;22:14;24:12;
25:5,24;26:7;28:17;
34:19;41:17;42:4;
49:24;75:15;100:21;
109:25
**certainly (3)**
20:3;59:18;62:25
**chairs (1)**
78:11
**challenge (1)**
33:22
**challenged (1)**
33:19
**challenges (2)**
11:18;12:17
**chance (2)**
35:8;36:4
**change (7)**
18:1;71:10;77:23;
88:22;106:12,12;120:7
**changed (7)**
18:23;43:12;69:17;
74:19;76:25;88:16;
120:8
**changes (3)**
35:22;36:23;106:13
**Chapter (29)**
19:2,7;28:4;36:1;
41:20;42:18;43:10,14;
44:11,25;48:3;49:10;
52:5,18;57:24;58:7,15;
59:16;66:23;71:7;
77:24;78:2;79:20;
82:17;110:3,6;114:2;
115:6;117:23
**characterization (5)**
51:8,23;52:16;
81:18;119:6
**charged (1)**
119:23
**chased (1)**
13:6

**check (1)**
115:15
**Checks (1)**
92:1
**Chicago (1)**
9:19
**children (1)**
22:3
**choosing (1)**
44:13
**Chris (2)**
54:19;76:16
**circulated (1)**
88:7
**circumstance (2)**
24:16;59:14
**circumstances (1)**
33:5
**circumvent (2)**
50:12;60:5
**cities (7)**
11:21;12:4;19:13;
20:9;26:6;30:25;57:3
**city (70)**
19:3;20:6;23:5,6;
24:22;25:1,23,24;27:6,
8,10;29:9;32:12,13,22,
25;33:3;34:24;40:5,
17;41:11;54:16,20;
55:2,3,6;56:25;57:24;
58:7;59:4,22;60:3,12;
61:25;63:6;64:5;
65:16,21;68:13;70:14;
74:8;75:18,23,25;76:2,
14,17;100:13,25;
101:5,19;102:11;
103:1,10,13,15,16;
104:8,16,24;105:1,8,
12,25;113:15;114:3,5,
24;115:5;123:6
**city's (7)**
17:11;48:6;59:23;
62:1;70:18;75:14;
103:22
**clad (1)**
106:16
**claimants (1)**
48:7
**claims (2)**
42:6;63:11
**clear (5)**
8:21;19:5;57:9;
61:15;99:12
**clearly (2)**
56:24;68:16
**close (4)**
14:20;36:11,18;
74:11
**closely (1)**
74:14
**closer (1)**
100:7
**coalition (3)**

102:3,9;103:6
**Coalition-City (1)**
102:15
**coincide (1)**
53:16
**collateral (3)**
25:15;27:15;28:1
**collect (1)**
105:6
**collected (1)**
105:10
**collecting (1)**
104:24
**collection (1)**
101:17
**Collections (2)**
101:11,13
**collectively (2)**
16:16;17:14
**collects (1)**
25:22
**com (2)**
49:6;106:21
**comfortable (2)**
18:12;95:19
**coming (4)**
47:15;57:18;58:3;
80:1
**commence (2)**
44:11;76:24
**comment (5)**
31:24;63:14;81:17;
90:13;109:25
**commentary (1)**
30:10
**comments (2)**
67:23;119:25
**Committee (3)**
96:18,19;120:5
**communicate (3)**
57:9;103:6,9
**communicated (1)**
82:20
**communications (6)**
61:6;66:16,19,25;
103:12;109:8
**communities (1)**
26:19
**community (3)**
23:16;24:15;57:6
**companies (4)**
10:3,6;13:6,7;68:6
**compare (1)**
18:12
**compared (1)**
37:8
**compelling (1)**
98:14
**competing (5)**
17:21;39:17;72:17;
73:1,16
**Compound (2)**
31:6,12

**concept (3)**
25:13;45:16;49:25
**concern (2)**
35:20;68:8
**concerning (3)**
45:25;66:22,22
**concerns (3)**
33:1;34:10;39:12
**concluded (1)**
123:19,21
**conclusion (10)**
6:8;27:17;38:23;
41:16;68:14;80:7;
81:23;101:10,20,25
**condition (4)**
9:6;60:8;64:5;65:16
**conditions (2)**
52:4,17
**conference (6)**
45:10,15;46:4,7;
47:19,20
**conferences (1)**
77:16
**confidence (2)**
119:21;120:10
**confidential (2)**
46:21;47:2
**conflicting (1)**
17:17
**confronted (1)**
59:2
**conjunction (1)**
86:4
**connection (3)**
102:14;117:12,22
**cons (1)**
45:12
**consent (13)**
19:3,7;35:24;55:4;
76:6,7,11;79:18;
112:24;113:11,14;
123:6,13
**consider (2)**
11:3;121:12
**consideration (2)**
39:2;74:5
**considering (1)**
69:15
**consistent (2)**
64:19;82:8
**consternation (1)**
69:13
**Constitution (16)**
38:10,11,17,21;39:5;
41:6;42:14;50:12;
62:8,23;64:19,25;
65:10;78:17,18;79:12
**constitutional (19)**
17:17,21;40:6,18;
48:6,13;49:3,10;50:4;
62:13,17,20;72:17,18;
73:1;79:25;82:15;
83:5,20

**constitutionality (1)**
17:13
**consultants (7)**
75:10;90:9;91:11,
14;109:16,18,19
**consulted (1)**
109:1
**Consulting (2)**
112:25;118:1
**containing (1)**
16:8
**contains (1)**
44:14
**contemplated (1)**
69:20
**content (1)**
92:14
**context (4)**
42:18;49:13,14;
120:4
**contingencies (7)**
44:8,12,13,25;45:25;
48:19;74:6
**contingency (5)**
44:15;45:5;47:8;
48:4,12
**continues (1)**
61:20
**contract (4)**
18:1,2;73:17;115:12
**contracts (3)**
17:18;39:20;73:3
**contractual (2)**
28:24;38:14
**contributing (1)**
118:6
**contributions (1)**
115:10
**Control (4)**
122:10,13,21;123:1
**conversation (10)**
45:23;46:20;47:2;
56:2;61:13;79:21;
83:18;92:12,14;120:21
**conversations (27)**
21:13;45:19;50:1;
53:14;60:20;61:9;
67:16;77:8;78:15,21,
24;79:2,14,16;85:16,
19,23,25;88:19,20;
92:6;93:3,10,19;94:8;
110:23;111:3
**Conway (1)**
55:8
**coordinating (1)**
53:2
**copied (1)**
111:8
**copies (2)**
111:7;112:16
**copy (7)**
23:11;38:4;107:7,
17;111:20;113:13;

115:21
**Corinne (1)**
111:15
**cost (2)**
61:25;115:7
**costs (2)**
16:14;102:13
**Councils (1)**
34:24
**counsel (16)**
6:15;46:10,15,18;
55:2;61:9,18,25;66:20;
78:25;79:3;85:14;
94:9;107:20;113:16;
114:6
**couple (5)**
8:5;13:13;93:5,22;
94:18
**course (1)**
63:5
**Court (12)**
7:9;8:9,10,15;21:23;
33:17,19;48:20;65:24;
72:8;85:9;86:19
**courtesy (1)**
71:16
**courts (2)**
42:9;64:21
**covered (1)**
63:10
**covering (1)**
114:4
**create (1)**
36:3
**created (1)**
87:14
**creates (1)**
27:1
**creation (1)**
122:16
**creative (5)**
120:25;121:3,7,13,
15
**credit (15)**
29:11,13,17,18,20,
25;30:1,12,14,21;31:1;
32:1,1,7,19
**creditor (3)**
24:14,14;28:25
**creditors (18)**
22:8;24:1;25:24;
26:9;27:8;41:11;
63:20;64:4;65:15,19,
23;66:23;67:13;68:2,
13,17;94:22;95:16
**creditors' (1)**
95:24
**credits (1)**
13:2
**crew (1)**
14:11
**crises (2)**
12:13;32:21

**crisis (7)**
17:10;18:2,5;20:7,
11,14;110:13
**critical (2)**
117:2,10
**criticism (6)**
19:25;20:4,12;
22:10,23;23:9
**criticisms (6)**
22:6;34:8;35:4,10,
14;51:21
**criticized (1)**
19:18
**Critics (2)**
23:25;57:6
**crunches (1)**
75:10
**cue (1)**
12:5
**current (2)**
61:23;91:12
**currently (3)**
64:13,18;65:8
**cut (1)**
91:12
**cuts (3)**
64:12,17;65:7
**cutting (1)**
60:6

**D**

**D-2 (1)**
38:9
**D-3 (2)**
48:18;49:2
**D-7 (1)**
121:24
**Daddow (1)**
109:11
**damage (1)**
92:2
**damaging (1)**
91:25
**damning (1)**
91:24
**date (34)**
7:11;14:19;33:12;
47:12;49:23;51:10;
52:24;53:2,5,8,10,12,
16,18,21,22;60:22;
70:21;74:20;85:1;
87:6,6;89:14;98:7,10,
13,25;99:5,6,8,13,15,
18;105:18
**dated (3)**
6:17;68:24;111:1
**dates (3)**
74:25;87:1;89:5
**Day (29)**
45:16,21;47:16,21,
25;55:17;56:6;58:5,6,
13;62:14;84:5,18;89:1,

2,18;94:18;106:3,8;
109:24;110:17,23;
111:1,6,14;113:7,10,
14,21
**days (3)**
45:13;53:24;85:5
**day-to-day (1)**
77:6
**deal (11)**
17:1;18:2;23:6;
24:17,23;27:22;28:5,
14;36:23;79:17;99:3
**dealing (6)**
57:3;58:1;60:13;
67:5;73:5;108:13
**dealings (1)**
75:5
**deals (1)**
26:6
**dealt (5)**
73:11;79:24;80:5;
82:17;84:15
**debate (1)**
119:23
**debt (5)**
24:20;28:3,17;
30:11;33:7
**debts (1)**
41:24
**December (10)**
12:3;37:19;55:6;
76:16,19;77:3;100:13,
20;105:15;107:23
**decide (1)**
64:22
**decided (2)**
69:17;104:4
**decision (6)**
35:6,7;43:6;49:3;
87:2;104:2
**decisions (2)**
20:8;43:3
**declined (1)**
11:4
**deemed (3)**
21:16;29:18,19
**defects (1)**
28:23
**defending (1)**
21:11
**degree (3)**
12:24;119:20;
120:10
**deleted (2)**
117:12,14
**deliverable (1)**
67:14
**dep (1)**
6:9
**Department (7)**
101:11;113:9;
115:17;116:4;117:3,6,
13

**Depends (1)**
77:14
**deposed (1)**
8:2
**deposition (23)**
6:6,22;7:13;13:11,
15;23:20;31:20;38:2;
43:20;44:6;50:20;
68:20;87:9;89:16;
112:14,14,19;114:16;
116:1;118:11;121:25;
123:19,21
**describe (2)**
14:24;63:11
**described (3)**
47:17;108:21;
114:15
**describes (1)**
51:4
**designed (1)**
122:4
**desire (3)**
50:12;98:20;122:20
**desks (1)**
78:11
**Detroit (41)**
7:25;23:6;25:21;
27:6;28:10,14;29:10;
33:3;40:5,17;41:11;
54:9;55:2;57:24;58:8;
59:22;63:6;65:21;
68:13;69:2,6;70:3,12;
71:1;74:14;75:2,8,9,
12;82:10;84:1;86:5;
90:9;100:13,18,25;
101:14;105:25;107:5;
114:3;115:5
**Detroit's (3)**
27:23;32:11;114:5
**develop (1)**
55:22
**Dick (2)**
108:16;109:14
**dictatorship (3)**
19:21;35:17,21
**difference (3)**
16:23;18:25;49:20
**differences (3)**
18:7;37:1,3
**different (10)**
18:20;25:18;28:6,8;
39:13;40:24;41:21;
78:4;91:18;101:24
**differentiate (2)**
84:13,17
**difficult (7)**
16:20;20:11;33:8;
68:5,10,16;82:12
**Dillon (18)**
7:14,23;24:2;31:17;
43:17,23,25;44:2,2;
48:23;50:25;51:1;
68:23,23;72:3;80:9;

97:24;105:22
**DILLON- (1)**
7:18
**diminished (5)**
38:15;42:15;62:10;
63:13;77:6
**direct (4)**
86:16;87:10,11;
94:15
**directed (3)**
19:25;69:24;119:4
**direction (1)**
15:10
**directional (1)**
108:20
**directly (2)**
30:9;121:16
**disagree (2)**
52:14,16
**disclose (1)**
109:3
**discount (1)**
67:10
**discovery (2)**
97:9,10
**discuss (8)**
37:2;48:21;49:8;
57:23;61:24;62:4;
65:23;100:24
**discussed (21)**
7:3;37:22;39:15;
45:12;47:9;52:24;
53:15;59:18,23;60:13,
14;61:21;73:18,21;
78:15;79:10;82:23;
83:18;87:5;88:1,8
**discussing (1)**
73:2
**discussion (20)**
37:8;39:7,8;40:1;
45:22,24;47:7;49:12;
50:11;52:23;53:1,19;
58:15,18;59:8;60:4;
67:20;79:6;97:19;
98:11
**discussions (36)**
11:23;12:3,8,11;
37:2;39:3,25;45:4,8;
49:1,6,14;58:25;59:18;
60:3,8,10;61:1,19;
62:15,19;67:5;68:5;
72:11;73:11,12;74:2,
10;77:15;79:8;80:23;
83:2;85:7;86:17;
88:23;102:8
**disposable (1)**
76:20
**disposition (1)**
57:8
**disregard (2)**
40:6,18
**district (2)**
17:10;20:6

**districts (6)**
12:5;19:14;20:10;
22:4;25:19;30:25
**Diversity (2)**
99:21,24
**doctor (1)**
9:4
**document (9)**
63:25;64:3,15;
65:14,18;87:12,14,24;
111:21
**documents (1)**
74:24;87:4
**dollar (1)**
118:16
**dollars (1)**
76:18
**done (15)**
24:17;26:20;28:16;
42:8;48:8;57:10,10;
61:22;77:1;96:11;
105:2,19;117:2;121:8;
123:16
**Donnelly (2)**
13:23;14:2
**donors (1)**
100:9
**dot (3)**
6:20;49:5;106:21
**Dowling (1)**
14:1
**down (11)**
8:9;29:2;33:16;
51:25;69:23;70:17;
73:25;90:18,25;94:19;
106:22
**dozens (2)**
61:13;121:5
**DPS (2)**
75:6,11
**Draconian (1)**
17:6
**draft (2)**
44:19,21
**drafted (1)**
39:16
**drafting (10)**
14:25;37:16,17,23;
45:1;74:11;107:19,19;
108:18;113:10
**drastic (1)**
17:6
**drove (4)**
10:11,17;98:13;
120:6
**DTMI (2)**
111:24;112:1
**due (1)**
91:2
**duly (1)**
7:19
**Duncan (1)**
103:11

**during (29)**
  15:3,5;19:17;22:10;
  33:24;35:2,15;39:2,25;
  45:3,23;46:4;50:1;
  52:12;57:23;58:5,25;
  59:18;61:12;63:9;
  66:25;76:11;86:12;
  89:5;100:24;109:2;
  110:18;113:21;114:5
**duty (1)**
  17:19

# E

**earlier (11)**
  17:4,5,9;37:17;42:3;
  52:7;80:10;91:19;
  106:19;107:18;114:16
**early (11)**
  37:19;70:7;71:2;
  72:10;75:13;76:1;
  79:10;83:23;107:22;
  119:9;120:9
**easier (2)**
  8:15;31:25
**economic (4)**
  11:18;40:22;65:21;
  68:7
**economy (1)**
  32:17
**Ed (4)**
  100:12,17,18,21
**effect (3)**
  34:1,4;52:20
**effective (4)**
  22:3;29:23;53:18,21
**effectively (2)**
  26:15;27:2
**efficient (1)**
  98:22
**effort (4)**
  36:7;41:20;102:2;
  105:5
**efforts (2)**
  52:10;104:23
**EFM (2)**
  18:21;19:2
**eight (2)**
  115:20,24
**either (16)**
  13:7;14:25;50:2;
  53:17;66:4;77:16;
  78:14,16;79:3;83:3,18;
  84:13;85:17;110:6,10;
  122:12
**electeds (1)**
  34:15
**election (1)**
  34:7
**electorate (1)**
  21:21
**else (6)**
  14:6;54:6,16;67:15;

**80:4;121:20**
**EM (10)**
  35:16,20;51:4,17;
  52:9;53:3,11,12,16;
  59:11
**email (32)**
  6:9,10,14,17;7:2;
  68:23,25;69:5;89:17,
  20;91:10,20;92:8,9;
  107:11,14,17;111:1;
  112:22;115:16;116:9,
  19,24;117:10;118:14;
  119:2,3,7;120:6,15,24;
  121:25
**emails (3)**
  51:1,3;92:8
**embrace (1)**
  68:7
**emergencies (2)**
  57:3;58:1
**emergency (34)**
  18:5,17,21,23;19:22;
  33:12;34:17,20,25;
  35:23,25;36:24;43:7,
  10;48:5;51:3,8,11;
  54:3;55:11;56:21;
  57:14;59:3;66:2,12;
  74:8;75:21;77:4;82:9;
  86:5;94:17;100:5;
  110:6,10
**employees (5)**
  59:5;62:1;64:13;
  70:14;116:7
**employees' (1)**
  94:21
**enable (1)**
  43:9
**enabled (2)**
  16:25;17:3
**enacting (1)**
  35:11
**encountering (1)**
  17:11
**end (9)**
  15:9;18:11;27:21;
  34:17;47:25;51:4,17;
  75:13;76:1
**Energy (2)**
  99:20,24
**engagement (1)**
  75:7
**enough (3)**
  41:12;59:25;119:19
**entitled (6)**
  27:20,24;81:15,16;
  96:24;97:2
**entitlement (1)**
  42:5
**entity (1)**
  26:1
**environment (1)**
  29:14
**equal (1)**

**24:15**
**equation (2)**
  16:21;95:18
**equity (1)**
  9:18;10:13
**Ernst (1)**
  75:12
**eroding (1)**
  76:20
**essential (2)**
  33:6;75:16
**essentially (2)**
  52:3;77:22
**establish (1)**
  78:23
**established (3)**
  99:8,13,17
**estimate (2)**
  61:22;118:23
**evasive (1)**
  28:7
**even (11)**
  11:13;12:10;13:15;
  27:11;42:22;65:17,17;
  89:4;104:7;116:19;
  119:20
**event (2)**
  122:22;123:2
**events (6)**
  66:6;86:8;87:19;
  98:5,17,24
**everybody (1)**
  96:11
**everybody's (1)**
  63:18
**everyone (3)**
  26:5;111:7;114:17
**evidence (2)**
  42:21;43:1
**exact (1)**
  84:7
**EXAMINATION (3)**
  7:21;72:1;105:20
**examined (2)**
  7:20;51:21
**example (8)**
  25:18,21;32:11;
  34:14;35:5,22;40:24;
  91:23
**exception (1)**
  115:11
**exceptions (1)**
  26:17
**excerpt (1)**
  38:10
**excited (1)**
  11:9
**exclude (2)**
  79:2;85:16
**excluding (2)**
  85:19;88:20
**exclusive (1)**
  42:6

**executable (1)**
  44:16
**executing (1)**
  108:22
**exhausts (1)**
  80:19
**Exhibit (22)**
  6:12,16,21,24,24;
  7:2;23:18,20;37:25;
  38:2;43:20;50:20;
  68:20;87:9;89:16;
  112:14,17,19;116:1;
  118:9,11;119:1
**exhibits (1)**
  99:4
**existed (2)**
  11:25;38:18
**existence (2)**
  122:5,14
**existing (1)**
  24:16
**exists (2)**
  82:16;99:25
**expecting (1)**
  119:14
**expenses (1)**
  16:17;30:2;100:4
**experience (12)**
  12:18;13:9;22:2;
  30:14;31:5;32:5;
  36:20;40:3,15;56:18;
  57:2;58:1
**experiencing (1)**
  75:9
**experts (1)**
  102:20
**expiration (3)**
  53:3,11,17
**explaining (1)**
  121:12
**explore (2)**
  56:15;121:1
**explored (2)**
  104:25;121:15
**exposure (3)**
  56:5;59:19,19
**express (1)**
  122:20
**expressed (2)**
  57:13;91:14
**expressing (1)**
  68:16
**extent (4)**
  8:13,17;27:4;66:15

# F

**FAB (2)**
  122:10,17
**face (1)**
  84:16
**face-to-face (1)**
  77:19

**facing (2)**
  11:18;12:21
**fact (5)**
  29:12;43:13;62:4;
  66:17;78:18;79:8,22;
  83:4,20;85:8;89:3;
  103:11,23;107:16;
  116:11,18
**factors (1)**
  91:18
**facts (5)**
  42:21,25;64:4;
  65:15,20
**failure (1)**
  90:18
**fair (5)**
  15:20;16:5;20:4;
  56:6;74:13;82:8;119:6
**fall (1)**
  11:2
**familiar (9)**
  19:23;22:9;38:16;
  44:17;68:25;99:20,23;
  101:3;115:16
**Famous (1)**
  98:3
**far (2)**
  33:7;107:20
**fascinating (3)**
  11:15,16,17
**fast (1)**
  98:22
**favor (1)**
  21:9
**favorable (1)**
  29:14
**favorably (1)**
  56:15
**FCB (4)**
  122:6,7,8,9
**feathers (1)**
  57:7
**February (2)**
  102:1,10
**Federal (2)**
  44:14;48:20
**feel (2)**
  18:12;45:2
**fees (6)**
  115:5;117:21;118:1,
  7,21,23
**felt (2)**
  59:14;114:17
**few (7)**
  15:5;21:15;34:7;
  54:22;55:20;97:25;
  98:16
**fight (1)**
  21:17
**figure (1)**
  95:18
**file (10)**
  19:6;36:25;43:10;

74:9;86:5,18;88:13;
93:4,21;98:15
**filed (22)**
26:15;42:22;63:3;
69:12,19;72:8,9;77:24;
78:1;80:2;81:5;83:24;
84:5,6,18;86:24;90:3;
106:3,6,9,15;107:4
**files (1)**
113:22
**filing (34)**
6:13;7:7;19:15;
43:14;44:12,25;48:3;
49:9;52:5,18;60:22;
71:7;79:19;86:13,22;
87:18;90:12;93:6,22;
98:6,13;99:6,8,13,18;
107:11;114:2;115:8,9,
13;118:2,6;120:2,7
**filled (1)**
11:7
**finalized (1)**
117:4
**financed (1)**
13:2
**finances (2)**
30:24;62:2
**financial (23)**
10:5;11:24;12:13,
21;18:21;20:7,11,14;
24:6;26:19;34:20;
38:11;54:21;59:21;
62:9;64:5;65:16;
122:10,13,16,21;
123:1,13
**financially (1)**
23:15
**financing (1)**
28:13
**find (7)**
16:2;20:9;26:18;
64:9;78:4,10;101:22
**fine (5)**
23:13;81:21;93:25;
112:6,10
**firm (3)**
9:20;55:9;70:18
**firms (15)**
54:10;55:7,16;
58:13,16;110:13,16,
17;113:1,7;114:7,11,
14,20;115:3
**first (26)**
7:19;10:9;24:12;
25:6,20;26:2;28:21;
32:24;45:23;46:24;
47:20;49:5;56:8;75:4;
78:10;90:25;94:15;
95:6,14;96:9,13,15;
98:14;106:5,19;107:7
**Fitch (1)**
30:19
**five (6)**

94:12;101:23;115:7;
118:3,4,16
**five-minute (1)**
50:14
**Flint (1)**
75:6
**flipped (1)**
63:8
**flow (1)**
25:10
**Flowers (7)**
72:7;84:13;87:7;
90:2;91:6;92:21;98:9
**fluid (2)**
91:19;95:14
**focal (1)**
73:19
**focus (3)**
10:7;72:22;75:13
**focused (1)**
15:24
**folks (7)**
15:5;32:14;45:11;
46:15;62:14;107:23;
108:3
**follow (3)**
33:15;87:19;98:25
**following (3)**
98:1,5;106:1
**follows (3)**
7:20;40:13;93:18
**followup (2)**
96:12,14
**follow-up (2)**
47:11;97:25
**footing (1)**
24:15
**forecast (1)**
118:18
**forget (2)**
36:14;56:16
**forgot (1)**
112:23
**form (14)**
31:6,10;42:20,23,24;
44:21;51:13;60:15;
77:25;81:9,20;92:4;
96:1;116:13
**formal (1)**
121:11
**formally (1)**
53:23
**formation (1)**
109:6
**former (1)**
65:5
**forth (1)**
48:18
**forward (7)**
28:12;29:1;62:2;
69:20,21;86:22;95:19
**found (5)**
10:2;16:12;33:5;

106:5,14
**foundation (10)**
31:7,10;42:20,24;
60:16;77:25;81:10,20;
96:1;116:13
**four (2)**
9:16;52:8
**four-day (1)**
86:15
**fourth (1)**
36:1
**Fox (1)**
87:20
**frame (1)**
60:16
**framed (1)**
108:2
**framework (1)**
75:1
**Frank (1)**
87:21
**Fred (1)**
85:14
**Free (5)**
82:10;113:18,20;
114:17;119:24
**freep (2)**
49:5;106:21
**Friday (2)**
86:6;88:13
**friend (2)**
11:10;13:20
**friendly (1)**
113:18
**front (6)**
15:9;18:11;27:21;
59:24;94:12;116:9
**fulfill (2)**
32:25;33:4
**full (2)**
8:14;21:23
**fully (1)**
11:14
**fund (9)**
9:18;10:13;40:25;
80:11;91:17;99:25;
100:1,4,10
**fundamental (1)**
102:24
**funded (4)**
40:25;70:22;90:16;
95:13
**funding (12)**
49:18;61:19,23;
80:11;90:11,21;91:17;
92:4;95:17;96:6;
119:21;120:11
**funds (14)**
25:10;61:23;70:22;
91:2,25;92:3;93:1;
99:21,21;100:3;
104:24;119:22;
120:11;121:6

**further (3)**
90:25;96:10;121:19

**G**

**Gadola (2)**
46:7,9
**GALLAGHER (2)**
96:19;97:1
**gamut (1)**
119:16
**Garrett (2)**
100:12,16
**gather (1)**
34:8
**gave (7)**
18:9;40:21;78:10,
11;88:22;98:8;106:17
**GE (1)**
12:25
**General (15)**
14:4;33:13;46:10,
18;49:14;60:7;62:12;
67:22;75:1;81:5,11;
82:2,14,20,24
**generally (11)**
12:10;14:19,24;
22:13;26:18;75:2;
78:17;80:16;83:4,19;
88:11
**Generals (1)**
13:14
**Generals' (1)**
14:9
**General's (1)**
82:7
**George (1)**
87:20
**gets (2)**
24:6;95:10
**given (8)**
35:8;49:10;64:11;
66:2,5;78:13;113:21;
118:23
**giving (5)**
65:4;74:8;85:18,18;
88:21
**glance (1)**
44:7
**goal (1)**
17:8
**goes (2)**
24:21;74:21
**good (9)**
7:23;8:14;29:22;
32:11,22;37:7,14;
65:13;80:1
**Gora (1)**
75:12
**governance (1)**
20:9
**government (8)**
11:25;12:22;16:19;

17:2;29:8;30:15;
32:25;33:4
**governmental (1)**
16:13
**Governor (53)**
10:8,11,21;11:24;
15:21;16:6;20:3;
21:13,25;35:13;43:6;
44:19,24;48:2,3,11,14,
17,22;49:6,8;50:1,2;
52:11;53:15;59:2;
62:25;65:12;68:24;
70:1,25;71:6;75:17;
76:22;83:3,25;84:8,15;
86:25;88:12;89:17,21;
91:11,21;92:7;93:4,20;
94:8,16;95:1;103:23,
25;119:19
**Governor's (36)**
6:6,9,10,11,16,21,24,
24;7:2,5;19:12,7,14;
45:10,11,14;46:10,18;
47:14;66:9;70:2;71:9,
10;84:22;86:4,12,17;
87:9,16;89:13,16;
98:21;106:20;107:24;
108:4,12
**Granholm (1)**
10:12
**great (1)**
11:11
**GREEN (17)**
96:14;105:21,24;
107:1;109:17;111:10,
12,16;112:2,6,16,21;
115:22,24;116:3,15;
118:13
**grill (1)**
12:15
**ground (2)**
8:6;108:22
**groundwork (1)**
57:20
**group (6)**
58:7;72:8;79:4;
83:15;93:10;114:15
**growth (1)**
13:7
**guess (9)**
18:25;23:18;41:19;
53:11;60:18;89:23;
92:18;107:21;108:12
**guys (2)**
55:12;63:2

**H**

**hair (1)**
60:6
**half (3)**
10:18;28:13;115:7
**handed (1)**
108:3

**hands-on (1)**
13:5
**handwriting (3)**
111:20;112:5,8
**happen (7)**
13:15;47:17,18;
53:20;55:23;86:9;
98:18
**happened (7)**
16:3;29:3;47:19,23;
76:5;77:20;106:13
**happening (1)**
77:21
**happens (5)**
15:25;25:19;41:2;
80:21,24
**happy (1)**
118:25
**hard (5)**
61:14;92:4;96:6;
107:7,16
**harder (1)**
26:11
**harms's (1)**
28:3
**harsh (1)**
20:5
**head (3)**
82:21;100:18;
106:22
**Headen (1)**
85:14
**health (14)**
17:20;18:3;32:11,
12,20;39:18;60:7,12;
61:25;72:19;73:17;
92:25;104:11,15
**healthier (1)**
23:16
**healthy (2)**
32:22,23
**hear (1)**
88:24
**heard (7)**
20:25;25:14,14;
35:15;54:23;89:1,9
**hearing (11)**
16:24;84:21,24,25;
85:2,9,21;86:6;87:6;
119:13;120:17
**hearings (2)**
86:19,23
**Heather (3)**
111:17;113:4;122:1
**heavily (1)**
19:18
**held (2)**
9:11;97:19
**Hello (1)**
105:23
**help (8)**
23:5,12;41:23;
44:19;55:6;75:11,25;

103:22
**helped (3)**
13:4;23:3;28:15
**helps (2)**
24:4;84:6
**hey (2)**
11:11;48:12
**Hi (1)**
105:22
**high (7)**
6:18,25;12:10;
15:10,12;107:24;
108:19
**high-level (5)**
12:2,8,10;37:21;
60:2
**hired (1)**
70:19
**hires (1)**
65:13
**historical (1)**
118:19
**history (2)**
9:14;118:20
**Hold (3)**
31:21;39:22;76:17
**holders (1)**
42:12
**home (1)**
26:16
**honest (1)**
48:1
**honor (1)**
80:21
**honoring (1)**
80:1
**hood (1)**
15:16
**hoped (1)**
21:19
**hour (3)**
10:18,18;56:17
**hours (1)**
13:18
**House (2)**
9:16;12:19
**Howard (1)**
108:11
**huge (1)**
115:2
**hundred (4)**
34:19;43:16;84:8,12
**Huron (2)**
112:25;113:5
**hypothetical (3)**
42:25;70:7;119:10

**I**

**idea (3)**
35:8;49:8;56:11
**ideas (4)**
10:19;15:24;36:5;

120:18
**identical (2)**
6:20,25
**identified (4)**
6:19,21;34:12;55:22
**identify (3)**
111:11;112:4;
123:11
**identifying (1)**
121:12
**illnesses (1)**
9:4
**imagine (2)**
107:7;116:22
**immediately (2)**
76:21,24
**impact (15)**
29:7,24;30:14;
32:12,16;38:20;59:21;
62:1;90:14;92:5;
94:20;95:22,23;96:7;
98:9
**impair (2)**
39:19;50:4
**impaired (4)**
38:15;42:15;62:11;
63:13
**impairing (1)**
17:18
**impairment (2)**
73:3,16
**implemented (4)**
17:7;34:3;105:12,15
**important (5)**
44:14;57:4,12;
95:16;96:8
**impose (1)**
44:13
**impossible (1)**
68:12
**impressed (1)**
57:19
**improper (1)**
42:25
**improve (3)**
15:7;34:9;37:19
**improved (2)**
16:11;34:6
**improvement (2)**
22:5;34:13
**improvements (2)**
16:9;29:23
**inadequate (1)**
28:2
**inclined (1)**
56:15
**include (2)**
68:18;112:4
**included (1)**
113:7
**includes (1)**
89:11
**Including (2)**

79:13;87:20
**incomplete (2)**
116:25;117:6
**incorporated (2)**
10:19;15:17
**incorrect (1)**
81:19
**increase (2)**
16:20;100:25
**incurred (1)**
115:5
**indeed (1)**
106:15
**indicate (1)**
50:2
**indicated (3)**
37:17;72:10;81:10
**indicates (1)**
87:16
**Indirectly (3)**
30:1,5;101:18
**individuals (1)**
68:18
**industry (1)**
10:5
**information (9)**
58:3;87:12;90:5;
92:25;100:8;101:8;
116:5;117:3,7
**informational (5)**
70:9,11;71:3;91:22;
119:11
**ingredients (1)**
35:9
**inheriting (1)**
12:12
**initial (4)**
76:4,4,25;109:6
**Initially (4)**
11:4;53:5;69:15;
83:23
**initiated (1)**
77:2
**initiative (4)**
15:21;51:5,18;52:13
**injunctive (2)**
84:21;85:10
**instance (1)**
32:24
**instruct (1)**
66:16
**instructions (1)**
8:24
**insulate (2)**
122:21;123:1
**insurance (1)**
68:6
**intent (1)**
64:3
**interaction (1)**
60:11
**intercept (14)**
24:11,19;25:4,8,13;

26:9,14,21,24,25;27:4,
14;28:8,16
**intercepted (1)**
25:20
**interest (2)**
25:10,15
**interested (1)**
122:24
**interesting (2)**
119:13;120:17
**interlocal (1)**
123:8
**internal (1)**
85:7
**intervened (1)**
82:2
**interview (4)**
22:21;114:7,13,20
**interviewed (2)**
54:10;58:13
**interviews (1)**
56:16
**into (17)**
10:19;11:23;12:14;
14:17;15:17;17:4;
24:6;25:1;29:15;33:7;
35:5;59:15;76:3;
90:13;94:20;95:22;
101:7
**intrude (1)**
61:5
**investment (1)**
55:7
**investments (1)**
70:16
**invited (2)**
114:24,25
**involved (19)**
27:11;39:9;54:5,6;
55:6;72:11;74:14;
88:19;99:2;102:1;
107:19;108:14;109:12,
13,15;110:5,9;114:6,9
**involvement (3)**
15:9;35:5;108:5
**iron (1)**
106:16
**issuance (1)**
45:3
**issue (21)**
17:12;39:23,24;
45:13;46:19;48:11,15,
20;60:1;62:24;79:17;
85:10;93:4,20;95:13,
14;96:22;103:12;
119:5,24;121:10
**issued (3)**
21:10;30:18,21
**issues (21)**
12:21;17:1;18:10;
23:14;52:12;58:11,12;
59:1;61:1;75:6;76:15;
77:14;90:17;92:7,15;

102:24;103:4,4,6,9;
107:25
**item (1)**
39:11

## J

**Jack (3)**
7:24;54:19;97:24
**January (11)**
9:12;51:10,17;54:9;
58:6,20,21;60:18,21;
74:15,20
**Jennifer (1)**
105:24
**job (7)**
11:9,15,23;28:19;
32:24;57:5;65:13
**Jobs (3)**
10:13,20;12:24
**Joe (1)**
103:11
**Jones (18)**
45:16,21;47:16,21,
25;55:17;56:5;58:5,6,
109:24;110:17,23;
111:1,14;113:7,10,13,
21
**judge (3)**
13:16;43:3;85:9
**judge's (2)**
97:4,6
**judgment (1)**
57:22
**July (26)**
6:12,17;7:4;43:17;
45:4;60:22;68:24;
69:16;70:11;71:11;
83:23;84:6,24;85:22;
86:7;87:14;89:24;
90:3;94:11;98:7,15;
99:10,11,14,18;119:2
**June (5)**
63:7,20;65:6;95:24;
118:5

## K

**keep (1)**
36:16
**kept (1)**
36:15
**Kevyn (10)**
6:11;7:5;51:10;
59:14;66:8;69:2,6,11;
101:19;120:5
**key (1)**
39:11
**kicked (1)**
53:25
**kids (1)**
32:14
**kind (9)**

13:5;28:11;57:7;
67:14;74:6;75:1,18,21;
108:2
**kinds (1)**
87:19
**knew (7)**
49:17;67:12;75:3;
85:2;86:15;92:3;
106:10
**knowing (2)**
89:7;111:14
**knowledge (6)**
28:15;40:4,15;56:4;
121:17,18
**known (3)**
10:8;54:23;99:24

## L

**labor (1)**
102:20
**lack (2)**
22:23;23:9
**lacks (1)**
24:2
**laid (1)**
58:11
**landslide (1)**
36:9
**language (8)**
15:15;37:23;44:17;
45:1;48:18,19;49:2;
63:16
**Lansing (5)**
6:2;7:15;11:14;
86:11;89:5
**large (1)**
57:11
**larger (1)**
77:15
**last (18)**
9:16;13:1,16;44:8;
55:8;69:23;77:20;
88:16;89:24,25;90:6;
95:11;98:3;100:20;
105:12;111:25;119:1;
120:15
**lasted (2)**
13:18;56:17
**late (3)**
37:18;75:24;107:22
**later (5)**
11:6;15:10;47:18;
71:16;85:22
**law (50)**
12:23;14:17;16:1;
17:11;19:21;21:9,18,
23;22:1;24:1;29:19;
33:12,14,23;35:17,20;
36:15,19;43:13;44:14;
51:4,17;52:2,3,17;
53:3,11,12,17,18,21,
25;54:10;55:9,15;

58:2;76:25;77:2;
80:12,14,15,16;110:7,
10;113:1,7;114:7,11,
14,20
**laws (2)**
122:6;123:8
**lawsuit (2)**
69:11;85:20
**lawsuits (4)**
69:19;72:8;83:24;
84:8
**lawyer (6)**
46:22;47:5;49:22;
85:23;93:24;98:3
**lawyers (7)**
39:9;45:16;71:17;
86:1;109:2,3,9
**lay (2)**
58:6;64:3
**laying (2)**
65:14,20
**lead (2)**
69:24;119:4
**leading (1)**
45:3
**leaked (3)**
116:12,14;117:7
**learn (2)**
84:4;86:3
**learned (7)**
35:1;59:12;84:5;
85:20,21;90:5;91:1
**learning (7)**
70:13,13,15,17;
84:20;90:17;92:25
**least (3)**
29:11,17;86:21
**leave (1)**
45:21
**leaves (2)**
16:14,18
**led (5)**
73:13;76:5;77:3;
98:5;108:1
**left (2)**
24:21;92:11
**legal (26)**
27:17,17;28:20,23;
33:21;38:22;41:1,15;
42:8;46:11,15;52:19;
58:5;64:21,23;80:6,23;
81:7,12,19,22;85:14;
88:21;123:7,12,12
**legally (1)**
44:15
**legislation (6)**
14:14,14;44:24;
51:22;74:12;108:4
**Legislator (2)**
12:19;65:5
**Legislature (10)**
9:15;10:10;16:2,6;
35:12;74:12;108:5,14,

23,24
**legs (1)**
108:21
**lender (4)**
13:1;27:1,2,20
**lenders (1)**
28:19
**lending (1)**
29:14
**lengthy (2)**
98:20;99:2
**Lennox (2)**
111:17;122:1
**less (3)**
40:25;59:11;86:2
**lessons (1)**
59:11
**lets (1)**
65:13
**letter (13)**
6:12;7:4,7;43:18;
44:19;45:4,14;47:15;
49:5;106:20;107:6,12,
15
**level (12)**
15:10,12,23;70:20;
90:10,20;91:17;95:17;
107:24;108:19;
119:21;120:10
**liabilities (2)**
63:7;101:1
**liability (1)**
60:5
**liable (1)**
49:20
**lien (1)**
26:15
**life (4)**
32:6,6;120:25;121:7
**lights (1)**
32:15
**liked (1)**
57:8
**likely (3)**
54:15;73:20;75:20
**limitations (1)**
15:5
**limited (3)**
15:17;56:19;75:5
**line (3)**
23:24;63:24;106:1
**lines (2)**
67:19;85:10
**list (4)**
110:12,15;114:10,20
**listening (1)**
67:1
**litigation (3)**
92:21,22,24
**little (2)**
12:23;14:13
**Local (11)**
11:20,25;12:22;

23,24
**legs (1)**
108:21

17:2;30:3,7;33:6;
34:15;35:4;36:3;
115:18
**locals (2)**
35:6;52:8
**lodged (1)**
22:10
**logic (2)**
41:10,14
**long (8)**
9:11,22;10:8;39:23;
56:16;74:22;120:25;
121:6
**longer (2)**
77:1;98:1
**look (15)**
19:8;38:5;51:25;
63:18;73:15;89:3,19;
90:25;94:11;95:24;
97:12,12;113:22,25;
123:9
**looked (6)**
34:8;35:3;91:20;
101:7,13;110:17
**looking (5)**
15:6;50:3;63:17;
118:19,24
**looks (2)**
87:13;92:9
**losing (1)**
48:24
**lost (1)**
64:7
**lot (27)**
12:4;13:6;17:12;
27:17,23;28:7;36:20,
21;37:6;39:12;55:19;
57:20;68:6,8;74:22;
76:12;87:12;90:22;
91:16,17,18;92:1;
98:17;106:18;120:25;
121:7,10
**Lowenstein (1)**
7:24
**lunch (3)**
11:10;57:17;59:9

## M

**MacKenzie (1)**
55:8
**Mahatra (1)**
75:12
**Main (2)**
26:4,10
**major (2)**
16:22;100:9
**majority (1)**
101:24
**makes (2)**
20:10;36:19
**making (7)**
49:20;66:12;67:24;

68:10;70:18;75:15;
80:1
**manage (3)**
31:3,8;103:1
**management (1)**
102:25
**manager (28)**
18:17,21,24;33:12;
35:7;36:6,25;43:7,10;
48:5;51:3,9,11;54:3;
55:11;56:21;57:4,15;
59:3;66:2,12;74:8;
77:5;82:9;86:5;100:5;
110:7,10
**managers (1)**
19:22
**manager's (2)**
77:4;94:17
**managing (2)**
10:2;30:24
**many (9)**
8:4;55:11,12;57:11;
70:8,23;85:25;119:11;
122:3
**March (4)**
14:18;53:6,22;
122:25
**Margaret (2)**
81:13,15
**mark (15)**
6:16;13:23;14:1,2;
23:18;37:25;43:17;
109:12;111:19;112:3,
9,11,17;115:23;118:9
**marked (19)**
6:11,22;23:20;38:2,
9;43:16,20;50:20;
51:1;63:19;68:20,23;
87:8;89:15;112:14,19;
116:1;118:11;119:2
**market (9)**
10:6;22:24;23:2,7,
10;24:3,7,8;26:7
**markets (6)**
30:12;31:2,5;32:1,2,
8
**marking (1)**
7:1
**Martin (1)**
54:19
**material (1)**
35:7
**matter (4)**
6:23;78:20;80:5;
86:1
**Matthew (2)**
13:21;14:8
**maxed (1)**
118:17
**may (25)**
12:2;26:17;28:11,
12;33:20;40:2;41:24;
44:12;49:15,21,21,23;

54:20,22;73:14;82:14;
88:18;91:7;96:7;
100:7;103:11;113:16,
17;114:24;115:10
**maybe (5)**
20:10;29:11,17;
31:24;113:4
**Mayor (1)**
34:24
**McNeil (2)**
100:12,17
**mean (32)**
11:17;15:23;22:14;
25:9,16;27:10,12,16;
28:7;30:1,17,20;33:10;
43:2,11;48:10;49:15;
52:10;61:13;70:10;
75:2;80:12;82:7,12,24;
84:12;95:12;101:18;
112:23;114:15;
119:17;121:5
**meaning (2)**
94:19;123:10
**means (5)**
80:20;104:23;105:6;
122:8,18
**meant (1)**
83:1
**measure (1)**
57:12
**measured (1)**
90:12
**measures (5)**
17:6;21:8,16,20;
36:12
**mechanics (1)**
15:22
**media (6)**
115:18;116:21;
117:1,8,17,19
**medical (1)**
9:6
**medications (1)**
9:3
**meet (8)**
10:11;69:2,6,13,17,
18;75:15;94:17
**meeting (43)**
10:10,17;13:13,17,
17,19;14:10;54:8,24;
55:2,10,14,15,23,24,
25;56:4;57:16,19;
58:20,24;59:9;66:4,7;
67:12;69:9,15,20,22,
24;76:16,21;77:18;
78:12;88:7;100:12,22,
24;103:10;106:10;
114:21;119:3;120:4
**meetings (15)**
34:7;36:6;37:18,22;
51:20;57:23;65:22,25;
66:3;78:14;79:4;
83:15;86:11,14;107:22

**members (4)**
19:19;54:21;66:8,9
**memories (1)**
68:3
**memory (37)**
13:24;17:24;19:1,9;
33:13;36:8;41:5;53:8,
24;54:1;56:3;57:16;
58:17;59:16;61:15;
64:2;67:4,11;68:4;
69:11,18;73:15,22,23;
74:4;76:10;79:6;
84:10;86:10;87:25;
88:9,15;89:6;100:15;
101:2;102:16;123:14
**memos (5)**
110:2;113:20,23;
114:1,4
**mentioned (3)**
106:19;117:21;
120:24
**merely (1)**
52:4
**message (2)**
57:9;92:12
**met (12)**
10:9,18;56:16,17;
58:17;68:2;72:3;88:1;
100:14,20;111:18;
113:4
**mic (1)**
71:18
**Michigan (23)**
6:2;7:15;9:9,15;
11:19;12:1;19:19;
29:9,12,19,25;30:16;
33:17;38:21;40:5,17;
42:14;62:8,23;64:19;
65:9;108:25;113:24
**microphone (2)**
48:24;96:16
**mid (1)**
53:6
**Middle (2)**
10:6;119:22
**midwest (1)**
10:6
**might (12)**
8:16;16:15;17:5;
26:20;30:20;55:3;
69:11;75:24;101:19;
104:7;115:12;122:9
**Mike (2)**
46:6,9
**mill (2)**
13:3,4
**Miller (3)**
113:1,6;114:23
**Milliman (6)**
70:19;115:17;
116:12,20,25;117:11
**million (11)**
28:14;75:19;76:23;

101:5,17;105:4,10;
115:7;118:3,4,16
**millions (1)**
76:18
**mind (6)**
29:22;39:24;64:21;
65:12;69:17;82:13
**mine (1)**
11:10
**minute (1)**
88:17
**mischaracterized (1)**
117:24
**misguided (1)**
24:17
**mismanaging (1)**
30:7
**modification (1)**
18:14
**modified (1)**
93:15
**modify (6)**
17:13,24;18:5;39:4,
13;72:23
**Monday (4)**
86:6;88:1,2;106:10
**Mondays (1)**
77:18
**money (13)**
24:10,10,11;25:1;
41:18,25;42:1;49:19;
101:20,23;103:16;
104:8;105:7
**monies (4)**
26:2;67:10;80:20;
94:21
**month (1)**
13:13
**months (1)**
75:4
**Moody (1)**
30:19
**Moody's (1)**
30:20
**more (21)**
12:14;17:5;18:10;
20:9;23:8,15;24:25;
29:11;35:4;40:11;
51:13;53:9;57:17,25;
58:2;59:10;75:7;96:8;
100:8;113:19;118:19
**morning (5)**
7:23;14:10,12;
71:19;87:19
**mortgage (1)**
26:16
**most (5)**
27:2;44:14;54:15;
57:12;58:16
**mostly (1)**
67:1
**movable (1)**
106:17

**move (1)**
29:1
**moved (6)**
76:3;89:1,2,7,14;
108:4
**movement (1)**
74:11
**moving (5)**
61:21;70:23;90:15
**much (11)**
21:21;57:18;61:16,
17;73:22;78:8,13;
98:1;108:6,20;120:13
**municipal (5)**
22:24;23:2,7,10;
24:3
**Murray (1)**
109:12
**must (2)**
64:11;117:18
**myriad (1)**
28:6
**myself (1)**
14:7

## N

**name (7)**
7:23;9:20;10:15;
72:3;87:21;108:8;
110:15
**names (2)**
47:25;114:25
**narrow (1)**
25:17
**navigate (2)**
20:11;33:8;59:25
**necessarily (1)**
80:3
**necessary (5)**
21:18;22:1;36:22;
52:4,17
**need (6)**
28:20;46:5;52:21;
72:15;95:23;106:23
**needed (4)**
16:10;22:4;29:23;
56:24
**needs (2)**
32:25;33:4
**negative (3)**
29:18;32:16;95:23
**negatively (1)**
30:8
**negotiate (5)**
68:10,12,17;102:12;
123:6
**negotiated (3)**
27:21;28:9;104:12
**negotiation (2)**
102:15;104:17
**negotiations (4)**
66:13,22;67:17;

76:12
**NELSON (58)**
6:5;13:23;14:2,4;
19:10,12;20:20;21:2;
31:6,10,12;38:4,22;
41:15;42:20,24;46:1,5,
23;50:6;51:7;60:15,
19;61:4;65:2;66:14;
77:25;78:22;80:6,25;
81:9,14,18,22;83:7;
85:12;93:7;95:5,9;
96:1,11,17,21;97:3,8,
15;98:3;102:5;104:9,
18;109:4,7;112:7,11;
115:21,23;116:13;
123:16
**NERD (1)**
99:21
**NERDs (3)**
99:24;100:3,9
**N-E-R-D-s (1)**
100:4
**nervous (1)**
84:9
**new (11)**
51:4,22;52:2,17;
53:12,18,21,25;77:2;
99:20,23
**News (3)**
87:20;116:21;
117:17
**next (7)**
60:1;71:11;77:21;
91:11;94:18;112:11,16
**night (1)**
88:13;107:9
**nine (2)**
73:18;98:20
**nine-year (1)**
13:8
**ninth (1)**
120:7
**Nodding (1)**
106:22
**nonbond (1)**
24:14
**none (1)**
102:16
**nonlawyers (1)**
109:16
**nonprivileged (1)**
67:16
**note (1)**
7:6
**notice (1)**
56:8
**notified (1)**
84:19
**November (6)**
20:15;29:3;37:18;
51:6,19;107:22
**nuance (1)**
108:6

**number (10)**
61:16;68:8;75:18;
76:18;84:7;90:15;
103:3,4;111:22,24

## O

**oath (1)**
8:10
**object (9)**
8:16;31:9;42:23;
51:7,13;60:15;61:4;
66:14;95:2
**Objection (17)**
38:22;41:15;42:20;
46:1;50:6;65:2;77:25;
78:22;80:6;81:9,16,19;
83:7;85:12;96:1;
104:9;116:13
**objections (1)**
51:14
**obligation (4)**
25:5;38:14;50:4;
59:20
**obligations (9)**
23:17;30:3,4;41:13,
13;60:12,14;75:16;
114:2
**obvious (1)**
64:24
**obviously (7)**
8:17;15:23;70:1;
76:12;119:16,23;120:3
**occasion (1)**
113:2
**occasions (2)**
8:4;98:23
**occur (1)**
86:23
**occurred (1)**
78:24
**October (3)**
6:1,7;7:11
**off (11)**
16:18;23:24;37:12;
50:16;71:21;72:4;
94:2;97:17,19;108:3;
117:2
**offered (2)**
70:14;118:1
**offhand (1)**
122:19
**office (17)**
6:11;7:5;14:9;21:11;
45:11;47:23;66:9,10;
72:12;74:15;86:4,12,
17;89:13;107:24;
108:12;111:2
**officer (1)**
116:6
**official (4)**
20:21,23;54:4;83:24
**often (6)**

20:8;21:21;24:6;
34:14;77:11,17
**old (3)**
53:3,11,17
**older (1)**
26:18
**once (4)**
24:23;25:6;77:5;
108:2
**one (68)**
13:22;17:17;21:8;
22:6;23:8;28:9;29:11,
17;34:14;35:22;36:12,
13,13,16,18;37:10;
39:23;40:11;43:9;
46:20;47:23;50:2;
56:23;57:16;61:14,14;
62:14;63:24;67:4,13;
68:4;72:7,18;74:3;
75:10;82:16;84:10;
89:14,18;92:9,15,17,
19;94:12,12;95:5,11;
96:12;97:8;99:4,19;
103:10;105:15,15,17;
110:17;111:6,20;
112:8,12,17;115:10,
12,14;116:7;121:5,8,
24
**one-on-one (7)**
77:8;78:14;83:2,13,
14;93:8,10
**One-on-ones (2)**
77:12;79:3
**ones (2)**
36:17;70:18;73:16
**Online (4)**
22:19,22;106:20;
107:8
**only (20)**
21:21;30:5;36:13,
13,15;51:12;56:4,15;
67:4,11,13;68:4;79:17,
24;97:9;108:12;111:6,
13,20;115:21
**operate (1)**
33:10
**operational (2)**
13:5;56:25
**opined (1)**
82:18
**opinion (13)**
32:18;33:16,19;
49:22;52:19;81:7,11,
12,19;82:21;92:4;
120:8,13
**opportunities (1)**
10:2
**opportunity (1)**
11:11
**opposed (1)**
122:10
**option (1)**
36:1

**options (6)**
36:3;52:8;120:25;
121:3,13,15
**order (6)**
18:2;34:16;95:7;
97:5,7,9
**organization (1)**
99:23
**original (2)**
63:25;99:5
**Orr (43)**
6:11;7:5;37:2;43:22,
24;51:11;52:1,14,24;
53:2,6,15;54:23;55:22;
56:2,5,8,11,20;57:14,
23;58:3,25;60:11;
61:17;62:19;66:19;
67:8;69:15;77:9,17,23;
78:15;79:7,13;82:9;
88:13;89:1;93:4,20;
94:19,24;101:16
**Orr's (2)**
51:16;57:8
**others (5)**
40:2;54:22;68:24;
82:11;109:15
**ours (1)**
53:9
**out (37)**
6:23;9:18;17:23;
21:9,22;26:20;33:8;
35:1;36:2,19;39:3,10;
44:21;45:14,21;47:15;
49:19;58:7,11;61:7,14;
64:3;65:14,20,24;78:4,
10;85:13;92:1;95:18;
106:6,14;108:2;
117:17;118:17;121:6,9
**outlets (1)**
117:20
**out-of-court (1)**
66:13
**outside (8)**
61:18,24;66:19;
94:1,8;107:20;108:24,
25
**over (14)**
18:6;22:7;31:3,8;
34:20;71:18;77:19,23;
78:1;101:5,14;108:6;
113:4;120:1
**overly (1)**
82:12
**overstate (1)**
26:13
**owed (2)**
67:11;101:5
**owes (1)**
101:23
**own (5)**
24:7;30:1,2,4;76:15
**owner (1)**
13:4

**options**

## P

**PA (102)**
14:15,21,21,22;15:1,
3,4,20;16:5,8,10,25;
18:8,8,9,11,12,13,16,
19,23;19:6,9,10,11,12,
13,17;20:15,19;21:14,
18;22:7,16,19,23;23:3,
5,9;29:2;30:12,13;
32:7;33:9,14,14,23,25;
34:1,2,3,3,5,6,8,9,11;
35:10,11,11;36:8,10,
21,23,23;37:3,3,16;
38:19,20;39:2,11,16,
25;40:4,16,21;43:11,
11,12,14;44:9,23;
45:24;47:8;51:21;
107:19;108:1,17,18,
18;109:1,4,6,21,25;
110:2,10,12,24;122:4;
123:2
**page (5)**
44:8;63:21;64:7,10;
111:25
**paid (2)**
24:12;25:6
**pain (1)**
26:5,10;27:7,15
**paper (1)**
100:6
**papers (1)**
81:5
**paragraph (7)**
44:9;48:21;52:1;
69:23;91:1,11;94:16
**pari (1)**
24:15
**parse (1)**
61:7
**part (16)**
16:3;45:1;52:11,23;
54:2;56:5;74:10;87:2;
98:21;104:12,16;
108:8;109:16,19;
115:4;122:15
**participate (1)**
65:25
**participated (1)**
47:21
**particular (7)**
17:10;23:14;25:11;
58:14;61:14;84:10;
92:20
**particularly (1)**
27:5
**parties (3)**
96:24;97:9;101:6
**partner (1)**
10:2
**partnership (1)**
76:1

party (1)
53:14
pass (1)
11:1
passage (1)
14:25
passed (2)
15:20;16:1
passu (1)
24:15
path (7)
20:13;35:24,24,25;
57:24;58:7,18
pay (16)
23:17;24:20,25;
25:1;27:25;41:7,7,12,
12,18,25;59:20;90:14;
115:7;117:22;118:1
paying (1)
115:4
payments (2)
25:24;80:21
payroll (2)
41:25;75:16
PCA (4)
122:6,8,12,18
pdf (1)
6:20
pending (2)
40:10;50:10
pension (42)
38:12;40:7,19,25;
41:7,7,12;42:1,1,12;
48:6;49:4,11,18;59:4,
19,19;60:12;61:17,23;
62:9;64:12,17;65:7;
73:12;80:11,20,21;
84:2,14;90:16;91:2,17,
25;92:3;93:1;94:23;
114:2;119:5,21;
120:11;121:6,16
pensioners (1)
60:6
pensions (27)
50:5;61:20;62:13;
63:12,22;69:3,7,16;
70:3,12;71:1;73:6;
74:3;78:19;79:9;80:2;
83:6,21;90:11,14,23;
91:12;94:18;110:3,6;
117:7;120:24
people (15)
14:22;36:21;55:1;
65:13;68:11;77:15;
79:11;89:11,13;
101:12,16;103:19;
108:8;109:10;113:18
per (1)
24:24
percent (8)
16:13,17,18;34:19;
41:1;70:22;101:15;
118:1

perception (1)
32:7
period (2)
15:4;34:12
permanently (1)
18:1
person (4)
32:5;77:16;82:24;
111:13
personal (5)
20:21,22,25;32:18;
92:6
personality (1)
57:5
persons (2)
64:18;65:8
perspective (1)
31:4
petition (5)
7:8;106:3,6,15;
107:3
ph (1)
75:12
philosophy (2)
12:6,16
phone (5)
11:2;46:16;56:2;
77:19;113:5
pick (2)
61:14;121:6
piece (1)
55:8
pieces (1)
70:23
pitch (2)
56:6;58:15
place (15)
16:16;24:23;25:3,6;
26:14;28:12;34:5,22;
44:12,25;47:12;48:4;
98:14;105:8;123:5
Plaintiffs (1)
72:7
plan (16)
10:13,20;38:12;
42:21;44:15;49:18;
62:10;69:18;86:18,21,
22;87:16;88:10,12,16,
22
planned (2)
86:4,5
plans (4)
36:5;60:13;90:16;
94:23
played (1)
114:23
please (4)
7:16;8:20;51:13;
89:19
pledge (1)
25:15
pledged (1)
25:10

Pluta (2)
116:12;117:18
pm (6)
6:18;7:5,9;87:17;
123:20,21
point (22)
6:23;22:15;27:10,
13;43:4;48:14;50:15;
55:13,19;63:22;70:10;
73:19;74:7;75:20,25;
76:13;86:3;94:25;
101:4;108:6;120:20;
122:24
pointed (3)
119:12,14;120:16
political (5)
31:3;38:13;59:1;
95:21;119:24
pool (2)
26:22;68:17
Poor (1)
30:19
poorly (1)
67:18
population (1)
19:19
portion (1)
118:7
position (12)
10:1;11:4;20:18,24;
59:23;71:10;75:14;
82:4,8,9,16,19
positive (7)
29:13,20;30:13,14,
22;31:4;32:19
possible (3)
99:17;110:20,22
post (2)
9:11;112:14
postfiling (1)
98:18
Posthumus (2)
108:16;109:14
potential (2)
57:14,21
potentially (2)
75:4;85:18
power (6)
18:10;31:2;34:15,
19,23;123:1
powers (2)
122:6,8,21,22;123:2
practical (3)
79:17,24;80:5
practically (1)
33:10
practice (1)
117:5
preceding (3)
88:2;93:5,22
precise (1)
100:8
precisely (3)

83:17;98:25;113:19
precluded (1)
84:22
predated (2)
75:7;101:19
predecessor (1)
14:21
premise (2)
43:15;62:15
preparation (2)
44:5;113:11
prepare (2)
13:11,17
prepared (1)
34:18
presence (5)
61:18,24;66:20;
68:14;94:8
present (11)
6:15;46:4;61:10;
79:3,5;83:16;85:17,24;
86:1;88:20,23
presentation (3)
58:5,11;63:9
presented (1)
17:1
preserve (1)
21:23
preserved (1)
21:19
preserving (1)
21:9
press (3)
21:23;82:5,10
presume (1)
79:10
pretty (10)
14:20;36:11,18;
49:24;64:24;78:8,13;
108:6,20;120:13
prevent (1)
32:20
prevents (1)
42:14
previous (1)
9:14
previously (2)
63:19;89:18
primarily (2)
11:20;54:7
primary (3)
17:8;18:7;56:22
prior (15)
9:17;51:5,18;52:3;
76:11;77:2;86:13;
98:8;106:1;107:11;
111:14,18;115:8;
118:2,5
priority (3)
6:19,25;28:21
private (6)
9:18;10:13;11:5;
12:20;26:1;32:5

privilege (7)
21:1;46:2;51:13;
78:23;81:1;85:13;
93:12
privileged (5)
20:22;46:21;61:6;
109:8,8
proactively (2)
30:24;32:20
probably (20)
8:5;10:23;16:3;
22:15;27:2;28:22,25;
37:18;47:23;49:24;
51:2;57:12;58:16;
60:1;63:8;91:8,9;
100:21;101:23;117:20
problem (2)
41:19;111:19
problematic (2)
103:2,5
problems (1)
103:22
proceeding (2)
44:11;82:18
process (15)
22:11;70:7;71:2;
98:19;99:2;108:22;
109:20;110:5,9,11,18;
113:21;114:5;115:6;
119:9
produce (1)
112:8
produced (3)
6:14;7:3;113:23
production (1)
6:9
productive (1)
67:23
products (1)
10:5
professional (1)
115:4
professionals (1)
55:5
program (6)
70:14;90:18;91:24;
105:9,10,13
progress (2)
66:11;67:24
prohibited (1)
48:5
prohibition (1)
17:18
promoted (1)
16:5
promotion (1)
31:19
proposal (7)
63:6,13,15,20;65:17,
18;95:24
proposals (1)
121:11
propose (1)

56:11
**proposed (6)**
20:19;21:14;65:6;
99:5,8;115:2
**pros (1)**
45:12
**prospect (1)**
56:8
**protect (1)**
18:3
**protected (3)**
22:7;28:22;79:9
**protecting (2)**
40:7,19
**protection (6)**
36:10;42:4,13;
49:10;62:13,21
**protections (2)**
49:4;78:19
**protects (3)**
24:1;83:6,21
**provide (9)**
17:19;23:16;30:9;
33:6;39:18;58:10;
65:11;101:16;110:15
**provided (6)**
6:14;44:24;62:9;
109:24;116:20;117:1
**providers (4)**
24:11;25:5;67:6,10
**provides (1)**
52:2
**providing (2)**
46:15;65:7
**provision (27)**
18:13,16;38:16;
39:15;40:6,18;45:5,24;
47:8;48:13;49:7;
62:18,22;72:19;73:1,3,
5,12,21;74:3;79:9,12,
25;82:15;83:5,20;84:2
**provisions (6)**
17:17,21;39:17;
72:18;103:2;122:3
**Public (27)**
15:7;16:23;17:8,20;
18:3;19:23;21:10,12;
22:2,5;23:25;29:12,21,
24;32:6,14;34:16;35:2,
5;37:20;39:6,18;72:12,
19;73:13,25;116:5
**publication (1)**
22:18
**publicly (1)**
82:10
**pull (1)**
30:17
**pulled (1)**
23:24
**punt (1)**
48:20
**purpose (3)**
85:17;88:21;100:1

purposes (3)
6:5;7:1;43:9
**pursue (1)**
19:2
**put (8)**
24:23,25;34:5,21;
35:4;74:6;105:8;123:5
**putting (1)**
21:23;114:10,19
**puzzle (2)**
55:9;70:24

**Q**

**qualified (1)**
56:21
**quick (2)**
34:2;71:20

**R**

**radar (3)**
12:5;75:3;92:16
**raise (1)**
41:3
**raised (2)**
39:12;52:12
**rapidly (1)**
76:20
**rather (2)**
28:10;75:5
**rating (6)**
29:11,17,25;30:2,6,
15
**ratings (1)**
30:18
**reach (2)**
68:14;95:15
**reached (3)**
67:7,9;117:23
**reaction (1)**
56:14
**read (21)**
22:6;23:8;24:4;
31:15,21;38:18;40:8,9,
10,11,13;50:8;82:3,
5,13;93:18;100:6;
107:6,8;116:24
**reading (7)**
19:5;36:21;37:6;
69:21;92:9;107:3;
113:12
**reads (1)**
91:1
**ready (1)**
11:5
**real (2)**
34:2;67:23
**realities (2)**
40:23;68:7
**reality (3)**
20:5,13;65:21
**realize (1)**

51:1
**really (20)**
21:8;34:7;36:2,21;
57:4,17;58:21;64:23;
70:19;73:15,19;75:13;
84:17;92:3;96:6,6;
98:8;105:19;106:17;
120:1
**reason (10)**
8:25;34:5;57:10;
88:22;89:7;90:5;
95:21;98:14;99:1;
106:11
**reasons (3)**
101:22,24;102:24
**recall (103)**
12:2,9;14:19;19:20;
21:7,7,10;22:14,22;
23:1;33:18,20;37:1,4,
9;39:16;41:1;45:9,20;
47:6,22,25;48:8;49:12,
15:51:20;53:4,5,19,20;
54:22;55:3,18;59:6,7,
8,13;60:10;64:2;67:15,
20;68:15;72:13;73:11;
74:5;75:6;79:21;
83:22,23;84:4,18,19,
20,25;85:1,6,23;86:2;
88:16;89:20;90:8,25;
94:7;98:11,19;99:9;
100:12,22;101:4,7,7;
103:8,10;104:11,14,
15,19;105:3,8,17;
106:4,5,21;107:9,10,
13,14;109:14,15,23;
110:4;111:3,14;
113:13,16,20;114:1,4,
13,15;115:11;118:14;
120:20
**recalling (1)**
122:19
**receivables (2)**
105:5,9
**receives (1)**
26:2
**receiving (1)**
113:13
**recent (1)**
91:2
**recently (1)**
105:17
**recess (3)**
50:18;71:23;94:4
**recognize (2)**
42:10;112:22
**recollection (5)**
19:24;22:17;91:5;
99:12;107:5
**recommend (1)**
75:20
**recommendation (1)**
44:11
**reconsidered (1)**

11:6
**record (28)**
6:6;7:1,6,12;37:13;
38:6;40:13;50:16,22;
58:19,23;63:23;71:21,
24;72:4;90:2;93:18;
94:2,5;97:14,16,17,19,
20;100:16;111:22;
117:2;119:19
**record's (1)**
19:4
**redo (1)**
52:3
**reduce (1)**
16:17
**RE-EXAMINATION (2)**
97:22;121:22
**reference (4)**
44:9;90:8;91:3,4
**referenced (1)**
80:10
**references (1)**
122:5
**referendum (6)**
20:15,19;21:14;
22:10,19;73:24
**referred (1)**
19:21
**referring (8)**
22:21;25:2;92:19,
21,22,24;118:22;122:9
**reflect (1)**
28:11
**reflected (2)**
30:12;99:5
**reflects (2)**
22:23;23:9
**refresh (2)**
13:24;88:9
**regard (1)**
74:10
**regarding (7)**
75:6;100:13;110:2;
117:7;119:17;120:8,21
**reigns (1)**
34:15
**Reinvest (2)**
99:20,24
**rejected (3)**
51:5,18;52:3
**related (7)**
57:18;84:1,9;110:3,
12,21;114:1
**relates (2)**
28:9;29:16
**relating (9)**
72:19;74:2,3;110:5,
9,24;113:14;119:1,5
**relative (1)**
94:17
**relevance (1)**
12:25
**relevant (1)**

12:18
**relief (2)**
84:21;85:10
**rely (1)**
33:24
**relying (2)**
35:2;43:13
**remain (2)**
70:8;119:10
**remaining (1)**
16:19
**remember (19)**
22:18;30:19;33:23;
49:22;54:17;58:14;
59:9;67:14;87:1,6;
92:11,17;95:10;99:15,
16;103:3;107:2;
110:23;115:1
**reminder (1)**
8:7
**repay (1)**
30:11
**repeal (9)**
22:16,19;29:24;
33:9,12,14;35:11;
108:1;122:22
**repealed (3)**
29:16;33:25;123:3
**rephrase (1)**
31:24
**replacement (1)**
74:1
**replacing (1)**
72:12
**report (5)**
67:17;115:17;
116:12,20,25
**reported (1)**
66:11
**reporter (6)**
8:9,15;40:10,13;
50:10;93:18
**reports (3)**
66:2;82:5;121:11
**represent (4)**
7:25;68:9;72:6;
105:24
**represented (1)**
72:6
**representing (1)**
113:17
**request (1)**
6:8
**requests (1)**
84:21
**require (2)**
19:14;68:1
**required (1)**
36:17
**requirement (2)**
44:15;57:12
**requirements**
28:20

**requires (1)**
91:17
**reserve (1)**
71:15
**residents (1)**
22:3
**resolve (1)**
41:21
**resolved (1)**
39:24
**resort (1)**
13:2
**respect (12)**
20:18,19;21:14;
26:8;48:15;93:16;
102:18;104:1;105:4;
108:17;109:1,4
**respectfully (1)**
11:4
**respond (2)**
70:7;119:10
**response (1)**
70:25
**responsibilities (1)**
30:4
**responsibility (1)**
39:18
**responsible (2)**
108:13;114:19
**restart (1)**
13:4
**restate (8)**
23:4;25:12;39:1;
86:20;93:17;110:8;
116:17;122:23
**restated (1)**
114:9
**restriction (1)**
57:1
**restructure (2)**
41:23,24
**restructuring (14)**
13:5;27:5,6,10,11;
35:25;55:7;56:23;
58:12;63:6;109:18,19;
114:6;121:2
**result (1)**
33:21
**resurfaced (1)**
40:1
**retained (1)**
18:19
**retired (4)**
61:25;64:13,18;65:8
**retiree (2)**
59:20;96:17
**retirees (8)**
68:9,10;72:8;79:18;
92:5;94:20;95:22;
119:18
**retirement (11)**
38:12;40:7,19;
42:13;49:11;59:4;

62:10;63:12;96:20,21;
105:24
**return (1)**
34:18
**revenue (13)**
16:20;27:19,21,24,
24;28:1,2,5,17,21,24;
42:5,10
**revenues (5)**
24:19;25:22;28:10;
30:2;100:25
**reverted (1)**
29:21
**review (13)**
18:11;38:19;44:5;
75:21,21,24;76:5,24;
77:1,2;103:19;104:14;
109:25
**reviewed (2)**
102:20;118:24
**reviewing (1)**
118:18
**reviews (1)**
76:4
**revision (1)**
52:2
**revisit (1)**
40:1
**RFP (5)**
110:5,9,11,18,20
**Rich (5)**
54:7;55:25;56:1;
57:20;100:6
**Rich's (1)**
57:21
**Rick (1)**
117:18
**right (70)**
9:9;11:22;13:20;
14:18,22,23;16:24;
18:20,22;20:16;21:2,2,
17;24:9;26:21;27:19;
28:21,24;29:1,4,5;
32:13;34:2;35:23;
38:9;40:22;42:6,9,10;
45:18,21;46:13;47:9;
53:23;56:7,10;57:4;
70:4,4,5;71:4,5,13,15;
72:24,25;73:8,9;76:4;
80:12,13,17;83:14;
86:12;87:13;88:4,14;
90:1;92:11;93:2;
95:16;99:4;103:24;
119:8;122:14;123:4,16
**rights (3)**
48:6;50:4;94:21
**ringing (1)**
122:12
**rings (1)**
84:3
**road (1)**
17:9

**role (17)**
11:14;12:7;14:24;
15:18;37:10,16,23;
59:11;74:18,19;77:6,
22;102:14;103:25;
107:18;108:18;114:23
**rollout (1)**
87:16
**room (2)**
46:22;47:5
**ruffle (1)**
57:7
**ruled (1)**
13:16
**rules (1)**
8:6
**running (1)**
10:21
**runs (2)**
41:2;49:19
**Ryan (1)**
108:11

**S**

**sacrifice (1)**
42:17
**safe (1)**
118:16
**safely (1)**
32:15
**safety (7)**
17:20;18:3;32:14,
21;39:19;72:19;73:17
**Same (10)**
14:11;34:5;42:12;
53:22;58:23;77:22;
78:8;108:19,20;120:14
**Sandler (1)**
7:24
**sat (1)**
36:6
**satisfy (1)**
100:25
**saved (2)**
103:15;104:8
**savings (2)**
104:11,15
**saw (2)**
49:5;106:20
**Saxton (1)**
54:18
**saying (15)**
22:22;23:1;26:4,5,8;
27:3;30:21;33:3;
36:19;58:19;70:4;
79:13;81:11;82:14;
84:10
**schedule (9)**
53:9;86:9,16;87:5;
89:4;98:16;106:11,12,
16
**scheduled (4)**

84:24,25;86:23;87:7
**SCHNEIDER (3)**
13:21,21;14:8
**school (12)**
11:21;12:4;17:10;
19:6,14;20:6,10;22:4;
23:5;25:19;30:25;
32:15
**schools (1)**
19:1
**Schuette (1)**
82:25
**se (1)**
24:24
**search (3)**
54:2,4;55:10
**second (1)**
37:10
**secondhand (1)**
88:24
**Secretary (2)**
7:16;48:23
**Section (14)**
38:9,20;39:4;62:4,6,
8;64:20;65:9;78:16;
81:7;82:22;83:4,19;
84:17
**sector (1)**
11:6
**secure (1)**
28:15
**secured (3)**
27:1,2,20
**security (2)**
25:9,15
**seek (1)**
34:13
**seeking (2)**
97:10;112:25
**select (1)**
55:2
**sending (2)**
89:20;118:14
**sense (1)**
36:19
**sensitive (1)**
119:24
**sent (4)**
51:3,8;107:12;
115:17
**sentence (3)**
91:1;120:15;122:3
**sentences (1)**
94:19
**September (1)**
76:19
**sequence (3)**
86:8;87:1;98:5
**serious (1)**
55:12
**serve (1)**
52:9
**served (3)**

9:15;53:24;54:1
**serves (1)**
26:15
**service (2)**
28:2;41:4
**serviced (1)**
28:18
**services (3)**
23:16;28:1;33:7
**set (3)**
25:22;33:2;48:18
**settled (1)**
65:24
**settlement (2)**
67:7;95:15
**several (6)**
22:20;25:17;90:17;
98:23;100:14;115:22
**severe (1)**
20:7
**sewer (1)**
27:25
**shake (1)**
39:10
**shall (3)**
38:13,14;62:10
**share (6)**
26:5,10;27:7,15;
49:25;94:21
**shared (4)**
49:15,21,24;117:19
**sharing (2)**
57:25;59:10
**sharings (1)**
28:17
**sheet (3)**
57:1;60:3,9
**SHERWOOD (63)**
7:22,24;13:25;14:3,
5;15:19;19:16;20:25;
21:4,5;23:22;31:9,11,
13,18,21;32:3;37:14,
15;38:8,24;40:9;41:9;
42:2,23;43:5,24;44:1;
46:3,8,25;47:1;48:25;
50:14,24;51:12,15;
60:17,21,25;61:8;62:7;
64:1,6;65:3;66:18;
68:22;71:13;96:12,16;
97:13,23,24;98:4;
102:7;104:10,20,22;
111:9;112:1;121:20,
23;123:15
**short (1)**
110:12
**shortly (1)**
72:11
**show (6)**
58:10;87:4,8,10;
89:15;111:5
**showed (1)**
50:25
**shown (1)**

89:18
**side (2)**
16:20;54:16
**sign (2)**
87:17;88:13
**signed (2)**
14:17;97:8
**significant (4)**
22:5;64:12,17;
114:23
**significantly (1)**
91:13
**sincere (3)**
36:7;51:20;52:10
**sit (4)**
79:23;80:4,22;81:4
**situation (5)**
17:5;25:3;74:15;
75:23;119:18
**situations (1)**
11:25
**six (9)**
9:15;11:13;21:7,16;
36:12;58:13;75:4;
101:24;112:12
**six-front (1)**
21:17
**skilled (1)**
101:12
**slide (1)**
58:10
**small (1)**
23:23
**Snyder (9)**
10:8;11:24;15:21;
20:3;31:13;43:22,24;
63:19;87:9
**social (2)**
57:17,18
**solely (1)**
117:2
**solicit (1)**
48:14
**solutions (1)**
102:12
**solve (3)**
20:14;95:18;103:22
**somehow (2)**
40:4,15
**someone (6)**
10:15;20:8;24:13;
36:2;108:13;111:2
**sometimes (2)**
25:25,25
**somewhat (1)**
77:6
**somewhere (1)**
53:6
**sooner (1)**
35:1
**sorry (15)**
14:3,6;15:12;19:4;
23:23;24:5;31:18;

37:11;40:8;63:18;
64:8;96:21;99:22;
117:25;122:23
**sort (4)**
48:20;53:1,16;85:13
**sound (1)**
19:23
**sounds (3)**
22:25;90:1;101:2
**source (1)**
25:11
**span (1)**
21:22
**Speaker (2)**
9:16;12:19
**speaking (9)**
14:20;19:10;20:20,
23;26:18;51:14;75:2;
88:11;93:7
**special (2)**
27:14;78:19
**specialize (1)**
10:4
**specific (24)**
14:19;15:15;22:16,
21;49:12,23;60:10;
67:4,12,14,20;68:3,4,
15;74:2;79:6;81:11;
84:10;85:1;87:25;
91:5;99:1,15;101:2
**specifically (17)**
12:9;18:9;22:12;
23:1;29:9;35:19;
36:24;45:9;47:22;
55:18;73:5,14;78:17;
83:3;84:15;115:11;
120:20
**specifics (5)**
47:7;58:14;59:8;
83:19;98:19
**speculation (4)**
41:16;42:24;89:9;
96:2
**spent (7)**
11:13;12:25;16:19;
17:11;36:21;37:4,5
**spoke (3)**
52:7;92:13;111:2
**spoken (1)**
22:20
**sponsor (1)**
16:2
**stability (1)**
122:16
**stable (1)**
23:15
**staff (10)**
28:15;47:24;52:11;
101:8,10;107:23;
108:3,4,11;109:13
**stage (5)**
70:9,12;71:3;91:22;
119:11

**stamp (1)**
7:8
**stamped (1)**
111:9
**stance (1)**
120:2
**stand (1)**
55:11
**stand-alone (1)**
30:3
**standard (2)**
28:11;30:19
**standing (3)**
77:18;78:12;123:12
**Stanton (4)**
116:4,11,20;117:11
**stark (1)**
20:12
**start (10)**
14:13;29:22;52:24;
53:2,5,8,10,12,16;
95:17
**started (5)**
12:6;15:3,6;56:3;
75:9
**starting (1)**
75:24
**State (65)**
9:9;10:24;11:15;
12:1,13,22;14:14;15:8;
16:25;17:9,19;18:4,9;
23:6;24:20;25:4,19,25;
28:16;29:3,6,9,12,15,
25;30:1,7,9,10,23;
31:2;32:4,13,19,21,23;
33:17;38:10,13,17;
40:5,16;42:14;49:20;
54:16;55:1;62:5;72:8;
78:18;79:9,24,25;80:1;
83:5,20;85:9;108:25;
111:21;113:15,24;
115:4;116:24;117:22;
118:6;122:5
**stated (4)**
82:10;117:10;120:9,
12
**statement (6)**
21:11;23:8;51:16;
52:6,14;82:13
**statements (2)**
30:17,21
**states (3)**
52:1;117:1;119:3
**State's (1)**
32:17
**status (9)**
34:25;61:19,23;
66:5;91:25;92:4;
95:13;96:6;119:17
**statute (4)**
14:21;59:3;74:7,7
**statutes (2)**
14:25;37:6

**stayed (1)**
77:22
**steel (1)**
13:3
**Stephanopoulos (1)**
87:21
**steps (1)**
122:25
**Stibitz (3)**
54:18;108:11;
109:13
**still (6)**
41:6;70:11;71:3;
116:16;118:6;122:4
**stop (1)**
71:14
**stream (6)**
28:1,2,21,24;42:9,11
**streams (4)**
27:21,25;42:5,6
**Street (7)**
26:5,10;31:1;41:13;
89:9,10,11
**Street's (1)**
29:7
**striking (1)**
29:2
**struck (1)**
33:16
**structure (1)**
26:6
**structured (2)**
26:3;114:22
**structuring (1)**
123:5
**struggling (2)**
55:4;56:24
**study (1)**
61:22
**stuff (1)**
74:25
**subdivision (2)**
31:3;38:13
**subdivisions (3)**
29:8,8;30:15
**subject (6)**
6:18,23;78:16,20;
83:11;86:1
**submissions (1)**
115:3
**submitted (2)**
20:15;110:20
**subpoena (4)**
96:22,23,24;97:3
**substantial (2)**
32:5;103:4
**substantive (1)**
92:12
**suffering (1)**
9:3
**suggest (2)**
48:2,17
**suggested (1)**

85:11
**suggestion (1)**
69:5
**suggests (1)**
42:22
**suit (2)**
90:12;91:6
**suits (2)**
84:18;91:2
**summary (2)**
117:11;118:21
**Sunday (1)**
87:20
**support (4)**
57:14;103:20,24;
104:4
**supported (1)**
115:13
**supportive (1)**
57:19
**supposed (1)**
33:24
**Supreme (1)**
33:17
**sure (8)**
16:24;19:4;52:25;
60:8;62:3;68:1;97:11;
104:21
**suretys (1)**
68:6
**surmising (1)**
122:11
**surplus (1)**
24:21
**surprise (1)**
106:14
**suspect (1)**
60:2
**suspended (1)**
115:10
**SWOP (2)**
67:5,9
**SWOPS (4)**
67:5,8,11,21
**sworn (2)**
7:16,19
**system (2)**
38:12;62:10
**systems (5)**
63:12;96:20,22;
105:25;121:16

**T**

**tab (1)**
52:7
**table (2)**
16:18;121:4
**takeover (1)**
31:7
**talk (3)**
31:7;60:5;61:16;
98:7

**talked (5)**
16:8;45:18;72:17;
105:5;107:24
**talking (11)**
14:13;15:3;21:25;
22:15,18;58:23;73:24,
25;81:14;89:10;92:23
**target (1)**
61:21
**taxes (1)**
41:3
**team (5)**
54:2,4;56:6;66:9;
108:20
**TECHNICIAN (12)**
7:11;37:12;48:23;
50:16,22;71:21,24;
94:2,5;97:17,20;
123:19
**telephone (1)**
77:16
**telling (3)**
91:10;94:16;95:1
**temporarily (3)**
17:24;18:5;39:13
**temporary (1)**
18:14
**tended (1)**
13:1
**tens (1)**
76:18
**tentative (12)**
102:2,10,16,19;
103:14,21,24;104:1,4,
7,12,16
**term (1)**
116:14
**terminate (1)**
34:25
**terms (8)**
15:14,24;18:1,20;
37:7,22;59:2;66:11
**Terry (1)**
116:4
**testified (3)**
7:20;42:3;107:18
**testify (1)**
8:25
**testifying (1)**
8:10
**testimony (5)**
52:15;71:19;72:10;
98:8;99:14
**Thanks (1)**
8:1
**thematic (3)**
15:10,14;16:23
**theme (1)**
16:22
**themes (2)**
37:21;108:2
**thereby (1)**
38:15

**thereof (1)**
38:14
**thin (1)**
52:2
**thinking (2)**
96:5,5
**thirties (1)**
39:22
**though (6)**
11:13;65:17,18;
87:14;91:23;104:7
**thought (25)**
12:13,20;17:16,25;
18:4;21:18;22:4;34:6;
35:17,18;55:20;57:8,
11;69:8;73:10;83:1;
90:13;91:24;92:2;
97:4;106:18;117:17,
19;119:18;123:11
**thoughts (4)**
10:19;119:12;
120:16,22
**Three (8)**
9:23,24;12:24,25;
14:7;53:24;86:2;95:3
**three- (1)**
86:14
**three-year (1)**
16:15
**threshold (1)**
76:23
**throughout (1)**
12:13
**throw (1)**
121:9
**Thursday (3)**
6:17;87:17;88:13
**thus (1)**
23:15
**tie (1)**
90:13
**tight (1)**
76:3
**timeline (3)**
86:16;88:1;98:6
**times (10)**
20:8;21:21;22:20;
24:6;34:14;43:16;
78:4;98:16;100:14;
109:25
**timing (1)**
99:3
**title (1)**
65:18
**titles (1)**
74:25
**today (7)**
6:15;8:1;9:1;13:12;
44:6,13;91:1
**Today's (1)**
7:11
**together (2)**
114:10,19

**token (1)**
42:12
**told (4)**
33:13;58:20;75:17;
99:19
**Tom (1)**
54:18
**tomorrow (1)**
69:3
**Tomorrow's (2)**
69:23;119:3
**took (6)**
34:1;72:12;74:15;
77:23;78:1;109:19
**tool (1)**
15:8
**topic (9)**
63:10;69:25;70:2,2;
82:23;84:9;85:24;
94:9;119:5
**topics (1)**
110:3;114:4,13,20
**tough (1)**
13:2
**traced (1)**
117:3
**transfer (1)**
34:23
**transfers (1)**
25:23
**transition (6)**
15:4,6;34:22;109:2,
11,12
**translate (2)**
94:20;95:22
**translated (1)**
12:24
**transmission (2)**
6:10;7:4
**transmitted (1)**
6:18
**traveling (1)**
106:2
**Treasurer (23)**
7:13,18,23;9:8;
10:24;11:15;20:21,24;
21:6,25;29:6;31:13,16;
32:4;44:2;50:25;57:2;
65:4;68:23;71:14;
72:12;96:23;97:24
**Treasurer's (1)**
21:11
**Treasury (19)**
7:14;24:9;27:11;
33:24;45:12;54:18;
58:3;82:21;85:7;
89:11;101:12;109:12;
110:11;113:8;115:16;
116:4,5;117:5,13
**treated (2)**
28:25;121:1
**treatment (4)**
59:3;63:11,22;65:6

**tried (5)**
35:4,14;36:3,4;
51:22
**tries (1)**
32:20
**trigger (1)**
75:18
**trouble (3)**
24:6;26:19;75:4
**troubled (4)**
12:4;24:18;26:6;
91:23
**true (2)**
103:14;109:24
**trust (1)**
57:21
**trustee (5)**
24:19;25:3,21,23;
26:1
**truthfully (1)**
9:1
**try (3)**
8:21;13:4;39:4
**trying (3)**
37:19;78:4;90:23
**turn (3)**
34:2;63:21;71:17
**turnarounds (2)**
13:8,10
**Turning (1)**
44:8
**tutorial (1)**
59:15
**twice (1)**
77:13
**two (23)**
11:6;13:18;14:12;
17:16;18:7,20;29:17;
37:8;45:18;46:24;
47:23;56:22;67:9;
71:16;73:16,19;76:4;
78:3;83:11,23;92:8;
96:12;121:8
**type (4)**
10:4;22:9;23:23;
41:20
**types (3)**
22:8;32:20;111:3
**typically (9)**
13:2;15:25;16:12,
19;17:4;24:19;26:12;
27:19;66:4

**U**

**ultimately (1)**
77:3
**unable (1)**
33:6
**uncollectible (3)**
101:9,15,21
**uncomfortable (1)**
34:17

**undemocratic (2)**
19:22;35:18
**under (16)**
8:10;9:4;15:15;
18:21,23;19:1,13;
34:16;40:4,15;48:18;
53:24;54:1;55:4;
63:13;77:1
**underfunded (1)**
61:17
**underfunding (3)**
64:11;70:20;119:17
**underlined (1)**
63:22
**underlining (1)**
112:5
**underlying (1)**
74:24
**understood (12)**
10:15;12:3,12;15:4;
62:14,16,17,20,22,25;
79:11;119:19
**undo (1)**
24:24;25:7
**union (1)**
104:5
**unions (8)**
68:9;79:19;102:3,9,
12;103:7,15;104:13
**unique (1)**
28:10
**unit (15)**
16:13,15;23:14;
24:6,18,20;39:13;
40:24;41:3,6,11,18;
49:16;80:10,19
**units (9)**
11:20;12:1,22;17:2;
30:3,8;33:6;36:4;
41:22
**unsecured (4)**
24:14;26:20,22;
94:22
**unsecureds (1)**
26:23
**unsettled (2)**
80:13,15
**unusual (1)**
117:9
**unwillingness (1)**
68:7
**up (29)**
8:21;17:25;25:22;
33:2;35:8;36:4;45:3;
49:20;73:13;74:20;
78:20;79:14,16;83:11,
15;87:20;89:1,2,7;
92:15;98:1,5;101:24;
102:16;106:1,22;
115:7;118:3,4
**update (2)**
66:5;67:2
**upon (3)**

33:13,24;34:6

**upper (1)**
87:13
**use (7)**
17:14;48:17,19;
49:1;96:16;104:23;
105:6
**used (6)**
22:15;68:15;75:11;
100:4;105:6;113:1
**using (1)**
35:2

## V

**vague (2)**
100:14;107:5
**valid (1)**
77:1
**value (1)**
91:16
**varies (1)**
77:12
**variety (3)**
26:3;101:22;102:24
**various (11)**
35:3,9;39:9;65:22,
23;66:9;67:13;68:2;
101:5;113:1,6
**vast (1)**
101:24
**vendor (2)**
113:8;115:12
**veneer (1)**
52:2
**venture (2)**
10:14,16
**verbally (1)**
46:5
**versus (2)**
70:18;102:25
**vested (7)**
42:12;49:11;50:5;
64:12,17;65:7;94:21
**vet (1)**
57:21
**vetting (1)**
114:5
**via (1)**
107:16
**vibrant (2)**
32:22,23
**VIDEO (13)**
7:11,13;37:12;
48:23;50:16,22;71:21,
24;94:2,5;97:17,20;
123:19
**videotaped (1)**
8:9
**view (26)**
11:24;27:3;29:6,7;
30:7,8;31:1;35:12;
46:20;47:2;48:9,14;

49:19;56:20;64:16;
65:5;69:25;70:2;71:1,
9;91:14,15;101:14;
102:18;119:4,9
**viewed (4)**
29:14;32:7;49:2;
91:22
**violate (1)**
93:11
**violating (1)**
48:5
**violation (1)**
64:24
**violative (1)**
65:9
**virtually (2)**
80:11;101:9
**vis-a-vis (1)**
70:12
**volume (1)**
115:3
**vote (8)**
21:2,3;36:8,11,14,
16,17,18
**voters (5)**
29:2;35:13,16;51:5,
19

## W

**wage (2)**
17:1;102:12
**wages (1)**
16:14
**wait (2)**
8:13;96:15
**walk (1)**
32:15
**walking (1)**
60:6;115:1
**Wall (3)**
29:7;31:1;41:13
**wants (2)**
16:1;98:22
**water (1)**
27:25
**way (22)**
12:17;24:8;26:7;
28:3;36:14;38:20;
41:21;42:16;48:20;
49:2;50:3,13;57:5,6,7;
58:2,4;79:14,17,24;
84:22;91:22
**ways (10)**
25:18;26:3;28:6,8;
57:11;70:8;100:24;
119:11;121:10;123:7
**Webster (3)**
84:13;92:21;98:9
**Webster's (1)**
90:3
**Wednesday (4)**
87:15;89:24,25;90:6

**week (10)**
13:16;47:14;67:12;
71:11;77:13,13,20,21;
85:5;120:1
**weekly (4)**
66:4,7;78:12,14
**weeks (4)**
11:6;93:5,22;99:16
**weigh (1)**
113:10
**welfare (5)**
17:20;18:3;39:19;
72:20;73:17
**wellness (1)**
32:21
**weren't (5)**
21:22;53:14;67:23,
24;113:8
**WERTHEIMER (34)**
15:12;31:16;38:6;
43:22;60:23;62:6;
63:23;72:2,3;78:3,6;
79:1;80:8;81:3,13,15,
21,24,25;83:10;85:15;
93:9,25;94:10;95:7,20;
96:3;97:6,11;106:23;
111:11;112:3,10;
121:21
**West (1)**
7:15
**what's (7)**
12:15;50:25;77:21;
94:25;95:13,17;112:11
**whole (1)**
119:16
**Who's (1)**
14:1
**whose (1)**
56:11
**willing (1)**
55:21
**window (5)**
13:9;49:23;52:9;
86:12,15
**windows (1)**
33:25
**within (3)**
32:21;47:14;101:11
**without (9)**
19:2,7;34:24;36:18;
48:12;61:9;65:4;
78:24;83:16
**witness (29)**
7:19;13:22;15:14;
19:11,13;31:19,23;
40:11,21;41:17;43:2;
46:6;50:8,11;60:24;
64:2;81:2;83:9;93:23;
94:7;95:12;97:4;
102:6;104:19;106:25;
109:6,9;111:13;123:18
**word (3)**
17:14;69:4;123:4

**words (3)**
15:16;68:15;98:3
**work (8)**
9:14;16:1;24:8;
28:23;42:8;68:17;
103:21;110:13
**worked (4)**
9:18;34:11;101:17;
114:24
**working (6)**
41:22;76:2;102:9,
11;103:15;112:24
**works (4)**
37:5;58:2;100:18;
116:5
**world (1)**
101:14
**worried (1)**
49:17
**worth (1)**
105:4
**write (2)**
90:18;110:2
**written (2)**
58:10;70:16
**wrote (1)**
69:5
**Wynnchurch (4)**
9:21,22;10:4;13:7

## Y

**year (2)**
28:13;60:1
**years (5)**
9:15,23,24;11:13;
12:25
**yesterday (4)**
6:22;81:10;87:8;
89:16
**Young (1)**
75:13

## Z

**zero (3)**
41:2;58:17;77:13

## 0

**00234 (1)**
112:1
**00234878 (1)**
111:24
**01 (1)**
9:25
**04 (1)**
9:25
**0718 (1)**
6:20

## 1

**1 (3)**
9:12;23:18,20
**10 (6)**
6:1,21,25;12:3;
40:25;85:5
**10:21 (1)**
50:17
**10:30 (1)**
50:23
**109 (2)**
63:21;64:10
**10th (2)**
7:12;69:16
**11 (7)**
6:16,24;7:2;9:12;
43:22,24;76:5
**11:02 (1)**
71:21
**11:06 (1)**
71:25
**11:35 (1)**
94:2
**11:37 (1)**
94:6
**11:40 (1)**
97:17
**11:43 (1)**
97:21
**12 (4)**
76:8,9,16;77:3
**12:23 (2)**
123:20,21
**13th (1)**
92:1
**14th (4)**
63:7,20;65:6;95:24
**155044034 (1)**
6:20
**15th (1)**
88:4
**17th (1)**
87:14
**18-month (1)**
52:9
**18th (14)**
6:12,17;7:4;43:17;
45:4;60:22;71:11;
87:18;98:7,13,15;99:7,
12;120:8
**1990 (1)**
15:1
**19th (5)**
86:7;87:19;99:5,7,
13
**1st (4)**
99:10,11,14,18

## 2

**2 (5)**
6:12;37:25;38:2;
43:22,24
**20,000 (3)**

68:11,18;79:18
**2010 (2)**
  10:23;11:2
**2011 (7)**
  14:18;19:18;74:16,
  20;110:7,9,18
**2012 (12)**
  19:18;20:16;29:3;
  100:13,20;102:1,10;
  105:2,16;110:24;
  111:4;122:25
**2013 (18)**
  6:1,12,17,20;7:12;
  43:18;45:4;51:10,17;
  53:7,22;54:9;65:6;
  69:16;70:11;111:14,
  18;118:5
**21st (2)**
  10:12,19
**22nd (1)**
  84:24
**24 (14)**
  38:9,20;39:4;62:4,6,
  8;64:20;65:9;78:16;
  81:7;82:22;83:4,19;
  84:17
**25 (1)**
  16:18
**28th (5)**
  53:22;54:9;58:6,20;
  60:21
**29th (5)**
  58:21;114:7,11,14,
  21

## 3

**3 (6)**
  43:17,20,23,25;44:2;
  63:19
**3:47 (2)**
  6:18;7:5
**31st (2)**
  51:10,17
**3-2-2012 (1)**
  111:1
**3rd (3)**
  84:6;89:24;90:3

## 4

**4 (84)**
  14:15,21,21;15:3,20;
  16:5,8,23,25;17:8;
  18:8,9,12,19,23;19:6,
  10,11,12,13,17;20:15,
  19;21:10,12,14,18;
  22:5,7,16,19,23;23:3,5,
  9,25;29:2,13,24;30:12,
  13;32:7;33:9,14,25;
  34:5,8,9,11,16;35:2,10,
  11;36:8,10,22,23;37:3,
  20;39:6,11,16,25;

43:11;50:20;51:1,21;
  52:20;73:13,25;108:1,
  17,18;109:1,4,6,21,25;
  110:2,10,12,24;122:4;
  123:2
**4:06 (1)**
  7:9
**430 (1)**
  7:15
**436 (35)**
  34:1,2,3,21;35:5,11,
  19;36:23;37:3,5,7,16;
  38:20,20;39:2,25;40:4,
  16,21;41:8;43:9,12,12;
  44:9,23;45:6,25;47:9;
  52:17,21,21;53:12;
  107:19,21;108:18

## 5

**5 (3)**
  68:20,23;119:1
**50 (3)**
  75:19,23;118:1

## 6

**6 (2)**
  87:9;112:14

## 7

**7 (2)**
  112:17,19
**700 (1)**
  105:10
**700,000 (1)**
  32:13
**7-18 (1)**
  7:7
**72 (24)**
  14:22;15:1,4,7;
  16:10,23;18:8,11,13,
  16,21;19:9;22:2;
  29:21;33:14,23;34:3,6;
  43:11,14;52:20,22;
  53:24;72:13
**75 (2)**
  16:13,17

## 8

**8 (3)**
  87:17;89:16;116:1
**8:30 (1)**
  14:10
**878 (1)**
  112:2
**880 (1)**
  111:24

## 9

**9 (43)**
  19:2,7;28:4;36:1;
  41:20;42:18;43:10,14;
  44:11,25;48:3;49:10;
  52:5,18;57:24;58:7,15;
  59:16;62:6,8;66:23;
  71:7;73:21;74:2;
  77:24;78:2,16;79:7,20;
  81:7;82:17,22;83:4,19;
  84:16;94:11;110:3,6;
  114:2;115:6;117:23;
  118:9,11
**9:17 (1)**
  6:3
**9:20 (1)**
  7:12
**90 (1)**
  101:15
**9th (4)**
  6:7;68:24;70:11;
  119:2

# EXHIBIT  C

**Page 1**

1            IN THE UNITED STATES BANKRUPTCY COURT
2                  EASTERN DISTRICT OF MICHIGAN
3                       SOUTHERN DIVISION
4
5    In re                      Chapter 9
6    CITY OF DETROIT, MICHIGAN,  Case No. 13-53846
7            Debtor.            Hon. Steven W. Rhodes
8    _____/
9
10   DEPONENT:  MAYOR DAVE BING
11   DATE:      Monday, October 14, 2013
12   TIME:      10:27 a.m.
13   LOCATION:  CITY OF DETROIT MAYOR'S OFFICE
14              2 Woodward Avenue
15              11th Floor Conference Room
16              Detroit, Michigan
17   REPORTER:  Jeanette M. Fallon, CRR/RMR/CSR-3267
18
19
20
21
22
23
24
25

**Page 2**

1    APPEARANCES:
2
3    JONES DAY
4    By:  Thomas Cullen
5         Dan T. Moss
6    51 Louisiana Avenue, NW
7    Washington, D.C. 20001.2113
8    202.879.3939
9         Appearing on behalf of the Debtor
10
11   DENTONS US LLP
12   By:  Anthony B. Ullman
13   620 Fifth Avenue
14   New York, NY 10020.2457
15   212.632.8342
16        Appearing on behalf of Official Committee of Retirees
17
18
19
20
21
22
23
24
25

**Page 3**

1    APPEARANCES (continued):
2
3    COHEN WEISS AND SIMON LLP
4    By:  Joshua J. Ellison
5    330 West 42nd Street
6    New York, NY 10036.6979
7    212.356.0216
8         Appearing on behalf of UAW
9
10   LOWENSTEIN SANDLER LLP
11   By:  Sharon L. Levine
12   65 Livingston Avenue
13   Roseland, NJ 07068
14   973.597.2374
15        Appearing on behalf of AFSCME
16
17   CLARK HILL PLC
18   By:  Jennifer K. Green
19   500 Woodward Avenue, Suite 3500
20   Detroit, MI 48226
21   313.965.8384
22        Appearing on behalf of Retirement Systems
23
24
25

**Page 4**

1    APPEARANCES (continued):
2
3    WILLIAMS WILLIAMS RATTNER & PLUNKETT PC
4    By:  Ernest J. Essad, Jr.
5    380 N Old Woodward Ave Ste 300
6    Birmingham, MI 48009
7    248.642.0333
8         Appearing on behalf of FGIC
9
10   CITY OF DETROIT LAW DEPARTMENT
11   By:  Portia L. Roberson
12   2 Woodward Avenue, Suite 500
13   Detroit, Michigan 48226
14   313.237.3018
15        Appearing on behalf of the City of Detroit,
16        Residents of the City, Mayor's Office and City Council
17
18
19
20
21
22
23
24   ALSO PRESENT:
25   Patrick Murphy, videographer

Page 5

1                    TABLE OF CONTENTS
2
3   WITNESS                                           PAGE
4
5   MAYOR DAVE BING
6   Examination by Mr. Ullman                           7
7   Examination by Mr. Ellison                         98
8   Examination by Ms. Levine                         100
9
10
11                    E X H I B I T S
12
13  NUMBER      IDENTIFICATION                        PAGE
14
15  Exhibit 1  Email from Andrews to Bing, 12/6/12      16
16  Exhibit 2  Emails dated 11/27/12                    40
17  Exhibit 3  City of Detroit Restructuring Plan,
18             March 23, 2012                           50
19  Exhibit 4  Comprehensive Annual Financial Report,
20             City of Detroit, for its fiscal year-ended
21             June 30, 2012, two pages                 62
22  Exhibit 5  Email from Andrews to Bing, 7/10/13      74
23
24
25

Page 6

1                   Detroit, Michigan
2                 Monday, October 14, 2013
3                    *   *   *   *
4          THE VIDEOGRAPHER:  We are on the record.
5   This is disk one of the video deposition of David Bing
6   being taken at number 2 Woodward Avenue, 11th Floor in
7   Detroit, Michigan.  Today is Monday, October 14th,
8   2013, the time is 9:27 (sic) a.m.
9          This is in re City of Detroit, Michigan,
10  Case Number 13-53846, pending in U.S. Bankruptcy Court
11  for the Eastern District of Michigan.
12         My name is Patrick Murphy, legal
13  videographer, our court reporter today is
14  Jeanette Fallon and we both represent Esquire
15  Deposition Solutions.
16         The attorneys will now introduce themselves
17  for the record.
18         MR. ULLMAN:  This is Anthony Ullman from
19  Dentons, counsel for the Official Committee of
20  Retirees.
21         MR. ELLISON:  Josh Ellison from Cohen Weiss
22  and Simon LLP, counsel for the UAW.
23         MS. LEVINE:  Sharon Levine, Lowenstein
24  Sandler, for AFSCME.
25         MR. ESSAD:  Ernest Essad, Williams,

Page 7

1   Williams, Rattner & Plunkett, on behalf of the FGIC.
2          MR. CULLEN:  Tim Cullen, Jones Day, for the
3   City and the Emergency Manager.
4          MS. ROBERSON:  Portia Roberson, corporation
5   counsel for the City of Detroit, for Residents of the
6   City, Mayor's Office and City Council.
7          MR. MOSS:  Dan Moss, Jones Day, for the
8   City.
9          MAYOR DAVE BING
10  was thereupon called as a witness herein, and after having
11  first been duly sworn to tell the truth, the whole truth,
12  and nothing but the truth, was examined and testified as
13  follows:
14                   EXAMINATION
15  BY MR. ULLMAN:
16  Q.  Good morning, Mr. Mayor.
17  A.  Good morning.
18  Q.  Have you ever been deposed before?
19  A.  Yes.
20  Q.  Okay, so I assume you're generally familiar with the
21      process, but let me just go over a few ground rules.
22      I will ask questions and you will give me answers and
23      I would appreciate it if you could wait until I finish
24      asking the question before you start giving the answer
25      and I'll wait until you answer before asking the next

Page 8

1   question; otherwise, the court reporter can't get
2   things down if both of us are speaking; okay?
3          If at any point there's anything in a
4   question that I ask that you don't understand, let me
5   know and I'll rephrase it and if you don't indicate
6   that you don't understand the question, the assumption
7   will be that you do; okay?
8   A.  Sure.
9   Q.  Okay.  Now, you are currently the Mayor of Detroit; is
10      that right?
11  A.  That is correct.
12  Q.  And when did you -- when were you elected Mayor, when
13      did you become Mayor?
14  A.  I was elected Mayor May 5th, 2009.
15  Q.  And is it correct that at that time when you were
16      elected Mayor that Detroit was in fiscal difficulties?
17  A.  That would be correct.
18  Q.  And can you describe just in very general terms, I'm
19      not looking for detail, but just generalities what
20      steps if any you took to attempt to address that
21      situation?
22  A.  Detroit, when I came in office, was $330 million
23      accumulated deficit over several different years.
24      Budget for the 2009 period -- '09 and '10 was already
25      in place when I got here.  There were several areas

Page 9

1    that we had to make cuts. Revenue was going south and
2    the only way that we thought that we could maintain a
3    balanced budget was in cuts. Most of those cuts
4    occurred with layoffs and retirements. There were
5    some areas over in the transportation area that we
6    made some significant improvements, but overall I made
7    it very clear that we could not balance our budget
8    just with cuts, we had to try to generate revenue and
9    that was an ongoing problem.
10  Q.  So I take it then that as of the end of 2012, Detroit
11   was still, notwithstanding the efforts you made, in
12   substantial financial difficulties?
13  A.  That would be correct.
14  Q.  Now, of course you're aware that Kevyn Orr has been
15   appointed the Emergency Manager?
16  A.  That is correct.
17  Q.  Did you have any involvement in the selection of
18   Mr. Orr as Emergency Manager?
19  A.  None whatsoever.
20  Q.  And when was Mr. Orr appointed the Emergency Manager?
21   Actually to be technically accurate I believe he was
22   first appointed Emergency Financial Manager; is that
23   right?
24  A.  That would be correct.
25  Q.  Okay, and then he became automatically the Emergency

Page 10

1    Manager under the new law; is that right?
2    A.  Under 436, yes.
3    Q.  So when, as you understood it, was Mr. Orr selected as
4    the Emergency Financial Manager?
5    A.  I met Mr. Orr in mid February of 2012. I was asked to
6    go down and meet him at the law firm of Jones Day in
7    Washington, D.C. I met him, spent maybe a half a day
8    with him, because he at that time was the leading
9    candidate to be selected.
10            (Ms. Green enters deposition room.)
11  Q.  Okay, and did you have an understanding as of that
12   time whether Mr. Orr had in fact or a decision had
13   been made to appoint Mr. Orr, assuming he took the
14   appointment?
15            MR. CULLEN: Objection, foundation, form,
16   but you can address the question.
17  A.  I believe Mr. Orr had not made his mind up at that
18   point. In my meeting and conversation with him he was
19   going through a process to see whether or not, if the
20   job was offered to him, whether or not he would
21   accept.
22  Q.  Okay. And what was your understanding as to the
23   situation from the other side, from the State side?
24   As you understood it, had the State decided that Orr
25   was the man they wanted if he took the job?

Page 11

1    A.  I believe that the State had made the decision that
2    Orr not only was a leading candidate but was their
3    choice.
4    Q.  And do you know as of that time when you met with
5    Mr. Orr in you said mid February were there any other
6    candidates that the State was actively considering?
7    A.  If there were, I didn't know, because I met no one
8    else.
9    Q.  Okay. How was Mr. Orr's name first brought to your
10   attention? How did you first come to hear of him
11   being a candidate for the Emergency Financial Manager
12   or Emergency Manager position?
13  A.  I was contacted by phone by Rich Baird of the
14   Governor's office who said that they thought that they
15   had identified a key candidate for the position of
16   Emergency Financial Manager, so Rich Baird was the one
17   who made contact with him.
18  Q.  And do you recall when that contact was?
19  A.  Pardon?
20  Q.  When, do you recall?
21  A.  That would have been in late January, early February.
22  Q.  And did Mr. Baird give you any further information
23   about Mr. Orr's background or qualifications for the
24   Emergency Financial Manager position?
25  A.  Yes, he did. He said he had met -- in an interview

Page 12

1    process that I was not a part of, they were
2    interviewing counsel for the City and Mr. Orr was part
3    of the Jones Day law firm and I think through that
4    interview process Baird was impressed with him and,
5    therefore, moved down the road to try to select him as
6    the candidate.
7    Q.  And did Mr. Baird at that time give you any
8    indications as to what he believed Mr. Orr's
9    qualifications were to serve as Emergency Financial
10   Manager?
11  A.  No, he didn't. He said he was impressed with him,
12   that he had been part of the bankruptcy team
13   representing Chrysler and I guess from that ordeal was
14   pretty impressed with him.
15  Q.  And did you ask Mr. Baird anything else about
16   Mr. Orr's qualifications to serve as Emergency
17   Financial Manager?
18  A.  He -- yes, I did, and he felt --
19  Q.  Thank you.
20  A.  -- and he felt that not only was he a lawyer that
21   dealt with bankruptcy for over 30 years but also had
22   some qualifications as it related to restructuring. I
23   think it was important to Lansing that the financial
24   manager would be of African-American descent. Kevyn
25   also I understand was a graduate of the University of

Page 13

1  Michigan and had some understanding of Detroit and our
2  issues, so those were the background qualifications
3  that he gave me.
4  Q.  And did Mr. Baird indicate that Orr had qualifications
5  concerning restructuring outside the context of
6  bankruptcy?
7  A.  That would be no.
8  Q.  Did you ask Mr. Baird anything further about Mr. Orr's
9  qualifications?
10  A.  But they were very generic, the questions that I was
11  asking, trying to find out if in fact he was going to
12  be selected, you know, how were we going to work
13  together, because I was not in support of an Emergency
14  Manager.
15  Q.  And did you ask Mr. Baird how you and the Emergency
16  Manager were going to work together during that
17  conversation?
18  A.  The answer would be yes and the conversation was that
19  he would be responsible, meaning Kevyn Orr would be
20  responsible for really trying to restructure the
21  balance sheet in the -- for the City of Detroit and
22  that me and my administration would continue to try to
23  restructure City government and run the City on a
24  day-to-day basis.
25  Q.  That was the plan or the idea, the concept, in -- this

Page 14

1  was around -- did you say this was in the February
2  time frame or January time frame?  I forget.
3  A.  That would have been in the February time frame.
4  Q.  So that was the concept that was articulated to you in
5  the February time frame?
6  A.  That is correct.
7  Q.  And is that how things in fact turned out?
8  A.  That is not how things have turned out.
9  Q.  Had you yourself -- you were aware prior to the time
10  that you were told about Mr. Orr in the conversation
11  with Mr. Baird that you just related that there was an
12  Emergency Manager that was being sought; correct?
13  A.  That is correct.
14  Q.  And had you yourself proposed any candidates for that
15  position?
16  A.  The answer would be no.
17  Q.  Did you have any discussions with people on your staff
18  about possibly proposing one or more candidates for
19  that position?
20  A.  That answer would be no, because I along with my staff
21  were not in favor of an Emergency Manager coming on.
22  Q.  Do you recall any discussions or communications via
23  email or otherwise with Kriss Andrews about the
24  possibility of proposing a candidate for Emergency
25  Manager?

Page 15

1  A.  The answer would be yes.  I've had conversation with
2  Kriss and Kriss indicated that he was aware of someone
3  that he felt could come in and work with us as an
4  Emergency Manager.
5  Q.  Okay, and just so the record is clear, I made
6  reference to Kriss Andrews, you made reference to
7  Kriss, who is Kriss Andrews?
8  A.  Kriss Andrews was the -- his title was director of --
9  he actually was COO, but he had a different title.
10  I'm trying to remember what that title was now.
11  Q.  Perhaps program management director?
12  A.  Director of program management.
13  Q.  Okay.  And he had been brought on by you, is that
14  right, or had he been here before you came on?
15  A.  Kriss was selected by Lansing for that position.
16  Q.  And do you know when he had been put in that position
17  by Lansing?
18  A.  Kriss came in in May of 2012.
19  Q.  Is he still in that same position?
20  A.  Kriss is no longer with City government.  He left in
21  July of '13.
22  Q.  And do you know why he left?
23  A.  He was asked to leave by Lansing.
24  Q.  Let me show you a document that we'll mark as Bing
25  Exhibit 1.

Page 16

1  (Marked Exhibit No. 1.)
2  Q.  Are you familiar with what we've marked as Exhibit
3  Bing 1, Mr. Mayor?
4  A.  I am familiar with this document.
5  Q.  And just for the record it bears Bates numbers DM --
6  I'm sorry, DTMI0007955, that's the starting number.
7  And it's an email from Kriss Andrews to the Mayor,
8  December 6th, 2012.
9  Now, before I -- first of all, can you tell
10  me what this is?  Can you identify this for me?
11  A.  This is a memo from Kriss Andrews to me recommending
12  an individual that he knew that he thought could work
13  well with us as we move to an Emergency Manager.
14  Q.  Did you have a good working relationship with
15  Mr. Andrews?
16  A.  Very good working relationship with, yes.
17  Q.  And you had previously indicated that you had been
18  against the appointment of an Emergency Manager.  Why
19  was that?
20  A.  We thought, meaning this administration thought we --
21  we could run the City without an Emergency Manager
22  coming in.
23  Q.  Now turning back to Exhibit Bing 1, Mr. Andrews is
24  writing this email to you and he starts out with a
25  phrase, though the Group did not agree.

Page 17

1      Do you have an understanding as to what
2 Group Mr. Andrews is referring to? And that's Group
3 with a capital G.
4 A. I think that would have been the representation from
5 Lansing.
6 Q. And who was in that Group? Was that --
7 A. It would have been Rich Baird, it would have been
8 Andy Dillon and I'm not sure who else may have
9 represented the State.
10 Q. And was this Group concerned with the selection of the
11 emergency -- or an Emergency Manager?
12 A. That would be yes.
13 Q. Now, if you go down -- so in this email, as I
14 understand it, Mr. Andrews is proposing a candidate
15 that he says might be a good fit as Emergency Manager
16 who, as he writes, would align with your, meaning the
17 Mayor's, reform agenda; right?
18 A. That's correct.
19 Q. Now, in the third paragraph Mr. Andrews writes, I
20 realize he, referring to the candidate being proposed,
21 does not meet the standards of what the State would
22 want but he would meet the standards of what we would
23 want with you firmly in place to pursue your agenda.
24      Do you have an understanding of what
25 Mr. Andrews is referring to in that paragraph?

Page 18

1 A. Yeah, I think what he meant is the State -- you know,
2 my agenda had been laid out for some time going all
3 the way back to 2011 and some of the things that we
4 wanted to do and focus on did not necessarily align
5 with what the State wanted us to do and Kriss felt
6 that this individual would be much more aligned with
7 us.
8 Q. And in brief can you tell me what some of those items
9 were?
10 A. You know, we had somewhere around 21 different items
11 that the State and our administration agreed upon from
12 a restructuring standpoint, but I knew it was
13 impossible for us to attack all of those at one time
14 and have any success, so I selected about six
15 different areas that we should focus on. Number one
16 being public safety. Number two, public lighting.
17 Number three, public transportation. Number four,
18 eradication of blight. And number five, the support
19 and maintenance of our recreation and parks system.
20 Q. And I take it from your prior answer that the State
21 had different priorities?
22 A. I think the State had different priorities. They were
23 never spelled out to us, if you will. Because of the
24 21 that we had agreed upon, I think maybe their focus
25 and mine just wasn't aligned.

Page 19

1 Q. And do you recall whether the State had a particular
2 focus with which you disagreed or that you did not
3 think should be the priority?
4 A. I don't really recall that.
5 Q. Now, Mr. Andrews in his email says, I realize he,
6 meaning the candidate attached, does not meet the
7 standards of what the State would want.
8      Do you have an understanding as to what
9 Mr. Andrews is referring to when he writes that this
10 person would not meet the standards of what the State
11 would want?
12 A. I think the standards that he was referring to was
13 whatever the State wanted that person to do, that
14 person would do it and this person was going to be
15 much more aligned with our agenda as opposed to the
16 State's.
17 Q. And did you have discussions with Mr. Andrews on that
18 point?
19 A. Yes.
20 Q. And is that what he conveyed to you orally as well as
21 in writing?
22 A. Yes.
23 Q. And did you have any discussions with Mr. Andrews as
24 to whether Mr. Orr was a person who would essentially
25 follow what the State wanted him to do?

Page 20

1      MR. CULLEN: Objection, foundation, form.
2 You can address the question.
3 A. Kriss at that time had not met Mr. Orr --
4 Q. Uh-huh.
5 A. -- so I don't think he had a determination one way or
6 the other about Mr. Orr.
7 Q. And did you have conversations on that topic with
8 Mr. Andrews subsequent to the appointment of Orr as
9 Emergency Manager?
10 A. The answer would be yes.
11 Q. Okay, and what was the substance of those
12 conversations?
13 A. Based on the meeting that I had with Kevyn in
14 Washington, he seemed to understand the plight that we
15 were facing here in Detroit and seemed to be willing
16 to work with us on our agenda.
17 Q. And did he ultimately work with you on your agenda?
18 A. Not to my satisfaction.
19 Q. And did you form an impression as to whether Mr. Orr
20 was someone who was essentially willing to do what the
21 State wanted him to do?
22      MR. CULLEN: Objection, foundation, form.
23 A. He was chosen by the State and so he was taking his
24 direction from the State.
25 Q. And is there anything else that leads you to believe

Page 21

1  that he was willing to do essentially what the State
2  was asking him to do?
3           MR. CULLEN: Objection, foundation, form.
4  A.  The answer would be no.
5  Q.  I take it from your prior testimony that you never in
6    fact proposed this individual that was recommended as
7    a possible candidate by Mr. Andrews; is that right?
8  A.  That would be correct.
9  Q.  I'm going to show you another document, which was
10    previously marked as Exhibit 6 to the deposition of
11    Mr. Orr, which commenced on September 16 and was
12    continued on October 4th.
13          And just so the record is clear, there are
14    other documents I'm going to show you that were marked
15    as exhibits to the Orr deposition that began on
16    September 16 and continued on October 4 and I'm going
17    to refer to those just generically as Orr Deposition
18    Exhibits and I say that -- we'll use that terminology,
19    because there was a prior deposition with Mr. Orr in
20    connection with the SWAP issues. So when I refer to
21    Orr deposition, it's referring to the ones that were
22    done on September 16th and October 4th. Is that okay?
23  A.  Okay.
24  Q.  Have you ever seen this Orr Exhibit 6 before, which
25    begins with Bates number JD-RD-0000216, or parts of

Page 22

1    it?
2  A.  I have.
3  Q.  And have you seen the entire document or only parts of
4    it?
5  A.  Parts of it.
6  Q.  And what part would that be?
7  A.  That would be the summary of partnership.
8  Q.  And can you tell me what that is? Can you identify
9    that?
10  A.  The conversation that I had with Rich Baird and made
11    reference to as I met with Kevyn, I asked for some
12    things that I thought were germane to helping to turn
13    the City around and I spoke to Kevyn about that, I
14    spoke to Rich Baird about that, and I guess Rich Baird
15    and Kevyn spoke after my meeting with Kevyn. So I
16    don't remember seeing the front -- this front page
17    from Rich Baird.
18  Q.  Okay, and the document you're referring to is what
19    appears on Bates pages 217 and 218; is that right?
20  A.  That would be correct.
21  Q.  And this was in fact a summary of partnership document
22    that was -- it was not drafted by you; was it?
23  A.  No, it was not.
24  Q.  It was given to you by Mr. Baird?
25  A.  No, this was -- I think this was prepared by Kriss

Page 23

1    Andrews.
2  Q.  Okay, and if you look at the first page of the
3    document, this is an email from Mr. Baird saying -- by
4    the way, just so the record's clear, just tell me
5    quickly who Mr. Baird is. We've used his name and
6    actually haven't identified him.
7  A.  He is the advisor to Governor Snyder.
8  Q.  And in this email dated February 20th, which is to
9    Mr. Orr, Baird writes, FYI, the summary of partnership
10    prepared by the Mayor from the outline I gave him last
11    week.
12          So I think you indicated that the summary
13    of partnership was actually drafted by Mr. Andrews
14    from your office or the COO for the City?
15  A.  Yes.
16  Q.  And had Mr. Baird given you an outline previously?
17  A.  Not an outline, but he did give me some areas that he
18    thought we could agree upon.
19  Q.  Was that in written form?
20  A.  Yes.
21  Q.  And that was one of the things that Mr. Andrews used
22    to prepare the summary of partnership?
23  A.  That is correct.
24  Q.  If you'd look at the first page of this document,
25    Mr. Baird is writing about a conversation that he had

Page 24

1    with you. He says, told him, meaning you, Mr. Mayor,
2    that there were certain things I would not think we
3    could agree to without your, meaning Mr. Orr's,
4    review, assessment and determination such as keeping
5    the executive team in its entirety.
6          Do you have an understanding what that's
7    referring to?
8           MR. CULLEN: Objection, foundation, form.
9    Mr. Baird's note, he's never seen it before.
10  Q.  You can answer my question, Mr. Mayor.
11  A.  One of the things that I wanted to keep intact was my
12    executive team. It took me a couple years to really
13    put that team together and I thought not keeping that
14    team together would not be good in terms of helping us
15    turn the City around so I wanted to keep my team in
16    place.
17  Q.  Okay, and was Mr. Andrews part of that team?
18  A.  He was.
19  Q.  And did you have a discussion about keeping the
20    executive team in place with Mr. Baird, as is
21    recounted by Mr. Baird in this email?
22  A.  That would be correct.
23  Q.  And can you tell me the substance of the conversation
24    on that point you had with Mr. Baird?
25  A.  Once again, because it took such a long time, I didn't

Page 25

1 want to see a lot of turnover, additional turnover.
2 With an Emergency Manager coming in, if we started
3 losing some of our key players that have been there
4 with me to put a plan together and then try to execute
5 the plan, relieving or dismissing any of those people
6 I thought would be a negative, would take us backwards
7 and not forward.
8 Q. And by this in terms of timing, we had talked before
9 about the call or conversation you had with Baird when
10 he first told you about Mr. Orr as being considered
11 for the Emergency Manager position. The conversation
12 we're talking about now, is this part of the same
13 conversation or is it subsequent?
14 A. Same conversation.
15 Q. Okay. And in the email that Mr. Baird writes, he
16 says, that Mr. Baird told you during this conversation
17 that there were some things that he, Baird, couldn't
18 agree to without first getting Orr's approval.
19 Do you recall that?
20 A. Yes.
21 Q. Can you tell me what -- as much as you can about that
22 subject matter?
23 A. No guarantees in terms of making sure that the
24 executive team in its entirety stayed in place with
25 their pay level.

Page 26

1 Q. And did he talk to you specifically about having a
2 need to get, as he puts it here, the review,
3 assessment and determination from this -- on that
4 subject from Mr. Orr? In other words, did he tell you
5 that he needed to run that by Orr and get Orr's
6 approval?
7 A. Yes, he did.
8 MR. CULLEN: Objection, foundation, form.
9 Q. And did he tell you why he needed to get approval from
10 Mr. Orr?
11 A. I think he wanted to make sure that Orr was
12 comfortable with the staff that was already here.
13 Q. Because the Emergency Manager would have the power to
14 fire the staff; wouldn't he?
15 A. That is correct.
16 Q. Now, if you look at some of the items that are on this
17 list in the partnership, like number 4, number 5, 6,
18 7, what are those? Can you just tell me briefly?
19 MR. CULLEN: Objection, foundation, form.
20 You want him to go through them one by one, counsel?
21 MR. ULLMAN: Yeah, just a brief summary of
22 what each of these points is.
23 Q. And these are things, as I say, were prepared by
24 Mr. Andrews and had been discussed at least in concept
25 with Mr. Baird; is that right?

Page 27

1 MR. CULLEN: Objection, foundation, form.
2 A. That is correct. Number 4 I will respond to. Wanted
3 to make sure that if I called an executive meeting or
4 Mr. Orr called an executive meeting, we wanted to make
5 sure that all the key people were invited to the
6 meeting and so that, you know, everybody would know
7 what was going on. That was number 4.
8 As relates to number 5, back in December of
9 '12 I had agreed with the Governor in concept that the
10 State would lease Belle Isle and run it as a State
11 park, which would relieve us from an expense of
12 roughly $6 million a year, it would allow my 38
13 recreation department employees to be redeployed to
14 other parks across the City and also the State would
15 invest somewhere up to 10 to $20 million to upgrade
16 Belle Isle over a three-year period.
17 Q. Okay.
18 A. I don't know if there were other ones that you --
19 Q. Number 6 briefly. This is --
20 A. Okay. We had put together over maybe an 18-month
21 period with a lot of input from a lot of constituents
22 across the City developing the Detroit Future City
23 Plan and I wanted to make sure that we didn't just put
24 that plan on a shelf somewhere. That with so many of
25 our constituents involved in that process we needed to

Page 28

1 use that as a blueprint to move forward and I never
2 got heavily involved with Kevyn on the financial
3 initiatives as it relates to reducing the long-term
4 liabilities, managing cash flow, achieving the
5 long-term sustainable financial stability. He's
6 basically taken that upon himself.
7 Q. Okay. And what was the Detroit Future City framework
8 that's referred to in point six?
9 A. It's a booklet, a plan, that was put together over an
10 18-month period by -- I don't even -- I think it said
11 they had over 30,000 meetings with constituents all
12 across the City so everybody had some input into what
13 the City's future would look like.
14 Q. Okay. And those -- those initiatives, were they --
15 let me ask you this more as a question. Were the
16 initiatives outlined in that booklet that you
17 mentioned intended to assist in reducing long-term
18 liabilities and manage cash flow and achieve long-term
19 and sustainable financial stability?
20 MR. CULLEN: Objection, foundation, form.
21 A. I don't believe -- not with any specificity. It was
22 more of the areas that we were going to focus on in
23 the City, so I don't think it had a lot to do with the
24 financial stability of the City.
25 Q. Okay. And when had that booklet been put together?

Page 29

1    Did you say?
2  A.   It was about six months ago so it was in -- probably
3       in March/April of '13.
4  Q.   Well, this email is dated February of 2013.
5  A.   That -- that book did not come out for public
6       consumption I think until sometime in '13.  I think it
7       was really the March/April time frame.
8  Q.   Okay.  So at this point in time what you're referring
9       to in this draft partnership agreement is something --
10      a booklet that had been drafted but had not yet been
11      published?
12 A.   That would be correct.
13 Q.   Okay.  And what is number 7 on this list?
14 A.   There were a lot of negotiations that had gone on
15      prior to Mr. Orr coming on board and we wanted to go
16      back and relook at a lot of those initiatives, things
17      that we had already been negotiating with labor, but
18      once again, I never -- since Kevyn came on board, I
19      never sat in another meeting where labor initiatives
20      were discussed.
21 Q.   Now, as of the date of this email, and this is around
22      the time of your conversation with Mr. Baird, had you
23      spoken with anyone else from the State about Mr. Orr
24      as a candidate for the Emergency Manager or Emergency
25      Financial Manager position?

Page 30

1  A.   Mostly that was done with Rich Baird, but I do think
2       the Governor and I may have had a brief conversation
3       in one of our meetings, because Baird had made the
4       recommendation to the Governor and I think the
5       Governor was receptive to his -- to his
6       recommendation.
7  Q.   And do you recall any discussions with the Governor as
8       to the qualifications of Mr. Orr to serve as Emergency
9       Financial Manager or Emergency Manager?
10 A.   No.
11 Q.   If you turn back to the first page of this Exhibit Orr
12      Number 6, in the bottom email on the first page
13      Mr. Baird is saying, will broker a meeting via Note
14      between you, meaning Mr. Orr, and the Mayor's personal
15      assistant who is not FOIAable.
16           Do you have an understanding as to what
17      that's referring to?
18           MR. CULLEN:  Objection, foundation, form.
19 A.   I don't think he wanted to send something on my
20      personal email.  I don't have -- I should say my City
21      email, because I don't have a personal email, so he
22      wanted to send it to somebody else, he didn't want to
23      send it on a City email.
24 Q.   Do you ever recall any discussions with Mr. Baird in
25      which Mr. Baird indicated that he didn't want to send

Page 31

1       anything to you on your City email?
2  A.   No.
3  Q.   Do you have an understanding as to why Mr. Baird would
4       not want to send something to you under City email?
5  A.   No.
6  Q.   Who is the personal assistant that's referred to here?
7  A.   Her name is Sue Ray, R-A-Y.
8  Q.   And do you recall Ms. Ray getting an email from
9       Mr. Baird to set up a meeting between you and Mr. Orr?
10 A.   I don't recall that.  I mean, I knew the meeting, it
11      was by phone that Mr. Baird and I talked about going
12      down to meet Kevyn.
13 Q.   I'm going to show you another document which we --
14      which was previously marked as Orr Deposition Exhibit
15      7.
16           And for the record this first page of this
17      document bears Bates numbers JD-RD-0000459.
18 A.   Okay.
19 Q.   Okay.  Mr. Mayor, have you ever seen this document or
20      parts of it before?
21 A.   I don't recall seeing this.
22 Q.   And if I can direct your attention to the last two
23      pages of the document, there's a summary of
24      partnership again.
25 A.   Okay.

Page 32

1  Q.   Do you recall --
2  A.   This --
3  Q.   -- seeing specifically the last two pages?
4  A.   The last two pages, yes.
5  Q.   Okay.  And that is, is it not, a revised version of
6       what appears at the end of what we've put in the
7       record as Orr Exhibit 6?
8           MR. CULLEN:  Objection, foundation, form.
9       You can address the question.
10 A.   I have read all of this.  I don't know if this is
11      different from the other one that we saw.
12 Q.   Okay, I guess if you look at the date of the last one,
13      you'll see it's dated February 18 and this one is
14      dated February 21.
15 A.   Twenty-one.
16           MR. CULLEN:  Is there a question, counsel?
17 Q.   Do you see that?
18           MR. CULLEN:  I beg your pardon?
19           MR. ULLMAN:  I asked him if he saw the
20      dates.
21           MR. CULLEN:  Okay.
22 A.   Yes, I see the dates.
23 Q.   Okay.  And I think if you look at the text -- do you
24      recall getting an updated version or one or more
25      versions of this partnership agreement?

Page 33

1  A.  Yes.
2  Q.  And I think if you look at the text, you'll see that
3      there are indeed some differences, some of which I'm
4      going to ask you about.
5  A.  Okay.
6  Q.  First of all, if you look at the first page of this
7      exhibit, there's a note from Mr. Orr who says he spoke
8      with the Mayor this morning, he's writing as of
9      February 22nd, and we're all set to meet Monday
10     morning.
11            The Monday would be the 25th.
12 A.  Okay.  Yes.
13 Q.  Okay, did you in fact meet with Mr. Orr on February
14     25th, Monday?
15 A.  If -- yeah, I mean, I think we can go back and track
16     my travel day, and yeah, I do remember going then.  I
17     don't know if it was the 25th or not, but I only went
18     there once.
19 Q.  Okay, so it was around -- that's the meeting that
20     Mr. Orr --
21 A.  Yes.
22 Q.  -- is referring to in his email?
23 A.  Yes.
24 Q.  You said it took place at Jones Day in Washington?
25 A.  Correct.

Page 34

1  Q.  So you actually physically traveled up to Washington
2      to meet with Mr. Orr?
3  A.  That is correct.
4  Q.  Is there a particular reason he didn't come down to
5      Detroit to meet with you?
6  A.  I don't know if there was a reason that he wouldn't
7      come here.  He wasn't -- I guess he felt more
8      comfortable with me coming to Washington as opposed to
9      his coming here.
10 Q.  Okay.  And do you recall discussing a summary of
11     partnership document with Mr. Orr at the meeting?
12 A.  Yes.
13 Q.  And let me just ask you in particular about number 7
14     here.  And if you compare this with a version number 7
15     on what's attached to Orr Deposition Exhibit 6, you'll
16     see that the earlier version from Exhibit 6 has item 7
17     as labor and it says labor initiatives will be pursued
18     jointly by the Mayor and the manager.
19 A.  Just a moment here.  Now, give me your question again,
20     please.
21 Q.  If you look at the first version which is attached to
22     Orr 6, number 7 says labor initiatives will be pursued
23     jointly by the Mayor and the manager?
24 A.  Uh-huh.
25 Q.  And if you look at number 7 on the February 21 version

Page 35

1      attached to Orr Exhibit 7, item 7 has been revised to
2      say labor, retiree and benefit initiatives will be
3      pursued jointly by the Mayor and the manager to the
4      extent permitted by law.
5  A.  And the question is?
6  Q.  Okay, do you recall any discussion as to the reason
7      for those changes?
8  A.  No.
9  Q.  Do you recall any discussion -- let me ask you this.
10           Do you have an understanding as to what
11     labor, retiree and benefit initiatives are being
12     referred to in item 7 of the summary agreement at the
13     end of Orr Deposition Exhibit 7?
14 A.  Yes, I do.
15 Q.  And what are those?
16 A.  One of the things that was being discussed even before
17     Kevyn came on board was the healthcare cost, which we
18     wanted to change.  We knew also that we needed to take
19     a look at the pension funds.  But we had made no
20     determination as to what direction that we were going
21     to go in.
22 Q.  And did you have any discussion with Mr. Orr at this
23     meeting in DC concerning pension related issues?
24 A.  No, not to my knowledge, no, I don't remember that.
25 Q.  In item 7 on this document it refers to initiatives

Page 36

1      will be jointly pursued to the extent permitted by
2      law.  Do you have an understanding as to what that
3      phrase was referring to?
4  A.  No, I don't.
5  Q.  Did you have any discussion with Mr. Orr at the
6      meeting in DC as to legal constraints on actions that
7      could be taken to address various of the City's
8      financial issues?
9  A.  No.
10 Q.  Now, this last document is around February 22nd.  You
11     had said that you had -- you were taking a look at
12     issues relating to healthcare and pensions but nothing
13     -- no determinations had been made?
14 A.  That's correct.
15 Q.  And what -- what avenues, what possibilities, were you
16     exploring as regards pensions?
17 A.  We were looking at the potential of moving everything
18     to a 401(k) plan, because we knew that we couldn't
19     continue to fund the pension as it has historically
20     been funded.  It was -- it was obviously hurting us.
21     The same thing would be true on the healthcare side.
22     We had looked back three or four years where we saw
23     the healthcare costs were increasing by double numbers
24     on an annualized basis and from an affordability
25     standpoint we knew that we could no longer continue to

Page 37

1    do that.
2  Q.  Now, with respect to the pensions had you given any
3      consideration to how the pension clause in the
4      Michigan Constitution affected your ability to take
5      various actions that you might like to take?
6  A.  No.
7          MR. CULLEN:  Again -- just going to ask if
8      you had a time frame, counsel, but if it's no, it's
9      no.
10 Q.  I'm asking about the time frame we're talking about
11     here as of the end of February of 2013.
12 A.  No.
13 Q.  At this point in time were you -- I've made reference
14     to the pension clause in the Michigan Constitution.
15     As of February 2013 were you aware of that?
16         Let me withdraw that and ask you, first of
17     all, do you understand what I'm referring to when I
18     use the term pension clause?
19 A.  Maybe you want to explain it.
20 Q.  Okay.  Well, let me show you another document that
21     we've also had marked at the Orr deposition.  This is
22     Orr Deposition Exhibit 5.  And what we have as Exhibit
23     5 from the Orr deposition is a copy of the Michigan
24     Constitution, Article 9, Section 24.
25 A.  Okay.

Page 38

1  Q.  Have you ever seen that provision before?
2  A.  No.
3  Q.  You never saw it before today?
4  A.  I don't recall it, no.
5  Q.  Were you -- prior to seeing it now, were you aware
6      that there is a clause in the Michigan Constitution
7      that provides certain protection for vested pension
8      rights and payments in respect thereof?
9          MR. CULLEN:  Objection, foundation, form.
10     You can address the question.
11 A.  I think those responsibilities rested with the labor
12     law department.  I mean, I didn't get involved in
13     that.
14 Q.  So your testimony is similarly that you were
15     completely unaware up till now that there is a clause
16     in the Michigan Constitution that deals specifically
17     with issues pertaining to pensions and payments
18     associated therewith?
19 A.  No, I mean --
20         MR. CULLEN:  Objection, foundation, form.
21 Q.  You can answer the question.
22         MR. CULLEN:  You can answer the question,
23     if you can unpack it.
24         THE WITNESS:  Yeah.
25 A.  I mean, I read in the paper like everybody else, so

Page 39

1      this is not -- seeing this here today at this time is
2      not the first time that I'm aware of it.  I mean, I've
3      read -- I read the paper.
4  Q.  Okay.  And were you aware of this clause in the
5      Michigan Constitution at the time while you as Mayor
6      were considering issues that might be taken to lower
7      the pension costs that the City of Michigan -- of
8      Detroit was facing?
9          MR. CULLEN:  Objection, foundation, form.
10     You can address the question to the extent you
11     understand it.
12 A.  The answer would be no.
13 Q.  I think you indicated there was another -- there was a
14     department within the City that was responsible for
15     pension related issues?
16 A.  That would be correct.
17 Q.  Okay.  And who was the head of that?
18 A.  What's his -- I'm trying to think of the name right
19     now.  I can't -- yes, Lamont Satchel.  He heads up our
20     labor law department.
21 Q.  And does Mr. Satchel have access to legal advice,
22     legal counsel provided by the City of Detroit?
23 A.  I'm sure he does.  He's a lawyer himself.
24 Q.  And do you recall any discussions with Mr. Satchel as
25     to any constitutional limits on the City's ability to

Page 40

1      take steps with respect to pension rights and related
2      payments?
3          MR. CULLEN:  Objection, foundation, form,
4      calls for a -- to the extent you're calling beyond the
5      fact of any such conversations, for the substance of
6      any conversations which would be privileged.
7  Q.  You can answer the question.
8  A.  No, I had none of those conversations with
9      Mr. Satchel.
10 Q.  Okay.  I'm going to show you another document.  This
11     one we will mark as Bing Number 2.
12         (Marked Exhibit No. 2.)
13 A.  Okay.
14 Q.  Okay, for the record what we've marked as Bing 2 is a
15     chain of emails, this top one is November 27, 2012.
16     Beginning Bates page number is DTMI00079928.
17         Have you ever seen these emails before,
18     Mr. Mayor?
19 A.  Yes, I have.
20 Q.  And what was the context in which you saw them?
21 A.  That Leonard Fleming, who is a reporter for the
22     Detroit News, wanted to write an article on how close
23     we were to bankruptcy, and I think Bob got in contact
24     with Kriss and Kriss put that document -- put this
25     email together for Bob answering the question from the

Page 41

1   media.
2   Q.   Okay.  And Mr. Andrews writes in the top email, this
3        is recounting his conversation with Leonard Fleming,
4        he says, I made the following three major points:  The
5        first one is we fully intend to be successful without
6        the use of bankruptcy.
7            Do you have an understanding of what
8        Mr. Andrews was referring to there?
9   A.   Yeah, if we could continue to get the support that we
10       needed from the State on our 21 initiatives that we
11       agreed upon, we should not have to go the route of
12       bankruptcy.
13  Q.   And did that -- the substance of what you just said
14       reflect conversations that you had had with Mr. Kriss
15       -- I'm sorry, with Mr. Andrews --
16  A.   Yes.
17  Q.   -- apart from the email?
18  A.   That would be yes.
19  Q.   So is it correct then that at least as of the date of
20       this email, which is November 2012, November 27, 2012,
21       the possibility of filing for Chapter 9 had been
22       discussed with you and members of your team?
23  A.   I wasn't part of that, maybe Kriss was part of that,
24       but not myself.
25  Q.   Okay.  But you said you were aware that this -- I'm

Page 42

1        sorry, I thought you said you were aware that the idea
2        was to be successful without the need to file
3        bankruptcy?
4   A.   Correct.
5   Q.   So the possibility of filing bankruptcy had been
6        something that had been discussed and I take the
7        conclusion was you didn't think you needed to go that
8        route?
9   A.   That would be correct.
10  Q.   And when did those discussions take place?
11  A.   I can't -- I mean, it was in -- I'm sure at the end of
12       2012 and ongoing up until bankruptcy was actually
13       filed.
14  Q.   And with whom did you have those discussions?
15  A.   That would have been internally with the leadership
16       team, Jack Martin, Kriss, the executive team.  None of
17       us wanted to go in that direction.
18  Q.   Who is Jack Martin?
19  A.   Jack Martin was the CFO.
20  Q.   And you made reference to a leadership team.  Does
21       that involve individuals other than Martin and
22       Andrews?
23  A.   It would have involved -- I don't know if -- I don't
24       think Portia was part of that at that time; but it
25       would have been I think Kirk Lewis was still here, who

Page 43

1        was Deputy Mayor; I think at that time I'm not sure
2        that Chris Brown, I don't remember when he left, but
3        Chris Brown was part of that leadership team; and
4        Bob Warfield.
5   Q.   And what was the basis on which the people involved in
6        those discussions concluded that the City's finances
7        could be redressed without the need to file a Chapter
8        9 bankruptcy?
9            MR. CULLEN:  Objection, foundation, form.
10       You can address the question.
11  A.   We all felt that if we got the kind of resources that
12       we needed, the support that we needed from the State,
13       that we could manage our way through the catastrophe
14       without necessarily going bankrupt, filing for
15       bankruptcy.
16  Q.   And was that through a combination of raising revenue
17       and cutting costs?
18  A.   That would be correct.
19  Q.   And the proposal -- the means by which you would do
20       that or wanted to try to do that, was that set out in
21       a document?
22  A.   There were several different documents that had been
23       prepared internally.  In terms of raising revenue was
24       the collection of taxes, which was a big thing for us,
25       but still, I mean, we wanted to go back to the State,

Page 44

1        we thought that from a cash flow standpoint we saw
2        where we were running out of money, we saw where we
3        were hitting the wall, we needed some support from the
4        State and we did get that to the tune of a
5        $137 million loan that we got.  The State was to
6        release over time certain amounts of that loan.  We
7        had to repay I think an $80 million loan that we had
8        prior to the 137.  I don't recall all of the details
9        right now, but I do know that some of the initiatives
10       that we and the State had agreed upon releasing those
11       funds was contingent upon us making sure that those
12       were deliverables that we could live up to.
13  Q.   And was the -- did the initiatives that you had --
14       that you described and that were proposing entail the
15       City of Michigan -- I keep saying that.  Let me
16       withdraw that and start again.
17           Did the initiatives that you described for
18       cost cutting, raising revenue, require the City of
19       Detroit doing anything that was prohibited by Michigan
20       law?
21           MR. CULLEN:  Objection, foundation, form.
22  A.   I don't know.
23           MR. CULLEN:  You're asking for a legal
24       conclusion.
25  A.   I don't know the answer to that.

Page 45

1  Q.  Well, did you -- as part of this initial -- this
2      restructuring program, were you aware in any way that
3      anything that was being proposed was contrary to the
4      laws or Constitution of the State of Michigan?
5  A.  No.
6  Q.  And do you recall specifically how if at all the
7      pension liabilities were to be dealt with under your
8      proposed approach?
9  A.  No.
10 Q.  Would that be set out in whatever documents there are
11     that describe your initiatives?
12 A.  I didn't understand your question.
13 Q.  Would the approach to pensions be set out in whatever
14     documents exist that describe the initiatives that
15     you've referred to?
16 A.  Those probably were internal meetings between the CFO
17     and the COO and probably people from the labor
18     department.  Those aren't meetings that I sat in.
19 Q.  So you don't recall the specifics of how the pension
20     issues were --
21 A.  No.
22 Q.  -- being dealt with?
23 A.  No.
24 Q.  But as you understood it, the City's -- if the
25     proposed restructuring, the initiatives that you put

Page 46

1      in place went through, you believe that the City would
2      be able to survive without bankruptcy and would
3      continue to be able to meet its legal obligations?
4          MR. CULLEN:  Objection, foundation, form.
5  A.  The answer would be we wanted that opportunity.
6  Q.  Okay.  And you thought that if you had that
7      opportunity, you could make it happen; is that right?
8  A.  That would be correct.
9  Q.  But you weren't given that opportunity; were you?
10 A.  That is correct.
11 Q.  Let me go back to what we've marked as Orr Exhibit --
12     that we haven't marked but we've identified as Orr
13     Deposition Exhibit 7, which has the proposed summary
14     of partnership.
15 A.  Uh-huh.
16 Q.  Was this partnership agreement, the document that
17     appears here where it has a draft label on it, was
18     that ever made final?
19 A.  Not to my knowledge.
20 Q.  When you met with Mr. Orr on -- at the end of February
21     in DC, you indicated that you discussed this with him,
22     though; correct?
23 A.  Correct.
24 Q.  And did he tell you that he was -- that he was
25     agreeable to it?

Page 47

1  A.  He was agreeable in working together, but we didn't go
2      step by step and say that I agree or I don't agree.
3  Q.  Okay.  So did you have an understanding as when you
4      left that meeting in DC whether Mr. Orr had in fact
5      agreed to the points that were set out in this summary
6      of partnership document?
7          MR. CULLEN:  Objection, foundation, form.
8  A.  One of the areas that I do recall and me saying is
9      that it made reference to keeping the executive team
10     intact.  He wanted the opportunity to make an
11     assessment himself.
12 Q.  Okay, and did he make an assessment?
13         MR. CULLEN:  Objection, foundation, form.
14 A.  I think over the time that he's been here, I don't
15     think he personally made an assessment.  I think there
16     were others who may have made an assessment and made
17     recommendations to him.
18 Q.  And was your team -- your executive team left intact?
19 A.  No.
20 Q.  And who was gotten rid of besides Mr. Andrews, if
21     anyone?
22 A.  Jack Martin is no longer here as the CFO.  Karla
23     Henderson, who was the group executive for planning
24     and development and BC, is no longer here.  I think
25     before Kevyn came on Kirk Lewis was already gone.  I

Page 48

1      do think that Chris Brown was already gone.  As of
2      today our purchasing director is no longer here,
3      Andre DuPerry.  Richard Kay, who was the director of
4      the lighting department, is no longer here.  The
5      director of DDOT is no longer here.  I think there --
6      that's right off the top of my head.  I think there
7      were nine or ten department heads that are no longer
8      here.
9  Q.  And were they asked to leave by Mr. Orr or --
10 A.  For the most -- for the most part, yes.  There was one
11     guy who headed up -- he was the director of homeland
12     security, he left on his own accord because of the
13     environment that he felt he could no longer work in,
14     but for the most part all of those other people were
15     asked to leave.
16 Q.  Now -- and are the positions that those people held
17     vacant -- or have they been replaced with other people?
18 A.  There's a mixed bag, quite frankly.  I mean, some of
19     them -- I think you got some consultants in some of
20     those positions.  I mean, I had no input at all.  I
21     mean, I found out after the fact that either people
22     were removed or if somebody was coming in.  I had -- I
23     never had the opportunity to interview even the new
24     CFO who came in, the new COO who came in.  Those were
25     selected by Kevyn in a vacuum, as far as I'm

Page 49

1    concerned.
2  Q.  Moving on past February of 2013, as I recall, the
3    official appointment of Mr. Orr as the emergency -- I
4    forget whether it was the Emergency Financial Manager
5    or Emergency Manager, but it took place sometime
6    around the end of March.  Is that generally consistent
7    with your recollection?
8  A.  Yeah, I think March 25th was his first day.
9  Q.  And from the meeting in DC up to March -- say March
10    25th, did you have any conversations with Mr. Orr?
11  A.  I may have had one phone -- one other phone
12    conversation with him.
13  Q.  And do you recall what the substance of that call was
14    about?
15  A.  I think more than anything else it was making sure
16    that when he came on board, we were having a press
17    conference, introducing him as the Emergency Financial
18    Manager and wanted me to stand with he and the
19    Governor at that, because we didn't want, quote
20    unquote, a divided house, if you will, and I thought
21    it was better since an Emergency Manager was coming on
22    board, it was no sense in us continuing to fight that.
23    If he could be helpful to turn this City around, it
24    would be better we do it together.
25  Q.  So in that phone conversation was there any discussion

Page 50

1    of Chapter 9 filing?
2  A.  No.
3  Q.  Was there any discussion of anything related to
4    pensions?
5  A.  No.
6  Q.  I'm going to show you another document, Mr. Mayor,
7    which we'll mark as Bing Number 3.
8      (Marked Exhibit No. 3.)
9  Q.  For the record what we've marked as Bing Exhibit --
10    what is this, 4?  Three.  Actually I think we had
11    previously marked this as Exhibit 22 to the Orr
12    deposition, but since I've forgotten about that, now
13    we'll just leave it as Bing Number 3, but I believe it
14    is the same document.
15      Do you recognize this document, Mr. Mayor?
16  A.  Yes.
17  Q.  For the record it's entitled City of Detroit
18    Restructuring Plan, dated March 23, begins with Bates
19    number DTMI00129416.
20  A.  Yes.
21  Q.  And just briefly tell me what this is and I'll ask me
22    a few questions about it.
23  A.  Well, it speaks to the things that we were working on,
24    the recommendations that we had put together to get us
25    through a very tumultuous time in the City of Detroit.

Page 51

1    We knew that this plan was going to negatively impact
2    a lot of folks in order for us to move forward with
3    implementation, but it was all about trying to manage
4    our way through without going to the route of
5    bankruptcy.
6  Q.  And this was a document that was put together by you
7    and people on your team; is that right?
8  A.  That would be correct.
9  Q.  And I see we've been going for a little over an hour,
10    an hour and 20 minutes.  It's probably a good time for
11    a break, but let me ask you first up to this time this
12    is now March 13, towards the -- by the end of March
13    had you had any conversations with anyone else from
14    the Governor's staff or with the Governor himself
15    about Mr. Orr as the Emergency Financial Manager or
16    the Emergency Manager?
17      MR. CULLEN:  Objection, foundation, form.
18      You can address the question.
19  A.  It was obvious to me in this time frame that Lansing
20    had made their selection, so, I mean, that's something
21    that I couldn't control so it was more important to
22    me, once again, to be part of the team to help fix the
23    City as opposed to constantly fighting and pushing --
24    and pushing back.  I didn't think that would get us
25    anywhere.

Page 52

1  Q.  Okay.  So after you had your initial conversations
2    with Baird in February, you then met with Orr in the
3    end -- towards the end of February also in DC, and
4    then Orr -- there was an official announcement at the
5    end of March saying Orr's the new EM or the new EFM.
6    Prior to the meeting in DC and the official
7    announcement of Orr, did you have any contact with
8    anyone from the State about Mr. Orr's being made the
9    Emergency Manager or Emergency Financial Manager?
10  A.  The answer would be very little, if any, because they
11    had the right to make the decision, they made the
12    decision, so once again, I would prefer to work with
13    the individual seeing what we could do together to fix
14    the City, a broken City.
15  Q.  Okay, so let me just ask more directly.  Did you have
16    advanced notice before the public announcement that
17    the City -- the State was going to come out and make
18    an announcement saying Kevyn Orr is our man?
19  A.  Yes.
20  Q.  And when were you told?
21  A.  That had to be in early -- early to mid March.
22  Q.  And do you remember the specifics of that discussion,
23    who told you what was said?
24  A.  Whether that was Rich Baird or Andy Dillon, it wasn't
25    the Governor.

Page 53

1  Q.  And other than them telling you that Orr was the man,
2      did you have any other discussions about Mr. Orr with
3      anyone from the State up till the end of March when
4      the formal announcement was made?
5  A.  No.
6          MR. ULLMAN:  Okay, why don't we just take a
7      short break now, because we've been going for awhile.
8          THE VIDEOGRAPHER:  Okay, we're off the
9      record, 11:40 a.m.  This completes disk one.
10         (A brief recess was taken.)
11         THE VIDEOGRAPHER:  We are back on the
12     record at 11:48 a.m.  This is disk two of the
13     deposition of David Bing.  Please proceed.
14  BY MR. ULLMAN:
15  Q.  Mr. Mayor, I would like you to refer to what we've
16     marked as Bing Exhibit 3 and ask you to turn to the
17     Bates page ending in 421 at the bottom.
18  A.  Uh-huh.
19  Q.  I guess before I ask you a specific question about
20     this, this document in general was intended to lay out
21     ways to raise -- both raise and save money from the
22     City's perspective; is that right?
23  A.  That would be correct.
24  Q.  And laid out in here were perhaps not all but a number
25     of the initiatives that you've previously made

Page 54

1      reference to; is that right?
2  A.  That would also be correct.
3  Q.  And I see in some of them there are cost savings that
4      are identified or potential cost savings in
5      parentheses.  We were just looking at this page 421;
6      is that right?
7  A.  Correct.
8  Q.  Now, with respect to item 2C on the page I've asked
9      you to refer to, it's headed identified future cost
10     savings initiatives and there's a parenthetical saying
11     that's in process and there's a long list of various
12     items that the City is pursuing at this time, and the
13     last one says asset monetization strategies; do you
14     see that?
15  A.  Yes.
16  Q.  Can you explain what that is referring to?
17  A.  There was real estate that I knew we had been in
18     discussions in terms of selling some real estate.
19     They also had been -- even going back in the
20     Kilpatrick administration there was discussion about
21     selling our rights in the Detroit/Windsor tunnel.
22     There was -- there was a recreation center that we had
23     a proposal on, a closed recreation center.  Those were
24     some of the things that we talked about potentially
25     for monetization.

Page 55

1  Q.  Did you have an understanding at the time this
2      document was prepared, which was March 2013, as to
3      what the potential or estimated value of the real
4      estate that you referred to was?
5  A.  The UAW building across the street is for UAW, that
6      was a $5 million proposal.  The recreation center was
7      a $1.7 million proposal.  I don't recall, because I
8      think there was an updated assessment being done on
9      the valuation for the tunnel.
10  Q.  Okay, I'm not sure -- can you explain a little more
11     briefly what you meant about the UAW?  You said that
12     there was a --
13  A.  There's a building across the street, it's city-owned,
14     but the UAW has been leasing the building.
15  Q.  You mean across the street from where we're sitting
16     here now?
17  A.  From where we're sitting, yes, across the street on
18     Jefferson Avenue.
19  Q.  Okay.
20  A.  The UAW is leasing that building from the City.  They
21     made a proposal to purchase the building and we had
22     really come to an agreement in principle to the tune
23     of about $5 million.
24  Q.  And what happened?
25  A.  It's never closed.  It has never closed at this point.

Page 56

1  Q.  So am I to understand it was effectively taken out of
2      your hands and you don't know what happened to it
3      since?
4  A.  That would be --
5          MR. CULLEN:  Objection, foundation, form.
6      Go ahead.
7  Q.  You can answer the question.
8  A.  That would be correct.
9  Q.  And the Windsor tunnel, you said you're not certain
10     what the current -- there may be an updated valuation?
11  A.  There may be an updated valuation.  If I were to go
12     back 60 to 90 days or maybe even more than that, I
13     knew that there was an updated evaluation being done.
14  Q.  And what was the valuation that you were familiar with
15     as of March --
16  A.  I don't recall.  I don't recall what that was.
17  Q.  Then you made also reference to a recreation center.
18     You said it was closed but there was some proposal
19     that was made to purchase it; is that right?
20  A.  Correct, to the tune of about 1.7 million.
21  Q.  Do you know who made that proposal?
22  A.  That was the Salvation Army.
23  Q.  And as of the time as around March 13th, was that
24     something that looked like it was proceeding towards
25     this closing?

Page 57

1  A.  Yes, it did.
2  Q.  And was that taken out of your hands also?
3  A.  Yes, it was.
4  Q.  And that like the other real estate you mentioned was
5      taken out of your hands by the Emergency Manager and
6      his team I take it?
7  A.  The whole process --
8          MR. CULLEN:  Objection, foundation, form.
9  A.  -- yeah.
10 Q.  And did there come a time when someone -- how did this
11     process come about that it was taken out of your
12     hands?  Did the Emergency Manager or someone from his
13     staff actually tell you or your staff, don't worry
14     about these things anymore, it's not your business or
15     words to that effect?
16         MR. CULLEN:  Objection.
17 A.  No.
18         MR. CULLEN:  Foundation, form.
19 Q.  How did it come about that it was taken out of your
20     hands?
21 A.  I actually went to the Emergency Manager and told him
22     about these potential deals and in order for them to
23     go forward, he had to sign-off on it.  He said to me
24     that it looked like they were decent deals and that he
25     would, but obviously that hasn't happened yet.

Page 58

1  Q.  And has there been any follow-up with the Emergency
2      Manager between him and you as to why he hasn't signed
3      off?
4          MR. CULLEN:  Objection, foundation, form.
5  A.  I think more than anything else he wants to look at
6      some of the bigger issues that he's got to deal with
7      as opposed to these things which he may consider, you
8      know, not big issues.
9  Q.  Even though if these things went through, they would
10     at least bring in some immediate cash; is that right?
11 A.  They would.
12 Q.  As part of the asset monetization, did you give any
13     consideration to try to monetize art that is owned by
14     the City of Detroit and maintained at the Detroit
15     Institute of Arts?
16 A.  The answer would be no.
17 Q.  And was there a particular reason you didn't give any
18     consideration to that?
19 A.  Back at that time when we were thinking about it, that
20     never came up, that was never a conversation that we
21     had internally.  I think since he's been on board, the
22     subject obviously has gotten a lot of heat and a lot
23     of visibility.  I'm not sure what's going to happen
24     there.
25 Q.  Okay.  And do you -- let me ask it this way.

Page 59

1          Did you as of the March 2013 time frame
2      have any understanding, just a general understanding,
3      as to what the value was of the art that's owned by
4      the City of Detroit?
5          MR. CULLEN:  Objection, foundation, form.
6  A.  The answer would be no.
7  Q.  And as you sit here today, do you have any
8      understanding as to the value of the art that's owned
9      by the City of Detroit?
10         MR. CULLEN:  Same objection.
11 A.  The answer would still be no.
12 Q.  Are you aware of reports in the press stating that the
13     city-owned art could easily be worth billions of
14     dollars?
15 A.  I have read that, yes.
16 Q.  And do you have any reason to believe those reports
17     are inaccurate?
18         MR. CULLEN:  Objection, foundation, form.
19     Of what they report or the value or what, counsel?
20         MR. ULLMAN:  I think my question was clear.
21 Q.  You can answer my question.
22 A.  I know that he's engaged Christie's to do an
23     evaluation and I'm not sure that that's complete yet,
24     so I have no idea of what the value may or may not be.
25 Q.  Okay.  Let me ask you to turn now to the next page

Page 60

1      this document, which is ending in Bates page 422.  And
2      this heading says, and I quote, "The Mayor's plan
3      includes strategies to implement changes that will
4      significantly reduce general fund long-term
5      liabilities."
6          Do you see that?
7  A.  Yes.
8  Q.  And so we're clear, what in brief is the general fund?
9  A.  That's the -- the general fund is what we use to run
10     the City on a day-to-day basis.
11 Q.  Now, in subpoint A, 3A, you give some -- you give two
12     subpoints, two bullets.  The second one says,
13     approximately 6 billion of City debt is owed by the
14     water and sewer department and does not have an impact
15     on the general fund.  Do you see that?
16 A.  Yes.
17 Q.  Can you explain what you were referring to by those
18     words?
19 A.  That -- that debt is paid by the users of the water
20     and sewerage department, so there's a revenue stream
21     that pays that debt down, so it's not part of the
22     general fund.
23 Q.  Okay, and as you put it here, that that debt, while
24     it's on the books as City debt because the department
25     of water and sewer is part of the City, that doesn't,

Page 61

1  as you put it, have an impact on the general fund
2  because it's -- the water and sewer debt is paid for
3  by the department of water and sewer?
4  A. That would be correct.
5  Q. And that, as I understand it, is run as a separate
6  authority and has its own books and records and is
7  solvent; is that right?
8  A. That would be correct.
9  Q. You then go on in the next point, sub B, to refer to
10  pension unfunded liabilities, and you say
11  approximately 650 million of unfunded liability as of
12  FY 2012 of which only 250 million relates to general
13  fund.
14  A. Uh-huh.
15  Q. Do you see that? And could you tell me what you meant
16  when you wrote that?
17       MR. CULLEN: Objection, foundation, form.
18  A. I believe that makes reference to both the payment to
19  the pension fund and maybe even to the healthcare
20  benefits.
21  Q. Okay, I'm going to be a little more specific. The
22  language of this restructuring plan states that
23  there's 650 million of unfunded pension liability. Do
24  you see that?
25  A. Uh-huh.

Page 62

1  Q. And then it says of that only 250 million relates to
2  the general fund.
3       Can you tell me what that's referring to?
4  A. No, not right off the top of my head I can't, no.
5  Q. So you don't recall what that level of detail is as to
6  the --
7  A. Correct, correct, correct.
8  Q. Then the next bullet it -- well, I guess -- do you
9  recall where the 650 million liability -- unfunded
10  liability number comes from?
11  A. We have not -- we're not current with our pension
12  contributions.
13  Q. I guess let me ask it a little -- let me mark then
14  another document. We'll mark this as Bing 4.
15       (Marked Exhibit No. 4.)
16  Q. And Bing 4 for the record is an excerpt from a
17  document entitled Comprehensive Annual Financial
18  Report for the City of Detroit for its fiscal
19  year-ended June 30, 2012 and I've attached just two
20  pages of it because it's a very long document.
21       Okay, Mr. Mayor? You've seen -- you know
22  what the Comprehensive Annual Financial Report is;
23  right?
24  A. Yes.
25  Q. And I've attached the pages that pertain to the

Page 63

1  pensions and if you look on page 124, it talks about
2  the unfunded AAL on line 3 of that table.
3  A. Uh-huh.
4  Q. And which stands for unfunded actuarial -- as I
5  understand it, actuarial accrued liability?
6  A. Correct.
7  Q. And then if you look at the table, it says for the
8  General Retirement System there's a number of
9  approximately 640 million and on the Police and Fire
10  Retirement System it's about 4 million. Do you see
11  that?
12  A. Yes.
13  Q. And is it correct that that -- so that adds up to
14  about 644 million. Does that correspond to the
15  650 million that's in the restructuring plan that we
16  have as Exhibit 3?
17  A. Yes, yes.
18       MR. CULLEN: Objection, foundation, form.
19  Q. And when you -- the restructuring document refers to
20  the unfunded liability at fiscal year 2012, is that
21  referring to the valuation that's referred to at the
22  top of page 124 of Bing 4 where it says, and I quote,
23  "The funded status of each plan as of June 30, 2011,
24  the most recent actuarial valuation date, is as
25  follows" and then gives a table?

Page 64

1       MR. CULLEN: Objection, foundation, form.
2  A. And your question was?
3       MR. ULLMAN: Do you want to read it back?
4  If you don't understand, I'll rephrase it, but --
5       THE WITNESS: Yes. I just need --
6  Q. Would it be easier if I just rephrased the question?
7  A. Go ahead.
8  Q. Okay. When you referred to the approximately
9  650 million of unfunded liability as of fiscal year
10  2012, okay, the unfunded liability as of 2012, is that
11  referring to the underfunding as reported as of the
12  June 30, 2011 actuarial valuation which is referred to
13  on the top of page 124?
14  A. The answer would be --
15       MR. CULLEN: Objection, foundation, form.
16  When you say when you refer, you mean -- are you
17  implying that he wrote this document personally?
18       MR. ULLMAN: No, he and his team.
19  Q. I'm obviously referring to that in the general sense.
20  I didn't intend to imply that you physically drafted
21  this, Mr. Mayor. I understand this was put together
22  by you and people working for you.
23  A. And the answer to that would be yes.
24  Q. And also under this -- going back to page 422 of
25  Exhibit 3 under the subheading B under pension



Page 65

1  unfunded liabilities it says, the City is developing a
2  plan to reduce the unfunded liability.
3        Do you have any recollection as to the
4  specifics of that plan?
5  A.  No, I don't.
6  Q.  Now, you recall -- let me ask you.
7        Are you aware that on June 14th, 2013 the
8  Emergency Manager had a meeting with creditors?
9  A.  I'm aware.
10 Q.  Prior to the time that he was appointed or I should
11    say -- let me withdraw that.
12        Prior to the time that the Emergency
13    Manager's appointment was formally announced and June
14    14, 2013, did you have any conversations with the
15    Emergency Manager himself?
16 A.  Yes.
17 Q.  And do you recall how many?
18 A.  We don't -- we don't meet that often.  You know, if we
19    meet once or twice a week, that's about it and the
20    meetings are usually very short meetings.  Usually
21    called by me.
22 Q.  And can you say how long a typical meeting would last?
23 A.  Thirty minutes tops.
24 Q.  During that time between March 25th and June 14th do
25    you recall any discussions with the Emergency Manager

Page 66

1  concerning pensions, anything to do with pensions?
2  A.  I -- yes.
3  Q.  And tell me what you recall.
4  A.  You know, the general conversation was that pensions
5    are a major problem that we have and we've got to
6    address it.
7  Q.  And do you recall when those conversations took place?
8  A.  Probably more in the May time frame.
9  Q.  And was there any conversation with the Emergency
10    Manager as to how the Emergency Manager intended to
11    address the issues of pensions?
12 A.  No.
13 Q.  Was there any discussion with the Emergency Manager
14    during the period I've been asking about, the end of
15    March and June 14, about the City's filing for Chapter
16    9 bankruptcy?
17 A.  I think the only conversations we may have had about
18    that is that's the last resort and that's from him
19    saying, you know, that's not the direction we want to
20    go in and it would be last resort.
21 Q.  Did the emergency -- did you have any discussions with
22    the Emergency Manager in which he indicated that he
23    had any approaches or thoughts as to how to address
24    issues relating to pensions other than filing for
25    Chapter 9 bankruptcy?

Page 67

1  A.  No.
2  Q.  And did you have any conversations with him in which
3    he specifically referred to a Chapter 9 bankruptcy as
4    a way to deal with the pension issues?
5  A.  I believe the answer to that would be yes.  I can't be
6    very specific, I don't recall, but I think -- I
7    believe that conversation -- or a conversation like
8    that did occur.
9  Q.  Okay, and can you give me, as best you can recall, a
10    time frame as to when?
11 A.  I think it would be in that same May time frame in one
12    of our discussions.
13 Q.  And can you tell me with as much specificity as you
14    can remember what the Emergency Manager said during
15    that conversation?
16 A.  Once again, with not a lot of specifics, but in order
17    to fix the problems of the City where -- I know this
18    number has been thrown out a lot, the $3.5 billion of
19    unfunded liabilities, etc., etc., I mean, he talked
20    about that, but that was a generality and so it was no
21    more -- it was not more specific than that.
22 Q.  But he referred to Chapter 9 as a way to get rid of or
23    address what he referred to as a 3.5 billion unfunded
24    liability?
25 A.  As a possibility.

Page 68

1        MR. CULLEN:  Objection, foundation, form.
2    You can answer.
3  A.  As a possibility.
4  Q.  And did Mr. Orr tell you at that time that the
5    unfunded liability was indeed 3.5 billion?
6  A.  The answer to that would be yes.
7  Q.  And did he tell you that that had been shown through
8    an actuarial valuation?
9  A.  The answer to that would be yes.
10 Q.  During that conversation or any other conversation
11    with Mr. Orr during the March 25 through June 14 time
12    frame, was there any discussion with Mr. Orr of what
13    we've referred to previously and I've shown you the
14    pension clause in the Michigan Constitution or any
15    other legal impediments to -- affecting pension
16    rights?
17 A.  No.
18 Q.  Let me ask you the same questions now -- well, let me
19    preface it by saying you're aware, of course, that
20    there was a bankruptcy filing on July 18.
21 A.  That would be correct.
22 Q.  Okay.  Now, during the period between June 14, that
23    was when the creditor proposal was issued, and the
24    filing, did you have any conversations with Mr. Orr?
25 A.  About?

Page 69

1  Q.  Just in general first.
2  A.  Yeah, we probably had general conversations, but
3      nothing relative to the filing.
4  Q.  Okay.  So between June 14th and July 18th did you have
5      any conversations with Mr. Orr regarding pensions at
6      all?
7  A.  No.
8  Q.  Any discussions with Mr. Orr at all regarding the
9      possibility of a Chapter 9 filing?
10 A.  No.
11 Q.  So I take it the Chapter 9 filing a complete surprise
12     to you?
13 A.  Yes, it was.
14 Q.  I've asked you conversations with Mr. Orr concerning
15     pensions and Chapter 9.  Going back, we don't have to
16     do it in two time frames, but between March 25th which
17     is when the -- the last point we asked about and July
18     18th, did you have any conversations with anyone from
19     the State about the City's unfunded pension liability?
20 A.  No.
21 Q.  And during that same time frame did you have any
22     conversations with anyone from the State about the
23     possibility of a Chapter 9 bankruptcy filing?
24 A.  No.
25 Q.  Now, you said you were not made aware in advance of

Page 70

1      the bankruptcy filing.  I take it you were made aware
2      of the bankruptcy filing after it happened?
3  A.  No.  The day that he was going to file is when he told
4      me he was going to file.
5  Q.  Okay.  And did he -- what was the substance of what he
6      told you?  Did he just say we're filing or did he give
7      any explanation?
8  A.  That's all he said, we're filing, today.
9  Q.  And what time did he say that?  Do you remember?
10 A.  This was in the afternoon so it had to be somewhere
11     between 3 and 4 o'clock, somewhere in there I think.
12 Q.  And at that time he didn't give you any explanation as
13     to why?
14 A.  No.
15 Q.  And did you have conversations with Mr. Orr subsequent
16     to the filing discussing the reasons why the filing
17     had been done?
18 A.  No.
19 Q.  Did Mr. Orr ever discuss with you the reasons for the
20     timing, the specific timing, of the filing?
21 A.  No, he didn't.
22 Q.  Did you have any discussions with anyone from the
23     State as to the specifics of the timing of the
24     bankruptcy filing?
25 A.  No.

Page 71

1  Q.  Now, were you aware that around -- as of the time the
2      bankruptcy filing was made that there was state court
3      litigation that was ongoing that was challenging the
4      ability of the Emergency Manager to file for Chapter
5      11 -- I'm sorry, for Chapter 9 in the first place?
6  A.  I read that in the paper.
7  Q.  Okay.  Did you ever hear that the City made its
8      bankruptcy filing at the time it did in order
9      effectively to get it in before the state court issued
10     what the City expected to be an adverse ruling?
11 A.  No.
12         MR. CULLEN:  Objection, foundation, form.
13 A.  I think I read that in the paper the following day.
14 Q.  Now, I think you had indicated previously that you had
15     been opposed to the idea of the City having to file
16     for bankruptcy, you didn't think it was necessary; is
17     that right?
18 A.  That's correct.
19 Q.  And I remember you gave -- one last -- a couple last
20     questions.
21         You gave an interview with the Emergency
22     Manager I think it was either the day of or the day
23     after the filing.  Do you recall that?  You -- I think
24     you talked about a troubling day for Detroit.
25 A.  Somewhat remember that, yeah.

Page 72

1  Q.  And you introduced Mr. Orr who then made his comments.
2      In the course of that press conference you made the
3      statement to the effect that Mr. Orr and his team have
4      brought together -- have brought together a lot of
5      history of success or words to that effect.  Do you
6      recall making that statement?
7  A.  No.
8  Q.  Do you -- are you aware of any history of success that
9      Mr. Orr and his team have?
10 A.  Only Chrysler.
11 Q.  Only in the context of bankruptcy?
12 A.  Yeah.
13 Q.  Are you aware of any success or history of success
14     that Mr. Orr has had outside the context of
15     bankruptcy?
16 A.  No.
17 Q.  Now, you obviously, you know, have been following even
18     if you've not been directly involved in what the
19     Emergency Manager has been doing; right?
20 A.  Uh-huh.
21 Q.  And you've been looking at or since obviously Detroit
22     is impacted by what he's doing in terms of both
23     reducing liabilities and trying to raise or conserve
24     cash; right?
25 A.  Correct.

Page 73

1 Q. Now, when exactly did Kriss Andrews leave? I forget.
2     You may have told me.
3 A. It was late July of '13.
4 Q. And did you just have discussions with Mr. Andrews
5     before the time he left as to -- with the job that the
6     Emergency Manager was doing, whether he was doing a
7     good job or a bad job, being effective or not being
8     effective?
9 A. Yes.
10 Q. And can you relate -- were you in agreement with the
11     views of Mr. Andrews or did you and he have different
12     views?
13         MR. CULLEN: Objection, foundation, form.
14     That's an unfair question, counsel. Which views?
15 Q. You can answer my question.
16 A. I was in agreement with Mr. Andrews.
17 Q. And can you tell me what the substance of the
18     discussions were and in particular the views expressed
19     by Mr. Andrews with which you agreed?
20 A. I think he felt as far as --
21         MR. CULLEN: Objection, foundation. You
22     can address it.
23 A. I think he felt as far as the balance sheet issues
24     were concerned that Kevyn had the ability to help
25     solve problems in that realm, but from a restructuring

Page 74

1     standpoint he didn't think that he had the requisite
2     skills to do an effective restructuring.
3 Q. Now, was this -- these were discussions -- let me ask
4     it this way.
5         Was this a discussion that took place at
6     one point in time or was this --
7 A. It was ongoing.
8 Q. These were ongoing discussions with Mr. Andrews? Just
9     during what time frame?
10 A. I think from probably April through June.
11 Q. Let me mark as the last exhibit I will show you Bing
12     5.
13         (Marked Exhibit No. 5.)
14         MR. ULLMAN: I'll just state for the record
15     what we've marked as Bing 5 is an email from
16     Kriss Andrews to Mayor Bing dated July 10, 2013. The
17     first page bears Bates numbers DTMI00098861.
18 Q. Are you familiar with what we've marked as Exhibit
19     Bing 5, Mr. Mayor?
20 A. Yes.
21 Q. And can you tell me what this is?
22 A. I asked Kriss, because at this time I knew he was
23     leaving and I asked him to give me a kind of overview
24     in terms of what he'd seen since Kevyn came on board
25     and this is the feedback that I got from him.

Page 75

1 Q. Okay, and did you have an oral discussion with
2     Mr. Andrews about this?
3 A. Yes, I did.
4 Q. Okay, and did you advise Mr. Andrews that you
5     concurred in the views that he expressed here?
6         MR. CULLEN: Objection, foundation, form.
7 A. I would say the answer would be yes.
8 Q. And then did you in fact agree with the views
9     expressed in this document, Bing 5, by Mr. Andrews?
10         MR. CULLEN: Objection, foundation, form.
11 A. The answer would be yes.
12 Q. Okay, and let me just go through some of this briefly.
13     I think in the first couple of paragraphs Mr. Andrews
14     essentially says that he's giving the Emergency
15     Manager good mark -- good marks in long-term
16     liabilities, stating at least in his view that the
17     Emergency Manager was building on many of the
18     initiatives that you had started previously?
19 A. Correct.
20 Q. And did you agree with that assessment?
21 A. Yes.
22 Q. Then Mr. Andrews goes on and starts discussing
23     operations, which he says are a different matter
24     altogether and basically his -- Mr. Andrews'
25     conclusion is that the Emergency Manager, and I quote,

Page 76

1     "threw away the head start we gave him. He frankly is
2     not competent at all. In fact, he's embarrassingly
3     incompetent and only listened to his equally
4     incompetent staff and did not well-exercise the added
5     powers he had."
6         So Mr. Andrews gives him an A in long-term
7     liabilities and an F in operations.
8         And did you agree with that assessment by
9     Mr. Andrews?
10         MR. CULLEN: Objection. Every word of it,
11     counsel? Is that what you're asking?
12         MR. ULLMAN: My question is pretty plain.
13     You can answer.
14         MR. CULLEN: No, it's an objectionable
15     question, but he can answer it.
16         MR. ULLMAN: Then your objection stands and
17     the question would be answered.
18 A. From my vantage point, you know, I'm not going to give
19     him a grade from A to F in either one of those areas,
20     but I would agree that his strength was in dealing
21     with the long-term liabilities and not operations.
22 Q. And Mr. Andrews goes so far as to say that in at least
23     Mr. Andrews' view that he's not doing a competent job
24     in the restructuring aspect and the operational
25     aspect. Did you agree with that?

Page 77

1      MR. CULLEN: Objection, form and
2  foundation.
3  A.  Yes, I would.
4  Q.  And he gives -- he, meaning Mr. Andrews, goes on to
5  discuss some specific points that he believes, he
6  Mr. Andrews, believes support that conclusion. I want
7  to ask you about some of those.
8      Mr. Andrews -- he has items 1 through 4
9  initially. Mr. Andrews first talks about issues
10  with -- you called it DDOT?
11  A.  Yes.
12  Q.  And he says that they were ready to choose -- I guess
13  MV is someone, is a person?
14  A.  No, that's a company --
15  Q.  Oh.
16  A.  -- that manages transportation.
17  Q.  Okay. And then it goes on to say, the Emergency
18  Manager slowed the process down and he says that
19  although he, meaning Orr, gave me a poor excuse for so
20  doing, it does not hold water.
21      Can you tell me in your own words, what was
22  the situation, the issue, with DDOT?
23  A.  We had poor management at best at DDOT. And before we
24  wanted to make any long-term decisions, what to do
25  with the transportation department, we felt we had to

Page 78

1  get a capable management team in there to do the
2  assessment and make some improvements before we made
3  any final long-term decision and so we chose -- we had
4  chosen MV and Kevyn stopped that process and
5  ultimately, maybe three months later, chose the same
6  company that we recommended. So we think we lost
7  time.
8  Q.  Okay, and so during that three-month period the same
9  prior, as you characterize it, bad management
10  continued in place?
11  A.  Yes.
12  Q.  And that resulted in continued -- were they losing
13  money, DDOT?
14  A.  Yes.
15  Q.  So it continued -- that perpetrated -- or perpetuated
16  at least for that three-month period the same
17  operation losing money?
18      MR. CULLEN: Objection, foundation, form.
19  A.  We didn't see any improvement in efficiencies plus the
20  fact they were still the same kind of complaints that
21  we were getting from the ridership and we felt that if
22  there had been a management team in there sooner, we
23  could have probably made some improvements.
24  Q.  Okay. And have there been improvements since MV was
25  put in place as the manager?

Page 79

1  A.  I would say yes, but they've only been there for the
2  last four to six weeks so maybe it's too soon to
3  really do a good assessment, but they are the right
4  company and I believe given time and tools, they will
5  make major improvements.
6  Q.  Okay, and does DDOT have any importance as concerns
7  Detroit's financial viability in terms of being able
8  to offer public transportation to citizens or things
9  like that?
10      MR. CULLEN: Objection.
11  Q.  Is that something that's important to have in place
12  for recovery?
13      MR. CULLEN: Objection, foundation -- I'm
14  sorry. I didn't know whether there was going to be
15  another clause in the question.
16      MR. ULLMAN: No, no more clauses.
17      MR. CULLEN: Okay. Objection, foundation,
18  form.
19      MR. ULLMAN: Duly noted.
20  Q.  You can answer.
21  A.  As one of my initiatives, one of my key initiatives,
22  public transportation is one of the top five
23  initiatives from my vantage point, because it impacts
24  so many of our citizens who have either got to travel,
25  a lot of them don't have cars, a lot of them work

Page 80

1  outside of the City and if you don't have dependable
2  public transportation, it does create a major issue.
3  Plus we've been subsidizing DDOT out of our general
4  fund for some time so the quicker that we can fix it,
5  the less subsidizing we have to get -- get over to
6  DDOT.
7  Q.  Let me go onto -- the next item listed is number 2.
8  Mr. Andrews writes, we should also be progressing on
9  providing the new management team in PLD.
10      Can you tell me what --
11  A.  Public lighting department.
12  Q.  Ah, okay. And can you explain what the issue is here?
13  A.  We have 88,000 lights in our City with about 40,000
14  that are working. We have a system that is so
15  outdated that even with new technology, you know, we
16  -- we can't fix it. So there's got to be a huge
17  investment into public lighting. It's something that
18  we've been talking about for years and years. We have
19  a plan to put in place to invest in a new lighting
20  grid across the entire City and, once again, we
21  haven't moved the needle on that at all. We had a
22  Lighting Authority legislation was passed in December
23  of 2012 and we had an opportunity I think to put some
24  lights on in different parts of the City, but it
25  hasn't happened as I speak to you now.

1  Q.  And do you know why it -- why things have been, in the
2      words of Mr. Andrews, been slowed down?
3  A.  Once again, I would say to you, and this is more
4      hearsay than anything else and this would be from --
5          MR. CULLEN:  Objection, foundation.
6  A.  What I hear is Lansing wants to take some credit for
7      fixing the lighting system and they're trying to get
8      the funding, 100 -- I think it's $150 million they
9      want to go to the bond market.  That hasn't happened
10     yet.  So the investment that's necessary to put on
11     lights and start to fix the system has taken much
12     longer than any of us anticipated.
13 Q.  Now, at the time that Mr. Andrews wrote this email to
14     you, he was still part of your team; right?
15 A.  Correct.
16 Q.  He was still the -- what was his title?  Was it
17     program manager director?
18 A.  Program director.
19 Q.  And you had asked him to write this email to you as
20     part of his job duties?
21 A.  Yes.
22 Q.  To inform you as to --
23 A.  How things were going, yes.
24 Q.  And that's what this is?  This is the email that he
25     wrote while in the -- employed in the capacity of

1      program manager director in response to your request
2      that he do so?
3  A.  That would be correct.
4  Q.  And this was within the ordinary scope of his job
5      activities?
6  A.  Yes.
7  Q.  And you had asked him as part of his job to observe
8      and monitor what was going on in the City under the
9      direction of the Emergency Manager and report back to
10     you?
11 A.  Yes.
12 Q.  Now, Mr. Andrews writes in this -- and this is on both
13     points one and two, he writes, and I quote, "He" --
14     the he there referring to Mr. Orr -- "He told me a
15     disaster at DDOT would not be a problem for him since
16     it would highlight how screwed up the City is."  And
17     then similarly, if you look at number 2, Mr. Andrews
18     writes that the EM slowed the process here also and
19     said the same thing, a disaster at PLD would not be a
20     bad thing because it would highlight how messed up the
21     City is.
22         Did you ever have any conversations with
23     Mr. Orr in which Mr. Orr conveyed the substance of
24     what is reported here by Mr. Andrews to you?
25 A.  No.

1  Q.  Going onto number 3, it says, similar issues surfaced
2      around the Lighting Authority.
3          Let me ask you.  What's the difference
4      between the PLD and the Lighting Authority?
5  A.  Lighting Authority is independent of PLD.  The
6      Lighting Authority is more regional.  We had had
7      legislation passed and so those people on the
8      authority are not employees of the City, it's
9      independent.
10 Q.  And do they have -- do they deal with different --
11     with lights in different parts of Detroit than PLD?
12     I'm not sure what the interplay between the two is.
13 A.  No, it would be the exact same PLD, but see, with PLD,
14     we don't control all the lighting in the City, DTE
15     controls probably at least 40 percent of the lights in
16     the City because they have upgraded and they have made
17     the necessary technology, investments in 40 percent of
18     lights in the City so their grid works, ours doesn't.
19 Q.  DTE is what?
20 A.  Detroit -- DTE, Detroit -- Detroit Edison.
21 Q.  Detroit Edison supplies the electricity or --
22 A.  PLD also has the ability to generate electricity, but
23     once again, it's such an old, outdated entity they've
24     not made any kind of investments in their system in 30
25     or 40 years, so a lot of the system is just broken, it

1      can't even be fixed, you can't even get replacement
2      parts.
3  Q.  Okay, just -- so you had indicated there were 88,000
4      lights --
5  A.  Correct.
6  Q.  -- in Detroit?  And some of those --
7  A.  Some of them are on the grid with DTE.
8  Q.  Okay.  And those are DTE's responsibility?
9  A.  Correct.
10 Q.  And some are the responsibility of PLD?
11 A.  That would be correct.
12 Q.  And that's about how many?
13 A.  That's probably around 55,000.
14 Q.  And then are others the responsibility of the Lighting
15     Authority?
16 A.  No, no.
17 Q.  That's why I'm still a little unclear as to how the
18     Lighting Authority factors into this.
19 A.  We went to the outside, because we thought that one of
20     the things we were thinking about doing was
21     outsourcing the responsibility of lighting the City of
22     Detroit.  We didn't think that we had the capacity or
23     the capability to do that internal so we were talking
24     to DTE as an alternative source, but we wanted to have
25     the Lighting Authority in place because DTE did not

Page 85

1    want to make the necessary investment, so we had to do
2    that through this Lighting Authority by issuing bonds.
3 Q. Okay, so one option was to work with DTE, but that
4    didn't look like it was going to work so the Lighting
5    Authority is a regional authority and you were going
6    to like bring them in through the floating of bonds to
7    have them help take over and fix the lights in
8    Detroit; is that it?
9 A. Yep, yep, yep.
10 Q. And is there a name of this authority or is that a
11    particular name?
12 A. No, Detroit Lighting Authority.
13 Q. Just called the --
14 A. Yeah.
15 Q. There you go. Works for me.
16       Okay, and so what is -- can you explain the
17    issue that Mr. Andrews is writing about here in item 3
18    when he says similar issues surfaced with the Lighting
19    Authority?
20 A. We -- one of the big issues that we have is with our
21    union employees, because as you start talking about
22    outsourcing, in a lot of cases they may very well lose
23    a job, they're at risk, and as far as the lighting --
24    the lighting department is concerned, you're not
25    talking about a lot of people and there were

Page 86

1    negotiations, I'm not involved in that, where those
2    people who wanted to stay as City employees could be
3    transferred over to an outside third-party and
4    wouldn't lose their jobs. So a lot of those
5    negotiations were going on, but what Kriss is saying
6    is that Kevyn slowed that process down which kept us
7    from moving forward to try to get the investment in
8    place and start to get lights on in the City.
9 Q. And is that process still ongoing to where --
10 A. That's ongoing.
11 Q. And are people -- but it's just ongoing, as I think
12    you had said, in a slower way than you had expected it
13    would be given the work -- the groundwork that you had
14    done?
15 A. That would be correct.
16    MR. CULLEN: Objection, foundation, form.
17 Q. And Mr. Andrews writes that they went to Kevyn and got
18    a deal which forces the City to put in more money than
19    they need and essentially saying a better deal than
20    they were able to negotiate with the City without the
21    Emergency Manager.
22       Do you have an understanding as to what
23    Mr. Andrews is referring to here?
24 A. If I recall, there's a tax that's about $12.5 million
25    a year that I think I recall that is utilized once the

Page 87

1    -- once you've gone out and you've secured the bonds,
2    you can use this tax to pay down the loan, and this
3    Authority did not need the $12.5 million in year one,
4    but he's -- I think he told me that Kevyn gave them
5    the $12.5 million and his feeling was that they only
6    needed as a startup entity 2 to $3 million. Why not
7    use the rest of the money to put into other areas that
8    the City needs and I think that's what his -- what he
9    was referring to.
10 Q. Okay. In item 4 Mr. Andrews makes a number of -- I
11    guess it's some general observations. One is ordering
12    us not to coordinate with the consultants we hired to
13    help us.
14       Do you have an understanding as to what
15    that's referring to?
16 A. Yeah, Kriss was told not to -- not to have any contact
17    with the consultants and that the consultants that
18    were coming in were very inexperienced people, that
19    had really no knowledge of Detroit and of municipal
20    government, so it really slowed the process down.
21 Q. And did Mr. Andrews tell you that he had been told not
22    to have contacts with the consultants?
23 A. Yes.
24 Q. And when did -- did he tell you that directive was
25    given?

Page 88

1 A. Oh, that was given by Kevyn. I don't know the exact
2    timing of that. It had to be in the April/May time
3    frame.
4 Q. And up to the point of that directive had Mr. Andrews
5    been having contact with the consultants?
6 A. Yes.
7 Q. And is that something you would know due to your
8    supervision of Mr. Andrews?
9 A. Yes.
10 Q. And after that directive was given did Mr. Andrews
11    continue to have contact with the consultants?
12 A. No.
13 Q. And then Mr. Andrews goes on to say, putting in place
14    very inexperienced staff to control things.
15       Do you have an understanding as to what
16    Andrews was referring to there?
17 A. All the consultants.
18 Q. Well, he's referring specifically to staff. Is
19    that --
20 A. Well, they -- they became staff.
21 Q. Oh, okay. Anyone in particular?
22 A. It's a bunch of them.
23 Q. You mean these were people that Mr. Andrews -- Mr. Orr
24    brought in to take on positions in the City management
25    structure to replace people that you had previously

Page 89

1    installed; is that right?
2  A.  That would be correct.
3  Q.  And can you just give me -- you don't have to name
4    names but give me some of the positions where you
5    believe he put in people who are inexperienced or very
6    inexperienced.
7         MR. CULLEN:  Objection, foundation, form.
8    Which is it?
9         MR. ULLMAN:  I think we'll go with very
10    inexperienced.
11  A.  He brought on a CFO from the outside to replace Jack
12    and everybody said from day one he was not a good fit.
13    I believe he'll be relieved of his duties for other
14    reasons this week.  Kriss was replaced by Gary Brown,
15    who was a City Council -- City Councilman who has
16    never run anything much less 11 different departments
17    reporting to him.  He was a police officer before he
18    became a City Councilman and he took Kriss' place.
19    Karla has not been replaced at all, Karla Henderson,
20    who I think was one of our high profile leaders that
21    really did an outstanding job in blight elimination
22    and planning for the City.  She's not been replaced to
23    my knowledge.  Only recently our director of
24    purchasing has left and he has not been replaced.  So
25    a lot of the key people that they're taking out, what

Page 90

1    they're doing is putting in consultants in those
2    positions and, you know, they're learning on the fly
3    and just, once again, it's not efficient.
4  Q.  I think you mentioned specifically two people who were
5    replaced who you didn't believe were good people or
6    experienced people.  You mentioned CFO, Jack Martin,
7    as I recall, and then Kriss Andrews himself who was
8    replaced by Gary Brown.  Anyone else that was put out
9    and replaced by someone that you believe to be not
10    suited, not experienced enough for the job apart from
11    those two?  And put aside positions that are currently
12    unfilled.
13  A.  No, those would be the two key along with Karla and
14    Karla's just hasn't been replaced.  They may be
15    looking for a person for that, I don't know, but some
16    of the other positions they've just put young
17    consultants in those positions.  My big concern there
18    is at some point in time we will come out of
19    bankruptcy and if you don't have the people internally
20    that know the system and you have all these
21    consultants doing the job that City employees ought to
22    be doing, when Kevyn leaves, which could be within the
23    next 11 months, and those consultants leave, you
24    haven't developed anybody to run the City on a
25    day-to-day basis.  That's my biggest concern.  We

Page 91

1    don't even have a line item in our budget for
2    training.  Somebody's got to get trained to do these
3    jobs on a long going basis.
4  Q.  So when you said -- you made some reference to young
5    consultants that were brought in.  Is it the case that
6    the Emergency Manager has put in staff positions
7    people who are actually consultants rather than
8    long-term employees of the City?
9  A.  Yes.
10         MR. CULLEN:  Objection, foundation, form.
11  Q.  And do you know the names or positions of those
12    people?
13  A.  No, I don't.
14  Q.  But that's at a lower level so you don't know the
15    specific names?
16  A.  Correct.
17  Q.  But it's your understanding that that's what's
18    happened?
19  A.  Correct.  I get feedback from a lot of my department
20    heads and directors that that's what's going on and
21    they're frustrated as hell.
22  Q.  And can you tell me who are some of these department
23    heads who are --
24  A.  All of them.
25  Q.  Mr. Andrews also says that the Emergency Manager is

Page 92

1    not listening to Conway MacKenzie.  Do you see that at
2    the top of Bates page 862?
3  A.  Yes, I see that.
4  Q.  Do you have an understanding of what he was referring
5    to there?
6  A.  No, I don't.  Conway MacKenzie is the restructuring --
7    the primary restructuring firm, but I'm -- you know, I
8    have no contact with them at all.
9  Q.  So you don't know the specifics of what Mr. Andrews
10    was referring to?
11  A.  No, no, I don't.
12  Q.  Okay.  Let me just go quickly through the last couple
13    of things.  Mr. Andrews continues in this email
14    stating that the Emergency Manager and his team also
15    pursued wrong things and he gives a list.  First he
16    talks about focusing on outsourcing solid waste.  Do
17    you have an understanding of what the issue is there?
18  A.  Yeah, trash is getting picked up, garbage and trash is
19    getting picked up.  Maybe not as efficient as it
20    should be, but it's not like it's not happening.  You
21    know, there may be a delay of several hours or maybe a
22    day and he's saying that's not an area to overly
23    concern itself with.  You know, the real issues still
24    are the things that I focused on earlier.
25  Q.  Mr. Andrews states in this paragraph that the

Page 93

1    announced savings of 15 million are ridiculous and he
2    says they don't really know what the savings are, if
3    there are any.
4         Do you see that?  Do you have an
5    understanding of what's referred to there?
6  A.  Yeah, I think you first got to know your internal
7    costs and I think what Kriss is saying if you don't
8    know your internal costs, how do you know that when
9    you go out, without quoting other companies, that
10   you're going to save this money?  And so, you know,
11   that work had not been quoted out.
12 Q.  I'm sorry, what work had not been quoted out?
13 A.  Trash and garbage pickup.
14 Q.  I'm -- I'm not -- I'm sorry, I'm not following.
15 A.  Solid waste.
16 Q.  It had not been quoted out.  I thought there was an
17   RFP that was put out for solid waste?
18 A.  It may have been now, but before -- but I think he was
19   given information on this 15 million savings before
20   any information came back from the RFP.
21 Q.  Oh, you're saying that there was an announcement that
22   there would be a savings of 15 million --
23 A.  Right.
24 Q.  -- before the specifics of the RFP were in --
25 A.  Correct.

Page 94

1  Q.  -- compared so you could then compare with what the
2    internal --
3  A.  What the internal cost was, correct.
4  Q.  Okay.  And at that time were the internal costs -- had
5    they been tabulated, calculated?
6  A.  I don't know the answer to that.
7  Q.  Number 2 on this last list of Mr. Andrews is moving
8    PDD to DEGC.
9         Can you tell me what that refers to?
10 A.  You got to learn the acronyms here.  Planning and
11   development and DEGC is Detroit Economic Growth
12   Corporation, and you know you got two functions that
13   do planning for the City of Detroit.  DEGC is a little
14   different.  They're basically about new business
15   coming into town and they're more growth oriented than
16   anything else.  They don't get into the nitty-gritty
17   of managing what happens in city departments on a
18   day-to-day basis.  We don't think, meaning my
19   administration, don't think that that's a good use of
20   the skill sets that we have in the two departments.
21   There may be some things and we've even heard from
22   HUD, which is a big supporter of our Planning
23   Department, there are things that we can't transfer to
24   DEGC.  And so when people just with blinders on
25   saying, you know, take all the responsibilities from

Page 95

1    the Planning Department and shift it over to DEGC,
2    DEGC doesn't even want all of that, doesn't make -- we
3    don't think it makes a lot of good sense right now.
4  Q.  Okay.  And there's also the last point that
5    Mr. Andrews makes, number 3, is about putting a new
6    chief in place.  I think he's suggesting it should be
7    an existing person as opposed to someone brought in
8    from the outside?
9  A.  Too late.  That's done.  Traditionally -- historically
10   I should say the police chief and the fire
11   commissioner were always appointees selected by the
12   Mayor.  With the kind of problems that we've had from
13   a public safety standpoint and with the turnover of
14   police chiefs since I've been in office, they made a
15   change so that the Mayor no longer selected the police
16   chief.  The police chief was selected by Lansing going
17   back -- actually he started July 1st, but they didn't
18   follow the process and we have a police commission
19   that purportedly has the responsibility of selecting
20   and interviewing and they have a process of
21   identifying police chiefs.  It didn't happen that way
22   with them.  And I had no input into it at all and when
23   I found out that they were ready to name a police
24   chief and they showed me a couple names, they had no
25   internal candidates at all and I went to Kevyn and

Page 96

1    said, you know, you got to -- we've got almost 3,000
2    police officers in the City of Detroit, you can't make
3    me believe that we don't have somebody internally who
4    has the capability and capacity to be considered and
5    at the 11th hour they did interview two internal
6    candidates but the reality is that the die was cast.
7    The guy who they selected is the guy that's here now
8    from Cincinnati.
9  Q.  And then lastly, if you look at the second to the last
10   paragraph in this email, Mr. Andrews makes reference
11   to a gag order or gag orders from Kevyn, which he says
12   only support the very poor reporting.
13        Do you have an understanding as to what
14   he's referring to when he uses the phrase gag orders
15   from Kevyn?
16 A.  I think anytime -- we got a different kind of press
17   here.  I don't know.  Are you from here?
18 Q.  I'm from New York.
19 A.  Okay, our press may be worse than New York press.
20 Q.  That's a matter of opinion.
21 A.  Having said that, having said that, the negative
22   stories about Detroit is pretty rampant and you know,
23   I guess things happen internally that you would hope
24   would maybe stay inside, but our press does a pretty
25   good job of digging and so when something happens

ESQUIRE
S O L U T I O N S

Page 97

1  internally and the press gets ahold of it, I think
2  what Kevyn is saying, you know, there must be a leak
3  somewhere so, you know, we don't -- we want to make
4  sure that that stops, we don't need to read about some
5  of the things that are being discussed internally,
6  etc., etc., so I'm putting a gag order out and
7  anybody -- if I find out that you are the leak, then
8  I'm going to have to deal with you appropriately.
9  Q.  Okay.  And then actually as I see in the email above
10     this Mr. Andrews says, we need to talk, we need to
11     plan this communication well, how do we get out a
12     message that helps matters.
13        Do you know what he was referring to by
14     planning this communication well?
15  A.  I'm not 100 percent sure on that, but it's one of the
16     things that we talk about internally a lot.  You know,
17     I have an administration that have accomplished a lot
18     of things and because the focus is always on the
19     negative things that are happening, we're trying to
20     figure out -- there are some good stories.  I mean,
21     even yesterday with 60 Minutes, I guess, it was all
22     pretty negative about the City.  It's the same thing
23     over and over and over.  Nobody talks about some of
24     the positive things that are going on and I think in
25     deference to staff, I want people to understand that

Page 98

1  they've accomplished a lot and so we wanted -- I think
2  Kriss and Bob wanted to make sure that our press
3  understood that there were good things, that we had
4  accomplished things, etc., etc.  It's not all about
5  the Emergency Manager coming in and now things start
6  to happen.  It's about things were already happening.
7        MR. ULLMAN:  Okay, I have no further
8  questions at this time.  I will pass the witness.
9        THE VIDEOGRAPHER:  We'll go off the record
10  at 12:49.
11        (A brief recess was taken.)
12        THE VIDEOGRAPHER:  Back on the record,
13  12:52.  Go ahead.
14        EXAMINATION
15  BY MR. ELLISON:
16  Q.  Good afternoon, Mr. Mayor.  I just have a few
17     questions so I'll be very brief.
18        How many discussions did you have with
19     Mr. Baird about the Emergency Manager; do you recall?
20  A.  No more than two.
21  Q.  And when was the last one?
22  A.  I think after -- after I met with Kevyn.
23  Q.  So that would have been in the February or March time
24     frame?
25  A.  In late February, yeah.

Page 99

1  Q.  And earlier you had mentioned Treasurer Andy Dillon.
2     Did you have any discussions with him about the
3     Emergency Manager?
4  A.  Not as much.  Rich seemed to have taken the lead on
5     that.  I think the Treasurer was more involved in what
6     was happening in Detroit in 2012 as opposed to 2013.
7     I've not seen a lot of him in 2013.
8  Q.  But did you have any discussion about --
9  A.  No, no with Andy, no.
10  Q.  Did you have any discussions with him about Detroit's
11     pension issues?
12  A.  With Andy, no.
13  Q.  Okay.  And how about Governor Snyder?  Have you had
14     any discussions with him about the Emergency Manager?
15  A.  Just once.
16  Q.  And when was that?
17  A.  That was before I went to DC to meet Kevyn.
18  Q.  And what was the substance of that conversation, if
19     you remember?
20  A.  That they think that they found the right guy.
21  Q.  How long was the conversation?
22  A.  Short conversation.
23  Q.  Did you say anything back or was it him simply
24     informing you that --
25  A.  Just informing me.

Page 100

1  Q.  Did you have any discussions with the Governor about
2     the possibility of filing for bankruptcy?
3  A.  No.
4  Q.  And did you have any discussions with him about the
5     City's pension issues?
6  A.  No.
7        MR. ELLISON:  That's all I have for the
8  witness.
9        EXAMINATION
10  BY MS. LEVINE:
11  Q.  Good afternoon, Mr. Mayor.
12  A.  Good afternoon.
13  Q.  Sharon Levine, Lowenstein Sandler, for AFSCME.
14  A.  Okay.
15  Q.  Just a couple more questions.
16        Prior to -- going back 18 months before the
17     bankruptcy filing, are you aware that there were
18     negotiations with the City and a coalition of unions
19     with regard to certain tentative agreements?
20  A.  Yes.
21  Q.  Were you involved in those negotiations?
22  A.  Yes.
23  Q.  Is it your understanding that those negotiations with
24     your unions actually did result in tentative
25     agreements?

Page 101

1  A.  Yes.
2  Q.  And is it your understanding that those tentative
3       agreements were ratified by the unions?
4  A.  Yes.
5  Q.  Were those -- and was it your understanding that those
6       tentative agreements would have resulted in savings
7       for the City?
8  A.  Yes.
9  Q.  Were the tentative agreements -- were the tentative
10      agreements ever implemented by the City?
11 A.  No.
12 Q.  Do you know why?
13 A.  They were rejected by the Treasurer, Andy Dillon.
14 Q.  After the rejection of the tentative agreements did
15      there come a point in time where you were involved in
16      further negotiations with your unions with regard to
17      concessions, specifically including meetings with
18      Ernst & Young?
19 A.  I wasn't actually involved in any of that so I'm not
20      100 percent sure what other meetings occurred after we
21      didn't get the tentative agreements implemented.
22 Q.  Were there meetings -- were you aware of meetings
23      between various union representatives and E&Y or
24      Ernst & Young?
25 A.  Yes.

Page 102

1  Q.  When did those occur?
2  A.  Those would have been late 2012 and maybe the first
3       quarter of '13.
4  Q.  And who was present at those meetings on behalf of the
5       City?
6              MR. CULLEN:  Objection, foundation.
7  Q.  Are you aware who was in attendance at those meetings
8       on behalf of the City?
9  A.  That would have been our top labor guy, I don't know
10      if he was by himself.  I don't know if Kriss was still
11      involved in it, Andrews.  I'm not sure from the City's
12      perspective who all may have been there.
13 Q.  But these took place before the Emergency Manager was
14      appointed in March of 2013; correct?
15 A.  Correct.
16 Q.  And these were done under -- although you weren't
17      physically there, they were done under your
18      supervision and control and the people who were
19      involved in those conversations reported to you; is
20      that correct?
21 A.  No, they reported to Kriss.
22 Q.  To Kriss Andrews and Kriss Andrews reported to you?
23 A.  Yes, Kriss --
24 Q.  In other words, they weren't done --
25             MR. CULLEN:  Could you let the witness

Page 103

1       finish?
2  A.  Kriss and Jack Martin would have been the two guys,
3       the CFO and the COO would have been the guys that were
4       heading that up, and I would think HR guy had to be
5       involved in that who's no longer here, Patrick Aquart,
6       and then our labor person would have been involved in
7       that, and they reported to either Jack or Kriss.
8  Q.  To your knowledge did those meetings result in
9       tentative agreements or any agreements with the
10      unions?
11 A.  Not to my knowledge.
12 Q.  Why did those -- did those discussions come to a halt?
13 A.  I believe they did, once the determination was made
14      that an Emergency Manager was imminent.
15 Q.  Following the appointment of the Emergency Manager,
16      were you -- are you aware of any further discussions
17      with your unions or coalition of unions before the
18      filing of the Chapter 9 case?
19 A.  I'm sure there were ongoing meetings, but I've not
20      been involved in any of them because that was under
21      the purview of the Emergency Manager.
22 Q.  How are you sure that there were ongoing meetings if
23      you weren't involved?
24 A.  Just conversations, you hear conversation, people let
25      you know what's going on.

Page 104

1  Q.  So what -- with whom did you have a conversation that
2       indicated to you that there were ongoing meetings with
3       the coalition of unions after the appointment of the
4       Emergency Manager?
5  A.  Jack or Kriss.
6  Q.  And when did those meetings take place?
7  A.  Once again, it was sometime in the first quarter of
8       '13.  I don't know that there were ongoing meetings.
9       Once Kevyn got here I do think there were still
10      meetings, but like I said, I'm not involved in that at
11      all anymore.
12 Q.  So while you were in control, there were negotiations
13      with the coalition of unions that resulted in a TA
14      where the unions ratified those TAs and those were not
15      implemented because Mr. Baird declined to implement
16      them; is that your understanding?
17 A.  Not --
18             MR. CULLEN:  Objection, foundation, form.
19 A.  Not Mr. Baird.  That was the Treasurer, Andy Dillon.
20 Q.  Andy Dillon, okay.
21             After the appointment of Emergency Manager
22      you're not sure what meetings took place, although you
23      did hear around the halls that some meetings were
24      ongoing?
25 A.  Yes.

1  Q.  Before the Emergency Manager was appointed were you
2      involved in budgeting for the City?
3  A.  At a very high level.  Not so much in budgeting.  I
4      mean, the budget director --
5  Q.  Who was responsible -- and did the budget director
6      report to you?
7  A.  No, he reported to the CFO.
8  Q.  And did the CFO report to you?
9  A.  Correct.
10 Q.  Okay, since the appointment of the Emergency Manager
11     do you know who's involved in budgeting for the City?
12 A.  Brent Hartzell.  Brent Hartzell.  H-A-R-T-Z-E-L-L.
13     He's the budgeting director.
14 Q.  And to whom does he report?
15 A.  He reported directly to the new CFO, the guy that I
16     don't think's going to be here after this week,
17     Jim Bonsall.
18 Q.  And does he report to you?
19 A.  I've never seen an org chart.  I've asked for it on
20     several occasions and I've never seen one.
21 Q.  So you're not sure what the reporting org chart would
22     be after the appointment of the Emergency Manager?
23 A.  That is correct.
24 Q.  Do you know whether or not any of the consultants
25     retained by the financial manager are involved in the

1      budgeting functions?
2  A.  I'm sure they are.
3  Q.  But you're not involved in those meetings?
4  A.  No.
5  Q.  And you don't get reports from those meetings?
6  A.  No.
7  Q.  You discussed earlier a conversation that you had with
8      Kriss around outsourcing.  I believe that was with
9      regard to solid waste; is that correct?
10 A.  Correct.
11 Q.  And I believe you testified that one of the concerns
12     you had was that there was an estimated savings from
13     outsourcing that had been announced before RFPs had
14     gone out and the actual numbers had come in; is that
15     correct?
16         MR. CULLEN:  Objection, foundation, form.
17 A.  Maybe not before the proposals went out, but before
18     they came back in I think that number of 15 million
19     was out there.
20 Q.  Since the appointment of the Emergency Manager, is
21     there somebody who's specifically looking at whether
22     or not outsourcing specific City functions would save
23     money for the City?
24         MR. CULLEN:  Objection, foundation, form.
25 A.  I think that would be Conway MacKenzie from a

1      restructuring standpoint.  Maybe Ernst & Young from a
2      financial standpoint.
3  Q.  But that's not the -- that's not the -- the line of
4      folks we just discussed with regard to budgeting?
5         MR. CULLEN:  Objection, foundation, form.
6  A.  I'm not sure your question.
7  Q.  Before the Emergency Manager was appointed when you
8      did budgeting, did you look at things in your budget
9      like what, for example, you would spend on solid
10     waste?
11 A.  Yes.
12 Q.  And did you consider in the budget whether or not
13     there were ways to save costs with things such as
14     solid waste?
15 A.  Yes.
16 Q.  Okay, and one of the things that you talked about
17     earlier was whether or not you could save money if you
18     outsourced?  Without the City would save money by
19     outsourcing various function such as solid waste;
20     correct?
21 A.  Correct.
22 Q.  And one of the concerns you had was it appeared people
23     were reaching conclusions with regards to numbers
24     about those savings without having gone through an RFP
25     process first; is that correct?

1  A.  That would be correct.
2  Q.  Okay.  My question to you is who's the point person
3      now under the Emergency Manager who was looking at
4      these outsourcing issues?
5  A.  I would assume it's somebody from Ernst & Young and
6      somebody from Conway MacKenzie.
7  Q.  Do you have any -- have you had any conversations with
8      that person?
9  A.  Neither, neither organization.
10 Q.  From the period from November 2012 through March of
11     2013 did you have any discussions with anybody from
12     Lansing with regard to the ability to restructure
13     Detroit without the need to appoint an Emergency
14     Manager or an Emergency Financial Manager?
15 A.  I think I made it clear to all of those that we were
16     in contact in Lansing that that was not the direction
17     that I supported.
18 Q.  And did you -- did you have an opportunity to discuss
19     with the folks in Lansing your particular ideas with
20     regard to how to restructure or rehabilitate Detroit?
21 A.  Yes, they had -- they had what we would call a -- we
22     gave them a lot of information in terms of department
23     by department what we thought we needed to do to
24     either create savings or generate some revenue from a
25     reorganization standpoint.

Page 109

1  Q.  During the course of those discussions did you ever
2      have conversations with anybody in Lansing about the
3      prospect of filing a Chapter 9 without appointing an
4      Emergency Manager?
5  A.  No.
6  Q.  Did your plan or plans or any of the issues you
7      discussed include modifying vested pension benefits?
8  A.  Yes.
9  Q.  With whom did you have discussions with regard to
10     modifying vested pensions?
11 A.  I had personally no discussion.  I think the COO and
12     the CFO had those discussions, I believe probably with
13     Andy.
14 Q.  Was there any discussion to your knowledge of how to
15     implement a change to vested pension benefits given
16     the Michigan State Constitution?
17 A.  No.
18 Q.  Did your plan or the plans that were adopted by you
19     include privatization?
20 A.  Of?
21 Q.  Anything.
22 A.  I think we looked at privatization, yes.  I mean, we
23     just talked about the DDOT, we just talked about PLD,
24     as two.
25 Q.  So in connection with outsourcing or privatization did

Page 110

1      your plan include a process for evaluating or valuing
2      whether or not there really truly would be savings to
3      the City as a result of that job loss?
4  A.  Yes, that was done through the purchasing department.
5  Q.  And what was your process for evaluating outsourcing?
6  A.  I can't tell you the process.
7  Q.  But did it include getting RFPs before you announced
8      what the purported savings would be?
9  A.  Yes, yes.
10 Q.  Did your plan include the sale of assets?
11 A.  Some.
12 Q.  And you discussed them previously with counsel?
13 A.  Correct.
14 Q.  So I won't do that again.
15 A.  Correct.
16 Q.  Did your plan include a loss of City jobs?
17 A.  Yes.
18 Q.  Do you recall how many?
19 A.  I don't -- we -- I think it was a number of 1,500 jobs
20     in total.
21 Q.  How many of those were nonuniform employees?
22 A.  I don't know the answer to that.
23 Q.  Do you understand that in a Chapter 11 corporate case
24     if a pension is terminated, the PBGC or the Pension
25     Benefit Guaranty Corp, provides federally provided

Page 111

1      insurance to cover certain otherwise provided pension
2      benefits that are now lost?
3          MR. CULLEN:  Objection, foundation, form,
4      asks for a legal conclusion.
5  A.  I wouldn't know the answer to that.
6  Q.  I'm asking your understanding.  I'm going to try
7      again.
8          Do you understand that in a Chapter 11
9      corporate case if there's a defined pension benefit
10     plan that's terminated, the PBGC provides federal
11     insurance protection for the pension beneficiaries?
12         MR. CULLEN:  Why don't you just ask him the
13     foundation question whether he has any understanding
14     about that whatsoever?
15         MS. LEVINE:  I did.  That's the start of
16     the question is -- is it his understanding.
17         MR. CULLEN:  Well, that's not the rest of
18     the question, but I'll object to the form and the
19     foundation and you can address the question.
20 A.  You have to ask me the question again I think.
21 Q.  If the pension is terminated -- if Detroit's pension
22     is terminated, is there any federal program that
23     provides pension benefits for the retirees who have
24     now lost their benefits?
25 A.  Not to my knowledge.

Page 112

1  Q.  In a Chapter 11 case or in a bankruptcy case that
2      doesn't involve a municipality, is there a federal
3      program that provides benefits to pension
4      beneficiaries who've lost their benefit from a private
5      pension?
6          MR. CULLEN:  Objection, foundation, form.
7  A.  I wouldn't know the answer to that.
8  Q.  In the plans that you discussed with Lansing what was
9      your understanding of how retirees were going to live
10     post restructuring if pension benefits were going to
11     be cut?
12 A.  Never had that conversation.
13 Q.  Did you have any input into the retention of
14     restructuring counsel for the City?
15 A.  No.
16 Q.  How did you learn that Jones Day was retained as the
17     City's restructuring counsel?
18 A.  There was a meeting in the airport in the December
19     time frame of 2012.  Representing the City was
20     Kriss Andrews and Jack Martin and they're the ones
21     that made me aware.
22 Q.  Since November of 2012 have you had any conversations
23     with House Speaker Bolger with regard to Detroit's
24     financial issues?
25 A.  No.

1  Q.  Any conversations with Randy Richardville?
2  A.  I think I was up in Lansing and at that time it was
3     really trying to get the legislature to vote and pass
4     some legislation for the Lighting Authority and the
5     Regional Transportation Authority.
6  Q.  And what were those conversations that you had with --
7  A.  We needed them to support it, because we were in dire
8     need of both.
9  Q.  Did they agree to support it?
10 A.  They did.  The legislation was passed in December.
11 Q.  Did that provide State assistance?
12 A.  It's supposed to.  That hasn't happened yet.
13 Q.  What's your understanding why that hasn't happened
14    yet?
15 A.  They had to get the Authorities' board together and
16    they've been working on that for a long time for both
17    authorities, but I think they're both in play right
18    now and they have both chosen the leadership for the
19    Regional Authority for Transportation as well as for
20    the Lighting Authority.
21 Q.  Prior to the appointment of the Emergency Manager did
22    you have any involvement to trying to get access to
23    federal assistance for Detroit?
24 A.  Absolutely.
25 Q.  Since the appointment of the Emergency Manager do you

1     continue to have involvement in trying to get federal
2     assistance for Detroit?
3  A.  Absolutely.
4  Q.  Who were you talking to before the appointment of the
5     Emergency Manager?
6  A.  Three to four of the different secretaries under the
7     Obama administration.
8  Q.  And who have you been talking to since the appointment
9     of the Emergency Manager?
10 A.  The same ones, except now there's a new department,
11    there's a new Secretary of Transportation.
12 Q.  Prior to the appointment of the Emergency Manager did
13    you have any discussions other than what we've just
14    been talking about with anybody in Lansing with regard
15    to assistance for Detroit?
16 A.  Yes.  We have talked -- I mean, I've had ongoing
17    conversations with the Treasurer as well as the
18    Governor.
19 Q.  Have you continued those discussions post the
20    appointment of the Emergency Manager?
21 A.  No.
22 Q.  Prior to the appointment of the Emergency Manager did
23    you have any discussions with anybody about accessing
24    private or not-for-profit assistance to help with the
25    financial issues in Detroit?

1  A.  Yes, I've met with our business community leadership,
2     I've met with most of our foundations and I think
3     because of that we've gotten the kind of support we've
4     gotten.
5  Q.  Have you continued to have those discussions since the
6     appointment of the Emergency Manager?
7  A.  Yes.  For the record let me be specific about that.
8        MR. CULLEN:  Always a bad idea, but go
9     ahead.
10 A.  You know, I've been able to raise -- I raised
11    $8 million from our corporate community to assist us
12    with 100 police vehicles, with 23 brand-new fleet of
13    EMS vehicles.  From the corporate and foundation
14    community, I've been able to generate $14 million to
15    keep our recreation and parks open.  So -- and that's
16    been ongoing.  So all of this was before the Emergency
17    Manager and since the Emergency Manager I've continued
18    to do that and will continue.
19       MS. LEVINE:  If I can confer for a second.
20       THE VIDEOGRAPHER:  We're off the record,
21    1:14.
22       (A brief recess was taken.)
23       THE VIDEOGRAPHER:  Back on the record,
24    1:17.  Go ahead.
25       MS. LEVINE:  Thank you.  Just a couple more

1     questions.
2  BY MS. LEVINE:
3  Q.  We've had some discussion with regard to quoting
4     potential savings from outsourcing without RFPs having
5     gone out.  To your knowledge as we sit here today have
6     RFPs -- have any RFPs gone out and come back?
7  A.  Not to -- not to my knowledge.  I'm not involved in it
8     anymore and I know there's a concern from our
9     purchasing department that the process isn't being --
10    they got a process that's not being followed.
11 Q.  And as we sit here today, is it your understanding
12    that that concern persists?
13 A.  Yes.
14 Q.  And that's part of the discussion we had earlier where
15    you just hear things in the hall?
16 A.  Yes.
17 Q.  Is it your understanding that Miller Buckfire has been
18    retained by the City?
19 A.  Yes.
20 Q.  When were they retained?
21 A.  I think they may have been retained back in the
22    December/January time frame.
23 Q.  Were they retained as a restructuring professional?
24 A.  I think they were as the bank -- the corporate bank
25    representing the City.

Page 117

1   Q.  Did you hire them?
2   A.  No.
3   Q.  Who retained them?
4   A.  I think -- once again, most of these companies were
5       being -- they were being pressed by the -- we were
6       pressed by the State to my understanding, the State
7       had a lot of input into the selection process and in
8       some cases where the City has a responsibility for
9       paying part of the fees, you know, I've always had a
10      problem that I was not at the table to participate in
11      the selection process.
12  Q.  Do you pay part of the fees for Miller Buckfire?
13  A.  Yes.
14  Q.  Does the State pay part of the fees for Miller
15      Buckfire?
16  A.  Yes.
17  Q.  Does the NERD Fund pay part of the fees for Miller
18      Buckfire?
19  A.  I wouldn't know that.
20  Q.  Do you have a copy of Miller Buckfire's retention or
21      engagement letter?
22  A.  I would think we have that. I don't -- I don't have
23      it personally, but I would think we do in the purchase
24      department and maybe in the law department.
25          MS. LEVINE: We would request a copy of

Page 118

1       that letter. I know that there's been a lot of
2       documents that have been produced but we didn't happen
3       to see what in there so we would make that specific
4       request.
5           MR. GREEN: And if I may add the 2012
6       engagement letter from Miller Buckfire as well. I
7       understand they were initially engaged the prior year.
8       There may be two engagement letters.
9           MR. MOSS: Please put that in a letter so
10      we make sure we get it part of the record. We'll take
11      a look.
12          MS. LEVINE: So the request will be for any
13      engagement letters or contracts with Miller Buckfire
14      and we'll clarify that.
15  Q.  During the deposition last week with Treasurer Dillon
16      he made a reference to a report with regard to certain
17      tax write-offs or uncollected taxes. Are you familiar
18      with that?
19  A.  No, I'm not. Not specifically.
20  Q.  Are you familiar with any issue with regard to
21      potential tax write-offs where the taxes could have
22      been collected?
23          MR. CULLEN: Objection, foundation, form.
24  A.  No, I'm not. You know, we've got uncollected taxes
25      that go back ten, 12 years, and so prior

Page 119

1       administrations in my -- in my perspective a lot of
2       that should have been written off a long time ago but
3       they've been carrying it on books and I just think
4       that's the wrong approach.
5   Q.  Under your administration were -- how many -- how much
6       did you write-off in what you believe to be
7       uncollected taxes?
8   A.  I'm not sure of that. I would have to get with the
9       CFO.
10  Q.  Do you have an approximate number?
11  A.  No, I don't.
12          MS. LEVINE: I don't have anything further.
13      Thank you.
14          THE WITNESS: Thank you.
15          MR. GREEN: No, I don't have any questions.
16          MR. CULLEN: We don't need the Pistons
17      question on the record?
18          MR. ESSAD: No.
19          MR. CULLEN: Thank you very much.
20          THE VIDEOGRAPHER: This completes the
21      deposition. We're off the record, 1:22.
22          (Deposition concluded at 1:22 p.m.)
23              *   *   *
24
25

Page 120

1   State of Michigan)
2   County of Genesee)
3           Certificate of Notary Public
4       I certify that this transcript is a complete, true and
5   correct record of the testimony of the witness held in this
6   case.
7       I also certify that prior to taking this deposition,
8   the witness was duly sworn or affirmed to tell the truth.
9       I further certify that I am not a relative or an
10  employee of or an attorney for a party; and that I am not
11  financially interested, directly or indirectly, in the
12  matter.
13          WITNESS my hand this 16th day of October,
14  2013.
15
16          Jeanette M. Fallon
17          —
18  Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267
19  Certified Realtime Reporter
20  Registered Merit Reporter
21  Certified LiveNote Reporter
22  Certified Shorthand Reporter
23  Notary Public, Genesee, Michigan
24  Acting in Oakland County, Michigan
25  My Commission Expires: 9-19-18

**Page 121**

1      DEPOSITION ERRATA SHEET
2
3    Our Assignment No. 19355
4    Case Caption:  In re City of Detroit, Michigan
5
6         DECLARATION UNDER PENALTY OF PERJURY
7
8         I declare under penalty of perjury that I have read
9    the entire transcript of my Deposition taken in the
10   captioned matter or the same has been read to me, and the
11   same is true and accurate, save and except for changes
12   and/or corrections, if any, as indicated by me on the
13   DEPOSITION ERRATA SHEET hereof, with the understanding that
14   I offer these changes as if still under oath.
15   Signed on the _____ day of _____, 20___.
16   _____
17   MAYOR DAVE BING
18
19
20
21
22
23
24
25

**Page 122**

1      DEPOSITION ERRATA SHEET
2
3    Page No._____Line No._____Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25   MAYOR DAVE BING

**Page 123**

1      DEPOSITION ERRATA SHEET
2
3    Page No._____Line No._____Change to:_____
4    _____
5    Reason for change:_____
6    Page No._____Line No._____Change to:_____
7    _____
8    Reason for change:_____
9    Page No._____Line No._____Change to:_____
10   _____
11   Reason for change:_____
12   Page No._____Line No._____Change to:_____
13   _____
14   Reason for change:_____
15   Page No._____Line No._____Change to:_____
16   _____
17   Reason for change:_____
18   Page No._____Line No._____Change to:_____
19   _____
20   Reason for change:_____
21   Page No._____Line No._____Change to:_____
22   _____
23   Reason for change:_____
24   SIGNATURE:_____DATE:_____
25   MAYOR DAVE BING