UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN

Chapter 9
Case No. 13-53846-swr
Hon. Steven W. Rhodes

**RETIRED DETROIT POLICE MEMBERS ASSOCIATION'S
PRETRIAL BRIEF, PROPOSED FINDINGS OF FACT AND
PROPOSED CONCLUSIONS OF LAW**

The Retired Detroit Police Members Association ("RDPMA"), by and through its attorneys, Strobl & Sharp, P.C., without acknowledging the jurisdiction of this Court, the constitutionality of the City of Detroit's ("Debtor" or "Detroit") Chapter 9 bankruptcy filing, or the eligibility of Detroit to relief under Chapter 9 of the Bankruptcy Code, hereby submits this Pretrial Brief, Proposed Findings of Fact and Proposed Conclusions of Law in connection with the trial on its Objection to the Chapter 9 Petition filed by the City of Detroit. The RDPMA hereby adopts its Objection to the City of Detroit Chapter 9 Petition filed on August 18, 2013 [Docket #520] as if fully set forth herein

**I.
BURDEN OF PROOF**

Under Section 921(c) of the Bankruptcy Code, a municipality's bankruptcy petition must be dismissed if either the debtor did not file the petition in good faith or the debtor does not meet the requirements of Chapter 9. 11 USC § 921(c); *In re Valley Health Sys.*, 383 BR 156, 160 (Bankr. C. D. Cal. 2008) (despite permissive language of the statute, Section 921(c) requires dismissal if debtor is not eligible for relief under Chapter 9). Thus, an entity may be a debtor under Chapter 9 if the entity files its petition in good faith and meets the following requirements of Section 109(c):

1

(1) is a municipality;

(2) is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter;

(3) is insolvent;

(4) desires to effect a plan to adjust such debts; and

(5) (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

    (B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

    (C) is unable to negotiate with creditors because such negotiation is impracticable; or

    (D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 USC § 109(c). The debtor bears the burden of establishing that it meets each of those five statutory requirements of Section 109(c). *In re Valley Health*, 383 BR at 161; *In re County of Orange*, 183 BR 594, 599 (Bankr. C. D. Cal. 1995). As one court explained "[t]he bankruptcy court's jurisdiction should not be exercised lightly in Chapter 9 cases . . . .Considering the bankruptcy court's severely limited control over the debtor, once the petition is approved, access to Chapter 9 relief has been designed to be an intentionally difficult task." *In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 BR at 82.

In the instant matter, the City of Detroit must establish that the Michigan law under which it was purportedly authorized by Governor Richard Snyder to file this Chapter 9 proceeding is constitutional under the applicable provisions of the Michigan Constitution. Specifically, the City of Detroit, and to the extent it has argued this matter, the State of

Michigan, bear the burden of establishing that Public Act 436, in relevant part, did not violate Article II, Section 9 of the Michigan Constitution.

## II.
## PROPOSED FINDINGS OF FACT

1. The Michigan electorate rejected Public Act 4 of 2011 ("PA 4") in total on November 6, 2012.

2. As early as March 2012, the Michigan Department of Treasury was considering alternatives to PA 4 in the event it was rejected in the November 2012 general election.

3. Governor Richard Snyder and the State of Michigan, Department of Treasury participated in the drafting of the legislation that became Public Act 436 of 2012 ("PA 436").

4. PA 436 was presented to Governor Richard Snyder on December 20, 2012 for approval.

5. PA 436 was approved by Governor Richard Snyder on December 26, 2012.

6. Section 34 of PA 436 provides for appropriations in the amount of $780,000 for fiscal year ending September 30, 2013 to administer the provisions of PA 436, including for the payment of the salaries of emergency managers appointed thereunder.

7. Section 35 of PA 436 provides for appropriations in the amount of $5,000,000 for the fiscal year ending September 30, 2013 to administer the provisions of PA 436, including for the payment of professionals hired to assist emergency managers appointed thereunder.

8. Pursuant to the State of Michigan Comprehensive Annual Financial Report for the period ending September 30, 2012, the State of Michigan program revenues for operating expenses for fiscal year 2012 were $46,495,152,000. See RDPMA Trial Exhibit C.

9. The appropriation provisions included in PA 436 are *de minimis* relative to the State of Michigan overall budget and spending.

10. The appropriation provisions in Sections 34 and 35 of PA 436 were included to ensure that PA 436 could not be defeated by referendum. (See **Exhibit A**, Howard Ryan Deposition, October 14, 2013, p. 46, L 1 – 23)

11. The provisions in PA 436 regarding the determination of financial crisis and the appointment of an emergency manager are similar, if not identical in all critical aspects, to such provisions in PA 4. (See **Exhibit B**)

12. The provisions in PA 436 regarding the filing of a Chapter 9 petition by an emergency manager are similar, if not identical in all critical aspects, to such provisions in PA 4. (See **Exhibit B**)

13. PA 436 was implemented for the same reasons PA 4 was passed. (See **Exhibit C**, Treasurer Andrew Dillon Deposition, October 10, 2013, p. 34, L 3 – 5)

14. PA 436 was not subject to referendum under the Michigan Constitution due to the inclusion of Sections 34 and 35.

15. There was no general election in the State of Michigan after PA 4 was referred to the people of the State of Michigan for referendum and the approval of PA 436 by Governor Snyder on December 26, 2013.

### III.
### PROPOSED CONCLUSIONS OF LAW

1. Article II, Section 9 of the Michigan Constitution grants the power of referendum to the people of the State of Michigan with respect to all laws except with respect to acts containing appropriations for state institutions or meeting deficiencies in state funds.

2. Article II, Section 9 of the Michigan Constitution requires that no law that has been rejected by referendum can become effective thereafter unless approved by a majority of the voters at the next general election.

3. PA 4 was properly rejected by the Michigan voters pursuant to Article II, Section 9 of the Michigan Constitution.

4. The inclusion of the appropriation provisions in Sections 34 and 35 of PA 436 was an improper attempt to subvert the right of referendum provided to the people of the State of Michigan in Article II, Section 9 of the Michigan Constitution.

5. Article II, Section 9 of the Michigan Constitution required that the provisions of PA 436 be submitted to the general electorate before being enacted.

6. PA 436 violates Article II, Section 9 of the Michigan Constitution.

7. The provisions of PA 436 which provide for the determination of financial crisis and the appointment of an emergency manager and for the filing of a Chapter 9

4

petition by an emergency manager are unconstitutional under Article II, Section 9 of the Michigan Constitution.

8. The appointment of Kevyn Orr as the emergency financial manager over the City of Detroit was not properly authorized by PA 436 as PA 436, to the extent it provides for the appointment of an emergency manager by the governor of the State of Michigan, is unconstitutional under Article II, Section 9 of the Michigan Constitution.

9. The filing of this Chapter 9 Petition by the City of Detroit was not properly authorized by PA 436 as PA 436, to the extent it provides for the authorization by the governor of the State of Michigan of the filing of a Chapter 9 petition by emergency manager, is unconstitutional under Article II, Section 9 of the Michigan Constitution.

10. The filing of this Chapter 9 Petition by Kevyn Orr is not properly authorized by the laws of the State of Michigan.

11. The City of Detroit is not specifically authorized by the laws of the State of Michigan or by any properly authorized governmental officer or organization empowered by the laws of the State of Michigan, law to be a debtor under Chapter 9 of the Bankruptcy Code as required by Section 109(c) of the Bankruptcy Code.

## IV.
## ARGUMENT

The State of Michigan (the "State") has presented in oral argument the only response to the RPDMA's objection to eligibility based on the failure of PA 436 to comply with Article II, Section 9 of the Michigan Constitution. The State refutes the argument that PA 436 was passed in violation of the Michigan constitutional requirement that grants citizens of Michigan the power of referendum. In oral argument, counsel for the State, relied solely on the findings of the Michigan Court of Appeals in the case of *Reynolds v. Martin,* 240 Mich. App. 84 (2000), in support of the argument that PA 436 is constitutional. However, counsel for the State has misrepresented the factual application and the importance of *Reynolds* to this case.

In *Reynolds*, the Court analyzed a provision of the Bingo Act, MCL 432.103(6) (the "Bingo Act"), which authorized political candidate committees to conduct bingo activities. 240

5

Mich. App. 84 (2000). In 1994, the Michigan Legislature passed Public Act 118 ("PA 118"), which amended the Bingo Act to exclude all political committees from conducting bingo. Individual citizens petitioned for a statewide referendum on PA 118. However, a question regarding the validity of the signatures on the petition created a delay before the matter could be placed on the statewide ballot. *Reynolds*, 240 Mich. App. at 88. During the period of time the signatures were under review, the Legislature enacted 1995 PA 275 ("PA 275"), an almost identical bill to PA 118. 240 Mich. App. at 89. Following several judicial proceedings, it was determined that the signatures collected in regard to PA 118 were valid, and the referendum was certified for the 1996 general election. 240 Mich. App. at 90. During the 1996 election, 1994 PA 118 was rejected by the majority of the voters. *Id*. When the Plaintiffs filed an application for a bingo license, they were denied based upon the amended statute, PA 275. *Id*. The Plaintiffs in *Reynolds* challenged PA 275 on the grounds that it violated the constitutional right of referendum. In reviewing the referendum provisions of the Michigan Constitution, the *Reynolds* court held that the Michigan Legislature did not undermine the peoples' referendum authority when it passed PA 275 because there had been an intervening general election after PA 118 was referred for a referendum vote and prior to the enactment of PA 275.

In analyzing *Reynolds* with the case at hand, the State of Michigan has misled this Court with respect to the key aspects of the case. Of paramount importance to the *Reynolds* court was the protection of the peoples' right of referendum. The *Reynolds* court looked to the Michigan Supreme Court case *Michigan Farm Bureau v. Secretary of State*, 379 Mich. 387 (1967) in support of its conclusion that PA 275 was valid. In *Michigan Farm Bureau*, the Michigan Supreme Court held that the Michigan Legislature could not subvert the right of referendum with respect to an act involving the implementation of daylight savings time by

6

simply passing the act annually early in the session and repealing it prior end of the session. Actually, *Michigan Farm Bureau* supports the position that PA 436 is unconstitutional. The *Reynolds* court noted that the Supreme Court in *Michigan Farm Bureau*

> was concerned that, with respect to the rather unique legislative issue presented there, a contrary result [not allowing the referendum petition] would have meant that the people might never be afforded the referendum right to express at a general election their will with respect to the enacted law…The Court's ruling thus prevented 'outright legislative defeat, not just hindrance, of the people's reserved right' to a referendum.

*Reynolds*, 240 Mich. App. at 93-94 (citing *Michigan Farm Bureau*, 379 Mich. at 394). The *Reynolds* court further stated that:

> The only logical and consistent interpretation is that when an act of the legislature is referred, that particular act is suspended in its operation, but that such suspension does not deprive the legislature of the right thereafter to pass, **in the legal manner** any measure it may deem advisable, notwithstanding such measure may deal with exactly the same subject as the referred act, and in the same manner, **but subject, or course, to the same right of reference as was the original act.**

*Michigan Farm Bureau*, 379 Mich. at 396 (*quoting McBride v. Kerby*, 32 Ariz. 515 (1927))(emphasis added).

The most important consideration to the *Reynolds* court was the fact that the peoples' right to referendum was preserved with respect to PA 118 as well as PA 275. In fact, the *Reynolds* court specifically noted that "**should the legislators not be responsive to the will of the people expressed at the referendum vote, the second legislation itself is "subject . . . to the same right of reference as was the original act.**" *Reynolds*, 240 Mich. App. at 100 (citations omitted)(emphasis added).

When reviewing Article II, Section 9 of the Michigan Constitution and its application to PA 436, this Court must be mindful of the well-settled principles of the construction of

7

constitutional provisions. The Michigan Supreme Court has noted that the dominant principle to the analysis of constitutional provisions is the maxim that such provisions are to be construed in accordance with "common understanding." *American Axle & Mfg., Inc. v. Hamtramck*, 461 Mich. 352, 363 (2000)(citation omitted). The *Reynolds* court noted that "[w]hen interpreting the constitution the primary duty of the judiciary is to 'ascertain as best the Court may, the general understanding and therefore the uppermost or dominant purpose of the people when they approved the provision or provisions.'" *Reynolds,* 240 Mich. App. at 86-87 (citations omitted). Moreover, the Michigan Supreme Court in *Kuhn v. Dep't. of Treas.*, 382 Mich. 378 (1971), noted specifically that "under a system of government based on grants of power from the people, constitutional provisions by which the people reserve to themselves a direct legislative voice ought to be liberally construed." *Kuhn,*. 384 Mich. at 385. In other words, the right of referendum as provided for in the Michigan Constitution is to be liberally construed in favor of the people.

In the instant case, not only was the right of referendum not protected with respect to PA 436, the Governor, the Michigan Department of Treasury and Michigan Legislature specifically intended to deprive the Michigan citizens of their right of referendum. In an effort to undermine the will of the people as demonstrated in the November 2012 general election, insignificant spending provisions were tacked on to PA 436, an act that is essentially identical to the rejected PA 4 with respect to the power of the governor to appoint emergency managers and to authorize the filing of a Chapter 9 proceeding. Unlike in *Reynolds*, PA 436 has never been presented to the statewide general election and therefore the peoples' right to referendum has been improperly denied. As this Court noted, the Governor, the Department of Treasury and the Michigan

Legislature have made a mockery of the Michigan Constitution and the peoples' right of referendum.

V.
CONCLUSION

Based upon the foregoing, Public Act 436 should be found to be unconstitutional under Article II, Section 9 of the Michigan Constitution and therefore the City of Detroit has failed to establish that it is eligible for Chapter 9 relief under Section 109(c) and Section 921(c). Therefore, this case must be dismissed.

Respectfully Submitted,

**STROBL & SHARP, P.C.**

/s/ Lynn M. Brimer
LYNN M. BRIMER (P43291)
MEREDITH E. TAUNT (P69698)
MALLORY A. FIELD (P75289)
Attorneys for the Retired Detroit
Police Members Association
300 East Long Lake Road, Suite 200
Bloomfield Hills, MI 48304-2376
Telephone: (248) 540-2300
Facsimile: (248) 645-2690
E-mail: lbrimer@stroblpc.com
mtaunt@stroblpc.com
mfield@stroblpc.com

Dated: October 17, 2013

*S&B\85244\001\PLDG\SB431916.DOCX