## Page 1

```
IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
Case No. 13-53846; Hon. Steven W. Rhodes
-----------------------------------------X

In re:   Chapter 9

CITY OF DETROIT, MICHIGAN,

Debtor.

-----------------------------------------X




            DEPONENT: KENNETH A. BUCKFIRE
            DATE: Friday, September 20, 2013
                   TIME: 8:30 a.m.
```

## Page 2

```
                    September 20, 2013
                         8:33 a.m.



         Deposition of KENNETH A. BUCKFIRE, held
at the offices of JONES DAY, 222 East 41st Street,
New York, New York pursuant to Notice before
DANIELLE GRANT, a Shorthand Reporter and Notary
Public of the State of New York.
```

## Page 3

```
APPEARANCES:

JONES DAY
By:  THOMAS CULLEN
     BENJAMIN ROSENBLUM
222 East 41st Street
NEW YORK, NEW YORK 10017
Appearing on behalf of the Debtor

SALANS FMC SNR DENTON
By: CLAUDE D. MONTGOMERY
620 Fifth Avenue
New York, NY 10020.2457
212.632.8342
Appearing on behalf of Retirees Committee

COHEN WEISS AND SIMON LLP
By:  THOMAS N. CIANTRA
330 West 42nd Street
New York, NY 10036.6979
212.356.0216
Appearing on behalf of UAW
```

## Page 4

```
APPEARANCES (continued):

LOWENSTEIN SANDLER LLP
By:· JOHN K. SHERWOOD
65 Livingston Avenue
Roseland, NJ 07068
973.597.2374
Appearing on Behalf of AFSCME

CLARK HILL PLC
By: SHANNON L. DEEBY (appearing via Telephone)
500 Woodward Avenue, Suite 3500.
Detroit, MI 48226
313.965.8274
Appearing on behalf of Retirement Systems

WILLIAMS WILLIAMS RATTNER & PLUNKETT PC
By: NOT PRESENT, Jr.
380 N Old Woodward Ave Ste 300
Birmingham, MI 48009
248.642.0333
Appearing on behalf of FGIC
```

Page 13

1    K. Buckfire
2 joined the record.
3    A    Since the founding of the firm in
4 2002.
5    Q    2002.  And what is your formal
6 position with Miller Buckfire?
7    A    Co-president.
8    Q    Who is the other co-president?
9    A    Norma Corio, C-O-R-I-O.
10    Q    Does Miss Corio have any roll in
11 connection with the City of Detroit engagement
12 of which you are employed?
13    A    Yes.
14    Q    What is her role?
15    A    She is overseeing the process by
16 which we are securing debtor and possession of
17 financing for the City.
18    Q    And what is your role in
19 connection with the City of Detroit bankruptcy?
20    A    I'm the senior banker at Miller
21 Buckfire responsible for advising the emergency
22 manager in the City of Detroit on all aspects
23 of financial strategy and restructuring
24 alternatives, including potential exchange
25 offers, debt for equity conversions, and other

Page 14

1    K. Buckfire
2 potential transactions that might be required
3 to effectuate a restructure.
4    Q    And this current role began when,
5 sir?
6    A    January of 2013.
7    Q    And I believe you indicated in
8 your prior deposition that you had other roles
9 in connection with the City of Detroit; is that
10 correct?
11       Let me rephrase the question if
12 you don't understand it.  Prior to your current
13 engagement, had you done work for either the
14 City or the State in connection with the City
15 of Detroit?
16    A    Yes, in 2012 we had a two-month
17 engagement with the State the Michigan to
18 evaluate the City's financial condition.
19    Q    Was that July 2012?
20    A    I believe it was July.
21    Q    Prior to that, any engagement if
22 connection with the City of Detroit?
23    A    No.
24    Q    And after that was there an
25 intermediate role prior to your current one?

Page 15

1    K. Buckfire
2    A    No.
3    Q    In January of 2013, was the scope
4 of your engagement changed in any way?
5    A    Yes, the scope of our engagement
6 in January was to continue our role as
7 evaluating the City's financial condition from
8 a solvency perspective, and advise the City on
9 what they might be able to do to create more
10 liquidity or deal with their liabilities.
11    Q    And did you reach any conclusions
12 in connection with the solvency or how the City
13 should deal with its liabilities?
14    A    Not until May.
15    Q    And did you reach any conclusions
16 in May regarding solvency?
17    A    Yes.
18    Q    What was that conclusion, sir?
19    A    That the City was insolvent.
20    Q    And did you report that conclusion
21 to anyone?
22    A    Yes, I did.
23    Q    And in what form did that report
24 take?
25    A    It was on oral report to the

Page 16

1    K. Buckfire
2 emergency manager.
3    Q    And when did you give that oral
4 report to the emergency manager?
5    A    In early May.
6    Q    Can you be more precise than early
7 May?
8    A    No.
9    Q    Would it be before May 7, by any
10 chance?
11    A    It could have been, but I don't
12 recall exactly.
13    Q    You don't recall exactly, okay.
14       And did you give any advice to the
15 emergency manager on how he should deal with
16 his creditors in connection with your report on
17 solvency?
18    A    Yes, I advised him that the City's
19 financial condition was so dire that we had to
20 take immediate steps to preserve the City's
21 liquidity so that it would be in jeopardy of
22 losing essential public services, and we
23 identified the need to negotiate with the swap
24 counterparties, which I previously to in this
25 case, as an immediate and urgent priority of

Page 17

K. Buckfire

the City.

Q   And when you say you previously testified, are you speaking of your deposition which took place on August 29, 2013?

A   Correct.

Q   And in what form did your report to Mr. Orr -- let me rephrase it.

What form did your report to Mr. Orr take?

A   Verbal.

Q   And was is it delivered at exactly the same time as your report on solvency or at a later time?

A   It was all part of the same discussion.

Q   And how long did this discussion take place -- let me rephrase the question.

How long was a conversation was it?

A   It was a lengthy conversation. We were not the only ones present at the time.

Q   Who else was present in the room at the time?

A   Representatives of Conway

Page 18

K. Buckfire

McKenzie, Ernst and Young and Jones Day.

Q   Was this a report by you or an interactive conversation?

A   Conversation.

Q   Was counsel present?

A   Jones Day.

Q   So you have Conway McKenzie, Miller Buckfire Jones Day, any other organizations represented in that meeting?

A   Ernst and Young.

Q   Any others?

A   Not that I recall.

Q   Who from Ernst and Young was that?

A   Gaurav Malhotra.

Q   Anyone else from his shop?

A   I don't recall.  I'm sure there were but I can't recall who it was.

Q   Anyone else from Buckfire Miller there?

A   Miller Buckfire.

Q   Miller Buckfire, sorry.

A   You're forgiven.

Q   Let me rephrase the question.  Was there anyone else from your institution in that

Page 19

K. Buckfire

conversation with the emergency manager?

A   Yes, Mr. James Doak, D-O-A-K.

Q   Anyone else that you can recall?

A   No.

Q   And what was Mr. Doak's role in that conversation?

A   He didn't really have much to say. It was primarily a report I was giving on behalf of the firm.

Q   I think you indicated a moment ago that the conversation was interactive?

A   Yes.

Q   Who else participated in the conversation, specifically?

A   I can't recall.

Q   Did Mr. Mohatra participate in the conversation?

A   I'm sure he did but I can't recall what he said.

Q   Okay.  Did Mr. Moore participate in the conversation?

A   I'm believe he did.

Q   Can you recall anything about what Mr. Moore said?

Page 20

K. Buckfire

A   No.

Q   Can you recall anything that Mr. Orr said during that conversation?

A   Yes, he agreed, having reviewed the financial forecast provided by Ernst and Young that the situation was indeed very serious and, he agreed with my recommendation that we immediately formulate a strategy to preserve the City's cash flow.

Q   Had you seen Mr. Mohatra's forecast prior to that meeting?

A   No.

Q   Were you able to review it during the meeting?

A   Yes.

Q   And what conclusions, if any, did you reach with regard to that forecast during that meeting?

A   I was shocked at how much worse the situation was than I had imaged before that.

Q   Now, I believe you indicated to me earlier that you were engaged to review the City's solvency?

Page 33

K. Buckfire
Q  That will help.
A  It's a confidential assignment for a company which in the zone of insolvency so I can't tell you which company it is, but we've been working with them on that particular engagement since last January, January of 2012.
Q  And prior to January of 2012, can you recall any engagements on which you and Jones Day were on the same side?
A  Well, my firm has worked with Jones Day very actively over the ten years, primarily in auto parts companies in which we are involved, as is Jones Day. I personally have not worked with Jones Day in any of those cases.
Q  Thank you. We're going to switch topics now, Mr. Buckfire.
   In connection with your review for Mr. Orr on the solvency of the City, did you look at a balance sheet for the City?
A  Yes.
Q  And do you know if that balance sheet has been produced by the City in connection with the discovery in the

Page 34

K. Buckfire
eligibility dispute?
A  Well, we've produced a tremendous amount of financial information including balance sheets, both historical as audited by the City's auditors, and more recent analyzes produced by Ernst and Young.
   MR. MONTGOMERY: Can you confirm that,   Mr. Rosenbloom?
   MR. ROSENBLOOM: I'm not aware of any balance sheet.
   MR. MONTGOMERY: You're not representing the City, you're representing Mr. Buckfire; is that right. Rosenbloom?
   MR. ROSENBLOOM: I'm representing the City and Mr. Buckfire. I'm not aware of any balance sheet document that we have not produced.
Q  Can you recall from your memory, sir, what the asset side of that balance sheet totaled as of any date prior to your meeting with Mr. Orr?
A  No.
Q  Are you familiar with the June 14

Page 35

K. Buckfire
creditor proposal?
A  Yes.
Q  Is there a balance sheet contained in that presentation?
A  Not in conformity with what you would consider generally accepted accounting principles. It's more of a market-to-market analysis of the true liabilities of the City.
Q  Is there any presentation, document, or section of the report that quantifies the asset side of the City's balance sheet?
A  Not that I recall.
Q  But it is your testimony, Mr. Buckfire, that you have seen a document that quantifies the asset side of the City's balance sheet?
A  Well, the City has produced an annual report for a hundred years, and most recent of which in 2012 is in the data room, which I reviewed.
Q  Okay. Sir, are all of the City's assets of which you are aware on that balance sheet that appears in the City's data room?

Page 36

K. Buckfire
A  I don't understand your question.
Q  Are there any assets that the City owns of which you are aware that are not included on the balance sheet which you say is in the City's data room?
A  I have to assume that the City's balance sheet as audited reports fairly the financial condition of the City and therefore incorporates all of the assets in which it owns.
   MR. MONTGOMERY: I'm going to ask the court reporter to mark as Buckfire Exhibit 2, the credit proposal as it appears attached to the Orr declaration as Exhibit A, which is docket 11, Exhibit 1.
   (June 14 report and proposal was marked as Buckfire Exhibit No. 2 for identification, as of this date.)
Q  Mr. Buckfire, I've handed you what has been marked as Buckfire Exhibit No. 2. Have you seen this before?
A  Yes.

Page 37

1  K. Buckfire
2  Q  What is it, sir?
3  A  It's the June 14 report and
4  proposal to creditors.
5  Q  Did you participate in its
6  preparation?
7  A  No.
8  Q  Would you turn to page 118 on that
9  document, which I believe is has a slightly
10  different docket reference?
11  A  Is this the page that says "A
12  preliminary transition advisory board"?
13  Q  No.
14  MR. CULLEN:  Is it 118 of the
15  document or --
16  MR. MONTGOMERY:  Forgive me.  Off
17  the record for a moment.
18  (Discussion off the record.)
19  Q  Page 113 of the document, which is
20  also page 120 of 135.
21  A  Calendar of contacts?
22  Q  Yes.  You see that you are
23  identified as a contact?
24  A  Yes.
25  Q  Do you know why you are identified

Page 38

1  K. Buckfire
2  as a contact in connection with this document?
3  A  Yes.
4  Q  Please?
5  A  To allow for creditors to call and
6  ask me questions about the information and
7  proposal contained within this plan.
8  Q  Okay.  So is it your testimony,
9  Mr. Buckfire, that you played no role in the
10  creation of this document?
11  A  Aside from some minor stylistic
12  changes, no.
13  Q  Had you reviewed it prior to its
14  submission to creditors on June 14?
15  A  Yes.
16  Q  When did you first see a draft of
17  this document?
18  A  It was about two weeks prior.
19  Q  And you, I believe you just
20  indicated you made some minor edits?
21  A  That's right.
22  Q  Can you recall what sections of
23  the document you thought required minor
24  editing?
25  A  No.

Page 39

1  K. Buckfire
2  Q  Does this document reflect in any
3  way the substance of conversations you had with
4  Mr. Orr?
5  A  Yes.
6  Q  How so, sir?
7  A  I've had many conversations with
8  Mr. Orr and the advisors to Mr. Orr over the
9  course of our engagement, and this document
10  reflects a consensus amongst all of us as to
11  the condition of the City and recommendation
12  and what to do about it.
13  Q  So is it your testimony, sir, that
14  you endorse or support the recommendations that
15  are contained in this document?
16  A  Yes.
17  Q  Is it your testimony that to the
18  best of your understanding the facts presented
19  in this document are accurate?
20  A  To my understanding, yes.
21  Q  Is there anything in this document
22  that you have challenged to Mr. Orr?
23  MR. CULLEN:  Objection,
24  foundation, form.
25  You can address the question if

Page 40

1  K. Buckfire
2  you understand it.
3  A  I can't answer it.
4  Q  Have you in any way suggested to
5  Mr. Orr that the June 14 creditor proposal
6  contains inaccuracies?
7  A  No.
8  Q  Have you in any way suggested to
9  Mr. Orr that the June 14 creditor proposal
10  contains omissions in your mind?
11  MR. CULLEN:  Material omissions,
12  is that what you mean?
13  MR. MONTGOMERY:  Yes.
14  A  No.
15  Q  Now, sir, if you would look at
16  page 7, which is also marked as page 14 of
17  docket 11-1, I'll try to use both numbers.
18  A  It's the page entitled "The City
19  is insolvent"?
20  Q  Indeed it is.
21  A  Okay.
22  Q  Do you believe that each of the
23  statements that appear on this page are
24  accurate?
25  A  Well, it's based on the work of

Page 41

K. Buckfire
Ernst and Young and Conway McKenzie. I have no reason to doubt their accuracy.
  Q  Other than the work by Conway McKenzie and Ernst and Young, do you have any reason to believe that the statements here are true, other than -- let me rephrase the question.
     I think you just said that it's Ernst and Young and Conway McKenzie who formed -- gave you the information that forms the basis of this statement; is that correct?
  A  That's correct.
  Q  And so I'm simply asking you if you have an independent reason to believe these are accurate?
  A  I relied on their professional judgment and work to produce this information.
  Q  Okay. And I think that means you have no other reason to believe that this information is accurate.
  A  I don't understand the question.
     MR. CULLEN:  Objection to foundation and form.
  Q  Has Miller Buckfire done any work

Page 42

K. Buckfire
to confirm the accuracy of the statements made on page 14 of docket 11-1 -- has Miller Buckfire done any work to confirm the statements that are on page 14 of docket 11-1?
     MR. CULLEN:  May I ask, Counsel, do you mean the actual numbers or the overall conclusion? It's a little vague.
  Q  I'm going to rephrase the question. You have said today that you believe the statements that are contained on page 7, which is of this document, that they are accurate. Did I understand that correctly?
  A  I'm relying on the work of other professional as I'm entitled to do.
  Q  I was not challenging your entitlement one way or the other, I was simply asking you if you had any basis other than the work of Conway McKenzie and Ernst and Young to reach the conclusion that the statements on this page are accurate?
  A  Are you asking if I audited their work?
  Q  No, I'm just asking the very

Page 43

K. Buckfire
simple question, do you have any other reason to believe that these statements are correct other than the good work by Ernst and Young and Conway McKenzie?
  A  I am highly confident they did excellent work.
  Q  I'm not asking you how good the work is, I'm asking you if you have any other reason to believe these statements are accurate?
  A  Honestly I don't know how to answer that question, I'm sorry.
  Q  Okay, let's turn to the next page. You will see that there is a statement there that, "The City is not paying their debts as they come due."
     Do you see that statement, sir?
  A  I do.
  Q  You believe that to be an accurate statement?
  A  Yes, I do.
  Q  You'll see that the first bullet is "The City is not making its pension contributions as they come due."

Page 44

K. Buckfire
     Do you believe that to be an accurate statement?
  A  I do.
  Q  You'll also see in there that there is a reference to the deferral of pension contributions?
  A  Yes.
  Q  You see that one of those statements is that, "As of May 2013, the City had deferred approximately 54 million in pension contributions related to current or prior periods and will defer approximately 50 million on June 30, 2013 for current year PFRS pension contributions."
     Do you see that?
  A  Yes.
  Q  To your understanding is that a true statement?
  A  To my understanding, yes.
  Q  Okay. And what is the basis of your understanding, sir?
  A  Reports from Ernst and Young and Conway McKenzie.
  Q  Anything else?

Page 49

1  K. Buckfire
2  A  No.  The alternative would be for
3  the City to make the payment as schedule and
4  thereby render itself cash insolvent.
5  Q  So I'm asking you how it is that a
6  deferral increases liabilities, which is a
7  statement you made to me.
8  A  If debt is due, that would be a
9  reduction of liabilities.  If you don't make
10 the payment, then that becomes an increase in
11 liabilities.
12 Q  Is it not correct, sir, that if
13 you make a payment on the liabilities, you
14 reduce the liabilities but you also reduce your
15 assets?
16 A  Cash.
17 Q  That's an asset, is it not?
18 A  That is correct.
19 Q  If you defer a liability you do
20 not affect either the sum of the liabilities or
21 the sum of the assets that are available.
22 A  That's true.
23 Q  So I ask you again, sir, how is it
24 that a deferral increases liabilities?
25 A  Because the alternative would be a

Page 50

1  K. Buckfire
2  reduction of liabilities.
3  Q  So a failure to reduce liabilities
4  is the same as an increase in liabilities?
5  A  Well, in the case of a requirement
6  to make a payment, you're required to make that
7  payment, that would be a reduction of
8  liabilities and a reduction of cash.  If you
9  are able to defer or unilaterally not make that
10 payment, of course the liabilities would be
11 unchanged, that represents an increase in
12 liabilities from what you were legally required
13 to do.
14 Q  You've said that a failure to
15 timely reduce liabilities acts as an increase
16 in liabilities.  Did I hear that correctly?
17 A  From what you are suppose to have
18 done.
19 Q  But the -- is it not correct that
20 the failure or ability to defer a debt also
21 leads the asset side of your balance sheet
22 unchanged?
23 A  Yes.
24 Q  Thank you.  Do you happen to know
25 if the City actually issued notes in connection

Page 51

1  K. Buckfire
2  with these deferrals of pension obligations
3  that are referred to on docket 11-1, page 15?
4  A  No.
5  Q  You will recall that as we were
6  looking at the first bullet, the statement,
7  "Will defer approximately  50 million on June
8  30, 2013 for a current year PFRS pension
9  contributions," was made, that statement was
10 made?
11 A  That statement was made.
12 Q  And I think you indicated that
13 that was an accurate statement to your
14 understanding?
15 A  To my understanding.
16 Q  Do you happen to know whether in
17 fact the City deferred the June 30, 2013
18 contribution?
19 A  No.
20 Q  So why did you believe that the
21 June 14 creditor proposal was accurate when it
22 said the City will defer  $50 million?
23 A  I don't understand the question.
24 Q  You said you don't know if they
25 actually deferred it.

Page 52

1  K. Buckfire
2  A  I assume they did.
3  Q  You assume they did, but you don't
4  actually know it?
5  A  That's what I testified to.
6  Q  And so I'm asking you, why is it
7  that you were confident that they were going to
8  defer it?
9  A  Because it was our conclusion that
10 the City had no cash and could not afford to
11 make this payment and therefore should not make
12 this payment.
13 Q  Was that one of the
14 recommendations you made to Mr. Orr?
15 A  It wasn't my recommendation.
16 Q  Who made that recommendation?
17 A  It was a collective recommendation
18 among all the advisors, but I did not
19 individually make that recommendation.
20 Q  Who first proffered the
21 recommendation for which the collective body of
22 advisors endorsed it?
23 A  I don't know.
24 Q  But you indicated that the
25 collective body did endorse it?

Page 65

K. Buckfire

your conclusion that it would be prudent the treat the pension as an unsecured claim flowed from that April letter?

A  No.

Q  Why did you reach the conclusion that it would be prudent financially for the City not to make any cash contributions to the pension plan?

A  It was part of a general review of all the City's liabilities, both funded and unfunded. That's what we were doing. Prior to the involvement of Conway McKenzie, Ernst and the Milliman, we really had no fact in which to base out analysis on what the City should do about its balance sheet and about its in ability to fund operations or to invest in quality of life.

That is why Conway, Ernst and Young and Milliman were retained, to do exactly that analysis.

Q  And as precisely as you can, sir, did you make a specific recommendation to Mr. Orr that no cash be contributed ed to the pension plans as part of the City's

Page 66

K. Buckfire

restructuring proposal, and when I say you I mean you personally?

MR. CULLEN: Objection, foundation, form, asked and answered. Address it again.

A  We were not singling out any particular creditor or body. Our recommendations were all about preserving cash for the City and whatever steps the City had to take to do so, it was part of a recommendation, including not paying our bond holders.

Q  And you made that recommendation following the April Milliman report?

A  No, I did not. I didn't testify to that. I testified we became aware of the seriousness of the issue in April. We did not form any conclusions until late May, early June.

Q  When, if ever, did you make a recommendation to Mr. Orr that the City not pay any cash to the retirement system as part of the restructuring proposal? The question is when.

MR. CULLEN: Objection,

Page 67

K. Buckfire

foundation, form. You're misstating the witness' testimony.

A  I just answered the question.

Q  When?

A  I've answered that already.

Q  You said May?

A  Late May, early June.

Q  Okay. You don't recall specifically when?

A  No.

Q  Do you recall specifically who heard the recommendation?

A  No.

Q  Was it oral?

A  Yes.

Q  Was it also in writing?

A  No.

Q  Who was present when the oral recommendation was made?

A  I don't recall.

Q  Mr. Orr was present, of course?

A  I believe so, but I can't be certain.

Q  You can't be certain as to whether

Page 68

K. Buckfire

Mr. Orr was present when you made an oral recommendation?

A  There were many, many conversations and meetings during that period of time. I can't recall who was at any particular one and when this issue came up or not. It was one of many other issues that had to be decided to perform this presentation. It's certainly not the only one and maybe not even the most important.

Q  What was the most important recommendation you made?

A  The decision whether or not to make the     $40 million payment to our cops bond holders on June 15.

Q  Why was that the most important in your judgment?

A  Because that would trigger an event of default on the part of the City which would immediately trigger other consequences related to the swap collateral agreement, which was a direct threat to the City's ability to operate in its ordinary course.

Q  Sir, if you would turn to -- back

Page 121

1       K. Buckfire
2       A   I suggested to him we figure out
3   how to do a better job of collecting taxes.
4       Q   I assume there was no disagreement
5   on that point?
6       A   Not that I recall.
7       Q   Do you know, Mr. Buckfire, whether
8   there has been more than one Compuware report
9   on the non-filers?
10      A   No.
11      Q   As the debtor's financial advisor,
12  do you have any assessment as to potential
13  value of collections from non-filers?
14      A   Well, in my judgment, and again,
15  speaking with my judgment, and I think that the
16  ability of the City to collect a material
17  amount of these delinquent payables is low.
18      Q   Why is that, sir?
19      A   For two reasons.  Number one, I
20  think many of the people who have not paid have
21  no capacity to pay.  We can't find them, or we
22  simply have no ability to enforce a judgment
23  against them.
24          And, secondly, the City ability
25  administratively to collect taxes has been

Page 122

1       K. Buckfire
2   proven to be quite low.  I think for those
3   reasons, the eventual ability to collect on
4   these receivables is low.
5       Q   I would like to hand you another
6   document that touches on this subject.  It's a
7   letter dated January 10, 2012, addressed to
8   Mr. Kenneth B. Cockrill, Chair, Budget, Finance
9   and Auditing Standing Committee, from
10  Cheryl Johnson, Group Executive Finance
11  Director, Office of the Mayor.
12          (Document, dated 1/10/12 was marked
13          as Buckfire Exhibit No. 10 for
14          identification, as of this date.)
15      Q   Mark this as Buckfire Exhibit 10.
16          Mr. Buckfire, have you seen
17  Deposition Exhibit Number 10 before?
18      A   No.
19      Q   Were you aware that the City
20  finance department had, in fact, identified
21  companies owing money to the City with balances
22  in excess of two thousand dollars?
23      A   No.
24      Q   Had you had any conversations with
25  Mr. Orr regarding corporate assessments of

Page 123

1       K. Buckfire
2   taxes due to the City?
3       A   No.
4       Q   Did you have any such
5   conversations with Mr. Malhotra?
6       A   No.
7       Q   With Mr. Moore?
8       A   About this report?
9       Q   Yes, A, about this report.
10      A   I've never seen this report, so
11  clearly, I didn't have any conversations about
12  it.
13      Q   Did you have any conversations
14  with either Mr. Malhotra or Mr. Moore about the
15  City's ability to identify corporate entities
16  that had not paid taxes to the City?
17      A   Not specifically, no.
18      Q   I think a few moments ago you
19  thought that it would be difficult to identify
20  and find people who owed money to the City.
21          Did I hear that correctly?
22      A   Individuals, yes.
23      Q   Is that true for corporations as
24  well?
25      A   There are fewer corporations and

Page 124

1       K. Buckfire
2   they're more visible, and it's probably a more
3   simple task to find them right now.
4           But this actually notes, since you
5   just gave it to me, that even they point out
6   they only had one accountant working on the
7   corporate sector, which gets to my second
8   points, which is the City's ability to collect
9   taxes is extremely low.
10      Q   Will that ability change as part
11  of the reorganization process?
12      A   If the City's allowed to maintain
13  its reinvestment plan, the expectation is it
14  will.
15      Q   And if the City's allowed to
16  continue with its reinvestment plan and
17  dedicates the appropriate resources, do you
18  believe that corporate taxes will be realized
19  by the City?
20      A   I believe that the projections
21  produced as part of the June 14 report, which
22  indicate certain expected revenues in the
23  future will be achievable.
24      Q   Do you believe that such
25  projections include improved tax collections?