Page 1

1              IN THE UNITED STATES BANKRUPTCY COURT
2                   EASTERN DISTRICT OF MICHIGAN
3                        SOUTHERN DIVISION
4
5    In re                        Chapter 9
6    CITY OF DETROIT, MICHIGAN,      Case No. 13-53846
7              Debtor.            Hon. Steven W. Rhodes
8    _____/
9
10   DEPONENT:  LAMONT SATCHEL
11   DATE:      Thursday, September 19, 2013
12   TIME:      11:00 a.m.
13   LOCATION:  MILLER CANFIELD PADDOCK & STONE PLC
14              150 West Jefferson, Suite 2500
15              Detroit, Michigan
16   REPORTER:  Jeanette M. Fallon, CRR/RMR/CSR-3267
17
18
19
20
21
22
23
24
25

Page 2

1    APPEARANCES:
2
3    JONES DAY
4    By:  Evan Miller
5    51 Louisiana Avenue, NW
6    Washington, D.C. 20001.2113
7    202.879.3939
8    -and-
9    MILLER CANFIELD PADDOCK AND STONE PLC
10   By:  Jonathan S. Green
11   150 West Jefferson, Suite 2500
12   Detroit, MI 48226.4415
13   313.496.7997
14        Appearing on behalf of the Debtor
15
16   DENTONS US LLP
17   By:  Anthony B. Ullman
18   620 Fifth Avenue
19   New York, NY 10020.2457
20   212.632.8342
21        Appearing on behalf of Retirees Committee
22
23
24
25

Page 3

1    APPEARANCES (continued):
2
3    COHEN WEISS AND SIMON LLP
4    By:  Joshua J. Ellison
5    330 West 42nd Street
6    New York, NY 10036.6979
7    212.356.0216
8        Appearing on behalf of UAW
9
10   LOWENSTEIN SANDLER LLP
11   By:  Sharon L. Levine
12   65 Livingston Avenue
13   Roseland, NJ 07068
14   973.597.2374
15   -and-
16   Matt Blumin (appearing telephonically)
17        Appearing on behalf of AFSCME
18
19   CLARK HILL PLC
20   By:  Sean Gallagher (appearing via LiveNote Streaming)
21   500 Woodward Avenue, Suite 3500
22   Detroit, MI 48226
23   313.965.8384
24        Appearing on behalf of Retirement Systems
25

Page 4

1    APPEARANCES (continued):
2
3    WINSTON & STRAWN LLP
4    By:  Bianca M. Forde (appearing via LiveNote Streaming)
5    200 Park Avenue
6    New York, NY 10166.4193
7    212.294.4733
8        Appearing on behalf of Assured Guaranty Municipal
9        Corp.
10
11   LIPPITT O'KEEFE, PLLC
12   By:  Anne Cubera Lipp (appearing telephonically)
13   370 E. Maple Road
14   Third Floor
15   Birmingham, MI 48009
16   248.646.8292
17        Appearing on behalf of the Retiree Association Parties
18
19
20
21
22
23
24
25

Page 57

1  A.  Not necessarily.  I don't ever recall having met with
2     Ed with counsel present.
3  Q.  Did you run those meetings prior to the appointment of
4     the EM?
5  A.  Which meetings?
6  Q.  If you met with Ed McNeil, did you run those meetings
7     prior to the appointment of the EM?
8  A.  Yes.
9  Q.  And after the appointment of the EM, were those
10    meetings run by Jones Day or somebody from the EM's
11    office?
12 A.  Which --
13        MR. MILLER:  Object to form.
14 A.  -- meetings?
15        MR. MILLER:  Go ahead.
16 Q.  Well, you testified, for example, that your processes
17    changed and that outside counsel was involved.
18 A.  For instance, if I had -- I mean, I have special
19    conversations all the time and to this date with
20    AFSCME so that's why I want to know what meetings.
21    Are you talking about negotiation meetings?
22 Q.  Negotiation meetings, meetings with regard to the
23    proposals that were made, for example, at the June
24    14 -- for example, the June 14 proposal?
25 A.  So that meeting, yeah, that meeting would have been

Page 58

1     handled by Jones Day, Mr. Easley.
2        MS. LEVINE:  Okay.  Thank you.  I have no
3     further questions.
4        MR. MILLER:  Now's a good time for a break.
5        (A brief recess was taken.)
6             EXAMINATION
7  BY MR. ELLISON:
8  Q.  Good afternoon, Mr. Satchel.  I'm Josh Ellison, I'm
9     the attorney representing the UAW in this matter.
10 A.  Good afternoon.
11 Q.  And same ground rules as you discussed with
12    Ms. Levine.  If you don't understand a question,
13    please let me know and I'll try to rephrase.  Try to
14    keep your responses oral so that the court reporter
15    can take them down.
16 A.  I will.
17 Q.  I believe you testified that you attended the meeting
18    on June 14th, 2013 with City employees and unions; is
19    that correct?
20 A.  If this is the meeting on the 13th floor of K-MAC,
21    yes.  I don't know if the date is right.
22 Q.  Okay.  Do you recall who else on behalf of the City
23    was at that meeting?
24 A.  It would have been -- present would have been myself,
25    I believe Wendy Brown, attorneys from Jones Day, I

Page 59

1     believe representatives from E&Y and from Milliman.
2  Q.  And was the Emergency Manager present?
3  A.  No.
4  Q.  Aside from the attorneys from Jones Day, anyone on the
5     Emergency Manager's team that was present do you
6     recall?
7  A.  Ms. Mays may have come down for a minute, but she
8     didn't stay long.  I think she came down to ask me a
9     question, an unrelated question, and may have left.
10 Q.  Okay.  And who if anyone did the speaking for the City
11    primarily at that meeting?
12 A.  The presentation was made by I believe Mr. Miller.
13 Q.  And did you discuss the meeting with anyone prior to
14    it occurring?
15 A.  Other than with the attorneys, no.
16 Q.  Did you discuss it with the mayor?
17 A.  I don't recall having a discussion with the mayor
18    regarding that meeting.
19 Q.  Do you know who Richard Baird is?
20 A.  I've heard of the name.  I don't know him.
21 Q.  Did you discuss it with him?
22 A.  No.
23 Q.  Do you know who Mike Duggan is?
24 A.  No.
25 Q.  Do you know who Andy Dillon is?

Page 60

1  A.  Yes.
2  Q.  Did you discuss it with him?
3  A.  No.  Mike Duggan?  Mike Duggan?
4  Q.  I believe he's a mayoral candidate.
5  A.  I know Mike, yes.
6  Q.  Was it discussed with him prior to the meeting?
7  A.  No.
8  Q.  And do you recall roughly how many -- very roughly how
9     many people attending this meeting aside from the City
10    representatives?
11 A.  I couldn't tell you off the top of my head.
12 Q.  Do you recall if any UAW representatives attended?
13 A.  Yes.
14 Q.  Who were they?
15 A.  I don't know who they were.  There was at least one, a
16    gentleman was there from the UAW, I believe it was an
17    attorney.
18 Q.  Do you recall what Mr. Miller said as to what feedback
19    attendees would -- they were expecting from attendees
20    if any?
21 A.  It was I think both before and after the proposal was
22    made and even during it when questions were taken,
23    Mr. Miller made it clear that the City would welcome
24    and in fact had solicited input or suggestions from
25    the -- those in attendance with respect to the items

Page 61

1    that were discussed in the deck.
2  Q.  Did Mr. Miller say that this meeting was a negotiation
3    session?
4  A.  I don't recall him making those -- stating those exact
5    words, but it was -- it had all the trappings of a
6    negotiation, it just wasn't labor negotiation in the
7    traditional sense of a labor negotiation over a
8    collective bargaining agreement, but it had all the
9    trappings of it, of a negotiation, to me.
10  Q.  Can you just -- what perhaps did it have that gave you
11    that impression?
12  A.  You had two or more parties engaged in the discussion
13    of a proposal that had been made, we had the
14    solicitation of a response to that proposal, a
15    willingness to cooperate and welcome any input from
16    the other party.  There was also an offer of
17    information to be provided to the parties to extent
18    that they wanted -- I think there was some discussion
19    about a data room that had been set up with the
20    parties.  The only thing missing was folk screaming at
21    me.
22  Q.  Did any of the union representatives offer a
23    counterproposal?
24  A.  I recall Mr. McNeil and a number of other union
25    officials proposing that the City take a look at the

Page 62

1    healthcare items that were negotiated and encompassed
2    in that purported tentative agreement.
3  Q.  What if anything was said about pension benefits?
4  A.  By who?
5  Q.  By the City representatives.
6  A.  I can't tell you exactly, but they had a -- there was
7    a handout that the City representatives walked through
8    with the -- with those in attendance.
9  Q.  And did that -- and did they indicate that pension
10    benefits would need to be reduced?
11  A.  As I recall the discussions were around freezing the
12    plan, going to a DC plan, there was an abundance of
13    information, financial information, discussed with
14    respect to the -- to the plans, but I don't recall
15    anyone ever saying -- saying such.
16  Q.  Did the City indicate there was any flexibility as to
17    what changes might need to be made to the pension, the
18    pension plan?
19  A.  Yeah, that was the whole purpose of it.  They were
20    engaging the unions and representatives from the
21    various pension boards and their advisors to get --
22    solicit input from them with respect to that topic.
23    The City had a proposal and wanted to know if
24    anyone had a proposal that -- or counterproposal they
25    would like to offer in that regard.

Page 63

1  Q.  Did anyone from the UAW say it was representing
2    retirees from UAW bargaining units at that meeting?
3  A.  I did not hear.
4  Q.  How long did the meeting take; do you recall?
5  A.  I know it was at least an hour, if not more.
6  Q.  Are you aware of Article 9, Section 24 of the Michigan
7    Constitution?
8  A.  Generally, yes.
9  Q.  Was that discussed at this meeting?
10  A.  By who?
11  Q.  By -- by anyone.
12  A.  I don't recall if anyone specifically discussed or
13    that was a topic of discussion.
14  Q.  Prior to the meeting do you recall any discussion of
15    Article 9, Section 24 of the Michigan Constitution?
16  A.  With who?
17  Q.  With anyone.
18  A.  With me and anyone?
19  Q.  Yes.
20        MR. MILLER:  Object to form.
21  A.  I've never had those discussions with anyone with
22    respect to --
23  Q.  So you've never discussed Article 9, Section 24 of the
24    Michigan Constitution with anyone from the City or the
25    Emergency Manager's team?

Page 64

1  A.  I've never discussed with anyone from the City -- from
2    the Emergency Manager's team -- and when you say
3    discuss, I mean, I've discussed with folk like in
4    passing what the -- you know, what the claim was but
5    I've never -- it wasn't any -- anything beyond that.
6  Q.  Well, what what claim was?
7  A.  Where some folk felt that there was a constitutional
8    provision that impacted pensions throughout the State.
9  Q.  Do you recall when the first such discussion you may
10    have had was?
11  A.  No, I don't.  It would have been with someone -- you
12    know, someone in my office.  Like I said, it's like,
13    you know, watercooler talk, it wasn't debate over the
14    merits of -- I haven't looked into the issue.
15  Q.  Now, prior to the meeting on the 14th did you discuss
16    with anyone from the City or the Emergency Manager's
17    team the City might need to file bankruptcy in order
18    to restructure its pension obligations?
19  A.  Could you restate that?
20        MR. ELLISON:  Can you just read that back,
21    please?
22        (Record read back as requested.)
23  A.  I've never had such discussions.
24  Q.  You didn't -- did you discuss it with Mayor Bing?
25  A.  I never had those discussions with Mr. Bing,

Page 69

1    MR. MILLER: Objection, asked and answered.
2 A.  Yeah, like I said, I would have seen this like right
3    before the meeting, would have taken a look at it.
4 Q.  Okay.  And who if anyone was the primary spokesman for
5    the City at this meeting?
6 A.  I think it would have been -- I think it may have been
7    Mr. Miller.
8 Q.  Do you recall what he said?
9 A.  I don't recall what he said, but it would have been
10    consistent with -- I mean, they just walked through
11    the slide deck, so.
12 Q.  Did he indicate that this was a negotiation session?
13    MR. MILLER:  Asked and answered.
14    MR. ELLISON:  I'm talking about the meeting
15    on the 20th, not the 14th.
16 A.  It was the same.  It was the same.  It was -- it had
17    all the trappings of a negotiation.  It wasn't the
18    traditional labor negotiation, but as I said, it had
19    all the trappings of a negotiation.
20 Q.  Did any of the unions offer a counterproposal?
21 A.  At that meeting?
22 Q.  Yes.
23 A.  Not that I'm aware of.
24 Q.  Was there a procedure for the unions or employees to
25    express their view?

Page 70

1 A.  If I'm not mistaken, City representatives after they
2    solicited responses gave folk a contact person, I
3    believe maybe from Jones Day, who they could contact
4    to provide any responses to or proposals.
5 Q.  So did the City invite unions or employees to speak up
6    at the meeting and express their views on the
7    proposal?
8 A.  Yeah, there was an opportunity for those in attendance
9    to speak too and many of them did.
10 Q.  And how did that work?
11 A.  I believe that may have been the meeting where folk
12    filled out cards and a good number of them spoke even
13    without the card or who submitted the card spoke to
14    their card when it was read, when the question was
15    read.
16 Q.  So people would fill out cards and they would be
17    submitted to the City and then read aloud; is that
18    correct?
19 A.  Yeah, the City would have them and read them and would
20    respond and if someone who submitted the question
21    would -- if they wanted to pose a question or had a
22    follow-up or some clarity with respect to that
23    question, they did.  You had others who just raised
24    their hand -- raised their hand and spoke out.
25 Q.  Would someone from the City call on someone who's

Page 71

1    raising their hand or would they just speak without
2    being asked?
3 A.  You had a little of both.  Some people raise their
4    hand, others just may have blurted out something.
5 Q.  Did any of the unions offer any counterproposals at
6    that meeting?
7 A.  I don't recall that any were offered at the meeting.
8 Q.  Did Mr. Miller or anyone else from the City discuss
9    pension benefits?
10 A.  On the 20th?  To the extent it was covered in the
11    slide deck, they would have.
12 Q.  Do you recall any specific statements that were made?
13 A.  I don't recall any specific statements.  I know -- I
14    know they walked through -- point by point through
15    this deck.  I recall that.  It was tedious, walked
16    through the deck, point by point.
17 Q.  Did the City indicate it was prepared to negotiate
18    over the pension?
19    MR. MILLER:  Objection, asked and answered.
20 A.  As I said before, it was the City both at the
21    beginning, at the end and even throughout answering
22    questions made it clear that they were soliciting
23    responses from the union with respect to their
24    proposal in terms of in this case pension they thought
25    were the issues and soliciting from the unions their

Page 72

1    proposal with respect to solving any pension issues
2    that the City had in terms of funding.
3 Q.  And do you recall if any UAW representatives said that
4    UAW was representing retirees from the UAW locals at
5    this meeting?
6    MR. MILLER:  Asked and answered.
7 A.  If they said that, I don't recall.
8 Q.  And do you recall a meeting on July 11th, 2013 with
9    unions?
10 A.  Yes, there would have been meetings.
11 Q.  And who was present for that meeting from the City or
12    the Emergency Manager?
13 A.  From the City it would have been I think Mr. Miller
14    and Mr. Heiman, maybe Mr. Easley, maybe Heather Lennox
15    may have been there, a representative from E&Y and
16    Conway MacKenzie.  I would have been there in and out
17    of that meeting.  Those are those that I can remember.
18 Q.  Did you discuss that meeting with anyone beforehand?
19 A.  Not that I recall, other than scheduling it, because
20    it was scheduled in my office so I would have had --
21    my office would have had discussions in terms of
22    scheduling the meeting.
23 Q.  And do you -- was there a primary spokesman for the
24    City at this meeting?
25 A.  I don't recall who it would have been.  Like I say, I

