Page 1

```
 1       IN THE UNITED STATES BANKRUPTCY COURT
 2           EASTERN DISTRICT OF MICHIGAN
 3                 SOUTHERN DIVISION
 4
 5   In re                        Chapter 9
 6   CITY OF DETROIT, MICHIGAN,   Case No. 13-53846
 7              Debtor.           Hon. Steven W. Rhodes
 8   _____/
 9              VIDEOTAPED DEPOSITION
10
11   DEPONENT:  KEVYN ORR
12   DATE:      Monday, September 16, 2013
13   TIME:      10:08 a.m.
14   LOCATION:  MILLER CANFIELD PADDOCK & STONE PLC
15              150 West Jefferson, Suite 2500
16              Detroit, Michigan
17   REPORTER:  Jeanette M. Fallon, CRR/RMR/CSR-3267
```

Page 2

```
 1   APPEARANCES:
 2
 3   JONES DAY
 4   By:  Gregory M. Shumaker
 5        Dan T. Moss
 6   51 Louisiana Avenue, NW
 7   Washington, D.C. 20001.2113
 8   202.879.3939
 9       Appearing on behalf of the Debtor
10
11   DENTONS
12   By:  Anthony B. Ullman
13   620 Fifth Avenue
14   New York, NY 10020.2457
15   212.632.8342
16       Appearing on behalf of Retirees Committee
17
18   COHEN WEISS AND SIMON LLP
19   By:  Peter D. DeChiara
20   330 West 42nd Street
21   New York, NY 10036.6979
22   212.356.0216
23       Appearing on behalf of UAW
```

Page 3

```
 1   APPEARANCES (continued):
 2
 3   LOWENSTEIN SANDLER LLP
 4   By:  Sharon L. Levine
 5   65 Livingston Avenue
 6   Roseland, NJ 07068
 7   973.597.2374
 8   -and-
 9   AFSCME
10   By:  Michael L. Artz
11        Tiffany Ricci
12   1101 17th Street, NW
13   Suite 900
14   Washington, D.C. 20036
15   202.775.5900
16       Appearing on behalf of AFSCME
17
18   CLARK HILL PLC
19   By:  Jennifer K. Green
20   500 Woodward Avenue, Suite 3500
21   Detroit, MI 48226
22   313.965.8274
23       Appearing on behalf of Retirement Systems
```

Page 4

```
 1   APPEARANCES (continued):
 2
 3   WILLIAMS WILLIAMS RATTNER & PLUNKETT PC
 4   By:  Ernest J. Essad, Jr.
 5   380 N Old Woodward Ave Ste 300
 6   Birmingham, MI 48009
 7   248.642.0333
 8       Appearing on behalf of FGIC
 9
10   SIDLEY AUSTIN LLP
11   By:  Guy S. Neal (appearing via LiveNote Streaming)
12   1501 K St., NW
13   Washington, D.C.
14   202.736.8000
15       Appearing on behalf of National Public Finance
16       Guarantee Corp.
17
18   WINSTON & STRAWN LLP
19   By:  Bianca M. Forde (appearing via LiveNote Streaming)
20   200 Park Avenue
21   New York, NY 10166.4193
22   212.294.4733
23       Appearing on behalf of Assured Guaranty Municipal
24       Corp.
25   ALSO PRESENT:  Mark Meyers, videographer
```

Page 21

1 Q. Did I -- were you done?
2 A. No, no, I was done, yeah.
3 Q. Okay. And were your credentials presented that
4    presented you as primarily as a bankruptcy lawyer?
5 A. As primary as a bankruptcy and restructuring attorney,
6    yes.
7 Q. And was there any discussion specifically of the
8    possibility of a Chapter 9 filing at this
9    presentation?
10 A. I don't think so. I don't recall -- I don't -- I
11    don't -- I don't recall, and the reason I say I don't
12    recall is there -- no, wait a minute. I don't know if
13    there was a discussion about the City. There was a
14    discussion about other Chapter 9 cases, other cities.
15 Q. And what specifically do you recall being said about
16    the Chapter 9 filings in the other cases? Let me put
17    it this way. Did Jones Day refer to experience it had
18    in doing other Chapter 9 filings?
19 A. Yes, yes, various members of the team referred to that
20    experience, yes.
21 Q. And is it fair to say that the Chapter 9 experience
22    was a substantial part of the pitch that Jones Day was
23    making to this committee?
24 A. No.
25         MR. SHUMAKER: Object to the form.

Page 22

1 A. No, it was a component of the presentation.
2 Q. That -- you said there was a written presentation or
3    written material?
4 A. There was a book, yes, there were written materials.
5 Q. And do you know whether that's been produced?
6 A. I do not.
7         MR. ULLMAN: I would like to call for the
8    production of that, please.
9         MR. SHUMAKER: We'll look into it. I would
10    ask here that if you're going to ask for documents
11    throughout the deposition, that you follow-up with a
12    letter and email.
13         MR. ULLMAN: Sure.
14 Q. And do you recall whether there was any discussion at
15    this presentation as to the major problems that were
16    facing Detroit at the time?
17 A. I think there were discussions about Detroit's issues,
18    various issues at the time, yes.
19 Q. And do you recall any discussion about the issues that
20    Detroit was facing regarding its pension liabilities?
21 A. I don't recall specific discussions and -- no, I don't
22    recall specific discussions but there may have been.
23 Q. Okay. And the same question for retirement benefits
24    in general apart from pension benefits. Do you recall
25    any discussion of that?

Page 23

1 A. I don't recall specific discussions, but there may
2    have been. The discussions were more at a high level
3    as opposed to detailed level.
4 Q. And do you recall at a general level there being
5    discussion that Detroit was facing major issues
6    regarding its pension and other retirement benefit
7    liabilities?
8 A. I know, to be candid with you, the pitch book
9    contained the information regarding employee benefits
10    and labor attorneys. One of the attorneys on the team
11    was a labor attorney, but I don't recall there being
12    specific discussions in detail about those issues.
13 Q. Do you recall in general at the committee discussion
14    being raised that Detroit was in fact facing
15    substantial issues concerning its pension and other
16    retirement benefits and needed to find a way to deal
17    with those?
18 A. Here again I don't recall specific discussions. There
19    may have been. I just don't recall.
20 Q. Okay. Let me show you some documents, Mr. Orr.
21 A. Thank you.
22 Q. You can't thank me until you've seen the documents.
23 A. It may refresh my recollection. I just don't recall.
24         MR. ULLMAN: Let's mark the first one as
25    Orr 1.

Page 24

1         (Marked Exhibit No. 1.)
2 Q. Are there other copies of that? Thanks.
3 A. Okay.
4 Q. Okay, what we're marked as Orr Number 1 is an email,
5    bears the Bates stamp ending in 113.
6 A. Yes.
7 Q. Now, these either -- there are a couple of emails on
8    this chain from January of 30 -- January 30, 2013.
9 A. Yes.
10 Q. And the bottom one states that it's from Richard Baird
11    to Corinne Ball. Who is Richard Baird?
12 A. Richard Baird is the governor's transition manager on
13    contract to the State of Michigan.
14 Q. And he says -- the message is to Corinne, sorry I
15    missed your call. Basically says, I'm inquiring about
16    the potentiality of actually hiring a member of your
17    team for the Detroit EM spot.
18 A. Yes.
19 Q. And is this what you were referring to before in your
20    testimony?
21 A. Yes. Says, was on the phone with Steve Brogan. He
22    can fill you in, but basically thinking about
23    potential -- yes, that's what I was talking about.
24 Q. And it's your testimony that prior to this you had not
25    had discussions with anyone from the State of Michigan

Page 37

1 be given acknowledgment for the success. Further, it
2 might give me the ability to come back to the firm and
3 make up for the time that I'd lose if I did this job.
4 Q. The job being the Emergency Manager job?
5 A. Yes.
6 Q. Okay. Now, in the next email that's going up the
7 chain that is on the first page you say you wouldn't
8 do it.
9 A. Yes.
10 Q. And when you say you wouldn't do it, again, do you
11 have -- what is the it that's being referred to? So
12 far no one's ever really identified what nationalizing
13 meant.
14 A. I'm telling you what I can think, what I meant by this
15 writing.
16 Q. Okay.
17 A. What I meant was I wouldn't necessarily make it a
18 national issue and I think I say it would just bring
19 in the Demo/Republican polarization on a national
20 scale and make Detroit a fall for the agendas of both
21 sides, meaning that people would try to use it as an
22 allegory for whatever their particular perception was.
23 I go on to say that the president would have to
24 criticize the trampling of democracy, and that's been
25 done here, not by the president I might add, and the

Page 38

1 Republicans would rail against any further federal
2 bailouts and that's been said, plus if the feds did
3 anything for Detroit, a number of other municipals
4 would have their hands out at a time when no one's in
5 the mood to dole out federal largess. I think I go on
6 to say this is a morass of problems.
7    So my thought was there, to be clear, that
8 I did not think it, meaning to try to give the issues
9 of Detroit national prominence, was particularly
10 productive.
11 Q. Now, in the top email you write -- or I'm sorry,
12 Mr. Moss writes back to you and in the second
13 paragraph he goes on to say, it seems the ideal
14 scenario would be that Snyder and Bing both agree that
15 the best option is simply to go through an orderly
16 Chapter 9. And then he goes on to say that that
17 avoids a political fight over the scope of any
18 appointed Emergency Manager, moves the ball forward.
19 And then he goes on to say, appointing Emergency
20 Manager whose ability to actually do anything is
21 questionable, would only serve to kick the can down
22 the wrong path.
23 A. Yes.
24 Q. And can you tell me -- obviously this is -- Mr. Moss
25 here is referring to the possibility of a Chapter 9

Page 39

1 filing?
2 A. Yes.
3 Q. And was this something that you discussed specifically
4 with Mr. Moss?
5 A. We probably did.
6 Q. Okay. And did you discuss the possibility -- so at
7 this point it was understood that one possibility, one
8 potential route of action, would be to file a Chapter
9 9 for Detroit if you took the Emergency Manager job;
10 is that right?
11 A. Yeah, I think that since we have been reviewing
12 background information on Detroit and the possibility
13 of a Chapter 9 filing had been mentioned in 2005,
14 2006, 2009, 2011, 2012, up until this point, in fact I
15 think it was, as I said, I testified earlier this
16 morning, the possibility of Chapter 9s in other cities
17 have been discussed, that the issue of a potential
18 Chapter 9 filing for the City of Detroit was not a
19 particularly surprising discussion. That had been
20 discussed on many levels in the national press, in the
21 local press, it had been recommended by a prior -- in
22 2005 I think it was recommended by a prior employee --
23 senior employee of the City, so I think that
24 discussion was the typical type of discussion that
25 you'd have with your colleagues.

Page 40

1 Q. And were you in fact at this time having those types
2 of discussions with your colleagues at Jones Day as to
3 the possibilities of a Chapter 9 filing if you took
4 the Emergency Manager job and how that would be
5 implemented?
6 A. Yes, but I don't want to give you the wrong impression
7 because I think based upon what I've seen from some of
8 the briefing and some of the interrogatories the
9 impression is that that was predetermined and that's
10 not true. The reality is there was much discussion
11 about what the alternatives would be and the need to
12 bring something that would bring order and efficiency
13 to the process given the number of interests that were
14 involved.
15 Q. But it was certainly one of the possibilities that was
16 on the table as a course that might need to be
17 followed; is that right?
18 A. Oh, sure, it had been discussed for the better part of
19 the prior decade.
20 Q. And in fact, Mr. Moss is recommending the simplest
21 thing, the best option would be to have the -- Snyder
22 and Bing, the mayor and the governor, both agree to go
23 through an orderly Chapter 9?
24    MR. SHUMAKER: Object to form, calls for
25 speculation.

Page 261

1 Q. Are you saying --
2 A. The following week, yes.
3 Q. When you say one of those meetings, are you sure you
4    attended June 14th?
5 A. No, no, no, when I say one, I mean one of the
6    subsequent. I'm sure I attended June 14th. June 10th
7    was Monday, June 14th was Friday, my public meeting
8    was Monday, June 14th was the all creditors meeting.
9    There was subsequent due diligence meetings the
10   following week and I recall attending at least one of
11   those that week. That was the those I was referring
12   to.
13 Q. I'm a little confused. Are you sure you attended June
14   14th?
15 A. Yes.
16 Q. Okay. So do you recall whether you attended June
17   20th?
18 A. I think I did, but I don't recall.
19 Q. Okay. What about July 11th?
20 A. I don't recall.
21 Q. Okay. So I already asked you about whether at the
22   June 14th meeting you said anything to the effect of
23   that this was not a negotiation. Let me ask you the
24   same question for the June 20th and July 11th. Do you
25   recall at that -- at those meetings saying anything to

Page 262

1    the effect of this is not a negotiation?
2 A. I may have. As I've said several times today, you
3    know, bargaining negotiations is suspended for five
4    years so I may have said that, but I don't recall.
5 Q. And again, if there were witnesses who testified they
6    heard you say that at one or more of these meetings,
7    would you be in a position to deny that?
8 A. I don't know if I would deny it or if I would confirm
9    it. I mean, their recollection of what was said could
10   be different than mine or what they heard.
11 Q. Did you attend a meeting on July 10th with creditors?
12 A. I may have.
13 Q. Same question for July 10th. Do you recall saying
14   anything to the effect that that meeting was not a
15   negotiation?
16 A. I think I generally, when I would go to these
17   meetings, say we're having discussions and exchange,
18   but I would try -- if I said this is not a
19   negotiation, I would try to make sure that I did not
20   waive the suspension of bargaining under 436, so I may
21   have said that, yes.
22 Q. You may have said what?
23 A. This is not a negotiation, yeah, I may have said that.
24 Q. Okay. Apart from you there were others who attended
25   those meetings on behalf of the City; correct?

Page 263

1 A. Yes, I believe so.
2 Q. Okay. And some of those individuals spoke?
3 A. Yes.
4 Q. Okay. Do you recall whether at any of those meetings
5    that you attended whether any of the other individuals
6    who were there on behalf of the City said words to the
7    effect of this is not a negotiation?
8 A. Do I recall? No.
9 Q. At the June 20th meeting, is it true that the
10   attendees, and by the attendees I mean the people who
11   were not there on behalf of the City but the other
12   people, that in order to be heard they needed to fill
13   out a card and submit the card to someone who was
14   running the meeting? Is that how things worked?
15 A. Where was the June 20th meeting?
16 Q. I don't know.
17 A. I -- I know at my June 10th meeting that we had
18   speakers. I don't recall. I don't recall June 20.
19 Q. Let me clarify. Let's talk about the June 14th
20   meeting, the one you're sure you attended.
21 A. Right.
22 Q. Was there a system in place at that meeting where for
23   an attendee to be heard he or she had to write -- fill
24   out a card and submit it?
25 A. Yes, I believe so.

Page 264

1 Q. Okay, and describe how -- how did that -- what was
2    that process, how did that work?
3 A. That process was arranged by my staff. My
4    understanding is that if people wanted to speak, they
5    could fill out a card and a question would be asked
6    and members who were on the DS on the panel would
7    answer the question.
8 Q. Who would read out the card?
9 A. Initially it was the -- someone I believe on my staff
10   or some of my consultant's staff, but toward the end
11   of the meeting people just started asking questions
12   outright.
13 Q. Did -- that same process of attendees having to fill
14   out a card, did that occur at any of the other
15   meetings? And by the other meetings I mean either
16   June 20th, July 10th or July 11th?
17 A. I don't recall.
18 Q. It may have?
19 A. It may have, but I don't recall.
20 Q. Okay. Have you ever in your career as an attorney
21   attended a negotiation session of any kind?
22 A. Yes.
23 Q. Have you ever been at a negotiation session where one
24   side or the other has to fill out a card and have it
25   read by someone else to be heard?



Page 301

1 pursuant to my contract and in fact I have not been
2 seeking any benefits under that contract such as
3 commuting expense, healthcare, malpractice insurance,
4 directors and officers insurance. In fact, I've been
5 subsidizing my efforts out of my own pocket.
6     MS. GREEN: If that situation changes and
7 private funds are provided, I would request a standing
8 request for supplementation to be made aware if that
9 happens.
10     MR. SHUMAKER: I'm sure --
11     MS. GREEN: I'm directing that to your
12 counsel. You don't have to personally let me know.
13     MR. SHUMAKER: We'll look into that if that
14 would happen.
15     MS. GREEN: I appreciate that.
16     THE WITNESS: I have not asked and there is
17 no intent or expectation in that regard.
18 Q. The -- I have one last question.
19     We talked about the draft of the petition
20 being prepared by Jones Day. There were media reports
21 that the City was planning to file on Friday, July
22 19th. Do you recall seeing those?
23 A. Yes.
24 Q. What was it that made the City -- that prompted the
25 City to file them instead on July 18th at 4:06 p.m.?

Page 302

1 A. Counselor, just because they're media reports doesn't
2 mean that that was accurate.
3 Q. Was there ever a plan to file them on the 19th?
4 Setting aside what the media reported, was there a
5 plan to file them on the 19th?
6 A. No, my plan was to have the permission, the authority,
7 to file them and make that call at some point after I
8 transmitted my letter of July 16.
9 Q. Were any of your conversations on the 18th or the 17th
10 relating to the timing of the petition?
11 A. Outside of communications with counsel?
12     MR. SHUMAKER: I'm going to object to the
13 form just -- I'm not following your question,
14 counselor.
15 Q. Were any of the conversations that you had on the 17th
16 or the 18th with, for instance, the governor, we've
17 talked about these conversations, were any of those
18 conversations relating to the timing of the filing
19 itself?
20     MR. SHUMAKER: Again, to the extent that
21 you're going to go into the content of the
22 conversations where counsel was present between
23 Mr. Orr and the governor, I'm going to instruct him
24 not to answer.
25 Q. Were there any conversations that you had without

Page 303

1 counsel present?
2 A. No.
3 Q. And are you not willing to answer even what topics --
4 in broad categories of topics that were discussed?
5     MR. SHUMAKER: Again, to the extent that
6 they reveal what the communications are, I'm going to
7 instruct him not to answer.
8 Q. Do you know if anyone else from your team had
9 conversations, outside of conversations with counsel,
10 relating to the timing of the filing?
11 A. There may have been conversations. I'm not aware of
12 any specific ones.
13     MS. GREEN: I don't have any further
14 questions. Do you have follow-up?
15     MR. SHUMAKER: Thank you, counsel.
16     THE VIDEOGRAPHER: This concludes the
17 deposition and we're going off the record at 6:12 p.m.
18     (Deposition adjourned at 6:12 p.m.)
19     * * *

Page 304

1 State of Michigan)
2 County of Genesee)
3     Certificate of Notary Public
4   I certify that this transcript is a complete, true and
5 correct record of the testimony of the witness held in this
6 case.
7   I also certify that prior to taking this deposition,
8 the witness was duly sworn or affirmed to tell the truth.
9   I further certify that I am not a relative or an
10 employee of or an attorney for a party; and that I am not
11 financially interested, directly or indirectly, in the
12 matter.
13     WITNESS my hand this 19th day of September,
14 2013.
15
16
17
18     Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267
19     Certified Realtime Reporter
20     Registered Merit Reporter
21     Certified LiveNote Reporter
22     Certified Shorthand Reporter
23     Notary Public, Genesee, Michigan
24     Acting in Oakland County, Michigan
25     My Commission Expires: 9-19-18

Page 308

```
 1            UNITED STATES BANKRUPTCY COURT
 2              EASTERN DISTRICT OF MICHIGAN
 3                    SOUTHERN DIVISION
 4    -------------------------------X
 5    IN RE                          ) Chapter 9
 6    CITY OF DETROIT, MICHIGAN,     ) Case No. 13-53846
 7              Debtor.              ) Hon. Steven W. Rhodes
 8    -------------------------------X
 9
10
11            CONTINUED VIDEOTAPED DEPOSITION of
12                       KEYVN D. ORR
13                       Volume II
14                    Washington, D.C.
15                 Friday, October 4, 2013
16
17
18   Pages:   308 - 496
19   Reported by:  Cindy L. Sebo, RMR, CSR, RPR, CRR,
20                 CCR, CLR, RSA
21   Assignment Number:   14008
22   File Number:  105824
```

Page 309

```
 1                      October 4, 2013
 2                         11:11 a.m.
 3
 4
 5         Continued Videotaped Deposition of KEYVN D.
 6   ORR held at the law offices of:
 7
 8
 9                         Jones Day
10              51 Louisiana Avenue, Northwest
11                    Washington, D.C. 20001
12
13
14
15
16         Pursuant to notice, before Cindy L. Sebo,
17   Registered Merit Reporter, Certified Shorthand
18   Reporter, Registered Professional Reporter,
19   Certified Real-Time Reporter, Certified Court
20   Reporter, Certified LiveNote Reporter, Real-Time
21   Systems Administrator, a Notary Public in and for
22   the District of Columbia.
```

Page 310

```
 1   APPEARANCES:
 2
 3   JONES DAY
 4     For the Debtor:
 5           51 Louisiana Avenue, Northwest
 6           Washington, D.C. 20001-2113
 7           202.879.3939
 8     BY:   GREGORY M. SHUMAKER, ESQUIRE
 9           gshumaker@jonesday.com
10     BY:   DAN T. MOSS, ESQUIRE
11           dtmoss@jonesday.com
12
13   DENTONS US LLP
14     For the Retirees Committee:
15           1221 Avenue of the Americas
16           New York, New York 10020-1089
17           212.632.8342
18     BY:   ANTHONY B. ULLMAN, ESQUIRE
19           anthony.ullman@dentons.com
20
21
22
```

Page 311

```
 1   APPEARANCES (Continued):
 2
 3   LOWENSTEIN SANDLER LLP
 4     For the AFSCME:
 5           65 Livingston Avenue
 6           Roseland, New Jersey 07068
 7           973.597.2374
 8     BY:   SHARON L. LEVINE, ESQUIRE
 9           slevine@lowenstein.com
10
11   COHEN, WEISS AND SIMON LLP
12     For the United Auto Workers Union:
13           330 West 42nd Street
14           New York, New York 10036-6979
15           212.356.0216
16     BY:   PETER D. DECHIARA, ESQUIRE
17           pdechiara@cwsny.com
18
19
20
21
22
```

Page 360

1  ASME's motion, so I'm not even certain that it's
2  proper that Mr. Ullman be asking questions.
3      Secondly, this is -- Mr. Ullman can
4  identify it, but this document is the Jones Day
5  presentation to the City of Detroit on January
6  29th, 2013.
7      I don't see how that funnels into the
8  request that was made to Judge Rolls -- Rhodes
9  regarding three hours of deposition testimony
10 concerning Mr. Orr's communications with State
11 officials in the presence of legal counsel since
12 his appointment as emergency manager.
13     That said, this document was produced
14 after the deposition, and I'm going to let you go
15 into it.  But I am going to say --
16     MR. ULLMAN:  I --
17     MR. SHUMAKER:  -- within reason --
18     MR. ULLMAN:  -- I don't -- I don't
19 intend to dwell very long on it --
20     MR. SHUMAKER:  Okay.
21     MR. ULLMAN:  -- and I appreciate your
22 recognition.  This was produced after the last

Page 361

1  deposition.
2  BY MR. ULLMAN:
3     Q.    Okay.  Mr. --
4           THE COURT REPORTER:  I have to mark
5  it there first.
6  BY MR. ULLMAN:
7     Q.    Okay.  Mr. Orr, what we've marked as
8  Exhibit 21 is entitled, Presentation to the City
9  of Detroit; Detroit, Michigan, January 29, 2013
10 from Jones Day.
11          Can you identify this document for
12 me, Mr. Orr?
13    A.    Yes.
14    Q.    Okay.  And what is it, please?
15    A.    I believe it's a slide deck
16 presentation to the City of Detroit for a -- in
17 response to a solicitation the firm received for
18 representation regarding potential restructuring
19 work on behalf of the City dated January 29th,
20 2013 marked confidential.
21    Q.    Okay.  And this is in connection with
22 the presentation that you testified about last

Page 362

1  time; is that correct?
2     A.    Yes, when I said the end of January.
3  It's commonly referred to as a "pitch book."
4     Q.    Okay.  And you -- you were part of
5  the Jones Day team, and your picture appears on
6  Page 3 of this document; is that right?
7     A.    Yes, I was part of the presentation
8  team, yes.
9     Q.    Okay.  And did you have any role in
10 the preparation of this document?
11    A.    Yes.  I mean, it -- it was a
12 collaborative effort from a number of different
13 attorneys in the Jones Day law firm, but I was
14 involved in that process as well.
15    Q.    Okay.  And did you review the
16 document -- can we refer to this as the pitch
17 book?
18    A.    Yes.
19    Q.    Okay.  Did you -- did you review the
20 pitch book, Exhibit 21, before it -- before the
21 presentation?
22    A.    Yes.

Page 363

1     Q.    Okay.  And I just note -- I'm not
2  going to go into my particular specifics here, but
3  if, for example, just picking one, if you look at
4  Page 18, there's what's called Speaker Notes,
5  which -- I assume this was a PowerPoint
6  presentation, so someone would be talking --
7  speaking orally as a slide goes on the screen; is
8  that right?
9     A.    Well, it was -- it -- it -- it -- it
10 could have been a PowerPoint.  As I recall, we did
11 not -- there weren't PowerPoint capabilities, so
12 we intended to work off the document --
13    Q.    Um-hum.
14    A.    -- but the discussion, within a
15 minute or two, veered away from the document and
16 more was a dialogue, so . . .
17    Q.    Okay.  So what we have as Exhibit 21
18 was the -- the internal -- at least was this
19 internal version of the pitch book; in other
20 words, were there speaker notes?
21    A.    Yes, were the speaker -- this --
22 the -- the speaker notes were not presented to --

Page 364

1   Q.   That's --
2   A.   -- the review team.
3   Q.   -- that's what I wanted to clarify.
4   A.   Yes.
5   Q.   Okay. And when you say that you
6  reviewed the document before -- before it went out
7  in its final form to the -- to the people you were
8  pitching to at the meeting, you know, with the
9  City, you reviewed the speaker notes as well?
10   A.   Mr. Ullman, to be honest, I -- I
11  reviewed -- I can't be -- this document was not
12  generated solely by me --
13   Q.   I understand.
14   A.   -- it was generated by a team effort.
15       I think I reviewed a number of
16  different drafts of the document. I'm not -- I --
17  I believe I reviewed the final draft of the pitch
18  book that went out. I am not sure I reviewed the
19  final draft of the draft of the speaker notes,
20  because at that time, I think I was involved in
21  the actual mediation of another matter. So I was
22  doing this in between some other matters.

Page 365

1       But generally speaking, I'm familiar
2  with this document.
3   Q.   Okay. And was there -- was there
4  anything in the document that you disagreed with?
5       MR. SHUMAKER: Object to the form.
6       THE WITNESS: Without reviewing it
7  today, generally speaking, no.
8  BY MR. ULLMAN:
9   Q.   Okay. And can you tell me were there
10  any particular portions of Exhibit 21 that you had
11  primary responsibility for preparing?
12   A.   No. The -- the document evolved
13  through -- as you are probably familiar with the
14  pitch books for attorneys seeking legal work, the
15  document evolves as you go through it, a number of
16  conversations, e-mails with a number of different
17  sources.
18       I don't recall being -- I don't
19  recall looking at this document and saying, oh, I
20  only did Pages 23 through 23 [verbatim], for
21  instance. I may have commented and edited
22  different pages. I may have made suggestions on

Page 366

1  who should be on the team, who should be on the
2  representation team, what -- what potential legal
3  services might be necessary.
4       And, for instance, at the back, you
5  have team members, things along those lines,
6  but -- but there was no specific section that was
7  dedicated solely to me.
8   Q.   Okay. I'm not asking whether it was
9  dedicated solely to you, but whether you had
10  primary responsibility for preparing.
11   A.   No.
12   Q.   Okay.
13   A.   No.
14   Q.   And I think you indicated that the
15  slides themselves were given over to the City at
16  the meeting or -- was it the City or the State?
17  I'm trying to remember, did you --
18   A.   It -- it was a review team composed
19  of I think --
20   Q.   Buckfire was there?
21   A.   -- the -- the investment bankers were
22  there --

Page 367

1   Q.   Yeah.
2   A.   -- for the City who had been
3  retained, the City representatives were there and
4  the State representatives were there.
5   Q.   Okay. I'll talk -- call that the --
6  the review team --
7   A.   Review team --
8   Q.   -- is that the term you like?
9       Okay --
10   A.   -- yeah.
11   Q.   -- so as I understand what you're
12  saying, the -- the -- the slides themselves were
13  present -- given over to the review team as a --
14  a -- a bound --
15   A.   Yes.
16   Q.   -- volume or attached in some way?
17   A.   Yes, the -- the -- the slide deck as
18  the pitch book was given to the review team.
19   Q.   Okay. And then, at the presentation,
20  were -- how did that work? Did you -- did people
21  sort of go through the slides orally and then --
22  and -- and make comments as they were going