UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

-------------------------------------------------------- x
                  :
In re:                   :  Chapter 9
                  :
CITY OF DETROIT, MICHIGAN,  :  Case No.: 13-53846
                  :
           DEBTOR.  :  Hon. Steven W. Rhodes
                  :
-------------------------------------------------------- x

## INTERNATIONAL UNION, UAW'S MOTION (A) TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD ON GROUNDS OF PRIVILEGE AND (B) FOR RECONSIDERATION OF THIS COURT'S SEPTEMBER 19 ORDER ON PRIVILEGE ISSUES

International Union, UAW ("UAW") hereby moves this Court for the entry of an order in the form attached hereto as Exhibit 1 to compel production of documents withheld by the City of Detroit on the grounds of attorney-client privilege and for reconsideration of the this Court's September 19, 2013 decision denying the motion of AFSCME and Sub-Chapter 98, City of Detroit Retiree's Motion to Compel Testimony of Kevyn Orr and All Other City and State Witnesses, dated September 18, 2013, [Docket no. 920] ("AFSCME Motion to Compel").

We show in Part I below that the City is improperly relying on the work product doctrine to shield from production memoranda its restructuring counsel provided to the State close to a year before Jones Day was retained by the City and more than a year before the filing. In responding to document production

requests, the City withheld dozens of documents on the basis of attorney-client privilege or common interest privilege involving communications with the City's restructuring counsel, Jones Day, dated from *before* the time Jones Day was retained. We requested production of these documents and the City broadly complied. But on October 15, in response to a parallel request from counsel for the City's Retirement System with respect to memoranda prepared by Jones Day in 2012 which were apparently shared with the Governor, counsel for the City advised that while it was no longer claiming attorney-client privilege, that it was asserting that the memoranda were attorney work product and that it would refuse to produce them. There is no basis for a claim of work product inasmuch as Jones Day was not counsel for the state and it was only retained by the City close to a year later.

We have conferred with counsel for the City without resolution. Because it is unclear whether the City will now take the position that other documents which reflect or contain communications with Jones Day lawyers prepared before Jones Day was retained by the City are work product, we would request that the Court enter an order compelling production of all such documents.[1]

---

[1] UAW has also raised similar issues with respect to the State's assertion of privilege. While the State's production was due on October 5, it has yet to provide compliant privilege logs. UAW has conferred with counsel to the State and expect a complete response to the issues raised on October 18.

The Court's September 19 ruling has permitted the City and the State to block inquiry into their joint communications concerning the decision to pursue this Chapter 9 filing. This involves both precluding deposition testimony concerning communications between and among the Emergency Manager and state officials – both elected and appointed – and withholding thousands of documents reflecting such communications.

We show in Part II below that the Court's September 19 Order was error and should be reconsidered. In particular, the Court's reliance on the relationship between special counsel for a corporate board considering whether to authorize a bankruptcy and counsel for the corporation – an argument not presented by the City or addressed by the parties – was misplaced. Special counsel is typically retained by a corporate board in cases of a divergence between the views or interests of the board and those of the corporation. Once all parties have concluded that a filing is warranted, then they would arguably share a common legal interest in, say, opposing a motion to dismiss the case. But not before.

Here, the Emergency Manager and the State of Michigan had different interests before the filing and they likely have differing interests given the City's decision (through the Emergency Manager) to seek to impair pension benefits and the state's decision not to condition the filing given the constitutional protections of Article 9, Section 24 of the Michigan Constitution. The State may be liable for

violating the Constitution by purporting to authorize a filing in violation of these constitutional protections.[2]

The Emergency Manager and the State also have divergent roles with respect to the decision to file Chapter 9 under PA 436 of 2012. The Emergency Manager was tasked under the statute to, among other things, evaluate whether there were alternatives to rectifying Detroit's financial emergency outside of bankruptcy and given the discretion to recommend that the Governor authorize the local government to file bankruptcy. That recommendation must be reviewed and approved by the Governor.

Until and unless the Emergency Manager recommended and the Governor approved the filing, they could share no common interest in the issue to be litigated here: whether the City is eligible for the protections of Chapter 9. That is, unless the Emergency Manager's review of Detroit's financial condition was a sham and he was acting at the behest of the State in seeking authority to file.

There is an additional reason why the City's reliance on a common interest privilege should be rejected. That is that as the governing body of the City of Detroit, the Emergency Manager's policy deliberations can have no expectation of confidentiality under Michigan's Open Meetings Law. As shown below, case law

---

[2] When counsel for the City was questioned about this on October 15 he offered Jones Day's position on the issue – which was that the state was not liable.

is clear that when a governing body's powers are delegated to even a single individual, that individual's acts and deliberations are subject to the Open Meetings Law. As such, the Emergency Manager's discussions with the State concerning the filing can as a matter of law carry no expectation of confidentiality and thus cannot be privileged communications in any event. This would apply to communications before and after the filing.

Even if the Emergency Manager could claim confidentiality with respect to his deliberations, the breadth of the common interest asserted by the City and recognized by the Court's September 19 order is inconsistent with case law. The City asserts a common interest with the State in rectifying Detroit's financial emergency and assuring the City's fiscal accountability during the Emergency Manager's term of service. Those are policy concerns. Courts narrowly construe the common interest privilege to discussions involving shared legal interests. This narrow construct is particularly appropriate in cases where, as here, privilege is asserted by government entities over matters of public policy that are presumptively open to public scrutiny.

In sum, assuming, *arguendo*, that a common interest can shield *some* communications between the Emergency Manager and the State, it cannot shield communications *before the filing* concerning the issue of whether Detroit should file for bankruptcy and should only apply to post-filing communications related to

*specific legal interests*, such as defending against the motions to dismiss the filing, and not policy questions, including the treatment of the claims of particular creditor constituencies, such as employees or pensioners.

## ARGUMENT

## I.

### THE CITY SHOULD BE COMPELLED TO PRODUCE DOCUMENTS INVOLVING COMMUNICATIONS WITH ITS RESTRUCTURING COUNSEL THAT ANTE-DATE COUNSEL'S RETENTION

On the privilege log the City provided with its production, a number of documents were identified as withheld either under the common interest or attorney-client privileges that involved or referenced communications from counsel at Jones Day that ante-date Jones Day's retention by the City. On October 2, 2013, counsel for UAW identified these documents in correspondence and requested their production. A copy of that correspondence is Attachment A to this brief. One of the documents identified in that letter (at p.2 ) is PRIV9731. The log entry for this document recites that it is dated June 6, 2012 and that it is an "E-Mail Reflecting Confidential Attorney-Client Communications and Reflecting Common Legal Interest Re: Chapter 9 Bankruptcy Filing Issues." (Exhibit B to the October 2 correspondence collects privilege log entries where attorney client privilege is asserted for documents dated before March 11, 2013 when Jones Day was retained

by the City.)  There are a number of documents on Exhibit B described in similar fashion.

In responses dated October 7 (Attachments B and C hereto) Counsel for the City withdrew the claims of privilege with respect to most of the documents identified as antedating Jones Day's retention.  Included was PRIV9731. *See* Attachment B at p. 3.

On October 15, in response to inquiries from counsel for the Retirement System concerning PRIV9731, counsel for the City sent the e-mail that is Attachment D to this Letter.  In that communication counsel advised that PRIV9731 had been "inadvertently produced" as DTMI00233348.[3]  Counsel advised that this document had nine attachments which are itemized in the October 15 correspondence.  With respect to the e-mail and its attachments, the City withdrew the claim of attorney-client privilege and has now asserted that the documents are shielded from production under the work product doctrine.  This contention is baseless.

Under Rule 26, the work product doctrine shields from discovery documents "prepared *in anticipation of litigation or for trial* by or for another party

---

[3] Counsel for UAW was aware of the document, and, indeed, it has been marked as a deposition exhibit.  However, as the privilege log does not proved Bates numbers for withheld documents, we were unable to correlate PRIV9731 with the document produced.

*or its representative (**including the other party's attorney**, consultant, surety, indemnitor, insurer, or agent)" (emphasis supplied). Fed.R.Civ.P. 26(b)(3). "At its core, the work-product doctrine shelters the mental processes of the attorney, providing a privileged area within which he can analyze *and prepare his client's case*." *United States v. Nobles*, 422 U.S. 225, 238 (1975) (emphasis supplied). The doctrine thus "prevents discovery of documents prepared *in anticipation of litigation by a party's attorney* or a party's insurer unless the party seeking discovery satisfies two requirements, substantial need for them, and the inability to obtain the substantial equivalent of them without undue hardship." *Taylor v. Temple & Cutler*, 192 F.R.D. 552, 556-57 (E.D. Mich. 1999) (emphasis supplied).

While the October 15 e-mail does not identify the litigation for which the memoranda was prepared, the log indicates that they relate to "Chapter 9 Bankruptcy Filing Issues." The document name of Item (2) on the October 15 e-mail explicitly references Chapter 9 ("NYI_4399007_4_Detroit Memo Re Public Act 4 and Chapter 9.DOCX") and Items (5) ("ATI_2484061_2_City of Detroit-Memo on Michigan Constitutional OPEB Protections.DOC") and (6) ("ATI_2483523_2_City of Detroit- Memo on Michigan Constitutional Pension Plan Protections.DOC") obviously appear to be directed at Chapter 9 issues.

Jones Day was not counsel to the City until March 11, 2013 at the earliest and it was never counsel to the State. The work product doctrine is thus

inapplicable. The documents attached to PRIV9731 – and any and all other documents which on the privilege log which ante-date Jones Day's retention but involve or reflect communications with Jones Day lawyers should be ordered produced and UAW permitted to supplement its exhibit list accordingly.

## II.

### THIS COURT SHOULD RECONSIDER AND VACATE ITS SEPTEMBER 19 ORDER CONCERNING THE COMMON INTEREST PRIVILEGE

Reconsideration should be granted if the movant "demonstrate[s] a palpable defect by which the court and the parties have been misled [and] also show[s] that a different disposition of the case must result from a correction thereof." E.D. Mich. Local Bankr. R. 9024-1(a)(3). "To establish a 'palpable defect,' the moving party generally must point to '(1) a clear error of law; (2) newly discovered evidence; (3) an intervening change in controlling law; or (4) a need to prevent manifest injustice.' " *In re Collins & Aikman Corp.*, 417 B.R. 449, 454 (E.D. Mich. 2009) (quoting *Henderson v. Walled Lake Consolidated Schools*, 469 F.3d 479, 496 (6th Cir. 2006)).

The AFSCME Motion to Compel sought to compel testimony by the Emergency Manager and other City and State witnesses concerning communications before the City filed for bankruptcy that involved representatives of the State and counsel. UAW joined in that motion at the September 19 hearing.

In denying the motion in part, the Court held that the City (and State) were entitled to rely upon a common interest privilege with respect to pre-filing communications. The Court analogized the situation, as follows:

> as we all know when a corporation files bankruptcy its Board of Directors must give its consent, must authorize the filing. Ordinarily, of course, the corporation itself would have its own counsel giving it advice on whether to file bankruptcy, what the ramifications would be, what possible reasons there might be to not file bankruptcy, etc., etc. Ordinarily the Board of Directors would not have its own separate counsel in that process. It would rely on corporate counsel, but it could. The Board of Directors could hire special counsel to advise it on whether to authorize the filing or not. Assume for a moment it did and then the Board or members of the Board, its lawyer, the corporation's lawyer and corporate management all met together, it seems clear enough to this court that the common interest doctrine would shield those conversations, even though technically the corporate attorney does not represent the Board and the Board's attorney does not represent the corporation. The court cannot identify any way to distinguish that case from our case.

Respectfully, the Court's reliance on this analogy is misplaced. The situation where a Board seeks separate representation from the corporation would arise where there is an actual or perceived conflict of interest between the insiders and the corporation. Specifically, once a corporation enters the "zone of insolvency," the board members may have conflicting interests from those of the corporation in the decision on whether to file for bankruptcy or not. *See, e.g.*, *In re Kendavis Indus. Int'l, Inc.*, 91 B.R. 742, 751-52 (Bankr. N.D. Tex. 1988) (quoting *In re Coral Petroleum, Inc.*, No. 83–02460–H2–5, slip op. at 3 (Bankr.S.D.Tex. Jan.

30, 1988)) ("[Coral Petroleum's law firm] was acting in the best interest of the *principals* of Coral Petroleum during the time they were appointed by the Court as attorneys for the debtor-in-possession. This raises most serious issues of conflicts of interest and of benefit to the estate.") (emphasis in original); *see also* Jonathan T. Edwards and Andrew D. Appleby, *The Twilight Zone of Insolvency: New Developments in Fiduciary Duty Jurisprudence That May Affect Directors and Officers While in the Zone of Insolvency*, 18 J. Bankr. L. & Prac. 3 Art. 2 (2009) ("To ensure that directors and officers satisfy all the requisite duties while in this zone [of insolvency], they should contact independent counsel and hire outside experts – specifically turnaround or restructuring advisors – as soon as possible."); John T. Cross, *Conflicts of Interest in Bankruptcy Representation*, 1 J. Bankr. L. & Prac. 233, 241-42 (1992) ("Because bankruptcy forces this basic question into the forefront, it creates the potential for a conflict of interest for the attorney who continues to represent both the corporation and its insiders. The potential for conflict is especially great in a Chapter 11 case in which the debtor is serving as a debtor-in-possession.").[4] Of course, as the *Kendavis* court noted, "once counsel is

---

[4] This is reflected in multiple decisions reducing an attorney's fee award to punish the attorney for representing both the debtor corporation and directors or other insiders simultaneously. *See, e.g., In re Kendavis Indus. Int'l, Inc.*, 91 B.R. 742 (Bankr. N.D. Tex. 1988) (reducing corporate debtor's attorneys' fees by 50% after finding that debtor's law firm had opposed creditors' reorganization plans and intentionally delayed the bankruptcy proceedings for the sole benefit of controlling shareholders); *In re Rancourt*, 207 B.R. 338 (Bankr. D.N.H. 1997); *In re Hot Tin*

employed, 'a lawyer owes his allegiance to the entity and not to the stockholder, director, officer, employee, representative or other person connected with the entity.'" 91 B.R. at 752 (*quoting In re King Resources Co.*, 20 B.R. 191, 200 (D.Colo.1982)).

Of course once a filing is authorized the directors and corporation may well share particular *legal interests* in issues arising in the case, for example, defeating a motion to dismiss a petition or appoint a trustee, that could conceivably warrant assertion of a common interest in communications between those parties and counsel.

Here, the Emergency Manager and the State of Michigan had different interests before the filing. Under the statute, the Emergency Manager "[a]ct[s] for and in the place and stead of the governing body and the office of chief administrative officer of the local government." Mich. Comp. Laws § 141.1549(2). So, too, the Emergency Manager and the State have divergent roles with respect to the decision to file Chapter 9. The Emergency Manager was tasked under the statute to, among other things, evaluate whether there were alternatives to rectifying Detroit's financial emergency outside of bankruptcy and given the discretion to recommend that the Governor authorize the local government to file bankruptcy.

*Roof, Inc.*, 205 B.R. 1000 (B.A.P. 1st Cir. 1997) (denying requests for compensation by corporate debtor's attorney who had represented officers and directors because it was conflict of interest that would prejudice creditors).

Mich. Comp. Laws § 141.1558(1). That recommendation must be reviewed and approved by the Governor. *Id.*

Until and unless the Emergency Manager recommended and the Governor approved the filing, they could share no common interest in the issue to be litigated here: whether the City is eligible for the protections of Chapter 9.

There is an additional reason why the City's reliance on a common interest privilege should be rejected. That is that as the governing body of the City of Detroit, the Emergency Manager's policy deliberations can have no expectation of confidentiality under Michigan's Open Meetings Law. Under Section 3 of the Open Meetings Law, "[a]ll deliberations of a public body constituting a quorum of its members shall take place at a meeting open to the public" with certain exceptions not relevant here.[5] Mich. Comp. Laws § 15.263(3). A "public body" is defined in Section 2 as "any state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council, that is empowered by state constitution, statute, charter, ordinance, resolution, or rule to exercise governmental or proprietary authority or perform a governmental or proprietary function[.]" Mich. Comp. Laws § 15.262(a).

---

[5] Those exceptions are "public bodies only when deliberating the merits of a case" such as an "an arbitrator or arbitration panel appointed by the employment relations commission," Mich. Comp. Laws § 15.263(7), (d), or "an association of insurers created under the insurance code of 1956," *id.* 15.263(8).

In *Booth Newspapers, Inc. v. University Of Michigan Board Of Regents*, 444 Mich. 211 (1993), the Supreme Court held that where a "public body" delegates its authority to a subcommittee or individual, that subcommittee or individual is subject to the Open Meetings Law. *Board of Regents* involved public access to the regents decision-making process with respect to the selection of the University of Michigan's president. The board delegated certain decision-making functions to a sole member who conducted the search process and reported to meetings of groups of the regents in groups that never comprised a quorum. The Court rejected the notion that this would avoid the strictures of the Open Meetings Law because the individual was exercising the authority of a public body, the regents. In particular, the Court held:

> The Legislature did not grant any exception to specific types or forms of committees. Therefore, delegating the task of choosing a public university president to a one-man committee, such as Regent Brown, would warrant the finding that this one-man task force was in fact a public body.

444 Mich. at 226. *See Goode v. Dep't of Social Services*, 143 Mich.App. 756, 759 (1985).

Here, the statute vests the Emergency Manager with the powers of a public body within the meaning of the Open Meetings Law: the Emergency Manager "[a]ct[s] for and in the place and stead of the governing body and the office of chief administrative officer of the local government." Mich. Comp. Laws

§ 141.1549(2).  It is noteworthy that the Open Meetings Law provides only a narrow scope for attorney-client privilege for a public body subject to its provisions.  A public body may conduct a closed meeting  "[t]o consult with its attorney regarding trial or settlement strategy in connection with specific *pending* litigation, but only if an open meeting would have a detrimental financial effect on the litigating or settlement position of the public body[.]"  Mich. Comp. Laws § 15.268(e) (emphasis supplied).  Thus, all of the Emergency Manager's deliberations with the State concerning the decision on whether or not to file are subject to the Open Meetings Law and are presumptively public.  As such they cannot be viewed as confidential communications and cannot be privileged.

Even if the Emergency Manager could claim confidentiality with respect to his deliberations with the state concerning the decision to file, the breadth of the common interest asserted by the City and recognized by the Court's September 19 order is inconsistent with case law.  Based on this assertion, the Governor refused to answer questions involving his discussion with Orr concerning a host of policy-related topics: the June 14 Proposal to Creditors; consideration to be provided to retirees whose pension benefits the City would impair; sales of City

assets; the City's cash flow, and whether reductions in accrued pension benefits were necessary.[6]

The very first sentence in the City's opposition to the AFSCME Motion to Compel misconceives the state of the law in claiming that it "is well-established that the common interest privilege extends the attorney-client privilege to confidential communications between parties that share a substantially similar legal interest." Doc. 940 at ¶ 6.

A common-interest doctrine is anything but "well-established" in Michigan. Rather, "[t]he case law on the so-called common interest privilege or joint defense privilege is complicated and contradictory." *State Farm Mut. Auto. Ins. Co. v. Hawkins*, 2010 WL 2287454 at *7 (E.D. Mich. June 4, 2010) (unpublished).[7] The *Hawkins* court noted that the Michigan Supreme Court has yet to adopt any common interest privilege and concluded that since the "the scope of the attorney-client privilege is narrow" in this state, "the Michigan Supreme Court would likely adopt [a] *narrow version* of the common interest privilege," *State Farm*, 2010 WL 2287454 at *7 (emphasis added).

---

[6] *See* Deposition of Richard Snyder, dated October 9, 2013, Tr. at 12, 14, 430, 58, and 68. (Relevant excerpts collected as Attachment E to this brief).

[7] *See, e.g.*, Katharine Traylor Schaffzin, *An Uncertain Privilege: Why the Common Interest Doctrine Does Not Work and How Uniformity Can Fix It*, 15 B.U. Pub. Int. L.J. 49 (2005); Susan K. Rushing, *Separating the Joint-Defense Doctrine from the Attorney-Client Privilege*, 68 Tex. L. Rev. 1273 (1990).

Second, the City is simply wrong that to invoke the common interest doctrine, the parties' interests must only be "substantially similar," as opposed to "identical." Conspicuously absent from the City's Opposition, is the leading District Court case in this circuit, *Libbey Glass, Inc. v. Oneida, Ltd.*, 197 F.R.D. 342 (N.D. Ohio 1999). *Libbey Glass* holds that the common interest must be "an *identical* legal interest with respect to the subject matter of the communication." *Id.* at 347 (citing *Duplan Corp. v. Deering Milliken*, 397 F.Supp. 1146, 1164 (D.S.C. 1974)) (emphasis added). Even the unpublished case that the City relies upon, *Dura Global, Technologies, Inc. v. Magna Donnelly Corp.*, 2008 WL 2217682 (E.D. Mich. May 27, 2008) (unpublished), employs the "identical interest" standard. "[T]he common interest privilege permits the disclosure of privileged communication without waiving the privilege, provided that the parties have 'an *identical* legal interest with respect to the subject matter of the communication.'" *Id.* at *1 (quoting *Libbey Glass*, 197 F.R.D. at 347) (emphasis added).[8]

---

[8] The City distorts the holding of the case upon which it principally relies, *In re Leslie Controls, Inc.*, 437 B.R. 493, 497 (Bankr. D. Del. 2010). In that case, the court wrote: "[w]hen the interests of the parties diverge to some extent the common interest doctrine applies 'only insofar as their interests [are] in fact *identical*; communications relating to matters as to which they [hold] opposing interests … lose any privilege.'" *Id.* at 497 (quoting *In re Rivastigmine Patent Litigation*, 2005 WL 2319005, *4 (S.D.N.Y. Sept.22, 2005) (unpublished)) (emphasis added). Thus, *Leslie Controls* applies the "identical" standard; its earlier use of the phrase "substantially similar" is only meant to clarify that opposing parties may also benefit from the common interest privilege on certain issues in which they share identical

Although no court has defined the term "identical," "the level of similarity needed to satisfy the requirement that parties' interests be *identical* is implicitly very high." Schaffzin at 69-70 (emphasis in original). For example, the District of Utah has applied the common interest doctrine in a *qui tam* case where "co-plaintiffs [relator and the United States], [were] allied in their interest in this litigation in identifying ... false claims, proving them, obtaining statutory redress in the form of damages, and distributing the proceeds of this suit." *U.S. ex rel. (Redacted) v. (Redacted)*, 209 F.R.D. 475, 479 (D. Utah 2001). The oneness of the sharing entities' interests is especially important when the entities are not parties to the same litigation because the common interest doctrine requires that the purpose of sharing communications be to obtain legal advice, *Libbey Glass*, 197 F.R.D. at 347-48 ("In theory, the common interest doctrine encourages parties working with a common purpose to benefit from the guidance of counsel, and thus avoid pitfalls that otherwise might impair their progress toward their shared objective.").

Simply put, the City and State's stated common "legal" interest in "rectifying the financial emergency in Detroit," Doc. 940 at ¶ 14 n.4, is much too broad to fall under the extremely limited extension of the attorney-client privilege that the common interest doctrine may provide. All parties – even those challenging

---

interests – as long as their *overall* legal interests are "at least substantially similar." *See id.* (quotation omitted).

the City's eligibility to pursue this case can be said to have an interest in "rectifying the financial emergency in Detroit."  The City's position would make the privilege limitless.

The existence of a written "Common Interest Agreement" executed on September 12 – months after the City and State claimed in the Agreement to invoke the privilege and conspicuously close to the date that the City and State raised the common interest doctrine for the first time in this litigation – likewise does not provide the City or State a basis to claim the attorney-client privilege in their communications with each other.  *Visual Scene*, 508 So. 2d at 441 n.4 ("Of course, the mere existence of an agreement between parties to keep documents confidential is not, in itself, sufficient to protect them from discovery under a claim of privilege.").

As governmental entities, it is especially critical that the City and State not be permitted to cloak their communications under the attorney-client privilege, even if the Court were to hold that those deliberations are not subject to the Open Meetings Law.  In *Reed v. Baxter*, the controlling case on this issue, two firefighters sued a municipality for "reverse discrimination," claiming that the city hired an African American fire captain on account of his race without regard to other qualifying factors.  *Reed v. Baxter*, 134 F.3d 351, 352 (6th Cir. 1998).  The district court ruled that the attorney-client privilege protected the communications during a

meeting at which the city attorney, the fire chief, the city manager, and two city council members discussed the promotion of the new fire captain. *Id.*

The Sixth Circuit vacated the district court's ruling. It noted that the court had "never explicitly" held that governmental entities may claim attorney-client privilege. *Id.* at 356. The Court went on to hold that – assuming the privilege exists in the governmental context – because the city council members were not there to solicit the advice of the city attorney, they were third parties whose presence destroyed the attorney-client privilege. *Id.* at 358. In support of its decision, the Sixth Circuit noted that "courts and commentators have cautioned against broadly applying the [attorney-client] privilege to governmental entities." *Id.* at 357 (citing Restatement (Third) of the Law Governing Lawyers § 124, cmt. b; 24 Wright and Graham § 5475, at 126). The Court went on to explain that, "*[t]he governmental privilege stands squarely in conflict with the strong public interest in open and honest government.*" *Id.* (emphasis added) (citing *In re Grand Jury Subpoena Duces Tecum (Office of President v. Office of Indep. Counsel)*, 112 F.3d 910, 916, 920-21 (8th Cir. 1997)).

The Sixth Circuit's in requiring a heightened standard of governmental entities when invoking the attorney-client privilege has been followed by other circuits including the Seventh Circuit, *In re Witness Before Special Grand Jury 2000-2*, 288 F.3d 289, 293 (7th Cir. 2002) ("government lawyers have a higher,

competing duty to act in the public interest" and are "obligated not to protect [their] governmental client[s] but to ensure [their] compliance with the law"), the Eighth Circuit, *In re Grand Jury Subpoena Duces Tecum*, 112 F.3d 910, 921, 922 (8th Cir. 1997) (declining to apply the common interest doctrine and holding that "to allow any part of the federal government to use its in-house attorneys as a shield against the production of information relevant to a federal criminal investigation would represent a gross misuse of public assets"), and the D.C. Circuit, *In re* Lindsey, 158 F.3d 1263, 1272 (D.C. Cir. 1998) ("government attorneys stand in a far different position from members of the private bar. Their duty is not to … protect wrongdoers from public exposure … [and] the loyalties of a government lawyer therefore cannot and must not lie solely with his or her client agency"). While the Seventh, Eighth, and D.C. Circuit holdings were in the context of criminal grand jury subpoenas, the United States Supreme Court has admonished courts that the attorney-client privilege should not be "appli[ed] differently in criminal and civil cases…." *Swidler & Berlin v. United States*, 524 U.S. 399, 400 (1998).

Michigan has no law explicitly protecting government-attorney-client privilege and, as noted above, the Open Meetings Law presumptively makes all deliberations of governmental bodies public and limits attorney-client privilege. In addition, in construing Michigan's Freedom of Information Act, Mich. Comp. Laws Ann. § 15.231 *et seq.*, the courts have held that Michigan has a "strong public policy

favoring public access to government information, recognizing the need that citizens be informed as they exercise their role in a democracy, and the need to hold public officials accountable for the manner in which they discharge their duties." *Great Lakes Media v. City of Pontiac, Nos. 208306, 208320*, 2000 WL 33419383, *2 (Mich. App. May 19, 2000) (internal citation omitted).

The Court should grant this motion reconsider its September 19 decision and hold that the City and State are not entitled to claim any common interest privilege with respect to communications before the filing of this case.

## CONCLUSION

The Court should compel production of documents (a) reflecting communications with restructuring counsel produced before the City retained Jones Day and (b) upon reconsideration of its September 19 order those dated before July 18, 2013 as to which a common-interest privilege was asserted.

Dated: New York, New York
      October 17, 2013

            /s/ Babette A. Ceccotti
            Cohen, Weiss and Simon LLP
            Babette A. Ceccotti
            Thomas N. Ciantra
            330 West 42nd Street
            New York, New York 10036-6976
            T: 212-563-4100
            F: 212-695-5436
            bceccotti@cwsny.com
            tciantra@cwsny.com

                -  and -

            Niraj R. Ganatra (P63150)
            Michael Nicholson (P33421)
            8000 East Jefferson Avenue
            Detroit, Michigan  48214
            T: (313) 926-5216
            F: (313) 926-5240
            nganatra@uaw.net
            mnicholson@uaw.net

            *Attorneys for International Union, UAW*