# Exhibit B

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001.2113
TELEPHONE: +1.202.879.3939 • FACSIMILE: +1.202.626.1700

Direct Number: (202) 879-3768
gsirwin@JonesDay.com

October 7, 2013

**BY FIRST CLASS MAIL**

Thomas N. Ciantra
Cohen Weiss and Simon
330 West 42nd Street
New York, New York  10036-6979

Re:     **City of Detroit**

Dear Mr. Ciantra:

This letter responds to your letter of October 2, 2013, regarding documents which the City of Detroit withheld from its document production on the basis of a privilege, as identified on the accompanying privilege log.  Rather than respond to the factual and legal assertions in your letter, with which we disagree, we believed the most productive approach was to again review the documents you identified, to determine whether the privilege claim was correct, and if so, whether the privilege log correctly reflected available information.  As you know, you have asked us to investigate 423 documents in just a few days and we have done our best to oblige, but require additional time for certain documents.  The size and exigent circumstances of this document production contributed to the mis-designation of some documents as privileged that were not, if fact, privileged.  Indeed, some of the document you have identified have already been produced provided elsewhere in our own production.  We will address the documents according to the categories to which you assigned them.

**Exhibit A Documents**

Your letter describes these documents as dated before March 15, 2013, for which a common interest privilege was claimed.

The following Exhibit A documents have already been produced:

|       |                    |
|-------|--------------------|
| 10568 | DTMI00151454       |
| 7219  | DTMI00156103-6104  |
| 7220  | DTMI00156105-6107  |
| 9830  | DTMI00203649       |

ALKHOBAR • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DUBAI
DÜSSELDORF • FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID
MEXICO CITY • MILAN • MOSCOW • MUNICH • NEW YORK • PARIS • PITTSBURGH • RIYADH • SAN DIEGO
SAN FRANCISCO • SÃO PAULO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

We are preparing the following Exhibit A documents for production, and no longer claim any privilege with respect to these documents.

| | | | | |
|---|---|---|---|---|
| 0349 | 8901 | 2930 | 8931 | 7280 |
| 10482 | 8904 | 7232 | 9830 | 7287 |
| 10544 | 8910 | 7274 | 9732 | 8823 |
| 10592 | 8926 | 7284 | 0565 | 8900 |
| 10645 | 9749 | 7596 | 10509 | 8903 |
| 3401 | 8925 | 8898 | 10557 | 8906 |
| 7273 | 0405 | 8902 | 10621 | 8924 |
| 7283 | 10483 | 8905 | 2931 | 9733 |
| 7289 | 10556 | 8923 | 7242 | 10629 |
| 8824 | 10606 | 0484 | 8825 | |

The City of Detroit is asserting attorney-client privilege, but not the common interest privilege, with respect to the Exhibit A documents listed immediately below. Although the date of these documents is earlier that the date Jones Day's retention agreement was reduced to writing, the City was involved in various efforts related to restructuring, with the advice of counsel both from the City of Detroit Law Department, and the firm of Miller Canfield, before Jones Day was retained. Further, the privilege can attach to pre-retention communications. *See, State Farm Mut. Auto. Ins. Co. v. Hawkins,* No. 08-10367, 2010 BL 125273, at *4 (E.D. Mich. June 04, 2010) ("the privilege is not limited to fully consummated attorney-client relationships; it applies also to communications between a prospective client consulting with an attorney.") (citing *Devich v. Dick,* 143 N.W. 56, 58 (Mich. 1913).); *Kearns v. Fred Lavery/Porsche Audi Co.,* 573 F. Supp. 91, 94 (E.D. Mich. 1983) ("Communications in the course of preliminary discussions with a view to employing the lawyer are privileged . . . .") (quoting McCormick on Evidence, 2d ed. 179 (West Publishing Co. 1972)).

| PRIV Number | Additional Information/Comments |
|---|---|
| 7571 | The privilege log will be corrected to reflect that author is Ernst & Young. |
| 8784 | Privilege log reflects that Michael McGee, an attorney from Miller Canfield, was a recipient of this communication. |

With respect to the remaining Exhibit A documents listed immediately below, the City of Detroit is assessing whether these documents are subject to the attorney-client privilege and common interest doctrine. We will get back to you shortly on these: 8826, 8841, 4959.

Thomas N. Ciantra
October 7, 2013
Page 3

**Exhibit B Documents**

You described these documents as dated before the retention of Jones Day by the City, for which the attorney-client privilege was asserted. Of course, the city has and had retained many other law firms to advise it with respect to various matters prior to the time they retained Jones Day.

The following Exhibit B documents have already been produced:

|   |   |
|---|---|
| 0394 | DTMI00166138-197 |
| 0414 | DTMI00166198-200 |
| 5665 | DTMI00146890-147206 |

Moreover, we are preparing the following Exhibit B documents for production, and no longer claim any privilege with respect to these documents.

| | | | | |
|---|---|---|---|---|
| 0277 | 0348 | 0398 | 0512 | 5658 |
| 0296 | 0349 | 0399 | 0513 | 5660 |
| 0297 | 0359 | 0400 | 0514 | 5662 |
| 0298 | 0369 | 0405 | 0517 | 5663 |
| 0301 | 0370 | 0407 | 0519 | 5664 |
| 0302 | 0371 | 0408 | 0520 | 5665 |
| 0303 | 0372 | 0411 | 0521 | 5698 |
| 0304 | 0373 | 0414 | 0523 | 5710 |
| 0305 | 0375 | 0493 | 0524 | 9672 |
| 0306 | 0376 | 0494 | 0551 | 9685 |
| 0307 | 0377 | 0496 | 0553 | 9692 |
| 0308 | 0378 | 0497 | 0555 | 9719 |
| 0310 | 0380 | 0498 | 0565 | 9720 |
| 0321 | 0381 | 0499 | 0566 | 9726 |
| 0322 | 0382 | 0502 | 4890 | 9731 |
| 0333 | 0383 | 0505 | 5630 | 9738 |
| 0335 | 0386 | 0506 | 5637 | 9739 |
| 0339 | 0388 | 0507 | 5649 | 9740 |
| 0340 | 0394 | 0508 | 5650 | 9742 |
| 0342 | 0395 | 0509 | 5652 | 9745 |

Thomas N. Ciantra
October 7, 2013
Page 4

| 0344 | 0397 | 0511 | 5656 | 9749 |
| 0267 | 2930 | 2931 |      |      |

The following Exhibit B documents were included on our original privilege log as attachments. The city is still asserting a privilege for these documents as they reflect attorney markings.

| PRIV Number | Additional Information/Comments |
| --- | --- |
| 5755 | This document is reflected in error on the privilege log as "Work Product." It should be reflected as "Attorney-Client Privileged." It reflects an attorney notation. The parent email, PRIV5754, reflects the attorneys involved with this communication. |
| 5968 | This is the same document as PRIV 5755, and reflects the same notation. The parent email, PRIV 5967, reflects the attorneys involved with this communication. |

The remaining Exhibit B documents were created in the period immediately prior to the date on which the City of Detroit engaged Jones Day as counsel, but nonetheless reflect attorney-client communications and thus remain privileged: 9660, 9661, 9664, 9667.


**Exhibit C Documents**

According to your letter, these are documents for which the common interest privilege was asserted, yet which lack documentation on the privilege log sufficient to support that assertion. Specifically, you state that no attorney was identified in the description of these documents.

The following Exhibit C documents have already been produced:

| 10730 | DTMI00217102 | 6275 | DTMI213740 |
| 2944 | DTMI00202331-2361 | 8405 | DTMI00203279-80 |
| 3012 | DTMI00210446 | 8406 | DTMI00203281-82 |
| 3415 | DTMI00211375 | 8407 | DTMI00203283 |
| 3795 | DTMI00212692 | 8530 | DTMI00203319 |
| 3798 | DTMI00212693 | 8531 | DTMI0020322 |
| 3979 | DRMI00213055 | 8532 | DTMI00203324 |

JONES DAY

| 3991 | DTMI00213056 | 8567 | DTMI00203376 |
| 4266 | DTMI002087093 | 8932 | DTMI00203650 |

We are preparing the following Exhibit C documents for production, and no longer claim any privilege with respect to these documents.

| 0020 | 7287 | 10423 | 7267 | 10635 | 7516 |
| 10636 | 7523 | 10637 | 7283 | 10767 | 7525 |
| 10800 | 7540 | 10801 | 7289 | 10802 | 7679 |
| 10803 | 8005 | 10804 | 7524 | 10805 | 8152 |
| 2744 | 8153 | 3118 | 7674 | 3144 | 8223 |
| 3165 | 8390 | 3185 | 8006 | 3142 | 8393 |
| 3276 | 8543 | 3332 | 8220 | 3333 | 8542 |
| 3368 | 8647 | 3248 | 8542 | 3765 | 8636 |
| 3981 | 8696 | 4066 | 8544 | 4183 | 8695 |
| 4230 | 8894 | 4233 | 8694 | 4403 | 8890 |
| 4424 | 8902 | 4427 | 8713 | 4461 | 8901 |
| 4490 | 8905 | 6569 | 8900 | 7121 | 8904 |
| 7165 | 8932 | 7173 | 8903 | 7221 | 8907 |
| 7228 | 7260 | 7234 | 8823 | 7242 | 9442 |
| 7247 | 7274 | 7248 | 8906 | 7253 | 7284 |
| | | | 9018 | 7268 | 8825 |

The City of Detroit is asserting attorney-client privilege, but not the common interest privilege, with respect to the documents listed immediately below. With respect to these documents, if the data on the privilege log was incorrect, or could be supplemented, we provide that information here. One recurring problem, especially with the documents in Category D, but also with the documents in this category, is that you have separated the parent email from the attachments. The information on the log with respect to the parent email (date, author, etc.) should inform your judgments as to the privileged nature of the attachment.

| PRIV Number | Additional Information/Comments |
|---|---|
| 0086 | The entry on the log was undated, but should reflect a date of 05/22/2013. This is a draft spreadsheet authored b2744y Ernst & Young in the context of the restructuring, to aid Jones Day and Miller Canfield. |

Thomas N. Ciantra
October 7, 2013
Page 6

| PRIV Number | Additional Information/Comments |
|---|---|
| 10848 | This email forwards an email from Dan Moss of Jones Day. If the privileged portion of the email were redacted, the resulting document would be non-responsive. |
| 1351 | This draft spreadsheet was prepared by both Conway MacKenzie and Jones Day. The email is attached to a parent email (PRIV 1350) which is privileged itself, but that entry on the privilege log provides further information as to the lawyers and advisors drafting and using the spreadsheet. |
| 1527 | This is the same draft spreadsheet as 1351. The parent email is at PRIV 1526. |
| 2315 | This is a draft spreadsheet prepared by Ernst & Young, for Jones Day. The parent email (PRIV 2315) provides the identity of the lawyers communicating regarding the chart. |
| 2316 | This is a draft spreadsheet similar to PRIV 2315, with the same parent email. |
| 2317 | This is a draft spreadsheet similar to PRIV 2315, with the same parent email. |
| 2750 | This is a draft document authored by Jones Day. The privilege log erroneously identifies the author as Kevyn Orr. |
| 2982 | This is an outline that was prepared by Conway MacKenzie. The parent email (PRIV 2981) provides the identity of the lawyers communicating regarding the chart. |
| 3084 | This is a draft chart prepared by Ernst & Young in connection with work done by Jones Day for the City of Detroit. Please see parent email at PRIV 3083. |
| 3208 | This is an email from B. Nowling to K. Orr forwarding another email from Abernathy MacGregor (a public relations firm working for the City) to all the advisors (including Jones Day) requesting advice. |
| 3210 | This was an attachment to PRIV 3208 above, and is a draft document sent to the advisors (including |

Thomas N. Ciantra
October 7, 2013
Page 7

| PRIV Number | Additional Information/Comments |
|---|---|
| | Jones Day). |
| 3211 | This was an attachment to PRIV 3208 above, and is a draft document sent to the advisors (including Jones Day). |
| 4022 | This is an email that forwards another email from S. Mays to K. Orr which discusses legal advice. We will produce a redacted version. |
| 4334, 4335, 4336 | These are the same documents as 3208 (not identical; this is the email forwarded by PRIV 3208), 3210, and 3212.   In this instance of the parent email, the recipients of the email were not included in the privilege log.  They are:  Bill Nowling, Bruce Bennett*, Corinne Ball*, David Heiman*, Heather Lennox*, Jeffrey Ellman,* James Doak, Kenneth Buckfire and Kyle Herman. |
| 4406 | This is a draft document attached to an email sent by The Abernathy MacGregor Group (a public relations firm working for the City) to Jones Day and other advisors.  See parent email at 4405 for identification of the attorneys that this was sent to. |
| 4407 | This is the same document as 4406 above. |
| 4423 | The privilege log erroneously identifies Bill Nowling as the author of this document.  It was authored by Jones Day. |
| 7566, 7567, 7569 | These spreadsheets were all prepared by Ernst & Young for Jones Day. |
| 7813 | This is an email between advisors at Conway MacKenzie and at Milliman regarding privileged matters. |
| 7814 | This is the another version of the email string at PRIV 7813 above, and contains communications among the advisors regarding privileged matters. |
| 8411, 8412, 8413, 8414, 8415, 8416, 8417, 8418, | Emails, and an attached draft  document, communicating among advisors about matters undertaken with the advice and on behalf of Jones Day. |

Thomas N. Ciantra
October 7, 2013
Page 8

| PRIV Number | Additional Information/Comments |
|---|---|
| 8419, 8420 | |
| 8450 | Email reflects status of Jones Day legal advice. |
| 9355 | This is a draft spreadsheet prepared for Ernst & Young for Jones Day. The parent email, PRIV 9354, reflects the attorneys involved in the communication about this document. |
| 0732 | This document appears in error on the log to have been authored by Jones Day, and Rick Snyder (as does PRIV 0731, another attachment to the same parent email). Both were authored by Jones Day. |

With respect to the documents listed immediately below, the City of Detroit is asserting both attorney-client privilege and common interest privilege. Errors in the privilege log as well as additional information about the document are listed below.

| PRIV Number | Additional Information/Comments |
|---|---|
| 0081 | This document appears undated on the log, but is dated 06/06/2013. The parent email, PRIV 0080, reflects the attorneys and Michigan state officials involved with this document. |
| 0093 | This document appears undated on the log, but is date 06/03/2012. This is a different version of PRIV 0081, above. The parent email, PRIV 0092, reflects the attorneys and Michigan state officials involved with this document. |
| 0224 | This document appears undated on the log, but is dated 04/08/2013. The parent email, PRIV 0223, reflects the attorneys and Michigan state officials involved with this communication. |
| 0458 | This document appears undated on the log, but is dated 05/14/2013. The parent email, PRIV 0457, reflects the attorneys, advisors, and Michigan state officials involved with this document. |
| 0979 | The parent email, PRIV 0977, reflects the attorneys and further contains an email string indicating that the document was sent to Andy |

| PRIV Number | Additional Information/Comments |
| --- | --- |
| | Dillon of the State of Michigan. |
| 0980 | The parent email, PRIV 977, reflects the attorneys involved with this communication and further contains an email string indicating that the document was sent to Andy Dillon of the State of Michigan. |
| 0981 | The parent email, PRIV 977, reflects the attorneys involved with this communication and further contains an email string indicating that the document was sent to Andy Dillon of the State of Michigan. |
| 3236 | This email forwards several emails from Brian Sedlak*, to K. Orr which reflect attorney-client privileged communications. |
| 3460 | Email discusses attorney-client communications, and forwards an email to C. Ball*, J. Telpner *, D. Heiman*, and Miller Canfield attorneys. |
| 3602 | Email string building on PRIV 3460, above. |
| 4079 | Email forwards email from Jeffrey Ellman*, to Bill Nowling, Kevyn Orr, Sonya Mays, Shani Penn, Brom Stibitz, Andy Dillon, Thomas Saxton, Greg Tedder, with cc to C. Moore, G. Malhotra, B. Bennett*, C. Ball*, D. Heiman*, H. Lennox*, and K. Buckfire containing privileged communications. |
| 4338 | Email forwards email string among Jeffrey Ellman*, David Heiman*, cc Kevyn Orr, Corrine Ball,* and A. Dillon, reflecting privileged communications. |
| 6483 | Email from Kevyn Orr to Andy Dillon reflecting privileged communications. |
| 6601 | Same email string as PRIV 3460 and 3602, above. |
| 6645 | This is the same document as PRIV 4423 (for which attorney-client privilege is asserted, above). This document was shared with Michigan state officials. |
| 8664 | Email reflects confidential communication with |

| PRIV Number | Additional Information/Comments |
|---|---|
| | attorney. |
| 8666 | Same email string as PRIV 8664. |
| 8667 | Same email string as PRIV 8664. |
| 8668 | Same email string as PRIV 8668. |

Due to the very tight time period you requested for our response, we are not yet finished with our analysis of the documents you categorized to Exhibit D, although we hope to have that completed by tomorrow. The major issue we are finding with the documents listed in Exhibit D is that you need to refer to the parent email to determine which lawyers were involved with the attachment. We will provide our response on those documents as soon as we can.

Sincerely,

Geoffrey S. Irwin

# Exhibit C

# JONES DAY

51 LOUISIANA AVENUE, N.W. • WASHINGTON, D.C. 20001.2113
TELEPHONE: +1.202.879.3939 • FACSIMILE: +1.202.626.1700

October 7, 2013

**BY FIRST CLASS MAIL**

Thomas N. Ciantra
Cohen Weiss and Simon
330 West 42nd Street
New York, New York  10036-6979

Re:     **City of Detroit**

Dear Mr. Ciantra:

In our letter yesterday, we informed you that we would get you the results of our analysis of the documents you categorized as Exhibit D documents in your letter of October 2, 2013, as soon as possible.  This letter provides the results of that analysis.

**Exhibit D Documents**

Your letter describes these documents as having no source or recipient listed on the privilege log.

The following Exhibit D documents have already been produced:

| | | | |
|---|---|---|---|
| 3417 - DTMI00211376-380 | | 8537 - DTMI00203327-3328 |
| 8538 - DTMI00203329-3348 | | 10518 - DTMI00150711-0855 |
| 10519 - DTMI00150856-1012 | | 10553 - DTMI00151050-1071 |
| 10554 - DTMI00151072-1213 | | 8824 - DTMI00234951-4956 |

We are preparing the following Exhibit D documents for production, and no longer claim any privilege with respect to these documents.

| | | | | | |
|---|---|---|---|---|---|
| 0094 | 0484 | 5371 | 5372 | 6131 | 3401 |
| 5317 | 5372 | 6984 | 7225 | 7505 | 7680 |
| 8008 | 8534 | 8535 | 8648 | 8650 | 8699 |
| 8700 | 8895 | 8954 | 8955 | 9443 | 9733 |
| 10500 | 10509 | 10510 | 10523 | 10524 | 10526 |
| 10527 | 10545 | 10546 | 10563 | 10564 | 10566 |
| 10567 | 10598 | 10599 | 10600 | 10612 | 10613 |
| 10614 | 10625 | 10626 | | | |

The City of Detroit is asserting attorney-client privilege, but not the common interest privilege, with respect to the Exhibit D documents listed in the chart that follows.  We have provided additional information when available, as well as identified corrections to the privilege log.

ALKHOBAR • ATLANTA • BEIJING • BOSTON • BRUSSELS • CHICAGO • CLEVELAND • COLUMBUS • DALLAS • DUBAI
FRANKFURT • HONG KONG • HOUSTON • IRVINE • JEDDAH • LONDON • LOS ANGELES • MADRID • MEXICO CITY
MILAN • MOSCOW • MUNICH • NEW DELHI • NEW YORK • PARIS • PITTSBURGH • RIYADH
SAN DIEGO • SAN FRANCISCO • SHANGHAI • SILICON VALLEY • SINGAPORE • SYDNEY • TAIPEI • TOKYO • WASHINGTON

| PRIV Number | Additional Information/Comments |
|---|---|
| 0450 | The privilege log erroneously reflects no date or author for this document. This draft report is dated 05/29/2013, and was authored by Jones Day. Reference to the parent email, PRIV 449, will reflect the lawyers and advisors involved with this document. |
| 0451 | The privilege log erroneously reflects no date or author for this document. This draft report is dated 05/29/2013, and was authored by Jones Day. Reference to the parent email, PRIV 449, will reflect the lawyers and advisors involved with this document. |
| 1955 | The privilege log erroneously reflects no author for this document. The author is Oliver S. Zeltner, a Jones Day lawyer. Reference to the parent email, PRIV 1953, will reflect the lawyer this document was sent to. |
| 2697 | The privilege log erroneously reflects no author for this document. The author is Oliver S. Zeltner, a Jones Day attorney. Reference to the parent email PRIV 2696, will reflect the lawyer this document was sent to. |
| 2698 | The privilege log erroneously reflects no author for this document. The author is Oliver S. Zeltner, a Jones Day attorney. Reference to the parent email 2696, will reflect the lawyer this document was sent to. |
| 6139 | The privilege log erroneously reflects no author or date for this document. This document is dated 02/07/2013, and was authored by Michael McGee and Richard Warren of Miller Canfield. |
| 6232 | The privilege log erroneously reflects no author for this document. This document was authored by Jones Day. |
| 6315 | The privilege log erroneously reflects no author for this document. This document was authored by Jones Day. |
| 6390 | The privilege log erroneously reflects no author for this document. This draft letter was authored by John Willems of Miller Canfield. |
| 10454 | The privilege log erroneously reflects no author or date for this document. The author is Cadwalader, a firm that does not represent the City. However, the document reflects comments by Miller Canfield. The date of the document is 03/02/2013. |

With respect to the Exhibit D documents listed in the chart that follows, the City of Detroit is asserting both attorney-client privilege and common interest privilege. Errors in the privilege log as well as additional information about the documents are listed below.

| PRIV Number | Additional Information/Comments |
|---|---|
| 0088 | The privilege log erroneously reflects no author for this document. This draft presentation was created by Ernst & Young for Jones Day, and was shared with Michigan state officials. Reference to the parent email, PRIV 0087, reflects the attorneys and Michigan state officials involved with this document. |
| 0089 | The privilege log erroneously reflects no author for this document. This draft presentation was authored by Jones Day. Reference to the parent email, PRIV 0087, reflects the attorneys and Michigan state officials involved with this document. |
| 0090 | The privilege log erroneously reflects no author for this document. This draft presentation was authored by Jones Day, and was shared with Michigan state officials. Reference to the parent email, PRIV 0087, reflects the attorneys and Michigan state officials involved with this document. |
| 3060 | The privilege log erroneously reflects no author for this document. This draft report was drafted by Jones Day. Reference to the parent email, PRIV 3058, reflects the attorneys and Michigan state officials involved with this document. |
| 7148 | The privilege log erroneously reflects no author, recipient or cc's for this email. The document is an email string among Brom Stibitz, a Michigan state official, Shani Penn, Jeff Ellman*, Laura Bassett* and Michael McGee.* CCs include K. Orr, A. Dillon, T. Saxton, and G. Tedder (the last three are Michigan officials) |
| 8339 | The privilege log erroneously reflects no author for this document. The author is Daniel Moss of Jones Day. Although the document is not dated, the parent email, PRIV 8338, reflects a date of 05/09/2013, and also reflects that the original email to which this document was attached was sent to Greg Tedder, a Michigan state official. |
| 8399 | The privilege log erroneously reflects no author for this document. The author is Ernst & Young. Reference to the parent email, PRIV 8398, reflects the lawyers and |

| PRIV Number | Additional Information/Comments |
|---|---|
| | Michigan state officials, involved with this document. |
| 8431 | The privilege log erroneously reflects no author or date for this document. The date is 04/25/2013, and the author is Ernst & Young. Reference to the parent email, PRIV 8429, reflects the lawyers and Michigan officials involved with this document. |
| 8432 | The privilege log erroneously reflects this document as undated. It is dated 04/26/2013. Reference to the parent email, PRIV 8429, reflects the lawyers and Michigan officials involved with this document.` |
| 8433 | The privilege log erroneously reflects this document as undated. It is dated 04/26/2013. Reference to the parent email, PRIV 8429, reflects the lawyers and Michigan officials involved with this document. |

The City of Detroit is still assessing its position with respect to privileges applicable to the following documents: 7571, 8637, 8639, 8785, 8824. We will get back to you shortly on those documents.

In addition, we produced one document, PRIV 4416 – DTMI00209362, that we request you destroy all copies of, pursuant to the terms under which we produced these documents, because it is a privileged document, authored by a Jones Day attorney.

Sincerely,

Geoffrey S. Irwin

# Exhibit D

**From:** Geoffrey S Irwin [mailto:gsirwin@JonesDay.com]
**Sent:** Tuesday, October 15, 2013 10:49 PM
**Cc:** slevine@lowenstein.com; wjung@lowenstein.com; pgross@lowenstein.com; bceccotti@cwsny.com; pdechiara@cwsny.com; anthony.ullman@dentons.com; lbrimer@stroblpc.com; mtaunt@stroblpc.com; mfield@stroblpc.com; eerman@ermanteicher.com; czucker@ermanteicher.com; bpatek@ermanteicher.com; Gordon, Robert D.; Deeby, Shannon L.; Green, Jennifer K.; Feldman, Evan J.; charlesidelsohnattorney@yahoo.com; Gregory Shumaker
**Subject:** City of Detroit

Ms. Green:

    I am in receipt of your email on Saturday night to Greg Shumaker regarding privilege claims.  As to your general question regarding the production of attachments, each document in the review is analyzed as a stand-alone document for privilege purposes, unless there are circumstances in the cover email or attachment which would make the attachment privileged or work product in the context of the entire collection of documents (for example, the cover email reflects that the markings on the attachment are from an attorney; or the cover email is forwarding a set of documents and requesting attorney advice with respect to those documents).  Each document on the privilege log, whether a parent email or an attachment, is designated with its own number, and when counsel sends us a request to produce a document on the privilege log with reference to a specific number, we analyze that document alone, not that document and all the attachments.  Of course, the log also reflects if the document is a parent or attachment, to aid you in determining the relationship between the documents.  The bottom line is that we did not analyze the privileged status of the documents that you did not request that we analyze, whether they were parents or attachments.  Another reason we proceed in this way is that if we assume you are challenging the privileged status of all of the attachments to a document, it increases the time it takes to respond to your request, perhaps needlessly, if you have no intention of challenging the privileged status of the attachment.

    The example you provided is a case in point (DTMI002333348-3349).  This document has eight attachments.  Based on your request that we produce those attachments, we have gone back and reviewed the status of the attachments.  The attachments to this email, and the email itself,  are all privileged.  To the extent any of this email and any of its attachments have previously been inadvertently produced, we request that you return or destroy them pursuant to the reservation of rights regarding the inadvertent production of any documents protected by the work product doctrine, common interest doctrine, the attorney-client privilege or any other applicable privilege.

    We will address the status of each of the parent email, as well as each attachment, as they are described at the bottom of the parent email:

(1)  Email dated 06/05/2012 from Thomas A. Wilson to Heather Lennox; cc to Corinne Ball, and Jeffrey Ellman.  This email appears as PRIV 9731 on our first privilege log, and 2677 on our second privilege log, and the attorney-client privilege is claimed for this document.  After further investigation, we believe that this document is shielded from

1

production by the work product doctrine. The document was inadvertently produced at DTMI00233348, and we request its return or destruction.

(2) Document listed as "NYI_4399007_4_Detroit_Memo Re Public Act 4 and Chapter 9.DOCX." This document was listed on our first privilege log as PRIV 5621, and on our second privilege log as PRIV 2678. Both the attorney-client and work product doctrine were claimed with respect to this document. After further investigation, we believe that this document is shielded from production by the work product doctrine. The document has not been produced.

(3) Document _1933683_13_Detroit - Memorandum Analyzing Various Aspects of Proposed DWSD Transaction.DOCX." This document was listed on our first privilege log as PRIV 1199, PRIV 9732, PRIV 1204, and PRIV 9681, and on our second privilege log as PRIV 2618. The attorney-client privilege was claimed, as well as the common legal interest doctrine. After further investigation, we believe that this document is shielded from production by the work product doctrine. It was inadvertently produced at DTMI00233350-3404, and we request its return or destruction.

(4) Document listed as "CLI_1934731_6_Detroit - Cover Memo for DWSD Transaction Memo.DOCX." This document was listed on our first privilege log as PRIV 1201, PRIV 1205, PRIV 5625, and on our second privilege log as PRIV 2680. Both attorney-client privilege and the work product doctrine were claimed for this document. After further investigation, we believe that this document is shielded from production by the work product doctrine. It has not been produced.

(5) Document listed as "ATI_2484061_2_City of Detroit - Memo on Michigan Constitutional OPEB Protections.DOC." This document was listed on our first privilege log as PRIV 5708 and on our second privilege log as PRIV 0077, and PRIV 2681, and attorney-client privilege was claimed. After further investigation, we believe that this document is shielded from production by the work product doctrine. It has not been produced.

(6) Document listed as ATI_2483523_2_City of Detroit - Memo on Michigan Constitutional Pension Plan Protections.DOC." This document was listed on our first privilege log as PRIV 5709 and PRIV 5627, and on our second privilege log as PRIV 0076 and PRIV 2682. Both attorney-client privilege and the work product doctrine were claimed. After further investigation, we believe that this document is shielded from production by the work product doctrine. It has not been produced.

(7) Document listed as "CLI_1933048_2_Detroit - Establishing Tri County Authority.DOCX." This document was listed on our first privilege log as PRIV 0482, PRIV 0563, and PRIV 0628 and on our second privilege log as PRIV 2683, PRIV 2619 and PRIV 0139. Claims of both attorney-client privilege and the work product doctrine were claimed. After further investigation, we believe that this document is shielded from production by the work product doctrine. It has not been produced.

2

(8) Document "Detroit - Seidman Email Memos.pdf." This document was listed on our first privilege log as PRIV 9733, PRIV 5630, PRIV 0399, and on our second privilege log as PRIV 2685. The attorney-client privilege was claimed. On further investigation, we believe that this document is shielded from production by the work product doctrine. It was inadvertently produced at DTMI00233405-3406, DTMI100233441-3442, and DTMI00234872-4873, and we request its return or destruction.

(9) Document "Ability of Various Entities to Enter into Interlocal Agreement.pdf." This document was listed on our first privilege log as PRIV 0564, and PRIV 5629, and on our second privilege log as PRIV 2620 and PRIV 2684. Both the attorney-client privilege and the work product doctrine, as well as the common interest doctrine were claimed. On further investigation, we believe that this document is shielded from production by the work product doctrine. It has not been produced.

Thank you.

Geoff Irwin



**Geoffrey S. Irwin** • Partner

Washington Office • 51 Louisiana Ave. NW • Washington, DC 20001-2113
**Direct**: 202.879.3768 • **Fax**: 202.626.1700 • gsirwin@jonesday.com

==========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
==========


LEGAL NOTICE: This e-mail is for the exclusive use of the intended recipient(s), and may contain privileged and confidential information. If you are not an intended recipient, please notify the sender, delete the e-mail from your computer and do not copy or disclose it to anyone else. Your receipt of this message is not intended to waive any applicable privilege. Neither this e-mail nor any attachment(s) establish an attorney-client relationship, constitute an electronic signature or provide consent to contract electronically, unless expressly so stated by a Clark Hill attorney in the body of this e-mail or an attachment.

FEDERAL TAX ADVICE DISCLAIMER: Under U. S. Treasury Regulations, we are informing you that, to the extent this message includes any federal tax advice, this message is not intended or written by the sender to be used, and cannot be used, for the purpose of avoiding federal tax penalties.

# Exhibit E

*In Re: City of Detroit, Debtor*

---

*Governor Richard D. Snyder*

*October 9, 2013*

---

*Moretti Group*

*471 W. South Street*

*Suite 41B*

*Kalamazoo, MI 49007*

*800-536-0804*



Original File 100913RS.TXT

Min-U-Script® with Word Index

## Page 1

```
 1          UNITED STATES BANKRUPTCY COURT
         FOR THE EASTERN DISTRICT OF MICHIGAN
 2            SOUTHERN DIVISION - DETROIT
   -----------------------------------
 3 In re:                    Chapter 9

 4 CITY OF DETROIT, MICHIGAN,    Case No. 13-53846

 5         Debtor,         Hon. Steven W. Rhodes
   -----------------------------------
 6 V I D E O T A P E D   D E P O S I T I O N   O F

 7 WITNESS:      GOVERNOR RICHARD D. SNYDER

 8 LOCATION:     The Romney Building
               111 S. Capitol Avenue
 9             Lansing, Michigan

10 DATE:         Wednesday, October 9, 2013
               8:38 a.m.
11
   APPEARANCES:
12 FOR PLAINTIFFS FLOWERS:

13
               LAW OFFICE OF WILLIAM A. WERTHEIMER
14             30515 Timberbrook Lane
               Bingham Farms, Michigan  48025
15             248.644.9200
               billwertheimer@gmail.com
16             BY: WILLIAM A. WERTHEIMER  (P26275)

17 FOR INTERNATIONAL UNION, UAW:

18             COHEN, WEISS and SIMON, LLP
               330 West 42nd Street
19             New York, New York  10036-6976
               212.563.4100
20             pdechiara@cwsny.com
               BY: PETER D. DeCHIARA, ESQUIRE
21
   FOR THE RETIREES COMMITTEE:
22
               DENTONS US LLP
23             1221 Avenue of the Americas
               New York, New York  10020-1089
24             212.768.6881
               arthur.ruegger@dentons.com
25             BY: ARTHUR H. RUEGGER, ESQUIRE
```

## Page 2

```
 1 APPEARANCES, CONTINUING:

 2 FOR AFSCME, AMERICAN FEDERATION OF STATE, COUNTY and
   MUNICIPAL EMPLOYEES, AFL-CIO:
 3
               AFSCME GENERAL COUNSEL'S OFFICE
 4             1101 17th Street, NW, Suite 900
               Washington, D.C.  20036
 5             202.775.5900
               martz@afscme.org
 6             BY: MICHAEL L. ARTZ, ESQUIRE

 7             LOWENSTEIN SANDLER, LLP
               65 Livingston Avenue
 8             Roseland, New Jersey  07068
               973.597.2374
 9             slevine@lowenstein.com
               BY: SHARON L. LEVINE, ESQUIRE
10
11 FOR GENERAL RETIREMENT SYSTEM; CITY OF DETROIT POLICE AND
   FIRE RETIREMENT SYSTEM:
12
               CLARK HILL
13             212 E. Grand River Avenue
               Lansing, Michigan  48906
14             517.318.3060
               sgallagher@clarkhill.com
15             BY: SEAN PATRICK GALLAGHER  (P73108)

16             CLARK HILL
17             500 Woodward Avenue, Suite 3500
               Detroit, Michigan  48226
18             313.965.8274
               jgreen@clarkhill.com
19             BY: JENNIFER K. GREEN  (P69019)

20 FOR THE FINANCIAL GUARANTY INSURANCE CORPORATION:

21             WILLIAMS WILLIAMS RATTNER &
               PLUNKETT, PC
22             380 North Old Woodward Avenue
               Suite 300
23             Birmingham, Michigan  48009
               248.642.0333
24             eje@wwwrplaw.com
               BY: ERNEST J. ESSAD, JR.  (P32572)
25
```

## Page 3

```
 1 APPEARANCES, CONTINUING:

 2 FOR THE STATE OF MICHIGAN:

 3             MICHIGAN DEPT. OF ATTORNEY GENERAL
               Assistant Attorney General
 4             Solicitor General Bureau
               7th Floor G. Mennen Williams Building
 5             525 West Ottawa Street
               P.O. Box 30212
 6             Lansing, Michigan  48909
               517.373.1124
 7             nelsonm9@michigan.gov
               BY: MARGARET A. NELSON  (P30342)
 8
               MICHIGAN DEPT. OF ATTORNEY GENERAL
 9             Chief Legal Counsel
               Executive Division
10             7th Floor G. Mennen Williams Building
               525 West Ottawa Street
11             P.O. Box 30212
               Lansing, Michigan  48909
12             517.373.1110
               schneiderm7@michigan.gov
13             BY: MATTHEW SCHNEIDER  (P62190)

14             OFFICE OF THE GOVERNOR-LEGAL DIVISION
               George W. Romney Building
15             111 South Capitol Avenue
               P.O. Box 30013
16             Lansing, Michigan  48909
               517.241.5630
17             gadolam@michigan.gov
               BY: MICHAEL F. GADOLA  (P43960)

18             DICKINSON WRIGHT, PLLC
19             215 South Washington Square, Suite 200
               Lansing, Michigan  48933-1816
20             517.487.4710
               pellsworth@dickinsonwright.com
21             BY: PETER H. ELLSWORTH  (P23657)
22
23
24
25
```

## Page 4

```
 1 APPEARANCES, CONTINUING:

 2 FOR THE CITY OF DETROIT:

 3             JONES DAY
 4             51 Louisiana Avenue, NW
               Washington, D.C.  20001-2113
 5             202.879.3939
               gshumaker@jonesday.com
 6             BY: GREGORY M. SHUMAKER, ESQUIRE

 7 VIDEO BY:    Tim Reitman, Reitman Video Specialists

 8 REPORTED BY:  Laurel A. Jacoby, CSR-5059, RPR
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

1        I N D E X
2   WITNESS: GOVERNOR RICHARD D. SNYDER        PAGE NO.
3   Examination by Ms. Levine                       10
4   Examination by Mr. DeChiara                     51
5   Examination by Mr. Wertheimer                  106
6
7
8
9
10           E X H I B I T   I N D E X
11
12  EXHIBIT NO.        DESCRIPTION         PAGE NO.
13  Exhibit 1    July 16, 2013 Letter
14               Re: Recommendation Pursuant to
15               Section 18(1) of PA 436            51
16  Exhibit 2    July 18, 2013 Letter
17               Re: Authorization to Commence
18               Chapter 9 Bankruptcy Proceeding    59
19  Exhibit 3    City of Detroit Proposal for
20               Creditors, June 14, 2013           60
21  Exhibit 4    Free Press article
22               "Michigan Attorney General
23               Bill Schuette files on behalf of
24               retirees in Detroit bankruptcy"    75
25

Page 6

1           E X H I B I T   I N D E X
2
3   EXHIBIT NO.        DESCRIPTION         PAGE NO.
4   Exhibit 5    Jones Day Presentation to
5                the City of Detroit on
6                January 29, 2013
7                (Bates Nos. DTMI00128731-8805)     96
8   Exhibit 6    City of Detroit Chapter 9
9                Communications Rollout Plan
10               (Bates No. SOM200001331)          126
11  Exhibit 7    June 3-7, 2013 email chain
12               Re: Financial & Operating Plan
13               Power Point
14               (Bates No. SOM20001327-28)        126
15  Exhibit 8    July 8, 2013 email
16               Re: Detroit
17               (Bates No. SOM200003601)          141
18  Exhibit 9    July 9, 2013 email
19               Re: Detroit
20               (Bates No. SOM200003657)          141
21
22
23
24
25

Page 7

1           E X H I B I T   I N D E X
2
3   EXHIBIT NO.        DESCRIPTION         PAGE NO.
4
5   Exhibit 10   July 18, 2013 email
6                Re: High Priority with attached
7                July 18, 2013 Letter
8                Re: Authorization to Commence
9                Chapter 9 Bankruptcy Proceeding
10               (Bates Nos. DTMI00116442-445)     153
11
12  Exhibit 11   Oct. 9, 2013 email
13               Subject: High Priority            159
14               (Exhibit marked post deposition)
15
16
17
18               (Exhibits attached to transcript.)
19                    -   -   -
20
21
22
23
24
25

Page 8

1           Lansing, Michigan
2           October 9, 2013
3           8:38 a.m.
4              -   -   -
5        MR. WERTHEIMER: William Wertheimer on
6   behalf of the Flowers Plaintiffs.
7        I would like to put on the record the fact
8   that the order that Judge Rhodes entered under which
9   we're conducting this and the other State
10  depositions provides at Paragraph 7 that the State
11  would complete its document production by October 5
12  provided the parties could mutually agree to extend
13  that date.
14       That date has not been extended by
15  agreement.  As late as last night at 10:15 -- I woke
16  up this morning to find that the State had produced
17  a fourth production that is not in compliance with
18  the order.
19       I want to make clear on the record that we
20  may take the position that we may need to continue
21  the Governor and the other State's depositions after
22  we have reviewed those documents as we have not
23  looked at any of those documents as of now.
24       MS. NELSON: This is Margaret Nelson on
25  behalf of the State.

Page 9

1    The fourth production of documents was made
2 under the State's continuing obligation to
3 supplement its discovery responses. So the fact
4 that our production was completed by the fifth,
5 pursuant to the court order, is irrelevant to the
6 fact that we have an ongoing duty to supplement, and
7 that was the purpose for the additional document
8 production yesterday.
9    MR. WERTHEIMER: I'll leave further
10 argument for later.
11    VIDEO TECHNICIAN: Today's date -- hold on.
12 I have to start over again. Give me a second.
13    (A pause was had in the proceedings.)
14    VIDEO TECHNICIAN: Today's date is
15 October 9th, 2013, and we're on the record at
16 8:42 a.m.
17    This is the video deposition of Governor
18 Richard Snyder. We're at the Romney Office
19 Building, 111 South Capitol Avenue in Lansing,
20 Michigan.
21    Could the reporter administer the oath to
22 the Governor, please.
23    - - -
24    -GOVERNOR RICHARD D. SNYDER-
25 called as a witness, being first duly sworn, was

Page 10

1 examined and testified as follows:
2    EXAMINATION
3 BY MS. LEVINE:
4 Q. Good morning, Governor.
5 A. Good morning.
6 Q. My name is Sharon Levine. I'm with the law firm of
7    Lowenstein Sandler. I'm here on behalf of AFSCME,
8    and we appreciate your appearing for your deposition
9    today, so thank you.
10    Just for the record, when did you take
11    office as Governor of the State of Michigan?
12 A. January 1, 2011.
13 Q. And at the time you took office, was the State
14    providing greater financial -- a greater level of
15    financial support to the City of Detroit than it is
16    today?
17 A. I would have to check that.
18 Q. Would you be willing to support having the State
19    provide a greater level of financial support than it
20    is today in order to help the City of Detroit with
21    its plan of adjustment and particularly in order to
22    help fund the pension issues?
23 A. In terms of we have many competing interests for the
24    State of Michigan with respect to our budget. I
25    don't make those decisions by myself. It goes

Page 11

1    through the appropriations process with the
2    legislature and the Governor.
3 Q. My question was would you support an additional
4    level of support?
5 A. I said I've been supportive of improved services for
6    citizens, not necessarily the repayment of debts.
7 Q. That might have been responsive so I don't mean to
8    be argumentative, but the narrower question is would
9    you support an additional level of support for
10    Detroit in order to help deal with the so-called
11    underfunding pension issue?
12    MS. NELSON: Asked and answered. Go ahead.
13    Go ahead.
14    THE WITNESS: Oh. I view that as a --
15    that's a question that I couldn't answer because
16    it's a hypothetical. It would depend on the entire
17    situation for the facts depending on the potential
18    plan of adjustment for the debts.
19 BY MS. LEVINE:
20 Q. Well, between March 28, 2013 and June 14, 2013, did
21    you have discussions with Kevyn Orr about a business
22    plan or a restructuring plan or a redevelopment plan
23    for the City of Detroit?
24 A. Kevyn Orr was building a plan for creditors they
25    presented in June of this year.

Page 12

1 Q. Did you have discussions with him with regard to
2    that plan before the June presentation?
3 A. I had discussions that would have been subject to
4    attorney-client privilege.
5 Q. Is it your understanding that that plan includes a
6    two billion dollar note for unsecured creditors?
7 A. Yes.
8 Q. And what's your understanding of what that plan
9    includes with regard to vested pension benefits for
10    the citizens of Detroit?
11 A. The proposal includes some portion of that note
12    being allocated towards pensioners.
13 Q. So the plan does not include just leaving the vested
14    pension benefits alone, does it?
15 A. Well, with respect to the funded piece of pension
16    plans, that's available. There's an open question
17    with respect to the unfunded portion.
18 Q. Do you understand that in a Chapter 11 corporate
19    bankruptcy case that the Pension Benefit Guaranty
20    Corporation or the PBGC provides federal insurance
21    for beneficiaries of a pension if a defined benefit
22    plan is terminated?
23 A. Yes.
24 Q. And is it your understanding that in a Chapter 9
25    bankruptcy case there is no similar protection for

Page 13

1     vested pension benefits?
2 A.  Yes.
3 Q.  What's your understanding of how the Detroit
4     citizens, the AFSCME retirees will support
5     themselves assuming that there's a diminution in the
6     current level of pension benefit provided?
7 A.  Could you clarify your question because you had
8     conflicting statements.
9         You asked about the citizens of Detroit and
10    then you asked about the retirees.
11 Q.  Well, let's go with the retired citizens of Detroit
12    first.
13        To the extent that their pensions are
14    diminished and there is no PBGC or federal
15    protection for them, what's your understanding under
16    the plan of -- the proposed plan how they will
17    support themselves?
18        MS. NELSON: Objection; calls for
19    speculation, form, foundation.
20        THE WITNESS: Given that we're in the
21    Chapter 9 process, there's been no plan presented at
22    this point in time.
23 BY MS. LEVINE:
24 Q.  We already had a little bit of a discussion that
25    you're aware of the plan that was presented to

Page 14

1     creditors in June of 2013, correct?
2 A.  That was part of going through a process from the
3     City of Detroit asking its creditors for good faith
4     negotiations.
5 Q.  Right. And under that plan, to the extent there was
6     an underfunding with regard to the pensions, there
7     was going to be some change made to the pension
8     benefits, correct?
9 A.  That would depend on mutual agreement between the
10    parties.
11 Q.  Well, assuming that there is a reduction for the
12    moment in pension benefits, have you had any
13    conversations with Kevyn Orr with regard to whether
14    or not there would be any other benefit or provision
15    made to the retirees of the City of Detroit that
16    were going to lose pension benefits as a result of
17    that plan?
18 A.  Those discussions would have been subject to
19    attorney-client privilege.
20 Q.  What's your understanding of the options that are
21    available to the City of Detroit?
22 A.  Well, again, we're in bankruptcy now so there's been
23    no plan presented by the City at this point in time,
24    so that's a hypothetical.
25 Q.  Do you believe it's fair to have the bankruptcy

Page 15

1     attorney and other bankruptcy professionals paid
2     ahead of retirees in connection with the Chapter 9
3     process?
4 A.  I view that as a legal matter because that's a
5     subject matter of how Chapter 9 bankruptcies work.
6 Q.  The question I was asking was whether or not you
7     believe it's fair. I'm not asking you whether or
8     not it's a legal matter.
9 A.  Well, I view it as just speculation on my part
10    because we're in Chapter 9, so that would be part of
11    the legal process.
12 Q.  Is it your understanding that the Wall Street
13    creditors, municipal bond holders will share in this
14    two billion dollar note alongside of the retirees
15    with regard to their unsecured claims?
16 A.  Again, there has been no plan presented in
17    bankruptcy, so that would be a hypothetical. If you
18    go back to the proposal to the creditors, that was
19    to be part of good faith negotiations, and there was
20    an attempt to do that so that would have all been
21    consentual.
22 Q.  Do you believe it's fair to pay Wall Street-type
23    municipal bond creditors ahead of retirees?
24 A.  Again, that's part of the mutual negotiations that
25    were part of the proposal for creditors.

Page 16

1 Q.  Prior to the time that Detroit filed for bankruptcy,
2     is it your understanding that House Speaker Bolger
3     had any involvement or discussions with Kevyn Orr
4     with regard to the bankruptcy filing?
5 A.  I don't recall.
6 Q.  Did he have discussions with you with regard to the
7     bankruptcy filing?
8 A.  In terms of speaking to Speaker Bolger, occasionally
9     I would give updates on what was going on with the
10    City of Detroit.
11 Q.  And did he express any views with regard to the
12    Chapter 9 filing?
13 A.  Not that I recall.
14 Q.  Did you have any conversations with Randy
15    Richardville prior to the Chapter 9 filing?
16 A.  It would be the same with Speaker Bolger, that as
17    part of the normal process I would give updates on
18    where the situations stood.
19 Q.  Do you have any recollection of what he said to you
20    with regard to those updates?
21 A.  No.
22 Q.  On or about July 18, when you authorized Detroit's
23    Chapter 9 filing, what was your understanding of the
24    dollar amount of the pension obligations that were
25    underfunded?

Page 41

1    deferential to his partners or recent former
2    partners at Jones Day?
3 A.  No. Because, in fact, the City of Detroit made the
4    determination to hire Jones Day, and they went
5    through with that process, and that was a separate
6    independent process that I believe actually occurred
7    prior to Kevyn Orr joining the City of Detroit as
8    emergency manager.
9 Q.  Did you consider whether it would be difficult for
10   Mr. Orr to favor the interests of the City over the
11   interests of Jones Day?
12 A.  I don't understand your question because I don't
13   understand why Jones Day would be in conflict with
14   the City of Detroit. They're representing the City
15   of Detroit.
16 Q.  And aren't they being compensated by the City of
17   Detroit?
18 A.  They are being compensated by the City of Detroit.
19 Q.  Isn't there less of an appearance of conflict if it
20   had been a different law firm that had been retained
21   by the City of Detroit than Kevyn Orr's prior firm?
22 A.  And that's why it was important that he resigned and
23   severed all ties.
24 Q.  During the discussions that you had with Kevyn Orr
25   prior to the time that he was appointed as emergency

Page 42

1    manager or after he was appointed as emergency
2    manager but before July 18th, did you ever discuss
3    with Kevyn Orr outsourcing for the City of Detroit?
4 A.  Could you explain what you mean by outsourcing?
5 Q.  As part of the business plan for the City of
6    Detroit, the City of Detroit is looking at --
7    potentially looking at outsourcing some of the
8    services that are currently performed by City
9    employees; is that correct?
10 A.  They're looking at the most efficient ways to
11   deliver services to the citizens of Detroit.
12 Q.  Is that yes?
13 A.  That would include that. In terms of looking at
14   other alternatives, some of those were outlined, in
15   fact, during the consent agreement in terms of
16   looking at opportunities such as having the Detroit
17   Economic Growth Corporation handle the planning and
18   zoning activities of the City of Detroit, and that
19   was done in the context of the Mayor and the City
20   Council approving that consent agreement.
21 Q.  I'm going to try again.
22        Did you have any conversations with Kevyn
23   Orr prior to the time that he was appoint -- prior
24   to the time that he was -- during the interview
25   process, prior to the time that he was appointed as

Page 43

1    emergency manager or at any time during the period
2    of time that he was appointed as emergency manager
3    on July 18th with regard to outsourcing?
4 A.  I don't recall with respect to the interview
5    process, and there has been discussions about
6    looking at providers of services in both internal
7    and external services for the City of Detroit since
8    that date.
9 Q.  For that same period of time, during the interview
10   process and up to and including July 18th or 19th,
11   did you have any conversation with Kevyn Orr with
12   regard to selling or monetizing assets such as the
13   art, Belle Isle and water and sewer and other assets
14   of Detroit?
15 A.  Those discussions would have been subject to
16   attorney-client privilege.
17 Q.  Is it your understanding that the sale of assets are
18   one of the things that are under consideration in
19   connection with the restructuring plan that Kevyn
20   Orr proposed during June of 2013?
21 A.  I don't recall that portion of the proposal.
22 Q.  What's your view on monetizing these assets as part
23   of a restructuring plan including the art, Belle
24   Isle and water and sewer and some of the other
25   assets of Detroit?

Page 44

1 A.  Again, that's a hypothetical discussion because it
2    would really come down to what's presented in the
3    plan of adjustment within the context of the
4    bankruptcy court, and it hasn't been done at this
5    point.
6 Q.  Well, I'm asking your view of whether or not those
7    items should be on the table in connection with the
8    structuring of that plan?
9 A.  I view those as primarily Kevyn Orr's decisions
10   because he's the emergency manager for the City of
11   Detroit.
12 Q.  During the interview process, prior to Kevyn Orr's
13   selection but during the period of time you were
14   talking to him, did you ever express a view that
15   vested pension benefits should not be modified by
16   the emergency manager for the City of Detroit?
17 A.  I don't recall.
18 Q.  Did you have discussions prior to the time that
19   Kevyn Orr was selected with regard to your views
20   about whether or not vested pension benefits should
21   be modified?
22 A.  I think that's just what -- what's different than
23   the prior question?
24 Q.  Are you saying you don't recall?
25 A.  I don't recall.

Page 57

1  Q.  Have you ever been involved in a business, Governor
2      Snyder?
3  A.  Yes.
4  Q.  Isn't it true to assess the financial picture of a
5      business you need to know both the assets and the
6      liabilities of the business?
7  A.  This is a different situation in terms --
8  Q.  Could you answer my question?
9  A.  Yes.
10 Q.  The answer to my question is yes?
11 A.  Yes.
12 Q.  Okay.  At the time you received Mr. Orr's July 16th,
13     2013 letter, do you know whether Mr. Orr or his
14     staff had undertaken an analysis such that they knew
15     with specificity the City's cash flow?
16 A.  There had -- there was extensive work done doing
17     cash flow analysis of the City.  Some of that work
18     was included in the proposal to creditors back in
19     June --
20 Q.  Okay.
21 A.  -- in addition to reports that had been provided
22     under his obligation as emergency manager.
23 Q.  But at the time that you received the July 16th,
24     2013 letter, do you know whether Mr. Orr or his
25     staff had done an analysis which allowed them to

Page 58

1      know with specificity the extent of the City's cash
2      flow?
3  A.  I believe they had.
4  Q.  Okay.  Did you ever discuss that with Mr. Orr?
5  A.  That would be a matter of attorney-client privilege.
6  Q.  Well, whether it's a matter of attorney-client
7      privilege is a legal question, and you have counsel
8      here who can object if she believes that a question
9      infringes on the attorney-client privilege, so I
10     would ask you to answer the question.
11         MS. NELSON: You can answer yes or no.
12         THE WITNESS: Yes.
13 BY MR. DeCHIARA:
14 Q.  Yes, you did have discussions?
15 A.  Yeah.
16 Q.  And were those discussions -- were other people
17     present other than you and Mr. Orr in those
18     discussions?
19 A.  Yes.
20 Q.  Isn't it true you had one-on-one conversations with
21     Mr. Orr prior to the bankruptcy filing?
22 A.  Yes.
23 Q.  Okay.  In any of those one-on-one conversations with
24     Mr. Orr did you ever have a discussion of the City's
25     cash flow?

Page 59

1  A.  Not that I recall.
2  Q.  Do you know whether a significant portion of
3      Detroit's unfunded pension liability is allocable to
4      the City's Water and Sewer Department?
5  A.  I'm not aware of that relationship.
6  Q.  Okay.  Is that something that you think would be
7      relevant to a determination about whether or not the
8      City should pursue a bankruptcy?
9  A.  I haven't considered that as a question.
10 Q.  Okay.  Let me now refer you to page six of
11     Exhibit 1, and at the bottom paragraph of the page
12     there's a reference to the June 14th creditor
13     proposal.  Do you see that?
14 A.  Yes.
15 Q.  Okay.  And you were familiar with that proposal when
16     you received this letter on July 16th?
17 A.  Generally familiar.  It's a 128-page document.
18 Q.  Okay.
19
20         (Deposition Exhibit 2 was marked.)
21
22 BY MR. DeCHIARA:
23 Q.  I'd like to mark as -- well, I've already marked as
24     Exhibit 2, and I'll ask you to identify what I'll
25     identify for the record as a July 18th, 2013 letter

Page 60

1      from you to Mr. Orr and Mr. Dillon.
2          Is Exhibit 2 your response to what's been
3      marked as Exhibit 1?
4  A.  Yes.
5
6          (Deposition Exhibit 3 was marked.)
7
8  BY MR. DeCHIARA:
9  Q.  Governor, I've had the court reporter mark as
10     Exhibit 3 a document which bears the title City of
11     Detroit Proposal for Creditors, June 14th, 2013.
12         Let me represent to you that this document
13     was attached to the Orr Declaration that was filed
14     in the bankruptcy proceeding as the City's proposal
15     for creditors.
16         Let me -- did you see this document in any
17     prior form before it was made public on or about
18     June 14th, 2013?
19 A.  Yes.
20 Q.  And do you plan -- were you shown drafts of the
21     document?
22 A.  I'd seen a draft or so.  I can't recall whether it
23     was one or more.
24 Q.  Okay.  And who showed them to you?
25 A.  Again, I don't recall.

Page 65

1    It doesn't say I agree with that or disagree with
2    that.  It simply says I authorized it to go forward
3    where a plan would be presented to a judge that
4    could be the result of further negotiations,
5    mediations, all kinds of work that ultimately a
6    judge would decide.
7 Q. Okay.  I'm not addressing your July 18th letter.
8 A. Yeah.
9 Q. I'm just pegging the question --
10 A. Okay.
11 Q. -- by time frame as of July 18th.
12 A. Okay.
13 Q. So as of July 18th, did you share Mr. Orr's view
14    that there had to be significant cuts in pension
15    liabilities?
16 A. Based on the current situations with negotiations,
17    that continued to be the position that would be on
18    the table going into bankruptcy.
19 Q. Again, I'm not sure that was responsive.
20 A. Uh-huh.
21 Q. As of July 18th, 2013, did you share Mr. Orr's view
22    that whether through negotiation or other means that
23    there as an end result had to be significant cuts in
24    accrued pension liabilities?
25 A. I wouldn't use the word had to be but likely could

Page 66

1    be.
2 Q. Okay.  Well, Mr. Orr used the word "there must be".
3 A. Uh-huh.
4 Q. Did you share that view that there had to be?
5 A. Not necessarily.
6 Q. Okay.
7 A. Just as I said.
8 Q. Okay.  So did you think about this issue as of -- or
9    as of the July 18th, 2013 time frame, had you given
10    thought to whether or not there had to be cuts to
11    accrued pension benefits?
12 A. I gave thought to the issue because I have concern
13    for the retirees, and that was why one of the
14    important questions in my view was to have a retiree
15    representative in the bankruptcy.
16 Q. And what was your -- since you said you gave thought
17    to it, can you articulate what your position was as
18    to whether or not there had to be cuts to accrued
19    pension liabilities?  And I'm focusing on your views
20    on the matter as of July 18th, 2013.
21 A. My view going back prior to that is is I had hoped
22    that there would be negotiations to resolve this
23    short of bankruptcy because bankruptcy was a last
24    resort; that I hoped that people could come to the
25    table and come up with a mutual understanding and

Page 67

1    negotiation that would be satisfactory to the
2    parties involved.
3    That didn't happen in terms of that regard
4    but I still had hope to say that as you go through
5    the bankruptcy process I viewed it as likelihood
6    that there was less flexibility under the bankruptcy
7    process just because of the nature of federal
8    bankruptcy law than there probably was before.
9 Q. Was it your view that as of July 18th in the
10    bankruptcy one way or another accrued pension
11    liabilities would have to be reduced?
12 A. Based on the facts going into it, it was one of
13    those questions, as you said, there was a likelihood
14    of that happening.
15 Q. That's not my question.
16 A. Yes.  Yeah, I believe there's a likelihood there
17    could be reductions in unfunded pension liabilities.
18 Q. Okay.  I'm not asking --
19 A. Yeah.
20 Q. Governor, I'm not asking you to predict the
21    likelihood of what might have happened.
22 A. Okay.
23 Q. I'm asking you whether you believed that in
24    bankruptcy there would have had to be one way or
25    another reductions in Detroit's accrued pension

Page 68

1    liabilities?
2 A. I would say it's not a hundred percent belief.
3 Q. But was it a less than 100 percent belief that there
4    had to be reductions?
5 A. Again, if you looked at the numbers, as we discussed
6    earlier, those are significant numbers, and it would
7    be hard to see how it could be a hundred percent.
8 Q. Let me -- did you discuss with anyone other than
9    your legal counsel and Mr. Orr whether there had to
10    be cuts to Detroit's accrued pension liability?
11 A. When you say other people, there would be people
12    from the administration in the meetings that we had.
13 Q. Who did you discuss that issue with?
14 A. There could be any number of people that would
15    include my chief of staff, Andy Dillon, and other
16    people of the administration.
17 Q. And what did you and Andy Dillon discuss on that
18    issue?
19    MS. NELSON: I'm going to object on the
20    grounds of attorney-client privilege.  These
21    discussions occurred in the meetings with Mr. Orr
22    and his counsel.
23    MR. DeCHIARA: Well, there hasn't been
24    testimony to that effect.
25    MS. NELSON: He just said it.