# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-------------------------------------------------------x
                                      :
In re                                 :      Chapter 9
                                      :
CITY OF DETROIT, MICHIGAN,            :      Case No. 13-53846
                                      :
                    Debtor.           :      Hon. Steven W. Rhodes
                                      :
                                      :
-------------------------------------------------------x
```

## CITY OF DETROIT'S PRE-TRIAL BRIEF IN (I) SUPPORT OF ENTRY OF AN ORDER FOR RELIEF AND (II) OPPOSITION TO OBJECTIONS REQUIRING THE RESOLUTION OF ISSUES OF MATERIAL FACT

# TABLE OF CONTENTS

I.      Preliminary Statement ...................................................................3

II.     The City Was Specifically Authorized to Commence This
        Chapter 9 Case and Has Satisfied Section 109(c)(2) of the
        Bankruptcy Code .........................................................................6

        A.      Chapter 9 Is Constitutional.................................................7

        B.      The Tenth Amendment Does Not
                Pose Any Obstacle to Chapter 9........................................11

        C.      The Pensions Clause Does Not
                Pose Any Obstacle to Chapter 9........................................14

        D.      The Takings Clause Does Not
                Pose Any Obstacle to Chapter 9........................................21

        E.      The Emergency Manager Was
                Validly Appointed Under Both PA 72 and PA 436 ............24

III.    The City Is Insolvent and Has Satisfied
        Section 109(c)(3) of the Bankruptcy Code....................................28

IV.     The City Satisfies Section 109(c)(4) of the Bankruptcy Code
        Because It Desires to Effect a Plan to Adjust Its Debts ................45

V.      The City Satisfies Section 109(c)(5)(C) of the Bankruptcy Code
        Because Negotiation With Its Creditors Was Impracticable.........49

VI.     The City's Good Faith Negotiations With Its Creditors
        Satisfy Section 109(c)(5)(B) of the Bankruptcy Code ..................55

VII.    The City Filed Its Petition in Good Faith Within the
        Meaning of Section 921(c) of the Bankruptcy Code.....................67

VIII.   Conclusion ................................................................................74

**EXHIBITS**

Exhibit A: Order of November 16, 2012 Issued by the Michigan Court of Appeals in <u>Davis v. Roberts</u>; Michigan Attorney General Opinion No. 7267

Exhibit B: Initial and Current EM Contracts

Exhibit C: Excerpt of Transcript of September 30, 2013 Deposition of Kenneth A. Buckfire

Exhibit D: Excerpt of Transcript of September 20, 2013 Deposition of Gaurav Malhotra

Exhibit E: Excerpt of Transcript of September 24, 2013 Deposition of Glenn Bowen

Exhibit F: Excerpts of Sewer and Water Indentures

Exhibit G: Excerpt of Transcript of September 19, 2013 Deposition of Lamont Satchel

Exhibit H: Excerpt of Transcripts of September 16, 2013 and October 4, 2013 Deposition of Kevyn D. Orr

Exhibit I: Excerpt of Transcript of October 9, 2013 Deposition of Richard Snyder

# TABLE OF AUTHORITIES

CASES

Am. Transit Ins. Co. v. Wilfred,
  745 N.Y.S.2d 171 (N.Y. App. Div. 2002) .........................................................26

Americredit Fin. Servs., Inc. v. Nichols (In re Nichols),
  440 F.3d 850 (6th Cir. 2006) ..............................................................................22

Ashton v. Cameron Cnty. Water Improvement Dist. No. 1,
  298 U.S. 513 (1936) ...................................................................................... 14-15

Ass'n of Retired Emps. v. City of Stockton
(In re City of Stockton),
  478 B.R. 8 (Bankr. E.D. Cal. 2012) ...................................................................11

Bank of Minden v. Clement,
  256 U.S. 126 (1921) ...................................................................................... 17-18

Brown v. Legal Found. of Wash.,
  538 U.S. 216 (2003) ...........................................................................................23

Davis v. Roberts,
  No. 313297 (Mich. Ct. App. Nov. 16, 2012) ............................................... 24-25

E. Enters. v. Apfel,
  524 U.S. 498 (1998) ...........................................................................................23

Energy Reserves Grp., Inc. v. Kan. Power & Light Co.,
  459 U.S. 400 (1983) ......................................................................................... 8-9

Faitoute Iron & Steel Co. v. City of Asbury Park,
  316 U.S. 502 (1942) ....................................................................................... 8-11

Frankfather & Sons Trucking, Inc. v. Guar. Nat'l Cos.,
  No. 93WD080, 1994 WL 236185 (Ohio Ct. App. May 27, 1994) ............... 26-27

French v. Nardolillo (In re Perry),
  158 B.R. 694 (Bankr. N.D. Ohio 1993) .............................................................44

Garcia v. San Antonio Metro. Transit Auth.,
  469 U.S. 528 (1985) ...........................................................................................13

Gray v. Chace (In re Boston Publ'g Co.),
209 B.R. 157 (Bankr. D. Mass. 1997) ........................................................ 43-44

Hallock v. Income Guar. Co.,
259 N.W. 133 (Mich. 1935).................................................................................26

Home Bldg. & Loan Ass'n v. Blaisdell,
290 U.S. 398 (1934)...........................................................................................16

Humana Inc. v. Forsyth,
525 U.S. 299 (1999)...........................................................................................18

In re Chrysler LLC,
405 B.R. 84 (Bankr. S.D.N.Y. 2009)...................................................................23

In re City of Central Falls,
No. 11-13105 (Bankr. D.R.I. Aug. 1, 2011) ........................................................70

In re City of Columbia Falls, Mont., Special Improvement Dist. No 25,
143 B.R. 750 (Bankr. D. Mont. 1992) .................................................................47

In re City of San Bernardino,
No. 6:12-bk-28006 (Bankr. C.D. Cal. Sept. 17, 2013).......................................44

In re City of Stockton,
493 B.R. 772 (Bankr. E.D. Cal. 2013).................................................44, 46, 68

In re Connector 2000 Ass'n, Inc.,
No. 10-04467 (Bankr. D.S.C. June 24, 2010) ........................................... 70-71

In re Jefferson Cnty.,
474 B.R. 228 (Bankr. N.D. Ala. 2012) .................................................................9

In re McCurtain Mun. Auth.,
No. 07-80363, 2007 WL 4287604
(Bankr. E.D. Okla. Dec. 4, 2007) .......................................................................71

In re New York City Off-Track Betting Corp.,
427 B.R. 256 (Bankr. S.D.N.Y. 2010)........................................... 41, 45, 65-66

In re Ocwen Loan Servicing, LLC Mortg. Servicing Litig.,
491 F.3d 638 (7th Cir. 2007) .............................................................................20

In re Sanitary & Improvement Dist., No. 7,
    98 B.R. 970 (Bankr. D. Neb. 1989) ............................................................ 47-48

In re Valley Health Sys.,
    383 B.R. 156 (Bankr. C.D. Cal. 2008) ........................................................ 52-53

In re Varanasi,
    394 B.R. 430 (Bankr. S.D. Ohio 2008) ....................................................... 22-23

In re Vills. at Castle Rock Metro. Dist. No. 4,
    145 B.R. 76 (Bankr. D. Colo. 1990) ................................................................54

In re Westfall Twp.,
    No. 09-02736 (Bankr. M.D. Pa. Apr. 10, 2009) ..............................................71

Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo
    (In re City of Vallejo),
    408 B.R. 280 (B.A.P. 9th Cir. 2009) ...............................44, 45, 46-47, 52, 66-67

Klapp v. United Ins. Grp. Agency, Inc.,
    663 N.W.2d 447 (Mich. 2003)........................................................................27

Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.),
    78 F.3d 30 (2d Cir. 1996) ...............................................................................43

Majkowski v. Am. Imaging Mgmt. Servs., LLC,
    913 A.2d 572 (Del. Ch. 2006) ........................................................................20

McCarthy v. City of Cleveland,
    626 F.3d 280 (6th Cir. 2010) ....................................................................23, 24

Microsoft Corp. v. i4i L.P.,
    131 S. Ct. 2238 (2011)....................................................................................21

Murray v. Charleston,
    96 U.S. 432 (1877)............................................................................................9

New York v. United States,
    505 U.S. 144 (1992).......................................................................................10

People v. Williams,
    160 Cal. Rptr. 3d 779 (Cal. Ct. App. 2013)....................................................18

Perrin v. United States,
        444 U.S. 37 (1979)............................................................................................13

Planters' Bank v. Sharp,
        47 U.S. 301 (1848)............................................................................................18

Printz v. United States,
        521 U.S. 898 (1997)..........................................................................................10

Riverview Health Inst. LLC v. Med. Mut. of Ohio,
        601 F.3d 505 (6th Cir. 2010) .............................................................................18

Rodriguez de Quijas v. Shearson/Am. Express, Inc.,
        490 U.S. 477 (1989).......................................................................................... 7-8

Roy v. Teachers Ins. & Annuity Ass'n,
        878 F.2d 47 (2d Cir. 1989) ............................................................................ 12-13

State ex rel. Cleveringa v. Klein,
        249 N.W. 118 (N.D. 1933) .................................................................................18

Swinburne v. Mills,
        50 P. 489 (Wash. 1897) .....................................................................................18

TMW Enters., Inc. v. Fed. Ins. Co.,
        619 F.3d 574 (6th Cir. 2010) ......................................................................... 19-20

United States v. Bekins,
        304 U.S. 27 (1938)..................................................................... 7-12, 14, 15

United States v. Sec. Indus. Bank,
        459 U.S. 70 (1982)............................................................................................22

U.S. Trust Co. of N.Y. v. New Jersey,
        431 U.S. 1 (1977)..........................................................................................8, 16

W. B. Worthen Co. v. Kavanaugh,
        295 U.S. 56 (1935) .......................................................................................... 8-9

W. B. Worthen Co. v. Thomas,
        292 U.S. 426 (1934)..........................................................................................16

Westamerica Bank v. Mendocino Coast Recreation & Park Dist.
   (In re Mendocino Recreation & Park Dist.),
      No. 12-cv-02591, 2013 WL 5423788 (N.D. Cal. Sept. 27, 2013) ......... 61, 65-67

**FEDERAL CONSTITUTION AND STATUTES**

U.S. Const. art. I, § 10 ................................................................................ 8-9, 15-21

U.S. Const. amend. V ...................................................................................... 21-24

U.S. Const. amend. X ...................................................................................... 10-14

11 U.S.C. § 101(32)(C) ................................................................................... 28-31

11 U.S.C. § 109(c) ......................................................................................... *passim*

11 U.S.C. § 903 ......................................................................................... 10-11, 14

11 U.S.C. § 904 ..................................................................................................... 14

11 U.S.C. § 921 ............................................................................................... 67-74

11 U.S.C. § 941 ..................................................................................................... 52

11 U.S.C. § 943 ............................................................................................... 47-49

29 U.S.C. § 1003 ................................................................................................... 13

29 U.S.C. §§ 1081-85 ........................................................................................... 13

29 U.S.C. §§ 1101-14 ........................................................................................... 13

**STATE CONSTITUTION AND STATUTES**

Mich. Const. art. IX, § 24 ................................................................................. 15-21

MCL § 8.4 ............................................................................................................. 25

Public Act 4 of 2011 – MCL §§ 141.1501-1531 .............................................. 24-27

Public Act 72 of 1939 – MCL § 141.201 .............................................................. 17

Public Act 72 of 1990 – MCL §§ 141.1201-1244 ............................................ 24-27

Public Act 436 of 2012 – MCL §§ 141.1541-1575 .......................... 6, 24-27, 59, 71

**OTHER AUTHORITIES**

Black's Law Dictionary (6th ed. 1990) .................................................18

Black's Law Dictionary (9th ed. 2009) .................................................18

2 COLLIER ON BANKRUPTCY ¶ 109.04
    (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev. 2013) ......................45

Bryan A. Garner, Garner's Dictionary of Legal Usage (3d ed. 2011) .....................19

Bryan A. Garner, The Redbook: A Manual on Legal Style (2d ed. 2006)..............20

Merriam-Webster's Collegiate Dictionary (11th ed. 2011) ....................................11

Michigan Attorney General Opinion No. 7267 (Aug. 6, 2012) ..............................25

Webster's Third New International Dictionary (1986) ...........................................19

The City of Detroit (the "City" or the "Debtor") respectfully submits this pre-trial brief in (i) support of the entry of an order for relief in this chapter 9 case (any such order, an "Order for Relief") and (ii) opposition to objections to the entry of an Order for Relief that require the resolution of genuine issues of material fact (each, an "Objection").[1]

Many of the legal and factual issues supporting the entry of an Order for Relief (and underlying the Objections) have been exhaustively documented – through argument and evidence – and/or briefed by the City in:

- its Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 14) (the "Eligibility Memorandum");

- the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 11) (the "Orr Declaration");[2]

- the Declaration of Gaurav Malhotra in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 12) (the "Malhotra Declaration");

- the Declaration of Charles M. Moore in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (Docket No. 13) (the "Moore Declaration");

- its Consolidated Reply to Objections to the Entry of an Order for Relief (Docket No. 765) (the "Consolidated Reply"); and

---

[1] The various parties that have filed Objections to the entry of an Order for Relief are referred to herein as "Objectors").

[2] Capitalized terms used but not defined herein have the meaning given to them in the Orr Declaration.

- its Reply to the Objection of the Official Committee of Retirees to the Entry of an Order for Relief (Docket No. 918) (the "Reply to Committee Objection" and, collectively with each of the foregoing submissions, the "Prior Submissions").

Rather than rehearse arguments and facts set forth in the Prior Submissions, this Brief (i) incorporates the Prior Submissions by reference, (ii) supplements the Prior Submissions by reference to discovery propounded in connection with this contested matter and (iii) responds to certain arguments set forth in certain amended Objections filed with the Court.[3]  The City reserves its right to rely at trial

---

[3]  On October 11, 2013, amended Objections to the entry of an Order for Relief were filed by:  (a) the Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees ("AFSCME") (Docket No. 1156) (the "Amended AFSCME Objection"); (b) GRS and PFRS (together, the "Retirement Systems") (Docket No. 1166) (the "Amended Retirement Systems Objection"); (c) certain of the City's public safety unions (collectively, the "Public Safety Unions") (Docket No. 1169) (the "Amended Public Safety Unions Objection"); (d) the International Union, UAW (the "UAW") and certain plaintiffs in the lawsuit captioned as Flowers v. Snyder, No. 13-729-CZ (Ingham Cnty. Cir. Ct.) (Docket No. 1170) (the "Amended UAW Objection"); and (e) the official committee of retirees appointed in this chapter 9 case (the "Retiree Committee") (Docket No. 1174) (the "Amended Committee Objection" and, collectively with the foregoing amended Objections, the "Amended Objections").

Although Section VII of this Court's First Amended Order Regarding Eligibility Objections, Notices of Hearings and Certifications Pursuant to 28 U.S.C. § 2403(a) & (b) (Docket No. 821) provided that the Amended Objections were to be "based on evidence obtained during discovery" (and, moreover, "shall supersede the party's original objection"), many of the Amended Objections serve primarily (a) as sur-replies to the City's Consolidated Reply and/or Reply to Committee Objection and (b) to

on any and all evidence relevant to the entry of an Order for Relief, including, but not limited to, any deposition testimony or documents not cited or referenced herein.

## I.    PRELIMINARY STATEMENT

As set forth in the Prior Submissions (particularly, the Orr Declaration), the City of Detroit currently is beset by a state-declared emergency. Decades of declining population, employment and revenues and failures of management have produced a multitude of civic ills: widespread urban blight; deteriorating infrastructure and assets; alarming crime rates (compounded by low response times); and an inability to provide acceptable levels of the most basic municipal services.

These problems are exacerbated – and rendered intractable – by the City's debt burden. The City estimates that, as of the Petition Date, it owed approximately $18 billion to more than 100,000 creditors: approximately (A) $5.85 billion in special revenue obligations; (B) $6.4 billion in other post-employment benefit liabilities; (C) $3.5 billion in underfunded pension liabilities based on current estimates; (D) $1.13 billion in secured and unsecured

---

(continued…)

supplement prior briefing on constitutional arguments (with little to no reference to relevant discovery).

general obligation liabilities; (E) $1.43 billion in liabilities under pension-related certificates of participation ("COPs"); (F) $296.5 million in swap liabilities related to the COPs; and (G) $300 million in other liabilities. Even after removing special revenue (enterprise fund) debt from the equation, debt service on these obligations consumes substantial amounts of the City's annual revenue (i.e., 42.5% in the current fiscal year and a projected 65% by 2017).

It quickly became apparent to the City – following good faith attempts to negotiate an out-of-court, consensual restructuring of its obligations with a fragmented creditor constituency (all of whom are competing for every available dollar) – that, absent court intervention, the City's problems (both financial and operational) could not be resolved in a fashion that would maximize equitable recoveries for creditors while also permitting the substantial reinvestment necessary for the long-term rejuvenation of the City. Accordingly, the City commenced this chapter 9 case on July 18, 2013 (the "Petition Date") by filing a Petition for Relief (the "Petition").

In light of the foregoing realities, it would seem manifest that, if ever a city needed to adjust its debts consistent with the provisions and purpose of chapter 9, Detroit is that city. Nevertheless, the prospect of an Order for Relief for the City has met with fierce opposition, with arguments covering the spectrum from

allegations of bad faith on the part of the City to the threshold unconstitutionality of chapter 9 itself.

None of these objections has merit. As demonstrated at length in the Prior Submissions, and further demonstrated herein, the City is eligible to be a chapter 9 debtor and has demonstrated that an Order for Relief should be entered. The City has demonstrated its satisfaction of the state law requirements that govern – and permit – access to chapter 9 (and has refuted the sundry arguments that the federal and Michigan Constitutions prohibit such access). It has conclusively shown, by way of essentially unrebutted financial analyses and projections, its financial insolvency. It has demonstrated both the impracticability of attempts to negotiate a resolution of that insolvency and adjust its $18 billion in debt, as well as its good faith attempts to engage as much of its creditor constituency as possible despite that impracticability. Finally, it has demonstrated both that it desires to effect a plan of adjustment in consonance with the rehabilitative purposes of the Bankruptcy Code, and that it filed its Petition in good faith to achieve those ends.

Accordingly, as set forth in the Statement of Qualifications, the Prior Submissions and herein, the City has satisfied all the requirements of section 109(c) of the Bankruptcy Code, it is eligible to be a debtor under chapter 9 and the Court should promptly enter an Order for Relief.

## II. THE CITY WAS SPECIFICALLY AUTHORIZED TO COMMENCE THIS CHAPTER 9 CASE AND HAS SATISFIED SECTION 109(c)(2) OF THE BANKRUPTCY CODE

No party disputes that the City has satisfied the mechanical requirements of PA 436 governing a Michigan municipality's filing of a chapter 9 petition. On July 16, 2013, consistent with MCL § 141.1558(1), the Emergency Manager provided the Governor and Treasurer with his written recommendation that the City be authorized to file for chapter 9 relief. <u>See</u> Orr Declaration, at Exhibit J (copy of Emergency Manager's written recommendation). Thereafter, on July 18, 2013, pursuant to the same statute, the Governor approved in writing the Emergency Manager's recommendation to commence this chapter 9 case. <u>See</u> <u>id.</u> at Exhibit K (copy of Governor's written approval of Emergency Manager's recommendation). Finally, on July 18, 2013 (and, again, pursuant to MCL § 141.1558(1)), consistent with the Governor's written approval, the Emergency Manager issued a written order directing the City to commence this chapter 9 case. <u>See</u> <u>id.</u> at Exhibit L (copy of Emergency Manager's order directing commencement). Unable to contest either (A) PA 436's authorization of chapter 9 filings or (B) the City's satisfaction of the applicable statutory requirements, the Objectors have resorted to indirect attacks on the City's authorization to commence this case; <u>i.e.</u>, attacks on the constitutionality of (A) the Emergency Manager's and Governor's actions, (B) PA 436 and (C) chapter 9 itself.

Although the purpose of the Amended Objections was to give Objectors the opportunity to update their arguments with new facts in light of the ongoing discovery process, the Objectors instead have taken the opportunity to raise a slew of new constitutionally-based arguments on the eve of the eligibility trial. The Court should decline to entertain these eleventh-hour arguments. In any event, the new arguments raised by the Objectors do not undermine the soundness of the City's legal position. As the City has already explained at length, chapter 9 is perfectly constitutional under binding Supreme Court precedent, and the City was validly authorized under Michigan law to become a chapter 9 debtor. The State's authorization did not violate the Pensions Clause or the Contracts Clause because no pensions or other contractual obligations have been impaired.

A.     Chapter 9 Is Constitutional

Over seventy years ago, the Supreme Court held that the municipal bankruptcy provisions of the Bankruptcy Act of 1937 – the predecessor of the current chapter 9 – was not "an unconstitutional interference with the essential independence of the State as preserved by the Constitution." United States v. Bekins, 304 U.S. 27, 49, 53-54 (1938). The Objectors now seek to upend this longstanding precedent on the ground that subsequent Supreme Court cases have "effectively overruled" Bekins. Because Bekins has never been "actually overruled" by the Supreme Court, however, and because it has "direct application"

to this case, this Court must adhere to it, even if it "appears to rest on reasons rejected in some other line of decisions." Rodriguez de Quijas v. Shearson/Am. Express, Inc., 490 U.S. 477, 484 (1989). The Objectors have yet to offer any response to this well-established rule.

Although Bekins alone is dispositive of chapter 9's constitutionality, none of the Supreme Court's post-Bekins cases provides any reason to doubt the continued validity of chapter 9. The Objectors insist, for example, that chapter 9 is no longer necessary to adjust municipal debts (and thus no longer constitutional) because the Court's New Deal-era Contracts Clause cases, particularly Faitoute Iron & Steel Co. v. City of Asbury Park, 316 U.S. 502 (1942), allow States to enact their own municipal bankruptcy laws. But the Objectors' attempt to scrub the Contracts Clause out of the Constitution cannot be squared with the Supreme Court's admonition that "[w]hen a State itself enters into a contract, it cannot simply walk away from its financial obligations." Energy Reserves Grp., Inc. v. Kan. Power & Light Co., 459 U.S. 400, 412 n.14 (1983).

For this reason, the Supreme Court itself, as well as other courts, have viewed Asbury Park as an outlier. "In almost every case," observed the Supreme Court, it "has held a governmental unit to its contractual obligations when it enters financial or other markets." Energy Reserves Grp., 459 U.S. at 412 n.14 (citing U.S. Trust Co. of N.Y. v. New Jersey, 431 U.S. 1, 25-28 (1977), W.B. Worthen Co.

v. Kavanaugh, 295 U.S. 56 (1935), and Murray v. Charleston, 96 U.S. 432 (1877), in contrast to Asbury Park, 316 U.S. 502); see also In re Jefferson Cnty., 474 B.R. 228, 279 & n.21 (Bankr. N.D. Ala. 2012) (explaining that, because of the Contracts Clause, "non-consensual alteration of contracted debt is, at the very least, severely restricted, if not impossible" and stating that "[t]here has been only one instance in this and the last century when the Supreme Court of the United States has sustained the alteration of a municipal bond contract outside a bankruptcy case" and that Asbury Park has since been "distinguished and its precedent status, if any, is dubious"), aff'd sub nom. Mosley v. Jefferson Cnty. (In re Jefferson Cnty.), No. 11-05736, 2012 WL 3775758 (N.D. Ala. Aug. 28, 2012). Indeed, even Asbury Park sees itself as a limited case bound by its facts. 316 U.S. at 516 (clarifying that "[w]e do not go beyond the case before us" and that "[d]ifferent considerations may come into play in different situations"). The Objectors' attempt to transform Asbury Park into a watershed case is simply unavailing.

Even if Asbury Park stands for the proposition that States may adjust municipal debts in limited ways under extraordinary conditions without violating the Contracts Clause, that power is not – and cannot be – coextensive with Congress' power to authorize the adjustment of municipal debts through Congress' bankruptcy power or any other of its enumerated powers since Congress, unlike the States, is not bound at all by the Contracts Clause. For this reason, Bekins's

essential point – that the "bankruptcy power is competent to give relief to debtors" where state law is not (304 U.S. at 54) – is still valid.

Also unavailing is the Objectors' contention that Congress unconstitutionally enlarged its powers through chapter 9, thus infringing the States' reserved powers under the Tenth Amendment. As a textual matter, Congress' bankruptcy power easily encompasses regulation of municipal bankruptcy. <u>Bekins</u> itself acknowledged that Congress' "bankruptcy power is competent to give relief" to municipal debtors. <u>See</u> <u>Bekins</u>, 304 U.S. at 54. Because municipal bankruptcy falls squarely within Congress' bankruptcy power, the only limitation on Congress' exercise of that power is that it not "commandeer" the States into enacting or administering the federal bankruptcy scheme. <u>See</u> <u>Printz v. United States</u>, 521 U.S. 898, 900 (1997) ("The Federal Government may not compel the States to enact or administer a federal regulatory program.") (quoting <u>New York v. United States</u>, 505 U.S. 144, 188 (1992)). Congress has not done so here. State participation in chapter 9 is wholly voluntary.[4]

---

[4]    AFSCME argues that chapter 9 (and, specifically, section 903 of the Bankruptcy Code) is "coercive," and thus violative of the Tenth Amendment, because it establishes the sole means of adjusting municipal debt. Amended AFSCME Objection, ¶¶ 86, 89. This argument is inconsistent with <u>Bekins</u>, which contemplated that the power to adjust municipal debts "was not available under state law," but nonetheless held that States were free to choose whether to opt in to the federal municipal bankruptcy scheme or to "oppose federal interference." 304 U.S. at 54. Although section 903 might

Not only is chapter 9 non-coercive, it is carefully crafted "to preserve the niceties of the state-federal relationship" for those States that voluntarily authorize their municipalities to seek relief under it.  Ass'n of Retired Emps. v. City of Stockton (In re City of Stockton), 478 B.R. 8, 20 (Bankr. E.D. Cal. 2012).  Under 11 U.S.C. § 903, a bankruptcy court is prohibited from "limit[ing] or impair[ing] the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality …."  Therefore, even if there is some core of sovereign state functions – such as the enactment of State law – that cannot be ceded to the federal government by State consent, chapter 9 itself prohibits the bankruptcy court from intruding on those core functions.

B.    The Tenth Amendment Does Not Pose Any Obstacle to Chapter 9

The Objectors contend that Detroit cannot enter chapter 9 because the Tenth Amendment purportedly reserves all regulation of state and municipal pension

_____
(continued…)

have curtailed the States' limited power under Asbury Park to make minor adjustments to municipal debts, States are no worse off than they were in Bekins.  In that case, the Court assumed that the States were "powerless" to adjust their municipal debts except through the federal bankruptcy process, but nonetheless held that States had a free choice whether to do so.  See id. Even though States cannot pass their own bankruptcy laws, they remain free to forgo chapter 9 and to deal with municipal debts in other ways – for example, by using State tax revenues to relieve their financially-strapped municipalities.

benefits to the States.  See Amended Retirement Systems Objection, at 25-27.  At the outset, this argument is premature at the eligibility stage, because the permissibility of any impairment of pensions is best addressed at the stage of plan confirmation.  If the Objectors' argument is relevant, it must be rejected because it would eviscerate chapter 9.  For state sovereignty purposes, nothing distinguishes municipal pension debt from debt that arises from other municipal obligations; a city's decision to issue bonds, hire contractors or purchase property reflects its control over its spending priorities just as much as its decision to offer certain pension benefits does.  It follows that if the Objectors were right about pension benefits, the Tenth Amendment would prohibit virtually any effort by a bankruptcy court to adjust *any* municipal debt.  That cannot be right.  Bekins makes clear that the adjustment of municipal debts does not impermissibly intrude on state sovereignty, and this Court is bound to follow that holding.

The Objectors also fail to marshal any real evidence in support of their claim that the Tenth Amendment reserves all issues surrounding municipal pensions to the States.  To demonstrate Congress' supposed lack of power, the Objectors note only that, out of respect for federalism, the Employee Retirement Income Security Act ("ERISA") does not cover government pension plans.  See Amended Retirement Systems Objection, at 25-26 (citing Roy v. Teachers Ins. & Annuity

Ass'n, 878 F.2d 47 (2d Cir. 1989); see also 29 U.S.C. § 1003(b)(1) (exempting "governmental plan[s]")).

This is not enough. To begin with, Congress' decision not to regulate a given area, even if inspired by a desire to foster federalism, does not prove that Congress lacks power to enter that area later if it so chooses; many subjects within the States' traditional purview are now filled with federal additions. See, e.g., Perrin v. United States, 444 U.S. 37, 42 (1979) (noting Congress' "now familiar power under the Commerce Clause . . . to prohibit activities of traditional state and local concern that also have an interstate nexus"). Moreover, it is far from clear – to say the least – that Congress lacks the power to impose general substantive rules on state and municipal pension plans if it so desired. See Garcia v. San Antonio Metro. Transit Auth., 469 U.S. 528 (1985) (holding that Congress had power under the Commerce Clause to subject state governments to the Fair Labor Standards Act despite Tenth Amendment concerns).

Finally, the differences between ERISA and chapter 9 demonstrate that Congress has not impermissibly intruded upon state sovereignty by allowing states to authorize municipal bankruptcies. ERISA creates a host of substantive rules with which pension plans must comply. See, e.g., 29 U.S.C. §§ 1081-85 (funding rules); §§ 1101-14 (fiduciary duties). By contrast, chapter 9 simply allows a state, if it chooses, to permit its municipalities to address their insolvency through federal

bankruptcy court.  <u>See</u> 11 U.S.C. § 109(c).  At every step of that process, chapter 9

protects the State's sovereign interests from disruption or control.

<u>See, e.g.</u>, 11 U.S.C. §§ 903 ("This chapter does not limit or impair the power of a

State to control . . . a municipality of or in such State in the exercise of the political

or governmental powers of such municipality …."); 11 U.S.C. § 904(1) ("[T]he

court may not . . . interfere with . . . any of the political or governmental powers of

the debtor.").  Thus, whatever Congress' authority to impose ERISA's substantive

requirements on state or municipal pension plans might be, the Tenth Amendment

does not prohibit Congress from working with states to solve municipal crises

through state-authorized federal bankruptcy proceedings.

     C.     <u>The Pensions Clause Does Not Pose Any Obstacle to Chapter 9</u>

     As the City has already explained, the Pensions Clause treats pensions as

"contractual obligation[s]," thus entitling them to the same protection that applies

under the Contracts Clause – which does not pose any obstacle to chapter 9.  A

State's authorization of municipal bankruptcy does not impair pensions or any

other contractual obligations, but merely "invites the intervention of the bankruptcy

power" to resolve the crisis of municipal insolvency pursuant to federal law.

<u>Bekins</u>, 304 U.S. at 54.  <u>See also</u> <u>Ashton v. Cameron Cnty. Water Improvement</u>

<u>Dist. No. 1</u>, 298 U.S. 513, 542 (1936) (Cardozo, J., dissenting) ("If contracts are

impaired, the tie is cut or loosened through the action of the court of bankruptcy

approving a plan of composition under the authority of federal law. There, and not beyond in an ascending train of antecedents, is the cause of the impairment to which the law will have regard."). The Objectors ask this Court to ignore <u>Bekins</u> and to revert to the long-discredited holding in <u>Ashton</u> that State authorization is unconstitutional because it allows States to accomplish impairments indirectly in violation of the Contracts Clause and/or the Pensions Clause. <u>See</u> Amended AFSCME Objection, at ¶¶ 92-93. <u>Bekins</u> rejected this argument for good reason: the federal municipal-bankruptcy scheme does not authorize *States* to impair contractual obligations. On the contrary, unilateral impairment can only occur pursuant to *federal* law, by order of an impartial *federal* judge. For that reason, chapter 9 simply does not implicate the Contracts Clause or the Pensions Clause. To conclude otherwise would be to fly in the face of both <u>Bekins</u> and the plain language of the constitutional text.

Objectors now raise the new argument that the Pensions Clause offers greater protection than the Contracts Clause because the Pensions Clause prevents pensions from being "diminished or impaired," while the Contracts Clause only prevents contracts from being "impaired." <u>Id.</u> at ¶¶ 139-140. According to Objectors, this linguistic difference must mean that the Pensions Clause is somehow more "absolute" than the Contracts Clause. There is no basis for that conclusion.

In fact, when interpreting the Contracts Clause to be non-absolute, courts have never relied on the bizarre notion that the Clause's prohibition on the "impairment" of contracts does not apply to the "diminishment" of contracts. Rather, courts have given a flexible meaning to the Contracts Clause because reading it too rigidly would "throttle the capacity of the states to protect their fundamental interests." Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 443-44 (1934), and "would make [the Clause] destructive of the public interest by depriving the State of its prerogative of self-protection." W. B. Worthen Co. v. Thomas, 292 U.S. 426, 433 (1934).  For that reason, the United States Supreme Court has held that the Contracts Clause prohibits contractual impairments only if they are "substantial," and not "reasonable and necessary to serve an important public purpose." U.S. Trust, 431 U.S. at 25; see also Blaisdell, 290 U.S. at 438 (stating that contracts may be impaired by measures that are "addressed to a legitimate end" as long as "the measures taken are reasonable and appropriate to that end").

In light of this long-established doctrine, the way for the drafters of the Pensions Clause to create an "absolute" protection for pensions would have been to include language to the effect that pensions cannot be impaired even if the impairment is *not* substantial, and even if the impairment *is* reasonable and

necessary to serve a legitimate public purpose. Of course, the Pensions Clause contains no such language.

Nor does the Pensions Clause contain any language suggesting that pensions, unlike contracts, should be rigidly protected during the rare crisis of municipal bankruptcy. There is nothing about the word "diminish" as opposed to the word "impair" that would suggest as much. Indeed, as the City has already pointed out, when the Pensions Clause was ratified in 1963, Michigan law specifically authorized instrumentalities of the State to commence bankruptcy cases, and that authority remained in place for another 20 years without anyone ever thinking there was a conflict with the Pensions Clause. See Consolidated Reply, at 26 (quoting Public Act 72 of 1939, MCL § 141.201(1) (repealed in 1982)).

Finally, Objectors insist that the term "diminished" must be given *some* independent legal effect for the sake of avoiding surplusage in the constitutional text. If the term "diminish" is given any meaning independent from "impair," however, the Contracts Clause would be hobbled because it would not prohibit diminishments. Any reading of the Pensions Clause that would so impair the Contracts Clause cannot be correct. On the contrary, it has long been understood that the "diminishment" of an obligation is a specific type of "impairment." As the United States Supreme Court has explained, "'[o]ne of the tests that a contract has been impaired is that its value has by legislation been diminished.'" <u>Bank of</u>

Minden v. Clement, 256 U.S. 126, 128 (1921) (quoting Planters' Bank v. Sharp,

47 U.S. 301, 327 (1848)). "The dictionary definition of 'impair' is '[t]o weaken, to

make worse, to lessen in power, *diminish*, or relax, or otherwise affect in an

injurious manner.'" Humana Inc. v. Forsyth, 525 U.S. 299, 309-10 (1999) (quoting

Black's Law Dictionary 752 (6th ed. 1990)) (emphasis added). The Sixth Circuit

has relied on the same definition. See Riverview Health Inst. LLC v. Med. Mut. of

Ohio, 601 F.3d 505, 515 n.3 (6th Cir. 2010) ("To 'impair' means '[t]o weaken, to

make worse, to lessen in power, *diminish*, or relax, or otherwise affect in an

injurious manner.'") (quoting Black's Law Dictionary at 752 (6th ed. 1990))

(emphasis added).[5] The most recent version of Black's Law Dictionary continues

to define the verb "impair" as "[t]o diminish the value of (property or a property

right)," and it defines the noun "impairment" as: "[t]he fact or state of being

damaged, weakened, or diminished." Black's Law Dictionary (9th ed. 2009).

---

[5]     Several state courts have made the same point. See, e.g., State ex rel.
Cleveringa v. Klein, 249 N.W. 118, 122 (N.D. 1933) (""[T]he term 'impair'
means diminish in value or excellence or strength."); Swinburne v. Mills,
50 P. 489, 490 (Wash. 1897) ("What is an impairment of a contract?
Webster's definition of 'impair' is, 'To make worse; to diminish in quality,
value, excellence, or strength; to deteriorate.' Then, if the value of a contract
is deteriorated or lessened by the passage of an act, the obligation of the
contract is most certainly impaired."). People v. Williams, 160 Cal. Rptr. 3d
779, 790 (Cal. Ct. App. 2013) ("The verb 'impair' means 'to damage or make
worse by or as if by diminishing in some material respect.'") (quoting
Merriam-Webster's Collegiate Dictionary 622 (11th ed. 2011)).

Webster's Third similarly defines "impair" as "to make worse:  diminish in quantity, value, excellence, or strength:  do harm to."  Webster's Third New International Dictionary (1986).  Consequently, because "diminish" is a linguistic subset of "impair," the former does not have any additional legal effect.

Although it may be somewhat redundant for the Pensions Clause to use the phrase "diminished or impaired," such redundancy is hardly uncommon. "Amplification by synonym has long been a part of the English language, and especially a part of the language of the law.  In the English Renaissance, this habit was a common figure of speech called *synonymia*….  The purpose of doubling [is] dual: to give rhetorical weight and balance to the phrase, and to maximize the understanding of readers or listeners." Bryan A. Garner, Garner's Dictionary of Legal Usage 294 (3d ed. 2011) ("Doublets, Triplets, and Synonym-Strings").  To take but a few examples of well-known "doublets" in the law, consider the following pairs: "aid and abet," "pardon and forgive," "dominion and authority," "each and every," "false and untrue," "furnish and supply," "null and void," "part and parcel," "power and authority," "restrain and enjoin," and "sole and exclusive." Id. at 295.

As the Sixth Circuit has explained, "lawyers frequently say two (or more) things when one will do or say two things as a way of emphasizing one point. Courts themselves frequently apply 'arbitrary and capricious' review in

administrative law cases.  But no one, I suspect, has ever seen agency action that was 'arbitrary' but not 'capricious.'" TMW Enters., Inc. v. Fed. Ins. Co., 619 F.3d 574, 578 (6th Cir. 2010) (citation omitted).  See also, e.g., In re Ocwen Loan Servicing, LLC Mortg. Servicing Litig., 491 F.3d 638, 646 (7th Cir. 2007) ("The full name of the duty, … 'duty of good faith and fair dealing' – could be thought ominously open-ended.  But the full name is merely what is called a 'doublet,' a form of redundancy in which lawyers delight, as in 'cease and desist' and 'free and clear.'") (quoting Bryan A. Garner, The Redbook: A Manual on Legal Style § 11.2(f) (2d ed. 2006)); Majkowski v. Am. Imaging Mgmt. Servs., LLC, 913 A.2d 572, 588  (Del. Ch. 2006) (declining to give independent meaning to the synonymous phrases "indemnify and hold harmless").

To be sure, the terms "diminish" and "impair" are not exact synonyms, because diminishment is a linguistic subset of impairment.  The important point, however, is that "diminish" does not add any legal effect beyond "impair," since every diminishment of a contractual obligation is also an impairment.  To diminish a contractual obligation is simply to impair it in a specific way.  Indeed, the fact that the term "diminish" has a more specific meaning than "impair" helps illustrate why the drafters had good reason to use both terms together:  By using "impair" they ensured that pensions would be covered by the full, traditional legal protection of the Contracts Clause.  By adding the term "diminish," they focused attention on

the specific type of impairment that the ratifying public would have found most easily understandable.

Finally, as the City has already explained, a party invoking the canon against surplusage must be able to offer a better alternative – i.e., a "competing interpretation [that] gives effect to every clause and word." <u>Microsoft Corp. v. i4i L.P.</u>, 131 S. Ct. 2238 (2011). Objectors cannot meet that test because their reading of the Pensions Clause suffers from an even worse surplusage problem: it fails to give effect to the provision that each pension "shall be a contractual obligation." <u>See</u> Reply to Committee Objection, at 9-11. Objectors do not even attempt to explain why the drafters of the Pensions Clause would have gone out of their way to refer to pensions as "contractual obligation[s]" if they did not intend to treat pensions as contracts, entitled only to the familiar protection of the Contracts Clause. On the City's reading, by contrast, it is perfectly plausible that the drafters added the term "diminished" simply to emphasize the specific point that pension payments could not be reduced – an important political point that may not have been as clear to the public if the drafters had used only the broader and more legalistic term "impaired."

    D.    <u>The Takings Clause Does Not Pose Any Obstacle to Chapter 9</u>

The Objectors contend that modifying their pension benefits through bankruptcy would take their property in violation of the Fifth Amendment.

See Amended Retirement Systems Objection, at 29-30; U.S. Const. amend. V ("nor shall private property be taken for public use, without just compensation"). Once again, this argument is premature and incorrect.

As unsecured creditors, the Objectors lack the kind of property interest required to support a takings claim. "The bankruptcy power is subject to the Fifth Amendment's prohibition against taking private property without compensation," United States v. Sec. Indus. Bank, 459 U.S. 70, 75 (1982), but not everyone whose rights are affected by a bankruptcy plan has his or her property taken for purposes of the Fifth Amendment. Rather, in defining what constitutes "property," the Supreme Court has distinguished between contractual obligations and "traditional property interests"; modifications of the former cannot support a takings claim, while deprivations to the latter can. Id.; see also Americredit Fin. Servs., Inc. v. Nichols (In re Nichols), 440 F.3d 850, 854 (6th Cir. 2006) (distinguishing between "the *contractual* right to obtain repayment of [a] debt" and the "*property right* the [secured] creditor has in the collateral that secures the debt") (emphasis in original).

To even trigger a takings analysis, then, the Objectors must demonstrate that they have a property right in a part of the debtor's property, not just a contractual right to be repaid. This they cannot do. As unsecured creditors, they "do not have interests in any of [the] debtor's property prior to the debtor filing bankruptcy," and thus their "unsecured … claims do not rise to the level of a property interest" for

purposes of the Takings Clause. In re Varanasi, 394 B.R. 430, 438 (Bankr. S.D. Ohio 2008); see also In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) (rejecting an objection premised on the Takings Clause because "the objector holds an unsecured claim, rather than a lien in some collateral that is property of the estate, which is a necessary prerequisite to a Fifth Amendment Takings Clause claim in the bankruptcy context").

In an effort to bootstrap their contractual rights into a Fifth Amendment property interest, the Objectors note that the Takings Clause applies where the government "seize[s] a sum of money from a specific fund," McCarthy v. City of Cleveland, 626 F.3d 280, 284 (6th Cir. 2010), or where it "appropriate[s], transfer[s], or encumber[s] … specific identified property interest[s], such as a bank account or accrued interest," id. at 285 (quoting E. Enters. v. Apfel, 524 U.S. 498, 540 (1998) (Kennedy, J., concurring in part and dissenting in part)). These facts, while true, are irrelevant. A modification of pension benefits would not "seize" money from a "specified fund"; it would discharge Detroit from certain contractual obligations to make payments from future cash flow going forward. Cf. Brown v. Legal Found. of Wash., 538 U.S. 216 (2003) (state law requiring lawyers to transfer interest on certain accounts to legal aid services constituted a taking of that interest).

Moreover, modifying pension benefits would not "encumber" any of the Objectors' "specific identified property interests." They have no such interest in any particular account, only a general contract claim to receive future cash payments from the City's coffers on account of a pension underfunding. Because modifying pension benefits to address underfunding would not "seize or otherwise impair an identifiable fund of money," McCarthy, 626 F.3d at 286, the Objectors' Takings claim fails.

E. The Emergency Manager Was
Validly Appointed Under Both PA 72 and PA 436

In her (late-filed) Objection (D.I. 1222) to the entry of an Order for Relief (the "Crittenden Objection"), Objector Krystal Crittendon argued that the appointment of the Emergency Manager was invalid – and, thus, the filing of the Petition was invalid – because (a) the rejection of PA 4 by referendum in November of 2012 did not serve to revive PA 72 (i.e., the statute under which the Emergency Manager was initially appointed) (Crittendon Objection, at 1-2) and (b) a temporal ambiguity in the initial contract appointing the Emergency Manager resulted in a 24-hour period during which no emergency manager served (Crittendon Objection, at 2-3). Each of these arguments should be rejected.

First, Ms. Crittendon's assertion that PA 72 was not revived by the electorate's rejection of PA 4 has already been rejected by the Michigan Court of Appeals. See Order, Davis v. Roberts, No. 313297 (Mich. Ct. App. Nov. 16, 2012)

(confirming that the tenure of an emergency manager appointed under PA 4 continued under a revived PA 72; holding that, as with the rest of the statute, the section of PA 4 repealing PA 72 "did not survive the referendum and has no effect"; holding that Michigan's anti-revival statute, MCL § 8.4, "includes no reference to statutes that have been rejected by referendum" and that "MCL [§] 8.4 does not apply to the voters' rejection, by referendum, of PA 4."); see also Mich. Att'y Gen. Op. No. 7267 (Aug. 6, 2012) (opining, prior to the rejection of PA 4, that a rejection by referendum of PA 4 would not constitute a "repeal" of the statute and, thus, MCL § 8.4 would not apply; opining that PA 72 would be permanently revived upon the rejection of PA 4).[6]  Accordingly, the Emergency Manager was validly appointed under the revived PA 72, and Ms. Crittendon's argument should be rejected.

Second, Ms. Crittendon's suggestion that an alleged gap in the Emergency Manager's tenure of service invalidates his appointment (and, thus, the City's Petition) should likewise be rejected.  Ms. Crittendon intends to exploit an ambiguity in the "Contract for Emergency Financial Manager Services" (the "Initial EM Contract"), entered into between the Emergency Manager and the LEFALB on March 14, 2013 pursuant to PA 72.  Ms. Crittendon argues that,

---

[6]     Copies of the Michigan Court of Appeals order in Roberts and the Michigan attorney general's opinion are attached hereto as Exhibit A.

because (a) the Initial EM Contract provides that it "shall terminate at *midnight* on Wednesday, March 27, 2013" (Initial EM Contract, at § 2.2; emphasis added) and (b) the current contract between the Emergency Manager and the State of Michigan, dated March 27, 2013 (the "Current EM Contract"), did not become effective until Thursday, March 28, 2013 (Current EM Contract, at § 2.2),[7] there was no emergency manager appointed for the City on March 27, 2013.

The Michigan Supreme Court has previously indicated its understanding that the term "midnight" means the *end* of the specified day. See Hallock v. Income Guar. Co., 259 N.W. 133, 134 (Mich. 1935) (holding that an insurance policy expired at "midnight," i.e., at the end of the day, on the specified expiration date, and not at the beginning of said date). Other courts commonly find the term "midnight" to be ambiguous. See, e.g., Am. Transit Ins. Co. v. Wilfred, 745 N.Y.S.2d 171, 172 (N.Y. App. Div. 2002) (holding that where an insurance contract specified that the policy was valid "to midnight" on a certain date, the word "midnight" was ambiguous because it could have referred to the beginning or end of the specified expiration date); Frankfather & Sons Trucking, Inc. v. Guar. Nat'l Cos., No. 93WD080, 1994 WL 236185, at *1 (Ohio Ct. App. May 27, 1994) ("[T]he term '12:00 a.m.' is capable of having several meanings in reference to [a

---

[7]     Copies of the Initial EM Contract and the Current EM Contract are attached hereto as Exhibit B.

specific] date …. Such term could refer to the first moment of the day ….
However, the term also could refer to … the last moment of the day."). Michigan
courts have held that, when a contract term is ambiguous, the trier of fact must
decide what the term means, and may consider extrinsic evidence in such cases
without violating the parol evidence rule. See, e.g., Klapp v. United Ins. Grp.
Agency, Inc., 663 N.W.2d 447, 454 (Mich. 2003) ("A written instrument is open to
explanation by parol or extrinsic evidence when it is … susceptible of two
constructions, or where the language employed is vague, uncertain, obscure, or
ambiguous ….").

In light of the foregoing, Ms. Crittendon's restrictive interpretation of the
word "midnight" – which is plainly contrary to the parties' intent that the
Emergency Manager's tenure be continuous – should be rejected by this Court.
Moreover, even if such a gap in the contracts for services existed (which the Court
should find it does not), such a gap does not compel the conclusion that the
Emergency Manager's *appointment* by the LEFALB is thereby invalidated as a
threshold matter.

…..

Accordingly, the City has satisfied the requirements of section 109(c)(2) of
the Bankruptcy Code, no constitutionally based argument impairs the City's access
to chapter 9 and the Court should enter the Order for Relief.

## III. THE CITY IS INSOLVENT AND HAS SATISFIED SECTION 109(c)(3) OF THE BANKRUPTCY CODE

The Prior Submissions – including the extensive data contained in or accompanying the Orr Declaration and the Malhotra Declaration – conclusively demonstrate that the City satisfies each of the disjunctive tests for municipal insolvency contained in section 101(32)(C) of the Bankruptcy Code.

Specifically, the City has demonstrated that:

- the City (A) did not make a $39.7 million payment due and owing to certain service corporations established in connection with the issuance of the COPs on June 14, 2013, (B) on the same day, publicly declared a moratorium on all payments related to unsecured debt and (C) had deferred nearly $110 million in required pension contributions for the 2012 and 2013 fiscal years (among other payments) and, thus, was "generally not paying its debts as they become due" within the meaning of section 101(32)(C)(i) of the Bankruptcy Code;[8]

- the City satisfies the prospective test for "cash insolvency" where (A) it has experienced negative cash flows for years (including negative cash flows of $115.5 million in fiscal year 2012), (B) the City's $31.5 million positive cash flow for fiscal year 2013 was accomplished only through the non-payments and deferrals referenced in the prior bullet and a $10 million draw of escrowed debt proceeds, (C) the City projects cash flow deficits of $198.5 million for the current fiscal year and $260.4 million for the next fiscal year and (D) the City's net cash position will turn negative by the end of the calendar year, reach negative $143.3 million by the end of the current fiscal year and reach negative $404.5 million as of the end of fiscal

---

[8]     See Orr Declaration, at ¶¶ 12, 54, n.152; Eligibility Memorandum, at 13.

year 2015 (numbers that would only be exacerbated by the inclusion of accumulated payment deferrals);[9]

- the City is "budget insolvent" where (A) it had run substantial budget deficits for the preceding six years, (B) its accumulated deficit (excluding the effect of certain borrowings) would have been approximately $700 million as of the end of the 2013 fiscal year and (C) at the City's current run rate, the accumulated deficit was projected to grow to approximately $1.3 billion by fiscal year 2017;[10]

- the City is "service delivery insolvent" and unable to fund the necessary costs of providing its residents with basic municipal services, as evidenced by (A) alarmingly high crime rates and low response times and case clearance rates, (B) approximately 40% of the City's street lights being inoperative, (C) the existence of more than 140,000 blighted properties throughout the City (including approximately 40,000 abandoned structures considered to be dangerous), (D) the City's aged and inadequately maintained infrastructure and equipment and (E) the City's obsolete and non-integrated information technology;[11] and

- the City is unable to render itself solvent where it (A) cannot raise taxes, (B) cannot reduce expenditures without further endangering public health and safety, (C) cannot ameliorate its insolvency on a sustainable basis through asset sales that would be insufficient to resolve its $18 billion debt burden and would threaten to impair the City's long term growth prospects and (D) has limited access to capital markets.[12]

---

[9]  See Orr Declaration, at ¶¶ 11, 50-51, 56-57; Malhotra Declaration, at ¶¶ 20-23; Eligibility Memorandum, at 19-22.

[10]  See Orr Declaration, at ¶ 50; Malhotra Declaration, at ¶ 23; Eligibility Memorandum, at 22.

[11]  See Orr Declaration, at ¶¶ 31-44; Eligibility Memorandum, at 23-26; June 14 Creditor Proposal (attached as Exhibit A to Orr Declaration), at pp. 9-22.

[12]  See Orr Declaration, at ¶¶ 29-31, 38-44, 53, 58, 64-66, 72, 83 n.53; Eligibility Memorandum, at 23-26; Malhotra Declaration, at ¶ 25.

No Objector challenges *any* of the foregoing with evidence. None of the initial Objections challenged the City's showing of insolvency with any facts then available, despite all interested parties having had access to a wealth of financial information for months (e.g., the cash flow projections and other financial data set forth in the June 14 Creditor Proposal; the detailed financial information contained in the data room). The subsequent opportunity to conduct extensive discovery and submit Amended Objections based thereon has not addressed the evidentiary deficiency in the Objectors' case for solvency.[13] Indeed, four of the five Amended Objections filed (i.e., those filed by the Retiree Committee, the Retirement Systems, the Public Safety Unions and the UAW) do not mention the topic of insolvency *at all*, and the Amended Objection that does (the AFSCME Amended Objection) provides only scant citation to evidence in support of its argument.

The Amended AFSCME Objection argues (A) the City's prepetition non-payment of debt (described above) does not satisfy the test for insolvency set forth at section 101(32)(C)(i) (i.e., whether the City generally is paying its debts as they come due) and (B) the City cannot satisfy the test for insolvency set forth at

---

[13]     See Transcript of Deposition of Kenneth A. Buckfire, dated September 20, 2013, Case No. 13-53846 (the "Buckfire Deposition"), at 34:3-7 ("Well, we've produced a tremendous amount of financial information including balance sheets, both historical as audited by the City's auditors, and more recent analyses produced by Ernst & Young."). Excerpts from the Buckfire Deposition containing all testimony cited herein are attached hereto as Exhibit C.

section 101(32)(C)(ii) of the Bankruptcy Code (i.e., whether the City is "unable to pay its debts as they come due") because it (1) deliberately budgeted itself into insolvency and (2) the City's evidence of insolvency is founded on unreliable evidence. See Amended AFSCME Objection, at ¶¶ 225-237.

None of these arguments withstands scrutiny. AFSCME's characterization of the City's prepetition non-payment of debt as the "purposeful refusal to make a few payments comprising a relatively small part of the City's budget" (Amended AFSCME Objection, at ¶ 227) implies that the City essentially manufactured its prepetition insolvency for the purpose of satisfying section 109(c)(3) of the Bankruptcy Code. In so doing, AFSCME ignores relevant evidence addressing precisely this topic and mischaracterizes the financial reality facing the City in the months preceding the Petition Date.

In the first half of 2013, the City was starved for liquidity and driven to take emergency measures to preserve cash. See Buckfire Deposition, at 15:5-16:22 (Miller Buckfire had "evaluate[d] the City's financial condition from a solvency perspective," determined that the City was insolvent in May of 2013 and advised the Emergency Manager that "the City's financial condition was so dire that we had to take immediate steps to preserve the City's liquidity so that it would [not] be in jeopardy of losing essential public services…."); 20:5-10 (noting that the Emergency Manager "agreed, having reviewed the financial forecast prepared by

Ernst & Young, that the situation was indeed very serious and he agreed with my recommendation that we immediately formulate a strategy to preserve the City's cash flow.").

Accordingly, to preserve sufficient liquidity to make payments related to basic municipal services and payroll, the City had no choice but to withhold payment on certain debts that were currently due and owing. <u>See</u> Buckfire Deposition, at 52:9-12 (stating, with respect to the City's decision to defer payment on pension contributions, "it was our conclusion that the City had no cash and could not afford to make this payment and therefore should not make the payment."). Indeed, with respect to its decision to withhold the $40 million payment on the COPs in June of 2013, the City was forced to make that decision despite the fact that such non-payment would constitute an event of default under its swap-related obligations (and thus threaten the City's ability to pay for even the most basic public services). <u>See</u> Buckfire Deposition, at 68:12-24 (characterizing "[t]he decision whether or not to make the $40 million payment to our [COPs] bond holders on June 15" as "the most important recommendation" made to the Emergency Manager "[b]ecause that would trigger an event of default on the part of the City which would immediately trigger other consequences related to the swap collateral agreement, which was a direct threat to the City's ability to operate in the ordinary course.").

These are not the actions of an entity manufacturing a cosmetic cash insolvency. They are the actions of an entity already deep in the throes of the real thing. Nor do these non-payments amount to "a few payments comprising a relatively small part of the City's budget." In June of 2013, the City withheld payment on approximately $150 million in currently owing debts (i.e., approximately $110 million of pension contributions and $40 million of debt related to the COPs) while simultaneously declaring a moratorium on principal and interest payments on all unsecured debt. AFSCME's attempt to characterize these defaults as non-material is belied by the basic facts of the matter.[14]

AFSCME's suggestion that the City "deliberately budgeted itself into insolvency" is likewise contradicted by evidence. AFSCME's argument on this point generally consists of an attack on the supposed unreliability of the evidence put forth in the Prior Submissions and suggests that the City's presentation with respect to its insolvency "relies on unaudited and unfounded assumptions, unsupported statements and a complete lack of expert opinion." That is, unable to (A) demonstrate the City's alleged solvency based on its own financial analysis

---

[14]    Moreover, AFSCME's argument appears to suggest that section 109(c)(3) of the Bankruptcy Code required the City to withhold the filing of its bankruptcy petition until it was essentially operating without any available cash whatsoever. The City – which has the obligation to provide for the public health and safety of its citizens and meet current payroll – has no such obligation, and AFSCME cites to no authority in support of any such implicit requirement.

supported by evidence (expert or otherwise)[15] or (B) avoid the ineluctable

conclusion of insolvency demonstrated by the City presentation, AFSCME can do

little else but resort to impugning the integrity of the City's data and methodology.

The attempt fails.

First, the testimony of Gaurav Malhotra establishes the reliability of the data

used by Ernst & Young, as financial advisor to the City, in creating the cash flow

forecasts described in the Prior Submissions (which forecasts conclusively

demonstrate insolvency). First, Mr. Malhotra's testimony makes clear that the

2012 CAFR – one of the sources upon which Ernst & Young relied in creating its

assumptions and forecasts – is, in fact, an audited document. See Transcript of

Deposition of Gaurav Malhotra, dated September 20, 2013, Case No. 13-53846

(the "Malhotra Deposition"),[16] at 111:2-15 ("Q: Was the CAFR audited? A: Yes.

Q: Audited by who? A: KPMG…. KPMG is the city's auditor and it is another

Big 4 accounting firm…. Q: Comparable to E&Y in terms of what it does?

A: Yes.")

Second, Mr. Malhotra makes clear that, to the extent Ernst & Young

received financial data directly from the City, it did not accept that data at face

---

[15]  No Objector, including AFSCME, has provided the Court with any financial
analysis and/or data that might suggest solvency on the part of the City.

[16]  Excerpts from the Malhotra Deposition containing all testimony cited herein
are attached hereto as Exhibit D.

value. Rather, Ernst & Young undertook an independent evaluation of such data to

ensure its reliability.

> Q: … Did Ernst & Young do anything to ensure that the information that Ernst & Young evaluated and relied upon as received from the City was accurate information that you could draw assumptions from?

> A: EY did – our team based on the data that was received did go through the information to make sure that the assumptions were reasonable…. [I]f we were receiving some information, we would try and review what other documentation may or may not be available to support any trends from a historical perspective and whether the information was consistent, and if it was not consistent, if there were any major outliers, speak to the team at the City to try and understand what changes might be happening. So, I'm comfortable that we undertook … an analysis of the information that was presented by the City after asking questions that we were using reasonable assumptions…. [T]his was generally an iterative and collaborative process of exchanging information and assumptions back and forth….

> Q: Can you give me one example of any instance where Ernst & Young challenged the information received and went back to any department in the City where the information came from to verify or better understand a problem with the information received?

> A: There were instances when we were receiving reports on cash collections that were not appropriately categorized and which – and which we went back and, you know, further evaluated as to, you know, what the – where those cash receipts really actually belonged in terms of income taxes or property taxes. They were – that's one example. There were questions with respect to the amount of accounts payable outstanding that the City was reporting and, you know, if there were more invoices that were actually entered into the system or not. So,

there have been a variety of back-and-forth conversations on different topics which is part of what we actually are helping at the City with is to try and get our arms around reasonable assumptions around the data that is available. (Malhotra Deposition, at 65:16-68:11)

….

Q: You took the historical data directly from the City?

A: The City's historical data, we took the data that the City gave us and then made sure that … data was reasonable, how we would actually look at the assumptions and that historical data. So we had to look at the data, look at what the assumptions were with respect to how that data was classified, how that data was categorized to make sure that we could actually use that data. *So there wasn't just a raw data dump in which we could use that data in its original form without having to analyze it further.* (Malhotra Deposition, at 107:20-108:7) (emphasis added).[17]

Third, AFSCME's attempt to characterize the City's estimation of the true extent of the underfunding of the Retirement Systems as unreliable is also belied by the evidence produced through discovery. According to AFSCME, because the City has not yet produced its own independent actuarial valuation of the Retirement Systems' underfunding (which work is in process and hampered by the Retirement Systems' recalcitrance in responding to the City's information requests),

---

[17]    Kenneth Buckfire, the City's lead investment banker, also provided testimony regarding the integrity of the financial data underlying the City's demonstration of insolvency. See Buckfire Deposition, at 40:25-41:2 (noting that the City's demonstration of insolvency "is based on the work of Ernst & Young and Conway McKenzie. I have no reason to doubt their accuracy.").

preliminary work performed by Milliman to estimate the amount of that

underfunding using the Retirement Systems' data and new assumptions that would

more realistically reflect a market valuation thereof is inadequate to establish

insolvency. Essentially, AFSCME suggests that, because the City's estimation of

its pension underfunding is not as precise as it will be following the completion of

the City's independent actuarial valuation, its current estimation is worthless.

Moreover, AFSCME suggests that Milliman's valuation of the City's pension

underfunding is compromised by the fact that the assumptions adopted by

Milliman in performing its analyses "were directly dictated by the City." Amended

AFSCME Objection, at ¶ 56.[18]

However, observing – correctly – that the City asked Milliman to perform its

calculations based on certain assumptions is not at all the same thing as

demonstrating that such assumptions were improper. Indeed, relevant discovery

reveals not only that the City's assumptions are warranted (and, thus, its estimation

---

[18]   Notably, AFSCME does nothing to establish that the City's approach to
       estimating the amount of its pension underfunding obligation is
       presumptively unreliable, nor does it attempt to undermine the qualifications
       of Milliman to perform such work (which are unassailable). Nor does
       AFSCME cite to any evidence or present any financial analyses
       demonstrating that, even if the City were to adopt what it believes are the
       radically understated estimates of underfunding developed by the Retirement
       Systems' actuary, that the City would thus be rendered solvent (which it
       would not).

of its pension underfunding reliable), but that the assumptions used by the Retirement Systems' current actuary are unwarranted.

For example, asked his opinion with respect to whether the respective assumed rates of return used by the Retirement Systems for their pension assets were "above the top end of your reasonable range," Mr. Glenn Bowen, a principal and consulting actuary at Milliman, testified that "[w]hen we calculated the – using the specific investment policy provided by the City, we developed the expected return and a best estimate range, and the top of that range was below the 7.9 and the 8 percent used in the [Retirement Systems'] valuations…. I would not recommend a rate outside of our best estimate range to any of my clients." Transcript of Deposition of Glenn Bowen, dated September 24, 2013, Case No. 13-53846 (the "Bowen Deposition"),[19] at 33:19 – 34:3; 36:10-12.  Indeed, based on its capital market assumptions, Milliman recommended assumed rates of return of 6.3% and 6.57% for the GRS and PFRS, respectively; i.e., rates *lower* than the 7.0% assumed rate used by the City to arrive at its $3.5 billion estimate of underfunding.  See Letter from Glenn Bowen and Katharine A. Warren to Evan Miller, dated June 4, 2013 (Bates Numbers DTMI00066292-6307) (the "Milliman GRS Letter") (analysis of GRS underfunding), at 2; Letter from Glenn Bowen and

---

[19]     Excerpts from the Bowen Deposition containing all testimony cited herein are attached hereto as Exhibit E.

Katharine A. Warren to Evan Miller, dated June 4, 2013 (Bates Numbers DTMI00066176-6190) (the "Milliman PFRS Letter") (analysis of PFRS underfunding), at 2.

Mr. Bowen further testified that, although the Retirement Systems' 30-year amortization periods are not uncommon in public sector pension plans, "30 years is shorthand for a lot of different types of amortization methods. So … the particulars of this 30-year amortization method lead to an increasing debt each year, and that was what we felt was important to point out, the functioning of this particular methodology." Id. at 40:10-18. Amortization periods adopted by Milliman were substantially shorter, generally ranging from 15 to 20 years. See Milliman GRS Letter, at 2-5; Milliman PFRS Letter, at 2-5.[20]

AFSCME's suggestion that, in asking Milliman to estimate the City's pension underfunding consistent with these differing, and substantially more conservative, assumptions, the City intended to overstate the City's pension underfunding for the ulterior purpose of demonstrating insolvency is self-serving and easily dispatched. A city with $14.5 billion in debt in the absence of pension underfunding has little need to inflate its underfunding obligation to demonstrate insolvency. What the City *did* need – for the dual purpose of understanding the

---

[20]    Mr. Bowen further testified that the Retirement Systems' use of a seven year period for "smoothing" returns was "not a standard number" and that "[f]ive is the most common." Id. at 44:11-13.

extent of its obligations and presenting an accurate picture of those obligations to its creditor constituency – was a realistic, market-based estimate of the extent of that underfunding.  As Mr. Bowen testified, "only the market value of assets really exists and is available to pay benefits with."  Bowen Deposition, at 176:2-4.

AFSCME's further assertion that the City either had access to available funds, or avoided asset transactions, that might have resolved the City's insolvency prior to the Petition Date cannot be credited.  See Amended AFSCME Objection, at ¶¶ 233, 235, 237.  First, contrary to AFSCME's assertion, the City's General Fund does not have access to revenues generated by its water and sewer department, the use of which is governed by the ordinances and indentures governing the special revenue debt issued by such funds.  See Amended and Restated Bond Ordinance No. 01-05, at §§ 12(B), 13(F); Amended and Restated Bond Ordinance No. 18-01, at §§ 12(B), 13(F); Trust Indenture among The City of Detroit, Detroit Water and Sewerage Department and U.S. Bank National Association as Trustee (Sewage Disposal System), dated February 1, 2013 (the "Sewer Indenture"), at § 2.10; Trust Indenture among The City of Detroit, Detroit Water and Sewerage Department and U.S. Bank National Association as Trustee (Water Supply System), dated February 1, 2013 (the "Water Indenture"), at § 2.10 (generally providing that any "surplus funds" generated by water and

sewer systems are to be used for systems purposes only);[21] Malhotra Deposition, at 45:12-46:1 ("A: … The City has multiple funds outside the general fund. The main one is the water and sewer…. My understanding is that those funds are not necessarily available to the general fund…. It would be available to the City for the purposes those funds were raised for, which is generally maintenance and capital improvements on the water and sewer side.").

Second, AFSCME's suggestion that the City might have easily disposed of its "prized artwork collection" currently exhibited and/or stored at the Detroit Institute of Arts in order to resolve its insolvency (A) underestimates the likelihood of contentious disputes with various constituencies should the City propose such a sale (and thus overestimates the City's ability to effect such a sale expeditiously) and (B) ignores that (1) the City must retain certain assets (including culturally significant assets) to effect a sustainable restructuring and (2) applicable case law does not require a municipality to sell assets (essential or non-essential) prior to commencing a chapter 9 case. E.g., In re New York City Off-Track Betting Corp., 427 B.R. 256, 282 (Bankr. S.D.N.Y. 2010) ("Even assuming [the debtor] could have theoretically done more to avoid bankruptcy, courts do not require chapter 9 debtors to exhaust every possible option before filing for chapter 9 protection.").

---

[21] Relevant portions of the Sewer Indenture and Water Indenture are attached hereto as Exhibit F.

Third, the City actually has attempted to realize value from the leasing of Belle Isle (identified by AFSCME as a monetizable asset). However, (A) these efforts have been frustrated by the City Council and (B) the amount of cost savings to be realized from the proposed lease transaction (approximately $6 million annually), while welcome, would not materially impact the City's solvency.

Fourth, AFSCME suggests that increased tax collection efforts by the City may be available to alleviate the City's insolvency. See Amended AFSCME Objection, at ¶ 225. However, as demonstrated by the testimony of Ken Buckfire, "the ability of the City to collect a material amount of these delinquent taxes is low…. For two reasons. Number one, I think many of the people who have not paid have no capacity to pay. We can't find them, or we simply have no ability to enforce a judgment. And, secondly, the City ability administratively to collect taxes has been proven to be quite low…. [The City] had only one accountant working on the corporate sector…." Buckfire Deposition, at 121:16-122:2; 124:6-7. Accordingly, the City's alleged ability to address its insolvency through increased tax collection is illusory.

Fifth, AFSCME contends that the City's agreement with its swap counterparties to allow for a reduced payment in satisfaction of the City's termination liabilities "potentially freed up significant cash and did not make the filing imminent." Amended AFSCME Objection, at ¶ 237. Of course, the City's

settlement of its swap-related liabilities did not "free up" any cash.  Rather, it merely preserved access to the City's gaming revenues (which might have been seized in the event of a termination of the swaps).  The swap settlement generated no additional cash for the City; it simply avoided instant cash insolvency in the event access to the City's gaming revenue stream were lost.[22]

Finally, AFSCME contends that "[i]t is telling (and should be shocking to all citizens of Detroit and Michigan) that … the City fails to offer even one person to stand up as an *expert* and testify to the City's insolvency."  Amended AFSCME Objection, at ¶ 231 (emphasis in original).  Citing to several avoidance action proceedings, AFSCME suggests (without actually stating) that the evidence of insolvency offered by the City is inadequate without expert testimony.  Id.  Even in the context of such avoidance actions, however, courts – including the Second Circuit in one of the decisions cited by AFSCME – do not require expert testimony to find insolvency.  See Lawson v. Ford Motor Co. (In re Roblin Indus., Inc.), 78 F.3d 30, 38 (2d Cir. 1996) (preference action; affirming finding of insolvency notwithstanding the absence of appraisals or expert testimony); Gray v. Chace (In re Boston Publ'g Co.), 209 B.R. 157, 172-73 (Bankr. D. Mass. 1997) (preference

---

[22]  Moreover, the June 14 Creditor Proposal expressly contemplated that creditors would see recoveries in the event of material asset dispositions.  See June 14 Creditor Proposal (attached as Exhibit A to the Orr Declaration), at 106-08.

action; finding insolvency was supported by multifaceted evidence provided by debtor notwithstanding absence of appraisals or expert testimony); French v. Nardolillo (In re Perry), 158 B.R. 694, 697 (Bankr. N.D. Ohio 1993) (preference action; concluding that debtor was insolvent on a balance-sheet basis without reference to expert testimony).

Indeed, the insolvency of several large chapter 9 debtors has been established on the basis of evidence other than expert testimony. See, e.g., Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo), 408 B.R. 280, 291-93 (B.A.P. 9th Cir. 2009) (affirming bankruptcy court's finding of insolvency notwithstanding absence of expert testimony); In re City of San Bernardino, No. 6:12-bk-28006, Court's Statement of Uncontroverted Facts and Conclusions of Law (Bankr. C.D. Cal. Sept. 17, 2013) (finding debtor insolvent solely on basis of statement of qualifications supported by declaration where insolvency uncontroverted); In re City of Stockton, 493 B.R. 772, 787, 798 (Bankr. E.D. Cal. 2013) (finding insolvency based upon documentary evidence provided by the City without reference to expert testimony).

AFSCME neither (A) offers any explanation of why expert testimony is to be accorded talismanic significance when determining municipal insolvency under section 109(c)(3) of the Bankruptcy Code, (B) demonstrates any lack of qualification on the part of the experienced professionals employed by the City nor

(C) materially undermines the reliability of the data utilized, projections made or conclusions reached by such professionals (as demonstrated above). The City should not be – and is not – required to supplement the wealth of competent evidence on insolvency it has provided with unnecessary expert testimony.

Accordingly, the City has established, and the Objectors have failed to refute, that the City is insolvent within the meaning of section 109(c)(3) of the Bankruptcy Code.

## IV. THE CITY SATISFIES SECTION 109(c)(4) OF THE BANKRUPTCY CODE BECAUSE IT DESIRES TO EFFECT A PLAN TO ADJUST ITS DEBTS

The record establishes that the City desires to effect a plan to adjust its debts and, therefore, satisfies section 109(c)(4) of the Bankruptcy Code. See 11 U.S.C. § 109(c)(4) (requiring that a municipality demonstrate that it "desires to effect a plan to adjust [its] debts"). "[N]o bright line test for determining whether a debtor desires to effect a plan" exists because of the "highly subjective nature of the inquiry." New York City Off-Track Betting, 427 B.R. at 272 (quoting Vallejo, 408 B.R. at 295). A putative debtor need only show that the "purpose of the filing of the chapter 9 petition [is] not simply … to buy time or evade creditors." Vallejo, 408 B.R. at 295 (quoting 2 COLLIER ON BANKRUPTCY ¶ 109.04[3][d] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. rev.)); New York City Off-Track Betting, 427 B.R. at 272 (same). A municipality may meet the

13-53846-tjt   Doc 1240   Filed 10/17/13   Entered 10/17/13 22:58:11   Page 54 of 84

subjective eligibility requirement of section 109(c)(4) of the Bankruptcy Code by attempting to resolve claims, submitting a draft plan or producing other direct or circumstantial evidence customarily submitted to show intent. Vallejo, 408 B.R. at 294-95.

In the Eligibility Memorandum, the City referenced the ample evidence of its desire to effect a chapter 9 plan. Eligibility Memorandum, at 35-39. In particular, the City pointed to its efforts to restructure its debts prior to the commencement of this chapter 9 case, including the two-hour June 14 Meeting with approximately 150 representatives of all of the City's creditor groups regarding the 128-page June 14 Creditor Proposal, which described in detail the economic circumstances that resulted in Detroit's current predicament and proposed a thorough overhaul and restructuring of the City's operations, finances and, importantly, existing capital structure. Id. at 36-38. In addition, the fact that the City's cash reserves would have been depleted by the end of the calendar year absent the intervention of this chapter 9 case supported the City's intent to effectuate a plan of adjustment. See Stockton, 493 B.R. at 792 (finding that the debtor had "little choice but to effect a plan" to adjust its debts where a dismissal of the proceeding would have left the debtor in worse financial condition than existed in chapter 9). The City also demonstrated its intent to effect a plan to adjust its debts through its submission of its Statement of Qualifications. See Vallejo,

408 B.R. at 295 (finding that the debtor's submission of a statement of qualifications that was certified under oath by the Vallejo city manager was evidence supporting the subjective inquiry into the debtor's desire to effect a plan of adjustment).

The Amended UAW Objection argues that the City does not "desire to effect a plan" within the meaning of section 109(c)(4) of the Bankruptcy Code because, to the extent it provides for the impairment of pension obligations, any plan the City desires to effect would be unlawful and, thus, allegedly unconfirmable under section 943(b)(4) of the Bankruptcy Code.  Amended UAW Objection, at ¶¶ 46-47. This argument is misplaced, however, for at least two reasons.

First, section 943(b) of the Bankruptcy Code provides for confirmation of a chapter 9 debtor's plan of adjustment so long as, among other things, "the debtor is not prohibited by law from taking any action necessary to carry out the plan." 11 U.S.C. § 943(b)(4).  The focus under section 943(b)(4) of the Bankruptcy Code is on the debtor's *post-confirmation* ability to carry out or implement the plan within the confines of applicable nonbankruptcy law.  In re City of Columbia Falls, Mont., Special Improvement Dist. No. 25, 143 B.R. 750, 760 (Bankr. D. Mont. 1992) ("… Section 943(b)(4) does not prevent the debtors from proposing a plan that impairs the rights of the bondholders.  This provision applies to postpetition actions after confirmation of the plan …."); see also In re Sanitary

& Improvement Dist., No. 7, 98 B.R. 970, 973-75 (Bankr. D. Neb. 1989)

(distinguishing between the proper application of section 943(b)(4) to the

post-confirmation implementation of a chapter 9 plan and its improper application

to the impairment of claims).

> State law already requires full payment of the bonds
> issued prepetition and the state and the municipality are
> forbidden the opportunity to compromise the amounts
> due…. To create a federal statute based upon the theory
> that federal intervention was necessary to permit
> adjustment of a municipality's debts and then to prohibit
> the municipality from adjusting such debts is not, in the
> point of view of this Court, a logical or necessary result.

Id. at 974. The possible impairment of pension claims under the City's chapter 9

plan, therefore would not violate section 943(b)(4) of the Bankruptcy Code.

Second, even if section 943(b)(4) of the Bankruptcy Code were implicated

by the proposed impairment of claims under – as opposed to the implementation of

– a chapter 9 plan (which it is not), consideration of section 943(b)(4) remains

irrelevant for the purpose of determining whether a municipality desires to effect a

chapter 9 plan under section 109(c)(4) of the Bankruptcy Code. The Amended

UAW Objection cites to no authority whatsoever in support of its argument that the

prospective application of the confirmation standards of section 943 of the

Bankruptcy Code should govern eligibility, and the City is aware of none. The

proper time for the UAW and the Flowers Plaintiffs to test their erroneous theory

that section 943(b) of the Bankruptcy Code would prohibit the impairment of

pension claims will be in connection with confirmation of a proposed plan of adjustment that seeks to impair such claims. There is no basis for the UAW and Flowers Plaintiffs' attempt to invoke section 943(b) of the Bankruptcy Code in connection with this Court's eligibility determination generally or the City's desire to effect a plan to adjust its debts under section 109(c)(4) in particular.

Accordingly, the City has established, and the Objectors have failed to refute, that the City desires to effect a plan to adjust its debts within the meaning of section 109(c)(4) of the Bankruptcy Code.

## V. THE CITY SATISFIES SECTION 109(c)(5)(C) OF THE BANKRUPTCY CODE BECAUSE NEGOTIATION WITH ITS CREDITORS WAS IMPRACTICABLE

In the Prior Submissions, the City demonstrated the impracticability of conducting negotiations with its very numerous creditors and that the requirement for eligibility set forth at section 109(c)(5)(C) of the Bankruptcy Code was satisfied. Specifically, the City explained that: (A) the "impracticability" requirement was added to the Bankruptcy Code to facilitate relief under chapter 9 for major American cities (i.e., precisely this circumstance); (B) the numerosity and fragmented nature of the City's creditors made negotiations with the creditor body impracticable; (C) in many instances, the City was unable to negotiate with representatives with authority to bind creditors because there were no such representatives; and (D) the City did not have time to conduct extended creditor

negotiations.  As demonstrated in the Consolidated Reply and the Reply to

Committee Objection, none of the initial Objections to the entry of an Order for

Relief succeeded in undermining any of the foregoing.  <u>See</u> Eligibility

Memorandum, at 40-53; Consolidated Reply, at 45-53; Reply to Committee

Objection, at 20-21; Orr Declaration, at ¶¶ 105-111.

The Amended Objections likewise do nothing to undermine the City's

showing of impracticability.  The Amended AFSCME Objection and the Amended

Committee Objection rehearse previous arguments that the City could have

negotiated with its retirees and/or bondholders, despite the facts that (A) the City

cannot restructure key terms of its bond debt absent the unanimous consent of the

thousands of holders of such debt and the lack of any representatives with authority

to bind all such bondholders (<u>see</u> Eligibility Memorandum, at 46-47; Consolidated

Reply, at 45-46), (B) the various unaffiliated retiree associations (which purport to

represent only 70% of the City's retirees) do not constitute a unified, natural

bargaining representative of the City's retirees and lack the legal authority to bind

such retirees in any event (<u>see</u> Consolidated Reply, at 47-49) and (C) the majority

of the Unions either (1) expressly indicated unwillingness or legal inability to

represent retirees or (2) neither agreed nor refused to represent retirees (<u>see</u>

Consolidated Reply, at 50-52).[23]  The Objectors' repackaging of these flawed

arguments is insufficient to overcome the City's showing of impracticability.[24]

Moreover, the unwillingness of the overwhelming majority of the City's

Unions to negotiate on behalf of their retirees fatally undermines AFSCME's

attempt to demonstrate the practicability of negotiations with retirees by reference

to previous circumstances where the City and its Unions successfully reached

tentative (but never implemented) labor agreements.  See Amended AFSCME

Objection, at ¶¶ 50-52.  It cannot be the case, however, that, because an

unspecified coalition of Unions was, at some point in the past, willing to negotiate

---

[23]     The Amended AFSCME Objection's argument (at ¶ 211, note 14) that the
City was not entitled to rely on AFSCME's representation in a letter from
Edward L. MacNeil, Special Assistant to the President of AFSCME, to
Brian Easley of Jones Day that AFSCME "has no authority in which to
renegotiate the Pension or Medical Benefits that members of our Union
currently receive" because (a) the letter was dated three weeks prior to the
commencement of good faith negotiations and (b) AFSCME might have
negotiated an agreement binding such retirees anyway is frivolous on its face
and should be rejected.

[24]     The Amended AFSCME Objection asserts that "the City ignores that serious
bargaining and negotiations with bond trustees (even where bondholders
could not have been bound 100%) and the City's unions could have yielded
the major deals necessary to prevent the crash landing in chapter 9 that
occurred."  Amended AFSCME Objection, at ¶ 211.  Even assuming that the
City could have negotiated with AFSCME's hypothetical "bond trustees" (as
set forth in the Prior Submissions, U.S. Bank generally serves solely as a
paying agent and not as a traditional trustee for GO debt), AFSCME offers
no suggestion as to precisely how these results might have been obtained
despite the threshold obstacles to negotiation set forth above (and discussed
in detail in the Prior Submissions).

with the City with respect to benefit changes that impacted certain retirees, prepetition negotiations were somehow rendered practicable under circumstances where the majority of Unions were *unwilling* to negotiate on behalf of their retirees.

The arguments made in the Amended Committee Objection likewise fail to overcome the City's showing of impracticability. First, the Retiree Committee simply invents the notion that section 109(c)(5)(C) of the Bankruptcy Code cannot be satisfied in the absence of the City's proposal of a comprehensive plan of adjustment (as contemplated by section 941 of the Bankruptcy Code) and, unsurprisingly, finds that the City does not satisfy this heretofore unknown requirement.

The Retiree Committee concedes that "other bankruptcy courts have decided this issue differently"[25] and should have further conceded, consistent with its lack of relevant citation, that no bankruptcy court has *ever* decided it similarly. The Retiree Committee argues, inscrutably, that section 109(c)(5)(C) of the Bankruptcy Code is informed by the alleged requirement that good faith negotiations under section 109(c)(5)(B) of the Bankruptcy Code require the proposal of a plan of adjustment. This interpretation of the statute is strained past the point of breaking.

---

[25]    Amended Committee Objection, at 9 n.6 (citing <u>Vallejo</u>, 408 B.R. 280, and <u>In re Valley Health Sys.</u>, 383 B.R. 156, 161-62 (Bankr. C.D. Cal. 2008)). In the face of these adverse decisions, the Retiree Committee argues that this Court is not bound by <u>Vallejo</u> and <u>Valley Health</u> and champions the "textual accuracy" of its *sui generis* reading of section 109(c)(5)(C).

As the <u>Valley Health</u> court observed, the two subsections are plainly disjunctive, and the court specifically rejected the notion that the requirements of section 109(c)(5)(B) are to be imported into section 109(c)(5)(C). <u>See</u> <u>Valley Health</u>, 383 B.R. at 162-63 ("Because § 109(c)(5) is written in the disjunctive, a debtor has four options to satisfy the requirement for negotiation…. There is nothing in the language of § 109(c)(5)(C) that requires a debtor to either engage in good faith pre-petition negotiations with its creditors to an impasse …."). Further, it strains credulity to suggest that an inquiry into whether negotiations are practicable as a threshold matter would look to the potential subject matter of those negotiations (in this case, a proposed plan of adjustment) as being relevant to – to say nothing of dispositive of – the threshold question.

The Retiree Committee's further argument that the City cannot satisfy section 109(c)(5)(C) of the Bankruptcy Code because it failed to negotiate in good faith with retirees (<u>see</u> Amended Committee Objection, at ¶¶ 93-96) fails for multiple reasons of both fact and law. First, the Committee improperly conflates the good faith of the City's negotiation effort (addressed by section 109(c)(5)(B) of the Bankruptcy Code) with the impracticability of those negotiations (separately addressed by section 109(c)(5)(C) of the Bankruptcy Code), an error previously addressed at length by the City at pages 51-52 of the Consolidated Reply. Second, as demonstrated in the Prior Submissions, contrary to the Retiree Committee's

assertion, negotiations with the City's retiree constituency were impracticable for a host of reasons. See, e.g., Consolidated Reply, at 47-49. An argument founded solely upon the practicability of such negotiations must therefore fail. Third, as set forth at pages 46-47 of the Consolidated Reply, courts have consistently determined that the "impracticability" requirement of section 109(c)(5)(C) of the Bankruptcy Code is satisfied where negotiations with *any* significant creditor constituency is impracticable. See In re Vills. at Castle Rock Metro. Dist. No. 4, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) (holding that negotiations were impracticable for purposes of 109(c)(5)(C) of the Bankruptcy Code where negotiations with single class of bondholders holding one-third of the debtor's total bond debt would have been futile). Finally, as is the case with respect to its argument that section 109(c)(5)(C) of the Bankruptcy Code contemplates the proposal of a plan of adjustment, the Retiree Committee cites to absolutely no authority in support of its newly-minted test for impracticability.[26]

For all of the foregoing reasons (and those set forth in the Prior Submissions), the City has satisfied the requirements of section 109(c)(5)(C) of the Bankruptcy Code.

---

[26] Similar arguments set forth at paragraphs 207 to 209 of the Amended AFSCME Objection, which likewise reference the requirement of good faith negotiation set forth at section 109(c)(5)(B) of the Bankruptcy Code and the City's alleged failure to negotiate with certain constituencies, should be rejected for the same reasons.

## VI. THE CITY'S GOOD FAITH NEGOTIATIONS WITH ITS CREDITORS SATISFY SECTION 109(c)(5)(B) OF THE BANKRUPTCY CODE

As set forth in the Prior Submissions, the City has carried its burden of demonstrating that it negotiated in good faith with those of its creditors who were both organized and willing to engage the City (despite the impracticability of such negotiations). Specifically, (A) the City convened the June 14 Meeting (attended by representatives of each of the various classes of creditors that may be impaired under a plan of adjustment), at which it engaged its creditors with respect to a comprehensive – and consensual – restructuring of the City's obligations, (B) engaged in a significant number of follow-up negotiation sessions with discrete creditor constituencies, often meeting with particular constituencies multiple times and (C) conveyed and otherwise made available to creditors (e.g., through the Data Room) significant amounts of financial and other information. See Orr Declaration, at ¶¶ 79-104; Eligibility Memorandum, at 53-61; Consolidated Reply, at 53-59; Reply to Committee Objection, at 18-20. Despite the City's good faith efforts, however, it was unable to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that the City intended to impair under a plan of adjustment.

The Amended Objections repeat arguments made in many of the initial Objections, including that the City's restructuring proposals were presented to

creditor constituencies at non-interactive meetings on a "take it or leave it" basis that precluded any prospect of actual "negotiation."[27]  The Amended Objections, however, ignore the evidence (set forth in the Prior Submissions) that the City (A) actively sought continuing dialogue with, *and counter-proposals from*, its counterparties but (B) *received no concrete proposal or comprehensive feedback* from any Objector prior to the commencement of this case.[28]

The Amended Objections further ignore relevant deposition testimony that confirms the City's characterization of its various meetings with its creditor constituencies as good faith negotiations within the meaning of section 109(c)(5)(B) of the Bankruptcy Code.  For example, the testimony of Lamont Satchel, director of labor relations for the City, directly contradicts the Objectors' characterization of the meetings held with creditor constituencies in the weeks preceding the Petition Date as one-sided, non-interactive, take-it-or-leave-it affairs.  Speaking of a meeting between the City and Unions that he personally attended on June 20, 2013, Mr. Satchel testified as follows:

> Q:  Do you recall what Mr. Miller [counsel to the City] said as to what feedback attendees would – they were expecting from attendees if any?

---

[27]  <u>See</u> Amended AFSCME Objection, at ¶¶ 188-90; Amended UAW Objection, at 49.

[28]  <u>See</u> Orr Declaration, at ¶¶ 108-11; Eligibility Memorandum, at 55-59; Consolidated Reply, at 53-58.

A: I think it was both before and after the proposal was made and even during it when questions were taken, Mr. Miller made it clear that the City would welcome and in fact had solicited input or suggestions from the – those in attendance with respect to the items that were discussed in the deck.

Q: Did Mr. Miller say that this meeting was a negotiation session?

A: I don't recall him making those – stating those exact words, but it was – it had all the trappings of a negotiation, it just wasn't labor negotiation in the traditional sense of a labor negotiation over a collective bargaining agreement, but it had all the trappings of it, of a negotiation, to me.

Q: Can you just – what perhaps did it have that gave you that impression?

A: You had two or more parties engaged in the discussion of a proposal that had been made, we had the solicitation of a response to that proposal, a willingness to cooperate and welcome any input from the other party. There was also an offer of information to be provided to the parties to the extent that they wanted – I think there was some discussion about a data room that had been set up with the parties. The only thing missing was folk screaming at me.

....

Q: Did the City indicate there was any flexibility as to what changes might need to be made to the pension, the pension plan?

A: Yeah, that was the whole purpose of it. They were engaging the unions and representatives from the various pension boards and their advisors to get – solicit input from them with respect to that topic. The City had made a proposal and wanted to know if anyone had a proposal

that – or counterproposal they would like to offer in that regard.

…

Q: So did the City invite unions or employees to speak up at the meeting and express their views on the proposal?

A: Yeah, there was an opportunity for those in attendance to speak too and many of them did…. I believe that may have been the meeting where folk filled out cards and a good number of them spoke even without the card….

Q: So people would fill out cards and they would be submitted to the City and read aloud; is that correct?

A: Yeah, the City would have them and read them and would respond and if someone who submitted the question would – if they wanted to pose a question or had a follow-up or some clarity with respect to that question, they did. You had others who just raised their hand and spoke out.

Q: Would someone from the City call on someone who's raising their hand or would they just speak without being asked?

A: You had a little of both. Some people raise their hand, others may have just blurted out something.

…

Q: Did the City indicate it was prepared to negotiate over the pension?

A: As I said before, it was the City both at the beginning, at the end and even throughout answering questions made it clear that they were soliciting responses from the union with respect to their proposal in terms of in this case pension they thought were the issues and soliciting

> from the unions their proposal with respect to solving any
> pension issues that the City had in terms of funding.

Transcript of Deposition of Lamont Satchel, dated September 19, 2013, Case No. 13-53846 (the "Satchel Deposition"), at 60:18-61:21; 62:16-25; 70:5-71:4; 71:17-72:2.[29]

Despite the character of the June 20th meeting (as described by Mr. Satchel), many objectors seek to elevate form over substance by arguing that the City's reluctance to expressly characterize its discrete creditor meetings as "negotiations" confirms that they were never intended as such. E.g., Amended AFSCME Objection, at ¶ 186; Amended Public Safety Unions Objection, Brief, at 14. However, as set forth in the Consolidated Reply (at 55-56), the City avoided characterizing its meetings and discussions with its unions as formal "bargaining negotiations" to avoid any argument that it had triggered obligations to collectively bargain under Michigan law that are currently suspended by PA 436. This reason for the City's circumspection on this point was confirmed by testimony given by the Emergency Manager. See Transcript of Deposition of Kevyn D. Orr, dated September 16, 2013, Case No. 13-53846 (the "Orr Deposition"), at 261:24-262:21 (Q: … Let me ask you the same question for the June 20th and July 11th [meetings]. Do you recall at that – at those meetings saying anything to the effect

---

[29]     Excerpts from the Satchel Deposition containing all testimony cited herein are attached hereto as Exhibit G.

of this is not a negotiation?  A:  I may have.  As I've said several times today, you know, bargaining negotiation is suspended for five years so I may have said that, but I don't recall…. I think generally, when I would go to these meetings, say we're having discussions and exchange, but I would try – if I said this is not a negotiation, I would try to make sure that I did not waive the suspension of bargaining under [PA] 436, so I may have said that, yes.").[30]

AFSCME alleges that the City could not have engaged in good faith negotiations with creditors because "the City had already made a determination as early as the beginning of July 2013 that it would be filing for chapter 9 protection on or about July 19, 2013."  Amended AFSCME Objection, at ¶ 37.[31]  In support of

---

[30]  Excerpts from the Orr Deposition containing all testimony cited herein are attached hereto as <u>Exhibit H</u>.  References to the Orr Deposition also include the continued deposition testimony provided by the Emergency Manager on October 4, 2013.

[31]  At page 54 n.48 of the Consolidated Reply, the City criticized AFSCME's (and other Objectors') flagrant misuse of statements made by the Emergency Manager in connection with the issuance of his "Financial and Operating Plan," dated May 12, 2013, to the effect that "[t]his isn't a plebiscite, we are not, like, negotiating the terms of the plan. It's what I'm obligated to do."  As the City noted, the "Financial and Operating Plan" is required by PA 436, was issued a month prior to the June 14 Creditor Meeting, does not address the specific treatment of creditor claims against the City and is completely unrelated to the good faith negotiations commenced by the City on June 14, 2013.  Undeterred, the Amended AFSCME Objection doubles down, now characterizing the Financial and Operating Plan as "a predecessor to [the City's] ultimate Restructuring Plan."  Amended AFSCME Objection, at ¶ 38.  This is false.

its argument, AFSCME references, in bold and underlined text, a "Chapter 9 Communications Rollout" prepared by the City that suggests a potential date of commencement for a chapter 9 case of July 19, 2013, that supposedly evidences the predetermined nature of the filing.  Id. at ¶ 46.

Yet AFSCME has demonstrated no more than that the City was preparing a chapter 9 filing in parallel to its efforts at good faith negotiation, as every debtor must.  Indeed, later in its Objection, AFSCME cites approvingly to Westamerica Bank v. Mendocino Coast Recreation & Park Dist. (In re Mendocino Recreation & Park Dist.), No. 12-cv-02591, 2013 WL 5423788 (N.D. Cal. Sept. 27, 2013), for the alleged proposition that the City would be unable to satisfy section 109(c)(5)(B) of the Bankruptcy Code if it were *not* preparing a chapter 9 case and negotiating over the terms of a plan of adjustment to be filed in an *imminent* bankruptcy.  See Mendocino, 2013 WL 5423788, at *6 (stating that section 109(c)(5)(B) of the Bankruptcy Code requires that an "imminent bankruptcy plan cannot be absent from the conversation").  AFSCME's argument that section 109(c)(5)(B) of the Bankruptcy Code obliges the City both to negotiate over the terms of a fully-formed – and imminent – plan of adjustment while at the same time refraining from any chapter 9 planning must, therefore, be rejected.[32]

---

[32]    Indeed, as set forth in the Consolidated Reply (at 65-66), the Objectors are aware that the Emergency Manager had always indicated that the

Moreover, the Emergency Manager's testimony demonstrates that, although the City was preparing its chapter 9 filing in the event that its good faith negotiations should ultimately prove fruitless, the filing of the City's Petition was never set in stone (its planning documents notwithstanding).

> A: … I don't want to give you the wrong impression because I think based upon what I've seen from some of the briefing and some of the interrogatories the impression is that [the chapter 9 filing] was predetermined and that's not true. The reality is that there was much discussion about what the alternatives would be and the need to bring something that would bring order and efficiency to the process given the number of interests that were involved.
>
> …………..
>
> Q: Was there ever a plan to file [the Petition] on the 19th? Setting aside what the media reported, was there a plan to file [the Petition] on the 19th?
>
> A: No, my plan was to have the permission, the authority to file [the Petition] and make that call at some point after I transmitted my [recommendation] letter of July 16.

See Orr Deposition, at 40:6-14; 301:3-8.

AFSCME further cites to an annotated copy of a document prepared by Jones Day (the "Jones Day Presentation") – and distributed to various City and

---

(continued…)

commencement of a chapter 9 case was an option for the City if its negotiations with creditors regarding an out-of-court restructuring proved impracticable or fruitless.

State personnel at a meeting held on January 29, 2013 (the "<u>January 29 Meeting</u>") at which Jones Day presented its qualifications to serve the City as lead restructuring counsel – as evidence that the City's eventual chapter 9 filing was a foregone conclusion.  See Amended AFSCME Objection, at ¶¶ 3-4, 31-32.

AFSCME distorts the Jones Day Presentation through selective quotation. At no point does the Jones Day Presentation state that the City should adopt a strategy with the intended result of a chapter 9 filing.  Indeed, it says *precisely the opposite*.  Prior to any mention of chapter 9, the Jones Day Presentation states plainly, in 24-point font, that "Out of Court Solutions are Preferred" and further notes the "Benefits of Well Planned Out-Of-Court Restructuring."  Jones Day Presentation, at 13; <u>see</u> <u>also</u> <u>id.</u> at 19 ("*If Chapter 9 Needed*, Planning Is Key") (emphasis added).  AFSCME further ignores that the overwhelming majority of the Jones Day Presentation addresses topics other than a potential chapter 9 filing. <u>See</u>, <u>e.g.</u>, Jones Day Presentation, at 22 ("Establish Long-Term Goals and Promote Inclusiveness"; addressing out of court negotiations with no reference to chapter 9); 24, 26 ("Multi-Year Budget" and "Prepare to Defend the Budget"; no reference to chapter 9); 30 ("Exploring Creditor Recoveries"; no reference to chapter 9); 32 ("Equitable Shared Sacrifice Among Creditor Groups"; no reference to chapter 9).  In light of the foregoing, the fact that the Jones Day Presentation also acknowledges the possibility of a chapter 9 filing – and suggests steps that might

prudently be taken in contemplation of that possibility – is hardly evidence of any predetermined strategy to commence a chapter 9 case, and AFSCME's suggestion to the contrary is a flagrant mischaracterization of the document.

Moreover, AFSCME fails to observe that the copy of the Jones Day Presentation to which it refers (and which includes the supposedly offending language) was a "speaker notes" – i.e., annotated – copy that was not distributed to any attendee at the January 29 Meeting. Rather, it was a document created solely for Jones Day's internal use. See Orr Deposition, at 363:17-364:2 ("Q: So what we have as Exhibit 21 [i.e., the Jones Day Presentation] was the – the internal – at least this was the internal version of the pitch book; in other words, were there speaker notes? A: Yes … the speaker notes were not presented to … the review team."). It is unlikely that the attendees at the January 29 Meeting were influenced by a document they never saw. This is especially significant where, as the Emergency Manager testified, (A) Jones Day spent almost no time discussing the Jones Day Presentation at the January 29 Meeting and (B) neither chapter 9 nor Jones Day's experience with chapter 9 cases were substantial portions of Jones Day's presentation at the January 29 Meeting.

> A: As I recall, [at the January 29 Meeting] we did not – there weren't PowerPoint capabilities, so we intended to work off the document … but the discussion, within a minute or two, veered away from the document and more was a dialogue….

….

> Q: And was there any discussion specifically of the possibility of a Chapter 9 filing at [the January 29 Meeting]?
>
> A: I don't think so. I don't recall … and the reason I say I don't recall is there – no, wait a minute. I don't know if there was a discussion about the City. There was a discussion about other Chapter 9 cases, other cities.
>
> Q: And what specifically do you recall being said about the chapter 9 filings in the other cases? Let me put it this way. Did Jones Day refer to experience it had in doing other chapter 9 filings?
>
> A: Yes, yes, various members of the team referred to that experience, yes.
>
> Q: And is it fair to say that the Chapter 9 experience was a substantial part of the pitch that Jones Day was making to this committee?
>
> A: No. … It was a component of the presentation.

See Orr Declaration, at 21:7 – 22:1; 363:10-16. Accordingly, the Jones Day

Presentation does not evidence any intention or desire by the City (or Jones Day)

to commence chapter 9 proceedings.

Finally, the Retiree Committee's argument that the City is incapable of

satisfying section 109(c)(5)(B) of the Bankruptcy Code because it has failed to "set

forth what is, in substance, a plan of adjustment under Section 941 [of the

Bankruptcy Code]" is contradicted by both relevant cases (including the

Mendocino and New York City Off-Track Betting opinions cited by the Retiree

Committee) and the substance of the June 14 Creditor Proposal.

Although it is true that the New York City Off-Track Betting court found a debtor to have satisfied section 109(c)(5)(B) of the Bankruptcy Code where it had "engaged in negotiations with creditors regarding the possible terms of a reorganization plan prior to filing" (New York City Off-Track Betting, 427 B.R. at 274), at no point did that court require that an actual draft of a ready-to-file plan of adjustment was a prerequisite to those negotiations being conducted in good faith. Indeed, the court found precisely the opposite and stated that "talks need not involve a formal plan to satisfy section 109(c)(5)(B)'s negotiation requirement." Id. at 275. This finding is consistent with the conclusions of the bankruptcy appellate panel in Vallejo, which required that a debtor must "negotiat[e] with creditors revolving around a proposed plan, *at least in concept*…. [that] designates classes of creditors and their treatment" (Vallejo, 408 B.R. at 297 (emphasis added)), and which opinion is cited by the Mendocino court as following the "restrictive view" with respect to the necessity of negotiation over a plan of adjustment. See Mendocino, 2013 WL 5423788, at *2.

The Mendocino opinion, which affirmed the bankruptcy court's finding that section 109(c)(5)(B) was satisfied even though the proposal put forth by the debtor "did not mention any other creditors, designate classes of creditors, or describe their treatment in a proposed bankruptcy plan" (id. at *1), is not to the contrary. Mendocino expressly subscribes to the "restrictive view" espoused by the Vallejo

panel, which test is plainly satisfied by the June 14 Creditor Proposal (which identifies each of the City's various creditor classes, quantifies the amount of the claims within each such class and describes their treatment pursuant to a comprehensive scheme of debt adjustment). Id. at **6, 8 ("The Court sees good reasons to adopt the Vallejo rule as an extremely useful indicium of whether parties negotiated in good faith regarding a bankruptcy plan. …. This Court does not mean to undermine Vallejo's requirement that municipalities provide an outline of classes of creditors and their treatment. In any negotiation, it is a requirement whose absence will defeat a municipality's claim to have negotiated in good faith over the terms of a bankruptcy plan."). Even under the "restrictive view" espoused by the Vallejo and Mendocino courts, the City satisfies the requirements of section 109(c)(5)(B).

Accordingly, for the reasons set forth above and in the Prior Submissions, the City has satisfied the requirements of section 109(c)(5)(B) of the Bankruptcy Code.

## VII. THE CITY FILED ITS PETITION IN GOOD FAITH WITHIN THE MEANING OF SECTION 921(c) OF THE BANKRUPTCY CODE

In its Prior Submissions, the City conclusively demonstrated that its Petition was filed in "good faith" within the meaning of section 921(c) of the Bankruptcy Code. Specifically, the City established that (A) its purposes for seeking relief

under chapter 9 – i.e., to adjust approximately $18 billion in debt and resolve

intractable and disabling liquidity crises threatening its ability to provide residents

with basic municipal services – were consistent with the rehabilitative purposes of

the Bankruptcy Code, (B) chapter 9 relief was sought only after the City engaged

in exhaustive prepetition efforts to address its financial and operational problems

and explore alternatives to bankruptcy;[33] and (C) the prejudice that would result to

City residents in the event the Petition were dismissed. See Consolidated Reply,

at 62-69; Stockton, 493 B.R. at 794 (finding that "[r]elevant considerations in the

comprehensive analysis for § 921 good faith include whether the City's financial

problems are of a nature contemplated by chapter 9, whether the reasons for filing

are consistent with chapter 9, the extent of the City's prepetition efforts to address

the issues, the extent that alternatives to chapter 9 were considered, and whether

the City's residents would be prejudiced by denying chapter 9 relief.").

Certain of the Amended Objections argue that the Petition cannot have been

filed in good faith where the filing of the City's chapter 9 case was allegedly

"predetermined," with the possibility of "unlawfully" impairing the City's pension

---

[33]    See Orr Declaration, at ¶¶ 58-73 (describing various measures taken by the
City during the 16 months preceding the Petition Date to address its
financial challenges and avoid bankruptcy, including, but not limited to: the
execution of a consent agreement with the State of Michigan and creation of
a financial advisory board; employee headcount reductions; reduction of
labor costs through the implementation of CETs; the increase of corporate
tax rates; and the implementation of tax collection initiatives).

obligations.  See Amended Committee Objection, at ¶ 99; Amended AFSCME

Objection, at ¶ 220.

This argument is wrong as a matter of both fact and law.  As described

above, evidence adduced during discovery demonstrates that the City's chapter 9

filing was not predetermined.  See Section VI *supra*.  Deposition testimony further

establishes – and conclusively – that the primary purpose of the filing was the

comprehensive restructuring of the City's obligations and operations, *not* the

impairment of pension benefits "in violation of the Michigan Constitution."

> Q: Do you recall telling the governor and his staff in
> general that one of the purposes, I'm not saying the only
> purpose, one of the purposes or intentions of the
> chapter 9 filing would be to allow you to cut back the
> pension benefits?
>
> A:  Yeah, I don't want to give the misimpression that that
> was the singular focus.  I think most of our discussions
> were about the need for the City to deal overall with its
> balance sheet and its obligations, which would include
> pensions.
>
> ……….
>
> Q:  And do you recall any discussion during those same
> conversations with the governor or anyone from his staff
> as to the impact, if any, of Article 9, chapter – Section 24
> of the Michigan Constitution as regards pension benefits?
>
> A:  I don't recall having discussions in that regard.  No.
>
> Q:  … [I]n making your bankruptcy filing, were you
> intending to do something that was in violation of state
> law? ….

> A: Here again… I was intending to aleve [sic] the City of a very dire situation and provide it with the maximum ability to restructure itself…. [having had the question read back] No.

See Orr Declaration, at 116:20-117:4; 117:13-18; 121:18-122:6.

Moreover, the Objectors fail to establish that, even if the City had always intended to commence this chapter 9 case for the express purpose of compromising its pension obligations, such an intent and purpose would constitute a lack of "good faith" within the meaning of section 921(c) of the Bankruptcy Code. Although many Objectors forcefully indicate their belief that a municipality's intent to compromise pension benefits (or any specific obligation or obligations) in chapter 9 *ought* to be considered bad faith, no Objectors offer any citation to that effect. For good reason: numerous municipalities have commenced chapter 9 cases to address a specific obligation or category of obligations without those petitions having been found to have been filed in bad faith. See, e.g., In re City of Central Falls, No. 11-13105 (Bankr. D.R.I. Aug. 1, 2011) (Docket No. 8) (memorandum in support of statement of qualifications stating that the debtor sought chapter 9 relief to address unfunded pension and healthcare obligations); In re Connector 2000 Ass'n, Inc., No. 10-04467 (Bankr. D.S.C. June 24, 2010) (Docket No. 4) (statement of qualifications attaching as Exhibit 1 a resolution of board of directors providing that the debtor sought relief under chapter 9 because

of its failure to generate sufficient toll revenue to service special revenue bonds issued for the construction of a toll road); In re Westfall Twp., No. 09-02736 (Bankr. M.D. Pa. Apr. 10, 2009) (Docket No. 1) (petition and statement of qualifications providing that the debtor sought chapter 9 relief to address a crippling monetary judgment obtained by a single creditor).

The Amended Objections further reiterate the argument that the Petition was not filed in good faith because the City filed solely to pre-empt the imminent entry of a temporary restraining order in Michigan state court. E.g., Amended Committee Objection, at ¶ 102; Amended AFSCME Objection, at ¶ 218. As the City previously demonstrated in its Consolidated Reply, however, (A) the Emergency Manager had always indicated – and the timeline for negotiation set forth in the June 14th Creditor Proposal (at 113) reinforced – that the commencement of a chapter 9 case was an option if good faith negotiations failed, (B) the process for authorizing the City's chapter 9 filing under PA 436 was set in motion days prior to the state court TRO hearing and (C) it would not have been improper even if the TRO hearing had been a factor in the timing of the City's Petition. See In re McCurtain Mun. Auth., No. 07-80363, 2007 WL 4287604, at *5 (Bankr. E.D. Okla. Dec. 4, 2007) (finding chapter 9 petition to have been filed in good faith where factor precipitating filing (i.e., the imminent appointment of a receiver) "was not the only reason for filing bankruptcy"). The Emergency

Manager's deposition testimony confirms that the potential entry of a temporary

restraining order by the Michigan state court was not the primary motivator of the

City's chapter 9 filing.

> Q: And isn't it correct that you wanted to get the bankruptcy petition filed as soon as possible because you know there was a risk that the state might rule it was illegal – the state court might rule it was illegal under state law for the bankruptcy proceeding to be filed?
>
> A: No, that wasn't the reason.
>
> ……………
>
> Q: And in fact, the petition was filed just prior to the start of a TRO hearing in one of those state litigations, wasn't it?
>
> A: I was told that either that night or the following day.
>
> Q: And are you aware that certain objectors in this proceeding have stated that the bankruptcy petition was filed just before the judge in the case was to issue a TRO prohibiting the bankruptcy filing from taking place?
>
> A: I heard that after the fact, yes.

Orr Declaration, at 125:17-126:4; 124:18-125:3; see also Transcript of Deposition

of Richard Snyder, dated October 9, 2013, Case No. 13-53846 (the "Snyder

Deposition"),[34] at 131:14-132:12.

> Q: …. Do you know anything about why the change was made from the 19th to the 18th?

---

[34] Excerpts from the Snyder Deposition containing all testimony cited herein are attached hereto as Exhibit I.

A: Yes.

Q: What do you know about it? Just tell me.

A: I made the decision that I was comfortable in my conclusion that it was appropriate to file. When the letter came to me on the 16th in terms of recommending bankruptcy, I had set aside to say I wanted an extended period of time to review and to contemplate the situation. So I actually set aside enough time that would have led to the Friday morning situation to say I wanted more than one night to sleep on this because the importance of this act. And as I proceeded through the thought process to say do I concur, am I going to authorize the bankruptcy, I started discussions with my legal counsel on how we would prepare a letter, how we would go through that process and my thought process and I felt I didn't need to wait. I had made my decision, I had consulted with legal counsel, we had prepared a letter authorizing bankruptcy, and I said we should just go ahead and get this done.

Finally, the Retiree Committee's suggestion that the Petition was filed in bad faith because the City's estimates of its pension underfunding obligations were "untrue, misleading or made without a reasonable basis" must be rejected. As demonstrated above (see Section III, *supra*), the City's estimation of its pension underfunding, far from being misleading, presents a reasonable, market-based picture of the extent of the City's obligation. The disclosure of that information – i.e., the opportunity for interested parties to obtain a more focused picture of the true scope of the City's obligation – hardly represents a failure of "honesty and candor." The Retiree Committee's characterization of such disclosure as "untrue," "incomplete, misleading or outright false" is simply inflammatory.

In light of the foregoing, all available evidence demonstrates the good faith of the filing of the City's Petition, and there is no credible evidence to suggest otherwise. The arguments that the City did not file its Petition in good faith within the meaning of section 921(c) of the Bankruptcy Code should be rejected.

## VIII. CONCLUSION

For the foregoing reasons, the Court should promptly enter an Order for Relief in this case.

Dated:  October 17, 2013          Respectfully submitted,


  /s/  Bruce Bennett

Bruce Bennett (CA 105430)
JONES DAY
555 South Flowers Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
   STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY