# **EXHIBIT A**

# Court of Appeals, State of Michigan

# ORDER

Robert Davis v Roy Roberts

Docket No. 313297

Kirsten Frank Kelly
Presiding Judge

Christopher M. Murray

Michael J. Riordan
Judges

The Court orders that the motion for immediate consideration is GRANTED.

The application for leave to file a complaint for quo warranto is DENIED. As a result of the November 6, 2012 election, no part of 2011 Public Act 4, MCL 141.1501 *et seq.* ("PA 4") remains operative. Therefore, the section of PA 4 repealing 1990 Public Act 72, MCL 141.1201 *et seq.* ("PA 72") did not survive the referendum and has no effect. Respondent Roberts was appointed under PA 72 after PA 4 was suspended and thus lawfully holds office.

Petitioner's reliance on the anti-revival statute, MCL 8.4, is unavailing. The plain language of MCL 8.4 includes no reference to statutes that have been rejected by referendum. The statutory language refers only to statutes subject to repeal. Judicial construction is not permitted when the language is unambiguous. *Driver v Naini*, 490 Mich 239, 247; 802 NW2d 311 (2011). Accordingly, under the clear terms of the statute, MCL 8.4 does not apply to the voters' rejection, by referendum, of PA 4. Even if the rejection of PA 4 is deemed to operate as a repeal subject to MCL 8.4, the voters rejected PA 4 in its entirety by way of the referendum.

Petitioner consequently has failed to disclose sufficient apparent merit to justify further inquiry by quo warranto proceedings. *Penn School District 7 v Bd of Ed of Lewis-Cass Intermediate School Dist,* 14 Mich App 109, 118; 165 NW2d 464 (1969).



A true copy entered and certified by Larry S. Royster, Chief Clerk, on

NOV 16 2012
Date

Chief Clerk

The following opinion is presented on-line for informational use only and does not replace the official version.

STATE OF MICHIGAN

BILL SCHUETTE, ATTORNEY GENERAL

| | |
|---|---|
| CONST 1963, ART 2, § 9:<br><br>REFERENDUM:<br><br>LOCAL GOVERNMENT AND SCHOOL DISTRICT FISCAL ACCOUNTABILITY ACT: | Revival of repealed law where right of referendum is properly invoked as to act that repealed prior law. |

If 2011 PA 4 is disapproved by voters pursuant to the power of referendum under Const 1963, art 2, § 9, that law will no longer have any effect and the formerly repealed law, 1990 PA 72, is permanently revived upon certification of the November 2012 general election results.

Once the effect of 2011 PA 4, the Local Government and School District Fiscal Accountability Act, MCL 141.1501 *et seq.*, was suspended under Const 1963, art 2, § 9 and MCL 168.477(2), the prior repealed law, 1990 PA 72, is revived until certification of the November 2012 general election results. Depending on the vote of the electorate, the temporary revival of 1990 PA 72 will either cease with the approval of Public Act 4, or become permanent with the Act's disapproval.

Opinion No. 7267

August 6th, 2012

Honorable Andy Dillon
State Treasurer
Treasury Building
Lansing, MI 48922

You have asked, in the event 2011 PA 4, the Local Government and School District Fiscal Accountability

Act, MCL 141.1501 *et seq.*, is suspended as provided for in Const 1963, art 2, § 9, and MCL 168.477(2), whether 1990 PA 72 is temporarily revived until the results of the November 2012 general election are certified, and then permanently revived in the event 2011 PA 4 is disapproved by the voters.

On March 16, 2011, the Governor signed 2011 PA 4 into law. Public Act 4 repealed the Local Government Fiscal Responsibility Act, 1990 PA 72, MCL 141.1201 *et seq.*, the prior version of Michigan's financial emergency manager law. Because Public Act 4 received immediate effect in the Legislature, the Act became effective the same day it was signed by the Governor. Const 1963, art 4, § 27.

Public Act 4 provides a process for determining whether the Governor should appoint an emergency manager because a local unit of government is in severe financial stress. Pursuant to MCL 141.1512, the Department of Treasury may conduct a preliminary review of a local government to determine if a financial crisis exists. If a finding of probable financial stress is made, a review team is appointed consisting of various statutorily provided-for members. MCL 141.1512(4). A review team performs functions such as interviewing officials of the local government, and receiving and reviewing information in order to make a recommendation to the Governor as to whether severe financial stress exists. MCL 141.1513. If the review team advises that a severe financial emergency exists, and the Governor confirms the finding, the Governor shall declare the local government in receivership and appoint an emergency manager to act for and in the place of the governing body and the office of chief administrative officer of the local government. MCL 141.1515(4).

Since its enactment, the Department of Treasury and the Governor have used the process set forth in Public Act 4 to appoint emergency managers for financially distressed local units of government around the State. These emergency managers are currently exercising powers accorded them under the Act.[1] However, Public Act 4 is the subject of a referendum as provided for in Const 1963, art 2, § 9.

The Michigan Constitution provides the people with the power to approve or reject laws enacted by the Legislature through referenda. Const 1963, art 2, § 9 provides, in part[2]:

> The people reserve to themselves . . . the power to approve or reject laws enacted by the legislature, called the referendum. . . . The power of referendum . . . must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the . . . referendum, petitions signed by a number of registered electors, not less than . . . five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

The Legislature implemented art 2, § 9 with respect to referenda in various sections of the Michigan Election Law, MCL 168.1 *et seq*. Under the Constitution and the Election Law, in order for a referendum to be placed on the general election ballot, a proponent must: (1) prepare a petition that meets the formatting requirements of MCL 168.482; (2) gather the required number of valid signatures under art 2, § 9; and (3) file the petitions timely with the Secretary of State under MCL 168.473 and art 2, § 9 (no later than 90 days following the final adjournment of the legislative session at which the law was enacted, *Michigan Farm Bureau v Secretary of State*, 379 Mich 387, 390-391; 151 NW2d 797 (1967)).

After filing, the Board of State Canvassers must review the petition to determine whether there are sufficient valid signatures under MCL 168.476, which is accomplished with the assistance of the Department of

State's Bureau of Elections.[3] Once the review is complete, the Board of State Canvassers must make an official declaration of the sufficiency or insufficiency of the referendum petition two months before the election at which the proposal is to be submitted. MCL 168.477(1).

If the Board of State Canvassers certifies the referendum for placement on the ballot, the second paragraph of Const 1963, art 2, § 9 applies, which states:

> No law as to which the power of referendum properly has been invoked *shall be effective thereafter* unless approved by a majority of the electors voting thereon at the next general election. [Emphasis added.]

MCL 168.477(2) implements art 2, § 9, and provides in part:

> For the purposes of the second paragraph of section 9 of article [2] of the state constitution of 1963, a law that is the subject of the referendum continues to be effective until the referendum is properly invoked, *which occurs when the board of state canvassers makes its official declaration of the sufficiency of the referendum petition.* [Emphasis added.]

With respect to Public Act 4, the Board of State Canvassers will soon meet to certify the referendum petition as sufficient as directed by the courts. As a result, the effect of Public Act 4 will be suspended as a matter of law until the outcome of the November 6, 2012 general election.

You ask whether 1990 PA 72, the prior emergency manager law repealed by Public Act 4, applies during the interim period of suspension, and after the general election if Public Act 4 is disapproved by the voters. Because the answer to your second question provides guidance with respect to the first, your second question will be addressed first.

In enacting Public Act 4, the Legislature repealed all of the statutory provisions of Public Act 72, MCL 141.1201 *et seq*. And by operation of art 2, § 9, the repeal of Public Act 72 has been rendered ineffective unless approved by the electors at the next election because the power of the referendum has been properly invoked. Thus, in the absence of law to the contrary, the electors' decision to eliminate the repeal reinstates Public Act 72.

Michigan's anti-revival statute, which creates an exception to the revival doctrine, addresses the repeal of a statute by a subsequent statute, not the nullification of a statute by a referendum. MCL 8.4 provides: "Whenever a statute, or any part thereof shall be repealed by a subsequent statute, such statute, or any part thereof, so repealed, shall not be revived by the *repeal* of such subsequent repealing statute." (Emphasis added.) When a term is not defined in the statute, with certain exceptions for technical terms, every word or phrase of a statute should be accorded its plain and ordinary meaning, taking into account the context in which the words are used. MCL 8.3a; *Robertson v DaimlerChrysler Corp*, 465 Mich 732, 748; 641 NW2d 567 (2002). Giving the word "repeal" its ordinary meaning and in context with MCL 8.4, which concerns legislative action, it means "to revoke or annul (a law, tax, duty, etc) by express *legislative enactment*." *The American College Dictionary* (1961) (emphasis added). The disapproval of an act by referendum does not constitute a "legislative enactment" but rather the "disapproval" of a prior legislative enactment. Accordingly, MCL 8.4, on its face, does not apply to a referendum.

This distinction accords with common sense. In the ordinary circumstance in which the Legislature repeals a

replacement statute, it simultaneously has the opportunity to create a third new framework. That is not true here. The suspension of the replacement statute by subjection to a referendum carries with it absolutely no opportunity for the creation of a replacement statute.

Consider the example of a new sex-offender registration statute that repeals a prior sex-offender scheme and requires more or less onerous registration requirements. If a referendum suspended the operation of the successor statute without suspending the repealer provision of that statute, *no* statute would be left in place. That makes no sense where the peoples' representatives certainly wanted a sex-offender scheme of some sort to be in effect, and the proponents of the referendum on the successor statute evidenced no disgruntlement with the prior statute. (Otherwise, there would have been a similar referendum challenging the prior statute.)

The same is true here, where there have been emergency procedures to appoint management to assist troubled local entities for more than 20 years, first under PA 72, more recently under PA 4. The referendum does not attack the concept of emergency management, just the way that concept is addressed in PA 4. There is no policy reason to prevent the temporary revival of PA 72 while the referendum suspends PA 4, or a permanent revival should the voters approve the referendum and reject PA 4 at the polls.

The conclusion that the repealed statute becomes effective again where the repeal is nullified by referendum is consistent with the only Michigan appellate court that has addressed this point. In *McDonald v Grand Traverse Co Election Comm'n*, 255 Mich App 674; 662 NW2d 804 (2003), the Court of Appeals reached the same conclusion. In that case, the Court addressed a constitutional challenge to straight-ticket voting, and recounted the following history:

> Michigan has traditionally permitted a straight-ticket ballot option . . . . However, in 2001, the Michigan Legislature enacted Public Act 269, which eliminated the straight-ticket ballot option. . . . Pursuant to [the] referendum power, the Democratic Party circulated petitions and obtained enough signatures to invoke a referendum on 2001 PA 269. As a result of the referendum, Proposal 1 appeared on the general election ballot on November 5, 2002, and the people of the State of Michigan were permitted to vote on whether 2001 PA 269, which would, among other things, eliminate the straight-ticket ballot option, should go into effect. 1,775,043 voters voted not to approve 2001 PA 269, and 1,199, 236 voters voted to approve 2001 PA 269. Because 2001 PA 269 was not approved by a majority of the voters on November 5, 2002, it did not go into effect. *The law in effect before 2001 PA 269 was enacted, MCL 168.737, is thus still in effect today. Therefore, the straight-ticket ballot option is the law in Michigan.* [*Id.* at 680-681; emphasis added; footnotes omitted. [4]]

In other words, the prior statute was applicable because its repeal was undone by the rejection of the repealing statute by referendum. The same is true here.

The North Dakota Supreme Court reached this same conclusion in an analogous situation. In *Dawson v Tobin*, 24 NW2d 737 (ND 1946), the court addressed the very question presented here and concluded that the rejection of an act via a referendum resulted in the revival of the statute originally repealed by the act. In North Dakota, the Legislature amended and re-enacted a tax provision relating to the valuation of property

taxes and repealed any conflicting provisions. *Id*. at 721-722. This legislation, known as Chapter 317, was given immediate effect as emergency legislation, but was then disapproved by the voters at the vote on the referendum. *Id*. at 722. The plaintiffs argued that the prior version of the tax provision revived as a result of the disapproval, while the defendants argued that the repeal of the prior provision was unaffected by the referendum. *Id*. at 722-723.

The court's decision in favor of the plaintiffs essentially rested on two points. First, North Dakota's constitutional provision providing for the power of referendum would be undermined if the invalidated act still had an effect – the repeal of the original act – despite the act's disapproval by the voters. Second, North Dakota's analogous anti-revival statute did not apply on its face because the word "repeal" means the replacement or nullification of one statute by another, and the disapproval of an act through referendum does not result in the replacement of one act with another.

As to the first point, the court observed that North Dakota's Constitution did not exempt any enactment or portions of a legislative enactment, like the repeal provision, from the operation of the power of referendum. *Id*. at 730-732. The court noted that the defendant's argument was based solely on a statutory provision providing that "[w]henever any act of the legislative assembly which repealed a former act is repealed, such former act shall not be revived by such repeal, unless there is express provision to the contrary." *Id*., quoting N.D.R.C. 1943, Sec. 1-0216.

But the court determined that "this statute has no application to and does not affect repeal provisions in an emergency measure that is rejected at a referendum election and as a result is 'thereby repealed.'" *Id*. at 732. The court determined that to apply the statute in that way would conflict with North Dakota's Constitution and "infringe upon the power of the referendum" because it would insulate acts or portions of an act from the power of referendum. "If the contentions of the defendants are sustained it would necessarily follow that repeal provisions in an emergency measure will be withdrawn from the operation of the referendum." *Id*. Thus, the court concluded that the constitution did not permit such a construction or application of the statute.

And as to the second point, the court determined that the statute, on its face, did not apply to an act disapproved by referendum because the rejection of the act by the voters was not a "repeal" for purposes of the statute. *Id*. at 733. The court reviewed various definitions of the word "repeal" and concluded that it means "the repeal of an existing law by means of an enactment *by the lawmaking power*" – the Legislature. *Id*. at 735 (emphasis added). The court observed that the rejection of an emergency law by referendum is a legislative action, but that such "action does not result in a legislative enactment, any more than the refusal of one of the houses of the legislative assembly to approve an act passed by the other results in a legislative enactment." *Id*. Rather,

> It results in disapproval and disaffirmance of the action of the legislature, and in the recall and destruction of the law which the legislature enacted. The emergency measure is given the force and effect of law from the time of its approval; but the period of its existence is indefinite and contingent upon what may be, and is, done under the power of the referendum. The people have the last word. [*Id*. at 736.]

The court then rejected the defendants' argument that the people were required to use the power of initiative because "[t]he power of the referendum is reserved to enable that people pass final judgment on whether

laws enacted by the legislative assembly shall be approved or rejected." *Id*. at 737. Lastly, the court dismissed the defendants' argument that another case had decided the issue differently, and held:

> It necessarily follows that from the time such rejection became effective the whole emergency measure, including the repealing provision therein, was recalled and destroyed, and that the law that had been replaced and superseded by the rejected emergency measure was revived. [*Id*. at 741.]

The same analyses applies to the power of referendum under Michigan law. Like the North Dakota Constitution, Const 1963, art 2, § 9 does not except any portion of a statute from the power of referendum, and thus includes a repealing provision. "No law" subject to a referendum "shall be effective" under art 2, § 9; there is no limitation of that stricture for the repealer portion of a law subject to a referendum. An opposite conclusion would infringe on the power of referendum by giving effect to at least a portion of an act – the repealing provision – that was stuck down by the voters. It cannot be that, despite being disapproved, the repealing section of the disapproved public act remains effective. If this were true, then any public act that does nothing more than repeal another statute could be insulated from referendum by simply giving the public act immediate effect. *Dawson*, at 732. Such an interpretation would "defeat" the power of referendum. *Id*.

And as explained by the *Dawson* Court, when voting on a referendum, voters decide whether a particular public act should become the law of the State, even though the public act has been enacted, and may even have become effective before the election, like Public Act 4. If the voters disapprove the public act, their vote displaces the Legislature's and Governor's prior enactment, and the public act either does not become, or no longer is, the law of the State. *No* part of the public act, including a provision repealing a prior law, survives after disapproval at a referendum. In essence, the public act is nullified—not repealed—at that point in time.

Applying this analysis to Public Act 4, if the Act is disapproved at the November 2012 general election, it is no longer the law of the State and no part of Public Act 4 may thereafter be applied once the election results are certified. [5] This includes the provision of Public Act 4 repealing 1990 PA 72. See Enacting section 1 of 2011 PA 4. Since the repeal of 1990 PA 72 will no longer have any effect, 1990 PA 72 revives and becomes the law of the State again. *McDonald*, 255 Mich App at 680-681; *Dawson*, 24 NW2d at 741.

It is my opinion, therefore, that if 2011 PA 4 is disapproved by voters pursuant to the power of referendum under Const 1963, art 2, § 9, that law will no longer have any effect and the formerly repealed law, 1990 PA 72, is permanently revived upon certification of the November 2012 general election results.

Turning to your first question, you ask whether 1990 PA 72 is temporarily revived while the effect of Public Act 4 is suspended under Const 1963, art 2, § 9 and MCL 168.477(2).

As discussed above, once the petition was declared sufficient by the Board of State Canvassers, Public Act 4 ceased to be "effective" under Const art 2, § 9. The Michigan Supreme Court has described the status of a law subject to referral during this period as "suspended" or a "suspension" of the law. See *Michigan*

*Farm Bureau*, 379 Mich at 396, quoting *McBride v Kerby*, 260 P 435 (Ariz 1927); *Wolverine Golf Club v Hare*, 384 Mich 461, 463; 185 NW2d 329 (1971). See also *Reynolds v Bureau of State Lottery*, 240 Mich App 84; 610 NW2d 597 (2000), and Letter Opinion of Attorney General Frank J. Kelley to Patrick Babcock, dated March 28, 1988. Thus, Public Act 4 is not rendered "void" by the Board of State Canvassers' certification of referendum. Rather, its effect is "stayed" until the results of the election are certified.

In the absence of any Michigan court decision addressing this question,[6] there is no apparent reason why the rationale set forth above with respect to the question of a permanent revival of 1990 PA 72 does not apply equally well to the question of its temporary revival.

Const 1963, art 2, § 9 states, in part: "*No law* as to which the power of referendum properly has been invoked *shall be effective thereafter* unless approved by a majority of the electors voting thereon at the next general election." (Emphasis added.) Based on the section's plain language, "no law" is exempt from the suspension nor is any part or provision of a law exempt. Where a constitutional term is undefined, dictionary definitions may be consulted to determine its meaning. See, e.g., *National Pride At Work, Inc v Governor of Michigan*, 481 Mich 56, 69-76; 748 NW2d 524 (2008). The term "effective" may be understood to mean "in effect; operative; active." See *Webster's New World Dictionary, Third College Edition* (1988).

Thus, when a referendum is properly invoked, no part of the subject law is thereafter operative or active. Applying this interpretation to Public Act 4, once the Board of State Canvassers certified the referendum, no part of the Act remained operative, including the repeal provision. Accordingly, just as with the permanent revival upon disapproval, the suspension of Public Act 4's repeal provision results in the temporary revival of the prior repealed law – 1990 PA 72.

It is my opinion, therefore, that once the effect of 2011 PA 4 was suspended under Const 1963, art 2, § 9 and MCL 168.477(2), the prior repealed law, 1990 PA 72, is revived until certification of the November 2012 general election results. Depending on the vote of the electorate, the temporary revival of 1990 PA 72 will either cease with the approval of Public Act 4, or become permanent with the Act's disapproval.

BILL SCHUETTE
Attorney General

---

[1] Information regarding the various appointed emergency managers is available on the Michigan Department of Treasury's website, see <www.michigan.gov/treasury/0,1607,7-121-1751_51556-201116--,00.html.> (accessed July 30, 2012.)

[2] Under Const 1963, art 2, § 9, acts that contain an "appropriation" are not subject to referral, see *Michigan United Conservation Clubs v Secretary of State*, 464 Mich 359; 630 NW2d 297 (2001), nor are acts enacted to meet "deficiencies in state funds," see *Kuhn v Dep't of Treasury*, 384 Mich 378; 183 NW2d 796 (1971). Public Act 4 does not contain an appropriation, nor does it appear to have been enacted to "meet deficiencies in state funds," which term has been interpreted to mean only deficiencies existing at the time of enactment, and not future or anticipated deficiencies. *Kuhn*, 384 Mich at 385. Thus, Public Act 4 was not immune from referral under art 2, § 9.

[3] The Bureau of Elections and the Board of State Canvassers must perform their canvassing duties within 60 days of the petitions being filed with the Secretary of State, MCL 168.477(2), except that one 15-day extension may be granted by the Secretary of State if necessary to complete the canvass.

[4] 2001 PA 269 was signed by the Governor on January 11, 2002. The Act was not given immediate effect, and thus became effective March 22, 2002. Const 1963, art 4, § 27. A group filed petitions in support of a referendum of 2001 PA 269 on March 21, 2002. The Board of State Canvassers certified the referendum petition as sufficient on May 14, 2002. Accordingly, the effect of 2001 PA 269 was suspended as of May 14, 2002. As a result, Public Act 69 was effective for a short period of time before its suspension. The relevant statutes were recently amended or repealed by 2012 PA 128. MCL 168.736b now provides for the straight-ticket voting option.

[5] Const 1963, art 2, § 9, provides that "[a]ny law submitted to the people by either initiative or referendum petition and approved by a majority of the votes cast thereon at any election *shall take effect 10 days after the date of the official declaration of the vote*." (Emphasis added.) Under MCL 168.842(1) and 168.845, the Board of State Canvassers must meet on or before the twentieth day after the election to certify the results. The twentieth day after the November 6 general election is November 26, 2012. Assuming the results are certified that day, the vote on the referendum would become effective ten days later or December 6, 2012.

[6] Attorney General Frank Kelley briefly addressed this issue in a letter opinion to Secretary of State Richard Austin, which discussed a potential referral on 1978 PA 427 regarding license fees. The Attorney General observed that "[a]t the point at which the power of referendum is properly invoked, 1978 PA 427 would cease to have any effect. Taxes and fees for license plates would then be based on the schedule in effect in the Motor Vehicle Code prior to the enactment of 1978 PA 427." (Letter Opinion of Attorney General Frank J. Kelley to Richard Austin, dated November 15, 1978). But this conclusion was never tested because no referendum was certified.