# **EXHIBIT C**

Page 1

```
2  IN THE UNITED STATES BANKRUPTCY COURT
3  EASTERN DISTRICT OF MICHIGAN
4  SOUTHERN DIVISION
5  Case No. 13-53846; Hon. Steven W. Rhodes
6  ----------------------------------------X
7  In re:   Chapter 9
8  CITY OF DETROIT, MICHIGAN,
9  Debtor.
10 ----------------------------------------X
11
12
13
14
15
16
17          DEPONENT: KENNETH A. BUCKFIRE
18          DATE: Friday, September 20, 2013
19                TIME: 8:30 a.m.
```

Page 2

```
10              September 20, 2013
11                  8:33 a.m.
16           Deposition of KENNETH A. BUCKFIRE, held
17 at the offices of JONES DAY, 222 East 41st Street,
18 New York, New York pursuant to Notice before
19 DANIELLE GRANT, a Shorthand Reporter and Notary
20 Public of the State of New York.
```

Page 3

```
2  APPEARANCES:
4  JONES DAY
5  By:   THOMAS CULLEN
6        BENJAMIN ROSENBLUM
7  222 East 41st Street
8  NEW YORK, NEW YORK 10017
9  Appearing on behalf of the Debtor

11 SALANS FMC SNR DENTON
12 By: CLAUDE D. MONTGOMERY
13 620 Fifth Avenue
14 New York, NY 10020.2457
15 212.632.8342
16 Appearing on behalf of Retirees Committee

18 COHEN WEISS AND SIMON LLP
19 By:   THOMAS N. CIANTRA
20 330 West 42nd Street
21 New York, NY 10036.6979
22 212.356.0216
23 Appearing on behalf of UAW
```

Page 4

```
2  APPEARANCES (continued):
4  LOWENSTEIN SANDLER LLP
5  By:· JOHN K. SHERWOOD
6  65 Livingston Avenue
7  Roseland, NJ 07068
8  973.597.2374
9  Appearing on Behalf of AFSCME

12 CLARK HILL PLC
13 By: SHANNON L. DEEBY (appearing via Telephone)
14 500 Woodward Avenue, Suite 3500.
15 Detroit, MI 48226
16 313.965.8274
17 Appearing on behalf of Retirement Systems

19 WILLIAMS WILLIAMS RATTNER & PLUNKETT PC
20 By: NOT PRESENT, Jr.
21 380 N Old Woodward Ave Ste 300
22 Birmingham, MI 48009
23 248.642.0333
24 Appearing on behalf of FGIC
```

Page 13

1      K. Buckfire
2  joined the record.
3      A   Since the founding of the firm in
4  2002.
5      Q   2002. And what is your formal
6  position with Miller Buckfire?
7      A   Co-president.
8      Q   Who is the other co-president?
9      A   Norma Corio, C-O-R-I-O.
10     Q   Does Miss Corio have any roll in
11  connection with the City of Detroit engagement
12  of which you are employed?
13     A   Yes.
14     Q   What is her role?
15     A   She is overseeing the process by
16  which we are securing debtor and possession of
17  financing for the City.
18     Q   And what is your role in
19  connection with the City of Detroit bankruptcy?
20     A   I'm the senior banker at Miller
21  Buckfire responsible for advising the emergency
22  manager in the City of Detroit on all aspects
23  of financial strategy and restructuring
24  alternatives, including potential exchange
25  offers, debt for equity conversions, and other

Page 14

1      K. Buckfire
2  potential transactions that might be required
3  to effectuate a restructure.
4      Q   And this current role began when,
5  sir?
6      A   January of 2013.
7      Q   And I believe you indicated in
8  your prior deposition that you had other roles
9  in connection with the City of Detroit; is that
10  correct?
11          Let me rephrase the question if
12  you don't understand it. Prior to your current
13  engagement, had you done work for either the
14  City or the State in connection with the City
15  of Detroit?
16     A   Yes, in 2012 we had a two-month
17  engagement with the State the Michigan to
18  evaluate the City's financial condition.
19     Q   Was that July 2012?
20     A   I believe it was July.
21     Q   Prior to that, any engagement if
22  connection with the City of Detroit?
23     A   No.
24     Q   And after that was there an
25  intermediate role prior to your current one?

Page 15

1      K. Buckfire
2      A   No.
3      Q   In January of 2013, was the scope
4  of your engagement changed in any way?
5      A   Yes, the scope of our engagement
6  in January was to continue our role as
7  evaluating the City's financial condition from
8  a solvency perspective, and advise the City on
9  what they might be able to do to create more
10  liquidity or deal with their liabilities.
11     Q   And did you reach any conclusions
12  in connection with the solvency or how the City
13  should deal with its liabilities?
14     A   Not until May.
15     Q   And did you reach any conclusions
16  in May regarding solvency?
17     A   Yes.
18     Q   What was that conclusion, sir?
19     A   That the City was insolvent.
20     Q   And did you report that conclusion
21  to anyone?
22     A   Yes, I did.
23     Q   And in what form did that report
24  take?
25     A   It was on oral report to the

Page 16

1      K. Buckfire
2  emergency manager.
3      Q   And when did you give that oral
4  report to the emergency manager?
5      A   In early May.
6      Q   Can you be more precise than early
7  May?
8      A   No.
9      Q   Would it be before May 7, by any
10  chance?
11     A   It could have been, but I don't
12  recall exactly.
13     Q   You don't recall exactly, okay.
14          And did you give any advice to the
15  emergency manager on how he should deal with
16  his creditors in connection with your report on
17  solvency?
18     A   Yes, I advised him that the City's
19  financial condition was so dire that we had to
20  take immediate steps to preserve the City's
21  liquidity so that it would be in jeopardy of
22  losing essential public services, and we
23  identified the need to negotiate with the swap
24  counterparties, which I previously to in this
25  case, as an immediate and urgent priority of

Page 17

1      K. Buckfire
2   the City.
3      Q   And when you say you previously
4   testified, are you speaking of your deposition
5   which took place on August 29, 2013?
6      A   Correct.
7      Q   And in what form did your report
8   to Mr. Orr -- let me rephrase it.
9          What form did your report to
10  Mr. Orr take?
11     A   Verbal.
12     Q   And was is it delivered at exactly
13  the same time as your report on solvency or at
14  a later time?
15     A   It was all part of the same
16  discussion.
17     Q   And how long did this discussion
18  take place -- let me rephrase the question.
19         How long was a conversation was
20  it?
21     A   It was a lengthy conversation.  We
22  were not the only ones present at the time.
23     Q   Who else was present in the room
24  at the time?
25     A   Representatives of Conway

Page 18

1      K. Buckfire
2   McKenzie, Ernst and Young and Jones Day.
3      Q   Was this a report by you or an
4   interactive conversation?
5      A   Conversation.
6      Q   Was counsel present?
7      A   Jones Day.
8      Q   So you have Conway McKenzie,
9   Miller Buckfire Jones Day, any other
10  organizations represented in that meeting?
11     A   Ernst and Young.
12     Q   Any others?
13     A   Not that I recall.
14     Q   Who from Ernst and Young was that?
15     A   Gaurav Malhotra.
16     Q   Anyone else from his shop?
17     A   I don't recall.  I'm sure there
18  were but I can't recall who it was.
19     Q   Anyone else from Buckfire Miller
20  there?
21     A   Miller Buckfire.
22     Q   Miller Buckfire, sorry.
23     A   You're forgiven.
24     Q   Let me rephrase the question.  Was
25  there anyone else from your institution in that

Page 19

1      K. Buckfire
2   conversation with the emergency manager?
3      A   Yes, Mr. James Doak, D-O-A-K.
4      Q   Anyone else that you can recall?
5      A   No.
6      Q   And what was Mr. Doak's role in
7   that conversation?
8      A   He didn't really have much to say.
9   It was primarily a report I was giving on
10  behalf of the firm.
11     Q   I think you indicated a moment ago
12  that the conversation was interactive?
13     A   Yes.
14     Q   Who else participated in the
15  conversation, specifically?
16     A   I can't recall.
17     Q   Did Mr. Mohatra participate in the
18  conversation?
19     A   I'm sure he did but I can't recall
20  what he said.
21     Q   Okay.  Did Mr. Moore participate
22  in the conversation?
23     A   I'm believe he did.
24     Q   Can you recall anything about what
25  Mr. Moore said?

Page 20

1      K. Buckfire
2      A   No.
3      Q   Can you recall anything that
4   Mr. Orr said during that conversation?
5      A   Yes, he agreed, having reviewed
6   the financial forecast provided by Ernst and
7   Young that the situation was indeed very
8   serious and, he agreed with my recommendation
9   that we immediately formulate a strategy to
10  preserve the City's cash flow.
11     Q   Had you seen Mr. Mohatra's
12  forecast prior to that meeting?
13     A   No.
14     Q   Were you able to review it during
15  the meeting?
16     A   Yes.
17     Q   And what conclusions, if any, did
18  you reach with regard to that forecast during
19  that meeting?
20     A   I was shocked at how much worse
21  the situation was than I had imaged before
22  that.
23     Q   Now, I believe you indicated to me
24  earlier that you were engaged to review the
25  City's solvency?

Page 33

K. Buckfire
Q That will help.
A It's a confidential assignment for a company which in the zone of insolvency so I can't tell you which company it is, but we've been working with them on that particular engagement since last January, January of 2012.
Q And prior to January of 2012, can you recall any engagements on which you and Jones Day were on the same side?
A Well, my firm has worked with Jones Day very actively over the ten years, primarily in auto parts companies in which we are involved, as is Jones Day. I personally have not worked with Jones Day in any of those cases.
Q Thank you. We're going to switch topics now, Mr. Buckfire.
In connection with your review for Mr. Orr on the solvency of the City, did you look at a balance sheet for the City?
A Yes.
Q And do you know if that balance sheet has been produced by the City in connection with the discovery in the

Page 34

K. Buckfire
eligibility dispute?
A Well, we've produced a tremendous amount of financial information including balance sheets, both historical as audited by the City's auditors, and more recent analyzes produced by Ernst and Young.
    MR. MONTGOMERY: Can you confirm that, Mr. Rosenbloom?
    MR. ROSENBLOOM: I'm not aware of any balance sheet.
    MR. MONTGOMERY: You're not representing the City, you're representing Mr. Buckfire; is that right. Rosenbloom?
    MR. ROSENBLOOM: I'm representing the City and Mr. Buckfire. I'm not aware of any balance sheet document that we have not produced.
Q Can you recall from your memory, sir, what the asset side of that balance sheet totaled as of any date prior to your meeting with Mr. Orr?
A No.
Q Are you familiar with the June 14

Page 35

K. Buckfire
creditor proposal?
A Yes.
Q Is there a balance sheet contained in that presentation?
A Not in conformity with what you would consider generally accepted accounting principles. It's more of a market-to-market analysis of the true liabilities of the City.
Q Is there any presentation, document, or section of the report that quantifies the asset side of the City's balance sheet?
A Not that I recall.
Q But it is your testimony, Mr. Buckfire, that you have seen a document that quantifies the asset side of the City's balance sheet?
A Well, the City has produced an annual report for a hundred years, and most recent of which in 2012 is in the data room, which I reviewed.
Q Okay. Sir, are all of the City's assets of which you are aware on that balance sheet that appears in the City's data room?

Page 36

K. Buckfire
A I don't understand your question.
Q Are there any assets that the City owns of which you are aware that are not included on the balance sheet which you say is in the City's data room?
A I have to assume that the City's balance sheet as audited reports fairly the financial condition of the City and therefore incorporates all of the assets in which it owns.
    MR. MONTGOMERY: I'm going to ask the court reporter to mark as Buckfire Exhibit 2, the credit proposal as it appears attached to the Orr declaration as Exhibit A, which is docket 11, Exhibit 1.
    (June 14 report and proposal was marked as Buckfire Exhibit No. 2 for identification, as of this date.)
Q Mr. Buckfire, I've handed you what has been marked as Buckfire Exhibit No. 2. Have you seen this before?
A Yes.

Page 37

1    K. Buckfire
2    Q   What is it, sir?
3    A   It's the June 14 report and
4  proposal to creditors.
5    Q   Did you participate in its
6  preparation?
7    A   No.
8    Q   Would you turn to page 118 on that
9  document, which I believe is has a slightly
10 different docket reference?
11   A   Is this the page that says "A
12 preliminary transition advisory board"?
13   Q   No.
14       MR. CULLEN:  Is it 118 of the
15   document or --
16       MR. MONTGOMERY:  Forgive me.  Off
17   the record for a moment.
18       (Discussion off the record.)
19   Q   Page 113 of the document, which is
20 also page 120 of 135.
21   A   Calendar of contacts?
22   Q   Yes.  You see that you are
23 identified as a contact?
24   A   Yes.
25   Q   Do you know why you are identified

Page 38

1    K. Buckfire
2  as a contact in connection with this document?
3    A   Yes.
4    Q   Please?
5    A   To allow for creditors to call and
6  ask me questions about the information and
7  proposal contained within this plan.
8    Q   Okay.  So is it your testimony,
9  Mr. Buckfire, that you played no role in the
10 creation of this document?
11   A   Aside from some minor stylistic
12 changes, no.
13   Q   Had you reviewed it prior to its
14 submission to creditors on June 14?
15   A   Yes.
16   Q   When did you first see a draft of
17 this document?
18   A   It was about two weeks prior.
19   Q   And you, I believe you just
20 indicated you made some minor edits?
21   A   That's right.
22   Q   Can you recall what sections of
23 the document you thought required minor
24 editing?
25   A   No.

Page 39

1    K. Buckfire
2    Q   Does this document reflect in any
3  way the substance of conversations you had with
4  Mr. Orr?
5    A   Yes.
6    Q   How so, sir?
7    A   I've had many conversations with
8  Mr. Orr and the advisors to Mr. Orr over the
9  course of our engagement, and this document
10 reflects a consensus amongst all of us as to
11 the condition of the City and recommendation
12 and what to do about it.
13   Q   So is it your testimony, sir, that
14 you endorse or support the recommendations that
15 are contained in this document?
16   A   Yes.
17   Q   Is it your testimony that to the
18 best of your understanding the facts presented
19 in this document are accurate?
20   A   To my understanding, yes.
21   Q   Is there anything in this document
22 that you have challenged to Mr. Orr?
23       MR. CULLEN:  Objection,
24   foundation, form.
25       You can address the question if

Page 40

1    K. Buckfire
2    you understand it.
3    A   I can't answer it.
4    Q   Have you in any way suggested to
5  Mr. Orr that the June 14 creditor proposal
6  contains inaccuracies?
7    A   No.
8    Q   Have you in any way suggested to
9  Mr. Orr that the June 14 creditor proposal
10 contains omissions in your mind?
11       MR. CULLEN:  Material omissions,
12   is that what you mean?
13       MR. MONTGOMERY:  Yes.
14   A   No.
15   Q   Now, sir, if you would look at
16 page 7, which is also marked as page 14 of
17 docket 11-1, I'll try to use both numbers.
18   A   It's the page entitled "The City
19 is insolvent"?
20   Q   Indeed it is.
21   A   Okay.
22   Q   Do you believe that each of the
23 statements that appear on this page are
24 accurate?
25   A   Well, it's based on the work of

Page 41

1  K. Buckfire
2  Ernst and Young and Conway McKenzie.  I have no
3  reason to doubt their accuracy.
4      Q   Other than the work by Conway
5  McKenzie and Ernst and Young, do you have any
6  reason to believe that the statements here are
7  true, other than -- let me rephrase the
8  question.
9          I think you just said that it's
10 Ernst and Young and Conway McKenzie who
11 formed -- gave you the information that forms
12 the basis of this statement; is that correct?
13     A   That's correct.
14     Q   And so I'm simply asking you if
15 you have an independent reason to believe these
16 are accurate?
17     A   I relied on their professional
18 judgment and work to produce this information.
19     Q   Okay.  And I think that means you
20 have no other reason to believe that this
21 information is accurate.
22     A   I don't understand the question.
23         MR. CULLEN:  Objection to
24      foundation and form.
25     Q   Has Miller Buckfire done any work

Page 42

1  K. Buckfire
2  to confirm the accuracy of the statements made
3  on page 14 of docket 11-1 -- has Miller
4  Buckfire done any work to confirm the
5  statements that are on page 14 of docket 11-1?
6          MR. CULLEN:  May I ask, Counsel,
7      do you mean the actual numbers or the
8      overall conclusion?  It's a little
9      vague.
10     Q   I'm going to rephrase the
11 question.  You have said today that you believe
12 the statements that are contained on page 7,
13 which is of this document, that they are
14 accurate.  Did I understand that correctly?
15     A   I'm relying on the work of other
16 professional as I'm entitled to do.
17     Q   I was not challenging your
18 entitlement one way or the other, I was simply
19 asking you if you had any basis other than the
20 work of Conway McKenzie and Ernst and Young to
21 reach the conclusion that the statements on
22 this page are accurate?
23     A   Are you asking if I audited their
24 work?
25     Q   No, I'm just asking the very

Page 43

1  K. Buckfire
2  simple question, do you have any other reason
3  to believe that these statements are correct
4  other than the good work by Ernst and Young and
5  Conway McKenzie?
6      A   I am highly confident they did
7  excellent work.
8      Q   I'm not asking you how good the
9  work is, I'm asking you if you have any other
10 reason to believe these statements are
11 accurate?
12     A   Honestly I don't know how to
13 answer that question, I'm sorry.
14     Q   Okay, let's turn to the next page.
15 You will see that there is a statement there
16 that, "The City is not paying their debts as
17 they come due."
18         Do you see that statement, sir?
19     A   I do.
20     Q   You believe that to be an accurate
21 statement?
22     A   Yes, I do.
23     Q   You'll see that the first bullet
24 is "The City is not making its pension
25 contributions as they come due."

Page 44

1  K. Buckfire
2          Do you believe that to be an
3  accurate statement?
4      A   I do.
5      Q   You'll also see in there that
6  there is a reference to the deferral of pension
7  contributions?
8      A   Yes.
9      Q   You see that one of those
10 statements is that, "As of May 2013, the City
11 had deferred approximately 54 million in
12 pension contributions related to current or
13 prior periods and will defer approximately 50
14 million on June 30, 2013 for current year PFRS
15 pension contributions."
16         Do you see that?
17     A   Yes.
18     Q   To your understanding is that a
19 true statement?
20     A   To my understanding, yes.
21     Q   Okay.  And what is the basis of
22 your understanding, sir?
23     A   Reports from Ernst and Young and
24 Conway McKenzie.
25     Q   Anything else?

Page 49

1  K. Buckfire
2  A  No. The alternative would be for
3  the City to make the payment as schedule and
4  thereby render itself cash insolvent.
5  Q  So I'm asking you how it is that a
6  deferral increases liabilities, which is a
7  statement you made to me.
8  A  If debt is due, that would be a
9  reduction of liabilities. If you don't make
10 the payment, then that becomes an increase in
11 liabilities.
12 Q  Is it not correct, sir, that if
13 you make a payment on the liabilities, you
14 reduce the liabilities but you also reduce your
15 assets?
16 A  Cash.
17 Q  That's an asset, is it not?
18 A  That is correct.
19 Q  If you defer a liability you do
20 not affect either the sum of the liabilities or
21 the sum of the assets that are available.
22 A  That's true.
23 Q  So I ask you again, sir, how is it
24 that a deferral increases liabilities?
25 A  Because the alternative would be a

Page 50

1  K. Buckfire
2  reduction of liabilities.
3  Q  So a failure to reduce liabilities
4  is the same as an increase in liabilities?
5  A  Well, in the case of a requirement
6  to make a payment, you're required to make that
7  payment, that would be a reduction of
8  liabilities and a reduction of cash. If you
9  are able to defer or unilaterally not make that
10 payment, of course the liabilities would be
11 unchanged, that represents an increase in
12 liabilities from what you were legally required
13 to do.
14 Q  You've said that a failure to
15 timely reduce liabilities acts as an increase
16 in liabilities. Did I hear that correctly?
17 A  From what you are suppose to have
18 done.
19 Q  But the -- is it not correct that
20 the failure or ability to defer a debt also
21 leads the asset side of your balance sheet
22 unchanged?
23 A  Yes.
24 Q  Thank you. Do you happen to know
25 if the City actually issued notes in connection

Page 51

1  K. Buckfire
2  with these deferrals of pension obligations
3  that are referred to on docket 11-1, page 15?
4  A  No.
5  Q  You will recall that as we were
6  looking at the first bullet, the statement,
7  "Will defer approximately 50 million on June
8  30, 2013 for a current year PFRS pension
9  contributions," was made, that statement was
10 made?
11 A  That statement was made.
12 Q  And I think you indicated that
13 that was an accurate statement to your
14 understanding?
15 A  To my understanding.
16 Q  Do you happen to know whether in
17 fact the City deferred the June 30, 2013
18 contribution?
19 A  No.
20 Q  So why did you believe that the
21 June 14 creditor proposal was accurate when it
22 said the City will defer $50 million?
23 A  I don't understand the question.
24 Q  You said you don't know if they
25 actually deferred it.

Page 52

1  K. Buckfire
2  A  I assume they did.
3  Q  You assume they did, but you don't
4  actually know it?
5  A  That's what I testified to.
6  Q  And so I'm asking you, why is it
7  that you were confident that they were going to
8  defer it?
9  A  Because it was our conclusion that
10 the City had no cash and could not afford to
11 make this payment and therefore should not make
12 this payment.
13 Q  Was that one of the
14 recommendations you made to Mr. Orr?
15 A  It wasn't my recommendation.
16 Q  Who made that recommendation?
17 A  It was a collective recommendation
18 among all the advisors, but I did not
19 individually make that recommendation.
20 Q  Who first proffered the
21 recommendation for which the collective body of
22 advisors endorsed it?
23 A  I don't know.
24 Q  But you indicated that the
25 collective body did endorse it?

Page 65

1  K. Buckfire
2  your conclusion that it would be prudent the
3  treat the pension as an unsecured claim flowed
4  from that April letter?
5  A   No.
6  Q   Why did you reach the conclusion
7  that it would be prudent financially for the
8  City not to make any cash contributions to the
9  pension plan?
10  A   It was part of a general review of
11  all the City's liabilities, both funded and
12  unfunded.  That's what we were doing.  Prior to
13  the involvement of Conway McKenzie, Ernst and
14  the Milliman, we really had no fact in which to
15  base out analysis on what the City should do
16  about its balance sheet and about its in
17  ability to fund operations or to invest in
18  quality of life.
19      That is why Conway, Ernst and
20  Young and Milliman were retained, to do exactly
21  that analysis.
22  Q   And as precisely as you can, sir,
23  did you make a specific recommendation to
24  Mr. Orr that no cash be contributed ed to the
25  pension plans as part of the City's

Page 66

1  K. Buckfire
2  restructuring proposal, and when I say you I
3  mean you personally?
4     MR. CULLEN:  Objection,
5     foundation, form, asked and answered.
6     Address it again.
7  A   We were not singling out any
8  particular creditor or body.  Our
9  recommendations were all about preserving cash
10  for the City and whatever steps the City had to
11  take to do so, it was part of a recommendation,
12  including not paying our bond holders.
13  Q   And you made that recommendation
14  following the April Milliman report?
15  A   No, I did not.  I didn't testify
16  to that.  I testified we became aware of the
17  seriousness of the issue in April.  We did not
18  form any conclusions until late May, early
19  June.
20  Q   When, if ever, did you make a
21  recommendation to Mr. Orr that the City not pay
22  any cash to the retirement system as part of
23  the restructuring proposal?  The question is
24  when.
25     MR. CULLEN:  Objection,

Page 67

1  K. Buckfire
2     foundation, form.  You're misstating
3     the witness' testimony.
4  A   I just answered the question.
5  Q   When?
6  A   I've answered that already.
7  Q   You said May?
8  A   Late May, early June.
9  Q   Okay.  You don't recall
10  specifically when?
11  A   No.
12  Q   Do you recall specifically who
13  heard the recommendation?
14  A   No.
15  Q   Was it oral?
16  A   Yes.
17  Q   Was it also in writing?
18  A   No.
19  Q   Who was present when the oral
20  recommendation was made?
21  A   I don't recall.
22  Q   Mr. Orr was present, of course?
23  A   I believe so, but I can't be
24  certain.
25  Q   You can't be certain as to whether

Page 68

1  K. Buckfire
2  Mr. Orr was present when you made an oral
3  recommendation?
4  A   There were many, many
5  conversations and meetings during that period
6  of time.  I can't recall who was at any
7  particular one and when this issue came up or
8  not. It was one of many other issues that had
9  to be decided to perform this presentation.
10  It's certainly not the only one and maybe not
11  even the most important.
12  Q   What was the most important
13  recommendation you made?
14  A   The decision whether or not to
15  make the     $40 million payment to our
16  cops bond holders on June 15.
17  Q   Why was that the most important in
18  your judgment?
19  A   Because that would trigger an
20  event of default on the part of the City which
21  would immediately trigger other consequences
22  related to the swap collateral agreement, which
23  was a direct threat to the City's ability to
24  operate in its ordinary course.
25  Q   Sir, if you would turn to -- back

Page 121

1          K. Buckfire
2    A   I suggested to him we figure out
3 how to do a better job of collecting taxes.
4    Q   I assume there was no disagreement
5 on that point?
6    A   Not that I recall.
7    Q   Do you know, Mr. Buckfire, whether
8 there has been more than one Compuware report
9 on the non-filers?
10   A   No.
11   Q   As the debtor's financial advisor,
12 do you have any assessment as to potential
13 value of collections from non-filers?
14   A   Well, in my judgment, and again,
15 speaking with my judgment, and I think that the
16 ability of the City to collect a material
17 amount of these delinquent payables is low.
18   Q   Why is that, sir?
19   A   For two reasons. Number one, I
20 think many of the people who have not paid have
21 no capacity to pay. We can't find them, or we
22 simply have no ability to enforce a judgment
23 against them.
24        And, secondly, the City ability
25 administratively to collect taxes has been

Page 122

1          K. Buckfire
2 proven to be quite low. I think for those
3 reasons, the eventual ability to collect on
4 these receivables is low.
5    Q   I would like to hand you another
6 document that touches on this subject. It's a
7 letter dated January 10, 2012, addressed to
8 Mr. Kenneth B. Cockrill, Chair, Budget, Finance
9 and Auditing Standing Committee, from
10 Cheryl Johnson, Group Executive Finance
11 Director, Office of the Mayor.
12       (Document, dated 1/10/12 was marked
13       as Buckfire Exhibit No. 10 for
14       identification, as of this date.)
15   Q   Mark this as Buckfire Exhibit 10.
16       Mr. Buckfire, have you seen
17 Deposition Exhibit Number 10 before?
18   A   No.
19   Q   Were you aware that the City
20 finance department had, in fact, identified
21 companies owing money to the City with balances
22 in excess of two thousand dollars?
23   A   No.
24   Q   Had you had any conversations with
25 Mr. Orr regarding corporate assessments of

Page 123

1          K. Buckfire
2 taxes due to the City?
3    A   No.
4    Q   Did you have any such
5 conversations with Mr. Malhotra?
6    A   No.
7    Q   With Mr. Moore?
8    A   About this report?
9    Q   Yes, A, about this report.
10   A   I've never seen this report, so
11 clearly, I didn't have any conversations about
12 it.
13   Q   Did you have any conversations
14 with either Mr. Malhotra or Mr. Moore about the
15 City's ability to identify corporate entities
16 that had not paid taxes to the City?
17   A   Not specifically, no.
18   Q   I think a few moments ago you
19 thought that it would be difficult to identify
20 and find people who owed money to the City.
21       Did I hear that correctly?
22   A   Individuals, yes.
23   Q   Is that true for corporations as
24 well?
25   A   There are fewer corporations and

Page 124

1          K. Buckfire
2 they're more visible, and it's probably a more
3 simple task to find them right now.
4       But this actually notes, since you
5 just gave it to me, that even they point out
6 they only had one accountant working on the
7 corporate sector, which gets to my second
8 points, which is the City's ability to collect
9 taxes is extremely low.
10   Q   Will that ability change as part
11 of the reorganization process?
12   A   If the City's allowed to maintain
13 its reinvestment plan, the expectation is it
14 will.
15   Q   And if the City's allowed to
16 continue with its reinvestment plan and
17 dedicates the appropriate resources, do you
18 believe that corporate taxes will be realized
19 by the City?
20   A   I believe that the projections
21 produced as part of the June 14 report, which
22 indicate certain expected revenues in the
23 future will be achievable.
24   Q   Do you believe that such
25 projections include improved tax collections?