**EXHIBIT D**

## Page 1

```
 1       IN THE UNITED STATES BANKRUPTCY COURT
 2            EASTERN DISTRICT OF MICHIGAN
 3                  SOUTHERN DIVISION
 4
 5   ----------------------------x
 6                                :
 7   In re                        : Chapter 9
 8   CITY OF DETROIT, MICHIGAN,   : Case No. 13-53846
 9            Debtor.             : Hon. Steven W. Rhodes
10   ----------------------------x
11
12            The videotaped deposition of GAURAV
13   MALHOTRA, called for examination, taken pursuant to
14   the Federal Rules of Civil Procedure of the United
15   States District Courts pertaining to the taking of
16   depositions, taken before JULIANA F. ZAJICEK, CSR No.
17   84-2604, a Certified Shorthand Reporter of said State
18   of Illinois, at the offices of Jones Day, Suite 3500,
19   77 West Wacker Drive, Chicago, Illinois, on
20   September 20, 2013, at 9:30 a.m.
```

## Page 2

```
 1   APPEARANCES:
 2        JONES DAY,
          (51 Louisiana Avenue, N.W.,
 3        Washington, D.C. 20001-2113,
          202-897-3939), by:
 4        MR. GEOFFREY S. STEWART,
          gstewart@jonesday.com;
 5        MR. CHRISTOPHER DiPOMPEO,
          cdipompeo@jonesday.com,
 6
              appeared on behalf of the Debtor
 7            and the witness;
 8        LATHAM & WATKINS LLP,
          (355 South Grand Avenue,
 9        Los Angeles, California 90071-1560,
          213-485-1234), by:
10        MR. WAYNE S. FLICK,
          wayne.s.flick@lw.com,
11
              appeared telephonically on behalf of
12            Ernst & Young;
13        DENTONS,
          (233 South Wacker Drive, Suite 7800,
14        Chicago, Illinois 60606-6306,
          312-876-2572), by:
15        MS. LEAH R. BRUNO,
          leah.bruno@dentons.com;
16        MS. MELISSA A. ECONOMY,
          melissa.economy@dentons.com,
17
              appeared on behalf of Retirees Committee;
18
          COHEN WEISS AND SIMON LLP,
19        (330 West 42nd Street,
          New York, NY 10036-6979,
20        212-356-0216), by:
          MR. PETER D. DeCHIARA,
21        pdechiara@cwsny.com,
22            appeared telephonically on behalf of the
              International Union, UAW;
```

## Page 3

```
 1   APPEARANCES: (Continued)
 2        LOWENSTEIN SANDLER LLP,
          (65 Livingston Avenue,
 3        Roseland, New Jersey 07068,
          973-597-2346), by:
 4        MR. S. JASON TEELE,
          steele@lowenstein.com,
 5
              appeared on behalf of AFSCME;
 6
          CLARK HILL PLC,
 7        (151 South Old Woodward, Suite 200,
          Birmingham, Michigan 48009,
 8        248-642-9692), by:
          MR. JOHN R. STEVENSON,
 9        jstevenson@clarkhill.com,
10            appeared telephonically on behalf of the
              Police and Fire Retirement System of the
11            City of Detroit and the General Retirement
              System of the City of Detroit;
12
          WEIL, GOTSHAL & MANGES LLP,
13        (767 Fifth Avenue,
          New York, New York 10153,
14        212-310-8257), by:
          MS. DANA KAUFMAN,
15        dana.kaufman@weil.com,
16            appeared telephonically on behalf of
              Fidelity Guaranty Insurance Company;
17
          LIPPITT O'KEEFE, PLLC,
18        (370 East Maple, 3rd Floor,
          Birmingham, Michigan 48009,
19        248-646-8292), by:
          MR. RYAN C. PLECHA,
20        rplecha@lippittokeefe.com,
21            appeared telephonically on behalf of the
              Detroit Retired Police and Fire Fighters
22            Association, Detroit Retired City
              Employees Association, Don Taylor,
23            individually and as president of the
              RDPFFA, and Shirley Lightsey, individually
24            and as president of the DRCEA;
```

## Page 4

```
 1   APPEARANCES: (Continued)
 2        STROBL & SHARP, P.C.,
          (300 East Long Lake Road, Suite 200,
 3        Bloomfield Hills, Michigan 48304-2376,
          248-540-2300), by:
 4        MS. MEREDITH E. TAUNT,
          mtaunt@stroblpc.com,
 5            appeared telephonically on behalf of the
              Retired Detroit Police Members
 6            Association.
 7
 8
 9
10   REPORTED BY:  JULIANA F. ZAJICEK, C.S.R.
                   CERTIFICATE NO. 84-2604.
```

Page 45

1  excuse me, "were limited to the City's general fund,"
2  is that correct?
3      A.   That is correct.
4      Q.   In other words, the projections assume
5  that there are no other funds available to the City
6  beyond the general fund, is that correct?
7      A.   It -- it assumes that the general fund
8  will not have additional funds from other funds, yeah,
9  that's generally correct.
10     Q.   What about the City having available --
11 other available funds outside of the general fund?
12     A.   The City has multiple funds outside the
13 general fund.  The main one is the water and sewer,
14 which we did not perform a ten-year projection on the
15 water and sewer funds.  My understanding is that those
16 funds are not necessarily available to the general
17 fund.
18     Q.   To the general fund that may be correct,
19 but it would be available to the City, would it not?
20     MR. STEWART:  Objection.
21 BY THE WITNESS:
22     A.   It would be available to the City for the
23 purposes those funds were raised for, which is
24 generally maintenance and capital improvements on the

Page 46

1  water and sewer side.
2  BY MS. BRUNO:
3      Q.   Let's backtrack a little bit.  I think
4  we've gone in a different direction than I'm trying to
5  focus on.
6          My question to you is:  The forecasts that
7  you provided in this declaration are limited solely to
8  the general fund, is that correct?
9      A.   They are generally limited to the general
10 fund, other than if they were other enterprise funds
11 the City was subsidizing, like the Department of
12 Transportation, those would have been included in the
13 general fund as it is a -- a fund that the City
14 subsidizes and has historically subsidized.
15     Q.   So you would agree, though, that subject
16 to your exception there that the assumptions and
17 forecasts provided in this declaration do not take
18 into account other funds available to the City?
19     MR. STEWART:  Objection.
20 BY THE WITNESS:
21     A.   You have to rephrase your question.
22 BY MS. BRUNO:
23     Q.   The forecasts and cash flows, the
24 projections, the information that is discussed in your

Page 47

1  declaration here are solely limited with the caveat
2  that you provided to the general fund, is that
3  correct?
4      MR. STEWART:  Objection.
5  BY THE WITNESS:
6      A.   The cash flow forecasts and the ten-year
7  projections with respect to the receipts and
8  disbursements and the revenues and expenses are
9  generally reflective of the general fund and the
10 Department of Transportation.  That's the way I would
11 characterize it.
12 BY MS. BRUNO:
13     Q.   You would agree that the City does have
14 access to other funds, correct?
15     MR. STEWART:  Objection.
16 BY THE WITNESS:
17     A.   I don't understand when you say the City
18 has access to.
19 BY MS. BRUNO:
20     Q.   There is other enterprise funds available
21 to the City, correct?
22     MR. STEWART:  Objection.
23 BY THE WITNESS:
24     A.   Available to the City for what?

Page 48

1  BY MS. BRUNO:
2      Q.   Well, if you are talking about the cash
3  available to the City, certainly there is other
4  sources of cash available to the City outside of the
5  general fund, you would agree with that?
6      MR. STEWART:  Objection.
7  BY THE WITNESS:
8      A.   No.  It depends on what purpose you are
9  asking the question, the context of.
10 BY MS. BRUNO:
11     Q.   You would agree with me that the general
12 fund is not the only source of available cash to the
13 city, would you not?
14     MR. STEWART:  Objection.
15 BY THE WITNESS:
16     A.   The general fund -- the cash that is
17 available to the general fund is generally the only
18 cash that is available to the City for its core
19 operations that are not related to any other
20 enterprise funds.  So, my answer would be, that the
21 cash flows that are reflective in here and are
22 generally available for the general fund is the City's
23 operating cash in general.
24 BY MS. BRUNO:



Page 65

1 noted issues and problems with the recordkeeping of
2 the City?
3     MR. STEWART: Objection; the document speaks for
4 itself. There is no evidence he wrote it.
5 BY THE WITNESS:
6     A. That's what the statement says. So, I'm
7 not sure I fully understand what your question is.
8 BY MS. BRUNO:
9     Q. Did Ernst & Young do anything to ensure
10 that the information that they evaluated and relied
11 upon was accurate information to draw assumptions
12 from?
13     A. Who is "they"?
14     Q. Ernst & Young. The question -- let me
15 rephrase the question. That might help.
16         Did Ernst & Young do anything to ensure
17 that the information that Ernst & Young evaluated and
18 relied upon as received from the City was accurate
19 information that you could draw assumptions from?
20     A. EY did -- our team based on the data that
21 was received did go through the information to make
22 sure that the assumptions we were using were
23 reasonable.
24     Q. And what would be the process that Ernst &

Page 66

1 Young would go through to make sure that information
2 used was reasonable?
3     A. Well, it would generally have been that if
4 we were receiving some information, we would try and
5 review what other documentation may or may not be
6 available to support any trends from a historical
7 perspective and whether the information was
8 consistent, and if it was not consistent, if there
9 were any major outliers, speak to the team at the City
10 to try and understand what changes may be happening.
11         So, I'm comfortable that what we undertook
12 as an analysis of the information that was presented
13 by the City after asking questions that we were using
14 reasonable assumptions.
15     Q. This process that you just outlined, can
16 you recall any specific instances where Ernst & Young
17 determined that the financial information received
18 from the City contained either an outlier or an error?
19     A. This was generally a collaborative
20 process. So, there was exchange of information
21 between the City and the EY team on a regular basis.
22 And so I can't recall something off the top of my
23 head, but my point is that this was generally an
24 iterative and a collaborative process of exchanging

Page 67

1 information and assumptions back and forth.
2     Q. Just to be clear, are you aware of any
3 instance or any specific circumstance of -- at all
4 where Ernst & Young went back to the City and said, I
5 think there is a problem with the information you
6 provided?
7     A. I am sure there were several conversations
8 in which we were challenging and asking questions with
9 respect to the data that we were receiving, but I
10 don't recall of any one specific instance off the top
11 of my head that stands out versus not.
12     Q. Can you give me one example of any
13 instance where Ernst & Young challenged the
14 information received and went back to any department
15 in the City where the information came from to verify
16 or better understand a problem with the information
17 received?
18     MR. STEWART: Objection to form.
19 BY THE WITNESS:
20     A. There were instances when we were
21 receiving reports on cash collections that were not
22 appropriately categorized and which -- and which we
23 went back and, you know, further evaluated as to, you
24 know, what the -- where those cash receipts really

Page 68

1 actually belonged in terms of income taxes or property
2 taxes. They were -- that's one example.
3         There were questions with respect to the
4 amount of accounts payable outstanding that the City
5 was reporting and, you know, if there were more
6 invoices than that were actually entered into the
7 system or not. So, there have been a variety of
8 back-and-forth conversations on different topics which
9 is part of what we actually are helping at the City
10 with is to try and get our arms around reasonable
11 assumptions around the data that is available.
12 BY MS. BRUNO:
13     Q. Why don't we turn back to Exhibit 4, which
14 is the June 14 proposal. And I'll direct your
15 attention to what is page 68 of 135 in the electronic
16 numbering. And this relates -- the questions that I'm
17 going to ask you relate to the restructuring and
18 reinvesting initiatives.
19         Why is the City spending $1.25 billion on
20 these initiatives?
21     A. I think it's in general to improve the
22 quality of safety as well as blight removal in the
23 City. The specifics of that as to how that number was
24 brought about is something that should be discussed

Page 105

1  Q. Going back a little bit, with respect to
2  the ten-year projections, do you recall who instructed
3  EY to begin compiling or preparing the ten-year
4  projections?
5  A. I think it was generally the former CFO
6  and the former program management director.
7  Q. And they did that prior to or after the
8  appointment of the Emergency Manager?
9  A. I have to recall. We started with a
10 five-year projection that we would start figuring out
11 whether we do a five-year or a ten-year and then we
12 transitioned from five-year to ten-year. I don't
13 recall specifically at what timeframe.
14 Q. And then why did you transition from
15 five-year to ten-year?
16 A. Just from the nature of looking at the
17 City's liabilities, having a longer term view was more
18 relevant versus having a shorter term view.
19 Q. Generally speaking, the longer you project
20 financial performance of an entity, government entity
21 or even a private entity, does your confidence in the
22 results shown in the projections decrease with the
23 longer period? In other words -- I'm sorry.
24     Did you understand that question?

Page 106

1  A. I did.
2  Q. Okay.
3  A. As long as you are making reasonable
4  assumptions for a five-year or a ten-year timeframe,
5  the comfort along certain assumptions in the short
6  term when they are based on recent trends is always
7  higher than projections that are in the long term.
8  That being said, it also depends on the reasonableness
9  of the assumptions in terms of the comfort level.
10 Q. And is it true that EY did not compile the
11 data that is included in the buildup to the ten-year
12 projections?
13 A. We did not audit the data. When you say
14 compile the data, if you can rephrase your question.
15 Q. You took data from other sources, for
16 example, from the CAFR, the Comprehensive Annual
17 Financial Report, right?
18 A. That was one source.
19 Q. Right. That's one source. And there are
20 other sources.
21     And you took data that was compiled by
22 other consultants retained by the City, for example,
23 by Milliman, is that right?
24 A. For certain assumptions.

Page 107

1  Q. And you used information that you were
2  able to obtain directly from the City's -- directly
3  from the City, the different agencies and departments
4  of the City in your ten-year projections, right?
5  A. Not necessarily. The City does not have
6  any ten-year projections currently. The data that we
7  used was based on ascertaining what historical
8  information was available and then using those --
9  using that data alongside some of the assumptions that
10 we got from the other advisers, helping pull together
11 ten-year assumptions. I do not know of any ten-year
12 assumptions the City had historically that we would
13 have used as a starting point.
14 Q. But you didn't create the historical -- in
15 other words, you didn't -- again, you didn't create
16 the historical data yourself from -- from original
17 sources, did you? You took -- did you?
18 A. When you -- you've got to rephrase that
19 question.
20 Q. You took the historical data directly from
21 the City?
22 A. The City's historical data, we took the
23 data that the City gave us and then made sure that
24 what data was reasonable, how we would actually look

Page 108

1  at the assumptions and that historical data. So we
2  had to look at the data, look at what the assumptions
3  were with respect to how that data was classified, how
4  that data was categorized to make sure that we could
5  actually use that data. So there wasn't just a raw
6  data dump in which we could use that data in its
7  original form without having to analyze it further.
8  Q. All right. See, that's where my confusion
9  is, because I thought that you had testified earlier
10 that you didn't really audit data?
11 A. That's right.
12 Q. And you didn't go back to --
13 MR. STEWART: You have to wait for a question.
14 He is not asking you a question.
15 BY MR. TEELE:
16 Q. And you didn't, for example -- and I think
17 you gave this example, you didn't go back to the
18 original bond offering documents to make sure that the
19 amounts stated in the data that you were using was
20 correct, right?
21 MR. STEWART: Well, wait a minute. What's the
22 question? That was a speech essentially. Just ask a
23 question.
24 BY MR. TEELE:

Page 109

1  Q.  I'm going to move on. It's a point of
2  confusion in my head, but I'll move on.
3      MR. STEWART: I think the transcript will clear
4  it up. I think it was covered.
5      MR. TEELE: I don't have anything further.
6  Thank you.
7      MR. STEWART: Does anyone else have questions?
8      MS. BRUNO: Why don't we take a short break so I
9  can communicate with everyone on the phone.
10     MR. STEWART: Okay.
11     MS. BRUNO: And then we can come back to you.
12     MR. STEWART: Okay.
13         (WHEREUPON, a recess was had
14         from 12:22 to 12:30 p.m.)
15     MS. BRUNO: We are back on.
16         Counsel on the phone, we are back on the
17  record. And I believe when we went off the record, we
18  were going through the people on the phone on a roll
19  call to see if anyone has any questions for
20  Mr. Malhotra.
21     MR. PLECHA: Ryan Plecha from the Association
22  Parties, we do not have any questions.
23     MR. STEVENSON: This is John Stevenson from
24  Clark Hill. I do not have any questions.

Page 110

1      MS. TAUNT: Meredith Taunt on behalf of the
2  Retired Detroit Police Members Association. We do not
3  have any questions.
4      MS. BRUNO: Anyone else on the phone?
5      MS. KAUFMAN: This is Dana Kaufman for Financial
6  Guaranty Insurance Company. We do not have any
7  questions.
8      MR. STEWART: This is Jeff Stewart, I have just
9  a few questions of Mr. Malhotra, from Jones Day. I
10 represent the witness and also the City, just a few
11 questions.
12             EXAMINATION
13 BY MR. STEWART:
14     Q.  Mr. Malhotra, you were asked in your
15 deposition about a document called the Comprehensive
16 Annual Financial Report of the City of Detroit.
17         Do you remember being asked about that?
18     A.  Yes.
19     Q.  That's sometimes called a CAFR, C-A-F-R?
20     A.  Yes.
21     Q.  Did E&Y audit the CAFR?
22     A.  No.
23     Q.  Or audit the accounts that led to the
24 creation of the CAFR?

Page 111

1      A.  No.
2      Q.  Was the CAFR audited?
3      A.  Yes.
4      Q.  Audited by who?
5      A.  KPMG.
6      Q.  And tell us who or what is KPMG?
7      A.  KPMG is the City's auditor and it is
8  another Big 4 accounting firm.
9      Q.  Is it one of the international accounting
10 firms that is known in the United States and
11 elsewhere?
12     A.  Yes.
13     Q.  Comparable to E&Y in terms of what it
14 does?
15     A.  Generally, yes.
16     MR. STEWART: Okay. That's all I have.
17         Thank you.
18     MR. TEELE: I have no questions.
19     MR. STEWART: So is the record closed?
20     MS. BRUNO: It is at this time.
21     MR. STEWART: Okay.
22         (Time Noted: 12:32 p.m.)
23         FURTHER DEPONENT SAITH NOT.
24

Page 112

1              REPORTER'S CERTIFICATE
2      I, JULIANA F. ZAJICEK, C.S.R. No. 84-2604,
3  a Certified Shorthand Reporter, do hereby certify:
4      That previous to the commencement of the
5  examination of the witness herein, the witness was
6  duly sworn to testify the whole truth concerning the
7  matters herein;
8      That the foregoing deposition transcript
9  was reported stenographically by me, was thereafter
10 reduced to typewriting under my personal direction and
11 constitutes a true record of the testimony given and
12 the proceedings had;
13     That the said deposition was taken before
14 me at the time and place specified;
15     That I am not a relative or employee or
16 attorney or counsel, nor a relative or employee of
17 such attorney or counsel for any of the parties
18 hereto, nor interested directly or indirectly in the
19 outcome of this action.
20     IN WITNESS WHEREOF, I do hereunto set my
21 hand on this 21st day of September, 2013.
22
23     _____
24     JULIANA F. ZAJICEK, Certified Reporter