# **EXHIBIT E**

Page 1

```
 1        UNITED STATES BANKRUPTCY COURT
 2         EASTERN DISTRICT OF MICHIGAN
 3              SOUTHERN DIVISION
 4   -----------------------------X
 5   IN RE                     ) Chapter 9
 6   CITY OF DETROIT, MICHIGAN, ) Case No. 13-53846
 7            Debtor.          ) Hon. Steven W. Rhodes
 8   -----------------------------X
 9
10
11
12           DEPOSITION of GLENN DAVID BOWEN
13                    Washington, D.C.
14                Tuesday, September 24, 2013
15
16
17
18   Pages:  1 - 213
19   Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR,
20                 CCR, CLR, RSA
21   Assignment Number:  472421
22   File Number:  105824
```

Page 2

```
 1                   September 24, 2013
 2                        9:47 a.m.
 3
 4
 5            Deposition of GLENN DAVID BOWEN held
 6   at the law offices of:
 7
 8
 9                        Jones Day
10             51 Louisiana Avenue, Northwest
11                   Washington, D.C. 20001
12
13
14
15
16               Pursuant to notice, before Cindy L.
17   Sebo, Registered Merit Reporter, Certified Real-Time
18   Reporter, Registered Professional Reporter,
19   Certified Shorthand Reporter, Certified Court
20   Reporter, Certified LiveNote Reporter, Real-Time
21   Systems Administrator and a Notary Public in and for
22   the District of Columbia.
```

Page 3

```
 1   APPEARANCES:
 2     JONES DAY
 3       For the Debtor:
 4            51 Louisiana Avenue, Northwest
 5            Washington, D.C. 20001-2113
 6            202.879.3939
 7     BY:    EVAN MILLER, ESQUIRE
 8            emiller@jonesday.com
 9     BY:    MIGUEL F. EATON, ESQUIRE
10            meaton@jonesday.com
11
12     DENTONS US LLP
13       For the Official Committee of Retirees:
14            233 South Wacker Drive
15            Suite 7800
16            Chicago, Illinois 60606-6306
17            312.876.7994
18     BY:    ROBERT B. MILLNER, ESQUIRE
19            robert.millner@dentons.com
20     BY:    ARTHUR H. RUEGGER, ESQUIRE
21            arthur.ruegger@dentons.com
22
```

Page 4

```
 1   APPEARANCES (Continued):
 2     COHEN, WEISS AND SIMON LLP
 3       For the United Auto Workers Union:
 4            330 West 42nd Street
 5            New York, New York 10036-6979
 6            212.356.0216
 7     BY:    THOMAS N. CIANTRA, ESQUIRE
 8            tciantra@cwsny.com
 9
10     LOWENSTEIN SANDLER LLP
11       For AFSCME:
12            65 Livingston Avenue
13            Roseland, New Jersey 07068
14            973.597.2538
15     BY:    JOHN K. SHERWOOD, ESQUIRE
16            jsherwood@lowenstein.com
17
18
19
20
21
22
```

Page 33

1 I'll say 60/40 was designed to be a proxy equity
2 and fixed income. The asset allocation is more
3 complicated with additional asset classes.
4     The results were roughly the same.
5  Q.  "The results" meaning what?
6  A.  Our -- our -- once we received the
7 investment policy in particular and we ran it
8 through our modeling, we developed the best
9 estimate range based upon the particulars of the
10 investment policies, and we developed an expected
11 return and a best estimate range around that
12 return, which I will characterize simply as told
13 the same story as we had in our high-level proxy
14 analysis in this letter (indicating).
15  Q.  Well, is it -- is it your -- is it
16 the -- let me ask -- start with you, yourself.
17     Is it your position presently that the
18 7.9 percent investment return expectations for the
19 General Retirement System is above the top end of
20 your reasonable range?
21  A.  When we calculated the -- using the
22 specific investment policy provided by the City, we

Page 34

1 developed the expected return and a best estimate
2 range, and the top of that range was below the 7.9
3 and the 8 percent used in the valuations.
4  Q.  Is it -- is it -- is that -- well, I
5 assume that's the opinion of the Milliman firm?
6  A.  Based on our capital market
7 assumptions, yes.
8  Q.  Is it -- is it the position of the
9 Milliman firm that the 7.9 percent investment
10 return expectation is inconsistent with Actuarial
11 Standards of Practice?
12  A.  We have not been asked to make an
13 opinion on that, and I have no opinion on that.
14  Q.  You have not been asked to make an
15 opinion?
16  A.  We have not.
17  Q.  Have you been asked to make an opinion
18 as to whether any of the actuarial assumptions that
19 the Gabriel, Roeder, Smith firm has done are
20 inconsistent with Actuarial Standards of Practice?
21  A.  We have not been asked that.
22  Q.  Would there be -- other than yourself

Page 35

1 at Milliman, would there be someone else that a
2 representative of the City of Detroit would have
3 asked that opinion for?
4  A.  They have not asked me. As far as I
5 know, they have not asked anyone who's been
6 involved in the pension work. I cannot state
7 definitively they haven't asked someone at
8 Milliman, but I would be surprised.
9  Q.  You would be the logical person they
10 would ask?
11  A.  Yes.
12  Q.  The General Retirement System presently
13 uses a seven-year smoothing period for its
14 actuarial valuation of the plan's assets; is that
15 correct?
16  A.  Yes.
17  Q.  All right. And is that within -- in
18 your opinion, within Actuarial Standards of
19 Practice?
20  A.  We've not been asked to opine on that
21 for the City of Detroit, merely pointed out the
22 methodology that was being used.

Page 36

1  Q.  Okay. Do you have an opinion on that
2 sitting here?
3  A.  I can't say that it's not within
4 acceptable standards of practice.
5  Q.  How about the earnings assumption, the
6 7.9 percent earnings assumption?
7  A.  Again, we -- we have our capital market
8 assumptions model, which develops an expected
9 return and a range of results, which we recommend
10 to our clients. I would not recommend a rate
11 outside of our best estimate range to any of my
12 clients.
13  Q.  But -- okay.
14     But if the client wanted to use, say, a
15 7.9 percent rate, would you view that as outside of
16 Actuarial Standards of Practice?
17     MR. MUTH: Object to the form.
18     You can go ahead and answer.
19     THE WITNESS: I don't know what that
20 meant.
21     I would view it as outside of our best
22 estimate range, and clients can mandate

Page 37

assumptions. They don't always listen to us.
BY MR. CIANTRA:
Q. Okay. But I guess -- help me out here.
Does there come a point where, in your professional judgment, if the client says I want you to use this return assumption, where you, as a professional, would not, say, sign a report, an actuarial valuation that used a particular assumption that you mandated?
A. That's not the way that I would approach it. My understanding of Actuarial Standards or Practices that we disclose mandated assumptions, and if they're unreasonable or if they are un- -- if they are outside of what we would consider to be reasonable, we'll state that.
Q. And similarly, if -- if you don't state that in a report, one would assume that -- that -- would it be reasonable to assume that the firm's position is that it is within Actuarial Standards of Practice?
MR. MUTH: Object to the form.
Go ahead, you can answer. Yeah, I'll

Page 38

tell you if you are not supposed to answer.
THE WITNESS: Okay.
In terms of following Actuarial Standards of Practice, to the extent that there is a mandated assumption or an assumption which we think is unreasonable, which I guess would basically derive from a mandated assumption, I would state that in my report.
And to the extent that I write a report and don't state that implicitly, you could make the assumption that I believe that what I've done is within reasonable practice.
BY MR. CIANTRA:
Q. That would be a reasonable reading of that?
A. Yes.
Q. With respect to the 30-year amortization methodology that the Detroit General Retirement System uses, in your opinion, is that within reasonable actuarial standards?
MR. MUTH: Can you read that back?
- - -

Page 39

(Whereupon, the court reporter read back the pertinent part of the record.)
- - -
THE WITNESS: I'm not aware of an actuarial standard that puts a specific limit on duration of amortization periods.
BY MR. CIANTRA:
Q. So not unreasonable?
A. I didn't say that.
Q. You think it's unreasonable?
A. I didn't answer the question in that regard in terms of defining reasonableness or unreasonableness. I said I'm not aware of an Actuarial Standard of Practice that provides a definition as to what is within or without bounds for amortization periods.
Q. Okay. Would it be correct that -- that the selection of that 30-year amortization period for the unfunded liabilities is not inconsistent with Actuarial Standards of Practice?
A. I really have no way to define what is and what is in -- what is within or without

Page 40

Actuarial Standards of Practice for amortization periods.
Q. Well, is -- in your experience, is a 30-year amortization period unusual in a public sector plan?
MR. MUTH: Object to the form.
BY MR. CIANTRA:
Q. Go ahead. You can answer.
A. Thirty years is not uncommon; however, 30 years is shorthand for a lot of different types of amortization methods.
So the particular method, as I'll refer you to the top of Page 4 in this July 6th, 2012 letter, the particular -- the particulars of this 30-year amortization method lead to an increasing debt each year, and that was what we felt was important to point out, the functioning of this particular methodology.
Q. Have you seen that methodology used in other public retirement systems?
A. I've -- I will say I've seen 30-year periods; I've seen open amortization; I've seen

Page 41

1 level-percent-of-pay amortization.
2     I can't say specifically that I
3 remember a system that had each of those three
4 components, each one of those three being as
5 important to me as the third [verbatim] year in
6 terms of understanding the workings of the
7 methodology.
8    Q.   You said in your response "the third
9 year."
10     Did you mean the 30th -- the 30 year?
11    A.   Thirty year, yes.  I apologize for my
12 voice this morning.
13    Q.   The -- why, in your understanding,
14 would a -- a retirement system want to use a -- a
15 smoothing technique to come up with the actuarial
16 value of its assets?
17    A.   Well, generally, the desire, as I
18 understand it, is that market value of assets
19 arises in a very volatile fashion year over year.
20 A smooth value of assets is -- is, in concept,
21 designed to arise in a smoother fashion, a less
22 volatile fashion over time; and using that less

Page 42

1 volatile actuarial value of assets in the
2 development of an employer contribution rate leads
3 to a smoother pattern of employer contributions,
4 which budget officers tend to prefer in funding
5 pension plans.
6    Q.   So for an -- an ongoing plan, does --
7 the sponsor might well prefer to smooth the
8 actuarial values of the assets, rather than taking
9 a market snapshot at a given date?
10       MR. MILLER:  Object to form.
11       THE WITNESS:  So I answer that?
12       It seems like the same question that I
13 just answered.
14       So, yes, my understanding is you would
15 prefer a smooth actuarial value of assets to
16 develop a smoother employer contribution pattern.
17 BY MR. CIANTRA:
18    Q.   Right.  And in the -- I'm not a
19 benefits lawyer, so I'm going to risk this by
20 asking you this question.
21       In the world of private defined benefit
22 pension plans, if the sponsor is going to terminate

Page 43

1 the plan, you -- you determine the market value of
2 the assets as of the termination date, correct?
3    A.   That is one step in the process, yes.
4    Q.   One step?
5    A.   Yes.
6    Q.   But that's the valuation process; you
7 wouldn't be looking to smooth the values going
8 forward because you're projecting the termination
9 of the plan, correct?
10    A.   In a termination, you have the assets
11 that you have, which is the market value of assets.
12    Q.   Right.  Okay.
13       So the -- so why would you, in an
14 ongoing plan -- is there -- well, let me step back.
15       It would be consistent with Actuarial
16 Standards of Practice to use smoothing in an
17 ongoing plan, correct, so long as the -- as
18 the -- the assumptions for that smoothing were
19 otherwise reasonable?
20    A.   Actuarial Standard of Practice 44
21 discusses asset smoothing methods for the purpose
22 of developing employer contribution rates.

Page 44

1    Q.   And it allows for smoothing?
2    A.   It allows for smoothing, yes.
3    Q.   Anything unusual with respect to the
4 smoothing methodology that the Detroit General
5 Retirement System has adopted in your practice --
6 in your -- in your experience?
7    A.   I wouldn't say there's anything
8 unusual.
9    Q.   You've seen the seven-year period used
10 before?
11    A.   Five is the most common.  I mean, seven
12 is not a standard number, but it's two more than
13 five.
14    Q.   Is there -- does the General Retirement
15 System employ a corridor above -- above or below
16 which the actuarial value cannot vary from the
17 market value?
18    A.   To my understanding, they do, yes.
19    Q.   And what is that corridor?
20    A.   I would have to look at the valuation
21 report to be certain, but I believe the corridor
22 was loosened after the market crash of 2008-2009

Page 173

1    MR. MUTH: Object to form.
2    THE WITNESS: Our initial engagement
3  was, as I've said, read this report and explain it
4  to us, help us understand what's going on. Our
5  resulting document was our effort to highlight
6  things that we thought the user should be aware of.
7  BY MR. SHERWOOD:
8    Q.  Do you know why the City of Detroit was
9  asking you to provide the -- them with this
10 assistance in reviewing the Gabriel, Roeder, Smith
11 reports?
12   A.  I don't know the specific cause, no.
13   Q.  Do you know generally?
14   A.  I could give you a typical example, but
15 I can't guarantee it applies to this situation.
16   Q.  I'd like to know what -- how -- how you
17 think it came to pass that Milliman got hired by
18 the City of Detroit in the spring or summer of
19 2012.
20   A.  That I can't speculate --
21      MR. MILLER: Objection.
22

Page 174

1  BY MR. SHERWOOD:
2    Q.  You haven't been instructed not to
3  answer, so you can answer.
4    A.  Well, in terms of how Milliman was --
5  was -- Milliman was contacted by the City. So
6  that's how we came to be hired, in response to that
7  specific question.
8       Their motivation for hiring us
9  specifically in this case would be speculation on
10 my part.
11   Q.  If you have an understanding of why the
12 City came and hired Milliman when it did, I'd like
13 you to give it to me.
14      MR. MUTH: Objection: asked and
15 answered.
16      THE WITNESS: That I don't know.
17 BY MR. SHERWOOD:
18   Q.  What did you understand the state of
19 the affairs to be with respect to the City of
20 Detroit's pension plan in the spring of 2012?
21   A.  I had no knowledge of the state of
22 Detroit's pension plan in the spring of 2012.

Page 175

1    Q.  You came to learn what it was, though,
2  correct?
3    A.  During the course of our assignment, in
4  reviewing the valuation reports for the two
5  systems, we came to some -- I'll say given that we
6  started with no knowledge of the system, we came to
7  some knowledge of the systems through that process.
8    Q.  And what -- what were the major
9  problems that you learned about?
10   A.  In our letter, I'll point you to the
11 comments that we made. That would be Exhibit 1.
12      So given the very broad assignment of
13 read the report and explain it to us, we started on
14 Page 2, developed the table that started with
15 valuation report numbers. And the first item that
16 we mentioned as -- and used the word "problems."
17 I'm not using the word "problems." We're pointing
18 out -- we're pointing out issues that the City
19 should be aware of to the extent that it was not
20 obvious to them.
21      But take DGRS, for example, the market
22 value of assets was $1 billion lower than the

Page 176

1  smooth value of assets. And as we had discussion
2  earlier this morning, only the market value of
3  assets really exists and is available to pay
4  benefit payments with. So we thought that was an
5  important point to make.
6       So to the extent that users had not
7  understood that from the valuation report, we tried
8  to make it clear.
9       We offered commentary as well on what
10 we viewed as optimism in the discount rate;
11 potential optimism in the mortality assumption as
12 well; and, again, very high-level comments at this
13 point in this letter, as we have discussed earlier.
14      And, finally, we noted that a
15 relatively significant portion of the actual market
16 value of assets in the trust were based upon
17 borrowing that the City had done, and just pointed
18 that out so that people didn't forget, when looking
19 at the valuation report, that a portion of the
20 funded status is due to debt that exists elsewhere
21 in the City's general balance sheet.
22   Q.  So in terms of these issues, did the