EXHIBIT A

TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

# In the Matter Of:

## CITY OF DETROIT, MICHIGAN

Case NO. 13-53846

# KEVYN ORR

*September 16, 2013*



800.211.DEPO (3376)
EsquireSolutions.com

```
 1   A.   Yes.
 2   Q.   -- you're talking again -- at this point in time had
 3        you decided whether to accept the Emergency Manager
 4        job?  This is later in the afternoon on January 31.
 5   A.   No, I didn't.  I -- no, there was no time in the
 6        initial two days that this came up that I decided to
 7        accept the Emergency Manager job.
 8   Q.   Okay.  And in this email you're giving some thoughts
 9        on some of the issues that pertain to that; aren't
10        you?
11   A.   Yes.
12   Q.   And in particular you start talking about the
13        legislation that pertains to the EM position.  You
14        said you went back and reviewed various laws; do you
15        see that?
16   A.   Yes.
17   Q.   And you talked about some laws in DC control board and
18        then you go on in the last sentence -- or I'm sorry,
19        the second to the last sentence to write, and I quote,
20        "By contrast Michigan's new EM law is a clear
21        end-around the prior initiative that was rejected by
22        the voters in November."
23             You wrote that?
24   A.   Yes.
25   Q.   And by the new EM law, you were referring to PA 436?
```



1    Q.   And you go on then in the -- and you were -- I guess

2         -- were you aware that for either the case of the

3         Chapter 9 being filed with the governor's approval

4         without the Emergency Manager being involved or the

5         Chapter 9 filing with the Emergency Manager, that in

6         either case PA 436 did not require the governor to

7         impose any contingencies on the bankruptcy filing?

8                   MR. SHUMAKER:  Objection, calls for legal

9         conclusion.

10   A.   I don't recall if I had done a deep dive in that

11        question at this time.  Please understand, counselor,

12        at this time I was doing a preliminary review of the

13        statute based upon I believe some published reports

14        and a look at it online.  I may have gotten to that

15        point, I just don't recall if at this time during that

16        day I had.

17   Q.   Okay.

18   A.   But I did at some point.

19   Q.   But you certainly knew that ultimately?

20   A.   At some point I did, sure.

21   Q.   Obviously.  And then you go on in the next sentence in

22        this email to say, "So although the new law provides

23        the thin veneer of a revision, it is essentially a

24        redo of the prior rejected law and appears to merely

25        adopt the conditions necessary for Chapter 9 filing."



1    A.   Yes, I said that.

2    Q.   And were you writing truthfully when you said that?

3    A.   Yeah, and I think the balance of the paragraph, the

4         news reports state that opponents of the prior law are

5         already lining up to challenge this law.  So as I just

6         testified, this was my preliminary analysis based upon

7         a number of sources, some of them were the news

8         reports.

9    Q.   And you were aware in fact that as you just indicated

10        that there were either challenges already made or that

11        were going to be made to the law?

12   A.   I was not aware that there were challenges already

13        made.  I was aware the news report states that

14        opponents of the prior law were already lining up to

15        challenge the law.

16   Q.   And did you have any understanding at this time as to

17        what those grounds of challenge were or may be?

18   A.   No.  As I said, this was, you know, within the span of

19        a day when this was going back and forth about what it

20        may require, I was beginning to familiarize myself to

21        some degree with the statute.

22   Q.   Your email goes on to say you're going to speak with

23        Baird in a few minutes and see what his thinking is.

24   A.   Yes.

25   Q.   Did you speak with Mr. Baird that day?



1    potential ground for challenge, was that it allowed

2    the governor to authorize a bankruptcy filing without

3    imposing a condition that would prevent pension

4    obligations from being impaired?

5  A.  I don't know if I was aware of that issue at this

6    time, no.

7  Q.  Well, were you aware -- you became aware of it if not

8    then at some point shortly thereafter; correct?

9  A.  Yeah, let me say this.  There was no broad based

10   concern at this point about with what the authority

11   was with regards to pensions so any sort of

12   insinuation that that was the focus at this point is

13   just inaccurate.  That wasn't true.  This as I said

14   before was a very cursory and initial sort of review

15   of what I was being asked to do so when I had a

16   discussion with Mr. Baird later I would have some

17   information and that's what I gleaned based upon a few

18   hours since apparently I got the call -- I was

19   informed that day, that morning or the day before to

20   the time I was going to have a call that afternoon.

21  Q.  But I take it at some point in time you became aware

22   that Article 9, Section 24 of the Michigan

23   Constitution protects pension benefits from being

24   diminished or impaired?

25  A.  I believe at some point in time I became aware that



1    Article 9, Section 24 purports to protect pensions and

2    benefits in certain circumstances, yes.

3              MR. ULLMAN:  Let's mark Exhibit 5.

4              (Marked Exhibit No. 5.)

5  Q.  Exhibit 5 is just a printout of Article 9, Section 24

6    of the Michigan Constitution.  Do you recognize it as

7    such?

8  A.  I mean, the document speaks for itself, but that

9    appears to be what it is, yes.

10 Q.  Okay, and I think your last answer you said that in

11   your view Section 24, Article 9 purports to protect

12   pensions and benefits in certain circumstances.

13 A.  Yes.

14 Q.  And are you contending that the words of Article 9,

15   Section 24 means something other than what they say?

16              MR. SHUMAKER:  Objection, calls for legal

17   conclusion.

18 A.  Yeah, I -- here again, I think the document speaks for

19   itself.  I think that my response to that issue is

20   throughout the arc of my career, whether in federal

21   government or in private practice at the Chrysler

22   case, there have been many state laws, some of them

23   quite sacrosanct, that have been abrogated by federal

24   law, not just bankruptcy law.  At the RTC we preempted

25   state, New York state, rent control litigation, law;



1    we preempted California state escheat law; we

2    preempted -- and that was the model for 50s.  In

3    Chrysler, we preempted 50 states have dealer franchise

4    laws that were preempted.  So when I said I recognize

5    this, there are federal laws that preempt state laws.

6            MR. ULLMAN:  I'm going to move to strike as

7    nonresponsive.

8 Q.  Mr. Orr, I appreciate your perhaps trying to be

9    helpful, but my question was really very limited and I

10   would appreciate it if you could just answer it.

11           MR. ULLMAN:  Could I have my question read

12   back, please?

13           (Record read back as requested.)

14 A.  I think that calls for a legal conclusion and I

15   contend that they speak for themselves.

16 Q.  Now, you made mention in your -- I think when you were

17   giving your prior response, you made some allusion to

18   federal law.

19 A.  Uh-huh.

20 Q.  Is there any question in your mind that apart from

21   anything that may come into play under federal law,

22   that the constitution of Michigan, Article 9, Section

23   24, prohibits pension rights from being diminished or

24   impaired?

25           MR. SHUMAKER:  Objection, calls for legal



```
 1        conclusion.
 2   A.   The document, as I said, speaks for itself.  Certainly
 3        I think I've said before that parties can negotiate a
 4        resolution of contracts.
 5   Q.   That's -- that's not my question.
 6             MR. ULLMAN:  Could you -- can you read my
 7        question back?  If there's anything about it you don't
 8        understand, I would be glad to rephrase.
 9             THE WITNESS:  Uh-huh.
10             (Record read back as requested.)
11             MR. SHUMAKER:  Objection to form, calls for
12        legal conclusion.  You can answer.
13   A.   Yeah, I think it does call for legal conclusion, but
14        as I said, contractual obligations can be negotiated
15        at any time.
16   Q.   Let me rephrase it.
17             You understand what the constitution is
18        talking about is diminishing or impairing is
19        nonconsensual; correct?
20             MR. SHUMAKER:  Objection, calls for legal
21        conclusion.
22   Q.   Let me rephrase it so there can't be any ambiguity.
23        Clearly parties can if they so choose change their
24        contract; rights?
25   A.   Yes.
```



1   Q.  Is there any question in your mind that Article 9,

2       Section 24 of the Michigan Constitution protects

3       pension rights from being diminished or impaired if

4       the beneficiaries of those rights do not agree

5       consensually to such diminishment or impairment?

6                   MR. SHUMAKER:  Objection, calls for legal

7       conclusion.

8   A.  I think I've answered that before.  I think there's

9       certain federal laws that allow for preemption --

10  Q.  I'm asking about independent of any federal law.  The

11      Michigan Constitution on its own, apart from any

12      overlay that you say may apply from federal law, is

13      there any question that the Michigan Constitution,

14      assuming that the beneficiaries of the retirement

15      obligations don't consent, any question that in that

16      circumstance the Michigan Constitution prohibits

17      pension rights from being diminished or impaired?

18                  MR. SHUMAKER:  Objection, calls for legal

19      conclusion.

20  A.  Here again, Mr. Ullman, you're asking me -- I'm a fact

21      30(b)(6) witness, you're asking me for a legal

22      conclusion about what the statute says.  I'll say that

23      the statute speaks for itself and I certainly have

24      heard that people take that position.

25  Q.  Okay, and I'm asking you -- I'm not asking you to give



13-53846-tjt   Doc 1242-1   Filed 10/17/13   Entered 10/17/13 23:44:05   Page 10 of 66

 1        wasn't.  It was the Emergency Manager's duties writ

 2        large.

 3   Q.   And when you say you were pouring over the law, you

 4        yourself were doing legal analysis, reading various

 5        laws; is that right?

 6   A.   Yes, I was trying to get background information, yes.

 7   Q.   And as part of that background information did you

 8        read Article 9, Section 24 of the Michigan

 9        Constitution?

10   A.   I may have.

11   Q.   Is there any question in your mind that you didn't?

12   A.   I -- if you have a document to refresh my

13        recollection, I'm happy to look at it.  Sitting here

14        on this day on February 20th, I don't recall whether

15        or not I read that article of the constitution.

16   Q.   There's no question that at some point after February

17        20th you read Article 9, Section 24 of the Michigan

18        Constitution; correct?

19   A.   My testimony is it may have been before or after the

20        20th.  I don't recall whether I did that sitting here

21        today.

22   Q.   Okay, but it was either one or the other, but you

23        certainly have read it?

24   A.   Yes, I've read it.  I read it today.

25   Q.   And you read it before you became Emergency Manager;


13-53846-tjt   Doc 1242-1   Filed 10/17/13   Entered 10/17/13 23:44:05   Page 11 of 66

1     didn't you?

2  A.  Yes.

3  Q.  One other question on this document actually.  As you

4      look at page 460, at the bottom there's a February 21

5      email.

6  A.  Yes.

7  Q.  And it refers to point 8 of the attachment.  This

8      again has to do with the mayor's existing executive

9      team; right?

10 A.  Yes.

11 Q.  And in this time -- this is from Mr. Baird again;

12     right?

13 A.  Yes.

14 Q.  And he's really explicit.  He says, other than a few

15     grammatical nits, and some more language around point

16     8, so we can manage expectations if Kevyn needs to

17     make some personnel changes.  So he's clearly

18     referring here to you making personnel changes that

19     could affect the mayor's existing executive team;

20     isn't he?

21 A.  Yes, this wasn't written to me, but I'll read it.  I

22     mean to myself.  Yes, document speaks for itself, but

23     that seems to say that.

24 Q.  Isn't it clear at this point that it was envisioned

25     and understood that Kevyn Orr, you Mr. Orr, were in



1       that right?

2   A.  I believe so.

3   Q.  And did the governor share that view with you?

4   A.  No.

5   Q.  He thought that the pension and OPEB obligations were

6       not impediments to Detroit's fiscal health?

7   A.  No, the governor -- the only discussion I had with the

8       governor was at a very high level about the dire

9       straits of the City and the need for some -- it was

10      actually the dire straits of the City and the need for

11      some reform.  There was no specific discussion about

12      pension or OPEB.

13  Q.  Now, at some point after you became the Emergency

14      Manager, did you have discussions with the governor

15      about a Chapter 9 filing to among other things get out

16      of the pension obligations that the City owed?

17              MR. SHUMAKER:  Object to form.

18  A.  Yes, I believe so.

19  Q.  And when did those take place?

20  A.  Since becoming Emergency Manager on the 25th I've had

21      regular conversations with the governor.  Typically

22      weekly.  I don't recall the specific conversation when

23      they came up.  I will say that it wasn't within our

24      initial conversations.

25  Q.  Okay.  And we're talking -- these conversations, are



1    A.   I'm taking my time because I'm trying to remember.

2         There were a number of different analyses and briefing

3         papers and -- that would come across the desk and I'm

4         not sure any of them focused solely on state law.

5    Q.   Okay.  And what else -- what other law did they focus

6         on if not solely state law?

7    A.   They may have focused on state law and federal law.

8    Q.   So you don't recall if there was any analysis that

9         just looked at state law?

10   A.   No, sitting here today, I don't recall.  There may

11        have been, but I don't recall.

12   Q.   And were you aware prior to the bankruptcy filing that

13        under state law alone the pension obligations could

14        not be diminished or impaired?

15   A.   This is the discussion we had about five to ten

16        minutes ago about whether or not state law permitted

17        it and I will go back to my answer with that.  It

18        seems to suggest a legal conclusion based upon what

19        the statute 436 provides and the intent of the

20        legislature.

21   Q.   Let me ask you a different question.

22              Is there anything in PA 436 that allows in

23        your view the Emergency Manager to impact or adversely

24        affect pension rights in the absence of a Chapter 9

25        bankruptcy filing?



1   A.   Defined contribution.

2   Q.   Defined contribution?

3   A.   Uh-huh.

4   Q.   Now, the existing -- the pension plan that exists

5        under the steady state projections, is that defined

6        contribution plan?

7   A.   That would be switched over.  No, no, defined -- the

8        steady state scenario?

9   Q.   That's a defined benefit?

10  A.   That's a defined benefit plan.

11  Q.   So what you're projecting here is a switch over to a

12       defined contribution program and for 2014 we see the

13       number for the city's contributions is now

14       25.4 million; is that right?

15  A.   Yes, that's -- yes.

16  Q.   And that compares with the -- what was the figure?

17       199.5 million that we saw under the as is?

18  A.   Yes, projections.

19  Q.   Yes.  So the diminution it looks just on the rough

20       math that the City's pension contributions under the

21       restructuring are being cut by about 80 percent; is

22       that right?

23  A.   Under 75 million, 80 percent, sure, roughly.

24  Q.   And for health, the health benefits, which we saw that

25       were, what, under the current scenario something like



1  147 million?

2 A. Retiree health, yes.

3 Q. For retiree health?

4 A. Uh-huh.

5 Q. Under this proposal, the restructuring proposal, I

6  don't see any line entry for the retiree health

7  benefits.

8 A. Yes.

9 Q. So they're essentially being cut; correct?

10 A. Well, the obligation is being provided with a

11  different program, but yes, the City would not have an

12  obligation going forward of that magnitude.

13 Q. And going back to the pension contributions, you know,

14  we had talked about a diminution on the order of 80

15  percent from the 199.5 figure, and I think it's the

16  City's contention that the 199.5 figure is really

17  understated, right, because the obligations are really

18  a lot higher?

19 A. I think we think the liabilities -- this is the steady

20  state projection on 91.  I think we think the

21  liabilities are higher because what we represented on

22  the second page of 98 is the estimated undersecured

23  claims for out years as opposed to a ten-year

24  projection.

25 Q. Right.  And if the liabilities were really greater



1       than the diminution from the steady state to the

2       restructuring scenario would be greater than 80

3       percent; wouldn't it?

4  A.  It might be.  I mean, we've said 80 percent.  I mean,

5       199.5 less 25, you know, you just roughly cut those in

6       half, that's a 12 and 1/2 percent, but you know, 88

7       percent, somewhere in that neighborhood.

8  Q.  Now, the people who are -- the retirees who are

9       getting impacted from these -- by these cuts in the

10      proposed restructuring, these are who?  These are men

11      and women who previously served the City and are now

12      retired?

13  A.  Yeah, they're two pension plans: one for General

14      services and the other for Police and Fire.

15  Q.  And these individuals that serve the City in both

16      public safety and nonpublic safety capacities?

17  A.  Uniform and nonuniform, yes.

18  Q.  And were these -- I guess the issue comes because the

19      pension liabilities and the healthcare benefits that

20      may be due are not -- there's not sufficient funding

21      that was put into them; correct?

22  A.  Well, the healthcare benefit has no funding, the

23      $5.7 billion.  And the pension underfunding has our

24      estimate of the level of underfunding, the unfunded

25      portion of the pensions, in them.  There are assets



| | |
|---|---|
| 1 | propose to reduce would get a share of the note, yes. |
| 2 Q. | And is there any way to tell from this document how |
| 3 | much any individual retiree would ultimately get if |
| 4 | the notes go ahead and are issued? |
| 5 A. | Not from this document. |
| 6 Q. | There's no way to tell how much cash value any retiree |
| 7 | would receive under this plan that's laid out here |
| 8 | where they get notes? |
| 9 A. | It is my understanding that there are a number of |
| 10 | different plans and benefits and factors that go into |
| 11 | that determination for any specific retiree. |
| 12 Q. | Okay.  Now, Chapter 9 is not referred to in this |
| 13 | restructuring plan; is it? |
| 14 A. | I don't think we did. |
| 15 Q. | And I think you indicated before that if this was not |
| 16 | agreed to by the various constituencies, then the only |
| 17 | way to implement this restructuring plan would be, if |
| 18 | at all, would be to try to go ahead and do that |
| 19 | through Chapter 9; is that right? |
| 20 A. | I think what I said before, I think you're referring |
| 21 | to the May 12th 45-day operating plan, but I think |
| 22 | what I said before on June 10th and June 14th is we |
| 23 | needed to engage in a dialogue, because we didn't want |
| 24 | to go to Chapter 9. |
| 25 | MR. ULLMAN:  That wasn't my question.  Can |



1       you read my question back?

2                (Record read back as requested.)

3   A.  Yeah, I indicated that here today.

4   Q.  I'll just ask the question again.  As you understood

5       it, if the proposal here were not agreed to or some

6       other consensual resolution was not reached, was there

7       any way for you as Emergency Manager to implement this

8       plan other than to try to get it put in place through

9       a Chapter 9 filing?

10  A.  Subject to the discussion that we've had a couple of

11      times earlier today, what I have said is that Chapter

12      9 is an option to achieve these goals.

13  Q.  And were you at this point aware of any option to

14      achieve these goals other than Chapter 9 if a

15      consensual resolution was not reached?

16  A.  There were various briefing memos and discussions, but

17      given the time frames that we were under, and I said

18      this at the June 10th meeting and I said it at the

19      June 14th meeting and I want to be responsive, that if

20      we didn't, Chapter 9 was an alternative.

21  Q.  And I don't think that's fully responsive at this

22      point.  Had you identified anything else as of June 14

23      to get this plan implemented, any other course,

24      putting aside consensual resolution, other than a

25      chapter 9 file?



1    A.   Nothing that would give us an orderly and

2         comprehensive resolution of these problems.

3    Q.   Now, you gave an interview, that I'm sure you're

4         familiar with, with the Detroit Free Press on or

5         around June 14th.  Do you remember it?  I'll just tell

6         you what -- I believe you said -- and I'm sure you

7         remember this one and you can tell me.  If not, I have

8         the quote.

9    A.   Yeah, you can give me the quote.  There's so many

10        interviews, but I'll trust your quote.

11   Q.   Okay.

12   A.   Okay.

13   Q.   This is the quotation.  Question, you said in this

14        report, referring to the June 14th proposal, that you

15        don't believe there is an obligation under our state

16        constitution to pay pensions if the City can't afford

17        it?  Answer, the reason we said it that way is to

18        quantify the bankruptcy question.  We think federal

19        supremacy trumps state law.

20   A.   Yes.

21   Q.   You don't deny making that statement?

22   A.   No, I think I've said that several times.

23   Q.   And the state law you were referring to that you

24        referred to as being trumped was Article 9, Section 24

25        of the state constitution; is that right?



```
 1   A.   I believe so.

 2   Q.   There's no other state law that you view as relevant

 3        to the pension issue; is there?

 4   A.   Subject to the discussions that we had earlier today.

 5   Q.   As being trumped?  There's no other state law that you

 6        regarded as being trumped; is there?

 7   A.   No, there's no other as being trumped.

 8   Q.   Trumped.

 9   A.   Right.

10   Q.   So the answer to my question -- just so the record is

11        clear, the answer to my question is no other?

12   A.   We're not referring to another state law.

13   Q.   Okay, thank you.

14   A.   Okay.

15   Q.   Now, ultimately -- so when the subsequent bankruptcy

16        filing was made -- which it was; right?

17   A.   Yes.

18   Q.   The intention -- specific intention was indeed to

19        trump Article 9, Section 24 of the state constitution;

20        correct?

21   A.   That wasn't the only intention.

22   Q.   But that was an intention; was it not?

23   A.   That was one of the objectives.

24   Q.   Now, ultimately you did request authorization for the

25        governor to file; right?
```



1      was the singular focus.  I think most of our
2      discussions were about the need for the City to deal
3      overall with its balance sheet and its obligations,
4      which would include pensions.
5             MR. ULLMAN:  Uh-huh.  Okay, can you read my
6      question back?  Listen a little more closely because I
7      was really -- it was a little more specific of a
8      question.
9             THE WITNESS:  Okay.
10            (Record read back as requested.)
11  A.  We probably had that discussion.  I don't recall
12      anything specific, but we probably did.
13  Q.  And do you recall any discussion during those same
14      conversations with the governor or anyone from his
15      staff as to the impact, if any, of Article 9, chapter
16      -- Section 24 of the Michigan Constitution as regards
17      pension benefits?
18  A.  I don't recall having discussions in that regard.  No.
19  Q.  Now, if you look at the governor's response letter,
20      okay, and the last page, you see at the top there's a
21      heading called contingencies?
22  A.  Yes.
23  Q.  And it says 2012 PA 436 provides that my approval of
24      the recommendation to commence a Chapter 9 proceeding
25      may place contingencies on such a filing and it gives



```
 1          the citation.  It continues, I am choosing not to
 2          impose any such contingencies today.  Federal law
 3          already contains the most important contingency, a
 4          requirement that the plan be legally executable,
 5          11 U.S.C. Section 943(b)(4).  Do you see that?
 6   A.     Yes.
 7   Q.     And did you have any discussions with the governor or
 8          anyone from his staff about that language before you
 9          received this letter back?
10   A.     No.
11   Q.     Were you -- did you have any understanding before
12          receiving this that as to whether or not the governor
13          was going to place any contingencies on the bankruptcy
14          filing?
15   A.     No, but I was concerned about it.
16   Q.     And what were you concerned about?
17   A.     I was concerned that the governor might place some
18          contingency in any regards, not just related to the
19          pensions and others, but that the inner array on
20          limiting what authority I might have would impact what
21          discretion I would have under either 436 or Chapter 9.
22          I was just concerned about contingencies.
23   Q.     And was one of the contingencies that you were
24          concerned about the contingency that could impair your
25          ability or restrict your ability to cut back the
```



1    Q.   And did you have any plan in place as to what you
2         would do if the letter came back that imposed a
3         contingency that in any Chapter 9 filing nothing could
4         be done that would affect pension rights that were
5         protected under the Michigan Constitution?
6    A.   No.
7    Q.   Now, in his letter the governor -- the portion we've
8         just looked at on the back of page 5, the governor
9         says, having a legally executable plan under Section
10        943(b)(4).  That's a reference, 943(b)(4), the
11        bankruptcy code; isn't it?
12   A.   I believe so.
13   Q.   So he says, he the governor says, having a legally
14        executable plan under Section 943(b)(4) of the
15        bankruptcy code is a contingency for Detroit's filing
16        a bankruptcy petition.  Correct?
17             MR. SHUMAKER:  Objection, document speaks
18        for itself.
19   A.   That's -- I was going to say the document speaks for
20        itself.  You're sort of reading it, you know, just
21        inversing it, but it says federal law already contains
22        the most important contingency requirement that the
23        plan is legally executable.
24   Q.   Right.  And this is in the context of him asking or
25        noting that under PA 436 he could, he the governor,



1      could place contingencies on a Chapter 9 filing;

2      right?

3  A.   Yes.

4  Q.   And he goes on to say that federal law also contains

5      what he calls the most important contingency on the

6      Chapter 9 filing, that it be legally executable;

7      correct?

8  A.   Yes, the letter speaks -- that's the language of the

9      letter.

10  Q.   Did you agree with the governor's analysis here?

11  A.   I -- do I agree?  Yes, I mean, I agree that that's the

12      most important contingency that we get to, yes.

13  Q.   Now, petition was filed -- the bankruptcy petition was

14      filed on July 18th, like at 4 in the afternoon, 4:05,

15      something like that?

16  A.   That's what I was told.  I don't know the specific

17      time.

18  Q.   Now, in doing -- in making your bankruptcy filing,

19      were you intending to do something that was in

20      violation of state law?

21           MR. SHUMAKER:  Objection, calls for legal

22      conclusion.

23  A.   Here again, subject to all the discussions that we had

24      earlier today, I was intending to aleve the City of a

25      very dire situation and provide it with the maximum



1      telephone conversations with him and I recall meeting

2      with him.  I don't recall whether it was prior or

3      after the filing.  I know from time to time -- I just

4      don't recall when it was.

5  Q.  Would there have been any reason for you not to

6      consult the Attorney General prior to the bankruptcy

7      filing on that issue?

8  A.  No, I think the State Attorney General made his

9      position known prior to the filing.

10 Q.  Now, as of this time the petition was filed there were

11     various state court litigations that had been begun?

12 A.  Yes.

13 Q.  And those challenged, among other things, PA 436;

14     correct?

15 A.  Yes.

16 Q.  And its constitutionality?

17 A.  Yes.

18 Q.  And in fact, the petition was filed just prior to the

19     start of a TRO hearing in one of those state

20     litigations; wasn't it?

21 A.  I was told that either that night or the following

22     day.

23 Q.  And are you aware that certain objectors in this

24     proceeding have stated that the bankruptcy petition

25     was filed just before the judge in the case was about



1          to issue a TRO prohibiting the bankruptcy filing from

2          taking place?

3   A.     I heard that after the fact, yes.

4   Q.     And are you aware that these objectors have stated

5          that in fact the state lawyers asked for a short delay

6          before the ruling was issued so they could get the

7          bankruptcy filing in before the judge came down with a

8          TRO?

9   A.     I don't know if I heard it -- I may have read that

10         later.  I don't know if I heard it.

11  Q.     Did you have any involvement in those actions?

12  A.     No, no.

13  Q.     Do you deny that that's what occurred?

14  A.     I only know what I've heard and I have no personal

15         knowledge, I just know what I've heard and what I've

16         read.

17  Q.     And isn't it correct that you wanted to get the

18         bankruptcy petition filed as soon as possible because

19         you knew there was a risk that the state might rule it

20         was illegal -- the state court might rule it was

21         illegal under state law for the bankruptcy proceeding

22         to be filed?

23  A.     No, that wasn't the reason.

24  Q.     Is there a particular reason that the bankruptcy

25         filing was made at 4:06 in the afternoon of the same



1    day a TRO was being heard in the state court other

2    than to get the jump on the state court ruling?

3         MR. SHUMAKER:  Object to the form.

4  A.  Not to the best of my knowledge.

5  Q.  Now, you're aware that the state court in that

6    litigation in fact later issued a ruling that PA 436

7    is unconstitutional to the extent that it authorizes a

8    proceeding under Chapter 9 in the way that could

9    threaten to impair or diminish accrued pension

10   benefits?

11 A.  Yes, I was informed that there are I believe three

12   TROs after the bankruptcy filing.

13 Q.  And you have proceeded with the bankruptcy petition

14   notwithstanding; correct?

15 A.  Well, the bankruptcy petition had been filed.  There

16   were open questions about the application of the stay.

17   There was also a question about an appeal, which was

18   taken up I believe by the Attorney General's office.

19   So when you say you proceeded with the petition, we

20   filed the petition, there was a ruling, and there were

21   appeals.

22 Q.  Okay.  And in light of the state court ruling that

23   PA 436 was unconstitutional, you did not take any

24   steps to withdraw the bankruptcy petition from filing;

25   did you?



```
 1   A.   No.
 2   Q.   And you have not taken any steps to stop the
 3        bankruptcy proceeding from going forward; have you?
 4   A.   No.
 5             MR. ULLMAN:  Would this be a good time to
 6        stop for lunch, a quick lunch?
 7             MR. SHUMAKER:  Sure.
 8             MR. ULLMAN:  I'm ready to continue but I
 9        know --
10             THE WITNESS:  You got another -- how much
11        -- do you have another line of inquiry?  Whatever
12        everybody --
13             MR. ULLMAN:  I'm about to switch subject
14        matters.
15             THE VIDEOGRAPHER:  Going off the record at
16        12:52 p.m.
17                  (Luncheon recess between
18                  12:52 p.m. and 1:30 p.m.)
19             THE VIDEOGRAPHER:  We're back on the record
20        at 1:35 p.m.
21   BY MR. ULLMAN:
22   Q.   Welcome back, Mr. Orr.
23   A.   Good afternoon.
24   Q.   One other question about the June 14th proposal.
25        Referring to page 98, we talked about the defined
```



1        contribution benefit plan?

2   A.   Yes.

3   Q.   Okay.  Is it correct that under that plan

4        contributions are being made only for people who would

5        be current City employees?

6   A.   Will the plan be closed?

7   Q.   Yes.

8   A.   Yes, I believe so.

9   Q.   So under the restructuring plan there would be no

10       pension contributions made for retirees; correct?

11  A.   I believe that's correct.

12  Q.   Now, you I believe said that the June 14th proposal

13       was presented at a meeting to representatives of

14       various creditors, I think you said that in your

15       declaration?

16  A.   On June 14th, yes.

17  Q.   Okay.  Did you speak at that meeting?

18  A.   Yes.

19  Q.   And who else spoke?

20  A.   I believe all -- several members of our team, I

21       believe it was Mr. Heiman, David Heiman, I believe it

22       was Ken Buckfire, I believe Heather Lennox was on, I

23       believe Bruce Bennett was there, I believe Ken

24       Buckfire may have spoken.  I'm trying to recall if

25       there was anyone else.



1    association that the City would in fact be willing to

2    agree to a restructuring that did not involve the

3    elimination of ongoing pension contributions for

4    retirees.

5  A.  No, I didn't say that.

6  Q.  And do you know in fact whether anyone working on your

7    team ever said that to any union or retiree

8    association?

9  A.  No.

10 Q.  Okay.  During the time from June 14th to July 17, did

11   you or anyone else from your team tell any union or

12   retiree association that the City acknowledged that

13   under Michigan law pension rights were explicitly

14   protected from being impaired or diminished?

15 A.  I don't --

16        MR. SHUMAKER:  Objection, form, calls for

17   speculation.

18 A.  I don't recall anyone saying that, but it may have

19   happened.

20 Q.  But you personally didn't make that statement; did

21   you?

22 A.  I don't recall saying that.  I may -- you know,

23   anything is possible, I just don't recall saying it.

24 Q.  And as of July 17, had the City, you or anyone working

25   for you, told any union or retiree association that it



1    would in fact be willing to agree to a restructuring
2    plan that did not effectively eliminate the prior
3    existing health benefits for retirees?
4              MR. SHUMAKER:  Objection, foundation, calls
5         for legal speculation.
6    A.   Healthcare benefit for retirees?
7    Q.   Yeah.
8    A.   That did not eliminate it?
9    Q.   Yeah, that you --
10   A.   Did not adjust it in some fashion?
11   Q.   Did not essentially cut it out the way it was being
12        cut out in the June 14th proposal.
13   A.   Yeah, I want to be careful with the frame cut out,
14        because I think there were subsequent discussions
15        about what would be provided instead --
16   Q.   Uh-huh.
17   A.   -- as a proposal, so I don't want my testimony to seem
18        as if we were not proposing an alternative to the
19        existing healthcare plan and that had not been
20        discussed prior to July 17th, but subject to those
21        qualifications the answer to your question is yes.
22   Q.   Now, I've been asking you as of July 17 and then the
23        bankruptcy filing was the very next day; correct?
24   A.   Yes.
25   Q.   Now, in your declaration do you recall making



```
 1   Q.   And on the pension side of things has there been any
 2        change from what was set out in the June 14th
 3        proposal?  As I understand this, it's still a defined
 4        contribution plan for current employees and no
 5        contributions being made by the City for retired --
 6        for retirees; is that right?
 7                MR. SHUMAKER:  Object to the form.
 8   A.   Yeah, the general consensus is that you would close
 9        the plan and there would be contributions for
10        currents, yes.
11   Q.   And so again, just to be clear, that means for
12        retirees no ongoing contributions provided by the
13        City?
14   A.   None other than their participation in the note that's
15        proposed in the June 14th proposal.
16   Q.   And with no new funding for their pensions the
17        payments will stop -- to the retirees would stop being
18        made when the retirement funds run out; is that right?
19   A.   That's a loaded question.  I mean, the -- and the
20        reason I say it's a loaded question, some of the
21        retirement funds have said their payments won't run
22        out so that's why we want to have a dialogue.  We
23        think they're at risk.  They've told us they're not.
24   Q.   And by the City's estimation the pension funding will
25        run out when?  If no new funds are put in?
```



1        unreasonable assumptions either way.  But your general

2        question as to whether or not if the information going

3        in was inaccurate, revealed an inaccurate result, I

4        think it's true as a matter of just common sense and

5        logic.

6    Q.  And the same thing as to assumptions.  If the

7        assumption made was wrong, then the output would be

8        wrong also?

9    A.  I think that's why we asked several times to have a

10       discussion about the assumptions that are necessary

11       for pension benefits.

12   Q.  Now, the cash flows that are being reported in your

13       declaration, those do not include any assumptions as

14       to the monetization of various assets that the City

15       continues to hold; is that right?

16            MR. SHUMAKER:  This is paragraph 56 that

17       you're referring to, counsel?

18            MR. ULLMAN:  Yeah, I'm looking in general.

19            MR. SHUMAKER:  In cash flow?

20            MR. ULLMAN:  Yeah, cash flow.

21   A.  You're talking about generally do the cash flows

22       include any monetization of any City assets?

23   Q.  Yeah.

24   A.  No, they do not.

25   Q.  And obviously if assets currently held by the City



```
 1        for some period of time; true?
 2                MR. SHUMAKER:  Objection to form.
 3   A.   Here again, depending upon the size of the asset, but
 4        anything is possible.
 5   Q.   Okay.  Now, the City of Detroit owns certain pieces of
 6        art that are stored at the Detroit Institute of Art;
 7        is that right?
 8   A.   Yes.
 9   Q.   And how many is that?
10   A.   I think the City owns approximately 66,000 pieces of
11        art.
12   Q.   Now, those --
13   A.   No, strike that.  Let me be clear so we can move on.
14   Q.   Yeah.
15   A.   I think there are 66,000 pieces of art over at Detroit
16        Institute of Art.  I'm not sure the City owns all
17        66,000 pieces.  I've been informed that it owns 35,000
18        of those pieces in an undisputed capacity.
19   Q.   Okay, that's what I was getting at.  And that's
20        distinct from art that is subject to a public -- or is
21        or may be subject to a public trust or something like
22        that.  This is 35,000 pieces that the City owns, as
23        you said, in an undisputed capacity?
24   A.   Outright, yes.
25   Q.   Outright.  Now, is it correct that the City has
```



```
 1        reports.
 2   Q.   Do you have any reason to believe that the value of
 3        the City-owned art is less than something on that
 4        order of magnitude?
 5   A.   I'm relatively agnostic on the value of the art at
 6        this point.  I'm waiting to see the appraisal.
 7   Q.   Do you have any understanding as you sit here today as
 8        to what the value of the City-owned art is?
 9   A.   No.
10   Q.   Are you considering selling the City-owned art to
11        generate cash?
12   A.   What I've said consistently is all options on the
13        table, but we first have to decide what we're talking
14        about.
15   Q.   Do you have any understanding as to how long it would
16        take to sell the art if a decision were made to sell
17        it?
18   A.   No.
19   Q.   Have you considered other ways to monetize the art
20        besides an outright sale?
21   A.   All options are on the table.
22   Q.   Well, have you considered any others in particular?
23   A.   We have not made -- meaning my team and I have not
24        made any decisions with regard to the art contained at
25        DIA.
```



1    Q.    I'm not asking about decisions, I'm just asking what

2          you considered.

3    A.    We considered a lot of things, yes.

4    Q.    And have you -- well, then can you answer my question

5          more specifically? What if any ways to monetize the

6          art have you considered other than an outright sale?

7    A.    I think there's been discussions about some form of --

8          and I'm not clear because to be direct, I know that

9          some of my -- I've never been to DIA, I don't think

10         I've ever spoken with their board, I know that some of

11         my consultants have been over there and have had

12         various discussions about the art. I think the

13         discussions were very high level and very general.

14         That's what I know.

15    Q.    Okay, that's really very nonspecific. Are you aware

16         of any specific consideration given to any form of

17         monetizing the art other than an outright sale?

18    A.    No, nothing specific.

19    Q.    Could be a lease -- sorry, but nothing has been

20         identified as a possible route to monetize?

21    A.    Nothing specific. There have been discussions, but

22         nothing specific.

23    Q.    Have there been discussions of leasing as a possible

24         way to monetize?

25    A.    Possibly, yes.



800.211.DEPO (3376)
EsquireSolutions.com

1    Q.    Okay.  And do you have any understanding of the amount
2          of cash flow that could be generated on an annual
3          basis if the art were leased?
4    A.    Sitting here today, no.
5    Q.    Has that number been talked about?  Is there a
6          document that might discuss that?
7    A.    No, no, there's no document.  I -- I -- in an effort
8          to be accurate, I think I had a discussion with one of
9          the representatives at Christie's that was generally
10         speaking leasing is a very difficult thing to do.
11         That's the nature of the discussion, that you would
12         have to have the right pieces at the right time at the
13         right market to generate cash.
14   Q.    So there was no discussion about the amount of money
15         it could generate?
16   A.    No, no, it -- there was some discussion about
17         $1 million, for instance, or something like that, but
18         it's nothing substantive.
19   Q.    Okay.  Now, the City also has a department of water
20         and sewers; is that right?
21   A.    Yes.
22   Q.    And as I understand it, the department of water and
23         sewers operates as a separate entity for accounting
24         and operating purposes?
25   A.    As a result of Judge Cox's opinion, it has separate



```
 1   A.   When you talk about asset values, you're talking about
 2        switches, pipes, valves, things along that nature.  I
 3        don't think I've ever seen an appraisal of the value
 4        of the assets of the water and sewer department.
 5   Q.   Do you have a general understanding of what the value
 6        of the assets --
 7   A.   No.
 8   Q.   -- is worth?
 9   A.   No.
10   Q.   Have you taken any steps to monetize the value of the
11        assets owned by the water and sewer department?
12   A.   When you say monetize, I'm going to respond to the
13        question on the basis that monetize is in the broad
14        sense --
15   Q.   Uh-huh.
16   A.   -- not whether it's a lease, whether it's a sale,
17        getting authority.
18   Q.   Just get money for it.
19   A.   Get money for it, get some dough, okay, just want to
20        be clear.  Discussions are ongoing in that regard.
21   Q.   What are those discussions in a nutshell?
22   A.   Those are commercially sensitive so I don't want to
23        interfere.  Suffice it to say, the -- Judge Cox's
24        opinion spoke to the possibility of creating an
25        authority that would remove the water and sewer
```



1      when you talk about values, there's a range of values

2      from asset disposition and outright sale and

3      privatization to creating an operation or an authority

4      where someone has brought in, as has been done in

5      Washington, D.C., to actually operate the garages and

6      meters.  So we're looking at a range of alternatives

7      to determine what those values could be.

8  Q.  What's the range of values you're looking at so far?

9  A.  We don't have that yet.

10 Q.  How concrete have you -- let me withdraw that.

11          What specific steps have been taken so far?

12 A.  Our investment advisors and consultants are beginning

13     discussions with various parties that undertake these

14     types of operations within a range of alternatives to

15     try to assess values.

16 Q.  And the investment advisors, would that be Buckfire?

17 A.  Yeah, it would be our investment banker, Ken Buckfire,

18     Miller Buckfire.

19 Q.  Okay.  In the June 14th proposal you also make

20     reference to about 22 square miles of land that the

21     City owns?

22 A.  City-owned land, yes.

23 Q.  Do you have an understanding as to the value of that

24     land?

25 A.  I've been informed that some of the value is at best



1    nominal, but no, sitting here today, I do not have a

2    number as to the value of the land.

3  Q.  Have any steps been taken to try to monetize that

4    value, to get dough as you put it?

5  A.  Yeah.  Well, here again, you're -- to get income

6    realization perhaps I should say more articulately,

7    but here again, we're at the preliminary steps of

8    examining potential alternatives regarding land.

9  Q.  So you don't know yet?

10 A.  No.

11 Q.  The Belle Isle Park, that's also referenced in the

12   June 14th proposal?

13 A.  Yes.

14 Q.  It's indicated that there's a prospective lease to the

15   state?

16 A.  Yes.

17 Q.  Okay.  And do you expect that to go through?

18 A.  I'm going to ask for it.  It was proposed and was not

19   accepted in time so the state withdrew it, but I do

20   believe we're going to intend to ask that that lease

21   be renewed.

22 Q.  And what's the annual rent the City would get under

23   that lease?

24 A.  The City has a $6 million maintenance obligation and

25   that would be taken up by the state so that wouldn't



```
 1   A.   I can't -- it was an attorney-client communication.
 2   Q.   And are you aware of any cases where, to use your
 3        phraseology, as a result of a Chapter 9 filing by a
 4        municipality the state constitution was trumped?
 5   A.   Chapter 9 filing?
 6   Q.   Yes.
 7   A.   I'm not sure, because the case I'm aware of, I don't
 8        know if it was a state constitution.  I don't recall.
 9             MR. ULLMAN:  Okay, I have no more questions
10        at this time.  But I may reserve the right, we have
11        some other people that are going to ask questions, at
12        the end of that to ask some follow-ups, if that's
13        possible.
14             THE WITNESS:  Okay.
15             MR. SHUMAKER:  You want to take a quick
16        break?
17             MR. ULLMAN:  Yeah, why don't we take a
18        break.  Someone else has to sit here.
19             THE VIDEOGRAPHER:  Going off the record at
20        2:53 p.m.
21             (A brief recess was taken.)
22             THE VIDEOGRAPHER:  We're back on record at
23        3:07 p.m.
24                         EXAMINATION
25   BY MS. LEVINE:
```


ESQUIRE

1  Q.   At the time the City filed for bankruptcy, was it your

2       view that there had to be significant cuts in accrued

3       vested pension amounts for both active and currently

4       retired persons?

5  A.   Yes.

6  Q.   And is it still -- still your view today?

7  A.   Yes, based upon our analysis, yes.

8  Q.   This conclusion that there must be significant cuts in

9       accrued vested pension amounts for both active and

10      currently retired persons, was that assertion or that

11      idea or that notion discussed by you with the governor

12      at any time before June 14th, 2013?

13  A.  Outside of meetings with attorneys?

14           MR. SHUMAKER:  Outside of meetings or calls

15      with attorneys present.

16  Q.  Yeah, I'm not looking to infringe your attorney-client

17      privilege.

18  A.  I know.  I just don't recall all of the meetings.  It

19      may have been discussed outside those meetings.

20  Q.  Well, do you have a recollection?

21  A.  I do not have a recollection of specific discussions.

22  Q.  Just so I understand your testimony, are you saying it

23      was -- it may have been discussed but you're not sure

24      whether or not it was discussed in meetings that were

25      outside the attorney-client privilege?  Is that your



1        June 14th meeting.

2   A.   Okay.

3   Q.   Do you have a recollection of any words you used to

4        communicate to those in attendance that you were open

5        to consider anything, if that's a fair

6        characterization of your prior testimony?  Did you use

7        words to that effect and if so what were those words?

8   A.   I don't remember the exact words, but I think we

9        expressed the sentiment that this is a proposal and

10       we're open to discussions.

11  Q.   Well, that's a little different.  I mean, to be open

12       to discussion.  I'm not asking you -- I think you

13       testified a few minutes ago that you were open to

14       anything and if I'm mischaracterizing that, correct

15       me.

16  A.   Well, no, anything -- and I meant anything meaning

17       anything in terms of discussions, that's why we styled

18       this, we never called this a plan, we never called

19       this a deal, we always called it a proposal because we

20       were open for discussions, any response, meaning

21       anything, so I think they're the same thing.  I'm not

22       trying to be cute in any fashion, I'm just saying we

23       were open to responses, yes.

24  Q.   Did you ever say to the attendees at the meetings or

25       communicate to the attendees in writing that the City



13-53846-tjt   Doc 1242-1   Filed 10/17/13   Entered 10/17/13 23:44:05   Page 44 of 66

```
 1        movement on it.
 2   Q.   So as things now stand, there's no plan to put forward
 3        anything else if the creditors and in particular the
 4        retirees do not agree to what's set out in the June
 5        14th proposal?
 6   A.   As it stands right now, we don't have a plan.
 7             MR. ULLMAN:  I have nothing further.  Thank
 8        you, Mr. Orr.
 9             MR. SHUMAKER:  Thank you, counsel.
10             THE WITNESS:  Thank you.
11             THE VIDEOGRAPHER:  Going off the record at
12        5:41 p.m.
13             (Discussion held off the record.)
14             THE VIDEOGRAPHER:  We're back on the record
15        at 5:43 p.m.
16                      EXAMINATION
17   BY MS. GREEN:
18   Q.   Hi, Mr. Orr.  We've met before.
19   A.   Yes.
20   Q.   My name is Jennifer Green, I represent the two
21        Retirement Systems for the City of Detroit.
22   A.   Yes, Jennifer -- Ms. Green.  Good to see you again.
23   Q.   Thank you.  Nice to you see you again too.
24             I have a question about Exhibit 11.  I
25        don't know if you have it in front of you or not.
```



```
 1   State of Michigan)

 2   County of Genesee)

 3              Certificate of Notary Public

 4       I certify that this transcript is a complete, true and

 5   correct record of the testimony of the witness held in this

 6   case.

 7       I also certify that prior to taking this deposition,

 8   the witness was duly sworn or affirmed to tell the truth.

 9       I further certify that I am not a relative or an

10   employee of or an attorney for a party; and that I am not

11   financially interested, directly or indirectly, in the

12   matter.

13              WITNESS my hand this 19th day of September,

14   2013.

15

16

17

18              Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267

19              Certified Realtime Reporter

20              Registered Merit Reporter

21              Certified LiveNote Reporter

22              Certified Shorthand Reporter

23              Notary Public, Genesee, Michigan

24              Acting in Oakland County, Michigan

25              My Commission Expires:  9-19-18
```



ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

```
 1              UNITED STATES BANKRUPTCY COURT

 2              EASTERN DISTRICT OF MICHIGAN

 3                    SOUTHERN DIVISION

 4       ------------------------------X

 5       IN RE                    ) Chapter 9

 6       CITY OF DETROIT, MICHIGAN,    ) Case No. 13-53846

 7               Debtor.          ) Hon. Steven W. Rhodes

 8       ------------------------------X

 9

10

11           CONTINUED VIDEOTAPED DEPOSITION of

12                    KEYVN D. ORR

13                    Volume II

14                   Washington, D.C.

15                Friday, October 4, 2013

16

17

18       Pages:   308 - 496

19       Reported by:  Cindy L. Sebo, RMR, CSR, RPR, CRR,

20                 CCR, CLR, RSA

21       Assignment Number:    14008

22       File Number:  105824
```



1   demonstrated any concern about political

2   ramifications as they're being used today.

3       Q.      Did you understand that reductions in

4   vested pension benefits would be a necessary part

5   of any restructuring for Detroit?

6       A.      I think that was certainly

7   anticipated, yes.

8       Q.      Is it your understanding that the

9   Governor understood that the reduction in vested

10  pension benefits would be part of any

11  restructuring for Detroit?

12              MR. SHUMAKER:  Objection: foundation.

13              MS. LEVINE:  I'm asking him his

14  understanding.

15              THE WITNESS:  I'm not sure what the

16  Governor understood.  You'd have to ask him.

17  BY MS. LEVINE:

18      Q.      Did the Governor ever communicate to

19  you that he expected that vested pension benefits

20  would be part of any restructuring for Detroit?

21      A.      The Governor communicated to me that

22  he expected -- no.


ESQUIRE

800.211.DEPO (3376)
EsquireSolutions.com

1        Q.      Yeah.

2        A.      -- for the City who had been

3    retained, the City representatives were there and

4    the State representatives were there.

5        Q.      Okay.  I'll talk -- call that the --

6    the review team --

7        A.      Review team --

8        Q.      -- is that the term you like?

9            Okay --

10       A.      -- yeah.

11       Q.      -- so as I understand what you're

12   saying, the -- the -- the slides themselves were

13   present -- given over to the review team as a --

14   a -- a bound --

15       A.      Yes.

16       Q.      -- volume or attached in some way?

17       A.      Yes, the -- the -- the slide deck as

18   the pitch book was given to the review team.

19       Q.      Okay.  And then, at the presentation,

20   were -- how did that work?  Did you -- did people

21   sort of go through the slides orally and then --

22   and -- and make comments as they were going



1    through the different pages in the pitch book?

2        A.      No.  As I recall, we handed out the

3    pitch book and began sort of going through the

4    slide, but within the first page or two, the

5    discussion exceeded the slides.  And we really

6    ended up not going through the pitch book in any

7    meaningful manner --

8        Q.      Okay.

9        A.      -- at the presentation.

10       Q.      Okay.  And this -- at the time of the

11   presentation, you were indeed still part of

12   Jones Day --

13       A.      Yes.

14       Q.      -- and part of the pitch team?

15       A.      Yes, absolutely.

16       Q.      Okay.

17               Okay.  I'm going to mark another

18   document, Mr. Orr, and ask if you've ever seen

19   this, which is Number 22.

20       A.      Two.

21               MR. ULLMAN:  Here's a copy for you,

22   two copies for you, and an extra, and an extra.  I



1    don't want to bring these back with me is all.

2                        -  -  -

3                (Whereupon, City of Detroit —

4                Restructuring Plan, Mayor's

5                Implementation Progress Report was

6                marked, for identification purposes,

7                as Orr Deposition Exhibit

8                Number 22.)

9                        -  -  -

10               THE WITNESS:   Thank you.

11   BY MR. ULLMAN:

12         Q.    Okay.   What we've marked as

13   Exhibit 22, Mr. Orr, is entitled, City of Detroit

14   — Restructuring Plan, Mayor's Implementation

15   Progress Report, with the date of March 2013.

16               Have you ever seen this document

17   before?

18         A.    I think I've seen it before, but I

19   think that was after I became emergency manager.

20         Q.    Okay.   That's fine.

21               And what I'd like to do is try to

22   just ask you about one page of this.



800.211.DEPO (3376)
EsquireSolutions.com

1        A.      Um-hum.

2        Q.      If you could look at Page 6.

3        A.      Um-hum.

4        Q.      Okay.  What we --

5                MR. SHUMAKER:  Of the -- of the

6    actual document?

7                MR. ULLMAN:  Of the -- yes.  I'm

8    sorry, yeah.

9                And just for clarity, this document

10   bears Bates Number DTMI00129416, and Page 6 of the

11   document bears the Bates number ending in 422.

12               THE WITNESS:  Um-hum.

13   BY MR. ULLMAN:

14       Q.      Okay.  And this page, in general, is

15   entitled, The Mayor's plan includes strategies to

16   implement changes that will significantly reduce

17   general fund long-term liabilities.

18               I'd like you to focus on Number -- or

19   Letter (b) --

20       A.      Yes.

21       Q.      -- you see 3(b)?

22       A.      Um-hum.



1    Q.    It says, Pension unfunded

2  liabilities, and the first bullet point says,

3  Approximately 650 million of unfunded liability as

4  of fiscal year 2012, of which only 250 million

5  relates to general fund.

6    A.    Yes, I see that.

7    Q.    And do you have an understanding as

8  to what's being said there and what that reference

9  is?

10    MR. SHUMAKER:  Objection: foundation.

11    THE WITNESS:  Yeah.  I was obviously

12  not responsible for drafting, developing or the

13  due diligence behind the document.  The document

14  speaks for itself.

15    But what I think is being said there

16  is that the unfunded liability for the -- and I

17  assume it's speaking to both pension funds; it may

18  be one or the other --

19  BY MR. ULLMAN:

20    Q.    Um-hum.

21    A.    -- but the unfunded liability for

22  fiscal year 2012 is 250, and 250 million of that



1   is somehow an obligation of the general fund.

2       Q.    Okay.  Did you say 250?  It's -- you

3   meant to say 650, right?

4       A.    No, no.  It's 650 total --

5       Q.    Right.

6       A.    -- but 250 million of that is an

7   obligation of the general fund.

8       Q.    You had misspoken and said 250 both

9   times --

10      A.    Oh, I'm sorry --

11      Q.    -- so --

12      A.    -- oh, no -- okay.  650 and 250, I'm

13  sorry.  I was --

14      Q.    Okay.

15      A.    -- thinking ahead, thinking quicker

16  than my mouth moved.

17      Q.    Okay.  And as I -- I understand that

18  the 650 million that's referred here -- to here by

19  the Mayor corresponds pretty closely, if I recall,

20  to the $644 million figure that was referred to in

21  the June 14th proposal; is that right?

22      A.    I would -- I -- yes, I -- I would



1    think it does --

2         Q.    Okay.

3         A.    -- I'm -- I'm -- here again, I'm

4    not -- I'm assuming it -- it speaks for itself and

5    it's facially correct; but, yes, I would think

6    that's the reference.

7         Q.    Okay.  And so can you tell me what --

8    what is your understanding when the Mayor says

9    here that 250 million relates to the general fund,

10   what the other 300 --

11        A.    400.

12        Q.    -- 400 million relates to?  And

13   what's -- what is the distinction being drawn

14   between what relates to the general fund versus

15   what relates to something other than the general

16   fund?

17        A.    I'm not sure.

18        Q.    Well, is it correct that -- that some

19   portion -- let's just stick with the -- we can use

20   the $644 million number --

21        A.    Um-hum.

22        Q.    -- because I think that's what you



1   would probably say is more accurate.

2                   That's the number that's cited in the

3   June 14th proposal, right?

4       A.      Yeah, they may have -- they may have

5   rounded up here --

6       Q.      Okay.

7       A.      -- but we'll -- it's -- it's

8   approximately that amount.

9       Q.      Okay.  Is it correct that for the

10  approximately 644 million unfunded pension

11  liability that you refer to in the June 14th

12  proposal, that some portion of that is allocable

13  to a payment source other than the general fund?

14      A.      I think that's correct.

15      Q.      Okay.  And what are those --

16  what is -- what are the other payment sources to

17  which the total 650 -- or I'm sorry -- 644 million

18  is allocable other than the general fund?

19      A.      Well, there are other sources, but it

20  could be principally related to the Water

21  department.

22      Q.      Okay.  And what is your understanding



1    as to how much of the approximately 644 million

2    unfunded pension liability relates to liability

3    for personnel from the Department of Water and

4    Sewer?

5          A.     Approximately that difference.

6          Q.     Okay.  So it's about 450 million?

7          A.     Approximately, yeah.

8          Q.     Okay.  And I'm trying to recall from

9    your last testimony.

10          For the -- the pension monies that

11    are due relative to personnel from the Department

12    of Water and Sewer, are the pension payments made

13    directly by the Department of Water Sewer to the

14    retirement systems, or is the money paid first by

15    the retirement -- I'm sorry -- by the Water and

16    Sewer Department to the City, which then transmits

17    it to the retirement system, or is there another

18    mechanism for the payment?

19          MR. SHUMAKER:  Objection to form.

20          THE WITNESS:  I believe it's the -- I

21    believe it's the latter.

22



```
 1        A.     I could go back and check it to be
 2   sure, but I think that's the approximate mechanism
 3   as I understand it.
 4        Q.     Okay.  Now, by my math -- I make no
 5   representations as to my math, but just looking at
 6   the numbers, it looked -- actually, do I have a
 7   calculator here?  I don't think I do.
 8               What percentage is 250 over 650?  I
 9   actually didn't do the math.
10        A.     Four -- it's 40-some odd.
11        Q.     It's 40-some -- yeah, we can get it
12   precisely.
13               Zero?  Oh.
14               250 divided by 6 -- let's say 650 --
15   shoot, I didn't do that right.  I apologize.  Let
16   me try to clear this and do it again.
17               250 divided -- 6.  This isn't right.
18               Okay.  It looks like about
19   38 percent.
20        A.     Right.
21        Q.     Okay.  You recall that -- that during
22   the last deposition, you indicated that you
```



1  thought that the actual unfunded liability was --

2  was higher than the 644 number and could be as

3  much as 3.5 billion or something like that?

4      A.    Yes.

5      Q.    Okay.  My question is, does the --

6  does the -- is the proportion of unfunded

7  liability allocable to the general fund versus the

8  Department of Water Sewer personnel constant if

9  you -- if you use a higher liability figure?

10            In other words --

11      A.    If we went up to 3.5 --

12      Q.    Yeah, yeah --

13      A.    -- million, would it be --

14      Q.    -- would the Department of Water and

15  Sewer still be approximately 38 percent of the

16  total unfunded liability?

17      A.    I'm -- I'm not sure.  I would think

18  that a rough estimate might be.  But as I said, I

19  think, in September 16th, part of those

20  calculations had to do with a number of factors,

21  so I don't want to say that my testimony is as

22  exactly proportioned.



```
 1                           -  -  -
 2                THE VIDEOGRAPHER:  Going back on the
 3   record at 1306.  This marks the beginning of
 4   Tape Number 2.
 5                MR. DECHAIRA:  Okay.
 6   BY MR. DECHAIRA:
 7        Q.    Mr. Orr, before we broke, I was
 8   asking you about a meeting you had with the
 9   Michigan Attorney General.
10                And my question was, what was said at
11   that meeting?
12        A.    Yes.
13                With Attorney General Schuette, I
14   don't recall the exact date; but, generally
15   speaking, the Attorney General -- at the meeting,
16   as I said, was Mr. Heiman on the phone, the
17   Attorney General and an attorney from his office,
18   Matt, whose last name escapes me right now.  And
19   generally what was said, the Attorney General
20   wanted to express why he felt duty-bound to take a
21   position that the Michigan State Constitution
22   protected vested pension obligations.
```



1   approximately 61.5 percent?

2          A.     But, remember, I said that you have

3   to be careful with trying to draw a straight-line

4   comparison between the two numbers you may

5   calculate in.  But generally speaking, if we're

6   just talking about the math, that -- that --

7          Q.     Right --

8          A.     -- would be the estimate.

9          Q.     -- I'm right here just talking about

10  the ratio on the -- the number that's referred to

11  as the 650 -- the approximately 650 by the Mayor.

12         A.     Yes.

13         Q.     And then I think the next question I

14  asked you, which I think is what you were alluding

15  to, that if you assumed a larger liability figure,

16  would that ratio continue to hold; and my

17  recollection is, your answer was roughly it would,

18  but you may have to, you know, fine-tune the math.

19         A.     It -- it -- it might roughly hold,

20  but you need to be careful to not draw the

21  conclusion that is -- it's exactly comparable.

22         Q.     Okay.  I understand.



1    A.    Okay.

2    Q.    Okay.

3          And then the other question I have

4  for you -- this is referring to the unfunded

5  pension liability --

6    A.    Um-hum.

7    Q.    -- you're also familiar with the

8  medical benefits for retirees --

9    A.    Yes.

10   Q.    -- the health -- and I think that's

11 sometimes referred to as OPEB?

12   A.    Yes, other [sic] employee benefits.

13   Q.    Okay.  And for the OPEB is -- are --

14 is the -- is the situation similar that some

15 amount of the total OPEB liability that the City

16 faces is allocable to sources other than the

17 general fund?

18   A.    You -- you know, I think it is; but

19 I'm not recalling that mechanism as well as I

20 recall the pension mechanism, but I think it is.

21   Q.    Okay.  And would then some portion of

22 the total OPEB unfunded liability be allocable



1   also to the Department of Water and Sewer to their

2   retirees?

3        A.    It might well be, but I'd need to

4   confirm that.

5        Q.    Okay.  And have you done any analysis

6   of that question?

7        A.    Yes --

8        Q.    Okay.

9        A.    -- well, our contractors have done an

10  analysis of the question.

11       Q.    Okay.  And who specifically has done

12  an analysis of that?

13       A.    Oh, I think our team at -- the entire

14  team: Conway MacKenzie, Ernst & Young,

15  Miller Buckfire.

16       Q.    And do you recall their general

17  conclusions to what percentage of the total

18  unfunded OPEB liability is allocable to the -- A,

19  to the Department of Water of Sewer; or, B, some

20  other fund or entity apart from the general fund?

21       A.    I'm -- I'm not -- I don't recall if

22  it is, and I don't recall the percentage.


ESQUIRE

13-53846-tjt   Doc 1242-1   Filed 10/17/13   Entered 10/17/13 23:44:05   Page 63 of 66

```
1                    C E R T I F I C A T E
2     DISTRICT OF COLUMBIA:
3            I, Cindy L. Sebo, a Notary Public within
4     and for the Jurisdiction aforesaid, do hereby
5     certify that the foregoing deposition was taken
6     before me, pursuant to notice, at the time and place
7     indicated; that said deponent was by me duly sworn
8     to tell the truth, the whole truth, and nothing but
9     the truth; that the testimony of said deponent was
10    correctly recorded in machine shorthand by me and
11    thereafter transcribed under my supervision with
12    computer-aided transcription; that the deposition is
13    a true record of the testimony given by the witness;
14    and that I am neither of counsel nor kin to any
15    party in said action, nor interested in the outcome
16    thereof.
17
18                              Cindy L. Sebo
                        District of Columbia, Notary Public
19                         My Commission Expires
                                April 14, 2015
20    _____
21           Cindy L. Sebo, RMR, CRR, RPR, CSR,
22              CCR, CLR, RSA, Notary Public
```



From: CN=Kevyn Orr/O=JonesDay
Sent: 1/31/2013 3:45:47 PM
To: CN=Corinne Ball/O=JonesDay@JonesDay
CC: "Stephen Brogan" <sjbrogan@jonesday.com>
Subject: Re: D

CB,

Thank you for thinking about alternative ways to skin this cat. But I don't think we should look at this right now for at least two reasons. First, the state already has EMs appointed or five cities and four school districts. I wouldn't want it to seem like I have a special deal. Second, in thinking about the EM position I went back and looked at the SIGTARP legislation and the federal law authorizing the creation of the D.C. Control Board in 95. Both gave those managers tremendous powers, but neither was subject to questions about the authority of the Congress to enact them and the President's authority to sign them into law. By contrast Michigan's new EM law is a clear end-around the prior initiative that was rejected by the voters in November. The new EM law gives local governments four choices to fix their financial emergency:

Consent Agreement, in which local leaders remain in charge but must meet certain conditions in an agreement negotiated with the state (Detroit is already under a CA and it sounds like it's not working);
A state appointed EM that has broad authority over local finances;
Chapter 9 bankruptcy with the Governor's approval; and
Mediation, in which the local government and interested parties meet with a neutral party to resolve financial issues, such as employee contracts (this is essentially required to file a Chapter 9 petition).

So although the new law provides the thin veneer of a revsion it is essentially a redo of the prior rejected law and appears to merely adopts the conditions necessary for a chapter 9 filing. The news reports state that opponents of the prior law are already lining up to challenge this law.

Nonetheless, I'm going to speak with Baird in a few minutes to see what his thinking is. I'll let you know how it turns out. Thanks.

Kevyn

Kevyn D. Orr
51 Louisiana Ave. NW, Washington, DC 20001-2113 • Direct: 202.879.5560 • Fax: 202.626.1700 •
Cell: [Redacted] • korr@jonesday.com


From:    Corinne Ball/JonesDay
To:      "Kevyn Orr" <korr@jonesday.com>
Cc:      "Stephen Brogan" <sjbrogan@jonesday.com>
Date:    01/31/2013 08:10 AM
Subject:      D


Kevyn--

Food for thought for your conversation with Baird and us --
I understand that the Bloomberg Foundation has a keen interest in this area. I

Exhibit
Exhibit No.: 4
Name: Orr
Date: 9-16-13
ESQUIRE

CONFIDENTIAL

was thinking about whether we should talk to Baird about financial support for this project and in particular the EM. Harry Wilson--from the auto task force--told me about the foundation and its interest. I can ask Harry for contact info--this kind of support in ways "nationalizes" the issue and the project.

-------------------

This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.

-------------------

CONFIDENTIAL