EXHIBIT E

TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

**Page 1**

1  IN THE UNITED STATES BANKRUPTCY COURT
2  EASTERN DISTRICT OF MICHIGAN
3  SOUTHERN DIVISION
4
5  In re                    Chapter 9
6  CITY OF DETROIT, MICHIGAN,    Case No. 13-53846
7  Debtor.             Hon. Steven W. Rhodes
8  _____/
9
10  DEPONENT:   MAYOR DAVE BING
11  DATE:       Monday, October 14, 2013
12  TIME:       10:27 a.m.
13  LOCATION:   CITY OF DETROIT MAYOR'S OFFICE
14              2 Woodward Avenue
15              11th Floor Conference Room
16              Detroit, Michigan
17  REPORTER:   Jeanette M. Fallon, CRR/RMR/CSR-3267
18
19
20
21
22
23
24
25

**Page 2**

1  APPEARANCES:
2
3  JONES DAY
4  By:  Thomas Cullen
5       Dan T. Moss
6  51 Louisiana Avenue, NW
7  Washington, D.C. 20001.2113
8  202.879.3939
9       Appearing on behalf of the Debtor
10
11  DENTONS US LLP
12  By:  Anthony B. Ullman
13  620 Fifth Avenue
14  New York, NY 10020.2457
15  212.632.8342
16       Appearing on behalf of Official Committee of Retirees
17
18
19
20
21
22
23
24
25

**Page 3**

1  APPEARANCES (continued):
2
3  COHEN WEISS AND SIMON LLP
4  By:  Joshua J. Ellison
5  330 West 42nd Street
6  New York, NY 10036.6979
7  212.356.0216
8       Appearing on behalf of UAW
9
10  LOWENSTEIN SANDLER LLP
11  By:  Sharon L. Levine
12  65 Livingston Avenue
13  Roseland, NJ 07068
14  973.597.2374
15       Appearing on behalf of AFSCME
16
17  CLARK HILL PLC
18  By:  Jennifer K. Green
19  500 Woodward Avenue, Suite 3500
20  Detroit, MI 48226
21  313.965.8384
22       Appearing on behalf of Retirement Systems
23
24
25

**Page 4**

1  APPEARANCES (continued):
2
3  WILLIAMS WILLIAMS RATTNER & PLUNKETT PC
4  By:  Ernest J. Essad, Jr.
5  380 N Old Woodward Ave Ste 300
6  Birmingham, MI 48009
7  248.642.0333
8       Appearing on behalf of FGIC
9
10  CITY OF DETROIT LAW DEPARTMENT
11  By:  Portia L. Roberson
12  2 Woodward Avenue, Suite 500
13  Detroit, Michigan 48226
14  313.237.3018
15       Appearing on behalf of the City of Detroit,
16       Residents of the City, Mayor's Office and City Council
17
18
19
20
21
22
23
24  ALSO PRESENT:
25  Patrick Murphy, videographer



Page 45

1  Q.  Well, did you -- as part of this initial -- this
2       restructuring program, were you aware in any way that
3       anything that was being proposed was contrary to the
4       laws or Constitution of the State of Michigan?
5  A.  No.
6  Q.  And do you recall specifically how if at all the
7       pension liabilities were to be dealt with under your
8       proposed approach?
9  A.  No.
10 Q.  Would that be set out in whatever documents there are
11      that describe your initiatives?
12 A.  I didn't understand your question.
13 Q.  Would the approach to pensions be set out in whatever
14      documents exist that describe the initiatives that
15      you've referred to?
16 A.  Those probably were internal meetings between the CFO
17      and the COO and probably people from the labor
18      department.  Those aren't meetings that I sat in.
19 Q.  So you don't recall the specifics of how the pension
20      issues were --
21 A.  No.
22 Q.  -- being dealt with?
23 A.  No.
24 Q.  But as you understood it, the City's -- if the
25      proposed restructuring, the initiatives that you put

Page 46

1       in place went through, you believe that the City would
2       be able to survive without bankruptcy and would
3       continue to be able to meet its legal obligations?
4             MR. CULLEN:  Objection, foundation, form.
5  A.  The answer would be we wanted that opportunity.
6  Q.  Okay.  And you thought that if you had that
7       opportunity, you could make it happen; is that right?
8  A.  That would be correct.
9  Q.  But you weren't given that opportunity; were you?
10 A.  That is correct.
11 Q.  Let me go back to what we've marked as Orr Exhibit --
12      that we haven't marked but we've identified as Orr
13      Deposition Exhibit 7, which has the proposed summary
14      of partnership.
15 A.  Uh-huh.
16 Q.  Was this partnership agreement, the document that
17      appears here where it has a draft label on it, was
18      that ever made final?
19 A.  Not to my knowledge.
20 Q.  When you met with Mr. Orr on -- at the end of February
21      in DC, you indicated that you discussed this with him,
22      though; correct?
23 A.  Correct.
24 Q.  And did he tell you that he was -- that he was
25      agreeable to it?

Page 47

1  A.  He was agreeable in working together, but we didn't go
2       step by step and say that I agree or I don't agree.
3  Q.  Okay.  So did you have an understanding as when you
4       left that meeting in DC whether Mr. Orr had in fact
5       agreed to the points that were set out in this summary
6       of partnership document?
7             MR. CULLEN:  Objection, foundation, form.
8  A.  One of the areas that I do recall and me saying is
9       that it made reference to keeping the executive team
10      intact.  He wanted the opportunity to make an
11      assessment himself.
12 Q.  Okay, and did he make an assessment?
13            MR. CULLEN:  Objection, foundation, form.
14 A.  I think over the time that he's been here, I don't
15      think he personally made an assessment.  I think there
16      were others who may have made an assessment and made
17      recommendations to him.
18 Q.  And was your team -- your executive team left intact?
19 A.  No.
20 Q.  And who was gotten rid of besides Mr. Andrews, if
21      anyone?
22 A.  Jack Martin is no longer here as the CFO.  Karla
23      Henderson, who was the group executive for planning
24      and development and BC, is no longer here.  I think
25      before Kevyn came on Kirk Lewis was already gone.  I

Page 48

1       do think that Chris Brown was already gone.  As of
2       today our purchasing director is no longer here,
3       Andre DuPerry.  Richard Kay, who was the director of
4       the lighting department, is no longer here.  The
5       director of DDOT is no longer here.  I think there --
6       that's right off the top of my head.  I think there
7       were nine or ten department heads that are no longer
8       here.
9  Q.  And were they asked to leave by Mr. Orr or --
10 A.  For the most -- for the most part, yes.  There was one
11      guy who headed up -- he was the director of homeland
12      security, he left on his own accord because of the
13      environment that he felt he could no longer work in,
14      but for the most part all of those other people were
15      asked to leave.
16 Q.  Now -- and are the positions that those people held
17      vacant or have they been replaced with other people?
18 A.  There's a mixed bag, quite frankly.  I mean, some of
19      them -- I think you got some consultants in some of
20      those positions.  I mean, I had no input at all.  I
21      mean, I found out after the fact that either people
22      were removed or if somebody was coming in.  I had -- I
23      never had the opportunity to interview even the new
24      CFO who came in, the new COO who came in.  Those were
25      selected by Kevyn in a vacuum, as far as I'm



Page 49

1  concerned.

2  Q.  Moving on past February of 2013, as I recall, the

3  official appointment of Mr. Orr as the emergency -- I

4  forget whether it was the Emergency Financial Manager

5  or Emergency Manager, but it took place sometime

6  around the end of March.  Is that generally consistent

7  with your recollection?

8  A.  Yeah, I think March 25th was his first day.

9  Q.  And from the meeting in DC up to March -- say March

10  25th, did you have any conversations with Mr. Orr?

11  A.  I may have had one phone -- one other phone

12  conversation with him.

13  Q.  And do you recall what the substance of that call was

14  about?

15  A.  I think more than anything else it was making sure

16  that when he came on board, we were having a press

17  conference, introducing him as the Emergency Financial

18  Manager and wanted me to stand with he and the

19  Governor at that, because we didn't want, quote

20  unquote, a divided house, if you will, and I thought

21  it was better since an Emergency Manager was coming on

22  board, it was no sense in us continuing to fight that.

23  If he could be helpful to turn this City around, it

24  would be better we do it together.

25  Q.  So in that phone conversation was there any discussion

Page 50

1  of Chapter 9 filing?

2  A.  No.

3  Q.  Was there any discussion of anything related to

4  pensions?

5  A.  No.

6  Q.  I'm going to show you another document, Mr. Mayor,

7  which we'll mark as Bing Number 3.

8        (Marked Exhibit No. 3.)

9  Q.  For the record what we've marked as Bing Exhibit --

10  what is this, 4?  Three.  Actually I think we had

11  previously marked this as Exhibit 22 to the Orr

12  deposition, but since I've forgotten about that, now

13  we'll just leave it as Bing Number 3, but I believe it

14  is the same document.

15        Do you recognize this document, Mr. Mayor?

16  A.  Yes.

17  Q.  For the record it's entitled City of Detroit

18  Restructuring Plan, dated March 23, begins with Bates

19  number DTMI00129416.

20  A.  Yes.

21  Q.  And just briefly tell me what this is and I'll ask you

22  a few questions about it.

23  A.  Well, it speaks to the things that we were working on,

24  the recommendations that we had put together to get us

25  through a very tumultuous time in the City of Detroit.

Page 51

1  We knew that this plan was going to negatively impact

2  a lot of folks in order for us to move forward with

3  implementation, but it was all about trying to manage

4  our way through without going to the route of

5  bankruptcy.

6  Q.  And this was a document that was put together by you

7  and people on your team; is that right?

8  A.  That would be correct.

9  Q.  And I see we've been going for a little over an hour,

10  an hour and 20 minutes.  It's probably a good time for

11  a break, but let me ask you first up to this time this

12  is now March 13, towards the -- by the end of March

13  had you had any conversations with anyone else from

14  the Governor's staff or with the Governor himself

15  about Mr. Orr as the Emergency Financial Manager or

16  the Emergency Manager?

17        MR. CULLEN:  Objection, foundation, form.

18  You can address the question.

19  A.  It was obvious to me in this time frame that Lansing

20  had made their selection, so, I mean, that's something

21  that I couldn't control so it was more important to

22  me, once again, to be part of the team to help fix the

23  City as opposed to constantly fighting and pushing --

24  and pushing back.  I didn't think that would get us

25  anywhere.

Page 52

1  Q.  Okay.  So after you had your initial conversations

2  with Baird in February, you then met with Orr in the

3  end -- towards the end of February also in DC, and

4  then Orr -- there was an official announcement at the

5  end of March saying Orr's the new EM or the new EFM.

6  Prior to the meeting in DC and the official

7  announcement of Orr, did you have any contact with

8  anyone from the State about Mr. Orr's being made the

9  Emergency Manager or Emergency Financial Manager?

10  A.  The answer would be very little, if any, because they

11  had the right to make the decision, they made the

12  decision, so once again, I would prefer to work with

13  the individual seeing what we could do together to fix

14  the City, a broken City.

15  Q.  Okay, so let me just ask more directly.  Did you have

16  advanced notice before the public announcement that

17  the City -- the State was going to come out and make

18  an announcement saying Kevyn Orr is our man?

19  A.  Yes.

20  Q.  And when were you told?

21  A.  That had to be in early -- early to mid March.

22  Q.  And do you remember the specifics of that discussion,

23  who told you what was said?

24  A.  Whether that was Rich Baird or Andy Dillon, it wasn't

25  the Governor.



13-53846-tjt   Doc 1242-5   Filed 10/17/13   Entered 10/17/13 23:44:05   Page 4 of 10

Page 57

1  A.  Yes, it did.

2  Q.  And was that taken out of your hands also?

3  A.  Yes, it was.

4  Q.  And that like the other real estate you mentioned was

5      taken out of your hands by the Emergency Manager and

6      his team I take it?

7  A.  The whole process --

8          MR. CULLEN:  Objection, foundation, form.

9  A.  -- yeah.

10 Q.  And did there come a time when someone -- how did this

11     process come about that it was taken out of your

12     hands?  Did the Emergency Manager or someone from his

13     staff actually tell you or your staff, don't worry

14     about these things anymore, it's not your business or

15     words to that effect?

16         MR. CULLEN:  Objection.

17 A.  No.

18         MR. CULLEN:  Foundation, form.

19 Q.  How did it come about that it was taken out of your

20     hands?

21 A.  I actually went to the Emergency Manager and told him

22     about these potential deals and in order for them to

23     go forward, he had to sign-off on it.  He said to me

24     that it looked like they were decent deals and that he

25     would, but obviously that hasn't happened yet.

Page 58

1  Q.  And has there been any follow-up with the Emergency

2      Manager between him and you as to why he hasn't signed

3      off?

4          MR. CULLEN:  Objection, foundation, form.

5  A.  I think more than anything else he wants to look at

6      some of the bigger issues that he's got to deal with

7      as opposed to these things which he may consider, you

8      know, not big issues.

9  Q.  Even though if these things went through, they would

10     at least bring in some immediate cash; is that right?

11 A.  They would.

12 Q.  As part of the asset monetization, did you give any

13     consideration to try to monetize art that is owned by

14     the City of Detroit and maintained at the Detroit

15     Institute of Arts?

16 A.  The answer would be no.

17 Q.  And was there a particular reason you didn't give any

18     consideration to that?

19 A.  Back at that time when we were thinking about it, that

20     never came up, that was never a conversation that we

21     had internally.  I think since he's been on board, the

22     subject obviously has gotten a lot of heat and a lot

23     of visibility.  I'm not sure what's going to happen

24     there.

25 Q.  Okay.  And do you -- let me ask it this way.

Page 59

1          Did you as of the March 2013 time frame

2      have any understanding, just a general understanding,

3      as to what the value was of the art that's owned by

4      the City of Detroit?

5          MR. CULLEN:  Objection, foundation, form.

6  A.  The answer would be no.

7  Q.  And as you sit here today, do you have any

8      understanding as to the value of the art that's owned

9      by the City of Detroit?

10         MR. CULLEN:  Same objection.

11 A.  The answer would still be no.

12 Q.  Are you aware of reports in the press stating that the

13     city-owned art could easily be worth billions of

14     dollars?

15 A.  I have read that, yes.

16 Q.  And do you have any reason to believe those reports

17     are inaccurate?

18         MR. CULLEN:  Objection, foundation, form.

19     Of what they report or the value or what, counsel?

20         MR. ULLMAN:  I think my question was clear.

21 Q.  You can answer my question.

22 A.  I know that he's engaged Christie's to do an

23     evaluation and I'm not sure that that's complete yet,

24     so I have no idea of what the value may or may not be.

25 Q.  Okay.  Let me ask you to turn now to the next page of

Page 60

1      this document, which is ending in Bates page 422.  And

2      this heading says, and I quote, "The Mayor's plan

3      includes strategies to implement changes that will

4      significantly reduce general fund long-term

5      liabilities."

6          Do you see that?

7  A.  Yes.

8  Q.  And so we're clear, what in brief is the general fund?

9  A.  That's the -- the general fund is what we use to run

10     the City on a day-to-day basis.

11 Q.  Now, in subpoint A, 3A, you give some -- you give two

12     subpoints, two bullets.  The second one says,

13     approximately 6 billion of City debt is owed by the

14     water and sewer department and does not have an impact

15     on the general fund.  Do you see that?

16 A.  Yes.

17 Q.  Can you explain what you were referring to by those

18     words?

19 A.  That -- that debt is paid by the users of the water

20     and sewerage department, so there's a revenue stream

21     that pays that debt down, so it's not part of the

22     general fund.

23 Q.  Okay, and as you put it here, that that debt, while

24     it's on the books as City debt because the department

25     of water and sewer is part of the City, that doesn't,



Page 61

1    as you put it, have an impact on the general fund
2    because it's -- the water and sewer debt is paid for
3    by the department of water and sewer?
4  A.  That would be correct.
5  Q.  And that, as I understand it, is run as a separate
6    authority and has its own books and records and is
7    solvent; is that right?
8  A.  That would be correct.
9  Q.  You then go on in the next point, sub B, to refer to
10    pension unfunded liabilities, and you say
11    approximately 650 million of unfunded liability as of
12    FY 2012 of which only 250 million relates to general
13    fund.
14  A.  Uh-huh.
15  Q.  Do you see that? And could you tell me what you meant
16    when you wrote that?
17        MR. CULLEN: Objection, foundation, form.
18  A.  I believe that makes reference to both the payment to
19    the pension fund and maybe even to the healthcare
20    benefits.
21  Q.  Okay, I'm going to be a little more specific. The
22    language of this restructuring plan states that
23    there's 650 million of unfunded pension liability. Do
24    you see that?
25  A.  Uh-huh.

Page 62

1  Q.  And then it says of that only 250 million relates to
2    the general fund.
3        Can you tell me what that's referring to?
4  A.  No, not right off the top of my head I can't, no.
5  Q.  So you don't recall what that level of detail is as to
6    the --
7  A.  Correct, correct, correct.
8  Q.  Then the next bullet it -- well, I guess – do you
9    recall where the 650 million liability -- unfunded
10    liability number comes from?
11  A.  We have not -- we're not current with our pension
12    contributions.
13  Q.  I guess let me ask it a little -- let me mark then
14    another document. We'll mark this as Bing 4.
15        (Marked Exhibit No. 4.)
16  Q.  And Bing 4 for the record is an excerpt from a
17    document entitled Comprehensive Annual Financial
18    Report for the City of Detroit for its fiscal
19    year-ended June 30, 2012 and I've attached just two
20    pages of it because it's a very long document.
21        Okay, Mr. Mayor? You've seen -- you know
22    what the Comprehensive Annual Financial Report is;
23    right?
24  A.  Yes.
25  Q.  And I've attached the pages that pertain to the

Page 63

1    pensions and if you look on page 124, it talks about
2    the unfunded AAL on line 3 of that table.
3  A.  Uh-huh.
4  Q.  And which stands for unfunded actuarial -- as I
5    understand it, actuarial accrued liability?
6  A.  Correct.
7  Q.  And then if you look at the table, it says for the
8    General Retirement System there's a number of
9    approximately 640 million and on the Police and Fire
10    Retirement System it's about 4 million. Do you see
11    that?
12  A.  Yes.
13  Q.  And is it correct that that -- so that adds up to
14    about 644 million. Does that correspond to the
15    650 million that's in the restructuring plan that we
16    have as Exhibit 3?
17  A.  Yes, yes.
18        MR. CULLEN: Objection, foundation, form.
19  Q.  And when you -- the restructuring document refers to
20    the unfunded liability at fiscal year 2012, is that
21    referring to the valuation that's referred to at the
22    top of page 124 of Bing 4 where it says, and I quote,
23    "The funded status of each plan as of June 30, 2011,
24    the most recent actuarial valuation date, is as
25    follows" and then gives a table?

Page 64

1        MR. CULLEN: Objection, foundation, form.
2  A.  And your question was?
3        MR. ULLMAN: Do you want to read it back?
4    If you don't understand, I'll rephrase it, but --
5        THE WITNESS: Yes. I just need --
6  Q.  Would it be easier if I just rephrased the question?
7  A.  Go ahead.
8  Q.  Okay. When you referred to the approximately
9    650 million of unfunded liability as of fiscal year
10    2012, okay, the unfunded liability as of 2012, is that
11    referring to the underfunding as reported as of the
12    June 30, 2011 actuarial valuation which is referred to
13    on the top of page 124?
14  A.  The answer would be --
15        MR. CULLEN: Objection, foundation, form.
16    When you say when you refer, you mean -- are you
17    implying that he wrote this document personally?
18        MR. ULLMAN: No, he and his team.
19  Q.  I'm obviously referring to that in the general sense.
20    I didn't intend to imply that you physically drafted
21    this, Mr. Mayor. I understand this was put together
22    by you and people working for you.
23  A.  And the answer to that would be yes.
24  Q.  And also under this -- going back to page 422 of
25    Exhibit 3 under the subheading B under pension



Page 65

1     unfunded liabilities it says, the City is developing a
2     plan to reduce the unfunded liability.
3        Do you have any recollection as to the
4     specifics of that plan?
5 A.   No, I don't.
6 Q.   Now, you recall -- or let me ask you.
7        Are you aware that on June 14th, 2013 the
8     Emergency Manager had a meeting with creditors?
9 A.   I'm aware.
10 Q.   Prior to the time that he was appointed or I should
11     say -- let me withdraw that.
12        Prior to the time that the Emergency
13     Manager's appointment was formally announced and June
14     14, 2013, did you have any conversations with the
15     Emergency Manager himself?
16 A.   Yes.
17 Q.   And do you recall how many?
18 A.   We don't -- we don't meet that often. You know, if we
19     meet once or twice a week, that's about it and the
20     meetings are usually very short meetings. Usually
21     called by me.
22 Q.   And can you say how long a typical meeting would last?
23 A.   Thirty minutes tops.
24 Q.   During that time between March 25th and June 14th do
25     you recall any discussions with the Emergency Manager

Page 66

1     concerning pensions, anything to do with pensions?
2 A.   I -- yes.
3 Q.   And tell me what you recall.
4 A.   You know, the general conversation was that pensions
5     are a major problem that we have and we've got to
6     address it.
7 Q.   And do you recall when those conversations took place?
8 A.   Probably more in the May time frame.
9 Q.   And was there any conversation with the Emergency
10     Manager as to how the Emergency Manager intended to
11     address the issues of pensions?
12 A.   No.
13 Q.   Was there any discussion with the Emergency Manager
14     during the period I've been asking about, the end of
15     March and June 14, about the City's filing for Chapter
16     9 bankruptcy?
17 A.   I think the only conversations we may have had about
18     that is that's the last resort and that's from him
19     saying, you know, that's not the direction we want to
20     go in and it would be last resort.
21 Q.   Did the emergency -- did you have any discussions with
22     the Emergency Manager in which he indicated that he
23     had any approaches or thoughts as to how to address
24     issues relating to pensions other than filing for
25     Chapter 9 bankruptcy?

Page 67

1 A.   No.
2 Q.   And did you have any conversations with him in which
3     he specifically referred to a Chapter 9 bankruptcy as
4     a way to deal with the pension issues?
5 A.   I believe the answer to that would be yes. I can't be
6     very specific, I don't recall, but I think -- I
7     believe that conversation -- or a conversation like
8     that did occur.
9 Q.   Okay, and can you give me, as best you can recall, a
10     time frame as to when?
11 A.   I think it would be in that same May time frame in one
12     of our discussions.
13 Q.   And can you tell me with as much specificity as you
14     can remember what the Emergency Manager said during
15     that conversation?
16 A.   Once again, with not a lot of specifics, but in order
17     to fix the problems of the City where -- I know this
18     number has been thrown out a lot, the $3.5 billion of
19     unfunded liabilities, etc., etc., I mean, he talked
20     about that, but that was a generality and so it was no
21     more -- it was not more specific than that.
22 Q.   But he referred to Chapter 9 as a way to get rid of or
23     address what he referred to as a 3.5 billion unfunded
24     liability?
25 A.   As a possibility.

Page 68

1        MR. CULLEN: Objection, foundation, form.
2     You can answer.
3 A.   As a possibility.
4 Q.   And did Mr. Orr tell you at that time that the
5     unfunded liability was indeed 3.5 billion?
6 A.   The answer to that would be yes.
7 Q.   And did he tell you that that had been shown through
8     an actuarial valuation?
9 A.   The answer to that would be yes.
10 Q.   During that conversation or any other conversation
11     with Mr. Orr during the March 25 through June 14 time
12     frame, was there any discussion with Mr. Orr of what
13     we've referred to previously and I've shown you the
14     pension clause in the Michigan Constitution or any
15     other legal impediments to -- affecting pension
16     rights?
17 A.   No.
18 Q.   Let me ask you the same questions now -- well, let me
19     preface it by saying you're aware, of course, that
20     there was a bankruptcy filing on July 18.
21 A.   That would be correct.
22 Q.   Okay. Now, during the period between June 14, that
23     was when the creditor proposal was issued, and the
24     filing, did you have any conversations with Mr. Orr?
25 A.   About?



Page 117

1 Q. Did you hire them?
2 A. No.
3 Q. Who retained them?
4 A. I think -- once again, most of these companies were
5    being -- they were being pressed by the -- we were
6    pressed by the State to my understanding, the State
7    had a lot of input into the selection process and in
8    some cases where the City has a responsibility for
9    paying part of the fees, you know, I've always had a
10   problem that I was not at the table to participate in
11   the selection process.
12 Q. Do you pay part of the fees for Miller Buckfire?
13 A. Yes.
14 Q. Does the State pay part of the fees for Miller
15   Buckfire?
16 A. Yes.
17 Q. Does the NERD Fund pay part of the fees for Miller
18   Buckfire?
19 A. I wouldn't know that.
20 Q. Do you have a copy of Miller Buckfire's retention or
21   engagement letter?
22 A. I would think we have that. I don't -- I don't have
23   it personally, but I would think we do in the purchase
24   department and maybe in the law department.
25       MS. LEVINE: We would request a copy of

Page 118

1    that letter. I know that there's been a lot of
2    documents that have been produced but we didn't happen
3    to see what in there so we would make that specific
4    request.
5        MR. GREEN: And if I may add the 2012
6    engagement letter from Miller Buckfire as well. I
7    understand they were initially engaged the prior year.
8    There may be two engagement letters.
9        MR. MOSS: Please put that in a letter so
10   we make sure we get it part of the record. We'll take
11   a look.
12       MS. LEVINE: So the request will be for any
13   engagement letters or contracts with Miller Buckfire
14   and we'll clarify that.
15 Q. During the deposition last week with Treasurer Dillon
16   he made a reference to a report with regard to certain
17   tax write-offs or uncollected taxes. Are you familiar
18   with that?
19 A. No, I'm not. Not specifically.
20 Q. Are you familiar with any issue with regard to
21   potential tax write-offs where the taxes could have
22   been collected?
23       MR. CULLEN: Objection, foundation, form.
24 A. No, I'm not. You know, we've got uncollected taxes
25   that go back ten, 12 years, and so prior

Page 119

1    administrations in my -- in my perspective a lot of
2    that should have been written off a long time ago but
3    they've been carrying it on books and I just think
4    that's the wrong approach.
5 Q. Under your administration were -- how many -- how much
6    did you write-off in what you believe to be
7    uncollected taxes?
8 A. I'm not sure of that. I would have to get with the
9    CFO.
10 Q. Do you have an approximate number?
11 A. No, I don't.
12       MS. LEVINE: I don't have anything further.
13   Thank you.
14       THE WITNESS: Thank you.
15       MR. GREEN: No, I don't have any questions.
16       MR. CULLEN: We don't need the Pistons
17   question on the record?
18       MR. ESSAD: No.
19       MR. CULLEN: Thank you very much.
20       THE VIDEOGRAPHER: This completes the
21   deposition. We're off the record, 1:22.
22       (Deposition concluded at 1:22 p.m.)
23       *    *    *
24
25

Page 120

1   State of Michigan)
2   County of Genesee)
3                Certificate of Notary Public
4       I certify that this transcript is a complete, true and
5   correct record of the testimony of the witness held in this
6   case.
7       I also certify that prior to taking this deposition,
8   the witness was duly sworn or affirmed to tell the truth.
9       I further certify that I am not a relative or an
10  employee of or an attorney for a party; and that I am not
11  financially interested, directly or indirectly, in the
12  matter.
13       WITNESS my hand this 16th day of October,
14  2013.
15
16
17
18       Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267
19       Certified Realtime Reporter
20       Registered Merit Reporter
21       Certified LiveNote Reporter
22       Certified Shorthand Reporter
23       Notary Public, Genesee, Michigan
24       Acting in Oakland County, Michigan
25       My Commission Expires: 9-19-18



**To:** Bing, Dave[BingD@detroitmi.gov]; Martin, Jack[MartinJack@detroitmi.gov]; Warfield, Robert[WarfieldR@detroitmi.gov]
**Cc:** Andrews, Kriss[AndrewsK@detroitmi.gov]
**From:** Kriss Andrews
**Sent:** Wed 7/10/2013 8:56:40 AM
**Subject:** Emergency Management

You have asked for some views of how the emergency management process is going and how it contrasts with what we were doing without regard to the Emergency Manager.

In answering this one needs to consider we did not have certain opportunities that the EM did, such as filing for bankruptcy, or credibly threatening to do so. Thus, unless we were allowed to operate under PA 436 (which we were not given the opportunity to do) we had to defer attacking certain of the long term obligations as we would not have been able to threaten bankruptcy.

We did attack both health care and pension, which the EM continued, and I would say continued well. They put in place the pension task force that I recommended after some irregularities surfaced which Jack's folks brought to our attention. They continued and I would say improved on the health care work we started. But Jack brought in the actuary they used, and that actuary was really key. So overall, in long term liabilities they continued and improved on what we started, and had tools we simply did not have. Overall I give them good marks in long term liabilities, but that does not mean they will be successful or we did poorly. We simply did not have the tools we needed and they are not done.

Operations are a different matter altogether. Kevyn did well attacking long term liabilities because we gave him a good headstart, it is an area he knows well, and he has the tools to be successful.

In operations he threw away the headstart we gave him, he frankly is not competent at all (in fact, he is embarrassingly incompetent and only listened to his equally incompetent staff) and did not well exercise the added powers he has. I would give him an A in long term liabilities and an F in operations. Given his limited background (legal representation really is all he has, since his other roles are so narrow and unrelated to running a complex operation) and the weak experience the folks from the state have (experienced folks around town will tell you Andy is resume light and highlights disasterous deals as his credentials), this is not surprising.

Since March 28 we have been forced sideways on operations, or simply been told to stand down. A few areas where progress has been slowed are as follows.

1. We should now be installing a new management team in DDOT. We diagnosed this problem correctly, ran a compliant RFP process, and were ready to choose MV as the manager when the EM slowed the process. Though he gave me a poor excuse for doing so, it does not hold water. In addition, he told me a disaster at DDOT would not be a problem for him since it would highlight how screwed up the city is. So I guess the good citizens of Detroit can wait for busses that do not come because it is not inconvenient to Kevyn for them to do so.

2. We should also be progressing on providing a new management team in PLD. As I have said, it is not operationally reasonable to conclude PLD can work through a several year wind-down. We need to outsource the management there and make the operations safe and reasonably compliant. The EM slowed the process here also, and said the same thing: a disaster at PLD would not be a bad thing because it would highlight how messed up the city is. Again, we can expose our employees to safety issues and violate federal regulations because it is not inconvenient to Kevyn to do so.

3. Similar issues surfaced around the lighting authority. After the authority could only get a workable agreement with us (which gave them what they needed but no more, since Detroit has no more) they went to Kevyn and got a deal which forces the City to put in more money than they need, sooner than they need it, while the city struggles. And they cut this deal without coordinating with us so we were just wasting our time since the Authority had softer hands to negotiate with than us.

DTMI_00098861

4. The rest of the control of operations was equally incompetent. Ordering us not to coordinate with the consultants we hired to help us, putting in place very inexperienced staff that controlled things. Not listening to Conway MacKenzie. Every department and thinking person is left wondering.

They also pursued the wrong things, as follows.

1. Focussing on outsourcing solid waste first. While this may be something we should look at, no informed person puts it first. However, it was something they could do, so they focussed on what they could do, not on what needed to be done. Moreover, the announced savings of $15 million are ridiculous. They have no idea what the savings are, presuming there are savings.

2. Moving PDD to DEGC. When I told Kevyn we had issued a plan to the state on this and said we had studied it carefully, Kevyn gave me a legalistic view of Annex B. it was clear Kevyn had his marching orders and logic and operations had nothing to do with his orders. This whole sordid matter you all know well and needs no more documentation. The state's plan is poorly thought out and will just create a mess.

3. Public Safety. While there is emotional appeal to putting in place a new Chief, not giving insiders a real shot and not going through a thorough search were poor choices. Hopefully this will turn out okay, but we should be able to rely on more than hope. Also, I am lost as to where we are on the choice of a consultant, which I also do not believe was followed wisely from a process standpoint.

There are many other areas that could be discussed, I am sure Jack and the Mayor can add to the above lists. The question is how do we stay honest and complete without sounding complaining and negative? There are signs they are realizing how poorly they have done in operations. But the inherent problem is they do not know what they do not know. And that is not changing. I doubt they have learned to look and listen, which is what is needed.

We can talk at your convenience (evenings are best, though today we are at sea and I could talk anytime) or when I get back. But we need to plan this communication well. How do we get out a message that helps matters?

This is especially so since the press has so poorly reported on matters and seems to just write what the state gives them. Apparently keeping peace with their sources of information (the state) is more important than critically thinking about what is happening and doing a little investigation. And the gag orders from Kevyn only support the very poor reporting.

But remember, though they have completed nothing to date, they get an A in my book in teeing up a reduction in long term liabilities. That is worth a lot; they could just do a lot more by looking and listening.

Kriss

Sent from my iPad
Krissandrews@hotmail.com
Cell 586-202-2035