# EXHIBIT F

## TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

# In the Matter Of:

## CITY OF DETROIT, MICHIGAN

Case No. 13-53846

## CHARLES M. MOORE

*September 18, 2013*



800.211.DEPO (3376)
*EsquireSolutions.com*

1  A.  The rate of payouts is another area where the
2      actuaries make assumptions as to what benefits will be
3      paid in what periods and to the extent that those are
4      underestimated, that can impact the funded position as
5      well. Tying into previous assumptions that I had
6      indicated.
7  Q.  So is it -- is it your position that the City views
8      the actuarial payout assumptions as understating
9      unfunded liabilities?
10         MR. MILLER: Object to form. Go ahead.
11 A.  As an example, Mr. Ruegger, the actuarial valuation
12     assumes certain payouts. The actual payouts in the
13     most recent completed year of plan assets were
14     substantially higher than what was anticipated prior
15     to that valuation being done and so at a minimum that
16     would indicate that there were more assets that were
17     paid out than what was assumed by the actuary.
18 Q.  Other than the assumptions and methods you've
19     identified, are there any other assumptions and
20     methods that to your understanding the City views as
21     understating the systems' unfunded liabilities?
22 A.  The City and most importantly its actuary has not
23     completed its analysis on the unfunded position. The
24     City is trying to undertake a process to actually
25     develop a more concrete valuation model on its own so



1  it's been relying on the valuation model of the
2  pension systems' actuary.  As such we have focused on
3  a few items here, but until the City completes its
4  analysis and completes its own actuarial valuation,
5  neither the City nor its actuary nor I would be able
6  to say what all the assumptions are that could be used
7  to either overstate or understate the funded position.
8  Q.  Very well.
9      Let's turn to one of the assumptions that
10     you address in your declaration and specifically in
11     paragraph 11 you talk about the projected net rate of
12     return.  The 7.0 percent or 7.25 percent figure, do
13     you see that in paragraph 11?
14 A.  Yes, sir.
15 Q.  Those were not figures that were recommended by a
16     particular actuary; were they?
17 A.  The 7 percent is actually higher than the rate that
18     Milliman, the City's actuary, had originally put
19     forward, which in its view would result -- the rate at
20     which there was a fifty-fifty chance of achieving that
21     rate.
22     MR. RUEGGER:  All right.  I'm going to move
23     to strike, because with all respect that was not
24     responsive to my question, Mr. Moore.
25 Q.  I understand Milliman has prepared a variety of



1         from an actuarial standpoint and no new benefits
2         accrued and you experience a 7.9 percent assumed rate
3         of return -- or actual rate of return, what would
4         happen to the plan assets.
5    Q.   Let me ask you if you have Moore Exhibit 3 there, I
6         want to ask you a few questions with regard to that.
7                   Let me direct you to page 95 of that
8         presentation. Hang on for a second. I'm sorry, I was
9         in the wrong place. Page 109. Looking at the heading
10        there, claims for unfunded pension liabilities.
11   A.   Yes, sir.
12   Q.   Were you involved at all in the drafting of that part
13        of this presentation?
14   A.   I don't think I wrote that, but I was aware of this
15        language.
16   Q.   Okay. How about the specifically the language of the
17        third bullet point? Because the amounts realized on
18        the underfunding claims would be substantially less
19        than the underfunding amount, there must be
20        significant cuts in accrued vested pension amounts for
21        both active and currently retired persons. Were you
22        involved in formulating that?
23   A.   Yes, sir.
24   Q.   And has the City -- I noticed in this presentation
25        there's no quantification of what -- of the cuts that



```
 1            would be -- that in the City's view must occur;
 2            correct?
 3    A.      Correct.
 4    Q.      Has there been a specification of those level of cuts
 5            that the City contends must occur?
 6                    MR. MILLER:  Object to form.
 7    Q.      I mean, have you put a dollar amount on it?
 8    A.      No, and our analysis of this continues.  Right now we
 9            still don't know what assets could be available to put
10            towards the pensions.  We still have not had the type
11            of dialogue that we would like to have related to the
12            calculation of the unfunded amount, so because of
13            those two uncertainties among others we don't know
14            what cuts, if any, there may need to be.
15    Q.      Well, doesn't it say there must be significant cuts?
16            Am I -- are you saying that there's some -- that the
17            City's position may be that there are no cuts that are
18            necessary in accrued vested pension amounts?
19                    MR. MILLER:  Object to form.
20    A.      We don't know.  That's where we want to continue to
21            engage in discussions and negotiations with the
22            parties, but depending on what the unfunded amount is
23            and what assets may be available for those claims, it
24            certainly is possible.
25    Q.      So maybe that should have been worded there may be
```



```
1   State of Michigan)
2   County of Genesee)
3                  Certificate of Notary Public
4        I certify that this transcript is a complete, true and
5   correct record of the testimony of the witness held in this
6   case.
7        I also certify that prior to taking this deposition,
8   the witness was duly sworn or affirmed to tell the truth.
9        I further certify that I am not a relative or an
10  employee of or an attorney for a party; and that I am not
11  financially interested, directly or indirectly, in the
12  matter.
13                  WITNESS my hand this 20th day of September,
14  2013.
15
16
17            [signature]
18            Jeanette M. Fallon, CRR/RMR/CLR/CSR-3267
19            Certified Realtime Reporter
20            Registered Merit Reporter
21            Certified LiveNote Reporter
22            Certified Shorthand Reporter
23            Notary Public, Genesee, Michigan
24            Acting in Oakland County, Michigan
25            My Commission Expires: 9-19-18
```



ESQUIRE  800.211.DEPO (3376)
EsquireSolutions.com