# EXHIBIT H

# TO THE DECLARATION OF CLAUDE D. MONTGOMERY, ESQ.

*In Re: City of Detroit, Debtor*

*Treasurer Andrew Dillon*
*October 10, 2013*

*Moretti Group*
*471 W. South Street*
*Suite 41B*
*Kalamazoo, MI 49007*
*800-536-0804*



Moretti GROUP

Original File 101013AD.TXT

Page 65

1  A.   I don't agree with that.
2           MS. NELSON: Objection; argumentative.
3  BY MR. SHERWOOD:
4  Q.   And without giving your -- as a Treasurer, as a
5       former Legislator, is it your view or do you agree
6       that the proposed treatment on June 14th, 2013,
7       providing for cuts in accrued vested pension amounts
8       for both active and currently retired persons would
9       be violative of Section 24 of the Michigan
10      Constitution?
11 A.   No, because that doesn't provide for it. To my
12      mind, and this is how this Governor does business,
13      is he hires good people and lets them do their job.
14          To me that document was laying out the
15      facts for creditors so they could understand the
16      financial condition of City.
17 Q.   So this wasn't a proposal even though it's -- even
18      though the title of the document is proposal for
19      creditors?
20 A.   I think he's just laying out the facts. This is the
21      economic reality of the City of Detroit. From
22      there, as you know, there was various meetings with
23      various creditors to discuss can we get this thing
24      settled out of court.
25 Q.   Did you participate in any of those meetings?

Page 66

1  A.   I don't believe so.
2  Q.   Were you given reports by the emergency manager as
3       to how those meetings were going?
4  A.   We typically had a weekly either meeting or call
5       where we were given an update on the status of
6       events.
7  Q.   Who was on the weekly meeting call?
8  A.   It would be Kevyn and some of the members from his
9       team, various members of the Governor's office as
10      well as my office.
11 Q.   And what was reported in terms of the progress that
12      the emergency manager was or wasn't making with the
13      out-of-court negotiations?
14          MS. NELSON: I'm going to object to the
15      extent that it calls for attorney-client
16      communications and instruct him not to answer.
17          That, in fact, is what it calls for.
18 BY MR. SHERWOOD:
19 Q.   Did you have any communications with Mr. Orr outside
20      the presence of counsel --
21 A.   Yes.
22 Q.   -- concerning -- concerning negotiations with
23      creditors before the Chapter 9?
24 A.   Yes.
25 Q.   And what did you say during those communications?

Page 67

1  A.   I was mostly just listening because I was getting an
2       update about how things were going.
3  Q.   What was the -- what did he say?
4  A.   The only specific memory I have would be the one
5       dealing with the SWOPS, discussions with the SWOP
6       providers and whether or not there could be a
7       settlement reached with them.
8  Q.   What did Mr. Orr say about the SWOPS?
9  A.   He reached an agreement with two of the SWOP
10      providers that he could get a discount on the monies
11      owed on the SWOPS, and that's my only memory of a
12      specific -- I knew every week that he was meeting
13      with various creditors, but that's the only one that
14      I remember kind of a specific deliverable for.
15 Q.   And do you recall anything else about those
16      nonprivileged conversations?
17          Did he report that the negotiations were
18      going well, that they were going poorly, that they
19      were not going at all, anything along those lines or
20      do you just recall the specific discussion about the
21      SWOPS?
22 A.   Yeah. I -- there was, I think, just general
23      comments that they weren't real productive, right,
24      that we weren't making progress.
25 Q.   Did he say why?

Page 68

1  A.   I'm sure he did, but it would require going through
2       each of the various creditors that he met with at
3       the time so I don't have specific memories of each.
4           The only one I have a specific memory right
5       now about would be very difficult discussions with
6       the suretys, the insurance companies, a lot of
7       unwillingness to embrace what the economic realities
8       were, and then a lot of concern about the number of
9       retirees and the unions not wanting to represent the
10      retirees, making it difficult to negotiate for
11      20,000 people.
12 Q.   Did he say it was impossible to negotiate with all
13      of the creditors of the City of Detroit? Did he
14      reach that conclusion in your presence?
15 A.   I don't recall the specific words he used but
16      clearly he was expressing that it was very difficult
17      to work and negotiate with a pool of creditors that
18      include 20,000 individuals, yes.
19
20          (Deposition Exhibit 5 was marked.)
21
22 BY MR. SHERWOOD:
23 Q.   Treasurer Dillon, we've marked as Dillon 5 an email
24      from you dated July 9th to the Governor and others.
25          Are you familiar with this email?

Page 69

1 A. Yes.
2 Q. And it says that "Kevyn will meet with the Detroit
3     pensions tomorrow after all."
4     I want to ask you about the word after all.
5     Was there a suggestion before you wrote this email
6     that Kevyn was not going to meet with the Detroit
7     pensions?
8 A. Yeah. I think before that there was some thought
9     that that meeting was going to get cancelled.
10 Q. And who was going to cancel it?
11 A. My memory is Kevyn might have. There was a lawsuit
12     that was filed that I think caused some
13     consternation about whether or not he should meet
14     with them.
15 Q. So initially Mr. Orr was considering not meeting
16     with the pensions on July 10th, 2013, and then he
17     changed his mind and decided to meet with them?
18 A. My memory is there was a plan to meet with them,
19     then some lawsuits got filed which I think he
20     contemplated not going forward with the meeting.
21     And from reading this, apparently he went forward
22     with the meeting.
23 Q. Going down to the last paragraph it says "Tomorrow's
24     meeting could lead to questions directed to you
25     about your view on this topic."

Page 70

1     Obviously, you is the Governor, and the
2     Governor's view on this topic, I assume this topic
3     is the Detroit pensions. Would that -- is that
4     right? Am I right saying those things?
5 A. Right.
6 Q. So and then you -- then you say "...it's too
7     early in the process to respond to hypothetical
8     questions. We remain in many ways in the
9     informational stage."
10     Does that mean that at this point in time,
11     July 9th, 2013, you were still in the informational
12     stage vis-a-vis the Detroit pensions?
13 A. We were learning things. We were learning about an
14     annuity program that the City had offered employees.
15     We were learning that there was alternative
16     investments that were made that were not written
17     down. We were learning what assumptions the
18     City's actuarial firm was making versus the ones
19     that Milliman was hired to really appreciate and
20     understand what was the level of underfunding.
21     So on that date in question I couldn't tell
22     you that these funds were funded at X percent
23     because there was too many moving pieces to the
24     puzzle.
25 Q. So your advice to the Governor was in response to

Page 71

1     questions about his view on the Detroit pensions was
2     to just say it was too early in the process and you
3     were still in the informational stage; is that
4     right?
5 A. That's right.
6 Q. And this was before the Governor authorized
7     Chapter 9 filing, correct?
8 A. Correct.
9 Q. Did that -- did your view of the Governor's -- what
10     the Governor's position should be change before
11     July 18th, in the next week?
12 A. No.
13     MR. SHERWOOD: All right. I'm going to
14     stop here, Treasurer. Thank you.
15     I reserve the right if we have time to ask
16     a question or two later, but I think as a courtesy
17     to my -- the other lawyers here I'm going to turn
18     over the mic to them.
19     Thank you for your testimony this morning.
20     Should we take a quick break?
21     VIDEO TECHNICIAN: Off the record 11:02
22     a.m.
23     (A brief recess was taken.)
24     VIDEO TECHNICIAN: We're back on the record
25     at 11:06 a.m.

Page 72

1     EXAMINATION
2 BY MR. WERTHEIMER:
3 Q. Mr. Dillon, my name is Bill Wertheimer. We've met
4     off the record. I'm going to be asking you some
5     questions.
6     I represented and represent what we've
7     called the Flowers Plaintiffs. That is one of the
8     group of retirees that filed lawsuits in state court
9     before the bankruptcy was filed.
10     You indicated early in your testimony that
11     you were involved in some discussions shortly after
12     you took office as Treasurer about replacing Public
13     Act 72. Do you recall that?
14 A. Uh-huh. Yes.
15 Q. You need to say your answer.
16 A. Yes.
17 Q. And you talked about competing constitutional
18     provisions, one of them being the constitutional
19     provision relating to public health, safety,
20     welfare, correct?
21 A. Correct.
22 Q. And as I understand it, your focus at the time had
23     to do with your ability to modify CBAs; is that
24     right?
25 A. That's right.

### Page 93

1 pension funds.
2 Q. Okay. All right.
3 Did you have any conversations with the
4 Governor about the issue of whether Orr should file
5 for bankruptcy say in the couple weeks preceding the
6 filing?
7 MS. NELSON: Again, are you speaking just
8 one-on-one other than attorney-client?
9 BY MR. WERTHEIMER:
10 Q. One-on-one or in group conversations -- I don't
11 want -- I'm not asking you to violate the
12 attorney-client privilege. I think you understand
13 what we're getting at here.
14 A. Yeah.
15 Q. So my questions you should assume are modified in
16 that respect.
17 A. Yeah, so can you restate the question?
18 (Reporter read record as follows:
19 "Q. Did you have any conversations with the
20 Governor about the issue of whether Orr
21 should file for bankruptcy say in the
22 couple weeks preceding the filing?")
23 THE WITNESS: I have a question for my
24 lawyer.
25 MR. WERTHEIMER: That's fine. If you want

### Page 94

1 to take a break or just go outside.
2 VIDEO TECHNICIAN: Off the record 11:35
3 a.m.
4 (A brief recess was taken.)
5 VIDEO TECHNICIAN: We're back on the record
6 at 11:37 a.m.
7 THE WITNESS: Yeah, I don't recall any
8 conversations with the Governor outside the presence
9 of counsel on that topic.
10 BY MR. WERTHEIMER:
11 Q. Okay. If you take a look at the July 9 -- do you
12 have that one in front -- that's five. This one
13 here.
14 A. Okay.
15 Q. And let me direct your attention to the first
16 paragraph. You're telling the Governor that the
17 emergency manager's going to meet relative to the
18 pensions the next day, and then a couple of
19 sentences down you say he, meaning Orr, will not
20 translate that into an impact on retirees or
21 employees' vested rights or what share of monies
22 available to unsecured creditors would go to the
23 pension plans.
24 What was your understanding of why Orr was
25 not going to do that? What's the point, and why are

### Page 95

1 you telling the Governor?
2 That's -- your attorney's going to object.
3 That was three questions.
4 A. Okay.
5 MS. NELSON: Yes, which one would you like
6 him to answer first?
7 MR. WERTHEIMER: He can do it in order or
8 however he'd like.
9 MS. NELSON: Well, I don't know that he's
10 going to remember them all by the time he gets to
11 the last one.
12 THE WITNESS: I mean, to me the building
13 block is what's the funded status. And that issue
14 was fluid, and I think that's the first issue that
15 if you're going to reach a settlement with your
16 creditors it's important to understand, all right,
17 what's the funding level. From there you can start
18 to figure out how do you solve this equation going
19 forward. So I was comfortable with that.
20 BY MR. WERTHEIMER:
21 Q. Well, isn't there a political reason to not
22 translate it into the impact on retirees because the
23 impact is going to be negative? All we need to do
24 is look at the June 14th creditors' proposal to know
25 that, don't we?

### Page 96

1 MS. NELSON: Objection; form, foundation,
2 calls for speculation.
3 BY MR. WERTHEIMER:
4 Q. Go ahead.
5 A. That wasn't my thinking. My thinking was until you
6 really know the funding status, it's hard to really
7 understand what the impact may be.
8 So it was more important to understand that
9 first.
10 Q. Okay. I have nothing further. Thank you.
11 MS. NELSON: Is everybody done?
12 MR. SHERWOOD: I have one or two followup,
13 but I'll let you go first.
14 MS. GREEN: You can go. Do your followup
15 first. We'll wait.
16 MR. SHERWOOD: Can I use this microphone?
17 MS. NELSON: Well, you're the Retiree
18 Committee and I don't believe you --
19 MR. GALLAGHER: We're not the Committee,
20 we're the Retirement Systems.
21 MS. NELSON: I'm sorry, the Retirement
22 Systems. You did not subpoena -- did not issue a
23 subpoena to the Treasurer, and it's my understanding
24 the parties that didn't subpoena aren't entitled to
25 question.

Page 117

1 was provided to the media, and it states it's being
2 done solely off the record and it's critical this
3 information is not traced back to the Department
4 because it has not been finalized.
5     Is it the practice of the Treasury
6 Department to allow admittedly incomplete
7 information regarding the pensions to be leaked to
8 the media?
9 A. I would say it's unusual.
10 Q. Why would it be critical, as stated in the email,
11 for the Milliman summary that Mr. Stanton had asked
12 for to be deleted and not in connection to the
13 Treasury Department?
14 A. Does it say deleted in here? Oh, yeah. I see.
15 Okay.
16     I assume he didn't want to -- yeah, he
17 thought it was out there with other news media.
18 Rick Pluta must have been asking about it, so he
19 shared with him that which he thought other media
20 outlets probably already had.
21 Q. You mentioned that there was a cap for the fees that
22 the State would pay in connection with the
23 Chapter 9. Have we reached --
24 A. Actually, you mischaracterized it.
25 Q. I'm sorry, what was your --

Page 118

1 A. We offered to pay 50 percent of consulting fees
2 prior to the filing.
3 Q. Up to five million?
4 A. Up to five million.
5 Q. And so in June of 2013 that would have been prior to
6 the filing and the State was still contributing to a
7 portion of those fees, correct?
8 A. I believe so.
9 Q. We can mark this as Exhibit 9.
10
11     (Deposition Exhibit 9 was marked.)
12
13 BY MS. GREEN:
14 Q. Do you recall sending this email?
15 A. I do.
16 Q. Is it safe to say the five million dollar cap has
17 been maxed out?
18 A. What I was reviewing was both the forecast as well
19 as the historical, so I was looking at more than
20 just the history.
21 Q. So what is the summary of fees that you were
22 referring to?
23 A. We were given an estimate of what the fees were
24 looking like and I reviewed it and wasn't very
25 happy.

Page 119

1 Q. The last question is relating to Exhibit 5 which has
2 already been marked. It's the July 9th email.
3     The email states "Tomorrow's meeting could
4 lead to questions directed to you about your view on
5 this topic." It's relating to the pension issue.
6     Is that a fair characterization of the
7 email?
8 A. Right.
9 Q. "In my view, it's too early in the process to
10 respond to hypothetical questions. We remain in
11 many ways in the informational stage. I have some
12 thoughts as to how you could address some pointed
13 questions if you're interesting in hearing them."
14     What pointed questions were you expecting?
15 A. Anything from -- well, going back in time here, but
16 just obviously the whole gamut of questions
17 regarding what the underfunding status could mean to
18 retirees, and I thought that the situation was not
19 understood enough for the Governor to go on record
20 yet because I couldn't even tell him with any degree
21 of confidence what level of funding these pension
22 funds had, so why should he get in the middle of a
23 debate about this. It's obviously a very charged
24 and sensitive issue, and it was my free political
25 comments to him.

Page 120

1 Q. And this was really just over a week before the
2 filing. That was your stance?
3 A. Yeah. I don't -- yeah, obviously. But I don't -- I
4 think it was in the context of this meeting that
5 Kevyn was going to have with the committee that
6 drove this email.
7 Q. Did anything change between the ninth and the filing
8 on the 18th that changed your opinion regarding what
9 you, I believe, just stated was too early to tell
10 him with any degree of confidence what level of
11 funding the pension funds had I believe is what you
12 just stated.
13 A. Yeah, I have not -- my opinion is pretty much the
14 same.
15 Q. The last sentence of the email says "I have some
16 thoughts as to how you could address some pointed
17 questions if you're interesting in hearing them."
18     What were your ideas for how to answer the
19 questions?
20 A. I don't recall specifically at this point.
21 Q. Did you ever have a conversation with him regarding
22 your thoughts on how to answer the questions?
23 A. No.
24 Q. You mentioned in the email "Because pensions have
25 such a long life there are a lot of creative options

Page 121

1  we can explore to address how they will be treated
2  in restructuring."
3      What were your creative options that you
4  had on the table?
5  A.  There's dozens. I mean, I don't have one that I
6      would pick out. But pension funds do have a long
7      life and there's a lot of creative things that can
8      be done, so I -- I don't have one or two that I
9      would just throw out, but I do know that there's a
10     lot of ways to address that issue.
11 Q. Have there been any formal reports or proposals
12     identifying and explaining what you consider to be
13     these creative options?
14 A. No.
15 Q. Were these creative options ever explored with the
16     pension systems directly --
17 A. Not to my knowledge.
18 Q. -- to your knowledge?
19     I don't have any further questions.
20     MR. SHERWOOD: Anybody else have questions?
21     MR. WERTHEIMER: I do not.
22     RE-EXAMINATION
23 BY MR. SHERWOOD:
24 Q. I have one question about D-7, which I hadn't seen
25     before the deposition. It's an email to you from

Page 122

1  Heather Lennox.
2      I just want to know what your understanding
3  of the sentence "Many provisions in here are
4  designed to take advantage of PA 4 while it is still
5  in existence, but this also references other state
6  laws that would buttress the FCB and PCA powers..."
7      What is FCB -- what is your understanding
8  of what FCB and PCA powers, what that means?
9  A. FCB I don't know. She might be referring to
10     Financial Control Board, but as opposed to the FAB
11     I'm surmising.
12     PCA is not ringing a bell either.
13 Q. At this time there was a Financial Control Board in
14     existence, right?
15 A. No, I think that -- well, I think it was part of the
16     financial stability agreement, the creation of the
17     FAB, I think.
18 Q. And PCA, you don't know what that means?
19 A. I'm not recalling offhand, no.
20 Q. Was it -- did you express a desire to buttress the
21     powers of the Financial Control Board and insulate
22     those powers from attack in the event of a repeal?
23 A. Can you restate the question? I'm sorry.
24 Q. Was it -- were you interested at this point in time,
25     in March of 2012, to take steps to buttress the

Page 123

1  power of the Financial Control Board and insulate
2  those powers from being attacked in the event PA 4
3  was repealed?
4  A. I don't know if buttress is the right word. If
5      you're going to put in place all the structuring and
6      negotiate a consent agreement with the City, there's
7      other ways -- other legal basis to do that through
8      interlocal agreements. There's other laws that we
9      could look to that would give us the authority to
10     have this agreement have meaning to it.
11     So the thought was, you know, identify all
12 those legal arguments that would give legal standing
13 to the Financial Advisory Board and the consent
14 agreement is my memory.
15     MR. SHERWOOD: That's all.
16     MS. NELSON: All right, we're done. Thank
17 you.
18     THE WITNESS: Thank you.
19     VIDEO TECHNICIAN: Deposition has concluded
20 at 12:23 p.m.
21     (Deposition concluded at 12:23 p.m.)
22     - - -

Page 124

CERTIFICATE

STATE OF MICHIGAN    )
                            ) SS:
COUNTY OF OAKLAND    )

    I, LAUREL A. JACOBY, Certified Shorthand reporter, a Notary Public, hereby certify that I recorded in shorthand the examination of TREASURER ANDREW DILLON, the deponent in the foregoing deposition; and that prior to the taking of said deposition the deponent was first duly sworn, and that the foregoing is a true, correct and complete transcript of the testimony of said deponent.

    I further certify that no request was made for submission of the transcript to the deponent for reading and signature and that no such submission was made.

    I also certify that I am not a relative or employee of a party or an attorney for a party; or financially interested in the action.

LAUREL A. JACOBY, CSR-5059, RPR

Notary Public, Oakland County, Michigan
My commission expires: 9/1/18
Dated: This 13th day of October, 2013.