# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| | ) | Hon. Steven W. Rhodes |
| Debtor. | ) | |
| | ) | |

## PRE-HEARING BRIEF OF THE DETROIT RETIREMENT SYSTEMS IN SUPPORT OF THEIR ELIGIBILITY OBJECTIONS SPECIFICALLY PURSUANT TO SECTIONS 109(c)(5) AND 921(c) OF THE BANKRUPTCY CODE

Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Jennifer K. Green (P69019)
CLARK HILL PLC
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

*Counsel to the Police and Fire Retirement System of the
City of Detroit and the General Retirement System of the City of Detroit*

# **TABLE OF CONTENTS**

Introduction ………………………………………………………………1

Factual Background …………………………………………………...…2

    I.    The Retirement Systems ……………………………………...…2

    II.   The Michigan Constitution ……………………………………3

    III.  The Emergency Manager and the Restructuring Proposal ………..…4

    IV.  Pre-Petition Meetings Attended by the Retirement Systems ………..6

    V.   The Authorization and Filing of the Chapter 9 Bankruptcy Petition....8

    VI.  The City's and the Governor's Admissions ……………………9

Argument ………………………………………………………………10

    I.    The City Cannot Meet Its Burden of Proof Under Section
          109(c)(5)(B) of the Bankruptcy Code Because it Failed to Negotiate in
          Good Faith With Its Creditors ……….....................................10

          A.    Standard of Review ……………………………………10

          B.    The City Did Not Negotiate with the Retirement Systems …13

               1.    Meetings attended by representatives of the Retirement
                        Systems were informational only ……………………13

    II.   Negotiations With Its Creditors Were Not Impracticable Per Section
          109(c)(5)(C) of the Bankruptcy Code ……………………………17

    III.  The City Did Not File the Petition in Good Faith and It Must Be
          Dismissed Under Section 921(c) of the Bankruptcy Code . . . . . . . 18

          A.    The Petition Was Not Filed In Good Faith Because It
                 Was Filed With the Intention of Impairing Accrued
                 Pension Benefits In Violation of the Pensions

13-53846-tjt    Doc 1244    Filed 10/17/13    Entered 10/17/13 23:59:44    Page 2 of 25

Clause.
................................................................20

B.  Material Financial Information Required for
    Good Faith Negotiations Was Not Complete
    Pre-Petition ................................................20

Conclusion ................................................................22

The Police and Fire Retirement System of the City of Detroit ("PFRS") and the General Retirement System of the City of Detroit ("GRS," and together with PFRS, the "Retirement Systems") submit the following as their pre-hearing brief in connection with the October 23, 2013 evidentiary hearing and in support of their objections[1] to the eligibility of the City of Detroit, Michigan (the "City") to be a debtor under Chapter 9 of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code"), specifically pursuant to sections 109(c)(5) and 921(c) of the Bankruptcy Code.

## Introduction

The City filed this Chapter 9 case mere weeks after presenting its Restructuring Proposal (defined below) to creditors, before it reasonably understood its own finances, including the value of its assets, anticipated cash flows, and the scope of its liabilities. The Restructuring Proposal treats the City's legacy pension liabilities as unsecured debts, in violation of the Michigan Constitution, and does not propose any go-forward plan for the continuation or modification of the pension plans themselves. Abdicating its responsibilities to

---

[1] The Retirement Systems incorporate by reference and rely upon the facts and arguments set forth in the Objection of the Detroit Retirement Systems to the Eligibility Of the City of Detroit, Michigan to Be a Debtor Under Chapter 9 of the Bankruptcy Code [Dkt. No. 519] (the "Eligibility Objection") and in the Reply in Support of Objection of the Detroit Retirement Systems to the Eligibility of the City of Detroit, Michigan to Be a Debtor Under Chapter 9 of the Bankruptcy Code [Dkt. No. 1166].

1

negotiate with its creditors, the City instead filed Chapter 9 to improperly evade the restrictions on the diminishment or impairment of accrued financial benefits imposed by the Pensions Clause (defined below), and to gain leverage over creditors through the Chapter 9 process. At the evidentiary hearing on the section 109(c)(5) and 921(c) issues, the Retirement Systems will demonstrate that: (i) the City failed to negotiate in good faith with its creditors; (ii) negotiations were not impracticable; and (iii) the petition was not filed in good faith. As a result, the petition must be dismissed.

## Factual Background[2]

### I. The Retirement Systems

The residents of the City established the Retirement Systems through amendments to the City's Charter of 1918 (effective July 1, 1938, and effective

---

[2] On October 8, 2013, after reviewing requests from the UAW and the Retirement Systems, the City produced documents that it had previously claimed as privileged. Upon becoming aware that the Retirement Systems intended to use these documents as exhibits at the evidentiary hearing, the City reasserted the attorney-client privilege with respect to certain of the documents that it had produced. The Retirement Systems had intended to rely upon the documents at issue in support of its arguments that the City did not negotiate with its creditors in good faith as required by Bankruptcy Code section 109(c)(5) and that the City did not file the petition in good faith as required by Bankruptcy Code section 921(c). Although the Retirement Systems have attempted to resolve this issue through discussions with the City, it has not been able to do so as of the filing of this brief. Therefore, the Retirement Systems reserve the right to supplement this brief to include the additional facts learned during discovery and to supplement its legal arguments accordingly.

2

July 1, 1941, respectively) as authorized by Article VII, section 22 of the Michigan Constitution and sections 4i, 4j, and 21 of the Home Rule City Act, 1909 PA 267 (as amended), M.C.L. § 117.1 *et seq.* Among other things, the Retirement Systems: (i) administer retirement, disability, and survivor benefits to eligible uniformed and non-uniformed City employees and their beneficiaries (*i.e.,* the participants); (ii) ensure that the City actually honors its collective bargaining agreements by tendering to the Retirement Systems the City's annual and obligatory pension contributions; and (iii) protect the vested pension benefits (*i.e.,* "accrued financial benefits") of the Retirement Systems and their participants. There are more than 32,000 active and retired employees of the City, who are participants in the Retirement Systems and whose "accrued financial benefits" the Retirement Systems must protect.

## II.    The Michigan Constitution

To ensure protection of public pension benefits, the Michigan Constitution states: "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." MICH. CONST., art. IX, § 24. Article IX, §24 of the Michigan Constitution is referred to as the "Pensions Clause" herein.

3

### III.  The Emergency Manager and the Restructuring Proposal

On March 14, 2013, Kevyn D. Orr was appointed as the emergency financial manager of the City pursuant to Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, M.C.L. §141.1201, *et seq.* On March 28, 2013, upon the effectiveness of Public Act 436, the Local Financial Stability and Choice Act, M.C.L. §141.1541, *et seq.* ("PA 436"), Mr. Orr became, and continues to act as, the emergency manager with respect to the City (the "Emergency Manager").

On March 14, 2013, as mandated by Article XI, section 1 of the Michigan Constitution and section 1 of the Constitutional Oath of Office Act, 1951 PA 22, M.C.L. § 15.151 *et seq.*, ("PA 22"), the Emergency Manager swore the following oath, which was later filed with the Michigan Secretary of State: "*I do solemnly swear that I will support the Constitution of the United States and the Constitution of this State, and that I will faithfully discharge the duties of the office of Emergency Financial Manager – City of Detroit according to the best of my ability.*"

In a June 13, 2013 interview with The Detroit Free Press, the Emergency Manager addressed the protection under the Pensions Clause against the impairment of accrued public pension benefits, expressing his intention to evade

this provision of the Michigan Constitution through a federal Chapter 9 bankruptcy

proceeding:[3]

> Q: You said in this report that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?

> A: The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law.

> Q: Which the 9th Circuit agrees for now.

> A: It is what it is—so we said that in a soft way of saying, "Don't make us go into bankruptcy." **If you think your state-vested pension rights, either as an employee or retiree—that's not going to protect you. If we don't reach an agreement one way or the other, we feel fairly confident that the state federal law, federalism, will trump state law** or negotiate. The irony of the situation is we might reach a deal with creditors quicker because employees and retirees think there is some benefit and that might force our hand. That might force a bankruptcy.

On June 14, 2013, the Emergency Manager issued his Proposal for Creditors

(the "Restructuring Proposal") wherein he took the position that: (i) pension debts

are unsecured claims that may be, and must be, impaired in any prospective

Chapter 9 bankruptcy proceeding; and (ii) the City's alleged approximate $3.5

billion underfunding liability would be placed in a pool of unsecured claims

---

[3] *See Q & A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, Detroit Free Press (June 16, 2013), *available at* http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-detroit-emergency-manager-creditors-fiscal-crisis.

comprising approximately $11.5 billion in claims, and exchanged for a *pro rata* share of an unsecured note in the face amount of $2.0 billion. The Restructuring Proposal is attached as Exhibit A to the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code. [Dkt. No. 11] (the "Orr Declaration").

## IV. Pre-Petition Meetings Attended by the Retirement Systems

On June 14, 2013, a meeting occurred at which the Emergency Manager and the City's advisors presented the Restructuring Proposal to many representatives of the City's creditors. Representatives for the Retirement Systems were in attendance at the June 14, 2013 presentation. The meeting was an informational presentation, with no negotiations.

On the morning of June 20, 2013, a meeting occurred that was attended by certain of the City's advisors and representatives from the City's unions and retiree associations, representing the City's non-uniformed employees and retirees, relating to health and pension obligations. Advisors from the GRS attended this meeting. The meeting was informational, and negotiations did not occur.

In the afternoon of June 20, 2013, a meeting occurred that was attended by certain of the City's advisors and representatives from the City's unions and retiree associations, representing the City's uniformed employee and retirees, relating to

6

retiree health and pension obligations. Advisors from the PFRS attended this meeting. The meeting was informational, and negotiations did not occur.

On or about June 20, 2013, access was first granted to the Retirement Systems' professionals to the City's electronic data room. That data room had a limited population of documents, which was supplemented over ensuing periods of time.

On June 25, 2013, a meeting occurred that was attended by certain of the City's advisors and representatives and advisors from the City's bond insurers and U.S. Bank, the trustee or paying agent on all of the City's bond issuances, to review various financial information. The Retirement Systems financial advisors attended this meeting. The meeting was informational, and negotiations did not occur.

On July 9, 2013 and July 10, 2013, representatives of the Retirement Systems attended the diligence sessions regarding the City's finances that were held at The Cadillac Place in Detroit, Michigan (the "July Diligence Sessions"). The July Diligence Sessions were attended by, among other persons, representatives of and advisors to the Emergency Manager, the City, and various creditors of the City. The July Diligence Sessions were informational, and negotiations did not occur.

## V.   The Authorization and Filing of the Chapter 9 Bankruptcy Petition

On July 16, 2013, upon information and belief, the Emergency Manager delivered a letter to the Governor and the State Treasurer recommending, pursuant to section 18(l) of PA 436, that the City be authorized to file a case under Chapter 9 of the Bankruptcy Code (the "Bankruptcy Recommendation"). The Bankruptcy Recommendation is attached as Exhibit J to the Orr Declaration.   In the Bankruptcy Recommendation, the Emergency Manager states that "[t]he City's debt and legacy liabilities must be significantly reduced" and that, in recommending a Chapter 9 bankruptcy, "the negotiation of changes to pension and retiree benefits with the City's retiree constituency is impracticable without court intervention."   Bankruptcy Recommendation at pp. 2, 8.   Based on the foregoing and many other excerpts from the Bankruptcy Recommendation, it is clear that the Emergency Manager contemplated use of the Chapter 9 process to implement his Restructuring Proposal, including the impairment and diminishment of "legacy" accrued pension benefits.

On July 18, 2013, the Governor sent a letter to the Emergency Manager and the State Treasurer purporting to grant to the Emergency Manager authorization to place the City into Chapter 9 bankruptcy (the "Governor's Authorization").   The Governor's Authorization is attached as Exhibit K to the Orr Declaration.   The Governor expressly recognized that section 18(1) of PA 436 authorized him to

8

place "contingencies" on a bankruptcy filing, but he nevertheless declined to do so. *Id.* at p. 4. Citing section 943(b)(4) of the Bankruptcy Code, the Governor concluded: "Federal law already contains the most important contingency—a requirement that the plan be legally executable." *Id.*

On July 18, 2013 (the "Petition Date"), the City filed its Voluntary Petition under Chapter 9 of the Bankruptcy Code (the "Bankruptcy Petition") and also filed the City Eligibility Submissions.[4]

## VI. The City's and the Governor's Admissions

In the City of Detroit, Michigan's Objections and Responses to Detroit Retirement Systems' First Requests for Admission Directed to the City of Detroit, Michigan [Dkt. No. 849] (the "City's Responses to Requests for Admissions"):

- "The City admits that the Restructuring Proposal contemplates a reduction in Accrued Financial Benefits to participants of the Retirement Systems, but seeks agreement and acceptance by plan beneficiaries." City's Responses to Requests for Admissions, Response No. 5.

- "The City admits that the Bankruptcy Recommendation contemplates a reduction in Accrued Financial Benefits

---

[4] The Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code [Dkt. No. 10] (the "Statement of Qualifications"), the Orr Declaration, the Declaration of Gaurav Malhotra in Support of Statement of Qualifications [Dkt. No. 12] (the "Malhotra Declaration"), the Declaration of Charles M. Moore in Support of Statement of Qualifications [Dkt. No. 13] (the "Moore Declaration"), and the Memorandum in Support of Statement of Qualifications [Dkt. No. 14] (the "Eligibility Memorandum") are collectively referred to herein as the "City Eligibility Submissions."

to participants of the Retirement Systems, but seeks agreement and acceptance by plan beneficiaries." *Id.* at Response No. 6.

- The City admits that the Governor's Authorization adopts the Bankruptcy Recommendation without modification. *Id.* at Response No. 7.

- The City admits that the Governor's Authorization enables the City to seek to diminish or impair Accrued Financial Benefits through this Chapter 9 Case. *Id.* at Response No. 11.

- The City admits that it intends to seek to diminish or impair the Accrued Financial Benefits of the participants in the Retirement Systems though this Chapter 9 Case. *Id.* at Response No. 12.

Likewise, the Governor admitted that at the time he authorized the bankruptcy, he knew that "[b]ased on the facts going into it" there was a "likelihood" accrued pension benefits would be reduced in the Chapter 9 case. (Ex. A, Snyder Dep. 10/9/2013, pp. 66-67).

## Argument

### I. THE CITY CANNOT MEET ITS BURDEN OF PROOF UNDER SECTION 109(C)(5)(B) OF THE BANKRUPTCY CODE BECAUSE IT FAILED TO NEGOTIATE IN GOOD FAITH WITH ITS CREDITORS.

#### A. Standard of Review

The City may be a debtor under Chapter 9 of the Bankruptcy Code if, and only if, it:

      (1)    is a municipality;

10

(2)    is specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State Law to authorize such entity to be a debtor under such chapter;

(3)    is insolvent;

(4)    desires to effect a plan to adjust such debts; and

(5)    (A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

       (B) has negotiated in good faith with creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

       (C) is unable to negotiate with creditors because such negotiation is impracticable; or

       (D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c)(1-5). The burden rests with the debtor to establish by a preponderance of the evidence that the requirements of Bankruptcy Code section 109(c) have been met. *In re City of Stockton*, 475 B.R. 720, 725 (Bankr. E.D. Cal. 2012 (internal citations omitted) ("The burden of proof, at least as to the five § 109(c) elements, is on the municipality as the proponent of voluntary relief. . . . The quantum of proof . . . is the familiar preponderance-of-evidence standard of

basic civil litigation."); *In re City of Harrisburg,* 465 B.R. 744, 752 (Bankr. M.D. Pa. 2011) (citations omitted) ("The burden of establishing eligibility is on the debtor.").

Further, Section 921(c) of the Bankruptcy Code provides that "[a]fter any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of [the Bankruptcy Code]." 11 U.S.C. § 921(c). Courts have ruled that after an objection to the petition, the bankruptcy court must dismiss the case if the petition does not meet the requirements of the Bankruptcy Code, notwithstanding the seemingly permissive language of section 921(c). *See, e.g., In re New York City Off-Track Betting Corporation*, 427 B.R. 256, 264 (Bankr. S.D.N.Y. 2010) ("Courts must dismiss the petitions of debtors filing under chapter 9 who fail to satisfy [the] requirements [of section 109(c)]."), citing *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo)*, 408 B.R. 280, 289 (9th Cir. B.A.P. 2009); *In re Suffolk Regional Off-Track Betting Corp.,* 462 B.R. 397, 421 (Bankr. E.D.N.Y. 2011) (citation omitted) ("Despite the permissive statutory language, courts have construed § 921(c) to require the mandatory dismissal of a petition filed by a debtor who fails to meet the eligibility requirements under §109(c).").

## B. The City Did Not Negotiate with the Retirement Systems

### 1. Meetings attended by representatives of the Retirement Systems were informational only.

In the weeks prior to the Petition Date, the Retirement Systems, its counsel and advisors, attended the informational presentations on June 14, June 20, June 25, July 10, and July 11, 2013. At the evidentiary hearing, Bradley A. Robins and Eric Mendelsohn, both of Greenhill & Co., LLC, the Retirement Systems' restructuring advisor with respect to the City's finances, will testify that these sessions were primarily presentational and informational, with multiple parties in attendance, and that no negotiations occurred during those sessions.

Although the City suggests that the informational presentations made to various creditors regarding its Restructuring Proposal satisfied its obligation to negotiate under section 109(c)(5)(B), in reality, no negotiations ever took place between the City and the Retirement Systems regarding the City's financial restructuring. With respect to the June 14, 2013 presentation, the Emergency Manager admits that negotiations did not occur. *See* Ex. B, Orr Dep, at 129:14-18 ("Q: There were no actual negotiations at that [June 14, 2013] meeting; were they? A: I don't think that—you know, be careful of the word negotiations, but no, not as it's generally understood.").

The extent to which a debtor must, prior to bankruptcy, engage in good-faith negotiations with creditors is subject to judicial review based on the facts of each

13

case. *Compare In re Ellicott Sch. Bldg. Auth.*, 150 B.R. 261, 266 (Bankr. D. Colo. 1992) (debtor did not negotiate in good faith where it indicated that the economic terms of its proposed plan were nonnegotiable), *with In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 84-86 (Bankr. D. Colo. 1990) (debtor's meetings with institutional bondholders to develop a financial model and to reach a conceptual agreement held to be sufficient). *See also In re Cottonwood Water & Sanitation Dist.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992) (requiring an evidentiary hearing on the scope of prepetition negotiations).

From the outset, it was made clear that the terms of the Restructuring Proposal were not negotiable. The Emergency Manager admitted: "The public can comment [on the City's proposed restructuring plan], but. . . it is my plan and it's within my discretion and obligation to do it. This is isn't a plebiscite, *we are not, like, negotiating the terms of the plan.*"[5]

It is evident from the City's actions that it had no intention of truly negotiating with its creditors. Indeed, the evidence will show that at least as early as July 1, 2013, the City had determined that its chapter 9 petition would be filed on July 19, 2013. Therefore, chapter 9 was already an inevitability by the time the City met with creditors on July 10 and 11, 2013.

---

[5] Orr Interview to Detroit WWJ Newsradio 950/AP, Detroit EM Releases Financial Plan; City Exceeding Budget By $100M Annually, May 12, 2103, available at http://detroit.cbslocal.com/2103/05/12/kevin-orr-releases-finanical-plan-for-city-of-detroit/.

14

The Retirement Systems submit that one of the primary purposes of requiring good faith negotiations with creditors prior to filing a petition under chapter 9 is to ensure that the entity seeking chapter 9 protection has sufficiently considered its alternatives to bankruptcy before filing. *See In re New York City Off-Track Betting Corp.*, 2010 Bankr. LEXIS 791, at *64-65 (Bankr. S.D.N.Y. Mar. 22, 2010) (suggesting that alternatives to bankruptcy must be considered to file a chapter 9 petition in good faith under section 921(c)). Here, the City arrived at the decision to file a petition under chapter 9 before its discussions with creditors had hardly begun, which indicates that the City engaged in these discussions merely as a "check the box" exercise as a means of establishing the record for eligibility under section 109(c)(5)(B) of the Bankruptcy Code, rather than to earnestly attempt to avoid bankruptcy by negotiating a consensual deal with creditors.

Indeed, with respect to negotiating with creditors, it is clear that the City's ultimate intent was not to strike a deal with creditors which could have avoided the necessity of a chapter 9 petition, but rather to negotiate *inside* the bankruptcy proceeding so that it would have the leverage provided to it by the provisions of the Bankruptcy Code. Filing a petition for such purposes is not within the spirit of chapter 9 and should not be considered "good faith" sufficient to satisfy sections 109(c)(5)(B) or 921(c). As explained by the court in *In re Cottonwood Water*:

In general, the Bankruptcy Code, as remedial legislation, should be broadly construed in order to provide the intended relief. However, municipal bankruptcies involve significant problems which are not encountered in the private sector. Important constitutional issues arise when a municipality enters the bankruptcy arena. Recognizing these problems, Congress consciously sought "to limit accessibility to the bankruptcy court" by municipalities. H.R. Conference Report, 94-938, p. 10. One way to do so was to require the municipal entity, before rushing to this Court, to first seek to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan to be filed under section 941 of the Code. The conditioned entry to this Court which is afforded by section 109(c) recognizes that *the negotiating posture of the parties changes once the bankruptcy petition is filed. . . . The "creditor protection" provided by section 109(c)(5), as interpreted by this Court, insures that the creditors have an opportunity to negotiate concerning a plan on a level playing field with the debtor <u>before</u> their rights are further impaired by the provisions of section 362 of the Code."*

*In re Cottonwood Water & Sanitation Dist.*, 138 B.R. 973, 979 (Bankr. D. Colo. 1992) (emphasis added). In this case, the City made no real effort to negotiate prior to filing its petition. Instead, the Emergency Manager followed the model set forth in the Jones Day pitch presentation to the City. That pitch presentation encouraged negotiations in the shadow of chapter 9 because it "Creates Leverage in Creditor Negotiations." *See Ex. C, Jones Day Presentation to the City of Detroit*, p. 17.

The Bankruptcy Code requires that good faith negotiations occur *before* filing. In *In re Ellicott School Building Authority*, 150 B.R. at 266, court held that good faith negotiations had not taken place when the debtor held three public

16

meetings with its creditors regarding its restructuring plan but informed the creditors at those meetings that the substantive terms of the plan were non-negotiable. *In re Ellicott School Building Authority*, 150 B.R. at 266. The court found it "difficult to imagine that any true negotiations [could] take place in an environment where the substantive terms of a proposal were not open to discussion." *Id.* Similarly, the City held several informational meetings regarding its Restructuring Proposal, but the evidence will show that the City's representatives made several statements to creditors that the discussions involving the Restructuring Proposal were not negotiations. Ultimately, the evidence will show that the City determined that it would file its petition before two of the meetings even took place. Both the Restructuring Proposal and the restructuring plan presented to creditors in the *Ellicott* case were presented with a "take it or leave it" approach, and, like in *Ellicott*, this Court should reject the notion that the City negotiated in good faith with its creditors.

## II. Negotiations With Its Creditors Were Not Impracticable Per Section 109(c)(5)(C) of the Bankruptcy Code.

Absent good faith negotiations with its creditors, the City must demonstrate that negotiations were impracticable under section 109(c)(5)(C) to be eligible to be a debtor under chapter 9, which it cannot do. *See In re Pierce County Housing Authority*, 414 B.R. 702, 713 (Bankr. W.D. Wash. 2009). While the City suggests that its large number of creditors rendered negotiations "impracticable" under

17

section 109(c)(5)(B), the fact that the City may have certain creditors with whom they were not able to negotiate does not remove the City from the obligation under the statute to negotiate with those creditors who are able to organize themselves and negotiate with the City. *See In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990).

Moreover, the number of a municipality's creditors alone does not, and should not, automatically render negotiations with creditors impracticable. If that were the case, every municipality with more than a handful of creditors would be able to prove the impracticability of negotiations without any evidence other than the number of creditors identified on the list of creditors. Here, multiple unions and retiree associations exist which could have and were willing to engage in negotiations with the City on behalf of their members. That the City failed and refused to negotiate with any of them, as alleged in declarations filed by other objecting parties, does not evidence impracticability of negotiations.

## III. The City Did Not File The Petition In Good Faith And It Must Be Dismissed Under Section 921(c) of the Bankruptcy Code.

Under section 921(c), the court may dismiss the petition if the debtor did not file it in good faith. 11 U.S.C. § 921(c). "Good faith is not defined in the Code." *In re McCurtain Mun. Auth.*, 2007 Bankr. LEXIS 4160, *10 (Bankr. E.D. Okla. Dec. 4, 2007). The "primary function of the good faith requirement has always been to ensure the integrity of the reorganization process by limiting access to its

18

protection to those situations for which it was intended." *In re Sullivan County Regional Refuse Disposal Dist.*, 165 B.R. 60, 80 (Bankr. D.N.H. 1994). Courts have found the bad faith standard applied in Chapter 11 cases equally applicable to Chapter 9 cases. *In re McCurtain*, 2007 Bankr. LEXIS 4160, *10 (Bankr. E.D. Okla. Dec. 4, 2007); *In re Villages at Castle Rock Metropolitan Dist. No.* 4, 145 B.R. 76, 81 (Bankr. D. Colo. 1990) (citations omitted) (internal citation omitted). As one court explained:

> In the Chapter 11 context, "good faith" has been described as a requirement which prevents abuse of the bankruptcy process by debtors whose overriding motive is to delay creditors without benefitting them in any way or to achieve reprehensible purposes. Determining whether a petition has been filed in good faith requires an evaluation of a debtor's financial condition, motives, and the local financial realities. These comments would appear to be equally applicable, at least in part, to a Chapter 9 petition.

*In re Villages at Castle Rock Metropolitan Dist. No.* 4, 145 B.R. 76, 81 (Bankr. D. Colo. 1990) (citations omitted). Other relevant considerations regarding good faith under Chapter 9 include "whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing are consistent with chapter 9, the extent of the City's pre-petition efforts to address the issues, the extent that alternatives to chapter 9 were considered, and whether the City's residents would be prejudiced by denying chapter 9 relief." *In re City of Stockton*, 493 B.R. 772, 794 (2013). The evidence needs to demonstrate that the "purpose of

the filing of the chapter 9 petition not simply be to evidence needs to buy time or evade creditors." *In re City of Vallejo*, 408, B.R. 280, 295 (2009).

A.  **The Petition Was Not Filed In Good Faith Because It Was Filed With The Intention of Impairing Accrued Financial Benefits In Violation Of The Pensions Clause.**

As discussed above, and as admitted by the City, the City intends to seek to diminish or impair the accrued pension benefits of the participants in the Retirement Systems though this Chapter 9 Case. *See* City's Responses to Requests for Admissions, at Response No. 12. Because the City seeks to impair vested pension benefits in violation of the Pensions Clause, and to evade paying its pension obligations, the filing is in bad faith under 921(c).

B.  **Material Financial Information Required For Good Faith Negotiations Was Not Complete Pre-petition.**

Prior to the Petition Date, the City did not have the requisite financial information necessary to reasonably assess whether a Chapter 9 was necessary to restructure its debts. As of the Petition Date, the City did not have a complete understanding of the value of its assets, the income that could be generated from the monetization of its assets, its projected cash flows, or the scope of its liabilities. Notwithstanding these financial uncertainties, and the resulting inability to assess out-of-court restructuring options, the City filed the petition in the hopes of gaining leverage in negotiations with its creditors. As such, the petition was not filed in

good faith.

In fact, the information needed for such discussions is still not complete. Charles M. Moore, a senior managing director at Conway MacKenzie, Inc., the City's operational restructuring advisor, testified:

> Q.     Has there been a specification of those levels of cuts [in accrued vested pension amounts] that must occur?
>
> Mr. Miller:  Object to form.
>
> Q.     I mean, have you put a dollar amount on it?
>
> A.     No, and our analysis of this continues.  Right now we still don't know what assets could be available to put towards the pensions.  We still have not had the type of dialogue that we would like to have related to the calculation of the underfunded amount, so because of those two uncertainties among others, we don't know what cuts, if any, there may need to be.
>
> Q.     Well, doesn't it say there must be significant cuts? Am I - - are you saying that there's some - - that the City's position may be that there are no cuts that are necessary in accrued vested pension amounts?
>
> Mr. Miller:  Object to form.
>
> A.     We don't know.  That's where we want to continue to engage in discussions and negotiations with the parties, but depending on what the unfunded amount is and what assets may be available for those claims, it certainly is possible.

Ex. D, Moore Dep 9/18/2013, p. 151: 4-24.  In addition, as of the petition date, and

still to date, the City does not know the value derivable from two of its primary assets: the Water and Sewerage Department (and its potential disposition into a Water Authority) and the City-owned art work at the Detroit Institute of Arts. Because the City does not yet know what assets are available to satisfy liabilities and does not know the scope of its liabilities, the Chapter 9 filing was premature and not in good faith.

## Conclusion

For the reasons set forth herein and in the Eligibility Objection, the petition should be dismissed.

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Jennifer K. Green (P69019)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

Dated: October 17, 2013    *Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*