## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| *In re:* | ) Chapter 9 |
| | ) Case No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | ) |
| *Debtor.* | ) Hon. Steven W. Rhodes |
| | ) |

## THE DETROIT RETIREMENT SYSTEMS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD ON THE GROUNDS OF PRIVILEGE

Pursuant to rules 26, 34 and 37 of the Federal Rules of Civil Procedure made applicable to this proceeding through rules 7026, 7034, and 7037 of the Federal Rules of Bankruptcy Procedure, the Police and Fire Retirement System of the City of Detroit ("PFRS") and the General Retirement System of the City of Detroit ("GRS") (collectively, the "Retirement Systems") move this Court for an order compelling the City of Detroit, Michigan (the "City") to produce documents to which it asserts privilege, without factual or legal bases for making such a claim. After a series of communications with the City's counsel, on October 17, 2013, the Retirement Systems sought from the City's counsel concurrence in the relief requested in this motion pursuant to E.D. Mich. LBR 9014-1(g). The requested concurrence was denied.

9760999.4 14893/165083

## Introduction

Prior to being retained by the City as its restructuring counsel, documents produced in this case demonstrate that Jones Day undertook a concerted effort to position itself to be chosen as the City's official restructuring legal counsel. The privilege log produced by the City reveals that this undertaking included, among other things: (i) numerous communications with state officials and other potential restructuring consultant candidates, (ii) reviewing and commenting on Public Act 4 ("PA 4") and the March 2012 Consent Agreement between the City and the State, and (iii) preparation of memoranda relating to chapter 9 issues, including the treatment of pension obligations and good faith negotiations. A "business development" matter code was opened so that Jones Day could track its efforts. This all took place well before Jones Day was formally retained as legal counsel. The pitch materials eventually prepared for the City acknowledged that Jones Day had spent 1,000 hours making itself familiar with relevant statutes and the financial condition of Detroit in order to demonstrate a working knowledge of the issues involved —so that *if* chosen as restructuring counsel, they would be prepared to begin work right away. These "Pre-Retention Documents," which amount to nothing more than information compiled for the purpose of currying favor with a *potential* client, are now being withheld as "privileged."

2

Initially, the City and State argued these materials were protected by the attorney-client privilege, but that privilege was unavailing because there was admittedly no attorney-client relationship formed. Accordingly, having thought better of the privilege assertion, the City then produced the documents voluntarily. But after producing the documents in response to a written request by two of the objecting parties and expressly stating that the City would "***no longer claim <u>any</u> privilege with respect to these documents***," the City recently changed course and is now asking that the documents be clawed back on the ostensible basis of the attorney-client privilege, work product doctrine, and/or common interest privilege.

It is now just days before trial, and the City has persisted in withholding from the Retirement Systems (and the public, for that matter) a number of relevant materials which were shared with third parties and, in many cases, created long before the City ever engaged Jones Day as counsel and before Kevyn Orr was appointed Emergency Manager. And with respect to other documents that were already produced, the City is now seeking to claw them back after it deliberately produced them and after expressly waiving its privilege claims (in writing, no less, and after specifically considering for several days whether to produce the documents in the first place). As set forth in more detail below, the eligibility-related materials that the City now attempts to shield from view were not created as a result of any attorney-client relationship (in fact, it is unclear *who* Jones Day is

3

even claiming it was representing during that time period—the City or the State), nor were they created as work product prepared in anticipation of litigation.

Moreover, even *if* the documents were somehow privileged, that putative privilege was waived by the intentional and deliberate dissemination of those documents to third parties at the time the documents were created (*i.e.,* by circulating them to state officials, financial advisors, and other restructuring consultants) and/or by producing them to the Retirement Systems and other creditors of the City in this case.

These Pre-Retention Documents (defined below) evidence the City's and the State's stance with respect to many of the issues for trial. Accordingly, the Retirement Systems hereby request a determination that: (i) documents created prior to the time that Jones Day was formally retained as counsel for the City are not privileged and must immediately be produced in their entirety (including all attachments); and (ii) the City's recent re-assertion of any privilege is ineffective due to its express waiver.

<u>Factual and Procedural Background</u>

**A.    Relevant Factual History**

**1.    The History of Jones Day's Legal Relationship with the City**

In 2012, the State of Michigan retained the financial advisory firm of Miller Buckfire for a 60-day period (from July 1, 2012 to August 31, 2012) to perform an

analysis of the City's financial condition. (Ex. 6-A, 9/20/2013 Buckfire Dep. at 14-17; Ex. 6-B, 8/29/2013 Buckfire Dep at 11-12). After Miller Buckfire received this engagement in 2012, it got "calls from a lot of law firms who wanted to know if there was a way for us to introduce them to the situation if the City decided it needed a different set of capabilities that it could find locally." (Ex., 6-A 9/20/2013 Buckfire Dep at 165-166). Corrine Ball of Jones Day "was very interested in finding out if there might be a role for Jones Day. . . She wanted me to meet one of her partners who is the lead bankruptcy partner for Orange County, which was a successful Chapter 9." *Id.* at 166-167. At the time, Miller Buckfire was reporting to State Treasurer Andrew Dillon ("Dillon"). Both before and after Miller Buckfire performed its 60-day review for the State, Jones Day, Miller Buckfire, and another restructuring consultant (Huron Consulting Group) were all weighing in on the City's financial crisis and providing State officials with their thoughts on PA 4 and the Consent Agreement between the City and the State. (Ex. 6-C, Dillon Dep at 111-114; Ex. 6-D, 3/2/2012 and 3/3/2012 Emails to Dillon). The hours spent by the Jones Day attorneys in attempting to secure this potential new business was allocated under a "business development" time code internally. (Ex. 6-E, 1/24/2013 Email, "Until Detroit selects counsel next week, I don't believe there is a "billable" CAM. I would just use a business development CAM."). In all, Jones Day devoted substantial time to its business development endeavor and

5

admits that this work was done for just that purpose—with the goal of winning the contract as the City's restructuring counsel: "Over the past 18 months, Jones Day has devoted over 1,000 hours of studying these statutes, evaluating related regulations and court rulings in Michigan, and developing an understanding of the City's financial and operational circumstances to be prepared if Jones Day is fortunate enough to assist the City in its restructuring."  (Ex. 6-F, Jones Day Pitch Written Materials, pg. 98)

In January of 2013, Miller Buckfire was re-engaged—this time by the City—to continue its evaluation of the City's financial condition. (Ex. 6-A, 9/20/2013 Buckfire Dep at 14-16).  Treasurer Dillon asked Ken Buckfire of Miller Buckfire to make arrangements for City and State officials to meet and interview Jones Day as well as seven other law firms who were interested in serving as restructuring counsel for the City. (Ex. 6-A, 9/20/2013 Buckfire Dep at 25-26).

On January 29, 2013, City and State officials (and some of their advisors, including Buckfire) interviewed Jones Day and seven other law firms at the Detroit Metropolitan Airport. (Ex. 6-A, Buckfire Dep at 29-31, 195-199; Ex. 6-C, Dillon Dep at 54-55).  Based in part on a 24-point law firm ranking system which was created by Buckfire and which favored Jones Day by one point, the City ultimately solicited a Request for Proposal from Jones Day to serve as restructuring counsel on February 27, 2013. (Ex. 6-A, Buckfire Dep at 32-33).  Jones Day submitted its

6

RFP in March of 2013 and the City formalized its engagement with Jones Day on April 23, 2013. (Ex. 6-G, EM Order No. 4, Approval of the Contract for Professional Legal Services Between the City of Detroit and Jones Day).

Prior to this selection, the City had been represented by its "long-time counsel at Miller Canfield." (Ex. 6-A, 9/20/2013 Buckfire Dep at 155). The City's Emergency Manager and former Jones Day partner, Kevyn Orr ("Orr"), confirmed that as of January 31, 2013, Jones Day did not have "an official role with Detroit or with the State of Michigan" and that Jones Day was merely "a candidate to be the attorneys for the City." (Ex. 6-H, Orr 9/16/2013 Dep at 27.)

State officials similarly denied that Jones Day was representing the State during this time frame. Governor Snyder testified that he was not aware of Jones Day providing any services to or being retained by the State from June 2012 through October 9, 2013, and that it was his understanding that Jones Day relationship was only with the City. (Ex. 6-I, Snyder Dep. Tr. at 40 ("[T]he City of Detroit was making a determination to retain Jones Day, and they were making that through their own decision making processes."). Similarly, Richard Baird testified that he was "not aware" of Jones Day providing "any services paid or unpaid or legal advice to the State" and Treasurer Dillon testified that Jones Day was not "a vendor to the Treasury Department." (Ex. 6-J, Baird Dep at 15; Ex. 6-C, Dillon Dep at 113).

9760999.4 14893/165083

Thus, the record is clear that before April 2013, Jones Day did not represent or form an attorney-client relationship with either the City or the State.

**B.  Relevant Procedural History**

On August 19, 2013, the Retirement Systems, in addition to several other parties, filed an Objection to the City's Eligibility to be a Debtor under Chapter 9 of the Bankruptcy Code [Dkt. No. 519] (the "Eligibility Objection") arguing, generally, that the City cannot satisfy the requirements of sections 109(c)(2), 109(c)(5), and 921(c) of title 11 of the United States Code, 11 U.S.C. § 101, *et seq.* (the "Bankruptcy Code") and that this case must be dismissed.  An evidentiary hearing relating to the eligibility determination is scheduled to begin on October 23, 2013.

On August 23, 2013, the Retirement Systems served the City with their First Sets of Interrogatories [Dkt. No. 612], Requests for Production of Documents [Dkt. No. 613], and Requests for Admissions [Dkt. No. 611] (collectively, the "Discovery Requests") which sought information and documents relevant to their Eligibility Objection.

On Friday, September 13, 2013, the City served its Objections and Responses to the Retirement Systems' Discovery Requests [Dkt. Nos. 849-850, 852] (the "City's Responses").  The City's Responses were also accompanied by a privilege log listing 10,910 documents and communications as purportedly being

8

protected by either the attorney-client privilege, work-product doctrine, or the common interest privilege.[1]  Hundreds of these purportedly privileged documents and communications, however, consisted of Jones Day communications, memorandums, and marketing materials that were created well before Jones Day was engaged by the City in April 2013 (the "Pre-Retention Documents").   In many cases, the documents Jones Day seeks to claim as "privileged" were never shared with anyone on behalf of *the City*—its present client—at all.   Instead, they were sent to certain State officials (such as the State Treasurer) and various financial advisors and restructuring consultants (such as Miller Buckfire and Huron Consulting Group).  (*Id.*)

Three days after the production of the City Privilege Log and production of documents (on September 16), Orr's second deposition took place.   During that deposition, Orr asserted the "common interest" privilege for the first time.   The City stated the "common interest" applied to "what Mr. Orr's been doing since he became emergency manager where there was a common interest between the State and the Emergency Manager's office."  (Ex. 6-H, 9/16/13 Orr Dep at 227).

---

[1]     On September 30, 2013, the City served the Retirement Systems with a Supplemental Privilege Log which included a list of 8,347 purportedly privileged documents. The various privilege logs are over 1,000 pages in length and have not been attached in full due to their voluminous nature, but an excerpt from the Privilege Log is attached to Dkt. No. 1234, Exhibit A.

9

On September 18, 2013, the American Federation of State, County and Municipal Employees ("ASCME") filed a motion to compel [Dkt. No. 920] Orr's testimony and argued that the common interest privilege did not apply. In response to AFSCME's Motion, the City produced a copy of the written common interest agreement, which conveniently, was entered into the day before the City was due to produce its documents and just four days before Orr was to be deposed in this matter. (*See* Dkt. No. 940, Ex. B thereto, the "Common Interest Agreement"). Under this common interest theory, the City and State sought to prevent disclosure of hundreds (if not thousands) of documents.

At the expedited hearing on AFSCME's Motion on September 19, 2013, the Retirement Systems appeared and raised concerns regarding the overly broad assertion of the privilege, because hundreds of documents the City claimed fell under the "common interest" umbrella pre-dated the Emergency Manager's appointment by several years. (See Ex. 6-K, 9/19/13 Hrg. Tr. at 75-78). The Retirement Systems concurred with AFSCME's Motion and represented to the Court that it would separately attempt to resolve its privilege dispute with the City.

As it said it would at the hearing, the Retirement Systems contacted the City's counsel by telephone on October 3, 2013 and attempted to resolve the issue. The City informed the Retirement Systems that another objecting party, the International Union, United Automobile Workers (the "UAW"), had sent it a letter

10

the day before requesting the same documents that the Retirement Systems were seeking. (See Ex. 6-L, 10/2/2013 UAW Letter).[2]

The following morning, October 4, 2013, Kevyn Orr was deposed a third time. At that deposition he testified again that the relationship with Jones Day was not formalized until *after* he became Emergency Manager. (Ex. 6-M, Orr 10/4/2013 Dep at 483-484). He also admitted that at the time leading up to the Jones Day pitch given in the winter of 2013, Jones Day was merely "soliciting becoming legal counsel." (*Id.*) Finally, he admitted that with regard to the current matter, "I don't know of Jones Day representing the State of Michigan other than. . . through my [Emergency Manager] office" and when asked if he had any evidence that there was an attorney-client relationship between Jones Day and the State of Michigan, he admitted: "I'm not aware of any." (*Id.* at 486, 488).[3]

The following day, on October 5, 2013, the Retirement Systems wrote to the City (i) citing Orr's testimony from the day before, (ii) joining in the UAW's October 2, 2013 request for documents, and (iii) separately requesting production of specifically identified documents the City withheld on the basis of the work-

---

[2] In the UAW letter, it sought production of specifically identified documents (i) the City withheld on the basis of the attorney-client privilege but which pre-dated the City's retention of Jones Day; (ii) the City withheld on the basis of the common interest privilege but which failed to identify any attorney; and (iii) the City claimed to be privileged but failed to identify the source or recipient.

[3] This is consistent with other testimony in this case as established above.

11

product doctrine or attorney-client privilege that pre-dated the City's retention of Jones Day. (Ex. 6-N, 10/05/13 Email to Shumaker). The Retirement Systems attached excerpts from the City's Privilege Log and specifically identified numerous documents that pre-dated any legal relationship between Jones Day and the City. (*Id.*)

The City responded to the Retirement Systems' and the UAW's concerns on October 7, 2013. The City said it was "investigating" certain privileged documents but with respect to other documents requested, it acquiesced, stating: "We are preparing the following Exhibit D documents for production, ***and no longer claim any privilege with respect to these documents***." (Ex. 6-O, Oct. 7, 2013 Letter from G. Irwin, pg. 1). The next evening, the City produced those documents. (Ex. 6-P, 10/08/13 Email from Irwin to Green). The production encompassed hundreds of pages of documents and the late timing prevented the Retirement Systems and the UAW from being able to review the documents in time for the Governor's deposition slated to begin the next morning. Several emails that the City produced on the evening of October 7, however, were later used at the deposition of Andrew Dillon, and notably, ***the City made no claim of privilege at that time***. (Ex. 6-C Dillon Dep at 111-114; Ex. 6-D, 3/2/2012 and 3/3/2012 Emails to Dillon, marked as Ex. 6 and Ex. 7 during Dillon Dep). Thus, not only did the City expressly

*disclaim* any privilege on October 7, it also failed to *raise* any privilege objection to these Jones Day communications at Dillon's deposition.

By October 12, 2013, however, the City had still not produced certain attachments affiliated with many of the emails the City had produced. Accordingly, the Retirement Systems sent an email to the City requesting production of the attachments. (Ex. 6-Q, 10/12/13 Email from Green to Shumaker). In response, the City refused to produce the attachments, and in addition, it backtracked and announced that it was now *re*-asserting privilege with respect to certain documents that it had already produced:

> The example you provided is a case in point (DTMI002333348-3349).[4]  This document has eight attachments.  Based on your request that we produce those attachments, we have gone back and reviewed the status of the attachments.  The attachments to this email, and the email itself, are all privileged.  To the extent any of this email and any of its attachments have previously been inadvertently produced, we request that you return or destroy them pursuant to the reservation of rights regarding the inadvertent production of any documents protected by the work product doctrine, common interest doctrine, the attorney-client privilege or any other applicable privilege.

(Ex. 6-R 10/15/13 Email between Irwin and Green).  Thus, the City is once raising the full panoply of potential privileges.

---

[4]     The document mentioned in the City's response is an email authored by a Jones Day attorney in June of 2012—almost an entire year before Jones Day was hired by the City.

13

This last-minute change by the City has made preparation of the exhibit and witness lists (as well as general preparation for next week's evidentiary hearing) extremely difficult. The Retirement Systems were first prejudiced by the City's improper assertion of privilege because it did not have many documents it needed during depositions in this case (namely, Orr's, Buckfire's, and the State officials); then they were prejudiced by the City's production of the documents after business hours the night before the Governor's deposition; then they were prejudiced when the production was missing the attachments; and now they are prejudiced again by the City's eleventh hour flip-flop and reassertion of the privilege on the eve of trial. As of the filing of this Motion, it is still somewhat unclear exactly how many documents the City has withheld and which ones it wishes to claw back. Regardless, now that several documents have already been disclosed and used during depositions, the City cannot request a claw back in the face of an obvious waiver.

## Argument

**A.**      **The Attorney-Client Privilege Does Not Protect From Disclosure the Pre-Retention Documents Of Jones Day**

"The burden of establishing an attorney-client privilege rests with the person asserting it." *Amway Corp. v. P&G, Co.,* 2001 U.S. Dist. LEXIS 4561, at *13 (W.D. Mich. Apr. 3, 2001*) (citing United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999)). "Such a showing must be made by deposition, affidavit, or in any

14

other manner in which facts are established in pretrial proceedings." *Id.* "The risk of nonpersuasion arising from a failure to establish facts supporting a claim of privilege falls upon the party asserting it." *Id.* (citation omitted).

The attorney-client privilege is "'narrowly construed because it reduces the amount of information discoverable during the course of a lawsuit.'" *Ross v. City of Memphis*, 423 F.3d 596, 600 (6th Cir. 2005) (quoting *United States v. Collis*, 128 F.3d 313, 320 (6th Cir. 1997)); see also *United States v. Goldfarb*, 328 F.2d 280, 282 (6th Cir. 1964) ("[T]he attorney-client privilege is an exception carved from the rule requiring full disclosure, and as an exception should not be extended to accomplish more than its purpose."); *Welch Foods v. Packer*, 1995 U.S. Dist. LEXIS 16158, at *6 (W.D. Mich. July 14, 1995) (unpublished) (citation and quotation omitted) ("[T]he attorney-client privilege is strictly construed to protect only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege.").

The Sixth Circuit has recognized the need to for the narrow application of the privilege to prevent abuse, particularly where (as here) government actors are attempting to shield the free flow of information to the public:

> [I]t is appropriate to recognize a privilege only to the very limited extent that . . . excluding relevant evidence has a public good transcending the normally predominant principal of utilizing all rational means for ascertaining truth. Guided by this principle, courts and commentators have cautioned against broadly applying the privilege to

15

> governmental entities. The recognition of a
> governmental attorney-client privilege imposes the same
> costs as are imposed in the application of the corporate
> privilege, but with an added disadvantage. The
> governmental privilege stands squarely in conflict with
> the strong public interest in open and honest government.

*Reed v. Baxter,* 134 F.3d 351, 356-57 (6th Cir. 1998) (citations omitted).

The mere fact that an attorney was involved in a communication therefore does not automatically render the communication subject to the attorney-client privilege. In the Sixth Circuit, the elements necessary to prove the privilege are:

> (1) Where legal advice of any kind is sought (2) from a
> professional legal adviser in his capacity as such, (3) the
> communications relating to that purpose, (4) made in
> confidence (5) by the client, (6) are at his instance
> permanently protected (7) from disclosure by himself or
> by the legal adviser, (8) unless the protection is waived.

*Reed,* 134 F.3d at 355-56 (citation omitted). In addition, "to assert attorney-client privilege, an individual must have a 'subjective belief' that is 'reasonable under the circumstances' that an attorney-client relationship existed." *United States v. Okun*, 281 Fed. Appx. 228, 230 (4th Cir. 2008) (citation omitted).

In the present matter, the City cannot establish that the Pre-Retention Documents are protected by the attorney-client privilege. First, the Pre-Retention Documents of Jones Day *in no way stemmed from the City's seeking of legal advice*. These documents were instead created by Jones Day attorneys for the benefit of Jones Day attorneys in their quest to be awarded a lucrative contract.

16

*Bruce v. County of Rensselaer*, 2003 U.S. Dist. LEXIS 1889, at *9-10 (N.D.N.Y Feb. 11, 2003) (unpublished) ("The attorney-client privilege protects from disclosure communications between clients and attorneys actually providing representation, not whose representation is *anticipated*.") (emphasis added).

The City had neither met with nor solicited legal advice from Jones Day, either directly or indirectly, prior to the January 29, 2013 presentations. Accordingly, the City has not met and cannot meet its burden of establishing that *any* of the Pre-Retention Documents were derived from the City's request for legal advice. *See, e.g., Poluch v. Am. Fan Co.,* 119 F.R.D. 621, 622 (D. Mass. 1988) ("[N]o attorney/client relationship existed between plaintiff's counsel and the workers' compensation carrier at the time of the investigation. Thus, there is no attorney/client privilege."); *Bank Hapoalim, B.M. v. Am Home Assurance Co*., 1993 U.S. Dist. LEXIS 1300, at *16 (S.D.N.Y. Feb. 8, 1993) (unpublished) (holding that documents "prepared *prior* to a showing of the establishment of an attorney-client relationship . . . are not protected by the attorney-client privilege.") (emphasis added).[5]

---

[5] *See also Nemecek v. Bd. of Governors*, 2000 U.S. Dist. LEXIS 22340, 17 (E.D.N.C. Sept. 27, 2000) (unpublished) ("However, in 1996, Plaintiff had not yet retained counsel. Therefore, Plaintiff cannot invoke the attorney-client privilege as to his prior conversations with O'Dell based on the fact that she now works with his attorney.").

Second, the putative client must have a 'subjective belief' that is 'reasonable under the circumstances that an attorney-client relationship existed." *Okun*, 281 Fed. Appx. at 230. Here, at the time the Pre-Retention Documents were created, the City did not and could not have had a subjective belief that an attorney-client relationship existed with Jones Day. From all accounts, the City did not even *meet* with Jones Day until the January 29, 2013 presentation and the engagement was not consummated until April of 2013.

Third, the Pre-Retention Documents of Jones Day—most of which were created between 2004 and 2012—in no way reflect any confidential communications made by the City (*i.e.*, the client). *See Amway Corp.*, 2001 U.S. Dist. LEXIS 4561, at *14 ("[T]ransmittal letters from counsel are not privileged where they contain no facts tending to reveal the client's confidences."). In fact, none of the documents at issue even relate to communications *with City officials*— rather, the allegedly privileged documents are all between Jones Day and various State officials, financial advisors, and restructuring consultants. Such third-party communications are not privileged. Accordingly, the City has not met its burden of establishing that the Pre-Retention Documents of Jones Day are privileged.

**B. The Pre-Retention Documents Of Jones Day Do Not Constitute Protected Work Product**

The work-product doctrine protects an attorney's trial preparation materials from discovery to preserve the integrity of the adversarial process. *See Hickman v.*

18

*Taylor,* 329 U.S. 495, 510-14; 67 S. Ct. 385 (1947).  Rule 26(b)(3) protects only

documents prepared in *anticipation of litigation* or for trial.  Fed. R. Civ. P.

26(b)(3).  Two factors are considered when determining whether a document has

been prepared in anticipation of litigation:

> 1)      whether the document was prepared "because of" a
>         party's subjective anticipation of litigation, as
>         contrasted with ordinary business purpose; and
>
> 2)      whether that subjective anticipation was
>         objectively reasonable.

*United States v. Roxworthy*, 457 F.3d 590, 594 (6th Cir. 2006).[6]  "Because

documents are not protected if they were created for nonlitigation purposes,

regardless of content, '[d]etermining the driving force behind the preparation of

each requested document is therefore required in resolving a work product

immunity question.'"  *Id.* at 595, *citing Nat'l Union Fire Ins. Co. v. Murray Sheet

Metal Co.*, 967 F.2d 980, 984 (4th Cir. 1992).  Thus, the court "must examine not

only the documents themselves, but the circumstances surrounding the documents'

creation."  *Id.*

       In this case, the City cannot establish that the Pre-Retention Documents are

protected work product because those documents were <u>not</u> prepared as a result of

any anticipated litigation by the City.  Rather, the documents at issue were created

---

[6]      The burden is on the party claiming work product protection.  *Roxworthy*,
457 F.3d at 593.

long before any engagement between Jones Day and the City and appear to be based solely on Jones Day's business development efforts. (Ex. 6-A, 9/20/13 Buckfire Dep at 165-167). Thus, the challenged documents were created by Jones Day and *for* Jones Day in the ordinary course of soliciting restructuring business. (Ex. 6-E, 1/24/13 Email, "Until Detroit selects counsel next week, I don't believe there is a "billable" CAM. I would just use a business development CAM.").

Similarly, in *Village of Rosemont v. Priceline.com Inc*., 2010 U.S. Dist. LEXIS 124559, at *10-11 (N.D. Ill. Nov. 22, 2010), the district court held a law firm marketing pamphlet sent by counsel to a future client was not protected by the attorney-client privilege. *See also EEOC v. CRST Van Expedited, Inc.*, 2009 U.S. Dist. LEXIS 3621, 2009 WL 136025, at *4 (N.D. Iowa 2009) ("[T]he Court concludes that contacts by the EEOC in an effort to solicit an attorney-client relationship are not protected by the attorney-client privilege.")

Moreover, Pre-Retention Documents can hardly be prepared in the anticipation of the chapter 9 filing when the City has roundly *denied* that a chapter 9 was reasonably foreseeable until just prior to its actual filing—not for years beforehand. "[T]he mere fact that litigation does eventually ensue does not, by itself, cloak materials with work product immunity." *Nat'l Union*, 967 F.2d at 984; *Resident Advisory Bd. v. Rizzo*, 97 F.R.D. 749, 754 (E.D. Pa. 1983) ("The abstract possibility that an event might be the subject of future litigation will not support a

20

claim of privilege."); *In re Dow Corning Corp.*, 2010 U.S. Dist. LEXIS 110644, at *6 (E.D. Mich. June 15, 2010) (unpublished) ("As to the LMI Claimants' work-product privilege argument, the Court finds that the privilege does not apply to the December 1999 document since the LMI Claimants did not file the reimbursement claim until 2004.").

Accordingly, the City has not met its burden of establishing that the Pre-Retention Documents of Jones Day are protected work product.

### C. Even If The Pre-Retention Documents Of Jones Day Were Protected Attorney-Client Communications Or Work Product, The Privileges Were Waived

"Both the attorney-client privilege and work-product protection are waived by voluntary disclosure of private communications to third parties." *New Phoenix Sunrise Corp. v. Comm'r of Internal Revenue*, 408 F. App'x 908, 918 (6th Cir. 2010) (*citing United States v. Dakota*, 197 F.3d 821, 825 (6th Cir. 1999); *see also In re Columbia/HCA Corp.*, 293 F.3d 289, 306 (6th Cir. 2002) ("[T]here is no compelling reason for differentiating waiver of work product from waiver of attorney-client privilege."). "[W]here the moving defendants have waived the attorney-client privilege, they have also waived the protection of the work product doctrine." *360 Constr. Co. v. Atsalis Bros. Painting Co.*, 280 F.R.D. 347, 353 (E.D. Mich. 2012) (citation omitted).

9760999.4 14893/165083

Once a party has waived the attorney-client privilege with respect to some items, that waiver extends beyond those items to all other communications relating to the same subject matter. *Fort James Corp. v. Solo Cup Co.*, 412 F.3d 1340, 1349 (Fed. Cir. 2005) ("The widely applied standard for determining the scope of a waiver of attorney-client privilege is that the waiver applies to all other communications relating to the same subject matter."); *United States v. Jones*, 696 F.2d 1069, 1072 (4th Cir. 1982) ("Any voluntary disclosure by the client to a third party waives the privilege not only as to the specific communication disclosed, but often as to all other communications relating to the same subject matter."); *In re Rospatch Securities Litigation*, 1991 U.S. Dist. LEXIS 3270 at 44 (W.D. Mich. 1991) ("[A]ny voluntary disclosure by the client to a third party waive the privilege, not only to that document, but possibly to all communications relating to that subject matter.").

In the present matter, any purported claims of privilege to the Pre-Retention Documents have been waived no less than ***three times.*** First, many of these documents were knowingly and intentionally disclosed and disseminated to third parties such as the State of Michigan and its advisors such as Miller Buckfire.

Second, Jones Day expressly and knowingly retracted its privilege claims— in writing—with respect to over 300 of the challenged documents. It explicitly stated that the City "no longer claim any privilege with respect to these

9760999.4 14893/165083

document[.]" (Ex. 6-P 10/08/13 Correspondence from Irwin to Green).

Third, several of the Pre-Retention Documents produced by the City in response to the Retirement Systems written request have been used as exhibits at deposition in this matter without objection from the City. (Ex. 6-D, Dillon Dep, Ex. 6 and Ex. 7 thereto).

It is well established that when a privileged document is used at a deposition, and the privilege holder fails to object immediately, courts have found the privilege to be waived. *See, e.g., Nguyen v. Excel Corp.*, 197 F.3d 200, 206 (5th Cir. 1999) ("A client waives the attorney-client privilege, however, by failing to assert it when confidential information is sought in legal proceedings."); *Brandon v. D.R. Horton, Inc.*, 2008 U.S. Dist. LEXIS 40000, at *7 (S.D. Cal. May 16, 2008) (unpublished) ("Plaintiffs failure to assert the privilege at Plaintiff Brandon's deposition is clear proof that, even if there was a privilege, it was absolutely and irrevocably waived, regardless of whether disclosure was inadvertent."). Further, to the extent that the City permitted certain Pre-Retention Documents to be used at the Dillon deposition yet it now wants to claw back others that it perceives as more harmful to its case, this type of "selective disclosure" is also a waiver. *See Jones*, 696 F.2d at 1072 (noting "[s]elective disclosure of a communication may also waive the privilege as to all related portions of the communication, particularly if selective disclosure is used to gain a tactical

9760999.4 14893/165083

litigation advantage.")

Accordingly, to the extent that Court finds the Pre-Retention Documents to somehow have been subject to the attorney-client privilege or work product protection, those privileges have long since been waived.

## Conclusion

For the foregoing reasons, the Retirement Systems respectfully request that the Court enter an Order in the form attached as **Exhibit 1**: (a) granting this Motion; (b) declaring that the Pre-Retention Documents of Jones Day are neither subject to the attorney-client privilege or work product protection or, alternatively, that those privileges were waived; (c) compelling the City to immediately produce all of the Pre-Retention Documents; and (d) granting to the Retirement Systems such further relief this Court finds equitable and just.

9760999.4 14893/165083

Respectfully submitted,

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Jennifer K. Green (P69019)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com
sdeeby@clarkhill.com
jgreen@clarkhill.com

Dated: October 20, 2013

*Counsel to the Police and Fire
Retirement System of the City of
Detroit and the General Retirement
System of the City of Detroit*

9760999.4 14893/165083