# EXHIBIT 6

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| *In re:* ) | Chapter 9 |
| ) | Case No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, ) | |
| *Debtor.* ) | Hon. Steven W. Rhodes |
| ) | |

## EXHIBIT LIST

| Exhibit | Description |
|---|---|
| 6-A | Excerpt from 9/20/13 Deposition of Kenneth Buckfire |
| 6-B | Excerpt from 8/29/13 Deposition of Kenneth Buckfire |
| 6-C | Excerpt from 10/10/13 Deposition of Treasurer Andrew Dillon |
| 6-D | 3/2/2012 and 3/3/2012 Emails to Treasurer Andrew Dillon, marked as Exhibit 6 and Exhibit 7 during Treasurer Dillon's deposition |
| 6-E | 1/24/13 Email |
| 6-F | Excerpt from Jones Day Pitch Written Materials |
| 6-G | EM Order No. 4, Approval of the Contract for Professional Legal Services Between the City of Detroit and Jones Day |
| 6-H | Excerpt from 9/16/13 Deposition of Kevyn D. Orr |
| 6-I | Excerpt from 10/9/13 Deposition of Governor Richard D. Snyder |
| 6-J | Excerpt from 10/10/13 Deposition of Richard Baird |
| 6-K | Excerpt from 9/19/13 Hearing Transcript |
| 6-L | 10/2/13 Correspondence from Thomas N. Ciantra to Bruce Bennett |
| 6-M | Excerpt from 10/4/13 Deposition of Kevyn D. Orr |

6-N           10/5/13 Email from Jennifer Green to Greg Shumaker

6-O           10/7/13 Correspondence from Geoffrey S. Irwin to Thomas N. Ciantra

6-P            10/8/13 Email from Geoffrey S. Irwin to Jennifer K. Green

6-Q           10/12/13 Email from Jennifer K. Green to Gregory M. Shumaker

6-R            10/15/13 Email from Geoffrey S. Irwin to Jennifer K. Green

# EXHIBIT 6-A

IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
Case No. 13-53846; Hon. Steven W. Rhodes
----------------------------------------X

In re:   Chapter 9

CITY OF DETROIT, MICHIGAN,

Debtor.

----------------------------------------X

DEPONENT: KENNETH A. BUCKFIRE

DATE: Friday, September 20, 2013

TIME: 8:30 a.m.



                    K. Buckfire

1

2    joined the record.

3         A    Since the founding of the firm in

4    2002.

5         Q    2002.  And what is your formal

6    position with Miller Buckfire?

7         A    Co-president.

8         Q    Who is the other co-president?

9         A    Norma Corio, C-O-R-I-O.

10        Q    Does Miss Corio have any roll in

11   connection with the City of Detroit engagement

12   of which you are employed?

13        A    Yes.

14        Q    What is her role?

15        A    She is overseeing the process by

16   which we are securing debtor and possession of

17   financing for the City.

18        Q    And what is your role in

19   connection with the City of Detroit bankruptcy?

20        A    I'm the senior banker at Miller

21   Buckfire responsible for advising the emergency

22   manager in the City of Detroit on all aspects

23   of financial strategy and restructuring

24   alternatives, including potential exchange

25   offers, debt for equity conversions, and other


ESQUIRE
SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

```
 1                    K. Buckfire
 2   potential transactions that might be required
 3   to effectuate a restructure.
 4         Q    And this current role began when,
 5   sir?
 6         A    January of 2013.
 7         Q    And I believe you indicated in
 8   your prior deposition that you had other roles
 9   in connection with the City of Detroit; is that
10   correct?
11              Let me rephrase the question if
12   you don't understand it.  Prior to your current
13   engagement, had you done work for either the
14   City or the State in connection with the City
15   of Detroit?
16         A    Yes, in 2012 we had a two-month
17   engagement with the State the Michigan to
18   evaluate the City's financial condition.
19         Q    Was that July 2012?
20         A    I believe it was July.
21         Q    Prior to that, any engagement if
22   connection with the City of Detroit?
23         A    No.
24         Q    And after that was there an
25   intermediate role prior to your current one?
```


ESQUIRE
SOLUTIONS

```
 1                    K. Buckfire
 2        A    No.
 3        Q    In January of 2013, was the scope
 4   of your engagement changed in any way?
 5        A    Yes, the scope of our engagement
 6   in January was to continue our role as
 7   evaluating the City's financial condition from
 8   a solvency perspective, and advise the City on
 9   what they might be able to do to create more
10   liquidity or deal with their liabilities.
11        Q    And did you reach any conclusions
12   in connection with the solvency or how the City
13   should deal with its liabilities?
14        A    Not until May.
15        Q    And did you reach any conclusions
16   in May regarding solvency?
17        A    Yes.
18        Q    What was that conclusion, sir?
19        A    That the City was insolvent.
20        Q    And did you report that conclusion
21   to anyone?
22        A    Yes, I did.
23        Q    And in what form did that report
24   take?
25        A    It was on oral report to the
```



800.211.DEPO (3376)
EsquireSolutions.com

```
 1                    K. Buckfire
 2    emergency manager.
 3         Q    And when did you give that oral
 4    report to the emergency manager?
 5         A    In early May.
 6         Q    Can you be more precise than early
 7    May?
 8         A    No.
 9         Q    Would it be before May 7, by any
10    chance?
11         A    It could have been, but I don't
12    recall exactly.
13         Q    You don't recall exactly, okay.
14              And did you give any advice to the
15    emergency manager on how he should deal with
16    his creditors in connection with your report on
17    solvency?
18         A    Yes, I advised him that the City's
19    financial condition was so dire that we had to
20    take immediate steps to preserve the City's
21    liquidity so that it would be in jeopardy of
22    losing essential public services, and we
23    identified the need to negotiate with the swap
24    counterparties, which I previously to in this
25    case, as an immediate and urgent priority of
```



1                    K. Buckfire

2    law firms that we believed would have the

3    qualifications to advise the City in all

4    potential outcomes related to a restructuring

5    of the City of Detroit.  So we gave them some

6    suggestions, we arranged for the City and the

7    financial advisory board and the State to

8    interview all the law firms that were being

9    considered for this role, and at the end of the

10   process we were requested to provide an

11   evaluation based on the criteria originally

12   suggested and the relative qualifications.

13        Q    Whose idea was it that you should

14   do the evaluation of the law firms?

15        A    I believe it was Mr. Dillon

16   actually, State Treasurer.

17        Q    And prior to that suggestion by

18   Mr. Dillon, had you met with Jones Day in

19   connection with possible City of Detroit

20   engagement?

21        A    I called all the law firms that

22   were being invited and gave them the

23   opportunity to ask us questions about the

24   situation so they could prepare their

25   presentations.



1                       K. Buckfire

2        Q    I'm asking specifically prior to

3   the suggestion by Mr. Dillon, had you met with

4   Jones Day in connection with possible retention

5   with the City of Detroit?

6        A    No.

7        Q    So all of those conversations you

8   just mentioned came after Mr. Dillon made the

9   suggestion that you undertake the review?

10       A    At the point in time which we were

11  asked to put together the presentation process

12  we called them all, including Jones Day.

13       Q    So that I am clear, prior to the

14  creation of that presentation, had you met with

15  Jones Day in connection with their possible

16  retention by the City of Detroit?

17       A    No.

18       Q    Sir, I'm going to ask the court

19  reporter to mark as Buckfire Exhibit No. 1 an

20  AmLaw daily report that is dated May 13, 2013.

21            (AmLaw Daily Report dated May 13,

22            2013 was marked as Buckfire Exhibit

23            No. 1 for identification, as of

24            this date.)

25       Q    I'm handing you, Mr. Buckfire,



```
 1                    K. Buckfire
 2         A    No.
 3         Q    Okay.  After the instruction by
 4   Mr. Dillon, did you speak with individuals
 5   associated with these four firms?
 6         A    Yes.
 7         Q    Okay.  Did you communicate with
 8   them in writing as well?
 9         A    Only to formally invite them to a
10   meeting at the airport.
11         Q    Okay.  And were you present at
12   that meeting at the airport?
13         A    The February 27 meeting, yes.
14         Q    Who else participated on behalf of
15   either the City or the emergency -- or the
16   State in connection with those meetings?
17         A    Well, let's see, from the city we
18   had Chris Andrews, Jack Martin.  I don't
19   believe the mayor came, I believe he was
20   invited to come.  From the State we had
21   Mr. Dillon, the state treasurer, senior deputy
22   treasurer for Tom Saxton, Bram Stibbets, senior
23   advisor to the treasurer.  The we had Sandy
24   Pierce, chairman of the financial advisory
25   board and Ken Whipple, vice chairman of the
```


ESQUIRE
SOLUTIONS

1                    K. Buckfire

2       financial advisory board.  There might have

3       been others but those are the ones I remember.

4              Q     Can you recall any elected City

5       officials were present?

6              A     The Mayor was invited was I

7       believe he decided to send Mr. Martin and

8       Andrews in his place.

9              Q     Following that meeting, whose idea

10      was it to broaden the search?

11             A     I don't understand the question.

12             Q     Let me ask the question, did you

13      invite more firms to participate in a review

14      process by the State on behalf of the City

15      following that meeting?

16             A     I don't understand, we had about

17      eight firms show up at that meeting.  There was

18      only one meeting.

19             Q     Did you review any other firms

20      other than the ones that participated in that

21      one meeting on February 27?

22             A     We contacted a few other firms we

23      thought might be qualified.  They ultimately

24      were not invited for different reasons.

25             Q     The first sentence in the second



```
 1              K. Buckfire
 2   paragraph said, "Mr. Bing's office broadened
 3   the search on February 27 by inviting more than
 4   a dozen firms, including with those with whom
 5   it had already met to submit official proposals
 6   by March 6."
 7              Do you see that sentence?
 8        A    Yes.
 9        Q    Do you know if that is a true
10   statement?
11        A    Well, this is a newspaper article.
12        Q    I'm asking you if you know, I'm
13   not asking you to say anything else?
14        A    We had a meeting at the airport on
15   January 27 as I recall, at which the people I
16   mentioned earlier interviewed all the firms
17   that came in to make presentations.  There were
18   about eight law firms in total who made those
19   presentations all in the same day.
20        Q    Are the eight firms that
21   participated in the meeting on February 27 the
22   only ones that were the subject of your review
23   process?
24        A    No.
25        Q    Were there other firms that were
```

1                    K. Buckfire

2    the subject of your review process after

3    February 27?

4         A    No.

5         Q    So it's your testimony that all

6    the other firms were subject to your review

7    prior February 27?

8         A    I don't understand what you're

9    asking me.  I've already testified, we had one

10   meeting to select a law firm.  We invited other

11   law firms to participate.  Some of them were

12   not ultimately invited to that in-person

13   meeting because they weren't judged to be

14   qualified to do so.

15        Q    Okay.

16        A    That was the beginning of it and

17   that was the end of my involvement of any

18   formal interview process of any law firms.

19        Q    Did you create a 24-point system

20   for review of the firms?

21        A    At the State's request, I did.

22        Q    Okay.  And did you reach a

23   conclusion based on that 24-point review as to

24   who would be an appropriate selection by the

25   state?

1                    K. Buckfire

2        A    We told the State that any of the

3    firms that they'd interviewed were qualified to

4    do to so.  They asked us to score them all and

5    put them on a comparison sheet, which we did.

6    They asked for quantitative analysis, which we

7    did, and then they made their decision at a

8    meeting we were not present at.

9        Q    Is it accurate that there was a

10    one point difference between Jones Day and the

11    next one on your quantitative report?

12        A    I believe so.

13        Q    Had you ever worked with Jones Day

14    before engaging with the City of Detroit?

15        A    We worked with all the law firms

16    the City interviewed including Jones Day.

17        Q    Can you identify from your memory

18    a recent engagement on which you and Jones Day

19    were on the same side?

20        A    I have to consult with counsel,

21    I'm not sure the engagement is public.

22        Q    Please.

23        MR. MONTGOMERY:  We can give you

24        the time frame, counsel, if that will

25        help.



1                    K. Buckfire

2   inform their views as to what the City should

3   be doing to sort out its problems.

4        Q    And other than Miller Buckfire,

5   were there any other professionals retained, or

6   was that exclusively your role at that point in

7   time?

8        A    E&Y had been retained by the City

9   before us and, I believe, was providing

10  financial information to the state about the

11  City's condition, as well as to us, so we

12  were relying, to some extent, on the numbers.

13       Q    Was Conway on the scene yet?

14       A    No.

15       Q    And what about counsel?

16       A    Obviously, Detroit has its

17  long-time counsel at Miller Canfield and

18  others.  We didn't talk to them during this

19  period.

20       Q    Did that engagement run until,

21  say, Labor Day of 2012, September 2012?

22       A    No, it was a 60-day engagement.  I

23  recollect we finished sometime in the summer.

24       Q    And after -- so let's say end of

25  August, early September.  During September,



```
 1                  K. Buckfire
 2   and we made this point to Jack and to Chris
 3   several times -- that maintaining liquidity was
 4   the paramount objective the City should have
 5   over the short term.  As long as the City had
 6   cash to operate, they would have the ability to
 7   negotiate with the parties and not have to seek
 8   bankruptcy protection.
 9        Q    Did you, in November of 2012, have
10   conversations with anyone at Jones Day about
11   Chapter 9 for Detroit?
12        A    No.
13        Q    If you look at B13 again,
14   Mr. Herman says, This could open up an avenue
15   for Jones Day.  Do one of your senior folks
16   want to send to C or H?
17             Do you see that?
18        A    I do.
19        Q    Do you know what he's talking
20   about there in terms of an avenue for Jones
21   Day?
22        A    We had had some conversations with
23   Jones Day over the past few months because it
24   was well known we'd been hired to do a
25   financial review of the City; that was public
```



1                    K. Buckfire

2    information.  We had gotten calls from a lot of

3    law firms who wanted to know if there was a way

4    for us to introduce them to the situation if

5    the City decided it needed a different set of

6    capabilities that it could find locally.  And

7    he's probably referring to a conversation he

8    must have had with someone at Jones Day about

9    the state of the claim.

10         Q    And would you agree that C

11   probably stands for Corinne and H for Heather

12   in that sentence?

13         A    I assume so.

14         Q    Did you personally have any

15   conversations with any of the Jones Day

16   attorneys in November 2012 or around that time

17   about Detroit Chapter 9 restructuring?

18         A    Yes.  I spoke with Corinne Ball a

19   few times starting in the summer about what was

20   going on in Detroit.  She was very interested

21   in finding out if there might be a role for

22   Jones Day, particularly in an out of court

23   restructuring context, which is something that

24   Jones Day is particularly strong at.  She

25   wanted me to meet one of her partners who is

1                    K. Buckfire

2    the lead bankruptcy partner for Orange County,

3    which was a successful Chapter 9.

4         Q    Who was that person?

5         A    Bruce Bennett.  I didn't know him,

6    but she wanted me to meet him.  I heard of him,

7    I didn't know him.  I never got around to doing

8    that.

9                    So it was one of the many

10   conversations that we had among other firms

11   that called inquiring about this.

12        Q    Do you specifically recall

13   conversations with Corinne Ball about out of

14   court restructuring versus Chapter 9?

15        A    Only to the extent that an out of

16   court restructuring is always the preferable

17   outcome.

18        Q    Do you recall having a specific

19   conversation like that with her in November of

20   2012?

21        A    No, but I was speaking with

22   Corinne probably every day on another matter,

23   so I can't really recall.

24        Q    So when you were engaged in

25   January by the City, who did you work with at



1                          K. Buckfire

2    did you first become aware that Mr. Orr was

3    being considered as the emergency manager?

4            A     We had the initial interviews late

5    January of the firms that the City wanted to

6    consider.  I believe it was a few weeks later

7    the City picked Jones Day.  It was after that I

8    got a call from Richard Baird who was helping

9    the governor select the emergency manager

10   asking for my views whether or not Mr. Orr

11   would be the right candidate for the job.

12           Q     So Jones Day was selected as

13   restructuring counsel before Mr. Orr was

14   appointed as the emergency manager, is that

15   your understanding?

16           A     Yes.  And the City selected Jones

17   Day, not the State.

18           Q     So when you heard that Mr. Orr was

19   being considered by the State, did you or was

20   your opinion solicited with respect to the

21   selection of Mr. Orr?

22           A     Yes.

23           Q     Who asked you for your opinion on

24   that?

25           A     Mr. Baird.



1                    K. Buckfire

2        Q     Anyone else from the State?

3        A     Not that I recall.

4        Q     And had you known Mr. Orr before

5   this whole Detroit thing?

6        A     No.

7        Q     Did you -- what was your opinion?

8        A     Well, I had met him for the first

9   time at the presentations by Jones Day to the

10  financial advisory board and others and he was

11  part of the Jones Day team and he spoke about

12  the relative experience involving Chrysler and

13  other matters, and that was my only interaction

14  with him at that point.

15       Q     When that presentation was made by

16  Jones Day, that was part of a presentation

17  between them and other counsel seeking the job

18  as counsel to the City, correct?

19       A     I believe the City interviewed

20  eight firms.

21       Q     And Jones Day it was one day?

22       A     One long day.

23       Q     At the airport?

24       A     At the airport.

25       Q     And as bunch of firms interviews



1            K. Buckfire

2    and Mr. Orr attended with the Jones Day team?

3        A    He was part have the team, yes.

4        Q    Who was on the other side of the

5    table, it was you and other people from the

6    City?

7        A    I testified before it was Chris

8    Andrews, chief restructuring officer of the

9    City Detroit, Jack Martin, chief financial

10   office.  We did invite the mayor and he didn't

11   come.  From the State we had Treasurer Dillon,

12   senior deputy treasurer Tom Saxton, Stibitz,

13   S-T-I-B-I-T-Z, senior advisor to the treasurer,

14   and then from the financial advisory board we

15   had Sandra Pierce and Ken Whipple, and I was

16   president along with Mr. Doak really to

17   facilitate the meeting.

18       Q    At the meeting was bankruptcy

19   discussed?  Did you want to know if these

20   various law firms had the right bankruptcy

21   experience and Chapter 9 experience?

22       A    That's why this were all invited

23   because they met the minimum requirements, out

24   of court experience, Chapter 9, labor

25   experience, bond holder negotiations, and for



1                    K. Buckfire

2    lack of a better word, M and A experience, and

3    that's the basis for which they were invited.

4         Q    So, how long after that meeting

5    did Mr. Orr's name appear in the discussion

6    with regard to the emergency manager, was it

7    days, weeks?

8         A    As I remember the selection of

9    Jones Day was a week or two later.  The City

10   was in a hurry to select counsel.  I don't

11   recall being called about Mr. Orr until after

12   Jones Day had been picked.

13        Q    In your conversation with

14   Mr. Baird, do you recall discussing with him

15   the idea of putting the City of Detroit into

16   Chapter 9 bankruptcy?

17        A    Not with respect to Mr. Orr, no.

18        Q    With respect to anything?

19        A    It was one of the alternatives and

20   all the law firms discussed the merits of

21   Chapter 9 because we asked them to do so.

22        Q    In your conversations with

23   Mr. Baird after your engagement in 2013 by the

24   City, did you ever say words to the effect like

25   we got to figure out a way to get Detroit into



```
 1                      K. Buckfire
 2    bankruptcy?
 3         A     No.
 4                (Two-page Document was marked as
 5                Buckfire Exhibit No. 18 for
 6                identification, as of this date.)
 7         Q     We've marked as Buckfire 18 a
 8    two-page document that is called city
 9    government restructuring program, hot items.
10                Do you see it?
11         A     I do.
12         Q     Have you seen it before?
13         A     No.
14         Q     Let me ask you to look at Item
15    1.6, it says possible contracts for actuaries
16    and counsel to manage pension issues.
17                Do you see that?
18         A     I do.
19         Q     On the right-hand side it says
20    governance issues behind financial issues.
21                Do you see that?
22         A     I do.
23         Q     Was the priority with respect to
24    the pension to deal with the financial issues
25    first and then the governance issue?
```



# EXHIBIT 6-B

1                    UNITED STATES BANKRUPTCY COURT

2                FOR THE EASTERN DISTRICT OF MICHIGAN

3                        SOUTHERN DIVISION

4

5      In Re:

6

7      CITY OF DETROIT, MICHIGAN    Chapter 9

8                                   Case No.13-53846

9                Debtor.           Hon. Steven Rhodes

10                                      /

11

12

13          The Video Deposition of KENNETH BUCKFIRE,

14          Taken at 1114 Washington Boulevard,

15          Detroit, Michigan,

16          Commencing at 9:31 a.m.,

17          Thursday, August 29, 2013,

18          Before  Nora Morrissy, RMR, CRR, CSR-2642.

19

20

21

22

23

24

25

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

1      City.  Prepared to testify to the general condition of

2      the City's financials leading up to the execution of

3      the forbearance agreement.

4  Q.  Are there any other topics that you intend to testify

5      at the hearing concerning the forbearance agreement?

6  A.  I'll testify at that point to the status of the DIP

7      form process that will provide the financing to

8      execute the City's option under the forbearance

9      agreement to retire the Swaps.

10  Q.  Are there any other topics that you have not mentioned

11      in your answers that you intend to testify about?

12  A.  I'm sure there will be other things but I can't recall

13      at this time what they might be.

14  Q.  Mr. Buckfire, what is your position with Miller

15      Buckfire?

16  A.  Co-founder and co-president of Miller

17      Buckfire & Company.

18  Q.  Miller Buckfire currently is employed as the financial

19      advisor to the City of Detroit, correct?

20  A.  As the investment banker to the City, that's correct.

21  Q.  And when was Miller Buckfire first engaged by the City

22      as investment banker?

23  A.  We were first engaged in July of 2012 for a 60-day

24      review of the City's financial condition.  We were

25      re-engaged on January 8th of this year to continue to

1        advise the City on its financial condition and

2        financial alternatives.  Both were -- were hired

3        pursuant to an RFP process to which we submitted a

4        proposal.

5  Q.    When you were hired in July 2012, can you describe the

6        scope of services that Miller Buckfire was engaged to

7        provide?

8  A.    As I mentioned earlier, we were engaged to do a

9        general financial review of the City's financial

10       condition particularly with respect to its ability to

11       service its debt obligations.

12  Q.   Were there specific tasks that you were asked to

13       perform in connection with doing a general financial

14       review of the debt obligations?

15  A.   No, we were engaged to do a general financial review

16       and advise the mayor and the chief financial officer

17       as to what those financial conditions implied for the

18       City's ability to operate in the ordinary course.

19  Q.   That engagement began in July 2012 is what you

20       testified to, is that correct?

21  A.   Correct, and ended on August 31st.

22  Q.   Very good.  I would point out that I would ask you to

23       wait until I ask the question, though.

24              Miller Buckfire was then re-engaged on

25       January 8th of 2013, is that correct?

# EXHIBIT 6-C

| | |
|---|---|
| 08:48:15 1 | UNITED STATES BANKRUPTCY COURT |
| 08:48:15 2 | FOR THE EASTERN DISTRICT OF MICHIGAN<br>SOUTHERN DIVISION - DETROIT |
| 08:48:15 3 | -------------------------------- |

```
08:48:15  1              UNITED STATES BANKRUPTCY COURT
08:48:15  2         FOR THE EASTERN DISTRICT OF MICHIGAN
                          SOUTHERN DIVISION - DETROIT
08:48:15  3   --------------------------------
08:48:15  3   In re:                          Chapter 9

08:48:15  4   CITY OF DETROIT, MICHIGAN,      Case No. 13-53846

08:48:15  5             Debtor,               Hon. Steven W. Rhodes
              --------------------------------
08:48:15  6   V I D E O T A P E D   D E P O S I T I O N   O F

08:48:15  7   WITNESS:        TREASURER ANDREW DILLON

08:48:15  8   LOCATION:       The Treasury Building
                              430 West Allegan
08:48:15  9                   Lansing, Michigan  48909

08:48:15 10   DATE:           Thursday, October 10, 2013
                              9:17 a.m.
08:48:15 11

08:48:15 12   APPEARANCES:
              FOR PLAINTIFFS FLOWERS:
08:48:15 13
                              LAW OFFICE OF WILLIAM A. WERTHEIMER
08:48:15 14                   30515 Timberbrook Lane
                              Bingham Farms, Michigan  48025
08:48:15 15                   248.644.9200
                              billwertheimer@gmail.com
08:48:15 16                   BY: WILLIAM A. WERTHEIMER  (P26275)

08:48:15 17   FOR INTERNATIONAL UNION, UAW:

08:48:15 18                   COHEN, WEISS and SIMON, LLP
                              330 West 42nd Street
08:48:15 19                   New York, New York  10036-6976
                              212.563.4100
08:48:15 20                   pdechiara@cwsny.com
                              BY: PETER D. DeCHIARA, ESQUIRE
08:48:15 21
              FOR THE RETIREES COMMITTEE:
08:48:15 22
                              DENTONS US LLP
08:48:15 23                   1221 Avenue of the Americas
                              New York, New York  10020-1089
08:48:15 24                   212.768.6881
                              arthur.ruegger@dentons.com
08:48:15 25                   BY: ARTHUR H. RUEGGER, ESQUIRE
```

| | | |
|---|---|---|
| 10:36:07 | 1 | served under both is my memory. |
| 10:36:09 | 2 | Q. Okay. Do you -- were you part of the search team |
| 10:36:35 | 3 | for the emergency manager? |
| 10:36:38 | 4 | A. I don't think we had an official search team, but |
| 10:36:41 | 5 | yes, I was involved. |
| 10:36:42 | 6 | Q. Who else was involved with you? |
| 10:36:44 | 7 | A. Primarily Rich Baird. |
| 10:36:48 | 8 | Q. And were you at the meeting on I think it was |
| 10:36:55 | 9 | January 28th, 2013, at the airport in Detroit where |
| 10:37:01 | 10 | the law firms were interviewed? |
| 10:37:03 | 11 | A. Yes. |
| 10:37:03 | 12 | Q. And Mr. Baird was there as well? |
| 10:37:09 | 13 | A. Yes. |
| 10:37:09 | 14 | Q. And I think Mr. Buckfire was there? |
| 10:37:11 | 15 | A. Most likely. |
| 10:37:12 | 16 | Q. Anyone else on the side of the City and the State |
| 10:37:15 | 17 | that you remember? |
| 10:37:16 | 18 | A. I believe Tom Saxton and Brom Stibitz from Treasury |
| 10:37:21 | 19 | were there. I believe Chris Andrews and Jack Martin |
| 10:37:24 | 20 | from the City were there. I believe we may have had |
| 10:37:27 | 21 | some members of the Financial Advisory Board there. |
| 10:37:33 | 22 | There may have been a few others I don't recall. |
| 10:37:35 | 23 | Q. Had you known or heard of Mr. Orr before that |
| 10:37:38 | 24 | meeting? |
| 10:37:39 | 25 | A. No. |

| | | |
|---|---|---|
| 10:37:39 | 1 | Q. Why was it that people from the State were at a |
| 10:37:43 | 2 | meeting to select counsel for the City of Detroit? |
| 10:37:47 | 3 | A. Well, the City, as you might recall at the time, was |
| 10:37:52 | 4 | under a consent agreement, and we were struggling |
| 10:37:56 | 5 | with that and we were bringing in some professionals |
| 10:38:01 | 6 | to help with the City. And December it involved an |
| 10:38:06 | 7 | investment bank and some restructuring firms; E and |
| 10:38:09 | 8 | Y and Conway MacKenzie, and then the last piece of |
| 10:38:14 | 9 | the puzzle was the law firm. |
| 10:38:17 | 10 | Q. And before that meeting, where did the search for an |
| 10:38:27 | 11 | emergency manager stand? How many candidates -- how |
| 10:38:31 | 12 | many serious candidates did you guys have at that |
| 10:38:34 | 13 | point? |
| 10:38:34 | 14 | A. Before the -- what meeting? |
| 10:38:37 | 15 | Q. Before the meeting at the airport with the law |
| 10:38:39 | 16 | firms. |
| 10:38:40 | 17 | A. At the Jones Day? |
| 10:38:41 | 18 | I don't recall specifically but there |
| 10:38:44 | 19 | wasn't a lot. You know, we -- at that point I would |
| 10:38:49 | 20 | say we thought we had very few candidates that, A, |
| 10:38:54 | 21 | could do it and, B, were willing to do it. |
| 10:38:57 | 22 | Q. And how did it develop that Mr. Orr was identified |
| 10:39:03 | 23 | as a candidate? Did it happen at that meeting or |
| 10:39:09 | 24 | after that meeting? |
| 10:39:10 | 25 | A. I believe it was after that meeting Rich called me, |

| | | |
|---|---|---|
| 12:01:20 | 1 | Q. If there's an email dated 3-2-2012 from Jones Day |
| 12:01:27 | 2 | that just said we spoke to someone in Andy's office, |
| 12:01:32 | 3 | do you recall those types of conversations back in |
| 12:01:34 | 4 | 2012? |
| 12:01:35 | 5 | A. Can you show me the -- |
| 12:01:39 | 6 | Q. Yeah. I only have one. We just got it a day ago so |
| 12:01:44 | 7 | I apologize, I don't have copies for everyone. We |
| 12:01:48 | 8 | copied some of them. |
| 12:01:49 | 9 | MR. SHERWOOD: Is it Bate stamped? |
| 12:01:52 | 10 | MS. GREEN: It is. |
| 12:01:53 | 11 | MR. WERTHEIMER: Can you identify it? |
| 12:01:55 | 12 | MS. GREEN: Yeah. |
| 12:02:32 | 13 | THE WITNESS: Yeah, the only person I |
| 12:02:33 | 14 | recall knowing prior to 2013 from Jones Day was |
| 12:02:37 | 15 | Corinne Ball. |
| 12:02:41 | 16 | BY MS. GREEN: |
| 12:02:41 | 17 | Q. What about Heather Lennox? |
| 12:02:44 | 18 | A. I don't think I met her prior to 2013. |
| 12:02:47 | 19 | Q. Yeah, can we mark that -- well, the problem is I |
| 12:02:54 | 20 | only have one copy and it has my handwriting on it |
| 12:02:57 | 21 | because we just got the document, but I can state |
| 12:03:00 | 22 | for the record the Bates number if that's |
| 12:03:02 | 23 | appropriate. We can have an agreement on that. |
| 12:03:15 | 24 | The Bates number is DTMI 00234878 to 880 is |
| 12:03:26 | 25 | the last page. |

12:03:31 1          MR. SHERWOOD:  DTMI 00234.

12:03:35 2          MS. GREEN:  878.

12:03:43 3          MR. WERTHEIMER:  Why don't we just mark it

12:03:45 4     and you can identify that it should not include any

12:03:49 5     of the underlining and handwriting.

12:03:53 6          MS. GREEN:  That's fine.

12:03:53 7          MS. NELSON:  Well, why don't we just have

12:03:55 8     her produce one that doesn't have handwriting on it

12:03:58 9     and mark it.

12:04:06 10          MR. WERTHEIMER:  That would be fine too.

12:04:06 11          MS. NELSON:  And mark it -- what's the next

12:04:15 12     one, six?

12:04:15 13

12:04:15 14     (Deposition Exhibit 6 marked post deposition.)

12:04:15 15

12:04:15 16          MS. GREEN:  I do have copies of the next

12:04:16 17     one, which we can mark as Exhibit 7.

12:04:16 18

12:04:16 19          (Deposition Exhibit 7 was marked.)

12:04:33 20

12:04:33 21  BY MS. GREEN:

12:04:33 22  Q.    Do you recognize this email?

12:04:41 23  A.    Yeah.  Okay.  I mean, I forgot about this but I

12:04:54 24     think when we were working on the consent agreement

12:04:57 25     we were seeking advice from Huron Consulting and

| 12:05:01 | 1 | | Miller Buckfire. They used various law firms on |
| 12:05:04 | 2 | | occasion. |
| 12:05:04 | 3 | | And in this case, I don't know that I ever |
| 12:05:08 | 4 | | actually met Heather other than maybe over the |
| 12:05:10 | 5 | | phone, but we were -- through Huron or through |
| 12:05:13 | 6 | | Miller Buckfire we were getting advice from various |
| 12:05:16 | 7 | | law firms, Jones Day being included. |
| 12:05:23 | 8 | | They weren't a vendor to the Treasury |
| 12:05:26 | 9 | | Department. |
| 12:05:28 | 10 | Q. | And did Jones Day also weigh in on the drafting in |
| 12:05:35 | 11 | | preparation of the consent agreement? |
| 12:05:38 | 12 | A. | From my reading of this, they did. |
| 12:05:40 | 13 | Q. | Do you recall receiving a blackline copy from Jones |
| 12:05:46 | 14 | | Day at any time relating to the consent agreement |
| 12:05:49 | 15 | | between the City and the State? |
| 12:05:50 | 16 | A. | I don't recall. We may have but we had counsel |
| 12:05:58 | 17 | | representing us, and this may have been just |
| 12:06:04 | 18 | | friendly free advice, but there's other people that |
| 12:06:09 | 19 | | can answer that question more precisely than I. |
| 12:06:12 | 20 | Q. | Do you recall getting any free advice, any memos |
| 12:06:19 | 21 | | given to you by Jones Day during this process? |
| 12:06:21 | 22 | A. | I'd have to look in my files to know. |
| 12:06:27 | 23 | Q. | Do you know if any of those memos have been produced |
| 12:06:30 | 24 | | by the State of Michigan in this case? |
| 12:06:32 | 25 | A. | I don't know. I'd have to look. |

| | | |
|---|---|---|
| 12:06:36 | 1 | Q. Would you recall if any of those memos were related |
| 12:06:42 | 2 | to Chapter 9 filing or the pension obligations of |
| 12:06:45 | 3 | the City of Detroit? |
| 12:06:47 | 4 | A. I don't recall any memos covering those topics. |
| 12:06:52 | 5 | Q. During the vetting process for the City of Detroit's |
| 12:07:05 | 6 | restructuring counsel, were you involved in the |
| 12:07:10 | 7 | interview on the 29th of the law firms? |
| 12:07:17 | 8 | A. Yes. |
| 12:07:17 | 9 | Q. I should have restated it. Were you involved in |
| 12:07:20 | 10 | putting together the list of questions that would be |
| 12:07:22 | 11 | asked of the law firms on the 29th? |
| 12:07:24 | 12 | A. I don't believe so. |
| 12:07:24 | 13 | Q. Do you recall the interview topics that were asked |
| 12:07:28 | 14 | of the law firms on the 29th? |
| 12:07:30 | 15 | A. I don't recall. I mean, we had a group I described |
| 12:07:37 | 16 | earlier in the deposition who was there. I think |
| 12:07:40 | 17 | everyone was -- felt free to ask the questions that |
| 12:07:42 | 18 | they had. |
| 12:07:42 | 19 | Q. Do you know who was responsible for putting together |
| 12:07:46 | 20 | the list of interview topics for the law firms at |
| 12:07:50 | 21 | the 29th meeting? |
| 12:07:51 | 22 | A. I don't think it was that structured. I think |
| 12:07:55 | 23 | Miller Buckfire played a significant role in who was |
| 12:07:57 | 24 | invited, and the City worked with them and may have |
| 12:08:01 | 25 | added some names to who was invited. |

# EXHIBIT 6-D

> We spoke to a person from Andy's office and a lawyer to get their thoughts on some of the issues. I thought MB was also going to try to follow up with Andy directly about the process for getting this to the Governor, but I am not sure if that happened.

> The premise of this agreement right now and as it is being revised is that the PCA will have fundamental control with the oversight and approval of the Board. I think that is consistent with MB's approach.

> Part of the approach is to fit the powers within PA4 while it is still in effect, which will allow us to argue that the agreements remain valid because they were implemented under a the statute when it was in effect. To that end, if there is a "recovery plan", that will supersede the budget and appropriations ordinance of the local government, and we have given that power to the Board. Controlling the budget gives the FCB broad authority.

> PA4 also allows an officer of the City to have all of the powers of an EM (other than to abrogate CBAs), so we have set this up for the FCB to appoint the PCA and for the City to give him/her an officer title. Then the PCA will have the EM powers, and we can argue that they are vested powers granted when PA4 was in effect.

> One of MB's comments was skepticism about the ability of the FCB to sue and be sued, so we took it out. It can be added back easily enough.

> If PA4 is repealed or suspended, there may be an argument that some or all of this does not work. We have added authority from a couple of other statutes to try to bolster the argument, but those statutes are bit vague and do not specifically authorize the control of the FCB etc.

> The cities derive their power from the Michigan Constitution and a Home Rule Act. To take away certain powers from the Cities, we would need at the very least legislation, but may also need to amend the Constitution.

> The cleanest way to do all of this probably is new legislation that establishes the board and its powers, AND includes an appropriation for a state institution. If an appropriation is attached to (included in) the statute to fund a state institution (which is broadly defined), then the statute is not subject to repeal by the referendum process.

Tom is revising the document and should have a new version shortly, with the idea of getting this to at least MB/Huron by lunchtime. Would it be helpful to have a call internally first?

*************************************

Jeffrey B. Ellman
Jones Day
1420 Peachtree Street, NE
Suite 800
Atlanta, Georgia 30309-3053
Phone: 404-581-8309
Fax: 404-581-8330

EXHIBIT NO. 6
DILLON
10-10-13



EXHIBIT NO. 7
DILLON
10-10-13

From: CN=Heather Lennox/O=JonesDay
Sent: 3/3/2012 4:00:44 PM
To: "Dillon, Andy (Treasury)" <DillonA2@michigan.gov>
CC: "Corinne Ball (cball@jonesday.com)" <cball@jonesday.com>;"hsawyer@huronconsultinggroup.com"
<hsawyer@huronconsultinggroup.com>;Jeffrey B Ellman <jbellman@JonesDay.com>;"Buckfire, Ken"
<ken.buckfire@millerbuckfire.com>;"Herman, Kyle"
<kyle.herman@millerbuckfire.com>;"lmarcero@huronconsultinggroup.com"
<lmarcero@huronconsultinggroup.com>;"Marken, Sanjay" <sanjay.marken@millerbuckfire.com>;"Stibitz, Brom
(Treasury)" <StibitzB@michigan.gov>;"Erickson, Stuart" <stuart.erickson@millerbuckfire.com>;CN=David J.
Kates/O=JonesDay;CN=Thomas A Wilson/O=JonesDay@JonesDay
Subject: Re: Detroit - email list for status updates

Andy:

   Attached for your review and consideration is a draft consent
agreement, which has been reviewed by Miller Buckfire and Huron. Please let us
know if you have any comments or if you'd like to convene a call to discuss
anything. Many provisions in here are designed to take advantage of PA4 while
it is still in existence, but this also references other state laws that would
buttress the FCB and PCA powers, and enhance the chances of this being
insulated from attack, in the event of a repeal.

       Best --

       Heather

Heather Lennox
Jones Day
222 East 41st Street
New York, New York 10017
Direct: 212-326-3837
Fax: 212-755-7306
email: hlennox@jonesday.com

==========
This e-mail (including any attachments) may contain information that is
private, confidential, or protected by attorney-client or other privilege. If
you received this e-mail in error, please delete it from your system without
copying it and notify sender by reply e-mail, so that our records can be
corrected.
==========

Attachment: CLI_1966878_9_Detroit - Consent Agreement Between City and State Financial Review
Team.DOCX

DTMI00234877

# EXHIBIT 6-E

From: CN=Jeffrey B Ellman/O=JonesDay
Sent: 1/24/2013 4:16:26 PM
To: CN=Corinne Ball/O=JonesDay@JonesDay;CN=Heather Lennox/O=JonesDay@JonesDay;CN=Bruce Bennett/O=JonesDay@JONESDAY
CC: CN=Thomas A Wilson/O=JonesDay@JonesDay
Subject: Fw: Coleman Young airport- history of airline service

See below. Some hurdles to using airport privatization to raise money based on the nature of the airport asset.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Jeffrey B. Ellman
Jones Day
1420 Peachtree Street, NE
Suite 800
Atlanta, Georgia  30309-3053
Phone:  404-581-8309
Fax:  404-581-8330
E-mail:  jbellman@jonesday.com
----- Forwarded by Jeffrey B Ellman/JonesDay on 01/24/2013 11:14 AM -----

From:      Rebecca B MacPherson/JonesDay
To:        Brian L. Sedlak/JonesDay
Cc:        Jeffrey B Ellman/JonesDay@JonesDay, Naveen C Rao/JonesDay@JonesDay
Date:      01/24/2013 11:11 AM
Subject:          Re: Coleman Young airport- history of airline service


All,

I think it is unlikely that the City of Detroit would be able to convince a scheduled air carrier to initiate operations at Coleman Young Airport. Accordingly, while it may be possible to privatize the airport under the FAA's pilot program, there is little incentive to do so since the airport would remain a general aviation airport.  In order to conduct scheduled service with aircraft capable of carrying more than 30 passengers, a carrier must operate at a part 139, Class I airport.  This is because the Class I airports must meet the highest airport safety standards.  At one time, Coleman Young would have had a Class I status since as recently as 2000 there was scheduled air carrier service there and Southwest was at the airport in the early 90s.  However, Coleman Young was decertified as a part 139 airport 5-6 years ago, likely a result of extended non-use by anyone other than general aviation.  Being completely de-certified is pretty drastic -- that indicates that there is very little market for this airport.  While the airport has relatively good runway markings, it will not have the more expensive safety equipment necessary to regain part 139 Class I status, and a significant amount of resources would have to be spent to make the needed improvements.  If Detroit's main airport was over-subscribed, it might be worthwhile to make the improvements.  However, I reviewed the FAA's FACT 2 study, which analyzes projected growth at the nation's top 35 airports.  That study does not project any congestion constraints at the Detroit airport through the period of the study (2025).  Accordingly, there is room for growth at the main airport.

I understand the overall potential project goes well beyond this issue.  However, should we be retained, we will need to advise the client on the value of the airport.

Rebecca

Rebecca B. MacPherson
Of Counsel
51 Louisiana Ave. NW, Washington, DC 20001-2113 • Direct: 202.879.4645 • Fax:
202.626.1700 •rmacpherson@jonesday.com

From:     Brian L. Sedlak/JonesDay
To:       Rebecca B MacPherson/JonesDay@JonesDay
Cc:       Naveen C Rao/JonesDay@JonesDay, Jeffrey B Ellman/JonesDay@JonesDay
Date:     01/24/2013 10:30 AM
Subject:          Re: Coleman Young airport- history of airline service

Rebecca,

Until Detroit selects counsel next week, I don't believe there is a "billable"
CAM.  I would just use a business development CAM.

Jeff - Would you mind confirming whether the above is correct?

Thank you.

Brian

Brian S. Sedlak • Partner77 W. Wacker Drive • Chicago, IL 60601
DIRECT 312.269.4334 • FAX 312.782.8585 • MOBILE 312.404.9426
brianlsedlak@JONESDAY.COM

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by
the IRS, we inform you that any U.S. federal tax advice contained in this
communication (including any attachments) is not intended or written to be
used, and cannot be used, for the purpose of (i) avoiding penalties under the
Internal Revenue Code or (ii) promoting, marketing or recommending to another
party any transaction or matter addressed herein.
P  Please consider the environment before printing this email.

From:     Rebecca B MacPherson/JonesDay
To:       Naveen C Rao/JonesDay@JonesDay
Cc:       Brian L. Sedlak/JonesDay@JonesDay
Date:     01/24/2013 09:11 AM
Subject:          Re: Coleman Young airport- history of airline service

Looks like it is no longer a part 139 airport, which is problematic to say the
least.  If someone could give me the CAM, I'll verify with the FAA's regional
office.

Rebecca

Rebecca B. MacPherson
Of Counsel
51 Louisiana Ave. NW, Washington, DC 20001-2113 • Direct: 202.879.4645 • Fax: 202.626.1700 •rmacpherson@jonesday.com

From:     Naveen C Rao/JonesDay
To:       Rebecca B MacPherson/JonesDay@JonesDay
Cc:       Brian L. Sedlak/JonesDay@JonesDay
Date:     01/24/2013 09:34 AM
Subject:          Re: Coleman Young airport- history of airline service

I agree.

I was checking out the runways during our call.

http://www.airnav.com/airport/KDET

The longest one is 5,000 feet (about the same as the secondary runway at DCA) which more or less limits the airport to narrowbody airplanes on short flights and regional jets.

I was thinking further about candidate airlines that might be interested in serving an airport like DET. The one that came to mind is Allegiant.

Naveen C. Rao
Jones Day - Washington, D.C.
Phone: 202-879-3708
E-mail: ncrao@jonesday.com

From:     Rebecca B MacPherson/JonesDay
To:       Naveen C Rao/JonesDay@JonesDay
Cc:       Brian L. Sedlak/JonesDay@JonesDay
Date:     01/24/2013 08:57 AM
Subject:          Re: Coleman Young airport- history of airline service

I wonder what the runways look like and if they've reclassified the airport as something less than Class I. I'll look into that.If it isn't a Class I, it's not likely to be particularly appealing.

Rebecca B. MacPherson
Of Counsel
51 Louisiana Ave. NW, Washington, DC 20001-2113 • Direct: 202.879.4645 • Fax: 202.626.1700 •rmacpherson@jonesday.com

From:    Naveen C Rao/JonesDay
To:      Brian L. Sedlak/JonesDay@JonesDay, Rebecca B MacPherson/JonesDay@JonesDay
Date:    01/23/2013 05:46 PM
Subject:        Coleman Young airport- history of airline service

Brian and Rebecca,

DET has not had an airline service in a very long time.  I recalled during the
call yesterday that Pro Air stopped flying more than a couple of years ago.

They actually stopped flying in September 2000.

http://www.nytimes.com/2000/09/20/business/company-news-pro-air-an-airline-servi
ng-detroit-suspends-flights.html

According to Wikipedia, Southwest was out by 1993.  Even if that is off by a
year or two, it has been while.

http://en.wikipedia.org/wiki/Coleman_A._Young_International_Airport

FYI


Naveen C. Rao
Jones Day - Washington, D.C.
Phone:  202-879-3708
E-mail: ncrao@jonesday.com

# EXHIBIT 6-F



Materials Prepared for:

## City of Detroit



March 5, 2013



The contents of this document are proprietary and should not be duplicated or shared without express permission from Jones Day.

This proposal includes data that shall not be disclosed outside the government and shall not be duplicated, used, or disclosed – in whole or in part – for any purpose other than to evaluate this proposal. If, however, a contract is awarded to this offeror as a result of – or in connection with – the submission of this data, the government shall have the right to duplicate, use, or disclose the data to the extent provided in the resulting contract. This restriction does not limit the government's right to use information contained in this data if it is obtained from another source without restriction. The data subject to this restriction are contained in Tab 10 hereto.

Certain sections of this proposal contain trade secret or confidential business or financial information exempt from disclosure under the Michigan Freedom of Information Act ("MI FOIA"), Mich. Comp. Laws § 15.231 et seq., and should be treated as confidential.

**Privasoft Inc.**
Jones Day successfully represented Privasoft as an intervenor to a General Accountability Office bid protest related to the provision of Freedom of Information Act software to the Department of Justice Office of Information Policy.

**Sportsman's Market Inc.**
*Sportsman's Market Inc. v. Federal Aviation Admin. (D.D.C.)*
Jones Day attorneys represented Sportsman's Market in connection with litigation arising under the Freedom of Information Act.

Further, before joining Jones Day, Columbus Partner Mike Gladman served as an Assistant Attorney General in the Ohio Attorney General's Office for approximately five years, and he gained significant experience advising numerous Ohio state agencies regarding Ohio's public records and open meeting laws. Since joining Jones Day, Mike has focused his practice on representing clients in litigation with the government and who are the targets of government investigations, and he has experience with public records and open meeting laws in that capacity as well.

In addition to the foregoing, Jones Day possesses a broad working knowledge of state and local laws applicable to the restructuring efforts of the City of Detroit, including, but not limited to: (a) Public Act 4 of 2011; (b) Public Act 72 of 1990; (c) Public Act 436 of 2012 (Local Financial Stability and Choice Act); (d) the Urban Cooperation Act (Public Act 7 of 1967); (e) the Budgeting and Accounting Act (Public Act 2 of 1968); and (f) the Emergency Municipal Loan Act (Act 243 of 1980). Over the past 18 months, Jones Day has devoted over 1,000 hours to studying these statutes, evaluating related regulations and court rulings in Michigan, and developing an understanding of the City's financial and operational circumstances to be prepared if Jones Day is fortunate enough to assist the City in its restructuring. Jones Day also understands that the City has skilled local lawyers and other professionals who are highly experienced in such matters. Jones Day is fully prepared to collaborate with the City and its professionals to achieve prompt, efficient, and practical solutions to the City's problems.

