UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,          .       Docket No. 13-53846
        MICHIGAN,                 .
                                  .       Detroit, Michigan
                                  .       October 16, 2013
                   Debtor.        .       10:00 a.m.
. . . . . . . . . . . . . . . .


HEARING RE. OBJECTIONS TO ELIGIBILITY TO CHAPTER 9 PETITION
        BEFORE THE HONORABLE STEVEN W. RHODES
            UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street
                       Fiftieth Floor
                       Los Angeles, CA  90071-2452
                       (213) 243-2382

For the State of       Michigan Department of Attorney General
Michigan:              By:  MARGARET A. NELSON
                       P.O. Box 30758
                       Lansing, MI  48909
                       (517) 373-1124

For Detroit            Clark Hill, PLC
Retirement Systems-    By:  ROBERT GORDON
General Retirement     151 South Old Woodward, Suite 200
System of Detroit,     Birmingham, MI  48009
Police and Fire        (248) 988-5882
Retirement System
of the City of
Detroit:

For the Inter-         Cohen, Weiss & Simon, LLP
national Union,        By:  BABETTE A. CECCOTTI
UAW:                   330 West 42nd Street, 25th Floor
                       New York, NY  10036-6976
                       (212) 356-0227

APPEARANCES (continued):

```
For the United      U.S. Department of Justice
States:             Civil Division
                    By:  MATTHEW J. TROY
                    P.O. Box 875
                    Ben Franklin Station
                    Washington, D.C.  20044
                    (202) 514-9038


Court Recorder:     Letrice Calloway
                    United States Bankruptcy Court
                    211 West Fort Street
                    21st Floor
                    Detroit, MI  48226-3211
                    (313) 234-0068


Transcribed By:     Lois Garrett
                    1290 West Barnes Road
                    Leslie, MI  49251
                    (517) 676-5092
```

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please
2    be seated.  Case Number 13-53846, City of Detroit, Michigan.
3          THE COURT:  Good morning, everybody.
4          ATTORNEYS:  Good morning, your Honor.
5          THE COURT:  Okay.  Who's up?
6          MS. NELSON:  Good morning, your Honor.  Assistant
7    Attorney General Margaret Nelson on behalf of the State of
8    Michigan in response to the objections that are currently
9    pending legal issues before the Court.  Before I begin, if I
10   may approach, I would like to present the Court with two
11   cases -- well, actually an order and a case decision that I
12   will be referring to later in my arguments --
13         THE COURT:  Okay.
14         MS. NELSON:  -- the state's rebuttal or response to
15   arguments that were raised yesterday.  The state's focus with
16   respect to the legal objections raised to the City of
17   Detroit's eligibility focused principally on the
18   constitutionality of Public Act 436 and the lawfulness of the
19   governor's authorization thereunder to the city and the
20   emergency manager to proceed in bankruptcy under Chapter 9.
21   The objectors essentially identified four principal bases for
22   contending that Public Act 436 is unconstitutional.  The
23   first is in the context of Section 18(1) when they allege
24   that it fails to protect public pensions from inclusion in
25   the bankruptcy proceedings initiated by the local government

1    as authorized by the state.  Second, they allege that Public

2    Act 436 violates the home rule provisions of Michigan's

3    Constitution under Article VII.  Third, they allege that 436

4    improperly delegates authority to the emergency manager and

5    thereby violates the separation of powers provisions within

6    Michigan's Constitution.  And, fourth, they argue that Public

7    Act 436 lacks adequate standards to guide the emergency

8    manager's actions in bankruptcy, thereby creating, I'm

9    assuming, a due process violation, although they aren't

10   specifically clear with respect to that.  Principally, the

11   arguments presented yesterday addressed Sections 18(1), and

12   that will essentially be the focus of my response this

13   morning, your Honor.

14        THE COURT:  Excuse me for just one second.  I meant

15   to say this at the beginning of our session here this

16   morning.  Ms. Levine, due to time constraints, you did not

17   address your home rule argument yesterday.  I hope you'll

18   give that a priority when you do get the microphone again.

19        MS. NELSON:  Thank you, your Honor.  In addressing

20   the constitutionality of this provision and, in fact, the

21   overall statute -- state statute itself, the Court must be

22   guided by specific principles of state law in addressing

23   constitutionality of statutes.  First -- the first principle

24   that the Court must be guided by is that statutes are

25   presumed to be constitutional, and courts have a duty to

1    construe a statute as constitutional unless its
2    unconstitutionality is clearly apparent on its face, and for
3    that proposition, your Honor, I cite you to a case relied on
4    by principally all of the objectors, and it's also cited by
5    the City of Detroit, <u>In re. Request for Advisory Opinion of</u>
6    <u>the Constitutionality of 2011 Public Act 238</u>, and that's
7    found at 490 Mich. 295.
8              THE COURT:  Of course, that's not exactly the
9    standard when the challenge is that the law was enacted in
10   some unconstitutional manner.
11             MS. NELSON:  Correct, your Honor, and that's the
12   next principle.
13             THE COURT:  Okay.
14             MS. NELSON:  So when you're construing the statute
15   itself in a facial challenge to the statute which is
16   presented here initially, the unconstitutionality must first
17   be apparent on its face.  And the reason the <u>In re. Request</u>
18   opinion is so significant is because it is a direct analysis
19   of the very constitutional provision that's at issue here,
20   and it directs the Court to the second principle of
21   construction that's applicable to this analysis, and that is
22   the principle of construction given to constitutional
23   provisions under Michigan law.  The objective in reviewing a
24   constitutional provision is to effectuate the intent of the
25   ratifiers who adopted the constitution, not the drafters but

1   the ratifiers.  And the lodestar principle, for purposes of

2   this review, is that of common understanding, so, in other

3   words, the Court must determine the common understanding of

4   the terms and give sense to the words used that would have

5   been most obvious to those who voted to adopt that particular

6   constitutional provision.  That, again, is emphasized in the

7   In re. Advisory Opinion with respect to 2011 Public Act 38 at

8   page 308.  And it's significant here, your Honor, for two

9   purposes, for the two reasons that are essential to the

10  analysis here.  The Michigan Supreme Court has already done

11  this principle analysis in the context of Article IX, Section

12  24, with respect to the impairment of pensions and squarely

13  addresses the issue that the objectors have been arguing to

14  this Court is created or is significant here.  In this

15  advisory opinion, the Michigan Supreme Court concluded that

16  Article IX, Section 24, does essentially four things.  It was

17  the obvious intent of the provision to ensure public pensions

18  be treated as contractual obligations that once earned could

19  not be diminished.  There's no question of that.  Second, the

20  provision is designed to say that when an employee benefit

21  comes due, a pension -- when the employee's pension benefit

22  comes due, he or she has a contractual right to receive it.

23  Third, the accrued financial benefit of a pension is the

24  pension income itself, and, fourth, diminishing or impairing

25  the accrued financial benefit means the actual reduction of

1   pension income.  In other words, the loss -- the actual loss

2   of pension income is the impairment.  That's significant to

3   the issue raised by the objectors in the context of the

4   facial challenge to 436 and as this Court has addressed

5   questions on yesterday.  Clearly 18(1) of 436 does not on its

6   face cause or commit an actual reduction of pension income,

7   and that is the definition, and that is the application of

8   impairment this Court must apply because that is the

9   determination of the Michigan Supreme Court's common

10  understanding of impairment or diminishment in the context of

11  Article IX, Section 24.

12          So what does that mean to this discussion?  Going

13  back to the statutory interpretation principles, the Court

14  must look at the language of the statute and determine if

15  it's ambiguous or not, the clear meaning, and construe it in

16  a way that gives meaning to the legislature's intent.  Here

17  the legislature clearly did not intend to impair public

18  pensions through the use of the bankruptcy process in terms

19  of its authorization.  So 18(1), by authorizing the

20  bankruptcy filing or authorizing the government to -- or the

21  governor to authorize the bankruptcy filing and ultimately

22  making that filing does not commit an impairment because it

23  does not cause an actual diminishment in pension benefits as

24  defined by the Michigan Supreme Court.  So on its face, 436

25  is constitutional and in accord with Article IX, Section 24.

1          Need there be any further discussion with respect to

2   that?  Actually not.  And there is additional case law, your

3   Honor, that's cited within that advisory opinion which

4   confirms that.  The Court relies very heavily on the Studier

5   versus Michigan Public School Retirement Board case from a

6   few years prior to that, and I have the cite for the Court if

7   it cares for that because essentially the same analysis was

8   done in that case.  Studier is found at 472 Mich. 642, and

9   the discussion of the interpretation of Article IX, Section

10  24, begins at page 6 -- let me make sure I have the right

11  page here -- 656, so it's consistent.  And, in fact, that

12  court, the Studier court, criticizes Musselman and the

13  analysis made in the Musselman decisions as to what the

14  intent of the drafters and the ratifiers was in the context

15  of adopting Article IX, Section 24.

16          So with respect to that first issue on which the

17  constitutionality of 436 hinges in terms of the arguments

18  raised by the objector, the Michigan Supreme Court has

19  addressed that.  This Court is obligated to apply the

20  definition of Article IX, Section 24, identified and applied

21  by the Michigan Supreme Court, and so in that context,

22  Section 18, Sub 1, does not impair -- actually impair and,

23  therefore, does not violate Article IX, Section 24, by

24  failing to carve out any protections for those pensions.

25          Similar analysis is required then of the

1    authorization provided by the governor.  As we've argued, as
2    the Court has noted, essentially in the context of the
3    ripeness arguments that have been made and the questions that
4    it has been asked, the authorization clearly applying that
5    application made by the Michigan Supreme Court does not cause
6    an actual impairment of pension benefits.  Doesn't matter
7    what the intent might be.  Doesn't matter if the governor
8    chose not to impose contingencies.  In order for the legal
9    process to operate in the context of the Bankruptcy Code, as
10   this Court noted, there is no actual impairment worked or
11   caused by the authorization; therefore, the authorization is
12   in total compliance with Article IX, Section 24, and allows
13   this matter to proceed through the appropriate legal
14   processes established under the Bankruptcy Code.
15           With respect to the home rules provisions analysis,
16   your Honor, Article VII, Section 22, of Michigan's
17   Constitution recognizes that there are obligations and
18   responsibilities imposed on local governments separate and
19   apart from the state; however, the constitutional provision
20   also recognizes that these duties, obligations,
21   responsibilities, and authorities of the local governments
22   are subject to the control and change by state law.  Very
23   clearly, this constitutional limitation on the powers and
24   authorities of municipalities has been recognized in
25   legislation, specifically the Home Rule Act, which we cite in

1   our brief, at MCL 171.1 et seq. and particularly at Section

2   MCL 117.36, which is -- which essentially codifies the

3   limitations of Article VII, Section 22.

4           What the objectors' argument fails to recognize is,

5   first, local governments are not sovereign.  Second, they are

6   creatures of the state.  Third, the federal government and

7   the federal courts have long recognized those limitations on

8   local governments, and, fourth, they are subject to control

9   by the state legislature in that the state may change the

10  laws, authorities, powers of local governments at any given

11  time.  And the federal courts have consistently recognized

12  that most recently in the Sailors decision that's cited in

13  our brief, which is exactly what has occurred here.  Because

14  the local governments derive their power and authority from

15  the state and are, in fact, creatures of the state, the state

16  has the power to change that authority and to change the

17  course, the shape, and the force and authority of their

18  governments.  This statute, Public Act 436, is just such a

19  law, and it has that purpose.

20          THE COURT:  Well, but to what extent are the home

21  rule powers of a city derived from the Michigan Constitution

22  as opposed to statute?

23          MS. NELSON:  The Michigan Constitution has limited

24  recognition of home rule authority, and in the language of

25  Article VII, Section 22, it recognizes that all resolutions

1 and ordinances of the local governments are subject to the
2 Constitution and laws of the state, so, in other words, case
3 law has recognized, as does the codification of these
4 limitations in the Constitution, that the legislature may
5 impact and affect any municipality's ordinances, any
6 municipality's laws, forms of government, funding, or any
7 other aspect of authority granted it directly from the state,
8 so to the extent that 436 has the purpose of addressing
9 emergency financial crises in local communities, that is
10 exactly the type and purpose of the law recognized under
11 Article VII, Section 22, an authority that is given to the
12 legislature over its local communities.

13 THE COURT: So is there any limitation in the
14 Michigan Constitution on the legislature's power and
15 authority to control the form of government for the City of
16 Detroit?

17 MS. NELSON: In the form of adopting their charter
18 provisions, yes. The city can in its charter, which is then
19 submitted to the voters for approval, identify its form of
20 government, how its officials will be elected, and allocate
21 the power and authority granted to those officials through
22 the Constitution and the laws of the State of Michigan, and
23 that's what has occurred. However, the legislature retains
24 authority through the Home Rule Act to even alter or amend
25 ordinances and charter provisions; in other words, the

1  legislature can pass a law that in its application and effect
2  would render a charter provision or a city ordinance
3  unconstitutional.  For example, with respect to taxation, the
4  state can cap the amount of tax -- or the level of taxation
5  that a community might be able to impose, mills or things
6  like that.  If a charter provision had been adopted that
7  established a higher level, it would be subordinate to the
8  state law, so in the same -- in that context, because the
9  legislature retains authority under Article II to promulgate
10 legislation and does not commit to any specific type or form
11 or purpose of legislation with respect to cities, that can
12 change.  It recognizes the legislature's continuing authority
13 to change the law and the effect that those changes in law
14 will have on the operations of its local communities vis-a-
15 vis its ordinances and its charters.  So the two, yes, work
16 in tandem.  The communities do have the authority to identify
17 their forms of government, how their officials will be
18 elected, and how that will be implemented, but at the same
19 time, the legislature, for example, controls the election
20 laws, identifies how elections will be handled, taxation.
21      THE COURT:  But the question the objection raises
22 here is doesn't the state's appointment and imposition of an
23 emergency manager on the City of Detroit change its form of
24 government by abrogating the powers of the City Council and
25 the mayor to the emergency manager?

1        MS. NELSON: Absolutely, it does, and the

2  legislature clearly, as we've identified in our brief, has

3  the authority to do that under both the Home Rule Cities Act

4  and under the various provisions of the Constitution that

5  control forms of government and the authority of the state

6  over its local communities. The local communities --

7        THE COURT: So is it too simplistic to say that the

8  city sets its own form of government through its charter

9  unless the state dictates otherwise through its legislation?

10       MS. NELSON: Absolutely, and that's the whole point

11  of the home rule --

12       THE COURT: It's not too simplistic --

13       MS. NELSON: It's not too simplistic.

14       THE COURT: -- to put it just that way.

15       MS. NELSON: It's just that way, and it's clear in

16  both the constitutional provision, and it's clear under the

17  Home Rules Cities Act, which implements those limitations

18  that are imposed on local governments vis-a-vis Article VII,

19  Section 22. The federal courts have recognized that as --

20  and, again, I cite the Court to the Sailors decision from the

21  United States Supreme Court, which recognizes the overarching

22  authority of the state. Because local governments are

23  creatures of the state, the state can determine what it's --

24  what authority it's going to give, what its local officials

25  will look like, what its forms of government will look like.

1          Second, I would also point out, your Honor, that

2    this is essentially a temporary situation, so this isn't the

3    state dictating that this is how the city is going to be

4    operating forever.  There are limits on this, and there are

5    authorities in Public -- authority in Public Act 436 given to

6    the local officials to petition the state to remove the

7    emergency manager, so there is --

8          THE COURT:  Right, but none of that is

9    constitutionally required.  If I understand you correctly,

10   the legislation could say the governor picks the mayor of the

11   City of Detroit.

12         MS. NELSON:  Well, potentially it could, yes, but it

13   doesn't.  It doesn't have to.  They chose not to.

14         THE COURT:  So but bottom line, your position is

15   that in no sense is the city charter supreme or preemptive

16   over state legislation.

17         MS. NELSON:  Absolutely not, or over the state's

18   Constitution.  In fact, it's the reverse, and that's very

19   clearly the relationship established in Article VII, Section

20   22, and in the Home Rules Act statute itself that codifies

21   those provisions.

22         The next challenge -- and I might also point out, as

23   we did in our brief, your Honor, there is a parallel example

24   in the Home Rule Village Act itself which does essentially

25   the same thing, so we're not just talking about cities, but

1  we're talking about all local governments.  The Home Rule
2  Cities Act, the Home Rule Village Act, all operate in the
3  same way.  Now, the forms of government where there might be
4  some differences are principally townships and school
5  districts, although they, too, are creatures of the state.
6  While the Court -- or the -- I'm sorry -- while the
7  legislature gives them some different authorities, it still
8  gives them those authorities and those powers in the same way
9  that it does its cities and villages and other local forms of
10  government.
11       The objectors also challenge the constitutionality
12  of 436 with respect to Article VII, Section 21, and Section
13  34.  Section 21 is a taxation essentially provision, and it
14  limits the authority of local governments to tax, borrow
15  money, and contract debts, so this is another example of the
16  authority that the state exercises over its local
17  communities.  436 recognizes and imposes these same
18  limitations on the emergency manager that the law imposes on
19  its public officials who are operating their local
20  governments, and it provides the state oversight and control
21  of these matters in the same way that it does its local
22  government officials, especially when they are under a
23  financial emergency.  So, in effect, 436 treats the emergency
24  manager no differently than it does local officials in the
25  context of the local government's authority to tax, to borrow

1  money, or to contract debts, so there is no unconstitutional

2  actions at work here merely because the emergency manager is

3  now the one operating the city making those decisions as

4  opposed to the elected officials.

5        Similarly, Article VII, Section 34, merely

6  establishes the standard for interpreting the authority

7  granted by Constitution and state law, so, in other words, it

8  says the Michigan legislature retains authority to define and

9  modify the powers, duties, and obligations of its local

10 governments, which are derived from the state in the first

11 instance.  It says that those powers given to the local

12 governments must be construed with deference to the local

13 government, but it still recognizes that those powers come

14 from the state, from the legislature, and can be changed in

15 any instance where the legislature believes that it's

16 appropriate to do so.

17       Finally, your Honor, as we've argued in our brief --

18 and there were no arguments presented to the Court

19 yesterday -- 436 is not an unconstitutional delegation of

20 authority under Article III, Section 2.  It's not delegating

21 legislative power to the emergency manager.  It allows the

22 emergency manager to simply execute the same executive powers

23 that the elected officials of the community would have within

24 the context of authority granted it under 436, principally in

25 Section 12(1), which identifies all of the various powers and

1 authorities.  There are controls.  There are restraints.
2 There are reviews required, approvals from the treasurer for
3 many of these at the state level or approval from the
4 governor for some of these actions that have to be done, and
5 there are also limitations on the emergency manager's
6 authority to make actions without the approval of the local
7 government, a significant difference between Public Act 4.
8 For example, with respect to the sale of assets or the
9 distribution of assets, the value of the assets will
10 determine the extent to which the local government must also
11 be involved in many of these decisions, so it is not -- and
12 to the extent that the objectors are arguing that there are
13 insufficient standards by which to guide the emergency
14 manager, I would submit the emergency manager is guided by
15 the same standards that would have applied to the local
16 officials when they were exercising that power, and there's
17 no argument from the objectors that those standards applied
18 to and by the local elected officials are inadequate for
19 their exercise of that authority, and those are the standards
20 that guide the emergency manager's actions as well.  So not
21 only is this an appropriate delegation of authority by the
22 state under its constitutional and statutory authority and
23 its role in relation to its local governments, it is also
24 sufficient for purposes of guiding the emergency manager's
25 actions both as to -- under the law and in relation to the

1    oversight provided by the State of Michigan.

2              Yesterday, your Honor, there was an argument made by

3    Krystal Crittendon with respect to the Court's -- the

4    jurisdiction and the authority essentially of the emergency

5    manager to file this action.  I have provided the Court a

6    copy of an order issued by the Michigan Court of Appeals on

7    November 16th, 2012 -- I brought a copy for Ms. Crittendon,

8    but she's not here today -- which squarely resolves that

9    issue.  And if I'm understanding her -- following her

10   argument correctly, her argument is that because the

11   emergency manager was appointed under Public Act 72, that

12   that was an improper appointment because the repeal of Public

13   Act 4 did not revive Public Act 72 under the state's repealer

14   statute.  That was --

15             THE COURT:  That was part of her argument.

16             MS. NELSON:  Right.  That has been an issue, and

17   that's the part that I'm addressing with respect to this

18   order, your Honor.  That particular issue has been raised in

19   at least four different cases challenging the appointment of

20   various emergency managers after the suspension of Public Act

21   4 under the referendum process and subsequently under its

22   rejection.  And the order that I have provided to you is in

23   the case of Robert Davis versus Roy Roberts.  It's Court of

24   Appeals Docket Number 313297, and it squarely rejects that

25   argument.  Quite frankly, this was a quo warranto action, so

1  it directly attacked the authority of the emergency manager,

2  Roy Roberts, who is the emergency manager for the Detroit

3  Public School System, to hold that position because of his

4  appointment under Public Act 4 and then subsequently under

5  72.  The Court of Appeals indicated the plain language of MCL

6  8.4, which is the repealer statute, includes no reference to

7  statutes that have been rejected by referendum.  The

8  statutory language refers only to statutes subject to repeal,

9  and judicial construction is not permitted here because this

10  language is clearly unambiguous.  Accordingly, under the

11  clear terms of the statute, MCL 8.4 does not apply to the

12  voters' rejection of referendum of Public Act 4.  Even if the

13  rejection of Public Act 4 is deemed to operate as a repeal

14  subject to 8.4, the voters rejected Public Act 4 in its

15  entirety by way of the referendum, and this, in fact, revived

16  Public Act 72.  So I think -- I believe that addresses Ms.

17  Crittendon's objection with respect to jurisdiction, and I

18  just wanted the Court to have that authority for when she

19  submits her supplemental brief.

20       Finally, your Honor, the other issue that I would

21  like to address relates to the Retired Detroit Police Member

22  Association's argument with respect to the referendum process

23  and the validity of 436 as a result of the referendum

24  process.  I first take exception to the representation that

25  an appropriation of $5,780,000 total is an insubstantial or

1    insignificant appropriation with respect to the state, but I

2    would point out to the Court the argument fails for two

3    principal purposes or reasons.  First, Public Act 436 is

4    significantly different than Public Act 4, so Ms. Brimer's

5    argument that it's identical fails on that ground alone, and

6    the very example that she provides in terms of the

7    appropriation is one of the major differences.  Public Act

8    436 imposes the requirement on the State of Michigan to pay

9    the salaries of the emergency managers.  Neither Public Act 4

10   nor Public Act 72 had that requirement.  So it, in fact,

11   required an appropriation in order to have -- so that the

12   state agency -- in this case, Treasury -- that's

13   administering that aspect of the statute would be able to

14   make that expenditure.  Under state law a state agency must

15   have an appropriation in order to be able to make an

16   expenditure, and that's exactly what happened in this

17   instance.  In addition, the $5 million that was appropriated,

18   as was pointed out yesterday, is for the purpose of paying

19   for consultants, attorneys, and others that are going to be

20   assisting the local communities that are in a financial

21   emergency with their restructuring.  That was not part of

22   Public Act 4 or Public Act 72 either, so on those two

23   grounds, that is a difference.  There are many other

24   substantial and significant differences between these two

25   statutes, but even without any difference, your Honor, the

1  case that I have handed you, <u>Reynolds</u> versus the <u>Bureau of</u>
2  <u>State Lottery</u>, resolves this issue, and I would point the
3  Court to page 604 and 605 of that opinion.  In this case --
4  although somewhat factually different, in this case a 1994
5  act that controlled fund-raising abilities of political
6  campaigns to use bingo and other types of gaming to raise
7  monies was being challenged by referendum.  There was a
8  challenge to the signature process that went to the Court of
9  Appeals and then back down to the Board of Canvassers.  The
10  Board of Canvassers split and didn't certify the statute, so
11  it went back up -- or the referendum -- excuse me -- back up
12  to the Court of Appeals.  While that process was in play, the
13  legislature adopted a new act that was identical, word for
14  word identical to the challenged 1994 act, and the governor
15  signed it, and it went into effect.  The 1994 act then was
16  ultimately certified on the ballot, went through the
17  referendum and was rejected by the voters.  The parties that
18  had moved for that referendum then dismissed their appeal
19  case, applied for a bingo license to raise money, were
20  rejected under the new law, and then brought this challenge,
21  a declaratory challenge, arguing that the new statute was
22  invalid because it violated the referendum process.  In
23  addressing that issue, the Court of Appeals analyzed and
24  interpreted the referendum provision, and that is the portion
25  of the opinion that I refer the Court to.  It begins at page

1    604 and continues onto 605.  And in there the Court very

2    clearly said the referendum provision and the purpose for the

3    referendum in terms of its definition and use of the term

4    "enacted law" means only the particular law supported by a

5    majority of legislators and signed by the governor and no

6    more.  They went on to hold that when a law enacted by the

7    legislature is referred to the people, the reference to a

8    particular definite act and not by implication the general

9    principle or subject matter at issue.  So, in other words, it

10   is the act itself, not the general purpose or the particular

11   purpose of the act, that is subject to the referendum.  And

12   because it is the specific act that is the subject of the

13   referendum, the legislature is not precluded from

14   subsequently adopting a new law that is either identical to

15   or dealing with the same subject matter or purpose.  The

16   Court continued, "nothing in the Michigan Constitution

17   suggests that the referendum had a broader effect than

18   nullification of the 1994 Public Act 118," the act at issue

19   in that case.  We cannot read into our Constitution a general

20   preemption of the field that would prevent further

21   legislative action on the issues raised by the referendum.

22   The legislature remained in full possession of all its other

23   ordinary constitutional powers, including legislative power

24   over the subject matter addressed in 1994 Public Act 118.

25            THE COURT:  Well, how do you or how does this case

1   deal with the argument that that kind of very strict
2   interpretation of the referendum power of the people makes a
3   mockery of it?

4           MS. NELSON:  I disagree that it makes a mockery of
5   it, your Honor, because prior to this analysis, the Court of
6   Appeals went through the very same review and applied the
7   very same review standards in terms of the common
8   understanding of the provisions of the constitutional act or
9   provision that was in play as the Supreme Court did in the In
10  re. Advisory Opinion and in Studier and in all of those cases
11  dealing with the interpretation of the Constitution.  And the
12  Court very clearly said that the common understanding of the
13  terms in that provision require this outcome, so any other
14  alternative would have been contrary to both the
15  constitutional standard of review that the Supreme Court
16  requires, and a different outcome would have been contrary to
17  the very meaning and common understanding of that provision,
18  so --

19          THE COURT:  Well, but what --

20          MS. NELSON:  I'm sorry.  Go ahead.

21          THE COURT:  What's the point of giving the people
22  the right of referendum to reject a statute if the same
23  Constitution is read to give the legislature the authority to
24  reenact word for word the same statute that the voters just
25  rejected?  What's the point?

1          MS. NELSON:  Well, the point is that that then

2    becomes a political issue in and of itself, and do the people

3    then want to continue to keep those legislators in office.

4    That makes it a different question than the referendum of the

5    actual law.  That then makes it a political question and a

6    question of political will, which I think is a different

7    analysis than what is required here for purposes of our case.

8          THE COURT:  Well, but why put the people to that?

9          MS. NELSON:  Well --

10         THE COURT:  The people spoke.

11         MS. NELSON:  The people spoke in the context of

12   Public Act 4.  I will agree, and --

13         THE COURT:  Okay.  But the position you're arguing

14   for is a much broader one, which is even if law number two is

15   word for word the same as law number one, law two prevails --

16         MS. NELSON:  That's what the case --

17         THE COURT:  -- or it remains in effect.

18         MS. NELSON:  That's correct.  That's what the case

19   law says, but I'm also pointing out that in this instance law

20   number two --

21         THE COURT:  Doesn't the --

22         MS. NELSON:  -- is not word for word the same --

23         THE COURT:  Okay.

24         MS. NELSON:  -- and addresses --

25         THE COURT:  Hold that argument for just a moment

1    because --

2              MS. NELSON:  Sure.

3              THE COURT:  -- I am interested in that, but where is

4    the substance of the right of referendum that the

5    Constitution gives the people if the legislature has the

6    authority to thumb its nose at it like that?

7              MS. NELSON:  Well, the right of referendum remains

8    because the people could initiate a referendum with respect

9    to the next bill.  I know that's not --

10             THE COURT:  To which the question remains why put

11   the people to that?

12             MS. NELSON:  It certainly does beg the question,

13   your Honor, and that's why my response to you and the only

14   response I think that's applicable is that it becomes a

15   matter of political will, and there are other ways for the

16   people to address that issue, and that is elect --

17             THE COURT:  Well, they've already expressed their

18   political will.  Why do they have to do it twice, three

19   times, an infinite number of times?

20             MS. NELSON:  Well, that's -- because that's how the

21   Court has interpreted that particular referendum.

22             THE COURT:  This is the Court of Appeals, not the --

23             MS. NELSON:  This is --

24             THE COURT:  -- Michigan Supreme Court.

25             MS. NELSON:  Yes, but leave to appeal was denied by

1    the Supreme Court.  Now --

2                THE COURT:  Means nothing.

3                MS. NELSON:  It means nothing other than it wasn't

4    interested in taking this particular issue at that particular

5    time, so I'm referring the Court, yes, to a Court of Appeals

6    decision, which is the last court decision on this particular

7    issue.  I'm not saying that I agree with that or that many --

8    that everybody agrees with it.  I'm just simply saying that

9    is the law, the most current law applicable on this

10   particular issue.  This is how the Court of Appeals has

11   interpreted, and the Supreme Court allowed that

12   interpretation to stand, and so this is the interpretation

13   that has to be applied in the context of the argument raised

14   by the Retired Detroit Police Members Association.

15               THE COURT:  Am I bound by this decision?

16               MS. NELSON:  I'm sorry.  What?

17               THE COURT:  Am I bound by this decision?

18               MS. NELSON:  I believe that you are because it's the

19   last highest court decision on this particular issue, and

20   leave to appeal was denied by the Supreme Court.

21               THE COURT:  What are the three or five most

22   significant differences then between PA 4 and PA 436?

23               MS. NELSON:  The first one is one that we've already

24   discussed in terms of the transfer of authority to fund this

25   proposition.  The second one is -- the second most critical

1    one is the options that are made available to the local

2    governments that didn't exist under 4 or 72.  Public Act 436

3    creates four choices for the local governments once a

4    determination of a financial emergency has been identified.

5    They can choose either the appointment of an emergency

6    manager, the negotiation of a consent decree.  They can

7    submit to neutral mediation, which, if unsuccessful, then

8    they must proceed in Chapter 9, or they can opt to go right

9    into Chapter 9, of course, with the approval of the governor.

10   There are several options -- or changes within the context of

11   the authority that's set out in Section 12(1) for the

12   emergency manager, particularly with respect to the assets of

13   the city and who has to be involved in the process in terms

14   of if there's going to be a lease or sale of assets of over a

15   certain value.  I believe it's 50,000.  The local officials

16   have to be involved in that process as well.  A third

17   significant difference that didn't exist under either prior

18   laws is the ability of the local government to present

19   alternative plans, and an example is what's going on with

20   Belle Isle.  Under 436 the local government can object to or

21   reject a proposal made by the emergency manager, and they

22   have the opportunity to present an alternative plan.  I

23   believe it's to the emergency financial loan board.  It's

24   either to the emergency manager financial loan board or the

25   treasurer -- an alternative proposal that could achieve the

1    same amount of savings, so they have the authority and the
2    ability to object and present their own proposal for
3    clarification.

4          Another significant change is the limitation on the
5    term of the emergency manager.  Under Public Act 436, the
6    term is limited to 18 months.  Additionally, another change
7    is the fact that the local government may petition for
8    removal of the emergency manager anytime before the
9    expiration of that 18 months.  So those are some of the more
10   significant differences.

11         Another major -- excuse me.  Another major
12   difference is the creation of the transition advisory board
13   that will participate with the local community or the local
14   government once the emergency manager is -- emergency is
15   deemed resolved and the emergency manager steps down, and
16   that, for example, is a process that's taking place in
17   Pontiac at the moment.  The emergency manager there has
18   stepped down, and so there are certain relationships that
19   have been established to assist the local government with
20   transition back into control of its financial operations and
21   obligations.  And one of the reasons for that was to address
22   the criticisms that the emergency managers have never proved
23   successful.  Many of these communities, once the emergency
24   manager steps down, find themselves within a year or two
25   struggling again and back into the same circle, same process,

1   and so that's a very significant and substantial change as

2   well.

3           Those are the some of the major highlights.  There

4   are a number of other ones in the process of how you initiate

5   the financial review, the factors that are to be considered

6   by the financial review team as they evaluate the cities.

7   There are also some differences in terms of the authority of

8   the emergency manager with respect to removing officials from

9   office or appointing officials to take their place.  That's

10  been an issue in Detroit as well with respect to certain of

11  the city council members.  So there are some major -- but

12  those are the major ones that come to my mind right off the

13  top of my head.

14          THE COURT:  If the Court rejects your arguments and

15  holds that to the extent that PA 436 authorizes the

16  appointment of an emergency manager that is unconstitutional,

17  is there enough left of PA 436 for this bankruptcy to

18  continue or not?

19          MS. NELSON:  At this point, I don't believe there

20  would be, your Honor, because the mechanisms or the way that

21  the statute is designed right now, the emergency manager is

22  acting on behalf of the city, and he is the one who made the

23  recommendation, and he is the one that's specifically been

24  approved.  If you conclude --

25          THE COURT:  Approved?

1          MS. NELSON:  I'm sorry.

2          THE COURT:  Approved for what?

3          MS. NELSON:  Approved to file.  The authorization

4  was given to him to file, and he was doing it in the place

5  and stead of the elected officials.  So if the determination

6  is that 436 is unconstitutional and his appointment,

7  therefore, is void --

8          THE COURT:  That was not exactly my hypo.

9          MS. NELSON:  Okay.

10          THE COURT:  My hypo was that holding that his

11  appointment was unconstitutional or that so much of PA 436

12  that allowed the governor to appoint him was

13  unconstitutional.

14          MS. NELSON:  Well, first of all --

15          THE COURT:  I mean I guess it's partially a

16  severability question.

17          MS. NELSON:  That's correct.  There's a severability

18  provision within 436 itself, and there's also a general

19  severability question.  And the first issue or the first

20  question that would have to be decided is whatever you

21  conclude -- whatever provisions you conclude to be

22  unconstitutional, when they are severed, does that leave a

23  substantial or significant amount of the Act in place so that

24  it can be reasonably carried out.  I would submit that if you

25  conclude the appointment of the emergency manager is

1   unconstitutional, that goes right to the heart of the

2   authority to proceed or the authorization to proceed in

3   bankruptcy because he was acting on behalf of the city.  If

4   the appointment is deemed unconstitutional, then that would

5   restore the local elected officials, the mayor and the

6   council, as the representatives of the city, and they would

7   have to then take the action to continue this bankruptcy.

8           THE COURT:  I think your colleague represented the

9   last time she was here in court -- and forgive me for not

10  remembering her name.  Who was it?

11          MS. NELSON:  In what context?  Michelle Brya?

12          THE COURT:  A couple weeks back.

13          MS. NELSON:  Is that who you might be thinking of?

14          THE COURT:  Anyway, she --

15          MS. NELSON:  Nicole Grimm.

16          THE COURT:  -- referred to the statute, and there's

17  a provision that authorizes the emergency manager to conduct

18  the case.

19          MS. NELSON:  Correct.  That's Subsection 2.  That's

20  18 -- Section 18, Subsection 2, which specifically

21  authorizes -- once he receives the authorization from the

22  governor, it specifically authorizes the emergency -- we're

23  using "authorization" a lot or I am anyway --

24          THE COURT:  Right.

25          MS. NELSON:  -- but it specifically authorizes the

1  emergency manager to file the bankruptcy petition, so that's
2  Subsection 2, so -- Section 18, Sub 2.
3          THE COURT:  But it wasn't just file.  It was file
4  and conduct the case.
5          MS. NELSON:  And conduct it.  That's correct.  And
6  so if, in fact, he is removed from office by virtue of a
7  ruling that his appointment was unconstitutional, that would
8  necessarily terminate the case because it would revert back
9  to the local officials, and they would then have to either
10  reinitiate the process or somehow decide to continue the case
11  without having -- if they could without reinitiating.
12          THE COURT:  There's nothing else besides PA 436 that
13  provides the necessary basis for authorization or consent for
14  a municipality to be in bankruptcy?
15          MS. NELSON:  Correct.  Does the Court have any other
16  questions?
17          THE COURT:  No.
18          MS. NELSON:  Thank you.
19          THE COURT:  Thank you.  Who's up next?
20          MR. BENNETT:  I think our side.  We relinquish our
21  remaining time.
22          THE COURT:  I did have a few questions for Mr. Troy.
23  Stand by one second.
24          MR. TROY:  Good morning, your Honor.  Matthew Troy,
25  Department of Justice, Civil Division, on behalf of the

1   United States.  Your Honor, I want to clarify that we're on
2   the same page with respect to the question that you had
3   yesterday, which was, I think, how does the government
4   respond to the objectors' reply regarding the ripeness issue.
5   I went back last night and looked at what was filed on Friday
6   by the various objectors.  I think I found it, but I want to
7   make sure we're talking about the same thing.  I saw it in
8   AFSCME's amended objection filed Friday wherein they talk
9   about the harm that their members are suffering right now.
10          THE COURT:  Right now, precisely.
11          MR. TROY:  Okay.  From the potential --
12          THE COURT:  Ms. Ceccotti mentioned that in her
13   argument yesterday as well.
14          MR. TROY:  Okay.  And, in fact, I mean I guess if I
15   could read what I understood that Governor Snyder's
16   authorization has itself unconstitutionally caused an
17   immediate concrete injury to Council 25's members by creating
18   a contingent liability that their inviolable rights will be
19   disregarded causing them to reorder their financial affairs.
20   It's articulated in different ways elsewhere in the brief,
21   but I think that kind of encapsulates it.
22          THE COURT:  Yes.
23          MR. TROY:  I'll answer your Honor's question, but I
24   do want to clarify one point before doing so.  That
25   contention, your Honor, is made in the context or in response

1   to the debtor's reply regarding the argument of whether or

2   not there was proper authorization under 109(c)(2).  That's

3   not an argument made in the context of their constitutional

4   challenge to Chapter 9, but I can see where it also falls

5   over into that analysis.

6           THE COURT:  Okay.

7           MR. TROY:  But I want to make clear that on the

8   109(c)(2) issue the United States government is not taking a

9   position on that issue.

10          THE COURT:  Right.

11          MR. TROY:  Okay.  And that's where that argument

12  arose, but I can see where your Honor thinks that has

13  applicability to the constitutional challenge as well, and

14  that's why I'll address that.

15          THE COURT:  Well, I think we have to consider it and

16  deal with it.

17          MR. TROY:  Right.  Your Honor, that articulation or

18  that argument goes to whether or not they have standing.  Is

19  there a concrete actual injury?  And when I read that

20  description of the harm, the injury that they're suffering,

21  to me, as a bankruptcy lawyer, that strikes me as a dynamic

22  that occurs, frankly, every day in bankruptcy.  A small

23  business owner is faced with a debtor who wishes to assume

24  and assign its lease or executory contract and says, "Consent

25  or I'll reject it," or a nondebtor party that is faced with

1   the threat of a turnover action by a debtor in possession or

2   trustee, and the nondebtor party says, "No, it's not property

3   of the estate.  It's held in a validly state law created

4   trust or escrow account."  Going back to my prior

5   hypothetical, I left out that point as well saying the

6   nondebtor party, small business owner, to the executory

7   contract or lease says, "Wait a minute.  I've got state law

8   nonassignability rights.  You can't do that."  And the debtor

9   says, "Yes, I can.  Bankruptcy Code says I can."

10  Preferential actions, your Honor, where seemingly innocent

11  defendants are faced with a trustee or debtor in possession

12  saying, "Pay or else I'm filing the action," particularly

13  perhaps pointing at our seemingly innocent investors in what

14  turns out to be a Ponzi scheme facing clawback suits.  Some

15  are less sympathetic than others, but there are some that are

16  very sympathetic.  They face the same dynamic that AFSCME

17  poses here, and, unfortunately, that's just a dynamic that

18  exists in bankruptcy.

19          THE COURT:  Well, but to carry those hypos to the

20  next step that may make it analogous here, couldn't any of

21  those parties who you have identified file something in court

22  asking for a court ruling sustaining their position, whatever

23  it is, there was no preference, there was no fraudulent

24  transfer, whatever their position is on the executory

25  contract?

1          MR. TROY:  That is true, your Honor, but that's
2     an -- that's either an affirmative defense or an argument
3     that the debtor or trustee has failed to satisfy one of the
4     elements of even bringing the claim.  That's not what's being
5     posed here.  What's being posed here is that the whole
6     statute is unconstitutional, and for a party to come in and
7     say that and to assert that, they have to meet a high hurdle,
8     and that hurdle is in part -- some of the hurdles they have
9     to meet -- and the two that are relevant here are standing
10    and ripeness.  And that hurdle, I would submit, is not met
11    here with the argument that they have posed as being their
12    injury in fact.  It's a commonplace dynamic in bankruptcy.
13    It's unfortunate -- and I'll take the objectors at their
14    word, and it might very well have tragic consequences, but
15    that's, unfortunately, what can happen in bankruptcy given
16    the powers afforded a debtor.
17         THE COURT:  Well, but I can hear the response now.
18    The response is we retirees don't know what to do about our
19    financial futures because of the uncertainty that this
20    bankruptcy has created for us about the security of our
21    retirement pensions.  That uncertainty will be resolved or
22    would be resolved if the Court were to take head on right now
23    in the eligibility context the issue of whether this
24    bankruptcy can impair pensions.
25         MR. TROY:  And my response, your Honor, is that that

1   asserted injury in fact is not sufficient to vest them with

2   standing to ask you to make that reach at this stage of the

3   case.

4           THE COURT:  Okay.  So why not?

5           MR. TROY:  Because it is -- what they're asking for

6   is a significant remedy, which is the invalidation of the

7   entire statute, at this stage of the case.

8           THE COURT:  Right.

9           MR. TROY:  To do that, they have to meet a much

10  higher standard for their injury in fact.

11          THE COURT:  So what's the -- what's, in your view,

12  the most pertinent Supreme Court case that says that this

13  kind of contingent concern, just to put a legal label on it,

14  is insufficient?

15          MR. TROY:  I don't have one to say that it is

16  insufficient.  I can explain to you why I think the one that

17  they cite as evidencing it is inapplicable here.

18          THE COURT:  Okay.

19          MR. TROY:  I think they're principally relying on

20  Clinton v. United States to say that this contingent

21  liability is sufficient to constitute an injury in fact

22  imbuing them with standing.  My response, your Honor, is that

23  that case is significantly different and distinguishable from

24  this.  In that case, your Honor, HHS went to the State of New

25  York and its various municipalities, I guess, subsidiaries,

 1   that administered Medicaid and said, "Look, you receive
 2   federal subsidies from us.  You have to pay some of those
 3   back if you tax the healthcare providers providing those
 4   healthcare services."  And so HHS issued a notice and demand
 5   to New York and said, "Pay.  You've been imposing these taxes
 6   in the past.  Those have to be reimbursed to us as basically
 7   a recoupment of the federal subsidies you've been receiving."
 8   They issued a demand saying pay.

 9             THE COURT:  Um-hmm.

10             MR. TROY:  Well, some members in Congress,
11   presumably from -- representing New York, said, "We don't
12   like that so much, so we're going to put a section in the
13   federal -- in the Balanced Budget Act of 1997 that says that
14   liability is zapped out of existence."  So New York and
15   others then went and filed suit and said, "No, they can't do
16   that."  Ultimately the Court said, "No, you don't have
17   standing.  It hasn't happened yet."  Then President Clinton
18   actually exercised his line item veto power and excised that
19   provision that said that liability is now zapped out of
20   existence.  The only reason it was contingent is because
21   after the State of New York got the notice saying pay, they
22   exercised apparently a valid right to request HHS to waive
23   it, and HHS hadn't acted on it yet, but there was an explicit
24   demand to pay from the federal government to the State of New
25   York.  It's not quite as contingent as what we're dealing

1    with here, your Honor, is my basic submission.  There was an
2    explicit demand to pay, and the ripeness -- or the standing,
3    rather, was cured when President Clinton excised that
4    specific section that had eliminated the liability.  The
5    liability rearose, and it was very real.  The only thing that
6    the City of New York, I guess, as the appellee in that case,
7    had left was, well, we have a waiver request pending with HHS
8    that hasn't been acted on, but HHS had already made the clear
9    demand and said pay.  That's why I think it's a different
10   case than this, your Honor.
11          THE COURT:  All right.  One final question for you,
12   and it goes to the issue of the constitutionality of Chapter
13   9, and it addresses some language in one of the commandeering
14   cases, the New York case.  There's some broad language in
15   here that I think we have to deal with somehow, and so I'm
16   asking for your help in how you think it should be dealt
17   with.  In that case, the Supreme Court said -- and I want to
18   quote it to you.  It's at 182.  "The constitutional authority
19   of Congress cannot be expanded by the 'consent' of the
20   governmental unit whose domain is thereby narrowed, whether
21   that unit is the Executive Branch or the States."  How do we
22   reconcile that language with the constitutionality of Chapter
23   9?
24          MR. TROY:  Because I don't -- I would submit that,
25   as set forth in our brief, I think, that Chapter 9 does not

1    so narrowly proscribe the powers of the state, if I am

2    recalling the quote correctly, your Honor.   Chapter 9 --

3         THE COURT:  Constitutional authority of Congress

4    cannot be expanded by the consent of the governmental unit

5    whose domain is thereby narrowed.

6         MR. TROY:  I would submit, your Honor, that Chapter

7    9 does not -- it gives the states the consent to decide

8    whether or not its municipalities can file Chapter 9 and

9    under what terms and conditions, but I would submit also

10    that, having done so -- having given states that right to

11    consent, Chapter 9 does not then narrow impermissibly and

12    unconstitutionally the state's sovereign powers to control

13    and regulate its municipalities.

14         THE COURT:  Well, but the objectors argue that it

15    does because it imposes federal priorities on creditors that

16    may be different from the priorities the state has.

17         MR. TROY:  Right.  And this all goes back, your

18    Honor --

19         THE COURT:  So its sovereign powers says we want

20    priority scheme A, and, you know, the federal government has

21    got its priority scheme B, so by filing bankruptcy, there's

22    this narrowing of the state's sovereignty and this expansion

23    of the federal government's sovereignty.

24         MR. TROY:  Right.  And, your Honor, I think this all

25    goes back to the --

1     THE COURT:  And New York says that can't be done by

2  consent.

3     MR. TROY:  Right.  And I think all that is hinged

4  upon and was subject to a lengthy colloquy between you and

5  Mr. Bennett about Bekins or Bekins, take your pick, and

6  Asbury Park.  It's all -- that whole hypothetical that you're

7  posing, your Honor, is -- again, it's dependent upon what did

8  Asbury Park do and what did it imbue the states with.

9     THE COURT:  Well, but what do I do with this

10  language?

11     MR. TROY:  Well, again, your Honor, that language --

12  I think when you then take that language and say, "Well, what

13  about this hypothetical?" that hypothetical to me that you

14  just posed raises the issue of why can't states then just

15  impose their own municipal debt adjustment schemes because

16  Asbury Park says we can, and --

17     THE COURT:  Is the answer nothing more than if the

18  state doesn't want to use the federal priority scheme, it

19  just doesn't authorize bankruptcies?

20     MR. TROY:  I think that might be --

21     THE COURT:  Is that the answer to this?

22     MR. TROY:  I think that might be the answer, yes,

23  and that's the ultimate control that the state has.  And that

24  goes back to the language that Mr. Bennett was quoting from,

25  I believe, Bekins and somewhat in a parallel sense in the

1  dissent from Ashton.  It's the state's decision.  It's the

2  state's control.  And as your Honor has pointed out in

3  subsequent more recent cases involving Chapter 9, that's how

4  the courts have viewed the issue.  Once in, you're in.

5          THE COURT:  All right.  Thank you, sir.

6          MR. TROY:  If I may, your Honor, if I just address

7  one point --

8          THE COURT:  Yes.

9          MR. TROY:  There's standing, and there's ripeness.

10 They're distinct, and they're different.  Admittedly, if you

11 look at the requirements for each, they arguably bleed into

12 one another, but there is an element of ripeness here, your

13 Honor, that I think is important for you to consider in

14 determining whether or not to take up the objectors on their

15 challenge to the constitutionality of Chapter 9, and it's

16 principally judicial discretion, your Honor.  Do you really

17 have to do this now?  Should you make this reach in declaring

18 the statute that effectively has been upheld for 75 years and

19 say it's unconstitutional right now at this stage of the

20 proceeding?  As articulated in our brief, we don't think you

21 have to.

22         THE COURT:  Well, since you raise standing, it was

23 pointed out by one of the attorneys that under the Bankruptcy

24 Code, creditors have standing to raise any issue that affects

25 them in the bankruptcy.  Does that provision in the

1   Bankruptcy Code answer the standing question?  If not, why
2   not?
3           MR. TROY:  Because it's different than
4   constitutional standing, which is what we're talking about
5   here.  We're talking about a constitutional standing to
6   invalidate an entire statute.
7           THE COURT:  Are the considerations on constitutional
8   standing any different than the constitutional considerations
9   on ripeness in any substantial way or significant way?  Can
10  you have one without the other?
11          MR. TROY:  Can you have standing without --
12          THE COURT:  Do they walk hand in hand down the same
13  path?
14          MR. TROY:  I'm sorry, your Honor.  Are you referring
15  to standing and ripeness?
16          THE COURT:  That's what I meant, standing and
17  ripeness.
18          MR. TROY:  As I understand the doctrines, your
19  Honor -- again, principally I'm a bankruptcy lawyer, not a
20  constitutional lawyer, but as I understand the doctrines,
21  your Honor, I would submit you could have one without the
22  other.  They are -- while similar, they are distinct.  You
23  could have standing but not have ripeness.
24          THE COURT:  You argue neither here.
25          MR. TROY:  Correct.

1          THE COURT:  All right.  I sense a certain eagerness

2     on Mr. Bennett's part, so let's yield the lectern to him.

3          MR. TROY:  Thank you, your Honor.

4          MR. BENNETT:  Your Honor, I want to return to your

5     question about whether or not the constitutional authority of

6     Congress is being expanded here at all.  From the very, very

7     beginning of my argument we talked about why the Chapter 9 or

8     the Chapter 9 -- whoops -- or the Chapter 9 equivalent from

9     back in the '30s, what did not run afoul of the Tenth

10    Amendment.  And remember there was -- the first part of it

11    was because there are -- uniform laws on the subject of

12    bankruptcies are the domain of Congress, and the Supreme

13    Court has told us that uniform laws on the subject of

14    bankruptcies, as they apply to -- does apply to municipal

15    credits.

16         THE COURT:  Yeah.  I get all that, and in the New

17    York case the Congress was legislating within its commerce

18    powers; right?

19         MR. BENNETT:  But the problem with New York was it

20    chose means; i.e., the only part that it didn't like was

21    directing the states to buy or to take possession of nuclear

22    waste.  That was it.  It was that part.  It was the state's

23    direction.

24         THE COURT:  Well, okay.  So do we read this language

25    simply to say that the state cannot consent to a

1  Congressional enactment that goes beyond its commerce powers?

2          MR. BENNETT:  I think --

3          THE COURT:  If that's what they mean, that's sort --

4          MR. BENNETT:  I think that the --

5          THE COURT:  -- of like, "Well, duh."

6          MR. BENNETT:  Well, that they can't consent to

7  the -- also to the commandeering aspect of it.  They can't

8  consent to the direction to the states to do something the

9  states can't be directed to do.

10         THE COURT:  Okay.  Pause there.  If that

11 commandeering in the statute were directed to a private

12 party, would that have been within Congress' commerce power?

13         MR. BENNETT:  It actually would have been because

14 they talk about --

15         THE COURT:  Okay.

16         MR. BENNETT:  -- nuclear waste.  And I also want to

17 come back to the point, though, that --

18         THE COURT:  But, okay, if that's true -- I have to

19 pin this down with you.

20         MR. BENNETT:  That's okay.

21         THE COURT:  If that's true, what is the Court

22 talking about in this language in New York when it says the

23 constitutional authority of Congress cannot be expanded?

24         MR. BENNETT:  That New York, by having participated

25 in negotiations and been part of the group that pulled

1 together the statute at issue, can't have consented -- can't

2 consent to the part that requires the state to buy nuclear

3 waste, the part that was unconstitutional in the New York

4 case.

5     THE COURT:  Okay.  But what authority -- what

6 constitutional authority of Congress is being expanded by

7 that?

8     MR. BENNETT:  The Congress doesn't have the

9 authority to direct the states to do things that it -- to buy

10 things.  It doesn't have that authority.  That's the part

11 that was the problem.

12     THE COURT:  That's the Tenth Amendment --

13     MR. BENNETT:  Correct.

14     THE COURT:  -- limitation on the commerce power.

15     MR. BENNETT:  Correct.  But here I want to come back

16 and say in the bankruptcy realm, because the Congress has the

17 power to pass uniform laws on the subject of bankruptcies,

18 because the subject of bankruptcies include municipal debt

19 adjustment, of all the things that are clearly within

20 Congress' power and is not an expansion, it's priorities when

21 there's not enough to go around.

22     THE COURT:  So your argument is that in order for

23 this comment by the Supreme Court in New York to impact this

24 case, the Court would have to find that the bankruptcy power

25 of Congress does not include the power to include municipal

1   bankruptcies?

2           MR. BENNETT:  Yes, your Honor.

3           THE COURT:  Okay.

4           MR. BENNETT:  Or that the subject of municipal --

5   the subject of bankruptcies does not include priorities.

6           THE COURT:  Okay.

7           MR. BENNETT:  And I would -- just to round out the

8   answer to the rest of the points, there was also a

9   recognition that Chapter 9 might creep up to the edges.

10  That's where we have the 903 and 904 focus on governmental

11  and political powers, and there there was a recognition that

12  consent might not be enough.  That's why we have 903 and 904

13  that people aren't requiring consent to too much.

14          MS. NELSON:  Your Honor, may I just quickly make a

15  brief statement to the Court?

16          THE COURT:  Sure.

17          MS. NELSON:  Margaret Nelson again on behalf of the

18  state.  I just wanted to let the Court know you requested

19  yesterday that we file all of the Webster documents, and I

20  just wanted to let you know that that likely will happen this

21  afternoon or tomorrow morning --

22          THE COURT:  Okay.

23          MS. NELSON:  -- including all of the transcripts.  I

24  know I didn't discuss it during my oral, and I just wanted to

25  ask the Court if it had any questions specific to the

1   collateral estoppel argument for the state.

2           THE COURT:  No.

3           MS. NELSON:  All right.  Thank you.

4           THE COURT:  All right.  Mr. Gordon, may I have your

5   attention, please?  I had promised you and your colleagues on

6   the objecting side here an opportunity before your rebuttal

7   to organize.  Would you like that opportunity now, or are you

8   and your group prepared to proceed?

9           MR. GORDON:  Your Honor, in that regard, a couple of

10  things.  One, in discussing these matters last night with the

11  group on the objectors' side, it is the sort of universal

12  view that there were issues that were raised and arguments

13  that were made by Mr. Bennett yesterday that, frankly,

14  weren't in the city's papers prior to yesterday.  And in

15  light of the importance of these issues, we would

16  respectfully ask that there be perhaps an adjournment of the

17  rebuttal argument and an opportunity to brief this with the

18  idea that we would strive to coordinate so as to minimize the

19  burden on the Court in terms of the amount of paper that gets

20  filed and so forth, but it is our request in the first

21  instance, your Honor, that there be essentially an

22  adjournment of the rebuttal.

23          Also, as you can imagine, just trying to coordinate

24  who would address what in rebuttal is something that was

25  difficult to do at the end of a very long day yesterday, and

1  so there are some logistical issues, but, again, from a

2  substantive standpoint, we were desirous of asking the Court

3  if we could have two weeks to submit briefs on these issues

4  and have rebuttal argument in the course of the --

5          THE COURT:  Okay.

6          MR. GORDON:  -- the Court's conducting of the

7  evidentiary hearing at some point.

8          THE COURT:  I fully intended to offer you the

9  opportunity to file supplemental briefs, and that was just a

10  question of how much time you needed, so for me that's not an

11  issue.  Much more problematic is the issue of adjourning the

12  rebuttal arguments.  Mr. Bennett, do you have a position on

13  this?

14          MR. GORDON:  And by the way, just for the record, I

15  did at least reach out to Mr. Bennett last --

16          THE COURT:  Um-hmm.  Okay.

17          MR. GORDON:  -- night about this, and he has his

18  opinions, of course.

19          THE COURT:  That was very civil and courteous of

20  you.

21          MR. GORDON:  Thank you.  I try.

22          THE COURT:  Yes, you do.

23          MR. BENNETT:  Yes.  That's true.  I did receive

24  this -- the notice of the possibility that this request would

25  be made.  First of all, we did not cite any new cases.  We

1   certainly read cases that they had cited perhaps more closely
2   than they did, and that was all within the fair game of the
3   party who speaks not having filed the last set of papers.
4   The last set of papers were, of course, filed by the
5   objectors, so there's been no impropriety, nothing unfair,
6   nothing unusual.  And the fact that they had overnight to
7   prepare is a courtesy that, quite frankly, I don't always get
8   when I have to deal with an oral argument after full sets of
9   papers.

10          Adjourning the hearing will create another time
11  burden and expense.  We're getting enough complaints in the
12  press about how much this case is costing.  I'm prepared and
13  the city has invested in that preparation, and we're ready to
14  go.  If we put this off, we're going to get to do that all
15  over again.  The request for two weeks, quite frankly, may
16  well be okay depending upon the length of the trial, but we
17  would need an opportunity to respond, and that would push the
18  response beyond the trial.  And we have business we need to
19  conduct.  We have a DIP financing that we're going to need to
20  get approved, and that won't fund until there's a
21  determination on eligibility.  So there's all kinds of
22  calendar difficulties if your Honor chooses to adjourn, and,
23  frankly, there's calendar difficulties if we have to do
24  another set of briefs.  The ultimate objective is to give
25  your Honor the help you need to decide, and so with the

1  understanding that there will be incremental additional

2  expense if there's an adjournment -- and we're ready to go

3  today -- I believe there's nothing unfair about that -- it's

4  ultimately what works for you, and we'll accommodate whatever

5  your Honor decides.  I have no problem with a short break if

6  people want to get organized.  That's perfectly okay

7  obviously.

8       THE COURT:  All right.  Stand by one moment, please.

9  All right.  Mr. Gordon, may I have your attention again,

10 please?  In the circumstances, I can't justify putting off

11 rebuttal for any substantial period of time.  I can offer you

12 the choice of proceeding after lunch at one o'clock today or

13 proceeding this Friday.  We do have another motion hearing on

14 an unrelated matter at ten, and we could go in this matter at

15 11 on Friday.

16      MR. BENNETT:  Your Honor, I'm not available.  I'm

17 not available on Friday.  It's mid-semester break for one of

18 my sons, and I'm planning to be away this weekend, including

19 Friday.

20      THE COURT:  Well, hold on one more second.

21      MR. GORDON:  Your Honor, I can perhaps short-circuit

22 the issue.  I think, from what I'm hearing, we're comfortable

23 then under the circumstances with coming back at one o'clock

24 today and presenting our rebuttal.

25      THE COURT:  Your other choice would be to do this on

1    Monday either before or after or as part of the pretrial

2    conference that's scheduled for that date.  Do you have any

3    objection to that?

4              MR. BENNETT:  I'll have to take a red-eye unless it

5    starts really late like at about -- I can make a 3:30, I

6    think.

7              THE COURT:  I can't do that myself.

8              MR. BENNETT:  Look, I'll take a red-eye.

9              THE COURT:  I have to be done by three.

10             MR. BENNETT:  I'll take a red-eye, and someone will

11   nudge me if I fall asleep.  As long as it's in the afternoon,

12   it's okay.

13             THE COURT:  Well, hopefully their arguments will not

14   have that impact on you.

15             MR. BENNETT:  Okay.  If it's in the afternoon, it'll

16   work.  It'll be okay.

17             THE COURT:  Okay.  If I understand our time

18   constraints correctly, there's an hour on each side left,

19   right, for rebuttals?  So if we start at one, then I can

20   leave by three, which is what I need to do.  Does that help

21   you?

22             MR. BENNETT:  I'll make it work.

23             THE COURT:  So you were not going to be at the

24   pretrial conference at ten.

25             MR. BENNETT:  That's correct.

1      THE COURT:  Somebody else was covering that for you.

2  That's fine with me, one o'clock Monday for the rebuttal

3  arguments.  Did you want to say something?  Go ahead.

4      MS. CECCOTTI:  Yes.  One o'clock is fine actually.

5  That's helpful to me.  I wonder, though, in terms of the

6  pretrial, I was actually going to ask as a housekeeping

7  matter, again, just due to flights and so forth, it may not

8  be one of my team, but if we had some -- a UAW designee,

9  would that be sufficient, a lawyer for our side here?

10  Otherwise --

11      THE COURT:  That's up to you.

12      MS. CECCOTTI:  Okay.  You don't --

13      THE COURT:  No.

14      MS. CECCOTTI:  I just wondered if the Court had

15  any --

16      THE COURT:  I mean generally speaking, we want at

17  the final pretrial conference whoever is going to conduct the

18  trial.

19      MS. CECCOTTI:  Yeah.

20      THE COURT:  Is that -- is there that disconnect for

21  you?

22      MS. CECCOTTI:  There is.  There are four lawyers on

23  my side and all handling different aspects --

24      THE COURT:  Um-hmm.

25      MS. CECCOTTI:  -- so -- and they're all busy.

1          THE COURT:  Well, all right.  So long as the person

2   is familiar enough, you know, to conduct the sort of

3   administrative stuff we do at a final pretrial conference,

4   including dealing with exhibits, that's fine.

5          MS. CECCOTTI:  I see.  Okay.  All right.  That's

6   helpful, your Honor.  We'll be --

7          THE COURT:  All right.

8          MS. CECCOTTI:  -- guided accordingly.

9          THE COURT:  All right.  So -- all right.  I guess

10   the point is we're adjourning for today to reconvene in this

11   matter at one o'clock on Monday for the final two hours.

12          MR. TROY:  Apologies, your Honor.  Matthew Troy

13   again.  I'm not sure if my presence here was helpful or not,

14   but I will not be here on Monday --

15          THE COURT:  That's fine.

16          MR. TROY:  -- unless you request it or ask of it,

17   and then --

18          THE COURT:  But please accept my assurance that your

19   appearance here today and your argument was helpful.

20          MR. TROY:  Thank you, your Honor.  If your Honor

21   wants me here for that hearing, I can start making inquiries.

22          THE COURT:  You know, if that arises, we do have the

23   option of a telephonic appearance as well.

24          MR. TROY:  Okay.

25          THE COURT:  In fact, you have that option regardless

1  to listen in, so, you know, in terms of whether you, on

2  behalf of your client, feel the need to make any further oral

3  argument, I leave that to your discretion.  And if you want

4  to, we'll do it by telephone.

5          MR. TROY:  Thank you, your Honor.

6          THE COURT:  Just let us know in advance.

7          MR. TROY:  Yes, sir.

8          THE COURT:  All right.  Anything further for today,

9  anyone?  No.  All right.  That's it then.

10          THE CLERK:  All rise.  Court is adjourned.

11      (Proceedings concluded at 4:21 p.m.)

INDEX

<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    October 20, 2013
_____       _____
Lois Garrett