# EXHIBIT 6

**Excerpts from Transcripts of Depositions of Charles Moore and Glenn Bowen**

Page 1

```
 1      IN THE UNITED STATES BANKRUPTCY COURT
 2          EASTERN DISTRICT OF MICHIGAN
 3              SOUTHERN DIVISION
 4
 5   In re                      Chapter 9
 6   CITY OF DETROIT, MICHIGAN,  Case No. 13-53846
 7            Debtor.            Hon. Steven W. Rhodes
 8   _____/
 9
10   DEPONENT:  CHARLES M. MOORE
11   DATE:      Wednesday, September 18, 2013
12   TIME:      10:02 a.m.
13   LOCATION:  MILLER CANFIELD PADDOCK & STONE PLC
14              150 West Jefferson, Suite 2500
15              Detroit, Michigan
16   REPORTER:  Jeanette M. Fallon, CRR/RMR/CSR-3267
```

Page 2

```
 1   APPEARANCES:
 2
 3   JONES DAY
 4   By:  Evan Miller
 5   51 Louisiana Avenue, NW
 6   Washington, D.C. 20001.2113
 7   202.879.3939
 8   -and-
 9   MILLER CANFIELD PADDOCK AND STONE PLC
10   By:  Jonathan S. Green
11   150 West Jefferson, Suite 2500
12   Detroit, MI 48226.4415
13   313.496.7997
14       Appearing on behalf of the Debtor
15
16   DENTONS US LLP
17   By:  Arthur H. Ruegger
18   1221 Avenue of the Americas
19   New York, NY 10020.1089
20   212.768.6881
21       Appearing on behalf of Retirees Committee
```

Page 3

```
 1   APPEARANCES (continued):
 2
 3   COHEN WEISS AND SIMON LLP
 4   By:  Thomas N. Ciantra
 5   330 West 42nd Street
 6   New York, NY 10036.6979
 7   212.356.0216
 8       Appearing on behalf of UAW
 9
10   LOWENSTEIN SANDLER LLP
11   By:  Sharon L. Levine
12   65 Livingston Avenue
13   Roseland, NJ 07068
14   973.597.2374
15   -and-
16   Michael L. Artz (appearing telephonically)
17       Appearing on behalf of AFSCME
18
19   CLARK HILL PLC
20   By:  Andrew Mast
21       Ed Hammond (appearing telephonically)
22   500 Woodward Avenue, Suite 3500
23   Detroit, MI 48226
24   313.965.8384
25       Appearing on behalf of Retirement Systems
```

Page 4

```
 1   APPEARANCES (continued):
 2
 3   WILLIAMS WILLIAMS RATTNER & PLUNKETT PC
 4   By:  Ernest J. Essad, Jr.
 5   380 N Old Woodward Ave Ste 300
 6   Birmingham, MI 48009
 7   248.642.0333
 8       Appearing on behalf of FGIC
 9
10   WINSTON & STRAWN LLP
11   By:  Bianca M. Forde (appearing telephonically)
12   200 Park Avenue
13   New York, NY 10166.4193
14   212.294.4733
15       Appearing on behalf of Assured Guaranty Municipal
16       Corp.
17
18   STROBL & SHARP
19   By:  Meredith Cox (appearing telephonically)
20   300 East Long Lake Road, Suite 200
21   Bloomfield Hills, MI 48304
22   248.540.2300
23       Appearing on behalf of Retired Detroit Police Members
24       Association
```

Page 21

1 A. Yes, sir.
2 Q. And just so I'm clear, I apologize, it was the
3    employment retirement system of the Government
4    Development Bank that you did this work for?
5 A. The Government Development Bank was the engaging
6    entity. The pension system for which our work related
7    was the employee retirement system.
8 Q. For what entity or group?
9 A. For the Commonwealth of Puerto Rico.
10 Q. Thank you.
11 A. It was a public pension plan. Mr. Ruegger, I'll just
12    clarify as well that my firm did work -- other work
13    related to the Commonwealth of Puerto Rico for a
14    different client prior to the assignment where we
15    worked for the government.
16 Q. All right. Can you identify what that other client
17    was?
18 A. Yes. We were engaged by both AFSCME and UAW.
19 Q. And what were you engaged to do for those unions?
20 A. Assist in analysis related to a plan that the governor
21    had prepared and analysis of the upcoming budget.
22 Q. Do you remember approximately when that work was done?
23 A. I believe that may have been in 2009.
24 Q. And how long did you work in the engagement for those
25    two unions?

Page 22

1 A. Approximately two months, if I recall correctly.
2 Q. It's set out in your declaration that -- and I believe
3    it's paragraph 6 --
4        (Discussion held off the record.)
5 Q. -- that you're a Certified Public Accountant. That's
6    accurate; correct?
7 A. Yes, sir.
8 Q. And you are also a certified turnaround professional?
9 A. Yes, sir.
10 Q. Do you have any other formal certificates?
11 A. I am also, as is listed here, certified in financial
12    forensics.
13 Q. Any others that you recall?
14 A. No, sir.
15 Q. Other than -- any other formal training that you've
16    had or certifications?
17 A. Can you define formal training?
18 Q. Sure. We'll try to break it down. How about any
19    other classroom training or work at an educational
20    institution?
21 A. Through the course of my certifications as well as
22    professional organizations to which I belong I
23    regularly attend educational sessions every year.
24 Q. So seminars, conferences, those kind of things you
25    attend on a regular basis?

Page 23

1 A. Yes, sir.
2 Q. Anything other than seminars and conferences and what
3    you've mentioned already?
4 A. Over the course of my career I've also spent time with
5    a few other certifications related to operational
6    items; as an example, I don't believe it's called this
7    anymore, but formerly the American Production
8    Inventory Control Society, APICS, A-P-I-C-S. And I
9    have been certified in certain operational information
10    system applications used by businesses.
11 Q. Can you identify any of the operational information
12    system applications that you just mentioned?
13 A. Yes, I have multiple certifications from QAD is the
14    name of the company related to its software enterprise
15    resource planning application known as MFG Pro.
16 Q. Any others you can recall right now?
17 A. No, I think that's it.
18 Q. We're going to come back to the declaration in a
19    second, but have you ever testified under oath before,
20    Mr. Moore?
21 A. Yes, sir.
22 Q. Approximately how many times?
23 A. If you count testifying in the same matter multiple
24    times as each individual instance, it would be perhaps
25    15 -- 10 to 15 I think would be a fair number.

Page 24

1 Q. And of the 10 to 15 how many were in court?
2 A. I've testified in court perhaps five to eight times.
3 Q. Any instances where you testified in an arbitration
4    proceeding?
5 A. Not that I can recall.
6 Q. And approximately how many of those instances were
7    deposition testimony?
8 A. I have been deposed approximately five times.
9 Q. Other than the court and the deposition instances,
10    have you testified under oath in any other context?
11 A. Not that I can recall.
12 Q. I'm going to ask you to identify for us the cases that
13    you've testified -- in which you've testified, so
14    let's start with the instances in court. When was the
15    first time you testified in court?
16 A. The matter would have been DCT, Inc., and I believe I
17    testified in 2002.
18 Q. Were you a fact or an expert witness?
19 A. I was a fact witness.
20 Q. And what issues did you testify to?
21 A. This goes back 11 years so I'm stretching my memory
22    here.
23 Q. Just do the best you can, sir.
24 A. But this was an involuntary bankruptcy filing where
25    Conway MacKenzie was engaged on behalf of the debtor

Page 61

1 A. The rate of payouts is another area where the
2 actuaries make assumptions as to what benefits will be
3 paid in what periods and to the extent that those are
4 underestimated, that can impact the funded position as
5 well. Tying into previous assumptions that I had
6 indicated.
7 Q. So is it -- is it your position that the City views
8 the actuarial payout assumptions as understating
9 unfunded liabilities?
10     MR. MILLER: Object to form. Go ahead.
11 A. As an example, Mr. Ruegger, the actuarial valuation
12 assumes certain payouts. The actual payouts in the
13 most recent completed year of plan assets were
14 substantially higher than what was anticipated prior
15 to that valuation being done and so at a minimum that
16 would indicate that there were more assets that were
17 paid out than what was assumed by the actuary.
18 Q. Other than the assumptions and methods you've
19 identified, are there any other assumptions and
20 methods that to your understanding the City views as
21 understating the systems' unfunded liabilities?
22 A. The City and most importantly its actuary has not
23 completed its analysis on the unfunded position. The
24 City is trying to undertake a process to actually
25 develop a more concrete valuation model on its own so

Page 62

1 it's been relying on the valuation model of the
2 pension systems' actuary. As such we have focused on
3 a few items here, but until the City completes its
4 analysis and completes its own actuarial valuation,
5 neither the City nor its actuary nor I would be able
6 to say what all the assumptions are that could be used
7 to either overstate or understate the funded position.
8 Q. Very well.
9     Let's turn to one of the assumptions that
10 you address in your declaration and specifically in
11 paragraph 11 you talk about the projected net rate of
12 return. The 7.0 percent or 7.25 percent figure, do
13 you see that in paragraph 11?
14 A. Yes, sir.
15 Q. Those were not figures that were recommended by a
16 particular actuary; were they?
17 A. The 7 percent is actually higher than the rate that
18 Milliman, the City's actuary, had originally put
19 forward, which in its view would result -- the rate at
20 which there was a fifty-fifty chance of achieving that
21 rate.
22     MR. RUEGGER: All right. I'm going to move
23 to strike, because with all respect that was not
24 responsive to my question, Mr. Moore.
25 Q. I understand Milliman has prepared a variety of

Page 63

1 letters and reports and we'll take those up with the
2 Milliman folks, but I'm trying now to focus on the 7.0
3 figure. That was a figure selected by the City for
4 illustrative purposes; correct?
5     MR. MILLER: Object to form.
6 A. Yes.
7 Q. And that was not the specific figure or a specific
8 figure recommended by Milliman or any other actuary;
9 correct?
10 A. I can't speak to any other actuary, but going back to
11 the previous question, yes, 7 percent was used for
12 illustrative purposes.
13 Q. The -- and the Milliman analysis that's been
14 undertaken so far, to your understanding, that hasn't
15 been the product of work on the actual data for the
16 systems; has it?
17     MR. MILLER: Object to form.
18     MR. RUEGGER: Okay, that was a poor
19 question, I'll try again. Actually withdrawn.
20 Q. Related to the projected net return, in paragraph 15
21 of your declaration, I believe it's 15, you have a --
22 we'll get to it.
23     Let's talk now about the concept of
24 smoothing that you reference in paragraph 12. In your
25 understanding smoothing is a common calculation used

Page 64

1 by actuaries related to pension projections; correct?
2 A. I would clarify your question from the standpoint of
3 typically pension boards will decide on the policies
4 and then actuaries will perform calculations based on
5 the policies that a board will decide to use.
6 Q. But smoothing is a common practice for actuaries; is
7 it not?
8     MR. MILLER: Object to form.
9 A. Based on my experience, yes, there is a number of
10 plans that I've looked at that involve a smoothing.
11 Q. And would you agree that smoothing is a method to
12 manage the effect of investment volatility on
13 contributions and to provide a more consistent measure
14 of plan funding over time?
15     MR. MILLER: Object to form.
16 A. Generally speaking, yes. What's important to note is
17 that smoothing is a concept, and I agree with the
18 purpose of that concept. The number of years over
19 which a pension system may smooth can differ
20 significantly.
21 Q. Based on the -- well, withdrawn.
22     To your knowledge is smoothing generally
23 consistent with the actuarial standards of practice?
24     MR. MILLER: Object to form.
25 A. Well, I can tell you, Mr. Ruegger, later this year new

Page 65
1  GASB standards go into effect, GASB 67 and 68, that
2  actually for financial reporting purposes will not
3  allow smoothing.
4  Q. Okay, so then go back to my question, which related to
5  actuary standards or practice. Is not smoothing
6  consistent and endorsed by actuarial standards of
7  practice?
8      MR. MILLER: Object to form.
9  A. As we established earlier, I'm not an actuary so I
10  can't comment on that. I am a CPA so I can comment on
11  financial reporting standards.
12 Q. Do you -- there's some reference here.
13      You'll see in paragraph 14, the first
14  sentence references the City's estimated underfunding
15  of approximately $3.5 billion. Do you see that
16  reference?
17 A. Yes, sir.
18 Q. Do you know whether that calculation was based on the
19  assumption the systems would continue or that they
20  would be frozen?
21      MR. MILLER: Object to form.
22 A. My understanding is that this is based on the
23  assumption that the plans would continue.
24 Q. And if the plans were to continue, would, in your
25  view, it be more appropriate to use actuarial values

Page 66
1  for assets and liabilities or market figures for
2  assets and liabilities?
3      MR. MILLER: Object to form.
4  A. It depends on for what purpose the calculation is
5  being made.
6  Q. Okay. And can you explain that answer?
7  A. If you are referring to for financial reporting
8  purposes, I can comment on the basis that is included
9  in GASB Statements 67 and 68 that are coming out. As
10  to whether it is appropriate from an actuarial
11  standpoint, again, because I'm not an actuary, I can't
12  comment on that.
13 Q. When you refer to the City in these -- starting in
14  paragraph 11, who at the City are you referring to?
15      MR. MILLER: Object to form.
16 Q. Or I'll try it again.
17      Who working within or for the City do you
18  include when you make a reference such as in the
19  beginning of paragraph 11 related to the City's view?
20      MR. MILLER: Object to form.
21 A. My primary contact at this point within the City is
22  Mr. Kevyn Orr.
23 Q. So when you reference the City's view or the City's
24  position in your declaration in Moore Exhibit 1, you
25  mean Mr. Orr?

Page 67
1      MR. MILLER: Object to form.
2  A. Based on the discussions that would have taken place
3  with Mr. Orr, yes, he is in agreement with these
4  statements.
5  Q. In paragraph 15 of your declaration you address the
6  systems' use of 29- and 30-year amortization periods
7  for funding the underfunding. Do you see that
8  discussion, sir?
9  A. Yes, sir.
10      MR. MILLER: Let me object to form in
11  connection with the prior question.
12      MR. RUEGGER: That's fine.
13 Q. Do you have any understanding whether amortization
14  periods of 29 and 30 years are commonly used for
15  governmental pension plans?
16 A. Commonly used I think is difficult to say, because
17  there are obviously probably thousands of pension
18  plans in the United States, so not having the data to
19  understand how often that's used, I am aware of other
20  plans, other governmental plans, that use 29- or
21  30-year amortizations.
22 Q. Do you have any understanding whether the amortization
23  periods used for the PFRS and the GRS are matters that
24  were voted on by the Detroit city council?
25 A. I don't know how the board comes to decide on its

Page 68
1  policies.
2  Q. And the board you're talking about here is the board
3  that -- of the systems, the respective systems --
4  withdrawn.
5      And when you say the board, do you mean the
6  board of the GRS, the General Retirement System, or
7  the -- and/or the PFRS?
8  A. Yes, sir.
9  Q. So the policy -- withdrawn.
10      So the amortization period in your view is
11  approved by the board of the respective systems;
12  correct?
13 A. That's my understanding.
14 Q. And if I'm understanding your testimony, you don't --
15  you do not have an understanding of whether the city
16  council also weighs in on that amortization period;
17  correct?
18 A. Correct, I do not have visibility if there are other
19  individuals that influence the boards' decisions as to
20  policies.
21      MR. RUEGGER: All right. It's noon so I
22  would like to go off the record and discuss the
23  process for a second.
24      (Discussion held off the record.)
25      MR. RUEGGER: Back on the record. Off the

Page 1

```
 1          UNITED STATES BANKRUPTCY COURT
 2           EASTERN DISTRICT OF MICHIGAN
 3                 SOUTHERN DIVISION
 4   -----------------------------X
 5   IN RE                        ) Chapter 9
 6   CITY OF DETROIT, MICHIGAN,   ) Case No. 13-53846
 7            Debtor.             ) Hon. Steven W. Rhodes
 8   -----------------------------X
 9
10
11
12         DEPOSITION of GLENN DAVID BOWEN
13                  Washington, D.C.
14              Tuesday, September 24, 2013
15
16
17
18   Pages:  1 - 213
19   Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR,
20                 CCR, CLR, RSA
21   Assignment Number:  472421
22   File Number:  105824
```

Page 2

```
 1               September 24, 2013
 2                    9:47 a.m.
 3
 4
 5         Deposition of GLENN DAVID BOWEN held
 6   at the law offices of:
 7
 8
 9                    Jones Day
10          51 Louisiana Avenue, Northwest
11                Washington, D.C. 20001
12
13
14
15
16              Pursuant to notice, before Cindy L.
17   Sebo, Registered Merit Reporter, Certified Real-Time
18   Reporter, Registered Professional Reporter,
19   Certified Shorthand Reporter, Certified Court
20   Reporter, Certified LiveNote Reporter, Real-Time
21   Systems Administrator and a Notary Public in and for
22   the District of Columbia.
```

Page 3

```
 1   APPEARANCES:
 2     JONES DAY
 3       For the Debtor:
 4           51 Louisiana Avenue, Northwest
 5           Washington, D.C. 20001-2113
 6           202.879.3939
 7     BY:   EVAN MILLER, ESQUIRE
 8           emiller@jonesday.com
 9     BY:   MIGUEL F. EATON, ESQUIRE
10           meaton@jonesday.com
11
12     DENTONS US LLP
13       For the Official Committee of Retirees:
14           233 South Wacker Drive
15           Suite 7800
16           Chicago, Illinois 60606-6306
17           312.876.7994
18     BY:   ROBERT B. MILLNER, ESQUIRE
19           robert.millner@dentons.com
20     BY:   ARTHUR H. RUEGGER, ESQUIRE
21           arthur.ruegger@dentons.com
22
```

Page 4

```
 1   APPEARANCES (Continued):
 2     COHEN, WEISS AND SIMON LLP
 3       For the United Auto Workers Union:
 4           330 West 42nd Street
 5           New York, New York 10036-6979
 6           212.356.0216
 7     BY:   THOMAS N. CIANTRA, ESQUIRE
 8           tciantra@cwsny.com
 9
10     LOWENSTEIN SANDLER LLP
11       For AFSCME:
12           65 Livingston Avenue
13           Roseland, New Jersey 07068
14           973.597.2538
15     BY:   JOHN K. SHERWOOD, ESQUIRE
16           jsherwood@lowenstein.com
17
18
19
20
21
22
```

Page 145

1  this development, that there would be no further
2  transfers from the DB plan assets into -- into
3  individual accounts; thus no calculation was
4  needed.
5      Q.  On the Page 3 we see Rule-of-Thumb
6  Adjustments.
7          Do you see that?
8      A.  I do.
9      Q.  And on the -- the last adjustment, the
10 pages that -- Total actuarial accrued liability
11 decreases by 10 percent due to the plan freeze and
12 the cancellation of all future COLAs.
13         Do you see that?
14     A.  I do.
15     Q.  And what is the source of
16 the 10 percent number that you used there?
17     A.  It is due to the plan freeze and the
18 cancellation of COLAs, so we would have done two
19 separate calculations or two separate estimates to
20 determine the 10 percent overall estimate for those
21 plan changes and the plan freeze.
22         I believe we discussed this before, but

Page 146

1  it was based upon a lower expectation of future
2  benefits, which generates a lower liability.  And
3  then the cancellation of future COLAs generates
4  lower future benefit payments as well.
5          So in using information we were able to
6  draw from the valuation reports, we prepared
7  estimates of those two topics.
8      Q.  Are these the estimates that you, in an
9  earlier document, called "guesses"?
10     A.  I'm not sure which -- I mean, you can
11 put that particular document back in front of me.
12 I've used the phrase "rough guess"; I've used the
13 phrase "estimate" --
14     Q.  Rough guess.
15     A.  Rules of thumb, I would say, by
16 definition, are rough guesses.  They're defined to
17 give us a proxy of what we -- the result we would
18 arrive at had we done more detailed modeling.
19     Q.  And you have a workpaper showing this
20 calculation?
21     A.  Yes.  We would have developed two
22 calculations, one for the impact of the plan freeze

Page 147

1  and then one for the COLA cancellation.
2      Q.  The rule-of-thumb adjustment not above
3  that, but two above that says that Total benefit
4  payments increased by 4.25 percent annually in the
5  baseline scenario and by 2.17 percent in
6  Scenario 2.
7          And how did you derive those estimates?
8      A.  The total benefit payment increased.
9  And to put this in chronology, we had discussed
10 earlier today that Milliman had calculated benefit
11 payments from Gabriel, Roeder projections when they
12 were available.  At this time, they weren't.
13         The 4.25 percent was an estimate based
14 upon historical growth and benefit payments as new
15 members retired.  The 2.17 lower estimate for
16 Scenario 2 was adjusted downward to reflect a plan
17 freeze which generates future lower benefit
18 payments and the cancellation of cost-of-living
19 increases as well.
20     Q.  When you say "adjusted downward," in
21 this instance, is it a -- is it a -- an estimate
22 that is based on a -- simply the judgment of the

Page 148

1  actuaries?  Is that -- is that what this is?  Or do
2  you have specific data that you point to to take
3  that number down from the baseline scenario?
4      A.  We -- we do not have a specific full
5  valuation run where we've modeled the overall
6  group, each on an individual basis, to develop
7  these numbers.
8          The 4.25, as I stated, was based upon
9  trailing growth and benefit payments.  The 2.17
10 would have been adjusted based upon what
11 information was available in the valuation report,
12 and it reflects an adjustment for the plan freeze
13 and for the cancellation of future COLAs, so,
14 actually, two adjustments to get the 4.25 to the
15 2.17.
16     Q.  Let me see.  Just a few more of these
17 letters, Mr. Bowen.
18             - - -
19         (Whereupon, a letter with attachment
20         was marked, for identification
21         purposes, as Bowen Deposition
22         Exhibit Number 11.)

Page 205

1 pension task force.
2    Q.  And you -- you had not -- no idea why
3 the pension task force asked for this?
4    A.  The request came to us from the pension
5 task force, and I suppose they wanted an answer to
6 this question.
7    Q.  You said earlier that you're in the
8 process of doing, I think you used the word,
9 "replication"?
10    A.  That is correct.
11    Q.  And can you just tell me what -- what a
12 replication is?
13    A.  We gather census data from, in this
14 case, the actuary, who has taken raw system data,
15 edited it for -- edited it for use in their
16 valuation system. We take that data, we take our
17 understanding of the benefit provisions that exist
18 in the plan and apply the actuarial assumptions and
19 methods used by the system actuary to try to see if
20 we can develop the same results based on the same
21 inputs.
22    Q.  So is it, like, proofreading the work

Page 206

1 of the system actuary?
2    A.  I'm not sure if "proofreading" is the
3 right word, but I think replication -- we're trying
4 to replicate -- we're trying to do what they did
5 with the materials they had.
6    Q.  And where does that stand? Is that
7 almost done?
8    A.  Well, it is in progress. We have done
9 some programming. We're doing internal checking
10 and peer review. And as we talked about earlier
11 today, we have outstanding questions.
12    Q.  I don't think we talked about that on
13 the record.
14      But --
15    A.  Okay.
16    Q.  -- do you have -- do you have an idea
17 when the replication will be done?
18    A.  Actually, I believe we did speak about
19 this on the record earlier, and I don't believe we
20 have an indication when we'll be receiving answers
21 from the system or system actuary. So it's very
22 tough for me to give you an ETA.

Page 207

1    Q.  Do you know why a replication is being
2 done by Milliman at this time?
3    A.  We were requested to replicate by the
4 pension task force.
5    Q.  Do you know what the projected costs of
6 the replication is going to be?
7    A.  I don't know off the top of my head.
8    Q.  Okay.
9      MR. SHERWOOD: Mr. Bowen, I think
10 that's everything. And I thank you for your time
11 today. I have no further questions.
12      MR. MILLER: Thank you.
13      MR. MUTH: We're done?
14      MR. MILLER: Okay.
15      MR. CIANTRA: Thank you.
16      (Whereupon, at 3:38 p.m., the
17      deposition was concluded.)

Page 208

1      C E R T I F I C A T E
2 DISTRICT OF COLUMBIA:
3      I, Cindy L. Sebo, a Notary Public within
4 and for the Jurisdiction aforesaid, do hereby
5 certify that the foregoing deposition was taken
6 before me, pursuant to notice, at the time and place
7 indicated; that said deponent was by me duly sworn
8 to tell the truth, the whole truth, and nothing but
9 the truth; that the testimony of said deponent was
10 correctly recorded in machine shorthand by me and
11 thereafter transcribed under my supervision with
12 computer-aided transcription; that the deposition is
13 a true record of the testimony given by the witness;
14 and that I am neither of counsel nor kin to any
15 party in said action, nor interested in the outcome
16 thereof.
17
18           _[signature]_
19
20      _____
21      Cindy L. Sebo, RMR, CRR, RPR, CSR,
22      CCR, CLR, RSA, Notary Public