# EXHIBIT B



P.O. Box 30212
LANSING, MICHIGAN 48909

**BILL SCHUETTE**
ATTORNEY GENERAL

October 18, 2013

Thomas N. Ciantra
Cohen Weiss and Simon LLP
330 West 42nd Street
New York, NY 10036-6979

     Re:   **In re City of Detroit**

Dear Mr. Ciantra:

     I write in response to your October 15 letter. As I mentioned in my email to you Thursday morning, October 17, 2013, since receiving your letter we are making every effort to carefully review the issues you raised and respond to them as quickly as possible. As I noted, there were some issues that we could resolve immediately but other items would require additional review and a more detailed response. Below is an issue-by-issue response.

     First, with respect to the March 12 document you reference in the fourth paragraph of your letter, that document was actually produced in redacted form, along with unredacted copies of the attachments (SOM40003136-3154). The document was not withheld. More broadly, we disagree with your interpretation of the Common Interest Agreement and application of the common interest doctrine. The recognition of a common interest as existing "on or around the appointment of the Emergency Manager" plainly extends to a communication occurring in connection with, and only a few days prior to, the appointment. Therefore, we cannot agree to your categorical request that the State withdraw its assertion of privilege pursuant to the common interest doctrine as to all documents before March 15, 2013. Additionally, even without the Common Interest Agreement, the redacted portions of the March 12 document are protected attorney-client communications.

     Second, as I noted in my earlier email to you, I believe the issue you raise concerning documents identifying emergency manager candidates has now been resolved with the October 8, 2013 Protective Order.

Third, we will be providing you a revised privilege log that includes bates number references for all documents that were produced in redacted form on the basis of privilege. But, as previously noted, the only documents that were withheld on the basis of executive privilege were Resumes or similar documents which by their very nature and purpose identified the respective candidate. This is what I explained in a telephone conversation with your co-counsel, Mr. Wertheimer, which he indicated was acceptable to him and the UAW. My confirming email to Mr. Wertheimer is attached. Nevertheless, to simplify matters and avoid any unnecessary dispute, we will identify each document previously withheld on this basis and produce them in redacted form.

Fourth, although we disagree with your characterization of the descriptions in our privilege log, we will revise the entries to include additional detail concerning the nature of the issues underlying the attorney-client communications (your Exhibit D reference.) Additionally, we concur in your criticism of the privilege log for the State's Second Production of Documents and are revising it to conform with the requested information.

Finally, we are unable to identify any issue with the documents listed on your Exhibit E. The entries on your Exhibit E do not correspond to any entries on our privilege log. Can you identify the specific document on the log and we will examine them and respond.

I expect to provide you with our revised privilege logs by the end of the day Monday, and will follow up with a supplemental production of any additional documents on Tuesday at the latest. However, we cannot agree to submit all the documents as to which the State asserts privilege for *in camera* inspection absent a court order.

After you have reviewed the forthcoming revised privilege logs, if you have any questions as to specific documents, please call me to discuss them in more detail. I am committed to avoiding unnecessary disputes and welcome the opportunity to reach a reasonable resolution of any issues.

Very truly yours,

Margaret A. Nelson
Complex Litigation Manager

MAN:hlg
Attachment

**Subject:**                    FW: Redactions to documents related to Emergency Manager Candidates

**From:** Nelson, Margaret (AG)
**Sent:** Friday, October 11, 2013 3:00 PM
**To:** 'billwertheimer@gmail.com' (billwertheimer@gmail.com)
**Cc:** Schneider, Matthew (AG); Gadola, Michael (GOV); Brader, Valerie (GOV); Peter H. Ellsworth (PEllsworth@dickinson-wright.com); Steven G. Howell (SHowell@dickinson-wright.com); Donnelly, Mark (AG)
**Subject:** Redactions to documents related to Emergency Manager Candidates

We spoke again this afternoon by telephone regarding the redactions to the State's document production related to the Emergency Manager candidates. I reiterated my earlier email response of October 8 @ 9:00 a.m. that indicated only the candidate's name and personal information was redacted from emails, but that the redacted email document was produced. I also indicated that Resumes for these candidates were redacted to eliminate names, and identifying information, but those redacted Resumes were also produced. You indicated that was acceptable to you and to the UAW.

Margaret A. Nelson
Assistant Attorney General
(517) 335-0825

1

# EXHIBIT C

| | |
|---|---|
| **From:** | Baird, Richard (GOV) |
| **Sent:** | Tuesday, March 12, 2013 8:54 PM |
| **To:** | 'Kevyn Orr' |
| **Subject:** | FW: Draft Contracts--final draft |
| **Attachments:** | Emergency Financial Manager Contract, 3-14-13.docx; Emergency Manager Contract, 3-28-13.docx |
| | |
| **Importance:** | High |

Kevyn:

It would be our hope that we could execute these contracts Thursday after the ELB appointment should it be confirmed.

Rich

Yes.  I just wondered if we might save ourselves an issue with the City and some of our "friends" there if we volunteered to pick up the expenses too, but it might be argued that the appropriation in PA 436 doesn't cover expenses.  I'm OK with leaving as is but just thought I would raise it.

Mike

SOM40003137

3



STATE OF MICHIGAN
DEPARTMENT OF TREASURY
LANSING

RICK SNYDER
GOVERNOR

ANDY DILLON
STATE TREASURER

## CONTRACT FOR EMERGENCY FINANCIAL MANAGER SERVICES

The Local Emergency Financial Assistance Loan Board (the Board) retains and appoints _____ as the Emergency Financial Manager (Emergency Financial Manager) for the City of Detroit (City) under Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, MCL 141.1201 *et seq*, (the Act).

The Emergency Financial Manager will provide services to the City pursuant to the terms and conditions set forth in this Contract and the Act.

The Emergency Financial Manager's role is to remedy the financial distress of the City by requiring, within available resources, prudent fiscal management and an efficient provision of municipal services by exercising the necessary authority conferred herein to take appropriate action on behalf of the City and its residents. In accepting this appointment, the Emergency Financial Manager agrees to leverage all the Emergency Financial Manager's skills and abilities to accomplish these objectives on behalf of City residents.

## 1. PARTIES, PURPOSE, DUTIES, AND REPORTS

1.1 <u>Parties</u>. The parties to this Contract are the Board and _____.

1.2 <u>Purpose</u>. The parties to this Contract agree that _____ will act as the Emergency Financial Manager for the City. The Emergency Financial Manager's duties and responsibilities are delineated in the Act and include conducting all aspects of the operations of the City and establishing and implementing a written financial plan as required by Section 20 of the Act.

1.3 <u>Duties</u>. The Emergency Financial Manager shall possess all the powers and duties authorized under the Act, including those specifically related to local governments. In addition, the Emergency Financial Manager shall work cooperatively with the Office of the Governor and the State Treasurer. The Emergency Financial Manager agrees to continue to keep these officials informed of major initiatives to be undertaken in furtherance of this Contract before their public announcement. The Emergency Financial Manager shall seek the approval of the State Treasurer before entering into a new collective bargaining agreement.

1.4 <u>Reports</u>. The Emergency Financial Manager shall file quarterly reports with the Department of Treasury beginning on July 15, 2013, for the immediately preceding quarter and shall file the first report required by Section 21a of the Act within six months of the Emergency Financial Manager's appointment and every six months thereafter.

1.5 <u>Communications</u>. The Emergency Financial Manager shall establish and maintain an appropriate protocol for ongoing communications with officials of the City, City residents, and the media. The communications protocol should include a variety of means, including personal interactions.

## 2. TERM OF CONTRACT

2.1 The Emergency Financial Manager serves at the pleasure of the Board as provided in Section 18 of the Act.

2.2 <u>Effective Date</u>. This contract is effective on Monday March 25, 2013 and shall terminate at midnight on Wednesday March 27, 2013.

2.3 <u>Oath of Office</u>. Before exercising the duties of office, the Emergency Financial Manager shall take and subscribe an oath of office administered by an official authorized to administer oaths under the laws of Michigan and file such oath with the Office of the Great Seal.

## 3. COMPENSATION FOR SERVICES PROVIDED

3.1 <u>Source of Payment</u>. The City shall pay the compensation of the Emergency Financial Manager for all services rendered under this Contract.

3.2 <u>Salary</u>. The Emergency Financial Manager's salary for services rendered under this Contract shall be $275,000 per year. If this Contract is terminated after the Emergency Financial Manager has provided services for a portion of a month, the Emergency Financial Manager shall be entitled, for that portion of that month, to $22,916.67 multiplied by the proportion that the number of days of the month for which services were provided bears to the number of days of the whole month. The Emergency Financial Manager shall not receive or accept any compensation from the City except as provided for in this contract.

3.3 <u>Payment for Services</u>. The Emergency Financial Manager shall be paid in installments consistent with the established written policies and procedures of the Michigan Department of Treasury. If requested by the State Treasurer, the Emergency Financial Manager shall provide to the Michigan Department of Treasury additional information regarding services performed pursuant to this Contract.

3.4 <u>Reimbursement for Actual and Necessary Expenses</u>. The actual and necessary expenses of the Emergency Financial Manager, including customary expenses related to travel, meals, and lodging which are incurred in connection with service to the City will be reimbursed by the City. The Emergency Financial Manager shall provide original copies of all receipts for meals, lodging, and travel reimbursement with any request for reimbursement. Any reimbursement for expenses under this contract shall be reviewed and approved in writing by the City's Chief Financial Officer.

## 4. ADDITIONAL STAFF AND CONSULTANT FEES

4.1 <u>Staff</u>. The Emergency Financial Manager may, as provided in the Act, appoint addi-

SOM40003140

tional staff as necessary to fulfill the obligations of the Emergency Financial Manager's appointment and duties under this Contract. Payment of compensation for additional staff will be the obligation of the City. While authority to hire additional staff rests with the Emergency Financial Manager, the Emergency Financial Manager agrees to consult with the State Treasurer, or the designee of the State Treasurer, at least 24 hours before extending offers of employment for positions paying $50,000.00, or more, annually. The Emergency Financial Manager shall issue a written employment contract to each individual hired pursuant to this Section, regardless of the compensation paid to that individual. The employment contract issued pursuant to this Section shall, as of the date the individual is hired by the Emergency Financial Manager, prohibit the individual from engaging in any other employment for remuneration without the express written approval of the Emergency Financial Manager. The Emergency Financial Manager agrees to consult with the State Treasurer, or the designee of the State Treasurer, at least 24 hours before approving outside employment for any individual. A breach of this Section shall be a material breach of this Contract.

    4.2 <u>Professional Assistance</u>. The Emergency Financial Manager may, as provided in the Act, secure professional assistance as necessary to fulfill the obligations of the Emergency Financial Manager's appointment and duties under this Contract. Payment of compensation for additional professional assistance will be the obligation of the City. The Emergency Financial Manager agrees to consult with the State Treasurer, or the designee of the State Treasurer, at least 24 hours before authorizing professional services contracts of $50,000.00, or more, per engagement or project.

    4.3 <u>Security</u>. The Emergency Financial Manager will be entitled to receive security protection in connection with the Emergency Financial Manager's duties under this Contract. Security personnel will be retained only upon the approval of the State Treasurer, or the designee of the State Treasurer, and only after consultation with the Director of the Michigan Department of State Police, or the designee of the Director of the Michigan Department of State Police. Payment of compensation for security personnel will be the obligation of the City.

## 5. REPRESENTATIONS

    5.1 <u>Qualifications</u>. By signing this Contract, the Emergency Financial Manager, represents that the Emergency Financial Manager meets the minimum qualifications for appointment set forth in the Act. The Emergency Financial Manager shall perform the duties of that office on a full-time basis and shall not accept any other employment or engage in any other activity for remuneration without the express written approval of the State Treasurer.

    5.2 <u>Conflict of Interest</u>. The Emergency Financial Manager represents and warrants that the Emergency Financial Manager has no personal or financial interest, and will not acquire any such interest, that would conflict in any manner or degree with the performance of this Contract.

    5.3 <u>Non-competition</u>. The Emergency Financial Manager represents and warrants that the Emergency Financial Manager is not subject to any non-disclosure, non-competition, or similar clause with current or prior clients or employers that will interfere with the performance of this Contract. The Board will not be subject to any liability for any such claim.

SOM40003141

5.4 <u>Facilities and Personnel</u>. The City will provide the Emergency Financial Manager with proper facilities and personnel to perform the services and work required to be performed pursuant to this Contract.

5.5 <u>Records</u>. The Emergency Financial Manager shall maintain complete records in accordance with generally accepted accounting practices and sound business practices. This requirement applies to all information maintained or stored in the computer system of the Emergency Financial Manager or computer system of the City. The State Treasurer and his designees shall have the right to inspect all records related to this Contract.

5.6 <u>Non-Discrimination</u>.

a) The Emergency Financial Manager shall comply with Public Act 220 of 1976, the Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq.,* and all applicable federal, State, and local fair employment practices and equal opportunity laws. The Emergency Financial Manager covenants that the Emergency Financial Manager will not discriminate against any employee or applicant for employment with respect to hire, tenure, terms, conditions, or privileges of employment, or a matter directly or indirectly related to employment, because of a disability that is unrelated to the individual's ability to perform the duties of a particular job or position. The Emergency Financial Manager shall impose this covenant upon every subcontractor that enters into an agreement for the performance of any obligation imposed by this Contract. A breach of this covenant shall be a material breach of this Contract.

b) The Emergency Financial Manager shall comply with Public Act 453 of 1976, the Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.,* and all applicable federal, State, and local fair employment practices and equal opportunity laws. The Emergency Financial Manager covenants that the Emergency Financial Manager will not discriminate against an employee or applicant for employment with respect to hire, tenure, terms, conditions, or privileges of employment, or a matter directly or indirectly related to employment, because of race, color, religion, national origin, age, sex, height, weight, or marital status. The Emergency Financial Manager shall impose this covenant upon every subcontractor that enters into an agreement for the performance of any obligation imposed by this Contract. A breach of this covenant shall be a material breach of this Contract.

5.7 <u>Unfair Labor Practices</u>. The Emergency Financial Manager shall not enter into a contract for the performance of any obligation imposed by this Contract with a subcontractor, manufacturer, or supplier whose name appears in the register prepared pursuant to Public Act 278 of 1980, MCL 423.322, of employers found in contempt of court for failure to correct unfair labor practices. The State may void this Contract if the Emergency Financial Manager, or any subcontractor, manufacturer, or supplier of the Emergency Financial Manager that is a party to a contract for the performance of any obligation imposed by this Contract, appears in the above mentioned register.

5.8 <u>Independent Contractor</u>. The relationship of the Emergency Financial Manager to the Board and to the City under this Contract is that of an independent contractor. Except as specifically provided in the Act, no liability, benefits, workers compensation rights or liabilities, insur-

SOM40003142

ance rights or liabilities, or any other rights or liabilities arising out of, or related to, a contract for hire, nor employer-employee relationship, shall arise, accrue, or be implied to either party under this Contract or to an agent, subcontractor, or employee of either party under this Contract, as a result of the performance of this Contract.

## 6. NOTICES

6.1 The State Treasurer is the designee of this Board for this Contract unless notice of another designation is provided by the Board. All notices, correspondence, requests, inquiries, billing statements, and other documents mentioned in this Contract shall be directed to the attention of the State Treasurer, Andy Dillon, and to the following:

For the Board:

> Michigan Department of Treasury
> Office of Legal Affairs
> Richard H. Austin Building, 430 West Allegan Street
> Lansing, Michigan 48922
> Phone: (517) 373-3223

For the Emergency Financial Manager:

> _____
> _____
> _____, MI 4____

## 7. LIMITATION UPON LIABILITY

7.1 The Board. The Board, this State, the Treasurer, and all other State officials are not liable for any obligation of or claim against the City resulting from actions taken in accordance with the Act or this Contract.

7.2 The Emergency Financial Manager. Pursuant to the Act, in performing this Contract the Emergency Financial Manager is engaging in a governmental function and is immune from liability for any action taken which the Emergency Financial Manager reasonably believes to be within the scope of the Emergency Financial Manager's authority granted by the Act or by this Contract.

## 8. INSURANCE

8.1 General. The Emergency Financial Manager may procure and maintain, at the expense of the City, health, worker's compensation, general liability, professional liability, and motor vehicle insurance for the Emergency Financial Manager and any employee, agent, appointee, or contractor of the Emergency Financial Manager as may be provided to elected officials, appointed officials, or employees of the City. The insurance procured and maintained by the Emergency Financial Manager may extend to any claim, demand, or lawsuit asserted or costs recovered against the Emergency Financial Manager and any employee, agent, appointee, or contractor of the

SOM40003143

Emergency Financial Manager to the extent permitted by the Act.

8.2 <u>Post-Contract</u>. If, after the date that the service of the Emergency Financial Manager is concluded, the Emergency Financial Manager or any employee, agent, appointee, or contractor of the Emergency Manager is subject to a claim, demand, or lawsuit arising from an action taken during the service of the Emergency Financial Manager, and not covered by a procured insurance policy, litigation expenses, including but not limited to attorney fees, payments in satisfaction of judgments, and payments made in settlement as specified pursuant to the Act, shall be paid by the City. If such expenses are not paid by the City, they shall be treated as a debt owed to this State pursuant to section 17a(5) of Public Act 140 of 1971, the Glenn Steil State Revenue Sharing Act of 1971, MCL 141.917a.

8.3 <u>Additional Insurance</u>. If the City has purchased, or otherwise obtained, an errors and omissions policy, then the Emergency Financial Manager may choose to be covered under such policy at the expense of the City.

8.4 <u>Payment by City</u>. All insurance required under this Contract shall be acquired at the expense of the City under valid and enforceable policies, issued by insurers of recognized responsibility. The Board reserves the right to reject as unacceptable any insurer.

## 9. TERMINATION OF CONTRACT AND APPOINTMENT

9.1 <u>Termination by the Board</u>.

a) <u>The Board</u>. The Emergency Financial Manager serves at the pleasure of the Board which has the power to rescind the appointment and terminate this Contract at any time, and without cause, by issuing a Notice of Termination to the Emergency Financial Manager.

9.2 <u>Termination Process</u>. Upon receipt of a Notice of Termination, and except as otherwise directed by the Board, the Emergency Financial Manager shall:

a) Cease work under this Contract upon the date and to the extent specified in the Notice of Termination;

b) Incur no costs beyond the date specified by the Notice of Termination;

c) Submit to the State Treasurer on the date the termination is effective all records, reports and documents as this State shall specify and carry out such directives as the State Treasurer may issue concerning the safeguarding and disposition of files and property; and

d) Submit within 30 calendar days a closing memorandum and final billing, which shall be paid within 30 days.

9.3 <u>Termination by Emergency Financial Manager</u>. The Emergency Financial Manager may terminate this Contract at any time, with or without cause, with 30 days written notice to the State Treasurer. Within 30 days of the Emergency Financial Manager's final day of service, the

SOM40003144

Emergency Financial Manager shall submit a closing memorandum and final billing, which shall be paid within 30 calendar days.

## 10. GENERAL PROVISIONS

10.1 <u>Governing Law and Jurisdiction</u>. This Contract shall be subject to, and construed according to, the laws of the State of Michigan, and no action shall be commenced against this State, its agents, or employees for any matter whatsoever arising out of this Contract, in any court other than a Michigan State court.

10.2 <u>No Waiver</u>. A party's failure to insist on the strict performance of this Contract shall not constitute waiver of any breach of the Contract.

10.3 <u>Other Debts</u>. The Emergency Financial Manager represents and warrants that the Emergency Financial Manager is not, and will not become, in arrears on any contract, debt, or other obligation to the State of Michigan, including taxes.

10.4 <u>Invalidity</u>. If any provision of this Contract or its application to any persons or circumstances shall, to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Contract shall not be affected, and each remaining provision of this Contract shall be valid and enforceable to the fullest extent permitted by law.

10.5 <u>Headings</u>. Section headings contained in this Contract are for convenience only and shall not be used to interpret the scope or intent of this Contract.

10.6 <u>Entire Agreement</u>. This Contract represents the entire and exclusive agreement between the parties and supersedes all proposals or other prior agreements, oral or written, and all other communications between the parties.

10.7 <u>Amendment</u>. No Contract amendment will be effective and binding upon the parties to this Contract unless the amendment expressly makes reference to this Contract, is in writing, and is signed by duly authorized representatives of all parties and all the requisite State approvals are obtained.

10.8 <u>Order of Priority</u>. This Contract and the Act shall be read to be consistent one with the other. However, if a conflict is deemed to exist between the terms of this Contract and the Act, the Act shall supersede the terms of this Contract.

10.9 <u>Counterparts</u>. This Contract may be executed in separate counterparts, each of which when executed shall be deemed an original, but all of which when taken together shall constitute one and the same Contract.

IN WITNESS WHEREOF, the members of the Board, or their designees, and the Emergency Financial Manager have signed and executed this Contract.

LOCAL EMERGENCY FINANCIAL ASSISTANCE
LOAN BOARD

By_____
Andy Dillon, State Treasurer


By_____
John E. Nixon, Director
Department of Technology, Management and Budget


By_____
Steve Arwood, Director
Department of Licensing and Regulatory Affairs


By_____
_____, Emergency Financial Manager

Dated: _____



RICK SNYDER
GOVERNOR

ANDY DILLON
STATE TREASURER

## CONTRACT FOR EMERGENCY MANAGER SERVICES

Rick Snyder, Governor of the State of Michigan (Governor) and the Michigan Department of Treasury retain and appoint _____ as the Emergency Manager (Emergency Manager) for the City of Detroit (City) under Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1541 *et seq,* (the Act).

The Emergency Manager will provide services to the City pursuant to the terms and conditions set forth in this Contract and the Act.

The Emergency Manager's role is to remedy the financial distress of the City by requiring, within available resources, prudent fiscal management and an efficient provision of municipal services by exercising the necessary authority conferred herein to take appropriate action on behalf of the City and its residents. In accepting this appointment, the Emergency Manager agrees to leverage all the Emergency Manager's skills and abilities to accomplish these objectives on behalf of City residents.

## 1. PARTIES, PURPOSE, DUTIES, AND REPORTS

1.1 Parties. The parties to this Contract are the State of Michigan by the Department of Treasury and _____.

1.2 Purpose. The parties to this Contract agree that _____ will act as the Emergency Manager for the City. The Emergency Manager's duties and responsibilities are delineated in the Act and include conducting all aspects of the operations of the City and establishing and implementing a written financial plan as required by Section 11 of the Act.

1.3 Duties. The Emergency Manager shall possess all the powers and duties authorized under the Act, including those specifically related to local governments. In addition, the Emergency Manager shall work cooperatively with the Office of the Governor and the State Treasurer. The Emergency Manager agrees to continue to keep these officials informed of major initiatives to be undertaken in furtherance of this Contract before their public announcement. The Emergency Manager shall seek the approval of the State Treasurer before entering into a new collective bargaining agreement.

1.4 Reports. The Emergency Manager shall file quarterly reports with the Department of Treasury beginning on July 15, 2013, for the immediately preceding quarter and shall file the first report required by Section 17 of the Act within six months of the Emergency Manager's appointment and every six months thereafter.

SOM40003147

1.5 Communications. The Emergency Manager shall establish and maintain an appropriate protocol for ongoing communications with officials of the City, City residents, and the media. The communications protocol should include a variety of means, including personal interactions.

## 2. TERM OF CONTRACT

2.1 The Emergency Manager serves at the pleasure of the Governor except as provided in Section 9(3)(d) and Section 9(6)(c) of the Act.

2.2 Effective Date. This contract is effective on Thursday March 28, 2013.

## 3. COMPENSATION FOR SERVICES PROVIDED

3.1 Source of Payment. The State shall pay the compensation of the Emergency Manager for all services rendered under this Contract.

3.2 Salary. The Emergency Manager's salary for services rendered under this Contract shall be $275,000 per year. If this Contract is terminated after the Emergency Manager has provided services for a portion of a month, the Emergency Manager shall be entitled, for that portion of that month, to $22,916.67 multiplied by the proportion that the number of days of the month for which services were provided bears to the number of days of the whole month. The Emergency Manager shall not receive or accept any compensation from the City or the State except as provided for in this contract.

3.3 Payment for Services. The Emergency Manager shall be paid in installments consistent with the established written policies and procedures of the Michigan Department of Treasury. If requested by the State Treasurer, the Emergency Manager shall provide to the Michigan Department of Treasury additional information regarding services performed pursuant to this Contract.

3.4 Reimbursement for Actual and Necessary Expenses. The actual and necessary expenses of the Emergency Manager, including customary expenses related to travel, meals, and lodging which are incurred in connection with service to the City will be reimbursed by the City. The Emergency Manager shall provide original copies of all receipts for meals, lodging, and travel reimbursement with any request for reimbursement. Any reimbursement for expenses under this contract shall be reviewed and approved in writing by the City's Chief Financial Officer.

## 4. ADDITIONAL STAFF AND CONSULTANT FEES

4.1 Staff. The Emergency Manager may, as provided in the Act, appoint additional staff as necessary to fulfill the obligations of the Emergency Manager's appointment and duties under this Contract. Payment of compensation for additional staff will be the obligation of the City. While authority to hire additional staff rests with the Emergency Manager, the Emergency Manager agrees to consult with the State Treasurer, or the designee of the State Treasurer, at least 24 hours before extending offers of employment for positions paying $50,000.00, or more, annually. The Emergency Manager shall issue a written employment contract to each individual hired pursuant

SOM40003148

to this Section, regardless of the compensation paid to that individual. The employment contract issued pursuant to this Section shall, as of the date the individual is hired by the Emergency Manager, prohibit the individual from engaging in any other employment for remuneration without the express written approval of the Emergency Manager. The Emergency Manager agrees to consult with the State Treasurer, or the designee of the State Treasurer, at least 24 hours before approving outside employment for any individual. A breach of this Section shall be a material breach of this Contract.

4.2 Professional Assistance. The Emergency Manager may, as provided in the Act, secure professional assistance as necessary to fulfill the obligations of the Emergency Manager's appointment and duties under this Contract. Payment of compensation for additional professional assistance will be the obligation of the City. The Emergency Manager agrees to consult with the State Treasurer, or the designee of the State Treasurer, at least 24 hours before authorizing professional services contracts of $50,000.00, or more, per engagement or project.

4.3 Security. The Emergency Manager will be entitled to receive security protection in connection with the Emergency Manager's duties under this Contract. Security personnel will be retained only upon the approval of the State Treasurer, or the designee of the State Treasurer, and only after consultation with the Director of the Michigan Department of State Police, or the designee of the Director of the Michigan Department of State Police. Payment of compensation for security personnel will be the obligation of the City.

## 5. REPRESENTATIONS

5.1 Qualifications. By signing this Contract, the Emergency Manager, represents that the Emergency Manager meets the minimum qualifications for appointment set forth in the Act. The Emergency Manager shall perform the duties of that office on a full-time basis and shall not accept any other employment or engage in any other activity for remuneration without the express written approval of the State Treasurer.

5.2 Conflict of Interest. The Emergency Manager represents and warrants that the Emergency Manager has no personal or financial interest, and will not acquire any such interest, that would conflict in any manner or degree with the performance of this Contract.

5.3 Non-competition. The Emergency Manager represents and warrants that the Emergency Manager is not subject to any non-disclosure, non-competition, or similar clause with current or prior clients or employers that will interfere with the performance of this Contract. The State will not be subject to any liability for any such claim.

5.4 Facilities and Personnel. The City will provide the Emergency Manager with proper facilities and personnel to perform the services and work required to be performed pursuant to this Contract.

5.5 Records. The Emergency Manager shall maintain complete records in accordance with generally accepted accounting practices and sound business practices. This requirement applies to all information maintained or stored in the computer system of the Emergency Manager or com-

SOM40003149

puter system of the City. The State Treasurer and his designees shall have the right to inspect all records related to this Contract.

5.6 <u>Non-Discrimination</u>.

a) The Emergency Manager shall comply with Public Act 220 of 1976, the Persons with Disabilities Civil Rights Act, MCL 37.1101 *et seq.,* and all applicable federal, State, and local fair employment practices and equal opportunity laws. The Emergency Manager covenants that the Emergency Manager will not discriminate against any employee or applicant for employment with respect to hire, tenure, terms, conditions, or privileges of employment, or a matter directly or indirectly related to employment, because of a disability that is unrelated to the individual's ability to perform the duties of a particular job or position. The Emergency Manager shall impose this covenant upon every subcontractor that enters into an agreement for the performance of any obligation imposed by this Contract. A breach of this covenant shall be a material breach of this Contract.

b) The Emergency Manager shall comply with Public Act 453 of 1976, the Elliott-Larsen Civil Rights Act, MCL 37.2101 *et seq.,* and all applicable federal, State, and local fair employment practices and equal opportunity laws. The Emergency Manager covenants that the Emergency Manager will not discriminate against an employee or applicant for employment with respect to hire, tenure, terms, conditions, or privileges of employment, or a matter directly or indirectly related to employment, because of race, color, religion, national origin, age, sex, height, weight, or marital status. The Emergency Manager shall impose this covenant upon every subcontractor that enters into an agreement for the performance of any obligation imposed by this Contract. A breach of this covenant shall be a material breach of this Contract.

5.7 <u>Unfair Labor Practices</u>. The Emergency Manager shall not enter into a contract for the performance of any obligation imposed by this Contract with a subcontractor, manufacturer, or supplier whose name appears in the register prepared pursuant to Public Act 278 of 1980, MCL 423.322, of employers found in contempt of court for failure to correct unfair labor practices. The State may void this Contract if the Emergency Manager, or any subcontractor, manufacturer, or supplier of the Emergency Manager that is a party to a contract for the performance of any obligation imposed by this Contract, appears in the above mentioned register.

5.8 <u>Independent Contractor</u>. The relationship of the Emergency Manager to the State and to the City under this Contract is that of an independent contractor. Except as specifically provided in the Act, no liability, benefits, workers compensation rights or liabilities, insurance rights or liabilities, or any other rights or liabilities arising out of, or related to, a contract for hire, nor employer-employee relationship, shall arise, accrue, or be implied to either party under this Contract or to an agent, subcontractor, or employee of either party under this Contract, as a result of the performance of this Contract.

## 6. NOTICES

6.1 The State Treasurer is the designee for this Contract unless notice of another designation is provided by the Governor. All notices, correspondence, requests, inquiries, billing statements, and other documents mentioned in this Contract shall be directed to the attention of the

SOM40003150

State Treasurer, Andy Dillon, and to the following:

For the State:

> Michigan Department of Treasury
> Office of Legal Affairs
> Richard H. Austin Building, 430 West Allegan Street
> Lansing, Michigan 48922
> Phone: (517) 373-3223

For the Emergency Manager:

> _____
> _____
> _____, MI 4\_\_\_\_

## 7. LIMITATION UPON LIABILITY

7.1 The State. The State, the Treasurer, and all other State officials are not liable for any obligation of or claim against the City resulting from actions taken in accordance with the Act or this Contract.

7.2 The Emergency Manager. Pursuant to the Act, in performing this Contract the Emergency Manager is engaging in a governmental function and is immune from liability for any action taken which the Emergency Manager reasonably believes to be within the scope of the Emergency Manager's authority granted by the Act or by this Contract.

## 8. INSURANCE

8.1 General. The Emergency Manager may procure and maintain, at the expense of the City, health, worker's compensation, general liability, professional liability, and motor vehicle insurance for the Emergency Manager and any employee, agent, appointee, or contractor of the Emergency Manager as may be provided to elected officials, appointed officials, or employees of the City. The insurance procured and maintained by the Emergency Manager may extend to any claim, demand, or lawsuit asserted or costs recovered against the Emergency Manager and any employee, agent, appointee, or contractor of the Emergency Manager to the extent permitted by the Act.

8.2 Post-Contract. If, after the date that the service of the Emergency Manager is concluded, the Emergency Manager or any employee, agent, appointee, or contractor of the Emergency Manager is subject to a claim, demand, or lawsuit arising from an action taken during the service of the Emergency Manager, and not covered by a procured insurance policy, litigation expenses, including but not limited to attorney fees, payments in satisfaction of judgments, and payments made in settlement as specified pursuant to the Act, shall be paid by the City. If such expenses are not paid by the City, they shall be treated as a debt owed to this State pursuant to section 17a(5) of Public Act 140 of 1971, the Glenn Steil State Revenue Sharing Act of 1971, MCL 141.917a.

SOM40003151

8.3 <u>Additional Insurance</u>. If the City has purchased, or otherwise obtained, an errors and omissions policy, then the Emergency Manager may choose to be covered under such policy at the expense of the City.

8.4 <u>Payment by City</u>. All insurance required under this Contract shall be acquired at the expense of the City under valid and enforceable policies, issued by insurers of recognized responsibility. The State Treasurer reserves the right to reject as unacceptable any insurer.

## 9. TERMINATION OF CONTRACT AND APPOINTMENT

9.1 <u>Termination by the State</u>.

a) <u>The State</u>. The Emergency Manager serves at the pleasure of the Governor except as provided in Section 9(3)(d) and Section 9(6)(c) of the Act. The Governor has the power to rescind the appointment and terminate this Contract at any time, and without cause, by issuing a Notice of Termination to the Emergency Manager.

9.2 <u>Termination Process</u>. Upon receipt of a Notice of Termination, and except as otherwise directed, the Emergency Manager shall:

a) Cease work under this Contract upon the date and to the extent specified in the Notice of Termination;

b) Incur no costs beyond the date specified by the Notice of Termination;

c) Submit to the State Treasurer on the date the termination is effective all records, reports and documents as this State shall specify and carry out such directives as the State Treasurer may issue concerning the safeguarding and disposition of files and property; and

d) Submit within 30 calendar days a closing memorandum and final billing, which shall be paid within 30 days.

9.3 <u>Termination by Emergency Manager</u>. The Emergency Manager may terminate this Contract at any time, with or without cause, with 30 days written notice to the State Treasurer. Within 30 days of the Emergency Manager's final day of service, the Emergency Manager shall submit a closing memorandum and final billing, which shall be paid within 30 calendar days.

## 10. GENERAL PROVISIONS

10.1 <u>Governing Law and Jurisdiction</u>. This Contract shall be subject to, and construed according to, the laws of the State of Michigan, and no action shall be commenced against this State, its agents, or employees for any matter whatsoever arising out of this Contract, in any court other than a Michigan State court.

10.2 <u>No Waiver</u>. A party's failure to insist on the strict performance of this Contract shall not constitute waiver of any breach of the Contract.

SOM40003152

10.3 Other Debts. The Emergency Manager represents and warrants that the Emergency Manager is not, and will not become, in arrears on any contract, debt, or other obligation to the State of Michigan, including taxes.

10.4 Invalidity. If any provision of this Contract or its application to any persons or circumstances shall, to any extent, be determined by a court of competent jurisdiction to be invalid or unenforceable, the remainder of this Contract shall not be affected, and each remaining provision of this Contract shall be valid and enforceable to the fullest extent permitted by law.

10.5 Headings. Section headings contained in this Contract are for convenience only and shall not be used to interpret the scope or intent of this Contract.

10.6 Entire Agreement. This Contract represents the entire and exclusive agreement between the parties and supersedes all proposals or other prior agreements, oral or written, and all other communications between the parties.

10.7 Amendment. No Contract amendment will be effective and binding upon the parties to this Contract unless the amendment expressly makes reference to this Contract, is in writing, and is signed by duly authorized representatives of all parties and all the requisite State approvals are obtained.

10.8 Order of Priority. This Contract and the Act shall be read to be consistent one with the other. However, if a conflict is deemed to exist between the terms of this Contract and the Act, the Act shall supersede the terms of this Contract.

10.9 Counterparts. This Contract may be executed in separate counterparts, each of which when executed shall be deemed an original, but all of which when taken together shall constitute one and the same Contract.

SOM40003153

IN WITNESS WHEREOF, the Governor and the Emergency Manager have signed and executed this Contract.

STATE OF MICHIGAN

Dated: _____    _____
                                    Rick Snyder, Governor


Dated: _____    _____
                                    _____, Emergency Manager


Approved as to form and content pursuant to Section 9(3)(e) of Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1541 *et seq.*


Dated: _____    _____
                                    Andy Dillon, State treasurer

SOM40003154

# EXHIBIT D

*In Re: City of Detroit, Debtor*

---

*Governor Richard D. Snyder*
*October 9, 2013*

---

*Moretti Group*
*471 W. South Street*
*Suite 41B*
*Kalamazoo, MI 49007*
*800-536-0804*



Moretti GROUP

Original File 100913RS.TXT

Min-U-Script® with Word Index

## Page 1

```
 1              UNITED STATES BANKRUPTCY COURT
            FOR THE EASTERN DISTRICT OF MICHIGAN
 2                SOUTHERN DIVISION - DETROIT
    ----------------------------------
 3  In re:                          Chapter 9

 4  CITY OF DETROIT, MICHIGAN,      Case No. 13-53846

 5            Debtor,              Hon. Steven W. Rhodes
    ----------------------------------
 6  V I D E O T A P E D   D E P O S I T I O N   O F

 7  WITNESS:   GOVERNOR RICHARD D. SNYDER

 8  LOCATION:  The Romney Building
               111 S. Capitol Avenue
 9             Lansing, Michigan

10  DATE:      Wednesday, October 9, 2013
               8:38 a.m.
11

12  APPEARANCES:
    FOR PLAINTIFFS FLOWERS:
13
                   LAW OFFICE OF WILLIAM A. WERTHEIMER
14                 30515 Timberbrook Lane
                   Bingham Farms, Michigan  48025
15                 248.644.9200
                   billwertheimer@gmail.com
16                 BY: WILLIAM A. WERTHEIMER   (P26275)

17  FOR INTERNATIONAL UNION, UAW:

18                 COHEN, WEISS and SIMON, LLP
                   330 West 42nd Street
19                 New York, New York  10036-6976
                   212.563.4100
20                 pdechiara@cwsny.com
                   BY: PETER D. DeCHIARA, ESQUIRE
21
    FOR THE RETIREES COMMITTEE:
22
                   DENTONS US LLP
23                 1221 Avenue of the Americas
                   New York, New York  10020-1089
24                 212.768.6881
                   arthur.ruegger@dentons.com
25                 BY: ARTHUR H. RUEGGER, ESQUIRE
```

## Page 2

```
 1  APPEARANCES, CONTINUING:

 2  FOR AFSCME, AMERICAN FEDERATION OF STATE, COUNTY and
    MUNICIPAL EMPLOYEES, AFL-CIO:
 3
                   AFSCME GENERAL COUNSEL'S OFFICE
 4                 1101 17th Street, NW, Suite 900
                   Washington, D.C.   20036
 5                 202.775.5900
                   martz@afscme.org
 6                 BY: MICHAEL L. ARTZ, ESQUIRE

 7                 LOWENSTEIN SANDLER, LLP
                   65 Livingston Avenue
 8                 Roseland, New Jersey  07068
                   973.597.2374
 9                 slevine@lowenstein.com
                   BY: SHARON L. LEVINE, ESQUIRE
10
11  FOR GENERAL RETIREMENT SYSTEM; CITY OF DETROIT POLICE AND
    FIRE RETIREMENT SYSTEM:
12
                   CLARK HILL
13                 212 E. Grand River Avenue
                   Lansing, Michigan  48906
14                 517.318.3060
                   sgallagher@clarkhill.com
15                 BY: SEAN PATRICK GALLAGHER  (P73108)

16                 CLARK HILL
                   500 Woodward Avenue, Suite 3500
17                 Detroit, Michigan  48226
                   313.965.8274
18                 jgreen@clarkhill.com
                   BY: JENNIFER K. GREEN   (P69019)
19
    FOR THE FINANCIAL GUARANTY INSURANCE CORPORATION:
20
                   WILLIAMS WILLIAMS RATTNER &
21                 PLUNKETT, PC
                   380 North Old Woodward Avenue
22                 Suite 300
                   Birmingham, Michigan  48009
23                 248.642.0333
                   eje@wwwrplaw.com
24                 BY: ERNEST J. ESSAD, JR.   (P32572)

25
```

## Page 3

```
 1  APPEARANCES, CONTINUING:

 2  FOR THE STATE OF MICHIGAN:

 3                 MICHIGAN DEPT. OF ATTORNEY GENERAL
                   Assistant Attorney General
 4                 Solicitor General Bureau
                   7th Floor G. Mennen Williams Building
 5                 525 West Ottawa Street
                   P.O. Box 30212
 6                 Lansing, Michigan  48909
                   517.373.1124
 7                 nelsonm9@michigan.gov
                   BY: MARGARET A. NELSON   (P30342)
 8
                   MICHIGAN DEPT. OF ATTORNEY GENERAL
 9                 Chief Legal Counsel
                   Executive Division
10                 7th Floor G. Mennen Williams Building
                   525 West Ottawa Street
11                 P.O. Box 30212
                   Lansing, Michigan  48909
12                 517.373.1110
                   schneiderm7@michigan.gov
13                 BY: MATTHEW SCHNEIDER  (P62190)

14                 OFFICE OF THE GOVERNOR-LEGAL DIVISION
                   George W. Romney Building
15                 111 South Capitol Avenue
                   P.O. Box 30013
16                 Lansing, Michigan  48909
                   517.241.5630
17                 gadolam@michigan.gov
                   BY: MICHAEL F. GADOLA   (P43960)
18
                   DICKINSON WRIGHT, PLLC
19                 215 South Washington Square, Suite 200
                   Lansing, Michigan  48933-1816
20                 517.487.4710
                   pellsworth@dickinsonwright.com
21                 BY: PETER H. ELLSWORTH  (P23657)

22
23
24
25
```

## Page 4

```
 1  APPEARANCES, CONTINUING:

 2  FOR THE CITY OF DETROIT:

 3                 JONES DAY
                   51 Louisiana Avenue, NW
 4                 Washington, D.C.  20001-2113
                   202.879.3939
 5                 gshumaker@jonesday.com
                   BY: GREGORY M. SHUMAKER, ESQUIRE
 6

 7  VIDEO BY:    Tim Reitman, Reitman Video Specialists

 8  REPORTED BY:   Laurel A. Jacoby, CSR-5059, RPR

 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
               I N D E X
WITNESS: GOVERNOR RICHARD D. SNYDER       PAGE NO.
Examination by Ms. Levine                      10
Examination by Mr. DeChiara                    51
Examination by Mr. Wertheimer                 106


           E X H I B I T   I N D E X

EXHIBIT NO.        DESCRIPTION            PAGE NO.
Exhibit 1    July 16, 2013 Letter
             Re: Recommendation Pursuant to
             Section 18(1) of PA 436            51
Exhibit 2    July 18, 2013 Letter
             Re: Authorization to Commence
             Chapter 9 Bankruptcy Proceeding    59
Exhibit 3    City of Detroit Proposal for
             Creditors, June 14, 2013           60
Exhibit 4    Free Press article
             "Michigan Attorney General
             Bill Schuette files on behalf of
             retirees in Detroit bankruptcy"    75
```

```
         E X H I B I T   I N D E X

EXHIBIT NO.         DESCRIPTION          PAGE NO.

Exhibit 10   July 18, 2013 email
             Re: High Priority with attached
             July 18, 2013 Letter
             Re: Authorization to Commence
             Chapter 9 Bankruptcy Proceeding
             (Bates Nos. DTMI00116442-445)      153

Exhibit 11   Oct. 9, 2013 email
             Subject: High Priority             159
             (Exhibit marked post deposition)




             (Exhibits attached to transcript.)
                    -   -   -
```

```
         E X H I B I T   I N D E X

EXHIBIT NO.         DESCRIPTION          PAGE NO.
Exhibit 5    Jones Day Presentation to
             the City of Detroit on
             January 29, 2013
             (Bates Nos. DTMI00128731-8805)     96
Exhibit 6    City of Detroit Chapter 9
             Communications Rollout Plan
             (Bates No. SOM200001331)          126
Exhibit 7    June 3-7, 2013 email chain
             Re: Financial & Operating Plan
             Power Point
             (Bates No. SOM200001327-28)       126
Exhibit 8    July 8, 2013 email
             Re: Detroit
             (Bates No. SOM200003601)          141
Exhibit 9    July 9, 2013 email
             Re: Detroit
             (Bates No. SOM200003657)          141
```

Lansing, Michigan
October 9, 2013
8:38 a.m.
- - -

MR. WERTHEIMER: William Wertheimer on behalf of the Flowers Plaintiffs.

I would like to put on the record the fact that the order that Judge Rhodes entered under which we're conducting this and the other State depositions provides at Paragraph 7 that the State would complete its document production by October 5 provided the parties could mutually agree to extend that date.

That date has not been extended by agreement. As late as last night at 10:15 -- I woke up this morning to find that the State had produced a fourth production that is not in compliance with the order.

I want to make clear on the record that we may take the position that we may need to continue the Governor and the other State's depositions after we have reviewed those documents as we have not looked at any of those documents as of now.

MS. NELSON: This is Margaret Nelson on behalf of the State.

Page 9

1       The fourth production of documents was made
2   under the State's continuing obligation to
3   supplement its discovery responses. So the fact
4   that our production was completed by the fifth,
5   pursuant to the court order, is irrelevant to the
6   fact that we have an ongoing duty to supplement, and
7   that was the purpose for the additional document
8   production yesterday.
9       MR. WERTHEIMER: I'll leave further
10  argument for later.
11      VIDEO TECHNICIAN: Today's date -- hold on.
12  I have to start over again. Give me a second.
13      (A pause was had in the proceedings.)
14      VIDEO TECHNICIAN: Today's date is
15  October 9th, 2013, and we're on the record at
16  8:42 a.m.
17      This is the video deposition of Governor
18  Richard Snyder. We're at the Romney Office
19  Building, 111 South Capitol Avenue in Lansing,
20  Michigan.
21      Could the reporter administer the oath to
22  the Governor, please.
23              -   -   -
24      -GOVERNOR RICHARD D. SNYDER-
25  called as a witness, being first duly sworn, was

Page 10

1   examined and testified as follows:
2               EXAMINATION
3   BY MS. LEVINE:
4   Q.  Good morning, Governor.
5   A.  Good morning.
6   Q.  My name is Sharon Levine. I'm with the law firm of
7       Lowenstein Sandler. I'm here on behalf of AFSCME,
8       and we appreciate your appearing for your deposition
9       today, so thank you.
10      Just for the record, when did you take
11      office as Governor of the State of Michigan?
12  A.  January 1, 2011.
13  Q.  And at the time you took office, was the State
14      providing greater financial -- a greater level of
15      financial support to the City of Detroit than it is
16      today?
17  A.  I would have to check that.
18  Q.  Would you be willing to support having the State
19      provide a greater level of financial support than it
20      is today in order to help the City of Detroit with
21      its plan of adjustment and particularly in order to
22      help fund the pension issues?
23  A.  In terms of we have many competing interests for the
24      State of Michigan with respect to our budget. I
25      don't make those decisions by myself. It goes

Page 11

1   through the appropriations process with the
2   legislature and the Governor.
3   Q.  My question was would you support an additional
4       level of support?
5   A.  I said I've been supportive of improved services for
6       citizens, not necessarily the repayment of debts.
7   Q.  That might have been responsive so I don't mean to
8       be argumentative, but the narrower question is would
9       you support an additional level of support for
10      Detroit in order to help deal with the so-called
11      underfunding pension issue?
12      MS. NELSON: Asked and answered. Go ahead.
13      Go ahead.
14      THE WITNESS: Oh. I view that as a --
15      that's a question that I couldn't answer because
16      it's a hypothetical. It would depend on the entire
17      situation for the facts depending on the potential
18      plan of adjustment for the debts.
19  BY MS. LEVINE:
20  Q.  Well, between March 28, 2013 and June 14, 2013, did
21      you have discussions with Kevyn Orr about a business
22      plan or a restructuring plan or a redevelopment plan
23      for the City of Detroit?
24  A.  Kevyn Orr was building a plan for creditors they
25      presented in June of this year.

Page 12

1   Q.  Did you have discussions with him with regard to
2       that plan before the June presentation?
3   A.  I had discussions that would have been subject to
4       attorney-client privilege.
5   Q.  Is it your understanding that that plan includes a
6       two billion dollar note for unsecured creditors?
7   A.  Yes.
8   Q.  And what's your understanding of what that plan
9       includes with regard to vested pension benefits for
10      the citizens of Detroit?
11  A.  The proposal includes some portion of that note
12      being allocated towards pensioners.
13  Q.  So the plan does not include just leaving the vested
14      pension benefits alone, does it?
15  A.  Well, with respect to the funded piece of pension
16      plans, that's available. There's an open question
17      with respect to the unfunded portion.
18  Q.  Do you understand that in a Chapter 11 corporate
19      bankruptcy case that the Pension Benefit Guaranty
20      Corporation or the PBGC provides federal insurance
21      for beneficiaries of a pension if a defined benefit
22      plan is terminated?
23  A.  Yes.
24  Q.  And is it your understanding that in a Chapter 9
25      bankruptcy case there is no similar protection for

Page 13

1    vested pension benefits?
2  A.  Yes.
3  Q.  What's your understanding of how the Detroit
4      citizens, the AFSCME retirees will support
5      themselves assuming that there's a diminution in the
6      current level of pension benefit provided?
7  A.  Could you clarify your question because you had
8      conflicting statements.
9          You asked about the citizens of Detroit and
10     then you asked about the retirees.
11 Q.  Well, let's go with the retired citizens of Detroit
12     first.
13         To the extent that their pensions are
14     diminished and there is no PBGC or federal
15     protection for them, what's your understanding under
16     the plan of -- the proposed plan how they will
17     support themselves?
18         MS. NELSON: Objection; calls for
19     speculation, form, foundation.
20         THE WITNESS: Given that we're in the
21     Chapter 9 process, there's been no plan presented at
22     this point in time.
23 BY MS. LEVINE:
24 Q.  We already had a little bit of a discussion that
25     you're aware of the plan that was presented to

Page 14

1      creditors in June of 2013, correct?
2  A.  That was part of going through a process from the
3      City of Detroit asking its creditors for good faith
4      negotiations.
5  Q.  Right. And under that plan, to the extent there was
6      an underfunding with regard to the pensions, there
7      was going to be some change made to the pension
8      benefits, correct?
9  A.  That would depend on mutual agreement between the
10     parties.
11 Q.  Well, assuming that there is a reduction for the
12     moment in pension benefits, have you had any
13     conversations with Kevyn Orr with regard to whether
14     or not there would be any other benefit or provision
15     made to the retirees of the City of Detroit that
16     were going to lose pension benefits as a result of
17     that plan?
18 A.  Those discussions would have been subject to
19     attorney-client privilege.
20 Q.  What's your understanding of the options that are
21     available to the City of Detroit?
22 A.  Well, we're in bankruptcy now so there's been
23     no plan presented by the City at this point in time,
24     so that's a hypothetical.
25 Q.  Do you believe it's fair to have the bankruptcy

Page 15

1      attorney and other bankruptcy professionals paid
2      ahead of retirees in connection with the Chapter 9
3      process?
4  A.  I view that as a legal matter because that's a
5      subject matter of how Chapter 9 bankruptcies work.
6  Q.  The question I was asking was whether or not you
7      believe it's fair. I'm not asking you whether or
8      not it's a legal matter.
9  A.  Well, I view it as just speculation on my part
10     because we're in Chapter 9, so that would be part of
11     the legal process.
12 Q.  Is it your understanding that the Wall Street
13     creditors, municipal bond holders will share in this
14     two billion dollar note alongside of the retirees
15     with regard to their unsecured claims?
16 A.  Again, there has been no plan presented in
17     bankruptcy, so that would be a hypothetical. If you
18     go back to the proposal to the creditors, that was
19     to be part of good faith negotiations, and there was
20     an attempt to do that so that would have all been
21     consentual.
22 Q.  Do you believe it's fair to pay Wall Street-type
23     municipal bond creditors ahead of retirees?
24 A.  Again, that's part of the mutual negotiations that
25     were part of the proposal for creditors.

Page 16

1  Q.  Prior to the time that Detroit filed for bankruptcy,
2      is it your understanding that House Speaker Bolger
3      had any involvement or discussions with Kevyn Orr
4      with regard to the bankruptcy filing?
5  A.  I don't recall.
6  Q.  Did he have discussions with you with regard to the
7      bankruptcy filing?
8  A.  In terms of speaking to Speaker Bolger, occasionally
9      I would give updates on what was going on with the
10     City of Detroit.
11 Q.  And did he express any views with regard to the
12     Chapter 9 filing?
13 A.  Not that I recall.
14 Q.  Did you have any conversations with Randy
15     Richardville prior to the Chapter 9 filing?
16 A.  It would be the same with Speaker Bolger, that as
17     part of the normal process I would give updates on
18     where the situations stood.
19 Q.  Do you have any recollection of what he said to you
20     with regard to those updates?
21 A.  No.
22 Q.  On or about July 18, when you authorized Detroit's
23     Chapter 9 filing, what was your understanding of the
24     dollar amount of the pension obligations that were
25     underfunded?

Page 41

1      deferential to his partners or recent former
2      partners at Jones Day?
3 A.   No. Because, in fact, the City of Detroit made the
4      determination to hire Jones Day, and they went
5      through with that process, and that was a separate
6      independent process that I believe actually occurred
7      prior to Kevyn Orr joining the City of Detroit as
8      emergency manager.
9 Q.   Did you consider whether it would be difficult for
10     Mr. Orr to favor the interests of the City over the
11     interests of Jones Day?
12 A.   I don't understand your question because I don't
13     understand why Jones Day would be in conflict with
14     the City of Detroit. They're representing the City
15     of Detroit.
16 Q.   And aren't they being compensated by the City of
17     Detroit?
18 A.   They are being compensated by the City of Detroit.
19 Q.   Isn't there less of an appearance of conflict if it
20     had been a different law firm that had been retained
21     by the City of Detroit than Kevyn Orr's prior firm?
22 A.   And that's why it was important that he resigned and
23     severed all ties.
24 Q.   During the discussions that you had with Kevyn Orr
25     prior to the time that he was appointed as emergency

Page 42

1      manager or after he was appointed as emergency
2      manager but before July 18th, did you ever discuss
3      with Kevyn Orr outsourcing for the City of Detroit?
4 A.   Could you explain what you mean by outsourcing?
5 Q.   As part of the business plan for the City of
6      Detroit, the City of Detroit is looking at --
7      potentially looking at outsourcing some of the
8      services that are currently performed by City
9      employees; is that correct?
10 A.   They're looking at the most efficient ways to
11     deliver services to the citizens of Detroit.
12 Q.   Is that yes?
13 A.   That would include that. In terms of looking at
14     other alternatives, some of those were outlined, in
15     fact, during the consent agreement in terms of
16     looking at opportunities such as having the Detroit
17     Economic Growth Corporation handle the planning and
18     zoning activities of the City of Detroit, and that
19     was done in the context of the Mayor and the City
20     Council approving that consent agreement.
21 Q.   I'm going to try again.
22      Did you have any conversations with Kevyn
23     Orr prior to the time that he was appoint -- prior
24     to the time that he was -- during the interview
25     process, prior to the time that he was appointed as

Page 43

1      emergency manager or at any time during the period
2      of time that he was appointed as emergency manager
3      on July 18th with regard to outsourcing?
4 A.   I don't recall with respect to the interview
5      process, and there has been discussions about
6      looking at providers of services in both internal
7      and external services for the City of Detroit since
8      that date.
9 Q.   For that same period of time, during the interview
10     process and up to and including July 18th or 19th,
11     did you have any conversation with Kevyn Orr with
12     regard to selling or monetizing assets such as the
13     art, Belle Isle and water and sewer and other assets
14     of Detroit?
15 A.   Those discussions would have been subject to
16     attorney-client privilege.
17 Q.   Is it your understanding that the sale of assets are
18     one of the things that are under consideration in
19     connection with the restructuring plan that Kevyn
20     Orr proposed during June of 2013?
21 A.   I don't recall that portion of the proposal.
22 Q.   What's your view on monetizing these assets as part
23     of a restructuring plan including the art, Belle
24     Isle and water and sewer and some of the other
25     assets of Detroit?

Page 44

1 A.   Again, that's a hypothetical discussion because it
2      would really come down to what's presented in the
3      plan of adjustment within the context of the
4      bankruptcy court, and it hasn't been done at this
5      point.
6 Q.   Well, I'm asking your view of whether or not those
7      items should be on the table in connection with the
8      structuring of that plan?
9 A.   I view those as primarily Kevyn Orr's decisions
10     because he's the emergency manager for the City of
11     Detroit.
12 Q.   During the interview process, prior to Kevyn Orr's
13     selection but during the period of time you were
14     talking to him, did you ever express a view that
15     vested pension benefits should not be modified by
16     the emergency manager for the City of Detroit?
17 A.   I don't recall.
18 Q.   Did you have discussions prior to the time that
19     Kevyn Orr was selected with regard to your views
20     about whether or not vested pension benefits should
21     be modified?
22 A.   I think that's just what -- what's different than
23     the prior question?
24 Q.   Are you saying you don't recall?
25 A.   I don't recall.

13-53846-tjt    Doc 1294-3    Filed 10/21/13    Entered 10/21/13 17:24:13    Page 31 of 33

Page 57

1 Q.  Have you ever been involved in a business, Governor
2      Snyder?
3 A.  Yes.
4 Q.  Isn't it true to assess the financial picture of a
5      business you need to know both the assets and the
6      liabilities of the business?
7 A.  This is a different situation in terms --
8 Q.  Could you answer my question?
9 A.  Yes.
10 Q.  The answer to my question is yes?
11 A.  Yes.
12 Q.  Okay.  At the time you received Mr. Orr's July 16th,
13      2013 letter, do you know whether Mr. Orr or his
14      staff had undertaken an analysis such that they knew
15      with specificity the City's cash flow?
16 A.  There had -- there was extensive work done doing
17      cash flow analysis of the City.  Some of that work
18      was included in the proposal to creditors back in
19      June --
20 Q.  Okay.
21 A.  -- in addition to reports that had been provided
22      under his obligation as emergency manager.
23 Q.  But at the time that you received the July 16th,
24      2013 letter, do you know whether Mr. Orr or his
25      staff had done an analysis which allowed them to

Page 58

1      know with specificity the extent of the City's cash
2      flow?
3 A.  I believe they had.
4 Q.  Okay.  Did you ever discuss that with Mr. Orr?
5 A.  That would be a matter of attorney-client privilege.
6 Q.  Well, whether it's a matter of attorney-client
7      privilege is a legal question, and you have counsel
8      here who can object if she believes that a question
9      infringes on the attorney-client privilege, so I
10      would ask you to answer the question.
11      MS. NELSON:  You can answer yes or no.
12      THE WITNESS:  Yes.
13 BY MR. DeCHIARA:
14 Q.  Yes, you did have discussions?
15 A.  Yeah.
16 Q.  And were those discussions -- were other people
17      present other than you and Mr. Orr in those
18      discussions?
19 A.  Yes.
20 Q.  Isn't it true you had one-on-one conversations with
21      Mr. Orr prior to the bankruptcy filing?
22 A.  Yes.
23 Q.  Okay.  In any of those one-on-one conversations with
24      Mr. Orr did you ever have a discussion of the City's
25      cash flow?

Page 59

1 A.  Not that I recall.
2 Q.  Do you know whether a significant portion of
3      Detroit's unfunded pension liability is allocable to
4      the City's Water and Sewer Department?
5 A.  I'm not aware of that relationship.
6 Q.  Okay.  Is that something that you think would be
7      relevant to a determination about whether or not the
8      City should pursue a bankruptcy?
9 A.  I haven't considered that as a question.
10 Q.  Okay.  Let me now refer you to page six of
11      Exhibit 1, and at the bottom paragraph of the page
12      there's a reference to the June 14th creditor
13      proposal.  Do you see that?
14 A.  Yes.
15 Q.  Okay.  And you were familiar with that proposal when
16      you received this letter on July 16th?
17 A.  Generally familiar.  It's a 128-page document.
18 Q.  Okay.
19
20      (Deposition Exhibit 2 was marked.)
21
22 BY MR. DeCHIARA:
23 Q.  I'd like to mark as -- well, I've already marked as
24      Exhibit 2, and I'll ask you to identify what I'll
25      identify for the record as a July 18th, 2013 letter

Page 60

1      from you to Mr. Orr and Mr. Dillon.
2      Is Exhibit 2 your response to what's been
3      marked as Exhibit 1?
4 A.  Yes.
5
6      (Deposition Exhibit 3 was marked.)
7
8 BY MR. DeCHIARA:
9 Q.  Governor, I've had the court reporter mark as
10      Exhibit 3 a document which bears the title City of
11      Detroit Proposal for Creditors, June 14th, 2013.
12      Let me represent to you that this document
13      was attached to the Orr Declaration that was filed
14      in the bankruptcy proceeding as the City's proposal
15      for creditors.
16      Let me -- did you see this document in any
17      prior form before it was made public on or about
18      June 14th, 2013?
19 A.  Yes.
20 Q.  And do you plan -- were you shown drafts of the
21      document?
22 A.  I'd seen a draft or so.  I can't recall whether it
23      was one or more.
24 Q.  Okay.  And who showed them to you?
25 A.  Again, I don't recall.

Page 65

1  It doesn't say I agree with that or disagree with
2  that. It simply says I authorized it to go forward
3  where a plan would be presented to a judge that
4  could be the result of further negotiations,
5  mediations, all kinds of work that ultimately a
6  judge would decide.
7 Q.  Okay. I'm not addressing your July 18th letter.
8 A.  Yeah.
9 Q.  I'm just pegging the question --
10 A.  Okay.
11 Q.  -- by time frame as of July 18th.
12 A.  Okay.
13 Q.  So as of July 18th, did you share Mr. Orr's view
14  that there had to be significant cuts in pension
15  liabilities?
16 A.  Based on the current situations with negotiations,
17  that continued to be the position that would be on
18  the table going into bankruptcy.
19 Q.  Again, I'm not sure that was responsive.
20 A.  Uh-huh.
21 Q.  As of July 18th, 2013, did you share Mr. Orr's view
22  that whether through negotiation or other means that
23  there as an end result had to be significant cuts in
24  accrued pension liabilities?
25 A.  I wouldn't use the word had to be but likely could

Page 66

1  be.
2 Q.  Okay. Well, Mr. Orr used the word "there must be".
3 A.  Uh-huh.
4 Q.  Did you share that view that there had to be?
5 A.  Not necessarily.
6 Q.  Okay.
7 A.  Just as I said.
8 Q.  Okay. So did you think about this issue as of -- or
9  as of the July 18th, 2013 time frame, had you given
10  thought to whether or not there had to be cuts to
11  accrued pension benefits?
12 A.  I gave thought to the issue because I have concern
13  for the retirees, and that was why one of the
14  important questions in my view was to have a retiree
15  representative in the bankruptcy.
16 Q.  And what was your -- since you said you gave thought
17  to it, can you articulate what your position was as
18  to whether or not there had to be cuts in accrued
19  pension liabilities? And I'm focusing on your views
20  on the matter as of July 18th, 2013.
21 A.  My view going back prior to that is I had hoped
22  that there would be negotiations to resolve this
23  short of bankruptcy because bankruptcy was a last
24  resort; that I hoped that people could come to the
25  table and come up with a mutual understanding and

Page 67

1  negotiation that would be satisfactory to the
2  parties involved.
3     That didn't happen in terms of that regard
4  but I still had hope to say that as you go through
5  the bankruptcy process I viewed it as likelihood
6  that there was less flexibility under the bankruptcy
7  process just because of the nature of federal
8  bankruptcy law than there probably was before.
9 Q.  Was it your view that as of July 18th in the
10  bankruptcy one way or another accrued pension
11  liabilities would have to be reduced?
12 A.  Based on the facts going into it, it was one of
13  those questions, as you said, there was a likelihood
14  of that happening.
15 Q.  That's not my question.
16 A.  Yes. Yeah, I believe there's a likelihood there
17  could be reductions in unfunded pension liabilities.
18 Q.  Okay. I'm not asking --
19 A.  Yeah.
20 Q.  Governor, I'm not asking you to predict the
21  likelihood of what might have happened.
22 A.  Okay.
23 Q.  I'm asking you whether you believed that in
24  bankruptcy there would have had to be one way or
25  another reductions in Detroit's accrued pension

Page 68

1  liabilities?
2 A.  I would say it's not a hundred percent belief.
3 Q.  But was it a less than 100 percent belief that there
4  had to be reductions?
5 A.  Again, if you looked at the numbers, as we discussed
6  earlier, those are significant numbers, and it would
7  be hard to see how it could be a hundred percent.
8 Q.  Let me -- did you discuss with anyone other than
9  your legal counsel and Mr. Orr whether there had to
10  be cuts to Detroit's accrued pension liability?
11 A.  When you say other people, there would be people
12  from the administration in the meetings that we had.
13 Q.  Who did you discuss that issue with?
14 A.  There could be any number of people that would
15  include my chief of staff, Andy Dillon, and other
16  people of the administration.
17 Q.  And what did you and Andy Dillon discuss on that
18  issue?
19     MS. NELSON: I'm going to object on the
20  grounds of attorney-client privilege. These
21  discussions occurred in the meetings with Mr. Orr
22  and his counsel.
23     MR. DeCHIARA: Well, there hasn't been
24  testimony to that effect.
25     MS. NELSON: He just said it.