# Exhibit B

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GET BACK UP, INC.,

      Plaintiff,

                                      Case No. 11-cv-13909
vs.                                   Hon. Robert H. Cleland

CITY OF DETROIT,
CITY OF DETROIT BOARD OF ZONING APPEALS,

      Defendants.
_____/

**MOTION FOR JUDGMENT FOR PERMANENT INJUNCTION, BRIEF IN SUPPORT**

**PROOF OF SERVICE**

## INTRODUCTION

Plaintiff Get Back Up, Inc. ("Get Back Up" or "GBU"), a non-profit organization, operates a 160-bed residential substance abuse treatment facility in the City of Detroit, until recently serving approximately 40 residents. Get Back Up is fully licensed by the State of Michigan Department of Community Health, which has a specific license for and regulations governing substance abuse programs. MCL 333.6233.

This case arises out of a dispute with the City of Detroit over Get Back Up's use of its facility. The City's ordinance places unique restrictions on a substance abuse treatment facility, including a requirement that such a facility obtain a Conditional Use Permit. Although Get Back Up was granted such a permit by the City's Building and Safety Engineering Department, the City's Board of Zoning Appeals reversed this grant after neighbors complained about their fears of living near recovering addicts. Get Back Up's efforts to reverse this decision through an administrative appeal to Wayne County Circuit Court were unsuccessful.

In this Court, Get Back Up challenges the City's ordinance and its actions because they violate federal law, specifically the Fair Housing Act, the Americans with Disabilities Act, and the Rehabilitation Act, as well as the United States Constitution. Courts faced with nearly identical cases have ruled in favor of treatment centers such as Get Back Up's; no case has found in favor of the municipality.

## TABLE OF CONTENTS

Introduction .................................................................................................................2

Question Presented ........................................................................................................4

Controlling Authority ....................................................................................................4

Statement of Facts .........................................................................................................5

    Get Back Up Obtains a Conditional Use Permit ......................................................7

    BZA Appeal ...........................................................................................................9

    The Wayne County Circuit Court Action ................................................................10

    GBU Opens the Facility .........................................................................................11

    Subsequent Activity in the Wayne County Circuit Court Action ..............................12

    The BZA's Findings ..............................................................................................13

    Michigan State Court Proceedings .........................................................................18

    Subsequent History at the Facility .........................................................................18

Argument ....................................................................................................................20

    1.  The City's Ordinance and Application of the Ordinance Violate Federal Law .......20

        A.  The City's Ordinance is Facially Invalid ..........................................................22

        B.  The City's Ordinance, as Applied, Violates Federal Law ....................................27

    2.  The City's Ordinance is Unconstitutional ............................................................29

    Conclusion ...........................................................................................................32

## QUESTION PRESENTED

Should the Court grant a permanent injunction restraining the City from enforcing its Ordinances regarding a Conditional Use Permit and requiring the City to issue a permit to allow Plaintiff to operate a substance abuse treatment facility?

## CONTROLLING AUTHORITY

Cases:

*Grayned v. City of Rockford*, 408 U.S. 104, 92 S.Ct. 2294 (1972).

*MX Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002)

Statutes:

29 USC § 794(a)

42 USC 3602(h)

42 USC § 3604(f)(1)

42 USC § 12132

4

# STATEMENT OF FACTS[1]

**Counsel have conferred and agreed to most of the the facts in this section.**
**Certain facts, in italics, are not stipulated.**
**The City may be submitting additional non-stipulated facts.**
**All exhibits were previously filed in connection with Docket No. 10.**

1.  Plaintiff Get Back Up, Inc. ("Get Back Up" or "GBU"), a non-profit organization, operates a 160-bed residential substance abuse treatment facility in the City of Detroit, previously serving approximately 40 residents.

2.  Get Back Up is fully licensed by the State of Michigan Department of Community Health, which has a specific license for and regulations governing substance abuse programs. MCL 333.6233.

3.  More information about Get Back Up is found at www.btgetbackup.com. A recent article from the Detroit Legal News is attached as Exhibit B. Get Back Up's most recent annual report is attached as Exhibit C.

4.  The facility is on a major street, Dexter, adjacent to the residential neighborhood. The address is 12305 Dexter, between Cortland and Sturtevant, about one-third of a mile south of Davison.

5.  This location makes the facility easily accessible to clients.

6.  Get Back Up has invested approximately $3,000,000 in the facility. The primary expense was rehabilitating the facility, which was an abandoned Detroit school.

7.  Get Back Up is the vision of its founder, President and CEO, Dr. William L. (Billy) Taylor, Jr., and is based on the belief that having a positive vision of the future is a powerful motivator for change. Dr. Taylor has inspired thousands to turn life's setbacks into comebacks and "Get Back Up" – he is a former All-American football player at the University of Michigan

---

[1] Unless otherwise noted, these facts are supported by the Declaration of Dr. William L. Taylor, attached as Exhibit A.

and also a recovering alcoholic who spent time living on the streets of Detroit before turning his life around, getting a PhD, and starting Get Back Up. His biography can be found at http://www.btgetbackup.com/index.php/about_us/about_dr_billy_taylor.

8. *As Dr. Taylor explained in highlighting the fact that GBU is an all-male facility, "when a man changes his life, the wife gets the husband back, parents get their son back, grandparents get their grandchild back and children get their father back." (12/8/09 Transcript, at 54; Exhibit D). His program does not take all candidates – as he explained, "we are a serious program to help people change their lives and if a person doesn't show that they are serious about their own recovery and they are probably not a good candidate for Get Back Up." (Id., at 66).*

9. GBU's programs draw upon the personal achievements and life experiences of Dr. Taylor and focus on several core areas:

    a. **Transitional Dynamics:** Dealing with individual and collective behaviors, environmental influences, personal actions and attitudes that shape clients' experiences as they navigate the rigorous road of recovery.

    b. **Academic Success:** Get Back Up stresses that academic success can provide clients with skills, knowledge and self-esteem that no one can ever take away.

    c. **Second Starts:** Because of his personal experience, Dr. Taylor is committed to building new services and working with existing programs that bolster the opportunities for and success of people who are striving for second starts.

6

    d. **Motivation:** Having a positive vision of the future is a powerful motivator for change. Get Back Up focuses on the "five P's": Preparation, Persistence, Patience, Perseverance and the Power of Transformation.

    e. **Life Coaching:** Get Back Up consistently uses two "headline" phrases that relate to the Life Coaching Process: "Plan your Life's Work, and Work your Life's Plan" and "When Plan A Fails, Implement Plan B".

10. Get Back Up currently has contracts to serve adult males who are homeless, unemployed, uninsured and underinsured and/or mandated to enter the program by a court.

11. In addition to substance abuse treatment, Get Back Up offers adult education that includes G.E.D. instruction and job training that includes federally-sponsored apprenticeship programs.

### *Get Back Up Obtains a Conditional Use Permit*

12. Get Back Up purchased its facility from the Detroit Public School District for roughly $500,000 on August 2, 2007.

13. The facility is located in a B4-H General Business District and Residential Historic zoning district. Exhibit E contains excerpts from the City's Ordinance.

14. The Ordinance defines a "substance abuse service facility" as "An establishment used for the treatment of persons having drug or alcohol abuse problems on an outpatient basis. The establishment may or may not dispense compounds or prescription medicines to individuals depending upon the severity of their drug or alcohol abuse problems. A generally recognized pharmacy or licensed hospital dispensing prescription medicines shall not be considered a substance abuse service facility." Exhibit E (last page).

7

15. Certain uses are permitted in this B4 district "by-right." Secs. 61-9-73 through 78. Among the "by-right" uses are boarding schools (74(1)), convalescent, nursing or rest homes (74(3)), domestic violence shelters (74(6)), hospitals (75(8)), neighborhood centers non-profit (75(11)), schools (75(14)), business colleges and commercial trade schools (76(8)), medical clinics (76(16), and private clubs (76(25))).

16. Other uses are deemed "conditional uses." Secs. 61-3-201 et seq.; 61-9-79 et seq. Two such "conditional uses" are residential and non-residential "substance abuse service facilities." Secs. 61-9-80(6), 61-9-81(5).

17. To operate one of these "conditional uses," the owner must obtain a Conditional Use permit, which entails review by the City's Building and Safety Engineering Department ("B&SE"), public hearings, site plan review and review by the City's Board of Zoning Appeals. Secs. 61-3-203, 214, 216, 242, 243, 244, 245.

18. Get Back Up applied for a Conditional Use permit.

19. There was a public hearing before B&SE on November 7, 2007.

20. On December 12, 2007, the City's Planning and Development Department ("PDD") initially recommended that B&SE deny the application.

21. However, B&SE conditionally approved the application on December 21, 2007, responding to PDD's concerns. Exhibit F.

22. PDD then reversed itself, approving GBU's site plan and use on January 9, 2008.

23. Robert Davenport, Co-Administrator of the B&SE, described the reasons for his department's support at the February 19, 2008 Board of Zoning Appeals ("BZA") hearing (Exhibit G).

8

24. B&SE's approval contained 17 conditions, such as a requirement that GBU take all necessary steps to "not create a nuisance of any kind to the surrounding neighborhood."

25. B&SE's approval was based on a variety of supporting information.

26. One supporting fact was the resolution from the Detroit Public Schools. (BZA Exhibit 6, Exhibit H hereto; 12/8/09 Transcript, at 42-43 [Exhibit D]).

27. The building was previously abandoned

28. *GBU's use is a significant improvement.  (BZA Exhibits 10 and 11, Exhibits I and J hereto; Id., at 47, 160).*

29. The physical facility primarily meets all the City's requirements. (Id., at 174-176).

30. There are 160 beds, which was the negotiated figure when GBU and the City agreed to the terms of the Consent Judgment. (Id., at 73).

31. The building is located along a commercial strip on a major street, adjacent to a residential and historic neighborhood. (Id., at 171).

32. GBU secured the necessary parking; the parking lot used by GBU has always been used as a parking lot despite the fact that it is within a residential zoning district. (Id., at 70, 172-173).

33. *Traffic is less congested than when the facility was used as a school. (Id., at 171, 173-174).*

34. *With its recent renovation, GBU's facility is in far better shape than many neighboring buildings. (BZA Exhibit 13, Exhibit K hereto).*

**BZA Appeal**

35. The Russell Woods Sullivan Area Association (the "Association"), the local homeowners' association, filed an appeal to the BZA on January 18, 2008.

9

36. The BZA conducted an appeal hearing on February 19, 2008.

37. GBU addressed what appeared to be a primary concern: parking. (Transcript, 2/19/08, at 168 [Exhibit G]).

38. GBU presented evidence that its use would further the City's goals to improve quality of life and reduce crime.

39. GBU presented evidence that its use of the building would save it from staying vacant and abandoned, as many former DPS buildings had become. (Id., at 152).

40. GBU presented evidence that it would enhance safety in the neighborhood. (Id., at 47-48, 56-57, 122-123, 152).

41. Mr. Davenport from B&SE explained his department's support. (Id., at 59-61).

42. The Association's counsel, Vanessa Fluker, presented her opinion, but no testimony, in opposition.

43. *Notably, she relied heavily on myths and stereotypes regarding recovering substance abusers. (Id., at 87-99).*

44. The BZA reversed the decision of the B&SE by a vote of 5-2, with the Chair and Vice-Chair supporting GBU.  Exhibit L.

### The Wayne County Circuit Court Action

45. GBU filed an action in Wayne County Circuit Court.

46. GBU's complaint listed two counts: (1) an appeal from the adverse decision of the BZA; and (2) a constitutional challenge to the ordinance.

47. On the day of oral argument of the appeal, August 15, 2008, GBU and the BZA entered into a Consent Judgment that reflected a compromise position – reducing the number of beds in the facility and dismissing GBU's claim for damages.  Exhibit M.

10

48. Based in part on the Consent Judgment, GBU obtained its accreditation and remodeled its facility at substantial expense, obtaining all necessary permits and a Certificate of Occupancy in early 2009. Exhibit N.

49. In the meantime, the Association was allowed to intervene and file a motion to set aside the Consent Judgment, which the circuit court denied. Exhibit O. The Association did not set its Motion to Intervene for hearing until October 10, 2008.

50. Although the circuit court refused to set aside the Consent Judgment, it incongruously remanded the case to the BZA. Thus, the public had a second opportunity to object to Get Back Up's facility.

51. The circuit court denied motions to reconsider on December 1, 2008. Exhibit P.

***GBU Opens the Facility***

52. GBU officially welcomed its first residents in April, 2009; there were 29 residents by December and there were 40 as of May, 2012. These residents receive three meals a day and continuous programming that includes relapse prevention, anger management, domestic violence counseling, and job training.

53. GBU's staff numbers 18 and includes a Director of Operations, a Director of Rehabilitation Services, three counselors/care managers, nine security monitors, two administrative assistants, and two chefs.

54. GBU provides a wide range of indispensable services to counter the large and growing drug problem in the City. Significantly, many of the GBU residents have chosen to participate, indicating a strong desire to improve their lives. Others participate as a condition of incarceration and/or probation through GBU's prior contract with the Michigan Department of Corrections. Exhibit Q. All of these services are not inconsistent with the Next Detroit

11

Neighborhood Initiative (focusing on three key areas: serious crime prevention, major land use/reuse, and prevention of illegal dumping) and the City's Master Plan. (BZA Exhibits 2, 5, Exhibits R and S hereto; 12/8/09 Transcript, at 30-32, 38-39, 43, 159-160 ["it has been established that the City's Master Plan contemplates drug rehabilitation facilities within the Detroit community and moreover there are two drug rehabilitation facilities within a short distance away from this facility."], 200). GBU, through its programming, community-building and resident leadership, attempts to create an environment where crime is suppressed and the quality of life enhanced.

55. Sherry Brown, a licensed master social worker (not employed by GBU) with an extensive background in programs for addicts and ex-offenders and a recovering addict herself, explained the value of GBU's multi-faceted treatment program. (12/8/09 Transcript, at 83-87).

56. *There is no evidence that GBU generates more drug use or crime. Instead, it combats the City-wide drug problem by rehabilitating users and providing them the skills they need to become productive members of society.*

57. *Similar programs have produced impressive results, including **lowering neighborhood crime rates**. As the National Conference of State Legislators found in an independent study, "in almost every instance, a community's fear of having an alcohol or other drug treatment program located within its borders is unfounded." (BZA Exhibit 4, Exhibit T hereto, Id., at 44-46).*

### *Subsequent Activity in the Wayne County Circuit Court Action*

58. Even though GBU had successfully opened the facility, the Association again filed a motion to set aside the Consent Judgment.

59. On April 20, 2009, the circuit court granted the Association's motion, setting aside the Consent Judgment eight months after it had been entered and after GBU had spent considerable money and time in reliance on the Consent Judgment, obtaining all necessary permits and a Certificate of Occupancy.    This order states that "in the interim, Plaintiffs/Appellants may, at their own risk, continue to operate and use the Get Back Up facility at 12305 Dexter." Exhibit U.

60. The circuit court again remanded the case to the BZA, which conducted a hearing on December 8, 2009 (Exhibit D) and issued a decision on March 10, 2010 reversing the B&SE's grant of the conditional use permit. Exhibit V.

### The BZA's Findings

61. *GBU established that there had not been any increase in criminal activity.   Dr. Taylor explained to the BZA that in the nine months of operation between April and December, 2009, there were no criminal incidents.  (12/8/09 Transcript., at 55).   Dr. Taylor is present every day.  (Id., at 57-58).   There are 16 security cameras within and outside the facility and security staff monitors every door.  (Id., at 67).   Bed checks are done every night.  (Id., at 68).   Residents are not allowed to have cars.  (Id., at 68).   To ensure safety in the surrounding area, new residents must complete 60 days of programming before they earn a day pass to leave the facility or have visitors (these visitors must be on a pre-determined list); all visitors must pass through metal detectors.  (Id., at 69-70).[2]*

62. *GBU also provides the surrounding area with the direct benefit of heightened security.  (Id., at 36-37, 40-41).   Local businesses support GBU.  (Id., at 37-38).   In one specific case, GBU's security foiled an attempted break-in at the neighboring Grace Temple Church of God in Christ.  (BZA Exhibit 9, Exhibit W hereto (this Exhibit also contains numerous letters of*

---

[2] The 60-day requirement has been reduced to 30 days.

support); *Id., at 46-47, 80-81).   GBU's security staff also discouraged break-ins in the neighborhood. (2/19/08 Transcript, at 56).  As GBU's security employee explained, "it is safer because we patrol that area day and night."  (Id., at 56-58).  Pastor Franklin Garrison submitted three additional letters explaining the value of GBU's presence in maintaining a secure and inviting neighborhood and praising Dr. Taylor's courage for investing in a program that will "make a positive change..."  GBU continues to work closely with the church, to the point of providing food and school supplies.  (12/8/09 Transcript, at 63, 82)("Dr. Taylor has been a faithful contributor to the ministry in assisting us with food.").*

63. *The Association's witness on this issue was an assistant manager of the local CVS, who told a story about an unidentified man who attempted to shoplift $30-$40 worth of merchandise and another who attempted to shoplift $90 worth of merchandise.  There was no evidence that either shoplifter was in fact associated with GBU; even the witness acknowledged the distinct possibility that the two men could be lying when they claimed to have come from the "rehab place down the street." (Id., at 115-121, 129).  But even if they were from GBU, these incidents hardly qualify as a threat to neighborhood security, especially when the CVS employee quickly conceded that they have "a lot of people stealing."  In fact, they catch people almost every day. (Id., at 122, 129).  When the CVS employee tried to link a small increase in CVS's theft rate with GBU, he was cross-examined by the Chair. (Id., at 123-124).  There was no evidence linking the increase to GBU.  Another witness, unintentionally highlighting the speculative nature of his objection, asked "when are they [GBU residents] going to start coming into the neighborhood?" (Id., at 139).  Another neighbor asked, without supplying any evidence, "where are they going to park...They are going to take all of the parking for the residents in the*

14

neighborhood." *(Id., at 145).* Another talked about criminal activity in the area without even trying to link it to GBU. *(Id., at 151).*

64. *In the absence of criminal activity, residents complained to the BZA about their general fears of having addicts in the neighborhood and inappropriate conduct such as residents making gestures from their windows. Of critical importance, there is no evidence that these fears became reality or that the neighbors brought these minor incidents to GBU's attention. Nor was there any evidence that the conduct continued after residents complained to the BZA.*

65. *GBU established that its facility had a positive effect on property values, as the report provided to the BZA establishes. (BZA Exhibit 12, Exhibit X hereto, Id., at 35-36, 48-50, 162-163). Bill Blevins, the author of the report, testified at the February 19, 2008 hearing. (2/19/08 Transcript, at 48-50, 53-55). Home prices in the immediate area are actually better than in other areas. A 2009 update confirmed Mr. Blevins' report. (BZA Exhibit 15, Exhibit Y hereto).*

66. *The Association had no proof to the contrary. The Association's only witness, a realtor in the area, offered hearsay testimony about someone who decided to buy a house two blocks away from the GBU facility instead of closer. (12/8/09 Transcript, at 106-108). This witness did not actually know the reason for the buyer's decision, and the BZA chair expressed his confusion about the value of her testimony. This witness also testified to another situation but could not provide any helpful details. (Id., at 108-109). Finally, this witness conceded that any reduction in values was due to the market, not to GBU. (Id., at 111-112).*

67. The BZA concluded that the proposed use "would not be compatible with the adjacent residential community and would be an intrusion to the adjacent property because this use would have an adverse effect on the community relative to health and safety." Finding No. 2.

68. *As for "health," the only evidence is that GBU will **improve** the health of the community by addressing serious drug problems. There was no evidence that anyone's health would suffer.*

69. *As for "safety," the only evidence is that GBU has enhanced neighborhood security by occupying and placing a positive security presence in what used to be an abandoned building. Indeed, GBU has a tremendous motivation to ensure the security of its facility and the neighborhood since its very existence depends on its ability to provide a safe environment for its residents, staff and neighbors. Of course, some residents expressed their **fear** about security, but fear is not a proper or legally valid basis for Finding No. 2.*

70. *There was no support in the record for the BZA's conclusion that the proposed use "would most definitely" worsen conditions in the area. Finding No. 4. GBU has invested hundreds of thousands of dollars in the building to rehabilitate a 30,000 square foot structure and the adjoining parking lot. GBU has a staff of trained employees working in the neighborhood every day.*

71. *Similarly, there was no evidence that the proposed use "would be injurious to the use and enjoyment of other properties in the area." Finding No. 5. Indeed, the only evidence supported the opposite conclusion. The neighboring businesses strongly supported GBU, as did the neighboring church and its local congregants.*

72. *Although some of the neighboring homeowners voiced concerns about what "might" happen, none of those concerns has actually materialized during the time GBU has been open.*

73. *Moreover, the strict conditions imposed by the B&SE when it granted the Condition Use permit ensure that if any neighbors feel that GBU has become a nuisance or otherwise a*

*danger, those neighbors have recourse. Not a single neighbor has complained to the B&SE since GBU opened.*

74. *In Finding No. 6, the BZA did not cite any facts to support its conclusion that there would be "practical difficulty or unnecessary hardship to the community and would deprive the area residents of reasonable use of their land because the proposed use would be virtually in the community's backyard." GBU is a self-contained facility; there is no encroachment of any kind into the neighborhood that would "deprive" anyone of the use of their property. Commercial neighbors supported GBU, as did many residential neighbors. Not a single resident within this two-block radius testified of any concern about losing the use of their property.*

75. *In Finding No. 7, the BZA concluded that GBU's substantial renovation of the building, which has existed for over seventy years and was most recently an abandoned school, would "substantially affect the neighboring properties by detracting from the aesthetic value of the surrounding properties that are historic." The BZA did not cite any record evidence because there was none.*

76. *Finding No. 8 mimics the language of the ordinance, as do many of the others: the BZA asserted that GBU's use would "aggravate pre-existing conditions in the area and impede orderly development in the community." The BZA did not cite any record evidence because there was none.*

77. *The BZA did not identify any "pre-existing conditions."*

78. *If the pre-existing conditions are poverty, drug use, theft, and vandalism, the only evidence in the record proves that GBU will help to **reverse** these conditions by rehabilitating drug users.*

79. *Finding No. 9 mimics the ordinance.  There was no proof that GBU's use "would have a detrimental effect on neighboring properties" or "alter the character of the residential area."*

80. *Finding No. 10 mimics the ordinance.  The BZA did not cite any evidence that property owners "would reconsider their plans for ongoing expansion, enhancement and maintenance" of their properties.  To the contrary, the record evidence established that the commercial property owners support GBU.  Residents, certainly committed to their neighborhood, can be expected to continue to expand, enhance and maintain it.*

### *Michigan State Court Proceedings*

81. On June 16, 2010, the Wayne County Circuit Court upheld the BZA's decision. Exhibit Z.[3]

82. GBU appealed to the Michigan Court of Appeals, which determined that the Wayne County Circuit Court had simply ruled on an administrative appeal from the BZA's decision and (1) refused to permit Plaintiff an appeal as of right and (2) refused to grant Plaintiff leave to appeal.  The Michigan Supreme Court rejected Plaintiff's application for leave and denied Plaintiff's motion for reconsideration on September 6, 2011.

83. As a result of these decisions, the BZA determination became final.[4]

### *Subsequent History at the Facility*

84. Since opening, Get Back Up has provided services to a total of 675 residential clients and 63 outpatient clients.  Many of these subsequently joined GBU's outpatient program and continue to participate.

85. *Client testimonials are attached as Exhibit AA.*

---

[3] This Court, through Magistrate Judge Michelson, has ruled that the Wayne County action does not bar the present action.

[4] Magistrate Judge Michelson also ruled that the case is not barred by the *Rooker-Feldman* doctrine.

18

86. *Supporting letters from Pastor Garrison, the Wayne County Sheriff's Office, the Wayne County Executive's Office, the Probation Parole Outreach & Referral Center and Patti Garbacz are attached as Exhibit BB.*

87. *There have been no reports of criminal activity at the facility.*

88. Other than operating without a zoning permit, there have been no code violation citations or other complaints about the condition of the facility.

89. *There is no evidence that the facility has caused a decline in property values. To the contrary, any decline in values correlates with the overall decline in Detroit. Exhibit CC. The homes in Russell Woods continue to sell at a premium over other homes in the City.*

90. On June 21, 2012, the Michigan Department of Corrections, which had just sent a letter terminating its contract with GBU, explained in a letter that this decision was based in part on the fact that GBU did not have a valid permit to operate. Exhibit DD.[5]

---

[5] The letter also notes an issue related to GBU's disclosure of the litigation. GBU is working with the MDOC to resolve this issue.

19

## ARGUMENT

## 1. THE CITY'S ORDINANCE AND APPLICATION OF THE ORDINANCE VIOLATE FEDERAL LAW

The Fair Housing Act ("FHA") makes it unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap." 42 USC § 3604(f)(1). The statute defines discrimination to include "a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford [a handicapped] person equal opportunity to use and enjoy a dwelling." *Id.* § 3604(f)(3)(B).[6]

The Americans with Disabilities Act ("ADA") and the Rehabilitation Act also prohibit all discrimination based on disability by public entities. Specifically, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity," 42 USC § 12132; and the Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 USC § 794(a).

To start, it is well-established that individuals can be considered disabled under the ADA, FHA, and Rehabilitation Act if they are recovering from substance abuse problems. *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 338-339 (6th Cir. 2002); 42 USC 3602(h). Under the ADA, as amended in 2009, a person is considered "disabled" if the person suffers from "a

---

[6] Residential substance abuse treatment facilities constitute dwellings under the FHA. *Lakeside Resort Enters., LP v. Bd. of Supervisors of Palmyra Township*, 455 F.3d 154, 157 (3d Cir. 2006).

physical or mental impairment that substantially limits one or more of the [person's] major life activities." 42 U.S.C. § 12102(2). Under the FHA, as amended in 1988, the definition of the protected class of persons is identical except the person is referred to as "handicapped." 42 U.S.C. § 3602(h). Both Acts provide that individuals participating in a supervised rehabilitation program and no longer using drugs are protected. *See* 42 U.S.C. § 12210(b)(2) (ADA); *United States v. Southern Mgmt. Corp.*, 955 F.2d 914, 920-23 (4th Cir. 1992) (acknowledging that residents of a supervised drug rehabilitation program meet the definition of handicapped under the FHA because the FHA covers recovering drug users but not current abusers).[7]

Next, it is equally well-established that "[a]ll three statutes apply to municipal zoning decisions." *Forest City Daly Hous, Inc. v. Town of North Hempstead*, 175 F.3d 144, 151 (2d Cir. 1999); see also *Innovative Health Sys., Inc. v. City of White Plains*, 117 F.3d 37, 44 (2d Cir. 1997) (ADA and the Rehabilitation Act apply to zoning decisions), *overruled on other grounds by Zervos v. Verizon New York*, 252 F.3d 163, 171 n7 (2d Cir. 2001); *Larkin v. State of Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 289 (6th Cir. 1996) (noting Congress's explicit intent to have the FHA apply to zoning laws); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1498 (10th Cir. 1995) (stating that the FHA, as amended, applies to "land-use regulations, restrictive covenants, and conditional or special use permits").

Finally, it is well-established that community views may be attributed to government bodies when the government acts in response to these views. See *A Helping Hand, LLC v. Baltimore County*, 515 F.3d 356, 366 (4th Cir. 2008).

With this background, the Court can move to an analysis of the facts of this case. But first, the Court should appreciate that disputes like this one have become common. Judge

---

[7] Both Acts specifically exempt from protection persons currently engaged in illicit drug use. *See* 42 U.S.C. § 12210(a) (ADA); 42 U.S.C. § 3602(h) (FHA).

21

Gibson in the Western District of Pennsylvania recently provided this explanation in *RHJ Medical Center, Inc. v. City of DuBois,* 754 F. Supp. 2d 723 (W.D. Pa. 2010):

> "This case presents the familiar conflict between the legal principle of non-discrimination and the political principle of not-in-my-backyard." *New Directions Treatment Services v. City of Reading,* 490 F.3d 293, 296 (3rd Cir.2007) (Smith, J.). When an organization submits plans to open a methadone treatment facility, the story usually unfolds as follows. First, after filing the appropriate zoning paperwork, the organization begins preparation to open the facility. Second, after concerned community leaders learn of this proposal, fears of attracting drug addicts to their town generates massive opposition to the plan. Third, invariably, a town meeting of some kind is held to allow representatives from the methadone clinic to address community concerns. Fourth, the discussions at the town hall meeting primarily focus on the dangers that a methadone clinic poses to the municipality. Fifth, through some zoning mechanism—whether an existing zoning ordinance, or a new one which is enacted for the instant situation—the community finds a reason why the methadone clinic should not be opened.
>
> Although in most cases the die is cast following step two, invariably following step five, the organization is left without redress, and is effectively banned from opening a facility in the town. Tragically, the victims of exclusionary zoning tactics— recovering opiate addicts—tend to be those least prepared to fight against such tactics. Left with no other remedy, the organization files suit in court.

## A. The City's Ordinance is Facially Invalid

The facts of this case fall into the same paradigm.

First, the ordinance is facially invalid because it imposes an additional, discriminatory burden on "substance abuse service" facilities. The starting point is an understanding of the City's B4 commercial district, in which the Get Back Up facility is located. Certain uses are permitted in this B4 district "by-right." Secs. 61-9-73 through 78. Among the "by-right" uses are convalescent, nursing or rest homes (74(3)), hospitals (75(8)), and medical clinics (76(16)). In other words, if Get Back Up wanted to call itself a nursing home or hospital, both of which entail continuing overnight stays (for weeks or months) with medical treatment, Get Back Up

22

would have had an absolute right to operate. Likewise, a hospital that provided treatment for recovering substance abusers would be allowed to operate "by-right."

Other uses are deemed "conditional uses." Secs. 61-3-201 et seq.; 61-9-79 et seq. Two such "conditional uses" are residential and non-residential "substance abuse service facilities." Secs. 61-9-80(6), 61-9-81(5). According to the City's definition, such a facility treats "persons having drug or alcohol abuse problems..." Exhibit E, last page. To operate one of these facilities, the owner must obtain a Conditional Use permit, which entails review by the City's Building and Safety Engineering Department, public hearings, site plan review and review by the City's Board of Zoning Appeals. Secs. 61-3-203, 214, 216, 242. Not only does this process represent significant additional expense, but it subjects the owner to "not-in-my-backyard" public criticism and the risk that a publicly-appointed body will reject the application. That is exactly what happened here.

It is the distinction between "by-right" uses and "conditional" uses that violates federal law. In short, the City treats Get Back Up differently based on the composition of Get Back Up's patients – recovering addicts and alcoholics. As a hospital or nursing home, it would be allowed to operate. As a substance abuse treatment facility, it must go through the Conditional Use permitting process.

Under the ADA, FHA and Rehabilitation Act, however, a public entity *is prohibited from implementing a zoning scheme that treats disabled individuals differently than non-disabled individuals. MX Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002)(ordinance violated the ADA and Rehabilitation Act on its face because it was directed at methadone clinics, which had standing to sue under the ADA and Rehabilitation Act). The Court was specifically concerned about myths and stereotypes directed at recovering substance abusers, stating:

[it] is clear that insofar as the Rehabilitation Act [or the ADA] evinces a general recognition of substance abuse as a disease, discrimination on the basis of such a handicap is antithetical to one of the goals of the Act – to ensure that persons . . . are not victimized . . . by . . . stereotypical assumptions concerning their handicap.

*Id.* at 342 (citing *Teahan v. Metro-North Commuter R. Co.,* 951 F.2d 511 (2nd Cir. 1991)). After recognizing substance abuse as a disease under the ADA and Rehabilitation Act, the Court held:

Where the discrimination results from unfounded fears and stereotypes that merely because plaintiff's potential clients are recovering drug addicts, they would necessarily attract increased drug activity and violent crime to the City, such discrimination violates the ADA and Rehabilitation Act.

*Id.* In reaching this conclusion, the Sixth Circuit specifically relied upon the concerns stated at the administrative hearing:

Based on the witness testimony at the Board of Adjustment hearing, we believe that Plaintiff adduced sufficient evidence to show that the reason the city denied Plaintiff the zoning permit was because the city feared that Plaintiff's clients would continue to abuse drugs, continue in their drug activity, and attract more drug activity to the city. In other words, based on fear and stereotypes, residents believed that the drug addiction impairment of Plaintiff's potential clients, at the very least, limited the major life activity of product social functioning, as their status as recovering drug addicts was consistently equated with criminality.

*Id.;* see also *New Directions Treatment Servs. v. City of Reading,* 490 F.3d 293, 305 (3d Cir. 2007)(finding a Pennsylvania statute facially discriminatory under the ADA and Rehabilitation Act because it "single[d] out methadone clinics for different zoning procedures" and noting that "[a] statute that facially discriminates against disabled individuals, however, faces a far different and more skeptical inquiry under the ADA and Rehabilitation Act [than under an Equal Protection analysis]."); *Bay Area Addiction Research and Treatment, Inc. v. Antioch,* 179 F.3d 725, 733 (9th Cir. 1999)(ordinance directed at methadone clinic "discriminates on its face"); *Innovative Health Systems, Inc. v. City of White Plains,* 117 F.3d 37 (2nd Cir. 1997)(the plaintiff's allegation "that they have been denied the benefit of having the City make a zoning

decision without regard to the disabilities of IHS's clients" stated a valid claim); *Bangerter v. Orem*, 46 F.3d 1491, 1498-99 (10th Cir. 1995)(unique 24-hour supervision requirement placed on home for mentally handicapped); *Habit Management, Inv. v. Lynn*, 235 F. Supp. 2d 28 (D. Mass. 2002)(invalidating ordinance directed at methadone clinics); *Hispanic Counseling Center v. Village of Hempstead*, 237 F. Supp. 2d 284 (E.D.N.Y. 2002)(enjoining enforcement of zoning ordinance that violated ADA by disparately treating substance abuse treatment clinics); *Potomac Group Home Corp. v. Montgomery Cnty., Md.*, 823 F. Supp. 1285 (D. Md. 1993) (neighborhood notification and public hearing requirement led to disparate impact on disabled elderly); *Stewart B. McKinney Found. v. Town Plan and Zoning Comm'n*, 790 F. Supp. 1197 (D. Conn. 1992) (special exception requirement placed on foundation seeking to locate home for HIV-infected individuals as a two-family residence held to be a violation).[8]

  *Human Resource Research and Management Group, Inc. v. County of Suffolk*, 687 F. Supp. 2d 237 (E.D.N.Y. 2010), is the most recent case on this issue. The plaintiff operated substance abuse recovery houses in Suffolk County, and asked the Court to declare a county ordinance invalid because it violated the FHA and ADA. The ordinance imposed four additional restrictions on a group home servicing people seeking treatment for drug and alcohol addiction that were not generally imposed on others. *Id.*, at 254 ("The law does not regulate apartment houses, multiple dwellings, fraternity and sorority houses, dormitories, or otherwise impose *any* restrictions on a group of unrelated individuals who are not receiving treatment for addiction from living together."). When the County could not justify its disparate treatment, the Court invalidated the ordinance on its face and enjoined the County from enforcing it. As the Court explained, "[u]pon examination of the record in this case, the Court concludes that defendant has

---

[8] The cases decided under only the ADA and Rehabilitation Act involved methadone clinics that did not have a residential component; therefore, the FHA did not apply.

failed to present any evidence, apart from scattered anecdotes and unsupported generalizations, in support of its justification for the challenged portions of the law and that, in any event, the challenged provisions have so broad an application that no rational trier of fact could find them to be narrowly tailored under a heightened scrutiny standard." *Id.*, at 257.

One specific aspect of the invalid Suffolk County ordinance was its requirement that substance abuse treatment facilities proceed through a public notification and comment process, much like the BZA process in the City of Detroit that is required for a Conditional Use permit. The Court struck this requirement down. As the Court explained, "courts have specifically warned that public notice can actually cut against the purported interest of integrating disabled individuals into a community, 'as it would more likely have quite the opposite effect, as it would facilitate the organized opposition to the home, and animosity towards its residents.' (citations omitted)." The Court cited *Potomac Group Home Corp. v. Montgomery County, Md.,* 823 F. Supp. 1285, 1296 (D. Md. 1993) ("[N]otices of this sort galvanize neighbors in their opposition to the homes.") and *Oxford House, Inc. v. Town of Babylon,* 819 F. Supp. 1179, 1184-1185 (E.D.N.Y. 1993)(the court found that the residents of Babylon had previously organized in a "hostile" manner at a public hearing to oppose the Oxford House residence in East Farmingdale, making it clear that they "did not want recovering individuals living in their neighborhood.").[9]

In this case, the City has no justification whatsoever for its discriminatory treatment of substance abuse treatment centers. The evidence establishes that Get Back Up poses no risk at all to the community, much less the "significant risk" required to justify a facially-discriminatory

---

[9] The *New Directions* Court was likewise concerned with the zoning statute's requirement that a methadone clinic could not obtain a permit to operate without a majority vote from the municipality's governing body. *New Directions,* 490 F.3d at 299, 304. The "evidence" presented by local residents in *New Directions* was the same type of unsubstantiated fear as the "evidence" presented by the Association to the BZA in this case. See *New Directions,* 490 F.3d at 310, n. 12 ("The records of the three City Council hearings are replete with statements by participants illustrating the atmosphere of prejudice and fear that permeated the proceedings.").

26

ordinance. See *New Directions*, 490 F.3d at 306 (the City offered no evidence of an actual threat

to the neighborhood, as opposed to unsubstantiated fears); *Bay Area Addiction Research and*

*Treatment, Inc v. Antioch*, 179 F.3d 725, 737 (9th Cir. 1999)("it is not enough that individuals

pose a hypothetical or presumed risk. Instead, the evidence must establish that an individual

does, in fact, pose a significant risk. Further, it should be emphasized that the risk must be of a

serious nature."). The Ordinance is therefore facially invalid and thus preempted by the FHA,

ADA and Rehabilitation Act.[10]

### B. The City's Ordinance, as Applied, Violates Federal Law

The Ordinance also violates federal law *as applied* because the "evidence" against Get

Back Up at the City's BZA hearing consisted entirely of unsubstantiated fears about recovering

addicts and alcoholics.

In *Innovative Health Systems, Inc. v. City of White Plains*, 117 F.3d 37, 49 (2d Cir. 1997),

the Court affirmed the grant of a preliminary injunction in favor of an outpatient drug and

alcohol rehabilitation center that was denied a building permit by the City's zoning board of

appeals. The Court concluded that the decision to deny the permit was based on stereotypes

against the disabled, which violated the ADA and Rehabilitation Act, explaining that "[t]here is

little evidence in the record to support the ZBA's decision on any ground other than the need to

alleviate the intense political pressure from the surrounding community brought on by the

prospect of drug- and alcohol-addicted neighbors. The public hearings and submitted letters

were replete with discriminatory comments about drug- and alcohol-dependent persons based on

stereotypes and general, unsupported fears." See also *Tsombanidis v. W. Haven Fire Dep't*, 352

---

[10] There was an argument in *Human Resource* about the proper level of scrutiny. However, as the Court noted, the Sixth Circuit applies heightened scrutiny. *Id.*, at 256, citing *Larkin v. State of Mich. Dep't of Soc. Servs.*, 89 F.3d 285, 290 (6th Cir.1996)("in order for facially discriminatory statutes to survive a challenge under the FHAA, the defendant must demonstrate that they are 'warranted by the unique and specific needs and the abilities of those handicapped persons' to whom the regulations apply.")

27

F.3d 565, 573 (2d Cir.2003)(owner of a home for recovering addicts and alcoholics established that the City intentionally discriminated in its classification of plaintiff's home, in violation of the FHA and ADA); *Regional Economic Community Action Program v. City of Middletown*, 294 F.3d 35 (2d Cir. 2002)(denial of a special-use permit for halfway houses serving recovering alcoholics could violate ADA, Rehabilitation Act and FHA.); *First Step, Inc. v City of New London*, 247 F. Supp. 2d 135 (D. Conn. 2003) (city's exclusion of facilities catering to the mentally ill based on intentional discrimination held to be in violation of the ADA).

The most recent case on this point is *Valley Housing LP v. Derby*, 802 F. Supp. 2d 359 (D. Conn. 2011).  The plaintiffs owned and managed housing for low-income disabled people, including those recovering from substance abuse addictions.  They needed a certificate of zoning compliance (CZC) in order to renovate their properties.  The City, however, rejected their application.  At the City's Zoning Board of Appeals hearing, residents objected to the plaintiffs' proposed use, "based on their fears and concerns about the prospective tenants." *Id.*, at 376.  The ZBA also rejected plaintiff's application.  Eventually, a Connecticut state court reversed this decision and ordered the City to grant the CZCs.

The federal court was faced with a claim for damages, not a request for an injunction. Ruling in the plaintiffs' favor, the Court found that the plaintiffs had established a prima facie case of discrimination based on the City's conduct.  The Court then rejected the City's purported explanation, concluding that discrimination was the sole reason for the City's actions.  Based on this finding, the Court awarded damages for the period of time between the plaintiffs' application and the successful result in state court.  The Court also awarded attorney fees, which Get Back Up will be pursuing later if it is successful.

28

Like these cases, the testimony and evidence elicited at the City's BZA Hearing and relied upon by the BZA to deny GBU's Conditional Use application demonstrate the discriminatory underpinnings of the BZA's decision. Community members repeatedly voiced their speculative fears about a recognized disability -- drug and alcohol addiction. They were concerned about what *might happen*. But this "evidence" may not be used as a basis to deny GBU's Conditional Use application. Because there were no objective facts supporting the BZA's decision, the only conclusion that can be drawn is that the members of the BZA, like the local residents, were simply afraid of what *might happen* if recovering substance abusers were being treated at Get Back Up's facility. But federal law prohibits the BZA from making its decision on that basis.

2.        **THE CITY'S ORDINANCE IS UNCONSTITUTIONAL**

The City's Ordinances should also be invalidated because they are void for vagueness, in violation of the Fourteenth Amendment. "[A]n enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298 (1972). "[L]aws must provide specific standards for those who apply them." *Id.* The absence of clear standards or objective criteria guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors. *See Leonardson v. City of East Lansing*, 896 F.2d 190, 198 (6th Cir. 1990). The void-for-vagueness doctrine not only ensures that laws provide "fair warning" of prescribed conduct, but it also protects citizens against the impermissible delegation of basic policy matters "for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *United Food & Comm. Workers Union Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 358-59 (6th

Cir. 1998). The doctrine "requires that the limits the [government] claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice." *City of Lakewood v. Plain Dealer Publ'g Co.,* 486 U.S. 750, 770 (1988).

A statute or ordinance may be challenged for vagueness on three grounds: (1) it does not provide fair notice of the conduct proscribed; (2) it confers on the trier of fact unstructured and unlimited discretion to determine whether an offense has been committed; and (3) its coverage is overbroad and impinges on First Amendment freedoms. *West Bloomfield Charter Twp v. Karchon,* 209 Mich. App. 43, 49; 530 N.W.2d 99 (1995) (citations omitted). "An ordinance does not provide fair notice of proscribed conduct if it 'either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application.' That is, an ordinance must be sufficiently clear and definite as to give those reading it fair notice of prohibited conduct." *Id.,* at 49 (quoting *Allison v. Southfield,* 172 Mich. App. 592, 596; 432 N.W.2d 369 (1988)).

Furthermore, the presumption of constitutionality of a zoning regulation carries no weight when the ordinance is unconstitutional on its face, or merely contains "broad statements as to the public health, safety, and general welfare, since such statements afford no sufficient guide for the board in the exercise of its discretion." *Osius v. St Clair Shores,* 344 Mich. 693, 699-700; 75 N.W.2d 25 (1956) (citing *Keating v. Patterson,* 132 Conn. 210 (43 A.2d 659)).

> Where a zoning ordinance permits officials to grant or refuse permits without the guidance of any standard, but according to their own ideas, it does not afford equal protection. It does not attempt to treat all persons or property alike as required by the zoning act. While the exercise of discretion and judgment is to a certain extent necessary for the proper administration of zoning ordinances, this is so only where some standard or basis is fixed by which such discretion and judgment may be exercised by the board. Where a

zoning ordinance is vague and indefinite, it cannot be sustained as valid under
the authorizing act.

*Osius*, 344 Mich. at 699-700 (quoting *Taylor v. Moore*, 303 Pa. 469, 479 (154 A. 799)).
Similarly, "[a] challenge on the basis of overbreadth raises two questions: whether the language
of the statute reaches too broadly and proscribes protected conduct, and whether too much
discretion is vested in the officials who administer the statute." *15192 Thirteen Mile Road v.
City of Warren*, 593 F. Supp. 147 (E.D. Mich. 1984) (citing *Broadrick v. Oklahoma*, 413 U.S.
601 (1973)).

In the present case, Section 61-3-231 is unconstitutional as both impermissibly vague and
overbroad.  Section 61-3-231 requires that a property owner seeking approval for a special use
permit meet fifteen mandatory "standards."  On their face, however, and as applied by the BZA
in this case, the fifteen standards of Section 61-3-231 provide no guidance as to how the
Ordinance could possibly be complied with, impermissibly vest unbridled discretion in the BZA,
and merely make broad statements as to public health, safety, and general welfare.  *Osius*, 344
Mich. at 699-700.

Judge Cook in this District has already reached this same conclusion, and has specifically
held that Section 61-3-231 is both impermissibly vague, and that it impermissibly vests broad
discretion to the City and its officials:

> Conditional use approval requires that the Buildings and Safety
> Engineering Department make fifteen affirmative findings, including
> an assessment as to whether the use will be consistent, compatible, or
> appropriate with the surrounding area and other businesses. **These
> criteria give impermissibly vest [sic] broad discretion to the City
> and its officials.**

*See HDV – Greektown, LLC, et al v City of Detroit,* Case No. 06-11282, Slip Op at 11 (ED Mich
Aug 6, 2007) (Cook, J.); Exhibit EE (emphasis added).  These are the same criteria and

31

conditions at issue in the present case.   Because Section 61-3-231 is impermissibly vague and overbroad, the BZA's reliance upon the standards set forth in Section 61-3-231 to deny Plaintiff's Conditional Use application violates the state and federal constitutions and MCL 125.3502(1) by failing to adequately specify the requirements and standards for approving a request for a Conditional Use.   Accordingly, the BZA's denial of the Plaintiff's Conditional Use application must be reversed, and the B&SE conditional approval reinstated.

## CONCLUSION

Get Back Up respectfully requests that the Court invalidate the City's ordinance and/or the City's actions and order the City to grant Get Back Up a permit allowing Get Back Up to operate a substance abuse treatment facility at its present location.

Respectfully submitted,

**JONATHAN B. FRANK, P.C.**

By:_____/s/_____
        Jonathan B. Frank (P42656)
        Attorney for Plaintiff

Dated:  August 17, 2012

## PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing document was served upon the attorneys of record of all parties in the above cause electronically, in accordance with Fed.R.Civ.P. 5(d) on the 17th day of August, 2012.

_____/s/_____
            Amy Zielinski

32

