# Exhibit C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

GET BACK UP, INC.,

    Plaintiff,

vs.

Case No. 11-cv-13909
Hon. Robert H. Cleland

CITY OF DETROIT,
CITY OF DETROIT BOARD OF ZONING APPEALS,

    Defendants.

                                                                /

**MOTION FOR RECONSIDERATION AND/OR TO AMEND THE JUDGMENT**

**PROOF OF SERVICE**

# TABLE OF CONTENTS

Introduction ...........................................................................................................................2

Question Presented ................................................................................................................3

Controlling Authority ............................................................................................................4

Standard of Review ...............................................................................................................5

Argument ..............................................................................................................................6

   1. Get Back Up's SASF Should Have Been Grouped with Other Public Health Uses ...............6

Conclusion ...........................................................................................................................17

## INTRODUCTION

The Court's opinion pivots on one issue: is Get Back Up's non-profit residential substance abuse service facility ("SASF") more like a nursing home/convalescent home/rest home/hospital/medical clinic/adult foster care home/religious residential facility/shelter for victims of domestic abuse or more like a rooming house. The Court placed the SASF in with rooming houses, thereby concluding that the City's zoning ordinances were neutral. But, due to the critical public health need addressed by Get Back Up's SASF and a variety of other similarities, the facility properly belongs in the former group for zoning purposes. Critically, the City never argued otherwise -- instead, the City argued, without evidentiary support, that a residential SASF was distinct from other public health uses *only* because its residents may have had more recent contact with law enforcement. The City did not argue that SASFs were like rooming houses.

To group Get Back Up's SASF in with rooming houses is to ignore the very reason for Get Back Up's existence: to solve one of the most vexing and historic public health problems facing the City. Seen in this light, Get Back Up's SASF shares only one unremarkable characteristic with a rooming house -- a residential setting (one of the many characteristics it also shares with nursing homes, convalescent homes, rest homes and the other residential uses permitted by-right in a B4 district). Get Back Up respectfully suggests that, given the fact that the City did not dispute this point, the Court did not have before it the substantial evidence that would have clarified the scope of Get Back Up's public health mission and led to the inescapable conclusion that the City's zoning ordinance was far from neutral in its treatment of SASFs (especially in light of the City's discriminatory treatment of residential SAFSs and non-residential SASFs across the zoning spectrum). In short, given the City's concession, there was no reason for Get Back Up to highlight the public health attributes of its facility until now.

2

## QUESTION PRESENTED

Should the Court reconsider its July 1, 2013 opinion because the Court raised issues that had not been raised in the briefs.

## CONTROLLING AUTHORITY

*First Step, Inc. v. City of New London,* 247 F. Supp. 2d 135 (D. Conn. 2003) ................................. 11

*MX Group, Inc. v. City of Covington,* 293 F.3d 326 (6th Cir. 2002) ................................................. 6

*New Directions Treatment Servs. v. City of Reading,* 490 F.3d 293, 304-05 (3d Cir. 2007) ........... 6

*Olmstead v. Zimring,* 527 U.S. 581, 598 n.10 (1999) ...................................................................... 11

*River of Life Kingdom Ministries v. Hazel Crest, Ill.,* 611 F.3d 367 (7th Cir. 2010) ....................... 6

*U.S. v. City of Baltimore,* 845 F. Supp. 2d 640 (D. Md. 2012) ........................................................ 12

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 59(e) governs the altering or amending of judgment. A district court maintains discretion when deciding a motion to amend a judgment under Rule 59(e). *Northland Ins. Co. v. Stewart Title Guar. Co.*, 327 F.3d 448, 454-55 (6th Cir. 2003). "Motions to alter or amend judgment may be granted if there is a clear error of law, newly discovered evidence, an intervening change in controlling law, or to prevent manifest injustice." *GenCorp, Inc. v. Am. Int'l Underwriters,* 178 F.3d 804, 834 (6th Cir. 1999) (citations omitted).

Get Back Up is sensitive to the limitations of a motion to reconsider and understands that a motion for reconsideration that presents "the same issues ruled upon by the court, either expressly or by reasonable implication," will not be granted. E.D. Mich. LR 7.1(h)(3); *Czajkowski v. Tindall & Assocs., P.C.*, 967 F. Supp. 951, 952 (E.D. Mich. 1997). Get Back Up is also sensitive to the restrictions on submitting new evidence.

However, this case presents a unique circumstance. Because the City did not raise the issue that the Court deemed dispositive, Get Back Up had no motive or opportunity to present the arguments raised in this motion; the Court and the parties were thus misled by a "palpable defect." Specifically, the City did not argue and, as will be discussed in greater detail below, could not possibly have argued, that a SASF should not be classified with other public health facilities. Indeed, the City conceded the point. On the other hand, the City did argue that, among public health facilities, a SASF should be distinguished because its residents, as recovering addicts, may have had recent contact with law enforcement. This stereotypical view, unsupported by any evidence, was refuted by Get Back Up and ignored by the Court, rightfully so. In short, the City agreed that a SASF should fall on one side of the line, with nursing homes, rest homes, convalescent homes, hospitals and medical clinics, and not on the other side of the line, with rooming houses, fraternities,

5

and multi-family dwellings. The Court, on the other hand, put Get Back Up's SASF on the other side of the line. Get Back Up could not have anticipated this; there is nothing in the federal rules or the policies underlying them that would justify preventing Get Back Up from introducing and the Court from considering the evidence in this motion.

Notably, the Sixth Circuit disfavors raising such issues *sua sponte* for exactly the reason applicable here: Get Back Up did not create a full record on a point with which the City agreed. Entry of summary judgment on grounds not raised or argued by the parties is "discourage[d]," (citation omitted) but the district court may do so "in certain limited circumstances, 'so long as the losing party was on notice that [it] had to come forward with all of [its] evidence,'" (citation omitted). "The key inquiry is whether the losing party was on notice that he had to muster the necessary facts to withstand summary judgment, lest he face the dismissal of his claims." (citation omitted). *Smith v. Perkins Bd. of Educ.*, 708 F.3d 821, 829 (6th Cir. 2013). Get Back Up had no such notice.

## ARGUMENT

### 1. GET BACK UP'S SASF SHOULD HAVE BEEN GROUPED WITH OTHER PUBLIC HEALTH USES

The starting point is the fundamental principle that a zoning law is facially discriminatory if it subjects drug treatment programs to more restrictive standards than other comparable facilities. *New Directions Treatment Servs. v. City of Reading*, 490 F.3d 293, 304-05 (3d Cir. 2007); *MX Group, Inc. v. City of Covington*, 293 F.3d 326 (6th Cir. 2002).

In order to evaluate the City's differing treatment of a SASF, a hospital, a nursing home, and a rooming house, the Court found an applicable legal principle in RLIUPA cases, enunciated recently by the Seventh Circuit in *River of Life Kingdom Ministries v. Hazel Crest, Ill.*, 611 F.3d 367, 371 (7th Cir. 2010). As that court explained, "If a church and a community center, though

different in many respects, do not differ with respect to any accepted zoning criterion, then an ordinance that allows one and forbids the other denies equality and violates the equal-terms provision." Thus, the question on which this case pivots is whether accepted zoning criteria would define a SASF as similar to a nursing home/convalescent home/rest home or a rooming house. All of them are included in the broader category "group living." Sec. 61-12-11.

Although the Court did not discuss a rooming house in great detail, it is important to understand the definition: 'A dwelling, occupied by the owner or his or her agent, consisting of: (1) not more than two dwelling units; and (2) not more than ten rooming units without cooking or kitchen accommodations for individuals leasing or renting rooms." A "rooming unit" is defined as "a room rented as sleeping and living quarters but without cooking facilities and with or without an individual bathroom. In a suite of rooms without cooking facilities, each room which provides sleeping accommodations shall be counted as one rooming unit for purposes of this Zoning Ordinance."

Given this definition (and without the benefit of the City's own explanation), it can be surmised that the City is concerned about the placement of rooming houses because of the transient, low socio-economic status of the unsupervised residents, as well the physical burdens associated with traffic and parking for a relatively dense use. Exhibit A (http://business.highbeam.com/industry-reports/personal/rooming-boarding-houses). In addition, the City may be concerned about the location of a for-profit group living business. See *Smith & Lee Assoc. v. City of Taylor,* 13 F.3d 920, 926 (6th Cir. 1993)(noting legitimate concerns about traffic and noise). Certainly, there is no offsetting public health benefit. Rooming houses are nothing more than small apartment buildings with an owner/agent on site, rooms without a kitchen and low-income tenants who are free to live, come and go as they please.

Get Back Up respectfully suggests that the Court misapprehended the fundamental nature of Get Back Up's facility. It is far more like a nursing home, rest home, convalescent center, medical clinic or hospital than it is like a rooming house.

We will start with a hospital. Although a hospital is not a residential facility, it is a facility where large numbers of people receive treatment and stay overnight, with large numbers of employees and visitors. Whether patients are "residents" is immaterial for zoning purposes; hospital rooms are occupied on a daily basis, like rooms in a SASF. In a hospital, but not in a SASF, traffic and noise from emergency vehicles can be particularly problematic. Applying the zoning criteria that *River of Life Kingdom Ministries* focuses on, a SASF would thus pose a *far smaller* burden on the neighborhood in terms of traffic or noise than would a hospital. Put another way, a hospital is a more intensive use, which would normally correspond with a more restrictive zoning designation.

Given the obvious burdens to the neighborhood imposed by a hospital, the Court may have been persuaded that the City could prefer a hospital over a SASF because of the offsetting benefits. As the Court noted, hospitals are provided certain zoning benefits because they have "an exceptional impact on public health." Opinion, at 12. This suggestion, however, undervalues Get Back Up's impact on public health. In fact, Get Back Up's public health mission is paramount; not only does Get Back Up's SASF treat a specific disease, it addresses, and works to cure, a variety of societal ills ranging from homelessness to street crime to family dysfunction. No nursing home, convalescent home, or rest home can make that claim. And certainly no rooming house can.

Here are the key attributes that make this so:

- Like a hospital, Get Back Up's facility is licensed by the State under MCL 333.6233, which, when read with the corresponding definitions in MCL 330.1100d, leaves no doubt that the SASF is a public health facility[1];

- Like a hospital, Get Back Up provides medical treatment and has licensed medical professionals on staff;

- Like a hospital, Get Back Up is accredited – Get Back Up's accreditation comes from CARF (Commission on Accreditation of Rehabilitation Facilities), a national agency that accredits providers of health and human services. See www.carf.org; Exhibit B;

- Like a hospital, Get Back Up addresses public health. Substance abuse addiction presents a serious public health problem, as recognized by the federal government, the State of Michigan, and the City of Detroit (see Exhibits C, D and E)[2];

---

[1] MCL 330.1100d defines: (10) "Substance abuse" means the taking of alcohol or other drugs at dosages that place an individual's social, economic, psychological, and physical welfare in potential hazard or to the extent that an individual loses the power of self-control as a result of the use of alcohol or drugs, or while habitually under the influence of alcohol or drugs, endangers public health, morals, safety, or welfare, or a combination thereof.
(11) "Substance use disorder" means chronic disorder in which repeated use of alcohol, drugs, or both, results in significant and adverse consequences. Substance abuse is considered a substance use disorder.
(12) "Substance use disorder prevention services" means services that are intended to reduce the consequences of substance use disorders in communities by preventing or delaying the onset of substance abuse and that are intended to reduce the progression of substance use disorders in individuals. Substance use disorder prevention is an ordered set of steps that promotes individual, family, and community health, prevents mental and behavioral disorders, supports resilience and recovery, and reinforces treatment principles to prevent relapse.
(13) "Substance use disorder treatment and rehabilitation services" means the providing of identifiable recovery-oriented services including:
(a) Early intervention and crisis intervention counseling services for individuals who are current or former individuals with substance use disorder.
(b) Referral services for individuals with substance use disorder, their families, and the general public.
(c) Planned treatment services, including chemotherapy, counseling, or rehabilitation for individuals physiologically or psychologically dependent upon or abusing alcohol or drugs.
[2] Various other resources are collected as Exhibits F through H.

- Indeed, based on all of these attributes, the City of Detroit awarded Get Back Up a block grant to provide substance abuse treatment, through the City's Department of Health and Wellness Promotion, Bureau of Substance Abuse Prevention, Treatment and Recovery, a local public health department organized under the Michigan Public Health Code, P.A. 368 of the Public Acts of 1978, as amended. Exhibit I. This should leave no doubt as to Get Back Up's critical public health mission.

Respectfully, Get Back Up is thus concerned that the Court drew an illusory, even impermissible, distinction between a SASF and a hospital. Both provide critical public health services to disabled populations.

Perhaps more so, the Court drew an improper distinction between a SASF and a nursing home. Nursing homes, rest homes and convalescent homes are defined as follows: "Establishments primarily engaged in the providing in-patient nursing care, other than a private home, where seven (7) or more older adults or disabled persons receives on-going care and supervision. These are facilities that provide a full range of 24-hour direct medical, nursing, and other health services by registered nurses, licensed practical nurses, and nurses aides prescribed by a resident's physician. They are designed for older adults or disabled persons who need health care supervision, but not hospitalization. Emphasis is on nursing care, but restorative therapies may be provided. Specialized nursing services such as intravenous feeds or medication, tube feeding, injected medication, daily would care, rehabilitation services, and monitoring of unstable conditions may also be provided." Sec. 61-16-53. Within this definition is the word "disabled," so we can assume that Get Back Up's residents qualify, as they do under federal law. Thus, the only practical medical distinction is that residents of a nursing home, rest home or convalescent home may need *more*

*intensive* medical care than residents of a SASF. But there is no practical distinction from a zoning perspective (i.e., traffic, noise, congestion, parking).

Here, the Court, without the benefit of evidence in the record, reached the conclusion that "A nursing home provides medical care and houses people of limited mobility, who struggle to walk, who need help bathing and dressing, who, in short, need constant physical assistance. A substance-abuse treatment center provides medical care and houses people who, notwithstanding their other problems, can physically attend themselves. One establishment systematically assists the physically disabled; the other does not." Opinion, at 13. As noted above, this is the Court's, not the City's, explanation. If the City did not draw up its zoning ordinances with this distinction in mind, and the City's Bolger Affidavit (Exhibit J) confirms this, the Court should not have done so.

The Court's post-facto distinction, because it has nothing to do with the City's actual rationale, was not put through the crucible of the City's legislative process. In fact, the Court's post-facto distinction does not withstand critical analysis. If all else is equal, the fact that a nursing home treats people with limited ambulatory capacity is not an "accepted zoning criterion." In fact, whether nursing home residents are or are not mobile does not materially change the noise/traffic/parking/congestion created by residents, employees and family members.

And finally, the Court's use of the phrase "physically disabled" is problematic in and of itself -- under the ADA, and as conceded by the City, Get Back Up's residents are equally "disabled." If the City had drawn a distinction between nursing homes and SASFs based on the "physical" disability of nursing home residents and the "mental" disability associated with recovering addicts, the Court would have had no choice but to invalidate the ordinance. See *Olmstead v. Zimring*, 527 U.S. 581, 598 n.10 (1999)(the ADA recognizes discrimination between different disabled groups); *First Step, Inc. v. City of New London*, 247 F. Supp. 2d 135, 150-151 (D. Conn. 2003)(city

11

impermissibly distinguished educational facilities for learning disabled or mentally retarded adults from educational facilities that cater to persons with mental illness or drug or alcohol dependency). The Court should not have drawn a similar distinction.

There is no support in the relevant case law for the distinction between a SASF and a nursing home. Indeed, in a recent decision involving the City of Baltimore's across-the-board requirement that substance abuse treatment facilities obtain a conditional-use permit, the City proposed and that court agreed that substance abuse treatment facilities, "unlike unlicensed supportive housing, do involve a medical component. Therefore, they are somewhat comparable to nursing homes." *U.S. v. City of Baltimore*, 845 F. Supp. 2d 640, 651 (D. Md. 2012). The court agreed that the zoning ordinance was facially discriminatory because the ordinance did not impose a requirement for obtaining a conditional-use permit upon comparable uses; the court then focused on the City's practice of only requiring a conditional-use permit for larger facilities. According to the court, the ordinance was not discriminatory **because larger facilities were like nursing homes**, and since nursing homes required conditional-use permits, there was no discrimination in requiring such permits for substance abuse treatment facilities. Here, of course, the opposite is true. In Detroit, nursing homes do not require a conditional-use permit; SASFs do.

Again respectfully, Get Back Up suggests that the record of this case, upon which the Court was bound to rely, simply does not provide evidentiary support for the Court's distinction between a nursing home/convalescent home/rest home and a SASF (no doubt because the City did not make such a distinction or supply evidence that Get Back Up's SASF was not a public health facility).

Nor can the City or the Court distinguish Get Back Up's use from an adult foster care facility, also licensed by the State. That use is defined as "An establishment that provides supervision, assistance, protection or personal care, in addition to room and board, to seven (7) or more adults.

12

An adult foster care facility is other than a nursing home or a mental hospital for mental patients or a pre-release adjustment center. (A "home for the aged" is licensed as an adult foster care facility.)" Sec. 61-16-31. An adult foster care facility is a "by right" use in a B4 district.

There is also a useful comparison to "religious residential facilities", which includes "rectories, parsonages, monasteries, convents, seminaries, religious retreats and the like." The City allows this use "by right" in a B4 district, so residential density is not the problem. The same comparison can be made with a "shelter for victims of domestic violence", also a "by right" use.

In short, the Court should not have presumed the City's intentions. If the City has decided to benefit facilities housing religious workers, those in need of medical, nursing or adult foster care, and victims of domestic violence over facilities housing recovering addicts, it is up to the City to explain why. All that the City offers, through Mr. Bolger's affidavit, is the conclusion that recovering addicts are "more likely to have had recent contact with law enforcement or corrections than residents of a convalescent home or nursing home." Bolger Aff., ¶ 14. *In short, Mr. Bolger's affidavit makes the following point, and only the following point: because a SASF is basically a hospital/nursing home/convalescent home/rest home for recovering addicts, the City can treat a SASF differently because addicts are "more likely to have had recent contact with law enforcement or corrections."*

This was the entire record before the Court. Significantly, there was no supporting evidence whatsoever -- if the Court is critical of Get Back Up's submission of a study to the BZA, the Court should be even more critical of the City's submission to this Court of Mr. Bolger's bold, unsubstantiated assertion. He cites no study, regression or otherwise. He cites no details (how much more likely? how many addicts? how recent? in what context?). Importantly, he does not link contact with law enforcement to a zoning criteria or hazard. Finally, the supposed link between

13

recovering addicts, contact with law enforcement and zoning restrictions is prohibited by federal law. Discrimination is only permitted if allowing the use "would constitute a *direct threat* to the health or safety of other individuals or whose tenancy would result in the substantial physical damage to the property of others." 42 U.S.C. §§ 3602(h), 3604(f)(9)(emphasis added). The City did not and cannot meet the standard for "direct threat" found in the federal regulation, 28 CFR 35.139(b):

> "In determining whether an individual poses a direct threat to the health or safety of others, a public entity must make an individualized assessment, based on reasonable judgment that relies on current medical knowledge or on the best available objective evidence, to ascertain: the nature, duration, and severity of the risk; the probability that the potential injury will actually occur; and whether reasonable modifications of policies, practices, or procedures or the provision of auxiliary aids or services will mitigate the risk."

Because of this standard, in none of the ADA/FHA/Rehabilitation Act cases involving recovery centers or methadone clinics did the Court allow a municipality to exclude or restrict a use for "disabled" recovering addicts or alcoholics because of "recent contact with law enforcement." Indeed, if municipalities were allowed to use "recent contact with law enforcement" as a proxy for discriminating against recovering addicts, the federal disability statutes would be eviscerated (as would civil rights laws, since "recent contact with law enforcement" could be used as a proxy to discriminate against African-Americans -- approximately 12%-13% of the American population is African-American, but they make up 40.1% of the almost 2.1 million male inmates in jail or prison (U.S. Department of Justice, 2009, http://www.bjs.gov/content/pub/pdf/pim09st.pdf; Exhibit K, at 2, 19-22)).

Furthermore, the Court does not even know if Mr. Bolger's proffered explanation was in fact the City's real motivation. There is no corresponding affidavit from a member of the City Council or any other body responsible for enacting the ordinance. At a minimum, the Court should consider

14

reopening the record to allow Get Back Up to test Mr. Bolger's assertion; the parties agreed to submit this dispute on a stipulated record, but Get Back Up never stipulated to the unsubstantiated assertions in Mr. Bolger's affidavit. The existence of this critical disputed fact is thus a procedural bar to the Court's decision under Rule 12 or 56.

In addition, the City's discriminatory treatment of SASFs is clear from the City's treatment of non-residential SASFs, described by the City as a "community service" use that is generally grouped with public, civic and institutional uses. Sec. 61-12-22. In the B3, B4, B5 and B6 commercial districts and M4 industrial district, "medical clinics" are a by-right use; non-residential SASFs, including methadone clinics, are a conditional use. Sec. 61-9-61. Non-residential SASFs, but not medical clinics, are barred on a B4 lot "abutting any street designated as a Gateway Radial Thoroughfare." Sec. 61-11-304. There is only one difference: recovering addicts are the sole patients at a SASF, while they may comprise less than the total patient base of a medical clinic. This distinction undoubtedly violates the ADA and Rehabilitation Act (not the Fair Housing Act, since there is no residential component).

The City also unfairly discriminates against residential SASFs in residential districts. Exhibit L (a table from the City's zoning ordinances). In an R4 and R5 district, a rooming house is a "by right" use; a residential SASF is a conditional use. If, as the Court suggests, the two uses are analogous, there is no possible explanation other than the obvious discriminatory one. As argued above, a residential SASF is entitled to more preferential treatment than a rooming house due to its public health mission; under no circumstances should it be treated worse. The fact that the City discriminates against SASFs in an R4 and R5 district represents unequivocal proof that the City unfairly disadvantages facilities treating recovering addicts, in violation of federal law.

The City also discriminates against residential SASFs in other commercial districts. In a B5 Major Business District, the City allows a residential "pre-release adjustment center" *by right*. Section 61-9-94. Such a center is defined as: "An establishment that provides shelter, supervisory and social services to convicts in a pre-release parole preparation program, as authorized by the Michigan Corrections Commission under authority of P.A. 232 of 1953, as amended, or by the Federal Bureau of Prisons under authority of P.L. 91:492, as amended." These halfway-house residents are, by definition, in "recent contact" with law enforcement. In fact, they are still under the jurisdiction of the Michigan Department of Corrections or the Federal Bureau of Prisons. Still, no Conditional Use Permit is required in a B5 District. Yet, *in the same district*, a residential substance abuse treatment facility is a conditional use and must therefore pass through public hearings. Section 61-9-100. Even a *non-residential* substance abuse service facility must obtain a Conditional Use Permit; indeed, it is the only "public, civic and institutional" use for which such a permit is required. Section 61-9-101. Mr. Bolger's affidavit cannot explain away this discrimination.

Given the obvious unlawful discrimination in the City's treatment of non-residential SASFs and residential SASFs in every other zoning category, there was no reason for the Court to give the City the benefit of the doubt regarding the classification of a residential SASF in the B4 district. The City's true colors shine throughout the rest of its zoning ordinances.

For all of these reasons, the analogy between a SASF and a rooming house (drawn by the Court but not by the City) was a superficial one, based entirely on physical structure (a collection of rooms) and temporal residence (longer than overnight, though residents in rooming houses undoubtedly stay longer than a typical resident of a SASF). Rooming houses do not have social workers or medical professionals on staff, they do not provide therapy, they do not serve meals, they do not supervise their residents, they are not licensed, they do not have contracts with city and state

agencies, and they do not have, as their goal, the reduction of a myriad of societal problems. Public health policy aside, basic zoning criteria demonstrate the dissimilarity between a rooming house and a SASF: parking for rooming houses is based on the number of residents, who presumably drive and park, while parking for public health uses including SASFs is based on the number of employees. Sec. 61-14-23.

Since the City did not analogize SASFs to rooming houses, the Court should not have either. Instead, the Court should have agreed with the City's premise that SASFs are like other public health uses and then gone on to dissect the City's stated rationale for discriminating against SASFs.

## CONCLUSION

Get Back Up understands the tension between judicial intervention and permissible land use planning; Get Back Up is not asking the Court to sit as a zoning review body. However, because the City's land use planning impermissibly discriminates against disabled recovering addicts and alcoholics, judicial intervention is appropriate.

Respectfully submitted,

**JONATHAN B. FRANK, P.C.**

By: _____/s/_____
Jonathan B. Frank (P42656)
Attorney for Plaintiff

Dated: July 15, 2013

### PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing document was served upon the attorneys of record of all parties in the above cause electronically, in accordance with Fed.R.Civ.P. 5(d) on the 15th day of July, 2013.

_____/s/_____
Amy Zielinski

J:\8135\1\00180958.DOCX