UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re | No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | Chapter 9 |
| Debtor. | HON. STEVEN W. RHODES |

### STATE OF MICHIGAN'S RESPONSE TO MOTION OF INTERNATIONAL UNION, UAW AND FLOWERS PLAINTIFFS TO COMPEL PRODUCTION OF DOCUMENTS WITHHELD ON GROUNDS OF PRIVILEGE BY THE STATE OF MICHIGAN

The State of Michigan, through its undersigned counsel, submits this Response to Motion of International Union, UAW and Flowers Plaintiffs (collectively, "UAW") to Compel Production of Documents Withheld on Grounds of Privilege by the State of Michigan (the "Motion to Compel").

### INTRODUCTION

The first matter at issue in the UAW's Motion to Compel is an Email message from Richard Baird, the State's Transformation Manager, to Kevyn Orr dated March 12, 2013 (the "March 12 Email"). The State produced the March 12 Email, with the portions conveying

legal advice redacted, along with unredacted copies of the attachments to the email, and indicated on its privilege log that March 12 Email was redacted as privileged because it "forward[ed] attorney's legal advice." While the State does not agree with the UAW's asserted challenges and does not waive or alter the Common Interest Agreement or any attorney-client communication privilege, in an effort to resolve this discovery dispute raised on the eve of trial, it is producing the challenged document.

The second issue is whether the Common Interest Agreement between the City and State precludes disclosure of privilege communications between "the Governor, the Governor's lawyers, Mr. Orr and/or Mr. Orr's lawyers." The Court has already determined that it does.

The Common Interest Agreement is between the City, now represented by the Emergency Manager, and the State. Although the formalizing of this Agreement was "on or around the appointment of the Emergency Manager," the common interests of the City and the State began as early as April 9, 2012 with implementation of the Financial Stability Agreement. These common interests include "the legal and

policy issues that arise as a result of and in relation to the City's financial emergency, the appointment of the Emergency Manager, and the Bankruptcy Case." (Exhibit B, Common Interest Agreement, p. 3). Thus, the Governor's assertions of attorney-client privilege related to discussions with the Emergency Manager, the City's lawyers, and members of his executive and legal staff, are proper. These communications involved "legal and policy issues" arising "as a result of and in relation to the City's financial emergency" and/or the bankruptcy case. The Governor is entitled to the protection of the attorney-client privilege when acting in his individual executive capacity and is not a "public body" within the meaning of the State's Open Meetings Act, contrary to the UAW's assertion.

As to entries on the State's privilege log that the UAW characterizes as "insufficient," the State disagrees with this characterization. Yet, the State agreed to the UAW's request on October 18, 2013. (UAW's Motion, Doc. 1294-3, Ex. B, pp. 2-3 of 33.) The State's revised Privilege Logs were e-mailed and mailed to the UAW's counsel. The State does not agree, however, that it has waived

its right to assert privilege based on the nature and character of its initial and/or amended privilege logs.

## ARGUMENT

### I. The State Has Agreed to Produce the Requested March 12, 2013 Email

In an effort to resolve this dispute and without waiving or amending the Common Interest Agreement, the State is agreeing to produce the March 12, 2013 Email at issue. It is attached as Exhibit A.

### II. The Governor Properly Invoked Attorney-Client Privilege During His Deposition

The UAW argues that the City and the State have used the common-interest theory to block inquiry into their joint communications concerning the decision to pursue this chapter 9 filing. *Motion to Compel*, p. 3. This assertion is wholly incorrect and unsupported by any testimony or evidence.

**B. The Governor's assertion of attorney-client privilege in the context of the Common Interest Agreement is consistent with this Court's September 19, 2013 ruling and subsequent order.**

The Governor's assertion of attorney-client privilege in the context of the Common Interest Agreement is consistent with the Court's September 19, 2013 ruling and its subsequent order.

First, the common interest agreement clearly involves more than the bankruptcy filing. In fact, the agreement specifically identifies the common interests as "including but not limited to, those *in connection with* the legal and policy issues that arise as a result of and in relation to the City's Financial Emergency, [and] the appointment of the Emergency Manager." *Common Interest Agreement*, pp. 2-3, emphasis added, attached as Exhibit B. The Governor asserted attorney-client privilege to discussions occurring at the weekly meetings between himself, his executive and legal staff, the Emergency Manager, and the City's attorneys, which he described as discussing the strategies, policies, updates, and other issues related to the City's financial emergency. The State and the City's common interests described in the Agreement are clearly involved in these discussions.

Second, these discussions involved legal strategy and advice. At the September 19 Hearing, the Court analogized the relationship between the City and the State to that of a corporation and its board of directors. The Court reasoned that if the board, its lawyer, the corporation's lawyer and the corporate management all met together, the common interest privilege would shield those communications. While the Court's analogy was in the context of a bankruptcy filing, the Court's reasoning would be equally applicable to a board's appointment of the corporation's CEO, and documents communicating legal advice from the board's lawyer to the CEO just prior, and relating to, the CEO's appointment. Consistent with the Court's September 19, 2013 ruling and subsequent order, attorney-client privilege attached and was properly invoked by the Governor.

Third, while the State appropriately invoked the attorney-client privilege to protect the content of *conversations and discussions* occurring at these meetings, the deposition questions for which the privilege was invoked related to the treatment of pension benefits, and other provisions, of the Emergency Manager's June 2013 proposal to creditors—not to "the decision to pursue the Chapter 9 filing."

6
13-53846-tjt    Doc 1319    Filed 10/22/13    Entered 10/22/13 17:17:00    Page 6 of 15

Moreover, the Governor freely testified as to his understanding, views, thoughts, and recollection of facts in response to every topic addressed at the deposition, even when the State could not disclose specific discussions.

Examples of the Governor's testimony in this regard—taken from the deposition transcript excerpts attached by the UAW— are:

> Q. Well, between March 28, 2013 and June 14, 2013, did you have discussions with Kevyn Orr about a business plan or a restructuring plan or a redevelopment plan of the City of Detroit?
>
> A. Kevyn Orr was building a plan for creditors they presented in June of this year.
>
> Q. Did you have discussions with him with regard to that plan before the June presentation?
>
> A. I had discussions that would have been subject to attorney-client privilege.
>
> Q. Is it your understanding that that plan includes a two billion dollar note for unsecured creditors?
>
> A. Yes.
>
> Q. And what's your understanding of what that plan includes with regard to vested pension benefits for the citizens of Detroit?
>
> A. The proposal includes some portion of that note being allocated towards pensioners.
>
> *Transcript*, pp. 11-12.

Q. Well, assuming that there is a reduction for the moment in pension benefits, have you had any conversations with Kevyn Orr with regard to whether or not there would be any other benefit or provision made to the retirees of the City of Detroit that were going to lose pension benefits as a result of that plan?

A. Those discussions would have been subject to attorney-client privilege.

Q. What's your understanding of the options that are available to the City of Detroit?

A. Well, again, we're in bankruptcy now so there's been no plan presented by the City at this point in time, so that's a hypothetical.

Q. Do you believe it's fair to have the bankruptcy attorney and other bankruptcy professionals paid ahead of retirees in connection with the Chapter 9 process?

A. I view that as a legal matter because that's a subject matter of how Chapter 9 bankruptcies work.

Q. The question I was asking was whether or not you believe it's fair. I'm not asking you whether or not it's a legal matter.

A. Well, I view it as just speculation on my part because we're in Chapter 9, so that would be part of the legal process.

*Transcript*, pp. 14-15

Q. For that same period of time, during the interview process and up to and including July 18th or 19th, did you have any conversation with Kevyn Orr with regard to selling or monetizing assets such as the art, Belle Isle and water and sewer and other assets of Detroit?

A. Those discussions would have been subject to attorney-client privilege.

Q. Is it your understanding that the sale of assets are one of the things that are consideration in connection with the restructuring plan that Kevyn Orr proposed during June of 2013?

A. I don't recall that portion of the proposal.

Q. What's your view on monetizing these assets as part of a restructuring plan including the art, Belle Isle and water and sewer and some of the other assets of Detroit?

A. Again, that's a hypothetical discussion because it would really come down to what's presented in the plan of adjustment within the context of the bankruptcy court, and it hasn't been done at this point.

*Transcript*, pp. 43-44

Discussions between the Governor, the Emergency Manager the Emergency Manager's counsel and/or the State's counsel relating to the treatment of pension benefits, whether prior to or after the Chapter 9 filing, are discussions of legal issues that are protected by attorney-client privilege through the common interest agreement. That privilege was properly invoked during the Governor's deposition.

C. **The Governor is not subject to the Open Meetings Act.**

In a footnote, the UAW asserts that the Governor's refusal to answer deposition questions involving his discussions with Mr. Orr is "contrary to the Open Meetings Law. . ." and thus shields the deliberations of public officials from disclosure. *Motion to Compel*, p. 5,

9

fn 2.  The UAW is incorrect.  The Governor is not subject to the Open Meetings Act (OMA) where, as here, he is not a "public body" when acting in his individual executive capacity.

Mich. Comp. Laws 15.262(a) defines a public body as:

[A]ny state or local legislative or governing body, including a board, commission, committee, subcommittee, authority, or council, that is empowered by state constitution, statute charter ordinance, resolution, or reule to exercise governmental or proprietary authority or perform a governmental or proprietary function . . . .

Michigan appellate courts have held that an individual executive acting in his executive capacity is not a "public body" for purposes of OMA.  See, e.g., *Herald Co. v. Bay City*, 614 N.W.2d 873, 883 (Mich. 2000) (city manager not a public body); *Davis v. City of Detroit Financial Review Team*, 821 N.W.2d 896, 905 (Mich. App. 2012) (When acting in his official capacity with authority derived from the Constitution or by statute, State Treasurer is not a public body). "Public body" denotes a collective entity and "does not encompass individuals." *Herald Co.*, 614 N.W.2d at 882.  Accordingly, the Governor's refusal to answer deposition questions involving his discussions with Mr. Orr was not contrary to the OMA.

## D. The UAW's Objections to the State's Assertion of Attorney-Client Privilege at the Governor's Deposition is incorrect, untimely, and prejudicial.

Despite the speedy progression of the bankruptcy proceedings, the UAW has literally waited until the eve of trial to raise this objection. They did not object to the assertion of attorney-client privilege during the deposition, despite the Court's offer to be available during the deposition to resolve any problems that might arise. Nor did they raise a written objection in the nearly two weeks since the deposition. The UAW's delay prejudices the City and the State in terms of overall trial preparation and potentially places additional costs on these parties to produce these documents at trial. The UAW has waived this objection.

## III. While The State Disagrees With The UAW's Characterization, The State Has Revised Its Privilege Logs To Provide the Additional Detail Requested

The UAW characterizes the State's Privilege Logs as "insufficient." *Motion to Compel*, p. 6. The UAW also claims that the State has waived its right to assert privilege. *Id*.

The State disagrees with the UAW's characterization of the entries on its privilege logs, instead asserting that the logs were sufficient as presented. Again, in an effort to resolve this discovery

dispute raised on the eve of trial, the State agreed to revise its Privilege Logs (attached as Exhibit C.) These revised Privilege Logs have been emailed and mailed to counsel. Despite this agreement, which was given to UAW's counsel on October 18, 2013, the UAW still included this issue in its motion to compel.

The State disagrees that it has waived its right to assert attorney-client privilege. First, the initial log met the minimum requirements for providing sufficient detail to demonstrate that the communications in question were in fact confidential communications relating to legal advice. Contrary to the UAW's assertions, the State did more than offered "conclusory" statements.

The UAW also provides no support for the proposition that a Privilege Log cannot be amended. Indeed, the opposite is true. See, e.g., *Pulte Homes, Inc. v. American Guarantee, and Liability Ins. Co.* No. 09-CV-11616, 2011 WL 8212 (E.D. Mich. January 3, 2011) (noting that the defendant "has already amended this privilege log once.") (Attached as Exhibit D.) As was true in *Pulte Homes, Inc. v. American Guarantee, and Liability Ins. Co.*, No. 09-CV-11616, 2011 WL 8212 (E.D. Mich. January 3, 2011), the State is entitled to amend its

privilege log without the loss of the asserted privilege. Unlike *Pulte*, the State's privilege logs were not bare bones, required only modest modification, if at all, and was not voluntarily at the request of the UAW's counsel.

## CONCLUSION

For the above reasons, the State requests that the Court deny the UAW's Motion to Compel.

Respectfully submitted,

*/s/Matthew Schneider*
Matthew Schneider
Chief Legal Counsel
Attorney for State of Michigan
P.O. Box 30754
Lansing, Michigan 48909
(517) 373-3203
SchneiderM7@michigan.gov
[P62190]

Aaron D. Lindstrom
Assistant Solicitor General

Margaret A. Nelson
Assistant Attorney General

Steven G. Howell
Special Assistant Attorney General
Dickinson Wright PLLC
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226-3425

Attorneys for the State of Michigan
Michigan Dep't of Attorney General

Dated: October 22, 2013

# CERTIFICATE OF SERVICE

I hereby certify that on October 22, 2013, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

> */s/Matthew Schneider*
> Matthew Schneider
> Chief Legal Counsel
> Attorney for State of Michigan
> P.O. Box 30754
> Lansing, Michigan  48909
> (517) 373-3203
> SchneiderM7@michigan.gov
> [P62190]
>
> Attorney for the State of Michigan
> Michigan Department of Attorney General