UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

------------------------------------------------------x
                                                               :
In re                                          : Chapter 9
                                                               :
CITY OF DETROIT, MICHIGAN,     : Case No. 13- 53846
                                                                :
               Debtor.                 : Hon. Steven W. Rhodes
                                                                 :
------------------------------------------------------x

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM UNDER CERTAIN TRANSACTION DOCUMENTS WITH THE PUBLIC LIGHTING AUTHORITY AND (II) GRANTING OTHER RELATED RELIEF**

The City of Detroit, Michigan (the "Debtor" or the "City"), as the debtor in the above-captioned case, submits this motion (the "Motion") for entry of an order: (i) authorizing, pursuant to sections 105(a), 362, 364, 904(2) and 922 of title 11 of the United States Code (the "Bankruptcy Code"), the City to enter into and perform under (a) the Interlocal Agreement for the Construction and Financing of a Public Lighting System (the "C&F Agreement") by and between the City and the Public Lighting Authority (the "PLA"), (b) the Interlocal Agreement for the Operation, Maintenance and Management of a Public Lighting System by and between the City and the PLA (the "O&M Agreement" and, together with the C&F Agreement, the "Interlocal Agreements") and (c) the Amended and Restated Trust

Agreement (the "Trust Agreement" and, together with the Interlocal Agreements, the "PLA Transaction Documents") by and among the City, the PLA, the Michigan Finance Authority (the "MFA") and Wilmington Trust, National Association (the "Trustee"), each in substantially the form attached hereto as Exhibits 6.1, 6.2 and 6.3, respectively; (ii) authorizing and approving a financing transaction for the benefit of the Debtor and the granting of a pledge and lien in, and the irrevocable transfer of, specified revenues of the Debtor under section 364(c)(2) of the Bankruptcy Code; and (iii) granting other related relief.[1]

The relief requested above is necessary for the City to facilitate the adequate financing of the PLA. The PLA is an integral component to the City's restructuring and future, as, upon consummation of the transactions contemplated under the PLA Transaction Documents (collectively, the "PLA Transaction"), the PLA will commence the improvement of the City's public lighting system and will assume operational control of the portions of the public lighting system the PLA improves. The City's public lighting system currently is in a state of disarray, and the PLA Transaction is the City's best viable option to fix its public lighting system

---

[1] This Motion includes certain attachments that are labeled in accordance with Rule 9014-1(b)(1) of the Local Rules of the Bankruptcy Court for the Eastern District of Michigan (the "Local Rules"). Consistent with Local Rule 9014-1(b), a copy of the proposed form of order granting this Motion is attached hereto as Exhibit 1. A summary identifying each included attachment by exhibit number is appended to this Motion.

and provide the level of lighting services that the City's residents expect. As such, the City's ability to consummate the PLA Transaction is of utmost importance. **The City respectfully requests that the Court schedule a hearing on this Motion for the omnibus hearing scheduled on November 13, 2013 at 10:00 a.m., Eastern Time**. In further support of this Motion, the City further respectfully represents as follows:

## General Background

1. On July 18, 2013 (the "Petition Date"), the City filed a petition for relief in this Court, thereby commencing the largest chapter 9 case in history.

2. Incorporated in 1806, Detroit is the largest city in Michigan. As of December 2012, the City had a population of less than 685,000 (down from a peak population of nearly 2 million in 1950). Over the past several decades, the City has experienced significant economic challenges that have negatively impacted employment, business conditions and quality of life.

3. As of June 30, 2013 — the end of the City's 2013 fiscal year — the City's liabilities exceeded $18 billion (including, among other things, general obligation and special revenue bonds, unfunded actuarially accrued pension and other postemployment benefit liabilities, pension obligation certificate liabilities and related derivative liabilities). As of June 30, 2013, the City's accumulated unrestricted general fund deficit was approximately $237 million.

4. In February 2013, a state review team determined that a local government financial emergency exists in the City. Thereafter, in March 2013, Kevyn D. Orr was appointed, and now serves as, emergency manager with respect to the City (in such capacity, the "Emergency Manager") under Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, *et seq*. ("PA 436"). Under Section 18(1) of PA 436, the Emergency Manager acts exclusively on behalf of the City in this chapter 9 case. MCL § 141.1558.

**The Public Lighting Authority Transaction**

5. In 2012, the State legislature enacted Public Act 392 of 2012, the Municipal Lighting Authority Act, as amended, MCL § 123.1261, *et seq*. ("Act 392"). Act 392's primary purpose was to provide an equitable and reasonable method and means of financing, operating and maintaining public lighting systems for cities of a certain size, including the City. To accomplish its intended purpose, Act 392 specifically allows for the creation of separate public lighting authorities to provide the City and other cities with more favorable and efficient access to the credit markets, thus enabling such cities to obtain the financing necessary to operate and maintain effective public lighting systems.

6. In accordance with Act 392, on February 5, 2013, the City created the PLA, a separate municipal corporation, to manage and maintain the City's public lighting system. Section 21 of Act 392 provides the PLA with

authority to issue bonds (the "Act 392 Bonds") and to sell those bonds to the MFA.[2] The PLA will use the proceeds of the Act 392 Bonds to construct and improve the public street lighting system of the City under the C&F Agreement. The PLA also will bear responsibility for the operation and maintenance of the portion of the City's public lighting system that the PLA has constructed and improved in accordance with the terms of the O&M Agreement.

7. The City will continue levying a utility tax (the "Utility Tax") as permitted under Public Act of 1990, the Utility Users Tax Act, MCL §§ 141.1151 to 141.1177 ("Act 100"). The Utility Tax generates revenue collected by public utilities and resale customers and. Upon issuance of the Act 392 Bonds, the City will irrevocably pledge and cause the existing and future revenue generated from the Utility Tax (the "Pledged Revenues") to be directed to the Trustee under the Trust Agreement as security for, and the primary source for the repayment of, the Act 392 Bonds. Under Act 100 and Act 392, the total amount of the Pledged Revenues to which the PLA is entitled, in any calendar year, is the lesser of (i) $12.5 million and (ii) the total revenues generated by the Utility Tax.

---

[2] The MFA intends to issue its own bonds (the "MFA Bonds") to one or more third-party lenders, including Citibank N.A., and use the proceeds of the MFA Bonds to purchase the Act 392 Bonds. The MFA Bonds will be secured by the MFA's right to payment under the Act 392 Bonds.

13-53846-tjt    Doc 1341    Filed 10/23/13    Entered 10/23/13 17:15:55    Page 5 of 18

8. As required under Act 392, the City will enter into the Trust Agreement. Pursuant to the Trust Agreement and the irrevocable directive of the Emergency Manager, the public utilities and resale customers that collect the Utility Tax for the City will transfer the Pledged Revenues to the Trustee directly. Under Act 392 and the Trust Agreement, the Trustee will hold the Pledged Revenues in trust (the "Trust Fund"). The Trustee will use the Pledged Revenues as set forth in the Trust Agreement, including for the repayment of the Act 392 Bonds and the payment to the City of all Pledged Revenues in excess of $12.5 million that the Trustee collects in any calendar year.

9. Under the PLA Transaction Documents and Act 392, the City has no liability for, and undertakes no full faith and credit obligation in connection with, the Act 392 Bonds or the C&F Agreement. However, as described above, under the Trust Agreement and Act 392, the City is required to direct the transfer of all of the City's right, title and interest in the Pledged Revenues to the Trustee for the payment of the Act 392 Bonds.[3] It is this transaction for which the City seeks authorization under sections 105(a) and 364(c) and (e) of the Bankruptcy Code.

---

[3] Despite this pledge of the entirety of the revenues generated by the Utility Tax, Act 392 limits the amount of the Pledged Revenues that the PLA may utilize in any calendar year to $12.5 million, and the Trustee must disburse to the City all amounts in excess of $12.5 million.

## City Council and Emergency Loan Board Approval

10. Pursuant to Section 12(1)(r) of PA 436, the Emergency Manager may, subject to Section 19 of P.A. 436, " transfer . . . the responsibilities of the local government." Section 19(1) of PA 436 provides that an emergency manager shall, prior to transferring the responsibilities of the local government, submit his or her proposed action to the governing body of the local government for approval. Section 19(1) of PA 436 further provides the local governing body with 10 days from the date of submission to approve or disapprove the action proposed by the emergency manager.

11. If the governing body of the local government disapproves the proposed action within 10 days, Section 19(2) of PA 436 requires the governing body of the local government, within 7 days of its disapproval, to submit to the local emergency financial assistance loan board (the "Emergency Loan Board") an alternative proposal that "would yield substantially the same financial result as the action proposed by the emergency manager." The Emergency Loan Board then has 30 days to review both the alternative proposal submitted by the governing body of the local government, as well as the proposal submitted by the emergency manager and approve the proposal that "best serves the interest of the public."

12. On October 23, 2013, the Emergency Manager issued Order No. 18 (the "EM Order"), generally approving the PLA Transaction Documents

and authorizing the necessary actions contemplated thereunder. A copy of the EM Order is attached hereto as <u>Exhibit 6.4</u>. The EM Order serves as the submission to City Council of the Interlocal Agreements and directs City Council to either approve or disapprove the Interlocal Agreements within 10 days of such submission, based on the terms attached to the EM Order.[4] The PLA Transaction Documents, along with the Emergency Order, were hand-delivered to City Council on October 23, 2013.

13. To the extent approved by City Council or the Emergency Loan Board, the City respectfully submits that no other or further consents are required under applicable Michigan law, and prior to closing, the Interlocal Agreements will be fully authorized in that regard.

## Jurisdiction

14. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue for this matter is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

## Relief Requested

15. By this Motion, the City respectfully requests the entry of an order (i) authorizing, pursuant to sections 105(a), 362, 364, 904(2) and 922 of the

---

[4] Except for the approval contained in the EM Order, the Trust Agreement requires no further approval under PA 436 or other applicable law.

Bankruptcy Code, the City to enter into and perform under the PLA Transaction Documents;[5] (ii) authorizing and approving a financing transaction for the benefit of the Debtor and the granting of a pledge and lien in, and the irrevocable transfer of, the Pledged Revenues under section 364(c)(2); and (iii) granting other related relief.

## Basis for Relief Requested

16. The City seeks authorization to enter into and perform under the PLA Transaction Documents under sections 105(a), 362, 364, 904(2) and 922 of the Bankruptcy Code. While the City does not believe it is required to seek approval of, or authority to enter into and perform under, the PLA Transaction Documents, the initial purchasers of the MFA Bonds, which among other things are secured by the Act 392 Bonds and the Pledged Revenues, require such approval and, thus, the City elected to seek such approval solely with respect to the relief requested in this Motion.

17. The City also seeks approval of the transfer of all of its right, title and interest in the Pledged Revenues to the Trustee under the Trust Agreement in support of, as security for, and as the primary source for the repayment of, the

---

[5] The City respectfully requests limited relief under sections 362 and 922 of the Bankruptcy Code, modifying the stay solely to the extent necessary to allow the parties to the PLA Transaction Documents to fully perform their obligations and exercise any rights and remedies they may have under the PLA Transaction Documents.

Act 392 Bonds under section 364(c)(2) of the Bankruptcy Code. Finally, the City seeks a determination that section 364(e) of the Bankruptcy Code applies to the transactions contemplated under the PLA Transaction Documents, including the City's pledge and grant of the lien in the Pledged Revenues.

A. **The City's Entry Into the PLA Transaction Documents is Appropriate Under Sections 364(c) and 105(a) of the Bankruptcy Code**

18. Section 364 of the Bankruptcy Code allows a debtor to pledge assets as security for postpetition credit obligations regardless of whether such obligations allow for recourse against a debtor.[6] In this case, the City seeks the authority and approval of the Court to the transfer of the Pledged Revenues, and grant of a lien in any residual interest in the Pledged Revenues the City may possess, to secure the non-recourse debt of the PLA under the Act 392 Bonds. The transfer of, and the grant of a lien in any residual interest in, the Pledged Revenues is both collateral support for, and the source for the repayment of, the Act 392 Bonds – support that Act 392 creates and requires, and support that is to be implemented under the PLA Transaction Documents for the benefit of the City, its citizens and others.

---

[6] A "debt" means liability on a claim, §101(12), and a "claim" includes a non-recourse claim. Cf. Johnson v. Home State Bank, 501 U.S. 78 (1991) (mortgage that survived a chapter 7 discharge of the debtor's personal liability was a "claim" subject to inclusion in approved chapter 13 reorganization plan).

19. Under sections 3.1 and 3.2 of the C&F Agreement, with the borrowings afforded by the Act 392 Bonds, the PLA has agreed to finance the cost to construct, improve, enlarge, reduce or extend the City's Public Lighting System for the benefit of the City.  The City has no liability to reimburse the PLA for these costs, nor does the City pledge its full faith and credit in connection with the Act 392 Bonds.  However, as means of implementing the financing necessary for the PLA to improve the public lighting system, under Act 392, section 4.2 of the C&F Agreement and the EM Order, the City must (i) direct the transfer of the Pledged Revenues to the Trust under the Trust Agreement and (ii) pledge in trust, and grant a lien in any residual interest of, the City's right, title and interest in the Pledged Revenues.  This directive to transfer, pledge in trust, and grant a lien in, the Pledged Revenues allows the Pledged Revenues to secure, and serve as the primary source for the repayment of, the Act 392 Bonds.

20. Despite the City's directive to transfer all of the Pledged Revenues to the Trustee, Act 392 limits the amount of the Pledged Revenues that the PLA may utilize in any calendar year to $12.5 million.  As such, in any calendar year, the Trustee must disburse to the City all amounts of the Pledged Revenues in excess of $12.5 million under the terms of the Trust Agreement.

21. The ability of the City to consummate the transactions contemplated under the PLA Transaction Documents (collectively, the "PLA

Transaction") is one of many essential components to the City's restructuring. In fact, it is well known that the City and its residents suffer from the City's inability to maintain the street light system. See Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code at ¶ 33 (Docket No. 11). The PLA Transaction represents the City's best (and perhaps only) opportunity to remedy this public safety concern.

22. The Court's approval of the PLA Transaction is necessary for the Debtor, the PLA, the MFA and the Trustee to consummate the PLA Transaction successfully. Obtaining the Court's approval of the PLA Transaction is necessary to allow the MFA to successfully issue and sell the MFA Bonds.

23. Specifically, it is essential for the purchasers of the MFA Bonds that the Debtor receive an order from the Court determining, upon the City's execution of the PLA Transaction Documents and except as otherwise set forth in Act 100, Act 392 and the PLA Transaction Documents (including, without limitation, that the Trustee disburse to the Debtor all Pledged Revenues in excess of $12.5 million in any calendar year) that: (i) the Pledged Revenues will no longer constitute property of the City pursuant to the operation of Act 100 and Act 392; and (ii) the City will have no further claim to, interest in, or right to control the Pledged Revenues, to which the PLA is statutorily entitled pursuant to Act 100 and Act 392.

24. Given the importance of the PLA Transaction to the City and its residents, the Debtor respectfully submits that it is appropriate for the Court to approve the PLA Transaction under sections 105(a) and 364(c) of the Bankruptcy Code and consents to seek such approval.

B.   **Section 364(e) Applies to the PLA Transaction**

25. Given the nature of the PLA Transaction, it is equally important that the Court expressly find that the PLA Transaction Documents are the result of good faith, arms-length negotiations among the City, the PLA, the MFA and the initial purchasers of the MFA Bonds to ensure all parties that the PLA Transaction Documents and the pledge and transfer of, and lien on, the Pledged Revenues to secure, and provide the primary source for the repayment of, the Act 392 Bonds, is in "good faith" within the meaning of section 364(e), thus allowing the purchasers of the MFA Bonds to rely upon the protections afforded under section 364(e) of the Bankruptcy Code.

26. Section 364(e) of the Bankruptcy Code states:

> The reversal or modification on appeal of an authorization under this section to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

27.	As the transaction described in the PLA Transaction Documents and the City's pledge and transfer of the Pledged Revenues in support of that transaction constitutes, subject to the limitations set forth in Act 100 and Act 392, the granting of a lien on all of the City's right, title and interest in the Pledged Revenues, for the reasons set forth above, section 364(e) of the Bankruptcy Code applies to the City's pledge and transfer of the Pledged Revenues.

28.	Further, the PLA Transaction Documents are the result of good faith, arms-length negotiations among the City, the PLA, the MFA and the initial purchasers of the MFA Bonds; and the MFA Bonds are payable from, and which bonds are secured by the right to payment under, payments on the Act 392 Bonds from the Pledged Revenues. Each of those entities is acting in "good faith" within the meaning of section 364(e) of the Bankruptcy Code.

29.	Finally, as a practical matter, it appears that no potential purchaser of the MFA Bonds will make such purchase, and thus provide the financing necessary to consummate the lighting transaction under the PLA Transaction Documents and Act 392, in the face of an appeal, without the comfort of an order from this Court that section 364(e) applies. As such, without a specific determination that section 364(e) applies in the instant situation, the initial

purchasers of the MFA Bonds in this case, will only provide financing pursuant to a final and nonappealable order.

30. As such, the mere filing of a notice of appeal of an order approving the PLA Transaction, regardless of how potentially meritorious or baseless such appeal may be, likely will delay unnecessarily the PLA Transaction for an extended period of time. This result is precisely what section 364(e) is intended to avoid. This transaction is too important to the public safety of the residents of Detroit and the City's overall restructuring to allow such a delay.

## Conclusion

31. As set forth above, the authorization sought in this Motion will provide an immense and vital benefit to the City and its residents. Further, the City's request for the relief set forth herein represents a sound exercise of the City's business judgment and is in the best interest of the City, its creditors and other parties in interest. Thus, the City respectfully submits that the granting of the Motion is appropriate under the instant circumstances.

## Reservation of Rights

32. The City files this Motion without prejudice to or waiver of its rights pursuant to section 904 of the Bankruptcy Code, and nothing herein is intended to, shall constitute or shall be deemed to constitute the City's consent, pursuant to section 904 of the Bankruptcy Code, to this Court's interference with

(a) any of the political or governmental powers of the City, (b) any of the property or revenues of the City or (c) the City's use or enjoyment of any income-producing property.

### Notice

33. Notice of this Motion has been given to all entities that have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure (or their counsel if known) and all parties to the PLA Transaction Documents (or their counsel if known). In addition, a copy of the Motion was served on the Office of the United States Trustee. The City submits that no other or further notice need be provided.

### Statement of Concurrence

34. Local Rule 9014-1(g) provides that "in a bankruptcy case unless it is unduly burdensome, the motion shall affirmatively state that concurrence of opposing counsel in the relief sought has been requested on a specified date and that the concurrence was denied." Local Rule 9014-1(g). Given the number of parties and potential parties involved in this case and the lack of known opposing parties who would be adversely impacted by the relief requested herein, it would be impracticable (and, with regard to unknown parties, impossible) for the City to affirmatively seek the concurrence of each opposing counsel interested in the relief sought herein. Accordingly, the City submits that imposing the requirements of

Local Rule 9014-1(g) in this matter would be "unduly burdensome" and requests that its requirements be waived.

## No Prior Request

35. No prior request for the relief sought in this Motion has been made to this or any other Court.

[*The Remainder of this Page is Intentionally Blank*]

WHEREFORE, the City respectfully requests that this Court: (a) enter an order substantially in the form attached hereto as <u>Exhibit 1</u> granting the relief sought herein; and (b) grant such other and further relief to the City as the Court may deem proper.

Dated: October 23, 2013

Respectfully submitted,

/s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com