**<u>EXHIBIT 6.1</u>**

**(C&F Agreement)**

**INTERLOCAL AGREEMENT**

BETWEEN

**THE CITY OF DETROIT**

AND THE

**PUBLIC LIGHTING AUTHORITY**

FOR THE

**CONSTRUCTION AND FINANCING
OF A
PUBLIC LIGHTING SYSTEM**

The following recitals are made regarding this interlocal agreement between the City of Detroit, a Michigan municipal corporation (the "City"), and the Public Lighting Authority, a Michigan municipal corporation (the "Authority", together with the City, the "Parties" and each a "Party"):

WHEREAS, the City has properly incorporated the Authority pursuant to the Michigan Municipal Lighting Authority Act, 2012 PA 392, MCL 123.1261 *et seq.* ("Act 392") for the purpose of providing an equitable and reasonable method and means of financing, operating, and maintaining a lighting system in sufficient quantities within the City; and

WHEREAS, Act 392 and the Urban Cooperation Act, 1967 PA 7, MCL 124.501 *et seq.*, each authorize interlocal public agency agreements between a city and a public lighting authority; and

WHEREAS, the governor of the state of Michigan has appointed an emergency manager ("Emergency Manager") for the City pursuant to the Local Financial Stability and Choice Act, 2012 PA 436, MCL 141.1541 – 1575. ("EM Act"); and

WHEREAS, the EM Act provides that the Emergency Manager shall have broad powers in receivership to rectify the financial emergency of the applicable local government and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare; and

WHEREAS, the City and the Authority desire to enter into this Agreement for the purposes, among other things, of defining the roles and responsibilities of each of the Parties with respect to the construction and financing of a public lighting system within the City for the benefit of residents of and visitors to the City; and

WHEREAS, the City, the Authority and Trustee have entered into the Trust Agreement whereby the Utility Taxes collected pursuant to Act 100 are deposited with the Trustee to be disbursed pursuant to the Authority's instructions, subject to the terms and conditions of the Trust Agreement; and

WHEREAS, the City, the Authority, the Michigan Finance Authority, and the Trustee will; contemporaneously herewith, enter into the Amended and Restated Trust Agreement, which will terminate and supersede the Trust Agreement; and

WHEREAS, the Emergency Manager issued Order No. 6 and Order No. 14, affirming the creation of the Authority and the execution of the Trust Agreement; and

WHEREAS, the Emergency Manager will, contemporaneously herewith, issue Order No. [___], affirming the execution of the Amended and Restated Trust Agreement.

NOW THEREFORE, in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

## ARTICLE I
## DEFINITIONS

**Section 1.1     Definitions**.  As used in this interlocal agreement:

"Act 100" means the City Utility Users Tax Act, 1990 PA 100, MCL 141.1151 to MCL 141.1177.

"Act 392" has the meaning set forth in the Recitals to this Agreement.

"Agreement" means this Interlocal Agreement for the Construction and Financing of a Public Lighting System by and between the City and the Authority.

"Amended and Restated Trust Agreement" means that certain agreement that will be entered into contemporaneously herewith by and among the City, the Authority, the Michigan Finance Authority, and the Trustee pursuant to Act 392 and Act 100.

"Ancillary Facility" shall mean "Ancillary facility" as defined in Act 392.

"Bond Indenture" means any bond or trust indenture entered into by the Authority and a bank, financial institution, or other entity pursuant to which the Authority bonds (including the Utility Bonds) as authorized by Act 392 will be issued, refunded, or reissued.

"City Council" means the legislative body of the City of Detroit, established by §4-101 of the 2011 City Charter.

"Contractors" means any third party contractors who have entered into agreements to provide services to the Authority, notwithstanding whether those agreements are directly with the Authority or as a subcontractor to a prime contractor of the Authority.

"Effective Date" means the date described in Section 7.1.

"Excess Revenue" has the meaning set forth in Section 3.2.

"Financing Costs" means the costs, including, without limitation, principal, interest, accreted value, if any, premium, if any, the costs of replenishing reserves, if any, and costs of issuance, payable in respect of any Utility Bonds issued by the Authority or any Ancillary Facility entered into by the Authority pursuant to Act 392 and Act 100, which Financing Costs are subject to the first sentence of Section 5.2 hereof.

"Improvements" or "Work", means all of the work, investments, and activities made or conducted, in whole or in part, on the construction, improvement, enlargement, reduction or extension of the System as contemplated by this Agreement or Act 392 and undertaken in compliance with the Lighting Plan approved by the City Council pursuant to Act 392, as amended.

"Initial Work" means the implementation of the Lighting Plan in the pilot projects the Authority will complete by December 31, 2013, which are further described on Exhibit 2, attached hereto and made a part hereof.

"Lighting Plan" means the plan required under MCL §123.1277.

"MFA" means the Michigan Finance Authority created by Executive Reorganization Order No. 2010-2.

"Revenue Bonds" means the bonds authorized pursuant to Act 392 and this Agreement and not secured by the Utility Taxes.

"System" means all of the luminaires, lamps, photocells, brackets, conductors, lights, poles and foundations, ballasts, circuits, transformers, conduits, underground equipment that are not part of the distribution system, and other equipment and appurtenances, including any easements or other interests in real property, commencing at the point of connection to the electric distribution system and continuing to the luminaire, necessary for the operation of the street lights within the City. For the avoidance of doubt, the System includes any Improvements to it. This definition specifically excludes the Mistersky Power Plant, any distribution assets of the City or DTE Energy, and any transmission assets of the City or DTE Energy, including any and all wires, distribution poles, transmission poles, substations, and transformers used for the distribution or transmission of electricity.

"Trust Agreement" means that certain Trust Agreement, as amended, entered into between the Authority, the City, and the Trustee, executed and effective as of August 1, 2013, which will terminate upon the execution of, and be superseded by, the Amended and Restated Trust Agreement.

"Trustee" means Wilmington Trust, N.A., as trustee pursuant to the Trust Agreement and the Amended and Restated Trust Agreement.

"Utility Bondholder" means any holder of a Utility Bond.

"Utility Bonds" means any bonds issued by the Authority pursuant to Act 392, Act 100 and the Amended and Restated Trust Agreement and secured by a pledge of Utility Taxes.

"Utility Revenues" means the revenues collected pursuant to Act 100, the Amended and Restated Trust Agreement and the Bond Indenture in the annual amount up to Twelve Million, Five Hundred Thousand Dollars and zero/100 ($12,500,000.00).

"Utility Taxes" means the taxes authorized to be levied by the City of Detroit pursuant to Act 100.

**Section 1.2     Captions and Headings**.   The captions, headings, and titles in this Agreement are intended as a convenience and not intended to have any substantive meaning or be interpreted as part of this Agreement.

**Section 1.3     Plural Terms**.   A term or phrase in this Agreement importing the singular number only may extend to and embrace the plural number and every term or phrase importing the plural number may be applied and limited to the singular number.

**ARTICLE II**
**ASSURANCES**

**Section 2.1     Assurances by the City**.   The City hereby makes the following assurances, representations, and warranties:

(a) That the Utility Taxes, authorized to be collected pursuant to Act 100, have been properly levied by the City in full compliance with the requirements of Act 100.

(b) Except as contemplated herein, that all necessary permissions, approvals, reviews, or any other forms of acquiescence necessary to authorize the City to enter into this Agreement have been obtained and conducted.

(c) To the extent permitted by law and any agreement to which the City is a party, the City shall use commercially reasonable efforts to provide all information within its control requested by the Authority to the Authority necessary to effectuate the purposes of this Agreement, including taking actions and providing certifications to effectuate the issuance of debt by the Authority as further described in Section 5.6 of this Agreement.

**Section 2.2     Assurances by the Authority**.   The Authority hereby makes the following assurances, representations, and warranties:

(a) That the organizational structure necessary to implement the Lighting Plan is established.

(b) That all funds shall be expended and accounted for according to generally accepted accounting standards for governmental entities.

(c) That the construction, improvements, enlargements, reductions or extensions of the System shall be completed within reasonable conformance to the Lighting Plan, accommodating any unforeseen conditions according to the objectives of the Lighting Plan.

(d) That the Authority shall take reasonable actions to reduce and limit the costs associated with this Agreement, including future System operating costs.

(e) The Authority shall use reasonable efforts, subject to the availability of funding and operational considerations, to ensure that the Pilot Work is substantially completed by December 31, 2013 and that the Lighting Plan in effect as of the date hereof or as properly amended, is completed in substantial conformity therewith as prescribed by statute.

(f) To the extent permitted by law and any agreement to which the Authority is a party, the Authority shall use commercially reasonable efforts to provide all information within its control requested by the City to the City necessary to effectuate the purposes of this Agreement.

## ARTICLE III
## CONSTRUCTION OF THE PUBLIC LIGHTING SYSTEM

**Section 3.1    The System**. The Authority shall undertake the Work pursuant to the terms of this Agreement and the Lighting Plan. The Authority shall coordinate and receive input from the City, the Emergency Manager and third parties with an interest in the retail distribution and transmission systems within the city to ensure technological compatibility between the portion of the System being upgraded and the distribution and transmission systems necessary to provide electricity to such upgraded portions of the System. The Authority will conduct a field survey and research of the existing System to determine the actual condition of the System and to identify the components that need repair, improvement, enlargement, reduction, or extension. The results of this survey and research will be integrated into the Lighting Plan. All work will be kept within allowable limits of funding. Acceptance of the project shall be based upon the work being completed within reasonably close conformance to the plans and specifications. For any contract with a value that equals or exceeds $100,000, other than contracts for services that are exempt from a competitive requirement under Michigan law, the Authority shall award such contracts pursuant to a competitive process. For purposes of determining such $100,000 threshold, the value of any contracts entered into during any twelve month period that relate generally to the same subject matter shall be aggregated for determining if such contracts exceed the $100,000 threshold and are thus subject to award pursuant to a competitive process.

**Section 3.2    Costs and Financing**. The costs of construction of the Improvements shall be paid for with the Utility Bonds. The City does not pledge its full faith and credit to any Utility Bonds authorized under this Agreement. The Parties agree that the Authority may finance the Initial Work with Utility Revenues it receives pursuant to the Trust Agreement, prior to the issuance of Utility Bonds. In the event the Authority (i) does not issue Utility Bonds or (ii) issues Utility Bonds and the Utility Revenues are in excess of the amounts required to pay Financing Costs ("Excess Revenue"), the Parties agree the Authority may expend such Excess Revenue on any of the Improvements to the System contemplated by Act 392 or for any other lawful purpose under Act 392 consistent with the Lighting Plan.

**Section 3.3    Third-Party Attachments, Fixtures, and Other Property**.    The Authority shall conduct its activities under this Article in a manner so as not to impair any leases or other contractual rights of third parties to attach any fixtures or other property to System assets.

The Authority shall relocate any third party fixtures or other property to the extent required by**,** and subject to the terms of, the applicable agreement with the third party. The Authority shall be entitled to all access and relocation rights of the City under such agreements, including reimbursement for fixture relocation costs. Notwithstanding the foregoing, in connection with the Work, the Authority, at its expense, shall relocate all fixtures or other property of the City attached to or on System assets to improved System assets in a manner that is reasonably acceptable to the City. To the extent permitted by law, and subject to Section 11.11, the Authority agrees to defend, indemnify and hold the City harmless, from and against any and all losses, damages, claims, suits, proceedings, liabilities, and out-of-pocket costs and expenses (including settlement costs, interest, penalties, reasonable attorneys' fees and any reasonable legal or other expenses for investigation or defense of any actions or threatened actions) that are actually sustained or incurred by the City and that arise out of any actions or omissions taken by the Authority pursuant to this Section 3.3

**Section 3.4    Operation of Lighting System**. Nothing in this Agreement is intended to convey any operational duties or responsibilities from the City to the Authority. The Parties acknowledge and agree that the Authority has no obligation to pay any costs of operating or maintaining the System or any portion thereof. The City shall remain responsible for the operation, maintenance, and upkeep of the entire System, and for all costs associated therewith, including those portions of the System that are constructed, improved, enlarged, reduced or extended pursuant to this Agreement. The City shall also be responsible for providing, or contracting for the provision of, and paying the costs for, the quantity and quality of electricity necessary for the proper operation of the System. Notwithstanding the foregoing, the Parties may contemporaneously herewith or subsequently agree to transfer certain operational responsibilities to the Authority by the execution of a separate operations and maintenance agreement; provided however, that to the extent the Parties so contract, to the extent that the Authority undertakes any operational, maintenance or management obligations, the Authority and the City must identify a source of revenues for such undertakings other than the Utility Revenues needed to pay Financing Costs, which requirement may be satisfied by the City's payment from such other revenue source in advance.

**Section 3.5    Public Property and Ownership**. All property of the Authority is public property devoted to an essential public and governmental purpose. All income of the Authority is for a public and governmental purpose. Nothing in this Agreement shall be construed as transferring the ownership of any lighting system assets owned by the City to the Authority.

**ARTICLE IV**
**FINANCE**

**Section 4.1    Ratification of Direction of Funds**. The City hereby ratifies the direction established under that certain Trust Agreement to each public utility and resale customer that collects or receives revenues pursuant to Act 100 to remit payment of all such revenues to the Trustee. For the avoidance of doubt, the Parties agree that regardless of the stated effective date of the Trust Agreement that the Trust Agreement was fully executed and effective on August 1, 2013, shortly after the Emergency Manager issued Order No. 14 authorizing the Trust Agreement.

**Section 4.2    Pledge of Utility Taxes**.  The City hereby pledges the Utility Taxes to the Utility Bonds, provided that funds from the Utility Taxes transferred to the City Disbursement Fund pursuant to the Trust Agreement or the Amended and Restated Trust Agreement shall be free and clear of all liens as more particularly described in the Amended and Restated Trust Agreement.

**Section 4.3    No Exemptions**.  The City shall not permit or authorize any exemption not authorized and in effect on the date of issuance of the first series of Utility Bonds to the tax assessed under Act 100 for any end user required to pay such assessment under Act 100.

**Section 4.4    Disbursement and Expenditure of Funds**.  Revenues from Utility Taxes shall be applied by the Trustee pursuant to the Trust Agreement or the Amended and Restated Trust Agreement, as applicable.  The Authority may expend the Excess Revenue on any of the Improvements to the System contemplated by Act 392 or for any other lawful purpose under Act 392 consistent with the Lighting Plan.

**Section 4.5    Orderly Collection of Utility Taxes.**  The City shall take all steps reasonably necessary to ensure the orderly collection of Utility Taxes so that they are deposited pursuant to the Trust Agreement or the Amended and Restated Trust Agreement, as applicable.

**Section 4.6    Tax Covenant.**  The Authority may temporarily invest any bond proceeds or other funds held by it as permitted by law, and investment income shall accrue to and follow the fund producing such income.  Neither the Authority nor the City shall invest, reinvest, or accumulate any moneys deemed to be proceeds of the bonds pursuant to applicable federal law and regulations, in such a manner as to cause the bonds to be "arbitrage bonds" within the meaning of said law and regulations, nor shall either take or fail to take any actions which would cause the interest on the bonds to be included in gross income for federal income taxation purposes.  The City agrees that, to the extent Utility Bonds are issued on a "tax-exempt" basis, it will use reasonable efforts to cooperate with the Authority to maintain that status, including but not limited to, executing a non-arbitrage and tax compliance certificate(s) and any other documents determined necessary or advisable to the Authority's counsel.

**Section 4.7    Authority Revenue**.  For the avoidance of doubt, and notwithstanding anything to the contrary set forth in this Agreement, regardless of the pledge by the City of the Utility Taxes pursuant to Section 4.2, the amount payable to the Authority for repayment of the Utility Bonds in any one year shall be limited to the Utility Revenues for that year.

## ARTICLE V
## BONDS, DEBTS, AND SECURITIES

**Section 5.1    Issuance of Bonds, Debts, or Other Securities.**  Subject to the requirements of Act 392, the Amended and Restated Trust Agreement, any Bond Indenture, and this Agreement, the Authority is authorized to issue or refund bonds, debts, securities, and other forms of indebtedness, or may otherwise enter into other agreements obligating itself to repayment of debt.

**Section 5.2    Limitation on Bond Issuance**.  The Authority shall not issue, or cause to be issued Utility Bonds: (i) in an amount that shall require payments from the Utility Revenues of the Financing Costs in excess of Twelve Million, Five Hundred Thousand Dollars, and Zero Cents ($12,500,000.00) in any single year; or (ii) in an aggregate principal amount that exceeds five percent (5%) of the total state equalized valuation of the property assessed in the City.  This limitation on the issuance of Utility Bonds in no way limits the ability of the Authority to finance the costs of operating, maintaining, or managing the System by issuing Revenue Bonds to the extent that the City and the Authority have entered into such a contract for such purpose in accordance with Section 3.4.

**Section 5.3    Nonimpairment of Bondholder Security**.  The City shall not take any action that may impair the security of bondholders in repayment of the Utility Bonds, any Ancillary Facilities or other debt obligations authorized hereunder. Such impairment includes, but is not limited to, a reduction of the tax authorized and in effect on the date of issuance of the first series of Utility Bonds pursuant to Act 100, or a reduction in category of taxpayers required to pay the Utility Taxes.  Nothing in this section shall be construed as a limitation on the City's power to increase the tax authorized under Act 100 or to broaden the category of taxpayers required to pay the Utility Taxes.

**Section 5.4    Revised Municipal Finance Act**.  This Agreement, and any bonds, debts, or other securities issued under or pursuant to this Agreement, are not subject to the Revised Municipal Finance Act, 2001 PA 34, MCL 141.2401 to 141.2821.

**Section 5.5    Revenue Bond Act**.  This Agreement, and any bonds, debts, or other securities issued under or pursuant to this Agreement, are not, subject to the Revenue Bond Act of 1933, 1933 PA 94, MCL 141.101 to 141.140.

**Section 5.6    Enforceability Opinions/Certificates**.  The City agrees that in connection with the issuance of any Utility Bonds by the Authority it will cause its corporation counsel or outside counsel to deliver an enforceability opinion as to this Agreement and the Amended and Restated Trust Agreement.  The City also agrees to deliver customary forms of certificates as to the due authorization, execution and enforceability of this Agreement and the Amended and Restated Trust Agreement and other certificates as are necessary or advisable in connection with the issuance of any Utility Bonds.

## ARTICLE VI
## DATA SHARING, ACCESS, COOPERATION, PERMITS, AND SYSTEM PROTECTION

**Section 6.1    Data and Information**.    To the extent permitted by law and any agreements to which the City is a party, the City shall provide the Authority full access to all data and information in its possession or control, which is reasonably accessible, including all data and information contained in the documents commonly known as the "series streetlight maps," necessary to provide the Work.  To the extent permitted by law and any agreements to which the Authority is a party, the Authority shall provide the City full access to all data in the Authority's possession or control, which is reasonably accessible, reasonably related to the System.  The

Authority shall provide notice to the City of recent Improvements made and shall, on a continuing basis, provide notice to the City on future Improvements.

Section 6.2  **Access to Assets**.  The City shall provide the Authority or any of its Contractors full access to all facilities, assets, easements, appurtenances, and related rights and property, owned, operated, or maintained by the City necessary to design, establish, construct, operate, and maintain the System on behalf of the City. The Authority shall permit the City full access to all facilities, assets, easements or appurtenances owned, operated, or maintained by the Authority related to the System, if any, and shall not impair access to any public rights of way.

Section 6.3  **Cooperation**.  The Parties hereby agree to use commercially reasonable efforts to cooperate with each other to the fullest extent possible to effectuate the purposes of this Agreement.

Section 6.4  **Permits**.  The City shall process and issue any permit(s) required under the City Charter, the City Code of Ordinances, or any other local regulatory requirements to the Authority, its employees, agents, or Contractors within fifteen (15) business days of receiving a request for such permit(s) provided that such request includes the detail and documentation otherwise required to issue such permit; *provided, however*, that if there are any permit(s) required to conduct any work specified herein that are not within the direct control of the City, the City shall use commercially reasonable efforts to ensure that such permits are issued within a commercially reasonable timeframe.  The City shall not charge a fee to the Authority for any permits, approvals, reviews, or other actions required by the City.

Section 6.5  **System Damage**.  The Authority shall not be responsible for any damage to the System, or any component thereof, resulting from the criminal, intentional, or negligent acts of any third parties.  In the event any portion of the System or Improvements are damaged by the negligent acts of a third party and the City refuses or is unable to seek recovery of funds for such damage, the Authority may, but is not required, to seek such recovery in the City's name.


**ARTICLE VII**
**EFFECTIVE DATE, TERM, and EXPIRATION**

Section 7.1  **Effective Date**.  This Agreement shall become effective on the date that each of the following events have occurred: (i) the approval and execution by the City; (ii) the approval of the Agreement pursuant to the procedures set forth in the EM Act; (iii) the approval by resolution of the Authority; (iv) the execution by the Executive Director of the Authority; (v) approval and execution of the Amended and Restated Trust Agreement and the Bond Indenture; and (vi) the City has caused a notice to be sent to each public utility and resale customer that collects or receives revenues pursuant to Act 100.

Section 7.2  **Term and Expiration**.  This Agreement shall commence on the Effective Date and shall expire upon final payment of all financial obligations of the Authority under Act 392 or this Agreement.

## ARTICLE VIII
## BOOKS, RECORDS, AND FINANCES

**Section 8.1    Financial Statements and Reports by City**.  The City shall prepare, or cause to be prepared, at its own expense, audited financial statements of the City, which shall include the Utility Revenues and the other revenues collected pursuant to Act 100 each fiscal year and provide such statements to the Authority, the Trustee, the Emergency Manager and any other parties reasonably necessary to ensure compliance with the disclosure requirements of all relevant state and federal laws, including, but not limited to the Securities and Exchange Act, Pub.L. 73-291, 48 Stat. 881, 15 U.S.C.§78a *et seq*.

**Section 8.2    Books and Records**.  The Authority shall provide for a system of accounts for the Authority to conform to a uniform system required by law and for the auditing of the accounts of the Authority. The Authority shall obtain an annual audit of the Authority's books and records by an independent certified public accountant and report on the audit and auditing procedures in the manner provided by sections 6 to 13 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.426 to 141.433. The audit also shall be in accordance with generally accepted auditing standards for public bodies and shall satisfy any applicable federal regulations relating to federal grant compliance audit requirements.    The audit shall be provided to the City within thirty (30) days of acceptance by the Board of Directors of the Authority but in no event more than one hundred and twenty (120) days following the end of the Authority's fiscal year.  The City may examine the books and records of the Authority related to the Authority's finances, the System or the Work, and make copies and extracts therefrom at its own expense, all during regular business hours as may be reasonably requested and reasonably agreed to by the Authority in advance.

## ARTICLE IX
## INDEMNIFICATION, LIABILITY, DAMAGES, AND INSURANCE

**Section 9.1    Indemnification**.  To the extent permitted by law and subject to Section 11.11, each Party shall indemnify and hold harmless the other Party and the other Party's employees, agents, directors and officers against all liability arising out of, or resulting from any third party claim, suit, action or proceeding arising out of or resulting  from (i) the failure of a Party or any of its agents, employees or contractors, to comply with the terms of this Agreement or any applicable law; or (ii) any injury, loss, claim or damages arising from the actions or omissions of a Party or an agent, employee, director, officer or contractor of the Party.

**Section 9.2    Limitation of Liability; No Special Damages**.  Notwithstanding any other provision of this Agreement, neither Party shall be liable to the other for any damages for loss of profits, loss of revenues, loss of goodwill, loss of anticipated savings, loss of data or cost of purchasing replacement services, or any indirect, incidental, special, consequential, exemplary or punitive damages arising out of the performance or failure to perform under this Agreement. Nothing in this Agreement shall be construed as a waiver of governmental immunity, where applicable, or as a limitation on any rights of Utility Bondholders under applicable law.

**Section 9.3    Notice of Claims**.  If either Party becomes aware of any injury, damages, claim, demand, action, legal proceeding, or other loss that may involve the other Party, whether directly or indirectly, it shall inform the other Party in writing within fifteen (15) business days of receiving knowledge of the injury, damages, claim, demand, action, legal proceeding, or other loss.  Such notice(s) shall be provided in accordance with Section 12.7 of this Agreement.

**Section 9.4    Insurance**.  At all times during the term of this Agreement, each Party shall procure and maintain, at its sole cost and expense, the following types and amounts of insurance coverage issued by an insurance company reasonably acceptable to the other Party, unless otherwise agreed to by the Parties in writing:

(a)    Commercial General Liability, covering bodily and personal injury, property damage, and contractual liability insuring the activities of the Party under this Agreement, in a minimum amount of One Million Dollars ($1,000,000) per claim and Five Million Dollars ($5,000,000) in the annual aggregate, adding the other Party as an additional insured with respect to this Agreement.

(b)    Commercial Automobile Liability with limits of One Million Dollars ($1,000,000) per claim and Five Million Dollars ($5,000,000) in the annual aggregate, adding the other Party as an additional insured with respect to this Agreement.

(c)    Worker's compensation insurance in amounts required in accordance with applicable laws.

(d)    Errors and Omissions/Professional Liability with limits no less than One Million Dollars ($1,000,000) per claim and Three Million Dollars ($3,000,000) in the annual aggregate.

The insurance required of the City by this Agreement in the amounts, with the coverage and other features herein required, may be supplied by a fully funded self-insurance program of the City or a self-insurance pool in which the City is a participant; provided that such self-insurance program or pool will provide the full coverage required herein.

**ARTICLE X**
**DISPUTES**

**Section 10.1   Informal Dispute Resolution**.  The Authority and the City will attempt to settle any dispute through informal good faith negotiations.  The dispute will be escalated to appropriate senior level management of the Parties, if necessary.  Except as otherwise set forth herein, if such managers are unable to resolve the dispute within fifteen (15) business days of referral (or any other mutually agreed upon timeframe), the Parties will seek resolution of such disputes pursuant to Section 10.2.

**Section 10.2   Jurisdiction and Venue**.  Except as otherwise set forth herein, in the event of any disputes between the Parties over the meaning, interpretation, or implementation of the terms, covenants, or conditions of this Agreement, the matter under dispute, unless resolved any the Parties pursuant to Section 10.1, shall be submitted to the courts of the State of Michigan.

## ARTICLE XI
## MISCELLANEOUS

**Section 11.1   Amendment**.  This Agreement can be modified or amended only by written agreement executed and approved by both Parties in the same manner as required for the initial effectiveness of the Agreement, as applicable.

**Section 11.2   Heirs, Successors, and Assigns**.  All provisions of this Agreement are and will be binding on the heirs, executors, administrators, personal representatives, successors and assigns of the Authority and the City.

**Section 11.3   Severability**.   If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**Section 11.4   Governing Law**.  The internal laws of the State of Michigan will control in the construction and enforcement of this Agreement.

**Section 11.5   Third Party Beneficiary Rights.** The Parties expressly acknowledge that the Utility Bondholders (and the Trustee on behalf of such Bondholders) are direct, intended third party beneficiaries of Article IV and Article V of this Agreement and of all other provisions of this Agreement relating to the Utility Taxes and Utility Revenues and as such, are entitled, but not obligated to enforce this Agreement and shall be afforded all remedies available hereunder or otherwise afforded by law against the Parties hereto.

**Section 11.6   Entire Agreement**.   This Agreement sets forth the entire agreement between the Parties and supersedes any and all prior agreements or understandings between them in any related to the subject matter of this Agreement.  It is further understood and agreed that the terms and conditions of this Agreement are contractual and are not a mere recital and that there are no other agreements, understandings, contracts, or representations between the Parties in any way related to the subject matter of this Agreement, except as expressly stated in this Agreement.

**Section 11.7   Notices**.  Any and all correspondence or notices required, permitted, or provided for under this Agreement to be delivered to any Party shall be sent to that Party by first class mail.  All such written notices shall be addressed to each other Party's signatory to this Agreement.  All correspondence shall be considered delivered to a Party as of the date that the notice is deposited with sufficient postage with the United State Postal Service.  A notice of termination shall be sent via certified mail to the address included with each Party's signature to this Agreement.  Notices shall be mailed to the following addresses:

If to the Authority:   Public Lighting Authority
65 Cadillac Square, Ste. 2900
Detroit, MI 48226

| | |
|---|---|
| If to City: | City of Detroit |
| | Office of the Mayor |
| | 2 Woodward Avenue, 11th Floor |
| | Detroit, MI 48226 |
| | |
| With a copy to: | City of Detroit |
| | Office of the Emergency Manager |
| | Coleman A. Young Municipal Center |
| | 2 Woodward Ave. |
| | 11th Floor |
| | Detroit, MI 48226 |
| | Attn: Sonya Mays |

**Section 11.8   Force Majeure**.  Any delay or failure in the performance by either Party hereunder shall be excused if and to the extent caused by the occurrence of a Force Majeure. For purposes of this Agreement, Force Majeure shall mean a cause or event that is not reasonably foreseeable or otherwise caused by or under the control of the Party claiming Force Majeure, including acts of God, fires, floods, explosions, riots, wars, hurricane, sabotage terrorism, vandalism, accident, restraint of government, governmental acts, injunctions, labor strikes, other than those of the claiming Party or its suppliers, that prevent the claiming Party from furnishing the materials or equipment, and other like events that are beyond the reasonable anticipation and control of the Party affected thereby, despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of such acts, events or occurrences, and which events or the effects thereof are not attributable to a Party's failure to perform its obligations under this Agreement.

**Section 11.9   Counterparts.**   This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

**Section 11.10 Binding Effect.**   This Agreement shall be binding upon and inure to the benefit of the Parties hereto.   No Party to this Agreement may assign its rights under this Agreement to any other person without obtaining the written permission of the other Parties in advance, provided that the Authority's right to terminate this Agreement may be collaterally assigned by the Authority.

**Section 11.11. Limited Obligation**.  Notwithstanding anything herein to the contrary, all of the Authority's obligations under this Agreement, other than the obligations which are payable out of proceeds of the insurance required to be maintained by the Authority pursuant to this Agreement, to the extent such obligations are payable out of those insurance proceeds, shall be limited obligations, payable from and expressly limited to those funds provided to the Authority in accordance with the Trust Agreement or the Amended and Restated Trust Agreement or any Bond Indenture, and not payable from any portion of the Utility Revenues needed to pay Financing Costs.

**Section 11.12 Emergency Manager Approval.**  If the City is under the management of an Emergency Manager pursuant to the EM Act, at the time of a decision for which the approval of

the City, the City Council or the Mayor is required, then the approval of the Emergency Manager is hereby substituted in place of the approval of the City, the City Council or the Mayor, as applicable..

[SIGNATURE PAGE FOLLOWS]

This Agreement is executed by the Parties on the dates indicated below.

**CITY OF DETROIT**

Dated: _____      By: _____
                                       KEVYN D. ORR
                               Its:      Emergency Manager

**PUBLIC LIGHTING AUTHORITY**

Dated: _____      By: _____
                                       ODIS JONES
                               Its:      Executive Director

**<u>Exhibit 1</u>**

Lighting Plan



# PUBLIC LIGHTING AUTHORITY

# LIGHTING PLAN



**Office Location:**           **65 Cadillac Square, Suite 2900**
                               **Detroit, MI 48226**


**Project Location:**          **City of Detroit**


**Executive Director:**        **Odis Jones**


**Revision:**                  **10**

**Date Issued**                **9-9-2013**



## TABLE OF CONTENTS:

A – Project Information ……………………………………………………………………………... 4

     1.  Project Background ……………………………………………………………….. 4
     2.  Facility Background …………………………………………………………….. 5
     3.  Scope and Schedule ……………………………………………………………. 5
     4.  Operations & Maintenance …………………………………………………….. 6

B – Project Funding ………………………………………………………………………… 7

C – Appendices

     1.  Appendix A – PLA Articles of Incorporation
     2.  Appendix B – Trust Agreement
     3.  Appendix C – West PLA Pilot Area
     4.  Appendix D – East PLA Pilot Area
     5.  Appendix E – Detroit Zip Code Map
     6.  Appendix F – Project Schedule
     7.  Appendix G – Cash Flow/Budget



## A. Project Information

### 1. Project Background

The Public Lighting Authority ("PLA") was authorized by the Michigan Legislature in 2012 pursuant to a three-bill package that included: (1) the Michigan Municipal Lighting Authority Act, 2012 PA 392, MCL 123.1261 – MCL 123.1295 ("Act 392"), which authorized the creation of lighting authorities and granted the statutory authority for their operations; (2) an amendment to the City Utility Users' Tax Act, 1990 PA 100 as amended, MCL 141.1151 – MCL 141.1177 ("Act 100"), which required a city that creates a lighting authority to direct Twelve Million, Five Hundred Thousand Dollars ($12,500,000) to the authority from the revenues authorized under Act 100; and (3) an amendment to the City Income Tax Act, 1964 PA 284 as amended, MCL 141.501 – MCL 141.787, which authorized a city that creates a lighting authority to continue to assess an increased income tax rate in order to hold harmless the public safety departments from the mandatory diversion of revenues under Act 100.

The City Council and Mayor of the City of Detroit ("City") properly incorporated and perfected the formation of the PLA as required under Act 392, with an effective formation date of April 5, 2013. The approved Articles of Incorporation ("Articles") commit the City to the annual payment of $12.5 million to the Authority. (*See* Appendix A, Articles of Incorporation, Art. XIII, Sec. 1). The PLA and the City have executed a Trust Agreement with Wilmington Trust, N.A. as Trustee, wherein the City has irrevocably directed all of the Utility Users' Tax Revenue to the Trustee to be disbursed pursuant to the Trust terms. (See Appendix B, Trust Agreement). The disbursement terms provide that the revenues will be directed as follows: of the first $12.5 million, first to any holders of bonds or debt of the PLA and second to the PLA, if any is left; and third, to City for all of the revenues exceeding $12.5 million.

Consistent with Act 392 and the Articles, the PLA is overseen by an independent, five-member board. The PLA board includes former State Rep. Maureen Stapleton, who serves as chair, Michael Einheuser, John L. Davis, Marvin Beatty and Cedric Dargin. As stated under Act 392, the purpose of the PLA is to provide an equitable and reasonable method and means of financing, operating, and maintaining a lighting system to supply lighting in sufficient quantities to the City of Detroit. The PLA anticipates making a multi-year, large scale, city-wide investment in the public lighting infrastructure including poles, ballasts, circuits, transformers, and distribution connections. The PLA anticipates funding the improvements through: (i) a bridge loan in the amount of $60 million; and (ii) the subsequent sale of approximately $153 million in bonds. The financing will be paid back with the mandatory payment of $12.5 million per year as required under Act 100.

The PLA staff will consist of an Executive Director and support staff. DTE Energy has been selected as the owner's representative. In addition, the PLA has or will procure the services of


legal, accounting, engineering, public relations, construction, and maintenance through contracting. Gregory Terrell & Company will provide financial accounting, the Allen Law Group, P.C. will provide legal service and Berg Muirhead and Associates will provide public relations.

2. Facility Background

The Detroit street light system is in need of repair and improvement. Detroit's street light system of 88,000 lights is in disrepair, with approximately 55,000 lights being fed by DTE Electric and the remaining 33,000 being fed by Public Lighting Department (PLD). Although it is estimated that half of the lights in the system are not working, the status of the street light system is unknown and will require a survey of each light. Most of the underground fed lighting circuits within Detroit are made up of series circuits consisting of multi-generation light fixtures.

3. Scope and Schedule

The implementation of the lighting plan is being segregated into a short-term and long-term plan. Two pilot areas have been chosen for the short-term plan implementation, the outcomes of which will inform the long-term process. (*See* Appendices C and D for maps of the selected areas). Both the short and long-term plans will be implemented in several segments, specifically consisting of survey, design and construction work. All contracts will be awarded pursuant to a competitive bid process. The short-term plan implementation will commence in 2013 with completion projected in 1st quarter 2014. The field survey will include collecting status information on each pole and recording in a geographical mapping system. The owner's engineer will provide engineering, material specifications and work packages for construction. A specific improvement will be converting "series" circuits to "multiple" circuits. The overhead and underground construction contractors will perform all field installations and provide field records. Quality and safety audits will be performed throughout the project. Each area has approximately 2,500 lights, for a total of approximately 5,000 street lights.

The long term plan, scheduled from 1st quarter 2014 through 4th quarter 2016, would consist of progressive geographic implementation using Detroit zip codes, as shown on Appendix E, as improvement project areas. (*See also* Appendix F for the long term schedule of project areas). New project areas will begin approximately every other month and take approximately nine months to complete. The final number of street lights will be approximately 46,000. After the two pilot areas, contiguous areas will be addressed including those defined as high priority areas by the City of Detroit. To inform the public of changes and facilitate outage reporting, public notice will be made by way of door hangers and public meetings.

The project design criteria are as follows:
a) Lighting will remain essentially the same in densely populated areas and thoroughfares


b) All intersections will have lighting

c) Streets blocks greater than 600 feet long will have a street light in the middle of the block

d) All new lamp heads should be one cost effective style

e) All new light arms should be 6 foot in length, centering new lamp head illumination in the street

f) Standardize on two sizes of lights for majority of fixtures (150Watt (W) High Pressure Sodium (HPS) & 250W HPS)

g) Overhead feeds will be standard where allowable

h) Existing lights that do not fit in the above criteria, such as alley lights, will be removed as part of the improvement model

i) All applicable codes and regulations will be followed

4. Operation & Maintenance

The PLA has drafted a proposed operations & maintenance agreement ("O&M Agreement") with the City of Detroit. Please note that negotiations on the O&M Agreement have not commenced, therefore the information contained in this section should be considered prospective and subject to modification.

Financially, the O&M Agreement will cover two separate costs associated with operating the street light system: the cost of energy to actually light the lights, and the cost of on-going operations and maintenance of the system. The O&M Agreement contemplates the annual establishment of rates to be charged to the City for the services provided.

With respect to the purchase of energy, the O&M Agreement provides two options: one is for the City to purchase electricity directly from a third-party power provider at regulated rates, and the second is for the PLA to purchase power and pass through that purchase to the City at cost. Under either option, DTE Energy will supply the energy under the Michigan Public Service Commission-approved DTE Energy Municipal Street Lighting Rate E.1 – Option III tariff.

With respect to the ongoing operations and maintenance, it is contemplated that the PLA will enter into an agreement with DTE Energy for the duration of the project wherein DTE Energy will operate and maintain the System on a per unit cost basis. Maintenance will include replacement material and equipment as may be necessary to ensure that the refurbished street light system is fully operational with an anticipated 30 year expected useful life. This includes both preventative and reactive maintenance services. The maintenance program will also include outage notification methods with repair time requirements. Upon completion of the project, the PLA will competitively bid this service.

The estimated annual costs for these operations and maintenance services, including PLA administrative costs, is $11M to $12M based on the criteria contained in Section A.3. The


source of the City funds for the payment of rates has not been identified yet, but it should be anticipated that the source will be the City of Detroit General Fund.

## B. Project Funding

The total estimated project cost for capital improvements is $153 million, excluding the operations and maintenance and PLA administrative costs. This is the anticipated total investment to be repaid through the Utility Users Tax of $12.5 million per year for an expected 30 years. (*See* Appendix G for the cash flow projections for the project by quarter). As stated, street light energy, operation and maintenance are not included in the project costs and will likely be supported by the City of Detroit General Fund.

A strict change control process will be deployed throughout the project.

## C. Appendices
   a) Appendix A – PLA Articles of Incorporation
   b) Appendix B - Trust Agreement
   c) Appendix C – West PLA Pilot Area
   d) Appendix D – East PLA Pilot Area
   e) Appendix E – City of Detroit by Zip Code
   f) Appendix F – Schedule Summary
   g) Appendix G – Cash Flow/Budget

# APPENDIX A

# ARTICLES OF INCORPORATION
## OF THE
## PUBLIC LIGHTING AUTHORITY

These Articles of Incorporation are executed and adopted by the City Council of the City of Detroit for the purpose of establishing a Public Lighting Authority pursuant to Act 392 of the Public Acts of Michigan of 2012.

### Article I
### Name

The name of the corporation and Authority is the Public Lighting Authority (the "Authority").

### Article II
### Definitions

As used in these Articles of Incorporation, the following words have the following meanings:

**Section 1.**     The "*Act*" means Act 392 of the Public Acts of Michigan of 2012, and such amendments as may be hereinafter adopted.

**Section 2.**     "*Authority*" means the Public Lighting Authority incorporated under these Articles of Incorporation pursuant to the Act.

**Section 3.**     "*Best Value*" means a contract and procurement process to be followed by an authority that encourages and considers bids from locally headquartered companies and that considers use of the local workforce.

**Section 4.**     "*Board*" or "*Authority Board*" means the Board of Directors of the Authority.

**Section 5.**     "*Bonds*" mean bonds and notes issued by the Authority and includes any Ancillary Facility (as defined in Act) or other financing instruments entered into by the Authority if the facilities are permitted by the contract entered into between the City and the Authority.

**Section 6.**     "*City*" means the City of Detroit, located in Wayne County, Michigan.

**Section 7.**     "*City Council*" means the City Council of the City of Detroit.

**Section 8.**     "*Lighting System*" or "*System*" means plants, works, instrumentalities, and properties used or useful in connection with providing lighting and necessary resources and appurtenances for the System.

**Section 9.**     "*Mayor*" means the Mayor of the City of Detroit.

**Section 10.**     "*Utility Users Tax*" means the tax levied by the City authorized by Utility Users Tax Act.

**Section 11.** *"Utility Users Tax Act"* means the City Utility Users Tax Act, Act 100 of the Public Acts of Michigan of 1990, as last amended by Act 393 of the Public Acts of Michigan of 2012.

## Article III
## Purpose and Intent

**Section 1.** It is the intent of these Articles of Incorporation to provide an equitable and reasonable method and means of financing, operating, and maintaining a Lighting System to supply lighting in sufficient quantities to the City.

**Section 2.** The City, by majority vote of its City Council, hereby incorporates the Authority comprising the territory within its respective limits for acquiring, constructing, consolidating, purchasing, operating, or maintaining a municipally owned Lighting System. The Authority is a public municipal corporation with the rights, powers, and duties as provided by the Act.

**Section 3.** The powers of the Authority shall be carried out in a manner authorized by the Act.

**Section 4.** Nothing in the Act or these Articles of Incorporation shall be construed as transferring the ownership of any Lighting System assets to the Authority unless the transfer is specified in these Articles of Incorporation and the transfer is ratified in accordance with all applicable laws.

**Section 5.** A transfer of ownership or operational control of a Lighting System to the Authority shall not be considered a sale, lease, or disposal of any kind of an asset by the City under any state or local law.

## Article IV
## Franchises

**Section 1.** Nothing in these Articles of Incorporation shall be considered to alter the laws and regulations regarding utility franchises unless explicitly stated. The creation of the Authority shall not be considered to create a new franchise as long as the Authority only provides service within the City and any area that the City may be serving or permitted to serve under law on the effective date of the Act.

## Article V
## Powers, Duties and Limitations

**Section 1.** The Authority is a public municipal corporation. The Authority is a public body corporate with the power to sue and be sued in any court of this state. The Authority possesses all the powers necessary to carry out the purposes of its incorporation. The enumeration of any

powers in the Act or in these Articles of Incorporation shall not be construed as a limitation on the Authority's general powers.

**Section 2.**     The Authority may do any of the following:

a.     Adopt bylaws for the regulation of the Authority's affairs and the conducting of its business.

b.     Adopt an official seal and alter the seal at its pleasure.

c.     Maintain an office at a place or places within the City as it may designate.

d.     Sue and be sued in its own name, plead and be impleaded.

e.     Determine the location of any project constructed by it under the Act and determine, in its discretion and without reference to any other provisions of the Act or any other law, the design, standards, and the materials of construction, and construct, maintain, repair, and operate the project.

f.     Issue Bonds of the Authority for any of its corporate purposes under those means as provided by the Act.

g.     Adopt and promulgate rules and regulations for the use of any project operated or constructed by it under the provisions of the Act.

h.     Acquire, hold, lease and dispose of real and personal property in the exercise of its powers and the performance of its duties under the Act.

i.     Engage engineering, legal, and other professional services as considered necessary to effectuate the purposes of the Authority.

j.     Enter into contracts for any purpose necessary or incidental to its purposes under the act, including, but not limited to, contracts with the City necessary for financing the Lighting System.

m.     The Authority shall possess all powers necessary to carry out the purpose of its incorporation, including any powers authorized by the Act or the incidental power necessary thereto.

**Section 3.**     The Authority shall maintain its books and records and its funds on an enterprise fund basis. The Authority shall not pay any net proceeds or profits to the City, but may pay the City for services provided.

**Section 4.**     Following the appointment of the Authority Board, the Board shall implement a Best Value supply chain and procurement practice and shall annually report thereon to the City Council.

## Article VI
## Authority Board

**Section 1.**     The Authority shall be directed and governed by a Board of Directors consisting of 5 members appointed as provided by the Act.

**Section 2.**     The Board shall consist of members with the qualifications as required by the Act. Such Board members shall be appointed and serve terms of service as provided by the Act.

**Section 3.**     Each Board member shall make such certifications as required by the Act. A person shall not begin service as a Board member until he or she completes and files the certification with the Michigan Attorney General as required under this Article.

**Section 4.**     If the required certification is not filed by a Board member as required by the Act as described in a report of the Michigan Attorney General, the term of office for that Board member who fails to make the required certification as required by the Act shall automatically terminate as required by the Act.

## Article VII
## Authority Organization

**Section 1.**     Within 30 days following the appointment of the last Board member to the Board, the Board shall hold its first meeting.

**Section 2.**     At its first meeting, the Board shall select a chairperson, treasurer, and any other officers as the Board considers necessary. The Board shall require the treasurer to post a suitable bond of not less than $100,000.00 issued by a responsible bonding entity, with the cost of the premium of the bond paid for by the Authority.

**Section 3.**     The Board shall select, employ, and fix the compensation for employees of the Board and contract for those engineering, legal, and other professional services that the Board considers necessary to effectuate the purposes of the Authority.

**Section 4.**     A majority of the members of the Board constitute a quorum for the purpose of conducting business and exercising powers of the Authority. Official action may be taken by the Authority upon the vote of a majority of the Board members present.

**Section 5.**     The Board shall adopt rules and bylaws governing its procedures and the holding of meetings. The Board shall designate an office or location within the City as its principal place of business.

**Section 6.**     The business of the Board shall be conducted at a public meeting of the Board held in compliance with the Open Meetings Act, 1976 PA 267, MCL 15.261 to 15.275. Public notice of the time, date, and place of the meeting shall be given in the manner required by the