# EXHIBIT 6.2

## (O&M Agreement)

INTERLOCAL AGREEMENT

BETWEEN

THE CITY OF DETROIT

AND THE

PUBLIC LIGHTING AUTHORITY

FOR THE

OPERATION, MAINTENANCE AND MANAGEMENT
OF A
PUBLIC LIGHTING SYSTEM

The following recitals are made regarding this interlocal agreement between City of Detroit, a Michigan municipal corporation (the "City"), and the Public Lighting Authority, a Michigan municipal corporation (the "Authority", together with the City, the "Parties" and each a "Party"):

WHEREAS, the City has properly incorporated the Authority pursuant to the Michigan Municipal Lighting Authority Act, 2012 PA 392, MCL 123.1261 *et seq.* ("Act 392") for the purpose of providing an equitable and reasonable method and means of financing, operating, and maintaining a lighting system in sufficient quantities within the City; and

WHEREAS, Act 392 and the Urban Cooperation Act, 1967 PA 7, MCL 124.501 *et seq.*, each authorize interlocal public agency agreements between a city and a public lighting authority; and

WHEREAS, the City and the Authority have previously entered into an agreement for the financing and construction of a Public Lighting System (as amended, the "Construction and Financing Interlocal Agreement");

WHEREAS, the City and the Authority desire to enter into an agreement for the purposes of defining the roles and responsibilities of each of the Parties with respect to the operation, maintenance and management of the System within the City for the benefit of residents of and visitors to the City; and

NOW THEREFORE, in consideration of the mutual covenants and promises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Parties agree as follows:

<div align="center">

ARTICLE I
DEFINITIONS

</div>

**Section 1.1     Definitions**.  As used in this interlocal agreement:

"Act 392" has the meaning set forth in the Recitals to this Agreement.

"Agreement" means this Interlocal Agreement for the Operation, Maintenance and Management of a Public Lighting System by and between the City and the Authority.

"Approving Entities" shall have the meaning set forth in Section 4.3.

"Certificate of Completion" means a certification in substantially the form attached hereto as Exhibit A, issued by the Authority that all construction, improvement, enlargement, reduction or extension of a geographically-specified portion of the System has been completed pursuant to the Construction and Financing Interlocal Agreement and the Lighting Plan.

"City Council" means the legislative body of the City of Detroit, established by §4-101 of the 2011 City Charter.

"Construction and Financing Interlocal Agreement" has the meaning set forth in the Recitals to this Agreement.

"CPI" means the Consumer Price Index for All Urban Consumers, Detroit-Ann Arbor-Flint, all items, (1982-84=100), published by the Bureau of Labor Statistics of the United States Department of Labor.

"Effective Date" has the meaning set forth in Section 7.1.

"EM Act" means the Local Financial Stability and Choice Act, 2012 PA 436, MCL 141.1541 – 1575

"Emergency Manager" means the emergency manager appointed by the Governor of Michigan pursuant to the EM Act.

"Extraordinary Maintenance" means any non-routine maintenance of any System component(s), requiring replacement or repair of any System component(s) prior to the natural expiration of its expected useful life due solely to the criminal acts of third parties regardless of whether such acts are actually prosecuted or the offenders identified or arrested.

"Financing Costs" shall have the meaning given to such term in the Construction and Financing Interlocal Agreement.

"Improvements" means all of the work, investments, and activities made or conducted, in whole or in part, on the construction, improvement, enlargement, reduction or extension of the System as contemplated by the Construction and Financing Interlocal Agreement or Act 392.

"Industry Practices" means the practices, methods, techniques, standards and acts employed in the public lighting industry for the operation and maintenance of a public lighting system similarly sized to the System.

"Lighting Plan" means the plan required under MCL §123.1277.

"Managed System Area" shall mean that geographic portion of the System that has been constructed, improved, enlarged, reduced, or extended pursuant to the Lighting Plan, and the responsibility to manage, operate, and maintain such upgraded area has been assumed by Authority pursuant to Section 3.2.

"Mayor" means the executive of the City of Detroit, established by §5-101 of the 2011 City Charter.

"Overhead-Fed Streetlight" means any streetlight in the Managed System Area, which receives electricity directly from wires that travel above ground.

"Quarterly Statement" has the meaning set forth in Section 4.2.

"Services" shall mean all actions necessary to operate, maintain, and manage the Managed System Area required under this Agreement.

"Streetlight" means any Overhead-Fed Streetlight or Underground-Fed Streetlight.

"System" means all of the luminaires, lamps, photocells, brackets, conductors, lights, poles and foundations, ballasts, circuits, transformers, conduits, underground equipment that are not part of the distribution system, and other equipment and appurtenances, including any easements or other interests in real property, commencing at the point of connection to the electric distribution system and continuing to the luminaire, necessary for the operation of the street lights within the City. This definition specifically excludes the Mistersky Power Plant, any distribution assets of the City or DTE Energy, and any transmission assets of the City or DTE Energy, including any and all wires, distribution poles, transmission poles, substations, and transformers used for the distribution or transmission of electricity.

"Underground-Fed Streetlight" means any streetlight in the Managed System Area, which receives electricity directly from wires that travel below ground.

"Utility Revenues" shall have the meaning given to such term in the Construction and Financing Interlocal Agreement.

**Section 1.2    Captions and Headings**.  The captions, headings, and titles in this Agreement are intended as a convenience and not intended to have any substantive meaning or be interpreted as part of this Agreement.

**Section 1.3    Plural Terms**.  A term or phrase in this Agreement importing the singular number only may extend to and embrace the plural number and every term or phrase importing the plural number may be applied and limited to the singular number.

<div align="center">

**ARTICLE II**
**ASSURANCES**

</div>

**Section 2.1    Assurances by the City**.  The City hereby makes the following assurances, representations, and warranties:

(a) Except as contemplated herein, that all necessary permissions, approvals, reviews, or any other forms of acquiescence have been obtained and conducted authorizing the City to enter into this Agreement.

(b) To the extent permitted by law and any agreement to which the City is a party, the City shall use commercially reasonable efforts to provide all information within its control requested by the Authority to the Authority necessary to effectuate the purposes of this Agreement.

**Section 2.2    Assurances by the Authority**.    The Authority hereby makes the following assurances, representations, and warranties:

(a) All funds paid by the City to the Authority pursuant to this Agreement shall be expended and accounted for according to accounting standards for governmental entities.

(b) The Authority shall take reasonable actions to minimize the costs associated with this Agreement, including future System operating costs, while providing the levels of operation and maintenance set forth herein.

(c) The Authority shall perform, or cause to be performed, all Services required under this Agreement with the typical level of skill as is customary in the public lighting industry.

(d) To the extent permitted by law and any agreement to which the Authority is a party, the Authority shall use commercially reasonable efforts to provide all information within its control requested by the City to the City necessary to effectuate the purposes of this Agreement.


**ARTICLE III**
**OPERATION, MAINTENANCE, AND MANAGEMENT OF A PUBLIC LIGHTING SYSTEM**

**Section 3.1    Operation and Management**.  Subject to the terms of Section 5.2 and the availability of funding from the City, the Authority shall commence and perform the Services for the Managed System Areas in accordance with Section 3.2.  The City shall purchase all electricity necessary to power the System from a third-party power provider.  The Authority is not obligated to provide or otherwise arrange for the purchase of electricity on the City's behalf under this Agreement.

**Section 3.2    Certificate of Completion**.  The commencement of the Services by the Authority of the Managed System Area shall be effectuated by the delivery of a Certificate of Completion to the City.  The Authority shall deliver such Certificate of Completion within thirty (30) calendar days of acceptance of the work in such area as required by the Lighting Plan and in conformity with the Construction and Financing Interlocal Agreement.  The City shall be responsible for all activities required for the proper operation, maintenance, and management of the portion of the System that are not included in any Managed System Area.  The Authority's responsibility to provide the Services is only applicable to the Managed System Area.  Upon the delivery of a Certificate of Completion, the obligation to operate and maintain any real property, facilities, equipment, or other personal property held and used by the City necessary for the Services in the Managed System Area, including, but not limited to, any part of the System, shall be automatically assumed by the Authority without the requirement of further action by the

Parties.  At the request of the City, the Authority shall execute documents that are reasonably necessary to evidence such assumption.

**Section 3.3    Service Requirements**.  The Authority shall ensure that the luminaires, lamps, photocells and lights in the Managed System Area are in operation and emitting light from daily dusk, defined as the half-hour after sunset, to dawn, defined as the half-hour before sunrise, in accordance with the service levels set forth in Section 3.7.

**Section 3.4    Outage Reporting System**.  The Authority shall establish a telephonic and internet reporting system, such that individuals may report outages of any System components in a Managed Service Area to the Authority, and the Authority shall use commercially reasonable efforts to ensure that the individuals that live or work in the geographic area of the Managed Service Area are aware of such reporting system.

**Section 3.5    Maintenance**.

**3.5.1    Routine Maintenance**.  The Authority shall conduct routine maintenance on an on-going basis according to Industry Practices to ensure that, at a minimum, the System provides the service levels described in Section 3.7.  The Authority shall plan and budget for equipment replacement and upgrades based on the expected useful life of System equipment and components based on manufacturer recommendations.

**3.5.2    Extraordinary Maintenance.**  Subject to the payment of funds under this Agreement in sufficient amounts, the Authority shall perform Extraordinary Maintenance as necessary to ensure that, at a minimum, the System provides the service levels described in Section 3.7.  The Authority shall make such personnel and equipment available as necessary to respond to and remediate any damage to or failure of the System or any individual System component on an as-needed basis.  In the event any portion or individual components of the System are damaged due to the criminal, intentional, or negligent acts of a third party, Authority may, but is not required to, seek such recovery in its own name from such responsible parties.

3.5.3.    **Maintenance Resulting from Vegetation.**  In the event that any System asset in the Managed System Area becomes non-functional due to the City's failure to maintain the vegetation on City property, the Authority shall remain obligated to make the repairs it is required to make under this Agreement, provided that the City shall reimburse the Authority for the costs directly related to such maintenance, including the costs of any necessary vegetation maintenance in connection therewith, which payment shall be in addition to the fees and costs set forth in Article IV, upon the City's receipt of invoices therefor and commercially reasonable documentation showing the required maintenance was due to the City's failure to maintain such vegetation.

**Section 3.6    Delegation of Responsibilities**.  Subject to the written consent of the City, which shall not be unreasonably withheld, the Authority can delegate any or all of its responsibilities under this Agreement to a third party contractor.  The City shall have fifteen (15) business days from the date of submission of a notice of intent to delegate responsibility under

this Section 3.6 to consent or not to consent to such delegation. If the City does not act within fifteen (15) business days, the City shall be deemed to have consented to such delegation.

**Section 3.7    Service Levels.**    The Authority shall repair any damaged individual System assets, or components thereof, that have been reported as non-functioning within the standard timeframe for such repair, which standard timeframe shall be the standard of DTE Energy for the southeastern Michigan region but in no event more than seven (7) days, of receiving such report of non-functionality, provided that if such damage cannot be reasonably repaired within such timeframe, then the Authority shall commence such repair within such timeframe and diligently prosecute such repairs until completion.

**Section 3.8    Asset Management**. The Authority shall operate and maintain the assets of the Managed System Area according to Industry Practices. Inspections and testing of the System components shall occur no less than once every six years. Structural inspections and risk assessments will be conducted on a rotating basis of distinct geographical portions of the System every three years. The Authority shall maintain an asset management database that includes, at minimum, the following information: the location and installation dates of all poles and components; the results of any inspections, testing, and risk assessments of the System components; the expected useful life of each of the components of an individual pole; the projected inspection and testing date of each component; the type and technical detail of each component; and an incident record of each occurrence that requires Extraordinary Maintenance, the type and costs of repairs performed, and any third parties that may be liable.

## ARTICLE IV
## BUDGETS AND FINANCING

**Section 4.1    Operation and Management Fees and Costs**. The City shall pay the Authority the following amounts for the Services, provided that in no event, shall the City be obligated to pay more in any given year than $8,024,000 (the "Annual Cap Amount"), excluding any payments for Extraordinary Maintenance:

(a) <u>Operations and Maintenance Costs</u>: $9.62 per month per Overhead-Fed Streetlight, and $17.66 per month per Underground-Fed Streetlight.
(b) <u>Extraordinary Maintenance Costs</u>:    The actual costs of any Extraordinary Maintenance performed during the second previous quarterly period, such that the City will pay the Extraordinary Maintenance costs performed for the period of January through March of any year on the Quarterly Statement for the July through September quarter of that year.
(c) <u>Administrative Costs</u>:  One Hundred and Twenty-Six Thousand and Two-Hundred and Fifty Dollars ($126,250) per month for the operation of the Authority.

The amounts to be paid under this Section 4.1 shall increase annually by the lesser of (i) three percent (3%) or (ii) the percentage increase in the CPI over the prior year.

**Section 4.2    Calculation of Quarterly Costs**. No later than thirty (30) days prior to the first date of each fiscal quarter (defined as January 1, April 1, July 1 and October 1 of each

13-53846-tjt    Doc 1341-9    Filed 10/23/13    Entered 10/23/13 17:15:55    Page 8 of 21

calendar year), the Authority shall submit a statement to the City estimating the costs to be paid by the City for such fiscal quarter pursuant to Section 5.1 (the "Quarterly Statement"). The Quarterly Statement shall include detail of the fees for such fiscal quarter, including the number and type of Streetlights expected to be serviced, broken out by each of the cost categories in substantially the form provided in Exhibit B.

**Section 4.3** **Adjustments to Quarterly Statements**. To the extent the Authority deems it necessary to adjust any of the Quarterly Statements to address a change in circumstances outside the Authority's reasonable control, it shall submit such revisions to the City Council and the Mayor or their respective lawful designees (the "Approving Entities") for their approval, which approval shall not be withheld, except in the reasonable discretion of the Approving Entities. The Approving Entities shall have fifteen (15) business days from the date of submission of the revisions under this Section to approve or disapprove the revision. If either of the Approving Entities does not to disapprove the revision within fifteen (15) days, the revision shall be deemed approved.

**Section 4.4** **Limited Obligation**s. Nothing in this Agreement, including but not limited to this Article IV, shall require the Authority to pay the costs associated with the performance of any Services or other obligations under this Agreement from Utility Revenues.

<div align="center">

**ARTICLE V**
**PAYMENT**

</div>

**Section 5.1** **Payments.**

**Section 5.1.1 Budgeted Payments**. At the beginning of each fiscal quarter (which shall be January 1st, April 1st, July 1st, October 1st of each calendar year), the City shall pay the Authority the amount for such quarter set forth in the Quarterly Statement provided pursuant to Article IV, such that the City shall pay on January 1, 2014 the budgeted amount for January, February and March 2014. The City shall pay such payments by check, payable to the Public Lighting Authority, which must be received by the Authority by the fifth (5th) business day following the beginning of the fiscal quarter. Any payment not received by the fifth (5th) day following the beginning of a fiscal quarter shall be subject to a ten percent (10%) late payment penalty.

**Section 5.1.2 Quarterly Reconciliation**. Within ten (10) days after the end of each fiscal quarter (which shall be March 31st, June 30th, September 30th and December 31st of each calendar year), except for the fiscal quarter coinciding with the Authority's fiscal year-end, and within thirty (30) days after the Authority's fiscal year-end, the Authority shall provide to the City a detailed reconciliation of the actual out-of-pocket costs and expenses incurred by the Authority in the performance of the Services for such fiscal quarter based on the actual number of Streetlights serviced. If the reconciliation discloses an overpayment by the City for the previous fiscal quarter, the Authority shall credit the difference to the City against the next amounts that may become due under this Agreement. If the reconciliation shows an underpayment by the City for the previous fiscal quarter, the City shall remit the difference to the Authority within fifteen (15) business days of such reconciliation pursuant to the procedures set forth in Section 5.1.1; provided, however, that, in no event, shall the City be obligated to pay

more in any given year than $8,024,000, excluding any payments for Extraordinary Maintenance. In no event shall the Authority perform any Services under this Agreement once the cumulative costs for a given year submitted by the Authority in the Quarterly Statements for such one year period equal the Annual Cap Amount unless the City has agreed in writing to pay the Authority for such costs above the Annual Cap Amount pursuant to the payment procedure set forth in this Agreement or the Authority has otherwise has identified and earmarked available sources of revenue to pay for those Services in excess of the Annual Cap Amount. In the event that the City determines that it, in good faith, believes that the reconciliation does not fully and accurately set out the actual out-of-pocket expenses of the Authority that the City is responsible to reimburse pursuant to this Agreement, it shall provide notice to the Authority within fifteen (15) business days of receipt of the reconciliation, and such dispute will be reconciled pursuant to the procedures set forth in Article X. If the City provides notice of such dispute, the City shall remain obligated to pay any undisputed amounts required pursuant to this Section 5.1.3, and the City shall deposit the maximum disputed amount in escrow pending resolution of the dispute.

**Section 5.2 No Service Without Payment.** In the event that the City does not make a payment pursuant to Section 5.1 or otherwise due hereunder, the Authority shall not perform the Services until such time as the City has made such payment; provided, however, (i) if there is a good-faith dispute about the amount owed pursuant to the reconciliation procedure set forth in Section 5.1.2, then the City's delivery of the contested amount to escrow rather than the Authority pursuant to the terms herein shall not permit the Authority to cease performing the Services until such time as the dispute is resolved and (ii) the Authority may perform Services following a nonpayment by the City but only if it has identified and earmarked available sources of revenue other than the Utility Revenues. In the event the City makes any payments less than the amounts included in the Quarterly Statement, as may be revised pursuant to this Agreement, the Authority is authorized to apply any payments to and continue that portion of the Services it deems to be the highest priority and is excused from providing any other Services.

**Section 5.3 Other Revenues.** The Authority shall not be entitled to any revenues arising from pole attachment fees, lease payments, or other payments for the use or right to attach property to any System assets.

**ARTICLE VI**
**DATA SHARING, ACCESS, COOPERATION, AND SYSTEM DAMAGE**

**Section 6.1 Data and Information.** To the extent permitted by law and any agreements to which the City is a party, the City shall provide the Authority full access to all data and information in its possession or control, which is reasonably accessible, including all data and information contained in the documents commonly known as the "series streetlight maps," necessary to provide the Services. To the extent permitted by law and any agreements to which the Authority is a party, the Authority shall provide the City full access to all data in the Authority's possession or control, which is reasonably accessible, reasonably related to the System.

**Section 6.2 Access to Assets.** The City hereby grants the Authority a license to access all facilities, assets, easements or appurtenances owned, operated, or maintained by the City's

Public Lighting Department or any other City department necessary to provide the Services. The Authority may only use such license for the performance of its obligations pursuant to this Agreement and all activities reasonably related thereto. In using such license, the Authority shall not interfere with the City and its representatives, contractors or employees in the performance of their duties. The Authority shall permit the City full access to all facilities, assets, easements or appurtenances owned, operated, or maintained by the Authority related to the System, if any, and shall not impair access to any public rights of way.

**Section 6.3    Cooperation**. The Parties hereby agree to cooperate with each other to the fullest extent possible to effectuate the purposes of this Agreement.

**Section 6.4    Permits**. The City shall process and issue any permit(s) required under City Charter, City Code of Ordinances, or any other local regulatory requirements to the Authority, its employees, agents, or contractors within fifteen (15) business days of receiving a request for such permit(s) provided that such request includes the detail and documentation otherwise required to issue such permit; *provided, however*, that if there are any permit(s) required to conduct any work specified herein that are not within the direct control of the City, the City shall use commercially reasonable efforts to ensure that such permits are issued within a commercially reasonable timeframe. The City shall not charge a fee to the Authority for any permits, approvals, reviews, or other actions required by the City, but in the event that the City does charge a fee to the Authority, such fees can be included as a cost to be reimbursed by the City pursuant to this Agreement.

**Section 6.5    System Damage**. The Authority shall not be responsible for any damage to the System, or any component thereof, resulting from the criminal, intentional, or negligent acts of any third parties, except for its maintenance obligations set forth herein that are fully compensated pursuant to this Agreement. In the event any portion of the System or Improvements are damaged by the negligent acts of a third party and the City refuses or is unable to seek recovery of funds for such damage, the Authority may, but is not required, to seek such recovery in the City's name.

**Section 6.6    System Status Meetings**. The Parties shall meet monthly to review data and information relevant to the entire System. Such meetings shall include a review of system outages, Extraordinary Maintenance issues and updates, any outstanding financial issues, and any other issues relevant to this Agreement.

## ARTICLE VII
## EFFECTIVE DATE, TERM, DEFAULT, TERMINATION

**Section 7.1    Effective Date**. This Agreement shall become effective on the later date that each of the following events have occurred: (i) the approval and execution by the City; (ii) the approval of the Agreement pursuant to the procedures set forth in the EM Act; (iii) the approval of the Agreement by resolution of the Authority; and (iv) the execution by the Executive Director of the Authority (the "Effective Date").

**Section 7.2    Term**.  This Agreement shall commence on the Effective Date and shall continue for a period of three years.  This Agreement shall automatically renew for additional three-year terms unless the non-renewing Party provides notice to the other Party of its intent not to renew no later than one year prior to the expiration date of a term. The non-renewal of the Agreement shall be approved by the same process as is required to terminate the Agreement under Section 7.5.

**Section 7.3    Default.**

**Section 7.3.1    City Default.**  The City shall be in default of this Agreement if the City does not make the payments required hereunder, whether in whole or in part, including any late payment penalty authorized under Section 5.1.1, within ten (10) days after the due date set forth in Section 5.1; provided, however, that the City shall not be in default hereunder if the City is in good faith contesting the amount of such payment pursuant to Section 5.1.2.

**Section 7.3.2    Authority Default.**    Subject to Section 5.2, the Authority shall be in default of this Agreement if the Authority fails to perform any of its obligations hereunder after the Authority has received thirty (30) days' notice of such default, provided that if such failure cannot be remedied within such thirty (30) day period, the Authority shall not be in default if it commences to remedy the default and diligently pursues the remedy to its completion.

**Section 7.4    Remedies upon Default.**

**Section 7.4.1    Remedies for City Default.**  Upon the occurrence of a default by the City under Section 7.3.1, the Authority shall first satisfy itself from funds paid in advance to the Authority pursuant to Section 5.1.  In the event such amounts are not sufficient to cover all payments then due to the Authority, this Agreement shall immediately terminate upon notice from the Authority, provided that if such default is cured by the City at any time during the thirty (30) consecutive days immediately following termination of this Agreement, such termination shall be deemed void and of no further force or effect, provided that the Authority shall have no obligations hereunder, financial or otherwise, during such period when the City's default remains uncured or during the 10 day grace period set forth in Section 7.3.1

**Section 7.4.2    Remedies for Authority Default.**  Upon    default    by    the Authority under this Article VII, the City may, at its sole option, (i) perform such obligation of the Authority without further notice, and the Authority shall reimburse the City for all costs incurred by the City in such performance, but in no event shall the Authority be required to reimburse the City any amount in excess of the amounts paid to the Authority in advance pursuant to section 5.1.1; or (ii) terminate this Agreement by providing thirty (30) days' written notice to the Authority of the City's intent to terminate, which notice shall describe in detail the Authority's default; provided that, if the default is cured by the Authority at any time during the thirty (30) day notice period, the notice shall be deemed void and of no further force or effect.

**Section 7.5    Termination for Convenience**.    Either Party may terminate this Agreement, for any reason or no reason, with one year advance notice that is approved by a two-

thirds vote of the governing body of the Party. If the terminating Party is the City, then the approval of the Mayor is required in addition to the vote of the City Council.

## ARTICLE VIII
## BOOKS, RECORDS, AND FINANCES

**Section 8.1 Books and Records**. The Authority shall provide for a system of accounts for the Authority to conform to a uniform system required by law and for the auditing of the accounts of the Authority. The Authority shall obtain an annual audit of the Authority's books and records by an independent certified public accountant and report on the audit and auditing procedures in the manner provided by sections 6 to 13 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.426 to 141.433. The audit also shall be in accordance with generally accepted government auditing standards and shall satisfy federal regulations relating to federal grant compliance audit requirements. The audit shall be provided to the City within thirty (30) days of acceptance by the Board of Directors of the Authority but in no event more than one hundred and twenty (120) days following the end of the Authority's fiscal year. The City may examine the books and records of the Authority related to the Authority's finances or the System and make copies and extracts therefrom at its own expense, all during regular business hours as may be reasonably requested and reasonably agreed to by the Authority in advance.

**Section 8.2 Enterprise Fund**. The Authority shall maintain its books and records and its funds on an enterprise fund basis. The Authority shall not pay any net proceeds or profits to its local government, other than for services received by the Authority.

## ARTICLE IX
## INDEMNIFICATION, LIABILITY, DAMAGES, NOTICE, AND INSURANCE

**Section 9.1 Indemnification**. To the extent permitted by law and subject to Section 4.4, each Party shall indemnify and hold harmless the other Party and the other Party's employees, agents, directors and officers against all liability arising out of, or resulting from any third party claim, suit, action or proceeding arising out of or resulting from (i) the failure of a Party or any of its agents, employees or contractors, to comply with the terms of this Agreement or any applicable law; or (ii) any injury, loss, claim or damages arising from the actions or omissions of a Party or an agent, employee, director, officer or contractor of the Party.

**Section 9.2 Limitation of Liability; No Special Damages**. Notwithstanding any other provision of this Agreement, neither Party shall be liable to the other for any damages for loss of profits, loss of revenues, loss of goodwill, loss of anticipated savings, loss of data or cost of purchasing replacement services, or any indirect, incidental, special, consequential, exemplary or punitive damages arising out of the performance or failure to perform under this Agreement. Nothing in this Agreement shall be construed as a waiver of governmental immunity, where applicable.

**Section 9.3 Notice of Claims**. If either Party becomes aware of any injury, damages, claim, demand, action, legal proceeding, or other loss that may involve the other Party, whether

directly or indirectly, it shall inform the other Party in writing within fifteen (15) business days of receiving knowledge of the injury, damages, claim, demand, action, legal proceeding, or other loss.

**Section 9.4    Insurance**.  At all times during the term of this Agreement, each Party shall procure and maintain, at its sole cost and expense, the following types and amounts of insurance coverage issued by an insurance company reasonably acceptable to the other Party, unless otherwise agreed to by the Parties in writing:

(a)     Commercial general liability, covering bodily and personal injury, property damage, and contractual liability insuring the activities of the Party under this Agreement, in a minimum amount of One Million Dollars ($1,000,000) per claim and Five Million Dollars ($5,000,000) in the annual aggregate, adding the other Party as an additional insured with respect to this Agreement.

(b)     Commercial automobile liability with limits of One Million Dollars ($1,000,000) per claim and Five Million Dollars ($5,000,000) in the annual aggregate, adding the other Party as an additional insured with respect to this Agreement.

(c)     Worker's compensation insurance in amounts required in accordance with applicable laws.

(d)     Errors and Omissions/Professional Liability with limits no less than One Million Dollars ($1,000,000) per claim and Three Million Dollars ($3,000,000) in the annual aggregate.

The insurance required of the City by this Agreement in the amounts, with the coverage and other features herein required, may be supplied by a fully funded self-insurance program of the City or a self-insurance pool in which the City is a participant; provided that such self-insurance program or pool will provide the full coverage required herein.

<div align="center">

**ARTICLE X**
**DISPUTES**

</div>

**Section 10.1   Informal Dispute Resolution**.  The Authority and the City will attempt to settle any dispute through informal good faith negotiations.  The dispute will be escalated to appropriate senior level management of the Parties, if necessary.  Except as otherwise set forth herein, if such managers are unable to resolve the dispute within fifteen (15) business days of referral (or any other mutually agreed upon timeframe), the Parties will seek resolution of such disputes pursuant to Section 10.2.

**Section 10.2   Jurisdiction and Venue**.  Except as otherwise set forth herein, in the event of any disputes between the Parties over the meaning, interpretation, or implementation of the terms, covenants, or conditions of this Agreement, the matter under dispute, unless resolved any the Parties pursuant to Section 10.1, shall be submitted to the courts of the State of Michigan.

.

**ARTICLE XI**
**MISCELLANEOUS**

**Section 11.1   Amendment**.   This Agreement can be modified or amended only by written agreement executed and approved by both Parties in the same manner as required for the initial effectiveness of the Agreement, as applicable.

**Section 11.2   Heirs, Successors, and Assigns**.   All provisions of this Agreement are and will be binding on the heirs, executors, administrators, personal representatives, successors and assigns of the Authority and the City.

**Section 11.3   Severability**.   If any provision of this Agreement is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Agreement will remain in full force and effect. Any provision of this Agreement held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

**Section 11.4   Governing Law**.   The internal laws of the State of Michigan will control in the construction and enforcement of this Agreement.

**Section 11.5   Intentionally Omitted.**

**Section 11.6   Entire Agreement**.   This Agreement sets forth the entire agreement between the Parties and supersedes any and all prior agreements or understandings between them related to the subject matter of this Agreement.  It is further understood and agreed that the terms and conditions of this Agreement are contractual and are not a mere recital and that there are no other agreements, understandings, contracts, or representations between the Parties in any way related to the subject matter of this Agreement, except as expressly stated in this Agreement.

**Section 11.7   Notices**.   Any and all correspondence or notices required, permitted, or provided for under this Agreement to be delivered to any Party shall be sent to that Party by first class mail.  All such written notices shall be addressed to each other Party's signatory to this Agreement.  All correspondence shall be considered delivered to a Party as of the date that the notice is deposited with sufficient postage with the United State Postal Service.  A notice of termination shall be sent via certified mail to the address included with each Party's signature to this Agreement.  Notices shall be mailed to the following addresses:

If to the Authority:     Public Lighting Authority
                         65 Cadillac Square, Ste. 2900
                         Detroit, MI 48226

If to City:              City of Detroit
                         Office of the Mayor
                         2 Woodward Avenue, 11th Floor
                         Detroit, MI 48226

With a copy to:      City of Detroit
                        Office of the Emergency Manager
                        Coleman A. Young Municipal Center
                        2 Woodward Ave.
                        11th Floor
                        Detroit, MI 48226
                        Attn: Sonya Mays

**Section 11.8 Force Majeure**. Any delay or failure in the performance by either Party hereunder shall be excused if and to the extent caused by the occurrence of a Force Majeure. For purposes of this Agreement, Force Majeure shall mean a cause or event that is not reasonably foreseeable or otherwise caused by or under the control of the Party claiming Force Majeure, including acts of God, fires, floods, explosions, riots, wars, hurricane, sabotage terrorism, vandalism, accident, restraint of government, governmental acts, injunctions, labor strikes, other than those of the claiming Party or its suppliers, that prevent the claiming Party from furnishing the materials or equipment, and other like events that are beyond the reasonable anticipation and control of the Party affected thereby, despite such Party's reasonable efforts to prevent, avoid, delay, or mitigate the effect of such acts, events or occurrences, and which events or the effects thereof are not attributable to a Party's failure to perform its obligations under this Agreement.

**Section 11.9 Counterparts.** This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original and all of which together shall constitute one and the same instrument.

**Section 11.10 Binding Effect.** This Agreement shall be binding upon and inure to the benefit of the Parties hereto. No Party to this Agreement may assign its rights under this Agreement to any other person, without obtaining the written permission of the other Parties in advance.

**Section 11.11 Emergency Manager Approval.** If the City is under the management of an Emergency Manager pursuant to the EM Act, at the time of a decision for which the approval of the City, the City Council or the Mayor is required, then the approval of the Emergency Manager is hereby substituted in place of the approval of the City, the City Council or the Mayor, as applicable.

**Section 11.12 No Third Party Beneficiaries.** Nothing expressed or referred to in this Agreement is intended or shall be construed to give any person other than the Parties to this Agreement or their respective successors or permitted assigns any legal or equitable right, remedy or claim under or in respect of this Agreement it being the intention of the Parties that this Agreement and the transactions contemplated hereby shall be for the sole and exclusive benefit of such Parties or such successors and permitted assigns.

[SIGNATURE PAGE FOLLOWS]

This Agreement is executed by the Parties on the dates indicated below.

**CITY OF DETROIT**

Dated: _____          By: _____
                                          KEVYN D. ORR
                                  Its:    Emergency Manager


**PUBLIC LIGHTING AUTHORITY**

Dated: _____          By: _____
                                          ODIS JONES
                                  Its:    Executive Director

**EXHIBIT A**

**Form Certificate of Completion**

Please see attached.

# PUBLIC LIGHTING AUTHORITY
## CERTIFICATE OF COMPLETION

In compliance with the Lighting Plan of the Public Lighting Authority of Detroit ("PLA"), the Improvements to the System have been completed for the following geographic area and shall now become a Managed System Area of the PLA:

| | |
|---|---|
| **Zip Code** | |
| **Date of Acceptance** | |
| **Number of Street Lights** | |
| **Northern Boundary** | |
| **Southern Boundary** | |
| **Western Boundary** | |
| **Eastern Boundary** | |

In addition to the Street Lights located within the Managed System Area, the following operation, maintenance, and management of the following property, facilities, or other System assets, including any easements or rights-of-way, shall also be assumed by the PLA:

| | |
|---|---|
| **Type of Asset** | |
| **General Location** | |

| | |
|---|---|
| **Type of Asset** | |
| **General Location** | |

| | |
|---|---|
| **Type of Asset** | |
| **General Location** | |

| | |
|---|---|
| **Type of Asset** | |
| **General Location** | |

A Map of the Managed System Area is attached to this Certificate of Completion as Exhibit A.


Submitted and certified by:


_____          _____
Signature                                                               Date


_____          _____
Name                                                                    Title


The contents of this document may be amended from time to time by written mutual consent of the Parties.

# EXHIBIT B
## Public Lighting Authority
## Operations and Maintenance
### Quarterly Statement

| Table 1: Summary of Estimated Costs For This Quarter | |
|---|---|
| **Cost Category** | **Total** |
| Operations and Maintenance Costs (See Table 2) | $[     ] |
| Extraordinary Maintenance Costs (See Table 3) | $[     ] |
| Administrative Costs (See Table 4) | $[     ] |
| | |
| **Estimated Quarterly Total Costs** | $[     ] |

| Table 2: Estimated Operations and Maintenance Costs | | | |
|---|---|---|---|
| **Period** | **Estimated Number of Streetlights** | **Per Streetlight Cost** | **Total** |
| Month 1 | | | |
| *Overhead-Fed Streetlight* | [     ] | $[     ] | $[     ] |
| *Underground-Fed Streetlight* | [     ] | $[     ] | $[     ] |
| *Overhead-Fed Streetlight (LED)* | [     ] | $[     ] | $[     ] |
| *Underground-Fed Streetlight (LED)* | [     ] | $[     ] | $[     ] |
| Month 2 | | | |
| *Overhead-Fed Streetlight* | [     ] | $[     ] | $[     ] |
| *Underground-Fed Streetlight* | [     ] | $[     ] | $[     ] |
| *Overhead-Fed Streetlight (LED)* | [     ] | $[     ] | $[     ] |
| *Underground-Fed Streetlight (LED)* | [     ] | $[     ] | $[     ] |
| Month 3 | | | |
| *Overhead-Fed Streetlight* | [     ] | $[     ] | $[     ] |
| *Underground-Fed Streetlight* | [     ] | $[     ] | $[     ] |
| *Overhead-Fed Streetlight (LED)* | [     ] | $[     ] | $[     ] |
| *Underground-Fed Streetlight (LED)* | [     ] | $[     ] | $[     ] |
| | | | |
| **Operations and Maintenance Costs – Quarterly Subtotal** | | | $[     ] |

| Table 3: Estimated Extraordinary Maintenance Costs | | | |
|---|---|---|---|
| **Period** | **Estimated Number of Streetlights** | **Per Streetlight Cost (as determined in Table 3a)** | **Total** |
| Month 1 | [     ] | $[     ] | $[     ] |
| Month 2 | [     ] | $[     ] | $[     ] |
| Month 3 | [     ] | $[     ] | $[     ] |
| **Extraordinary Maintenance Costs – Quarterly Subtotal** | | | $[     ] |

| Table 3a: Prior Six Month Extraordinary Maintenance Per Streetlight Costs | | | |
|---|---|---|---|
| **Period** | **Total Actual Cost of Extraordinary Maintenance** | **Actual Number of Streetlights Serviced** | **Per Streetlight Total** |
| Prior Month 1 | [          ] | [          ] | $[     ] |
| Prior Month 2 | [          ] | [          ] | $[     ] |
| Prior Month 3 | [          ] | [          ] | $[     ] |
| Prior Month 4 | [          ] | [          ] | $[     ] |
| Prior Month 5 | [          ] | [          ] | $[     ] |
| Prior Month 6 | [          ] | [          ] | $[     ] |
|  |  |  |  |
| **Prior Six-Month Average Extraordinary Maintenance Costs (Sum of prior six months divided by six)** | | | $[     ] |

| Table 4: Administrative Costs | |
|---|---|
| **Period** | **Total** |
| Month 1 | $[     ] |
| Month 2 | $[     ] |
| Month 3 | $[     ] |
|  |  |
| **Administrative Costs – Quarterly Subtotal** | $[     ] |