UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,       .       Docket No. 13-53846
        MICHIGAN,              .
                              .       Detroit, Michigan
                              .       October 21, 2013
                Debtor.       .       1:00 p.m.
. . . . . . . . . . . . . . .


        HEARING RE. OBJECTIONS TO ELIGIBILITY TO CHAPTER 9
                       PETITION (CONTINUED)
             BEFORE THE HONORABLE STEVEN W. RHODES
              UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:       Jones Day
                      By:  BRUCE BENNETT
                      555 South Flower Street
                      Fiftieth Floor
                      Los Angeles, CA  90071-2452
                      (213) 243-2382

                      Jones Day
                      By:  GEOFFREY S. IRWIN
                      51 Louisiana Avenue, N.W.
                      Washington, D.C.  20001-2113
                      (202) 879-3768

                      Pepper Hamilton, LLP
                      By:  ROBERT S. HERTZBERG
                      4000 Town Center, Suite 1800
                      Southfield, MI  48075-1505
                      (248) 359-7333

For the State of      State of Michigan
Michigan:             Michigan Department of Attorney General
                      By:  MATTHEW SCHNEIDER
                      P.O. Box 30754
                      Lansing, MI  48909
                      (517) 241-8403

APPEARANCES (continued):

| | |
|---|---|
| For AFSCME, AFL-CIO, and Sub- Chapter 98, City of Detroit Retirees: | Lowenstein Sandler, LLP By: SHARON L. LEVINE 65 Livingston Avenue Roseland, NJ 07068 (973) 597-2374 |
| For Detroit Retirement Systems- General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC By: ROBERT D. GORDON 151 South Old Woodward, Suite 200 Birmingham, MI 48009 (248) 988-5882 |
| For the Detroit Fire Fighters Association, the Detroit Police Officers Associa- tion and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Miller, Zucker & Freedman, P.C. By: BARBARA A. PATEK 400 Galleria Officentre, Suite 444 Southfield, MI 48034 (248) 827-4100 |
| For the Inter- national Union, UAW: | Cohen, Weiss & Simon, LLP By: BABETTE A. CECCOTTI PETER D. DECHIARA 330 West 42nd Street, 25th Floor New York, NY 10036-6976 (212) 356-0227 |
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Associa- tion, Shirley V. Lightsey, and Donald Taylor: | Silverman & Morris, PLLC By: THOMAS R. MORRIS 30500 Northwestern Highway, Suite 200 Farmington Hills, MI 48334 (248) 539-1330 Lippitt O'Keefe, PLLC By: RYAN C. PLECHA 370 East Maple Road, Fl. 3 Birmingham, MI 48009 (248) 646-8292 |

APPEARANCES (continued):

```
For the Official     Dentons
Committee of         By:  CLAUDE D. MONTGOMERY
Retirees:                 ANTHONY B. ULLMAN
                     1121 Avenue of the Americas
                     New York, NY  10020-1089
                     (212) 632-8390

                     Brooks, Wilkins, Sharkey & Turco, PLLC
                     By:  MATTHEW E. WILKINS
                     401 South Old Woodward, Suite 400
                     Birmingham, MI  48009
                     (248) 971-1711

For Retired          Strobl & Sharp, PC
Detroit Police       By:  LYNN M. BRIMER
Members              300 East Long Lake Road, Suite 200
Association:         Bloomfield Hills, MI  48304-2376
                     (248) 540-2300

For the Flowers      Law Offices of William A. Wertheimer
Plaintiffs:          By:  WILLIAM WERTHEIMER
                     30515 Timberbrook Lane
                     Bingham Farms, MI  48025
                     (248) 644-9200

For Ambac            Schafer and Weiner, PLLC
Assurance Corp.:     By:  DANIEL J. WEINER
                     40950 Woodward Avenue, Suite 100
                     Bloomfield Hills, MI  48304
                     (248) 540-3340


Court Recorder:      Letrice Calloway
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1    THE CLERK: All rise. Court is in session. Please

2 be seated. Recalling Case Number 13-53846, City of Detroit,

3 Michigan.

4    THE COURT: And you may proceed.

5    MR. GORDON: Thank you, your Honor. Good afternoon.

6 For the record, Robert Gordon of Clark Hill on behalf of the

7 Detroit Retirement Systems. Your Honor, we did not submit a

8 proposed line-up to the Court as we did for the October 15th

9 hearing; however, the objectors have all conferred with one

10 another over the weekend and have come up with an informal

11 line-up, if you will, and have discussed amongst themselves

12 sort of loosely how much time each party would need. And so

13 rather than inform the Court of the time slots, we'll just

14 sort of try to self-police ourselves and inform the Court if

15 that's okay.

16    THE COURT: Okay.

17    MR. GORDON: Again, as with the October 15th

18 hearing, each party will try its best to identify before it

19 starts its rebuttal argument -- apprise the Court of what

20 issues it plans to touch upon. Unlike the October 15th

21 hearing, of course, because time is short, various parties

22 will be trying to touch upon discrete issues and not overlap

23 with one another, so while each party may support the

24 arguments that are being made, for the record, I just need to

25 state that each party obviously reserves its right to make

1  similar arguments or diverge from those arguments in its
2  supplemental briefing.  Thank you.

3          With that, your Honor, just so the Court has an
4  understanding of the order in which we are proposing the
5  objectors rise, first would be Ms. Levine on behalf of
6  AFSCME, then Ms. Brimer on behalf of the Retired Detroit
7  Police Members Association, then myself on behalf of the
8  Retirement Systems, then Mr. Morris on behalf of the Retiree
9  Associations, then Ms. Patek on behalf of the Public Safety
10 Unions, then Ms. Crittendon as an interested party, and then
11 Mr. Montgomery on behalf of the Retiree Committee.

12          THE COURT:  All right.

13          MR. GORDON:  Oh, my goodness.  I'm sorry.  After --
14 I'm sorry.  After Mr. Morris, Ms. Ceccotti would be next on
15 behalf of the UAW.

16          THE COURT:  Thank you.  It's fine with me not to
17 keep track of your time individually if that's your request,
18 but I do have to cut off all rebuttal argument in one hour.

19          MR. GORDON:  Very well, your Honor.  Thank you.

20          THE COURT:  And one more thing.  You will notice
21 that on your tables we now have three microphones instead of
22 one.  I have been asked to advise you that this makes it much
23 more likely that our record will pick up your private
24 conversations, and you should be concerned about that because
25 we do post the audio unedited on our website every night.

1   And I should say if there is a private conversation that you

2   want to have at any point today or during the trial and

3   you're concerned about it getting on the microphone, just

4   request a brief pause from the recording.  We'll turn the

5   recording off.  You can have your conversation, and we'll

6   continue.

7            MS. LEVINE:  Good afternoon, your Honor.  Sharon

8   Levine, Lowenstein Sandler, for AFSCME.  Your Honor, I've

9   been given ten or twelve minutes and will address, per the

10  Court's suggestion, home rule and then perhaps if there's

11  time a sentence on Chapter 9 again.

12           THE COURT:  Okay.

13           MS. LEVINE:  Thank you, your Honor.  Your Honor,

14  similar to the arguments or the statements in the

15  conversation we had with the Court with regard to Chapter 9

16  and the interplay between the federal Constitution and the

17  state municipal governments under the Tenth Amendment, we

18  would respectfully submit that under the Cooley Doctrine and

19  the cases that have been decided here in Michigan that the

20  Michigan Constitution in Chapter 7 also reflects a very

21  strong view towards home rule, and what we mean by home rule,

22  your Honor, is that the local governments -- in this case,

23  Detroit -- are given a lot of respect by the state government

24  in order to manage and run their own local governments.  And

25  we would respectfully submit that the way that either 439 is

1   written or as applied in this case, that the grant of power
2   given the emergency manager here in Detroit violates the
3   state Constitution.

4          So, first, your Honor, we would note that the
5   emergency manager has been appointed by the state.  He was
6   not elected by the local electorate.  He was not elected the
7   way, for example, the mayor and the City Council were
8   elected.  He has supplanted them, and he was -- and he didn't
9   supplant them by a vote of the citizens, and he didn't even
10  supplant them with the consent of the locally elected
11  officials.  So first point is that we believe that the
12  emergency manager and 436 is inappropriate here because he's
13  not an elected official.

14         Two, your Honor, we would note that the breadth of
15  the powers granted the emergency manager even if the
16  appointment of the emergency manager were appropriate is
17  inappropriate here both as a matter of constitutional law and
18  as applied in this particular case because the governor
19  failed to appoint the emergency manager with any appropriate
20  contingencies in the letter of appointment, and that's
21  because of the scope of the power that the emergency manager
22  wields is well in excess of that which the Constitution --
23  the Michigan Constitution would permit.  So, for example,
24  even if the scope of the powers were not subject to -- sorry.
25  Let me say it differently.  Even if the Michigan Constitution

1    does allow, for example, taxation or even debt adjustment, it
2    doesn't allow the wholesale taking over of the local
3    government by the emergency manager.  So, for example, not
4    allowing there to be replacements to the City Council, day-
5    to-day negotiation of vendor contracts, labor contracts,
6    grievances, de minimis asset sales, these are the types of
7    things that are not necessarily --
8         THE COURT:  Well, but let me ask you to -- let me
9    ask you to pause there with this question.  Is the
10   constitution -- or would the constitutionality of PA 436, as
11   it pertains to those kinds of issues, be before this Court?
12   Are they necessary to decide in the context of eligibility?
13        MS. LEVINE:  They are, your Honor, because the way
14   this appointment has taken place, all of those individual
15   acts that the emergency manager has been allowed to engage in
16   ahead of a plan of adjustment which might deal with just the
17   debt makes the very decision that the emergency manager made
18   with regard to filing the Chapter 9 petition itself
19   unconstitutional or unconstitutional as applied to the facts
20   of this case because there was no limitation on what the
21   scope of his authority was just dealing with that one issue.
22   And that scope -- the unfettered scope, your Honor, is not
23   just related to the day-to-day business operations, and we've
24   seen that play out in the deposition of Mayor Bing and in
25   others who talk about the fact that they're bottlenecked with

1 regard to decision-making and that ordinary types of
2 decision-making is now deferred to the emergency manager or
3 his counsel, but we've seen that, your Honor, in the
4 unfettered scope that provides for no judicial review of
5 those decisions as well.  So, for example, if, in fact,
6 there's a dispute under a Chapter 11 or a Chapter 7 where you
7 have a debtor in possession or a trustee, a debtor in
8 possession, for example, a corporate debtor, has fiduciary
9 obligations under the direct language of the Bankruptcy Code
10 and has fiduciary obligations under state law.  A Chapter 7
11 or a Chapter 11 trustee similarly has fiduciary obligations,
12 and they are not allowed to take actions either outside the
13 ordinary course of business or under the course of a Chapter
14 7 without coming to this Court for approval, sales,
15 settlements, ultimate plans of reorganization.  Under Chapter
16 9, because we're dealing with the fact -- and we believe it's
17 the unconstitutional fact -- that there's a tension between
18 what the state can do and what the federal government can do,
19 we don't have that same access to judicial review, so under
20 904, 362, and even Stern's there are a lot of decisions that
21 get made on the day-to-day basis.  And I'm not dealing with
22 the global jurisdictional issues, just the day-to-day basis
23 of tort claims, of contract disputes, of settlements with
24 individual creditors that don't ever see the light of day in
25 this court, and to the extent that there was a grievance or a

1    dispute about that under 362 in this Court's stay extension

2    orders, there's no other court where those disputes can be

3    taken.

4              So we have an unelected emergency manager who's in

5    place now because he's a contractor with the state

6    government, and we have unfettered rights where basically our

7    view is it's tantamount to all of the rights that were

8    granted to the city under Chapter -- under Article VII of the

9    Constitution are now within the power of the EM in this

10   particular case.  And we'd respectfully submit that that is

11   just not what the Cooley Doctrine or the state Constitution

12   envisioned even if it did envision in appropriate

13   circumstances debt restructuring.

14             Nine minutes.  With that, your Honor, I would just

15   close briefly on Chapter 9.  We would respectfully submit

16   that similar -- well, I'll --

17             THE COURT:  I'm not sure you've quite addressed the

18   central home rule question that at least I see.  The city and

19   the state argue that to whatever extent home rule powers

20   apply to the City of Detroit under the Michigan statutes,

21   they are effectively modified by PA 436 and that that

22   modification is not inconsistent with whatever the Michigan

23   Constitution says about home rule.  How do you deal with

24   that?

25             MS. LEVINE:  Your Honor, we understand the statement

1   has been made along those lines.  We don't see those
2   modifications in PA 436.  In other words, either in the
3   statute itself or in the authorization as granted under the
4   statute here, there is no limitation that we can see, and, in
5   fact, we've seen the opposite through the emergency manager's
6   orders and the emergency manager's right to run unfettered
7   the City of Detroit.  And in addition to that, one of the
8   issues that they talk about in terms of limiting his ability
9   is that his term is only 18 months, but that also is not
10  supported if you take a look at the statute and you take a
11  look at the statute in practice without any limitation in the
12  authorization because at the end of 18 months, the state has
13  the absolute right to continue the term.  The City Council
14  can only stop that by a two-thirds vote, but since the EM has
15  effectively taken over the City Council, we don't even have
16  the checks and balances that appear facially on the statute,
17  so we're saying two things.  We're saying they can say that
18  it's a limitation, but as far as we can tell, PA 436
19  virtually gives away to the emergency manager everything that
20  was referred to the states under Chapter 7 of the
21  Constitution, and not only that, there is no redress for
22  addressing violations of that unfettered right or stopping
23  the time line pursuant to which the EM can stay in office.
24  Thank you.
25          MS. BRIMER:  Good afternoon, your Honor.  Lynn M.

1   Brimer appearing on behalf of the Retired Detroit Police

2   Members Association.  Your Honor, to begin with, I have

3   approximately ten to twelve minutes of the allotted time for

4   the objectors.  I am going to discuss, your Honor, the narrow

5   issue of whether or not PA 436 is constitutional under the

6   referendum provision of the Michigan Constitution.  As your

7   Honor will recall, Article II, Section 9, of the Michigan

8   Constitution specifically reserves to the people of Michigan

9   the right of referendum with respect to any law other than

10  those that contain a spending or appropriation provision.

11          When we were here on Tuesday, your Honor, last week,

12  I advised the Court that at that time the city and the state

13  neither had responded to the arguments that had been raised

14  by the RDPMA in its opening objection and, moreover, that at

15  that point in time we had not been able to find a case that

16  was factually similar to this case.  Today, we do have the

17  oral arguments that were presented by Ms. Nelson in response

18  to this argument during the state's opening arguments.  The

19  city has still not responded to this discussion, and we

20  still, your Honor, do not have a case that is even closely

21  factually similar to this case.

22          As the Court may recall, Ms. Nelson cited the case

23  of Reynolds v. Martin for the proposition that the governor

24  and the state legislature can completely disregard the will

25  of the people and thwart the people's constitutional right to

1    a referendum by placing an insignificant spending provision

2    at the tail end of an act that had previously been defeated

3    on referendum, pass such act during a lame duck session, and

4    consider it to be constitutional.  Reynolds v. Martin is so

5    factually distinguishable, your Honor, as to be of little or

6    no actual application to this case, and ultimately we would

7    conclude that its holding, in fact, supports the argument of

8    the RDPMA.  And I think it's very important to very briefly

9    discuss that case.  In Reynolds in 1994 the legislature

10   passed an act amending the state's Bingo Act.  That act was

11   referred for referendum.  However, before it was placed on

12   the 1994 ballot, certain of its signatures were questioned.

13   Therefore, it did not make the 1994 ballot.  The general

14   election was held in November of '94.  A new legislation --

15   legislators were elected.  They were seated in 1995.  In 1995

16   with the new legislation in -- legislative body in place, a

17   new act was passed.  Subsequently, in 1996 the 1994 act was

18   certified for the referendum, and it was, in fact, voted down

19   in the referendum.

20          A party challenged the denial of a license under the

21   1995 act on the grounds that it could not have been passed in

22   contravention of the referral of the 1994 act to the

23   referendum process under Article II, Section 9.  However,

24   your Honor -- and ultimately the 1995 act was upheld as

25   constitutional.

1     The state would argue that that case is factually

2  applicable and the holding consistent with their position

3  that PA 436 is constitutional.  However, there are two

4  significant distinctions between the holding and the facts in

5  Reynolds and the matter before this Court with respect to

6  436.  One, there was a general election after the matter had

7  been referred to referendum.  A new legislative body was in

8  place, and it was the new legislative body that had been, in

9  fact -- that passed the new act.  But more significantly,

10 your Honor, the 1995 act did not contain a spending

11 provision, and it was not, therefore, removed from the

12 referendum provisions of the Michigan Constitution.  In fact,

13 in Reynolds the appellate court relied on the Michigan

14 Supreme Court holding in Michigan Farm Bureau versus

15 Secretary of State at 379 Mich. 387, 1997, and noted that

16 should the legislators not be responsive to the will of the

17 people expressed at the referendum vote, the second

18 legislation itself is subject to the same right of referendum

19 as the original act.  That is simply not what we have with

20 respect to 436.

21     The question, your Honor, is why wasn't 436 subject

22 to the referendum vote?  It was not subject to the referendum

23 vote because the governor, the Michigan Department of

24 Treasury, and their consultants devised a scheme in the event

25 that PA 4 was defeated on referendum, that would remove a new

law from the referendum.  And how do we know that there was a scheme that was devised?  We have communications that have been produced during discovery that confirm that the spending provisions in Section 34 and 35 were included in order to avoid the referendum vote.  For example, as early as March 2nd, 2012, in communications between Mr. Ellman at Jones Day and Ms. Ball at Jones Day, Mr. Ellman was discussing the possibility that PA 4 would be defeated on referendum and what the options would be in the event it was rejected by the people.  He states in discussing the options, your Honor, "The cleanest way to do all of this probably is new legislation that establishes the board and its powers and" -- with the "and" in capital letters, your Honor -- "includes an appropriation for the state institution.  If an appropriation is attached to, parenthetical, included in the statute to fund a state institution, parenthetical, which is broadly defined, then the statute is not subject to repeal by the referendum process."

In fact, Mr. Orr himself has acknowledged this concern with respect to PA 436.  On January 31st, 2013, he e-mailed Ms. Ball stating the following:  "Michigan's new EM law is a clear end-around the prior initiative that was rejected by the voters in November."  He then discusses some of the provisions of PA 436 and concludes with the following statement:  "So although the new law provides the thin veneer

1  of a revision, it is essentially a redo of the prior rejected

2  law."  Your Honor --

3          THE COURT:  What was the date of that?

4          MS. BRIMER:  That, your Honor, was January 31st,

5  2013.  So, your Honor, despite Ms. Nelson's contention that

6  the spending provisions were not added in an effort to avoid

7  the referendum vote, we would suggest that the evidence and

8  the discovery proves otherwise.

9          Ms. Nelson also argued that the $5,780,000 spending

10 provisions were meaning provisions not designed to avoid the

11 referendum.  First, I would suggest quite to the contrary,

12 your Honor.  A review of the state's financial statements for

13 the fiscal year ending 9-30, 2012, suggests that $5,780,000

14 represents approximately .011 percent of the state's

15 expenditures for the prior fiscal year.  With respect to the

16 pensioners that are before this Court making an average of

17 $18,000 in their pension, that would represent $1.98.  I

18 would suggest that's hardly a meaningful spending provision.

19         But second and more significant is that we have the

20 words of the debtor's attorney in the e-mails that I read to

21 you that the spending provisions were added with the intent

22 of avoiding the referendum.  We also have testimony from the

23 state's 30(b)(6) witness, Howard Ryan, the legislative

24 liaison for the Department of Treasury during the period for

25 the drafting of 436, in which he testified in his deposition

1    on October 14th that the spending provisions were added to
2    avoid the referendum.
3              "Question:  Based on your conversations with the
4              people at the time, was it your understanding that
5              one or more of the reasons to put the appropriation
6              language in there was to make sure it could not --
7              that the new act could not be defeated by
8              referendum?
9              Answer:  Yes.
10             Question:  Where did you get that knowledge
11             from?
12             Answer:  Well, having watched the entire process
13             unfold over the past two years.
14             Question:  The governor's office knew that that
15             was the point of it?
16             Answer:  Yes."
17             Your Honor, we would suggest that those spending
18   provisions were, one, de minimis, and, two, added solely for
19   the purpose of removing this act from the constitutional
20   right of the people to a referendum vote.
21             I'm uncomfortable with the amount of time I have
22   left here, your Honor.  Two more points.  Ms. Nelson argued
23   that PA 436 has substantially changed PA 4.  We prepared a
24   comparative analysis, your Honor, of the relevant provisions,
25   those with respect to the appointment of an emergency manager

1    and those with respect to the authorization for the filing of

2    a Chapter 9.  Those provisions are virtually identical.  Our

3    comparative analysis has been attached and submitted to the

4    Court as Exhibit B to our pretrial brief.  Those provisions

5    were, in fact, your Honor, subject to the provision in the

6    Constitution which provides that no law as to which the power

7    of referendum properly has been invoked shall be effective

8    thereafter unless approved by a majority of the electors

9    voting thereon in the next general election.

10           Your Honor, the Michigan Supreme Court, which should

11   be our controlling court here, has, in fact, suggested that

12   the right of referendum is so important to this state and so

13   important to our constitutional rights that in Kuhn -- I'm

14   trying so hard to get through my time -- that in the matter

15   of Kuhn v. Department of Treasury the Court said that this is

16   a reserved right to the people which must be liberally

17   construed.  This Court must liberally construe the right of

18   the people to the referendum, find that the Michigan Supreme

19   Court would, in fact, determine that PA 436 violates Article

20   II, Section 9, of the Michigan Constitution, and, therefore,

21   cannot have been a proper basis for authorization of the

22   filing of this Chapter 9 under Section 109(c) of the

23   Bankruptcy Code.

24           THE COURT:  Thank you.

25           MR. GORDON:  Again, for the record, Robert Gordon of

1  Clark Hill.  Your Honor, I want to touch upon, if I may, an
2  issue that was raised on the 15th regarding who is
3  essentially the impairer of contracts in a Chapter 9 process
4  and then touch upon one other small matter that came up in
5  colloquy on that day.

6      Your Honor, during the oral argument, city's counsel
7  argued that in a Chapter 9 case, the law  views the federal
8  government as the sole relevant actor impairing contracts of
9  the debtor municipality and that, therefore, the prohibition
10  in the pensions clause against the state and its subdivisions
11  impairing accrued pension benefits is of no moment in this
12  matter because it will be the federal government and not the
13  state or the city that is doing the impairing.

14      In making the argument, the city's counsel relies on
15  the language of a dissenting opinion of Justice Cardozo in
16  the Ashton case and then suggests that the viewpoint
17  expressed therein is adopted by the Bekins court, which
18  overruled Ashton.  We submit that the analysis is incorrect.
19  First, it is not entirely clear that the expansive
20  interpretation of Justice Cardozo's opinion suggested by the
21  city comports with his intended meaning.  However, even if
22  that interpretation is accurate, there is no indication that
23  his views were adopted in Bekins, a decision in which Justice
24  Cardozo did not even participate.

25      Contrary to the city's argument, as we've pointed

1    out in our papers, it is the municipality alone that can file

2    a plan and propose the impairment of claims, and it is the

3    municipality alone that can solicit votes and ask the Court

4    to approve such a plan.  Indeed, your Honor, the reality of

5    the active role played by the debtor is reflected clearly in

6    Section 109 itself.  109(c)(5) provides, and I quote, "(a) An

7    entity may" -- excuse me.  It provides under 109(c), I quote,

8    "An entity may be a debtor under Chapter 9 of this title if

9    and only if such entity," and then under (5)(A) it says, "has

10   obtained the agreement of creditors holding at least a

11   majority in amount of the claims of each class that such

12   entity intends to impair under a plan in a case under such

13   chapter," and there's similar language under 109(c)(5)(B).

14   Both of those provisions talk about the municipal debtor

15   being the one who intends to impair under the plan.  It

16   doesn't say that the municipal entity intends to ask the

17   Court to impair.  So 109(c)(5) reflects the reality that we

18   just discussed.

19          Moreover, contrary to the city's argument, your

20   Honor, Chapter 9 jurisdiction turns on the basic concept that

21   the state can consent to subjecting a political subdivision

22   to federal bankruptcy law.  Having thus consented, federal

23   law will then apply, but it is still the state and its local

24   governmental unit that is actively availing itself of the

25   Bankruptcy Code in the Bankruptcy Court.  The city has not

1   and we submit cannot cite to any case law that describes a

2   Chapter 9 debtor as standing mute and passive in the

3   Bankruptcy Court during the plan process and simply accepting

4   whatever impairment of contracts the Court may mete out.

5   It's an unsupportable and unsupported proposition, we submit.

6          Since the state and its political subdivision is

7   clearly the impairer of contracts in the Chapter 9, then

8   absent the relief that's been requested by the Retirement

9   Systems and other objectors, the state or the city in this

10  case would be directly breaching the pensions clause, which

11  it cannot do.  To the extent it is asking the federal court

12  to assist, it cannot do so since the state government and its

13  subdivisions are bound by the pensions clause and cannot

14  delegate to another entity authority that they do not have to

15  abrogate Michigan's Constitution.  And we've cited several

16  cases in our reply brief at page 15 for the axiom that the

17  state and its various branches cannot do indirectly what they

18  cannot do directly.

19         Since the state and the city cannot violate the

20  Michigan Constitution and specifically the pensions clause

21  outside of the Chapter 9 process, they can no more do so in

22  Chapter 9, and the requirement that the Retirement Systems

23  and other objectors have advocated for -- i.e., an explicit

24  conditioning of the bankruptcy upon the protection of the

25  pensions clause -- is absolutely proper and mandated by

1    Section 109(c)(2)'s respect for state law.  Any other

2    conclusion we submit eviscerates 109(c)(2) and its

3    requirement to uphold the Tenth Amendment and the sovereignty

4    of state law.  Moreover, your Honor, there was --

5            THE COURT:  So is the end result of that argument

6    that no municipality in Michigan can file a Chapter 9?

7            MR. GORDON:  The end result would be that they

8    cannot file a Chapter 9 without the explicit understanding

9    that they will not impair accrued pension benefits in

10   violation of the pension clause.

11           THE COURT:  Well, but that violates the Bankruptcy

12   Code.

13           MR. GORDON:  How so, your Honor?

14           THE COURT:  Well, it gives a priority to one

15   unsecured creditor over all the others, or one group of

16   unsecured creditor over all the others.

17           MR. GORDON:  We disagree, but the priority issue I'm

18   going to defer to Mr. Morris on.  He was going to speak about

19   that issue, but we disagree that it can be characterized as a

20   priority issue, your Honor.  I just don't want to steal his

21   portion.

22           THE COURT:  Okay.

23           MR. GORDON:  But it is not a priority --

24           THE COURT:  No pressure, Mr. Morris.

25           MR. GORDON:  It is not a priority issue, your Honor.

1    Moreover, your Honor, the city's counsel had suggested, I

2    believe, on October 15th that Section 943(b) may not contain

3    any bar to adjusting debts but only technical restrictions on

4    how debt adjustment may be implemented.  If he is correct --

5    and we think not -- then all the more reason why the

6    protection of pension benefits under the pensions clause must

7    be addressed at the eligibility stage.

8            The only other thing, your Honor, I wanted to touch

9    upon was at, I think, page 103 of the written transcript of

10   the hearing on the 15th we had a discussion in which I

11   likened the accrued pension benefits to a nondischargeable

12   debt, and the Court questioned whether that concept was truly

13   applicable in a Chapter 9.  I wish to simply note to the

14   Court that while Section 523 of the Bankruptcy Code was not

15   incorporated into Chapter 9, Section 944(c) provides that the

16   debtor is not discharged under Subsection (b) of this section

17   from any debt excepted from discharge by the plan or order

18   confirming the plan.  So, indeed, concepts of

19   nondischargeable debt do exist under Chapter 9 of the

20   Bankruptcy Code, and because it is not governed by Section

21   523 of the Bankruptcy Code, it must be assumed -- because

22   there's no other basis identified in the Bankruptcy Code

23   itself, it must assumed that the bases for

24   nondischargeability would arise under state law such as the

25   absolute and impermeable protection of accrued pension

1   benefits under the state's Constitution.

2           THE COURT:  Why isn't it safer to assume that that

3   provision is in there to facilitate parties' negotiations

4   regarding how to treat debts?

5           MR. GORDON:  I don't know that it's mutually

6   exclusive.  It could be nondischargeability.  It could be as

7   a matter of law --

8           THE COURT:  Okay.

9           MR. GORDON:  -- or by negotiation, your Honor.

10          THE COURT:  Okay.

11          MR. GORDON:  We would simply submit that with

12  respect to a state constitutional protection, it can't be the

13  subject of negotiation.  Thank you, your Honor.

14          THE COURT:  Okay.

15          MR. MORRIS:  Good afternoon, your Honor.  Thomas

16  Morris on behalf of the Retiree Association parties.  There

17  was discussion last week and, in fact, this morning, today,

18  this afternoon, regarding the manner in which the pensions

19  clause operates.  Specifically, there were comments by Mr.

20  Bennett which characterize the pensions clause as

21  establishing a payment priority.  Mr. Bennett would have the

22  Court view the pensions clause as the equivalent of a state

23  law which designates a public pension obligation as a

24  priority claim in bankruptcy.  This is an incorrect

25  characterization of the pensions clause.

1      The pensions clause is a state law which controls

2  the city in the exercise of its political or governmental

3  power.  The pensions clause establishes a constitutional and,

4  therefore, fundamental rule addressing the authority of a

5  municipality to reduce or impair its pension obligations.  It

6  is an essential definition of the state -- of the duties of

7  the state and its subdivisions.  The pensions clause simply

8  doesn't provide for a priority payment.  The usual way for a

9  state to provide for a priority is to specify that the debt

10 is entitled to priority.  An example is found in the Worker's

11 Compensation Disability Act, MCL 418.821, which provides that

12 liability of an employer for Worker's Compensation claims or

13 Worker's Compensation payments shall be paramount to other

14 claims except for wages and taxes.  Another way to ensure a

15 priority is to provide for a statutory lien, so we've got

16 lien -- a lien under Section 211.40 of the Michigan Compiled

17 Laws for property taxes that are secured by a first lien,

18 prior, superior, and paramount.  And MCL 324.3115 provides

19 that certain fines for environmental liabilities constitute a

20 lien on all property of any kind or nature owned by the

21 defendant.  And a construction lien is entitled to priority

22 under state law.

23      In Orange County -- in the case if Orange County

24 found at 151 B.R., there's a quote on page 1017.  In Orange

25 County there was a statute at issue, a California statute

1　that was found by the Orange County court to be preempted by

2　the Bankruptcy Code.  Now, that statute provided that --

3　provided for certain funds to be treated as trust funds, and

4　that statute, as interpreted by the Court, apparently or was

5　argued to provide for there to be no tracing requirement, so

6　the Court in that case found that statute to effectively

7　establish a priority in bankruptcy and found it to be

8　preempted.  That case is distinguishable.  The Michigan

9　pensions clause provides for no priority of payment.  It

10　simply provides an ongoing indestructible duty of the

11　municipality or the state to not impair and not reduce

12　pensions.

13　　　　　Now, the priorities provided for in Section 507 are

14　applicable in Chapter 7 cases, for example, because Chapter 7

15　is a process of liquidation, liquidation of assets and the

16　distribution of those assets, so you need to determine who's

17　going to get the assets.  Who gets paid first?  That's the

18　priority.  Those priorities are also applicable in Chapter 11

19　because in every Chapter 11 case, liquidation is an

20　alternative.  Liquidation is the implied alternative, and

21　it's a standard by which a plan of reorganization in a

22　Chapter 11 case is measured.  Liquidation is not provided for

23　in Chapter 9.  Therefore, priorities are not provided for in

24　Chapter 9 with one exception.  That one exception is

25　507(a)(2), which provides for administrative expense

1  priorities.  That's a --

2       THE COURT:  But doesn't the best interest test of

3  943(b)(7) implicate the priorities of the Bankruptcy Code?

4       MR. MORRIS:  It doesn't.  It doesn't implicate the

5  priorities of a liquidation as an alterative unlike in

6  Chapter 11.  That's what's done -- in a Chapter 11 you look

7  at the unsecured creditors.  What would they get in

8  liquidation?

9       THE COURT:  Your position is that there's nothing in

10 a municipal bankruptcy case that would prohibit one group of

11 unsecured creditors from insisting on payment before or in

12 full while other unsecured creditors are paid later or not in

13 full.

14       MR. MORRIS:  Well, in confirmation of a case where

15 the pensions are unimpaired, you have a possible

16 discrimination claim by other creditors.  The bondholders

17 might claim that it's unfair discrimination, and I think the

18 response would be any bondholders who purchased their bonds

19 prior to 1963 when the Michigan Constitution was adopted,

20 you've got a different argument, but those bondholders who

21 purchased their bonds after 1963, which is all of them, don't

22 have an argument.  They're aware of the political climate.

23 They're aware of the Constitution.  They're aware that the

24 municipality cannot --

25       THE COURT:  Right, but the city's response to that

1   is the people who lobbied for and got the pensions clause in

2   the Constitution were aware of the Chapter 9 possibility.

3   How do I deal with that, or how do you deal with that?

4          MR. MORRIS:  Mr. Gordon dealt with that.

5          THE COURT:  Okay.  I will look at what he said.

6          MR. MORRIS:  But I don't want to -- I don't want to

7   repeat it, but the city is not permitted to restrict or

8   impair the pensions.  They are an inviolate obligation that

9   the city will live with even if it reorganizes under Chapter

10  9.  That's just a fact.  If the City of Detroit were to cease

11  to exist, if there were to be some horrendous natural

12  catastrophe that wiped the city off the state -- wiped the

13  city off the map, then we believe the city would still owe

14  that obligation, and it might cause a constitutional crisis.

15  Maybe the state would have to -- let's say the city remained

16  with only one resident, and that one resident couldn't

17  possibly pay the taxes to pay this.  It would cause a

18  constitutional crisis.  There'd have to be a resolution.

19  Maybe the state would step in.  I don't know.  That's beyond

20  conjecture.

21         THE COURT:  The city says we're there now.  I'm

22  sensing from Ms. Ceccotti having risen that your time may be

23  up.

24         MR. MORRIS:  Yes, it is.  Thank you.

25         MS. CECCOTTI:  Your Honor, I actually rose because I

1   was planning to address the question that you just asked --

2          THE COURT:  Okay.

3          MS. CECCOTTI:  -- about -- and I was going to

4   actually spend less time on it, but I think I'll just

5   dispense with -- I was going to -- first of all, for the

6   record, Babette Ceccotti, Cohen, Weiss & Simon, LLP, for the

7   UAW, and good afternoon again.

8          I was going to spend some time on talking about the

9   pension clause, the language of the pension clause, and how

10  the courts in Michigan address constitutional provisions when

11  called upon to review them and the principles that they

12  apply, but I'm going to move actually right to your Honor's

13  question because I do think that a lot of -- some of the

14  questions that your Honor has asked, particularly this

15  afternoon, really do go to what I think is going to be the

16  crux of this.

17         First of all, on the city's point that the pension

18  clause doesn't seem to make any -- doesn't, in fact, make any

19  reference to the possibility of municipal bankruptcy, I think

20  we have to go and ask ourselves a couple of questions.

21  First, what did municipal bankruptcy mean at the time, and

22  what did pension rights mean at the time?  And so we have to,

23  you know, sort of bring ourselves back in the legal regime --

24  in two legal regimes to 1963.  First, the city's brief cites

25  to a law that was on the books in Michigan, PA 72, dating

1  from 1939, and the law refers to the 1898 Bankruptcy Act and

2  basically says that any taxing agency or instrumentality as

3  defined in the bankruptcy law may proceed to do something

4  called secure a composition of its debts, and the law then

5  goes on to describe rules about who can file the petition and

6  who can agree to the plan of composition and what kinds of

7  things can be in the plan of composition and also provides

8  that the composition is binding on the instrumentality.

9           In 1963 -- okay.  So that's the law that's on the

10 books.  In 1963 as well the municipal bankruptcy law that is

11 being referenced looks a lot more like the '37 law than it

12 does the law that we have today.  On the sort of time line of

13 Chapter 9 changes starting with the law that was declared

14 constitutional by the Supreme Court in '37, while there are

15 some changes that take effect in 1946, you really don't get a

16 major overhaul until 1976 and the events surrounding the New

17 York City fiscal crisis, so from that point forward -- from

18 that amendment forward, Chapter 9 looks a lot closer to the

19 Chapter 9 that we're dealing with today, but in 1963 it

20 really didn't look like that.  And, frankly, the notion

21 that -- and this is where we get to the pension regime part

22 of my answer.  The notion that the pension clause coming in

23 as it did to take a situation where employees working for the

24 state had, in effect, no vested right to deferred

25 compensation they had earned with services that they provided

1    to the state, that was -- that's the gratuity and the gift --
2    that changes with the pension clause, which then provides the
3    protection for accrued financial benefits.  This is a new
4    thing under the state Constitution.  So it's not -- to me
5    it's not surprising at all that you wouldn't find a reference
6    to the plan of composition or municipal bankruptcy because we
7    have really these arcane terms that it is very unlikely
8    anyone would have applied to vested pension rights.  It's not
9    until 11 years later that ERISA is enacted in the federal
10   regime.  ERISA, of course, has language -- sets forth a
11   comprehensive scheme to protect pensions and uses words like
12   "nonforfeitable benefits" and "vested pensions" and "accrued
13   pensions" and the like.  And as we talked about last week,
14   that regime includes the pension termination system, and you
15   get then developing in the private sector bankruptcy world,
16   the Chapter 11 world, the Chapter 7 world, where the
17   priorities do function, what is the status of a pension
18   contribution given the fact that it is based on services that
19   were rendered to the debtor pre-petition?  All of that law
20   comes up after 1963.  There just simply wouldn't be a way to
21   think about a pension benefit in the context of a debt
22   composition, or at least that is -- that seems very likely to
23   me because you just don't get this law -- all of this law
24   coming up until you get to ERISA and the concept of plan
25   termination and the priorities that apply in Chapter 11 and

1    Chapter 7 years and years later.  And now, you know, to my
2    way of thinking about it, unfortunately, we have seen a lot
3    of pension terminations, and so there's a lot of law on that
4    subject now, but it didn't exist in 1963, and it couldn't
5    possibly have been fairly contemplated.  So I think that
6    we're then left with a section, which is the pension clause,
7    Article -- of the pension clause of the Michigan Constitution
8    that is very much standing on its own without reference to
9    any exception, and we can see why, I think, no -- in
10   particular no reference to the concept of municipal
11   bankruptcy working very much, in effect, each word being
12   given effect by the courts of Michigan who have construed it
13   a number of times to protect accrued pensions.  And it's
14   standing on its own effectively against impairment or
15   diminishment by, as we spoke about last week, the state, the
16   state officials, or governance -- government and political
17   subdivisions to which it applies, so I think the --
18           THE COURT:  I have to interrupt you and ask this
19   question about bankruptcy.  Is there anywhere else in the
20   Bankruptcy Code where a party's nonbankruptcy law right to
21   payment is given an absolute status in the bankruptcy?
22           MS. CECCOTTI:  Well, your Honor, I think that there
23   are a number of places in the Bankruptcy Code where state law
24   is referenced, and we had a reference to the effect given to
25   certain types of liens, which are given effect, but I think

1    the --

2            THE COURT:  Well, but even there there are many

3    circumstances in which security interests are not given

4    absolute effect in bankruptcy.

5            MS. CECCOTTI:  Your Honor, here's --

6            THE COURT:  Cramdown, of course, is a perfect

7    example of that.

8            MS. CECCOTTI:  Here's where I think the crux of this

9    is.  We have a regime in Chapter 9 that must operate by

10   maintaining the state's sovereign control over the political

11   and governmental affairs, including the expenditures

12   therewith under 903.  Chapter 9 is not Chapter 11, and so,

13   therefore, the question to start with is what is the -- what

14   limited things can be done in Chapter 9, not necessarily

15   let's look at the whole of the Bankruptcy Code and try to

16   sort of plug in examples that are going to cross between a

17   Chapter 9 debtor and a Chapter 11 debtor.

18           THE COURT:  I understand that argument, but isn't

19   the end result of that argument that a state like Michigan

20   that has this clause, if it is to be given absolute impact,

21   cannot authorize its municipalities to file bankruptcy?

22           MS. CECCOTTI:  Cannot authorize its municipalities

23   to file for bankruptcy if a purpose is to diminish or impair

24   accrued pensions.  That's correct, and that is --

25           THE COURT:  But what you're not saying there is that

1    if there is the intent not to diminish pensions, they can

2    file municipal bankruptcy?

3            MS. CECCOTTI:  In this case, your Honor, the intent

4    was made abundantly clear going in.  If they had hidden the

5    intent, we might --

6            THE COURT:  No.  I understand that.  I'm trying

7    to --

8            MS. CECCOTTI:  -- we might not be standing here

9    today.

10           THE COURT:  I'm trying to figure out where your

11   argument goes because there are two possible outcomes here.

12   One is when a municipality is subject to the state

13   constitutional provision, it can file bankruptcy and still

14   impair, or it can file bankruptcy without the intent to

15   impair, or I suppose there's a third alternative, which is

16   the one I'm asking about, which is they can't file bankruptcy

17   because bankruptcy doesn't permit that kind of

18   discrimination.

19           MS. CECCOTTI:  I think -- your Honor, I think it's a

20   false choice, frankly.  I really do.  And we've seen some --

21   we've seen enough instances, I guess, of the more modern use

22   of Chapter 9, particularly the cases out in California,

23   where -- and this is -- and CalPERS has been just on the

24   forefront of this, as I'm sure you know -- where they're not

25   touched.  I just -- I don't see what is so accepted or that

1   it's a black and white choice between filing for bankruptcy
2   and not filing for bankruptcy simply based on the pension
3   question.  I mean this is a -- this is a very -- this is a
4   large, large municipality to be seeking Chapter 9 relief.
5   There is a lot going on.  This very much reminds me, Judge,
6   of going from the very small Chapter 11's at the beginning of
7   the '78 Code and then all of a sudden finding companies like
8   LTV Steel filing for bankruptcy and suddenly declaring that
9   retiree health was a general unsecured claim, someone no one
10  had thought of before.  This very much feels to me like that
11  type of a moment where the size of this city and the
12  magnitude of what it's trying to accomplish simply cannot be
13  easily fit within the rules that might otherwise apply in a
14  smaller -- in a smaller context or with less going on or with
15  less money available for fewer options.  It's very much a
16  moment, I think, where -- it's one of those moments that I
17  think we will look back on and say this is where Chapter 9
18  changed.  And we are very much hoping it does not change in
19  the direction of violating what we believe are legitimate --
20  a legitimate basis for a municipality to say, "I need to
21  adjust my debt, but I am going to adhere to a state law, a
22  state constitutional provision like the pension clause, and I
23  can accomplish both."  I very much think that those things
24  are possible, and if we don't have a bankruptcy system that
25  allows for that duality -- the dual sovereignty to have play

1   like that, then we are simply wiping aside centuries of

2   constitutional law.  And I'm really -- my colleagues are

3   going to be very upset with me.

4           THE COURT:  Eleven minutes left.

5           MS. CECCOTTI:  I'm sorry.

6           MS. PATEK:  Your Honor, given the time

7   limitations -- again, Barbara Patek on behalf of the Detroit

8   Public Safety Unions -- I want to address for the moment the

9   Court's question about whether there's anywhere else in the

10  Code, and I don't -- I believe the answer to that question is

11  no, but I think also the Tenth Amendment answers that

12  question.  And I think even if you assume for the sake of

13  argument that there are -- that what the -- what is being

14  said here, that this is just a priority issue, that this

15  constitutional promise that was made to these public servants

16  is to be treated like general unsecured debt as if it were

17  credit card debt, I think a careful look at the Code answers

18  that question to the contrary, and I think you can start with

19  the Orange County versus Merrill Lynch case, which talks

20  about 507 and the reason for the exclusion of (a)(1) and

21  (a)(3) through (9) from the Code.  And in a footnote it talks

22  about what were then (a)(3) and (a)(4) being excluded because

23  they had to do with employment rights and collective

24  bargaining agreement rights potentially of employees which

25  could affect the ability of the municipality to continue its

1    operation.  I suggest it's no accident that those two
2    sections were excluded.  I suggest that it's no accident --
3    we heard a lot about electoral will or political will last
4    week -- that this provision is tucked away in the Michigan
5    Constitution so it's difficult to change.  This is a promise
6    that's made to people as part of the sovereignty of the State
7    of Michigan to the people who are necessary in this case,
8    talking about my clients, the Public -- the members of the
9    Public Safety Unions, and I would suggest that it would be a
10   violation of the Tenth Amendment to read the Code otherwise.
11   Thank you, your Honor.
12        MR. MONTGOMERY:  Your Honor, Claude Montgomery for
13   the Retiree Committee.  I had four things that I was going to
14   try to address today in my seven minutes.  One was ripeness.
15   One was whether or not there is an issue, despite the Cardozo
16   dissent, and, three, I'd like to answer the question of
17   whether or not intent matters for the governor and the
18   emergency manager, a question raised by the state, and,
19   finally, if I have any time left, that Studier does not
20   undercut Seitz v. Probate Judges System.
21        But I'd also like to take the opportunity to answer
22   the last question or at least offer a thought -- whether or
23   not it's considered useful or not, I will, of course, leave
24   to the Court -- and that Bekins itself tells us what the best
25   interest question was, and it wasn't relative treatment of

1   creditors.  It was whether or not bondholders could get tax

2   people to actually levy on property that was either worthless

3   among the municipalities or couldn't be sold for the amount

4   or tax levy marshals and whatnot were running away from

5   creditors.  So the best interest of creditors that Bekins saw

6   being made possible by the plan of adjustment was better than

7   zero, not a relative priority vis-a-vis other creditors but

8   an ability to get paid where the state was actively, through

9   its minor officials, resisting paying anything.  And so I

10  think that is the best interest of creditors that 943(7) is

11  looking to, and I have further statutory construction for

12  that.  At least I offer it.  One is that neither 1129(a)(7)

13  nor 1129(a)(11) are actually adopted by Chapter 9, and so

14  the -- what is the best interest of creditors as in feasible

15  is not necessarily identical to those statutory -- those two

16  statutory provisions to which no reference is made.

17       So now I'd like, if you will, turn my attention to

18  the Cardozo dissent, which I must say I thought Mr. Bennett

19  made a very interesting offer to the Court as a foundation

20  for Bekins, but I would like to suggest and only suggest,

21  your Honor, that there is a key -- two key parts to the

22  Cardozo consent that the Court may wish to pay attention to.

23  One is that the Court action on which Mr. Bennett relies was

24  the discharge of the debt.  It wasn't what happened inside

25  the plan process.  It was the actual discharge, which

1   couldn't be accomplished without court intervention.  The
2   second thing that was critical to Justice Cardozo's thinking
3   and, according to Mr. Bennett, ultimately adopted by the
4   Bekins court, which was this concept of consent.  Well,
5   Justice Cardozo characterized it as a waiver of a privilege,
6   right, but here what controls how the state exercises the
7   waiver of the privilege?  Well, obviously that has to be a
8   question of state law.  It can't be transformed into a
9   question of federal law.  And what is the state law that
10  controls the exercise of the waiver of the privilege?  Well,
11  it's this Michigan state Constitution.  So if the Michigan
12  state Constitution is the bedrock on which the waiver takes
13  place and the Michigan Constitution says, according to the
14  Seitz case and according to the Musselman case, no act can be
15  taken that results in a diminishment of pensions, not affects
16  the value of those pensions but actually diminishes the
17  amount of those pensions, then the state actors cannot do
18  anything in that regard.  And I would further answer the
19  question your Honor asked earlier, was if the Michigan
20  Constitution is a proscription on the behavior designed to
21  undercut the Constitution, does that mean that no city can
22  file a Chapter 9?  Well, obviously ones that don't have
23  pension issues don't even have to ask the question, so 436
24  and the Michigan Constitution are clearly not a bar where
25  there's no desire to impair pensions because they don't have

1    pensions, but if they do have pensions --

2            THE COURT:  Well, I'm not sure that's so.

3            MR. MONTGOMERY:  Well, as your Honor -- forgive me.

4            THE COURT:  I mean my question would be in that

5    case -- I mean you can construct a hypothetical in which the

6    city proposes to impair bonds and the bondholders are saying,

7    "Wait a minute.  There's this other asset over here, the

8    pension assets, you know.  We have to impair everybody, not

9    just us."

10           MR. MONTGOMERY:  I presume your Honor meant pension

11   obligations.

12           THE COURT:  Pension, yeah.  Thank you.

13           MR. MONTGOMERY:  The one difference between the

14   state constitutional provision on impairment of contracts and

15   Article IX, Section 24, is that Article I, Section 8, of the

16   Michigan Constitution speaks of legislation whereas Article

17   IX, Section 24 --

18           THE COURT:  And I don't mean to frame this in terms

19   of a constitutional protection for bonds because that's not

20   the point of it.  The point of it is that the bondholders

21   could argue that under the Bankruptcy Code, pension holders

22   do have to be impaired, even if the municipality doesn't want

23   to, to achieve fairness in treatment.

24           MR. MONTGOMERY:  Well, first, they would have to, of

25   course, start on a class basis because obviously --

1     THE COURT:  Right.

2     MR. MONTGOMERY:  -- the unfair discrimination starts

3 there, but, secondly, the key issue here for whether or not

4 there is an unfair discrimination is whether or not there are

5 differences in the protections afforded each claim.  It is

6 well-established that you can make distinctions between

7 creditors based on the nature of the obligation and that you

8 can make differences in treatment based on the nature of the

9 obligation, so the only question is whether or not it's

10 unfair, and how could it be unfair to let the pension rights

11 of the City of Detroit retirees pass through a Chapter 9 case

12 if the Michigan Constitution says it's unconstitutional to

13 try to impair them?

14     THE COURT:  The bondholders say protected by

15 Constitution or not, in bankruptcy they are unsecured claims.

16     MR. MONTGOMERY:  Right.  And so if, your Honor, the

17 only possibility of dealing with a pension obligation is that

18 it has to be done in a Chapter 9 and it is unconstitutional

19 for the actor, the state actors to ask for Chapter 9, I think

20 you're blocked.  You can't ask for the Chapter 9 position.

21 And we find nothing inconsistent with that roadblock because

22 the people of Michigan retain the right and the ability to

23 change the law if they wish to give their municipalities

24 greater access to Chapter 9.  If, in fact, Article IX,

25 Section 24, is a roadblock -- and we assert it is a

1  roadblock -- the people of Michigan, not the federal

2  government, but the people of Michigan retain the right to

3  make that change.

4          THE COURT:  One more minute.

5          MR. MONTGOMERY:  Yes, sir.

6          THE COURT:  Ripeness.  I would simply commend your

7  attention to U.S. Postal Service v. National Association of

8  Letter Carriers, which your Honor no doubt has read and which

9  ripeness focuses on the timing of the action rather than the

10 party that brings the action, and the key question there for

11 the Court was whether or not there was a reasonable threat of

12 liability if compliance with the arbitration order violated

13 the CSRA, which was the relevant statute, and we say the

14 analogy to that is whether or not there's a reasonable threat

15 of harm to the pensioners as a result of the city's action.

16         THE COURT:  Um-hmm.

17         MR. MONTGOMERY:  And I think that's -- at least we

18 would offer to your Court that is a difficult thing to

19 dispute.  And I think that exhausts my ten minutes, your

20 Honor.

21         THE COURT:  Thank you.

22         MR. SCHNEIDER:  Your Honor, Matthew Schneider, chief

23 legal counsel, Michigan Department of Attorney General, on

24 behalf of the state.  Your Honor, I'd only like to discuss

25 two topics here.  One is home rule and then, secondly, the

1    referendum issues regarding PA 436.

2          So if we start with the home rule argument, if we

3    look at Article VII, Section 22, just setting aside the text,

4    we have to look at the text and ask what does this do.  What

5    does this provision of the Constitution do?  It gives local

6    citizens the power to adopt their own governing structure and

7    ordinances.  And what it allows citizens to do is gives them

8    a City Council.  The City Council can adopt ordinances and

9    resolutions.  And the citizens have a right to that power.

10          In this case, what did the citizens do with that

11    power?  Look at Detroit City Charter, Section 1-102.  They

12    enacted as part of that charter a provision that reads,

13    quote, "The City has the comprehensive home rule power

14    conferred upon it by the Michigan Constitution, subject only

15    to the limitations on the exercise of that power contained in

16    the Constitution or this Charter or imposed by statute."  So

17    the charter itself states that the home rule power is limited

18    to what is imposed by statute.

19          But even if it didn't say that, if the charter

20    didn't say that, we know that when the citizens of Detroit go

21    to the ballot box and they elect their City Council members,

22    those same members, those same citizens, have an opportunity

23    to vote for their state senator and their state

24    representative and their governor, and those representatives

25    in Lansing, who the city has an ability to vote for, pass

1  laws that govern those city residents as well.  Those

2  representatives passed PA 436.

3  　　　　　This cannot possibly violate the home rule concept.

4  Let's look at what those representatives did.  They passed

5  the Home Rule City's Act, MCL 117.36.  Quote, "No provision

6  of any city charter shall conflict with or contravene the

7  provisions of any general law of the state," unquote.

8  　　　　　And we have to look at this through another third

9  and final prism.  In 1963 the residents of this city had an

10 opportunity to vote another time, and they voted to ratify

11 the state Constitution.  Article VII, Section 22, contains a

12 very important line that now binds those city residents.  A

13 city, quote, "shall have the power to adopt resolutions and

14 ordinances related to its municipal concerns, property and

15 government, subject to the Constitution and law," unquote.

16 The law is passed by the legislature.  In other words, you

17 can only pass local laws that are subject to the Constitution

18 and the laws passed by the legislature, and this is all about

19 representative government.  This is how it works in our

20 constitutional republic.  The city residents still govern

21 themselves.  They voted for the people enacting the city

22 charter.  The city residents voted for a legislature that

23 enacted PA 436, and the city residents had a hand in the

24 Michigan Constitution as well.

25 　　　　　If you look at the legal priority here, we know, as

1  I've stated, that the acts of the legislature can take

2  priority over local acts.  The Michigan Supreme Court in <u>Mack</u>

3  v. <u>City of Detroit</u>, 467 Mich. 186, a 2002 case, explained

4  this.  There was a Detroit city charter provision that

5  created a private cause of action for discrimination.  A city

6  police officer brought a discrimination suit under the

7  charter, but in this case the legislature had already passed

8  a governmental immunity statute that prevented these actions

9  against the city.  And the Michigan Supreme Court held that

10  the charter provision conflicted with the law as passed by

11  the legislature, and so the legislation took priority over

12  the charter.

13         PA 436 is not a local act.  It can be applied to any

14  other city, and we can see in the newspapers today about the

15  issue of PA 436 being raised in other cities or

16  municipalities.  So there's a much larger point here, your

17  Honor.  The objectors, I think, are incorrect in the overall

18  approach to the home rule argument.  They're arguing that PA

19  436 trumps home rule and ignores the will of the voters and

20  that the legislature somehow just wanted to overrule the

21  citizens of Detroit, but we have to look at PA 436 and know

22  that there were incredibly compelling reasons for PA 436.

23  The point of that, as spelled out in the Act, was to help

24  distressed cities and school districts.  The evidence showed

25  that this was a problem that was not going away.  It was true

1    before PA 4, after PA 4, before PA 436, and after it.  And

2    the language of PA 436 shows that the legislature wanted to

3    fix it, but it also responded to the voters' rejection of PA

4    436.  If we look at the governor's testimony in his

5    deposition, he indicates as such.

6         THE COURT:  Well, but the fact that there may have

7    been compelling reasons for 436 wouldn't justify it if it's

8    otherwise unconstitutional, would it?

9         MR. SCHNEIDER:  No, but there's no -- it's not

10   unconstitutional.  That's my point.

11        THE COURT:  I'm just wondering why you're arguing

12   that it was compelling.  What's the point?

13        MR. SCHNEIDER:  It's a point because -- just to say,

14   your Honor, there's a much larger point here, and the point

15   is is this wasn't done arbitrarily.  This was done for a very

16   specific purpose.

17        Secondly, your Honor, I want to respond to the issue

18   regarding the right to referendum.  I believe Assistant

19   Attorney General Margaret Nelson explained this quite

20   adequately yesterday, but I do want to address the fact that,

21   you know, there's been argument raised here that there were

22   documents produced in discovery that lawyers at Jones Day

23   discussed how PA 436 would be, you know, going around the

24   referendum power.  Well, neither of these people were members

25   of the legislature.  If we look at the governor's position

1  itself, the state has produced discovery in this case

2  explaining the governor's position, and it was not to go

3  around the legislature.  The governor had directed -- I

4  believe it was Dick Posthumus, the former lieutenant

5  governor, and his legislative director, how are we going to

6  craft -- how would PA 436 be crafted?  It would be crafted

7  not to ignore the will of the voters.  It would be crafted in

8  order to make sure that different changes were made to make

9  it better.  And, you know, as to --

10        THE COURT:  But how does anyone know whether the

11  changes that 436 incorporated over the rejected law, PA 4,

12  responded to the will of the voters or not?  How does anyone

13  know that?

14        MR. SCHNEIDER:  Well --

15        THE COURT:  I mean all we know is PA 436 was

16  repeal -- PA 4 was repealed.

17        MR. SCHNEIDER:  Folks aren't blind, I think, to the

18  media coverage as well.  When an act is --

19        THE COURT:  Rely on media coverage?

20        MR. SCHNEIDER:  Well, they have constituents.  Laws

21  are passed only through the regular process of legislators

22  responding to their constituents, and that is the will of the

23  voters.  And when the governor wants a new structure, PA 436,

24  or the members of the legislature want that, their

25  constituents will go to the media as well or will speak

1    directly to them, so it was in direct response to fixing the

2    problems that the will of the voters pointed out.

3           If you have any other questions on these topics, I'd

4    be happy to answer them or I could defer to Mr. Bennett on

5    the other issues.

6           THE COURT:  Thank you, sir.

7           MR. SCHNEIDER:  Thank you.

8           MR. BENNETT:  Good afternoon, your Honor.  Bruce

9    Bennett of Jones Day on behalf of the city.  I got a little

10   bit of an organizational challenge here.  One comment with

11   respect to the last point concerning the right of referendum,

12   if the defect in 436 is that there was a right -- there

13   should have been a right to referendum anyway,

14   notwithstanding what the statute says, well, I suppose the

15   remedy is for someone to try to mount a referendum, not to

16   wait till you come to a Bankruptcy Court and ask the

17   Bankruptcy Court to decide there should have been a

18   referendum.  If there had been a referendum, it would have

19   been rejected, and, therefore, we're going to hold it

20   unconstitutional.  It seems that there's a whole -- there's a

21   few steps that are being skipped in the relief that's been

22   requested of you here.

23           There's a number of topics, and I can only refer to

24   the other Mr. Bennett to cover all the different questions,

25   so I'm going to try to organize it, but if it falls apart a

1   little bit, I apologize.

2         First, there was an appeal to the other California

3   cases, which has to refer to <u>Vallejo</u>, where, of course,

4   pension claims were not impaired, debt claims were impaired,

5   in what was a largely consensual plan.  I think I said in

6   another appearance before this Court that today <u>Vallejo</u> may

7   well be in trouble again and perhaps because it did not get

8   enough relief from its debt generally, but that's not the

9   reason I refer to it this time because I think you can't

10   refer to <u>Vallejo</u> without referring to <u>Central Falls</u> in Rhode

11   Island.  And in <u>Central Falls</u> in Rhode Island, what happened

12   was was that the pension claims, pension and benefit claims,

13   took haircuts and the debt did not, again, a consensual

14   outcome.

15         If the economics were a little different, perhaps we

16   could have a consensual outcome one way or another in

17   Detroit's case, but I'm pretty sure that the bondholders, who

18   I think are listening on the phone and not here today, would

19   say that they are not in a position and would not consent to

20   allowing pension claims in this case to be unimpaired, and

21   I've certainly heard the various representatives of those

22   holding pension and other retiree benefit claims here and

23   indicating that they're not in a position or willing to let

24   bondholders leave unimpaired.  And it may well be that this

25   is the first case where irrespective of consent from one side

1  or another, we could not achieve that result, so I think

2  the -- that a consensual outcome could come out differently

3  and could come out with only part of a capital structure

4  being impaired unfortunately says nothing about the

5  controversy we have today.

6         The second point I want to cover is the point about

7  the discharge language in Bankruptcy Code Section 944.  It's,

8  of course, important whenever reading a provision in a

9  statute to figure out where it is in the statute, and the

10 provision relating to discharge is in the effect of a

11 confirmation order.  And the line is that the discharge

12 applies -- excuse me -- the debtor is not discharged --

13 there's a broader discharge provision that comes ahead --

14 from any debt exempted from discharge by the plan or order

15 confirming the plan.  This is not a claim that has some

16 inherent nondischargeability.  This is a reference to a plan

17 exempting from the provision before it, and I suppose that

18 what this is intended to do is to say that obligations as

19 modified will continue if the plan or the order confirming

20 the plan says so.  Otherwise, if you go up and look at the

21 discharge, it covers all claims, period, and so I think this

22 is a provision that makes a plan that partially and does not

23 fully discharge claims work, and I think that's all it is.

24 It's not a recognition --

25         THE COURT:  Well, but what Mr. Gordon argues, if I

1    understand it correctly, is that this provision of the Code

2    allows a municipal debtor to waive the discharge of the

3    claims of a class, and, therefore, this city can pursue a

4    Chapter 9 case that addresses all of the debt other than the

5    pension debt which can't be pursued or at least impaired

6    because of the Michigan Constitution.

7         MR. BENNETT:  Well, once again, this provision is

8    one section in a Bankruptcy Code that contains lots of other

9    sections, and a couple of them were touched upon by your

10   Honor and other people addressing you just a few minutes ago.

11        First, there was a discussion about whether it

12   creates a priority or not.  I don't think that's terribly

13   relevant.  The issue that the Bankruptcy Code sets up is that

14   it has a distribution scheme imbedded in it.  The

15   distribution scheme in some places is given effect through a

16   combination of a declaration that a particular claim has

17   priority and then a treatment requirement that you would find

18   in 1129.  In others there's no explicit priority, but there's

19   a treatment -- there's a treatment requirement in 1129, and

20   that treatment requirement works two ways, and I think this

21   came out in the discussion.  One, there's the ranking, which

22   is basically what 1129(b) does between secured claims,

23   unsecured claims, subordinated claims, and not in Chapter 9

24   equity.  But it also has the nondiscrimination provisions,

25   and I actually think that counsel for the retiree committee

1   slightly misspoke when he said, well, nondiscrimination,

2   that's an issue between classes, and it is, but within

3   classes there's actually a stronger nondiscrimination

4   provision.  The treatment within a class has to be the same.

5   Between classes the rule is unreasonable discrimination.  And

6   so the discharge -- the provision in 944, the ability to have

7   an exception in the confirmation order from discharging all

8   claims that existed on the petition date and leaving some

9   around to some extent, I don't think is a license to confirm

10  a plan that doesn't meet with the requirements of 1129, both

11  the priority -- what I called priority, but the

12  distributional entitlement requirements and the creditor

13  justice requirements, whether they are unlawful

14  discrimination or same treatment within a class.  And so you

15  get to the point where your Honor was, I think, which is that

16  these claims are --

17          THE COURT:  Well, but Mr. Morris pointed out

18  astutely that Chapter 9 itself prohibits -- or I should say

19  requires that a plan be fair and equitable.  Yes?

20          MR. BENNETT:  It has a different meaning than the

21  provision in the Chapter 11 --

22          THE COURT:  Right.

23          MR. BENNETT:  -- for -- yes.

24          THE COURT:  Right.

25          MR. BENNETT:  But he referred to best interest, but,

1   yes, it has a fair and equitable provision.

2           THE COURT:  So he argues how can a provision that

3   impairs pensions be fair and equitable in the face of the

4   constitutional protection of them?

5           MR. BENNETT:  I think you go back to the -- again,

6   what came up when we were last here, which is that you can

7   say as a constitutional matter these cannot be impaired for

8   one -- by the municipality, but the reality is at the end of

9   the day there isn't enough money.  And when the reality is

10  there isn't enough money to pay them, then if you went

11  through all and exhausted all of the nonbankruptcy procedures

12  for enforcing a debt, where would you be?  That is the --

13  that is essentially the best interest benchmark.  And we've

14  got a lot of law on this.  Bekins, which was referenced, is

15  one of them.  The fact pattern that you see in cases

16  involving very distressed municipalities in the cases, which

17  a lot of them are from the depression era, of course, is

18  situations where the municipality, notwithstanding an

19  obligation to raise taxes, just can't collect any more money

20  no matter what it does.  Sadly, that fact situation, albeit

21  with more modern features, presents itself in Detroit.  And I

22  think it would be what the city will have to prove, open

23  paren, one, in the event it does not achieve a consensual

24  plan, which it still hopes to and that the -- that it is

25  object -- the plan is objected to by relevant constituents

1    representing retirees, the city will ultimately have to prove
2    that the distributions on account of underfunding claims
3    offered by the plan are better than the contributions that
4    could be achieved if there wasn't a Chapter 9 case and if the
5    creditors were free to pursue their remedies, all creditors
6    were free to pursue their remedies, and if the residents
7    reacted as we can predict residents would react because they
8    have been doing so for the past several decades.  And if the
9    city -- if the retiree -- committees represented by the
10   retiree groups are able to prove that the environment for
11   them outside of Chapter 9 is better than the results we are
12   able to achieve in this Chapter 9 case, they may get a chance
13   to prove to themselves whether they were right or wrong
14   because that's where we'll be.  We'll be in a dismissed case.
15   There will be lots of unsatisfied bond debt.  There will be
16   lots of unsatisfied pension debt.  There will be lots of
17   unsatisfied OPEB debt, and we'll see how it turns out.  I
18   think that will not be a good outcome.
19          So this kind of brings me back to how the system
20   works, and I think, frankly, why don't I start with really
21   Justice Cardozo's reasoning?  And first I wanted to spend a
22   minute to take away some of the mystery that seems to be
23   surrounding who was where in 1936 and 1938.  It was mentioned
24   that Judge Cardozo for some reason didn't participate in the
25   decision in <u>Bekins</u>.  Unfortunately, that's because Justice

1   Cardozo had a heart attack at the end of 1937, a stroke at

2   the beginning of 1938, and he died in early July 1938, about

3   ten weeks after the decision in _Bekins_.  The reality was is

4   Justice Cardozo was too sick to participate.  His opinion was

5   joined by, quote, the chief justice, Justices Brandeis and

6   Justice Stone -- excuse me -- Justices Brandeis and Stone.  I

7   actually didn't know when we were here last for certain that

8   the chief justice at the time of the dissent was the same

9   Chief Justice Hughes who wrote the opinion in _Bekins_.  It

10  turns out he was.  I was able to verify that during the

11  break.  And I think I offer what Justice Cardozo had to say

12  because its logic is irrefutable.  By the way, its reasoning

13  wasn't assailed by any of the retiree representatives.  It's

14  joined by a very distinguished group of justices, and all of

15  them except for Cardozo participated in the ultimate reversal

16  of _Ashton_ in _Bekins_.  The opinion, of course, was written by

17  Hughes, who joined the dissent, and I think, therefore, it's

18  an excellent aid to interpretation.

19          I admitted last time that _Bekins_ is a little hard to

20  interpret because it's dealing actually with three specific

21  constitutional challenges.  It spends most of its column

22  inches on the Article X problem.  It spends exactly one

23  column inch on the Fifth Amendment problem and really only

24  talks about the commerce clause problem because the

25  legislative history that it quotes for the changes made

1  between Ashton and Bekins touches on the commerce clause

2  issue, and the Court basically is agreeing with the treatment

3  that accompanied it -- accompanied the statute in the

4  legislative history.

5       It turns out that Cardozo didn't write on a clean

6  slate.  He cited a case, Imperial Irrigation District, 10

7  Fed. Supp. 832, which is probably where he borrowed the

8  concept, and I quote from that case, "The impairment of

9  contracts is brought about by the national law, and not by

10  the state measure, and local consent similar in effect to

11  that sanctioned by the California statute."  The judge in

12  that case -- so it's obviously a district judge -- it's not

13  even an appellate judge -- is dealing with the same problem

14  that you would have if you tried to ground the

15  constitutionality of the Bankruptcy Court -- Bankruptcy Code

16  as against the contracts clause on anything other than the

17  reality that it is the federal power that is impairing

18  contracts.  You wind up with a situation that you have

19  basically destroyed Chapter 9 and maybe parts of Chapter 11

20  as an avenue for impairing contracts in many circumstances,

21  not just pensions.

22       In short, you've proven too much.  You've proven

23  that contracts clauses in every state -- and I said last time

24  I think there's a contracts clause in every state

25  Constitution, but I could be off by one or two -- that would

1  prevent the impairment of bonds.  That would prevent the

2  impairment of trade claims.  In fact, you would have

3  effectively preempted all impairments, and Chapter 9 would be

4  completely a dead letter.  And so we have to look for other

5  interpretations or we should be looking very hard for other

6  interpretations, and we don't have to look very far.  And as

7  I said before, I think while <u>Bekins</u> says -- crunches it into

8  a couple of sentences, Justice Cardozo's reasoning joined by

9  Hughes, Stone, and Brandeis explains to us why,

10 notwithstanding the federal contracts clause, notwithstanding

11 state contracts -- state Constitution contracts clauses, and

12 notwithstanding the pension clause, we still have an

13 effective bankruptcy power to implement debt restructurings

14 and debt impairments in cases where there are necessary --

15 where they are necessary.  Nothing about eligibility is

16 dealing with the question that your Honor sensibly asked,

17 which is, "Don't you have to show that a plan is in the best

18 interest of creditors?"  Clearly we do.  Is there anybody

19 going to use Chapter 9 as a method for impairing contracts if

20 they're not in financial extremis?  No, they should not, and,

21 no, they will not.  It is in those circumstances where the

22 federal government comes to the aid of states and

23 municipalities that can't on their own restructure their

24 financial affairs.

25          And by the way, a nice corollary of looking at it

1   this way is that it dovetails precisely with one of your
2   Honor's observations, which is the last word -- I think it's
3   the last word of the relevant sentence of the pensions
4   clause, the words "thereby," which relate back to the state,
5   relate back to the municipality, but don't say that they
6   can't be impaired by anybody, just says the pension --
7   accrued pension benefits cannot be diminished or impaired
8   thereby, "thereby" being the state and the municipality.  So
9   adopting the language and approach in the California case
10  just cited, in the Cardozo dissent joined by the other
11  justices, and in _Bekins_ itself, albeit not quite as
12  precisely, you wind up with federal law that happens to fit
13  nicely with the actual language of the state law with a
14  bankruptcy system that does still work and has not been
15  crippled and made unable to deal with every financial --
16  every municipality in financial distress and a Bankruptcy
17  Code that is constitutional, as _Bekins_ said it was.

18          I don't think I have many more points.  First, I
19  wanted to make clear -- someone mentioned that the city had
20  not in oral argument taken positions on certain points
21  relating to PA 436.  We've been relying and join in the
22  arguments of the attorney general.  I think I dealt with
23  that.  Oh, there was an assertion that the 1963 bankruptcy
24  law was somehow different than the fact that throughout --
25  beginning in the '30s but all the way through '61, '63, all

1   the way up until the Bankruptcy Code made specific
2   authorization unnecessary for awhile, Michigan authorized all
3   of its municipalities to resort to the composition law.  This
4   1963 law still had impairment of contracts as one of its
5   central elements.  In fact, if you look at Bekins, which
6   stands, of course, for many things, Bekins is a case where
7   it's a 60-percent -- it's a 60-cent distribution on account
8   of debt, and it was a mercifully simple case.  There was one
9   class, so we didn't have to deal with discrimination and all
10   those other things.  But Bekins is a debt impairment case.
11   It turned out to be that 86 percent of the creditors by
12   amount approved it, and it's the 14 percent who are
13   complaining.  And so it really isn't fair to say that the
14   bankruptcy laws as they apply to municipalities were vastly
15   different than the laws that -- the laws that are here now.
16   They're probably a little bit more advanced in certain
17   respects, informed by the New York experience, but the idea
18   that contracts between a municipality or obligations of a
19   municipality because very often they're not just in the form
20   of contracts, they're in the form of ordinances, and its
21   creditors can be -- could be -- could have been in 1963 and
22   in 1961 impaired as a matter of federal bankruptcy law.  It's
23   the absence of any mention at all of this issue or problem
24   anywhere in -- specifically in the pensions clause itself,
25   but also in the convention history leads to the conclusion

1  that people weren't thinking or it's hard to find any

2  evidence that anyone was thinking that anything that happened

3  in the structuring of the pensions clause was intended to

4  take Chapter 9 relief away from a municipality, period, in

5  any circumstances.  And we think, again, that even if it did

6  or tried to -- and I think this is important -- even if it

7  did or tried to, the Justice Cardozo, Hughes, Stone, and

8  Brandeis reasoning would say it doesn't matter, that at the

9  end of the day, the -- unless there's an explicit direction

10 not to file Chapter 9, the state can only protect pension

11 claims so much.  They can't protect them ultimately from

12 federal power.

13         I think those are all the points I need to cover.

14 If your Honor has any questions that I could answer --

15         THE COURT:  No.  Thank you.

16         MR. BENNETT:  Thank you.

17         THE COURT:  All right.  Ladies and gentlemen, I

18 promised you one deliverable at the conclusion of these

19 arguments, which was a decision on whether or not there are

20 any genuine issues of material fact that should be addressed

21 at the upcoming trial relating to these issues which I had

22 preliminarily determined were strictly legal issues.  I'm

23 going to take ten more minutes to just think about that.  I

24 think there might actually be one.  So we'll reconvene at

25 2:45.  In the meantime, I want to remind you, please, that

1    when you are in the hallway, you must remain absolutely

2    silent, no talking in the halls.  If you want to talk, you

3    can talk in here or down on the first floor.

4            One other housekeeping matter, which, again, I want

5    to bring up just in case I forget later.  It was requested of

6    the Court permission to have in the courtroom a transcriber

7    to provide -- I guess it's called realtime transcripts, and

8    that's fine with the Court so long as we all understand that

9    that transcript is not the official transcript of the court

10   and may not be used in lieu of what would otherwise be

11   required to be used, the official transcript.  So 2:45 we'll

12   reconvene.

13           THE CLERK:  All rise.  Court is in recess.

14       (Recess at 2:34 p.m., until 2:46 p.m.)

15           THE CLERK:  Court is in session.  Please be seated.

16   Recalling Case Number 13-53846, City of Detroit, Michigan.

17           THE COURT:  Counsel are present.  I want to

18   emphasize again what I think I stated the other day, that the

19   Court certainly will take into account in deciding these

20   issues which I have preliminarily determined are legal issues

21   any facts that come out in the trial that bear upon them.

22   Having said that, though, there is one issue of fact that

23   needs to be identified because the parties do disagree about

24   it, and it might have a bearing on one of these legal issues,

25   and that specific factual issue is what was the purpose of

1   adding the spending provision to PA 436.

2           Anything further for today?  All right.  We will

3   begin our trial at nine o'clock Wednesday morning in this

4   room.  Oh, I urge you to get here early because the security

5   lines are longer at that hour in the morning than they are at

6   the times we've been starting.

7           THE CLERK:  All rise.  Court is adjourned.

8       (Proceedings concluded at 2:48 p.m.)

INDEX

<u>WITNESSES:</u>

None

<u>EXHIBITS:</u>

None

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                           October 23, 2013
_____     _____
Lois Garrett