# EXHIBIT A
# ROUGH TRANSCRIPT
# OCTOBER 23, 2013

ROUGH DRAFT - 10/23/13 - DAY 1

**REALTIME ROUGH DRAFT & CERTIFIED COPY ORDER**

The stenographic notes taken in this proceeding are being translated instantaneously into their English equivalent through an automated process called realtime translation. You may receive this realtime rough draft in printed form, if available, or in ASCII/PDF form on diskette/CD.

The realtime rough draft is unedited and uncertified and may contain untranslated stenographic symbols, an occasional reporter's note, misspelled proper names and/or nonsensical word combinations. All such entries will be corrected on the final certified transcript which we will deliver to you in accordance with our standard delivery terms, or on an expedited basis, should you desire faster delivery.

Due to the need to correct entries prior to certification, you agree to use this realtime draft only for the purpose of augmenting counsel's notes and not to use or cite it in any court proceeding or to distribute it to any other parties.

Also note that this constitutes your order for a certified copy of the transcript.

ROUGH DRAFT - 10/23/13 - DAY 1

COURT CLERK: Case number 1353846, City of Detroit, Michigan.

THE COURT: Good morning. We have an attorney to admit to the bar of the court, Miguel Eaton.

(Eaton sworn)

THE COURT: And we should go ahead and have appearances entered, please.

MR. IRWIN: Good morning, Your Honor, Geoff Erwin, Jones Day, on behalf of the City.

MR. STEWART: Geoffrey Stewart, Jones Day, also on behalf of the City, Your Honor.

MS. LEVINE: Good morning, Your Honor. Sharon Levine. And if I can introduce to the Court, my partner, Jack Sherwood, Lowenstein Sandler, for AFSCME. Thank you.

THE COURT: Welcome, sir.

MR. MONTGOMERY: Good morning, Your Honor. I'm Claude Montgomery, Dentons West, for the retirement committee. And with me in the courtroom today with possible speaking roles are Anthony Ullman, a partner at Dentons and Arthur

Ruegger back there. Thank you, Your Honor.

MR. SCHNEIDER: Good morning, Your Honor. Matthew Schneider, chief legal counsel, Michigan Department of the Attorney General on behalf of the State of Michigan. And with me is Steven Howell, special assistant, Attorney General.

MS. CECCOTTI: Good morning, Your Honor. Babette Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW. I would also like to introduce my partners, Tom Ciantra, sitting here at counsel table, Peter DeChiara over in the corner, both of whom will be speaking retiree predominantly at the trial.

THE COURT: Thank you.

MR. WERTHEIMER: William Wertheimer, Your Honor, on behalf of the Flowers plaintiffs.

MS. GREEN: Good morning. Jennifer Green, on behalf of the General Police and Fire Retirement Systems. And I have with me my colleagues Ron King and Bob Gordon.

THE COURT: I'm sorry?

MS. GREEN: Ronald King and Bob Gordon.

THE COURT: Mr. King. Okay.

MR. MORRIS: Good morning, Your Honor. Thomas Morris of Morris & Silverman on behalf of

the Retiree Association Parties. Also here representing those parties is Ryan Plecha of Lippitt O'Keefe.

MS. PADDOCK: Good morning, Your Honor. Barbara Patek of Erman, Teicher, Miller & Friedman, on behalf of the Detroit Public Safety Unions. And with me this morning are Julie Tisher and David Eisenberg.

MS. BRIMER: Good morning, Your Honor. Lynn M. Brimer, appearing on behalf of the Retired Police Officers Association. Also with me this morning is trial counsel, Meredith Taunt, and Mallory Field, from the firm of Stroebel & Sharp, PC.

THE COURT: Thank you.

MR. BENNETT: Bruce Bennett of Jones Day on behalf of the City, Your Honor.

THE COURT: Okay then. In terms of our order of proceeding this morning, I would first like to deal with the motion in limine and then the three remaining discovery motions, then the joint final pre-trial order and then we will begin the trial. Is that order of proceeding okay with everyone? Okay. Actually, first, dealing with the motion in limine, I'm going to waive further oral

1    argument on that and rely on your papers and
2    conclude as I suggested I might the other day the
3    court must conclude that it is challenging if not
4    difficult if not impossible to resolve this motion
5    before trial and before Mr. Moore is actually
6    testifying.  Before the Court can determine the add
7    admissibility of his proffered testimony, the Court
8    must have before it the question that the proponent
9    of the witness asks of him.
10        So under the circumstances, I will
11   deny the motion, but without prejudice, of
12   course, to the right of any party to object to any
13   of Mr. Moore's testimony on any a appropriate
14   ground.  So let's turn our attention then to the
15   three discovery motions.  Who will argue those.
16        MR. CIANTRA:  I will start off, Your
17   Honor.  Thomas Ciantra, Cohen, Weiss & Simon for
18   the UAW.
19        THE COURT:  All right, sir.
20        MR. CIANTRA:  Your Honor, first I want to
21   thank the Court for its indulgence.  Obviously we
22   have been under a lot of strain and effort to
23   complete discovery in this matter so that the trial
24   can take place on an expedited basis and we
25   appreciate the Court's hearing these issues on an

1    expedited basis.  I'm not going to go over the
2    papers extensively.  The Court has seen the issues
3    and I'm sure has read the papers, but I will make a
4    presentation and its going to be divided basically
5    chronologically.  First part I want to discuss are
6    documents and testimony concerning matters which
7    ant he date the retention of Jones Day or the
8    emergency manager's retention, and then the second
9    part of the argument deals with matters that come
10   after that point in time, and that are really taken
11   up with with our request that the Court revisit the
12   issues that it ruled upon back in September.
13        So let me begin then with the first part,
14   the matters that antedate Jones Day retention.  And
15   the issue has been crystalized by the position that
16   counsel for the City took in the October 15th email
17   that is attached as Exhibit 6D to the UAW's motion
18   papers with respect to the City.  And what it
19   involves are a series of memoranda that Jones Day
20   prepared in 2012, approximately at least a year
21   before the firm was retained to represent the City
22   in this matter, and these emails -- these memoranda
23   are referenced in an email that discusses a meeting
24   between partner Jones Day that had been scheduled
25   with governor Snyder for June 5th, I believe, of

1    2012.  And they're very specific emails, Your
2    Honor.  They're identified there and they go to
3    obviously issues that are at the heart of UAW and
4    other objectors issues that they would raise here,
5    the constitutional protection of the retirees
6    pensions being the most salient.
7        And obviously we are seeking production
8    of those documents as well as anything else that
9    may be being withheld that antedates the retention
10   of Jones Day.
11        Now the City has sort of taken a
12   selective approach with respect to these types of
13   materials.  Obviously Jones Day spent a lot of time
14   and a lot of effort to get itself in a position to
15   impress the state and get hired to represent the
16   City in connection with this case.  There's a very
17   detailed pitch book that we have marked as an
18   exhibit that will be discussed throughout this
19   proceeding.  They have pro dude that, they have
20   withheld these emails.  These memoranda that are
21   attached to the email.  And the principal basis for
22   that decision is the work product doctrine that
23   doctrine.  They have withdrawn attorney-client
24   privilege, they weren't retained by the state at
25   any point, and now they are focusing on work

1    product.
2        And of course going back to first
3    principles, the work product doctrine as it
4    developed is intended to preserve a party's lawyers
5    work on developing the theories and facts of a
6    case.  I mean, this is Hickman v Taylor, the
7    classic example of an attorney who was interviewing
8    witnesses to an accident to assist his clients
9    defense of that case.  That's not what's involved
10   here.  Of course, Jones Day wasn't retained at this
11   date at any point and they weren't retained by the
12   City --
13        THE COURT:  What do you contend was the
14   relevance or would be the relevance of these
15   memoranda in this eligibility trial?
16        MR. CIANTRA:  I think, Your Honor, it
17   gets to the central question of what were the
18   motivations and intent of the decision makers here.
19   We know from discovery and it's going to be crystal
20   clear that the governor and the state were well
21   aware of the constitutional protections that apply
22   to retiree pensions.  They knew that, they were
23   well aware of what the position was with respect to
24   the creditor proposal that the emergency manager
25   made in June.  The following was authorized without

1 any conditions. We all know that. These memos, we
2 believe, will get beyond that, get into the
3 question of the specifics of knowledge, the
4 specifics of the intent of the parties to do that.
5 And that's why we're looking --
6 THE COURT: Doesn't that statement of
7 relevance prove more conclusively perhaps than the
8 City could even on its own that these memoranda are
9 prepared in anticipation of litigation.
10 MR. CIANTRA: They weren't, Your Honor.
11 They were prepared more than a year in advance of
12 any litigation. And by a firm that was not
13 representing anyone. These were like the pitch
14 book. They were prepared to market. To develop
15 theories and to market services. There's no case
16 law that they cite that would support the assertion
17 of work product privilege for documents that are
18 prepared in this context. They have selectively
19 produced the pitch book. It's the same type of
20 material.
21 So for them at this point to demand work
22 product protection with respect to this, we think
23 is just base less. I mean, this is not a case
24 where maybe the memo is prepared, the client comes
25 in to meet with the attorney and reveals

1 confidences and those are protected. We all know
2 that. That's basic attorney-client privilege law.
3 But this is not that situation. This is -- this is
4 their marketing effort to the state to be retained
5 and we think it is not --
6 THE COURT: To be retained for what?
7 MR. CIANTRA: To apparently be retained
8 at some point. Who knows? At that point there was
9 no emergency manager, there obviously was no
10 Chapter 9 case. This is devoid of a litigation
11 context where you could claim work product.
12 They're not representing a party at this point.
13 THE COURT: I'm just struggling with what
14 the relevance of the fact that Jones Day was
15 pitching the governor a year before would be to
16 this eligibility trial if that's all you assert it
17 was.
18 MR. CIANTRA: Well, we know that. We
19 know they were pitching that. That's clear.
20 They've admitted that.
21 THE COURT: My question is relevance.
22 MR. CIANTRA: Well, what's relevant is
23 potentially the doesn't of the documents, which of
24 course which haven't seen. That --
25 THE COURT: To prove what though?

1 MR. CIANTRA: To prove what these people
2 knew and what they were intend together do?
3 THE COURT: Regarding what though.
4 MR. CIANTRA: We think it would be
5 relevant to assess the conduct that we know
6 occurred in 2013.
7 THE COURT: Which was to file this
8 Chapter 9 case.
9 MR. CIANTRA: Which was to authorize the
10 filing in the face of the constitutional
11 protections for the pension benefits.
12 THE COURT: Okay. But doesn't that
13 establish that these memoranda were in anticipation
14 of litigation.
15 MR. CIANTRA: It can't, Your Honor,
16 because of the simple distance in time. They have
17 not provided any indication that the memoranda were
18 demanded by the state, that there was any retention
19 at that point in time. It's an effort like the
20 pitch book, which is a very detailed document, to
21 get work. They spent a thousand hours to get work.
22 That's what law firms do and that's what's involved
23 here. Since we don't have the memos, we have the
24 titles of the memos that are revealed in the email.
25 We don't have them. I can't argue the specific

1 relevance of the content. I would.
2 THE COURT: Do you have any case law that
3 specifically says that pre-retention work by a
4 lawyer cannot be the subject of the work product
5 privilege.
6 MR. CIANTRA: Your Honor, to be honest
7 with you, we have done the research. I haven't
8 been able to find a case that is recognized work
9 product in this instance. The text of the rule
10 talks.
11 THE COURT: But you haven't found any
12 that specifically key nice it either, huh?
13 MR. CIANTRA: But the purpose of work
14 product and the wording of Rule 26 contemplates a
15 representation. It contemplates that the lawyer is
16 working for a client, developing facts, developing
17 theories. It does not contemplate a relationship
18 between parties who never consummated an
19 attorney-client relationship. Of course, Jones Day
20 is not working for the State of Michigan here.
21 That's who these discussions were with. It wasn't
22 with the City of Detroit. It was with the State of
23 Michigan. But as I said, Your Honor, we haven't
24 had access to the memos, I.
25 THE COURT: We know, don't we, that as a

1    matter of law, the attorney-client privilege can
2    extend to preretention discussions, isn't that
3    right?
4          MR. CIANTRA: Well, of course. It can
5    extend -- if the prospective client reveals
6    confidences, but that's not what's involved here.
7    They're not claiming to shield the confidences of
8    the State of Michigan.
9          THE COURT: No, my question went to the
10   next question. If the attorney-client privilege
11   can extend pre-retention, why not the work product
12   doctrine too if it's otherwise in anticipation of
13   litigation?
14        MR. CIANTRA: Well, I think that if there
15   were notes of a meeting that took place where
16   client confidences would be revealed, that would
17   be -- that would be privileged, but I.
18        THE COURT: That's not what we're talking
19   about.
20        MR. CIANTRA: That's not what we're
21   talking about. At least -- I mean, I haven't seen
22   the memos.
23        THE COURT: Let's boil it down to a
24   simple hypo, okay? Client calls up attorney and
25   says I'm thinking of retaining you to pursue this

1    claim I have against a potential defendant. When I
2    interview, I want to know what your strategy will
3    be. They have a further conversation about the
4    facts, the attorney prepares a memo, they have
5    their meeting, client decides to retain that
6    attorney.
7          MR. CIANTRA: Right.
8        THE COURT: Is that memo protected by
9    work product or not?
10        MR. CIANTRA: I don't believe it's
11   protected by work product, I believe parts of it
12   would be protected by attorney-client.
13        THE COURT: But I'm talking about work
14   product. You're talking about work product here,
15   not protected by work product. So the defendant in
16   that case could subpoena that memorandum from that
17   attorney.
18        MR. CIANTRA: Subject to the client
19   confidences that were revealed in it, cannot be --
20   would be attorney client. We're not challenging --
21        THE COURT: But otherwise it's
22   discoverable, disclosable.
23        MR. CIANTRA: Otherwise, yeah, I think it
24   is, until there's a retention. Especially if
25   there's never been a retention, which is the case

1    here. This is something that happened a year
2    before between parties that never had an
3    attorney-client relationship. As I said, Your
4    Honor, we haven't looked at the memos. I don't
5    know what's in them. I would suggest and we would
6    request that the Court consider in camera review of
7    the documents.
8        THE COURT: I think you said six
9    memoranda that are the subject of this dispute.
10        MR. CIANTRA: At this point, that's what
11   it's boiled down to, Your Honor, and we feel that
12   we're entitled to a decision with respect to this
13   that would -- if there's anything else out there
14   that we're not aware of and frankly, Your Honor,
15   there's been a lot of documents that have been
16   produced in a very exigent period of time, we would
17   like --
18        THE COURT: All right. We'll inquire
19   about that.
20        MR. CIANTRA: Okay. Let me turn to the
21   second point. And this concerns the issue that was
22   litigated back in September, September 19th, on the
23   joint --
24        THE COURT: On that one, you need you to
25   begin a response to the City's assertion that this

1    motion is late, untimely.
2        MR. CIANTRA: It is late, Your Honor. It
3    is late.
4        THE COURT: So why should it be
5    considered?
6        MR. CIANTRA: I think it should be
7    considered because of the particular facts and
8    circumstances that are involved here. We -- back
9    in September as this issue was framed, and as the
10   Court ruled, it was rather narrowly focused with
11   respect to the question of authorization. It was
12   the hypothetical that the Court developed to
13   support its reasoning.
14        THE COURT: Right. I recall that.
15        MR. CIANTRA: What has happened since
16   then, and this I think is most clearly brought out
17   in the excerpts from Governor Snyder's deposition,
18   that are attached to both of the motions that UAW
19   filed, is that common interest has moved and
20   morphed well beyond the issue of authorization that
21   was presented in September to basically every
22   element of every material element with respect to
23   the case. The development of the creditors
24   proposal, the discussion of article nine, section
25   24, and its protections here, consideration to be

1   provided to creditors under the proposed plan,
2   consideration to be provided to the pensioners
3   under the proposed plan.  It has just morphed into
4   essentially a cloak with respect to -- excuse me,
5   very dry -- with respect to all of the
6   deliberations involving the emergency manager and
7   the state.
8           And while we concede the City is correct,
9   there is an attorney-client privilege that they
10  have, it should be construed narrowly in light of
11  the public interest that's involved here.  The
12  emergency manager by law is the governing body of
13  the City of Detroit.  He has executive and
14  legislative authority rolled into one.  His actions
15  obviously affect the 700,000 residents of the City,
16  and people have a right, we submit, to know what
17  his deliberations are, how policy is being
18  formulated, and it shouldn't be cloaked under a
19  very broad and we would submit legally unsupported
20  construction of the attorney-client privilege.
21  Discovery has been -- has been curtailed and it has
22  put us in a position where now we are facing trial
23  and we have not been able to, because of the
24  extensive theory of privilege, that the state and
25  the City have adhered to, to develop facts fully in

1   motion vis-a-vis the City.  I did formally join on
2   the papers the motion vis-a-vis the state.
3           I just have two points in addition to
4   what Mr. Ciantra just argued.  One relates to the
5   Snyder deposition, which I participated in, and
6   kind of what it revealed about the scope of the
7   privilege arguments now being made and how far we
8   are from the day in Court where you made it a point
9   of indicating to the state that transparency was
10  necessary here.
11          At the governor's deposition, essentially
12  privilege was invoked as to the entire content of
13  weekly meetings that the governor had with the
14  emergency manager for months as to the entire scope
15  of those meetings.  Making it virtually impossible
16  to examine the governor as to any of that.  That's
17  point number one.  And just one other point, and
18  that is that in the normal case -- let me back up.
19          Per the agreement the parties made and
20  given the position of the governor, we agreed to
21  limit our discovery deposition to three hours.  In
22  the normal case, where privileges are alleged on
23  privilege logs like what we have here, you have an
24  opportunity to go beyond the privilege log and the
25  cursory explanation for why the privilege is being

1   deposition and otherwise.
2           We would submit that the assertion of the
3   privilege that the governor has made and as
4   revealed in the deposition transcripts that that
5   has been taken throughout the discovery is
6   extensive beyond what was considered in the Court's
7   September 19th ruling and we would ask the Court to
8   respectfully to reconsider it.
9           Because otherwise, we have secrecy.  We
10  have public actors here, Your Honor.  The public
11  has to be able to hold political representatives
12  accountable for their actions.  They have to know
13  what policy decisions are being made and right now,
14  this privilege ruling has cloaked -- has cloaked
15  that in secrecy.
16          I don't have anything else, Your Honor,
17  to state.
18          THE COURT:  Thank you.
19          MR. CIANTRA:  I don't know if
20  Mr. Wertheimer has anything he would like to add.
21          THE COURT:  Okay.
22          MR. CIANTRA:  Thank you for your
23  consideration.
24          MR. WERTHEIMER:  William Wertheimer, Your
25  Honor.  First, I would like to join in the UAW's

1   invoked by -- at deposition, asking witnesses
2   questions, detailed yes, sir about the particular
3   meeting at which they're claiming a privilege, what
4   the other subjects were, how long the meeting took,
5   did the lawyer do anything at the meeting, et
6   cetera.  As to key documents.
7           We have not had that opportunity here,
8   just given the time -- and no one is at fault for
9   that, it's going too fast, we had three hours with
10  the governor, we did appropriate examinations, but
11  I think in this circumstance that it would make
12  sense for this Court to examine certain of the
13  documents in camera in order to assure that the
14  Court's desire and everybody's desire for
15  transparency is met.  I think this is a special
16  case.  I don't think.
17          THE COURT:  Are you referring to
18  documents other than these six memoranda attached
19  to the email?
20          MR. WERTHEIMER:  I am, Your Honor.  I'm
21  referring specifically to documents that are in
22  dispute that are in the state's possession.
23          THE COURT:  Can you identify them anymore
24  particularly for me?
25          MR. WERTHEIMER:  We've attempted to

1     identify them to the state by indicating in logs,
2     documents that covered what we believed to be a key
3     time period was, we've also attempted to limit the
4     request in terms of those in which Mr. Orr and
5     Mr. Snyder were directly involved, but I must admit
6     to the Court, it still involves at least at this
7     point in terms of our back and forth a fairly large
8     number of documents that I would respectfully
9     suggest that the best way to proceed given the fact
10     that the governor is going to be testifying on
11     Monday at trial, the best way to proceed maybe for
12     the Court to get involved in terms of in camera
13     review.
14     THE COURT: And these are documents which
15     you claim were improperly withheld pursuant to the
16     common interest exception?
17     MR. WERTHEIMER: Not just common
18     interest, Your Honor, also just documents where
19     they claimed attorney-client. And we're not
20     claiming -- we don't know whether they're
21     improperly withheld, I guess is what I'm trying to
22     say. We're claiming.
23     THE COURT: You're concerned. Okay.
24     MR. WERTHEIMER: That we should not have
25     to rely upon the cursory description of counsel

1     given.
2     THE COURT: But in order for me to exceed
3     to your request to look at documents, we have to
4     have identified what documents you want me to look
5     at and what documents you want the City or governor
6     or the state excuse me to produce.
7     MR. WERTHEIMER: I agree, Your Honor.
8     And what I'm suggesting is we did make such an
9     effort on a preliminary basis with the state in
10     trying to resolve it, but I'm acknowledging that
11     that effort would still -- if we stopped there
12     would still leave Your Honor with a large number of
13     documents. We could continue that effort, I agree
14     that that would be necessary, but I still think
15     that it calls for in camera review of relevant
16     documents or potentially relevant documents. And
17     we're happy to work with the state to try and limit
18     what that -- what the documents would be?
19     THE COURT: When are you going to do that
20     given we're in trial all day today, tomorrow and
21     Friday.
22     MR. WERTHEIMER: Well, if we can't, we
23     can't, and then I would suggest to the Court that
24     the limitation which we did communicate to the
25     state should be the one the state should use or

1     that we should use, and as I recall, there were at
2     least two attempts to limit the documents, one
3     related to time, that is, we said we think that the
4     judge should be able to take an in camera look at
5     documents between key players from date A to date
6     B. and I don't have in front of me exactly what
7     those dates were.
8     And second, we indicated that the
9     documents directly between the governor and the
10     emergency manager over a broader period of time
11     should be the subject of in camera review. If
12     there's no time to do anything else, our position
13     would be that the Court should examine those
14     documents in camera.
15     THE COURT: All right. Thank you, sir.
16     MR. WERTHEIMER: Yes, Your Honor.
17     THE COURT: While you're sitting down, I
18     would suggest you try to figure out what those
19     dates are. That would be helpful.
20     MR. WERTHEIMER: Yes, Your Honor.
21     MR. SCHNEIDER: Your Honor, Matthew
22     Snyder on behalf of the state. Mr. Wertheimer has
23     raised some issues that relate to this and also to
24     the other motion, so in expediency, I can kind of
25     respond to both.

1     The first issue here that Mr. Wertheimer
2     or the UAW and Flowers objectors raised relates to
3     a March 12 email and the objection was that it
4     should have opinion produced without redactions.
5     Now the state disagrees, but we want to
6     resolve this dispute. And we have produced that
7     any way. So we're not waiving the attorney-client
8     privilege or altering the common interest agreement
9     or anything by doing that, but I wanted to let know
10     at least one issue has been resolved.
11     Secondly --
12     THE COURT: When you say has been
13     resolved, you say you have or are willing to turn
14     over the memos.
15     MR. SCHNEIDER: We have. Is. This is
16     related to the March 12 email.
17     THE COURT: March 12.
18     MR. SCHNEIDER: An email from
19     Richard bare to.
20     THE COURT: 2012.
21     MR. SCHNEIDER: 2013.
22     THE COURT: Okay.
23     MR. SCHNEIDER: Secondly, there's another
24     argument that the state hasn't been specific on its
25     privilege log and I think that's why this is kind

1    of bleeding together.  Again, the state disagrees,
2    we think the logs are sufficient, but we've advised
3    these anyway and we're giving them to
4    Mr. Wertheimer.  Again, we're not waiving anything
5    but we want to let the Court know that we are
6    working with them and are happy to do so.
7              But finally, third --
8              THE COURT:  It is a little frustrating
9    that your log didn't provide any identifying
10   information involving the people involved other
11   than their names.
12             MR. SCHNEIDER:  Well, we've corrected
13   that.
14             THE COURT:  Where?  How.
15             MR. SCHNEIDER:  Well, Mr. Wertheimer
16   asked for additional information, more specific on
17   the privilege log, and I believe we've done that.
18             THE COURT:  In the log itself, because we
19   looked at the revised log, at least I did, and all
20   I saw were names.  Now it's possible I missed a
21   page where the names were identified, whether
22   attorneys or officers of the state or associated
23   with the emergency manager, I couldn't tell who was
24   who.
25             MR. SCHNEIDER:  My understanding is

1    there's more description about what actually is in
2    there, but I will continue to work with
3    Mr. Wertheimer on this so as to not delay.
4              The third issue here is relating to the
5    common interest agreement and I think that's where
6    the Flowers and UAW objectors are really going
7    here.  The state's position ultimately at the end
8    of the day, the state's position is that your
9    order, Your Honor, that you entered on September 19
10   was corrects and we believe that it was correct
11   then and it's correct today.  And the new position
12   that the objectors are raising is essentially that
13   there's no common interest privilege before the
14   filing.  This is, as the Court is aware, this has
15   been brought to your attention literally, literally
16   on the eve of trial.  There was a deposition in
17   which the Court invited the parties to contact the
18   Court in case there were concerns.  They never did
19   that.  They never raised a written objection after
20   the deposition.  It's beyond the 14 day rule and
21   there's no defect or no error shown, so I think
22   there's a waiver here.  And therefore, it should be
23   denied on that ground.
24             In addition, the common interest
25   agreement here, as to the argument that the

1    objectors are trying to find information that
2    antedate the appointment of the emergency manager,
3    if you look at the common interest agreement
4    itself, it states that this isn't just about the
5    appointment of the emergency manager, it states
6    that the parties have a common interest in relation
7    to the City's financial emergency and the
8    bankruptcy case and the emergency manager, so this
9    goes to a lot more than just the chapter nine
10   filing.  It goes to the financial emergency and
11   things in connection with the policy issues and the
12   legal discussions related to that.  Thank you.
13             THE COURT:  Thank you.
14             MR. IRWIN:  Thank you, your.  I will
15   address the motion to compel Jones Day and then the
16   motion for reconsideration.
17             The request that has been made as it
18   relates to core Jones Day internal research
19   memoranda, it seems to us, is antithetical to the
20   work product privilege and we think the Court's
21   analogy is exactly right.  If a client prepares a
22   legal -- if a lawyer prepares a legal memoranda to
23   assist him or her or a team of lawyers in order to
24   deliver legal advice to a potential client, a
25   client or potential client, even before there is an

1    attorney-client relationship, that is wholly
2    protected by work product.  If it reflects the
3    attorney's mental impressions and it puts him or
4    her in a position where they can deliver
5    appropriate legal advice, and it shouldn't matter
6    if that attorney-client relationship is ultimately
7    consummated or not.  It is an inviolable attorney
8    work product that is belongs to the lawyer who
9    prepared it and puts them in a position where they
10   can effectively do their jobs and deliver legal
11   advice.
12             Now what happened in this particular
13   case, just to put a finer point on it, is I think
14   not the subject of any real debate.  Everyone knew
15   that Detroit was in trouble in late 2011 and that
16   there were people working this problem and that
17   included people from the state, it included people
18   from the City, it included numerous advisors and
19   consultants, it involved numerous law firms, and
20   there were lots of people who wanted to get
21   involved and Jones Day had the opportunity to do
22   just that, and we.
23             THE COURT:  So why doesn't it matter that
24   the work product was for the state, for the
25   governor -- state officials, and the ultimate

1    client wound up being none of those, but the City?

2         MR. IRWIN:  Well, I think it was all part

3    of the same problem.  I think the entity that had

4    the problem here was the City and I think the law

5    firms like Jones Day and I think the papers that we

6    submit support that, were hoping and expecting to

7    be retained and engaged by the City, and it's

8    not -- it shouldn't surprise anyone that Jones Day

9    would have been doing legal research in order to

10   put itself in a position to assist the City in that

11   regard, and so it really didn't matter which of the

12   entities was -- not engaging in the sense of an

13   attorney-client representation, but was discussing

14   these matters with Jones Day.  Jones Day had to put

15   itself in a position where it was able to represent

16   the City effectively and in order to do that, it

17   had to investigate this entire situation.  There

18   was a legal analysis that you would expect to have

19   been done on a number of levels and we have

20   memoranda that came about as a result and if?

21        THE COURT:  But what's the foundational

22   basis for the work product privilege that shields

23   otherwise relevant facts from discovery and

24   suggests that that basis should apply to memoranda

25   such as you claim privilege for here.

1         MR. IRWIN:  Well, if they're prepared in

2    anticipation of litigation, and as we've indicated

3    in the papers, that's a broad standard.  You don't

4    have to anticipate a specific piece of litigation.

5    You can anticipate litigation broadly.  You can

6    anticipate that this is a City and financial crisis

7    and that they are going to need assistance moving

8    forward.  It might take the path of a Chapter 9, it

9    might not, it might take the form of numerous

10   previous lawsuits against individual stakeholders

11   in all of this, and a law firm has to be able to

12   explore those various options to put itself in a

13   position where it can ably represent the ultimate

14   client here, which turned out to be the City.  But

15   we also -- Your Honor, the -- we're having a hard

16   time understanding the relevance here of the

17   memoranda as well.  We are happy to provide them to

18   the Court in camera.  If the Court would like to

19   see the memoranda, we have the memoranda, we can

20   easily provide them and the Court could determine

21   for itself if in fact it finds these memoranda

22   either surprising or relevant in some way.

23        And what we have done here, Your Honor,

24   is we've proposed a structure or a framework that I

25   would submit is reasonably conservative under the

1    circumstances in terms of the number of privileges

2    and the nature of privileges that we could assert.

3    What we have done here is we have in fact already

4    released many of the emails that reflect

5    conversations between Jones Day lawyers and the

6    folks in 2012 who were working this problem.  This

7    again is before there was any attorney-client

8    relationship with anyone.  We've released those and

9    we're not claiming those back.  What we're seeking

10   to an order from the Court is to protect our wholly

11   internal memoranda or internal deliberations which.

12        THE COURT:  Well, when you say wholly

13   internal.

14        MR. IRWIN:  Yes?

15        THE COURT:  Do you mean that these

16   memoranda were not shared even with with the state

17   officials.

18        MR. IRWIN:  We will make that

19   determination but we believe there are memoranda at

20   issue here that were not shared with anyone from

21   the state.  So we are asking to be able to hold our

22   internal research memoranda, even though work

23   product would protect that, the work product,

24   because there's no waiver of work product unlike

25   attorney-client, as long as you share it with

1    someone who is in a non adversarial -- you share it

2    in a non adversarial way.  It's not like

3    attorney-client in that regard.  We believe that we

4    would still have work product protection over those

5    materials and so we're asking for the Jones Day

6    research materials and the Jones Day internal

7    conversations about how to proceed here and how to

8    deliver advice should be protected.  Now there

9    comes a point in time later in 2012 when a specific

10   client opportunity presents itself in terms of

11   being hired by the City in the form of this RFP

12   process and the public documents that the pitch

13   material that is in the record already and that we

14   are not seeking to disclose, but insofar as

15   documents relating.

16        THE COURT:  You mean not seeking not to

17   disclose.

18        MR. IRWIN:  I'm sorry, Your Honor, yes.

19   It's in the record right now.  We are not seeking

20   to claw back or anything like that.  That's not an

21   issue here.  But we are -- we do believe that as

22   the Court referenced, because preengagement

23   conversations between a lawyer and a potential

24   client are still protected by the attorney-client

25   privilege, we are seeking -- we are seeking

33

1    protection for those communications, communications
2    out bound communications from Jones Day in the
3    retention period where we are receiving
4    confidential information and acting upon it, we do
5    think at that period of time, attorney-client
6    protection would attach as well as attorney work
7    product, but in the 2012 time period, which is what
8    the UAW motion is directed towards, we are simply
9    asserting work product for the Jones Day legal
10   research that was conducted to put our self in a
11   position to ultimately be hired and to assist the
12   City.
13           THE COURT:  Are you telling the Court you
14   don't have any objection to disclosing and don't
15   claim work product privilege as to any memoranda
16   that was shared with one or more state officials?
17           MR. IRWIN:  That's right.
18           THE COURT:  And have you already turned
19   over all such memoranda and communications that
20   were given to state officials?
21           MR. IRWIN:  The communication -- no, the
22   answer is no, but we are prepared to do that.  We
23   are not standing on that.
24           THE COURT:  Okay.  Thank you, sir.
25           MR. IRWIN:  Yeah.  Does the Court wish to

34

1    hear on the motion for reconsideration?  We.
2            THE COURT:  Yes, yes, I do.  If you would
3    like to address that, I would like to hear from you
4    of course.
5            MR. IRWIN:  I would, Your Honor.  As we
6    indicated, we think this is late.  There is no --
7    there's nothing in the papers that have been
8    submitted that indicate a good reason for reopening
9    this.  There is no palpable dealing in the ruling
10   and there's no new evidence.  Despite the fact they
11   occur in the same motion, there is no linking of
12   these two issues and so there's therefore no good
13   reason and I haven't heard one offered as to why
14   this matter should be reopened.  And the parties
15   have in fact been relying on this ruling in
16   connection with all of the discovery proceedings
17   that have taken place since then.  We think the
18   ruling was sound, the objectors have not indicated
19   why there is any reason to disturb the Court's a
20   analogy of a board of directors and corporation
21   counsel and the fact that they should be permitted
22   and need to talk to each other in order to reach a
23   sound conclusion as to whether to do something like
24   file for bankruptcy.  We think that's an analogous
25   here, that the governor and his legal team and the

35

1    emergency manager and his legal team need to be
2    able to talk, they need to be able to talk in
3    confidence with regard to the common interest,
4    which again, is counsel to what -- contrary to what
5    we heard, broader than simply a Chapter 9 filing.
6    The common interest related to the stays
7    financial -- the City's financial crisis more
8    broadly and the right legal path forward, and
9    insofar as the communications related to a legal
10   path forward, that privilege was properly invoked.
11   And I do recall at Court -- I read, I was not here,
12   but I understand that the Court made itself
13   available to the parties if in fact there were
14   specific questions.  Because it's very difficult to
15   know exactly what form these questions will take in
16   making a ruling.  Answered believe the Court
17   offered its services to the parties if in fact
18   there was any impasse at the depositions, and why
19   believe any objectors took advantage of that.  And
20   so we believe that under the circumstances, given
21   that the ruling was fundamentally correct, that
22   there was no attempt at the time to seek further
23   Court intervention and that we have been relying on
24   these rulings going forward, that there is no
25   reason to overturn them at this time.

36

1            THE COURT:  Thank you, sir.  Brief
2    rebuttal?
3            MR. CIANTRA:  Just very briefly, Your
4    Honor.  I just want to draw the Court's attention
5    to a couple of matters.  First, with respect to the
6    Jones Day memos, to the extent the Court determines
7    to review the memoranda in camera, I would request
8    that the Court also review the cover email that
9    enclosed the memoranda, and I'm not --
10           THE COURT:  An email from who to whom?
11           MR. CIANTRA:  This was an email from
12   Heather Lennox of Jones Day to certain of her
13   partners at Jones Day that references the meeting
14   with the governor.  And I am not going to read the
15   email because they have claimed in the October 15th
16   correspondence to myself that it's privileged, but
17   it goes to the -- I think goes to the issue that
18   the Court was addressing with respect to.
19           THE COURT:  So these memoranda are
20   internal in the sense that they were not shared
21   with any officials or the state of the City.
22           MR. CIANTRA:  It is unclear to me that
23   that can be said with any degree of assurance, and
24   it seems entirely --
25           THE COURT:  But Mr. Irwin states it here

1    on the record.  Do we doubt it?

2           MR. CIANTRA:  I did not hear that.  I did

3    not hear him say definitively that those memos were

4    not shared with anyone at the state.

5           THE COURT:  Let's ask to be sure.

6    Mr. Irwin?

7           MR. IRWIN:  I will investigate -- that's

8    part of what we're saying.  We will investigate

9    that and we will have a clear answer.

10         THE COURT:  There you go.

11         MR. CIANTRA:  So we don't have a clear

12    answer.  But I would suggest if the Court reviews

13    the email that they are claiming privilege with

14    respect to, the conclusion can be drawn that the

15    substance of those memos was surely shared in that

16    meeting.  And it would seem at a minimum that would

17    arguably constitute a waiver along with the

18    production of the pitch materials which go into

19    considerable detail with respect to the legal

20    theories that were involved here.

21         THE COURT:  All right.

22         MR. CIANTRA:  The second issue, just

23    brief clarification with respect to the privilege

24    logs.  We filed -- we requested that the state

25    supplement the privilege logs and that is in the

1    correspondence that is attached to the motion that

2    we filed with respect to the state because there

3    was no specification in certain cases of who was

4    involved in the communications, who authored them,

5    who received them, or the subject matter of many --

6    of all of the communications, so we had no way to

7    assess the assertion of privilege based on the

8    logs.

9         In response to that correspondence, they

10    revised the logs, so this is what the Court

11    referred to, but we only received those within the

12    past day or two.

13         THE COURT:  Right, I know.

14         MR. CIANTRA:  So we haven't had the

15    opportunity to, you know, line that up.

16         THE COURT:  Right.

17         MR. CIANTRA:  But I just wanted the

18    record to be clear with respect to that.

19         THE COURT:  I appreciate that very much.

20         MR. CIANTRA:  Obviously with respect to

21    having not filed this within 14 days, Your Honor,

22    obviously the discovery here was enfolding well

23    past the deadline for the production and we have

24    not -- we've done the best we could.  This was not

25    an intentional delay on our part.  As these issues

1    developed, it became clear to us that the scope of

2    what was being withheld, we felt was inconsistent

3    with what the Court had permitted.

4         THE COURT:  All right.  I'm going to take

5    this under advisement until 10:00 o'clock and I

6    will give you a decision then.

7         COURT CLERK:  All rise.

8         (Whereupon a break was taken

9         from 9:49 a.m. to 10:00 a.m.)

10         COURT CLERK:  Court is in session.

11    Please be seated.  Recalling case number 1353846.

12         MS. GREEN:  Good morning, Your Honor.  I

13    apologize, I think there was some shuffle --

14         THE COURT:  I was actually going to hear

15    it after, but if you would like to be heard now

16    that's fine.

17         MS. GREEN:  You know, it dovetailed with

18    what they were arguing, so I had a few points.

19         THE COURT:  Okay.  Go ahead.

20         MS. GREEN:  The first thing I wanted to

21    add is that at the time we drafted our motion, we

22    thought that the June 5, 2012, email was being

23    reasserted as privileged.

24         Mr. Irwin in his argument this morning

25    that they are not -- they are now waiving privilege

1    to that.  It is back in the record.  So to clarify,

2    the email does say that the memos were shared with

3    the Treasurer.  It says they were memos we did for

4    Andy.  I presume that means they were shared with

5    him.  I don't know if that's actually true or not,

6    but the memo does seem to indicate they were shared

7    with a third party.

8         As far as the work product analysis, in

9    our brief we went through the relevant standard,

10    Sixth Circuit, Your Honor.  I don't believe we

11    talked about that today.

12         There is a two-part of the test.  The

13    first part is whether prepared quote because of the

14    parties subjective anticipation of litigation as

15    contrasted with ordinary business purpose, and two,

16    whether that subjective anticipation was

17    objectively reasonable, and furthermore, the

18    drawing force of preparation of the document is

19    what is key, and we assert that the "because of"

20    part fails.  They did it because of the fact they

21    were trying to prepare themselves for the prospect

22    of being hired, not because of the fact that there

23    was actually anticipated litigation.

24         And moreover, it's very attenuated that

25    in 2011, they had some kind of crystal ball that

1  they knew two years from now they knew they were
2  going to be arguing about eligibility under
3  Chapter 9.  And we did cite case law in our brief.
4  You asked counsel this morning if there was any
5  case law regarding some type of temporal factor and
6  we cited two cases.  One, states the mere fact that
7  litigation does eventy ensue does not buy their
8  cloak materials with work product immunity.  So
9  between that and the next case that we cited, the
10  abstract possibility that an event might be the
11  subject of future litigation will not support the
12  claim of privilege.  I think those are dispositive.
13  This was two years before any of this even arose.
14          Furthermore, I think that goes to whether
15  or not the anticipation of litigation could be
16  objectively reasonable.  I don't know how two years
17  prior to the litigation it could be objectively
18  reasonable that number one, PA4 still had to get
19  past the Referendum N2, it was ten months before
20  the EM was hired even if you assume these were
21  prepared in June of 2012 when the memos were shared
22  with the governor, with Andy Dillon.  They may have
23  been prepared prior to that, we don't know.  More
24  over, the EM had to be a pointed, PA436 had to
25  become affected testify.  All of these things had

1  to to happen before we could be here today and
2  Jones Day had to be retained, so there from were at
3  least five or six major contingency that had to
4  occur before the actual litigation would ensue.
5          Furthermore, even if they can't establish
6  the work product, which we don't think they can,
7  they still have to overcome the waiver issue.  And
8  I don't -- I think that today is a further example
9  that they have she can actively waived.  They
10  waived the memo itself, but not the attachments.
11  Today, the state stood up and said, you know, we
12  have an email from March 3, 2013, between Kevyn
13  Orr, there are two attorneys on it from the State
14  of Michigan, but to be cooperative, we will give
15  you that email.  Well, if they're saying it's
16  privileged but they're giving it to us to me,
17  again, that's a selective waiver.  They just give
18  because they want when they want it but they keep
19  what they want as well.  And I don't see how they
20  get past that.
21          In addition, my last point would be it's
22  still not clear who the client is that Jones Day is
23  claiming they've been representing.  No City
24  official torques my knowledge through any of my
25  review of these documents or the emails, there's

1  not saying the City official that has ever CC'd,
2  BCC'd, sent the memos, it's purely between Jones
3  Day attorneys, Miller Buckfire, here on consulting,
4  all of these advisors that, again, when I think it
5  comes to waiver, clearly these are third parties
6  and not the potential client.
7          The last point I will make because I want
8  to be brief, I know you were ready to rule, I
9  think, is that I think the wrong standard was
10  stated earlier by the City.  He said that there's a
11  different standard for waiver of the
12  attorney-client privilege versus work product.  And
13  that is not true in the Sixth Circuit.  We cited
14  two cases in our brief.  First one is New Phoenix
15  Sunrise and it says both the attorney-client
16  privilege and work product protection are waived by
17  voluntary disclosure of private communications to
18  third parties.  We also cite the In Re: Columbia
19  case --
20          THE COURT:  I'm sorry, are waived by?
21          MS. GREEN:  Disclosure of private
22  communications to third parties.  And he had said
23  that some sort of different standard applied when
24  it was work product versus attorney-client and we
25  also cited the In Re: Columbia case that says the

1  same thing.  There's no compelling reason for
2  differentiating waiver work product from waiver of
3  the attorney-client work privilege, so to me, it's
4  a distinction without a difference to say well, we
5  gave it to -- and I think the quote he said a
6  minute ago was numerous consultants and advisors as
7  well as the state.  And to me, that is disclosing
8  to to third parties.  Therefore, it was waived when
9  it was created a year or two ago, not to mention
10  the fact that it's part of this litigation, they
11  have selectively waived certain emails that
12  somewhat have to do with this subject matter in
13  that they relate to for instance, reviewing the
14  consent agreement or reviewing and commenting on
15  PA4, and the analysis related to PA4.  And we cited
16  case law in our brief stating that if you waive the
17  privilege on selected pieces, you therefore waive
18  it as to the entire subject matter and therefore
19  you can't select actively say you can have the
20  email but you can't have the attachments or you can
21  have this email, but you can't have this email.  So
22  we would say that the entire privilege has been
23  waived by selectively waiving it as to a few emails
24  here and there.
25          Those are my comments.  Thank you.

1    THE COURT:  Thank you.
2    MR. IRWIN:  I'll simply respond to those
3 few points that counsel made.  The first, in
4 connection with whether the timing of all of this
5 should make a difference, I would submit that that
6 is arbitrary.  There are lots of things that could
7 have happened in the middle of 2012 that would have
8 been litigation events, maybe they didn't, but that
9 doesn't mean that at the time that all of this was
10 being considered, when legal advice or when Jones
11 Day was considering some of these issues they
12 weren't anticipating litigation.
13    It is fortuitous that this happened two
14 years later, actually, a year and a half later or
15 one year later, but that doesn't mean that either
16 potential clients or Jones Day were not working in
17 anticipation of litigation which as we indicate in
18 addition our brief does not need to be a specific
19 litigation event.  You can anticipate litigation
20 broadly, you never know what form it will take, you
21 know there are going to be fights, you know there
22 will be disputes, you don't know if it will be a
23 private lawsuits, you don't know if it will be a
24 Chapter nine filing, but you can anticipate the
25 need for legal advice in an adversarial proceeding

1 in some form and meet the standard.
2    In terms of whether there's been
3 selective waiver or subject matter waiver as
4 counsel suggests, this is, I think, fundamentally
5 incorrect.  The standard for subject matter waiver
6 is whether documents have been disclosed -- it's
7 the shield and sword problem.  If documents have
8 been disclosed and counsel intends to rely on them
9 affirmatively, yet withholds the balance of the
10 documents that in fairness should be considered,
11 and I think this is codified pretty clearly in the
12 advisory committee notes to federal rule 502, where
13 they say thus subject matter waiver is limited to
14 situations in which a party intentionally puts
15 protected information into the litigation in a
16 selective misleading and unfair manner.  Under both
17 rules a party that makes a selective misleading
18 presentation that is unfair to the adversarial
19 opens itself to a more complete and accurate
20 presentation.  We the City are not using any of
21 these materials affirmatively.  They are not on our
22 exhibit lists, we are not introducing them through
23 witnesses, we are not using them to our advantage
24 that should open us to some sort of claim of
25 subject matter waiver or selective disclosure under

1 the rules.  And then lastly, I think fundamentally
2 there is and I believe this is black letter law,
3 there are different standards for whether there is
4 waiver by disclosure under attorney work product as
5 opposed to attorney-client.
6    If you would disclose attorney-client
7 communications to a third party, you are much more
8 likely to be deemed to have waived that privilege,
9 but with attorney work product, you can make
10 disclosures, and as long as they are disclosures to
11 parties who are non-adversarial, then you can still
12 enjoy that protection.  And that is a fundamental
13 difference between the two privileges, it is not
14 something where they are -- where disclosures to
15 folks who are within the potential group of clients
16 or advisors who are working these problems operates
17 to waive the privilege and I think we've
18 demonstrated that, Your Honor.
19    THE COURT:  I want to be sure the record
20 accurately reflects your position regarding what's
21 to be disclosed and what isn't.
22    Is it correct that to the extent any of
23 these memoranda that were attached to this
24 June 2012 email from Ms. Lennox were disclosed to
25 state officials, you are willing to make them

1 available to counsel here.
2    MR. IRWIN:  Yes, Your Honor.  But the
3 email itself suggests that -- if memoranda was
4 prepared to prepare a Jones Day lawyer for a
5 meeting with counsel, that would not be -- that's
6 not my understanding of what we're talking about.
7    THE COURT:  Okay.  But you don't know
8 which of the several memoranda were shared and
9 which weren't?
10    MR. IRWIN:  And we'll do that.
11    THE COURT:  How will you determine that?
12    MR. IRWIN:  Because the Jones Day lawyers
13 are accessible and we can figure that out.
14    THE COURT:  All right.  Thank you.
15    MS. GREEN:  Brief rebuttal?
16    THE COURT:  Yes, of course.
17    MS. GREEN:  I think the hypo that you
18 stated earlier compared to what he just said, you
19 know, these were memos preparing a Jones Day lawyer
20 to go seek work is different than the hypo that you
21 stated earlier which was you meet with a client who
22 wants to meet with you for the purpose of retaining
23 you and you may make notes.  That's different to me
24 than I did memos to prepare myself to go pitch a
25 client.  To me, those are two different scenarios.

1 And there's a distinction, I think, between did the
2 state ask for this work or was Jones Day just doing
3 it internally again to prepare. I think it's two
4 distinct scenarios.
5 One other thing that occurred yesterday,
6 you made a note on the record about PA4 and that
7 perhaps the intent behind the appropriation, the
8 inclusion of the appropriation was a factual issue
9 for this trial and I think that some of the email
10 correspondence may go to that issue, quite frankly,
11 because the PA4 appropriation was extensively
12 discussed in some of these emails and for that
13 reason, I think there is a possibility that it
14 would become relevant to a separate issue than what
15 Mr. Ciantra stated this morning, which was the good
16 faith and the bad faith issues and things like
17 that.
18 The last thing I would offer is our
19 exhibits 31 through 65 have a lot of the email
20 correspondence that has been produced by the City
21 and there is a lot of, I guess, internal what they
22 would consider their internal work product in those
23 emails. I don't concede it's work product, but
24 according to what they are defining as work
25 product, it's in those emails and it's already been

1 produced and it's been waived. So if would you
2 like to look at those emails to sort of familiarize
3 yourself with what we're talking about, I have
4 produced a copy of our binder for your clerk this
5 morning if it would you like to look at those.
6 Thank you, Your Honor.
7 THE COURT: All right.
8 MS. BRIMER: Your Honor, I'll be very
9 brief.
10 THE COURT: Why should I hear you?
11 You're not a party to these motions.
12 MS. BRIMER: I understand, Your Honor. I
13 want to clarify one matter on the record that
14 Ms. Green made.
15 THE COURT: I will let you clarify a
16 statement on the record, but I can't let you argue
17 on one side or the other of these motions.
18 MS. BRIMER: That's fine, Your Honor.
19 And Ms. Green raised the issue of your
20 ruling on Monday with respect to the intent of the
21 appropriation in PA4 and I want to be sure the
22 record is very clear that it's the appropriation in
23 PA436 that Your Honor ruled may be a factual issue
24 that prior to that was not considered a factual
25 issue. I want to be sure the record is very clear

1 on that, which law we are addressing, Your Honor.
2 It may have an impact on the memos.
3 THE COURT: Thank you, I guess.
4 All right. On the first issue, the
5 motion for consideration of the Court's previous
6 ruling on the common interest doctrine, the Court
7 concludes that the record does not establish cause
8 to consider that motion out of time and accordingly
9 for that reason alone, the motion is denied.
10 But having said that, I want the record
11 to be clear and the parties to understand that to
12 the, tent a question is asked of a witness and
13 either witness or counsel on behalf of witness's
14 behalf claims attorney-client privilege and asserts
15 the common interest doctrine or any other privilege
16 for that matter, the Court will take a fresh look
17 at that and consider counsel's arguments relating
18 to that.
19 On the motions to compel, the Court
20 appreciates the City's willingness to disclose to
21 counsel for the objecting parties whatever
22 memoranda it shared the City's counsel, Jones Day,
23 shared with state officials and would request that
24 that disclosure be accomplished as promptly as
25 possible.

1 To the extent, however, that the moving
2 parties seek a ruling from the Court that the mere
3 fact that memoranda or other documents that would
4 otherwise be protected by the work product doctrine
5 were prepared pre-retention means that they are not
6 protected by that doctrine, the Court must reject
7 and overrule that position.
8 Accordingly, to the extent that the City
9 is maintaining this privilege as to any of these
10 memoranda that were attached to Ms. Lennox email or
11 any other memoranda for that matter, the Court will
12 look at them in camera and ask the City to produce
13 them for that purpose again as promptly as
14 possible.
15 As to the documents that Mr. Wertheimer
16 suggests were improperly withheld in discovery,
17 this parents a more challenging request if only
18 because the documents that are the subject of
19 Mr. Wertheimer's request are not identified. And
20 so Mr. Wertheimer, all can I do in that regard is
21 ask you to identify, again, as promptly as
22 possible, what documents or range of documents you
23 seek the City to be compelled to disclose, review
24 that with the City and to the extent you can't work
25 it out, we will take a break from our trial

1 whenever you are ready and work our way through it.
2         MR. WERTHEIMER: Yes, Your Honor. I
3 believe you meant the state.
4         THE COURT: The state. I did. Thank
5 you.
6         MR. WERTHEIMER: Yes. Thank you, Your
7 Honor.
8         THE COURT: All right. So are there any
9 other issues still open before we begin our opening
10 statements?
11         MR. SCHNEIDER: Your Honor, there is one
12 and that is because there has been discussion about
13 the trial subpoenas that were issued to the
14 governor, the Treasurer, Mr. Baird and Mr. Ryan.
15 Last time I appeared before you, I argued -- I
16 opposed that. I want the Court to know I am not
17 going to file a motion to quash.
18      The Governor, in the spirit of
19 cooperation and because he wants to move this
20 proceeding along, is willing to testify and we
21 have -- we will make all of those state witnesses
22 available and we believe that Monday between one
23 p.m. and three p.m., the Governor would be
24 available and we think the other witnesses -- well,
25 the other witnesses will be available on Monday or

1 Tuesday.
2         THE COURT: Thank you.
3         MR. DeCHIARA: Good morning, Your Honor.
4 Peter DeChiara, from the law firm of Cohen, Weiss &
5 Simon for the UAW.
6      The UAW and the Flowers plaintiffs
7 appreciates the State's decision to change its
8 position and to produce the state witnesses. We
9 just want to be careful to note for the record that
10 there's been no agreement that there should be any
11 set time for the testimony of the state witnesses,
12 including the Governor.
13      While we realize the Governor has a busy
14 schedule, it is also our view that the Governor
15 perhaps with the exception of Mr. Orr's may be the
16 most important witness in this case, and given the
17 significance of his testimony and given the
18 significance of the fact that there may be
19 documents, we may have to examine him on, which we
20 have not yet seen, we would just want to note for
21 the record that there's been no agreement that his
22 testimony would be limited to two hours. Thank
23 you.
24         THE COURT: Thank you. Mr. Schneider?
25         MR. SCHNEIDER: As of this point, Your

1 Honor, I fail to see the reason for the objectors
2 argument that the government would require to
3 testify for a lengthy period of time. This Court
4 is well aware of the Governor's situation and who
5 he is in the state. He is willing to do this, but
6 I think we will have to work with the objectors as
7 to timing.
8         THE COURT: Well, I would certainly
9 encourage that, but it's not for a witness who
10 appears in any Court to condition his appearance on
11 a specific time limit.
12         MR. SCHNEIDER: He's certainly not doing
13 that.
14         THE COURT: The UAW certainly interpreted
15 it that way, and frankly, I did, too.
16         MR. SCHNEIDER: Well, I'm sorry about
17 that, Your Honor, but I can tell you, as I
18 indicated before, the Governor wants to be as
19 cooperative as possible.
20         THE COURT: All right. Good. Thank you.
21      All right. We do have to get to the
22 issue of the amended joint final pre-trial order.
23 If.
24      I read it correctly, one or more of the
25 objecting parties decided after our final pre-trial

1 conference to object to a certain small number of
2 exhibits and the state was -- excuse me, the City
3 was not willing to allow for a statement of such a
4 late asserted objection, is that what this is
5 about?
6         MR. ULLMAN: Not really, Your Honor.
7         THE COURT: Not really?
8         MR. ULLMAN: Not really. Not in our
9 view.
10         THE COURT: So you're withdrawing our
11 objections.
12         MR. ULLMAN: May I speak?
13         THE COURT: Please.
14         MR. ULLMAN: Your Honor, the issue is not
15 that we're trying to add new objections, the --
16         THE COURT: You're not trying to add new
17 objections? So to the extent there are new
18 objections, we can strike them that?
19         MR. ULLMAN: Let me try to explain. We
20 had always told the State -- the City that for this
21 subset of documents, I believe there's six of them,
22 that we were not opposing admissibility in general,
23 but we believe that they are admissible for limited
24 purposes only, to show that these documents were
25 said, that they were in a created, that they were

1    given to people.  We weren't contesting that
2    they're authentic documents, but we spoke with
3    Mr. Irwin and told him but at the same time, that's
4    not why we're not contesting admissibility in
5    general.  We do not agree they're admissible for
6    the truth of what they say.
7         Some of these documents have
8    forward-looking objections that we don't think
9    there's been adequate foundation for, and in our
10   discussions with Mr. Irwin, he said we understand
11   that, we're not asking you to concede to the truth
12   of what's in there.  We said fine.  On that basis
13   --
14         THE COURT:  Well, but hang on.  The
15   admission of a document into evidence or the
16   agreement of the admission of a document into
17   evidence is not a stipulation to the truth or
18   credibility of the document, it just means that it
19   meets the criteria for admissibility under the
20   rules.
21         MR. ULLMAN:  And that may be all that's
22   going on here.  The reason this came up is because
23   I had heard -- I was not here at the legal argument
24   yesterday, but I had been told that Your Honor had
25   indicated that if a document did not have a note on

1    it saying there was some sort of objection would be
2    admitted for any and all purpose, at which point I
3    said to Mr. Irwin, wait a minute, there's a couple
4    documents here we know from our discussions, you
5    know, they're limited -- we agree they're
6    admissible for limited purposes only and we have
7    the right --
8         THE COURT:  But for what purpose do you
9    asswert these six documents are not admissible for?
10        MR. ULLMAN:  Just for truth of what's in
11   them, expert opinion and lack of foundation.  Some
12   of these have forward looking numbers or values
13   into them as to the amount of the unfunded pension
14   liability and for those we say we don't disagree
15   you gave these documents up, but we're not agreeing
16   that the numbers that are in there are necessarily
17   true numbers.  That's all we're saying.  That was
18   understood from day one with discussions with
19   Mr. Irwin.
20        We just wanted to make sure that Your
21   Honor -- that if the document came in, that Your
22   Honor would not assume that everything that was in
23   it in these six documents was true.  That's all
24   that we cared about.  We don't deny that they were
25   created, that they were given to people, and for

1    that purpose we have no problem with admission.
2    And it may have been that we misinterpretted what
3    Your Honor said.
4         THE COURT:  I'm having a hard time
5    comprehending what you're saying, frankly.
6         If a piece of evidence has hearsay within
7    hearsay, which think is what you're talking about
8    here, right, the document itself is hearsay, and it
9    contains hearsay statements.
10        MR. ULLMAN:  Yes.
11        THE COURT:  Okay.  If the documents is
12   admitted opposing parties waive -- if they agree to
13   the admission, they waive both hearsay objections.
14   That does not mean that that party is stipulating
15   to the truth of any of that hearsay.  It just
16   doesn't mean that.  All it means is it's evidence.
17        MR. ULLMAN:  And if I had been given a
18   misinterpretation or misapplication of what Your
19   Honor indicated the other day, then you're right,
20   this is a moot issue and there is no problem based
21   on what Your Honor said.  I think that's true.
22        THE COURT:  Okay.  All right.  Then in
23   that event, the Court will enter the amended final
24   pre-trial order, and based on the list of documents
25   that are shown as having no objections, the Court

1    will prepare an order admitting all of those
2    documents into evidence.
3         Okay.  Opening statements?
4         MR. BENNETT:  Good morning, Your Honor.
5    I'm assuming that you want to hear from us first,
6    notwithstanding the order was different in the
7    other -- in the legal issues proceedings, but in
8    any event --
9         THE COURT:  Well, you have the burden of
10   proof, right?
11        MR. BENNETT:  Correct.
12        First of all I want to make crystal clear
13   many people having different environments that I'm
14   not going to speak about any arguments that came up
15   in the context of the legal argument part of the
16   proceedings.
17        THE COURT:  Thank you.
18        MR. BENNETT:  I appreciate that part,
19   too.
20        And I want to confine myself to the
21   issues or the parts of the eligibility standard and
22   the part of 521C that have some factual disputes
23   that have been identified in connection with them.
24   And toward the end, I do want to spend a minute on
25   the materiality of facts relating to legislators or

1  governors intent relating to statutes because I
2  think it was not something we did cover when we
3  were here before.
4       So first of all, I'm going to start with
5  the issue of insolvency.  And what I'm going to say
6  about that because I could stand here for hours
7  describing the evidence that is going to come in on
8  that subject, but I'm not going to do that, I'm
9  going to say simply that the witnesses that we will
10 present on the subject are going to present a
11 mountain of evidence showing insolvency of the
12 City.
13      Sadly, that evidence will show that the
14 City is insolvent on every relevant standard and
15 Your Honor, there's been at least intimated in a
16 lot of the papers about the significance that no
17 expert report has been submitted quite frankly that
18 is because no expert report is required.  This is
19 one of those cases where the data speaks very
20 clearly and persuasively on its own, it needs no
21 gloss, and that observely AFSCME is objecting on
22 the insolvency point at least as I read the papers
23 itself speaks volumes.
24      I want to say from the near term
25 perspective, the City did not run out of cash only

1  out well from the perspective of many other
2  creditors.
3       Also, as will come into evidence, pension
4  contributions were deferred during at least the
5  past two fiscal years with the effect that the
6  under funding under anyone's measure don't have to
7  worry about the fight between the different
8  measures of pension under underring, it's greater
9  than it otherwise might have been.
10      Finally on the insolvency point, you're
11 going to hear from several witnesses but most
12 importantly perhaps Chief Craig about the fact that
13 the City is failing to provide basic services to
14 its residents.  We don't think that as another
15 which one of the creditor claims or obligations,
16 but the reality is it's important as anything else.
17 As we've indicated before and as the witness also
18 indicate without solving that problem, there may
19 not be a City to reorganize.
20      Now AFSCME makes a few points that are
21 worth discussing how the evidence will deal with
22 them.
23      First, much is made over the dispute
24 about the under funding amount and it is asserted
25 that because there's a dispute of the underfunding

1  because actions were taken to prevent that from
2  happening.  The evidence will show that if the City
3  just kept on paying debts as and when they were
4  becoming due, cash would have run out.  The fact
5  that the City stopped doing that is the only reason
6  why there are positive cash balances.  As I said
7  before, there's no question that if the actions
8  were not taken, cash would have run out.
9       I will also say that the steps that the
10 City took during past years to pay many of the
11 steps as they became due they didn't turn out
12 particularly well.  One of the consequences and
13 you'll see in the evidence and in fact a good
14 document to keep around at all times is the
15 proposal for creditors dated June 14th.  There's a
16 section in there that deals with this.  It shows
17 that there were numerous secured borrowings made to
18 create liquidity in the City in past years when
19 there were similar cash flow problems.  Each and
20 every one of those borrowings were done on a
21 secured basis and so the consequence that we face
22 today is that those borrowings consume a very
23 significant amount of cash otherwise available for
24 creditors generally.  So avoiding a liquidity
25 problem in the prior periods didn't exactly work

1  amount, the City can't demonstrate it's insolvent.
2  Well, as Your Honor knows, the insolvency test
3  focuses on cash flow, focuses on near term and
4  longer term cash flow type measures.
5       And in that connection, there are cash
6  flows that will be put into evidence.  There's also
7  convenient place to find them in the proposals for
8  creditors, there's different versions with
9  different levels of updates that are baked into
10 them, but the line items that talk about pension
11 contributions, Your Honor, is going to learn don't
12 change very much whether you use the City's
13 assumptions as to underfunding amount for the
14 City's calculation of underfunding amount for the
15 Gabriel Rotors calculation underfunded account,
16 Gabriel Rotors, of course, being the actuaries
17 retained by the pension fund management themself to
18 give them advice.
19      And so Your Honor, we take into the
20 numbers and you will find that the contribution
21 amounts which are the relevant numbers in the
22 insolvency calculation don't move around very much
23 notwithstanding the very different calculations of
24 underfunding amounts and the reason for that will
25 be remained.

1          Mr. Moore of Conway MacKenzie will be the
2     witness that will cover that area.  There's also a
3     little bit of numerical confusion concerning the
4     percentage of the City's contribution to the GRS
5     pension fund that is attributable to DWSD
6     employees.  You will see in the papers a number
7     band read around 62 percent.  Well, actually the
8     number is the reverse of that.  It's 38 to
9     39 percent.  Mr. Orr got that wrong in his
10    deposition.  He corrected it at the end, but of
11    course the correction wasn't cited in the papers.
12    There will be evidence on the point so there won't
13    be confusion on the point as we no forward with the
14    numbers.
15          Then AFSCME says the City deferred sales
16    of assets and they talk about two examples.  We
17    will demonstrate of course that that is not true.
18    First of all, the Belle Isle deal, Belle Isle
19    leased to the state in exchange for the state
20    taking over the maintenance and cap back
21    requirements with respect to Belle Isle.  Never
22    involved the generation of incremental expendable
23    cash.  It did and always has involved a reduction
24    of the cost on the City to maintain Belle Isle.
25    And what the evidence will show is that those

1     anticipated savings were included in the
2     projections that were the basis for insolvency
3     calculations and they are in the projections, the
4     basis for the proposal for creditors or at least
5     the lead up to the proposal for creditors in the
6     June 14th presentation.  It's also very hard for us
7     to understand how anyone can say that art sales
8     were deferred.  It is common knowledge and I
9     suspect we'll figure out a way to get this into
10    evidence as well, that there's an attorney general
11    opinion out there that basically says that the art
12    can't be sold for creditors.
13          We unfortunately in the absence of some
14    form of agreement, there are no sales possible
15    without a significant change in current management
16    of the museum or litigation and maybe and/or
17    litigation relating to some of the points made in
18    the attorney general's opinion.  There were no
19    pre-filing opportunities to liquidate art.
20          Next, AFSCME talks about the swap deal,
21    which of course Your Honor is familiar with because
22    it's before you in still another adversary set
23    inning this case.  The swap deal itself, you will
24    hear, does not provide adequate cash relief, but
25    the transaction hasn't been approved yet, and there

1     is unfortunately no assurance as we stand here
2     today and certainly as we stood here several months
3     ago that it will be done.  It turns out that some
4     of the objectors in this proceeding are also
5     objectors in that one.  And so I'm not sure how
6     we're supposed to even count the anticipated cash
7     flow relief that attributable to the swap
8     transaction as something that could have even
9     affected the City's insolvency calculations.
10          And lastly, there is the assertion and
11    I'm anxious to hear what the evidence will be to
12    support this one, that the appointment of the
13    emergency manager prevented the City from taking
14    actions designed to raise revenue and avoid
15    insolvency.  Of course in the briefs that have been
16    filed, there is no suggestion about exactly what
17    steps those are, that the City counsel council or
18    the mayor or whoever has been displaced in the view
19    of AFSCME have been planning and anxious to
20    implement that would solve the City's financial
21    problem.  No such actions have ever been specified,
22    we have idea where that evidence is coming from, it
23    will be quite a surprise if there is any.
24          It was for these reasons the insolvency
25    and the fact that there really weren't anything

1     left that the City or the state could think of to
2     do to address the problems that the June 14th --
3     June 14th presentation was put together and it
4     proposes a plan that includes significant
5     reductions in the City's obligations, including
6     bonds, including other post employment benefits,
7     including other unsecured claims and including
8     pension underfunding claims.
9          Whatever the law turns out to be
10    concerning protections to be afforded to various
11    claims, there is no law prohibiting the City from
12    trying to commence negotiations to resolve its
13    financial problems and that's what we were trying
14    to do.
15          Now while we're near this subject, there
16    is an issue that ripples through actually several
17    of the standards, which is whether or not the
18    proposal that's included in the proposal to
19    creditors -- and I'm referring to the materials
20    that are I think between pages 101 and 109 or
21    thereabouts of that document -- whether that
22    proposal was close enough to a confirmable plan of
23    adjustment to qualify for the purposes of open
24    paren one, demonstrating that the City desires to
25    implement a plan, open paren two, that the City was

1   in good faith as part of the good faith
2   negotiations because they had to be talking about a
3   certain kind of plan that is asserted, and three,
4   whether the City was acting in good faith
5   generally.
6       And I think the proposal for creditors
7   that June 14th document has been admitted into
8   evidence, again for all purposes, but very clearly
9   for purpose of showing this is what the proposal
10  was that the City presented as its initial
11  presentation to creditors.
12      And so it speaks for itself.  We can look
13  at it, we don't need testimony, it's reasonably
14  detailed in fact, I would argue Your Honor cease
15  disclosure statements, summaries of plans all the
16  time and you will see this measures up quite nicely
17  to the standard that's applicable even in
18  disclosure statements to what a plan should look
19  like.  It is he has a classification scheme, it
20  defines treatment for all classes, it includes a
21  very extensive term sheet for notes that are to be
22  distributed to creditors, and it is a plan, Your
23  Honor, that for that reason is a plan that could be
24  confirmable.
25      Now there is clearly disputes over what

1   law should be applied by this Court in determining
2   whether or not it would confirm that plan if it was
3   fleshed out, put into plan form and presented to
4   Your Honor.  I told Your Honor in prior hearings I
5   doubt that's the way this case is going to come
6   out, but that's the relevant standard for today.
7       And the reality is that on the City's
8   very reasonable view of the law, there is no
9   question that it could be confirmed.  I understand
10  that with respect to the retiree constituents use
11  of the law, they say it can't be, but that doesn't
12  render the proposal inappropriate for purposes of a
13  Chapter nine case.  We are dealing with issues that
14  Your Honor has heard argument about, is going to
15  ultimately decide, but the plan hangs together as
16  an appropriate expression of the kind of debt
17  relief the City should be able to get based upon
18  one very reasonable view of the law.  We think it's
19  absolutely the right view.
20      The other assertion as to why the plan
21  isn't an appropriate plan is that it doesn't
22  adequately liquidate claims and here again, they're
23  talking about the pension underfunding amount.  But
24  I think we know, both from the structure of the
25  bankruptcy code itself and for many many many other

1   cases that the liquidation of claims is not a
2   prerequisite to confirmation of a plan.  Plans are
3   confirmed all the time with a treatment specified
4   as the treatment is specified in the plan in the
5   proposal for creditors that is not claim size
6   dependent.  It's plan.  It makes distributions
7   based on pro rata interests in the overall claims
8   pool.  It was designed that way because there
9   are -- is in fact uncertainty concerning the
10  aggregate amount of certain claims.  Frankly, the
11  City believes it's more questions relating to the
12  size of the OPEB or other post employment benefit
13  claim pool than there is with respect to the
14  pension claim pool but there's uncertainty on these
15  issues it is acknowledged there is uncertainty of
16  issues, those are not confirmation problems, at
17  least least there's not confirmation problems with
18  some plan structures and they're certainly not
19  confirmation problems with the plan that was
20  offered by the City.
21      So for these reasons, that is a plan that
22  is sufficiently detailed, and that it has
23  been in many other of the reported Chapter nine
24  cases and it is appropriate for all purpose as a
25  starting point for good faith negotiations,

1   demonstration of the City's intent to implement a
2   plan in Chapter nine and demonstration of the
3   City's overall good faith in commencing its Chapter
4   nine case.  And so I think we've dispensed of that
5   component of the different standards.
6       We now to impracticability.  Moving to
7   impracticability.  The record shows in numerous
8   places that the City has many many issues of bonds
9   outstanding and another reason to keep the proposal
10  for creditors nearby is that toward the back of it,
11  and I think it's between pages like 115 and 130,
12  thereabouts, there is an extensive list and a type
13  size, not so good for people who wear bifocals.
14      I think you will hear in the evidence if
15  it's not already clear from the record that most of
16  the individual bond issues do not have indentured
17  trustees as we think of them in the commercial
18  context or any other equivalent holder
19  representative.  In fact, holders reserve more
20  rights in most muni structures or assign them to
21  their insurers, to bond insurers if insurers are
22  involved.
23      So what you have here is that in order to
24  comp mischaracterize prince amended pal or interest
25  as well as many other terms of debt that have to be

1    addressed in connection with radio resolving the
2    City's financial problems either under the proposed
3    plan that was in the proposal for creditors or in
4    any other plan, there is going to have to be
5    extensive solicitation, efforts to find relevant
6    bondholders to get the right consents. The
7    bankruptcy process can make it a little bit easier
8    because of course it will be majorities of those
9    who vote and the solicitation rules are clearer.
10   Outside of a proceeding you might have to get
11   everybody in order to implement changes.
12        In fact, you do have to get everybody
13   with respect to most of the issues. There are a
14   couple where there might be an exception if the
15   insurer exercises certain extensive levels of
16   control.
17        The bottom line is it is an awful mess.
18   There is many many many issues, many many many
19   holders. And this of course is the definition of
20   impracticability in a lot of ways in the bankruptcy
21   code and the whole reason we have impracticability
22   is because of New York's case back in the 70s. New
23   York back then, numbers are different, times have
24   changed, but didn't have materially more -- may
25   have had less -- bond issues and bondholders than

1    impracticability problem, you have an
2    impracticability problem in negotiating the the
3    groups are kind of pointless. I think if we think
4    about it, that has to be right. Because of course
5    its let's take a hype that you've got a group over
6    here, not organized, and then you have one bang
7    debt piece which is clearly organized, and you can
8    clearly negotiate it. Well, you try to do
9    everything with a bank but at some point the bang
10   is going to say what's going to happen with them,
11   all those people you can negotiate with. Because
12   no one ever makes a deal in a vacuum. And even if
13   you could get all the way to the conclusion with
14   the bank and you still have to file a Chapter 9
15   case doesn't that make you start effectively start
16   all over again with the one that was easy to
17   negotiate with. And even if it doesn't, even if
18   it's possible to negotiate a deal but both the bank
19   and City decides this is it, we're going to make
20   this deal no matter what happens in the Chapter 9
21   case that you need for everybody else, you still
22   have to go through the Chapter 9 case and waiting
23   to file a Chapter 9 case while you work with the
24   bank and finally reach the deal you're going to
25   have with the bank that's going to be permanent,

1    Detroit has today.
2         And the purpose of the impracticability
3    standard was to recognize with that kind of debt
4    structure, having good faith negotiations withs
5    creditors in advance of a proceeding in an effort
6    to have an out of Court work out were frankly
7    pointless or would have been pointless.
8         And frankly, for the most part, the
9    objectors don't disagree with anything I've just
10   said. It's hard to. What they say instead is that
11   whether -- however negotiations might have been
12   practicable with bondholders, negotiations were
13   practicable with them, with the in some senses self
14   appointed or appointed representatives of
15   particular labor groups or retirees. And we're
16   going to talk about that in detail in a second.
17        But we have a point first, which is if
18   you have a situation where it's admitted or almost
19   admitted and the Court may have to decide that
20   negotiations are impracticable with a huge universe
21   of creditors but they might be practicable with
22   respect to a another universe of creditors, what do
23   you do? And the retiree committee is actually good
24   about admitting there's law in this in one of their
25   footnotes and the law is that if you've got an

1    you've wasted a lot of time because you have to
2    start Chapter 9 process and go that process any
3    way.
4         So I submit the couple cases that are
5    focused on this and we cite in our papers and the
6    retirees cite in the footnote. Have got it exactly
7    right. If you have an impracticability with
8    respect to a material part of your capital
9    structure, you have an impracticability problem
10   period.
11        So I think that by looking at this -- by
12   the way, before we go off, I want to say there's
13   one paragraph of the AFSCME brief that I think is
14   just terribly important on this. They argue this
15   point a lot. But then they have paragraph 102 at
16   page 46. And it's only two sentences -- three
17   sentences, so I'm going to read the whole thing.
18        "AFSCME is not suggesting that
19   pre-petition negotiations could have bound
20   everyone" -- hold that thought -- "or must have
21   involved all of the City's thousands of creditors."
22        I don't -- I think that sentence means
23   we're done because if pre-petition negotiations
24   couldn't have bound everyone, how would you get a
25   plan done? And if it didn't involve all the City's

1    thousands of creditors, how would you get a plan
2    done?  So I think they're conceding that our
3    situation has to be regarded as impracticable, but
4    they go on.
5              They say some level of negotiation with
6    principal creditors could have led the City to a
7    non-bankruptcy solution.  I think that's a
8    nonsequitur.  If you're not talking to everyone,
9    you can't possibly have a solution.
10             But then they go on further.  By way of
11   analogy, Section 109C5B of the Bankruptcy Code
12   contemplates prebankruptcy negotiations with
13   creditors that the municipality intends to impair
14   not all creditors.
15             Well, one of the complaints of AFSCME is
16   that the City intends to impair substantially all
17   of its material creditors.  It has no other choice.
18   So I suppose there's a circumstance if the City was
19   arguing that we have the huge group of creditors as
20   to which negotiations are impracticable but we're
21   not going to impair them and we have another group
22   of creditors that we really can talk to and we're
23   going to impair them, if the City said no
24   discussions, that would be a rather extreme and
25   silly position, it's just not our case.  We need

1    impairment pretty much across the board.  We have
2    proposed an impairment pretty much across the
3    board.
4              And in that circumstance, the fact that
5    huge chunks of the relevant constituencies are not
6    organized, can't be organized, can't be found, that
7    is, to me, the end of the impracticability
8    discussion.
9              But maybe we should go on.  Maybe we
10   should try to figure out whether it was really
11   impracticable to negotiate with the unions
12   themselves.  And Your Honor, I think the answer to
13   whether or not it was practicable to negotiate with
14   the unions themselves and -- I include here the
15   unions and the other retiree groups -- is frankly
16   what happened when we asked the unions whether or
17   not they could represent retirees and the other
18   groups or they could represent retirees.  And we
19   have a demonstrative that we'll come back to and
20   put into evidence later on, but I think it's useful
21   to pause on it.  I think if we can go up.  We have
22   a big one there and I have a few we could hand out
23   to people so with the court's permission.
24             THE COURT:  Yes, sir.
25             MR. BENNETT:  Your Honor, objectors saw

1    this yesterday and even suggested some changes.  I
2    think it's also in the binders.
3              Now there's a lot of information on this
4    chart and I'm not going to try to take a us all the
5    way through it, but I want to zero in on the fourth
6    line of data, which is -- first of all the third
7    line of data which says was a letter sent to a
8    creditor.  What that is is basically a letter that
9    asked are you in a position to represent retirees
10   and which ones.  You'll see it.  It will be in
11   evidence.
12             And then the next line is respondent is
13   able to represent retirees.  And I'll give you the
14   key.  X means they said no, the Green check means
15   they said yes, and the question mark is there was
16   no response or it's not clear and Your Honor is
17   going to hear some evidence on that.
18             So look across the line.  I have a number
19   of your most vigorous objectors who said no, we
20   can't represent retirees.  So I'm going to come
21   back to this in the context of good faith, but we
22   can start thinking about it now.  What is -- what
23   do you expect of the City having made a proposal
24   heavily supported, certainly again as the standards
25   go in similar circumstances, had lots of meetings

1    to explain, answered every question, every question
2    that was asked at the meetings, there will be
3    evidence on that too, and you're negotiating
4    partner says to you, many instances in writing, we
5    actually can't represent the people who are
6    impaired by your proposal.  To say that anything
7    that happened afterwards is not in good faith,
8    you've got to have a good answer as to what do you
9    do.  What's the next sentence of the dialogue?
10   You're getting fade back from someone who doesn't
11   have authority to give feedback, if they give you
12   any feedback, by the way the bottom line is
13   feedback, X means no, there's no other term we need
14   to define, if they said responded otherwise
15   constructively which weighs either no but I might
16   do this, or yes, if, you make the following
17   changes, that's -- okay, but that just came from
18   somebody who said they don't represent the person
19   who's going to be affected.  What is the next step
20   in a negotiation where the person who said they're
21   here to negotiate says to you we really don't
22   represent the person who is affected by the plan
23   we're discussing?  None of the objectors say how
24   that question is supposed to be answered.
25             The reality is the City said tell us your

1    suggestions any way.  And if we got suggestions,
2    feedback, we would have had to then figure out what
3    to do with it in that very unusual circumstance
4    that I frankly haven't confronted very often in my
5    career.  But we weren't even put to that hard
6    question because what the other part says is
7    that -- and this is more towards the good faith
8    negotiation part than this one but as long as I've
9    got the chart up, as the bottom line indicates, the
10   evidence will show that from this creditor
11   constituency, not from others, I'll get to that in
12   a second, we received no concrete proposal or
13   comprehensive feedback, we got a lot of no, but
14   I'll come to that later.
15          With respect to this part, again,
16   impracticable.  AFSCME sites results of past
17   collective bargaining as a result of negotiations
18   with unions that have succeeded.  That doesn't
19   surprise me in the slightest, but there's also no
20   evidence and I don't think there will be any that
21   those past discussions began with unions
22   disclaiming power to bargain on behalf of the
23   relevant constituency.  As the evidence will
24   demonstrate, that's how these discussions did.
25          So the bottom line, again, with respect

1    to this part is even if and it's not, the standard
2    for impracticability of negotiations is
3    impracticability with every major constituency, I
4    think the fourth line of this chart demonstrates
5    that negotiations were impracticable with the tire
6    side and impracticable with the bond holder side.
7    Good faith negotiations.  Again, this is a question
8    I don't think we have to reach because I think
9    we've demonstrated that those kinds of negotiations
10   were impracticable.  But we tried really hard any
11   way.  The evidence will show that we presented the
12   June 14th plan.  Mr. Buckfire of Miller Buckfire
13   who was integral to all the negotiations but others
14   Mr. Moore, Mr. Malthotra, people you will hear
15   from, they also extensively participated and will
16   testify about what happened in the rooms.
17          The City told the creditors essentially
18   the following.  The City would have discussions
19   with all parties willing to speak for the City for
20   about a month after the June 14th presentation.  So
21   the City could listen to people and figure out if
22   there was an out of Court solution possible for
23   this enormously complex and dire circumstance.  The
24   City representative asked for feedback including
25   proposals that the creditors would accept if they

1    weren't going to accept the City's proposal.  And
2    the City said in writing and verbally that it would
3    evaluate what it heard during the following month
4    during the week beginning July 15, 2013, and decide
5    what came next.  It's conceivable, I think people
6    would say they doubted it would happen, that one of
7    the thins that would have come next were consensual
8    negotiations on the effort to build some kind of
9    plan.
10          THE COURT:  You said July.  Did you mean
11   June?
12          MR. BENNETT:  No, July was the evaluation
13   wheat.  The June 14 proposal and July 15th
14   evaluation week.  Meetings in the middle.  I'll
15   have a timeline at some point and you'll see how
16   this fits together.
17          THE COURT:  Okay.
18          MR. BENNETT:  So one of the things that
19   might have happened next would have been
20   negotiations on a consensual plan but after the
21   month of discussions and after the evaluation week,
22   the City could not see a path to an out of Court
23   reinstruct link that could be implemented outside
24   of Court, a Chapter 9 case would absolutely a
25   possibility.  No one was shy about that.  And

1    frankly, it should not be surprising to anyone that
2    the evidence shows that work on both contingencies
3    was proceeding throughout this entire period.  Much
4    is made of the fact that there's contingency
5    planning going on for a Chapter 9 case.  Absolutely
6    there was.  It would have been irresponsible not
7    to.
8          By the way, nothing in the Jones Day
9    pitch is inconsistent with this way of organizing a
10   case.  And there's a lot of complaints about well,
11   people thought they had to keep a record, make a
12   record.  Well, absolutely they that have to keep a
13   record and make a record.  Making a record of out
14   of Court steps taken in a Chapter 9 negotiating
15   process is just sensible when everybody knows based
16   upon the play book executed in the last six or
17   seven major cases have involved vigorous objections
18   to eligibility by bondholders and labor unions,
19   depending upon the case which, sometimes both, and
20   in every single one of those cases, the judge has
21   to go through pages and pages and pages about what
22   happened during the out of Court phase to determine
23   whether people were in good faith.
24          So courts do their opinions have sent a
25   message to people who are serious about Chapter 9

1    restructurings.  Keep records.  And we did.
2              There is a lot of criticism in the papers
3    that there were instances where the City said these
4    are not negotiations, particular meetings were not
5    negotiations.  I confess that this implicates an
6    area of law that I'm not tremendously familiar
7    with, it has to do with collective bargaining.  As
8    the evidence will show the collective bargaining
9    was suspended as a result of statutes passed and
10   there was a clear concern by the City that they
11   were not going to waive the or reverse the
12   suspension of collective bargaining and all of the
13   baggage that came with that, however, we don't
14   really have to deter ourselves much over that
15   incident because it's admitted by the objectors
16   that the City sought feedback.  The evidence will
17   show that.  It's admitted that when we quote
18   discussion, closed quote.  And by the way, the
19   leading case that people cite as -- I think it's
20   end cot schools case that cited for the proposition
21   of what is a non-negotiated process or absence of
22   negotiations -- that case talks about absence of
23   discussions.  That's the actual quote if you go
24   back to the case itself.
25             So in any event, there is no dispute that

1    dialogue was something that was encouraged and not
2    discouraged.  Nobody said we don't care what you
3    think.  Never happened.  Evidence will show never
4    happened.  Now, again, assuming for a second that
5    what the City did in negotiations has any relevance
6    at all given the clear impracticability in this
7    case, what is required of the City in good faith
8    negotiations -- and I intimated that when we
9    started talking about the chart -- is informed what
10   creditors -- by what creditors said and did okay?
11             Mr. Buckfire will testify about some of
12   that being especially careful not to talk about
13   proposals that other people made because they were
14   made with an intent that they be kept confidential,
15   but we got permission at least in one instance to
16   talk about the fact that a proposal was made and
17   what Mr. Buckfire is going to tell the Court is
18   that the proposals that the City got back were
19   proposals that basically said our position is
20   better than everybody else, we should do better
21   than everybody else and they were frankly
22   completely in sensitive to the overall problems
23   that the City faced.  Again, the fact that we did
24   get proposals from people other than the labor
25   negotiators is going to be Mr. Buckfire will

1    testify to it but there's a letter in evidence and
2    I don't have the number, I forgot to put it on this
3    morning is a letter in evidence, cover letter to a
4    proposal that came from three major insurers in the
5    pre-filing period, and Your Honor, that
6    demonstrates that a party that's represented by
7    qualified professionals as a number of the
8    labor/retiree constituents were you knew exactly
9    what you are supposed to do when you receive a
10   proposal and you don't like it.  The way you
11   respond to a proposal and you don't like it is you
12   send back something you do like and that's how a
13   negotiation gets started.  Whether it would have
14   worked that's a different question.  The point is
15   it wasn't a mystery to anybody how to start a
16   negotiation if somebody really wanted to start one.
17             What did labor do besides respond maybe
18   we're not right person to talk to, which is a
19   problem in and of itself?  Well, here, the UAW's
20   papers are particularly instructive.  And in many
21   places, in their papers, particularly their
22   supplemental objection, I think it's also in the
23   pre-trial brief, just not remembering that as
24   clearly today, the UAW says well, of course we
25   weren't going to say yes to any modifications of

1    retiree benefits of pension benefits in the
2    pre-filing scenario because we had a constitutional
3    guarantee.  Any proposal that doesn't pay these in
4    fall and does not impair retiree benefits is a
5    proposal we cannot accept, or we will not accept, I
6    think it says both of those things in different
7    places.
8              So again, I think we have to ask the most
9    crucial question in evaluating the City's good
10   faith.  When you get back a response that says
11   we're never going to agree to anything but
12   non-impairment, what exactly is the City supposed
13   to do next?  What's the next step in that
14   negotiations?  Gee, we were just kidding, we found
15   the money in a mattress, we'll do that?  I don't
16   think that's the right response.  I don't think
17   there is a right response.  I think at that point
18   you can determine that negotiations have failed and
19   they're not going to succeed.
20             The retiree committee goes even further
21   in their papers, their pre-trial brief.  They say
22   that negotiations were not in goods faith because
23   they included an impairment, meaning the City was
24   in good faith because we didn't agree with them
25   from day one.  Okay?  Again, I ask the question,

1  what exactly -- if anyone is going to contend the
2  City was a bad faith negotiations and got that
3  response, what exactly were they supposed to do
4  next in the negotiations that would have helped
5  matters?
6          And as I said before, many retiree groups
7  said we'd love to help you but we don't represent
8  the relevant people.
9          Clearly, Your Honor, we received many
10 requests for additional information.  You will see
11 some interesting charts that show what was in the
12 data room, at least in terms of volumes, how the
13 data room is populated.  The evidence will show
14 that the City did its best to comply with
15 information requests.  I'm absolutely certain that
16 no one was completely satisfied with what this City
17 gave them.  In some instances that's because the
18 City doesn't always have everything that people
19 want and some instances I suspect it's -- we will
20 find that to the end of this case, we will not
21 find -- we will find certain people who will never
22 agree that they've gotten everything they want or
23 they're satisfied with the information they
24 received.  It's a hard problem.  But the evidence
25 will show that the City created a database, worked

1  really hard to populate it, populated with enormous
2  amounts of information and did not withhold
3  information as a basis to obtain negotiating
4  advantage.
5          Final point with respect to this section.
6  In almost all the papers -- it could be all --
7  there is a statement quoted by Kevyn Orr concerning
8  the financial and operating plan at a meeting to
9  discuss the financial and operating plan, which is
10 not the proposal for creditors.  The financial
11 operating plan is a document required by statute to
12 be filed 45 days after his appointment.  It's about
13 facts and he's reporting facts, and someone asked
14 him about negotiating the financial and operating
15 plan and he said this is not something to
16 negotiate, this isn't a public site, this is a
17 report I'm supposed to file.  So that quote, which
18 I think the objectors would have you think applied
19 to the restructuring plan and does not, did not and
20 it applies to something completely different and I
21 think the evidence will show that.
22         For the foregoing reasons, I think the
23 City did act in good faith in all of the
24 negotiations that it conducted those negotiations
25 were unsuccessful and thus that prerequisite for

1  filing a Chapter 9 case and being eligible for
2  relief has been met.
3          I'm now going to turn to good faith
4  generally, spend a little time on it, 921C.  Here
5  again, I want to borrow AFSCME's papers because
6  they're just very instructive and really help us
7  with this.  Paragraph 109 on page 48, the relevant
8  considerations regarding good faith under Chapter 9
9  include -- and they point to five points out of the
10 Stockton case.  I'll accept them.  Number one,
11 whether the City's financial problems are of a
12 nature contemplated by Chapter 9.  The evidence
13 will show that if Detroit's financial problems are
14 not the financial problems of a nature contemplated
15 by Chapter 9, I don't know what City's is.  So we
16 think we will satisfied that one very easily.
17         Number two, whether the reasons for
18 filing are consistent with Chapter 9.  I think the
19 form and substance of the plan that was proposed
20 and frankly everything that the City has been
21 saying about it are indicative that the City's
22 trying very hard to use the powers subject to the
23 limitations included in Chapter 9 to effectuate a
24 financial restructuring for the City.  I don't
25 think we'll have any difficulty demonstrating that

1  with the evidence.
2          Number three, the extent of the City's
3  pre-petition efforts to address the issues.  Here I
4  want to pause and put on a timeline.  And
5  there's -- it's really long so there's two pieces,
6  but for this purpose, it's the first piece that's
7  the most relevant.
8          THE COURT:  Let me ask you to pause for
9  just a second.  We should have the record reflect
10 what exhibit number that chart is.
11         MS. HALE:  It's Exhibit No. 36.
12         MR. BENNETT:  I have better.  They'll try
13 to put it up, but I also have some copies of it.
14 Here's what I'm going to do.  Aisle a going to
15 distribute the first piece now with the Court's
16 permission and the second piece in a minute after I
17 get through this.
18         So here's the first piece.  Again, I
19 think everyone has seen this already.
20         MS. HALE:  I exhibit I just put up is
21 Exhibit No. 104, the timeline.  Ben the other page,
22 the one that looks like this.  The two pieces.  If
23 you don't have it, that's okay.  Everyone else is
24 going to have it.
25         MR. BENNETT:  Obviously in a bunch of

ways this chart summarizes lots and lots of
evidence that is going to go into the record, but
what is going to be seen in the record was that it
wasn't a bunch of people up at night on June 13th
working on a presentation of a plan for June 14th.
The efforts to address the pre-petition efforts to
address the issues stretch probably before
December 21-11, but I think at least as I
understand the history and as the evidence will
certainly show, no later -- excuse any. Yeah, no
later than December 21, 2011, December 2011, a
number of people within state government and City
government started focusing on the fact that the
Detroit financial situation was very serious and
had to be addressed. And there were a number of
efforts that were attempted all through 2012 to try
to grapple this problem short of
requiring concessions from creditors, short of
Chapter 9, kind of everything you might think
of doing was done by a large number of really
devoted and qualified people. Regrettably, it all
failed. And -- but the part about this first
chart, which covers almost a year and a half on one
page, it was a lot of time and a lot of effort in a
search for alternative solutions.

So for getting the what happened in the
June and July timeframe which we'll get to in a
second, it is clear that there was a tremendous
amount of time and effort considering the issues.
Next is the fourth item in the AFSCME
list, the Stockton list, the extent that
alternatives to Chapter 9 were considered. I think
alternatives broadly construed include all of this,
but then we'll turn to the timeframe and all of the
sudden they got this one up, the timeframe of the
June and July, which we've blown up because so much
happened to its own separate chart. So let me pass
this one out.
THE COURT: So ma'am, what's the number
of that one you're just now taking down.
MS. HALE: Both of these exhibits are
104.
THE COURT: Both 104. Okay.
MR. BENNETT: And because so much more
happened at least in terms of dates and places in
the June and July timeframe, we've blown that one
up so the last two months are their separate page.
In June, was devoted to heavily trying to figure
out whether the last round of possible
alternatives, any conceivable kinds of out of Court

restructuring could work. And what the evidence
will show is that on this page, which shows all
kinds of meetings and all kinds of different
interactions with creditors, a concerted decision
was made to exclude meetings with individual
creditors or individual creditor representatives
because it wouldn't be readable anymore, so this is
just organize the meetings with different groups
for different specific purposes. The other key to
interpretation is when it says non union, it means
the bonds, so the union --
THE COURT: It means what sir.
MR. BENNETT: The bonds. The non union
means bonds and other borrowed money because there
is a collection of notes involved in that side of
the case as well. Where it says union, it's really
the retiree representatives which at the time were
predominately union.
So what this demonstrates again, union
part of the good faith piece too, but for purposes
of the fourth prong of the Stockton test, I would
say both of these are relevant, both the long term
assessment of alternatives that were short of that
structuring and then the close in effort to figure
out whether there was any conceivable way to get

something accomplished out of Court. It is
perfectly clear that there was an extensive effort
to evaluate every conceivable alternative that
anyone could think of.
And then last factor, factor five.
Whether the City residents would be prejudiced by
denying Chapter 9 relief. As we said in argument
last week, and the Court will hear to extensive
evidence, and it's really important part of the
case, both for purposes of eligibility and for
everything that will follow, the residents are
dramatically prejudiced by denying Chapter 9
relief. Many of the problems the City confronts in
providing services to its residents is because so
many of its tax dollars are devoted to dealing with
bonds and other legacy liabilities. That's the
problem. The taxpayer in Detroit puts up a dollar
and gets back right now the number is something --
right now the number is something like 58 cents and
the projection show it could be some day 35 cents.
That's an unstable situation. It's not working
now, it's not going to work in the future and it
has to be changed.
The other side of the coin. Very often
the first reaction in cases like this is raise

1   taxes.  The evidence will show it summarized by the
2   way in the June 14th -- June 14th proposal that the
3   taxes in Detroit are already the highest in any
4   municipality in Michigan that we're already having
5   enforcement problems.  The City is already having
6   enforcement problems with respect to property
7   taxes, the that property tax assessments may be too
8   high, not too low, indicating that that revenue
9   source is stressed as well.  There's nothing left
10  to do here.  There is no revenue solution.  So we
11  have come to a case -- which is not necessarily
12  like other Chapter 9 cases -- where we have a very
13  finite revenue pool and it just isn't enough to
14  provide services and to pay debt and thus Chapter 9
15  is more needed here than in any other scenario you
16  can possibly think of.  The evidence will show
17  that.
18          Last topic.  And this gets a lot more
19  technical, but this is responsive to Your Honor's
20  suggestion that we had to deal with a disputed
21  issue of fact, and that was the motivation for the
22  inclusion of appropriations provisions in PA436.
23  Your Honor, I think the following is intended to
24  really indicate that that question isn't material,
25  but I think it's also when we did the research, we

1   found that it's also not a legitimate question for
2   judicial review so I'm going to give you some
3   citations and I'm going to read a very few quotes
4   and Your Honor is clearly going to find more when
5   you look at this question.
6          In the State of Michigan, frankly I think
7   in other places at all -- other places as well, the
8   judiciary is not supposed to engage in guessing
9   with the length slate you are's intent.  The
10  leading case about this turns out to be a
11  referendum case in Michigan.  It's called Michigan
12  United Conservation Clubs versus Secretary of
13  State.  It's found at 630 Northwest, 2nd, 297.
14          Michigan United involved a review of a
15  Court of Appeals decision, I think it's called the
16  Court of Appeals here, Court of Appeals decision
17  that held in fact that an appropriations provision
18  in gun control legislation was not going to prevent
19  that legislation from being subject to a referendum
20  and the Supreme Court reverses and says that the
21  inclusion of that provision is going to insulate
22  that statute from the referendum process, and along
23  the way, the Court was not fractured in result, but
24  was fractured a little bit in reasoning.  There's a
25  collection of I think it's three concurring

1   opinions, there's one judge who writes a dissenting
2   opinion, I think it's just one but not a hundred
3   percent positive about that, and so the lead -- the
4   first concurring opinion has this to say.  This
5   Court has repeatedly held the courts must not be
6   concerned with the alleged motives of a legislative
7   body in enacting a law but only with the end
8   result.  The actual language of the legislation and
9   a whole series of case that is are cited to support
10  that proposition that I won't read the citations in
11  the record unless Your Honor wants them.
12          The next concurring opinion, Judge
13  Corrigan's, quotes from Justice Cooley's
14  constitutional law thesis or textbook, looks like
15  maybe a textbook, and the quote I think is also
16  instructive.  It's a little bit longer.  It says
17  the following.  To make legislation depend upon
18  motives render all statute law uncertain and the
19  rule which should allow it could not logically stop
20  short of permitting a similar inquiry into the
21  motives of those who passed judgment, therefore,
22  the courts do no permit a question of improper
23  legislative motives to be raised, but they will in
24  every instance assume that the motives will public
25  and benefiting the station.  They will also assume

1   that the ledge sure had before it any evidence
2   necessity to enable it to take the action it did
3   take.
4          Then Your Honor, the next case you would
5   find if you look to this is Houston versus
6   Governor, which is a 2012 case.  491, Michigan,
7   876, 810, northwest second, 255.  And right near
8   the front of the opinion, there's a paragraph, I'm
9   only going to read two parts of the paragraph to
10  save time.  There is nothing that is relevant in
11  this regard in -- in terms of interpreting a
12  statute -- that can be drawn from the political or
13  partisan motivations of the parties.  Skip a
14  sentence.  Moreover, this Court possesses no
15  special capacity and there are no legal standards
16  by which to assess the political propriety of
17  actions undertaken by the legislative branch.
18          Now of course, much of this makes sense
19  because one of the problems we scratched our heads
20  about when we got back to think about how we would
21  address Your Honor's question is there are a whole
22  bunch of legislators in two houses that conceivably
23  had all kinds of different reasons for supporting
24  the appropriations, it could well be that most of
25  them put the appropriations there because they

1  really thought they needed the money even if some
2  thought they were putting it there because it was a
3  problem relating to the referendum process. I will
4  tell you a very persuasive example of the hazards
5  of trying to figure out the intent of statutes was
6  impressed upon by an example I learned in law
7  school which was about the age 55 -- or the 55-mile
8  per hour speed limit and research turns out to show
9  that the purpose of that speed limit was to save
10  fuel, and the reason that it wasn't increased for a
11  long time is because it saved lives. And so also
12  the purpose of legislation actually can change over
13  time or the reason why it stays there. So I think
14  it's a hazardous inquiry. I don't think we know
15  where to start. I don't think we can drag all the
16  legislators in here and ask them all and I think
17  the only other evidence you're going to see about
18  this is frankly inadmissible hearsay.
19      Maybe more importantly than this, I think
20  I indicated to Your Honor in argument last week
21  that I didn't think there was any consequence to a
22  determination by this Court that the -- that the
23  ledge -- that the appropriation provisions might
24  prevent a referendum. I said statute wouldn't be
25  unconstitutional, just would be subject to

1  referendum. Well, it turns out in the Michigan
2  united case, one of the concurrences goes back and
3  gives everybody the history of what happened in
4  that case and so how did that case wind up in Court
5  to begin with, and it wound up in Court because the
6  persons, the group that wanted to have referendum
7  went out and got the required number of signatures,
8  went to the appropriate office where the election
9  is going to be held and the first response was no
10  referendum because of the provisions and then they
11  went to Court to testify it, so I think we're in a
12  situation where frankly the only circumstance where
13  this issue of whether or not the appropriate --
14  whether or not the appropriation provisions are in
15  there for an appropriate purpose would conceivably
16  come up is when a person or organization desiring a
17  referendum within the time specified by the
18  statute -- and it could conceivably have run, I
19  couldn't figure that out -- actually collects the
20  signatures, goes down to the appropriate place and
21  tries. That never happened.
22      It also appears that even if a group or
23  person doesn't do that, there is an initiative
24  process which is different from a referendum
25  process which they could have triggered, and that

1  process is not dependent in any way on whether or
2  not there's an appropriation provision in the
3  relevant statute.
4      And finally I think it was pointed out
5  when we were together last that the PA436 contains
6  the sever ability clause, and so what's left to
7  have happen at this point is that if that provision
8  is somehow inappropriate and has to be stricken for
9  some legally cognizable reason, the rest of the
10  statute is still there. So I would say again,
11  summarizing from where I started, there's two
12  points here. One is that I think Your Honor is
13  asking for an inquiry that is not only
14  impracticable, it is not one for courts, but in any
15  event, it is not material to anything because it
16  doesn't lead us anywhere that would change the
17  result that we have PA436 or at least every single
18  one of its provisions with or without the
19  appropriation provision to apply and it's not upset
20  by reason of the possibility that a referendum
21  could have been attempted in some circumstances
22  where one never apparently has been attempted.
23      And with that, I'll -- if you have no
24  more questions, I think I'm done.
25      THE COURT: Thank you.

1      MR. BENNETT: Thank you. I have been
2  asked to offer 104 for demonstrable purposes only
3  because it may not be on the relevant list.
4      THE COURT: Any objection to 104 for
5  demonstrative purposes only?
6      All right. The Court will admit it for
7  that purpose.
8      MS. LEVINE: Good morning, Your Honor.
9  Sharon Levine.
10      THE COURT: Let's just have the record
11  clearly state this. Does the State of Michigan
12  wish to make an opening statement on the issue of
13  the City's eligibility?
14      MR. SCHNEIDER: No, Your Honor, however,
15  we may wish to make a closing statement.
16      THE COURT: Fine.
17      MR. SCHNEIDER: Thank you.
18      THE COURT: You may proceed.
19      MS. LEVINE: Thank you, Your Honor.
20  Sharon Levine, Lowenstein Sandler, for AFSCME. I'm
21  actually here in the role of MC.
22      As with the oral arguments, we have
23  agreed to work together to try and not duplicate
24  efforts and to make a cohesive presentation. So
25  just to give Your Honor a little bit of an

1  understanding, the retirement system is going to in
2  essence go first, spend about 20 minutes going
3  through the timeline as we see it, following that,
4  the retired Detroit police members association will
5  react to the City's final portion of their
6  statement and also to their particular issues as
7  reflected in the timeline and apply it to the
8  facts. The UAW, the public safety unions, the
9  retired association parties and AFSCME will each
10 spend just a few minutes indicate how long we see
11 any additional facts or how the facts applied to
12 our particular situations and then the retiree
13 committee probably for 20 or 30 minutes will give a
14 global overview of applying the facts that came out
15 in the timeline to the law. Thank you.
16      THE COURT: Okay. Well, do you think
17 it's okay with your group if at a convenient break
18 around noon we take our lunch break?
19      MS. LEVINE: That would be great.
20      MS. GREEN: Your Honor, Jennifer Green on
21 behalf of the Retirement Systems.
22      THE COURT: Be sure you speak right into
23 the microphone even though you've angled the
24 lectern there.
25      MS. GREEN: As Sharon mentioned, we have

1  put together a slide show presentation of the
2  timeline. We believe that these facts will later
3  be used to support certain legal arguments that we
4  will be raising throughout trial regarding the fact
5  that Chapter 9 was a foregone conclusion well
6  before any creditor negotiations occurred. The
7  Chapter 9 was filed in bad faith to circumstance
8  vent the pension clause and we submit respectfully
9  we disagree with the City's assertion a moment ago
10 that Chapter 9 was a mere contingency and our
11 assertion is that it really was a foregone
12 conclusion before any of the creditor negotiations
13 ever occurred. And with that, I will begin.
14      You may ask why we're going back this far
15 to 2011, but at his deposition, Your Honor,
16 Governor Snyder testified that this has been a high
17 ly structured process foreclose to three years. So
18 we again in January 2011 when Richard Snyder takes
19 office of the Governor of the State of Michigan.
20      Shortly thereafter, just three months
21 later, the Governor signs into law what we now
22 refer to as PA4. The legislation makes it is its a
23 awe both awes within just 34 days. February, 2012,
24 stand up for democracy files with the Secretary of
25 State a petition to invoke a referendum on PA4.

1      Just days later, within actually win
2  three days of stand up for Democracy's position,
3  discussions begin regarding ways to insulate PA436
4  or what will become PA436 eventually from
5  referendum. There are notations that discussions
6  were had with Andy Dillon, the treasurer of the
7  State of Michigan's office, and there are notes
8  about Miller Buckfire going to follow up with Andy
9  directly with the process for getting this to the
10 Governor and a notation that the cleanest way to do
11 all of this is new legislation that establishes
12 aboard and includes an appropriation for state
13 institution if an appropriation is attached, it
14 concludes then the statute is not subject to repeal
15 by the referendum process.
16      In April of 2012, the City enters into
17 the consent agreement with the State of Michigan.
18 Shortly thereafter, Heather Lennox of Jones Day and
19 Ken Buckfire of Miller Buckfire purportedly meet
20 with Governor Snyder on June 6 of 2012 to discuss
21 the City of Detroit's financial crisis and issues
22 related to potential Chapter 9 bankruptcy.
23      Prior to the meeting in the email that we
24 discussed earlier, and that I quoted for you
25 earlier during oral arguments, there is a notation

1  that Mr. Buckfire suggested that all the memos be
2  put together, the ones that were done for Andy. A
3  list of those memos were compiled and three of
4  those we think are pertinent to some of the issues
5  at trial in this case. One of the memos would
6  regarding a summary and comparison of PA4 in
7  Chapter 9, one was a memoranda on constitutional
8  protections for pension and OPEB liabilities and a
9  third memo was analysis of filing requirements of
10 section 109 C5 of the Bankruptcy Code in particular
11 negotiation being impracticable and negotiate
12 inning good faith.
13      Two weeks after meeting with Governor
14 Snyder, Miller Buckfire is engaged by the State of
15 Michigan to perform an analysis of the City's
16 financial condition. Shortly thereafter, Ken
17 Buckfire testified that after he got this
18 engagement, he started receiving phone calls from
19 law firms seeing if we would be interested in
20 helping them get inserted.
21      THE COURT: I need to interrupt you for a
22 second.
23      MS. GREEN: Going too fast? I was trying
24 to get done.
25      THE COURT: I really want to follow what

1    you say, so I need you to slow down.
2              MS. GREEN:  I knew I only had 30 minutes.
3              THE COURT:  We don't have to stop right
4    at noon.
5              MS. GREEN:  I will slow down.
6              THE COURT:  Slow down for me by about
7    50 percent.
8              MS. GREEN:  Wonderful.  I get this a lot.
9    I know I'm a fast talker.
10             The discussion continues, Mr. Buckfire
11   testified that core in ball had wanted him to meet
12   one of her partners who was successful in a Chapter
13   9 case.  This is in 2012.  In October of 2012,
14   PA -- before PA4 is even rejected by the voters,
15   the treasury department and the Governor's office
16   begin discussing creation of a new emergency
17   manager statute just in case the referendum is
18   passed.  Howard Ryan who is 30(b)(6) witness for
19   the State of Michigan will testify to that.
20             Shortly thereafter, November 6, 2012, the
21   Michigan electorate rejected PA4.  In December, a
22   Senate bill 865, which would eventually become
23   PA436 is introduced in the Michigan legislature.
24   The final version is adopted by both houses just 14
25   days later on December 15th.

1              Around that same time, the Treasurer
2    commences a preliminary review of the City's
3    finances under PA72 and determines that a serious
4    financial problem exists in the City of Detroit.
5              At the end of December, the golf of
6    Michigan signs PA436 into law, submits it to the
7    Secretary of State, the entire process for PA436
8    took only 26 days.
9              And it is insulated from public reference
10   dumb because it contains what the objecting parties
11   submit is a minor appropriation of $5.8 million
12   which is less than .09 of the state budget and
13   below we have the citation from the exhibit that
14   sets forth the amount of the state budget.
15             In connection with the PA436
16   appropriation, the state 30(b)(6) witness testified
17   at his deposition that he was aware that the
18   appropriation was included for the purpose of
19   insulating it from referendum.  He was asked the
20   question do you recall when that provision of the
21   legislation was added to the draft bill?  Pretty
22   early on, I believe.  It was quite early, maybe
23   from the inception.
24             He was then asked, based on your
25   conversations with the people at the time, was it

1    your understanding that one or more of the reasons
2    to put the appropriation language in there was to
3    make sure it could not -- the new act could not be
4    defended by a referendum?  He answered yes.  Where
5    did you get that knowledge from?  Well, having
6    watched the entire process unfold over the past two
7    years.  The Governor's office new that was the
8    point of it?  Yes.  That your department, his is
9    the treasury, knew that was the point of it?  Yes.
10             In January of 2013, Miller Buckfire was
11   reaguged this time by the City of Detroit to
12   continue its evaluation of the City's financial
13   condition.
14             Mr. Buckfire was then asked by treasurer
15   Dillon to make arrangements for the City and state
16   officials to meet and interview Jones Day and seven
17   other law firms that were interested in serving as
18   restructuring counsel.
19             The day before the pitch presentation,
20   with the City of Detroit, Kevyn Orr, who attends
21   the pitch, receives an email recounting
22   conversation withs Mr. Buckfire.  Mr. Buckfire will
23   be testifying live during this trial and listed are
24   the questions that will be asked the following day
25   at the pitch.  They all relate to Chapter 9.  Given

1    the issues that Detroit faces, how can they address
2    them outside of Chapter 9 is the first, but all the
3    rest are under what circumstances should Chapter 9
4    be used, how would one execute a low cost fast
5    Chapter 9.  Given Chapter 9 experience, what went
6    wrong with Jeff co and Orange County?  And at the
7    bottom, if Miller Buckfire finds away to monetize
8    assets and create liquidity, how would that impact
9    eligibility?
10             The next day on January 29, Joans day
11   parents its restructuring strategy to the City and
12   state officials and it explains, while out of Court
13   solutions are referred, they conclude they are
14   extremely difficult to achieve in practice.
15             They note the Chapter 9 can create
16   negotiating leverage, negotiating with the back
17   drop of bankruptcy which we submit is not good
18   faith.
19             They further conclude in their strategy
20   that an out of Court plan should contemplate the
21   possibility of Chapter 9 because it creates
22   leverage, you can negotiate in the shadow of
23   Chapter 9, and it helps bolster your eligibility
24   and your success in a Chapter 9 by establishing a
25   record of seeking creditor consensus.

1    There are notes on the slide that state a
2  good faith effort to pursue and out of Court
3  restructuring plan will establish that clear record
4  and will deflect any eligibility complaints based
5  on alleged failure to negotiate or bad faith.  If
6  needed though, Chapter 9 could be used as a means
7  to further cut back or compromise quota crude
8  financial benefits otherwise protected under the
9  Michigan constitution.
10    The next day, Richard Baird, who is
11  Governor Snyder's consultant reaches out to Jones
12  Day to inquire about hiring Kevyn Orr as the
13  emergency manager.  The following day, Mr. Orr
14  calls PA436 a clear end around the prior initiative
15  that is rejects by the voters in November.  And
16  also comments so although the new law, PA436,
17  provides the thin veneer of a revision, it is
18  essentially a redo of the prior rejected law and
19  appears to merely adopt the conditions necessary
20  for a Chapter 9 filing?
21    THE COURT:  What do those statements
22  appear in?
23    MS. GREEN:  It's Orr Exhibit 4,
24  JDRD0000295.  An email.
25    THE COURT:  Right.  But what is that?

1    MS. GREEN:  It's an email.  An email.
2  I'm sorry.
3    THE COURT:  Thank you.
4    MS. GREEN:  In February of 2013, Mayor
5  Bing was approached by Mr. Baird regarding Kevyn
6  Orr as the candidate for the emergency manager
7  position and Mayor Bing recalls that the only
8  salient qualifications about Mr. Orr was his
9  bankruptcy experience.
10    Mr. Baird told him about Kevyn Orr's
11  experience in part of the Chrysler bankruptcy team.
12  And Mr. Orr -- Mayor Bing was asked, did you ask
13  Mr. Baird anything else about Mr. Orr's
14  qualifications to serve as emergency financial
15  manager.
16    And then he answers, yes, I did, and he
17  felt that not only was he a lawyer that dealt with
18  bankruptcy for over 30 years, but he also had some
19  qualifications as it related to restructuring.  And
20  did Mr. Baird indicate that Orr had qualifications
21  concerning restructuring outside the context of
22  bankruptcy?  That would be no was his response.
23    In March, the Governor declared that a
24  local government financial emergency existed in the
25  City of Detroit.  At the end of March, Kevyn or was

1  appointed emergency manager of the City of Detroit
2  and March 28, PA436 becomes effective in and in
3  April 2013, Jones Day is engaged as legal counsel
4  for the City of Detroit.
5    After being appointed emergency manager,
6  Kevyn Orr is quoted on May 12, 2013, and we've all
7  heard this quote, I'll say it again, the public can
8  comment on the City's financial and operating plan,
9  but we are not like negotiating the terms of the
10  plan.
11    The day before presenting its proposal to
12  the creditors, Mr. Orr gives an interview with the
13  Detroit Free Press and expresses his intent to
14  invade the pensions clause through a Chapter 9
15  bankruptcy proceeding.  And we have quoted you
16  the portion of that interview and highlighted it in
17  yellow.
18    He states if you think your state vested
19  pension rights, either as an employee or retiree --
20  that's not going to protect you.  If we don't reach
21  an agreement one way or the other, we feel fairly
22  confident that the state federal law, federalism
23  will trump state law.
24    On June 14, the emergency manager held a
25  meeting at the Detroit Metropolitan airport and

1  presented the City's proposal for the creditors.
2  The evidence will show that the City proposed to
3  fully intended to impair and diminish accrued
4  financial benefits.  This is an excerpt from the
5  proposal for creditors and it clearly states that
6  with respect to unfunded pension liabilities, quote
7  such contributions will not be made under the plan.
8  And it further states there must be quote
9  significant cuts and accrued vested pension amounts
10  for both active and currently retired persons.
11    On June 20, the emergency manager
12  undertook a presentation regarding the City's
13  finances and planned restructuring to both uniform
14  and non uniformed retirees.  Numerous witnesses who
15  attended this meeting, several of which will be
16  testifying at trial, will testify that they did not
17  observe or participate in any negotiations
18  regarding the City's financials and that these
19  meetings were purely informational.
20    On June 27, following this presentation
21  that I just spoke of, the city sends a letter to
22  the UAW thanking them for their time and
23  participating in the meeting and in that letter
24  even the City acknowledged that unions would need
25  more information moving forward.  The letter here

1    is quoted.  The City recognizes that
2    representatives of active and retired employees
3    will need access to additional information to
4    analyze the restructuring proposals outlined in the
5    June 20 meetings.  Information relevant to these
6    proposals will be made available in the online data
7    room, but at this time on June 27th, that
8    information, as they were saying, was not yet
9    available.
10          Five days later on July 23, gracey
11   Websters and Veronica Thomas commenced lawsuits
12   against the State of Michigan, the Governor and the
13   Treasurer, seek ago declaratory judgment that PA436
14   violated the pensions clause and they also sought
15   an injunction.
16          In July, when several of the creditor
17   meetings took place, the evidence will show that
18   the City had no intention of actually negotiating
19   with its creditors.  By July 8, you will see an
20   email with an attachment of a timeline and a
21   communications roll out demonstrating that the City
22   had already determined that its Chapter 9 petition
23   was going to be filed on July 19th.  There's a
24   timeline crafted by the State of Michigan that
25   identifies July 19th as a filing date despite the

1    which is in bold and capital letters called the
2    filing day, at 9:00 the Governor's office is
3    supposed to transmit the authorization letter to
4    the emergency manager and at 10:00 on the 19th, the
5    necessary paperwork is supposed to be filed with
6    the Court system and then a series of press
7    conferences are to be held.
8          The following day, on July 9th, an email
9    from treasurer Dillon to the Governor of the State
10   of Michigan states we are still in the
11   informational mode.  This email is interesting for
12   several reasons.  First, it states that Kevyn will
13   meet with the Detroit pensions the following day on
14   July 10th.  It says there will be no exchange of
15   documents.  And that he will not translate the
16   information that he gives into an impact on retiree
17   or employees vested rights.  Treasurer Dillon
18   continues and says that are a lot of creative
19   options that we can explore to address how they
20   will be treated and restructuring with respect to
21   the pensions but at his deposition when he was
22   asked whether these creative options were ever
23   explored directly with the Retirement Systems,
24   Dillon said no and it's not up there but he also
25   was asked if they were ever -- three creative

1    fact that the creditor meetings had not yet
2    occurred, therefore, the objecting parties submit
3    that Chapter 9 was already a foregone conclusion
4    before the City met with its creditors on July 10th
5    and 11th.
6          In fact, here is a copy of that Chapter 9
7    roll out communications roll out that I spoke of.
8    In an email from Kevyn Orr's press secretary, Bill
9    Nowling to certain state officials, he lays out the
10   communications plan and if you go down to the
11   yellow portion, starts with we negotiated in good
12   faith with all of Detroit's creditors.  Mind you,
13   several of the meetings had not yet even occurred.
14   We presented a comprehensive restructuring plan to
15   creditors in June.  At this point, it would be
16   impractical to continue discussions out of Court
17   because it is clear that we will be able to reach
18   agreement with some creditors only through a Court
19   supervised process.  And the State of Michigan has
20   authorized the emergency manager to take this step.
21   This is on July 8th.
22          The timeline attached to that
23   communications roll out, on Thursday, July 18th,
24   states that last minute revisions will be made to
25   all the key documents and on Friday, July 19th,

1    options were put into written reports or formal
2    proposals and he also said no, they were not.
3          If you are in the email I says to the
4    Governor, tops rows meetings could be lead to
5    directions to you about your view on this topic.
6    In my view, it's too early in the process to
7    respond to hypothetical questions.  We remain in
8    many ways at the informational stage.  This was
9    just one week before the filing and Mr. Dillon
10   admitted at his deposition that nothing changed
11   between July 9 and the filing date of July 18th
12   that would take them out of this informational
13   stage as he called it.
14          On July 10 and 11, there were a series of
15   creditor negotiations, alleged creditor
16   negotiations that took place.  The emergency
17   manager himself did not even attend.  But witnesses
18   who did attend the meeting will testify that they
19   did not observe or participate in any negotiations
20   regarding the City's finances and that again these
21   meetings were purely informational.  And this is
22   consistent with the state treasurer's report to the
23   Governor that as of July 8, we are still in the
24   informational mode.  It's also consistent with
25   Mr. Orr's admission at his deposition when he was

1    questioned, there were no actual negotiations at
2    the June 14th meeting, were they? And he answers
3    no, not as is generally understood.
4           Lastly, the fact that there were no
5    negotiations on July 10th and 11 is consistent with
6    the City's and the state's communications roll out
7    which had already adopted the excuse that
8    negotiations were going to be impractical.
9           On July 12, following those meetings, the
10   Detroit firefighters association sends a letter to
11   the emergency manager asking for more information
12   and stating it would be productive if the City
13   could provide us with its specific proposals on
14   pension benefit restructuring as soon as possible.
15   We have two meetings with the City where pension
16   benefits were addressed and City have only the
17   City's general observation that pension benefits
18   must be reduced.
19          At trial, Mark Diaz, the president of the
20   Detroit Police Officers Association and Dan
21   McNamara, the president of the Detroit Fire
22   fighters association, will testify that no specific
23   proposal were ever given by the City after this
24   letter and instead the City filed bankruptcy just
25   six days later.

1           On July 15, the Webster defendants filed
2    a response brief and a motion for summary
3    disposition. About in that Court paper, the state
4    asserted that a bankruptcy filing by the City of
5    Detroit is quote only a possibility that plaintiffs
6    claims were quote unripe, premature and based on a
7    speculative threat of future injury. And mind you
8    this position is taken in open Court which
9    conflicts with the timeline that had already been
10   circulated within the Governor's office that slated
11   the filing date as just four days later.
12          On July 16, Mr. Orr submitted the
13   bankruptcy recommendation letter to Governor Snyder
14   and treasurer Dillon N that letter he stated that
15   dramatic but necessary benefit modifications must
16   be made. The Governor acknowledged that he read
17   that letter before authorizing the filing and that
18   he knew that the City's request for authorization
19   that dramatic cuts be given would be part of any
20   Chapter 9 process.
21          He also testified that he knew quote
22   based on the facts going into it, there was a
23   likelihood accrued pension benefits would be
24   reduced in the Chapter 9 case.
25          The next day, the Detroit public safety

1    unions received correspondence from the City thing
2    them on behalf of the emergency manager for their
3    quote strong cooperation regarding the City of
4    Detroit pension restructuring. Later that same
5    day, the Retirement Systems filed their lawsuit
6    against the Governor and the emergency manager
7    inning am county circuit Court seeking declaratory
8    relief.
9           That same night at 6:23 p.m., the
10   Governor's press secretary Sara Warfal, circulates
11   an updated timeline that still shows the bankruptcy
12   filing date of Friday, July 19th.
13          This is July 17th at 6:23 p.m. The
14   following day, the Retirement Systems filed a
15   motion for a TRO seeking an injunction. At 3:05
16   p.m. that afternoon, Margaret Nelson of the
17   Attorney General's office received a phone call
18   informing her the retirement systems were in Court
19   seeking a TRO.
20          At 3:47, the governor emailed his
21   authorization to Orr and to Treasurer Dillon. At
22   4:06, Orr changes the date on the filing papers
23   from July 18th, crosses us out the 19 because it
24   was supposed to be filed on the 19th, handwrites in
25   18 and files the petition, one hour and one minute

1    after finding out that the retirement systems were
2    in Court seeking a TRO, which is inconsistent with
3    the timeline sent at 6:30 the night before saying
4    it was going to be on Friday. And at 4:10 p.m. the
5    attorney general appears for the TRO hearing inning
6    am county. And this is reflected in the papers
7    filed by the state, the docket history and the
8    hearing transcripts.
9           Orr later admitted he was being counseled
10   that it would be quote irresponsible not to file
11   the petition sooner rather than later given all the
12   lawsuits that were popping up.
13          On July 19, following day, the
14   declaratory judgment was entered against the
15   Governor, Treasurer and State of Michigan and that
16   declaratory judgment states PA436 is
17   unconstitutional and in violation of Article IX,
18   Section 24 of the Michigan constitution. It
19   further states the Governor is prohibited from
20   authorizing an emergency manager to proceed under
21   Chapter 9.
22          Yet the City filed its Chapter 9 petition
23   despite the fact that each of its advisors
24   uniformly testified at the depositions that the
25   City's financial information was still incomplete

1  as of the filing and in fact to date is still
2  incomplete.
3       Charles Moore, senior managing director
4  at Conway McKenzie testified that quote when he was
5  asked how has there been a specification of those
6  level of cuts that the City contends must occur?
7  He says I mean, have you put a dollar amount on it?
8  He answers no, our analysis of this continues.
9  Right now we still don't know what assets could be
10  available to put towards the pensions.  We still
11  have not had the type of dialogue that we would
12  like to have related to the calculation of the
13  unfunded amount so because of those two
14  uncertainties among others we don't know what cuts,
15  if any, there may need to be.
16       State Treasurer also agreed that as of
17  July 8, just a week before the filing, I thought
18  that situation was not understood enough for the
19  Governor to go on record yet because I don't even
20  tell him with any degree of confidence what level
21  of funding the pension funds had, so why should he
22  get in the middle of a debate about this?
23       In addition, as of the petition date, and
24  I believe the City's witnesses will testify
25  consistent with their depositions, that to date,

1  the City still does not know the value of two of
2  its primary assets, including the water and sewage
3  department and the City owned art work at the
4  Detroit Institute of Arts.  Because the City still
5  does not know what assets are available to satisfy
6  liabilities and does not know the scope of its
7  liabilities, it the objecting parties position that
8  the Chapter 9 filing was premature and not made in
9  good faith.
10       Thank you.  I believe Mr. Ullman may be
11  following me.
12       THE COURT:  Okay.
13       MS. GREEN:  I apologize, it's Lynn
14  Brimer.
15       THE COURT:  Perhaps we should move that
16  lectern back to center.
17       Let me just ask, will there be other uses
18  of the projector during openings?
19       MR. ULLMAN:  Yes, Your Honor.
20       THE COURT:  Okay.
21       MS. BRIMER:  Good morning, Your Honor.
22  And Your Honor, I thank Mr. Bennett for raising the
23  legal issues with respect to the spending provision
24  because it at least makes me more comfortable as to
25  why I thought it so important we clarify the record

1  on the discovery matters with respect to which law
2  had a spending provision added onto it.
3       THE COURT:  Okay.
4       MS. BRIMER:  So rather than address my
5  opening issue, to begin with, would the Court like
6  me to address the legal issues raised by
7  Mr. Bennett or would you like -- I'm prepared to
8  briefly discuss those.  I don't have a written
9  preparation but document into evidence think it's
10  important for Court to understand, I did look at
11  the case that Mr. Bennett cited.  I didn't
12  disregard in a case law when come together this
13  Court and believing there was a factual issue.
14       With respect to the Michigan united case,
15  I think it's factually distinguishable again.  That
16  case did not involve an original law that did not
17  have a spending provision that was overturned on
18  referendum and then a new law presented.  In that
19  case, Your Honor, the issue is whether or not the
20  spending provision itself, added in the original
21  law, such that it was not subject to referendum,
22  was in fact an appropriate provision taking it out
23  of the referendum provision.  You know, Your Honor,
24  that is not the facts that we have before us today.
25  In addition, Your Honor, I have reviewed justice

1  core began's opinion, which by the way was a
2  concurring opinion, not the Court's majority
3  opinion, but she addressed the issue of intent and
4  that generally speaking we do not look to the
5  motive or intent of the legislature -- legislative
6  body when passing a law, but she said this is
7  because and she notes this in a footnote, this is
8  because generally speaking we do not have any
9  testimonial record regarding motive or intent.
10       That would be, Your Honor, in her
11  concurring opinion, there is no testimonial record
12  in the -- in this original action regarding the
13  motive or intent.  Well, Your Honor, that is simply
14  not the case in this matter.
15       As Ms. Green read to you and as I quoted
16  from the state's own 30(b)(6) witness, we have
17  evidence regarding the motive of the inclusion of
18  the spending provisions on an act that had
19  previously been rejected on referendum.  We believe
20  that factual issue is important to this Court in
21  determining that whether or not some or all of
22  PA436 should have been subject to the second
23  provision that everyone seems to gloss over in
24  article two, section nine of the constitution,
25  which states specifically that no law that has

1  properly been submitted to referendum can then --
2  and rejected can then be passed without a referral
3  back to the general electorate.
4      Your Honor, the cases cited by the state,
5  Ms. Nelson, of Reynolds v Martin, and the case
6  cited this morning just simply are not factually --
7  similar enough to PA436 to be controlling and we do
8  and -- my opening can be as simple as Your Honor,
9  the evidence will show that the motive of including
10 the spending provisions was to in fact take an act
11 that had previously been overturned on referendum
12 and disregard the will of the people and it's very
13 clear that the state's attorney argued yesterday
14 that we knew what the people's will was because we
15 have the media.  Well, we know what the people's
16 will was.  The people's will was we not have an
17 emergency manager who would supplant the
18 democratically elected officials in the City of
19 Detroit and that was very clear and yet we now have
20 PA436, which disregarded that, which added spending
21 provision to it and the facts will demonstrate that
22 we can establish what the motive was in adding
23 those spending provisions, and moreover, we can
24 establish that the emergency manager, Mr. Orr, was
25 fully aware of that at the time he accepted his

1  appointment as the emergency manager.
2      I'll conclude --
3      THE COURT:  Well, how do you deal with
4  Mr. Bennett's argument that if the issue is ever
5  appropriate for a Court review, it is not
6  appropriate until petition signatures are collected
7  on the bill that has the spending provision in it
8  and the petitions are rejected because it's not the
9  kind of a law that can be subject to a referendum?
10     MS. BRIMER:  Well, certainly I don't
11 think there's any case law that would sitting
12 suggest that the people be required to take an act
13 on which its face would be rejected.  I'm not a
14 share I'm aware of any case law that would suggest
15 that the people had to refer the law to a
16 referendum and have it denied because of the
17 failure -- or the inclusion of the spending
18 provision.  At issue here, Your Honor, is whether
19 or not the act is sufficiently similar enough not
20 that it had to go back to referendum, but whether
21 it's sufficiently similar enough that the second
22 provision would require that it be deemed to be
23 unconstitutional because it was not presented to
24 the people again.
25     THE COURT:  Okay.  All right.  Let's take

1  our lunch break now.  Before we do, I want to
2  remind everyone that we are guests here in this
3  building and we need to maintain decor up and
4  silence while we are in the hallways.  Please don't
5  linger in the halls.  You can have your
6  conversations here in the courtroom over lunch if
7  you would like to do that or in the elevator or on
8  the first floor but please maintain silence in the
9  hall.
10     Is it -- let's see.  It's noon.  We'll
11 reconvene at 1:30 please.  And that's it.
12     COURT CLERK:  All rise.
13     (Whereupon a lunch break was taken
14      from 11:59 a.m. to 1:30 p.m.)
15     THE COURT:  Counsel are present.  We have
16 a couple of housekeeping matters that we need to
17 address before we continue with our opening
18 statements please.
19     The first is that in the amended final
20 pre-trial order that was submitted through our
21 order processing program, on Attachment G, which is
22 attachment from the Retirement Systems, the exhibit
23 numbers were omitted.  I'm sure that was
24 inadvertent.  So please fix that and resubmit it as
25 soon as possible so we can get it entered, okay.

1      MR. IRWIN:  Of course, Your Honor.
2      THE COURT:  And then a second brief
3  housekeeping matter is Ms. Green still here?
4  Mr. Gordon?
5      Just to keep the record a hundred percent
6  clean, we need to put an exhibit number on a paper
7  version of the slide presentation.  So that for the
8  record, that is identified, whatever exhibit number
9  you want to put on it.
10     MR. GORDON:  All right.  Very well, Your
11 Honor.
12     THE COURT:  Thank you.
13     MR. IRWIN:  Your Honor, will counsel be
14 provided a copy of that when it's done?
15     THE COURT:  Can you do that?
16     MR. GORDON:  Yes.  Absolutely.
17     THE COURT:  All right.  We are ready to
18 proceed.
19     MR. WERTHEIMER:  William Wertheimer on
20 behalf of the plaintiffs.  I'll be very brief and I
21 just want to add a couple points relative to the
22 timeline Ms. Green was showing you.  I do not have
23 a clicker, but I'll just state them.
24     THE COURT:  Okay.
25     MR. WERTHEIMER:  That is, first on

1  July 3rd, the Flowers lawsuit was actually filed
2  before the Webster lawsuit.  They were both filed
3  on July 3rd, so they were both filed that day.
4        Second, on the same day, both Flowers and
5  Webster cases, the Judge Aquilina signed orders to
6  show cause setting a hearing for the preliminary
7  injunction that we were seeking for July 22nd.  So
8  that -- and those were served on the Governor and
9  the Treasurer on July 3rd.  So that at the point in
10 time on the timeline a few days later, when they're
11 sitting the punitive bankruptcy for July 19th,
12 fray, they know that the state Court preliminary
13 injunction hearing is being scheduled for
14 July 22nd, the following Monday.  That's it.  Thank
15 you.
16        THE COURT:  Okay.
17        MS. CECCOTTI:  Good afternoon, Your
18 Honor.  Babette Ceccotti, Cohen, Weiss & Simon LLP
19 for the UAW.  Ms. Green's timeline was very
20 complete and detailed.  I do want to just --
21 because I don't think this particular slide was up
22 there, so I would like to mention the pitch book
23 again.  Ms. Green had a slide from the Jones Day
24 pitch book from January 20, 2013, and 1 thing that
25 when Your Honor goes through the pitch book, you'll

1  notice that there are a few -- quite a few, I would
2  say, or certainly more than one or two references
3  to the use of Chapter 9, either itself or the
4  shadow of Chinas leverage.  Vis-a-vis creditors,
5  vis-a-vis specific proposals and claims related
6  to -- related to labor costs, and I think Ms. Green
7  showed the slide with the quote on there about
8  using Chapter 9 to reduce accrued financial
9  benefits.
10       The other thing that I would like to
11 mention about the pitch book which really does
12 become something of a blueprint, I think, for what
13 follows, is at page 57, there's a slide that reads
14 any Chapter 9 process should be comprehensive, and
15 it starts with the bullet plans of adjustment
16 address narrow range of economic compromises.  And
17 then it talks about -- then there are other bullets
18 that follow.  Other fundamental changes must occur
19 outside the plan context.  Any Chapter 9 process
20 should pursue as many revitalization initiatives as
21 possible.  Negotiating in Chapter 9 or its shadow
22 is a powerful tool for revitalization and finally,
23 the City should take advantage of its opportunity
24 for long-term comprehensive solutions.
25       So that's actually a good segue to the

1  June 14th proposal because as we've talked about
2  before, in the other arguments that we've had, this
3  is really a massive comprehensive revitalization
4  proposal.  It really has elements of more or less
5  what that slide that I just read you is talking
6  about.  It's got the plans include a $1.25 billion
7  spending program going out over ten years.  There
8  are many detailed wide ranging initiatives that
9  have to do with improvement of services, upgrades,
10 reinvestment, and the like, and there is also a
11 restructuring proposal.  There is a section called
12 restructuring proposal.  I don't have to take you
13 through that because we've been through it a number
14 of times.  You know what the pension proposal, what
15 the pension proposal is, but the point being that
16 just the four corners of the proposal itself, what
17 that reflects in terms of what it is that the City
18 is trying to pursue through Chapter 9.
19       In terms of the events following the
20 launch of that proposal on June 14th, I think that
21 we see a number of things, and the evidence will
22 show this.
23       As we saw actually from Mr. Bennett's
24 slide, the number of meetings that actually occur
25 on this proposal -- regarding this proposal are

1  relatively few.  It's a limited number of sessions
2  regardless of how we're characterizing them.
3  There's at least one document that refers to one of
4  the meetings as informational, in fact.
5        We have the data room issue.  Ms. Green
6  read the letter or showed the letter to the UAW
7  regarding the fact that the data room wasn't quite
8  up and running yet, but what is also true about the
9  data room is as Your Honor knows from the early
10 days of this case, is that in order to access the
11 data room, one had to sign a confidentiality
12 agreement and an additional release to get the
13 Milliman pension materials and my client at least
14 took issue with that prior to the bankruptcy.  And
15 others -- other groups may have as well, so you had
16 this quite massive proposal, a series of really a
17 handful of meetings being held, with the data that
18 the City was loading into the data room about the
19 proposal not readily available.
20       In addition, as I mentioned, these were
21 not -- they were just a few of these meetings, and
22 I think the evidence will show that they wouldn't
23 really constitute labor negotiations, the unions
24 various ways that they talk about that in the
25 evidence.  They are fairly well, I guess I'll just

1    use the word highly organized or the phrase highly
2    organized by the City, including one meeting
3    where -- at least one meeting where if there are
4    were questions about the proposal, those in
5    attendance were required to submit them on cards
6    anded cards would be read as opposed to any sort of
7    free flowing give and take that one might associate
8    with a meeting with stakeholders that we might
9    think about in terms of going over a restructuring
10   proposal or even a labor proposal.
11        So now I would like to get to
12   Mr. Bennett's comments about the UAW because I
13   think this really does -- this is really a very
14   important point. Yes, it is true that we as we
15   know, the proposal included the cessation of
16   funding to the retirement system and the statement
17   about -- the statement that significant cuts to
18   accrued vested pension benefits would be necessary.
19   So yes, on its -- the UAW's position is yes, on its
20   face, looking at page 109, if that's the right
21   page, that is a proposal that violates the Michigan
22   State constitution and the immediate question that
23   a rises on its face just looking at it like that is
24   how could it be accepted, how could it be a
25   accepted by a labor union, how could it be accepted

1    by anyone purporting to speak for or represent
2    actives or retirees.
3        So yes, on its face, the proposal was not
4    acceptable and we believe that that has legal
5    consequences as distinct from fact consequences, so
6    I do want to make that point about the -- about our
7    objection our amended objection in that regard.
8        We very much believe that has legal
9    consequences. As a factual matter, however, and
10   notwithstanding the fact that the proposal on its
11   face could not be accepted, you couldn't simply
12   hand it to the union with a signature line and say
13   here, sign. The UAW, through its general counsel,
14   contacted Jones Day on July 9th and we'll have a
15   witness to this effect and we have an exhibit on it
16   as well, to raise a couple of points. One
17   regarding the data room and the confidentiality
18   issue that I mentioned already, and in response to
19   the letter that Mr. Bennett's chart showed trying
20   to ask the labor organizations and the retiree
21   groups if they would be representing their
22   retirees, the email to Jones Day reads as follows.
23   Further, to -- it's reservation of rights, the UAW
24   continues to seek an answer from Mr. Orr and your
25   firm as to the following. Please cite the basis

1    for any claim that the UAW has the authority to
2    compromise the vested benefits of active and/or
3    retired UAW or former UAW members employed or
4    formerly employed by the City of Detroit and its
5    affiliates, as I presume you know, article nine,
6    section 24 of the Michigan constitution provides in
7    pertinent part that quote the accrued financial
8    benefits of each pension plan and retirement system
9    of the state and its political subdivisions shall
10   be a contractual obligation thereof, which shall
11   not be diminished or impaired thereby, unquote.
12        Please tell me what authority your firm
13   and/or Mr. Orr believe gives the UAW the right to
14   compromise vested pension benefits despite the
15   contrary preventions of article nine, section 24.
16   Please also tell us whether Mr. Orr and/or your
17   firm take the position that Article IX, Section 24
18   of the Michigan constitution is not or may not be
19   binding on the City of Detroit, the State of
20   Michigan, Governor Snyder, Mr. Orr, or the UAW and
21   the state, if that is the case, under what
22   circumstances you believe that, Article IX,
23   Section 24 would not bind some all of these persons
24   or entities.
25        We also seek answer to the same question

1    with regard to vested post retirement insurance
2    benefits and then there's a reference to the
3    Supreme Court's decision in the Pittsburgh plate
4    glass case. And the letter makes it clear that
5    again from the UAW's perspective we do not
6    understand the July 10 and 11 multiple stakeholder
7    meetings to which we have been invited to be a form
8    for negotiations of your proposed pension and
9    retiree healthcare changes but are willing to
10   attend and obtain for our union whatever
11   information may be provided if those meetings. And
12   then -- and finally, your full answers to the
13   questions opposed in the foregoing paragraphs of
14   this message will help the UAW determine the scope
15   of any such negotiations and the UAW's decisions
16   regarding its representative capacity in them about
17   which your firm has inquired.
18        So we very much have a factual case as
19   well as a legal case regarding the implications of
20   the proposal and I did want to make that clear for
21   the record. The point being that what is in this
22   email represents some fairly fundamental questions
23   about the ground rules upon which discussions or
24   negotiations with the City regarding its proposal
25   can proceed.

1    I should note that -- and we'll have
2  testimony to this effect -- that no answer was
3  forthcoming from the City and as far as I know has
4  not been forthcoming regarding the questions posed
5  other than obviously when we got into bankruptcy
6  Your Honor solved the problem of the debtor.
7    Timeframe.  Putting aside the lawsuits
8  and all of the activity surrounding all of that, it
9  does appear that the City set out a timeline for
10  itself that only had about a 30 day period for this
11  launch, notwithstanding everything that's in that
12  proposal, and everything that was expected
13  apparently to be accomplished by it.  I think I
14  heard Mr. Bennett refer to something like a
15  valuation week, which was supposed to occur on or
16  probably did occur, I gather did occur on
17  July 15th, that's really a month later.
18    So one -- now Mr. Bennett's timeline of
19  course goes way back, I think it was to 2011 and
20  the various initiatives to deal with Detroit's
21  problems and we are certainly not denying any of
22  those and I'm sure everyone is fully cognizant of
23  particularly those who live here are fully
24  cognizant of all of those efforts, but we think as
25  a legal matter that those efforts really don't

1  legally count.  They obviously count to the
2  citizens of Detroit, but for purposes of
3  eligibility, the relevant timeframe from our
4  perspective is the proposal is launched on
5  June 14th, and then apparently evaluated -- the
6  sponsor reaction apparently evaluated merely a mere
7  four weeks later.
8    So during this time, again, the evidence
9  we believe will show that during the same sort of
10  compressed time period, we know that the Governor
11  and the Emergency Manager are meeting on a fairly
12  regular basis, we know that the Governor had seen
13  the June 14th proposed, had a draft of it before it
14  was launched, he knew about the pension proposal,
15  he knew that there was an issue a legal issue with
16  respect to Article IX, section 24, of the Michigan
17  constitution and the effect, if any, of the
18  Bankruptcy Code in federal law on the continued
19  enforcement of that section.  He knew it was a
20  serious issue.
21    We know again since we have discussed it
22  most recently last week at the argument that we
23  then Marched through the timeline to get to
24  Mr. Orr's July 16th request and the Governor's
25  July 18th response.  We know that the Governor

1  obviously from the dates signed it only two days
2  later.  Apparently with a review of all of the
3  material that was contained in Mr. Orr's letter, I
4  think could probably best be characterized as
5  limited.  It does not appear that there was an
6  independent evaluation that the Governor conducted
7  regarding many of the sort of predicate items that
8  Mr. Orr laid out in his letter.  The Governor was
9  also aware as we know from the slides that
10  Ms. Green showed that the pension numbers were very
11  much still up in the air and in question.
12    Nevertheless, both the July 16th and the
13  July -- the July 16th letter from Mr. Orr and the
14  July 18th approval letter from the Governor lay out
15  the what I will characterize as the shift in
16  spending priorities.  This is the part of the
17  proposal that relates to revitalization.  And we
18  know that the Governor in his letter approves of
19  the manner in which Mr. Orr has proposed to proceed
20  in that regard.  And so he signs the letter and of
21  course the bankruptcy petition is filed on the
22  18th.
23    So what all of this adds up to, we think
24  at the end of the day, in terms of the legal cases,
25  in terms of our legal objections, is a fairly

1  deliberate plan to use Chapter 9.  We think that
2  really knitting, connecting all of the dots here,
3  that the plan was to use Chapter 9, we've said for
4  another day all of the legal issues associated with
5  that.  The state's authorization, there's really --
6  well, we won't get knee those because we'll have
7  closing and we'll have other briefs on all of that,
8  but the sort of deliberate plan which starts
9  whenever you would like to start it on the
10  timeline, but certainly from the Governor's
11  appointment of Mr. Orr leaving the Jones Day firm,
12  the Jones Day retention by the City, this really
13  several month timeline leading from the end of
14  March to the middle of July, we believe the
15  evidence establishes this as a deliberate plan to
16  use Chapter 9 to, in effect, find a way to under
17  mine the Michigan State constitution through the
18  use of bankruptcy.  We believe that that is
19  evidence of a lack of bad faith under 921C, a lack
20  of bad faith in connection with --
21    THE COURT:  You mean a lack of good
22  faith.
23    MS. CECCOTTI:  I'm sorry.  I'm sorry
24  sorry, Your Honor.  Not enough sleep.  Now I'm
25  afraid to open my mouth.

1          THE COURT:  I'll help you.
2          MS. CECCOTTI:  A lack of good faith
3    negotiations under 109 C5 and not a valid plan of
4    adjustment for Chapter 9 purposes.
5          Thank you.
6          MS. PATEK:  Good afternoon, Barbara Patek
7    again, on behalf of the Detroit firefighters
8    association, the Detroit Police Officers
9    Association, the Detroit police lieutenants and
10   sergeants association and the Detroit police
11   command officers association who have been
12   collectively referred to in these proceedings as
13   the Detroit public safety unions or the public
14   safety unions.
15         As the evidence in this case will show,
16   the public safety unions are the recognized
17   collective bargaining representatives of the nearly
18   3200 men and woman employed by the Detroit fire
19   department and the Detroit Police Department.  I'm
20   sure we'll here from Chief Craig, either today,
21   tomorrow or sometime this week about the very
22   daunting and difficult conditions in which they
23   work to provide police and fire services to that
24   are so essential to the survival and the revival of
25   the City of Detroit.

1          The public safety unions piece of this in
2    terms of the evidence is a small but important part
3    of the timeline that was gone over this morning by
4    Ms. Green and also by Mr. Bennett.
5          First, I think I want to say at the
6    outset that the public safety unions have never in
7    these proceedings disputed that the City was in
8    severe financial distress beginning in the time
9    period where I believe both Mr. Bennett and
10   Ms. Green's timelines began.
11         The public safety unions do not, however,
12   believe that the City can meet its burden of
13   showing that it is eligible for these Chapter 9
14   proceedings because of the issue of the good faith
15   negotiations.  What we believe was a, as
16   Ms. Ceccotti referred to a deliberate effort to
17   sort of create a record of impracticality where
18   they set themselves up for failure, and we also
19   believe that the evidence will show based upon the
20   same set of facts that the petition was not filed
21   in good faith as required by section 921C.
22         While we acknowledge the legal nature of
23   the constitution the questions that this Court must
24   wrestle with, we also believe that the evidence
25   that this Court will hear in this eligibility trial

1    may help in form those decisions by providing the
2    Court with a practical and very real platform in
3    which those questions can be applied.
4          Because the public safety unions will
5    rely on and adopt certain proofs submitted by the
6    other objectors, I'm going to try to avoid
7    repeating what was said this morning, but I do want
8    to briefly address where our proofs will fit in the
9    chronology, the retirement system's put up this
10   morning.  And for ease of the Court's reference,
11   and I apologize in advance, this will also have to
12   be marked and we'll get a paper copy and I believe
13   it will be Exhibit 720?
14         THE COURT:  Okay.  And I'll have to ask
15   you to understand that I'm going to be looking at
16   what's there on this little screen here just
17   because it's easier for me, not that I'm not paying
18   attention to you.  I'm looking at it here.
19         MS. PATEK:  That's okay.  That's okay.
20   The public safety union's piece of it are in red
21   and the portions in black are portions from
22   Ms. Green's timeline.  And we did that so the Court
23   could see where they fit in.
24         And we start in December of 2011 and
25   January of 2012, but before we start talking about

1    that time period, I do want to take a moment
2    because I think it's important to this negotiations
3    issue, and I think it's also important to some of
4    the state labor law issues that inform how we ended
5    up in Chapter 9 to take the Court back about 44
6    years ago.  In the fall of 1969, again, not long
7    after the City had been through some very, very
8    trying times, then Governor Milliken, a Republican
9    Governor, signed into law an act found beginning at
10   MCL 423.231, that has come to be known as act 312.
11   Act 312 is as the Court may be aware the platform
12   on which public safety unions negotiate their labor
13   agreements under the auspices of the Michigan
14   employment relations commission.
15         Before the Emergency Manager, terms and
16   conditions of employment were negotiated pursuant
17   to this process.  That process which will be
18   described by one of our witnesses, the Detroit
19   police command officers labor attorney, Mary Ellen
20   Gurwitz, is designed to provide for a period of
21   mediation, followed by if the mediation fails,
22   compulsory arbitration, including the opportunity
23   to send the parties back to mediation, and it's
24   designed to be expeditious and to keep labor piece,
25   and if I might say, might be a tool that if it

1    could be applied to everybody in this proceedings,
2    some of the mediators working so hard to try to
3    resolve our differences, might find useful.
4         Ms. Gurwitz will explain much better than
5    I can the mechanics of the act 312 process and also
6    her experience in negotiating with the City and the
7    D PC OA in the relevant time period.
8         We start with 2011 and Decembers 2011 and
9    January of 2012 and I believe that was also on
10   Mr. Bennett's initial timeline.  Interestingly, at
11   that time, there were negotiations between the
12   City, recognizing the financial difficulties that
13   were present, and each of the Detroit public safety
14   unions of concessionary agreements or tentative
15   agreements.  These agreements were never adopted
16   but our purpose in offering them is to show that
17   where there's a will, it could be done.
18        Our intention is not to suggest in this
19   setting that such negotiations would be easy and
20   that's precisely taking up on Ms. Ceccotti's point
21   why that 30 day period that the City gave itself
22   was doomed to fail.
23        During the same time period as the
24   various acts were being repealed and reenacted, and
25   shortly after the Governor signed a PA436 into

1    effect, mark Diaz, the president of the Detroit
2    Police Officers Association will tell the Court
3    that pursuant to act 312 proceeding, there was an
4    award that became the contract for the police
5    officers association through June of 2014.  This is
6    important because as I'm going to talk about
7    continuing along this timeline to the period after
8    the appointment of the Emergency Manager, which
9    takes us to our second slide, there were acts that
10   the City took to specifically remove this tool from
11   the tool kit of the City and its labor unions, and
12   I'm not suggesting that that removal was not
13   perhaps authorized, although the unions dispute
14   that as a matter of labor law under public act 436,
15   but I think that it's important to suggest that in
16   light of the concept, that there was a plan and
17   design going back a long way.  It was no accident
18   that the City filed an emergency motion on
19   April 18th of 2013, and on June 14th, June 13, the
20   very same day it rolled out its proposal, it
21   obtained an opinion from MARC blocking the police
22   you lieutenants and sergeants association, the
23   police command officers association, and the
24   firefighters from resorting to act 312 arbitration,
25   finding that public act 436 had divested MARC of

1    jurisdiction to address those disputes.  And that
2    becomes important because if you consider there's a
3    plan on June 30, 2013, the collective bargaining
4    agreements between the City, the DFFA, and the
5    DPLSA all expired.  Just two and a half weeks
6    before the Chapter 9 petition was filed.
7         The presidents of the firefighters
8    association, Dan McNamara, the president of the
9    lieutenants and sergeants, mark young, and the
10   president of the DPOA, Mr. Diaz, as previously
11   referred to, will each tell the Court that very
12   quickly after the Emergency Manager's appointment
13   on March 28th, they were each informed by the City
14   that it was exercising its right under public act
15   436 not to bargain.  I know we've heard through
16   some of the testimony that that was done to somehow
17   not waive their rights not to bargain, but the
18   Court will have to consider whether it accepts that
19   as a credible explanation for what happened next.
20        Following the June 14th presentation,
21   again, as Ms. Ceccotti referred to, things moved
22   very quickly.  There was a presentation by the City
23   the week of July 10th, and on July 12th, and it was
24   up on the screen earlier today in Ms. Green's
25   presentation, and I believe it is in the record as

1    Exhibit -- give you the right number here.  I'm not
2    seeing it, but it's a letter from each of the
3    presidents of each of the Detroit public safety
4    unions addressed to Jones Day indicating in
5    response that they were in fact interested in
6    making a counter proposal, they were seeking more
7    information and a concrete proposal from the City
8    in that regard.
9         Four days later, on June -- July 16, the
10   Governor -- I'm sorry, Mr. Orr sent his letter to
11   the Governor seeking authorization.  The following
12   day, Jones Day sent correspondence back to the four
13   public safety unions thanking them on behalf of the
14   Emergency Manager for their strong cooperation in
15   the City of Detroit's pension restructuring
16   efforts.  The next day, the petition was filed.
17   Your Honor, we believe that when the Court has
18   heard all the evidence that it will be difficult
19   for the Court not to conclude that in this case
20   that there was in fact a calculated effort by the
21   City going back over an extended period of time to
22   use Chapter 9 to both in Mr. Orr's words trump that
23   constitutional provision, but also as suggested in
24   some of the arguments last week, to obtain the
25   political cover that would be provided by this

1  Court to do so.  That's all I have to say.  Thank
2  you very much.
3          THE COURT:  Thank you.
4          MR. MORRIS:  Good afternoon.  Thomas
5  Morris of Silverman & Morris on behalf of the
6  Retiree Association parties.
7          The Court heard a comprehensive opening
8  statement from the Retirement Systems and opening
9  statements from other opponents of the City's
10 eligibility.  Those statements chronicle the
11 voluminous evidence weighing against eligibility.
12         In our pre-trial brief, we focused on the
13 evidence which we will offer through Shirley
14 Lightsey, president of the DRCEA, that's the
15 Detroit Retired City Employees Association, and
16 Donald Taylor, the president of the RDPFFA.  That's
17 the Retired Detroit Police & Firefighters
18 Association.  My opening statement will likewise
19 address that evidence.
20         Mr. Taylor and Ms. Lightsey will testify
21 that their associations have a long and active
22 history they're not organizations which came into
23 being just to respond to the present situation.
24 But they are and were prepared to deal with it.
25         The police and firefighters have had a

1  Retiree Association since 1946.  The DRCEA was
2  formed in 1960.  The elected leadership of these
3  associations includes persons who had they been
4  working for the City would be the ones responsible
5  for helping to resolve the City's problems.
6  Members and management of the associations include
7  a past can chief of police, deputy chief, City
8  budget director, personnel managers, a Retirement
9  Systems trustee, and City financial and legal
10 staff.  These are people who are leaders during
11 their active service for the City and they continue
12 to be leaders for the retirees.
13         More than 12,000 retired non uniform City
14 employees are members of the DRCEA, and more than
15 8,000 retired Detroit police officers and
16 firefighters and members of their organization.
17 Both of these organizations serve City retirees in
18 a number of ways but they have particular expertise
19 in the pension and benefits areas.  Although the
20 associations do not have the power for governmental
21 body to enter into agreements that bind their
22 members, the elected leadership is responsible to
23 the membership in responsive to the membership.
24 They communicate with the retirees.  The
25 associations go beyond service through members.

1  Together they represent the class of retired
2  Detroit employees.  All Detroit retirees, not just
3  the members who send in their dues.
4          The associations have appeared before
5  City council, they have lobbied the state
6  legislature, they have been party to lawsuits
7  involving pension and benefit issues.  The evidence
8  will show that the associations of the natural
9  representatives of the retirees capable of
10 negotiating on their behalf.  Upon the Emergency
11 Manager's appointment, each of the associations
12 contacted the Emergency Manager in writing, sent
13 him a letter.  Mr. Orr did not respond to the
14 letters but he did invite the association --
15 associations to informational sessions which they
16 conducted.  The City conducted in April, June and
17 July.
18         Both Ms. Lightsey and Mr. Taylor attended
19 those meetings.  The evidence will show that the
20 City in its meetings never got beyond the first
21 step of presenting information.  The City never
22 offered to meet with the retirees to discuss the
23 City's proposal or to negotiate.  The retiree
24 representatives were relegated to being members of
25 a large audience.  The associations had their

1  attorney contact the City's attorneys, Jones Day,
2  to request the opportunity to specifically address
3  retiree issues but nothing came of that.  Instead,
4  on July 18, in a tactical rush, the City filed its
5  petition.
6          The evidence will show that negotiations
7  with the retirees was possible.  The membership of
8  the associations is more than a majority of the
9  retirees.  Overall, it's considerably more than two
10 thirds.  By working with the membership, the City
11 had the opportunity to make an agreement with a
12 majority of the retirees and thereby satisfy
13 section 109 C5 A either by not impairing the class
14 or by reaching an agreement.
15         The evidence will show that negotiation
16 was not impracticable.  Certainly not with the
17 retirees who prior to the appointment of the
18 Emergency Manager had already elected their
19 leaders.  The retirees had built and maintained
20 through the work of generations of dedicated
21 volunteers organizations which were prepared to
22 work on behalf of the retirees for the best outcome
23 of Detroit for Detroit.  The evidence will show
24 that the Emergency Manager in his advisors rejected
25 the opportunity to attempt to resolve matters as to

1    the retirees.  The City therefore does not satisfy
2    the eligibility requirements of section 109 C5.
3    Thank you.
4          THE COURT:  Thank you.
5          MS. LEVINE:  Good afternoon, Your Honor.
6    Sharon Levine, Lowenstein Sandler for AFSCME.
7          Very briefly and not to be repetitive,
8    with regard to solvency, the City addressed
9    AFSCME's brief with regard to our request that
10   there should actually be expert testimony in order
11   to meet the burden of proof with regard to this
12   issue.
13         And the City's response is basically what
14   we've seen in some smaller debtor cases which is
15   the debtor can testify to its own numbers.  We're
16   not necessarily disputing that line of cases.  What
17   we're saying here, Judge, is that this is not the
18   debtor that's testifying to its own numbers.  We
19   don't have anybody from the budget department, we
20   don't have any of the elected officials.  What we
21   have are hired experts who are being offered as
22   fact witnesses, so we're bringing in experts like
23   Ernst & Young, Conway MacKenzie, Miller Buckfire
24   being paid millions of dollars who routinely appear
25   as expert witnesses and for reasons that we submit

1    are not appropriate here are just simply being
2    offered without having to give their expert
3    testimony with regard to solvency.
4          With regard to impracticality and the
5    issue of good faith.  We would respectfully submit
6    that the argument that there is simply too many
7    classes of bondholders doesn't make a lot of since.
8    The June 14 date that the proposal was presented
9    and the filing date of July 18th was only one month
10   and three days.  Even if we went by the City's own
11   originally projected timeline, the filing date was
12   projected to be July 19th.  That's only one month
13   and four days.  It takes more months than that to
14   negotiate out of Court work outs in simple, small,
15   single level of debt Chapter 11 cases.  We
16   respectfully submit that the timeline the City set
17   for itself was a team line not to allow an out of
18   Court negotiation to fully take place.
19         The City also looks to the fact that
20   there are too many bondholders.  And therefore, it
21   was impractical to negotiate with bondholders and
22   they cited to a New York case.  The only New York
23   case we were able to find that addressed the issue
24   was the off track betting case which dealt with a
25   six-month period before that case which wasn't even

1    an entire City said that there wasn't enough --
2    there wasn't an ability to get it done out of Court
3    and they had run out of time.
4          The other issue there is too many bold
5    holders means that you've met the impracticality
6    standard means that what you're doing is you're
7    writing the need to respond to labor out of the
8    code.  If you have too many bondholders it's
9    impractical and therefore you don't even have to go
10   further.  With we would respectfully submit that
11   that would be a sad day for Detroit if we're
12   actually writing the need to negotiate with labor
13   out of the code.
14         The June 14 meeting is the meeting where
15   the proposal was presented.  We've heard the City
16   say that at that meeting, they invited questions.
17   Okay.  So we have a meeting that lasts a couple of
18   hours, we have a proposal that's in excess of 110
19   pages, the amount of time it takes to read the
20   slides takes up the line's share of that meeting
21   and in addition to that, the questions this which
22   were can permitted were in a very controlled
23   environment and under the guise that the City was
24   quote unquote begging for feedback.  All right?
25   The City announced at that meeting that these are

1    not negotiations.  Now whether that announcement
2    was made to preserve a technical reservation of
3    rights under PA436, they invited a roomful of labor
4    negotiations and they held a meeting that was
5    basically a classroom type instruction meeting and
6    then they announced after a brief Q&A period these
7    are not negotiations.  And somehow or other, this
8    roomful of labor negotiations was supposed to
9    understand that, well, they're not technically
10   legal negotiations for PA436, we really are asking
11   for negotiations to meet the good faith requirement
12   under the Bankruptcy Code.  That's not a realistic
13   or fair interpretation of the facts here, coupled
14   with the fact we have sophisticated bankruptcy
15   counsel and all these sophisticated outside
16   consultants who apparently when receiving a letter
17   from these same labor negotiations that a
18   certificate and response to the June 14 proposal
19   what we have factual and legal reasons why we think
20   we can't negotiate with you, that causes them to
21   immediately think negotiations are impossible.
22   That's not an -- that's not a fair reaction either.
23   I've never walked into a labor negotiation where
24   the company said to the union here's your 1113
25   proposal, what do you think.  And the union has

1 said oh, good idea. It takes a little bit more
2 than that, Your Honor.
3 In addition to that,.
4 THE COURT: Well, you raise an
5 interesting point there that has been on my mind
6 and that is the extent to which the standard of
7 good faith negotiation in 1113 is related to or
8 overlaps with the standard of good faith
9 negotiation in Section 109 or even for that matter
10 the extent to which it overlaps with whatever the
11 law of good faith negotiation is in labor law
12 outside of bankruptcy.
13 I think it would help me if anyone would
14 be interested in briefing that subject. I'm not
15 surprised. And two distinct questions there. The
16 one is is there this overlap, should there be this
17 overlap; and second, how might the law in those
18 other circumstances, 1113 and labor law more
19 generally, help to resolve the issue here of
20 whether there was good faith negotiation?
21 MS. CECCOTTI: Your Honor, may we join
22 with that?
23 THE COURT: Yes, the invitation is an
24 open invitation.
25 MS. LEVINE: Thank you, Your Honor. We

1 accept the invitation and if you if Your Honor sets
2 a deadline.
3 THE COURT: What's convenient for you
4 all?
5 MS. LEVINE: Two weeks? Is that --
6 THE COURT: Two weeks is fine with me.
7 MS. LEVINE: Thank you, Your Honor.
8 THE COURT: Two weeks from today then.
9 I'll enter an order just so the record has it
10 there.
11 MS. LEVINE: Your Honor, but moving past
12 that, okay, so we have the City saying that these
13 are not negotiations and labor negotiators are
14 supposed to glean that they are negotiations, and
15 then we have labor negotiations taking a hard line
16 at the initial proposal and the City accepting that
17 then there can't be any negotiation somehow or
18 other this proves that the City acted in good faith
19 or that the negotiations were impractical, we
20 respectfully submit that's false, and not only is
21 it false, but for the reasons that you've heard
22 from some of the folks already, we too sent
23 requests to the City for additional information to
24 understand what the ask was, what the savings, what
25 the proposed savings were and for better

1 information to understand while it was a long slide
2 show, a little bit more about what the assumptions
3 behind the proposal or the alleged proposal were so
4 that we could in fact liken an 1113 context truly
5 engage in a meaning fulling negotiation. And
6 AFSCME itself, Your Honor, just a mere 18 months
7 prior to the bankruptcy filing, on behalf of itself
8 and with a coalition of 30 unions, did agree to a
9 tentative agreement which resulted in substantial
10 savings for active and retirees benefits and those
11 were ratified by all of those respective unions but
12 not implemented by the City.
13 So I would respectfully submit that not
14 only was there an ability to negotiate in good
15 faith over a period of just a couple of months, but
16 there's a proven track record that on this side of
17 the table, we have been able to actually do those
18 negotiations and accomplish results.
19 THE COURT: Why not implemented?
20 MS. LEVINE: You would have to ask the
21 City and the State, Your Honor.
22 THE COURT: Okay.
23 MS. LEVINE: It does remain a mystery to
24 us because it also included for example changes to
25 the pension benefits on a go forward basis and to

1 the extent that there are other different issues
2 that they needed to address now, those too should
3 have been addressed through negotiations.
4 What we seem to be hearing and what is
5 also a very important point for the City of Detroit
6 and for Chapter 9 on a go forward basis is that if
7 you have legacy liabilities and you have to deal
8 with retiree benefits, then you automatically get
9 to say it's impractical and I don't have to show
10 good faith at all and we would respectfully submit
11 that that would be a very sad place for the City of
12 Detroit to take Chapter 9 in all cases on a go
13 forward basis. We would respectfully submit, Your
14 Honor, that the City can't meet its burden of proof
15 and that it's not eligible in this case at this
16 time to be a Chapter 9 debtor.
17 Thank you.
18 THE COURT: Thank you.
19 MR. ULLMAN: Good afternoon, Your Honor.
20 Anthony Ullman from Dentons. I'll be speaking for
21 the Retiree Committee.
22 But first, Ms. Patek asked me to tell you
23 that Exhibit 704 was the number of the joint public
24 safety unions letter that she couldn't find
25 previously.

1        THE COURT:  Okay.

2        MR. ULLMAN:  So I've done that.

3        Your Honor, of course we're here today on

4   what the Court has identified as a factual issues

5   which rise in the context of eligibility which the

6   City has the burden of proof on and you've heard an

7   overview of a lot of the evidence that the

8   objectors expect to bring to the hearing, much of

9   it in chronological order.  And what I'm going to

10  try to do is put that in a framework of the legal

11  issues that relate to eligibility and try to

12  explain how the evidence that we expect to come out

13  at the hearing fits in with those legal issues.

14  I'm going to be focusing of course on the issues

15  that the Retiree Committee is advancing which I

16  think are common to most if not all of the

17  objectors.

18        Now it's the committee -- it's the

19  committee's contention and the contention of the

20  objectors in general that the City's failed to meet

21  its burden of proof on a number of specific

22  elements that it has to meet to be eligible for

23  Chapter 9 and that it also has failed to meet its

24  burden that showing that it's filing has been made

25  in good faith, so I what I would like to do is kind

1   of go through those elements serially and put into

2   context our view of how the evidence falls into

3   that and how the evidence should shape your view of

4   the law and application of the law.

5        And basically, our points are as follows.

6   The committee itself of course doesn't contest the

7   Detroit's municipality and the committee is not

8   contesting insolvency, although AFSCME of course

9   is, but we do contest that other necessary elements

10  have been met.  Specifically it's our contention

11  that the City can't show that the Emergency Manager

12  first of all was specifically authorized to make

13  this Chapter 9 filing.

14        We also contend that the City that is

15  failed to meet the eligibility criteria that are

16  set out in 109 C5 and there are of course two

17  prongs of that.  We say the City has not shown that

18  it negotiated in good faith which was fired under

19  sub prong C5 B, and we say the City can't show that

20  the good faith negotiations were impracticable,

21  which is a prong under sub CSC and finally the

22  committee says that the City cannot show that it

23  filed its petition in good faith which is required

24  under 921C.

25        So taking that from the top, this is

1   first of all what section 109C2 requires.  And it

2   requires specifically that the City be specifically

3   authorized or the person acting for the City be

4   specifically authorized to be a debtor under state

5   law.  And we don't think the City can show this as

6   a factual matter because in filing the Chapter 9

7   petition, the Emergency Manager did so with the

8   specific intent of taking actions and achieving

9   results that are prohibited by the Michigan State

10  constitution, namely the pension clause, Article

11  IX, section 24.  And we believe that that renders

12  the filing ultra vires ineffective and void.  And

13  this point also obviously ties in with the view

14  that in filing the Chapter 9 petition, the

15  Emergency Manager didn't act in good faith under

16  section 921C.  So what I'm going to do is review

17  the evidence on the intent in filing particularly

18  relative to the pension clause for both purposes of

19  specific authorization and good faith under 921C

20  together.

21        Now as the Court may recall, there's also

22  another aspect we've raised with respect too

23  section 921C, and good faith, and that is what we

24  contend are the misleading statements and omission

25  that is were made in connection with the Chapter 9

1   filing and I'll deal with those later in the

2   presentation.

3        So turning now to the Emergency Manager's

4   intentions as regards to the pension clause.  We

5   think that the evidence is very clear and I'll

6   summarize some of the key points.

7        First of all, we know that Mr. Orr was

8   made the Emergency Manager under PA 436 and that

9   of course as you've heard was replacement law for

10  PA 4, the prior Emergency Manager law which had

11  given the emergency manager very broad powers and

12  then was repealed by vote of referendum in PA 436

13  was passed in its place and as we know it was

14  passed with a minor appropriation provision.  And

15  we believe that the evidence will show that that

16  was intended to immunize the law from Michigan

17  voter review and in fact was a strategy that had

18  been devised and suggested by the Jones Day law

19  firm itself.

20        Now PA 436 was enacted in November 2002,

21  within an effective date of March 2013, and it's

22  against this background that the Emergency Manager,

23  Mr. Orr, was selected for his post.

24        Now Kevyn Orr, we know, is a bankruptcy

25  lawyer by trade.  That of course in and of itself

1    doesn't prove anything, but the evidence will show
2    that before becoming the emergency manager, he was
3    a bankruptcy lawyer at Jones Day ands as I believe
4    the Court has heard, he participated in the pitch
5    that Jones Day made to the City and to the state to
6    get its current assignment as restructuring
7    counsel.
8         Now we've already seen from Ms. Green's
9    presentation that prior to the pitch that Jones Day
10   made, which was in late January, 2013, Mr. Orr was
11   specifically asked about the availability and use
12   of Chapter 9 specifically relative to the City of
13   Detroit.  And the evidence will show that in
14   connection with pitch, the Jones Day team was
15   not only focused on Chapter 9, but was also
16   specifically aware of the Michigan State pension
17   clause and had already thought of using Chapter 9
18   as a means to try to get around it.
19        Now this is the cover of the Jones Day
20   pitch book.  And here's a slide from it.  Which
21   we're blowing up and what it says specifically is
22   that if needed, Chapter 9 could be used as a means
23   to further cut back or compromise quota crude
24   financial benefits closed quote otherwise protected
25   under the Michigan constitution.  And that

1    quotation accrued financial benefits, I believe are
2    words that are lifted right out of the pension
3    clause itself.
4         So this is from the pitch book that Jones
5    Day prepared and as we've said, Mr. Orr himself was
6    a major player and part of the pitch book -- the
7    Jones Day pitch team.
8         And the evidence further is that from his
9    own review of the circumstances of PA 436 and PA 4,
10   Mr. Orr concluded that the new law PA 436, in
11   reality, was nothing more than a thin veneer.
12   Those are Mr. Orr's words -- a thin veneer of a
13   revision that's essentially a redo of the prior PA
14   4, the voters rejected and an end run around the
15   voter rejection.  This is from an email that
16   Mr. Orr wrote and I believe it's a little hard to
17   read because we didn't blow that top part up but I
18   believe it's January 31 of 2013.
19        And this is from one of the exhibits that
20   was gone over with Mr. Orr in his deposition.
21        Now central to the issue of bad faith and
22   authorization is a Michigan constitutions pension
23   clause.  I'll just put a copy of that up on the
24   screen.  And as we see the same word, the financial
25   accrued financial benefits, the same words that

1    appeared in the Jones Day pitch book are right
2    there in the constitution.
3         Now the evidence will show that Mr. Orr
4    was personally aware of the pension clause and the
5    evidence will also show that when he became the
6    emergency manager, Mr. Orr took an oath requiring
7    him to uphold the pension -- the state constitution
8    of which the pension clause is part.
9         And this is Mr. from Mr. Orr's testimony,
10   where he acknowledged that yes, he took the oath of
11   office and he solvency Emily swore to support the
12   constitution of the United States and the
13   constitution of this state, that is, of the State
14   of Michigan.  But the evidence will show that
15   instead of adhering to the strictures of the
16   pension clause, Mr. Orr decided contrary to his
17   sworn oath, to engage on a course of action that
18   was deliberately designed to thwart it through the
19   vehicle of a Chapter 9 filing.  And I'm going to go
20   through now some highlights of what I think the
21   evidence will show, some of which your seen before,
22   some of which you may not have.
23        The evidence will show that as early as
24   May 2013, which is less than two months after he
25   became the Emergency Manager, Mr. Orr made the

1    decision to cut pension benefits that were owed to
2    retirees.  And it will show that he therefore -- he
3    understood that he was unable to identify any
4    viable way to achieve that end just under state law
5    and the evidence will show that the emergency
6    manager therefore decided to accomplish that end
7    through the means of a Chapter 9 filing.
8         And even more specifically, the evidence
9    will show that the emergency manager decided to try
10   to use Chapter 9, the Chapter 9 filing as a vehicle
11   specifically to quote trump the pension clause of
12   the Michigan constitution.
13        Now this all came together in the
14   proposal to creditors that the Emergency Manager
15   made on June 14 of 2013.  And in his proposal, the
16   Emergency Manager made no pretense that he was
17   intending to protect accrued financial benefits as
18   is required and provided for in the Michigan
19   constitution.  For example, here's an excerpt from
20   page 109, where he specifically says that under
21   this proposal, there must be significant cuts in
22   accrued, vested pension amounts for both active and
23   currently retired persons.
24        And under this June 14 proposal, the
25   emergency manager in fact said that the City would

1    not make any further pension contributions on
2    account of retirees.
3         For retirees, the defined pension
4    benefits were to be cut entirely from the forecast
5    of the City's expenses going forward as were the
6    retiree healthcare benefits. And for active
7    employees, they were being shown as switched from a
8    defined benefit plan to a defined contribution plan
9    with the level of the City's funding of the
10   contributions slashed dramatically from the present
11   levels. Now for the actives, that is a new plan
12   and the contributions are being made only on a
13   going forward basis, so for the active employees,
14   vested pensions, under this proposal, no further
15   contributions would be made for those either.
16        Now the June 14 proposal, although it was
17   very lengthy, well over a hundred pages, didn't
18   mention anywhere in it the prospect or even the
19   potentiality of a Chapter 9 filing, but the
20   evidence will show very clearly that the Emergency
21   Manager understood that his proposal could not be
22   implemented outside of the context of Chapter 9
23   specifically because of the pension clause and that
24   he therein tended to use Chinas a vehicle to, again
25   in his words, trump that very clause, the

1    constitution's pension clause, and he's freely
2    admitted that it's the state constitution, the
3    pension clause and no other provision of the
4    Michigan constitution that the Emergency Manager
5    was trying to trump. This is an excerpt from his
6    deposition. I think you may have seen parts of
7    this before, but he says -- he goes on to say that
8    he answers we don't believe there's an obligation
9    under the state constitution to pay pensions. He
10   says yes, that's right. He says no, I've made that
11   statement many times.
12        And then we go on to ask him and the
13   state law that you were referring to is being
14   trumped was Article IX, section 24, isn't that
15   right? He says yes, that's right. We asked is
16   there any other state law that you viewed as
17   relevant to the pension issue that you were trying
18   to trump. He says no, there's no other state law
19   that he's trying to trump. It's specific, the
20   pension clause. Chapter 9 filing was done
21   specifically to try to get around the pension
22   clause of the constitution and there's no other way
23   to read the evidence on that.
24        And these admissions also confirm the
25   City's recognition that the pension clause in fact

1    applies directly to what the City is trying to do
2    through this Chapter 9 proceeding and that the
3    pension clause is indirect conflict with what the
4    emergency manager is trying to do here as regards
5    pensions. There's no question about it, they are
6    trying to do something that they acknowledge is in
7    conflict with the pension clause. If that weren't
8    the case, there would be no context in which the
9    federal law could trump anything. There would be
10   nothing to trump.
11        THE COURT: I don't mean to cut you off,
12   but haven't we been through this?
13        MR. ULLMAN: To some extent, Your Honor,
14   I'm trying not to repeat.
15        THE COURT: Any extent to which we
16   haven't?
17        MR. ULLMAN: Yes, I believe there is,
18   Your Honor. I'm trying to bring in additional
19   evidence to make the largely the same points but in
20   a more summary fashion and then move on to the
21   eligibility issues.
22        And the Emergency Manager did all this in
23   circumstances where he himself has admitted that he
24   was not aware of any Court decision that allowed
25   the use of a federal bankruptcy proceeding to trump

1    a provision of the state law constitution. And the
2    emergency manager did this in circumstances where
3    the Jones Day law firm itself had previously
4    advised that the Emergency Manager's ability to cut
5    pensions through Chapter 9 was at best uncertain.
6    That comes from the Jones Day pitch book itself.
7    They said it was uncertain. And he did this in
8    circumstances where the emergency manager had been
9    advised by the state attorney general that the
10   pensions were protected under Michigan State law
11   and that what the emergency manager was doing in
12   terms of trying to cut them was contrary to the
13   Michigan constitution.
14        And finally on this point, we think that
15   the timing of the filing itself is very
16   significant. You've seen already that there
17   were -- there was state Court litigation that was
18   pending and you've heard that there was a TRO
19   hearing that was scheduled and that the hearing on
20   the TRO was scheduled to take place on the 18th.
21   And what the evidence shows -- I'm sorry, yeah, it
22   was on the 18th and the evidence shows as your seen
23   already that the bankruptcy filing had been
24   originally scheduled for the 19th and then had been
25   moved up to go and Cohen side on the 18th

1    immediately prior to when the TRO hearing was
2    supposed to take place.
3         And the evidence on that is as follows.
4    I'll just skip to this particular slide.  Mr. Orr
5    was asked specifically about the timing of the
6    filing of the bankruptcy petition and in particular
7    about the timing relative to the TRO proceeding, he
8    was asked is there a particular reason why the
9    filing was made when it was at the time it was
10   other than to try to get a jump on the state Court
11   decision.  And the Emergency Manager answered that
12   to the best of his knowledge, there was no such
13   reason.
14        So to sum up on all this, we think that
15   it boils down to the simple proposition that a
16   state actor who takes actions that are
17   intentionally designed to achieve results that are
18   in plain violation and indirect odds with the state
19   constitution is not acting within the scope of his
20   authority and is not acting in good faith and we
21   believe the evidence will show that that's the
22   situation here.
23        And I'm going to turn now to the issues
24   of eligibility.  And as we've said there are two
25   prongs here.  The City can prove by the good faith

1    never called it a deal, we always called it a
2    proposal.  So it was never considered whatever the
3    City is saying now, at the time that the proposal
4    was made, which of course was well before we filed
5    our pre-trial brief, which is the same period
6    Mr. Orr testified prior to the filing of our
7    pre-trial brief, Mr. Orr was quite clear that what
8    they put on the table on June 14th was not a plan
9    of adjustment, was not intended as a plan of
10   adjustment, was just intended as a proposal,
11   something to be discussed.
12        And we believe this is important because
13   under the clear what we believe is the clear weight
14   of the law, in order for the negotiations that are
15   referred to in subpart C5 B.
16        THE COURT:  One second.  I have been
17   asked to ask you to move back from the mike just a
18   bit.
19        MR. ULLMAN:  Is that better?
20        THE COURT:  Maybe a little bit more.
21        MR. ULLMAN:  Little bit more.
22        THE COURT:  There you go.
23        MR. ULLMAN:  The reason this is important
24   is because under subpart 109 C5 B, the negotiation
25   that is are referred to in that subpart have to be

1    negotiation or the impracticality issue either by
2    showing it engaged in good faith negotiations or by
3    showing that those were impracticable.  Now on the
4    good faith negotiation prong, we believe the
5    evidence is going to show two things.  First of
6    all, the Emergency Manager has argued that the
7    presentations and discussions that followed his
8    June 14th proposal to creditors constituted
9    attempts add good faith negotiation, however, the
10   evidence will show that at the time of the
11   presentations and meetings, the Emergency Manager
12   did not have what he believed was a plan of
13   adjustment and specifically the Emergency Manager
14   himself viewed the June 14th proposal only as a
15   proposal and not as a plan of adjustment.
16        Now we've heard this morning from
17   Mr. Bennett that the City is apparently trying to
18   backtrack on this now, but when Mr. Orr was
19   questioned at his deposition, he not only
20   acknowledged but was adamant that what he presented
21   on June 14th, which was the subject of the
22   following discussions and meetings, was not a plan,
23   but merely a proposal that he had put out to seek
24   the general creditor feedback.  He said this very
25   specifically.  We never called this a plan.  We

1    negotiations over what is a plan of adjustment as
2    that plan is used in the Bankruptcy Code.  The
3    legal analysis on that, the authority as we site in
4    our brief, and I'm in the going to repeat that
5    here, but the point is that for the good faith
6    negotiation prong to be met, the negotiations that
7    have to be at issue have to take place over a plan
8    of adjustment and the evidence shows that per the
9    Emergency Manager's own testimony in this case no
10   plan of adjustment was ever presented to the
11   creditors and so a fortiori, the negotiations
12   required under subprong C5 B never took place.
13        And so there's no confusion on this, I
14   want to be clear that the question of whether the
15   City presented the creditors with a plan of
16   adjustment is a very different question from
17   whether the City intended to impair or diminish
18   protected pension payments.
19        On the one hand, as I've gone through,
20   the evidence will show that the City never
21   presented creditors with anything that they
22   considered a plan of adjustment and on the other
23   hand, as I've gone through and Ms. Green has
24   summarized, the evidence will show that the
25   Emergency Manager did intend to impair the

1   protected pension benefits.
2         In fact, this latter point is not even
3   subject to question.  The City has actually
4   admitted in an RFA in this proceeding that's
5   binding on it that it in fact intends to impair the
6   pension rights as part of this proceeding and
7   that's from the City's answer to the RFA that was
8   served on it, number 12, where they admit that the
9   City intends to seek to diminish or impair accrued
10  financial benefits, and that again is a term that's
11  used in the pension clause of the constitution.  So
12  that's what the evidence will show on the existence
13  of a plan of adjustment.
14        Now we also believe and you've heard
15  before that even if there were a plan of
16  adjustment, even if there had been one presented,
17  there were no good faith negotiations.  For
18  example, there was into way to know from the
19  evidence or rather from the information that was
20  provided at the June 14 meeting how an actual
21  monetary terms the individuals that the City sought
22  to effect under the June 14 proposal would be
23  impacted.  And specifically, in terms of both the
24  proposed pension cuts and the OPEB where the City
25  was saying that the retirees would instead get some

1   share of notes, there was no way for the retirees
2   to know what the cash value was of what the City
3   was proposing.  And in fact, the evidence will show
4   that for at least for retirees, at the time of the
5   discussions over the June 14 proposal, the time
6   those discussions were proceeding, the City itself
7   did not even know what the real size of the
8   unfunded pension liability was.  In other words,
9   there was no way to know what the parties were even
10  negotiating over.  And here's some of the evidence,
11  quickly, on the negotiations.
12        First of all, the Emergency Manager has
13  admitted, this is a question asked in regards to
14  the June 14 meeting.  We asked him were there
15  negotiations there.  His answer, no, there are not
16  negotiations.  I'm going to be careful how I use
17  the word, but no, as we generally use the word,
18  there were none.
19        There are other meetings that then took
20  place.  The next meetings as I recall took place on
21  June 20.  And this is from a letter that Jones Day
22  wrote.  And it called them informational meetings.
23  And acknowledged that actives and retired employees
24  will need access to additional information to
25  analyze the proposals that are being -- that are

1   proposed in the June 14th document.  And here's
2   another letter from Jones Day.  This is dated I
3   believe July 17th, and what it says is we think it
4   first makes sense to try to reach common ground
5   with the unions and associations on actuarial
6   assumptions and methods and the amount of the
7   underfunding.  First we got to figure out what the
8   amount of the underfunding is, and then tackle the
9   contributions and attendant benefit changes.  We
10  have to know what the size of the underfunding is
11  before discussions can even take place.  So again,
12  there wasn't even anything concrete to negotiate
13  over.
14        And finally, on this point, we believe
15  the evidence will show the City never really
16  intended to engage in good faith negotiations.  I'm
17  going to put this document up briefly.  We've gone
18  through this before.  This is a document from Bill
19  Nowling of the Emergency Manager's office and
20  basically what he's saying, this is as of July 8th,
21  that they've already concluded what their key
22  filing messages would be, July 8th, they're saying
23  it's impracticable.  This is before the meetings
24  that were scheduled for July 10th and 11, even too
25  took place.  So what we can see is even as the City

1   was telling the world that it wanted to have more
2   meetings, it had already internally and secretly
3   decided it would claim impracticability.  So the
4   meetings that were followed were really nothings
5   more than an effort to create a record that would
6   allow the City to claim good faith negotiations
7   when in there were no real negotiations and the
8   City wasn't negotiating with we believe in good
9   faith.
10        With respect to the impracticability
11  prong, we believe the situation is similar.  At the
12  outset as we explained in our pre-trial brief, the
13  committee believes that the requirement that there
14  be a plan of adjustment applies equally to the
15  impracticability test.  And this makes sense
16  because without an actual plan identifying who the
17  City intends to impair and how, there is no way to
18  a sirs whether negotiations would be practicable.
19  And specifically what as we said, the only
20  document that was on the table was the June 14
21  proposal and that was a proposal not a plan.
22        And further, as we've set out, we believe
23  in the law is that to show impracticability, the
24  City has to show impracticability with respect to
25  each class of creditors, it has to try to negotiate

1  with those with whom negotiations are possible, and
2  as you've heard, the evidence will show that we
3  believe there was certainly a number of classes of
4  creditors with whom that was possible.  And as we
5  saw from the last slide, the evidence indicates the
6  City really never intended to try to negotiate but
7  really just tried to use impracticability as a tool
8  to get out of it.  So from a factual viewpoint, we
9  believe the impracticability prong will not be met
10  either.
11          Finally, I want to talk briefly about
12  section 921C, which is a good faith requirement.
13  I've already addressed one aspect of the good
14  faith, the emergency manager's pursuit of a course
15  of action that's contrary to the pension clause of
16  the constitution but there's also another aspect to
17  it.  And that is this.  That we believe that in
18  connection with his filing of the petition, the
19  Emergency Manager made a number of
20  misrepresentation -- or of representations that we
21  believe the evidence will show were at minimum
22  misleading and incomplete.  And I'll give you some
23  examples.
24          First of all, in his declaration, this is
25  the deck rakes that the Emergency Manager filed

1  unfunded pension liability, that the unfunded
2  pension liability is $3.5 billion.  And this is
3  stated here as a fact, not subject to
4  qualification, and as we all know, the unfunded
5  pension liability, how big it is and what if
6  anything will be done about it, those are central
7  issues that will have to be addressed if this
8  action proceeds, but for present purposes, the
9  evidence will show that this $3.5 billion number
10  that Mr. Orr stated in his declaration is not a
11  fact.  I think we think the evidence will show that
12  the fact is that at the time the petition was
13  filed, the City did not know the actual size of the
14  unfunded pension liability as its analysis on that
15  was ongoing and hadn't been completed and indeed
16  still hasn't been completed today.  And this, for
17  example, is from the deposition testimony of
18  Charles more, who is -- who is the City's from
19  Conway McKenzie, who is the City's operational
20  restructuring advisor.  Mr. Moore also put in a
21  declaration addressing unfunded pension
22  liabilities.  And at his deposition, Mr. Moore
23  candidly admitted that in fact the City didn't know
24  what the actual amount of the unfunded liability
25  was and that work was going on to try to make that

1  with the petition.  He stated that the City has
2  over 18 billion in accrued liabilities and
3  including specifically over 6.4 billion in bonds
4  that are backed by enterprise revenues or otherwise
5  secured.  Now that of course sounds like a huge
6  liability for the struggling City of Detroit to
7  bear, but the evidence will show that what's not
8  stated in this is that the vast majority of these
9  bonds that we see referred to here, the
10  6.4 billion, are bonds that are issued by the
11  Detroit water and sewer and department which is
12  operated as a separate authority and is fully
13  responsible for the payment of those bonds, and the
14  evidence will show that the department of water and
15  sewers itself has the financial wherewithal to make
16  those payments.  We put this question to the
17  Emergency Manager in his deposition.  Said yes, the
18  department of water and sewers, it generates its
19  own revenues and it pays its debts as they come do.
20  So right off the bat, the total liabilities that
21  according to the Emergency Manager he has to
22  struggle to meet are effectively reduced by at
23  least a third.
24          Now also in his declaration, the
25  Emergency Manager stated that in terms of the

1  determination.  He says specifically, the most
2  importantly the City's actuary has not completed
3  its analysis on the unfunded position and until
4  that work is done, no one really knows what the
5  unfunded liability is.
6          And indeed, we believe the evidence will
7  show that the last full actuarial valuation of the
8  unfunded liability was done around June of 2011 and
9  the unfunded amount that was shown in that
10  evaluation was about 643, 644 million.
11          And the evidence is also going to show
12  that of that total amount, the 644 or so only about
13  250 million is allocable to the general fund, which
14  is the fund that the City's most concerned about,
15  which it pays most of its bills, and that is not a
16  charge on the general fund.  What the evidence will
17  show that a very large chunk that have is in fact
18  allocable to other departments such as the
19  department of water and sewer and, which again is
20  responsible for that and pays its own bills.
21          Now during Mr. Bennett's arguments, he
22  suggested that we had somehow misstated what
23  Mr. Orr said at his deposition, failed to cite all
24  the appropriate parts, that's not accurate.  At his
25  deposition, Mr. Orr was put through the numbers and

1    there was initial error, he then corrected that
2    arithmetic error at the end of the deposition,
3    Mr. Orr said that it appeared -- to his knowledge
4    at the time, the portion of the unfund funded
5    pension liability that was allocable to the
6    department of water and sewerage was about
7    68 percent.  Mr. Bennett suggesting that maybe
8    68 percent isn't the right number, and the right
9    number should be 38 percent.  Be that as it may,
10   38 percent is still in this context a huge chunk of
11   the unfunded pension liability which is something
12   that's born by department of water and sewerage and
13   payable from those funds without any strain on the
14   general fund.  And the evidence will show that the
15   Emergency Manager has acknowledged that even if the
16   unfunded pension liability were ultimately found to
17   be greater than the $644 million number, even if it
18   were found to be as high as $3.5 billion number
19   that you've heard, that same principal would hold
20   true that there's is a significant portion of it
21   that is not allocable to the general fund, but is
22   born entirely and payable by and fully funded by
23   the department of water and sewers.  And as I said,
24   the evidence will show that that department is
25   solvent and capable of meeting its obligations and

1    indeed the water and sewerage pension payments even
2    have priority over secured claims in that they're
3    included in net operating expenses.
4         So we believe the evidence will show that
5    the amount of the underfunding on the pension
6    liability is not nearly as severe as -- still
7    substantial, not denying that, but not nearly as
8    severe as was portrayed in the Emergency Manager's
9    declaration.
10        And finally, related to all of this, the
11   evidence will show that the City does we believe
12   have substantial assets that can be monetized.
13   Chiefly, but not alone among them is the art that's
14   owned by the City that's maintained at the Detroit
15   Institute of Arts, and we're talking about art
16   that's owned out ride by the City, not art that's
17   subject to any charitable trust.  And the evidence
18   will show that there is that asset and also the
19   department of waters and sewers is a valuable asset
20   that can be monetized.  The City may be well be in
21   a position to obtain the substantial attached
22   influx from these assets and we understand is
23   actively pursuing these opportunities, those
24   assets, those cash flows could obviously be used to
25   fund other obligations as well, yet none of that

1    was factored in any way into the Orr declaration
2    even though that could dramatically change the nix
3    in terms of what happens in terms of not only
4    paying pension obligations but other obligations as
5    well.
6         So that, Your Honor, is what we believe
7    the evidence will show.  Based on that, we believe
8    the City cannot meet its burdens of proving
9    eligibility or good faith and we look forward to
10   proceeding.  Thank you, Your Honor.
11        THE COURT:  Thank you.
12        MR. ULLMAN:  And we will have a bound
13   copy of the slides that I used for you and marked.
14        THE COURT:  Thank you.
15        MS. LEVINE:  Your Honor, I apologize, but
16   I got a flurry of emails after I got away from the
17   emails saying two weeks, what are you crazy?
18        THE COURT:  What was your answer to that
19   question?
20        MS. LEVINE:  I have to ask the judge if
21   I'm crazy or not.
22        THE COURT:  I take it you're asking for
23   more time?
24        MS. LEVINE:  If we could have another
25   week, Your Honor.

1    THE COURT:  Sure.  Three weeks.
2    Absolutely.
3         So does that conclude your openings
4    statements?
5         All right.  We'll take a recess now until
6    ten after three and we'll begin with the evidence
7    at that time.
8         COURT CLERK:  All rise.
9         (Whereupon a break was taken
10        from 2:51 p.m. to 3:10 p.m.)
11        COURT CLERK:  Court is in session.
12        THE COURT:  Please be seated.  It appears
13   everyone is here.  You may proceed
14        MR. STEWART:  Thank you, Your Honor,
15   Geoffrey Stewart, Jones Day for the City.
16        Our first witness will be Gurav Malhotra,
17   but before we call him, I wanted to put on the
18   record a stipulation that the parties have reached
19   with regard to the sequestration.  We believe the
20   witnesses should be sequestered with the exception
21   of those who by definition representatives of a
22   party.
23        THE COURT:  That's fine.  I ask counsel
24   please to supervise this sequestration because you
25   know who your opinions witnesses are.

1      MR. MONTGOMERY:  Thank you, Your Honor,
2    we will.
3      MR. STEWART:  May we call Mr. Malhotra to
4    the stand.
5  (Witness sworn.)
6      THE COURT:  Please sit down.
7      You may proceed, sir.
8           EXAMINATION
9  BY MR. STEWART:
10 Q.  Good afternoon.  Mr. Malhotra, could you please,
11     for the record, give us your full name and your
12     home address?
13 A.  Gurav Malhotra, and I live in Chicago, Illinois.
14 Q.  And are you presently employed?
15 A.  Yes.
16 Q.  Who are you employed by?
17 A.  Ernst & Young.
18 Q.  And what is Ernst & Young?
19 A.  Ernst & Young is a big four accounting firm.
20 Q.  And how long have you worked for Ernst & Young?
21 A.  For close to four years since I recently joined.
22 Q.  And what part of Ernst & Young's practice do you
23     work?
24 A.  Restructuring specifically.
25 Q.  And just for the record, tell us what that means

1      when you say restructuring?
2  A.  I'm a practice predominantly represents
3      corporations and public sector clients in order to
4      assist with business plan assessments, liquidity
5      analyses, as well as developing restructuring
6      proposals.
7  Q.  Tell us, if you could, about your college education
8      and any post-graduate education that you have.
9  A.  I went to college in New Delhi, India, and I did my
10     MBA in finance in business policy from Case
11     Western, and I'm also a CFA.
12 Q.  Certified Financial Analyst?
13 A.  That is correct.
14 Q.  After you left Case Western, what was the first job
15     that you had?
16 A.  I joined Ernst & Young.
17 Q.  And how long were you at EY at that point?
18 A.  At EY, I joined in May of 2000 and EY's
19     restructuring practice was, I believe about 2004,
20     sold to Julian Capital Advisors.  I transitioned
21     with that team.  That team was subsequently sold to
22     MaQuarry, an Australian investment bank, and I
23     transitioned with that team, and came full circle
24     back to EY about four years ago.
25 Q.  And what is your title at EY now?

1  A.  I am a principal.
2  Q.  And what does that mean?
3  A.  It's a non-CPA partner of the firm.
4  Q.  So you're an equity partner of EY?
5  A.  I am an equity partner of EY.
6  Q.  Tell us some of the clients you have worked for as
7      part of your work in restructuring.
8  A.  I worked for Delta Airlines, I did work for Detroit
9      Public Schools, doing work for liberty medical
10     right now, worked at Collins & Aikman, and those
11     are some of the clients that I have worked with in
12     addition to others.
13 Q.  Did there come a time when EY was retained by the
14     City of debt at the time to perform work for the
15     City?
16 A.  Yes.  We started our work in about the May, June of
17     2011 timeframe.
18 Q.  So over two years ago?
19 A.  That's right.
20 Q.  At the time the City approached you or any time
21     since, was EY retained to serve as an expert for
22     the City in any litigation including Chapter nine
23     litigation?
24 A.  No, in fact, it's very clear in our letter that we
25     will not serve as an expert.

1  Q.  What were you hired to do in May of 2011?
2  A.  Generally it was to get a handle on the City's
3      liquidity position and try and get our arms around
4      in terms of the City's short term liquidity
5      forecast over the next 12 months or so.
6  Q.  And this was back in 2011, that was what you were
7      asked to do?
8  A.  That is correct.
9  Q.  Did there come a time earlier this year when the
10     scope of work the City asked of EY was expanded?
11 A.  Yes, in the timeframe of this calendar year, our
12     role was expanded to look at a ten-year forecast
13     for the City, predominantly on the general fund,
14     and to ascertain what the deficit as well as cash
15     projections would be over a longer timeframe versus
16     a shorter timeframe.
17 Q.  Now you just used the term general fund.
18 A.  Yes.
19 Q.  What is the general fund?
20 A.  The general fund is basically where the day-to-day
21     activities for a municipality are recorded, IE
22     collection of taxes, payment of operating expenses
23     and administrative expenses, as well as debt
24     service that is not related to an enterprise fund.
25 Q.  Why is the general fund a logical place to look

1    when you're analyzing the City's financial
2    position?

3  **A.**  Because that's where the tax revenues of the fees
4    are recorded, so the enterprise funds specifically
5    charge their own fees for their specific service,
6    but the general fund is where the core operating
7    deficit office cities is recorded in municipal
8    accounting across the country.

9  **Q.**  You used the term a couple times enterprise funds.
10   For the record, what are the enterprise funds or
11   what are examples of the enterprise funds?

12  **A.**  Enterprise funds generally are have a specific fees
13   that is charged for the services that are provided
14   by that fund.  It's generally break even.  For
15   example, the water and sewer department is an
16   enterprise fund of the City, the Detroit department
17   of transportation is enterprise fund of the City,
18   all the department of transportation requires a
19   subsidy from the general fund so it's not break
20   even.

21  **Q.**  Now in your analysis of the City's financial
22   position and of the general fund, did you take into
23   account the enterprise funds?

24  **A.**  We looked at some of the cash activity of the
25   enterprise funds back in 2011, but focused majority

---

1    of our efforts on the general fund and those
2    enterprise funds that require a subsidy from the
3    general fund like DDOT, which is the department of
4    transportation.

5  **Q.**  Now in the course of your work, what materials or
6   information from the City did you rely upon?

7  **A.**  We looked at a CAFR --

8  **Q.**  I'm going to stop you right there.  Can we put up
9   Exhibit 6?  And I believe Your Honor, the CAFR,
10   which is Exhibit 6 has been stipulated into
11   evidence.

12        Is this the CAFR?

13  **A.**  Yes, that's the CAFR for 2012.  Its eight
14   comprehensive annual financial report, which is the
15   City's audited financial statements.

16  **Q.**  Those are audited?

17  **A.**  Yes.

18  **Q.**  By Ernst & Young?

19  **A.**  No.

20  **Q.**  And what does the CAFR tell you?

21  **A.**  It gives you a detailed snapshot of revenues and
22   expenses as well as the deficit position of the
23   general fund as well as some activity of the
24   enterprise funds.

25  **Q.**  Is this a public document?

---

1  **A.**  Yes, it is.

2  **Q.**  What else did you look at in the course of your
3   work to learn about the details of the finances of
4   the City?

5  **A.**  We looked at the City's budgets, we looked at
6   internal financial reports that we had access to
7   from the City.

8  **Q.**  What kind of financial reports?

9  **A.**  They were generally department specific revenues
10   and expenses as we had available.  We also looked
11   at receipts and disbursements activity for
12   different bank accounts to try and get our arms
13   around the financial position of the City.

14  **Q.**  Now were these materials you looked at records that
15   financial records that the City had kept in the
16   ordinary course of its business?

17  **A.**  Yes.

18  **Q.**  And in your experience, is it in the ordinary
19   course of an enterprise or City's business to keep
20   records such as the ones you were looking at?

21  **A.**  Yes.

22  **Q.**  And did the records appear to you to be accurate?

23  **A.**  Generally, yes.  I mean, they were always questions
24   about assumptions, like specifically on budgets,
25   but we did not find any material discrepancies at

---

1    least in the information that we were trying to get
2    our arms around specifically like the CAFR.

3  **Q.**  What did you do to check the reliability of the
4   information the City gave you?

5  **A.**  What we did is we looked at the information that
6   was made available, we spoke to various members of
7   the City's management team, the finance department
8   at the City, various department heads, we looked at
9   the receipts and disbursements activity as
10   generally cash was a telling barometer in terms of
11   the quality of information we were receiving.

12        So we went through and tried to scrub the
13   data to the best of our ability.

14  **Q.**  You just used the term we.  I should have asked you
15   earlier, how many people from EY worked with you on
16   this project?

17  **A.**  On the front end of this engagement, we had a team
18   of about four or five and that team is larger now.

19  **Q.**  What deliverables were expected of E&Y as a result
20   of its work?

21  **A.**  It was generally a cash flow updates, whether they
22   be short term or medium term.  Generally going out
23   on a monthly basis.  Variance reports in terms of
24   how the City was performing in context of those
25   cash flows.  As time progressed, our work expanded

---

1    to helping develop the long-term projections in
2    conjunction with other members of the City.  So we
3    also helped in terms of updating the financial
4    advisory board on a monthly basis in terms of where
5    some of the cash position of the City was.
6
7  Q.  And in terms of organizing and presenting your
8    data, what methods did you use?
9  A.  It was just lien Excel spreadsheets or PowerPoint
10    presentations.
11  Q.  And an Excel spreadsheet is what?
12  A.  It's a software that allows you to compile,
13    organize or make calculations in terms of the data
14    we have available.
15  Q.  And the calculations are a arithmetical
16    calculations?
17  A.  Yes.
18  Q.  Let me ask you this.  Did there come a time when
19    you learned an Emergency Manager had been appointed
20    for the City of Detroit?
21  A.  Yes.
22  Q.  And do you remember when you learned of it?
23  A.  Right around March.
24  Q.  And when did you meet Kevyn Orr for the first time?
25  A.  The first time I met Kevyn Orr was during the

1    interview process of various law firms where Jones
2    Day was one of the firms that was presenting its
3    credentials to represent the City.
4  Q.  And after Mr. Orr was appointed as Emergency
5    Manager, how often did you meet with him?
6  A.  Generally weekly.
7  Q.  And is that continued to this day?
8  A.  Yes, either meetings or phone conversations.
9  Q.  Are you aware of something called a 45 day report?
10  A.  Yes.
11  Q.  What is the 45 day report?
12  A.  It's a report that an Emergency Manager has to
13    present 45 days after his or her appointment to
14    provide a snapshot of the financial and operating
15    condition of the City.
16  Q.  Now we've put up on the monitor before you exhibit,
17    I think it's 75 for identification.  Is that the 45
18    day report?
19  A.  Yes, it is.
20  Q.  And you've seen this before?
21  A.  I have.
22  Q.  And do you understand why it was Mr. Orr was
23    required to submit a 45 day report?
24  A.  I believe it's per statute, under P 436.
25  Q.  Did you yourself contribute any part of the content

1    of the 45 day report?
2  A.  We did.  We helped work on the financial section of
3    the document as well as short term liquidity
4    projections that were available as of that point in
5    time.
6  Q.  Let me ask if we could go to page 40 of the -- and
7    if we could blow it up for the monitor please,
8    Lauren, so we can see it better.  Mr. Malhotra, do
9    you have that before you, page 40 of the report?
10  A.  Yes, I do.
11  Q.  And what is that?
12  A.  That is a snapshot of the monthly receipts and
13    disbursements activity of the general fund and the
14    cash balance available for the general fund along
15    with any deferrals that we were able to identify as
16    of that time.
17  Q.  And is this a spreadsheet that you or someone at EY
18    working at your direction prepared?
19        MR. SHERWOOD:  Your Honor, I would just
20    like to interpose an objection at this time.
21        THE COURT:  Would you identify yourself,
22    sir.
23        MR. SHERWOOD:  I'm, Your Honor, I was
24    introduced this morning.  I'm Jack Sherwood,
25    Lowenstein Sandler, counsel for AFSME.  I'm Ms.

1    Levine's partner.
2        THE COURT:  Go ahead, sir.
3        MR. SHERWOOD:  I believe this testimony
4    in terms of forecasts of future performance by the
5    City is improper lay opinion testimony and should
6    be disallowed.  We submit that this testimony is in
7    the nature of financial projections requires
8    special expertise training and so forth and under
9    federal rule of evidence 701C, should be excluded.
10    Thank you.
11        MR. STEWART:  Well, Your Honor, two
12    responses.
13        THE COURT:  Excuse me.  One second.  Is
14    it the exhibit you object to or the testimony about
15    it.
16        MR. SHERWOOD:  Both, Your Honor.
17        THE COURT:  The exhibit is already in
18    evidence, right?
19        MR. SHERWOOD:  Then the testimony about T
20    I think it has been stipulated into evidence.  I
21    think this document is in evidence, but I do
22    believe that any testimony about these projections
23    is expert testimony and should be disregarded.
24        THE COURT:  Sir.
25        MR. STEWART:  Well, first of all, I don't

1  believe the witness is going to be asked any
2  opinion about this and he's testified earlier he
3  has not been hired as an expert, but more
4  fundamentally, I think the rule is clear that to
5  the extent a witness even one who has expertise is
6  simply performing arithmetic or similar
7  calculations on voluminous data, it is not expert
8  testimony and I think the leading Sixth Circuit
9  case on that, Your Honor, is I think it's the
10 Madison case, 226 federal appendix 535, which is
11 the 2007 case, and it cites at length at 11th
12 circuit case that says that in greater detail
13 on different facts.
14         And so that is why I ask the questions I
15 ask a few minutes ago about the source of the data,
16 were they business records, what did he do with
17 them, they went into a spreadsheet, what is a
18 spreadsheet do, and this stage I'm still trying to
19 explain how he went about compiling his
20 spreadsheets, but counsel is correct, I'm going to
21 ask him at some point what were the results of the
22 calculations.  I'm not going to ask him his opinion
23 on what anything ought to be, it is simply going to
24 be after you compiled the information as you
25 testified, what did the number turn out to be.

1          MR. SHERWOOD:  Just briefly, Your Honor.
2  Anything that projects future revenues or forecasts
3  is opinion, it's not fact.  It's not adding numbers
4  that exist.  I understand that a fact witness can
5  testify what are expenses and payments were on a
6  given month or even that are due this month, but
7  this is forecasting into the future in terms of not
8  only -- not only expenses, but also receipts,
9  things like property taxes, utility taxes, various
10 types of revenues going out through the end of this
11 year.  And I think that by definition that requires
12 some type of expertise specialized training,
13 certainly not something that anyone can do as
14 properly the subject of expert testimony and
15 shouldn't be allowed.
16         MR. STEWART:  I think what the Sixth
17 Circuit wrote, Your Honor, was that there are many
18 things that require expertise, for example,
19 requires expertise to read the records and know
20 what part of the City's records are important, but
21 where the calculations themselves do not require
22 expertise beyond simple mathematics, it's not
23 expert testimony.  They distinguish between an
24 expert and expert testimony.
25         THE COURT:  What was the specific last

1  question that you asked?
2          MR. STEWART:  I believe it was, if I --
3  how went about preparing or his staff went about
4  preparing the spreadsheet we see before us on the
5  screen.
6          THE COURT:  I'll permit that question.
7          MR. STEWART:  You may answer.
8          THE WITNESS:  The way we helped pull this
9  spreadsheet together or any of the spreadsheets on
10 the cash flows were we looked at the information
11 that was available in the different budgets, we
12 were able to look at the different receipts and
13 disbursements on an actual basis in terms of what
14 was actually coming in to the City and break that
15 down into the different categories and then based
16 on the assumptions that we had collectively in
17 conjunction with the City, forecast what the
18 monthly receipts and disbursements could be over
19 this forecast period.
20 BY MR. STEWART:
21 Q.  And you populated the spreadsheet with those
22      numbers?
23 A.  That is correct.
24 Q.  And you performed addition and subtraction on them
25      to reach the conclusions that are shown here; is

1      that correct?
2  A.  Yes.
3  Q.  And now may I ask you, just as to this, what did
4      you conclude the short term cash flow forecast
5      would yield to in terms of the City's available
6      cash as of the end of calendar year 2013.
7          MR. SHERWOOD:  We're going to have the
8      same objection, Your Honor.
9          THE COURT:  That objection is sustained.
10 BY MR. STEWART:
11 Q.  Mr. Malhotra, let me also ask you to look at --
12      I'll come back to that in just one minute.
13         Did there come a time, Mr. Malhotra, that
14      you learned the Emergency Manager had
15      scheduled a meeting with creditors of the City for
16      June 14 of this year?
17 A.  Yes.
18 Q.  And when did you learn of the meeting?
19 A.  It was right around I think in that June timeframe.
20 Q.  And did you attend the meeting?
21 A.  I did.
22 Q.  Where was it held?
23 A.  At the west in at the airport.
24 Q.  And how many people attended?
25 A.  I would say about a couple hundred.

1  Q.  How long did it last?
2  A.  Four, five hours.
3  Q.  Did you speak or present anything at the meeting?
4  A.  I did.
5  Q.  And were were materials passed out at the June 14
6      meeting?
7  A.  Yes.
8  Q.  Let me first put up on the screen Exhibit 43.  Do
9      you see Exhibit 43?
10 A.  I do.
11 Q.  Is that a document entitled proposal for creditors
12     that was distributed on June 14?
13 A.  It was.
14 Q.  And let's put up Exhibit 44.  Is that an executive
15     summary of the proposal that was also distributed
16     that day?
17 A.  That is correct.
18 Q.  Now at that meeting, this is entitled proposal for
19     creditors?
20 A.  Yes.
21 Q.  That's the title of it.  What's being proposed?
22 A.  What the City was proposing was a framework for a
23     restructuring of its long-term liabilities showing
24     that the City was going to be unable to meet its
25     obligations as they came due.

1  Q.  Now I think you testified that you prepared certain
2      parts of this document?
3  A.  That is correct.
4  Q.  And let me direct your attention, if I could, to
5      page eight of the document.
6          Is this a spreadsheet that you or others
7      at E&Y prepared?
8  A.  Yes, it was.
9  Q.  And what does it per port to show?
10 A.  The first column in that spreadsheet --
11 Q.  First of all, what's the title of the spreadsheet?
12 A.  It says fiscal year 2013 forecasted cash flow to
13     year end.
14 Q.  Now it uses the term fiscal year 13.  What is the
15     fiscal year of the City of Detroit?
16 A.  July 1 to June 30th.
17 Q.  So at the time of this meeting, the fiscal year 13
18     had about 16 days to go?
19 A.  Yes, June -- the month of June 2013 was still a
20     forecast.
21 Q.  So before we go further, let's look at our
22     spreadsheet here.  How many months of this
23     spreadsheet are actual numbers?
24 A.  On the first column is 12 months, fiscal year 2012,
25     and subsequent to that, 11 of the 12 months are

1      actuals and a month of forecast.
2  Q.  And that information you obtained from where?
3  A.  It was compiled from the information that was given
4      to us by the City.
5  Q.  Okay.  And what I would like to do, because we're
6      going to be dealing with some of these issues
7      later, is to go over some of the elements of
8      operating receipts and operating disbursements that
9      we see here on the spreadsheet.  And I don't know
10     if they can be blown up to be even larger or not,
11     Lauren.  I don't know if everyone can see them.
12         Let's just blow up operating receipts if
13     we could.  I have asked the technical assistant
14     here to blow these up so we can all see them
15     better.  And let me ask you about some of the
16     operating receipts.
17         Property taxes and income and utility
18     taxes are just what they say they are?
19 A.  That's right.  That's what they contain.
20 Q.  And gaming taxes, what are gaming taxes?
21 A.  Those are the taxes the City receives from the
22     three casinos.
23 Q.  Next is municipal service fee to casinos?
24 A.  Those are generally additional fees that the City
25     collects from the casinos for additional services

1      that are provided.
2  Q.  And then our next line is state revenue sharing?
3  A.  That's state aide that the City receives every
4      other month.
5  Q.  And below that, we have other receipts.  Could you
6      tell us what the other receipts are?
7  A.  Sure.  Those are combination of fees from the
8      different departments, it has grant revenue in
9      there as well as any other one time items that are
10     also captured in there.
11 Q.  And the final item is called refinancing proceeds.
12 A.  Yes, those generally reflect the monies that the
13     City was borrowing from the escrow account that was
14     set up with the state, so it was essentially
15     additional debt borrowings.
16 Q.  Let's go back if we could, Lauren, to the -- if you
17     could just then expand for us the part of our chart
18     that says operating receipts.  Still be the top
19     part, I think.
20 Q.  Now your spreadsheet purported to tabulate what the
21     operating receipts were and I think the first
22     column is actual for fiscal year 12.  What did you
23     determine the City's operating receipts had been
24     for that fiscal year?
25 A.  For the general fund, predominantly the

1 operating -- total operating receipts were
2 1.765 billion of which 50 million was related to
3 so-called proceeds from debt issuance or borrowings
4 from the escrow fund.
5 **Q.** And then for fiscal year 2013, you had 11 months
6 actual and one month forecast; is that right?
7 **A.** That is correct.
8 **Q.** Okay. And can you tell me what your forecast was
9 with those 11 actual and one forecasted month?
10 MR. SHERWOOD: Objection. Sorry.
11 MR. STEWART: For the operating receipts
12 for fiscal queer 13.
13 MR. SHERWOOD: Your Honor, I object to
14 testimony based on forecasts.
15 MR. STEWART: Your Honor, what we have,
16 he spoke not only about the City's actual receipts,
17 he also spoke about the City's budgets. Not as a
18 forecast he made, but as a budget the City had.
19 Which was itself a factual document. To the extent
20 he's talking about what the City has budgeted,
21 especially when he test it against actual
22 experience for reliability, I believe he can talk
23 about what the forecast result is to look at. I
24 would add that this is one where 11/12th of the
25 date as is actuals that had already in fact come to

1 pass.
2 THE COURT: Sir, is the number for the
3 column forecast June 13 of 125 your number or the
4 City's number?
5 THE WITNESS: It was generally a
6 collaborative effort in which we used the numbers
7 that were, Your Honor, developed by the City
8 originally, we scrubbed them along with the City.
9 THE COURT: What does scrub mean?
10 THE WITNESS: So we looked at, Your
11 Honor, the historical actuals in terms of how the
12 amount of collections that were received in that
13 particular month in conjunction and comparison with
14 the overall tax row, so it was, you know, actually
15 or looking through the historical information that
16 we had available as well as the best forecast
17 information we had available to demonstrate what
18 the one month of forecast would have looked like.
19 THE COURT: All right. I'll permit the
20 testimony as to the full year for actual and
21 forecast, but subject to credible admissible
22 evidence regarding June 13.
23 MR. STEWART: Your Honor, we will provide
24 that.
25

1 BY MR. STEWART:
2 **Q.** And then Mr. Malhotra, as to the full year
3 operating receipts for 2012, what did you
4 calculate?
5 **A.** For the full year of fiscal year 2013, the total
6 operating receipts were 11 months of actual and one
7 month of forecast were 1.582 billion, which
8 included roughly $30 million of borrowings from the
9 escrow account as shown in the line item up above.
10 **Q.** And sorry, the line you are referring to is the
11 line that says refinancing proceeds?
12 **A.** That is correct.
13 **Q.** And you better tell us what the escrow account is?
14 **A.** It's an account escrow account that's set up with
15 that's subject to an escrow agreement between the
16 City and the state where they are roughly about
17 $70 million of cash that is sit inning that escrow
18 account today. It was projected that $20 million
19 of that 70 would have been collected, Your Honor,
20 in June of 2013, but that has not happened. We are
21 anticipating to collect that $20 million from the
22 escrow account in the subsequent months going
23 forward, but it is subject to the -- the amount in
24 there is subject to an escrow agreement between the
25 City and the state.

1 MR. STEWART: Okay. Thank you.
2 **Q. (By Mr. Stewart):** Let's if we could now?
3 THE COURT: Excuse me one second. So the
4 20 billion you're talking about is the 20 that's
5 shown in forecast June 13.
6 THE WITNESS: Yes, sir, that's --
7 THE COURT: That did not happen.
8 THE WITNESS: That did not happen, that
9 is correct, Your Honor.
10 BY MR. STEWART:
11 **Q.** At the time you wrote it, you expected that it
12 would happen?
13 **A.** That is correct.
14 **Q.** Could we now expand the segment of the chart that
15 talks about operating disbursements. Just the
16 title so we can see them all.
17 **Q.** Now we've now expanded on the screen Mr. Malhotra
18 the segment of the spreadsheet that speaks of
19 operating disbursements. Let me ask you, if we
20 could go through this. The first line is payroll
21 taxes and deductions. And I assume that's self
22 explanatory, that's what it says?
23 **A.** Yes.
24 **Q.** Next is benefits. What are benefits?
25 **A.** Those are generally health benefits.

1  Q.  Okay.  Below that is something called pension
2      contributions?
3  A.  That is correct.
4  Q.  And those are pension contributions to who?
5  A.  To either the police retirement system or the
6      general retirement system.
7  Q.  And those are both defined benefit plans?
8  A.  Those are defined benefit plans, yes.
9  Q.  Now I understand that some portion of the benefits
10     from the general retirement system goes to City
11     employees who work for the department of water and
12     sewer?
13 A.  That is correct.
14 Q.  And how do you account for that in this
15     spreadsheet?
16 A.  Those are not accounted for here because this shows
17     the activity predominantly of the general fund.
18     The contributions that the water and sewer
19     department makes for pension go directly to the
20     retirement system.
21         THE COURT:  Excuse me, sir.  You need to
22     lien back away from the make phone a little bit
23     because when you get too close, it cuts out.
24         THE WITNESS:  Great.
25         THE COURT:  And while we have a break

1      here, I think your tech person needs to redo that
2      chart because her effort to line up the headings
3      isn't working very well separately.
4          MR. STEWART:  Okay.
5          THE COURT:  That's better.
6          MR. STEWART:  That's better.
7          THE COURT:  Thank you.
8  BY MR. STEWART:
9  Q.  We were talking I guess about pension
10     contributions.  Next we have -- for actual of the
11     year 2012, those had amounted to how much?
12 A.  For actual orifice calendar year 12, there were
13     pension contributions of 103.9 million made by the
14     general fund.
15 Q.  And for fiscal year 2013, what is the number?
16 A.  That reflects 11 months of actuals and one month of
17     forecast, but about $30.8 million of pension
18     contributions that were made.
19 Q.  Why is that so much lower than the pension
20     contributions that have been made in 2012?
21 A.  Because the City was trying its best to preserve
22     liquidity during this timeframe where liquidity was
23     extremely tight and was deferring pension
24     contributions.
25 Q.  Now let's -- let me ask you about this.  When you

1      say deferring pension contributions, what do you
2      mean?
3  A.  It's essentially not making the scheduled payments
4      as they came due and as were laid out by the City's
5      systems actuaries, so I would say it was more or
6      less borrowing money from the pension system to
7      fund ongoing operations.
8  Q.  Just so just to be clear, the money was owed to the
9      pension systems, correct?
10 A.  That is correct.
11 Q.  But the City did not pay the pension systems the
12     money it owed them?
13 A.  That is correct.
14 Q.  And that is called deferral?
15 A.  Yes, that's what we are calling deferral.
16 Q.  And do you know, looking at this, what the amount
17     of deferrals were for fiscal year 2013?
18 A.  For fiscal year 2013, I would say compared to the
19     beginning of fiscal year 2012, there was problem
20     another 70 odd million dollars that was deferred
21     compared to the beginning of fiscal year 2012, an
22     additional 70 million.
23         THE COURT:  May I interrupt for one
24     moment?  Just so the record is clear, and everyone
25     understands, would you describe in more plain

1      English what you mean by the concept of liquidity
2      was tight.
3          THE WITNESS:  Sure, Your Honor.  The City
4      was during this timeframe paying very close
5      attention to its cash position and in order to
6      ensure that the City did not have a pay less pay
7      day or run out of complete cash in its bank
8      account, the amount of cash available for the
9      City's general fund to continue to operate was
10     dwindling, and in order to make sure that the cash
11     position did not get to an unsustainable level
12     where the core operations of the City were put at
13     peril, that's what Your Honor I meant by liquidity
14     being extremely tight.  It's the cash that was
15     available to run the operations of the general
16     fund.
17 BY MR. STEWART:
18 Q.  If we can go back to the full chart for just a
19     minute, please.  And before we go further, just on
20     the same point, this chart is a projection of cash
21     flow for the City for the past year and for fiscal
22     year 2013?
23 A.  It's actuals --
24         MR. STEWART:  Actuals and -- okay.
25

BY MR. STEWART:

Q. Now you just talked about deferrals as something the City did to preserve cash. Is there something called pooled funds?

THE COURT: I'm sorry, something called what?

MR. STEWART: Pooled funds. And I'm going to ask him what they are.

BY MR. STEWART:

Q. Can you tell us what pooled funds are?

A. The pooled funds are cash that has been available in other accounts for specific purposes such as the solid waste fund or the street fund or the risk management fund that has been pooled with the general fund cash so that the general fund cash is higher because of the result of the pooling of cash from these other accounts.

Q. Now these other accounts, are not -- first of all, you better tell us what these other accounts are.

A. As highlighted in the City's CAFR, the City had roughly $92 million of pooled cash from the solid waste fund, the street fund, and the risk management fund, cash that was combined with the general fund that is currently reflected in the cash balances reported for the general fund.

Q. And so that I understand, so that because of the liquidity problems the City faced, that took the $90 million out of the street fund, the solid waste fund and the public safety or emergency fund and commingled it with money in the general fund?

A. I don't know when it was done, but that would generally be yes. The commingling has probably happened some time ago., but the answer would be yes, it would be to further supplement the cash available for the general fund.

Q. And if the City had not done that, what would have been the effect on its liquidity position?

A. Well, at the end of fiscal year 12, where the cash net of distributions would shown as 1.9 million, if the City had to go ahead and segregate or unpool almost $92 million, that cash net of distributions or cash available to the general fund would have been significantly lower of dollar for dollar.

Q. It would have been $92 million lower?

A. Yes, that is my understanding.

Q. Let's go back now to our operating disbursements that we were talking about.

All right. The next item there is something called subsidy payments. What are subsidy payments?

A. Subsidy payments are the cash payments that the general fund makes to DDOT, which is department of transportation, because the department of transportation requires an annual subsidy every year from the general fund.

And below that, we have distributions in there three different lines, distributions, tax authorities, then distributions, UTGO, and then distributions DDA. Please tell us what those items are.

A. Those are distributions to other taxing authorities. In the first line when we saw property tax collections, the City collects property taxes not only for itself but also on behalf of other taxing authorities, like Detroit Public Schools, Wayne County, and what the City does then is once the gross property taxes are collected, it distributes to these other entities on behalf of whom the cash has come in.

Q. So in other words, it's cash the City has but then it has to turn over to someone else?

A. Yes, that is correct.

Q. And below that, we have income tax refunds, account payables and other disbursements and professional fees.

Now let's go back to the full chart if we could. And for purposes of simplicity, why don't we simply expand actual fiscal year 12 along with the descriptions of items that will help us walk through them.

Q. Okay. Now our next line has total disbursements. Do you see that?

A. Yes.

Q. And that's just the sum of all the operating disbursements?

A. That is correct.

Q. And below that, there's something called net cash flow. What is net cash flow?

A. That's the total operating receipts less the total disbursements.

Q. And what was it for fiscal year 2012?

A. It was negative $65.5 million after including $50 million of proceeds from the escrow fund.

Q. Okay. And why were those excluded?

A. Those were already a part of a negative 65.5. Had they been excluded, the net cash flow would have been negative 115.5.

Q. And then the next line is beginning cash balance. And what is that?

A. That would be reflective of the cash balance the

1  City's general fund had in its account including
2  the pooled cash.
3  Q. And you subtract that the net cash flow we just
4  talked about, correct?
5  A. Yes.
6  Q. And we end up with cash before required
7  distributions of $29.8 million?
8  A. That is correct.
9  Q. And then there's something subtracted from that.
10  And what is subtracted?
11  A. Those are the accumulated property tax
12  distributions. So when the City collects its
13  property taxes, makes the distributions to the
14  different taxing authorities, there still is a hold
15  back in terms of amounts that are being reconciled
16  where the City and the different taxing authorities
17  are going back and forth in terms of what the final
18  amount is that is due to those authorities, that is
19  the estimate that the City has available at that
20  point in time in terms of additional monies that
21  were due to these other taxing authorities but had
22  not been paid yet. So we reserve for that the cash
23  that it will eventually be paid out.
24  Q. Okay. And what's an example of one of these other
25  authorities that is owed the to which the money has

1  A. Those are the escrow amounts that were still in
2  escrow and had not been drawn upon. There was
3  still subject to this escrow agreement with the
4  state.
5  Q. From the refunding financing that you told us about
6  earlier?
7  A. Yes.
8  Q. And finally, reimbursements owed to other funds,
9  what is that?
10  A. That is where we've highlighted the amounts or we
11  haven't put an amount in off the funds that would
12  subject -- be subject to the unpooling of the cash
13  that is shown in the general fund, but the City did
14  not have a specific view in terms of when and how
15  the unpooling of some of that cash would take
16  place.
17  Q. Now if we could, now highlight the far right column
18  which is the fiscal year 2013. It says 11A plus
19  1F. And let's look at that. And then Lauren if
20  you could put the categories next to it.
21  Q. So I'm going to ask you the same questions but I'm
22  going to be quicker when it comes to the fiscal
23  year 2013. You already told us I think that the
24  operating receipts were thought to be 1.52 -- 582.2
25  billion. What were the total disbursements

1  to be paid out by the City?
2  A. It would include Detroit Public Schools, it would
3  include Wayne County, it would include the library.
4  Those would be some of those examples.
5  Q. And so our last line hearsays cash net of
6  distributions and that's $1.9 million?
7  A. That is correct.
8  Q. And what does that represent?
9  A. That would be the net cash available for the
10  general fund, including pooled cash, that was
11  available for the general fund's operations at that
12  point in time.
13  Q. At the end of fiscal year 2012?
14  A. 2012.
15  Q. Which would be June 30, 2012, correct?
16  A. Yes.
17  Q. And below you have something that says memo and the
18  first line is accumulated deferrals.
19  A. Yes.
20  Q. And is that what you told us about earlier, which
21  were pension contributions that the City owed but
22  had not paid?
23  A. That is correct, about 64.4 million.
24  Q. And below that, refunding bond proceeds in escrow.
25  What are those?

1  expected to be?
2  A. 1.5 --
3  MR. SHERWOOD: Objection. This is the
4  same point I think we argued earlier.
5  THE COURT: What is the objection,
6  please? Excuse me one second? And I have been
7  asked to ask you to pull that microphone closer to
8  you and you speak.
9  MR. SHERWOOD: I object based on the fact
10  that the disbursements include projections for June
11  of 2013 and that requires expert testimony. That's
12  improper lay opinion testimony.
13  THE COURT: All right. Subject to the
14  same condition I indicated earlier, the Court will
15  permit this. Go ahead.
16  BY MR. STEWART:
17  Q. I'll repeat the question. The total disbursements
18  for fiscal year 2013 are shown to be what?
19  A. 1.578.2 billion.
20  Q. And the net cash flow for the City in fiscal 2013
21  was how much?
22  A. $4 million positive.
23  Q. And then we had cash before required distributions
24  of how much?
25  A. Before required distributions, $33.8 million.

1 **Q.** And then cash net of those distributions for fiscal
2 year 2013 came to what?
3 **A.** $14.1 million.
4 **Q.** And by then, what was the accumulated -- what was
5 the amount of accumulated deferrals and what was
6 owed to the pension funds?
7 **A.** By then, the amount of accumulated deferrals
8 predominantly due to the pension funds had
9 increased from roughly $65 million at the end of
10 fiscal year 2012, all the way to $118.7 million at
11 the end of fiscal year 2013.
12 **Q.** And where did the number come from in terms of what
13 was owed to the pension funds?
14 **A.** The amount of funding that would have been
15 scheduled for the general retirement system and the
16 police and fire retirement system would have come
17 from the payments that the actuaries of the systems
18 had suggested to be made but had not been made over
19 the course of this timeframe. That was
20 predominantly the way those numbers came from.
21 **Q.** So the numbers came from the pension plans
22 themselves or their actuaries?
23 **A.** The schedule.
24 MR. SHERWOOD: Objection. Hearsay. Move
25 to strike.

1 MR. STEWART: He can know this.
2 THE COURT: The objection is overruled.
3 It was however a leading question.
4 MR. STEWART: It was, Your Honor. I was
5 trying to clarify, but let me ask it again.
6 THE COURT: Where if anywhere did these
7 numbers come from the accumulated deferral number
8 which is predominantly made up of the pension
9 deferrals would have been a sum of the pension
10 payments that were not made during the course of
11 fiscal year 2013 and would have been in the amount
12 of the scheduled payments, the systems actuaries
13 had suggested that should have been made on a
14 monthly basis but were not.
15 BY MR. STEWART:
16 **Q.** So who is it who tells the City how much the
17 pension payments ought to be?
18 **A.** It's the system's actuaries.
19 **Q.** The system being the general retirement system and
20 the police and fire retirement system, correct?
21 **A.** That is correct.
22 **Q.** Did there come a time when you spoke with Mr. Orr
23 about what you had found in the course of this
24 analysis?
25 **A.** We showed Kevyn Orr in terms of what the actual

1 activity was and the magnitude of the deferrals
2 that were taking place to sustain the City's cash
3 position on a monthly basis.
4 **Q.** Do you remember what you said to him and what he
5 said to you?
6 **A.** Not specifically, but it was generally showing us
7 to what the magnitude of the -- what the magnitude
8 of the dire liquidity position of the City.
9 THE COURT: I'm sorry, the magnitude
10 what?
11 THE WITNESS: The dire.
12 THE COURT: I didn't hear what you said.
13 What did you say?
14 THE WITNESS: Your Honor, I said the dire
15 liquidity situation of the City.
16 THE COURT: Okay.
17 BY MR. STEWART:
18 **Q.** Let's go now to page nine of the same exhibit and
19 the control number on this if it makes it easier is
20 ends with 7289.
21 And could you just tell us what this is?
22 **A.** This is the fiscal year 2014 forecasted cash flow
23 to year end on a monthly basis.
24 **Q.** And is this a document you or others at Ernst &
25 Young prepared?

1 **A.** Yes, it is.
2 **Q.** Did you show it to Mr. Orr?
3 **A.** Yes, we did.
4 **Q.** Did you discuss it with Mr. Orr?
5 **A.** Yes, we discussed their receipts and disbursements.
6 **Q.** As shown in this document?
7 **A.** That is correct.
8 **Q.** And do you remember what you said to him and what
9 he said to you?
10 MR. SHERWOOD: Your Honor, object to the
11 extent the question calls for testimony about these
12 forecast, this document, this particular page
13 relates to 2014 which is all projections?
14 MR. STEWART: And that's why I'm asking
15 the questions I'm asking. Only was this shown to
16 Mr. Orr and did he discuss it with him and I won't
17 go my deeper into it right now.
18 MR. SHERWOOD: I didn't object to those
19 questions.
20 THE COURT: No, I believe the witness can
21 testify as to what he said to Mr. Orr about these
22 documents. It goes to what Mr. Orr new or at
23 leastly knew what he was advised of at the time.
24 So just tell us what you said to him about these
25 documents or this document.

1         THE WITNESS: Your Honor, my recollection
2  what I would have said on this particular document
3  would have been the that the fiscal year 2014?
4         THE COURT: Well, hold on. Are you
5  reconstructing what you said would have said or are
6  you remembering what you did say?
7         THE WITNESS: Your Honor, it's -- I am
8  trying to recall what I would have said. I do not
9  remember specifically what I would have said.
10        THE COURT: But don't know the answer to
11  a question, just say that. Don't guess or try to
12  reconstruct.
13        THE WITNESS: Yes, Your Honor.
14        THE COURT: Okay.
15 BY MR. STEWART:
16 Q.  Did you provide this document to Mr. Orr?
17 A.  I did.
18 Q.  Did there come a time that he raised it with you?
19        THE COURT: I'm sorry, was there would
20  inter.
21 BY MR. STEWART:
22 Q.  Did there come a time when Mr. Orr raised this
23  document with you? Did he call you up and ask to
24  have a conversation with you about it that you can
25  remember?

1 A.  We had several discussions about this particular
2  document and the overall contents of the numbers,
3  yes.
4 Q.  And my only question to you is going to be if you
5  remember what did you say to him and what did he
6  say to you, just that?
7 A.  What I would have said on this.
8 Q.  Not would have said. What you did say if you done
9  remember?
10        THE COURT: If you don't remember, just
11  say that.
12        THE WITNESS: I don't remember
13  specifically what I would have said to Mr. Orr on
14  this particular page in a specific conversation
15  around that but.
16        MR. STEWART: Let me ask the question a
17  different way.
18 BY MR. STEWART:
19 Q.  In the timeframe around June 14, did you have
20  discussions with Kevyn Orr about the liquidity
21  situation of the City?
22 A.  I did.
23 Q.  And do you remember what you said to him about the
24  liquidity situation of the City?
25 A.  I do.

1 Q.  And would you tell us what you told him?
2 A.  The point -- what I said is that the fiscal year
3  '14 cash receipts could fall short of the cash
4  disbursements.
5 Q.  And what did he say to you?
6 A.  I do not remember specifically about what he said
7  to me directly.
8 Q.  Let's go if we could now to another page of this,
9  page 47, which has control number 227327. And
10  what's the title of this document?
11 A.  The ten-year projections for the general fund only
12  on the steady state.
13 Q.  What is a steady state?
14 A.  The steady state would have reflected no
15  restructuring of the City's long-term obligations
16  or legacy liabilities.
17 Q.  And I'm not going to ask you about the content of
18  this, but I'm going to ask you to tell us how you
19  prepared it.
20 A.  The way we prepared this is through different line
21  items in terms of the revenue assumptions, we
22  looked into specifically the overall State of
23  Michigan forecast, we looked at the historical
24  information with respect to the City of Detroit, we
25  also went ahead and looked at analyses in terms of

1  what the property taxes recently were for the City,
2  and what the -- where the City of Detroit was
3  faring in conjunction with the State of Michigan to
4  come up with a forecast in terms of what the
5  assumptions were for the revenue and property tax
6  and income tax assumptions over the next ten years.
7  We did it in conjunction with the management team
8  of the City, we went through income taxes in a
9  great level of detail between residents and non
10  residents, corporations, to build up assumptions
11  from the standpoint of what the revenues would look
12  like over the next ten years. We looked at the
13  casino taxes with respect to all three casinos,
14  read what their growth had been historically, where
15  they were projected to be in the future, state
16  aide, we got those numbers directly from the budget
17  department of the State of Michigan in terms of
18  where they saw the overall sales taxes that were
19  due to the City, were projected to be over the next
20  ten years. That's generally how we came up with
21  the revenue forecast and I can highlight how we
22  went through the expenses as well.
23 Q.  Well, yes, if you could. The expense and finally
24  the legacy cost without getting into what the
25  numbers actually are. Just what your methodology

1    was?

2  **A.**  With respect to the salaries, wages and over time,

3    we started with what the current wage levels and

4    the head count was, it was built up by department

5    to try and ascertain what the exact head count was

6    by department. From there on, we had fairly

7    simplistic assumptions with respect to wage level

8    increases of two percent on a year over year basis

9    over the forecast period. From the health benefits

10    for the active employees, we used assumptions that

11    the City's health actuaries have developed on a

12    pull-ahead basis which is what we used the based on

13    a pull-ahead count basis to extrapolate over the

14    next ten years. On the other operating expenses,

15    it was developed by individual department to look

16    at every single department, their budgets, to help

17    ascertain what were the ongoing operating expenses

18    of each one of those departments on a ongoing

19    basis.

20

21          MR. DeCHIARA: Objection, Your Honor.

22    Peter DeCharia, Cohen, Weiss & Simon, for UAW.

23          Objection based on relevance. The only

24    relevance it would have to how this witness

25    performed these numbers would be if the numbers

1    were working with with the City or the City's debt

2    documents with respect to the long-term liabilities

3    of the City, or in terms of the revenues, it was

4    assumptions that we worked on in conjunction with

5    the City.

6          MR. DeCHIARA: Your Honor --

7          MR. STEWART: So Your Honor, my point on

8    that is the following. The fact something is a

9    future projection does not make it an opinion. In

10    the sense of being an expert opinion. If one is

11    relying on numbers from another source in this

12    case, all the sources Mr. Malhotra told us about,

13    it is their numbers, not his numbers, but their

14    numbers, and what he is doing is tabulating them

15    and calculating them?

16          THE COURT: I heard him say that at least

17    some portion of this, which he didn't specify, was

18    done in collaboration.

19          MR. STEWART: Well, let me -- but I asked

20    him this other question about which of these --

21    collaboration, and I will ask him this,.

22          MR. DeCHIARA: Your Honor, may I be

23    heard?

24          THE COURT: One second.

25          MR. STEWART: Sounded from his testimony

1    were coming in for the truth of the matter. Others

2    wise it, has no relevance.

3          THE COURT: I'm concerned about that,

4    Mr. Stewart. First of all, just so the record is

5    clear, what exhibit number is this page 47 of?

6          MR. STEWART: It is Exhibit 44.

7          THE COURT: All right.

8          MR. STEWART: Forty-four is in evidence?

9          THE COURT: So the question is what

10    weight is page 47 of this exhibit entitled to.

11          MR. STEWART: Correct. It goes to

12    weight.

13          THE COURT: If the witness has not been

14    qualified as an expert.

15          MR. STEWART: Well, Judge, what I was

16    going to do was lay a greater foundation for how it

17    was put together and then I was going to simply ask

18    the witness this question, which I'll ask him now,

19    wherein here, Mr. Malhotra, did you insert your own

20    personal assumptions?

21          THE WITNESS: All of the assumptions were

22    done in collaboration with the City?

23  BY MR. STEWART:

24  **Q.**  Well, where do the numbers come from?

25  **A.**  The numbers came from either the actuaries that we

1    he met with them and worked with them to get the

2    numbers when I asked him which assumptions were his

3    assumption, not the assumptions of the people who

4    gave him the numbers. The answers were they were

5    not his assumptions.

6          THE COURT: His answer was we

7    collaborated.

8          MR. STEWART: Well, I thought maybe I

9    heard him -- I must have heard him differently than

10    Your Honor. Should we ask him again?

11  BY MR. STEWART:

12  **Q.**  Mr. Malhaltra, of these numbers, which ones are

13    your assumptions?

14  **A.**  The EY has made no assumptions that these are EY's

15    numbers. I want to make that -- that's what I'm

16    making clear.

17  **Q.**  So these numbers came to you from who?

18  **A.**  The numbers with respect to -- they are a lot of

19    numbers on this page. The numbers with respect to

20    all of the debt service would have been picked up

21    from the City's CAFR. The numbers on the health

22    benefits for pension and retiree contributions

23    would have come from the City's actuaries. The

24    numbers for the actual head count for all of the

25    departments and associated costs would have come

241

1    from the City and its departments.  The numbers
2    with respect to the health costs for the active
3    employees on a per head basis would have come from
4    the City's actuaries.  The numbers with respect to
5    state revenue sharing would have come from the
6    state directly.  The numbers for property taxes,
7    income taxes and wage range taxes, those numbers in
8    terms of the assumptions were validated --
9    collaborated between our team and the City in terms
10   of the assumptions behind the revenue assumptions.
11 **Q.**  When you say assumptions do you mean the number
12   here?
13            THE COURT:  I need to hear from counsel
14   at this point.
15            MR. DeCHIARA:  Your Honor, to the extent
16   the information in this exhibit comes from
17   actuaries who are not on the witness stand, those
18   numbers are hearsay and should not come in.
19            THE COURT:  But the document is already
20   in evidence.
21            MR. DeCHIARA:  Your Honor, and also I
22   would say to the witness is testifying about a
23   process that took high degree of expertise.  I
24   don't think I or most of the people in this room
25   let alone the man on the street would be able to

242

1    take these raw data and convert them into ten-year
2    projections.  It took the sophisticated work of an
3    Ernst & Young team to put it together.  This is in
4    the nature.  This is the very essence of expert
5    testimony.
6            THE COURT:  I agree.  I do.
7            MR. STEWART:  All right.  Your Honor, we
8    may ask leave to do submit perhaps a memorandum
9    raising this with Your Honor later on.
10            THE COURT:  You may, of course.
11            MR. STEWART:  So we can move on now.
12            (Discussion off the record.)
13            MR. STEWART:  Your Honor, one other
14   thing.  Since it's in evidence, I assume I am
15   allowed to at least ask the witness what it says
16   and objections go to weight.
17            THE COURT:  Well, it's duplicative to do
18   that, but I suppose to make a point you could ask
19   briefly for the witness to review what it says.
20            MR. STEWART:  I'm going to ask him to
21   look at the far right column and then I'm going
22   to -- I'll move on to my next question.
23            MR. RUEGGER:  Arthur Ruegger from
24   Dentons, Your Honor.  We submit the document speaks
25   for itself.  Any further narrative from this

243

1    witness is in the nature of asking for his
2    expertise on that.
3            THE COURT:  Well, it doesn't take an
4    expert to read it, so I'll permit it.
5            MR. RUEGGER:  Very well, Your Honor.
6            MR. STEWART:  Could we simply blow up the
7    far right column?
8  BY MR. STEWART:
9  **Q.**  As a result of your calculations, Mr. Malhotra,
10   what did your spreadsheet conclude was the ten-year
11   adjusted deficit the City was facing?
12 **A.**  That the spreadsheet would have said that revenues
13   would be 10.4 billion, operating expenditures would
14   be 7.4 billion legacy expenditures would be
15   7 billion over this ten-year timeframe for a
16   surplus/deficit of almost $4 billion, so negative
17   $3.93 billion.
18 **Q.**  All right.  So did there come a time when you sat
19   down with the Emergency Manager to talk about these
20   projections?
21 **A.**  Yes.
22 **Q.**  Now in preparing the projections, what did you do
23   to make them as accurate as you knew how to make
24   them accurate?
25 **A.**

244

1            MR. SHERWOOD:  Objection.  Calls for
2    analysis of projections that have.
3            THE COURT:  I'm sorry, sir, I can't hear
4    you.
5            MR. SHERWOOD:  Objection.  Calls for
6    improper opinion testimony.  He is he a being asked
7    to testify about projections that are properly the
8    subject of expert testimony.
9            MR. STEWART:  I think I asked him what he
10   did to be accurate.
11            THE COURT:  No, the objection is
12   sustained.
13            MR. STEWART:  Okay.
14  BY MR. STEWART:
15 **Q.**  In your conversations with Mr. Orr, what did you
16   say to him about your ten-year projections?
17            MR. SHERWOOD:  Same objection?
18            THE COURT:  That objection is overruled.
19   Please answer.
20            THE WITNESS:  What we said is that if you
21   lack at simply the operating --
22            THE COURT:  You said, we said.
23            THE WITNESS:  What I said is if you look
24   at the total operating revenues and the total
25   operating expenditures, the City still has a

1  **Q.**  surplus of roughly $3 billion, however, when you
2  Lear in the legacy costs of roughly $7 billion over
3  next ten years, the City has a deficit of almost
4  $4 billion over that ten-year timeframe.
5  BY MR. STEWART:
6  **Q.**  And what did he say to you?
7  **A.**  I don't remember specifically about what he said
8  back to me.
9  **Q.**  Now June 14 was the date of the meeting I have been
10 asking you about, I believe.  This document was a
11 document passed out that day, correct?
12 **A.**  Yes.
13 **Q.**  Before moving on from the meeting, let me ask you
14 this.  Were questions asked by anyone at that
15 meeting on June 14?
16 **A.**  Yes, there were questions asked.
17 **Q.**  Do you remember any of the questions that were
18 asked or who asked them?
19 **A.**  I don't know who asked them, but there were
20 questions about the assumptions and the liquidity
21 position of the City.
22 **Q.**  And am I correct in understanding that when you
23 addressed the people attending that meeting that
24 day, you were speaking about the spreadsheets I've
25 asked you about this afternoon?

1  **Q.**  The City defaulted on it?
2  **A.**  Yes, that is correct.
3  **Q.**  What effect did that default have upon the City's
4  cash position?
5  **A.**  It improved the cash position by $40 million at the
6  end of June 30, 2012.
7  **Q.**  What conversations if any did you have with the
8  Emergency Manager or his advisors on the subject of
9  the decision to default on the swaps?
10 **A.**  I do not recall a specific discussion with Kevyn
11 Orr on defaulting on the swaps.
12 **Q.**  Let's move on to another set of meetings.  Did you
13 attend meetings held on June 20th, 2013, with
14 representatives of the pension plans?
15 **A.**  I do.
16 **Q.**  And am I correct in remembering there were two
17 meetings that day?
18 **A.**  That is correct.
19 **Q.**  The morning meeting was with a non uniformed
20 pension plan, the GRS?
21 **A.**  Yes.
22 **Q.**  And the afternoon meeting was with who?
23 **A.**  With police and fire.
24 **Q.**  And we have put up the first exhibit, I believe
25 this is in evidence, Exhibit 48.  Can you tell me

1  **A.**  That is correct.
2  **Q.**  And were questions asked of you then about those
3  spreadsheets?
4  **A.**  They were -- yes, they were questions about it.
5  **Q.**  Okay.  Let me move to another subject.
6  You are aware of a security called the
7  certificates of participation?
8  **A.**  Yes.
9  **Q.**  Sometimes called pension obligation certificates?
10 **A.**  Yes, I am aware.
11 **Q.**  For the record, can you tell us what those are?
12 **A.**  Those are certificates of participation of the fund
13 that the City borrowed back in about 2005 that
14 helped fund the underfunding on the two pension
15 systems.
16 **Q.**  And did the City have obligations to service the
17 interest or principal of those securities?
18 **A.**  Yes.
19 **Q.**  And do you know what the City's obligation was?
20 **A.**  As of June of 2013, the City had a $40 million
21 payment that was due to those on behalf of those
22 POCs.
23 **Q.**  And what did the City do with respect to that
24 payment?
25 **A.**  The City did not make that payment.

1  what Exhibit 48 is?
2  **A.**  It's the presentation that was used for the meeting
3  with the non uniform retirees on June 20th.
4  **Q.**  And let's go back just ask you a question towards
5  the back of this.  Are there projections that were
6  included in here that you or Ernst & Young had
7  prepared?  Look at page four and page five.  Are
8  these projections you prepared page four was a
9  summary of the legacy expenditures, historical
10 actual and forecast.  That would have been
11 information on the pension and health benefits we
12 received from the City's actuaries.
13 **Q.**  And the next page?
14 **A.**  Page five was the ten-year projections for the
15 general fund only under a restructuring scenario
16 that highlighted claims or amounts that were
17 available to service unsecured claims.
18 **Q.**  Now let's go back to the meeting itself.  How long
19 did that morning meeting last?
20 **A.**  Probably about three hours.
21 **Q.**  And who was there?
22 **A.**  It was the City's advisors, along with the members
23 from the -- some retirees and some of the members
24 from the retirement system.
25 **Q.**  Were questions asked?

1 **A.** That were some questions asked.
2 **Q.** Do you remember the questions?
3 **A.** They were questions about the cash position of the
4      City, they were questions about the City's ability
5      to make any changes to specific legacy liabilities.
6 **Q.** Do you remember any questions being directed to
7      you?
8 **A.** They were -- yes, I remember questions that came up
9      with respect to the cash flows of the City.
10 **Q.** And do you recall who in particular asked you those
11      questions?
12 **A.** No, I don't.
13 **Q.** Or what you said in response to them?
14 **A.** No, I don't.
15 **Q.** Was Mr. Orr there that day?
16 **A.** He was not.
17 **Q.** Let's go to the next exhibit if we could, which is
18      Exhibit 49. Is this the hand out that was given in
19      the afternoon meeting?
20 **A.** Yes, it was.
21 **Q.** And tell me about the afternoon meeting. First of
22      all, I should have asked where these meetings were
23      held.
24 **A.** These meetings were held at City hall.
25 **Q.** And how long did the after than meeting last?

1 **A.** About two or three hours.
2 **Q.** Who attended?
3 **A.** It was the City's advisors along with some
4      representatives from the Retirement Systems as well
5      as I thought some active employees.
6 **Q.** And once again, if you look towards the back, are
7      there portions of this document that was prepared
8      by you or someone else at E&Y?
9 **A.** Yes, we helped pull together pages four and five
10      for this particular presentation.
11 **Q.** Okay. Now page four which we have has legacy
12      liabilities, some for fiscal years that have
13      already ended?
14 **A.** That is correct.
15 **Q.** And theories are projected?
16 **A.** Yes.
17 **Q.** And where did your numbers come from for these?
18 **A.** The debt service numbers are the scheduled debt
19      service as the amortization tables exist today, the
20      POC principal and interest payments were again
21      based on the current amortization schedules, the
22      POC swaps payments were based on the existing swap
23      schedule, the pension contributions and the health
24      benefits for retirees would have come based on the
25      assumptions that were provided to us by the City's

1      actuaries.
2 **Q.** Now let me ask you about the substance of the
3      meeting. Did you make any part of the presentation
4      that afternoon?
5 **A.** I did.
6 **Q.** And what parts of the presentation did you make?
7 **A.** I would have focused on pages four and five in
8      terms of laying out what the financial position of
9      the City was.
10 **Q.** Were questions asked of you that day, that
11      afternoon?
12 **A.** I don't remember specific questions that afternoon.
13 **Q.** Where were matters left at the end of the morning
14      meeting?
15 **A.** They were generally left to have an open dialogue
16      and communication flow between the City's advisors
17      and participants in the meeting.
18 **Q.** And at the end of the afternoon meeting?
19 **A.** It was the same.
20 **Q.** Let's look at the next exhibit, Exhibit 51. Could
21      you tell us what Exhibit 51 is?
22 **A.** Exhibit 51 is the ten-year plan in terms of the
23      forecast that was available at that point in time
24      as of June 21st.
25 **Q.** Did you attend a meeting on June 25th with

1      representatives of the bondholders?
2 **A.** I did.
3 **Q.** And where was that meeting held?
4 **A.** That meeting was held in New York.
5 **Q.** Who attended?
6 **A.** It was bondholders and bond insurers and theirs
7      financial advisors.
8 **Q.** Was Exhibit 50 a document given to them that day?
9 **A.** That -- yes, that was the document that we went
10      through on that particular day.
11 **Q.** Do you remember which bond insurers you met with or
12      bondholders you met with on the 25th?
13 **A.** Yes, Ann Beck was there I think assured was there,
14      national advisors from Frigic, advisors from
15      Sincora. Those are at least some of the ones I
16      remember of specifically. It was a pretty big
17      meeting.
18 **Q.** And I apologize if I asked you this. How long did
19      you meet with them?
20 **A.** We met with them for at least four to five hours.
21 **Q.** What was the purpose of that meeting?
22 **A.** The purpose of the meeting was to have a subsequent
23      discussion and Q&A on the assumptions behind the
24      information that was shared as of June 20th.
25 **Q.** Do you remember any questions you were asked?

253

1  **A.**  They were a lot of questions with respect to the
2  assumptions underlying the ten-year projections and
3  the details in terms of how those numbers were
4  built up.
5  **Q.**  And once again, where were matters left at the end
6  of the June 25th meeting?
7  **A.**  They were left to have follow up meetings on an
8  individual basis with certain bondholders or their
9  insurers to have more specific discussions around
10  the business plan.
11  **Q.**  Let me direct your attention to July 9.  Were there
12  meetings that day with bondholders or insurers for
13  bondholders?
14  **A.**  Yes.
15  **Q.**  Where where those meetings?
16  **A.**  Those meetings were held in Detroit.
17  **Q.**  And did you attend them?
18  **A.**  Yes.
19  **Q.**  How long did they last?
20  **A.**  I think the morning meeting lasted about four or
21  five hours.
22  **Q.**  And then I assume there was an afternoon meeting as
23  well?
24  **A.**  Yeah, there was an afternoon meeting my
25  recollection is with the pension systems.  I

254

1  believe there were a lot of meetings during this
2  timeframe.
3  **Q.**  How long was your meeting with the pension systems?
4  **A.**  I think we had a meeting for about two or three
5  hours.
6  **Q.**  What was the purpose of the morning meeting?
7  **A.**  The morning meeting was generally to have
8  additional dialogue and discussions around the
9  assumptions of the business plan.
10  **Q.**  Do you remember who you met with in particular that
11  morning?
12  **A.**  I remember it was the financial advisors for
13  national, it was the financial advisors for Fugic,
14  assured was some of the names that at least come to
15  mind.
16  **Q.**  In this period, did the City, to your knowledge,
17  make any proposals to the bondholders to resolve
18  their claims?
19  **A.**  The City made a proposal or framework for a
20  proposal in its June 14th presentation.
21  **Q.**  Did the bondholders at any point or any sub group
22  of bondholders make a proposal to the City at some
23  point?
24  **A.**  My understanding is yes.  I have not reviewed a
25  proposal from the bondholders in detail.

255

1  **Q.**  Do you recall when that proposal was made?
2  **A.**  My recollection is it was prior to the City filing.
3  **Q.**  Okay.  Now in the afternoon meeting, what was the
4  reason for meeting with the two pensions on the
5  afternoon of July 9?
6  **A.**  It was to have additional discussions around the
7  assumptions that the City's actuaries were using
8  with respect to not only the size of the claim but
9  also to ascertain the contribution levels required
10  over the next ten years for the pension systems.
11  **Q.**  And I apologize if I have asked you this before, at
12  the end of that afternoon meeting with the
13  pensions, what was supposed to happen next if
14  anything?
15  **A.**  There was supposed to be a process to try and
16  understand the assumptions, the actuarial
17  assumptions, and thereby drive -- have an
18  understanding of the amount of the claim and then
19  have subsequent discussions around the amount of
20  funding that the City may or may not be able to
21  afford over the long term.
22  **Q.**  Now let's now go to July 18th?
23         THE COURT:  Excuse me, Mr. Stewart.  I'm
24  sorry to be such a nuisance about this, but please
25  try not to wander so far from the microphone.

256

1         MR. STEWART:  Sorry, judge.
2         THE COURT:  Part of our issue is we have
3  over flow courtrooms where people are trying to
4  hear what we say, so it's not just a question of
5  the recording which is important but other people
6  are listening in as well.
7         MR. STEWART:  I'll do better, Your Honor.
8  Sorry.
9  BY MR. STEWART:
10  **Q.**  Let me direct your attention, if I could now to
11  July 18.  Were you asked on or about July 18 to
12  execute a declaration in connection with Detroit's
13  bankruptcy?
14  **A.**  Yes, I was.
15  **Q.**  How many days before July 18 did you start working
16  on your declaration?
17  **A.**  I don't recall the specific number of days.  It was
18  sometime in June, late June is I think when we
19  started.
20  **Q.**  And do you -- how much of your declaration did you
21  write and how much of it was written by others for
22  you?
23  **A.**  Majority of it of the declaration was written by me
24  in conjunction with counsel.
25  **Q.**  Now your declaration has a number of attachments to

1  it and I'm going to put them up before I question
2  you about them and let's start with exhibit -- the
3  attachment A, which is Exhibit 9.  And is that one
4  of the exhibits to your declaration?
5  **A.**  It is.
6  **Q.**  And is this a document you or someone else at E&Y
7  prepared?
8  **A.**  Yes.
9  **Q.**  And what is it?
10  MR. RUEGGER:  Your Honor, objection.  We
11  objected to this document.  It is forecast which we
12  think would require expert testimony.  We believe
13  any testimony related to it should be excluded on
14  that grounds.
15  THE COURT:  The document is in evidence.
16  MR. RUEGGER:  No, Your Honor.
17  THE COURT:  It's not.
18  MR. STEWART:  Judge I'm going to ask him
19  now about his dealings with Mr. Orr about the
20  document however we also designated this document
21  and the next two as summaries under federal rule of
22  evidence 1006, since they accumulate voluminous
23  evidence which we made available to the objectors.
24  THE COURT:  What does this document
25  purport to do or to be without telling me what its

---

1  contents are?
2  THE WITNESS:  It was meant to be to show
3  the two years of actual cash activity for the
4  general fund and what the City's cash position was
5  at the end of fiscal year 2013 and fiscal year
6  2012.  The magnitude of the deferrals over that
7  timeframe, Your Honor, and then the two-year
8  forecast beyond that timeframe.
9  **Q.  (By The Court):**  And who?
10  THE COURT:  And so how was the document
11  come pied?
12  THE WITNESS:  Your Honor, the actuals for
13  the first two years were compiled based on the
14  receipts and disbursements activity that we were
15  able to ascertain for the bank accounts.  Your
16  Honor, for the next two years, with respect to the
17  different line items, I can walk through the
18  assumptions, but by.
19  THE COURT:  By the next two years you
20  mean fiscal year 14 and 15.
21  THE WITNESS:  That is right, Your Honor.
22  THE COURT:  No need.  I'll admit the
23  document as to actual and preliminary for 2012 and
24  2013, but the objection is sustained as to the
25  forecasts.

---

1  MR. STEWART:  Thank you.
2  BY MR. STEWART:
3  **Q.**  Is this a document you discussed with the Emergency
4  Manager or his advisors, Mr. Malhotra, on or before
5  the date you executed your declaration?
6  **A.**  Yes.
7  **Q.**  And why did you discuss it with them?
8  **A.**  Because it showed the status of the City's
9  liquidity position right from that timeframe and in
10  the subsequent few months.
11  **Q.**  And what did you say to the Emergency Manager or
12  his advisors about the City's liquidity position at
13  that time or in the coming periods?
14  **A.**  What I said is the City'sing liquidity position at
15  the end of fiscal year 2013 had improved by roughly
16  $40 million because the City did not make the BOC
17  payment that was due on June 15, 2013, and what I
18  said is that over the next two years, the City was
19  requesting to have a significant cash burn for each
20  particular year based on the disbursements
21  significantly exceeding receipts.
22  THE COURT:  Excuse me one second.  Again,
23  we have to clarify your language.  You used the
24  phrase POC.  What does that mean?
25  THE WITNESS:  Your Honor, I was referring

---

1  to the pension obligation certificate and the
2  payment that was due on June 15th.
3  THE COURT:  And then you used the phrase
4  cash burn.  What does that refer to?
5  THE WITNESS:  Your Honor, that refers to
6  the City's operating disbursements exceeding its
7  receipts or its City's total disbursements
8  exceeding its receipts thereby reducing the cash
9  over specified timeframe.
10  BY MR. STEWART:
11  **Q.**  And so you told us what you said to Mr. Orr.  Did
12  you tell him what the cash position was going to be
13  at this rate in the coming years?
14  **A.**  Yes, I did.
15  **Q.**  And what did you tell him?
16  **A.**  I would have -- what I said is that the City's cash
17  position net of deferrals could be approximately
18  $143 million negative at the end of fiscal year
19  2014, not making -- by not repaying any of the
20  deferrals that had already been made as of that
21  point in time or without unpooling any of the cash
22  that the City has currently pooled.
23  **Q.**  And if the City had unpooled the cash or paid up
24  with the deferrals, what did you tell them the cash
25  position was going to be?

1  **A.**  What I said is that the City's cash position for

2  would have been almost $150 million worse off if

3  the pension contributions that had been deferred

4  until that timeframe were made, as well as if the

5  deferred POC payment had been made.  If the pooled

6  cash had to be unpooled, that amount would be

7  roughly an additional $90 million based on what was

8  in the CAFR.

9  **Q.**  For a total cash shortfall of how much?

10  **A.**  Before the unpooling of cash --

11  MR. DeCHIARA:  Objection.  Your Honor, I

12  just am objecting to the extent that this -- what

13  the witness is recounting he's saying to Mr. Orr, I

14  just want to make clear that's not coming into the

15  record as the truth of the matter of the statements

16  he's make together Mr. Orr.  If that's clear, I

17  have no objection, but the line is getting pretty

18  blurred and I think it's getting close to the line.

19  THE COURT:  I'm concerned about that.  I

20  share your concern.  You used a phrase again that

21  needs clarification.  Unpooled --

22  MR. STEWART:  I'm talking about --

23  THE COURT:  I'm asking the witness.  What

24  does unpooled cash mean?

25  THE WITNESS:  Your Honor, what I meant to

1  say is if the pooled cash had to be restricted or

2  segregated out of the general fund, that's what I

3  was referring to the unpooling of cash

4  BY MR. STEWART:

5  **Q.**  What did Mr. Orr say to you?

6  **A.**  On this particular document, the discussions with

7  Mr. Orr or specifically also the other advisors was

8  the magnitude.

9  MR. RUEGGER:  Your Honor, I'm sorry to

10  interrupt the witness, but I thought the question

11  was what was the conversation with Mr. Orr.

12  MR. STEWART:  Or his advisors.

13  MR. RUEGGER:  And I thought the witness

14  was describing a conversation that might not have

15  been with Mr. Orr but might have been with the

16  advisors.

17  MR. STEWART:  I thought I said Mr. Orr or

18  his advisors but if not I'll reask the question.

19  MR. RUEGGER:  Thank you.

20  BY MR. STEWART:

21  **Q.**  What did Mr. Orr or his advisors say to you?

22  **A.**  The specific discussions on this particular page

23  were around the magnitude of the City's cash

24  disbursements exceeding its cash receipts in terms

25  of how dire the situation was with respect to the

1  general funds cash position.

2  **Q.**  Page two of our exhibit is -- let's put it up

3  there.  Let me ask you, just what this is.

4  MR. RUEGGER:  Your Honor, objection.

5  It's a forecast.  I would rather not have any

6  testimony on this.

7  THE COURT:  I'm sorry, did you say you

8  would rather not have any testimony about it?

9  MR. RUEGGER:  I will rephrase my

10  objection without -- with respect, Your Honor.

11  Objection.  It's a forecast, Your Honor.

12  MR. STEWART:  My question is what is this

13  document.

14  THE COURT:  I think we can get at least

15  that much in.

16  MR. STEWART:  Yeah.

17  BY MR. STEWART:

18  **Q.**  What is this document?

19  **A.**  It's the monthly cash flow forecast for fiscal year

20  2014 under base case.

21  THE COURT:  I'm sorry, what?

22  THE WITNESS:  Base case.

23  THE COURT:  I base case which means.

24  THE WITNESS:  Your Honor on this it means

25  the City continuing to make its payments for both

1  all unsecured claims, per schedule, and no

2  restructuring initiatives such as any benefits from

3  the bankruptcy protection may avail.  It was the

4  City paying its payments as they came due based on

5  the information that we had including the

6  information from the actuaries.

7  THE COURT:  Like steady state before.

8  THE WITNESS:  That is correct, Your

9  Honor.

10  BY MR. STEWART:

11  **Q.**  And did you discuss your conclusions with Mr. Orr

12  or his advisors?

13  **A.**  Yes.

14  **Q.**  Let's put up the next exhibit.  Ten for

15  identification.  Mr. Malhotra, I think we have

16  Exhibit 10 for identification, which is Exhibit B

17  to your declaration.  Is this a ten-year financial

18  projection?

19  **A.**  Yes, it is.

20  **Q.**  Did you discuss this with Mr. Orr or his advisors?

21  **A.**  Yes, I did.

22  **Q.**  And what did you say to him and what did he say to

23  you or his advisors say to you about the ten-year

24  projections?

25  MR. RUEGGER:  Objection, Your Honor.

1  This is the same issue that Mr. DeCharia raised, a
2  discussion of forecasts is essentially I think a
3  back door around your ruling, so we would object to
4  the question and the answer.
5      THE COURT:  Well, I'll permit the witness
6  to answer this question with the understanding that
7  the document is not in evidence and the witness's
8  testimony about what the document says is only for
9  the purpose of the truth of what he told Mr. Orr
10  and not for the truth of the statements themselves.
11      MR. RUEGGER:  Thank you, Your Honor.
12  BY MR. STEWART:
13  Q.  And what did you say to Mr. Orr about the
14  conclusions you had reached in the document?
15  A.  What I said is that the City's revenues over the
16  ten years, approximately ten and a half billion
17  dollars, and the City's operating expenditures over
18  these next ten years, approximately seven and a
19  half billion dollars for roughly a $3 billion
20  operating surplus.  What I said specifically around
21  the legacy liabilities was based on the current
22  amortization schedule and the information that we
23  have received from the actuaries, the legacy cost
24  could be in excess of $7 billion over the ten
25  years, which would result in a potential

1  operating -- a potential deficit to the tune of
2  $4 billion over the next ten years.
3  Q.  And let's put up Exhibit 11, if we could.
4      Can you tell us what Exhibit 11 is?
5  A.  Exhibit 11 is the five years of actual legacy
6  expenditures and five years of a forecast on the
7  scheduled debt service as it exists today, or the
8  pension and retiree healthcare information we
9  received from the actuaries.
10  Q.  Let's blow up if we could the part that deals with
11  the fiscal years ended between 2008 and 2012.  Are
12  those numbers numbers relating to years that had
13  already where the books had already been closed?
14  A.  That is correct.
15  Q.  Where did your numbers come from?
16  A.  The numbers would have come from, for the debt
17  service, the POCs, would have come from the City,
18  the pension contributions and the health benefits,
19  the retirees, for the retirees, would have also
20  come from the City in conjunction with the City's
21  actuaries on the allocation of what was for public
22  safety versus non public safety or DDOT.
23      MR. STEWART:  Your Honor, I would move
24  this portion of the document into evidence since it
25  reflects only historical data.

1      THE COURT:  Any objections?  The Court
2  will admit this document.  What was the exhibit
3  number again so we're clear?
4      MR. STEWART:  Eleven, believe, judge.
5      THE COURT:  Admitted Exhibit 11, 2008,
6  20022012 only.
7      MR. STEWART:  And then go back to the
8  full document if you could.
9  BY MR. STEWART:
10  Q.  As to the overall document, Mr. Malhotra, did you
11  have discussions with the Emergency Manager or his
12  advisors about it?
13  A.  Yes, I did.
14  Q.  And why did you discuss it with him?
15  A.  We discussed it in the context of the legacy
16  expenditures continuing to have an increasing
17  percentage of the overall general fund revenues
18  compared to where the City was five years ago
19  compared to where the City was headed by 2017, that
20  the weight of the legacy expenditures was almost
21  going to close to double based on the projections
22  that we had been given.
23  Q.  And what did Mr. Orr or his advisors say to you in
24  response to the points that you made?
25  A.  Specifically, there was -- they were surprised in

1  terms of the magnitude of the increase in pension
2  and retiree healthcare costs over the next five
3  years.
4  Q.  (By Mr. DeChiara):  Objection.  Lack of foundation.
5  Testifying to the state of mind of the
6      THE COURT:  It actually wasn't the
7  question.  The question was what did they say.
8      THE WITNESS:  They basically said that
9  the costs going up from where they were five years
10  ago to where they were ten years ago, I
11  specifically remember that it was almost going to
12  double was the response that I got back on this
13  particular page.
14  Q.  (By Mr. DeChiara):
15      THE COURT:  Okay.  Can you try to specify
16  for us when these conversations were that
17  Mr. Stewart has been asking you about?
18      THE WITNESS:  Sure.  On this particular
19  document, we would have had -- which was also as a
20  part of the June 14th proposal, Your Honor, so we
21  would have had meetings with Mr. Orr and the other
22  advisors all through the June timeframe and even in
23  some of the May timeframe, so they were a series of
24  meetings that we had.
25      THE COURT:  At which these documents were

1  discussed?

2          THE WITNESS:  Yes.  The June 14th

3  proposal, Your Honor, was pulled together over a

4  period of time so there was specific documents that

5  were discussed in those meetings.

6          MR. STEWART:  Your Honor, I have a

7  demonstrative Exhibit I would like to use but

8  before putting it up on the screen, since there

9  have been objections, it's Exhibit 38.  Why don't

10  we put it up on the screen.

11          Judge, this is a graphic representation

12  of what the witness has already testified to that

13  he told Mr. Orr was the City's cash position as the

14  witness had seen it.  And what I would like to ask

15  the witness is does this represent what you told

16  Mr. Orr or his advisors about what you believe the

17  City's cash position was going to look like in the

18  coming year.

19          MR. RUEGGER:  Objection.  Leading.  And

20  it's also a forecast.

21          MR. STEWART:  I can ask it in a

22  non-leading way, Judge.

23          MR. RUEGGER:  Then just forecast.

24          THE COURT:  No, the objection is

25  sustained.

1  BY MR. STEWART:

2  Q.  Your Honor, as to these last three exhibits and

3  actually also this chart, I would like to move them

4  into evidence on another ground.  And as I

5  mentioned, we identified these to the objectors as

6  documents that qualified as summaries over

7  federal -- under federal rule of evidence 1006, in

8  other words, they compiled and pulled together

9  voluminous records that could not conveniently or

10  easily otherwise be made into proofs.  That was

11  done with proper notice as the rule requires.  We

12  notified the objectors of this, we told them we

13  have the underlying records available for your

14  examination, if you wish to see them, please come

15  and do so.  One person did call to say they would

16  like to see them but never in fact came.  I would

17  submit that we have actually satisfied the

18  requirements of rule 1006 by doing this and that as

19  simple summaries of voluminous information they

20  qualify for admission.

21          MR. RUEGGER:  Your Honor, I think

22  Mr. Stewart misunderstands our objection.  It's not

23  that there's a lot of data underlying any of these

24  documents that might very well be, but they are

25  forecasts which require in our view expert

1  testimony which is not in the courtroom.  So we're

2  not objecting due to the volume of the underlying

3  data, it's because they are forecasts.

4          THE COURT:  I do agree with that.  The

5  motion is denied.

6          MR. STEWART:  Your Honor, could I be

7  heard one more moment on this?

8          THE COURT:  All right.

9          MR. STEWART:  The fact they're forecast

10  doesn't per se change anything.  They would have to

11  be opinions before they're excludable.  And it's

12  been testified --

13          THE COURT:  But why isn't the forecast an

14  opinion about what's being forecast?

15          MR. STEWART:  Well, it's possible to have

16  forecast that is are factual, that are

17  extrapolations, that are not really opinions, and

18  there are forecasts rendered many times that don't

19  involve experts.  In fact, the two decisions I

20  cited earlier involved financial analysts, much

21  like Mr. Malhotra, who pulled together documents

22  from which conclusions could be reached about the

23  probability of something happening or not

24  happening?

25          THE COURT:  They involve forecasts,

1  financial forecasts.

2          MR. STEWART:  These involved complicated

3  personal financial records, but they did involve an

4  ultimate issue such as could this person have

5  possibly afforded this item based on his or her

6  income.

7          THE COURT:  The past.

8          MR. STEWART:  Well, it's past, but if a

9  forecast is based on information that is either

10  historical or is made available as information

11  about a forecast,.

12          THE COURT:  I have to say I'm not

13  persuaded, but if you can find me a case which says

14  that a forecast does not involve expertise, I'll

15  certainly consider it.

16          MR. STEWART:  Okay, Your Honor.  We'll do

17  that.

18          THE COURT:  We'll leave it open to that

19  extent.

20          MR. STEWART:  Thank you.  That's all I

21  have of this witness, Your Honor.

22          THE COURT:  All right.  Well, we won't

23  press on with cross examination now.  We will break

24  for the day and reconvene at 9:00 tomorrow morning.

25          Before we go, Ms. Patek has something and

1    then I have something.

2              MS. PATEK:  Your Honor, this is just a

3    brief housekeeping matter about a matter of a

4    summary exhibit that came in at the beginning of

5    the day and in this is something Mr. Irwin and I

6    had talked about and there was an error on it and

7    it was to be corrected and it didn't get corrected

8    but it's going to be corrected on the --

9              THE COURT:  Let me ask the two of you to

10   consult about that and get back to me first thing

11   in the morning.

12             I have been asked to remind you that

13   although this courtroom will be locked overnight

14   there may and probably will be people in here doing

15   what they regularly do, the IT staff, court staff,

16   cleaning staff, so you are free to leave your

17   equipment and property here, with that

18   understanding or of course you can take it with

19   you.  And I remind you once again, please be quiet,

20   perfectly quiet in the hall was.  And we will

21   reconvene at 9:00 tomorrow morning.

22             COURT CLERK:  All rise.

23

24   4:53

25

**$**

$1.25 [1]  135/6
$1.25 billion [1]  135/6
$1.9 [1]  226/6
$1.9 million [1]  226/6
$118.7 [1]  229/10
$118.7 million [1]  229/10
$14.1 [1]  229/3
$14.1 million [1]  229/3
$143 [1]  260/18
$143 million [1]  260/18
$150 [1]  261/2
$150 million [1]  261/2
$20 [2]  215/18 215/21
$20 million [2]  215/18 215/21
$29.8 [1]  225/7
$29.8 million [1]  225/7
$3 [2]  245/1 265/19
$3 billion [2]  245/1 265/19
$3.5 [3]  187/2 187/9 189/18
$3.5 billion [3]  187/2 187/9 189/18
$3.93 [1]  243/17
$3.93 billion [1]  243/17
$30 [1]  215/8
$30 million [1]  215/8
$30.8 [1]  218/17
$30.8 million [1]  218/17
$33.8 [1]  228/25
$33.8 million [1]  228/25
$4 [4]  228/22 243/16 245/4 266/2
$4 billion [3]  243/16 245/4 266/2
$4 million [1]  228/22
$40 [3]  246/20 247/5 259/16
$40 million [2]  247/5 259/16
$5.8 [1]  110/11
$5.8 million [1]  110/11
$50 [1]  224/18
$50 million [1]  224/18
$644 [1]  189/17
$644 million [1]  189/17
$65 [1]  229/9
$65 million [1]  229/9
$65.5 [1]  224/17
$65.5 million [1]  224/17
$7 [2]  245/2 265/24
$7 billion [2]  245/2 265/24
$70 [1]  215/17
$70 million [1]  215/17
$90 [2]  222/3 261/7
$90 million [2]  222/3 261/7
$92 [3]  221/21 222/16 222/19
$92 million [3]  221/21 222/16 222/19

**'**

'14 [1]  235/3

**.**

.09 [1]  110/12

**1**

1.5 [1]  228/2
1.52 [1]  227/24
1.578.2 [1]  228/19
1.582 billion [1]  215/7
1.765 billion [1]  213/2
1.9 million [1]  222/14
10 [3]  120/14 140/6 264/16
10.4 billion [1]  243/13
10/23/13 [2]  1/2 2/2
1006 [3]  257/22 270/7 270/18
101 [1]  68/20
102 [1]  76/15
103.9 million [1]  218/13
104 [5]  92/21 94/17 94/18 104/2 104/4
109 [11]  68/20 91/7 108/10 137/20 145/3
 156/13 157/2 161/9 166/16 172/20
 179/24
109C2 [1]  167/1
109C5B [1]  77/11
10:00 [1]  39/9
10:00 o'clock [1]  39/5
10:00 on [1]  119/4
10th [5]  118/4 119/14 121/5 151/23
 183/24
11 [15]  93/8 120/14 121/5 140/6 158/15
 183/24 210/25 213/5 213/9 215/6 218/16
 266/3 266/4 266/5 267/5
11/12th [1]  213/24
110 [1]  159/18
1113 [4]  160/24 161/7 161/18 163/4
115 [1]  72/11
115.5 [1]  224/22
11:59 [1]  131/14
11A [1]  227/18
11th [2]  118/5 205/11
12 [13]  24/3 24/16 24/17 115/6 121/9
 181/8 196/5 210/24 210/25 212/22
 218/12 222/13 224/3
12,000 [1]  154/13
125 [1]  214/3
12th [2]  151/23 213/24
13 [9]  1/2 2/2 150/19 210/14 210/17
 213/12 214/3 214/22 216/5
130 [1]  72/11
1353846 [2]  2/4 39/11
13th [1]  93/4
14 [23]  26/20 38/21 83/13 109/24 115/24
 158/8 159/14 160/18 172/15 172/24
 173/16 181/20 181/22 182/5 182/14
 184/20 208/16 209/5 209/12 234/19
 245/9 245/15 258/20
14th [25]  62/15 66/6 68/2 68/3 69/7 82/12
 82/20 93/5 97/2 97/2 121/2 135/1 135/20
 142/5 142/13 150/19 151/20 178/8
 178/14 178/21 179/8 183/1 254/20
 268/20 269/2
15 [4]  83/4 122/1 258/20 259/17
15th [6]  6/16 36/15 83/13 109/25 141/17
 260/2
16 [3]  122/12 152/9 210/18
16th [3]  142/24 143/12 143/13
17th [2]  123/13 183/3
18 [6]  123/25 156/4 163/6 256/11 256/11
 256/15
18 billion [1]  186/2
18th [12]  118/23 120/11 123/23 142/25
 143/14 143/22 150/19 158/9 176/20
 176/22 176/25 255/22
19 [3]  26/9 123/23 124/13
1946 [1]  154/1
1960 [1]  154/2
1969 [1]  148/6
19th [11]  15/22 18/7 117/23 117/25
 118/25 119/4 123/12 123/24 133/11
 158/12 176/24
1:30 [2]  131/11 131/14
1F [1]  227/19

**2**

20 [6]  105/13 116/11 117/5 133/24
 182/21 216/4
20 billion [1]  216/4
20 minutes [1]  105/2
2000 [1]  194/18
2002 [1]  168/20
20022012 [1]  267/6
2004 [1]  194/19
2005 [1]  246/13
2007 [1]  205/11
2008 [2]  266/11 267/5
2011 [15]  28/15 40/25 93/11 93/11
 106/15 106/18 141/19 147/24 149/8
 149/8 188/8 195/17 196/1 196/6 197/25
2012 [36]  6/20 7/1 24/20 31/6 32/9 33/7
 39/22 41/21 45/7 47/24 93/16 100/6
 106/23 107/16 107/20 109/13 109/13
 109/20 147/25 149/9 198/13 210/24
 215/3 218/11 218/20 219/19 219/21
 224/16 226/13 226/14 226/15 229/10
 247/6 258/6 258/23 266/11
2013 [40]  11/6 24/21 42/12 83/4 111/10
 114/4 115/3 115/6 133/24 150/19 151/3
 168/21 169/10 170/18 171/24 172/15
 208/6 210/12 210/19 213/5 215/5 215/20
 218/15 219/17 219/18 220/22 227/18
 227/23 228/11 228/18 228/20 229/2
 229/11 230/11 246/20 247/13 258/5
 258/24 259/15 259/17
2014 [6]  150/5 231/22 232/13 233/3
 260/19 263/20
2017 [1]  267/19
20th [3]  247/13 248/3 252/24
21 [1]  93/11
21st [1]  251/24
226 [1]  205/10
227327 [1]  235/9
22nd [2]  133/7 133/14
23 [1]  117/10
24 [9]  16/25 124/18 139/6 139/15 139/17
 139/23 142/16 167/1 174/14
250 million [1]  188/13
255 [1]  100/7
25th [3]  251/25 252/12 253/6
26 [2]  12/14 110/8
27 [1]  116/20
27th [1]  117/7
28 [1]  115/2
28th [1]  151/13
29 [1]  112/10
297 [1]  98/13
2:51 [1]  192/10
2nd [1]  98/13

**3**

30 [10]  109/18 110/16 114/18 128/16
 141/10 149/21 151/3 163/8 226/15 247/6
30 minutes [2]  105/13 109/2
30th [1]  210/16
31 [2]  49/19 170/18
312 [5]  148/10 148/11 149/5 150/3
 150/24
3200 [1]  145/18
34 [1]  106/23
35 [1]  96/20
36 [1]  92/11
38 [2]  65/8 269/9
38 percent [2]  189/9 189/10
39 percent [1]  65/9
3:05 [1]  123/15
3:10 [1]  192/10
3:47 [1]  123/20
3rd [3]  133/1 133/3 133/9

**4**

40 [2]  203/6 203/9
423.231 [1]  148/10
43 [2]  209/8 209/9
436 [9]  150/14 150/25 151/15 168/8
 168/12 168/20 170/9 170/10 202/24

## 4

44 [3] 148/5 209/14 238/6
45 [7] 90/12 202/9 202/11 202/13 202/17
  202/23 203/1
46 [1] 76/16
47 [3] 235/9 238/5 238/10
48 [3] 91/7 247/25 248/1
49 [1] 249/18
491 [1] 100/6
4:06 [1] 123/22
4:10 [1] 124/4
4:53 [1] 273/24

## 5

50 million [1] 213/2
50 percent [1] 109/7
502 [1] 46/12
51 [4] 251/20 251/21 251/22 252/8
521C [1] 60/22
535 [1] 205/10
55 [1] 101/7
55-mile [1] 101/7
57 [1] 134/13
58 [1] 96/19
582.2 [1] 227/24
5th [1] 6/25

## 6

6.4 billion [2] 186/3 186/10
62 percent [1] 65/7
630 [1] 98/13
64.4 million [1] 226/23
643 [1] 188/10
644 [1] 188/12
644 million [1] 188/10
65 [1] 49/19
65.5 [1] 224/20
68 percent [2] 189/7 189/8
6:23 [2] 123/9 123/13
6:30 [1] 124/3
6D [1] 6/17

## 7

7 billion [1] 243/15
7.4 billion [1] 243/14
70 [2] 215/19 219/20
70 million [1] 219/22
700,000 [1] 17/15
701C [1] 204/9
704 [1] 164/23
70s [1] 73/22
720 [1] 147/13
7289 [1] 231/20
75 [1] 202/17

## 8

8,000 [1] 154/15
810 [1] 100/7
865 [1] 109/22
876 [1] 100/7
8th [3] 118/21 183/20 183/22

## 9

921C [8] 91/4 144/19 146/21 166/24
  167/16 167/19 167/23 185/12
9:00 [1] 273/21
9:00 the [1] 119/2
9:00 tomorrow [1] 272/24
9:49 [1] 39/9
9th [2] 119/8 138/14

## A

a.m [3] 39/9 39/9 131/14

ability [6] 103/6 159/2 163/14 176/4
  200/13 249/4
able [19] 12/8 17/23 18/11 23/4 29/15
  30/11 31/21 35/2 35/2 70/17 79/13
  118/17 158/23 163/17 203/15 207/12
  241/25 255/20 258/15
ably [1] 30/13
aboard [1] 107/12
about [192] 13/19 13/21 14/3 14/13 14/14
  15/19 19/6 20/2 26/1 27/4 29/20 32/7
  40/11 41/2 48/6 49/6 50/3 53/12 55/16
  56/5 58/24 59/7 60/14 61/6 61/16 63/7
  63/12 63/24 64/10 65/16 66/20 67/16
  69/2 70/14 70/23 74/16 74/24 75/4 79/22
  82/16 82/20 83/25 84/10 84/21 84/25
  85/22 86/9 86/11 86/12 86/16 90/12
  90/14 91/21 93/22 98/10 99/3 100/20
  100/20 101/7 101/17 105/2 107/8 109/6
  113/12 114/8 119/22 119/14 120/5 122/3
  125/22 134/7 134/11 134/17 135/1 135/6
  136/8 136/18 136/24 137/4 137/9 137/12
  137/17 138/6 138/6 140/16 140/23
  141/10 142/14 145/21 147/25 148/5
  150/6 163/2 169/11 175/5 177/5 177/7
  185/11 187/6 188/10 188/12 188/14
  189/6 190/15 194/7 194/19 194/24
  195/16 199/3 199/24 200/18 204/14
  204/19 204/22 205/2 205/15 205/19
  207/3 207/3 208/25 210/18 211/15
  213/16 213/17 213/20 213/23 215/16
  216/4 216/15 218/9 218/17 218/25 221/2
  222/22 225/4 226/20 226/23 227/5
  230/23 232/11 232/21 232/24 233/24
  234/1 234/20 234/23 235/6 235/17 238/3
  239/12 239/20 241/22 243/19 244/7
  244/16 245/7 245/10 245/20 245/24
  245/25 246/2 246/4 246/13 248/20 249/3
  249/4 249/21 250/1 251/2 253/20 254/4
  255/24 256/11 257/2 257/19 257/19
  259/12 261/19 261/22 263/8 264/23
  265/8 265/13 267/12 268/17 269/16
  271/14 271/22 272/11 273/3 273/6
  273/10
above [1] 215/9
absence [3] 66/13 85/21 85/22
absolutely [7] 70/19 83/24 84/5 84/12
  89/15 132/16 192/2
abstract [1] 41/10
accept [6] 82/25 83/1 88/5 88/5 91/10
  162/1
acceptable [1] 138/4
accepted [5] 129/25 137/24 137/25
  137/25 138/11
accepting [1] 162/16
accepts [1] 151/18
access [5] 12/24 117/3 136/10 182/24
  199/6
accessible [1] 48/13
accident [2] 8/8 150/17
accomplish [2] 163/18 172/6
accomplished [3] 51/24 96/1 141/13
accordance [1] 1/15
according [2] 49/24 186/21
accordingly [2] 51/8 52/8
account [14] 64/15 173/2 197/23 212/13
  215/9 215/13 215/14 215/14 215/18
  215/22 217/14 220/8 223/23 225/1
accountable [1] 18/12
accounted [1] 217/16
accounting [2] 193/19 197/8
accounts [6] 199/12 221/12 221/17
  221/18 221/19 258/15
accrued [12] 116/3 116/9 122/23 134/8

137/18 139/7 170/1 170/25 172/17
  172/22 181/9 186/2
accumulate [1] 257/22
accumulated [6] 225/11 226/18 229/4
  229/5 229/7 230/7
accurate [6] 46/19 188/24 199/22 243/23
  243/24 244/10
accurately [1] 47/20
achieve [3] 112/14 172/4 177/17
achieving [1] 167/8
acknowledge [2] 146/22 175/6
acknowledged [7] 71/15 116/24 122/16
  171/10 178/20 182/23 189/15
acknowledging [1] 22/10
across [4] 78/1 78/2 79/18 197/8
act [16] 90/23 111/3 128/18 129/10
  130/12 130/19 148/9 148/10 148/11
  149/5 150/3 150/14 150/24 150/25
  151/14 167/15
acted [1] 162/18
acting [5] 33/4 69/4 167/3 177/19 177/20
action [5] 100/2 128/12 171/17 185/15
  187/8
actions [9] 17/14 18/12 62/1 62/7 67/14
  67/21 100/17 167/8 177/16
active [12] 116/10 117/2 139/2 153/21
  154/11 163/10 172/22 173/6 173/13
  237/10 241/2 250/5
actively [3] 42/9 44/19 190/23
actives [3] 138/2 173/11 182/23
activities [1] 196/21
activity [10] 141/8 197/24 198/23 199/11
  200/9 203/13 217/17 231/1 258/3 258/14
actor [1] 177/16
actors [1] 18/10
acts [2] 149/24 150/9
actual [26] 42/4 85/23 99/8 121/1 181/20
  184/16 187/13 187/24 207/13 210/23
  212/22 213/6 213/9 213/16 213/21
  214/20 215/6 218/10 218/12 224/3
  230/25 240/24 248/10 258/3 258/23
  266/5
actually [30] 4/24 5/5 26/1 39/14 40/5
  40/23 45/14 65/7 68/16 74/23 80/5
  101/12 102/19 104/21 107/1 117/18
  133/1 134/25 135/23 135/24 157/10
  159/12 163/17 181/3 207/14 214/14
  236/25 268/6 270/3 270/17
actuals [7] 211/1 213/25 214/11 218/16
  220/23 220/24 258/12
actuarial [3] 183/5 188/7 255/16
actuaries [18] 64/16 219/5 229/17 229/22
  230/12 230/18 237/11 238/25 240/23
  241/4 241/17 248/12 251/1 255/7 264/6
  265/23 266/9 266/21
actuary [1] 188/2
adamant [1] 178/20
add [8] 5/6 18/20 39/21 56/15 56/16
  132/21 178/9 213/24
added [4] 110/21 127/2 127/20 129/20
adding [2] 129/22 206/3
addition [1] 19/3 26/24 42/21 45/18
  125/23 127/25 136/20 159/21 161/3
  195/12 207/24
additional [16] 25/16 89/10 105/11 117/3
  136/12 162/23 175/18 182/24 211/24
  211/25 212/15 219/22 225/20 254/8
  255/6 261/7
address [19] 27/15 34/3 68/2 92/3 93/6
  93/7 100/21 112/1 119/19 127/4 127/6
  131/17 134/16 147/8 151/1 153/19 156/2
  164/2 193/12
addressed [11] 73/1 93/15 121/16 128/3

## A

addressed... [7] 152/4 157/8 158/23
164/3 185/13 187/7 245/23
addressing [3] 36/18 51/1 187/21
adds [1] 143/23
adequate [2] 57/9 66/24
adequately [1] 70/22
adhered [1] 17/25
adhering [1] 171/15
adjusted [1] 243/11
adjustment [15] 68/23 134/15 145/4
178/13 178/15 179/9 179/10 180/1 180/8
180/10 180/16 180/22 181/13 181/16
184/14
administrative [1] 196/23
admissibility [4] 5/7 56/22 57/4 57/19
admissible [5] 56/23 57/5 58/6 58/9
214/21
admission [6] 57/15 57/16 59/1 59/13
120/25 270/20
admissions [1] 174/24
admit [6] 2/7 21/5 104/6 181/8 258/22
267/2
admitted [16] 10/20 58/2 59/12 69/7
74/18 74/19 85/15 85/17 120/10 124/9
174/2 175/23 181/4 182/13 187/23 267/5
admitting [2] 60/1 74/24
adopt [2] 113/19 147/5
adopted [3] 109/24 121/7 149/15
advance [3] 9/11 74/5 147/11
advancing [4] 165/15
advantage [4] 35/19 46/23 90/4 134/23
47/11
adversarial [5] 32/1 32/2 45/25 46/18
47/11
adversary [1] 66/22
advice [7] 27/24 28/5 28/11 32/8 45/10
45/25 64/18
advised [4] 25/2 176/4 176/9 232/23
advisement [1] 39/5
advisor [1] 187/20
advisors [30] 28/18 43/4 44/6 47/16
124/23 156/24 194/20 247/8 248/22
250/3 251/16 252/7 252/14 252/14
254/12 254/13 259/4 259/12 262/7
262/12 262/16 262/18 262/21 264/12
264/20 264/23 267/12 267/23 268/22
269/16
advisory [2] 46/12 201/4
affect [1] 17/15
affected [4] 41/25 67/9 80/19 80/22
affiliates [1] 139/5
affirmatively [2] 46/9 46/21
afford [1] 255/21
afforded [2] 68/10 272/5
afraid [1] 144/25
AFSCME [16] 2/19 61/21 63/20 65/15
66/20 67/19 76/13 76/18 77/15 81/16
94/5 104/20 105/9 157/6 163/6 166/8
AFSCME's [2] 91/5 157/9
AFSME [1] 203/25
after [28] 6/10 26/19 39/15 55/25 82/20
83/20 83/21 90/12 92/16 108/13 108/17
115/5 121/23 124/1 148/7 149/25 150/7
151/12 160/6 171/24 191/16 192/6
194/14 202/4 202/13 205/24 224/17
249/25
afternoon [20] 123/16 133/17 145/6
153/4 157/5 164/19 193/10 245/25
247/22 249/19 249/21 251/4 251/11
251/12 251/18 253/22 253/24 255/3
255/5 255/12
afterwards [1] 80/7

again [49] 25/1 25/4 31/7 35/4 42/17 43/4
49/3 52/13 52/21 69/8 70/22 75/16 79/24
81/15 81/25 82/7 86/4 86/23 88/8 88/25
91/5 92/18 95/19 103/10 106/18 115/7
120/20 127/15 130/24 133/23 140/5
142/8 142/21 145/7 148/6 151/21 173/24
181/10 183/11 188/19 230/5 240/10
250/6 250/20 253/5 259/22 261/20 267/3
273/19
against [11] 14/1 30/10 117/12 123/6
124/14 153/11 168/22 213/21
age [1] 101/7
aggregate [1] 71/10
ago [13] 44/6 44/9 67/3 106/9 117/13
148/6 194/24 195/18 205/15 222/8
267/18 268/10 268/10
agree [12] 1/18 22/7 22/13 57/5 58/5
59/12 88/11 88/24 89/22 163/8 242/6
271/4
agreed [3] 19/20 104/23 125/16
agreeing [1] 58/15
agreement [20] 19/19 24/8 26/5 26/25
27/3 44/14 54/10 54/21 57/16 66/14
107/17 115/21 118/18 136/12 156/11
156/14 163/9 215/15 215/24 227/3
agreements [6] 148/13 149/14 149/15
149/15 151/4 154/21
ahead [8] 2/10 39/19 204/2 222/15
228/15 235/25 237/12 237/13
aide [2] 212/3 236/16
Aikman [1] 195/10
air [1] 143/11
Airlines [1] 195/8
airport [2] 115/25 208/23
Aisle [1] 92/14
all [149] 1/14 5/9 9/1 10/1 10/16 15/18
17/5 22/20 23/15 25/19 29/2 30/11 33/19
34/16 37/21 38/6 39/4 39/7 41/25 43/4
45/4 45/9 48/14 50/7 51/4 52/20 53/8
53/21 55/20 55/21 57/21 58/2 58/17
58/23 59/16 59/22 60/1 60/12 61/4 62/14
65/18 69/8 69/15 69/20 71/3 71/24 75/11
75/13 75/16 76/21 76/25 77/14 77/16
79/4 79/6 82/13 82/19 85/12 86/6 90/6
90/6 90/23 93/16 93/21 94/8 94/9 95/2
95/3 98/7 99/18 100/23 101/15 101/16
104/6 107/11 108/1 111/25 112/2 115/6
118/12 118/25 124/11 128/21 130/25
131/12 132/10 132/17 139/23 141/8
141/8 141/24 143/2 143/23 144/2 144/4
144/7 151/5 152/18 153/1 155/2 159/24
160/15 162/4 163/11 164/10 164/12
165/16 166/12 167/1 168/7 172/13
175/22 177/14 178/6 182/12 185/24
187/4 188/23 190/10 192/5 192/8 197/18
204/25 210/11 211/14 214/19 216/16
221/18 222/23 224/9 228/13 229/10
232/13 236/13 238/4 238/7 238/21
239/12 240/20 240/24 242/7 243/18
249/22 264/1 268/22 271/8 272/20
272/22 273/22
alleged [5] 19/22 99/6 113/5 120/15
163/3
allocable [4] 188/13 188/18 189/5 189/21
allocation [1] 266/21
allow [4] 56/3 99/19 158/17 184/6
allowed [3] 175/24 206/15 242/15
allows [1] 201/12
almost [9] 74/18 90/6 93/23 222/16
243/16 245/3 261/2 267/20 268/11
alone [3] 5/1 190/13 241/25
along [9] 37/17 53/20 98/22 150/7 203/14
214/8 224/3 248/22 250/3

already [33] 31/3 32/13 33/18 49/25
72/15 92/19 97/3 97/4 97/5 117/22 118/3
121/7 122/9 138/18 156/18 162/22 169/8
169/17 176/16 176/23 183/21 184/2
185/13 204/17 213/25 224/20 227/23
241/19 250/13 260/20 266/13 266/13
269/12
also [87] 1/22 2/15 3/9 4/1 4/11 21/3
21/18 23/23 30/15 36/8 43/18 43/25
54/14 62/9 63/3 63/17 64/6 65/2 66/6
67/4 79/2 81/19 82/15 87/22 92/13 97/25
98/1 99/15 99/25 101/11 102/22 105/6
113/16 114/18 117/14 119/24 120/2
120/24 122/21 125/16 135/10 136/8
139/16 139/25 143/9 146/4 146/18
146/24 147/11 148/3 149/5 149/9 152/23
158/19 163/24 164/5 165/23 166/14
167/13 167/21 169/15 171/5 174/24
181/14 185/16 186/24 187/20 188/11
190/18 194/11 199/10 201/3 206/8
208/11 209/15 212/10 213/17 223/14
235/25 241/21 255/9 257/20 262/7
266/19 268/19 269/20 270/3
altering [1] 24/8
alternative [2] 93/25 96/3
alternatives [4] 94/7 94/8 94/25 95/23
although [6] 113/16 150/13 154/19 166/8
173/16 273/13
always [5] 56/20 65/23 89/18 179/1
199/23
am [13] 20/20 36/14 53/16 123/7 124/6
195/1 195/5 233/7 242/14 245/22 246/10
247/16 261/12
amended [5] 55/22 59/23 72/24 131/19
138/7
among [1] 125/14 190/13
amortization [3] 250/19 250/21 265/22
amount [32] 58/13 62/23 63/24 64/1
64/13 64/14 70/23 71/10 94/4 110/14
125/7 125/13 159/19 183/6 183/8 187/24
188/9 188/12 190/5 214/12 215/23
219/16 220/8 225/18 227/11 229/5 229/7
229/14 230/11 255/18 255/19 261/6
amounted [1] 218/11
amounts [9] 64/21 64/24 90/2 116/9
172/22 225/15 227/1 227/10 248/16
analogous [1] 34/24
analogy [3] 27/21 34/20 77/11
analyses [2] 194/5 235/25
analysis [12] 29/18 40/8 44/15 108/9
108/15 125/8 180/3 187/14 188/3 197/21
230/24 244/2
Analyst [1] 194/12
analysts [1] 271/20
analyze [2] 117/4 182/25
analyzing [1] 197/1
and/or [5] 1/13 66/16 139/2 139/13
139/16
anded [1] 137/6
ands [1] 169/3
Andy [5] 40/4 41/22 107/6 107/8 108/2
angled [1] 105/23
Ann [1] 252/13
announced [2] 159/25 160/6
announcement [1] 160/1
annual [2] 198/14 223/4
another [17] 24/23 63/14 66/22 72/9
74/22 77/21 144/4 167/22 183/2 185/16
191/24 219/20 235/8 239/11 246/5
247/12 270/4
answer [18] 33/22 37/9 37/12 78/12 80/8
138/24 139/25 141/2 181/7 182/15
191/18 207/7 222/8 233/10 240/6 244/19

**A**

answer... [2] 265/4 265/6

answered [5] 35/16 80/1 80/24 111/4 177/11

answers [6] 114/16 121/2 125/8 140/12 174/8 240/4

ant [1] 6/7

antedate [2] 6/14 27/2

antedates [1] 7/9

Anthony [2] 2/25 164/20

anticipate [5] 30/4 30/5 30/6 45/19 45/24

anticipated [3] 40/23 66/1 67/6

anticipating [2] 45/12 215/21

anticipation [8] 9/9 11/13 13/12 30/2 40/14 40/16 41/15 45/17

antithetical [1] 27/19

anxious [2] 67/11 67/19

any [120] 1/19 1/20 5/12 5/12 5/13 7/25 8/11 9/1 9/12 11/17 11/18 12/2 12/11 19/16 24/7 25/9 28/14 31/7 33/14 33/15 34/19 35/18 35/19 36/21 36/23 41/4 41/13 42/24 46/20 47/22 51/15 52/9 52/11 53/8 54/10 55/10 58/2 59/15 60/8 60/14 67/23 72/18 73/4 76/2 80/12 81/1 81/20 82/10 85/25 86/5 87/25 88/3 91/25 93/10 94/25 95/25 97/3 97/15 100/1 101/21 103/1 103/14 104/4 105/11 106/6 106/12 113/4 116/17 120/19 122/19 125/15 125/20 128/8 130/11 130/14 134/14 134/19 137/6 139/1 140/15 141/21 142/17 157/20 162/17 172/3 173/1 174/16 175/15 175/24 189/13 190/17 191/1 194/8 195/20 195/22 199/25 202/25 203/15 204/22 205/1 207/9 212/9 242/25 245/17 247/7 249/5 249/6 251/3 252/25 254/17 254/21 254/21 257/13 260/19 260/21 263/5 263/8 264/2 267/1 270/23

anybody [2] 87/15 157/19

anymore [2] 20/23 95/7

anyone [13] 9/13 29/8 31/8 31/20 37/4 66/7 84/1 89/1 96/4 138/1 161/13 206/13 245/14

anyone's [1] 63/6

anything [26] 7/8 15/13 18/16 18/20 20/5 23/12 24/9 25/4 32/20 63/16 67/25 74/9 80/6 88/11 103/15 114/13 169/1 175/9 180/21 183/12 187/6 205/23 206/2 209/3 255/14 271/10

anyway [1] 25/3

anywhere [3] 103/16 173/18 230/6

apologize [6] 39/13 126/13 147/11 191/15 252/18 255/11

apparently [8] 10/7 103/22 141/13 142/5 142/6 143/2 160/16 178/17

Appeals [3] 98/15 98/16 98/16

appear [5] 113/22 141/9 143/5 157/24 199/22

appearance [1] 55/10

appearances [1] 2/11

appeared [4] 53/15 155/4 171/1 189/3

appearing [1] 4/10

appears [5] 55/10 102/22 113/19 124/5 192/12

appendix [1] 205/10

applicable [1] 69/17

application [1] 166/4

applied [6] 43/23 70/1 90/18 105/11 147/3 149/1

applies [3] 90/20 175/1 184/14

apply [4] 8/21 29/24 103/19 105/7

applying [1] 105/14

appointed [6] 74/14 74/14 115/1 115/5 201/19 202/4

appointment [11] 27/2 27/5 67/12 90/12 130/1 144/11 150/8 151/12 155/11 156/17 202/13

appreciate [3] 5/25 38/19 60/18

appreciates [2] 51/20 54/7

approach [1] 7/12

approached [2] 114/5 195/20

appropriate [15] 5/13 20/10 28/5 70/16 70/21 71/24 102/8 102/13 102/15 102/20 127/22 130/5 130/6 158/1 188/24

appropriation [16] 49/7 49/8 49/11 50/21 50/22 101/23 102/14 103/2 103/19 107/12 107/13 110/1 110/16 110/18 111/2 168/14

appropriations [4] 97/22 98/17 100/24 100/25

approval [1] 143/14

approved [1] 66/25

approves [1] 143/18

approximately [4] 6/20 260/17 265/16 265/18

April [4] 107/16 115/3 150/19 155/16

April 18th [1] 150/19

April 2013 [1] 115/3

Aquilina [1] 133/5

arbitrary [1] 45/6

arbitration [2] 148/22 150/24

are [300]

are's [1] 98/9

area [2] 65/2 85/6

areas [1] 154/19

arguably [1] 37/17

argue [5] 5/15 11/25 50/16 69/14 76/14

argued [5] 19/4 53/15 129/13 178/6 228/4

arguing [3] 39/18 41/2 77/19

argument [14] 5/1 6/9 24/24 26/25 39/24 55/2 57/23 60/15 70/14 96/7 101/20 130/4 142/22 158/6

arguments [9] 19/7 51/17 60/14 104/22 106/3 107/25 135/2 152/24 188/21

arithmetic [2] 189/2 205/6

arithmetical [1] 201/15

arms [3] 196/3 199/12 200/2

arose [1] 41/13

around [24] 62/14 64/22 65/7 105/18 110/1 113/14 169/18 170/14 174/21 188/8 196/3 199/13 200/2 201/23 208/19 234/15 234/19 253/9 254/8 255/6 255/19 262/23 265/3 265/20

arrangements [1] 111/15

art [7] 66/7 66/11 66/19 126/3 190/13 190/15 190/16

Arthur [2] 2/25 242/23

article [10] 16/24 124/17 128/24 139/5 139/15 139/17 139/22 142/16 167/10 174/14

Arts [2] 126/4 190/15

as [328]

ascertain [5] 196/14 237/5 237/17 255/9 258/15

ASCII [1] 1/9

ASCII/PDF [1] 1/9

aside [1] 141/7

ask [55] 18/7 37/5 49/2 52/12 52/21 88/8 88/25 92/8 101/16 106/14 114/12 126/17 138/20 147/14 162/24 163/20 174/12 179/17 191/20 192/23 201/18 203/6 205/14 205/15 205/21 205/22 208/3 208/11 211/15 216/19 218/25 221/8 227/21 228/7 230/5 233/23 234/16

235/17 235/18 238/17 238/18 239/21 240/10 242/8 242/15 242/18 242/20 245/13 248/4 251/2 257/18 263/3 269/14 269/21 273/9

asked [53] 25/16 41/4 51/12 78/16 79/9 80/2 82/24 90/13 104/2 110/19 110/24 111/4 111/24 114/12 119/22 119/25 125/5 164/22 169/11 174/15 177/5 177/8 179/17 182/13 182/14 196/7 196/10 200/14 205/1 207/1 211/13 228/7 239/19 240/2 244/6 244/9 245/14 245/16 245/18 245/18 245/19 245/25 246/2 248/25 249/1 249/10 249/22 251/10 252/18 252/25 255/11 256/11 273/12

asking [5] 20/1 31/21 32/5 57/11 103/13 121/11 160/10 191/22 232/14 232/15 243/1 245/10 261/23 268/17

asks [1] 5/9

aspect [3] 167/22 185/13 185/16

assert [3] 10/16 31/2 40/19

asserted [4] 56/4 63/24 69/3 122/4

asserting [1] 33/9

assertion [8] 9/16 15/25 18/2 38/7 67/10 70/20 106/9 106/11

asserts [1] 51/14

assess [3] 11/5 38/7 100/16

assessment [1] 95/23

assessments [2] 97/7 194/4

asset [2] 190/18 190/19

assets [8] 65/16 112/8 125/9 126/2 126/5 190/12 190/22 190/24

assign [1] 72/20

assignment [1] 169/6

assist [5] 8/8 27/23 29/10 33/11 194/4

assistance [1] 30/7

assistant [2] 3/6 211/13

associate [1] 137/7

associated [3] 25/22 144/4 240/25

association [21] 4/1 4/11 105/4 105/9 121/10 121/20 121/22 145/8 145/9 145/10 145/11 150/2 150/5 150/22 150/23 151/8 153/6 153/15 153/18 154/1 155/14

associations [12] 153/21 154/3 154/6 154/20 154/25 155/4 155/8 155/11 155/15 155/25 156/8 183/5

assume [7] 41/20 58/22 99/24 99/25 216/21 242/14 253/22

assuming [2] 60/5 86/4

assumption [1] 240/3

assumptions [32] 64/13 163/2 183/6 199/24 207/16 235/21 236/5 236/6 236/10 237/7 237/10 238/20 238/21 239/4 240/2 240/3 240/5 240/13 240/14 241/8 241/10 241/10 241/11 245/20 250/25 252/23 253/2 254/9 255/7 255/16 255/17 258/18

assurance [2] 36/23 67/1

assure [1] 20/13

assured [2] 252/13 254/14

aswert [1] 58/9

attach [1] 33/6

attached [10] 6/17 7/21 16/18 20/18 38/1 47/23 52/10 107/13 118/22 190/21

attachment [4] 117/20 131/21 131/22 257/3

attachments [3] 42/10 44/20 256/25

attempt [2] 35/22 156/25

attempted [5] 20/25 21/3 93/16 103/21 103/22

attempts [2] 23/2 178/9

attend [7] 120/17 120/18 140/10 208/20 247/13 251/25 253/17

## A

attendance [1] 137/5
attendant [1] 183/9
attended [5] 116/15 155/18 208/24 250/2
252/5
attending [1] 245/23
attends [1] 111/20
attention [8] 5/14 26/15 36/4 147/18
210/4 220/25 253/11 256/10
attenuated [1] 40/24
attorney [48] 2/7 3/4 3/6 7/23 8/7 9/25
10/2 12/19 13/1 13/10 13/24 14/4 14/6
14/12 14/17 14/20 15/3 17/9 17/20 21/19
24/7 28/1 28/6 28/7 29/13 31/7 31/25
32/3 32/24 33/5 33/6 43/12 43/15 43/24
44/3 47/4 47/5 47/6 47/9 51/14 66/10
66/18 123/17 124/5 129/13 148/19 156/1
176/9
attorney's [1] 28/3
attorney-client [26] 7/23 10/2 12/19 13/1
13/10 14/12 15/3 17/9 17/20 21/19 24/7
28/1 28/6 29/13 31/7 31/25 32/3 32/24
33/5 43/12 43/15 43/24 44/3 47/5 47/6
51/14
attorneys [4] 25/22 42/13 43/3 156/1
attributable [2] 65/5 67/7
audience [1] 155/25
audited [2] 198/15 198/16
augmenting [1] 1/19
auspices [1] 148/13
Australian [1] 194/22
authentic [1] 57/2
authored [1] 38/4
authorities [8] 223/8 223/12 223/15
225/14 225/16 225/18 225/21 225/25
authority [7] 17/14 80/11 139/1 139/12
177/20 180/3 186/12
authorization [9] 16/11 16/20 119/3
122/18 123/21 144/5 152/11 167/19
170/22
authorize [1] 11/9
authorized [6] 8/25 118/20 150/13 166/12
167/3 167/4
authorizing [2] 122/17 124/20
automated [1] 1/7
automatically [1] 164/8
avail [1] 264/3
availability [1] 169/11
available [34] 1/9 35/13 48/1 53/22 53/24
53/25 62/23 117/6 117/9 125/10 126/5
136/19 199/10 200/6 201/14 203/4
203/14 207/11 208/5 214/16 214/17
220/8 220/15 221/12 222/10 222/17
225/19 226/9 226/11 248/17 251/23
257/23 270/13 272/10
avoid [2] 67/14 147/6
avoiding [1] 62/24
award [1] 150/4
aware [16] 8/21 8/23 15/14 26/14 55/4
110/17 129/25 130/14 143/9 148/11
169/16 171/4 175/24 202/9 246/6 246/10
away [3] 112/7 191/16 217/22
awe [1] 106/23
awes [1] 106/23
awful [1] 73/17

## B

Babette [2] 3/8 133/18
back [59] 3/1 6/12 8/2 15/22 16/8 19/18
21/7 31/9 32/20 40/1 65/20 72/10 73/22
73/23 78/19 79/21 80/10 85/24 86/18
87/12 88/10 96/18 100/20 102/2 106/14

112/16 113/7 126/16 129/3 130/20
141/19 148/5 148/23 150/17 152/12
152/21 169/23 179/17 194/24 196/6
197/25 208/12 212/16 217/22 220/18
222/21 224/1 225/15 225/17 245/8
246/13 248/4 248/5 248/18 250/6 265/3
267/7 268/12 273/10
backed [1] 186/4
background [1] 168/22
backtrack [1] 178/18
bad [7] 49/16 89/2 106/7 113/5 144/19
144/20 170/21
baggage [1] 85/13
Baird [6] 53/14 113/10 114/5 114/10
114/13 114/20
baked [1] 64/9
balance [4] 46/9 203/14 224/23 224/25
balances [2] 62/6 221/25
ball [2] 40/25 109/11
band [1] 65/7
bang [2] 75/6 75/9
bank [9] 75/9 75/14 75/18 75/24 75/25
194/22 199/12 220/7 258/15
bankruptcy [37] 27/8 34/24 70/25 73/7
73/20 77/7 77/11 107/22 108/10 112/17
114/9 114/11 114/18 114/22 115/15
121/24 122/4 122/13 123/11 133/11
136/14 141/5 142/23 142/3 143/21 144/18
160/12 160/14 161/12 163/7 168/24
169/3 175/25 176/23 177/6 180/2 256/13
264/3
bar [1] 2/7
Barbara [2] 4/5 145/6
bare [1] 24/19
bargain [3] 81/22 151/15 151/17
bargaining [6] 81/17 85/7 85/8 85/12
145/17 151/3
barometer [1] 200/10
base [4] 9/23 263/20 263/22 263/23
based [28] 38/7 59/20 59/24 70/17 71/7
84/15 110/24 113/4 122/6 122/22 146/19
191/7 207/15 213/14 228/9 237/12
237/23 250/21 250/22 250/24 258/13
259/20 261/7 264/4 265/21 267/21 272/5
272/9
basic [2] 10/2 63/13
basically [11] 6/4 16/21 66/11 79/8 86/19
157/13 160/5 166/5 183/20 196/20 263/25
142/12 163/25 164/6 164/13 173/13
200/23 201/4 207/13 230/14 231/3
231/23 237/8 237/12 237/13 237/19
241/3 253/8
bat [1] 186/20
BCC'd [1] 43/2
be [346]
bear [1] 186/7
became [5] 39/1 62/11 150/4 171/5
171/25
because [103] 11/16 16/7 17/23 18/9
25/18 31/24 32/22 35/14 36/15 38/2
40/13 40/19 40/20 40/22 42/18 43/7
48/12 49/11 52/18 53/12 59/19 57/22
61/1 61/6 61/18 62/1 63/25 66/21 69/2
71/8 73/8 73/22 75/4 75/11 76/1 76/23
81/6 82/8 85/15 86/13 88/2 88/22 88/24
89/17 91/5 94/11 94/19 95/7 95/14 96/14
100/19 100/25 101/2 101/11 102/5
102/10 103/15 104/3 110/10 112/21
118/17 123/23 125/13 125/19 126/4
126/24 128/7 128/8 129/14 130/8 130/16
130/23 133/21 135/1 135/13 137/12

144/6 146/14 147/4 147/17 148/2 150/6
151/2 163/24 167/6 170/17 173/23
179/12 179/24 184/16 192/24 197/3
211/5 217/16 217/23 218/2 218/21
221/16 222/1 223/3 259/8 259/16 271/3
Beck [1] 252/13
become [5] 41/25 49/14 107/4 109/22
134/12
becomes [2] 115/2 151/2
becoming [2] 62/4 169/2
been [126] 5/22 6/15 6/24 12/8 14/25
15/15 15/15 17/21 17/21 17/23 18/5
24/10 24/12 24/24 26/15 27/17 29/9
29/19 34/7 34/15 35/23 41/23 42/23
44/22 45/8 46/2 46/6 46/8 49/20 49/25
50/1 52/12 54/10 54/21 57/9 57/24 59/2
59/17 60/23 61/15 61/17 63/9 66/25
67/15 67/18 67/19 67/21 69/7 71/23 74/7
74/11 83/19 84/6 91/2 91/20 103/21
103/22 104/1 106/16 122/9 125/5 128/19
128/22 129/1 129/11 135/13 140/7 141/4
145/11 148/7 154/3 155/6 161/5 163/17
164/3 165/24 166/10 168/18 175/12
176/8 176/23 176/24 179/16 181/16
187/15 187/16 198/10 201/19 204/20
205/3 212/23 215/19 218/20 221/11
221/14 222/12 222/18 222/19 224/21
224/22 225/22 227/2 228/6 229/14
229/18 230/9 230/11 230/13 233/3
236/14 238/13 240/20 245/9 248/10
260/20 261/2 261/3 261/5 262/15 262/15
266/13 267/22 268/17 269/9 271/12
273/12
before [74] 5/5 5/5 5/6 5/8 6/21 10/15
15/2 26/13 27/25 31/7 41/13 41/19 42/1
42/4 53/9 53/15 55/18 61/3 62/7 63/17
66/22 76/12 89/6 93/7 100/1 106/6
106/12 109/14 111/19 115/11 118/4
120/9 122/17 124/3 125/17 127/24 131/1
131/17 133/2 135/2 142/13 147/25
148/15 151/6 154/4 158/25 169/2 171/21
174/7 179/4 181/15 183/11 183/18
183/23 192/17 202/16 202/20 203/9
207/4 210/21 220/19 225/6 228/23
228/25 245/13 255/11 256/15 257/1
259/4 261/10 264/7 269/8 271/11 272/25
began [2] 81/21 146/10
began's [1] 128/1
begging [1] 159/24
begin [10] 4/22 6/13 15/25 53/9 102/5
106/13 107/3 109/16 127/5 192/6
beginning [7] 83/4 146/8 148/9 219/19
219/21 224/23 273/4
behalf [25] 2/13 2/15 3/4 3/16 3/18 3/25
4/6 4/10 4/17 23/22 51/13 51/14 81/22
105/21 123/2 132/20 145/7 152/13 153/5
155/10 156/22 163/7 223/15 223/19
246/21
behind [4] 49/7 163/3 241/10 252/23
being [42] 1/6 7/6 7/9 17/17 18/13 19/7
19/25 29/1 32/11 39/2 39/22 40/22 45/10
64/16 86/12 91/1 98/19 108/11 115/5
124/9 133/13 135/15 136/17 140/21
149/24 153/23 155/24 157/21 157/24
158/1 173/7 173/12 174/13 182/25
209/21 220/14 225/15 230/19 239/10
244/6 249/6 271/14
believe [82] 6/25 9/2 14/10 14/11 25/17
26/10 31/19 32/3 32/21 35/16 35/19
35/20 40/10 47/2 53/3 53/22 56/21 56/23
106/2 110/22 125/24 126/10 128/19
138/4 138/8 139/13 139/22 142/9 144/14
144/18 146/9 146/12 146/15 146/19

## B

believe... [48] 146/24 147/12 149/9
151/25 152/17 167/11 168/15 169/3
170/1 170/16 170/18 174/8 175/17
177/21 178/4 179/12 179/13 181/14
183/3 183/14 184/8 184/11 184/22 185/3
185/9 185/17 185/21 188/6 190/4 190/11
191/6 191/7 192/19 194/19 198/9 202/24
204/3 204/22 205/1 207/2 213/22 232/20
245/10 247/24 254/1 257/12 267/24
269/16
believed [2] 21/2 178/12
believes [2] 71/11 184/13
believing [1] 127/13
Belle [4] 65/18 65/18 65/21 65/24
belongs [1] 72/8
below [8] 110/13 212/5 217/1 223/6
223/23 224/12 226/17 226/24
Ben [1] 92/21
benefit [8] 71/12 121/14 122/15 155/7
173/8 183/9 217/7 217/8
benefiting [1] 99/25
benefits [39] 11/11 68/6 88/1 88/1 88/4
113/8 116/4 121/16 121/17 122/23 134/9
137/18 139/2 139/8 139/14 140/2 154/19
163/10 163/25 164/8 169/24 170/1
170/25 172/1 172/17 173/4 173/6 181/1
181/10 216/24 216/24 216/25 217/9
237/9 240/22 248/11 250/24 264/2
266/18
Bennett [9] 4/16 126/22 127/7 127/11
141/14 146/4 146/9 178/17 189/7
Bennett's [7] 130/4 135/23 137/12 138/19
141/18 149/10 188/21
besides [1] 87/17
best [11] 21/9 21/11 38/24 89/14 143/4
156/22 176/5 177/12 200/13 214/16
218/21
better [13] 86/20 86/20 92/12 149/4
162/25 179/19 203/8 211/15 215/13
218/5 218/6 221/19 256/7
betting [1] 158/24
between [26] 6/24 12/18 15/2 23/5 23/9
31/5 32/23 41/9 42/12 43/2 47/13 49/1
53/22 63/7 68/20 72/11 120/11 149/11
151/4 206/23 215/15 215/24 236/9 241/9
251/16 266/11
beyond [9] 9/2 16/20 18/6 19/24 26/20
154/25 155/20 206/22 258/8
bifocals [1] 72/13
big [4] 78/22 187/5 193/19 252/16
bill [5] 109/22 110/21 118/8 137/20 183/18
billion [25] 135/6 186/2 186/3 186/10
187/2 187/9 189/18 213/2 215/7 216/4
227/25 228/19 243/13 243/14 243/15
243/16 243/17 245/1 245/2 245/4 265/16
265/19 265/19 265/24 266/2
bills [2] 188/15 188/20
bind [2] 139/23 154/21
binder [1] 50/4
binders [1] 79/2
binding [1] 139/19 181/5
Bing [3] 114/5 114/7 114/12
bit [11] 65/3 73/7 98/24 99/16 104/25
161/1 163/2 179/18 179/20 179/21
217/22
black [2] 47/2 147/21
bleeding [1] 25/1
blocking [1] 150/21
blow [6] 170/17 203/7 211/12 211/14
243/6 266/10
blowing [1] 169/21
blown [3] 94/11 94/21 211/10
blueprint [1] 134/12
blurred [1] 261/18
board [4] 34/20 78/1 78/3 201/4
Bob [2] 3/20 3/22
BOC [1] 259/16
body [4] 17/12 99/7 128/6 154/21
boil [1] 13/23
boiled [1] 15/11
boils [1] 177/15
bold [2] 119/1 159/4
bolster [1] 112/23
bond [7] 72/16 72/21 73/25 82/6 226/24
252/6 252/11
bondholders [18] 73/6 73/25 74/12 84/18
158/7 158/20 158/21 159/8 252/1 252/6
252/12 253/8 253/12 253/13 254/17
254/21 254/22 254/25
bonds [10] 68/6 72/8 95/11 95/13 95/14
96/16 186/3 186/9 186/10 186/13
book [14] 7/17 9/14 9/19 11/20 84/16
133/22 133/24 133/25 134/11 169/20
170/4 170/6 171/1 176/6
books [1] 266/13
born [2] 189/12 189/22
borrowed [2] 95/14 246/13
borrowing [2] 212/13 219/6
borrowings [6] 62/17 62/20 62/22 212/15
213/3 215/8
both [34] 3/11 16/18 23/25 43/15 46/16
59/13 70/24 75/18 84/2 84/19 88/6 94/16
94/18 95/22 95/22 96/10 106/23 109/24
116/10 116/13 133/2 133/3 133/4 143/12
146/9 152/22 154/17 155/18 167/18
172/22 181/23 204/16 217/7 263/25
bottom [5] 73/17 80/12 81/9 81/25 112/7
bound [4] 33/2 76/19 76/24 191/12
branch [1] 100/17
break [12] 39/8 52/25 105/17 105/18
131/1 131/13 192/9 197/14 197/19
207/14 217/25 272/23
brief [24] 36/1 37/23 40/9 41/3 43/8 43/14
44/16 45/18 48/15 50/9 76/13 87/23
88/21 122/2 132/2 132/20 153/12 157/9
160/6 179/5 179/7 180/4 184/12 273/3
briefing [1] 161/14
briefly [8] 36/3 127/8 147/8 157/7 183/17
185/11 206/1 242/19
briefs [2] 67/15 144/7
Brimer [2] 4/10 126/14
bring [2] 165/8 175/18
bringing [1] 157/22
broad [3] 17/19 30/3 168/11
broader [2] 23/10 35/5
broadly [4] 30/5 35/8 45/20 94/8
brought [2] 16/16 26/15
Bruce [1] 4/16
Buckfire [19] 43/3 82/12 82/12 86/11
86/17 86/25 107/8 107/19 107/19 108/1
108/14 108/17 109/10 111/10 111/14
111/22 111/22 112/7 157/23
budget [6] 110/12 110/14 154/8 157/19
213/18 236/16
budgeted [1] 213/20
budgets [5] 199/5 199/24 207/11 213/17
237/16
build [2] 83/8 236/10
building [1] 131/3
built [3] 156/19 237/4 253/4
bullet [1] 134/15
bullets [1] 134/17
bunch [3] 92/25 93/4 100/22

burden [7] 60/9 146/12 157/11 164/14
165/6 165/21 165/24
burdens [1] 191/8
burn [2] 259/19 260/4
business [8] 40/15 194/4 194/10 199/16
199/19 205/16 253/10 254/9
busy [1] 54/13
buy [1] 41/7

## C

C5 [9] 108/10 145/3 156/13 157/2 166/16
166/19 179/15 179/24 180/12
C5C [1] 166/21
CAFR [9] 198/7 198/9 198/12 198/13
198/20 200/2 221/20 240/21 261/8
calculate [1] 215/4
calculated [1] 152/20
calculating [1] 239/15
calculation [3] 64/14 64/22 125/12
calculations [10] 64/23 66/3 67/9 201/13
201/15 201/16 205/7 205/22 206/21
243/9
calculuation [1] 64/15
calendar [3] 196/11 208/6 218/12
call [5] 123/17 192/17 193/3 233/23
270/15
called [21] 1/8 98/11 98/15 119/1 120/13
135/11 178/25 179/1 179/1 182/22 202/9
212/11 213/3 217/1 219/14 221/4 221/5
222/24 224/12 246/6 246/9
calling [1] 219/15
calls [7] 13/24 22/15 108/18 113/14
232/11 244/1 244/5
came [25] 29/20 57/22 58/21 60/14 80/17
83/5 85/13 87/4 105/14 153/22 156/3
172/13 194/23 209/25 219/4 229/2
229/20 229/21 236/20 238/25 240/17
249/8 264/4 270/16 273/4
camera [10] 15/6 20/13 21/12 22/15 23/4
23/11 23/14 30/18 36/7 52/12
can [94] 2/17 5/6 5/24 13/1 13/4 13/11
20/23 23/24 28/4 28/10 30/5 30/5 30/13
30/19 36/23 37/14 42/6 42/9 44/19 44/20
45/19 45/24 47/9 47/11 48/13 52/20
55/17 56/18 66/7 69/12 73/7 75/7 75/11
77/22 78/21 79/22 88/18 97/16 100/12
101/12 101/15 112/1 112/15 112/22
115/7 119/19 129/1 129/2 129/8 129/22
129/23 130/9 131/5 131/25 132/15
140/25 146/12 147/3 149/5 154/7 157/15
159/22 167/5 177/25 183/11 183/25
190/12 190/20 198/8 203/8 206/4 206/13
211/10 211/11 211/14 213/8 213/22
216/16 220/18 221/10 230/1 232/20
233/24 236/21 242/11 246/11 247/25
258/17 263/14 266/4 268/15 269/21
272/13 273/18
can't [24] 11/15 11/25 22/22 22/23 42/5
44/19 44/20 44/21 50/16 52/24 64/1
66/12 70/11 77/9 78/6 78/6 79/20 80/5
160/20 162/17 164/14 166/11 166/19
244/3
candidate [1] 114/6
candidly [1] 187/23
cannot [5] 12/4 14/19 88/5 166/22 191/8
cap [1] 65/20
capable [2] 155/9 189/25
capacity [2] 140/15 140/16
capital [2] 76/8 119/1 194/20
captured [1] 212/10
cards [2] 137/5 137/6
care [1] 86/2
cared [1] 58/24

**C**

career [1] 81/5
careful [3] 54/9 86/12 182/16
case [98] 2/4 7/16 8/6 8/9 9/15 9/23
10/10 11/8 12/2 12/8 14/16 14/25 16/23
19/18 19/22 20/16 26/18 27/8 28/13
39/11 41/3 41/5 41/9 43/19 43/25 44/16
54/16 66/23 70/5 70/13 72/4 73/22 75/15
75/21 75/22 75/23 77/25 83/24 84/5
84/10 84/19 85/19 85/20 85/22 85/24
86/7 89/20 91/1 91/10 95/16 96/10 97/11
98/10 98/11 99/9 100/4 100/6 102/2
102/4 102/4 108/5 109/13 109/17 122/24
127/11 127/12 127/14 127/16 127/19
128/14 129/5 130/11 130/14 136/10
139/21 140/4 140/18 140/19 145/15
152/19 158/22 158/23 158/24 158/25
164/15 175/8 180/9 194/10 194/14 205/9
205/10 205/11 205/12 239/12 263/20
263/22 263/23 272/13
cases [18] 38/3 41/6 43/14 61/19 71/1
71/24 76/4 84/17 84/20 96/25 97/12
129/4 133/5 143/24 157/14 157/16
158/15 164/12
cash [95] 61/25 62/4 62/6 62/8 62/19
62/23 64/3 64/4 64/5 65/23 66/24 67/6
182/2 190/24 196/14 197/24 200/10
200/21 200/25 201/5 203/14 207/10
208/4 208/6 210/12 215/17 220/5 220/7
220/8 220/10 220/14 220/20 221/3
221/11 221/15 221/15 221/17 221/21
221/23 221/25 222/9 222/13 222/16
222/17 223/1 223/19 223/20 224/12
224/13 224/21 224/23 224/25 225/2
225/3 225/6 225/22 226/5 226/9 226/10
227/12 227/15 228/20 228/23 229/1
231/2 231/22 235/3 235/3 247/4 247/5
249/3 249/9 258/3 258/4 259/19 260/4
260/8 260/12 260/16 260/21 260/23
260/24 261/1 261/6 261/9 261/10 261/24
262/1 262/3 262/23 262/24 263/1 263/19
269/13 269/17
casino [1] 236/13
casinos [4] 211/22 211/23 211/25 236/13
categories [2] 207/15 227/20
cause [2] 51/7 133/6
causes [1] 160/20
CC'd [1] 43/1
CD [1] 1/9
cease [1] 69/14
Ceccotti [4] 3/8 133/18 146/16 151/21
Ceccotti's [1] 149/20
center [1] 126/16
central [3] 8/17 170/21 187/6
cents [2] 96/19 96/20
certain [15] 20/12 36/12 38/3 44/11 56/1
69/3 71/10 73/15 89/15 89/21 106/3
118/9 147/5 210/1 253/8
certainly [15] 55/8 55/12 55/14 67/2
71/18 79/24 93/10 130/10 134/2 141/21
144/10 156/16 185/3 206/13 272/15
certificate [2] 160/18 260/1
certificates [3] 246/7 246/9 246/12
certification [1] 1/18
certified [4] 1/4 1/14 1/22 194/12
cessation [1] 137/15
cetera [1] 20/6
CFA [1] 194/11
challenging [3] 5/3 14/20 52/17
change [7] 54/7 64/12 66/15 101/12
103/16 191/2 271/10
changed [3] 73/24 96/23 120/10

changes [9] 73/11 79/1 80/17 123/22
134/18 140/9 163/24 183/9 249/5
chapter [95] 10/10 11/8 27/9 30/8 35/5
41/3 45/24 70/13 71/23 72/2 72/3 75/14
75/20 75/22 75/23 76/2 83/24 84/5 84/14
84/25 91/1 91/8 91/12 91/15 91/18 91/23
93/19 94/7 96/7 96/12 97/12 97/14 106/5
106/7 106/10 107/22 108/7 109/12
111/25 112/2 112/3 112/5 112/5 112/15
112/21 112/23 112/24 113/6 113/20
115/14 117/22 118/3 118/6 122/20
122/24 124/21 124/22 126/8 134/3 134/8
134/14 134/19 134/21 135/18 144/1
144/3 144/16 145/4 146/13 148/5 151/6
152/22 158/15 164/6 164/12 164/16
165/23 166/13 167/6 167/14 167/25
169/12 169/15 169/17 169/22 171/19
172/7 172/10 172/10 173/19 173/22
177/10 175/2 176/5 195/22
characterize [1] 143/15
characterized [1] 143/4
characterizing [1] 136/2
charge [2] 188/16 197/5
charged [1] 197/13
charitable [1] 190/17
Charles [2] 125/3 187/18
chart [16] 79/4 81/9 82/4 86/9 92/10 93/1
93/23 94/12 138/19 212/17 216/14 218/2
220/18 220/20 224/1 270/3
charts [1] 89/11
check [2] 79/14 200/3
Chicago [1] 193/13
chief [5] 3/3 63/12 145/20 154/7 154/7
Chiefly [1] 190/13
Chinas [2] 134/4 173/24
choice [1] 77/17
chronicle [1] 153/10
chronological [1] 165/9
chronologically [1] 6/5
chronology [1] 147/9
Chrysler [1] 114/11
chunk [2] 188/17 189/10
chunks [1] 78/5
Ciantra [4] 3/10 5/17 19/4 49/15
circle [1] 194/23
circuit [6] 40/10 43/13 123/7 205/8
205/12 206/17
circulated [1] 122/10
circulates [1] 123/10
circumstance [7] 20/11 77/18 78/4 81/3
82/23 102/12 106/7
circumstances [13] 5/10 16/8 31/1 35/20
79/25 103/21 112/3 139/22 161/18 170/9
175/23 176/2 176/8
citation [1] 110/13
citations [2] 98/3 99/10
cite [9] 1/19 9/16 41/3 43/18 76/5 76/6
85/19 138/25 188/23
cited [13] 41/6 41/9 43/13 43/25 44/15
65/11 85/20 99/9 127/11 129/4 129/6
158/22 271/20
cites [1] 205/11
cities [1] 197/7
citizens [1] 142/2
city [334]
City's [101] 25/5 27/7 35/7 51/20 51/22
64/12 64/14 65/4 67/9 67/20 68/5 70/7
72/1 72/3 73/2 76/21 76/25 83/1 88/9
91/11 91/15 91/21 92/2 104/13 105/5
106/9 108/15 110/2 111/12 115/8 116/1
116/12 116/18 120/20 121/6 121/17
122/18 124/25 125/24 153/9 154/5
155/23 156/1 157/13 158/10 165/20

173/5 173/9 174/25 181/7 187/18 187/19
188/2 188/14 196/2 196/4 197/1 197/21
198/15 199/5 199/19 200/7 206/20 208/5
212/23 213/16 213/17 214/4 219/4 220/9
221/20 225/1 231/2 235/15 237/11 239/1
240/21 240/23 241/4 246/19 247/3
248/12 248/22 249/4 250/3 250/25
251/16 255/7 258/4 259/8 259/12 260/6
260/7 260/16 261/1 262/23 265/15
265/17 266/20 269/13 269/17
City'sing [1] 259/14
claim [15] 10/11 14/1 21/15 29/25 33/15
41/12 46/24 71/5 71/13 71/14 139/1
184/3 184/6 255/8 255/18
claimed [2] 21/19 36/15
claiming [7] 13/7 20/3 21/20 21/22 31/9
37/13 42/23
claims [16] 51/14 63/15 68/7 68/8 68/11
70/22 71/1 71/7 71/10 122/6 134/5 190/2
248/16 248/17 254/18 264/1
clarification [2] 37/23 261/21
clarify [6] 40/1 50/13 50/15 126/25 230/5
259/23
class [3] 155/1 156/13 184/25
classes [3] 69/20 158/7 185/3
classic [1] 8/7
classification [1] 69/19
classroom [1] 160/5
Claude [1] 2/22
clause [25] 103/6 106/8 115/14 117/14
167/10 167/18 168/4 169/17 170/3
170/23 171/4 171/8 171/16 172/11
173/23 173/25 174/1 174/3 174/20
174/22 174/25 175/3 175/7 181/11
185/15
claw [1] 32/20
clean [1] 132/6
cleanest [1] 107/10
cleaning [1] 273/16
clear [38] 8/20 10/19 37/9 37/11 38/18
39/1 42/22 50/22 50/25 51/11 60/12
72/15 79/16 85/10 86/6 94/3 96/2 113/3
113/14 118/17 129/13 129/19 140/4
140/20 168/5 179/7 179/13 179/13
180/14 195/24 205/4 219/8 219/24 238/5
240/16 261/14 261/16 267/3
clearer [1] 73/9
clearly [14] 16/16 43/5 46/11 61/20 69/8
69/25 75/7 75/8 87/24 89/9 98/4 104/11
116/5 173/20
clerk [1] 50/4
clicker [1] 132/23
client [47] 7/23 9/24 10/2 12/16 12/19
13/1 13/5 13/10 13/16 13/24 14/5 14/12
14/18 14/20 15/3 17/9 17/20 21/19 24/7
27/21 27/24 27/25 27/25 28/1 28/6 29/1
29/13 30/14 31/7 31/25 32/3 32/10 32/24
32/24 33/5 42/22 43/6 43/12 43/15 43/24
44/3 47/5 47/6 48/21 48/25 51/14 136/13
clients [6] 8/8 45/16 47/15 194/3 195/6
195/11
cloak [2] 17/4 41/8
cloaked [3] 17/18 18/14 18/14
close [7] 68/22 95/24 193/21 217/23
220/4 261/18 267/21
closed [3] 85/18 169/24 266/13
closer [1] 228/7
closing [2] 104/15 144/7
Clubs [1] 98/12
co [1] 112/6
coalition [1] 163/8
code [9] 70/25 73/21 77/11 108/10
142/18 159/8 159/13 160/12 180/2

**C**

codified [1] 46/11
cognizable [1] 103/9
cognizant [2] 141/22 141/24
Cohen [6] 3/8 5/17 54/4 133/18 176/25 237/22
cohesive [1] 104/24
coin [1] 96/24
collaborated [2] 240/7 241/9
collaboration [3] 238/22 239/18 239/21
collaborative [1] 214/6
colleagues [1] 3/19
collect [1] 215/21
collected [3] 130/6 215/19 223/18
collections [2] 214/12 223/13
collection [3] 95/15 98/25 196/22
collective [6] 81/17 85/7 85/8 85/12 145/17 151/3
collectively [2] 145/12 207/16
collects [4] 102/19 211/25 223/13 225/12
college [2] 194/7 194/9
Collins [1] 195/10
Columbia [2] 43/18 43/25
column [7] 210/10 210/24 212/22 214/3 227/17 242/21 243/7
combination [1] 212/7
combinations [1] 1/14
combined [1] 221/23
come [44] 6/9 61/7 63/3 70/5 78/19 79/20 81/14 83/7 97/11 102/16 127/12 148/10 165/12 186/19 195/13 196/9 201/18 208/12 208/13 213/25 231/19 229/12 229/16 230/7 230/22 233/18 233/22 236/4 238/24 240/23 240/25 241/3 241/5 241/18 243/18 250/17 250/24 254/14 258/11 266/15 266/16 266/17 266/20 270/14
comes [6] 9/24 32/9 43/5 176/6 227/22 241/16
comfortable [1] 126/24
coming [7] 67/22 207/14 238/1 259/13 260/13 261/14 269/18
command [3] 145/11 148/19 150/23
commence [1] 68/12
commenced [1] 117/11
commences [1] 110/2
commencing [1] 72/3
comment [1] 115/8
commenting [1] 44/14
comments [3] 44/25 113/16 137/12
commercial [1] 72/17
commingled [1] 222/5
commingling [1] 222/7
commission [1] 148/14
committee [12] 2/23 46/12 74/23 88/20 105/13 164/21 165/15 165/18 166/6 166/7 166/22 184/13
committee's [1] 165/19
common [16] 16/19 21/16 21/17 24/8 26/5 26/13 26/24 27/3 27/6 35/3 35/6 51/6 51/15 66/8 165/16 183/4
communicate [2] 22/24 154/24
communication [2] 33/21 251/16
communications [15] 33/1 33/1 33/2 33/19 35/9 38/4 38/6 43/17 43/22 47/7 117/21 118/7 118/10 118/23 121/6
comp [1] 72/24
company [1] 160/24
compared [5] 48/18 219/18 219/21 267/18 267/19
comparison [2] 108/6 214/13
compel [2] 27/15 51/19

compelled [1] 52/23
compelling [1] 44/1
compile [1] 201/12
compiled [5] 108/3 205/24 211/3 258/13 270/8
compiling [1] 205/19
complaints [3] 77/15 84/10 113/4
complete [4] 5/23 46/19 133/20 220/7
completed [3] 187/15 187/16 188/2
completely [3] 86/22 89/16 90/20
complex [1] 82/23
complicated [1] 272/2
comply [1] 89/14
component [1] 72/5
comprehending [1] 59/5
comprehensive [7] 81/13 118/14 134/14 134/24 135/3 153/7 198/14
compressed [1] 142/10
compromise [4] 113/7 139/2 139/14 169/23
compromises [1] 134/16
compulsory [1] 148/22
concede [3] 17/8 49/23 57/11
conceding [1] 77/2
conceivable [4] 83/5 94/25 95/25 96/3
conceivably [3] 100/22 102/15 102/18
concept [2] 150/16 220/1
concern [2] 85/10 261/20
concerned [5] 21/23 99/6 188/14 238/3 261/19
concerning [6] 6/6 65/3 68/10 71/9 90/7 114/21
concerns [2] 15/21 26/18
concerted [1] 95/4
concessionary [1] 149/14
concessions [1] 93/18
conclude [9] 5/2 5/3 112/13 112/19 130/2 152/19 192/3 208/4 243/10
concluded [2] 170/10 183/21
concludes [2] 51/7 107/14
conclusion [6] 34/23 37/14 75/13 106/5 106/12 118/3
conclusions [4] 207/25 264/11 265/14 271/22
conclusively [1] 9/7
concrete [3] 81/12 152/7 183/12
concurrences [1] 102/2
concurring [5] 98/25 99/4 99/12 128/2 128/11
condition [5] 55/10 108/16 111/13 202/15 228/14
conditions [4] 9/1 113/19 145/22 148/16
conduct [1] 11/5
conducted [5] 33/10 90/24 143/6 155/16 155/16
conference [1] 56/1
conferences [1] 119/7
confess [1] 85/5
confidence [2] 35/3 125/20
confidences [5] 10/1 13/6 13/7 13/16 14/19
confident [1] 115/22
confidential [2] 33/4 86/14
confidentiality [2] 136/11 138/17
confine [1] 60/20
confirm [2] 70/2 174/24
confirmable [2] 68/22 69/24
confirmation [4] 71/2 71/16 71/17 71/19
confirmed [2] 70/9 71/3
conflict [2] 175/3 175/7
conflicts [1] 122/9
confronted [1] 81/4
confronts [1] 96/13

confusion [3] 65/3 65/13 180/13
conjunction [8] 201/2 207/17 214/13 236/3 236/7 239/4 256/24 266/20
connecting [1] 144/2
connection [13] 7/16 27/11 34/16 45/4 60/23 64/5 73/1 110/15 144/20 167/25 169/14 185/18 256/12
consensual [2] 83/7 83/20
consensus [1] 112/25
consent [2] 44/14 107/17
consents [1] 73/6
consequence [2] 62/21 101/21
consequences [4] 62/12 138/5 138/5 138/9
Conservation [1] 98/12
conservative [1] 30/25
consider [7] 15/6 49/22 51/8 51/17 151/2 151/18 272/15
considerable [1] 37/19
considerably [1] 156/9
consideration [4] 16/25 17/2 18/23 51/5
considerations [1] 91/8
considered [9] 16/5 16/7 18/6 45/10 46/10 50/24 94/7 179/2 180/22
considering [2] 45/11 94/4
consistent [5] 91/18 120/22 120/24 121/5 125/25
constituencies [1] 78/5
constituency [3] 81/11 81/23 82/3
constituents [2] 70/10 87/8
constitute [2] 37/17 136/23
constitutes [1] 1/22
constitution [26] 113/9 124/18 128/24 137/22 139/6 139/18 142/17 144/17 146/23 167/10 169/25 171/2 171/7 171/12 171/13 172/12 172/19 174/2 174/4 174/9 174/22 176/1 176/13 177/19 181/11 185/16
constitution's [1] 174/1
constitutional [7] 7/5 8/21 11/10 88/2 99/14 108/7 152/23
constitutions [1] 170/22
construction [1] 17/20
constructively [1] 80/15
construed [2] 17/10 94/8
consult [1] 273/10
consultant [1] 113/11
consultants [3] 28/19 44/6 160/16
consulting [1] 43/3
consume [1] 62/22
consummated [2] 12/18 28/7
contact [2] 26/17 156/1
contacted [2] 138/14 155/12
contain [2] 1/12 211/19
contained [1] 143/3
contains [3] 59/9 103/5 110/10
contemplate [2] 12/17 112/20
contemplated [2] 91/12 91/14
contemplates [3] 12/14 12/15 77/12
contend [4] 8/13 89/1 166/14 167/24
contends [1] 125/6
content [4] 12/1 19/12 202/25 235/17
contention [3] 165/19 165/19 166/10
contents [2] 234/2 258/1
contest [2] 166/6 166/9
contesting [3] 57/1 57/4 166/8
context [15] 9/18 10/11 60/15 72/18 79/21 114/21 134/19 163/4 165/5 166/2 173/22 175/8 189/10 200/24 267/15
contingencies [1] 84/2
contingency [3] 42/3 84/4 106/10
continue [7] 22/13 26/2 111/12 118/16

## C

continue... [3]  131/17 154/11 220/9
continued [2]  142/18 202/7
continues [4]  109/10 119/18 125/8
138/24
continuing [3]  150/7 263/25 267/16
contract [1]  150/4
contractual [1]  139/10
contrary [5]  35/4 139/15 171/16 176/12
185/15
contrasted [1]  40/15
contribute [1]  202/25
contribution [4]  64/20 65/4 173/8 255/9
contributions [22]  63/4 64/11 116/7 173/1
173/10 173/12 173/15 183/9 217/2 217/4
217/18 218/10 218/13 218/18 218/20
218/24 219/1 226/21 240/22 250/23
261/3 266/18
control [4]  73/16 98/18 231/19 235/9
controlled [1]  159/22
controlling [1]  129/7
convenient [3]  64/7 105/17 162/3
conveniently [1]  270/9
conversation [6]  14/3 111/22 233/24
234/14 262/11 262/14
conversations [9]  31/5 32/7 32/23 110/25
131/6 202/8 244/15 247/7 268/16
convert [1]  242/1
Conway [4]  65/1 125/4 157/23 187/19
Cooley's [1]  99/13
cooperation [3]  53/19 123/3 152/14
cooperative [2]  42/14 55/19
copies [1]  92/13
copy [8]  1/4 1/22 50/4 118/6 132/14
147/12 170/23 191/13
core [5]  27/18 109/11 128/1 197/6 220/12
corner [1]  3/11
corners [1]  135/16
corporation [1]  34/20
corporations [2]  194/3 236/10
correct [43]  1/18 17/8 26/10 26/11 35/21
47/22 60/1 194/13 196/8 205/20 207/23
208/1 209/17 210/3 213/7 215/12 216/9
216/13 217/3 217/13 219/9 219/10
219/13 223/22 224/11 225/4 225/8 226/7
226/15 226/23 230/20 230/21 232/7
238/11 245/11 245/22 246/1 247/2
247/16 247/18 250/14 264/8 266/14
corrected [7]  1/14 25/12 65/10 189/1
273/7 273/7 273/8
correction [1]  65/11
correctly [1]  55/24
corrects [1]  26/10
correspondence [7]  36/16 38/1 38/9
49/10 49/20 123/1 152/12
Corrigan's [1]  99/13
cost [4]  65/24 112/4 236/24 265/23
costs [6]  134/6 240/25 241/2 245/2 268/2
268/9
cot [1]  85/20
could [89]  9/8 10/11 14/16 22/13 30/20
31/2 38/24 41/15 41/17 42/1 45/6 61/6
67/8 68/1 69/23 70/9 75/13 76/19 77/6
78/17 78/18 78/22 82/21 83/22 83/23
90/6 95/1 96/4 96/20 99/19 100/24
102/18 102/25 103/21 111/3 111/3 113/6
120/4 121/13 125/9 137/24 137/24
137/25 138/11 143/4 147/23 149/1
149/17 163/4 169/22 173/21 175/9
190/24 191/2 191/24 193/10 194/7 203/6
203/7 207/18 210/4 211/13 212/5 212/16
212/17 216/2 216/14 216/20 224/2

227/17 227/20 231/21 235/3 235/8
236/23 242/18 243/6 249/17 251/20
256/10 260/17 265/24 266/3 266/10
267/8 270/9 271/6 271/22 272/4
couldn't [5]  25/23 76/24 102/19 138/11
164/24
council [2]  67/17 155/5
counsel [29]  3/3 3/10 4/12 6/16 21/25
34/21 35/4 41/4 45/3 46/4 46/8 48/1 48/5
51/13 51/21 51/22 67/17 111/18 115/3
131/15 132/13 138/13 160/15 169/7
192/23 203/25 205/20 241/13 256/24
counsel's [2]  1/19 51/17
counseled [1]  124/9
count [7]  67/6 142/1 142/1 237/4 237/5
237/13 240/24
counter [1]  152/6
country [1]  197/8
county [5]  112/6 123/7 124/6 223/16
226/3
couple [11]  36/5 58/3 73/14 76/4 131/16
132/21 138/16 159/17 163/15 197/9
208/25
coupled [1]  160/13
course [41]  5/12 8/2 8/10 10/24 12/19
13/4 34/4 48/16 64/16 65/11 65/17 66/21
67/15 73/8 73/19 75/4 87/24 100/18
132/1 141/19 143/21 165/3 165/14 166/6
166/8 166/16 168/9 168/25 171/17 179/4
185/14 186/5 198/5 199/2 199/16 199/19
229/19 230/10 230/23 242/10 273/18
court [119]  1/19 2/7 2/18 5/3 5/6 5/7 5/21
6/2 6/11 15/6 16/10 16/12 18/7 19/8
20/12 21/6 21/12 22/23 23/13 25/5 26/14
26/17 26/18 30/18 30/18 30/20 31/10
32/22 33/13 33/25 35/11 35/12 35/16
35/23 36/6 36/8 36/18 37/12 38/10 39/3
39/10 51/6 51/16 51/19 52/2 52/6 52/11
53/16 55/3 55/10 59/23 59/25 70/1 74/6
74/19 82/22 83/22 83/24 84/14 84/22
86/17 94/25 96/1 96/8 98/15 98/16 98/16
98/20 98/23 99/5 100/14 101/22 102/4
102/5 102/11 104/6 112/12 112/20 113/2
118/16 118/18 119/6 122/3 122/8 123/7
123/18 124/2 127/5 127/10 127/13
128/20 130/5 133/12 146/23 146/25
147/2 147/22 148/5 148/11 150/2 151/11
151/18 152/17 152/19 153/1 153/7
158/14 158/18 159/2 165/4 167/21 169/4
175/24 176/17 177/10 192/11 228/14
267/1 273/15
court's [12]  5/25 18/6 20/14 27/20 34/19
36/4 51/5 78/23 92/15 128/2 140/3
147/10
courtroom [4]  2/24 131/6 271/1 273/13
courtrooms [1]  256/3
courts [4]  84/24 94/5 99/22 103/14
cover [6]  36/8 61/2 65/2 87/3 152/25
169/19
covered [1]  21/2
covers [1]  93/23
CPA [1]  195/3
crafted [1]  117/24
Craig [2]  63/12 145/20
crazy [2]  191/17 191/21
create [5]  62/18 112/8 112/15 146/17
184/5
created [4]  44/9 56/25 58/25 89/25
creates [1]  112/21
creation [1]  109/16
creative [3]  119/18 119/22 119/25
credentials [1]  202/3
credibility [1]  57/18

credible [2]  151/19 214/21
creditor [13]  8/24 63/15 79/8 81/10 95/6
106/6 106/12 112/25 117/16 118/1
120/15 120/15 178/24
creditors [54]  16/23 17/1 62/15 62/24
63/2 64/8 66/4 66/5 66/12 68/8 69/9 69/6
69/11 69/22 71/5 72/10 73/3 74/5 74/21
74/22 76/21 77/1 77/6 77/13 77/14 77/17
77/19 77/22 82/17 82/25 86/10 86/10
90/10 93/18 95/4 95/6 115/12 116/1
116/5 117/19 118/4 118/12 118/15
118/18 134/4 172/14 178/8 180/11
180/15 180/21 184/25 185/4 208/15
209/11 209/19
crisis [3]  30/6 35/7 107/21
criteria [2]  57/19 166/15
criticism [1]  85/2
cross [1]  272/23
crosses [1]  123/23
crucial [1]  88/9
crude [2]  113/7 169/23
crystal [3]  8/19 40/25 60/12
crystalized [1]  6/15
current [5]  66/15 169/6 237/3 250/21
265/21
currently [4]  116/10 172/23 221/24
260/22
cursory [2]  19/25 21/25
curtailed [1]  17/21
cut [7]  113/7 169/23 172/1 173/4 175/11
176/4 176/12
cuts [8]  116/9 122/19 125/6 125/14
137/17 172/21 181/24 217/23

## D

Dan [2]  121/20 151/8
data [22]  61/19 79/6 79/7 89/12 89/13
117/6 136/5 136/7 136/9 136/11 136/17
136/18 138/17 200/13 201/8 201/13
205/7 205/15 242/1 266/25 270/23 271/3
database [1]  89/25
date [19]  6/7 8/11 23/5 23/5 117/25
120/11 122/11 123/12 123/22 125/1
125/23 125/25 158/8 158/9 158/11
168/21 213/25 245/9 259/5
dated [2]  62/15 183/2
dates [4]  23/7 23/19 94/20 143/1
daunting [1]  145/22
David [1]  4/7
day [121]  1/2 2/2 2/13 2/15 4/16 5/2 6/7
6/14 6/19 6/24 7/10 7/13 8/10 10/14
12/19 19/8 22/20 26/8 26/20 27/15 27/18
28/21 29/5 29/8 29/14 29/14 31/5 32/5
32/6 33/2 33/9 36/6 36/12 36/13 38/12
42/2 42/22 43/3 45/11 45/16 48/4 48/12
48/19 49/2 51/22 58/18 59/19 84/8 88/25
96/20 107/18 111/16 111/19 111/24
112/10 112/10 113/10 113/12 113/13
115/3 115/11 119/2 119/8 119/13 122/25
123/5 123/14 124/13 133/3 133/4 133/23
138/14 138/22 141/10 143/24 144/4
144/11 144/12 149/21 150/20 152/4
152/12 152/12 152/16 156/1 159/11
168/18 169/3 169/5 169/9 169/14 169/19
170/5 170/7 171/1 176/3 176/6 182/21
183/2 192/15 196/20 196/20 202/2 202/7
202/9 202/11 202/18 202/23 203/1
209/16 220/7 245/11 245/24 247/17
249/15 251/10 252/8 252/10 253/12
272/24 273/5
day-to-day [1]  196/20
days [20]  38/21 90/12 106/23 107/1
107/2 109/25 110/8 117/10 121/25

# D

days... [11] 122/11 133/10 136/10 143/1
152/9 158/10 158/13 202/13 210/18
256/15 256/17
DDA [1] 223/9
DDOT [3] 198/3 223/2 266/22
deadline [2] 38/23 162/2
deal [4] 4/20 63/21 65/18 66/20 66/23
75/12 75/18 75/20 75/24 97/20 130/3
141/20 153/24 164/7 168/1 179/1
dealing [5] 4/24 34/9 70/13 96/15 211/6
dealings [1] 257/19
deals [3] 6/9 62/16 266/10
dealt [2] 114/17 158/24
debate [2] 28/14 125/22
debt [16] 70/16 72/25 74/3 75/7 97/14
158/15 195/14 196/23 212/15 213/3
239/1 240/20 250/18 250/18 266/7
266/16
debtor [6] 141/6 157/14 157/15 157/18
164/16 167/4
debts [2] 62/3 186/19
December [7] 93/8 93/11 93/11 109/21
109/25 110/5 147/24
December 15th [1] 109/25
December 2011 [1] 93/11
December 21 [1] 93/11
December 21-11 [1] 93/8
Decembers [1] 149/8
DeCharia [2] 237/22 265/1
DeChiara [2] 3/11 54/4
decide [3] 70/15 74/19 83/4
decided [5] 55/25 171/16 172/6 172/9
184/3
decides [2] 14/5 75/19
decision [13] 7/22 8/18 15/12 39/6 54/7
95/4 98/15 98/16 140/3 172/1 175/24
177/11 247/9
decisions [4] 18/13 140/15 147/1 271/19
deck [1] 185/25
declaration [14] 185/24 186/24 187/10
187/21 190/9 191/1 256/12 256/16
256/20 256/23 256/25 257/4 259/5
264/17
declaratory [4] 117/13 123/7 124/14
124/16
declared [1] 114/23
decor [1] 131/3
dedicated [1] 156/20
deductions [1] 216/21
deemed [2] 47/8 130/22
deeper [1] 232/17
default [2] 247/3 247/9
defaulted [1] 247/1
defaulting [1] 247/11
defect [1] 26/21
defendant [2] 14/1 14/15
defendants [1] 122/1
defended [1] 111/4
defense [1] 8/9
deferral [3] 219/14 219/15 230/7
deferrals [12] 203/15 219/17 221/2
226/18 229/5 229/7 230/9 231/1 258/6
260/17 260/20 260/24
deferred [6] 63/4 65/15 66/8 219/20
261/3 261/5
deferring [2] 218/23 219/1
deficit [7] 196/14 197/7 198/22 243/11
243/16 245/3 266/1
define [1] 80/14
defined [5] 173/3 173/8 173/8 217/7
217/8

defines [1] 69/20
defining [1] 49/24
definition [3] 73/19 192/21 206/11
definitively [1] 37/3
deflect [1] 113/4
degree [3] 36/23 125/20 241/23
Delhi [1] 194/9
deliberate [4] 144/1 144/8 144/15 146/16
deliberately [1] 171/18
deliberations [3] 17/6 17/17 31/11
deliver [5] 1/15 27/24 28/4 28/10 32/8
deliverables [1] 200/19
delivery [2] 1/15 1/16
Delta [1] 195/8
demand [1] 9/21
demanded [1] 11/18
democracy [1] 106/24
Democracy's [1] 107/2
democratically [1] 129/18
demonstrable [1] 104/2
demonstrate [5] 64/1 65/17 81/24 129/21
214/17
demonstrated [2] 47/18 82/9
demonstrates [3] 82/4 87/6 95/19
demonstrating [3] 68/24 91/25 117/21
demonstration [2] 72/1 72/2
demonstrative [3] 78/19 104/5 269/7
denied [4] 26/23 51/9 130/16 271/5
Dentons [2] 2/22 2/25 164/20 242/24
deny [2] 5/11 58/24
denying [4] 96/7 96/12 141/21 190/7
department [32] 3/4 109/15 111/8 126/3
145/19 145/19 157/19 186/11 186/14
186/18 188/19 189/6 189/12 189/23
189/24 190/19 197/15 197/16 197/18
198/3 199/9 200/7 200/8 217/11 217/19
223/2 223/3 236/17 237/4 237/6 237/15
237/16
departments [5] 188/18 212/8 237/18
240/25 241/1
depend [1] 99/17
dependent [2] 71/6 103/1
depending [1] 84/19
deposition [24] 16/17 18/1 18/4 19/5
19/11 19/21 20/1 26/16 26/20 65/10
106/15 110/17 119/21 120/10 120/25
170/20 174/6 178/19 186/17 187/17
187/22 188/23 188/25 189/2
depositions [3] 35/18 124/24 125/25
deputy [1] 154/7
describe [1] 219/25
described [1] 148/18
describing [2] 61/7 262/14
description [2] 21/25 26/1
descriptions [1] 224/4
design [1] 150/17
designated [1] 257/20
designed [6] 67/14 71/8 148/20 148/24
171/18 177/17
desire [3] 1/16 20/14 20/14
desires [1] 68/24
desiring [1] 102/16
despite [4] 34/10 117/25 124/23 139/14
detail [5] 37/19 74/16 205/12 236/9
254/25
detailed [9] 7/17 11/20 20/2 69/14 71/22
71/22 133/20 135/8 198/21
details [2] 199/3 253/3
deter [1] 85/14
determination [3] 31/19 101/22 188/1
determine [7] 5/6 30/20 48/11 84/22
88/18 140/14 212/23

determined [1] 117/22
determines [2] 36/6 110/3
determining [2] 70/1 128/21
Detroiit [1] 190/14
Detroit [65] 2/5 4/6 12/22 17/13 28/15
74/1 93/14 96/17 97/3 105/4 110/4
111/11 111/20 112/1 114/25 115/1 115/8
115/13 115/25 119/13 121/10 121/20
121/21 122/5 122/25 123/4 126/4 129/19
139/4 139/19 142/2 145/7 145/8 145/9
145/10 145/13 145/18 145/19 145/25
148/18 149/13 150/1 152/3 153/15
153/17 154/15 155/2 155/2 156/23
156/23 159/11 164/5 164/12 169/13
186/6 186/11 195/8 197/16 201/20
210/15 223/15 226/2 235/24 236/2
253/16
Detroit's [7] 91/13 107/21 118/12 141/20
152/15 166/7 256/12
develop [3] 9/14 17/25 201/1
developed [6] 8/4 16/12 39/1 214/7
237/11 237/15
developing [4] 8/5 12/16 12/16 194/5
development [1] 16/23
devised [1] 168/18
devoid [1] 10/10
devoted [3] 93/21 94/23 96/15
DFFA [1] 151/4
dialogue [5] 80/9 86/1 125/11 251/15
254/8
Diaz [3] 121/19 150/1 151/10
did [169] 19/1 20/5 20/10 22/8 22/24
25/19 26/18 37/2 37/2 40/3 40/20 41/3
48/24 49/1 53/4 55/15 57/25 61/2 61/25
65/23 81/24 83/10 85/1 86/5 86/10 86/23
87/17 89/14 90/2 90/19 90/23 97/25
100/2 102/4 111/5 114/12 114/16 114/20
116/16 120/17 120/18 120/19 127/10
127/16 127/16 140/20 141/16 141/16
147/22 155/13 155/14 163/8 167/7
175/22 176/2 176/7 178/12 180/25 182/7
187/13 194/9 195/8 195/13 196/9 197/22
198/6 199/2 199/22 199/25 200/3 200/5
201/8 201/18 201/24 202/5 202/25 203/2
205/16 205/25 208/3 208/13 208/18
208/20 208/21 209/1 209/3 209/4 212/22
215/3 216/7 216/8 219/11 220/6 220/11
221/3 227/13 229/12 230/6 230/22
231/13 232/2 232/3 232/4 232/16 233/6
233/16 233/17 233/18 233/22 233/23
234/5 234/5 234/8 234/19 234/22 235/5
236/7 238/19 243/10 243/18 243/22
244/10 244/15 245/6 246/16 246/23
246/25 247/3 247/7 247/12 248/19
249/25 250/17 251/3 251/5 251/6 251/25
252/2 252/18 253/17 253/19 254/16
254/21 256/15 256/20 259/7 259/11
259/16 260/11 260/14 260/15 260/24
262/5 262/21 263/7 264/11 264/20
264/21 264/22 264/22 265/13 266/15
267/10 267/13 267/14 267/23 268/7
267/15 272/3
didn't [18] 25/9 29/11 45/8 62/11 62/25
73/24 76/25 88/24 101/21 127/11 167/15
170/17 173/17 187/23 231/12 232/18
239/17 273/7
difference [3] 44/4 45/5 47/13
differences [1] 149/3
different [36] 43/11 43/23 47/3 48/20
48/23 48/25 60/6 60/13 63/7 64/8 64/9
64/23 72/5 73/23 87/14 88/6 90/20 95/3
95/8 95/9 100/23 102/24 164/1 180/16
199/12 205/13 207/11 207/12 207/15

# D

different... [7] 212/8 223/7 225/14 225/16 234/17 235/20 258/17
differentiating [1] 44/2
differently [1] 240/9
difficult [5] 5/4 35/14 112/14 145/22 152/18
difficulties [1] 149/12
difficulty [1] 91/25
Dillon [9] 41/22 107/6 111/15 119/9 119/17 119/24 120/9 122/14 123/21
diminish [3] 116/3 180/17 181/9
diminished [1] 139/11
dire [5] 82/23 231/8 231/11 231/14 262/25
direct [3] 210/4 253/11 256/10
directed [2] 33/8 249/6
direction [1] 203/18
directions [1] 120/5
directly [9] 21/5 23/9 107/9 119/23 175/1 217/19 235/7 236/16 241/6
director [2] 125/3 154/8
directors [1] 34/20
disagree [3] 58/14 74/9 106/9
disagrees [2] 24/5 25/1
disallowed [1] 204/6
disbursements [23] 199/11 200/9 203/13 207/13 207/18 211/8 216/15 216/19 222/21 223/24 224/6 224/10 224/15 227/25 228/10 228/17 232/5 235/4 258/14 259/20 260/6 260/7 262/24
disclaiming [1] 81/22
disclosable [1] 14/22
disclose [5] 32/14 32/17 47/6 51/20 52/23
disclosed [4] 46/6 46/8 47/21 47/24
disclosing [2] 33/14 44/7
disclosure [7] 43/17 43/21 46/25 47/4 51/24 69/15 69/18
disclosures [3] 47/10 47/10 47/14
discouraged [1] 86/2
discoverable [1] 14/22
discovery [12] 4/21 5/15 5/23 8/19 17/21 18/5 19/21 29/23 34/16 38/22 52/16 127/1
discrepancies [1] 199/25
discuss [11] 6/5 90/19 107/20 127/8 155/22 232/4 232/16 259/7 264/11 264/20 267/14
discussed [10] 7/18 49/12 107/24 142/21 179/11 232/5 259/3 267/15 269/1 269/5
discusses [1] 6/23
discussing [4] 29/13 63/21 80/23 109/16
discussion [9] 16/24 53/12 78/8 85/18 109/10 242/12 247/10 252/23 265/2
discussions [30] 12/21 13/2 27/12 57/10 58/4 58/18 77/24 81/21 81/24 82/18 83/21 85/23 107/3 107/5 118/16 140/23 178/7 178/22 182/5 182/6 183/11 234/1 234/20 253/9 254/8 255/6 255/19 262/6 262/22 267/11
diskette [1] 1/9
diskette/CD [1] 1/9
dispensed [1] 72/4
displaced [1] 67/18
disposition [1] 122/3
dispositive [1] 41/12
dispute [7] 15/9 20/22 24/6 63/23 63/25 85/25 150/13
disputed [2] 97/20 146/7
disputes [4] 45/22 60/22 69/25 151/1
disputing [1] 157/16

disregard [2] 127/12 129/12
disregarded [2] 129/20 204/23
dissenting [1] 99/1
distance [1] 11/16
distinct [3] 49/4 138/5 161/15
distinction [2] 44/4 49/1
distinguish [1] 206/23
distinguishable [1] 127/15
distress [1] 146/8
distribute [2] 1/20 92/15
distributed [3] 69/22 209/12 209/15
distributes [1] 223/18
distributions [15] 71/6 222/14 222/16 223/6 223/7 223/8 223/9 223/11 225/7 225/12 225/13 226/6 228/23 228/25 229/1
disturb [1] 34/19
divested [1] 150/25
divided [1] 6/4
do [137] 8/13 9/4 11/2 11/22 12/2 20/5 22/19 23/12 25/6 28/10 28/21 29/16 31/15 32/21 33/4 33/22 34/2 34/23 35/11 37/1 44/12 48/10 52/20 55/5 55/21 57/5 58/8 60/24 61/8 68/2 68/14 72/16 73/12 74/22 74/23 75/8 79/23 80/8 80/9 80/16 81/3 84/24 85/7 86/20 87/9 87/12 87/17 88/13 88/15 89/3 92/14 97/10 99/22 102/23 105/16 107/10 110/20 113/21 128/4 128/8 129/7 130/3 131/1 131/7 132/15 132/22 133/20 135/9 138/6 140/5 146/11 147/7 148/1 153/1 154/20 160/25 163/17 165/10 165/25 166/9 167/16 175/1 175/4 175/6 186/19 193/22 196/1 196/7 200/3 201/22 202/22 203/8 203/10 204/21 205/16 205/18 206/13 206/21 209/8 209/10 211/5 217/14 219/1 219/16 224/7 231/4 232/8 233/8 234/23 234/25 235/6 238/16 238/24 241/11 242/6 242/8 242/17 243/22 245/17 246/19 246/23 247/10 247/15 249/2 249/6 249/10 252/11 252/25 254/10 255/1 256/7 256/20 257/25 270/15 271/4 272/16 273/15
docket [1] 124/7
doctrine [7] 7/23 8/3 13/12 51/6 51/15 52/4 52/6
document [61] 11/20 40/18 57/15 57/16 57/18 57/25 58/21 59/8 62/14 68/21 69/7 90/11 127/9 136/3 183/1 183/17 183/18 184/20 198/25 203/3 204/21 209/11 210/2 210/5 213/19 231/24 232/6 232/12 232/25 233/2 233/16 233/23 234/2 235/10 241/19 242/24 245/10 245/11 250/7 252/8 252/9 257/6 257/11 257/15 257/20 257/20 257/24 258/10 258/23 259/3 262/6 263/13 263/18 265/7 265/8 265/14 266/24 267/2 267/8 267/10 268/19
documents [58] 6/6 7/8 9/17 10/23 15/7 15/15 20/6 20/13 20/18 20/21 21/2 21/8 21/14 21/18 22/3 22/4 22/5 22/13 22/16 22/16 22/18 23/2 23/5 23/9 23/14 32/12 32/15 42/25 46/6 46/7 46/10 52/3 52/15 52/18 52/22 52/22 54/19 56/21 56/24 57/2 57/7 58/4 58/9 58/15 58/23 59/11 59/24 60/2 118/25 119/15 232/22 232/25 239/2 268/25 269/4 270/6 270/24 271/21
does [37] 12/17 33/25 40/2 40/6 41/7 41/7 45/18 51/7 59/14 66/24 88/4 90/19 104/11 126/1 126/5 126/6 134/11 137/13 141/9 143/5 157/1 163/23 190/11 192/3 195/2 198/20 210/9 214/9 223/17 226/8 239/9 257/24 259/24 260/4 261/24

269/15 272/14
doesn't [22] 9/6 10/23 11/12 28/23 45/9 45/15 59/16 70/11 70/21 75/15 75/17 80/10 81/18 88/3 89/18 102/23 103/16 158/7 166/6 169/1 243/3 271/10
doing [22] 24/9 29/9 49/2 55/12 62/5 93/20 159/6 176/11 195/9 239/14 270/18 273/14
dollar [4] 96/17 125/7 222/18 222/18
dollars [5] 96/15 157/24 219/20 265/17 265/19
don't [88] 11/23 11/25 12/25 14/10 15/4 18/16 18/19 20/16 21/20 23/6 30/3 33/14 33/14 37/11 40/5 40/10 41/16 41/23 42/6 42/8 42/19 45/22 45/23 48/7 49/23 57/8 58/14 58/24 63/6 63/14 64/11 64/22 69/13 74/9 76/22 80/18 80/21 81/20 82/8 85/13 86/2 87/2 87/10 87/11 88/15 88/16 89/7 91/15 91/24 92/23 101/14 101/15 109/3 115/20 125/9 125/14 125/19 127/8 130/10 131/4 133/21 135/12 141/25 157/19 157/20 159/9 164/9 167/5 174/8 175/11 204/25 211/9 211/11 222/6 224/2 233/10 233/11 234/10 234/12 241/24 245/7 245/19 249/12 249/14 251/12 256/17 269/9 271/18
Donald [1] 153/16
done [30] 12/7 25/17 29/19 30/23 31/3 38/24 62/20 67/3 76/23 76/25 77/2 93/20 103/24 108/2 108/24 132/14 149/17 151/16 159/2 165/2 174/20 187/6 188/4 188/8 222/6 222/11 234/8 238/22 239/18 270/11
doomed [1] 149/22
door [1] 265/3
dots [1] 144/2
double [2] 267/21 268/12
doubt [2] 37/1 70/5
doubted [1] 83/6
dovetailed [1] 39/17
down [13] 13/23 15/11 23/17 94/15 102/20 109/1 109/5 109/6 118/10 177/15 193/6 207/15 243/19
DPLSA [1] 151/5
DPOA [1] 151/10
draft [8] 1/2 1/4 1/8 1/12 1/19 2/2 110/21 142/13
drafted [1] 39/21
drag [1] 101/15
dramatic [2] 122/15 122/19
dramatically [3] 96/12 173/10 191/2
draw [1] 36/4
drawing [1] 40/18
drawn [3] 37/14 100/12 227/2
DRCEA [3] 153/14 154/1 154/14
drive [1] 255/17
drop [1] 112/17
dry [1] 17/5
dude [1] 7/19
due [15] 1/18 62/4 62/11 206/6 209/25 219/4 225/18 225/21 229/8 236/19 246/21 259/17 260/2 264/4 271/2
dues [1] 155/3
dumb [1] 110/10
duplicate [1] 104/23
duplicative [1] 242/17
during [18] 62/10 63/4 83/3 83/4 84/22 107/25 111/23 126/18 142/8 142/9 149/23 154/10 188/21 201/25 218/22 220/4 230/10 254/1
dwindling [1] 220/10
DWSD [1] 65/5

**E**

earlier [14] 43/10 48/18 48/21 107/24
107/25 151/24 196/9 200/15 205/2
226/20 227/6 228/4 228/14 271/20
early [5] 110/22 110/22 120/6 136/9
171/23
ease [1] 147/10
easier [3] 73/7 147/17 231/19
easily [3] 30/20 91/16 270/10
easy [2] 75/16 149/19
Eaton [2] 2/8 2/9
economic [1] 134/16
education [2] 194/7 194/8
effect [9] 63/5 138/15 141/2 142/17
144/16 150/1 181/22 222/12 247/3
effective [2] 115/2 168/21
effectively [4] 28/10 29/16 75/15 186/22
effectuate [1] 91/23
effort [19] 5/22 7/14 10/4 11/19 22/9
22/11 22/13 74/5 83/8 93/24 94/4 95/24
96/2 113/2 146/16 152/20 184/5 214/6
218/2
efforts [10] 73/5 92/3 93/6 93/6 93/16
104/24 141/24 141/25 152/16 198/1
eight [2] 198/13 210/5
Eisenberg [1] 4/8
either [18] 12/12 30/22 45/15 51/13 73/2
80/15 115/19 134/3 145/20 156/13
160/22 173/15 178/1 185/10 202/8 217/5
238/25 272/9
elected [5] 129/18 154/2 154/22 156/18
157/20
election [1] 102/8
electorate [2] 109/21 129/3
element [2] 16/22 16/22
elements [5] 135/4 165/22 166/1 166/9
211/7
elevator [1] 131/7
Eleven [1] 267/4
eligibility [21] 8/15 10/16 41/2 60/21
84/18 96/10 104/13 112/9 112/23 113/4
142/3 146/25 153/10 153/11 157/2 165/5
165/11 166/15 175/21 177/24 191/9
eligible [4] 91/1 146/13 164/15 165/22
Ellen [1] 148/19
else [15] 7/8 15/13 18/16 23/12 63/16
75/21 86/20 86/21 92/23 93/19 114/13
199/2 223/21 250/8 257/6
EM [2] 41/20 41/24
email [38] 6/16 6/23 7/21 11/24 20/19
24/3 24/16 24/18 36/8 36/10 36/11 36/15
37/13 39/22 40/2 42/12 42/15 44/20
44/21 44/21 47/24 48/3 49/9 49/19 52/10
107/23 111/21 113/24 114/1 114/1
117/20 118/8 119/8 119/11 120/3 138/22
140/22 170/15
emailed [1] 123/20
emails [13] 6/22 7/1 7/20 31/4 42/25
44/11 44/23 49/12 49/23 49/25 50/2
191/16 191/17
emergency [94] 6/8 8/24 10/9 17/6 17/12
19/14 23/10 25/23 27/2 27/5 27/7 27/8
27/10 35/1 67/13 109/16 113/13 114/6
114/14 114/24 115/1 115/5 115/24
116/11 118/20 119/4 120/16 121/11
123/2 123/6 124/20 129/17 129/24 130/1
142/11 148/15 150/8 150/18 151/12
152/14 155/10 155/12 156/18 156/24
166/11 167/7 167/15 168/3 168/8 168/10
168/11 168/22 169/2 171/6 171/25 172/5
172/9 172/14 172/16 172/25 173/20
174/4 175/4 175/22 176/2 176/4 176/8
176/11 177/11 178/6 178/11 178/13
180/9 180/25 182/12 183/19 185/14
185/19 185/25 186/17 186/21 186/25
189/15 190/8 201/9 202/4 202/12
208/14 222/4 243/19 247/8 259/3 259/11
267/11
Emily [1] 171/11
employed [5] 139/3 139/4 145/18 193/14
193/16
employee [1] 115/19
employees [13] 65/6 117/2 119/17
153/15 154/14 155/2 173/7 173/13
182/23 217/11 237/10 241/3 250/5
employment [4] 68/6 71/12 148/14
148/16
enable [1] 100/2
enacted [1] 168/20
enacting [1] 99/7
enclosed [1] 36/9
encourage [1] 55/9
encouraged [1] 86/1
end [34] 26/7 60/24 65/10 78/7 85/20
89/20 99/7 110/5 113/14 114/25 143/24
144/13 170/14 172/4 172/6 189/2 200/17
206/10 208/6 210/13 222/13 225/6
226/13 229/9 229/11 231/23 247/6
251/13 251/18 253/5 255/12 258/5
259/15 260/18
ended [3] 148/4 250/13 266/11
ends [1] 231/20
enfolding [1] 38/22
enforcement [3] 97/5 97/6 142/19
engage [4] 98/8 163/5 171/17 183/16
engaged [4] 29/7 108/14 115/3 178/2
engagement [2] 108/18 200/17
engaging [1] 29/12
English [2] 1/7 220/1
enjoy [1] 47/12
enormous [1] 90/1
enormously [1] 82/23
enough [8] 68/22 97/13 125/18 129/7
130/19 130/21 144/24 159/1
ensue [2] 41/7 42/4
ensure [1] 220/6
enter [3] 59/23 154/21 162/9
entered [2] 2/11 26/9 124/14 131/25
enterprise [14] 186/4 196/24 197/4 197/9
197/10 197/11 197/12 197/16 197/17
197/23 197/25 198/2 198/24 199/19
enters [1] 107/16
entire [9] 19/12 19/14 29/17 44/18 44/22
84/3 110/7 111/6 159/1
entirely [3] 36/24 173/4 189/22
entities [3] 29/12 139/24 223/18
entitled [4] 15/12 209/11 209/18 238/10
entity [1] 29/3
entries [2] 1/14 1/18
environment [1] 159/23
environments [1] 60/13
equally [1] 184/14
equipment [1] 273/17
equity [2] 195/4 195/5
equivalent [2] 1/7 72/18
Erman [1] 4/5
Ernst [11] 157/23 193/17 193/18 193/19
193/20 193/22 194/16 198/18 231/24
242/3 248/6
error [4] 26/21 189/1 189/2 273/6
Erwin [2] 2/13
escrow [14] 212/13 213/4 215/9 215/13
215/14 215/19 215/15/17 215/22 215/24
224/18 226/24 227/1 227/2 227/3
especially [3] 14/24 86/12 213/21

essence [2] 105/2 242/4
essential [1] 145/24
essentially [9] 17/4 19/11 26/12 82/17
113/18 170/13 212/14 219/3 265/2
129/22 129/24
establish [6] 11/13 42/5 51/7 113/3
establishes [2] 107/11 144/15
establishing [1] 112/24
estimate [1] 225/19
et [1] 20/5
evaluate [2] 83/3 96/3
evaluated [2] 142/5 142/6
evaluating [1] 88/9
evaluation [6] 83/12 83/14 83/21 111/12
143/6 188/10
eve [1] 26/16
even [51] 9/8 27/25 31/16 31/22 41/13
41/20 42/5 67/6 67/8 69/17 75/12 75/17
75/17 79/1 81/5 82/1 88/20 101/1 102/22
105/23 109/14 116/24 118/13 120/17
125/19 137/10 158/10 158/25 159/9
161/9 172/8 173/18 181/2 181/15 181/16
182/7 182/9 183/11 183/12 183/24
183/25 189/15 189/17 190/1 191/2
197/14 197/20 205/5 206/6 211/10
268/22
event [6] 41/10 45/19 59/23 60/8 85/25
103/15
events [2] 45/8 135/19
eventually [3] 107/4 109/22 225/23
eventy [1] 41/7
ever [9] 43/1 67/21 75/12 106/13 119/22
119/25 121/23 130/4 180/10
every [14] 16/21 16/22 61/14 62/20 80/1
80/1 82/3 84/20 96/3 99/24 103/17 212/3
223/4 237/16
everybody [8] 73/11 73/12 75/21 84/15
86/20 86/21 102/3 149/1
everybody's [1] 20/14
everyone [13] 4/24 28/14 76/20 76/24
77/8 92/19 92/23 128/23 131/2 141/22
192/13 211/11 219/24
everything [9] 58/22 75/9 89/18 89/22
91/20 93/19 96/11 141/11 141/12
evidence [140] 34/10 57/15 57/17 59/6
59/16 60/2 61/7 61/11 61/13 62/2 62/13
63/3 63/21 64/6 65/12 65/25 66/10 67/11
67/22 69/8 72/14 78/20 79/11 79/17 80/3
81/10 81/20 81/23 82/11 84/2 85/8 85/16
86/3 87/1 87/3 89/13 89/24 90/21 91/12
92/1 93/2 93/9 95/1 96/9 97/1 97/16
100/1 101/17 116/2 117/17 127/9 128/17
129/9 135/21 136/22 136/25 142/8
144/15 144/19 145/15 146/2 146/19
146/24 152/18 153/1 153/13 153/19
155/7 155/19 156/6 156/15 156/23 165/7
165/12 166/2 166/3 167/17 168/5 168/15
169/1 169/13 170/8 171/3 171/5 171/14
171/21 171/23 172/5 172/8 173/20
174/23 176/21 176/21 176/22 177/3
177/21 178/5 178/10 180/8 180/20
180/24 181/12 181/19 182/3 182/10
183/15 185/2 185/5 185/21 186/7 186/14
187/9 187/11 188/6 188/11 188/16
189/14 189/24 190/4 190/11 190/17
191/7 192/6 198/11 204/9 204/18 204/20
204/21 214/22 238/8 241/20 242/14
247/25 257/15 257/22 257/23 265/7
266/24 270/4 270/7
exact [1] 237/5
exactly [10] 23/6 27/21 35/15 62/25
67/16 76/6 87/8 88/12 89/1 89/3
examination [3] 193/8 270/14 272/23

# E

examinations [1]  20/10
examine [4]  19/16 20/12 23/13 54/19
example [11]  8/7 42/8 101/4 101/6
163/24 172/19 181/18 187/17 197/15
206/18 225/24
examples [4]  65/16 185/23 197/11 226/4
exceed [1]  22/2
exceeding [4]  259/21 260/6 260/8 262/24
Excel [2]  201/9 201/11
exception [4]  21/16 54/15 73/14 192/20
excerpt [3]  116/4 172/19 174/5
excerpts [1]  16/17
excess [2]  159/18 265/24
exchange [2]  65/19 119/14
excludable [1]  271/11
exclude [1]  95/5
excluded [4]  204/9 224/19 224/21 257/13
excuse [11]  17/4 22/6 56/2 93/10 121/7
204/13 216/3 217/21 228/6 255/23
259/22
execute [2]  112/4 256/12
executed [2]  84/16 259/5
executive [2]  17/13 209/14
exercises [1]  73/15
exercising [1]  151/14
exhibit [53]  6/17 7/18 46/22 92/10 92/11
92/20 92/21 110/13 113/23 131/22 132/6
132/8 138/15 147/13 152/1 164/23 198/9
198/10 202/16 204/14 204/17 209/8
209/9 209/14 231/18 238/5 238/6 238/10
241/16 247/24 247/25 248/1 249/17
249/18 251/20 251/20 251/21 251/22
252/8 257/2 257/3 263/2 264/14 264/16
264/16 266/3 266/4 266/5 267/2 267/5
269/7 269/9 273/4
Exhibit 10 [1]  264/16
Exhibit 11 [3]  266/3 266/4 267/5
Exhibit 38 [1]  269/9
Exhibit 4 [1]  113/23
Exhibit 43 [2]  209/8 209/9
Exhibit 44 [2]  209/14 238/6
Exhibit 48 [2]  247/25 248/1
Exhibit 49 [1]  249/18
Exhibit 51 [3]  251/20 251/21 252/8
Exhibit 6 [2]  198/9 198/10
Exhibit 6D [1]  6/17
Exhibit 704 [1]  164/23
Exhibit 720 [1]  147/13
Exhibit 9 [1]  257/3
exhibits [6]  49/19 56/2 94/16 170/19
257/4 270/2
exigent [1]  15/16
exist [2]  206/4 250/19
existed [1]  114/24
existence [1]  181/12
existing [1]  250/22
exists [2]  110/4 266/7
expand [3]  212/17 216/14 224/3
expanded [4]  196/10 196/12 200/25
216/17
expect [4]  29/18 79/23 165/8 165/12
expected [4]  141/12 200/19 216/11 228/1
expecting [1]  29/6
expediency [1]  23/24
expedited [3]  1/15 5/24 6/1
expeditious [1]  148/24
expendable [1]  65/22
expenditures [8]  243/13 243/14 244/25
248/9 265/17 266/6 267/16 267/20
expense [1]  236/23
expenses [11]  173/5 190/3 196/22

196/23 198/22 199/10 206/5 206/8
236/22 237/14 237/17
experience [6]  112/5 114/9 114/11 149/6
199/18 213/22
expert [3]  58/11 61/17 61/18 157/10
157/25 158/2 195/21 195/25 204/23
205/3 205/7 206/14 206/23 206/24
206/24 228/11 238/14 239/10 242/4
243/4 244/8 257/12 270/25
expertise [10]  154/18 204/8 205/5 206/12
206/18 206/19 206/22 241/23 243/2
272/14
experts [3]  157/21 157/22 271/19
expired [1]  151/5
explain [5]  56/19 80/1 149/4 165/12
205/19
explained [1]  184/12
explains [1]  112/12
explanation [2]  19/25 151/19
explanatory [1]  216/22
explore [2]  30/12 119/19
explored [1]  119/23
expresses [1]  115/13
expression [1]  70/16
extend [3]  13/2 13/5 13/11
extended [1]  152/21
extensive [8]  17/24 18/6 69/21 72/12
73/5 73/15 96/2 96/8
extensively [3]  6/2 49/11 82/15
extent [19]  36/6 47/22 52/1 52/8 52/24
56/17 92/2 94/6 161/6 161/10 164/1
175/13 175/15 205/5 213/19 232/11
241/15 261/12 272/19
extrapolate [1]  237/13
extrapolations [1]  271/17
extreme [1]  77/24
extremely [3]  112/14 218/23 220/14
EY [12]  194/17 194/18 194/24 194/25
195/4 195/5 195/13 195/21 196/10
200/15 203/17 240/14
EY's [2]  194/18 240/14

# F

face [7]  11/10 62/21 130/13 137/20
137/23 138/3 138/11
faced [2]  86/23 222/2
faces [1]  112/1
facing [2]  17/22 243/11
fact [68]  10/14 21/9 30/21 31/3 34/10
34/15 34/21 35/13 35/17 40/20 40/22
41/6 44/10 52/3 54/18 62/4 62/13 63/12
67/25 69/14 71/9 72/19 73/12 78/4 84/4
86/16 86/23 93/13 97/21 98/17 106/4
118/1 118/6 121/4 124/23 125/1 127/22
129/10 136/4 136/7 138/5 138/10 152/5
152/20 157/22 158/19 160/14 163/4
168/17 172/25 174/25 181/2 181/5 182/3
187/3 187/11 187/12 187/23 188/17
195/24 206/3 206/4 213/25 228/9 239/8
270/16 271/9 271/19
factor [3]  41/5 96/5 96/5
factored [1]  191/1
facts [20]  8/5 12/16 14/4 16/7 17/25
29/23 60/25 90/13 90/13 105/8 105/11
105/11 105/14 106/2 122/22 127/24
129/21 146/20 160/13 205/13
factual [14]  49/8 50/23 50/24 60/22
127/13 128/20 138/9 140/18 160/19
165/4 167/6 185/8 213/19 271/16
factually [2]  127/15 129/6
fade [1]  80/10
fail [2]  55/1 149/22
failed [6]  88/18 93/22 165/20 165/23

166/15 188/23
failing [1]  63/13
fails [2]  40/20 148/21
failure [3]  113/5 130/17 146/18
fair [2]  160/13 160/22
fairly [7]  21/7 115/21 136/25 140/22
142/11 143/25 237/6
fairness [1]  46/10
faith [65]  49/16 49/16 69/1 69/1 69/4
71/25 72/3 74/9 79/21 80/7 81/7 82/7
84/23 86/7 88/10 88/22 88/24 89/2 90/23
91/3 91/8 95/20 106/7 108/12 112/18
113/2 113/5 118/12 126/9 144/19 144/20
144/22 145/2 146/14 146/21 158/5
160/11 161/7 161/8 161/11 161/20
162/18 163/15 164/10 165/25 166/18
166/20 166/23 167/15 167/19 167/23
170/21 177/20 177/25 178/2 178/4 178/9
180/5 181/17 183/16 184/6 184/9 185/12
185/14 191/9
fakes [1]  159/19
fall [3]  88/4 148/6 235/3
falls [1]  166/2
false [2]  162/20 162/21
familiar [2]  66/21 85/6
familiarize [1]  50/2
far [8]  19/7 40/8 106/14 141/3 227/17
242/21 243/7 255/25
faring [1]  236/3
fashion [1]  175/20
fast [4]  20/9 108/23 109/9 112/4
faster [1]  1/16
fault [1]  20/8
February [2]  106/23 114/4
federal [10]  46/12 115/22 142/18 175/9
175/25 204/9 205/10 257/21 270/7 270/7
federalism [1]  115/22
fee [1]  211/23
feedback [9]  80/11 80/12 80/13 81/2
81/13 82/24 85/16 159/24 178/24
feel [2]  15/11 115/21
fees [6]  197/3 197/5 197/12 211/24 212/7
223/25
felt [2]  39/2 114/17
few [14]  39/18 44/23 45/3 63/20 78/22
98/3 105/10 133/10 134/1 134/1 136/1
136/21 205/15 259/10
Field [1]  4/13
fight [1]  63/7
fighters [1]  121/22
figures [1]  45/21
figure [11]  23/18 48/13 66/9 78/10 81/2
82/21 94/23 95/24 101/5 102/19 183/7
file [7]  11/7 34/24 53/17 75/14 75/23
90/17 124/10
filed [29]  16/19 37/24 38/2 38/21 67/16
90/12 106/7 117/23 119/5 121/24 122/1
123/5 123/14 123/24 124/7 124/22 133/1
133/2 133/3 143/21 146/20 150/18 151/6
152/16 156/4 166/23 179/4 185/25
187/13
files [2]  106/24 123/25
filing [47]  11/10 26/14 27/10 35/5 45/24
66/19 87/5 88/2 91/1 91/18 108/9 113/20
117/25 119/2 120/9 120/11 122/4 122/11
122/17 123/12 123/22 125/1 125/17
126/8 158/9 158/11 163/7 165/24 166/13
167/6 167/12 167/14 167/17 168/1
171/19 172/7 172/10 173/19 174/20
176/15 176/23 177/6 177/9 179/6 183/22
185/18 255/2
final [11]  1/14 4/22 55/22 55/25 59/23
90/5 105/5 109/24 131/19 212/11 225/17

**F**

finally [13] 25/7 63/10 75/24 103/4 134/22 140/12 166/21 176/14 183/14 185/11 190/10 227/8 236/23
finance [2] 194/10 200/7
finances [4] 110/3 116/13 120/20 199/3
financial [60] 27/7 27/10 30/6 35/7 35/7 67/20 68/13 73/2 90/8 90/9 90/10 90/14 91/11 91/13 91/14 91/24 93/14 107/21 108/16 110/4 111/12 113/8 114/14 114/24 115/8 116/4 124/25 134/8 139/7 146/8 149/12 154/9 169/24 170/1 170/24 170/25 172/17 181/10 186/15 194/12 197/1 197/21 198/14 198/15 199/6 199/8 199/13 199/15 201/3 202/14 203/2 204/7 251/8 252/7 254/12 254/13 264/17 271/20 272/1 272/3
financials [1] 116/18
financing [1] 227/5
find [16] 12/8 27/1 64/7 64/20 73/5 89/20 89/21 89/21 98/4 100/5 144/16 149/3 158/23 164/24 199/25 272/13
finding [2] 124/1 150/25
finds [2] 30/21 112/7
fine [6] 39/16 50/18 57/12 104/16 162/6 192/23
finer [1] 28/13
finite [1] 97/13
fire [7] 3/18 121/21 145/18 145/23 229/16 230/20 247/23
fired [1] 166/18
firefighters [7] 121/10 145/7 150/24 151/7 153/17 153/25 154/16
firm [14] 4/13 6/21 9/12 30/11 54/4 138/25 139/12 139/17 140/17 144/11 168/19 176/3 193/19 195/3
firms [7] 11/22 28/19 29/5 108/19 111/17 202/1 202/2
first [64] 4/19 4/24 5/20 6/5 6/13 8/2 18/25 24/1 36/5 39/20 40/13 43/14 45/3 51/4 60/5 60/12 61/4 63/23 65/18 74/17 79/6 92/6 92/15 92/18 93/22 96/25 99/4 102/9 105/2 112/2 119/12 131/8 131/19 132/25 146/5 155/20 164/22 166/12 167/1 168/7 178/5 182/12 183/4 183/7 185/24 192/16 194/14 201/24 201/25 204/25 209/8 210/10 210/11 210/24 212/21 216/20 221/18 223/12 226/18 238/4 247/24 249/21 258/13 273/10
fiscal [40] 63/5 210/12 210/14 210/15 210/17 210/24 212/22 212/24 213/5 213/12 215/5 218/15 219/17 219/18 219/19 219/21 220/21 222/13 224/3 224/16 226/13 227/18 227/22 228/18 228/20 229/1 229/10 229/11 230/11 231/22 233/3 235/2 250/12 258/5 258/5 258/20 259/15 260/18 263/19 266/11
fit [2] 147/8 147/23
fits [2] 83/16 165/13
five [17] 42/3 91/9 96/5 117/10 200/18 209/2 248/7 248/14 250/9 251/7 252/20 253/21 266/5 266/6 267/18 268/2 268/9
fix [1] 131/24
fleshed [1] 70/3
floor [1] 131/8
flow [13] 62/19 64/3 64/4 67/7 200/21 208/4 210/12 220/21 224/13 224/13 224/21 225/3 228/20 231/22 251/16 256/3 263/19
Flowers [6] 3/16 24/2 26/6 54/6 133/1 133/4
flowing [1] 137/7

flows [5] 64/6 190/24 200/25 207/10 249/9
flurry [1] 191/16
focused [6] 16/10 76/5 153/12 169/15 197/25 251/7
focuses [2] 64/3 64/3
focusing [3] 7/25 93/13 165/14
folks [3] 31/6 47/15 162/22
follow [5] 96/11 107/8 108/25 134/18 253/7
followed [3] 148/21 178/7 184/4
following [23] 8/25 80/16 82/18 83/3 97/23 99/17 105/3 111/24 113/13 116/20 119/8 119/13 121/9 123/14 124/13 126/11 133/14 135/19 138/25 151/20 152/11 178/22 239/8
follows [4] 134/13 138/22 166/5 177/3
footnote [2] 76/6 128/7
footnotes [1] 74/25
force [1] 40/18
forecast [41] 173/4 196/5 196/12 207/17 207/19 208/4 210/20 211/1 213/6 213/8 213/18 213/23 214/3 214/16 214/18 214/21 215/7 216/5 218/17 232/12 235/23 236/4 236/21 237/9 248/10 251/23 257/11 258/8 263/5 263/11 263/19 266/6 269/20 269/23 271/9 271/13 271/14 271/16 272/9 272/11 272/14
forecasted [3] 210/12 213/9 231/22
forecasting [1] 206/7
forecasts [10] 204/4 206/2 213/14 258/25 265/2 270/25 271/3 271/18 271/25 272/1
foreclose [1] 106/17
foregoing [2] 90/22 140/13
foregone [3] 106/5 106/11 118/3
forgot [1] 87/2
form [12] 1/9 1/9 30/9 32/11 35/15 45/20 46/1 66/14 70/3 91/19 140/7 147/1
formal [1] 120/1
formally [1] 19/1
formed [1] 154/2
former [1] 139/3
formerly [1] 139/4
formulated [1] 17/18
forth [4] 21/7 110/14 204/8 225/17
forthcoming [2] 141/3 141/4
fortiori [1] 180/11
fortuitous [1] 45/13
Forty [1] 238/8
Forty-four [1] 238/8
forward [15] 30/8 35/8 35/10 35/24 57/8 58/12 65/13 116/25 163/25 164/6 164/13 173/5 173/13 191/9 215/23
forward-looking [1] 57/8
found [9] 12/11 78/6 88/14 98/1 98/13 148/9 189/16 189/18 230/23
foundation [4] 57/9 58/11 238/16 268/4
foundational [1] 29/21
four [19] 122/11 135/16 142/7 152/9 152/12 158/13 193/19 193/21 194/24 200/18 209/2 238/8 248/7 248/8 250/9 250/11 251/7 252/20 253/20
fourth [4] 79/5 82/4 94/5 95/21
fractured [2] 98/23 98/24
framed [1] 16/9
framework [4] 30/24 165/10 209/22 254/19
frankly [16] 15/14 49/10 55/15 59/5 61/17 71/10 74/6 74/8 78/15 81/4 84/1 86/21 91/20 98/6 101/18 102/12
fray [1] 133/12
free [3] 115/13 137/7 273/16

freely [1] 174/1
fresh [1] 51/16
Friday [4] 22/21 118/25 123/12 124/4
Friedman [1] 4/5
Frigic [1] 252/14
front [3] 23/6 100/8 200/17
frustrating [1] 25/8
fuel [1] 101/10
Fugic [1] 254/13
full [10] 140/12 188/7 193/11 194/23 214/20 215/2 215/5 220/18 224/1 267/8
fulling [1] 163/5
fully [8] 17/25 116/3 129/25 141/22 141/23 158/18 186/12 189/22
fund [61] 64/17 65/5 188/13 188/14 188/16 189/14 189/21 190/25 196/13 196/17 196/19 196/20 196/24 196/25 197/6 197/14 197/16 197/17 197/19 197/22 198/1 198/3 198/23 203/13 203/14 212/25 213/4 217/17 218/14 219/7 220/9 220/16 221/13 221/13 221/14 221/15 221/15 221/22 221/22 221/23 221/24 221/25 222/3 222/4 222/4 222/5 222/10 222/17 223/2 223/5 224/18 225/1 226/10 227/13 235/11 246/12 246/14 248/15 258/4 262/2 267/17
fund's [1] 226/11
fundamental [3] 47/12 134/18 140/22
fundamentally [4] 35/21 46/4 47/1 205/4
funded [2] 189/4 189/22
funding [7] 63/6 63/24 125/21 137/16 173/9 229/14 255/20
funds [21] 125/21 189/13 197/4 197/9 197/10 197/11 197/12 197/23 197/25 198/2 198/24 221/4 221/7 221/10 221/11 227/8 227/11 229/6 229/8 229/13 263/1
further [21] 4/25 14/3 35/22 42/8 77/10 88/20 112/19 113/7 116/8 124/19 138/23 159/10 169/23 170/8 173/1 173/14 184/22 210/21 220/19 222/9 242/25
furthermore [3] 40/17 41/14 42/5
future [8] 41/11 96/22 122/7 204/4 206/2 206/7 236/15 239/9

**G**

Gabriel [2] 64/15 64/16
gaming [2] 211/20 211/20
gather [1] 141/16
gave [6] 44/5 58/15 89/17 149/21 200/4 240/4
Gee [1] 88/14
general [58] 3/4 3/6 3/18 56/22 57/5 66/10 121/17 124/5 129/3 138/13 165/20 176/9 178/24 188/13 188/16 189/14 189/21 196/13 196/17 196/19 196/20 196/25 197/6 197/19 197/22 198/1 198/3 198/23 203/13 203/14 212/25 217/6 217/10 217/17 218/14 220/9 220/15 221/15 221/15 221/24 221/25 222/5 222/10 222/17 223/2 223/5 225/1 226/10 226/11 227/13 229/15 230/19 235/11 248/15 258/4 262/2 263/1 267/17
general's [2] 66/18 123/17
generally [26] 62/24 69/5 91/4 121/3 128/4 128/8 161/19 182/17 196/2 197/12 197/14 199/9 199/23 200/10 200/21 200/22 202/6 211/24 212/12 214/5 216/25 222/7 231/6 236/20 251/15 254/7
generates [1] 186/18
generation [1] 65/22
generations [1] 156/20
Geoff [1] 2/13
Geoffrey [2] 2/14 192/15

## G

get [54]  7/14 7/15 9/2 9/2 11/21 11/21
21/12 28/20 41/18 42/20 55/21 66/9
70/17 73/6 73/10 73/12 75/13 76/24 77/1
81/11 86/24 88/10 92/17 94/2 95/25
108/20 108/24 109/8 111/5 125/22
131/25 136/12 137/11 142/23 144/6
147/12 159/2 164/8 169/6 169/18 174/21
177/10 181/25 185/8 196/2 196/3 199/12
200/1 217/23 220/11 240/1 263/14 273/7
273/10
gets [4]  8/17 87/13 96/18 97/18
getting [6]  80/10 94/1 107/9 236/24
261/17 261/18
give [15]  39/6 42/14 42/17 64/18 79/13
80/11 80/11 98/2 104/25 105/13 137/7
152/1 158/2 185/22 193/11
given [24]  19/20 20/8 21/9 22/1 22/20
33/20 35/20 54/16 54/17 57/1 58/25
59/17 86/6 111/25 112/5 121/23 122/19
124/11 168/11 206/6 211/3 249/18 252/8
267/22
gives [5]  102/3 115/12 119/16 139/13
198/21
giving [2]  25/3 42/16
glass [1]  140/4
glean [1]  162/14
global [1]  105/14
gloss [2]  61/21 128/23
go [59]  2/10 6/1 7/2 19/24 37/10 37/18
39/19 48/20 48/24 49/10 75/22 76/2
76/12 77/4 77/10 78/9 78/21 79/25 84/21
85/23 93/2 105/2 118/10 125/19 130/20
154/25 159/9 163/25 164/6 164/12 166/1
171/19 174/12 176/25 179/22 203/6
204/2 210/18 210/21 211/7 212/16
216/20 217/19 220/18 220/19 222/15
222/21 224/1 228/15 231/18 232/17
235/8 242/16 248/4 248/18 249/17
255/22 267/7 272/25
goes [14]  27/9 27/10 36/17 36/17 41/14
88/20 102/2 102/20 133/25 141/19 174/7
217/10 232/22 238/11
going [128]  4/25 6/1 6/4 8/2 8/19 20/9
21/10 22/19 26/6 30/7 35/24 36/14 39/4
39/14 41/2 45/21 53/17 57/22 60/14 61/4
61/5 61/7 61/8 61/9 61/10 63/11 64/11
70/5 70/14 73/4 74/16 75/10 75/10 75/19
75/24 75/25 76/17 77/21 77/23 79/4
79/17 79/20 80/19 83/1 84/5 85/11 86/17
86/25 87/25 88/11 88/19 89/1 91/3 92/14
92/14 92/24 93/2 93/3 96/22 98/2 98/3
98/4 98/18 98/21 100/9 101/17 102/9
105/1 105/2 106/14 107/8 108/23 115/20
117/23 121/8 122/22 124/4 135/7 137/9
147/6 147/15 150/6 150/17 152/21 165/9
165/14 167/16 171/19 173/5 173/13
177/23 178/5 180/4 182/16 183/17
187/25 188/11 198/8 200/22 205/1
205/20 205/22 205/23 206/10 208/7
209/24 211/6 215/22 221/8 225/17
227/21 227/22 234/4 235/17 235/18
238/16 238/17 242/20 242/21 257/1
257/18 260/12 260/25 267/21 268/9
268/11 269/17 273/8
golf [1]  110/5
gone [5]  146/3 170/20 180/19 180/23
183/17
good [87]  2/6 2/12 2/16 2/21 3/2 3/7 3/17
3/24 4/4 4/9 34/8 34/12 39/12 49/15 54/3
55/20 60/4 62/13 69/1 69/1 69/4 71/25
72/3 72/13 74/4 74/23 79/21 80/7 80/8

81/7 82/7 84/23 86/7 88/9 88/24 90/23
91/3 91/8 95/20 104/8 108/12 112/17
113/2 118/11 126/9 126/21 133/17
134/25 144/21 145/2 145/6 146/14
146/21 153/4 157/5 158/5 160/11 161/1
161/7 161/8 161/11 161/20 162/18
163/14 164/10 164/19 165/25 166/18
166/20 166/23 167/15 167/19 167/23
177/20 177/25 178/2 178/4 178/9 180/5
185/13 191/9 193/10
goods [1]  88/22
Gordon [3]  3/20 3/22 132/4
got [23]  65/9 74/25 75/5 76/6 80/8 81/1
81/9 81/13 86/15 86/18 89/2 94/10
100/20 102/7 108/17 135/6 141/5 155/20
183/7 191/16 191/16 236/16 268/12
gotten [1]  89/22
governing [1]  17/12
government [4]  55/2 93/12 93/13 114/24
governmental [1]  154/20
governor [57]  6/25 8/20 10/15 16/17 18/3
19/13 19/16 19/20 20/10 21/10 22/5 23/9
28/25 34/25 36/14 41/22 53/14 53/18
53/23 54/12 54/13 54/14 55/18 100/6
106/16 106/19 106/21 107/10 107/20
108/13 113/11 114/23 117/12 119/9
120/4 120/23 122/13 122/16 123/6
123/20 124/15 124/19 125/19 133/8
139/20 142/10 142/12 142/25 143/6
143/8 143/14 143/18 148/8 148/9 149/25
152/10 152/11
governor's [9]  19/11 55/4 109/15 111/7
119/2 122/10 123/10 142/24 144/10
governors [1]  61/1
gracey [1]  117/10
graduate [1]  194/8
grant [1]  212/8
graphic [1]  269/11
grapple [1]  93/17
great [3]  105/19 217/24 236/9
Green [14]  3/18 50/14 50/19 79/14
105/20 128/15 132/3 132/22 133/23
134/6 136/5 143/10 146/4 180/23
Green's [5]  133/19 146/10 147/22 151/24
169/8
gross [1]  223/17
ground [5]  5/14 26/23 140/23 183/4
270/4
grounds [1]  257/14
group [8]  47/15 75/5 77/19 77/21 102/6
102/22 105/17 254/21
groups [8]  74/15 75/3 78/15 78/18 89/6
95/8 136/15 138/21
growth [1]  236/14
GRS [2]  65/4 247/20
guarantee [1]  88/3
guess [6]  21/21 49/21 51/3 136/25 218/9
233/11
guessing [1]  98/8
guests [1]  131/2
guise [1]  159/23
gun [1]  98/18
Gurav [2]  192/16 193/13
Gurwitz [2]  148/20 149/4

## H

had [135]  6/24 12/24 15/2 19/13 20/7
20/9 28/21 29/3 29/14 29/17 38/6 38/14
39/3 39/18 40/25 41/18 41/24 41/24
41/25 42/2 42/3 43/22 56/20 57/23 57/24
57/24 59/17 69/2 73/25 79/25 81/2 84/11

88/2 93/15 97/20 100/1 100/23 107/6
109/2 109/11 114/18 114/20 117/18
117/22 118/1 118/13 121/7 122/9 125/11
125/21 127/2 128/18 129/11 130/15
130/20 133/23 135/2 136/11 136/15
141/10 142/12 142/13 148/7 150/25
153/25 154/3 155/25 156/11 156/18
156/19 159/3 168/10 168/17 169/17
176/3 176/8 176/23 176/24 178/23
181/16 184/2 188/22 194/15 199/6
199/10 199/15 200/17 201/19 207/16
208/14 210/18 212/23 213/5 213/18
213/25 214/16 214/17 218/11 221/20
222/11 222/15 224/20 225/1 225/21
226/22 227/2 228/23 229/8 229/18
229/18 230/13 230/23 234/1 236/14
237/6 246/20 248/6 254/4 259/15 260/20
260/23 261/3 261/5 261/6 262/1 264/5
265/14 266/12 266/13 267/22 268/19
268/21 268/24 269/14 273/6
hadn't [1]  187/15
half [5]  45/14 93/23 151/5 265/16 265/19
hall [3]  131/9 249/24 273/20
halls [1]  131/5
hallways [1]  131/4
hand [5]  78/22 138/12 180/19 180/23
249/18
handful [1]  136/17
handle [1]  196/2
handwrites [1]  123/24
hang [1]  57/14
hangs [1]  70/15
happen [8]  42/1 75/10 83/6 103/7 216/7
216/8 216/12 255/13
happened [20]  15/1 16/15 28/12 45/7
45/13 78/16 80/7 82/16 83/19 84/22 86/3
86/4 94/1 94/12 94/20 102/3 102/21
151/19 215/20 222/8
happening [3]  62/2 271/23 271/24
happens [2]  75/20 191/3
happy [3]  22/17 25/6 30/17
hard [12]  30/15 59/4 66/6 74/10 81/5
82/10 89/24 90/1 91/22 149/2 162/15
170/16
has [117]  6/2 6/3 6/15 7/11 16/15 16/19
17/3 17/13 17/21 17/21 17/21 18/3 18/5
18/11 18/14 18/14 18/20 23/22 24/10
24/12 26/14 27/17 30/11 43/1 44/22
49/20 53/12 54/13 59/6 61/17 65/23
67/18 69/7 69/19 70/14 71/22 72/8 74/1
75/4 77/3 77/17 84/20 85/7 86/5 91/2
91/20 92/19 96/23 99/4 99/5 103/8
103/22 106/16 118/19 125/5 128/25
130/7 135/4 138/4 138/8 139/1 140/17
141/3 143/19 148/10 152/17 160/25
161/5 162/9 165/4 165/6 165/22 165/23
165/24 166/17 169/4 175/23 178/6
180/23 181/3 182/12 184/24 184/25
186/1 186/15 186/21 188/2 189/15
198/10 202/12 204/20 205/3 205/5 212/8
213/20 215/20 221/11 221/14 222/7
223/19 223/20 223/21 224/6 225/19
225/25 235/9 238/2 238/13 240/14
244/25 245/3 250/11 256/25 260/22
268/7 269/12 272/25
hasn't [3]  24/24 66/25 187/16
have [368]
haven't [12]  10/24 12/7 12/11 12/23
13/21 15/4 34/13 38/14 81/4 175/12
175/16 227/11
having [12]  30/15 38/21 51/10 59/4 59/25
60/13 74/4 79/23 97/4 97/5 111/5 158/2
hazardous [1]  101/14

## H

hazards [1] 101/4
he [115] 6/7 17/13 18/20 43/10 43/22
44/5 48/18 53/19 55/5 55/5 57/10 65/10
69/19 90/15 108/17 108/18 110/17
110/19 110/24 111/4 114/16 114/16
114/17 114/18 115/18 118/9 119/15
119/16 119/21 119/24 120/2 120/13
120/25 121/2 122/14 122/16 122/18
122/21 122/21 124/9 125/4 125/7 125/8
125/21 129/25 142/14 142/15 142/19
143/20 155/14 169/2 169/4 171/5 171/10
171/10 171/11 171/24 172/2 172/2 172/3
172/16 172/20 173/24 174/7 174/7 174/8
174/9 174/10 174/15 174/18 175/23
175/23 176/7 177/7 178/12 178/19
178/20 178/23 178/24 186/1 186/21
188/1 188/21 189/1 205/2 205/16 205/19
213/16 213/17 213/18 213/21 213/22
230/1 231/4 232/9 232/16 232/21 232/23
233/18 233/23 234/5 235/5 235/6 239/14
239/17 240/1 244/6 244/6 244/9 245/6
245/7 249/16 264/22 265/9 269/13
he's [19] 55/12 90/13 174/1 174/19 183/20
205/2 213/20 261/13 261/16
head [4] 237/4 237/5 240/24 241/3
headed [1] 267/19
headings [1] 218/2
heads [2] 100/19 200/8
health [8] 216/25 237/9 237/11 240/21
241/2 248/11 250/23 266/18
healthcare [4] 140/9 173/6 266/8 268/2
hear [19] 34/1 34/3 37/2 37/3 39/14
50/10 60/5 63/11 66/24 67/11 72/14
79/17 82/14 96/8 146/25 231/12 241/13
244/3 256/4
heard [26] 34/13 35/5 39/15 57/23 70/14
83/3 115/7 141/14 151/15 152/18 153/7
159/15 162/21 165/6 168/9 169/4 176/18
178/16 181/14 185/2 189/19 239/16
239/23 240/9 240/9 271/7
hearing [11] 5/25 124/5 124/8 133/6
133/13 164/4 165/8 165/13 176/19
176/19 177/1
hearings [1] 70/4
hearsay [9] 59/6 59/7 59/8 59/9 59/13
59/15 101/18 229/24 241/18
hearsays [1] 226/5
heart [1] 7/3
Heather [2] 36/12 107/18
heavily [2] 79/24 94/23
held [14] 98/17 99/5 102/9 115/24 119/7
136/17 160/4 208/22 247/13 249/23
249/24 252/3 252/4 253/16
help [9] 89/7 91/6 140/14 145/1 147/1
161/13 161/19 224/4 237/16
helped [6] 89/4 201/3 203/2 207/8 246/14
250/9
helpful [1] 23/19
helping [3] 108/20 154/5 201/1
helps [1] 112/23
her [10] 27/23 28/4 36/12 109/12 123/18
128/10 149/6 202/13 218/2 272/5
here [98] 3/10 4/1 7/4 8/10 8/18 11/23
12/20 13/6 14/14 15/1 16/8 16/25 17/11
18/10 19/10 19/23 20/7 24/1 26/4 26/7
26/22 26/25 29/4 29/25 30/14 30/16
30/23 31/3 31/20 32/7 32/21 34/25 35/11
36/25 37/20 38/22 42/1 43/3 44/24 48/1
57/22 57/23 58/4 59/8 61/3 61/6 67/1
67/2 70/22 72/23 75/6 78/14 80/21 87/19
91/4 92/3 97/10 97/15 98/16 101/16

103/12 104/21 116/25 118/6 130/18
131/2 131/6 132/3 138/13 141/23 144/2
145/20 147/16 147/18 152/1 157/17
158/1 160/13 161/19 165/3 175/4 177/22
177/25 180/5 186/9 187/3 192/13 207/25
210/22 211/9 211/14 217/16 218/1
238/19 241/12 248/6 273/14 273/17
here's [7] 92/14 92/18 160/24 169/20
172/19 182/10 183/1
Hickman [1] 8/6
high [4] 97/8 106/16 189/18 241/23
higher [1] 221/16
highest [1] 97/3
highlight [2] 227/17 236/21
highlighted [4] 115/16 221/20 227/10
248/16
highlights [1] 171/20
highly [2] 137/1 137/1
him [44] 5/9 27/23 28/3 37/3 40/5 54/19
57/3 90/14 109/11 114/10 125/20 155/13
171/7 174/12 182/14 192/17 202/5
205/21 205/22 221/8 231/4 232/8 232/16
232/24 234/5 234/23 235/1 238/18
239/16 239/20 239/21 240/2 240/4 240/9
240/9 240/10 242/20 244/9 244/16
257/18 260/12 260/15 264/22 267/14
himself [4] 120/17 170/5 175/23 178/14
hired [8] 7/15 32/11 33/11 40/22 41/20
157/21 196/1 205/3
hiring [1] 113/12
his [73] 5/7 8/8 17/14 17/17 34/25 35/1
39/24 54/17 54/21 55/10 65/9 90/12
106/15 110/17 111/8 114/8 114/22
115/13 119/21 120/10 120/25 123/20
129/25 143/8 143/18 152/10 156/24
168/23 170/8 170/20 171/16 172/15
173/21 173/25 174/5 177/12 177/19
178/7 178/19 182/15 185/18 185/24
186/17 186/24 187/10 187/22 188/23
188/24 189/3 202/13 205/19 205/22
207/3 239/13 239/25 240/2 240/5 240/6
243/1 247/8 257/19 259/4 259/12 262/12
262/18 262/21 264/12 264/20 264/23
267/11 267/23 269/16 272/5
historical [6] 214/11 214/15 235/23 248/9
266/25 272/10
historically [1] 236/14
history [4] 93/9 102/3 124/7 153/22
hold [6] 18/11 31/21 76/20 189/19 225/14
233/4
holder [2] 72/18 82/6
holders [3] 72/19 73/19 159/5
home [1] 193/12
honest [1] 12/6
Honor [198] 2/2 12/2 15/2 16/2 2/22 3/1 3/2
3/7 3/16 3/24 4/4 4/9 4/17 5/17 5/20 7/2
8/16 9/10 11/15 12/6 12/23 15/4 15/11
15/14 16/2 18/10 18/16 18/25 20/20
21/18 22/7 22/12 23/16 23/20 23/21 26/9
30/15 30/23 32/18 34/5 36/4 38/21 39/12
40/10 47/18 48/2 50/6 50/8 50/12 50/18
50/23 51/1 53/2 53/7 53/11 54/3 55/1
55/17 56/6 56/14 57/24 58/21 58/22 59/3
59/19 59/21 60/4 61/15 64/2 64/11 64/19
66/21 69/14 69/23 70/4 70/4 70/14 78/12
78/25 79/16 87/5 89/9 97/23 98/4 99/11
100/4 101/20 103/12 104/8 104/14
104/19 104/25 105/20 106/15 126/19
126/21 126/22 127/19 127/23 127/25
128/10 128/13 129/4 129/8 130/18 132/1
132/11 132/13 133/18 133/25 136/9
141/6 144/24 152/17 157/5 161/2 161/21
161/25 162/1 162/7 162/11 163/6 163/21

164/14 164/19 165/3 175/13 175/18
191/6 191/10 191/15 191/25 192/14
193/1 198/9 203/19 203/23 204/11
204/16 205/9 206/1 206/17 208/8 213/13
213/15 214/7 214/11 214/23 215/19
216/9 220/3 220/13 230/4 231/14 232/10
233/1 233/7 233/13 237/21 239/6 239/7
239/22 240/10 241/15 241/21 242/7
242/9 242/13 242/24 243/5 256/7 257/10
257/16 258/7 258/12 258/16 258/21
259/25 260/5 261/11 261/25 262/9 263/4
263/10 263/11 263/24 264/9 264/25
265/11 266/23 268/20 269/3 269/6 270/2
270/21 271/6 272/16 272/21 273/2
Honor's [2] 97/19 100/21
hoping [1] 29/6
hour [2] 101/8 123/25
hours [12] 11/21 19/21 20/9 54/22 61/6
159/18 209/2 248/20 250/1 252/20
253/21 254/5
housekeeping [3] 131/16 132/3 273/3
houses [2] 100/22 109/24
Houston [1] 100/5
how [78] 17/17 19/7 20/4 25/14 32/7 32/7
41/16 42/19 48/11 63/21 66/7 67/5 76/24
77/1 80/23 81/24 83/15 87/12 87/15
89/12 100/20 102/4 105/10 105/11 112/1
112/4 112/8 119/19 125/5 130/3 136/2
137/24 137/24 137/25 148/4 161/17
165/12 166/2 166/3 181/20 182/16
184/17 187/5 193/20 194/17 200/15
200/24 202/5 205/19 207/3 208/24 209/1
210/22 214/11 217/14 218/11 227/14
228/21 228/24 230/16 235/18 236/20
236/21 237/24 238/16 243/23 248/18
249/25 252/18 253/3 253/19 254/3
256/15 256/20 256/21 258/10 261/9
262/25
Howard [1] 109/18
Howell [1] 3/5
however [10] 52/1 74/11 85/13 104/14
138/9 146/11 178/9 230/3 245/1 257/20
huge [5] 74/20 77/19 78/5 186/5 189/10
huh [1] 12/12
hundred [4] 99/2 132/5 173/17 208/25
hype [1] 75/5
hypo [3] 13/24 48/17 48/20
hypothetical [2] 16/12 120/7

## I

I'll [34] 45/2 50/8 79/13 81/11 81/14
83/14 91/10 103/23 115/7 130/2 132/20
132/23 136/25 145/1 147/14 162/9
164/20 168/1 168/5 170/23 177/4 185/22
207/6 208/12 214/19 228/17 238/18
242/22 243/4 256/7 258/22 262/18 265/5
272/14
I'm [106] 2/22 3/21 4/25 6/1 6/3 10/13
13/25 14/13 20/20 21/21 22/8 22/10
32/18 36/9 39/4 43/20 55/16 59/4 60/5
60/13 61/4 61/5 61/8 61/8 67/5 67/11
68/19 76/17 79/4 79/20 85/6 89/15 90/17
91/3 92/14 98/2 98/3 100/8 103/24
104/20 109/9 114/2 127/7 130/13 130/14
131/23 141/22 144/23 144/23 144/24
145/19 147/6 147/15 147/17 147/18
150/6 150/12 152/1 152/10 161/14 165/9
165/14 167/16 171/19 175/14 175/18
176/21 177/23 180/4 182/16 183/16
191/21 194/2 194/11 198/8 203/23
203/24 203/25 205/18 205/20 205/22
221/5 221/7 227/21 227/21 231/9 232/14
232/15 233/19 235/17 235/18 238/3

I'm... [14] 240/15 242/20 242/21 244/3
255/23 257/1 257/18 261/19 261/22
261/23 262/9 263/7 263/21 272/12
I've [9] 74/9 81/8 160/23 165/2 174/10
180/19 180/23 185/13 245/24
idea [2] 67/22 161/1
identification [3] 202/17 264/15 264/16
identified [8] 7/2 22/4 25/21 52/19 60/23
132/8 165/4 270/5
identifies [1] 117/25
identify [6] 20/23 21/1 52/21 172/3
203/15 203/21
identifying [2] 25/9 184/16
IE [1] 196/21
Illinois [1] 193/13
immediate [1] 137/22
immediately [2] 160/21 177/1
immunity [1] 41/8
immunize [1] 168/16
impact [3] 51/2 112/8 119/16
impacted [1] 181/23
impair [11] 77/13 77/16 77/21 77/23 88/4
116/3 180/17 180/25 181/5 181/9 184/17
impaired [2] 80/6 139/11
impairing [1] 156/13
impairment [4] 78/1 78/2 88/12 88/23
impasse [1] 35/18
implement [1] 67/20 68/25 72/1 73/11
implemented [4] 83/23 163/12 163/19
173/22
implicates [1] 85/5
implications [1] 140/19
important [19] 54/16 63/16 76/14 96/9
126/25 127/10 128/20 137/14 146/2
148/2 148/3 150/6 150/15 151/2 164/5
179/12 179/23 206/20 256/5
importantly [3] 63/12 101/19 188/2
impossible [3] 5/4 19/15 160/21
impracticability [20] 72/6 72/7 73/20
73/21 74/2 75/1 75/2 76/7 76/9 78/7 82/2
82/3 86/6 184/3 184/10 184/15 184/23
184/24 185/7 185/9
impracticable [14] 74/20 77/3 77/20
78/11 81/16 82/5 82/6 82/10 103/14
108/11 156/16 166/20 178/3 183/23
impractical [6] 118/16 121/8 158/21
159/9 162/19 164/9
impracticality [4] 146/17 158/4 159/5
178/1
impress [1] 7/15
impressed [1] 101/6
impressions [1] 28/3
improper [4] 99/22 204/5 228/12 244/6
improperly [3] 21/15 21/21 52/16
improved [2] 247/5 259/15
improvement [1] 135/9
inadmissible [1] 101/18
inadvertent [1] 131/24
inappropriate [2] 70/12 103/8
inception [1] 110/23
incident [1] 85/15
include [9] 78/14 91/9 94/8 135/6 154/6
226/2 226/3 226/3 228/10
included [13] 28/17 28/17 28/18 66/1
68/18 88/23 91/23 110/18 137/15 163/24
190/3 215/8 248/6
includes [1] 68/4 69/20 107/12 154/3
including [16] 54/12 68/5 68/6 68/7 68/7
82/24 126/2 129/19 137/2 148/22 186/3
195/22 224/17 225/1 226/10 264/5
inclusion [5] 49/8 97/22 98/21 128/17
130/17
income [6] 211/17 223/23 236/6 236/8
241/7 272/6
incomplete [3] 124/25 125/2 185/22
inconsistent [3] 39/2 84/9 124/2
incorrect [1] 46/5
increase [1] 268/1
increased [2] 101/10 229/9
increases [1] 237/8
increasing [1] 267/16
incremental [1] 65/22
indeed [3] 187/15 188/6 190/1
indentured [1] 72/16
independent [1] 143/6
India [1] 194/9
indicate [7] 34/8 40/6 45/17 63/18 97/24
105/10 114/20
indicated [10] 23/8 30/2 34/6 34/18 55/18
57/25 59/19 63/17 101/20 228/14
indicates [2] 81/9 185/5
indicating [4] 19/9 21/1 97/8 152/4
indication [1] 11/17
indicative [1] 91/21
indirect [2] 175/3 177/18
individual [6] 30/10 72/16 95/5 95/6
237/15 253/8
individuals [1] 181/21
indulgence [1] 5/21
ineffective [1] 167/12
influx [1] 190/22
inform [1] 148/4
information [47] 25/10 25/16 27/1 33/4
46/15 79/3 89/10 89/15 89/23 90/2 90/3
116/25 117/3 117/5 117/8 119/16 121/11
124/25 140/11 154/22 155/21 162/23
163/1 181/19 182/24 198/6 200/1 200/4
200/5 200/11 205/24 207/10 211/2 211/3
214/15 214/17 235/24 241/16 248/11
252/24 264/5 264/6 265/22 266/8 270/19
272/9 272/10
informational [9] 116/19 119/11 120/8
120/12 120/21 120/24 136/4 155/15
182/22
informed [2] 86/9 151/13
informing [1] 123/18
initial [4] 69/10 149/10 162/16 189/1
initiative [2] 102/23 113/14
initiatives [4] 134/20 135/8 141/20 264/2
injunction [1] 117/15 123/15 133/7
133/13
injury [1] 122/7
inning [5] 66/23 108/12 123/7 124/5
215/17
inquire [2] 15/18 113/12
inquired [1] 140/17
inquiry [3] 99/20 101/14 103/13
insert [1] 238/19
inserted [1] 108/20
insofar [1] 32/14 35/9
insolvency [11] 61/5 61/11 61/22 63/10
64/2 64/22 66/2 67/9 67/15 67/24 166/8
insolvent [2] 61/14 64/1
instance [4] 12/9 44/13 86/15 99/24
instances [4] 80/4 85/3 89/17 89/19
instantaneously [1] 1/7
instead [5] 74/10 121/24 156/3 171/15
181/25
institute [1] 126/4 190/15
institution [1] 107/13
instruction [1] 160/5
instructive [3] 87/20 91/6 99/16
insulate [1] 98/21 107/3
insulated [1] 110/9
insulating [1] 110/19
insurance [1] 140/1
insurer [1] 73/15
insurers [8] 72/21 72/21 72/21 87/4 252/6
252/11 253/9 253/12
integral [1] 82/13
intend [2] 11/2 180/25
intended [9] 8/4 97/23 116/3 168/16
179/9 179/10 180/17 183/16 185/6
intending [1] 172/17
intends [6] 46/8 77/13 77/16 181/5 181/9
184/17
intent [16] 8/18 9/4 49/7 50/20 61/1 72/1
86/14 98/9 101/5 115/13 128/3 128/5
128/9 128/13 167/8 167/17
intention [1] 117/18 149/18
intentional [1] 38/25
intentionally [2] 46/14 177/17
intentions [1] 168/4
inter [1] 233/20
interactions [1] 95/4
interest [17] 16/19 17/11 21/16 21/18
24/8 26/5 26/13 26/24 27/3 27/6 35/3
35/6 51/6 51/15 72/24 246/17 250/20
interested [4] 108/19 111/17 152/5
161/14
interesting [3] 89/11 119/11 161/5
Interestingly [1] 149/10
interests [1] 71/7
internal [10] 27/18 31/11 31/11 31/13
31/22 32/6 36/20 49/21 49/22 199/6
internally [2] 49/3 184/2
interpose [1] 203/20
interpretation [2] 95/10 160/13
interpreted [1] 55/14
interpreting [1] 100/11
interrupt [3] 108/21 219/23 262/10
intervention [1] 35/23
interview [5] 14/2 111/16 115/12 115/16
202/1
interviewing [1] 8/7
intimated [2] 61/15 86/8
introduce [2] 2/17 3/9
introduced [2] 109/23 203/24
introducing [1] 46/22
invade [1] 115/14
investigate [3] 29/17 37/7 37/8
investment [1] 194/22
inviolable [1] 28/7
invitation [3] 161/23 161/24 162/1
invite [1] 155/14
invited [4] 26/17 140/7 159/16 160/3
invoke [1] 106/25
invoked [3] 19/12 20/1 35/10
involve [6] 76/25 127/16 271/19 271/25
272/3 272/14
involved [21] 8/9 11/22 13/6 16/8 17/11
21/5 21/12 25/10 28/19 28/21 37/20 38/4
65/22 65/23 72/22 76/21 84/17 95/15
98/14 271/20 272/2
involves [2] 6/19 21/6
involving [3] 17/6 25/10 155/7
irresponsible [2] 84/6 124/10
Irwin [8] 36/25 37/6 39/24 57/3 57/10
58/3 58/19 273/5
is [754]
Isle [4] 65/18 65/18 65/21 65/24
isn't [11] 13/2 27/4 47/21 70/21 90/16
97/13 97/24 174/14 189/8 218/3 271/13
issuance [1] 213/3
issue [54] 6/15 15/21 16/9 16/20 24/1
24/10 26/4 31/20 32/21 36/17 37/22 42/7
49/8 49/10 49/14 50/19 50/23 50/25 51/4

**I**

issue... [35]  55/22 56/14 59/20 61/5
68/16 97/21 102/13 104/12 127/5 127/13
127/19 128/3 128/20 130/4 130/18 136/5
136/14 138/18 142/15 142/15 142/20
146/14 148/3 157/12 158/5 158/23 159/4
161/19 170/21 174/17 178/1 180/7 256/2
265/1 272/4
issued [2]  53/13 186/10
issues [44]  5/25 6/2 6/12 7/3 7/4 23/23
27/11 34/12 38/25 45/11 49/16 53/9 60/7
60/21 70/13 71/15 71/16 72/8 72/16
73/13 73/18 73/25 92/3 93/7 94/4 105/6
107/21 108/4 112/1 126/23 127/6 144/4
148/4 155/7 156/3 164/1 165/4 165/11
165/13 165/14 175/21 177/23 187/7
211/6
it [516]
it's [150]  8/19 9/19 11/19 13/12 14/10
14/21 15/11 20/9 25/20 26/11 26/20 29/7
32/2 32/19 35/14 36/16 40/24 42/15
42/21 43/2 44/3 44/10 46/6 49/3 49/23
49/25 49/25 50/1 50/22 55/9 59/16 63/8
63/16 64/1 65/8 66/6 66/22 69/13 70/18
71/6 71/11 72/11 72/15 74/10 74/18
75/18 76/16 77/25 78/20 79/2 79/16 82/1
83/5 85/15 85/17 85/19 87/22 89/19
89/24 90/12 92/5 92/6 92/11 95/16 96/9
96/21 96/22 97/25 98/1 98/11 98/13
98/15 98/25 99/2 99/16 101/14 103/19
105/17 113/23 114/1 119/24 120/6
120/24 126/13 127/9 127/15 129/12
130/8 130/21 131/10 132/14 135/6 136/1
138/23 147/17 148/2 148/3 148/23
150/15 152/2 156/9 159/8 164/9 164/15
165/18 165/18 165/24 166/10 168/21
170/16 170/18 174/2 174/19 183/23
195/3 195/24 197/14 197/19 201/12
202/12 202/17 202/24 205/9 206/3 206/3
206/22 215/14 219/3 220/14 220/23
223/20 230/18 233/7 242/14 242/17
248/2 256/4 257/17 261/18 263/5 263/11
263/19 269/9 269/20 270/22 271/3
271/11 271/15 272/8 273/8
item [5]  94/5 212/11 215/9 222/23 272/5
items [7]  64/10 143/7 212/9 223/9 224/4
235/21 258/17
its [88]  5/21 6/4 9/8 16/13 16/25 24/24
35/17 54/7 61/20 63/14 68/12 69/10 72/3
75/5 77/17 89/14 94/12 96/14 96/15
103/18 106/22 111/12 112/11 115/11
117/19 117/22 118/4 121/13 124/22
124/23 126/2 126/6 130/13 134/21
134/23 137/19 137/19 137/23 138/3
138/10 138/13 139/4 139/9 140/16
140/24 146/12 150/11 150/20 151/14
155/20 156/4 157/15 157/18 164/14
165/21 165/23 166/23 168/13 169/6
186/18 186/19 187/14 188/3 188/15
188/20 189/25 191/8 198/13 199/16
200/20 202/2 209/23 209/24 218/21
220/5 220/7 222/12 225/1 225/12 241/1
254/20 257/25 260/6 260/7 260/8 262/24
263/25 264/4
itself [41]  7/14 25/18 27/4 29/10 29/15
30/12 30/21 32/10 35/12 41/7 42/10
46/19 48/3 59/8 61/23 66/23 69/12 70/25
85/24 87/19 127/20 134/3 135/16 141/10
149/21 158/17 163/6 163/7 166/6 168/19
168/25 170/3 176/3 176/6 176/15 182/6
186/15 213/19 223/14 242/25 248/18
IX [6]  124/17 139/17 139/22 142/16

**J**

Jack [2]  2/18 203/24
January [8]  106/18 111/10 112/10 133/24
127/25 149/9 169/10 170/18
January 20 [1]  133/24
January 2011 [1]  106/18
January 29 [1]  112/10
January 31 [1]  170/18
JDRD0000295 [1]  113/24
Jeff [1]  112/6
Jennifer [2]  3/17 105/20
Joans [1]  112/10
job [1]  194/14
jobs [1]  28/10
join [3]  18/25 19/1 161/21
joined [3]  193/21 194/16 194/18
joint [4]  4/21 15/23 55/22 164/23
Jones [65]  2/13 2/14 4/16 6/7 6/14 6/19
6/24 7/10 7/13 8/10 10/14 12/19 27/15
27/18 28/21 29/5 29/8 29/14 29/14 31/5
32/5 32/6 33/2 33/9 36/6 36/12 36/13
42/2 42/22 43/2 45/10 45/16 48/4 48/12
48/19 49/2 51/22 84/8 107/18 111/16
113/11 115/3 133/23 138/14 138/22
144/11 144/12 152/4 152/12 156/1
168/18 169/3 169/5 169/9 169/14 169/19
170/4 170/7 171/1 176/3 176/6 182/21
183/2 192/15 202/1
judge [13]  23/4 84/20 99/1 99/12 133/5
157/17 191/20 238/15 256/1 257/18
267/4 269/11 269/22
judgment [4]  99/21 117/13 124/14 124/16
judicial [1]  98/2
judiciary [1]  98/8
Julian [1]  194/20
Julie [1]  4/7
July [65]  83/4 83/10 83/12 83/13 94/2
94/11 94/21 117/10 117/16 117/19
117/23 117/25 118/4 118/21 118/23
118/25 119/8 119/14 120/11 120/11
120/14 120/23 121/5 121/9 122/12 122/12
123/12 123/13 123/23 124/13 125/17
133/1 133/3 133/7 133/9 133/11 133/14
138/14 140/6 141/17 142/24 142/25
143/12 143/13 143/13 143/14 144/14
151/23 151/23 152/9 155/17 156/4 158/9
158/12 183/3 183/20 183/22 183/24
210/16 253/11 255/5 255/22 256/11
256/11 256/15
July 1 [1]  210/16
July 10 [2]  120/14 140/6
July 10th [5]  118/4 119/14 121/5 151/23
183/24
July 12 [1]  121/9
July 12th [1]  151/23
July 15 [2]  83/4 122/1
July 15th [2]  83/13 141/17
July 16 [2]  122/12 152/9
July 16th [3]  142/24 143/12 143/13
July 17th [2]  123/13 183/3
July 18 [2]  156/4 256/15
July 18th [7]  118/23 120/11 123/23
142/25 143/14 158/9 255/22
July 19 [1]  124/13
July 19th [6]  117/23 117/25 118/25
123/12 133/11 158/12
July 22nd [2]  133/7 133/14
July 23 [1]  117/10
July 3rd [3]  133/1 133/3 133/9
July 8 [3]  117/19 120/23 125/17
July 8th [3]  118/21 183/20 183/22

**K**

keep [9]  42/18 62/14 72/9 84/11 84/12
85/1 132/5 148/24 199/19
Ken [2]  107/19 108/16
kept [3]  62/3 86/14 199/15

July 9 [3]  120/11 253/11 255/5
July 9th [2]  119/8 138/14
jump [1]  177/10
June [90]  6/25 8/25 39/22 41/21 47/24
62/15 66/6 68/2 68/3 69/7 82/12 82/20
83/11 83/13 93/4 93/5 94/2 94/11 94/21
94/23 97/2 97/2 107/20 115/24 116/11
116/20 117/5 117/7 118/15 121/2 135/1
135/20 142/5 142/13 150/5 150/19
150/19 151/3 151/20 152/9 155/16 158/8
159/14 160/18 172/15 172/24 173/16
178/8 178/14 178/21 179/8 181/20
181/22 182/5 182/14 182/21 183/1
184/20 188/8 195/16 208/16 208/19
209/5 209/12 210/16 210/19 210/19
214/3 214/22 215/20 216/5 226/15
228/10 234/19 245/9 245/15 246/20
247/6 247/13 248/3 251/24 251/25
252/24 253/6 254/20 256/18 256/18
259/17 260/2 268/20 268/22 269/2
June 13 [4]  150/19 214/3 214/22 216/5
June 13th [1]  93/4
June 14 [19]  83/13 115/24 158/8 159/14
160/18 172/15 172/24 173/16 181/20
181/22 182/5 182/14 184/20 208/16
209/5 209/12 234/19 245/9 245/15
June 14th [25]  62/15 66/6 68/2 68/3 69/7
82/12 82/20 93/5 97/2 97/2 121/2 135/1
135/20 142/5 142/13 150/19 151/20
178/8 178/14 178/21 179/8 183/1 254/20
268/20 269/2
June 15 [1]  259/17
June 15th [1]  260/2
June 20 [3]  116/11 117/5 182/21
June 2012 [1]  47/24
June 2013 [1]  210/19
June 20th [3]  247/13 248/3 252/24
June 21st [1]  251/24
June 25th [2]  251/25 253/6
June 27 [1]  116/20
June 27th [1]  117/7
June 30 [3]  151/3 226/15 247/6
June 30th [1]  210/16
June 5 [1]  39/22
June 5th [1]  6/25
jurisdiction [1]  151/1
just [114]  9/23 10/13 17/3 19/3 19/4
19/17 20/8 21/17 21/18 27/4 27/9 28/13
28/22 36/3 36/4 37/22 38/17 42/17 48/18
49/2 54/9 54/20 57/18 58/10 58/20 59/15
62/3 74/9 76/14 77/25 80/17 84/15 87/23
88/14 91/6 92/9 92/20 94/15 95/8 97/13
99/2 101/25 104/10 104/25 105/10
106/20 106/23 107/1 109/17 109/24
116/21 120/9 121/24 122/11 125/17
126/17 129/6 132/5 132/21 132/23
133/20 135/5 135/16 136/21 136/25
137/23 147/16 151/5 153/23 155/2 158/1
162/9 163/6 163/15 170/23 172/4 177/4
179/10 179/17 185/7 193/25 196/17
200/14 201/9 203/19 206/1 208/3 208/12
211/12 211/18 212/17 216/15 219/8
219/8 219/24 220/18 220/19 221/2 224/9
225/3 231/21 232/24 233/11 234/6
234/10 236/25 238/4 248/4 256/4 261/12
261/14 263/3 269/23 273/2
justice [2]  99/13 127/25

**K**

Kevyn [16]  42/12 90/7 111/20 113/12
114/5 114/10 114/25 115/6 118/8 119/12
168/24 201/24 201/25 230/25 234/20
247/10
key [10]  12/12 20/6 21/2 23/5 40/19
79/14 95/9 118/25 168/6 183/21
kidding [1]  88/14
kind [13]  19/6 23/24 24/25 40/25 69/3
70/16 74/3 75/3 83/8 93/19 130/9 165/25
199/8
kinds [5]  82/9 94/25 95/3 95/3 100/23
King [3]  3/20 3/22 3/23
kit [1]  150/11
knee [1]  144/6
knew [16]  8/22 11/2 28/14 41/1 41/1 87/8
109/2 111/9 122/18 122/21 129/14
142/14 142/15 142/19 232/23 243/23
knitting [1]  144/2
know [79]  8/19 9/1 10/1 10/18 10/19 11/5
12/25 14/2 15/5 17/16 18/12 18/19 21/20
24/9 25/5 35/15 38/13 38/15 39/17 40/5
41/16 41/23 42/11 43/8 45/20 45/21
45/21 45/22 45/23 48/7 48/19 53/16 58/4
58/5 70/24 91/15 101/14 109/9 125/9
125/14 126/1 126/5 126/6 127/23 129/15
133/12 135/14 137/15 139/5 141/3
142/10 142/12 142/21 142/25 143/9
143/18 151/15 168/7 168/13 168/24
181/18 182/2 182/7 182/9 183/10 187/4
187/13 187/23 192/25 206/19 211/9
211/11 214/14 219/16 222/6 230/1
233/10 245/19 246/19
knowledge [7]  9/3 42/24 66/8 111/5
177/12 189/3 254/16
known [1]  148/10
knows [5]  10/8 64/2 84/15 136/9 188/4

**L**

labor [26]  74/15 84/18 86/24 87/8 87/17
134/6 136/23 137/10 137/25 138/20
148/4 148/12 148/19 148/24 150/11
150/14 159/7 159/12 160/3 160/8 160/17
160/23 161/11 161/18 162/13 162/15
labor/retiree [1]  87/8
lack [7]  58/11 144/19 144/19 144/21
145/2 244/21 268/4
laid [2]  143/8 219/4
language [3]  99/8 111/2 259/23
large [5]  21/7 22/12 93/20 155/25 188/17
largely [1]  175/19
larger [2]  200/18 211/10
last [24]  42/21 43/7 49/18 53/15 84/16
94/22 94/24 96/5 96/8 97/18 101/20
103/5 118/24 142/22 152/24 185/5 188/7
206/25 209/1 226/5 248/19 249/25
253/19 270/2
lasted [1]  253/20
lastly [3]  47/1 67/10 121/4
lasts [1]  159/17
late [8]  16/1 16/2 16/3 28/15 34/6 56/4
169/10 256/18
later [26]  32/9 45/14 45/14 45/15 78/20
81/14 93/10 93/11 106/2 106/21 107/1
109/25 117/10 121/25 122/11 123/4
124/9 124/11 133/10 141/17 142/7 143/2
152/9 168/1 211/7 242/9
latter [1]  181/2
launch [2]  135/20 141/11
launched [2]  142/4 142/14
Lauren [4]  203/8 211/11 212/16 227/19
law [75]  9/16 10/2 11/22 12/2 13/1 17/12

28/19 29/4 30/11 41/3 41/5 44/16 47/2
51/1 54/4 68/9 68/11 70/1 70/8 70/11
70/18 74/24 74/25 85/6 99/7 99/14 99/18
101/6 105/15 106/21 108/19 110/6
111/17 113/16 113/18 115/22 115/23
127/1 127/12 127/16 127/18 127/21
128/6 128/25 130/9 130/11 130/14
130/15 142/18 148/4 148/9 150/14
161/11 161/11 161/17 161/18 166/4
166/4 167/5 168/9 168/10 168/16 168/18
170/10 172/4 174/13 174/16 174/18
175/9 176/1 176/3 176/10 179/14 184/23
202/1
lawsuit [3]  123/5 133/1 133/2
lawsuits [6]  30/10 45/23 117/11 124/12
141/7 155/6
lawyer [11]  12/4 12/15 20/5 27/22 28/8
32/23 48/4 48/19 114/17 168/25 169/3
lawyers [4]  8/4 27/23 31/5 48/12
lay [4]  143/14 204/5 228/12 238/16
laying [1]  251/8
lays [1]  118/9
lead [4]  66/5 99/3 103/16 120/4
leaders [3]  154/10 154/12 156/19
leadership [2]  154/2 154/22
leading [7]  85/19 98/10 144/13 205/8
230/3 269/19 269/22
Lear [1]  245/2
learn [3]  64/11 199/3 208/18
learned [4]  101/6 201/19 201/22 208/14
leased [1]  65/19
least [31]  6/20 13/21 21/6 23/2 24/10
25/19 42/3 61/15 61/22 63/4 64/4 71/17
71/17 86/15 89/12 93/8 94/20 103/17
126/24 136/3 136/13 137/3 182/4 186/23
200/1 239/16 242/15 252/15 252/20
254/14 263/14
leastly [1]  232/23
leave [4]  22/12 242/8 272/18 273/16
leaving [1]  144/11
lectern [2]  105/24 126/16
led [1]  77/6
ledge [2]  100/1 101/23
left [8]  68/1 97/9 103/6 194/14 251/13
251/15 253/5 253/7
legacy [14]  96/16 164/7 235/16 236/24
243/14 245/2 248/9 249/5 250/11 265/21
265/23 266/5 267/15 267/20
legal [40]  3/3 27/12 27/22 27/22 27/24
28/5 28/10 29/9 29/18 33/9 34/25 35/1
35/8 35/9 37/19 45/10 45/25 57/23 60/7
60/15 100/15 106/3 115/3 126/23 127/6
138/4 138/8 140/19 141/25 142/15
143/24 143/25 144/4 146/22 154/9
160/10 160/19 165/10 165/13 180/3
legally [3]  17/19 103/9 142/1
legislation [8]  98/18 98/19 99/8 99/17
101/12 106/22 107/11 110/21
legislative [5]  17/14 99/6 99/23 100/17
128/5
legislators [3]  60/25 100/22 101/16
legislature [3]  109/23 128/5 155/6
legitimate [1]  98/1
length [2]  98/9 205/11
lengthy [1]  55/3 173/17
Lennox [4]  36/12 47/24 52/10 107/18
less [8]  9/23 73/25 110/12 135/4 171/24
219/6 220/6 224/14
let [30]  6/13 15/20 19/18 24/9 25/5 50/15
50/16 56/19 92/8 94/12 126/17 201/18
203/6 208/11 209/8 210/4 211/15 216/19
218/25 230/5 234/16 239/19 241/25
245/13 246/5 251/2 253/11 256/10 263/3

273/9
let's [29]  5/14 13/23 37/5 75/5 104/10
130/25 131/10 209/14 210/21 211/12
212/16 216/2 218/25 222/21 224/1
227/19 231/18 235/8 247/12 248/4
248/18 249/17 251/20 255/22 257/2
263/2 264/14 266/3 266/10
letter [33]  47/2 79/7 79/8 87/1 87/3 87/3
116/21 116/23 116/25 119/3 121/10
121/24 122/13 122/14 122/17 136/6
136/6 138/19 140/4 143/3 143/8 143/13
143/14 143/18 143/20 152/2 152/10
155/13 160/16 164/24 182/21 183/2
195/24
letters [2]  119/1 155/14
level [8]  77/5 125/6 125/20 158/15 173/9
220/11 236/9 237/7
levels [6]  29/19 64/9 73/15 173/11 237/3
255/9
leverage [3]  112/16 112/22 134/4
Levine [2]  2/17 104/9 104/20 157/6
Levine's [1]  204/1
liabilities [15]  96/16 108/8 116/6 126/6
126/7 164/7 186/2 186/20 187/22 209/23
235/16 239/2 249/5 250/12 265/21
liability [14]  58/14 182/8 186/6 187/1
187/2 187/5 187/14 187/24 188/5 188/8
189/5 189/11 189/16 190/6
liberty [1]  195/9
library [1]  226/3
lien [2]  201/9 217/22
lieutenants [3]  145/9 150/22 151/9
lifted [1]  170/2
light [2]  17/10 150/16
Lightsey [3]  153/14 153/20 155/18
like [60]  3/9 4/20 9/13 11/9 15/17 18/20
18/25 19/23 29/5 30/18 32/2 32/20 34/3
34/3 34/23 39/15 49/16 50/2 50/5 69/19
72/11 87/10 87/11 87/12 92/22 96/19
96/25 97/12 99/14 115/9 125/12 127/5
127/7 131/7 133/22 134/10 135/10
137/11 137/23 141/14 144/9 157/22
165/25 186/5 198/3 199/24 200/2 203/20
206/9 211/5 214/18 223/15 236/12 264/7
269/7 269/14 269/17 270/3 270/6
271/21
likelihood [1]  122/23
likely [1]  47/8
liken [1]  163/4
likewise [1]  153/18
limine [2]  4/20 4/25
limit [7]  19/21 21/3 22/17 23/2 55/11
101/8 101/9
limitation [1]  22/24
limitations [1]  91/23
limited [7]  46/13 54/22 56/23 58/5 58/6
136/1 143/5
line [30]  38/15 64/10 73/17 79/6 79/7
79/12 79/18 80/12 81/9 81/25 82/4
138/12 157/16 158/17 162/15 212/2
215/9 215/10 215/11 216/20 218/2
223/12 224/6 224/23 226/5 226/18
235/20 258/17 261/17 261/18
line's [1]  159/20
lines [1]  223/7
linger [1]  131/5
link [1]  83/23
linking [1]  34/11
Lippitt [1]  4/3
liquidate [2]  66/19 70/22
liquidation [1]  71/1
liquidity [21]  62/18 62/24 112/8 194/4
196/3 196/4 203/3 218/22 218/22 220/1

# L

liquidity... [11]  220/13 222/2 222/12 231/8
231/15 234/20 234/24 245/20 259/9
259/12 259/14
list [6]  59/24 72/12 94/6 94/6 104/3 108/3
listed [1]  111/23
listen [1]  82/21
listening [1]  256/6
lists [1]  46/22
literally [2]  26/15 26/15
litigated [1]  15/22
litigation [27]  9/9 9/12 10/10 11/14 13/13
30/2 30/4 30/5 40/14 40/23 41/7 41/11
41/15 41/17 42/4 44/10 45/8 45/12 45/17
45/19 45/19 46/15 66/16 66/17 176/17
195/22 195/23
little [14]  25/8 65/3 73/7 91/4 98/24 99/16
104/25 147/16 161/1 163/2 170/16
179/20 179/21 217/22
live [3]  111/23 141/23 193/13
lives [1]  101/11
LLP [2]  3/8 133/18
loading [1]  136/18
lobbied [1]  155/5
local [1]  114/24
locked [1]  273/13
log [6]  19/24 24/25 25/9 25/17 25/18
25/19
logical [1]  196/25
logically [1]  99/19
logs [7]  19/23 21/1 25/2 37/24 37/25 38/8
38/10
long [26]  20/4 31/25 47/10 81/8 92/5
95/22 101/11 105/10 134/24 148/6
150/17 153/21 163/1 193/20 194/17
201/1 209/1 209/23 235/15 239/2 248/18
249/25 252/18 253/19 254/3 255/21
long-term [5]  134/24 201/1 209/23
235/15 239/2
longer [3]  64/4 99/16 196/15
look [32]  22/3 22/4 23/4 27/3 50/2 50/5
51/16 52/12 69/12 69/18 79/18 98/5
100/5 127/10 128/4 191/9 196/12 196/25
199/2 207/12 208/11 210/21 213/23
227/19 236/11 237/15 242/21 244/23
248/7 250/6 251/20 269/17
looked [17]  15/4 25/19 197/24 198/7
199/5 199/5 199/10 199/14 200/5 200/8
207/10 214/10 214/18 235/22 235/23
235/25 236/12
looking [11]  9/5 57/8 58/12 76/11 137/20
137/23 147/15 147/18 199/20 214/15
219/16
looks [3]  92/22 99/14 158/19
lot [26]  5/22 7/13 7/14 15/15 27/9 49/19
49/21 61/16 73/20 76/11 76/15 79/3 81/13
84/10 85/2 93/24 93/24 97/18 109/8
119/18 158/7 165/7 240/18 253/1 254/1
270/23
lots [5]  28/20 45/6 79/25 93/1 93/1
love [1]  89/7
low [2]  97/8 112/4
Lowenstein [4]  2/18 104/20 157/6 203/25
lower [3]  218/19 222/18 222/19
lunch [4]  105/18 131/1 131/6 131/13
ly [1]  106/17
Lynn [2]  4/10 126/13

# M

ma'am [1]  94/14
MacKenzie [2]  65/1 157/23
made [60]  8/25 18/3 18/13 19/7 19/8

---

19/19 27/17 35/12 45/3 49/6 50/14 62/17
63/23 66/17 79/23 84/4 86/13 86/14
86/16 95/5 116/7 117/6 118/24 122/16
126/8 160/2 165/24 167/25 168/8 169/5
169/10 171/25 172/15 172/16 173/12
173/15 174/10 177/9 179/4 185/19 200/6
213/18 218/13 218/18 218/20 229/18
229/18 230/8 230/10 230/13 240/14
254/19 255/1 257/23 260/20 261/4 261/5
267/24 270/10 272/10
Madison [1]  205/10
magnitude [8]  231/1 231/7 231/7 231/9
258/6 262/8 262/23 268/1
maintain [3]  65/24 131/3 131/8
maintained [2]  156/19 190/14
maintaining [1]  52/9
maintenance [1]  65/20
major [5]  42/3 82/3 84/17 87/4 170/6
majorities [1]  73/8
majority [6]  128/2 156/8 156/12 186/8
197/25 256/23
make [51]  6/3 20/11 22/8 31/18 43/7 45/5
47/9 47/25 48/23 53/21 58/20 60/12 73/7
75/15 75/19 80/16 84/11 84/13 99/17
104/12 104/15 104/24 111/3 111/15
138/6 140/20 156/11 158/7 166/12 173/1
175/19 186/15 187/25 201/13 217/22
220/10 239/9 240/15 242/18 243/23
243/23 246/25 249/5 251/3 251/6 254/17
254/22 259/16 261/14 261/16 263/25
makers [1]  8/18
makes [14]  46/17 63/20 71/6 75/12
100/18 106/22 126/24 140/4 183/4
184/15 217/19 223/2 225/13 231/19
making [7]  19/15 35/16 84/13 152/6
219/3 240/16 260/19
Malhaltra [1]  240/12
Malhotra [16]  192/16 193/3 193/10
193/13 203/8 208/11 208/13 215/2
216/17 238/19 239/12 243/9 259/4
264/15 267/10 271/21
Mallory [1]  4/13
Malthotra [1]  82/14
man [1]  241/25
management [7]  64/17 66/15 154/6 200/7
221/14 221/23 236/7
manager [80]  8/24 10/9 17/6 17/12 19/14
23/10 25/23 27/2 27/5 27/8 35/1 67/13
109/17 113/13 114/6 114/15 115/1 115/5
115/24 116/11 118/20 119/4 120/17
121/11 123/2 123/6 124/20 129/17
129/24 130/1 142/11 148/15 150/8
152/14 155/12 156/18 156/24 166/11
167/7 167/15 168/8 168/10 168/11
168/22 169/2 171/6 171/25 172/6 172/9
172/14 172/16 172/25 173/21 174/4
174/5 175/22 176/2 176/8 176/11 177/11
178/6 178/11 178/13 180/25 182/12
185/19 185/25 186/17 186/21 186/25
189/15 201/19 202/5 202/12 208/14
243/19 247/8 259/4 259/11 267/11
manager's [9]  6/8 151/12 155/11 168/3
176/4 180/9 183/19 185/14 190/8
managers [1]  154/8
managing [1]  125/3
manner [2]  46/16 143/19
many [39]  31/4 38/5 60/13 62/10 63/1
70/25 70/25 70/25 71/23 72/8 72/8 72/25
73/18 73/18 73/18 73/18 73/18 73/18
80/4 87/20 89/6 89/9 96/13 96/15 120/8
134/20 135/8 143/7 158/6 158/20 159/4
159/8 174/11 200/15 206/17 208/24
210/22 256/15 271/18

---

MaQuarry [1]  194/22
MARC [2]  150/21 150/25
March [11]  24/3 24/16 24/17 42/12
114/23 114/25 115/2 144/14 151/13
168/21 201/23
March 12 [3]  24/3 24/16 24/17
March 2013 [1]  168/21
March 28 [1]  115/2
March 28th [1]  151/13
March 3 [1]  42/12
Marched [1]  142/23
Margaret [1]  123/16
mark [4]  79/15 121/19 150/1 151/9
marked [3]  7/17 147/12 191/13
market [2]  9/14 9/15
marketing [1]  10/4
Martin [1]  129/5
Mary [1]  148/19
massive [2]  135/3 136/16
material [9]  9/20 16/22 32/13 76/8 77/17
97/24 103/15 143/3 199/25
materiality [1]  60/25
materially [1]  73/24
materials [11]  7/13 32/5 32/6 37/18 41/8
46/21 68/19 136/13 198/5 199/14 209/5
mathematics [1]  206/22
matter [29]  5/23 6/22 13/1 28/5 28/23
29/11 34/14 38/5 44/12 44/18 46/3 46/5
46/13 46/25 50/13 51/16 52/11 75/20
128/14 132/3 138/9 141/25 150/14 161/9
167/6 238/1 261/15 273/3 273/3
matters [11]  6/6 6/9 6/14 29/14 36/5 89/5
127/1 131/16 156/25 251/13 253/5
Matthew [2]  3/3 23/21
mattress [1]  88/15
may [54]  1/8 1/12 7/9 41/22 48/23 49/10
50/23 51/2 54/15 54/18 54/19 56/12
57/21 59/2 63/18 73/24 74/19 97/7 104/3
104/15 104/18 106/14 115/6 125/15
126/10 136/15 139/18 140/11 147/1
174/6 189/9 190/20 192/13 193/3 193/7
194/18 195/16 196/1 207/7 208/3 219/23
239/22 242/8 242/10 255/20 255/20
264/3 268/23 273/14
May 12 [1]  115/6
May 2013 [1]  171/24
maybe [14]  9/24 21/11 45/8 66/16 78/9
78/9 87/17 95/19 99/15 101/19 110/22
179/20 189/7 240/8
mayor [4]  67/18 114/4 114/7 114/12
MBA [1]  194/10
MC [1]  104/21
McKenzie [2]  125/4 187/19
MCL [1]  148/10
McNamara [2]  121/21 151/8
me [68]  2/23 3/5 4/7 4/11 6/13 15/20 17/4
19/18 20/24 22/2 22/4 22/6 23/6 36/22
42/16 44/3 44/7 48/23 48/25 56/2 56/19
78/7 81/19 92/8 94/12 109/6 126/11
126/17 126/24 127/6 139/12 147/17
161/13 162/6 164/22 201/18 203/6
204/13 208/11 209/8 210/4 211/15 213/8
216/3 216/19 217/21 218/25 228/6 230/5
234/16 235/7 239/19 245/8 245/13 246/5
247/25 249/21 251/2 253/11 255/23
256/10 256/23 257/25 259/22 263/3
272/13 273/9 273/10
mean [22]  8/6 9/23 13/21 31/15 32/16
45/9 45/15 59/14 59/16 83/10 125/7
144/21 175/11 195/2 199/23 214/9 219/2
220/1 241/11 258/20 259/24 261/24
meaning [2]  88/23 163/5

# M

means [20] 40/4 52/5 57/18 59/16 76/22
79/14 79/14 80/13 95/10 95/12 95/14
113/6 159/5 159/6 169/18 169/22 172/7
193/25 263/23 263/24
meant [4] 53/3 220/13 258/2 261/25
measure [1] 63/6
measures [3] 63/8 64/4 69/16
mechanics [1] 149/5
media [1] 129/15
mediation [3] 148/21 148/21 148/23
mediators [1] 149/2
medical [1] 195/9
medium [1] 200/22
meet [23] 9/25 46/1 48/21 48/22 107/19
109/11 111/16 119/13 146/12 155/22
157/11 160/11 164/14 165/20 165/22
165/23 166/15 186/22 191/8 201/24
202/5 209/24 252/19
meeting [72] 6/23 13/15 14/5 20/3 20/4
20/5 36/13 37/16 48/5 90/8 107/23
108/13 115/25 116/15 116/23 120/18
121/2 137/2 137/3 137/8 142/11 159/14
159/14 159/16 159/17 159/20 159/25
160/4 160/5 181/20 182/14 189/25
208/15 208/18 208/20 209/3 209/6
209/18 210/17 245/9 245/13 245/15
245/23 247/19 247/22 248/2 248/18
248/19 249/19 249/21 249/25 251/3
251/14 251/17 251/18 251/25 252/3
252/4 252/17 252/21 252/22 253/6
253/20 253/22 253/24 254/3 254/4 254/6
254/7 255/3 255/4 255/12
meetings [48] 19/13 19/15 79/25 80/2
83/14 85/4 95/3 95/5 95/8 116/19 117/5
117/17 118/1 118/13 120/4 120/21 121/9
121/15 135/24 136/4 136/17 136/21
140/7 140/11 155/19 155/20 178/11
178/22 182/19 182/20 182/22 183/23
184/2 184/4 202/8 247/12 247/13 247/17
249/22 249/24 253/7 253/12 253/15
253/16 254/1 268/21 268/24 269/5
meets [1] 57/19
members [13] 105/4 139/3 154/6 154/14
154/16 154/22 154/25 155/3 155/24
200/6 201/2 248/22 248/23
membership [4] 154/23 154/23 156/7
156/10
memo [7] 9/24 14/4 14/8 40/6 42/10
108/9 226/17
memoranda [34] 6/19 6/22 7/20 8/15 9/8
11/13 11/17 15/9 20/18 27/19 27/22
29/20 29/24 30/17 30/19 30/19 30/21
31/11 31/16 31/19 31/22 33/15 33/19
36/7 36/9 36/19 47/23 48/3 48/8 51/22
52/3 52/10 52/11 108/7
memorandum [2] 14/16 242/8
memos [20] 9/1 11/23 11/24 12/24 13/22
15/4 24/14 36/6 37/3 37/15 40/2 40/3
41/21 43/2 48/19 48/24 51/2 108/1 108/5
108/5
men [1] 145/18
mental [1] 28/3
mention [4] 44/9 133/22 134/11 173/18
mentioned [4] 105/25 136/20 138/18
270/5
mere [5] 41/6 52/2 106/10 142/6 163/6
Meredith [1] 4/12
merely [3] 113/19 142/6 178/23
mess [1] 73/17
message [2] 84/25 140/14
messages [1] 183/22

met [13] 20/15 91/2 118/4 159/5 166/10
180/6 185/9 201/25 240/1 252/11 252/12
252/20 254/10
methodology [1] 236/25
methods [2] 183/6 201/8
Metropolitan [1] 115/25
Michigan [51] 2/5 3/3 3/5 12/20 12/23
13/8 42/14 97/4 98/6 98/11 98/11 98/14
100/6 102/1 104/11 106/19 107/17
108/15 109/19 109/21 109/23 110/6
113/9 117/12 117/24 118/19 119/10
124/15 124/18 127/14 137/21 139/6
139/18 139/20 142/16 144/17 148/13
167/9 168/16 169/16 169/25 170/22
171/14 172/12 172/18 174/4 176/10
176/13 235/23 236/3 236/17
Michigan's [1] 107/7
microphone [3] 105/23 228/7 255/25
middle [4] 45/7 83/14 125/22 144/16
might [23] 5/2 30/8 30/9 30/9 41/10 63/9
73/10 73/14 74/11 74/21 80/15 83/19
93/19 101/23 137/7 137/8 148/25 148/25
149/3 161/17 262/14 262/15 270/24
Miguel [1] 2/7
mike [1] 179/17
mile [1] 101/7
Miller [9] 4/5 43/3 82/12 107/8 107/19
108/14 111/10 112/7 157/23
Millikin [1] 148/8
Milliman [1] 136/13
million [34] 110/11 188/10 188/13 189/17
213/2 215/8 215/17 215/18 215/21
218/13 218/17 219/20 219/22 221/21
222/3 222/14 222/16 222/19 224/17
224/18 225/7 226/6 226/23 228/22
228/25 229/3 229/9 229/10 246/20 247/5
259/16 260/18 261/2 261/7
millions [1] 157/24
mind [5] 118/12 127/7 161/5 254/15
268/5
mine [1] 144/17
minimum [2] 37/16 185/21
minor [2] 110/11 168/14
minute [8] 44/6 58/3 60/24 92/16 118/24
123/25 208/12 220/19
minutes [1] 105/2 105/10 105/13 109/2
205/15
misapplication [1] 59/18
mischaracterize [1] 72/24
misinterpretation [1] 59/18
misinterpretted [1] 59/2
misleading [4] 46/16 46/17 167/24
185/22
misrepresentation [1] 185/20
missed [1] 25/20
misspelled [1] 1/13
misstated [1] 188/22
misunderstands [1] 270/22
mode [2] 119/11 120/24
modifications [2] 87/25 122/15
moment [4] 106/9 148/1 219/24 271/7
Monday [5] 21/11 50/20 53/22 53/25
133/14
monetary [1] 181/21
monetize [1] 112/7
monetized [2] 190/12 190/20
money [8] 88/15 95/14 101/1 219/6 219/8
219/12 222/5 225/25
monies [2] 212/12 225/20
monitor [2] 202/16 203/7
Montgomery [1] 2/22
month [19] 82/20 83/3 83/21 141/17
144/13 158/9 158/12 158/25 206/6 206/6

210/19 211/1 212/4 213/6 213/9 214/13
214/18 215/7 218/16
monthly [8] 200/23 201/4 203/12 207/18
230/14 231/3 231/23 263/19
months [18] 19/14 41/19 67/2 94/22
106/20 158/13 163/6 163/15 171/24
196/5 210/22 210/24 210/25 213/5 215/6
215/22 218/16 259/10
Moore [6] 5/5 65/1 82/14 125/3 187/20
187/22
Moore's [1] 5/13
moot [1] 59/20
more [52] 9/7 9/11 25/16 26/1 27/9 33/16
35/7 41/23 46/19 47/7 52/17 55/24 71/11
71/22 72/19 73/24 81/7 94/19 97/15
97/18 98/4 101/19 103/24 111/1 116/25
121/11 126/24 134/2 135/4 152/6 154/13
154/14 156/8 156/9 158/13 161/1 161/18
163/2 170/11 172/8 175/20 179/20
179/21 184/1 184/5 187/18 191/23 205/3
219/5 219/25 253/9 271/7
moreover [3] 40/24 100/14 129/23
morning [39] 2/6 2/12 2/16 2/21 3/2 3/7
3/17 3/24 4/4 4/7 4/9 4/12 4/19 39/12
39/24 41/4 49/15 50/5 54/3 60/4 87/3
104/8 126/21 129/6 146/3 147/7 147/10
178/16 203/24 247/19 248/19 251/13
253/20 254/6 254/7 254/11 272/24
273/11 273/21
morphed [2] 16/20 17/3
Morris [4] 3/25 3/25 153/5 153/5
most [18] 7/6 16/16 54/16 63/11 72/15
72/20 73/13 74/8 79/19 88/8 92/7 100/24
142/22 165/16 188/1 188/14 188/15
241/24
motion [24] 4/20 4/25 5/4 5/11 6/17 16/1
19/1 19/2 23/24 27/15 27/16 33/8 34/1
34/11 38/1 39/21 51/5 51/8 51/9 53/17
122/2 123/15 150/18 271/5
motions [6] 4/21 5/15 16/18 50/11 50/17
51/19
motivation [1] 97/21
motivations [2] 8/18 100/13
motive [6] 128/5 128/9 128/13 128/17
129/9 129/22
motives [5] 99/6 99/18 99/21 99/23 99/24
mountain [1] 61/11
mouth [1] 144/25
move [12] 53/19 64/22 126/15 175/20
179/17 229/24 242/11 242/22 246/5
247/12 266/23 270/3
moved [3] 16/19 151/21 176/25
moving [6] 30/7 52/1 72/6 116/25 162/11
245/13
Mr [8] 3/23 5/5 5/13 23/22 65/1 82/14
187/20 187/22
Mr. [154] 18/20 19/4 21/4 21/5 24/1 25/4
25/15 26/3 36/25 37/6 39/24 49/15 52/15
52/19 52/20 53/14 53/14 54/15 54/24
57/3 57/10 58/3 58/19 65/9 82/12 82/14
86/11 86/17 86/25 108/1 109/10 111/14
111/22 111/22 113/13 114/5 114/8
114/10 114/12 114/13 114/5 114/20
115/12 120/9 120/25 122/12 126/10
126/22 127/7 127/11 129/24 130/4 132/4
135/23 137/12 138/19 138/24 139/13
139/16 139/20 141/14 141/18 142/24
143/3 143/8 143/23 143/19 144/11 146/4
146/9 149/10 151/10 152/10 152/22
153/20 155/13 155/18 168/7 168/23
169/10 170/5 170/10 170/12 170/16
170/20 171/3 171/6 171/9 171/9 171/16
171/25 177/4 178/17 178/18 179/6 179/7

## M

Mr.... [58]  187/10 188/21 188/23 188/25 189/3 189/7 193/3 193/10 202/4 202/22 203/8 208/11 208/13 215/2 216/17 230/22 232/2 232/4 232/16 232/21 232/22 233/16 233/22 234/13 238/4 238/19 239/12 240/12 243/9 244/15 249/15 255/23 257/19 259/4 260/11 261/13 261/16 262/5 262/7 262/11 262/15 262/17 262/21 264/11 264/15 264/20 265/1 265/9 265/13 267/10 267/23 268/17 268/21 269/13 269/16 270/22 271/21 273/5

Mr. Baird [5]  53/14 114/5 114/10 114/13 114/20

Mr. Bennett [8]  126/22 127/7 127/11 141/14 146/4 146/9 178/17 189/7

Mr. Bennett's [7]  130/4 135/23 137/12 138/19 141/18 149/10 188/21

Mr. Buckfire [9]  82/12 86/11 86/17 86/25 108/1 109/10 111/14 111/22 111/22

Mr. Ciantra [2]  19/4 49/15

Mr. DeCharia [1]  265/1

Mr. Diaz [1]  151/10

Mr. Dillon [1]  120/9

Mr. from [1]  171/9

Mr. Gordon [1]  132/4

Mr. Irwin [8]  36/25 37/6 39/24 57/3 57/10 58/3 58/19 273/5

Mr. Malhaltra [1]  240/12

Mr. Malhotra [14]  193/3 193/10 203/8 208/11 208/13 215/2 216/17 238/19 239/12 243/9 259/4 264/15 267/10 271/21

Mr. Malthotra [1]  82/14

Mr. Orr [68]  21/4 65/9 113/13 114/8 114/12 115/12 122/12 129/24 138/24 139/13 139/16 139/20 143/8 143/13 143/19 144/11 152/10 155/13 168/7 168/23 169/10 170/5 170/10 170/16 170/20 171/3 171/6 171/16 171/25 177/4 178/18 179/6 179/7 187/10 188/23 188/25 189/3 202/4 202/22 230/22 232/2 232/4 232/16 232/21 232/22 233/16 233/22 234/13 244/15 249/15 257/19 260/11 261/13 261/16 262/5 262/7 262/11 262/15 262/17 262/21 264/11 264/20 265/9 265/13 267/23 268/21 269/13 269/16

Mr. Orr's [8]  54/15 114/13 120/25 142/24 143/3 152/22 170/12 171/9

Mr. Ryan [1]  53/14

Mr. Schneider [1]  54/24

Mr. Snyder [1]  21/5

Mr. Stewart [4]  238/4 255/23 268/17 270/22

Mr. Taylor [2]  153/20 155/18

Mr. Ullman [1]  126/10

Mr. Wertheimer [7]  18/20 24/1 25/4 25/15 26/3 52/15 52/20

Mr. Wertheimer's [1]  52/19

Ms [2]  203/25 272/25

Ms. [26]  47/24 50/14 50/19 52/10 128/15 129/5 132/3 132/22 133/19 133/23 134/6 136/5 143/10 146/4 146/10 146/16 147/22 149/4 149/20 151/21 151/24 153/20 155/18 164/22 169/8 180/23 180/23

Ms. Ceccotti [2]  146/16 151/21

Ms. Ceccotti's [1]  149/20

Ms. Green [11]  50/14 50/19 128/15 132/3 132/22 133/23 134/6 136/5 143/10 146/4 180/23

Ms. Green's [5]  133/19 146/10 147/22 151/24 169/8

Ms. Gurwitz [1]  149/4

Ms. Lennox [2]  47/24 52/10

Ms. Lightsey [2]  153/20 155/18

Ms. Nelson [1]  129/5

Ms. Patek [1]  164/22

much [28]  38/19 47/7 63/23 64/12 64/22 78/1 78/2 84/3 85/14 94/11 94/19 100/18 138/8 140/18 143/11 149/4 153/2 165/8 218/11 218/19 228/21 228/24 230/16 256/20 256/21 261/9 263/15 271/20

multiple [1]  140/6

muni [1]  72/20

municipal [2]  197/7 211/23

municipality [4]  77/13 97/4 166/7 196/21

museum [1]  66/16

must [14]  5/3 5/8 21/5 52/6 76/20 99/5 116/8 121/18 122/15 125/6 134/18 146/23 172/21 240/9

my [31]  2/18 3/9 3/19 10/21 13/9 25/25 42/21 42/24 42/24 44/25 48/6 81/4 120/6 127/4 129/8 136/13 144/25 153/18 161/5 194/9 222/20 232/17 233/1 234/4 239/7 242/22 253/24 254/24 255/2 263/9 263/12

myself [3]  36/16 48/24 60/20

mystery [2]  87/15 163/23

## N

N2 [1]  41/19

name [1]  193/11

namely [1]  167/10

names [5]  1/13 25/11 25/20 25/21 254/14

narrative [1]  242/25

narrow [1]  134/16

narrowly [2]  16/10 17/10

national [2]  252/14 254/13

natural [1]  155/8

nature [7]  31/2 91/12 91/14 146/22 204/7 242/4 243/1

near [4]  61/24 64/3 68/15 100/7

nearby [1]  72/10

nearly [3]  145/17 190/6 190/7

necessarily [3]  58/16 97/11 157/16

necessary [7]  19/10 22/14 113/19 119/5 122/15 137/18 166/9

necessity [1]  100/2

need [26]  1/18 15/24 30/7 34/22 35/1 35/2 45/18 45/25 69/13 75/21 77/25 80/13 108/21 109/1 116/24 117/3 125/15 131/3 131/16 132/6 159/7 159/12 182/24 217/21 241/13 258/22

needed [5]  97/15 101/1 113/6 164/2 169/22

needs [3]  61/20 218/1 261/21

negative [5]  224/17 224/20 224/22 243/16 260/18

negotiate [21]  75/8 75/11 75/17 75/18 78/11 78/13 80/21 90/16 108/11 112/22 113/5 148/12 155/23 158/14 158/21 159/12 160/20 163/14 183/12 184/25 185/6

negotiated [4]  85/21 118/11 148/16 166/18

negotiating [14]  75/2 80/3 84/14 90/3 90/14 112/16 112/16 115/9 117/18 134/21 149/6 155/10 162/10 184/8

negotiation [20]  77/5 80/20 81/8 87/13 87/16 108/11 156/15 158/18 160/23 161/7 161/9 161/11 161/20 162/17 163/5 178/1 178/4 178/9 179/24 180/6

negotiations [79]  68/12 69/2 71/25 74/4

74/11 74/12 74/20 76/19 76/23 77/12 77/20 81/17 82/2 82/5 82/7 82/9 82/13 83/8 83/20 85/4 85/5 85/22 86/5 86/8 88/14 88/18 88/22 89/2 89/4 90/24 90/24 106/6 106/12 116/17 120/15 120/16 120/19 121/1 121/5 121/8 136/23 140/8 140/15 140/24 145/3 146/15 148/2 149/11 149/19 156/6 160/1 160/4 160/7 160/8 160/10 160/11 160/17 160/21 162/13 162/14 162/15 162/19 163/18 164/3 166/20 178/2 179/14 180/1 180/6 180/11 181/17 182/11 182/15 182/16 183/16 184/6 184/7 184/18 185/1

negotiators [2]  86/25 162/13

Nelson [2]  123/16 129/5

net [12]  190/3 222/14 222/16 224/12 224/13 224/21 225/3 226/5 226/9 228/20 229/1 260/17

never [26]  12/18 14/25 15/2 26/18 26/19 45/20 65/21 86/3 86/3 88/11 89/21 102/21 103/22 146/6 149/15 155/20 155/21 160/23 178/25 179/1 179/2 180/12 180/20 183/15 185/6 270/16

Nevertheless [1]  143/12

new [21]  26/11 34/10 43/14 56/15 56/16 56/17 73/22 73/22 73/22 107/11 109/16 111/3 111/7 113/16 127/18 158/22 158/22 170/10 173/11 194/9 232/22 252/4

next [49]  13/10 41/9 66/20 79/12 80/9 80/19 83/5 83/7 83/19 88/13 88/13 89/4 94/5 99/12 100/4 112/10 113/10 122/25 151/19 152/16 182/20 196/5 211/23 212/2 216/24 218/10 222/23 224/6 224/23 227/20 236/6 236/12 236/19 237/14 242/22 245/3 248/13 249/17 251/20 255/10 255/13 257/21 258/16 258/19 259/18 264/14 265/18 266/2 268/2

nice [1]  12/12

nicely [1]  69/16

night [3]  93/4 123/9 124/3

nine [12]  16/24 27/9 45/24 70/13 71/23 72/2 72/4 128/24 139/5 139/15 195/22 231/18

nix [1]  191/2

no [111]  9/15 10/9 10/9 13/9 20/8 23/12 26/13 26/21 26/21 31/24 33/21 33/22 34/6 34/9 34/10 34/11 34/12 35/22 35/24 38/3 38/6 42/23 44/1 54/10 54/21 59/1 59/20 59/25 61/16 61/18 61/20 62/7 65/13 66/14 66/18 67/1 67/16 67/21 68/11 70/8 75/12 75/20 77/17 77/23 79/14 79/16 79/19 80/13 80/15 81/12 81/13 81/19 83/12 83/25 85/25 89/16 93/10 93/10 97/10 99/22 100/14 100/15 102/9 103/23 104/14 114/22 117/18 119/14 119/24 120/2 121/1 121/3 121/4 121/22 125/8 128/11 128/25 141/2 150/17 172/16 173/14 174/3 174/10 174/18 174/18 174/22 175/5 175/8 177/12 180/9 180/13 181/17 182/1 182/9 182/15 182/17 184/7 184/17 188/4 195/24 198/19 232/20 235/14 238/2 240/14 244/11 249/12 249/14 257/16 258/22 261/17 264/1 269/24

No. [2]  92/11 92/21

No. 104 [1]  92/21

No. 36 [1]  92/11

Nobody [1]  86/2

non [16]  32/1 32/2 47/11 77/7 85/21 88/12 95/10 95/13 116/14 154/13 195/3 236/9 247/19 248/3 266/22 269/22

non-adversarial [1]  47/11

**N**

non-bankruptcy [1] 77/7
non-CPA [1] 195/3
non-impairment [1] 88/12
non-leading [1] 269/22
non-negotiated [1] 85/21
none [4] 29/1 80/23 182/18 190/25
nonsensical [1] 1/13
nonsequitor [1] 77/8
noon [3] 105/18 109/4 131/10
normal [2] 19/18 19/22
northwest [2] 98/13 100/7
not [389]
notation [2] 107/10 107/25
notations [1] 107/5
note [8] 1/13 1/22 49/6 54/9 54/20 57/25
112/15 141/1
notes [11] 1/6 1/19 13/15 46/12 48/23
69/21 95/15 107/7 113/1 128/7 182/1
nothing [8] 34/7 84/8 97/9 100/10 120/10
156/3 170/11 175/10
nothings [1] 184/4
notice [2] 134/1 270/11
notified [1] 270/12
notwithstanding [4] 60/6 64/23 138/10
141/11
November [3] 109/20 113/15 168/20
November 2002 [1] 168/20
November 6 [1] 109/20
now [102] 7/11 7/25 17/22 18/13 19/7
24/5 25/20 28/12 32/8 32/19 39/15 39/25
41/1 63/20 68/15 69/25 72/6 79/3 79/22
86/4 91/3 92/15 94/15 96/18 96/19 96/22
100/18 106/21 125/9 129/19 131/1
137/11 141/18 144/24 160/1 164/2
165/18 167/21 168/3 168/20 168/24
169/8 169/19 170/21 171/3 171/20
172/13 173/11 173/16 177/23 178/3
178/16 178/18 179/3 181/14 186/5
186/24 188/21 192/5 194/25 195/10
196/17 197/21 198/5 199/14 200/18
202/16 208/3 209/18 210/1 210/14
212/20 216/2 216/14 216/17 216/17
217/9 218/25 221/2 221/18 222/21 224/1
224/6 227/17 227/17 231/18 232/17
235/8 238/18 242/11 243/22 245/9
248/18 250/11 251/2 255/3 255/22
255/22 256/10 256/25 257/19 272/23
Nowling [2] 118/9 183/19
nuisance [1] 255/24
number [57] 2/4 19/17 21/8 22/12 29/19
31/1 39/11 41/18 56/1 65/6 65/8 79/18
87/2 87/7 91/10 91/17 92/2 92/10 93/12
93/15 93/20 94/14 96/18 96/19 102/7
132/6 132/8 135/13 135/21 135/24 136/1
152/1 154/18 164/23 165/21 181/8 185/3
185/19 187/9 189/8 189/9 189/17 189/18
205/25 214/2 214/3 214/4 218/15 229/12
230/7 231/19 235/9 238/5 241/11 256/17
256/25 267/3
numbers [52] 58/12 58/16 58/17 64/20
64/21 65/14 73/23 131/23 143/10 157/15
157/18 188/25 206/3 207/22 210/23
214/6 229/20 229/21 230/7 234/2 236/16
236/25 237/25 237/25 238/24 238/25
239/11 239/13 239/13 239/14 240/2
240/4 240/12 240/15 240/17 240/18
240/19 240/19 240/21 240/24 241/1
241/4 241/6 241/7 241/18 250/17 250/18
253/3 266/12 266/12 266/15 266/16
numerical [1] 65/3
numerous [7] 28/18 28/19 30/9 44/6

62/17 72/7 116/14

**O**

o'clock [1] 39/5
O'Keefe [1] 4/3
OA [1] 149/7
oath [3] 171/6 171/10 171/17
object [8] 52/12 56/1 204/14 213/13 228/9
232/10 232/18 265/3
objected [1] 257/11
objecting [8] 51/21 55/25 61/21 110/10
118/2 126/7 261/12 271/2
objection [36] 24/3 26/19 33/14 56/4 58/1
87/22 104/4 138/7 138/7 203/20 208/8
208/9 213/10 228/3 228/5 229/24 230/2
237/21 237/23 244/1 244/5 244/11
244/17 244/18 257/10 258/24 261/11
261/17 263/4 263/10 263/11 264/25
268/4 269/19 269/24 270/22
objections [12] 56/11 56/15 56/17 56/18
57/8 59/13 59/25 84/17 143/25 242/16
267/1 269/9
objectively [3] 40/17 41/16 41/17
objectors [24] 7/4 24/2 26/6 26/12 27/1
34/18 35/19 55/1 55/6 67/4 67/5 74/9
78/25 79/19 80/23 85/15 90/18 147/6
165/8 165/17 165/20 257/23 270/5
270/12
obligation [5] 139/10 174/8 246/9 246/19
260/1
obligations [9] 63/15 68/5 189/25 190/25
191/4 191/4 209/25 235/15 246/16
observation [1] 121/17
observe [2] 116/17 120/19
observely [1] 61/21
obtain [4] 90/3 140/10 152/24 190/21
obtained [2] 150/21 211/2
obviously [14] 5/21 7/3 7/7 7/13 10/9
17/15 38/20 38/22 92/25 141/5 142/1
143/1 167/13 190/24
occasional [1] 1/13
occur [8] 34/11 42/4 125/6 134/18 135/24
141/15 141/16 141/16
occurred [6] 11/6 49/5 106/6 106/13
118/2 118/13
October [3] 6/16 36/15 109/13
October 15th [2] 6/16 36/15
odd [1] 219/20
odds [1] 177/18
off [8] 5/16 76/12 158/24 175/11 186/20
227/11 242/12 261/2
offer [3] 49/18 104/2 153/13
offered [6] 34/13 35/17 71/20 155/22
157/21 158/2
offering [1] 149/16
office [11] 102/8 106/19 107/7 109/15
111/7 119/2 122/10 123/17 171/11
183/19 197/7
officers [10] 4/11 25/22 121/20 145/8
145/11 148/19 150/2 150/5 150/23
154/15
official [2] 42/24 43/1
officials [12] 28/25 31/17 33/16 33/20
36/21 47/25 51/23 111/16 112/12 118/9
129/18 157/20
often [3] 81/4 96/24 202/5
oh [1] 161/1
okay [55] 3/23 4/18 4/23 4/24 11/12
13/24 15/20 18/21 21/23 24/22 33/24
39/19 48/7 59/11 59/22 60/3 80/17 83/17
86/10 88/25 92/23 94/18 105/16 105/17
126/12 126/20 127/3 130/25 131/25
132/24 133/16 147/14 147/19 147/19

159/17 162/12 163/22 165/1 211/5 213/8
216/1 217/1 218/4 220/24 224/6 224/19
225/24 231/16 233/14 244/13 246/5
250/11 255/3 268/15 272/16
omission [1] 167/24
omitted [1] 131/23
once [4] 223/17 250/6 253/5 273/19
one [113] 15/24 17/14 19/4 19/17 19/17
20/8 22/25 23/2 24/10 33/16 34/13 41/6
41/18 43/14 45/15 49/5 50/13 50/17
53/11 53/22 55/24 58/18 61/19 62/12
62/20 63/15 67/5 67/12 68/24 70/18
74/24 75/6 75/12 75/16 76/13 77/15
78/22 81/8 83/6 83/18 83/25 84/20 86/15
87/16 88/25 89/16 91/10 91/16 92/22
93/23 94/10 94/13 94/15 94/21 99/1 99/2
100/19 102/2 103/12 103/14 103/18
103/22 108/5 108/7 109/12 111/1 112/4
115/21 120/9 123/25 123/25 134/2 136/3
136/3 136/11 137/2 137/3 137/7 138/16
141/18 148/18 158/9 158/12 161/16
170/19 179/16 180/19 181/16 185/13
188/4 202/2 204/13 205/5 208/12 212/9
213/6 213/9 213/24 214/18 215/6 216/3
218/16 219/23 225/24 228/6 237/18
239/10 239/24 242/13 257/3 259/22
270/15 271/7
ones [6] 79/10 108/2 154/4 199/20
240/12 252/15
ongoing [4] 187/15 219/7 237/17 237/18
online [1] 117/6
only [49] 1/19 38/11 52/17 56/24 58/6
61/25 62/5 76/16 99/7 100/9 101/17
102/12 103/13 104/2 104/5 109/2 110/8
114/7 114/17 118/18 121/16 122/5
141/10 143/1 158/9 158/12 158/22
162/20 163/14 169/15 173/12 178/14
178/19 184/19 188/12 191/3 206/8 206/8
213/16 223/14 232/15 234/4 235/11
237/23 248/15 255/8 265/8 266/25 267/6
OPEB [3] 71/12 108/8 181/24
open [9] 46/24 53/9 68/23 68/25 122/8
144/25 161/24 251/15 272/18
opening [9] 53/9 60/3 104/12 127/5 129/8
131/17 153/7 153/8 153/18
openings [2] 126/18 192/3
opens [1] 46/19
operate [1] 220/9
operated [1] 186/12
operates [1] 47/16
operating [37] 90/8 90/9 90/11 90/14
115/8 190/3 196/22 197/6 202/14 211/8
211/8 211/12 211/16 212/18 212/21
212/23 213/1 213/1 213/11 215/3 215/6
216/15 216/19 222/21 224/9 224/14
227/24 237/14 237/17 243/13 244/21
244/24 244/25 260/6 265/17 265/20
266/1
operational [1] 187/19
operations [4] 219/7 220/12 220/15
226/11
opinion [22] 24/4 58/11 66/11 66/18 99/2
99/4 99/12 100/8 128/1 128/2 128/3
128/11 150/21 204/5 205/2 205/22 206/3
228/12 239/9 239/10 244/6 271/14
opinions [5] 84/24 99/1 192/25 271/11
271/17
opponents [1] 153/9
opportunities [2] 66/19 190/23
opportunity [10] 19/24 20/7 28/21 32/10
38/15 134/23 148/22 156/2 156/11
156/25
opposed [4] 47/5 53/16 137/6 140/13

O

opposing [2] 56/22 59/12
options [4] 30/12 119/19 119/22 120/1
or would [1] 127/7
oral [3] 4/25 104/22 107/25
Orange [1] 112/6
order [29] 1/4 1/22 4/19 4/22 4/23 20/13
22/2 26/9 27/23 29/9 29/16 31/10 34/22
55/22 59/24 60/1 60/6 72/23 73/11
131/20 131/21 136/10 157/10 162/9
165/9 179/14 194/3 220/5 220/10
orders [1] 133/5
ordinary [3] 40/15 199/16 199/18
organization [2] 102/16 154/16
organizations [4] 138/20 153/22 154/17
156/21
organize [2] 95/8 201/13
organized [6] 75/6 75/7 78/6 78/6 137/1
137/2
organizing [2] 84/9 201/7
orifice [1] 218/12
original [3] 127/16 127/20 128/12
originally [3] 158/11 176/24 214/8
Orr [86] 21/4 42/13 65/9 90/7 111/20
113/12 113/13 113/23 114/6 114/8
114/12 114/20 115/6 115/12 122/12
123/21 123/22 124/9 129/24 138/24
139/13 139/16 139/20 143/8 143/13
143/19 144/11 152/10 155/13 168/7
168/23 168/24 169/10 170/5 170/10
170/16 170/20 171/3 171/6 171/16
171/25 177/4 178/18 179/6 179/7 187/10
188/23 188/25 189/3 191/1 201/24
201/25 202/4 202/22 230/22 230/25
232/2 232/4 232/16 232/21 232/22
233/16 233/22 234/13 234/20 244/15
247/11 249/15 257/19 260/11 261/13
261/16 262/5 262/7 262/11 262/15
262/17 262/21 264/11 264/20 265/9
265/13 267/23 268/21 269/13 269/16
Orr's [10] 54/15 114/10 114/13 118/8
120/25 142/24 143/3 152/22 170/12
171/9
other [100] 1/20 5/2 7/4 19/17 20/4 20/18
23/24 25/10 34/22 49/5 50/17 51/15 52/3
52/11 53/9 53/24 53/25 59/19 60/7 63/1
68/6 68/7 70/20 70/25 71/12 71/23 72/18
72/25 73/4 77/17 78/15 78/17 80/13 81/6
86/13 86/24 92/21 95/9 95/14 96/16
96/24 97/12 97/15 98/7 98/7 101/17
111/17 115/21 126/17 134/10 134/17
134/18 135/2 136/15 141/5 144/7 147/6
153/9 159/4 160/7 161/18 162/18 162/22
164/1 166/9 174/3 174/16 174/18 174/22
177/10 180/22 182/8 182/19 188/18
190/25 191/4 201/2 212/4 212/5 212/6
212/9 221/12 221/17 221/18 221/19
223/11 223/15 223/18 223/20 223/24
225/21 225/24 227/8 237/14 239/20
242/13 256/5 262/7 268/21 270/8
others [9] 81/11 82/13 125/14 136/15
195/12 210/6 231/24 238/1 256/21
otherwise [14] 13/12 14/21 14/23 18/1
18/9 29/23 52/4 62/23 63/9 80/14 113/8
169/24 186/4 270/10
ought [2] 205/23 230/17
our [83] 1/15 4/18 5/14 6/11 19/21 21/7
23/12 31/10 31/21 33/10 38/25 39/21
40/9 41/3 43/14 44/16 45/18 46/21 46/23
49/18 50/4 52/23 52/5 1 53/9 54/14 55/25
56/8 56/10 57/9 58/4 76/5 77/2 77/25
86/19 100/19 105/12 105/18 106/10

125/8 131/1 131/17 131/20 138/6 138/7
140/10 142/3 143/25 147/8 148/18 149/3
149/16 149/18 150/9 153/12 157/9 166/2
166/5 166/10 179/5 179/6 180/4 184/12
192/16 195/16 195/24 196/3 196/11
198/1 199/12 200/2 200/13 200/25
210/21 212/2 212/17 222/21 224/6 226/5
241/9 256/2 263/2 270/22 270/25
ourselves [1] 85/14
out [91] 15/13 16/16 23/18 30/14 33/2
48/13 51/8 52/25 61/25 62/4 62/8 62/11
63/1 66/9 66/11 67/3 68/9 70/3 70/6 74/6
74/6 78/10 78/22 81/2 82/21 82/22 83/22
84/13 84/22 91/9 94/13 94/24 94/25
95/25 96/1 98/10 101/5 101/8 102/1
102/7 102/19 103/4 105/14 112/12
112/20 113/2 113/11 117/21 118/7 118/7
118/9 118/16 118/23 120/12 121/6
123/23 124/1 127/22 135/7 141/9 143/8
143/14 150/20 158/14 158/17 159/2
159/3 159/7 159/13 165/12 166/16 170/2
178/23 183/7 184/22 185/8 190/16
200/22 205/25 206/10 209/5 217/23
219/4 220/7 222/3 225/23 226/1 245/11
249/18 251/8 262/2
outcome [1] 156/22
outlined [1] 117/4
outs [1] 158/14
outset [2] 146/6 184/12
outside [8] 73/10 83/23 112/2 114/21
134/19 160/15 161/12 173/22
outstanding [1] 72/9
over [63] 3/11 6/1 23/10 24/14 32/4 33/19
41/24 63/23 65/20 69/25 75/5 75/16
85/14 101/12 111/6 114/18 128/23 131/6
135/7 137/9 146/3 152/21 163/15 170/20
173/17 180/1 180/7 182/5 182/10 183/13
186/2 186/3 190/2 195/18 196/5 196/15
207/18 211/7 223/21 229/18 236/6
236/12 236/19 237/2 237/8 237/9 237/13
243/15 245/2 245/4 255/10 255/21 256/3
258/6 259/18 260/9 265/15 265/17
265/24 266/2 268/2 269/3 270/6
overall [10] 71/7 72/3 86/22 156/9 214/14
234/2 235/22 236/18 267/10 267/17
overcome [1] 42/7
overlap [2] 161/16 161/17
overlaps [2] 161/8 161/10
overnight [1] 273/13
overrule [1] 52/7
overruled [2] 230/2 244/18
overturn [1] 35/25
overturned [2] 127/17 129/11
overview [2] 105/14 165/7
owed [8] 172/1 219/8 219/12 225/25
226/21 227/8 229/6 229/13
own [13] 9/8 61/20 94/12 128/16 157/15
157/18 158/10 170/9 180/9 186/19
188/20 197/5 238/19
owned [3] 126/3 190/14 190/16

P

p.m [9] 53/23 53/23 123/9 123/13 123/16
124/4 131/14 192/10 192/10
PA [9] 109/14 168/8 168/10 168/12
168/20 170/9 170/9 170/10 170/13
PA4 [11] 41/18 44/15 44/15 49/6 49/11
50/21 106/22 106/25 108/6 109/14
109/21
PA436 [22] 41/24 50/23 97/22 103/5
103/17 107/3 107/4 109/23 110/6 110/7
110/15 113/14 113/16 115/2 117/13
124/16 128/22 129/7 129/20 149/25

160/3 160/10
PA72 [1] 110/3
page [31] 25/21 76/16 91/7 92/21 93/24
94/22 95/2 134/13 137/20 137/21 172/20
203/6 203/9 210/5 231/18 232/12 234/14
235/8 235/9 238/5 238/10 240/19 248/7
248/7 248/8 248/13 248/14 250/11
262/22 263/2 268/13
pages [9] 68/20 72/11 84/21 84/21 84/21
159/19 173/17 250/9 251/7
paid [6] 157/24 225/22 225/23 226/1
226/22 260/23
pal [1] 72/24
palpable [1] 34/9
paper [3] 122/3 132/6 147/12
papers [21] 5/1 6/2 6/3 6/18 19/2 29/5
30/3 34/7 61/16 61/22 65/6 65/11 76/5
85/2 87/20 87/21 88/21 90/6 91/5 123/22
124/6
paperwork [1] 119/5
paragraph [5] 76/13 76/15 91/7 100/8
100/9
paragraphs [1] 140/13
paren [2] 68/24 68/25
parents [2] 52/17 112/11
part [43] 6/5 6/9 6/13 29/2 37/8 38/25
40/12 40/13 40/20 44/10 60/15 60/18
60/22 69/1 74/8 76/8 81/6 81/8 81/15
82/1 93/22 95/20 96/9 114/11 122/19
139/7 143/16 146/2 170/6 170/17 171/8
181/6 193/22 195/7 202/25 206/20
212/17 212/19 224/20 251/3 256/2
266/10 268/20
participants [1] 251/17
participate [2] 116/17 120/19
participated [3] 19/5 82/15 169/4
participating [1] 116/23
participation [2] 246/7 246/12
particular [27] 16/7 20/2 28/12 74/15 85/4
105/6 105/12 108/10 133/21 154/18
177/4 177/6 177/8 214/13 232/12 233/2
234/1 234/14 249/10 250/10 252/10
254/10 259/20 262/6 262/22 268/13
268/18
particularly [6] 20/24 62/12 87/20 87/21
141/23 167/17
parties [33] 1/20 4/1 4/2 9/4 12/18 15/2
19/19 26/17 27/6 34/14 35/13 35/17
40/14 43/5 43/18 43/22 44/8 47/11 51/11
51/21 52/2 55/25 59/12 82/19 100/13
105/9 110/10 118/2 126/7 148/23 153/6
182/9 192/18
partisan [1] 100/13
partner [8] 2/18 2/25 6/24 80/4 195/3
195/4 195/5 204/1
partners [3] 3/10 36/13 109/12
parts [7] 14/11 60/21 100/9 174/6 188/24
210/2 251/6
party [11] 5/12 10/12 40/7 46/14 46/17
47/7 50/11 59/14 87/6 155/6 192/22
party's [1] 8/4
pass [2] 94/12 214/1
passed [8] 85/9 99/21 109/18 129/2
168/13 168/14 209/5 245/11
passing [1] 128/6
past [15] 38/12 38/23 41/19 42/20 62/10
62/18 63/5 81/16 81/21 111/6 154/7
162/11 220/21 272/7 272/8
Patek [4] 4/5 145/6 164/22 272/25
path [4] 30/8 35/8 35/10 83/22
pause [3] 78/21 92/4 92/8
pay [7] 62/10 88/3 97/14 174/9 219/11
220/6 220/6

**P**

payable [2] 189/13 189/22
payables [1] 223/24
paying [5] 62/3 147/17 191/4 220/4 264/4
payment [8] 186/13 196/22 246/21
  246/24 246/25 259/17 260/2 261/5
payments [17] 180/18 186/16 190/1
  206/5 219/3 222/24 222/25 223/1 223/1
  229/17 230/10 230/12 230/17 250/20
  250/22 263/25 264/4
payroll [1] 216/20
pays [3] 186/19 188/15 188/20
PC [2] 4/14 149/7
PDF [1] 1/9
pending [1] 176/18
pension [112] 11/11 58/13 63/3 63/8
  64/10 64/17 65/5 68/8 70/23 71/14 88/1
  106/8 108/8 115/19 116/6 116/9 121/14
  121/15 121/17 122/23 123/4 125/21
  135/14 135/15 136/13 137/18 139/8
  139/14 140/8 142/14 143/10 152/15
  154/19 155/7 163/25 167/10 167/18
  168/4 169/16 170/2 170/22 171/4 171/7
  171/8 171/16 172/1 172/11 172/22 173/1
  173/3 173/23 174/1 174/3 174/17 174/20
  174/21 174/25 175/3 175/7 180/18 181/1
  181/6 181/11 181/24 182/8 185/15 187/1
  187/2 187/5 187/14 187/21 189/5 189/11
  189/16 190/1 190/5 191/4 217/1 217/4
  217/19 218/9 218/13 218/17 218/19
  218/23 219/1 219/6 219/9 219/11 226/21
  229/6 229/8 229/13 229/21 230/8 230/9
  230/17 240/22 246/9 246/14 247/14
  247/20 248/11 250/23 253/25 254/3
  255/10 260/1 261/3 266/8 266/18 268/1
pensioners [1] 17/2
pensions [14] 7/6 8/22 115/14 117/14
  119/13 119/21 125/10 173/14 174/9
  175/5 176/5 176/10 255/4 255/13
people [43] 11/1 17/16 25/10 28/16 28/17
  28/17 28/20 57/1 58/25 60/13 72/13
  75/11 78/23 80/5 82/14 82/21 83/5 84/11
  84/23 84/25 85/19 86/13 86/24 89/8
  89/18 89/21 93/4 93/12 93/21 110/25
  129/12 130/12 130/15 130/24 154/10
  200/15 208/24 240/3 241/24 245/23
  256/3 256/5 273/14
people's [3] 129/14 129/15 129/16
per [8] 19/19 101/8 180/8 202/24 210/9
  241/3 264/1 271/10
percent [10] 65/7 65/9 99/3 109/7 132/5
  189/7 189/8 189/19 189/10 237/8
percentage [2] 65/4 267/17
perfectly [2] 96/2 273/20
perform [2] 108/15 195/14
performance [1] 204/4
performed [2] 207/24 237/25
performing [2] 200/24 205/6
perhaps [7] 9/7 49/7 54/15 63/12 126/15
  150/13 242/8
peril [1] 220/13
period [28] 15/16 21/3 23/10 33/3 33/5
  33/7 55/3 76/10 84/3 87/5 141/10 142/10
  146/9 148/1 148/20 149/7 149/21 149/23
  150/7 152/21 158/25 160/6 163/15 179/5
  207/19 237/9 254/16 269/4
periods [2] 62/25 259/13
permanent [1] 220/13
permission [3] 78/23 86/15 92/16
permit [6] 99/22 207/6 214/19 228/15
  243/4 265/5
permitted [3] 34/21 39/3 159/22

permitting [1] 99/20
person [10] 80/18 80/20 80/22 87/18
  102/16 102/23 167/3 218/1 270/15 272/4
personal [2] 238/20 272/3
personally [1] 171/4
personnel [1] 154/8
persons [5] 102/6 116/10 139/23 154/3
  172/23
perspective [4] 61/25 63/1 140/5 142/4
persuaded [2] 272/13
persuasive [1] 101/4
persuasively [1] 61/20
pertinent [2] 108/4 139/7
petition [23] 76/19 76/23 92/3 93/6
  106/25 117/22 123/25 124/11 124/22
  125/23 130/6 143/21 146/20 151/6
  152/16 155/6 166/23 167/7 167/14 177/6
  185/18 186/1 187/12
petitions [1] 130/8
phase [1] 84/22
Phoenix [1] 43/14
phone [4] 108/18 123/17 202/8 217/22
phrase [4] 137/1 259/24 260/3 261/20
picked [1] 240/20
piece [11] 30/4 59/6 75/7 92/6 92/15
  92/16 92/18 95/20 146/1 147/20 148/24
pieces [3] 44/17 92/5 92/22
pied [1] 258/11
pitch [24] 7/17 9/13 9/19 11/20 32/12
  37/18 48/24 84/9 111/19 111/21 111/25
  133/22 133/24 133/25 134/11 169/4
  169/9 169/14 169/20 170/4 170/6 170/7
  171/1 176/6
pitching [2] 10/15 10/19
Pittsburgh [1] 140/3
place [21] 5/24 13/15 34/17 64/7 102/20
  117/17 120/16 158/18 164/11 168/13
  176/20 177/2 180/7 180/12 182/20
  182/20 183/11 183/25 196/25 227/16
  231/2
places [6] 72/8 87/21 88/7 94/20 98/7
  98/7
plain [2] 177/18 219/25
plaintiffs [4] 3/16 54/6 122/5 132/20
plan [77] 17/1 17/3 68/4 68/22 68/25 69/3
  69/18 69/22 69/23 70/2 70/3 70/15 70/20
  70/21 71/2 71/4 71/6 71/18 71/19 71/21
  72/2 73/3 73/4 76/25 77/1 80/22 82/12
  83/9 83/20 90/8 90/9 90/11 90/15 90/19
  91/19 93/5 112/20 113/3 115/8 115/10
  116/7 118/10 118/14 134/19 139/8 144/1
  144/3 144/8 144/15 145/3 150/16 151/3
  173/8 173/8 173/11 178/12 178/15
  178/22 178/25 179/8 179/9 180/1 180/2
  180/7 180/10 180/15 180/22 181/13
  181/15 184/14 184/16 184/21 194/4
  247/20 251/22 253/10 254/9
planned [1] 116/13
planning [2] 67/19 84/5
plans [8] 69/15 71/2 134/15 135/6 217/7
  217/8 229/21 247/14
plate [1] 140/3
platform [2] 147/2 148/11
play [1] 84/16
player [1] 170/6
players [1] 23/5
please [23] 2/11 39/11 56/13 131/4 131/8
  131/11 131/18 131/24 138/25 139/12
  139/16 192/12 192/24 193/6 193/10
  203/7 220/19 223/9 228/6 244/19 255/24
  270/14 273/19
Plecha [1] 4/2

plus [1] 227/18
POC [4] 250/20 250/22 259/24 261/5
POCs [2] 246/22 266/17
point [66] 6/10 7/22 7/25 8/11 9/21 10/8
  10/8 10/12 11/19 15/10 15/21 19/8 19/17
  19/17 21/7 28/13 32/9 42/21 43/7 54/25
  58/2 61/22 63/10 65/12 65/13 71/25
  74/17 75/9 76/15 83/15 87/14 88/17 90/5
  91/9 103/7 111/8 111/9 118/15 133/9
  135/15 137/14 138/6 140/21 149/20
  161/5 164/5 167/13 176/14 180/5 181/2
  183/14 194/17 203/4 205/21 220/20
  225/20 226/12 228/4 235/2 239/7 241/14
  242/18 251/23 254/21 254/23 260/21
pointed [2] 41/24 103/4
pointless [3] 74/7 74/7 75/3
points [13] 19/3 39/18 45/3 63/20 66/17
  91/9 103/12 132/21 138/16 166/5 168/6
  175/19 267/24
police [22] 3/18 4/11 105/4 121/20 145/8
  145/9 145/10 145/19 145/23 148/19
  150/2 150/4 150/21 150/23 153/17
  153/25 154/7 154/15 217/5 229/16
  230/20 247/23
policy [4] 17/17 18/13 27/11 194/10
political [5] 18/11 100/12 100/16 139/9
  152/25
pool [4] 71/8 71/13 71/14 97/13
pooled [11] 221/4 221/7 221/10 221/11
  221/14 221/21 225/2 226/10 260/22
  261/5 262/1
pooling [1] 221/16
popping [1] 124/12
populate [1] 90/1
populated [3] 89/13 90/1 207/21
port [1] 210/9
portion [8] 105/5 115/16 118/11 189/4
  189/20 217/9 239/17 266/24
portions [3] 147/21 147/21 250/7
portrayed [1] 190/8
posed [1] 141/4
position [56] 6/15 7/14 8/23 17/22 19/20
  23/12 26/7 26/8 26/11 28/4 28/9 29/10
  29/15 30/13 33/11 47/20 52/7 54/8 77/25
  79/9 86/19 107/2 114/7 122/8 126/7
  137/19 139/17 188/3 190/21 196/3 197/2
  197/22 198/22 199/13 201/5 220/5
  220/11 222/12 231/3 231/8 245/21 247/4
  247/5 249/3 251/8 258/4 259/9 259/12
  259/14 260/12 260/17 260/25 261/1
  263/1 269/13 269/17
positive [3] 62/6 99/3 228/22
possesses [1] 100/14
possession [1] 20/22
possibility [6] 41/10 49/13 83/25 103/20
  112/21 122/5
possible [17] 2/24 25/20 51/25 52/14
  52/22 55/19 66/14 75/18 82/22 94/24
  121/14 131/25 134/21 156/7 185/1 185/4
  271/15
possibly [3] 77/9 97/16 272/5
post [5] 68/6 71/12 140/1 168/23 194/8
post-graduate [1] 194/8
potential [10] 14/1 27/24 27/25 32/23
  43/6 45/16 47/15 107/22 265/25 266/1
potentiality [1] 173/19
potentially [2] 10/23 22/16
power [2] 81/22 154/20
powerful [1] 134/22
PowerPoint [1] 201/9
powers [2] 91/22 168/11
practicable [5] 74/12 74/13 74/21 78/13
  184/18

# P

practical [1]  147/2
practice [4]  112/14 193/22 194/2 194/19
pre [21]  4/22 12/3 13/11 52/5 55/22
55/25 59/24 66/19 76/19 76/23 87/5
87/23 88/2 88/21 92/3 93/6 131/20
153/12 179/5 179/7 184/12
pre-filing [3]  66/19 87/5 88/2
pre-petition [4]  76/19 76/23 92/3 93/6
pre-retention [3]  12/3 13/11 52/5
pre-trial [11]  4/22 55/22 55/25 59/24
87/23 88/21 131/20 153/12 179/5 179/7
184/12
prebankruptcy [1]  77/12
precisely [1]  149/20
predicate [1]  143/7
predominantly [8]  3/12 194/2 196/13
212/25 217/17 229/8 229/20 230/8
predominately [1]  95/18
preengagement [1]  32/22
prejudice [1]  5/11
prejudiced [2]  96/6 96/12
preliminary [5]  22/9 110/2 133/6 133/12
258/23
premature [2]  122/6 126/8
preparation [2]  40/18 127/9
prepare [5]  40/21 48/4 48/24 49/3 60/1
prepared [6]  6/20 9/9 9/11 9/14 9/18
9/24 28/9 30/1 33/22 40/13 41/21 41/23
48/4 52/5 127/7 153/24 156/21 170/5
203/18 210/1 210/7 231/25 235/19
235/20 248/7 248/8 250/7 257/7
prepares [3]  14/4 27/21 27/22
preparing [4]  48/19 207/3 207/4 243/22
prerequisite [2]  71/2 90/25
preretention [1]  13/2
present [9]  61/10 61/10 131/15 149/13
153/23 173/10 187/8 202/13 209/3
presentation [24]  6/4 46/18 46/20 66/6
68/3 69/11 82/20 93/5 104/24 106/1
111/19 116/12 116/20 132/7 151/20
151/22 151/25 168/2 169/9 248/2 250/10
251/3 251/6 252/20
presentations [3]  178/7 178/11 201/10
presented [15]  16/21 69/10 70/3 82/11
116/1 118/14 127/18 130/23 158/8
159/15 178/20 180/10 180/15 180/21
181/16
presenting [4]  115/11 155/21 201/7 202/2
presently [1]  193/14
presents [1]  32/10
preserve [4]  8/4 160/2 218/21 221/3
president [7]  121/19 121/21 150/1 151/8
151/10 153/14 153/16
presidents [2]  151/7 152/3
press [5]  115/13 118/8 119/6 123/10
272/23
presume [2]  40/4 139/5
pretense [1]  172/16
pretty [6]  46/11 78/1 78/2 110/21 252/16
261/17
prevent [3]  62/1 98/18 101/24
prevented [1]  67/13
preventions [1]  139/15
previous [2]  30/10 51/5
previously [5]  128/19 129/11 151/10
164/25 176/3
primary [1]  126/2
prince [1]  72/24
principal [6]  7/21 77/6 189/19 195/1
246/17 250/20
principles [1]  8/3

printed [1]  1/9
prior [18]  1/18 41/17 41/23 50/24 62/25
70/4 107/23 113/14 113/18 136/14
156/17 163/7 168/10 169/9 170/13 177/1
179/6 255/2
priorities [1]  143/16
priority [1]  190/2
private [3]  43/17 43/21 45/23
privilege [43]  7/24 9/17 10/2 12/5 13/1
13/10 17/9 17/20 17/24 18/3 18/14 19/7
19/12 19/23 19/24 19/25 20/3 24/8 24/25
25/17 26/13 27/20 29/22 29/25 32/25
33/15 35/10 37/3 37/23 37/25 38/7
39/25 41/12 43/12 43/16 44/3 44/17
44/22 47/8 47/17 51/14 51/15 52/9
privileged [4]  13/17 36/16 39/23 42/16
privileges [4]  19/22 31/1 31/2 47/13
pro [2]  7/19 71/7
probability [1]  271/23
probably [7]  93/7 105/13 141/16 143/4
222/7 248/20 273/14
problem [22]  28/16 29/3 29/4 31/6 46/7
59/1 59/20 62/25 63/18 67/21 75/1 75/2
76/9 87/19 89/24 93/17 93/17 96/17
101/3 110/4 141/6 219/19
problems [19]  47/16 62/19 68/2 68/13
71/16 71/17 71/19 73/2 86/22 91/11
91/13 91/14 96/13 97/5 97/6 100/19
141/21 154/5 222/2
proceed [10]  21/9 21/11 32/7 104/18
124/20 132/18 140/25 143/19 192/13
193/7
proceeding [20]  1/6 1/20 4/19 4/23 7/19
45/25 53/20 67/4 73/10 74/5 84/3 115/15
150/3 175/2 175/25 177/7 181/4 181/6
182/6 191/10
proceedings [7]  34/16 60/7 60/16 145/12
146/7 146/14 149/1
proceeds [6]  187/8 212/11 213/3 215/11
224/18 226/24
process [28]  1/7 32/12 73/7 76/2 76/2
84/15 85/21 98/22 101/3 102/24 102/25
103/1 106/17 107/9 107/15 110/7 111/6
118/19 120/6 122/20 134/14 134/19
148/17 148/17 149/5 202/1 241/23
255/15
processing [1]  131/21
produce [3]  22/6 52/12 54/8
produced [7]  9/19 15/16 24/4 24/6 49/20
50/1 50/4
product [40]  7/22 8/1 8/3 9/17 9/22 10/11
12/4 12/9 12/14 13/11 14/9 14/11 14/14
14/14 14/15 27/20 28/2 28/8 28/24 29/22
31/23 31/23 31/24 32/4 33/7 33/9 33/15
40/8 41/8 42/6 43/12 43/16 43/24 44/2
47/4 47/9 49/22 49/23 49/25 52/4
production [3]  7/7 37/18 38/23
productive [1]  121/12
professional [1]  223/24
professionals [1]  87/7
proffered [1]  5/7
program [2]  131/21 135/7
progressed [1]  200/25
prohibited [2]  124/19 167/9
prohibiting [1]  68/11
project [1]  191/8
projected [6]  158/11 158/12 215/18
236/15 236/19 250/15
projection [4]  96/20 220/20 239/9 264/18
projections [22]  66/2 66/3 196/15 201/1
203/4 204/7 204/22 228/10 232/13
235/11 242/2 243/20 243/22 244/2 244/7
244/16 248/5 248/8 248/14 253/2 264/24

267/21
projector [1]  126/18
projects [1]  206/2
promptly [3]  51/24 52/13 52/21
prong [7]  95/21 166/19 166/21 178/4
180/6 184/11 185/9
proof [5]  60/10 157/11 164/14 165/6
165/21
proofs [3]  147/5 147/8 270/10
proper [2]  1/13 270/11
properly [4]  35/10 129/1 206/14 244/7
property [13]  97/6 97/7 206/9 211/17
223/13 223/14 223/17 225/11 225/13
236/1 236/5 241/6 273/17
proponent [1]  5/8
proposal [96]  8/24 16/24 62/15 66/4 66/5
68/18 68/18 68/22 69/6 69/9 70/12 71/5
72/9 73/3 79/23 80/6 81/12 83/1 83/13
86/16 87/4 87/10 87/11 88/3 88/5 90/10
97/2 115/11 116/1 116/5 121/23 135/1
135/4 135/11 135/12 135/14 135/15
135/16 135/20 135/25 135/25 136/16
136/19 137/4 137/10 137/10 137/15
137/21 138/3 138/10 140/20 140/24
141/12 142/4 142/14 143/17 150/20
152/6 152/7 155/23 158/8 159/15 159/18
160/18 160/25 162/16 163/3 163/3
172/14 172/15 172/21 172/24 173/14
173/16 173/21 178/8 178/14 178/15
178/23 179/2 179/3 179/10 181/22 182/5
184/21 184/21 209/11 209/15 209/18
254/19 254/20 254/22 254/25 255/1
268/20 269/3
proposals [14]  64/7 82/25 86/13 86/18
86/19 86/24 117/4 117/6 120/2 121/13
134/5 182/25 194/6 254/17
proposed [14]  17/1 17/3 30/24 73/2 78/2
91/19 116/2 140/8 142/13 143/19 162/25
181/24 183/1 209/21
proposes [1]  68/4
proposing [2]  182/3 209/22
proposition [3]  85/20 99/10 177/15
propriety [1]  100/16
prospect [2]  40/21 173/18
prospective [1]  13/5
protect [4]  31/10 31/23 115/20 172/17
protected [16]  10/1 14/8 14/11 14/12
14/15 28/2 32/8 32/24 46/15 52/4 52/6
113/8 169/24 176/10 180/18 181/1
protection [8]  7/5 9/22 32/4 33/1 33/6
43/16 47/12 264/3
protections [5]  8/21 11/11 16/25 68/10
108/8
prove [5]  9/7 10/25 11/1 169/1 177/25
proven [1]  163/16
proves [1]  162/18
provide [12]  25/9 30/17 30/20 63/13
66/24 97/14 121/13 145/23 148/20
202/14 214/23 233/16
provided [11]  11/17 17/1 17/2 132/14
140/11 152/25 172/18 181/20 197/13
212/1 250/25
provides [2]  113/17 139/6
providing [2]  96/14 147/1
proving [1]  191/8
provision [21]  98/17 98/21 103/2 103/7
103/19 110/20 126/23 127/2 127/17
127/20 127/22 127/23 128/23 129/21
130/7 130/18 130/22 152/23 168/14
174/3 176/1
provisions [8]  97/22 101/23 102/10
102/14 103/18 128/18 129/10 129/23

## P

public [35]  4/6 17/11 18/10 18/10 32/12 90/16 99/24 105/8 110/9 115/7 122/25 145/13 145/13 145/16 146/1 146/6 146/11 147/4 147/20 148/12 149/13 150/14 150/25 151/14 152/3 152/13 164/23 194/3 195/9 198/25 222/4 223/16 226/2 266/21 266/22
pull [5]  207/8 228/7 237/12 237/13 250/9
pull-ahead [2]  237/12 237/13
pulled [3]  269/3 270/8 271/21
punitive [1]  133/11
purely [3]  43/2 116/19 120/21
purport [1]  257/25
purported [1]  212/20
purportedly [1]  107/19
purporting [1]  138/1
purpose [22]  1/19 12/13 40/15 48/22 52/13 58/2 58/8 59/1 69/9 71/24 74/2 92/6 101/9 101/12 102/15 104/7 110/18 149/16 252/21 252/22 254/6 265/9
purposes [16]  56/24 58/6 68/23 69/8 70/12 95/9 95/20 96/10 104/2 104/5 142/2 145/4 167/18 187/8 221/12 224/2
pursuant [3]  21/15 148/16 150/3
pursue [4]  13/25 113/2 134/20 135/18
pursuing [1]  190/23
pursuit [1]  185/14
put [50]  17/22 28/13 29/10 29/14 30/12 33/10 64/6 68/3 70/3 78/20 81/5 87/2 92/4 92/13 92/20 100/25 106/1 108/2 111/2 120/1 125/7 125/10 132/6 132/9 147/9 165/10 166/1 170/23 178/23 179/8 183/17 186/16 187/20 188/25 192/17 198/8 202/16 209/8 209/14 220/12 227/11 227/20 238/17 242/3 247/24 257/1 263/2 264/14 266/3 269/10
puts [4]  28/3 28/9 46/14 96/17
putting [3]  101/2 141/7 269/8

## Q

qualification [1]  187/4
qualifications [4]  114/8 114/14 114/19 114/20
qualified [4]  87/7 93/21 238/14 270/6
qualify [2]  68/23 270/20
quality [1]  200/11
quash [1]  53/17
queer [1]  213/12
question [57]  5/8 8/17 9/3 10/21 13/9 13/10 16/11 51/12 62/7 70/9 79/15 80/1 80/1 80/24 81/6 82/7 87/14 88/9 88/25 97/24 98/1 98/5 99/22 100/21 110/20 137/22 139/25 143/11 175/5 180/14 180/16 181/3 182/13 186/16 191/19 207/1 207/6 228/17 230/3 232/11 233/11 234/4 234/16 238/9 238/18 239/20 242/22 248/4 256/4 257/1 262/10 262/18 263/12 265/4 265/6 268/7 268/7
questioned [2]  121/1 178/19
questions [39]  20/2 35/14 35/15 71/11 103/24 111/24 120/7 137/4 140/13 140/22 141/4 146/23 147/3 159/16 159/21 161/15 199/23 205/14 227/21 232/15 232/19 245/14 245/16 245/17 245/20 246/2 246/4 248/25 249/1 249/2 249/3 249/4 249/6 249/8 249/11 251/10 251/12 252/25 253/1
quicker [1]  227/22
quickly [3]  151/12 151/22 182/11
quiet [2]  273/19 273/20
quite [9]  49/10 61/17 67/23 69/16 110/22

134/1 136/7 136/16 179/7
quota [2]  113/7 169/23
quotation [1]  170/1
quote [21]  40/13 44/5 85/17 85/18 85/23 90/17 99/15 115/7 116/6 116/8 122/5 122/6 122/21 123/3 124/10 125/4 134/7 139/7 159/24 169/24 172/11
quoted [6]  90/7 107/24 115/6 115/15 117/1 128/15
quotes [2]  98/3 99/13

## R

radio [1]  73/1
raise [5]  7/4 67/14 96/25 138/16 161/4
raised [10]  23/23 24/2 26/19 50/19 99/23 127/6 167/22 233/18 233/22 265/1
raising [4]  26/12 106/4 126/22 242/9
rakes [1]  185/25
range [3]  52/22 134/16 241/7
ranging [1]  135/8
rata [1]  71/7
rate [1]  260/13
rather [7]  16/10 77/24 124/11 127/4 181/19 263/5 263/8
ratified [1]  163/11
raw [1]  242/1
RDPFFA [1]  153/16
Re [2]  43/18 43/25
reach [7]  34/22 75/24 82/8 115/20 118/17 183/4 207/25
reached [3]  192/18 265/14 271/22
reaches [1]  113/11
reaching [1]  156/14
react [1]  105/5
reaction [3]  96/25 142/6 160/22
read [21]  6/3 35/11 36/14 55/24 61/22 65/7 76/17 98/3 99/10 100/9 122/16 128/15 135/5 136/6 137/6 159/19 170/17 174/23 206/19 236/14 243/4
readable [1]  95/7
readily [1]  136/19
reads [2]  134/13 138/22
ready [3]  43/8 53/1 132/17
real [4]  28/14 147/2 182/7 184/7
realistic [1]  160/12
reality [4]  63/16 70/7 80/25 170/11
realize [1]  54/13
really [42]  6/10 26/6 29/11 56/6 56/7 56/8 67/25 77/22 78/10 80/21 82/10 85/14 87/16 90/1 91/6 92/5 93/20 95/16 96/9 97/24 101/1 106/11 108/25 134/11 135/3 135/4 136/16 136/23 137/13 137/13 141/17 141/25 144/2 144/5 144/12 160/10 183/15 184/4 185/6 185/7 188/4 271/17
realtime [5]  1/4 1/8 1/8 1/12 1/18
reask [1]  262/18
reason [22]  34/8 34/13 34/19 35/25 44/1 49/13 51/9 55/1 57/22 62/5 64/24 69/23 72/9 73/21 101/10 101/13 103/9 103/20 177/8 177/13 179/23 255/4
reasonable [5]  40/17 41/16 41/18 70/8 70/18
reasonably [2]  30/25 69/13
reasoning [2]  16/13 98/24
reasons [10]  67/24 71/21 90/22 91/17 100/23 111/1 119/12 157/25 160/19 162/21
reasserted [1]  39/23
rebuttal [2]  36/2 48/15
recall [11]  16/14 23/1 35/11 110/20 167/21 182/20 233/8 247/10 249/10 255/1 256/17

Recalling [1]  39/11
recalls [1]  114/7
receipts [28]  199/11 200/9 203/12 206/8 207/12 207/18 211/8 211/12 211/16 212/5 212/6 212/18 212/21 212/23 213/1 213/11 213/16 215/3 215/6 224/14 227/24 232/5 235/3 258/14 259/21 260/7 260/8 262/24
receive [2]  1/8 87/9
received [11]  38/5 38/11 81/12 89/9 89/24 123/1 123/17 214/12 248/12 265/23 266/9
receives [3]  111/21 211/21 212/3
receiving [4]  33/3 108/18 160/16 200/11
recently [3]  142/22 193/21 236/1
recess [1]  192/5
recognition [1]  174/25
recognize [1]  74/3
recognized [2]  12/8 145/16
recognizes [1]  117/1
recognizing [1]  149/12
recollection [3]  233/1 253/25 255/2
recommendation [1]  122/13
reconciled [1]  225/15
reconsider [1]  18/8
reconsideration [2]  27/16 34/1
reconstruct [1]  233/12
reconstructing [1]  233/5
reconvene [3]  131/11 272/24 273/21
record [50]  32/13 32/19 37/1 38/18 40/1 47/19 49/6 50/13 50/16 50/22 50/25 51/7 51/10 54/9 54/21 72/7 72/15 84/11 84/12 84/13 84/13 84/13 92/9 93/2 93/3 99/11 104/10 112/25 113/3 125/19 126/25 128/9 128/11 132/5 132/8 140/21 146/17 151/25 162/9 163/16 184/5 192/18 193/11 193/25 197/10 219/24 238/4 242/12 246/11 261/15
recorded [3]  196/21 197/4 197/7
recording [1]  256/5
records [11]  85/1 199/14 199/15 199/20 199/22 205/16 206/19 206/20 270/9 270/13 272/3
recounting [2]  111/21 261/13
red [1]  147/20
redactions [1]  24/4
redo [3]  113/18 170/13 218/1
reduce [1]  134/8
reduced [3]  121/18 122/24 186/22
reducing [1]  260/8
reduction [1]  65/23
reductions [1]  68/5
reenacted [1]  149/24
refer [4]  106/22 130/15 141/14 260/4
reference [3]  110/9 140/2 147/10
referenced [1]  6/23 32/22
references [2]  36/13 134/2
referendum [28]  41/19 98/11 98/19 98/22 101/3 101/24 102/1 102/6 102/10 102/17 102/24 103/20 106/25 107/5 107/15 109/17 110/19 111/4 127/18 127/21 127/23 128/19 129/1 129/11 130/9 130/16 130/20 168/12
referral [1]  129/2
referred [9]  38/11 112/13 145/12 146/16 151/11 151/21 179/15 179/25 186/9
referring [7]  20/17 20/21 68/19 174/13 215/10 259/25 262/3
refers [2]  136/3 260/5
refinancing [2]  212/11 215/11
reflect [3]  31/4 92/9 212/12
reflected [4]  105/7 124/6 221/24 235/14
reflective [1]  224/25

R

reflects [5] 28/2 47/20 135/17 218/16 266/25
refunding [2] 226/24 227/5
refunds [1] 223/23
regard [15] 29/11 32/3 35/3 52/20 100/11 138/7 140/1 143/20 152/8 157/8 157/9 157/11 158/3 158/4 192/19
regarded [1] 77/3
regarding [24] 11/3 41/5 47/20 91/8 106/4 107/3 108/6 114/5 116/12 116/18 120/20 123/3 128/9 128/12 128/17 135/25 136/7 138/17 140/16 140/19 140/24 141/4 143/7 214/22
regardless [1] 136/2
regards [3] 168/4 175/4 182/13
regauged [1] 111/11
Regrettably [1] 93/21
regular [1] 142/12
regularly [1] 273/15
reimbursements [1] 227/8
reinstruct [1] 83/23
reinvestment [1] 135/10
reject [1] 52/6
rejected [9] 109/14 109/21 113/18 128/19 129/2 130/8 130/13 156/24 170/14
rejection [1] 170/15
rejects [1] 113/15
relate [4] 23/23 44/13 111/25 165/11
related [16] 23/3 24/16 27/12 35/6 35/9 44/15 107/22 114/19 125/12 134/5 134/6 161/7 190/10 196/24 213/2 257/13
relates [5] 19/4 24/2 27/18 143/17 232/13
relating [9] 26/4 32/15 51/17 60/25 61/1 66/17 71/11 101/3 266/12
relation [1] 27/6
relations [1] 148/14
relationship [6] 12/17 12/19 15/3 28/1 28/6 31/8
relative [4] 132/21 167/18 169/12 177/7
relatively [1] 136/1
release [1] 136/12
released [2] 31/4 31/8
relegated [1] 155/24
relevance [11] 8/14 8/14 9/7 10/14 10/21 12/1 30/16 86/5 237/23 237/24 238/2
relevant [25] 10/22 11/5 22/15 22/16 29/23 30/22 40/9 49/14 61/14 64/21 70/6 73/5 78/5 81/23 89/8 91/7 92/7 95/22 100/10 103/3 104/3 117/5 142/3 149/7 174/17
reliability [1] 200/3 213/22
relief [7] 66/24 67/7 70/17 91/2 96/7 96/13 123/8
rely [5] 5/1 21/25 46/8 147/5 198/6
relying [3] 34/15 35/23 239/11
remain [2] 120/7 163/23
remained [1] 64/25
remaining [1] 4/21
remember [23] 201/22 231/4 232/8 233/9 233/25 234/5 234/9 234/10 234/12 234/23 235/6 245/7 245/17 249/2 249/6 249/8 251/12 252/11 252/16 252/25 254/10 254/12 268/11
remembering [3] 87/23 233/6 247/16
remind [3] 131/2 273/12 273/19
removal [1] 150/12
remove [1] 150/10
render [2] 70/12 99/18
rendered [1] 271/18
renders [1] 167/11
reopened [1] 34/14

reopening [1] 34/8
reorganize [1] 63/19
repaying [1] 260/19
repeal [1] 107/14
repealed [2] 149/24 168/12
repeat [3] 175/14 180/4 228/17
repeatedly [1] 99/5
repeating [1] 147/7
repetitive [1] 157/7
rephrase [1] 263/9
replacement [1] 168/9
report [12] 61/17 61/18 90/17 120/22 198/14 202/9 202/11 202/12 202/18 202/23 203/1 203/9
reported [2] 71/23 221/25
reporter's [1] 1/13
reporting [1] 90/14
reports [4] 120/1 199/6 199/8 200/23
represent [18] 6/21 7/15 29/15 30/13 78/17 78/18 79/9 79/13 79/20 80/5 80/18 80/22 89/7 138/1 155/1 202/3 226/8 269/15
representation [3] 12/15 29/13 269/11
representations [1] 185/20
representative [3] 72/19 82/24 140/16
representatives [12] 18/11 74/14 95/6 95/17 117/2 145/17 155/9 155/24 192/21 247/14 250/4 252/1
represented [1] 87/6
representing [5] 4/2 9/13 10/12 42/23 138/21
represents [2] 140/22 194/2
Republican [1] 148/8
request [13] 6/11 15/6 21/4 22/3 27/17 36/7 51/23 52/17 52/19 122/18 142/24 156/2 157/9
requested [1] 37/24
requesting [1] 259/19
requests [3] 89/10 89/15 162/23
require [7] 55/2 130/22 198/2 206/18 206/21 257/12 270/25
required [15] 61/18 86/7 90/11 102/7 130/12 137/5 146/21 166/23 172/18 180/12 202/23 225/6 228/23 228/25 255/9
requirement [3] 160/11 184/13 185/12
requirements [4] 65/21 108/9 157/2 270/18
requires [9] 167/1 167/2 197/18 204/7 206/11 206/19 223/4 228/11 270/11
requiring [2] 93/18 171/6
research [8] 12/7 27/18 29/9 31/22 32/6 33/10 97/25 101/8
reservation [2] 138/23 160/2
reserve [2] 72/19 225/22
residents [7] 17/15 63/14 96/6 96/11 96/14 236/9 236/10
resolve [9] 5/4 22/10 24/6 68/12 149/3 154/5 156/25 161/19 254/17
resolved [2] 24/10 24/13
resolving [1] 73/1
resorting [1] 150/24
respect [53] 6/18 7/12 8/23 9/22 15/12 16/11 16/22 17/4 17/5 36/5 36/18 37/14 37/19 37/23 38/2 38/18 38/20 50/20 65/21 70/10 71/13 73/13 74/22 76/8 81/15 81/25 90/5 97/6 116/6 119/20 126/23 127/1 127/14 142/16 167/22 184/10 184/24 235/24 236/13 237/2 237/7 239/2 240/18 240/19 241/2 241/4 246/23 249/9 253/1 255/8 258/16 262/25 263/10
respectfully [10] 18/8 21/8 106/8 158/5

158/16 159/10 162/20 163/13 164/10 164/13
respective [1] 163/11
respond [8] 23/25 45/2 87/11 87/17 120/7 153/23 155/13 159/7
responded [1] 80/14
respondent [1] 79/12
response [18] 15/25 38/9 79/16 88/10 88/16 88/17 89/3 102/9 114/22 122/2 138/18 142/25 152/5 157/13 160/18 249/13 267/24 268/12
responses [1] 204/12
responsible [4] 154/4 154/22 186/13 188/20
responsive [2] 97/19 154/23
rest [2] 103/9 112/3
restricted [1] 262/1
restructuring [29] 90/19 91/24 95/1 111/18 112/11 113/3 114/19 114/21 116/13 117/4 118/14 119/20 121/14 123/4 135/11 135/12 137/9 152/15 169/6 187/20 193/24 194/1 194/5 194/19 195/7 209/23 235/15 248/15 264/2
restructurings [1] 85/1
resubmit [1] 131/24
result [11] 29/20 81/17 85/9 98/23 99/8 103/17 200/19 213/23 221/16 243/9 265/25
resulted [1] 163/9
results [5] 81/16 163/18 167/9 177/17 205/21
retain [1] 14/5
retained [12] 6/21 7/24 8/10 8/11 10/4 10/6 10/7 29/7 42/2 64/17 195/13 195/21
retaining [2] 13/25 48/22
retention [12] 6/7 6/8 6/14 7/9 11/18 12/3 13/11 14/24 14/25 33/3 52/5 144/12
retired [13] 4/10 105/4 105/9 116/10 117/2 139/3 153/15 153/17 154/13 154/15 155/1 172/23 182/23
retiree [28] 3/12 4/1 8/22 70/10 74/23 78/15 87/8 88/1 88/4 88/20 89/6 95/17 105/12 115/19 119/16 138/20 140/9 153/6 154/1 155/23 156/3 164/8 164/21 165/15 173/6 240/22 266/8 268/2
retirement [1] 2/23
retirees [36] 7/5 74/15 76/6 78/17 78/18 79/9 79/13 79/20 116/14 138/2 138/22 154/12 154/17 154/24 155/2 155/9 155/22 156/7 156/9 156/12 156/17 156/19 156/22 157/1 163/10 172/2 173/2 173/3 181/25 182/1 182/4 248/3 248/23 250/24 266/19 266/19
retirement [25] 3/19 105/1 105/21 119/23 123/5 123/14 123/18 124/1 131/22 137/16 139/8 140/1 147/9 153/8 154/8 217/5 217/6 217/10 217/20 229/15 229/16 230/19 230/20 248/24 250/4
revealed [5] 11/24 13/16 14/19 18/4 19/6
reveals [2] 9/25 13/5
revenue [11] 67/14 97/8 97/10 97/13 212/2 212/8 235/21 236/5 236/21 241/5 241/10
revenues [13] 186/4 186/19 197/3 198/21 199/9 206/2 206/10 236/11 239/3 243/12 244/24 265/15 267/17
reverse [2] 65/8 85/11
reverses [1] 98/20
review [17] 15/6 21/13 22/15 23/11 36/7 36/8 42/25 52/23 98/2 98/14 110/2 130/5 143/2 167/16 168/17 170/9 242/19
reviewed [2] 127/25 254/24
reviewing [2] 44/13 44/14

**R**

reviews [1] 37/12
revised [2] 25/19 38/10
revision [2] 113/17 170/13
revisions [1] 118/24
revisit [1] 6/11
revitalization [4] 134/20 134/22 135/3
 143/17
revival [1] 145/24
Reynolds [1] 129/5
RFA [2] 181/4 181/7
RFP [1] 32/11
Richard [3] 24/19 106/18 113/10
ride [1] 190/16
right [82] 5/12 5/19 13/3 14/7 15/18 16/14
 17/16 18/13 23/15 27/21 32/19 33/17
 35/8 37/21 38/13 38/16 39/4 48/14 50/7
 51/4 53/8 55/20 55/21 58/7 59/8 59/19
 59/22 60/10 70/19 73/6 75/4 76/7 87/18
 88/16 88/17 96/18 96/19 100/7 104/6
 105/22 109/3 113/25 125/9 130/25
 132/10 132/17 137/20 139/13 151/14
 152/1 159/24 170/2 171/1 174/10 174/15
 174/15 186/20 189/8 189/8 192/5 195/10
 195/19 198/8 201/23 204/18 208/19
 211/19 213/6 214/19 222/23 227/17
 228/13 232/17 238/7 242/7 242/21 243/7
 243/18 258/21 259/9 271/8 272/22
rights [7] 72/20 115/19 119/17 138/23
 151/17 160/3 181/6
ripples [1] 68/16
rise [5] 39/7 131/12 165/5 192/8 273/22
rises [1] 137/23
risk [2] 221/14 221/22
role [2] 104/21 196/12
roles [1] 2/24
roll [5] 117/21 118/7 118/7 118/23 121/6
rolled [2] 17/14 150/20
Ron [1] 3/20
Ronald [1] 3/22
room [10] 89/12 89/13 117/7 136/5 136/7
 136/9 136/11 136/18 138/17 241/24
roomful [2] 160/3 160/8
rooms [1] 82/16
Rotors [2] 64/15 64/16
rough [5] 1/2 1/4 1/8 1/12 2/2
roughly [9] 215/8 215/16 221/21 229/9
 245/1 245/2 259/15 261/7 265/19
round [1] 94/24
routinely [1] 157/24
row [1] 214/14
rows [1] 120/4
Ruegger [2] 3/1 242/23
rule [12] 12/9 12/14 26/20 43/8 46/12
 99/19 204/9 205/4 257/21 270/7 270/11
 270/18
ruled [3] 6/12 16/10 50/23
rules [5] 46/17 47/1 57/20 73/9 140/23
ruling [11] 18/7 18/14 34/9 34/15 34/18
 35/16 35/21 50/20 51/6 52/2 265/3
rulings [1] 35/24
run [8] 61/25 62/4 62/8 102/18 159/3
 170/14 220/7 220/15
running [1] 136/8
rush [1] 156/4
Ryan [3] 4/2 53/14 109/18

**S**

sad [2] 159/11 164/11
Sadly [1] 61/13
safety [19] 4/6 105/8 122/25 145/13
 145/14 145/16 146/1 146/6 146/11 147/4

147/20 148/12 149/13 152/3 152/13
 164/24 222/4 266/22 266/22
said [91] 12/23 15/3 15/8 23/3 36/23
 42/11 43/10 43/22 44/5 48/18 51/10
 56/25 57/10 57/12 58/3 59/3 59/21 62/6
 74/10 77/23 79/14 79/15 79/19 80/14
 80/18 80/20 80/25 83/2 83/10 85/3 86/2
 86/10 86/19 89/6 89/7 90/15 96/7 101/24
 119/24 120/2 128/6 144/3 147/7 159/1
 160/24 161/1 170/5 172/25 176/7 177/24
 178/24 184/19 186/17 188/23 189/3
 189/23 231/4 231/5 231/12 231/14 232/8
 232/9 232/21 232/24 233/2 233/5 233/5
 233/8 233/9 234/7 234/8 234/13 234/23
 235/2 235/6 243/12 244/20 244/22
 244/22 244/23 245/7 249/13 259/14
 259/18 260/11 260/16 261/1 262/17
 265/15 265/20 268/8
salaries [1] 237/2
sales [4] 65/15 66/7 66/14 236/18
salient [2] 7/6 114/8
same [9] 9/19 29/3 34/11 44/1 57/3
 110/1 123/4 123/9 133/4 139/25 142/9
 146/20 149/23 150/20 160/17 170/24
 170/25 175/19 179/5 189/19 208/8
 220/20 227/21 228/4 228/14 231/18
 244/17 251/19 265/1
Sandler [4] 2/19 104/20 157/6 203/25
Sara [1] 123/10
sat [1] 243/18
satisfied [4] 89/16 89/23 91/16 270/17
satisfy [3] 126/5 156/12 157/1
save [2] 100/10 101/9
saved [1] 101/11
savings [4] 66/1 162/24 162/25 163/10
saw [6] 25/20 78/25 135/23 185/5 223/12
 236/18
say [75] 21/22 24/12 24/13 31/12 37/3
 40/2 44/4 44/19 44/22 46/13 57/6 58/14
 61/5 61/9 61/24 62/9 66/7 70/11 74/10
 75/10 76/12 77/5 80/6 80/23 83/6 87/25
 88/21 95/22 99/4 103/10 109/1 115/7
 134/2 138/12 146/5 148/25 153/1 159/16
 164/9 166/17 166/19 174/7 194/1 208/25
 211/18 219/1 219/5 219/18 231/13 233/6
 233/11 234/5 234/6 234/8 234/11 235/5
 239/16 241/11 241/22 244/16 245/6
 256/4 259/11 262/1 262/5 262/21 263/7
 264/22 264/22 264/23 265/13 267/23
 268/7 270/15 272/12
saying [17] 37/8 42/15 43/1 58/1 58/17
 59/5 91/21 117/8 124/3 157/17 162/12
 179/3 181/25 183/20 183/22 191/17
 261/13
says [43] 12/3 13/25 40/3 43/15 43/25
 65/15 66/11 79/7 80/4 80/21 81/6 87/24
 88/6 88/10 95/10 95/16 98/20 99/16
 119/14 119/18 120/3 125/7 166/22
 169/21 172/20 174/7 174/10 174/10
 174/15 174/18 183/3 188/1 205/12
 210/12 212/18 215/11 216/22 226/17
 227/18 242/15 242/19 265/8 272/13
scenario [3] 88/2 97/15 248/15
scenarios [2] 48/25 49/4
schedule [5] 54/14 229/23 250/23 264/1
 265/22
scheduled [12] 6/24 133/13 176/19
 176/20 176/24 182/4 208/15 219/3
 229/15 230/12 250/18 266/7
schedules [1] 250/21
scheme [6] 69/19
Schneider [2] 3/3 54/24
school [1] 101/7

schools [4] 85/20 195/9 223/16 226/2
scope [7] 19/6 19/14 39/1 126/6 140/14
 177/19 196/10
scratched [1] 100/19
screen [8] 147/16 151/24 170/24 207/5
 209/8 216/17 269/8 269/10
scrub [2] 200/12 214/9
scrubbed [1] 214/8
se [1] 271/10
search [1] 93/25
seated [2] 39/11 192/12
second [24] 6/8 15/21 23/8 37/22 74/16
 81/12 86/4 92/9 92/16 94/3 100/7 108/22
 128/22 131/2 132/2 133/4 150/9 161/17
 179/16 204/13 216/3 228/6 239/24
 259/22
Secondly [2] 24/11 24/23
secrecy [2] 18/9 18/15
secretary [5] 98/12 106/24 110/7 118/8
 123/10
secretly [1] 184/2
section [25] 16/24 62/16 77/11 90/5
 108/10 124/18 128/24 135/11 139/6
 139/15 139/17 139/23 142/16 142/19
 146/21 156/13 157/2 161/9 167/1 167/11
 167/16 167/23 174/14 185/12 203/2
sector [1] 194/3
secured [4] 62/17 62/21 186/5 190/2
securities [1] 246/17
security [1] 246/6
see [30] 30/19 42/19 55/1 62/13 65/6
 69/16 79/10 83/15 83/22 89/10 101/17
 105/3 105/10 117/19 131/10 135/21
 147/23 170/24 183/25 186/9 203/8 207/4
 209/9 211/9 211/14 211/14 216/16 224/7
 270/14 270/16
seeing [2] 108/19 152/2
seek [9] 35/22 48/20 52/2 52/23 117/13
 138/24 139/25 178/23 181/9
seeking [15] 7/7 31/9 32/14 32/16 32/19
 32/25 32/25 112/25 123/7 123/15 123/19
 124/2 133/7 152/6 152/11
seem [3] 37/16 40/6 164/4
seems [3] 27/19 36/24 128/23
seen [15] 6/2 10/24 13/21 54/20 92/19
 93/3 142/12 157/14 169/8 171/21 174/6
 176/16 176/22 202/20 269/14
segment [2] 216/14 216/18
segregate [1] 222/15
segregated [1] 262/2
segue [1] 134/25
select [1] 44/19
selected [2] 44/17 168/23
selective [6] 7/12 42/17 46/3 46/16 46/17
 46/25
selectively [3] 9/18 44/11 44/23
self [3] 33/10 74/13 216/21
Senate [1] 109/22
send [3] 87/12 148/23 155/3
sends [2] 116/21 121/10
senior [1] 125/3
sense [7] 20/12 29/12 36/20 100/18
 183/4 184/15 239/10
senses [1] 74/13
sensible [1] 84/15
sent [8] 43/2 79/7 84/24 124/3 152/10
 152/12 155/12 162/22
sentence [3] 76/22 80/9 100/14
sentences [2] 76/16 76/17
separate [4] 49/14 94/12 94/22 186/12
separately [1] 218/3
September [7] 6/12 15/22 15/22 16/9

S

September... [3] 16/21 18/7 26/9
September 19 [1] 26/9
September 19th [2] 15/22 18/7
sequestered [1] 192/20
sequestration [2] 192/19 192/24
sergeants [3] 145/10 150/22 151/9
serially [1] 166/1
series [6] 6/19 99/9 119/6 120/14 136/16 268/23
serious [4] 84/25 93/14 110/3 142/20
serve [4] 114/14 154/17 195/21 195/25
served [2] 133/8 181/8
service [12] 154/11 154/25 196/24 197/5 211/23 240/20 246/16 248/17 250/18 250/19 266/7 266/17
services [9] 9/15 35/17 63/13 96/14 97/14 135/9 145/23 197/13 211/25
serving [1] 111/17
session [2] 39/10 192/11
sessions [2] 136/1 155/15
set [11] 54/11 66/22 141/9 146/18 146/20 158/16 166/16 184/22 212/14 215/14 247/12
sets [2] 110/14 162/1
setting [2] 133/6 149/19
seven [3] 84/17 111/16 265/18
sever [1] 103/6
several [10] 48/8 63/11 67/2 68/16 116/15 117/16 118/13 119/12 144/13 234/1
severe [3] 146/8 190/6 190/8
sewage [1] 126/2
sewer [5] 186/11 188/19 197/15 217/12 217/18
sewerage [3] 189/6 189/12 190/1
sewers [4] 186/15 186/18 189/23 190/19
shadow [3] 112/22 134/4 134/21
shall [2] 139/9 139/10
shape [1] 166/3
share [6] 31/25 32/1 130/14 159/20 182/1 261/20
shared [14] 31/16 31/20 33/16 36/20 37/4 37/15 40/2 40/4 40/6 41/21 48/8 51/22 51/23 252/24
sharing [2] 212/2 241/5
Sharon [5] 2/17 104/9 104/20 105/25 157/6
Sharp [1] 4/13
she [5] 42/9 128/3 128/6 128/7 164/24
sheet [1] 69/21
Sherwood [2] 2/18 203/24
shield [2] 13/7 46/7
shields [1] 29/22
shift [1] 143/15
Shirley [1] 153/13
short [9] 93/17 93/18 95/23 99/20 196/4 200/22 203/3 208/4 235/3
shorter [1] 196/16
shortfall [1] 261/9
shortly [5] 106/20 107/18 108/16 109/20 149/25
should [56] 1/16 2/10 16/4 16/6 17/10 21/24 22/25 22/25 23/1 23/4 23/11 23/13 24/4 26/22 29/24 32/8 34/14 34/21 45/5 46/10 46/24 50/10 54/10 69/18 70/1 70/17 78/9 78/10 84/1 86/20 92/9 99/19 112/3 112/20 125/21 126/15 128/22 134/14 134/20 134/23 141/1 157/10 161/16 164/2 166/3 189/9 192/20 200/14 204/5 204/9 204/23 230/13 240/10 241/18 249/22 257/13

shouldn't [4] 17/18 28/5 29/8 206/15
show [82] 56/24 61/13 62/2 65/25 81/10 82/11 85/8 85/17 86/3 89/11 89/13 89/25 90/21 91/13 93/10 95/2 96/20 97/1 97/16 101/8 106/1 116/2 117/17 129/9 133/6 135/22 136/22 142/9 145/15 146/19 149/16 155/8 155/19 156/6 156/15 156/23 163/2 164/9 166/11 166/19 166/22 167/5 168/15 169/1 169/13 171/3 171/5 171/14 171/21 171/23 172/2 172/5 172/9 173/20 177/21 178/5 178/10 180/20 180/24 181/12 182/3 183/15 184/23 184/24 185/2 185/21 186/7 186/14 187/9 187/11 188/7 188/11 188/17 189/14 189/24 190/4 190/11 190/18 191/7 210/9 232/2 258/2
showed [6] 134/7 136/6 138/19 143/10 230/25 259/8
showing [9] 61/1 69/9 132/22 146/13 165/24 178/2 178/3 209/23 231/6
shown [13] 26/21 59/25 166/17 173/7 188/9 207/25 215/9 216/5 222/14 227/13 228/18 232/6 232/15
shows [9] 62/16 72/7 84/2 95/2 123/11 176/21 176/22 180/8 217/16
shuffle [1] 39/13
shy [1] 83/25
side [7] 50/17 82/6 82/6 95/15 96/24 163/16 176/25
sign [2] 136/11 138/13
signature [1] 138/12
signatures [3] 102/7 102/20 130/6
signed [4] 133/5 143/1 148/9 149/25
significance [3] 54/17 54/18 61/16
significant [9] 62/23 66/15 68/4 116/9 137/17 172/21 176/16 189/20 259/19
significantly [2] 222/18 259/21
signs [3] 106/21 110/6 143/20
silence [2] 131/4 131/8
silly [1] 77/25
Silverman [2] 3/25 153/5
similar [8] 62/19 79/25 99/20 129/7 130/19 130/21 184/11 205/6
Simon [5] 3/8 5/17 54/5 133/18 237/22
simple [7] 11/16 13/24 129/8 158/14 177/15 206/22 270/19
simplicity [1] 224/2
simplistic [1] 237/1
simply [15] 33/8 35/5 45/2 61/9 128/13 129/6 138/11 158/1 158/6 205/6 205/23 224/3 238/17 243/6 244/21
since [12] 11/23 16/15 34/17 142/21 154/1 158/7 193/21 195/21 242/14 257/22 266/24 269/8
Sincora [2] 152/15
single [4] 84/20 103/17 158/15 237/16
sir [16] 2/20 5/19 20/2 23/15 33/24 36/1 78/24 95/12 193/7 203/22 204/2 204/24 214/2 216/6 217/21 244/3
sirs [1] 184/18
sit [2] 193/6 215/17
site [2] 90/16 180/3
sites [1] 81/16
sitting [3] 3/10 23/17 130/11 133/11
situation [16] 10/3 29/17 55/4 74/18 77/3 93/14 96/21 102/12 125/18 153/23 177/22 184/11 231/15 234/21 234/24 262/25
situations [2] 46/14 105/12
six [9] 15/8 20/18 42/3 56/21 58/9 58/23 84/16 121/25 158/25
six-month [1] 158/25
Sixth [4] 40/10 43/13 205/8 206/16

size [7] 71/5 71/12 72/13 182/7 183/10 187/13 255/8
skip [2] 100/13 177/4
slashed [1] 173/10
slate [1] 98/9
slated [1] 122/10
sleep [1] 144/24
slide [14] 106/1 113/1 132/7 133/21 133/23 134/7 134/13 135/5 135/24 150/9 163/1 169/20 177/4 185/5
slides [3] 143/9 159/20 191/13
slightest [1] 81/19
slow [3] 109/1 109/5 109/6
small [3] 56/1 146/2 158/14
smaller [1] 157/14
snapshot [3] 198/21 202/14 203/12
Snyder [10] 6/25 19/5 21/5 23/22 106/16 106/18 107/20 108/14 122/13 139/20
Snyder's [2] 16/17 113/11
so [195] 5/10 5/14 5/23 6/13 9/21 14/15 16/4 23/24 24/7 25/6 26/3 26/21 27/8 28/23 29/11 31/21 32/5 34/12 35/20 36/19 37/11 38/6 38/10 38/14 39/18 40/1 41/8 42/2 44/3 44/21 50/1 52/20 53/8 56/10 56/17 61/4 62/21 62/24 64/19 65/12 67/5 69/12 71/21 72/4 72/13 72/23 76/4 76/11 76/17 77/2 77/18 78/23 79/18 79/20 81/25 82/20 83/18 84/24 85/25 88/8 90/17 91/15 92/5 92/18 94/1 94/1 94/12 94/14 94/19 94/22 95/7 95/11 95/19 96/14 97/10 98/2 99/3 101/11 101/13 102/4 102/11 103/6 103/10 104/24 106/17 109/1 113/16 125/13 125/21 126/25 127/4 131/24 131/25 132/7 133/3 133/7 133/9 133/22 134/25 136/15 137/11 137/19 138/3 138/5 140/18 141/18 142/8 143/20 143/23 145/24 147/22 149/2 153/1 157/22 159/17 162/9 162/12 163/3 163/13 165/2 165/25 166/25 167/7 167/16 168/3 170/4 173/13 177/14 179/2 180/11 180/13 181/1 181/11 183/25 184/3 185/8 186/20 188/12 190/4 191/6 192/3 195/4 195/18 196/5 197/4 197/19 200/12 201/2 203/8 204/8 205/14 210/17 210/21 211/14 212/14 213/3 214/10 214/14 216/3 216/16 218/19 219/5 219/8 219/24 221/15 222/1 222/1 223/20 225/12 225/22 226/5 227/21 229/21 230/16 232/24 238/4 238/9 239/7 240/17 242/11 243/4 243/16 243/18 255/25 256/4 258/10 260/11 265/3 267/3 268/20 268/23 269/4 270/15 271/1 273/16
so-called [1] 213/3
software [1] 201/12
sold [3] 66/12 194/20 194/21
solicitation [2] 73/5 73/9
solid [3] 221/13 221/21 222/3
solution [4] 77/7 77/9 82/22 97/10
solutions [3] 93/25 112/13 134/24
solve [1] 67/20
solved [1] 141/6
solvency [3] 157/8 158/3 171/11
solvent [1] 189/25
solving [1] 63/18
some [84] 10/8 23/23 30/22 39/13 40/25 41/5 43/23 45/11 46/1 46/24 49/9 49/12 57/7 58/1 58/11 60/22 66/13 66/17 67/3 71/18 74/13 75/9 77/5 79/1 79/17 83/8 83/15 86/11 89/11 89/17 89/19 92/13 96/20 98/2 101/1 103/9 103/21 108/4 114/18 118/18 128/21 139/23 140/22 148/3 147/7 149/2 151/16 152/24 157/14

S

some... [35]  162/22 168/6 171/20 171/21
171/22 175/13 181/25 182/10 185/22
195/6 195/11 197/24 198/23 201/5 203/3
205/21 206/12 211/6 211/7 211/15 217/9
222/8 226/4 227/15 239/17 248/23
248/23 249/1 250/3 250/5 250/12 252/15
254/14 254/22 268/23
somebody [2]  80/18 87/16
somehow [5]  103/8 151/16 160/7 162/17
188/22
someone [7]  32/1 80/10 90/13 203/17
223/21 250/8 257/6
something [32]  15/1 34/23 47/14 61/2
67/8 86/1 87/12 90/15 90/20 96/1 96/18
96/19 134/12 141/14 175/6 179/11
189/11 202/9 206/13 217/1 221/2 221/3
221/5 222/24 224/12 225/9 226/17 239/8
271/23 272/25 273/1 273/5
sometime [2]  145/21 256/18
sometimes [2]  84/19 246/9
somewhat [1]  44/12
soon [2]  121/14 131/25
sooner [1]  124/11
sophisticated [3]  160/14 160/15 242/2
sorry [22]  3/21 32/18 43/20 55/16 114/2
144/23 144/23 144/24 152/10 176/21
213/10 215/10 221/5 231/9 233/19 244/3
255/24 256/1 256/8 262/9 263/7 263/21
sort [10]  7/11 43/23 46/24 50/2 58/1
137/6 142/9 143/7 144/8 146/17
sought [3]  85/16 117/14 181/21
sound [2]  34/18 34/23
Sounded [1]  239/25
sounds [1]  186/5
source [3]  97/9 205/15 239/11
sources [1]  239/12
speak [7]  56/12 60/14 82/19 105/22
138/1 209/3 228/8
speaking [6]  2/24 3/12 128/4 128/8
164/20 245/24
speaks [5]  61/19 61/23 69/12 216/18
242/24
special [4]  3/6 20/15 100/15 204/8
specialized [1]  206/12
specific [31]  7/1 11/25 24/24 25/16 30/4
32/9 35/14 45/18 55/11 95/9 121/13
121/22 134/5 165/21 167/8 167/19
174/19 197/5 197/12 199/9 206/25
221/12 227/14 234/14 247/10 249/5
251/12 253/9 256/17 262/22 269/4
specifically [42]  12/3 12/12 20/21 128/25
150/10 156/2 166/10 166/12 167/2 167/2
167/4 169/11 169/12 169/16 169/21
172/8 172/11 172/20 173/23 174/21
177/5 178/13 178/25 181/23 184/19
186/3 188/1 193/24 197/4 199/24 200/2
231/6 233/9 234/13 235/6 235/22 245/7
252/16 262/7 265/20 267/25 268/11
specification [2]  38/3 125/5
specifics [2]  9/3 9/4
specified [5]  67/21 71/3 71/4 102/17
260/9
specify [2]  239/17 268/15
speculative [1]  122/7
speed [2]  101/8 101/9
spend [4]  60/24 91/4 105/2 105/10
spending [12]  126/23 127/2 127/17
127/20 128/18 129/10 129/20 129/23
130/7 130/17 135/7 143/16
spent [2]  7/13 11/21
spirit [1]  53/18

spoke [7]  57/2 116/21 118/7 200/6
213/16 213/17 230/22
sponsor [1]  142/6
spreadsheet [18]  201/11 203/17 205/17
205/18 207/4 207/9 207/21 210/6 210/10
210/11 210/22 210/23 211/9 212/20
216/18 217/15 243/10 243/12
spreadsheets [5]  201/9 205/20 207/9
245/24 246/3
staff [5]  154/10 207/3 273/15 273/15
273/16
stage [3]  120/8 120/13 205/18
stakeholder [1]  140/6
stakeholders [2]  30/10 137/8
stand [6]  61/6 67/1 106/24 107/2 193/4
241/17
standard [17]  1/15 30/3 40/9 43/9 43/11
43/23 46/1 46/5 60/21 61/14 69/17 70/6
74/3 82/1 159/6 161/6 161/8
standards [5]  47/3 68/17 72/5 79/24
100/15
standing [1]  33/23
standpoint [1]  236/11
start [15]  5/16 61/4 75/15 75/15 76/2
79/22 87/15 87/16 101/15 144/9 147/24
147/25 149/8 256/15 257/2
started [8]  86/9 87/13 93/13 103/11
102/18 195/16 237/3 256/19
starting [1]  71/25
starts [3]  118/11 134/15 144/8
state [133]  3/5 7/15 7/24 8/20 10/4 11/18
12/20 12/22 13/8 17/7 17/24 18/17 19/2
19/9 21/1 22/6 22/17 22/25 22/25
23/22 24/5 24/24 25/1 25/22 28/17 28/24
28/25 31/16 31/21 33/16 33/20 36/21
37/4 37/24 38/2 42/11 42/13 44/7 47/25
49/2 51/23 53/3 53/4 53/21 54/8 54/11
55/5 56/2 56/20 65/19 65/19 68/1 93/12
98/6 98/13 104/11 104/11 106/19 106/25
107/7 107/12 107/17 108/14 109/19
110/7 110/12 110/14 110/16 111/15
112/12 113/1 115/18 115/22 115/23
117/12 117/24 118/9 118/19 119/9
120/22 122/3 124/7 124/15 125/16 129/4
132/23 133/12 137/22 139/9 139/19
139/21 144/17 148/4 155/5 163/21 167/4
167/9 169/5 169/16 171/7 171/13 171/13
172/4 174/2 174/9 174/13 174/16 174/18
176/1 176/9 176/10 176/17 177/10
177/16 177/18 212/2 212/3 212/14
215/16 215/25 227/4 235/12 235/13
235/14 235/22 236/3 236/15 236/17
241/5 241/6 264/7 268/5
state's [8]  20/22 26/7 26/8 54/7 121/6
128/16 129/13 144/5
stated [10]  43/10 48/18 48/21 49/15
122/14 186/1 186/8 186/25 187/3 187/10
statement [2]  9/6 50/16 56/3 90/7
104/12 104/15 105/6 137/16 137/17
153/8 153/18 174/11
statements [14]  53/10 59/9 60/3 69/15
69/18 113/21 131/18 153/9 153/10
167/24 192/4 198/15 261/15 265/10
states [14]  27/4 27/5 36/25 41/6 115/18
116/5 116/8 118/24 119/10 119/12
124/16 124/19 128/25 171/12
stating [2]  44/16 121/12
station [1]  99/25
status [1]  259/8
statute [11]  90/11 98/22 99/18 100/12
101/24 102/18 103/3 103/10 107/14
109/17 202/24
statutes [3]  61/1 85/9 101/5

stays [2]  35/6 101/13
steady [4]  235/12 235/13 235/14 264/7
stenographic [2]  1/6 1/13
step [4]  80/19 88/13 118/20 155/21
steps [4]  62/9 62/11 67/17 84/14
Steven [1]  3/5
Stewart [6]  2/14 192/15 238/4 255/23
268/17 270/22
still [36]  21/6 22/11 22/12 22/14 32/4
32/24 41/18 42/7 42/22 47/11 53/9 66/22
75/14 75/21 103/10 119/10 120/23
123/11 124/25 125/1 125/9 125/10 126/1
126/4 132/3 143/11 187/16 189/10 190/6
205/18 210/19 212/18 225/14 227/1
227/3 244/25
stipulated [2]  198/10 204/20
stipulating [1]  59/14
stipulation [2]  57/17 192/18
Stockton [5]  91/10 94/6 95/21
stood [2]  42/11 67/2
stop [3]  99/19 109/3 198/8
stopped [2]  22/11 62/5
strain [2]  5/22 189/13
strategy [4]  14/2 112/11 112/19 168/17
street [4]  221/13 221/22 222/3 241/25
stressed [1]  97/9
stretch [1]  93/7
stricken [1]  103/8
strictures [1]  171/15
strike [2]  56/18 229/25
Stroebel [1]  4/13
strong [2]  123/3 152/14
structure [4]  30/24 70/24 74/4 76/9
structured [1]  106/17
structures [2]  71/18 72/20
structuring [1]  95/24
struggle [1]  186/22
struggling [2]  10/13 186/6
sub [3]  166/19 166/21 254/21
subdivisions [1]  139/9
subject [41]  12/4 14/18 15/9 23/11 28/14
38/5 41/11 44/12 44/18 46/3 46/5 46/13
46/25 52/18 61/8 61/10 68/15 91/22
98/19 101/25 107/14 127/21 128/22
130/9 161/14 178/21 181/3 187/3 190/17
206/14 214/21 215/15 215/23 215/24
227/3 227/12 227/12 228/13 244/8 246/5
247/8
subjective [2]  40/14 40/16
subjects [1]  20/4
submit [25]  17/16 17/19 18/2 29/6 30/25
45/5 76/4 106/8 110/11 112/17 118/2
137/5 157/25 158/5 158/16 159/10
162/20 163/13 164/10 164/13 202/23
204/6 242/8 242/24 270/17
submits [1]  110/6
submitted [6]  34/8 61/17 122/12 129/1
131/20 147/5
subpart [3]  179/15 179/24 179/25
subpoena [1]  14/16
subpoenas [1]  53/13
subprong [1]  180/12
subsequent [5]  210/25 215/22 252/22
255/19 259/10
subsequently [1]  194/21
subset [1]  56/21
subsidy [6]  197/19 198/2 222/24 222/25
223/1 223/4
substance [3]  37/15 91/19 251/2
substantial [4]  163/9 190/7 190/12
190/21
substantially [1]  77/16
subtract [1]  225/3

**S**

subtracted [2] 225/9 225/10
subtraction [1] 207/24
succeed [1] 88/19
succeeded [1] 81/18
success [1] 112/24
successful [1] 109/12
such [17] 1/14 22/8 29/25 33/19 56/3
  67/21 116/7 127/21 140/15 149/19
  177/12 188/18 199/20 221/13 255/24
  264/2 272/4
sudden [1] 94/10
sufficient [1] 25/2
sufficiently [3] 71/22 130/19 130/21
suggest [9] 15/5 21/9 22/23 23/18 37/12
  130/12 130/14 149/18 150/15
suggested [8] 5/2 79/1 108/1 152/23
  168/18 188/22 229/18 230/13
suggesting [4] 22/8 76/18 150/12 189/7
suggestion [2] 67/16 97/20
suggestions [2] 81/1 81/1
suggests [4] 29/24 46/4 48/3 52/16
sum [3] 177/14 224/9 230/9
summaries [4] 69/15 257/21 270/6
  270/19
summarize [1] 168/6
summarized [2] 97/1 180/24
summarizes [1] 93/1
summarizing [1] 103/11
summary [6] 108/6 122/2 175/20 209/15
  248/9 273/4
Sunrise [1] 43/15
supervise [1] 192/24
supervised [1] 118/19
supplant [1] 129/17
supplement [2] 37/25 222/9
supplemental [1] 87/22
support [8] 9/16 16/13 29/6 41/11 67/12
  99/9 106/3 171/11
supported [1] 79/24
supporting [1] 100/23
suppose [2] 77/18 242/18
supposed [6] 67/6 80/24 87/9 88/12
  89/3 90/17 98/8 119/3 119/5 123/24
  141/15 160/8 162/14 177/2 255/13
  255/15
Supreme [2] 98/20 140/3
sure [18] 6/3 37/5 47/19 50/21 50/25
  58/20 67/5 100/1 105/22 111/3 131/23
  141/22 145/20 192/1 212/7 220/3 220/10
  268/18
surely [1] 37/15
surplus [3] 243/16 245/1 265/20
surplus/deficit [1] 243/16
surprise [3] 29/8 67/23 81/19
surprised [2] 161/15 267/25
surprising [3] 30/22 84/1
surrounding [1] 141/8
survival [1] 145/24
suspect [2] 66/9 89/19
suspended [1] 85/9
suspension [1] 85/12
sustain [1] 231/2
sustained [4] 208/9 244/12 258/24
  269/25
swap [4] 66/20 66/23 67/7 250/22
swaps [3] 247/9 247/11 250/22
switched [1] 173/7
sword [1] 46/7
swore [1] 171/11
sworn [2] 2/9 171/17 193/5
symbols [1] 1/13

**system** [15] 105/1 119/6 137/16 139/8
  217/5 217/6 217/10 217/20 219/6 229/15
  229/16 230/19 230/19 230/20 248/24
system's [2] 147/9 230/18
systems [20] 3/19 105/21 119/23 123/5
  123/14 123/18 124/1 131/22 153/8 154/9
  219/5 219/9 219/11 229/17 230/12
  246/15 250/4 253/25 254/3 255/10

**T**

table [4] 3/11 163/17 179/8 184/20
tables [1] 250/19
tabulate [1] 212/20
tabulating [1] 239/14
tackle [1] 183/8
tactical [1] 156/4
take [39] 5/24 23/4 30/8 30/9 35/15 39/4
  45/20 51/16 52/25 64/19 75/5 79/4 100/2
  100/3 105/18 118/20 120/12 129/10
  130/12 130/25 134/23 135/12 137/7
  139/17 148/1 148/5 158/18 164/12
  176/20 177/2 180/7 183/11 191/22 192/5
  197/22 227/15 242/1 243/3 273/18
taken [12] 1/6 6/10 7/11 18/5 34/17 39/8
  62/1 62/8 84/14 122/8 131/13 192/9
takes [6] 106/18 150/9 158/13 159/20
  161/1 177/16
taking [9] 65/20 67/13 94/15 127/22
  149/20 162/15 166/25 167/8 231/2
talk [15] 34/22 35/2 35/2 64/10 65/16
  74/16 77/22 86/12 86/16 87/18 136/24
  150/6 185/11 213/22 243/19
talked [5] 40/11 135/1 221/2 225/4 273/6
talker [1] 109/9
talking [19] 13/18 13/21 14/13 14/14 48/6
  50/3 59/7 69/2 70/23 77/8 86/9 135/5
  147/25 190/15 213/20 216/4 218/9
  222/22 261/22
talks [5] 12/10 66/20 85/22 134/17
  216/15
Taunt [1] 4/12
tax [10] 96/15 97/7 197/3 214/14 223/7
  223/13 223/23 225/11 236/5 236/6
taxes [22] 97/1 97/3 97/7 196/22 206/9
  206/9 211/17 211/18 211/20 211/20
  211/21 216/21 223/14 223/17 225/13
  236/1 236/8 236/13 236/18 241/6 241/7
  241/7
taxing [5] 223/11 223/15 225/14 225/16
  225/21
taxpayer [1] 96/17
Taylor [4] 8/6 153/16 153/20 155/18
team [16] 27/23 34/25 35/1 114/11
  158/17 169/14 170/7 194/21 194/21
  194/23 200/7 200/17 200/18 236/7 241/9
  242/3
tech [1] 218/1
technical [3] 97/19 160/2 211/13
technically [1] 160/9
Teicher [1] 4/5
tell [33] 25/23 55/17 80/25 86/17 101/4
  125/20 139/12 139/16 150/2 151/11
  164/22 193/25 194/7 195/6 198/20 212/6
  213/8 215/13 221/10 221/19 223/9
  231/21 232/24 235/1 235/18 246/11
  247/25 249/21 251/21 260/12 260/15
  260/24 266/4
telling [4] 33/13 184/1 200/10 257/25
tells [1] 230/16
temporal [1] 41/5
ten [28] 41/19 135/7 192/6 196/12 235/11
  236/6 236/12 236/20 237/14 242/1
  243/10 243/15 244/16 245/3 245/4

**248/14** 251/22 253/2 255/10 264/14
  264/17 264/23 265/16 265/16 265/18
  265/24 266/2 268/10
ten-year [12] 196/12 235/11 242/1
  243/10 243/15 244/16 245/4 248/14
  251/22 253/2 264/17 264/23
tended [1] 173/24
tent [1] 51/12
tentative [2] 149/14 163/9
term [22] 61/24 64/3 64/4 69/21 80/13
  95/22 134/24 181/10 196/4 196/17 197/9
  200/14 200/22 200/22 201/1 203/3 208/4
  209/23 210/14 235/15 239/2 255/21
terms [56] 1/15 4/18 21/4 21/7 21/12 31/1
  32/10 46/2 72/25 89/12 94/20 100/11
  115/9 135/17 135/19 137/9 143/24
  143/25 146/2 148/15 176/12 181/21
  181/23 186/25 191/3 191/3 196/4 200/10
  200/23 201/3 201/4 201/7 201/13 204/4
  206/7 207/13 208/5 214/11 225/15
  225/17 225/20 227/14 229/12 230/25
  235/21 235/25 236/4 236/17 239/3 241/8
  241/9 251/8 251/22 253/3 262/24 268/1
terribly [1] 76/14
test [5] 40/12 64/2 95/21 184/15 213/21
testified [13] 106/16 108/17 109/11
  110/16 122/21 124/24 125/4 179/6 205/2
  205/25 210/1 269/12 271/12
testify [17] 41/25 53/20 55/3 82/16 86/11
  87/1 102/11 109/19 116/16 120/18
  121/22 125/24 153/20 157/15 206/5
  232/21 244/7
testifying [7] 5/6 21/10 111/23 116/16
  157/18 241/22 268/5
testimonial [2] 128/9 128/11
testimony [40] 5/7 5/13 6/6 54/11 54/17
  54/22 69/13 141/2 151/16 157/10 158/3
  171/9 180/9 187/17 204/3 204/5 204/6
  204/14 204/19 204/22 204/23 205/8
  206/14 206/23 206/24 213/14 214/20
  228/11 228/12 232/11 239/25 242/5
  244/6 244/8 257/12 257/13 263/6 263/8
  265/8 271/1
text [1] 12/9
textbook [2] 99/14 99/15
than [40] 9/7 9/11 20/18 25/11 27/9 35/5
  48/20 48/24 49/14 63/9 71/13 71/22
  73/25 81/8 86/20 86/21 86/24 93/11
  97/15 101/19 110/12 124/11 127/4 134/2
  141/5 149/4 154/13 154/14 156/8 156/9
  158/13 161/2 170/11 171/24 177/10
  184/5 189/17 218/19 240/9 249/25
thank [56] 2/19 3/1 3/14 4/15 5/21 18/18
  18/22 23/15 27/12 27/13 27/14 33/24
  36/1 44/25 45/1 48/14 50/6 51/3 53/4
  53/6 54/2 54/22 54/24 55/20 60/17
  103/25 104/1 104/17 104/19 105/15
  114/3 126/10 126/22 132/12 133/14
  145/5 153/1 153/3 157/3 157/4 161/25
  162/7 164/17 164/18 191/10 191/11
  191/14 192/14 193/1 204/10 216/1 218/7
  259/1 262/19 265/11 272/20
thanking [2] 116/22 152/13
that [1613]
that's [115] 8/9 9/5 10/2 10/16 10/19
  11/22 11/22 12/21 13/6 13/18 13/20
  15/10 17/11 19/16 24/25 26/5 30/3 32/20
  33/17 34/24 37/7 39/16 40/5 42/17 48/5
  48/23 50/18 57/3 57/21 58/17 58/23
  59/21 68/13 68/18 69/17 70/5 70/6 75/25
  77/7 80/17 81/24 85/23 87/6 87/12 87/14
  88/16 89/17 92/6 92/23 96/16 96/21
  115/20 131/11 133/14 134/25 137/20

T

that's... [59] 141/11 141/17 147/19
147/19 149/20 153/1 153/14 153/16
157/18 158/12 159/18 160/12 160/22
160/22 162/20 170/13 174/10 174/15
177/21 181/4 181/7 181/10 181/12
185/15 188/24 189/12 190/13 190/14
190/16 190/16 192/23 195/19 197/3
198/13 209/21 211/19 211/19 212/3
215/14 215/15 216/4 216/6 216/21
216/22 218/5 218/6 219/15 220/13 224/9
224/14 226/6 228/11 232/14 236/20
240/15 261/14 261/16 262/2 272/20

their [46] 1/7 10/4 14/5 18/12 25/11 28/10
49/22 72/21 74/24 84/24 87/21 87/21
88/21 88/21 94/22 105/5 105/6 112/19
116/22 123/2 123/5 125/25 138/21
148/12 151/17 152/14 153/21 154/11
154/16 154/21 155/3 155/10 155/25
156/18 158/2 183/21 197/5 197/5 229/22
232/5 236/14 237/16 239/13 239/13
253/8 254/18

theirs [1] 252/6

them [85] 9/21 11/25 15/5 20/23 21/1
25/3 25/6 28/9 30/17 30/20 35/25 38/4
38/5 46/8 46/22 46/23 47/25 52/12 52/13
56/18 56/21 58/11 58/13 60/23 63/22
64/7 64/10 64/18 72/17 72/20 74/13
75/10 77/21 77/23 88/24 89/17 91/10
99/11 100/25 101/16 108/20 112/2
116/22 120/12 123/2 132/23 136/2 137/5
140/16 149/16 152/13 160/20 176/12
182/22 190/13 205/17 207/24 211/11
211/14 214/8 216/16 219/12 224/5
239/14 239/15 240/1 240/1 242/1 243/23
243/24 245/18 245/19 249/13 252/8
252/19 252/20 253/17 257/1 257/2 259/7
260/24 270/3 270/12 270/14 270/16

themself [1] 64/17

themselves [7] 40/21 78/12 78/14 146/18
206/21 229/22 265/10

then [85] 4/18 4/20 4/21 4/22 5/14 6/8
6/13 16/16 22/23 26/11 27/15 34/17 39/6
47/1 47/11 59/19 59/22 65/15 73/23 75/6
76/15 77/10 79/12 81/2 94/9 95/24 96/5
100/4 102/10 105/12 107/14 110/24
111/14 114/16 119/6 127/18 129/1 129/2
132/2 134/17 134/17 140/2 140/12 142/5
142/23 148/8 160/6 162/8 162/15 162/17
164/8 168/12 174/12 175/20 176/24
182/19 183/8 189/1 204/19 207/15 212/2
212/17 213/5 215/2 223/8 223/8 223/17
223/20 224/23 225/9 227/19 228/23
229/1 229/4 229/7 238/17 242/21 246/2
253/22 255/18 258/7 260/3 267/7 269/23
273/1

theories [5] 8/5 9/15 12/17 37/20 250/15

theory [1] 17/24

there [237] 3/1 7/2 10/8 10/9 11/18 13/14
15/13 17/9 22/11 23/1 26/2 26/16 26/18
27/25 28/16 28/20 29/17 31/7 31/19 32/8
34/6 34/9 34/11 34/19 35/13 35/18 35/22
35/24 37/10 38/2 39/13 40/12 40/22 41/4
42/2 42/13 44/24 45/6 45/21 45/21 47/2
47/3 47/3 49/13 49/21 53/8 53/11 53/12
54/10 54/18 56/17 57/12 58/1 58/16
59/20 62/6 62/16 62/17 62/19 63/18 64/5
65/12 65/12 66/11 66/14 66/18 66/25
67/10 67/16 67/23 67/25 68/11 68/15
69/25 70/8 71/8 71/13 71/15 72/12 73/4
73/13 73/14 73/18 78/22 79/15 80/2
81/20 82/22 84/6 85/2 85/3 85/10 85/17

85/25 88/17 90/7 93/15 94/3 95/14 95/25
96/2 97/10 100/10 100/15 100/21 100/25
101/2 101/13 101/21 102/15 102/23
103/10 105/24 107/5 107/7 107/25 111/2
113/1 116/8 119/14 119/24 120/14 121/1
121/4 122/22 125/5 125/15 126/17
127/13 128/11 133/22 134/1 134/7
134/17 135/7 135/10 135/11 137/3
142/15 143/5 147/16 149/11 150/3 150/9
150/16 151/22 152/20 157/10 158/6
158/20 159/1 159/2 159/4 161/5 161/15
161/16 161/16 161/20 162/10 162/17
163/14 164/1 166/16 171/2 172/21
174/16 175/8 175/9 175/17 176/16
176/17 176/18 177/18 177/12 177/24
179/22 181/15 181/16 181/17 181/18
182/1 182/9 182/14 182/15 182/15
182/18 182/19 183/12 184/7 184/13
184/17 185/3 189/1 190/18 195/13 196/9
198/8 201/18 206/17 208/13 212/9
212/10 215/24 218/12 219/19 221/3
222/23 223/7 225/14 227/2 230/22
233/18 233/19 233/22 237/6 243/18
245/16 245/19 247/16 248/5 248/21
249/15 250/7 252/13 252/13 253/11
253/22 253/24 254/1 255/15 263/3
267/25 269/4 269/8 271/18 273/6 273/14

there's [73] 7/16 9/15 14/24 14/25 15/13
15/15 23/12 24/23 26/1 26/13 26/21
26/22 31/24 34/7 34/10 34/12 42/25
43/10 44/1 46/2 49/1 54/10 54/21 56/21
57/9 58/3 61/15 62/7 62/15 63/25 64/6
64/8 65/2 66/10 71/14 71/17 74/24 76/12
77/18 79/3 80/13 81/19 84/4 84/10 87/1
92/5 92/5 97/9 98/24 99/1 100/8 103/2
103/11 117/23 130/11 134/13 136/3
140/2 144/5 149/17 151/2 163/16 167/21
174/8 174/18 174/22 175/5 180/13
185/16 189/20 224/12 225/9 270/23

thereabouts [2] 68/21 72/12

thereafter [4] 106/20 107/18 108/16
109/20

thereby [4] 139/11 156/12 255/17 260/8

therefore [12] 26/22 34/12 44/8 44/17
44/18 99/21 118/2 157/1 158/20 159/9
172/2 172/6

therein [1] 173/24

thereof [1] 139/10

these [108] 5/25 6/22 6/22 7/12 7/20 7/20
8/14 9/1 9/8 9/13 11/1 11/13 12/21 20/18
21/14 25/3 29/14 30/21 31/15 34/12
35/15 35/24 36/19 38/25 41/20 41/25
42/25 43/4 43/5 45/11 46/21 47/16 47/23
48/19 49/12 50/11 50/17 52/9 56/24 57/7
58/9 58/12 58/15 58/23 67/24 71/14
71/21 81/24 85/3 88/3 94/16 95/22 106/2
116/18 117/5 119/22 120/20 136/20
136/21 139/23 145/12 146/7 146/13
149/15 154/2 154/10 154/17 159/25
160/6 160/15 160/17 162/12 174/24
186/8 190/22 190/23 199/14 204/22
211/6 211/14 221/17 221/18 221/19
223/18 225/21 225/24 230/6 232/11
232/21 232/24 237/25 239/20 240/12
240/14 240/17 242/1 243/19 248/8
249/22 249/24 250/17 265/18 268/16
268/25 270/2 270/5 270/23 272/2

thesis [1] 99/14

they [222] 7/2 7/4 7/19 7/19 7/23 7/24
7/25 8/11 8/22 8/22 9/10 9/11 9/14 9/16
9/18 10/19 11/2 11/16 11/21 14/3 14/4
17/9 18/12 21/19 26/18 26/19 28/4 28/9
30/7 34/10 34/21 35/2 36/15 36/20 37/13

38/9 39/18 39/25 39/25 40/3 40/4 40/6
40/20 40/20 40/25 41/1 41/1 41/1 41/22
42/5 42/6 42/7 42/9 42/9 42/17 42/18
42/18 42/18 42/19 42/19 44/10 44/13
45/8 45/11 46/13 46/21 47/10 47/14
49/21 49/24 52/6 56/23 56/25 56/25 57/6
58/24 58/25 59/12 59/13 62/3 62/11
62/11 65/16 66/3 69/2 70/11 74/10 74/21
76/14 76/15 77/4 77/5 77/10 78/17 78/18
79/14 79/15 80/11 80/14 80/18 82/15
82/25 83/6 84/11 84/12 85/10 86/13
86/14 86/21 88/21 88/23 89/3 89/22
89/23 91/9 94/10 99/23 99/25 100/25
101/1 101/2 102/10 102/25 111/25 112/1
112/13 112/13 112/15 112/19 116/16
117/8 117/14 119/19 119/25 120/2
120/18 121/2 133/2 133/3 133/12 136/21
136/22 136/24 136/25 138/21 142/1
145/22 146/18 147/23 151/13 152/5
152/6 153/24 154/3 154/11 154/18
154/24 155/1 155/5 155/6 155/15 158/22
159/3 159/16 160/3 160/4 160/6 162/14
164/2 173/7 175/5 175/6 176/7 179/8
180/21 181/8 186/19 199/9 199/23
200/21 205/16 205/17 206/23 209/25
211/10 211/18 211/18 211/19 215/16
219/4 221/8 224/21 236/15 236/18 240/4
240/18 246/4 246/4 249/3 249/4 249/8
251/15 253/1 253/7 253/19 257/22 264/4
267/25 268/7 268/8 268/9 268/10 268/23
270/8 270/15 270/19 270/24 271/3
271/10 271/25 272/3 273/15

They'll [1] 92/12

they're [27] 7/1 7/2 10/12 13/7 20/3 21/20
30/1 42/15 42/16 57/2 57/5 58/5 58/5
70/22 71/18 77/2 80/20 88/19 89/23 91/6
133/10 153/22 160/9 183/22 190/2 271/9
271/11

they've [4] 10/20 42/23 89/22 183/21

thin [3] 113/17 170/11 170/12

thing [10] 39/20 44/1 49/5 49/18 76/17
123/1 133/24 134/10 242/14 273/10

things [11] 27/11 41/25 45/6 49/16 83/18
88/6 135/21 151/21 178/5 206/9 206/18

think [182] 8/16 9/22 10/5 11/4 13/14
14/23 15/6 16/16 16/16 20/11 20/15 20/16
22/14 23/3 24/25 25/2 26/5 26/21 27/20
28/13 29/2 29/3 29/4 29/5 33/5 34/6
34/17 34/24 36/17 39/13 41/12 41/14
42/6 42/8 43/4 43/9 43/9 44/5 46/4 46/11
47/1 47/17 48/17 49/1 49/3 49/9 49/13
53/24 55/6 57/8 59/7 59/21 61/2 63/14
68/1 68/20 69/6 70/18 70/24 72/4 72/11
72/14 72/17 75/3 75/3 76/11 76/13 76/22
77/2 77/7 78/12 78/20 78/21 79/2 81/20
82/4 82/8 82/8 83/5 85/19 86/3 87/22
88/6 88/8 88/16 88/16 88/17 90/18 90/18
90/21 90/22 91/16 91/18 91/25 92/19
93/8 93/19 94/7 96/4 97/16 97/23 97/25
98/6 98/15 98/25 99/2 99/15 100/20
101/13 101/14 101/15 101/16 101/19
101/21 102/11 103/4 103/12 103/24
105/16 108/4 115/18 127/9 127/15
130/11 133/21 134/6 134/12 135/20
136/22 137/9 137/13 141/13 141/19
141/24 143/4 143/23 144/1 146/5 148/2
148/3 150/15 160/19 160/21 160/25
161/13 165/16 167/5 168/5 171/20 174/6
176/14 177/14 183/3 187/11 187/11
202/17 204/20 204/21 205/4 205/8 205/9
206/11 206/16 208/19 210/1 212/19
212/21 218/1 227/23 228/4 241/24 244/9
252/13 253/20 254/4 256/18 257/12

T

think... [5]  261/18 263/14 264/15 265/2
270/21
thinking [2]  13/25 79/22
thins [1]  83/7
third [11]  25/7 26/4 40/7 43/5 43/18 43/22
44/8 47/7 79/6 108/9 186/23
thirds [1]  156/10
this [446]
Thomas [4]  3/25 5/17 117/11 153/4
those [130]  4/2 5/15 7/8 10/1 19/15 21/4
23/7 23/13 23/18 29/1 30/12 31/8 31/9
32/4 33/1 37/3 37/15 38/11 41/12 44/25
45/2 48/25 49/22 49/25 50/2 50/5 53/21
58/14 60/1 61/19 62/20 62/22 65/25
67/17 71/16 73/8 75/11 81/21 82/9 84/20
88/6 90/24 99/21 108/3 108/4 113/21
121/9 125/5 125/13 127/8 129/23 133/8
137/4 140/11 141/22 141/23 141/24
141/25 144/6 147/1 147/3 151/1 153/10
155/19 161/17 163/10 163/11 163/17
164/2 165/13 166/1 168/1 170/12 173/15
178/3 182/6 185/1 186/13 186/16 187/6
189/13 190/23 190/24 192/21 195/10
198/1 198/16 200/24 207/21 211/21
211/24 212/7 212/12 213/9 216/25 217/4
217/7 217/8 217/16 218/11 223/9 223/11
224/19 224/20 225/11 225/18 226/4
226/4 226/25 227/1 229/1 229/20 232/18
236/16 237/18 241/7 241/17 246/2
246/11 246/12 246/17 246/21 246/21
249/10 252/15 253/3 253/15 253/16
266/12 269/5
though [6]  10/25 11/3 31/22 105/23 113/6
191/2
thought [14]  39/22 76/20 84/11 101/1
101/2 117/12 126/25 169/17 227/24
240/8 250/5 262/10 262/13 262/17
thousand [1]  11/21
thousands [2]  76/21 77/1
threat [1]  122/7
three [25]  4/21 5/15 19/21 20/9 53/23
69/3 76/16 87/4 92/2 98/25 106/17
106/20 107/2 108/3 119/25 158/10 192/1
192/6 211/22 223/7 236/13 248/20 250/1
254/4 270/2
through [52]  1/7 40/9 42/24 46/22 49/19
53/1 68/16 75/22 79/5 84/21 92/17 93/16
105/3 115/14 118/18 131/20 133/25
135/13 135/13 135/18 138/13 142/23
144/17 148/7 150/5 151/15 153/13
154/25 156/20 164/3 166/1 171/18
171/20 172/7 175/2 175/12 176/5 180/19
180/23 183/18 188/25 200/12 206/10
214/15 216/20 224/5 235/20 236/8
236/22 252/10 258/17 268/22
throughout [4]  7/18 18/5 84/3 106/4
Thursday [1]  118/23
thus [3]  46/13 90/25 97/14
thwart [1]  171/18
ties [1]  167/13
tight [3]  218/23 220/2 220/14
time [92]  6/10 7/13 11/16 11/19 15/16
20/8 21/3 23/3 23/10 23/12 30/16 32/9
33/5 33/7 35/22 35/25 39/21 45/9 51/8
53/15 54/11 55/3 55/11 57/3 59/4 69/16
71/3 76/1 91/4 93/24 94/4 95/17 100/10
101/11 101/13 102/17 110/1 110/25
111/11 116/22 117/7 129/25 133/10
142/8 142/10 146/8 148/1 149/7 149/11
149/23 152/21 159/3 159/19 164/16
177/9 178/10 179/3 182/4 182/5 187/12

189/4 191/23 192/7 195/13 195/14
195/20 195/20 196/9 200/25 201/18
201/24 201/25 203/5 203/16 203/20
208/13 210/17 212/9 216/11 222/8
225/20 226/12 230/22 232/23 233/18
233/22 237/2 243/18 251/23 259/13
260/21 269/4
timeframe [25]  94/2 94/9 94/10 94/21
141/7 142/3 195/17 196/11 196/15
196/16 208/19 218/22 220/4 229/19
234/19 243/15 245/4 254/2 258/7 258/8
259/9 260/9 261/4 268/22 268/23
timeline [27]  83/15 92/4 92/21 105/3
105/7 105/15 106/2 117/20 117/24
118/22 122/9 123/11 124/3 132/22
133/10 133/19 141/9 141/18 142/23
144/10 144/13 146/3 147/22 149/10
150/7 158/11 158/16
timelines [1]  146/10
times [7]  62/14 73/23 135/14 148/8
174/11 197/9 271/18
timing [5]  45/4 55/7 176/15 177/5 177/7
tire [1]  82/5
Tisher [1]  4/7
title [5]  194/25 209/21 210/11 216/16
235/10
titles [1]  11/24
today [21]  2/24 22/20 26/11 40/11 42/1
42/8 42/11 62/22 67/2 70/6 74/1 87/24
127/24 145/20 151/24 162/8 165/3
187/16 215/18 250/19 266/7
together [21]  11/2 25/1 68/3 70/15 83/16
103/5 104/23 106/1 108/2 127/12 155/1
167/20 172/13 207/9 238/17 242/3 250/9
261/16 269/3 270/8 271/21
told [16]  56/20 57/3 57/24 70/4 82/17
114/10 226/20 227/5 227/23 235/1
239/12 260/11 265/9 269/13 269/15
270/12
Tom [1]  3/10
tomorrow [4]  22/20 145/21 272/24 273/21
too [19]  13/12 20/9 55/15 60/19 80/3
95/20 97/7 97/8 108/23 120/6 158/6
158/20 159/4 159/8 162/22 164/2 167/22
183/24 217/23
took [19]  6/16 13/15 20/4 35/19 62/10
110/8 117/17 120/16 136/14 150/10
171/6 171/10 180/12 182/19 182/20
183/25 222/2 241/23 242/2
tool [5]  134/22 148/25 150/10 150/11
185/7
top [3]  166/25 170/17 212/18
topic [2]  97/18 120/5
tops [1]  120/4
torques [1]  42/24
total [13]  186/20 188/12 213/1 215/5
224/6 224/14 224/14 227/25 228/17
244/24 244/24 260/7 261/9
toward [2]  60/24 72/10
towards [5]  33/8 81/7 125/10 248/4 250/6
track [2]  158/24 163/16
trade [1]  168/25
training [2]  204/8 206/12
transaction [2]  66/25 67/8
transcript [2]  1/14 1/22
transcripts [2]  18/4 124/8
transitioned [2]  194/20 194/23
translate [1]  119/15
translated [1]  1/6
translation [1]  1/8
transmit [1]  119/3
transparency [2]  19/9 20/15
transportation [5]  197/17 197/18 198/4

223/3 223/4
treasurer [13]  40/3 53/14 107/6 110/1
111/14 117/13 119/9 119/17 122/14
123/21 124/15 125/16 133/9
treasurer's [1]  120/22
treasury [2]  109/15 111/9
treated [1]  119/20
treatment [3]  69/20 71/3 71/4
tremendous [1]  94/3
tremendously [1]  85/6
trial [31]  3/13 4/12 4/22 4/23 5/5 5/23
8/15 10/16 17/22 21/11 22/20 26/16 49/9
52/25 53/13 55/22 55/25 59/24 87/23
88/21 106/4 108/5 111/23 116/16 121/19
131/20 146/25 153/12 179/5 179/7
184/12
tried [3]  82/10 185/7 200/12
tries [1]  102/21
triggered [1]  102/25
TRO [8]  123/15 123/19 124/2 124/5
176/18 176/20 177/1 177/7
trouble [1]  28/15
true [9]  40/5 43/13 58/17 58/23 59/21
65/17 136/8 137/14 189/20
truly [1]  163/4
trump [10]  115/23 152/22 172/11 173/25
174/5 174/18 174/19 175/9 175/10
175/25
trumped [1]  174/14
trust [1]  190/17
trustee [1]  154/9
trustees [1]  72/17
truth [9]  57/6 57/11 57/17 58/10 59/15
238/1 261/15 265/9 265/10
try [28]  22/17 23/18 56/19 75/8 78/10
79/4 92/12 93/16 104/23 147/6 149/2
150/10 165/11 169/18 172/9 174/21
177/10 183/4 184/25 185/6 187/25 196/3
199/12 233/11 237/5 255/15 255/25
268/15
trying [31]  21/21 22/10 27/1 40/21 56/15
56/16 68/12 68/13 91/22 94/23 101/5
108/23 135/18 138/19 148/8 174/5
174/17 174/19 175/1 175/4 175/6 175/14
175/18 176/12 178/17 200/1 205/18
218/21 230/5 233/8 256/3
Tuesday [1]  54/1
tune [1]  266/1
turn [9]  5/14 15/20 24/13 62/11 91/3 94/9
177/23 205/25 223/21
turned [2]  30/14 33/18
turning [1]  168/3
turns [5]  67/3 68/9 98/10 101/8 102/1
two [66]  19/3 23/2 34/12 38/12 40/12
40/15 41/1 41/6 41/13 41/16 42/13 43/14
44/9 45/13 47/13 48/25 49/3 54/22 63/5
65/16 68/25 76/16 91/17 92/5 92/22
94/22 100/9 100/22 103/11 108/13 111/6
121/15 125/13 126/1 128/24 134/2 143/1
151/5 156/9 161/15 162/5 162/6 162/8
166/16 171/24 177/24 178/5 191/17
195/18 204/11 237/8 246/14 247/16
250/1 254/4 255/4 257/21 258/3 258/7
258/13 258/16 258/19 259/18 263/2
271/19 273/9
two percent [1]  237/8
two-part [1]  40/12
two-year [1]  258/7
type [7]  9/19 41/5 64/4 72/12 125/11
160/5 206/12
types [2]  7/12 206/10

U

UAW [25]  3/9 5/18 7/3 16/18 24/2 26/6

## U

UAW... [19]  33/8 54/5 54/6 55/14 87/24
105/8 116/22 133/19 136/6 137/12
138/13 138/23 139/1 139/3 139/3 139/13
139/20 140/14 237/22
UAW's [6]  6/17 18/25 87/19 137/19 140/5
140/15
Ullman [3]  2/25 126/10 164/20
ultimate [3]  28/25 30/13 272/4
ultimately [5]  26/7 28/6 33/11 70/15
189/16
ultra [1]  167/12
unable [2]  172/3 209/24
uncertain [3]  99/18 176/5 176/7
uncertainties [1]  125/14
uncertainty [3]  71/9 71/14 71/15
uncertified [1]  1/12
unclear [1]  36/22
unconstitutional [3]  101/25 124/17
130/23
under [58]  5/10 5/22 17/1 17/3 17/18
30/25 35/20 39/5 41/2 46/16 46/25 47/4
57/19 63/6 63/6 63/8 63/24 73/2 91/8
110/3 112/3 113/8 116/7 124/20 139/21
144/16 144/19 145/3 148/13 150/14
151/14 159/23 160/3 160/12 166/18
166/21 166/24 167/4 167/15 167/19
168/8 169/25 172/4 172/20 172/24
173/14 174/9 176/10 179/13 179/24
180/12 181/22 202/24 204/8 248/15
257/21 263/20 270/7
underfunded [1]  64/15
underfunding [11]  63/25 64/13 64/14
64/24 68/8 70/23 183/7 183/8 183/10
190/5 246/14
underlying [4]  253/2 270/13 270/23 271/2
underring [1]  63/8
understand [19]  35/12 50/12 51/11 57/10
66/7 70/9 93/9 127/10 140/6 147/15
160/9 162/24 163/1 190/22 202/22 206/4
217/9 222/1 255/16
understanding [11]  25/25 30/16 48/6
105/1 111/1 222/20 245/22 254/24
255/18 265/6 273/18
understands [1]  219/25
understood [5]  58/18 121/3 125/18 172/3
173/21
undertaken [1]  100/17
undertook [1]  116/12
unedited [1]  1/12
unfair [2]  46/16 46/18
unfold [1]  111/6
unfortunately [2]  66/13 67/1
unfund [1]  189/4
unfunded [16]  58/13 116/6 125/13 182/8
187/1 187/1 187/4 187/14 187/21 187/24
188/3 188/5 188/8 188/9 189/11 189/16
uniform [3]  116/13 154/13 248/3
uniformed [2]  116/14 247/19
uniformly [1]  124/24
union [10]  95/10 95/11 95/13 95/16 95/18
137/25 138/12 140/10 160/24 160/25
union's [1]  147/20
unions [29]  4/6 78/11 78/14 78/15 78/16
81/18 81/21 84/18 105/8 116/24 123/1
136/23 145/13 145/14 145/16 146/1
146/6 146/11 147/4 148/12 149/14
150/11 150/13 152/4 152/13 163/8
163/11 164/24 183/5
united [5]  98/12 98/14 102/2 127/14
171/12
universe [2]  74/20 74/22

unless [1]  99/11
unlike [1]  31/24
unpool [1]  222/15
unpooled [4]  260/23 261/6 261/21 261/24
unpooling [5]  227/12 227/15 260/21
261/10 262/3
unquote [2]  139/11 159/24
unripe [1]  122/6
unsecured [3]  68/7 248/17 264/1
unstable [1]  96/21
unsuccessful [1]  90/25
unsupported [1]  17/19
unsustainable [1]  220/11
until [6]  14/24 39/5 130/6 188/3 192/5
261/4
untimely [1]  16/1
untranslated [1]  1/12
unusual [1]  81/3
up [79]  6/11 13/24 19/18 29/1 38/15
42/11 57/22 58/15 60/14 66/5 69/16
78/21 81/9 92/13 92/20 93/4 94/10 94/11
94/22 96/17 102/4 102/5 102/16 106/24
107/2 107/8 119/24 124/12 131/3 133/21
136/8 143/11 143/23 146/18 147/9 148/5
149/20 151/24 159/20 169/21 170/17
170/23 176/25 177/14 183/17 198/8
202/16 203/7 209/8 209/14 211/10
211/12 211/14 212/14 215/9 215/14
218/2 225/6 230/8 233/23 236/4 236/10
236/20 237/4 240/20 243/6 247/24 249/8
253/4 253/7 257/1 260/23 263/2 264/14
266/3 266/10 268/9 269/8 269/10
updated [1]  123/11
updates [2]  64/9 200/21
updating [1]  201/3
upgrades [1]  135/9
uphold [1]  171/7
upon [14]  6/12 21/25 33/4 70/17 84/16
84/19 99/17 101/6 140/23 146/19 155/10
198/6 227/2 247/3
upset [1]  103/19
us [45]  17/22 27/19 39/1 42/16 46/24
60/5 66/6 79/4 80/25 91/6 103/16 121/13
123/23 127/24 139/16 150/9 163/24
193/11 193/25 194/7 195/6 207/4 211/4
212/6 212/17 215/13 221/10 221/19
223/9 224/4 226/20 227/5 227/23 231/6
231/21 232/24 235/1 235/18 239/12
246/11 250/25 251/21 260/11 266/4
268/16
use [23]  1/18 1/19 22/25 23/1 64/12
70/10 91/22 134/3 137/1 144/1 144/3
144/16 144/18 152/22 169/11 172/10
173/24 175/25 182/16 182/17 185/7
201/8 269/7
used [18]  106/3 112/4 113/6 169/22
180/2 181/11 190/24 191/13 196/17
197/9 200/14 214/6 237/10 237/12 248/2
259/23 260/3 261/20
useful [2]  78/20 149/3
uses [2]  126/17 210/14
usually [5]  46/20 46/23 134/8 169/17 255/7
UTGO [1]  223/8
utility [2]  206/9 211/17

## V

vacuum [1]  75/12
valid [1]  145/3
validated [1]  241/8
valuable [1]  190/19
valuation [2]  141/15 188/7
value [2]  126/1 182/2
values [1]  58/12

Variance [1]  200/23
various [9]  30/12 68/10 136/24 141/20
149/24 200/6 200/8 202/1 206/9
vast [1]  186/8
vehicle [3]  171/19 172/10 173/24
veneer [3]  113/17 170/11 170/12
vent [1]  106/8
verbally [1]  83/2
Veronica [1]  117/11
version [2]  109/24 132/7
versions [1]  64/8
versus [6]  43/12 43/24 98/12 100/5
196/15 266/22
very [69]  7/1 7/16 11/20 15/16 17/5 17/19
35/14 36/3 38/19 40/24 50/8 50/22 50/25
61/19 62/22 64/12 64/22 64/23 66/6 69/8
69/21 70/8 70/18 81/3 81/4 91/6 91/16
91/22 93/14 96/24 97/12 98/3 101/4
129/12 129/19 132/10 132/20 133/19
137/13 138/8 140/18 143/10 145/21
147/2 148/7 148/7 150/20 151/11 151/22
153/2 157/7 159/22 164/5 164/11 168/5
168/11 173/17 173/20 173/25 176/15
178/24 180/16 188/17 195/24 218/3
220/4 242/4 243/5 270/24
vested [9]  115/18 116/9 119/17 137/18
139/2 139/14 140/1 172/22 173/14
viable [1]  172/4
view [13]  54/14 56/9 67/18 70/8 70/18
70/19 120/5 120/6 166/2 166/3 167/13
227/14 270/25
viewed [2]  174/16 178/14
viewpoint [1]  185/8
vigorous [2]  79/19 84/17
violated [1]  117/14
violates [1]  137/21
violation [2]  124/17 177/18
vires [1]  167/12
virtually [1]  19/15
vis [8]  19/1 19/1 19/2 19/2 134/4 134/4
134/5 134/5
vis-a-vis [4]  19/1 19/2 134/4 134/5
void [1]  167/12
volume [1]  271/2
volumes [2]  61/23 89/12
voluminous [5]  153/11 205/7 257/22
270/9 270/19
voluntary [1]  43/17
volunteers [1]  156/21
vote [2]  73/9 168/12
voter [2]  168/17 170/15
voters [3]  109/14 113/15 170/14

## W

wage [3]  237/3 237/7 241/7
wages [1]  237/2
wait [1]  58/3
waiting [1]  75/22
waive [8]  4/25 44/16 44/17 47/17 59/12
59/13 85/11 151/17
waived [9]  42/9 42/10 43/16 43/20 44/8
44/11 44/23 47/8 50/1
waiver [15]  26/22 31/24 37/17 42/7 42/17
43/5 43/11 44/2 44/2 46/3 46/3 46/5
46/13 46/25 47/4
waiving [4]  24/7 25/4 39/25 44/23
walk [2]  224/4 258/17
walked [1]  160/23
wander [1]  255/25
want [45]  5/20 6/5 14/2 22/4 22/5 24/5
25/5 36/4 42/18 42/18 42/4 47/17 47/19
50/13 50/21 50/25 51/10 53/16 54/9
54/20 60/5 60/12 60/20 60/24 61/24

**W**

want... [20]  76/12 79/5 89/19 89/22 91/5
92/4 108/25 131/1 132/9 132/21 133/20
138/6 140/20 146/5 147/7 148/1 180/14
185/11 240/15 261/14
wanted [10]  24/9 28/20 38/17 39/20
58/20 87/16 102/6 109/11 184/1 192/17
wants [4]  48/22 53/19 55/18 99/11
Warfal [1]  123/10
was [522]
wasn't [13]  8/10 12/21 65/11 87/15 93/4
101/10 136/7 158/25 159/1 159/2 183/12
184/8 268/6
waste [3]  221/13 221/22 222/3
wasted [1]  76/1
watched [1]  111/6
water [12]  126/2 186/11 186/14 186/18
188/19 189/6 189/12 189/23 190/1
197/15 217/11 217/18
waters [1]  190/19
way [46]  21/9 21/11 24/7 30/22 32/2 38/6
53/1 55/15 66/9 70/5 71/8 75/13 76/3
76/12 77/10 79/5 80/12 81/1 82/11 84/8
84/9 85/18 87/10 95/25 97/2 98/23 103/1
107/10 115/21 128/1 141/19 144/16
150/17 172/4 174/22 181/18 182/1 182/9
184/17 191/1 207/8 229/10 229/20
234/17 235/20 269/22
Wayne [2]  223/16 226/3
ways [6]  73/20 93/1 107/3 120/8 136/24
154/18
we [597]
we'd [1]  89/7
we'll [19]  15/18 48/10 66/9 78/19 88/15
91/25 94/2 94/9 131/10 138/14 141/1
144/6 144/7 145/20 147/12 192/5 192/6
272/16 272/18
we're [50]  9/5 13/18 13/20 14/20 15/12
15/14 21/19 21/22 22/17 22/20 24/7 25/3
25/4 30/15 31/9 31/9 32/5 37/8 48/6 50/3
56/15 57/4 57/11 58/15 58/17 67/6 68/15
74/15 75/19 76/23 77/20 77/22 80/23
87/18 88/11 97/4 102/11 106/14 136/2
157/15 157/17 157/22 159/11 165/3
169/21 190/15 208/7 211/5 267/3 271/1
we've [34]  20/25 21/3 25/2 25/12 25/17
30/2 30/24 31/8 38/24 47/17 63/17 72/4
82/9 94/11 94/21 115/6 135/1 135/2
135/13 144/3 151/15 157/14 159/15
167/22 169/8 170/5 177/24 178/16
183/17 184/19 184/22 202/16 216/17
227/10
wear [1]  72/13
Webster [3]  122/1 133/2 133/5
Websters [1]  117/11
week [13]  83/4 83/14 83/21 96/8 101/20
120/9 125/17 141/15 142/22 145/21
151/23 152/24 191/25
weekly [2]  19/13 202/6
weeks [8]  108/13 142/7 151/5 162/5
162/6 162/8 191/17 192/1
weighing [1]  153/11
weighs [1]  80/15
weight [5]  179/13 238/10 238/12 242/16
267/20
Weiss [5]  3/8 5/17 54/4 133/18 237/22
Welcome [1]  2/20
well [95]  7/8 8/20 8/23 10/18 10/22 13/4
13/14 16/20 22/22 25/12 25/15 29/2 30/1
30/17 31/12 33/6 38/22 42/15 42/19 44/4
44/7 53/24 55/4 55/8 55/16 57/14 60/9
62/12 63/1 64/2 65/7 66/10 72/25 75/8

77/15 84/10 84/12 87/19 87/24 95/16
97/9 98/7 100/24 102/1 105/16 106/5
111/5 128/13 129/15 130/3 130/10
132/10 136/15 136/25 138/16 140/19
144/6 160/9 161/4 173/17 179/4 190/20
190/25 191/5 194/5 196/14 196/23
198/22 198/23 203/3 204/11 204/25
212/9 214/16 218/3 222/13 233/4 236/22
236/23 238/15 238/24 239/19 240/8
242/17 243/3 243/5 250/4 253/23 256/6
261/4 265/5 270/24 271/15 272/8 272/22
went [17]  13/9 40/9 102/7 102/8 102/11
112/5 158/10 194/9 200/12 205/17
205/19 207/3 207/3 235/25 236/8 236/22
252/9
were [271]  8/17 8/20 8/22 9/11 9/13 9/14
10/19 11/2 11/13 11/17 12/21 13/15
14/19 20/4 21/5 21/15 23/1 23/7 25/20
25/21 26/18 28/16 28/20 29/6 31/6 31/16
31/20 33/20 35/13 36/20 37/3 37/20
39/18 40/2 40/3 40/4 40/6 40/21 41/1
41/20 41/21 42/2 43/8 45/16 47/23 47/24
48/8 48/19 52/5 52/10 52/16 53/13 56/22
56/24 56/25 56/25 58/24 58/25 61/3 62/1
62/3 62/8 62/17 62/19 62/20 63/4 66/1
66/2 66/8 66/18 68/13 74/6 74/12 82/5
82/10 83/7 84/23 85/3 85/4 85/11 85/17
86/13 86/18 86/21 87/8 88/14 88/22 89/3
90/25 93/15 93/16 94/7 95/17 95/23
101/2 103/5 107/6 108/2 108/3 111/17
116/19 117/8 119/22 119/25 120/1 120/2
120/14 120/21 121/1 121/2 121/4 121/8
121/16 121/23 121/23 123/8 124/1
124/12 131/23 132/3 133/3 133/7 133/8
136/20 136/21 137/4 137/5 143/10
148/16 149/11 149/13 149/15 149/24
150/9 151/13 152/5 152/6 153/24 155/24
156/21 158/23 159/22 159/22 162/19
162/25 163/3 163/11 166/20 167/25
172/1 173/4 173/5 173/7 174/13 174/17
176/10 176/17 178/3 181/15 181/17
182/6 182/9 182/14 182/18 183/24 184/4
184/4 184/7 185/21 189/16 189/18
194/17 196/1 196/6 199/9 199/14 199/20
199/23 200/1 200/11 200/19 203/4
203/15 205/16 205/21 206/5 207/10
207/12 209/5 209/5 212/21 213/1 214/7
214/12 215/6 215/7 218/9 218/12 218/18
219/4 219/17 220/12 222/22 224/19
224/20 225/21 226/21 227/1 227/24
227/25 230/10 230/14 231/2 236/1 236/5
236/15 236/18 236/19 237/17 238/1
238/21 239/1 240/2 240/4 240/4 241/8
245/14 245/16 245/17 245/19 245/24
246/2 246/4 246/4 247/16 248/5 248/16
248/25 249/1 249/3 249/4 249/8 249/22
249/24 250/20 250/22 250/25 251/10
251/13 251/15 252/25 253/1 253/3 253/5
253/7 253/11 253/16 254/1 255/7 256/11
258/13 258/14 261/4 262/23 267/25
268/9 268/10 268/16 268/23 268/25
269/5
weren't [11]  7/24 8/11 9/10 45/12 48/9
57/1 67/25 81/5 83/17 87/25 175/7
Wertheimer [10]  3/15 18/20 18/24 24/1
25/4 25/15 26/3 52/15 52/20 132/19
Wertheimer's [1]  52/19
Wertheimer [1]  23/22
west [2]  2/22 208/23
Western [2]  194/11 194/14
what [395]
what's [22]  8/9 10/22 11/22 13/6 15/5
29/21 47/20 57/12 58/10 75/10 80/9

88/13 94/14 103/6 147/16 162/3 186/7
209/21 210/11 225/24 235/10 271/14
whatever [6]  51/21 68/9 132/8 140/10
161/10 170/2 179/2
wheat [1]  83/13
when [71]  14/1 22/19 24/12 31/12 32/9
41/21 42/18 43/4 43/23 44/8 45/10 45/10
61/2 62/3 62/18 78/16 84/15 86/8 87/9
88/10 95/10 97/25 98/4 100/20 102/16
103/5 106/18 110/20 117/16 119/21
120/25 125/4 127/12 128/6 132/14
133/10 133/25 141/5 152/17 160/16
171/5 177/1 177/9 178/18 184/7 194/1
195/13 196/9 197/1 201/18 201/22
201/24 208/18 213/21 217/23 218/25
222/6 223/12 225/12 227/14 227/22
230/22 233/22 240/2 241/11 243/18
245/1 245/22 255/1 256/18 268/16
whenever [2]  53/1 144/9
where [85]  9/24 10/11 13/15 17/22 19/8
19/22 21/18 25/14 25/21 26/5 28/4 28/9
29/15 30/13 33/3 46/12 47/14 47/14
61/19 67/22 73/14 74/18 80/20 85/3
95/16 97/12 101/15 102/8 102/12 102/12
103/11 103/22 111/4 121/15 137/3 137/3
146/9 146/17 147/8 147/23 149/17
159/14 160/23 171/10 172/20 175/23
176/2 176/8 181/8 181/24 196/20 197/3
197/6 201/4 202/1 206/21 208/22 211/2
213/24 215/16 218/22 220/12 222/13
225/16 227/10 229/12 230/6 236/2
236/14 236/18 238/24 249/22 250/17
251/13 252/3 253/5 253/15 253/15 256/3
266/13 266/15 267/18 267/19 268/9
268/10
wherein [1]  238/19
Whereupon [3]  39/8 131/13 192/9
wherewithal [1]  186/15
whether [42]  21/20 25/21 34/23 40/13
40/16 41/14 45/4 46/2 46/6 47/3 64/12
68/17 68/21 69/4 70/2 74/11 78/10 78/13
78/16 84/23 87/13 91/11 91/17 94/24
95/25 96/6 102/13 102/14 103/1 119/22
127/19 128/21 130/18 130/20 139/16
151/18 160/1 161/20 180/14 180/17
184/18 200/21
which [160]  1/14 6/6 10/23 10/24 11/7
11/9 11/20 14/25 19/5 20/3 21/4 21/14
22/24 26/17 29/11 30/14 31/11 33/7 35/4
37/18 42/6 45/17 46/14 48/8 48/9 48/21
49/15 51/1 54/19 58/2 59/7 63/15 64/21
66/21 68/17 74/17 75/7 77/20 79/6 79/7
79/10 80/15 84/19 87/18 90/9 90/17
93/23 94/2 94/11 95/2 95/17 97/11 99/19
100/6 100/16 101/7 102/24 102/25
109/22 110/12 112/17 116/15 119/1
121/7 122/8 124/2 127/1 128/1 128/25
129/20 129/20 130/13 131/21 134/11
139/10 140/7 140/17 140/23 141/15
143/19 144/8 145/22 147/3 148/12
148/17 150/8 153/13 153/22 155/15
156/21 157/14 158/24 158/25 159/21
161/6 161/10 163/9 165/5 165/5 165/15
166/18 166/21 166/23 168/10 169/10
169/20 171/8 171/21 171/22 171/24
175/8 175/15 178/21 179/4 179/5 185/12
186/11 187/19 188/13 188/15 188/19
189/11 198/3 198/10 198/14 205/10
213/2 213/19 214/6 215/7 223/2 225/25
226/15 226/20 227/18 230/8 232/13
235/9 237/12 238/18 239/17 239/20
240/2 240/12 249/17 250/11 252/11
256/5 257/3 257/11 257/23 263/23

# W

which... [8] 264/16 265/25 268/19 268/25 270/25 271/1 271/22 272/13
while [10] 17/8 23/17 54/13 68/15 75/23 112/12 131/4 146/22 163/1 217/25
who [76] 5/15 8/7 10/8 12/18 12/21 25/23 25/24 28/8 28/20 31/6 32/1 36/10 38/3 38/4 38/5 42/22 47/1 47/15 47/16 48/21 55/4 55/9 72/13 73/9 79/19 80/5 80/10 80/18 80/20 80/22 82/13 84/25 89/21 99/1 99/21 109/12 109/18 111/20 113/10 116/14 120/18 129/17 141/23 145/11 154/3 154/10 155/3 156/17 157/21 157/24 160/16 177/16 184/16 187/18 187/18 192/21 192/25 193/16 205/5 217/4 217/11 230/16 230/16 240/3 240/17 241/17 245/18 245/19 247/22 248/21 249/10 250/2 252/5 254/10 258/9 271/21
who's [1] 80/19
whoever [1] 67/18
whole [4] 73/21 76/17 99/9 100/21
wholly [3] 28/1 31/10 31/12
whom [5] 3/12 36/10 185/1 185/4 223/19
why [32] 9/5 13/11 16/4 19/25 24/25 28/23 34/13 34/19 35/18 50/10 57/4 62/6 70/20 101/13 106/14 125/21 126/25 149/21 160/19 163/19 177/8 196/25 202/22 205/14 219/18 224/2 224/19 232/14 259/7 267/14 269/9 271/13
wide [1] 135/8
will [211] 1/14 1/15 3/12 4/22 5/10 5/15 5/16 6/3 7/18 9/2 14/2 26/2 27/14 31/18 35/15 37/7 37/8 37/9 39/6 41/11 42/14 43/7 45/20 45/22 45/22 45/23 48/11 50/15 51/16 52/11 52/25 53/21 53/25 55/6 59/23 60/1 61/9 61/13 62/2 62/9 63/3 63/21 64/6 64/20 64/24 65/1 65/2 65/6 65/12 65/17 65/25 66/23 67/3 67/11 67/23 69/16 72/14 73/8 79/10 80/2 81/10 81/20 81/23 82/11 82/14 82/15 85/8 85/16 86/3 86/11 86/25 88/5 89/10 89/13 89/19 89/20 89/21 89/21 89/25 90/21 91/13 91/16 93/9 95/2 96/8 96/11 97/1 97/16 99/23 99/24 99/25 101/3 104/6 105/4 105/9 105/13 106/2 106/4 106/13 107/4 109/5 109/19 111/22 111/24 113/3 113/4 115/23 116/2 116/7 116/15 116/16 117/3 117/6 117/17 117/19 118/17 118/24 119/12 119/14 119/15 119/20 120/18 121/22 125/24 126/17 129/9 129/12 129/14 129/16 129/16 129/21 132/13 135/21 136/22 140/14 142/9 143/15 145/15 146/19 146/25 147/4 147/8 147/11 147/13 148/17 149/4 149/17 150/2 151/11 151/18 152/18 153/13 153/18 153/20 155/8 155/19 156/6 156/15 156/23 168/15 169/1 169/13 171/3 171/5 171/14 171/21 171/23 172/2 172/5 172/9 173/20 177/21 178/10 180/20 180/24 181/12 182/3 182/24 183/15 185/2 185/9 185/21 186/7 186/14 187/6 187/7 187/9 187/11 188/6 188/16 189/14 189/24 190/4 190/11 190/18 191/7 191/12 192/16 193/2 195/25 214/23 224/4 225/23 228/14 239/21 263/9 267/2 272/23 273/13 273/14 273/20
William [3] 3/15 18/24 132/19
willing [7] 24/13 47/25 53/20 55/5 56/3 82/19 140/9
willingness [1] 51/20

win [1] 107/1
wind [1] 102/4
wise [1] 238/2
wish [4] 33/25 104/12 104/15 270/14
withdrawing [1] 56/10
withdrawn [1] 7/23
withheld [6] 7/9 7/20 21/15 21/21 39/2 52/16
withhold [1] 90/2
withholds [1] 46/9
within [11] 38/11 38/21 47/15 59/6 93/12 102/17 106/23 107/1 122/10 168/21 177/19
without [15] 5/11 8/25 24/4 44/4 63/18 66/15 103/18 129/2 158/2 184/16 189/13 236/24 257/25 260/21 263/10
withs [2] 74/4 111/22
witness [34] 5/9 51/12 51/13 54/16 55/9 63/17 65/2 109/18 110/16 128/16 138/15 192/16 193/5 205/1 205/5 206/4 232/20 237/24 238/13 238/18 241/17 241/22 242/15 242/19 243/1 261/13 261/23 262/10 262/13 265/5 269/12 269/14 269/15 272/21
witness's [2] 51/13 265/7
witnesses [18] 8/8 20/1 46/23 53/21 53/24 53/25 54/8 54/11 61/9 63/11 116/14 120/17 125/24 148/18 157/22 157/25 192/20 192/25
woman [1] 145/18
won't [5] 65/12 99/10 144/6 232/16 272/22
Wonderful [1] 109/8
word [5] 1/14 137/1 170/24 182/17 182/17
wording [1] 12/14
words [8] 152/22 170/2 170/12 170/25 173/25 182/8 223/20 270/8
work [80] 7/22 7/25 8/3 8/5 9/17 9/21 10/11 11/21 11/21 12/3 12/4 12/8 12/13 13/11 14/9 14/11 14/13 14/14 14/15 22/17 26/2 27/20 28/2 28/8 28/24 29/22 31/22 31/23 31/24 32/4 33/6 33/9 33/15 40/8 41/8 42/6 43/12 43/16 43/24 44/2 44/3 47/4 47/9 48/20 49/2 49/22 49/23 49/24 52/4 52/24 52/25 55/6 62/25 74/6 75/23 84/2 95/1 96/22 104/23 126/3 145/23 156/20 156/22 158/14 187/25 188/4 193/23 195/7 195/8 195/9 195/14 195/16 196/10 198/5 199/3 200/20 200/25 203/2 217/11 242/2
worked [10] 87/14 89/25 193/20 195/6 195/8 195/10 195/11 200/15 239/4 240/1
working [16] 12/16 12/20 25/6 28/16 31/6 45/16 47/16 93/5 96/21 149/2 154/4 156/10 203/18 218/3 239/1 256/15
world [1] 184/1
worry [1] 63/7
worse [1] 261/2
worth [1] 63/21
would [238] 3/9 4/19 7/4 8/14 9/16 10/15 11/4 12/1 13/16 13/16 13/17 14/12 14/20 15/5 15/5 15/13 15/16 17/19 18/2 18/7 18/20 18/25 20/11 21/8 22/11 22/12 22/14 22/18 22/23 23/13 23/18 23/19 29/9 29/18 30/18 30/25 31/23 32/4 33/6 34/2 34/3 34/5 36/7 37/12 37/16 37/16 39/15 42/4 42/21 44/16 45/5 45/7 47/6 48/5 49/14 49/18 49/22 50/1 50/5 51/23 52/3 53/23 54/20 54/22 55/2 55/8 58/1 58/22 62/4 62/8 67/20 69/14 70/2 74/7 76/24 77/1 77/24 81/2 82/18 82/25 83/2 83/6 83/6 83/7 83/19 83/24 84/6 87/13

89/4 90/18 95/21 96/6 100/4 100/20 101/25 102/15 103/10 103/16 105/19 108/5 108/19 109/22 112/4 112/8 114/22 116/24 118/15 120/12 121/12 122/19 122/23 124/10 125/11 127/5 127/7 128/10 129/17 130/11 130/13 130/14 130/22 131/7 133/22 134/1 134/10 137/6 137/11 137/18 138/21 139/23 144/9 149/19 152/25 154/4 158/5 159/10 159/11 161/13 161/13 163/13 163/20 164/10 164/11 164/13 165/25 172/25 173/15 175/8 175/9 181/22 181/25 183/22 184/3 184/5 184/18 189/19 196/15 203/19 203/21 208/5 208/25 211/5 213/24 214/18 215/19 216/12 219/5 219/18 219/25 222/6 222/8 222/9 222/11 222/14 222/17 222/19 224/21 224/25 226/2 226/2 226/3 226/4 226/9 226/15 227/11 227/15 229/14 229/16 230/9 230/11 233/2 233/3 233/5 233/8 233/9 233/19 234/7 234/8 234/13 235/1 235/14 236/11 237/24 237/25 240/20 240/23 240/25 241/3 241/5 241/22 241/25 242/13 243/13 243/13 243/14 248/10 250/24 251/7 257/12 260/16 261/2 261/6 263/5 263/8 265/3 265/25 266/16 266/17 266/19 266/23 268/19 268/21 269/7 269/14 270/3 270/15 270/16 271/10
wouldn't [3] 95/7 101/24 136/22
wound [2] 29/1 102/5
wrestle [1] 146/24
write [1] 256/21
writes [1] 99/1
writing [5] 80/4 83/2 155/12 159/7 159/12
written [5] 26/19 120/1 127/8 256/21 256/23
wrong [3] 43/9 65/9 112/6
wrote [4] 170/16 182/22 206/17 216/11

# Y

yeah [6] 14/23 33/25 93/10 176/21 253/24 263/16
year [74] 6/20 9/11 10/15 15/1 44/9 45/14 45/15 93/23 196/9 196/11 196/12 206/11 208/6 208/16 210/12 210/13 210/14 210/15 210/17 210/24 212/22 212/24 213/5 214/20 215/2 215/5 215/5 218/11 218/12 218/15 219/17 219/18 219/19 219/21 220/21 220/22 222/13 223/5 224/3 224/16 226/13 227/18 227/23 228/18 229/2 229/10 229/11 230/11 231/22 231/23 233/3 235/2 235/11 237/8 237/8 242/1 243/10 243/15 244/16 245/4 248/14 251/22 253/2 258/5 258/5 258/7 258/20 259/15 259/20 260/18 263/19 264/17 264/23 269/18
years [40] 41/1 41/13 41/16 45/14 62/10 62/18 63/5 106/17 111/7 114/18 135/7 148/6 193/21 194/24 195/18 236/6 236/12 236/20 237/14 245/3 250/12 255/10 258/3 258/13 258/16 258/19 259/18 260/13 265/16 265/18 265/25 266/2 266/5 266/6 266/11 266/12 267/18 268/3 268/9 268/10
yellow [2] 115/17 118/11
yes [101] 20/2 23/16 23/20 31/14 32/18 34/2 34/2 42/8 44/2 46/12 52/3 53/6 59/10 78/24 79/15 80/16 87/25 111/4 111/8 111/9 114/16 126/19 132/16 137/14 137/19 137/19 138/3 161/23 171/10 174/10 174/15 175/17 186/17 193/15 195/16 196/11 196/18 198/13 198/17

## Y

yes... [63]  199/1 199/17 199/21 199/23
 201/17 201/21 202/8 202/10 202/19
 203/10 208/2 208/17 209/7 209/20 210/8
 210/19 212/12 216/6 216/23 217/8
 219/15 222/7 222/9 222/20 223/22 224/8
 225/5 226/16 226/19 227/7 232/1 232/3
 232/5 233/13 234/3 236/23 243/21
 245/12 245/16 246/4 246/8 246/10
 246/18 247/2 247/21 249/8 249/20 250/9
 250/16 252/9 252/13 253/14 253/18
 254/24 256/14 257/8 259/6 260/14
 264/13 264/19 264/21 267/13 269/2
yesterday [4]  49/5 57/24 79/1 129/13
yet [12]  46/9 54/20 66/25 117/8 118/1
 118/13 124/22 125/19 129/19 136/8
 190/25 225/22
yield [1]  208/5
York [4]  73/23 158/22 158/22 252/4
York's [1]  73/22
you [544]
you'll [4]  62/13 79/10 83/15 133/25
you're [22]  14/14 21/23 23/17 50/11
 56/10 56/16 59/5 59/7 59/19 63/10 75/24
 77/8 80/3 80/10 94/15 101/17 159/6
 159/6 191/22 195/4 197/1 216/4
you've [15]  74/25 75/5 76/1 80/8 105/23
 159/5 162/21 165/6 168/9 176/16 176/18
 181/14 185/2 189/19 202/20
young [11]  151/9 157/23 193/17 193/18
 193/19 193/20 194/16 198/18 231/25
 242/3 248/6
Young's [1]  193/22
your [279]
yourself [3]  50/3 202/25 203/21

## Z

zero [1]  79/5