# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re

CITY OF DETROIT, MICHIGAN,

      Debtor.

_____/

Chapter 9

Case No. 13-63846

Hon. Steven W. Rhodes

## MOTION AND BRIEF IN SUPPORT OF
## MOTION FOR MODIFICATION OF AUTOMATIC STAY AND
## THE STAY EXTENSION ORDER

BH01\1909479.1
ID\RLR - 019956\0999

# TABLE OF CONTENTS

INDEX OF AUTHORITIES.................................................................................................ii

INTRODUCTION ...........................................................................................................1

BACKGROUND AND FACTS .........................................................................................2

LEGAL STANDARD FOR GRANTING RELIEF FROM AUTOMATIC STAYS ....................4

ARGUMENT.................................................................................................................5

    I.     The automatic stay (Docket No. 166) and the stay extension order (together the "Stays") should be modified because there is a public interest in allowing the federal appellate courts to rule on important questions of constitutional law and civil liberties unrelated to the bankruptcy. ............................5

    II.    The equities favor modifying the Stays because granting such relief will not result in any great prejudice to the estate or the debtor; the harm in not granting relief would considerably outweigh any hardship to the debtor; and the plaintiffs are likely to prevail on the merits of the appeal. ..................................8

        A.    Modifying the Stays will not result in any great prejudice to the estate or the debtor because plaintiffs seek the limited relief of allowing the Sixth Circuit to render a decision, not the ability to enforce a judgment or collect money damages outside the bankruptcy forum. ...............................9

        B.    The harm in not modifying the Stays considerably outweighs the harm to the debtor because plaintiffs have spent years developing their case for appellate review and briefing in the Sixth Circuit is complete. .................10

        C.    Plaintiffs are likely to prevail on the merits....................................................11

CONCLUSION...............................................................................................................11

BH01\1909479.1
ID\RLR - 019956\0999

# INDEX OF AUTHORITIES

**Cases**

*City of Riverside v. Rivera*, 477 U.S. 561 (1986) ...........................................................7

*In re Combs*, 435 B.R. 467 (Bankr. E.D. Mich. 2010) ..............................................4, 6

*In re Dow Corning Corp.*, No. 95-20512,
    1995 WL 495978 (Bankr. E.D. Mich. Aug. 9, 1995) ...............................................5

*In re ExpressTrak, LLC*, No. 03-67235,
    2004 WL 373526 (Bankr. E.D. Mich. Jan. 20, 2004)...............................................10

*In re Garzoni*, 35 F. App'x 179 (6th Cir. 2002) .........................................................5

*In re Jefferson County, Ala.*, 484 B.R. 427 (Bankr. N.D. Ala. 2012) .............................5, 8, 10, 11

*In re Moralez*, 128 B.R. 526 (Bankr. E.D. Mich. 1991) ...............................................5

*In re Philadelphia Athletic Club*, 9 B.R. 280 (Bankr. E.D. Pa. 1981).............................10

*In re Sonnax Indus., Inc.*, 907 F.2d 1280 (2d Cir. 1990) ...........................................5

*In re Wilson*, 85 B.R. 722 (Bankr. E.D. Pa. 1988)....................................................10

*Marek v. Chesny*, 473 U.S. 1 (1985).......................................................................6

*Mitchell v. Forsyth*, 472 U.S. 511 (1985) ................................................................4

**Statutes**

11 U.S.C. § 362.............................................................................................4, 11

42 U.S.C. § 1983.............................................................................................6, 7

**Court Rule**

6th Cir. R. 34....................................................................................................5

**Other Authority**

S. Rep. No. 95-989 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787................................4

BH01\1909479.1
ID\RLR - 019956\0999

## MOTION

This Motion is made by Ian Mobley, Paul Kaiser, Angie Wong, James Washington, Nathaniel Price, Stephanie Hollander, Jason Leverette-Saunders, Darlene Hellenberg, Kimberly Mobley, Jerome Pierce, Wanda Leverette, and Laura Malher (referred to both as "Plaintiffs" or "*Mobley* Plaintiffs"), by and through their attorneys, the American Civil Liberties Union of Michigan and Dykema Gossett, PLLC, cooperating attorneys with the American Civil Liberties Union of Michigan to modify the stays imposed by both § 362(a) of the Bankruptcy Code with regard to Debtor, and this Court's order entered July 25, 2013 at Docket No. 166 (the "Stay Extension Order") with regard to police officers employed by the City of Detroit. The automatic stay and the Stay Extension Order are referred to below as the "Stays". Each of the Plaintiffs are plaintiffs in a case currently pending in the U.S. Court of Appeals for the Sixth Circuit and is referred to as either the *Mobley* case or *Mobley v. City of Detroit.* The case is presently in the United States Court of Appeals for the Sixth Circuit, case number 12-2674.

## INTRODUCTION

Government agencies and the general public look to our federal appellate courts for guidance as to the limits on police power, the scope of individual liberty guaranteed by our Constitution, and the dividing line between "reasonable" conduct and a police state. *Mobley v. City of Detroit* exemplifies that tradition. For years, the parties have been engaged in litigation where the central legal question is whether the police, when raiding an establishment that is serving alcohol without a license, may arrest every single patron merely for being present at the establishment, and seize each patron's car under a forfeiture statute merely for being parked outside, without any individualized probable cause that the patrons know that the establishment is unlicensed or otherwise operating unlawfully.

1

This important civil liberties case has finally made it to the Sixth Circuit, where a published opinion would establish binding precedent for Detroit as well as the rest of Michigan, Kentucky, Ohio and Tennessee. The City of Detroit's filing of a chapter 9 bankruptcy petition should not prevent the Sixth Circuit from deciding a case with jurisprudential significance that is wholly unrelated to the bankruptcy. The *Mobley* Plaintiffs brought this case so that what happened to them will not continue to happen in Detroit and other municipalities. The Stays, insofar as they will prevent the Sixth Circuit from issuing a published decision on the merits of their case, threatens to undermine this years-long effort. Plaintiffs therefore seek relief from the Stays to allow the Sixth Circuit to rule.

Briefing in the Sixth Circuit is complete, so modifying the Stays will impose virtually no burden on the City. Furthermore, Plaintiffs do not seek permission at this time to enforce a judgment or collect damages outside the bankruptcy forum; they agree that the Stays may be reinstated after the Sixth Circuit issues its decision. Accordingly, Plaintiffs submit that there is good cause to modify the Stays and allow the *Mobley* appeal to proceed.

## BACKGROUND AND FACTS

*Mobley v. City of Detroit* is a federal civil rights case in which Plaintiffs are challenging as unconstitutional a widespread police practice of making arrests and seizing property without probable cause while raiding so-called "blind pigs" in the City of Detroit. The case arises from the Detroit Police Department's raid of the Contemporary Art Institute of Detroit ("CAID") on May 31, 2008, during a popular and publicly advertised monthly fundraising event known as Funk Night. Unbeknownst to the patrons who were attending Funk Night, the CAID had not obtained the legally required license to serve alcohol at such an event. The CAID was therefore deemed by the police to be a "blind pig," an establishment that serves alcohol beverages

2

illegally. Even though the patrons at the CAID had no reason to know that the CAID was unlicensed, dozens of Detroit police officers stormed into the CAID with weapons drawn in the middle of a Funk Night event and arrested everyone there for allegedly "loitering in a place of illegal occupation" in violation of a local city ordinance. The police then seized the cars of anyone who had driven to the CAID and initiated forfeiture proceedings against the cars under Michigan's "nuisance abatement" law.

The police arrested 130 CAID patrons and seized 44 cars based on their mere presence at that location, without any individualized probable cause that the patrons knew of any illegal conduct taking place or that their cars had been used for any illegal activity. The Plaintiffs in *Mobley v. City of Detroit* are eight of the patrons who were present at the CAID and four individuals who were not present but were owners of cars that were taken by the police. Plaintiffs brought suit to put an end to these unconstitutional raids and make sure that what happened to them would not happen to others under similar circumstances.

During discovery, it was revealed that what happened at the CAID is, literally, "standard operating procedure" for the Detroit Police Department in its enforcement of liquor licensing laws. (*See* Exhibit 6a, District Court Opinion at 24.) Undisputed testimony by Detroit police officers disclosed that hundreds of similar raids have taken place where all the patrons at unlicensed establishments were detained and charged with loitering, and their cars seized for "nuisance abatement" forfeiture proceedings, based on their mere presence at the raid location, without regard to whether the patrons who happened to be present actually knew that the location was operating in violation of liquor licensing laws. (*See id.* at 23-27.)

Based on this uncontested evidence, the United States District Court granted Plaintiffs' motion for partial summary judgment and denied the motions for summary judgment brought by

3

the City of Detroit and the police officers who were named as defendants in the suit. (*See id.* at 1-4, 31.) The District Court expressly recognized that the CAID raid was part a "widespread practice" and "standard operating procedure" for the City of Detroit. (*Id.* at 23-27.)

Before a final judgment could be entered, the City and the defendant officers took an interlocutory appeal. (*See* Exhibit 6b, Notice of Appeal.) Interlocutory appeal is permitted because the officers were denied qualified immunity. *Mitchell v. Forsyth*, 472 U.S. 511 (1985).

The appeal was fully briefed in the Sixth Circuit. The parties were awaiting a date for oral argument when the City of Detroit filed its petition for chapter 9 bankruptcy and the appeal was automatically stayed. (*See* Exhibit 6c, Notice of Automatic Stay.)

## LEGAL STANDARD FOR GRANTING MODIFICATION OF THE STAYS

Section 362(d) of the Bankruptcy Code provides that the automatic stay may be modified "for cause." 11 U.S.C. § 362(d)(1).[1]

> Under this section, courts must determine whether discretionary relief is appropriate on a case by case basis. As used in § 362(d)(1), the term "cause" is a broad and flexible concept, which permits a bankruptcy court, as a court of equity, to respond to inherently fact-sensitive situations. In determining whether cause exists, the bankruptcy court should base its decision on the hardships imposed on the parties with an eye towards the overall goals of the Bankruptcy Code.

*In re Combs*, 435 B.R. 467, 470-71 (Bankr. E.D. Mich. 2010) (citations and quotation marks omitted). In enacting section 362(d), Congress recognized that

> it will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere.

---

[1] Because the Stay Extension Order was an extension of the automatic stay, the same standards apply to the automatic stay and the Stay Extension Order.

BH01\1909479.1
JD\RLR - 019956\0999

S. Rep. No. 95-989, at 50 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5836. Thus, "[f]or

purposes of § 362(d)(1), 'cause' includes a determination that the preferable course of action

would be to allow the litigants to resume their battle on non-bankruptcy turf." *In re Dow*

*Corning Corp.*, No. 95-20512, 1995 WL 495978 at *4 (Bankr. E.D. Mich. Aug. 9, 1995).

Although some courts have tried to delineate specific factors that should be considered

when deciding whether to modify a stay, *see, e.g.*, *In re Garzoni*, 35 F. App'x 179, 181 (6th Cir.

2002) (non-precedential decision listing five factors); *In re Sonnax Indus., Inc.*, 907 F.2d 1280,

1286 (2d Cir. 1990) (listing twelve factors), the more sound approach is simply to treat the "for

cause" standard as a traditional balancing of equities:

> To determine whether "cause" exists to lift the stays and allow a
> suit to proceed in a non-bankruptcy forum, a court typically
> analyzes whether (1) any great prejudice to either the bankrupt
> estate or the debtor will result from continuation of a civil suit, (2)
> the hardship to the non-bankrupt party by maintenance of the stay
> considerably outweighs the hardship to the debtor, and (3) the
> creditor has a probability of prevailing on the merits of its lawsuit.

*In re Jefferson County, Ala.*, 484 B.R. 427, 465-66 (Bankr. N.D. Ala. 2012) (chapter 9 case).

Indeed, this court has said that it must "balance the harm to the parties" and "consider the effect

of modifying the stay on the administration of the bankruptcy estate." *In re Moralez*, 128 B.R.

526, 528 (Bankr. E.D. Mich. 1991) (Rhodes, J.).

## ARGUMENT

**I.      The Stays should be modified because there is a public interest in allowing the
federal appellate courts to rule on important questions of constitutional law and
civil liberties unrelated to the bankruptcy.**

Given that "cause" to modify the Stays is a "broad and flexible concept" that allows for

case-by-case determinations, *In re Combs*, 435 B.R. at 470, Plaintiffs believe that in this case the

court should recognize the significant public interest in allowing the Sixth Circuit to establish

BH01\1909479.1
ID\RLR - 019956\0999

binding precedent on the important civil liberties issues involved in the *Mobley* appeal. Modifying the Stays in the *Mobley* appeal is in the public interest because this lawsuit was brought to establish clear and binding precedent on the limits of police power and the constitutional rights of citizens in Detroit and elsewhere.

For better or worse, our legal system depends almost entirely on private lawsuits to deter police misconduct and to establish clear limits on the government's ability to detain citizens and take their property, and only through published opinions by federal appellate courts are such judicial pronouncements considered binding. Thus, 42 U.S.C. § 1983 and other civil rights statutes, while nominally creating "private" causes of action, have long been recognized as vindicating important public interests through the "private attorney general" concept. *See, e.g., Marek v. Chesny*, 473 U.S. 1, 32 (1985). Lawsuits such as the *Mobley* case work their way through the litigation process for years, eventually culminating in an appellate decision on discrete legal issues that establishes important precedent for the benefit of all. Unless the Stays are modified here, the potential benefit of a long hoped-for precedential decision will be lost.

In *Mobley*, the public interest in a Sixth Circuit decision is particularly compelling because the challenged police practices were found to be widespread. (See Exhibit 6a, District Court Opinion, at 23-27.) As mentioned above, undisputed testimony established that the police have orchestrated hundreds of similar "blind pig" raids and their standard operating procedure is to detain everyone present and take their vehicles regardless of whether the patrons at such establishments know that any illegal conduct is occurring. (*Id.*) Thus, this is not a case about an unusual event that is unlikely to recur; it is a case about a widespread police practice such that the development of constitutional precedent will likely affect thousands of people in the future.

BH01\1909479.1
ID\RLR - 019956\0999

Admittedly, the *Mobley* appeal is not a case involving injunctive relief. However, the fact that constitutional questions are presented to the court in the context of a case that seeks damages does not diminish the appeal's importance in developing constitutional precedent that will be binding in the future. In *City of Riverside v. Rivera*, 477 U.S. 561 (1986), the Supreme Court recognized that the importance of damages actions in vindicating civil rights and liberties transcends the monetary value of the case:

> [W]e reject the notion that a civil rights action for damages constitutes nothing more than a private tort suit benefiting only the individual plaintiffs whose rights were violated. Unlike most private tort litigants, a civil rights plaintiff seeks to vindicate important civil and constitutional rights that cannot be valued solely in monetary terms. And, Congress has determined that the public as a whole has an interest in the vindication of the rights conferred by [42 U.S.C. § 1983], over and above the value of a civil rights remedy to a particular plaintiff. Regardless of the form of relief he actually obtains, a successful civil rights plaintiff often secures important social benefits that are not reflected in nominal or relatively small damages awards. . . .
>
> In addition, the damages a plaintiff recovers contributes significantly to the deterrence of civil rights violations in the future. . . .
>
> Congress expressly recognized that a plaintiff who obtains relief in a civil rights lawsuit does so not for himself alone but also as a "private attorney general," vindicating a policy that Congress considered of the highest importance. . . .
>
> [D]amage awards do not reflect fully the public benefit advanced by civil rights litigation . . . because the rights involved may be nonpecuniary in nature.

*Id.* at 574-76 (citations and quotation marks omitted). Although the actual holding in *City of Riverside* pertained to attorney's fees, the lengthy passage quoted above underscores the importance of damages actions in contributing to the development of constitutional precedent.

In sum, the *Mobley* Plaintiffs may be "creditors" in this bankruptcy in the sense that they have a monetary claim against the City, but they are also "private attorney[s] general" whose

BH01\1909479.1
ID\RLR - 019956\0999

purpose is to "secure[] important social benefits that are not reflected in . . . damages awards," but rather in the development of appellate case law that can "contribute significantly to the deterrence of civil rights violations in the future." *Id.* at 574-75. The substantial public interest and benefit in allowing the Sixth Circuit to rule on the appeal outside the bankruptcy forum therefore constitutes cause to modify the Stays.

II.    **The equities favor modifying the Stays because granting such relief will not result in any great prejudice to the estate or the debtor; the harm in not granting relief would considerably outweigh any hardship to the debtor; and the Plaintiffs are likely to prevail on the merits of the appeal.**

The more traditional equities also weigh in favor of granting Plaintiffs' motion for modification of the Stays. As noted above, "a court typically analyzes whether (1) any great prejudice to either the bankrupt estate or the debtor will result from continuation of a civil suit, (2) the hardship to the non-bankrupt party by maintenance of the Stays considerably outweighs the hardship to the debtor, and (3) the creditor has a probability of prevailing on the merits of its lawsuit." *In re Jefferson County*, 484 B.R. at 465-66. Here, the balance of the equities weigh in favor of granting the relief sought because: (1) Plaintiffs seek only limited modification of the Stays to complete the Sixth Circuit appeal, which has already been fully briefed; thus, neither the estate nor the debtor will suffer "any great prejudice" from the relief sought; (2) the hardship that the *Mobley* Plaintiffs face in losing the long-awaited opportunity to set precedent in the Sixth Circuit on an important civil liberties issue considerably outweighs the nominal inconvenience that the debtor would incur by arguing the already-briefed appeal; and (3) Plaintiffs' success on the merits in the District Court suggest a high probability of prevailing on the merits on appeal.

BH01\1909479.1
ID\RLR - 019956\0999

**A.** **Modifying the Stays will not result in any great prejudice to the estate or the debtor because Plaintiffs seek the limited relief of allowing the Sixth Circuit to render a decision, not the ability to enforce a judgment or collect money damages outside the bankruptcy forum.**

The first equitable consideration is whether continuing the action in the non-bankruptcy forum will result in any great prejudice to either the bankrupt estate or the debtor. *Id.* at 465. Here, there will be no prejudice to the estate or the debtor because Plaintiffs are not seeking the ability to enforce a judgment or collect money damages outside of the bankruptcy forum; rather, they want the Stays modified only for the purpose of allowing the Sixth Circuit to reach a decision on the merits of an appeal that has already been briefed and involves legal issues completely unrelated to the bankruptcy.

In previous filings with this court, the City has stated that it intends to establish a claims resolution process for creditors. (*See* Dkt. # 572 at 9.) Assuming eligibility objections are overruled, and without waiving their future ability to join in any objections to the particulars of the City's restructuring plan, the *Mobley* Plaintiffs are not opposed to participating in the claims resolution process within the bankruptcy forum. Plaintiffs agree that after the Sixth Circuit issues a decision and mandate, the Stays will once again be in place and, absent further order of this court, Plaintiffs will not seek to enforce the judgment or collect damages outside the bankruptcy forum.

This limited and temporary relief from the Stays is similar to other relief this court has already granted in this case. On September 25, 2013, the court modified the stay of a case pending in the Michigan Court of Appeals "for the limited purpose of permitting the Michigan Court of Appeals to issue its ruling." (Dkt. # 1020 at 1.) The *Mobley* Plaintiffs seek substantially the same form of relief with respect to the appeal now pending in the Sixth Circuit.

BH01\1909479.1
ID\RLR - 019956\0999

**B.     The harm in not modifying the Stays considerably outweighs the hardship to the debtor because Plaintiffs have spent years developing their case for appellate review and briefing in the Sixth Circuit is complete.**

The second equitable consideration is whether the hardship to the non-bankrupt party in maintaining the Stays would considerably outweigh the hardship to the debtor in modifying the Stays. *In re Jefferson County*, 484 B.R. at 465-66.

Here, the harm in maintaining the Stays will be significant because Plaintiffs have invested years of time, legal resources, and energy into developing a record necessary to obtain a clear-cut ruling on important questions of constitutional law. Courts have recognized that when a case is litigated extensively prior to the filing of the bankruptcy petition, judicial economy weighs in favor of modifying the Stays. *See In re ExpressTrak, LLC*, No. 03-67235, 2004 WL 373526, at *9 (Bankr. E.D. Mich. Jan. 20, 2004). This is particularly true "when the bankruptcy petition was filed on the eve of the resolution of pending prepetition litigation," *In re Wilson*, 85 B.R. 722, 728 (Bankr. E.D. Pa. 1988), or when the action "has been pending for several years and is almost completed," *In re Philadelphia Athletic Club*, 9 B.R. 280, 282 (Bankr. E.D. Pa. 1981). As discussed above, the *Mobley* case involves more than a mere request for money damages; it involves the development of constitutional precedent through years of concerted effort. The case was finally pending before the Sixth Circuit when the bankruptcy petition was filed. If the Stays are not Modified, the potential benefit of a long hoped-for precedential decision will be lost.

In contrast, modifying the Stays to the limited extent requested by Plaintiffs will impose almost no hardship on the City. The briefing in the Sixth Circuit is complete, so the City will not have to devote resources of any significance to the appeal. In short, balancing the harms and hardships clearly weighs in favor of modifying the Stays.

BH01\1909479.1
JD\RLR - 019956\0999

**C.    Plaintiffs are likely to prevail on the merits.**

The final equitable consideration is the creditor's chance of success on the merits. *In re Jefferson County*, 484 B.R. at 466. Here, Plaintiffs are very likely to prevail on the merits of their case. On the legal questions at issue on appeal, the District Court granted summary judgment in favor of Plaintiffs and against the City. (Exhibit 6a, District Court Opinion, at 1-4, 31.) There have been no intervening developments in the law that would undermine confidence in the correctness of that result. Thus, to the extent that Plaintiffs' probability of success on the merits is relevant to whether the court grants relief from the Stays, that factor clearly weighs in Plaintiffs' favor.

In compliance with Local Rule 9014-1(g), the *Mobley* Plaintiff's counsel sought the concurrence of counsel for the City of Detroit in the relief sought by this motion and concurrence was not granted.

## CONCLUSION

For the reasons set forth above, the *Mobley* Plaintiffs request that this court find that there is cause to modify the Stays pursuant to 11 U.S.C. § 362(d)(1) for the limited purpose of allowing the Sixth Circuit to hear argument and render a decision in the appeal that is currently pending in that court, and enter an order accordingly.

Respectfully submitted,

/s/ Ronald L. Rose
Ronald L. Rose (P19621)
Cooperating Attorney, American Civil Liberties
    Union Fund of Michigan
Dykema Gossett PLLC
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI  48304
(248) 203-0519 / (248) 203-0763 (fax)
rrose@dykema.com

11

Daniel S. Korobkin (P72842)
Michael J. Steinberg (P48085)
Kary L. Moss (P49759)
American Civil Liberties Union
   Fund of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6824
dkorobkin@aclumich.org
msteinberg@aclumich.org

William H. Goodman (P14173)
Julie H. Hurwitz (P34720)
Kathryn Bruner James (P71374)
Cooperating Attorneys, American Civil
   Liberties Union Fund of Michigan
Goodman & Hurwitz, P.C.
1394 E. Jefferson Ave.
Detroit, MI 48207
(313) 567-6170
bgoodman@goodmanhurwitz.com
jhurwitz@goodmanhurwitz.com
kjames@goodmanhurwitz.com

Dated: October 25, 2013

12

## EXHIBIT 1 – PROPOSED ORDER

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re

CITY OF DETROIT, MICHIGAN,

   Debtor.

_____/

Chapter 9
Case No. 13-63846
Hon. Steven W. Rhodes

## ORDER GRANTING MOTION TO MODIFY AUTOMATIC STAY AND STAY IMPOSED BY THE STAY EXTENSION ORDER (DOCKET NO. 166)

On October 24, 2013, the plaintiff-appellees in *Mobley v. City of Detroit*, currently

pending as case number 12-2674 in the United States Court of Appeals for the Sixth Circuit,

filed a motion for relief from the automatic stay and the Stay Extension Order (Docket No. 166).

They seek relief for the limited purpose of allowing the Sixth Circuit to render a decision in the

aforementioned appeal. The court having considered the motion on notice and hearing, it is

ORDERED as follows:

1.  The motion is granted.

2.  Relief from the automatic stay is granted, and the stay is hereby modified, with

  respect to the appeal currently pending before the U.S. Court of Appeals for the

  Sixth Circuit in *Mobley v. City of Detroit*, case number 12-2674.

3.  Relief is granted for the limited purpose of allowing the Sixth Circuit to hear

  argument and render a decision and mandate in the appeal. Plaintiff-appellees

  may not seek enforcement of any judgment pursuant to the appeal, or collection of

  any money damages, nor may they seek costs or attorney's fees, absent further

  order of this court.

13

BH01\1909479.1
ID\RLR - 019956\0999

13-53846-tjt  Doc 1377  Filed 10/25/13  Entered 10/25/13 09:47:39  Page 16 of 70

IT IS SO ORDERED.

14

BH01\1909479.1
ID\RLR - 019956\0999

**EXHIBIT 2**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

In re

CITY OF DETROIT, MICHIGAN,

      Debtor.

_____/

Chapter 9
Case No. 13-63846
Hon. Steven W. Rhodes

**NOTICE OF MOTION FOR RELIEF FROM AUTOMATIC STAY
AND OPPORTUNITY TO OBJECT**

The plaintiff-appellees in *Mobley v. City of Detroit*, currently pending as case number 12-2674 in the United States Court of Appeals for the Sixth Circuit, have filed papers with the court to lift the automatic stay in that case.[2]

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case. (If you do not have an attorney, you may wish to consult one.)**

If you do not want the court to lift the automatic stay in *Mobley v. City of Detroit*, or if you want the court to consider your views on the motion, you or your attorney must file a written objection, answer or response with the United States Bankruptcy Court, explaining your position, within fourteen days of the date of this notice, at 211 West Fort Street, Detroit, Michigan 48226.

If you mail your objection, answer or response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above. All attorneys are required to file electronically. Your objection, answer or response must comply with Fed. R. Civ. P. 8(b), (c) and (e).

You must also mail a copy to Ronald L. Rose, Dykema Gossett PLLC, 39577 Woodward Avenue, Suite 300, Bloomfield Hills, MI 48304.

If an objection, answer or response is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing.

---

[2] The plaintiff-appellees are Ian Mobley, Kimberly Mobley, Paul Kaiser, Angie Wong, James Washington, Nathaniel Price, Jerome Price, Stephanie Hollander, Jason Leverette-Saunders, Wanda Leverette, Darlene Hellenberg and Laura Mahler.

BH01\1909479.1
ID\RLR - 019956\0999

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion and may enter an order granting that relief.**

/s/ Ronald L. Rose (P19621)
Cooperating Attorney, American Civil Liberties
  Union Fund of Michigan
Dykema Gossett PLLC
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304

Dated: October 25, 2013

16

## EXHIBIT 4

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re

CITY OF DETROIT, MICHIGAN,

      Debtor.

_____/

Chapter 9
Case No. 13-63846
Hon. Steven W. Rhodes

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2013, I electronically filed the foregoing motion for relief from automatic stay and its exhibits using the ECF system which will send notification of such filing to all ECF participants in this matter.

/s/ Ronald L. Rose (P19621)
Cooperating Attorney, American Civil Liberties
    Union Fund of Michigan
Dykema Gossett PLLC
39577 Woodward Avenue, Suite 300
Bloomfield Hills, MI 48304

17

BH01\1909479.1
ID\RLR - 019956\0999

**EXHIBIT 6**

**INDEX OF EXHIBITS**

In accordance with Local Rule 9014-1(b), the exhibits to this motion are:

Exhibit 1            Proposed Order

Exhibit 2            Notice of Motion and Opportunity to Object

Exhibit 3            [none]

Exhibit 4            Certificate of Service

Exhibit 5            [none]

Exhibit 6            Documentary Exhibits:

                        a.      District Court Opinion

                        b.      Notice of Appeal

                        c.      Notice of Automatic Stay

18

BH01\1909479.1
ID\RLR - 019956\0999

# EXHIBIT 6A

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IAN MOBLEY, ET AL,

     Plaintiffs,

vs                                  Case No: 10-10675
                                          Honorable Victoria A. Roberts

CITY OF DETROIT, ET AL,

     Defendants.

_____

## OPINION AND ORDER

I.    **SUMMARY**

Pending before the Court are three dispositive motions arising from events that occurred on May 31, 2018:

1.    Plaintiffs' motion for partial summary judgment against the City of Detroit ("the City") (Doc. 81). Plaintiffs say that all of the actions taken by Defendant police officers on May 31, 2008, (arrest, search, seizure of property, excessive force, prosecution and due process violations) were pursuant to unlawful policies and customs of the City and the Detroit Police Department ("DPD").

This motion is **GRANTED IN PART**. The Court **GRANTS** summary judgment on Plaintiffs' § 1983 unlawful arrest, search, and seizure of property claims. Trial will proceed on damages on these claims. It **DENIES** summary judgment with respect to Plaintiffs' malicious prosecution, excessive force and due process claims.

1

2.      The City, Gregory McWhorter "(McWhorter"), Anthony Potts ("Potts"),
        Charles Turner ("Turner"), Michael Brown (Brown"), Brandon Cole
        ("Cole"), Tyrone Gray (Gray"), Sheron Johnson ("Johnson") and Kathy
        Singleton's ("Singleton") Motion for Summary Judgment (Doc. 84).
        Defendants claim Plaintiffs fail to demonstrate a City policy or custom that
        was behind their detention or prosecutions. They argue there is no
        evidence of excessive force against any Plaintiff. Finally, they argue that
        the officers had probable cause to arrest, prosecute and seize vehicles,
        and that qualified immunity shields them because their conduct did not
        violate clearly established law.

This motion is **DENIED IN PART AND GRANTED IN PART**. The Court grants
Defendants' motion with respect to the excessive force, malicious prosecution and due
process claims but **DENIES** it in all other aspects. As already stated, trial will proceed
against all Defendants on the issue of damages for Plaintiffs' unlawful arrest, search,
and seizure of property claims.

3.      Defendant Vicki Yost ("Yost") and Daniel Buglo's ("Buglo") Amended
        Motion for Summary Judgment (Doc. 85). Defendants argue the facts do
        not demonstrate that Plaintiffs' constitutional rights were violated, either in
        their seizure or in the seizures of vehicles. They contend also, that even if
        the Court finds they made a mistake, their mistake was reasonable and
        they are entitled to qualified immunity.

This motion is **DENIED IN PART AND GRANTED IN PART**. The Court grants

2

Defendants' motion with respect to the excessive force, malicious prosecution and due process claims but **DENIES** it in all other aspects.  Trial will proceed on the issue of damages for Plaintiffs' unlawful arrest, search, and seizure of property claims against these Defendants.

The Court holds that:

1.    Plaintiffs establish several violations of constitutional rights:

    A.    Defendants had no probable cause to arrest them; Defendants were unaware of whether each Plaintiff had engaged in criminal conduct.

    B.    Defendants had no probable cause or reasonable suspicion to search them.

    C.    Defendants had no probable cause to seize vehicles.

2.    The right of Plaintiffs to be secure in their persons and property is clearly established.

3.    Defendants are not entitled to qualified immunity; any mistake they made was not reasonable under the circumstances.

4.    The individual Defendants acted pursuant to a custom or policy of the City to enforce its ordinance, City Code § 38-5-1 ("disorderly conduct ordinance"), even when there is no probable cause to believe that the persons against whom it is being enforced, have knowledge of illegal activity.  In other words, the City had a practice of arresting persons for loitering and searching them, even when there was no probable cause to believe they intended to engage in unlawful conduct.

3

5.      The individual Defendants acted pursuant to a custom or policy of the City

to enforce M.C.L §600.3801 ("Nuisance Abatement" statute) against cars,

even when there was no probable cause to believe that the cars were

knowingly used for an illegal purpose described in the statute. This

custom or policy of the City allowed police officers to seize vehicles simply

because they were driven to a location where unlawful conduct occurred.

II.   **OVERVIEW**

Plaintiffs were patrons at the Contemporary Art Institute of Detroit ("CAID") in the

City on the evening of May 31, 2008.  They attended a popular late-night event known

as "Funk Night," which occurred the last Friday of each month.  Funk Night occurred

after hours, i.e., after 2:00 am, and involved the service of alcohol.  Although CAID

could have obtained a special license to serve alcohol after hours, it did not have that

license on May 31, 2008;  It did not have a license to serve *any* alcohol, *any* time.

DPD had CAID under surveillance before May 31, 2008.  Yost, then commanding

officer of DPD's Vice Unit, received and investigated complaints of unlicensed, after

hours liquor sales at CAID.  She and Buglo conducted surveillance outside of CAID on

March 29, 2008.  They observed many parked cars and young people entering CAID.

They heard loud music, and observed patrons concealing and drinking intoxicants.

They smelled marijuana coming from a fenced, outdoor area belonging to CAID.

On April 26, 2008, Yost and Buglo entered CAID as undercover patrons, in

response to "blind pig" activity complaints.  A "blind pig" is a regional Prohibition-Era

term for a "speakeasy," an establishment that sells and service alcoholic beverages

illegally. *See American Heritage Dictionary of the English Language* 196, 1680 (5th ed,

4

2011); Karen Blumenthal, *Bootleg: Murder, Moonshine, and the Lawless Years of Prohibition* 64, 81, 128 (2011). Yost and Buglo observed patrons purchase beer; they purchased it themselves. They went to the outdoor patio and observed patrons drinking and smoking marijuana. Buglo purchased beer both before and after 2:00 am. When Yost and Buglo left at 2:20 am, a long line of patrons waited to get into CAID.

On May 24, 2008, Buglo conducted a third investigation, an outdoor surveillance. His observations were consistent with what he and Yost observed on April 26, 2008. They also confirmed that CAID was neither licensed to conduct business in the City nor to sell liquor in the State of Michigan.

Yost and Buglo documented their observations and investigations in reports Buglo used to obtain an Anticipatory Search Warrant for CAID on May 29, 2008. The Anticipatory Search Warrant gave authority to DPD officers to search the CAID and to seize: (1) firearms; (2) property such as contraband and things associated with illegal drug activity and gambling; (3) alcohol and profits associated with its sale, and (4) computer equipment associated with the operation of the CAID. It did not authorize any arrests or searches of patrons.

On May 31, 2008 the prior observations of Yost and Buglo were confirmed; they observed alcohol sold and purchased before and after 2:00 am; they smelled marijuana. Shortly after 2:00 am, Yost gave the go-ahead to assembled officers to enter the CAID and execute the warrant.

Plaintiffs Ian Mobley, Paul Kaiser, Angie Wong, James Washington, Nathaniel Price , Stephanie Hollander, Jason Leverette-Saunders and Darlene Hellenberg were among 130 patrons detained, searched and charged with loitering in a place of illegal

occupation.  Defendants say authority for these actions was the City's disorderly conduct ordinance.

The criminal charges against Plaintiffs were eventually dismissed.

Also, Kimberly Mobley, Angie Wong, Jerome Price, Wanda Leverette, Darlene Hellenberg and Laura Mahler were among 44 patrons whose cars were seized for forfeiture under the Nuisance Abatement statute.

Plaintiffs Kimberly Mobley, Jerome Price, Wanda Leverette and Laura Mahler were not at the CAID on May 31, 2008, but owned cars that were seized that night under the Nuisance Abatement statute, solely because they were driven by CAID patrons.

The vehicles of Kimberly Mobley, Wanda Leverette, Laura Mahler, Angie Wong and Darlene Hellenberg were returned to them; the Jerome Price vehicle was stolen from the lot to which it had been towed.

### WHAT PLAINTIFFS CLAIM

Plaintiffs say that those among them who were arrested, were arrested for their mere presence at the CAID and not because DPD officers had probable cause to arrest them.  Indeed, Plaintiffs allege that Plaintiffs Paul Kaiser, Ian Mobley, Angie Wong, James Washington, Stephanie Hollander and Jason Leverette-Saunders were in the fenced patio where no alcohol was served.  They allege that Paul Kaiser and Angie Wong were leaving when the raid occurred and had come there only to pick up a friend. They say Ian Mobley, Paul Kaiser and James Washington had never been to the CAID before May 31, 2008, that Nathaniel Price had just arrived and was still at the front door, and Darlene Hellenberg was in a back room where people danced. They argue that the

6

City's disorderly conduct ordinance required that officers first ascertain whether patrons

knew they were in a place of "illegal occupation," and that the DPD had no probable

cause to believe that the patrons knew owners of CAID had failed to obtain the proper

licenses to serve alcohol.  Plaintiffs contend this lack of probable cause to arrest them

violated the Fourth Amendment's prohibition against illegal searches and seizures.

Relatedly, Plaintiffs argue that the DPD officers had no reasonable suspicion that

Plaintiffs were armed and dangerous, so there was no basis to search them.  Plaintiffs

contend the Anticipatory Search Warrant did not authorize the search and detention of

any person.

Plaintiffs do not challenge that the DPD had probable cause to obtain the

Anticipatory Search Warrant.  They do challenge what they claim was the unjustified

search and arrest of Plaintiffs, merely because they were present at the CAID. They

also challenge their criminal prosecution for loitering in a place of illegal occupation.

Plaintiffs say this was a "merely present" -- and illegal -- prosecution.

With respect to the seizure of vehicles, those Plaintiffs who had vehicles seized

argue that this was an unlawful taking of property because the DPD officers lacked

probable cause to believe the vehicles had been used for an unlawful purpose.  They

say the vehicles were "merely parked" outside and DPD officers had no evidence that

Plaintiffs knew that the owners had done anything wrong, or knew that CAID was not

licensed to serve alcohol.

Plaintiffs contend that both the seizure of persons and vehicles was done with

the blessing of the City, hence their *Monell* claim.  *Monell v. Dept. Of Social Services,*

436 U.S. 658 (1978).  They say the seizures of persons and cars was done under the

7

authority of long-standing policies and customs of the City and the DPD.

III.   **ORDINANCE AND STATUTE AT ISSUE**

The disorderly conduct ordinance under which Plaintiffs were ticketed on May 31,

2008 was City Code § 38-5-1. It then read:

> Any person who shall make or assist in making any noise,
> disturbance, or improper diversion or any rout or riot, by
> which the peace and good order of the neighborhood is
> disturbed, or any person who shall consume alcoholic
> beverages on any street or sidewalk, or who shall engage in
> any indecent or obscene conduct in any public place, or who
> shall engage in an illegal occupation, or who shall loiter in a
> place of illegal occupation, shall be guilty of a misdemeanor.

After suit was filed, the ordinance was amended to prohibit loitering in a place of

illegal occupation "with the intent to engage in such illegal occupation":

> Any person who shall make or assist in making any noise,
> disturbance, or improper diversion or any rout or riot, by
> which the peace and good order of the neighborhood is
> disturbed, or any person who shall consume alcoholic
> beverages on any street or sidewalk, or who shall engage in
> any indecent or obscene conduct in any public place, or who
> shall engage in an illegal occupation, or who shall loiter in a
> place of illegal occupation *with the intent to engage in such
> illegal occupation*, shall be guilty of a misdemeanor.
> (emphasis added)

Plaintiffs' vehicles were seized under the authority of Michigan's Nuisance

Abatement statute, M.C.L. §600.3801 *et seq.* When their vehicles were seized, the

drivers were given pieces of paper entitled "Nuisance Abatement: Notice of

Impoundment of Vehicle." The notice stated:

> The motor vehicle you were driving or in which you were a
> passenger was seized pursuant to an arrest or a state
> misdemeanor or a comparable city ordinance violation
> involving lewdness, assignation, and/or solicitation for

8

prostitution, or used for the unlawful manufacture, storing, possessing, transporting, sale, keeping for sale, giving away, bartering or furnishing of any controlled substance or any intoxicating liquors...

IV.   **WHAT IS NOT IN DISPUTE**

The City does not dispute important allegations made by Plaintiffs:

1.   Plaintiffs were under arrest on May 31, 2008, and not merely detained;

2.   All patrons during the so-called "blind pig" raids were detained, searched and charged with loitering in a place of illegal occupation, and the DPD had not first ascertained whether the patrons knew the place was unlicensed or operating unlawfully, or whether the patrons intended to engage in illegal activity.

3.   Knowledge is an implied element of the misdemeanor offense "loitering in a place of illegal occupation."

4.   The seized vehicles were seized only under the authority of the Nuisance Abatement statute, and police seized vehicles solely because they were used to transport certain Plaintiffs to or near the CAID.

5.   Defendants believed that simply driving vehicles to the location of an unlawful sale of alcohol was sufficient to seize a car.

V.   **DEFENSES AND MOTION FOR SUMMARY JUDGMENT**

While the City agrees that knowledge is an implied element of loitering in a place of illegal occupation, it contends there was probable cause to believe Plaintiffs knew that the CAID sold alcohol without a liquor license and after 2:00 am, and that the probable cause justified the detention, arrest, search and prosecution of Plaintiffs and

9

the towing of their vehicles.

The City disputes that this same knowledge component is imported into the Nuisance Abatement statute, or that the statute was unconstitutionally applied to the Plaintiffs. The City also says that the DPD had probable cause to seize and tow the vehicles, because Plaintiffs knew or should have known the CAID operated as a blind pig.

They say Plaintiffs can point to no custom or policy of the City which officers relied upon. Even if an unconstitutional policy existed, Defendants say Plaintiffs cannot point to: (1) a policy maker such as the Mayor, Police Chief or City Council members who implemented such a policy; (2) a policy that was persistent and widespread; or, (3) a policy that was the moving force behind the actions taken by DPD officers on May 31, 2008.

## INDIVIDUAL POLICE OFFICERS

Defendants say there is no *Monell* claim for failure to train, supervise or discipline. They also argue no excessive force was used, there was probable cause for the arrest, search and seizure of Plaintiffs' vehicles and that the officers are shielded by qualified immunity.

VI.   **RULE 56 STANDARD**

The Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-57 (1986). When reviewing cross-motions for summary judgment, the court must

10

assess each motion on its own merits. *Federal Ins. Co. v. Hartford Steam Boiler Insp. and Ins. Co.*, 415 F.3d 487, 493 (6th Cir. 2005). "The standard of review for cross-motions for summary judgment does not differ from the standard applied when a motion is filed by only one party to the litigation." *Lee v. City of Columbus*, 636 F.3d 245, 249 (6th Cir.2011). "[T]he filing of cross-motions for summary judgment does not necessarily mean that an award of summary judgment is appropriate." *Spectrum Health Continuing Care Group v. Anna Marie Bowling Irrevocable Trust*, 410 F.3d 304, 309 (6th Cir.2005). However, summary judgment is particularly appropriate where "the case turns upon an issue of law, such as the construction of a statute." *Salazar v. Brown*, 940 F.Supp. 160, 161 (W.D. Mich. 1996).

VII.    **QUALIFIED IMMUNITY**

Numerous individual officers named as Defendants assert qualified immunity as a defense. This is a list of them and the roles Plaintiffs say they played on the morning of May 31, 2008.

Plaintiffs say Yost unreasonably authorized their constitutional violations. They say Buglo and Turner directly participated in these violations because they were responsible for: (1) processing Plaintiffs, (2) charging them and (3) impounding their cars.

1.    **LIEUTENANT VICKI YOST, SUPERVISOR OF DPD VICE UNIT**

a. Yost authorized the constitutional violations.

b. Yost took full responsibility for the law enforcement action and decision-making at the CAID as the raid commander.

11

    c. Yost initiated the raid.

    d. Yost contacted the manager of the CAID on an earlier date to inform him that he could sell alcohol legally if he obtained a license.

    e. Yost and Buglo entered the CAID in an undercover capacity on earlier dates to confirm that alcohol was served unlawfully.

    f. Yost called in the armed raid team to execute the search warrant.

    g. Yost decided to impound all the patrons' cars - she says she spoke with someone at the Wayne County prosecutor before the raid, who confirmed the statute authorized the seizure of the cars.

  2.  **SERGEANT DANIEL BUGLO**

    a. Defendant Buglo was deputy raid commander.

    b. Sergeant Buglo obtained the Anticipatory Search Warrant.

    c. As deputy raid commander, he had supervisory authority over the officers who issued the citations.

  3.  **SERGEANT CHARLES TURNER**

    a. Turner had supervisory responsibility for "processing" Plaintiffs, charging them with loitering, and impounding their vehicles.

    b. Turner was the officer who issued Wong a criminal citation for loitering in a place of illegal occupation.

Plaintiffs say the following Defendants are liable because they: (1) were directly responsible for issuing criminal citations to Plaintiffs, thereby giving rise to Plaintiffs' claims for malicious prosecution and (2) knowingly worked together to detain and

12

search Plaintiffs without individualized probable cause and towed their cars.

4. **SERGEANT G. MCWHORTER**

a. McWhorter charged Plaintiff James Washington with loitering in a place of illegal occupation.

5. **SERGEANT A. POTTS**

a. Potts charged Plaintiffs Ian Mobley and Nathaniel Price with loitering in a place of illegal occupation.

6. **OFFICER M. BROWN**

a. Brown charged James Washington with loitering in a place of illegal occupation.

7. **OFFICER B. COLE**

a. Cole participated in the search and seizure of Plaintiffs and issued the citation that led to the seizure of Laura Mahler's car.

b. Cole issued a citation to Thomas Mahler for loitering in a place of illegal occupation.

8. **OFFICER TYRONE GRAY**

a. Gray charged Jason Leverette-Saunders with loitering in a place of illegal occupation.

9. **OFFICER SHERON JOHNSON**

a. Johnson charged Darlene Hellenberg and Paul Kaiser with loitering in a place of illegal occupation.

10. **OFFICER K. SINGLETON**

13

> a.  Singleton charged Stephanie Hollander with loitering in a place of
>
> illegal occupation.

Qualified Immunity protects people such as these individual police officers from

the burden of litigation and the burden of any liability for a plaintiff's damages, so long

as the defendant did not violate clearly established law.  *Harlow v. Fitzgerald*, 457 U.S.

800, 818 (1982).  For purposes of this litigation the Court assesses whether Plaintiffs

allege a constitutional violation and, secondly, whether the alleged violations are of

clearly established law.  *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

A.  **PROBABLE CAUSE TO ARREST UNDER THE CITY ORDINANCE (COUNT
ONE)**

The Fourth Amendment protects against unreasonable searches and seizures,

and searches and seizures not based on probable cause.  Probable cause is a

"reasonable grounds for belief, supported by less than prima facie proof but more then

mere suspicion."  *United States v. McLain*, 444 F.3d 556, 562 (6th Cir. 2005) (quoting

*United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (en banc)).  Probable cause

is established if there is an objectively reasonable basis for the belief that a crime has

been committed.  *Id.* at 563.

Knowledge or intent to violate a law that is not one of strict liability, is implied as a

matter of law.  *Staples v. United States*, 511 U.S. 600, 607 n. 3 (U.S. 1994); *United*

*States v. Bailey*, 444 U.S. 394, 404, n. 4 (U.S. 1980).

The Michigan Supreme Court has held that "Absent some clear indication that

the Legislature intended to dispense with the requirement, we presume that silence

suggests the legislature's intent not to eliminate *mens rea*."  *People v. Tombs*, 472

14

Mich 446, 457; 697 N.W.2d. 494 (2005).  Importantly, the Michigan Supreme Court held

that "[i]nferring some type of guilty knowledge or intent is necessary when a statute is

silent regarding *mens rea* because without it innocent conduct could be criminalized."

*People v. Kowalski*, 489 Mich. 488, 500 n.12;  803 N.W.2d. 200 (Mich 2011).

The City does not disagree, that *mens rea* is an essential element of the City's

disorderly conduct ordinance. For the individual Defendants to have arrested Plaintiffs,

they had to have reasonable grounds to believe - supported by more than mere

suspicion - that Plaintiffs knew the CAID did not have the proper license to serve

alcohol.

There is no doubt that the CAID was a place of illegal occupation on May 31,

2008, because it had no license to serve alcohol either before or after 2:00 am.  But, the

pertinent inquiry is, what is the proof presented by Defendants that Plaintiffs knew this?

There is none. The City and the individual Defendants seek to justify their arrests of

Plaintiffs based on Plaintiffs' mere presence at the CAID.  But, mere presence, in and of

itself, is never sufficient to establish probable cause that a person knowingly and

intentionally was in a place of illegal occupation. *Harris v. Bornhorst*, 513 F.3d 503, 515

(6th Cir. 2008), *cert. denied*, 554 U.S. 903 (2008) ("[I]t is well-established that an

individual's mere presence at a crime scene does not constitute probable cause for an

arrest.").

The Fourth Amendment requires far more than mere association and presence.

"Where the standard is probable cause, a search or seizure of a person must be

supported by probable cause particularized with respect to that person." *Ybarra v.*

*Illinois*, 444 U.S. 85, 91 (1979).

15

Thus, "[e]ven assuming that [police] had probable cause to believe that *some people* present had committed arrestable offenses, [they] nonetheless lacked probable cause for detaining *everyone* who happened to be [at the CAID]." *Barham v. Ramsey* 434 F.3d 565, 573 (D.C. Cir. 2006) (emphasis in original). In the end, all the Defendants say is that Plaintiffs "knew or should have known" about the illegality of CAID's operations.

The Court finds that the Plaintiffs presence at CAID on May 31, 2008, without any reasonable grounds for the Defendants to believe Plaintiffs knew the CAID did not have the proper license, was not a crime.

While qualified immunity protects reasonable mistakes by police officers as to what the law requires, *Saucier v. Katz*, 533 U.S. 194, 205 (2001), the proper inquiry is whether the contours of the constitutional right pled by Plaintiffs were "sufficiently clear that a reasonable official would understand that what he [did] violate[d] that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

While Defendants may be entitled to qualified immunity if they were reasonably mistaken about the facts underlying their incorrect probable cause determinations. *Feather v. Aey*, 319 F.3d 843, 851 (6th Cir. 2001). There do not appear to be reasonable factual errors at play here. Defendants are not entitled to qualified immunity on Plaintiffs' arrest claim.

B.    **UNREASONABLE SEARCH (COUNT THREE: YOST, BUGLO, MCWHORTER, POTTS, TURNER, BROWN, COLE, GRAY JOHNSON, AND SINGLETON)**

The Court finds that Plaintiffs allege and substantiate that their clearly established constitutional right to be free from unreasonable searches was violated.

16

The Fourth Amendment protects against unreasonable searches and seizures, and searches and seizures not based on probable cause. Defendants say they could lawfully search Plaintiffs incident to their arrests.

But, the Court has already ruled there was no probable cause to arrest Plaintiffs. In the alternative, Defendants say there was reasonable suspicion to conduct a *Terry* search.

They make this argument in conclusory fashion, but *Terry* does not authorize generalized searches. A pat down or frisk is a search within the meaning of the Fourth Amendment. *Terry v. Ohio*, 392 U.S. 1, 16 (1968). When executing a search warrant, an officer may pat down or frisk individuals present if there is reasonable suspicion that the specific individual is armed and dangerous. *Ybarra*, 444 U.S. at 93. *Terry* authorizes frisks of the outer garments of a person to detect weapons for the limited purpose of officer safety, provided however, the officer can articulate facts which amount to reasonable suspicion to believe the individual is armed and dangerous. *Terry*, 392 U.S. at 27, 30. Reasonable suspicion is "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Id.* at 21. "[I]n making that assessment it is imperative the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?" *Id.* at 21-22. Reasonable suspicion requires more than good faith on the part of the officer. *Id.*

Defendants conducted more than pat down searches; they required each Plaintiff to empty pockets once they separated the men and women. They made no

17

assessment of danger.

Since the law is clear that an officer must have reasonable suspicion to believe an individual is armed and dangerous before performing a frisk, and Defendants did not search Plaintiffs incident a lawful arrest, Defendants searched each person because they were merely present at a blind pig. Defendants are not entitled to qualified immunity.

C. **PROBABLE CAUSE TO SEIZE VEHICLES AND THE NUISANCE ABATEMENT STATUTE (COUNT FIVE: YOST AND BUGLO)**

Defendants claim qualified immunity with respect to the Nuisance Abatement statute. Defendants' primary argument is that the Anticipatory Search Warrant authorized DPD officers to seize evidence or contraband during the search. Defendants say that since the Plaintiffs admitted they used the vehicles to get to the CAID — a nuisance -- seizure of the vehicles was authorized as a deterrent measure under the Nuisance Abatement statute. They cite *Michigan v. Bennis*, 116 S. Ct. 994 (1994) and *Ross v. Duggan*, 402 F.3d 575 (6th Cir. 2004).

Defendants say there was probable cause to seize the vehicles and no clearly established rights of Plaintiffs were violated.

The Plaintiffs ask for summary judgment on the same issue. They say the warrant did not authorize the seizure of Plaintiffs' cars. And, they argue that the statute allows for the taking and sale of property declared a nuisance. They say that under the statute, Plaintiffs' vehicles could not have reasonably been considered to be a nuisance. Hence, the seizures were in violation of the Fourth Amendment.

18

There is no question that Plaintiffs' vehicles were seized within the meaning of the Fourth Amendment. Seizure occurs when there is "some meaningful interference with an individual's possessory interest in that property." *Soldal v. Cook County*, 506 U.S. 56, 61 (1992).

*Michigan ex rel Wayne Co Prosecutor v. Bennis,* 447 Mich. 719, 732; 527 N.W.2d 483 (1994), *aff'd Bennis v. Mich,* 516 U.S. 42 (1996) (*"Bennis II"*) confirmed that Michigan's Nuisance Abatement statute is a forfeiture statute. Thus, to seize a vehicle as a nuisance, police officers must have probable cause to believe that the vehicle is a nuisance subject to forfeiture under the statute. *Florida v. White*, 526 U.S. 559, (1999); *Soldal, supra*, 506 U.S. at 69.

Defendants rely on *Bennis I* to support their contention that Plaintiffs' vehicles were nuisances subject to forfeiture. This reliance is misplaced; *Bennis* dealt with a part of the Nuisance Abatement statute not at issue here.

*Bennis* was a prostitution case. The Supreme Court decision upholding the forfeiture of a jointly owned automobile turned on the Court's decision that the automobile itself engaged in criminal activity. Mr. Bennis was under surveillance when he flagged down a prostitute; she entered the Bennis car and engaged in an act of fellatio in the car.

The part of the Nuisance Abatement statute under construction in *Bennis I* states:

> Any ... vehicle ... or place used for purpose of lewdness, assignation or prostitution ... or used by, or kept for the use of prostitutes ... is declared a public nuisance... M.C.L. 600.3801.

19

Once Mr. Bennis was convicted of gross indecency, the Wayne County Prosecutor filed a complaint alleging that the Bennis vehicle was a public nuisance subject to abatement pursuant to M.C.L. 600.3801. The trial court held the vehicle was a nuisance and abated the ownership interest of innocent Mrs. Bennis. The Michigan Supreme Court and the United States Supreme Court upheld the ruling.

At issue in this case is a different part of M.C.L. 600.3801:

> Any building ... vehicle ... or place ... used for the unlawful manufacture, transporting, sale, keeping for sale, bartering, or furnishing of any controlled substance ... or intoxicating liquors ... is declared a nuisance. M.C.L. 600.3801.

We know this because the notice Plaintiffs were given when their vehicles were seized said, "the motor vehicle you were driving or in which you were a passenger was seized pursuant to an arrest or a state misdemeanor ... violation ... used for the unlawful manufacture, storing, possessing, transporting, sale, keeping for sale, giving away, bartering or furnishing of any controlled substance or any intoxicating liquors . . . ."

While Plaintiffs do not dispute that the CAID - without proper licenses - was a nuisance under the statute, they argue that to be forfeitable, their vehicles had to be used for one of the enumerated purposes under the statute, and there is no evidence of such use. Defendants say the mere fact that the vehicles were used to get Plaintiffs to the CAID, justifies seizure.

Defendants also rely on *Ross, supra,* in which the Sixth Circuit found that the seizure of plaintiffs' vehicles was lawful even if the illegal conduct occurred outside of the vehicle. *Ross*, 402 F.3d at 586. In *Ross*, the police established a prostitution sting

20

where officers posed as prostitutes; plaintiffs' cars were impounded under the Nuisance Abatement statute in conjunction with their arrests for soliciting prostitutes and other lewdness offenses identified in M.C.L. § 600.3801. *Id.* at 578-79. Two of the plaintiffs challenged the seizure of their cars on grounds that their alleged sex offenses took place outside their cars. *Id.* at 580, 586.  The Sixth Circuit rejected their claims, reasoning that their cars had been "used for the purpose of lewdness, assignation or prostitution" within the meaning of M.C.L. § 600.3801 because "they had transported the criminal perpetrators to the sites of their crimes." *Id.* at 586.

Like *Bennis*, *Ross* deals with a portion of the statute not at issue here. Furthermore, in *Ross*, the Sixth Circuit held that notwithstanding plaintiffs' claims of actual innocence, plaintiffs "conceded that the challenged arrests were supported by probable cause;" thereby giving rise to probable cause to seize plaintiffs' vehicles. *Id.* at 585-86.

Here, the Court agrees with Plaintiffs: there was no probable cause for police to believe that any Plaintiff engaged in any criminal activity, or to believe that any vehicle had been used for the unlawful manufacture, storing, possessing, transporting, sale, keeping for sale, giving away, bartering or furnishing of any controlled substance ... or intoxicating liquors."  M.C.L. 600.3801.

Courts construe the Michigan Nuisance Statute and similar statutes as authorizing the seizure of vehicles when the vehicles themselves have been the scene of a crime. (*Bennis*: car used for act of fellatio; *People ex rel Wayne Prosecuting Attorney v. Sill,* 310 Mich 570; 17 N.W.2d. 756 (1945)*(car used to transport betting slips and proceeds in illegal gambling operation); VanOster v. Kansas,* 272 U.S. 465, 467

21

(1926)(car used to illegally transport liquor); *Calero-Toledo v. Pearson Yacht*, 416 U.S. 663, 683 (1974)(yacht used to transport marijuana).

In all cases, the vehicles themselves were involved in or used for the criminal activity. Defendants do not direct the Court to any case where the lawfulness of seizing a vehicle used to transport a person to a place that is the nuisance, without knowledge that it is a nuisance, has been upheld.

In contrast, Plaintiffs direct the Court's attention to *In re Maynard's Petition*, 333 Mich 543, 53 N.W.2d. 370 (1952), where the Court held the nuisance statute did not authorize the forfeiture of a third party's vending machines located inside of a place engaged in the unlawful sale of liquor: "[T]he presence of these machines may add to the convenience of the customers in purchasing candy or cigarettes but certainly did not contribute to the violation of the liquor law, neither were they *implements in the hands of the unlawful operators to further the sale of liquor."* *Id.* at 546 (emphasis added).

Indeed, if people cannot be guilty of loitering in a place that doesn't have a liquor license if they don't know a liquor license is lacking, they can't have their cars forfeited for getting them to such places if they don't know the places don't have liquor licenses.

If the Nuisance Abatement statute were given the broad interpretation sought by Defendants, there is no end to the forfeitures that could occur in the City: numerous patrons to restaurants, bars, concerts, and sporting events could have their cars forfeited simply for purchasing tickets, or buying drinks or dinner at establishments that did not secure proper licenses.

It is an untenuous result that cannot be sanctioned.

The Court holds that the Nuisance Abatement statute did not authorize the

22

seizure of vehicles under the circumstances that existed at the CAID on May 31, 2008.

Defendant officers did not have probable cause to seize vehicles. Plaintiffs establish

the violation of their clearly established rights to be free from unlawful seizures in

violation of the Fourth Amendment.

The Court rejects Defendants argument that Plaintiffs' rights were not clearly

established at the time of the seizure because they reasonably relied on a Prosecutor

before seizing Plaintiffs' cars, and Defendants are not entitled to qualified immunity.

VIII.   **PLAINTIFFS' MONELL CLAIMS (COUNTS ONE THROUGH SEVEN: CITY OF
DETROIT)**

In all counts of the First Amended Complaint, Plaintiffs allege that policies or

practices of the City led to the constitutional deprivations they allege.

The Court has already ruled that Defendants arrested, searched and seized

vehicles without probable cause. The Plaintiffs seek to hold the City liable for these

constitutional violations under *Monell v. Dept. Of Social Services,* 436 U.S. 658 (1978).

A municipality is liable under §1983 if the acts that violated a person's rights were

undertaken pursuant to its policies and customs. *Id.* at 690-94.

The City is liable because it has a widespread practice, permanent and well

settled, that constitutes a custom of: (1) detaining, searching, and prosecuting large

groups of persons for "loitering in a place of illegal occupation" based on their *mere*

*presence* at a blind pig, without probable cause; and (2) impounding all the cars that are

driven to such places, based solely on the drivers' mere presence there. *See Cash v.*

*Hamilton County Dep't of Adult Probation,* 388 F.3d 539, 543 (6th Cir. 2004) (quoting

*Monell,* 436 U.S. at 691)(A city may be liable for "a widespread practice that, although

23

not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law.")).

The City admitted that its "standard operating procedure when raiding an establishment that was selling alcohol without a license and/or selling alcohol after 2 a.m. was to ticket *all persons in attendance* for loitering in a place of illegal occupation and to seize their vehicles under the Nuisance Abatement statute." This "standard operating procedure" admission is sufficient to establish municipal liability. *Hunter v. City of Sacramento*, 652 F.3d 1225, 1233 (9th Cir. 2011). The admission was also consistent with the testimony of several police officers who had participated in numerous raids of suspected "blind pigs" over many years.

The City's suggestion that its custom was not "widespread" because the vice unit has only six to eight officers is not persuasive. Although blind pig raids were organized by the vice squad, the raids were carried out by fifty or more officers assigned to multiple units and divisions of the DPD. Narcotics crews rotated through the vice squad every 28 days.

Sergeant Potts was not a member of the vice unit, but he participated in blind pig raids while assigned to the tactical mobile unit, the special response team, the Eastern Precinct support unit, and the Thirteenth Precinct; and, he was aware that the disorderly conduct ordinance and Nuisance Abatement statute were enforced against everyone in a blind pig location based on their mere presence.

Likewise, Officer Cole was not a member of the vice unit, but he participated in hundreds of blind pig raids. He, too, participated in detaining, searching, and prosecuting all the patrons, and seizing their cars for forfeiture, merely because they

24

were present at the raid location.

The City argues that it is not liable because "Yost took full responsibility for the law enforcement action and decision-making at the CAID as the raid commander." This argument is unavailing. Yost states that she based her call to arrest, search and seize Plaintiffs' vehicles upon her training and actions during previous blind pig raids with DPD. The City cannot avoid liability by training an officer to act unconstitutionally and then pointing the finger at the officer when she acts as trained.

The City argues it is not subject to liability because "Plaintiff [sic] cannot show that a policy maker such as the City of Detroit Police Chief, Mayor, or City Council members, implemented the policy or custom . . . ." But, Plaintiffs are not required to identify a policymaker such as the mayor or police chief who personally approved a policy or displayed "deliberate indifference" to Plaintiffs' rights. *Monell*, 436 U.S. at 690-91 (1978) (An official legislative or executive act is not required to establish liability; "local governments . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels.").

Although evidence of a policymaker's specific decision or deliberate indifference are potential avenues to establish municipal liability, they are not necessary if a plaintiff can point to testimony from which a jury can reasonably infer an unconstitutional municipal custom and practice. *See, e.g., Thompson v. City of Los Angeles*, 885 F.2d 1439, 1444 (9th Cir. 1989) ("If such a showing is made, . . . a local government may be liable for its custom irrespective of whether official policymakers had actual knowledge of the practice at issue."); *see also Cash*, 388 F.3d at 543-44 (reversing summary

25

judgment for city and county based on evidence of long-standing police custom of destroying personal property belonging to homeless persons).

Discovery yielded evidence that sufficiently establishes the City's policy under *Monell*. Sergeant Buglo, deputy raid commander, testified that it was "standard procedure," "general practice," and the "custom and usage of the Detroit Police Department." He further testified that "It's been done that way long before I got to [the vice unit]. That's just how it was done. . . . It's just part of the raid procedure . . . ." He says "this was routine practice and policy of the vice enforcement unit of the Detroit Police Department."

Sergeant Turner was involved in about 100 blind pig raids over approximately fifteen years as an officer and supervisor. He testified that "normally anyone inside the location is going to be ticketed," and agreed that this "decision has been made even before you go in" for the raid, and said "we're ticketing the person because he's in the location and there's illegal activity inside the location, whether he knew it or not." He further says that "Normally, . . . if they drove a vehicle, it's going to be impounded."

Sergeant Potts participated in multiple blind pig raids. He said at deposition that "it's the standard operating procedure to detain *all* of the patrons, to pat them down, to remove the contents of their pockets, and to ultimately ticket them." He further agreed that "it was the custom of the police department that when raiding an establishment that was selling alcohol without a license or selling after 2:00 a.m., to charge *all persons in the building* with loitering in a place of illegal occupation and seiz[e] their vehicles under the Nuisance Abatement statute."

Officer Cole took part in hundreds of blind pig raids, and testified that "it was the

26

standard operating procedure of the City of Detroit Police Department, when raiding a blind pig, to ticket everyone there for loitering in a place of illegal occupation and to confiscate the cars that they drove there," regardless of whether they knew they were in a blind pig.

Finally, Officer Gray agreed that "it was the standard operating procedure of the police department and the City that when raiding an establishment that was selling alcohol without a license or selling alcohol after two a.m., to charge all persons in attendance either as an engager or for loitering in a place of illegal occupation and to seize their vehicles under the Nuisance Abatement statute. . . . . And of the ten or so blind pig raids that [he has] participated in, [they have] generally followed this same procedure."

This deposition testimony, coupled with the City's admission, is sufficient to establish a policy or custom.

To impose liability, Plaintiffs must not only identify a policy, it must also establish that the policy or custom is the moving force behind the deprivation. *City of Canton v. Harria*, 489 U.S. 378 (1989); *Searcy v. City of Dayton*, 38 F.3d 282 (6th Cir. 1994). "[T]his is a causation inquiry, requiring the plaintiff to show that it was the defendant's custom or policy that led to the complained of injury." *Powers v. Hamilton County Public Defender Comm'n*, 501 F.3d 592, 608 (6th Cir. 2007); *see, e.g., Garner v. Memphis Police Dep't*, 8 F.3d 358, 364-65 (6th Cir. 1993) (concluding that police department's unconstitutional policy authorizing deadly force against nondangerous fleeing felons caused the death of plaintiff's son).

There is no question that the policies and customs led directly to the arrests,

27

searches and forfeitures complained of by Plaintiffs, in violation of the Fourth Amendment.

IX.   **EXCESSIVE FORCE (COUNT TWO: ALL DEFENDANTS)**

Count Two of Plaintiffs' First Amended Complaint is an excessive force one on behalf of : Paul Kaiser, Angie Wong, Nathaniel Price, James Washington, Jason Leverette-Saunders.  It is against "unnamed officers."

Defendants seek summary judgment, arguing that "Plaintiffs cannot produce any City of Detroit policy or custom which authorizes or encourages excessive force or detention and prosecution without reasonable suspicion or probable cause." (Doc. 84, pp 10-12 (or 20-21).  They deny that any excessive force was used, and contend that Plaintiffs have not named Defendants McWhorter, Cole, Brown, Potts, Singleton, Turner, Johnson or Gray as officers who used excessive force.  (Doc. 84.... p. 13/23)

Plaintiffs responded that Defendants motion is premature since Defendants had not fully complied with Plaintiffs' discovery requests.

Plaintiffs submit an affidavit as part of their response to Defendants' motion, stating that they have outstanding discovery on their excessive force claim, and that so long as Defendants fail to comply, summary judgment would be improper.

Discovery disputes have now been resolved, and Plaintiffs continue to be unable to identify the specific officers who allegedly engaged in excessive force.

For those reasons, the individual Defendants are entitled to summary judgment on Plaintiffs' excessive force claim.

Also, the Court declines to extend *Monell* liability against the City on Plaintiffs' excessive force claim.

28

The Complaint alleges that the City's:

> unconstitutional custom, policy, or practice includes, but is not limited to, the City of Detroit's formal or tacit approval of its officers' conduct, deliberately indifferent failure to train its officers, and deliberately indifferent failure to supervise and discipline its officers, all of which proximately caused the constitutional deprivations and harm suffered by Plaintiffs

Plaintiffs must show that "deliberate and discernible municipal policies or customs . . . were the moving force behind the constitutional injury." *Beddingfield v. City of Pulaski*, 861 F.2d 968, 971 (6th Cir. 1988). Plaintiffs have identified no policy to impose such liability. The City is entitled to summary judgment. *See Russo v. Massullo*, No. 90-3240, 1991 U.S. App. LEXIS 3861, 1991 WL 27420 (6th Cir. Mar. 5, 1991) (granting summary judgment in favor of Beaver Township because Plaintiffs failed to articulate what they perceive to be the "deliberate and discernable [sic]" policy or establish the existence of such policy).

## X.   MALICIOUS PROSECUTION: COUNT FOUR: YOST, BUGLO, MCWHORTER, POTTS, TURNER, BROWN, COLE, GRAY, JOHNSON AND SINGLETON

Plaintiffs allege the Defendants lacked probable cause to initiate criminal proceedings against them, and the proceedings ended in their favor.

To prevail on this claim, a plaintiff must demonstrate that (1) the defendant participated in the decision to prosecute the plaintiff, (2) probable cause did not support the institution of legal process, (3) the plaintiff suffered a Fourth Amendment deprivation of liberty in addition to the initial seizure as a result of the institution of proceedings, and (4) the legal proceedings resulted in the plaintiff's favor. *Sykes v. Anderson*, 625 F.3d 294, 308-09 (6th Cir. 2010). "[A] plaintiff must show, at a minimum, that there was no probable cause to justify [his] arrest and prosecution." *Barnes v. Wright*, 449 F.3d 709,

29

716 (6th Cir. 2006)(citations omitted); see also *Sykes*, 625 F.3d at 310-11 (same).

Plaintiffs' claim for malicious prosecution fails because the charges against them were voluntarily dismissed. *Cheolas v. City of Harper Woods*, 2012 U.S. App. LEXIS 802, 2012 WL 89173 (6th Cir. Jan. 10, 2012) (finding no viable claim for malicious prosecution because the charges were voluntarily dismissed).

## XI.  DENIAL OF DUE PROCESS– DISORDERLY CONDUCT ORDINANCE: COUNT SIX: ALL DEFENDANTS

In Count Six, Plaintiffs challenge the constitutionality of the disorderly conduct ordinance on due process grounds, "but only in the event the court concludes that the ordinance must be construed as a strict liability offense."

The Court has already concluded that the disorderly conduct ordinance has a *mens rea* requirement.  Summary judgment is granted to Defendants on this claim.

## XI.  DENIAL OF DUE PROCESS- MICHIGAN'S NUISANCE ABATEMENT STATUTE: COUNT SEVEN: ALL DEFENDANTS

One page of Plaintiffs' thirty-three page brief in support of their motion for summary judgment discusses an "as applied" constitutional challenge to Defendants' application of the Nuisance Abatement statute.  They say the statute violates their right to due process as applied because it is unconstitutionally vague; they say it does not put ordinary persons on notice of what property can be forfeited as a result of what wrongdoing if the statute does not have a knowledge requirement.

Plaintiffs fail to adequately develop this argument and the issue is waived. *See United States v. Robinson*, 390 F.3d 853, 886 (6th Cir. 2004)("We have cautioned that

30

issues adverted to in a perfunctory manner, unaccompanied by some effort at

developed argumentation, are deemed waived, and that it is not sufficient for a party to

mention a possible argument in the most skeletal way, leaving the court to . . . put the

flesh on the bones.) (citations and internal quotations omitted).

## CONCLUSION

The Court **GRANTS** Plaintiffs' motion for summary judgment against the City on:

1.      Count One: Unlawful Detention;

2.      Count Three: Unreasonable Search of Persons; and

3.      Count Five: Unreasonable Seizure of Property.

Trial will **PROCEED** against the City on damages in connection with these three

Counts.

In all other respects, Plaintiff's motion is **DENIED**.

The Court **GRANTS** Defendants' motion for summary judgment and

**DISMISSES**:

1.      Count Two: Excessive Force;

2.      Count Four: Malicious Prosecution;

3.      Count Six: Due Process - Disorderly Conduct Ordinance; and

4.      Count Seven: Due Process - Nuisance Abatement statute.

In all other respects the motion is **DENIED**. Trial will **PROCEED** against the

individual officers on the issue of damages in connection with:

1.      Count One: Unlawful Detention;

2.      Count Three: Unreasonable Search of Persons; and

31

3.      Count Five: Unreasonable Seizure of Property.

**IT IS ORDERED.**

S/Victoria A. Roberts
Victoria A. Roberts
United States District Judge

Dated:  December 4, 2012

> The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on December 4, 2012.
>
> S/Linda Vertriest
> Deputy Clerk

32

# EXHIBIT 6B

MIED (Rev. 04/09/06) Notice of Appeal

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

Ian Mobley, et al.,

                    Plaintiff(s),                    Case No. 10-10675

v.                                                   Judge Victoria A. Roberts

City of Detroit, et al.,                            Magistrate Judge

                    Defendant(s).
_____/

## NOTICE OF APPEAL

Notice is hereby given that _all defendants_____ appeals to

the United States Court of Appeals for the Sixth Circuit from the:  ☐ Judgment  ☑ Order

☐ Other: _____

entered in this action on _December 4, 2012_____.

Date: December 18, 2012                    /s/ Jerry L. Ashford_____

Counsel is: RETAINED

                                           P47402
                                           City of Detroit Law Department
                                           2 Woodward Avenue
                                           Suite 500
                                           Detroit, MI 48226
                                           313-237-3089
                                           ashfj@detroitmi.gov

Appellant: Please file this form with the District Court Clerk's Office.  If you are paying the filing fee, please make your $455.00 check payable to:  Clerk, U.S. District Court.

# EXHIBIT 6C

Case No. 12-2674

---

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

---

IAN MOBLEY; KIMBERLY MOBLEY; PAUL KAISER; ANGIE
WONG; JAMES WASHINGTON; NATHANIEL PRICE; JEROME
PRICE; STEPHANIE HOLLANDER; JASON LEVERETTE-SAUNDERS;
WANDA LEVERETTE; DARLENE HELLENBERG; LAURA MAHLER

     Plaintiffs-Appellees,

v.

CITY OF DETROIT; VICKIE YOST, a Detroit police officer, in her
individual capacity; DANIEL BUGLO, a Detroit police officer, in his
individual capacity UNNAMED DETROIT POLICE OFFICERS, in their individual
capacities, GREGORY MCWHORTER, a Detroit police Sergeant; ANTHONY
POTTS, a Detroit police Sergeant; CHARLES TURNER, MICHAEL BROWN,
BRANDON COLE, TYRONE GRAY, SHERON JOHNSON; KATHY
SINGLETON, Detroit Police Officers,

    Defendants-Appellants.

---

On appeal from the United States District Court
Eastern District of Michigan at Detroit

---

## NOTICE OF SUGGESTION OF PENDENCY OF
## BANKRUPTCY CASE AND APPLICATION OF THE AUTOMATIC STAY

## CERTIFICATE OF SERVICE

K:\DOCS\APPEALS\FEGHL\A37000\MEMO\LF1025.WPD

## NOTICE OF SUGGESTION OF PENDENCY OF
## BANKRUPTCY CASE AND APPLICATION OF THE AUTOMATIC STAY

**PLEASE TAKE NOTICE THAT,** on July 18, 2013 (the "Petition Date"), the City of Detroit, Michigan (the "City") filed a petition for relief under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code"). The City's bankruptcy case is captioned *In re City of Detroit, Michigan*, Case No. 13-53846, (Bankr. E.D. Mich.) (the "Chapter 9 Case"), and is pending in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). A copy of the voluntary petition filed with the Bankruptcy Court commencing the Chapter 9 Case is attached hereto as Exhibit A.

**PLEASE TAKE FURTHER NOTICE THAT,** in accordance with the automatic stay imposed by operation of sections 362 and 922 of the Bankruptcy Code (the "Stay"), from and after the Petition Date, no act to (i) exercise control over property of the City or (ii) collect, assess or recover a claim against the City that arose before the commencement of the Chapter 9 Case may be commenced or continued against the City without the Bankruptcy Court first issuing an order lifting or modifying the Stay for such specific purpose.

**PLEASE TAKE FURTHER NOTICE THAT,** in accordance with the Stay, from and after the Petition Date, no cause of action arising prior to, or relating to the

K:\DOCS\APPEALS\FEGIL\A37000\MEMO\LF1025.WPD          1

period prior to, the Petition Date may be commenced or continued against (i) the City, an employee of the City who is or may be indemnified by the City, in any judicial, administrative or other action or proceeding, or (ii) an officer or inhabitant of the City, in any judicial, administrative or other action or proceeding that seeks to enforce a claim against the City, and no related judgment or order may be entered or enforced against the City outside of the Bankruptcy Court without the Bankruptcy Court first issuing an order lifting or modifying the Stay for such specific purpose.

**PLEASE TAKE FURTHER NOTICE THAT** actions taken in violation of the Stay, and judgments or orders entered or enforced against the City, or its officers or inhabitants to enforce a claim against the City, while the Stay is in effect, are void and without effect.

**PLEASE TAKE FURTHER NOTICE THAT** neither the Bankruptcy Court nor the United States District Court for the Eastern District of Michigan has issued an order lifting or modifying the Stay for the specific purpose of allowing any party to the above-captioned proceeding to commence or continue any cause of action against the City or its officers or inhabitants.  As such, the above-captioned proceeding may not be prosecuted, and no valid judgment or order may be entered or enforced against the City or its officers or inhabitants.

K:\DOCS\APPEALS\FEGII\AA37000\MEMO\LF1025.WPD         2

**PLEASE TAKE FURTHER NOTICE THAT**, in light of the foregoing, the City will not defend against, or take any other action with respect to, the above-captioned proceeding while the Stay remains in effect.

**PLEASE TAKE FURTHER NOTICE THAT** the City hereby expressly reserves all rights with respect to the above-captioned proceeding, including, but not limited to, the right to move to vacate any judgment entered in the above-captioned proceeding as void.

Respectfully submitted,

CITY OF DETROIT LAW DEPARTMENT

Portia L. Roberson (P-49858)
Corporation Counsel

By:   /s/Linda D. Fegins
Linda D. Fegins (P31980)
Senior Assistant Corporation Counsel
City of Detroit Law Department
Attorney for Defendant-Appellants
2 Woodward Avenue, Suite 500
Detroit, Michigan 48226
(313) 237-3022

Dated: July 24, 2013

Case No. 12-2674

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

IAN MOBLEY; KIMBERLY MOBLEY; PAUL KAISER; ANGIE
WONG; JAMES WASHINGTON; NATHANIEL PRICE; JEROME
PRICE; STEPHANIE HOLLANDER; JASON LEVERETTE-SAUNDERS;
WANDA LEVERETTE; DARLENE HELLENBERG; LAURA MAHLER

        Plaintiffs-Appellees,

v.

CITY OF DETROIT; VICKIE YOST, a Detroit police officer, in her
individual capacity; DANIEL BUGLO, a Detroit police officer, in his
individual capacity UNNAMED DETROIT POLICE OFFICERS, in their individual
capacities, GREGORY MCWHORTER, a Detroit police Sergeant; ANTHONY
POTTS, a Detroit police Sergeant; CHARLES TURNER, MICHAEL BROWN,
BRANDON COLE, TYRONE GRAY, SHERON JOHNSON; KATHY
SINGLETON, Detroit Police Officers,

        Defendants-Appellants.

On appeal from the United States District Court
Eastern District of Michigan at Detroit

### CERTIFICATE OF SERVICE

I certify that on July 24, 2013, the foregoing Notice of Suggestion of Pendency of
Bankruptcy Case and Application of the Automatic Stay and Certificate of Service
was served on all parties or their counsel of record through the CM/ECF system if
they are registered users or, if they are not, by placing a true and correct copy in the
United States mail, postage prepaid, to their address of record.

        /s/Linda D. Fegins P31980
        Attorney for Defendant-Appellee
        2 Woodward, Suite 500
        Detroit, MI 48226
        (313) 237-3022
        fegil@detroitmi.gov

K:\DOCS\APPEALS\FEGIL\A37000\MEMO\LF1025.WPD

# EXHIBIT A

Revised 05/08

# UNITED STATES BANKRUPTCY COURT
### Eastern District of Michigan

In re:

City of Detroit, Michigan,

_____ Debtor. _____/

Case No. 13-_____

### BANKRUPTCY PETITION COVER SHEET

(The debtor must complete and file this form with the petition in every bankruptcy case. Instead of filling in the boxes on the petition requiring information on prior and pending cases, the debtor may refer to this form.)

#### Part 1

"Companion cases," as defined in L.B.R. 1073-1(b), are cases involving any of the following: (1) The same debtor; (2) A corporation and any majority shareholder thereof; (3) Affiliated corporations; (4) A partnership and any of its general partners; (5) An individual and his or her general partner; (6) An individual and his or her spouse; or (7) Individuals or entities with any substantial identity of financial interest or assets.

Has a "companion case" to this case ever been filed at any time in this district or any other district?  Yes ___  No  __X__
(If yes, complete Part 2.)

#### Part 2

For each companion case, state in chronological order of cases:

*Not applicable*

If the present case is a Chapter 13 case, state for each companion case:

*Not applicable*

#### Part 3 - In a Chapter 13 Case Only

The Debtor(s) certify, re: 11 U.S.C. § 1328(f):                    *Not Applicable*
[indicate which]

☐ Debtor(s) received a discharge issued in a case filed under Chapter 7, 11, or 12 during the 4-years before filing this case.

☐ Debtor(s) did not receive a discharge issued in a case filed under Chapter 7, 11, or 12 during the 4-years before filing this case.

☐ Debtor(s) received a discharge in a Chapter 13 case filed during the 2-years before filing this case.

☐ Debtor(s) did not receive a discharge in a Chapter 13 case filed during the 2-years before filing this case.

I declare under penalty of perjury that I have read this form and that it is true and correct to the best of my information and belief.

Kevyn D. Orr
Emergency Manager
City of Detroit

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, OH 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK
   AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, MI 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

Date: July 18, 2013                         ATTORNEYS FOR THE CITY OF DETROIT, MICHIGAN

B 1 (Official Form 1) (04/13)

| UNITED STATES BANKRUPTCY COURT<br>EASTERN DISTRICT OF MICHIGAN | VOLUNTARY PETITION |
|---|---|

| Name of Debtor (if individual, enter Last, First, Middle):<br>City of Detroit, Michigan | Name of Joint Debtor (Spouse) (Last, First, Middle): |
|---|---|
| All Other Names used by the Debtor in the last 8 years<br>(include married, maiden, and trade names): | All Other Names used by the Joint Debtor in the last 8 years<br>(include married, maiden, and trade names): |
| Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN)/Complete EIN<br>(if more than one, state all):<br>38-6004606 | Last four digits of Soc. Sec. or Individual-Taxpayer I.D. (ITIN)/Complete EIN<br>(if more than one, state all): |
| Street Address of Debtor (No. and Street, City, and State):<br>2 Woodward Avenue<br>Suite 1126<br>Detroit, Michigan<br>ZIP CODE 48226 | Street Address of Joint Debtor (No. and Street, City, and State):<br>ZIP CODE |
| County of Residence or of the Principal Place of Business:<br>Wayne | County of Residence or of the Principal Place of Business: |
| Mailing Address of Debtor (if different from street address):<br>ZIP CODE | Mailing Address of Joint Debtor (if different from street address):<br>ZIP CODE |
| Location of Principal Assets of Business Debtor (if different from street address above):<br>ZIP CODE | |

| Type of Debtor<br>(Form of Organization)<br>(Check one box.) | Nature of Business<br>(Check one box.) | Chapter of Bankruptcy Code Under Which<br>the Petition is Filed (Check one box.) |
|---|---|---|
| ☐ Individual (includes Joint Debtors)<br>*See Exhibit D on page 2 of this form.*<br>☐ Corporation (includes LLC and LLP)<br>☐ Partnership<br>☒ Other (If debtor is not one of the above entities, check<br>this box and state type of entity below.)<br>Municipality | ☐ Health Care Business<br>☐ Single Asset Real Estate as defined in<br>11 U.S.C. § 101(51B)<br>☐ Railroad<br>☐ Stockbroker<br>☐ Commodity Broker<br>☐ Clearing Bank<br>☒ Other | ☐ Chapter 7   ☐ Chapter 15 Petition for<br>☒ Chapter 9      Recognition of a Foreign<br>☐ Chapter 11     Main Proceeding<br>☐ Chapter 12   ☐ Chapter 15 Petition for<br>☐ Chapter 13     Recognition of a Foreign<br>                 Nonmain Proceeding |

| Chapter 15 Debtors<br>Country of debtor's center of main interests:<br><br>Each country in which a foreign proceeding by, regarding, or<br>against debtor is pending: | Tax-Exempt Entity<br>(Check box, if applicable.)<br><br>☐ Debtor is a tax-exempt organization<br>under title 26 of the United States<br>Code (the Internal Revenue Code). | Nature of Debts<br>(Check one box.)<br>☐ Debts are primarily consumer   ☒ Debts are<br>debts, defined in 11 U.S.C.      primarily<br>§ 101(8) as "incurred by an      business debts.<br>individual primarily for a<br>personal, family, or<br>household purpose." |
|---|---|---|

| Filing Fee (Check one box.) | Chapter 11 Debtors |
|---|---|
| ☒ Full Filing Fee attached.<br><br>☐ Filing Fee to be paid in installments (applicable to individuals only). Must attach<br>signed application for the court's consideration certifying that the debtor is<br>unable to pay fee except in installments. Rule 1006(b). See Official Form 3A.<br><br>☐ Filing Fee waiver requested (applicable to chapter 7 individuals only). Must<br>attach signed application for the court's consideration. See Official Form 3B. | Check one box:<br>☐ Debtor is a small business debtor as defined in 11 U.S.C. § 101(51D).<br>☐ Debtor is not a small business debtor as defined in 11 U.S.C. § 101(51D).<br>Check if:<br>☐ Debtor's aggregate noncontingent liquidated debts (excluding debts owed to<br>insiders or affiliates) are less than $2,490,925 (*amount subject to adjustment<br>on 4/01/16 and every three years thereafter*).<br>Check all applicable boxes:<br>☐ A plan is being filed with this petition.<br>☐ Acceptances of the plan were solicited prepetition from one or more classes<br>of creditors, in accordance with 11 U.S.C. § 1126(b). |

| Statistical/Administrative Information | THIS SPACE IS FOR<br>COURT USE ONLY |
|---|---|
| ☒ Debtor estimates that funds will be available for distribution to unsecured creditors.<br>☐ Debtor estimates that, after any exempt property is excluded and administrative expenses paid, there will be no funds available for<br>distribution to unsecured creditors. | |

Estimated Number of Creditors

| 1-49 | 50-99 | 100-199 | 200-999 | 1,000-<br>5,000 | 5,001-<br>10,000 | 10,001-<br>25,000 | 25,001-<br>50,000 | 50,001-<br>100,000 | Over<br>100,000 |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

Estimated Assets

| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001<br>to $1<br>million | $1,000,001<br>to $10<br>million | $10,000,001<br>to $50<br>million | $50,000,001<br>to $100<br>million | $100,000,001<br>to $500<br>million | $500,000,001<br>to $1 billion | More than<br>$1 billion |
|---|---|---|---|---|---|---|---|---|---|
| ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

Estimated Liabilities

| $0 to<br>$50,000 | $50,001 to<br>$100,000 | $100,001 to<br>$500,000 | $500,001<br>to $1<br>million | $1,000,001<br>to $10<br>million | $10,000,001<br>to $50<br>million | $50,000,001<br>to $100<br>million | $100,000,001<br>to $500<br>million | $500,000,001<br>to $1 billion | More than<br>$1 billion |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | |

B 1 (Official Form 1) (04/13)                                                                                                    Page 2

| Voluntary Petition<br>*(This page must be completed and filed in every case.)* | Name of Debtor(s):<br>City of Detroit, Michigan |
|---|---|

| All Prior Bankruptcy Cases Filed Within Last 8 Years (If more than two, attach additional sheet.) | | |
|---|---|---|
| Location<br>Where Filed: | Case Number: | Date Filed: |
| Location<br>Where Filed: | Case Number: | Date Filed: |

| Pending Bankruptcy Case Filed by any Spouse, Partner, or Affiliate of this Debtor (If more than one, attach additional sheet.) | | |
|---|---|---|
| Name of Debtor: | Case Number: | Date Filed: |
| District: | Relationship: | Judge: |

<table>
<tr>
<td><b>Exhibit A</b><br>(To be completed if debtor is required to file periodic reports (e.g., forms 10K and 10Q) with the Securities and Exchange Commission pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 and is requesting relief under chapter 11.)<br><br>☐  Exhibit A is attached and made a part of this petition.</td>
<td><b>Exhibit B</b><br>(To be completed if debtor is an individual whose debts are primarily consumer debts.)<br><br>I, the attorney for the petitioner named in the foregoing petition, declare that I have informed the petitioner that [he or she] may proceed under chapter 7, 11, 12, or 13 of title 11, United States Code, and have explained the relief available under each such chapter. I further certify that I have delivered to the debtor the notice required by 11 U.S.C. § 342(b).<br><br>X _____<br>    Signature of Attorney for Debtor(s)   (Date)</td>
</tr>
</table>

**Exhibit C**

Does the debtor own or have possession of any property that poses or is alleged to pose a threat of imminent and identifiable harm to public health or safety?

☒  Yes, and Exhibit C is attached and made a part of this petition.

☐  No.

**Exhibit D**

(To be completed by every individual debtor. If a joint petition is filed, each spouse must complete and attach a separate Exhibit D.)

☐  Exhibit D, completed and signed by the debtor, is attached and made a part of this petition.

If this is a joint petition:

☐  Exhibit D, also completed and signed by the joint debtor, is attached and made a part of this petition.

**Information Regarding the Debtor - Venue**
(Check any applicable box.)

☒  Debtor has been domiciled or has had a residence, principal place of business, or principal assets in this District for 180 days immediately preceding the date of this petition or for a longer part of such 180 days than in any other District.

☐  There is a bankruptcy case concerning debtor's affiliate, general partner, or partnership pending in this District.

☐  Debtor is a debtor in a foreign proceeding and has its principal place of business or principal assets in the United States in this District, or has no principal place of business or assets in the United States but is a defendant in an action or proceeding [in a federal or state court] in this District, or the interests of the parties will be served in regard to the relief sought in this District.

**Certification by a Debtor Who Resides as a Tenant of Residential Property**
(Check all applicable boxes.)

☐  Landlord has a judgment against the debtor for possession of debtor's residence. (If box checked, complete the following.)

                        _____<br>
                        (Name of landlord that obtained judgment)

                        _____<br>
                        (Address of landlord)

☐  Debtor claims that under applicable nonbankruptcy law, there are circumstances under which the debtor would be permitted to cure the entire monetary default that gave rise to the judgment for possession, after the judgment for possession was entered, and

☐  Debtor has included with this petition the deposit with the court of any rent that would become due during the 30-day period after the filing of the petition.

☐  Debtor certifies that he/she has served the Landlord with this certification. (11 U.S.C. § 362(l)).

13-53846   Doc 1   Filed 07/18/13   Entered 07/18/13 16:06:22   Page 3 of 16

B 1 (Official Form 1) (04/13)
Page 3

| Voluntary Petition *(This page must be completed and filed in every case.)* | Name of Debtor(s): City of Detroit, Michigan |
|---|---|

**Signatures**

| Signature(s) of Debtor(s) (Individual/Joint) | Signature of a Foreign Representative |
|---|---|

**Signature(s) of Debtor(s) (Individual/Joint)**

I declare under penalty of perjury that the information provided in this petition is true and correct.
[If petitioner is an individual whose debts are primarily consumer debts and has chosen to file under chapter 7] I am aware that I may proceed under chapter 7, 11, 12 or 13 of title 11, United States Code, understand the relief available under each such chapter, and choose to proceed under chapter 7.
[If no attorney represents me and no bankruptcy petition preparer signs the petition] I have obtained and read the notice required by 11 U.S.C. § 342(b).

I request relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____
 Signature of Debtor

X _____
 Signature of Joint Debtor

 _____
 Telephone Number (if not represented by attorney)

 _____
 Date

**Signature of a Foreign Representative**

I declare under penalty of perjury that the information provided in this petition is true and correct, that I am the foreign representative of a debtor in a foreign proceeding, and that I am authorized to file this petition.

(Check only one box.)

☐ I request relief in accordance with chapter 15 of title 11, United States Code. Certified copies of the documents required by 11 U.S.C. § 1515 are attached.

☐ Pursuant to 11 U.S.C. § 1511, I request relief in accordance with the chapter of title 11 specified in this petition. A certified copy of the order granting recognition of the foreign main proceeding is attached.

X _____
 (Signature of Foreign Representative)

 _____
 (Printed Name of Foreign Representative)

 _____
 Date

---

**Signature of Attorney***

X _____(signature)_____
 Signature of Attorney for Debtor(s)

David G. Heiman      Bruce Bennett        Jonathan S. Green
Heather Lennox       JONES DAY            Stephen S. LaPlante
JONES DAY            555 South Flower Street   MILLER, CANFIELD
North Point          Fiftieth Floor       PADDOCK AND STONE,
901 Lakeside Avenue  Los Angeles, CA 90071   P.L.C.
Cleveland, OH 44114  Tel: (213) 243-2382   150 West Jefferson
Tel: (216) 586-3939  Fax: (213) 243-2539   Suite 2500
Fax: (216) 579-0212  bbennett@jonesday.com   Detroit, MI 48226
dgheiman@jonesday.com                      Tel: (313) 963-6420
hlennox@jonesday.com                       Fax: (313) 496-7500
                                           green@millercanfield.com
                                           laplante@millercanfield.com

_____July 18, 2013_____
 Date

*In a case in which § 707(b)(4)(D) applies, this signature also constitutes a certification that the attorney has no knowledge after an inquiry that the information in the schedules is incorrect.

**Signature of Non-Attorney Bankruptcy Petition Preparer**

I declare under penalty of perjury that: (1) I am a bankruptcy petition preparer as defined in 11 U.S.C. § 110; (2) I prepared this document for compensation and have provided the debtor with a copy of this document and the notices and information required under 11 U.S.C. §§ 110(b), 110(h), and 342(b); and, (3) if rules or guidelines have been promulgated pursuant to 11 U.S.C. § 110(h) setting a maximum fee for services chargeable by bankruptcy petition preparers, I have given the debtor notice of the maximum amount before preparing any document for filing for a debtor or accepting any fee from the debtor, as required in that section. Official Form 19 is attached.

_____
Printed Name and title, if any, of Bankruptcy Petition Preparer

_____
Social-Security number (If the bankruptcy petition preparer is not an individual, state the Social-Security number of the officer, principal, responsible person or partner of the bankruptcy petition preparer.) (Required by 11 U.S.C. § 110.)

_____
Address

X _____
 Signature

 _____
 Date

---

**Signature of Debtor (Corporation/Partnership)**

I declare under penalty of perjury that the information provided in this petition is true and correct, and that I have been authorized to file this petition on behalf of the debtor.

The debtor requests the relief in accordance with the chapter of title 11, United States Code, specified in this petition.

X _____(signature)_____
 Signature of Authorized Individual

 Kevyn D. Orr
 Printed Name of Authorized Individual

 Emergency Manager, City of Detroit
 Title of Authorized Individual

 July 18, 2013
 Date

Signature of bankruptcy petition preparer or officer, principal, responsible person, or partner whose Social-Security number is provided above.

Names and Social-Security numbers of all other individuals who prepared or assisted in preparing this document unless the bankruptcy petition preparer is not an individual.

If more than one person prepared this document, attach additional sheets conforming to the appropriate official form for each person.

*A bankruptcy petition preparer's failure to comply with the provisions of title 11 and the Federal Rules of Bankruptcy Procedure may result in fines or imprisonment or both. 11 U.S.C. § 110; 18 U.S.C. § 156.*



EMERGENCY MANAGER
CITY OF DETROIT

ORDER No. 13

FILING OF A PETITION UNDER CHAPTER 9
OF TITLE 11 OF THE UNITED STATES CODE

BY THE AUTHORITY VESTED IN THE EMERGENCY MANAGER
FOR THE CITY OF DETROIT
PURSUANT TO MICHIGAN'S PUBLIC ACT 436 OF 2012,
KEVYN D. ORR, THE EMERGENCY MANAGER,
ISSUES THE FOLLOWING ORDER:

*Whereas*, on March 28, 2013, Michigan Public Act 436 of 2012 ("PA 436") became effective and Kevyn D. Orr became the Emergency Manager (the "EM") for the City of Detroit (the "City") with all the powers and duties provided under PA 436; and

Pursuant to section 9(2) of PA 436, the EM "shall act for and in the place and stead of" the Detroit Mayor and City Council; and

Section 9(2) of PA 436 also grants the EM "broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the [City] and the [City's] capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare;" and

Pursuant to section 10(1) of PA 436, the EM may "issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the [EM] considers necessary to accomplish the purposes of this act;" and

Section 18(1) of PA 436 provides that "[i]f, in the judgment of the [EM], no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the [EM] may recommend to the governor and the

state treasurer that the local government be authorized to proceed under chapter 9" of title 11 of the United States Code (the "Bankruptcy Code"); and

Section 18(1) of PA 436 further provides that "[i]f the governor approves of the [EM's] recommendation, the governor shall inform the state treasurer and the emergency manager in writing of the decision.... Upon receipt of the written approval, the emergency manager is authorized to proceed under chapter 9 [of the Bankruptcy Code]. This section empowers the local government for which an emergency manager has been appointed to become a debtor under [the Bankruptcy Code], as required by section 109 of [the Bankruptcy Code], and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9" of the Bankruptcy Code; and

In accordance with section 18 of PA 436, the EM has recommended to the Governor of Michigan (the "Governor") and the Michigan State Treasurer (the "State Treasurer") that the City be authorized to proceed under chapter 9 of the Bankruptcy Code (the "Recommendation"); and

The Governor has provided the State Treasurer and the EM with his written approval of the Recommendation, a true and correct copy of which is attached hereto as Exhibit A, thereby authorizing the City to proceed under chapter 9.

**It is hereby ordered that:**

1. The City shall file a petition for relief under chapter 9 of the Bankruptcy Code (the "Petition") in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court").

2. The City's Corporation Counsel, financial advisors, outside legal advisors and other officers and employees of the City, as applicable, are hereby authorized and directed, on behalf of and in the name of the City, to execute and verify the Petition and related Bankruptcy Court filings and perform any and all such acts as are reasonable, appropriate, advisable, expedient, convenient, proper or necessary to carry out this Order, as and to the extent directed by the EM or his designee.

3. If any component of this Order is declared illegal, unenforceable or ineffective in a legal or other forum or proceeding such component shall be deemed severable so that all other components contained in this Order shall remain valid and effective.

4. This Order is effective immediately upon the date of execution below.

5. This Order shall be distributed to the Mayor, City Council members and all department heads.

6.  The EM may modify, rescind, or replace this Order at any time.

Dated: July 18, 2013

By: _____
Kevyn D. Orr
Emergency Manager
City of Detroit

cc:    State of Michigan Department of Treasury
Mayor David Bing
Members of Detroit City Council

3