UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION



In re:

City of Detroit, Michigan,

    Debtor.
_____/

Chapter 9
Case No. 13-53846
Hon. Steven W. Rhodes

### Notice of Filing by Detroit City Council of Resolution Regarding The Emergency Manager's Post-Petition Financing Proposal

Now Comes the Detroit City Council and hereby gives notice of the adoption of the attached Resolution Regarding The Emergency Manager's Post-Petition Financing Proposal, and its filing with this Court.

October 25, 2013

By: Saunteel Jenkins, President
Detroit City Council

Form C of D—16-CE

# TRUE COPY CERTIFICATE

STATE OF MICHIGAN, } ss.
City of Detroit

## CITY CLERK'S OFFICE, DETROIT

I, *Janice M. Winfrey*, City Clerk of the City of Detroit, in said State, do hereby certify that the annexed paper is a TRUE COPY OF **RESOLUTION**

adopted (passed) by the City Council at session of

October 25, 20 13

and approved by Mayor

_____ 20 ___

as appears from the Journal of said City Council in the office of the City Clerk of Detroit, aforesaid; that I have compared the same with the original, and the same is a correct transcript therefrom, and of the whole of such original.

In Witness Whereof, I have hereunto set my hand and affixed the corporate seal of said City, at Detroit, this 25th day of October, A.D. 20 13

_____
CITY CLERK

A RESOLUTION BY COUNCIL MEMBER _____

## RESOLUTION REGARDING THE EMERGENCY MANAGER'S POST PETITION FINANCING PROPOSAL

**WHEREAS**  On October 11, 2013, the Emergency Manager Kevyn Orr (EM) filed with the City Clerk for transmission to the City Council *Order No. 17 – Approval of Post-Petition Financing* for the issuance of Financial Recovery Bonds (Secured Financing) pursuant to Sec. 36a of the Home Rule City Act, 279 PA of 1909, as part of the EM's ongoing restructuring and settlement strategies being advanced through the City's Chapter 9 bankruptcy proceedings, *In Re City of Detroit*, United States Bankruptcy Court for the Eastern District of Michigan, Case No. 13-53846. More specifically, the financing from the proposed transaction would refinance the interest rate Swap Agreements at 75% to 82% of their purported value and include additional financing to provide the City of Detroit with funds to use for City service improvement projects; and

**WHEREAS**  The proposed Debtor-in-Possession Financing transaction is an extremely complex deal on a number of fronts that does not seem to be in the best interest of the City. The key terms include a maximum principal aggregate amount of $350 million dollars at a floating interest rate with a maturity date no later than two and one half years from the date of issuance, although it is quite possible that the loans would mature as early as November 2014. Essentially, if the proposed transaction is consummated the City will be taking a fixed rate loan and swapping it for a variable rate loan putting the City in the same predicament that the original Swaps were supposed to cure, and seems to primarily benefit the two Swap counterparties Bank of America and UBS; and

**WHEREAS**  It cannot be emphasized enough that this lending is of a very temporal nature; the maturity date of the loans is estimated by the Emergency Manager to be some time between November 2014 and May 2016. There is no guarantee that replacement funding will be available by this lender or any other lender when these loans mature in as little as one year placing the City into a very foreseeable default position triggering onerous default penalty provisions; and

**WHEREAS**  Miller Buckfire has indicated that the City will save approximately $35M per year in financing costs by accepting this deal; however, these savings are achieved by making interest only payments on these new loans. The City's underlying principal debt will not decrease under this proposal; rather, it is a mere stop gap measure until permanent financing is found; and

**WHEREAS**  It has been indicated that the impetus for this transaction is to ensure the continued flow of casino tax revenues to the City throughout the bankruptcy process; however, this seems to disregard Judge Rhodes' order

1

|               | that essentially accomplished the same thing by providing that the casino revenue is the property of the bankruptcy estate and therefore subject to the automatic stay; and |
|---|---|
| **WHEREAS** | This Post-Petition financing appears to be an attempt to keep the Swaps out of the bankruptcy proceeding instead of challenging the Swaps counterparties' tenuous status as secured creditors. The counterparties' senior creditor status was achieved by pledging the casino wagering taxes to collateralize the underlying Swap agreements. According to MCL 432.212(2), the use of casino wagering taxes for such a pledge appears impermissible. Rather than seeking a declaration of this position by the Court, this deal would transform a soft liability into a firm liability at a time in the interest rate cycle when the Swap liability could actually start to decline; and |
| **WHEREAS** | Not unlike the Swap Agreements that have been universally recognized as a bad deal for the City, Barclays is requiring the City to pledge its major revenue in order to secure this transaction. The City will have to pledge not only its casino wagering tax revenue but also its income tax revenue. These are the City's two most stable general fund revenue sources. Barclays is also requiring prepayment of any asset monetization net proceeds over $10M. This would give Barclays too much power and control over the City's revenues and future and limits the City's ability to negotiate or resolve other claims in bankruptcy; and |
| **WHEREAS** | Municipal Market Advisors support the thought that proposed financing is more advantageous to the financiers. They indicate that the loans seem to be "a very good deal for the lender and the swap counterparties but less so for the [C]ity's unsecured creditors and its residents. The seeming lack of a tangible recovery plan that improves Detroit's revenues over the period of the loans renders us skeptical about the [C]ity's ability to repay an amount of this magnitude in a short time frame without causing additional stress to the detriment of city residents and unsecured creditors that may have their recoveries tied to the [C]ity's financial performance."[1]; and |
| **WHEREAS** | The default provisions within the proposed agreement are very aggressive and easily triggered. The default provisions are broad and include the following: the agreement calls for the City to remain under some level of state control, *i.e.,* emergency manager, consent agreement, or transition advisory board. Additionally, a mere assertion by any person or entity acting on behalf of or having jurisdiction over the City that any Quality of Life loan is not binding, would trigger a default; and |
| **WHEREAS** | The $350M Post-Petition Financing includes a Quality of Life Loan; these newly borrowed funds are proposed to be used to make certain unspecified improvements in City government. From the information provided thus far, it appears that none of the proceeds will be used to create new |

---

[1] *Bond Buyer*, October 21, 2013, "Detroit Council Rejects DIP Loan"

revenue. If the City is ever to achieve a stronger financial position, strengthening revenues and revenue collection under the City's control is key. Additional revenues will improve the quality of life for citizens as it will provide funds for City services. It is difficult without additional information to determine whether the use of these funds would be prudent investments. Additionally, it would be unwise to incur more debt to facilitate the payment of costly consultants; and

**WHEREAS** Pursuant to Sec. 19 of Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1541, *et seq.*, City Council had the authority to approve or disapprove this proposed transaction within ten (10) days from the date of submission by the EM, or by October 21, 2013. If Council votes to disapprove, it must submit an alternative proposal to the local emergency financial assistance loan board that would yield substantially the same financial result for the City as the EM's proposal within seven (7) days of its disapproval. If Council does not act, within the ten (10) day timeframe, the EM's proposed transaction is considered approved under the relevant statute; and

**WHEREAS** Upon receipt of the proposal, City Council, in addition to its own individualized study of the transaction, requested its Legislative Policy Division (LPD) to review the documents related to the proposed transaction. LPD immediately consulted with the City's financial and legal consulting firms principally responsible for crafting the transactional documents on the City's behalf, Miller Buckfire and Jones Day. Since the beginning of LPD's review, numerous questions have been submitted to the consultants and although some information has been provided, a host of uncertainties and unanswered questions remain; and many of these questions simply cannot be answered adequately within the short window allotted for City Council's consideration under the aforementioned statute. Additionally, many critical issues remain unresolved until decisions by the Bankruptcy Court or other courts are made; and

**WHEREAS** Despite Council's diligent efforts, the complexities of the proposed transaction coupled with its uniqueness (to date the single largest municipal bankruptcy filed in the United States), and the precedent setting ramifications of decisions related to this bankruptcy financing instrument, the lack of available independent subject matter experts in municipal financing arrangements of this type to properly vet the transaction, combine to make it impractical to meet the compressed statutory deadline in any competent, meaningful way; and

**WHEREAS** In addition to not being able to properly vet the proposed transaction given the information provided, the abbreviated timeframe also constrains Council's authority to propose a reasonable or credible alternate proposal under MCL 141.1559(2); and

**WHEREAS** Based on the foregoing information, it appears that the deal being brokered is being done in order to set a precedent for how municipal

3

bankruptcies work to facilitate future bankruptcies in other cities rather than to broker the best deal for the City of Detroit, thus putting the interests of lenders before the interests of the City and its residents. The goal seems to be to ensure the protection of the lenders at the detriment of all other interested parties. By settling all claims against the counterparties, the City would surrender any ability to challenge the legality of any of the actions taken regarding the original Swap Agreement, as well as any ability to challenge the City's receivership status, the counterparties' creditor status or the appropriateness of the pledging of revenues; and

**WHEREAS** The City Council has received an alternative to the proposed Post-Petition Financing. The proposal attempted to improve upon some of the terms of the proposal proffered by the Emergency Manager. The untimely receipt of the proposal, however, does not allow City Council to obtain the expertise necessary to properly vet the alternative proposal. The seven (7) day limitation created by P.A. 436 of 2012 places an unrealistic time frame in which to solicit and consider a counteroffer to a proposal that took months to create. **NOW THEREFORE BE IT**

**RESOLVED** That the Detroit City Council is in receipt of *Order No. 17 – Approval of Post-petition Financing* for the issuance of Financial Recovery Bonds (Secured Financing) which has triggered the provisions of Sec. 19 of Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1541, *et seq.*, granting City Council the authority to vote on the proposed transaction; and **BE IT FURTHER**

**RESOLVED** If obtained, it is strongly urged that any funds from the Quality of Life Loan be used to strengthen revenues and revenue collections by improving the collection systems for income tax, property tax and the property assessment. Hardware improvements as well as staffing level increases in the Finance Department and the Law Department will send a message to non-payers that not paying what is owed is no longer an option; and **BE IT FURTHER**

**RESOLVED** That the Detroit City Council has voted to disapprove Mr. Orr's proposed transaction and would ask that Judge Rhodes determine whether counterparties are indeed secured creditors in light of the Michigan statute that prohibits the use of wagering taxes in transactions collateralizing swap agreements and whether the instant settlement with the counterparties are in the best interest of the City in light of surrounding circumstances as discussed above; and **BE IT FINALLY**

**RESOLVED** That a copy of this resolution be forwarded to Judge Steven Rhodes, Governor Rick Snyder, State of Michigan Department of Treasury, Emergency Manager Kevyn Orr, Municipal Loan Board and Mayor Dave Bing.

4

October 25, 2013

5