UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,                .
                                 .        Detroit, Michigan
                                 .        October 23, 2013
                 Debtor.         .        9:00 a.m.
. . . . . . . . . . . . . .

HEARING RE. ELIGIBILITY TRIAL
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                     By:  BRUCE BENNETT
                     555 South Flower Street
                     Fiftieth Floor
                     Los Angeles, CA  90071-2452
                     (213) 243-2382

                     Jones Day
                     By:  GEOFFREY S. IRWIN
                          GEOFFREY S. STEWART
                          MIGUEL F. EATON
                     51 Louisiana Avenue, N.W.
                     Washington, D.C.  20001-2113
                     (202) 879-3768

                     Pepper Hamilton, LLP
                     By:  ROBERT S. HERTZBERG
                     4000 Town Center, Suite 1800
                     Southfield, MI  48075-1505
                     (248) 359-7333

For the State of     State of Michigan
Michigan:            Michigan Department of Attorney General
                     By:  MATTHEW SCHNEIDER
                     P.O. Box 30754
                     Lansing, MI  48909
                     (517) 241-8403

                     Dickinson Wright, PLLC
                     By:  STEVEN G. HOWELL
                     500 Woodward Avenue, Suite 4000
                     Detroit, MI  48226-3425
                     (313) 223-3033

APPEARANCES (continued):

```
For AFSCME,           Lowenstein Sandler, LLP
AFL-CIO, and Sub-     By:  SHARON L. LEVINE
Chapter 98, City           JOHN K. SHERWOOD
of Detroit            65 Livingston Avenue
Retirees:             Roseland, NJ  07068
                      (973) 597-2374


For Detroit           Clark Hill, PLC
Retirement Systems-   By:  ROBERT D. GORDON
General Retirement         JENNIFER K. GREEN
System of Detroit,    151 South Old Woodward, Suite 200
Police and Fire       Birmingham, MI  48009
Retirement System     (248) 988-5882
of the City of
Detroit:


                      Clark Hill, PLC
                      By:  RONALD A. KING
                      212 East Grand River Avenue
                      Lansing, MI  48096
                      (517) 318-3015


For the Detroit       Erman, Teicher, Miller, Zucker &
Fire Fighters           Freedman, P.C.
Association, the      By:  BARBARA A. PATEK
Detroit Police             JULIE BETH TEICHER
Officers Associa-          DAVID EISENBERG
tion and the          400 Galleria Officentre, Suite 444
Detroit Police        Southfield, MI  48034
Lieutenants &         (248) 827-4100
Sergeants
Association:


For the Inter-        Cohen, Weiss & Simon, LLP
national Union,       By:  BABETTE A. CECCOTTI
UAW:                       PETER D. DECHIARA
                           THOMAS N. CIANTRA
                      330 West 42nd Street, 25th Floor
                      New York, NY  10036-6976
                      (212) 356-0227
```

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Silverman & Morris, PLLC<br>By:  THOMAS R. MORRIS<br>30500 Northwestern Highway, Suite 200<br>Farmington Hills, MI  48334<br>(248) 539-1330<br><br>Lippitt O'Keefe, PLLC<br>By:  RYAN C. PLECHA<br>370 East Maple Road, Fl. 3<br>Birmingham, MI  48009<br>(248) 646-8292 |
| For the Official Committee of Retirees: | Dentons<br>By:  CLAUDE D. MONTGOMERY<br>     ANTHONY B. ULLMAN<br>     ARTHUR H. RUEGGER<br>1121 Avenue of the Americas<br>New York, NY  10020-1089<br>(212) 632-8390<br><br>Brooks, Wilkins, Sharkey & Turco, PLLC<br>By:  MATTHEW E. WILKINS<br>401 South Old Woodward, Suite 400<br>Birmingham, MI  48009<br>(248) 971-1711 |
| For Retired Detroit Police Members Association: | Strobl & Sharp, PC<br>By:  LYNN M. BRIMER<br>     MEREDITH E. TAUNT<br>     MALLORY A. FIELD<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI  48304-2376<br>(248) 540-2300 |
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer<br>By:  WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI  48025<br>(248) 644-9200 |
| For Ambac Assurance Corp.: | Schafer and Weiner, PLLC<br>By:  DANIEL J. WEINER<br>40950 Woodward Avenue, Suite 100<br>Bloomfield Hills, MI  48304<br>(248) 540-3340 |

Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

```
 1          THE CLERK:  Court is in session.  Please be seated.
 2   Case Number 13-53846, City of Detroit, Michigan.
 3          THE COURT:  Good morning.  Excuse me.  We have an
 4   attorney to admit to the Bar of the Court, Miguel Eaton.
 5          MR. EATON:  Good morning, your Honor.
 6          THE COURT:  Are you Mr. Eaton?
 7          MR. EATON:  Yes, sir.
 8          THE COURT:  Okay.  Are you prepared to take the oath
 9   of admission to the Bar of the Court?
10          MR. EATON:  Yes, your Honor.
11          THE COURT:  Please raise your right hand.  Do you
12   affirm that you will conduct yourself as an attorney and
13   counselor of the Court with integrity and respect for the
14   law; that you have read and will abide by the civility
15   principles approved by the Court; and that you will support
16   and defend the Constitution and laws of the United States?
17          MR. EATON:  I will.
18          THE COURT:  Welcome, sir.
19          MR. EATON:  Thank you, your Honor.
20          THE COURT:  We will take care of your paperwork for
21   you.  And we should go ahead and have appearances entered,
22   please.
23          MR. IRWIN:  Good morning, your Honor.  Geoff Irwin
24   from Jones Day on behalf of the city.
25          MR. STEWART:  Geoffrey Stewart, Jones Day, also on
```

1   behalf of the city, your Honor.

2          MS. LEVINE: Good morning, your Honor. Sharon

3   Levine, and if I could introduce to the Court my partner,

4   Jack Sherwood, Lowenstein Sandler, for AFSCME. Thank you.

5          THE COURT: Welcome, sir.

6          MR. MONTGOMERY: Good morning, your Honor. Claude

7   Montgomery, Dentons US, for the retiree committee, and with

8   me in the courtroom today with possible speaking roles are

9   Anthony Ullman, partner in Dentons, and Arthur Ruegger back

10   there. Thank you, your Honor.

11          MR. SCHNEIDER: Good morning, your Honor. Matthew

12   Schneider, chief legal counsel, Michigan Department of

13   Attorney General, on behalf of the State of Michigan, and

14   with me is Steven Howell, special assistant attorney general.

15          MS. CECCOTTI: Good morning, your Honor. Babette

16   Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW. I would

17   also like to introduce my partners, Tom Ciantra sitting here

18   at counsel table, Peter DeChiara over in the corner, both of

19   whom you will see predominantly at the trial.

20          THE COURT: Thank you.

21          MR. WERTHEIMER: William Wertheimer, your Honor, on

22   behalf of the Flowers plaintiffs.

23          MS. GREEN: Good morning. Jennifer Green on behalf

24   of the General and Police and Fire Retirement Systems, and I

25   have with me my colleagues Ron King and Bob Gordon.

```
1          THE COURT:  I'm sorry.

2          MS. GREEN:  Ronald King and Bob Gordon.

3          THE COURT:  Mr. King.  Okay.

4          MR. MORRIS:  Good morning, your Honor.  Thomas

5    Morris of Silverman & Morris on behalf of the Retiree

6    Association parties.  Also here representing those parties is

7    Ryan Plecha of Lippitt O'Keefe.

8          MS. PATEK:  Good morning, your Honor.  Barbara Patek

9    of Erman, Teicher, Miller, Zucker & Friedman on behalf of the

10   Detroit Public Safety Unions, and with me this morning are

11   Julie Teicher and David Eisenberg.

12         MS. BRIMER:  Good morning, your Honor.  Lynn M.

13   Brimer appearing on behalf of the Retired Detroit Police

14   Officers Association.  Also with me this morning as trial

15   counsel are Meredith Taunt and Mallory Field from the firm

16   Strobl & Sharp, PC.

17         THE COURT:  Thank you.

18         MR. BENNETT:  Bruce Bennett of Jones Day on behalf

19   of the city, your Honor.

20         THE COURT:  Okay.  Then in terms of our order of

21   proceeding this morning, I'd first like to deal with the

22   motion in limine and then the three remaining discovery

23   motions, then the joint final pretrial order, and then we'll

24   begin the trial.  Is that order of proceeding okay with

25   everyone?  Okay.
```

1          Actually, first, dealing with the motion in limine,

2    I'm going to waive further oral argument on that and rely on

3    your papers and conclude, as I suggested I might the other

4    day, the Court must conclude that it is challenging, if not

5    difficult, if not impossible, to resolve this motion before

6    trial and before Mr. Moore is actually testifying.  Before

7    the Court can determine the admissibility of his proffered

8    testimony, the Court must have before it the questions that

9    the proponent of the witness asks of him, so in the

10   circumstances, I will deny the motion but without prejudice,

11   of course, to the right of any party to object to any of Mr.

12   Moore's testimony on any appropriate ground.

13          So let's turn our attention then to the three

14   discovery motions.  Who will argue those?

15          MR. CIANTRA:  I will start off, your Honor.  Thomas

16   Ciantra, Cohen, Weiss & Simon, for the UAW.

17          THE COURT:  Go ahead, sir.

18          MR. CIANTRA:  Your Honor, first I want to thank the

19   Court for its indulgence.  Obviously we have been under a lot

20   of strain and effort to complete discovery in this matter so

21   that the trial can take place on an expedited basis, and we

22   appreciate the Court's hearing these issues on an expedited

23   basis.  I'm not going to go over the papers extensively.  The

24   Court has seen the issues and I'm sure has read the papers,

25   but I will make a presentation, and it's going to be divided

1    basically chronologically.

2          The first part I want to discuss are the documents

3    and testimony concerning matters which antedate the retention

4    of Jones Day or the emergency manager's retention, and then

5    the second part of the argument deals with matters that come

6    after that point in time and that are really taken up with

7    our request that the Court revisit the issues that it ruled

8    upon back in September.

9          So let me begin then with the first part, the

10   matters that antedate Jones Day's retention, and the issue

11   has been crystallized by the position that counsel for the

12   city took in the October 15th e-mail that is attached as

13   Exhibit 6(d) to the UAW's motion papers with respect to the

14   city.  And what it involves are a series of memoranda that

15   Jones Day prepared in 2012, approximately at least a year

16   before the firm was retained to represent the city in this

17   matter, and these e-mails -- these memoranda are referenced

18   in an e-mail that discusses a meeting between partner Jones

19   Day that had been scheduled with Governor Snyder for June

20   5th, I believe, of 2012, and they're very specific e-mails,

21   your Honor.  They are identified there, and they go to

22   obviously issues that are at the heart of UAW and other

23   objectors' issues that they would raise here, the

24   constitutional protection of the retirees' pensions being the

25   most salient.  And obviously we are seeking production of

1  those documents as well as anything else that may be being

2  withheld that antedates the retention of Jones Day.

3       Now, the city has sort of taken a selective approach

4  with respect to these types of materials.  Obviously Jones

5  Day spent a lot of time and a lot of effort to get itself in

6  a position to impress the state and get hired to represent

7  the city in connection with this case.  There's a very

8  detailed pitch book that we have marked as an exhibit that

9  will be discussed throughout this proceeding.  They have

10  produced that.  They have withheld these e-mails -- these

11  memoranda that are attached to the e-mail.  And the principal

12  basis for that decision at this point is the work product

13  doctrine.  They have withdrawn attorney-client privilege.

14  They weren't retained by the state at any point.  And now

15  they are focusing on work product.

16       And, of course, going back to first principles, the

17  work product doctrine, as it developed, intended to preserve

18  a party's lawyer's work on developing the theories and facts

19  of a case.  I mean this is Hickman v. Taylor, the classic

20  example of an attorney who was interviewing witnesses to an

21  accident to assist his client's defense of that case.  That's

22  not what's involved here, of course.  Jones Day wasn't

23  retained by the state at any point, and they weren't retained

24  by the city in 2012.

25       THE COURT:  What do you contend was the relevance or

1  would be the relevance of these memoranda in this eligibility

2  trial?

3       MR. CIANTRA:  I think, your Honor, it gets to the

4  central question of what were the motivations and intent of

5  the decision-makers here.  We know from discovery -- and it's

6  going to be crystal clear -- that the governor and the state

7  were well-aware of the constitutional protections that apply

8  to retiree pensions.  They knew that.  They were well-aware

9  of what the position was with respect to the creditor

10  proposal that the emergency manager made in June.  The filing

11  was authorized without any conditions.  We all know that.

12  These memos we believe will get beyond that, get into the

13  question of the specifics of knowledge, the specifics of the

14  intent of the parties to do that, and that's why we're

15  looking to get them.

16       THE COURT:  Okay.  Doesn't that statement of

17  relevance prove more conclusively perhaps than the city could

18  even on its own that these memoranda are prepared in

19  anticipation of litigation?

20       MR. CIANTRA:  They weren't, your Honor.  They were

21  prepared more than a year in advance of any litigation and by

22  a firm that was not representing anyone.  These were like the

23  pitch book.  They were prepared to market, to develop

24  theories and to market services.  All right.  There's no case

25  law that they cite that would support the assertion of work

1  product privilege for documents that are prepared in this

2  context.  They have selectively produced the pitch book.

3  It's the same type of material.  So for them at this point to

4  demand work product protection with respect to this we think

5  is just baseless.  I mean this is not a case where maybe a

6  memo is prepared, the client comes in to meet with the

7  attorney and reveals confidences, and those are protected.

8  We all know that.  That's basic attorney-client privilege

9  law, but this is not that situation.  This is their marketing

10  effort to the state to be retained, and we think it is not

11  entitled to --

12          THE COURT:  To be retained for what?

13          MR. CIANTRA:  To apparently be retained at some

14  point.  Who knows?  At that point there was no emergency

15  manager.  There obviously was no Chapter 9 case.  This is

16  devoid of a litigation context where you could claim work

17  product.  They're not representing a party at this point.

18  They're pitching.

19          THE COURT:  Well, I'm just struggling with what the

20  relevance of the fact that Jones Day was pitching the

21  governor a year before would be to this eligibility trial if

22  that's all you assert it was.

23          MR. CIANTRA:  Well, we know that.  We know that they

24  were pitching that.  That's clear.  They've admitted that.

25  What's relevant is --

1          THE COURT:  My question is relevance.

2          MR. CIANTRA:  Well, what's relevant is potentially

3    the content of the documents, which, of course, we haven't

4    seen.  That we think --

5          THE COURT:  To prove what, though?

6          MR. CIANTRA:  To prove what these people knew and

7    what they were intending to do.

8          THE COURT:  Regarding what, though?

9          MR. CIANTRA:  We think it would be relevant to

10   assess the conduct that we know occurred in 2013.

11         THE COURT:  Which was to file this Chapter 9 case?

12         MR. CIANTRA:  Which was to authorize the filing in

13   the face of the constitutional protections for the pension

14   benefits.

15         THE COURT:  Okay.  But doesn't that establish that

16   these memoranda were in anticipation of litigation?

17         MR. CIANTRA:  It can't, your Honor, because of the

18   simple distance in time.  They have not provided any

19   indication that the memoranda were demanded by the state;

20   that there was any retention that existed at that point in

21   time.  It's an effort like the pitch book, which is a very

22   detailed document, to get work.  They spent a thousand hours

23   to get work.  That's what law firms do, and that's what's

24   involved here.

25         Now, obviously we haven't been able -- we don't have

1    the memos.  I have the titles of the memos that are revealed

2    in the e-mail.  We don't have them.  I can't argue the

3    specific relevance of the content.  I would suggest at this

4    point --

5              THE COURT:  Do you have any case law that

6    specifically says that pre-retention work by a lawyer cannot

7    be the subject of the work product privilege?

8              MR. CIANTRA:  Well, your Honor, to be honest with

9    you, I have -- we have done the research.  I haven't been

10   able to find a case that has recognized work product in this

11   instance.  The text of the rule talks about --

12             THE COURT:  But you haven't found any that

13   specifically denies it either, huh?

14             MR. CIANTRA:  No, but the --

15             THE COURT:  Okay.

16             MR. CIANTRA:  But the purpose of work product and

17   the wording of Rule 26 contemplates a representation.  It

18   contemplates that the lawyer is working for a client

19   developing facts, developing theories.  It does not

20   contemplate a relationship between parties who never

21   consummated an attorney-client relationship.  Remember, of

22   course, Jones Day is not working for the State of Michigan

23   here.  That's who these discussions were with.  It wasn't

24   with the City of Detroit.  It was with the State of Michigan.

25   But as I said, your Honor, you know, we haven't had access to

1  the memos.  I would suggest --

2        THE COURT:  We know, don't we, that as a matter of

3  law the attorney-client privilege can extend to pre-retention

4  discussions; isn't that right?

5        MR. CIANTRA:  Well, of course.  It can extend if the

6  client -- if the prospective client reveals confidences, but

7  that's not what's involved here.  They're not claiming to

8  shield the confidences of the State of Michigan.

9        THE COURT:  No.  My question went to the next

10  question.  If the attorney-client privilege can extend pre-

11  retention, why not the work product doctrine, too, if it

12  would -- if it's otherwise in anticipation of litigation?

13        MR. CIANTRA:  Well, I think if there were notes of a

14  meeting that took place where client confidences would be

15  revealed, that would be -- that would be privileged, but I

16  don't believe --

17        THE COURT:  That's not what we're talking about.

18        MR. CIANTRA:  That's not what we're talking about,

19  at least -- I mean I haven't seen the memos, so I --

20        THE COURT:  Let's boil it down to a simple hypo.

21  Okay.  Client calls up attorney and says, "I'm thinking of

22  retaining you to pursue this claim I have against a potential

23  defendant.  When I interview you, I want to know what your

24  strategy will be."  They have a further conversation about

25  the facts.  The attorney prepares a memo.  They have their

1  meeting.  Client decides to retain that attorney.

2          MR. CIANTRA:  Right.

3          THE COURT:  Is that memo protected by work product

4  or not?

5          MR. CIANTRA:  I don't believe it's protected by work

6  product.  I believe parts of it would be protected by

7  attorney-client in terms of the --

8          THE COURT:  Okay.  But I'm talking about work

9  product.  You're talking about work product here.

10          MR. CIANTRA:  I am talking about work --

11          THE COURT:  Not protected by work product.  So the

12  defendant in that case could subpoena that memorandum from

13  that attorney?

14          MR. CIANTRA:  Subject to the client confidences that

15  were revealed in it cannot be -- would be attorney-client.

16  We're not challenging --

17          THE COURT:  Okay.  But otherwise it's disclosable.

18          MR. CIANTRA:  Otherwise I think it is.

19          THE COURT:  Discoverable.

20          MR. CIANTRA:  Yeah.  Otherwise I think it is until

21  there's a retention, especially if there's never been a

22  retention, which is the case here.  This is something that

23  happened a year before between parties that never had an

24  attorney-client relationship.

25          THE COURT:  Um-hmm.  Um-hmm.

1        MR. CIANTRA:  As I said, your Honor, we haven't

2  looked at the memos.  I don't know what's in them.  I would

3  suggest and we would request that the Court consider in

4  camera review of the documents and then make a ruling.

5        THE COURT:  Is it just these -- I think you said six

6  memoranda that are the subject of this dispute?

7        MR. CIANTRA:  At this point, that's what it's boiled

8  down to, your Honor, but we feel that we're entitled to a

9  decision with respect to this that if there's anything else

10  out there that we're not aware of -- and, frankly, your

11  Honor, there's been a lot of documents that have been

12  produced in a very exigent period of time -- we would like

13  the city to produce those.

14        THE COURT:  All right.  Well, we'll inquire -- we'll

15  inquire about that.

16        MR. CIANTRA:  Okay.  Now, let me turn to the

17  second -- let me turn to the second point, and this concerns

18  the issue that was litigated back in September, September

19  19th, on the joint --

20        THE COURT:  Well, on that one I need you to begin

21  with a response to the city's assertion that this motion is

22  late --

23        MR. CIANTRA:  It is --

24        THE COURT:  -- untimely.

25        MR. CIANTRA:  It is late, your Honor.  It is late.

1        THE COURT:  So why should it be considered?

2        MR. CIANTRA:  Well, I think it should be considered

3   because of the particular facts and circumstances that are

4   involved here.  Back in September as this issue was framed

5   and as the Court ruled, it was rather narrowly focused with

6   respect to the question of authorization.  That was the

7   hypothetical that the Court developed to support its

8   reasoning.

9        THE COURT:  Right.  I recall that.

10       MR. CIANTRA:  And what has happened since then --

11  and this, I think, is most clearly brought out in the

12  excerpts from Governor Snyder's deposition that are attached

13  to both of the motions that UAW filed -- is that that common

14  interest has moved and morphed well beyond the issue of

15  authorization that was presented in September to basically

16  every element of -- every material element with respect to

17  the case, the development of the creditors' proposal, the

18  discussion of Article IX, Section 24, and its protections

19  here, consideration to be provided to creditors under the

20  proposed plan, consideration to be provided to the pensioners

21  under the proposed plan.  It has just morphed into

22  essentially a cloak with respect to -- and excuse me; it's

23  very dry -- with respect to all of the deliberations

24  involving the emergency manager and the state, and while, you

25  know, we concede the city is correct, there is an attorney-

1 | client privilege that they have, the -- it should be
2 | construed narrowly in light of the public interest that's
3 | involved here. The emergency manager by law is the governing
4 | body of the City of Detroit. He has executive and
5 | legislative authority rolled into one. His actions obviously
6 | affect the 700,000 residents of the city, and people have a
7 | right, we submit, to know what his deliberations are, how
8 | policy is being formulated, and it shouldn't be cloaked under
9 | a very broad and we would submit legally unsupported
10 | construction of the attorney-client privilege. Discovery has
11 | been curtailed, and it has put us in a position where now we
12 | are facing trial, and we have not been able to -- because of
13 | the extensive theory of privilege that the state and the city
14 | have adhered to, to develop facts fully in deposition and
15 | otherwise.

16 | We would submit that the assertion of the privilege
17 | that the governor has made, as revealed in the deposition
18 | transcripts that has been taken throughout the discovery, is
19 | extensive beyond what was considered in the Court's September
20 | 19th ruling, and we would ask the Court to -- respectfully to
21 | reconsider it because otherwise we have secrecy. We have
22 | public actors here, your Honor. The public has to be able to
23 | hold political representatives accountable for their actions.
24 | They have to know what policy decisions are being made, and
25 | right now this privilege ruling has cloaked that in secrecy.

1          I don't have anything else, your Honor, to state.

2          THE COURT:  Thank you.

3          MR. CIANTRA:  I don't know if Mr. Wertheimer, who

4     has joined the motions for the Flowers plaintiffs, has

5     anything he would like to add.

6          THE COURT:  Okay.

7          MR. CIANTRA:  Thank you for your consideration.

8          MR. WERTHEIMER:  William Wertheimer, your Honor.

9     First, I would like to join in the UAW's motion vis-v-vis the

10    city.  I did formally join on the papers the motion vis-a-vis

11    the state.

12         I just have two points in addition to what Mr.

13    Ciantra just argued.  One relates to the Snyder deposition,

14    which I participated in, and kind of what it revealed about

15    the scope of the privilege arguments now being made and how

16    far we are from the day in court where you made it a point of

17    indicating to the state that transparency was necessary here.

18    At the governor's deposition essentially privilege was

19    invoked as to the entire content of weekly meetings that the

20    governor had with the emergency manager for months as to the

21    entire scope of those meetings making it virtually impossible

22    to examine the governor as to any of that.  That's point

23    number one.

24         And just one other point, and that is that in the

25    normal case -- well, let me back up.  Per the agreement the

1   parties made and given the position of the governor, we

2   agreed to limit our discovery deposition to three hours.  In

3   the normal case where privileges are alleged on privilege

4   logs like what we have here, you have an opportunity to go

5   beyond the privilege log and the cursory explanation for why

6   the privilege is being invoked by at deposition asking

7   witnesses questions, detailed questions about the particular

8   meeting at which they're claiming a privilege, you know, what

9   the other subjects were, how long the meeting took, did the

10  lawyer do anything at the meeting, et cetera, as to key

11  documents.  We have not had that opportunity here just given

12  the time, and I'm not -- no one is at fault for that.  It's

13  going too fast.  We had three hours with the governor.  We

14  did appropriate examinations.  But I think in this

15  circumstance that it would make sense for this Court to

16  examine certain of the documents in camera in order to assure

17  that the Court's desire and everybody's desire for

18  transparency is met.  I think this is a special case.  I

19  don't think --

20          THE COURT:  Are you referring to documents other

21  than these six memoranda attached to the e-mail?

22          MR. WERTHEIMER:  I am, your Honor.  I'm referring

23  specifically to documents that are in dispute that are in the

24  state's possession.

25          THE COURT:  Can you identify them any more

1  particularly for me or the record?

2        MR. WERTHEIMER:  We've attempted to identify them to

3  the state by indicating in logs documents that covered a

4  particular -- what we believe to be a key time period was.

5  We've also attempted to limit the request in terms of those

6  in which Mr. Orr and Mr. Snyder were directly involved, but I

7  must admit to the Court it still involves, at least at this

8  point, in terms of our back and forth, a fairly large number

9  of documents that I would respectfully suggest that the best

10  way to proceed -- given the fact that the governor is going

11  to be testifying on Monday at trial, the best way to proceed

12  may be for the Court to get involved in terms of in camera

13  review.

14        THE COURT:  And these are documents which you claim

15  were improperly withheld pursuant to the common interest

16  exception?

17        MR. WERTHEIMER:  Not just common interest, your

18  Honor, also just documents where they claimed attorney-

19  client.  And we're not claiming -- we don't know whether

20  they're improperly withheld I guess is what I'm trying to

21  say.  We're claiming that they may be --

22        THE COURT:  You're concerned.  Okay.

23        MR. WERTHEIMER:  -- and that we should not have to

24  rely upon the cursory description of counsel given --

25        THE COURT:  Well, but in order for me to accede to

1  your request to look at documents, we have to have identified
2  what documents you want me to look at and what documents you
3  want the city or the governor or the state -- excuse me -- to
4  produce to me.
5        MR. WERTHEIMER:  What I'm -- I agree, your Honor,
6  and what I'm suggesting is we did make such an effort on a
7  preliminary basis with the state in trying to resolve it, but
8  I'm acknowledging that that effort would still -- if we stop
9  there, would still leave your Honor with a large number of
10 documents.  We could continue that effort.  I agree that that
11 would be necessary, but I still think that it calls for in
12 camera review of relevant documents or potentially relevant
13 documents.  And we're happy to work with the state to try and
14 limit what that -- what the documents would be.
15       THE COURT:  Well, when are you going to do that
16 given that we're in trial all day today, tomorrow, and
17 Friday?
18       MR. WERTHEIMER:  Well, if we can't, we can't, and
19 then I would suggest to the Court that the limitation which
20 we did communicate to the state should be the one the state
21 should use -- or that we should use.  And as I recall, there
22 were at least two attempts to limit the documents.  One
23 related to time; that is, we said we think that the judge
24 should be able to take an in camera look at documents between
25 key players from date A to date B, and I don't have in front

1  of me exactly what those dates were.  And, second, we

2  indicated that the documents directly between the governor

3  and the emergency manager over a broader period of time

4  should be subject to in camera review.  If there's no time to

5  do anything else, our position would be that the Court should

6  examine those documents in camera.

7  THE COURT:  All right.  Thank you, sir.

8  MR. WERTHEIMER:  Yes, your Honor.

9  THE COURT:  While you're sitting down, I would

10  suggest you try to figure out what those dates are.  That

11  would be helpful.

12  MR. SCHNEIDER:  Your Honor, Matthew Schneider on

13  behalf of the state.  Mr. Wertheimer has raised some issues

14  that relate to this and also to the other motion, so in

15  expediency here I can kind of respond to both.

16  THE COURT:  Please.

17  MR. SCHNEIDER:  The first issue here that Mr.

18  Wertheimer's -- or the UAW and Flowers objectors raised

19  relates to a March 12 e-mail, and the objection was that it

20  should have been produced without redactions.  Now, the state

21  disagrees, but we want to resolve this dispute, and we have

22  produced that anyway, so we're not waiving the attorney-

23  client privilege or altering the common interest agreement or

24  anything by doing that, but I wanted to let you know at least

25  one issue has been resolved.  Secondly --

1      THE COURT:  When you say "has been resolved," you
2  say you have or are willing to turn over the memos?
3      MR. SCHNEIDER:  We have.  This is related to the
4  March 12 e-mail.
5      THE COURT:  March 12 --
6      MR. SCHNEIDER:  It's an e-mail from Richard Baird to
7  Kevyn Orr, and this was at issue.
8      THE COURT:  -- 2012?
9      MR. SCHNEIDER:  2013.
10     THE COURT:  Okay.
11     MR. SCHNEIDER:  Okay.  Secondly, there's another
12  argument that the state hasn't been specific on its privilege
13  log, and I think that's why this is kind of bleeding
14  together.  Again, the state disagrees.  We think the logs are
15  sufficient, but we've revised these anyway, and we've -- you
16  know, we're giving them to Mr. Wertheimer.  So, again, we're
17  not waiving anything, but we want to let the Court know that
18  we are working with them and are happy to do so.  But,
19  finally, third --
20     THE COURT:  It was a little frustrating that your
21  log didn't provide any identifying information regarding the
22  people involved other than their names.
23     MR. SCHNEIDER:  Well, we've corrected that.
24     THE COURT:  Where?  How?
25     MR. SCHNEIDER:  Well, Mr. Wertheimer asked for

1   additional information that's more specific on the privilege

2   log, and I believe we've done that, and --

3            THE COURT:  In the log itself because we looked at

4   the revised log -- at least I did, and all I saw were names?

5   Now, it's possible that I missed a page where the names were

6   identified, whether they're attorneys or officers of the

7   state or associated with the emergency manager.  I couldn't

8   tell who was who.

9            MR. SCHNEIDER:  My understanding is there's more

10  description about what actually is in there, but I will --

11  you know, I will continue to work with Mr. Wertheimer on this

12  so as to not -- not to delay.

13           The third issue here is relating to the common

14  interest agreement, and I think that's where the Flowers and

15  the UAW objectors are really going here.  The state's

16  position ultimately at the end of the day -- the state's

17  position is is that your order, your Honor, that you entered

18  on September 19 was correct, and we believe that it was

19  correct then and it's correct today.  And the new position

20  that the objectors are raising is essentially that there's no

21  common interest privilege before the filing.  This is -- as

22  the Court is aware, this has been brought to your attention

23  literally -- literally -- on the eve of trial.  There was a

24  deposition in which the Court invited the parties to contact

25  the Court in case there were concerns.  They never did that.

 1   They never raised a written objection after the deposition.

 2   It's beyond the 14-day rule, and there's no defect or no

 3   error shown, so I think there's a waiver here, and,

 4   therefore, it should be denied on that ground.

 5          In addition, the common interest agreement here as

 6   to the argument that the objectors are trying to find

 7   information that antedate the appointment of the emergency

 8   manager, if you look at the common interest agreement itself,

 9   it states that this isn't just about the appointment of the

10   emergency manager.  It states that the parties have a common

11   interest in relation to the city's financial emergency and

12   the bankruptcy case and the emergency manager, so this goes

13   to a lot more than just the Chapter 9 filing.  It goes to the

14   financial emergency and things in connection with the policy

15   issues and the legal discussions related to that.  Thank you.

16          THE COURT:  Thank you.

17          MR. IRWIN:  Thank you, your Honor.  I will address

18   the motion to compel the Jones Day materials first and then

19   the motion for reconsideration.  The request that has been

20   made as it relates to core Jones Day internal research

21   memoranda it seems to us is antithetical to the work product

22   privilege, and we think the Court's analogy is exactly right.

23   If a client prepares a legal -- if a lawyer prepares a legal

24   memoranda to assist him or her or a team of lawyers in order

25   to deliver legal advice to a potential client -- a client or

1   a potential client, even before there is an attorney-client

2   relationship, that is wholly protected by work product if it

3   reflects the attorney's mental impressions and it puts him or

4   her in a position where they can deliver appropriate legal

5   advice.  And it shouldn't matter if that attorney-client

6   relationship is ultimately consummated or not.  It is an

7   inviolable attorney work product that is -- belongs to the

8   lawyer who prepared it and puts them in a position where they

9   can effectually do their jobs and deliver legal advice.

10          Now, what happened in this particular situation,

11  just to put a finer point on it, is I think not the subject

12  of any real debate.  Everyone knew that Detroit was in

13  trouble in late 2011 and that there were people working this

14  problem, and that included people from the state.  It

15  included people from the city.  It included numerous advisors

16  and consultants.  It involved numerous law firms, and there

17  were lots of people who wanted to get involved.  And Jones

18  Day had the opportunity to do just that, and we --

19          THE COURT:  So why doesn't it matter that the work

20  product was for the state, for the governor or state

21  officials, and the ultimate client wound up being none of

22  those but the city?

23          MR. IRWIN:  Well, I think it was all part of the

24  same problem.  I think that the entity that had the problem

25  here was the city, and I think the law firms like Jones

1  Day -- and I think that the papers that we submit support

2  that -- were hoping and expecting to be retained and engaged

3  by the city.  And it's not -- it shouldn't surprise anyone

4  that Jones Day would have been doing legal research in order

5  to put itself in a position to assist the city in that

6  regard, and so it really didn't matter which of the entities

7  was -- not engaging in the sense of an attorney-client

8  representation, but was discussing these matters with Jones

9  Day.  Jones Day had to put itself in a position where it was

10 able to represent the city effectively, and in order to do

11 that, it had to investigate this entire situation.  There was

12 a legal analysis that you would expect to have been done on a

13 number of levels, and we have, you know, memoranda that came

14 about as a result.  And if the Court would be --

15         THE COURT:  Well, okay, but what's the foundational

16 basis for the work product privilege that shields otherwise

17 relevant facts from discovery and suggests that that basis

18 should apply to memoranda such as you claim privilege for

19 here?

20         MR. IRWIN:  Well, it's if they're prepared in

21 anticipation of litigation, and as we've indicated in the

22 papers, that's a broad standard.  You don't have to

23 anticipate a specific piece of litigation.  You can

24 anticipate litigation broadly.  You can anticipate that this

25 is a city in financial crisis and that they are going to need

1  assistance moving forward.  It might take the path of a

2  Chapter 9.  It might not.  It might take the form of numerous

3  private lawsuits against individual stakeholders in all of

4  this.  And a law firm has to be able to explore those various

5  options to put itself in a position where it can ably

6  represent the ultimate client here, which turned out to be

7  the city.

8       We also -- your Honor, the -- we're having a hard

9  time understanding the relevance here of the memoranda as

10  well.  We are happy to provide them to the Court in camera.

11  If the Court would like to see the memoranda, we have the

12  memoranda.  We can easily provide them, and the Court could

13  determine for itself if, in fact, it finds these memoranda

14  either surprising or relevant in some way.  And what we have

15  done here, your Honor, is we've proposed a structure or a

16  framework that I would submit is reasonably conservative

17  under the circumstances in terms of the number of privileges

18  and the nature of privileges that we could assert.  What we

19  have done here is we have, in fact, already released the --

20  many of the e-mails that reflect the conversations between

21  Jones Day lawyers and the folks in 2012 who were working on

22  this problem.  This, again, is before there's any attorney-

23  client relationship with anyone.  We've released those, and

24  we're not claiming those back.  We are seeking an order from

25  the Court is to protect our wholly internal memoranda or

1  internal deliberations, which conversations are not --

2          THE COURT:  Now, when you say "wholly internal" --

3          MR. IRWIN:  Yes.

4          THE COURT:  -- do you mean that these memoranda were

5  not shared even with the state officials?

6          MR. IRWIN:  We will make that determination, but we

7  believe there are memoranda at issue here that were not

8  shared with anyone from the state, so our -- we are asking to

9  be able to withhold our internal research memoranda even

10  though work product would protect that.  The work product,

11  because there's no waiver of work product, unlike attorney-

12  client, as long as you share it with someone who is in a

13  nonadversarial -- you share it in a nonadversarial way.  It's

14  not like attorney work -- it's not like attorney-client in

15  that regard.  We believe that we would still have work

16  product protection over those materials, and so we are asking

17  for the Jones Day research materials and the Jones Day

18  internal conversations about how to proceed here and how to

19  deliver advice should be protected.

20          Now, there comes a point in time later in 2012 when

21  a specific client opportunity presents itself in the form of

22  being hired by the city, in the form of this RFP process, and

23  the public document that is the pitch material that is in the

24  record already and that we not seeking to disclose, but

25  insofar as documents relating --

1    THE COURT: You mean not seeking not to disclose?

2    MR. IRWIN: I'm sorry, your Honor. Yes. It's in

3  the record right now. We are not seeking to clawback or

4  anything like that. That's not an issue here. But we are --

5  we do believe that -- as the Court referenced, because pre-

6  engagement conversations between a lawyer and a potential

7  client are still protected by the attorney-client privilege,

8  we are seeking -- we are seeking protection for those

9  communications, communications -- outbound communications

10  from Jones Day in the retention period where we are receiving

11  confidential information and acting upon it. We do think at

12  that period of time, attorney-client protection would attach

13  as well as attorney work product. But in the 2012 time

14  period, which is what the UAW's motion is directed towards,

15  we are simply asserting work product for the Jones Day legal

16  research that was conducted to put ourselves in a position to

17  ultimately be hired in to assist the city.

18    THE COURT: So are you telling the Court that you

19  don't have any objection to disclosing and don't claim work

20  product privilege as to any memoranda that was shared with

21  one or more state officials?

22    MR. IRWIN: That's right.

23    THE COURT: And have you already turned over all

24  such memoranda and communications that were given to state

25  officials?

1            MR. IRWIN: No. The answer is no, but we are

2 prepared to do that. We are not standing on that.

3            THE COURT: Okay. Thank you, sir.

4            MR. IRWIN: Yeah. Does the Court wish to hear on

5 the motion for reconsideration?

6            THE COURT: Yes. Yes, I do.

7            MR. IRWIN: Yes.

8            THE COURT: If you'd like to address that, I'd like

9 to hear from you, of course.

10            MR. IRWIN: I would, your Honor. As we indicated,

11 we think this is late. This is -- there is no -- there's

12 nothing in the papers that have been submitted that indicate

13 a good reason for reopening this. There is no palpable

14 defect in the ruling, and there is nothing new. There's no

15 new evidence. There's no -- despite the fact that they occur

16 in the same motion, there's no linking of these two issues,

17 and so there's, therefore, no good reason -- and I haven't

18 heard one offered -- as to why this matter should be

19 reopened. And the parties have, in fact, been relying on

20 this ruling in connection with all of the discovery

21 proceedings that have taken place since then. We think the

22 ruling was sound. The objectors have not indicated why there

23 is any reason to disturb the Court's analogy of a board of

24 directors and corporation counsel and the fact that they

25 should be permitted and need to talk to each other in order

 1   to reach a sound conclusion as to whether to do something
 2   like file for bankruptcy.  We think that's analogous here.
 3   The governor and his legal team and the emergency manager and
 4   his legal team need to be able to talk.  They need to be able
 5   to talk in confidence with regard to the common interest,
 6   which, again, this is counsel to what -- contrary to what we
 7   heard, broader than simply a Chapter 9 filing.  The common
 8   interest related to the city's financial -- the city's
 9   financial crisis more broadly and the right legal path
10   forward.  And insofar as the communications related to a
11   legal path forward, that privilege was properly invoked.  And
12   I do recall that the Court -- I read -- I was not here, but I
13   understand that the Court made itself available to the
14   parties if, in fact, there were specific questions because
15   it's very difficult to know exactly what form these questions
16   will take in making a ruling, and I believe the Court offered
17   its services to the parties if, in fact, there was any
18   impasse at the depositions, and I don't believe any objectors
19   took advantage of that, and so we believe that under the
20   circumstances, given that the ruling was fundamentally
21   correct, that there was no attempt at the time to seek
22   further court intervention and that we've been relying on
23   these rulings going forward, that there is no reason to
24   overturn them at this time.
25            THE COURT:  Thank you, sir.

1      MR. IRWIN:  Yeah.

2      THE COURT:  Brief rebuttal.

3      MR. CIANTRA:  Just very briefly, your Honor.  I just

4  want to draw the Court's attention to a couple of matters.

5  First, with respect to the Jones Day memos, to the extent the

6  Court determines to review the memoranda in camera, we'd

7  request that the Court also review the cover e-mail that

8  enclosed the memoranda.  And I'm not --

9      THE COURT:  This was an e-mail from who to whom?

10     MR. CIANTRA:  This was an e-mail from Heather Lennox

11 of Jones Day to certain of her partners at Jones Day that

12 references the meeting with the governor, and I'm not going

13 to read the e-mail because they've claimed in the October

14 15th correspondence to myself that it's privileged, but it

15 goes to the -- I think goes to the issue that the Court was

16 addressing with respect to --

17     THE COURT:  So these memoranda are internal in the

18 sense that they were not shared with any officials of the

19 state or the city?

20     MR. CIANTRA:  It is unclear to me that that can be

21 said with any degree of assurance, and it seems entirely --

22     THE COURT:  Well, but Mr. Irwin states it here on

23 the record.  Do we doubt it?

24     MR. CIANTRA:  I did not hear that.  I did not hear

25 him say definitively that those memos were not shared with

1   anyone at the state, and from the --

2          THE COURT:  Well, let's just ask to be sure.  Mr.

3   Irwin.

4          MR. IRWIN:  We will -- I will absolutely

5   investigate.  That's part of what we're saying.  We will

6   investigate that, and we'll have a clear answer.

7          THE COURT:  Oh, all right.

8          MR. CIANTRA:  So we don't have --

9          THE COURT:  So there you go.

10         MR. CIANTRA:  So we don't have a clear answer, but I

11  would suggest that if you -- if the Court reviews the e-mail

12  that they are claiming privilege with respect to, the

13  conclusion can be drawn that the substance of those memos was

14  surely shared in that meeting, and it would seem, at a

15  minimum, that would arguably constitute a waiver along with

16  the production of the pitch materials, which go into

17  considerable detail with respect to the legal theories that

18  were involved here.

19         THE COURT:  All right.

20         MR. CIANTRA:  The second issue I just wanted to just

21  very -- just brief clarification with respect to the

22  privilege logs.  We filed -- we requested that the state

23  supplement the privilege logs, and that is in the

24  correspondence that is attached to the motion that we filed

25  with respect to the state because there was no specification

1  in certain cases of who was involved in the communications,

2  who authored them, who received them, or the subject matter

3  of many of the -- of all of the communications, so we had no

4  way to assess the assertion of privilege based on the logs.

5  In response to that correspondence, they revised the logs, so

6  this is what the Court referred to, but we only received

7  those within the past day or two --

8            THE COURT:  Right.  I know.

9            MR. CIANTRA:  -- so we haven't had the opportunity

10  to, you know, line that --

11            THE COURT:  Right.

12            MR. CIANTRA:  -- up, but I just wanted the record to

13  be clear with respect to that.

14            THE COURT:  No.  I appreciate that very much.

15            MR. CIANTRA:  Yeah, yeah.  Obviously with respect to

16  the -- having not filed this within 14 days, your Honor,

17  obviously the discovery here was enfolding well past the

18  deadline for the production, and we have not -- we've done

19  the best we could.  This was not an intentional delay on our

20  part.  As these issues developed, it became clear to us that

21  the scope of what was being withheld we felt was inconsistent

22  with what the Court had permitted.

23            THE COURT:  All right.  I'm going to take this under

24  advisement until ten o'clock, and I'll give you a decision

25  then.

 1          THE CLERK:  All rise.  Court is in recess.

 2     (Recess at 9:49 a.m., until 10:00 a.m.)

 3          THE CLERK:  All rise.  Court is in session.  Please

 4     be seated.  Recalling Case Number 13-53846, City of Detroit,

 5     Michigan.

 6          THE COURT:  All counsel are present.  Ma'am.

 7          MS. GREEN:  Good morning, your Honor.  I apologize.

 8     I think our motion got lost in the shuffle.  The Retirement

 9     Systems filed a similar motion to the UAW's.  I just have a

10     few --

11          THE COURT:  I was actually going to hear it after,

12     but if you'd like to be heard now, that's fine.

13          MR. GREEN:  Oh, you know, I just -- it dovetailed

14     with what they were arguing, so I just had a few points --

15          THE COURT:  Okay.  Go ahead.

16          MS. GREEN:  -- to raise.  The first thing I wanted

17     to add is that at the time we drafted our motion, we thought

18     that the June 5th, 2012, e-mail was being reasserted as

19     privileged.  Mr. Irwin in his argument this morning has said

20     that they are not waiving privilege -- or they are now

21     waiving privilege to that.  It is back in the record.  So to

22     clarify, the e-mail does say that the memos were shared with

23     the treasurer.  It says they were memos that we did for Andy.

24     I presume that means they were shared with him.  I don't know

25     if that's actually true or not, but the memo does seem to

1    indicate that they were shared with a third party.

2          As far as the work product analysis, in our brief we

3    went through the relevant standard in the Sixth Circuit, your

4    Honor, and I don't believe that we talked about that yet

5    today.  There's a two-part test.  The first part of that test

6    is whether the document was prepared, quote, "because of the

7    party's subjective anticipation of litigation, as contrasted

8    with ordinary business purpose, and (2) whether that

9    subjective anticipation was objectively reasonable."  And,

10   furthermore, the driving force behind the preparation of the

11   document is what is key, and we assert that the "because of"

12   part fails.  They did it because of the fact that they were

13   trying to prepare themselves for the prospect of being hired,

14   not because of the fact that there was actually anticipated

15   litigation.  And, moreover, it's very attenuated that in 2011

16   they had some kind of crystal ball that they knew two years

17   from now they were going to be in this courtroom arguing

18   about eligibility under Chapter 9.  And we did cite case law

19   in our brief.  You had asked counsel this morning if there

20   was any case law regarding some kind of temporal factor, and

21   we cited two cases.  One states, "the mere fact that

22   litigation does eventually ensue does not, by itself, cloak

23   materials with work product immunity," so between that and

24   the next case that we cited, "The abstract possibility that

25   an event might be the subject of future litigation will not

1   support the claim of privilege," I think those are

2   dispositive.  This was two years before any of this even

3   arose.

4           Furthermore, I think that goes to whether or not the

5   anticipation of litigation could be objectively reasonable.

6   I don't know how two years prior to the litigation it could

7   be objectively reasonable that, number one, PA 4 still had to

8   get past the referendum.  Number two, it was ten months

9   before the EM was hired even if you assume that these were

10  prepared in June of 2012 when the memo -- memos were shared

11  with the governor or with Andy Dillon.  They may have been

12  prepared prior to that.  We don't know.  Moreover, the EM had

13  to be appointed.  PA 436 had to become effective.  All of

14  these things had to happen before we could be here today, and

15  Jones Day had to be retained.  So there are like at least

16  five or six major contingencies that had to occur before the

17  actual litigation would ensue.

18          Furthermore, even if they can establish the work

19  product, which we don't think they can, they still have to

20  overcome the waiver issue, and I don't -- I think that today

21  is a further example that they have selectively waived.  They

22  waived the memo itself but not the attachments.  Today the

23  state stood up and said, you know, "We have an e-mail from

24  March 3rd, 2013, between Kevyn Orr.  There are two attorneys

25  on it from the State of Michigan.  But to be cooperative, we

 1    will give you that e-mail."  Well, if they're saying it's
 2    privileged but they're giving it to us, to me, again, that's
 3    a selective waiver.  They just give us what they want when
 4    they want it, but they keep what they want as well, and I
 5    don't see how they get past that.
 6            In addition, my last point would be it's still not
 7    clear who the client is that Jones Day is claiming they've
 8    been representing.  No city official, to my knowledge,
 9    through any of my review of these documents or the e-mails --
10    there is not a single city official that is ever cc'd, bcc'd,
11    you know, sent the memos.  It's purely between Jones Day
12    attorneys, Miller Buckfire, Huron Consulting, all of these
13    advisors that, again, when I think it comes to waiver,
14    clearly these are third parties and not the potential client.
15            The last point I will make because I want to be
16    brief -- I know you are ready to rule, I think -- is that I
17    think the wrong standard was stated earlier by the city.  He
18    said that there's a different standard for waiver of the
19    attorney-client privilege versus work product, and that is
20    not true in the Sixth Circuit.  We cited two cases in our
21    brief.  The first one is New Phoenix Sunrise, and it says,
22    "Both the attorney-client privilege and work product
23    protection are waived by voluntary disclosure of private
24    communications to third parties."  We also cited the In re.
25    Columbia case also --

1    THE COURT: I'm sorry. Are waived by what? I just
2  didn't hear what you said.

3    MS. GREEN: Disclosure of private communications to
4  third parties. And he had said that some sort of different
5  standard applied when it was work product versus attorney-
6  client, and we also cited the In re. Columbia case that said
7  the same thing. There's no compelling reason for
8  differentiating waiver of work product from waiver of the
9  attorney-client privilege, so to me it's a distinction
10  without a difference to say, "Well, we gave it to," and I
11  think the quote he said a minute ago was, "numerous
12  consultants and advisors as well as the state." And to me
13  that is disclosing it to third parties; therefore, it was
14  waived when it was created a year or two ago, not to mention
15  the fact that as part of this litigation, they have
16  selectively waived certain e-mails that somewhat have to do
17  with this subject matter in that they relate to, for
18  instance, reviewing the consent agreement or reviewing and
19  commenting on PA 4 and the analysis related to PA 4. And we
20  cited case law in our brief stating that if you waive the
21  privilege on selected pieces, you, therefore, waive it as to
22  the entire subject matter, and, therefore, you can't
23  selectively say, "Well, you can have the e-mail, but you
24  can't have the attachments," or, "You can have this e-mail,
25  but you can't have this e-mail." So we would say that the

1  entire privilege has been waived by selectively waiving it as

2  to a few e-mails here and there.  Those are my comments.

3           THE COURT:  Thank you.

4           MS. GREEN:  Thank you.

5           MR. IRWIN:  I'll simply respond to those few points

6  that counsel made.  The first, in connection with whether the

7  timing of all of this should make a difference, I would

8  submit that that is arbitrary.  There are lots of things that

9  could have happened in the middle of 2012 that would have

10  been litigation events.  Maybe they didn't, but that doesn't

11  mean that at the time that all of this was being considered,

12  when legal advice -- or when Jones Day was considering some

13  of these issues, they weren't anticipating litigation.  It is

14  fortuitous that this happened two years later, actually, a

15  year and a half later or one year later, but that doesn't

16  mean that either potential clients or Jones Day were not

17  working in anticipation of litigation, which, as we indicated

18  in our brief, does not need to be a specific litigation

19  event.  You can anticipate litigation broadly.  You never

20  know what form it will take.  You know there are going to be

21  fights.  You know there will be disputes.  You don't know if

22  it'll be a private -- private lawsuits.  You don't know if

23  it'll be a Chapter 9 filing, but you can anticipate the need

24  for legal advice in an adversarial proceeding in some form

25  and meet the standard.

1          In terms of select -- whether there's been selective

2   waiver or subject matter waiver, as counsel suggests, this is

3   I think fundamentally incorrect.  The standard for subject

4   matter waiver is whether documents have been disclosed.  It's

5   the shield and sword problem.  It's if documents have been

6   disclosed and counsel intends to rely on them affirmatively

7   and yet withholds the balance of the documents that, in

8   fairness, should be considered, and I think this is codified

9   pretty clearly in the advisory committee notes to Federal

10  Rule 502 where they say, "Thus, subject matter waiver is

11  limited to situations in which a party intentionally puts

12  protected information into the litigation in a selective,

13  misleading and unfair manner.  Under both Rules, a party that

14  makes a selective, misleading presentation that is unfair to

15  the adversary opens itself to a more complete and accurate

16  presentation."  We are not -- we, the city, are not using any

17  of these materials affirmatively.  They are not on our

18  exhibit lists.  We are not introducing them through

19  witnesses.  We are not using them to our advantage that

20  should open us to some sort of claim of subject matter waiver

21  or selective disclosure under the rules.

22          And then lastly, I think fundamentally there is --

23  and I believe this is black letter law -- there are different

24  standards for whether there is waiver by disclosure under

25  attorney work product as opposed to attorney client.  If you

1   disclose attorney-client communications to a third party, you
2   are much more likely to be deemed to have waived that
3   privilege, but with attorney work product, you can make
4   disclosures.  And as long as they are disclosures to parties
5   who are nonadversarial, then you can still enjoy that
6   protection.  And that is a fundamental difference between the
7   two privileges.  It is not something where they are -- where
8   disclosures to folks who are within the potential group of
9   clients or advisors who are working these problems operates
10  to waive the privilege.  And I think we've demonstrated that,
11  your Honor.
12          THE COURT:  I want to -- I want to be sure the
13  record accurately reflects your position regarding what's to
14  be disclosed and what isn't.  Is it correct that to the
15  extent any of these memoranda that were attached to this June
16  2012 e-mail from Ms. Lennox were disclosed to state
17  officials, you are willing to make them available to counsel
18  here?
19          MR. IRWIN:  Yes, your Honor, but the e-mail itself
20  suggests -- if memoranda was prepared to prepare a Jones Day
21  lawyer for a meeting with counsel, that would not be.  It's
22  not my understanding of what we're talking about.
23          THE COURT:  Okay.  But you don't know which of the
24  several memoranda were shared and which weren't?
25          MR. IRWIN:  We'll do that.

1           THE COURT:  How will you determine that or --

2           MR. IRWIN:  Because we have the -- the Jones Day

3    lawyers are accessible, and we can figure that out.

4           THE COURT:  All right.  Thank you.

5           MS. GREEN:  I have a brief rebuttal.

6           THE COURT:  Yes, of course.

7           MS. GREEN:  I think the hypo that you stated earlier

8    compared to what he just said -- you know, these were memos

9    preparing a Jones Day lawyer to go seek work -- is different

10   than the hypo that you stated earlier, which was you meet

11   with a client who wants to meet with you for the purpose of

12   retaining you, and you may make notes.  That's different to

13   me than, "I did memos to prepare myself to go pitch a

14   client."  To me those are two different scenarios, and

15   there's a distinction, I think, between did the state ask for

16   this work, or was Jones Day just doing it internally, again,

17   to prepare.  I think those are two distinct scenarios.

18           One other thing that occurred yesterday, you made a

19   note on the record about PA 4 and that perhaps the intent

20   behind the appropriation -- the inclusion of the

21   appropriation was a factual issue for this trial, and I think

22   that some of the e-mail correspondence may go to that issue,

23   quite frankly, because the PA 4 appropriation was extensively

24   discussed in all these e-mails, and for that reason I think

25   there is a possibility that it would become relevant to a

1  separate issue than what Mr. Ciantra stated this morning,

2  which was the good faith and the bad faith issues and things

3  like that.

4        The last thing I would offer is our Exhibits 31

5  through 65 have a lot of the e-mail correspondence that has

6  been produced by the city, and there is a lot of, I guess,

7  internal -- what they would consider their internal work

8  product in those e-mails.  I don't concede it's work product,

9  but according to what they are defining as work product, it's

10  in those e-mails, and it's already been produced, and it's

11  been waived.  So if you'd like to look at those e-mails to

12  sort of familiarize yourself with what we're talking about,

13  I've produced a copy of our binder for your clerk this

14  morning if you'd like to look at those.  Thank you, your

15  Honor.

16        THE COURT:  All right.

17        MS. BRIMER:  Your Honor, I'll be very brief.

18        THE COURT:  Why should I hear you?  You're not a

19  party to these motions.

20        MS. BRIMER:  I understand that, your Honor.  I want

21  to clarify one matter on the record that Ms. Green made,

22  and --

23        THE COURT:  I will let you clarify a statement on

24  the record, but I can't let you argue on one side or the

25  other of these motions.

1    MS. BRIMER:  That's fine, your Honor.  And Ms. Green

2  raised the issue of your ruling on Monday with respect to the

3  intent of the appropriation in PA 4, and I want to be sure

4  the record is very clear that it's the appropriation in PA

5  436 that your Honor ruled may be a factual issue that prior

6  to that was not considered a factual issue.  I want to be

7  sure the record is very clear on that, which law we are

8  addressing, your Honor.  It may have an impact on the memos.

9  Thank you.

10    THE COURT:  Thank you, I guess.  All right.  On the

11  issue -- on the first issue, which is the motion for

12  reconsideration of the Court's previous ruling on the common

13  interest doctrine, the Court concludes that the record does

14  not establish cause to consider that motion out of time, and,

15  accordingly, for that reason alone, the motion is denied.

16    But having said that, I want the record to be clear

17  and the parties to understand that to the extent a question

18  is asked of a witness and either a witness or counsel on the

19  witness' behalf claims attorney-client privilege and asserts

20  the common interest doctrine or any other privilege, for that

21  matter, the Court will take a fresh look at that and consider

22  counsel's arguments relating to that.

23    On the motions to compel, the Court appreciates the

24  city's willingness to disclose to counsel for the objecting

25  parties whatever memoranda it shared -- the city's counsel,

1    Jones Day, shared with state officials and would request that
2    that disclosure be accomplished as promptly as possible.

3            To the extent, however, that the moving parties seek
4    a ruling from the Court that the mere fact that memoranda or
5    other documents that would otherwise be protected by the work
6    product doctrine were prepared pre-retention means that they
7    are not protected by that doctrine, the Court must reject and
8    overrule that position.

9            Accordingly, to the extent that the city is
10   maintaining this privilege as to any of these memoranda that
11   were attached to Ms. Lennox's e-mail or any other memoranda,
12   for that matter, the Court will look at them in camera and
13   ask the city to produce them for that purpose, again, as
14   promptly as possible.

15           As to the documents that Mr. Wertheimer suggests
16   were improperly withheld in discovery, this presents a more
17   challenging request if only because the documents that are
18   the subject of Mr. Wertheimer's request are not identified,
19   and so, Mr. Wertheimer, all I can do in that regard is ask
20   you to identify, again, as promptly as possible, what
21   documents or range of documents you seek the city to be
22   compelled to disclose, review that with the city, and to the
23   extent you can't work it out, we will take a break from our
24   trial whenever you are ready and work our way through it.

25           MR. WERTHEIMER:  Yes, your Honor.  I believe you

1  meant the state.

2       THE COURT:  The state.  I did.

3       MR. WERTHEIMER:  Yes.

4       THE COURT:  Thank you.

5       MR. WERTHEIMER:  Thank you, your Honor.

6       THE COURT:  All right.  So are there any other

7  issues still open before we begin our opening statements?

8       MR. SCHNEIDER:  Your Honor, there is one, and that

9  is because there has been discussion about the trial

10  subpoenas that were issued to the governor, the treasurer,

11  Mr. Baird, and Mr. Ryan.  The last time I appeared before

12  you, I argued -- I opposed that.  I want the Court to know I

13  am not going to file a motion to quash.  The governor, in the

14  spirit of cooperation and because he wants to move this

15  proceeding along, is willing to testify, and we have made --

16  we will make all of those state witnesses available.  And we

17  believe that Monday between 1 p.m. and 3 p.m. the governor

18  would be available, and we think the other witnesses -- well,

19  the other witnesses will be available on Monday or Tuesday.

20       THE COURT:  Thank you.

21       MR. DECHIARA:  Good morning, your Honor.  Peter

22  DeChiara from the law firm of Cohen, Weiss & Simon for the

23  UAW.  The UAW and the Flowers plaintiffs appreciate the

24  state's decision to change its position and to produce the

25  state witnesses.  We just want to be careful to note for the

1   record that there's been no agreement that there should be
2   any set time for the testimony of the state witnesses,
3   including the governor.  While we realize the governor has a
4   busy schedule, it is also our view that the governor, perhaps
5   with the exception of Mr. Orr, is maybe the most important
6   witness in this case, and given the significance of his
7   testimony and given the significance of the fact that there
8   may be documents we may have to examine him on which we have
9   not yet seen, we would just want to note for the record that
10  there's been no agreement that his testimony would be limited
11  to two hours.  Thank you.
12          THE COURT:  Thank you.  Mr. Schneider.
13          MR. SCHNEIDER:  As of this point, your Honor, I fail
14  to see the reason for the objector's argument that the
15  governor would require to testify for a lengthy period of
16  time.  This Court is well aware of the governor's situation
17  and who he is in the state.  He is willing to do this, but I
18  think we will have to work with the objectors as to timing.
19          THE COURT:  Well, I would certainly encourage that,
20  but it's not for a witness who appears in any court to
21  condition his appearance on a specific time limit.
22          MR. SCHNEIDER:  He's certainly not doing that.
23  That's certainly not the case.
24          THE COURT:  The UAW certainly interpreted it that
25  way, and, frankly, I did, too.

1          MR. SCHNEIDER:  Well, I'm sorry about that, your

2    Honor, but I can tell you, as I indicated before, the

3    governor wants to be cooperative --

4          THE COURT:  All right.

5          MR. SCHNEIDER:  -- as possible.

6          THE COURT:  Good.  Thank you.  All right.  We do

7    have to get to the issue of the amended joint final pretrial

8    order.  If I read it correctly, one or more of the objecting

9    parties decided after our final pretrial conference to object

10   to a certain small number of exhibits, and the state was --

11   or excuse me -- the city was not willing to allow for a

12   statement of such a late asserted objection.  Is that what

13   this is about?

14         MR. ULLMAN:  Not really, your Honor.

15         THE COURT:  Not really?

16         MR. ULLMAN:  Not really, not in our view.

17         THE COURT:  Oh, so you're withdrawing your

18   objections?

19         MR. ULLMAN:  No.  Should I -- may I speak?

20         THE COURT:  Please.

21         MR. ULLMAN:  No.  The issue is not that we're trying

22   to add new objections.  This whole --

23         THE COURT:  So you're not trying to add new

24   objections --

25         MR. ULLMAN:  We are maintaining the same --

1         THE COURT:  -- so to the extent there are new

2  objections, we can strike them.

3         MR. ULLMAN:  No, your Honor.  Let me try to explain.

4  We had always told the state -- the city that for this subset

5  of documents -- I believe there are six of them -- that we

6  were not opposing admissibility in general, but we believe

7  that they were admissible for limited purposes only to show

8  that these documents were said, that they were, you know,

9  created, that they were given to people.  We weren't

10  contesting that they're authentic documents, but we spoke

11  with Mr. Irwin and told him but at the same time -- that's

12  why we're not contesting admissibility in general -- we do

13  not agree that they're admissible for the truth of what they

14  say.  Some of these documents have forward-looking

15  projections that we don't think there's been an adequate

16  foundation for, and in our discussions with Mr. Irwin, he

17  said, "Yeah, we understand that.  We're not asking you to

18  concede to the truth of what's in there."  And we said,

19  "Fine.  On that basis" --

20         THE COURT:  Well, but hang on.  The admission of a

21  document into evidence or the agreement of the admission of a

22  document into evidence is not a stipulation to the truth or

23  credibility of the document.  It just means that it meets the

24  criteria for admissibility under the rules.

25         MR. ULLMAN:  And that may be all that's going on

1  here.  The reason this came up is because I had heard -- I

2  was not here at the legal argument yesterday, but I had been

3  told that your Honor had indicated that if a document did not

4  have a note on it saying there was some sort of objection, it

5  would be admitted for any and all purposes, at which point I

6  said to Mr. Irwin, "Wait a minute.  There's a couple of

7  documents here that we know from our discussions" -- you

8  know, they're limited for -- we agree they're admissible for

9  limited purposes only, and we have the right --

10        THE COURT:  Well, but what -- for what purpose do

11  you assert these six documents are not admissible for?

12        MR. ULLMAN:  Just for the truth of what's in them,

13  the hearsay, expert opinion, and then lack of foundation.

14  Some of these have forward-looking numbers or values in them

15  as to the amount of the unfunded pension liability, and for

16  those we're saying we don't disagree that you gave these

17  documents out, but we're not agreeing that the numbers that

18  are in there are necessarily true numbers.  That's all we're

19  saying.  That was understood from day one with discussions

20  with Mr. Irwin, and we just wanted to make sure that your

21  Honor -- that if the document came in, that your Honor would

22  not assume that everything that was in it on these -- on

23  these six documents was true.  That's all that we cared

24  about.  We don't deny that they were either created, that

25  they were given to people, and for that purpose we have no

1  problem with admission.  And it may have been that we

2  misinterpreted what your Honor said.

3       THE COURT:  I'm having a hard time comprehending

4  what you're saying, frankly.  If a piece of evidence has

5  hearsay within hearsay --

6       MR. ULLMAN:  Um-hmm.

7       THE COURT:  -- which I think is what you're talking

8  about here; right?  The document itself is hearsay.

9       MR. ULLMAN:  Okay.

10       THE COURT:  And it contains hearsay statements.

11       MR. ULLMAN:  Yes.

12       THE COURT:  Okay.  If the document is admitted,

13  opposing parties waive -- if they agree to the admission,

14  they waive both hearsay objections.  That does not mean that

15  that party is stipulating to the truth of any of that

16  hearsay.  It just doesn't mean that.  All it means is it's

17  evidence.

18       MR. ULLMAN:  Okay.  And if, you know, I had been

19  given a misinterpretation or a misapplication of what your

20  Honor indicated the other day, then you're right.  This is a

21  moot issue, and there is no problem based on what your Honor

22  said.  I think that's true.

23       THE COURT:  Okay.  All right.  Then in that event,

24  the Court will enter the amended final pretrial order, and

25  based on the list of documents that are shown as having no

 1    objections, the Court will prepare an order admitting all of

 2    those documents into evidence.  Okay.  Opening statements.

 3         MR. BENNETT:  One second, your Honor.  Good morning,

 4    your Honor.  I'm assuming that you want to hear from us

 5    first, notwithstanding that the order was different in the

 6    other -- in the legal issues proceedings, but, in any

 7    event --

 8         THE COURT:  Well, you have the burden of proof;

 9    right?

10         MR. BENNETT:  Correct.

11                    OPENING STATEMENT

12         MR. BENNETT:  First of all, I want to make crystal

13    clear -- many people have in different environments -- that

14    I'm not going to speak about any arguments that came up in

15    the context of the legal argument part of the proceedings.

16         THE COURT:  Thank you.

17         MR. BENNETT:  I appreciate that part, too.  And I'm

18    going to confine myself to the issues -- or the parts of the

19    eligibility standard and the part of 521(c) that have some

20    factual disputes that have been identified in connection with

21    them.  And toward the end I do want to spend a minute on the

22    materiality of facts relating to legislators' or governors'

23    intent relating to statutes because I think it was not

24    something that we did cover when we were here before.

25         So, first of all, I'm going to start with the issue

1  of insolvency, and what I'm going to say about that because I
2  could stand here for hours describing the evidence that is
3  going to come in on that subject, but I'm not going to do
4  that -- I'm going to say simply that the witnesses that we
5  will present on the subject are going to present a mountain
6  of evidence showing insolvency of the city.  Sadly, that
7  evidence will show that the city is insolvent on every
8  relevant standard.  And, your Honor, there's been at least
9  intimated in a lot of the papers about the significance that
10  no expert report has been submitted.  Quite frankly, that is
11  because no expert report is required.  This is one of those
12  cases where the data speaks very clearly and persuasively on
13  its own -- it needs no gloss -- and that only AFSCME is
14  objecting on the insolvency point, at least as I read the
15  papers, itself speaks volumes.
16        I want to say that from the near term perspective,
17  the city did not run out of cash because -- only because
18  actions were taken to prevent that from happening.  The
19  evidence will show that if the city just kept on paying debts
20  as and when they were becoming due, cash would have run out.
21  The fact that the city stopped doing that is the only reason
22  why there are positive cash balances.  As I said before,
23  there's no question that if the actions were not taken, cash
24  would have run out.
25        I will also say that the steps that the city took

1  during past years to pay many of its debts as they become due

2  didn't turn out particularly well.  One of the consequences

3  you'll see in the evidence and, in fact, a good document to

4  keep around at all times is the proposal for creditors dated

5  June 14th.  There's a section there that deals with this.  It

6  shows that there were numerous secured borrowings made to

7  create liquidity in the city in past years when there were

8  similar cash flow problems.  Each and every one of those

9  borrowings were done on a secured basis, and so the

10  consequence that we face today is that those borrowings

11  consume a very significant amount of cash otherwise available

12  for creditors generally, so that was -- so avoiding a

13  liquidity problem in the prior periods didn't exactly work

14  out well from the perspective of many other creditors.

15      Also, as will come into evidence, pension

16  contributions were deferred during at least the past two

17  fiscal years with the effect that the underfunding under

18  anyone's measure -- we don't have to worry about the fight

19  between the different measures of pension underfunding.  It's

20  greater than it might otherwise have been.

21      Finally, on the insolvency point, you are going to

22  hear from several witnesses, but most importantly perhaps

23  Chief Craig, about the fact that the city is failing to

24  provide basic services to its residents.  We don't think

25  about that as another one of the creditor claims or

1   obligations, but the reality is it's as important as anything

2   else.  As we've indicated before and as the witnesses will

3   indicate, without solving that problem, there may not be a

4   city to reorganize.

5           Now, AFSCME makes a few points that are worth

6   discussing how the evidence will deal with them.  First, much

7   is made over the dispute about the underfunding amount, and

8   it is asserted that because there's a dispute of the

9   underfunding amount, the city can't demonstrate it's

10   insolvent.  Well, as your Honor knows, the insolvency test

11   focuses on cash flow.  It focuses on near term and longer

12   term cash flow type measures, and in that connection, there

13   are cash flows that will be put into evidence.  There's also

14   a convenient place to find them in the proposal for

15   creditors.  There's different versions with different levels

16   of updates and different assumptions that are baked into

17   them, but the line items that talk about pension

18   contributions your Honor is going to learn don't change very

19   much whether you use the city's assumptions as to

20   underfunding amount or the city's calculation of underfunding

21   amount or the Gabriel, Roeder calculation of underfunding

22   amount, Gabriel, Roeder, of course, being the actuaries

23   retained by the pension funds, the pension fund management

24   themselves, to give them advice.  And so your Honor will be

25   taken through the numbers, and you will find that the

1  contribution amounts, which are the relevant numbers in the

2  insolvency calculation, don't move around very much

3  notwithstanding the very different calculations of

4  underfunding amounts, and the reason for that will be

5  explained.  Mr. Moore of Conway MacKenzie will be the witness

6  that will cover that area.

7       There's also a little bit of numerical confusion

8  concerning the percentage of the city's contribution to the

9  GRS Pension Fund that is attributable to DWSD employees.  You

10  will see in the papers a number bandied around, 62 percent.

11  Well, actually, the number is the reverse of that.  It's 38

12  to 39 percent.  Mr. Orr got that wrong in his deposition.  He

13  corrected it at the end, but, of course, the correction

14  wasn't cited in the papers.  There will be evidence on the

15  point so there won't be confusion on the point as we go

16  forward with the numbers.

17       Then AFSCME says that the city deferred sales of

18  assets, and they talk about two examples.  We will

19  demonstrate, of course, that that is not true.  First of all,

20  the Belle Isle deal, Belle Isle leased to the state in

21  exchange for the state taking over the maintenance and CAPX

22  requirements with respect to Belle Isle, never involved the

23  generation of incremental spendable cash.  It did and always

24  has involved a reduction of the cost on the city to maintain

25  Belle Isle.  And what the evidence will show is that those

 1   anticipated savings were included in the projections that
 2   were the basis for insolvency calculations, and they are in
 3   the projections.  They're the basis for the proposal for
 4   creditors or at least the lead-up to the proposal for
 5   creditors in the June 14th presentation.

 6          It's also very hard for us to understand how anyone
 7   can say that art sales were deferred.  It is common
 8   knowledge -- and I suspect we'll figure out a way to get this
 9   into evidence as well -- that there's an attorney general
10   opinion out there that basically says that the art can't be
11   sold for creditors.  We, unfortunately -- in the absence of
12   some form of an agreement, there are no sales possible
13   without a significant change in current management of the
14   museum or litigation and -- maybe and/or litigation relating
15   to some of the points made in the attorney general's opinion.
16   There were no pre-filing opportunities to liquidate art.

17          Next, AFSCME talks about the swap deal, which, of
18   course, your Honor is familiar with because it's before you
19   in still another adversary setting in this case.  The swap
20   deal itself, you will hear, does not provide adequate cash
21   relief, but the transaction hasn't been approved yet.  And
22   there is, unfortunately, no assurance as we stand here today
23   and certainly as we stood here several months ago, that it
24   will be done.  It turns out that some of the objectors in
25   this proceeding are also objectors in that one, and so I'm

1   not sure how we're supposed to even count the anticipated
2   cash flow relief attributable to the swap transaction as
3   something that could have even affected the city's insolvency
4   calculations.

5           And lastly, there is the assertion -- and I'm
6   anxious to hear what the evidence will be to support this
7   one -- that the appointment of the emergency manager
8   prevented the city from taking actions designed to raise
9   revenue and avoid insolvency.  Of course, in the briefs that
10  have been filed, there is no suggestion about exactly what
11  steps those are that the City Council or the mayor or whoever
12  else has been displaced in the view of AFSCME have been
13  planning and anxious to implement that would solve the city's
14  financial problem.  No such actions have ever been specified.
15  We have no idea where that evidence is coming from.  It will
16  be quite a surprise if there is any.

17          It was for these reasons, the insolvency and the
18  fact that there really weren't anything left, that the city
19  or the state could think of to do to address the problems
20  that the June 14th presentation was put together, and it
21  proposes a plan that includes significant reductions in the
22  city's obligations, including bonds, including other post-
23  employment benefits, including other unsecured claims, and
24  including pension underfunding claims.  Whatever the law
25  turns out to be concerning protections to be afforded to

 1    various claims, there is no law prohibiting the city from
 2    trying to commence negotiations to resolve its financial
 3    problems, and that's what we were trying to do.
 4            Now, while we're near this subject, there is an
 5    issue that ripples through actually several of the standards,
 6    which is whether or not the proposal that's included in the
 7    proposal to creditors -- and I'm referring to the materials
 8    that are, I think, between pages 101 and 109 or thereabouts
 9    of that document -- whether that proposal was a -- was close
10    enough to a confirmable plan of adjustment to qualify for the
11    purposes of, open paren, one, demonstrating that the city
12    desires to implement a plan; open paren, two, that the city
13    was in good faith as part of the good faith negotiations
14    because they had to be talking about a certain kind of plan
15    that is asserted; and, three, whether the city was acting in
16    good faith generally.  And I think the proposal for
17    creditors, that June 14th document, has been admitted into
18    evidence, again, for all purposes, but very clearly for the
19    purpose of showing this is what the proposal was that the
20    city presented as its initial presentation to creditors, and
21    so it speaks for itself.  We can look at it.  We don't need
22    testimony.  It's reasonably detailed.  In fact, I would
23    argue your Honor sees disclosure statements, summaries of
24    plans all the time, and you will see this measures up quite
25    nicely to the standard that's applicable even in disclosure

1    statements to what a plan should look like.  It is -- it has

2    a classification scheme.  It defines treatment for all

3    classes.  It includes a very extensive term sheet for notes

4    that are proposed to be distributed to creditors, and it is a

5    plan, your Honor, that for that reason is a plan that could

6    be confirmable.

7         Now, there is clearly disputes over what law should

8    be applied by this Court in determining whether or not it

9    would confirm that plan if it was fleshed out, put into plan

10   form, and presented to your Honor.  I told your Honor in

11   prior hearings that I doubt that's the way this case is going

12   to come out, but that's the relevant standard for today.

13        And the reality is is that on the city's very

14   reasonable view of the law, there is no question that it

15   could be confirmed.  I understand that with respect to the

16   retiree constituents' views of the law, they say it can't be,

17   but that doesn't render the proposal inappropriate for

18   purposes of a Chapter 9 case.  We are dealing with issues

19   that your Honor has heard argument about, is going to

20   ultimately decide, but the plan hangs together as an

21   appropriate expression of the kind of debt relief the city

22   should be able to get based upon one very reasonable view of

23   the law.  We think it's absolutely the right view.

24        The other assertion as to why the plan isn't an

25   appropriate plan is that it doesn't adequately liquidate

claims, and here again they're talking about the pension
underfunding amount. But I think we know both from the
structure of the Bankruptcy Code itself and from many, many,
many other cases that the liquidation of claims is not a
prerequisite to confirmation of a plan. Plans are confirmed
all the time with the treatment specified as the treatment is
specified in the plan in the proposal for creditors that is
not claim size dependent. It's by plan. It makes
distributions based upon pro rata interests in the overall
claims pool. It was designed that way because there is, in
fact, uncertainty concerning the aggregate amount of certain
claims. Frankly, the city believes there's more questions
relating to the size of the OPEB, or other post-employment
benefit, claim pool than there is with respect to the pension
claim pool, but there's uncertainty on these issues. It is
acknowledged there is uncertainty of issues. Those are not
confirmation problems. At least they're not confirmation
problems with some plan structures, and they're certainly not
confirmation problems with the plan structure that was
offered by the city.

        So for these reasons, that is a plan that is
sufficiently detailed, more detailed than it has been in many
other of the other reported Chapter 9 cases, and it is
appropriate for all purposes as a starting point for good
faith negotiations, demonstration of the city's intent to

1   implement a plan in Chapter 9, and demonstration of the
2   city's overall good faith in commencing its Chapter 9 case.
3   And so I think we've dispensed of that component of the
4   different standards.
5           We now turn to impracticability.  Can I have a
6   second for a glass of water?  Thank you, your Honor.  Moving
7   to impracticability, the record shows in numerous places that
8   the city has many, many issues of bonds outstanding, and
9   another reason to keep the proposal for creditors nearby is
10  that toward the back of it -- and I think it's between pages
11  like 115 and 130, thereabouts -- there is an extensive list
12  in a type size not so good for people who wear bifocals.  I
13  think you will hear in the evidence, if it's not already
14  clear from the record, that most of the individual bond
15  issues do not have indenture trustees as we think of them in
16  the commercial context or any other equivalent holder
17  representative.  In fact, holders reserve more rights in most
18  muni structures or assign them to their insurers, to bond
19  insurers if insurers are involved.  And so what you have here
20  is that in order to compromise principal or interest as well
21  as many other terms of debt that have to be addressed in
22  connection with resolving the city's financial problems
23  either under the proposed plan that was in the proposal for
24  creditors or in any other plan, there is going to have to be
25  extensive solicitation, efforts to find relevant bondholders

1    to get the right consents.  The bankruptcy process is going

2    to make it a little bit easier because, of course, it will be

3    majorities of those who vote, and the solicitation rules are

4    clearer.  Outside of a proceeding you might have to get

5    everybody in order to implement changes.  In fact, you do

6    have to get everybody with respect to most of the issues.

7    There are a couple where there might be an exception if the

8    insurer exercises certain extensive levels of control.  The

9    bottom line is it is an awful mess.  There is many, many,

10    many, many issues, many, many, many holders, and this, of

11    course, is the definition of impracticability in a lot of

12    ways in the Bankruptcy Code because the whole reason we have

13    impracticability was because of New York's case back in the

14    '70s.  New York back then -- the numbers were different;

15    times have changed -- didn't have materially more and may

16    have had less bond issues and bondholders than Detroit has

17    today.  And the purpose of the impracticability standard was

18    to recognize the fact that with that kind of a debt

19    structure, having good faith negotiations with creditors in

20    advance of a proceeding in an effort to have an out-of-court

21    workout were, frankly, pointless or would have been

22    pointless.

23          And, frankly, for the most part, the objectors don't

24    disagree with anything I've just said.  It's hard to.  What

25    they say instead is that whether -- however negotiations

1  might have been practicable with bondholders, negotiations

2  were practicable with them, with the -- in some senses, self-

3  appointed or appointed representatives of particular labor

4  groups or retirees, and we're going to talk about that in

5  detail in a second, but we have a point first, which is if

6  you have a situation where it's admitted or almost

7  admitted -- and the Court may have to decide -- that

8  negotiations are impracticable with a huge universe of

9  creditors but they might be practicable with respect to

10  another universe of creditors, what do you do?  And the

11  Retiree Committee actually is good about admitting there's

12  law on this in one of their footnotes, and the law is that if

13  you've got an impracticability problem, you have an

14  impracticability problem; that negotiating with the groups

15  you can groups with are kind of pointless.  I think that if

16  we think about it a little bit, that has to be right because,

17  of course, if -- let's take a hypothetical that you've got,

18  you know, a group over here not organized, and then you've

19  got one bank debt piece, which is clearly organized and you

20  can clearly negotiate it.  Well, you try to do everything you

21  can with the bank, but at some point the bank is going to say

22  what's going to happen with them, all those people that you

23  can negotiate with, because no one ever makes a deal in a

24  vacuum.  And even if you could get all the way to conclusion

25  with a bank and you still have to file a Chapter 9 case,

1   doesn't that make you start -- effectively start all over
2   again with the one that was easy to negotiate with?  And even
3   if it doesn't, even if it's possible to negotiate a deal with
4   both the bank and the city decides this is it, we're going to
5   make this deal no matter what happens in the Chapter 9 case
6   that you need for everybody else, you still have to go
7   through the Chapter 9 case.  And waiting to file a Chapter 9
8   case while you work with the bank and finally reach the deal
9   that you're going to have with the bank that's going to be
10  permanent, you've wasted a lot of time because you have to
11  start a Chapter 11 case and go through that process anyway.
12  So I submit that the couple of cases that have focused on
13  this that we cite in our papers and that the Retiree
14  Committee cites in a footnote have got it exactly right.  If
15  you have an impracticability with respect to a material part
16  of your capital structure, you have an impracticability
17  problem, period, so I think by looking at this -- and by the
18  way, before we go off, I want to say there's one paragraph of
19  the AFSCME brief that I think is just terribly important on
20  this.  They argue this point a lot, but then they have
21  paragraph 102 at page 46, and it's only two sentences, so I'm
22  going to -- three sentences, so I'm going to read the whole
23  thing.  "AFSCME is not suggesting that pre-petition
24  negotiations could have bound everyone" -- hold that
25  thought -- "or must have involved all of the city's thousands

1  of creditors."  I don't under -- I think that sentence means
2  we're done because if the pre-petition negotiations couldn't
3  have bound everyone, how would you get a plan done?  And if
4  it didn't involve all the city's thousands of creditors, how
5  would you get a plan done?  So I think they're conceding that
6  our situation has to be regarded as impracticable, but they
7  go on.  They say, "Some level of negotiation with principal
8  creditors could have led the city to a nonbankruptcy
9  solution."  I think that's a non sequitur.  If you're not
10 talking to everyone, you can't possibly have a solution.  But
11 then they go on further, "By way of analogy, Section
12 109(c)(5)(B) of the Bankruptcy Code contemplates pre-
13 bankruptcy negotiations with creditors that the
14 municipality" -- there's a "the" missing -- "intends to
15 impair, not all creditors."  Well, one of the complaints of
16 AFSCME is that the city intends to impair substantially all
17 of its material creditors.  It has no other choice.  So I
18 suppose there's a circumstance if the city was arguing that
19 we have a huge group of creditors as to which negotiations
20 are impracticable, but we're not going to impair them, and we
21 have another group of creditors that we really can talk to,
22 and we're going to impair them, if the city said no
23 discussions, that would be a rather extreme and silly
24 position.  It's just not our case.  We need impairment pretty
25 much across the board.  We have proposed impairment pretty

1  much across the board.  And in that circumstance, the fact
2  that huge chunks of the relevant constituencies are not
3  organized, can't be organized, can't be found, that is to me
4  the end of the impracticability discussion.
5          But maybe we should go on.  Maybe we should try to
6  figure out whether it was really impracticable to negotiate
7  with the unions themselves.  And, your Honor, I think the
8  answer to whether or not it was impracticable to negotiate
9  with the unions themselves -- and I include here the unions
10 and the other retiree groups -- is, frankly, what happened
11 when we asked the unions whether or not they could represent
12 retirees and the other groups or they could represent
13 retirees, and we have a demonstrative that we'll come back to
14 and put into evidence later on, but I think it's useful to
15 pause on, and I think it can go up on -- oh, you have a --
16 oh, okay.  Okay.  We have a big one there, and I have a few
17 that I can hand out to people, so with the Court's
18 permission --
19          THE COURT:  Yes, sir.
20          MR. BENNETT:  I think it's also in the -- I think
21 it's also in the binders.  Now, there's a lot of information
22 on this chart, and I'm not going to try to take us all the
23 way through it, but I want to zero in on the fourth line of
24 data, which is the -- which is -- well, first of all, the
25 third line of data, which says, "Was a letter sent to a

1  creditor?"  What that is is a letter that basically asked,
2  "Are you in a position to represent retirees and which ones?"
3  You'll see it.  It'll be in evidence.  And then the next line
4  is, "Respondent is able to represent retirees," and I'll give
5  you the key.  "X" means they said no, the green check means
6  they said yes, and the question mark is there was no response
7  or it's not clear, and your Honor is going to hear some
8  evidence on that.  And so look across the line.  I have a
9  number of your most vigorous objectors who said, "No, we
10  can't represent retirees," so I'm going to come back to this
11  in the context of good faith, but let's -- we can start
12  thinking about it now.  What is -- what do you expect of the
13  city having made a proposal heavily supported, certainly,
14  again, as standards go in this -- in similar circumstances,
15  had lots of meetings to explain, answered every question,
16  every question that was asked at the meetings -- there will
17  be evidence on that, too -- and your negotiating partner says
18  to you, in many instances in writing, "We actually can't
19  represent the people who are impaired by your proposal"?  To
20  say that anything that happened afterwards is not in good
21  faith, you've got to have a good answer as to what do you do.
22  What's the next sentence in the dialogue?  You're getting
23  feedback from someone who doesn't have authority to give
24  feedback if they give you any feedback.  By the way, the
25  bottom line is feedback.  "X" means no.  There's no other

1    term we need to define.  If they say -- if they said --
2    responded otherwise constructively, which was either "No, but
3    I might do this," or "Yes, if you make the following
4    changes," that's okay, but that just came from somebody who
5    said they don't represent the person who's going to be
6    affected.  What is the next step in a negotiation where the
7    person who said they're here to negotiate says to you, "We
8    really don't represent the person who's affected by the plan
9    we're discussing"?  None of the objectors say how that
10   question is supposed to be answered.
11          The reality is is the city said, "Tell us your
12   suggestions anyway."  And if we got suggestions, feedback, we
13   would have had to then figure out what to do with it in that
14   very unusual circumstance that I, frankly, haven't confronted
15   very often in my career, but we weren't even put to that hard
16   question because what the other part says is is that -- and
17   this is more toward the good faith negotiation part than this
18   one, but as long as I've got the chart up, as the bottom line
19   indicates, the evidence will show that from this creditor
20   constituency, not from others -- I'll get to that in a
21   second -- we received no concrete proposal or comprehensive
22   feedback.  We got a lot of "no," but I'll come to that later.
23          With respect to this part, again, impracticability,
24   AFSCME cites results of past collective bargaining as an
25   example of negotiations with unions that have succeeded.

1    That doesn't surprise me in the slightest, but there's also

2    no evidence and I don't think there will be any that those

3    past discussions began with unions disclaiming power to

4    bargain on behalf of the relevant constituency.  As the

5    evidence will demonstrate, that's how these discussions did.

6         So the bottom line, again, with respect to this

7    part, is even if -- and it's not -- the standard for

8    impracticability of negotiations is impracticability with

9    every major constituency, I think the fourth line of this

10   chart demonstrates that negotiations were impracticable with

11   the retiree side, and they were impracticable with the

12   bondholder side.

13        Good faith negotiations.  Again, this is a question

14   I don't think we have to reach because I think we've

15   demonstrated that those kinds of negotiations were

16   impracticable, but we tried really hard anyway.  The evidence

17   will show that we presented the June 14th plan.  Mr. Buckfire

18   of Miller Buckfire, who was integral to all the negotiations,

19   but others, Mr. Moore, Mr. Malhotra, people

20     you will hear from, they also extensively participated

21   and will testify about what happened in the rooms.  The city

22   told the creditors essentially the following.  The city would

23   have discussions with all parties willing to speak for the

24   city for about a month after the June 14th presentation so

25   that the city could listen to people and figure out if there

1  was an out-of-court solution possible for this enormously
2  complex and dire circumstance.  The city representatives
3  asked for feedback, including proposals that the creditors
4  would accept if they weren't going to accept the city's
5  proposal.  And the city said in writing and separate -- and
6  verbally that it would evaluate what it heard during the
7  following month, during the week beginning July 15th, 2013,
8  and decide what came next.  It's conceivable -- I think
9  people would say they doubted it would happen -- that one of
10  the things that would have come next were consensual
11  negotiations on the effort to build some kind of plan.  That
12  could have commenced.
13      THE COURT:  You said July.  Did you mean June?
14      MR. BENNETT:  No.  July 15th was the evaluation
15  week.
16      THE COURT:  Oh, okay.
17      MR. BENNETT:  The June 14th proposal and July 15th
18  evaluation week, meetings in the middle.  I'll have a
19  timeline at some point, and you'll see how this fits
20  together.
21      THE COURT:  Okay.
22      MR. BENNETT:  So one of the things that might have
23  happened next would have been negotiations on a consensual
24  plan, but if the -- after the month of discussions and after
25  the evaluation week the city could not see a path to an out-

 1   of-court restructuring that could be implemented outside of
 2   court, a Chapter 9 case was absolutely a possibility.  No one
 3   was shy about that.  And, frankly, it should not be
 4   surprising to anyone that the evidence shows that work on
 5   both contingencies was proceeding throughout this entire
 6   period.  Much is made of the fact that there's contingency
 7   planning going on for a Chapter 9 case.  Absolutely there
 8   was.  It would have been irresponsible not to.  By the way,
 9   nothing in the Jones Day pitch is inconsistent with this way
10   of organizing a case.  And there's a lot of complaints about,
11   well, people thought they had to keep a record, make a
12   record.  Absolutely they have to keep a record and make a
13   record.  Making a record of out-of-court steps taken in a
14   Chapter 9 negotiating process is just sensible when everybody
15   knows, based upon the play book executed in the last six or
16   seven major cases have involved vigorous objections to
17   eligibility by bondholders and labor unions, depending upon
18   the case which, sometimes both, and in every single one of
19   those cases, the judge has to go through pages and pages and
20   pages about what happened during the out-of-court phase to
21   determine whether people were in good faith.  So courts
22   through their opinions have sent a message to people who are
23   serious about Chapter 9 restructurings.  Keep records, and we
24   did.
25           There is a lot of criticism in the papers that there

1   were instances where the city said these are not negotiations

2   or particular meetings were not negotiations. I confess that

3   this implicates an area of law that I'm not tremendously

4   familiar with. It has to do with collective bargaining. As

5   the evidence will show, the collective bargaining was

6   suspended as a result of a statute passed, and there was a

7   clear concern by the city that they were not going to waive

8   the -- or reverse the suspension of collective bargaining and

9   all of the baggage that came with that. However, we don't

10   really have to deter ourselves much over that incident

11   because it's admitted by the objectors that the city sought

12   feedback. The evidence will show that. It's admitted that

13   there were, quote, discussions, close quote, and by the way,

14   the leading case that people cite as the -- I think it's

15   Endicott Schools case that is cited for the proposition of,

16   you know, what is a nonnegotiated process or absence of

17   negotiations. That case talks about absence of discussions.

18   That's the actual quote if you go back to the case itself.

19       So, in any event, there is no dispute that dialogue

20   was something that was encouraged and not discouraged.

21   Nobody said we don't care what you think. Never happens;

22   evidence will show never happens.

23       Now, again, assuming for a second that what the city

24   did in the negotiations has any relevance at all given the

25   clear impracticability in this case, what is required of the

 1   city in good faith negotiations -- and I intimated that when
 2   we started talking about the chart -- is informed what
 3   creditors -- by what creditors said and did.  Okay.  Mr.
 4   Buckfire will testify about some of that being especially
 5   careful not to talk about proposals that other people made
 6   because they were made with an intent that they be kept
 7   confidential, but we got permission at least in one instance
 8   to talk about the fact that a proposal was made.  And what
 9   Mr. Buckfire is going to tell the Court is that the proposals
10   that the city got back were proposals that basically said,
11   "Our position is better than everybody else.  We should do
12   better than everybody else," and they were, frankly,
13   completely insensitive to the overall problems that the city
14   faced.  Again, the fact that we did get proposals from people
15   other than the labor negotiators is going to be --
16   Mr. Buckfire will testify to it, but there's a letter in
17   evidence, and I don't have the number.  I forgot to put it on
18   this morning.  There's a letter in evidence -- a cover letter
19   to a proposal that came from three major insurers in the pre-
20   filing period.  And, your Honor, that demonstrates that a
21   party that's represented by qualified professionals, as a
22   number of the labor/retiree constituents were, knew exactly
23   what you're supposed to do when you receive a proposal and
24   you don't like it.  The way you -- the way you respond to a
25   proposal and you don't like it is you send back something

1    that you do like, and that's how a negotiation gets started.

2    Whether it would have worked or not is a different question.

3    The point is is that it wasn't a mystery to anybody how to

4    start a negotiation if someone really wanted to start one.

5          What did labor do besides respond maybe we're not

6    the right person to talk to, which is a problem in and of

7    itself?  Well, here the UAW's papers are particularly

8    instructive, and in many places in their papers, particularly

9    their supplemental objection -- I think it's also in the

10   pretrial brief; I'm just not remembering that as clearly

11   today -- the UAW says, "Well, of course we weren't going to

12   say yes to any modifications of retiree benefits or pension

13   benefits in the pre-filing scenario because we had a

14   constitutional guarantee.  Any proposal that doesn't pay

15   these in full and does not impair retiree benefits is a

16   proposal we cannot accept," or, "we will not accept."  I

17   think it says both those things in different places.

18         So, again, I think we have to ask the most crucial

19   question in evaluating the city's good faith.  When you get

20   back a response that says, "We're never going to agree to

21   anything but nonimpairment," what exactly is the city

22   supposed to do next?  What's the next step in that

23   negotiations?  "Gee, we were just kidding.  We found the

24   money in a mattress.  We'll do that"?  I don't think that's

25   the right response.  I don't think there is a right response.

1  I think at that point you can determine that negotiations

2  have failed and they're not going to succeed.

3       The Retiree Committee goes even further in their

4  papers, their pretrial brief.  They say that negotiations

5  were not in good faith because they included an impairment,

6  meaning the city wasn't in good faith because we didn't agree

7  with them from day one.  Okay.  Again, I ask the question,

8  what exactly -- if anyone is going to contend that the city

9  was in bad faith negotiations and got that response, what

10 exactly were they supposed to do next in the negotiations

11 that would have helped matters?

12      And as I said before, many retiree groups said,

13 "We'd love to talk to you, but we don't represent the

14 relevant people."

15      Clearly, your Honor, we received many requests for

16 additional information.  You will see some interesting charts

17 that show what was in the data room, at least in terms of

18 volumes, how the data room is populated.  The evidence will

19 show that the city did its best to comply with information

20 requests.  I'm absolutely certain that no one was completely

21 satisfied with what the city gave them.  In some instances,

22 that's because the city doesn't always have everything that

23 people want.  In some instances, I suspect it's -- we will

24 find that -- to the end of this case we will not find -- we

25 will find certain people who will never agree that they've

1　gotten everything that they want or they're satisfied with

2　the information they received.  It's a hard problem, but the

3　evidence will show that the city created a database, worked

4　really hard to populate it, populated it with enormous

5　amounts of information, and did not withhold information as a

6　basis to obtain a negotiating advantage.

7　　　　Final point with respect to this section.  In almost

8　all the papers -- and I want to -- it could be all -- there

9　is a statement quoted by Kevyn Orr concerning the financial

10　and operating plan at a meeting to discuss the financial and

11　operating plan, which is not the proposal for creditors.  The

12　financial and operating plan is a document required by

13　statute to be filed 40 days -- 45 days after his appointment.

14　It's about facts, and he's reporting facts.  And someone

15　asked him about negotiating the financial and operating plan,

16　and he said, "This is not something to negotiate.  This isn't

17　a plebiscite.  This is a report.  I'm supposed to file it."

18　So that quote, which I think the objectors would have you

19　think applied to the restructuring plan, and it does not, did

20　not, and it applies to something completely different, and I

21　think the evidence will show that.

22　　　　For the foregoing reasons, I think the city did act

23　in good faith in all of the negotiations that it conducted.

24　Those negotiations were unsuccessful and, thus, that

25　prerequisite for filing a Chapter 9 case and being eligible

 1    for relief has been met.

 2          I'm now going to turn to good faith generally, spend

 3    a little time on it, 921(c).  Here again, I want to borrow

 4    AFSCME's papers because they're just very instructive and

 5    really help us with this.  Paragraph 109 on page 48, "The

 6    relevant considerations regarding good faith under Chapter 9

 7    include," and they point to five points out of the Stockton

 8    case.  I'll accept them.  Number one, whether the city's

 9    financial problems are of a nature contemplated by Chapter 9.

10    The evidence will show that if Detroit's financial problems

11    are not the financial problems of the nature contemplated by

12    Chapter 9, I don't know what city's is, so we think we will

13    satisfy that one very easily.  Number two, whether the

14    reasons for filing are consistent with Chapter 9.  I think

15    the form and substance of the plan that was proposed and,

16    frankly, everything that the city has been saying about it

17    are indicative that the city is trying very hard to use the

18    powers subject to the limitations included in Chapter 9 to

19    effectuate a financial restructuring for the city.  I don't

20    think we'll have any difficulty demonstrating that with the

21    evidence.  Number three, the extent of the city's pre-

22    petition efforts to address the issues.  Here I want to pause

23    and put on a timeline, and there's -- it's really long, so

24    there's two pieces, but for this purpose it's the first piece

25    that's the most relevant.

1      THE COURT:  Let me ask you to pause for just a

2  second.  We should have the record reflect what exhibit

3  number that chart is.

4      UNIDENTIFIED SPEAKER:  It's Exhibit Number 36.

5      MR. BENNETT:  I have better.  They'll try and put it

6  up, but I also have some copies of it.  Here's what I'm going

7  to do.  I'm going to distribute the first piece now, with the

8  Court's permission, and the second piece in a minute, so --

9  after I get through this, so here's the first piece.  Again,

10  I think everyone has seen this already.  If you don't have

11  it, it's okay.  Everyone else is going to have it in a

12  second.  Obviously in a bunch of ways this chart summarizes

13  lots and lots of evidence that is going to go into the

14  record, but what is going to be seen in the record was that

15  it wasn't a bunch of people up at night on June 13th working

16  on a presentation of a plan for June 14th.  The efforts to

17  address the -- the pre-petition efforts to address the issues

18  stretch probably before December 21, '11, but I think at

19  least, as I understand the history and as the evidence will

20  certainly show, no later -- excuse me -- no later than

21  December 21, 2011, December 2011, a number of people within

22  state government and city government started focusing on the

23  fact that the Detroit financial situation was very serious

24  and had to be addressed.  And there were a number of efforts

25  that were attempted all through 2012 to try to grapple this

1  problem -- with this problem short of requiring concessions

2  from creditors, short of Chapter 9.  Kind of everything else

3  you might think of doing was done by a large number of really

4  devoted and qualified people.  Regrettably, it all failed,

5  and -- but the part about -- you know, this first chart,

6  which covers almost a year and a half on one page -- it was a

7  lot of time and a lot of effort in a search for alternative

8  solutions.  So forgetting the near-in -- what happened in the

9  June and July time frame, which we'll get to in a second,

10 the -- it is clear that there was a tremendous amount of time

11 and effort considering the issues.

12        Next is the fourth item in the AFSCME list, the

13 Stockton list, the extent that alternatives to Chapter 9 were

14 considered.  I think alternatives broadly construed include

15 all of this, but then we'll turn to the time frame -- and all

16 of a sudden -- we just got this one up -- the time frame of

17 June and July, which we've blown up because so much happened,

18 onto its own separate chart, so let me pass this one out.

19        THE COURT:  So, ma'am, what's the number of that one

20 that you're just now taking down?

21        UNIDENTIFIED SPEAKER:  They're both Exhibit 104.

22        THE COURT:  Oh, both 104.  Okay.

23        MR. BENNETT:  And because so much more happened, at

24 least in terms of dates and places, in the June and July time

25 frame, we've blown that one up so that the last two months

1   are their separate page.  And June was devoted to heavily
2   trying to figure out whether the last round of possible
3   alternatives, any conceivable kinds of out-of-court
4   restructuring, could work, and what the evidence will show is
5   that on this page, which shows all kinds of meetings and all
6   kinds of different interactions with creditors, a concerted
7   decision was made to exclude meetings with individual
8   creditors or individual creditor representatives because it
9   wouldn't be readable anymore, so this is just organized
10  meetings with different groups for different specific
11  purposes.  The other key to interpretation is when it says
12  "nonunion," it means the bonds, so the union -- for
13  purposes --
14          THE COURT:  Means what, sir?  Pardon?  It means
15  what?
16          MR. BENNETT:  The bonds.  "Nonunion" means --
17          THE COURT:  Bonds.
18          MR. BENNETT:  -- the bonds and other borrowed money
19  because there is a collection of notes involved in that side
20  of the case as well.  Where it says "union," it's really the
21  retiree representatives, which at the time were predominantly
22  union.  And so what this demonstrates -- again, it may be
23  part of the good faith piece, too, but for purposes of the
24  fourth prong of the Stockton test, I would say both of these
25  are relevant, both the long-term assessment of alternatives

1   that were short of debt restructuring, then the close-in

2   effort to figure out whether there was any conceivable way to

3   get something accomplished out of court.  It is perfectly

4   clear that there was an extensive effort to evaluate every

5   conceivable alternative that anyone could think of.

6            And then the last factor, factor five, whether the

7   city residents would be prejudiced by Chapter 9 relief.  As

8   we said in argument last week -- and the Court will hear

9   through extensive evidence -- and it's a really important

10  part of the case both for purposes of eligibility and for

11  everything that will follow -- the residents are dramatically

12  prejudiced by denying Chapter 9 relief.  Many of the problems

13  the city confronts in providing services to its residents is

14  because so many of its tax dollars are devoted to dealing

15  with bonds and other legacy liabilities.  That's the problem.

16  The taxpayer in Detroit puts up a dollar and gets back --

17  right now the number is something -- right now the number is

18  something like 58 cents, and the projections show it could be

19  some day 35 cents.  That's an unstable situation.  It's not

20  working now, it's not going to work in the future, and it has

21  to be changed.

22           The other side of the coin.  Very often the first

23  reaction in cases like this is raise taxes.  The evidence

24  will show -- it's summarized, by the way, in the June 14th

25  proposal -- that the taxes in Detroit are already the highest

1  in any municipality in Michigan; that we're already having

2  enforcement problems.  The city is already having enforcement

3  problems with respect to property taxes; that the property

4  tax assessments may be too high, not too low, indicating that

5  that revenue source is stressed as well.  There's nothing

6  left to do here.  There is no revenue solution.  So we have

7  come to a case, which is not necessarily like other Chapter 9

8  cases, where we have a very finite revenue pool, and it just

9  isn't enough to provide services and to pay debt, and, thus,

10 Chapter 9 is more needed here than in any other scenario you

11 can possibly think of.  The evidence will show that.

12        Last topic, and this gets a lot more technical, but

13 this is responsive to your Honor's suggestion that we had to

14 deal with a disputed issue of fact, and that was the

15 motivation for the inclusion of appropriations provisions in

16 PA 436.  Your Honor, I think the following is intended to

17 really indicate that that question isn't material, but I

18 think it's also -- when we did the research, we found that

19 it's also not a legitimate question for judicial review, so

20 I'm going to give you some citations, and I'm going to read a

21 very few quotes, and your Honor is clearly going to find more

22 when you look at this question.

23        In the State of Michigan, frankly, I think in other

24 places, et al. -- other places as well, the judiciary is not

25 supposed to engage in guessing about the legislature's

1    intent.  The leading case about this turns out to be a
2    referendum case in Michigan.  It's called Michigan United
3    Conservation Clubs versus Secretary of State.  It's found at
4    630 N.W. 2d 297.  Michigan United involved a review of a
5    Court of Appeals decision -- I think it's called the Court of
6    Appeals here -- a Court of Appeals decision that held, in
7    fact, that the -- that an appropriations provision in gun
8    control legislation was not going to prevent that legislation
9    from being subject to a referendum, and the Supreme Court
10   reverses and says that that -- that the inclusion of that
11   provision is going to insulate that statute from the
12   referendum process.  And along the way, the Court was not
13   fractured in result but was fractured a little bit in
14   reasoning.  There's a collection of -- I think it's three
15   concurring opinions.  There's one judge who writes a
16   dissenting opinion.  I think it's just one, but I'm not a
17   hundred percent positive about that.  And so the lead -- the
18   first concurring opinion has this to say.  "This court has
19   repeatedly held that courts must not be concerned with the
20   alleged motives of a legislative body in enacting a law, but
21   only with the end result - the actual language of the
22   legislation."  And then there's a whole series of cases that
23   are cited to support that proposition that I won't read the
24   citations in the record unless your Honor wants them.
25           The next concurring opinion, Judge Corrigan's,

 1    quotes from Justice Cooley's constitutional law thesis or

 2    textbook.  It looks like it may be a textbook.  And the

 3    quote, I think, is also instructive.  It's a little bit

 4    longer.  It says the following:  "to make legislation depend

 5    upon motives would render all statute law uncertain, and the

 6    rule which should allow it could not logically stop short of

 7    permitting a similar inquiry into the motives of those who

 8    passed judgment.  Therefore, the courts do not permit a

 9    question of improper legislative motives to be raised, but

10    they will in every instance assume that the motives were

11    public and benefitting (sic) the station.  They will also

12    assume that the legislature had before it any evidence

13    necessary to enable it to take the action it did take."

14         Then, your Honor, the next case you would find if

15    you looked at this is Houston versus Governor, which is a

16    2012 case.  There's a longer -- 491 Michigan 876, 810 N.W. 2d

17    255.  And right near the front of the opinion there's a

18    paragraph.  I'm only going to read two parts of the paragraph

19    to save time.  "There is nothing that is relevant in this

20    regard" -- that's in terms of interpreting a statute -- "that

21    can be drawn from the political or partisan motivations of

22    the parties."  I'm going to skip a sentence.  "Moreover, this

23    court possesses no special capacity and there are no legal

24    standards by which to assess the political propriety of

25    actions undertaken by the legislative branch."

1          Now, of course, much of this makes sense because one

2     of the problems we scratched our heads about when we got back

3     to think about how we would address your Honor's question is

4     there are a whole bunch of legislators in two Houses that

5     conceivably had all kinds of different reasons for supporting

6     the appropriations.  It could well be that most of them put

7     the appropriations there because they really thought they

8     needed the money even if some thought they were putting it

9     there because it was a problem relating to the referendum

10    process.  I will tell you a very, very persuasive example of

11    the hazards of trying to figure out the intent of statutes

12    was impressed upon me by a law school, an example I learned

13    in law school, which was about the age 55 -- or the 55-mile-

14    per-hour speed limit, and it -- research turns out to show

15    that the purpose of that speed limit was to save fuel, and

16    the reason that it wasn't increased for a long time is

17    because it saved lives.  And so also the purpose of

18    legislation actually can change over time or the reason why

19    it stays there, so I think it's a hazardous inquiry.  I don't

20    think we know where to start.  I don't think we can drag all

21    the legislators in here and ask them all, and I think the

22    only other evidence you're going to see about this is,

23    frankly, inadmissible hearsay.

24          Maybe more importantly than this, I think I

25    indicated to your Honor in argument last week that I didn't

 1    think there was any consequence to a determination by this
 2    Court that the appropriation provisions might prevent a
 3    referendum.  I said that the statute wouldn't be
 4    unconstitutional.  It just would be subject to referendum.
 5    Well, it turns out in the Michigan United case, one of the
 6    concurrences goes back and gives everybody the history of
 7    what happened in that case, and so how did that case wind up
 8    in court to begin with?  And it wound up in court because the
 9    persons, the group that wanted to have a referendum went out
10    and got the required number of signatures, went to the
11    appropriate office where the election is going to be held,
12    and the first response was no referendum because of the
13    provisions, and then they went to court to test it.  So I
14    think we're in a situation where, frankly, the only
15    circumstance where this issue of whether or not the
16    appropriate -- whether or not the appropriation provisions
17    are in there for an appropriate purpose would conceivably
18    come up is when a person or organization desiring a
19    referendum within the time specified by the statute -- and it
20    could conceivably have run; I couldn't figure that out --
21    actually collects the signatures, goes down to the
22    appropriate place and tries.  That never happened.
23              It also appears that even if a group or person
24    doesn't do that, there is an initiative process, which is
25    different from a referendum process, which they could have

1   triggered, and that process is not dependent in any way on

2   whether or not there's an appropriation provision in the

3   relevant statute.

4         And, finally, I think it was pointed out when we

5   were together last that the PA 436 contains a severability

6   clause, so what's left to have happen at this point is if

7   that provision is somehow inappropriate and has to be

8   stricken for some legally cognizable reason, the rest of the

9   statute is still there.  So I would say, again, summarizing

10   from where I started, there's two points here.  One is is

11   that I think your Honor has asked for an inquiry that is not

12   only impractical, it's not one for courts, but, in any event,

13   it's not material to anything because it doesn't lead us

14   anywhere that would change the result that we have PA 436 or

15   at least every single one of its provisions with or without

16   the appropriation provision to apply, and it's not upset by

17   reason of the possibility that a referendum could have been

18   attempted in some circumstances where one never apparently

19   has been attempted.

20         With that, if you have no more questions, I think

21   I'm done.

22         THE COURT:  Thank you.

23         MR. BENNETT:  Thank you.  I've been asked to offer

24   104 for demonstrable purposes only because it would not be on

25   the relevant lists.

1          THE COURT:  Is there any objection to 104 for

2    demonstrative purposes only?  All right.  The Court will

3    admit it for that purpose.

4          (Debtor's Exhibit 104 received at 11:25 a.m.)

5          MS. LEVINE:  Good morning, your Honor.  Sharon

6    Levine, Lowenstein Sandler.

7          THE COURT:  Let's just have the record clearly state

8    this.  Does the State of Michigan wish to make an opening

9    statement on the issue of the city's eligibility?

10         MR. SCHNEIDER:  No, your Honor.  However, we may

11   wish to make a closing statement.

12         THE COURT:  Thank you.  You may proceed.

13         MS. LEVINE:  Thank you, your Honor.  Sharon Levine,

14   Lowenstein Sandler, for AFSCME.  I'm actually here in the

15   role of emcee.  As with the oral arguments, we have agreed to

16   work together to try and not duplicate efforts and to make a

17   cohesive presentation, so just to give your Honor a little

18   bit of an understanding, the Retirement System is going to,

19   in essence, go first, spend about 20 minutes going through

20   the timeline as we see it.  Following that, the Retired

21   Detroit Police Members Association will react to the city's

22   final portion of their statement and also to their particular

23   issues as reflected in the timeline and apply it to the

24   facts.  The UAW, the Public Safety Unions, the Retired

25   Association Parties, and AFSCME will each spend just a few

1  minutes indicating how we see any additional facts or how the

2  facts apply to our particular situations, and then the

3  Retiree Committee probably for 20 or 30 minutes will give a

4  global overview of applying the facts that came out in the

5  timeline to the law.  Thank you.

6          THE COURT:  Okay.  Well, do you think it's okay with

7  your group if at a convenient break around noon we take our

8  lunch break?

9          MS. LEVINE:  That would be great.

10          THE COURT:  Okay.

11          MS. GREEN:  Your Honor, can I move the -- oh, I'm

12  sorry.

13          THE COURT:  Yes.  Can we arrange to move that easel,

14  please?  You can try.

15          MS. GREEN:  Your Honor, Jennifer Green on behalf of

16  the Retirement Systems.

17          THE COURT:  Be sure you speak right into the

18  microphone even though you've angled the lectern there.

19                    OPENING STATEMENT

20          MS. GREEN:  As Sharon mentioned, we have put

21  together a slideshow presentation of the timeline.  We

22  believe that these facts will later be used to support

23  certain legal arguments that we will be raising throughout

24  trial regarding the fact that Chapter 9 was a foregone

25  conclusion well before any creditor negotiations occurred;

1   that Chapter 9 was filed in bad faith to circumvent the

2   pension clause, and we submit, respectfully, we disagree with

3   the city's assertion a moment ago that Chapter 9 was a mere

4   contingency, and our assertion is that it really was a

5   foregone conclusion before any of the creditor negotiations

6   ever occurred, and with that I will begin.

7          You may ask why we're going back this far to 2011,

8   but at his deposition, your Honor, Governor Snyder testified

9   that this has been a highly structured process for close to

10  three years, so we begin in January 2011 when Richard Snyder

11  takes office as the governor of the State of Michigan.

12         Shortly thereafter, just three months later, the

13  governor signs into law what we now refer to as PA 4.  The

14  legislation makes its way through both Houses within just 34

15  days.  February 2012, Stand Up for Democracy files with the

16  Secretary of State a petition to invoke a referendum on PA 4.

17  Just days later, within -- actually, within three days of

18  Stand Up for Democracy's petition, discussions begin

19  regarding ways to insulate PA 436 -- or what will become PA

20  436 eventually from referendum.  There are notations that

21  discussions were had with Andy Dillon, the treasurer of the

22  State of Michigan's office, and there are notes about Miller

23  Buckfire are going to follow up with Andy directly about the

24  process for getting this to the governor and a notation that

25  the cleanest way to do all of this is new legislation that

1  establishes a board and includes an appropriation for a state

2  institution.  If an appropriation is attached, it concludes,

3  then the statute is not subject to repeal by the referendum

4  process.

5          In April of 2012, the city enters into the consent

6  agreement with the State of Michigan.  Shortly thereafter,

7  Heather Lennox of Jones Day and Ken Buckfire of Miller

8  Buckfire purportedly meet with Governor Snyder on June 6th,

9  2012, to discuss the Detroit -- the City of Detroit's

10  financial crisis and issues related to potential 9 Chapter --

11  or Chapter 9 bankruptcy.

12          Prior to the meeting, in the e-mail that we

13  discussed earlier and that I quoted for you earlier during

14  oral arguments, there is a notation that Mr. Buckfire

15  suggested that all the memos be put together, the ones that

16  were done for Andy.  A list of those memos were compiled, and

17  three of those we think are pertinent to some of the issues

18  at trial in this case.  One of the memos was regarding a

19  summary and comparison of PA 4 and Chapter 9.  One was a

20  memoranda on constitutional protections for pension and OPEB

21  liabilities, and a third memo was analysis of filing

22  requirements of Section 109(c)(5) of the Bankruptcy Code, in

23  particular, negotiation being impracticable and negotiating

24  in good faith.

25          Two weeks after the meeting with Governor Snyder,

1  Miller Buckfire is engaged by the State of Michigan to
2  perform an analysis and review of the city's financial
3  condition.  Shortly thereafter, Ken Buckfire testified that
4  after he got this engagement, he started receiving phone
5  calls from law firms seeing if he would be interested in
6  helping them get inserted in --
7            THE COURT:  I need to interrupt you for a second.
8            MS. GREEN:  Am I going too fast?
9            THE COURT:  Yes.
10           MS. GREEN:  I was trying to get done by noon.  I was
11  trying to get done by noon because you said you wanted to
12  break at noon.
13           THE COURT:  I really want to follow what you say,
14  so --
15           MS. GREEN:  I will slow down.
16           THE COURT:  -- I need you to slow down.
17           MS. GREEN:  I knew I only had 30 minutes, so I was
18  trying hard.
19           THE COURT:  Well, we don't have to stop right at
20  noon.
21           MS. GREEN:  Okay.  I will slow down.
22           THE COURT:  But slow down for me by about 50
23  percent.
24           MS. GREEN:  Wonderful.  I get this a lot, so I know
25  I'm a fast talker.  The discussion continues.  Mr. Buckfire

 1    testified that Corrine Ball had wanted him to meet one of her

 2    partners, who was successful in a Chapter 9 case.  This is in

 3    2012.  In October of 2012, PA -- before PA 4 is even rejected

 4    by the voters, the Treasury Department and the Governor's

 5    Office begin discussing creation of a new emergency manager

 6    statute just in case the referendum is passed.  Howard Ryan,

 7    who is the 30(b)(6) witness for the State of Michigan, will

 8    testify to that.  Shortly thereafter, November 6th of 2012,

 9    the Michigan electorate rejected PA 4.

10        In December Senate Bill 865, which would eventually

11    become PA 436, was introduced in the Michigan legislature.

12    The final version is adopted by both Houses just 14 days

13    later on December 15th, and around that same time the

14    treasurer commences a preliminary review of the city's

15    finances under PA 72 and determines that a serious financial

16    problem exists in the City of Detroit.

17        At the end of December, the governor of Michigan

18    signs PA 436 into law, submits it to the Secretary of State.

19    The entire process for PA 436 took only 26 days, and it is

20    insulated from public referendum because it contains what the

21    objecting parties submit is a minor appropriation of $5.8

22    million, which is less than .009 of the state budget, and

23    below we have the citation from the exhibit that sets forth

24    the amount of the state budget.

25        In connection with the PA 436 appropriation, the

 1  state 30(b)(6) witness testified at his deposition that he
 2  was aware that the appropriation was included for the purpose
 3  of insulating it from referendum.  He was asked the question,
 4          "Do you recall when that provision of the
 5          legislation was added to the draft bill?"
 6          Pretty early on, I believe.  It was quite early,
 7          maybe from the inception."
 8          He was then asked,  "Based on your conversations
 9  with the people at the time, was it your understanding that
10  one or more of the reasons to put the appropriation language
11  in there was to make sure it could not -- the new act could
12  not be defended by a referendum?"  He answered, "Yes."
13          "Where did you get that knowledge from?
14          Well, having watched the entire process unfold
15          over the two -- past two years.
16          The governor's office knew that was the point of
17          it?
18          Yes.
19          That your department" -- his is the treasury --
20          "knew that was the point of it?
21          Yes."
22          In January of 2013, Miller Buckfire was reengaged,
23  this time by the City of Detroit, to continue its evaluation
24  of the city's financial condition.  Mr. Buckfire was then
25  asked by Treasurer Dillon to make arrangements for the city

1   and state officials to meet and interview Jones Day and seven

2   other law firms that were interested in serving as

3   restructuring counsel.

4        The day before the pitch presentation with the City

5   of Detroit, Kevyn Orr, who attends the pitch, receives an e-

6   mail recounting conversations with Mr. Buckfire -- Mr.

7   Buckfire will be testifying live during this trial -- and

8   listed are the questions that will be asked the following day

9   at the pitch.  They all relate to Chapter 9.  "Given the

10  issues that Detroit faces, how can they address them outside

11  of Chapter 9?" is the first, but all the rest are, "Under

12  what circumstances should Chapter 9 be used?"  "How would one

13  execute a low-cost fast Chapter 9?"  "Given Chapter 9

14  experience, what went wrong with JeffCo and Orange County?"

15  And at the bottom, "If Miller Buckfire finds a way to

16  monetize assets and create liquidity, how would that impact

17  eligibility?"

18       The next day on January 29th, Jones Day presents its

19  restructuring strategy to the city and state officials, and

20  it explains that while out-of-court solutions are preferred,

21  they conclude they are extremely difficult to achieve in

22  practice.  They note that Chapter 9 can create negotiating

23  leverage negotiating with the backdrop of bankruptcy, which

24  we submit is not good faith.

25       They further conclude in their strategy that an out-

1    of-court plan should contemplate the possibility of Chapter 9

2    because it creates leverage, you can negotiate in the shadow

3    of Chapter 9, and it helps bolster your eligibility and your

4    success in a Chapter 9 by establishing a record of seeking

5    creditor consensus.

6            There are notes on the slide that state, "A good

7    faith effort to pursue an out-of-court restructuring plan

8    will establish that clear record and will deflect any

9    eligibility complaints based on alleged failure to negotiate

10   or bad faith.  If needed, though, Chapter 9 could be used as

11   a means to further cut back or compromise, quote, 'accrued

12   financial benefits otherwise protected under the Michigan

13   Constitution.'"

14           The next day Richard Baird, who's Governor Snyder's

15   consultant, reaches out to Jones Day to inquire about hiring

16   Kevyn Orr as the emergency manager.  The following day,

17   Mr. Orr calls PA 436 a clear end-run around the prior

18   initiative that was rejected by the voters in November and

19   also comments, "So although the new law, PA 436, provides the

20   thin veneer of a revision, it is essentially a redo of the

21   prior rejected law and appears to merely adopt the conditions

22   necessary for a Chapter 9 filing."

23           THE COURT:  What do those statements appear in?

24           MS. GREEN:  It's Orr Exhibit 4, JDRD0000295.  It's

25   an e-mail.

1          THE COURT:  Right, but what is that?

2          MS. GREEN:  An exhibit.  It's an e-mail.

3          THE COURT:  An e-mail.  Thank you.

4          MS. GREEN:  E-mail.  I'm sorry.  In February of

5     2013, Mayor Bing was approached by Mr. Baird regarding Kevyn

6     Orr as the candidate for the emergency manager position, and

7     Mayor Bing recalls that the only salient qualifications he

8     was offered about Mr. Orr was his bankruptcy experience.  Mr.

9     Baird told him about Kevyn Orr's experience in part of the

10    Chrysler bankruptcy team, and Mr. Orr -- Mayor Bing was

11    asked, "Did you ask Mr. Baird anything else about Mr. Orr's

12    qualifications to serve as emergency financial manager?"  And

13    then he answers, "He -- yes, I did, and he felt that not only

14    was he a lawyer that dealt with bankruptcy for over 30 years,

15    but he also had some qualification as it related to

16    restructuring."  "And did Mr. Baird indicate that Orr had

17    qualifications concerning restructuring outside the context

18    of bankruptcy?"  "That would be no" was his response.

19         In March the governor declared that a local

20    government financial emergency existed in the City of

21    Detroit.  At the end of March, Kevyn Orr was appointed

22    emergency manager of the City of Detroit.  On March 28th PA

23    436 becomes effective, and in April of 2013 Jones Day is

24    engaged as legal counsel for the City of Detroit.

25         After being appointed emergency manager, Kevyn Orr

1   is quoted on May 12th, 2013 -- we've all heard this quote,

2   but I'll say it again -- that the public can comment on the

3   city's financial and operating plan, but we are not, like,

4   negotiating the terms of the plan.

5          The day before presenting its proposal to the

6   creditors, Mr. Orr gives an interview with the Detroit Free

7   Press and expresses his intent to evade the pensions clause

8   through a federal Chapter 9 bankruptcy proceeding, and we

9   have quoted for you the portion of that interview and

10  highlighted it in yellow.  He states, "If you think your

11  state-vested pension rights, either as an employee or

12  retiree -- that's not going to protect you.  If we don't

13  reach an agreement one way or the other, we feel fairly

14  confident that the state federal law, federalism, will trump

15  state law."

16         On June 14th, the emergency manager held a meeting

17  at the Detroit Metropolitan Airport and presented the city's

18  proposal for the creditors.  The evidence will show that the

19  city proposed to fully -- fully intended to impair or

20  diminish accrued financial benefits.  This is an excerpt from

21  the proposal for creditors, and it clearly states that with

22  respect to unfunded pension liabilities, quote, "such

23  contributions will not be made under the plan."  And it

24  further states there must be, quote, "significant cuts in

25  accrued vested pension amounts for both active and currently

1    retired persons."

2            On June 20th, the emergency manager undertook a

3    presentation regarding the city's finances and plan

4    restructuring to both uniform and nonuniformed retirees.

5    Numerous witnesses who attended this meeting, several of

6    which will be testifying at trial, will testify that they did

7    not observe or participate in any negotiations regarding the

8    city's financials and that these meetings were purely

9    informational.

10           On June 27th following this presentation that I just

11   spoke of, the city sends a letter to the UAW thanking them

12   for their time in participating in the meeting, and in that

13   letter even the city acknowledged that the unions would need

14   more information moving forward.  The letter here is quoted,

15   "The city recognizes that representatives of active and

16   retired employees will need access to additional information

17   to analyze the restructuring proposals outlined in the June

18   20 meetings.  Information relevant to these proposals will be

19   made available in the on line data room," but at this time on

20   June 27th, that information, as they were saying, was not yet

21   available.

22           Five days later on July 23rd Gracie Webster and

23   Veronica Thomas commenced lawsuits against the State of

24   Michigan, the governor, and the treasurer seeking a

25   declaratory judgment that PA 436 violated the pensions

1  clause, and they also sought an injunction.

2          In July when several of the creditor meetings took

3  place, the evidence will show that the city had no intention

4  of actually negotiating with its creditors.  By July 8th you

5  will see an e-mail with an attachment of a timeline and a

6  communications roll-out demonstrating that the city had

7  already determined that its Chapter 9 petition was going to

8  be filed on July 19th.  There's a timeline crafted by the

9  State of Michigan that identifies July 19th as a filing date

10  despite the fact that the creditor meetings had not yet

11  occurred.  Therefore, the objecting parties submit that

12  Chapter 9 was already a foregone conclusion before the city

13  met with its creditors on July 10th and 11th.  In fact, here

14  is a copy of that Chapter 9 roll-out, communications roll-out

15  that I spoke of.  In an e-mail from Kevyn Orr's press

16  secretary, Bill Nowling, to certain state officials, he lays

17  out the communications plan.  And if you go down to the

18  yellow portion, it starts with, "We negotiated in good faith

19  with all of Detroit's creditors."  Mind you, several of the

20  meetings had not yet even occurred.  "We presented a

21  comprehensive restructuring plan to creditors in June.  At

22  this point, it would be impractical to continue discussions

23  out of court because it is clear that we will be able to

24  reach agreement with some creditors only through a court-

25  supervised process, and the State of Michigan has authorized

1   the emergency manager to take this step."  This is on July

2   8th.

3         The timeline attached to that communications roll-

4   out on Thursday, July 18th, states that, "Last minute

5   revisions will be made to all the key documents," and on

6   Friday, July 19th, which is in bold and capital letters

7   called "The Filing Day," at nine o'clock the Governor's

8   Office is supposed to transmit the authorization letter to

9   the emergency manager, and at ten o'clock on the 19th the

10  necessary paperwork is supposed to be filed with the court

11  system, and then a series of press conferences are to be

12  held.

13        The following day, on July 9th, an e-mail from

14  Treasurer Dillon to the governor of the State of Michigan

15  states that, "We are still in the informational mode."  This

16  e-mail is interesting for several reasons.  First, it states

17  that Kevyn will meet the Detroit pensions the following day,

18  on July 10th.  It says there will be no exchange of documents

19  and that he will not translate that -- the information that

20  he gives into an impact on retiree or employees' vested

21  rights.  Treasurer Dillon continues and says that there are a

22  lot of creative options that we can explore to address how

23  they will be treated in restructuring with respect to the

24  pensions, but at his deposition when he was -- when he was

25  asked whether these creative options were ever explored

directly with the Retirement Systems, Dillon said no.  And
it's not up there, but he also was asked if they were ever --
these creative options were put into written reports or
formal proposals, and he also said, no, they were not.

Further in the e-mail he says to the governor,
"Tomorrow's meeting could lead to questions directed to you
about your view on this topic.  In my view, it's too early in
the process to respond to hypothetical questions.  We remain
in many ways in the -- at the informational stage."  This was
just one week before the filing.  And Mr. Dillon admitted at
his deposition that nothing changed between July 9th and the
filing date of July 18th that would take them out of this
informational stage, as he called it.

On July 10th and 11th, there were a series of
creditor negotiations -- alleged creditor negotiations that
took place.  The emergency manager himself did not even
attend, but witnesses who did attend the meeting will testify
that they did not observe or participate in any negotiations
regarding the city's finances and that, again, these meetings
were purely informational.  And this is consistent with the
state treasurer's report to the governor that as of July 8th,
we are still in the informational mode.  It's also consistent
with Mr. Orr's admission at his deposition when he was
questioned, "There were no actual negotiations at the June
14th meeting, were they?"  And he answers, "No, not as it's

1    generally understood."

2          Lastly, the fact that there were no negotiations on

3    July 10th and 11th is consistent with the city's and the

4    state's communications roll-out, which already adopted the

5    excuse that negotiations were going to be impractical.

6          On July 12th, following those meetings, the Detroit

7    Fire Fighters Association sends a letter to the emergency

8    manager asking for more information and stating, "It would be

9    productive if the city could provide us with its specific

10   proposals on pension benefit restructuring as soon as

11   possible.  We have two meetings with the city where pension

12   benefits were addressed and still have only the city's

13   general observation that pension benefits must be reduced."

14   At trial Mark Diaz, the president of the Detroit Police

15   Officers Association, and Dan McNamara, president of the

16   Detroit Fire Fighters Association, will testify that no

17   specific proposals were ever given by the city after this

18   letter, and instead the city filed bankruptcy just six days

19   later.

20         On July 15th the Webster defendants filed a response

21   brief and a motion for summary disposition.  In that court

22   paper, the state asserted that a bankruptcy filing by the

23   City of Detroit is, quote, "only a possibility that

24   plaintiff's claims were, quote, 'unripe, premature, and based

25   on a speculative threat of future injury.'"  And mind you,

1  this position is taken in open court, which conflicts with
2  the timeline that had already been circulated within the
3  Governor's Office that slated the filing date as just four
4  days later.
5       On July 16th Mr. Orr submitted the bankruptcy
6  recommendation letter to Governor Snyder and Treasurer
7  Dillon.  In that letter he stated that dramatic but necessary
8  benefit modifications must be made.  The governor
9  acknowledged that he read that letter before authorizing the
10  filing and that he knew that the city's request for
11  authorization that dramatic cuts be given would be part of
12  any Chapter 9 process.  He also testified that he knew,
13  quote, "based on the facts going into it, there was a
14  likelihood accrued pension benefits would be reduced in the
15  Chapter 9 case."
16       The next day, the Detroit Public Safety Unions
17  received correspondence from the city thanking them on behalf
18  of the emergency manager for their, quote, "strong
19  cooperation regarding the City of Detroit pension
20  restructuring."  Later that same day, the Retirement Systems
21  filed their lawsuit against the governor and the emergency
22  manager in Ingham County Circuit Court seeking declaratory
23  relief.  That same night at 6:23 p.m. the governor's press
24  secretary, Sara Wurfel, circulates an updated timeline that
25  still shows the bankruptcy filing date of Friday, July 19th.

1  This is July 17th at 6:23 p.m.  The following day, the

2  Retirement Systems filed a motion for a TRO seeking an

3  injunction.  At 3:05 p.m. that afternoon, Margaret Nelson of

4  the Attorney General's Office received a telephone call

5  informing her that Retirement Systems were in court seeking a

6  TRO.  At 3:47 the governor e-mailed his authorization letter

7  to Orr and to Treasurer Dillon, and at 4:06 Orr changes the

8  date on the filing papers from July 18th, crosses out the 19

9  because it was supposed to be filed the 19th, handwrites in

10  an 18 and files the petition one hour and one minute after

11  finding out that the Retirement Systems were in court seeking

12  a TRO, which is inconsistent with the timeline sent at 6:30

13  the night before saying it was going to be on Friday.

14       And at 4:10 p.m. the attorney general appears for

15  the TRO hearing in Ingham County.  This is reflected in the

16  papers filed by the state, the docket history and the hearing

17  transcripts.  Orr later admitted that he was being counseled

18  that it would be, quote, irresponsible not to file the

19  petition sooner rather than later given all the lawsuits that

20  were popping up.

21       On July 19th, the following day, the declaratory

22  judgment was entered against the governor, the treasurer, and

23  the State of Michigan and that declaratory judgment states PA

24  436 is unconstitutional and in violation of Article IX,

25  Section 24, of the Michigan Constitution, and it further

1  states the governor is prohibited from authorizing an

2  emergency manager to proceed under Chapter 9, yet the city

3  filed its Chapter 9 petition despite the fact that each of

4  its advisors uniformly testified at their depositions that

5  the city's financial information was still incomplete as of

6  the filing, and, in fact, today it is still incomplete.

7        Charles Moore, senior managing director at Conway

8  MacKenzie, testified that quote, when he was asked, "Has

9  there been a specification of those level of cuts that the

10  city contends must occur?"  He says, "I mean have you put a

11  dollar amount on it?"  He answers, "No.  Our analysis of this

12  continues.  Right now we still don't know what assets could

13  be available to put toward the pensions.  We still have not

14  had the type of dialogue that we would like to have related

15  to the calculation of the unfunded amount, so because of

16  those two uncertainties, among others, we don't know what

17  cuts, if any, there may need to be."

18        The state treasurer also agreed that as of July 8th,

19  just a week before the filing, "I thought that the situation

20  was not understood enough for the governor to go on record

21  yet because I couldn't even tell him with any degree of

22  confidence what level of funding the pension funds had, so

23  why should he get in the middle of a debate about this?"

24        In addition, as of the petition date -- and I

25  believe the city's witnesses will testify consistent with

1  their depositions -- that to date the city still -- the city

2  still does not know the value of two of its primary assets,

3  including the Water and Sewage Department and the city-owned

4  artwork at the Detroit Institute of Arts.  Because the city

5  still does not know what assets are available to satisfy

6  liabilities, does not know the scope of the liabilities, it

7  is the objecting parties' position that the Chapter 9 filing

8  was premature and not made in good faith.  Thank you.  I

9  believe Mr. Ullman may be following me.

10            THE COURT:  Okay.

11            MS. GREEN:  I apologize.  It's Lynn Brimer.

12            THE COURT:  Okay.  Perhaps we should move that

13  lectern back to center, huh?

14            MS. BRIMER:  I can do that.

15            THE COURT:  Okay.  Thank you.

16            MS. BRIMER:  Is this good, your Honor?

17            THE COURT:  That's great.  Let me just ask will

18  there be other uses of the projector during openings?

19            ATTORNEY:  Yes, your Honor.

20            THE COURT:  Okay.

21                    OPENING STATEMENT

22            MS. BRIMER:  Good morning, your Honor.  And, your

23  Honor, I thank Mr. Bennett for raising the legal issues with

24  respect to the spending provision because it at least makes

25  me more comfortable as to why I thought it's so important we

 1  clarify the record on the discovery matters with respect to

 2  which law had a spending provision added onto it.

 3       THE COURT:  Okay.

 4       MS. BRIMER:  So rather than address my opening issue

 5  to begin with, would the Court like me to address the legal

 6  issues raised by Mr. Bennett, or would you like the legal

 7  issue -- I am prepared to briefly discuss those.  I don't

 8  have a written preparation, but I do think it's important for

 9  the Court to understand I did look at the case that

10  Mr. Bennett cited.  I didn't disregard any case law when

11  coming to this Court and believing that there was a factual

12  issue.

13       With respect to the Michigan United case, I think

14  it's factually distinguishable again.  That case did not

15  involve an original law that did not have a spending

16  provision that was overturned on referendum and then a new

17  law presented.  In that case, your Honor, the issue was

18  whether or not the spending provision itself added in the

19  original law such that it was not subject to referendum was,

20  in fact, an appropriate provision taking it out of the

21  referendum provision.  You know, under -- your Honor, that is

22  not the facts that we have before us today.

23       In addition, your Honor, I have reviewed Justice

24  Corrigan's opinion, which, by the way, was a concurring

25  opinion, not the Court's majority opinion, but she addressed

1   the issue of intent and that, generally speaking, we do not

2   look to the motive or intent of the legislature --

3   legislative body when passing a law, but she said this is

4   because -- and she notes this in a footnote -- this is

5   because, generally speaking, we do not have any testimonial

6   record regarding motive or intent.  That would be, your

7   Honor, in her concurring opinion.  There is no testimonial

8   record in the -- in this original action regarding the motive

9   or intent.  Well, your Honor, that is simply not the case in

10  this matter.  As Ms. Green read to you and as I quoted from

11  the state's own 30(b)(6) witness, we have evidence regarding

12  the motive of the inclusion of the spending provisions on an

13  act that had previously been rejected on referendum.  We

14  believe that factual issue is important to this Court in

15  determining that whether or not some or all of PA 436 should

16  have been subject to the second provision that everyone seems

17  to gloss over in Article II, Section 9, of the Constitution,

18  which states specifically that no law that has properly been

19  submitted to referendum can then -- and rejected can then be

20  passed without a referral back to the general electorate.

21       Your Honor, the cases cited by the state, Ms.

22  Nelson, of Reynolds v. Martin and the case cited this morning

23  just simply are not factually similar enough to PA 436 to be

24  controlling, and we do -- and, you know, my closing -- my

25  opening can be as simple as, your Honor, the evidence will

1  show that the motive of including the spending provisions was

2  to, in fact, take an act that had previously been overturned

3  on referendum and disregard the will of the people, and it's

4  very clear.  The state's attorney argued yesterday that we

5  knew what the people's will was because we have the media.

6  Well, we know what the people's will was.  The people's will

7  was that we not have an emergency manager who would supplant

8  the democratically elected officials in the City of Detroit,

9  and that was very clear, and yet we now have PA 436, which

10  disregarded that, which added a spending provision to it, and

11  the facts will demonstrate that we can establish what the

12  motive was in adding those spending provisions.  And,

13  moreover, we can establish that the emergency manager,

14  Mr. Orr, was fully aware of that at the time he accepted his

15  appointment as the emergency manager.  I'll conclude --

16        THE COURT:  Well, how do you -- how do you deal with

17  Mr. Bennett's argument that if the issue is ever appropriate

18  for court review, it is not appropriate until petition

19  signatures are collected on the bill that has the spending

20  provision in it and the petitions are rejected because it's

21  not the kind of a law that can be subject to a referendum?

22        MS. BRIMER:  Well, certainly I don't think there's

23  any case law that would suggest that the people be required

24  to take an act which on its face would be rejected.  I'm not

25  sure I'm aware of any case law that would suggest that the

1  people had to refer that case -- the law to a referendum and

2  have it denied because of the failure -- or the inclusion of

3  the spending provision.  At issue here, your Honor, is

4  whether or not the act is sufficiently similar enough, not

5  that it had to go back to referendum, but whether it's

6  sufficiently similar enough that the second provision would

7  require that it be deemed to be unconstitutional because it

8  was not presented to the people again.

9          THE COURT:  Okay.  All right.  Let's take our lunch

10 break now.  Before we do, I want to remind everyone that we

11 are guests here in this building, and we need to maintain

12 decorum and silence while we are in the hallways.  Please

13 don't linger in the halls.  You can have your conversations

14 here in the courtroom over lunch if you'd like to do that, or

15 in the elevator or on the 1st floor, but please maintain

16 silence in the hall.  Let's see.  It's noon.  We'll reconvene

17 at 1:30, please, and that's it.

18         THE CLERK:  All rise.  Court is in recess.

19     (Recess at 11:59 a.m., until 1:30 p.m.)

20         THE CLERK:  Court is in session.  Please be seated.

21         THE COURT:  Counsel are present.  We have a couple

22 of housekeeping matters that we need to address before we

23 continue with our opening statements, please.  The first is

24 that in the amended final pretrial order that was submitted

25 through our order processing program, on Attachment G, which

1    is the attachment from the Retirement Systems, the exhibit

2    numbers were omitted.  I'm sure that was inadvertent, so

3    please fix that and resubmit it as soon as possible so that

4    we can get it entered.  Okay?

5            ATTORNEY:  Of course, your Honor.

6            THE COURT:  And then a second brief housekeeping

7    matter is -- is Ms. Green still here?

8            ATTORNEY:  She's not here yet, your Honor.

9            THE COURT:  Okay.  Mr. Gordon, just to keep the

10   record a hundred percent clean, we need to put an exhibit

11   number on a paper version of the slide presentation so that

12   for the record that is identified, whatever exhibit number

13   you want to put on it.

14           MR. GORDON:  All right.  Very well, your Honor.

15           THE COURT:  Okay.

16           MR. IRWIN:  Your Honor, will counsel be provided a

17   copy of that when it's done in that way?

18           THE COURT:  Can you do that?

19           MR. GORDON:  Yes, absolutely.

20           THE COURT:  Okay.  All right.  We are ready to

21   proceed.

22                   OPENING STATEMENT

23           MR. WERTHEIMER:  William Wertheimer, your Honor, on

24   behalf of the Flowers plaintiffs.  I'll be very brief, and I

25   just want to add a couple of points relevant to the timeline

1  that Ms. Green was showing you.  I do not have a clicker, but

2  I'll just state them.

3          THE COURT:  Okay.

4          MR. WERTHEIMER:  That is, first, on July 3rd the

5  Flowers lawsuit was actually filed before the Webster

6  lawsuit.  They were both filed on July 3rd, so they were both

7  filed that day.  Second, on the same day, both Flowers and

8  Webster cases, Judge Aquilina signed orders to show cause

9  setting a hearing for the preliminary injunction that we were

10  seeking for July 22nd so that -- and those were served on the

11  governor and the treasurer on July 3rd so that at the point

12  in time on the timeline a few days later when they're setting

13  the putative bankruptcy for July 19th, Friday, they know that

14  the state court preliminary injunction hearing is being

15  scheduled for July 22nd, the following Monday.  That's it.

16  Thank you.

17          THE COURT:  Okay.

18                  OPENING STATEMENT

19          MS. CECCOTTI:  Good afternoon, your Honor.  Babette

20  Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW.  Ms.

21  Green's timeline was very complete and detailed.  I do want

22  to just -- because I don't think this particular slide was up

23  there, so I would like to mention the pitch book again.  Ms.

24  Green had a slide from the Jones Day pitch book from January

25  20, 2013, and one thing that -- when your Honor goes through

1   the pitch book you'll notice that there are, you know, a

2   few -- quite a few, I would say, or certainly more than one

3   or two references to the use of Chapter 9 either itself or

4   the shadow of Chapter 9 as leverage vis-a-vis creditors, vis-

5   a-vis specific proposals and claims related to labor costs,

6   and I think Ms. Green showed the slide with the quote on

7   there about using Chapter 9 to reduce accrued financial

8   benefits.

9        The other thing that I'd like to mention about the

10  pitch book, which really does become something of a

11  blueprint, I think, for what follows, is at page 57 there's a

12  slide that reads, "Any Chapter 9 process should be

13  comprehensive," and it starts with the bullet, "plans of

14  adjustment address narrow range of economic compromises."

15  And then it talks -- and then there are other bullets that

16  follow, "other fundamental changes must occur outside the

17  plan context," "any Chapter 9 process should pursue as many

18  revitalization initiatives as possible," "negotiating in

19  Chapter 9 or its shadow is a powerful tool for

20  revitalization," and, finally, "the city should take

21  advantage of its opportunity for long-term comprehensive

22  solutions."

23       So that's actually a good segue to June 14th

24  proposal because, as we've talked about before in the other

25  arguments that we've had, this is really a massive

1 comprehensive revitalization proposal that really has

2 elements of more or less what that slide that I just read you

3 is talking about.  It's got -- the plans include a $1.25

4 billion spending program going out over ten years.  There are

5 many detailed wide-ranging initiatives that have to do with

6 improvement of services, upgrades, reinvestment, and the

7 like, and there is also a restructuring proposal.  There's a

8 section called "restructuring proposal."  I don't have to

9 take you through that because we've been through it a number

10 of times.  You know what the pension proposal -- what the

11 pension proposal is, but the point being that the -- just the

12 four corners of the proposal itself, what that reflects in

13 terms of what it is that the city is trying to pursue through

14 Chapter 9.

15    In terms of the events following the launch of that

16 proposal on June 14th, I think that we see a number of

17 things, and the evidence will show this.  As we saw actually

18 from Mr. Bennett's slide, the number of meetings that

19 actually occur on this proposal -- regarding this proposal

20 are relatively few.  It's a limited number of sessions.

21 Regardless of how we're characterizing them, there's at least

22 one document that refers to one of the meetings as

23 informational, in fact.

24    We have the data room issue.  Ms. Green read the

25 letter or showed the letter to the UAW regarding the fact

1  that the data room wasn't quite up and running yet, but what

2  is also true about the data room, as your Honor knows from

3  the early days of this case, is that in order to access the

4  data room, one had to sign a confidentiality agreement and an

5  additional release to get the Milliman pension materials, and

6  my client, at least, took issue with that prior to the

7  bankruptcy, and others may -- other groups may have as well,

8  so you had this quite massive proposal, a series of really a

9  handful of meetings being held with the data that the city

10  was loading into the data room about the proposal not readily

11  available.

12        In addition, as I mentioned, these were not -- there

13  were just a few of these meetings, and I think the evidence

14  will show that they wouldn't really constitute labor

15  negotiations. The unions, you know, have various ways that

16  they talk about that in the evidence. They are fairly

17  well -- I guess I'll just use the word "highly organized" or

18  the phrase "high organized" by the city, including one

19  meeting where -- at least one meeting where if there were

20  questions about the proposal, those in attendance were

21  required to submit them on cards, and the cards would be read

22  as opposed to any sort of free flowing give and take that one

23  might associate with a meeting with stakeholders that we

24  might think about in terms of going over a restructuring

25  proposal or even a labor proposal.

1            So now I'd like to get to Mr. Bennett's comments

2    about the UAW because I think this really does -- that this

3    is really a very important point.  Yes, it is true that, as

4    we know, the proposal included the cessation of funding to

5    the Retirement System and the statement about -- the

6    statement that significant cuts to accrued vested pension

7    benefits would be necessary, so, yes, on its -- the UAW's

8    position is, yes, on its face, looking at that on page 109,

9    if that's the right page, that is a proposal that violates

10   the Michigan state Constitution, and the immediate questions

11   that arises on its face just looking at it like that is how

12   could it be accepted.  How could it be accepted by a labor

13   union?  How could it be accepted by anyone purporting to

14   speak for or represent actives or retirees?  So, yes, on its

15   face the proposal was not acceptable, and we believe that

16   that has legal consequences as distinct from fact

17   consequences, so I do want to make that point about the --

18   about our objection -- our amended objection in that regard.

19   We very much believe that that has legal consequences.

20           As a factual matter, however, and notwithstanding

21   the fact that the proposal on its face could not be accepted,

22   you couldn't simply hand it to the union with a signature

23   line and say, "Here, sign," the UAW, through its general

24   counsel, contacted Jones Day on July 9th, and we'll have a

25   witness to this effect, and we have an exhibit on it as well,

1    to raise a couple of points, one regarding the data room and

2    the confidentiality issue that I mentioned already.  Then in

3    response to the letter that Mr. Bennett's chart showed trying

4    to ask the labor organizations and the retiree groups if they

5    would be representing their retirees, the e-mail to Jones Day

6    reads as follows:  "Further to its reservation of rights, the

7    UAW continues to seek an answer from Mr. Orr and your firm as

8    to the following:  Please cite the basis for any claim that

9    the UAW has the authority to compromise the vested benefits

10   of active and/or retired UAW or former UAW members employed

11   or formerly employed by the City of Detroit and its

12   affiliates.  As I presume you know, Article IX, Section 24,

13   of the Michigan Constitution provides in pertinent part that,

14   quote, 'the accrued financial benefits of each pension plan

15   and Retirement System of the state and its political

16   subdivisions shall be a contractual obligation thereof which

17   shall not be diminished or impaired thereby,' unquote.

18   Please tell me what authority your firm and/or Mr. Orr

19   believe gives the UAW the right to compromise vested pension

20   benefits despite the contrary provisions of Article IX,

21   Section 24.  Please tell us -- please also tell us whether

22   Mr. Orr and/or your firm take the position that Article IX,

23   Section 24, of the Michigan Constitution is not or may not be

24   binding on the City of Detroit, the State of Michigan,

25   Governor Snyder, Mr. Orr, or the UAW and state, if that is

1    the case, under what circumstances you believe that Article
2    IX, Section 24, would not bind some or all of these persons
3    or entities.  We also seek the answer to the same question
4    with regard to vested post-retirement insurance benefits,"
5    and then there's a reference to the Supreme Court's decision
6    in the Pittsburgh Plate Glass case.  And the letter makes it
7    clear that, again, from the UAW's perspective, "We do not
8    understand the July 10 and 11 multiple stakeholder meetings
9    to which we have been invited to be a forum for negotiations
10   of your proposed pension and retiree healthcare changes but
11   are willing to attend and obtain for our union whatever
12   information may be provided at those meetings," and then --
13   and, finally, "Your full answers to the questions posed in
14   the foregoing paragraphs of this message will help the UAW
15   determine the scope of any such negotiations and the UAW's
16   decisions regarding its representative capacity in them about
17   which your firm has inquired."  So we very much have a
18   factual case as well as a legal case regarding the
19   implications of the proposal, and I did want to make that
20   clear for the record, the point being that what is in this e-
21   mail represents some fairly fundamental questions about the
22   ground rules upon which discussions or negotiations with the
23   city regarding its proposal can proceed.
24        I should note that -- and we'll have testimony to
25   this effect -- that no answer was forthcoming from the city

1 and, as far as I know, has not been forthcoming regarding the
2 questions posed other than obviously when we got into
3 bankruptcy, your Honor solved the problem of the data room.

4          Time frame.  Putting aside the lawsuits and all of
5 the activity surrounding all of that, it does appear that the
6 city set out a timeline for itself that only had about a 30-
7 day period for this launch notwithstanding everything that's
8 in that proposal and everything that was expected apparently
9 to be accomplished by it.  I think I heard Mr. Bennett refer
10 to something like evaluation week, which was supposed to
11 occur on or which probably did occur -- I gather it did occur
12 on July 15th.  That's really a month later.  So one -- now,
13 Mr. Bennett's timeline, of course, goes way back -- I think
14 it was to 2011 and the various initiatives to deal with
15 Detroit's problems, and we are certainly not denying any of
16 those or -- and I'm sure everyone is fully cognizant of --
17 particularly those who live here are fully cognizant of all
18 of those efforts, but we think, as a legal matter, that those
19 efforts really don't legally count.  They obviously count to
20 the citizens of Detroit, but for purposes of eligibility, the
21 relevant time frame, from our perspective, is the proposal is
22 launched on June 14th and then apparently evaluated -- the
23 response or reaction apparently evaluated merely -- a mere
24 four weeks later.

25          So during this time, again, the evidence, we

1    believe, will show that during the same sort of compressed
2    time period, we know that the governor and the emergency
3    manager are meeting on a fairly regular basis.  We know that
4    the governor had seen the June 14th proposal.  He had a draft
5    of it before it was launched.  He knew about the pension
6    proposal.  He knew that there was an issue -- a legal issue
7    with respect to Article IX, Section 24, of the Michigan
8    Constitution and the effect, if any, of the Bankruptcy Code
9    and federal law on the continued enforcement of that section.
10   He knew it was a serious issue.
11          We know, again, since we've discussed it most
12   recently last week at the argument that we then march through
13   the timeline to get to Mr. Orr's July 16th request and the
14   governor's July 18th response.  We know that the governor
15   obviously from the dates signed it only two days later
16   apparently with a review of all of the material that was
17   contained in Mr. Orr's letter, I think could probably best be
18   characterized as limited.  It does not appear that there was
19   an independent evaluation that the governor conducted
20   regarding many of the sort of predicate items that Mr. Orr
21   laid out in his letter.  The governor was also aware, as we
22   know from the slides that Ms. Green showed, that the pension
23   numbers were very much still up in the air and in question.
24   Nevertheless, both the July 16th and the July 8th -- the July
25   16th letter from Mr. Orr and the July 18th approval letter

1　from the governor lay out the -- what I will characterize as

2　the shift in spending priorities.  This is the part of the

3　proposal that relates to revitalization, and we know that the

4　governor in his letter approves of the manner in which

5　Mr. Orr has proposed to proceed in that regard, and so he

6　signs the letter, and, of course, the bankruptcy petition is

7　filed on the 18th.

8　　　　　So what all of this adds up to we think at the end

9　of the day in terms of the legal cases -- in terms of our

10　legal objections is a fairly deliberate plan to use Chapter

11　9.  We think that really knitting -- connecting all of the

12　dots here, that the plan was to use Chapter 9.  We've saved

13　for another day all of the legal issues associated with that,

14　the state's authorization.  There's really -- well, we won't

15　get into those because we'll have closing, and we've had --

16　and we'll have other briefs on all of that, but the sort of

17　deliberate plan, which starts whenever you'd like to start it

18　on the timeline but certainly from the governor's appointment

19　of Mr. Orr leaving his -- leaving the Jones Day firm, the

20　Jones Day retention by the city, this really several month

21　timeline leading from the end of March to the middle of July,

22　we believe the evidence establishes this as a deliberate plan

23　to use Chapter 9 to, in effect, find a way to undermine the

24　Michigan state Constitution through the use of bankruptcy.

25　We believe that that is evidence of a lack of bad faith under

1  921(c), a lack of bad faith in connection with --

2          THE COURT:  You mean a lack of good faith?

3          MS. CECCOTTI:  I'm sorry.  A lack of -- yes.

4  Apologies, your Honor.  Not enough sleep, once again, I'm

5  afraid.

6          THE COURT:  Okay.

7          MS. CECCOTTI:  Now I'm afraid to open my mouth.  No

8  good faith --

9          THE COURT:  I'll help you.

10          MS. CECCOTTI:  Yes.  All right.

11          THE COURT:  I'll help you.

12          MS. CECCOTTI:  No good faith, a lack of good faith

13  negotiations under 109(c)(5), and not a valid plan of

14  adjustment for Chapter 9 purposes.  Thank you.

15                    OPENING STATEMENT

16          MS. PATEK:  Good afternoon, your Honor.  Barbara

17  Patek again on behalf of the Detroit Fire Fighters

18  Association, the Detroit Police Officers Association, the

19  Detroit Police Lieutenants & Sergeants Association, and the

20  Detroit Police Command Officers Association, who have been

21  collectively referred to in these proceedings as the Detroit

22  Public Safety Unions or the Public Safety Unions.

23          As the evidence in this case will show, the public

24  safety unions are the recognized collective bargaining

25  representatives of the nearly 3,200 men and women employed by

1  the Detroit Fire Department and the Detroit Police

2  Department.  I'm sure we'll hear from Chief Craig either

3  today, tomorrow, or sometime this week about the very

4  daunting and difficult conditions in which they work to

5  provide -- excuse me -- police and fire services to -- that

6  are so essential to the survival and the revival of the City

7  of Detroit.

8        The public safety unions piece of this in terms of

9  the evidence is a small but important part of the timeline

10  that was gone over this morning by Ms. Green and also by

11  Mr. Bennett.  First, I think I want to say at the outset that

12  the public safety unions have never in these proceedings

13  disputed that the city was in severe financial distress

14  beginning in the time period where I believe both Mr. Bennett

15  and Ms. Green's timelines began.  The public safety unions do

16  not, however, believe that the city can meet its burden of

17  showing that it is eligible for these Chapter 9 proceedings

18  because of the issue of the good faith negotiations, what we

19  believe was a -- as Ms. Ceccotti referred to, a deliberate

20  effort to sort of create a record of impracticality where

21  they set themselves up for failure, and we also believe that

22  the evidence will show, based upon the same set of facts,

23  that the petition was not filed in good faith as required by

24  Section 921(c).

25        While we acknowledge the legal nature of the

1  constitutional questions that this Court must wrestle with,

2  we also believe that the evidence that this Court will hear

3  in this eligibility trial may help inform those decisions by

4  providing the Court with a practical and very real platform

5  in which those questions can be applied.

6       Because the public safety unions will rely on and

7  adopt certain proofs submitted by the other objectors, I'm

8  going to try to avoid repeating what was said this morning,

9  but I do want to briefly address where our proofs will fit in

10  the chronology the Retirement Systems put up this morning.

11  And for ease of the Court's reference -- and I apologize in

12  advance.  This will also have to be marked, and we'll get a

13  paper copy, and I believe --

14       THE COURT:  Okay.

15       MS. PATEK:  -- it'll be Exhibit 720.  Our facts --

16       THE COURT:  And I'll have to ask you to understand

17  that I'm going to be looking at what's there on this little

18  screen here just because it's easier for me.  It's not that

19  I'm not paying attention to you.  I'm looking at it here.

20       MS. PATEK:  That's okay.  That's okay.  The public

21  safety unions' piece of it are in red, and the portions in

22  black are portions from Ms. Green's timeline, and we did that

23  so the Court could see where they fit in.  And we start in

24  December of 2011 and January of 2012, but before we start

25  talking about that time period, I do want to take a moment

1    because I think it's important to this negotiations issue,

2    and I think it's also important to some of the state labor

3    law issues that inform how we ended up in Chapter 9 to take

4    the Court back about 44 years ago.  In the fall of 1969,

5    again, not long after the city had been through some very,

6    very trying times, then Governor Milliken, a Republican

7    governor, signed into law an act found beginning at MCL

8    423.231 that has become -- come to be known as Act 312.  Act

9    312 is, as the Court may be aware, the platform on which

10   public safety unions negotiate their labor agreements under

11   the auspices of the Michigan Employment Relations Commission.

12   Before the emergency manager, terms and conditions of

13   employment were negotiated pursuant to this process.  That

14   process, which will be described by one of our witnesses, the

15   Detroit Police Command Officers' labor attorney, Mary Ellen

16   Gurewitz, is designed to provide for a period of mediation

17   followed by, if the mediation fails, compulsory arbitration,

18   including the opportunity to send the parties back to

19   mediation, and it's designed to be expeditious and to keep

20   labor peace and, if might say, might be a tool that if it

21   could be applied to everybody in this proceedings, some of

22   the mediators working so hard to try to resolve our

23   differences might find useful.  Ms. Gurewitz will explain

24   much better than I can the mechanics of the Act 312 process

25   and also her experience in negotiating with the city and the

1    DPCOA in the relevant time period.

2           We start with 2011 and two thousand -- December 2011

3    and January of 2012, and I believe that was also on

4    Mr. Bennett's initial timeline.  Interestingly, at that time,

5    there were negotiations between the city, recognizing the

6    financial difficulties that were present, and each of the

7    Detroit public safety unions of concessionary agreements or

8    tentative agreements.  These agreements were never adopted,

9    but our purpose in offering them is to show that where

10   there's a will, it could be done.  Our intention is not to

11   suggest in this setting that such negotiations would be easy,

12   and that's precisely taking up on Ms. Ceccotti's point why

13   that 30-day period that the city gave itself was doomed to

14   fail.

15          During the same time period as the various acts were

16   being repealed and reenacted and shortly after the governor

17   signed PA 436 into effect, Mark Diaz, the president of the

18   Detroit Police Officers Association, will tell the Court that

19   pursuant to Act 312 proceeding, there was an award that

20   became the contract for the Police Officers Association

21   through June of 2014.  This is important because, as I'm

22   going to talk about continuing along this timeline to the

23   period after the appointment of the emergency manager, which

24   takes us to our second slide, there were acts that the city

25   took to specifically remove this tool from the tool kit of

1    the city and its labor unions, and I'm not suggesting that

2    that removal was not perhaps authorized, although the unions

3    dispute that as a matter of labor law under Public Act 436,

4    but I think that it's important to suggest that in light of

5    the concept that there was a plan and design going back a

6    long way, it was no accident that, you know, the city filed

7    an emergency motion on April 18th of 2013, and on June 14th,

8    2013, the very same day it rolled out its proposal, it

9    obtained an opinion from MERC blocking the Police Lieutenants

10   & Sergeants Association, the Police Command Officers

11   Association, and the fire fighters from resorting to Act 312

12   arbitration finding that Public Act 436 had divested MERC of

13   jurisdiction to address those disputes.  And that becomes

14   important because if you consider that there's a plan on June

15   30th, 2013, the collective bargaining agreements between the

16   city, the DFFA, and the DPLSA all expired just two and a half

17   weeks before the Chapter 9 petition was filed.

18          The president of the Fire Fighters Association, Dan

19   McNamara, the president of the Lieutenants & Sergeants, Mark

20   Young, and the president of the DPOA, Mr. Diaz, as previously

21   referred to, will each tell the Court that very quickly after

22   the emergency manager's appointment on March 28th, they were

23   each informed by the city that it was exercising its right

24   under Public Act 436 not to bargain.  I know we've heard

25   through some of the testimony that that was done to somehow

1    not waive their rights not to bargain, but the Court will
2    have to consider whether it accepts that as a credible
3    explanation for what happened next.

4            Following the June 14th presentation, again, as
5    Ms. Ceccotti referred to, things moved very quickly.  There
6    was a presentation by the city the week of July 10th, and on
7    July 12th -- and it was up on the screen earlier today in Ms.
8    Green's presentation, and I believe it is in the record as
9    Exhibit -- give you the right number here -- I'm not seeing
10   it, but it's a letter from each of the presidents of each of
11   the Detroit public safety unions addressed to Jones Day
12   indicating in response that they were, in fact, interested in
13   making a counter-proposal.  They were seeking more
14   information and a concrete proposal from the city in that
15   regard.  Four days later, on June -- or July 16th, the
16   governor -- or I'm sorry -- Mr. Orr sent his letter to the
17   governor seeking authorization.  The following day Jones Day
18   sent correspondence back to the four public safety unions
19   thanking them on behalf of the emergency manager for their
20   strong cooperation in the City of Detroit's pension
21   restructuring efforts.  The next day the petition was filed.

22           Your Honor, we believe that when the Court has heard
23   all the evidence, that it will be difficult for the Court not
24   to conclude that in this case that there was, in fact, a
25   calculated effort by the city going back over an extended

1  period of time to use Chapter 9 to both, in Mr. Orr's words,

2  trump that constitutional provision but also, as suggested in

3  some of the arguments last week, to obtain the political

4  cover that would be provided by this Court to do so.  That's

5  all I have to say.

6           THE COURT:  Thank you.

7           MS. PATEK:  Thank you very much.

8                    OPENING STATEMENT

9           MR. MORRIS:  Good afternoon, your Honor.  Thomas

10 Morris of Silverman & Morris on behalf of the Retiree

11 Association parties.  Your Honor, the Court heard a

12 comprehensive opening statement from the Retirement Systems

13 and opening statements from other opponents of the city's

14 eligibility.  Those statements chronicle the voluminous

15 evidence weighing against eligibility.  In our pretrial

16 brief, we focused on the evidence which we will offer through

17 Shirley Lightsey, president of the DRCEA -- that's the

18 Detroit Retired City Employees Association -- and Donald

19 Taylor, the president of the RDPFFA.  That's the Retired

20 Detroit Police & Fire Fighters Association.  My opening

21 statement will, likewise, address that evidence.

22           Mr. Taylor and Ms. Lightsey will testify that their

23 associations have a long and active history.  They're not

24 organizations which came into being just to respond to the

25 present situation, but they are and were prepared to deal

1    with it.  The police and fire fighters have had a retiree

2    association since 1946.  The DRCEA was formed in 1960.  The

3    elected leadership of these associations includes persons

4    who, had they been working for the city, would be the ones

5    responsible for helping resolve the city's problems.  Members

6    and management of the associations include a past chief of

7    police, a deputy chief, city budget director, personnel

8    managers, a Retirement Systems trustee, and city financial

9    and legal staff.  These are people who were leaders during

10   their active service for the city, and they continue to be

11   leaders for the retirees.

12          More than 12,000 retired nonuniform city employees

13   are members of the DRCEA, and more than 8,000 retired Detroit

14   police officers and fire fighters are members of their

15   organization.  Both of these organizations serve city

16   retirees in a number of ways, but they have particular

17   expertise in the pension and benefits areas.  Although the

18   associations do not have the power of a governmental body to

19   enter into agreements that bind their members, the elected

20   leadership is responsible to the membership and responsive to

21   the membership.  They communicate with the retirees.  The

22   associations go beyond service to their members.  Together

23   they represent the class of retired Detroit employees, all

24   Detroit retirees, not just the members who send in their

25   dues.  The associations have appeared before City Council.

1   They have lobbied the state legislature.  They have been

2   party to the lawsuits involving pension and benefit issues.

3   The evidence will show that the associations are the natural

4   representatives of the retirees capable of negotiating on

5   their behalf.

6        Upon the emergency manager's appointment, each of

7   the associations contacted the emergency manager in writing,

8   sent him a letter.  Mr. Orr did not respond to the letters,

9   but he did invite the association -- associations to

10  informational sessions which they conducted, the city

11  conducted, in April, June, and July.  Both Ms. Lightsey and

12  Mr. Taylor attended those meetings.

13       The evidence will show that the city in its meetings

14  never got beyond the first step of presenting information.

15  The city never offered to meet with the retirees to discuss

16  the city's proposal or to negotiate.  The retiree

17  representatives were relegated to being members of the large

18  audience.  The associations had their attorney contact the

19  city's attorneys, Jones Day, to request the opportunity to

20  specifically address retiree issues, but nothing came of

21  that.  Instead, on July 18, in a tactical rush, the city

22  filed its petition.

23       The evidence will show that negotiations with the

24  retirees was possible.  The membership of the associations is

25  more than a majority of the retirees.  Overall it's

1 considerably more than two-thirds.  By working with the

2 membership, the city had the opportunity to make an agreement

3 with a majority of the retirees and thereby satisfy Section

4 109(c)(5)(A) either by not impairing the class or by reaching

5 an agreement.

6 The evidence will show that negotiation was not

7 impracticable, certainly not with the retirees who, prior to

8 the appointment of the emergency manager, had already elected

9 their leaders.  The retirees had built and maintained through

10 the work of generations of dedicated volunteers organizations

11 which were prepared to work on behalf of the retirees for the

12 best outcome of Detroit -- for Detroit.  The evidence will

13 show that the emergency manager and his advisors rejected the

14 opportunity to attempt to resolve matters as to the retirees.

15 The city, therefore, does not satisfy the eligibility

16 requirements of Section 109(c)(5).  Thank you.

17 THE COURT:  Thank you.

18 OPENING STATEMENT

19 MS. LEVINE:  Good afternoon, your Honor.  Sharon

20 Levine, Lowenstein Sandler, for AFSCME.  Very briefly and not

21 to be repetitive, with regard to solvency, the city addressed

22 AFSCME's brief with regard to our request that there should

23 actually be expert testimony in order to meet the burden of

24 proof with regard to this issue, and the city's response is

25 basically what we've seen in some smaller debtor cases, which

 1   is the debtor can testify to its own numbers.  And we're not
 2   necessarily disputing that line of cases.  What we're saying
 3   here, Judge, is that this is not the debtor that's testifying
 4   to its own numbers.  We don't have anybody from the budget
 5   department.  We don't have any of the elected officials.
 6   What we have are hired experts who are being offered as fact
 7   witnesses, so we're bringing in experts like Ernst & Young,
 8   Conway MacKenzie, Miller Buckfire, being paid millions of
 9   dollars, who routinely appear as expert witnesses and, for
10   reasons that we submit are not appropriate here, are just
11   simply being offered without having to give their expert
12   testimony with regard to solvency.
13           With regard to impracticality and the issue of good
14   faith, we would respectfully submit that the argument that
15   there are simply too many classes of bondholders doesn't make
16   a lot of sense.  The June 14 date that the proposal was
17   presented and the filing date of July 18th was only one month
18   and three days.  Even if we went by the city's own originally
19   projected timeline, the filing date was projected to be July
20   19th.  That's only one month and four days.  It takes more
21   months than that to negotiate out-of-court workouts in simple
22   small single level of debt Chapter 11 cases.  We respectfully
23   submit that the timeline that the city set for itself was a
24   timeline that was designed not to allow an out-of-court
25   negotiation to fully take place.

1          The city also looks to the fact that there are too

2    many bondholders and, therefore, it was impractical to

3    negotiate with bondholders, and they cited to a New York

4    case.  The only New York case we were able to find that

5    addressed the issue was the Off-Track Betting case, which

6    dealt with a six-month period before that case, which wasn't

7    even an entire city, said that there wasn't enough -- there

8    wasn't an ability to get it done out of court, and they had

9    run out of time.

10          The other issue there is too many bondholders means

11   that you've met the impracticality standard means that what

12   you're doing is you're writing the need to respond to labor

13   out of the Code.  If you have too many bondholders, it's

14   impractical, and, therefore, you don't even have to go

15   further.  We would respectfully submit that that would be a

16   sad day for Detroit if we're actually writing the need to

17   negotiate with labor out of the Code.

18          The June 14 meeting is the meeting where the

19   proposal was presented.  We've heard the city say that at

20   that meeting, they invited questions.  Okay.  So we have a

21   meeting that lasts a couple of hours.  We have a proposal

22   that's in excess of 110 pages.  The amount of time it takes

23   to even read the slides takes up the lion's share of that

24   meeting, and in addition to that, the questions which were

25   permitted were in a very controlled environment and under the

1   guise that the city was, quote, unquote, begging for
2   feedback.  All right.  The city announced at that meeting
3   that these are not negotiations.  Now, whether that
4   announcement was made to preserve a technical reservation of
5   rights under PA 436, they invited a room full of labor
6   negotiators, and they held a meeting that was basically a
7   classroom type instruction meeting, and then they announced
8   after a brief Q&A period these are not negotiations.  And
9   somehow or other this room full of labor negotiators was
10  supposed to understand that, well, while they're not
11  technically legally negotiations per PA 436, we really are
12  asking for negotiations to meet the good faith requirement
13  under the Bankruptcy Code.  That's not a -- that's not a
14  realistic or fair interpretation of the facts here coupled
15  with the fact that we have sophisticated bankruptcy counsel
16  and all of these sophisticated outside consultants who
17  apparently, when receiving a letter from these same labor
18  negotiators that assert in response to the June 14 proposal,
19  well, we have factual and legal reasons why we think we can't
20  negotiate with you, that causes them to immediately think
21  negotiations are impossible.  That's not an -- that's not a
22  fair reaction either.  I've never walked into a labor
23  negotiation where the company said to the union, "Here's your
24  1113 proposal.  What do you think?" and the union has said,
25  "Oh, good idea."  It takes a little bit more than that, your

1   Honor.  In addition to that --

2          THE COURT:  Well, you raise an interesting point

3   here that has been on my mind, and that is the extent to

4   which the standard of good faith negotiation in 1113 is

5   related to or overlaps with the standard of good faith

6   negotiation in Section 109 or even, for that matter, the

7   extent to which it overlaps with whatever the law of good

8   faith negotiation is in labor law outside of bankruptcy.  I

9   think it would help me if anyone would be interested in

10  briefing that subject.  I'm not surprised.  And there are

11  really two distinct questions there.  The one is is there

12  this overlap, should there be this overlap, and, second, how

13  might the law in those other circumstances, 1113 and labor

14  law more generally, help to resolve the issue here of whether

15  there was good faith negotiation.

16         MS. CECCOTTI:  Your Honor, may we join with that

17  effort as well?

18         THE COURT:  Yes.  The invitation is an open

19  invitation.

20         MS. LEVINE:  Thank you, your Honor.  We accept the

21  invitation, and if your Honor sets a deadline by which you'd

22  like that brief, we will --

23         THE COURT:  Oh, a deadline.  I don't know.  What's

24  convenient for you all?

25         MS. CECCOTTI:  After the 30th.

1          MS. LEVINE:  Busy this week.

2          THE COURT:  Got that.

3          MS. LEVINE:  Two weeks?  Is that sufficient, or is

4     that too long?

5          THE COURT:  Two weeks is fine with me.

6          MS. LEVINE:  Thank you, your Honor.

7          THE COURT:  All right.  Two weeks from today then.

8     I'll enter an order just so the record has it there.

9          MS. LEVINE:  Your Honor, but moving past that, okay,

10    so we have the -- we have the city saying that these are not

11    negotiations and labor negotiators are supposed to glean that

12    they are negotiations, and then we have labor negotiators

13    taking a hard line at the initial proposal and the city

14    accepting that then there can't be any negotiation and

15    somehow or other this proves that the city acted in good

16    faith or that the negotiations were impractical.  We

17    respectfully submit that's false.  And not only is it false,

18    but for the reasons that you've heard from some of the other

19    folks already, we, too, sent requests to the city for

20    additional information to understand what the ask was, what

21    the savings -- what the proposed savings were, and for better

22    information to understand, while it was a long slideshow, a

23    little bit more about what the assumptions behind the

24    proposal or the alleged proposal were so that we could, in

25    fact, like in an 1113 context, truly engage in a meaningful

 1   negotiation.  And AFSCME itself, your Honor, just a mere 18

 2   months prior to the bankruptcy filing, on behalf of itself

 3   and with a coalition of 30 unions, did agree to a tentative

 4   agreement which resulted in substantial savings for active

 5   and retirees' benefits, and those were ratified by all of

 6   those respective unions but not implemented by the city.  So

 7   I'd respectfully submit that not only was there an ability to

 8   negotiate in good faith over a period of just a couple of

 9   months, but there's a proven track record that on this side

10   of the table, we have been able to actually do those

11   negotiations and accomplish results, so if --

12           THE COURT:  Why not implemented?

13           MS. LEVINE:  You'd have to ask the city and the

14   state, your Honor.

15           THE COURT:  Okay.

16           MS. LEVINE:  It does remain a mystery to us because

17   it also included, for example, changes to the pension

18   benefits on a go-forward basis, and to the extent that there

19   are other or different issues that they needed to address

20   now, those, too, should have been addressed through

21   negotiations.  What we seem to be hearing and what is also a

22   very important point for the City of Detroit and for Chapter

23   9 on a go-forward basis is that if you have legacy

24   liabilities and you have to deal with retiree benefits, then

25   you automatically get to say it's impractical, and I don't

1    have to show good faith at all. And we would respectfully

2    submit that that would be a very sad place for the City of

3    Detroit to take Chapter 9 and all cases on a go-forward

4    basis.

5          We respectfully submit, your Honor, that the city

6    can't meet its burden of proof and that it's not eligible in

7    this case at this time to be a Chapter 9 debtor. Thank you.

8          THE COURT: Thank you.

9               OPENING STATEMENT

10          MR. ULLMAN: Good afternoon, your Honor. Anthony

11    Ullman from Dentons. I'll be speaking for the Retiree

12    Committee. But first Ms. Patek asked me to tell you that

13    Exhibit 704 was the number of the joint public union --

14    safety union's letter that she couldn't find previously --

15          THE COURT: Okay.

16          MR. ULLMAN: -- so I've done that. Your Honor, of

17    course, we're here today on what the Court has identified as

18    factual issues which arise in the context of eligibility,

19    which the city has the burden of proof on. And you've heard

20    an overview of a lot of the evidence that the objectors

21    expect to bring to the hearing, much of it in chronological

22    order. And what I'm going to try to do is put that in the

23    framework of the legal issues that relate to eligibility and

24    try to explain how the evidence that we expect to come out at

25    the hearing fits in with those legal issues. I'm going to be

1   focusing, of course, on the issues that the Retiree Committee

2   is advancing, which I think are common to most, if not all,

3   of the objectors.

4           Now, it's the committee -- it's the committee's

5   contention and the contention of the objectors in general

6   that the city has failed to meet its burden of proof on a

7   number of specific elements that it has to meet to be

8   eligible for Chapter 9 and that it also has failed to meet

9   its burden of showing that its filing has been made in good

10  faith, and so what I'd like to do is kind of go through those

11  elements serially and put into context our view of how the

12  evidence falls into that and how the evidence should shape

13  your view of the law and application of the law, and

14  basically our points are as follows.

15          The committee itself, of course, doesn't contest

16  that Detroit is a municipality, and the committee is not

17  contesting insolvency, although AFSCME, of course, is, but we

18  do contest that other necessary elements have been met.  I

19  mean specifically it's our contention that the city can't

20  show that the emergency manager, first of all, was

21  specifically authorized to make this Chapter 9 filing.  We

22  also contend that the city has failed to meet the eligibility

23  criteria that are set out in 109(c)(5), and there are, of

24  course, two prongs of that.  We say the city has not shown

25  that it negotiated in good faith, which was required under

1    Subprong (c)(5)(B).  And we say the city can't show that the

2    good faith negotiations were impracticable, which is a prong

3    under Sub (c)(5)(C), and, finally, the committee says that

4    the city cannot show that it filed its petition in good

5    faith, which is required under 921(c).

6           So taking that from the top, this is, first of all,

7    what Section 109(c)(2) requires, and it requires specifically

8    that the city be specifically authorized or the person acting

9    for the city be specifically authorized to be a debtor under

10   state law, and we don't think the city can show this as a

11   factual matter because in filing the Chapter 9 petition, the

12   emergency manager did so with the specific intent of taking

13   actions and achieving results that are prohibited by the

14   Michigan state Constitution, namely the pension clause,

15   Article IX, Section 24.  And we believe that that renders the

16   filing ultra vires, ineffective, and void, and this point

17   also obviously ties in with the view that in filing the

18   Chapter 9 petition, the emergency manager didn't act in good

19   faith under Section 921(c), so what I'm going to do is review

20   the evidence on the intent in filing, particularly relative

21   to the pension clause, for both purposes of the specific

22   authorization and good faith under 921(c) together.

23          Now, as the Court may recall, there's also another

24   aspect that we've raised with respect to Section 921(c) and

25   good faith, and that is what we contend are the misleading

1   statements and omissions that were made in connection with
2   the Chapter 9 filing, and I'll deal with those later in the
3   presentation.

4        So turning now to the emergency manager's intentions
5   as regards the pension clause, we think that the evidence is
6   very clear, and I'll summarize some of the key points.  First
7   of all, we know that Mr. Orr was made the emergency manager
8   under PA 436, and that, of course, as you've heard, was the
9   replacement law for PA 4, the prior emergency manager law
10  which had given the emergency manager very broad powers and
11  then was repealed by voter referendum, and PA 436 was passed
12  in its place.  And as we know, it was passed with a minor
13  appropriation provision, and we believe that the evidence
14  will show that that was intended to immunize the law from
15  Michigan voter review and, in fact, was a strategy that had
16  been devised and suggested by the Jones Day law firm itself.

17       Now, PA 436 was enacted in November 2002 with an
18  effective date of March 2013, and it was against this
19  background that the emergency manager, Mr. Orr, was selected
20  for his post.  Now, Kevyn Orr we know is a bankruptcy lawyer
21  by trade.  That, of course, in and of itself, doesn't prove
22  anything, but the evidence will show that before becoming the
23  emergency manager, he was a bankruptcy lawyer at Jones Day,
24  and, as I believe the Court has heard, he participated in the
25  pitch that Jones Day made to the city and to the state to get

1   its current assignment as restructuring counsel.

2        Now, we've already seen from Ms. Green's

3   presentation that prior to the pitch that Jones Day made,

4   which was in late January 2013, Mr. Orr was specifically

5   asked about the availability and use of Chapter 9

6   specifically relative to the City of Detroit, and the

7   evidence will show that in connection with that pitch, the

8   Jones Day team was not only focused on Chapter 9 but was also

9   specifically aware of the Michigan state pension clause and

10  had already thought of using Chapter 9 as a means to try to

11  get around it.

12       Now, this is the cover of the Jones Day pitch book,

13  and here's a slide from it which we're blowing up, and what

14  it says specifically is that if needed, Chapter 9 could be

15  used as a means to further cut back or compromise, quote,

16  "accrued financial benefits," close quote, otherwise

17  protected under the Michigan Constitution.  And that

18  quotation, "accrued financial benefits," I believe, are words

19  that are lifted right out of the pension clause itself.  So

20  this is from the pitch book that Jones Day prepared, and, as

21  we've said, Mr. Orr himself was a major player and part of

22  the pitch book -- the Jones Day pitch team.

23       And the evidence further is that from his own review

24  of the circumstances of PA 436 and PA 4, Mr. Orr concluded

25  that the new law, PA 436, in reality, was nothing more than a

1   thin veneer -- those are Mr. Orr's words -- a thin veneer of

2   a revision that's essentially a redo of the prior PA 4 that

3   the voters had rejected and an end-run around the voter

4   rejection.  This is from an e-mail that Mr. Orr wrote, and I

5   believe -- it's a little hard to read because we didn't blow

6   that top part up, but I believe it's January 31 of 2013.  And

7   this is from one of the exhibits that was gone over with

8   Mr. Orr in his deposition.

9         Now, central to the issue of bad faith and

10  authorization is the Michigan Constitution's pension clause.

11  I'll just put a copy of that up on the screen.  And as we

12  see, the same word, the financial -- accrued financial

13  benefits, the same words that appeared in the Jones Day pitch

14  book, are right there in the Constitution.

15        Now, the evidence will show that Mr. Orr was

16  personally aware of the pension clause, and the evidence will

17  also show that when he became the emergency manager, Mr. Orr

18  took an oath requiring him to uphold the pension clause --

19  the state Constitution, of which the pension clause is part.

20  And this is from Mr. Orr's testimony where he acknowledged

21  that, yes, he took the oath of office, and he solemnly swore

22  to support the Constitution of the United States and the

23  Constitution of this state; that is, of the State of

24  Michigan.  But the evidence will show that instead of

25  adhering to the strictures of the pension clause, Mr. Orr

1    decided, contrary to his sworn oath, to engage in a course of

2    action that was deliberately designed to thwart it through

3    the vehicle of a Chapter 9 filing, and what I'm going to go

4    through now are some highlights of what I think the evidence

5    will show, some of which you've seen before, some of which

6    you may not have.

7         Now, the evidence will show that as early as May

8    2013, which was less than two months after he became the

9    emergency manager, Mr. Orr made the decision to cut pension

10   benefits that were owed to -- excuse me -- to retirees, and

11   it will show that he understood that he was unable to

12   identify any viable way to achieve that end just under state

13   law.  And the evidence will show that the emergency manager,

14   therefore, decided to try to accomplish that end through the

15   means of a Chapter 9 filing.  And even more specifically, the

16   evidence will show that the emergency manager decided to try

17   to use Chapter 9, the Chapter 9 filing, as a vehicle

18   specifically to, quote, "trump" the pension clause of the

19   Michigan Constitution.

20        Now, this all came together in the proposal to

21   creditors that the emergency manager made on June 14th of

22   2013, and in his proposal the emergency manager made no

23   pretense that he was intending to protect accrued financial

24   benefits as is required and provided for in the Michigan

25   Constitution.  For example, here's an excerpt from page 109

1   where he specifically says that under this proposal, there
2   must be significant cuts in accrued vested pension amounts
3   for both active and currently retired persons.

4           And under this June 14th proposal, the emergency
5   manager, in fact, said that the city would not make any
6   further pension contributions on account of retirees.  For
7   retirees the defined pension benefits were to be cut entirely
8   from the forecast of the city's expenses going forward as
9   were the retiree healthcare benefits.  And for active
10  employees, they were being shown as switched from a defined
11  benefit plan to a defined contribution plan with the level of
12  the city's funding of the contributions slashed dramatically
13  from the present levels.  Now, for the actives, this is a new
14  plan, and the contributions are being made only on a going-
15  forward basis, so for the active employees' vested pensions
16  under this proposal, no further contributions would be made
17  for those either.

18          Now, the June 14 proposal, although it was very
19  lengthy, well over a hundred pages, didn't mention anywhere
20  in it the prospect or even the potentiality of a Chapter 9
21  filing, but the evidence will show very clearly that the
22  emergency manager understood that his proposal could not be
23  implemented outside of the context of Chapter 9 specifically
24  because of the pension clause and that he, therefore,
25  intended to use Chapter 9 as a vehicle to, again, in his

words, trump that very clause, the Constitution's pension
clause. And he's freely admitted that it's the state
Constitution -- the pension clause and no other provision of
the Michigan Constitution that the emergency manager was
trying to trump. This is an excerpt from his deposition. I
think you may have seen parts of this before, but he says --
he goes on to say that -- he answers, "We don't believe
there's an obligation under the state Constitution to pay
pensions." He says, "Yes, that's right." He says, "No.
I've made that statement many times." And then we go on to
ask him, "And the state law that you were referring to as
being trumped was Article IX, Section 24; isn't that right?"
He says, "Yes. That's right." We asked, "Is there any other
state law that you viewed as relevant to the pension -- to
the pension issue that you were trying to trump?" He says,
"No," there's no other state law that he's trying to trump.
It's specific, the pension clause. This Chapter 9 filing was
done specifically to try to get around the pension clause of
the Constitution, and there's no other way to read the
evidence on that. And these admissions also confirm the
city's recognition that the pension clause, in fact, applies
directly to what the city is trying to do through this
Chapter 9 proceeding and that the pension clause is in direct
conflict with what the emergency manager is trying to do here
as regards pensions. There's no question about it. They are

1    trying to do something that they acknowledge is in conflict

2    with the pension clause.  If that weren't the case, there'd

3    be no context in which the federal law could trump anything.

4    There would be nothing to trump.  There's a direct --

5           THE COURT:  I don't mean to cut you off, but haven't

6    we been through this?

7           MR. ULLMAN:  To some extent, your Honor, and I'm

8    trying not to repeat exactly --

9           THE COURT:  Any extent to which we haven't?

10          MR. ULLMAN:  Yes, I believe there is, your Honor.

11   I'm trying to -- I'm trying to bring additional evidence to

12   make the -- largely the same points but in a more summary

13   fashion and then move on to the eligibility issues.

14          Now, the emergency manager did all this in

15   circumstances where he himself has admitted that he was not

16   aware of any court decision that allowed the use of a federal

17   bankruptcy proceeding to trump a provision of the state law

18   Constitution.  And the emergency manager did this in

19   circumstances where the Jones Day law firm itself had

20   previously advised that the emergency manager's ability to

21   cut pensions through Chapter 9 was, at best, uncertain.  That

22   comes from the Jones Day pitch book itself.  They said it was

23   uncertain.  And he did this in circumstances where the

24   emergency manager had been advised by the state attorney

25   general that the pensions were protected under Michigan state

1  law and that what the emergency manager was doing in terms of

2  trying to cut them was contrary to the Michigan Constitution.

3         And, finally, on this point, we think that the

4  timing of the filing itself is very significant.  You've seen

5  already that there were -- there was state court litigation

6  that was pending, and you've heard that there was a TRO

7  hearing that was scheduled and that the hearing on the TRO

8  was scheduled to take place on the 18th.  And what the

9  evidence shows -- I'm sorry.  Yeah.  It was on the 18th, and

10  the evidence shows, as you've seen already, that the

11  bankruptcy filing had been originally scheduled for the 19th

12  and then had been moved up to go -- to coincide on the 18th

13  immediately prior to when the TRO hearing was supposed to

14  take place, and the evidence on that is as follows, and I'll

15  just skip to this particular slide.

16         Mr. Orr was asked specifically about the timing of

17  the filing of the bankruptcy petition and, in particular,

18  about the timing relative to the TRO proceeding, he was

19  asked, "Is there a particular reason why the filing was made

20  when it was, at the time it was, other than to try to get a

21  jump on the state court decision?"  And the emergency manager

22  answered that, to the best of his knowledge, there was no

23  such reason.

24         So to sum up on all this, we think that it boils

25  down to the simple proposition that a state actor who takes

1  actions that are intentionally designed to achieve results
2  that are in plain violation and in direct odds with the state
3  Constitution is not acting within the scope of his authority
4  and is not acting in good faith, and we believe the evidence
5  will show that that's the situation here.

6        I'm going to turn now to the issues of eligibility,
7  and there are -- as we've said, there are two prongs here.
8  The city can prove by -- the good faith negotiation or the
9  impracticability issue either by showing that it engaged in
10  good faith negotiations or by showing that those were
11  impracticable.

12       Now, on the good faith negotiation prong, we believe
13  the evidence is going to show two things.  First of all, the
14  emergency manager has argued that the presentations and
15  discussions that followed his June 14th proposal to creditors
16  constituted attempts at good faith negotiations.  However,
17  the evidence will show that at the time of the presentations
18  and meetings, the emergency manager did not have what he
19  believed was a plan of adjustment and specifically that the
20  emergency manager himself viewed the June 14th proposal only
21  as a proposal and not as a plan of adjustment.  Now, we've
22  heard this morning from Mr. Bennett that the city is
23  apparently trying to backtrack on this now, but when Mr. Orr
24  was questioned at his deposition, he not only acknowledged
25  but was adamant that what he presented on June 14th, which

1  was the subject of the following discussions and meetings,

2  was not a plan but merely a proposal that he had put out to

3  seek the general creditor feedback.  He said this very

4  specifically.  "We never called this a plan.  We never called

5  it a deal.  We always called it a proposal."  So it was never

6  considered -- whatever the city is saying now, at the time

7  that the proposal was made, which, of course, was well before

8  we filed our pretrial brief, which is at the same period when

9  Mr. Orr testified prior to the filing of our pre-trial brief,

10  Mr. Orr was quite clear that what they put on the table on

11  June 14th was not a plan of adjustment, was not intended as a

12  plan of adjustment.  It was just intended as a proposal,

13  something to be discussed.  And we believe this is important

14  because under the clear -- what we believe is the clear

15  weight of the law, in order for the negotiations that are

16  referred to in Subpart (c)(5)(B) --

17          THE COURT:  One second.  I have been asked to ask

18  you to move back from the mike just a bit.

19          MR. ULLMAN:  Okay.  Is that better?

20          THE COURT:  Maybe a little bit more.

21          MR. ULLMAN:  Little bit more?

22          THE COURT:  There you go.

23          MR. ULLMAN:  Okay.  The reason this is important is

24  because under Subpart 109(c)(5)(B), the negotiations that are

25  referred to in that subpart have to be negotiations over what

1　is a plan of adjustment as that term is used in the

2　Bankruptcy Code.  The legal analysis on that, the authorities

3　we cite are all in our brief, and I'm not going to repeat

4　that here, but the point is that for the good faith

5　negotiation prong to be met, the negotiations that have to

6　be -- at issue have to take place over a plan of adjustment,

7　and the evidence shows that per the emergency manager's own

8　testimony in this case, no plan of adjustment was ever

9　presented to the creditors, and so a fortiori the

10　negotiations required under Subprong (c)(5)(B) never took

11　place.

12　　　　　And so there's no confusion on this, I want to be

13　clear that the question of whether the city presented the

14　creditors with a plan of adjustment is a very different

15　question from whether the city intended to impair or diminish

16　protected pension payments.  On the one hand, as I've gone

17　through, the evidence will show that the city never presented

18　creditors with anything that they considered a plan of

19　adjustment, and on the other hand, as I've gone through and

20　Ms. Green has summarized, the evidence will show that the

21　emergency manager did intend to impair the protected pension

22　benefits.  In fact, this latter point is not even subject to

23　question.  The city has actually admitted in an RFA in this

24　proceeding that's binding on it that it, in fact, intends to

25　impair the pension rights as part of this proceeding, and

1  that's from the city's answer to the RFA that was served on
2  it, Number 12, where they admit that the city intends to seek
3  to diminish or impair accrued financial benefits.  That,
4  again, is the term that's used in the pension clause of the
5  Constitution.  So that's what the evidence will show on the
6  existence of a plan of adjustment.
7          Now, we also believe and you've heard before that
8  even if there were a plan of adjustment, even if there had
9  been one presented, there were no good faith negotiations.
10 For example, there was no way to know from the evidence --
11 or, rather, from the information that was provided at the
12 June 14 meeting how in actual monetary terms the individuals
13 that the city sought to affect under the June 14 proposal
14 would be impacted, and specifically in terms of both the
15 proposed pension cuts and the OPEB where the city was saying
16 that the retirees would instead get some share of notes,
17 there was no way for the retirees to know what the cash value
18 was of what the city was proposing.  And, in fact, the
19 evidence will show that for -- at least for retirees at the
20 time of the discussions over the June 14 proposal, the time
21 those discussions were proceeding, the city itself did not
22 even know what the real size of the unfunded pension
23 liability was.  In other words, there was no way to know what
24 the parties were even negotiating over.  And here's some of
25 the evidence quickly on the negotiations.  First of all, the

1    emergency manager has admitted -- this is a question asked as

2    regards to the June 14 meeting.  We asked him, "Were there

3    negotiations there?"  His answer, "No.  There were not

4    negotiations.  I'm going to be careful how I use the word,

5    but no.  As we generally use the word, there were none."

6            There were other meetings that then took place.  The

7    next meeting, as I recall, took place on June 20, and this is

8    from a letter that Jones Day wrote, and it called them

9    informational meetings and acknowledged that actives and

10   retired employees will need access to additional information

11   to analyze the proposals that are being -- that are proposed

12   in the June 14th document.  And here's another letter from

13   Jones Day.  This is dated, I believe, July 17th, and what it

14   says is, "We think it first makes sense to try to reach

15   common ground with the unions and associations on actuarial

16   assumptions and methods and the amount of the underfunding."

17   First we got to figure out what the amount of the

18   underfunding is and then tackle the contributions and

19   attendant benefit changes.  You have to know what the size of

20   the underfunding is before discussions can even take place,

21   so, again, there wasn't even anything concrete to negotiate

22   over.

23            And, finally, on this point, we believe the evidence

24   will show the city never really intended to engage in good

25   faith negotiations.  I'm going to put this document up

1   briefly.  I think we've gone through this before.  This is a

2   document from Bill Nowling of the emergency manager's office,

3   and what he's basically saying -- this is as of July 8th --

4   that they've already concluded what their key filing messages

5   would be.  July 8th they're saying it's impracticable.  This

6   is before the meetings that took -- that were scheduled for

7   July 10th and 11 even took place.  So what we can see is that

8   even as the city was telling the world that it wanted to have

9   more meetings, it had already internally and secretly decided

10  that it would claim impracticability.  So the meetings that

11  were followed were really nothing more than an effort to

12  create a record that would allow the city to claim good faith

13  negotiations when, in truth, there were no real negotiations

14  and the city wasn't negotiating, we believe, in good faith.

15          With respect to the impracticability prong, we

16  believe the situation is similar.  At the outset, as we've

17  explained in our pretrial brief, the committee believes that

18  the requirement that there be a plan of adjustment applies

19  equally to the impracticability test, and this only makes

20  sense because without an actual plan identifying who the city

21  intends to impair and how, there's no way to assess whether

22  negotiations would be practicable.  And specifically, as

23  we've said, the only document that was on the table was the

24  June 14 proposal, and that was a proposal, not a plan.

25          And further, as we've set out, we believe and the

1  law is that to show impracticability, the city has to show

2  impracticability with respect to each class of creditors.  It

3  has to try to negotiate with those with whom negotiations are

4  possible, and, as you've heard, the evidence will show that

5  we believe there were certainly a number of classes of

6  creditors with whom that was possible.  And as we saw from

7  the last slide, the evidence indicates that the city really

8  never intended to try to negotiate but really just tried to

9  use impracticability as a tool to get out of it.  So from a

10  factual viewpoint, we believe the impracticability prong will

11  not be met either.

12        Now, finally, I want to talk briefly about Section

13  921(c), which is the good faith requirement.  I've already

14  addressed one aspect of the good faith, the emergency

15  manager's pursuit of a course of action that's contrary to

16  the pension clause of the Constitution, but there's also

17  another aspect to it, and that is this, that we believe that

18  in connection with his filing of the petition, the emergency

19  manager made a number of misrepresentation -- or of

20  representations that we believe the evidence will show were

21  at minimum misleading and incomplete, and I'll give you some

22  examples.

23        First of all, in his declaration -- this is the

24  declaration that the emergency manager filed with the

25  petition -- he stated that the city has over 18 billion in

accrued liabilities and including specifically over 6.4
billion in bonds that are backed by enterprise revenues or
otherwise secured. Now, that, of course, sounds like a huge
liability for the struggling City of Detroit to bear, but the
evidence will show that what's not stated in this is that the
vast majority of these bonds that we see referred to here,
the 6.4 billion, are bonds that are issued by the Detroit
Water and Sewerage Department, which is operated as a
separate authority and is fully responsible for the payment
of those bonds. And the evidence will show that the
Department of Water and Sewers itself has the financial
wherewithal to make those payments. We put this question to
the emergency manager in his deposition. He said, yes, the
Department of Water and Sewers, it generates its own
revenues, and it pays its debts as they come due. So right
off the bat, the total liabilities that, according to the
emergency manager, he has to struggle to meet are effectively
reduced by at least a third.

Now, also in his declaration the emergency manager
stated that in terms of the unfunded pension liability, that
the unfunded pension liability is $3.5 billion, and this is
stated here as a fact, not subject to qualification, and as
we all know, the unfunded pension liability -- how big it is
and what, if anything, will be done about it, those are
central issues that will have to be addressed if this action

1  proceeds, but for present purposes, the evidence will show
2  that this $3.5 billion number that Mr. Orr stated in his
3  declaration is not a fact.  We think the evidence will show
4  that the fact is that at the time the petition was filed, the
5  city did not know the actual size of the unfunded pension
6  liability as its analysis on that was ongoing and hadn't been
7  completed and, indeed, still hasn't been completed today.
8  And this, for example, is from the deposition testimony of
9  Charles Moore, who is the city's -- from Conway MacKenzie,
10  which is the city's operational restructuring advisor.  Mr.
11  Moore also put in a declaration addressing unfunded pension
12  liabilities, and at his deposition Mr. Moore candidly
13  admitted that, in fact, the city didn't know what the actual
14  amount of the unfunded liability was and that work was going
15  on to try to make that determination.  He says specifically,
16  most importantly, the city's actuary has not completed its
17  analysis on the unfunded position, and until that work is
18  done, no one really knows what the unfunded liability is.
19  And, indeed, we believe the evidence will show that the last
20  full actuarial evaluation of the unfunded liability was done
21  around June of 2011, and the unfunded amount that was shown
22  in that evaluation was about 643, 644 million.  And the
23  evidence is also going to show that of that total amount, the
24  644 or so, only about 250 million is allocable to the general
25  fund, which is the fund that the city is most concerned

1    about, which it pays most of its bills.  That is not a charge

2    on the general fund.  The evidence will show that a very

3    large chunk of that is, in fact, allocable to other

4    departments such as the Department of Water and Sewerage,

5    which, again, is responsible for that and pays its own bills.

6           Now, during the -- Mr. Bennett's arguments, he

7    suggested that we had somehow misstated what Mr. Orr said at

8    his deposition, failed to cite all the appropriate parts.

9    That's not accurate.  At his deposition Mr. Orr was put

10   through the numbers, and there was an initial error.  He then

11   corrected that arithmetic error.  At the end of the

12   deposition, Mr. Orr said that it appeared to his knowledge at

13   that time the portion of the unfunded pension liability that

14   was allocable to the Department of Water and Sewerage was

15   about 68 percent.  Mr. Bennett is suggesting that maybe 68

16   percent isn't the right number, and the right number should

17   be 38 percent.  Be that as it may, 38 percent is still in

18   this context a huge chunk of the unfunded pension liability,

19   which is something that's borne by Department of Water and

20   Sewerage and payable from those funds without any strain on

21   the general fund.  And the evidence will show that the

22   emergency manager has acknowledged that even if the unfunded

23   pension liability were ultimately found to be greater than

24   the $644 million number, even if it were found to be --

25   excuse me -- as high as the $3.5 billion number that you've

1   heard, that same principle would hold true, that there's a

2   significant portion of it that is not allocable to the

3   general fund but is borne entirely and payable by and fully

4   funded by the Department of Water and Sewers.  And as I said,

5   the evidence will show that that department is solvent and

6   capable of meeting its obligations, and, indeed, the Water

7   and Sewerage pension payments even have priority over secured

8   claims in that they're included in net operating expenses.

9        So we believe the evidence will show that the amount

10  of the underfunding on the pension liability is not nearly as

11  severe as -- still substantial -- we're not denying that, but

12  not nearly as severe as was portrayed in the emergency

13  manager's declaration.

14       And finally, related to all this, the evidence will

15  show that the city does, we believe, have substantial assets

16  that can be monetized.  Chiefly but not alone among them is

17  the art that's owned by the city that's maintained at the

18  Detroit Institute of Arts, and we're talking about art that's

19  owned outright by the city, not art that's subject to any

20  charitable trust.  And the evidence will show that there's

21  that asset, and also the Department of Waters and Sewers is a

22  valuable asset that could be monetized.  The city may well be

23  in a position to obtain substantial cash inflows from these

24  assets and we understand is actively pursuing these

25  opportunities.  Those assets, those cash flows could

1  obviously be used to fund other obligations as well, yet none
2  of that was factored in any way into the Orr declaration even
3  though that could dramatically change the mix of what happens
4  in terms of paying not only pension obligations but other
5  obligations as well.
6          So that, your Honor, is what we believe the evidence
7  will show.  Based on that, we believe the city cannot meet
8  its burdens of proving eligibility or good faith, and we look
9  forward to proceeding.  Thank you, your Honor.
10         THE COURT:  Thank you.
11         MR. ULLMAN:  Oh, and I do -- we will have a bound
12 copy of the slides that I used for you marked.  Thank you.
13         THE COURT:  All right.  Thank you.
14         MS. LEVINE:  Your Honor, I apologize, but I got a
15 flurry of e-mails after I stepped away from the podium saying
16 two weeks, what are you, crazy?
17         THE COURT:  What was your answer to that question?
18         MS. LEVINE:  I have to ask the judge if I'm crazy or
19 not.  I guess --
20         THE COURT:  I take it you're asking for more time.
21         MS. LEVINE:  If we could have another week, your
22 Honor, that would be --
23         THE COURT:  Sure.  Three weeks.  Absolutely.  Okay.
24 So does that conclude your opening statements?  All right.
25 We'll take a recess now until ten after three, and we'll

1  begin with the evidence at that time.

2  THE CLERK:  All rise.  Court is in recess.

3  (Recess at 2:51 p.m. until 3:10 p.m.)

4  THE CLERK:  Court is in session.  Please be seated.

5  THE COURT:  Okay.  It appears everyone is here.  You

6  may proceed.

7  MR. STEWART:  Thank you, your Honor.  Geoffrey

8  Stewart, Jones Day, for the city.  Our first witness will be

9  Gaurav Malhotra, but before we call him, I wanted to put on

10  the record a stipulation that the parties have reached with

11  regard to the sequestration of witnesses.  We've agreed that

12  witnesses should be sequestered with the exception of those

13  who, by definition, are representatives of a party.

14  THE COURT:  That's fine.  I ask counsel, please, to

15  supervise this sequestration because you know who your

16  witnesses are.

17  ATTORNEY:  Thank you, your Honor.  We will.

18  THE COURT:  Okay.

19  MR. STEWART:  May we call Mr. Malhotra to the stand?

20  THE COURT:  Yes, yes, of course.  Step forward,

21  please, sir.  Before you sit down, please raise your right

22  hand.

23  GAURAV MALHOTRA, DEBTOR'S WITNESS, SWORN

24  THE COURT:  Please sit down.  You may proceed, sir.

25  DIRECT EXAMINATION

1  BY MR. STEWART:

2  Q   Good afternoon.  Mr. Malhotra, could you please, for the

3  record, give us your full name and your home address?

4  A   Gaurav Malhotra, and I live in Chicago, Illinois.

5  Q   And are you presently employed?

6  A   Yes.

7  Q   Who are you employed by?

8  A   Ernst & Young.

9  Q   And what is Ernst & Young?

10 A   Ernst & Young is a Big Four accounting firm.

11 Q   And how long have you worked for Ernst & Young?

12 A   For close to four years since I recently joined.

13 Q   In what part of Ernst & Young's practice do you work?

14 A   Restructuring specifically.

15 Q   And just for the record, tell us what that means when you

16 say "restructuring"?

17 A   Our practice predominantly represents corporations and

18 public sector clients in order to assist with business plan

19 assessments, liquidity analyses, as well as developing

20 restructuring proposals.

21 Q   Tell us, if you could, about your college education and

22 any post-graduate education that you had.

23 A   I went to college in New Delhi, India, and I did my MBA

24 in Finance and Business Policy from Case Western, and I'm

25 also a CFA.

1  Q   Certified financial analyst?

2  A   That is correct.

3  Q   After you left Case Western, what was the first job that

4  you had?

5  A   I joined Ernst & Young.

6  Q   And how long were you at EY at that point?

7  A   At EY, I joined in May of 2000, and EY's restructuring

8  practice was, I believe, in 2004, sold to Giuliani Capital

9  Advisors.  I transitioned with that team.  That team was

10 subsequently sold to Macquarie, an Australian investment

11 bank, and I transitioned with that team and came full circle

12 back to EY about four years ago.

13 Q   And what is your title at EY now?

14 A   I'm a principal.

15 Q   And what does that mean?

16 A   It's a non-CPA partner of the firm.

17 Q   So you're an equity partner of EY?

18 A   I am an equity partner of EY.

19 Q   Could you tell us some of the clients you have worked for

20 as part of your work in restructuring?

21 A   I worked for Delta Airlines.  I did work for Detroit

22 Public Schools, doing work for Liberty Medical right now,

23 worked at Collins & Aikman, and those are some of the clients

24 that I've worked with in addition to others.

25 Q   Did there come a time when EY was retained by the City of

1  Detroit to perform work for the city?

2  A   Yes.  We started our work in about the May, June of 2011

3  time frame.

4  Q   So over two years ago?

5  A   That's right.

6  Q   At the time the city approached you or at any time since,

7  was EI -- EY -- sorry -- retained to serve as an expert for

8  the city in any litigation, including Chapter 9 litigation?

9  A   No.  In fact, it's very clear in our letter that we will

10 not serve as an expert.

11 Q   What were you hired to do in May of 2011?

12 A   Generally, it was to get a handle on the city's liquidity

13 position and try and get our arms around in terms of the

14 city's short-term liquidity forecast over the next 12 months

15 or so.

16 Q   And this was back in 2011.  That was what you were asked

17 to do?

18 A   That is correct.

19 Q   Did there come a time earlier this year when the scope of

20 work the city asked of EY was expanded?

21 A   Yes.  In the front end of this calendar year, our role

22 was expanded to look at a ten-year forecast for the city,

23 predominantly on the general fund, and to ascertain what the

24 deficit as well as cash projections would be over a longer

25 time frame versus a shorter time frame.

1  Q   Now, you just used the term "general fund."

2  A   Yes.

3  Q   What is the general fund?

4  A   The general fund is basically where the day-to-day

5  activities for a municipality are recorded. i.e., collection

6  of taxes, payment of operating expenses and administrative

7  expenses as well as debt service that is not related to an

8  enterprise fund.

9  Q   Why is the general fund a logical place to look when

10  you're analyzing the city's financial position?

11  A   Because that's where the tax revenues or the fees are

12  recorded, so the enterprise funds specifically charge their

13  own fees for that specific service, but the general fund is

14  where the core operating deficit of a city is recorded in

15  municipal accounting across the country.

16  Q   Now, you've used the term a couple of times "enterprise

17  funds."  For the record, what are the enterprise funds?  What

18  are examples of the enterprise funds?

19  A   Enterprise funds generally are -- have a specific fees

20  that is charged for the services that are provided by that

21  fund.  It's generally break-even.  For example, the Water and

22  Sewer department is an enterprise fund of the city.  The

23  Detroit Department of Transportation is an enterprise fund of

24  the city, although the Department of Transportation requires

25  a subsidy from general fund, so it's not break-even.

1  Q   Now, in your analysis of the city's financial position

2  and of the general fund, did you take into account the

3  enterprise funds?

4  A   We looked at some of the cash activity of the enterprise

5  funds back in 2011 but focused majority of our efforts on the

6  general fund and those enterprise funds that require a

7  subsidy from the general fund like DDOT, which is the

8  Department of Transportation.

9  Q   Now, in the course of your work, what materials or

10  information from the city did you rely upon?

11  A   We looked at a CAFR.

12  Q   I'm going to stop you right there.

13        MR. STEWART:  Can we put up Exhibit 6?  And I

14  believe, your Honor, the CAFR, which is Exhibit 6, has been

15  stipulated into evidence.

16  BY MR. STEWART:

17  Q   Is this the CAFR?

18  A   Yes.  That's the CAFR for 2012.  It's the Comprehensive

19  Annual Financial Report, which is the city's audited

20  financial statements.

21  Q   Those were audited?

22  A   Yes.

23  Q   By Ernst & Young?

24  A   No.

25  Q   And what does the CAFR tell you?

1  A   It gives you a detailed snapshot of revenues and expenses

2  as well as the deficit position of the general fund as well

3  as some activity of the enterprise funds.

4  Q   Is this a public document?

5  A   Yes, it is.

6  Q   What else did you look at in the course of your work to

7  learn about the details of the finances of the city?

8  A   We looked at the city's budgets.  We looked at internal

9  financial reports that we had access to from the city.

10  Q   What kind of financial reports?

11  A   They were generally department-specific revenues and

12  expenses as we had available.  We also looked at receipts and

13  disbursements activity for different bank accounts to try and

14  get our arms around the financial position of the city.

15  Q   Now, were these materials you looked at records -- the

16  financial records that the city had kept in the ordinary

17  course of its business?

18  A   Yes.

19  Q   And in your experience, is it in the ordinary course of

20  an enterprise or city's business to keep records such as the

21  ones you were looking at?

22  A   Yes.

23  Q   And did the records appear to you to be accurate?

24  A   Generally, yes.  I mean there were always questions about

25  assumptions like specifically on budgets, but we did not find

1   any material discrepancies at least in the information that
2   we were trying to get our arms around specifically like the
3   CAFR.
4   Q   Well, what did you do to check the reliability of the
5   information the city gave you?
6   A   What we did is we looked at the information that was made
7   available.  We spoke to various members of the city's
8   management team, the finance department at the city, various
9   department heads.  We looked at the receipts and
10  disbursements activity as generally cash was a telling
11  barometer in terms of the quality of information we were
12  receiving, so we went through and tried to scrub the data to
13  the best of our ability.
14  Q   You just used the term "we."  I should have asked you
15  earlier how many people from EY worked with you on this
16  project?
17  A   On the front end of this engagement, we had a team of
18  about four or five, and that team is larger now.
19  Q   What deliverables were expected of E&Y as a result of its
20  work?
21  A   It was generally cash flow updates, whether they be short
22  term or medium term, generally going out on a monthly basis,
23  variance reports in terms of how the city was performing in
24  context of those cash flows.  As time progressed, our work
25  expanded to helping develop the long-term projections in

1  conjunction with other members of the city, so we also helped

2  in terms of updating the financial advisory board on a

3  monthly basis in terms of where some of the cash position of

4  the city was.

5  Q   And in terms of organizing and presenting your data, what

6  methods did you use?

7  A   It was generally Excel spreadsheets or PowerPoint

8  presentations.

9  Q   Okay.  And an Excel spreadsheet is what?

10 A   It's a software that allows you to compile, organize, or

11 make calculations in terms of the data that we have

12 available.

13 Q   And the calculations are arithmetical calculations?

14 A   Yes.

15 Q   Now, let me ask you this.  Did there come a time when you

16 learned that an emergency manager had been appointed for the

17 City of Detroit?

18 A   Yes.

19 Q   And do you remember when you learned of it?

20 A   Right around March.

21 Q   And when did you meet Kevyn Orr for the first time?

22 A   The first time I met Kevyn Orr was during the interview

23 process of various law firms where Jones Day was one of the

24 firms that was presenting its credentials to represent the

25 city.

1   Q   And after Mr. Orr was appointed as emergency manager, how

2   often did you meet with him?

3   A   Generally weekly.

4   Q   And has that continued to this day?

5   A   Yes, either meetings or phone conversations.

6   Q   Okay.  Are you aware of something called a 45-day report?

7   A   Yes.

8   Q   What is a 45-day report?

9   A   It's a report that an emergency manager has to present 45

10  days after his or her appointment to provide a snapshot of

11  the financial and operating condition of the city.

12  Q   Now, we put up on the monitor before you Exhibit -- I

13  think it's 75 for identification.  Is that the 45-day report?

14  A   Yes, it is.

15  Q   And you've seen this before?

16  A   I have.

17  Q   And do you understand why it was Mr. Orr was required to

18  submit a 45-day report?

19  A   I believe it's per statute under PA 436.

20  Q   Did you yourself contribute any part of the content of

21  the 45-day report?

22  A   We did.  We helped work on the financial section of the

23  document as well as some short-term liquidity projections

24  that were available as of that point in time.

25  Q   Let me ask if we could go to page 40 of the --

1          MR. STEWART:  And if we blow it up for the monitor,

2     please, Lauren, so we can see it better --

3     BY MR. STEWART:

4     Q    Mr. Malhotra, do you have that before you, page 40 of the

5     report?

6     A    Yes, I do.

7     Q    And what is that?

8     A    That is a snapshot of the monthly receipts and

9     disbursements activity of the general fund and the cash

10    balance available for the general fund along with any

11    deferrals that we were able to identify as of that --

12    Q    And is this a spreadsheet that you or someone at E&Y

13    working at your direction prepared?

14    A    Yes.

15    Q    Without going --

16         MR. SHERWOOD:  Your Honor, I'd just like to

17    interpose an objection at this time.

18         THE COURT:  Would you identify yourself, sir?

19         MR. SHERWOOD:  I'm sorry, your Honor.  I was

20    introduced this morning.  I'm Jack Sherwood from Lowenstein,

21    counsel for AFSCME.  I'm Ms. Levine's partner.

22         THE COURT:  Okay.  Go ahead, sir.

23         MR. SHERWOOD:  I believe that this testimony in

24    terms of forecasts of future performance by the city is

25    improper lay opinion testimony and should be disallowed.  We

1  submit that this testimony is in the nature of financial

2  projections, requires special expertise, training, and so

3  forth and under Federal Rule of Evidence 701(c) should be

4  excluded.  Thank you.

5          MR. STEWART:  Well, your Honor, two responses.

6          THE COURT:  Excuse me one second.

7          MR. STEWART:  Yes.  I'm sorry.

8          THE COURT:  Is it the exhibit you object to or the

9  testimony about it?

10         MR. SHERWOOD:  Both, your Honor.

11         THE COURT:  The exhibit is already in evidence;

12 right?

13         MR. SHERWOOD:  Well, then the testimony about it.  I

14 think it has been stipulated into evidence.  I think this

15 document is in evidence, but I do believe that any testimony

16 about these projections is expert testimony and should be

17 disregarded.

18         THE COURT:  Sir.

19         MR. STEWART:  Well, first of all, I don't believe

20 the witness is going to be asked any opinion about this, and

21 he has testified earlier he has not been hired as an expert.

22 More fundamentally, I think the rule is clear that to the

23 extent a witness, even one who has expertise, is simply

24 performing arithmetic or similar calculations on voluminous

25 data, it is not expert testimony, and I think the leading

1   Sixth Circuit case on that, your Honor, is -- I think it's
2   the Madison case, 226 Federal Appendix 535, which is a 2007
3   case, and it cites at length an Eleventh Circuit case that
4   says that in greater detail and on the different facts, and
5   so that is why I asked the questions I asked a few minutes
6   ago about the source of the data, were they business records,
7   what did he do with them. They went into a spreadsheet.
8   What does a spreadsheet do? And at this stage I'm still
9   trying to explain how he went about compiling his
10  spreadsheets, but counsel is correct. I'm going to ask him
11  at some point what were the results or the calculations. I'm
12  not going to ask him his opinion on what anything ought to
13  be. It is simply going to be, "After you compiled the
14  information, as you testified, what did the number turn out
15  to be?"
16          MR. SHERWOOD: Just briefly, your Honor. Anything
17  that projects future revenues or forecasts is opinion. It's
18  not fact. It's not adding numbers that exist. I understand
19  that a fact witness can testify what our expenses and
20  payments were on a given month or even that are due this
21  month, but this is forecasting into the future in terms of
22  not only expenses but also receipts, things like property
23  taxes, utility taxes, various types of revenues going out
24  through the end of this year, and I think that by definition
25  that requires some type of expertise, specialized training,

1    certainly not something that anyone can do, is properly the

2    subject of expert testimony and shouldn't be allowed.

3           MR. STEWART:  And I think what the Sixth Circuit

4    wrote, your Honor, was that there are many things that

5    require expertise.  For example, it requires expertise to

6    read the records and know what part of the city's records are

7    important.  But where the calculations themself do not

8    require expertise beyond simple mathematics, it's not expert

9    testimony.  They distinguish being an expert and expert

10   testimony.

11          THE COURT:  What was the specific last question that

12   you asked?

13          MR. STEWART:  I believe it was how he went about

14   preparing -- or his staff went about preparing the

15   spreadsheet we see before us on the screen.

16          THE COURT:  I'll permit that question.

17   BY MR. STEWART:

18   Q   You may answer.

19   A   The way we helped pull this spreadsheet together or any

20   of the spreadsheets on the cash flows were we looked at the

21   information that was available in the different budgets.  We

22   were able to look at the different receipts and disbursements

23   on an actual basis in terms of what was actually coming into

24   the city and break that down into the different categories

25   and then, based on the assumptions that we had collectively

1    in conjunction with the city, forecast what the monthly

2    receipts and disbursements could be over this forecast

3    period.

4    Q    And you populated the spreadsheet with those numbers?

5    A    That is correct.

6    Q    And you performed addition and subtraction on them to

7    reach the conclusions that are shown here; is that correct?

8    A    Yes.

9    Q    And now may I ask you just as to this, what did you

10   conclude the short-term cash flow forecast would yield to in

11   terms of the city's available cash as of the end of calendar

12   year 2013?

13           MR. SHERWOOD:  I'd renew the same objection, your

14   Honor.

15           THE COURT:  That objection is sustained.

16           MR. STEWART:  Okay.

17   BY MR. STEWART:

18   Q    Mr. Malhotra, let me also ask you to look at -- actually,

19   I'll come back to that in just one minute.  Okay.  Did there

20   come a time, Mr. Malhotra, that you learned that the

21   emergency manager had scheduled a meeting with creditors of

22   the city for June 14 of this year?

23   A    Yes.

24   Q    And when did you learn of the meeting?

25   A    It was right around, I think, in that June time frame.

1   Q   And did you attend the meeting?

2   A   I did.

3   Q   Where was it held?

4   A   At the Westin at the airport.

5   Q   And how many people attended?

6   A   I would say about a couple of hundred.

7   Q   How long did it last?

8   A   Four, five hours.

9   Q   Did you speak or present anything at the meeting?

10  A   I did.

11  Q   Let me -- and were materials passed out at the June 14

12  meeting?

13  A   Yes.

14  Q   Let me first put up on the screen Exhibit 43.  You see

15  Exhibit 43?

16  A   I do.

17  Q   Is that a document entitled "Proposal for Creditors" that

18  was distributed on June 14?

19  A   It was.

20  Q   And let's put up Exhibit 44.  Is that an executive

21  summary of the proposal that was also distributed that day?

22  A   That is correct.

23  Q   Now, at that meeting -- this is entitled "Proposal for

24  Creditors."

25  A   Yes.

1  Q   That's the title of it.  What's being proposed?

2  A   What the city was proposing was a framework for

3  restructuring of its long-term liabilities showing that the

4  city was going to be unable to meet its obligations as they

5  came due.

6  Q   Now, I think you testified that you prepared certain

7  parts of this document?

8  A   That is correct.

9  Q   Okay.  And let me direct your attention, if I could, to

10  page 8 of the document.

11          MR. STEWART:  Can that be blown up, Lauren?

12  BY MR. STEWART:

13  Q   Is this a spreadsheet that you or others at E&Y prepared?

14  A   Yes, it was.

15  Q   And what does it purport to show?

16  A   The first column on that spreadsheet --

17  Q   Well, first of all, what's the title of the spreadsheet?

18  A   It says "Fiscal Year 2013 Forecasted Cash Flow to Year-

19  End."

20  Q   Now, it uses the term "fiscal year '13."  What is the

21  fiscal year of the City of Detroit?

22  A   July 1 to June 30th.

23  Q   So at the time of this meeting, the fiscal year '13 had

24  about 16 days to go?

25  A   Yes.  June -- the month of June 2013 was still a

1  forecast.

2  Q   So let's -- before we go further, let's look at our

3  spreadsheet here.  How many months of this spreadsheet are

4  actual numbers?

5  A   The first column has 12 months of fiscal year 2012, and

6  subsequent to that 11 of the 12 months are actuals, and

7  there's a month of forecast.

8  Q   And that information you obtained from where?

9  A   It was compiled from the information that was given to us

10 by the city.

11 Q   Okay.  And what I'd like to do because we're going to be

12 dealing with some of these issues later is to go over some of

13 the elements of operating receipts and operating

14 disbursements that we see here on the spreadsheet.

15          MR. STEWART:  And I don't know if that can be blown

16 up to be even larger or not, Lauren.  I don't know if

17 everyone can see them.  Let's just blow up operating receipts

18 if we could.  There.

19 BY MR. STEWART:

20 Q   I've asked the technical assistant here to blow these up

21 so we can all see them better, and let me ask you about some

22 of the operating receipts.  Property taxes and income and

23 utility taxes are just what they say they are?

24 A   That's right.  That's what they contain.

25 Q   And gaming taxes, what are gaming taxes?

1  A   Those are the taxes the city receives from the three

2  casinos.

3  Q   Next is municipal service fee to casinos.

4  A   Those are generally additional fees that the city

5  collects from the casinos for additional services that are

6  provided.

7  Q   And then our next line is state revenue sharing?

8  A   That's state aid that the city receives every other

9  month.

10  Q   And below that we have other receipts.  Could you tell us

11  what the other receipts are?

12  A   Sure.  Those are a combination of fees from the different

13  departments.  It has grant revenue in there as well as any

14  other one-time items that are also captured in there.

15  Q   And the final item is called refinancing proceeds?

16  A   Yes.  Those generally reflect the monies that the city

17  was borrowing from the escrow account that was set up with

18  the state, so it was essentially additional debt borrowings.

19  Q   Okay.

20       MR. STEWART:  Let's go back if we could, Lauren, to

21  the -- if you could just then expand for us the part of our

22  chart that says "Operating Receipts."  "Operating Receipts."

23  That would still be the top part, I think.  Now, "Operating

24  Receipts," that would be the rows there entitled "Operating

25  Receipts."  Okay?

1  BY MR. STEWART:

2  Q   Now, your spreadsheet purported to tabulate what the

3  operating receipts were.  I think the first column is actual

4  for fiscal year '12.  What did you determine the city's

5  operating receipts had been for that fiscal year?

6  A   For the general fund predominantly the operating -- total

7  operating receipts were 1.765 billion of which 50 million was

8  related to so-called proceeds from debt issuance or

9  borrowings from the escrow fund.

10 Q   And then for fiscal year 2013, you had 11 months actual

11 and 1 month forecast; is that right?

12 A   That is correct.

13 Q   Okay.  And can you tell me what your forecast was with

14 those 11 actual and 1 forecasted month for --

15         MR. SHERWOOD:  Object.  I'm sorry.

16 BY MR. STEWART:

17 Q   -- the operating receipts for fiscal year '13?

18         MR. SHERWOOD:  Your Honor, I object to testimony

19 based on forecasts.

20         MR. STEWART:  Your Honor, what we have -- he spoke

21 not only about the actual -- the city's actual receipts.  He

22 also spoke about the city's budgets not as a forecast he made

23 but as a budget the city had, which was itself a factual

24 document.  To the extent he's talking about what the city has

25 budgeted, especially when he tests it against actual

1  experience for reliability, I believe he can talk about what

2  the forecast result is to look like.  I would add that this

3  is one where 11/12ths of the data is actuals that had, in

4  fact, already come to pass.

5          THE COURT:  Sir, is the number for the column

6  forecast June 13 of 125 your number or the city's number?

7          THE WITNESS:  It was generally a collaborative

8  effort in which we used the numbers that were, your Honor,

9  developed by the city originally.  We scrubbed them along

10  with the city.

11          THE COURT:  What does "scrub" mean?

12          THE WITNESS:  So we looked at, your Honor, the

13  historical actuals in terms of how the amount of collections

14  that were received in that particular month in conjunction

15  and comparison with the overall tax row, so it was -- you

16  know, actually, you are looking through the historical

17  information that we had available as well as the best

18  forecast information we had available to demonstrate what the

19  one month of forecast would have looked like.

20          THE COURT:  Well, all right.  I'll permit the

21  testimony as to the full year for actual and forecast but

22  subject to credible admissible evidence regarding June '13.

23          MR. STEWART:  Your Honor, we will provide that.

24  BY MR. STEWART:

25  Q   And then, Mr. Malhotra, as to the full year operating

 1   receipts for 2012, what did you calculate?

 2   A    For the full year of fiscal year 2013, the total

 3   operating receipts were -- with 11 months of actual and 1

 4   month of forecast were 1.582 billion, which included roughly

 5   $30 million of borrowings from the escrow account as shown in

 6   the line item up above.

 7   Q    Okay.  And so the line you're referring to is the line

 8   that says "refinancing proceeds"?

 9   A    That is correct.

10   Q    And you better tell us what the escrow account is.

11   A    It's an account -- escrow account that's set up that's

12   subject to an escrow agreement between the city and the state

13   where there are roughly about $70 million of cash that is

14   sitting in that escrow account today.  It was projected that

15   $20 million of that 70 would have been collected, your Honor,

16   in June of 2013, but that has not happened.  We are

17   anticipating to collect that $20 million from the escrow

18   account in the subsequent months going forward, but it is

19   subject to -- the amount in there is subject to an escrow

20   agreement between the city and the state.

21   Q    Okay.  Thank you.  Lets, if we could, now --

22            THE COURT:  Excuse me one second.  So the 20 billion

23   you're talking about is the 20 that's shown in forecast June

24   '13?

25            THE WITNESS:  Yes, your Honor.  That's the 20

1   million.

2           THE COURT:  That didn't happen.

3           THE WITNESS:  That did not happen.  That is correct,

4   your Honor.

5   BY MR. STEWART:

6   Q   At the time you wrote it, you expected that it would

7   happen?

8   A   That is correct.

9           MR. STEWART:  Could we now expand the segment of the

10  chart that talks about operating disbursements, just the

11  title so we can see them all?  No.  That's fine.

12  BY MR. STEWART:

13  Q   Now, we've now expanded on the screen, Mr. Malhotra, the

14  segment of the spreadsheet that speaks of operating

15  disbursements.  Let me ask you if we could go through this.

16  The first line is payroll taxes and deductions, and I assume

17  that's self-explanatory.  That's what it says.

18  A   Yes.

19  Q   Next is benefits.  What are benefits?

20  A   Those are generally health benefits.

21  Q   Okay.  Below that is something called pension

22  contributions?

23  A   That is correct.

24  Q   And those are pension contributions to who?

25  A   To either the police Retirement System or the General

1  Retirement System.

2  Q    And those are both defined benefit plans?

3  A    Those are defined benefit plans, yes.

4  Q    Now, I understand that some portion of the benefits from

5  the General Retirement System goes to city employees who work

6  for the Department of Water and Sewer?

7  A    That is correct.

8  Q    And how do you account for that in this spreadsheet?

9  A    Those are not accounted for here because this shows the

10  activity predominantly of the general fund.  The

11  contributions that the Water and Sewer Department makes for

12  pension go directly to the Retirement System and --

13          THE COURT:  Excuse me, sir.  You need to lean back

14  away from the microphone a little bit because when you get

15  too close, it cuts out.

16          THE WITNESS:  All right.

17          THE COURT:  And while we have a break here, I think

18  your tech person needs to redo that chart because her effort

19  to line up the headings isn't working very well separately.

20          MR. STEWART:  Okay.  Thank you.

21          THE COURT:  That's better.

22          MR. STEWART:  That's better.  A little to the left,

23  yes.

24          THE COURT:  Thank you.

25  BY MR. STEWART:

1  Q   We were talking, I guess, about pension contributions.

2  Next we have -- and for actual year 2012, those had amounted

3  to how much?

4  A   For actual fiscal year '12, there were pension

5  contributions of 103.9 million made by the general fund.

6  Q   And for fiscal year 2013, what is the number?

7  A   That reflects 11 months of actuals and 1 month of

8  forecast, but about $30.8 million of pension contributions

9  that were made.

10  Q   Why is that so much lower than the pension contributions

11  that had been made in 2012?

12  A   Because the city was trying its best to preserve

13  liquidity during this time frame where liquidity was

14  extremely tight and was deferring pension contributions.

15  Q   Now, let's -- let me ask you about this.  When you say

16  "deferring pension contributions," what do you mean?

17  A   It's essentially not making the scheduled payments as

18  they came due and as were laid out by the city's other

19  systems actuaries, so I would say it was more or less

20  borrowing money from the pension system to fund ongoing

21  operations.

22  Q   So just to be clear, the money was owed to the pension

23  systems; correct?

24  A   That is correct.

25  Q   But the city did not pay the pension systems the money it

1   owed them?

2   A    That is correct.

3   Q    And that is called deferral?

4   A    Yes.  That's what we are calling deferral.

5   Q    And do you know looking at this what the amount of

6   deferrals were for fiscal year 2013?

7   A    For fiscal year 2013, I would say compared to the

8   beginning of fiscal year 2012 there was probably another 70-

9   odd million dollars that was deferred compared to the

10  beginning of fiscal year 2012, an additional 70 million.

11  Q    Okay.

12          THE COURT:  And may I interrupt for one moment?

13  Just so the record is clear and everyone understands, would

14  you describe in more plain English what you mean by the

15  concept of "liquidity was tight"?

16          THE WITNESS:  Sure, your Honor.  The city was during

17  this time frame paying very close attention to its cash

18  position, and in order to ensure that the city did not have a

19  payless payday or run out of complete cash in its bank

20  account, the amount of cash available for the city's general

21  fund to continue to operate was dwindling.  And in order to

22  make sure that the cash position did not get to an

23  unsustainable level where the core operations of the city

24  were put at peril, that's what, your Honor, I meant by

25  liquidity being extremely tight.  It's the cash that was

1    available to run the operations of the general fund.

2            MR. STEWART:  If we can go back to the full chart

3    for just a minute, please.

4    BY MR. STEWART:

5    Q   And before we go further, just on this same point, this

6    chart is a projection of cash flow for the city for the past

7    year and for fiscal year 2013; correct?

8    A   It's actuals for --

9    Q   Actuals and then -- okay.  Now, you just talked about

10   deferrals as something the city did to preserve cash.  Is

11   there something called pooled funds?

12           THE COURT:  I'm sorry.  Something called what?

13           MR. STEWART:  Pooled funds.  And I'm going to ask

14   him what they are.

15   BY MR. STEWART:

16   Q   Can you tell us what pooled funds are?

17   A   The pooled funds are cash that has been available in

18   other accounts for specific purposes such as the solid waste

19   fund or the street fund or the risk management fund that has

20   been pooled with the general fund cash so that the general

21   fund cash is higher because of the result of the pooling of

22   cash from these other accounts.

23   Q   Now, these other accounts are not -- well, first of all,

24   you better tell us what these other accounts are.

25   A   As highlighted in the city's CAFR, the city had roughly

1  $92 million of pooled cash from the solid waste fund, the
2  street fund, and the risk management fund, cash that was
3  combined with the general fund, that is currently reflected
4  in the cash balances reported for the general fund.
5  Q   And so that I understand, so because of the liquidity
6  problems the city faced, it took the $90 million out of the
7  street fund, the solid waste fund, and the public safety or
8  emergency fund and commingled it with money in the general
9  fund?
10 A   I don't know when it was done, but that would generally
11 be yes.  The commingling has probably happened some time ago,
12 but the answer would be yes.  It would be to further
13 supplement the cash available for the general fund.
14 Q   And if the city had not done that, what would have been
15 the effect on its liquidity position?
16 A   Well, at the end of fiscal year '12 where the cash net of
17 distributions was shown as 1.9 million, if the city had to go
18 ahead and segregate or unpool almost $92 million, that cash
19 net of distributions or cash available to the general fund
20 would have been significantly lower dollar for dollar.
21 Q   It would have been $92 million lower?
22 A   Yes.  That is my understanding.
23 Q   Let's go back now to our operating disbursements that we
24 were talking about.  All right.  The next item there is
25 something called subsidy payments.  What are subsidy

1   payments?

2   A    Subsidy payments are the cash payments that the general

3   fund fund makes to DDOT, which is the Department of

4   Transportation, because the Department of Transportation

5   requires an annual subsidy every year from the general fund.

6   Q    And below that we have distributions, and there are three

7   different lines.  There's distributions, tax authorities,

8   then distributions, UTGO, and then distributions, DDA.

9   Please tell us what those items are.

10  A    Those are distributions to other taxing authorities.  In

11  the first line when we saw property tax collections, the city

12  collects property taxes not only for itself but also on

13  behalf of other taxing authorities like Detroit Public

14  Schools, Wayne County, and what the city does then is once

15  the gross property taxes are collected, it distributes to

16  these other entities on behalf of whom the cash has come in.

17  Q    So, in other words, it's cash the city has but that it

18  has to turn over to someone else?

19  A    Yes.  That is correct.

20  Q    And below that we have income tax refunds, account

21  payables, and other disbursements and professional fees.

22            MR. STEWART:  Now let's go back to the full chart if

23  we could, and for purposes of simplicity, why don't we simply

24  expand actual fiscal year '12 along with the descriptions of

25  items that would help us walk through them?  All the way to

1 the bottom.  Thank you.  Okay.

2 BY MR. STEWART:

3 Q   Now, our next line has total disbursements.  Do you see

4 that?

5 A   Yes.

6 Q   And that's just the sum of all the operating

7 disbursements?

8 A   That is correct.

9 Q   And below that there's something called net cash flow.

10 What is net cash flow?

11 A   That's the total operating receipts less the total

12 disbursements.

13 Q   And what was it for fiscal year 2012?

14 A   It was negative $65.5 million after including $50 of

15 proceeds from the escrow fund.

16 Q   And why were those excluded?

17 A   Those were already a part of the negative 65.5.  Had they

18 been excluded, the net cash flow would have been negative

19 115.5.

20 Q   I see.  And then the next line is beginning cash balance,

21 and what is that?

22 A   That would be reflective of the cash balance the city's

23 general fund had in its account including the pooled cash.

24 Q   And you subtract from that the net cash flow that we just

25 talked about; correct?

1  A    Yes.

2  Q    And we end up with cash before required distributions of

3  $29.8 million?

4  A    That is correct.

5  Q    And then there's something subtracted from that, and what

6  is subtracted?

7  A    Those are the accumulated property tax distributions, so

8  when the city collects its property taxes, makes the

9  distributions to the different taxing authorities -- excuse

10  me -- there still is a holdback in terms of amounts that are

11  being reconciled where the city and the different taxing

12  authorities are going back and forth in terms of what the

13  final amount is that is due to those authorities.  That is

14  the estimate that the city has available at that point of

15  time in terms of additional monies that were due to these

16  other taxing authorities but had not been paid yet, so we

17  reserved for that cash that it will eventually be paid out.

18  Q    Okay.  What's an example of one of these other

19  authorities that is owed to which the money has to be paid

20  out by the city?

21  A    It would include the Detroit Public Schools.  It would

22  include Wayne County.  It would include the library.  Those

23  would be some of those examples.

24  Q    And so our last line here says cash net of distributions,

25  and that's $1.9 million?

1   A   That is correct.

2   Q   And what does that represent?

3   A   That would be the net cash available for the general

4   fund, including pooled cash, that was available for the

5   general fund's operations at that point of time.

6   Q   At the end of --

7   A   Fiscal year 2012.

8   Q   -- 2012, which would be June 30th, 2012; correct?

9   A   Yes.

10  Q   And below you have something that says "memo," and the

11  first line is accumulated deferrals?

12  A   Yes.

13  Q   Is that what you told us about earlier which were pension

14  contributions the city owed but had not paid?

15  A   That is correct, about 64.4 million.

16  Q   And below that refunding bond proceeds in escrow, what

17  are those?

18  A   Those are the escrow account's amounts that were still in

19  escrow and had not been drawn upon that were still subject to

20  this escrow agreement with the state.

21  Q   From the refunding financing that you told us about

22  earlier?

23  A   Yes.

24  Q   And finally reimbursements owed to other funds, what is

25  that?

1  A    That is where we've highlighted the amounts -- or we

2  haven't put an amount in off the funds that would subject --

3  be subject to the unpooling of the cash that is shown in the

4  general fund, but the city did not have a specific view in

5  terms of when and how the unpooling of some of that cash

6  would take place.

7          MR. STEWART:  Now, if we could now highlight the far

8  right column, which is the fiscal year 2013, it says 11(a)

9  plus 1(f), and let's look at that.  And then, Lauren, if you

10  could put the categories next to it so he could --

11  BY MR. STEWART:

12  Q    I'm going to ask you the same questions, but I'm going to

13  be quicker when it comes to the fiscal year 2013.  You

14  already told us, I think, that the operating receipts were

15  thought to be 1.52 -- 582.2 billion.  What were the total

16  disbursements expected to be?

17  A    1.5 --

18          MR. SHERWOOD:  Objection.

19          MR. STEWART:  This is the same point I think we

20  argued earlier.

21          THE COURT:  What is the objection, please?

22          MR. SHERWOOD:  The objection --

23          THE COURT:  Excuse me one second.  And I've been

24  asked to ask you to pull that microphone closer to you when

25  you speak.  Closer, closer, closer.

1    MR. SHERWOOD:  I object --

2    THE COURT:  Closer yet, please, sir.  There you go.

3    MR. SHERWOOD:  Okay.  I object based on the fact

4  that the disbursements include projections for June of 2013,

5  and that requires expert testimony.  That's improper lay

6  opinion testimony.

7    THE COURT:  All right.  Subject to the same

8  condition I indicated earlier, the Court will permit this.

9  Go ahead.

10  BY MR. STEWART:

11  Q   And to repeat the question then, the total disbursements

12  for fiscal year 2013 are shown to be what here?

13  A   1.578.2 billion.

14  Q   And so the net cash flow for the city in fiscal 2013 was

15  how much?

16  A   $4 million positive.

17  Q   And then we had cash before required distributions of how

18  much?

19  A   Before required distributions, $33.8 million.

20  Q   And then cash net of those distributions for fiscal year

21  2013 came to what?

22  A   $14.1 million.

23  Q   And by then, what was the accumulated -- was the amount

24  of accumulated deferrals, and what was owed to the pension

25  funds?

1  A   By then the amount of accumulated deferrals predominantly

2  due to the pension funds had increased from roughly $65

3  million at the end of fiscal year 2012 all the way to $118.7

4  million at the end of fiscal year 2013.

5  Q   And where did the number come from in terms of what was

6  owed to the pension funds?

7  A   The amount of funding that would have been scheduled for

8  the General Retirement System and the Police and Fire

9  Retirement System would have come from the payments that the

10  actuaries of the systems had suggested to be made but had not

11  been made over the course of this time frame.  That was

12  predominantly what -- where those numbers came from.

13  Q   So the numbers came from the pension plans themselves or

14  their actuaries.

15  A   The schedule came --

16         MR. SHERWOOD:  Objection.  Hearsay.  Move to strike.

17         MR. STEWART:  He can know this.

18         THE COURT:  The objection is overruled.  It was,

19  however, a leading question.

20         MR. STEWART:  It was, your Honor.  I was trying to

21  clarify, but let me ask it again.

22  BY MR. STEWART:

23  Q   Where, if anywhere, did these numbers come from?

24  A   The accumulated deferral number, which predominantly is

25  made up of the pension deferrals, would have been a sum of

1  the pension payments that were not made during the course of

2  fiscal year 2013 and it would have been in the amount of the

3  scheduled payments the systems actuaries had suggested that

4  should have been made on a monthly basis but were not.

5  Q    So who is it who tells the city how much the pension

6  payments ought to be?

7  A    It's the system's actuaries.

8  Q    The system being the General Retirement System and the

9  Police and Fire Retirement System; correct?

10 A    That is correct.

11 Q    Did there come a time when you spoke with Mr. Orr about

12 what you had found in the course of this analysis?

13 A    We showed Kevyn Orr in terms of what the actual activity

14 was and the magnitude of the deferrals that were taking place

15 to sustain the city's cash position on a monthly basis.

16 Q    Do you remember what you said to him and what he said to

17 you?

18 A    Not specifically, but it was generally showing as to what

19 the magnitude of the -- what the magnitude of the dire

20 liquidity position of the city.

21          THE COURT:  I'm sorry.  What?  The magnitude what?

22          THE WITNESS:  How dire the --

23          THE COURT:  I didn't hear what you said.  What did

24 you say?

25          THE WITNESS:  Your Honor, I said the dire liquidity

1  situation of the city.

2  BY MR. STEWART:

3  Q   Let me -- let's now go to page 9 of this same exhibit,

4  and the control number on this, if that makes it easier, ends

5  with 7289.  And could you just tell us what this is?

6  A   This is the fiscal year 2014 forecasted cash flow to

7  year-end on a monthly basis.

8  Q   And is this a document you or others at Ernst & Young

9  prepared?

10  A   Yes, it is.

11  Q   Did you show it to Mr. Orr?

12  A   Yes, we did.

13  Q   Did you discuss it with Mr. Orr?

14  A   Yes.  We discussed the receipts and disbursements

15  activity, yes.

16  Q   As shown in this document?

17  A   That is correct.

18  Q   And do you remember what you said to him and he said to

19  you?

20        MR. SHERWOOD:  Your Honor, object to the extent that

21  the question calls for testimony about these forecasts.  This

22  document -- this particular page relates to 2014, which is

23  all projections.

24        MR. STEWART:  And that's why I'm asking the

25  questions I'm asking, only was this shown to Mr. Orr and did

1  he discuss it with him, and I won't go any deeper into it

2  right now.

3          MR. SHERWOOD:  I didn't object to those questions.

4          THE COURT:  No.  I believe the witness can testify

5  as to what he said to Mr. Orr about these documents.  It goes

6  to what Mr. Orr knew or at least what he was advised of at

7  the time, so just tell us what you said to him about these

8  documents or this document.

9          THE WITNESS:  Your Honor, my recollection what I

10  would have said on this particular document would have been

11  that the fiscal year two thousand --

12          THE COURT:  Well, hold on.  Are you reconstructing

13  what you would have said, or are you remembering what you did

14  say?

15          THE WITNESS:  Your Honor, I am trying to recall what

16  I would have said.  I do not remember specifically what I

17  would have said.

18          THE COURT:  All right.  If you don't know the answer

19  to a question, just say that.  Don't guess or try to

20  reconstruct.

21          THE WITNESS:  Yes, your Honor.

22          THE COURT:  Okay.

23  BY MR. STEWART:

24  Q    Did you provide this document to Mr. Orr?

25  A    I did.

1  Q   Did there come a time that he raised it with you?

2          THE COURT:  I'm sorry.  Was there what?

3  BY MR. STEWART:

4  Q   Did there come a time when Mr. Orr raised this document

5  with you?  Did he call you up or ask to have a conversation

6  with you about it that you can remember?

7  A   We had several discussions about this particular document

8  and the overall contents of the numbers, yes.

9  Q   And my only question to you is going to be, if you

10 remember, what did you say to him, and what did he say to

11 you, just that?

12 A   What I would have said on this particular document --

13 Q   Not would have said, what you did say if you remember,

14 and if you don't remember, just tell me you don't remember.

15         THE COURT:  If you don't remember, just say that.

16         THE WITNESS:  I don't remember specifically what I

17 would have said to Mr. Orr on this particular page in a

18 specific conversation around that, but --

19 BY MR. STEWART:

20 Q   Then let me ask the question a different way.  In the

21 time frame around June 14, did you have discussions with

22 Kevyn Orr about the liquidity situation of the city?

23 A   I did.

24 Q   And do you remember what you said to him about the

25 liquidity situation of the city?

1  A   I do.

2  Q   And will you tell us what you told him?

3  A   The point -- what I said is that the fiscal year '14 cash

4  receipts could fall short of cash disbursements to the tune

5  of $185 million.

6  Q   What did he say to you?

7  A   I do not remember specifically about what he said to me

8  directly.

9  Q   Let's go, if we could, now to another page of this, page

10  47, which has control number 227327. Could you just tell us

11  the -- what this document is? What's the title of this

12  document?

13  A   "Ten Year Projections for the General Fund Only on the

14  Steady State."

15  Q   And what is a steady state?

16  A   The steady state would have reflected no restructuring of

17  the city's long-term obligations or legacy liabilities.

18  Q   I'm not going to ask you about the content of this, but

19  I'm going to ask you to tell us how you prepared it.

20  A   The way we prepared this is through different line items

21  in terms of the revenue assumptions. We looked into

22  specifically the overall State of Michigan forecast. We

23  looked at the historical information with respect to the City

24  of Detroit. We also went ahead and looked at analyses in

25  terms of what the property taxes recently were for the city

1  and what the -- where the City of Detroit was faring in

2  conjunction with the State of Michigan to come up with a

3  forecast in terms of what the assumptions were for the

4  revenue and property tax and income tax assumptions over the

5  next ten years.  We did it in conjunction with the management

6  team of the city.  We went through income taxes in a great

7  level of detail between residents and nonresidents,

8  corporations, to build up assumptions from the standpoint of

9  what the revenues would look like over the next ten years.

10 We looked at the casino taxes with respect to all three

11 casinos, what their growth had been historically, where they

12 were projected to be in the future, state aid.  We got those

13 numbers directly from the budget department of the State of

14 Michigan in terms of where they saw the overall sales taxes

15 that were due to the city were projected to be over the next

16 ten years.  That's generally how we came up with the revenue

17 forecast, and I can highlight how we went through the

18 expenses as well.

19 Q   Well, yes, if you could, the expense and, finally, the

20 legacy cost without getting into what the numbers actually

21 are, just what your methodology was.

22 A   With respect to the salaries, wages, and overtime, we

23 started with what the current wage levels and the headcount

24 was.  It was built up by department to try and ascertain what

25 the exact headcount was by department.  From there on we had

1  fairly simplistic assumptions with respect to wage level
2  increases of two percent on a year-over-year basis over the
3  forecast period.  For the health benefits for the active
4  employees, we used assumptions that the city's health
5  actuaries have developed on a per head basis, which is what
6  we used based on a per headcount basis to extrapolate over
7  the next ten years.  On the other operating expenses, it was
8  developed by individual department to look at every single
9  department, their budgets, to help ascertain what were the
10 ongoing operating expenses of each one of those departments
11 on a ongoing basis.
12        MR. DECHIARA:  Objection, your Honor.  Peter
13 DeChiara of Cohen, Weiss & Simon for the UAW.  We object to
14 this.
15        THE COURT:  Are you pulling your microphone nice and
16 close for me, please?
17        MR. DECHIARA:  Objection based on relevance.  The
18 only relevance it would have to how this witness performed
19 these numbers would be if the numbers were coming in for the
20 truth of the matter.  Otherwise it has no relevance.
21        THE COURT:  I'm concerned about that, Mr. Stewart.
22 First of all, just so the record is clear, what exhibit
23 number is this page 47 of?
24        MR. STEWART:  It is Exhibit 44.
25        THE COURT:  All right.  So the --

1      MR. STEWART:  44 is in evidence.

2      THE COURT:  Right.  So the question is what weight

3  is page 47 of this exhibit entitled to --

4      MR. STEWART:  Correct.  It goes to weight.

5      THE COURT:  -- if the witness has not been qualified

6  as an expert?

7      MR. STEWART:  Well, Judge, what I was going to do

8  was lay a greater foundation for how it was put together, and

9  then I was going to simply ask the witness this question,

10 which I will ask him now.

11 BY MR. STEWART:

12 Q   Where in here, Mr. Malhotra, did you insert your own

13 personal assumptions?

14 A   All of the assumptions were done in collaboration with

15 the city.

16 Q   Well, where did the numbers come from?

17 A   The numbers came from either the actuaries that we were

18 working with with the city or the city's debt documents with

19 respect to the long-term liabilities of the city or, in terms

20 of the revenues, it was assumptions that we worked on in

21 conjunction with the city.

22     MR. DECHIARA:  Your Honor --

23     MR. STEWART:  And so, your Honor, my point on this

24 is the following.  The fact something is a future projection

25 does not make it an opinion in the sense of being an expert

1  opinion.  If one is relying on numbers from another source --

2  in this case, all the sources Mr. Malhotra told us about --

3  it is their numbers, not his numbers but their numbers, and

4  what he is doing is tabulating them and calculating them.

5        THE COURT:  I heard him say that at least some

6  portion of this, which he didn't specify, was done in

7  collaboration.

8        MR. STEWART:  Well, let me -- but that's why I asked

9  him this other question about which of these --

10  collaboration, and I will ask him this --

11        MR. DECHIARA:  Your Honor, may I be heard?

12        THE COURT:  One second.

13        MR. STEWART:  It sounded from his testimony he met

14  with him and worked with him to learn the numbers.  When I

15  asked him which assumptions were his assumptions, not the

16  assumptions of the people who gave him the numbers, the

17  answer were they're not his assumptions.

18        THE COURT:  His answer was, "We collaborated."

19        MR. STEWART:  Well, I thought -- maybe I heard

20  him -- I must have heard him differently than your Honor

21  heard him.  I thought the answer -- well, should we ask him

22  again?

23  BY MR. STEWART:

24  Q   Mr. Malhotra, of these numbers, which ones are your

25  assumptions?

1    A    EY has made no assumptions that these are EY's numbers.

2    I want to make that -- that's what I'm making clear.

3    Q    So these numbers came to you from who?

4    A    The numbers with respect to -- there are a lot of numbers

5    on this page.  The numbers with respect to all of the debt

6    service would have been picked up from the city's CAFR.  The

7    numbers on the health benefits or pension retiree

8    contributions would have come from the city's actuaries.  The

9    numbers for the actual headcount for all of the departments

10   and the associated costs would have come from the city and

11   its departments.  The numbers with respect to the health

12   costs for the active employees on a per head basis would have

13   come from the city's actuaries.  The numbers with respect to

14   state revenue sharing would have come from the state

15   directly.  The numbers for property taxes, income taxes, and

16   wagering taxes, those numbers, in terms of the assumptions,

17   were validated, collaborated, between our team and the city

18   in terms of the assumptions behind the revenue assumptions.

19   Q    When you say "assumptions," you mean --

20            THE COURT:  One second.

21   BY MR. STEWART:

22   Q    -- the number that's there?

23            THE COURT:  I need to hear from counsel at this

24   point.

25            MR. STEWART:  Okay.  Go ahead.

1      MR. DECHIARA:  Your Honor, to the extent the
2  information in this exhibit comes from actuaries who are not
3  on the witness stand, those numbers are hearsay and should
4  not come in.
5      THE COURT:  Well, but the document is already in
6  evidence.
7      MR. DECHIARA:  Your Honor, and also I would say,
8  too, the witness is testifying about a process that took a
9  high degree of expertise.  I don't think I or most of the
10  people in this room, let alone the man on the street, would
11  be able to take these raw data and convert them into ten-year
12  projections.  It took the sophisticated work of an Ernst &
13  Young team to put it together.  This is in the nature -- this
14  is the very essence of expert testimony.
15      THE COURT:  I agree.  I do.
16      MR. STEWART:  All right.  Your Honor, what we may
17  ask leave to do is to submit perhaps a memoranda raising this
18  with your Honor later on so we can move on now.
19      THE COURT:  You may, of course.
20      MR. STEWART:  Yeah.  Okay.  Your Honor, since --
21      UNIDENTIFIED SPEAKER:  May I ask you --
22      MR. STEWART:  Yes.  Your Honor, one other thing.
23  Since it's in evidence, I assume I am allowed to at least ask
24  the witness what it says, and objections go to weight.
25      THE COURT:  Well, it's duplicative to do that, but I

1  suppose to make a point you could ask briefly for the witness

2  to review what it says.

3          MR. STEWART:  Well, I'm going to just ask him to

4  look at the far right column, and then I'm going to -- pardon

5  me, your Honor.  I'll move on to my next question.

6          MR. RUEGGER:  Excuse me.  Objection.  Arthur Ruegger

7  from Dentons on behalf --

8          THE COURT:  I need you to move that microphone

9  closer, sir.

10          MR. RUEGGER:  I'll try, Judge.  Is this better?

11          THE COURT:  Hold the base closer.

12          MR. RUEGGER:  Don't spill the water.

13          THE COURT:  There you go.  Much better.  Much

14  better.  Thank you.

15          MR. RUEGGER:  Your Honor, we submit the document

16  speaks for itself.  Any further narrative from this witness

17  is in the nature of asking for his expertise on that.

18          THE COURT:  Well, it doesn't take an expert to read

19  it, so I'll permit it.

20          MR. RUEGGER:  Very well, your Honor.

21          MR. STEWART:  Could we simply blow up the far right

22  column?

23  BY MR. STEWART:

24  Q   As a result of your calculations, Mr. Malhotra, what did

25  your spreadsheet conclude was the ten-year adjusted deficit

1  the city was facing?

2  A   The spreadsheet would have said that revenues would be

3  10.4 billion, operating expenditures would be 7.4 billion,

4  and legacy expenditures would be 7 billion over this ten-year

5  time frame for a surplus/deficit of almost $4 billion, a

6  negative $3.93 billion.

7  Q   All right.  So did there come a time when you sat down

8  with the emergency manager to talk about these projections?

9  A   Yes.

10 Q   Now, in preparing the projections, what did you do to

11 make them as accurate as you knew how to make them accurate?

12         MR. SHERWOOD:  Objection.  Calls for analysis of

13 projections that have been --

14         THE COURT:  I'm sorry, sir.  I can't hear you.

15         MR. SHERWOOD:  Objection.  Calls for improper

16 opinion testimony.  These are -- he's being asked to testify

17 about projections that are properly the subject of expert

18 testimony.

19         MR. STEWART:  I think I asked him what he did to try

20 to be accurate.

21         THE COURT:  No.  The objection is sustained.

22         MR. STEWART:  Okay.

23 BY MR. STEWART:

24 Q   In your conversations with Mr. Orr, what did you say to

25 him about your ten-year projections?

1          MR. SHERWOOD:  Same objection.

2          THE COURT:  That objection is overruled.  Please

3    answer.

4          THE WITNESS:  What we said is that if you look at

5    simply the operating --

6          THE COURT:  You said --

7          THE WITNESS:  I said.

8          THE COURT:  You said, "we said."

9          THE WITNESS:  What I said is if you look at the

10   total operating revenues and the total operating

11   expenditures, the city still has a surplus of roughly $3

12   billion.  However, when you layer in the legacy costs of

13   roughly $7 billion over the next ten years, the city has a

14   deficit of almost $4 billion over that ten-year time frame.

15   BY MR. STEWART:

16   Q   And what did he say to you?

17   A   I don't remember specifically about what he said back to

18   me.

19   Q   Now, June 14 was the date of a meeting we've been -- I've

20   been asking you about, I believe.  This document was a

21   document passed out that day; correct?

22   A   Yes.

23   Q   Before moving on from the meeting, let me ask you this.

24   Were questions asked by anyone at that meeting on June 14?

25   A   Yes.  There were questions asked.

1  Q    Do you remember any of the questions that were asked or

2  who asked them?

3  A    I don't know who asked them, but there were questions

4  about the assumptions and the liquidity position of the city.

5  Q    And am I correct in understanding that when you addressed

6  the people attending that meeting that day, you were speaking

7  about the spreadsheets I've asked you about this afternoon?

8  A    That is correct.

9  Q    And were questions asked of you then about those

10  spreadsheets?

11  A    There were -- yes, there were questions about it.

12  Q    Okay.  Let me move to another subject.  You're aware of a

13  security called the certificates of participation --

14  A    Yes.

15  Q    -- or sometimes called pension obligation certificates?

16  A    Yes, I am aware.

17  Q    For the record, can you tell us what those are?

18  A    Those are -- certificates of pension are the funds that

19  the city borrowed back in about 2005 to help fund the

20  underfunding on the two pension systems.

21  Q    And did the city have obligations to service the interest

22  or principal of those securities?

23  A    Yes.

24  Q    And do you know what the city's obligation was?

25  A    As of June of 2013, the city had a $40 million payment

1  that was due to those -- on behalf of those POC's.

2  Q   And what did the city do with respect to that payment?

3  A   The city did not make that payment.

4  Q   The city defaulted on it?

5  A   Yes.  That is correct.

6  Q   What effect did that default have upon the city's cash

7  position?

8  A   It improved the cash position by $40 million at the end

9  of -- June 30, 2012.

10 Q   What conversations, if any, did you have with the

11 emergency manager or his advisors on the subject of the

12 decision to default on the COPs?

13 A   I do not recall of a specific discussion with Kevyn Orr

14 on defaulting on the swaps.

15 Q   Let's move on to another set of meetings.  Did you attend

16 meetings held on June 20th, 2013, with representatives of the

17 pension plans?

18 A   I do.

19 Q   And am I correct in remembering there were two meetings

20 that day?

21 A   That is correct.

22 Q   The morning meeting was with the nonuniformed pension

23 plan, the GRS?

24 A   Yes.

25 Q   And the afternoon meeting was with who?

1  A    With police and fire.

2  Q    Okay.  And we have put up the first exhibit -- I believe

3  this is in evidence -- Exhibit 48.  Can you tell me what

4  Exhibit 48 is?

5  A    It's the presentation that was used for the meeting with

6  the nonuniform retirees on June 20th.

7  Q    And let's go back.  Just ask you a question.  Towards the

8  back of this, are there projections that were included in

9  here that you or Ernst & Young had prepared?  Let's look at

10  page 4 and page 5.  Are these projections you prepared?

11  A    Page 4 was a summary of the legacy expenditures,

12  historical, actual, and forecast.  That would have been

13  information on the pension and health benefits we received

14  from the city's actuaries.

15  Q    Okay.  And the next page?

16  A    Page 5 was the ten-year projections for the general fund

17  only under a restructuring scenario that highlighted claims

18  or amounts that were available to service unsecured claims.

19  Q    Now let's go back to the meeting itself.  How long did

20  the morning meeting last?

21  A    Probably about three hours.

22  Q    And who was there?

23  A    It was the city's advisors along with the members from

24  the -- some retirees and some of the members from the

25  Retirement System.

1    Q    Were questions asked?

2    A    There were some questions asked.

3    Q    Do you remember the questions?

4    A    They were questions about the cash position of the city.

5    They were questions about the city's ability to make any

6    changes to specific legacy liabilities.

7    Q    Do you remember any questions being directed to you?

8    A    They were -- yes.  I remember questions that came up with

9    respect to the cash flows of the city.

10    Q    And do you recall who in particular asked you those

11    questions --

12    A    No, I don't.

13    Q    -- or what you said in response to them?

14    A    No, I don't.

15    Q    Was Mr. Orr there that day?

16    A    He was not.

17    Q    Let's go to the next exhibit, if we could, which is

18    Exhibit 49.  Is this the handout that was given in the

19    afternoon meeting?

20    A    Yes, it was.

21    Q    And tell me about the afternoon meeting.  First of all, I

22    should have asked where these meetings were held.

23    A    These meetings were held at City Hall.

24    Q    And how long did the afternoon meeting last?

25    A    About two or three hours.

1   Q   Who attended?

2   A   It was the city's advisors along with some

3   representatives from the Retirement Systems as well as I

4   thought some active employees.

5   Q   And, once again, if you look towards the back, are there

6   portions of this document that was prepared by you or someone

7   else at E&Y?

8   A   Yes.  We helped pull together pages 4 and 5 for this

9   particular presentation.

10  Q   Okay.  Now, page 4, which we have, has legacy

11  liabilities, some for fiscal years that have already ended --

12  A   That is correct.

13  Q   -- and others that are projected?

14  A   Yes.

15  Q   And where did your numbers come from for these?

16  A   The debt service numbers, the scheduled debt service, as

17  the amortization tables exist today, the POC principal and

18  interest payments were, again, based on the current

19  amortization schedules.  The POC swaps payments were based on

20  the existing swap schedule.  The pension contributions and

21  the health benefits for retirees would have come based on the

22  assumptions that were provided to us by the city's actuaries.

23  Q   Now, let me ask you about the substance of the meeting.

24  Did you make any part of the presentation that afternoon?

25  A   I did.

1    Q    What parts of the presentation did you make?

2    A    I would have focused on pages 4 and 5 in terms of laying

3    out what the financial position of the city was.

4    Q    Were questions asked of you that day, that afternoon?

5    A    I don't remember specific questions that afternoon.

6    Q    Where were matters left at the end of the morning

7    meeting?

8    A    They were generally left to have an open dialogue and

9    communication flow between the city's advisors and the

10   participants in the meeting.

11   Q    And at the end of the afternoon meeting?

12   A    It was the same.

13   Q    Let's look at the next exhibit, Exhibit 51.  Can you tell

14   us what Exhibit 51 is?

15   A    Exhibit 51 is the ten-year plan in terms of the forecast

16   that was available at that point of time as of June 21st.

17   Q    Did you attend a meeting on June 25th with

18   representatives of the bondholders?

19   A    I did.

20   Q    And where was that meeting held?

21   A    That meeting was held in New York.

22   Q    Who attended?

23   A    It was bondholders and bond insurers and their financial

24   advisors.

25   Q    Was Exhibit 51 a document given to them that day?

1   A    Yes.  That was the document that we went through on that

2   particular day.

3   Q    Do you remember which bond insurers you met with or

4   bondholders you met with on the 25th?

5   A    Yes.  Ambac was there.  I think Assured was there.

6   National, advisors from FGIC, advisors from Syncora.  Those

7   are actually some of the ones that I remember specifically.

8   It was a pretty big meeting.

9   Q    And I apologize if I asked you this.  How long did you

10  meet with them?

11  A    We met with them for at least four to five hours.

12  Q    What was the purpose of that meeting?

13  A    The purpose of the meeting was to have a subsequent

14  discussion and Q&A on the assumptions behind the information

15  that was shared as of June 20th.

16  Q    Do you remember any questions you were asked?

17  A    There were a lot of questions with respect to the

18  assumptions underlying the ten-year projections and the

19  details in terms of how those numbers were built up.

20  Q    And once again, where were matters left at the end of the

21  June 25th meeting?

22  A    They were left to have follow-up meetings on an

23  individual basis with certain bondholders or the insurers to

24  have more specific discussions around the business plan.

25  Q    Let me direct your attention to July 9.  Were there

1  meetings that day with bondholders or insurers for

2  bondholders?

3  A    Yes.

4  Q    And where were those meetings?

5  A    Those meetings were held in Detroit.

6  Q    And did you attend them?

7  A    Yes.

8  Q    How long did they last?

9  A    The morning meeting lasted about four or five hours.

10 Q    And then I assume there was an afternoon meeting as well?

11 A    Yeah.  There was an afternoon meeting.  My recollection

12 is with the pension systems, I believe.  There were a lot of

13 meetings during this time frame.

14 Q    How long was your meeting with the pension systems?

15 A    I think we had a meeting for about two or three hours.

16 Q    What was the purpose of the morning meeting?

17 A    The morning meeting was generally to have additional

18 dialogue and discussions around the assumptions of the

19 business plan.

20 Q    Do you remember who you met with in particular that

21 morning?

22 A    I remember it was the financial advisors for National.

23 It was the financial advisors for FGIC, Assured were the some

24 of the names that at least come to mind.

25 Q    In this period, did the city, to your knowledge, make any

1  proposals to the bondholders to resolve their claims?

2  A   The city made a proposal or a framework for a proposal in

3  its June 14th presentation.

4  Q   Did the bondholders at any point or any subgroup of

5  bondholders make a proposal to the city at some point?

6  A   My understanding is yes.  I have not reviewed a proposal

7  from the bondholders in detail.

8  Q   Do you remember when that proposal was made?

9  A   My recollection is it was prior to the city filing.

10  Q   Okay.  Now, in the afternoon meeting, what was the reason

11  for meeting with the two pensions on the afternoon of July 9?

12  A   It was to have additional discussions around the

13  assumptions that the city's actuaries were using with respect

14  to not only the size of the claim but also to ascertain the

15  contribution levels required over the next ten years for the

16  pension systems.

17  Q   And I apologize if I've asked you this before.  At the

18  end of that afternoon meeting with the pensions, what was

19  supposed to happen next, if anything?

20  A   There was supposed to be a process to try and understand

21  the assumptions, the actuarial assumptions, and thereby

22  derive -- have an understanding of the amount of the claim

23  and then have subsequent discussions around the amount of

24  funding that the city may or may not able to afford over the

25  long term.

1   Q   Okay.  Now, let's now go to July 18.

2            THE COURT:  Excuse me, Mr. Stewart.

3            MR. STEWART:  Yes.

4            THE COURT:  I'm sorry to be such a nuisance about

5   this, but please try not to wander so far from the

6   microphone.

7            MR. STEWART:  Oh, sorry, Judge.

8            THE COURT:  Part of our issue here is that we have

9   overflow courtrooms where people are trying to hear what we

10  say, so it's not just a question of the recording, which is

11  important, but other people are listening in as well.

12           MR. STEWART:  I'll do better, your Honor.  Sorry.

13  BY MR. STEWART:

14  Q   Let me direct your attention, if I could, now to July 18.

15  Were you asked on or about July 18 to execute a declaration

16  in connection with Detroit's bankruptcy filing?

17  A   Yes, I was.

18  Q   How many days before July 18 did you start working on

19  your declaration?

20  A   I don't recall the specific number of days.  It was

21  sometime in June.  Late June is I think where we started it.

22  Q   And do you -- how much of your declaration did you write,

23  and how much of it was written by others for you?

24  A   A majority of it -- of the declaration was written by me

25  in conjunction with counsel.

1    Q    Now, your declaration has a number of attachments to it,

2    and I'm going to put them up before I question you about

3    them.  And let's start with Exhibit -- Attachment A, which is

4    Exhibit 9.  And is that one of the exhibits to your

5    declaration?

6    A    It is.

7    Q    And is this a document you or someone else at E&Y

8    prepared?

9    A    Yes.

10   Q    And what is it?

11             MR. RUEGGER:  Your Honor, objection.  We objected to

12   this document.  It is forecasts, which we think would require

13   expert testimony.  We believe any testimony related to it

14   should be excluded on that grounds.

15             THE COURT:  The document is in evidence?

16             MR. RUEGGER:  No, your Honor.

17             THE COURT:  It's not?

18             MR. STEWART:  It's not, Judge.  I'm going to ask him

19   now about his dealings with Mr. Orr on the document; however,

20   we also designated this document and the next two as

21   summaries under Federal Rule of Evidence 1006 since they

22   accumulate voluminous evidence which we made available to the

23   objectors.

24             THE COURT:  What does this document purport to do or

25   to be without telling me what its contents are?

1      THE WITNESS:  It was meant to be to show the two

2   years of actual cash activity for the general fund and what

3   the city's cash position was at the end of fiscal year 2013

4   and fiscal year 2012, the magnitude of the deferrals over

5   that time frame, your Honor, and then the two-year forecast

6   beyond that time frame.

7      THE COURT:  And so how was the document compiled?

8      THE WITNESS:  Your Honor, the actuals for the first

9   two years were compiled based on the receipts and

10  disbursements activity that we were able to ascertain for the

11  bank accounts.  Your Honor, for the next two years, with

12  respect to the different line items, I can walk through the

13  assumptions, but --

14     THE COURT:  By "the next two years," you mean fiscal

15  year '14 and '15?

16     THE WITNESS:  That is right, your Honor.

17     THE COURT:  No need.  I'll admit the document as to

18  actual and preliminary for 2012 and 2013, but the objection

19  is sustained as to the forecasts.

20     MR. STEWART:  Thank you, your Honor.

21     (Debtor's Exhibit 9 received at 4:33 p.m.)

22  BY MR. STEWART:

23  Q   Is this a document you discussed with the emergency

24  manager or his advisors, Mr. Malhotra, on or before the date

25  you executed your declaration?

1   A   Yes.

2   Q   And why did you discuss it with them?

3   A   Because it showed the status of the city's liquidity

4   position right around that time frame and in the subsequent

5   few months.

6   Q   And what did you say to the emergency manager or his

7   advisors about the city's liquidity position at that time or

8   in the coming periods?

9   A   What I said is that the city's liquidity position at the

10   end of fiscal year 2013 had improved by roughly $40 million

11   because the city did not make the POC payment that was due in

12   June -- on June 15, 2013.  And what I said is that over the

13   next two years the city was going to have a significant cash

14   burn for each particular year based on the disbursements

15   significantly exceeding receipts.

16   Q   What did you tell Mr. Orr --

17         THE COURT:  Excuse me one second.  Again, we have to

18   clarify your language.  You used the phrase P-O-C.  What does

19   that mean?

20         THE WITNESS:  Your Honor, I was referring to the

21   pension obligation certificate --

22         THE COURT:  Okay.

23         THE WITNESS:  -- and the payment that was due on

24   June 15th.

25         THE COURT:  And then you used the phrase "cash

1   burn."  What does that refer to?

2        THE WITNESS:  Your Honor, that refers to the city's

3   operating disbursements exceeding its receipts or its --

4   city's total disbursements exceeding its receipts thereby

5   reducing the cash over a specified time frame.

6   BY MR. STEWART:

7   Q   And so you've told us what you said to Mr. Orr.  Did you

8   tell him what the cash position was going to be at this rate

9   in the coming years?

10  A   Yes, I did.

11  Q   And what did you tell him?

12  A   I would have -- what I said is that the city's cash

13  position net of deferrals could be approximately $143 million

14  negative at the end of fiscal year 2014 not making -- while

15  not repaying any of the deferrals that had already been made

16  as of that point of time or without unpooling any of the cash

17  that the city had -- has currently pooled.

18  Q   And if the city had unpooled the cash or paid up the

19  deferrals, what did you tell him the cash position was going

20  to be?

21  A   What I said is that the city's cash position for -- would

22  have been almost $150 million worse off if the pension

23  contributions that had been deferred till that time frame

24  were made as well as if the deferred POC payment had been

25  made.  If the pooled cash had to be unpooled, that amount

1  would be roughly an additional $90 million based on what was

2  in the CAFR.

3  Q   For a total cash shortfall of how much?

4  A   Before the --

5           MR. DECHIARA:  Objection.

6           THE WITNESS:  -- unpooling of cash, it would --

7           MR. DECHIARA:  Objection.  Your Honor, I just am

8  objecting to the extent that this -- what the witness is

9  recounting he's saying to Mr. Orr, I just want to make clear

10 that that's not coming into the record as the truth of the

11 matter -- of the statements he's making to Mr. Orr.  If

12 that's clear, I have no objection, but the line is getting

13 pretty blurred, and I think it's getting pretty close to the

14 line.

15          THE COURT:  I'm concerned about that.  I share your

16 concern.  You used a phrase again that needs clarification,

17 "unpool."

18          MR. STEWART:  We were talking about the pooled

19 funds, your Honor.  Those were the --

20          THE COURT:  I'm asking the witness.

21          MR. STEWART:  Thanks.

22          THE COURT:  What does "unpool the cash" mean?

23          THE WITNESS:  Your Honor, what I was -- what I meant

24 to say is if the pooled cash had to be restricted or

25 segregated out of the general fund, that's what I was

1  referring to the unpooling of cash.

2          THE COURT:  Okay.

3  BY MR. STEWART:

4  Q   What did Mr. Orr say to you?

5  A   On this particular document, the discussions with Mr. Orr

6  or specifically also the other advisors was the magnitude --

7          MR. RUEGGER:  Your Honor, I'm sorry to interrupt the

8  witness, but I thought the question was what did Mr. -- what

9  was the conversation with Mr. Orr.

10         MR. STEWART:  Or his advisors.

11         MR. RUEGGER:  And I thought the witness was just

12 describing a conversation that might not have been with

13 Mr. Orr but might have been with the advisors.  If I

14 misheard, then I apologize.

15         MR. STEWART:  I thought I said Mr. Orr or his

16 advisors, but if not I'll reask the question.

17         MR. RUEGGER:  Thank you.

18         THE COURT:  Okay.

19 BY MR. STEWART:

20 Q   What did Mr. Orr or his advisors say to you?

21 A   The specific discussions on this particular page were

22 around the magnitude of the city's cash disbursements

23 exceeding its cash receipts in terms of how dire the

24 situation was with respect to the general fund's cash

25 position.

1  Q   Page 2 of our exhibit is -- let's put it up there, and

2  let me ask you just what this is.

3           MR. RUEGGER:  Your Honor, objection.  It's a

4  forecast.  I'd rather not have any testimony on this.

5           THE COURT:  I'm sorry.  Did you say you'd rather not

6  have any testimony about it?

7           MR. RUEGGER:  And I'll rephrase my objection with

8  all due respect, your Honor.  Objection.  It's a forecast,

9  your Honor.

10          MR. STEWART:  My question is what is this document?

11          THE COURT:  Yeah.  I think we can get at least that

12  much in.

13          MR. STEWART:  Yeah.

14 BY MR. STEWART:

15  Q   What is this document?

16  A   It's the monthly cash flow forecast for fiscal year 2014

17  under base case.

18          THE COURT:  I'm sorry.  Under what?

19          THE WITNESS:  Under base case.

20          THE COURT:  Base case, which means --

21          THE WITNESS:  So, your Honor, on this it means the

22  city continuing to make its payments for both all unsecured

23  claims per schedule and no restructuring initiatives such as

24  any benefits from the bankruptcy protection may avail.  It

25  was the city paying its payments as they came due based on

1  the information that we had, including information from the

2  actuaries.

3         THE COURT:  Like steady state before?

4         THE WITNESS:  That is correct, your Honor.

5  BY MR. STEWART:

6  Q   And did you discuss your conclusions with Mr. Orr or his

7  advisors?

8  A   Yes.

9  Q   Let's put up the next exhibit, 10, for identification.

10 Mr. Malhotra, I think we have Exhibit 10 for identification,

11 which is Exhibit B to your declaration.  Is this a ten-year

12 financial projection?

13 A   Yes, it is.

14 Q   Did you discuss this with Mr. Orr or his advisors?

15 A   Yes, I did.

16 Q   And what did you say to him, and what did he say to you

17 or his advisors say to you about the ten-year projections?

18 A   What the --

19        MR. RUEGGER:  Objection.  Your Honor, this is the

20 same issue that Mr. DeChiara raised.  A discussion of

21 forecasts is essentially I think a back door around your

22 ruling, so we'd object to the question and the answer.

23        THE COURT:  Well, I'll permit the witness to answer

24 this question with the understanding that the document is not

25 in evidence and the witness' testimony about what the

1  document says is only for the purpose of the truth of what he

2  told Mr. Orr, not for the truth of the statements themselves.

3          MR. RUEGGER:  Thank you, your Honor.

4  BY MR. STEWART:

5  Q   And what did you say to Mr. Orr about the conclusions you

6  had reached in the document?

7  A   What I said is that the city's revenues over the ten

8  years, approximately $10-1/2 billion, and the city's

9  operating expenditures over these next ten years,

10 approximately $7-1/2 billion, for roughly a $3 billion

11 operating surplus.  What I said specifically around the

12 legacy liabilities was based on the current amortization

13 schedule and the information that we have received from the

14 actuaries, the legacy costs could be in excess $7 billion

15 over the ten years, which would result in a potential

16 operating -- a potential deficit to the tune of $4 billion

17 over the next ten years.

18          MR. STEWART:  Let's put up Exhibit 11 if we could.

19 BY MR. STEWART:

20 Q   Can you tell us what Exhibit 11 is?

21 A   Exhibit 11 is the five years of actual legacy

22 expenditures and five years of a forecast on the scheduled

23 debt service as it exists today or the pension and health --

24 retiree healthcare information we received from the

25 actuaries.

1    MR. STEWART:  Let's blow up, if we could, the part

2  that deals with the fiscal years ended between 2008 and 2012.

3  BY MR. STEWART:

4  Q   Are those numbers numbers relating to years that had

5  already -- where the books had already been closed?

6  A   That is correct.

7  Q   Where did your numbers come from?

8  A   The numbers would have come from -- for the debt service,

9  the POC's, would have come from the city.  The pension

10  contributions and the health benefits, the retirees -- for

11  the retirees would have also come from the city in

12  conjunction with the city's actuaries on the allocation of

13  what was for public safety versus nonpublic safety or DDOT.

14    MR. STEWART:  Your Honor, I would move this portion

15  of the document into evidence since it reflects only

16  historical data.

17    THE COURT:  Any objections?  All right.  The Court

18  will admit this document.  What was the exhibit number again

19  just so we're clear?

20    MR. STEWART:  11, I believe, Judge.

21    THE COURT:  All right.  Admitted Exhibit 11, 2008

22  through '12 only.

23    (Debtor's Exhibit 11 received at 4:45 p.m.)

24  BY MR. STEWART:

25  Q   And then go back to the full document if you could, and

1 as to the overall document, Mr. Malhotra, did you have

2 discussions with the emergency manager or his advisors about

3 it?

4 A    Yes, I did.

5 Q    And why did you discuss it with them?

6 A    We discussed it in the context of the legacy expenditures

7 continuing to have an increasing percentage of the overall

8 general fund revenues compared to where the city was five

9 years ago, compared to where the city was headed by 2017,

10 that the weight of the legacy expenditures was almost going

11 to close to double based on the projections that we had been

12 given.

13 Q    And what did the -- Mr. Orr or his advisors say to you in

14 response to the points that you made?

15 A    Specifically, they were surprised in terms of the

16 magnitude of the increase in pension and retiree healthcare

17 costs over the next five years.

18        MR. DECHIARA:  Objection.  Lack of foundation.

19 Testifying to the state of mind of the --

20        THE COURT:  It actually wasn't the question.  The

21 question was what did they say.

22        THE WITNESS:  They basically said that the costs

23 going up from where they were five years ago to where they

24 were ten years ago -- I specifically remember that it was

25 almost going to double -- was the response that I got back on

1   this particular page.

2          THE COURT:  Okay.  Can you try to specify for us

3   when these conversations were that Mr. Stewart has been

4   asking you about?

5          THE WITNESS:  Sure.  On this particular document we

6   would have had -- which was also as a part of the June 14th

7   proposal, your Honor, so we would have had meetings with

8   Mr. Orr and the other advisors all through the June time

9   frame and even in some of the May time frame, so there were a

10  series of meetings that we had.

11         THE COURT:  At which these documents were discussed?

12         THE WITNESS:  Yes.  The June 14th proposal, your

13  Honor, was pulled together over a period of time, so there

14  were specific documents that were discussed in those

15  meetings.

16         MR. STEWART:  Your Honor, I have a demonstrative

17  exhibit I would like to use, but before putting it up on the

18  screen, since there have been objections, it's Exhibit 38.

19  Why don't we put it up on the screen?  Judge, this is a

20  graphic representation of what the witness already has

21  testified to that he told Mr. Orr was the city's cash

22  position as the witness had seen it, and what I would like to

23  ask the witness is does this represent what you told Mr. Orr

24  or his advisors about what you believe the city's cash

25  position was going to look like in the coming year?

1          MR. RUEGGER:  Objection.  Leading, and it's also a
2    forecast.
3          MR. STEWART:  I can ask it in a nonleading way,
4    Judge, but --
5          MR. RUEGGER:  Then just forecast.
6          THE COURT:  Yeah.  You can fix the question.  No.
7    The objection is sustained.
8          MR. STEWART:  Okay.  Now, your Honor, as to these
9    last three exhibits and actually also this chart, I'd like to
10   move them into evidence on another ground.  And as I
11   mentioned, we identified these to the objectors as documents
12   that qualified as summaries over Federal -- under Federal
13   Rule of Evidence 1006.  In other words, they compiled and
14   pulled together voluminous records that could not
15   conveniently or easily otherwise be made into proofs.  That
16   was done with proper notice.  As the rule requires, we
17   notified the objectors of this.  We told them we have the
18   underlying records available for your examination.  If you
19   wish to see them, please come and do so.  One person did call
20   to say they'd like to see them but never, in fact, came.  I
21   would submit that we have actually satisfied the requirements
22   of Rule 1006 by doing this and that as simple summaries of
23   voluminous information they qualify for admission.
24         MR. RUEGGER:  Your Honor, I think Mr. Stewart
25   misunderstands our objection.  It's not that there's a lot of

1    data underlying any of these documents.  That might very well

2    be, but they are forecasts, which require, in our view,

3    expert testimony, which is not in the courtroom, so we're not

4    objecting due to the volume of the underlying data.  It's

5    because they are forecasts.

6              THE COURT:  I do agree with that.  The motion is

7    denied.

8              MR. STEWART:  Well, your Honor, could I be heard

9    just one more --

10             THE COURT:  All right.

11             MR. STEWART:  -- one more moment on this?  The fact

12   they are forecasts doesn't, per se, change anything.  They

13   would have to be opinions before they're excludable.  It's

14   been testified he --

15             THE COURT:  But why isn't the forecast an opinion

16   about what's being forecast?

17             MR. STEWART:  Well, it's possible to have forecasts

18   that are factual, that are extrapolations, that are not

19   really opinions, and there are forecasts rendered many times

20   that don't involve experts.  In fact, the two decisions I

21   cited earlier involved financial analysts much like

22   Mr. Malhotra who pulled together documents from which then

23   conclusions could be reached about the probability of

24   something happening or not happening.  The fact --

25             THE COURT:  They involve forecasts?

1    MR. STEWART:  These did not.

2    THE COURT:  Financial forecasts?

3    MR. STEWART:  These involved complicated personal

4  financial records, but they did involve an ultimate issue

5  such as could this person have possibly afforded this item

6  based on his or her income or --

7    THE COURT:  In the past.

8    MR. STEWART:  Well, it's past, but if a forecast is

9  based on information that is either historical or is made

10  available as information about a forecast --

11    THE COURT:  I have to say I'm not persuaded, but if

12  you can find me a case which says that a forecast does not

13  involve expertise, I'll certainly consider it.

14    MR. STEWART:  Okay, your Honor.  We will do that.

15    THE COURT:  We'll leave it open to that extent.

16    MR. STEWART:  Thank you.  That's all I have of this

17  witness, your Honor.

18    THE COURT:  All right.  Well, we won't press on with

19  cross-examination now.  We will break for the day and

20  reconvene at nine o'clock tomorrow morning.  Before we go --

21  ah, Ms. Patek has something, and then I have something.

22    MS. PATEK:  Your Honor, this is just a brief

23  housekeeping matter about a matter of a summary exhibit that

24  came in at the beginning of the day, and this was something

25  Mr. Irwin and I had talked about, and there was an error on

1  it.  It was to be corrected, and it didn't get corrected, but

2  it's going to be corrected on the --

3          THE COURT:  All right.  Let me ask the two of you to

4  consult about that and get back to me first thing in the

5  morning.  I have been asked to remind you that although this

6  courtroom will be locked overnight, there may and probably

7  will be people in here doing what they regularly do, the IT

8  staff, court staff, cleaning staff, so you are free to leave

9  your equipment and property here with that understanding or,

10  of course, you can take it with you.  And I remind you once

11  again please be quiet, perfectly quiet in the hallways.  And

12  we'll reconvene at nine o'clock tomorrow morning.

13          THE CLERK:  All rise.  Court is adjourned.

14      (Proceedings concluded at 4:53 p.m.)

INDEX

|                                          | Page |
|------------------------------------------|------|
| Opening Statement by Mr. Bennett         | 56   |
| Opening Statement by Ms. Green           | 94   |
| Opening Statement by Ms. Brimer          | 112  |
| Opening Statement by Mr. Wertheimer      | 117  |
| Opening Statement by Ms. Ceccotti        | 118  |
| Opening Statement by Ms. Patek           | 128  |
| Opening Statement by Mr. Morris          | 135  |
| Opening Statement by Ms. Levine          | 138  |
| Opening Statement by Mr. Ullman          | 145  |

WITNESSES:          Direct   Cross   Redirect   Recross

Gaurav Malhotra      168


EXHIBITS:                              Received

Debtor's Exhibit 9                        228
Debtor's Exhibit 11                       236
Debtor's Exhibit 104                       93


        I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.




/s/ Lois Garrett                October 27, 2013
_____         _____
Lois Garrett