UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CITY OF DETROIT,          .          Docket No. 13-53846
      MICHIGAN,                      .
                         .          Detroit, Michigan
                         .          October 23, 2013
            Debtor.          .          9:00 a.m.
. . . . . . . . . . . . . . . .

EXCERPT OF HEARING RE. ELIGIBILITY TRIAL
(10:00 a.m. - 11:59 a.m.)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:      Jones Day
                   By:  BRUCE BENNETT
                   555 South Flower Street
                   Fiftieth Floor
                   Los Angeles, CA  90071-2452
                   (213) 243-2382

                   Jones Day
                   By:  GEOFFREY S. IRWIN
                        GEOFFREY S. STEWART
                        MIGUEL F. EATON
                   51 Louisiana Avenue, N.W.
                   Washington, D.C.  20001-2113
                   (202) 879-3768

                   Pepper Hamilton, LLP
                   By:  ROBERT S. HERTZBERG
                   4000 Town Center, Suite 1800
                   Southfield, MI  48075-1505
                   (248) 359-7333

For the State of    State of Michigan
Michigan:           Michigan Department of Attorney General
                   By:  MATTHEW SCHNEIDER
                   P.O. Box 30754
                   Lansing, MI  48909
                   (517) 241-8403

                   Dickinson Wright, PLLC
                   By:  STEVEN G. HOWELL
                   500 Woodward Avenue, Suite 4000
                   Detroit, MI  48226-3425
                   (313) 223-3033

APPEARANCES (continued):

```
For AFSCME,            Lowenstein Sandler, LLP
AFL-CIO, and Sub-      By:  SHARON L. LEVINE
Chapter 98, City            JOHN K. SHERWOOD
of Detroit             65 Livingston Avenue
Retirees:              Roseland, NJ  07068
                       (973) 597-2374


For Detroit            Clark Hill, PLC
Retirement Systems-    By:  ROBERT D. GORDON
General Retirement          JENNIFER K. GREEN
System of Detroit,     151 South Old Woodward, Suite 200
Police and Fire        Birmingham, MI  48009
Retirement System      (248) 988-5882
of the City of
Detroit:


                       Clark Hill, PLC
                       By:  RONALD A. KING
                       212 East Grand River Avenue
                       Lansing, MI  48096
                       (517) 318-3015


For the Detroit        Erman, Teicher, Miller, Zucker &
Fire Fighters            Freedman, P.C.
Association, the       By:  BARBARA A. PATEK
Detroit Police              JULIE BETH TEICHER
Officers Associa-           DAVID EISENBERG
tion and the           400 Galleria Officentre, Suite 444
Detroit Police         Southfield, MI  48034
Lieutenants &          (248) 827-4100
Sergeants
Association:


For the Inter-         Cohen, Weiss & Simon, LLP
national Union,        By:  BABETTE A. CECCOTTI
UAW:                        PETER D. DECHIARA
                            THOMAS N. CIANTRA
                       330 West 42nd Street, 25th Floor
                       New York, NY  10036-6976
                       (212) 356-0227
```

APPEARANCES (continued):

For Detroit            Silverman & Morris, PLLC
Retired City           By:  THOMAS R. MORRIS
Employees              30500 Northwestern Highway, Suite 200
Association,           Farmington Hills, MI  48334
Retired Detroit        (248) 539-1330
Police and Fire
Fighters Associa-      Lippitt O'Keefe, PLLC
tion, Shirley V.       By:  RYAN C. PLECHA
Lightsey, and          370 East Maple Road, Fl. 3
Donald Taylor:         Birmingham, MI  48009
                       (248) 646-8292

For the Official       Dentons
Committee of           By:  CLAUDE D. MONTGOMERY
Retirees:                   ANTHONY B. ULLMAN
                            ARTHUR H. RUEGGER
                       1121 Avenue of the Americas
                       New York, NY  10020-1089
                       (212) 632-8390

                       Brooks, Wilkins, Sharkey & Turco, PLLC
                       By:  MATTHEW E. WILKINS
                       401 South Old Woodward, Suite 400
                       Birmingham, MI  48009
                       (248) 971-1711

For Retired            Strobl & Sharp, PC
Detroit Police         By:  LYNN M. BRIMER
Members                     MEREDITH E. TAUNT
Association:                MALLORY A. FIELD
                       300 East Long Lake Road, Suite 200
                       Bloomfield Hills, MI  48304-2376
                       (248) 540-2300

For the Flowers        Law Offices of William A. Wertheimer
Plaintiffs:            By:  WILLIAM WERTHEIMER
                       30515 Timberbrook Lane
                       Bingham Farms, MI  48025
                       (248) 644-9200

For Ambac              Schafer and Weiner, PLLC
Assurance Corp.:       By:  DANIEL J. WEINER
                       40950 Woodward Avenue, Suite 100
                       Bloomfield Hills, MI  48304
                       (248) 540-3340

Court Recorder:       Letrice Calloway
                      United States Bankruptcy Court
                      211 West Fort Street
                      21st Floor
                      Detroit, MI  48226-3211
                      (313) 234-0068

Transcribed By:       Lois Garrett
                      1290 West Barnes Road
                      Leslie, MI  49251
                      (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1                           - - -

2            THE CLERK:  All rise.  Court is in recess.

3        (Recess at 9:49 a.m., until 10:00 a.m.)

4            THE CLERK:  All rise.  Court is in session.  Please

5    be seated.  Recalling Case Number 13-53846, City of Detroit,

6    Michigan.

7            THE COURT:  All counsel are present.  Ma'am.

8            MS. GREEN:  Good morning, your Honor.  I apologize.

9    I think our motion got lost in the shuffle.  The Retirement

10   Systems filed a similar motion to the UAW's.  I just have a

11   few --

12           THE COURT:  I was actually going to hear it after,

13   but if you'd like to be heard now, that's fine.

14           MR. GREEN:  Oh, you know, I just -- it dovetailed

15   with what they were arguing, so I just had a few points --

16           THE COURT:  Okay.  Go ahead.

17           MS. GREEN:  -- to raise.  The first thing I wanted

18   to add is that at the time we drafted our motion, we thought

19   that the June 5th, 2012, e-mail was being reasserted as

20   privileged.  Mr. Irwin in his argument this morning has said

21   that they are not waiving privilege -- or they are now

22   waiving privilege to that.  It is back in the record.  So to

23   clarify, the e-mail does say that the memos were shared with

24   the treasurer.  It says they were memos that we did for Andy.

25   I presume that means they were shared with him.  I don't know

1   if that's actually true or not, but the memo does seem to
2   indicate that they were shared with a third party.

3          As far as the work product analysis, in our brief we
4   went through the relevant standard in the Sixth Circuit, your
5   Honor, and I don't believe that we talked about that yet
6   today.  There's a two-part test.  The first part of that test
7   is whether the document was prepared, quote, "because of the
8   party's subjective anticipation of litigation, as contrasted
9   with ordinary business purpose, and (2) whether that
10  subjective anticipation was objectively reasonable."  And,
11  furthermore, the driving force behind the preparation of the
12  document is what is key, and we assert that the "because of"
13  part fails.  They did it because of the fact that they were
14  trying to prepare themselves for the prospect of being hired,
15  not because of the fact that there was actually anticipated
16  litigation.  And, moreover, it's very attenuated that in 2011
17  they had some kind of crystal ball that they knew two years
18  from now they were going to be in this courtroom arguing
19  about eligibility under Chapter 9.  And we did cite case law
20  in our brief.  You had asked counsel this morning if there
21  was any case law regarding some kind of temporal factor, and
22  we cited two cases.  One states, "the mere fact that
23  litigation does eventually ensue does not, by itself, cloak
24  materials with work product immunity," so between that and
25  the next case that we cited, "The abstract possibility that

1    an event might be the subject of future litigation will not

2    support the claim of privilege," I think those are

3    dispositive.  This was two years before any of this even

4    arose.

5            Furthermore, I think that goes to whether or not the

6    anticipation of litigation could be objectively reasonable.

7    I don't know how two years prior to the litigation it could

8    be objectively reasonable that, number one, PA 4 still had to

9    get past the referendum.  Number two, it was ten months

10   before the EM was hired even if you assume that these were

11   prepared in June of 2012 when the memo -- memos were shared

12   with the governor or with Andy Dillon.  They may have been

13   prepared prior to that.  We don't know.  Moreover, the EM had

14   to be appointed.  PA 436 had to become effective.  All of

15   these things had to happen before we could be here today, and

16   Jones Day had to be retained.  So there are like at least

17   five or six major contingencies that had to occur before the

18   actual litigation would ensue.

19           Furthermore, even if they can establish the work

20   product, which we don't think they can, they still have to

21   overcome the waiver issue, and I don't -- I think that today

22   is a further example that they have selectively waived.  They

23   waived the memo itself but not the attachments.  Today the

24   state stood up and said, you know, "We have an e-mail from

25   March 3rd, 2013, between Kevyn Orr.  There are two attorneys

1  on it from the State of Michigan.  But to be cooperative, we

2  will give you that e-mail."  Well, if they're saying it's

3  privileged but they're giving it to us, to me, again, that's

4  a selective waiver.  They just give us what they want when

5  they want it, but they keep what they want as well, and I

6  don't see how they get past that.

7         In addition, my last point would be it's still not

8  clear who the client is that Jones Day is claiming they've

9  been representing.  No city official, to my knowledge,

10  through any of my review of these documents or the e-mails --

11  there is not a single city official that is ever cc'd, bcc'd,

12  you know, sent the memos.  It's purely between Jones Day

13  attorneys, Miller Buckfire, Huron Consulting, all of these

14  advisors that, again, when I think it comes to waiver,

15  clearly these are third parties and not the potential client.

16         The last point I will make because I want to be

17  brief -- I know you are ready to rule, I think -- is that I

18  think the wrong standard was stated earlier by the city.  He

19  said that there's a different standard for waiver of the

20  attorney-client privilege versus work product, and that is

21  not true in the Sixth Circuit.  We cited two cases in our

22  brief.  The first one is New Phoenix Sunrise, and it says,

23  "Both the attorney-client privilege and work product

24  protection are waived by voluntary disclosure of private

25  communications to third parties."  We also cited the In re.

1  <u>Columbia</u> case also --

2          THE COURT:  I'm sorry.  Are waived by what?  I just

3  didn't hear what you said.

4          MS. GREEN:  Disclosure of private communications to

5  third parties.  And he had said that some sort of different

6  standard applied when it was work product versus attorney-

7  client, and we also cited the <u>In re. Columbia</u> case that said

8  the same thing.  There's no compelling reason for

9  differentiating waiver of work product from waiver of the

10  attorney-client privilege, so to me it's a distinction

11  without a difference to say, "Well, we gave it to," and I

12  think the quote he said a minute ago was, "numerous

13  consultants and advisors as well as the state."  And to me

14  that is disclosing it to third parties; therefore, it was

15  waived when it was created a year or two ago, not to mention

16  the fact that as part of this litigation, they have

17  selectively waived certain e-mails that somewhat have to do

18  with this subject matter in that they relate to, for

19  instance, reviewing the consent agreement or reviewing and

20  commenting on PA 4 and the analysis related to PA 4.  And we

21  cited case law in our brief stating that if you waive the

22  privilege on selected pieces, you, therefore, waive it as to

23  the entire subject matter, and, therefore, you can't

24  selectively say, "Well, you can have the e-mail, but you

25  can't have the attachments," or, "You can have this e-mail,

1  but you can't have this e-mail."  So we would say that the

2  entire privilege has been waived by selectively waiving it as

3  to a few e-mails here and there.  Those are my comments.

4        THE COURT:  Thank you.

5        MS. GREEN:  Thank you.

6        MR. IRWIN:  I'll simply respond to those few points

7  that counsel made.  The first, in connection with whether the

8  timing of all of this should make a difference, I would

9  submit that that is arbitrary.  There are lots of things that

10  could have happened in the middle of 2012 that would have

11  been litigation events.  Maybe they didn't, but that doesn't

12  mean that at the time that all of this was being considered,

13  when legal advice -- or when Jones Day was considering some

14  of these issues, they weren't anticipating litigation.  It is

15  fortuitous that this happened two years later, actually, a

16  year and a half later or one year later, but that doesn't

17  mean that either potential clients or Jones Day were not

18  working in anticipation of litigation, which, as we indicated

19  in our brief, does not need to be a specific litigation

20  event.  You can anticipate litigation broadly.  You never

21  know what form it will take.  You know there are going to be

22  fights.  You know there will be disputes.  You don't know if

23  it'll be a private -- private lawsuits.  You don't know if

24  it'll be a Chapter 9 filing, but you can anticipate the need

25  for legal advice in an adversarial proceeding in some form

1    and meet the standard.

2          In terms of select -- whether there's been selective

3    waiver or subject matter waiver, as counsel suggests, this is

4    I think fundamentally incorrect.  The standard for subject

5    matter waiver is whether documents have been disclosed.  It's

6    the shield and sword problem.  It's if documents have been

7    disclosed and counsel intends to rely on them affirmatively

8    and yet withholds the balance of the documents that, in

9    fairness, should be considered, and I think this is codified

10   pretty clearly in the advisory committee notes to Federal

11   Rule 502 where they say, "Thus, subject matter waiver is

12   limited to situations in which a party intentionally puts

13   protected information into the litigation in a selective,

14   misleading and unfair manner.  Under both Rules, a party that

15   makes a selective, misleading presentation that is unfair to

16   the adversary opens itself to a more complete and accurate

17   presentation."  We are not -- we, the city, are not using any

18   of these materials affirmatively.  They are not on our

19   exhibit lists.  We are not introducing them through

20   witnesses.  We are not using them to our advantage that

21   should open us to some sort of claim of subject matter waiver

22   or selective disclosure under the rules.

23         And then lastly, I think fundamentally there is --

24   and I believe this is black letter law -- there are different

25   standards for whether there is waiver by disclosure under

1    attorney work product as opposed to attorney client.  If you

2    disclose attorney-client communications to a third party, you

3    are much more likely to be deemed to have waived that

4    privilege, but with attorney work product, you can make

5    disclosures.  And as long as they are disclosures to parties

6    who are nonadversarial, then you can still enjoy that

7    protection.  And that is a fundamental difference between the

8    two privileges.  It is not something where they are -- where

9    disclosures to folks who are within the potential group of

10   clients or advisors who are working these problems operates

11   to waive the privilege.  And I think we've demonstrated that,

12   your Honor.

13           THE COURT:  I want to -- I want to be sure the

14   record accurately reflects your position regarding what's to

15   be disclosed and what isn't.  Is it correct that to the

16   extent any of these memoranda that were attached to this June

17   2012 e-mail from Ms. Lennox were disclosed to state

18   officials, you are willing to make them available to counsel

19   here?

20           MR. IRWIN:  Yes, your Honor, but the e-mail itself

21   suggests -- if memoranda was prepared to prepare a Jones Day

22   lawyer for a meeting with counsel, that would not be.  It's

23   not my understanding of what we're talking about.

24           THE COURT:  Okay.  But you don't know which of the

25   several memoranda were shared and which weren't?

```
1            MR. IRWIN:  We'll do that.

2            THE COURT:  How will you determine that or --

3            MR. IRWIN:  Because we have the -- the Jones Day

4    lawyers are accessible, and we can figure that out.

5            THE COURT:  All right.  Thank you.

6            MS. GREEN:  I have a brief rebuttal.

7            THE COURT:  Yes, of course.

8            MS. GREEN:  I think the hypo that you stated earlier

9    compared to what he just said -- you know, these were memos

10   preparing a Jones Day lawyer to go seek work -- is different

11   than the hypo that you stated earlier, which was you meet

12   with a client who wants to meet with you for the purpose of

13   retaining you, and you may make notes.  That's different to

14   me than, "I did memos to prepare myself to go pitch a

15   client."  To me those are two different scenarios, and

16   there's a distinction, I think, between did the state ask for

17   this work, or was Jones Day just doing it internally, again,

18   to prepare.  I think those are two distinct scenarios.

19          One other thing that occurred yesterday, you made a

20   note on the record about PA 4 and that perhaps the intent

21   behind the appropriation -- the inclusion of the

22   appropriation was a factual issue for this trial, and I think

23   that some of the e-mail correspondence may go to that issue,

24   quite frankly, because the PA 4 appropriation was extensively

25   discussed in all these e-mails, and for that reason I think
```

1   there is a possibility that it would become relevant to a

2   separate issue than what Mr. Ciantra stated this morning,

3   which was the good faith and the bad faith issues and things

4   like that.

5         The last thing I would offer is our Exhibits 31

6   through 65 have a lot of the e-mail correspondence that has

7   been produced by the city, and there is a lot of, I guess,

8   internal -- what they would consider their internal work

9   product in those e-mails. I don't concede it's work product,

10  but according to what they are defining as work product, it's

11  in those e-mails, and it's already been produced, and it's

12  been waived. So if you'd like to look at those e-mails to

13  sort of familiarize yourself with what we're talking about,

14  I've produced a copy of our binder for your clerk this

15  morning if you'd like to look at those. Thank you, your

16  Honor.

17        THE COURT: All right.

18        MS. BRIMER: Your Honor, I'll be very brief.

19        THE COURT: Why should I hear you? You're not a

20  party to these motions.

21        MS. BRIMER: I understand that, your Honor. I want

22  to clarify one matter on the record that Ms. Green made,

23  and --

24        THE COURT: I will let you clarify a statement on

25  the record, but I can't let you argue on one side or the

1  other of these motions.

2      MS. BRIMER:  That's fine, your Honor.  And Ms. Green

3  raised the issue of your ruling on Monday with respect to the

4  intent of the appropriation in PA 4, and I want to be sure

5  the record is very clear that it's the appropriation in PA

6  436 that your Honor ruled may be a factual issue that prior

7  to that was not considered a factual issue.  I want to be

8  sure the record is very clear on that, which law we are

9  addressing, your Honor.  It may have an impact on the memos.

10  Thank you.

11      THE COURT:  Thank you, I guess.  All right.  On the

12  issue -- on the first issue, which is the motion for

13  reconsideration of the Court's previous ruling on the common

14  interest doctrine, the Court concludes that the record does

15  not establish cause to consider that motion out of time, and,

16  accordingly, for that reason alone, the motion is denied.

17      But having said that, I want the record to be clear

18  and the parties to understand that to the extent a question

19  is asked of a witness and either a witness or counsel on the

20  witness' behalf claims attorney-client privilege and asserts

21  the common interest doctrine or any other privilege, for that

22  matter, the Court will take a fresh look at that and consider

23  counsel's arguments relating to that.

24      On the motions to compel, the Court appreciates the

25  city's willingness to disclose to counsel for the objecting

1  parties whatever memoranda it shared -- the city's counsel,

2  Jones Day, shared with state officials and would request that

3  that disclosure be accomplished as promptly as possible.

4         To the extent, however, that the moving parties seek

5  a ruling from the Court that the mere fact that memoranda or

6  other documents that would otherwise be protected by the work

7  product doctrine were prepared pre-retention means that they

8  are not protected by that doctrine, the Court must reject and

9  overrule that position.

10        Accordingly, to the extent that the city is

11 maintaining this privilege as to any of these memoranda that

12 were attached to Ms. Lennox's e-mail or any other memoranda,

13 for that matter, the Court will look at them in camera and

14 ask the city to produce them for that purpose, again, as

15 promptly as possible.

16        As to the documents that Mr. Wertheimer suggests

17 were improperly withheld in discovery, this presents a more

18 challenging request if only because the documents that are

19 the subject of Mr. Wertheimer's request are not identified,

20 and so, Mr. Wertheimer, all I can do in that regard is ask

21 you to identify, again, as promptly as possible, what

22 documents or range of documents you seek the city to be

23 compelled to disclose, review that with the city, and to the

24 extent you can't work it out, we will take a break from our

25 trial whenever you are ready and work our way through it.

1          MR. WERTHEIMER:  Yes, your Honor.  I believe you

2    meant the state.

3          THE COURT:  The state.  I did.

4          MR. WERTHEIMER:  Yes.

5          THE COURT:  Thank you.

6          MR. WERTHEIMER:  Thank you, your Honor.

7          THE COURT:  All right.  So are there any other

8    issues still open before we begin our opening statements?

9          MR. SCHNEIDER:  Your Honor, there is one, and that

10   is because there has been discussion about the trial

11   subpoenas that were issued to the governor, the treasurer,

12   Mr. Baird, and Mr. Ryan.  The last time I appeared before

13   you, I argued -- I opposed that.  I want the Court to know I

14   am not going to file a motion to quash.  The governor, in the

15   spirit of cooperation and because he wants to move this

16   proceeding along, is willing to testify, and we have made --

17   we will make all of those state witnesses available.  And we

18   believe that Monday between 1 p.m. and 3 p.m. the governor

19   would be available, and we think the other witnesses -- well,

20   the other witnesses will be available on Monday or Tuesday.

21         THE COURT:  Thank you.

22         MR. DECHIARA:  Good morning, your Honor.  Peter

23   DeChiara from the law firm of Cohen, Weiss & Simon for the

24   UAW.  The UAW and the Flowers plaintiffs appreciate the

25   state's decision to change its position and to produce the

1   state witnesses.  We just want to be careful to note for the

2   record that there's been no agreement that there should be

3   any set time for the testimony of the state witnesses,

4   including the governor.  While we realize the governor has a

5   busy schedule, it is also our view that the governor, perhaps

6   with the exception of Mr. Orr, is maybe the most important

7   witness in this case, and given the significance of his

8   testimony and given the significance of the fact that there

9   may be documents we may have to examine him on which we have

10  not yet seen, we would just want to note for the record that

11  there's been no agreement that his testimony would be limited

12  to two hours.  Thank you.

13          THE COURT:  Thank you.  Mr. Schneider.

14          MR. SCHNEIDER:  As of this point, your Honor, I fail

15  to see the reason for the objector's argument that the

16  governor would require to testify for a lengthy period of

17  time.  This Court is well aware of the governor's situation

18  and who he is in the state.  He is willing to do this, but I

19  think we will have to work with the objectors as to timing.

20          THE COURT:  Well, I would certainly encourage that,

21  but it's not for a witness who appears in any court to

22  condition his appearance on a specific time limit.

23          MR. SCHNEIDER:  He's certainly not doing that.

24  That's certainly not the case.

25          THE COURT:  The UAW certainly interpreted it that

1    way, and, frankly, I did, too.

2        MR. SCHNEIDER:  Well, I'm sorry about that, your

3    Honor, but I can tell you, as I indicated before, the

4    governor wants to be cooperative --

5        THE COURT:  All right.

6        MR. SCHNEIDER:  -- as possible.

7        THE COURT:  Good.  Thank you.  All right.  We do

8    have to get to the issue of the amended joint final pretrial

9    order.  If I read it correctly, one or more of the objecting

10   parties decided after our final pretrial conference to object

11   to a certain small number of exhibits, and the state was --

12   or excuse me -- the city was not willing to allow for a

13   statement of such a late asserted objection.  Is that what

14   this is about?

15       MR. ULLMAN:  Not really, your Honor.

16       THE COURT:  Not really?

17       MR. ULLMAN:  Not really, not in our view.

18       THE COURT:  Oh, so you're withdrawing your

19   objections?

20       MR. ULLMAN:  No.  Should I -- may I speak?

21       THE COURT:  Please.

22       MR. ULLMAN:  No.  The issue is not that we're trying

23   to add new objections.  This whole --

24       THE COURT:  So you're not trying to add new

25   objections --

1          MR. ULLMAN:  We are maintaining the same --

2          THE COURT:  -- so to the extent there are new

3    objections, we can strike them.

4          MR. ULLMAN:  No, your Honor.  Let me try to explain.

5    We had always told the state -- the city that for this subset

6    of documents -- I believe there are six of them -- that we

7    were not opposing admissibility in general, but we believe

8    that they were admissible for limited purposes only to show

9    that these documents were said, that they were, you know,

10   created, that they were given to people.  We weren't

11   contesting that they're authentic documents, but we spoke

12   with Mr. Irwin and told him but at the same time -- that's

13   why we're not contesting admissibility in general -- we do

14   not agree that they're admissible for the truth of what they

15   say.  Some of these documents have forward-looking

16   projections that we don't think there's been an adequate

17   foundation for, and in our discussions with Mr. Irwin, he

18   said, "Yeah, we understand that.  We're not asking you to

19   concede to the truth of what's in there."  And we said,

20   "Fine.  On that basis" --

21         THE COURT:  Well, but hang on.  The admission of a

22   document into evidence or the agreement of the admission of a

23   document into evidence is not a stipulation to the truth or

24   credibility of the document.  It just means that it meets the

25   criteria for admissibility under the rules.

1          MR. ULLMAN:  And that may be all that's going on

2     here.  The reason this came up is because I had heard -- I

3     was not here at the legal argument yesterday, but I had been

4     told that your Honor had indicated that if a document did not

5     have a note on it saying there was some sort of objection, it

6     would be admitted for any and all purposes, at which point I

7     said to Mr. Irwin, "Wait a minute.  There's a couple of

8     documents here that we know from our discussions" -- you

9     know, they're limited for -- we agree they're admissible for

10    limited purposes only, and we have the right --

11         THE COURT:  Well, but what -- for what purpose do

12    you assert these six documents are not admissible for?

13         MR. ULLMAN:  Just for the truth of what's in them,

14    the hearsay, expert opinion, and then lack of foundation.

15    Some of these have forward-looking numbers or values in them

16    as to the amount of the unfunded pension liability, and for

17    those we're saying we don't disagree that you gave these

18    documents out, but we're not agreeing that the numbers that

19    are in there are necessarily true numbers.  That's all we're

20    saying.  That was understood from day one with discussions

21    with Mr. Irwin, and we just wanted to make sure that your

22    Honor -- that if the document came in, that your Honor would

23    not assume that everything that was in it on these -- on

24    these six documents was true.  That's all that we cared

25    about.  We don't deny that they were either created, that

1    they were given to people, and for that purpose we have no

2    problem with admission.  And it may have been that we

3    misinterpreted what your Honor said.

4            THE COURT:  I'm having a hard time comprehending

5    what you're saying, frankly.  If a piece of evidence has

6    hearsay within hearsay --

7            MR. ULLMAN:  Um-hmm.

8            THE COURT:  -- which I think is what you're talking

9    about here; right?  The document itself is hearsay.

10           MR. ULLMAN:  Okay.

11           THE COURT:  And it contains hearsay statements.

12           MR. ULLMAN:  Yes.

13           THE COURT:  Okay.  If the document is admitted,

14   opposing parties waive -- if they agree to the admission,

15   they waive both hearsay objections.  That does not mean that

16   that party is stipulating to the truth of any of that

17   hearsay.  It just doesn't mean that.  All it means is it's

18   evidence.

19           MR. ULLMAN:  Okay.  And if, you know, I had been

20   given a misinterpretation or a misapplication of what your

21   Honor indicated the other day, then you're right.  This is a

22   moot issue, and there is no problem based on what your Honor

23   said.  I think that's true.

24           THE COURT:  Okay.  All right.  Then in that event,

25   the Court will enter the amended final pretrial order, and

1  based on the list of documents that are shown as having no

2  objections, the Court will prepare an order admitting all of

3  those documents into evidence.  Okay.  Opening statements.

4         MR. BENNETT:  One second, your Honor.  Good morning,

5  your Honor.  I'm assuming that you want to hear from us

6  first, notwithstanding that the order was different in the

7  other -- in the legal issues proceedings, but, in any

8  event --

9         THE COURT:  Well, you have the burden of proof;

10  right?

11         MR. BENNETT:  Correct.

12                    OPENING STATEMENT

13         MR. BENNETT:  First of all, I want to make crystal

14  clear -- many people have in different environments -- that

15  I'm not going to speak about any arguments that came up in

16  the context of the legal argument part of the proceedings.

17         THE COURT:  Thank you.

18         MR. BENNETT:  I appreciate that part, too.  And I'm

19  going to confine myself to the issues -- or the parts of the

20  eligibility standard and the part of 521(c) that have some

21  factual disputes that have been identified in connection with

22  them.  And toward the end I do want to spend a minute on the

23  materiality of facts relating to legislators' or governors'

24  intent relating to statutes because I think it was not

25  something that we did cover when we were here before.

1        So, first of all, I'm going to start with the issue
2   of insolvency, and what I'm going to say about that because I
3   could stand here for hours describing the evidence that is
4   going to come in on that subject, but I'm not going to do
5   that -- I'm going to say simply that the witnesses that we
6   will present on the subject are going to present a mountain
7   of evidence showing insolvency of the city.  Sadly, that
8   evidence will show that the city is insolvent on every
9   relevant standard.  And, your Honor, there's been at least
10  intimated in a lot of the papers about the significance that
11  no expert report has been submitted.  Quite frankly, that is
12  because no expert report is required.  This is one of those
13  cases where the data speaks very clearly and persuasively on
14  its own -- it needs no gloss -- and that only AFSCME is
15  objecting on the insolvency point, at least as I read the
16  papers, itself speaks volumes.

17       I want to say that from the near term perspective,
18  the city did not run out of cash because -- only because
19  actions were taken to prevent that from happening.  The
20  evidence will show that if the city just kept on paying debts
21  as and when they were becoming due, cash would have run out.
22  The fact that the city stopped doing that is the only reason
23  why there are positive cash balances.  As I said before,
24  there's no question that if the actions were not taken, cash
25  would have run out.

1    I will also say that the steps that the city took
2  during past years to pay many of its debts as they become due
3  didn't turn out particularly well.  One of the consequences
4  you'll see in the evidence and, in fact, a good document to
5  keep around at all times is the proposal for creditors dated
6  June 14th.  There's a section there that deals with this.  It
7  shows that there were numerous secured borrowings made to
8  create liquidity in the city in past years when there were
9  similar cash flow problems.  Each and every one of those
10  borrowings were done on a secured basis, and so the
11  consequence that we face today is that those borrowings
12  consume a very significant amount of cash otherwise available
13  for creditors generally, so that was -- so avoiding a
14  liquidity problem in the prior periods didn't exactly work
15  out well from the perspective of many other creditors.
16    Also, as will come into evidence, pension
17  contributions were deferred during at least the past two
18  fiscal years with the effect that the underfunding under
19  anyone's measure -- we don't have to worry about the fight
20  between the different measures of pension underfunding.  It's
21  greater than it might otherwise have been.
22    Finally, on the insolvency point, you are going to
23  hear from several witnesses, but most importantly perhaps
24  Chief Craig, about the fact that the city is failing to
25  provide basic services to its residents.  We don't think

1    about that as another one of the creditor claims or
2    obligations, but the reality is it's as important as anything
3    else.  As we've indicated before and as the witnesses will
4    indicate, without solving that problem, there may not be a
5    city to reorganize.

6          Now, AFSCME makes a few points that are worth
7    discussing how the evidence will deal with them.  First, much
8    is made over the dispute about the underfunding amount, and
9    it is asserted that because there's a dispute of the
10   underfunding amount, the city can't demonstrate it's
11   insolvent.  Well, as your Honor knows, the insolvency test
12   focuses on cash flow.  It focuses on near term and longer
13   term cash flow type measures, and in that connection, there
14   are cash flows that will be put into evidence.  There's also
15   a convenient place to find them in the proposal for
16   creditors.  There's different versions with different levels
17   of updates and different assumptions that are baked into
18   them, but the line items that talk about pension
19   contributions your Honor is going to learn don't change very
20   much whether you use the city's assumptions as to
21   underfunding amount or the city's calculation of underfunding
22   amount or the Gabriel, Roeder calculation of underfunding
23   amount, Gabriel, Roeder, of course, being the actuaries
24   retained by the pension funds, the pension fund management
25   themselves, to give them advice.  And so your Honor will be

1   taken through the numbers, and you will find that the

2   contribution amounts, which are the relevant numbers in the

3   insolvency calculation, don't move around very much

4   notwithstanding the very different calculations of

5   underfunding amounts, and the reason for that will be

6   explained.  Mr. Moore of Conway MacKenzie will be the witness

7   that will cover that area.

8          There's also a little bit of numerical confusion

9   concerning the percentage of the city's contribution to the

10  GRS Pension Fund that is attributable to DWSD employees.  You

11  will see in the papers a number bandied around, 62 percent.

12  Well, actually, the number is the reverse of that.  It's 38

13  to 39 percent.  Mr. Orr got that wrong in his deposition.  He

14  corrected it at the end, but, of course, the correction

15  wasn't cited in the papers.  There will be evidence on the

16  point so there won't be confusion on the point as we go

17  forward with the numbers.

18         Then AFSCME says that the city deferred sales of

19  assets, and they talk about two examples.  We will

20  demonstrate, of course, that that is not true.  First of all,

21  the Belle Isle deal, Belle Isle leased to the state in

22  exchange for the state taking over the maintenance and CAPX

23  requirements with respect to Belle Isle, never involved the

24  generation of incremental spendable cash.  It did and always

25  has involved a reduction of the cost on the city to maintain

1 Belle Isle. And what the evidence will show is that those
2 anticipated savings were included in the projections that
3 were the basis for insolvency calculations, and they are in
4 the projections. They're the basis for the proposal for
5 creditors or at least the lead-up to the proposal for
6 creditors in the June 14th presentation.
7 It's also very hard for us to understand how anyone
8 can say that art sales were deferred. It is common
9 knowledge -- and I suspect we'll figure out a way to get this
10 into evidence as well -- that there's an attorney general
11 opinion out there that basically says that the art can't be
12 sold for creditors. We, unfortunately -- in the absence of
13 some form of an agreement, there are no sales possible
14 without a significant change in current management of the
15 museum or litigation and -- maybe and/or litigation relating
16 to some of the points made in the attorney general's opinion.
17 There were no pre-filing opportunities to liquidate art.
18 Next, AFSCME talks about the swap deal, which, of
19 course, your Honor is familiar with because it's before you
20 in still another adversary setting in this case. The swap
21 deal itself, you will hear, does not provide adequate cash
22 relief, but the transaction hasn't been approved yet. And
23 there is, unfortunately, no assurance as we stand here today
24 and certainly as we stood here several months ago, that it
25 will be done. It turns out that some of the objectors in

1   this proceeding are also objectors in that one, and so I'm

2   not sure how we're supposed to even count the anticipated

3   cash flow relief attributable to the swap transaction as

4   something that could have even affected the city's insolvency

5   calculations.

6           And lastly, there is the assertion -- and I'm

7   anxious to hear what the evidence will be to support this

8   one -- that the appointment of the emergency manager

9   prevented the city from taking actions designed to raise

10   revenue and avoid insolvency. Of course, in the briefs that

11   have been filed, there is no suggestion about exactly what

12   steps those are that the City Council or the mayor or whoever

13   else has been displaced in the view of AFSCME have been

14   planning and anxious to implement that would solve the city's

15   financial problem. No such actions have ever been specified.

16   We have no idea where that evidence is coming from. It will

17   be quite a surprise if there is any.

18           It was for these reasons, the insolvency and the

19   fact that there really weren't anything left, that the city

20   or the state could think of to do to address the problems

21   that the June 14th presentation was put together, and it

22   proposes a plan that includes significant reductions in the

23   city's obligations, including bonds, including other post-

24   employment benefits, including other unsecured claims, and

25   including pension underfunding claims. Whatever the law

1   turns out to be concerning protections to be afforded to

2   various claims, there is no law prohibiting the city from

3   trying to commence negotiations to resolve its financial

4   problems, and that's what we were trying to do.

5          Now, while we're near this subject, there is an

6   issue that ripples through actually several of the standards,

7   which is whether or not the proposal that's included in the

8   proposal to creditors -- and I'm referring to the materials

9   that are, I think, between pages 101 and 109 or thereabouts

10  of that document -- whether that proposal was a -- was close

11  enough to a confirmable plan of adjustment to qualify for the

12  purposes of, open paren, one, demonstrating that the city

13  desires to implement a plan; open paren, two, that the city

14  was in good faith as part of the good faith negotiations

15  because they had to be talking about a certain kind of plan

16  that is asserted; and, three, whether the city was acting in

17  good faith generally.  And I think the proposal for

18  creditors, that June 14th document, has been admitted into

19  evidence, again, for all purposes, but very clearly for the

20  purpose of showing this is what the proposal was that the

21  city presented as its initial presentation to creditors, and

22  so it speaks for itself.  We can look at it.  We don't need

23  testimony.  It's reasonably detailed.  In fact, I would

24  argue your Honor sees disclosure statements, summaries of

25  plans all the time, and you will see this measures up quite

 1  nicely to the standard that's applicable even in disclosure

 2  statements to what a plan should look like.  It is -- it has

 3  a classification scheme.  It defines treatment for all

 4  classes.  It includes a very extensive term sheet for notes

 5  that are proposed to be distributed to creditors, and it is a

 6  plan, your Honor, that for that reason is a plan that could

 7  be confirmable.

 8        Now, there is clearly disputes over what law should

 9  be applied by this Court in determining whether or not it

10  would confirm that plan if it was fleshed out, put into plan

11  form, and presented to your Honor.  I told your Honor in

12  prior hearings that I doubt that's the way this case is going

13  to come out, but that's the relevant standard for today.

14        And the reality is is that on the city's very

15  reasonable view of the law, there is no question that it

16  could be confirmed.  I understand that with respect to the

17  retiree constituents' views of the law, they say it can't be,

18  but that doesn't render the proposal inappropriate for

19  purposes of a Chapter 9 case.  We are dealing with issues

20  that your Honor has heard argument about, is going to

21  ultimately decide, but the plan hangs together as an

22  appropriate expression of the kind of debt relief the city

23  should be able to get based upon one very reasonable view of

24  the law.  We think it's absolutely the right view.

25        The other assertion as to why the plan isn't an

1   appropriate plan is that it doesn't adequately liquidate
2   claims, and here again they're talking about the pension
3   underfunding amount.  But I think we know both from the
4   structure of the Bankruptcy Code itself and from many, many,
5   many other cases that the liquidation of claims is not a
6   prerequisite to confirmation of a plan.  Plans are confirmed
7   all the time with the treatment specified as the treatment is
8   specified in the plan in the proposal for creditors that is
9   not claim size dependent.  It's by plan.  It makes
10  distributions based upon pro rata interests in the overall
11  claims pool.  It was designed that way because there is, in
12  fact, uncertainty concerning the aggregate amount of certain
13  claims.  Frankly, the city believes there's more questions
14  relating to the size of the OPEB, or other post-employment
15  benefit, claim pool than there is with respect to the pension
16  claim pool, but there's uncertainty on these issues.  It is
17  acknowledged there is uncertainty of issues.  Those are not
18  confirmation problems.  At least they're not confirmation
19  problems with some plan structures, and they're certainly not
20  confirmation problems with the plan structure that was
21  offered by the city.
22          So for these reasons, that is a plan that is
23  sufficiently detailed, more detailed than it has been in many
24  other of the other reported Chapter 9 cases, and it is
25  appropriate for all purposes as a starting point for good

1   faith negotiations, demonstration of the city's intent to
2   implement a plan in Chapter 9, and demonstration of the
3   city's overall good faith in commencing its Chapter 9 case.
4   And so I think we've dispensed of that component of the
5   different standards.

6           We now turn to impracticability.  Can I have a
7   second for a glass of water?  Thank you, your Honor.  Moving
8   to impracticability, the record shows in numerous places that
9   the city has many, many issues of bonds outstanding, and
10  another reason to keep the proposal for creditors nearby is
11  that toward the back of it -- and I think it's between pages
12  like 115 and 130, thereabouts -- there is an extensive list
13  in a type size not so good for people who wear bifocals.  I
14  think you will hear in the evidence, if it's not already
15  clear from the record, that most of the individual bond
16  issues do not have indenture trustees as we think of them in
17  the commercial context or any other equivalent holder
18  representative.  In fact, holders reserve more rights in most
19  muni structures or assign them to their insurers, to bond
20  insurers if insurers are involved.  And so what you have here
21  is that in order to compromise principal or interest as well
22  as many other terms of debt that have to be addressed in
23  connection with resolving the city's financial problems
24  either under the proposed plan that was in the proposal for
25  creditors or in any other plan, there is going to have to be

1   extensive solicitation, efforts to find relevant bondholders

2   to get the right consents. The bankruptcy process is going

3   to make it a little bit easier because, of course, it will be

4   majorities of those who vote, and the solicitation rules are

5   clearer. Outside of a proceeding you might have to get

6   everybody in order to implement changes. In fact, you do

7   have to get everybody with respect to most of the issues.

8   There are a couple where there might be an exception if the

9   insurer exercises certain extensive levels of control. The

10   bottom line is it is an awful mess. There is many, many,

11   many, many issues, many, many, many holders, and this, of

12   course, is the definition of impracticability in a lot of

13   ways in the Bankruptcy Code because the whole reason we have

14   impracticability was because of New York's case back in the

15   '70s. New York back then -- the numbers were different;

16   times have changed -- didn't have materially more and may

17   have had less bond issues and bondholders than Detroit has

18   today. And the purpose of the impracticability standard was

19   to recognize the fact that with that kind of a debt

20   structure, having good faith negotiations with creditors in

21   advance of a proceeding in an effort to have an out-of-court

22   workout were, frankly, pointless or would have been

23   pointless.

24         And, frankly, for the most part, the objectors don't

25   disagree with anything I've just said. It's hard to. What

 1    they say instead is that whether -- however negotiations
 2    might have been practicable with bondholders, negotiations
 3    were practicable with them, with the -- in some senses, self-
 4    appointed or appointed representatives of particular labor
 5    groups or retirees, and we're going to talk about that in
 6    detail in a second, but we have a point first, which is if
 7    you have a situation where it's admitted or almost
 8    admitted -- and the Court may have to decide -- that
 9    negotiations are impracticable with a huge universe of
10    creditors but they might be practicable with respect to
11    another universe of creditors, what do you do?  And the
12    Retiree Committee actually is good about admitting there's
13    law on this in one of their footnotes, and the law is that if
14    you've got an impracticability problem, you have an
15    impracticability problem; that negotiating with the groups
16    you can groups with are kind of pointless.  I think that if
17    we think about it a little bit, that has to be right because,
18    of course, if -- let's take a hypothetical that you've got,
19    you know, a group over here not organized, and then you've
20    got one bank debt piece, which is clearly organized and you
21    can clearly negotiate it.  Well, you try to do everything you
22    can with the bank, but at some point the bank is going to say
23    what's going to happen with them, all those people that you
24    can negotiate with, because no one ever makes a deal in a
25    vacuum.  And even if you could get all the way to conclusion

1   with a bank and you still have to file a Chapter 9 case,
2   doesn't that make you start -- effectively start all over
3   again with the one that was easy to negotiate with?  And even
4   if it doesn't, even if it's possible to negotiate a deal with
5   both the bank and the city decides this is it, we're going to
6   make this deal no matter what happens in the Chapter 9 case
7   that you need for everybody else, you still have to go
8   through the Chapter 9 case.  And waiting to file a Chapter 9
9   case while you work with the bank and finally reach the deal
10  that you're going to have with the bank that's going to be
11  permanent, you've wasted a lot of time because you have to
12  start a Chapter 11 case and go through that process anyway.
13  So I submit that the couple of cases that have focused on
14  this that we cite in our papers and that the Retiree
15  Committee cites in a footnote have got it exactly right.  If
16  you have an impracticability with respect to a material part
17  of your capital structure, you have an impracticability
18  problem, period, so I think by looking at this -- and by the
19  way, before we go off, I want to say there's one paragraph of
20  the AFSCME brief that I think is just terribly important on
21  this.  They argue this point a lot, but then they have
22  paragraph 102 at page 46, and it's only two sentences, so I'm
23  going to -- three sentences, so I'm going to read the whole
24  thing.  "AFSCME is not suggesting that pre-petition
25  negotiations could have bound everyone" -- hold that

thought -- "or must have involved all of the city's thousands of creditors." I don't under -- I think that sentence means we're done because if the pre-petition negotiations couldn't have bound everyone, how would you get a plan done? And if it didn't involve all the city's thousands of creditors, how would you get a plan done? So I think they're conceding that our situation has to be regarded as impracticable, but they go on. They say, "Some level of negotiation with principal creditors could have led the city to a nonbankruptcy solution." I think that's a non sequitur. If you're not talking to everyone, you can't possibly have a solution. But then they go on further, "By way of analogy, Section 109(c)(5)(B) of the Bankruptcy Code contemplates pre-bankruptcy negotiations with creditors that the municipality" -- there's a "the" missing -- "intends to impair, not all creditors." Well, one of the complaints of AFSCME is that the city intends to impair substantially all of its material creditors. It has no other choice. So I suppose there's a circumstance if the city was arguing that we have a huge group of creditors as to which negotiations are impracticable, but we're not going to impair them, and we have another group of creditors that we really can talk to, and we're going to impair them, if the city said no discussions, that would be a rather extreme and silly position. It's just not our case. We need impairment pretty

1    much across the board.  We have proposed impairment pretty

2    much across the board.  And in that circumstance, the fact

3    that huge chunks of the relevant constituencies are not

4    organized, can't be organized, can't be found, that is to me

5    the end of the impracticability discussion.

6        But maybe we should go on.  Maybe we should try to

7    figure out whether it was really impracticable to negotiate

8    with the unions themselves.  And, your Honor, I think the

9    answer to whether or not it was impracticable to negotiate

10   with the unions themselves -- and I include here the unions

11   and the other retiree groups -- is, frankly, what happened

12   when we asked the unions whether or not they could represent

13   retirees and the other groups or they could represent

14   retirees, and we have a demonstrative that we'll come back to

15   and put into evidence later on, but I think it's useful to

16   pause on, and I think it can go up on -- oh, you have a --

17   oh, okay.  Okay.  We have a big one there, and I have a few

18   that I can hand out to people, so with the Court's

19   permission --

20           THE COURT:  Yes, sir.

21           MR. BENNETT:  I think it's also in the -- I think

22   it's also in the binders.  Now, there's a lot of information

23   on this chart, and I'm not going to try to take us all the

24   way through it, but I want to zero in on the fourth line of

25   data, which is the -- which is -- well, first of all, the

 1   third line of data, which says, "Was a letter sent to a
 2   creditor?"  What that is is a letter that basically asked,
 3   "Are you in a position to represent retirees and which ones?"
 4   You'll see it.  It'll be in evidence.  And then the next line
 5   is, "Respondent is able to represent retirees," and I'll give
 6   you the key.  "X" means they said no, the green check means
 7   they said yes, and the question mark is there was no response
 8   or it's not clear, and your Honor is going to hear some
 9   evidence on that.  And so look across the line.  I have a
10   number of your most vigorous objectors who said, "No, we
11   can't represent retirees," so I'm going to come back to this
12   in the context of good faith, but let's -- we can start
13   thinking about it now.  What is -- what do you expect of the
14   city having made a proposal heavily supported, certainly,
15   again, as standards go in this -- in similar circumstances,
16   had lots of meetings to explain, answered every question,
17   every question that was asked at the meetings -- there will
18   be evidence on that, too -- and your negotiating partner says
19   to you, in many instances in writing, "We actually can't
20   represent the people who are impaired by your proposal"?  To
21   say that anything that happened afterwards is not in good
22   faith, you've got to have a good answer as to what do you do.
23   What's the next sentence in the dialogue?  You're getting
24   feedback from someone who doesn't have authority to give
25   feedback if they give you any feedback.  By the way, the

1   bottom line is feedback.  "X" means no.  There's no other

2   term we need to define.  If they say -- if they said --

3   responded otherwise constructively, which was either "No, but

4   I might do this," or "Yes, if you make the following

5   changes," that's okay, but that just came from somebody who

6   said they don't represent the person who's going to be

7   affected.  What is the next step in a negotiation where the

8   person who said they're here to negotiate says to you, "We

9   really don't represent the person who's affected by the plan

10  we're discussing"?  None of the objectors say how that

11  question is supposed to be answered.

12          The reality is is the city said, "Tell us your

13  suggestions anyway."  And if we got suggestions, feedback, we

14  would have had to then figure out what to do with it in that

15  very unusual circumstance that I, frankly, haven't confronted

16  very often in my career, but we weren't even put to that hard

17  question because what the other part says is is that -- and

18  this is more toward the good faith negotiation part than this

19  one, but as long as I've got the chart up, as the bottom line

20  indicates, the evidence will show that from this creditor

21  constituency, not from others -- I'll get to that in a

22  second -- we received no concrete proposal or comprehensive

23  feedback.  We got a lot of "no," but I'll come to that later.

24          With respect to this part, again, impracticability,

25  AFSCME cites results of past collective bargaining as an

1  example of negotiations with unions that have succeeded.

2  That doesn't surprise me in the slightest, but there's also

3  no evidence and I don't think there will be any that those

4  past discussions began with unions disclaiming power to

5  bargain on behalf of the relevant constituency.  As the

6  evidence will demonstrate, that's how these discussions did.

7          So the bottom line, again, with respect to this

8  part, is even if -- and it's not -- the standard for

9  impracticability of negotiations is impracticability with

10  every major constituency, I think the fourth line of this

11  chart demonstrates that negotiations were impracticable with

12  the retiree side, and they were impracticable with the

13  bondholder side.

14          Good faith negotiations.  Again, this is a question

15  I don't think we have to reach because I think we've

16  demonstrated that those kinds of negotiations were

17  impracticable, but we tried really hard anyway.  The evidence

18  will show that we presented the June 14th plan.  Mr. Buckfire

19  of Miller Buckfire, who was integral to all the negotiations,

20  but others, Mr. Moore, Mr. Malhotra, people

21      you will hear from, they also extensively participated

22  and will testify about what happened in the rooms.  The city

23  told the creditors essentially the following.  The city would

24  have discussions with all parties willing to speak for the

25  city for about a month after the June 14th presentation so

1   that the city could listen to people and figure out if there
2   was an out-of-court solution possible for this enormously
3   complex and dire circumstance.  The city representatives
4   asked for feedback, including proposals that the creditors
5   would accept if they weren't going to accept the city's
6   proposal.  And the city said in writing and separate -- and
7   verbally that it would evaluate what it heard during the
8   following month, during the week beginning July 15th, 2013,
9   and decide what came next.  It's conceivable -- I think
10  people would say they doubted it would happen -- that one of
11  the things that would have come next were consensual
12  negotiations on the effort to build some kind of plan.  That
13  could have commenced.
14          THE COURT:  You said July.  Did you mean June?
15          MR. BENNETT:  No.  July 15th was the evaluation
16  week.
17          THE COURT:  Oh, okay.
18          MR. BENNETT:  The June 14th proposal and July 15th
19  evaluation week, meetings in the middle.  I'll have a
20  timeline at some point, and you'll see how this fits
21  together.
22          THE COURT:  Okay.
23          MR. BENNETT:  So one of the things that might have
24  happened next would have been negotiations on a consensual
25  plan, but if the -- after the month of discussions and after

1    the evaluation week the city could not see a path to an out-

2    of-court restructuring that could be implemented outside of

3    court, a Chapter 9 case was absolutely a possibility.  No one

4    was shy about that.  And, frankly, it should not be

5    surprising to anyone that the evidence shows that work on

6    both contingencies was proceeding throughout this entire

7    period.  Much is made of the fact that there's contingency

8    planning going on for a Chapter 9 case.  Absolutely there

9    was.  It would have been irresponsible not to.  By the way,

10   nothing in the Jones Day pitch is inconsistent with this way

11   of organizing a case.  And there's a lot of complaints about,

12   well, people thought they had to keep a record, make a

13   record.  Absolutely they have to keep a record and make a

14   record.  Making a record of out-of-court steps taken in a

15   Chapter 9 negotiating process is just sensible when everybody

16   knows, based upon the play book executed in the last six or

17   seven major cases have involved vigorous objections to

18   eligibility by bondholders and labor unions, depending upon

19   the case which, sometimes both, and in every single one of

20   those cases, the judge has to go through pages and pages and

21   pages about what happened during the out-of-court phase to

22   determine whether people were in good faith.  So courts

23   through their opinions have sent a message to people who are

24   serious about Chapter 9 restructurings.  Keep records, and we

25   did.

1          There is a lot of criticism in the papers that there
2     were instances where the city said these are not negotiations
3     or particular meetings were not negotiations.  I confess that
4     this implicates an area of law that I'm not tremendously
5     familiar with.  It has to do with collective bargaining.  As
6     the evidence will show, the collective bargaining was
7     suspended as a result of a statute passed, and there was a
8     clear concern by the city that they were not going to waive
9     the -- or reverse the suspension of collective bargaining and
10    all of the baggage that came with that.  However, we don't
11    really have to deter ourselves much over that incident
12    because it's admitted by the objectors that the city sought
13    feedback.  The evidence will show that.  It's admitted that
14    there were, quote, discussions, close quote, and by the way,
15    the leading case that people cite as the -- I think it's
16    Endicott Schools case that is cited for the proposition of,
17    you know, what is a nonnegotiated process or absence of
18    negotiations.  That case talks about absence of discussions.
19    That's the actual quote if you go back to the case itself.
20          So, in any event, there is no dispute that dialogue
21    was something that was encouraged and not discouraged.
22    Nobody said we don't care what you think.  Never happens;
23    evidence will show never happens.
24          Now, again, assuming for a second that what the city
25    did in the negotiations has any relevance at all given the

1    clear impracticability in this case, what is required of the
2    city in good faith negotiations -- and I intimated that when
3    we started talking about the chart -- is informed what
4    creditors -- by what creditors said and did.  Okay.  Mr.
5    Buckfire will testify about some of that being especially
6    careful not to talk about proposals that other people made
7    because they were made with an intent that they be kept
8    confidential, but we got permission at least in one instance
9    to talk about the fact that a proposal was made.  And what
10   Mr. Buckfire is going to tell the Court is that the proposals
11   that the city got back were proposals that basically said,
12   "Our position is better than everybody else.  We should do
13   better than everybody else," and they were, frankly,
14   completely insensitive to the overall problems that the city
15   faced.  Again, the fact that we did get proposals from people
16   other than the labor negotiators is going to be --
17   Mr. Buckfire will testify to it, but there's a letter in
18   evidence, and I don't have the number.  I forgot to put it on
19   this morning.  There's a letter in evidence -- a cover letter
20   to a proposal that came from three major insurers in the pre-
21   filing period.  And, your Honor, that demonstrates that a
22   party that's represented by qualified professionals, as a
23   number of the labor/retiree constituents were, knew exactly
24   what you're supposed to do when you receive a proposal and
25   you don't like it.  The way you -- the way you respond to a

1 proposal and you don't like it is you send back something

2 that you do like, and that's how a negotiation gets started.

3 Whether it would have worked or not is a different question.

4 The point is is that it wasn't a mystery to anybody how to

5 start a negotiation if someone really wanted to start one.

6 What did labor do besides respond maybe we're not

7 the right person to talk to, which is a problem in and of

8 itself? Well, here the UAW's papers are particularly

9 instructive, and in many places in their papers, particularly

10 their supplemental objection -- I think it's also in the

11 pretrial brief; I'm just not remembering that as clearly

12 today -- the UAW says, "Well, of course we weren't going to

13 say yes to any modifications of retiree benefits or pension

14 benefits in the pre-filing scenario because we had a

15 constitutional guarantee. Any proposal that doesn't pay

16 these in full and does not impair retiree benefits is a

17 proposal we cannot accept," or, "we will not accept." I

18 think it says both those things in different places.

19 So, again, I think we have to ask the most crucial

20 question in evaluating the city's good faith. When you get

21 back a response that says, "We're never going to agree to

22 anything but nonimpairment," what exactly is the city

23 supposed to do next? What's the next step in that

24 negotiations? "Gee, we were just kidding. We found the

25 money in a mattress. We'll do that"? I don't think that's

1  the right response.  I don't think there is a right response.

2  I think at that point you can determine that negotiations

3  have failed and they're not going to succeed.

4       The Retiree Committee goes even further in their

5  papers, their pretrial brief.  They say that negotiations

6  were not in good faith because they included an impairment,

7  meaning the city wasn't in good faith because we didn't agree

8  with them from day one.  Okay.  Again, I ask the question,

9  what exactly -- if anyone is going to contend that the city

10  was in bad faith negotiations and got that response, what

11  exactly were they supposed to do next in the negotiations

12  that would have helped matters?

13       And as I said before, many retiree groups said,

14  "We'd love to talk to you, but we don't represent the

15  relevant people."

16       Clearly, your Honor, we received many requests for

17  additional information.  You will see some interesting charts

18  that show what was in the data room, at least in terms of

19  volumes, how the data room is populated.  The evidence will

20  show that the city did its best to comply with information

21  requests.  I'm absolutely certain that no one was completely

22  satisfied with what the city gave them.  In some instances,

23  that's because the city doesn't always have everything that

24  people want.  In some instances, I suspect it's -- we will

25  find that -- to the end of this case we will not find -- we

1    will find certain people who will never agree that they've

2    gotten everything that they want or they're satisfied with

3    the information they received.  It's a hard problem, but the

4    evidence will show that the city created a database, worked

5    really hard to populate it, populated it with enormous

6    amounts of information, and did not withhold information as a

7    basis to obtain a negotiating advantage.

8            Final point with respect to this section.  In almost

9    all the papers -- and I want to -- it could be all -- there

10   is a statement quoted by Kevyn Orr concerning the financial

11   and operating plan at a meeting to discuss the financial and

12   operating plan, which is not the proposal for creditors.  The

13   financial and operating plan is a document required by

14   statute to be filed 40 days -- 45 days after his appointment.

15   It's about facts, and he's reporting facts.  And someone

16   asked him about negotiating the financial and operating plan,

17   and he said, "This is not something to negotiate.  This isn't

18   a plebiscite.  This is a report.  I'm supposed to file it."

19   So that quote, which I think the objectors would have you

20   think applied to the restructuring plan, and it does not, did

21   not, and it applies to something completely different, and I

22   think the evidence will show that.

23           For the foregoing reasons, I think the city did act

24   in good faith in all of the negotiations that it conducted.

25   Those negotiations were unsuccessful and, thus, that

1  prerequisite for filing a Chapter 9 case and being eligible

2  for relief has been met.

3          I'm now going to turn to good faith generally, spend

4  a little time on it, 921(c).  Here again, I want to borrow

5  AFSCME's papers because they're just very instructive and

6  really help us with this.  Paragraph 109 on page 48, "The

7  relevant considerations regarding good faith under Chapter 9

8  include," and they point to five points out of the Stockton

9  case.  I'll accept them.  Number one, whether the city's

10 financial problems are of a nature contemplated by Chapter 9.

11 The evidence will show that if Detroit's financial problems

12 are not the financial problems of the nature contemplated by

13 Chapter 9, I don't know what city's is, so we think we will

14 satisfy that one very easily.  Number two, whether the

15 reasons for filing are consistent with Chapter 9.  I think

16 the form and substance of the plan that was proposed and,

17 frankly, everything that the city has been saying about it

18 are indicative that the city is trying very hard to use the

19 powers subject to the limitations included in Chapter 9 to

20 effectuate a financial restructuring for the city.  I don't

21 think we'll have any difficulty demonstrating that with the

22 evidence.  Number three, the extent of the city's pre-

23 petition efforts to address the issues.  Here I want to pause

24 and put on a timeline, and there's -- it's really long, so

25 there's two pieces, but for this purpose it's the first piece

1    that's the most relevant.

2          THE COURT:  Let me ask you to pause for just a

3    second.  We should have the record reflect what exhibit

4    number that chart is.

5          UNIDENTIFIED SPEAKER:  It's Exhibit Number 36.

6          MR. BENNETT:  I have better.  They'll try and put it

7    up, but I also have some copies of it.  Here's what I'm going

8    to do.  I'm going to distribute the first piece now, with the

9    Court's permission, and the second piece in a minute, so --

10   after I get through this, so here's the first piece.  Again,

11   I think everyone has seen this already.  If you don't have

12   it, it's okay.  Everyone else is going to have it in a

13   second.  Obviously in a bunch of ways this chart summarizes

14   lots and lots of evidence that is going to go into the

15   record, but what is going to be seen in the record was that

16   it wasn't a bunch of people up at night on June 13th working

17   on a presentation of a plan for June 14th.  The efforts to

18   address the -- the pre-petition efforts to address the issues

19   stretch probably before December 21, '11, but I think at

20   least, as I understand the history and as the evidence will

21   certainly show, no later -- excuse me -- no later than

22   December 21, 2011, December 2011, a number of people within

23   state government and city government started focusing on the

24   fact that the Detroit financial situation was very serious

25   and had to be addressed.  And there were a number of efforts

1  that were attempted all through 2012 to try to grapple this

2  problem -- with this problem short of requiring concessions

3  from creditors, short of Chapter 9.  Kind of everything else

4  you might think of doing was done by a large number of really

5  devoted and qualified people.  Regrettably, it all failed,

6  and -- but the part about -- you know, this first chart,

7  which covers almost a year and a half on one page -- it was a

8  lot of time and a lot of effort in a search for alternative

9  solutions.  So forgetting the near-in -- what happened in the

10  June and July time frame, which we'll get to in a second,

11  the -- it is clear that there was a tremendous amount of time

12  and effort considering the issues.

13        Next is the fourth item in the AFSCME list, the

14  Stockton list, the extent that alternatives to Chapter 9 were

15  considered.  I think alternatives broadly construed include

16  all of this, but then we'll turn to the time frame -- and all

17  of a sudden -- we just got this one up -- the time frame of

18  June and July, which we've blown up because so much happened,

19  onto its own separate chart, so let me pass this one out.

20        THE COURT:  So, ma'am, what's the number of that one

21  that you're just now taking down?

22        UNIDENTIFIED SPEAKER:  They're both Exhibit 104.

23        THE COURT:  Oh, both 104.  Okay.

24        MR. BENNETT:  And because so much more happened, at

25  least in terms of dates and places, in the June and July time

1   frame, we've blown that one up so that the last two months

2   are their separate page.  And June was devoted to heavily

3   trying to figure out whether the last round of possible

4   alternatives, any conceivable kinds of out-of-court

5   restructuring, could work, and what the evidence will show is

6   that on this page, which shows all kinds of meetings and all

7   kinds of different interactions with creditors, a concerted

8   decision was made to exclude meetings with individual

9   creditors or individual creditor representatives because it

10  wouldn't be readable anymore, so this is just organized

11  meetings with different groups for different specific

12  purposes.  The other key to interpretation is when it says

13  "nonunion," it means the bonds, so the union -- for

14  purposes --

15          THE COURT:  Means what, sir?  Pardon?  It means

16  what?

17          MR. BENNETT:  The bonds.  "Nonunion" means --

18          THE COURT:  Bonds.

19          MR. BENNETT:  -- the bonds and other borrowed money

20  because there is a collection of notes involved in that side

21  of the case as well.  Where it says "union," it's really the

22  retiree representatives, which at the time were predominantly

23  union.  And so what this demonstrates -- again, it may be

24  part of the good faith piece, too, but for purposes of the

25  fourth prong of the Stockton test, I would say both of these

1   are relevant, both the long-term assessment of alternatives

2   that were short of debt restructuring, then the close-in

3   effort to figure out whether there was any conceivable way to

4   get something accomplished out of court.  It is perfectly

5   clear that there was an extensive effort to evaluate every

6   conceivable alternative that anyone could think of.

7           And then the last factor, factor five, whether the

8   city residents would be prejudiced by Chapter 9 relief.  As

9   we said in argument last week -- and the Court will hear

10  through extensive evidence -- and it's a really important

11  part of the case both for purposes of eligibility and for

12  everything that will follow -- the residents are dramatically

13  prejudiced by denying Chapter 9 relief.  Many of the problems

14  the city confronts in providing services to its residents is

15  because so many of its tax dollars are devoted to dealing

16  with bonds and other legacy liabilities.  That's the problem.

17  The taxpayer in Detroit puts up a dollar and gets back --

18  right now the number is something -- right now the number is

19  something like 58 cents, and the projections show it could be

20  some day 35 cents.  That's an unstable situation.  It's not

21  working now, it's not going to work in the future, and it has

22  to be changed.

23          The other side of the coin.  Very often the first

24  reaction in cases like this is raise taxes.  The evidence

25  will show -- it's summarized, by the way, in the June 14th

1  proposal -- that the taxes in Detroit are already the highest
2  in any municipality in Michigan; that we're already having
3  enforcement problems.  The city is already having enforcement
4  problems with respect to property taxes; that the property
5  tax assessments may be too high, not too low, indicating that
6  that revenue source is stressed as well.  There's nothing
7  left to do here.  There is no revenue solution.  So we have
8  come to a case, which is not necessarily like other Chapter 9
9  cases, where we have a very finite revenue pool, and it just
10  isn't enough to provide services and to pay debt, and, thus,
11  Chapter 9 is more needed here than in any other scenario you
12  can possibly think of.  The evidence will show that.

13        Last topic, and this gets a lot more technical, but
14  this is responsive to your Honor's suggestion that we had to
15  deal with a disputed issue of fact, and that was the
16  motivation for the inclusion of appropriations provisions in
17  PA 436.  Your Honor, I think the following is intended to
18  really indicate that that question isn't material, but I
19  think it's also -- when we did the research, we found that
20  it's also not a legitimate question for judicial review, so
21  I'm going to give you some citations, and I'm going to read a
22  very few quotes, and your Honor is clearly going to find more
23  when you look at this question.

24        In the State of Michigan, frankly, I think in other
25  places, et al. -- other places as well, the judiciary is not

supposed to engage in guessing about the legislature's
intent.  The leading case about this turns out to be a
referendum case in Michigan.  It's called <u>Michigan United
Conservation Clubs</u> versus <u>Secretary of State</u>.  It's found at
630 N.W. 2d 297.  <u>Michigan United</u> involved a review of a
Court of Appeals decision -- I think it's called the Court of
Appeals here -- a Court of Appeals decision that held, in
fact, that the -- that an appropriations provision in gun
control legislation was not going to prevent that legislation
from being subject to a referendum, and the Supreme Court
reverses and says that that -- that the inclusion of that
provision is going to insulate that statute from the
referendum process.  And along the way, the Court was not
fractured in result but was fractured a little bit in
reasoning.  There's a collection of -- I think it's three
concurring opinions.  There's one judge who writes a
dissenting opinion.  I think it's just one, but I'm not a
hundred percent positive about that.  And so the lead -- the
first concurring opinion has this to say.  "This court has
repeatedly held that courts must not be concerned with the
alleged motives of a legislative body in enacting a law, but
only with the end result - the actual language of the
legislation."  And then there's a whole series of cases that
are cited to support that proposition that I won't read the
citations in the record unless your Honor wants them.

1        The next concurring opinion, Judge Corrigan's,
2   quotes from Justice Cooley's constitutional law thesis or
3   textbook.  It looks like it may be a textbook.  And the
4   quote, I think, is also instructive.  It's a little bit
5   longer.  It says the following:  "to make legislation depend
6   upon motives would render all statute law uncertain, and the
7   rule which should allow it could not logically stop short of
8   permitting a similar inquiry into the motives of those who
9   passed judgment.  Therefore, the courts do not permit a
10  question of improper legislative motives to be raised, but
11  they will in every instance assume that the motives were
12  public and benefitting (sic) the station.  They will also
13  assume that the legislature had before it any evidence
14  necessary to enable it to take the action it did take."
15       Then, your Honor, the next case you would find if
16  you looked at this is Houston versus Governor, which is a
17  2012 case.  There's a longer -- 491 Michigan 876, 810 N.W. 2d
18  255.  And right near the front of the opinion there's a
19  paragraph.  I'm only going to read two parts of the paragraph
20  to save time.  "There is nothing that is relevant in this
21  regard" -- that's in terms of interpreting a statute -- "that
22  can be drawn from the political or partisan motivations of
23  the parties."  I'm going to skip a sentence.  "Moreover, this
24  court possesses no special capacity and there are no legal
25  standards by which to assess the political propriety of

1    actions undertaken by the legislative branch."

2         Now, of course, much of this makes sense because one

3    of the problems we scratched our heads about when we got back

4    to think about how we would address your Honor's question is

5    there are a whole bunch of legislators in two Houses that

6    conceivably had all kinds of different reasons for supporting

7    the appropriations.  It could well be that most of them put

8    the appropriations there because they really thought they

9    needed the money even if some thought they were putting it

10   there because it was a problem relating to the referendum

11   process.  I will tell you a very, very persuasive example of

12   the hazards of trying to figure out the intent of statutes

13   was impressed upon me by a law school, an example I learned

14   in law school, which was about the age 55 -- or the 55-mile-

15   per-hour speed limit, and it -- research turns out to show

16   that the purpose of that speed limit was to save fuel, and

17   the reason that it wasn't increased for a long time is

18   because it saved lives.  And so also the purpose of

19   legislation actually can change over time or the reason why

20   it stays there, so I think it's a hazardous inquiry.  I don't

21   think we know where to start.  I don't think we can drag all

22   the legislators in here and ask them all, and I think the

23   only other evidence you're going to see about this is,

24   frankly, inadmissible hearsay.

25         Maybe more importantly than this, I think I

1    indicated to your Honor in argument last week that I didn't

2    think there was any consequence to a determination by this

3    Court that the appropriation provisions might prevent a

4    referendum.  I said that the statute wouldn't be

5    unconstitutional.  It just would be subject to referendum.

6    Well, it turns out in the Michigan United case, one of the

7    concurrences goes back and gives everybody the history of

8    what happened in that case, and so how did that case wind up

9    in court to begin with?  And it wound up in court because the

10   persons, the group that wanted to have a referendum went out

11   and got the required number of signatures, went to the

12   appropriate office where the election is going to be held,

13   and the first response was no referendum because of the

14   provisions, and then they went to court to test it.  So I

15   think we're in a situation where, frankly, the only

16   circumstance where this issue of whether or not the

17   appropriate -- whether or not the appropriation provisions

18   are in there for an appropriate purpose would conceivably

19   come up is when a person or organization desiring a

20   referendum within the time specified by the statute -- and it

21   could conceivably have run; I couldn't figure that out --

22   actually collects the signatures, goes down to the

23   appropriate place and tries.  That never happened.

24          It also appears that even if a group or person

25   doesn't do that, there is an initiative process, which is

1  different from a referendum process, which they could have

2  triggered, and that process is not dependent in any way on

3  whether or not there's an appropriation provision in the

4  relevant statute.

5          And, finally, I think it was pointed out when we

6  were together last that the PA 436 contains a severability

7  clause, so what's left to have happen at this point is if

8  that provision is somehow inappropriate and has to be

9  stricken for some legally cognizable reason, the rest of the

10  statute is still there.  So I would say, again, summarizing

11  from where I started, there's two points here.  One is is

12  that I think your Honor has asked for an inquiry that is not

13  only impractical, it's not one for courts, but, in any event,

14  it's not material to anything because it doesn't lead us

15  anywhere that would change the result that we have PA 436 or

16  at least every single one of its provisions with or without

17  the appropriation provision to apply, and it's not upset by

18  reason of the possibility that a referendum could have been

19  attempted in some circumstances where one never apparently

20  has been attempted.

21          With that, if you have no more questions, I think

22  I'm done.

23          THE COURT:  Thank you.

24          MR. BENNETT:  Thank you.  I've been asked to offer

25  104 for demonstrable purposes only because it would not be on

1    the relevant lists.

2         THE COURT:  Is there any objection to 104 for

3    demonstrative purposes only?  All right.  The Court will

4    admit it for that purpose.

5         (Debtor's Exhibit 104 received at 11:25 a.m.)

6         MS. LEVINE:  Good morning, your Honor.  Sharon

7    Levine, Lowenstein Sandler.

8         THE COURT:  Let's just have the record clearly state

9    this.  Does the State of Michigan wish to make an opening

10   statement on the issue of the city's eligibility?

11        MR. SCHNEIDER:  No, your Honor.  However, we may

12   wish to make a closing statement.

13        THE COURT:  Thank you.  You may proceed.

14        MS. LEVINE:  Thank you, your Honor.  Sharon Levine,

15   Lowenstein Sandler, for AFSCME.  I'm actually here in the

16   role of emcee.  As with the oral arguments, we have agreed to

17   work together to try and not duplicate efforts and to make a

18   cohesive presentation, so just to give your Honor a little

19   bit of an understanding, the Retirement System is going to,

20   in essence, go first, spend about 20 minutes going through

21   the timeline as we see it.  Following that, the Retired

22   Detroit Police Members Association will react to the city's

23   final portion of their statement and also to their particular

24   issues as reflected in the timeline and apply it to the

25   facts.  The UAW, the Public Safety Unions, the Retired

1   Association Parties, and AFSCME will each spend just a few

2   minutes indicating how we see any additional facts or how the

3   facts apply to our particular situations, and then the

4   Retiree Committee probably for 20 or 30 minutes will give a

5   global overview of applying the facts that came out in the

6   timeline to the law.  Thank you.

7          THE COURT:  Okay.  Well, do you think it's okay with

8   your group if at a convenient break around noon we take our

9   lunch break?

10         MS. LEVINE:  That would be great.

11         THE COURT:  Okay.

12         MS. GREEN:  Your Honor, can I move the -- oh, I'm

13  sorry.

14         THE COURT:  Yes.  Can we arrange to move that easel,

15  please?  You can try.

16         MS. GREEN:  Your Honor, Jennifer Green on behalf of

17  the Retirement Systems.

18         THE COURT:  Be sure you speak right into the

19  microphone even though you've angled the lectern there.

20                      OPENING STATEMENT

21         MS. GREEN:  As Sharon mentioned, we have put

22  together a slideshow presentation of the timeline.  We

23  believe that these facts will later be used to support

24  certain legal arguments that we will be raising throughout

25  trial regarding the fact that Chapter 9 was a foregone

1  conclusion well before any creditor negotiations occurred;
2  that Chapter 9 was filed in bad faith to circumvent the
3  pension clause, and we submit, respectfully, we disagree with
4  the city's assertion a moment ago that Chapter 9 was a mere
5  contingency, and our assertion is that it really was a
6  foregone conclusion before any of the creditor negotiations
7  ever occurred, and with that I will begin.

8          You may ask why we're going back this far to 2011,
9  but at his deposition, your Honor, Governor Snyder testified
10  that this has been a highly structured process for close to
11  three years, so we begin in January 2011 when Richard Snyder
12  takes office as the governor of the State of Michigan.

13          Shortly thereafter, just three months later, the
14  governor signs into law what we now refer to as PA 4.  The
15  legislation makes its way through both Houses within just 34
16  days.  February 2012, Stand Up for Democracy files with the
17  Secretary of State a petition to invoke a referendum on PA 4.
18  Just days later, within -- actually, within three days of
19  Stand Up for Democracy's petition, discussions begin
20  regarding ways to insulate PA 436 -- or what will become PA
21  436 eventually from referendum.  There are notations that
22  discussions were had with Andy Dillon, the treasurer of the
23  State of Michigan's office, and there are notes about Miller
24  Buckfire are going to follow up with Andy directly about the
25  process for getting this to the governor and a notation that

1   the cleanest way to do all of this is new legislation that
2   establishes a board and includes an appropriation for a state
3   institution.  If an appropriation is attached, it concludes,
4   then the statute is not subject to repeal by the referendum
5   process.

6          In April of 2012, the city enters into the consent
7   agreement with the State of Michigan.  Shortly thereafter,
8   Heather Lennox of Jones Day and Ken Buckfire of Miller
9   Buckfire purportedly meet with Governor Snyder on June 6th,
10  2012, to discuss the Detroit -- the City of Detroit's
11  financial crisis and issues related to potential 9 Chapter --
12  or Chapter 9 bankruptcy.

13         Prior to the meeting, in the e-mail that we
14  discussed earlier and that I quoted for you earlier during
15  oral arguments, there is a notation that Mr. Buckfire
16  suggested that all the memos be put together, the ones that
17  were done for Andy.  A list of those memos were compiled, and
18  three of those we think are pertinent to some of the issues
19  at trial in this case.  One of the memos was regarding a
20  summary and comparison of PA 4 and Chapter 9.  One was a
21  memoranda on constitutional protections for pension and OPEB
22  liabilities, and a third memo was analysis of filing
23  requirements of Section 109(c)(5) of the Bankruptcy Code, in
24  particular, negotiation being impracticable and negotiating
25  in good faith.

1           Two weeks after the meeting with Governor Snyder,

2   Miller Buckfire is engaged by the State of Michigan to

3   perform an analysis and review of the city's financial

4   condition.  Shortly thereafter, Ken Buckfire testified that

5   after he got this engagement, he started receiving phone

6   calls from law firms seeing if he would be interested in

7   helping them get inserted in --

8           THE COURT:  I need to interrupt you for a second.

9           MS. GREEN:  Am I going too fast?

10          THE COURT:  Yes.

11          MS. GREEN:  I was trying to get done by noon.  I was

12  trying to get done by noon because you said you wanted to

13  break at noon.

14          THE COURT:  I really want to follow what you say,

15  so --

16          MS. GREEN:  I will slow down.

17          THE COURT:  -- I need you to slow down.

18          MS. GREEN:  I knew I only had 30 minutes, so I was

19  trying hard.

20          THE COURT:  Well, we don't have to stop right at

21  noon.

22          MS. GREEN:  Okay.  I will slow down.

23          THE COURT:  But slow down for me by about 50

24  percent.

25          MS. GREEN:  Wonderful.  I get this a lot, so I know

1    I'm a fast talker.  The discussion continues.  Mr. Buckfire
2    testified that Corrine Ball had wanted him to meet one of her
3    partners, who was successful in a Chapter 9 case.  This is in
4    2012.  In October of 2012, PA -- before PA 4 is even rejected
5    by the voters, the Treasury Department and the Governor's
6    Office begin discussing creation of a new emergency manager
7    statute just in case the referendum is passed.  Howard Ryan,
8    who is the 30(b)(6) witness for the State of Michigan, will
9    testify to that.  Shortly thereafter, November 6th of 2012,
10   the Michigan electorate rejected PA 4.
11          In December Senate Bill 865, which would eventually
12   become PA 436, was introduced in the Michigan legislature.
13   The final version is adopted by both Houses just 14 days
14   later on December 15th, and around that same time the
15   treasurer commences a preliminary review of the city's
16   finances under PA 72 and determines that a serious financial
17   problem exists in the City of Detroit.
18          At the end of December, the governor of Michigan
19   signs PA 436 into law, submits it to the Secretary of State.
20   The entire process for PA 436 took only 26 days, and it is
21   insulated from public referendum because it contains what the
22   objecting parties submit is a minor appropriation of $5.8
23   million, which is less than .009 of the state budget, and
24   below we have the citation from the exhibit that sets forth
25   the amount of the state budget.

1          In connection with the PA 436 appropriation, the
2     state 30(b)(6) witness testified at his deposition that he
3     was aware that the appropriation was included for the purpose
4     of insulating it from referendum.  He was asked the question,
5               "Do you recall when that provision of the
6               legislation was added to the draft bill?"
7               Pretty early on, I believe.  It was quite early,
8               maybe from the inception."
9          He was then asked,  "Based on your conversations
10    with the people at the time, was it your understanding that
11    one or more of the reasons to put the appropriation language
12    in there was to make sure it could not -- the new act could
13    not be defended by a referendum?"  He answered, "Yes."
14              "Where did you get that knowledge from?
15              Well, having watched the entire process unfold
16              over the two -- past two years.
17              The governor's office knew that was the point of
18         it?
19              Yes.
20              That your department" -- his is the treasury --
21         "knew that was the point of it?
22              Yes."
23         In January of 2013, Miller Buckfire was reengaged,
24    this time by the City of Detroit, to continue its evaluation
25    of the city's financial condition.  Mr. Buckfire was then

1  asked by Treasurer Dillon to make arrangements for the city

2  and state officials to meet and interview Jones Day and seven

3  other law firms that were interested in serving as

4  restructuring counsel.

5         The day before the pitch presentation with the City

6  of Detroit, Kevyn Orr, who attends the pitch, receives an e-

7  mail recounting conversations with Mr. Buckfire -- Mr.

8  Buckfire will be testifying live during this trial -- and

9  listed are the questions that will be asked the following day

10 at the pitch.  They all relate to Chapter 9.  "Given the

11 issues that Detroit faces, how can they address them outside

12 of Chapter 9?" is the first, but all the rest are, "Under

13 what circumstances should Chapter 9 be used?"  "How would one

14 execute a low-cost fast Chapter 9?"  "Given Chapter 9

15 experience, what went wrong with JeffCo and Orange County?"

16 And at the bottom, "If Miller Buckfire finds a way to

17 monetize assets and create liquidity, how would that impact

18 eligibility?"

19        The next day on January 29th, Jones Day presents its

20 restructuring strategy to the city and state officials, and

21 it explains that while out-of-court solutions are preferred,

22 they conclude they are extremely difficult to achieve in

23 practice.  They note that Chapter 9 can create negotiating

24 leverage negotiating with the backdrop of bankruptcy, which

25 we submit is not good faith.

1        They further conclude in their strategy that an out-

2   of-court plan should contemplate the possibility of Chapter 9

3   because it creates leverage, you can negotiate in the shadow

4   of Chapter 9, and it helps bolster your eligibility and your

5   success in a Chapter 9 by establishing a record of seeking

6   creditor consensus.

7        There are notes on the slide that state, "A good

8   faith effort to pursue an out-of-court restructuring plan

9   will establish that clear record and will deflect any

10  eligibility complaints based on alleged failure to negotiate

11  or bad faith.  If needed, though, Chapter 9 could be used as

12  a means to further cut back or compromise, quote, 'accrued

13  financial benefits otherwise protected under the Michigan

14  Constitution.'"

15        The next day Richard Baird, who's Governor Snyder's

16  consultant, reaches out to Jones Day to inquire about hiring

17  Kevyn Orr as the emergency manager.  The following day,

18  Mr. Orr calls PA 436 a clear end-run around the prior

19  initiative that was rejected by the voters in November and

20  also comments, "So although the new law, PA 436, provides the

21  thin veneer of a revision, it is essentially a redo of the

22  prior rejected law and appears to merely adopt the conditions

23  necessary for a Chapter 9 filing."

24        THE COURT:  What do those statements appear in?

25        MS. GREEN:  It's Orr Exhibit 4, JDRD0000295.  It's

1   an e-mail.

2         THE COURT:  Right, but what is that?

3         MS. GREEN:  An exhibit.  It's an e-mail.

4         THE COURT:  An e-mail.  Thank you.

5         MS. GREEN:  E-mail.  I'm sorry.  In February of

6   2013, Mayor Bing was approached by Mr. Baird regarding Kevyn

7   Orr as the candidate for the emergency manager position, and

8   Mayor Bing recalls that the only salient qualifications he

9   was offered about Mr. Orr was his bankruptcy experience.  Mr.

10   Baird told him about Kevyn Orr's experience in part of the

11   Chrysler bankruptcy team, and Mr. Orr -- Mayor Bing was

12   asked, "Did you ask Mr. Baird anything else about Mr. Orr's

13   qualifications to serve as emergency financial manager?"  And

14   then he answers, "He -- yes, I did, and he felt that not only

15   was he a lawyer that dealt with bankruptcy for over 30 years,

16   but he also had some qualification as it related to

17   restructuring."  "And did Mr. Baird indicate that Orr had

18   qualifications concerning restructuring outside the context

19   of bankruptcy?"  "That would be no" was his response.

20       In March the governor declared that a local

21   government financial emergency existed in the City of

22   Detroit.  At the end of March, Kevyn Orr was appointed

23   emergency manager of the City of Detroit.  On March 28th PA

24   436 becomes effective, and in April of 2013 Jones Day is

25   engaged as legal counsel for the City of Detroit.

1    After being appointed emergency manager, Kevyn Orr

2  is quoted on May 12th, 2013 -- we've all heard this quote,

3  but I'll say it again -- that the public can comment on the

4  city's financial and operating plan, but we are not, like,

5  negotiating the terms of the plan.

6    The day before presenting its proposal to the

7  creditors, Mr. Orr gives an interview with the Detroit Free

8  Press and expresses his intent to evade the pensions clause

9  through a federal Chapter 9 bankruptcy proceeding, and we

10  have quoted for you the portion of that interview and

11  highlighted it in yellow.  He states, "If you think your

12  state-vested pension rights, either as an employee or

13  retiree -- that's not going to protect you.  If we don't

14  reach an agreement one way or the other, we feel fairly

15  confident that the state federal law, federalism, will trump

16  state law."

17    On June 14th, the emergency manager held a meeting

18  at the Detroit Metropolitan Airport and presented the city's

19  proposal for the creditors.  The evidence will show that the

20  city proposed to fully -- fully intended to impair or

21  diminish accrued financial benefits.  This is an excerpt from

22  the proposal for creditors, and it clearly states that with

23  respect to unfunded pension liabilities, quote, "such

24  contributions will not be made under the plan."  And it

25  further states there must be, quote, "significant cuts in

1    accrued vested pension amounts for both active and currently
2    retired persons."

3         On June 20th, the emergency manager undertook a
4    presentation regarding the city's finances and plan
5    restructuring to both uniform and nonuniformed retirees.
6    Numerous witnesses who attended this meeting, several of
7    which will be testifying at trial, will testify that they did
8    not observe or participate in any negotiations regarding the
9    city's financials and that these meetings were purely
10   informational.

11        On June 27th following this presentation that I just
12   spoke of, the city sends a letter to the UAW thanking them
13   for their time in participating in the meeting, and in that
14   letter even the city acknowledged that the unions would need
15   more information moving forward.  The letter here is quoted,
16   "The city recognizes that representatives of active and
17   retired employees will need access to additional information
18   to analyze the restructuring proposals outlined in the June
19   20 meetings.  Information relevant to these proposals will be
20   made available in the on line data room," but at this time on
21   June 27th, that information, as they were saying, was not yet
22   available.

23        Five days later on July 23rd Gracie Webster and
24   Veronica Thomas commenced lawsuits against the State of
25   Michigan, the governor, and the treasurer seeking a

1  declaratory judgment that PA 436 violated the pensions

2  clause, and they also sought an injunction.

3        In July when several of the creditor meetings took

4  place, the evidence will show that the city had no intention

5  of actually negotiating with its creditors.  By July 8th you

6  will see an e-mail with an attachment of a timeline and a

7  communications roll-out demonstrating that the city had

8  already determined that its Chapter 9 petition was going to

9  be filed on July 19th.  There's a timeline crafted by the

10  State of Michigan that identifies July 19th as a filing date

11  despite the fact that the creditor meetings had not yet

12  occurred.  Therefore, the objecting parties submit that

13  Chapter 9 was already a foregone conclusion before the city

14  met with its creditors on July 10th and 11th.  In fact, here

15  is a copy of that Chapter 9 roll-out, communications roll-out

16  that I spoke of.  In an e-mail from Kevyn Orr's press

17  secretary, Bill Nowling, to certain state officials, he lays

18  out the communications plan.  And if you go down to the

19  yellow portion, it starts with, "We negotiated in good faith

20  with all of Detroit's creditors."  Mind you, several of the

21  meetings had not yet even occurred.  "We presented a

22  comprehensive restructuring plan to creditors in June.  At

23  this point, it would be impractical to continue discussions

24  out of court because it is clear that we will be able to

25  reach agreement with some creditors only through a court-

1   supervised process, and the State of Michigan has authorized

2   the emergency manager to take this step."  This is on July

3   8th.

4           The timeline attached to that communications roll-

5   out on Thursday, July 18th, states that, "Last minute

6   revisions will be made to all the key documents," and on

7   Friday, July 19th, which is in bold and capital letters

8   called "The Filing Day," at nine o'clock the Governor's

9   Office is supposed to transmit the authorization letter to

10  the emergency manager, and at ten o'clock on the 19th the

11  necessary paperwork is supposed to be filed with the court

12  system, and then a series of press conferences are to be

13  held.

14          The following day, on July 9th, an e-mail from

15  Treasurer Dillon to the governor of the State of Michigan

16  states that, "We are still in the informational mode."  This

17  e-mail is interesting for several reasons.  First, it states

18  that Kevyn will meet the Detroit pensions the following day,

19  on July 10th.  It says there will be no exchange of documents

20  and that he will not translate that -- the information that

21  he gives into an impact on retiree or employees' vested

22  rights.  Treasurer Dillon continues and says that there are a

23  lot of creative options that we can explore to address how

24  they will be treated in restructuring with respect to the

25  pensions, but at his deposition when he was -- when he was

1  asked whether these creative options were ever explored
2  directly with the Retirement Systems, Dillon said no.  And
3  it's not up there, but he also was asked if they were ever --
4  these creative options were put into written reports or
5  formal proposals, and he also said, no, they were not.

6         Further in the e-mail he says to the governor,
7  "Tomorrow's meeting could lead to questions directed to you
8  about your view on this topic.  In my view, it's too early in
9  the process to respond to hypothetical questions.  We remain
10 in many ways in the -- at the informational stage."  This was
11 just one week before the filing.  And Mr. Dillon admitted at
12 his deposition that nothing changed between July 9th and the
13 filing date of July 18th that would take them out of this
14 informational stage, as he called it.

15        On July 10th and 11th, there were a series of
16 creditor negotiations -- alleged creditor negotiations that
17 took place.  The emergency manager himself did not even
18 attend, but witnesses who did attend the meeting will testify
19 that they did not observe or participate in any negotiations
20 regarding the city's finances and that, again, these meetings
21 were purely informational.  And this is consistent with the
22 state treasurer's report to the governor that as of July 8th,
23 we are still in the informational mode.  It's also consistent
24 with Mr. Orr's admission at his deposition when he was
25 questioned, "There were no actual negotiations at the June

1  14th meeting, were they?"  And he answers, "No, not as it's
2  generally understood."

3         Lastly, the fact that there were no negotiations on
4  July 10th and 11th is consistent with the city's and the
5  state's communications roll-out, which already adopted the
6  excuse that negotiations were going to be impractical.

7         On July 12th, following those meetings, the Detroit
8  Fire Fighters Association sends a letter to the emergency
9  manager asking for more information and stating, "It would be
10  productive if the city could provide us with its specific
11  proposals on pension benefit restructuring as soon as
12  possible.  We have two meetings with the city where pension
13  benefits were addressed and still have only the city's
14  general observation that pension benefits must be reduced."
15  At trial Mark Diaz, the president of the Detroit Police
16  Officers Association, and Dan McNamara, president of the
17  Detroit Fire Fighters Association, will testify that no
18  specific proposals were ever given by the city after this
19  letter, and instead the city filed bankruptcy just six days
20  later.

21         On July 15th the Webster defendants filed a response
22  brief and a motion for summary disposition.  In that court
23  paper, the state asserted that a bankruptcy filing by the
24  City of Detroit is, quote, "only a possibility that
25  plaintiff's claims were, quote, 'unripe, premature, and based

1  on a speculative threat of future injury.'"  And mind you,

2  this position is taken in open court, which conflicts with

3  the timeline that had already been circulated within the

4  Governor's Office that slated the filing date as just four

5  days later.

6         On July 16th Mr. Orr submitted the bankruptcy

7  recommendation letter to Governor Snyder and Treasurer

8  Dillon.  In that letter he stated that dramatic but necessary

9  benefit modifications must be made.  The governor

10 acknowledged that he read that letter before authorizing the

11 filing and that he knew that the city's request for

12 authorization that dramatic cuts be given would be part of

13 any Chapter 9 process.  He also testified that he knew,

14 quote, "based on the facts going into it, there was a

15 likelihood accrued pension benefits would be reduced in the

16 Chapter 9 case."

17        The next day, the Detroit Public Safety Unions

18 received correspondence from the city thanking them on behalf

19 of the emergency manager for their, quote, "strong

20 cooperation regarding the City of Detroit pension

21 restructuring."  Later that same day, the Retirement Systems

22 filed their lawsuit against the governor and the emergency

23 manager in Ingham County Circuit Court seeking declaratory

24 relief.  That same night at 6:23 p.m. the governor's press

25 secretary, Sara Wurfel, circulates an updated timeline that

1    still shows the bankruptcy filing date of Friday, July 19th.

2    This is July 17th at 6:23 p.m.  The following day, the

3    Retirement Systems filed a motion for a TRO seeking an

4    injunction.  At 3:05 p.m. that afternoon, Margaret Nelson of

5    the Attorney General's Office received a telephone call

6    informing her that Retirement Systems were in court seeking a

7    TRO.  At 3:47 the governor e-mailed his authorization letter

8    to Orr and to Treasurer Dillon, and at 4:06 Orr changes the

9    date on the filing papers from July 18th, crosses out the 19

10   because it was supposed to be filed the 19th, handwrites in

11   an 18 and files the petition one hour and one minute after

12   finding out that the Retirement Systems were in court seeking

13   a TRO, which is inconsistent with the timeline sent at 6:30

14   the night before saying it was going to be on Friday.

15          And at 4:10 p.m. the attorney general appears for

16   the TRO hearing in Ingham County.  This is reflected in the

17   papers filed by the state, the docket history and the hearing

18   transcripts.  Orr later admitted that he was being counseled

19   that it would be, quote, irresponsible not to file the

20   petition sooner rather than later given all the lawsuits that

21   were popping up.

22          On July 19th, the following day, the declaratory

23   judgment was entered against the governor, the treasurer, and

24   the State of Michigan and that declaratory judgment states PA

25   436 is unconstitutional and in violation of Article IX,

1  Section 24, of the Michigan Constitution, and it further

2  states the governor is prohibited from authorizing an

3  emergency manager to proceed under Chapter 9, yet the city

4  filed its Chapter 9 petition despite the fact that each of

5  its advisors uniformly testified at their depositions that

6  the city's financial information was still incomplete as of

7  the filing, and, in fact, today it is still incomplete.

8          Charles Moore, senior managing director at Conway

9  MacKenzie, testified that quote, when he was asked, "Has

10 there been a specification of those level of cuts that the

11 city contends must occur?"  He says, "I mean have you put a

12 dollar amount on it?"  He answers, "No.  Our analysis of this

13 continues.  Right now we still don't know what assets could

14 be available to put toward the pensions.  We still have not

15 had the type of dialogue that we would like to have related

16 to the calculation of the unfunded amount, so because of

17 those two uncertainties, among others, we don't know what

18 cuts, if any, there may need to be."

19          The state treasurer also agreed that as of July 8th,

20 just a week before the filing, "I thought that the situation

21 was not understood enough for the governor to go on record

22 yet because I couldn't even tell him with any degree of

23 confidence what level of funding the pension funds had, so

24 why should he get in the middle of a debate about this?"

25          In addition, as of the petition date -- and I

1  believe the city's witnesses will testify consistent with

2  their depositions -- that to date the city still -- the city

3  still does not know the value of two of its primary assets,

4  including the Water and Sewage Department and the city-owned

5  artwork at the Detroit Institute of Arts.  Because the city

6  still does not know what assets are available to satisfy

7  liabilities, does not know the scope of the liabilities, it

8  is the objecting parties' position that the Chapter 9 filing

9  was premature and not made in good faith.  Thank you.  I

10  believe Mr. Ullman may be following me.

11          THE COURT:  Okay.

12          MS. GREEN:  I apologize.  It's Lynn Brimer.

13          THE COURT:  Okay.  Perhaps we should move that

14  lectern back to center, huh?

15          MS. BRIMER:  I can do that.

16          THE COURT:  Okay.  Thank you.

17          MS. BRIMER:  Is this good, your Honor?

18          THE COURT:  That's great.  Let me just ask will

19  there be other uses of the projector during openings?

20          ATTORNEY:  Yes, your Honor.

21          THE COURT:  Okay.

22                    OPENING STATEMENT

23          MS. BRIMER:  Good morning, your Honor.  And, your

24  Honor, I thank Mr. Bennett for raising the legal issues with

25  respect to the spending provision because it at least makes

1  me more comfortable as to why I thought it's so important we

2  clarify the record on the discovery matters with respect to

3  which law had a spending provision added onto it.

4          THE COURT:  Okay.

5          MS. BRIMER:  So rather than address my opening issue

6  to begin with, would the Court like me to address the legal

7  issues raised by Mr. Bennett, or would you like the legal

8  issue -- I am prepared to briefly discuss those.  I don't

9  have a written preparation, but I do think it's important for

10  the Court to understand I did look at the case that

11  Mr. Bennett cited.  I didn't disregard any case law when

12  coming to this Court and believing that there was a factual

13  issue.

14          With respect to the <u>Michigan United</u> case, I think

15  it's factually distinguishable again.  That case did not

16  involve an original law that did not have a spending

17  provision that was overturned on referendum and then a new

18  law presented.  In that case, your Honor, the issue was

19  whether or not the spending provision itself added in the

20  original law such that it was not subject to referendum was,

21  in fact, an appropriate provision taking it out of the

22  referendum provision.  You know, under -- your Honor, that is

23  not the facts that we have before us today.

24          In addition, your Honor, I have reviewed Justice

25  Corrigan's opinion, which, by the way, was a concurring

1   opinion, not the Court's majority opinion, but she addressed

2   the issue of intent and that, generally speaking, we do not

3   look to the motive or intent of the legislature --

4   legislative body when passing a law, but she said this is

5   because -- and she notes this in a footnote -- this is

6   because, generally speaking, we do not have any testimonial

7   record regarding motive or intent.  That would be, your

8   Honor, in her concurring opinion.  There is no testimonial

9   record in the -- in this original action regarding the motive

10  or intent.  Well, your Honor, that is simply not the case in

11  this matter.  As Ms. Green read to you and as I quoted from

12  the state's own 30(b)(6) witness, we have evidence regarding

13  the motive of the inclusion of the spending provisions on an

14  act that had previously been rejected on referendum.  We

15  believe that factual issue is important to this Court in

16  determining that whether or not some or all of PA 436 should

17  have been subject to the second provision that everyone seems

18  to gloss over in Article II, Section 9, of the Constitution,

19  which states specifically that no law that has properly been

20  submitted to referendum can then -- and rejected can then be

21  passed without a referral back to the general electorate.

22        Your Honor, the cases cited by the state, Ms.

23  Nelson, of Reynolds v. Martin and the case cited this morning

24  just simply are not factually similar enough to PA 436 to be

25  controlling, and we do -- and, you know, my closing -- my

1  opening can be as simple as, your Honor, the evidence will

2  show that the motive of including the spending provisions was

3  to, in fact, take an act that had previously been overturned

4  on referendum and disregard the will of the people, and it's

5  very clear.  The state's attorney argued yesterday that we

6  knew what the people's will was because we have the media.

7  Well, we know what the people's will was.  The people's will

8  was that we not have an emergency manager who would supplant

9  the democratically elected officials in the City of Detroit,

10  and that was very clear, and yet we now have PA 436, which

11  disregarded that, which added a spending provision to it, and

12  the facts will demonstrate that we can establish what the

13  motive was in adding those spending provisions.  And,

14  moreover, we can establish that the emergency manager,

15  Mr. Orr, was fully aware of that at the time he accepted his

16  appointment as the emergency manager.  I'll conclude --

17          THE COURT:  Well, how do you -- how do you deal with

18  Mr. Bennett's argument that if the issue is ever appropriate

19  for court review, it is not appropriate until petition

20  signatures are collected on the bill that has the spending

21  provision in it and the petitions are rejected because it's

22  not the kind of a law that can be subject to a referendum?

23          MS. BRIMER:  Well, certainly I don't think there's

24  any case law that would suggest that the people be required

25  to take an act which on its face would be rejected.  I'm not

1  sure I'm aware of any case law that would suggest that the

2  people had to refer that case -- the law to a referendum and

3  have it denied because of the failure -- or the inclusion of

4  the spending provision.  At issue here, your Honor, is

5  whether or not the act is sufficiently similar enough, not

6  that it had to go back to referendum, but whether it's

7  sufficiently similar enough that the second provision would

8  require that it be deemed to be unconstitutional because it

9  was not presented to the people again.

10         THE COURT:  Okay.  All right.  Let's take our lunch

11  break now.  Before we do, I want to remind everyone that we

12  are guests here in this building, and we need to maintain

13  decorum and silence while we are in the hallways.  Please

14  don't linger in the halls.  You can have your conversations

15  here in the courtroom over lunch if you'd like to do that, or

16  in the elevator or on the 1st floor, but please maintain

17  silence in the hall.  Let's see.  It's noon.  We'll reconvene

18  at 1:30, please, and that's it.

19         THE CLERK:  All rise.  Court is in recess.

20      (Recess at 11:59 a.m., until 1:30 p.m.)

21                           - - -

INDEX

|                                        | Page |
|----------------------------------------|------|
| Opening Statement by Mr. Bennett       | 56   |
| Opening Statement by Ms. Green         | 94   |
| Opening Statement by Ms. Brimer        | 112  |
| Opening Statement by Mr. Wertheimer    | 117  |
| Opening Statement by Ms. Ceccotti      | 118  |
| Opening Statement by Ms. Patek         | 128  |
| Opening Statement by Mr. Morris        | 135  |
| Opening Statement by Ms. Levine        | 138  |
| Opening Statement by Mr. Ullman        | 145  |

| WITNESSES:      | Direct | Cross | Redirect | Recross |
|-----------------|--------|-------|----------|---------|
| Gaurav Malhotra | 168    |       |          |         |

| EXHIBITS:            | Received |
|----------------------|----------|
| Debtor's Exhibit 9   | 228      |
| Debtor's Exhibit 11  | 236      |
| Debtor's Exhibit 104 | 93       |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                    October 27, 2013
_____         _____
Lois Garrett