# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |

## AFSCME'S SUPPLEMENTAL BRIEF REGARDING ELIGIBILITY

Pursuant to this Court's Order Regarding Further Briefing On Eligibility [Docket No. 1217], AFSCME submits this supplemental brief. The guiding principle of AFSCME's arguments is: whether the state constitution by PA 436 or the federal constitution by chapter 9, legislation cannot rewrite or violate a constitution. The City fails to meet the eligibility requirements because this chapter 9 filing violates both the state and federal constitutions generally and as applied in this case, including by seeking to impair or diminish vested pension benefits. This Court should not allow the challenges facing a distressed municipality, however daunting, to be solved by violating fundamentally protected constitutional rights.[1]

## I. STATE CONSTITUTIONAL PENSION RIGHTS ARE NON-DISCHARGEABLE RIGHTS NOT PRE-EMPTED BY THE CODE

Because the Pensions Clause creates a constitutional right, not a statutory priority, chapter 9 does not preempt it. Instead, this constitutional right renders the City's accrued pension obligations non-dischargeable. Even where a state law not enshrined in a state constitution advances "an essential state interest," the Bankruptcy Code "must be clear and manifest" if it is "[t]o displace" the state law. *BFP v. Resolution Trust Corp.,* 511 U.S. 531, 545 (1994). "[W]here the intent to override" state law "is doubtful, our federal system demands deference to long-established traditions of state regulation." *Id.* at 546.

*First,* no provision in chapter 9 preempts state constitutional rights, let alone the right to accrued public pensions, which have long been subject to state regulation. To the contrary, chapter 9 explicitly protects state law. *See, e.g.*, 11 U.S.C. §§ 109(c)(2), 903, and 943(b)(4). Most important, a chapter 9 bankruptcy is impossible without state consent. As a result, chapter

---

[1] The City's attempt to use chapter 9 to sidestep the Michigan and U.S. Constitutions was outlined in counsel for the City's journal article for using chapter 9 as a "toolbox that is unavailable outside of bankruptcy" for "compromising a municipality's pension debt" and as a mechanism to "generate leverage for the municipality and pave the way for consensual modifications to its pension obligations." Jeffrey B. Ellman & Daniel J. Merrett, *Pensions and Chapter 9: Can Municipalities Use Bankruptcy to Solve Their Pension Woes?,* 27 Emory Bankr. Dev. J. 365, 383-84 (2011).

1

9 *cannot* preempt state constitutional rights where, as here, that consent is given by state statute. For even assuming *arguendo* that "a state's authorization . . . is a declaration of state policy that the benefits of Chapter 9 take precedence over control of its municipalities" and that therefore state *statutes* conflicting with chapter 9 are made inapposite once a state authorizes a municipal bankruptcy, *In re City of Vallejo,* 432 B.R. 262, 268 (E.D. Cal. 2010), state legislatures lack the power to declare *by statute* that state policy takes precedence over the higher authority of the state *constitution*. Rather than preempt state constitutional rights, chapter 9 *requires* that state constitutional rights be honored at the outset as a condition of authorization under Section 109(c)(2), as a mechanism of state control under Section 903, and as a limit on the terms of the plan under Section 943(b)(4).

For this reason, *Matter of Sanitary & Imp. Dist. No. 7,* 98 B.R. 970 (Bankr. D. Neb. 1989), does not support the proposition that the City can impair its constitutional pension obligations through chapter 9. The issue there was whether Nebraska statutes, not the Nebraska c*onstitution,* which "grant a priority of payment in favor of bonds over warrants" applied in chapter 9. 98 B.R. at 973. The bankruptcy was authorized by a state statute. *See id.* at 971 (citing Neb. Rev. Stat. Section 77–2419). The court's holding that state priorities could be overcome in bankruptcy merely allowed the state authorization *statute* to trump the state priority *statute*. State statutes routinely trump one another, and state legislatures are free to rewrite their own statutes as a matter of legislative prerogative. But a state legislature cannot, by merely passing a statute, rewrite the state constitution. Likewise, the Michigan legislature cannot authorize municipal bankruptcy by passing PA 436 and thereby rewrite the Pensions Clause, let alone write the Pension Clause out of the Michigan Constitution.

***Second,*** the Supreme Court clearly instructed that "the federal bankruptcy court should

2

take whatever steps are necessary to ensure that" a creditor is "afforded in federal bankruptcy court the same protection he would have under state law if no bankruptcy had ensued." *Butner v. United States,* 440 U.S. 48, 56 (1979). Under Michigan law, an AFSCME retiree's *constitutional right,* as distinct from a statutory priority, provides that accrued pension "shall not be diminished or impaired," "shall be funded during" the year in which they "arise," and "shall not be used for financing unfunded accrued liabilities." The Constitution thus provides not a mine-run contract right, but an absolute guarantee of non-reduction and affirmative funding. *See* AFSCME Am. Elig. Obj. ¶¶ 119-20, 138-43. *Butner* further holds that the Code should not "afford . . . rights that are not" available "as a matter of state law." *Id.* Allowing pension rights expressly protected from reduction or non-funding to be discharged as unsecured claims would operate to convert a constitutional right to a claim on par with other unsecured creditors, thereby creating a right of equal treatment for other non-pension creditors they would not have outside of bankruptcy because the Pensions Clause is stronger than the Contracts Clause. *See* AFSCME Am. Elig. Obj. ¶¶138-43. This result would violate the Code by allowing other non-pension creditors to receive "a windfall merely by reason of the happenstance of bankruptcy." *Id.* at 55.

***Third,*** not only should the rights created by the Pensions Clause survive bankruptcy under *Butner* because they are constitutional rights rather than statutory priorities, but separately, the Pensions Clause is an exercise of the right to enact "state or local laws designed to protect public health or safety" which cannot be disregarded by the debtor. *Midlantic Nat'l Bank v. New Jersey Dep't of Env. Protection,* 474 U.S. 494, 502 (1986). In *Midlantic,* the Supreme Court held that a bankruptcy trustee's power to abandon property of the estate under chapter 11 did not include the power to violate state or local environmental protection laws because "the efforts of the trustee to marshal and distribute the assets of the estate must yield to the *governmental*

3

*interest in public health and safety.*" *Id.* Even a liquidating debtor cannot ignore state disposal requirements if doing so would create a public "hazard with no one clearly responsible for remedial action." *In re Wall Tube & Metal Prods. Co.,* 831 F.2d 118, 122 (6th Cir. 1987).

If the City cannot dump its toxic waste in violation of state law, surely it cannot put its elderly pensioners in harm's way by taking away their only source of income and violating their constitutional rights. For just as this "Bankruptcy Court does not have the power to authorize an abandonment without formulating conditions that will adequately protect the public's health and safety" from environmental danger, *Midlantic,* 474 U.S. at 507, this Court does not have the power to authorize cuts to vested pension rights which the Michigan Constitution recognizes as sacrosanct and not protected by federal government insurance. Until this Court holds conclusively that the state is responsible for the accrued pensions in full (or another funding source is provided by agreement), the Bankruptcy Code will not allow abandonment of this constitutional obligation.

## II. CHAPTER 9 VIOLATES THE U.S. CONSTITUTION REGARDLESS OF WHO TECHNICALLY "IMPAIRS" CONTRACT RIGHTS

For three reasons, the City's argument that chapter 9 is constitutional because the federal government, not the state, technically orders the impairment is flawed.

*First,* chapter 9 unconstitutionally permits the federal government to consent to a state impairment of contracts. Article I, Section 10, which contains the Contracts Clause, has three paragraphs. The second and third paragraphs prohibit states from taking certain acts "without the consent of Congress." The first, in contrast, contains a wholesale prohibition on defined state actions, including, along with the impairment of contracts, printing money and the entering into of any treaty, alliance, or confederation, *with no exception for federal consent*.

The plain language of Article I, Section 10 therefore makes clear that Congress cannot

4

pass a law consenting to an impairment of contracts by the state. Supreme Court case law supporting this interpretation is found in *Rhode Island v. Massachusetts,* 37 U.S. 657 (1838), where the Supreme Court held that it had original jurisdiction over a boundary controversy between states. Reaching that holding required the Court to analyze Article I, Section 10. The Supreme Court interpreted the "first clause" as "a positive prohibition against any state" taking certain actions, and stated conclusively that "no power under the government could make such an act valid, or dispense with the constitutional prohibition." 37 U.S. at 724-25. The Court thus left no doubt that Article I, Section 10, Clause 1 does not allow an end-run of state contracts.

The plan approval process in chapter 9 constitutes such unconstitutional federal consent. State and municipal actors take all the major steps on the road to debt adjustment: specific legal authorization of chapter 9, filing of the petition, and proposal of the plan. *See* 11 U.S.C. §§ 109(c)(2) & 941. Only then does the federal bankruptcy court provide *consent* – and violate the Contracts Clause – by confirming a plan proposed by the municipality. *See* 11 U.S.C. § 943(b).

This issue is a question of first impression on which this Court is not bound by precedent. Any comments in Justice Cardozo's dissent in *Ashton* are not precedent binding this Court. *See, e.g., United States v. Jahns,* 2012 WL 928725, at *6 (N.D. Ohio Mar. 19, 2012) ("Dissenting Supreme Court opinions are not binding precedent."). While the City points to language in *Bekins* which it claims "zeroes in on that they're dealing with this particular issue," Tr. 10/15/13 at 157:12-13, in fact *Bekins* identified the sole issue decided in that section of the opinion: "whether the exercise of the federal bankruptcy power in dealing with the composition of the debts of the [municipality], upon its voluntary application and with the State's consent, must be deemed to be an unconstitutional interference with the essential independence of the State as preserved by the Constitution." 304 U.S. at 49. Thus, the *Bekins* Court reconsidered the

federalism holding from *Ashton,* nothing more.

***Second,*** even assuming *arguendo* (and, AFSCME submits, incorrectly) that chapter 9 only involves state consent to federal impairment, *Bekins* is no longer good law**.** *Asbury Park* and the Court's federalism jurisprudence since *New York* render *Bekins* inapposite because chapter 9 unconstitutionally allows a state to lose sovereign powers by consent.

Both the Court's decision in *Bekins* and Justice Cardozo's dissent in *Ashton* hinged on two since-disproven notions: (1) that "composition of debts . . . was not available under state law" due to the Contracts Clause, *Bekins,* 304 U.S. at 54; and (2) that "dispensing with the consent of the state" would render a federal municipal bankruptcy law "a dislocation of that balance between the powers of the states and the powers of the central government which is essential to our federal system." *Ashton,* 298 U.S. at 538 (Cardozo, J., dissenting). *See also Bekins,* 304 U.S. at 51-52 ("It is of the essence of sovereignty to be able to make contracts and give consents bearing upon the exertion of governmental power.")

As we know from *Asbury Park*, the first assumption is not true because "the necessity compelled by unexpected financial conditions to modify an original arrangement for discharging a city's debt is implied in every such obligation." 316 U.S. at 511. Thus, although the Contracts Clause continues to apply as a limit on the precise features of "a state insolvency act," *id.* at 513, such acts are allowed under the Constitution as an exercise of a state's "autonomous regulation" of the "peculiarly local" problem of "the fiscal management of its own household." *Id.* at 509.

The second assumption is untrue because in *New York* the Supreme Court made clear that state consent *cannot* enlarge the powers of Congress. AFSCME Am. Elig. Obj. ¶¶ 82-84. As noted, both Justice Cardozo's dissent in *Ashton* and the Court's opinion in *Bekins* assumed that state consent was *precisely* what was required to "remove the obstacle," 304 U.S. at 52, and

6

extend the power of municipal bankruptcy legislation to Congress. But this enlargement of federal power is what *New York* forbids – the incursion into the sovereign powers of another branch of government by the consent of that branch. The *Bekins* Court apparently tolerated that incursion because it thought the City "was powerless" to adjust debts under state law and therefore acted "in aid, and not in derogation, of its sovereign powers" by consenting to federal bankruptcy. 304 U.S. at 54. Since *Asbury Park* made clear that the City is not so powerless, state consent to federal control in chapter 9 *is* an encroachment on a sovereign power and therefore is unconstitutional under *New York*.

***Third and in the alternative,*** further assuming *arguendo* (and, AFSCME submits, incorrectly) both that chapter 9 does not violate the constitutional prohibition on federal consent to state impairment *and* that *Bekins* is still good law, chapter 9 as amended violates the only remaining reasonable reading of *Bekins* consistent with the subsequently decided *Asbury Park* because use of a state municipal debt adjustment scheme requiring less than 100% creditor consent must be a remedy available to states. At the very least, therefore, the federal municipal bankruptcy statute ceased to be constitutional four years after *Asbury Park* when Congress amended it to deny states the sovereign right to adjust the debts of their own municipalities with less than 100% creditor consent, which is still the law today under Section 903(1).

If a municipality is so insolvent that it has no choice but to adjust its debts, Section 903(1) unconstitutionally forces it to reach 100% creditor consent and effectively compels it to resort to chapter 9. Doing so likewise forces the municipality to enlist its officers in designing a plan of adjustment according to federal rules and policies rather than different state rules and policies which might otherwise have been available under state insolvency law passed consistent with *Asbury Park* – for, as the City observed, Section 903(1) constitutes a "prohibition on

7

13-53846-tjt    Doc 1467    Filed 10/30/13    Entered 10/30/13 18:20:15    Page 8 of 11

competing state municipal schemes." Tr. 10/15/13 at 161:12-13. Congress's attempt to coerce states into chapter 9 regardless of their desire to manage their affairs differently constitutes "overreaching in violation of the Tenth Amendment." 16 Collier's on Bankruptcy P 903.03[2].

The City's counterargument that the Code's prohibition on competing state municipal schemes represents "recognition that they're not possible or workable" and that therefore Congress could not have "coerced anybody," Tr. 10/15/13 at 161:12-13. 22, is inaccurate. The House "favored" amending the statute to revive states' rights under *Asbury Park* in order to provide for "the availability of state composition proceedings as a less drastic alternative than bankruptcy," but the Senate "opposed" the House "in the interest of national uniformity," and "[t]he Senate's view ultimately prevailed[.]" 16 Collier on Bankruptcy § P 903.LH[2]. This attempt to undo *Asbury Park* to deny to States an "alternative" to chapter 9 was unconstitutional coercion. See *Dickerson v. United States,* 530 U.S. 428, 437 (2000) ("Congress may not legislatively supersede our decisions interpreting and applying the Constitution.").

### III. SECTION 109(C)(2) APPLIES A STATE LAW STANDARD AND BECAUSE PA 436 VIOLATES THE STATE CONSTITUTION THEREFORE THE CITY IS NOT ELIGIBLE FOR CHAPTER 9

As a threshold matter, because the state-law-authorization eligibility requirement in Section 109(c)(2) refers explicitly to "State law," every court to consider the issue has correctly held that Section 109(c)(2) is "governed by a state rule of decision." *In re City of Stockton,* 475 B.R. 720, 728-29 (Bankr. E.D. Cal. 2012) (collecting cases). An analogy between Section 109(c)(2) and the Supreme Court's 11th Amendment sovereign immunity jurisprudence confirms this result for two reasons. First, under *Palmer v. Ohio,* 248 U.S. 32 (1918), the question of whether a state has waived sovereign immunity by passing a state law remains a question of state, not federal, law. *See Lee-Thomas v. Prince George's County Public Schools,* 666 F.3d

8

244, 249-50 (4th Cir. 2012). Second, cases which have used a federal standard when deciding whether the state has waived sovereign immunity in other circumstances are distinguishable because the 11th Amendment, unlike Section 109(c)(2), does not explicitly refer to state law.

The State suggests that under its interpretation of the Michigan Constitution, the State could pass a law granting to the Governor the right to pick the mayor of Detroit. Tr. 10/16/13 at 14:8-12. But if, as the State contends, "[i]t's not too simplistic" to say that the City "sets its own form of government through its charter unless the state dictates otherwise through its legislation," Tr. 10/16/13 at 13:7-14, then the need for a home rule provision in the Constitution vanishes; local government could simply be governed by statute. However, it remains a bedrock principle of Michigan constitutional law that the Legislature *cannot* select the mayor of Detroit, or any other local representative. Any power the Legislature may have to amend the powers of local governments does not extend to the ability to appoint the EM because the legislature at most defines *what* powers the elected government has but not *who* will exercise those powers. As the Michigan Supreme Court has held, the Michigan Constitution incorporates the holdings of the Cooley Court establishing "the importance of elected representatives in any scheme of local government." *Brouwer,* 377 Mich. at 653. At the local level, "while the people are suffered to go through the forms of an election, there shall not rest in some authority at a distance, the power to deprive the election of any valuable significance." *Id.* (citation omitted). Local voters have the right to elect local officials, and the State cannot substitute unelected persons in their stead.

The State next argues that PA 436 "allows the emergency manager to simply execute the same executive powers that the elected officials of the community would have" and that therefore, because he is a local official as opposed to a state official, the Legislature has simply delegated to the EM the same powers it has delegated to the local government Tr. 10/16/13 at

9

16:21-23. The State argues that the EM can execute local power because he is a local official, not a state official, and thus the EM is delegated the same powers delegated to the local government. This argument fails for two reasons. First, the EM is a state official, not a local official. *See* AFSCME Am. Elig. Obj. ¶173. Second and regardless, the Legislature lacks the power to delegate local authority because under Article IV, Section 29 local authority already belongs to the local electors –inherently, with nothing left to delegate. *See* AFSCME Am. Elig. Obj. ¶ 151. The State unconstitutionally delegated this power without any *state law* standards to guide the EM *during bankruptcy*. Because local authority derives from the local electors, the State incorrectly suggests that the EM "is guided by the same standards that would have applied to the local officials when they were exercising that power." Tr. 10/16/13 at 17:14-16. For if the Mayor or City Council take actions in bankruptcy which the people of Detroit dislike, the people of Detroit who elected them can vote them out of office. Not so for the EM.

## CONCLUSION

AFSCME respectfully requests that this Court issue an order dismissing the City's chapter 9 petition, or, in the alternative, ensuring that accrued pension benefits protected by Article IX, Section 24 of the Michigan Constitution are not endangered by this bankruptcy.

Dated: October 30, 2013

| **LOWENSTEIN SANDLER LLP** <br> By: /s/ *Sharon L. Levine* <br> Sharon L. Levine, Esq. <br> 65 Livingston Avenue <br> Roseland, New Jersey 07068 <br> (973) 597-2500 (Telephone) <br> (973) 597-6247 (Facsimile) <br> slevine@lowenstein.com | Herbert A. Sanders, Esq. <br> THE SANDERS LAW FIRM PC <br> 615 Griswold St., Suite 913 <br> Detroit, MI 48226 <br> (313) 962-0099 (Telephone) <br> (313) 962-0044 (Facsimile) <br> hsanders@miafscme.org | Richard G. Mack, Jr., Esq. <br> Miller Cohen, P.L.C. <br> 600 West Lafayette Boulevard <br> 4th Floor <br> Detroit, MI 48226-3191 |
|---|---|---|

*Counsel to AFSCME Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub-Chapter 98, City of Detroit Retirees*