UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

----------------------------------------------------------- x
: 
In re: :
: Chapter 9
: 
CITY OF DETROIT, MICHIGAN, : Case No.: 13-53846
: 
Debtor. : Hon. Steven W. Rhodes
: 
----------------------------------------------------------- x

# SUPPLEMENTAL BRIEF OF INTERNATIONAL UNION, UAW IN SUPPORT OF THEIR AMENDED OBJECTION TO THE CITY OF DETROIT, MICHIGAN'S ELIGIBILITY FOR AN ORDER FOR RELIEF UNDER CHAPTER 9 OF THE BANKRUPTCY CODE

The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") submits this supplemental brief regarding its Amended Objections to the City of Detroit, Michigan's Eligibility for Relief under Chapter 9 [DE 1170] (the "Amended Objection").

## Argument

### The Governor's Approval of the Chapter 9 Filing Was Invalid Under State Law and Cannot Be Saved by Federal Bankruptcy Law

In issuing the July 18, 2013 approval letter, Governor Snyder was acting, and could only act, under *state* law. *See* 11 U.S.C. Section 109(c)(2) (requiring that the municipality be specifically authorized to be a debtor under State law, or by an officer empowered by State law). Here, confronted with a proposal by the Emergency Manager Kevyn Orr (the "EM") that, on its face compelled a significant reduction in accrued vested pension benefits, thus implicating Article 9, Section 24 of the Michigan Constitution, the Governor's approval necessarily required a condition

excepting accrued pensions. The Governor could not, consistent with State law, sign an approval for bankruptcy plan proposed that, as presented by the EM, would plainly violate the Michigan Constitution. Skirting that issue, however, Governor Snyder was apparently counting on *federal* law—through the federal bankruptcy court—to sort out the legal issues regarding the applicability of Article 9, Section 24.

But the Governor's deferral to the federal bankruptcy court as the basis for not applying Article 9, Section 24 to his approval cannot save a defective authorization, which must be issued consistent with *state* law. The Governor cannot simply ignore a substantive provision of the Michigan Constitution that plainly applies to him in his official acts and was plainly implicated by the EM's request for approval and instead rely upon federal law. Indeed, the conditions that led the Supreme Court to uphold the municipal bankruptcy law in *Bekins* were exactly the reverse: there, the Court expressly found that the taxing authority *was authorized by state law* to file the petition and to take the necessary steps to consummate the plan. *United States v. Bekins*, 304 U.S. 27, 47-48 (1938).[1] The state's authorization did not depend upon the

---

[1] The *Ashton* dissent is not to the contrary. Justice Cardozo emphasized that the municipal bankruptcy law "does not dislocate the balance" between the powers of the states and those of the federal government, citing, among other things, the requirement for consent by the state where necessary by local law and that the "composition, though approved by the requisite majority, shall not be confirmed" unless the municipality is authorized by law to take all action necessary to carry out the plan. *Ashton v. Cameron County Water Improvement Dist.*, 298 U.S. 513, 538-40 (1936) (Cardozo, J., dissenting). *See also id.* at 540 (noting that "it is clear to the point of demonstration that the filing of a voluntary petition by a political subdivision does not violate the local law or any local public policy. Petitioners are not the champions of any rights except their own."). Chapter 9 was deemed constitutional on these same grounds —adherence to state law—in *Bekins*. As expressed in the *Ashton* dissent, the operative function of the federal law was the ability to bind the minority—

*federal* law to paper over a violation of state law; then-chapter IX would have been found unconstitutional had the *Bekins* Court not found that the municipality was following *state* law in filing the bankruptcy case.

These are not the Depression-era conditions of municipal debt compositions, where holders of debt securities, having determined that the municipal well has run dry, could voluntarily decide to compromise their bond recoveries and obtain the requisite numbers to bind a minority through chapter IX. Here, the EM—aided by the Governor—embarked upon a plan to cut off the City's pension funding obligations and use the money for a massive revitalization program, transforming those obligations into bankruptcy claims. Little wonder that pensioners, relying upon their state's constitution to protect their accrued benefits, didn't recognize that the Governor and the EM expected them to replicate the voluntary debt compositions of Depression-era bondholders.[2]

Thus, Section 109(c)(2) requires that authorization be based on state law and state law *alone. See In re Harrisburgh, PA,* 465 B.R. 744, 755 (Bankr. M.D. Penn. 2011) (rejecting Supremacy Clause argument to support eligibility and dismissing Chapter 9 petition as not authorized by state law).

---

the majority having agreed to the plan of composition as a condition of the bankruptcy filing—not overriding the state law. *See id.* at 541.

[2] Nor does the Governor have any authority to consent to the impairment or diminishment of accrued benefits on their behalf. Simply put, there was no state law source of authority for the Governor to approve the chapter 9 filing but not protect accrued pension benefits covered by Article 9, Section 24.

Article 9, Section 24 was plainly implicated in the EM's proposal and, under well-established principles applied by the Michigan courts to the interpretation of the state's constitution, plainly applied to the Governor's approval under PA 436. "The primary objective in interpreting a constitutional provision is to determine the text's original meaning to the ratifiers, the people, at the time of ratification." *County of Wayne v. Hathcock*, 684 N.W.2d 765, 779 (2004) (citing *People v. Nutt*, 677 N.W.2d 1, 6 (2004)). "*The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.*" *Federated Publ'ns, Inc. v. Bd. of Trustees of Mich. State Univ.*, 594 N.W.2d 491, 496 (Mich. 1999) (quoting 1 Cooley, Constitutional Limitations (6th ed.), p. 81 ) (emphasis in original); *see also Comm. for Constitutional Reform v. Secretary of State*, 389 N.W.2d 430, 432 (1986) (" 'The cardinal rule of construction, concerning language, is to apply to it that meaning which it would naturally convey to the popular mind ….' '[W]e should endeavor to place ourselves in the position of the framers of the Constitution, and ascertain what was meant at the time ….' ") (quoting, respectively, *People v. Dean*, 14 Mich. 406, 417 (1866); *Pfeiffer v. Detroit Bd. of Ed.*, 77 N.W. 250, 251 (1898)).

Applying these principles, the Michigan courts have emphasized that Article 9, Section 24 expresses "the firmly established right of public employees to receive pension payments as those payments become due." *Kosa v. Treasurer of State of Mich.*, 292 N.W.2d 452, 460 (Mich. 1980). The courts have construed Article 9, Section 24 to protect pension benefits earned as deferred compensation for services performed and to establish that such benefits, having been earned, are vested and cannot be reduced. *E.g., Advisory Opinion re Constitutionality of 1972 P.A. 258*, 209

N.W.2d at 202 (" '[T]he benefits of pension plans are in a sense deferred compensation for work performed. And with respect to work performed, … the public employee should have a contractual right to benefits of the pension plan, which should not be diminished by the employing unit after the service has been performed.' ") (quoting 1 Official Record, Constitutional Convention 1961, 770-771). S*ee also In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 806 N.W. 2d 683, 694 (Mich. 2011) ("The obvious intent of § 24 [ ] was to ensure that public pensions be treated as contractual obligations that, once earned, could not be diminished.").³

The absence of a reference to municipal bankruptcy in Article 9, Section 24 does not render it inapplicable in chapter 9 nor ambiguous in that regard. The provision itself expresses no exceptions, and the Michigan courts have said that every possible condition to which a constitutional provision would apply need not be spelled out. *See Nat'l Pride at Work, Inc. v. Governor*, 748 N.W.2d 524, 540 n.21 (Mich. 2008) ("the fact that a constitutional provision does not explicitly set forth every specific action that is prohibited does not mean that such a provision is ambiguous"). Moreover, the courts apply the words that are there—nothing is superfluous. *See Syntex Labs., Inc. v. Dep't of Treasury*, 470 N.W. 2d 665, 667-68 (1991) (interpreting constitutional provision prohibiting sales and use taxes and declining to ignore reference to use tax as surplusage, noting "we borrow from the rules of statutory

---

³ A "vested right" is "an interest that the government is compelled to recognize and protect of which the holder could not be deprived without injustice." *City of Detroit v. Walker,* 520 N.W.2d 135, 143 (Mich. 1994).

construction the rule that no word should be treated as surplusage or rendered nugatory if at all possible.").

A reference to municipal bankruptcy would have been most unlikely in 1963 in any event. Chapter IX at the time was in a form much closer to the 1946 version than to the current statute. *See generally*, 6 Collier on Bankruptcy, ¶ 900.LH[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (noting that, until 1976, "Chapter IX, remained unchanged and virtually unused for 30 years …. Chapter IX as it then existed was scarcely usable by a large city…." (citations to legislative history of 1976 revision of Act omitted). Moreover, the idea that pension funding obligations—only just memorialized in the 1963 constitution—were debts subject to "composition" under Michigan's 1939 bankruptcy authorization statute would have been unimaginable. This is particularly so since from 1946 to 1976, "only securities debts could be modified in a chapter IX plan." *In re Stockton, Cal.*, 486 B.R. 194, 196 (Bankr. E.D. Cal. 2013).

Nor can the City's attempt to hide behind its own label of the funding obligations—unsecured claims to be treated the same as other unsecured claims under its plan—cannot shield the City from Article 9, Section 24. First, as shown above, *state* law governs authorization and, consistent with the courts' well established principles of construction, Article 9, Section 24 plainly forbids impairment or diminishment of accrued vested pensions through a bankruptcy principles of construction, authorized by the State. In any event, the EM must have known that as a chapter 9 debtor, the City would have wide latitude to spend its money for any reason, including "even in a manner that disadvantages other creditors" unless the

- 6 -
13-53846-tjt    Doc 1469    Filed 10/30/13    Entered 10/30/13 18:38:02    Page 6 of 9

construction the rule that no word should be treated as surplusage or rendered nugatory if at all possible.").

A reference to municipal bankruptcy would have been most unlikely in 1963 in any event. Chapter IX at the time was in a form much closer to the 1946 version than to the current statute. *See generally*, 6 Collier on Bankruptcy, ¶ 900.LH[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.) (noting that, until 1976, "Chapter IX, remained unchanged and virtually unused for 30 years …. Chapter IX as it then existed was scarcely usable by a large city…." (citations to legislative history of 1976 revision of Act omitted). Moreover, the idea that pension funding obligations—only just memorialized in the 1963 constitution—were debts subject to "composition" under Michigan's 1939 bankruptcy authorization statute would have been unimaginable. This is particularly so since from 1946 to 1976, "only securities debts could be modified in a chapter IX plan." *In re Stockton, Cal.*, 486 B.R. 194, 196 (Bankr. E.D. Cal. 2013).

Nor can the City's attempt to hide behind its own label of the funding obligations—unsecured claims to be treated the same as other unsecured claims under its plan—cannot shield the City from Article 9, Section 24. First, as shown above, *state* law governs authorization and, consistent with the courts' well established principles of construction, Article 9, Section 24 plainly forbids impairment or diminishment of accrued vested pensions through a bankruptcy principles of construction, authorized by the State. In any event, the EM must have known that as a chapter 9 debtor, the City would have wide latitude to spend its money for any reason, including "even in a manner that disadvantages other creditors" unless the

municipality consents to judicial oversight. *In re Stockton, Cal.,* 486 B.R. at 198-99. Section 904 of the Bankruptcy Code (called by the *Stockton* court "a keystone in the constitutional arch between federal bankruptcy power and state sovereignty," *id. at* 198) means that the City can expend its property and revenues during the chapter 9 case as it wishes." *Id.* at 199. The City has simply adopted a label of convenience for the pension funding obligations, in part because it wishes to divert the funding obligation money to its revitalization program—a deliberate choice on the City's part—and in part, perhaps, to avoid having to explain the choice to maintain its obligation to fund accrued vested pensions to its bondholders or their insurers.[4]

Moreover, the City cannot rely upon the characterization of pension funding obligations from chapter 11 case law, because the courts have made clear that the cessation of a private company's funding obligations, leading to termination of a pension plan, is inextricably linked to the guaranty program Congress enacted to backstop accrued pensions in the event the employer's funding ceased. *E.g., PBGC v. LTV Corp.*, 496 U.S. 633 (1990) (upholding PBGC's restoration of company pension plan when company and union negotiated a follow-on plan contrary to agency's policies as pension insurance guarantor); *In re UAL Corporation*, 428 F.3d 677 (7th Cir. 2005) (upholding settlement between PBGC and airline as consistent with PBGC's authority as federal "backstop" for pension benefits). Here, there is no

---

[4] One might ask whether the City's insistence on treating the funding obligations as unsecured claims operates as a form of "consent" under Section 904, by casting the Court as the decision-maker on the pension issues, and yet not expressly consenting to the Court's authority over spending under Section 904.

similar guaranty program. There is only Article 9, Section 24. The basis on which the City can cease its funding obligations cannot simply be decreed as a mere claims recovery exercise.[5] Accordingly, federal law cannot save an authorization that violated state law, and therefore violates Section 109(c)(2).

---

[5] Indeed, Congress did not extend ERISA to public sector plans because "'the ability of the governmental entities to fulfill their obligations to employees through their taxing powers' was an adequate substitute for both minimum funding standards and plan termination insurance." *Rose v. Long Island Pension Plan,* 828 F.2d 910, 914 (2d Cir. 1987) (quoting legislative history of ERISA). In addition, Congress determined that extending ERISA's requirement to state pension plans would unduly interfere with the administration of public retirement plans, or, put another way, in recognition of principles of federalism. *Id.* Thus, allowing the City to use federal bankruptcy law to create its own plan termination rules by simply wiping out its funding obligation, devoid of any guaranty program, creates the very interference of federal authority that Congress has rejected in connection with state pension plans.

## **CONCLUSION**

For the foregoing reasons, and those set forth in the Amended Objection, the City's chapter 9 petition should be dismissed.

Dated: New York, New York
       October 30, 2013

    /s/ Babette A. Ceccotti
Cohen, Weiss and Simon LLP
Babette A. Ceccotti
330 West 42nd Street
New York, New York 10036-6976
T: 212-563-4100
F: 212-695-5436
bceccotti@cwsny.com

- and -

Niraj R. Ganatra (P63150)
Michael Nicholson (P33421)
8000 East Jefferson Avenue
Detroit, Michigan 48214
T: (313) 926-5216
F: (313) 926-5240
nganatra@uaw.net
mnicholson@uaw.net

*Attorneys for International Union, UAW*