3   IN THE MATTER OF,            Case No. 13-53846
                                Detroit, Michigan
4   CITY OF DETROIT, MI         October 24, 2013
    _____/   9:05 a.m.
5
                     IN RE:  ELIGIBILITY TRIAL
6          BEFORE THE HONORABLE STEVEN W. RHODES
              TRANSCRIPT ORDERED BY: ROBIN WYSOCKI
7
    APPEARANCES:
8
    For the City of Detroit, MI:   GEOFFREY IRWIN, ESQ.
9                                  GEOFFREY STEWART, ESQ.
                                   THOMAS CULLEN, JR., ESQ.
10                                 Jones, Day
                                   51 Louisiana Avenue, N.W.
11                                 Washington, D.C. 20001-2113
                                   202-879-3939
12
                                   BRUCE BENNETT, ESQ.
13                                 Jones, Day
                                   555 South Flower Street
14                                 Fiftieth Floor
                                   Los Angeles, CA 90071-2452
15                                 213-243-2382

16                                 ROBERT HERTZBERG, ESQ. (P30261)
                                   Pepper, Hamilton
17                                 4000 Town Center
                                   Suite 1800
18                                 Southfield, MI 48075-1505
                                   248-359-7333
19
    For State of Michigan:         MATTHEW SCHNEIDER, ESQ.
20                                 (P62190)
                                   Chief Legal Counsel
21                                 Attorney for State of Michigan
                                   Michigan Department of
22                                 Attorney General
                                   P.O. Box 30754
23                                 Lansing, MI 48909
                                   517-373-0126
24

25

```
 1                              STEVEN HOWELL, ESQ. (P28982)
                                Special Assistant Attorney
 2                              General
                                Dickinson, Wright
 3                              500 Woodward Avenue
                                Suite 4000
 4                              Detroit, MI  48226-3425
                                313-223-3033
 5
    For Michigan Council 25 of  SHARON L. LEVINE, ESQ.
 6  the American Federation of  JOHN SHERWOOD, ESQ.
    State, County and Municipal Lowenstein, Sandler, LLP
 7  Employees (AFSCME), AFL-CIO 65 Livingston Avenue
    and Sub-Chapter 98, City of Roseland, NJ 07068
 8  Detroit Retirees:          973-597-2500

 9  For Detroit Retirement      ROBERT D. GORDON, ESQ. (P48627)
    Systems - General Retirement JENNIFER GREEN, ESQ.
10  System of Detroit, Police and Clark, Hill, PLC
    Fire Retirement System of   151 S. Old Woodward Avenue
11  the City of Detroit:        Suite 200
                                Birmingham, MI 48009
12                              248-988-5882

13                              RONALD KING, ESQ. (P45088)
                                Clark, Hill
14                              212 East Grand River Avenue
                                Lansing, MI 48906
15                              517-318-3015

16  For the Detroit Fire Fighters BARBARA PATEK, ESQ. (P34666)
    Association, the Detroit    JULIE BETH TEICHER, ESQ.
17  Police Officers Association (P34300)
    and the Detroit Police      DAVID EISENBERG, ESQ. (P68678)
18  Lieutenants and Sergeants   Erman, Teicher, Miller, Zucker
    Association:                & Freedman
19                              400 Galleria Officentre
                                Suite 444
20                              Southfield, MI 48034

21  For International Union, UAW: BABETTE A. CECCOTTI, ESQ.
                                PETER D. DECHIARA, ESQ.
22                              THOMAS CIANTRA, ESQ.
                                Cohen, Weiss, and Simon, LLP
23                              330 West 42nd Street
                                New York, NY 10036-6976
24                              212-356-0227

25
```

```
 1  For the Detroit Retired        THOMAS MORRIS, ESQ. (P39141)
    City Employees Association,     Silverman & Morris
 2  Retired Detroit Police and     30500 Northwestern Highway
    Fire Fighters Association,      Suite 200
 3  Shirley V. Lightsey, and       Farmington Hills, MI 48334
    Donald Taylor (Retiree         248-539-1330
 4  Association Parties):
                                    RYAN PLECHA, ESQ. (P71957)
 5                                  Lippitt, O'Keefe
                                    370 East Maple Road
 6                                  3rd Floor
                                    Birmingham, MI 48009
 7                                  248-646-8292

 8  For the Official Committee of  MATTHEW E. WILKINS, ESQ.
    Retirees:                      (P56697)
 9                                  Brooks, Wilkins, Sharkey &
                                    Turco, PLLC
10                                  401 S. Old Woodward Avenue
                                    Suite 400
11                                  Birmingham, MI 48009
                                    248-971-1711
12
                                    CLAUDE D. MONTGOMERY, ESQ.
13                                  ANTHONY ULLMAN, ESQ.
                                    ARTHUR RUEGGER, ESQ.
14                                  Dentons
                                    1221 Avenue of the Americas
15                                  New York, NY 10020-1089
                                    212-768-6700
16
    For the Retired Detroit        LYNN M. BRIMER, ESQ. (P43291)
17  Police Members Association:    MEREDITH TAUNT, ESQ. (P69698)
                                    MALLORY FIELD, ESQ. (P75289)
18                                  Strobl & Sharp, P.C.
                                    300 East Long Lake Road
19                                  Suite 200
                                    Bloomfield Hills, MI 48304-2376
20                                  248-540-2300

21  For the Flowers Plaintiffs -   WILLIAM A. WERTHEIMER, ESQ.
    Robert Flowers, Michael Wells, (P26275)
22  Janet Whitson, Mary Washington 30515 Timberbrook Lane
    and Bruce Goldman:             Bingham Farms, MI 48025
23                                  248-644-9200

24

25
```

```
1   For Ambac Assurance          DANIEL WEINER, ESQ. (P32010)
    Corporation:                 Schafer & Weiner
2                                40950 Woodward Avenue
                                 Suite 100
3                                Bloomfield Hills, MI 48304
                                 248-540-3340
4
    Court Recorder:              Letrice Calloway
5
    Transcriber:                 Deborah L. Kremlick
6

7

8

9   Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                   INDEX

2  WITNESSES FOR          Direct        Cross          Redirect
   THE CITY:
3
   GAURAV MALHOTRA                    8,56,67,82          85
4  CHARLES MOORE          90      128,143,148,151
   KENNETH BUCKFIRE       154
5
   EXHIBITS:                                           ID   ADM
6
   CX69     Draft Actuarial Evaluation Report         119  123
7  CX70     Actuarial Evaluation Report               126  127
   CX75     Financial Operating Plan                  182  184
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      (Court in Session)

2           THE CLERK:  All rise.  Court is in session.  Please

3   be seated.  Case number 13-53846, City of Detroit, Michigan.

4           THE COURT:  Is anybody not here?  All right.  Well,

5   then let's assume everyone's here and we don't have to repeat

6   appearances.

7       A couple of housekeeping matters.  Mr. Stewart, I

8   received and actually read the memorandum that was filed a few

9   minutes ago on this issue of allowing the witness to testify

10  about projections.  Thank you to whoever on your staff stayed

11  up all night doing that.

12          MR. STEWART:  Unfortunately Mr. DiPompeo did, Your

13  Honor.

14          THE COURT:  Well, thanks to him.  As a matter of

15  process, however, before we have any further argument on it,

16  it is appropriate to -- to take some time not only for us, but

17  for the objecting parties to study it and look at the cases

18  that have been cited and prepare.

19      So I think we'll proceed with his cross examination.  And

20  perhaps reconsider the issue after lunch.

21      The second housekeeping item is in regard to the

22  Governor's testimony.  Is Mr. Schneider here?  Mr. Howell is

23  here.  Is it -- is it --

24          MR. HOWELL:  Dickinson, Wright.  Special Assistant

25  Attorney General appearing on behalf of the state.

1          THE COURT: Thank you, sir. Is it the parties'

2   agreement and the Governor's intention to appear at 1:00 on

3   Monday?

4          MR. HOWELL: I don't know if that -- I believe

5   that's the plan without the limitations suggested.

6          THE COURT: Okay. I --

7          MR. DECHIARA: I'm sorry, Your Honor, I was

8   distracted for a moment.

9          MR. HOWELL: If I may, Your Honor, I -- I believe

10  the -- there is ongoing discussions between Matthew. He's

11  meeting today with the Governor to work those details out.

12  But I thought the offer was 1:00 on Monday.

13         MR. DECHIARA: Yes. The state offered to produce

14  the Governor at 1:00 on Monday and there's no agreement as to

15  any limitation on the time of his testimony.

16         MR. HOWELL: Okay. That is correct, Your Honor.

17         THE COURT: Okay. Then in -- in that circumstance,

18  the Court will change its plans and we will run Court until

19  5:00 instead of our previously scheduled time of 3:00 because

20  I don't want to have to require the Governor to come back a

21  second day on account of my schedule. So we'll plan on going

22  until at least 5:00 on Monday to try to get all of his

23  testimony in in one -- one day.

24         MR. DECHIARA: Thank you, Your Honor. We appreciate

25  it.

1          MR. HOWELL:  Thank you, Your Honor.  We appreciate

2   the accommodation.

3          THE COURT:  Okay.

4          MR. HOWELL:  Thank you very much.

5          THE COURT:  All right.  Let's proceed with the

6   testimony then.

7          MR. RUEGGER:  Your Honor, excuse me.  Art Ruegger

8   for Dentons on behalf of the Retiree Committee.

9      We respectfully request a little more time to read the

10  memo from Jones, Day and -- and respond.

11         THE COURT:  Do what you can over lunch and then

12  we'll see if we need any more time.

13         MR. RUEGGER:  Very well, Your Honor.

14         THE COURT:  Sir, would you resume the witness stand?

15  And you're still under oath so you may just have a seat and

16  we'll continue with the examination.

17     (WITNESS GAURAV MALHOTRA WAS PREVIOUSLY SWORN)

18         MR. SHERWOOD:  Good morning, Your Honor.  Jack

19  Sherwood, Lowenstein, Sandler for the record for AFSCME.

20                       CROSS EXAMINATION

21  BY MR. SHERWOOD:

22  Q    Mr. Malhotra, good morning.

23  A    Good morning.

24  Q    You were engaged by the City of Detroit in May of 2011,

25  isn't that right?

1  A    That's correct.

2  Q    So as of now you've been on the job for the city for over

3  two years, is that fair to say?

4  A    That is correct.

5  Q    And when you were initially engaged in May of 2011

6  through the appointment of Mr. Orr as the emergency manager,

7  you reported to officials, city officials, is that right?

8  A    That is correct.

9  Q    And some of those city officials include Kirk Lewis,

10 correct?

11 A    Yes.

12 Q    And who is Kirk Lewis?

13 A    Kirk Lewis was the former Chief of Staff for Mayor Bing.

14 Q    And Chris Brown, do you know that name?

15 A    I do.

16 Q    And who was Chris Brown?

17 A    He was the former Chief Operating Officer for the city.

18 Q    And when you say -- when you say former or -- or Mr.

19 Lewis and/or Mr. Brown, are they still employed by the City of

20 Detroit?

21 A    No, they are not.

22 Q    And -- and when were they -- when were they terminated by

23 the city?

24 A    I don't know if they were terminated and I don't know the

25 exact date they left.

1  Q    Okay.  But you know that as of now they're -- they're not

2  -- they're not working for the city, correct?

3  A    That's what I said earlier, yes.

4  Q    And -- and -- and you're not -- you're not reporting to

5  them any -- you're not reporting to any city officials at this

6  point in time, is that fair to say?

7  A    We report to Kevyn Orr.  We have been reporting to Gary

8  Brown.  We have been reporting to Jim Bonsall, was a former

9  Chief Financial Officer.  And those were the folks we were at

10  least reporting our day to day activities on.

11  Q    I just want to get this straight in terms of time, okay?

12  The -- I'm talking about since March of this year, are you

13  reporting to the Mayor or the Mayor's office since March of

14  this year when Mr. Orr was appointed?

15  A    No.  Our general updates are with Mr. Orr.

16  Q    And since March of this year, you're not reporting to the

17  city council of the City of Detroit, isn't that right, since

18  March of this year when Mr. Orr was appointed?

19  A    Not -- not specifically, no.

20  Q    Now Mr. Orr was -- was appointed in -- in March of this

21  year so at the time of his appointment you have been on the

22  job with Ernst and Young for about a year and ten months,

23  correct?

24  A    Sounds about right.

25  Q    And in -- in -- yesterday you testified on direct about

1 | various conversations, things that you told Mr. Orr and the

2 | other professionals for the city, correct?  Do you remember

3 | that testimony from yesterday?

4 | A    Yes.

5 | Q    So I assume that when you were updating Mr. Orr and the

6 | rest of the city's professionals, you drew on your year and

7 | ten months worth of experience that you had working for the

8 | city up to that point?

9 | A    For certain aspects of those updates, yes.

10 | Q    Do you recall in the course of your services for the

11 | city, before the appointment of the emergency manager in March

12 | 2013, providing services in connection with the response of

13 | the city to the report of the financial review team?

14 | A    You -- can you shorten the question so -- and which

15 | financial relating --

16 | Q    Do -- do you recall in -- in late 2012, early 2013,

17 | working with people from the city concerning the financial

18 | review team's report?

19 | A    We were working during that time frame on the specific

20 | improving -- mechanisms for improving the cash flows of the

21 | city, yes.

22 | Q    Okay.  And -- and as you just testified one of the -- one

23 | of the topics that you were working on during that period was

24 | improving cash flows, correct?

25 | A    That's right.  We were looking at different alternatives

1  how the city could improve its cash flow position.

2  Q    And -- and you were doing that work for the city and its

3  officials, correct?  Before Mr. Orr got involved.

4  A    That is correct.

5  Q    Did you attend meetings in December of 2012 where the

6  issue of the city's cash flows was discussed?

7  A    Meetings with who?

8  Q    Members of the city's -- members of the city council,

9  members of the Mayor's staff?

10 A    Yes.

11 Q    All right.  I'd like to refer you to a document it's

12 AFSCME 551, document 551.

13         MR. SHERWOOD:  And, Your Honor, I believe there

14 are --

15 Q    Are you okay with the -- with the screen or -- because I

16 think there might be some hard copies there too.

17 A    I'm okay.

18 Q    Okay.

19 A    Thank you.

20 Q    Now this letter is -- is dated February 22nd, 2013,

21 correct?

22 A    That is correct.

23 Q    And I'd like you to scroll down to the bottom of the

24 letter, the -- the paragraph marked cash crisis.  Do you see

25 that?

1  A      Yes.

2  Q      And there is a reference to Ernst and Young in that

3  paragraph.  And the administration, council President Pugh,

4  council President Brown, council member Cockrel, fiscal staff,

5  Ernst and Young consultant, along with Miller, Canfield met

6  over the December holiday break to come up with a cash plan

7  with counter measures to get the city through June 30th, 2013.

8  Do you recall participating in those meetings?

9  A      Yes, I do.

10 Q      And you see that in this letter the -- the authors

11 conclude on the first sentence that a satisfactory plan exists

12 to resolve the city's cash crisis.  Do you see that?

13 A      I see it.  I didn't write this, but I see it.

14 Q      You do see it?  And but that -- this was written after

15 your -- your lengthy meetings over the holiday break, correct?

16 A      I -- this was written on February 22nd.  We met during the

17 December time frame to come up with different ideas how the

18 city could preserve cash which included a significant amount

19 of deferrals, yes.

20 Q      Okay.  But -- and as -- as a result of those meetings --

21         THE COURT:  One second, counsel.  Have you seen this

22 letter before?

23 A      Your Honor, this letter was handed to me --

24         THE COURT:  That would be a yes or a no.

25 A      No.

1          THE COURT:  You've never seen this letter before?

2   A    It -- I have seen it, I have not read it is my answer.  I

3   was given it during my deposition.

4          THE COURT:  Is this letter in evidence?

5          MR. SHERWOOD:  I believe it is not, Your Honor.  I

6   was just asking him -- using it to refresh his recollection in

7   terms of things that happened.

8          THE COURT:  Well, it's proper to refresh a witness'

9   recollection when he says he doesn't have a recollection.  I

10  haven't heard that yet.

11         MR. SHERWOOD:  Okay.

12  Q    Did you believe in February of -- February 22nd, 2013,

13  that a satisfactory plan existed to address the city's cash

14  crisis?

15  A    What a satisfactory plan means is -- is subjective.  What

16  I can say is, during the December time frame we had a lot of

17  meetings with the city officials to see how the city could

18  preserve cash to -- to increase the cash position over the

19  next few months.

20       And that predominantly resulted in the city coming up

21  with a plan that said most of these would have to come through

22  deferrals because what the city could actually impact in terms

23  of permanent cost reductions, those options were very limited.

24  So the -- the majority of any savings that would come or any

25  cash increase would come, would come through the deferral of

1   either pension related costs or additional health care related

2   costs.  That -- that's at least the -- what -- what I view as

3   what the plan was at that point in time.

4   Q    Did you ever criticize the city or the council with

5   respect to their plans to address cash flow issues during the

6   February 2013 time period?

7   A    Criticize -- indirectly criticize in terms of what the

8   satisfactory plan was?

9   Q    Did you ever go to the city council or -- or the city

10  professionals and say, I disagree with your cash management,

11  cash flow plan, do something else?

12  A    During this time frame I made very clear that the --

13  based on the experience that I had over the past 18 months

14  working with the city, that the options that the city was

15  undertaking to preserve cash were predominantly based on

16  deferrals and not actual structural cost savings.  That's what

17  I -- I clearly highlighted.

18  Q    Let me ask you about additional revenue collection during

19  the period of early 2013.  Do you recall whether the city was

20  concerned about revenue collection from the 36th District Court

21  citations which the city -- where the city's share would be

22  $199,000,000?

23  A    No, I do not.

24  Q    You don't recall -- do you recall that that was an issue?

25  A    No, I do not.

1 Q    Do you recall being asked to look into the level of

2 collections from the 36th District Court in the amount of

3 $199,000,000?

4 A    No, I do not.

5 Q    Do you know what -- do you know whether the 36th District

6 Court is a source of revenue for the City of Detroit?

7 A    I think there are some collections, yes, that come

8 through the 36th District Court.  I am not exactly sure of the

9 amount off the 36th District Court collections.

10 Q    You don't -- you can't even estimate what the amount of

11 the collections are from the 36th District Court for 2013?

12 A    No, I cannot off the top of my head.

13 Q    So Ernst and Young didn't look into those collections or

14 whether they were slower than they should be, is that fair to

15 say?

16 A    That is fair.  Ernst and Young did not go into any

17 specific analysis on 36th District Court on their collections.

18 Q    Now you discussed a little bit yesterday about the -- the

19 general fund and the -- is all of the city's debt attributable

20 to the general fund?

21 A    No.

22 Q    Is -- does -- does the -- the total amount of debt that

23 the city has, does the number 14.9 billion, does that sound in

24 -- in the ballpark?

25 A    The amount of debt of 14,000,000,000 sounds a little high

1  because in my mind I remember the $18,000,000,000 of long term

2  liabilities as a total number of which.  And so that sounds a

3  little high to me.  If you could break it down for me, it will

4  -- it will refresh my recollection.

5  Q    Let me -- let me -- can we put the letter up again and

6  turn to Page 3?  Under long term liabilities there --

7          MR. STEWART:  Your Honor, I object.  We've been over

8  this.  He's not testifying to a lack of recollection.  He

9  hasn't seen the letter.  Unless there's a better --

10         THE COURT:  Well, no.  The -- the witness did

11  indicate some uncertainty about this question, so if this

12  refreshes his recollection, I'll permit it.  Does this refresh

13  your recollection about the debt of the city?

14  A    Yes, Your Honor, it's the long term liabilities of the

15  city which as noted here it's 14.9 billion dollars.  So, yes.

16         THE COURT:  Well, but the question for you is not

17  what this letter says because the letter is not in evidence.

18  The question is what do you remember after having seen this

19  letter?

20  A    Your Honor, I can at least frame up what was being asked

21  of me in terms of the total indebtedness.  Because when I look

22  at debt I consider this pure debt versus other long term

23  liabilities.  Yes, it does at least give me a frame of

24  reference to what the question was.

25         THE COURT:  Okay.

1  Q    And does this document -- do you agree with the statement

2  in this document that only 15% or 7.36 billion is attributable

3  to the general fund?  Does that -- does that sound right to

4  you?

5  A    That -- that could be an approximation based on the

6  existing assumptions with respect to unfunded liabilities from

7  a pension and -- and OPEB standpoint.

8  Q    And -- and the -- the city has other business type

9  activity funds, Department of Water and Sewage, Department of

10 Transportation and Municipal Parking.  And those funds are --

11 are not part of the general fund, correct?

12 A    That is correct.  They're -- they're enterprise funds.

13 Q    And do you know whether -- whether the -- the total

14 pension -- pension obligation of the city, is that all

15 attributable to the general fund, or is some of that

16 attributable to the enterprise funds?

17 A    The -- the pension liability is due to the two systems,

18 the general retirement system and the police and fire system.

19 The general retirement system is comprised of the general fund

20 employees, as well as water and sewer employees, as well as

21 Department of Transportation employees.

22 Q    So is it fair to say that some of the pension obligation

23 is -- is the responsibility of -- of water and sewer?

24 A    The -- yes, that would be -- that would be -- that would

25 be a fair assumption in terms of what they have been doing

1 Q    Now in -- in again early 2013, are you aware that the

2 City of Detroit was in the process and had been in the process

3 of trying to achieve certain cost saving initiatives?

4 A    I don't recall of specific initiatives in of early 2013.

5 But the city has been in a constant effort to reduce costs and

6 looking for cost savings initiatives.

7 Q    And would you agree that by March of 2013, $150,000,000

8 of cost saving initiatives have been achieved by the City of

9 Detroit?

10 A    Compared to what time frame?

11 Q    Simply do you agree that $150,000,000 of cost savings

12 have been achieved prior to March 2013?

13 A    It's -- it's difficult for me to answer a question on

14 cost savings achieved by a particular date unless you can

15 frame for me over what course of time your question is related

16 to.

17          MR. SHERWOOD:  Can you -- can you put up Exhibit

18 419, please?  Your Honor, I think this is in evidence.

19          THE COURT:  Thank you.

20          MR. STEWART:  It is.

21 Q    Have you seen this report dated March of 2013, Mr.

22 Malhotra?

23 A    I -- I think so.  I -- I would have to see the contents,

24 Your Honor, to make sure that I understand what's in the

25 report or what the contents were.

1          THE COURT:  Is it on the table over there?  Is it on

2  the table over there?

3          MR. SHERWOOD:  Yes, it's 419.  May I approach and

4  help him, or -- or --

5          THE COURT:  He can do it.

6          MR. SHERWOOD:  Okay.

7          THE COURT:  And while he's doing that, Mr. Stewart,

8  I have to ask you as I did the objecting attorneys yesterday,

9  to pull the microphone closer to you so that when you do speak

10  or object, the -- the microphone will pick it up.

11          MR. STEWART:  Thank you, Your Honor.  Will do.

12  A    I'm sorry, did you say 419?

13          MR. SHERWOOD:  419, yeah.

14  A    I don't see a 419.

15          THE COURT:  Which binder is that in?  Are they

16  labeled?

17          MR. SHERWOOD:  I -- I think that would be in the

18  Retiree Committee's binder.

19          THE COURT:  So you couldn't find it, sir?

20  A    Your Honor, I could not see it in this particular binder

21  or these three binders.  There is no number 419.

22          THE COURT:  Okay.  Can someone produce a copy for

23  the witness, please?

24          MR. SHERWOOD:  Your Honor, I'm sure we have it in

25  our binder which is up there.  I've just got to get the right

1 | number.

2 |          THE COURT:  Okay.  All right.

3 | Q    Can you try 522, Mr. Malhotra?  It's in the -- I think

4 | it's one of the black ones, probably to your right there.

5 |          THE COURT:  It's not there -- not there either?

6 | A    No.

7 |          MR. SHERWOOD:  Can I hand the witness a copy, Your

8 | Honor?

9 |          THE COURT:  Yes, please.

10 |          MR. SHERWOOD:  May I approach?

11 |          THE COURT:  Yes.

12 | Q    Have you -- you don't have to read the whole thing, but

13 | are you generally familiar with -- with this document?

14 | A    Very briefly.  I don't think we had any major part of

15 | putting this document together.

16 | Q    And this is called the -- the City of Detroit

17 | restructuring plan.  It's -- it's dated March of 2013.  And by

18 | this time Ernst and Young had, you know, been on the job for a

19 | year and ten months.  Are you saying you had no input into the

20 | Mayor's restructuring plan?

21 | A    We had a lot of things put into the Mayor's restructuring

22 | plan.  What you're referring to is this particular report on

23 | March 2013.  And what I'm saying is we did not have a

24 | significant amount of input that was put into this particular

25 | report.

1  Q    Okay.  Can you turn to Page 5 of the report?  Getting

2  back to the cost saving initiatives.  And if you look at the

3  -- the title of that page and -- and the first part there, it

4  says many revenue and cost saving initiatives have been

5  implemented and others have been identified to address the

6  $150,000,000 annual structural deficit.

7       And then if you look at sub paragraph (b) below that, it

8  says achieved cost saving initiatives approximately

9  $150,000,000.  Do you see that?

10 A    That's what's written on this page, yes.

11 Q    Okay.  And do you have any reason to -- to agree with --

12 with that conclusion -- or disagree with -- with that

13 conclusion in this document?

14 A    Your Honor, it's tough for me to make a -- I -- I cannot

15 make an agreement or disagreement until I understand the

16 context of the time frame where a statement is being referred

17 to.  Achieve cost savings of 150,000,000, but it's over three

18 years, two years, one year, it's -- it's -- I can't put any

19 sort of reference to it.

20 Q    Okay.  Let me try it this way.  You started in May 2011,

21 right?

22 A    That is correct.

23 Q    And this document was done around March of 2013.  During

24 that period, did you see achieved cost savings of

25 $150,000,000?

1  A     We -- we saw a lot of cost savings.  I do not know if

2  they aggregated to 150,000,000 or not.  I -- I would have to

3  go back and check.

4  Q    Okay.  Now what about -- what about reduction in debt

5  obligations of the general fund?  Would you agree that the

6  debt obligations of the general fund in March of 2013 were

7  $400,000,000 lower than five years prior to that?

8  A    You're referring to the outstanding debt obligations, I

9  assume.  I do not know what the outstanding debt balance was

10  five years ago to be able to draw inference to a five -- or a

11  $400,000,000 number.

12  Q    And I think we've -- we've covered this already.  But --

13  but if you look at -- would you agree that as of -- of March

14  2013, approximately $6,000,000,000 of city debt was owed by

15  the Water and Sewer Department and does not have an impact on

16  the general fund?

17  A    I -- I agree with the first part of that statement that

18  there's roughly about $6,000,000,000 of revenue bonds

19  outstanding for the Water and Sewer Department, yes.

20  Q    Now, again in March 2013, you had no idea that the

21  emergency manager was -- was going to be appointed, isn't that

22  right?

23  A    That is correct.

24  Q    Okay.  And certainly in March 2013, the -- the recovery

25  plan for the City of Detroit was not finished, correct?

1  A     Sorry, what recovery plan are you referring to?

2  Q     Well, were there other -- were there other cost saving

3  initiatives that the city and its advisors including yourself,

4  had planned?

5  A     Going back to December of 2012.

6  Q     Not --

7  A     I'll just finish the answer.

8  Q     Go ahead, I'm sorry, I'm sorry.

9  A     And I'll answer your question.  As I testified earlier,

10 in December of 2012, the city with -- along with us and some

11 of the other advisors, went through a detailed process to

12 figure out how to improve the city's cash position as I

13 testified earlier.  Majority of those were related to

14 predominantly deferrals off bills that the city had due, not

15 paying them on time.

16        MR. SHERWOOD:  Your Honor, I'm sorry to interrupt.

17 I -- I asked a specific question.  The specific question was,

18 in March of 2013, were there future initiatives that the city

19 had planned.

20    I -- and with -- with due respect, I -- I thought the

21 answer was non-responsive.  I think he was going back to 2012.

22 So I -- I'd you just to answer that question.

23 A     I do not recall of specific initiatives.  As of March

24 2013 from a cost savings standpoint, that were either not in

25 progress, or had not been achieved that were of significance

1 | -- that were of significance in my mind that stand out, that

2 | were of significance as of March of 2013.

3 | Q    Okay.  Thank you.  As of March 2013, and again this is

4 | before the appointment of Mr. Orr, the city had not only

5 | retained you, but it also had retained the Miller, Buckfire

6 | firm and it had retained Conway, MacKenzie, isn't that right?

7 | A    Yes, that's correct.

8 | Q    So they were on the scene in March 2013 before the

9 | emergency manager was appointed, correct?

10 | A    Yes.

11 | Q    And it was -- it was yourself and Mr. Moore and Mr.

12 | Buckfire, it's basically the same team of professionals were

13 | advising the city in their restructuring effort before Mr. Orr

14 | was appointed, and those same restructuring advisors are

15 | advising Mr. Orr now, true?

16 | A    We were all collectively advising the city from a

17 | restructuring standpoint, yes.

18 | Q    Okay.  So those advisors and yourself had been retained.

19 | And if you look at -- at the document, Page 5 again going down

20 | to Paragraph C.

21 | Again we talked about future cost saving initiatives.

22 | You said you didn't recall anything specific, but scrolling

23 | through those items in C, would you agree that those had been

24 | identified by the city and its professionals as potential

25 | future cost saving initiatives that were in process?

1  A    Yes.

2  Q    Now the last one there is asset monetization strategies.

3  Do you see that?

4  A    I do.

5  Q    Who was the person that was involved from the

6  professional side in the asset monetization strategy?

7  A    It would have been Miller, Buckfire.

8  Q    And what is your -- asset monetization strategies, that

9  means taking city's assets and either financing them, or

10 selling them to raise cash to pay liabilities.  Would you --

11 can we agree with that?  Agree on that?

12 A    Or any other -- I would say any other monetization

13 strategy to create cash for the city.  That's the way I would

14 frame it.

15 Q    And to the extent that assets were monetized in -- in

16 2013, those -- those monetized assets would -- would enhance

17 the cash profile, the actual cash collections during that

18 period for the general fund, let me just add that.

19 A    If you sell something you would intuitively have more

20 cash.  However, to answer the second part of your question,

21 which is to improve the cash profile, my personal experience

22 is, selling assets to improve cash versus -- and not

23 addressing the operational structural imbalance that exists.

24 I don't know if that improves -- improves the cash profile as

25 you put it, but if you sell assets that -- that generate cash,

1  you will have more cash, yes.

2  Q    And you can use that cash to satisfy your liabilities,

3  correct?

4  A    Cash is cash.  So if you have more cash, you have more

5  cash.

6  Q    Now, let's stay in the period of time before the

7  appointment of Mr. Orr.  Were there discussions among the

8  professionals and the -- the city concerning asset

9  monetization strategies?

10 A    Not that I was specifically a part of, so I do not know.

11 Q    And do you recall any conversations with Miller, Buckfire

12 concerning asset monetization strategies?

13 A    Yes.

14 Q    Was Miller, Buckfire concerned that asset monetization in

15 March 2013 or thereabouts, would have a negative impact on the

16 City of Detroit's ability to prove that it was eligible for

17 Chapter 9 bankruptcy?

18 A    That's a long question.  It's -- and you asked if Miller,

19 Buckfire was concerned?

20 Q    Right.

21 A    I can't answer the question if Miller, Buckfire was

22 concerned or not.  You would have to ask Miller, Buckfire.

23 Q    Did Miller, Buckfire say anything to you?  And I'm -- you

24 know, Mr. Buckfire or any of his colleagues, did he say

25 anything to you or in your presence where he or they suggested

1  that they were concerned that if the City of Detroit monetized

2  assets in 2013, early 2013, March, February, January, that

3  that would have a negative impact on the City of Detroit's

4  ability to prove that it was eligible for Chapter 9

5  bankruptcy?

6  A    I do not recall of a conversation like that.

7  Q    Did Miller, Buckfire express any opposition in your

8  presence to strategies that would call for short term

9  monetization of assets in early 2013?

10  A    I do not recall.

11  Q    You were at the Jones, Day meeting at the airport on

12  January 29th -- I'm sorry, not the Jones, Day meeting, that's

13  not fair.

14      The -- the council interview meeting on January 29th, 2013

15  at the airport, yes?

16  A    Yes.  I was at that meeting.

17  Q    And -- and were you there when Jones, Day gave the

18  presentation?

19  A    I was.

20  Q    And is it safe to assume that when Jones, Day or any

21  other attorneys that were giving their presentation, were

22  presenting, you were particularly interested in statements

23  that they had to make about liquidity, and cash flow, and

24  such, yes?

25  A    Yes, absolutely.

1  Q    Can -- can you put up 418, please?   This is a pretty

2  lengthy document.

3       If -- if you need a hard copy we can get it for you, but

4  let's -- let's try it without because the -- the statements

5  are -- I'm not going to go through the whole thing.

6            MR. SHERWOOD:  Is that okay, Your Honor?  It is in

7  evidence.

8            THE COURT:  Sure, try it.

9  Q    Was -- was this presentation handed out during the -- the

10 meeting at the airport?

11 A    Yes.

12 Q    And just to be clear, this presentation was given not

13 only by Jones, Day, but Mr. Orr was also giving this

14 presentation to the group?

15 A    He was part of the team that presented, yes.

16 Q    Can we turn to -- let's start with Page 30 of the

17 presentation.

18            THE COURT:  Excuse me, sir.  Has the Court been

19 given copies of these exhibits?

20            MR. SHERWOOD:  Yes, Your Honor.  I -- I think we

21 gave two to the law clerks and --

22            THE COURT:  Are there up here somewhere?

23            MR. SHERWOOD:  I believe so.  This is marked in the

24 -- in the -- the Retiree Committee's exhibits as Exhibit 418.

25 It might also be an AFSCME exhibit.  I think everybody offered

1    this one.

2              THE COURT:  Okay.  So the tabs in the binder don't

3    correspond to the numbers of the exhibits.

4              MR. SHERWOOD:  I think, Your Honor, that's because

5    we didn't decide on the prefix.  I think --

6              THE COURT:  Okay.  And we're -- and we're looking at

7    what exhibit number now?

8              MR. SHERWOOD:  It's 418, Your Honor.

9              THE COURT:  I have it.  We're all set.  Thank you.

10             MR. SHERWOOD:  You're welcome.  A lot of documents.

11   Q    Turning to Page 30, Mr. Malhotra, and if you look at the

12   third line down it says asset sales pose challenges to

13   generating substantial revenue.  Do you see that?

14   A    I see that line, yes.

15   Q    And do you recall whether this slide was presented at the

16   meeting?

17   A    I don't recall.

18   Q    You don't recall?

19   A    No, I do not.

20   Q    Do you recall any discussion about the next line, sale of

21   assets to pay creditors may not promote revitalization.  Do

22   you recall that being presented by Mr. Orr or anyone else at

23   Jones, Day?

24   A    Not specifically.

25   Q    Okay.  Now if you turn to the next page, Page 31.  And

1  these are –- these are the speaker notes for the slide.  And

2  if you go right to the middle, there's a thing called --

3  there's a line called note.  And it says asset monetization

4  outside of bankruptcy may implicate eligibility requirement

5  that the city be insolvent, e.g. measured by short term cash.

6      During the presentation, did anyone from Jones, Day

7  suggest to the group that it was not a good idea to engage in

8  asset monetization outside of bankruptcy because it could hurt

9  the city's case on insolvency?

10  A   I do not recall that.  We had five presentations as for

11  every presenting group.

12  Q   Let's look at Page 62 and 63 of this presentation.  I

13  know it's a long presentation, but Mr. Malhotra, did you

14  recall any discussion by Mr. Orr or the rest of the team at

15  Jones, Day about evaluating the impact of any asset sale on

16  Chapter 9 eligibility?  Do you recall -- recall anything about

17  that -- that day?  Does this -- this slide refresh your

18  recollection at all?

19  A   It does not.  No, I do not recall.

20  Q   And let me -- let me just -- let me just ask one more

21  question about -- on this topic.  If you turn to the next

22  page.  Maybe this will help you.

23      If you look at the speaker notes at the top under asset

24  sales, again we talk -- it says concerns regarding eligibility

25  for Chapter 9 may be implicated.  Any transactions should be

1 reviewed and restructured to address any eligibility issues,

2 e.g. earmarking of funds.

3      Do you recall any discussions by Jones, Day during this

4 presentation where they suggested that funds that come from

5 asset monetization be earmarked so that they don't end up in

6 the general fund and thereby jeopardize the Chapter 9

7 eligibility?

8 A    No.  I do not recall.

9 Q    Do you recall any discussions during that or with -- with

10 Mr. Buckfire where the idea was to the extent that we monetize

11 any assets, let's make sure they don't -- that the proceeds

12 don't end up in the general fund.  Anything like that?

13 A    I do not remember of any specific conversation of

14 earmarking or -- or highlighting assets like this.  I mean

15 during our general discussions were always -- asset sales were

16 one time sources and -- but we needed to continue to work to

17 fix the ongoing operating deficit debt and the cash deficit

18 that's been existing at the city for a long time.

19 Q    Let me ask you one more question about that meeting.  And

20 do you recall any suggestions by Mr. Orr or Jones, Day during

21 that presentation that the city's policy should be to defend

22 against approaches that focus on monetization of assets to pay

23 creditors?

24 A    No.

25 Q    Can you turn to Page 26?  Does that refresh your

1  recollection?  Fourth bullet point down, defend against calls

2  for expenses and monetizing assets to pay creditors?

3  A    No, I do not recall of a specific conversation like that.

4  Q    Now just -- just to -- just so I understand your

5  testimony from yesterday when you talked about the revenues

6  that you knew about through May of 2013.  To the extent that

7  there was any type of asset monetization before May of 2013,

8  the proceeds of asset monetization would -- could have

9  enhanced the general fund, is that fair to say?

10  A    Yes.  If you sell assets that generate cash you have --

11  you get more cash.

12  Q    All right.  I'd like -- let me switch topics real quick.

13  And can we -- 408.

14        MR. SHERWOOD:  Your Honor, 408 and Mr. Malhotra, is

15  the proposal for creditors.

16  Q    I think you talked about this yesterday on direct and

17  again we'll give you a copy if you need it, but we'll try to

18  make do with -- with the screen.

19  A    Okay.

20  Q    Okay.  If you look at Pages 54 and 55 of 408.  I'm

21  looking for 54 and -- well, hold on.  Let's try 83 and 84.

22        MR. SHERWOOD:  I'm -- I'm sorry, Your Honor.

23  There's kind of two sets of numbers on this one.  Let's do 83

24  and 84.  There we go.  That's 83.  Eighty-three or 135

25  depending on which number you're looking at, or 134.

1  Q    You testified that -- that we talked about realization

2  value of asset -- assets and I'm not going to spend a lot of

3  time on this, but -- but some of the -- there's a reference to

4  the Detroit Water and Sewer Department.  And if you scroll

5  down a few -- in the following pages, there's a Coleman Young

6  Airport, Detroit Windsor Tunnel, Belle Isle Park, Detroit

7  Institute of Arts, city owned land, parking operations, Joe

8  Louis Arena.

9       And I guess the question is, were -- when -- at this

10 presentation, were these assets that are described on these

11 pages, assets that -- that could be monetized in order to help

12 the city's cash flow situation?

13 A    I think these were generally all the assets that were

14 listed.  This is -- Miller, Buckfire is the investment bank

15 for the city in connection with asset monetization.  And so I

16 can't answer questions specifically on asset monetizations

17 because it includes eight or ten different assets, all of

18 which may have different reactions to each one.

19 Q    Let's talk -- let's talk about taxes for a minute.  And

20 -- and if we could stay with the same exhibit, I think there

21 is a discussion about taxes.

22      Do you know what the outstanding tax obligations of the

23 City of Detroit were in in or about say June of this year?

24 A    I do not recall, no.

25 Q    Well, I think that the presentation, if you turn to Page

1  87.  Let me make sure I'm using the right numbers here.

2  That's not 87.  Page -- Page 79, please.  Actually Page 80,

3  I'm sorry.

4      Do you recognize this page of the presentation?  It talks

5  about taxes.

6  A    It does talk about taxes.

7  Q    And if you look at about the fourth bullet point down, it

8  says Compuware has identified historical non-filers with

9  outstanding tax obligations totaling approximately

10  $250,000,000, correct?

11  A    That's what the sentence says.

12  Q    And have you -- have you heard numbers substantially in

13  excess of 250,000,000 in terms of the outstanding obligations

14  of taxpayers to the City of Detroit?

15  A    I have heard numbers like this and I've been hearing

16  numbers like this for the last two years despite which the

17  city's property taxes and income taxes keep going down every

18  year.

19  Q    But there are a lot of outstanding taxes and they're in

20  the hundreds of millions of dollars, fair?

21  A    I cannot -- I cannot say that.

22  Q    Okay.  And you can't say that because you didn't look

23  into the issue of -- of outstanding taxes in -- in your two

24  years plus, is that --

25  A    That is correct.  We were not going out looking for

1  delinquent taxes especially of numbers that were highlighted

2  of this magnitude, that's correct.

3  Q    Do you know who from the city or on behalf of -- well,

4  let's start with the city.  Who from the city was in charge of

5  improving tax collection efforts?

6  A    Yeah.  It was Cheryl Johnson who is the city's Treasurer

7  was working, I believe, with Compuware to try and get their

8  arms around what taxes were outstanding.  I believe that

9  project has been going on for a long time.  That's -- that's

10  what I know about it.

11  Q    And you'd agree that if -- if the -- the tax collection

12  efforts of the city in late -- in fiscal year 2013 which ends

13  June of 2013, correct?  If -- if those tax collection efforts

14  were better, that would have enhanced the general fund, is

15  that fair to say?

16  A    And the city has already implemented if -- if not two, at

17  least one amnesty program for sure.  And I think that yielded

18  probably single digit millions of dollars in the 3,000,000,

19  $5,000,000 range in terms of its amnesty program.

20       So the city has repeatedly done a efforts in order to

21  maximize the collections on taxes that they could at least

22  identified from their records.

23  Q    And who -- who from the city is involved in that -- in

24  that effort?

25  A    Specifically on the amnesty it was, I'm sure the -- the

1  tax department that has been involved, I think with respect to

2  any past due of these outstanding obligations.  I would say

3  that you would have to talk to Cheryl Johnson who is the

4  Treasurer in the context of this Compuware discussion.

5  Q     But -- but you -- you were not charged at Ernst and Young

6  in doing an analysis of the effectiveness of the city's

7  efforts prior to May, June of 2013 to collect taxes from

8  taxpayers, is that fair to say?

9  A     Yes, that is.

10 Q     What about abatements?  Do you know anything about

11 abatements?

12 A     No, I do not.

13 Q     Do you know that the city has a program for industrial

14 tax abatements?

15 A     I do not.

16 Q     Do you know anything about renaissance zone abatements

17 here in the city in terms of property taxes?

18 A     Not specifically.  I know it is a component of the

19 property tax for tax build up, but not specifically on

20 renaissance zone and the abatements.

21 Q     Do you know if -- if the city has taken any effort to

22 review the existing tax abatements that are enjoyed by certain

23 of the property owners here in the City of Detroit to make

24 sure that they are fair and up to speed and -- and current?

25 A     I do not know of a specific effort on reviewing the

1  abatements.

2  Q    Do you know -- do you know who the -- who -- who the tax

3  assessor is for the City of Detroit?

4  A    It used to be Linda Bade.  She has recently retired.  I'm

5  blacking out on the name of the new assessor.  I think it's

6  Alvin.

7  Q    I'm sorry.  Do you know has -- has Ernst and Young been

8  charged with trying to figure out how the assessment, the tax

9  assessment process works here in the -- in the City of

10  Detroit?

11  A    No, Ernst and Young has not been.  But what I do know is

12  that there are several reviews that are happening to assess --

13  ascertain better the assessed values are too high.  Currently

14  a lot in terms of the city's property taxes.

15  Q    What about too low?

16  A    From what I understand the general view is that the

17  assessments are too high.

18  Q    But are there -- so there's not a single property in the

19  City of Detroit that where -- where the assessment is -- is

20  too low?

21  A    I cannot answer that question.  I do not know.

22  Q    And you haven't been asked to audit that or anything like

23  that?

24  A    That is correct.

25  Q    Let me turn -- I just have one or two more topics.  But

1  let me turn to negotiations before the filing.  I think you

2  said yesterday that you were at the -- the meeting -- I'm

3  sorry, was it June 13th?  I'm trying to remember off the top --

4  A     June 14th.

5  Q     June 14th, thank you.  You were at that meeting?

6  A     Yes, I was.

7  Q     That June -- June 14th meeting.  And I think you said you

8  were at meetings between June 14th and July 11th as well,

9  correct?

10  A     That is correct.

11  Q     And how many -- there was a June 14th meeting, a June 20th

12  meeting, July 10th, July 11th.  Have I got them all?

13  A     I don't know.  There were -- there were several meetings

14  we had during those weeks and those are the ones I can

15  remember.  So there were several meetings that we had during

16  that time frame with -- with all of the creditors in some

17  fashion or the other.

18  Q     But June 14th was the first.  And -- and during that June

19  14th meeting, this -- the proposal was handed out and

20  presented, right?

21  A     That is correct.

22  Q     During all the meetings from June 14th to July 11th,

23  whatever.  After all of those meetings, are you aware of a

24  single change to the June 14th proposal by the city?

25  A     Not specific -- not specifically that I recall whether we

 1  were making changes or not to the June 14th proposal.

 2  Q     You can't cite to a single specific change to the

 3  proposal that was made on -- on June 14th, correct?

 4  A     Not that I can recall off the top of my head, yes.

 5  Q     Now, were any of those meetings with union

 6  representatives or retiree representatives?

 7  A     I think both were present on June 14th.

 8  Q     And you were at that meeting?

 9  A     I was.

10  Q     And let me ask you this.  In terms of dealing with the

11  employee issues, when Mr. Orr was appointed, did you tell him

12  about your personal experience with dealing with the city's

13  unions?

14  A     Yes.

15  Q     And you -- and you had been involved on behalf of the

16  city before the arrival of Mr. Orr in some pretty substantial

17  negotiations between the city and many many of its unions,

18  true?

19  A     I -- I was -- but I was involved in those meetings from

20  the standpoint of helping ascertain the financial

21  implications, yes.

22  Q     Okay.  And in February of 2012, and I know this -- we're

23  going -- we're going way back now.  So if you started May --

24  May 2011, you're only on the job about seven months at this

25  time.  There were negotiations between the city and a number

1  of unions.  And those negotiations were successful, correct?

2  A    I don't understand the meaning of successful or not.

3  There were negotiations that -- that were held.

4  Q    And they -- but they led to an agreement between the city

5  and the unions, correct?

6  A    They led to tentative agreements.

7  Q    Okay.  Let's -- let's look at Exhibit 505, please, 505.

8  Actually before I ask any questions about this.  You said they

9  led -- well, let me ask you about 505.  Is this a copy of the

10  -- the tentative agreement between the city and the coalition

11  of unions of the City of Detroit?

12  A    Yes.

13  Q    And if you -- if we turn to the --

14        MR. STEWART:  Well, Your Honor, may I interpose a

15  foundation objection.  This has been objected to.  If counsel

16  is laying a foundation for admissibility, I have no objection

17  if that's all you're doing.  But if he's going to question the

18  witness about it, I would have an objection.

19        MR. SHERWOOD:  I'm going to try to lay a foundation,

20  Your Honor, with this and maybe other witnesses.

21        THE COURT:  Okay.  Go ahead.

22        MR. SHERWOOD:  But I'd like to get his understanding

23  of this document, and some testimony -- what he knows about

24  this document on the record so that when we move it into

25  evidence later, you have the benefit of that.

1          THE COURT:  I'll permit that subject to its ultimate

2    admission.

3    Q    Page 17, please of -- of the agreement.  City of Detroit,

4    do you recognize that as Chris Brown's signature by any

5    chance?

6    A    I do think that is Chris Brown's signature.

7    Q    And that's dated February 1st, 2012.  CO -- and he was the

8    chief -- Chief Operating Officer for the City of Detroit,

9    correct?

10   A    That is correct.

11   Q    And just if you can take -- take that down.  Let's look

12   at the signatures on the right.  Now I don't -- I don't -- I'm

13   not going to ask you identify those signatures.

14          But the -- the parties to the right, you know, you see

15   IOU, SAA, are -- are these -- do you understand this to be

16   like various union representatives that signed on to this

17   agreement?

18   A    Yes.

19   Q    And it was the union coalition, right?

20   A    That is correct.

21   Q    Now did you -- did you participate with any of the

22   members of the union during the negotiation of this tentative

23   agreement?

24   A    I was present in those negotiations from -- to ascertain

25   the financial impact as I said earlier

1  Q    And -- and you were working for the city at that point,

2  correct?

3  A    That is correct.

4  Q    And -- and Chris Brown from the city signed this

5  agreement and agreed to it, correct?

6  A    Yes.

7  Q    During those negotiations, did you -- did you talk about

8  any wage concessions by the employees of the city?

9  A    I think there were discussions around wage concessions,

10  yes.

11  Q    And in fact there were wage concessions.  Do you recall

12  that?

13  A    Are you referring specifically to this tentative

14  agreement, or are you referring to --

15  Q    Yes.

16  A    -- broadly?

17  Q    This tentative agreement in February of 2012.

18  A    I would have to go back and look because whether it was

19  new wage concessions or it was a continuance of the wage

20  concessions that had already been provided in the past.

21  Q    Was -- was there a discussion about giving back some of

22  the wage concessions to the extent that the -- there was --

23  there was net surplus for 2012, 2013, and 2014?

24  A    Yes, there were discussions around how to give back wage

25  concessions that the active employees were giving.  If the --

1  the city can get back on its footing from a financial

2  standpoint, yes.

3  Q    And in -- in the -- and you were involved in that part of

4  the discussion, correct?

5  A    I was involved in at least trying to ascertain how to

6  insure either asset sales or refinancings were not considered

7  as an operational fix.  So not one time --

8  Q    Well, I just asked -- I just asked if you were involved

9  in that part of the discussions.

10 A    And I was giving you a context of how I was involved,

11 yes.

12 Q    And -- and -- but during those -- during those

13 discussions, weren't you saying to the union members that

14 based on the work of you and other people in the city that the

15 city was going to get back into the black in -- in 2013 and

16 2014?  Was that -- was that part of your pitch with respect to

17 this?

18 A    The -- the discussions that the city was having with its

19 unions was to try and come up with cash to try and deal with

20 the cash shortfall issues that were forthcoming, especially

21 after fiscal year '12 where the city continued to borrow and

22 defer.

23     And the city was -- and after discussions with its active

24 employees, how to try and address some of the oncoming fiscal

25 year '13 cash issues, yes.

1  Q    No, the -- the question was obviously you've got labor

2  representatives sitting on the other side of the table.  And

3  one of -- one of the terms was these -- these give backs,

4  right?  Give backs of -- of wage concessions, right?

5     Certainly the -- the labor people that were talking to

6  you wanted to know what's the likelihood of my people getting

7  these give backs, right?

8          MR. STEWART:  Objection.

9  Q    Did that happen?

10         MR. STEWART:  Sorry, I object.  He's asking for

11  speculation unless the last part of his sentence was asking

12  what they said to him.  I think his question --

13         THE COURT:  I agree, rephrase the question, please.

14  Q    During those -- the negotiations, was it your perception

15  based on things said to you by the labor representatives that

16  they were -- they were concerned about -- or they wanted to

17  know what the likelihood was that they would get their give

18  backs in terms of salary -- wage concessions.

19  A    Sorry, can you rephrase that question?  It's too long a

20  question.

21  Q    During the negotiations concerning the tentative

22  agreement, did anyone on the labor side ask you to tell them

23  if the wage concessions would happen?  Or -- or the give backs

24  on the wage concessions would happen, yes or no?

25  A    I don't recall specifically.

1   Q    Let me ask you this about those discussions.  There were

2   -- there were negotiations that surrounded health care,

3   correct?

4   A    Yes.

5   Q    And one of the objectives in the health care part of the

6   negotiation was to attain $60,000,000 in health care savings,

7   is that right?

8   A    That sounds right.

9   Q    Okay.  And those health care savings were going to come

10  from not only the existing employees of the City of Detroit,

11  but also the retired employees, isn't that right?

12  A    I'm not sure about that.  I think the majority of those

13  savings were coming from the active employees.  I don't recall

14  of a specific amount from the retirees.

15  Q    Well, you said the majority.  So some of the savings were

16  coming from the retired employees, isn't that right?

17  A    I do not recall that.

18         MR. SHERWOOD:  Your Honor, I'd like to mark a -- a

19  document that has not been marked before to try to refresh the

20  witness' recollection.

21         MR. STEWART:  Your Honor, in view of the fact this

22  wasn't identified to us, wasn't subject to the objection

23  process, before he uses it, I'd like to frame very carefully

24  exactly what the failure of recollection this is intended to

25  address.

1          MR. SHERWOOD:  Yes.  This is a document that talks

2  about cost savings in fiscal year 2012.  And there is a line

3  that talks about --

4          THE COURT:  Well, let's not say what the document

5  says because it's not in evidence.  But the document can be

6  used to refresh the witness' recollection if it -- if it has

7  that effect.

8          MR. STEWART:  May I also ask the parties where it

9  comes from.  Because I mean I understand it for pure purpose

10  of refreshing recollection, Your Honor, what -- what is

11  allowed.  On the other hand is this part of a larger document.

12  What is this?

13          MR. SHERWOOD:  I believe it was part of a

14  presentation that was made during the course of the

15  negotiations in 2012 with respect to the tentative agreement.

16          MR. STEWART:  Okay.  We have an objection to its use

17  generally, but --

18          THE COURT:  All right.  To the extent there's an

19  objection to the use of the document to refresh the witness'

20  recollection, it is overruled.  You may present it to the

21  witness.

22          MR. STEWART:  Once again could we -- what frame

23  exactly which failure of recollection this is intended --

24          THE COURT:  I think the record is clear enough on

25  that point.  Let's proceed.

1          MR. SHERWOOD:  May I approach the witness and hand

2   him the document, Your Honor?

3          THE COURT:  Please.

4          MR. SHERWOOD:  And for the record can I -- can we

5   mark this as 505A?

6          THE COURT:  Sure.  Whatever is convenient for you is

7   fine.

8          MR. SHERWOOD:  Your Honor, may I hand a copy to the

9   Court?

10          THE COURT:  Not if it's use is for refreshing

11   recollection.

12          MR. SHERWOOD:  Fair -- okay.

13   Q    So Mr. Malhotra, I've showed you what I will mark as

14   505A.  And -- and if you would look at the box to the left

15   relating -- that's -- that's called retirees.  And then the

16   data to the right of that.  Does that reflect your -- you

17   testified that the majority of the savings related to current

18   employees and you didn't know about whether -- whether any of

19   these savings also impacted retirees.  Do you remember that

20   testimony?

21   A    I testified that the tentative agreements as reached, if

22   they had any impact on retiree medical or not.  That's what I

23   testified to, yes.

24   Q    Okay.  And having reviewed this document, does this

25   refresh your recollection that in fact there were certain

1  savings projected to be achieved from retirees for fiscal year

2  2012 and 2013?

3          THE COURT:  All right.  Now here I want to caution

4  you, this does not ask you what that document says.  In fact

5  turn it over.  Do you have a recollection now having reviewed

6  that document of what the answer to counsel's question is?

7  A    Okay.  Your Honor, my answer is the same as it was

8  earlier.

9  Q    Do you recognize 505A?  Have you ever seen it before?

10          MR. SHERWOOD:  Can he look at it for that purpose?

11          THE COURT:  Yes, yes.

12 A    Yes, I recall seeing this in that 2012 time frame, yes.

13 Q    And can you describe what it is?

14 A    It is trying to describe the projected or ask of the --

15 the targeted savings the city was looking to get for fiscal

16 year '13.

17 Q    So this was prepared by the city and -- and these were

18 part of the requests by the city to the labor representatives

19 in -- in 2012, correct?

20 A    This could have framed some of those discussions, yes.

21 Q    And were you present when this document was discussed

22 with representatives of the unions in -- in 2012?

23 A    I do not recall the specific meeting, but I would have

24 generally been having some of the discussions in terms of the

25 qualification of some of these numbers.

1  Q    Let's go back to 505.  Now this agreement, this tentative

2  agreement, although it was -- was executed by the city and --

3  and various union representatives, was it implemented for the

4  City of Detroit?

5  A    I do not think this exact tentative agreement was

6  implemented.

7  Q    Do you know why this tentative agreement was not

8  implemented for the City of Detroit?

9  A    I think the city employment terms were implemented

10  instead.

11  Q    Isn't it true that the state refused to authorize the

12  city to implement this agreement?

13  A    I was not a part of those discussions with the state.

14  Q    And this agreement -- well, scratch that.  Let me just

15  ask a few more -- more random questions and then I'll be done.

16       This is the first Chapter 9 bankruptcy case that you've

17  ever worked on, correct?

18  A    That is correct.

19  Q    And neither you nor Ernst and Young have ever prepared a

20  balance sheet for the City of Detroit, correct?

21  A    That is correct.

22  Q    You began to prepare the schedules for the filing of this

23  bankruptcy case in May of 2013, isn't that right?

24  A    It was May, June time frame.  I do not remember the

25  specific date.

1  Q    But it could have been May -- May 2013?  May, June time

2  frame?

3  A    Like I said, May, June time frame, yes, that is right.

4  Q    Okay.  Now, in early July, your opinion was not solicited

5  by anyone before the bankruptcy filing about the decision to

6  file bankruptcy, isn't that right?

7  A    That is correct.

8  Q    So you and Ernst and Young, you didn't have any input

9  whatsoever on whether or not Chapter 9 was the only

10  alternative for the City of Detroit, isn't that right?

11  A    That is correct.

12         MR. SHERWOOD:  Your Honor, can I have a two minute

13  -- a 30 second break just to consult with a colleague a

14  minute?

15         THE COURT:  Yes.  We'll sit here while you do that.

16         MR. SHERWOOD:  Your Honor, I'd like to mark another

17  document to -- which addresses the issue of impact on retiree

18  benefits.  And just see if the witness recognizes -- not to

19  refresh recollection, just to see if he recognize it and can

20  authenticate it.

21         MR. STEWART:  This is a new exhibit?

22         MR. SHERWOOD:  I believe it is.

23         MR. STEWART:  We would object to it, Your Honor, for

24  any use other than refreshing recollection.  It was not

25  identified.

1          THE COURT:  Well, let's -- let's get it marked and

2   when it's offered into evidence I'll hear your objection.

3   What number would you propose?

4          MR. SHERWOOD:  505B.

5          THE COURT:  Are we out of numbers?

6          MR. SHERWOOD:  I just think we're in the five's and

7   I don't know what we're up to.

8          THE COURT:  Okay.  Well, let me see if I can help

9   you.

10          MR. SHERWOOD:  505B, I think.

11          THE COURT:  Hold -- hold on one second.  Ah, we have

12   used every number from 500 to 599.  All right, fine, 505B it

13   is.

14          MR. SHERWOOD:  May I approach, Your Honor?

15          THE COURT:  Yes.  Are you asking the witness if he

16   recognizes this?

17          MR. SHERWOOD:  Yes.

18          THE COURT:  Do you recognize that document, sir?

19   A    Yes, Your Honor, I do.

20   Q    And can you describe it for us?

21   A    It's a discussion document dated July 16th, 2012.

22   Q    And did you -- were you involved in the preparation of

23   this document?

24   A    Yes, we were.

25   Q    And was this document presented to -- who was this

1 document presented to?

2 A    I don't recall.

3 Q    For what purpose was this document prepared?

4 A    It would have been to -- for -- trying to ascertain the

5 tentative agreements and the savings that would have come from

6 some of the tentative agreements.

7 Q    And does this document refresh your recollection as to

8 the savings that could be achieved from retiree health care?

9 A    I would have to go to that specific section.

10 Q    Yes, please do.

11        THE COURT:  Well, hold on.  It's not proper to ask

12 the witness a question about the contents of the document

13 until it's admitted into evidence.

14        MR. SHERWOOD:  Well, I move it into evidence, Your

15 Honor.

16        MR. STEWART:  We object, Your Honor.  For the --

17 well, first of all, I'm not sure what its relevance is, but

18 more to the point it wasn't identified as part of the

19 pre-trial process we engaged in to identify, have timely

20 objections, and have an opportunity to review documents.

21        MR. SHERWOOD:  I -- I agree that it wasn't

22 identified pre-trial, Your Honor.  We did identify the -- the

23 tentative agreement, however.  We have maintained in this case

24 that on the impracticability issue, that indeed it was and is

25 possible to negotiate with a large number of unions for the

1 city and to negotiate with respect to the rights of retirees

2 in the context of those negotiations.

3     Our -- I was at the deposition of -- of one of our

4 clients in Washington where this issue was raised and -- and

5 probed.  We were -- we believed that this witness having been

6 involved in those negotiations would testify that indeed some

7 of the give backs in this tentative agreement impacted

8 retirees.

9     And he hasn't clearly done that.  So I'm using this to

10 refresh recollection.  Your Honor, there are a lot of

11 documents in this case.  This is a fast track case with a lot

12 of document review and production that has been done.  This is

13 a City of Detroit document that certainly this witness, and I

14 assume the other professionals, are -- are intimately familiar

15 with.

16     And I do not think that the failure to put it on our

17 exhibit list in this case and on this track should prevent the

18 admission into evidence.  It's otherwise relevant for the

19 reasons that I've set forth.  And I don't see any prejudice

20 whatsoever to the city.

21         MR. STEWART:  Your Honor, I think it is prejudicial.

22 We see this for the first time while the witness is on the

23 stand.  In fact so fresh is it we don't even know how to

24 number it as an exhibit.

25     And to the point that he didn't get the answer from the

1   witness he wanted.  If he fails in trying to refresh

2   recollection, the answer is for him to call his own witness,

3   not to bring in documents outside of the normal structure that

4   we had all agreed upon.

5           THE COURT:  I agree that this record does not

6   establish cause to add an exhibit to the established witness

7   list.  Accordingly, the objection is sustained.  The document

8   may be used to refresh recollection.

9           MR. SHERWOOD:  Excuse me one second, Your Honor.

10  Q   I'm going to try to use this to refresh your

11  recollection.  Can you turn to Page 7, please?  Now again

12  we're on the topic of whether this negotiation involved

13  savings on benefits that impacted retirees.  If you look at

14  the -- the second block down on the left, have you read that

15  block?

16  A   Yes.

17  Q   And have you -- and does that block and the -- the

18  numbers to the right of it, refresh your recollection as to

19  whether or not in the context of these negotiations, the city

20  was -- or -- or the union reps were negotiating with respect

21  to rights of retirees?

22  A   No.  In fact on my --

23          THE COURT:  The only question is, does that document

24  refresh your recollection on that question.

25  A   Sorry, Your Honor.  No.

1  Q    And it -- and just -- just to be clear on this point,

2  it's your -- you don't recall during these negotiations

3  whether the city and the representatives of the union

4  negotiated and reached an agreement that impacted the rights

5  of the city's retirees, is that your testimony?

6  A    That is my testimony, yes.

7  Q    But you don't recall?

8  A    That's what I just said.

9        MR. SHERWOOD:  Okay.  Thank you, Your Honor.  Thank

10  you, Mr. Malhotra.  I have nothing further.

11        THE COURT:  All right.  At this time we'll take our

12  morning 15 minute recess.

13        (WITNESS GAURAV MALHOTRA WAS TEMPORARILY EXCUSED AT 10:37

14  A.M.)

15        THE CLERK:  All rise.  Court is in recess.

16        (Court in Recess at 10:37 a.m.; Resume at 10:59 a.m.)

17        THE CLERK:  Court is in session.  Please be seated.

18        MR. DECHIARA:  Good morning, Your Honor.  Peter

19  Dechiara from the law firm of Cohen, Weiss, and Simon, LLP for

20  the UAW International Union.

21        (WITNESS GAURAV MALHOTRA RESUMED THE STAND AT 10:59 A.M.)

22                    CROSS EXAMINATION

23  BY MR. DECHIARA:

24  Q    Good morning, Mr. Malhotra.

25  A    Good morning.

1  Q    One preliminary question, Mr. Malhotra.  Between the time

2  that you completed your direct testimony at the end of the day

3  yesterday and when you began your cross examination today, did

4  you consult with counsel about the subject of your testimony?

5  A    No, I did not.

6  Q    You're not and never have been an officer of the City of

7  Detroit, correct?

8  A    That is correct.

9  Q    Okay.  And you've never -- and you don't currently and

10  you never have held any elected or appointed position with the

11  city, correct?

12  A    That is right.

13  Q    And you don't -- you're not involved in the direct

14  running of the city, the direct operation of the city,

15  correct?

16  A    Yes.

17  Q    Yes, I'm correct?

18  A    Yes, you're correct.

19  Q    Let me ask you about the June 14th, 2013 meeting at which

20  the emergency manager made his presentation of the creditor

21  proposal.  Do you remember your testimony about that meeting

22  yesterday?

23  A    Yes.

24  Q    And I believe you testified on direct that there were

25  questions that were asked by the people who were in attendance

1  at that meeting, correct?

2  A    Yes.

3  Q    Okay.  Am I correct that the procedure at that meeting

4  was that if an attendee wanted to ask a question or make a

5  comment, they had to write it down on a card which would then

6  be passed up to the front and then it would be read out by

7  someone in the front of the room?  Wasn't that the procedure?

8  A    As I recall I think, yes.

9  Q    And let me now draw your attention to the June 20th

10 meeting.  Do you recall your testimony about the June 20th

11 meeting?

12 A    Yes.

13 Q    And the emergency manager was not present, correct?

14 A    That is correct.

15 Q    And the people who were presenting at the meeting were

16 city advisors, including yourself, correct?

17 A    Yes.

18 Q    Did anyone from the city tell you that you had authority

19 to negotiate for the city at that meeting?

20 A    I was presenting at that meeting.

21 Q    Is the answer to my question no?

22 A    That is correct.

23 Q    Okay.  And it was not your understanding, was it, that

24 you had authority to negotiate on -- for the city at that

25 meeting, am I correct?

1  A    I was not negotiating for the city at that meeting, that

2  is correct.

3  Q    Okay.  And is it -- do you have any knowledge that any of

4  the other advisors who were attending that meeting on behalf

5  of the city had authority to negotiate for the city?

6  A    I can't say what the authority was of the other advisors,

7  you would have to ask them.

8  Q    So you have no knowledge -- you have no affirmative

9  knowledge that the -- any of the other advisors were

10 authorized to negotiate on behalf of the city, is that

11 correct?

12 A    I have no knowledge one way or the other, that is

13 correct.

14 Q    Okay.  Were there any other meetings besides the June 14th

15 and June 20th meeting that you -- that you attended where there

16 were presentations made to labor or retiree groups?

17 A    I don't recall specifically.

18 Q    As you sit here today you don't recall any others?

19 A    I do not recall any others, no.

20 Q    Okay.  You testified I believe on direct about a July 9th

21 meeting.  Do you recall that testimony?

22 A    Yes.

23 Q    And who -- who were the -- what category of attendees

24 attended the July 9th meeting?

25 A    My recollection is that it was the city's advisors and

1  members of the retirement systems or advisors for the

2  retirement systems and other retirees.

3  Q    So the -- the -- so I'm going to distinguish between the

4  presenters and the attendees.  The attendees were advisors to

5  the retirees and the retirees?

6  A    That's my recollection, yes.

7  Q    Okay.  And were there -- were there negotiations -- did

8  you engage in negotiations on behalf of the city at that

9  meeting?

10  A   We had discussions about the city's financial profile as

11  well as discussions around pensions as I recall.

12  Q    And I believe your direct testimony was that the purpose

13  of that meeting was to discuss actuarial assumptions, is that

14  correct?

15  A    No.  What I said on my testimony is that at the end of

16  the meeting there was a discussion or dialogue about trying to

17  get the retirement system and the city's advisors on the same

18  page with respect to the actuarial assumptions.

19  Q    And -- and the reason -- and you were involved in that

20  effort, is that correct?

21  A    Not really.  I -- I was not directly involved with the

22  actuarial assumptions at all.

23  Q    Okay.  Did you have an understanding about what -- did --

24  did the city advisors want to achieve an understanding with

25  the retiree system advisors as to actuarial assumptions?

1   A    Yes.

2   Q    And did -- did you have an understanding about why the

3   city advisors wanted to obtain that understanding?

4   A    I do.  It was generally to try and ascertain the amount

5   of the under funding in the -- in the two pension systems,

6   yes.

7   Q    Okay.  Would it be fair to say that as a predicate for

8   meaningful negotiations, it's often helpful to have shared

9   assumptions between the -- the parties?

10  A    Yes.

11  Q    Did anyone tell you that -- from the city -- did -- did

12  anyone from the city tell you that you were -- you were

13  authorized at the July 19th -- I'm sorry, the July 9th meeting

14  to negotiate on behalf of the city?

15  A    No.

16  Q    You testified about certain meetings you had with the

17  emergency manager Mr. Orr at which you orally presented to him

18  certain findings or analysis that you had prepared.  Do you

19  recall that testimony on direct?

20  A    Yes.

21  Q    Okay.  And how many of those meetings were there?

22  A    I cannot count the number of meetings or conference calls

23  that we had, there were numerous.

24  Q    Okay.  So there were numerous face to face meetings and

25  also numerous conference calls?

1  A    Can you clarify what time frame is your question related

2  to?

3  Q    Well, you tell me.  I'm just asking about the -- the

4  meetings that you had -- well, okay.  I -- I can do this.

5  From the time the emergency manager became the emergency

6  manager until the bankruptcy filing, let's say that's the time

7  frame.  How many face to face meetings did you have with the

8  emergency manager at which you presented conclusions, or

9  findings, or analysis?

10  A    I can't recall the specific number, but there were

11  several.

12  Q    Okay.  And were these one on one meetings that you had

13  with the emergency manager?

14  A    We may have had -- yes, there were a couple of one on one

15  meetings I thought and as I recall and there were meetings

16  with -- in a broader group setting with the city's other

17  advisors.

18  Q    Okay.  And the ones that took place in a broader group

19  setting with the city's other advisors, those were

20  pre-scheduled meetings?

21  A    Generally yes.

22  Q    Okay.  And who -- who were the other city advisors who

23  attended those meetings?

24  A    It would have been representatives from Jones, Day, from

25  Miller, Buckfire, Conway, MacKenzie, our team.  But there were

1  several meetings and there wasn't a set schedule that

2  everybody was at a particular meeting.

3  Q    Okay.  But --

4  A    Is my recollection.

5  Q    Okay.  But some of the meetings where there were other

6  advisors were present, were you presented conclusions, or

7  findings, or analysis to the emergency manager were meetings

8  where Jones, Day attorneys were present, correct?

9  A    Yes.

10        MR. DECHIARA:  Okay.  Your Honor, I -- I don't have

11  anything further on that line of questioning.  I would note

12  for the record that the city has on the direct of Mr.

13  Malhotra, had Mr. Malhotra testified on direct about meetings

14  he had with Mr. Orr in the presence of counsel.

15  Q    You -- you testified about a meeting that you attended in

16  New York, I believe with the bond holders and the insurers of

17  the bond holders, is that correct?

18  A    Yes.

19  Q    Okay.  And when was that meeting?

20  A    I think it was June 25th maybe is my recollection.

21  Q    I'd like now to direct your attention to the proposal to

22  creditors which is Exhibit 43.  Do you have the exhibit book

23  or could somebody call up Exhibit 43, please?

24  A    I'm happy to get it if you just tell me what folder it is

25  though.

1  Q    Okay.  Yeah, you can get it.  Excuse me?

2  A    What folder, 43?

3  Q    I don't know what folder it is, but it's -- oh, I'm

4  sorry.  I -- no -- no, I'm correct.  It's -- it's City Exhibit

5  43.

6          THE COURT:  Can you help the witness find it,

7  please?

8          MR. DECHIARA:  Absolutely.

9  Q    Do you have it?

10 A    I got it.  Thank you.

11 Q    Okay.  Mr. Malhotra, if I could ask you to turn to Page

12 114 of Exhibit 43.  Are you on Page 114?

13 A    Yes.

14 Q    Okay.  Let me direct your attention to the last column on

15 the right.  It says insurer.  Do you see that?

16 A    I do.

17 Q    And do you see there's a list of insurers there?

18 A    Yes.

19 Q    And those are the insurers for the bond holders?

20 A    Yes.

21 Q    And were representatives of those insurers present at the

22 June 25th meeting?

23 A    I can't recall if all of them were there, but there were

24 representatives from the bond insurers at that meeting, yes.

25 Q    Okay.  Do you remember specifically which ones were there

1  and which ones were not?

2  A     No, I do not.

3  Q     Can you testify whether they were all there, or they were

4  not all there?

5  A     No, I cannot.

6  Q     Okay.  So they -- they may all have been there, is that

7  correct?

8  A     It could be, yes.

9  Q     Okay.  Let me turn your attention to Page 120.  It's

10 Appendix E.  There's a similar column, the right column it

11 says insurers and let me ask -- just ask you the same

12 question.

13     Were representatives from those insurers at that -- at

14 the June 25th meeting?

15 A     I cannot recall specifically if all of them were there.

16 On my -- I think most of them were there, or their advisors.

17 But I do not recall specifically if each and every one of

18 these were there or not.

19 Q     Okay.  Do you have a understanding of what percentage of

20 the bond holders of the city -- of the unsecured bond holders

21 of the City of Detroit are -- were insured by the -- by the

22 insurers that were listed in Appendix A through E of Exhibit

23 43?

24 A     No, I do not.

25 Q     It's the majority, isn't it?

1  A    I would assume, but I'm not sure.  I haven't done the

2  percentage of all of the unsecured notes what percentage are

3  insured versus not.  I haven't done that calculation.

4  Q    Okay.  Am I correct if -- if we wanted to, or someone

5  wanted to determine that, one could add up the -- the numbers

6  on the appendices under the balance column and -- and

7  determine the percentage that are insured?

8  A    Presumably if the -- if they're still in short at that

9  particular time frame or not.  Presumably yes.

10  Q    Okay.  Thank you.  And just so I understand correctly,

11  when a bond holder is insured that means that if -- if the

12  municipality defaults on the bond, the bond holder has

13  recourse against the insurer?

14  A    That is my understanding, yes.

15          MR. DECHIARA:  No further questions.

16          THE COURT:  Anyone else have any cross examination

17  questions for the witness?

18          MR. RUEGGER:  Yes, Your Honor.

19          MR. DECHIARA:  Your Honor, I would just ask to

20  reserve the right to -- to ask additional cross examination

21  question if the Court decides to reverse its prior ruling.

22          THE COURT:  Yes, yes.  That -- that right is

23  reserved for everyone.

24      On that point, and just so I don't forget later, I have

25  reconsidered my suggestion that we revisit this after lunch

1  and to give both you all and us time to review the memorandum

2  and the issue, we'll take it up again tomorrow morning.

3         MR. RUEGGER:  Thank you, Your Honor.

4         THE COURT:  You're welcome.

5         MR. RUEGGER:  May I -- may I proceed?

6         THE COURT:  Yes.

7         MR. RUEGGER:  Thank you.

8                      CROSS EXAMINATION

9  BY MR. RUEGGER:

10  Q   Good morning, Mr. Malhotra.  My name is Arthur Ruegger

11  from the Dentons firm.  We haven't met before.  I represent

12  the retirees committee here.

13        And I don't have a lot to ask you.  But I -- I do want to

14  talk to you a little bit about a document that Mr. Stewart

15  raised yesterday.  It was City Exhibit 44.  It's -- it's, I

16  believe, the executive version of the June 14th proposal.  Is

17  it on your screen?

18  A   It is, yes.

19  Q   Okay.  And specifically if we could look at Page 8.  And

20  I'm going to ask you some questions about the fiscal year 2012

21  figures that are on that page.  So if Kathy, you could expand

22  that, it would probably make it easier for us to see.  Great.

23        First, Mr. Malhotra, when were the -- these figures, and

24  specifically the fiscal year 2012 figure, when were they

25  finalized?

1  A    This is cash activity so it's -- it would have been right

2  around the end of fiscal year 2012.  So July 2012.  This is

3  cash activity.

4  Q    And how large was the E & Y team at that time?

5  A    At what time?

6  Q    When these figures were finalized.

7  A    Probably four or five.

8  Q    And did they have specialized roles?

9  A    Yes.  Our team was -- was focused, very focused on

10 looking at all of the cash activity, yes.

11 Q    Okay.  So can you tell us what the individuals roles were

12 on your team?

13 A    They were to ascertain what receipts were timing versus

14 permanent, any variances.  Looking at all of the property

15 taxes, looking at the income taxes.

16      The city generally receives a lot of its collections in

17 certain lock boxes.  We had to try and ascertain what part of

18 those collections were related to property taxes versus not.

19 It was to track the monthly gaming taxes.  It was to look at

20 the activity and the other receipts.  It was to highlight any

21 sort of one time bond related or escrow related proceeds that

22 were coming in that were further augmenting the general fund's

23 cash.

24 Q    And did you assign any of your team members any of those

25 particular matters to be their responsibility?

1  A    No, they were generally a team effort.

2  Q    Can you tell us beyond what you've just answered, in

3  general what was the process of compiling those figures?

4  A    Our team tracks the pretty much daily cash activity of

5  the city to ascertain what receipts are coming in, what

6  disbursements are going out to at least help be able to

7  quantify where that activity is going on a day in day out

8  basis.  And because we had wanted to try our best to insure

9  that the city did not run out of cash.

10      And that's the reason we had our team working

11  specifically on the receipts and disbursements activity,

12  looking at the bank accounts, looking at bank statements to

13  insure that we -- we could forecast where the movement was so

14  that the city would not run out of cash as it had to rely on

15  refinancing proceeds to keep going.

16  Q    Did you do any of that tracking personally, or was that

17  your team's responsibility?

18  A    It was a combination.  I was intimately involved.

19  Q    Okay.  Tell me what part you were intimately involved and

20  what part your team did.

21  A    I don't think there's -- there's a specific delineation

22  of what part I did versus what my team did.  It was a team

23  effort and I was intimately involved with the team.

24  Q    All right.  If you could look at that part of Exhibit 44.

25  I think you testified yesterday that your team, or someone

1  from your team, contacted the city individual responsible for

2  the property taxes is that -- is that correct?

3  A    I don't recall that specific part of my testimony.

4  Q    Okay.  All right.  Forgive me.  I don't mean to misstate

5  your testimony.

6       How -- did your team attempt to verify for example the

7  property tax figure that's on -- on that document for fiscal

8  year 2012?

9  A    This would have represented to verify, I don't know if

10 you mean audits.  I just want to make sure --

11 Q    Don't mean audit.

12 A    We, in terms of all the cash that comes in, in gross tax

13 collections, our team is to try our best ability to segregate

14 what collections were for property taxes, and what taxes were

15 due to the city, and versus what property taxes were related

16 to distributions that the city had to make to other taxing

17 authorities.

18 Q    All right.  With all respect, sir, I'm not sure that was

19 responsive.  I'm trying to determine to what extent anyone on

20 your team verified the figures and specifically the property

21 tax figure there.

22 A    This would have been the number that we had for the -- to

23 the best of our ability.

24 Q    And you had it from what source, sir?

25 A    It would have been from a -- for fiscal year 2012 from a

1 combination of the bank accounts, or the city's internal

2 reports.

3 Q    The -- I'm sorry, I didn't hear you.  The city's what

4 reports?

5 A    Internal reports.

6 Q    Internal reports.

7 A    Yes.

8 Q    Did you consider the -- the CAFR for this analysis at

9 all?

10 A    This is fiscal year 2012 cash activity.  The CAFR, the

11 CAFR doesn't come out for months after that.

12 Q    I thought yesterday you testified, and correct me if I'm

13 wrong, that someone from your team contacted the city to -- to

14 check the property tax figures, is that not correct?

15 A    You can go back to my testimony.  I don't remember that

16 specific piece.  We looked at the cash activity of city in --

17 in a considerable amount of detail.

18 Q    Dropping down to the next item, income -- income and

19 utility taxes.  How were -- how was that figure derived?

20 A    That figure was derived from the information we had from

21 the bank accounts as well as the city's internal reports.

22 Q    And when you say city's internal reports, what kind of

23 reports were those?

24 A    They are various internal reports that the city tries its

25 best ability to track this cash activity.

1  Q    Did -- did anyone on your team ever try to get behind any

2  of those figures?

3  A    In order to --

4  Q    To check their accuracy.

5  A    Cash is generally cash.  If you are trying to ask the

6  classification of those receipts, there is -- there is always

7  classification issues, but cash is generally cash.  I don't

8  know what verification you do of cash.  This is not audited

9  statements.

10 Q    Your team didn't have the cash, right?

11 A    We tracked cash.

12 Q    Your team was not counting the cash?  It was looking at

13 reports from the city, correct?

14 A    That is accurate.  We were not counting dollar bills if

15 that is your question.

16 Q    No, that was true for both the bank reports and the

17 internal city reports?

18 A    We were tracking cash to the best of our ability.

19 Q    Based on the city's reports?

20 A    Based on our review of the city's reports and our review

21 of the bank statements.

22 Q    Sure.  And I don't mean to belabor the issue, but you

23 didn't check the city's reports, did you?  You reviewed them

24 and accepted them.

25 A    We subtract cash compared to the bank activity.  So we

1  used to check them.  We used to review them.  We used to ask

2  questions.  But generally tracking cash was not going to

3  approves or anything that.  It was -- it was tracking cash.

4  Q    All right.  So back to my question about the income and

5  utility taxes.  How did you derive that figure?

6  A    This will be a combination as I already testified based

7  on the city's internal reports and their bank accounts.  And

8  even out of discussions we may have had with the city

9  personnel.

10 Q    Did you have any personal conversations with city

11 personnel related to that item?

12 A    I may have, I don't recall specifically.  This is going

13 back to fiscal year 2012.

14 Q    Do you recall having any personal conversations with

15 anyone at the city related to the property tax item?

16 A    I don't remember a specific conversation.  We used to

17 track these daily, or actually on the fiscal year 2012 at

18 least weekly to -- to get our arms around the cash activity.

19 Q    You and your team?

20 A    That is correct.

21 Q    What about the gaming taxes?  Do you recall where that

22 figure came from?

23 A    I think it comes from the city's bank activity.

24 Q    The city's bank activity?

25 A    Its bank statements.

1  Q    Bank statements.  And how often did you receive the

2  city's bank statements?

3  A    It has varied from time to time, but we are receiving

4  statements right now on a weekly basis if not on a daily

5  basis --

6  Q    And in back --

7  A    That's --

8  Q    I'm sorry.  I didn't mean to speak over you.  And back in

9  2012, do you recall how often you were receiving those

10 statements?

11 A    I do not recall, but we -- we started getting the bank

12 statements on a regular basis as soon as we -- we got engaged

13 because that was the best proxy to track cash.

14 Q    And that would have been 2011, correct?

15 A    Calendar year 2011, that's right.

16 Q    Okay.  But I'm asking now about 2012.  Do you recall how

17 often you got statements related to gaming taxes?

18 A    Talking about fiscal year 2012.  I just want to make

19 clear that includes a part of 2011.  We would have received

20 activity on a regular basis that's what I would say.

21 Q    And you can't recall now whether that was weekly, or

22 twice a month, or monthly?

23 A    That is correct, I can't recall.

24 Q    How about the municipal service fee to casinos?

25 A    Consistent with how we received the gaming taxes

1  information.

2  Q    Reports from the city?

3  A    Reports, bank activity, discussions with -- with -- with

4  -- from the city's management team.

5  Q    I'm sorry?  Reports -- discussions with who at the city?

6  A    The city's management team.

7  Q    Okay.  Do you recall having any personal conversations

8  with the city's management team related to that line item?

9  A    No, I do not.

10 Q    So any -- any conversations would have been between your

11 team and -- and the people at the city?

12 A    No, that's not right.

13 Q    Okay.  What would -- who would be -- who was part of

14 those conversations to your knowledge?

15 A    Like I said earlier, I was intimately involved with the

16 tracking of cash activity of the city given how precarious the

17 cash position was.  I had several discussions with members of

18 the city's management team with respect to cash.

19      Your question was if I had a specific conversation on

20 this particular line item, I do not recall.  I had specific

21 conversations on the cash activity with various members of the

22 city's management team.

23 Q    Over what period of time?

24 A    Since the time we got engaged.

25 Q    And how frequently?

1  A    I cannot recall, it was very frequent.

2  Q    Just so we're clear, you don't recall having any

3  conversations specifically related to the municipal service

4  fee to casinos, is that correct?

5  A    I do not recall of a specific conversation, you're

6  correct.

7  Q    How about the state revenue sharing?  I think you talked

8  about that yesterday.  Did you have any personal involvement

9  in any conversations with the state relating to the revenue

10  sharing figure that's reflected in this exhibit?

11  A    It's -- no, it's -- the cash that's received every second

12  month pretty regular.

13  Q    I thought you testified yesterday, and I don't want to

14  put words in your mouth, that -- that there was a conversation

15  with the state related to what -- the revenues that came from

16  the state to the city.  Is that wrong?

17  A    No, you're correct.  But my testimony was related to the

18  forecast specifically and I'm happy to talk about it, and also

19  the ten year forecast in terms of the assumptions behind it.

20  Q    I understand you might be happy about that.  But let's

21  talk -- let's talk to these figures now.

22  A    I was just clarifying your -- your question and my

23  testimony.  This is for fiscal year 2012.

24  Q    Correct.

25  A    I did not have specific discussions with the state.  We

1  subtract this cash activity through a combination of the

2  city's reports, the bank activity, and discussions with the

3  management team on a regular basis.

4  Q    How about the last item there?  It's a fairly large one,

5  other receipts.  What -- what goes into that?

6  A    That includes grant receipts, it includes any sort of

7  fines that are collected, it includes any sort of fees that

8  are charged by the different departments.  It also includes

9  some of the utility charges that come through.  So it's --

10  it's a variety of items that makes up that line item.

11  Q    And did your team -- what was the source for your team's

12  collection of that data?

13  A    It was the same as I highlighted before.

14  Q    Reports from the city?

15  A    Bank statements, reports from the city, and discussions

16  with the management team.

17  Q    Do the bank statements that come in, do they break out

18  these line items as set forth in Exhibit 44 on this page?

19  A    Some of those items are -- are broken out, I believe.

20  But that -- that was part of the process in which we used to

21  look at that activity and try and ascertain where those

22  dollars belong so that we could be updating our forecast based

23  on the run rates more accurately based on the information we

24  received.

25  Q    For 2012, the figure on the -- on this exhibit is -- is

1  that $1,765,000,000, is that correct?

2  A    That is correct, including 50,000,000 of refinancing.

3  Q    Any -- and is it correct that that's simply cash, that's

4  not something that -- that it could be the subject of -- of

5  discussion or adjustment?

6  A    That's correct, it's -- it's cash.

7  Q    Did you have any conversations or did your team to your

8  knowledge have any conversations with anybody from Conway,

9  MacKenzie relating to the fiscal year 2012 figures?

10 A    We had discussions around the fiscal year 2012 figures

11 with all of the advisors in terms of what the cash activity

12 for fiscal year 2012 was.

13 Q    So in essence your team or you just relayed to Conway,

14 MacKenzie what the cash figures were?

15 A    We related to the cash activity of fiscal year 2012 as

16 shown on this page was discussed with Conway, MacKenzie and

17 all of the other advisors.

18 Q    Now these -- this is the general fund figure, is that

19 correct?

20 A    Predominantly, yes.  It does not include the activity for

21 Water and Sewer Department, all the receipts for DDOT.

22 Q    Or receipts for --

23 A    I'm sorry.  The Department of Transportation.

24 Q    It -- it -- it does not, or it does include Department of

25 Transportation?

1  A    It does not include the receipts of the Department of

2  Transportation.  The subsidy that's given to the Department of

3  Transportation from the general fund is shown on other

4  disbursement section.

5  Q    And -- and tell -- tell us why those enterprise funds

6  receipts are not included in -- in these figures.

7  A    The -- the Department of Transportation receipts are not

8  included because it's the net subsidy that the general fund

9  sends to the Department of Transportation after they go

10  through their own receipts and disbursements activity.  The

11  net subsidy that the general fund sends to the Department of

12  Transportation are included here.  With respect to the Water

13  and Sewer Department, they are receipts saying disbursements

14  activity are not included in here.

15  Q    And you said, I think earlier, that the department of --

16  Departments of Water and Sewer are self sustaining or break

17  even, correct?

18  A    That's generally correct.

19  Q    So that they can generally handle their own debts and

20  take care of their own business?

21  A    Yes.

22  Q    I would like to ask the help to put up Exhibit 6 which is

23  also in evidence.  And on this instance I believe it's the

24  CAFR for 2012.

25       And if you could turn to Page 20 of that -- that exhibit.

1  If you could highlight, please, just the 2012 total receipts.

2  And -- and compare it with, if you could, Exhibit 44 which we

3  were just looking at.

4      Okay.  I believe on the top we have an -- an excerpt from

5  Exhibit 6 which is the 2012 CAFR.  You're familiar with that

6  document, Mr. Malhotra?

7  A    Yes, I am.

8  Q    And at the bottom is the year -- well, we were actually

9  looking on the left hand column, but that's the figure from

10 Exhibit 44, am I correct?

11 A    That is correct.

12 Q    You will note there is a discrepancy between the -- the

13 total operating receipts figure which we were talking about in

14 the bottom and total revenues figure that's recorded in the

15 top.  Can you explain for us, please, what the differences are

16 between those two figures?

17 A    Sure.  I'll focus on your top table which is for

18 governmental activities of total revenues of 1,537,000,000

19 compared to the total operating receipts of 1,765,000,000.

20 Q    Right.

21 A    The 1,765,000,000 includes cash receipts that the city

22 collects in its property taxes line for distribution to other

23 taxing authorities.  If you go back to the cash flows you will

24 see there's a DDOT off a significant amount of disbursements

25 going to other taxing authorities for collections that have

1  come.

2      So again, I just want to clarify, you're tracking cash.

3  The city receives the gross tax collections then distributes

4  the taxes it has collected on behalf of other entities for a

5  net tax number.  Generally that net tax number is what's

6  reported in the coffer as property tax revenue.

7  Q    So the one five figure reflects a net figure for the

8  taxes that you just described, is that correct?

9  A    That is correct.

10 Q    Okay.  And -- and that's reflected below the revenue

11 line, or it should be above -- oh, forgive me.  It's -- it's

12 reflected in the tax figure itself.

13 A    You are correct.

14 Q    And if you could drop the Exhibit 44 and just stay with

15 -- yes, that page.  Just so I'm sure I understand it.  The --

16 the figures on the top, again this is from CAFR not your

17 document, show that the -- the governmental activities column,

18 the 1.5 is really just a -- it's far short of the -- no, you

19 don't need to do that.  The total operational receipts for the

20 City of Detroit, correct?

21 A    For the reasons that I described, yes.

22 Q    That's the business type activities, those are -- that's

23 water, sewer, transportation?

24 A    I believe so.  I -- I have not focused on the business

25 type activity, I believe so.  I'm not sure.

1  Q    Isn't it true that when you -- your engagement began in

2  2011, the business type activities were part of the financial

3  review that your team undertook, correct?

4  A    We were looking at the -- the receipts and disbursements

5  activity of some of the enterprise funds, that is correct.

6          MR. RUEGGER:  No further questions, Your Honor.

7          THE COURT:  Thank you, sir.

8          MR. RUEGGER:  Thank you, Mr. Malhotra.

9          THE COURT:  Any other questions for the witness?

10                    CROSS EXAMINATION

11  BY MS. PATEK:

12  Q    Good morning, Mr. Malhotra, Barbara Patek.  I represent

13  the Detroit Fire Fighters, the Detroit Police Officers

14  Association, and the Detroit Police Command Officers

15  Association, and the Detroit Police Lieutenant and Sergeants

16  Association.  I have just a few questions for you this

17  morning.

18          Mr. Stewart asked you some questions about negotiations

19  with various city unions in late 2011 and 2012.  Were you

20  involved in similar negotiations with the Detroit Fire

21  Fighters Association during that same time period?

22  A    Yes.  Me or my team members were involved, yes.

23  Q    Okay.  And was Chris Brown a member of that team?

24  A    Chris Brown was representing the city.

25  Q    And do you recall whether or not, let's start with the

1  Detroit Fire Fighters.  Whether or not you were able to --

2  your team negotiate an agreement with the fire fighters that

3  resulted in some cost savings?

4  A    Yes.  We did not negotiate it.  We helped ascertain the

5  financial impact, but I believe there was a tentative

6  agreement that was reached with Detroit Fire Fighters

7  Association and the city.

8  Q    Can I have 714, please?  Mr. Malhotra, can -- do you

9  recognize Exhibit 714?

10 A    It's the tentative agreement to --

11 Q    And -- and can you tell the Court going down to the first

12 -- the first full paragraph in the -- the agreement with whom

13 that appears to be?

14       MR. STEWART:  Your Honor, we've objected to this.

15 It is not in evidence.  If she's laying a foundation, no

16 objection.  But if she's going to question the witness about

17 the substance, we do object.

18       MS. PATEK:  I am just laying a foundation, Your

19 Honor.

20       THE COURT:  Well, the question you asked was not

21 exactly a question to establish foundation.

22       MS. PATEK:  Let me --

23 Q    Can you tell us what Exhibit 714 is?

24 A    It's the tentative -- tentative agreement entered the 23rd

25 of March between the City of Detroit and the Detroit Fire

1 Fighters Association.

2 Q   And can we flip to Page 6 of that agreement, please?  Oh,

3 I'm sorry, 7.  Do you recognize in the upper left hand corner

4 of that the -- the signature that appears?

5 A   I think that is the signature of Chris Brown.

6 Q   And Chris Brown was at that time the Chief Operating

7 Officer of the City of Detroit?

8 A   That is correct.

9 Q   Can we bring up 717?  Did you have similar discussions

10 with the Detroit Police Command Officers Association during

11 the same time period, 2011 and 2012?

12 A   We have ascertained some of the financial impact of those

13 discussions.

14 Q   And you participated and were there in those

15 negotiations?

16 A   I was participating from a financial standpoint, yes.

17 Q   Do you recall whether or not the agreement negotiated

18 with the Detroit Police Command -- well, strike that.  If we

19 can jump ahead to the signature page which I believe on this

20 one is Page 5.

21     And same question here.  If you look on the left hand

22 side of the page about a little better than halfway down on

23 Exhibit 717.  Do you recognize that signature?

24 A   I think that is the signature of Chris Brown.

25 Q   And again he was the Chief Operating Officer of the City

1  of Detroit at that time?

2  A    Yes.

3  Q    Do you recall whether or not as a result of the

4  negotiation of the tentative agreement, the agreement that

5  resulted provided for some cost savings to the City of

6  Detroit?

7  A    It was a combination of cost savings and deferrals, yes.

8              MS. PATEK:  I have nothing further at this time.

9              THE COURT:  Any other questions for the witness?

10 Any redirect?

11             MR. STEWART:  Not very much, Your Honor.

12                    REDIRECT EXAMINATION

13 BY MR. STEWART:

14 Q    Mr. Malhotra, and when you were questioned you mentioned

15 something called structural cash flow problems?

16 A    Yes.

17 Q    What are structural cash flow problems?

18 A    As shown on the city's cash flow activity for fiscal year

19 '12 and 2013, the disbursements continue to exceed receipts

20 for both of those years which in my mind are structural cash

21 flow issues especially given the fact that the city had

22 already made -- or had gotten a lot of concessions from some

23 of the active employees that -- but yet other than borrowing

24 new cash, or pooling new -- pooling accounts, or deferrals,

25 the core structural problems were -- or cash flow problems

1  where that the disbursements continued to exceed the receipts.

2  Q   Now when you used that term, it was in connection with

3  the questions you were asked about the monetization of city

4  assets.  What effect if any would the monetization of city

5  assets have upon the city's structural cash flow problems?

6  A   None.

7  Q   Why not?

8  A   Because in -- in my view those are one time proceeds from

9  asset sales that do not address the issues with respect to the

10  ongoing operating disbursements and the legacy cost

11  disbursements, the combination of which continue to exceed the

12  receipts that the city generates from its operations.

13  Q   Now you also were asked at various times about cost

14  savings that had been negotiated or realized or what have you

15  in previous years.  To the extent cost savings had been

16  achieved by the city, what if anything did you do in your

17  financial analyses with respect to those savings?

18  A   Those savings were clearly reflected in the cash activity

19  on a monthly basis all through fiscal year 2013.  So the

20  fiscal year 2013 would already reflect those cash savings that

21  had occurred during that time frame.

22     We also adjusted for additional cost savings from a

23  forecast basis over the forecast time frame which were already

24  incorporated in the cash flow assumptions.

25     MR. STEWART:  Thank you.  I have no further

1  questions.

2          THE COURT:  All right.  Sir, you may step down.

3  Thank you very much.  I will ask you to be here again tomorrow

4  morning in case we have more questions for you.

5  A    Yes, Your Honor.

6          (WITNESS GAURAV MALHOTRA WAS EXCUSED AT 11:43 A.M.)

7          THE COURT:  All right.  Your next witness, sir.

8          MR. STEWART:  Charles Moore.  Your Honor, before Mr.

9  Moore comes into the courtroom, as a foreseeable evidentiary

10  point, I think it might be best just to raise outside of the

11  presence of the witness.

12          THE COURT:  Okay.

13          MR. STEWART:  And here is what it is.  Yesterday in

14  the opening, I believe it was Mr. Oldman and if I'm wrong, I

15  apologize to Mr. Oldman who in the course of his opening about

16  the alleged bad faith of the emergency manager said, and we

17  have the imperfect transcript here with us, that Mr. Orr did

18  not have a factual basis to state in his declaration that the

19  pension claims were about 3.5 million dollars.

20      Because he opened on it, that is squarely now an issue in

21  our case.  And I intend to ask Mr. Moore about that.  And in

22  particular where that number came from.  I'm going to ask him

23  did he give that number to Mr. -- Mr. Orr and where did he get

24  it from and what made him believe that was a reliable number.

25      His answer is going to be that it was based upon reports

1  given to him by the pension plans actuaries.  And he has those

2  reports with him.  There have been -- they're exhibits here in

3  our case.  So I intend to ask him about that.

4      I'm not certain there will be an objection to it, but if

5  there is, I thought it would be more orderly to deal with it

6  now instead of while he was testifying.

7           THE COURT:  Any objections?

8           MR. RUEGGER:  On behalf of the committee yes, Your

9  Honor.  I believe that that's just an effort to introduce

10 opinion testimony, expert testimony through a witness who is

11 supposed to be a lay witness.  And I don't believe Mr.

12 Oldman's opening relating to that figure opened any doors to

13 allow that kind of expert testimony.  I would take it on a

14 question by -- I'm sorry, Your Honor.

15          MR. MONTGOMERY:  I didn't mean to interrupt you.

16          THE COURT:  I actually meant for him to remain quiet

17 so you could finish.  All right.

18          MR. RUEGGER:  I'm sorry, Your Honor.  I wasn't sure

19 who was where.

20          MR. MONTGOMERY:  We would simply object, Your Honor,

21 for the -- for the reasons that I think we've -- we've raised

22 with you in the past.

23          THE COURT:  Okay.  And please recall to speak right

24 into the microphone.  Any other objections before I get back

25 to Mr. Stewart?  Sir?

1          MR. SHERWOOD:  Yeah, on behalf of AFSCME, Jack

2   Sherwood.  We would join in the objection.  We would submit

3   that any testimony by Mr. Moore about pension under funding is

4   clearly, I don't think there's any dispute that that type of

5   testimony involves extremely specialized knowledge, training,

6   and is way beyond the understanding of the average person.

7          It is without a doubt the subject of what should be

8   expert testimony.  And for the city to try to use that

9   testimony in this proceeding by a witness who has not been

10  qualified as an expert, who has not rendered an expert report,

11  is improper.

12         And only experts can rely on -- on hearsay.  And that is

13  what this witness would be doing.  So on behalf of AFSCME, we

14  would also oppose any testimony by ths witness concerning the

15  -- the value of the -- the pension under funding.  Thank you,

16  Your Honor.

17         MR. CIANTRA:  Thomas Ciantra for the UAW, Your

18  Honor.  We would join in those objections and note that Mr.

19  Moore is not an actuary and has not been proffered, we

20  understand, as a -- as an expert qualified to provide

21  actuarial testimony.

22         THE COURT:  All right.  Thank you.  The -- go ahead,

23  I didn't mean to cut you off.

24         MR. STEWART:  I think there may be some confusion.

25  We're not offering it for the truth, we're offering it for the

1  good faith basis of Mr. Orr who has been accused of bad faith.

2  So that -- that is the nature of the proffer and there is a

3  hearsay exception for that.

4          THE COURT:  Yes.  The Court will admit the evidence

5  but for the limited purpose of addressing the challenge to Mr.

6  Orr's credibility and good faith.

7          MR. STEWART:  Mr. Moore is being brought to the

8  courtroom from the hall because of the sequestration --

9          THE COURT:  Yes.

10          MR. STEWART:  -- agreement, Your Honor.

11          THE COURT:  Step forward please, sir.  And before

12  you sit down, please raise your right hand.

13      (WITNESS CHARLES MOORE WAS SWORN)

14          THE COURT:  All right.  Please sit down.

15                    DIRECT EXAMINATION

16  BY MR. STEWART:

17  Q    Good morning, Mr. Moore.

18  A    Good morning.

19  Q    Could you please give the Court your full name and your

20  home address?

21  A    Charles Moore, M-o-o-r-e.  And I am out of Birmingham,

22  Michigan.

23  Q    And are you employed, Mr. Moore?

24  A    Yes, sir.

25  Q    And where do you work?

1  A    Conway, MacKenzie, Inc.

2  Q    And tell us if you could what Conway, MacKenzie, Inc. is.

3  A    We are primarily a turnaround and restructuring firm.

4  Q    How long have you worked for Conway, MacKenzie?

5  A    For approximately 12 years.

6  Q    Tell us if you could about your education, college and

7  after college if you have post graduate work.

8  A    I have a Bachelor's Degree in Accounting from Michigan

9  State University.  I have a Master's of Business

10 Administration from Michigan State University in Professional

11 Accounting.  And I have various certifications as well.

12 Q    Well, first of all, if you could give me the dates of

13 your degrees from Michigan State.

14 A    Sure.  I completed both degrees in 1994.  It was a

15 combined degree program and both degrees are granted at the

16 same time.

17 Q    And then you mentioned your professional certifications.

18 Could you tell us what those are?

19 A    Yes, sir.  I am a Certified Public Accountant, a

20 Certified Turnaround Professional, and I'm certified in

21 Financial Forensics.

22 Q    And who does the certifications for those qualifications?

23 A    The American Institute of Certified Public Accountants is

24 the CPA body.  The Turnaround Management Association is the

25 body for the Certified Turnaround Professional designation.

 1  And then the AICPA, the American Institute of Certified Public

 2  Accountants, also does the financial forensics certification.

 3  Q    Tell us if you could about your employment since your

 4  graduation from Michigan State.

 5  A    My first job was with Deloitte and Touche.  I was

 6  employed there for approximately five and a half years.  After

 7  that I was at a company by the name of Horizon Technology

 8  where I was Chief Financial Officer and then I joined Conway,

 9  MacKenzie.

10  Q    And you told us you've been there 12 years.

11  A    Yes, sir.

12  Q    Where is Conway, MacKenzie headquartered?

13  A    We are headquartered in Birmingham, Michigan.

14  Q    And what Conway, MacKenzie office do you work out of?

15  A    I work out of the Birmingham, Michigan office.

16  Q    What title do you hold at Conway, MacKenzie?

17  A    I'm Senior Managing Director and shareholder.

18  Q    Okay.  And tell us if you could what kind of practice you

19  have at the firm.

20  A    My work primarily involves turnaround and restructuring

21  services.  I also perform services in other areas of our firm

22  such as investment banking and litigation support.

23  Q    Could you -- to the extent they're probably discloseable,

24  could you tell us some of the clients you have worked for

25  while at Conway, MacKenzie?

1  A    Certainly.  As you mentioned, there are client

2  confidentiality restrictions, but publicly known clients

3  recently would include the City of Detroit, Detroit Public

4  Schools, the Commonwealth of Puerto Rico, Jefferson County,

5  Alabama, Greektown Casino and Hotel.

6  Q    Have your clients included unions?

7  A    Yes, sir.

8  Q    Which unions?

9  A    I have done work on behalf of AFSCME and UAW.

10  Q    And what project was that on if you can tell us?

11  A    Yes.  I was engaged jointly by AFSCME and the UAW related

12  to the Commonwealth of Puerto Rico.

13  Q    Now in 2007, did you sit on a commission appointed by the

14  Michigan government?

15  A    Yes, sir.

16  Q    Please tell us what that work involved.

17  A    The commission was the legislative commission on

18  government efficiency.  It was a nine person panel appointed

19  by legislators from the State of Michigan.

20  Q    And how long did you work with that commission?

21  A    It was approximately a two year assignment.

22  Q    And what did you do in those two years?

23  A    The primary objective of the commission was to find

24  operational efficiencies for the state government.

25  Q    Did there come a time in 2012 you began working for the

 1 | City of Detroit?

 2 | A    Yes.

 3 | Q    And tell us about that work.

 4 | A    In late 2012, Conway, MacKenzie did some pro bono work

 5 | for the City of Detroit.

 6 | Q    And what was -- what work -- what work -- sorry, what

 7 | work did you do?

 8 | A    Conway, MacKenzie was asked to perform analysis on

 9 | certain areas related to cashiering operations for the city.

10 | Q    And you'd better tell us what a cashiering operation is.

11 | A    Cashiering generally means areas where cash is coming

12 | into the city.

13 | Q    Okay.  And then what areas did you look into?

14 | A    There were, as I mentioned, about five areas.  Some were

15 | more of a focus than others.  Municipal parking was a primary

16 | area of focus.  We also looked at fire operations including

17 | the fire marshal where fees are generated.  We also looked at

18 | aspects of building safety and engineering.

19 | Q    Did there come a time earlier this year when Conway,

20 | MacKenzie was hired by the City of Detroit to -- on a non-pro

21 | bono basis to do work for the city?

22 | A    Yes, sir.

23 | Q    And how did that come about?

24 | A    The City of Detroit issued an RFP, a request for proposal

25 | in November of 2012 for restructuring services.  Conway,

1  MacKenzie was one of the firms that responded to that RFP and

2  was eventually engaged in January of 2013.

3  Q    And by restructuring services, what are you referring to?

4  A    Restructuring services is not really a defined term, but

5  because of the financial distress that the city was

6  experiencing, there was a desire to bring in outside expertise

7  to help the city deal with that financial distress.

8  Q    And so Conway, MacKenzie became a operational

9  restructuring advisor to the city?

10  A    Yes, sir.

11  Q    What areas did you look at?

12  A    We've looked at pretty much every area of the city's

13  operations.

14  Q    Okay.  Let me ask about some in particular.  What if

15  anything were you asked to do in terms of looking at the

16  city's operations in the area of public safety?

17  A    Public safety involves multiple areas.  It includes

18  police, fire, EMS, and Department of Homeland Security.  We

19  spent quite a bit of time understanding how those departments

20  function currently, what are the major impediments to

21  improving their performance, and working with individuals in

22  those departments to develop a plan for improving performance.

23  Q    Tell me if you could how did you go about doing this

24  work?

25  A    The city has had multiple consultants performing work

1  over the last several years.  And so one of the items that

2  Conway, MacKenzie did was to first understand work that has

3  been done in the past by outsider organizations so that we

4  could leverage that work.

5      In addition to that we worked very closely with the

6  people within the departments as well as outside organizations

7  to not only gather facts in terms of how the department is

8  performing currently, but also to benchmark as to how the

9  department stacks up compared to other areas that would be

10 relevant.

11 Q    Did there come a time when you made recommendations to

12 the city relating to public safety?

13 A    Yes, sir.

14 Q    And what did you recommend?

15 A    In the June time period of this year there was a document

16 that was put together.  A creditor proposal which incorporated

17 our work and specifically had initiatives related to public

18 safety in both restructuring expenses as well as capital

19 expenditures.

20 Q    And if we could, let's put up exhibit -- if we could,

21 let's put up Exhibit 43.  Mr. Moore, is this the creditor

22 proposal that you -- you referred to a few minutes ago?

23 A    This appears to be the title so, yes.

24 Q    And could you direct us to the portion of this that

25 contains the recommendations and analysis you told us about

1  just a few minutes ago?

2  A    If I recall correctly, this document is about 130 pages.

3  There are multiple areas where recommendations related to

4  public safety would exist.  If -- if we're able to scroll

5  through it, I could get you those pages.

6     I can tell you at the very end of the document that has a

7  summary listing of capital expenditures which you would be

8  able to look at from the standpoint of public safety.

9  Q    We will -- and we will do that once we've covered all

10  these areas.  And then what did you do if anything with regard

11  to the Water and Sewer Department?

12  A    Conway, MacKenzie was asked to prepare a long term, long

13  term being defined as ten year business plan for both the

14  water and sewer funds.

15  Q    And what do you mean when you say business plan?

16  A    A business plan essentially involves how the department

17  will operate over a period of time.  Anticipated revenues,

18  expenses, as well as other cash needs such as capital

19  improvements.

20  Q    And did there come a time when you made a recommendation

21  to the city or to the emergency manager based on the work that

22  you had done?

23  A    Yes.

24  Q    And when did you make that recommendation?

25  A    At the end of September of 2013 we delivered that ten

1   year business plan for the water and sewer funds.

2   Q    Now have you also been asked to look into the

3   monetization of the Water and Sewer Department?

4   A    Yes, sir.

5   Q    When did you begin your work looking into the

6   monetization of that department?

7   A    The business plan which our work began in July of 2013,

8   the development of the business plan for the water and sewer

9   funds was to be used as a basis for evaluating strategic

10  alternatives for the water and sewer funds.  And among those

11  strategic alternatives was the potential creation of a

12  regional water authority.  And that was one area that this

13  business plan is currently being used.

14  Q    And how, if you can disclose to us, how would the

15  creation of a regional water and sewer authority lead to its

16  monetization?

17  A    What is currently being discussed, and -- and this is a

18  publicly available aspect.  And I -- and I have to be careful

19  because the negotiations are ongoing and they are

20  confidential.

21       But what has been publicly discussed is the formation of

22  a regional authority would potentially involve the City of

23  Detroit leasing the water and sewer assets to a regional

24  authority and then receiving a payment in return.

25  Q    So the monetization would take the form of lease

1  payments?

2  A    Yes, sir.

3  Q    And did I hear you correctly this is under discussion as

4  we speak?

5  A    Yes, sir.

6  Q    Let me direct your attention to the Detroit -- Detroit

7  Department of Transportation.  What if anything was Conway,

8  MacKenzie asked to do with regard to DDOT?

9  A    DDOT as you mentioned, the Department of Transportation

10 is another department that we looked at and there are both

11 short term as well as longer term items that we evaluated

12 there.

13     In the short term, we looked at ways of potentially

14 improving the operation perhaps through as an example fare

15 increases to try to get more revenue into the department.

16 Identify ways that the -- that the department could operate

17 more efficiently.

18     As an example getting more buses on the road, maintenance

19 tends to be an issue in that department.  And also the

20 management of the department.  The longer term is still a

21 question and that could involve eventually merging into more a

22 regional transportation authority.

23 Q    And that merger would be done for what reason?

24 A    If the authority, if a regional authority could provide

25 better service to residents and it could also save the city

1  money, then that certainly is something that we would look at.

2  Q    Were you also asked to look at the Detroit Lighting

3  Authority?

4  A    Yes.

5  Q    What if anything did you do with regard to the Detroit

6  Lighting Authority?

7  A    Mr. Stewart, I'll just clarify.  You're referring to the

8  Public Lighting Authority.

9  Q    Public Lighting.

10  A    Yes.

11  Q    I'm sorry.  Thank you.

12  A    The -- the Public Lighting Authority was an authority

13  established within the past year and the primary purpose of

14  that lighting authority is to improve the lighting within the

15  city.  That needs to be funded.  And then the efforts to

16  replace lights will occur.

17      And so we worked with the city and the state as it

18  relates to the initial financing for the Public Lighting

19  Authority which is ongoing right now.  As well as we were

20  involved with a request for proposal related to the management

21  of the Public Lighting Department.

22  Q    What were you asked to do if anything with regard to tax

23  and revenue collection operations for the city?

24  A    The city takes in a variety of taxes.  The primary items

25  for taxes are property taxes, income taxes, and utility taxes

1 | among others.

2 |     And we looked at those operations as to how they could be

3 | made more efficient as well as potentially increase the amount

4 | of revenue that was coming in.

5 | Q    What did you find in the course of your investigation

6 | into the operations of the city's tax and revenue functions?

7 | A    As it relates to property taxes, there have been efforts

8 | that were underway for the last few years where the city had

9 | been using some outside assistance to try to improve that

10 | area.

11 |     The city, its ability to operate in the property tax

12 | area, was very broken.  Simple things such as getting bills

13 | out on time and to the right addresses, as well as having the

14 | right number of resources available to accept payment were

15 | both significant deficiencies.

16 | Q    Were -- were measures implemented to correct those

17 | deficiencies?

18 | A    Yes, sir.

19 | Q    Tell us if you could what those measures were or are?

20 | A    There are a number of things as it relates to property

21 | tax collections that are underway.  First of all, the property

22 | tax billing process has been improved significantly and so the

23 | bills have gone out on time.

24 |     In addition to that, a number of additional resources

25 | were brought in in July and August of this year in order to be

1  able to process the receipts, the -- the payments that

2  residents and others would make.

3      We also changed some of the bank information so that

4  payments would be received quicker as well as larger amounts

5  for property tax payments could actually be received.

6  Q    And do I understand correctly you're continuing to work

7  in the area?

8  A    Yes, sir.

9  Q    What did you do with regard to investigating the problem

10  of housing blight here in the City of Detroit?

11  A    Blight which is the term that most people use for

12  structures as well as non-structural areas that are -- could

13  be abandoned, burned out buildings, overgrowth of brush,

14  certainly was an area that we kept running into in a number of

15  the departments that would drive department activity.

16      As an example within the fire department, approximately

17  60% of the fire department's runs relate to abandoned

18  buildings.  We also noticed on the property tax side that

19  areas where there was significant amounts of blight, both

20  structural and non-structural, that property taxes -- or

21  property tax values would deteriorate very quickly.

22      And so there was an initiative identified as part of the

23  plan that was put together to eliminate the residential blight

24  within the City of Detroit.

25      THE COURT:  Excuse me.  You used the phrase

1  non-structural blight?

2  A    Yes, Your Honor.

3             THE COURT:  What is that?

4  A    If you think of a lot, a residential lot, some of these

5  lots don't have a structure on them anymore, however, there is

6  tremendous overgrowth.  And so it hides what activity may be

7  going on in that lot.  And that also can be a -- an area that

8  breeds crime.

9  Q    Now, have you heard the terms restructuring and

10  reinvestment as used with respect to the work of the emergency

11  manager?

12  A    Yes, sir.

13  Q    In fact was that not something also discussed in the June

14  14 presentation?

15  A    Yes, sir.

16  Q    Could you tell us please, what is meant by those terms?

17  And let's start with restructuring.

18  A    Restructuring refers to how the departments operate.  And

19  when Conway, MacKenzie first began its efforts with the

20  departments, very often we find that there are areas where

21  costs can be reduced and so that is a big focus in the

22  turnaround industry in general is reducing expenses.

23        What we found within the departments is that a number of

24  the -- the departments were severely broken.  The -- as a

25  result of a number of cost cuts that have happened over the

1  years, many departments couldn't perform the most basic

2  functions I referred to earlier, just the inability to get

3  property tax bills out.

4      And so when we use the word restructuring we're talking

5  about changing how the department operates.  And in many

6  instances what that actually revolved around was adding

7  expenses so that departments could function and services could

8  be performed.

9  Q    Were you able to determine whether the benefit from

10  adding these employees would outweigh the expense of hiring

11  them?

12  A    In addition to the expenses that we identified, we also

13  identified a number of revenue initiatives as well.

14  Q    If you could, just explain to us what the revenue

15  initiatives were?  Actually I should first ask what were the

16  amount of the expenses?

17  A    The amount of expenses, added expenses over the ten year

18  period which is the period that we developed for the

19  restructuring and reinvestment plan, was approximately

20  $250,000,000.

21  Q    And what did you calculate the benefits would be

22  financially from the restructuring?

23  A    We had other revenue initiatives where revenue

24  initiatives would revolve around areas where the city could

25  receive additional cash in flows revenue of approximately

1  $280,000,000.  There were some offsets to that as well as we

2  looked at changing some departments it would result in some

3  lower revenue as well.  And so as a result there was net

4  revenue improvements of about $250,000,000 as well.

5  Q    Now then the term was used reinvestment.

6  A    Yes, sir.

7  Q    Tell me -- or tell the Court what you mean -- or meant

8  when you used the term reinvestment.

9  A    Reinvestment is referred to as the category of planned

10  expenditures that would relate to the infrastructure of the

11  city.  As an example whether that is facility improvements,

12  vehicle fleet, information technology, or even in the case of

13  blight, spending on blight elimination.

14  Q    And why is reinvestment -- this was something you

15  recommended?

16  A    Yes, sir.

17  Q    Why did you recommend it?

18  A    What became very clear is that over the years as the

19  city's finances suffered and deteriorated that there was not

20  the necessary reinvestment made in the structural assets.  As

21  an example, there are parking garages where large portions of

22  the parking garages are actually blocked off because the

23  structures themselves are in disrepair.  And that's a source

24  of revenue for the city.

25       And that unless those items are fixed, the city will have

1  continued issues with just performing functions.  And so what

2  became very clear to Conway, MacKenzie and formed the basis of

3  our recommendations, is that without spending money on the

4  infrastructure, the ability to perform services and actually

5  have hard assets where those services are performed, would

6  continue to be challenged.

7  Q    Now is the removal of blighted structures part of

8  reinvestment?

9  A    Yes, sir.

10  Q    Okay.  And why as a matter of economics, is removal of

11  blighted properties -- well, you did recommend removal of

12  blighted properties, correct?

13  A    Blighted residential properties, yes.

14  Q    Why is that economically sensible to do?

15  A    As I mentioned before, blight seems to touch on a number

16  of the areas that we've looked at whether it is public safety,

17  property taxes, or even appearance.  And so by spending money

18  on eliminating that, you change the dynamics of where people's

19  time gets spent as well as the basis for how the city receives

20  revenue.

21  Q    Did you have an estimate of what it would cost to remove

22  the blighted residential properties?

23  A    Yes, sir.

24  Q    And what was your estimate?

25  A    Five hundred million dollars during this time period,

 1  Q    And the time period for removal was how many years?

 2  A    We forecasted $500,000,000 over six years.

 3  Q    And where did the number 500,000,000 come from?

 4  A    This was an estimate based on discussions with people

 5  that have been involved with blight removal in the past within

 6  the city.  The city has been undertaking blight removal

 7  efforts for some time as well as outside parties that have

 8  been involved with blight removal as well.

 9  Q    Now --

10          MR. RUEGGER:  I'm sorry, Mr. Stewart.

11          MR. STEWART:  Sure.

12          MR. RUEGGER:  I would object to the last testimony

13  as -- as hearsay, Your Honor.

14          THE COURT:  Would you speak into the microphone,

15  please?

16          MR. RUEGGER:  Objection to the last question and

17  answer as it called for hearsay and his answer was hearsay.  I

18  also want to object.  I believe this is bordering into expert

19  testimony and the witness is supposed to be a lay witness.

20          MR. STEWART:  Your Honor, he made recommendations

21  that resulted in a number for restructuring the reinvestment

22  during the openings yesterday.  That number too is challenged.

23  In particular I remember one of the openings saying how could

24  the city in good faith budget for this when it is not going to

25  be able to pay others.

1    So as a matter of dealing with the good faith issue and

2   the reliability of the data, I wanted to adduce testimony of

3   where these numbers came from.

4          THE COURT:  Is that the sole purpose that you're

5   offering this for?

6          MR. STEWART:  At this point, yes.

7          THE COURT:  All right.  With that limited purpose,

8   the Court will overrule the objection.

9   Q    I have one further question in this area which is

10  including the $500,000,000 for blight removal, what was the

11  total number you developed for reinvestment and restructuring

12  for the city?

13  A    It was approximately $1,000,000,000.

14  Q    Over ten years?

15  A    Over ten years, yes.  Excuse me, Mr. Stewart.  In your

16  question, did you ask restructuring and reinvestment?

17  Q    I did.

18  A    Okay.  The total with both of those would be

19  approximately 1.25 billion dollars.  A billion on the

20  reinvestment.

21  Q    Let me move to another area.  As part of your work for

22  the city or the emergency manager, were you asked to do

23  something called tax benchmarking?

24  A    Yes, sir.

25  Q    Could you tell us what tax benchmarking is?

1  A    As part of the -- our initial efforts when we were

2  looking at potential sources of cash, we looked at the current

3  level of taxation for residents and businesses within the City

4  of Detroit to understand whether that -- whether those could

5  be increased as a potential source of cash.  And so we looked

6  at the City of Detroit's taxation and we compared that to a

7  few of the surrounding communities.

8  Q    And what did you conclude?

9  A    That the City of Detroit residents were taxed far more

10  than surrounding communities.  And in fact had the highest

11  taxation within the State of Michigan.

12        MR. STEWART:  Your Honor, this is a good breaking

13  point for me, but I'm prepared to continue if the Court --

14        THE COURT:  No.  No, let's -- let's stop now for

15  lunch and reconvene at 1:45, please.

16    (WITNESS CHARLES MOORE WAS TEMPORARILY EXCUSED AT 12:15

17  P.M.)

18        THE CLERK:  All rise.  Court is in recess.

19    (Court in Recess at 12:15 p.m.; Resume at 1:45 p.m.)

20        THE CLERK:  Court is in session.  Please be seated.

21  Recalling case number 13-53846, City of Detroit, Michigan.

22        MR. IRWIN:  Good afternoon, Your Honor.  Geoff Irwin

23  from Jones, Day.  Might we return to a brief housekeeping

24  matter from yesterday morning just to update the Court?

25        THE COURT:  Sure, go ahead.

1          MR. IRWIN:  In regard to the -- the UAW motion to

2   compel, and I've -- I've conferred with Mr. Ciantra on this.

3   That you may recall that there were some Jones, Day research

4   memoranda that were the subject of the motion to compel.

5       And I indicated that we would do our very best to

6   investigate whether these memoranda were in fact shared with

7   the state.  And that if they were we would in fact disclose

8   them to -- to objectors here.

9       We have done our very best and it is proving too

10  difficult to know.  People just don't recall as they look at

11  individual memoranda whether they did or didn't.

12      So I -- I have conferred with Mr. Ciantra.  I am

13  perfectly prepared to share them with the Court.  I think the

14  Court invited for us to submit them in camera for the Court to

15  consider before deciding what -- what to do and I'm prepared

16  to do that.

17          THE COURT:  Okay.  I will accept that and give you a

18  decision tomorrow morning.

19          MR. CIANTRA:  Thank you, Your Honor.  In -- in

20  connection with that, I would just ask that the Court focus

21  with respect to the cover email that was -- that described --

22          THE COURT:  Is that there too, or is that in

23  evidence?

24          MR. CIANTRA:  I believe -- I believe it is -- is it

25  there?

1        MR. IRWIN:  It's not in -- it's not in here.

2        MR. CIANTRA:  But it was -- it was read into the

3   record yesterday by Ms. Green.

4        THE COURT:  Okay.  So I think I have -- so it's in

5   here?  Objecting parties opening statement, RSC867?

6        MR. CIANTRA:  I don't -- Your Honor, I don't believe

7   -- I don't believe it is in there.  I believe Ms. Green read

8   -- read it into the record in connection with her argument on

9   -- on the retirement systems motion.

10        THE COURT:  Oh, oh, okay, all right.  So we'll have

11   to get it from -- from the transcript.

12        MR. CIANTRA:  If -- I don't have it right --

13        THE COURT:  Ms. Green, can you help us?

14        MS. GREEN:  The date of the email is listed in the

15   PowerPoint presentation.  And it's June 5th, 2012.  The whole

16   email I don't believe is in it.  I think it's maybe a piece of

17   it perhaps, but --

18        THE COURT:  Well, let me just ask.  Does anyone have

19   the email?

20        MS. GREEN:  I do.  It is in our exhibit binders that

21   we gave to the Court.

22        THE COURT:  Can you -- can you give me a number?

23        MS. GREEN:  I will give you the number in one

24   second.  I will look it up.  I have my binder back here.

25        MR. CIANTRA:  Thank you for the Court's patience

1  with this, Your Honor.

2          THE COURT:  Well, Ms. Green, why don't you take your

3  time and look for that, or do you have it right at hand there?

4          MS. GREEN:  I have it, yeah.

5          THE COURT:  Oh, all right.

6          MS. GREEN:  I believe it is 844 -- it's 844 in the

7  retirement systems binder.

8          THE COURT:  Okay.  We are all set.  Thank you.  And

9  we got the envelope so we're all set.  May we proceed?  You

10 may proceed, sir.

11         MR. STEWART:  Thank you, Your Honor.

12      (WITNESS CHARLES MOORE RESUMED THE STAND AT 1:49 P.M.)

13 BY MR. STEWART:

14 Q   Mr. Moore, let me direct your attention to June 14, 2013.

15 Did -- did you have occasion that day to attend a meeting

16 given by the emergency manager?

17 A   Yes, sir.

18 Q   What was the purpose of that meeting?

19 A   The purpose of that meeting was to present what is

20 referred to as the proposal to creditors, to various creditors

21 of the City of Detroit.

22 Q   Can we put up Exhibit 43, please?  And do you see on the

23 monitor in front of you, Mr. Moore, a document Exhibit 43?

24 A   Yes.

25 Q   What is that?

1  A    This appears to be the title of that presentation.

2  Q    And that was a presentation made that day?

3  A    Yes, sir.

4  Q    What role if any did you have in making the presentation?

5  A    I spoke to a couple of parts in that presentation.

6  Q    How long was your part of the meeting?

7  A    I would estimate about 15 minutes or so.

8  Q    And what was the general reason for the meeting if you

9  know?

10  A    The general reason for the meeting as I indicated was to

11  present the current situation that the city found itself in.

12  And the plan that the city wanted to pursue regarding

13  restructuring and reinvestment.  As well as to lay out a

14  proposal as to how various classes of creditors would be

15  treated.

16  Q    Were particular questions asked of you that day?

17  A    Not that I recall.

18  Q    Let me ask you if you could, to go to -- and let's also

19  ask the -- Ms. Lori, to go to Page 98 of the document which

20  you can see on your monitor.  And is this -- actually let's go

21  one page earlier, just so the witness has his attention

22  focused on it.

23       Just one -- one -- one page before.  Do you see the page

24  that's before you?

25  A    Yes.

1  Q    Then go -- then go back to the page we just had.  And

2  this page as well?

3  A    Yes.

4  Q    Do you understand what these pages depict?

5  A    Yes.

6  Q    And what do they depict?

7  A    This is a ten year financial forecast indicating the

8  approximate amount of cash that was anticipated to be

9  available for unsecured claims.

10  Q    And that was --

11           MR. SHERWOOD:  Your Honor, I -- I object to this

12  testimony.

13           THE COURT:  All right.  First of all, pull the mike

14  closer.  Second of all, please talk louder.

15           MR. SHERWOOD:  I object on the grounds that this is

16  improper opinion testimony from a non-expert.

17           THE COURT:  Well, the last question certainly didn't

18  ask him an opinion, so to that extent it's overruled.  When

19  you think there is an opinion being given I invite your

20  objection at that time.

21           MR. SHERWOOD:  Thank you, Your Honor.

22  Q    And now, Lori, could be blow up the box?  There.  Do you

23  see the part of that page which has now been expanded to fill

24  the monitor screen?

25  A    Yes.

1  Q    What -- what is this?

2  A    This is a listing of the estimated unsecured claims as of

3  June 14ᵗʰ, 2013.

4  Q    And when you use the phrase unsecured claims, what are

5  you referring to?

6  A    This is based on claims for which there did not appear to

7  be a specific security interest.

8  Q    Claims by who?

9  A    Creditors of the City of Detroit.

10  Q    And claims against who?

11  A    Against the City of Detroit.

12  Q    Let me ask you to direct your attention to the line that

13  says unsecured pension and OPOB.  Do you see that?

14  A    Yes.

15  Q    And then do you see the area that has now just been

16  highlighted for you?

17  A    Yes.

18  Q    And what is that?

19  A    These are the estimated unfunded amounts related to the

20  two pension systems of the City of Detroit.

21  Q    Unfunded in what sense?

22  A    The liability for the pension system in excess of the

23  plan assets of the pension system.

24  Q    And those two numbers add up to about 3.474 billion

25  dollars?

1  A    Yes, sir.

2  Q    Do you know where that number came from?

3  A    Yes.

4  Q    Where did it come from?

5  A    From me.

6  Q    And why did -- who did you give it to?

7  A    I gave it to Mr. Malhotra.

8  Q    And anyone else?

9  A    I gave it to the other restructuring advisors that would

10 have put it into the document.

11 Q    And did you also share it with Mr. Orr?

12 A    Yes, sir.

13 Q    And where did you get it from?

14 A    I got it from Milliman.

15 Q    And for the record who is Milliman?

16 A    Milliman is the actuary engaged by the City of Detroit.

17 Q    Do you know how Milliman derived those numbers?

18 A    Yes.

19 Q    And could you tell us briefly how they did it and then

20 I'm going to show you some -- some exhibits.

21          MR. RUEGGER:  With respect, Mr. Stewart, objection.

22 I believe --

23          THE COURT:  And into the microphone, please.

24          MR. RUEGGER:  This is getting into expert opinion

25 testimony, Your Honor.

1          THE COURT:  The objection is overruled.

2  A     Would you please restate the question?

3  Q     Could you tell us how you -- how Milliman to your

4  knowledge came up with these numbers?

5  A     Yes.  The restructuring team has a task force

6  specifically --

7          THE COURT:  Excuse me one second.  How do you know

8  how Milliman came up with these numbers?

9  A     Your Honor, I lead a task force for the City of Detroit

10  on pensions and I specifically received this information from

11  Milliman.

12          THE COURT:  Okay.  You may answer the question.

13  A     The task force that I indicated that is specifically

14  focused on pensions asked Milliman to run a variety of

15  scenarios.

16  Q     Now let me -- and do you understand how Milliman in these

17  scenarios came up with its numbers?

18  A     Yes, sir.

19  Q     And how did they come up with their numbers?

20  A     Milliman used the Gabrielle Roeder actuarial evaluation.

21  Q     Stop you there.  Who is Gabrielle Roeder?

22  A     Gabrielle Roeder is the actuary that is used by each

23  pension system.

24  Q     Okay.  Sorry to have interrupted your answer.

25          MR. SHERWOOD:  Your Honor, I'm going to pose a

1  hearsay objection to this.  I think this is just -- he is

2  testifying to out of Court statements by -- presumably by

3  actuaries at Milliman as to how they derived numbers.  It's --

4  it's rank hearsay.

5            THE COURT:  And who was Milliman retained by?

6            MR. SHERWOOD:  Milliman was retained by the City of

7  Detroit.

8            MR. STEWART:  No, I think it was retained by the

9  pension --

10           THE COURT:  Who was Milliman retained by?

11 A    The City of Detroit.

12           MR. STEWART:  And, Your Honor --

13           THE COURT:  And you --

14           MR. STEWART:  Yes.  It's being offered for state of

15 mind.  As we -- as I -- before he took the stand I raised this

16 saying, we're not offering these for the truth, we're offering

17 these numbers to rebut the argument that has been made that

18 Mr. Orr did not have a good faith basis in this document and

19 other documents for representing that the pension claims would

20 be 3.5 million dollars.

21           THE COURT:  Did you tell Milliman -- I'm sorry, did

22 you tell Mr. Orr how Milliman came up with these numbers?

23 A    Yes, sir.

24           THE COURT:  All right.  Tell us what you told Mr.

25 Orr.

1  A    I told Mr. Orr that Milliman had taken the Gabrielle

2  Roeder actuarial evaluation and modified a couple of

3  assumptions based on that actuarial valuation.

4       THE COURT:  All right.  The Court will receive that

5  testimony again only for purposes of -- of demonstrating what

6  Mr. Orr was told, not for the truth of it.

7  Q    And did you have reason to believe that Milliman's

8  conclusions were reliable?

9       MR. CIANTRA:  I would object.  I'm going to again

10 object to this.  He's not an actuary.  He's not being

11 proffered for actuarial expertise.  I don't know what the

12 basis of him offering that opinion would be.

13      MR. STEWART:  Foundational question, Your Honor, but

14 also once again, since what we're talking about is good faith

15 reliance an element of reliance is reliance --

16      THE COURT:  All right.  Well, here's a better

17 question.  Did you express to Mr. Orr any doubt about the

18 reliability of the information that you had given him?

19 A    No, Your Honor.

20 Q    Let me put up, let's put up Page 1 of Exhibit 69, please.

21 Can you tell me what Exhibit 69 is?

22 A    This is the draft actuarial evaluation report from

23 Gabrielle Roeder for the general retirement system of the City

24 of Detroit as of June 30th, 2012.

25      (City's Exhibit 69 was identified)

1  Q    And the general retirement system is the system

2  representing non-uniformed employees of the City of Detroit?

3  A    Yes, sir.

4  Q    Do you know what percentage of those non-uniformed

5  employees work for the Department of Water and Sewer?

6  A    Approximately 40% of the contributions that typically are

7  made relate to water and sewer employees.

8  Q    Now let me ask if we could please put up Page 3 of this

9  document.

10          THE COURT:  Is this in evidence?

11          MR. STEWART:  It is in evidence.  Yes, Your Honor.

12  It has not been objected to.

13  Q    And in particular could I ask the Court technician to

14  expand the box at the bottom?  First of all, have you seen

15  this document before, Mr. Moore?

16  A    Yes.

17  Q    And tell us what it is.

18  A    This is the actuarial evaluation as of June 30th of 2012

19  in draft.  And this indicates what the estimated unfunded

20  actuarial accrued liability is as of that date and the

21  previous year.

22  Q    And how does one get from the information you see here

23  for the -- for the GRS, in other words the general retirement

24  system, to the amount of the unsecured claim the GRS would

25  have?

1  A    Focusing on the column on the left which is as of June

2  30th of 2012, the eight hundred, approximately $830,000,000 --

3  Q    Go back, the same box we need to keep that up.  There we

4  go.

5        THE COURT:  Okay.

6  A    The approximately $830,000,000 in the column on the left

7  is the UAAL, unfunded actuarial accrued liabilities.

8  Q    And may I stop you there and ask you to explain to us

9  what a UAAL is?

10  A    A UAAL is based on an actuarial calculation for

11  liabilities and assets.  So the first item in terms of the

12  unsecured claim amount was to look at the market value of the

13  assets rather than the actuarial value of the assets.

14       The actuarial value of the assets at that date was

15  approximately 2.8 million dollars.  The actual market value so

16  the -- the value of the assets at that point in time was

17  actually approximately $650,000,000 lower than what was showed

18  for actuarial purposes.

19       In addition to that, the top line, the actuarial accrued

20  liabilities is based on a discount rate and the discount rate

21  that is used here is 7.9% and in the claim, unsecured claim

22  calculation, a discount rate of 7% was used.

23  Q    And so how using those numbers do you come up with the

24  amount of the claim, the unsecured claim of this pension plan

25  against the city?

1  A    Yes, sir.

2  Q    So tell me how you then take those numbers and turn it

3  into a figure.

4  A    The accrued asset number, 2.8 million.

5           MR. RUEGGER:  Your Honor, I apologize for the

6  tardiness on this, but I believe Mr. Stewart was misinformed.

7  Sixty-nine was objected to on hearsay and expert opinion and

8  foundation grounds.

9           MR. STEWART:  I stand corrected.  I had been told it

10  had not been objected to.

11           MR. RUEGGER:  We would press those objections, Your

12  Honor.

13           MR. STEWART:  That's confirmed, it was indeed

14  objected to.  Your Honor, I believe the witness has laid a

15  foundation for it as a document he has seen, has worked with.

16  Let me ask two more questions, then I'm going to move it into

17  evidence so then it can be --

18           MR. RUEGGER:  Well, I object to the testimony.  Is

19  it foundation testimony?

20           THE COURT:  I'll let the witness testify or be asked

21  about foundational questions to see if it's admissible and

22  then we'll move on from there.

23  Q    So let's put up the cover page of the document again.

24  This is a document you've seen before, Mr. Moore?

25  A    Yes, sir.

1 Q    How did it come to you?

2 A    I received this as part of my role on the pension task

3 force.

4 Q    And you received it from who?

5 A    We received these -- this report from the retirement

6 system itself.

7 Q    And Gabrielle Roeder is employed by the retirement

8 system?

9 A    Yes, sir.

10 Q    And what use did you make of the document?

11 A    I reviewed this document for actuarial information

12 related to the general retirement system.

13        MR. STEWART:  I'd move it into evidence, Your Honor,

14 on the grounds it is, if nothing else, an admission of a party

15 opponent since the GRS is an objector here and this is an

16 agent of an objector.

17        MR. RUEGGER:  It's hearsay and it's expert opinion

18 and it's coming in through a lay witness, Your Honor.  We

19 press the objection.

20        THE COURT:  The objection is overruled.  The

21 document 69 is admitted in evidence.

22    (City's Exhibit 69 was admitted)

23 Q    Now let's please go back to Page 3.  So Mr. Moore, let's

24 go back to our calculation.  We have at the bottom unfunded

25 actuarial accrued liabilities and then two numbers above it

1    From the numbers you have described -- described to us --

2          THE COURT:  I want to be -- I want to be sure what

3    we're doing here again.

4          MR. STEWART:  Yes.

5          THE COURT:  This evidence is solely in relation to

6    the representation that Mr. Orr made to the Court regarding

7    the unfunded pension liability.

8          MR. STEWART:  Yes.

9          THE COURT:  Well, in that regard again, I'm much

10   more interested in what the witness told Mr. Orr than how he

11   did his calculations or really anything else.  Because

12   otherwise it sounds too much like him testifying as an expert.

13         MR. STEWART:  Let's take the document down.  I think

14   Your Honor already asked that question of the witness, but --

15         THE COURT:  Well, let's just be sure.

16         MR. STEWART:  Yes.

17         THE COURT:  Did you tell Mr. Orr anything about how

18   you made the adjustments that you made?

19   A    Yes, sir.

20         THE COURT:  What did you tell him?

21   A    I told Mr. Orr that two variables were adjusted based on

22   the Gabrielle Roeder actuarial evaluation.  And that included

23   the -- using the market value of the assets as well as using a

24   different discount rate.

25         THE COURT:  Uh-huh.  And did you disclose anything

1 | more specific about those two adjustments than just that much?

2 | A    No, sir.

3 |         THE COURT:  All right.  That's it.

4 |         MR. STEWART:  Let me then wrap up very quickly with

5 | this witness, Your Honor.

6 | Q    Did you attend other meetings with -- held on behalf of

7 | the emergency manager with creditors of the city?

8 | A    During what time period?

9 | Q    After June 14th?

10 | A    Yes, sir.

11 | Q    Okay.  And let me direct your attention in particular to

12 | a meeting held on June 20th.  Do you remember two meetings held

13 | that day?

14 | A    Yes, sir.

15 | Q    One in the morning and one in the afternoon?

16 | A    Yes.

17 | Q    Let me ask you about the afternoon meeting.  Was that a

18 | meeting with representatives of the non-uniformed employees of

19 | the city?

20 | A    I can't recall.  I -- I think that the non-uniform was

21 | the first meeting and then uniform was the second meeting.

22 | Q    And what was the purpose of those meetings?

23 | A    The purpose of those meetings was to lay out information

24 | more information from the June 14th presentation regarding the

25 | financial situation that the city was in.  And then specific

1  information related to health care and pension obligations.

2  Q    Do you remember any questions being asked at either of

3  those two meetings?

4  A    Yes.

5  Q    And what do you remember?

6  A    I recall one question from an attorney representing the

7  UAW questioning how we -- we being the City of Detroit would

8  be able to accomplish some of what was in the proposal outside

9  of bankruptcy.

10 Q    And do you remember what answer was given to that person?

11 A    I believe that the answer that was given by counsel to

12 the city was we want to move forward with these discussions

13 and determine whether or not something could actually occur

14 with all the parties outside of Court.

15 Q    Thank you.  Could we put Exhibit 70 on the screen,

16 please?  Mr. Moore, Exhibit 70 has been -- for identification

17 has been placed on the screen before you.  Have you seen this

18 document before?

19 A    Yes, sir.

20 Q    What is it?

21 A    This is the actuarial evaluation report as of June 30th of

22 2012 for the police and fire retirement system.

23      (City's Exhibit 70 was identified)

24 Q    And who was it prepared by?

25 A    By Gabrielle Roeder

1  Q    How did it come to you?

2  A    Through my role on the task force, pension task force.

3  Q    And what use did you make of the document?

4  A    I used this document to obtain actuarial and other

5  information on the pension system.

6         MR. STEWART:  Your Honor, I would move Exhibit 70

7  into evidence on the same grounds as recited in moving Exhibit

8  69 into evidence.

9         MR. RUEGGER:  Your Honor, I object based on the

10  statements Your Honor just explained on the limited use of

11  this -- these documents and this testimony.  I don't see how

12  this document moves it along.

13     It's -- it's hearsay and expert opinion just as 69 is.

14  But as Your Honor said, if -- if the issue is really what Mr.

15  Moore said to Mr. Orr, I'm not sure how this document adds to

16  the -- the evidence.  So we object on that ground.

17         THE COURT:  All right.  The objection is overruled.

18  Exhibit 70 is admitted into evidence for all purposes.

19     (City's Exhibit 70 was admitted)

20         MR. STEWART:  Thank you.  No further questions, Your

21  Honor.

22         MR. CIANTRA:  The first thing I want to do is make

23  sure that this microphone is positioned correctly.

24         THE COURT:  It sounds good, yes.

25         MR. CIANTRA:  Before I even say my name for the

1  record, I want to make sure.

2          THE COURT:  I appreciate that very much, sir.

3                      CROSS EXAMINATION

4  BY MR. CIANTRA:

5  Q    Good afternoon, Mr. Moore.  I'm Thomas Ciantra as you

6  know.  I'm the lawyer for the UAW.

7  A    Yes, sir.

8  Q    Now you had mentioned in your direct examination that you

9  formed part of a pension task force, is that correct?

10  A    Yes, sir.

11  Q    And that task force was created when?

12  A    In February or March of this year.

13  Q    So around the time the emergency manager was -- was

14  appointed, would that be correct?

15  A    Prior to the emergency manager being appointed.

16  Q    All right.  Let's focus on from the time the emergency

17  manager was appointed.  You remained on the task force

18  obviously?

19  A    Yes, sir.

20  Q    There were also individuals from the Milliman actuarial

21  consulting firm who were on the task force?

22  A    Yes, sir.

23  Q    And there were lawyers from the Jones, Day law firm that

24  were on the task force?

25  A    Yes.

1   Q     All right.  And that task force met on a regular basis?

2   A     Met or had calls, yes.

3   Q     Okay.  And on -- on some of those occasions was Mr. Orr

4   included in -- in those task force meetings?

5   A     Not that I recall.

6   Q     Now you testified that there was a meeting with Mr. Orr

7   where you reviewed with him the approximately 3 -- 3.5 billion

8   dollar number with respect to the pension plan under funding,

9   is that correct?

10  A     Yes, sir.

11  Q     There was -- there was one meeting, or was that multiple

12  meetings?

13  A     There were multiple meetings where we discussed this

14  number in combination with other numbers.

15  Q     Okay.  And at the meeting where you discussed how the --

16  how the number -- how the known -- let me step back.  The

17  number was actually -- you didn't actually do those

18  calculations, the Milliman Actuarial Firm did those

19  calculations, correct?

20  A     Correct.

21  Q     So you were relaying to Mr. Orr what the results of the

22  work of the Milliman firm had been?

23  A     Yes.

24  Q     And you did that at a -- an in person meeting?

25  A     There were both in person meetings and calls with Mr.

1  Orr.

2  Q    Okay.  Let's focus on the in person meetings.  Were the

3  other members of the task force present at that in person

4  meeting?

5  A    Well, there were multiple in person meetings.  I can't

6  recall if anyone else from the task force was in the in person

7  meetings or not.

8  Q    Okay.  Were -- were lawyers from Jones, Day in those

9  meetings with Mr. Orr?

10 A    Yes.

11         MR. CIANTRA:  I'm going to move, Your Honor, that --

12 that his testimony with respect to those meetings be struck

13 because it -- it is in effect a selective waiver of

14 attorney/client privilege that they are engaging in here.  We

15 have had multiple deposition questions cut off on the grounds

16 of attorney/client privilege with respect to the workings of

17 this task force in other areas and they are obviously now

18 making selective use of this to get in those figures.

19    He has just testified that counsel for Jones, Day was

20 present in the meeting.  He testified about it in direct.  We

21 would request that it be struck.

22         THE COURT:  Can you give me an example of such an

23 assertion?

24         MR. CIANTRA:  From prior testimony?

25         THE COURT:  You said that attorney/client privilege

1  had been asserted in relation to that meeting.  I'm asking you

2  for an example.

3          MR. CIANTRA:  Well, in relation to the workings of

4  the pension task force, that had --

5          THE COURT:   That's circled.

6          MR. CIANTRA:  I -- I questioned Mr. Moore in his

7  deposition with respect to deliberations of that pension task

8  force concerning the provisions of the Michigan Constitution

9  that protect pension obligations and the inquiry was stopped

10  on the grounds of attorney/client privilege.

11          THE COURT:  Have you got it?  Can you show me?

12          MR. CIANTRA:  If this had an index it would be

13  easier.  If you could give me a moment, Your Honor.

14          THE COURT:  Sure.  Well, let me ask you to pause

15  from that and ask you a slightly different question, or a very

16  question, sir.

17      Why wouldn't the remedy here be based on the testimony

18  that was given that privilege is waived as of now?  And that

19  -- and that -- and that therefore you can ask any questions

20  without fear of privilege being asserted, or at least a

21  privilege claim sustained.

22          MR. CIANTRA:  Well, Your Honor, the -- the problem

23  with that is that there's been weeks of discovery and

24  deposition testimony that's been taken where we have had

25  questions cut off on the grounds of privilege.  So I don't --

1  I can't do a redo of that at this point.

2          THE COURT:  He's right here.  Redo all you like.

3          MR. CIANTRA:  Well, though not -- with respect to

4  this question I can, but not with respect to questions or

5  documents that weren't produced during the course of this

6  litigation, I can't.

7          THE COURT:  Can you identify a document that wasn't

8  produced that related to this pension task force?

9          MR. CIANTRA:  There are multiple documents that --

10         THE COURT:  Can you identify one?

11         MR. CIANTRA:  Well, I can find the -- the log of

12 their production.  There are multiple documents that were

13 withheld.  I don't have it right with me.

14         THE COURT:  It doesn't sound to me like you're quite

15 ready to deal with the questions relating to your request

16 here, so let's move on and I will consider your request to

17 strike the testimony when you are ready to argue it.

18         MR. CIANTRA:  Thank you, Your Honor.

19 Q    I want to ask you some questions, Mr. Moore, with respect

20 to the city proposal for its creditors, the June 14th proposal.

21 Now with -- with respect to that proposal, I understand an

22 important component of it is reinvestment in the

23 infrastructure and operations of the City of Detroit.

24 A    Yes, sir.

25 Q    And we're projecting approximately a $1,000,000,000 price

1  tag for that -- for that program over the next ten years?

2  A   One billion on the reinvestment, if you will, the capital

3  expenditures, yes.

4  Q   And then there's an additional quarter of a billion

5  dollars with respect to other restructuring initiatives?

6  A   There are -- there is -- yes, that's correct, about a

7  quarter of a billion dollars for expenses.  There are also

8  about a quarter of a billion in revenue initiatives.

9  Q   Okay.  And you also indicated that the emergency manager

10 is of the view that there is no possibility for material

11 increases in the -- the tax revenues that are coming into the

12 city, is that correct?

13 A   I testified that we looked into that and that was our

14 conclusion, yes.

15 Q   You -- you can't raise taxes to -- to pay for that?

16 A   Yes.

17 Q   And it's also correct, isn't it, that -- well, over the

18 past ten years there's been a substantial reduction in the

19 amount of revenue sharing that's come to the City of Detroit

20 from the State of Michigan?

21 A   That's correct.  The revenue sharing has decreased, yes.

22 Q   And that is discussed in the proposal for creditors,

23 correct?

24 A   Yes.

25 Q   And let's just for the record do you have it?  It's

1  Exhibit 43, City Exhibit 43.  Do you have it there?

2  A    Nothing is up yet.

3           THE COURT:  Is it on the table there?

4  A    Yes, sir, I have it.

5  Q    If we turn to Page 4 of the document, the bullet point at

6  the top of that page is state revenue sharing.  Do you see

7  that?

8  A    Yes.

9  Q    And so that quantifies that you've seen approximately a

10 48% reduction in -- the city has seen approximately 48%

11 reduction in the amount of revenue sharing it's received from

12 the State of Michigan since fiscal year 2002?

13 A    Yes.

14 Q    And you're off -- they're approximately 30.6% since 2008?

15 A    There's been a reduction of 30.6% since 2008, yes, that's

16 correct.

17 Q    And would you agree those amounts are material?

18 A    They certainly have been -- had a significant impact on

19 the city's revenue, yes.

20 Q    And part of the projection that is included in the

21 proposal for creditors to the exhibit, Exhibit 43, are

22 projections with respect to the amount of the revenue sharing

23 going forward, is that -- is that correct?

24 A    Yes.

25 Q    And that is -- if you would turn to Page 90 of that

1  document.

2  A    Yes, sir.

3  Q    Towards the top of the page you list the preliminary

4  forecast revenues.  And the revenue sharing is the -- I guess

5  the second item there, correct?

6  A    Yes.

7  Q    So would I be correct that -- that year over year you're

8  projecting an increase in that of it looks like a little over

9  1%?

10  A    That's about right, yes.

11  Q    Is that a number that you calculated as a part of your

12  contribution to this report?

13  A    No, sir, I did not calculate that.

14  Q    But that's -- that was the assumption that the -- the

15  increase in the revenue sharing would be approximately 1% year

16  over year?

17  A    I can't speak to the assumption, but the number looks

18  like about 1% per year.

19  Q    Yeah, it's the arithemetic.

20  A    Yes.

21  Q    And the revenues of the city are -- other revenues of the

22  city are also projected there, correct?

23  A    Yes, sir.

24  Q    And you have there on the first line the municipal income

25  tax?

1  A    Yes.

2  Q    Right.  And the income tax in the City of Detroit now is

3  the highest in the State of Michigan?

4  A    Yes, for individuals the income tax rate for residents is

5  the highest in the State of Michigan.

6  Q    Okay.  So you're seeing -- I'm looking there at increases

7  in the order of a couple of percent per year?

8  A    Yes, sir.

9  Q    So that's -- those two items are staying -- well, one

10  would agree that probably not exceeding the rate of inflation,

11  correct?

12  A    I'm not sure because I did not put together an assumption

13  regarding inflation.

14  Q    Okay.  But 1 or 2% increases year over year?

15  A    That's what appears to be the math, yes.

16  Q    So sort of putting it together, it would be correct,

17  isn't it, that the -- the source of the funding for the -- the

18  reinvestment and restructuring that the city would like to

19  undertake here, is -- is basically going to come from a

20  reduction in the legacy costs, the bond debt and the -- the

21  accrued pension and other post retirement benefits?

22  A    I don't think that's the case.

23  Q    Where is the money coming from if the revenues are

24  staying the same and you're coming up with an extra billion

25  dollars, where is the revenue -- where is the money coming

1  from other than from cutting in those areas?

2  A    The -- the projections show approximately $250,000,000 in

3  additional revenue that I indicated as well as $350,000,000 in

4  also other categories of additional revenue which total about

5  $600,000,000 in new revenue during this ten year period.

6  Q    Okay.  So you got 600,000,000 new, and you've got the

7  rest of that 1.25.  And that's coming from reductions in the

8  legacy costs?

9  A    Could you define legacy costs?

10 Q    Sure.  The -- the -- the pensions that are owed to the

11 people I represent, their post retirement benefits, and the

12 bond holders, the debt on the existing bonds.

13 A    Yes.  Those three categories that is what the proposal

14 indicates is an adjustment to those categories.

15 Q    Now let me go back to Exhibit 43 just for a moment and

16 ask you to turn to Page 109 of that document.  And there's a

17 bullet point on that page, a little more than halfway down

18 claims for unfunded pension liabilities.

19 A    Yes, sir.

20 Q    And in the first bullet point it indicates that because

21 of the preliminary analysis with respect to the under funding,

22 that the city will not be making future contributions to the

23 retirement plans for its employees, is that correct?

24 A    Yes, sir.

25 Q    And that on account of that, in the third bullet point it

1  says there must be significant cuts in accrued vested pension

2  amounts for both active and currently retired persons.  Do you

3  see that?

4  A    Yes.

5  Q    And you were at the -- the June 14th meeting where this

6  was presented to -- well, among others, labor unions and other

7  organizations representing retirees, correct?

8  A    Yes.

9  Q    And I am correct that there was no number that was put on

10 the level of cuts that were -- that the -- the city believed

11 were necessary under this plan, correct?

12 A    Correct.

13 Q    And in fact as you sit here today, there has been no

14 number that has been put on that, correct?

15 A    Correct.

16         MR. CIANTRA:  I have no further questions.  Thank

17 you.

18         THE COURT:  Thank you, sir.

19         MR. CIANTRA:  Your Honor, if I could just address

20 that privilege issue.  And this is at Mr. Moore's deposition

21 that was taken on the 18th of September.  And I can read from

22 the transcript if Your Honor would --

23         THE COURT:  Go ahead.

24         MR. STEWART:  What page, please?

25         MR. CIANTRA:  Oh, certainly.  This begins -- I'm

1   looking at the minuscript of the transcript, Page 154,

2   beginning the bottom of -- of the page.

3          THE COURT:  Is there a line number?

4          MR. CIANTRA:  Yeah, I'm looking just let me see

5   where to start here.

6          THE COURT:  Ah, here we have it on the screen.

7          MR. CIANTRA:  We're beginning on Page 153.  We'll

8   see at page -- Line 14.  Actually I'm asking the questions.

9       You indicated earlier that you were part of a pension

10  task force that has been considering pension issues since I

11  guess the spring of this year.  My question is, during those

12  -- during the discussion, the meetings of that task force have

13  you -- has that provision of the Michigan State Constitution,

14  and that obviously is Article 9, Section 24, been a subject of

15  discussion?  The witness answers, yes.

16      And he goes on and then continuing on to Page 155 at the

17  top, Line 1.  And was there more than one such discussion or

18  did that come up on just one occasion?  It probably came up

19  more than -- I seem to recall more than one occasion where a

20  discussion about whether the city would have to file for

21  Chapter 9 took place and the pension element was discussed.

22      And what was the -- was the consensus that was developed

23  with respect to that issue?  And Mr. Miller, counsel for the

24  city responds.  I'm going to object and ask the witness before

25  he answers that question, whether in connection with any

1 discussion that might have led to a consensus, that discussion

2 included lawyers and counsel.

3     Mr. Ciantra, I'm not asking him -- and counsel that was

4 provided by those lawyers.  I'm not asking about discussion

5 with counsel, I'm asking whether this task force that was

6 looking at the pension issues reached a consensus.  And it

7 continues.

8     But the task force included counsel, he's testified to

9 that.  And then he goes -- then I interject, I'm interested in

10 whether there was a discussion not necessarily what your

11 counsel might have advised.  But to the extent that the

12 consensus was reached and that consensus was based on legal

13 advice, that consensus would be in my judgment privileged.

14     So that's why I asked him.  And he goes on and then at

15 the end, and so I would instruct you, Mr. Moore, not to

16 expound.

17     So our inquiry with respect to the consensus that was

18 developed by this pension task force was cut off by

19 attorney/client privilege assertions.  If the witness has

20 testified with respect to conversations in the -- in the

21 presence of lawyers for the city with respect to where these

22 -- these actuarial numbers came from, it -- it seems to be

23 just a -- a selective use of the privilege, depending on

24 circumstance, and it's put -- it's put us in a difficult

25 position, Your Honor, because I -- you know, as I said before,

1  I can't turn back the time -- the hands of time and, you know,

2  re-take Mr. Moore's deposition.  Go back and look at the, you

3  know, re -- review the tens of thousands of documents that

4  have been produced to deal with it.

5          THE COURT:  All right.  Thank you.

6          MR. CIANTRA:  It just seems unfair.

7          THE COURT:  Mr. Stewart.

8          MR. STEWART:  Perhaps, Your Honor, I'm -- I'm just

9  confused.  But -- and let's put that transcript back up on the

10  screen.

11     Mr. Ciantra paraphrased parts of it, but the fact of the

12  matter is, there was no instruction and his question got

13  answered.  And if we could blow up the bottom quadrant of our

14  document there.

15     And there's this colloquy between Mr. Miller and Mr.

16  Ciantra.  And Mr. Miller makes an objection.  Are you asking

17  -- and Mr. Ciantra, I am not asking him that.  And if so, I

18  would ask you not to expound.

19     So let me ask the question again.  Let's make the record

20  straight.  Question, did the task force you were a part of

21  reach a consensus on the question of what effect the provision

22  of the Michigan State Constitution that protects accrued

23  pension benefits would have on a Chapter 9 filing?  He

24  answered it, no.

25     Question, there was no consensus?  No.

1      And if we went to the following page with a follow up

2   question, there is none of those instructions either.

3             THE COURT:  Let's do that.  Can we go to the next

4   page, please?

5             MR. STEWART:  And you'll have to blow those up so we

6   can all see them, please.

7             THE COURT:  Yeah.

8             MR. STEWART:  So are we on the same page?

9             THE COURT:  Is this -- is this the next page that we

10  have now?

11            MR. STEWART:  Okay.  So I can keep reading, Judge,

12  but as I go down this, I don't see an instruction not to

13  answer the question.  I don't see what was withheld.

14      And then I could go further.  I have other reasons too,

15  but this to me seems to be the most important one.  And

16  perhaps I just misunderstood it, and we're on the wrong page.

17  And why don't I sit down and Mr. Ciantra can -- can stand up

18  and guide us to where maybe I should have looked.

19            THE COURT:  Mr. Ciantra, this is -- this is an

20  important motion that you have made to strike.

21            MR. CIANTRA:  Yes.

22            THE COURT:  So I don't want to press you for a

23  response to my question.  So let's take our time and -- and

24  you can research this properly and -- and -- and present your

25  best case to the Court as to maybe even more than one example

1  of situations in which you assert that the privilege claim was

2  selectively advanced.  So there's no need to rush through

3  this.

4          MR. CIANTRA:  Thank you, Your Honor.  I appreciate

5  it.

6          THE COURT:  All right.

7          MR. CIANTRA:  I will -- I will review the transcript

8  and I will respond.

9          THE COURT:  Okay.  All right.  Does anyone else have

10  any questions for Mr. Moore?  Yes, sir.

11          MR. SHERWOOD:  Your Honor, just -- on the last

12  point.  Before -- before I -- this privilege was also asserted

13  at the deposition of Mr. Bowen from Milliman.

14          THE COURT:  Okay.  Well, let's -- let's add that one

15  to the -- the group that you'll put together together and

16  we'll -- we'll deal with it in -- in due course.

17                      CROSS EXAMINATION

18  BY MR. SHERWOOD:

19  Q    Good afternoon, Mr. Moore.  Jack Sherwood on behalf of

20  AFSCME.

21  A    Good afternoon, Mr. Sherwood.

22  Q    Let me ask you about some of your conversations with Mr.

23  Orr about the under funding of the position of -- of the

24  pensions.  Do you recall that testimony?

25  A    Yes, sir.

1  Q    Okay.  And during those conversations between you and Mr.

2  Orr, did you advise him that the analysis of the unfunded

3  position had not yet been completed?

4  A    Could you be more clear on which conversations?

5  Q    In any of -- any conversations that you had with Mr. Orr

6  before the bankruptcy was filed, did you advise him that the

7  city's analysis with respect to the unfunded position on the

8  pension had not been completed?

9  A    I spoke with Mr. Orr regularly as to the status of all

10 analyses and what the sources of where numbers were coming

11 from.

12 Q    Okay.  But I'm just asking specifically if you remember

13 telling Mr. Orr that the city's analysis of -- and its

14 actuaries' analysis of the unfunded position had not been

15 completed.  Do you recall that?

16 A    I recall specifically telling him the source that we were

17 using for numbers as well as additional activities that the

18 pension task force would undertake or other analyses.

19 Q    So that means that additional analysis was in process, is

20 that fair to say?

21 A    Yes.  And to this day additional analysis is in process.

22 Q    Do you recall telling Mr. Orr that the city was trying to

23 undertake a process to develop a more concrete valuation model

24 to analyze the amount of the unfunded position?

25 A    I did tell Mr. Orr that the analyses that we were giving

1  him were based on Gabrielle Roeder's valuation and that

2  Milliman would be developing its own valuation model as well.

3  Q    And did you also tell Mr. Orr that -- that because the

4  analysis of the unfunded position was still in process, that

5  it was hard to negotiate with respect to that number because

6  there wasn't a common assumption with respect to what the

7  number should be?

8  A    No, I never told Mr. Orr that it was hard to negotiate.

9  Q    Did you tell him that it was difficult to negotiate with

10 respect to a pension under funding amount when that amount was

11 still in process of being developed?

12 A    No, I never told him that.

13 Q    Was that your belief in September of this year?

14 A    My belief in September of this year certainly was not

15 that it was difficult to have a discussion or a negotiation

16 over these numbers.

17 Q    Did you say it was premature -- would you say it was

18 premature to negotiate over the pension under funding if the

19 -- if the number was not known?

20 A    No.

21 Q    So it's your view that you -- you can negotiate --

22 negotiate with respect to a pension under funding amount even

23 though you don't know exactly what that amount is?

24 A    Any pension under funding amount is an estimate.  And we

25 have an estimate.  There are other estimates out there and

1  certainly you can engage in discussions around those

2  estimates.

3  Q    You testified earlier that the City of Detroit's

4  individual taxes are -- are the highest in Michigan, right?

5  A    Yes, sir.

6  Q    What about taxes on -- on people or entities other than

7  individuals?

8  A    There is a corporate tax rate as well, corporate income

9  tax rate.

10 Q    Are they the highest in the -- in the State of Michigan?

11 A    I believe that's the case, yes.

12 Q    Have -- have you investigated the operations of the tax

13 people in Michigan -- or the tax department?

14 A    Could you define tax people?

15 Q    The tax department.

16 A    The tax department of the State of Michigan?

17 Q    No, of the City of Detroit.

18 A    Which tax are you referring to?

19 Q    Any.

20 A    Yes, sir.

21 Q    And have you analyzed -- have you -- have you looked into

22 rebates, tax rebates for corporations in the State of

23 Michigan?  I'm sorry, in the City of Detroit?

24 A    Corporate taxes are only approximately $6,000,000 per

25 year, so we have not spent a whole lot of time on corporate

1  income taxes.

2  Q    And what about tax rebates?  Have you spent a lot of time

3  on that?

4  A    No, sir.

5  Q    At the -- at the meeting on June 14th, you were present,

6  correct?

7  A    Yes, sir.

8  Q    And then you testified about a meeting on June 20th also,

9  correct?

10  A    Yes.

11  Q    Were you present at -- were you present at that meeting?

12  A    There were two meetings on the 20th and yes, I was present

13  for both.

14  Q    Was Mr. Orr at either of those meetings?

15  A    No.

16  Q    And at either of those meetings did you have authority to

17  negotiate with the parties at that meeting -- at those

18  meetings?  Did you have authority to negotiate with the

19  parties at those meetings on behalf of the city?

20  A    Could you define what you mean by authority?

21  Q    Just the general understanding of authority that you --

22  you would have.  You don't understand what authority means?

23  A    Mr. Sherwood, I certainly was authorized to go to those

24  meetings, to present information, and to receive information

25  back.  So yes, I was authorized.

1  Q    You were authorized to go to the meeting, to present

2  information, and to receive information back, correct?

3  A    Yes, sir.

4  Q    And -- and is it your testimony that that constitutes

5  grounds to negotiate?

6  A    If you're talking --

7  Q    A party to negotiate, I'm sorry.

8  A    Yes, sir.  My understanding not in the context of the

9  collective bargaining agreements, but in the context of

10  negotiations where there's give and take, yes.

11  Q    Were you consulted by Mr. Orr in connection with the

12  decision of the city to file Chapter 9?

13  A    No, I was not.

14          MR. SHERWOOD:  I have nothing further.  Thank you.

15          THE COURT:  Any other questions?  Sir.

16          MR. KING:  Good afternoon, Your Honor.  Ron King

17  with Clark, Hill.  I'm a colleague of Ms. Green and Mr.

18  Gordon's.  Pleasure to be in front of you today.

19                    CROSS EXAMINATION

20  BY MR. KING:

21  Q    Mr. Moore, I just have a handful of questions and I'll

22  try -- I'm going to jump around a little bit just because I

23  don't want to be cumulative.

24  A    Okay, Mr. King.

25  Q    As we sit here today, is it true that the city and its

1  actuaries have not completed their analysis on the unfunded

2  pension liabilities?

3  A    The city has completed its analysis from the standpoint

4  of coming up with the 3.5 billion.  The city desires to

5  undertake additional analysis.

6  Q    So it's not completed the -- the analysis yet?

7  A    The city would like to continue to refine that avenue.

8  Q    So there's additional work that needs to be done before

9  they'll complete their analysis?

10 A    Not that needs to be done, but that we would like to do.

11 Q    And so I understand your earlier testimony, to date the

12 city hasn't proposed any specific restructuring of the pension

13 plans or a cut in pension benefits to any retiree, is that

14 correct?

15 A    The city has proposed a process, a couple of times with

16 which to undertake, but there have not been specifics as to

17 any cuts if you will in a pension.

18 Q    Now let me refer you back to Exhibit 43 if we could have

19 that put back on the screen, please.  And specifically Page

20 101, please.  And this is -- yeah, can we go -- next page,

21 please.  Now I'm -- I'm looking for the page relating to the

22 pension plan.  109, I'm sorry.  Thank you.

23      And referring you to a provision that you testified on

24 previously related to the claims for the unfunded pension

25 liabilities.  Do you see that section?

1    A    Yes, sir.

2    Q    Outside of this presentation, have there been any other

3    presentations or proposals presented to any of the objectors

4    with respect to the treatment of the unfunded pension

5    liabilities?

6    A    Yes, sir.

7    Q    And which ones are those?

8    A    The two meetings on June 20th.  There were documents that

9    were handed out that had specifics as it relates to pension in

10   those documents.

11   Q    What specifically?

12   A    There were some specific thoughts as to ideas for

13   modifying benefits of the pensions.

14   Q    But again no specific numbers in terms of no specific

15   numbers that reflect a cut to a pension benefit?

16   A    There were a lot of numbers in the June 20th document

17   regarding the pensions, yes.

18   Q    But my question is pretty simple.  There wasn't any

19   specific proposal that would say that the pension benefit of a

20   particular retiree is going to be cut by X percent?

21   A    Correct.

22   Q    And was there ever an effort undertaken by you or the

23   city to develop a plan or a proposal that didn't contemplate

24   an impairment or of accrued pension benefits?

25   A    Yes.

1  Q    And was that plan presented to any of the objectors?

2  A    Similar to what I indicated before.  I don't believe that

3  there is anything specifically that has been presented in

4  terms of pension benefits.

5  Q    So you're saying -- and I should be clear.  Pre-petition,

6  so prior to July 18th, was there ever a plan presented to any

7  of the objectors that contemplated not impairing or

8  diminishing pension benefits?

9  A    Yes, sir.  The June 14th presentation, the financial

10  projections, the base line show what we anticipate the

11  contributions would be without any cuts to pension plans.

12  Q    But that same June 14 proposal specifically states that

13  there will be significant cuts in accrued vested pension

14  amounts, correct?

15  A    It indicates that, yes.

16          MR. KING:  I don't have any further questions.

17          THE COURT:  Thank you, sir.  Other questions for the

18  witness?

19          MR. RUEGGER:  I do, Your Honor.

20                          CROSS EXAMINATION

21  BY MR. RUEGGER:

22  Q    Good afternoon, Mr. Moore.

23  A    Good afternoon.

24  Q    We met -- we met a month ago.

25  A    Yes, sir.

1  Q    I just have a couple of questions.  The first relates to

2  the June 20 meeting.  You testified about that on direct, do

3  you remember?

4  A    Yes, sir.

5  Q    At that meeting did you have authority to accept any

6  counter proposals from any of the participants?

7  A    Except from the standpoint I'd receive and then bring it

8  back to city officials?  Yes.

9  Q    Okay.  So you could have -- you could have informed Mr.

10 Orr and the other city officials, but you couldn't have agreed

11 to anything at that meeting that had been countered, is that

12 correct?

13 A    I think it would be highly unlikely that anything like

14 that would happen at that meeting.

15 Q    Okay.  Just answer my question though.  You couldn't have

16 agreed to anything that might have been proposed by any of the

17 participants, correct?

18 A    No, sir.

19 Q    Only a couple of questions.  Switching subjects.  On your

20 conversations with Mr. Orr relating to the alleged under

21 funding figure, did any of those occur prior to the June 14th

22 proposal that was just mentioned?

23 A    Yes, sir.

24 Q    Approximately how many?

25 A    This is a guess, but perhaps five to seven meetings or

1  conversations.

2  Q    On that -- on that issue before that meeting?

3  A    Yes, sir.

4  Q    Okay.  And approximately how many conversations with Mr.

5  Orr on that figure occurred between the June 14th proposal and

6  the July 18th petition filing?

7  A    I would guess maybe two.

8  Q    Did your information relating to that figure change at

9  all between the June 14th proposal and the July 18th filing?

10  A    No, sir.

11        MR. RUEGGER:  Thank you.  No further questions.

12  Thank you, Your Honor.

13        THE COURT:  Thank you.  Any redirect?

14        MR. STEWART:  No, Your Honor.

15        THE COURT:  You may step down.  Thank you very much

16  for coming today.

17  A    Thank you, Your Honor.

18        THE COURT:  I will have to really maintain your

19  status as a witness here until we resolve the earlier issue

20  that was raised about the privilege.  So your sequestration

21  still applies.  Okay, sir?

22  A    Understood.  Thank you, Your Honor.

23        THE COURT:  All right.

24        (WITNESS CHARLES MOORE WAS EXCUSED AT 2:48 P.M.)

25        MR. CULLEN:  Good afternoon, Your Honor.  My name is

1  Thomas Cullen of Jones, Day and I'm going to be presenting the

2  next witness, Ken Buckfire.

3          THE COURT:  All right.  What is your last name, sir?

4          MR. CULLEN:  Cullen, C-u-l-l-e-n.  We're going into

5  the hall to get him.  Sorry, Your Honor.  He's in the men's

6  room.

7          THE COURT:  While we're waiting, Ms. Patek, may I

8  have your attention, please?  Do you have one or two extra

9  copies of your exhibits or your exhibit book that we can have

10 for my law clerk or law clerks.

11     We'll start with your offer of one.  If we can have yet

12 one more at a -- at a later time, that would be great.  Okay?

13 Can you get through there?  Thank you so much.

14     Raise your right hand, please.

15     (WITNESS KENNETH BUCKFIRE WAS SWORN)

16          THE COURT:  Please sit down.

17                    DIRECT EXAMINATION

18 BY MR. CULLEN:

19 Q   Good afternoon, Mr. Buckfire.  Could you state your full

20 name and address for the record, please?

21 A   Kenneth Buckfire.  I reside at 1175 Park Avenue, New

22 York, New York.

23 Q   And where are you from originally?

24 A   Detroit, Michigan.

25 Q   Born and raised?

1  A    Born and raised in Detroit and its suburbs.  Then went to

2  the University of Michigan where I graduated in 1980.  And

3  then I went to New York.

4  Q    Can you tell me something -- you're employed now?

5  A    I am.

6  Q    And where are you employed?

7  A    I am the co-founder and co-President of Miller, Buckfire

8  and Company.  An investment banking firm based in New York

9  City.

10  Q    And prior to that, what was your employment experience?

11  A    Prior to that I began my career as a restructuring banker

12  in 1987 with Dillon, Reed and Company.  After several years

13  with that firm, I joined Lehman Brothers where I was a senior

14  restructuring banker.  In 1996, I joined Wasserstein, Perella

15  to help them found their financial restructuring practice

16  which my partner Henry Miller and I then bought in 2002 to

17  form Miller, Buckfire.

18  Q    And what does it mean -- what -- explain exactly what

19  Miller, Buckfire does.

20  A    Miller, Buckfire is an investment bank specializing in

21  restructuring advisory services to governments and companies.

22  Our mission is to work with those entities when they have

23  financial difficulties either paying their debts when due, or

24  need specific skills in negotiating with their creditors and

25  other stakeholders.

1  Q    Unpack that for me a little bit if you would, Mr.

2  Buckfire.  Restructuring advisory services.  What does -- what

3  does that mean?

4  A    Our typical engagement is with a company or government

5  which is experiencing financial difficulty and does not quite

6  know what to do about it.  So our first mission would be to

7  help them with a diagnosis, to identify the causes of their

8  financial pressures, to identify what can be done about those

9  in terms of the diagnostic, and then to make recommendations

10 on how to solve the problem which normally means for a company

11 making sure they have adequate liquidity to operate in the

12 ordinary course and maximize the value for their stakeholders.

13     In the case of the government, making sure they have

14 adequate access to capital markets and the ability to provide

15 an adequate level of public services.

16 Q    And in these engagements, what is your personal role?

17 A    My personal role is to manage our team of bankers in

18 working with our clients to do our diagnosis.  And then once

19 instructed by the client as to what they wish us to do, help

20 them formulate strategy and the next -- whatever transactions

21 are required, to implement that strategy.  My job is general

22 financial strategy and oversight.

23 Q    And could you give the Court some idea of specific

24 engagements you've worked on which are public?

25 A    Well, over the years we've worked on many well known and

1  complex restructurings.  Some of the more notable ones would

2  include Niagara Mohawk Power Company, Calpine Corporation,

3  General Growth Properties, K-Mart Corporation, Lehr, Dana.

4      We've also been involved in several well known municipal

5  restructurings including Stockton, California.  And we are

6  currently advising a -- a large sovereign country with its

7  financial issues.

8  Q    How did you first become familiar with Detroit's

9  financial and operational issues?

10  A    Well, being from here, I have always paid close attention

11  to what's been going on in Detroit.  Certainly in 2009 in

12  financial crisis when it became well known that Detroit had

13  lost access to the capital markets due to its downgrade, I

14  started paying more attention to the problems here trying to

15  figure out if there's some way that my firm could be helpful.

16  And obviously given my personal connection to the area, it was

17  of personal interest to me to try to find a way to contribute

18  to the revitalization of the city.

19  Q    And so what did you do?

20  A    We paid close attention to it.  We tried to figure out

21  where there was a way to form some relationships locally that

22  might eventually introduce us to Mayor Bing and to other

23  people in the administration who might find our particular

24  expertise of help.  And that just began a general program of

25  building those relationships.

1  Q    How did you first become engaged by the city?

2  A    We had done a very brief financial review of the city on

3  behalf of the state in March or April of 2012.  It was a 60

4  day process of just looking at the public information and

5  trying to identify what the financial --

6  Q    If you could just slow down and speak up, just a little.

7  A    All right.  We first were engaged by the state in March

8  or April of 2012 for a 60 day review.

9       They wanted us to review the public information of the

10 city to try to ascertain what their financial challenges were

11 and to put that in a format that could be useful for decision

12 makers to understand the situation more accurately.

13      That put us in contact with members of the Mayor's

14 administration, Jack Martin and Chris Andrews in particular.

15 So I began a relationship with them.

16 Q    Did there come a time in the fall of 2012 when the city

17 issued a request for proposal for certain financial services?

18 A    Yes.

19 Q    Could you describe that for me, please?

20 A    Well, the city had entered into a consent decree with the

21 state in March of 2012 pursuant to which the state promised to

22 provide financing to the city and support their restructuring

23 efforts as long as the city was meeting certain milestones

24 that were incorporated in that agreement.

25      I wasn't paying that much attention at the time.  But

1  then in the fall Jack Martin called me and said, you know,

2  we're probably going to have to put out a request for a

3  financial advisor because we're about to enter into a new

4  agreement with the state and they're going to require us to

5  hire advisors to help implement the restructuring program that

6  we first had described in the March 2012 consent agreement.

7  So we were invited to submit our qualifications to the city at

8  that time.

9  Q    Now, did you become familiar in the course of your work

10 with the consent agreement?

11 A    Yes, I did.

12 Q    And does the term milestone agreement mean anything to

13 you?

14 A    Yes.

15 Q    Let me show you Exhibit 23.  In the book beside you,

16 there's a book Exhibit 6 through 50.  And we'll throw it up on

17 the screen as well.  And it will be on the screen in front of

18 you.  Do you see it, sir?

19 A    I do.

20 Q    Is that the consent agreement to which you referred?

21 A    Yes.

22 Q    What understanding did you derive of the concept and

23 purpose of this consent agreement?

24 A    Well, the consent agreement as I reviewed it, describes a

25 transaction really between the state and the city in which the

1  state agreed to help the city raise funding to support its

2  liquidity while it began a reform program which was very

3  clearly delineated in -- in Section 2.4 and more fully

4  described in Annex B of this agreement.

5  Q    Could I direct your attention to I believe it's section

6  -- well, let's look at 2.4 and 2.5.  Do you see that, sir?

7  A    I do.

8  Q    Is that the reform program and the quid pro quo if you

9  will for the -- by the treasury?

10  A    Yes.

11  Q    And why did the state want the reform agreement in your

12  understanding?

13  A    Well, the city as I understood it had asked for financial

14  assistance from the state.  The city was under liquidity

15  stress.  They didn't have sufficient cash.  They needed to

16  find cash somewhere and the state agreed to facilitate the

17  city's sale of -- of bonds, a portion of which would be given

18  to the city and any consideration for that assistance, my

19  understanding is, the city agreed to implement the reform

20  program.

21        THE COURT:  Excuse me one second.  It turns out you

22  are now too close to the microphone and as a result our

23  overflow rooms are getting static.  So move it just a bit

24  further away.

25        MR. CULLEN:  Is that better, Your Honor?

1          THE COURT:  Yes.

2          MR. CULLEN:  Okay.  Thank you.  You should have a

3  training program, Your Honor.

4          THE COURT:  No.

5          MR. CULLEN:  Or -- or a ruler, either way.

6          THE COURT:  Yeah.  Or a better audio system.

7  Q    In terms of the division of responsibility between the

8  state and the city reflected in this agreement, did you have

9  an understanding of that?

10 A    I did.

11 Q    Could you tell me what that understanding was?

12 A    Well, my understanding was that the responsibility for

13 designing and the implementing the reform program was really

14 entirely the city's.  The state agreed to provide the funding

15 the city required to sustain its operations while doing the

16 formulation of the plan and executing it.  And that the state

17 also asked for a reasonable amount of oversight to make sure

18 the city in fact did what they said they were going to do.

19 Q    Was the state -- would it be fair to say therefore that

20 the state aid was conditional on progress on that reform

21 program?

22 A    Yes.

23 Q    If I could direct your attention to Exhibit B of Exhibit

24 23 -- Annex B, I'm sorry.  What's this, sir?

25 A    Well, this was the reform program goals and subjects that

1  had been agreed to by the city with the state.

2  Q    Just looking up at the top there, first is something

3  prioritization and timing to be mutually agreed upon by Mayor

4  and council and approved by financial advisory board as

5  provided in the agreement.  What was your understanding of

6  what the financial advisory board was and what its role was?

7  A    Well, the financial advisory board my understanding was

8  created to make sure that the city had appropriate level of

9  oversight in terms of developing accurate financial

10  information, reporting it to the stakeholders, and then making

11  sure that the -- once the operation of the program had been

12  designed, that it would be approved by the financial advisory

13  board as consistent with the goals of the agreement.

14  Q    Did this strike you as a fairly comprehensive set of

15  reform initiatives?

16  A    Yes.

17  Q    If I could direct your attention to Exhibit 7.  Is this

18  the agreement we've referred to as the milestone agreement?

19  A    Yes.

20  Q    What was your understanding of the concept and purpose of

21  this agreement?

22  A    Well, my understanding was that by November of last year,

23  the city had not been able to achieve many -- many of the

24  milestones or requirements of the original consent agreement.

25  And this was entered into between the state and city as a

1  condition of further disbursements of funds from the escrow

2  account that had been established by the state on behalf of

3  the city in March of 2012.

4  Q    And if you look at the bottom of the first page, and

5  going on to the top of the next.  Where it says joint

6  restructuring expenses and restructuring assistance.  And

7  because I'm closer, I'll read it.

8      The city will as expeditiously as possible, select and

9  retain a restructuring firm or teams to advise the city's

10  program management office upon and implement the city's reform

11  program, including but not limited to -- the next page as

12  well.  Could you blow that up, the top of that?

13      And was -- was it your under -- let me ask it in an open

14  ended way.  What impact did this milestone agreement have on

15  your hiring?

16  A    Well, this is what led to our retention.  We had stayed

17  in touch with Chris Andrews who was the corporate managing

18  director and Jack Martin, the CFO all during this period even

19  though we had no role.  And they had called me in November

20  after this was signed and said, we decided we really need

21  expert outside help to implement our reform program and look

22  forward to getting an RFP.

23  Q    Now, was there any borrowing in connection with the

24  milestone agreement?

25  A    Well, the original consent agreement had contemplated a

1  financing, I believe it was $130,000,000 of which I believe it

2  was 50,000,000 or 60,000,000 was released to the city upon

3  that funding and the rest was retained in an escrow account

4  which was still in effect as of the date of this agreement.

5  Q    And so was there some relation between progress on the

6  agreement and draws from the escrow account?

7  A    Yes.  The state was requiring the city to execute its

8  milestones in order for further cash to be released to it

9  pursuant to this agreement.

10 Q    At -- at what point were you actually hired by the city

11 in '12?

12 A    Well, as I recall, we submitted to the RFP process in --

13 it might have been late November.  We were told we had won in

14 December and we signed our agreement with the city, I believe,

15 on January the 5th of 2013.

16 Q    When you first came into your responsibilities as the

17 restructuring firm for the city, did you undertake an

18 assessment of the city's finances and operations?

19 A    Yes, we did.  And we already were familiar with that

20 because of the review we had done seven months before for the

21 state.

22 Q    Now in terms of the -- this consent agreement and the

23 milestone agreement, did you come to an understanding of the

24 degree to which those agreements had been a success in

25 promoting or helping the city to -- to achieve the identified

1  reforms?

2  A    Yes.

3  Q    What was that view?

4  A    That it had been a very mixed outcome.  The city had been

5  successful in delivering really for the first time good

6  financial information on a monthly basis to the FAB which had

7  been a responsibility required of it as part of the original

8  consent agreement.

9      But they had had very limited success in implementing any

10 other objectives of that March agreement.  And that's why this

11 milestone agreement goes into such specificity about what is

12 now required of the city to do in order for the state to

13 continue to release money from the escrow account.

14 Q    But -- but let's -- let me be clear.  Or let me allow you

15 to be clear.  Did the division of responsibility or authority

16 for these reforms remain the same under the milestone

17 agreement, or was it changed?

18 A    No, it was still with the city.

19 Q    And ultimately as of the date that the emergency

20 financial manager was named, had the city made substantial

21 progress on this reform program?

22 A    No.

23 Q    And why do you say that?

24 A    Because they hadn't.  I mean they -- they simply had

25 failed to address any of the major items first identified in

1  March of 2012, in particular on blight removal, restoration of

2  public safety.  There had been no initiatives made, no money

3  spent.  Simply nothing had happened.

4  Q    Let me direct your attention to Exhibit 7 at II VIII C.

5  It says, any future draws to be negotiated between the

6  administration of the estate are contingent on the following

7  provided that the escrow account will maintain a minimum

8  balance of $50,000,000 at all times.  First, what was the

9  escrow account?

10  A    Well, the escrow account had been created with some of

11  the proceeds from the $130,000,000 bond offering that had been

12  done in the late -- early spring of 2012.

13  Q    Speak up again, please.

14  A    I'm sorry.  Of the $130,000,000 bond offering that had

15  been done a year prior, that was the money that had been put

16  into escrow by the state on behalf of the city.

17  Q    And what was the significance -- did you attain an

18  understanding of the significance of the minimum balance of

19  $50,000,000 and its importance?

20  A    Well, the city has in aggregate $1,000,000,000 plus

21  budget.  It has nearly 10,000 employees and $50,000,000

22  represents approximately three weeks of expenditure on the

23  part of the city.

24      And that's relevant because the city's revenues come in

25  in a fairly lumpy way from a variety of different sources,

1   So to make sure they have adequate liquidity to meet their

2   obligations, particularly payroll, the state felt it

3   appropriate to make sure there was always $50,000,000 in

4   reserve if it turned out that the city had misestimated its

5   cash reserves, the state could step in and help.

6   Q     Pardon me, but what was --

7   A     The state could step in and release this money in an

8   emergency.

9   Q     You say that revenues came in in a lumpy way.  What does

10  that mean?

11  A     Well, the city -- well, the city relies on four primary

12  streams of revenue.  Gaming tax revenue, state revenue share,

13  property tax, and income tax.

14        Property tax income in particular comes in on a round

15  about quarterly basis because that's when assessments are

16  made.  Income taxes come in likewise in a fairly irregular

17  fashion.  The only revenue that is predictable and coherent is

18  gaming revenue.  Because it is being collected by the casinos

19  on behalf of the city and remitted to the city pursuant to a

20  fairly complex set of accounts on a monthly basis.

21  Q     And so there will be times when the city is more flush

22  than others?

23  A     Correct.

24  Q     Or more importantly less flush?

25        MR. MONTGOMERY:  Objection, leading, I believe

1  that's a leading question that is necessary.

2          THE COURT:  The objection is sustained.

3  Q    What were the terms of your engagement for the city at

4  that time?  What were you asked to do, what did you set out to

5  do?

6  A    We agreed to provide general financial advisory services.

7  There were no transactions contemplated or built into our

8  engagement.  We were providing corporate financial advice only

9  for $150,000 a month.

10  Q    When you say that -- when you distinguish between general

11  financial service and no transactional fees built in, what

12  difference does that make to an engagement for a firm such as

13  yours?

14  A    Well, when we begin an engagement for a government or a

15  company and we don't know what we might have to do, we

16  normally agree to provide general financial advice, just

17  diagnosis, a set of recommendations with no presumption that

18  we are going be hired to do any transactions as a result of

19  that because not only does it protect the client from knowing

20  that our advice is in any way biased, it protects our firm.

21  Because we don't want to agree to provide a transaction

22  service unless we really believe A, we can execute it, and B,

23  it's actually needed.

24  Q    So upon your appointment, what did you first do to get

25  your arms around the problem?

1  A    Well, the first thing we did was refresh our

2  understanding of the city's financial condition and having

3  worked with Jack and Chris nine months earlier, we had a very

4  strong understanding of their condition.  We wanted to revisit

5  that which we did.

6      We then sat down with the other advisors to the city at

7  that time, Ernst and Young and Conway, MacKenzie, and reviewed

8  together the city's reform program and quickly agreed on a

9  number of different projects that had to be done collectively

10 so we could form a coherent understanding of the city's short

11 term and long term financial condition.

12 Q    From that point forward, what was the working

13 relationship between you and the other advisors, Ernst and

14 Young and Conway, MacKenzie?

15 A    Very collaborative and close.  We were on the phone with

16 them probably on a daily basis, either myself or my team.

17 Because it's a very integrated advisory challenge.

18     We as the financial strategists can't do our job unless

19 we have good information from the city which has to focus on

20 two primary areas.  One, the short term liquidity position of

21 the city.  We have to make sure that at all times the city can

22 operate in the ordinary course because it is pointless to try

23 to address the long term issues unless you have the cash to

24 give you the time to do so.  That was a primary responsibility

25 of Ernst and Young.

1       Secondly, and also related again to the March 2012

2   agreement, we needed to understand exactly the costs and

3   timing of implementing the reform program.  There had been no

4   budget created by the city during that period of time to

5   address any of the issues in Annex B.

6       And therefore in order to form a long term financial

7   strategy for the city, we needed to know how much capital we

8   would need to raise from whatever source for the city to

9   implement that program.  And that was Conway, MacKenzie's

10  primary responsibility.

11  Q    Were you the -- were you personally the leader of this

12  integrated team of restructuring professionals?

13  A    Yes.

14  Q    And you said before that this is a complex task and you

15  need specialized help.  Did you come to a conclusion in their

16  respective fields as to whether you had the right help, in

17  E & Y, and Conway, MacKenzie?

18  A    From a financial perspective, I thought we had an

19  excellent team that could adequately address all the financial

20  and operational issues of the city.

21  Q    And as you went forward to make judgments and to give

22  strategic advice to the city, were you relying on the advice

23  and the work of Conway, MacKenzie and E & Y?

24  A    Yes.

25  Q    In terms of analyzing the finances of the city at that

1   time, what preliminary conclusions did you draw?

2   A    Well, we were very concerned about the city's ability to

3   operate in the ordinary course for a number of reasons.  The

4   first one which I was aware of because of my earlier work for

5   the city, was the default to the swap counter parties.

6        The city in 2009 had entered into a agreement with the

7   swap providers that were giving interest rate swap protection

8   to the certificate of participation bonds that had gone

9   against the city.  That is the present value of those swap

10  contracts was a significant cost to the city, not a benefit.

11       In 2009, because of a default at that time, the city

12  settled that default by granting a collateral interest in the

13  gaming revenues to UBS and Bank of America, and Merrill Lynch.

14  However, because of another credit downgrade in March of 2012,

15  the city was again in default to those banks.  I was very --

16            MS. GREEN:  To the extent that he is testifying to

17  the legal conclusion of what was a benefit --

18            THE COURT:  Speak into the mike.

19            MS. GREEN:  I object to -- to the extent that he's

20  testifying to a legal conclusion of what constitutes an event

21  of default under the swap contracts.

22            THE COURT:  Okay.  I don't understand him to be

23  testifying to that, so the objection is overruled.

24            MS. GREEN:  Thank you, Your Honor.

25            THE COURT:  You may continue, sir.

1  A     Thank you.  I was very concerned about this uncured

2  default and the threat that at any moment the swap counter

3  parties could exercise their remedies and block the city's

4  access to its gaming revenues which was and still is the

5  highest quality source of revenue the city has.  Approximately

6  $180,000,000 a year which represents close to 20% of its

7  annual budget.

8       And that was an immediate issue that we addressed and we

9  had to deal with in order to preserve the city's ability to

10 operate while we were trying to figure out what the long term

11 strategy should be.

12 Q    Now, did you go about -- did you do anything to evaluate

13 the assets of the city?

14 A     We did.  Together with the city and again we had a lot of

15 familiarity with the city because of our earlier work.

16 Q    I'm just talking about this -- in this initial phase.

17 A     Oh, yeah.

18 Q    When you were first getting yourself oriented.

19 A     We had begun to do what we always do is to address the

20 city's assets and liabilities to understand what value did we

21 have to work with to settle with the city's creditors and

22 perhaps monetized to create incremental liquidity for the city

23 to operate.

24      So we began to examine all of the city's assets to

25 determine whether any of them were in our words non-core, not

1 essential for city operations, and could be available for

2 sale.  And if they were available for sale, how much could be

3 realized.

4 Q    Okay.  Did you at that point evaluate the time necessary

5 to effectuate a sale and turn an asset into cash?

6 A    Yes.

7 Q    Now at the time you came into your responsibilities as

8 head of this restructuring effort for the City of Detroit, was

9 there talk about the possibility of Chapter 9?

10 A    Yes.

11 Q    Could you describe that for me?

12 A    Well, when a company or government is in default the

13 threat of bankruptcy is always real.  The lack of cash is

14 normally what would push a company into a Chapter 11.  In the

15 case of a government it's more complex.

16      But clearly we had to be concerned about that being a --

17 a necessary way of protecting the city given this uncured

18 default of the swap banks.  And in January of this year that

19 was our primary concern.

20 Q    What was your primary concern?

21 A    That the swap banks could take unilateral action to

22 deprive of us of access to the gaming revenues and that would

23 cause the city incredible damage because it would immediately

24 have to make massive cut backs to services.  And we weren't

25 sure what we would do about it.  So we had to consider Chapter

1    9 as an alterative to protect the city.

2    Q    As a result of your initial review of the city's

3    position, what was your first set of advice to the city about

4    what more they should do or what more you should do?

5    A    Well, in addition to accelerating our analysis of the

6    city's financial condition, which we obviously had undertaken

7    to do, we recommended that the city consider bringing in a law

8    firm with the multi-disciplinary skills and experience to help

9    the city with contingency planning for whatever might occur.

10   Q    And did you give specific instructions to either E & Y or

11   Conway, MacKenzie in terms of what they should try to

12   accomplish in the short term?

13   A    I did.

14   Q    Let's start with E & Y.

15   A    With E & Y, I suggested to them even though their RFP had

16   only required them to do a five year forecast, that really we

17   should extend that to ten years.  For a city or a government

18   to look at a long term financial picture, the longer you can

19   look out the safer you are in terms of understanding what you

20   need to do.  Five years is simply too short a period for any

21   realistic appraisal of its performance.

22        And they agreed to extend out their analysis to ten years

23   even though that did impose a significantly higher burden on

24   them.  And we also recommended to both Conway and E & Y that

25   we collectively try to form our conclusions about the

1  financial condition of the city as soon as possible given its

2  continued financial stress and the uncured nature of this

3  default.  We needed to move as fast as we could to figure out

4  what the true picture of Detroit's condition was.

5  Q    And to get a ten year picture of Detroit's condition,

6  what options were available to you at that time in terms of

7  resources in addition to or besides E & Y?

8  A    Well, we had access to the city of course and they were

9  very cooperative in giving us information about their cost

10 structure in particular.  But there really were no good

11 projections of revenues.

12     We had to go and do the best we could with information

13 that was available to us.  In particular and it turned our

14 fortuitously Ernst and Young has a group in Washington which

15 is probably the country's leading experts in revenue, policy,

16 and tax analysis for municipalities and states.

17     So we were able to avail ourselves of that resource as

18 well in terms of developing a revenue forecast for the city,

19 particularly with respect to property and income tax

20 collections.

21 Q    And did you feel that you had a competent team in E & Y

22 to do this?

23 A    Yes.

24 Q    Did you tell them what you were going to use it for?

25 A    Yes.

1  Q    Did you intend to rely on it?

2  A    I did.

3  Q    And did you rely on it?

4  A    I did.

5  Q    And do you, as you sit here now, feel justified in your

6  reliance upon it?

7  A    Yes.

8  Q    Did there come a time when Detroit turned its attention

9  to hiring legal counsel?

10  A    Yes.

11  Q    What was your involvement in that process?

12  A    Well, about a week after we had been officially retained,

13  I met with the city and we concluded that at a minimum the

14  city needed to focus on strategies, particularly legal

15  strategies to protect itself from the swap banks in terms of

16  any actions they might take to take the gaming revenues away.

17      It was their conclusion that bringing in another law

18  firm, at least considering bringing another law firm in to

19  supplement other attorneys already working for the city was a

20  sensible thing to consider.  They asked me to recommend firms

21  that might meet the qualifications required.

22      So we basically gave them a list of law firms that we

23  felt had all the qualifications to provide the full range of

24  services the city might require under any scenario.

25  Q    And how many law firms were there?

1  A    Well, I think we ended up with about 14 or 15 law firms.

2  Many of them were well known to the city having done work for

3  them before.  The rest were so-called national law firms that

4  had had very little exposure to the city but did have the

5  experience in complex reorganizations, has had some experience

6  with Chapter 9's, had a lot of experience with out of Court

7  restructurings.

8       In addition to that had sufficient familiarity with

9  health care regulation and pension reform to deal with those

10 issues as well.

11 Q    Was there a meeting at which these law firms presented

12 themselves?

13 A    Yes.

14 Q    Were you at that meeting?

15 A    I was.

16 Q    Who else was at that meeting?

17 A    Well, we had a large group from both the state and the

18 city represented there for the purpose of interviewing the law

19 firms they did not know.

20      As I testified earlier, the city already knew quite a few

21 law firms, especially in Detroit that it was quite comfortable

22 with.  They did not feel they needed to interview those firms

23 again.  So they interviewed the firms they did not know.

24      And I was present at that meeting with Andrew Dillon,

25 State Treasurer, Tom Saxton, who I believe his title is Senior

1  Deputy Treasurer, Braum Stibitz, which is S-t-i-b-i-t-z who

2  was a Senior Advisor to the Treasurer.  And Richard Baird who

3  my understanding at the time was he was the Governor's aid for

4  Human Resources and things like that.

5      And from the city we had Chris Andrews, Program Managing

6  Director, Jack Martin, CFO, and I believe we had somebody from

7  the legal department, but I can't recall their name.  Oh, I

8  apologize, we had two members also from the financial advisory

9  board, Sandy Pierce and Ken Whipple.

10 Q    In your understanding, who was to make the decision?

11 A    The city.

12 Q    And what was your input into this decision?

13 A    After the interviews were over, the city asked us to put

14 together a comparison sheet laying out the qualifications of

15 all the law firms that have interviewed, and giving them for

16 lack of a better word, a qualitative assessment of their

17 relatives strengths and weaknesses which we did provide.

18 Q    And was there another meeting after that at which the

19 actual selection was made?

20 A    The initial presentations were on a Friday.  I believe it

21 was January 29th.  And then the selection meeting was the

22 following Friday.

23 Q    Were you at that meeting?

24 A    No.  My plane was stuck on the ground at LaGuardia and

25 even though I had been invited, I didn't attend.

1  Q    And do you know who -- do you know who was at that

2  meeting?

3  A    I believe it was largely the same group that had done the

4  interviews.

5  Q    And were you informed of the result?

6  A    I was told that the city had selected Jones, Day.

7  Q    Did you have any role in selecting or suggesting the

8  emergency manager?

9  A    No.

10         THE COURT:  All right, sir.  Let's pause now for our

11  afternoon recess.  It's 3:30, we'll resume at 3:45 please.

12      (WITNESS KENNETH BUCKFIRE WAS TEMPORARILY EXCUSED AT 3:28

13  P.M.)

14         THE CLERK:  All rise.  Court is in recess.

15      (Court in Recess at 3:29 p.m.; Resume at 3:45 p.m.)

16         THE CLERK:  Court is in session.  Please be seated.

17         MR. CULLEN:  Mr. Buckfire.

18         THE COURT:  One second, please.

19         MR. CULLEN:  I'm sorry.

20         THE COURT:  It appears everyone's present.  You may

21  proceed.

22         MR. CULLEN:  Thank you.

23      (WITNESS KENNETH BUCKFIRE RESUMED THE STAND AT 3:45 P.M.)

24  BY MR. CULLEN:

25  Q    Mr. Buckfire, as Ernst and Young worked on these cash

1  projections, did they keep you informed of their progress?

2  A    Yes, they did.

3  Q    Was there any particular one of these projections that

4  stands out in your mind as having significance to this matter?

5  A    Yes.  In early May of this year they showed me a draft 12

6  month cash flow forecast.

7  Q    And what did that cash flow forecast indicate to you?

8  A    Well, it indicated to me that the city's cash position

9  was far worse than I had ever feared.  That the city would

10 effectively be operating with no cash by the end of that

11 period of time even on the current projections which

12 incorporated certain deferrals of expenses that in the

13 ordinary course they should not be making.

14     And I was very alarmed about this because I was acutely

15 aware of the fact we still had no solution to the default

16 under the swap agreements.  And that at any moment the city's

17 ability to provide services could be eliminated.

18 Q    How -- how would you describe the city's cash situation

19 at that time as presented in those projections?

20 A    The city had minimal cash.  They had a few tens of

21 millions of dollars.  It was erratic.  They had no real

22 ability to project because as I testified earlier cash would

23 come in in a somewhat lumpy and unpredictable manner.  And so

24 at any given time the city could find itself with no cash.

25 Q    Were those cash flow projections memorialized in a -- any

1  of the documents in this case?

2  A    Yes.

3  Q    If I could show you Exhibit 75 at Page 40.  If you could

4  blow up the numbers there, please.  And you could put the

5  thing below too.  Are these the numbers that you just

6  testified to?

7  A    Yes, they are.

8  Q    Could you tell us what your understanding was at the time

9  based upon these numbers?

10          MR. SHERWOOD:  Your Honor, I -- I object to this

11  witness' testifying about forecasted receipts for the period

12  set forth there.  That is the -- the proper subject for expert

13  testimony and this is a lay witness.

14          MR. CULLEN:  May I lay some foundational questions,

15  Your Honor?

16          THE COURT:  Okay.

17  Q    In your work as a restructuring analyst, do you normally

18  commission cash flow forecasts?

19  A    Routinely.

20  Q    Is it one of the ordinary tools of your trade?

21  A    Yes.

22  Q    Do you make decisions based on those cash flow forecasts?

23  A    I make recommendations based on these forecasts, yes.

24  Q    And when you make those forecasts, what kind of people do

25  you use to do them?

1  A    We use -- well, we rely upon outside professionals such

2  as Ernst and Young and Conway, MacKenzie as well as the

3  finance staff of our client.

4  Q    In this situation, did you think that a cash flow

5  forecast of this type was necessary for the city to have?

6  A    Yes.

7  Q    Was it necessary for you to make informed

8  recommendations?

9  A    Yes.

10  Q    And based upon these forecasts, did you indeed make

11  recommendations to the city about its strategy in the

12  restructuring?

13  A    I did.

14  Q    And did you have any other -- any better options

15  available to you at that time to make this kind of a cash flow

16  forecast which you said was necessary to your job on behalf of

17  the city?

18  A    No.

19          MR. CULLEN:  I'd -- I'd move the admission of this

20  cash flow forecast, Your Honor.

21          THE COURT:  What's the exhibit number?

22          MR. CULLEN:  The exhibit number is 75, Page 40.

23  It's the financial operating plan, Page 40 of -- of same.

24      (City's Exhibit 75 was identified)

25          MR. SHERWOOD:  Your Honor, Rule 702 of evidence is

1    specifically designed so that when a party offers testimony

2    requiring expertise, knowledge, tools of the trade, the trade

3    of this witness is not a simple trade.  It requires expertise,

4    experience and so forth.

5        And just because he relied on these and he does, it does

6    not take this outside of the scope of -- of Rule 702 and --

7    and frankly I just think this is sort of an end run around the

8    Court's decision to deny the -- the testimony or not give

9    weight to the testimony with respect to the projections of

10   Ernst and Young.

11           MR. MONTGOMERY:  Your Honor, could I join for a

12   moment if I might?  May I join in the objection?

13           THE COURT:  Of course you may.  I'm not sure why you

14   think you need to do that, but okay.

15           MR. MONTGOMERY:  I just wanted to point out one --

16   one foundation that was --

17           THE COURT:  Oh, there's an additional argument you

18   want to make, okay.

19           MR. MONTGOMERY:  -- missing, Your Honor.  Very

20   simply that to the extent that the city was going to try to

21   rely on an officer, director, or owner type exception,

22   obviously this witness does not fall within that category.

23           THE COURT:  Yeah, I don't -- I don't hear that quite

24   at issue here, but thank you.  And just so the record is clear

25   and I'm clear too, this was prepared by Ernst and Young?

1  A     That's correct.

2            MR. CULLEN:  Your Honor, if -- if I might.

3            THE COURT:  And it's not otherwise in evidence at

4  this point?

5            MR. CULLEN:  It is otherwise in evidence.  The

6  Exhibit 75 as a whole is in evidence subject to the fight

7  about these parts of the exhibit and what they're in for and

8  what they're not in for.

9            THE COURT:  All right.  I -- I will admit the

10 document but for the limited purpose of establishing what this

11 witness relied upon for his work and not for purposes of

12 establishing the truth of anything in it.

13         (City's Exhibit 75 was admitted)

14            MR. CULLEN:  I -- I take it, Your Honor, just to be

15 -- to be clear, that when we close up this matter depending on

16 how you rule on the motions tomorrow, that it is some

17 evidence, weight or not, of the state of the city that Mr.

18 Buckfire will testify that he believed this was the state of

19 the city.  Mr. Orr will testify that he believed this was the

20 state of the city.  And that they had a reasonable basis so to

21 believe.  The reasonableness of their reliance on these

22 numbers is a separate issue from their -- their --

23            THE COURT:  Well, it might -- it might go to good

24 faith, but on the substance of the issue for example of these

25 projections, it's not evidence of that.

1          MR. CULLEN:  All right, Your Honor.

2          THE COURT:  I don't know how more clear to be.

3  Q    What -- what conclusions did you --

4          THE COURT:  I will comment I have refrained from

5  making this comment till now, but I will make it now that

6  you've asked the question.  It's actually hard for me to

7  comprehend why you didn't offer the Ernst and Young witnesses

8  who prepared these projections as experts.  You may proceed.

9          MR. CULLEN:  Thank you, Your Honor.

10  Q    What impact did these numbers have upon your forward

11  planning and advise with respect to the Detroit restructuring?

12  A    Well, we were extremely alarmed by these numbers.

13  Remember, we received these numbers in early May.  We knew how

14  unpredictable the city's ability to collect property income

15  taxes were.

16      We immediately realized that in June of 2013, which was

17  only a month away from this forecast date, that the city was

18  operating on a razor's edge.  If it were to make the

19  $40,000,000 bond payment on June 15th to the TOC bond holders,

20  that would only make sense if it indeed collected all of its

21  anticipated tax revenues on schedule in the amounts stipulated

22  here.

23      A $7,000,000 cushion on a budget of this magnitude is

24  almost effectively nothing.  That also alarmed me because I

25  knew we still had a continuing problem with the swap banks

1  Bank of America and UBS.

2      We knew we would have to negotiate some kind of agreement

3  with them to retain our access to the gaming revenues which

4  you'll see here for this short period of time is $105,000,000.

5  You'll notice how regularly it's projected to come in.  And

6  that is a matter of historical record and is quite accurate.

7      The city has always been able to rely on those revenues

8  in the absence of anything else because they're collected by

9  the gaming casinos themselves.  We realized that if it turned

10  out that our recommendation to the city in order to reserve --

11  to preserve cash was to not make the $40,000,000 bond payment,

12  that would be another default to the swap counter parties.

13      At that point we already had two defaults to them.  The

14  original ratings downgrade of March of 2012 which had not been

15  cured, and indeed the appointment of Kevyn Orr as emergency

16  manager also in and of itself constituted an event of default.

17      The swap banks which were continuing to get paid, had not

18  shown any indication that they might change their minds.

19  Nonetheless it was a significant risk to the city.  So we

20  immediately turned our attention in early May to deciding what

21  should we do about this in order to make sure the city

22  continued to have adequate cash to operate and provide

23  services.

24  Q   Was there a -- were there any payments in the near future

25  that you had to decide whether to make or not?

1  A    Yes.  If you look at the schedule you'll notice under

2  June of '13 column -- second column to the left, there's a

3  line in the middle of the page called POC and debt related

4  payments.  There's approximately a $40,000,000 payment due by

5  the city on June 15th.

6  Q    And was there a decision to be made with respect to that

7  payment?

8  A    There was.  Given how tight the city's cash position was,

9  they only had even on the projections, 70,000,000 of cash if

10 they made that payment.  We had to consider the necessity of

11 not making it in order to preserve liquidity.

12 Q    Were there any other ways that you haven't discussed to

13 preserve or enhance the city's cash position in May of 2013?

14 A    Well, as I testified earlier, we had looked at all of the

15 city's assets to find out if any of them could be marshaled to

16 create significant cash for the city.  And that began in

17 January.

18     We revisited that in early May.  We unfortunately came to

19 the same conclusion we came to in January that really there

20 was nothing that was readily convertible into cash.  The city

21 effectively had mortgaged all of its real assets years before.

22     The city did have potentially $60,000,000 left in the

23 escrow account established with the state in 2012.  I called

24 Senior Deputy Treasurer Saxton to ask whether that might be

25 available to the state if we really found ourselves in an

1  emergency.  And he said that it would really depend on our

2  overall recommendation in dealing with the city's long term

3  financial problems.

4  Q    Did you and the advisors ever come to a conclusion, a

5  consensus at any point as to whether or not the city was

6  insolvent?

7  A    Yes.

8          MR. SHERWOOD:  Objection.  I -- I object to any

9  testimony about insolvency.  This is not an expert witness and

10  it calls for a legal conclusion.

11  Q    In the course of your work do you -- are you always or

12  often called upon to address that question and advise on that

13  issue?

14  A    Yes.

15  Q    What is your understanding of insolvency?

16          MR. SHERWOOD:  Your Honor, I -- I renew the

17  objection.  I assume that when this witness is called upon to

18  testify in other matters concerning insolvency, he's qualified

19  as an expert witness.

20          THE COURT:  Hold on one second.

21          MR. CULLEN:  Pardon me?

22          THE COURT:  Hold on one second for me, please.

23          MR. CULLEN:  Sure.

24          THE COURT:  I do think it is appropriate to ask the

25  witness about the -- the facts that constitute insolvency

1  under 10132(c) of the Bankruptcy Code.

2  Q    Did you come to the conclusion that the city was unable

3  to pay its debts as they came due?

4  A    Yes.

5  Q    What was the basis for that conclusion?

6  A    Well, there were two sets of facts that we relied upon.

7  One was this schedule which was very short term in nature and

8  therefore we felt had to be relied upon because it wasn't very

9  long dated.  And it clearly showed that the city was operating

10  on a razor's edge of liquidity.

11       Secondly, we knew because we were in constant

12  communication with the city's finance staff, that they were

13  routinely stretching out payables in an attempt to conserve

14  cash.  They were not paying their trade creditors when due,

15  even at the date of the May 13 report.

16  Q    In your view as of -- as of May of 19, '13, was the city

17  able to pay its debts as they came due?

18  A    No.  In fact they were continuing to stretch out and

19  defer payments wherever possible to conserve cash.

20  Q    Was there any probability in your view of the city's

21  operations and cash flow of its remedying either of those

22  situations without aid in the foreseeable future?

23  A    We didn't see a possibility of that.  The city had

24  lost --

25       MR. SHERWOOD:  Sorry to interrupt again, Your Honor.

1  I object, calls for a lay opinion.  Again, talking about that

2  what --

3          THE COURT:  The objection is overruled.  Go ahead,

4  sir.

5  A    Well, as a banker the first thing we always evaluate is

6  whether a company or a government can borrow to cover a short

7  term financing requirement.  And in the case of Detroit, its

8  access to the capital markets had been cut off long before.

9  The most recent downgrade made it impossible for the city to

10 borrow in the ordinary course on the markets.

11     And it in fact had nothing left to pledge to gain access

12 to capital markets.  So that source of financing was closed.

13 And that's why indeed the prior year the state had to step in

14 and assist the city in raising even the 130,000,000 it did

15 raise because without that it would never have been able to do

16 it.

17     We then looked again at all of the so-called non-core

18 assets of the city and determined again whether any of those

19 could be readily converted to cash.  We again came to the

20 conclusion that there was nothing of any significance that

21 could be converted to cash in the time frame required to avert

22 a cash crisis in June or July to this year.

23 Q    Turning your attention now to the June 14th proposal to

24 creditors, did you have input into the strategy and concept of

25 that document?

1  A     I did.

2  Q     Could you tell me what your understanding of what that

3  proposal was meant to achieve was?

4  A     Well, going back to the --

5  Q     If it's an understandable sentence.

6          THE COURT:  It's close enough.

7  A     Well, going back to the consent decree of 2012 between

8  the city and the state, Annex B clearly -- the state expected

9  the city and the city agreed to review comprehensively all of

10 its operations and its long term financial stability in order

11 to come up with a strategy that would if implemented, result

12 in the rebirth and rejuvenation of the city as well as paying

13 its creditors what they were owed.

14     We were specifically tasked with working on that list of

15 activities, especially with regard to the long term

16 obligations.  And when we got re-hired by the city in January

17 this year to assist with that project, we explained to the

18 city that the only way in which we could establish a proper

19 foundation to negotiate with our stakeholders, whenever that

20 deemed necessary to take advantage of, would require us to

21 give our stakeholders as much information about the city's

22 financial condition as we could.

23     And until they had as much information as we could

24 reasonably develop about the short term forecast as well as

25 the long term condition of the city, they could not be in a

1  position to properly evaluate whatever restructuring proposal

2  we ultimately made to them in consideration of their claims.

3      So in January when we first sat down with Ernst and Young

4  and Conway, MacKenzie, we all agreed that that would be the

5  goal toward which we would work.  Would be to develop a set of

6  information that all policy makers and our stakeholders could

7  rely upon to evaluate whatever we deemed our strategy to be.

8  And that was our goal and that was our objective from January

9  until May of this year.

10  Q    In terms of putting out all of the proposal and informing

11  the stakeholders of the state of the city, can you tell me

12  what your input was into the structure of the offer itself,

13  the structure of the plan?

14  A    Well, the structure of the -- the restructuring proposal

15  being made in the June 14th document that was publicly made

16  available on that date, really relied upon the ten year

17  forecast that Ernst and Young had put together to show what a

18  realistic view of the city's revenues would be and that would

19  be assuming the impact of the reinvestment plan of over

20  $1,000,000,000 over the next ten years would allow the city to

21  stop its decline and set a foundation for renewal.

22      Based on the financial implications of that program, we

23  then were able to calculate what was available to give to our

24  stakeholders in consideration of their claims which in and of

25  itself was a very complicated analytical challenge because

1  until Ernst and Conway had really examined the off balance

2  sheet liabilities of the city, we really didn't know what the

3  real liabilities of the city were.

4      In our original review of 2012 we relied on publicly

5  available information which was accurate insofar as the funded

6  debt went, but we really did not know whether the projections

7  and liabilities associated with other liabilities, particular

8  health care and pension were accurate or could be relied upon.

9      And that was a very important focus of our analytical

10 work this year until the release of the June 14th plan.  So our

11 role was after we received the information was to then review

12 with counsel the appropriate way to construct a offer to all

13 of our stakeholders which recognized what the city's true debt

14 capacity was and then decide what would be an appropriate way

15 of allocating that across our stakeholders.

16 Q    Now, you talked about a level of services consistent with

17 sustaining the population and the tax flow revenues of the

18 city, did you not?

19 A    I did.

20 Q    How did you go about identifying that level of services?

21 A    Well, again, going back to March of 2012, the city itself

22 had identified a long list of areas in which it felt it needed

23 to restore or invest services.  Blight removal, police, fire,

24 lighting, there's a whole list of things.

25      But there was no budget against them.  We didn't know

1  what it would cost, nor did we know how long it would take to

2  implement any of those potential program areas.

3      And that was the primary focus of Conway, MacKenzie's

4  work together with the city's own staff was to identify

5  precisely how much it might cost to implement all of those

6  objectives.

7  Q    And in terms of your previous discussions of time and

8  cash, how do they play into this June 14th proposal?

9  A    Well, we had discussed with the city back in January of

10  this year what we would do once we came to a conclusion about

11  what the city really could afford in terms of its obligations

12  while reinvesting in rehabilitation.  Then we explained to the

13  city that as long as we had cash, as long as we had liquidity,

14  we would be able to construct an out of Court negotiating

15  strategy that would with enough time, allow us to negotiate

16  with all of our creditors and not have to result in

17  immediately a Chapter 9 filing, although that would always

18  have to be considered if for no other reason that when

19  negotiating with creditors, if you don't let them know that

20  that's a possibility, it's hard to get them to take you

21  seriously in a negotiation to keep a country, or a city, or a

22  company out of Bankruptcy Court.

23  Q    So could you make that concrete for me?  How much cash

24  equals how much time?

25  A    Well, normally you'd want to have enough cash to operate

 1  without interruption from the negotiations for at least six

 2  months to a year.

 3  Q    All right.  And how much money would that be in this

 4  case?

 5  A    Several hundred million dollars.

 6  Q    Did the city have that?

 7  A    No.

 8  Q    If I could direct your attention to Page 41 of the --

 9  A    May I correct one thing?  I apologize.  The city did not

10  have the money, and the only way it could get the cash would

11  be not paying its unsecured obligations such as the POC bonds.

12       But that would have created another level of defaults

13  which would have brought us right back to the problem I had

14  with the swap counter parties which is they had the right

15  through their remedies to block our access to gaming revenues,

16  so if we did try to solve our liquidity problem by not paying

17  our unsecured creditors, we might immediately lose it because

18  we'd lose the gaming revenues.

19  Q    Forty-one of this exhibit, Exhibit 43, Page 41.

20  A    Sorry, I've lost you.  What tab -- what exhibit are you

21  on?

22  Q    I haven't -- I haven't asked a question yet.

23  A    Oh.

24  Q    All right.

25            THE COURT:  It's on your screen there.

1  Q     It's on your screen.

2  A     Oh, yes.

3  Q     Does this accurately reflect what it purports to reflect,

4  the key objectives for the financial rehabilitation and

5  restructuring?

6  A     Yes.  These are the objectives set out to us by the city.

7  Q     Were these objectives new in this report?

8  A     No.  These were all reflected in the consent agreement of

9  March of 2012.

10  Q     Had substantial progress been made on any of these?

11  A     No.

12  Q     In terms of the discussions internally within the -- the

13  brain trust of the city, as I might call it that.  The Mayor

14  and his advisors.  What was the -- was there an intention to

15  make this proposal a take it or leave it proposition?

16  A     No.

17  Q     What was the intention?

18  A     Well, the intention was to provide our stakeholders with

19  the best possible information about the city's true condition

20  that we could develop and we'd been working around the clock

21  on this for months.

22        We also wanted to make sure that when we did begin

23  discussing with stakeholders they would see what we thought

24  made sense for all of our stakeholders at the same time so

25  there would be no doubt the city was approaching this in the

1  most even handed and fair way possible.

2  Q    And when you say even handed and fair, what aspect of the

3  proposal can you point to that reflects that determination or

4  that principle?

5  A    Well, just to pick out one example.  We felt it important

6  to start out by delineating our creditors into whether they

7  were secured or unsecured.  And we proposed that our secured

8  creditors would receive 100 cent recoveries, our unsecured

9  creditors would share pro rata in what we believed was the

10  value available to them pursuant to our restructuring plan

11  which is $2,000,000,000 in notes.

12          THE COURT:  Which was what?

13  A    Two billion dollars of notes.  That was all we calculated

14  the city could afford post this restructuring in terms of debt

15  capacity.

16  Q    And have -- have you used the words in the past, pari

17  passu to explain that?

18  A    Yes.

19  Q    Model as well.  Now, there's been a lot of discussion in

20  the case about asset sales.  And you've discussed it some

21  today.  But I would like to direct your attention to Pages 83

22  to 89 of Exhibit 43.

23          And take you through this list of assets so that you can

24  talk about, and I apologize for the nature of this question,

25  but I think it will move things along.  So you can talk about

1  the nature of the consideration and effort given to each

2  asset, the values available, and the -- and the hurdles to be

3  overcome or -- or to be avoided in getting -- turning the

4  asset into money.

5        MR. CULLEN:  If I can proceed that way, Your Honor,

6  with respect to each of the assets.

7        THE COURT:  Yes, go ahead.

8  Q    Detroit water and sewage.

9  A    Well, Detroit -- the Detroit Water and Sewer Department

10 is a very complicated situation, had been operating under

11 Federal Court order for a very long time.

12       At the time of our engagement in January, it was still

13 operating under the supervision of the so-called Root Cause

14 Committee which was really effectively the governance body,

15 although the assets were owned by the city and are still owned

16 by the city.  The city has never received any cash flow from

17 it's ownership stake.

18       The department has operated on the basis of zero profit.

19 It is allowed to recover its operating, maintenance, and debt

20 service costs from rate payers and that's all.  So it's never

21 been a source of cash flow to the city.

22       And furthermore, in addition to that, we had no ability

23 to raise rates to generate cash.  That would not be allowed

24 under the utilities laws of the State of Michigan.

25       And we also had no ability to pick up and sell it

1  overnight because as I mentioned before it was under a Court

2  order until March of this year.  So we began to evaluate after

3  that Court order was, I guess, dismissed is the correct

4  phrase, whether or not we could in fact realize cash from the

5  system, but because of its public nature we recognized it

6  would be extremely complicated to do.

7       And that the only ways to do it really would be to either

8  sell it to its customers in exchange for a lease payment or a

9  pilot payment, or consider some version of a privatization.

10  We've been contacted by a number of private equity firms which

11  have expressed an interest in buying it if they could, but

12  only if they could charge higher rates to recover their own

13  costs as capital.

14       So we recognize even though this would be potentially a

15  source of great value to the city, it would be a long and

16  complex process with a low probability of success.

17  Q    The Coleman Young Airport, next page.  Keep going.

18  Coleman Young Airport.

19  A    The airport is currently not being used for commercial

20  services.  It's being used for so-called general aviation

21  only.  It's a very small airport.  Its runways are too -- too

22  short to allow regular commercial service by major carriers.

23       The airport itself is dilapidated and would require

24  reinvestment to bring it up to commercial standard.  It's

25  effectively worth nothing.  And likely not be worth anything

1  unless these reinvestments are made.

2      And we did explore it actively with one of my partners

3  who is an airlines expert.  We came to the conclusion that,

4  you know, we'd have to pay someone to take it.

5  Q    Move on to the Belle Isle Park if you would, please.  Oh,

6  I'm sorry, Detroit Windsor Tunnel.

7  A    Well, the city owns half the tunnel, Windsor owns the

8  other half.  Under a prior administration, Detroit leased its

9  portion of the tunnel in exchange for a rent to equal 20% of

10 the annual revenues.

11     Last year, I believe, it collected $750,000.  The city

12 has no ability to vacate the lease which runs through 2020.

13 There is no ready buyer for it.  Given the lease which

14 encumbers the asset, there was no value to be realized there.

15 Indeed we recommended instead that the city audit the

16 operations of the operator to find out whether we'd be getting

17 a fair allocation of revenue.  And that audit is still

18 ongoing.

19 Q    Belle Isle Park.

20 A    Belle Isle Park is a major park of the city.  And we did

21 not believe that it would have any material value as any other

22 -- in any other application.

23     First of all, it would require re-zoning.  Re-zonings

24 typically are long and complex undertakings.  It is an

25 important social asset of the city.

1      Converting it into any kind of private use would again be

2   a long and contentious process.  We did not believe it could

3   be converted into any form of cash at any time soon.

4   Q    Next page, please.  The Detroit Institute of the Arts.

5   The number of words understates the interest in the problem.

6   Could you tell us what investigations and efforts have been

7   done with respect to the Detroit Institute of Arts?

8   A    Well, back in January when we first began our engagement,

9   we discovered, we had not known this before, that the City of

10  Detroit actually does own the building and the art collection

11  of the Detroit Institute of Arts which is operated on the

12  city's behalf by the DIA Corp. which is the founder society as

13  a contractor to the city.

14      We obviously were concerned about this and had to decide

15  whether or not this might be a source of value for the city.

16  I did meet with trustees and managers of the DIA in May and

17  explained to them that they should be concerned about the fact

18  that in the worst scenario the collection and the art might

19  need to be dealt with as part of a restructuring.  And it

20  would be in their interest as trustees of the operator to try

21  to secure funding from whatever source they could to give to

22  the city in exchange for a protective covenant.

23      I thought that would be a clever way of realizing short

24  term cash for the city which would not necessarily require the

25  arduous process of trying to take the art and selling it on a

1  fire sale basis.

2  Q    And what was the response?

3  A    They told me that would be impossible, that no money was

4  available from anybody that they knew, and that it was not

5  something they would consider.

6  Q    And subsequently did any office of the state weigh in on

7  this issue?

8  A    Yes.  The Attorney General issued an opinion that the art

9  was in a public trust and could not be used for any other

10  purpose despite the fact that a significant part of the

11  collection had been paid for by tax revenues of the City of

12  Detroit.

13  Q    Has that progressed any further?

14  A    Somewhat.

15  Q    Has there been an attempt to value it?

16  A    In our recommendation to the emergency manager,

17  Christie's, which is an internationally known auction house

18  with expertise in these matters, has been engaged in a

19  appraisal of that portion of the collection paid for by the

20  city.  I expect to get a preliminary estimate from them in a

21  matter of weeks.

22  Q    City owned land.

23  A    Well, we originally hoped that this land could be quite

24  valuable.  It's not everyday that 22 square miles within a

25  massive urban area becomes available for re-development.  We

1  thought that should be of interest to some set of developers.

2      But again the land is in disparate parcels.  It's held in

3  disparate hands.  There are at last count five different

4  government entities that control different parts of the

5  property represented by this 22 square miles.

6      There is no coherent strategy for disposal, marshaling,

7  or re-development of this property.  In addition, much of the

8  land is still encumbered with blight.  It would require

9  significant investment to remove that blight.

10      And lastly, a lot of the land is subject to liens which

11  has not has been cleared.  And the cost of clearing those

12  liens, it would not be insubstantial here.  Again even though

13  individual parcels might be available for cash, there is no

14  substantial value to be realized from this today.

15  Q    Parking operations.

16  A    Again the city owns nine garages, many of which are being

17  operated by others.  We actually are in the process of putting

18  together an auction to sell the rights to use those parking

19  garages to others.

20      I would note that many of the garages are in such a

21  dilapidated condition they are unsafe.  Ironically enough the

22  garage supporting the DIA has been condemned.  It has not been

23  used for any commercial purpose for a number of years because

24  it's in such bad condition.  I'm not sure that anyone would

25  pay us for that.

1  Q    Next one.  The Joe Louis Arena.

2  A    Again, you know, it's an old facility, currently

3  obsolete.  We're entertaining alternatives for it, but we

4  haven't received any.

5  Q    And with respect to all of these assets sale

6  possibilities, or asset monetization possibilities, had they

7  all to your knowledge been the subject of discussion before

8  they appeared in this report?

9  A    Well, prior to our involvement, I can't testify to that.

10  But as we were engaged we immediately began to systemically

11  look at all these assets to find out whether any of them could

12  be turned into cash.  And it was the subject of intensive

13  analysis by my firm beginning in January of this year.

14  Q    All right.  And --

15        MR. CULLEN:  Pardon me, Your Honor.

16  Q    In the -- in the proposal itself, was there any

17  discussion of what would happen to further unsecured payments

18  of debt going forward?

19  A    Well, on June 14th we told the creditors, we had over 100

20  people show up at that meeting, that we had taken the decision

21  because of the city's dire cash position to not make the

22  $40,000,000 bond payment due on June 15th and that we would be

23  suspending all other unsecured debt payments for the

24  forseeable future in order to conserve cash.

25  Q    And did you view that as necessary in light of the

1  circumstances of the city?

2  A    We did, but we also felt we could take that step because

3  we were able to negotiate an agreement in principal just prior

4  to that date with the swap banks which we felt would allow us

5  to continue to have access to our gaming revenues which is an

6  essential condition to allowing the city sufficient time to

7  negotiate with the stakeholders.

8  Q    So again what was the relationship between the settlement

9  with the swap banks and the ability to negotiate?

10 A    Well, the swap banks already had one uncured default, the

11 ratings downgrade, the appointment of Kevyn Orr was in and of

12 itself a default.  And we knew that once we took the decision

13 to not make the bond payment, that would be another default.

14     At some point especially after the swap banks saw the

15 financial condition of the city, they might feel they had no

16 option but to be defensive in protecting their own position,

17 even if they didn't want to and block our access to gaming

18 revenues.  So having an agreement with them in place prior to

19 taking a decision to not make that bond payment was crucial.

20 Q    After the June 14th proposal in the public meeting at

21 which it was presented, did you make further efforts -- did

22 you make any efforts to generate counter proposals,

23 discussions, other -- other -- other interests?

24 A    Yes.

25 Q    What were -- could you describe generally those efforts?

1  First, let me put up a -- on the screen Exhibit 44, the full

2  version of the creditor's proposal.  Well, Pages 61 and 62.

3  Yeah, 61 and 62.

4      And is this the calendar that you set forth for your

5  efforts in the proposal?

6  A    Yes.

7  Q    Now what -- what did you personally do to try to talk to

8  contact various stakeholders?

9  A    Well, we were fortunate in one respect.  We had had a

10  very robust response to our invitation to the meeting on June

11  14.  We had been able to identify all of the bond trustees and

12  all of the bond insurers that insured much of the city's debt.

13      They effectively could be relied upon to speak for if not

14  actually vote the interests of their underlying bond holders.

15  And so we were very happy that they all agreed to come and

16  hear our proposal because we knew we could begin our

17  discussions with them.  They already were organized.

18      We also knew who could speak for the pension trusts and

19  they were invited.  And we also invited union representatives

20  who we hoped could speak for both the active and retired

21  employees of the city.  So they were all present on the 14th of

22  June.

23  Q    And was it -- was it your desire to promote discussions

24  and counter proposals?

25  A    That was the whole intent of the meeting.  We had spent

1  months developing the financial information.  We felt our

2  stakeholders deserved to be able to evaluate not only their

3  current conditions relative to the city, but evaluate the

4  proposal that we made to them at that meeting.

5      We wanted them to have exactly the same information that

6  we did.  We wanted to make sure they could rely upon it to be

7  accurate.  We wanted them to also understand that despite all

8  the promises had been made to both bond holders and others,

9  the city did not have the resources and likely would never

10  have the resources to honor those promises.

11      We felt they had to have information in order to

12  understand what we were asking them to do in terms of

13  compromising their claims to allow fair treatment for

14  everybody.

15  Q    In the discussions you had with any of the stakeholders,

16  did you encounter any resistance to the idea of compromising

17  their claims at less than 100%?

18  A    Nobody was willing to consider any proposal in which they

19  compromised their claims.

20  Q    And you're saying nobody, who do you mean?

21  A    Well, I was primary responsible for discussions with the

22  bond holders and other funded debt holders of the city.  And I

23  would further break that down between the Detroit water and

24  sewer revenue bond holders and the general obligation and comp

25  the bond holders of the city.

1    Given our expertise as investment bankers and the fact we

2   had relationships with most of these people, that made sense.

3   So I took primary responsibility for those discussions.

4    The discussions with our other claim holders, primarily

5   the pension funds, and retirees, and active employees were led

6   by Conway, MacKenzie and Jones, Day as well as some of my

7   partners at Miller, Buckfire.

8   Q    And what kind of a response did you get in those

9   discussions?

10  A    Well, in speaking with the bond holders, and again I'm

11  using that between both the secured bond holders and the

12  unsecured bond holders, nobody was willing to consider any

13  compromise of their claims whatsoever.

14    In fact even the secured bond holders, that is those bond

15  holders who held debt of the Water and Sewer Department were

16  very unhappy because our plan contemplated that if we were to

17  create a new authority controlled by the customers of it, that

18  we would want to take advantage of the fact that that

19  authority could borrow at a much higher credit rating than

20  Detroit could, and even though we were going to give them 100

21  cent recovery, it would not be in the form of new bonds that

22  would have the same old interest rates.

23    In other words they wanted to have the benefit of a

24  strong investment grade rating, but retain bonds that were

25  giving them interest at double B costs.  So even they didn't

1  like the proposal.  I was not surprised by that, but I hoped

2  that they would at least counter with something else which

3  they did not do.

4           THE COURT:  What -- what does the phrase double B

5  cost mean?

6  A    It refers, Your Honor, to a credit rating.  Cities as do

7  companies, borrow in the markets at a spread over the

8  so-called risk free rate, although some could argue to say,

9  I'm not sure what that is, but let's assume for the moment

10 that that's the treasury yield curve.

11         The double B cost would be perhaps a spread of 400 or 500

12 basis points over the treasury cost, whereas a single A cost

13 to borrowing might be only 100 basis points over.  So the

14 difference would be obviously reflecting the risk of a lower

15 rate of credit.

16 Q    Did -- did you receive any indications in your

17 discussions with any of these bond holders, that some of the

18 considerations in their negotiations or non-negotiations with

19 you, had to do with considerations that extended beyond the

20 City of Detroit?

21 A    Yes.  In discussions with the bond insurers who insured

22 the water and sewer debt, about five and a half billion

23 dollars of that, several of them also insured GO debt, general

24 obligation bonds of the city.

25         And they made it very clear to me that they were not

1  willing to consider any impairment of the GO bonds because

2  they believed that the GO pledge was so much more valuable in

3  every other jurisdiction of which they insured bonds, that

4  creating a precedent of impairment here would damage their

5  businesses elsewhere.

6  Q   And when you say GO bonds, explain to the Court what you

7  mean.

8  A   The city up until recent times, had been able to issue

9  unsecured debt that is not secured by a specific revenue

10 pledge, but secured instead by the full faith and credit

11 obligation to raise taxes sufficient to pay that debt when

12 due.

13     And there are two different kinds.  Unlimited tax and

14 limited tax general obligation bonds, both of which have been

15 considered for many years to be of higher credit and less risk

16 than revenue bonds because a revenue bond is specifically

17 secured only by the revenues of a project or an authority or a

18 utility.  Whereas bonds secured by taxing authority are

19 considered to be much safer because the city is required to

20 raise taxes in the ordinary course until that bond can be

21 repaid.

22     Now in the case of Detroit, of course, that's -- they've

23 come to the end of the road because on the property tax side

24 for a moment, we know that the property tax mileage that the

25 city is already assessing is already at the state maximum.  So

1   the city would have no ability to raise taxes or tax rates to

2   pay this debt.

3       That was anathema to the bond insurers because they had

4   operated, as does the municipal bond market, on the theory

5   that general obligation debts are higher -- higher credit and

6   less risky than revenue bonds.

7       We, on the other hand, when we did the math, recognized

8   the city could never begin to satisfy its unsecured

9   obligations which would include the general obligation bonds

10  and we had classified those bonds pari passu with the other

11  unsecured obligations of the city, in this case are under

12  funded pension claims and health care claims.

13  Q    If I could have you take a look at Exhibit 37.  Could you

14  blow that up a little bit, please?  This is a set of meetings

15  that I won't go through completely.  But if you'll just look

16  down the -- the left hand side and -- and across the top.

17      Can you tell me did you or representatives of Miller,

18  Buckfire participate in virtually all of these meetings?

19  A    Yes.

20  Q    Did the city ever receive a proposal from anybody?

21  A    We did.

22  Q    How many?

23  A    We received I would say one and a half.  One that was

24  actually written out and then to be responsive, the second was

25  really just a letter saying they'd like to come talk to us

1  again about something, but only if we would stipulate they'd

2  get 100 cent recovery.

3  Q    And was that the one or the one and a half proposal that

4  was attractive enough to follow up on?

5  A    No.  Because they were linking any willingness to

6  negotiate on water and sewer debt to our treatment of the GO

7  bonds that they also insured.

8  Q    What in your view is the alternative for the city if the

9  plan set forth in the June 14th proposal is not achieved?

10 A    Well, first, the city will not be able to execute is

11 reinvestment program.  It would simply not have the money.

12 That would mean the city would continue to be liquidated for

13 the benefit of its stakeholders.  Revenues are likely to

14 continue to decline.  Services will continue to deteriorate.

15 That would be the condition of the city in -- in the absence

16 of this plan.

17 Q    Is that a long term sustainable future for Detroit?

18 A    From a financial perspective, no.  Because I don't

19 believe if you want to measure sustainable future as having

20 access to the capital markets, that under that scenario

21 Detroit would ever have access to capital markets.  They would

22 have no credit.

23         MR. CULLEN:  That's all I have, Your Honor.

24         MR. MONTGOMERY:  If I may at this point.  I would

25 like to strike from the testimony the -- all of the opinion

1  testimony given by the witness for the last several questions

2  starting with how the capital markets are reacting, not

3  through conversations with the witness, but in general.

4      And I think this witness has given classic, wonderfully

5  prepared, rather wonderfully delivered, expert witness

6  testimony relying on hearsay, relying on specialized

7  knowledge, relying on years of accumulated talent and

8  education that this gentleman clearly has, but none of which

9  was offered prior to the pre-trial, or offered to Your Honor

10  as expert witness testimony.  I believe it should be stricken.

11          MR. CIANTRA:  UAW would join in that motion.

12          THE COURT:  I wish you had objected at the time.

13          MR. CULLEN:  Your Honor, part of our job here is to

14  set forth before the Court the story of the decisions that

15  were made and the reasons that they were made on behalf of the

16  City of Detroit.

17      This witness has done that.  He was an operative figure

18  in real time.  He has testified candidly as to the bases on

19  which his decisions were made, the things he looked at, the

20  advice he gave to the city as it faced these difficult

21  decisions.

22      The story cannot be -- this is a factual story.  It may

23  need a man of rare experience to tell it, but it is

24  nonetheless a factual story about things that were done in

25  real time, not about a piece of paper that was given to an

1  independent person to look at and -- a set of assumptions from

2  which to draw opinions.

3      This is the actor.  This is the actor at the heart of the

4  story and he is telling his story.  And as such, it has to be

5  admissible, if that as nothing else.

6      He is the man who made the recommendations.  He is the

7  man who presided over the analyses.  He has told that story

8  and told of the basis for making these.  Because it's -- it's

9  somewhat upside down, a -- an expert witness is qualified by

10  his expertise and nothing else.  That's why we let expert

11  witnesses testify only rarely and under certain circumstances,

12  but we let percipient witnesses testify all the time, all the

13  time to their experience, to what they saw and did, decided.

14      This man tells the story.  And that story is a factual

15  story by a percipient witness of rare gifts, but a percipient

16  witness.

17          THE COURT:  What -- what you say is good as far as

18  it goes, but it doesn't really meet the objection.  Because

19  the objection is that beyond explaining what the witness did

20  and why he did it, is the question of whether that constitutes

21  proof of the truth of the facts on which he relied to -- to

22  make the decisions that he made.

23          MR. CULLEN:  And -- and I would submit, Your Honor,

24  that the judgment of a sophisticated person in real time is

25  some proof of the truth of what they relied on.  I think that

1  that happens in -- in virtually every -- every case.

2          THE COURT:  Well, it strikes me that --

3          MR. CULLEN:  Some level.

4          THE COURT:  That this issue overlaps largely, if not

5  entirely, with the issue that you and your firm briefed here

6  this morning and that we're going to argue tomorrow morning.

7  So I would suggest that we hold the resolution of this until

8  then.  Do you have any further questions of the witness?

9          MR. CULLEN:  I -- I do not, Your Honor, at this

10  point.

11          THE COURT:  All right.  Counsel, do you want to

12  press ahead with cross examination at this time, or would you

13  prefer to break now and -- and resume in the morning?

14          MR. MONTGOMERY:  Your Honor, my colleagues had

15  suggested that we should break until tomorrow.

16          MR. RUEGGER:  Shocker.

17          THE COURT:  Yeah.  Apparently -- apparently there

18  was no vote for you in that, was there?

19  A    I didn't want to suggest that.

20          THE COURT:  Okay.  Well, we will -- we will break

21  for now.  It's fine.  We're close enough to 5:00 and so we'll

22  reconvene at 9:00 tomorrow morning.

23      Regarding our argument tomorrow morning on the issues

24  raised here just now and by the -- the memorandum that was

25  filed this morning, I certainly do not request that you take

1  your time to file a brief.  If you want to, obviously I can't

2  prevent it.  The sooner you file it, the more likely it is

3  we'll be able to read it and actually comprehend it.

4      So I would ask that if you do file something you do not

5  file it at ten minutes till 9:00 tomorrow morning, please.

6  But if there are authorities you want me to consider, feel

7  free to just bring them to Court tomorrow and we will deal as

8  best we can given the expedited nature of this.

9          MR. STEWART:  Thank you, Your Honor.

10          THE COURT:  All right.  So we'll be in recess.

11          MR. SHERWOOD:  Thank you, Your Honor.

12          MR. CULLEN:  Thank you, Your Honor.

13          THE CLERK:  All rise.  Court is adjourned.

14      (Court Adjourned at 4:42 p.m.)

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7    We certify that the foregoing is a correct transcript from the

8    electronic sound recording of the proceedings in the

9    above-entitled matter.

10

11   /s/Deborah L. Kremlick, CER-4872          Dated: 11-1-13
     Letrice Calloway
12

13

14

15

16

17

18

19

20

21

22

23

24

25