UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CITY OF DETROIT, MICHIGAN, Debtor.

Docket No. 13-53846
Detroit, Michigan
October 28, 2013
9:00 a.m.

HEARING RE. ELIGIBILITY TRIAL (CONTINUED)
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:

Jones Day
By: BRUCE BENNETT
555 South Flower Street
Fiftieth Floor
Los Angeles, CA 90071-2452
(213) 243-2382

Jones Day
By: GEOFFREY S. IRWIN
GEOFFREY S. STEWART
GREGORY SHUMAKER
THOMAS CULLEN, JR.
MIGUEL F. EATON
51 Louisiana Avenue, N.W.
Washington, D.C. 20001-2113
(202) 879-3768

Pepper Hamilton, LLP
By: ROBERT S. HERTZBERG
4000 Town Center, Suite 1800
Southfield, MI 48075-1505
(248) 359-7333

For the State of Michigan:

State of Michigan
Michigan Department of Attorney General
By: MATTHEW SCHNEIDER
P.O. Box 30754
Lansing, MI 48909
(517) 241-8403

Dickinson Wright, PLLC
By: STEVEN G. HOWELL
500 Woodward Avenue, Suite 4000
Detroit, MI 48226-3425
(313) 223-3033

APPEARANCES (continued):

| | |
|---|---|
| For AFSCME, AFL-CIO, and Sub-Chapter 98, City of Detroit Retirees: | Lowenstein Sandler, LLP<br>By: SHARON L. LEVINE<br>JOHN K. SHERWOOD<br>65 Livingston Avenue<br>Roseland, NJ 07068<br>(973) 597-2374 |
| For Detroit Retirement Systems-General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC<br>By: ROBERT D. GORDON<br>JENNIFER K. GREEN<br>151 South Old Woodward, Suite 200<br>Birmingham, MI 48009<br>(248) 988-5882<br><br>Clark Hill, PLC<br>By: RONALD A. KING<br>212 East Grand River Avenue<br>Lansing, MI 48096<br>(517) 318-3015 |
| For the Detroit Fire Fighters Association, the Detroit Police Officers Association and the Detroit Police Lieutenants & Sergeants Association: | Erman, Teicher, Miller, Zucker & Freedman, P.C.<br>By: BARBARA A. PATEK<br>JULIE BETH TEICHER<br>DAVID EISENBERG<br>400 Galleria Officentre, Suite 444<br>Southfield, MI 48034<br>(248) 827-4100 |
| For the International Union, UAW: | Cohen, Weiss & Simon, LLP<br>By: BABETTE A. CECCOTTI<br>PETER D. DECHIARA<br>THOMAS N. CIANTRA<br>330 West 42nd Street, 25th Floor<br>New York, NY 10036-6976<br>(212) 356-0227 |

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retired City Employees Association, Retired Detroit Police and Fire Fighters Association, Shirley V. Lightsey, and Donald Taylor: | Silverman & Morris, PLLC<br>By: THOMAS R. MORRIS<br>30500 Northwestern Highway, Suite 200<br>Farmington Hills, MI 48334<br>(248) 539-1330 |
| | Lippitt O'Keefe, PLLC<br>By: RYAN C. PLECHA<br>370 East Maple Road, Fl. 3<br>Birmingham, MI 48009<br>(248) 646-8292 |
| For the Official Committee of Retirees: | Dentons<br>By: CLAUDE D. MONTGOMERY<br>ANTHONY B. ULLMAN<br>ARTHUR H. RUEGGER<br>1121 Avenue of the Americas<br>New York, NY 10020-1089<br>(212) 632-8390 |
| | Brooks, Wilkins, Sharkey & Turco, PLLC<br>By: MATTHEW E. WILKINS<br>401 South Old Woodward, Suite 400<br>Birmingham, MI 48009<br>(248) 971-1711 |
| For Retired Detroit Police Members Association: | Strobl & Sharp, PC<br>By: LYNN M. BRIMER<br>MEREDITH E. TAUNT<br>MALLORY A. FIELD<br>300 East Long Lake Road, Suite 200<br>Bloomfield Hills, MI 48304-2376<br>(248) 540-2300 |
| For the Flowers Plaintiffs: | Law Offices of William A. Wertheimer<br>By: WILLIAM WERTHEIMER<br>30515 Timberbrook Lane<br>Bingham Farms, MI 48025<br>(248) 644-9200 |
| For Ambac Assurance Corp.: | Schafer and Weiner, PLLC<br>By: DANIEL J. WEINER<br>40950 Woodward Avenue, Suite 100<br>Bloomfield Hills, MI 48304<br>(248) 540-3340 |

Court Recorder:      Letrice Calloway
                      United States Bankruptcy Court
                      211 West Fort Street
                      21st Floor
                      Detroit, MI  48226-3211
                      (313) 234-0068

Transcribed By:      Lois Garrett
                      1290 West Barnes Road
                      Leslie, MI  49251
                      (517) 676-5092

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

THE CLERK: All rise. Court is in session. Please be seated. Case Number 13-53846, City of Detroit, Michigan.

THE COURT: Looks like everybody is here. Sir.

MR. CIANTRA: Good morning, your Honor. Thomas Ciantra, Cohen, Weiss & Simon, LLP, for the UAW. Before bringing the evidentiary motion that I would like to present, I just have one or two housekeeping matters. We will be providing the Court with binders with the separate UAW exhibits tomorrow morning, with the Court's indulgence. We haven't been able to get that pulled together as of yet.

THE COURT: Okay.

MR. CIANTRA: And I would also indicate that I guess there are one or two additional exhibits that will be included, short documents, in the binder from what the Court has presently in the stack. So with the Court's indulgence then, I would like to discuss the motion that I presented during Mr. Moore's testimony and provide some additional argument and record citation with respect to that.

THE COURT: I wonder if, in light of our schedule today, it would be okay with you if we considered this tomorrow morning.

MR. CIANTRA: That would be fine, your Honor.

THE COURT: Thank you very much. I just need an assurance from someone that the work that I requested regarding the exhibits has all been taken care of and we're

all -- we all have the same exhibit books with reconciled exhibits and exhibit numbers.

MR. IRWIN: Good morning, your Honor. Ms. Ramirez and I were in the courtroom yesterday, and we did our best to reconcile exhibits with the materials we had, and my understanding is that other objectors have brought new books this morning. I won't speak for them, but as of yesterday I thought that we had moved this along as best we could.

THE COURT: Okay. Sir.

MR. ULLMAN: Yes, your Honor. For the Retiree Committee, our understanding is that everything has been done. Either we did it on behalf of other objectors or some of them have come in themselves and done it with the exception of the UAW, which Mr. Ciantra explained.

THE COURT: Okay. Good. Okay. You may proceed with the direct examination of Mr. Orr.

MR. ORR: Good morning, your Honor.

THE COURT: Good morning.

MR. SHUMAKER: Good morning, your Honor. Greg Shumaker of Jones Day for the City of Detroit.

KEVYN ORR, DEBTOR'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION (CONTINUING)

BY MR. SHUMAKER:

Q Good morning, Mr. Orr.

A Good morning, Mr. Shumaker.

Q Mr. Orr, on Friday afternoon when we last were here, I believe you were sharing with the Court what you had experienced regarding the city's provision of services upon your arrival as the emergency manager. Do you recall that?
A Yes.
Q I believe I interrupted you, and you were sharing what you had experienced in the area of emergency medical services.
A Yes. I believe I was talking about an event at City Hall where the president of one of the unions was late to a meeting because since all of our ambulances were out typically by 7:30, a citizen woman had a seizure in the 1st floor, and he was the only one available to administer her. That's anecdotal, but, more importantly, I think it's been fairly well-reported that the EMS services have substandard equipment. They are typically on a significant number of calls every day. The policy of the unit is that if they're called to an event, they are to transport the patient to a medical facility. Oftentimes patients will call for things such as, "I fell asleep, and my wrist is" -- "I feel asleep on the couch, and my wrist is asleep," or, "I slipped, and I hurt my ankle," to more serious injuries that are fairly widely reported such as shootings and stabbings.
Q Thank you. What was the -- what did you learn about the city's streetlight situation?

A Here again, as has been widely reported, as in our June 14th presentation, roughly 40 percent plus of our lights are out, 38,000 over some 78,000 roughly. Large sloughs of the city are unlighted. More importantly, it's not just that the lights are out. The city infrastructure is somewhat destroying it, I've been informed. There are lights that are either above ground -- there are switches that are below ground. To replace the switches sometimes below ground requires excavation and a plan. It is significant. A lot of our deferred maintenance has caused us to be, shall we say, very much behind the technology curve in terms of the quality of our lightings, whether they're still 1970s vintage gaslights as opposed to LED, which provide more lights and last for up to 15 years, for instance, therefore, reduce your replacement cost. Our grid and our lighting is so old that typically PLD is very -- Public Lighting Department is very overworked, and, in fact, many private contractors' insurance companies and policies won't allow them to work in our lighting grid.

Q And how does that compare to other municipalities?

A We've done some analysis to other municipalities. I don't think there's any other municipality considered a large city, generally over 500,000 or so, that has as -- is as unlit as we are citywide.

Q What were your observations about blight in the city?

A Blight is endemic. It's apparent. If you drive in on 94, take out the Lodge or go to any street in the city, it's very clear, commercial and residential. We have 78,000 buildings. That's roughly 20 percent. 390,000 I think is our total housing stock. That's roughly 20 percent of our housing stock. No other city has that footprint. Our lots are about 66,000, which are quite significant, and it's not just the fact that there's blight. It's that the blight has been here -- working its way here for 60 years but more acutely in the past 15 to 20 years. There are trees growing out, growing on top of roofs, growing out of roofs. They are an attractive nuisance in the old language. Crime, rapes, dead bodies, and not to mention the impact it has on our residents and particularly our children. The Skillman Foundation did a study of our schoolchildren and asked them how they felt. Fifty percent responded they were afraid. And when it asked them what they're afraid of, they said everything. When they asked them how they coped with it, they said they usually picked up a stick or a rod on their way to school and on the way back because that's the way they could protect themselves given what they had to walk through to public school busses to get to school.

MR. DECHIARA: Objection. Hearsay.

THE COURT: Overruled. Go ahead, sir.

THE WITNESS: That's what they had to walk through

to get to the bus stop for school. It's been widely reported.

BY MR. SHUMAKER:

Q Your impression of any of the other city services that made an impact on you?

A Well, virtually all city services are generally considered not where they should be. Our city workers work very hard for the most part to try to work through the substandard level of services, whether it's in tax collection, assessments, blight remediation, lighting. Our power grid -- we have a power grid that costs the city about $30 million a year. There are 115 customers on that grid. Only five of those customers are residential, so we subsidize power for about a hundred commercial and institutional uses. Our grid -- in fact, the grid in City Hall is so old that most providers, such as DTE, will not allow their workers -- because of various pernicious effluent that's down there, asbestos and the like, will not allow them to go down into the grid because it's too dangerous. We have 38 stations and one power factory, Mistersky, which is obsolete. Our stations are sorely in need of repair. Our grid is a patchwork of repairs that we tried even earlier this year -- the grid went out for a period of time, which was not necessarily the grid. It was that we were running a test, and the test tripped the grid because it is so sensitive that

it turned off the lights for two and a half days.

Q During this time, as you were becoming familiar with the city's services, did anyone ever come up to you and say that the services were adequate?

A No one has ever said that the services are adequate for the City of Detroit.

Q Have you done anything to address the problems you've described?

A Yes.

Q What are they? What are they?

A When we came in, we did an assessment in the first 30 days to try to get to the real meaning of things. I sat down, as I said before, with a number of stakeholders, including all the City Council people. I tried to restore a sense of normalcy in the city by restoring compensation to the mayor and the City Council and then delegating authority to them to do most of the business of the city in the ordinary course, and then we began our assessment of the city operations. Many of the contractors -- in fact, all of them with the exception of Jones Day, the principal restructuring contractors -- Milliman, Ernst & Young, Conway MacKenzie, and Miller Buckfire were hired before 2013 to start assessing the city's needs and restructuring, and they were already well along their way of preparing reports. I started reviewing those reports and discussions, and I found out that much of

the city's structure needed to be reinvented, so we started out looking at lighting. We have since authorized the Public Lighting Authority. We found some money after the June 14th default on the COPs payment. We have created a $12 million fund to get the Lighting Authority stood up with cash. We also found $1.8 million for them to have an operational budget so they could run -- they are due to have two demonstration projects up and running in terms of relighting the city by the end of this year. We are going through the process of a bond issuance to get them additional tranches of money to provide a lighting plan for the entire city. We stood up a Detroit Land Bank Authority and in conjunction with MSHDA, the Michigan State Housing & Development Authority, created a fast-track authority so that we could deal with blight. One of the things we found was that on the City Code for the better part of 30 years there was the ability to declare a blight emergency in addition to the powers that I have under 436, so under that existing authority we put those two together, and we abolished for a time, being through the rest of this year, the requirement for Class B licenses -- that is, the demolition of structures 35 feet or lower -- so that we could get at residential blight in an expedited basis, expedited process, and allow other contractors who are licensed by the state, although not licensed by the city, to come into the city to help us with

blight remediation as quickly as possible.

We also began looking at the same process for Class A licenses -- that is usually commercial or higher structures, 35 feet or higher -- so that we could fast-track the blight. And most recently we appointed a chief land officer in conjunction with the federal government to try to use some of the hardest hit funds, which are funds designated directly for blight, to get to blight.

We began looking at city services, and particularly the revenue drivers, for tax collection. For instance, cities like Albion, Michigan, have a memorandum of understanding with the Department of Treasury whereby they will assist the city to collect some of its taxes. That's been in existence since 1997. One of the things in the financial stability agreement and the MOU that the city agreed to was that they would look at that. We've assigned a taskforce to find ways to enter a similar situation so that we can have enhanced tax collection.

We hired a new police chief, went through a fairly long and competitive process to get him here. He has opened up -- he may have testified -- I'm not sure, but I suspect he testified that he's opened up eight precincts that were closed. We had these virtual precincts where citizens after dark would have to go to a blue phone in order to get service. If there was an incident on the east side, for

instance, they may have to go as far as ten miles to file a report in the dead of night, oftentimes a victim being chased by a perpetrator or alleged perpetrator. We've opened up those. We flowed new money to the police force in addition to the hundred cars that the philanthropic and civic community donated on March 25th, the day I started. We have since purchased another 50 cars and have another 50 on order for a total of a hundred, so we get new vehicles going to the street. We recently restructured the police department so that you have more line authority pushed down as opposed to a third of the department being involved in clerical work. We're getting more officers on the street.

We've looked at a number of remediation plans also for city-owned property, city-owned land, parking lots. We also issued a number of orders focused on dealing with efficiency within the city and have a number of different things in the works as we speak.

Q What level of services are you trying to get to with these efforts?

A We're under no illusion that given the long term that it's taken the city to get here and the fact that the specifics of what's required by the city have been discussed in detail since 2010, that we're going to get to an A+ or honors level of services. We're trying to get to an average level of services, one that's acceptable, a C, C+.

Q Okay. On Friday you shared with the Court your efforts to get on top of the financial condition of the city and --
A Yes.
Q -- review of certain financial records. I want to ask you is it fair to say that part of your job responsibilities as the emergency manager is to understand the city's financial condition?
A Yes.
Q And have you become familiar with the city's records --
A Yes.
Q -- financial records?
A Yes.
Q You understand how they operate?
A Yes.
Q You're in charge of implementing them?
A Yes.
Q One of the agreements that you referred to was something called the consent agreement. Do you recall that?
A Yes.
Q I'd like to show you what is the consent agreement, which is Exhibit 23, and it has been admitted into evidence. It should appear on your screen there.
A Yeah. It's quite small.
Q Allow you to get your glasses on. Is that what you're trying --

A Yeah. Okay.
Q And is that -- that document is entitled the "Financial Stability Agreement"; correct?
A Yes.
Q And is that the agreement you understand as the consent agreement that you've testified about?
A I'm assuming this is the May 4th, 2012, financial stability agreement.
Q We can get you a copy.
A No. If that's the document, yes.
Q You recognize it?
A Yes, I do.
Q What was your understanding of the consent agreement?
A The city, starting with the 2009 collateral pledge agreement, June 15th, 2009, had experienced a number of financial upheavals, if you will, consistently throughout 2009 and 2010. The city again borrowed almost a quarter of a billion dollars to try to stem those upheavals in addition to the $1.4 billion that was borrowed in 2005 and 2006 and the $250 million that was borrowed in 2006 in addition to the 1.4. And this document was a result of a financial review team examination of the city that was begun in December 2011 and I believe in January or February 2012 found that the city was in financial distress. That finding by the financial review team also found that -- I think that finding or the

governor's recommendation in 2011 found that that finding was a precursor to the appointment of an emergency manager. This document grew out of the requirement that the city, as a result of the finding by the financial review team, engage in certain specified things to correct the endemic and widespread problems -- financial problems of the city -- would be required to agree to certain metrics to correct those on a very short time frame as embodied in this document, and I think it has five appendices as well.

Q Let me ask you about that, but who signed this agreement?

A This agreement was signed by four parties. It was signed by Deputy Mayor Kirk Lewis; the mayor, Dave Bing. It was signed by the governor and the treasurer.

Q And do you have -- and when was this? When was that signed?

A This was April 2012, April 5th, 2012, I believe. I think it's on the document somewhere.

Q And what did you understand the state's obligations to be under the consent agreement?

A In one of the appendices, it spells out -- I think the last one maybe, the fifth one, DRE -- it spells out certain specified obligations that the state is going to do in consideration for the city meeting certain metrics, fairly widespread, regarding both finances, revenue projections, estimation and metrics, operations, and long-term

liabilities.

Q And what were the city's obligations under that agreement?

A The city, in a series of appendices to the document, undertook about 40 obligations. Oftentimes when this document is referred to, people refer to the 21 obligations in Appendix B, but that's incomplete. The city, in Appendix C and D as well, I believe, undertook certain specified obligations in detail. In Appendix B, for instance, for the operational reforms, there were 21 specific requirements, some having to do with payroll, having to do with collective bargaining agreements, having to do with revenue estimation, having to do with the Water Department, and then in the other appendices there were obligations having to do with finance and metrics and so on and so forth.

Q What was your understanding of whether the city complied with those obligations specified in the appendices you referred to?

A When I got here, the city had undertaken one of them. I believe in November 2012 they entered into a four-year, $32 million, ADP contract. And I think there were one or two more in Appendix B that were ongoing.

Q And those are the only ones that were complied with?

A Essentially, those were the only ones in any demonstrable form that were ongoing, yes.

MR. SHUMAKER: Can you put up -- Laurie, can you put up Annex B at the back of that exhibit?

BY MR. SHUMAKER:

Q Are these the obligations of the city that you were referring to, Mr. Orr?

A Yes, they are.

Q And you indicated that the city had made progress on one or two of these?

A Yes. I believe there were demonstrable ones. There was a demolition effort. There was health and wellness department changes. I believe a privatization effort was ongoing. There was -- I believe I also said payroll was involved. Those were the ones that were ongoing at the time.

Q Now, you -- and then you also were referred to Annex D. Can you put that up?

A Yes. I would also say on Annex B there was an effort to procure technical assistance from the federal Department of Housing & Urban Development regarding grants management.

Q Here's Annex D.

A Yes.

Q These are some of the additional obligations of the city?

A Yes. Those are the ones I referred to about collective bargaining agreements.

Q Now, you also testified on Friday about another agreement. I believe you referred to it as the milestone

agreement.

A Yeah. That agreement is called the milestone agreement or the memorandum of understanding regarding the Detroit Reform Program.

Q And how did the milestone agreement and the consent agreement relate?

A The consent agreement, which was entered into in April 2012, also had two phases for Detroit Reform and certain specified metrics that the city was to undertake. Phase one of Detroit Reform was specified in some of the appendices to that agreement. Throughout that year apparently -- I wasn't here, but as I understood through reading through the documents and talking to people, the city had failed to meet some of those requirements within six or seven months of entering into the consent agreement, so the memorandum of understanding was negotiated and designed as a consideration for the city to get access to another $137 million in financial stabilization bonds later that year, and that's commonly referred -- I believe that was in November 2012, and that's commonly referred to as the memorandum of understanding.

Q I'd like to show you another document that's in evidence, which is Exhibit 7, and ask you if you recognize -- that's the cover page.

A Yes.

Q Do you recognize that document?
A Yeah. November 13th, 2012.
Q Is that the milestone agreement you referred to?
A Memorandum of understanding or milestone agreement.
Q And who signed the milestone agreement?
A Well, the milestone agreement had the signatures of the treasurer, Andy Dillon; and then the finance director for the city, Cheryl Johnson; the program director at that time for Detroit Reform, Kriss Andrews; and the chief financial officer, Jack Martin.
Q Did the Detroit City Council have anything to do with this document?
A Yes. The Detroit City Council approved aspects of this agreement in two resolutions, one by a vote of 6-0, and one says by a vote of 9-0, but I noticed that there's no check -- I thought there was no check for the president pro tem.
Q And what was your understanding as to whether the city had met its obligations under the milestone agreement?
A When I came on board on March 25th it had not. The city, however -- all the understandings -- as a component for this agreement, my understanding that is from 2010, 2011, and then in stark relief starting in December 2011, it became apparent that the city was in severe financial distress. This agreement, I believe, was a result of the city failing to comply with some of its obligations in the appendices to the

MOU. At this time, the city needed additional cash for operations, so the state used some of its authority to support the city in a bond issuance for 137 million. I believe from time to time it's referred to as a net of 129 million or so less fees and costs. In order for the city to have access to that cash, that cash was supposed to both fund operations but also assist the city in going forward with some of the reform that was specified in the MOU -- not MOU, in the consent agreement. This agreement also had certain specified obligations of the city to change some of its procurement obligations but also to retain financial professionals to assist the city and to use the proceeds of that bond issuance in part, after the retention of those professionals, as a condition to using the money.

Q And the city was unable to comply with the conditions of this agreement?

A The city was able to comply with the conditions of the agreement for the retention of an actuary, Milliman; for Ernst & Young, who had already been doing work as a city -- as its accountant but also for a restructuring effort; for Conway MacKenzie for operational restructuring; and, although not specified by name, I believe by December of this year the return of the Miller Buckfire firm. And it also retained local counsel in the guise of Miller Canfield to assist with the restructuring.

Q How about with regard to the rest of the agreement? How is the city's compliance?
A The city had not complied with more or less the balance -- as I understood it from reading the documents, the balance of the rest of the agreement.
Q Did this lead to any consequences for the city?
A Yes. Less than approximately a month later, another Detroit review team two was commissioned after finding the city was in financial -- I think it went from financial distress to severe financial crisis. That review team spent the holiday season, I believe, December and January, reviewing the city's restructuring efforts, and in February 2013 I think it issued a report to the governor finding that the city was in a financial emergency.
Q And is it that financial emergency that led to your appointment as emergency manager?
A Well, that February 2013 Detroit review team report, again, as in the prior Detroit review team, report number one, in 2012, specifies that the finding of that emergency is a precursor to the appointment of an emergency manager.
Q Is that financial emergency still in effect?
A Yes.
Q I want to ask you about a couple of other things about the city's finances aside from the consent agreement and the milestone agreement. upon your arrival as emergency manager.

What did you learn about the city's cash situation when you got here? When did you arrive? Let's start there.

A As I said, I took office March 25th under Public Act 72 as the emergency financial manager, and then effective March 28th I became the emergency manager under Public Act 436.

Q And on March 25th, March 28th, that time period, what did you learn about the city's cash situation?

A The cash situation was dire. The city was on a billion dollar budget roughly. The city was by, I believe, the middle of June -- it gets a little bump in the year from cash collections that it holds onto, but by the middle of June, the city was going to have on hand somewhere in the neighborhood of only $7 million.

Q How about the revenue situation upon your arrival?

A Revenue situation was, likewise, trying. The city's revenues had seen a period of decline in the past ten years. That's well-documented. I think it's in my June 14th report. And, likewise, the revenue collections were still challenging, and so there was no hope that the revenues were going to in some fashion make up for the shortfall in terms of the cash flow.

Q How about the city's liabilities at that time?

A The city's liabilities were significant. I had read as part of my due diligence before taking the job that the various statements of liability began in 2011 as all-in

liability, meaning both legacy costs and bond debt. At 12 billion in 2012, that grew to 14 billion. Between my appointment and within a few weeks after that, it became that the liability was approximately $4 billion larger than that, about $18.5 billion total. That's the long-term capital liabilities, but also the city's operational liabilities were quite significant, and we were not taking in enough cash to meet operational obligations.

Q Do you recall your general reaction upon learning all this about the cash and the liabilities and the revenue?

A Yeah. I knew things were bad. It was somewhat shocking just how dire it was. In fact, I think within a few weeks of coming on board or just prior to the June 14th presentation, I was informed that several of our employees had their checks bounce. They negotiated them later that day, but our cash flow on any given day was so tight that it was unclear we'd have sufficient cash on hand to meet payroll; that some of our obligations with regard to our contractors as well as our other suppliers were routinely pushed out beyond what should be an average 30-day or 45-day net period between the invoicing to the payment, oftentimes 180 days or greater; that there was no plan in place to remediate the situation and that the city was bumping along in the ordinary course in a very dire set of circumstances.

Q During this initial time frame, did the emergency manager

statute require anything of you?
A Yes. The emergency manager statute imposes upon me certain obligations with regard to reporting. I think the first report I had due was the 45-day report, and then I was obligated to have a public meeting within 30 days of issuing that report.
Q Let me show you an exhibit, which is Exhibit 75. It's in evidence.
A Yes.
Q And you see that document, sir?
A Yes.
Q And is that the 45-day plan that you just referred to?
A Here again, assuming -- without reviewing the entire document, yes, that's the May 12, 2013, financial and operating plan.
Q Okay. Did you have anyone help you in putting together that plan?
A Yes, absolutely.
Q And who was that?
A My entire team, restructuring team, as well as members of the city staff working with them, so that would be the accountants, the operational consultants, the investment bankers, the attorneys, as well as people in the finance department and operational departments of the city.
Q And this is a public document; correct?

A Yes, it is.
Q And obviously the document speaks for itself, but could you summarize generally what you concluded in this initial 45-day plan?
A Generally, we gave a snapshot of what we thought was the city's true financial condition. We both spoke to it in terms of spreadsheets but also a series of charts as far as demographic changes, crime rate, financial collections, expenditures, a number of debt issuances over and above the operational revenue collection in the document, and some of the key operational issues such as public health, safety, and welfare dealing with police, fire, EMS, and city operations.
Q And do you recall this plan containing cash flow projections?
A Yes.
Q Who put those together for you?
A Those would have been put together by a combination of the finance team and restructuring team, Ernst & Young, probably Miller Buckfire to a degree, attorneys probably lesser.
Q Okay. And were those put together at your direction?
A Yes.
Q Okay. I'd like to show you page 40 of this exhibit.
MR. SHUMAKER: If you could blow up the chart, Laurie.

THE WITNESS: Thank you.

BY MR. SHUMAKER:

Q Mr. Orr, could you tell the Court what this is?

A Yes. This is a document that shows monthly cash flow as a forecast -- that is, not actual numbers -- based upon anticipated revenue collections and projections, property tax, income tax, gaming revenue, municipal service fees from casinos, state revenue share, other receipts and refinancing proceeds. It also shows disbursements, which include payroll, benefit costs, other distributions, summarizes total disbursements. It shows what our net cash flow -- that is, disbursements over revenue -- and then it shows what our cash balances are going forward.

Q And that line near the bottom, cash net of distributions, what is that?

A That line shows what cash we would have after all the distributions were made. And as a forecast issue, it shows what cash we would have at the end of the year, December 2013.

Q And your reaction upon receiving these cash flow projections?

A A high degree of concern. Essentially, this document in our analysis showed that we would have $900,000 at the end of the year, which is below a margin of error for a billion dollar budget, so it essentially showed that we either would

have no money or would be negative in terms of cash flow.

Q And this plan, again, was issued on May 12th; is that right?

A On May 12th. It's my financial and operating plan on May 12th.

Q I'd ask you to turn -- I want to show you page 2 of that plan. There's a paragraph right at the bottom that carries over to page 3.

A Yes.

MR. SHUMAKER: And I'd ask if you'd put that up, too, Laurie. If you could blow up that paragraph, please.

THE WITNESS: Thank you.

BY MR. SHUMAKER:

Q Mr. Orr, I'd like you to read that --

A Yes.

Q -- for the Court. This was your conclusion, correct, one of --

A Yes.

Q -- your observations?

A Yes. As of --

Q What was that?

A Well, it says as of April 20 -- would you like me to summarize it or --

Q Please do.

A -- actually read it?

Q You can read it.

A Okay. Okay. As of April 26, 2013, the city had actual cash on hand of 64 million but had current obligations of 226 million to other funds and entities in the form of loans, property tax distributions, and deferred pension contributions and other payments. Therefore, the city's net cash position was a negative $162 million as of April 26, 2013. The city has been deferring and will need to continue to defer payments of its current obligations in order to avoid running out of cash.

Q Is that an accurate summary of the city's cash flow situation at that time?

A Yes.

MR. SHUMAKER: Let me ask you, Laurie, to put up page 26, and that paragraph, if you could blow it up for Mr. Orr, please.

BY MR. SHUMAKER:

Q Mr. Orr, do you recall this entry into the -- in the plan?

A Yes.

Q Would you read that for the Court?

A The City of Detroit continues to incur expenditures in excess of revenue despite cost reductions and proceeds from long-term debt issuances. In other words, Detroit spends more than it takes in. It is clearly insolvent on a cash

flow basis.

Q Was this your view as of May 12th of the city's cash situation?

A Yes, it was.

Q And you indicated that this document was publicly released. Did anyone after you released it come up to you in any forum at any time and dispute whether the city was insolvent?

A No one on a serious basis has ever disputed to me that the city was insolvent.

Q Mr. Orr, do you recall giving an interview at or about the time that this plan was released?

A I gave several interviews.

Q There was an interview by WWJ News Radio. Do you recall talking to them?

A Yes.

Q I'm going to read you a quote that -- you were asked a question, and you were quoted as saying, quote, "The public can comment, but it is under the statute. It is my plan and it is within my discretion and obligation to do it. This isn't a plebiscite. We are not, like, negotiating the terms of the plan. It's what I'm obligated to do," unquote. Do you recall giving that quote?

A On May 12th?

Q On May 12th.

A Yes.
Q What plan were you referring to when you were saying that it was a plebiscite?
A There's only been one plan. It's the financial and operating plan.
Q The plan you issued on May 12th?
A Yes, the May 12th financial and operating plan. That's the only document I've referred to as a plan.
Q And what did you mean when you said that?
A That it was my statutory obligation to issue the financial and operating plan and that this wasn't a document to be negotiated. It was supposed to be a true summary and public disclosure of the city's true state of affairs.
Q You indicated that after releasing the 45-day plan that the emergency manager statute obligated you to have a public informational meeting; is that correct?
A Yes.
Q And how soon after the plan came out were you supposed to do that?
A I was obligated to have that meeting within 30 days of the publication of the financial and operating plan.
Q Did you conduct such a meeting?
A Yes.
Q When did you have that meeting?
A June 10th, 2013.

Q Where was it held?

A Wayne State University auditorium.

Q Who was in -- I'm sorry.

A The exact name of the auditorium escapes me, but it was a large auditorium at Wayne State.

Q Who was invited?

A The public was invited.

Q And how many people attended?

A I believe it was perhaps 200. I know there was an overflow crowd, and some people couldn't get in, but the auditorium was full.

Q What was the thrust of your message at that meeting?

A The thrust of my message -- I think I took some of the slides from the May 12th financial and operating plan and used them as a slide deck in a presentation of the meeting to take the community through the financial and operating plan on a graphic basis as opposed to having to slough through the narrative and the spreadsheets. But it was basically a graphic depiction of the information we had contained in the financial summary of the information we had contained in the financial and operating plan. I also said that we would have to be making some very difficult decisions within the next 30 to 60 days. I think I mentioned that there were some powerful tools at my disposal, both the Public Act 436 as well as Chapter 9, but I would prefer not to use Chapter 9;

that I was certainly making an overture -- I think I even said an open hand -- for proposals from interested parties, but that time was moving quite quickly, and I was going to have to make some decisions because the city had been going through this process in one form or another for the prior almost two years.

Q You mentioned you showed some slides at that meeting; is that correct?

A Yes.

Q Okay. I'd like to show you a document that is not in evidence yet, so I don't want it to be shown on the screen, but I would refer you to the book of the city's exhibits, Exhibit 41.

A One marked "City"?

Q Yes, sir.

A Okay.

Q Again, that's 41.

A Okay. Yes, sir.

Q You have it?

A Yes, I do.

Q If you'd take a look at it, are you familiar with that document?

A Yes.

Q Did you prepare it?

A Yes, with my team, yes.

Q Is that the one you showed at the meeting?
A Yes.

MR. SHUMAKER: Your Honor, we would move to introduce Exhibit 41 into evidence.

THE COURT: Any objections?

MR. ULLMAN: Your Honor, to the extent that it contains the projections, we have the same objections as previously. I don't believe they were prepared by Mr. Orr personally.

THE COURT: Right. I wonder, counsel, if you would have any objection to me giving the objecting parties a continuing objection on that issue so that they don't have to rise and restate that every time.

MR. SHUMAKER: Certainly.

THE COURT: Is that all right with you, sir?

MR. ULLMAN: Thank you, your Honor.

THE COURT: All right. That objection is overruled. This document is admitted into evidence.

(Debtor's Exhibit 41 received at 9:40 a.m.)

THE COURT: You may proceed.

MR. SHUMAKER: Thank you. Laurie, if you could put 41 up -- you've done that. Thank you.

BY MR. SHUMAKER:

Q Mr. Orr, what is the -- are there any differences between this slide presentation and the 45-day plan that you were

just discussing?

A No. These graphs were generally contained in the 45-day financial and operating plan with the exception of the graph contained at page 8, which is a graphic depiction of the cash flow projections we went over in the financial and operating plan.

MR. SHUMAKER: Laurie, could you put up page 8, please?

BY MR. SHUMAKER:

Q And could you tell the Court what this is, Mr. Orr?

A Yes. This is a graphic depiction of the short-term cash flow projections from January 13 through December 13. Actually, by the time this document was prepared, the ones through approximately April, May, were actual numbers, and the projections went forward as they did on the spreadsheet on the financial and operating plan. The dark blue line shows the cash balance with deferrals -- that is, the payments we weren't making for either long-term liabilities or pension contributions -- and the light blue line shows what it would have been like -- the city's financial condition would have been like if we had not made those deferrals.

Q Okay. And when you say "deferrals," what do you mean?

A We weren't paying the money. When we say "deferral," it's just another way of saying we weren't making the

payments.

Q And what weren't you paying?

A We weren't paying a hundred million dollars of pension payments that year. I think there were some deferrals with regard to some reimbursable accounts that we weren't paying. There are a number of different things that we weren't paying at that time.

MR. SHUMAKER: Laurie, could you put up page 1, please?

BY MR. SHUMAKER:

Q Mr. Orr, could I ask you to take a look at -- this is page 1.

A Yes, um-hmm.

Q Could you read that slide for the Court?

A Yes. Detroit spends more than it takes in. It is insolvent. It has borrowed hundreds of millions of dollars and has deferred just as much in obligations in order to support city operations. This path is not sustainable.

Q Do you believe that statement was true and accurate when made?

A Yeah. I think actually this was one of the slides that I personally worked on, yes.

Q Okay.

MR. SHUMAKER: Can we go to page 13 of that, Laurie?

BY MR. SHUMAKER:

Q Do you recognize this page, Mr. Orr?
A Yes.
Q Could you tell us what that is --
A Well --
Q -- what you were intending to convey with that?
A What we were -- we were trying to say that we are currently evaluating options to adjust -- in other words, to either not pay or adjust our funded debt obligations to better fit our cash flow projections, which include a number of arrangements, such as rescheduling principal amortization without reduction in principal; that is, how you would pay the obligations that you owe without actually reducing the total amount, permanently reducing the principal amount of debt outstanding. That means giving someone a haircut. We're not going to pay. If we owe you a dollar, we're not paying a dollar. Reducing interest rates. If we owe you a dollar at credit card interest rates of 23 percent, we're not going to pay that to achieve cost savings or compensate for loss, extended principal, and issuing debt to provide for certain cash recoveries to other creditors; that is, refinancing high-cost debt with lower-cost debt to reduce our obligations.
Q And you presented each of these slides at the meeting?
A Yes, yes.
Q Was there an opportunity at the end of that meeting on

June 10th for the audience members to ask questions?
A Yes.
Q Did you answer them?
A Yes.
Q Did anyone at that time or any subsequent time come up to you after the meeting or at the meeting and say that the city wasn't insolvent?
A No. Most of the people who came up to me after the meeting expressed a level of shock. They hadn't -- some of them hadn't seen this before, and some actually expressed some gratitude for finally disclosing the true state of affairs. I think some of those comments I saw on video feeds either in newspapers or on You Tube.
Q You had another meeting a few days later; correct?
A Yes.
Q June 14th?
A Friday, June -- yes. This meeting was Monday, June 10th, and then we had the June 14th meeting for creditors.
Q Okay. I'd like to refer you to two documents in evidence. One is Exhibit 43, and if you could refer to that in your binder.
A Yes.
Q And then also 44, so one is entitled "City of Detroit Proposal for Creditors," and the other one is entitled "City of Detroit Proposal for Creditors Executive Summary."

A Yes.

Q Could you share with the Court what the difference is between those documents?

A The substance of the documents is essentially the same. 44, the executive summary, is basically a shortened or truncated version of Exhibit 43. We'd refer to them as the small slide deck and the large slide deck, but they're both the proposal for creditors that was presented to creditors on Friday, June 14th. I believe we gave the executive summary out either at or during the meeting and then gave the larger deck out at the conclusion of the meeting.

Q Okay. And so during the meeting, the executive summary slides is what was shown to the audience?

A Yes, I believe so.

Q Okay.

A Yes. I'm trying to think. Did we show the slides? I think so.

Q Okay. What were the differences between the 45-day report issued in May and the June 14th proposal to creditors?

A Yeah. What we were trying to do with the 45-day report was to give a true report on the condition of the city without any cant or any gloss. What we were trying to do with the June 14th report, which is essentially a month later, was to try to say, well, based upon this document, the true state of the city, this is what we can offer you in the

nature of a proposal. This was not a plan. It's what we were saying to creditors we would propose to deal with all these obligations that we reported in the May 12th report.
Q Was there any update on cash flows?
A I believe so, yes.
Q Okay. Who was invited to the June 14th meeting?
A We tried to invite all record debt holders of the city, according to their documents. We tried to invite all of the labor partners for the city or representatives of the labor partners. Occasionally there were parties who would call in who also wanted to be invited or wanted their representatives, either attorneys or financial advisors, to attend the meeting, and we tried to accommodate them as well.
Q Okay. Do you know how they were invited?
A We invited them through a number of ways. We followed the notice provisions of the actual debt instruments and documents. I think we did e-mails. I think we did mail as well, as well as phone calls.
Q I'm sorry. How many showed up?
A Oh, there were several hundred in the room.
Q Did this represent the entire universe of the city's creditors?
A No.
Q Why do you say that?
A Well, there are individual bondholders in terms of the

city creditors as well as trade creditors as well as labor unions as well as individual employees, both current active employees and retirees. The potential creditor core of the city probably numbers into the thousands, if not tens of thousands.

Q Who presented at the meeting?

A Me and my team. There was a panel on a DS. I believe it was David Heiman, who was a lead attorney, bankruptcy attorney, at Jones Day; Ken Buckfire, our investment banker at Miller Buckfire; Gaurav Malhotra at Ernst & Young. I believe Chuck Moore for Conway MacKenzie was there, and I also believe Bruce Bennett from the Jones Day law firm was there.

Q And they all contributed to the presentation?

A Yes.

Q What were the highlights of the presentation to the audience, as you recall?

A Well, generally, the presentation was designed to sort of take all the parties through a summary of the city's financial and operational condition, operational both health, safety, and welfare, police, fire, EMS, operations, obligations. Then we went through an analysis of more or less the city's various buckets of assets, the bridge, the tunnel, city-owned parking, city-owned land, DWSD, DIA, whatever. I think there were approximately 12 to 15 buckets

of assets that we discussed. And then we went through an explanation of how we were going to classify the various creditor cores. Generally the way you do in any restructuring is secured parties are treated in a different way than unsecured parties are. That's just like your -- the mortgage on your house has a different value to a lender as opposed to your credit card as a secured party. And then we concluded by both putting forward a proposal in exchange for downsizing or not paying the unsecured portion of the debt that we would create a note that all the parties in that pool of unsecured, whether it was a creditor or labor or a GO bond, whatever it was, would share in the note. And I think on the last page of the document we set out a timetable for both negotiations, evaluations, and decision-making.

Q Did you indicate anything about the city's payment plans with regard to various creditors?

A Yes.

Q What were they?

A Well, we announced that going forward that we would continue to pay our secured debt, the $6 billion or so, at DWSD, but that we were not going to be paying our unsecured debt, and some of the deferrals that had already been made on the year, we would continue with those. And, in fact, that day we were defaulting on our certificate of participation payment.

Q And why were you doing that?
A We needed the money.
Q Now, the title of this document is a proposal for creditors. Why did you call it a proposal?
A As we said at the meeting, and we tried to be quite clear both on June 10th and June 14th, we had some difficult decisions that we were going to have to make in a very short time frame; that we wanted to see responses from creditors quickly; that as we spelled out at the back of the document, we were going to be making some decisions based upon those responses. I think I said on June 10th and again on June 14th that if we saw proposals coming forward in the nature of term sheets or agreements in principle or something substantive and the like, we might extend our evaluation time frame a little longer beyond the July 15th, July 19th time frame, but if we did not, we were going to be making some very difficult decisions.
Q Did you tell the audience that the proposal was not negotiable?
A No.
Q Now, did you say anything about a reinvestment plan in this document?
A Yes. We mentioned the fact that one of the reasons we needed to go through this process quickly was to prepare for a reinvestments plan into the city to deal with the critical

issues we had discussed in the proposal, blight remediation, lighting, public safety, health and welfare, so on and so forth, along those lines.

Q How much was that reinvestment plan going to cost the city?

A Over the ten-year projection -- and the reason we indexed at the ten years is under 436 I'm obligated upon exit to provide a two-year budget and then a ten-year projection, so we indexed it to that period of time. And all-in on average over the ten years, it's $1.25 billion.

Q And how much of that was going to be spent on remediating blight?

A Almost $500 million in the first five and a half years. I think 50, 2014; 50, 2015; and then a hundred million dollars or so for the next four years.

Q How did you, as emergency manager, come to decide on what reinvestments were needed for the city?

A Well, it's been apparent for a long period of time, and it's been memorialized in the consent agreement that all parties on behalf of the city and the state agree to and the memorandum of understanding that these priorities were key priorities for the city. It's just that the city had not gotten at them in a meaningful way during that time, but we tracked what had already been agreed to by the city and the state.

Q Did any of your advisors focus on that area?
A On blight?
Q No. On the reinvestments for the city.
A Oh, sure. Oh, yeah, absolutely, yeah.
Q And who was that?
A Oh, all of our advisors in some capacity. I mean Conway MacKenzie had been hired at the end of 2012 to examine the city's operations. They had been doing that before I came on board. Ernst & Young I think had been on board prior in 2012. Milliman was doing its analysis based upon information obtained from the pension fund's regular actuary, Gabriel, Roeder, so they were examining obligations in that regard, and Miller Buckfire, which I believe was retained in 2012, began work almost -- I think they had been working informally prior, but they began work in earnest around that time, so all of them participated in some fashion on what we needed to do.
Q Do you recall what Conway MacKenzie did with regard to investigating reinvestment needs?
A Yes. There's another component in the financial stability agreement is that the financial stability agreement created what's called the FAB, Financial Advisory Board, and they were supervising Conway's insertion of itself in all operations of the city to examine ways to increase the efficiency of the city, which they had been doing.

Q Why do you believe this reinvestment is necessary?

A Well, I think some of it is apparent. As I said before, if you drive around the city -- this is not the way any major city or any city in America, for that matter, should operate or should look. The blight, while it has been tolerated for a long time, is unacceptable. Our police response rates by any objective measure, whether it's Bureau of Labor Statistics, Department of Justice, BJS, Bureau of Justice Statistics, or whether it's Quizzle on the Internet, show a low level of services. Our violence is apparent. I don't think any serious person -- I've heard no one say that this is the way the city should operate or that the city is not in need in some form of remediation.

Q Was the audience allowed to ask questions at this meeting?

A Yes.

Q Did they?

A Yes.

Q Did you answer their questions?

A Yes.

Q All of them?

A Yes.

Q When you made that quote about the plan being a plebiscite, were you talking about this one, the June 14th proposal?

A Absolutely not. Anybody who says that is taking the quote out of context.

Q Did you tell the audience that you would not negotiate the proposal?

A Absolutely not. We said it was a proposal. We were looking forward to having a series of meetings the next week. We were looking forward to counterproposals or suggestions. Quite frankly, given the fact that the city had been working through two Detroit review teams, three findings of financial distress, financial crisis, until March 1st, 2013, a full-blown financial emergency, all interested parties certainly had opportunity to all of those documents for over two years, to all of the metrics and timetables contained in both the MOU and the consent decree, and what was required in all aspects, both debt and labor. We anticipated that certainly very sophisticated and interested parties that were in that room had already had over two years to consider the condition of the city and would be coming forward to us with proposals.

MR. SHUMAKER: Laurie, could you put up page 61 of the summary? Could you blow that up, please?

BY MR. SHUMAKER:

Q Mr. Orr, do you recognize this slide?

A Yes.

Q What is it?

A This is the page 61, Section 9, of the proposal, whether

it's the full deck or the executive summary, and it sets out a timetable, as I said before, for how we're going to handle requests for additional information; that we wanted to have discussions with stakeholders throughout this time, essentially a month; and that we were going to evaluate those discussions following mid-July or so.

Q How much time did you say you had?

A I said I didn't have any time; that I felt at that point that I was running out of time both under Public Act 436; that my term and the powers that come with the emergency manager expire in September 2014; that some of the work we needed to get at, given that it had been discussed in detail on a number of different documents with specificity -- and I can only guess that it had been published throughout that time quite apparently throughout the city; that anyone paying attention knew that we had been working our way here certainly throughout 2012 and 2011 and that the time had come to make some very difficult decisions, to not delay, and that the regular order of things, whether it was delay, whether it was collective bargaining, whatever it was, that the regular order of things was suspended, and we were in a financial emergency and were going to have to move very quickly.

Q At this time, on June 14th, 2013, did you think that the city had to file for Chapter 9?

A No.

Q Why not?

A No. I thought that given the state of affairs in the city, given the amount of publicity surrounding the Financial Advisory Board, the agreements we discussed, the apparent condition of the city -- you know, if you live in a city where the bumpers on your police cars are falling off and every neighborhood, even the good ones, have some level of blight, you cannot possibly reasonably think that something doesn't need to be done, so I thought parties were going to be coming in with a discussion. In addition, we were already in discussions with other parties and had reached an agreement in principle on the swap agreement with Bank of America, Merrill Lynch.

Q I want to return to this time frame, but around this time, which is mid-June, you were involved in the city's budgeting process; is that correct?

A Yes. The budget is due June 30th. Yes.

Q Okay. And this is for the fiscal year budget; correct?

A Yes. July 1 through June 30 of each fiscal year.

Q Okay. Could you describe for the Court what the process was in coming up with the city's budget?

A Sure. There's a budget estimation process. There's a review of all the costs done by -- the city has 44 departments. Cost is done by departments, what the revenue is. The budget director and finance director get to go --

get together and discuss it, look at possible collections. The City Council then undertakes the mayor's budget. As he puts that together, that's sent to the council. The council makes recommendations and adjustment. The mayor gets to review it. And ultimately under 436 I have to approve or disapprove the budget.

Q Okay. So PA 436 requires you to look at the budget after the City Council passes it; is that correct?

A Yeah. I don't think -- I don't know if I have to look at it afterwards. I mean I could take it up, but I had delegated to the mayor and the council the authority to operate generally the city in the ordinary course, and that was part of the process.

Q Okay. I'd like to show you an exhibit that's in evidence. It's Exhibit 74. Take a look at that first page. And that's your signature, Mr. Orr?

A Yes, it is.

Q Okay. And what is this document?

A This document is the quarterly report that's necessary under 436 to the Treasury.

Q And does it include the city's fiscal year 2014 budget?

A I believe so, yes, a summary of it, not the entire budget but a summary --

Q Right.

A -- of the budget, yes.

Q Right. I'd like to show you Appendix D of this report.

MR. SHUMAKER: Laurie, if you could blow up the first three sentences maybe up at the top?

BY MR. SHUMAKER:

Q And is this what you were describing, Mr. Orr, about the process?

A Yes, more or less. I mean we summarized it here, but I have an obligation to approve the budget. The budget is apprised -- comprised of input from the City Council as well as their review of the mayor's cut and that to reconcile those figures with new ten-year projections under our projections and that this is the budget we're going to adopt.

Q Okay. If I could direct your attention to the middle of that page with the revenues. Obviously we know what the revenues are, but what were the total revenues at that point in time?

A Well, the total revenues, if you look at the general fund amount, are 988 million. If you include other funds, the total goes down in the bottom right-hand corner about 2.4 billion.

Q How about below that, the expenditures? Could you summarize that for us?

A Yes, yeah. Under the general fund it shows there are expenditures of about $380 million above revenues in the general fund.

Q Below there on the line under -- well, it says "total expenditures before concessions."

A Yes.

Q What -- and then concessions below that of 379; is that correct?

A Yes.

Q What are concessions?

A Well, concessions can mean both agreed to or unilaterally imposed adjustments to obligations, things you're supposed to pay.

Q And when you made the reference to concessions, what did that -- what did that mean?

A That meant both payments perhaps to -- for deferred obligations -- we knew we weren't paying a hundred million that year to the pension funds -- payments to creditors that we may not make, generally concessions we needed in that amount in order to balance the budget, the 988 over and above the 1.367.

Q Those are the payments that the city wouldn't be able to make in fiscal year 2014?

A Those are payments that the city would not be able to make as well as borrowings that the city was not going to engage in again.

Q Are you aware of any payments that the city has not been able to make in fiscal year 2014?

A Yes.

Q What are those?

A Oh, they're payments to trade creditors. We are still behind on our payments, for instance, to parts supplies that we have not made in several millions of dollars. There are creditors that we have not paid in connection with supply contracts, some of them in connection with the new police station, for instance. There are a number of different payments we have not made this year.

Q Let me return to --

MR. SHUMAKER: You can take that down, Laurie.

BY MR. SHUMAKER:

Q Let me return to the time frame after -- immediately after the June 14th creditors' meeting, if you will.

A Yes.

Q At that meeting, I believe you indicated that one of the topics discussed was the city's cash situation; correct?

A Yes.

Q Is one of the sources of the city's revenues or cash referred to as the casino revenues?

A Yes. Casino and developer fees, casino revenue and developer fees.

Q Now, what are the casino revenues as you understand them to be?

A There are three casinos in the city, and in consideration

for some time ago passing legislation for the casinos, they remit to us a portion of a tax that comes into the city in the sum of approximately $180 million a year total. A portion of that is used to pay certain creditors, and then a portion of that comes back to the city.

Q Is that an important revenue source for the city?

A That is probably -- yes, and it's probably the most stable source of revenue for the city.

Q Now, are those casino revenues freely available to the city? Are there any restrictions on the casino revenues?

A In 2009 the city entered into a collateral pledge because it was in default under the swap agreement. That collateral pledge gave a security interest to the swap counterparties. Under that collateral pledge, those counterparties, upon an event of default, had the option to execute on the totality of those payments, so they were not freely available to the city until we entered into the Bank of America, Merrill Lynch forbearance and optional termination agreement, which I believe we announced in principle on June 14th.

Q Okay. Let me ask you, you referred to swap counterparties.

A Yes.

Q Who were the swap counterparties?

A Bank of America, Merrill Lynch, and then U.S. Bank as trustee generally.

Q So there was some restriction in the ability of the city to get those revenues directly from the casinos?
A Yes. There was a mechanism by which the revenue was paid. I think the revenue is paid on a daily basis, about $500 million, into a holdback account. Then there's another distribution account when it reaches a certain level that that money is then -- about 4.2 million a month is then taken away and put into another account for the counterparties, and then every quarter that money, roughly a million or so, is then paid over to the counterparties.
Q I think you said 500 million a day.
A 500,000 a day, roughly --
Q Okay.
A -- somewhere in that --
Q I wish it would be 500 million.
A I wish it were 500 million a day.
Q So -- and this arrangement, does it have a name, a commonly referred to name?
A You mean the holdback account --
Q Yeah, the holdback account.
A -- or the swap? It's generally called a swap.
Q Have you heard of the phrase "lockbox arrangement"?
A Sure, yeah. That's a common term in financing, holdback account, lockbox, and the like.
Q After the June 14th meeting, did anything happen with

regard to the casino revenues?

A Yes.

Q What was that?

A On the following Monday, one of the parties that was a monoline insurer -- that is, insurer for some of these obligations -- called Syncora claimed that they had an interest in the swap agreement, which we very strongly disputed, and sent a letter to counterparties alleging that their interest prohibited them from performing on the agreement in principle that we had announced on Friday, the 14th.

Q So they sent a letter to UBS and Bank of America, Merrill Lynch?

A I think it was U.S. Bank --

Q Okay.

A -- and Bank of America, Merrill Lynch.

Q Okay. U.S. Bank, was U.S. Bank a swap counterparty, or were they something else?

A They were like a trustee.

Q A trustee. Okay.

A Yeah. They were a trustee for the counterparties.

Q So you had the swap counterparties, which are UBS and --

A And Merrill Lynch.

Q -- Merrill Lynch?

A Then you have U.S. Bank, which is a trustee.

Q Okay.

A Um-hmm.

Q And why would they send a letter to U.S. Bank?

A Well, we didn't know. We interpreted them -- our understanding was they had made a payment based upon our default under the certificate of participation as an insurer for the COPs, which is a separate structure. Under the swaps, which they did not have an agreement in the collateral pledge agreement, it appeared to us that they were trying to assert some interest under the swaps to bolster their position under the COPs. We thought that was inappropriate and unfounded.

Q What did U.S. Bank do in response to the letter it received from Syncora?

A Understandably, as a trustee, U.S. Bank more or less froze, and they froze the account.

Q What did that freezing of the account mean for the city?

A Well, it actually meant the city was in worse condition than it was on June 14th because not only were we getting that -- not getting that portion of the revenue, approximately $132 million that should come to us in the course of a year, but we weren't getting the benefits of the swap agreement that we had reached with them just that Friday.

Q Had you been counting on the money, the casino revenues?

A Yes, absolutely.

Q What did you do in response to Syncora's actions?

A I think I instructed our legal team to reach out to them. There was a letter. I think I wrote -- there was a series of letter exchanges over the next couple of weeks. I think I wrote back saying your position is unfounded to a -- to one of the principals, I think a Mr. LeBlanc at Syncora. I think he then wrote back to me, and this went on for about two weeks, and then I wrote another letter or two back to him, but there were a series of what we used to call nastygrams going back and forth about the parties' respective interest and how we felt they were unfounded and how they felt that they had a right to assert them.

Q Were you asking Syncora to change its position?

A Yes. We were very -- we were telling Syncora they did not have a position, that they were causing damage to the city, and they needed to cease and desist immediately.

Q Did your letters or meetings with Syncora work?

A No.

Q What was the next step that you took --

A Well --

Q -- with regard to the casino revenues?

A Well, we were relying on the casino revenue strongly to relieve the cash flow pressures that we were under from March to June because we -- mid-June we were going flow pretty

skinny cash flow negative. They refused apparently to reach some sort of accommodation. We told them if they didn't, we would have to pursue our legal remedies, and I think in this time frame we were also going through the discussion with the counterparties, certainly in the next week -- we spent that following week, the 17th through the 22nd -- 17th, 18th, 19th, 20th, 21st, 22nd -- yeah -- 17th through the 22nd having plenary meetings with a number of interested parties. We were writing these letters to Syncora. After several weeks of this, we eventually decided that we were going to have to sue them to stop, get a preliminary injunction -- or TRO, temporary restraining order.

Q Was what Syncora was doing affecting your negotiations with the swap counterparties --

A Yes.

Q -- the agreement you were talking about?

A Yes. It interfered with those negotiations quite severely.

Q So you decided to pursue legal action?

A Yes.

Q And when you say "legal action," what do you -- what do you mean?

A Well, after discussion with our team, we decided to sue Syncora.

Q Okay. And how did you go about doing that?

A We filed a complaint for a temporary restraining order in early July, July 5th, I believe.
Q Were you successful in obtaining the TRO?
A Yes, we were.
Q And what did that mean for the city?
A Well, that mean that Syncora had to cease and desist from interfering with the settlement agreement we had reached with Bank of America and Merrill Lynch and UBS; that the casino revenue begin to flow again so we had some relief from the financial pressures that we were feeling in terms of cash flow and that we could refocus quite clearly with that relief on trying to reach some agreements with other parties.
Q If the city hadn't gotten that TRO, what would it have meant to the city?
A It would have been pretty catastrophic. Without the casino revenue, even our projections for cash flow would not have flowed. We would have been short, in addition to the money we saw -- we lost on that blue graph that we discussed on the June 10th presentation, we have lost another $132 million a year, which would have put the city in dire straits. You could not cut enough city services to make up for that difference. We couldn't go back to the financial markets because we had exposed the true state of the city affairs, and any lending at that time perceivably without this revenue stream would have been very high. It would have

been very dire.

Q And you got this TRO on July 5th, you said?

A I believe it was July 5th.

Q Do you know how long a TRO typically lasts?

A In federal court it can last for a period of time, but I think this was in state court, and it had a 14-day life, I believe.

Q Mr. Orr, while you were dealing with the Syncora situation after the June 14th meeting, were there subsequent meetings between representatives of the city and its creditors?

A Yes, throughout that week, the following week.

Q I'd like to show you Exhibit 104, which has been admitted for demonstrative purposes. Do you see that, Mr. Orr?

A Yes.

Q And you see June 14th over on the left side of that document?

A Yes.

Q Could you walk us through any meetings that you participated in during this time period?

A Yes. I was at the June 10th meeting on the bottom, June 14th meeting, June 20th meeting. I believe -- I think at one other meeting or one other one-off meeting at some point the week after that, which would have been July 25th or so, thereabouts.

Q Or June 25th?
A Yeah. June. I'm sorry. June 25th.
Q Now, at these meetings, Mr. Orr, what did you tell those who came to them?
A I think at the June 20th meeting it was the afternoon session that I attended. I told them that we were -- same thing I said at June 14th essentially. We were working hard to try to get some concessions; that we were fighting very hard from a concession that we had obtained from Bank of America, Merrill Lynch; that we were looking -- we thought that that settlement as well as our willingness to default on the COPs payment would have told all interested parties that we were serious about trying to get some negotiations done fairly quickly; that we were working on a very tight time frame; and that we meant what we said in our June 14th proposal for creditors; that that was the time frame we were going to stick to.
Q Let me focus your attention on the meeting on June 20th with the nonuniformed union and retiree representatives.
A Um-hmm.
Q At that meeting, did you tell them that you would not negotiate with them?
A No. What I said was that we would not waive our rights under 436; that collective bargaining was suspended for five years under the statute, but that as long as everybody

understood we weren't engaging in collective bargaining, we'd be willing to have discussions and other negotiations short of calling it collective bargaining.
Q Did you tell the meeting participants in the afternoon session with the uniformed union and retiree representatives the same thing?
A Yes.
Q How about the meeting on June 25th with the nonunion creditors and representatives from the Retirement System?
A You know, I don't -- I'm trying to see if I meant at that meeting or if I had a separate one-off, but I think either way I was trying to tell everyone that we were meeting with the same message. We want to have discussions. We want to have proposals. We want to have negotiations, but we are not waiving our rights under the statute.
Q Did you tell the meeting participants that you -- the city would not accept proposals or counterproposals to what you had exhibited at the June 14th meeting?
A No. If anything, we kept telling people that we would accept counterproposals and we were looking for them.
Q Now, you didn't go to all the meetings; correct?
A No, I did not.
Q How did you stay informed as to what was happening at those meetings?
A My team kept me regularly informed. Typically either

during or after -- immediately after those meetings, they would stop by my office. We would have daily telephone calls. We have a number of standing calls called work in progress calls beginning of the week. At the end of the week we have team calls. During the middle of the week we have various operational calls and other calls with all the consultants. We have regular meetings and calls on a daily basis. In addition, lead counsel, David Heiman, as well as our investment banker, Ken Buckfire, speak to me essentially almost daily, maybe Ken not as much daily, but David certainly does on a regular basis. And any particular taskforce like the pension taskforce with Evan Miller, Jones Day, or Conway MacKenzie through Chuck Moore or Ernst & Young or any of their other partners would meet with me daily.

Q Do you think that any important developments at those meetings would have been reported to you?

A Without a doubt.

Q What was -- who was your team of -- who was the team that you had that went to the meetings you did not attend?

A Well, we had various teams for different obligations. For instance, on labor, we had a team headed up by Jones Day attorneys on pension and benefits. We had a team with Jones Day's attorneys, Conway MacKenzie, Ernst & Young on debt. We had a team with various attorneys as well as our investment bankers. Each sort of group between debt, labor, benefits,

employees would have members assigned to it who would attend those meetings, have follow-up calls, exchange e-mails, come back and forth with proposals. There were a number of letters that were exchanged which would routinely be shared with me.

Q Did you tell any of the members of your team not to negotiate with those who came to the meetings?

A Absolutely not. What I said is if there any serious proposals, I'm a phone call away. Typically what would happen, they would relay those proposals to me, and we'd make a consensual decision about how to respond or whether or not they were proposals that we thought were moving us forward, but, no, I was involved at every stage of that process.

Q Did you participate in these meetings in good faith?

A Yes, absolutely.

Q Do you believe your team did?

A Yes, I do.

Q Aside from the meetings that are set forth on Exhibit 104, were there other contacts with the city's creditors --

A Yes.

Q -- that you had?

A Yes.

Q What kinds of contacts?

A Various parties would routinely stop by my office, ask for meetings, either drop by when they were in other meetings

or we'd have set-up meetings. To this day, I routinely meet with various interested groups on behalf of the city. I don't think there's a point at which I have turned down a request for a meeting. Maybe if I'm busy, not immediately at that moment, but I generally will try to make myself available for any reasonable request for a meeting.

Q You believe you were available during this time?

A Yes.

Q Did any creditors submit proposals or counterproposals to you after the June 14th meeting and before July 18th?

A Yes.

Q Who did?

A I think a group of creditors led by Ambac, I believe, submitted a proposal, and then there was another sort of proposal, a single-page letter that was admitted -- submitted.

Q Let me show you Exhibit 102 and ask you, if you could, to identify it for the Court.

A I believe this was a letter that was submitted by Ambac and NPF, National Public Finance Guarantee Corporation.

Q And it was a proposal made to you after the June 14th meeting?

A Yes. I believe it was made roughly on the day that's referenced, July 15th, Monday, July 15th.

Q Okay. Aside from this proposal and the other one that

you referenced, did you receive any proposals between June 14th and July 18th from the unions?

A Nothing I would call a proposal. I think there was reference to -- may have been reference to a letter that requested collective bargaining but not a proposal.

Q How about the bondholders?

A No.

Q The retirees?

A No.

Q Pension funds?

A No.

Q Any other stakeholders?

A No.

Q At some point after the June 14th meeting, did you authorize your team to start preparing for a Chapter 9 filing?

A Yes.

Q When did you do that?

(Phone interruption at 10:24 a.m.)

THE COURT: I guess we have to pause our proceedings for a second to address this. Okay. Hold on one second. Letrice -- we're going to just pause in place here for a moment while we get the phone working again.

MR. SHUMAKER: Your Honor, this is somewhat of a breaking point if you would like to, or --

 THE COURT: Ah, let's talk about that. Okay. Just let me know when you're ready again, Letrice. Okay. On the issue of a break, because of our commitment to hear the governor's testimony beginning at one, it was my intent to call for lunch at 11:30 since the vote was to have an hour-and-a-half lunch, so in light of that, it was my intent to just plow ahead until 11:30.

MR. SHUMAKER: Fine. That's wonderful.

THE COURT: Okay. And you may proceed.

MR. SHUMAKER: Thank you, your Honor.

BY MR. SHUMAKER:

Q Mr. Orr, I forget the question.

A Okay.

Q You indicated that at some point after the June 14th meeting you authorized your team to start preparing a potential Chapter 9 filing. I believe I'd asked you when you thought that occurred.

A I think approximately late June, early July.

Q Okay.

A Maybe -- yeah, yeah.

Q Well, why did you need to start planning for a Chapter 9 filing at that point at the same time you were negotiating?

A It's basically contingency plan filing. I mean, you know, pray for peace, prepare for war. Any prudent person always prepares for the contingency that what you hope for

doesn't occur. To do so -- not do so would be irresponsible.

Q Do you believe these preparations for a possible Chapter 9 filing affected your ability to negotiate in good faith?

A Absolutely not.

Q How about your team?

A Absolutely not. We were willing to accept any agreement that came over the transom.

Q About this time -- I'm talking now July -- July 5th was the TRO.

A Yes.

Q And the negotiations that were on Exhibit 104 were -- the meetings that were taking place were going on. Did you become aware of any lawsuits filed around that time regarding the emergency manager statute?

A Yeah. There had been filed prior to this whole time frame lawsuits seeking to invalidate the statute. We were in a running gun battle with Syncora with the exchange of correspondence. We were trying to negotiate with a number of parties, I think 48 or so, 49 bargaining units, 44 or so bond issuers, 9 bond insurers. And also I believe that week, the first week of July, just before the July 4th holiday -- I think it was July 3rd -- two lawsuits -- two or three were filed against us, not against me personally at that time. I think they were filed against the state, the governor, and the treasurer, the Flowers and Webster's lawsuits, and then

we went to court. July 4th, I think, was a Thursday, and then we went to court to enjoin Syncora on the 5th, which I believe was a Friday.

Q Okay. So you believe that the Flowers and the Webster lawsuits were filed on July 3rd?

A Yes, I believe so.

Q Okay. What was your understanding of what these suits were alleging?

A There had been a lot of discussion prior to filing the suits as to whether or not the constitutional requirements of the Michigan state Constitution prohibited the adjustment of vested pension rights, and I thought these lawsuits were seeking to prohibit a Chapter 9 filing if it would include adjusting vested pension rights.

Q How did the filing of these lawsuits affect you in your role as emergency manager?

A They initially didn't really concern me. I assumed that parties were pursuing their legal rights. We were trying to negotiate. Frankly, I ignored them when they were initially filed and continued to try to reach some sort of negotiated solution with our interested parties and labor partners.

Q Did they tell you anything about the negotiations?

A Well, they suggested to me that parties were pursuing a litigation role or option as opposed to a sincere good faith negotiation option when we had already said that time was

running out. We were coming to the end of our 30 days; that they thought for whatever reason it was in their best interest to pursue litigation as opposed to coming -- proposing some sort of agreement.

Q Did this concern you?

A Yes. It wasn't -- it certainly wasn't showing of a willingness to enter into some sort of concessions or agreements. It said they wanted to sue.

Q Now, there was another lawsuit filed after the Flowers and Webster lawsuits; correct?

A Yes.

Q And when was that?

A I think that was the following week.

Q How did these lawsuits affect your negotiating posture?

A Well, from our perspective, we continued to say that we would negotiate even in the sort of litigious -- what I mean, we had been in a situation of opposition and some level of conflict from the beginning. We expected that, and that wasn't going to change our willingness to try to reach some sort of agreement. In fact, even in the face of litigation and some very contentious negotiations and statements, we continued to try to move forward.

Q Now, you indicated that in the Flowers and Webster lawsuits the governor and the treasurer were named as defendants.

A Yes.
Q In the pension fund lawsuit that you referenced --
A Yes.
Q -- on July 15th --
A Yes.
Q -- were those the same defendants?
A No. In the pension lawsuit, GRS, I believe, sued me along with some other parties, and they named me and the governor, I believe.
Q Did you continue to meet with the pension funds after they sued you?
A Yeah. We continue to meet with them now. We'll continue to meet with them, yes.
Q Did these lawsuits affect your decision to seek the governor's authorization to file for Chapter 9 bankruptcy?
A Yes, to some degree. It appeared --
Q How so?
A Well, between the Syncora litigation, that injunction was only going to last for two weeks, I believe, through the 19th or so, Friday, the 19th, I think it was -- the Webster and Flowers litigation suggested to me that an agreement was not going to be forthcoming. There was a lot of publicity regarding those lawsuits and what I viewed to be chest thumping, people saying what they were going to do and they weren't going to make any movement until we agreed as a

condition -- it appeared to be as a condition to going forward that we had to observe these sort of philosophical differences, these sort of philosophical positions that you couldn't touch vested pension rights. There was a lot of discussion in the general obligation bond community that unless we agreed to observe the implied full faith and credit of the city beyond our GO bond debt, that they weren't going to make any concessions. We had tried to tell them we could not comply with the $12 billion of unfunded -- unsecured liability, and the situation seemed to be growing more and more precarious and somewhat out of control.

Q Let me show you Exhibit 28, which is in evidence. Mr. Orr, do you recognize this document?

A Yes, I do.

Q And what is it?

A This is my recommendation to the governor, copying the treasurer, that I be given authority to file Chapter 9.

Q And it's dated as of July 16th; is that correct?

A Yes, it is. I believe that was a Tuesday.

Q Why did you send the governor this letter on that date?

A Well, as I said, I believe at that time there was a mounting level of conflict. There were a number of pieces of litigation going on. There were a number of what appeared to be conditions all parties were setting before we'd have discussions that we'd have to agree to. I was running out of

time. I meant what I said on June 14th that we were going to have to go through an evaluation period, and that was coming to a close. We hadn't received any real counterproposals from any parties. The only one actually we received in writing was from Ambac Assured and National Public Finance. We hadn't received any from the other parties, and time was running out that we said we'd have to do an evaluation, and I wanted to get the authority in hand to file Chapter 9 if we weren't receiving any proposals.

Q And is that what you told the governor in this letter?

A Yes. I told him about the condition of the city, the budget deficits, the growing liabilities, the ongoing financial emergency that he had declared now back in March, I believe March 1, 2013. We discussed our meeting with creditors and why there were certain barriers to reaching agreement and that it was time to make a decision.

Q Why did you recommend Chapter 9 bankruptcy for the city at this time?

A Well, it seemed to me that after going through a series of negotiations in the time frame that we said we would, after standing by and suffering a number of different lawsuits aimed at denuding us of the authority to make decisions under 436, after parties taking strong philosophical positions about what they would or wouldn't do based upon our position; that I had made a pledge of the time

I was going to keep open; that nobody was coming forward -- and I said it was approximate within that time frame -- and that I was running out of time. We had said for some of the things that we needed to accomplish we had to make some decisions, and, furthermore, given the amount of litigation, it was clear to me that there was going to be no other way to pursue a comprehensive and orderly resolution of the city's problems in an expeditious way.

Q On July 16th when you sent this letter, were you aware of any hearings in the Flowers or Webster or pension fund lawsuits that were upcoming?

A There were hearings that were scheduled at that time for the 22nd, I believe, the following week.

Q Were you aware of any other hearings on July 16th?

A Not on July 16th.

Q How long between concluding that bankruptcy was appropriate and sending this letter to Governor Snyder?

A Well, I think I reached the final conclusion the prior week, so drafts of the letter were probably prepared over the weekend and that Monday, and when I sent it, I was prepared to file.

Q Prior to sending this letter to the governor, did you have any agreement with the governor regarding what his response might be?

A No.

Q Did the governor respond to this letter?
A Yes.
Q I show you Exhibit 29, please. Do you recognize this document, Mr. Orr?
A Yes, I do.
Q It's in evidence. Could you give an overview of what the governor told you in this letter?
A The governor said that he had reviewed my recommendation; that he looked at the obligation of the city first and foremost to provide basic needs, basic obligations to its citizens, which were not being met; that it could not meet its basic obligations to creditors; that its failure to meet these obligations prohibited it from providing basic needs to the citizens and to its creditors; and that the only reasonable path to resolving this would be the filing of a bankruptcy.
Q And did he authorize you to file for a Chapter 9 --
A Yes.
Q -- bankruptcy?
A Yes, he did.
Q When on July 18th -- that's the date you received this letter; correct?
A Yes, it is.
Q When on July 18th did you receive this letter?
A I believe I received this letter late morning, maybe

early afternoon.

Q How did you receive it?

A I think someone on my staff brought it to me at first.

Q Hard copy?

A Yeah. I think it was either e-mail or fax, yeah.

Q What did you do upon receiving this letter?

A I called the attorneys and instructed them to prepare to file the bankruptcy case.

Q Why do you believe this Chapter 9 filing was in the best interest of the citizens of Detroit?

A I believe that the city had been dealing with the issues, as I said before, both on the creditors' side and some of its city operations and work rules for a long time. I believe that they had been agreed -- the city and the state and then the city officers and the state had agreed over a long period of time to resolve some of these issues. They had spelled them out in detail; that for whatever reason they were not being addressed in a timely fashion; that there are a number of efforts and safeguards that the parties had agreed to to redouble those efforts in specificity in the financial stability agreement, Detroit Reform 1 and Detroit Reform 2; that they failed to meet those obligations, so they started to put milestones in place to try to achieve those obligations. Those were not met; that the city had gone through between 2012 and 2013 essentially three different

reviews that had all gone from financial distress to financial crisis to financial emergency; that upon my appointment we were trying to look at some of those very same issues. We had specified to people that given this length of time that those issues had been discussed, that after our June 14th presentation we were going to take a certain period of time to do evaluation for counterproposals, which we thought were forthcoming; that they were not forthcoming; that we were running out of time both in terms of what was required in the statute and any reasonable period of time to get through a bankruptcy filing; that I had to make a difficult decision to try to resolve these issues once and for all in a comprehensive and orderly way under the guise of federal law so that they could be all resolved finally and the city could move forward to deal with some of the amazingly necessary reforms that have been agreed to by everyone in the city for two years.

Q Do you still believe that this bankruptcy filing is in the best interest of the citizens of Detroit?

A Yes.

Q If the city isn't eligible for Chapter 9, what's next?

A If the city isn't eligible for Chapter 9, there's either free-fall crisis -- I mean this city -- and I'm certainly -- the people that live here have seen this. This city for ten years, from 2000 to 2010, lost a city the size of Romulus or

Wyandotte every year, 24,000 people on average. That is free-fall flight out of the city. The services have degraded to a point that they are severely substandard, and they are apparent. To put the city either back in the status quo, which is clearly unacceptable -- and nobody of any serious note disagrees with that. No one says that we should go back to the way it is. No one says that our ability to meet our creditors should continue to be deferred or we should borrow more debt upon debt that for ten years averaged over a hundred million dollars deficit; that we have $1.4 billion that was supposed to resolve our pension obligations in 2005 and 2006. No one says that's an adequate way to proceed. If we do not go through Chapter 9, this city --

MR. DECHIARA: Objection, your Honor.

THE WITNESS: -- will continue to fail.

MR. DECHIARA: I would just object.

THE COURT: What is your objection, sir?

MR. DECHIARA: Speculation. He's speculating about events that are counterfactual and about the future.

THE COURT: The objection is overruled.

MR. SHUMAKER: Thank you, Mr. Orr. That's all I have.

THE WITNESS: Yes, sir.

THE COURT: All right. Cross-examination. Okay.

MR. ULLMAN: Your Honor, may I tilt the lectern so

I'm more facing the witness?

CROSS-EXAMINATION

BY MR. ULLMAN:

Q Good morning, Mr. Orr.

A Good morning, Mr. Ullman.

Q Now, we've met before, haven't we?

A Yes. Yes, we have, several times.

Q Twice, I think. I'm going to -- just preliminarily let me ask you a few questions. Now, apart from a college degree, do you have any degree other than a law degree?

A No.

Q You're not a CPA?

A No.

Q You're not an actuary?

A No.

Q Okay. I believe you testified that you've been with Jones Day since 2001; is that right?

A 2001 until March 15th, 2013.

Q Okay. So you were --

THE COURT: Excuse me. Would you point the microphone more towards you?

MR. ULLMAN: Is this better?

THE COURT: Yes.

MR. ULLMAN: Sorry.

THE COURT: Thank you, sir.

MR. ULLMAN: Okay.

BY MR. ULLMAN:

Q So you were a practicing attorney at Jones Day for about 12 years prior to becoming the emergency manager; is that right?

A Yes.

Q And I think you indicated you were primarily in the bankruptcy and restructuring group?

A Yes, litigation at first and then bankruptcy and restructuring.

Q Right. Now, you also mentioned that you'd been at the U.S. Trustee's Office; is that right?

A Yes.

Q And that was from around 1995 through 2001, if I recall?

A Yes.

Q Okay. And while you were there, did you ever serve as an actual trustee in a bankruptcy case?

A No.

Q And prior to the U.S. Trustee's Office, I believe you indicated you were at the RTC?

A Yes.

Q Okay. And that would have been from about '92 to '95 if I got the dateline right?

A Yeah. We originally came in as attorneys at FDIC. We were then assigned to RTC. RTC then got authority to hire

its own attorneys, and I became an attorney at the RTC proper.
Q Okay. So that's the general time frame, '92 to '95, that you were there?
A Yes. '91 through '95.
Q Okay. And I believe you mentioned that while you were at the RTC you served as the chief legal officer for a savings and loan company that had a sub-subsidiary or holding company called Landmark Land?
A Yes.
Q And you indicated that you ended up being responsible for the disposition of the assets of that company?
A Yes.
Q Okay. And those, I think you said, were golf courses and country clubs?
A There were a number -- golf courses, country clubs, vacant land, financial assets, yes, number of assets.
Q Okay. And the golf courses and country clubs, of course, are relatively high-value assets or --
A Yeah. They were at the time.
Q And that was all around 18 years ago; is that right?
A Whatever the math works out to, Mr. Ullman.
Q Okay. I think that's it.
A Um-hmm.
Q And is it correct that prior to becoming the emergency

manager, you never ran a city?

A No. Most governors haven't --

Q Okay.

A -- nor mayors.

Q Okay. And prior to becoming emergency manager, you never had responsibility for budgeting all of the various departments that are involved in running a city or a state; is that right?

A That is correct.

Q And you've never been employed by a corporation, have you, putting aside governmental like the RTC, in a private company?

A Well, there were times in college jobs that I was employed by corporations, but do you mean --

Q Well, after.

A -- during my professional career?

Q Yeah, in your professional career.

A I've been an attorney, then in government, and then an attorney again, yes.

Q Okay. And is it fair to say that other than being a bankruptcy and restructuring attorney, you have no particular expertise in finance?

A Well, I've been either a litigator or a regulator, a banking regulator, at FDIC, RTC, or an investigator when I handled the Whitewater investigation on behalf of the RTC for

six years. Whatever that amounts to is what it amounts to.

Q Okay.

A But are you saying do I have any particularized degrees or certifications?

Q I'm asking if you could answer my question, Mr. Orr, because --

A Sure.

Q -- I really don't believe you did, and it was -- the question was simply whether it's fair to say that other than being a bankruptcy and restructuring attorney, you have no particular expertise in finance?

A That's a broad question, but I'll grant you this. That's what I've been throughout the balance of my career.

THE COURT: Excuse me one second. I need you to move back from the microphone just a bit.

MR. ULLMAN: Okay.

THE COURT: Maybe not that much.

MR. ULLMAN: Okay.

THE COURT: Go ahead.

BY MR. ULLMAN:

Q Okay. So is the simple answer to my question "yes," that what I said is true? That would be a fair statement?

A If that's your characterization -- and I don't mean to joust with you, Mr. Ullman, but I think that accomplishes a number of things, but to move forward, I'll say your question

a fair representation.

Q Thank you. Let's go back to your time at Jones Day. Now, you indicated you were there as of 2012. Yes?

A Yes.

Q Okay. And Jones Day, of course, is the restructuring and bankruptcy counsel to the city, of course; right?

A Yes.

Q And we know that Jones Day got that work following a pitch that it made to various representatives of the city and the State of Michigan in January 2013; is that right?

A That is correct.

Q And you were part of the Jones Day pitch team at that time?

A Yes, I was.

Q And is it correct that one of the things that Jones Day was pitching at that meeting, at that presentation was its expertise and experience in municipal bankruptcy work?

A I think that's a fair statement.

Q And Jones Day prepared a pitch book, did it not?

A Yes, we did.

MR. ULLMAN: Can we put Exhibit 418 on the screen, which is the common exhibit 418?

BY MR. ULLMAN:

Q And what we have here is the cover of that pitch book; correct?

A I believe so.

Q And you were engaged in -- or you participated and took part in the preparation of this pitch book; right?

A Yes, to some degree.

Q And among other things, this pitch book laid out Jones Day's thoughts and insights on subjects, including municipal bankruptcy; is that right?

A Yes, I believe so.

Q Okay. And it also addressed issues relating to the appointment of an emergency manager; is that true?

A Yes, I believe it did.

Q Okay. And is it correct that the thoughts and insights prepared by the Jones Day pitch team and addressed in this pitch book included the possibility of a Chapter 9 bankruptcy filing made by the emergency manager?

A Yes, I believe it did.

Q Okay. And is it also the case that the Jones Day thoughts and insights specifically included using the backdrop of a bankruptcy filing, a Chapter 9 filing, as a tool for gaining leverage with creditors?

A I think it certainly contained -- if you're talking about the presentation, it certainly contained the potential pros and cons of Chapter 9, yes.

Q Okay.

MR. ULLMAN: And could we put up page 15?

BY MR. ULLMAN:

Q Okay. And so there's no question that it talked about that specifically. This is page 15. The heading you see is "Impact of Possible Emergency Manager Appointment." Do you see that?

A Yes. Thank you for putting up the page. If that's what you're talking about, that's what it says.

Q And the third bullet talks about the ability to commence a Chapter 9 filing quickly if warranted?

A If warranted, yes.

Q And the next bullet point talks about how that can create negotiating leverage, as they phrased it here, negotiating with the backdrop of bankruptcy; is that right?

A Yes.

Q Okay. And that's one of the points that the Jones Day team was making to the city and the state at this January presentation; correct?

A Yes. That's a point I echoed during my June 10th presentation.

Q Okay. And the Jones Day team also referred to this as, quote, "negotiating in the shadow of Chapter 9." Is that another phrase that you recall being used?

A It may have been used. This says "negotiating with the backdrop of bankruptcy," but "shadow," "backdrop," essentially the same.

Q Okay. And if we turn to page 17 of this presentation, we see right down there in the arrows that are following the third bullet, "negotiating in the shadow of Chapter 9"; right?
A Yes. It's essentially the same.
Q That's spelled out expressly, isn't it?
A Yes. Shadow, backdrop.
Q And is it fair to say that Jones Day was recommending the use of Chapter 9 as a threat in dealing with creditors?
A Your question implicates a threat. We will stand by -- or, rather, we were trying to say here that this was an alternative, as I said at June 10th.
Q Okay. So you'd rather stand by what's said in the pitch book; is that right?
A Sure.
Q Okay. Well, let's go to page 18 of the pitch book. Okay. And I'd like you to focus on the third paragraph, if we can highlight, and it says, "Creditors understand that a troubled municipality has greater leverage in a Chapter 9 case. Accordingly, developing an out-of-court restructuring plan that can later be implemented in Chapter 9, if necessary, can create leverage in favor of a negotiated deal." It goes on and then says, "This is particularly the case if an emergency manager is appointed because the threat of a Chapter 9 filing -- threat of a Chapter 9 filing,

including potential moratorium on payments, will be more tangible and possibly even more imminent." Did I read that correctly?

A Yes, you did.

Q Okay. And didn't Jones Day, in fact, say that having a viable threat of Chapter 9 was critical to Detroit's being able to restructure its debt?

A If that's in the document, yes, that's what we said.

Q Okay. And just so we can confirm whether it is or not, let's look at page 46. And if we look at the first bullet point right on the top, that's exactly what it says, isn't it?

A Yes.

Q So there's no question this is what Jones Day was telling the city and state in January of 2013?

A Yes. It's in the document.

Q And is it correct that Jones Day was also specifically recommending Chapter 9 as a way for Detroit to avoid payment of vested pension benefits?

A I believe we were recommending possibly filing a Chapter 9 as a way to avoid a number of things, included pension rights.

Q Okay. And isn't it correct that the Jones Day team specifically told the city that, in their view, Chapter 9 could, in fact, be potentially used to get out of accrued

financial benefits that were otherwise protected under the Michigan Constitution?

A You mean in the document?

Q The document.

A Yeah, I believe so.

Q And just so we can see whether that's right or not, can we look at page 41? And, in fact, that language appears there in what I've just highlighted; isn't that right?

A Yes. I said so.

Q Okay. Now, is it correct that the reference that we've just seen here that's still on the screen where it says cutting back or compromising the phrase "accrued financial benefits otherwise protected under the Michigan Constitution," that that's referring to accrued financial benefits that are protected under what's known as the pension clause of the Michigan Constitution?

A I believe so.

Q Okay. And were you aware of the -- and just for clarity, the pension clause is Article IX, Section 24, of the Michigan Constitution?

A I believe that's the appropriate section.

Q Okay. And were you aware of the pension clause prior to becoming the emergency manager?

A Yes.

Q Okay. And on becoming emergency manager, you took an

oath, didn't you?

A Yes, I did.

Q Okay. And I'm going to read you something. I'd like you to tell me whether it's correct that this is the oath you gave. Quote, "I do solemnly swear that I will support the Constitution of the United States and the Constitution of this state and that I will faithfully discharge the duties of the Office of Emergency Financial Manager, City of Detroit, according to the best of my ability."

A I believe that's the oath I took, yes.

Q And were you speaking truthfully when you gave that oath?

A Yes.

Q And I believe you've previously indicated that you understood that that same oath applied to your conduct as emergency manager as well; is that right?

A I believe so.

Q And I believe you've testified that upon becoming the emergency manager, you set about formulating a restructuring plan -- let me withdraw that. I guess on becoming emergency manager, you first put together a plan that showed the financial situation of Detroit and also made some observations or recommendations as to what you believe needed to be done; is that right?

A Yes.

Q Okay. And that's the May 12th document that we looked at

earlier.

A The May 12th financial and operating plan.

Q Right.

MR. ULLMAN: And let's put the first page of that on the screen.

BY MR. ULLMAN:

Q Okay. I'm just going to ask you a few questions about this. If we can go to page 21 -- and just to give the context, I think you've already testified this morning that a lot of this document was spent detailing what you perceived to be the financial situation of Detroit as it stood after you assumed your post as emergency manager; right?

A Yes. I believe that's correct.

Q Okay. And is it correct that as part of the initial review that you did, which was -- which culminated in the document that we have on the screen, which is Exhibit 407, that you made a determination that, in your view, accrued rights to pensions -- to pension benefits had to be cut?

A I think it's fair to say that we came to that conclusion, yes.

Q Okay. And you had come to that as of May 12th, 2013, the date of this operating plan and proposal; is that right?

A I think as of May 12th we made a representation that all stakeholders would have to be adjusted, yes.

Q Okay. So that we're clear, that at this point in time

you had made the determination that, in your view, vested pension benefits of Detroit's retirees had to be cut back; is that right?

A I think that's a fair characterization of what we're saying.

Q Okay. And at the time that you made that determination, you said you were aware of the pension clause in the Michigan Constitution?

A I think I said -- yes.

Q Okay. So you were aware at the same time that you made that determination that the pension clause specifically provided against the diminution or impairment of accrued financial benefits?

A Well, that's a conclusion. I think you'll remember, Mr. Ullman, during my deposition I said that, you know, we might either have concessions or we might have to go Chapter 9, but I think your characterization is fair one way or the other.

Q Let's turn now to the proposal that you made to creditors. That's the June 14 proposal.

MR. ULLMAN: Let's put the first page on the screen.

BY MR. ULLMAN:

Q And this is -- what we have here is common Exhibit 408. It's just a different -- I think you were shown this earlier today. I think the city used its exhibit number. We have the same document, just a different exhibit number --

Q Yeah.

A -- but it's the same.

A If you tell me it's the same thing, that's fine.

Q It's the same. Okay. Now, this, of course, is the proposal that you made to creditors in June -- on June 14, 2013.

A Yes.

Q And I believe it states expressly in here that, in your view, there have to be significant cuts to vested pensions; is that right?

A I believe so.

Q Okay. And just so we can see that, if we look at page 109 -- right -- we see the phrase that there must be significant cuts in accrued vested pension amounts for both active and currently retired persons; correct?

A Yes.

Q Okay. And is it correct that under this proposal, it shows current employees being switched to a defined contribution plan?

A That was our suggestion, yes.

Q Okay. And that would be a totally new plan from the one that had been in effect up to this point in time; is that right?

A We would be going from a defined benefit plan to a new defined contribution plan, yes.

Q And is it correct that under the June 14 proposal there would be some ongoing pension contributions for active employees under the new defined contribution plan but no pension contributions for active employees on account of pension benefits that were already vested?
A I think so. In other words, you're talking about closing the plan --
Q Yeah.
A -- the current plan? Yes.
Q Okay. So for the vested pension benefits, the contributions for those would be cut entirely for actives; is that right?
A I think the plan would be closed. I don't know if they'd be cut in the entirety, but what you mean -- there would be benefits under the existing plan that would continue to be paid out in some portion.
Q Well, what I meant is that under this proposal, it shows the city not making any more pension contributions for active employees for vested pension rights; is that true?
A Yeah. I think we switched to a different plan and would make contributions for a defined contribution plan as opposed to defined benefit plan.
Q All right. And under the defined benefit plan, the vested benefits, no more contributions being made by the city?

A It would be a different plan. That is correct.
Q And is it correct that under the June 14 proposal the pension contributions for retirees would be cut in their entirety?
A You know, Mr. Ullman, you keep saying "cut in their entirety." I don't want to give the wrong impression that somehow there'd be no pensions under the prior plan. When you say "cut in the entirety" --
Q Let me --
A -- if you mean -- let me finish my thought -- if you say "cut in their entirety," you mean that that plan would no longer continue, then your statement is accurate.
Q Well, I think what I was asking about was the pension contributions which are made by the city. The city would stop making pension contributions for retirees; correct?
A For retirees?
Q For retirees.
A Yes.
Q I've turned -- I'm asking about retirees now.
A Yes.
Q So what I said is true, that the pension contributions that had previously been made by the city on account of retirees are shown under this proposal as being cut in their entirety; right?
A The city would no longer make contributions. Here again,

for purposes of public concession, I don't want to say there are not going to be pensions for retirees. That's the only difference.

Q Okay. So we're clear, I am not saying that there would not be some ongoing pension amounts paid because of funds that were already there. I'm talking about contributions for vested pensions being made by the city. Under this proposal, those are over; right?

A With that clarification, yes.

Q Okay. And is it also correct that this proposal is showing health benefits for retirees being cut entirely; in other words, under the financials that are shown in this proposal, there's no more line item showing that the city is going to be paying out health benefits for retirees?

A Well, it shows that the current benefit plan will be cut. There will be payments made to some retirees with a stipend, either 120 or $125 a month, but that plan will be cut, yes.

Q Okay. I was asking specifically about this document. Is there anything in this document that shows anything other than the health benefit payments to retirees being cut?

A No, but I want to be clear on the record and also clear for the public. The fact that it's not in this document doesn't mean that that hasn't evolved, so let's not give a bad impression.

Q Mr. Orr --

A The reality -- let me finish my thought. The reality is your statement is correct under this plan, but that has evolved, and you know that.

Q Mr. Orr, I would request that you confine your answer to asking -- your answer to responding directly to my question --

A Um-hmm.

Q -- as opposed to volunteering information or providing extraneous information.

MR. ULLMAN: Your Honor, if you could ask the witness simply to respond, things would go more quickly.

THE COURT: Please just respond to the question.

THE WITNESS: Yes, your Honor.

MR. ULLMAN: Thank you, your Honor.

BY MR. ULLMAN:

Q So my question was that what's shown in this June 14 proposal shows healthcare payments that otherwise or in the past had been made by the city to retirees being cut completely; true?

A Yes. We would close a defined plan and change to a different plan, yes.

Q We're talking about healthcare.

A Yeah, I understand.

Q Okay.

A I'm just saying -- I'm using those terms, yes.

Q And so we're really clear, does this -- this specific document, this June 14 proposal, actually show the city in the future making any payments to retirees on account of healthcare?
A I don't believe it's contained in this document.
Q Thank you. And is it correct that under this proposal, the June 14 proposal, that all the retirees would get is some share of the notes that the -- the $2 billion or so in notes that the City of Detroit would be issuing?
A Yes. That was the proposal.
Q And is it correct that under the June 14 proposal, there's no way to tell how much in cash value any retiree would actually get if this proposal were accepted or otherwise went through?
A No. The proposal was a proposal, and we asked for responses, so, no --
Q Again --
A -- in the proposal there's no way to tell.
Q Yeah. If you could just answer the question, Mr. Orr, I'd appreciate it.
A I was doing that. Under the proposal the answer is yes.
Q Okay. "Yes" in the sense that there is no way that anyone would know -- there's no way to tell how much the retirees would get in cash value; is that correct?
A I think that's fair.

Q Okay. Now, this is June of 2013 that we're talking, right, this proposal?
A Yes, June 14th, 2013.
Q And at this point in time, did you have any ability as the emergency manager to actually impose the cuts on pension benefits that we've shown are reflected in this proposal if the retirees did not agree to it?
A Unilaterally?
Q Yes.
A I want to be responsive. I think it's fair to say --
THE COURT: If you can't answer the question "yes" or "no," just say that.
THE WITNESS: Okay. Please repeat your question.
BY MR. ULLMAN:
Q As of this point in time -- and we're talking June 14, June 2013 -- did you have any ability as the emergency manager to actually impose the cuts on pension benefits that are reflected in this proposal that we've discussed if the retirees did not agree to it?
THE WITNESS: Your Honor, that may call for a legal conclusion, and I don't want to be evasive.
MR. ULLMAN: I'm not --
THE WITNESS: Pardon me.
MR. ULLMAN: I'm not asking for his legal conclusion. I asked him what he believed, what he understood

his authority to be as emergency manager.

THE WITNESS: Let me say this, Mr. Ullman. I believe that my authority under 436 by itself would not give me that authority.

BY MR. ULLMAN:

Q Is the answer to my question then "no"? It's not that tough.

A No, it's not, but it implicates other things, but I'll give a "no" --

THE COURT: Well, I would say it's an extremely tough question.

THE WITNESS: Yeah. I mean it --

MR. ULLMAN: I never argue with the Court, your Honor.

THE COURT: I've got mountains of briefs to prove it.

THE WITNESS: Yeah.

BY MR. ULLMAN:

Q But, again, Mr. Orr, we're just talking as of June 2013.

A I understand the time frame we're talking, Mr. Ullman, but the reason I'm -- I'm not trying to joust with you here. The reason I'm trying to not follow your question with a simple "yes" or "no" answer is because that's a large debate as to what's required under 436, whether or not the provisions of 436 somehow can be trumped or implicated by the

Constitution, and whether or not there's a federal law overlay, so I want to be very careful. I understand what you're trying to ask me --

Q Let me --

A -- but -- let me finish my thought, please. I understand what you're trying to ask me, but I'm trying to relay to you that it's a much more complex question.

Q Okay. And I'm specifically asking as of the June 2013 time frame because at this point in time the Chapter 9 petition had not been filed.

A Yes.

Q Okay. So at this point in time, when the Chapter 9 petition had not yet been filed, did you have the ability, as you understood it, as emergency manager, to actually impose the cuts on the pension benefits that are reflected in this proposal if the retirees did not agree to it?

A I don't know.

MR. SHUMAKER: I'm going to object. Calls for a legal conclusion.

THE COURT: That objection is overruled.

THE WITNESS: Yeah. I don't know.

BY MR. ULLMAN:

Q And did you address that question? Did you analyze it?

A Yes.

Q Okay. And did you take into account in your analysis the

pension clause?

A Yes.

Q Okay. And isn't it correct that you understood that as of June '13, again, prior to the Chapter 9 filing, that you, as emergency manager, during that time frame, did not have the ability to actually impose the cuts on pension benefits if the retirees didn't agree?

A I don't know.

Q Okay. Did you obtain legal advice on that from Jones Day?

A Yes, from a number of different sources, yes.

Q Okay. And what did Jones Day tell you?

MR. SHUMAKER: Objection, your Honor. Calls for attorney-client communications.

MR. ULLMAN: Fair enough.

THE COURT: All right. The objection is sustained.

BY MR. ULLMAN:

Q Isn't it correct, Mr. Orr, that absent a consensual resolution, the only way that the proposal set out in the June 14 document could be implemented, if at all, was in the context of a Chapter 9 filing?

A No. I don't know if that's correct.

Q Okay. And what other avenues did you think were available to you, if any, again, putting aside a consensual resolution or a Chapter 9 filing?

A A court might conclude that under 436 I would have the authority to achieve those results.
Q Okay. So was it your contention that under PA 436 you were authorized without a Chapter 9 filing to take actions that were in contravention of the pension clause of the Michigan state Constitution?
A Mr. Ullman, you're trying to get at this a different way. Here again, there are a number of different potential legal outcomes, and I want to be very careful. Let me help you, if I can, to try to move along. Okay. A bland reading of the statute might get to your conclusion, but that ignores a number of different factors that have to be analyzed and concluded possibly by a court.
Q I'm just asking your position, Mr. Orr. Was it your position, again, in the June 2013 time frame, that you had some -- that the authorization that you had, the powers you had under PA 436 enabled you to take actions that were in contravention of the pension clause of the Michigan state Constitution?
A It's my position that 436 might have given me that authority.
Q Okay. And is it -- was it your position that the state legislature could amend the state Constitution simply by enacting legislature -- or legislation that authorized state actors to do things in contravention of the pension clause?

A I don't know the answer to that question, Mr. Ullman. That's a legal issue.

Q Okay. Now, nothing in -- but it was, nonetheless, your position that you thought you could do things that were specifically prohibited by the pension clause of the Michigan Constitution; is that right?

A That's a conclusion that you're making. What I'm trying to say to you is those were a number of legal issues that were being analyzed, and sitting here today, I don't know what the exact answer is.

Q Okay. Now, nothing in this document, this June 14 proposal, acknowledges -- well, let me ask you this question. In the course of your analysis on that issue, did you identify any case law that indicated to you that the emergency manager had powers under PA 436 to take actions that were prohibited by the Michigan Constitution?

A Mr. Ullman, I'm not acting as an attorney in this job, so, no, I did not identify any case law.

Q Okay. Is there any other authority that you can identify that you recall having looked at?

A Without getting into the content of the discussions, there are discussions that I had with attorneys, but I would not have done that research.

Q Okay. So I take it then at this point in time, the implications and the restrictions of the pension clause in

the Michigan Constitution were something that you were specifically focused on; is that right?

A I was aware of it, yes.

Q And you were aware that that was something that, depending on how things ultimately turned out, could be interpreted to prohibit your taking action that diminished or impaired accrued financial benefits that were due to retirees?

A Yes. I think that's a fair statement.

Q Now, there's nothing -- going back to the June 14 proposal, is there -- we've talked about the effect that the restructuring that's shown in here would have on the pensions. Is there anything in this June 14 proposal that acknowledges that accrued pension benefits are protected under the Michigan state Constitution?

A I don't think so.

Q Okay. Now, I think you made some reference in your testimony to how potentially there could be, you know, thousands of individual retirees that might be affected by this?

A I think there are thousands of individual retirees.

Q And you said that in theory -- at least in theory they could come and make proposals or talk to you about this June 14 proposal; is that right?

A Well, what we said was any party could come and make a

proposal, but we asked the unions early on would they represent retirees. They declined to do so, and so we said we needed a Retiree Committee.

Q Mr. Orr, you're really going well beyond what I asked you, so I would just appreciate if you'd focus on my question and answer it. If you think my question is confusing, let me know, and I'll be glad to rephrase it.

A No. I'm just trying to give you a complete answer.

Q Okay. And I just -- I would appreciate if you'd give me an answer to the direct question.

A I will.

Q So, now, with respect to the retirees, you understood that this was a document the retirees themselves, individuals, might well have access to and look at?

A We put it on the website, yes.

Q Okay. And you understand that retirees -- individual retirees are not necessarily fully aware of all of the legal provisions that exist in the State of Michigan?

A Some may be; some may not be.

Q Okay. And given that you envisioned that this document might be read by individual retirees, you still didn't see fit anywhere in here to mention that one of the things this proposal was doing, if it went through, is taking away pension rights that were protected under the Michigan Constitution?

A I think we made a proposal and were offering solutions. The proposal is what it is.
Q Um-hmm.
A I think the issue of retiree benefits had been fairly widely discussed in a number of different forums.
Q Um-hmm.
A I think anybody could have come in with a counterproposal.
Q Okay. And so in the interest of complete disclosure and putting all the things on the table, you still didn't feel it either necessary or appropriate to mention anywhere in this -- is it a hundred-some-odd-page document that one of the things that the proposal was proposing to take away were pension rights that were specifically protected under the Michigan Constitution?
A I think we said that in the highlighted portion.
Q That the pension rights were protected under the Michigan Constitution?
A No. I think there must be significant cuts in accrued vested pension rights.
Q That wasn't my question.
A If you're trying to get to the point as whether or not we should have -- we should have said Michigan Constitution, I think that was discussed quite broadly throughout this time period.

Q You're really still not answering my question, Mr. Orr. Given the fact that in this document, this some -- hundred-some-odd-page document that you said could be, you know, seen and reviewed by retirees, and given that this document -- the proposal, if it went through, would be taking away protected pension benefits, you didn't see fit anywhere in here to mention at all, even in passing, that the pension rights that this proposal shows as being cut in their entirety were specifically protected under the Michigan Constitution?

A The protections of the Michigan Constitution are not contained in this document.

Q And you didn't think that's something that ought to be mentioned, did you?

A I think everybody knew that, Mr. Ullman.

Q Okay. So you didn't believe that that was something you thought you needed or felt appropriate to mention in this document; correct?

A Mr. Ullman, it was quite public at that time that the attorney general had taken a position on that point. I think everybody was aware of it.

Q Okay. And in light of that, is that the only reason you didn't see fit to mention it?

A No. I think we mentioned what our proposal was, and whether or not the intent to include the Constitution was a decision that we made.

Q Now, Chapter 9 isn't mentioned anywhere in this June 14 proposal either, is it?
A I don't believe so.
Q And isn't it correct that this proposal was made against the context that if an agreement on the proposal wasn't reached, the city would, in fact, be filing for Chapter 9?
A I think I said on June 10th that I had a powerful statute; that we have another powerful tool called Chapter 9, but I don't want to use it, but we're going to have to make some difficult decisions.
Q So to go back to my question, is it correct that this proposal was made against the context that if agreement on the proposal wasn't reached, the city would file for Chapter 9?
A No.
Q Okay.
A What we said was that the proposal was a proposal, and we were looking for counteroffers and that we were going to have to make some evaluations within the next 30 days; if we had received agreements in principle and the like, we perhaps might extend that, but the proposal does not say that if we don't receive those agreements, we're going to file Chapter 9.
Q Well, hadn't you publicly stated around this time that the June 14 proposal -- around the time the June 14 proposal

was made that you intended to try to use Chapter 9 to try to trump the state Constitution?

A I think what I said at that time was that we had powerful tools, as I said before on June 10th. Chapter 9 was one of them, but I didn't want to use it.

Q Okay. And didn't you state that one of the -- that the state Constitution provision that you were trying to trump was the pension clause?

A I think I may have said at some point, either that time or before, that I felt federal law would trump state law.

Q Yeah. Do you remember at your deposition I asked you some questions about an interview you gave on June 14?

A Yes, I believe you did.

Q Okay.

A I don't remember exact -- if you want to refresh my recollection.

Q Were you testifying truthfully when you gave your testimony?

A Yes.

Q Okay. And do you recall giving the following testimony when I deposed you about one of the -- some of the things you said on June 14?

MR. ULLMAN: Do we have the clip? It's around lines 113.

(Videotape of deposition at 11:19 a.m. as follows:)

BY MR. ULLMAN:

"You gave an interview that I'm sure you're familiar with with the Detroit Free Press on or around June 14th. Do you remember? I'll just tell you what I believe you said, and you can tell me -- I'm sure you remember this one, and you can tell me -- if not, I have the quote.

Yeah. You can give me the quote. There's so many interviews, but I'll trust your quote.

Okay. This is the quotation.

'Question: You said in this report, referring to the June 14th proposal, that you don't believe there is an obligation under our state Constitution to pay pensions if the city can't afford it.

Answer: The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law.'

Yes.

Okay. You don't deny making that statement?

No. I think I've said that several times.

Okay. And the state law you were referring to that you referred to as being trumped was Article IX, Section 24, of the state Constitution; is that right?

I believe so."

(Videotape concluded at 11:20 a.m.)

Q Do you recall that testimony, Mr. Orr?

A Yes, I do.

Q Now, we're talking here -- this is June 14, the date of your proposal. Now, can you tell me -- refresh my recollection. I think you mentioned, but when exactly was it that you had given your oath to uphold the Michigan Constitution?

A I think it was March 25th.

Q Okay. So that was within 90 days of June 14th; is that right?

A Yes.

Q Now, prior to the June 14 proposal, did you make any inquiries as to the size of the unfunded pension liability?

A Yeah, I believe we did.

Q Okay. And who did you ask?

A I believe I asked our consultants, principally Conway, Ernst & Young, the entire crowd.

Q Okay. And who from Conway?

A There are a number of people from Conway. That team is led by Chuck Moore, but I may have talked with Chris Gannon and others. We had regular conversations.

Q Okay. And the amount of the -- the size of the unfunded pension liability isn't something that you have any personal knowledge of, is it?

A No. Those calculations are made both by Gabriel, Roeder and Milliman's review of Gabriel, Roeder's information, and since Milliman has made an independent calculation.

Q Okay. Mr. Orr -- and I believe my question really called for a "yes" or "no." I simply asked whether the unfunded pension liability was something you had personal knowledge of.

A Okay.

MR. SHUMAKER: Again, your Honor, if he --

THE WITNESS: Well --

MR. SHUMAKER: -- could just say "yes" or "no" where appropriate.

THE WITNESS: But to the extent I've read the reports, I have personal knowledge.

THE COURT: Hold on. I've been --

THE WITNESS: Oh, I'm sorry.

THE COURT: I've been asked to do something here. The question is ambiguous, and I'm going to ask you to rephrase it.

MR. ULLMAN: Okay.

BY MR. ULLMAN:

Q Did you have personal knowledge, based on work that you yourself had done, analysis you yourself had done, as to the size of the unfunded pension liability?

A No.

Q And, now, you indicated that you made inquiries as to the size of the unfunded pension liability prior to making the June 14 proposal; right?

A Yes, I believe so.

Q Okay. And was there any further work on the actuarial analysis that you recall being brought to your attention between June 14th and the date of the Chapter 9 filing?

A Yes.

Q And what was the subsequent work that you recall being done?

A I don't remember the exact dates, but the basic chronology was that Gabriel, Roeder, as part of the 2012 report, had done an analysis; that Milliman had done an analysis of Gabriel, Roeder's work, and that Milliman either was in the process of doing its own independent analysis or had completed that.

Q Okay. Do you recall -- do you recall hearing a figure for the unfunded pension liability of 3.5 billion at any point in time?

A Yes.

Q When do you recall first hearing that?

A I don't recall the exact date that I first heard that, but I remember we had discussions in May, I believe.

Q I'm sorry.

A In May.

Q In May. Okay. And was that prior to the filing of the May 12th report that we looked at previously?
A Yes, I believe so.
Q Okay. And as of May then -- that May report, based on what you were told, did you believe that the 3.5 billion was an accurate figure for the unfunded pension liability?
A Yes.
Q And did anything change on that between May and June 14?
A No, I don't think so.
Q Okay. And did you -- did what you wrote in the May 12th report accurately reflect the state of your knowledge as of that date regarding the size of the unfunded pension liability?
A Yes.
Q Okay. So if we can turn back to Exhibit 407 -- okay. Now, do you recall at the time that this proposal -- or this report was written, do you recall whether this 3.5 billion figure was being reported to you as something that was preliminary in nature and not yet final or something that was hard-fast and accurate?
A I think we felt at this time that that was an accurate analysis of the amount of the unfunded pension liability, but we certainly had said throughout that time that there were factors that went into that calculation that would be subject to discussion.

Q Um-hmm. So at this point in time, was it your understanding that as a fact the liability -- the unfunded liability was $3.5 billion and has been determined to be that figure by the Milliman actuarial firm?
A Yes. Based upon reasonable calculations, yes.
Q Okay. So if we look at page 3 of this document -- okay. In the first full paragraph I'd like you to focus on the last sentence.
A Yes.
Q Okay. It goes on. It says, "In addition, the city's pensions are underfunded by at least 0.6 billion and perhaps significantly more once appropriate actuarial assumptions and current data are considered."
A Yes.
Q Was that an accurate reflection of the state of how you understood things to be regarding the unfunded pension liability as of the date this document was written?
A Yes. I think at that time we thought it was at least 600 million but probably more once you consider certain factors.
Q Okay. And, in fact, this one says "perhaps significantly more"; correct?
A Yes. As I said, I don't remember the exact dates that we were getting the calculations in, but we were looking over the reports that had been made by Gabriel, Roeder and doing our own analysis.

Q Um-hmm. And if we look at page 37 -- okay. And if we look at the top paragraph, there's a sentence that begins, "As of June 30." Do you see that? We can pull that out, just the "As of June 30" sentence.

A Yes.

Q All right. And what that says is, "As of June, 30, 2011, the most recent actuarial reports provided to the city by the pension funds showed the pension UAAL" -- that's unfunded actuarially accrued liabilities; right?

A Yes. And to be accurate, I think you have to read the sentence right after that as well.

Q I haven't -- I'm planning to.

A Good.

Q I just wanted to clarify what UAAL meant.

A Yes. That's what it means.

Q Okay. So it says the -- it showed the pension UAAL at 646 million. Then it continues -- and please highlight the next sentence as well -- "Using more current data and/or more conservative assumptions could cause that deficiency to rise into the billions of dollars." You see that?

A Yes.

Q And does that also accurately reflect the state of your knowledge as of the date that Exhibit 407 was prepared, which is May 2003 (sic)?

A Yes. As I said before, I don't understand -- I don't

remember the specific dates that we were receiving data from Milliman based upon Gabriel, Roeder or Milliman by itself, but I think this is a fair characterization because that work was ongoing.

Q Okay. And did -- what is --

MR. ULLMAN: By the way, I would like to move to strike everything in his last answer after the word "yes," your Honor, because I think --

THE COURT: Any objections?

MR. SHUMAKER: Your Honor, I think he was clarifying his answer.

THE COURT: The motion is granted. If you are unable, Mr. Orr, to answer a question "yes" or "no," please say that.

THE WITNESS: Okay.

THE COURT: Otherwise, if it's a yes/no question, just answer "yes" or "no" or "I don't know."

THE WITNESS: Yes, your Honor.

THE COURT: All right. We're going to take our break now for lunch, but before we do, please, I have to ask you a question about your line of questioning of the witness regarding the Michigan Constitution. Is it your position that the Michigan Constitution prohibits a city from even asking its retirees to negotiate its retirement benefits in such a way that might work an impairment?

MR. ULLMAN: Subject to what my co-counsel says, no. I don't --

THE COURT: The answer to that question is no?

MR. ULLMAN: No. If they can ask?

THE COURT: All right.

MR. ULLMAN: No.

THE COURT: We will break for lunch now. We are going to remain in place for a few moments so that Mr. Orr can make his exit, and then we'll all go, so we'll be in recess now, and you may go, sir.

THE WITNESS: Thank you, your Honor.

THE CLERK: All rise. Court is in recess.

(Recess at 11:30 a.m. until 1:00 p.m.)

THE CLERK: All rise. Court is in session. Please be seated. Case Number 13-53846, City of Detroit, Michigan.

THE COURT: All right. It appears that everyone is here. Sir, would you please stand and raise your right hand?

GOVERNOR RICK SNYDER, WITNESS, SWORN

THE COURT: Please sit down. And just so the record is clear, we are interrupting the city's case to allow the objecting parties to call this witness.

MR. WERTHEIMER: Yes, your Honor.

THE COURT: And you may proceed, sir.

MR. WERTHEIMER: Thank you. William Wertheimer, your Honor, appearing on behalf of the Flowers plaintiffs.

Your Honor, before I begin questioning the governor, I would request permission of the Court to examine him under Federal Rule of Evidence 611(c)(2) -- that is, to ask leading questions -- as I believe he is clearly a party -- a witness -- excuse me -- a witness identified with an adverse party.

THE COURT: Any objections?

MR. SCHNEIDER: No objections.

MR. SHUMAKER: No objections, your Honor.

THE COURT: All right. Your motion is granted, sir.

DIRECT EXAMINATION

BY MR. WERTHEIMER:

Q Good afternoon, Governor.

A Good afternoon.

Q Thank you for appearing here this afternoon. You are appearing here pursuant to a subpoena that was issued by the UAW, are you not?

A I believe so.

Q When were you elected governor?

A January 1st, 2011.

Q And when were you sworn in as governor?

A Oh, I'm sorry. I was sworn in January 1st, 2011.

Q Okay.

A I was actually elected in November of 2010.

Q Okay. And I've got in front of me the oath that I think

you swore. I'm going to read it to you and ask you if you recall swearing to that oath. "I do solemnly swear that I will support the constitution of the United States and the constitution of this state, and that I will faithfully discharge the duties of the office of governor according to the best of my ability." Do you recall that as being the oath you swore to?

A Yes.

Q Did you know anything about Article IX, Section 24, of the Constitution, the one that we've now all heard so much about, relating to pension benefits of municipal employees at the time you were sworn in as governor?

A Yes.

Q Do you have an understanding, Governor, as to how a constitutional provision like that could be amended just generally? It's not a civics lesson, but -- and I'm --

A Yes.

Q Just generally. Would you tell us?

A Yeah. It could go to a vote of the people. It could be an item that would be proposed as an amendment to the Constitution and changed that way. It could be put on the ballot either by petition or by vote of the legislature.

Q But you would agree with me that you do not have the power to amend the state Constitution?

A That's correct.

Q Would it be fair to say, Governor, that at your deposition and actually for some time before then, you have taken the position publicly and at your deposition that while you've been supportive of -- you've been supportive of improved services for the citizens of the City of Detroit, you have not been supportive of the notion of the repayment of debts of the city, including any debt created by the pension; is that correct?

A Yes.

Q And have you taken that position throughout your time as governor?

A Yes.

Q And you've done so publicly?

A Yes.

Q Have you told Mr. Orr that that's your position in one way, shape, or form? In other words, does he know that that's your position?

A I couldn't speak to him -- I couldn't speak to his presumption, but I had publicly made those statements.

Q Did you ever make them in the presence of Mr. Orr?

A I don't recall.

Q How many times have you met with Mr. Orr since he became emergency manager either one on one or in groups?

A I would have to speculate. It would be a reasonably significant number.

Q Well, let's try it this way. How often -- from the time he became emergency manager, how often would you regularly see him? Every week or two, every month? Can you characterize it like that?

A Yeah. Typically weekly.

Q Weekly.

A In terms of not necessarily in person but on the phone or in person.

Q Either on the phone or in person weekly?

A Yes.

Q Okay. In any of those conversations, did the subject come up of your position being that you did not want the state to be obligated to pay any of the pension benefits at issue in this case?

A That would be a different question than my other statements in the sense that I view that as a legal matter in terms of if the court was deciding that we had a constitutional obligation, then we would pay it.

Q My question, Governor, was whether you had ever communicated that to Mr. Orr in any of these meetings that you've had with him weekly since he became emergency manager.

A Those meetings would have had our legal counsel present, where I was asking for their advice on topics such as that.

Q So do I take that to mean that you're asserting the attorney-client privilege as to that question?

MR. SCHNEIDER: And I'm objecting on the grounds that this question might implicate the attorney-client privilege.

MR. SHUMAKER: The city joins the objection.

THE COURT: Well, no. I think the witness can testify to what he told Mr. Orr on this question. Did you ever tell Mr. Orr what your position was on whether the State of Michigan has an obligation to pay the city's pension obligations?

THE WITNESS: What I told him was is I viewed that as a legal question that I thought best left to the courts to decide because anything else on my part would have been speculative in the fact if I had an opinion, it would get reviewed anyway, and I would rather have the most competent people make that decision to start with.

BY MR. WERTHEIMER:

Q Fair enough. While we're on the issue of your conversations with Mr. Orr during the period that he was emergency manager, these weekly or so conversations, at your deposition you refused to answer any questions related to whether you discussed the specifics of Article IX, Section 24, of the Constitution in those meetings. Does that remain your position?

A I think I made mention that it was an attorney-client issue.

Q Again, Governor -- I'm getting confused, Judge, Governor -- I just need to know whether you can -- I don't want to go through all those questions if that remains your position.
A It does, so the answer, yes.
Q All right. I believe you also asserted the attorney-client privilege or your attorneys did at your deposition as to those weekly meetings as it related to any discussions between you and Mr. Orr relating to the potential filing of a Chapter 9 proceeding; is that correct?
A Yes.
Q And that remains your position; that is, that because attorneys were present either on the phone or in the room at each of those meetings, as you recall, you are asserting the attorney-client privilege?
A Yes.
Q Thank you. I'd like to ask you a couple of questions about other -- well, let me start with your involvement. I think we all know you have been involved since you became governor with the financial problems that relate to the City of Detroit. You inherited that as an issue. Would that be fair?
A Yes.
Q And it was a big issue?
A I'd describe it as the largest issue in our country.

Q From day -- well, leaving aside the largest in our country, it's been a big issue for you from day one.
A This has been a large issue for 60 years.
Q Okay. When did -- and I think we all know that then Treasurer Dillon has been involved in assisting you on that issue; is that correct?
A Yes.
Q When did his involvement begin --
A It would have --
Q -- approximately?
A It would have began when he became treasurer.
Q Which was?
A It would have been about the same time I took office or shortly thereafter.
Q Early 2011?
A Yes.
Q Would that be fair? Okay. We also heard some testimony here that a Mr. Buckfire, an investment person, has been involved in this issue on your behalf; is that -- or on the state's behalf; is that correct?
A I don't -- I wouldn't characterize it as on the state's behalf. Mr. Buckfire came several times and presented information, and in some of those cases I didn't ask for him to come, and I'm not sure of all the grounds, whether it was with the treasurer or not, that they made the decision to

come.

Q Who was he being compensated for for the work he was doing at this early point, as far as you understood?

A My understanding is he wasn't necessarily getting compensated.

Q He was just doing it?

A There were a number of parties that during the course of this -- that first year, in particular, that offered unsolicited advice on Detroit.

Q Okay. Without going further with that, would it be fair to say that Mr. Buckfire and the people who work for his company were offering advice to the state?

A They were presenting information to the state, yes.

Q Not to the city. As far as you knew, they were trying to get your ear and Treasurer Dillon's ear. Would that be fair?

A I couldn't speak to that. I also know -- I also believe they were potentially talking to the city also.

Q Well, but didn't you understand that they were talking to the city as part of their efforts to help you out for the state as opposed to being an independent actor for the city?

A The way I would perceive it at that point in time, I perceived it as they were more presenting information to potentially get themselves hired for an engagement most likely --

Q Well, that's what I was getting to.

A -- but not necessarily by the state or by the city. I'm not going to speculate on who.
Q Okay. Fair enough. The Jones Day law firm, when did they first get involved in assisting the state in dealing with the problems relating to Detroit?
A Again, you're making the statement in the same fashion you did before. I believe they were presenting information to the state. I don't believe -- they were not hired by the state --
Q Well --
A -- to my knowledge.
Q So you would assume that they were looking for business also?
A Yes.
Q Okay. And don't you think, as sophisticated as they were, that they recognized, given all that was going on, that it would be you or people at your end who would be calling the shots relative to how the city's financial restructuring ultimately took place?
MR. SCHNEIDER: Objection. Calls for speculation.
MR. WERTHEIMER: I don't think it does. It seems --
THE COURT: If you can answer that question from your personal knowledge, I'll permit it.
THE WITNESS: I didn't believe that to be the case because, in fact, the city ended up hiring Jones Day without

me making a statement.

BY MR. WERTHEIMER:

Q You met with Jones Day and with Ken Buckfire in June of 2002 (sic), did you not?

A I don't recall the specific meeting.

MR. WERTHEIMER: Could you put up -- it's Retirement Systems' Exhibit 844, the second page.

BY MR. WERTHEIMER:

Q You should see this on your screen if it works, you know. That's a letter that's in evidence in this case from Heather Lennox at Jones Day to someone at her end where she's saying that she's going with Ken Buckfire to talk to the governor in Michigan tomorrow, and it's an e-mail dated June 5, 2012. Do you recall meeting with Heather Lennox and Ken Buckfire in June of 2012?

A I recall meeting with Mr. Buckfire. I apologize to Ms. Lennox, but I literally do thousands of meetings, so I don't recall the specific meeting.

Q Okay. I won't get into identifications. It's not that kind of case. Do you recall there being one or more Jones Day lawyers there with Mr. Buckfire?

A Yes.

Q And they were together talking to you about ways that the state could deal with the problem that you, as the governor, faced vis-a-vis the City of Detroit. Would that be fair?

A Yes.

Q If you look at that same document on the bottom where it lists the attachments, there's an attachment -- a listing of an attachment. I'll skip the numbers, but it says, "City of Detroit - Memo on Michigan Constitutional Pension Plan Protections.DOC." Do you see that?

A Yes.

Q Do you recall the Jones Day people or Buckfire at that meeting talking to you about that issue?

A No.

Q That is, the constitutional pension plan protection?

A No.

Q You're not saying it didn't happen. You're saying you don't recall one way or the other whether it did?

A Yeah. I believe that's how you stated your question.

Q It is. It is. It is. Do you recall whether or not the Jones Day attorneys provided you or any of your -- let me back up. Do you recall who was at this meeting?

A I don't recall all the participants. Generally the treasurer, I believe --

Q Okay.

A -- and Ken Buckfire.

Q Okay. So Treasurer Dillon. Would any of -- either of your aides have attended in the normal course?

A It would have been likely.

Q Likely. Okay. Do you recall whether the Jones Day lawyers -- excuse me -- provided either you or any of your people there with any legal documents? Did they share any legal documents with you?
A I don't recall legal documents. I recall a PowerPoint kind of presentation.
Q Made by Jones Day?
A No. More Ken Buckfire.
Q Okay. Do you recall whether in the PowerPoint presentation Mr. Buckfire referenced the constitutional -- the state constitutional provision relating to pensions in any way, shape, or form?
A Don't recall.
Q Okay. Again, you don't recall one way or the other?
A That's correct.
Q Sometimes my questions aren't as clean as they should be, and I'm just trying to make sure that --
A Okay.
Q You were involved in the selection of Mr. Orr as emergency manager, were you not?
A Yes.
Q Can you approximate when the process began that ended up with the hiring of Mr. Orr?
A The process generally would have started late '12, early '13 in terms of looking for potential emergency manager

candidates as a contingency plan.

Q Did you interview Mr. Orr?

A Yes.

Q Did you interview him more than once?

A I believe so.

Q How many times?

A I recall a couple.

Q Okay. Did you interview anybody else?

A Yes.

Q How many people?

A At least one.

Q Okay. During the interview process with Mr. Orr -- when I mean process, I mean not just the interviews but any communications you had with him up to the point he became emergency manager -- did you discuss whether vested pension benefits could be reduced or modified in a Chapter 9 proceeding?

A I don't --

Q Did you discuss that issue?

A I don't recall.

Q Do you recall discussing -- or do you recall discussing with Mr. Orr in any of these preliminary discussions before he became emergency manager anything regarding vested pension benefits?

A No.

Q No, or "I don't recall"?
A Again, I thought you --
Q Well, again, I'm trying to fine-tune my question, and now I confused you. I'm sorry.
A Well, I thought you started, as I recall --
Q You don't recall any such conversations?
A I was trying to get better and just do "yes" or "no" --
Q Me, too.
A -- to show I was a good listener.
Q No. You were. Me, too, but we missed each other, you know.
A Okay.
Q I switched, and you switched to say --
A "I don't recall" would be the summary answer.
Q Okay. Thank you. As part of the hiring of Mr. Orr, it's true, is it not, that parts of his expenses are being reimbursed by the NERD Fund, N-E-R-D Fund?
A Yes.
Q And what parts of his expenses?

MR. SCHNEIDER: Objection as to relevance.

THE COURT: What is the relevance?

MR. WERTHEIMER: I think it goes to the potential conflict issue; that is, I think that Mr. Orr is in a position where he has the state paying expenses for him and at the same time he has to make decisions relative to the

position he should take as to whether or not the state should be obligated to do something relative to the city's pension problems under Article IX, Section 24, of the Constitution.

THE COURT: Is this fund a state fund?

THE WITNESS: No. It's a separate nonprofit that was organized to help offset the cost of government.

THE COURT: The objection is sustained.

BY MR. WERTHEIMER:

Q I'm going to direct your attention now, Governor, to June of 2013, the point in time when Mr. Orr was -- specifically June 14th when he made a proposal. You're familiar with the June 14th proposal?

A Yes.

Q And I know you were asked about it at your deposition, so you know what I'm talking about.

A Yes.

Q Okay. Did you participate in the development of that proposal?

A I reviewed drafts of it.

Q And suggested -- either you or one of your people suggested changes in it, I would assume?

A I don't recall.

Q Okay. But you do recall reviewing drafts of it?

A At least one draft.

Q And do you recall that that proposal included -- I'll

read from it -- apologize, Governor -- "Because the amounts realized on the unfunding claims will be substantially less than the underfunding amount, there must be significant cuts in accrued vested pension amounts for both active and current retired persons"? Do you recall that as being part of his June 14th proposal?

A Yes.

Q And in your review, did you suggest any changes in that?

A No, because it was to be a mutual negotiation. It was a preliminary proposal.

MR. WERTHEIMER: Your Honor, I would ask the witness to simply respond to the question.

THE COURT: You may.

MR. WERTHEIMER: I didn't ask why. I don't mean to make a big deal, but I think it would go smoother.

THE COURT: You may ask the witness that.

MR. WERTHEIMER: Thank you.

BY MR. WERTHEIMER:

Q Do you understand -- did you understand, Governor, that at the time this proposal was being made, that the retirees -- the proposal was that the retirees would get treated as the other unsecured creditors in the language -- in the legal language would, including bondholders? They'd be treated the same way. Would that be fair?

A Yes.

Q Did you understand at the time you looked at -- or reviewed this proposal that the guarantees of pension benefits that there are in this country relate to private employees only under the Pension Benefit Guarantee Corporation? Did you understand that at the time?

A Yes.

Q In other words, you knew these people weren't being protected by any federal program --

A Yes.

Q -- "these people" being the retirees and those with vested benefits?

A Yes.

Q Did you also understand that the bondholders at least had insurance, at least many of them did? They were insured bonds?

A I was not clear on who had insurance and who did not.

Q Well, you were clear on the fact that the individual retirees didn't have insurance, weren't you?

A Yes.

Q Did you have any sense as to the impact these cuts might have on individual retirees at the time you reviewed the proposal?

MR. SCHNEIDER: Objection. Calls for speculation. It's also not relevant.

MR. WERTHEIMER: I'm just asking if he did or not,

your Honor.

THE COURT: Again, if you can speak from personal knowledge, I will accept your answer.

THE WITNESS: I viewed that as speculation at that point in time, in particular, that my understanding is the funded part of the pension plan would not be involved, but the unfunded was the part at issue.

BY MR. WERTHEIMER:

Q Okay.

A And that was a matter still to be determined.

Q Did you understand what the range of the pensions were of City of Detroit retirees; that is, how much money they would receive if they were getting a full pension?

A Not specifically.

Q How did you understand it? How generally, if you could just identify it in any way that is consistent with what you understood?

A Well, they would get a monthly payment of so much per month.

Q Did you have a sense as to whether there were many of them who were getting monthly payments of $10,000 or anything like that amount?

A That would be at the very high end.

Q Okay. Fair enough. I'll drop it. Did you know at around this time -- I think it was before it, but I don't

have the time line in front of me. You recall Mr. Orr making a statement to the Detroit Free Press that got publicized pretty widely that federal law would trump Article IX, Section 24, of the Constitution. Do you recall that being in the papers?
A I recall that from the questions that you and your colleagues asked me from the deposition.
Q Do you recall knowing that Orr had made a statement like that at the point you were reviewing his -- what became his June 14th proposal?
A I accepted the fact you were making a truthful assertion when you told me that.
Q No, but did you know at the time?
A I don't recall.
Q You know, as you sit here, I suspect, that the Attorney General has weighed in on this issue of the relationship between the state constitutional provision and the bankruptcy proceedings?
A Yes.
Q And you know that he has taken the position that in bankruptcy Mr. Orr is obligated to honor Article IX, Section 24, in proposing a plan of adjustment, do you not?
A Yes.
Q And you know that Mr. Orr in no way, shape, or form has indicated that he would be proposing any such plan of

adjustment, do you not?

A Well, no plan of adjustment has been presented, so that would be just speculative.

Q Has Mr. Orr ever said anything either in your conversations with him or that you've heard about secondhand that would indicate that he has any intent to honor the state constitutional provision when he proposes a plan?

MR. SCHNEIDER: I would object to the extent that this calls for secondhand conversation. The governor would not have firsthand knowledge of that.

THE COURT: The objection is overruled. What is your answer, sir?

THE WITNESS: Could we repeat the question?

MR. WERTHEIMER: Can you repeat the question, whoever is --

THE COURT: We don't have that ability.

MR. WERTHEIMER: Oh, I'm sorry. I'll ask it another way.

BY MR. WERTHEIMER:

Q Has Mr. Orr ever communicated anything to you either directly or indirectly that would indicate to you that at the point he is going to propose a plan, that he is going to propose a plan which would not adversely impact the retirees?

A I have not discussed a specific plan with Mr. Orr in any regard.

Q Let me ask it another way. Has Mr. Orr ever said anything to you inconsistent with what he said to the Detroit Free Press to the effect that he was going to use the federal bankruptcy law to trump Article IX, Section 24, of the state Constitution?
A The question is those discussions would have been with counsel present.
Q So you're asserting the attorney-client privilege?
A The way you stated that, yes.
Q Okay.

MR. SCHNEIDER: I'm objecting on privilege grounds as well.

MR. SHUMAKER: The city joins the objection.

BY MR. WERTHEIMER:

Q When did you first learn that the attorney general was going to take the position that he did?
A On a phone call a couple days --
Q And what --
A -- a day or so ahead.
Q A day or so ahead of his --
A Filing.
Q -- filing? Okay. And by "filing," to make sure we're talking about the same thing, the filing he made in federal court relative to his position at least on this issue?
A Yes.

Q Did you consult with the attorney general on this issue of the interrelationship of Article IX, Section 24, of the Constitution and bankruptcy anytime before this phone call?
A I did not personally.
Q Did you ask anybody on your behalf to do that?
A No.
Q Would it be fair to say that the call that he made to you a day or two before was a courtesy call?
A Yes.
Q He was letting you know one politician to another that I'm taking this position that may be adverse to you?
A I wouldn't describe it as one politician to the other. I would describe it as the chief --
Q I knew you wouldn't, and I apologize for framing it that way.

THE COURT: All right. So restate your question, sir.

BY MR. WERTHEIMER:
Q Why don't just tell us what was said between you and Attorney General Schuette --
A Yeah. The chief legal officer of the state called the chief executive of the state to --
Q Okay.
A -- let me know he was --
Q I accept your amendment.

A -- he was going to file a brief or a position on this issue, and I appreciated that, that he had his constitutional responsibilities, as did I, and we respect other and are good working colleagues.

Q I'd like to move you now to a different subject, and that is the Flowers and Webster lawsuits. Do you recall being asked about that at your deposition?

A Yes.

Q I'm going to ask you hopefully fewer questions than at your deposition about that.

A Thank you.

Q You're welcome. You learned of those lawsuits within a day or so after they would -- let me back up. I'll state for the record that they were filed on July 3rd. You learned about their filings within a day or two, did you not?

A I would assume so. I know it was relative -- yes.

Q Okay. And you also learned at the same time or shortly thereafter that the court had scheduled a hearing on preliminary injunction requests in both of those two cases for Monday, July 22nd, did you not?

A I didn't recognize it as simply about preliminary injunctions. I believed it was simply a hearing on the lawsuits, which could include preliminary injunctions.

Q Let me read to you a question and answer from your deposition and see if it's accurate, and I'm at page 125,

line 21. "You did know" -- and I'm asking the question. "You did know, did you not, shortly after those suits were filed -- it was all over the papers -- that Judge Aquilina was going to hold a hearing on whether to issue an injunction Monday, July 22nd, did you not?" Your answer was, "Yes."

A No. I was simply stating I believed it included that. I wasn't sure what else might have been in that hearing.

Q Okay. Fair enough. And I believe your counsel -- do you recall at your deposition we asked for the transmission -- the e-mail transmission of your authorization to Mr. Orr, and there were a bunch of questions because the only transmission that we had at the time was late in the evening or like seven something p.m.? Do you recall that?

A Yes.

Q And then later your counsel found the correct e-mail and provided it to us. Do you recall that --

A I actually found it.

Q -- learning that? Oh, I'm sorry. You found it?

A Yes.

Q Okay. And at the end of the deposition, you said you would, correct, that you would find it?

A Yes.

Q And you did?

A Took me about 30 seconds once I got on my computer.

Q Okay. And your counsel sent them to us or you instructed

your counsel, I assume, to do that?

A Yes.

Q And do you recall that that transmission occurred at 3:47 p.m.?

A Yes.

Q So it was not until 3:47 p.m. that Mr. Orr got written authorization from you to file the bankruptcy; correct?

A Yes.

Q Okay. When did you first learn that Mr. Orr was seriously considering filing Chapter 9? When I say "seriously," I mean to the point of preparing papers as opposed to just generally having it out there as a possibility.

A It probably would have been about a week, in the time frame of two or three to seven days or so before he sent his letter to me.

Q And he sent his letter to you on the 16th, so sometime maybe between July 6 and the 16th, somewhere in there?

A I couldn't speak to what specific day, but it was --

Q I understand.

A -- generally that time frame.

Q Okay. To your knowledge, did the state play any role in drafting the request that Mr. Orr made?

A Not to my knowledge.

Q Do you know one way or another whether Mr. Orr sent a

draft of his request to somebody on your team to take a look at and for input?

A That would have been at meetings that would have had counsel present.

Q So you're asserting attorney-client privilege?

A Yes.

MR. SCHNEIDER: Objection based on attorney-client privilege.

MR. SHUMAKER: The city joins the objection.

MR. WERTHEIMER: Your Honor, for the record, I believe the privilege has been waived as to that based on a document that the state voluntarily produced and waived the privilege as to, but it is not a document to or from the governor, so I'll delay examination relative to it.

THE COURT: Okay.

MR. SCHNEIDER: Of course, we object that there's been no waiver.

MR. WERTHEIMER: Understood.

BY MR. WERTHEIMER:

Q And I think we know from your deposition that as late as July 7th -- and let me back up. I apologize. If we're in this week that ends up the 19th, let's say earlier that week, if I can put you back there -- 15th is Monday, if I'm doing it right. You know that Judge Aquilina is going to hold a hearing on an injunction request the following Monday, the

22nd; correct?

A Yes.

Q And you know -- without getting into all the legalese, you know that the requests to Judge Aquilina are that she in one way or another make sure that if you authorize a bankruptcy, it will only be with a contingency that Article IX, Section 24, be honored. Would that be fair as to your knowledge?

A No, because I wouldn't speculate on what a judge is going to do in doing the order or not doing the order or what they might say in the order.

Q Well, you had been -- you were served on July 3rd with the complaint, the motion for preliminary injunction, the brief in support, and the order to show cause, were you not?

A I didn't personally receive all those documents.

Q Fair enough, but your office was served on that day. You don't dispute that.

A Again, I can't confirm nor dispute. You have better information on that than I do.

Q Okay. I mean for the record, we have documents showing that that's the day, and we didn't serve you personally. It was served at --

A My office.

Q -- the Romney Building at your office where you kindly always accept service. Let me ask you this. Did you at

least look at the complaint or talk to somebody about the contents of these complaints generally to get an idea what they were about?

A That would have been subject to attorney-client privilege.

Q Okay. Back to the beginning of the week. We're at Monday, the 15th. If we move to Wednesday, the 17th, there's a communications rollout document that we showed you at your deposition. Do you recall that?

A Yes.

Q Three- or four-page document showing a rollout of the bankruptcy filing that went into a lot of events that would occur before the filing; correct?

A Yes.

Q A bunch of events that would occur after it; correct?

A Correct.

Q Down to, you know, who you were interviewing with the following Monday and stuff like that. Am I -- is that correct?

A Yes.

Q Okay. And that document that we showed you that was dated -- was dated the 17th, do you recall that?

A Yes.

Q So that's Wednesday, and on Wednesday the rollout listed that the filing would occur on the 19th; is that correct?

A Yes.
Q And it didn't occur on the 19th, did it?
A No.
Q And we know, do we not, that the filing -- the actual physical paper filing the bankruptcy had a typed in nine that Mr. Orr at his deposition indicated he switched to an eight.
A That's what you explained to me in the deposition.
Q And you have no reason to dispute it, but you don't know it of your own knowledge?
A Yes.
Q Would it be fair to say that the fact that you, Mr. Orr, and others knew that a state court judge would be considering whether she should be imposing conditions on you authorizing a bankruptcy played a role in when you transmitted your okay to Mr. Orr at 3:47 on the 18th?
A I believe I explained this in my deposition that it was more the filing of the lawsuits and the fact that bankruptcy is a very last resort and that these actions showed that there wasn't a meeting of the minds; that there was not going to be a mutual understanding here to resolve this short of bankruptcy. And that was part of my decision-making process to say when I was comfortable to sign a letter authorizing bankruptcy, which was a tremendously difficult decision to make but the right one given the circumstances.
Q Fair enough. Just one other question, I think, related

to that. When you said "lawsuits" in that answer, would you have been referring to the Flowers lawsuit, the Webster lawsuit, and by that time the third lawsuit filed by the Retirement System?

A Yes, and an expectation that there could be many other lawsuits from debt holders and many other parties.

Q Okay. Fair enough. But no other specific lawsuits other than the three I identified?

A Correct.

Q I'm going to have you identify some documents, and then I've got some questions as to one, and then we're done, Governor.

MR. WERTHEIMER: Could you put UAW 616 up?

BY MR. WERTHEIMER:

Q Governor, can you confirm that this is an e-mail that you received from Andy Dillon?

A Yes.

Q And that you read it on or around July 8?

A Yes.

Q And that it's part of the communications that went on between you and your people relative to this issue of the bankruptcy filing?

A I'm not sure. That last question, me and my people --

Q Well, I'm sorry. I apologize. It's an e-mail that involves Mr. Dillon's role in helping you with the Detroit

problem.

A Yes.

MR. WERTHEIMER: Move for its admission. I believe that was not admitted.

MR. SHUMAKER: Your Honor, the city objects on hearsay grounds.

MR. WERTHEIMER: It goes to the state of mind of the state officers, the back and forth. It's not being offered for its truth as to any of the statements. It's being offered as to their state of mind. Good faith is an issue.

MR. SHUMAKER: Your Honor, state of mind is not at issue. This is for hearsay purposes.

THE COURT: Well, technically what's it --

MR. WERTHEIMER: I have one other point, your Honor, and that is it's an admission. We have a common interest privilege asserted when they want to keep documents from us, but they are not agents of each other for purposes of the hearsay rule, so it's -- not only is it offered as state of mind, not for its truth, but even were it offered for its truth, it should come in as an admission.

THE COURT: Well, what's at issue here in the eligibility trial is the good faith of the city in filing the case, so I would question how the good faith of the governor is an issue at all.

MR. WERTHEIMER: Your Honor, we will present

through --

THE COURT: Could you do me a favor and pull that microphone back closer to you? I think it got knocked somewhere in the meantime.

MR. WERTHEIMER: Yeah. I'm sorry. We'll be providing evidence indicating -- establishing that the state helped Mr. Orr draft the July 16th request, so the idea that we're going to in any way separate out state of minds here I think just is counterfactual.

THE COURT: Well, but how does this memo bear upon the city's good faith at all? That's the question.

MR. WERTHEIMER: Well, I think that the city, with all due respect to Mr. Orr, was acting at the behest of the state. I think that there is all kinds of evidence of that, and there will be further evidence of it. And given that, we think that if -- pulling the strings may be a little strong, but if the state is involved in that decision-making, the state of mind of the two principal state actors, by the way -- we're not offering, you know, someone at Department of Treasury whose name we've got to look up. This is Dillon to Snyder.

THE COURT: All right. This is arguable. I'll permit it.

MR. WERTHEIMER: Thank you.

MR. SCHNEIDER: Your Honor, I have an objection,

however. If this is to go to state of mind, this can't possibly go to the governor's state of mind because this is not a message sent from the governor. This is sent from the treasurer. Not only that, but no one from the city is --

THE COURT: Well, but who received it?

MR. SCHNEIDER: The governor. He received --

THE COURT: Yeah. That objection is overruled.

MR. WERTHEIMER: Thank you.

THE COURT: The document is admitted. What's the number again? 616?

MR. WERTHEIMER: 616, UAW 616.

THE COURT: 616 is admitted.

(Exhibit 616 received at 1:46 p.m.)

MR. WERTHEIMER: Would you now show 615?

MR. SCHNEIDER: Same objection, your Honor, on hearsay grounds.

THE COURT: You're objecting to 615?

MR. SCHNEIDER: 615.

THE COURT: Okay. Hold that until it's actually offered.

MR. SCHNEIDER: I'm sorry, your Honor.

MR. WERTHEIMER: Can you blow up that a little bit at the top? Yeah, just there. That's great. Thank you.

BY MR. WERTHEIMER:

Q Is that on your screen now, governor, the July 9 e-mail?

A Yes.

Q Okay. And this is Andy Dillon to you, a response to the -- or a follow-up to the e-mail of the day before?

A Yes.

MR. WERTHEIMER: Move for its admission again for the same reason, your Honor.

MR. SHUMAKER: Objection, your Honor. Hearsay. I'd also like to ask if counsel is going to attempt to introduce documents not in evidence already that they not be displayed to you prior to you making a ruling as to their introduction.

THE COURT: Well, that's interesting because sometimes I actually need to see the document to see if it's relevant, so I will not ask him to make that request. And you have your same objection, counsel?

MR. SCHNEIDER: Yes, your Honor.

THE COURT: All right. Both objections are overruled, and this document -- 615, did you say --

MR. WERTHEIMER: Yes, your Honor.

THE COURT: -- is admitted.

MR. WERTHEIMER: Thanks.

(Exhibit 615 received at 1:47 p.m.)

BY MR. WERTHEIMER:

Q I have just one other document to ask you about, and it's not in evidence yet, so I'm going to -- we're going to do it the old way. I'm going to show you a hard copy, and then

I'll come back here and ask you some questions about it. Do you have that document in front of you, Governor?

A Yes, 625.

Q And who's Dennis Muchmore?

A He's my chief of staff.

Q And was he your chief of staff in July?

A Yes.

Q Okay. And who is Mike Gadola?

A He's the legal counsel to the governor.

Q And who is John Roberts?

A Deputy chief of staff.

Q And Greg Tedder?

A He's the state liaison to Kevyn Orr.

Q And do I read this document right that this is an e-mail that Mr. Gadola sent to Mr. Muchmore and Roberts and that Muchmore then sent on to you?

A Yes.

Q And you received it on July 12th?

A Yes.

Q And you read it?

A Yes.

Q Both Mr. Muchmore's message and the underlying message from Mr. Gadola?

A Yes.

Q And it does relate to your decision-making relative to

the decision to authorize?

A I'm not sure I understand your question.

Q Well, I'll stop at this point.

MR. WERTHEIMER: I'd move for its admission at this point, your Honor.

MR. SHUMAKER: Objection. Hearsay, your Honor.

THE COURT: And that's number what?

MR. WERTHEIMER: 625. And, again, I think we've got the same arguments we had before, identical; that is --

MR. SCHNEIDER: Same objection.

MR. WERTHEIMER: Well, I won't repeat them, your Honor, and I'd like to -- I mean obviously I'll be examining the governor as to their content, but I thought it made sense to move for their admission first. I'm happy to answer -- ask any follow-up questions the Court thinks it needs. And I would also indicate for the record, your Honor, that --

THE COURT: One second.

MR. WERTHEIMER: I'm sorry.

THE COURT: So, Governor, have you seen this e-mail before?

THE WITNESS: I've seen it before. I'd like time to read it again --

THE COURT: Go ahead.

THE WITNESS: -- if possible.

THE COURT: Sure. Go ahead.

THE WITNESS: Thank you.

MR. WERTHEIMER: Your Honor, while he's doing that, if I could inform the Court this was a document that was withheld based on attorney-client privilege. It was privilege log Number 6 of the state's log. It was produced as part of the agreement that the state and I ended up making relative to those privilege logs that we argued in front of this Court a couple days ago, and in producing it, they specifically waived in writing the attorney-client privilege.

THE COURT: Thank you, sir.

MR. WERTHEIMER: Yes.

THE COURT: Did you receive this e-mail?

THE WITNESS: Yes.

THE COURT: All right. The objections are overruled, and Exhibit 625 is admitted into evidence.

(Exhibit 625 received at 1:52 p.m.)

THE COURT: Can we get a couple more copies of this, please? Do you have --

MR. WERTHEIMER: Yes.

THE COURT: -- extras to provide?

MR. WERTHEIMER: Yes, you can. I've got a couple here that are not marked 625.

THE COURT: All right. We'll take care of the marking. Don't worry about that.

MR. DECHIARA: Your Honor, we're going to -- UAW is

going to submit binders tomorrow that will have multiple copies of that exhibit.

THE COURT: Okay. That'll work, too. Thank you, sir.

BY MR. WERTHEIMER:

Q All right, Governor. My last round of questions is I'd like to go through the contents of this e-mail, specifically that part of it from Mr. Gadola ultimately to you, but indirectly to you.

A Um-hmm.

Q Okay. On the third line he indicates, Mr. Gadola does, that he spoke to Rich this morning. In context, would I be right in suspecting that that would be Rich Baird?

A I would assume so.

Q Okay. And Andy would be Andy Dillon?

A Yes.

Q And LG would be the lieutenant governor?

A Yes.

Q And who is the lieutenant governor, for the record?

A Brian Calley.

Q And one of the things that Mr. Gadola is communicating to you is that Baird is now in favor of a more deliberative approach at your end; correct?

A He's stating what Rich Baird's view is.

Q Yes.

A Yes.

Q Fair enough. By the way, would it be correct -- if I could move you off the document for just a minute, would I be correct in recalling from your deposition that the only investigation you did of the -- Orr's request on the 16th related to assessing the lawsuits and taking his word for some of the content of that letter; is that right?

MR. SCHNEIDER: Objection, your Honor. That's not a correct statement, I believe, of what was taken at the deposition.

MR. WERTHEIMER: Well, it may not be, your Honor. If I can go back, I'll get the correct statement. I don't want to -- I have no intention of misrepresenting.

BY MR. WERTHEIMER:

Q I think I'm going to have to read a couple of questions and answers to get this in context, if you'll bear with me, because I want to make sure I'm accurate. There was a question, and this is on page 77, line 20. "And did you undertake any independent investigation or cause to be undertaken any independent investigation to determine whether, in fact, Mr. Orr's representation to you that there had been" --

MR. SCHNEIDER: Your Honor, I object. There's no foundation for this. If he wants to ask the governor a question, that's fine, but that's not what's going on here.

THE COURT: The objection is sustained. Just ask the governor a question.

MR. WERTHEIMER: All right.

BY MR. WERTHEIMER:

Q Tell me what investigation you took between July 16th when you received the Orr request and July 18 when you sent the authorization back?

A I actually asked and built in additional time to think about it because of the consequence of this in terms of decision-making process, so I had them expand the calendar originally through that process to give me an extra night or so to sleep on something like this and to go through my process. And I went back -- and I know you didn't care for this last time, but literally I went back to since the time I became governor walking through the entire process with Mayor Bing about the prior review cycle at the end of 2011, 2012, about the consent agreement. I reviewed the other financial review team reports. I reviewed his 45-day report. I reviewed his proposal to creditors. So I didn't go out and find independent parties to do this, but I reviewed the file and went back through the decision-making process to recognize this was two and a half years of effort, and basically then I made a decision.

Q Fair enough. And in fairness to you, I think I broadened in my question what you were asked.

A Yeah.

Q And let me go down to the next question and answer, and I think that --

A Um-hmm.

Q -- where we're only talking about -- or the question only relates to the good faith negotiations, and I apologize for being broader than I should have been. At page 78, line 14, this is --

MR. SCHNEIDER: Same objection, your Honor. He's just reading the transcript.

THE COURT: If you're trying to impeach the witness, that's fine, but otherwise just ask a question.

MR. WERTHEIMER: Okay. Fair enough.

BY MR. WERTHEIMER:

Q Would it be true, Governor, that the only thing you did to check out the assertion that there had been -- there had been good faith negotiations was to take a look at the lawsuits or that issue and accept what Mr. Orr had in his July 16th letter? Did you do anything else relative to the assertion that there had been good faith negotiations?

A Well, I'd gone through multiple meetings where attorneys were present where I would get updates on how meetings had gone, and it wasn't just Mr. Orr. Mr. Dillon was present and those -- and other people that were monitoring this process.

MR. WERTHEIMER: Well, your Honor, then I would

offer two questions and answers to impeach, and this is page 78, line 14, through 78, line 21.

BY MR. WERTHEIMER:

Q "Question: So just so I understand your answer, your acceptance of the truth of the assertion that there had been good faith negotiations were based on what you read in the July 16th letter" -- "Uh-huh" -- that was the answer -- "Question: -- and also the fact that certain lawsuits had been filed?" "Answer: Yes." "Question: Was there anything else that you relied on to conclude that there had been good faith negotiations?" "Answer: No." Were those answers truthful?

A Well, I don't see the difference because in the letter --

Q I'm not suggesting there is.

A Okay.

Q I'm just asking the question whether those answers were truthful, Governor.

A Yeah, in the context of he cited meeting dates that were during the process where we had other meetings going on, and I got updates.

Q Fair enough. Let's go back to 625. The next sentence, "Am I right in understanding that it's not just Baird, but it's now Dillon and the lieutenant governor who are on board with a more deliberative approach?"

A That's what this e-mail says.

Q And then what they suggest is you writing a letter back to Mr. Orr and then the process continuing from there; is that correct?

A That's, again, what this e-mail says.

Q Let's go to the next paragraph of the letter -- or I'm sorry -- of the e-mail. Mr. Gadola then says, "I favor this approach for a number of reasons, but primarily because I think we should exercise the governor's ability under PA 436 to include conditions upon his authorization for a bankruptcy filing." Do you recall receiving that opinion from your attorney, Mr. Gadola, through this e-mail?

A I saw it through this e-mail, and I had other confirmation of that.

Q In fact, it was your office that was instrumental in getting the contingency language put into 436; isn't that true? That is, the Governor's Office. I'm jumping around, and I apologize. We took a -- we took a deposition of the state official from Treasury, who was authorized to speak for the state about the issue of who was doing what relative to the passage of 436.

THE COURT: Counsel, it's not appropriate to advise one witness of what another witness has said --

MR. WERTHEIMER: I'm just trying --

THE COURT: -- when they are sequestered.

MR. WERTHEIMER: I understand, your Honor. I'll

drop it.

BY MR. WERTHEIMER:

Q Mr. Gadola specifically mentions vested pension benefits, does he not?

A Yes.

Q And it's in the context of talking or recommending to you that you put contingencies on a bankruptcy filing; correct?

A I'm not sure what sentence you're looking at. The one I'm looking at said "could also include."

Q Yes.

A So it doesn't imply he's saying it has to but could include.

Q That's right, could include, but what -- the overall --

A And it talks --

Q -- subject of this paragraph is the contingency issue; isn't that right?

A It talks about vested pension benefits, GO debt, disposition of assets, and assets greater than a certain amount.

Q Fair enough. I didn't ask about those, but it does say other things; correct?

A Yes.

Q Okay.

MR. WERTHEIMER: I have nothing further subject to checking with my co-counsel. I have no further questions,

Governor. Again, thank you for your time.

MR. DECHIARA: Good afternoon, your Honor. Peter DeChiara from the law firm of Cohen, Weiss & Simon, LLP, for the UAW International Union.

DIRECT EXAMINATION

BY MR. DECHIARA:

Q Good afternoon, Governor.

A Good afternoon.

Q Governor, did Mr. Orr send a draft of his July 16th letter to you before he sent the actual letter on July 16th?

A I don't recall that.

Q Do you know whether he sent a draft of the letter to your staff?

A I don't recall.

Q Do you know whether he sent a draft of the letter to Mr. Dillon?

A I don't recall.

Q Do you know if he sent a draft of the letter to Mr. Dillon's staff?

A I don't recall.

Q Okay. Now, it's true that you were sent a draft of the June 14th proposal to creditors; correct?

A Yes.

Q And you reviewed it?

A Yes.

Q And you gave feedback on it; correct?

A I don't recall much feedback on it.

Q Well, do you recall giving feedback?

A No. I don't recall specific feedback.

Q I'm not asking you whether you recall specific feedback. Do you recall giving any feedback?

A I recall letting him know I read through it.

Q But no feedback?

A No.

Q Do you recall giving a deposition on October 9th, 2013, in this proceeding?

A Yes.

Q And did you testify truthfully at that deposition?

A Yes.

Q I'd like to refer you to page 61 of the deposition, line 1.

"Question: Okay. Did you comment on the draft?

Answer: I generally reviewed it and just gave general feedback."

Does that refresh your recollection about whether you gave feedback on the draft?

A Yeah.

Q Did you give feedback on the draft?

A Well, again, just general comments, thanks for sending me the draft.

Q And you saw in the proposal, did you not, that there was language that said that there must be significant cuts to accrued pension liabilities?
A Yes.
Q Okay. Did you raise any -- did you comment on that language?
A No.
Q Okay. So by that answer, I assume you did not say to Mr. Orr or to his staff that you opposed that position; correct?
A In their presentation in the draft in the way they described it to me, this was just the opening to describe the factual situation to start a dialogue with creditors.
Q That's not my question. Let me ask this question. Did you say to Mr. Orr or his staff that you opposed the position that was laid out in the proposal that said that there must be significant cuts to accrued pension liabilities?

MR. SCHNEIDER: I object to any question that might be leading us into the area of attorney-client privilege, which I believe this may be.

MR. DECHIARA: Your Honor, there's been absolutely no testimony that there are any lawyers involved, and even if there were, the governor commenting on the proposal -- there's already been testimony on it. And in any event, it's not -- doesn't go to attorney-client privilege.

THE COURT: The objection is overruled, but having said that, counsel, I would ask you and caution you not to ask the very same questions that Mr. Wertheimer asked.

MR. DECHIARA: Your Honor, I'll try my best. I really will.

THE COURT: I must insist on it.

MR. DECHIARA: I will try my best. Let me ask the same question.

THE COURT: Okay. I'm going to assume you didn't mean that.

MR. DECHIARA: Oh, your Honor, I don't believe there was any -- this was asked on the prior examination, and I think this is -- I don't recall --

THE COURT: Okay. I'll give you --

MR. DECHIARA: -- this being asked on the prior examination.

THE COURT: I'll give you one more shot. Go ahead.

MR. DECHIARA: Okay. Thank you.

BY MR. DECHIARA:

Q Governor, did you say anything to Mr. Orr after you reviewed the June 14th creditors' proposal that you objected to the position that was set out there, namely that there must be significant cuts to accrued pension liabilities?

A Again, there would have been attorneys present, but I'm confused enough now where --

THE COURT: Well, if you are claiming the privilege, we will deal with that. Is that your claim, sir?

MR. DECHIARA: Your Honor, I believe you overruled counsel's attorney-client objection, so is -- are you sustaining the governor's objection?

MR. SCHNEIDER: Renewing my objection, your Honor.

MR. DECHIARA: You're withdrawing it?

THE COURT: Okay.

MR. SCHNEIDER: I'll renew it.

THE COURT: Hang on. Hang on. All right. So I already permitted testimony on this, and, if so, why are we asking the question again?

MR. DECHIARA: The question has not been answered. My recollection of the sequence of events was I asked the question, counsel objected, you overruled the objection. I asked the question again. The witness objected. So I think that's where we are.

THE COURT: No, but when Mr. Wertheimer was questioning, wasn't this exact question asked? In fact, after the attorney-client privilege was overruled, I asked the question. Let's move on here.

MR. DECHIARA: Should I not ask the question, your Honor?

THE COURT: Let's move on.

MR. DECHIARA: Okay.

BY MR. DECHIARA:

Q Governor, do you support -- at the time you read that language in the proposal, did you support -- do you agree with that position that there must be significant cuts in accrued pension liabilities?

A No.

Q You do not agree with that position?

A Again, I think it's speculation at this point in time.

Q I'm asking you at the time that you read the proposal, did you agree with what was set out in the document?

A It used the word "must," and it was to go through a negotiation process, so good faith parties could come up with any arrangement they wanted to. Again, the numbers could be difficult to get there, but to say it's impossible, I couldn't say that.

Q Let me try to simplify it. Do you agree with the position that there must be -- as you sit here today, do you agree with the position that there must be significant cuts to accrued pension liabilities?

A Again, that's one of the issues in Chapter 9. I view this as not a matter of speculation. It depends on the plan and the judge's approval.

Q I'm not asking for any speculation. I'm asking if you agree with that position.

A Well, again, there's no plan been submitted yet.

Q I'm asking if you agree with that position, Governor.
A I don't necessarily know there have to be, and, again, it's not my decision to make that call.
Q Did you believe -- when you received the July 16th request by Mr. Orr for permission to file for bankruptcy, there was reference to the June 14th creditors' proposal in it, was there not?
A Yes.
Q Okay. And you approved the request to file for bankruptcy; correct?
A Yes.
Q Okay. Did you undertake any investigation before you approved the filing for bankruptcy of what impact that proposal would have on the retirees of the City of Detroit?
A Yes.
Q What investigation did you undertake?
A Well, not investigation, but understanding from the creditors' proposal it would have a dramatic impact, but also the points in Mr. Orr's letter -- he pointed out why the creditors' proposal didn't appear to be feasible.
Q Did you know the -- when you approved the bankruptcy filing, did you know the extent of the cuts to pension liabilities that were being proposed by Mr. Orr?
A Again, they were contingent, so it could have been any amount of numbers, and it was subject to negotiation.

Q So you didn't know how much Mr. Orr -- when Mr. Orr said there must be significant cuts, you didn't know what he had in mind in terms of the extent of the cuts, if he had anything in mind. Is that a fair statement?

A Yes.

Q Did you ask Mr. Orr before you approved the bankruptcy filing how much he intended to cut people's -- retirees' pensions?

A Those would have been in meetings subject to attorney-client privilege.

Q So are you refusing to answer the question on attorney-client privilege?

MR. SCHNEIDER: Objection based on attorney-client privilege.

MR. DECHIARA: Your Honor, are you sustaining the objection?

THE COURT: Would you like to be heard on whether it's an appropriate claim of privilege?

MR. DECHIARA: Yes. I don't think just the fact that there were attorneys present makes the communication between the governor and the emergency manager privileged. It doesn't deal with a legal issue. It's just a question about whether he inquired of Mr. Orr. It goes directly to the question of authorization.

THE COURT: Well, I assume it's relevant, but that

doesn't make it any less protected by the attorney-client privilege. If there were attorneys there, I will sustain the claim of privilege.

BY MR. DECHIARA:

Q Before you approved the bankruptcy filing, apart from the --

THE COURT: By the way, as a matter of procedure, counsel, when the witness claims privilege, there's no need to object on the grounds of privilege. If counsel wishes the witness to be compelled to answer in the face of the claim of privilege, he will make such a motion, and then you'll be heard.

MR. SCHNEIDER: That's fine, your Honor. Thank you.

BY MR. DECHIARA:

Q Did you understand that the proposal provided that in exchange for the cuts in accrued pension liabilities the retirees would get certain notes?

A Yes.

Q Okay. And did you know what the value of those notes would be that the retirees would get?

A I knew the principal amount of the notes.

Q But did you know how much the value of the notes would be that the retirees would get?

A Not to a specific number.

Q Okay. Did you have any idea?

A It would be a significant discount for the unfunded part of the obligation.

Q Was it your understanding that the notes would be interest only; in other words, that the retirees would not have an entitlement to receive principal on the notes?

A I don't recall.

Q You didn't know that?

A That's different than "I don't recall."

Q Okay. So let me clarify the question. Did you know at the time that you approved the bankruptcy filing whether or not the notes would be interest only?

A Again, that's where I don't recall.

Q You don't recall whether you knew or not? Is that your answer?

A I don't recall what the notes said specifically in terms of their terms other than understanding there was a contingent note.

Q Did you, before you approve the bankruptcy filing, undertake -- apart from anything you said to Mr. Orr, undertake any investigation or have any investigation undertaken for you to assess how much the cuts in pension liabilities would impact the retirees?

THE COURT: Asked and answered, your Honor, and I believe Mr. Wertheimer also went into this area.

MR. DECHIARA: I'll strike that question.

BY MR. DECHIARA:

Q Did you investigate how much an average retiree of the City of Detroit receives annually in retirement benefits?

MR. SCHNEIDER: Again, your Honor, asked and answered. We're covering the same ground.

MR. DECHIARA: I don't believe it was, your Honor.

THE COURT: I'll permit this one. Go ahead, sir. Please answer. Did you do such an investigation?

THE WITNESS: I had seen accounts in the press of what pension benefits were for a number of the retirees.

BY MR. DECHIARA:

Q And did you rely on those accounts in the press?

A Some of them, yes.

Q Okay. Did you undertake any investigation -- given the powers of your office and the resources at your disposal, did you undertake or have an investigation undertaken to determine the annual average pension benefits received by retirees?

A No.

Q You just -- whatever -- you just read about it in the newspaper. Is that your testimony?

A Again, there would have been meetings subject to attorney-client privilege.

Q I'm not asking anything about meetings or attorney-client privilege. I'm asking you did you rely on what you read in

the newspaper?

A I had other information that would have been in meetings provided to me where attorneys were present.

Q And what was your understanding of the average annual pension benefit received by a retiree?

A Again, it would have been in the thousand to $2,000-a-month range.

Q Okay. So about 12,000 to 24,000 annually; is that -- am I doing the math right?

A Sounds like it.

Q Okay. Did you do any investigation or cause any investigation to be undertaken whether a retiree whose pension is between 12 and $24,000 a year, if significant amounts of that income was cut, whether the retirees would be able to pay their mortgages or pay their rent necessary to stay in their homes?

MR. SCHNEIDER: Objection. Relevance.

MR. DECHIARA: Your Honor, the governor approved the bankruptcy filing based on -- he said he read the proposal -- based on the proposal. I'm trying to inquire into the state of the governor's knowledge when he approved the bankruptcy filing. I think to say -- let me just say this. To say that -- these questions all go to the impact that these cuts that Mr. Orr has proposed and that the governor knew about and that the governor approved -- to say that the impact of

these cuts are going to have on the retirees and whether they're going to be able to put food on the table and pay their rent --

MR. SCHNEIDER: Objection, your Honor, to --

MR. DECHIARA: To say that's irrelevant to this proceeding --

MR. SCHNEIDER: -- not only --

THE COURT: I need to hear the response to your objection, sir.

MR. SCHNEIDER: I believe he's testified --

MR. DECHIARA: To say that's irrelevant to this proceeding I think is incorrect.

THE COURT: Well, but your objection to eligibility is that this bankruptcy will impair the pensions regardless of their impact; right?

MR. DECHIARA: I'm sorry, your Honor.

THE COURT: Your objection to eligibility here is that pensions will be impaired regardless of their impact. Yes? Yes?

MR. DECHIARA: We object to any impairment of accrued pension liabilities. That's correct.

THE COURT: All right. So it's not on the grounds of impact. Its on the grounds of the Constitution. Yes?

MR. DECHIARA: Correct, but that's not our only --

THE COURT: All right. So the objection is

sustained.

BY MR. DECHIARA:

Q You testified earlier that since Mr. Orr has been emergency manager, you've had regular meetings with him; correct?

A Yes.

Q And those are both meetings in formal settings without other advisors present, other staff and advisors present, and also one-on-one meetings; correct?

A Yes.

Q In Mr. Orr's July 16th letter to you requesting permission to file bankruptcy, he asserted, did he not, that there were $3.5 billion in accrued pension liabilities that the city had?

A Yes.

Q Okay. And you accepted that number as true?

A I --

Q It's a "yes" or "no" question.

A I took that as a number that he was presenting in his letter. There's a variety of numbers out there.

Q My question is did you take that number that he presented as true?

A I believed he was presenting a number he believed was a true estimate.

Q And did you agree that it was true?

A I believe that there could be some reasonable range on that, but it was within the reasonable range.

Q And when you received the July 16th letter, you knew that the emergency manager had not completed an analysis of what assets of the city could monetized; correct?

A Correct.

Q And when you approved the bankruptcy filing, you were aware or were -- let me ask you. When you approved the bankruptcy filing in your July 18th letter, were you aware that a significant portion of the underfunded pension liability of the City of Detroit was allocable to the Water and Sewer Department?

A I didn't know what percentage, but there would be some portion --

Q Did you know --

A -- to Water and Sewer.

Q Did you know that there was some percentage that was allocatable?

A Yes.

Q Okay. Let me refer you back to your deposition. I'm referring to page 59, line 2.

"Question: Do you know whether a significant portion of Detroit's unfunded pension liability is allocable to the city's Water and Sewer Department?

Answer: I'm not aware of that relationship."

Was that true at your deposition when you said you were not aware of that relationship?
A At that time.
Q At the time of the deposition?
A Yeah.
Q And so since you -- so since then you've learned. Okay. My question was not that. My question was at the time -- on July 18th before your deposition, going back to July 18th --
A I'm sorry. I missed --
Q Okay. Okay.
A That would be correct.
Q We're not on the same page.
A Yes.
Q I think we are now. At the time of the July 18th letter that you issued approving the bankruptcy filing, were you aware then that a significant portion of the city's pension liability was allocable to the Water and Sewer Department?
A Not at that time.
Q You were aware, were you not, that under law you could have, had you chosen, put a contingency on your approval and made the bankruptcy filing contingent on Mr. Orr not seeking to impair accrued pension liabilities? Are you aware that you had that power?
A Yes.
Q Okay. And you chose not to exercise it?

A Yes.
Q Did you speak to Mr. Orr at any time about using Chapter 9 to get -- to eliminate pension liabilities of the city?
A Those discussions would have been with attorneys.
Q Okay. So are you refusing to answer the question?
A Yes.
Q Okay. Did you speak to Mr. Orr at any time about the timing of the bankruptcy filing?
A Those discussions would have been with attorneys present.
Q And you're refusing to answer that question?
A Yes.

MR. DECHIARA: Your Honor, I'm sorry if I'm taking some time. I'm trying to eliminate so --

THE COURT: Okay.

MR. DECHIARA: -- I don't duplicate.

THE COURT: Take your time. Actually, while you're doing that, I'm going to consult with my court security officer here, so give me just a minute, please. You may proceed whenever you are ready, sir.

MR. DECHIARA: Thank you, your Honor.

BY MR. DECHIARA:

Q Are you aware, Governor, that revenue sharing by the state with the city -- in other words, monies given by the state to the city -- have been reduced substantially over -- in recent years?

MR. SCHNEIDER: Objection to relevance.

THE COURT: No. That objection is overruled. Please answer the question.

THE WITNESS: Yes.

BY MR. DECHIARA:

Q And is -- that's true, that it has been reduced substantially over recent years?

A It has been reduced, yes.

Q Okay. Is it true, in your view, that if that state revenue sharing had not been reduced, there might have been monies to maintain the pensions of the Detroit retirees?

A That would be speculative.

Q Well, if the city had more money from the state, wouldn't that -- wouldn't it not have more money available to pay for pensions?

A Again, that's speculative because there are approximately somewhere between 15 and $18 billion worth of debt and needs in the services for better services -- excuse me -- the citizens having better services within the city.

Q Did Mr. Orr at some point ask you whether his decision whether or not to become emergency manager would impact the decision on whether or not Jones Day would be hired as restructuring counsel for the city?

A Would you repeat that again?

Q Sure. It was a little complicated. Did you -- excuse

me. Did Mr. Orr at any point when he was a candidate for emergency manager -- did he ever have a conversation with you where he said something to the effect of, "I don't want my decision as to whether or not I accept the job to impact Jones Day's chances of being hired as restructuring counsel for the city"? Did Mr. Orr ever say anything to you --

A I don't recall.

Q -- along those lines?

A I don't recall that.

Q Did Mr. Orr ever come to you at any point since he's been emergency manager asking whether or not the state would share in the financial burden of some or all of Detroit's pension liabilities?

A That would have been in meetings with attorneys present.

Q I'm just asking whether that conversation occurred.

A That particular question I don't recall being ever brought up.

Q You don't recall whether it was ever brought up, but if it did, it was -- it happened before attorneys? Is that your testimony?

A Well, again, we had discussions on pensions, but attorneys were present in those meetings.

Q Right, but this is a specific question. Did Mr. Orr ever have discussions with you about the state sharing in the financial burden in whole or in part of Detroit's financial

liabilities?

A I don't recall.

MR. DECHIARA: Nothing further, your Honor.

THE COURT: All right. Hang on. We're going to take our afternoon break at this time for 15 minutes. Well, actually until 2:45. I will, however, ask everyone to remain seated until the governor can make his exit, and so give us a couple minutes for that, and then we'll reconvene at 2:45. I think the court security officer or one of them will show you to the judges' conference room down the hall.

THE WITNESS: Okay. Just trying to show the right etiquette, Judge.

THE COURT: I'm sorry, sir.

THE WITNESS: That you were leaving first.

THE COURT: No, no, no. I'm going to sit here with everyone else, and then when you're all settled, we will go. Okay. All right. We're going to be in recess.

THE CLERK: All rise. Court is in recess.

(Recess at 2:27 p.m. until 2:45 p.m.)

THE COURT: You may proceed.

MS. LEVINE: Good afternoon, your Honor. Sharon Levine, Lowenstein Sandler, for AFSCME. Just to clarify the record, AFSCME also served a trial subpoena and appreciated the acceptance of service by the state. Thank you.

DIRECT EXAMINATION

BY MS. LEVINE:

Q Good afternoon, Governor.

A Good afternoon.

Q Briefly, do you recall a coalition of unions negotiating a tentative agreement with the City of Detroit back in -- in or around February of 2012?

A I don't recall.

Q If I could try just to refresh your recollection for a moment, there were about 30 unions that negotiated a tentative agreement that was a concessionary agreement that resulted in savings for the city. The unions ratified that agreement and then were advised by the city that the state asked them not to implement it. Are you familiar with that?

A I recall the general topic but no specifics.

Q Do you know why the state asked the city not to implement the terms of the concessionary agreement, which would have provided for savings to the city?

MR. SCHNEIDER: Objection to relevance.

THE COURT: Overruled. Please answer.

THE WITNESS: I don't recall.

BY MS. LEVINE:

Q Governor, it's true, is it not, that in a nonmunicipal bankruptcy case, the Pension Benefit Guarantee Corp. or the PBGC provides insurance coverage for retirees if their pensions are terminated; correct?

A For private entities, I believe that's true.

Q For private entities with, for example, single employer defined benefit plans; correct?

A Yes.

Q And the current level of protection provided by the PBGC is $57,500; is that correct?

A I wouldn't be aware of that number.

Q Well, isn't it true that -- our understanding is that the average pension in Detroit is approximately $18,000 a year, but even using your figure of between one or $2,000 a month, which is slightly higher, isn't it true that all of the retirees in Detroit would fall within the limits of the PBGC protections?

A Again, I'm relying on your statements.

Q So it's true, though, that all of the retirees would fall within the limits of about $57,000, in fact, substantially under $57,000 a year?

A Again, I don't know to a fact that every retiree is under that number.

Q Okay. We'll try this a different way. You reviewed the June 14th proposal prior to the time of the June 14 presentation; correct?

A Yes.

Q Were you present at the June 14 presentation?

A No.

Q Kevyn Orr was present at the June 14 presentation? Yes?
A Yes.
Q But he had discussions with you prior to that time?
A Yes.
Q And you reviewed the presentation before it was made; correct?
A Yes.
Q And on page 109 of the presentation, which was Exhibit 43, and on page 59 of the executive summary of the presentation, which is Exhibit 44, there is a comment with regard to underfunded pension, and I'm just going to read it so we don't have to find the document right now. "Because the amounts realized on the underfunding claims will be substantially less than the underfunding amount, there must be significant cuts in accrued vested pension amounts for both active and currently retired persons." Do you recall that?
A Yes.
Q Did you read that before June 14?
A Yes.
Q Now, with regard to the amount of the underfunding, I believe you previously testified today that you don't know what it is, is that correct, as we sit here today?
A Yes.
Q And it would be speculative to guess what it would be as

you sit here today; correct?
A Yes. There could be a wide range on that.
Q So there is nothing in this so-called proposal to creditors, for example, that would say to a retiree that if they earn currently $18,000 a year, that after the proposal was implemented, if it's implemented, their annual benefit will drop to nine, five, four, or zero; correct?
A Well, that was a proposal subject to mutual negotiations, so it didn't --
Q No, no, but under the proposal, regardless of what the mutual negotiation is, if I'm a retiree -- Sharon Levine is 86 years old. I live in Detroit. I look at this proposal, and I say to myself, okay, I currently get $18,000 a year. After the proposal, my vested accrued pension benefit payment will now drop to nine, five, seven, whatever the number is. You can't tell that from this proposal; correct?
A I believe that would be difficult.
Q And in addition to that, it talks about a $2 billion note for all of the unsecured creditors to share; correct?
A Yes.
Q And we don't know what the total universe of all unsecured claims are, do we?
A I believe -- well, there's an estimate in the proposal to creditors.
Q Right, but as we sit here today, exactly what that number

is going to be, we don't know what it is, do we?
A Correct.
Q And so any individual creditor doesn't really know, as we sit here today, what their share of the $2 billion note will be over the term of that note; correct?
A Well, you said "will be." You're assuming that will be the case. That's past tense now that --
Q Let's go back.
A -- we're in bankruptcy.
Q Let's go back to June 14 again. I'll try it again. Okay. On June 14 the city made a proposal that you read before it was made.
A Yes.
Q Okay. And a retiree reading that proposal doesn't know what their post-proposal, if it's implemented, retiree annual benefit is going to be post-proposal. We just had that conversation. We don't know if 18 is dropping to 9 or 4 or 7 or whatever the number is going to be; correct?
A I'm not trying to be difficult, but you're speaking in the future tense.
Q No. I'm speaking in the past. In other words, one of the things we're looking at --
A You said what it will be --
Q Okay. I'll rephrase it.
A -- or what it would have been.

Q I'll rephrase.
A Yeah.
Q I'll rephrase.
A I'm sorry. I'm just trying to make sure I'm answering --
Q I'll rephrase. Going back to June 14, we're making a proposal; right? We have a proposal. It's the so-called proposal to creditors. A retiree is a creditor; correct?
A Yes.
Q Okay. An individual retiree picks up the proposal or takes it off the website or comes to one of the public meetings. They currently get $18,000 a year. They take a look at this proposal. There is nowhere in that proposal that tells them what they're going to get if the proposal is implemented on that -- what they now know to be their $18,000 a year; correct?
A Yes.
Q Okay. And in addition to that, whatever that underfunding is would -- if I understood your testimony correctly, would be part of what gets paid under the $2 billion note; correct?
A Yes.
Q Okay. Now, there's nothing in that proposal, though, that would tell an individual creditor or an individual retiree exactly what their proportionate share of the $2 billion note would be; correct?

A I thought you already asked that, but yes.

Q Well, but we were -- okay. So that's good. So we don't know what we're getting on our annual pension benefit anymore, and we don't know what our claim is going to be worth as we read the June 14 proposal for creditors; correct?

A Yes.

Q Okay. In addition to that, as we sit here today, is it your understanding that the individual retiree asserts a claim for the underfunding portion, or is it, as the city contends, only the Retirement System that asserts that claim?

A That would be a legal question that I'd leave to the --

Q So a retired person who is coming to the June 14 meeting doesn't know what their annual pension benefit is going to be reduced to, doesn't know what their pro rata share of this $2 billion note is going to be, and doesn't even know if they're going to be allowed to assert a claim to share in the $2 billion note; is that correct?

A If you're speaking in the present tense, I believe one of the first things that was requested by the city during the bankruptcy process was to have someone represent the creditors so they would have a voice at the table, so I view that as one of the constructive issues that I looked at that retirees weren't having the kind of representation I thought they deserved until we got into this process.

Q Okay. But I'm going to ask my question again. On June

14, if you're a retiree and you're reading this proposal -- okay -- you cannot tell -- it's correct that you can't tell what your -- and I'm using a hypothetical -- $18,000 a year is going to be reduced to, you can't tell what your pro rata share of the $2 billion note is going to be in real quantifiable dollars, and you don't know even if you're going to be allowed to assert that claim or whether that claim only gets asserted by the pensions themselves; isn't that correct?

A The first two statements I would say yes. The third one is a legal question that I don't know the answer to.

Q But, Governor, if you don't understand it, how does the 86-year-old retiree understand it?

A Again, that's --

MR. SCHNEIDER: Objection. Speculation.

THE COURT: Overruled. Can you answer the question?

THE WITNESS: That would have been the part of the negotiate process because I believe Mr. Orr was trying to have meetings with various union and other representatives to potentially represent the retirees. My understanding is in many cases they would not take up that interest in representing the retirees.

BY MS. LEVINE:

Q Governor, are you aware that AFSCME wrote several letters to Jones Day and Miller Buckfire requesting meetings prior to the filing of the bankruptcy case on July 17 requesting

meetings with regard to negotiations?

A No.

Q Were you aware that those requests were declined?

A No.

Q In response to earlier questioning, you said if the Court ordered you -- sorry. In response to prior questioning with regard to not diminishing or impairing vested pension benefits, I believe you testified, and I quote, here today, if the court ordered you had to pay them, you would pay them. Is that a true statement?

A I will follow a lawful order of a court every time.

Q So if this Court finds --

A That's my goals as governor.

Q So if this Court finds that it's unconstitutional or unconstitutional as applied to impair or diminish vested pension benefits, are you, as the governor of the State of Michigan, saying that the state will pay those pension benefits?

A I think you're asking a broader question in that context because the case is with the City of Detroit, not the State of Michigan.

Q Your comment was if the court ordered you had to pay them, you would pay them.

A If the court through this process -- if I have a valid judicial order that's been reviewed and gone through the

judicial system ordering me to take an action, I'm going to follow the action of the court.

Q As we sit here today, have you or has anyone on behalf of the state offered to Detroit or Kevyn Orr state funding to avoid impairing or diminishing pension benefits?

A Those discussions would have been with attorneys present.

Q I'm not asking you what the discussions were. I'm not asking what you said or what they said. I'm asking as we sit here today, have you or has anyone on your behalf or on behalf of the state offered Detroit or Kevyn Orr state funding to avoid impairing or diminishing vested pension benefits?

THE COURT: I'm going to ask you to answer that question but with one further limitation, which is I don't want you to disclose any conversations that you have had or that you are aware has been had in the context of the District Court's mediation here.

MS. LEVINE: And we weren't looking for that, your Honor.

THE COURT: So with that limitation, would you answer the question?

THE WITNESS: Could you walk through that one more time for me? Sorry.

BY MS. LEVINE:

Q As we sit here today --

THE COURT: That's all right. That's all right.

BY MS. LEVINE:

Q -- have you or has anyone on your behalf or on behalf of the state offered Detroit or Kevyn Orr state funding to avoid impairing or diminishing vested pension benefits?

A No.

MS. LEVINE: No further questions, your Honor.

DIRECT EXAMINATION

BY MR. KING:

Q Good afternoon, Governor.

A Good afternoon.

Q My name is Ron King, and I represent the two Detroit Retirement Systems. If I understood your testimony correctly, leading up to the June 18th authorization, you'd indicated that this was a two-and-a-half-year-in-the-making process. Is that accurate?

A I had been involved with serious discussions on Detroit's financial condition over the last two and a half years, yes.

Q And as part of those discussions, is it safe to assume that there was substantial review of financial information, compilation of multiple reports, in-depth analysis of cash flow, and other factors that would go into evaluating the financial condition of the city?

A Yes.

Q And, additionally, even dating back to 2012, the city had

professionals on board, consultants on board, that were engaged in the process of conducting and compiling this information and performing those types of reviews, to your knowledge; correct?

A Yes.

Q So this has been a very lengthy ongoing process leading up to your authorization on July 18th. Is that accurate?

A Yes.

Q And you indicated that you were familiar with the June 14th proposal to creditors; correct?

A Yes.

Q And I believe you agreed that that June 14 proposal actually used the language that there would be significant cuts to pension benefits. Is that accurate?

A Yes.

Q And I think you also stated just a moment ago -- and I know you also did in your deposition -- that one of your concerns understandably was that retirees would have a voice in this process. Is that accurate?

A Yes.

Q If the city were to put forth a proposal that didn't contemplate an impairment or diminishment of pension benefits, then there wouldn't be a need for the retirees to have a voice, would there be?

MR. SCHNEIDER: Objection. Calls for speculation.

THE COURT: Sustained.

BY MR. KING:

Q Do you know if the city has set forth any other proposals to creditors other than the June 14 proposal?

A I wasn't present for the follow-up negotiations, the meetings that would have taken place in terms of I wasn't present in those meetings with all those various creditors.

Q And do you know whether or not the city contemplated a proposal that would not impair or diminish pension benefits?

A I don't recall.

Q Have you and Mr. Orr had any discussions that would contemplate a proposal that would not include the impairment or diminishment of pension benefits, and that's subject to Judge Rhodes' caveat that obviously you can't include anything that was done in the context of the mediation?

A I'm trying to recall.

Q And I can -- let me -- you want me to repeat the question for you? Have you or Mr. Orr had any discussions prior to your June 18 -- your July 18th authorization about putting forth a proposal to creditors that does not contemplate the diminishment or impairment of pension benefits?

MR. SCHNEIDER: Objection if the question is calling for attorney-client privileged information.

MR. SHUMAKER: Same objection.

THE COURT: You can answer that question if it does

not involve communication with counsel.

THE WITNESS: It did involve counsel.

THE COURT: All right.

BY MR. KING:

Q Thank you, Governor.

MR. KING: Can we see Exhibit 615, please?

BY MR. KING:

Q And, Governor Snyder, if I could just focus your attention to the last sentence of the first paragraph, and this is the e-mail from then Treasurer Dillon to you, and that sentence says, "Because pensions have such a long life, there are a lot of creative options we can explore." Have you explored any of these creative options that Treasurer Dillon set forth in this e-mail to you?

A In terms of this particular e-mail, what would have happened is -- what happened is I believe there was a phone conversation that he called me that evening and had a general discussion on that. I listened to what he had to say. I appreciated what he had to say. And then I passed it on to discussions with Kevyn Orr and the city in meetings that attorneys were present at and giving advice on.

Q Did any of these creative options contemplate a scenario where pension benefits were not diminished or impaired?

A I don't recall that specifically.

Q And let me -- if we could put up -- oh, one more question

on this.

MR. KING: Could we go back to the full text of the e-mail, please?

BY MR. KING:

Q In this e-mail, there's also a reference to at least Governor -- or excuse me -- Treasurer Dillon's statement that it's early in the process, and this is still in the informational stage. As of July 9th of 2013, did you believe that statement to be true?

A Which part? I'm sorry.

Q The part that's now --

THE COURT: Would you just rephrase the question?

MR. KING: Sure.

BY MR. KING:

Q In this e-mail Treasurer Dillon says, "In my view, it's too early in the process to respond to hypothetical questions. We remain in many ways at the information stage," and my question was as of July 9th, do you agree with that statement?

A That's what he shared with me, so I took that as accurate.

Q Do you agree that that's the case even today, as we sit here today?

A There's more work that's been done on the subject matter, and I believe people are still analyzing data on this

question.

Q Thank you.

MR. KING: Can you put up UAW 625, please? And can you scroll down to the second full paragraph where it starts "I favor"? Thank you.

BY MR. KING:

Q Now, this was an e-mail from your counsel to you, and --

A Actually, it was not to me. This e-mail wasn't -- you're quoting the part from Mike Gadola to a number of people that Mike Gadola -- that Dennis Muchmore then forwarded to me.

Q Fair enough. Did you see this statement here?

A Yes.

Q And did Mr. Gadola ever share with you his opinion that you should exercise your ability under PA 436 to put contingencies on the bankruptcy filing?

A Yeah. I don't want to be difficult here. I just need some help --

Q Sure.

A -- in the sense that it's in this document that's now an exhibit, but Mike Gadola is my counsel, so he shared information on this topic, but that's where I just need help to know is that subject to privilege or because it's here it's not anymore?

MR. KING: Your Honor, I'm not familiar with the agreement that Mr. Wertheimer entered into with the city, but

it's my understanding that there was a waiver of privilege at least with respect to this document.

MR. SCHNEIDER: Your Honor, the waiver is only as to this document, nothing else.

MR. WERTHEIMER: The waiver is as to this and other documents but nothing beyond the documents.

MR. KING: Let me move on, your Honor.

THE COURT: All right.

BY MR. KING:

Q At some point, you elected not to include any contingencies with the authorization that you sent to Mr. Orr on July 18th; correct?

A Correct.

Q And at the time that you sent that authorization to Mr. Orr, you were aware of his public position and, of course, the position set forth in the June 14 proposal that he believed pension benefits needed to be significantly reduced; is that correct?

A Again, I didn't take the June 14th proposal as conclusive. Again, that was part of the mutual negotiation process to avoid the bankruptcy. Now that we're in bankruptcy, it's really contingent on waiting for a plan on bankruptcy to be presented to the judge.

Q But at your deposition you indicated that you were aware at the time that you executed the July 18th letter that it

was Mr. Orr's position that there had to be significant cuts in accrued pension benefits?

A It was what he presented in the proposal to creditors.

Q And why is it that you chose not to put a contingency in the July 18th authorization related to accrued pension benefits?

A I made a decision not to put a contingency with respect to any conditions because my concern was is this is an extremely difficult process; that we're in a crisis mode; and that we have serious issues here. And I felt it could be an issue causing more delays, concern, complexity to a very complex case to begin with; that I have confidence in the judicial process, and that's why I actually asked that additional statement to be added in that paragraph that any plan that comes out of this has to be a legal plan. I thought it was a good opportunity to get people that are the appropriate people to make decisions that then I can help support the city in the implementation.

Q But ultimately you decided that the July 18th authorization should not have any contingencies?

A Yes. I made that decision.

Q And I'm going to finish up, I think, where you started, which was -- I think you testified very, very early on that you believe that the issue affecting the Detroit bankruptcy is one of I think national importance.

A Not national importance. It could be viewed that way. My concern is with the citizens of Michigan and the City of Detroit, including the retirees. To the degree it affects things nationally, that's a national issue. What I was putting in is if you look at difficult problems around our country, this is a problem that's been accumulating for 60 years and had not been solved before, and there are not many problems of this magnitude in our country.

Q So you certainly would agree that the situation in Detroit impacts the citizens of the State of Michigan?

A Yes.

Q And do you agree with me that until such time that the people of the State of Michigan, through a lawful amendment to the Constitution, choose to modify Article IX, Section 24, that the state should otherwise honor that obligation?

A I believe I'm following Michigan's Constitution and the Constitution of the United States, and the article says accrued financial benefits shall be treated as a contractual obligation.

MR. KING: Thank you, Governor. Appreciate your time.

DIRECT EXAMINATION

BY MS. PATEK:

Q Good afternoon, Governor. Barbara Patek. I represent the four public safety unions that represent the police and

fire fighters of the City of Detroit, and I have just a handful of questions for you. I want to start with Public Act 436. Obviously you're the chief executive of our state, and you're not a legislature, but Public Act 436 was an act that you favored; is that right?
A Yes.
Q And you favored it because it provided a number of tools that could be used in circumstances like that facing the City of Detroit; correct?
A That was very general. I'd be happy to give you more specific reasons.
Q And I'm going to ask you about --
A Okay.
Q -- some of the -- I mean I'm not suggesting that there aren't reasons --
A Okay.
Q -- but I'm going to ask you about some of those reasons. Among those tools, it did allow, upon a finding of a financial emergency, for the appointment of an emergency manager like Mr. Orr; right?
A Public Act 436 actually gives options to communities about one of four courses to follow, which --
Q Correct.
A -- was an improvement on Public Act 4.
Q I think you and I are talking about the same thing, but

I'm just asking about specific --

A Okay.

Q -- aspects of that. So among those options is, under the appropriate circumstances, an emergency manager like Mr. Orr can be appointed.

A A city may select that.

Q And that occurred in this particular case; correct?

A What happened in this particular case is Kevyn Orr came -- originally this process was under Public Act 72; that then he transitioned to Public Act 436.

Q But at the time Kevyn Orr became first the emergency financial manager under Public Act 72 or former Public Act 72, everyone knew that a few days hence that he would become the emergency manager under Public Act 436; isn't that right?

A He became -- it was under Public Act 72 that he would be transitioning to 436, yes.

Q And when that happened, you knew and the others involved with the City of Detroit knew that within a few days after that appointment because Public Act 436 would become effective on March 28th of this year, that he would then -- Kevyn Orr would then become the emergency manager under Public Act 436.

A He would transition from one act to the other.

Q And one of the -- one of the things that Public Act 436 also does is it allows an emergency manager to seek your

authorization to file for Chapter 9; correct?

A Correct.

Q And as we know, that, indeed, occurred in this case?

A Correct.

Q And we've talked a lot about -- well, strike that. Another thing that Public Act 436 does is it is designed to in a financial emergency situation reduce or eliminate under certain circumstances the collective bargaining rights of public employees.

A It allows contracts to be changed in some fashion, yes.

Q Including collective bargaining agreements, and it has --

A There is a process, though, that has to be followed. It's not simply a decision of the manager.

Q And if that process is followed, those -- the right to bargain collectively can be suspended?

A Yes.

Q And we talked about the June 14th proposal, and as I'm hearing your testimony sitting here this afternoon, one of the things that I hear you saying is it was the expectation that there would be some kind of more robust give-and-take negotiating process once that proposal was made that would potentially result in a solution to one or more of the problems facing the City of Detroit?

A I'm not sure I follow you. Could you --

Q The June 14th proposal, I think you've indicated a number

 of times you expect -- you expected that proposal to trigger negotiations between the various interested parties.

A Yes.

Q And was it your expectation that that negotiating process would take some time?

A Given that it's an environment of crisis, it would -- it could take some time, but hopefully it would be done promptly and thoughtfully given the urgency.

Q And one of the difficulties, as Ms. Levine went over with you a few moments ago, with respect to the impairment of the accrued vested pension benefits was the fact that there were a lot of numbers missing from the equation; that is, exactly what that impairment meant wasn't quite clear as of the time of the June 14th proposal. You would agree with that?

A In the proposal itself there were open issues, but that was the point of it being a proposal that needed further negotiation.

Q And I think you also told us when you made the decision in response to Mr. Orr's July 16th letter to authorize the Chapter 9 filing, you really went back over your term as governor and reviewed for yourself the process of -- you know, everything sort of that the City of Detroit had gone through and the milestones that perhaps had not been met and -- before you granted the authorization.

A Yes.

Q You are familiar, as the governor of the state, with Act 312?

A Yes.

Q And you know that that provides a mechanism that includes mediation and arbitration of disputes between public safety employees like police and fire with their various municipalities?

MR. SCHNEIDER: Objection as to the relevance.

THE COURT: Overruled. Go ahead.

THE WITNESS: Yes.

MS. PATEK: Can we have 720? Hopefully this will work. You can go to the second page, please.

BY MS. PATEK:

Q Were you monitoring or following closely the activities in terms of what was going on with the financial emergency in the City of Detroit after Mr. Orr's appointment on March 28th?

A Well, I'm not sure how you define "following closely." I followed it.

Q Were you aware that there were a number of collective bargaining agreements among the public safety unions that were due to expire as of June 30th of 2013?

A I believe there were some.

Q And would you agree with me -- well, strike that. Are you aware or did you play any role in the city's decision to

block the Act 312 proceedings associated with those efforts to negotiate and extend those collective bargaining agreements?

A No.

Q Would you agree with me that if the city were, in fact, looking to negotiate and address the problem of the accrued vested pension benefits, that, first of all, as a general matter, there was at least some question as to whether outside of bankruptcy those benefits could be impaired because of the state Constitution? Would you agree with that?

A I don't think I have enough knowledge to answer that question.

Q Would you agree that in the context of a negotiation and perhaps as a quid pro quo for an extension of the term of the contract, that that might be a place for the city to begin to address on a relatively expeditious basis the accrued vested benefits, at least of the active public safety employees involved in those negotiations?

MR. SCHNEIDER: Objection. Calls for speculation.

THE COURT: Overruled. Excuse me. Overruled. Please answer.

THE WITNESS: Again, I don't have enough knowledge of the specifics of the situation that I would just be speculating.

THE COURT: Okay.

BY MS. PATEK:

Q Do you know whether or not pursuant to Public Act 436 in this case the collective bargaining rights of the public safety employees were at least in some cases suspended by the emergency manager?

A I believe they had been suspended for some time under the prior emergency manager laws.

Q And that allowed the state to impose terms?

A Again, it's not the state. It would be the City of Detroit.

Q I'm sorry. That allowed the city to impose terms.

A Yes.

Q Well, by the time the emergency manager took his role under Public Act 436, if we focus on March 28th, 2013, whether -- without getting into the specifics, would it be fair to say that the legacy costs facing the City of Detroit were in issue?

A They had been an issue for some time.

Q And having the opportunity to have a negotiation with the public safety unions could provide a venue in which that issue could be addressed?

A That would be possible.

Q Now, in terms of the proposed significant impairments to pension benefits that we've been talking about, do you

understand that included in those accrued vested pension benefits are the benefits belonging to the active public safety -- that is, police and fire fighters -- who are working today for the City of Detroit?

A Yes.

Q And do you understand that in addition to -- well, strike that. Are you aware that the police and fire fighters in the City of Detroit do not have the benefit of Social Security?

A Yes.

Q And am I correct that in order for the City of Detroit to be exempted from paying Social Security on behalf of those fire fighters and police officers, it has to have a Section 218 agreement with the federal agreement?

A I'm not aware of that.

Q Are you aware that there has to be some sort of agreement with the federal government under which the federal government has to be satisfied that there is a qualified pension plan to provide pension and disability benefits to the affected employees?

A No. I'm not familiar with those federal statutes.

Q And if I were to ask you whether or not you were aware of the requirement that such a pension plan provide any minimum level of benefits, I take it you're unaware of that?

A With regard to federal law.

Q And would it be fair to say that you were unaware of that

at the time you authorized the bankruptcy filing on July 18th, 2013?

A Yes.

MS. PATEK: I think that's all I have.

THE COURT: Any other questions for the witnesses?

MS. BRIMER: Good afternoon, your Honor. Lynn M. Brimer.

DIRECT EXAMINATION

BY MS. BRIMER:

Q Good afternoon, Governor. My name is Lynn Brimer. We've not met. I represent an association, the Retired Detroit Police Members Association, in this matter. Your Honor, my -- Governor, my line of questioning will probably be a bit different, and if you don't mind to indulge me, I'd like to ask just a few questions to get a little bit of the lay of the land. Treasurer Dillon is an appointee that you appointed; correct?

A Yes.

Q And Treasurer Dillon and his staff ultimately would be responsible for reporting to you in connection with their activities on behalf of the State of Michigan. Is that a fair assumption?

A Yes.

Q Now, Richard Baird, do you mind explaining to me who Richard Baird is?

A Yeah. He works as part of the executive office in terms of his title is transformation manager with his primary responsibilities involving human relations, HR functions, in terms of sourcing people, finding people, counseling people.
Q And does he report directly to you, or does he report to some other representative in the executive office?
A No. He reports to me.
Q Now, at some point in 2011, Public Act 4 was referred -- a petition was circulated, and the matter was referred for being placed on the 2011 ballot for a referendum; is that correct?
A I believe it was the 2012 ballot.
Q You know, your Honor -- Judge -- Governor, yes, you are right. It was in early 2012.
A It was suspended and then went on the ballot in November of two thousand --
Q Do you recall when PA 4 was suspended?
A I don't recall the specific date, but it would have been in the earlier part of 2012.
Q And do you have an understanding of what the implications were of PA 4 being suspended?
A It meant that PA 72 came back, and that somewhat changed the rules. PA 72 has been around since 1990. It provided for emergency managers.
Q So once it was suspended, you were no longer authorized

to appoint an emergency manager under PA 4; is that correct?
A That's correct.
Q And when PA 4 was placed on the ballot for referendum, it became a concern to the state that it may be rejected; is that correct?
A It became a concern that I think it had some value. I wouldn't say to the state necessarily. People had different opinions of it.
Q Did it become a concern to you personally that PA 4 may ultimately be rejected?
A Yes.
Q So at some point in time, the state began drafting a new law to replace PA 4. Do you recall when that took place?
A It was after PA 4 was eliminated.
Q Are you aware of any discussions prior to the repeal of PA 4 regarding the drafting of a law to replace PA 4 in the event it was rejected?
A There were many discussions about alternatives and issues relating to PA 4's potential replacement because there were actually issues with PA 4 in terms of approvement, so as soon as PA 4 was passed, through that entire process, there was issues talking about how PA 4 could be improved, and they were talking about different options and ideas should PA 4 be eliminated.
Q Now, some --

A But the actual process, the main process didn't take place until after it was eliminated, as I recall.
Q Sometime in approximately March of 2012, Miller Buckfire was retained by the State of Michigan to perform a financial review of the City of Detroit. Are you familiar with that engagement?
A No. I don't recall them being hired by the state.
Q You are familiar that during the early months of 2012, Miller Buckfire was, in fact, involved with a review of the City of Detroit?
A They could have been. That could have been hired by the city or -- again, they were doing work on the project relating to the city.
Q Are you aware of the law firm of Jones Day being retained by the State of Michigan at any point in time in connection with the City of Detroit?
A No.
Q Are you aware that representatives of Miller Buckfire and Jones Day were involved with the Department of Treasury and Mr. Dillon specifically in connection with negotiating the consent agreement that was -- or drafting the consent agreement, rather, that was presented to the City of Detroit?
A Yeah. I don't recall that.
Q So if those activities were taking place, Miller Buckfire was hired by the State of Michigan to perform a financial

review and Miller Buckfire and Jones Day were engaged in drafting or working with Andy Dillon in connection with drafting a consent agreement, you were not apprised of that?
A Again, I would have been working with the treasurer on the consent agreement. They have lots of consultants that they work with on a multitude of projects.
Q So were you involved in the drafting of the law that was ultimately passed and became PA 436?
A Yeah. Switching subject -- yes.
Q And what was your involvement?
A Well, as governor of the state, I am involved in the legislative process, so I was involved in helping define some of the key parts of Public Act 436 that I viewed as improvements over Public Act 4 listening to what our citizens said, and then ultimately I signed the bill into law.
Q So one of those key provisions would have been, I think you testified a few moments ago, that cities have the opportunity to request that an emergency manager be appointed; is that correct?
A That would have been one of the improvements.
Q In the case of the appointment of Mr. Orr, he had actually, though, been appointed under PA 72; correct?
A Correct.
Q And he automatically became the emergency manager when PA 436 was effective; is that correct?

A Correct.
Q So the City of Detroit did not have the opportunity to exercise any of the options that were presented in PA 436; is that correct?
A Yes. PA 436 didn't apply. They had opportunities to speak and comment under --
Q But, yes --
A -- the PA 72 process.
Q Governor, I just -- that was a "yes" or "no" question. The City of Detroit did not have the opportunity to exercise any of the options that were presented in PA 436, and you --
A Correct.
Q Correct. Okay. So PA 436 contains a spending provision. Are you familiar with that?
A Yes.
Q Are you familiar with Article II, Section 9, of the Michigan Constitution?
A Yes.
Q And is it true that Article II, Section 9, of the Constitution reserves to the people the right of referendum; is that correct?
A Yes.
Q Other than those provisions, Governor, that contain a spending provision; is that correct?
A Correct.

Q Are you familiar with the provision of Article II, Section 9, which provides that -- and I'll read it to you. "No law as to which the power of referendum properly has been evoked shall be effective thereafter unless approved by a majority of the electors thereon at the next general election." Are you familiar with that provision?
A Yes.
Q And did you discuss that provision -- I'm just asking if you discussed, not the content -- that provision with your counsel prior to passing PA 436?
A PA 436 was a different act.
Q I just asked -- Governor --
A Yes.
Q -- "yes" or "no"? Did you discuss this provision with your counsel prior to passing PA 436, this provision?
A This provision?
Q Yeah.
A Yes.
Q Now, PA 4 was rejected on appeal on November 6, 2012; correct?
A I believe that's the date.
Q Do you know the date that the law that was ultimately signed as PA 436 was presented to Congress, the State of Michigan's legislators, and ultimately passed by both Houses?
A I believe it would have been in December.

Q Do you know what date in December?
A No, not without looking.
Q You ultimately signed it on December 26th; is that correct?
A I believe so.
Q Okay. So less than 60 days a new law was drafted, presented. I believe there was even a bill that was the combined bill of the two Houses, made its way through both Houses, and you signed it; is that correct?
A We work much more efficiently than Congress.
Q Now, the spending provisions, those are Sections 34 and 35 of the bill. Section 34 provides for $780,000 to cover the salaries of the emergency managers and their staff. Do you know whether or not anyone -- let me step back. Did you analyze whether or not $780,000 was a sufficient appropriation for the then appointed emergency managers or those emergency managers that you anticipated appointing under PA 436?
A I relied on the Treasury Department to make those calculations.
Q Are you aware of whether or not Treasury made those calculations?
A I believe so.
Q Did you review those calculations?
A No.

Q There were, though -- there were at the time a number of emergency managers in place in the State of Michigan; is that correct?
A I believe it was approximately seven or eight in both cities and school districts.
Q And the $780,000 was to cover their salaries. Do you know what the salary for the emergency manager that was appointed to the Detroit Public School system was?
A I would just be speculating.
Q Then there's a second provision for $5 million for the financial consultants.
A Yes.
Q Okay. Do you know whether or not any financial analysis had been performed, I assume, then again, by Treasury, in order to determine whether or not that was a sufficient spending provision?
A Treasury did make some analysis of that.
Q Did you review that analysis?
A No.
Q Was the analysis presented to you?
A No.
Q Did you ever discuss the analysis with the treasurer?
A I don't recall.
Q Would it be common for you to review the analysis of a spending provision in a law that you are signing?

A Quite often I do.

Q In which instances do you determine that it's not necessary for you -- I understand your background -- for you to review the financial analysis of a spending provision?

A The State of Michigan's budget is approximately $40 billion, so it's quite significant. So in terms of going through every line item, that's the point of having a treasurer and a budget office that are very good at what they do, so in many respects I count on the work of Treasury. Quite often they're checked by DTMB, the Department of Technology, Management & Budget.

Q So in light of an approximate $40 billion budget, $5,780,000 as a spending provision is not significant, is it, Governor?

A It is significant. Every taxpayer dollar is significant. In terms of the numbers, the $5 million, we had quite a bit of experience, having been through emergency managers going back to my predecessor, in understanding the cost from 2011 and 2012. The number -- the 700,000-and-some thousand dollars for emergency managers, you may wonder why it's that number. If you look at -- it's probably a half-year number because -- or less than a full-year number because it's during the middle of a year, and for us to follow through to implement the legislation, we needed legislative authorization to have the dollars to pay them, which was one

of the improvements of 436 over 4.

Q So the prior laws didn't require a spending provision, did they?

A The prior laws -- we were expending money on consultants and resources to help cities because we really do care about these cities and their citizens, so we thought it appropriate to provide additional resources so we could carry some of those opportunities and burdens through state resources. With the emergency manager, that was specifically done in response to concerns that were raised through the ballot initiative on PA 4. Previously emergency managers were paid by the city. In looking at it in retrospect, that wasn't appropriate, so we thought we should pay for them through the state.

Q Okay. You were aware, though, that by adding a spending provision, PA 436 would not be subject to the referendum; isn't that true?

A Yes. That would be one of the consequences with my reasoning being we needed the dollars to pay the consulting and the --

Q I just asked. You were fully aware that by adding a spending provision, PA 436, which is replacing a law that had just within weeks been repealed or rejected by the citizens of the State of Michigan, would not be subject to referendum?

A Yes.

Q Are you aware of any discussions between Mr. Dillon and the Jones Day attorneys in early 2012 with respect to the inclusion of a spending provision on a revised law in the event PA 4 was rejected?

A No.

Q So if he had such discussions, he kept -- he did not share them with you?

A Not that I recall.

Q Now, I'd just like to -- if I could look at 44, Retirement Systems 44, you looked at this exhibit with Mr. Wertheimer in connection with the second page. Do you recall that? And he pointed out a memo in connection with the constitutionality of the pension provisions.

A Yes.

Q Okay. But if you'll see on the very top line of the attachments, "Memo Re. Public Act 4 and Chapter 9" -- do you see that?

A Yes.

Q So if Mr. Dillon received a copy of a memo regarding Public Act 4 from the Jones Day attorneys, he did not share that with you?

A I don't recall.

Q And this e-mail, if you can go up just a bit in the paragraph, it's dated June 5th, 2012. Do you see that?

A Yes.

Q So is it fair to conclude that Mr. Dillon, at a minimum, on behalf of the state, is addressing issues with respect to the repeal of PA 4 at least in June of 2012?

MR. SCHNEIDER: Objection, your Honor. Calls for speculation.

THE COURT: Any response?

MS. PATEK: I'll withdraw the question.

THE COURT: Okay.

BY MS. PATEK:

Q Do you have regular meetings with Mr. Dillon?

A Yes.

Q And during 2012, did you have regular meetings with Mr. Dillon?

A Yes.

Q In your experience, does Mr. Dillon conduct business on behalf of the State of Michigan without informing you as his executive, chief executive?

A He has to make decisions as to what he thinks is most important to bring to my attention.

Q Now, Mr. Orr sits at your pleasure; correct? You could terminate him with or without cause?

A Yes.

Q Now, Mr. Baird -- you testified a few moments ago he reports directly to you. Are you aware of that? That was your testimony; correct?

A Yes.
Q Are you aware that in early January 2013 that Mr. Baird was conducting a review of the law firms that were presenting -- making presentations to the City of Detroit?
A I believe the city had asked him to help them in that process.
Q Are you aware that one of his concerns was the bankruptcy background of those law firms?
A I don't recall.
Q When do you recall the state first discussing the filing of a Chapter 9 by the City of Detroit?
A There was a lot of people that brought information to us about Chapter 9. In terms of discussions, in terms of the serious part, we had that discussion earlier. It literally was the week before because we were working through it as a last resort to the fact that the negotiations were not being successful. There were contingency plans put in place going back some time to say in the event things don't work, you needed to be thoughtful about it, but the serious discussion of getting the recommendation was really in that week before.
Q So if Mr. Dillon was having discussions with the attorneys at Jones Day regarding a filing of a Chapter 9 on behalf of the city in April of 2012, you were not a party or aware of those discussions?
A Again, I don't recall.

Q Were you at all involved or did you have any discussions with Mayor Bing regarding his selection of Miller Buckfire as financial consultants to the City of Detroit?

A I don't recall any specific discussions.

Q Did you have general discussions with the mayor regarding the selection of a financial consultant in late December of 2012 or early January?

A Again, I don't recall.

Q Did you have any discussions with the mayor regarding the selection of counsel, specifically ultimately Jones Day, and the selection process? Did you have --

A I don't recall. Those were city decisions.

Q Did you ever advise the mayor that the State of Michigan had retained Miller Buckfire to perform a 60-day financial review of the City of Detroit in March of 2012?

A I did not.

Q Did you ever advise the mayor or the City Council that Jones Day had been discussing the repeal of PA 4 with the Department of Treasury and its implication?

A I did not.

Q Did you ever discuss with the mayor or the City Council the fact that the Jones Day attorneys had been discussing with the treasurer the potential of filing a Chapter 9 on behalf of the city as early as April of 2012?

A No.

MS. BRIMER: May I have one moment, your Honor?

THE COURT: Yes.

MS. BRIMER: Thank you, your Honor. Thank you, Governor.

THE COURT: Any other questions for the governor?

MR. MONTGOMERY: None from the Retiree Committee, your Honor.

MR. WERTHEIMER: Your Honor, I know I'm out of turn, but I have one follow-up to Ms. Brimer's question. I promise, two minutes.

THE COURT: Well, let me see if there's any examination of the governor by either the state or the city, and then we'll get back to redirect.

MR. SCHNEIDER: Yes, your Honor. Could we have just one moment?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. SCHNEIDER:

Q Good afternoon, Governor. Governor, what did you do prior to becoming governor?

A I was a venture capitalist and entrepreneur. Prior to that, I was an executive at a computer company running that, and prior to that, I was in public accounting as a CPA.

Q So is it safe to say that your background involves the review of financial statements, financial documents; is that

correct?

A I have extensive experience in those matters.

Q And do you have extensive experience in reading and understanding balance sheets as well?

A Yes.

Q How long in your career have you been working in issues of finance of accounting?

A Since 1982.

Q Does your educational background also involve finance and accounting?

A It does. I have an MBA from the University of Michigan and basically a number of accounting classes in my undergraduate plus a law degree.

Q You're also a CPA; is that correct?

A That's correct. That's where the nerd thing came from.

Q Your Honor -- or, Governor -- a reoccurring problem in this courtroom apparently. After you --

THE COURT: I'm wondering if there's some interest in a judicial position that you haven't disclosed to us.

THE WITNESS: I'm not that qualified, your Honor.

BY MR. SCHNEIDER:

Q Your Honor, you -- Governor, you testified -- you testified regarding your review of financial reports after you became governor related to the City of Detroit. Do you remember that testimony?

A Yes.
Q Did you review reports regarding cash flow for the city?
A Yes.
Q And through this process, were you able to determine whether or not there was a cash flow problem with the City of Detroit?
A There's a serious cash flow problem.
Q And is it safe to say that the longer you stayed in office as governor, the cash flow problems worsened; is that correct?
A Yes. The most nonaccounting description I would use is the word hemorrhaging.
Q Okay. In fact, you received some reports from the financial review teams calling it a cash crisis; is that correct?
A Yes, including statements by the mayor going back to, I believe, 2011 talking about the city even at that point potentially running out of cash.
Q Okay. So the dialogue of -- and the discussion of running out of cash had been continual; correct?
A Yes.
Q And things were getting worse and not better. Is that accurate?
MR. DECHIARA: Objection.
THE WITNESS: Yes.

MR. DECHIARA: That was leading.

THE COURT: Yes. Please don't ask leading questions. The objection is sustained.

BY MR. SCHNEIDER:

Q Ultimately, however, Mr. Orr was appointed as emergency manager; correct?

A Yes.

THE COURT: Yes, that was another leading question.

MR. SCHNEIDER: I'm sorry, your Honor.

BY MR. SCHNEIDER:

Q Governor, there's been a lot of talk here about Chapter 9 filing, and I want to ask you during this process about cash flow discussions and your review of the reports, where was Chapter 9 in your mind?

A It was a last resort. When you looked at the entire process, I tried to be very diligent about this in a very difficult situation. If you go back to the time I took office, first it involved working with the mayor. I actually attended the State of the City address to show support for the mayor in a public fashion to help work in a collaborative fashion through that process. Then it became clear -- he made the statement, for example, that they were going to run out of cash, and there were other issues, so we started the -- the Treasury began a preliminary review of the city's finances, I believe, in late 2011. That's an objective

process. That's not a subjective process. They came out with their findings that then led to a financial review team that did an objective process again under Public Act 4 finding there's severe financial distress. There was a series of options given to me at that point in time that include there's no distress, there's a consent agreement, or there's a need for an emergency manager. We worked very hard and very diligently to do a consent agreement, and we finally got a consent agreement done that included an appendix that had 20-some items, I believe 23 different items to follow through on, again, to avoid more serious consequences, so there was a lot of work done through the summer on the consent agreement. Unfortunately, by fall it appeared that most of the items in that consent agreement were not being implemented. Again, people worked hard on doing those things, but they didn't happen. So another review took place along with continuing cash crises, so another review cycle was begun under Public Act 72 because this is a crisis. It still is a crisis today. And so we went through that exercise, and then they found that the consent agreement was not going to end up in a satisfactory plan that led to the emergency manager situation, and so, again, we went through a hearing process there. I appointed an emergency manager. The emergency manager went through a process of negotiation proposing something to creditors to work out. He came to me

then and said that was not successful. I authorized bankruptcy, and now that's where we're at. One of the things that doesn't come across very often is an overriding concern for the citizens of Detroit. That is, while all this is taking place, all we've seen is more blight, more lights going out, challenges on the police force. These things have to get resolved. It's an unacceptable situation.

Q So is it correct to say that you -- when you were reviewing these reports, you did not do so with the intention to authorize or seek a filing?

A I worked very diligently to avoid this process in good faith and to go through this process to say what are all the other steps possible and, again, avoid subjectivity and do it as objectively understanding that the subjective piece is people are suffering, the 700,000 citizens of Detroit.

Q Let me ask you some questions regarding PA 436. You testified that it gives options to communities. Can you explain just a little bit about what you meant by that?

A Yeah. One of the issues with Public Act 4 is it really had those three choices that I mentioned. What now happens is there's an opportunity for four different choices that the community has. They can do a consent agreement. There's an option for an emergency manager. There's an option for looking at a negotiated settlement to try to go to creditors to work things out, and then there's potentially bankruptcy.

Q Let me ask you more specifically about PA 436. You were asked regarding the appropriations provisions. For you what was the point of those appropriations, the purpose?

A Yeah. We were in the course of the middle of a fiscal year, and under Michigan's Constitution, I can't -- we cannot expend funds without an appropriation. Part of Public Act 436 is saying we were going to relieve the cities of the burden of paying for the emergency manager because that is a burden on them, so we needed an appropriation to do that, and it was the simplest best way to do it, in my view, along with the fact significant dollars were being spent on consultants in some capacity, whether it be the city or the state, and for us to continue to do consulting work to help cities out across our state is by having that additional appropriation we'd have those resources available. That was done to get us through that budget year with a view that I would include similar numbers for the following budget year, which was proposed in February, and that took effect this October 1.

Q Well, you signed the bill, so was your purpose to make it referendum-proof?

A No. It was to deal with this issue of paying for emergency managers and having financial resources in a crisis available.

Q Can the state make an expenditure without an appropriation?

A No.

Q So in order to pay for these salaries, an appropriation was required; is that correct?

A Yes.

Q And was the most efficient or best way to do this by putting the appropriation in the bill?

MR. WERTHEIMER: Object. I think we're back to the leading.

THE COURT: Yes. That was a leading question.

MR. SCHNEIDER: Okay.

THE COURT: The objection is sustained.

BY MR. SCHNEIDER:

Q Did either PA 4 or PA 72 require the state to pay for emergency managers' salaries?

A No.

Q So after the bill took effect, after PA 436 takes effect, was there ever a later appropriation in a budget bill to handle this type of issue?

A For ongoing expenses, I proposed it in the February budget message that I put forward. That would have been included in the budget adopted in the June time frame that began this October 1.

Q What was the purpose of that?

A Again, for ongoing, to help pay for the ongoing costs of emergency managers and consultants.

MR. SCHNEIDER: Thank you, your Honor.

THE COURT: Questions from the city?

MR. SHUMAKER: Your Honor, the city has no questions for the governor.

THE COURT: All right. Mr. Wertheimer, do you have questions?

MR. WERTHEIMER: Yes, I do.

MS. LEVINE: Your Honor, a point of process, so that there's time for all the objectors who want to redirect, can we talk about perhaps time limits?

MR. WERTHEIMER: I'll be two, three minutes.

THE COURT: Well, of course, your redirect of the governor should be limited to what was covered on his cross-examination, which wasn't much.

MS. LEVINE: Yeah. No, no. I'm going to be brief, your Honor, but I --

THE COURT: I don't mean to minimize his testimony, but it didn't take very long.

MS. LEVINE: Plan to be brief, your Honor, but I am third in the queue, so I just want to make sure third doesn't show up at five.

THE COURT: All right. Let me just see a show of hands. How many of you propose to ask redirect examination at this point? Just the three of you? All right. I think we'll be all right then.

REDIRECT EXAMINATION

BY MR. WERTHEIMER:

Q Governor, would you agree with me that the fact that these problems that Detroit has that we all recognize, that they have to be resolved and have to be resolved expeditiously, does not mean that they have to be resolved on the backs of retirees making one or $2,000 a month?

MR. SCHNEIDER: Objection. Relevance.

MR. WERTHEIMER: Your Honor, the governor made a long statement in response to a question that implied that all he was doing was dealing with the problem expeditiously, and I'm simply attempting to make the point that I'm attempting to make that seems obvious to me.

THE COURT: I'll permit it. Go ahead, sir. Can you answer the question?

THE WITNESS: Again, I have concerns about the retirees also. I'm concerned about the 700,000 citizens of Detroit, the citizens of Michigan, which include these retirees.

BY MR. WERTHEIMER:

Q Governor, I did not ask you whether you had concerns. Again, I'll ask you the same question again, and try to just answer that, please. Would you agree with me that the fact that the problems that you've identified that have to be resolved and have to be resolved quickly, that that does not

mean that they have to be resolved on the backs of the city retirees?

A I think you're asking me to speculate because we're still in this process where there isn't even a plan on the table to say how to resolve this issue.

Q All right. I'll let it go. Ms. Brimer asked you a question about you having the ability to fire Mr. Orr. Do you recall that?

A Yes.

Q You were also the person who recommended that he be hired, were you not?

A Yes.

MR. WERTHEIMER: That's all I have. Thank you.

REDIRECT EXAMINATION

BY MS. LEVINE:

Q Good afternoon again, Governor. Sharon Levine, Lowenstein Sandler, for AFSCME. In response to your counsel's questions, you went through your education, your CPA, your law degree, and some other financial experience that you've had; correct?

A Yes.

Q And that you also discussed the fact that going back to even 2011 you were having discussions with the mayor of Detroit about the fact that the mayor of Detroit was running out of cash; correct?

A It was a public statement. I was quoting a public statement the mayor made back, I believe, in November of 2011 where he publicly came out and said there was a concern about running out of cash.
Q So you were aware -- you were watching Detroit and its cash position going back as far as 2011; correct?
A Yes.
Q Okay. Does that refresh your recollection with regard to why the state stopped the implementation of the tentative agreement in February of 2012, which was ratified by a coalition of 30 unions and provided for substantial cash savings for the City of Detroit?
A No.
Q You also testified that Chapter 9 was a last resort and that you were looking to try to resolve it some other way in good faith; is that correct?
A Yes.
Q So then I'm going to go back to the June 14 proposal to creditors, and with your CPA and all of your financial background, if you didn't understand exactly what was being offered in dollars and cents to the retirees, how is it good faith if the retirees couldn't understand that either?
A What I would say is is if you looked at that package, it was described as preliminary, that there are many pieces needed to be fleshed out, including there's a section in

there about there had been no real evaluation of the assets of the city, so it was an open question as to where it would go. And the way I viewed it is in a situation like this, you had to start the discussion at some starting point, and this was something to get out on the table to say now people can have informed discussions, have dialogue, have questions, have answers, and then hopefully move towards a conclusion. In the case of retirees, in particular, though, in retrospect, I think there was a real challenge to say who was going to step up to represent them. And I felt that was one of the problems in that whole process that I thought could get resolved by authorizing the bankruptcy; that then somebody could be appointed to represent them.

Q So this is not a proposal for creditors or an offer for creditors. All it is is an invitation to start a process?

A No. I hope -- I believe it was a good faith negotiation, put something on the table based on the facts that were available. Again, you know, I --

Q I'm just trying to clarify. Is it a -- is it an invitation to negotiate, or is it an actual proposal to creditors?

A I believe it was a proposal, but then you start a dialogue because, again, it needed to be mutually agreed to.

Q Okay. So as a proposal --

A I don't think those two comments are mutually exclusive.

Q As a proposal to creditors, is it your testimony that it actually clarified how those creditors were going to be treated, including specifically how the retirees were going to be treated?

A I think it helped clearly clarify the financial situation of Detroit saying here are the resources available, here's where dollars need to go, and have a discussion as to what's possible.

MS. LEVINE: Thank you, Governor.

REDIRECT EXAMINATION

BY MS. BRIMER:

Q Just a very brief follow-up, Governor.

MS. BRIMER: And I'd like to ask him if he's ever seen this e-mail. It's Retirement Systems Number 46. No. I want to ask if he's ever seen it first. If he's not seen it, then I have no questions on it. I'd like to ask the governor if he's seen an e-mail that has been presented as an exhibit. He's not a part of it, but I may have questions if he's seen it. May I approach?

THE COURT: You may. What exhibit is it?

MS. BRIMER: It is the Retirement Systems Number 846.

THE COURT: You may ask the witness if he has seen it.

BY MS. BRIMER:

Q Have you --

MR. SCHNEIDER: Your Honor, before we go any further, I object because this is outside the scope of my examination.

MR. SHUMAKER: The city joins the objection.

MS. BRIMER: I believe -- I believe I will be able to tie it to his examination, your Honor.

THE COURT: All right. Have you seen this before, sir?

THE WITNESS: I don't recall.

MS. BRIMER: And if he's not recall -- does not recall seeing it, your Honor, I'll take it back from him, ask him a few questions --

THE COURT: Okay.

MS. BRIMER: -- not on it, but --

BY MS. BRIMER:

Q Governor, do you recall who suggested that the appropriation provisions in PA 436 should be included in the act?

A I don't recall.

Q Were you the one who suggested if -- that they should be included?

A Again, I said I don't recall --

Q Okay.

A -- because, again, that's an interactive process on

legislation, and clearly I do several hundred bills a year.

MS. BRIMER: I have nothing else, your Honor.

THE COURT: All right.

MR. KING: Your Honor, I just have a few questions.

REDIRECT EXAMINATION

BY MR. KING:

Q Governor, you indicated that you had reviewed a host of financial information and other documentation in the course of your review of Detroit's financial situation. I think that was what you just testified to with Mr. Schneider. Did you ever have an opportunity to review any information regarding funding levels of other Retirement Systems in the state relative to the two pension systems in Detroit?

A No.

Q So you wouldn't know one way or the other whether or not the Detroit systems, for example, are significantly better funded than either the Michigan State Employees Retirement System or the Michigan Public School Employees Retirement System? You wouldn't know one way or the other whether the Detroit systems are better funded than either -- better funded than either of those two state systems?

A Correct.

MR. KING: Thank you.

THE COURT: All right. We have concluded the witness' testimony. Sir, you are excused. Thank you very

much for coming today. Appreciate it.

(Witness excused at 4:08 p.m.)

THE COURT: We will remain in place while the governor takes his leave. Mr. Ciantra, I had indicated we would take up your issue tomorrow morning, but since we have time yet today, is it okay with you if we take up your issue today? All right.

MR. SHUMAKER: Your Honor, the attorneys that have been dealing with that issue are not present for the city.

THE COURT: Oh.

MR. SHUMAKER: I'm sorry about that.

THE COURT: Okay. Well, that's a problem. Remind me who that -- remind me who that was.

MR. SHUMAKER: It was Mr. Stewart.

THE COURT: Of course; of course. All right. Well, we'll deal with it first thing tomorrow morning then. Is there anything else we can do today? All right. We'll be in recess till tomorrow morning.

MR. SHUMAKER: Thank you, your Honor.

THE CLERK: All rise. Court is adjourned.

(Proceedings concluded at 4:09 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
| --- | --- | --- | --- | --- |
| Kevyn Orr | 6 | 81 | | |
| Governor Rick Snyder | 122/166<br>185/196<br>204/213 | 228 | 236/238<br>241/243 | |

| EXHIBITS: | Received |
| --- | --- |
| Debtor's Exhibit 41 | 35 |
| Exhibit 615 | 155 |
| Exhibit 616 | 154 |
| Exhibit 625 | 158 |

I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.

/s/ Lois Garrett                November 3, 2013

Lois Garrett