```
 1              UNITED STATES BANKRUPTCY COURT
               EASTERN DISTRICT OF MICHIGAN
 2                    SOUTHERN DIVISION

 3  IN THE MATTER OF,          Case No. 13-53846
                               Detroit, Michigan
 4  CITY OF DETROIT, MI        October 29, 2013
    _____/  9:00 a.m.
 5
                    IN RE:  ELIGIBILITY TRIAL
 6        BEFORE THE HONORABLE STEVEN W. RHODES
          TRANSCRIPT ORDERED BY: PAUL HAGE, ESQ.
 7
    APPEARANCES:
 8
    For the City of Detroit, MI:  GEOFFREY IRWIN, ESQ.
 9                                 GEOFFREY STEWART, ESQ.
                                   GREGORY SHUMAKER, ESQ.
10                                 THOMAS CULLEN, JR., ESQ.
                                   MIGUEL EATON, ESQ.
11                                 Jones, Day
                                   51 Louisiana Avenue, N.W.
12                                 Washington, D.C. 20001-2113
                                   202-879-3939
13
                                   BRUCE BENNETT, ESQ.
14                                 Jones, Day
                                   555 South Flower Street
15                                 Fiftieth Floor
                                   Los Angeles, CA 90071-2452
16                                 213-243-2382

17                                 ROBERT HERTZBERG, ESQ. (P30261)
                                   Pepper, Hamilton
18                                 4000 Town Center
                                   Suite 1800
19                                 Southfield, MI 48075-1505
                                   248-359-7333
20
    For State of Michigan:         MATTHEW SCHNEIDER, ESQ.
21                                 (P62190)
                                   Chief Legal Counsel
22                                 Attorney for State of Michigan
                                   Michigan Department of
23                                 Attorney General
                                   P.O. Box 30754
24                                 Lansing, MI 48909
                                   517-373-0126
25
```

```
1                              STEVEN HOWELL, ESQ. (P28982)
                               Special Assistant Attorney
2                              General
                               Dickinson, Wright
3                              500 Woodward Avenue
                               Suite 4000
4                              Detroit, MI  48226-3425
                               313-223-3033
5
   For Michigan Council 25 of  SHARON L. LEVINE, ESQ.
6  the American Federation of  JOHN SHERWOOD, ESQ.
   State, County and Municipal Lowenstein, Sandler, LLP
7  Employees (AFSCME), AFL-CIO 65 Livingston Avenue
   and Sub-Chapter 98, City of Roseland, NJ 07068
8  Detroit Retirees:          973-597-2500

9  For Detroit Retirement      ROBERT D. GORDON, ESQ. (P48627)
   Systems - General Retirement JENNIFER GREEN, ESQ.
10 System of Detroit, Police and Clark, Hill, PLC
   Fire Retirement System of   151 S. Old Woodward Avenue
11 the City of Detroit:        Suite 200
                               Birmingham, MI 48009
12                             248-988-5882

13                             RONALD KING, ESQ. (P45088)
                               Clark, Hill
14                             212 East Grand River Avenue
                               Lansing, MI 48906
15                             517-318-3015

16 For the Detroit Fire Fighters BARBARA PATEK, ESQ. (P34666)
   Association, the Detroit    JULIE BETH TEICHER, ESQ.
17 Police Officers Association  (P34300)
   and the Detroit Police      DAVID EISENBERG, ESQ. (P68678)
18 Lieutenants and Sergeants   Erman, Teicher, Miller, Zucker
   Association:                & Freedman
19                             400 Galleria Officentre
                               Suite 444
20                             Southfield, MI 48034

21 For International Union, UAW: BABETTE A. CECCOTTI, ESQ.
                               PETER D. DECHIARA, ESQ.
22                             THOMAS CIANTRA, ESQ.
                               Cohen, Weiss, and Simon, LLP
23                             330 West 42nd Street
                               New York, NY 10036-6976
24                             212-356-0227

25
```

```
 1   For the Detroit Retired        THOMAS MORRIS, ESQ. (P39141)
     City Employees Association,    Silverman & Morris
 2   Retired Detroit Police and     30500 Northwestern Highway
     Fire Fighters Association,     Suite 200
 3   Shirley V. Lightsey, and       Farmington Hills, MI 48334
     Donald Taylor (Retiree         248-539-1330
 4   Association Parties):
                                    RYAN PLECHA, ESQ. (P71957)
 5                                  Lippitt, O'Keefe
                                    370 East Maple Road
 6                                  3rd Floor
                                    Birmingham, MI 48009
 7                                  248-646-8292

 8   For the Official Committee of  MATTHEW E. WILKINS, ESQ.
     Retirees:                      (P56697)
 9                                  Brooks, Wilkins, Sharkey &
                                    Turco, PLLC
10                                  401 S. Old Woodward Avenue
                                    Suite 400
11                                  Birmingham, MI 48009
                                    248-971-1711
12
                                    CLAUDE D. MONTGOMERY, ESQ.
13                                  ANTHONY ULLMAN, ESQ.
                                    ARTHUR RUEGGER, ESQ.
14                                  Dentons
                                    1221 Avenue of the Americas
15                                  New York, NY 10020-1089
                                    212-768-6700
16
     For the Retired Detroit        LYNN M. BRIMER, ESQ. (P43291)
17   Police Members Association:    MEREDITH TAUNT, ESQ. (P69698)
                                    MALLORY FIELD, ESQ. (P75289)
18                                  Strobl & Sharp, P.C.
                                    300 East Long Lake Road
19                                  Suite 200
                                    Bloomfield Hills, MI 48304-2376
20                                  248-540-2300

21   For the Flowers Plaintiffs -   WILLIAM A. WERTHEIMER, ESQ.
     Robert Flowers, Michael Wells, (P26275)
22   Janet Whitson, Mary Washington 30515 Timberbrook Lane
     and Bruce Goldman:             Bingham Farms, MI 48025
23                                  248-644-9200

24

25
```

```
1   For Ambac Assurance           DANIEL WEINER, ESQ. (P32010)
    Corporation:                  Schafer & Weiner
2                                 40950 Woodward Avenue
                                  Suite 100
3                                 Bloomfield Hills, MI 48304
                                  248-540-3340
4
    Court Recorder:               Letrice Calloway
5
    Transcriber:                  Deborah L. Kremlick
6

7

8

9   Proceedings recorded by electronic sound recording, transcript
    produced by transcription service.
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              INDEX

2 <u>WITNESSES FOR</u>        <u>Cross</u>
  <u>THE CITY:</u>
3
  KEVYN ORR          22,69,115,
4                     131,166,171

5 <u>EXHIBITS:</u>                                    <u>ID</u>   <u>ADM</u>

6 UAWEX619 Chain of Emails                     77   78
  UAWEX620 Email                               81   81
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
(Court in Session)
2
        THE CLERK:  All rise.  Court is in session.  Please
3
be seated.  Case number 13-53846, City of Detroit, Michigan.
4
        THE COURT:  Good morning.  Everyone appears to be
5
here.  Sir.
6
        MR. CIANTRA:  Good morning, Your Honor.  If I may
7
proceed.
8
        THE COURT:  Yes.
9
        MR. CIANTRA:  Thank you.  Thomas Ciantra, Cohen,
10
Weiss, and Simon, LLP for the UAW.
11
    And I rise with respect to the motion I made during the
12
examination of Mr. Moore to exclude one part of his testimony.
13
And that is the portion of his testimony where he related a
14
conversation in the presence of counsel with respect to the
15
calculation of the unfunded liability of the Detroit City
16
Retirement Plans.
17
    And I'm going to make a -- a brief argument with respect
18
to that.  Cited a couple of cases.  And relied on some
19
deposition excerpts that I'll read to the Court that I've
20
shared with counsel for the city earlier this morning.
21
    We start with some of the basics.  Obviously under the
22
federal rules, discovery should be open and robust.  It's
23
intended to get at both the facts, to develop a factual
24
record, to present to the Trier of Fact.  And as well to
25

1 enable the parties to learn and understand the positions and

2 contentions of the other side.  That's -- that's what

3 discovery is supposed to get at.

4      And the case law as it is developed, is clear, at least

5 with respect to one thing which is that if a party asserts a

6 privilege, whether it be attorney/client, the Fifth Amendment,

7 spousal or something else, it cannot be both used as a shield

8 against disclosure to the adversary.  And then effectively as

9 a sword through selective later disclosure.

10      And that is -- is really a matter of fundamental --

11 fundamental fairness in the -- in the adversarial process.

12 And the case law as I said has applied this principal in --

13 with respect to the attorney/client privilege.  It's applied

14 it with respect to the Fifth Amendment privilege against self

15 incrimination which obviously carries with it other

16 constitutional values that aren't -- aren't present with

17 respect to the attorney/client privilege.

18      But -- and the basic principle that I think that

19 developed in that case law is that if a party is -- is going

20 to assert privilege with respect to a particular subject

21 matter, it has to be prepared to accept the consequence that

22 the -- the universe of proof that may -- it may introduce with

23 respect to that is going to be -- is going to be limited by

24 the -- by the extent to which is has asserted the privilege.

25      And in this district, the Eastern District of Michigan

1  that case law has developed most clearly in cases involving

2  the Fifth Amendment privilege and I would point the Court to

3  -- to -- two District Court decisions.  One by Judge Gadola,

4  it's a forfeiture case, U.S. v $60,000.  That is reported at

5  763 F Supp 909.  And a franchise case, a decision by Judge

6  Rosen, Dunkin Doughnuts v Taseski.  That's 47 F Supp 2d 867.

7      And in both of those cases we had parties who asserted

8  privilege in discovery to limit inquiry and then were

9  precluded once discovery had closed and summary judgment and

10 trial from then selectively waiving privilege to -- to either

11 try to defeat summary judgment or -- or defeat the claims of

12 -- of the -- their adversary.

13     In the -- in the Dunkin Doughnuts case it was evidence

14 with respect to sales levels under a franchise agreement and

15 the -- the franchisee took the Fifth Amendment apparently

16 because of the fraud allegations.  In the -- the forfeiture

17 case, it was someone whose property was seized at the airport

18 after a, you know, dog identified it as positive for drugs.

19     In both of those cases discovery had closed.  And -- and

20 the Court precluded the party that had asserted privilege from

21 then asserting by way of affidavit or other discovery

22 material, evidence to try to defeat summary judgment on the

23 principle that once the privilege had been asserted and

24 discovery had closed, the -- the adversary was precluded from

25 effectively from -- from rebutting it and the -- the party

1 that had asserted privilege had to accept the -- the

2 consequences of that assertion.

3     Now here, the city largely shielded almost entirely from

4 disclosure, the deliberations of the pension task force that

5 there's been testimony about.  That task force worked with

6 actuaries at the Milliman firm that the -- the city had

7 retained and it had the -- those actuaries undertake various

8 analyses with respect to the -- the funded status of the plan

9 and various alternatives and issues related to the plans that

10 the -- that the city was investigating.

11     And Mr. Moore's testimony with respect to that concerned

12 some of the work of that task force with respect to its -- the

13 -- the actuary's calculation based on the -- the retirement

14 system's actuary's work of what the unfunded liability of the

15 plan was.

16     But the -- the city did not in discovery permit the

17 objecting parties to take -- permit inquiry with respect to

18 the deliberations of the task force.  And in addition to the

19 excerpt that -- from Mr. Moore's deposition that we recited on

20 Thursday, which I will concede was not the crispest assertion

21 of privilege.

22     That issue -- that tactic was clearly pursued in the

23 deposition of the -- the actuary himself, Mr. Bowen.  And I

24 would point to two instances during my deposition of Mr. Bowen

25 and there was as well a follow up inquiry by counsel for the

1 retiree committee.

2      Let's talk about the -- the first one.  There is an

3 issue, Your Honor, with respect to remedies that the emergency

4 manager has under Public Act 436.  In the event that there is

5 a certain level of under funding in the pension system, the

6 emergency manager can take certain remedies with respect to

7 the governance of the system.

8      And the actuaries were asked -- tasked to compute the

9 under funding of the system lining up the provisions of this

10 statute.  The one question that became obvious was if the

11 actuaries and the emergency manager believed that the under

12 funding of the system permitted them to take remedies with

13 respect to the governance of the system, essentially replacing

14 the trustees, why had they not done so.  And what does that

15 tell us with respect to their confidence in the -- in the

16 calculation of the under funding.

17      So with respect to that issue, I questioned the actuary

18 with respect to the discussions of the task force where that

19 assignment was discussed, the assignment to calculate the --

20 the liabilities of the -- unfunded liabilities of the pension

21 plans in light of the -- the statutory provisions.

22      And this appears beginning at Page 53 of Mr. Bowen's

23 deposition.  And I'm -- I'm using the minuscript version of

24 the transcript.  And it continues a bit further.  And I'll --

25 let me read from that -- from that transcript.

1    This is my question.  The pension task force conference

2  call that you -- that you discussed where this assignment was

3  given to you, who participated in that?  Was there an attorney

4  on the line that participated in that call?  Answer, yes,

5  there was.

6    Okay, who was that?  That would have been Evan Miller

7  from Jones, Day.

8    All right.  Did Mr. Miller give you the instruction with

9  respect to this particular assignment?  I don't recall which

10  particular party on the pension task force asked the direct

11  question to do this now.

12    Next question.  Okay.  Was there a reason given for why

13  you were being asked to do this?  An objection is raised at

14  that point.  Mr. Miller, and again, to the extent that any

15  discussion that you had with members of the task force

16  relating to this assignment involved counsel for the city, I

17  would instruct you not to respond on the grounds of

18  attorney/client privilege.

19    And then I -- then I questioned.  So you can respond to

20  that question consistent with your counsel's direction or the

21  city -- the city counsel -- city's counsel's direction.

22  Answer -- or the witness, I have no response.

23    Question, yes.  But for Mr. Miller's instruction would

24  you answer the question?  Answer, I'm not going to disobey the

25  attorney for my client.

1      Continue.  So I assume the answer to that is yes, other

2  than his instruction you would answer the question.   The

3  witness, answer, yes.  That's -- that's a very difficult

4  hypothetical because that instruction exists and I plan to

5  follow the advice -- the instruction of my client's attorney.

6  And then I respond, I think that's clear.

7      So at that point our inquiry with respect to the reasons

8  for that calculation and that subject matter were clearly --

9  were clearly cut off.  Similarly, we sought to question the

10  witness with respect to the -- their analysis of the costs of

11  a defined contribution plan that they were proposing to

12  implement as a follow on to the -- the defined benefit plan

13  that the city contends it will no longer fund.

14      And there again at Page 77 of the transcript, I sought to

15  question them with respect to where that 10% number -- how

16  that 10% number was derived.  And I asked beginning at Lines

17  19 on Page 77.

18      And where -- how was that 10% number arrived at?  Answer,

19  it was provided to us by the pension task force.

20      Was there or were there discussions of using different --

21  a different percentage of pay?  Mr. Miller, wait.  To the

22  extent that those discussions if any involved counsel for the

23  City of Detroit, I would instruct the witness not to answer

24  those on the grounds of attorney/client privilege.

25      By Mr. Ciantra, so you can answer that question?  The

1  witness, no answer.  Because of the direction of the city

2  counsel -- the city's counsel?  Answer, that's correct.

3      So at that point, Your Honor, it was pretty clear at

4  least to me, that there was -- the city was not going to

5  permit the actuary to testify with respect to any of the

6  deliberations of the task force with respect to the

7  calculations that he had made.

8      And as a result, those areas were effectively blocked off

9  from our inquiry, both by deposition and -- and as well with

10 respect to -- to documents.  So at this point the city of

11 course has not -- did not call the actuary to testify.  They

12 didn't put in an -- an expert report with respect to these

13 calculations.

14     And the -- the evidence with respect to the Milliman

15 actuary's calculations has come in through the report of Mr.

16 Moore.  That was privileged.  It was made in the presence of

17 an attorney as to which we would submit that subject was not

18 permitted on account of their assertion of privilege, our

19 ability to take discovery with respect to that.

20     So we would ask that just that question and answer,

21 that's the only remedy that we are asking, be stricken from

22 the record because it's -- it is selective use of the

23 privilege that is simply inconsistent with notions of

24 fundamental fairness.

25          THE COURT:  Do you have the official transcript from

1  Mr. Moore's testimony and can you identify the pages and lines

2  that you want stricken?

3        MR. CIANTRA:  I do not at this point have the

4  official transcript.  You know, I have the unofficial daily,

5  but certainly I could provide that, Your Honor.  Once -- well,

6  I don't believe that it -- I don't believe that's been made

7  available to us as of yet.

8        THE COURT:  Okay.  So what was the precise question

9  and answer that you want stricken?

10       MR. CIANTRA:  The precise question and answer that I

11  would -- would ask that the Court strike, is the question

12  where he report -- he was asked to report on the -- the

13  calculation by the actuary of the -- the under funding of the

14  city's retirement system.  And he testified that the actuary

15  had taken the calculations of the systems actuaries, revised a

16  earnings assumption --

17       THE COURT:  Right.

18       MR. CIANTRA:  -- and instead of using the actuarial

19  value of the assets, had used a market value and that that

20  sort of in total gave the --

21       THE COURT:  He adjusted the discount rate.

22       MR. CIANTRA:  He adjusted -- well, there are two

23  things.  He adjusted the discount rate and then he used a

24  market valuation of the assets --

25       THE COURT:  Right.

1          MR. CIANTRA:  -- as of the date and time rather than

2    the actuarial value.

3          THE COURT:  All right.  Thank you, sir.

4          MR. STEWART:  Geoffrey -- Geoffrey Stewart of Jones,

5    Day for the city, Your Honor.

6       A couple of things.  First of all, just to put things in

7    perspective, the testimony we're talking about Mr. Ciantra

8    just described, and let me make a couple of points.

9       First of all, in his deposition Mr. Moore answered every

10   single question he was asked but one.  And the one was, what

11   did you discuss with your lawyer in preparing for your

12   deposition.  So there was no instruction to Mr. Moore to not

13   answer any substantive question.

14      Moreover, he was asked about and he did testify about at

15   no short length, this 3.5 billion dollar number.  And I guess

16   -- I think it was by Mr. Ciantra himself -- no, it was by Mr.

17   Ruegger.  And it's -- that questioning starts on Page 62 of

18   his deposition and runs for at least five more pages.

19      So this is a matter that he was not instructed on.  He

20   was asked -- he was asked about and he did testify about.  So

21   this is not a matter where any inquiry was blocked.  And I

22   think I said the pages but if not, I'll repeat myself.  It's

23   62 through 67 of Mr. Moore's deposition.

24      So there is no sword/shield issue going on with respect

25   to Mr. Moore if only because of the simple expedient that only

1  one question was he instructed to not answer and it was one

2  that no one I think would challenge.  It's certainly an

3  instruction objectors have given when their depositions were

4  taken.  And as I just said, he was allowed to answer questions

5  on this very subject.

6      Mr. Ciantra then goes to a different witness, one who has

7  not been called to testify here today, Mr. Bowen who is an

8  actuary.  And he did -- Mr. Ciantra kindly gave me the

9  deposition cites in the hall this morning so I did have a

10  chance to look at them.

11      There were two different topics and I agree, and I think

12  he -- Mr. Ciantra has accurately described them of what Mr.

13  Bowen was asked about that drew instructions.  The first had

14  do with a possibility under PA436 that if pension assets fell

15  below 80%, the emergency manager might have the right to

16  replace the pension plan trustees with trustees of his own

17  choosing.

18      The question there wasn't -- and that question, that

19  topic was certainly raised.  The instruction had to do with

20  how the subject came up in a meeting.

21      There was no instructions against and there were -- there

22  was, I ought to say, fairly significant testimony by Mr. Bowen

23  about Milliman, that's his firm.  Of Milliman's calculations

24  of whether or not the plan was under funded at the 80%

25  threshold.

1    Now let me grab the pages on his deposition and we can

2   provide that as well to the Court.  That -- after the

3   instruction, counsel then asked the question, well, sir, what

4   did you do?  And there were no instructions.  That starts on

5   Page 55 and goes at least to Page 62 of Bowen's deposition.

6    So once again I'd submit two things.  One is this is not

7   even the same subject as the testimony they would like to

8   strike.  It's not the same witness.  And the witness they did

9   question did answer all of their questions about the threshold

10  funding and what he did among other things is to say actually

11  if I look at your own actuary, you're so far below 80%, it's

12  -- it's not even a real issue.  And in the event by the way as

13  we all know, the emergency manager has not replaced any

14  trustees of the pension plan.

15   So the second one is -- is this.  Milliman was asked to

16  prepare a series of scenarios of what numbers would look like

17  if the plans were changed to define contribution from defined

18  benefit.  And then there were various assumptions.

19   That under this assumption the numbers came out this way,

20  and under that assumption, they came out a different way.  Mr.

21  Bowen was -- and once again obviously this is not the subject

22  Mr. Moore testified about, this is a different subject.

23   Mr. Bowen was asked about one of these scenarios called

24  scenario 2 where one of the assumptions came from, namely an

25  assumption of 10% of pay as the defined contribution.  And

1  counsel said, to the extent those discussions involve counsel

2  for the city, I'd instruct you not to answer.

3      And as Mr. Ciantra quoted, the witness did not answer.

4  However, when they went to what the scenarios were, how things

5  were calculated, and what was done, the witness testified

6  quite fully.  His testimony started on Page 79 and continued

7  for several pages thereafter where he described how the

8  scenarios were run, how he used the numbers, and what results

9  they came up with.

10      It is not the case that at that point anyone thought that

11  there was going to be total blocking of testimony about the

12  pension task force.  And in fact Mr. Ciantra on Page 83 asked

13  a question.  Other than these, the several letters that we've

14  gone through has Milliman analyzed any other scenarios on

15  behalf of the pension task force?  And there was an answer to

16  that.

17      So, just to be clear, our position is there were no --

18  there has not been a sword or shield issue.  The instructions

19  given are two in the Bowen deposition, none in the Moore

20  deposition.

21      They do not involve the subject of Mr. Moore's testimony

22  on the 3.5 billion dollars.  And in fact he was questioned

23  about that at his deposition and he did answer those

24  questions.

25      As to Mr. Bowen, there was no wholesale blocking of

1  inquiry into the pension task force.  Two instances and only

2  two, was there an instruction.  And in that case, in both

3  cases, counsel then proceeded with his questioning and got

4  answers to the substantive questions and in fact went on for a

5  number of pages in asking questions and getting answers.

6      And finally as I've said, these subjects do not relate to

7  the 3.5 million.  Anyway, they're extraneous.  And so I don't

8  think there has been any sword or shield used at all, Your

9  Honor.  Thank you.

10      THE COURT:  All right.  May I have the Moore and

11  Bowen deposition transcripts, please?

12      MR. STEWART:  Your Honor, I could pass you my copy

13  now or have a clean copy delivered later today.

14      MR. CIANTRA:  I have clean --

15      THE COURT:  Do you have them?

16      MR. CIANTRA:  I have clean copies, Your Honor.

17      THE COURT:  All right.  May I -- may I have your

18  copies then?  Thank you.

19      MR. CIANTRA:  Yes, the whole transcript.  I'll just

20  double check to make sure, I didn't write on it.  May I

21  approach, Your Honor?

22      THE COURT:  Please.

23      MR. CIANTRA:  Thank you.

24      THE COURT:  Now can you direct me to the page number

25  of the Bowen transcript where -- or page numbers where the

1   privileges are asserted?

2        MR. CIANTRA:  Yes, Your Honor.  Page 53, beginning

3   on Line 12.  And then continuing to Page 55, Line 8.

4        THE COURT:  Thank you.  Stand by, please.

5        MR. CIANTRA:  Oh, I'm sorry.  And then Page 77, Line

6   19, through Page 78, Line 14.  Those are the excerpts that I

7   read to the Court.

8        THE COURT:  Okay.

9        MR. CIANTRA:  Thank you, Your Honor.

10        THE COURT:  One second.  All right.  Anything

11   further, counsel?

12        MR. STEWART:  I do have one thing.  All right.  Your

13   Honor, I had not known until Mr. Ciantra raised it that the

14   relevance he was urging for this was that this point about

15   PA436 and the assumption of power over the pension systems.

16     Leafing through this, I see that Mr. Moore was also asked

17   about this.  Pardon me.  Pages 132 and following of his

18   deposition and he answered all of those questions and there

19   were no instructions to not answer.

20        MR. CIANTRA:  I have nothing further, to add, Your

21   Honor.

22        THE COURT:  Well, before I resolve this, I want to

23   have a conversation with Mr. Miller.  Is there a Mr. Miller

24   here?

25        MR. STEWART:  He is not here.  Pardon me, Your

1  Honor, he has been in Court, but he's not here today.  He's a

2  Jones, Day partner in the pension area.

3          THE COURT:  All right.  Well, communicate to him on

4  my behalf then, please.

5          MR. STEWART:  Yes, I will do so.

6          THE COURT:  In the few pages of these transcripts

7  that I have read, especially the transcript of Mr. Moore, it

8  appears that Mr. Miller objects to virtually every question

9  stating, "object to form".  Tell him that from now on he has a

10 standing objection on the grounds of form and he is not to

11 interrupt the flow of depositions with that objection.

12         MR. STEWART:  Pardon me.  Of course, Your Honor.

13         THE COURT:  All right.  After reviewing these --

14 these transcripts and reviewing the testimony that is sought

15 to be stricken here, the Court concludes that there is no

16 unfairness in permitting this testimony to be offered here, or

17 received here despite the earlier claim of attorney/client

18 privilege.

19     The Court so concludes because there was nothing about

20 the isolated and specific claims of privilege that were

21 asserted in the Bowen deposition that precluded a full

22 opportunity for discovery on all factual matters that directly

23 related to the subject of Mr. Moore's testimony now sought to

24 be stricken.  So the motion to strike is denied and I will

25 return the transcripts to counsel.

1          MR. CIANTRA:  Thank you, Your Honor.

2          THE COURT:  Okay.  Anything further before we resume

3    with Mr. Orr?  All right.  Can we arrange for him to be

4    brought back into the courtroom, please?

5       Mr. Orr, you may be seated.  You understand that you are

6    still under oath.

7          THE WITNESS:  Yes, Your Honor.

8       (WITNESS KEVYN ORR WAS PREVIOUSLY SWORN)

9          THE COURT:  Thank you.  And you may proceed, sir.

10          MR. ULLMAN:  Good morning, Your Honor.  Anthony

11   Ullman for the retiree committee.

12                      CROSS EXAMINATION

13   BY MR. ULLMAN:

14   Q    Good morning, Mr. Orr.

15   A    Good morning, Mr. Ullman.

16   Q    And you may recall when we broke yesterday, I had been

17   asking you about the -- your knowledge as to the size of the

18   unfunded pension liability.  And I think we had just finished

19   discussing the May 2013 plan that was Exhibit 407.  Do you

20   recall that in general?

21   A    Yes, I do.

22   Q    Okay.  Now the size of the unfunded pension liability was

23   also mentioned in the June 14 proposal which is number --

24   Exhibit 408, is that right?  Do you want to just put the cover

25   on the screen?

1  A    Yes.  It was mentioned in the June 14th presentation.

2  Q    And does what's written in Exhibit 408, the June 14

3  proposal, accurately reflect your knowledge about the size of

4  the unfunded pension liability as you understood it as of June

5  14th, 2013?

6  A    Yes.  It accurately reflects the size of the unfunded

7  pension liability to the extent -- to the best of our

8  knowledge, yes.

9  Q    Okay.  So if we look at Page 23 of this document, and

10 what we see there's a -- a bullet point there.  Yeah, thank

11 you.  We can pull out.  And it says, that further analysis by

12 the city using more realistic assumptions (including by

13 reducing the discount rate by one percentage point) suggests

14 that the pension UAAL will be approximately 3.5 billion as of

15 June 30, 2013.  Do you see that?

16 A    Yes.

17 Q    Okay.  And that reflects the state of things as you

18 understood it as of June 13, 2013?  I'm sorry, June 14, 2013?

19 A    Yes, I believe so.

20 Q    Okay.  And at that point in time it was characterized as

21 a suggestion, correct?

22 A    It was characterized as a proposal based upon our best

23 analysis at that time.

24 Q    I'm focusing on the bullet point that we have

25 highlighted.  This is -- this is what the analysis regarding

1  the unfunded pension liability suggests.  Did I read that

2  correctly?

3  A    Yes.  The document speaks for itself, that's what it

4  says.

5  Q    Okay.  And is it fair to say that what you knew about the

6  size of the unfunded pension liability in June 2013 was

7  fresher in your mind in June 2013 than it is today?

8  A    I think I've been aware of the unfunded -- the amount of

9  the unfunded pension liability from then until now.  I think

10 it's been fairly consistent.

11          MR. ULLMAN:  Okay.  I'll move to strike as

12 non-responsive, Your Honor.

13          THE COURT:  Motion denied.

14          MR. ULLMAN:  Okay.  Thank you.

15 Q    My question, Mr. Orr, was actually a different -- well,

16 let me rephrase the question.  Would you agree that the

17 information that you had about the size of the unfunded

18 pension liability as of June 14, 2013 was fresher in your mind

19 in June of 2013 than it is today?

20 A    No.

21 Q    And Mr. Orr, I previously asked you about the retiree

22 health benefits and how those were to be treated under the

23 June 14th proposal.  Do you remember that?

24 A    Yes

25 Q    Okay.  And just for clarity, the health benefits that we

1   were talking about are what is referred to in the June 14

2   proposal as OPEB, is that right?

3   A    Yes.  Other employee benefits.

4   Q    Okay.  And is it correct that according to -- in the

5   analysis that you had as of June 14, 2013, the unfunded OPEB

6   liabilities were reported as 5.7 billion dollars?

7   A    Yes.  I believe that's correct.

8   Q    Okay.  And that's set out in your June 14 proposal, isn't

9   it?

10  A    Yes, I believe so.

11  Q    Okay.  Now staying in the June 2013 time frame, and

12  putting aside the possibility of a consensual resolution,

13  okay.  Have you come up with what you considered a viable

14  course of action that allowed the city to cut pension benefits

15  that did not involve a Chapter 9 filing?

16  A    I'm just trying to -- that's a long question, so I'm

17  making sure that I understand it.  Putting aside a potential

18  consensual resolution, had we come up with a viable option to

19  cut pension benefits without filing Chapter 9.

20  Q    That's the question, sir.

21  A    Okay.  There were other options.  I don't know if they

22  were viable or not.  I think between June 14 and until a few

23  months later, it became clear that there were no other viable

24  options.

25  Q    Okay.  Thank you.  Now you in fact did file the Chapter 9

1 | petition obviously, right?

2 | A    I instructed my attorneys to file the Chapter 9 petition

3 | after receiving authority from the Governor.

4 | Q    Okay.  And in fact it is the City of Detroit that is the

5 | debtor, not the emergency manager as such, right?

6 | A    Yes.  Under 436 I act for the city.

7 | Q    All right.  Okay.  And to be clear at the time the city

8 | filed for bankruptcy, is it correct that it was your position

9 | that there had to be significant cuts in accrued pension

10 | rights for both active employees and retirees?

11 | A    Well, I don't know if active employees receive pensions,

12 | but I think the gist of your question is, would there have to

13 | be cuts in the accrued actuarial liability and the answer is

14 | yes.

15 | Q    Okay.  I was asking specifically about cuts in accrued

16 | pension benefits for both actives and retired persons.

17 | A    Well, they're vested pension benefits that active

18 | employees if they vest, have them.  And then there's accrued

19 | actuarial liabilities.  Let's just assume that we're talking

20 | about both in your question, is that fair?

21 | Q    Yes.

22 | A    Okay.  Then yes, there would have to be cuts.

23 | Q    Okay.  And is it correct that as part of the proceedings

24 | in this -- in this action after the Chapter 9 filing was made,

25 | that the city has in fact agreed and admitted that -- that it

1  in fact intends to cut vested pension benefits for actives and

2  retired persons?

3  A    I think you're referring to a request for admissions.

4  Q    Yes.

5  A    Yes, I believe so.

6  Q    Thank you.  Now I understand it's your position that the

7  Chapter 9 filing was done under the authority of PA436, is

8  that right?

9  A    Yes.

10 Q    Okay.  And of course you're generally familiar with that

11 law?

12 A    Yes.

13 Q    Okay.  And you're also generally familiar with PA4, the

14 predecessor statute?

15 A    Not quite as familiar.  Yes.

16 Q    Are you aware of it?

17 A    I'm aware of it.

18 Q    And you were aware that it was repealed by a referendum?

19 A    Yes.

20 Q    Okay.  And then PA436 was enacted with an appropriationed

21 measure that was tacked on that avoided the possibility of

22 another referendum for PA436, correct?

23 A    I'm aware that an appropriation measure was tacked on.  I

24 have read that that was to resolve the possibility of another

25 referendum, yes.

1  Q    Okay.  And I believe that prior to your appointment as

2  emergency manager, you yourself looked at the history of PA4

3  and PA436 at least to some degree, is that right?

4  A    If you're talking about the first day between January 30th

5  to 31st, I looked at it initially then.  And then I looked at

6  it in more depth later.

7  Q    Okay.  So let's put on the screen Exhibit 403.  Okay.

8  This is an email that you wrote from January 13, 2003 (sic).

9  Is this what you were referring to?

10 A    Yeah, I think that's the email we discussed during my

11 deposition.

12 Q    Okay.  And if we focus on the -- it talks about a number

13 of things.  What it does as you said, go over some of your

14 understanding of the legislative history.  And if we look at

15 the first paragraph, it's talking about the new EM law which

16 is PA436, correct?

17 A    Yes.

18 Q    And if you focus in particularly on the second to last

19 sentence it says, by contrast Michigan's new EM law is a clear

20 end run around the prior initiative that was rejected by the

21 voters in November, correct?

22 A    What day is this dated?

23 Q    I'm sorry?

24 A    Is this dated the 31st?

25 Q    January -- I think I may have said the 13th, but thank

1  you, it is the 31st.

2  A    Okay.  Thank you.  Yes, I see that.

3  Q    Okay.  And that was what you wrote in this email of

4  January 31st?

5  A    Yes.  That's what I wrote one day after being approached

6  about becoming the EM.

7  Q    And then if we skip two paragraphs down, there is --

8  right.  In the last paragraph we see the -- the phrase you

9  wrote.  It says, so although the new law provides the thin

10 veneer of a revision, it is essentially a redo of the prior

11 rejected law and appears to merely adopt the conditions

12 necessary for a Chapter 9 filing.  Do you see that?

13 A    Yes, I see it.

14 Q    Okay.  And that's what you wrote and concluded when you

15 created this email in January of 2013?

16 A    Yes.

17 Q    And subsequent to then, to that time, have you done any

18 further investigation as to how PA436 came about and the --

19 the origin of the appropriations measure?  It's really a yes

20 or no question.

21 A    Well, no, I want to be complete in my answer so it's not

22 misinterpreted either by people in the courtroom or the

23 public.  But have I done further investigation --

24 Q    I'm sorry, Mr. Orr, but the question is simply whether

25 you did investigation, sir.

1        THE COURT:  And as I've indicated to you before, if

2   you can't answer a question with a yes or a no answer, just

3   say that.

4   A    Okay.  I can't answer that question with a yes or no

5   answer.

6   Q    You cannot tell me yes or no whether you did any further

7   investigation subsequent to January of 2013?

8   A    It would be misleading for you to give just -- for me to

9   give you just a yes or no answer.

10  Q    Okay.  Did you ask any of your colleagues at Jones, Day

11  whether they had any information about the circumstances

12  surrounding the repeal of PA4 or the creation and enactment of

13  PA436?

14  A    I don't think I asked anyone at Jones, Day.  I think I

15  did my own analysis.

16  Q    Well, were you aware that Jones, Day was in discussions

17  with the State of Michigan in March of 2012 concerning the

18  challenge to PA4?

19  A    No.

20  Q    Okay.  Well, let's put 845 on the screen.  This is

21  Exhibit 845.  This is a March 24th, 2012 email.  Do you -- do

22  you need -- I think we have a hard copy in the binders there

23  if it's easier for you to look --

24  A    No, that's okay with my reading glasses, I can -- I can

25  keep up.

1  Q    Okay.  And why don't you take a moment to read it because

2  I don't want to just, you know, spring the paragraph on you.

3  A    All I have on the screen is the two's.

4  Q    Okay.  Can you just put the -- the document on the screen

5  so Mr. Orr can read it?

6  A    Well, I can't read that.  You want me to read the whole

7  email or just --

8  Q    You can look at the second page too and then I'll ask you

9  a few questions.

10  A    Okay.

11  Q    And then we'll move on.  Have you had a chance to look

12  through that, Mr. Orr?

13  A    I haven't read it all, but I -- I get the gist of the

14  email.

15  Q    Okay.  And this is as I said it's a May -- it's a March

16  24, 2012 email.  You are not on it.  I'm not suggest that you

17  are.

18  A    No.

19  Q    It's talking about a meeting that took place with Braum

20  Stibitz.  That's a person from the -- of the Treasury

21  Department of the state, is that right?

22  A    Yes.

23  Q    And if you look at the paragraph numbered 1 with the

24  Arabic number 1, giving the context it says the state and the

25  city were concerned that PA4 may not survive the petition

1  challenge.  Do you see that?

2  A    Yeah, that's what it -- that's what it says, yes.

3  Q    Yeah, okay.  And then if you go on to the next page, you

4  go through some more discussion.  It goes to the next page and

5  there is a -- a paragraph that says based on that conclusion,

6  it said the state quickly began evaluating the alternatives.

7  And go through one, could a consent agreement be achieved to

8  an artful solution such as the DEP was intended.

9        And then it goes to number three, thus, the state was

10  looking at declaring an emergency and appointing an EFM with a

11  likely subsequent step of a Chapter 9.  Do you see that?

12  A    Yes, I see that.

13  Q    Then in the next paragraph it goes on to say, the state

14  believes it needs PA4 or worse case PA72 to file a Chapter 9

15  case based on law.  And as such state legal counsel and Jones,

16  Day provided guidance on whether a Chapter 9 filing in April

17  could be upheld if PA 4 is pulled back at the end of April.

18  And does that refresh your recollection, Mr. Orr, as to

19  whether Jones, Day was involved in discussions in -- in -- or

20  in the spring of 2012 with the state concerning PA4 and

21  potential challenges to it?

22  A    No.  I have no -- I have -- did not have then and I just

23  learned now that Jones, Day had involvement in March 2012.

24  Q    Okay.  Well, were you aware, or are you aware I should

25  say, that Jones, Day itself was involved in suggesting the

 1  addition of an appropriation measure to PA436?

 2        MR. STEWART:  Objection, Your Honor, foundation.

 3        THE COURT:  I'll permit it.  Go ahead, sir.

 4  A    No.

 5  Q    You've never heard that?  You don't recall ever hearing

 6  that from anyone at Jones, Day?

 7  A    I just heard it from you.

 8  Q    That wasn't my question.  You don't recall ever hearing

 9  that from anyone at --

10  A    I never heard it from anyone at Jones, Day, no.

11  Q    Okay.  I'm going to show you a document and see if this

12  refreshes your recollection.  The document I'm going to show

13  the witness is not in evidence, so I will not put it on the

14  screen.  With permission, I'll just direct --

15        THE COURT:  Well, the -- the witness did not

16  indicate a lack of recollection.  He said -- the answer was

17  no.  He was not aware of that.

18        MR. ULLMAN:  Well, he said he -- I thought I asked

19  him whether he recalled ever hearing it and he said no.

20        THE COURT:  That he wasn't aware of it.  Is that

21  right, sir?

22  A    Yes, Your Honor.

23        MR. ULLMAN:  Well, Your Honor, if -- if he saw

24  something that refreshed his recollection that he had heard

25  of, then he would have been aware.  It's a little --

1          THE COURT:  But that's a question of impeachment,

2    not refreshing recollection.

3          MR. ULLMAN:  Okay, Your Honor.

4    Q    Mr. Orr, prior to the Chapter 9 filing, were you aware of

5    any legal precedent specifically allowing a city or an

6    emergency manager to use Chapter 9 as a means to trump a

7    provision of the State Constitution that protects vested

8    pension rights?

9    A    I cannot answer that in a yes or no fashion.  I'll give

10   you an explanation.

11        I -- as I had said before in my background, I handle

12   cases for federal preemption over state law in a number of

13   different roles.  And so I generally was aware and -- and as

14   you've said before with my oath, that federal law takes over

15   state law.

16        Was I aware of any specific cases regarding an emergency

17   manager authorizing a Chapter 9 to trump state filings.  I

18   don't think there were any specific cases of State

19   Constitution regarding vested pension rights.  I don't think

20   there were any specific cases that I was aware of in that

21   regard, but I was aware of federal preemption, yes.

22   Q    Okay.  And were you at the time that you filed, were you

23   aware of any legal precedent allowing a city or an emergency

24   manager to use Chapter 9 as a means to trump a state

25   constitutional provision in general, even apart from -- from

1  vested pension rights?

2  A    Here again broadly, federal supremacy takes over state

3  constitutional law.  I don't recall any specific cases in that

4  regard.

5  Q    Okay.  No specific cases regarding federal law trumping

6  the State Constitution, is that correct?

7  A    No.  I think I am aware of specific cases of federal law

8  trumping state constitutional law.  What I was saying to you,

9  I was not aware of specific cases of federal law trumping

10 state constitutional law regarding vested pension rights.

11 Q    Okay.  Do you recall being deposed before right around

12 September 16th?

13 A    Yes, I was deposed.

14 Q    And I think you indicated that you were testifying

15 truthfully when you --

16 A    I was testifying truthfully.

17 Q    Okay.  Let's show the -- the clip beginning at Page 192,

18 Line 2.  I'd like to know, Mr. Orr, whether this was testimony

19 that you gave during that deposition?

20      MR. STEWART:  Objection, Your Honor.  I don't think

21 that this is a proper use of -- of deposition testimony.  And

22 I would -- if Mr. Ullman has a question.

23      THE COURT:  What -- what do you assert is improper

24 about it?

25      MR. STEWART:  Well, there has been no statement

1  inconsistent with the deposition.

2        THE COURT:  Well, then the impeachment will be

3  ineffective.  But I'll permit counsel to -- to try.

4  Q    Okay.  The question is, do you recall giving this

5  testimony that we're about to play and you can answer yes or

6  no once you get --

7  A    Yes, I recall September 16 deposition.

8  Q    Okay.  Why don't I just play the testimony?

9        (Video Being Playing at 9:56 a.m.; Concluded at 9:56

10 a.m.)

11 Q    Now, Mr. Orr, is it correct that you've been told by the

12 State Attorney General that in his view the Michigan

13 Constitution protects the pensions that you're seeking to cut?

14 A    Yes.

15 Q    Is it correct that prior to the Chapter 9 filing there

16 were State Court proceedings that had been filed alleging

17 among other things that PA436 was unconstitutional inasmuch as

18 it purported to allow you to file for Chapter 9 without

19 insuring that the vested pension payments were protected?

20 A    Yes.

21 Q    Okay.  And those were pending as of July 2013, correct?

22 A    I believe they began July 3rd and there was another one

23 the following week and then one on July 15th, but yes.

24 Q    Okay.  And that litigation was pending in Ingham County

25 before Judge Aquiline?

1  A    Yes.  There was one case prior to the July cases

2  challenging the constitutionality of 436.  But the cases

3  you're talking about Flowers, Webster, and GRS, I think were

4  all pending in Ingham County.

5  Q    Yeah, in Ingham County.  And is it correct that at -- at

6  least at some point in July the date for the bankruptcy filing

7  had been planned for July 19?

8  A    No.  I think I said before that I wanted to file as soon

9  as I got the authority.  There wasn't a planning date.  But I

10 was going to file as soon as I asked for the authority to do

11 so.

12 Q    Okay.  Isn't it correct that there was a plan that had

13 been -- a written plan that had been put in place and that had

14 been created at least that showed the filing date of July 19?

15 A    I don't know if there was, I'm trying to recall.  I don't

16 know if there was a plan.  I think we had had discussions

17 about timing, yes.

18 Q    Okay.  And why don't we put on the screen Exhibit 831,

19 please.  Or, yeah, I'm sorry, or we can use 452, I think

20 that's easier.

21     Okay.  And what I'm putting before you is an email with

22 various attachments that comes from a Bill Nowling dated July

23 8th, 2013.

24 A    Yes.

25 Q    And it indicates at the bottom that Mr. Nowling works for

1  the office of the emergency manager, you?

2  A    Yes, he's my communications director.

3  Q    Okay.  And this is a document that was created by Mr.

4  Nowling, is that right?

5  A    I assume it was.  I haven't seen this document before.

6  Q    Okay.

7  A    But I assume it was.

8  Q    Okay.  And as you look at the attachments, it says

9  Chapter 9, COMS, which I assume is communications document,

10  Chapter 9 messages, Chapter 9 communications roll out from

11  July 4, 2013.  Do you see that?

12  A    Yes, that's what it says.

13  Q    Okay.  And Mr. Nowling in his ordinary course of duties

14  communicates with other people as to the state of things and

15  what the current schedule looks like, is that right?

16  A    Yes.  Mr. Nowling is the communications director and he

17  does a number of different things.

18  Q    Okay.  And if we turn to Page 7 of this document.  Okay.

19  This is what we see, it looks like the roll out schedule which

20  was referred to in the attachment.

21       And if we look at the first entry, under the middle

22  column, event.  It says Friday, July 19th, 2013 FILING DAY in

23  capital letters.  Do you see that?

24  A    Yes.

25  Q    And then if you look at the second box below there is an

1  item for 10:00 a.m., file necessary paperwork with Court

2  system?

3  A    Yes, that's what it says.

4  Q    Okay.  And this is all referring to the Chapter 9 filing,

5  isn't it?

6  A    I believe so.

7  Q    Okay.  Now do you recall, and I think you indicated

8  previously that in -- in early to mid-July you were aware that

9  there was -- there had been a hearing in the State Court

10  litigation for a TRO that had been scheduled for July 22nd, is

11  that right?

12  A    Yes.

13  Q    Okay.  And is it correct that the TRO hearing was then

14  moved up to July 18 in the late afternoon?

15  A    I believe so.

16  Q    Okay.  And is it correct that the bankruptcy filing was

17  in fact done on July 18, not on the 19th?

18  A    Yes.

19  Q    And is it correct that it was around 4:06 in the

20  afternoon of the 18th that it was filed shortly before the

21  State Court TRO hearing was scheduled to start?

22  A    If -- if that's the time it shows on the documents then

23  yeah, that's correct.

24  Q    Okay.  Now why don't we put up the -- do we have the

25  petition here?  And this is just from the Court files.  This

1    is a copy from the petition.

2        And if we look at the bottom, we see the filing date and

3    we see the filing time which is 4:06 in the afternoon.  And if

4    you look at the date, there was a date that was handwritten to

5    July 18th.  And I believe you've indicated previously that you

6    hand wrote the date to change it from July 19 to July 18, is

7    that right?

8    A    Yes, I did that.

9    Q    Okay.  Now, you of course know Kenneth Buckfire, is that

10   right?

11   A    Yes, I know Ken Buckfire.

12   Q    Okay.  And do you recall telling Mr. Buckfire that one of

13   the reasons that the bankruptcy filing was moved from the 19th

14   to the 18th, was to avoid the impact of a decision in the State

15   Court litigation that might have prevented you from filing the

16   bankruptcy petition?

17   A    I don't recall specifically saying that, but I may have

18   said it.

19   Q    Okay.  So if Mr. Buckfire testified to that, would you

20   have any reason to challenge that testimony?

21   A    Like I said, I don't specifically recall it, but I have

22   no reason -- I have no reason to say I did not say it.

23   Q    Okay.  And are you aware of any particular reason why the

24   Chapter 9 filing was filed when it was other than to get a

25   jump on a decision by the State Court?

1  A    Yeah.  I think I said before that once I sent the letter

2  to the Governor, I was prepared to file the case immediately.

3  I had said before that we were going to give it a month to try

4  to reach some sort of consensual resolution through the

5  process that we had outlined on June 14th and that wasn't

6  forthcoming.

7      I had said before that things were beginning to spiral

8  out of control.  We had sat by for the better part of three

9  weeks being sued on a regular basis.  We had the Syncora

10 litigation.  And the -- TRO, temporary restraining order that

11 was due to expire at the end of that week.  There were a

12 number of reasons besides the implication of your question

13 which was to try to get a jump.  That we were concerned about

14 filing as soon as we could.

15 Q    Okay.  Mr. Orr, again, you remember testifying on

16 September --

17 A    Yes.

18 Q    Of September?

19 A    Uh-huh.

20 Q    I'm sorry, September of -- of this year.

21 A    Yeah.

22 Q    And again you indicated you were testifying truthfully?

23 A    Yes, I was testifying truthfully.

24 Q    Okay.  And can you tell me did you give the following

25 testimony that we're about to play?

1   A    Sure.

2        (Video Being Played at 10:03 a.m.; Concluded at 10:04

3   a.m.)

4   Q    Okay.  That was your testimony, Mr. Orr?

5   A    Yes.

6   Q    Okay.  Now isn't it the case that subsequently the State

7   Court ruled that PA436 was unconstitutional to the extent that

8   it allowed a filing for Chapter 9 without protecting vested

9   pensions?

10  A    I'm aware that there was a State Court ruling.  I'm not

11  aware of the details.  But I think I -- I think I have heard

12  that.  I didn't -- I may have read the ruling, but I don't --

13  I think that's the gist of the ruling, yes.

14  Q    You're aware of that in substance?

15  A    I'm aware of that in substance.

16  Q    Okay.  And you didn't withdraw the bankruptcy petition in

17  response to the State Court ruling, did you?

18  A    No.  You asked me that on September 16th.  No.

19  Q    Now in connection with the bankruptcy filing, you filed

20  -- you yourself submitted a declaration, is that right?

21  A    Yes.

22  Q    Okay.  And in it among other things you gave figures as

23  to the city's liability in cash flow?

24  A    Yes.

25  Q    Okay.  And on the liability side, I believe you said that

1 the total liabilities are over $18,000,000,000, is that right?

2 A    Yes.

3 Q    Okay.  And I think you also broke that $18,000,000,000

4 figure down in a couple of ways.  And we can -- I can show

5 you.  Okay.  So why don't we put -- let's put Exhibit 414 on

6 the screen.  This is your declaration that you filed, isn't

7 it?

8 A    Yes.

9 Q    Okay.  And if we can go to Paragraph 9 which is on --

10 starts on Page 5 and then continues.  So okay, I guess we have

11 it all pieced together here.  So we see here that you wrote in

12 Paragraph 9 that the city has over 18,000,000,000 in accrued

13 obligations, right?

14 A    Yes.

15 Q    And then you go on further to say, that there is over

16 6,000,000,000 -- a little further down, over 6,000,000,000 in

17 obligations backed by enterprise revenue -- enterprise

18 revenues or that are otherwise secured?

19 A    Yes.

20 Q    Okay.  And then you elaborate that a little more in

21 Footnote 4.  Will you put Footnote 4 on the screen?  Okay.

22 And there is a phrase in there exactly where you say -- you're

23 elaborating on what that 6.4 billion dollar figure is.  And

24 among other things you say that that consists of 5.85 billion

25 in enterprise fund debt.  Do you see that?

1  A    Yes.

2  Q    Okay.  And is it correct that that is basically referring

3  to bonds that are issued by the Detroit Water and Sewer

4  Department and state loans that are also made to the

5  Department of Water and Sewer?

6  A    Yes.  That's generally -- yeah, 6,000,000,000 of it

7  belongs to DWSD, yes.

8  Q    And the DWSD, that's department of -- that's the Detroit

9  Water and Sewer Department?

10  A    Detroit Water and Sewer Department.

11  Q    Okay.

12  A    We call it DWSD.

13  Q    And the DWSD is operated as a separate authority in

14  Detroit, is that right?

15  A    It's a department of the City of Detroit, but it is

16  operated as a -- not as -- necessarily as an authority.  It's

17  operated with some autonomy, both operationally and as a

18  result of Judge Cox's ruling in the Clean Water Act case.

19  Q    Okay.  And it keeps its own books and records?

20  A    Yes.

21  Q    And the DWSD is responsible for the payment of these

22  bonds, isn't it?

23  A    Yeah.  There's a mechanism but generally, yes.

24  Q    Okay.  So the payment of these bonds, this about

25  6,000,000 is not allocable to the -- to the Detroit general

1  fund, is it?

2  A    Six billion.

3  Q    Six billion.  Did I say million?

4  A    Yeah, you did.

5  Q    Thank you.

6  A    Okay.  Six billion.

7  Q    And that's -- the payment -- the responsibility for the

8  6,000,000,000 in the DWSD related bonds and -- and loans is

9  not allocable to the general fund, is it?

10 A    No.  No, it's not part of the general fund debt, but it

11 is an obligation of the city.

12 Q    Okay.  And the DWSD has the financial wherewithal to make

13 the payments on its bonds as they come due, doesn't it?

14 A    Yes.  And it is doing so.

15 Q    Okay.  Now if we look a little further in your

16 declaration, staying with Paragraph 9.  You talk about where

17 is the 11. -- no, it's the top part.  11.9 billion in

18 unsecured obligations to lenders and retirees.

19 A    Yes.

20 Q    And we go back down this time to Footnote 3.  And we see

21 in -- in little letter (a), we see the 5.7 billion -- billion

22 dollar figure in the OPEB liabilities, right?

23 A    Yes.

24 Q    And then in little (b) we see that number again, 3.5

25 billion in under funding pension liabilities, correct?

1  A    Yes.

2  Q    Okay.  And that's a reference to the state of things as

3  you believe them to exist or saying they existed as of June

4  14, 2013, correct?

5  A    Well, I —— I think my affidavit also includes a state of

6  play that we believe them to exist at the time of filing.

7  Q    Well, I'm looking right now at Footnote 3 which says on

8  June 14, it says we met and these were the obligations.  And

9  it says see proposal for creditors as of June 14, correct?

10  A    Yeah.  I'm not taking issue with what is said in there,

11  I'm just saying that I didn't see any change in those numbers,

12  yes.

13  Q    Okay.

14  A    But the answer to your question is yes.

15  Q    Okay.  Now is it correct that as of June 14 —— and you

16  had not been aware of any —— was there any substantial

17  revision to the work that had been done regarding the size of

18  the unfunded pension liability as you recall between June 14

19  and the time of the bankruptcy filing?

20  A    There —— there —— there is ongoing work on these issues

21  through from June 14th until the bankruptcy filing.  But there

22  were no, to the best of my knowledge, there were no

23  substantial changes in the amount of the debt represented by

24  these figures.

25  Q    Okay.  And is it correct then that as of June 14, the

1  work that had been done by Milliman was in fact preliminary

2  work?

3  A    I don't remember the exact date, but I believe June 14th

4  is correct and that Milliman's first work was done off of

5  Gabrielle Roeder, yes.

6  Q    Okay.  So the June 14 preliminary.

7  A    Yeah.

8  Q    Was it still preliminary as you understood it as of the

9  date of the bankruptcy filing, July 18?

10  A    I don't know if it's -- if it's -- it's preliminary until

11  we reach agreement as to what the numbers are.  So the work is

12  consistently estimates.  When you say preliminary, I assume

13  you mean that we haven't reached a final conclusion as to the

14  amount.  But this represents our best analysis of what those

15  numbers are.

16  Q    Yes.  Preliminary in the sense that the Milliman firm had

17  not reached a final conclusion as to what the right number was

18  for the pension liability.

19  A    I -- I think that's fair.

20  Q    Okay.  And I think you testified earlier that during this

21  time frame, Milliman was doing an analysis of the Gabrielle

22  Roeder work, correct?

23  A    The --

24  Q    Well, I'm not saying that's all, I'm just taking this

25  piecemeal.

1  A    Yeah.  Well, so I don't -- without -- without looking at

2  the actual documents, I want to be sure I'm not misleading.

3  Milliman -- the sequence was Milliman was doing analysis of

4  Gabrielle Roeder.  Milliman then began doing its own analysis.

5  I don't remember the exact dates, so I don't want to say June

6  14th and it turns out it was June 15th.  But generally that's

7  the sequence and that's the approximate time.

8  Q    Okay.  So there are two aspects to what -- so we're

9  clear, what Milliman was doing one, was doing an analysis

10 based on the Gabrielle Roeder work, right?

11 A    Yes.

12 Q    And so we're clear Gabrielle Roeder is the actuary

13 retained by the retirement systems, correct?

14 A    Yes.

15 Q    Okay.  And it was also, I think you had said earlier, in

16 the process of creating its own valuation?

17 A    Yes.

18 Q    Okay.  And is it correct that as late as September 18,

19 2013, Milliman had not in fact yet completed its work and the

20 city was not in a position to know the actual size of the

21 pension under funding?

22 A    I think it's correct that as of the 18th, Milliman may

23 have not -- here again I'm trying not to be specific with

24 dates if they're different and are proven to be different,

25 that's fine.  But that's approximately the time.  I don't know

1   if it's fair to say that the actual valuations hadn't been

2   concluded.  Our valuations have been fairly consistent based

3   upon the assumptions used.

4   Q    Okay.  And you know Charles Moore, correct?

5   A    Yes.

6   Q    Okay.  And he is on the pension task force?

7   A    Yes.

8   Q    Okay.  And he was tied in with the Milliman work and the

9   status of it at various points in time?

10  A    Yes.

11  Q    Okay.  Why don't we put on the screen some deposition

12  transcript excerpts.  Do you know what I'm -- okay.

13       This is from the deposition of Mr. Moore on September 18th

14  of this year.

15            MR. STEWART:  Objection, Your Honor.

16            MR. ULLMAN:  I'm not sure what the objection is,

17  Your Honor.  I want to ask him some questions about some

18  specific things, made -- statements made by Mr. Moore.  This

19  document has not been objected to, or rather this -- this

20  deposition testimony has not been objected to.

21            THE COURT:  It's really not appropriate to ask one

22  witness about the testimony of another witness, or to confront

23  one witness with the testimony of another witness.  The

24  objection is sustained.

25  Q    Okay.  Is it correct, Mr. Orr, that so far as you were

1  aware that as late as September 18ᵗʰ, 2013, the city and its

2  actuary Milliman, had not completed the analysis on the

3  unfunded pension liability?

4  A    As I said, I think that's the approximate date.  I don't

5  recall independent the exact date.  But I think it's around

6  that time.

7  Q    What are you saying, it's around that time that they

8  complete -- I'm not sure when you say -- what's around that

9  time?

10  A    No, at some point Milliman completed its analysis.  I

11  don't remember the exact date that that was done.

12  Q    Okay.  But at -- you would agree that at least as of

13  September 18ᵗʰ, 2013, that Milliman had not completed its

14  analysis, correct?

15  A    I'll agree that it was around that date.  I don't want to

16  say yes and then it turns out that they had and I was wrong

17  because I just don't recall the date.

18  Q    Okay.  So that your best knowledge is around that date,

19  around September 18ᵗʰ.

20  A    Sometime in September.

21  Q    Okay.  And is it correct that as recently as September

22  18, Milliman and the city were still in the process of trying

23  to create their own valuation model?

24  A    That -- here again, it may be around that time.  I mean

25  we continually do work on -- on valuations and analysis, but

1  that may have been the approximate time.

2  Q    Okay.  And to the extent that they were still working on

3  it as of around the July -- I'm sorry, the September 18 time

4  frame, do you have any personal knowledge as to when if ever

5  the Milliman valuation work was completed?

6  A    Do I have personal knowledge of -- of when?  I believe it

7  was completed.  I don't know the exact time it was.

8  Q    In any event it -- to the extent it was, it would have

9  been sometime on or after September 18th, is that true?

10  A    Yeah, if your supposition is correct, that September 18th

11  it was still a work in progress, then it would have flowed

12  that it would follow sometime after that.

13  Q    Now I think you also made reference in your June 14

14  proposal to the investment rate of return that had been used

15  by the retirement systems actuary, do you recall that?  A 7.9

16  figure?

17  A    Yes.

18  Q    Okay.  And do you want me to show that to you, or do you

19  agree that you made some reference to that as being what you

20  considered an inappropriate assumption?

21  A    To move along, I will agree that we made a reference to

22  in our anticipated rate of return.  And if you say it was 7.9,

23  I have no reason to -- to disagree with you.

24  Q    Okay.  And as it correct that as -- as late as September

25  24, 2013, the Milliman firm had not given any opinion as to

1  whether the investment rate of return that was used by the

2  retirement systems actuary was inconsistent with actuarial

3  standards of practice?

4  A    Here again I'm -- I'm going to defer to the documents and

5  -- and the actual timing of when those reports were produced.

6  But I think there was one report that had a range of

7  assumptions as far as what was reasonably anticipated to be

8  the expected rate of return.

9  Q    My question is a little -- is really quite specific.  Are

10 you aware -- they called actuarial standards of practice?

11 A    Yes.

12 Q    Okay.  And is it correct that at least as late as

13 September 24, 2013, the Milliman firm had not opined, had not

14 given an opinion --

15 A    Right.

16 Q    -- that the investment rate of return used by the

17 retirement systems actuaries was inconsistent with actuarial

18 standards of practice?

19 A    Yeah, without seeing the report, I don't recall if

20 Milliman ever opined.  They may have, I just don't recall it.

21 If you say that there was some time after September 24th is

22 what you said, without getting caught up in the dates because

23 I don't have the document, and that document speaks for

24 itself, I have no reason to disagree with it.

25 Q    Okay.

1          THE COURT:  What's the relevance of all of this to

2   whether the city was eligible to file two months earlier?

3          MR. ULLMAN:  This has to go to what the city knew

4   and what it's the city, not Mr. Orr necessarily personally,

5   but the city and its state of mind in making the

6   representation that the number for the unfunded pension

7   liability was indeed 3.5 billion when we believe the evidence

8   will show and shows that no one had come to that conclusion

9   yet and in fact work was still ongoing.

10         THE COURT:  All right.  I'll permit some brief

11  further inquiry into this and then ask you to move on.

12         MR. ULLMAN:  Thank you, Your Honor.

13  Q   Is it correct that as of September -- at least September

14  24, 2003 (sic), the work done by Milliman, the city's actuary,

15  had not in fact progressed to the point where it was even able

16  to replicate the valuation model that had been used by the

17  retirement systems actuaries?

18  A   Mr. Ullman here again, I don't know what your dates are.

19  And I don't recall at what point --

20         THE COURT:  All right.  Mr. Orr --

21  A   I don't know.

22         THE COURT:  If you don't know, just say --

23  A   I don't know.

24         THE COURT:  -- I don't know.

25  A   I don't know.  I'm sorry, Your Honor.  I don't know.

1  Q    Is it correct, Mr. Orr, that the last actuarial valuation

2  for the pension liability as a whole was done as of June 2011,

3  that's for both systems, the GRS and the police and fire?

4  A    I don't know if that's the date.

5  Q    Okay.  Well, you recall that there was an actuarial

6  evaluation for June 2011 that showed a total unfunded

7  liability of about 643.8 million dollars?

8  A    I don't recall if that was the date.  I recall during a

9  deposition us discussing that number.  I think that number was

10  based off the Gabrielle Roeder report as part of their annual

11  valuation.

12  Q    Yeah.  And that number, the 643.8 million is referenced

13  in the June 14 proposal, isn't it?

14  A    I think it is, yeah.

15  Q    Okay.  And that would be for June 11, 2000 -- I'm sorry,

16  June 2011, right?

17  A    I -- I -- I think that's when the report dates back to.

18  Q    Okay.

19  A    The end of the calendar -- I mean fiscal year.

20  Q    Now for that -- didn't mean to interrupt you.  Now,

21  taking that number, the total liability number for the

22  unfunded pension liability of the reported figure of 643.8

23  million, not all of that is allocable to the general fund, is

24  it?

25  A    No.  I think we discussed this on September 16th.  There's

1 | a mechanism for some allocation to DWSD, but Gabrielle Roeder

2 | doesn't break that out between general fund and DWSD.

3 | Q    Okay.  And the fact is that a substantial portion of the

4 | unfunded pension liability, the reported one, the 643.8

5 | million, was allocable to DWSD, correct?

6 | A    Well, I think you and I discussed on September 16th that

7 | the math, and I thought I said let's be careful.  The math

8 | works out to about 38%.  I -- I think that figure does not --

9 | I think that figure focuses on what was actually paid as

10 | focusing on what was obligated.  That 38% might go down if you

11 | include the deferrals that we made.  But generally somewhere

12 | between a third to 40% is DWSD.

13 | Q    Of the unfunded pension liability --

14 | A    Of the unfunded --

15 | Q    -- is allocable -- I'm sorry, I didn't mean to --

16 | A    I didn't mean to interrupt you, I'm sorry.

17 | Q    Okay.  To be clear though about you said 38 to 40% of the

18 | unfunded pension liability is allocable to DWSD.

19 | A    What I -- what I said was, depending upon if you're

20 | looking at just what was paid for that year, or what was paid

21 | and deferred that that percentage probably ranges, because

22 | Gabrielle Roeder doesn't break out the difference between the

23 | general fund and DWSD obligations.  Probably ranges between 30

24 | to 38%.  I think that 38% is what we discussed during my

25 | September 16th deposition.

1  Q    Okay.  Just so I'm clear, the 38% that we discussed was

2  -- was allocable to the -- that we're talking about the

3  unfunded pension liability.  And you're getting a little

4  confused is your answer?

5  A    Yeah.  Let me -- yeah.  I'm going to try to clarify as

6  best I can because I want to be responsive.

7       If you calculated in the total amount the city had due

8  for instance in 2013 of about $130,000,000, then DWSD's

9  responsibility would be about 30% of that number.  If you

10 calculated in just the amount that was actually paid and other

11 deferrals in other years, then the DWSD component would

12 probably be about 38% of that number because it's -- it's a

13 larger component of what was actually paid as opposed to what

14 was obligated but a portion of which was deferred.

15 Q    Okay.

16 A    So the range depending upon whether it's -- it's all that

17 should be paid but was deferred, or whether it's just what was

18 actually paid, is somewhere between 30 to 38%.

19 Q    Isn't it correct that the unfunded pension, just the

20 unfunded amount allocable to DWSD is about 39 to 40%, that

21 range?

22 A    That's the figure we discussed on September 16th.  And --

23 and that -- that is correct for the amount that's actually

24 paid.  That percentage goes down if you include the deferral

25 amount.  But yes, that's correct.

1  Q    Okay.  Just so we're real clear, can we put up the City's

2  Exhibit 68?  Look at Page 1 first.  Okay.  This is the

3  Gabrielle Roeder.  It's a -- a report from July 2012.  Do you

4  see that?

5  A    Yes.

6  Q    And if we go to Page B3.  Okay.  If we can blow that up.

7  Do you see here Gabrielle Roeder actually breaks down the --

8  the actuarial accrued liability as of June 30, 2011?

9  A    Yes.

10 Q    And at the very bottom there's unfunded actuarial accrued

11 liabilities?

12 A    Yes.

13 Q    Okay.  You see there's a -- a total column at the far

14 right?

15 A    Yes.

16 Q    Okay.  And in the middle it's Department of Water and

17 Sewage -- or Sewage?

18 A    Yes, the middle column.

19 Q    The two forty-seven --

20 A    Yes.

21 Q    And I believe if you do the math, if you divide the two

22 forty-seven six two four figure into the total unfunded

23 accrued liabilities, it comes out to just about 38.6%.  Do you

24 see that?

25 A    Yeah, that's the discussion we had on September 16th.

1  Q    Okay.  And this is -- so this is talking about the

2  unfunded liabilities only, correct?

3  A    Yes.

4  Q    Okay.  And in the -- going back now to our discussion

5  September 16th, do you remember that there was some -- there

6  was some confusion over how to do the math to get the right

7  number?

8  A    Yes, I do.

9  Q    And remember we first did it the wrong way and we ended

10 up with 38%.  And then we went back and tried it again and you

11 ended up saying yes, the right number is 61 -- it was

12 something like 61%.

13 A    Well, I said if you -- I think what I said was, and I'm

14 sorry because we were both going back and forth on the math.

15 I think what I said is, the math is the math, but be very

16 careful with the numbers because you'd actually have to do

17 down.  So just -- just to clarify that whole discussion --

18 Q    I -- I agree.

19 A    We're -- we're talking about 38%.

20 Q    Right.  And at the deposition I think we ended up with

21 61, but we see now that the right number is more at -- at

22 38.6?

23 A    Yes, that's right.  Attorneys doing math.

24 Q    Thank you.  Okay.  And now with respect to the unfunded

25 pension liability that is allocable to DWSD, that is -- DWSD

1  bears financial responsibility for that, doesn't it?

2  A    Yes.

3  Q    Okay.  And so again that's not allocable to the general

4  fund, is it?

5  A    No.  It's accounted for in DWSD, but the general fund

6  makes the payment.  So whether or not, I don't want to get

7  confused with a legal conclusion as to whether or not there's

8  an obligation by the city to fund that, but DWSD makes a

9  contribution for that amount.

10 Q    So ultimately it's borne that the unfund -- the pension

11 amounts including the unfunded would ultimately be borne by

12 DWSD, correct?

13 A    Ultimately the -- the portion of that obligation due for

14 employees at DWSD is borne by DWSD, but is still a city

15 obligation because they're a department of the city.

16 Q    Okay.  But ultimately not an obligation that's payable at

17 the end out of the general fund?

18 A    It's not taken out of the general fund.

19 Q    Okay.  Now, is it correct -- what we've been talking

20 about now is the 643,000,000 or so liability as of June 2011.

21 And then we saw that there's an amount about 38 -- it was 38

22 to 39% that's allocable to DWSD.  Is it correct that with

23 respect to the unfunded pension liability, that if it were

24 concluded subsequently that the correct amount of the unfunded

25 pension liability is higher than 643.8 million, even as high

1 as 3.5 billion, that a substantial portion of that would still

2 remain allocable to DWSD?

3 A    I -- I think I cautioned on September 16th with being

4 careful about doing a straight line analysis.  And I think I

5 said then that you'd have to go back and do analysis of

6 deferrals and payments and so on and so forth.  So I'm going

7 to say that again today.  But if you're relying on the math, a

8 portion of that obligation is due from DWSD.

9 Q    And I was not suggesting that it was necessarily a

10 straight line relationship, but simply that there would be a

11 substantial portion of the unfunded liability that would

12 remain allocable to DWSD, correct?

13 A    Yeah.  I'm just going to -- I'm going to caution a little

14 bit about substantial.  There will be a portion substantial if

15 we go back and do an analysis that of the deferrals, different

16 proportion than other things.  Let's just be a little careful.

17 But generally speaking, there are obligations due from DWSD.

18 Q    Yeah.  And as you sit here now you don't know what that

19 portion that's allocable to DWSD would be, do you?

20 A    No.  We'd have to do an analysis.

21 Q    Is it correct that the City of Detroit owns certain

22 pieces of art that are maintained at the Detroit Institute of

23 Arts?

24 A    Yes.

25 Q    Okay.  And this is art that the -- we're talking about

1  art that the city owns itself, right, not art that's subject

2  to any kind of public trust?

3  A    Yes.

4  Q    Okay.  And that art is very valuable, is it not?

5  A    We're currently going through a valuation, but I believe

6  it's very valuable, yes.

7  Q    Okay.  And Christie's has been retained, correct?

8  A    Christie's has been retained, correct.

9  Q    And they were retained in August, is that right?

10 A    I believe -- well, let's -- let's get by the sequence.  I

11 believe they were initially requested to come out.  I told

12 them go away.  We were taken actually --

13       THE COURT:  Mr. Orr, please, just answer the

14 question.  Were they retained in August?

15 A    I don't recall a specific date.  I think it was August.

16 Q    Okay.  So you were appointed the emergency manager at the

17 end of March and Christie's was not retained until August.

18 Was that in the beginning or the end of August, do you recall?

19 A    I don't know.

20 Q    Okay.  Now the art is a potential source of cash for the

21 city, is it not?

22 A    I don't know.

23 Q    Okay.  Well, isn't it potentially a very large source of

24 cash for the city?

25 A    It is valuable.  I don't know if it's a large source of

1 | cash for the city.

2 | Q    Okay.  Have you received any estimates or preliminary

3 | views of its total value from Christie's?

4 | A    No.

5 | Q    You're aware of course of reports in the press that the

6 | art that's own by the city could be worth billions?

7 | A    Yes, I'm aware of press reports, yes.

8 | Q    Okay.  And billions in cash flow would certainly help the

9 | city's financial position, would it not?

10 | A    I think it would.

11 | Q    And in fact an influx of cash of that magnitude would

12 | provide funds to at least pay pension contributions for the

13 | next several years, isn't that right?

14 | A    It might.

15 | Q    And is there -- there -- let me ask it this way.  There's

16 | nothing in the June 14 proposal that recognizes the potential

17 | cash influx from the sale of art as a means to pay vested

18 | pensions, is there?

19 | A    June 14th proposal speaks to DIA, but we did not speak to

20 | any sale of art.

21 | Q    Okay.  We've also talked about the Department of Water

22 | and Sewer.  That's another potential cash source for the city,

23 | isn't it?

24 | A    Yes.

25 | Q    Okay.  And I think you've indicated previously that

1  you've been looking at ways to monetize that?

2  A    Well, yes.

3  Q    And at this point do you have any understanding as to

4  the, at least a preliminary valuation of what the -- the

5  amount of cash the Department of Water and Sewer might be able

6  to generate for the city?

7  A    No.

8  Q    And I take it nothing in the June 14 proposal shows any

9  funds generated by DW -- excuse me, DWSD being used to pay

10  retirees pension benefits, does it?

11  A    Well, to the extent the June 14th report speaks to trying

12  to monetize some value out of DWSD and that monetization would

13  go into in some form the $2,000,000,000 note, to the extent

14  pensions are unsecured, they would receive a benefit from that

15  process.

16  Q    Okay.  So the answer to my question is, I was correct,

17  wasn't I, that nothing in the June 14 proposal shows any funds

18  that might be received through DWSD is going to pay vested

19  pension benefits?

20  A    No, I don't think that's correct.  I think the June 14th

21  proposal speaks about a -- a process by which we would provide

22  benefits through the monetization of certain city assets to

23  the unsecured creditor class, so consequently they would

24  benefit.

25  Q    You're saying that if -- that under the June 14 proposal,

1  the pension holders would be treated as any other unsecured

2  creditor and the value of their bonds might go up a little,

3  correct?

4  A    Yes.

5  Q    But there's nothing in the June 14 proposal that says if

6  we're able to get cash out DWSD, we'll use that cash to

7  preserve pension benefits and not have to cut them or not have

8  to cut them so significantly, is there?

9  A    There is nothing that treats pension benefits differently

10 than any other unsecured creditor.

11 Q    Okay.  Going back now -- just a few more questions.

12 A    Okay.

13 Q    To the June 14 meeting.  Do you recall being there?

14 A    Yes.

15 Q    Okay.  There were no negotiations that took place at the

16 June 14 meeting, were there?

17 A    No.  I wouldn't call those negotiations.

18 Q    Okay.  Now subsequent to the June 14 proposal and the

19 meeting on June 14, there -- there were series of

20 presentations and discussions concerning the terms of the

21 proposal with respect to various persons and entities that

22 would be affected under it, correct?

23 A    Yes.

24 Q    Okay.  And is it correct that you yourself did not attend

25 all of the presentations and discussions that took place

1  concerning that subsequent to June 14?

2  A    Yes, that's correct.

3  Q    Okay.  And you didn't attend the June 20 meetings, did

4  you?

5  A    No.  I think I did attend the June 20th meeting.

6  Q    Okay.  Well, I'd just like to, if we can pull up Exhibit

7  414.  This is your declaration, Mr. Orr?

8  A    Yes.

9  Q    I just want to ask you if you can -- if we can turn to

10 Paragraphs 91 and 92.  Well, I'll just do it.  Do you see in

11 Paragraph 91 and 92 it's both talking about the June 20

12 meeting?

13 A    Yes.

14 Q    Okay.  And we can also show you the preceding paragraph

15 where it's talking about advisors.

16 A    Right.

17 Q    But if we focus on 91 and 92, it says on June 20, 2013,

18 certain of these advisors met in Detroit with representatives

19 of the city's unions and retiree associations.  And then in

20 Paragraph 92, it again in the first sentence talks about the

21 city's advisors answering as many questions as were asked.  Do

22 you see that?

23 A    Uh-huh.

24 Q    Okay.  And there's no reference to you personally being

25 there at the June 20 meetings, is there?

1  A    No, but I remember attending because I bought lunch.

2  Q    Okay.

3  A    Out of my pocket.

4  Q    Okay.  So if Mr. Malhotra testified that you were not

5  present at either of the June 20 meetings, would you have any

6  particular basis to disagree with him?

7  A    No.  But Mr. -- the way the meetings were designed, I

8  think there was a session in the morning, there was a session

9  in the afternoon.  And I may have been at one session that he

10  was not at.  But I remember being at the meeting.

11  Q    Okay.  And there were also meetings on July 10th and 11th,

12  correct?

13  A    I believe so.

14  Q    Okay.  And you -- I think you indicated previously that

15  you have no recollection of being present at those meetings,

16  is that correct?

17  A    No, I wasn't at those meetings.

18  Q    Okay.  Now on July 16th, you sent a letter to the

19  Governor, is that right?

20  A    Yes.

21  Q    Okay.  And why don't we put the July 16th letter, that's

22  Exhibit 409 on the screen?  Okay.  And this is a letter on

23  which you asked authorization to file the Chapter 9 filing, is

24  that right?

25  A    Yes.

1  Q    Okay.  And in this letter you went through a variety of

2  things reviewing what you represented to be the facts for the

3  Governor in which the Governor was to base his decision, is

4  that right?

5  A    Yes.

6  Q    And among other things you discussed the substance of

7  what happened at the various creditor meetings that took place

8  after June 14th, is that right?

9  A    Yes.

10  Q    Okay.  And if we look at page -- look at Pages 8 to 9 of

11  this document, we see there is a heading entitled individual

12  follow up meetings?

13  A    Yes.

14  Q    And that goes on to the next page?

15  A    Yes.

16  Q    Okay.  So just going through this briefly, the first one

17  talks about June 20.  And it says again, the city's advisors

18  conducted meetings with unions and retiree associations.  Do

19  you see that?

20  A    Uh-huh, yes.

21  Q    Okay.  On the 25th it says the advisors met with various

22  persons and among them is the GRS and PFRS?  Do you see that?

23  A    Yes, that's what the document says.

24  Q    And that that's -- the GRS and PFRS, that's the

25  retirement systems, right?

 1  A    General retirement system, police and fire retirement

 2  system, yes.

 3  Q    Okay.  Then the next bullet on the next page talks about

 4  July 9th and 10th and it talks about due diligence with persons

 5  including GRS, PFRS.  Do you see that?

 6  A    Yes.

 7  Q    Okay.  And then on July 10th, it talks about follow up

 8  diligence sessions again GRS and PFRS were mentioned and the

 9  unions?

10  A    Yes, I see what it says.

11  Q    Okay.  And then on July 11th, it again talks about

12  sessions with business people and advisors for the unions,

13  right?

14  A    Yes.

15  Q    And then finally on the last bullet it talks about

16  negotiations with counter parties to the pension related swap

17  contracts?

18  A    Yes.

19  Q    Okay.  And on the -- the counter parties to the swap

20  contracts though, they don't have anything to do, they're not

21  the unions or retiree association or the retirement system,

22  are they?

23  A    No.

24  Q    Okay.  Now in this final bullet paragraph, you say the

25  city's negotiations.  Do you see that?  You refer to the

1  city's negotiations?

2  A    Yes.

3  Q    Okay.  In any of the preceding bullet paragraphs that we

4  have talked about, did you use the word negotiations in

5  describing what took place?

6  A    The document speaks for itself, but I –– I don't see the

7  word negotiations, no.

8          MR. ULLMAN:  I have nothing further.

9          THE COURT:  All right.  We'll take out break now and

10  resume at 10:55, please.

11      (WITNESS KEVYN ORR WAS TEMPORARILY EXCUSED AT 10:38 A.M.)

12          THE CLERK:  All rise.  Court is in recess.

13      (Court in Recess at 10:38 a.m.; Resume at 10:55 a.m.)

14          THE CLERK:  Court is in session.  Please be seated.

15          MR. DECHIARA:  Good morning, Your Honor.  Peter

16  Dechiara from the law firm of Cohen, Weiss, and Simon, LLP for

17  the UAW International Union.

18                      CROSS EXAMINATION

19  BY MR. DECHIARA:

20  Q    Good morning, Mr. Orr.

21  A    Good morning, Mr. Dechiara.

22          THE COURT:  You may proceed, but please no redundant

23  questioning.

24          MR. DECHIARA:  I will try my best, Your Honor, to

25  avoid redundant questions.

1  Q    Mr. Orr, you testified at the beginning of your direct

2  fairly extensively about your background.  I just want to ask

3  you a few questions about that.

4  A    Sure.

5  Q    You testified you were born and raised in the State of

6  Florida, is that correct?

7  A    Yes.

8  Q    Okay.  Prior to --

9         THE COURT:  Excuse me, the first question you asked

10  was a redundant question.

11         MR. DECHIARA:  I was just saying the framework for

12  my next question, Your Honor.  I apologize.  I'll try my best

13  to keep it focused.

14  Q    Before you became emergency manager, had you ever lived

15  in the City of Detroit?

16  A    No.

17  Q    Do you currently maintain a permanent residence in the

18  Washington, D.C. area?

19  A    Yes.

20  Q    And I believe you -- and does your wife -- do your wife

21  and kids live in the Washington, D.C. area?

22         MR. STEWART:  Objection, relevance, Your Honor.

23         MR. DECHIARA:  Your Honor --

24         THE COURT:  The objection is sustained.

25  Q    Okay.  Since becoming emergency manager, do you commute

1  back and forth between Detroit and Washington, D.C.?

2  A    Yes.

3  Q    And you don't maintain a permanent residence in Detroit,

4  is that correct?

5  A    No.

6  Q    And since you've been emergency manager you've been --

7          THE COURT:  Fine.  Counsel said, is that correct and

8  you said no.  So you do or you don't maintain a permanent

9  residence here?

10 A    I do not maintain a permanent residence here.

11 Q    Since you've become emergency manager you -- while in

12 Detroit you've been living out of a hotel, is that correct?

13 A    Yes.

14 Q    You testified -- you were asked on -- on direct whether

15 you took the emergency manager job for the money.  Do you

16 recall that question?

17 A    Yes.

18 Q    And your answer on direct was no, correct?

19 A    I did not take the job for the money.

20 Q    Okay.  How much money do you earn as emergency manager?

21 A    As stated by -- stated in my contract $275,000 a year.

22 Q    Okay.  And do I take it from your answer that you didn't

23 take the job for the money to mean that when you were a

24 partner at Jones, Day you were earning much much more than

25 that?

1  A    Yes.

2  Q    And apart from your $275,000 a year salary, do you

3  receive any other compensation for your services as emergency

4  manager?

5  A    I do not receive directly any other compensation.  If

6  you're -- if you're trying to talk about the expenses of the

7  hotel, I've since understood that those are paid from a fund.

8  Q    What fund?

9  A    I believe it was the NERD fund.

10  Q    Okay.  And do you know who contributes to that fund?

11  A    I know nothing about that fund.  I know nothing about how

12  it's paid.  I've never seen my lease.

13  Q    Do you know that -- that fund, the NERD fund is the

14  Governor's fund?

15  A    I know that.  I know it's related to the Governor.  I

16  don't know what you mean by the Governor's fund, but yes, I

17  know that.

18  Q    Okay.  You know Richard Baird, do you not?

19  A    Yes, I do.

20  Q    Okay.  And he is a consultant to the Governor?

21  A    He is now a state employee.

22  Q    As of the time that -- as of January and February of

23  2013, was he a consultant to the Governor?

24  A    Yes.

25  Q    And in that period of time he worked closely with the

1  Governor?

2  A    I don't know about his -- I assume he did.  He -- I think

3  his title was transformation manager to the Governor.

4  Q    Okay.  To the best of your knowledge based on your

5  dealings with him, was it your understanding that he worked

6  closely with the Governor?

7  A    To the best of my knowledge based on my dealings with

8  him, yes.

9  Q    The meeting, and there's been a lot of testimony about

10  this, the meeting at which Jones, Day made a pitch to become

11  restructuring counsel for the City of Detroit was on January

12  29th, 2013, correct?

13  A    Yes.

14  Q    Okay.  And the very next day Mr. Baird called up the

15  managing partner of Jones, Day, Steven Brogan to inquire about

16  whether he could speak to you about becoming a candidate for

17  emergency manager, is that correct?

18  A    I believe that's correct.

19  Q    And then the very next day after that you spoke to Mr.

20  Baird, correct?

21  A    I may have spoken to him that day, or the day after that,

22  but it was closely after that, yes.

23  Q    Okay.  So it was either January 30th or January 31st that

24  you spoke to Mr. Baird?

25  A    I believe so.

1  Q    Okay.  Just to make the record clear, if I could ask you

2  to turn your attention to Exhibit 401.  Can -- can you blow

3  that up a bit?  Do you have that on your screen, Mr. Orr?

4  A    Yes, I do.

5  Q    Okay.  And is that an email from -- from you to others

6  dated January 31st, 2013?

7  A    Yes.

8  Q    And it says in the first sentence, I had a good

9  conversation with -- with Rich Baird this morning?  Do you see

10 that?

11 A    Yes, I do.

12 Q    Does that refresh your recollection about whether it was

13 on the 30th or the 31st that you spoke to Mr. Baird?

14 A    I -- I may have spoken with him both on the afternoon of

15 the 30th and again on the 31st.  But this says I clearly spoke

16 with him on the 31st, so I certainly spoke with him on the 31st.

17 Q    You interviewed with the Governor to become emergency

18 manager, correct?

19 A    Yes.

20 Q    And you interviewed with Mr. Dillon?

21 A    Yes.

22 Q    And you interviewed with Mr. Baird?

23 A    Mr. Baird was at the meeting that I had with the

24 Governor.

25 Q    Okay.  Now I believe you testified on direct that you

1  didn't want your decision about whether or not to become --

2  whether or not you wanted to become emergency manager to have

3  any impact on whether or not Jones, Day would be chosen as

4  restructuring counsel for the city, is that -- am I getting

5  that right?

6  A    Yes.  I think I testified that whether or not I was

7  interested in becoming the emergency manager, I did not want

8  it to either help or hurt Jones, Day.

9  Q    Okay.  And in fact on direct you testified that you told

10  the Governor, and the Treasurer, and Mr. Baird that you did

11  not want your decision about whether to become emergency

12  manager to have any impact on whether or not Jones, Day was

13  chosen as restructuring counsel for the city.  Am I -- am I

14  correct that that's what you testified on direct?

15  A    Yes.  I think I told both the Governor, and Mr. Baird,

16  and Treasurer Dillon as well.

17  Q    Okay.  And the reason you told the Governor that, and the

18  reason you told Mr. Dillon that, was because you understood

19  that they would be in a position to have influence or impact

20  on whether or not Jones, Day was chosen for -- as

21  restructuring counsel, correct?

22  A    I told Mr. Dillon and Mr. Baird that because they were on

23  the review team that we pitched to.  I think I told the

24  Governor that just to reinforce what I told Mr. Baird and Mr.

25  Dillon.

1    I assumed that Mr. Baird and Mr. Dillon would have some

2   influence on the selection process since they were on the

3   team.  I don't think I said that just because I assumed the

4   Governor would have that influence.

5   Q    Did the Governor say anything to you in response when you

6   said that to him?

7   A    I think the Governor agreed that it went one way or the

8   other.

9   Q    Okay.  I'd like to show you a document that's UAW 619.

10  It's --

11       MR. DECHIARA:  Your Honor, it's not yet admitted

12  into evidence.  I would just ask the witness to -- it's in the

13  UAW binders which were provided to the Court and the witness

14  and -- and city counsel this morning.

15  Q    Mr. Baird, if I could ask you to turn to -- behind Tab

16  619.

17  A    Mr. Orr?

18  Q    I'm sorry, whatever I said, excuse me.  Mr. Orr.  Are you

19  at -- do you see this exhibit?

20  A    Yes.

21  Q    Okay.  Am I correct that this is -- these -- this

22  exhibit, and I'm just referring to the first page, the first

23  page of this exhibit is a chain of emails.  The first one --

24  or the middle one is from Mr. Baird to you dated February 20th,

25  2013?

1  A    Yes.

2       (UAW Exhibit 619 was identified)

3  Q    Okay.  Did you receive that email?

4  A    Yes.

5  Q    And do you recall what the -- let me just read it.  It

6  says, FYI --

7            THE COURT:  Not in evidence yet.

8            MR. DECHIARA:  Okay.  Your Honor, I -- I would move

9  this document at this point into evidence.

10           MR. STEWART:  The objection is relevance, Your

11 Honor.

12           MR. DECHIARA:  Your Honor, a major theme of -- of

13 our case, and I believe some of the other objectors' cases, is

14 that the state was working hand and glove with the firm of

15 Jones, Day to implement this effort, this scheme, this

16 strategy to end run the Michigan Constitution in order to cut

17 the pensions of Detroit retirees.

18     And this is one data point, if I -- if I could, that

19 shows the intimate relationship between the state and Jones,

20 Day.  This is an email from the Governor's right hand man, Mr.

21 Baird before Mr. Orr was emergency manager, but while he was a

22 partner at Jones, Day saying what it says in this email which

23 if I may refer to it --

24           THE COURT:  No, that's all right I'm satisfied that

25 the document is relevant and that objection is overruled.

1   What -- what number was it again, sir?

2           MR. DECHIARA:  Six nineteen.

3           THE COURT:  Okay.

4       (UAW Exhibit 619 was admitted)

5   Q    Could you blow up the -- okay.  Do you recall Mr. Orr,

6   what this email was about?  What the general subject matter of

7   this exchange was?

8   A    Yes.

9   Q    What was it?

10  A    This was discussion of a proposed partnership agreement

11  between the Mayor and myself if I were to become emergency

12  manager.

13  Q    Okay.  I'd like to refer you to second sentence.  It's --

14  Mr. Baird writes, told him that there were certain things I

15  would not think we could agree to without your review,

16  assessment, and determination.  And then the sentence goes on

17  and you can read it, but I'll stop reading out loud there.  Do

18  you know who -- I know you didn't write the sentence, but did

19  you have an understanding of who the we was, that last word on

20  the -- on the second line on the -- on the right?

21  A    Yes.  I think he was talking about the Mayor.

22          MR. WERTHEIMER:  Pardon me.  I can't hear him and I

23  apologize.

24          THE COURT:  Would you repeat your answer, please?

25  A    Yes, Your Honor.  Yes, I think he was talking about the

1   Mayor.

2   Q    Okay.  Mr. Baird was talking about himself and the Mayor?

3   A    You know, I don't -- I don't know.

4   Q    Okay.  I don't want you to guess if you don't know.

5   A    I don't know.

6   Q    Okay.  All right.  But nonetheless, Mr. Baird was saying

7   to you that he did not think that we, whoever we were, could

8   agree to something without your review, assessment, and

9   determination.

10  A    Mr. Dechiara, let me clarify my answer.  I think this

11  email is Mr. Baird talking about an outline that he gave the

12  Mayor.  And I think the we is referring to me and Mr. Baird.

13  Q    Okay.  Did Mr. Baird ever explain to you apart from

14  what's written in this email, why your agreement -- your

15  review assessment and determination were necessary at this

16  point in time?

17  A    You know, as I read this email, Mr. Dechiara, let me

18  further clarify.

19           THE COURT:  I think I just need you to answer that

20  question, please.

21  A    Oh, I'm sorry, Your Honor.  Please --

22  Q    Did -- did Mr. Baird apart from what's written in this

23  email, ever explain to you why in his view your review,

24  assessment, and determination were necessary?

25  A    I don't recall.

1  Q    Okay.  But just to be clear, you were a partner at Jones,

2  Day at the time of this email, correct?

3  A    Yes.

4         THE COURT:  Excuse me one second.  Now, witness, you

5  say there's some testimony you'd like to clarify?

6  A    Yes, Your Honor.

7         THE COURT:  You can do that.

8  A    I think the we that's circled here at the end of the

9  second line is referring to both the -- the -- to Mr. Baird,

10  to myself, and the Mayor, the royal we if you will.

11  Q    And did Mr. Baird ever explain to you apart from what's

12  written here what -- what the we was, or are you just --

13  A    I don't recall.  I'm just reading the context of the

14  email.

15  Q    Okay, okay.  Let me refer you now to UAW Exhibit 620.

16  It's the next tab in the book.  And do you have it in front of

17  you, Mr. Orr?

18  A    Yes, I do.

19  Q    Okay.  Let me refer you to the -- the middle email, the

20  one that is from Richard -- which appears to be from Richard

21  Baird to you dated February 22nd, 2013.  Do you see that?

22  A    Yes, I do.

23  Q    And is that in fact an email that Richard Baird sent to

24  you on February 22nd, 2013?

25  A    Yes, I believe so.

1    (UAW Exhibit 620 was identified)

2        MR. DECHIARA:  Move the admission of UAW 620, Your

3  Honor.

4        MR. STEWART:  Same objection, Your Honor.

5        MR. DECHIARA:  Same argument, Your Honor.  It's --

6  it's just part of the same -- and it's not like I have a lot

7  of these.  This is the only other one on this line.

8        THE COURT:  All right.  It is admitted.  The

9  objection on relevance grounds is overruled.

10    (UAW Exhibit 620 was admitted)

11  Q    Let me if -- thank you.  Let me refer to the email from

12  Richard Baird it says, Kevyn, about to be in a car for several

13  hours so thought I would send this to you prior to hearing

14  back from the G a final time.  Did -- did you have an

15  understanding of who the G was?  That was the Governor, wasn't

16  it?

17  A    I -- I think it's referring to the Governor, yes.

18  Q    And then the -- and then the email goes on, if you agree

19  with what I have done to the doc, based on everyone's input

20  and agree that you should be the one to provide it to the

21  Mayor as fully endorsed by the Governor, and the Treasurer,

22  and you, then I think that clearly established that you are

23  already behaving as an agent of the state committed to getting

24  Detroit back on track.

25        Did you agree with Mr. Baird's statement there that if

1 you agree to the things that he refers to in that sentence

2 that you were already behaving as an agent of the state?

3 A    No.

4 Q    Did you disabuse Mr. Baird of that notion and -- and --

5 and tell him that he was wrong about that?

6 A    I don't recall.

7 Q    You did respond to the email, didn't you in the -- in the

8 email that is at the top of the exhibit?

9 A    Yes.

10 Q    If -- if you could blow that up.  And am I correct that

11 nowhere in that response do you say anything to Mr. Baird that

12 his statement in his email was incorrect, am I reading that

13 email accurately?

14 A    I think the email speaks for itself, yes.

15 Q    Okay.  Thank you.  Is it your understanding that you

16 serve at the pleasure of the Governor?

17 A    Yes, provided I'm acting under 436.  I think the Governor

18 has certain authority to remove me as well as the city council

19 and the Mayor at the end of 18 months.

20 Q    Are you aware of any limits on -- are you -- can the

21 Governor remove you at will?

22 A    I think that may be a legal conclusion under the statute.

23 Q    I'm not asking for your legal conclusion.  I'm asking for

24 your understanding.

25 A    I don't know.

1  Q    Okay.  Since you've become emergency manager, you've met

2  frequently -- frequently with the Governor, have you not?

3  A    Yes.

4  Q    Both in formal group settings with staff and -- and

5  advisors present as well as one on one?

6  A    I meet with the Governor --

7  Q    It's a yes or no question.

8  A    No.

9  Q    You have not met with the Governor both in formal

10  settings with others present as well as one on one since

11  you've become emergency manager?

12  A    Yes.  I have met with the Governor in formal settings and

13  with one on one.  The difference in my answer was your use of

14  frequently.  I meet with the Governor less frequently in the

15  one on one sessions.

16  Q    Okay.  But the totality of your meetings with the

17  Governor, are frequent, correct?

18  A    Yes.

19  Q    Okay.  And in your meetings with the Governor, have you

20  discussed the -- prior to the bankruptcy filing, did you

21  discuss plans for the filing of Detroit's bankruptcy petition?

22  A    Outside of implicating any privilege discussions?

23  Q    I'm just asking you the question.

24       MR. STEWART:  I would state an objection to the

25  extent that it's going to call the witness to reveal

1   attorney/client information.

2   A    We had discussions.

3   Q    And what were your -- what was discussed?  But let me --

4   let me -- let me -- let me ask you, on how many occasions did

5   you have those discussions?

6   A    The Governor and I and the Detroit --

7   Q    But do you have a number?

8   A    Weekly.

9        THE COURT:  That's not a number, but okay.

10  A    I don't -- I don't know the number, Your Honor.

11  Q    Okay.  Just so I understand -- understand your testimony,

12  testimony, Mr. Orr, you discussed with the Governor on a

13  weekly basis plans for the filing of the -- the bankruptcy

14  petition?

15  A    No.

16  Q    Okay.  So my question is, how often did you meet with the

17  Governor or speak to the Governor if it was by phone, about

18  plans for Detroit's bankruptcy filing?

19  A    Somewhere between two and four or five, maybe.

20  Q    And do you have a recollection of what was said in those

21  discussions between you and the Governor?

22       MR. STEWART:  Same objection, Your Honor, to the

23  extent it's calling for the witness to reveal privileged

24  attorney/client communications.  I would ask that he not

25  answer.  But if there were such discussions without counsel

 1  present.

 2          MR. DECHIARA:  I think the objection is premature,

 3  Your Honor.  I simply asked whether he recalls what was said.

 4  I didn't ask I didn't yet ask him to reveal it.

 5  Q    Do you recall what was said in those meetings?

 6  A    I recall some of what was said, yes.

 7  Q    Okay.  Now I would ask you to -- to testify as to what

 8  was said.

 9          MR. STEWART:  Same objection.

10  A    Those meetings were held with attorneys acting as

11  attorneys, Your Honor, and I'm remembering the admonition from

12  the Court about my follow on deposition.  So I -- I'd like to

13  say that the Governor has a J.D., and I believe the Treasurer

14  has a J.D., so I'm not talking about them.  I'm talking about

15  attorneys acting as attorneys.

16          THE COURT:  So is it your testimony to the Court

17  that none of the meetings at which the filing of this case was

18  discussed, was held outside of the presence of lawyers?

19  A    To the best of my recollection, none were held outside

20  the presence of lawyers acting as lawyers.

21  Q    What lawyers?

22  A    I believe it was -- there were -- there were a lot of

23  meetings with lawyers.  The Governor's staff lawyers --

24          THE COURT:  Fine, Mr. Orr.  The question was, what

25  lawyers attended the meetings where the filing of this case

1  was discussed.

2  A    Yes, Your Honor.

3          THE COURT:  The two to five that you said.  Was it

4  five?

5          MR. DECHIARA:  He said -- I think he said two to

6  four or five.

7  A    Two to four or five.

8          THE COURT:  Two to four or five.

9  A    Two to four or five.

10          THE COURT:  Those meetings.  What lawyers?

11  A    There were lawyers on the Governor's staff, Valerie

12  Brader and Mike Gadola.  There were lawyers from Jones, Day at

13  some of those meetings sometimes on the phone.  There would be

14  lawyers perhaps on the city's staff.  From Jones, Day it could

15  include David Heiman, could include Heather Lennox.  I'm

16  trying to think of other lawyers.  But generally lawyers both

17  on the Governor's staff and lawyers at the city's counsel,

18  Jones, Day.

19          MR. DECHIARA:  Your Honor, it's the UAW's position

20  that the -- the attorney/client privilege should not apply

21  here.  That these attorneys either for the state or Jones, Day

22  were being -- were working for the city or the state, public

23  entities of this -- of this state, paid for by the city or the

24  state.  And their presence at these meetings should not shield

25  from disclosure what was said at these critical meetings.

1      THE COURT:  Well, how do I reconcile that with your

2  relevance offer just a little while ago where you talked about

3  the common, I think the word you used was scheme.

4      MR. DECHIARA:  I don't see any tension between the

5  two, Your Honor.

6      THE COURT:  All right.  Response, please.

7      MR. STEWART:  Your Honor, there's no -- the

8  attorney/client privilege maintained applies to government --

9  government officials just like it will apply to private

10  parties and because of the fact that the lawyers were there in

11  connection with the rendition of legal advice and in

12  conjunction with the common interest agreement, we would

13  submit that they're privileged.

14      THE COURT:  Is there any reason for a different

15  ruling on the common interest issue here than there was

16  earlier?

17      MR. DECHIARA:  Your Honor, it's -- the UA -- UAW

18  took issue with Your Honor's ruling on that.  We moved for

19  reconsideration.  Your Honor, we're obviously not going to --

20  we're obviously going to comply with whatever ruling you make

21  on this issue.  I've stated our argument.

22      THE COURT:  And I appreciate that.  I appreciate

23  that, but my -- my question to you was in this specific

24  context, is there -- is there a reason to have a different

25  ruling --

1           MR. DECHIARA:  No, I think -- I think this specific

2  context --

3           THE COURT:  Is there a distinction to be made here?

4           MR. DECHIARA:  Yeah, this specific context is not

5  unique, it's part of a larger effort by the city and the state

6  to cloak under the attorney/client privilege these critical

7  discussions that bear -- that have such importance to the

8  people of this city and state.

9           THE COURT:  All right.  The Court will sustain the

10 claim of privilege and to the extent there was a motion to

11 compel, the Court will deny that.  But I do want to clarify

12 there was no one on one conversation between you and the

13 Governor with no one else present where the filing of this

14 case by the city was discussed, is that your testimony to this

15 Court?

16 A    Not that I recall, Your Honor.  The Governor and I have

17 one on ones.  Okay.

18          MR. DECHIARA:  Your Honor, if I may.  Your Honor --

19          THE COURT:  One second.  You need to be near a

20 microphone, sir.

21          MR. DECHIARA:  Your Honor, I don't want to burden

22 the record or take the Court's time necessarily.  I did -- I

23 was planning on asking the witness a series of questions about

24 what discussions he may have had with the Governor on issues

25 central to this case, including the timing of the bankruptcy

1   filing, the reasons for the bankruptcy filing.

2       If the Court's ruling is going to be if there were state

3   and city attorneys present, that the attorney/client privilege

4   applies, I would just like to note for the record that the UAW

5   would take exception to that ruling and preserve our position

6   for any possible subsequent proceedings.

7           THE COURT:  Well, I –- I appreciate your interest in

8   -- in saving time, but let's just clarify that the subjects

9   you were going to ask the witness about included matters

10  relating to the filing of the case, yes?

11          MR. DECHIARA:  Yes.

12          THE COURT:  Okay.  And your testimony, Mr. Orr, is

13  that every time you discuss matters relating to the filing of

14  the case with the Governor there were counsel –- counsel and

15  attorneys present.

16  A    Yes, Your Honor.

17          THE COURT:  All right.  You may have that objection.

18          MR. DECHIARA:  Thank you, Your Honor.  I will yield

19  to Mr. Wertheimer.  I believe he had something to say.

20          MS. LEVINE:  Your Honor, can all of the objectors

21  join in that reservation of rights so we don't have to do it

22  again?

23          THE COURT:  Yes, absolutely.

24          MS. LEVINE:  Thanks.

25          THE COURT:  Absolutely.

1        MR. WERTHEIMER:  William Wertheimer, Your Honor, on

2   behalf of the Flowers plaintiffs.  I just wanted to do a

3   couple of things.  First, join in that objection so that I

4   didn't have --

5        THE COURT:  Okay.  I appreciate that.

6        MR. WERTHEIMER:  -- to do it.  But second, Your

7   Honor, I would also add to the point made by counsel for the

8   UAW, that my objection is also based on the fact that the

9   Court consistent with its rulings yesterday relative to the

10  Governor, has acknowledged the attorney/client privilege and

11  says that it should apply with no more evidence than that an

12  attorney was present at a discussion.

13     And I just want the record to reflect that it's -- our

14  argument -- or the Flowers plaintiffs' argument is not just

15  that these are government attorneys, but that more of a

16  showing needs to be made for the privilege to apply, than that

17  an attorney was present.

18        THE COURT:  Well, since you've challenged that, sir,

19  I will state for the record that my ruling is based on more

20  than the fact that -- more than merely the fact that an

21  attorney was present.  When you're talking about as we are

22  here, the filing of a bankruptcy case, those conversations

23  relating to the filing of a bankruptcy case are in relation to

24  a legal matter and not what would otherwise be an unprivileged

25  matter.

1       MR. WERTHEIMER:  I did not mean to imply that the

2   Court was not making that ruling in that context.

3       THE COURT:  All right.

4       MR. WERTHEIMER:  I would add just one other point.

5   And that is I think consistent with your rulings yesterday

6   that the privilege would also be asserted were any questions

7   to be asked relative to communications between the Governor

8   and Mr. Orr relating to Section 924 of the State Constitution,

9   the constitutional pension provision, and what its impact

10  could be on the bankruptcy.  I would assume the privilege

11  would be asserted as to that and that the Court's ruling would

12  be the same.

13      Again for purposes of the record, I think that was the

14  position taken by the Governor yesterday.  I think it's

15  consistent with the Court's ruling yesterday.  But I want to

16  make sure that it's included as to this testimony also.

17      THE COURT:  All I can say as to that is, it sounds

18  like it would, but if in the context of a specific area of

19  inquiry you think that this ruling should be different because

20  of particular facts or circumstances, I certainly invite you

21  to draw my attention to any distinction that you think should

22  require a different result.

23      MR. WERTHEIMER:  I -- I understand that, Your Honor.

24  I -- my last point was just to make clear that it's my

25  understanding that the city is asserting the privilege also as

1  to conversations between --

2          THE COURT:  All right.  I think we've gone as far as

3  we can with this.  So I'm going to ask that we resume with our

4  cross examination at this time.

5          MR. WERTHEIMER:  Thank you, Your Honor.

6  Q   Mr. Orr, did you send a draft of your June 14th proposal

7  to creditors, to the Governor to review?  And when I say you,

8  I mean you or your staff?

9  A   I'm -- I'm trying to -- I don't recall.

10 Q   Do you recall whether you received feedback from the

11 Governor or comments of any sort on a draft of the June 14th

12 proposal to creditors?  And when I say you, I mean you or

13 people in your office.  And when I say the Governor, I mean

14 the Governor or his staff.

15 A   I don't think we received feedback.

16 Q   Did you receive any comments from the Governor or his

17 office on the proposal before it was made public?

18 A   No, I'm not aware of any comments.

19 Q   If the Governor had made comments or been given feedback,

20 is that something you would have been made aware of?

21 A   I might have been.  It might have been done at a

22 different level, at the drafting level.

23 Q   But if the Governor of the state had comments about the

24 June 14th proposal of the -- the key document in this case,

25 it's your testimony that you would not have been aware of his

1  comments?

2  A    One of the key documents.  And it's my testimony that

3  those comments could have been communicated through attorneys

4  or through a staff level that would not have gotten to me

5  during the drafting stage.

6  Q    Would they have gotten to you at some point before the

7  document was made public?

8            THE COURT:  Okay.  So counsel on this question, when

9  you say Governor, you don't mean the Governor or his staff,

10  you mean the Governor personally?

11            MR. DECHIARA:  No, I mean the Governor and his

12  staff.  Well, let me break it down to be clear.  Thank you,

13  Your Honor.  I appreciate the clarification.

14  Q    So let me start with the Governor.  Is it your testimony

15  that the Governor and the state had comments on the June 14th

16  creditors' proposal, you before the document became public,

17  would not have known about those comments?

18  A    It is my testimony that I don't recall the Governor

19  providing any comments and that if he had, they may not have

20  made their way to me.

21  Q    You -- you are aware, are you not, that part of your June

22  14th proposal, where that stated that there must be significant

23  cuts to accrued pension liabilities?

24  A    Yes.  I think we said that in the June 14th proposal.

25  Q    And was the June 14th proposal negotiable?  Were you

 1 | prepared to negotiate on it?

 2 | A    Yes.  That's why we called it a proposal.

 3 | Q    And were you prepared to negotiate on every -- every

 4 | element of it?

 5 | A    Yes.  I think we said that.

 6 | Q    And were you prepared to negotiate a -- an agreement that

 7 | would not have had any cuts to accrued pension liabilities?

 8 | A    I'm not sure that's accurate.  I think the amount of

 9 | unaccrued pension liabilities was so significant that we may

10 | not --

11 |           THE COURT:  All right.  Mr. Orr, again, I have to

12 | ask you please, just answer the question.  We're going to be

13 | here a really long time if you insist on going on and on.

14 | A    And -- and I don't want that, Your Honor.  I'll try to

15 | answer just the question.  Please, Mr. Dechiara.

16 | Q    I'll -- I'll repeat the question.

17 | A    Uh-huh.

18 | Q    Were you prepared in response to your proposal, your June

19 | 14th proposal, to accept any counter proposal that had as part

20 | of the counter proposal, an element that would have spared,

21 | that would have not had -- would not have impaired at all

22 | accrued pension liabilities?

23 | A    We were prepared to accept any counter proposal.

24 | Q    Including a counter proposal that would have had no cuts

25 | at all in accrued pension liabilities, is that your testimony?

1  A     Yes.

2  Q     Okay.  And are you prepared to do that today?

3  A     If there's a counter proposal, yes.  When you say accept,

4  Mr. Dechaira, we'll accept counter proposals, that's not

5  agreed to.

6  Q     Okay.  Thank you for that clarification.  That's what I'm

7  getting at.  Okay.  So let me -- let me try it again because I

8  think that's an important point.  At the time you made the

9  June --

10        THE COURT:  While we're clarifying here, I'm going

11  to strike the last question and answer about what he's willing

12  to do today.

13        MR. DECHIARA:  Thank you, Your Honor.  I -- I -- I

14  will not go there.

15  Q     At the time you made the June 14th proposal, until the

16  time you filed for bankruptcy, were you prepared to agree to

17  an agreement with the stakeholders that would have spared the

18  pension -- accrued pension liabilities from any cuts?

19  A     Probably not.

20  Q     Is it -- am I correct that the procedure at the June 14th

21  meeting was that for an attendee, in other words someone who

22  was invited to attend, for an attendee to make a comment or

23  ask -- ask a question, they had to fill out a card and have

24  that card brought up to the front of the room and read -- read

25  by someone else?

1  A    Yes, I believe so.

2  Q    You -- is your testimony here today on direct -- I mean,

3  not on direct, but on cross by -- by the retiree committee

4  that you did attend the June 20th meeting?

5  A    Yes.

6  Q    Okay.  Do you recall giving a deposition in this

7  proceeding on September 16th?

8  A    Yes.

9  Q    Okay.  And did you testify truthfully in that deposition?

10  A    Yes.

11  Q    I'd like to read for you, from Page 261 of your

12  deposition.  I'm at Line 16.

13       Question, okay.  So do you recall whether you attended

14  June 20th?  Answer, I think I did, but I don't recall.

15  A    Yes.

16  Q    Is it true that as of June 16th you could not recall with

17  certainty whether you had attended the June 20th meeting?

18  A    As of September 16th?

19           THE COURT:  You mean September 16th?

20           MR. DECHIARA:  Yes, I'm sorry.

21  A    Okay.

22  Q    Thank you.  As of September 16th?

23  A    I -- I think my answer was, I think I did, but I didn't

24  recall with specificity.  I now recall that I did.

25  Q    Was there something that happened between September 16th

1   and today that caused your recollection to improve on that

2   point?

3   A    Yes.

4   Q    What happened?

5   A    I went over my old American Express bills.

6   Q    Fair enough.  Was the same procedure that you -- that you

7   -- I asked you about -- about using the cards, did that apply

8   to the June 20th meeting as well?

9   A    I don't recall.

10  Q    I'd like to show you what's been admitted into evidence,

11  it's in your UAW binder as Exhibit 623.  Do you -- do you

12  recognize this -- is this -- it's a two page document.  If you

13  can look at both pages.  Putting aside this particular

14  document, is this the form of the question cards that were

15  used at these meetings?

16  A    I don't recall.

17  Q    Okay.  Do you recall this particular document?

18  A    I do not.

19  Q    Do you agree that the June 20th meeting was an

20  informational meeting?

21  A    Yes.  I would agree in part it was informational.

22  Q    Are you familiar with the term OPEB, other post

23  employment benefits?

24  A    Yes.

25  Q    Okay.  Did anyone at Jones, Day ever communicate to you

1  that the UAW was interested in setting up a process for

2  negotiating over OPEB benefits?

3  A    I don't recall.

4  Q    Let me now refer you to your July 16th letter requesting

5  permission from -- requesting authorization to file for

6  bankruptcy.  Do you recall that letter?

7  A    Yes, I do.

8  Q    Did you or your staff show a draft of that letter to the

9  Governor or his staff at any time before July 16th?

10  A    No, I don't think so.

11  Q    Did you or your staff show a draft of the July 16th letter

12  to the Treasurer or his staff at any time before July 16th?

13  A    No, I don't think so.

14  Q    I'd like to show you -- well, first, I'd like to call

15  your attention to the July 16th letter which is Exhibit 409.

16  Could you please call up Exhibit 409?  Mr. Orr, could you

17  please turn to Exhibit 626 in the UAW binder?

18  A    Yes, I have it.

19  Q    And this appears to be a July 10th email from Andy Dillon

20  to certain individuals, none of whom appear to be you?  Do you

21  see that?

22  A    Yes.

23  Q    Okay.  Did you -- have you ever seen this document

24  before?

25  A    I have not

1  Q    Okay.  Let me refer you, and I'm not going to read it

2  because it's not in evidence.  But let me just refer you to

3  the -- do you see the numbered paragraphs on the bottom of

4  page -- the first page?

5  A    Yes.

6  Q    Okay.  Let me refer you to the first one.  If you could

7  just read that to yourself.

8  A    Yes.

9  Q    Okay.

10        THE COURT:  What's the purpose of this, counsel?

11        MR. DECHIARA:  Your Honor, the purpose of this is to

12  show, to clearly show, we believe, that the Treasurer, not

13  only was shown a draft of the July 16th letter in contradiction

14  to the witness' testimony, but that the -- the Treasurer's

15  comments on the draft were incorporated into the final letter.

16        THE COURT:  Is the document in evidence?

17        MR. DECHIARA:  No, it's not, Your Honor, but --

18        THE COURT:  Okay.  So, you can't confront him with

19  it until it is.

20        MR. DECHIARA:  I'm trying to refresh -- Your Honor,

21  we -- we do intend to put it into -- into evidence, but I'm

22  trying to establish to essentially impeach this witness'

23  testimony that a draft was not provided to the Treasurer by

24  pointing out to him what I just said.

25        THE COURT:  Well, why don't you just point it out to

1   me after the document is in evidence.

2          MR. DECHIARA:  I will, Your Honor.

3   Q    Let me ask if Exhibit 44 can be called to the screen.

4   And while that's being done, Mr. Orr, let me ask you, when did

5   you begin to -- you didn't write the July 16th letter on July

6   16th, correct?  The preparation for that letter became -- began

7   earlier?

8   A    Yes.  There were drafts of that letter being made earlier

9   than July 16th.

10  Q    Okay.  Can we turn to Page 61 of Exhibit 44?  And if you

11  could blow that up, please.  And by the way, Mr. Orr, Exhibit

12  44 is the executive summary of the June 14th proposal, correct?

13  A    Yes.

14  Q    Okay.  And that was presented at the June 14th meeting?

15  A    Yes.

16  Q    And on Page 61, third bullet point, it says that there

17  would be -- it says as part of the calendar, there would be an

18  evaluation period from July 15th to July 19th, 2013.  Do you see

19  that?

20  A    Yes.

21  Q    Okay.  And you told the attendees at the June 14th

22  meeting, and I think I'm quoting you accurately from your

23  direct, but tell me if I'm not, "that that was a schedule that

24  you were sticking to".

25  A    Yes.

1  Q    Did you say that?

2  A    Yes.

3  Q    Okay.  And in fact you did not stick to that schedule,

4  isn't that a fact?

5  A    We substantially stuck to it, yes, but no, not exactly on

6  the 19th.

7  Q    Well, in fact you filed for bankruptcy on the 18th,

8  correct?

9  A    Yes.

10  Q    And in fact before July 15th, you were already writing

11  your July -- what became your July 16th letter, correct?

12  A    I or members --

13  Q    Just answer the question.

14  A    I wasn't writing it.

15  Q    It was -- the letter was being prepared, is that correct?

16  A    Yes.

17  Q    Did you tell -- did you contact the stakeholders or the

18  creditors who were at the June 14th meeting and tell them that

19  you were not going to be sticking to the schedule the way you

20  had told them you would?  Did you do that?

21  A    No.

22  Q    You testified, I believe on direct, that as a result of

23  the Flowers, Webster and -- lawsuits and the lawsuit by the

24  pension funds, that the situation, and I think I'm quoting you

25  correctly on direct, but -- but tell me if I'm not.  Was

1  becoming out of control?  Was -- was that your direct

2  testimony?

3  A    I think that's -- yes.  I think that's substantially my

4  testimony.

5  Q    Okay.  Is it fair to say that the plaintiffs in the -- in

6  those three lawsuits were exercising their lawful right to go

7  to the state judiciary to obtain a determination on a

8  important issue of law?

9  A    I think the plaintiffs were doing whatever they thought

10  was in their best interest.

11  Q    That may be, but that doesn't answer my question.

12  A    But your question were they exercising their judicial

13  rights.  I -- I don't know what they were doing.  I know that

14  they were not keeping with the schedule and not coming forward

15  with counter proposals, that's what I know.

16  Q    Well, they were filing lawsuits with the state judiciary,

17  correct?

18  A    Yes.

19  Q    And you consider that to be behavior that was out of

20  control?

21  A    No.  I consider that to be behavior that was calculated

22  to undermine my ability to discharge my obligations under the

23  statute.

24  Q    It was calculated to prevent you from filing for

25  bankruptcy, wasn't that what it was about?

1  A    No.  I -- I didn't say that.

2  Q    Could it -- could you not have waited a few days to see

3  how the Courts would have -- the State Courts would have

4  resolved important issues involving the statute and the

5  Constitution?

6  A    Mr. Dechaira, we'd waited almost a month.

7  Q    Okay.  Have you ever spoken to the Governor about having

8  the state assume some or all of the city's pension

9  liabilities?

10 A    I don't recall.

11 Q    You don't recall ever having done that?

12 A    No, I don't.

13 Q    Okay.  So you -- you may have done it, and you just don't

14 recall?

15 A    Yes.

16 Q    Did you ever undertake or cause to --

17         THE COURT:  One second.  I want to make sure I

18 understand that answer.

19 A    Yes.

20         THE COURT:  You do not remember asking the Governor

21 to write a check for 3.5 billion dollars?

22 A    This is the problem with a yes or no.  The number may not

23 have been 3.5 billion.  The -- the question may have come in

24 in terms of some assistance.  But I don't recall asking it in

25 that context, Your Honor.  There are things I can testify to,

 1  it's just that question I don't recall.

 2  Q    Just so the record is clear, let me ask it again.  Do you

 3  recall ever making a request to the Governor in any context

 4  seeking assistance, financial assistance from the state for

 5  some or all, any -- any amount of the state's pension

 6  liabilities -- of the city's pension liabilities?

 7  A    I don't recall asking for assistance in that form.

 8  Q    Do you recall asking in any form?

 9  A    I recall having discussions about whether the state would

10  be in a position to make any assistance to the city to deal

11  with its problems and I think I said this publicly before.

12  And that it was made clear that the city's obligated to

13  resolve its own problems.

14  Q    When -- when did you make that request?

15  A    I don't recall.

16  Q    Was it before you filed for bankruptcy?

17  A    Probably.

18  Q    You don't remember when?

19  A    I do not remember when.

20  Q    Was it a request in writing?

21  A    I don't think so.

22  Q    Was it -- was it a request face to face with the

23  Governor?

24  A    Yes.

25  Q    Was -- do you recall where the meeting took place?

```
 1  A    No, our meetings either take place in Lansing or here in
 2  -- in -- in Cadillac Place, but I don't recall which -- which
 3  location.
 4  Q    Do you recall who was present other than you and the
 5  Governor?
 6  A    There were -- it was -- it would have been in the Detroit
 7  team meeting.
 8  Q    What does that mean?  Who -- who would have been present
 9  at the meeting?
10  A    In -- in those meetings, sometimes it's me and the
11  Governor, Treasurer Dillon, Tom Saxon on behalf of the state,
12  Braum Stibitz occasionally, Rich Baird, Valerie Brader, Mike
13  Gadola.  There may be attorneys on the line, my state liaison
14  Greg Tedder.  There may be other attendees at those meetings.
15  Q    What to the best of your recollection was said at that
16  meeting on the subject that I've just asked you about?
17          MR. SCHNEIDER:  Objection, Your Honor, on behalf of
18  the state.  I object to any conversation--
19          THE COURT:  Go ahead and approach the podium and --
20  and -- and speak, sir.
21          MR. SCHNEIDER:  Objection to the -- on behalf of the
22  state to any content of this that might implicate the
23  attorney/client privilege.
24          THE COURT:  How is the state providing help to the
25  City of Detroit for assistance on its fiscal problems
```

1  protected by attorney/client privilege?

2          MR. SCHNEIDER:  The reason why I'm stating this is

3  because I believe the witness --

4          THE COURT:  I just need an answer to my question.

5          MR. SCHNEIDER:  Could you state it again, please?

6          THE COURT:  How is a conversation between Mr. Orr

7  and the Governor about whether the state can or is willing to

8  help the city with its fiscal problems, protected by

9  attorney/client privilege?

10          MR. SCHNEIDER:  Well, to the extent that attorneys

11  were present and attorney discussion was relevant -- relevant

12  to that, and that these conversations did take place if that

13  is what happened with attorneys advising and being there for

14  the purpose of that, I believe that that would be

15  attorney/client privilege information.

16          THE COURT:  Well, but how is -- how is it a

17  discussion about a legal matter?

18          MR. SCHNEIDER:  I don't know what the witness is

19  going to testify to.  The reason why I objected is because the

20  statement was made that attorneys were present.  And that's --

21  that's the --

22          THE COURT:  Well, but you certainly agree with the

23  proposition that just because attorneys were present doesn't

24  make every conversation protected by the attorney/client

25  privilege, don't you?

 1              MR. SCHNEIDER:  I believe in this situation --

 2              THE COURT:  Don't you, sir?

 3              MR. SCHNEIDER:  I think when the attorneys are

 4    present, Your Honor, my position is, is that they are there

 5    for the purposes of providing legal advice.

 6              THE COURT:  So there's like a presumption.  Any law

 7    in support of that?

 8              MR. SCHNEIDER:  Well, Your Honor, I'm willing to

 9    yield back to the city.  I just wanted my objection noted to

10    the extent that attorney/client privilege is --

11              THE COURT:  Well, counsel, we don't make objections

12    for the sake of making objections for the record.  We make

13    objections because you don't want the testimony to come in and

14    you have to be prepared to argue that.

15              MR. SCHNEIDER:  That's true.  And I don't know what

16    the testimony is and that's why I was objecting.

17              THE COURT:  All right.  I'm going to hold that --

18    that this question does not relate to a legal matter and

19    therefore is not protected by the attorney/client privilege

20    even though there may have been attorneys who were either

21    listening in to the conversation, or participating in it.  So,

22    please answer the question.

23    Q    Okay.  What was said at that meeting on the subject I

24    asked you about?

25    A    I don't recall the specifics, but the subject was

1  generally discussed that there was no ability for the state to

2  provide direct financial assistance to the city and that we

3  had to find a way to resolve our problems based upon what we

4  could work with.

5  Q    The words that you just said, were you saying those

6  words, or was -- was the Governor saying those words?

7  A    It -- it was an exchange.  I don't recall verbatim what

8  was said during the exchange.

9  Q    Did the Governor in any forum deny the request that you

10  were making?

11  A    I guess you could call that -- I don't know one, if it

12  was a request, or one if you call it denial.  I know there was

13  a dialogue and it became clear that there would be no

14  assistance coming from the state.

15  Q    Were you in that meeting seeking assistance from the

16  state?

17  A    I don't know if we were just seeking assistance for the

18  state, Mr. Dechaira.  As I said, it was part of a dialogue and

19  -- over a number of different things.

20  Q    Well, Mr. Orr, I wasn't at the meeting.  I'm asking you,

21  do you -- do you know what you were doing in that meeting on

22  this subject?

23  A    As I've said, we have weekly meetings.  We discussed a

24  number of things.  In those meetings there was an exchange in

25  dialogue about the state's ability to potentially help the

1  city.

2      It became clear as a part of that discussion that the

3  state would not be forthcoming with any assistance from the

4  city.  The exact exchange and the exact dialogue, I do not

5  recall, but that is the gist of the discussion.

6  Q    Okay.  And I'm not going to ask you to recollect

7  verbatim, I wouldn't expect that what was said.  But I want to

8  just get some basic information.

9  A    Uh-huh.

10 Q    Were you in what you said seeking in one form or another,

11 aid from the state for this -- to pay for -- to help pay for

12 the city's pension liabilities?

13 A    I don't recall.

14 Q    Okay.  And do you recall whether the Governor responded

15 in any way to what was said on that subject, other than what

16 you've already said?

17 A    I don't recall.

18 Q    Have you ever undertaken or caused to be undertaken any

19 analysis of whether it would be possible to craft a legal

20 claim by the city against the state to try to hold the state

21 responsible for some or all of the city's pension liabilities?

22 Have you ever caused any analysis to be undertaken on that

23 point?

24 A    No, not that I'm aware of.

25 Q    Have you ever looked into the issue of whether or not

1  there might be a conflict of interest between the existence of

2  such a claim and your position being paid by the state and

3  being housed by the Governor's NERD fund?  Have you ever

4  looked -- done any analysis to look into whether or not there

5  might be a conflict of interest?

6  A    No.

7  Q    Are you familiar with the concept of deferred

8  compensation?

9  A    Yes, I'm familiar with it.

10  Q    And is it your understanding that when an employee works

11  in exchange for his or her labor, the employee receives

12  current wages but also in certain circumstances part of that

13  compensation for the worker's labor is deferred until

14  retirement.  Is that your understanding of what deferred

15  compensation is?

16  A    It can mean that, yes.

17  Q    Okay.  And in that context if you have deferred

18  compensation such as a pension, is it your understanding that

19  that pension even though it's collected in retirement, has

20  already been earned through years of labor by the employee?

21  A    Mr. Dechiara, I believe that implicates a legal

22  conclusion.  It might be true.

23  Q    Well, I'm not asking a legal conclusion, unless you have

24  one.  But I'm -- I'm looking for your understanding apart from

25  any legal conclusion.

1   A    My understanding of your concept that pensions are a form

2   of deferred compensation, I'm aware of that.  My understanding

3   in this situation as to whether or not the pension fund is

4   adequately protected, that responsibility is a different

5   understanding.

6   Q    My question is, has the pension already been earned

7   through the employee's years of labor for the City of Detroit?

8   That's my question.  Do you have an understanding of that --

9   that, one way or another?

10  A    Yes.

11  Q    And what's your understanding?

12  A    My understanding is that the concept you're trying to

13  discuss is one where the employee's pension is earned through

14  the labor.

15  Q    Okay.  Is -- would you agree with me in your position as

16  emergency manager that to revitalize the City of Detroit

17  requires capable and committed employees working for the city?

18  A    Yes.

19  Q    Have you done any analysis as to whether proposing -- or

20  strike that.  Have you done any analysis as to whether cutting

21  accrued retiree benefits for active employees would negatively

22  impact their morale?

23  A    No.

24  Q    Have you done any analysis such as speaking to a labor

25  economist as to whether or not cutting accrued retiree

1  benefits for active employees of the city would diminish the

2  city's ability to attract and retain committed and capable

3  employees?  Have you ever undertaken any analysis on that

4  point?

5  A    I'm thinking it through because we recently held a job

6  fair and we received over 1,700 applications, so it doesn't

7  appear that the current situation is impairing our ability to

8  attract workers.

9  Q    That was not my question, Mr. Orr.

10 A    That's -- have I done analysis?  Yes.

11 Q    I'm sorry?

12 A    Yes.

13 Q    You have done analysis?

14 A    In my mind that's an analysis.

15 Q    You -- so you have done your own analysis, is that what

16 you're testifying?

17 A    Yes.  Unless you want to define some other term, yes.

18 Q    So, tell me what your analysis is?

19 A    My analysis is that during the course of the job fair,

20 we've seen another employees come in.  My analysis is that

21 we've spoken with several uniform unions who have said that

22 their morale is increasing even under the current

23 circumstances.

24      My analysis is, that I've spoken with city employees that

25 say despite the current circumstances, they continue to work

1  hard at their jobs and they're committed to assist this city

2  going forward.

3  Q    You testified on direct, I believe, that your June 14th

4  proposal was in the best interests of the citizens of Detroit.

5  Do you recall that?

6  A    Yes.

7  Q    And -- and when you say the best interests of the

8  citizens of Detroit, are you including the retirees of the

9  City of Detroit?

10 A    Not all the retirees are citizens of Detroit, Mr.

11 Dechiara.

12 Q    The ones that are, are you including among the citizens

13 of Detroit for whom you think your proposal would be in the

14 best interest?

15 A    I'm including the -- I'm sorry.

16 Q    Are you including retirees?

17 A    I'm including all of the 700,000 residents of the citizen

18 of Detroit and if that includes retirees, yes, I'm including

19 them.

20 Q    Do you have any doubt that some of the retirees of the

21 City of Detroit live in the City of Detroit?

22 A    No, I do not.

23 Q    Okay.  Have you done any analysis in coming to the

24 conclusion that your proposal is in the best interests of the

25 city -- of the citizens of the City of Detroit including the

1  retirees?  Have you done any analysis of the amount that

2  Detroit retirees receive on average annually in pension?

3  A     Have I done?

4  Q     Yes.

5  A     No.

6  Q     Have you taken any steps to inform yourself as to that

7  question, what's the average annual pension of a Detroit

8  retiree?

9  A     Yes.

10  Q     Have you?  Okay.  And did you come -- did you learn the

11  answer?

12  A     I've seen ranges, but yes.

13  Q     Okay.  And what's the range?

14  A     The ranges have gone from 19,000, approximately 24,000,

15  to 35,000 or more.

16  Q     And do you know whether there's any federal or other

17  insurance that would cover retirees to which -- strike that.

18  Are you aware of whether there's any federal or other

19  insurance that would provide benefits to retirees in the event

20  that their accrued pension liabilities were impaired?

21  A     Yes.

22  Q     What -- there -- is it your belief there is insurance?

23  A     No, you asked me if I were aware.

24  Q     Okay.  And is there such insurance?

25  A     No.

1  Q    Okay.  Have you done any analysis to determine whether if

2  retirees, whether they're earning $18,000 a year in

3  retirement, or $24,000 a year, have you done any analysis

4  whether under your proposal to significantly cut their

5  pensions, have you done any analysis to determine whether

6  those retirees would be able to make ends meet in terms of

7  paying their mortgage, paying their rent, putting food on the

8  table, buying their medications, et cetera?  Have you done any

9  analysis?

10          MR. STEWART:  Objection.  Objection, Your Honor,

11  relevance.

12          MR. DECHIARA:  We think it --

13          THE COURT:  Objection is -- the objection is

14  sustained.

15          MR. DECHIARA:  I have nothing further, Your Honor.

16                    CROSS EXAMINATION

17  BY MS. LEVINE:

18  Q    For two more minutes.  Good morning, Mr. Orr.

19  A    Good morning, Ms. Levine.

20          MS. LEVINE:  Your Honor, Sharon Levine, Lowenstein,

21  Sandler for AFSCME.

22  Q    Mr. Orr, do you receive -- do you recall receiving a

23  request from Ed McNeil on behalf of AFSCME's Council 25 on --

24  actually let me go back.  You were -- your -- you first day of

25  work if you will as the emergency manager, was March 25?

1  A    Yes.

2  Q    Do you recall receiving a request from Ed McNeil on

3  behalf of AFSCME Council 25 on March 25 to meet with you on

4  behalf of not only himself, but -- but a coalition of 30 city

5  unions who had previously worked together with regard to

6  concessionary bargaining and wanted to work together with you?

7  A    Are you talking about proposed two year collective

8  bargaining agreement that was presented to me on the --

9  Q    No, no.  I guess I've already -- a question.  Did you get

10  a request?

11  A    That was presented to me on the 26th.

12  Q    Did you get a request?  Do you recall getting a request

13  from Ed McNeil on March -- on your first day of work, on March

14  25th asking you and inviting you to meet with him and the

15  coalition of unions to work together with regard to the -- to

16  solving Detroit's problems?

17  A    Are you talking about the request of Mr. McNeil said he

18  taped to the door?

19  Q    That's the one.

20  A    The one.  I recall that that was sent to someone on my

21  staff.  I recall the next day I also got another request.

22  Q    And did your respond by offering to set up a meeting?

23  A    I think I said I was willing to meet with anyone going

24  forward.

25  Q    No, no.  But they specifically asked you to schedule a

1  meeting with them and it's -- actually let me rephrase it.

2  Isn't it true that you actually never met with the coalition

3  of unions separate -- separate and apart from the meetings

4  that we've been -- or the presentations that we've previously

5  been discussing that occurred on the 4th, the big 4th, what

6  we'll call the big 4th?

7  A    Me personally?

8  Q    Yes.

9  A    Yeah, I believe that's true.

10  Q    All right.  Is it your position that you directed

11  somebody on your behalf to meet with the coalition separate

12  and apart from the June 14, June 20, July 10, and July 11

13  meetings with the coalition of unions?

14  A    Are we still talking about the request?

15  Q    The -- the question is, did you direct somebody on your

16  behalf to meet with the coalition of unions separate and apart

17  from the June 14, June 20, July 10, and July 11 presentations

18  prior to the filing of the bankruptcy petition on July 18th?

19  A    There were meetings with other CDA's.  I don't know

20  specifically the coalition.  The request that you're talking

21  about was a request to enter into collective bargaining which

22  has been suspended by 436.

23  Q    I'm going to try again.

24        THE COURT:  No.  We're going to take our lunch break

25  now.  And Mr. Shumaker, I have obviously been ineffective at

1  having the witness answer questions.  So I'm going to instruct

2  you to counsel with your client over this lunch break about

3  the absolute criticality of just answering the question.  Will

4  you do that, please?

5           MR. SHUMAKER:  I will do that, Your Honor.

6  A    I apologize, Your Honor.

7           THE COURT:  Mr. Orr, I will accept your apology, if

8  you accept my advice and your attorney's advice.

9  A    Yes, Your Honor.

10           THE COURT:  All right.  1:30.

11      (WITNESS KEVYN ORR WAS TEMPORARILY EXCUSED AT 12:00 P.M.)

12           THE CLERK:  All rise.  Court is in recess.

13      (Court in Recess at 12:00 p.m.; Resume at 1:30 p.m.)

14           THE CLERK:  All rise.  Court is in session.  Please

15  be seated.  Recalling case number 13-53846, the City of

16  Detroit, Michigan.

17           THE COURT:  It appears everyone's here.  You may

18  proceed.

19  BY MS. LEVINE:

20  Q    Good afternoon, Your Honor.  Mr. Orr.

21  A    Good afternoon, Ms. Levine.

22  Q    Going back to where we were right before we broke for

23  lunch.  So on March 25, 2013, you received a request from Ed

24  McNeil from AFSCME Michigan Council 25 to meet, correct?

25  A    Yes.

1  Q    And that request was on behalf of not only himself, but a

2  coalition of approximately 30 unions, correct?

3  A    I believe so.

4  Q    And in that request he indicated that the coalition of

5  unions had met previously including with Ernst and Young and

6  were -- had agreed to concessions that hadn't been imposed,

7  but they -- they wanted to continue that dialogue with you,

8  correct?

9  A    I don't recall the specifics of the request.

10  Q    Well, you received a copy of a letter which I believe you

11  described as being taped to your door?

12  A    Yes.

13  Q    And you gave that letter to somebody who worked for you

14  in order to respond, is that correct?

15  A    Yes.  I or a member of my staff.

16  Q    Okay.  And do you recall who you gave the letter to?

17  A    I do not.

18  Q    Did you meet with that coalition of unions?

19  A    Not to the best of my knowledge.

20  Q    Did anybody -- did you direct anybody to meet with that

21  coalition of unions prior to the time that you filed the

22  bankruptcy?

23  A    I don't recall.

24  Q    Well, isn't it true that there was no meeting between

25  anybody on behalf of the emergency manager and that coalition

1  of unions prior to the filing of the bankruptcy case?

2  A    I don't know.

3  Q    If you personally attended a meeting with the coalition

4  of unions, is that something you believe you would recall?

5  A    I might.

6  Q    Okay.  Besides the June 14 proposal, presentation,

7  between March 25 and June 18 -- I'm sorry, and June 13, you

8  were never personally in a room with anybody from AFSCME where

9  the topic of concessions, labor, pension, or health benefits

10  was discussed, correct?

11  A    I don't think so.

12  Q    And between March 25 and June 13th you had no telephone

13  calls with anybody from AFSCME where the topic of concessions,

14  labor, pension, or health benefits was discussed, correct?

15  A    I don't recall.

16  Q    Do you recall having those types of conversations by

17  telephone?

18  A    I don't recall.

19  Q    Between June 14 and July 18, other than attending the

20  presentation on June -- on June 14, you were never in the same

21  room with anybody from AFSCME where the proposal for creditors

22  was discussed, correct?

23  A    I don't recall.

24  Q    Between June 14 and July 18th, you did not participate in

25  any telephone calls with anybody from AFSCME where the

1  proposal for creditors was discussed, correct?

2  A    Not to the best of my recollection.

3  Q    At the June 14 presentation of the so-called proposal to

4  creditors, your team perhaps through counsel announced that

5  these were not negotiations, correct?

6  A    I believe so.

7  Q    Is it true that -- that your team also announced that

8  these were not negotiations at the June 20, July 9, and July

9  10 presentations?

10 A    I don't know.

11 Q    Okay.  So going back to when you were still at Jones, Day

12 and even before your -- your practice was primarily

13 bankruptcy, is that correct?

14 A    Yes, I think that's fair.

15 Q    So you're generally -- generally familiar with the

16 process for achieving labor concessions under 1113 of the

17 Bankruptcy Code?

18 A    Generally, yes.

19 Q    And it's your understanding that under 1113 there are

20 certain protections that are afforded unions that don't exist

21 for example, under Bankruptcy Code Section 365, is that

22 correct?

23 A    Generally, yes.

24 Q    And are you generally familiar with the process for

25 achieving concessions to retiree health benefits under

1  Bankruptcy Code Section 1114?

2  A    I'm -- I'm familiar with Section 1113 generally, yes.

3          THE COURT:  The last question was about Section

4  1114.

5  A    1114, yes, I am.

6  Q    And are you generally familiar with the process for

7  seeking a distressed termination of a single employer defined

8  benefit pension plan in the corporate context under Chapter

9  11?

10  A    Generally, yes.

11  Q    So generally under Bankruptcy Code, Section 1113 and

12  1114, in order to modify or get concessions with regard to

13  CVA's or retiree health, there are certain elements that the

14  case law deciphering 1113 has come up with, correct?

15  A    I believe so.

16  Q    And that would include presenting a proposal explaining

17  the concessions that are being requested, correct?

18  A    I believe there's a process under 1113.  I don't know if

19  it's that specific but generally, yes.

20  Q    And does that process also include having the proposal be

21  based on complete reliable information?

22          MR. STEWART:  Objection, Your Honor, it calls for a

23  legal conclusion.

24  Q    Is it your understanding that under 1113 and 1114 the

25  process for seeking concessions under -- under collective

1  bargaining agreements and retiree health requires that the

2  proposal be based on complete and reliable information?

3  A    I think the statute speaks for itself.

4  Q    I'm asking your understanding, Mr. Orr.

5  A    I don't know.

6  Q    Is it your understanding that under 1113 and 1114 the

7  proposal needs to be fair and equitable?

8  A    Yes.

9  Q    And is it your understanding that under 1114 and 1113

10  there have to be good faith negotiations?

11  A    Yes.

12  Q    Are you aware that AFSCME made information requests both

13  through Ed McMahon (sic) and Steve Kreisberg requesting

14  additional information following the June 14 proposal?

15  A    No.

16  Q    Do you know whether or not all of the information

17  requests made from various constituencies were responded to in

18  the ordinary course between June 14, but prior to the filing

19  of the bankruptcy case?

20  A    No.

21  Q    Okay.  During the time that you were at Jones, Day,

22  Jones, Day was debtor's counsel in Chrysler, correct?

23  A    Yes.

24  Q    And isn't it true in Chrysler that vested pension

25  benefits survived even though creditors were adjusted?

1  A    Yes.

2  Q    And isn't it true that Jones, Day represent –- was

3  conflicts counsel in AbitiBowater and vested –- vested pension

4  benefits survived even though creditor claims were –- were

5  compromised?

6  A    I don't know.

7  Q    And isn't it true that in AES Eastern Energy, Jones, Day

8  represented a committee of certificate holders where the

9  pension, vested pension benefits survived, but the claims of

10 creditors were adjusted?

11 A    I don't know.

12 Q    And isn't it true that Jones, Day represented the debtor

13 in Dana where the pension, vested pension benefits survived

14 and the claims of creditors were adjusted?

15         MR. STEWART:  Objection, relevance.

16         MS. LEVINE:  Your Honor, it goes to good faith

17 negotiations with regard to whether or not we can actually

18 have a situation where vested pension benefits survive and you

19 can adjust the claims of creditors to successfully go through

20 a bankruptcy process.

21         THE COURT:  Well, the problem is that not only is

22 every case different, but of course Chapter 11 is different

23 from Chapter 9.  So the objection is sustained.

24 Q    Well, Mr. Orr, unlike Chapter 11, in all of those cases

25 where if the pensions had been terminated the retirees would

1  have had the benefit of a PBGC.  Isn't it true that under

2  Chapter 9 there is no similar insurance protection?

3  A    It is true that under Chapter 9 there's no protection by

4  PBGC.

5  Q    And isn't it true that the current protection provided by

6  the PBGC now is over $57,000 a year?

7  A    I don't know.

8  Q    Well, assuming for the moment that it is over $57,000 a

9  year.  Isn't it true that all of the retirees who received

10  pension benefits in -- from Detroit would fall within the PBGC

11  protections if that protection existed in municipal

12  situations?

13          MR. STEWART:  Objection, calls for speculation.

14          THE COURT:  That objection is overruled.  Please

15  answer if you can.

16  A    I don't know.

17  Q    Mr. Orr, is it your understanding that to the extent

18  pension benefits are cut, the individual retirees will become

19  unsecured creditors?

20  A    Yes.

21  Q    So then is it your understanding that to the extent

22  retiree pension benefits are cut, the individual retirees

23  would share in the $2,000,000,000 note that's -- that exists

24  under the currently existing proposal for creditors?

25  A    Yes.

1  Q    So is it your understanding then that the individual

2  retirees would have to file proofs of claim in order to assert

3  their claims in this bankruptcy case?

4  A    I don't know.

5  Q    Well, how would they -- how would you know the dollar

6  amount of the claims of the individual retirees in order to

7  determine what their pro rata share is under the

8  $2,000,000,000 note?

9  A    I don't know how to answer your question.

10 Q    Prior to the time that Detroit filed for bankruptcy, did

11 the retirement system discontinue paying pension benefits?

12 A    Prior to the time?

13 Q    Uh-huh.

14 A    No, I don't think so.

15 Q    And in fact as we sit here today, they continue to make

16 the pension benefits payments, correct?

17 A    Yes.

18 Q    Anywhere in the proposal for creditors, Exhibit 43 or

19 Exhibit 44, is there a chart or explanation that an individual

20 retiree can look at to know exactly what their benefit would

21 be if in fact the proposal for creditors were implemented?

22 A    No, I don't think so.

23 Q    Mr. Orr, there was some press coverage that seemed to

24 imply that you were considering or would consider a

25 restructuring or a plan of adjustment that would include

 1  freezing pension benefits.  Is that under consideration by

 2  you?

 3          THE COURT:  Excuse me, are you talking about now?

 4          MS. LEVINE:  I'm talking about now.

 5          MR. STEWART:  Objection, relevance, Your Honor.

 6          MS. LEVINE:  Well, then I'm going to ask the next

 7  question.

 8          THE COURT:  I'm sorry then what?

 9          MS. LEVINE:  Then I'm going to ask him whether he

10  considered it before July 19th, Your Honor.

11          THE COURT:  You may ask that question.

12  Q    Are -- are you considering it now?

13          THE COURT:  Well, I'm sorry, my ruling was you can

14  ask about his intent as of July, but --

15          MS. LEVINE:  Your Honor --

16          THE COURT:  But what's the relevance of that now?

17          MS. LEVINE:  Your Honor, it goes in part to the --

18  to the discussion that we've been having or the arguments that

19  we've been making with regard to good faith.  We had a month

20  and three days in order to negotiate prior to the bankruptcy.

21  If all we had were no real negotiations just presentations,

22  and no opportunity to have a dialogue with regard to some of

23  these issues and they are in fact being considered now, then

24  why weren't they considered then.

25          THE COURT:  No.  I'm going to sustain the objection.

1  Q     Mr. Orr, did you consider freezing the pensions prior to

2  July 19th?

3  A     Yes.

4  Q     And in connection with that consideration, did you talk

5  at all to the -- with the Governor about the state providing

6  support to the extent it was necessary in order to fund any

7  shortfall to effectuate a freezing?

8  A     I don't recall.

9  Q     In the Governor's testimony before this Court, with

10  regard to being questioned on vested pension benefits, he

11  responded, if the Court ordered you had to pay them, you would

12  pay them.

13        So in other words it appeared that the Governor was

14  saying that if in fact the Court directed that he pay whatever

15  was necessary in order to keep the vested pension benefits

16  from being impaired or diminished he would pay that.  Have you

17  had conversations with the Governor prior to July 19th in that

18  regard?

19  A     No.

20  Q     From January 2012, but prior to being retained by the

21  city, did your firm -- did your prior firm provide services to

22  the Governor?

23  A     I don't know.

24  Q     Did they provide services to the state?

25  A     I don't know.

1  Q    Did they provide services to anybody affiliated with the

2  Governor or the state?

3  A    I don't know.

4  Q    Did you run a conflict search before you took the

5  position as emergency manager?

6  A    No, I resigned from my firm.

7  Q    And do you know whether or not your firm ran a conflict

8  search before being retained as counsel to the city in these

9  proceedings?

10 A    I recused myself from the retention process, I don't

11 know.

12 Q    Prior to July 19, did you or did anybody on your behalf

13 if you didn't do it personally, or on behalf of the City of

14 Detroit, ask the Governor or anybody associated with the

15 Governor, for funding to avoid impairing or diminishing vested

16 pension benefits?

17            MR. STEWART:  Objection, foundation.

18            THE COURT:  What foundation is missing?

19            MR. STEWART:  Well, she asked for whether Mr. Orr,

20 any of his staff, or anyone else asked the Governor.  This

21 witness can only testify as to what he knew.

22            MS. LEVINE:  I'll -- I'll rephrase, Your Honor.

23 There was a on his behalf in there, but it may have gotten

24 lost for the record.

25 Q    As we sit here today, have you or has anybody on your

1  behalf, or anybody on behalf of the City of Detroit who -- who

2  responds to you, ask the Governor, or anybody affiliated with

3  the state, for funding to avoid impairing or diminishing

4  vested pension benefits, outside of any request that may have

5  been made through mediation?

6  A    I don't know.

7  Q    Well, we've heard the Governor testify and we've seen in

8  the press that the Governor's view seems to be that Detroit

9  has to handle Detroit's own problems.  Are you familiar with

10  that press?

11  A    Yes.

12  Q    Is that consistent with your conversations with the

13  Governor?

14  A    Yes.

15  Q    And we've heard both you and the Governor speak about the

16  fact that you serve at the pleasure of the Governor, correct?

17  A    Yes.

18  Q    At any time between July 15th and -- or July 14th and July

19  18th, did you ever feel that your job was in jeopardy?

20  A    Not at all.

21          MS. LEVINE:  No further questions.  Thank you.

22  A    Thank you.

23          THE COURT:  Who is next?

24                          CROSS EXAMINATION

25  BY MS. GREEN:

1  Q    Good afternoon, Mr. Orr.  Jennifer Green on behalf of the

2  retirement systems for the City of Detroit.

3  A    Good afternoon, Ms. Green.

4  Q    We've met on a few occasions at your prior deposition.

5  A    Yes, we have.

6  Q    I want to follow up on a question, something you stated a

7  second ago.  Why did you tell Christie's to go away in May of

8  2013?

9  A    We were immediately trying to assess a number of

10  different things and I felt that that wasn't as high a

11  priority as getting a real view of the financial condition of

12  the city.  And I didn't think it was ready to be assessed yet.

13  Q    And you changed your mind as of August 5th when I believe

14  they were retained, correct?

15  A    Approximately around that time.

16  Q    I'd like to draw your attention to Exhibit 865 if I may.

17  Do you have the appropriate witness binder or would you like

18  to see it on the screen?

19  A    I'll find it.

20       MR. STEWART:  State exhibit, retirees?  The exhibit

21  retiree committee.

22  Q    If you're okay with the screen, we can do the screen as

23  you have been.  I just wanted to verify.

24  A    I'll do the screen.

25  Q    Okay.  Do you recognize that email, Mr. Orr?

1  A     Yes.

2  Q     And it's dated February 11th, 2013?

3  A     Yes.

4  Q     And you were still a Jones, Day partner at this time?

5  A     Yes.

6  Q     When exactly did you resign from Jones, Day?

7  A     I resigned effective Friday, March 15th.

8  Q     If I may draw your attention to the first paragraph.  It

9  -- it talks about preparation -- well, I assume that's what

10 the abbreviation prep stands for, correct?

11 A     Uh-huh.

12 Q     Prep for EM appointment is important.  Ideally we would

13 like to plan for orderly transition to EM, whoever it is, not

14 a splash landing.  Does that -- do you remember getting this

15 email?

16 A     Yes.

17 Q     And the second paragraph talks about I am not sure the

18 state, Dillon, Baird, Governor, are really thinking on an

19 operational and practical level.  Do you see that part?

20 A     Yes.

21 Q     Further down there's a paragraph that states, it would be

22 a better process if the firm is on the ground working,

23 preparing and coming up with a well thought out game plan

24 before EM is appointed.  Do you see that portion?

25 A     Yes.

1  Q    At this time you were not yet appointed emergency

2  manager, correct?

3  A    Correct.

4  Q    At the bottom of the page, there is discussion about J.B.

5  should be there to make sure EM and process works.  Question,

6  maybe how does state get city and us six to eight weeks before

7  appointment if possible.  So my question for you is, was

8  Jones, Day already working on this case before your official

9  appointment six weeks later?

10  A    Not to the best of my knowledge.

11  Q    As of your appointment in March your public contract

12  states that your salary is $275,000, correct?

13  A    Yes.

14  Q    Are there any supplements or bonus payments associated

15  with that contract?

16  A    No.

17  Q    I'd like to direct your attention to Exhibit 807.  Do you

18  recognize this email, Mr. Orr?

19  A    Yes.

20  Q    Bullet point 2 talks about your contract period not to

21  exceed 18 months with incentives if job is completed sooner

22  based on mutually agreed milestones.  The next bullet point

23  talks about an intent to raise private funding for performance

24  measure outcome bonus.  And this is before -- this is a month

25  before you were appointed?

 1   A     Yes.

 2   Q     Was there ever an incentive bonus included in your

 3   compensation package?

 4   A     No.

 5   Q     After you were appointed, was there any change to your

 6   contract?

 7   A     No.

 8   Q     Was there ever a request made from a state fund to have a

 9   performance bonus included with your contract?

10   A     No.  This is the only time it was mentioned, I let it

11   drop.

12   Q     You were never sent a letter in April of 2013 relating to

13   a -- a performance bonus?

14   A     I don't recall.

15   Q     You are familiar with the NERD fund, I think we've talked

16   about it a few times?

17   A     I have heard what I read in the paper.

18   Q     This is not in our witness binder.  I will give you a

19   copy.

20            THE COURT:  Not in the exhibit binder.

21            MS. GREEN:  It is not in the exhibit binder, Your

22   Honor.  We received it on Friday afternoon with the latest

23   production from the city and the state.  So I apologize it's

24   not in our binder.

25            THE COURT:  Yes, is there an exhibit number on it?

1        MS. GREEN:  It will be 869.

2        THE COURT:  Okay.

3   Q    Do you recognize the letter dated April 12ᵗʰ, 2013?

4   A    No.

5   Q    You were never sent a letter discussing an early out

6   provision incentive payment in addition to your regular

7   compensation?

8   A    No.

9   Q    And there has been no discussion or contract -- contract

10  executed where you would get an early payment bonus if you

11  completed your emergency manager goals before the 18 months is

12  completed?

13  A    No.

14  Q    I'd like to draw your attention now to Exhibit 853.  For

15  starters Mr. Orr, do you -- do you recognize this email dated

16  January 28ᵗʰ, 2013?

17  A    I don't recall specifically but I see that I was one of

18  the addressees.

19  Q    For starters, what is Detroit News?

20  A    I think that's a -- I don't know.

21  Q    Have you ever heard the phrase project Detroit used

22  internally at Jones, Day?

23  A    Yes.

24  Q    Is it -- is it perhaps a play on the French pronunciation

25  of Detroit?

1  A    It might well be, I don't know for sure.

2  Q    So this email is relating to the City of Detroit.  At the

3  bottom I'd like to draw your attention to Paragraph 4.  June

4  -- I'm sorry, January 28th was the day before you pitched your

5  services to the State of Michigan and the City of Detroit,

6  correct?

7  A    Yes.

8  Q    At the bottom there, the discussion about avoiding

9  pitfalls of alienating the state, e.g. if something happens to

10 city's pension, state will probably step up to deal with, but

11 thus far has failed to concede this point at all.  Do you

12 recall any discussion about trying to side step this issue in

13 your pitch to the state and city officials?

14 A    No.

15 Q    In your pitch to the state and to the city, was this

16 issue of seeking contributions from the State of Michigan ever

17 raised?

18 A    Not that I recall.

19 Q    And when was the first time that after you became

20 emergency manager the issue of potentially seeking

21 contributions from the State of Michigan was -- was raised?

22 A    I don't recall.

23 Q    Yesterday you were asked to answer whether under PA436

24 you believed you had the authority to impair pensions.  Do you

25 recall that question?

1  A    Yes.

2  Q    I believe your response was, that you felt it called for

3  a legal conclusion?

4  A    Yes.

5  Q    Do you recall being asked the same question following

6  your June 14th meeting where you laid out the proposal for

7  creditors?

8  A    Generally, yes.

9  Q    Do you recall what your response was?

10  A    No, I don't.

11  Q    Can you pull up the part number 1?  I'm going to ask you

12  if you've -- if this refreshes your recollection.

13  A    Uh-huh.

14  Q    To what your response was at the time.

15       (Video Being Played at 1:57 p.m.; Concluded at 1:58 p.m.)

16  Q    Do you recall answering the question in that manner on

17  June 14th?

18  A    That was a press event after the meeting.  I might well

19  have said that, I don't recall specifically.

20  Q    Assuming that's what you said --

21  A    Uh-huh.

22  Q    By legislative relief, did you mean a constitutional

23  amendment?

24  A    I don't recall.

25  Q    Did you mean legislative relief in the form of

1 contributions from the State of Michigan?

2 A    No, I don't recall.

3 Q    You don't recall one way or the other what you meant?

4 A    I -- I don't recall one way or the other.

5 Q    You would agree with me though that this response is

6 different than the response you gave yesterday?

7 A    No.

8 Q    How so?

9 A    Well, I think this response I was saying that you can

10 negotiate which is what I think I said yesterday.  Read it

11 back.  I think this one said legislation.  I think yesterday I

12 also said that discussion was in the context of federal

13 supremacy.  And I'll stand by those statements.

14 Q    Was there any discussion following this statement as to

15 whether you should continue to make such statements regarding

16 the need for legislative relief in the face of the pensions

17 clause?

18 A    No.

19 Q    Were you ever advised that you should not state in the

20 future that legislative relief would be necessary if there was

21 not a consensual agreement?

22 A    No.

23 Q    Mr. Orr, did you have any involvement in the creation of

24 the pension task force?

25 A    Yes.

1   Q     How so?

2   A     Everything that's done under the aegis of 436 and the

3   efforts that we're making in the city is done under my

4   authority, so I suppose I had some involvement.

5   Q     And am I understanding it correctly that the pension task

6   force consists of attorneys from Miller, Canfield, attorneys

7   from Jones, Day, and then certain other financial advisors,

8   correct?

9   A     Financial and operational advisors, yes.

10  Q     Okay.  And when was it created?

11  A     I don't know.

12  Q     Was it in place before you became emergency manager?

13  A     Not to the best of my knowledge.

14  Q     Okay.  And -- and who created it specifically?  Was it

15  you under PA436?

16  A     I don't recall.

17  Q     Who else, if I may ask, would have the authority to

18  create a pension task force if it wasn't you?

19  A     As part of the financial stability agreement and the

20  memorandum of understanding, both of which were entered into

21  in 2012, there were certain tasks that were to be undertaken

22  at that point.  The task force itself as you're referencing

23  may have begun at that process.

24        Since Jones, Day got involved further in 2013, there may

25  have been other attorneys added to that task force, but the

1  MOU of November 2012 speaks to certain tasks that Milliman,

2  Miller -- Miller, Canfield, Conway, MacKenzie, E & Y, are

3  supposed to undertake.

4  Q    And what was the purpose of the pension task force?

5  A    I don't know.

6  Q    Well, who does it report to?

7  A    Well, it now reports to me.

8  Q    But you don't know the purpose of it?

9  A    Well, the purpose as spelled out in the MOU was to

10 examine certain pension issues.  But you asked me what was the

11 purpose of the task force as far as I understand it.  It's

12 what it does for me now.

13 Q    Okay.  So what does it do for you now?

14 A    It -- it analyzes and reports to me different issues

15 regarding the city's pension obligations.

16 Q    Have there been any findings, written reports,

17 memorandums, anything like that --

18 A    Yes.

19 Q    -- created by the pension task force?

20 A    The task force or members of the task force.

21 Q    Have those documents been produced in this litigation?

22 A    I don't know.

23 Q    And no one from either of the two retirement systems was

24 asked to participate in the pension task force, correct?

25 A    I don't know.

1  Q    Well, did you personally ask anyone from any of the

2  retirement systems to participate in the task force?

3  A    No.

4  Q    And no one from any of the retiree associations or active

5  employee associations were asked to join this pension task

6  force, correct?

7  A    I don't know.

8  Q    And no one from the unions were asked to join the pension

9  task force?

10  A    I don't know.

11  Q    But you don't know, or you did not do it?

12  A    I did not ask them.

13  Q    Okay.  Would anyone else have authority to be asking

14  people to join the pension task force?

15  A    Yes.

16  Q    Who would that be?

17  A    The people that were tasked, I think, under the MOU in

18  2012 and members of my staff whether they joined it or asked

19  them to participate would be authorized to solicit information

20  from other parties.

21  Q    But to your knowledge none of those people reached out to

22  any of the people I just listed, the retirement systems active

23  employees, retirees, or unions to join the pension task force,

24  correct?

25  A    I don't know.

1  Q    And this task force was not -- the existence of the task

2  force was not made public until the bankruptcy filing,

3  correct?

4  A    I don't know if that's true.

5  Q    Did the pension task force ever approach the retirement

6  systems to discuss any creative options relating to the design

7  of the pension plans or any cash flow changes that could be

8  made to resolve under funding problems?

9  A    I don't know.

10  Q    Yesterday I believe you stated that with respect to your

11  -- or I'm going to call them commercial creditors.  You said

12  that you followed all the notice provisions in the loan

13  documents and you sent notices of the June 14th meeting,

14  correct?

15  A    Yeah.  I said that we followed -- followed notice

16  provisions, sent notices to all record holders or their

17  agents, and also received telephone calls and other requests.

18  Q    Did you do the same thing with any active employees or

19  retirees?

20  A    I believe we reached out to -- I -- I don't know for

21  sure.

22  Q    Okay.  Let's talk about what attempts if any you made to

23  mobilize the actives or the retirees.

24  A    Uh-huh.

25  Q    Did you or anyone on your team make phone calls to each

1  individual?

2  A    To each individual active employee?

3  Q    Or retiree.

4  A    No, not that I know of.

5  Q    Did you reach out by mail, write letters, things of that

6  nature?

7  A    To the actives I believe we reached out.  There certainly

8  -- there are actives on my staff so they would have been

9  aware.  There are actives that are working with the

10  consultants, so they would have been aware.  To the retirees,

11  we asked certain bargaining units, unions to represent them

12  and they declined.

13  Q    My question was, did you reach out directly to any of the

14  retirees before the June 10th or June 14th meetings?

15  A    I don't know.  I don't recall.

16  Q    Did you post any public notices in newspapers or

17  advertise on television that there were these meetings coming

18  up?

19  A    I don't recall.

20  Q    Did you set up a web site where you could communicate

21  directly with any of the retirees or actives?

22  A    We have a web site in the city.  Whether or not that's of

23  the type you're talking about to communicate directly, you

24  have to examine the web site.

25  Q    I have.

1  A    Okay.

2  Q    I did not see anything.  It's your web site.  Do you have

3  anything on that web site that you believe enabled you to

4  directly communicate with actives or retirees?

5  A    Yes, I think I do, yeah.

6  Q    Okay.  Did you use anything on your web site before the

7  June 14th and June 10th meetings to reach out directly to any of

8  the actives or retirees?

9  A    Not that I recall.

10  Q    Okay.  Did you mail a copy of your proposal for creditors

11  to all of the -- or any of the actives or the retirees?

12  A    I don't know.

13  Q    You -- you do have a list of all those names though,

14  don't you?

15  A    We believe we have a list of all active employees.  I

16  would think that we would have a list of all retirees.  I know

17  we asked for some help in compiling that list, but they're our

18  list.

19  Q    And if you needed those identities there were places you

20  could look and people you could ask for that information,

21  correct?

22  A    We did ask.

23  Q    And you -- you never attempted to develop sub groups of

24  these retirees so that you could negotiate with them directly,

25  correct before the bankruptcy?

1  A    I don't know.

2  Q    Are you familiar with anyone else on your staff being

3  tasked with breaking up the group of retirees into smaller

4  groups to be able to negotiate with smaller groups directly?

5  A    Yes.

6  Q    Okay.  Who on your staff was responsible for that?

7  A    There are members both on the legal team and on the

8  actuarial as well as the -- well, principally that would have

9  been -- probably members on the legal team.

10  Q    And who would those individuals be that were tasked with

11  breaking the retiree groups into smaller sub sections?

12  A    That would have been led by the -- probably Evan Miller

13  at Jones, Day.

14  Q    And when did these smaller sub group negotiations, or

15  alleged negotiations take place?

16  A    I don't know.

17  Q    Are there any documents that actually reflect that

18  smaller sub groups were created for the purpose of

19  negotiating?

20  A    I -- I don't know.

21  Q    Have any documents been -- been produced in this case

22  that show that actual sub groups had been developed?

23  A    A lot of documents have been produced.  There may well

24  have been.  I don't know for sure.

25  Q    Are you familiar with any such documents?

1  A    I wasn't involved in the document production, no.

2  Q    Are you familiar with testimony on Friday that there was

3  no attempt made to create smaller sub groups of retirees?

4  A    No, I'm not familiar with that testimony.

5  Q    If it was from Mr. Buckfire who was your lead negotiator

6  for your financial advisory team, would it surprise you to

7  hear him saying that there had been no group, smaller sub

8  group developed?

9  A    No.  Mr. Buckfire may have not have been involved in all

10  aspects of it.

11  Q    Okay.  So it's your testimony the Jones, Day lawyer was

12  tasked with breaking out smaller sub sections and negotiating

13  directly?

14  A    It's my testimony that they could have been.  I don't

15  recall specifically the timing or the sub groups as you're

16  characterizing it.

17  Q    Okay.  So if we ask the retirees that are testifying next

18  week if anyone contacted them for the purpose of breaking into

19  smaller sections so that they could be negotiated with

20  directly, we're going to expect to hear that yes, Evan Miller

21  contacted me to negotiate?

22        MR. STEWART:  Objection, Your Honor, calls for

23  speculation.

24        THE COURT:  Sustained.

25  Q    What specific strategies other than this apparent sub

1  group that you've formulated, did you come up with to overcome

2  what was the perceived impractical nature of directly dealing

3  with large groups of people?

4  A    Can you impact that question a little bit?

5  Q    What specific strategies did you come up with to try to

6  overcome any perceived difficulty with negotiating with large

7  numbers of people, list them?

8  A    Related to retirees?

9  Q    Yes.

10  A    Okay.  Because your question said, as you did, we asked

11  for a retiree committee in bankruptcy.  You're talking about

12  before?

13  Q    Before bankruptcy.

14  A    Before bankruptcy.  We had made requests from certain of

15  the bargaining units to represent retirees.  I have certainly

16  met with I believe the Police and Fire Retiree Association.

17  Q    Okay.  Would that be the sum total of what you did?

18  A    It may not be.  Many of my consultants meet with

19  different groups all the time.  And sometimes I'm not aware of

20  all meetings.

21  Q    We talked a little bit about the pension task force.  Was

22  there a negotiations task force that was put together by your

23  team?

24  A    By my team?

25  Q    Yes.

1  A    I would think the entire effort was a negotiations task

2  force.

3  Q    But there was no specific committee on your team dealing

4  with how to tackle the problem of the retirees that needed to

5  be negotiated with, correct?

6  A    My team and consultants worked together collaboratively.

7  Whether or not that's called a task force as a proper noun, is

8  a different question.

9  Q    Well you had names for your teams.  I'm asking was there

10 an official team dedicated to negotiating with retirees?  Yes

11 or no?

12 A    Not -- I don't know.  Not that I'm aware of.

13 Q    The June 10th, June 14th, and June 20th presentations, I

14 believe we're all in agreement now were purely informational.

15 I believe that's what you've said between yesterday and today,

16 correct?

17 A    Generally, yes.

18 Q    In the June 10th time frame, you held the -- the public

19 meeting at Wayne State, correct?

20 A    Yes.

21 Q    And that was as I believe you testified kind of the

22 ground work and you were laying the foundation for the

23 negotiations that you expected to occur in the following

24 weeks?

25 A    No.  I think what I testified to was that the June 10th

1  meeting was required as a public meeting within 30 days of my

2  May 12th report.

3  Q    You may have said that.  At some point you agree with me

4  that that was your first public meeting and you were trying to

5  set the foundation for what was to occur?  Maybe I'm

6  mischaracterizing slightly, but it's the gist of what I got

7  from what you said yesterday.

8  A    Well, I -- I can't be responsible for the gist of what

9  you got.  What I said was, the June 10th meeting was required

10  by 436 within 30 days of the May 12th report.  There were many

11  things that were done at that meeting, but what I was trying

12  to relay yesterday was I was meeting my statutory obligations

13  under 436.

14  Q    Okay.  Do you remember at that June 10th meeting that it

15  was video taped?

16  A    Yes.

17  Q    And in fact you've posted these videos on your emergency

18  manager web site, correct?

19  A    Yes.

20  Q    Do you recall being asked a question by a retiree at the

21  June 10th meeting about what to expect to happen to their

22  pension funds?

23  A    I don't recall a specific question, but you're welcome to

24  show it to me.

25  Q    I will do that.

1      (Video Being Played at 2:12 p.m.; Concluded at 2:14 p.m.)

2  Q    So on June 10th when asked by a retiree what was to happen

3  to their pension benefits, you said they were sacrosanct and

4  they could not be touched, correct?

5  A    I think there was more to that clip.

6  Q    I'm only asking about that part.  I -- we can keep

7  playing it.  You say except OPEB's are different.  Is that --

8  did that refresh your recollection of what you followed

9  that --

10 A    No.  I mean the entire clip.  I think there were multiple

11 questions, but that clip speaks for itself, yes.

12 Q    Okay.  So on June 10th you told retirees at the June 10th

13 meeting that their pensions were sacrosanct and they couldn't

14 be touched.  And four days later you held the proposal for

15 creditors meeting.

16      And at that time you produced a 135 page proposal and I

17 believe we've shown it up on the screen a few times Page 109

18 where you say significant cuts will have to be taken.  Did you

19 invite all the same retirees to the second meeting and then

20 explain to them that what they may have heard at the June 10th

21 meeting was now being changed?

22 A    I don't know.

23 Q    Well, did you correct any misunderstanding out there

24 where retirees thought their pension obligations were indeed

25 sacrosanct and safe?

1   A    I may well have.

2   Q    So you told them no cuts.  Four days later you said cuts.

3   And that was on June 14th.  And the time line that you laid out

4   on your proposal for creditors slated June 17th through July

5   12th as the initial discussion round, correct?

6   A    It is whatever it is in the document, yes.

7   Q    We've looked at it a few times.  I won't bother pulling

8   it up again.  So on the 14th you -- you did state there had to

9   be cuts.  And three days later the negotiations were to

10  commence, correct?

11  A    Yes, generally.

12  Q    Okay.  And the data room wasn't live until June 20th,

13  right?

14  A    I don't know.

15  Q    If other people have testified June 20th, does that sound

16  about correct?

17  A    That -- that would not surprise me.  I don't know the

18  exact date.

19  Q    And as of the 20th the data room was not fully populated

20  with the -- with the data, right?

21  A    I don't know.  I wasn't populating the data room.

22  Q    And if other people testified that it was not fully

23  populated would that --

24  A    That would not surprise me.

25  Q    Okay.  So three days into the initial round of

1  discussions with all the stakeholders, the documents were

2  still not up?  You gave a proposal for creditors that changed

3  information that you had said at the public meeting on the

4  10th.  And you did not give a copy of this proposal for

5  creditors to all of the retirees, correct?

6  A    Not necessarily, Ms. Green.

7  Q    Okay.  When was the first time that you realized Chapter

8  9 was going to be necessary to cut the pension benefits?

9  A    I don't know if I realized Chapter 9 was going to be

10 necessary just to cut the pension benefits.

11 Q    Did you know it before you said on the 10th that pension

12 benefits could not be touched?

13 A    I think you're taking that quote out of context, but let

14 me respond this way.  The 10th and 14th, we were negotiating

15 with Bammel.  We thought that was going to spur other

16 settlements and other negotiations.  I had made no conclusion

17 regarding Chapter 9 at that point.

18 Q    Well, isn't it true you were being advised by your

19 financial advisors that Chapter 9 was necessary?

20 A    Chapter 9 had been discussed since 2005, Ms. Green.

21 Q    Can we look at Exhibit 870, please?  You were in contact

22 with your financial advisors continuously throughout this

23 period, correct, Mr. Orr?

24 A    Yes.

25 Q    And Chuck Moore is one of your financial advisors?

1  A    Yes.

2  Q    And he's on the pension task force?

3  A    Yes.

4          MR. STEWART:  Counsel, could I get a copy of that

5  document?  I don't think we have it.

6          MS. GREEN:  Oh, this was just -- I'm sorry, Your

7  Honor.  This was produced on Friday as well.  And we do have

8  extra copies for the Court today.

9  Q    Do you recognize this email?

10  A    Is it in here?

11  Q    It should be on the screen.

12  A    Okay.  Okay.  Thank you.

13  Q    Do you recognize this email dated June 7th, 2013?

14          THE COURT:  Do you have a number for this?

15          MS. GREEN:  It's 870, Your Honor.

16          THE COURT:  Thank you.

17  A    Yes.

18  Q    And at the bottom of that email it's -- it's a whole

19  string and there's an email from Chuck Moore at Conway,

20  MacKenzie dated 6-5-2013?

21  A    Yes.

22  Q    And it's an email to you, correct?

23  A    Yes.

24  Q    Discussing a lengthy call with Milliman this afternoon?

25  A    Yes.

1  Q    And you received this -- this email, right?

2  A    Yes, I believe so.

3  Q    On the second page there are numbered paragraphs.  I'd

4  like to call your attention to Paragraph 3.  Just above it

5  it's talking about under funding liability.

6       And it states, we anticipate a significant reduction and

7  already accrued benefits will be required in order to get

8  required contributions to the level of available cash to

9  service the UAAL.  It appears this may only be possible in a

10 Chapter 9 proceeding.

11 A    Yes.

12 Q    Do you -- do you recall receiving that portion of the

13 email?

14 A    Yes.

15 Q    And this was on June 5th?

16 A    It's dated June 5th, so I assume I received it around

17 then, yes.

18 Q    But on the meeting of June 10th you responded to questions

19 regarding the pension benefits and you stated that they could

20 not be touched?

21 A    In the clip that you showed, yes.

22 Q    So did you knowingly give misinformation to the retirees

23 that were asking questions on the 10th?

24 A    No.

25 Q    I believe that you testified earlier that Ernst and

1  Young, Miller, Buckfire, and Conway, MacKenzie had all been

2  engaged by the city prior to your arrival, correct?

3  A    Yes.

4  Q    And they were working since 2012 putting all the

5  financial data together, correct?

6  A    I believe Ernst and Young was engaged in 2012.  The

7  others may have begun work either at the end of December 2012,

8  or the beginning of 2013.

9  Q    And all of their work culminated with this proposal for

10  creditors that you laid out in the middle of June?

11  A    Yes.

12  Q    So that took your team of three financial advisor firms,

13  yourself, and whomever else you had working on it, several

14  months, five, six months all together, maybe longer?

15  A    I believe they met in 2013 and began to come up with

16  concepts and it culminated in this document.  But if that's

17  your supposition, yes.

18  Q    Okay.  And yet the time frame that you laid out for the

19  initial rounds of discussions with the relevant stakeholders

20  lasted from June 17th to July 12th, right, just a three week

21  period?

22  A    July 19th, but yes.

23  Q    And the evaluation period that you set forth in your

24  proposal for creditors was July 15th through the 19th, right?

25  A    Yes.

1  Q    I think you stated earlier that the pre-petition lawsuits

2  helped force the bankruptcy filing, correct?

3  A    I think I said either on September 16th, or yesterday, or

4  the day before, that we were getting ready to lose control,

5  that those lawsuits were creating concerns, yes.

6  Q    Okay.  And I believe you said that at first you ignored

7  the -- the lawsuits that were filed?

8  A    Yes.

9  Q    How long did you ignore them for?

10 A    Almost three weeks.

11 Q    Okay.  You were asked yesterday if you were aware of any

12 hearings that were scheduled in State Court lawsuits as of the

13 time that you sent your letter on the 16th?

14 A    Yes.

15 Q    And you stated that at time you were unaware of any

16 hearings in the State Court litigation?  The 16th.

17 A    I don't -- yeah.  I don't know if as of the 16th.  I don't

18 -- I don't recall when I became aware.  There were hearings

19 scheduled for the following week.  I may not have known as of

20 the 16th.

21 Q    What about the 18th when you filed the petition?

22 A    I think by the 18th, I knew there were hearings scheduled

23 for the following week.

24 Q    You said earlier that you were concerned that one of

25 these lawsuits could impact your ability or would undermine

1  your authority under PA436 to get your job done, something to

2  that effect.  Do you recall that from this morning?

3  A    Yes.

4  Q    What authority under PA –– PA436 did you think was going

5  to be undermined?

6  A    All of my authority.

7  Q    And in fact you expected these lawsuits, didn't you?

8  Let's call up Exhibit 403.  Do you recognize this email from

9  January of 2013?

10  A    Yes.

11  Q    And isn't it true that at that time you were observing

12  that there were already reports that "opponents of the prior

13  law are already lining up to challenge this law"?

14  A    Yes.

15  Q    So as of January before you even were appointed emergency

16  manager, you expected a legal battle forthcoming, correct?

17  A    Not of the nature you're talking about, but yes, I

18  expected that there were challenges because that's what I

19  read.

20  Q    Well, and to be clear the State Court lawsuits were

21  challenges to PA436 and your authority thereunder, correct?

22  A    Yes.  But I don't want to mislead you.  This is talking

23  about lawsuits to PA436.  I wasn't expecting injunctions, I

24  was expecting more lawsuits in the nature of declaratory

25  judgments and the like.

1    So the specifics of the lawsuit, I wasn't talking about

2 in here.  But I was expecting challenges because that's what

3 was being talked about in the news reports.

4 Q    Well, and there were in fact declaratory judgments sought

5 in those pre-petition lawsuits, weren't there?

6 A    I believe so.

7 Q    Okay.  And the retirement systems didn't file their

8 lawsuit until July 16th, correct?

9 A    Yes.  I believe GRS filed July 15th.

10 Q    Well, either way it was -- it was after the week, after

11 in your own time line, it was after the period where you had

12 set aside for discussions to take place with your

13 stakeholders?

14 A    Yes.

15 Q    Okay.  So there were no -- there wasn't a lawsuit

16 vis-a-vis the retirement systems during the week that you were

17 meeting with the retirement systems, correct?

18 A    I don't think so.

19 Q    And I believe you said yesterday the TRO from the Syncora

20 litigation was set to expire within 14 days?

21 A    Yes.

22 Q    And that would take you to July 19th?

23 A    I believe so.

24 Q    But the July 19th date was set forth on your proposal for

25 creditors as the end date unrelated to the Syncora litigation,

1  correct?

2  A    I think it was set forth related to everything.

3  Q    Yesterday you talked a lot about the swap transactions

4  and that negotiation.  At your deposition you testified that

5  they were extraordinarily complex.  I presume that your

6  testimony would be the same today?

7  A    The swap transactions.

8  Q    Yes.

9  A    Yes.

10  Q    And those negotiations started in earnest on June 4th,

11  right?

12  A    I don't recall the exact date, but that sounds about

13  right.

14  Q    Okay.  And the general terms of that negotiation were

15  agreed upon around June 11th?

16  A    Generally, yes.  Generally about those days, yeah.

17  Q    And then between June 11th, and July 15th through the 17th,

18  the paperwork was drafted and the forbearance agreement was

19  executed, correct?

20  A    Yes, forbearance and optional termination agreement, yes.

21  Q    Okay.  So even though the transactions were extremely

22  complex, and I believe you testified that the negotiations

23  were -- there was a lot of back and forth?

24  A    Uh-huh, yes.

25  Q    Even with all of that, the whole thing was wrapped up in

1  about four weeks, right?

2  A    Yes, I believe so.

3  Q    And that freed up the casino revenue?

4  A    Yes.

5  Q    That you thought was critical to the city's liquidity?

6  A    Yes.

7  Q    And yet having successfully negotiated that complex deal,

8  you didn't continue down the path of negotiating.  Two days

9  after you executed the forbearance agreement you actually

10 filed your bankruptcy petition, correct?

11 A    That's correct.  Forbearance agreement is dated July 15th

12 and we filed on July 18th.

13 Q    In three days?

14 A    Whatever that is, yeah.

15 Q    Okay.  We talked a lot about negotiations.  Isn't it true

16 though that if negotiations do not -- if there's -- I'm sorry,

17 let me restate that.  It was a terribly started question.

18 A    I understand.

19 Q    We talked about negotiations, but isn't it true that if a

20 consensual deal is not worked out, the city will use the cram

21 down provisions of the Bankruptcy Code to force a resolution?

22 A    The city would propose a resolution, but the cram down

23 provisions are available in Bankruptcy Code.

24 Q    So the answer is yes?

25 A    We hope to reach a negotiated solution even now.

1 | Q    But if you don't, the answer is yes, correct?

2 | A    If I don't we will address that situation then, but

3 | certainly cram down is an opportunity available to us.

4 | Q    And the $2,000,000,000 note that was proposed, there's no

5 | recourse if the city fails to pay that note back, correct?

6 | A    It is a non-recourse note.

7 | Q    And in fact as of June 14th the proposal for creditors

8 | does not actually identify anywhere in that document the

9 | amount that an individual -- an individual's benefits would be

10 | impacted, correct?

11 |          MR. STEWART:  Objection, asked and answered before,

12 | Your Honor.

13 |          THE COURT:  Sustained.

14 | Q    If an individual retiree was looking to find how much

15 | their individual pension benefits would be impacted prior to

16 | the bankruptcy filing, where would they look?

17 |          MR. STEWART:  Same objection, Your Honor.

18 |          MS. GREEN:  A different question.

19 |          THE COURT:  Well, it's slightly different.  What's

20 | the answer, please?

21 | A    I don't know, Your Honor.

22 | Q    Mr. Orr, earlier we looked at Exhibit 831.  If we could

23 | see that again, please.  This is the time line from July 8th.

24 | Bill Nowling or Nowling is your press secretary?

25 | A    He's my communications director, yes.

1  Q    Okay.  I would draw your attention to about three pages

2  in.  There is a list of bullet points relating to a

3  communications plan.  There we have it.  And as of July 8th

4  your communications plan was that you believe the Court

5  supervised restructuring is the best and most efficient way to

6  secure a viable strong future for Detroit, correct?

7  A    Yes.

8  Q    And further down on the page, there is a bullet point

9  that states, we negotiated in good faith with all of Detroit's

10 creditors and we will continue to work cooperatively with them

11 in the Federal Bankruptcy Court process, correct?

12 A    Yes.

13 Q    And it states that at this point it would be impractical

14 to continue discussions out of Court, correct?

15 A    Yes, it says that.

16 Q    And it states that the State of Michigan has authorized

17 the emergency manager to take this step?

18 A    Yes.

19 Q    As of July 8th, you had not yet even conducted several of

20 the meetings with the relevant stakeholders, correct?

21 A    July 8th?

22 Q    Right.

23 A    I think we had meetings beginning on June 17th, so we had

24 conducted a number of meetings.

25 Q    What about the ones on the 10th and the 11th?  Those had

 1  not even taken place, correct?

 2  A    Of July.

 3  Q    Right.

 4  A    Yes.  No, they hadn't taken place.

 5  Q    And I think we established earlier that all the

 6  presentations on the 10th, 14th, and 20th were merely

 7  informational and presentational, correct?

 8  A    Of July?

 9  Q    Of June.

10  A    Of June, yes.

11  Q    Okay.  And this same document has the filing date of the

12  19th, right?

13  A    Yes.

14  Q    Okay.  Was there another document that set forth some

15  sort of contingency plan if negotiations actually were

16  fruitful?

17  A    It looks like this is one of them.

18  Q    Where on here does it say what your steps are if the

19  negotiations, the meetings that took place July 10th and 11th

20  where --

21  A    Did you say that they were fruitful, or unfruitful?

22  Q    If they were fruitful.

23  A    Oh, they were fruitful.

24  Q    Where is your plan for if the negotiations on the 10th and

25  11th worked out?

1  A    Rephrase your question because I'm not sure I'm

2  understanding it.

3  Q    This document lays out a time line as of July 8th.

4  A    Contingency plan, yes.

5  Q    Okay.  Where on the document does this say it's a

6  contingency plan?

7  A    No.  I'm just saying that you do contingency planning.

8  It doesn't have to be called a contingency plan.  You plan for

9  contingencies before the last minute, Ms. Green, I'm sure

10  you're aware of that.

11  Q    Okay.  So where is the contingency plan for if

12  negotiations were fruitful?

13  A    I don't know.

14  Q    In the 200,000 pages of documents the city has produced,

15  is there a single contingency plan relating to negotiations

16  with creditors?

17         MR. STEWART:  Objection, Your Honor, foundation.

18         THE COURT:  Overruled.  Answer the question if you

19  know.

20  A    I don't know.

21         MS. GREEN:  Your Honor, I'm sorry.  I'm just going

22  through my notes.  I want to make sure I got everything.

23  Q    I have one more question.  At the June 10th proposal, or

24  I'm sorry, public meeting.

25  A    Uh-huh.

1  Q    Do you recall talking about your authority under PA436?

2  A    Yes.

3  Q    Do you recall making a statement about how powerful your

4  authority was under PA436?

5  A    Yes, I do remember that.

6  Q    Do you remember saying, and I don't want to misquote you,

7  so I'm going to have to play the clip, but do remember saying

8  that the statute itself was powerful, but you had a much more

9  powerful Chapter 9?

10 A    Yes.  I remember saying that I have a very powerful

11 statute, 436 is even a more powerful statute, Chapter 9, but I

12 don't want to use it.

13 Q    And didn't you end with but -- let's just play the clip

14 from what you actually said before --

15          MR. STEWART:  Your Honor, objection.  The -- the

16 witness has stated his memory.  There's no reason to -- to

17 show a -- a clip.

18          THE COURT:  I'll permit it, go ahead.  Go ahead.

19          MS. GREEN:  The clip says something different.

20          THE COURT:  Go ahead.

21     (Video Being Played at 2:35 p.m.; Concluded at 2:35 p.m.)

22 Q    Do you also recall just prior to that June 10th meeting

23 the -- the email we looked at earlier from Chuck Moore stating

24 that Chapter 9 would be necessary to deal with the pension

25 obligations?

1  A    I recall receiving that email.

2  Q    When you were discussing to the public this issue with

3  respect to Chapter 9, were you aware of the fact that your

4  financial advisors had already set on a course for Chapter 9

5  proceedings?

6  A    I'm not sure we'd set on a course for Chapter 9

7  proceedings.  We were trying very hard to get some consensual

8  resolutions and had one in hand.

9  Q    Last question.  Do you remember being asked by a precinct

10  delegate for the Democratic party after you made that

11  statement about Chapter 9.  Do you remember a woman standing

12  up and asking you -- stating that she felt as though she was

13  threatened by your Chapter 9 comments?

14  A    No, I don't remember.  Somebody may have said that, I

15  don't remember.

16  Q    Do you believe that when you stated that you had a very

17  powerful Chapter 9, that you were trying to set the tone for

18  the negotiations that were to take place over the following

19  weeks?

20  A    No, not necessarily.  I was just speaking.

21          MS. GREEN:  I have nothing further, Your Honor.

22                    CROSS EXAMINATION

23  BY MR. WERTHEIMER:

24  Q    Good afternoon, Mr. Orr.  My name is Bill Wertheimer and

25  I represent the Flowers plaintiffs, the plaintiffs in that

1 lawsuit --

2 A    Good afternoon, Mr. Wertheimer.

3 Q    We have not met, have we?

4 A    No, we have not.

5 Q    I'd like to clear up, if I can, the timing related to

6 these hearings in the State Court.  You testified that the

7 suits were filed on July 3rd, correct?  The Flowers and the

8 Webster suits were filed on July 3rd, correct?

9 A    Yes, I believe so.

10        THE COURT:  Counsel, I have to caution you not to

11 ask any redundant questions.

12        MR. WERTHEIMER:  That was -- I will not further.

13 Q    Did you also learn at the same time you learned about the

14 lawsuits that along with the lawsuits the same day the

15 lawsuits were filed, the Judge in that case entered an order

16 to show cause scheduling a hearing for preliminary injunctions

17 on the Websters and Flowers case for July 22nd?

18 A    No.

19 Q    When in time did you learn that hearings were scheduled

20 for July 22nd in front of Judge Aquiline?

21 A    I'm not aware if I ever knew in front of which Judge.  I

22 think I learned that a few days or weeks later.

23 Q    Okay.  Have you ever in your meetings or communications

24 with the Governor, or any of his staff people in any way

25 communicated to him that it was your intention as the

1 representative of the people of the City of Detroit to make a

2 legal claim against the state, that the state would be

3 obligated to pay any pension monies that the city could not

4 pay because of Article 9, Section 24 of the Constitution?

5 A    No, I don't think so.

6 Q    In any of your conversations with the Governor, beginning

7 at the time you became emergency manager in March, did you

8 ever communicate to the Governor what you communicated to that

9 retiree at a public meeting, that is that because of the state

10 law in Michigan pensions are sacrosanct?

11 A    I don't recall.

12 Q    You don't recall?  Are you testifying under an oath you

13 -- oath you don't recall one way or another whether you used

14 the term sacrosanct in your discussions with the Governor

15 relative to this issue?

16         MR. STEWART:  Objection, asked and answered.

17         THE COURT:  The objection is sustained.

18 Q    In your -- these conversations with the Governor, any of

19 them from the time you became emergency manager, have you had

20 discussions with the Governor about your claim that federal

21 law trumps state law on this pension issue?

22         MR. STEWART:  Objection, Your Honor.  To the extent

23 that the question calls for the witness to reveal privileged

24 attorney/client communications.  If there were lawyers in the

25 room and it was in connection with the rendition of legal

1  advice, I would object.

2          MR. WERTHEIMER:  Can I follow up a question?

3          THE COURT:  Uh-huh, sure.

4  Q    First of all, have you had any discussions with the

5  Governor where the issue of the impact of the filing of a

6  federal bankruptcy would have on this state constitutional

7  right outside the presence of attorneys?

8  A    No.

9  Q    How many meetings have you had with the Governor either

10 personally or over the telephone since you became emergency

11 manager approximately?

12         MR. STEWART:  Objection, asked and answered.

13         THE COURT:  Sustained.

14 Q    It was two to four or five, right?

15 A    No, I have weekly meetings but two to four or five with

16 the Governor.

17 Q    Okay.  Thank you.

18 A    Uh-huh.

19 Q    And in your meetings were there ever occasions where

20 attorneys were present and in your view of things you were not

21 seeking legal advice, they just happened to be either on the

22 line or in the meeting?

23 A    With the Governor?

24 Q    Yes.

25 A    Yes.

1  Q    In those meetings, were there occasions where you and the

2  Governor discussed the issue of federal law trumping or in

3  some way allowing you to adversely impact pension benefits?

4          MR. STEWART:  Renew my earlier objection, Your

5  Honor.

6          THE COURT:  Which objection, sir?

7          MR. STEWART:  The -- the -- to the extent that the

8  -- the question asks for the witness to reveal attorney/client

9  communications, we'd object.

10         MR. WERTHEIMER:  I'm only now asking about meetings

11  where he's acknowledged the attorneys were not there giving

12  legal advice.  He says there were such meetings.

13         MR. STEWART:  The question of -- I'm sorry.  The

14  question of whether federal law trumps, or trumps the Michigan

15  Constitution is clearly a request for legal advice.

16         MR. WERTHEIMER:  He's now testifying.  That's not

17  what Mr. Orr said.  Mr. Orr said --

18         THE COURT:  The problem is your question was

19  misleading, sir.  Because you asked --

20         MR. WERTHEIMER:  With all due respect, Your Honor, I

21  don't believe it was.

22         THE COURT:  Excuse me, you -- you asked were there

23  such meetings and there may have been.  But that doesn't mean

24  that every subject that was covered in such meeting was --

25  were subjects that did not involve legal advice.

1            MR. WERTHEIMER:  Well, then may I ask the question?

2    Q    At these -- these one or more meetings where there were

3    attorneys present, either on the telephone or in person, but

4    where you're not talking about legal advice or seeking legal

5    advice from those attorneys, in any of those contexts, did you

6    and the Governor talk about what the impact of your filing a

7    Chapter 9 proceeding might be on the pension rights of

8    citizens of the State of Michigan?

9            MR. STEWART:  Same objection, Your Honor.  That

10   issue is by definition one of a legal character.

11           THE COURT:  It seems to me, but I'll permit the

12   witness to answer.

13   A    No.

14           MR. WERTHEIMER:  Thank you.

15           THE COURT:  Any other questions for the witness?

16   Any redirect?  Oh, this I assume had all been worked out.  I'm

17   sorry.

18           MS. BRIMER:  I'm standing, Your Honor.  I'll --

19           THE COURT:  How many more?

20           MS. BRIMER:  Good afternoon, Your Honor.  Lynn M.

21   Brimer appearing on behalf of the Retired Detroit Police

22   Officers Association.

23                    CROSS EXAMINATION

24   BY MS. BRIMER:

25   Q    Mr. Orr, my name is Lynn Brimer.

1   A     Good afternoon, Ms. Brimer.

2   Q     We have never met before?

3   A     No, we have not.

4   Q     Mr. Orr, I'd like to go back to some discussion prior to

5   your appointment as the -- as the emergency manager.  Do you

6   recall when you first learned that Jones, Day would be

7   involved in preparing or presenting a pitch to the City of

8   Detroit for engagement?

9   A     Yes.

10  Q     And when was that?

11  A     Two weeks or so prior to the pitch.

12  Q     So about --

13  A     Mid-January.

14  Q     About mid-January?

15  A     Yes.

16  Q     And at that point in time did the topic of a Chapter 9

17  filing come up in your discussions?

18  A     No, not initially, no.

19  Q     Could we have Exhibit 866, please?  Do you -- do you see

20  that Exhibit 866?

21  A     Yes.

22  Q     All right.  Now that's an email from Ms. Ball and you're

23  listed on there at the end of the carbon copies, is that

24  correct?

25  A     Yes.

1  Q    What is Ms. Ball's role in connection with the City of

2  Detroit project at Jones, Day?

3  A    Ms. Ball is one of the attorneys at Jones, Day in the

4  restructuring practice that was at the pitch -- pitch

5  presentation.

6  Q    Okay.  So if you'd go down midway through the page you'll

7  see there is a paragraph that says Kevyn.

8  A    Uh-huh.

9  Q    I assume that's you, Mr. Orr?

10  A    Uh-huh.

11  Q    There are diversity related issues.  You have to be the

12  star on this stuff and be able to discuss what we can provide.

13  (We do submit reports to the Bar Association).  Also, can you

14  check with Dan Moss where he is on updating our Chapter 9

15  paper with new decisions like the ones in California, PA, and

16  Alabama among others.

17  A    Yes.

18  Q    All right.  Who is Mr. Moss?

19  A    Mr. Dan Moss is an attorney at Jones, Day seated at

20  counsel's table.

21  Q    And he was involved in the project to pitch to the City

22  of Detroit, correct?

23  A    Yes.

24  Q    All right.  Now already at least as early as January 15,

25  2013, the issue of a Chapter 9 was being addressed by the

1  Jones, Day attorneys, is that correct?

2  A    Yes, it appears to be so.

3  Q    So now you spent the -- the pitch was actually made on

4  January 29th, is that correct?

5  A    Yes.

6  Q    And who attended that pitch?

7         MR. STEWART:  Objection, Your Honor, asked and

8  answered.

9         THE COURT:  Sustained.

10 Q    There were attorneys from various offices of Jones, Day

11 at that pitch, is that correct?

12 A    Yes.

13 Q    And in that two week period were there discussions among

14 the attorneys of the role each would play in the pitch with

15 the city?

16 A    Yes.

17 Q    And during any of those discussions, did Ms. Ball ever

18 discuss any prior involvement with the State of Michigan?

19 A    Not with me.

20 Q    Was Ms. Lennox also involved in the pitch?

21 A    Yes.

22 Q    And did Ms. Lennox ever discuss in any of the meetings or

23 conversations preparing for the pitch, her role or Jones,

24 Day's role in connection with prior advice rendered to the

25 State of Michigan?

1  A    Not that I recall.

2  Q    Now shortly after the pitch you were approached in

3  connection with becoming the emergency manager?

4  A    Yes.

5  Q    And there were discussions internally with respect to

6  what Jones, Day may be able to do to generate funding for the

7  project and to nationalize the project, is that correct?

8  A    I think there was an email, yes.

9         MS. BRIMER:  Could we have 605?  It's 805, I

10  apologize.  And, Your Honor, I'm using exhibits that have been

11  admitted.

12         THE COURT:  Thank you.

13  Q    This is an email chain between you and Mr. Moore -- Moss,

14  is that correct?

15  A    Yes.

16  Q    Do you see that?  Okay.  Now if you go down to the second

17  page, it begins with an email to you from Ms. Ball, the last

18  sentence -- well, actually we'll go all the way down to the

19  first food for thought.  For your conversation with Baird and

20  us, I understand Bloomberg Foundation has a keen interest in

21  this area.  Do you know what area she is referring to?

22  A    I do not.

23  Q    Well, and the subject is D.  Do you know what that D is

24  referring to?

25  A    I think it's referring to Detroit

1  Q    Okay.  I was thinking about whether we should talk to

2  Baird about financial support for this project and in

3  particular the EM.  So the issue is discussions with respect

4  to whether or not you can generate additional funding for it,

5  is that correct?

6  A    I believe so.

7  Q    The last sentence is, I can ask Harry, I believe that's

8  Harry Wilson from the auto task force, for contact

9  information.  This kind of support and weighs -- nationalizes

10 the issue and the project.  What project is that she's

11 referring to, do you know?

12 A    I assume she's referring to something related to Detroit.

13 Q    So she related to the -- does the project relate to the

14 representation of the City of Detroit by the Jones, Day

15 attorneys?

16 A    I don't know.

17 Q    All right.  So then if you go up from that, there is an

18 email from Mr. Moss to you that begins, making this a national

19 issue is not a bad idea.  It provides political cover for the

20 state politicians.  Indeed this gives them an even greater

21 incentive to do this right because if it succeeds, there will

22 be more than enough patronage to allow either Bing or Snyder

23 to look for higher callings whether cabinet, Senate, or

24 corporate.  Further, this would give you, I assume you means

25 you, Mr. Orr.

1  A    Uh-huh.

2  Q    Would give you cover and options on the back end, I

3  assume that's when you're finished with your appointment as

4  the EM, to make up for lost time here.

5  A    Yeah.

6  Q    Is the perception at Jones, Day that your appointment as

7  the emergency manager for the City of Detroit is lost time?

8  A    No.

9  Q    Then why would Mr. Moss have included that sentence in an

10  email, if you know?

11  A    I don't know.

12  Q    Was it important to move forward with this project in a

13  fashion that provided political cover for those who are

14  involved?

15  A    No.  I think I say that in one of the following emails.

16  Q    Now when did you first learn that the Mayor -- I mean

17  that the Governor would be supporting your candidacy as the

18  emergency manager?

19  A    Sometime after we met in mid-February.

20  Q    Could we have 807?  So 807 is an email chain between

21  yourself and Mr. Baird, is that correct?

22  A    Yes.

23  Q    The Re line is tribute to my dad, Reverend Dr. Allen E.

24  Orr.

25  A    Senior.

1  Q    If we could go to the email midway down from Mr. Baird to

2  you dated February 12, 2013.  Do you recall receiving this

3  email?

4  A    Yes.

5  Q    And I think we've discussed part of this email with Ms.

6  Green.  But the paragraph that begins a little further down,

7  Kevyn, I know you have work -- you have to work logistics on

8  your end, but I do want you to know our folks are already

9  behaving if you have -- as if you accepted the job.  I guess

10 that's human nature since the chemistry envisioned was so

11 aligned with our own.

12     The last sentence in that paragraph reads, anyway, I need

13 to clue -- I need you to clue me in.  Are you feeling

14 differently because the boss and his team are already

15 arranging for the church and pastor and I need to talk them

16 off the ledge if you tell me we are misreading the

17 relationship.

18     So already by February 12th you understood that the

19 Governor was seriously supporting your candidacy, is that

20 correct?

21 A    Yes.

22 Q    Did you at that point in time do anything to advise the

23 Governor that you would not be taking the position?

24 A    No.  I think I still was taking it under consideration.

25 Q    Let's see here.  All right.  I'd like to -- I do have an

1  exhibit here --

2          THE COURT:  Actually, Ms. Brimer, I'm -- I'm going

3  to conclude Court now.  We do have some housekeeping matters

4  that I need to review with everyone.  How much longer will

5  your cross examination be?

6          MS. BRIMER:  Probably only about 15 minutes, Your

7  Honor.

8          THE COURT:  And the other cross examination, sir?

9          MR. WILKINS:  About 10 to 15 minutes.

10          THE COURT:  Ms. Patek?

11          MS. PATEK:  It will be less than that, Your Honor.

12          THE COURT:  All right.  So we'll reconvene next

13  Monday morning at 9:00 a.m.

14      Now I have been advised regarding exhibits and your other

15  property that your choices are a little more constrained at

16  this point.  You can either leave them in the jury room where

17  they will be locked, or you can take them with you.  But we

18  can't leave them in place between now and Monday.  I think

19  Judge Cook will be using this courtroom for other purposes.

20  Who else is the city intending to call, please?

21          MR. STEWART:  This is our last witness, Your Honor.

22          THE COURT:  All right.  Monday morning when we meet,

23  I would like some good faith estimate from the objecting

24  parties as to how long your case will take.  We need that

25  because if it's going to go beyond Thursday of that week, we

1  need to arrange for -- for courtrooms after that.

2      All right.  Any other further housekeeping matters?  Yes,

3  Ma'am.

4          MS. LEVINE:  Your Honor, just a question.  Assuming

5  the witnesses conclude maybe even Monday or Tuesday, can

6  closings be after we submit our briefs on 11-13 on Wednesday,

7  or are you going to want closings to be --

8          THE COURT:  No, I want closings immediately after

9  the conclusion of the proofs.

10          MS. LEVINE:  Thank you.

11          MR. DECHIARA:  One question in that regard, Your

12  Honor.  Is it your expectation that if we are not finished for

13  whatever reason Tuesday afternoon that we will go Wednesday

14  despite the current mediation order that's in place?

15          THE COURT:  I had not taken that into account.  Is

16  this something you need to know now, or can I get back to you

17  on Monday on that?

18          MR. DECHIARA:  No, you can get back to us on Monday,

19  Your Honor.

20          THE COURT:  All right.  If -- if -- if I don't,

21  please remind me of this question.  Anything further, anyone?

22  All right.  We'll stand in place while Mr. Orr takes his exit.

23  And my apologies to you for blasting out of here at lunch

24  without giving you that opportunity, sir.

25  A      Thank you.  Thank you.

1          THE COURT:  But go ahead and we'll just wait here.

2      (WITNESS KEVYN ORR WAS EXCUSED AT 2:59 P.M.)

3          THE COURT:  Jim, you'll let us know when we can go.

4  Ready?

5          THE CLERK:  All rise.

6          THE COURT:  All right.

7          THE CLERK:  Court is adjourned.

8      (Court Adjourned at 2:59 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7   We certify that the foregoing is a correct transcript from the

8   electronic sound recording of the proceedings in the

9   above-entitled matter.

10

11   /s/Deborah L. Kremlick, CER-4872          Dated: 11-4-13
     Letrice Calloway
12

13

14

15

16

17

18

19

20

21

22

23

24

25