# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |
|  | ) **Re: Docket No. 1341** |

## LIMITED OBJECTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER AUTHORIZING THE PUBLIC LIGHTING AUTHORITY TRANSACTION

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora") file this limited objection to *Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to Enter Into and Perform Under Certain Transaction Documents with the Public Lighting Authority and (II) Granting Other Related Relief* [Docket No. 1341] (the "Motion"). In support of this limited objection, Syncora respectfully states as follows:

### Preliminary Statement

1. Well before the City[1] filed its bankruptcy petition, it embraced the idea that Chapter 9, first and foremost, is a public revitalization process — not a process to allow the City to provide *essential services* while *minimizing creditor*

---

[1] Capitalized terms used but not otherwise defined herein have the meaning ascribed to them in the Motion.

*loss*, as legislative history and case law dictate.[2]  Indeed, in Jones Day's very first pitch to the City to become its legal counsel, it explained how it intended to transform the Chapter 9 *debt adjustment process*[3] into a public revitalization process that is subsidized by cuts to creditor recoveries:

- "[A]ny [C]hapter 9 process should pursue as many revitalization initiatives as possible."[4]

- "[A]s the City gains access to new revenues, it must develop an approach that preserves those revenues for reinvestment in the City and not just to pay off preexisting debts."[5]

- The City should "defend against approaches that focus on expense reduction and monetizing assets to pay creditors."[6]

---

[2]  *See* H.R. Rep. No. 95-595, at 263 (1977) ("[T]he primary purpose of Chapter 9 is to allow the municipal unit to continue operating while it adjusts or refinances creditor claims with minimum (and in many cases, no) loss to its creditors."); H.R. Rep. No. 94-686, at 524 (1975) (same); *Fano v. Newport Heights Irrigation Dist.*, 114 F.2d 563, 564–66 (9th Cir. 1940) (holding that a Chapter 9 debtor's "top-heavy and extravagant" infrastructure spending "of at least twice the sheer necessity of the situation" to be subsidized by cuts to creditor recoveries rendered plan of adjustment non-confirmable because "it would be highly unjust to allocate their cost to the bondholders" and such plan treatment was neither fair and equitable nor in the best interest of creditors).

[3]  *See In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 648–51 (Bankr. E.D. Mich. 1994) (describing Chapter 9 as a "debt adjustment process" that allows "municipalities to continue in existence" pursuant to a confirmable plan of adjustment that is "fair, equitable, and feasible, and does not discriminate unfairly in favor of any creditor or class of creditors").

[4]  Presentation to the City of Detroit, 57 (Jan. 29, 2013), attached hereto as Exhibit 1.

[5]  *Id.* at 54.

[6]  *Id.* at 27.

2

- The Chapter 9 process should be used "to address as many additional items as possible, not just the core debt readjustment issues in a Plan of Adjustment."[7]

The City's philosophical approach to this case conflicts with the way Congress intended Chapter 9 to operate and with the standards set forth therein — *e.g.*, a plan of adjustment must be in the "best interests of creditors," "fair and equitable," and submitted in good faith. While there is no question that the City of Detroit faces many challenges, the means by which these challenges are addressed must be integrated into the overall purpose of Chapter 9, which focuses on fairly adjusting the debts of the City's creditors.

2. Since that initial presentation, the City and its advisors have continued to focus on politically popular public revitalization projects, while at the same time marginalizing the City's many creditors. In its Creditors Proposal, for example, the City put forward a plan where it would spend $1.25 billion on public improvement projects such as a roof replacement for the Manoogian Mansion, an unspecified airport expansion, and approximately $300 million of unspecified "Additional Operating Expenses."[8] Similarly, in its DIP financing proposal, the

---

[7] *Id.* at 58.

[8] *Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [Docket No. 11] Ex. A (the "Creditors Proposal"), at 127–28.

3

City contemplates spending reportedly $120 million "to fund expenditures that are designed to contribute to the improvement of the quality of life in the City."[9]

3.      Meanwhile, the City previously announced that it proposes to pay certain unsecured creditors only approximately 16.8 cents on the dollar on account of their claims despite the size of the City's asset base and potential mutually beneficial and creative opportunities to enhance creditor recoveries.[10]  These cuts to creditor recoveries are projected to fund approximately $650 million of the City's public improvements spending in what literally amounts, at best, to a zero-sum proposition.[11]

---

[9]   *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* [Docket No. 1520] ¶ 47; *City of Detroit Receives Commitment for up to $350 Million of Post-Petition Financing*, PRNEWSWIRE, Oct. 11, 2013 *available at* http://www.prnewswire.com/news-releases/city-of-detroit-receives-commitment-for-up-to-350-million-of-post-petition-financing-227423391.html (estimating approximately $120 million for quality of life expenditures as of Oct. 11, 2013).  The City's DIP financing proposal is connected with its *Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of That Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(A) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant Rule 9019, and (III) Granting Related Relief* [Docket No. 17] (the "Forbearance Motion"), wherein the City seeks to pay one group of creditors — the swap counterparties — ahead of and before all others.

[10]   Creditors Proposal, *supra* note 8, at 23–29, 107.

[11]   Hr'g Tr. 137:6–14, Oct. 24, 2013; *see also id.* at 132:21–24 (Charles Moore confirming that "with respect to the [June 14] proposal . . . an important

4.     And yet, despite the obvious plan implications of these proposals, the City has consistently failed to provide its creditors — as well as the City Council — with the information necessary to properly evaluate the merits of its proposals. For example, the City refused to provide parties in interest with all necessary and requested documentation in connection with the DIP financing proposal and the Forbearance Motion.[12]

5.     The Motion is yet another example of the City's approach to its Chapter 9 case.  Though the City's desire to remedy the problems with its street lights is understandable, the process surrounding, and substance of, the Motion suffers from a number of fundamental flaws that have similarly plagued many of the City's other proposals.

---

component of it is reinvestment in the infrastructure and operations of the City of Detroit.").

[12]     *See, e.g.*, *Motion of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. for Authority to Issue Document and Deposition Subpoenas to the Debtor, the Emergency Manager, and Certain of the Debtor's Advisors Pursuant to Federal Rule of Bankruptcy Procedure 2004* [Docket No. 1342] ¶ 9 (requesting DIP term sheets and commitment letter that the City refuses to provide); *Objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of That Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(A) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant Rule 9019, and (III) Granting Related Relief* [Docket No. 366] ¶ 1 (detailing the City's secretive negotiations in connection with the Forbearance Motion).

6. *First*, the Motion lacks the detail necessary to evaluate the merits of the proposed transaction. Among other things, the Motion fails to address why, as the City contends, the PLA Transaction is "the best (and perhaps only) opportunity."[13] It further fails to describe what that opportunity really is — the lighting plan seems to exist in a vacuum divorced from the City's needs and any anticipated economic benefit. And it does not answer why, of all things the City can do to protect its citizens and generate revenues, jobs, and investment, upgrading the City's *entire* lighting infrastructure makes sense for the City at this time.

7. *Second*, the detail that the City *has* provided indicates that the transaction may be economically unsound. For example, though the City points out that only $12.5 million of the Pledged Revenues will fund the Act 392 Bond payments, it fails to explain why it is necessary to pledge *all* of the utility tax revenues in the first instance, which currently stand at approximately $40 million a year.[14] Additionally, as set forth in the exhibits attached to the Motion (but not referenced in the Motion itself), the City will also obligate itself generally to fund

---

[13] Motion ¶ 22.

[14] Creditors Proposal, *supra* note 8, at 3.

approximately $11 to $12 million of operating and maintenance costs under the PLA Transaction.[15]

8.    *Third*, the Motion is yet another attempt by the City to push through a public reinvestment initiative that would be more appropriately addressed at the plan of adjustment stage — and only then after creditors have been given the opportunity to evaluate and shape the proposal or propose other approaches. Though all parties prefer to see this case move quickly, speed should not come at the expense of due process.  Yet, by operating outside the plan of adjustment framework, the City is attempting to avoid many of the procedural and substantive plan confirmation requirements that are designed to protect creditors from precisely this type of transaction — which then requires creditors to respond to protect their rights.  If the City would instead negotiate with its creditors towards a holistic solution (*i.e.*, a mutually-agreeable plan of adjustment) — as opposed to these contested piecemeal proposals that lack the requisite detail this case would proceed more quickly and on a more consensual basis.

9.    For these reasons, Syncora submits the instant Limited Objection.

---

[15]    *See* Motion Ex. 1 to Ex. 6.1 (the "PLA Lighting Plan"), at A.4.

## Limited Objection

### A.     Relevant Details Surrounding the PLA Transaction.

10.     The City created the PLA as a separate municipal corporation to manage and maintain the City's public lighting system.[16] The PLA "is responsible for constructing, improving, enlarging, reducing or extending the City's street light system."[17]

11.     In connection with the Motion, the City seeks an order under section 364(c)(2) of the Bankruptcy Code (a) authorizing the City to enter into and perform under the PLA Transaction Documents, and (b) authorizing and approving the PLA financing transaction and the granting of a pledge and lien in, and the irrevocable transfer of, the Pledged Revenues.

12.     To secure the financing for the PLA Transaction, the City has agreed to "irrevocably pledge and cause the existing and future revenue generated from the Utility Tax . . . as security for, and the primary source for the repayment of, the Act 392 Bonds."[18] The amount of Pledged Revenues to which the PLA is entitled is the lesser of (a) $12.5 million, and (b) the total revenues generated by the Utility

---

[16]   Motion ¶ 6.

[17]   Motion Ex. 6.4, at 3.

[18]   Motion ¶ 7.

Tax.[19]  The City notes, however, that certain key transactional documents the City asks this Court to approve are "prospective and subject to modification."[20]  As its justification for this transaction, the City contends that the public lighting initiatives the Act 392 Bonds finance and the Pledged Revenues secure will allow the PLA to "construct, improve, enlarge, reduce or extend the City's Public Lighting System for the benefit of the City."[21]  According to the City, the "PLA Transaction represents the City's best (*and perhaps only*) opportunity to remedy this public safety concern."[22]

13.    To support these claims, the Motion provides some high-level details surrounding the transaction.  However, it makes no attempt to quantify or analyze how the PLA Transaction will benefit the City and its stakeholders.  Nor does it contain any evidence that the City considered any alternative financing structures.[23]

---

[19]  *Id.*

[20]  *E.g.*, PLA Lighting Plan, *supra* note 15, at A.4 ("Please note that negotiations on the O&M have not commenced, therefore the information contained in this section should be considered prospective and subject to modification.").

[21]  Motion ¶ 19.

[22]  Motion ¶ 22 (emphasis added).

[23]  It is also puzzling why the City did not wait for the City Council to analyze the terms of this proposal — or, for that matter, submit an alternative proposal (as they are entitled under PA 436) — before submitting the Motion.  Though the City Council's powers have been dramatically circumscribed by PA 436, it

9

**B.    The City's Motion Suffers from a Number of Fundamental Flaws.**

14.    The City must demonstrate that the proposed financing is "necessary to preserve the assets of the estate" and that the terms of the transaction are "fair, reasonable, and adequate."[24]   Courts consider the following factors, among others, to determine whether the terms of a postpetition financing transaction under section 364 of the Bankruptcy Code are appropriate: (a) whether the proposed transaction is an exercise of the debtor's reasonable business judgment; (b) whether alternative financing is available on any other basis; (c) whether the proposed transaction is in the best interests of both the estate and its creditors; (d) whether any better offers, bids, or timely proposals are before the court; (e) whether the transaction is necessary, essential, and appropriate to preserve estate assets and for the continued operation of a debtor's business; (f) whether the terms of the proposed financing are fair, reasonable, and adequate given the

---

retains the key right and obligation to evaluate dispositions of City Assets. Moreover, the City Council will be a critical part of any plan of adjustment. Giving the City Council the full statutory time to consider the proposal would seem to accord with at least minimal standards of comity.

[24]    *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (noting that debtor must also establish that it was unable to obtain alternative financing).

circumstances; and (g) whether the proposed transaction was negotiated in good faith and at arm's length (collectively, the "Farmland Factors").[25]

15.　As discussed below, the City cannot satisfy the Farmland Factors. First, the Motion fails to provide sufficient information to analyze the merits of the PLA Transaction. Second, the little information the City has provided demonstrates that the economics behind PLA Transaction may not be in the best interests of the City or its stakeholders. Third, the City is yet again asking this Court to approve a transaction that should be addressed within the procedural framework of a plan of adjustment.

### 1.　The City Has Failed to Provide Adequate Information to Evaluate the Proposed Transaction.

16.　Syncora favors the City of Detroit having adequate lighting to protect citizens (including considering reasonable prospective population growth) and to support other initiatives for the City's and its stakeholders' recovery. But Syncora does not support any proposal — like the one at issue in the Motion — that lacks all of the information necessary to evaluate that proposal.

---

[25] *In re Farmland Industries, Inc.*, 294 B.R. 855, 879–80 (Bankr. W.D. Mo. 2003); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003) (applying Farmland Factors).

17.    Here, the City has failed to provide many of the important details surrounding the PLA Transaction.    Among other omissions, the City has not provided the following information:

- What, if any, process it conducted (*e.g.*, competitive bidding for the bonds);

- Whether alternative financing structures were considered;[26]

- Any objective measure of the costs and benefits associated with the relief sought;

- The identity of the engineers and/or other professionals consulting on the lighting systems project and their related analyses;

- Why the PLA Transaction is "the best (***and perhaps only***) opportunity" to address public lighting issues;

- The ultimate scope of the lighting systems upgrade over the life of the project (*e.g.*, short-term and long-term objectives); and

- How this financing transaction is necessary, essential, or appropriate to preserve the City's assets for its continued operation.[27]

---

[26]    *See* 11 U.S.C. § 364(c) ("If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or incurring of debt . . . ."); *Crouse Grp.*, 71 B.R. at 549 (same).

[27]    *See, e.g.*, H.R. Rep. 94-686, at 546–47 (1975) ("[B]y facilitating borrowing to meet current expenses, the court was actually preserving former secured creditors' collateral by preserving the business as a going entity.  Thus, there was no actual or effective taking of property prohibited by the Fifth Amendment in giving new security that would prime the former liens of secured creditors.  In the municipal context, this reasoning is similarly applicable.  While the 'business' of government will continue whether it is insolvent or not, without cash to continue to provide ***essential government services***, the only asset available for the creditors, the municipality's tax base,

12

17.    Here, the City has failed to provide many of the important details surrounding the PLA Transaction.    Among other omissions, the City has not provided the following information:

- What, if any, process it conducted (*e.g.*, competitive bidding for the bonds);

- Whether alternative financing structures were considered;[26]

- Any objective measure of the costs and benefits associated with the relief sought;

- The identity of the engineers and/or other professionals consulting on the lighting systems project and their related analyses;

- Why the PLA Transaction is "the best (***and perhaps only***) opportunity" to address public lighting issues;

- The ultimate scope of the lighting systems upgrade over the life of the project (*e.g.*, short-term and long-term objectives); and

- How this financing transaction is necessary, essential, or appropriate to preserve the City's assets for its continued operation.[27]

---

[26]    *See* 11 U.S.C. § 364(c) ("If the trustee is unable to obtain unsecured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or incurring of debt . . . ."); *Crouse Grp.*, 71 B.R. at 549 (same).

[27]    *See, e.g.*, H.R. Rep. 94-686, at 546–47 (1975) ("[B]y facilitating borrowing to meet current expenses, the court was actually preserving former secured creditors' collateral by preserving the business as a going entity.  Thus, there was no actual or effective taking of property prohibited by the Fifth Amendment in giving new security that would prime the former liens of secured creditors.  In the municipal context, this reasoning is similarly applicable.  While the 'business' of government will continue whether it is insolvent or not, without cash to continue to provide ***essential government services***, the only asset available for the creditors, the municipality's tax base,

12

18.    While it may be true that certain improvements are necessary to the City's infrastructure, this is first and foremost a Chapter 9 debt adjustment process that requires the disclosure of certain information.    Notwithstanding that requirement, the City has not demonstrated that these reinvestment initiatives are necessary or how they map on to a plan of adjustment that benefits all of the City's stakeholders.    Nor, for that matter, has the City detailed the process behind the PLA Transaction.

19.    Without this information, it is impossible to assess the merits of the Motion and determine whether the PLA Transaction was presented in good faith, is in the best interest of creditors, or is fair and equitable.[28]    Put simply, it is not enough to say, without any supporting evidence, that the "PLA transaction represents the City's best (and perhaps only) opportunity to remedy this public safety concern."    The City's financial commitment to this project is at least $23.5 million per year for approximately 30 years, or approximately $705 million in

---

may be seriously eroded by flight of the city's businesses and residents.") (emphasis added); *see also In re Barbara K. Enterprises, Inc.*, 2008 WL 2439649, at *8 (Bankr. S.D.N.Y. June 16, 2008) ("A debtor may not obtain approval for extending secured credit unless it first establishes that it is otherwise unable to reasonably obtain unsecured credit, **and the credit is necessary for continued operation**.") (emphasis added).

[28]    See the Farmland Factors; *see also* 11 U.S.C. §§ 901(a), 943(b)(1), 943(b)(7), 1129(b)(2), 1129(a)(3) (analogous Chapter 9 plan confirmation requirements).

total.[29]  Of this $705 million, approximately $192 million, or 27%, will be used simply to finance the transaction (based on the City's own estimates).[30]  This projected $192 million financing cost is yet another material fact that is not disclosed by the City in the Motion.  For a transaction of this type and size, much more than the City's bare-bones disclosure is required.

20.    In addition, the timing of this transaction is suspect given that (a) the Act 392 Bonds are not projected to be issued until June 2014,[31] (b) the City previously anticipated spending a total of approximately $1.7 million on public lighting capital improvements in the Creditors Proposal,[32] and (c) the City Council had not yet had the opportunity to review and act on the PLA Transaction at the time the City filed the Motion.

**2.    The Economic Terms that the City Has Revealed Indicate that the PLA Transaction May Not Be in the Best Interests of the City and its Stakeholders.**

21.    While the City has failed to provide a full view of the economic burden that this transaction will place on the City, what little detail it has disclosed is troubling — both from the perspective of the City's taxpayers and its creditors.

---

[29]  *See* PLA Lighting Plan, *supra* note 15, at A.4, B (estimating $12.5 million pledged to repay bonds and $11-12 million in operating and maintenance costs).

[30]  *See id.* App. G.

[31]  *Id.*

[32]  Creditors Proposal, *supra* note 8, at 127.

14

22.     To begin, the PLA Transaction will actually cost the City more than the Motion reveals.  For example, hidden amidst the details of the exhibits attached to the Motion is the fact that the City has committed to fund the operation and maintenance of the PLA-managed lighting system.[33]  Though the City states that it assumes no liability for the Act 392 Bonds or C&F Agreement,[34] the estimated $11–$12 million in annual operational and maintenance expenses the City will pay out of its general fund almost doubles the $12.5 million per year price tag attached to the face of the Motion.[35]  Furthermore, of the approximately $150 million in projected bond proceeds, approximately $60 million will be used immediately to pay off the PLA's "bridge loan," which is yet another undisclosed financing device buried in the PLA's plan and budget that receives no mention in the Motion.[36]  As discussed above, of the City's total $705 million financial commitment,

---

[33]  *See* PLA Lighting Plan, *supra* note 15, at A.4 ("The estimated annual costs for these operation and maintenance services, including PLA administrative costs, is $11M to $12M based on the criteria contained in Section A.3.  The source of the City funds for the payment of rates has not been identified yet, but it should be anticipated that the source will be the City of Detroit General Fund.").

[34]  Motion ¶ 9.

[35]  *See* PLA Lighting Plan, *supra* note 15, at A.4; *see also* Motion Ex. 6.2, at 4.1 (stating that the annual cap for operations and maintenance will be $8.024 million, plus "Extraordinary Maintenance" payments).  A comparison of current costs to these estimates is impossible because the City has not disclosed the current operating and maintenance costs associated with its lighting infrastructure.

[36]  *See* PLA Lighting Plan, *supra* note 15, at A.1; *id.* App. G.

approximately $192 million, or 27%, will be used simply to finance the transaction.[37]  Finally, the City is quick to point out that only $12.5 million of the Pledged Revenues will fund the Act 392 Bond payments, but it fails to explain why it is pledging $40 million of utility tax revenues when only $12.5 million is necessary for the transaction.[38]

23.     The PLA Transaction is just as unfavorable to the City's creditors.  As part of the transaction, the City anticipates "making a multi-year, large scale, city-wide investment in the public lighting infrastructure."[39]  To do so, the City seeks to lock-up the Pledge Revenues for 30 years.[40]  All told, the City's financial commitment to this project is at least $23.5 million per year for approximately 30 years, or approximately $705 million in total.  Notably though, the Pledged Revenues are City resources that could be used to fund recoveries to creditors that invested their time and resources in the City's operations and pensions for decades — creditors that are now being asked to accept 16.8 cents on the dollar.[41]

---

[37]  *See* PLA Lighting Plan, *supra* note 15, App. G.

[38]  *E.g.*, Motion ¶ 17; Creditors Proposal, *supra* note 8, at 3.

[39]  PLA Lighting Plan, *supra* note 15, at A.1.

[40]  *Id*. at B.

[41]  *See In re FCX, Inc.*, 54 B.R. 833, 838 (Bankr. E.D.N.C. 1985) ("[T]he court should not ignore the basic injustice of an agreement in which the debtor, acting out of desperation, has compromised the rights of unsecured creditors.").

### 3. The Motion Should be Presented as Part of a Plan of Adjustment.

24.    In connection with the PLA Transaction, the City is attempting to restrict a revenue stream for 30 years in a way that diminishes creditor recoveries. Given the impact of this transaction, the City should have included it as part of its plan of adjustment.[42] To the contrary, the City has instead decided to hurriedly present this transaction to the City Council and ultimately the Court.

25.    Ignoring for the moment that the City cannot meet the requirements for approval of the Motion, the City's tactics here signal an awareness that it cannot meet the procedural and substantive plan confirmation requirements designed to protect creditors from precisely this kind of amorphous transaction.[43]

26.    For instance, to protect those entitled to vote on a plan of adjustment, a Chapter 9 debtor must provide "adequate information" in respect of the transactions contemplated thereunder, which means:

---

[42]    *See In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983) (transactions that dictate the terms of any future plan of restructuring, or alter creditors' rights without otherwise requiring the satisfaction of the disclosure and confirmation standards of the Bankruptcy Code are *sub rosa* plans); *see also In re Swallen's, Inc.*, 269 B.R. 634, 638 (B.A.P. 6th Cir. 2001) ("[A] bankruptcy court cannot issue orders that bypass the requirements of Chapter 11, such as disclosure statements, voting, and a confirmed plan, and proceed to a direct reorganization on the terms the court thinks best, no matter how expedient that might be.")

[43]    *See, e.g.*, *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) ("The bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements.").

[I]nformation of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records … that would enable [] a hypothetical investor of the relevant class to make an informed judgment about the plan.[44]

Here, at a minimum, and as set forth above, the City should be required to provide detailed financial information, a description of its process, and its underlying assumptions in respect of the PLA Transaction.

27. Moreover, sections 943(b)(7) and 1129(a)(3) of the Bankruptcy Code require that a plan of adjustment be in the best interests of creditors and proposed in good faith, respectively. And section 1129(b)(1) of the Bankruptcy Code provides that a plan of adjustment may be confirmed even if a class of claims rejects the plan so long as "the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan." The application of "fair and equitable" in Chapter 9, for instance, requires that "the amount proposed to be paid under the plan was

---

[44] 11 U.S.C. § 1125(a)(1); *In re Malek*, 35 B.R. 443 (Bankr. E.D. Mich. 1983) (finding debtor did not disclose adequate information where debtor did not include, *inter alia*, certain financial information, how a plan was to be executed, and a projection and underlying assumptions related to its operations); *see also In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2d Cir. 1994) ("This disclosure requirement does not attach only to the preparation of disclosure statements. 'Full and fair' disclosure is required during the *entire* reorganization process; it begins 'on day one, with the filing of the Chapter 11 petition.'") (citations omitted).

all that the creditors could reasonably expect under the circumstances."[45]  Collier

has taken the position that a plan of adjustment is not fair and equitable or in the

best interests of creditors if it invests heavily in facility improvements to the

detriment of creditors:

> [A Chapter 9] plan that makes little or no effort to repay creditors over
> a reasonable period of time may not be in the best interest of creditors.
> ***For example, a debtor that had invested heavily in improvements in
> its facilities at a time when it was unable to pay the claims of its
> bondholders cannot rely on its cash-poor position resulting from the
> investment as a reason why it should pay less to bondholders,
> because the bondholders should not be required in effect to
> subsidize the improvements***.  Such a plan is not fair and equitable and
> is not in the best interest of creditors.[46]

In order to determine whether a proposed treatment of creditors is fair:

> [T]he court must have before it data which will permit a reasonable,
> and hence an informed, estimate of the probable future revenues
> available for the satisfaction of creditors.  And where, as here,
> different classes of creditors assert prior claims to different sources of
> revenue, there must be a determination of the extent to which each
> class is entitled to share in a particular source, and of the fairness of
> the allotment to each class in the light of the probable revenues to be
> anticipated from each source.  To support such determinations, there
> must be findings, in such detail and exactness as the nature of the case

---

[45] *Lorber v. Vista Irrigation Dist.*, 127 F.2d 628, 639 (9th Cir. 1942) (citing *West Coast Life Insurance Co. v. Merced Irrigation District*, 114 F.2d 654, 678 (9th Cir. 1940); *see also* 6 Collier on Bankruptcy ¶ 943.03[1][f][i][B] (16th ed. 2013) (noting that the "fair and equitable rule has additional content in chapter 9 cases" while quoting the "reasonable expectations" standard set forth in *Lorber*).

[46] 6 Collier on Bankruptcy ¶ 943.03 (citing *Fano v. Newport Heights Irrigation Dist.*, 114 F.2d 563 (9th Cir. 1940)).

permits, of subsidiary facts on which the ultimate conclusion of fairness can rationally be predicated.[47]

Proposals like the City's financing of the PLA Transaction are precisely what the fair and equitable and best interests tests are designed to address, and the City should not be able to short-circuit the confirmation process — including the detailed findings that must accompany the Court's ultimate fairness determination — with the Motion.

28.     Similarly, in the context of section 364(e), where a debtor fails to provide sufficient information to support a finding of good faith, the court should not rubber-stamp the debtor's request for a finding under that section.[48]  Rather, where, as here, the City has not provided the necessary information to make such a finding, a section 364(e) good faith finding is not appropriate.

29.     Finally, it also makes more sense, from a practical perspective, to address the issues in the Motion as part of the confirmation process given that there are many outstanding that may impact the PLA Transaction but have not yet been

---

[47]  *Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 420 (1943).

[48]  *E.g.*, *In re White Crane Trading Co., Inc.*, 170 B.R. 694, 705 (Bankr. E.D. Cal. 1994) ("Parties similarly lack good faith when they fail to reveal material facts."); *cf. In re Buerge*, 479 B.R. 101, 107 (Bankr. D. Kan. 2012) ("The court cannot infer good faith from an evidentiary record silent on the question because such an inference would invert the burden of proof onto the objecting party.") *motion for relief from judgment denied*, 11-20325, 2013 WL 934836 (Bankr. D. Kan. Mar. 7, 2013).

addressed. For example, many of the City's pleadings have noted just how large the City of Detroit is and the difficulties that the City has experienced in providing municipal services over such a large area.[49] The City has also described the large number of property foreclosures that it has experienced and questioned what it will do with all of this land.[50] Presumably, the City will address issues relating to its infrastructure (*i.e.*, the land) as part of its proposed plan of adjustment. These issues, however, will likely impact the lighting issues that the City is seeking to address through the Motion. Syncora submits that the City would be better-served by addressing all of these issues at the same time as opposed to the piece-meal approach that the City is currently employing.

## Conclusion

30.     For the foregoing reasons, Syncora respectfully respects that the Court deny the Motion.

*[Remainder of page intentionally left blank.]*

---

[49] *See, e.g.*, *Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [Docket No. 11] ¶ 31 (discussing the City's 139-square mile footprint and challenges related to providing municipal services).

[50] *See, e.g.*, *id.* ¶¶ 34–35 (discussing the City's large number of foreclosures); Creditors Proposal, *supra* note 8, at 16–17 (same).

Dated: November 6, 2013  <u>/s/ *Ryan Blaine Bennett*</u>

        James H.M. Sprayregen, P.C.
        Ryan Blaine Bennett
        Stephen C. Hackney
        KIRKLAND & ELLIS LLP
        300 North LaSalle
        Chicago, Illinois 60654
        Telephone: (312) 862-2000
        Facsimile: (312) 862-2200

          - and -

        David A. Agay
        Joshua Gadharf
        MCDONALD HOPKINS LLC
        39533 Woodward Avenue
        Bloomfield Hills, Michigan 48304
        Telephone: (248) 646-5070
        Facsimile: (248) 646-5075

        *Attorneys for Syncora Guarantee Inc. and*
        *Syncora Capital Assurance Inc.*