UNITED STATES BANKRUPTCY COURT
                     EASTERN DISTRICT OF MICHIGAN
2                         SOUTHERN DIVISION

3   IN THE MATTER OF,              Case No. 13-53846
                                   Detroit, Michigan
4   CITY OF DETROIT, MI           November 5, 2013
    _____/   9:17 a.m.
5
                      IN RE:  ELIGIBILITY TRIAL
6             BEFORE THE HONORABLE STEVEN W. RHODES
              TRANSCRIPT ORDERED BY: PAUL HAGE, ESQ.
7
    APPEARANCES:
8
    For the City of Detroit, MI:  GEOFFREY IRWIN, ESQ.
9                                 GEOFFREY STEWART, ESQ.
                                  GREGORY SHUMAKER, ESQ.
10                                THOMAS CULLEN, JR., ESQ.
                                  MIGUEL EATON, ESQ.
11                                Jones, Day
                                  51 Louisiana Avenue, N.W.
12                                Washington, D.C. 20001-2113
                                  202-879-3939
13
                                  BRUCE BENNETT, ESQ.
14                                Jones, Day
                                  555 South Flower Street
15                                Fiftieth Floor
                                  Los Angeles, CA 90071-2452
16                                213-243-2382

17                                ROBERT HERTZBERG, ESQ. (P30261)
                                  DEBORAH KOVSKY-APAP, ESQ.
18                                (P68258)
                                  Pepper, Hamilton
19                                4000 Town Center
                                  Suite 1800
20                                Southfield, MI 48075-1505
                                  248-359-7333
21

22

23

24

25

```
 1  For State of Michigan:        MATTHEW SCHNEIDER, ESQ.
                                  (P62190)
 2                                Chief Legal Counsel
                                  Attorney for State of Michigan
 3                                Michigan Department of
                                  Attorney General
 4                                P.O. Box 30754
                                  Lansing, MI 48909
 5                                517-373-0126

 6                                MARGARET NELSON, ESQ. (P30342)
                                  Assistant Attorney General
 7                                Michigan Department of
                                  Attorney General
 8                                525 W. Ottawa Street
                                  Floor 7
 9                                P.O. Box 30212
                                  Lansing, MI 48933
10                                517-373-1124

11                                STEVEN HOWELL, ESQ. (P28982)
                                  Special Assistant Attorney
12                                General
                                  Dickinson, Wright
13                                500 Woodward Avenue
                                  Suite 4000
14                                Detroit, MI  48226-3425
                                  313-223-3033
15
    For Michigan Council 25 of    SHARON L. LEVINE, ESQ.
16  the American Federation of    JOHN SHERWOOD, ESQ.
    State, County and Municipal   Lowenstein, Sandler, LLP
17  Employees (AFSCME), AFL-CIO   65 Livingston Avenue
    and Sub-Chapter 98, City of   Roseland, NJ 07068
18  Detroit Retirees:             973-597-2500

19  For Detroit Retirement        ROBERT D. GORDON, ESQ. (P48627)
    Systems - General Retirement  JENNIFER GREEN, ESQ.
20  System of Detroit, Police and Clark, Hill, PLC
    Fire Retirement System of     151 S. Old Woodward Avenue
21  the City of Detroit:          Suite 200
                                  Birmingham, MI 48009
22                                248-988-5882

23                                RONALD KING, ESQ. (P45088)
                                  Clark, Hill
24                                212 East Grand River Avenue
                                  Lansing, MI 48906
25                                517-318-3015
```

```
 1  For the Detroit Fire Fighters    BARBARA PATEK, ESQ. (P34666)
    Association, the Detroit         JULIE BETH TEICHER, ESQ.
 2  Police Officers Association      (P34300)
    and the Detroit Police          DAVID EISENBERG, ESQ. (P68678)
 3  Lieutenants and Sergeants        Erman, Teicher, Miller, Zucker
    Association:                     & Freedman
 4                                   400 Galleria Officentre
                                     Suite 444
 5                                   Southfield, MI 48034
                                     248-827-4100
 6
    For International Union, UAW:    BABETTE A. CECCOTTI, ESQ.
 7                                   PETER D. DECHIARA, ESQ.
                                     THOMAS CIANTRA, ESQ.
 8                                   Cohen, Weiss, and Simon, LLP
                                     330 West 42nd Street
 9                                   New York, NY 10036-6976
                                     212-356-0227
10
    For the Detroit Retired         THOMAS MORRIS, ESQ. (P39141)
11  City Employees Association,      Silverman & Morris
    Retired Detroit Police and      30500 Northwestern Highway
12  Fire Fighters Association,       Suite 200
    Shirley V. Lightsey, and        Farmington Hills, MI 48334
13  Donald Taylor (Retiree          248-539-1330
    Association Parties):
14                                   RYAN PLECHA, ESQ. (P71957)
                                     Lippitt, O'Keefe
15                                   370 East Maple Road
                                     3rd Floor
16                                   Birmingham, MI 48009
                                     248-646-8292
17
    For the Official Committee of   MATTHEW E. WILKINS, ESQ.
18  Retirees:                        (P56697)
                                     Brooks, Wilkins, Sharkey &
19                                   Turco, PLLC
                                     401 S. Old Woodward Avenue
20                                   Suite 400
                                     Birmingham, MI 48009
21                                   248-971-1711

22                                   CLAUDE D. MONTGOMERY, ESQ.
                                     ANTHONY ULLMAN, ESQ.
23                                   ARTHUR RUEGGER, ESQ.
                                     Dentons
24                                   1221 Avenue of the Americas
                                     New York, NY 10020-1089
25                                   212-768-6700
```

```
 1                              SAM ALBERTS, ESQ.
                                DAN BARNOWSKI, ESQ.
 2                              Dentons US LLP
                                1301 K Street, N.W.
 3                              Suite 600 East Tower
                                Washington, D.C. 20005-3364
 4                              202-408-7004

 5   For the Retired Detroit    LYNN M. BRIMER, ESQ. (P43291)
     Police Members Association: MEREDITH TAUNT, ESQ. (P69698)
 6                              MALLORY FIELD, ESQ. (P75289)
                                Strobl & Sharp, P.C.
 7                              300 East Long Lake Road
                                Suite 200
 8                              Bloomfield Hills, MI 48304-2376
                                248-540-2300
 9
     For the Flowers Plaintiffs - WILLIAM A. WERTHEIMER, ESQ.
10   Robert Flowers, Michael Wells, (P26275)
     Janet Whitson, Mary Washington 30515 Timberbrook Lane
11   and Bruce Goldman:         Bingham Farms, MI 48025
                                248-644-9200
12
     For Ambac Assurance        DANIEL WEINER, ESQ. (P32010)
13   Corporation:              Schafer & Weiner
                                40950 Woodward Avenue
14                              Suite 100
                                Bloomfield Hills, MI 48304
15                              248-540-3340

16   Court Recorder:            Letrice Calloway

17   Transcriber:               Deborah L. Kremlick

18

19

20
     Proceedings recorded by electronic sound recording, transcript
21   produced by transcription service.

22

23

24

25
```

1                           INDEX

2   WITNESS FOR          Direct      Cross     Redirect     Recross
    THE AFSCME:
3
    STEVEN KREISBERG                    7         20          24
4
    WITNESSES FOR
5   THE UAW:

6   MICHAEL NICHOLSON      26          75

7   WITNESS FOR
    THE FLOWERS:
8
    JANET WHITSON         85           94
9   ANDY DILLON      101,134,154

10  EXHIBITS:                                              ID   ADM

11  CityX 105   Typed Notes                                75    75
    UAWX624     Affidavit                                  52    52
12  UAWX626     Email                                     122   122
    RSX870      Email                                     159   162
13

14

15

16

17

18

19

20

21

22

23

24

25

1    (Court in Session)

2        THE CLERK:  Case number 13-53846, City of Detroit,

3   Michigan.

4        MR. ALBERTS:  Your Honor, may we be excused?

5        THE COURT:  Yes.

6        MR. ALBERTS:  Thank you.

7        MR. SCHNEIDER:  Your Honor, Matthew Schneider on

8   behalf of the State of Michigan.  Before we begin, because

9   we're discussing witnesses here and the order of witnesses,

10  Ms. Brimer and I have been talking about one of the witnesses

11  that the objectors wish to have, Howard Ryan.

12      And Ms. Brimer and I are in agreement that instead of

13  having to have him called, that his 30(b)(6) deposition tape

14  could be a part of the record instead.  And Ms. Brimer and I

15  wanted to make sure that you were okay with that.

16       THE COURT:  Uh-huh, absolutely.  If that works for

17  you, it works for me.

18       MR. SCHNEIDER:  We also wanted to make sure that

19  nobody else objects to that.

20       THE COURT:  Any other objections to using the video

21  tape?

22       MR. SHUMAKER:  The city is in agreement with that,

23  Your Honor.

24       MS. BRIMER:  Thank you, Your Honor.

25       MR. SCHNEIDER:  Thank you, Your Honor.

1          THE COURT:  Are you ready, sir?

2                  CROSS EXAMINATION

3  BY MR. STEWART:

4  Q    Geoffrey Stewart for Jones, Day.  Good morning, Mr.

5  Kreisberg.  I don't think we've met.

6  A    No.

7  Q    My name is Geoffrey Stewart.  I'm a lawyer for Jones, Day

8  representing the city.  Let me collect my papers for a minute.

9       You, I think, testified that you attended the June 14

10 meeting?

11 A    Yes.

12 Q    Okay.  Can we put up Exhibit 43, Page 109?  While that's

13 being done, Mr. Kreisberg, that was the big meeting if you --

14 are you looking for your glasses as I look for mine all the

15 time?

16 A    Yeah, well -- I wasn't sure.

17 Q    I have a spare pair if you need them.

18 A    I'll be able to see.  If I have trouble, I'll --

19 Q    Okay.  I do -- I actually do have a spare pair.

20 A    Thank you.

21 Q    Okay.  And you remember that day attending a meeting for

22 I think you said that lasted a little less than two and a half

23 hours?

24 A    Yes, yes.

25 Q    And various slides were shown at the meeting, I think you

1  testified?

2  A    That's correct.

3  Q    Do you remember this slide and we're on Page 109 of

4  Exhibit 43.  Do you remember this slide being shown -- shown

5  that day?

6  A    It's -- it's possible the content was shown.  I don't

7  think it would have been slide 109 because the slide deck that

8  was shown had less slides than 100 slides.

9  Q    Okay.  I think we may have had slide deck inflation here.

10  Let me just put it this way.  Do you remember the subject

11  coming up at the meeting about what the city's intentions were

12  when it came to claims for unfunded OPEB liabilities?

13  A    Yes.

14  Q    And just for the record OPEB is short for other post

15  employment benefits?

16  A    That's right.

17  Q    And usually that's retiree benefits for health or

18  something else?

19  A    Correct.

20  Q    Okay.  I'm going to use OPEB unless that is going to be

21  confusing for you if I do.

22  A    It's fine with me.

23  Q    Okay.  Do you remember what the city said on June 14

24  about its intentions with respect to OPEB benefits?

25  A    I do.

1  Q    And what do you remember the city telling you?

2  A    Essentially that they would cease providing the current

3  benefit offerings and in lieu therefore they would provide

4  distinct benefits for pre-Medicare retirees and post-Medicare

5  retirees that would cost in -- in a pay range of approximately

6  100.00 to $130.00 per month for each of those categories with

7  a -- a separate category for retirees who may not be eligible

8  for Medicare.

9  Q    How extensive did you consider that proposal in a way of

10 changes to what the retirees currently enjoyed?

11 A    Well, the proposal lacked detail.  But the structure that

12 was described was very extensive.

13 Q    Okay.  And then the next bullet point on this slide has

14 to do with claims for unfunded pension liabilities.  Now, I

15 understand you may not remember this slide.  So if it helps

16 you, fine, but if not, you don't need to look at it.

17     Do you remember what it was the city said that day about

18 its intentions when it came to unfunded pension liabilities?

19 A    The city essentially said it would -- it would not be

20 paying into the fund for those unfunded liabilities other than

21 some of the contingency note that they talked about which

22 frankly at the time I didn't quite fully understand.

23 Q    Did you consider -- let's put it this way.  How extensive

24 or major did you consider the city's planned changes to its

25 pension liabilities?

1  A     Again the -- the city's proposal lacked any detail.  But

2  the structural changes described were very extensive.

3  Q     Okay.  Now is it not the case that your union AFSCME,

4  represents about half of all the city employees?

5  A     That's correct.

6  Q     Okay.  And is it also not the case that your union lacked

7  the authority to negotiate with respect to either pension

8  liabilities or OPEB with respect to retirees?

9  A     That's not the case.

10 Q     Okay.  Well, let me go to your deposition then.  Can we

11 put up Page 29, starting with Line 17.  And while we're doing

12 that, you remember giving a deposition in this case, do you

13 not, Mr. Kreisberg?

14 A     I do, I remember.

15 Q     That was just a few weeks ago.  And you were examined for

16 a couple of hours?

17 A     It seems like more than a couple of hours.

18 Q     Okay.  Let me start, I'm just going to read a part to

19 you.  And I'm going to read these questions and answers.  And

20 again I'm going to ask you whether this is -- these are the

21 questions you were asked and these were the answers you gave.

22       Question, by Mr. Miller, let me ask a clarifying

23 question.  Is it your understanding that under Michigan law

24 unions would be able to waive the rights of existing retirees

25 to their existing health benefits?  And then Mr. Sherman

1  interposes an objection.  And I'm jumping down to your answer.

2  The witness, again, that is a matter of law that I haven't

3  fully researched.

4      Question, so you would have no opinion about that?  Then

5  Mr. Sherwood interposes an objection.  And Mr. Miller says,

6  you can answer.  And you say, I may have opinions, but I have

7  no legal conclusion.

8      Question, what is your personal opinion?  My opinion

9  would be that the union can engage in such bargaining and

10 could possibly extensively or not extensively, you know, make

11 reasonable adjustments to retiree health care benefits.

12      Question, without the retirees' approval?  Answer,

13 without the retirees' approval.

14      Question, what about extensive changes to retirees health

15 benefits?  Could they make that without the retirees'

16 approval?  There's an objection.  You answer, I do not think

17 so.

18      Question, so the ability of the union to make changes to

19 the retirees benefits without the retirees' approval hinges on

20 the nature of the change?  Answer, yes.

21      And the more extensive the change at some point the union

22 does not have the ability to bind the retirees?  Answer, that

23 would be my opinion.

24      Were you asked those questions and did you give those

25 answers in your deposition?

1  A    Yes, sir.

2  Q    And were your answers truthful?

3  A    Yes.

4  Q    Now you were asked yesterday -- take that down and put up

5  Exhibit 505.  You were asked yesterday about the tentative

6  agreement.  Do you remember questions you were asked and this

7  Exhibit 505 was put up on the screen for you back then?

8  A    Yes.

9  Q    Okay.  It was the case, was it not -- first of all, that

10  was negotiated by a coalition of city unions, correct?

11  A    Correct.

12  Q    That did not include the uniform unions, right?

13  A    That is correct.

14  Q    It also did not include the water and sewer employees?

15  A    Again correct.

16  Q    Now is it also not the case that in those negotiations

17  the coalition did not represent retirees?

18  A    That's correct.

19  Q    Instead what the coalition did was agree that if the city

20  after this happened cut retiree benefits, the unions would not

21  help those retired employees in any grievance they might file

22  against the city?

23  A    I disagree with that characterization.

24  Q    Let's go to the last page of the exhibit then.  I think

25  that's -- there it is.  There's one more.  Should be another

1 page back there. And you want to go to Page 21 or what would

2 be 21 if it were numbered. There. Do you have that page

3 before you?

4 A    I do.

5 Q    And can you tell us what it is?

6 A    If you make that piece larger like we did the others.

7 Q    Go ahead, can you make the text larger for the witness,

8 please?

9         MS. LEVINE:  Reading glasses, is that what you're

10 using?

11         MR. STEWART:  You can have mine.  I actually do have

12 a second pair.  May -- may I approach the witness, Judge?

13         THE COURT:  Do you want to borrow some reading

14 glasses, sir?

15 A    I think we're going to be fine.

16         THE COURT:  Okay.  All right.  He's going to be

17 fine.

18         MR. STEWART:  I buy them by the box literally at

19 this age.  I have very -- very poor eyesight.

20 A    Where do you get them?  I could use them.

21         MR. STEWART:  Actually I get them on line and I will

22 after the break I will give you the web address.

23         THE COURT:  All right.  Let's proceed.

24         MR. STEWART:  I'm sorry, Your Honor.  Anyhow --

25         THE COURT:  Okay.

1  Q    Do you have this before you?

2  A    I do, yes.  Thank you.

3  Q    Okay.  And it says -- and first of all, who signed all of

4  this just in general?

5  A    These are the coalition union representatives.

6  Q    Okay.  Is your signature here by the way?

7  A    No, it is not.

8  Q    Okay.  And it says it is hereby agreed between the

9  parties that the coalition of unions waive their rights to

10 grieve and arbitrate, participate as a party, or sponsor legal

11 action brought by retirees concerning the changes in their

12 health care which may arise in 2012.  Is that -- did I read

13 that correctly?

14 A    Yes.

15 Q    And that was the coalition agreeing that if a retiree was

16 aggrieved by changes to health care benefits, the unions would

17 not support that grievance, right?

18 A    That's correct.

19 Q    Okay.  Now -- you can take that down.  There were a

20 series of meetings that counsel asked you about and I'll go

21 through them very quickly.

22     We talked about the one on the 14th already.  Then there

23 are meetings on June 20th, correct?

24 A    Correct.

25 Q    And you attended those?

1  A    Yes.

2  Q    And July 10?

3  A    I attended that meeting.

4  Q    And July 11th?

5  A    I attended that meeting.

6  Q    And there was a data room which was available to you and

7  you or people working with you accessed the data room?

8  A    Yes.

9  Q    Okay.  And during that period of time am I correct that

10  the city said to you that they were willing to talk with you

11  and share information with you and wanted to have discussions

12  with you?

13  A    The city had indicated it would share data.

14  Q    Uh-huh.  And they did?

15  A    Through the data room.

16  Q    Okay.  Well, they -- they also gave you data, did they

17  not, during various meetings that you attended with them?

18  A    The data consisted of the proposal for creditors which

19  was provided both in the shortened version and made available

20  in the longer version at the conclusion of the meeting on June

21  14th.

22  Q    Uh-huh.

23  A    And then approximately 20 or 25 page slide deck.

24  Q    Right.

25  A    On legacy costs on June 20th.

1  Q    Uh-huh.

2  A    And then a single page describing the bare outlines of

3  the OPEB proposal on July 11th.

4  Q    Uh-huh.

5  A    Most of those I would not characterize as data other than

6  the June 14th.  I would consider that a presentation which

7  included some data.  But it was not completely responsive to

8  all the data.

9  Q    I see.

10  A    That we would need.

11  Q    That all having been said, did the city not ask your

12  union more than once to make a counter proposal to them?

13  A    That was not a term that was used.

14  Q    And what term did you use?

15  A    They -- they were fond of the term feedback.

16  Q    I see.  But did the day come when your union actually did

17  prepare a counter proposal?

18  A    We never provided a counter proposal to the city.

19  Q    That wasn't my question.  My question was whether you

20  prepared one.

21  A    I did not prepare a proposal.

22  Q    Did your union prepare a proposal?

23  A    If I could -- could I ask a clarifying question of you?

24  Is that permitted?

25  Q    I'm sorry?

1  A    Is it permitted for me to ask a clarifying question?

2  Q    You can ask me whatever you want.

3  A    On what subject?

4  Q    Health care benefit, retiree health.

5  A    No.

6  Q    Did you prepare a counter proposal on anything?

7  A    We had on a post-petition -- post-petition we prepared a

8  counter proposal on active employee health care.

9  Q    Uh-huh.  Let's go to your deposition Page 82, Line 16.

10         MS. LEVINE:  Your Honor, I apologize.  Before we ask

11  a question, I just want to caution the witness to stay before

12  July 18th and not to discuss anything going on in the

13  mediations.

14         THE COURT:  That's good advice, sir.

15  Q    Page 82, Line 16.  And once again, Mr. Kreisberg, I'm

16  going to read the questions and answers and at the end I'm

17  going to ask you whether this was your testimony.  All right?

18      Question, did AFSCME make any formal counter proposal

19  subsequent to the June 20th meeting respecting retiree health?

20  Answer, we had proposed that we negotiate and suggested a date

21  for negotiations.

22      Question, but a labeled proposal to negotiate is not

23  itself a counter proposal, correct?  Answer, the counter

24  proposal would have been provided at the negotiating session.

25      Question, so you were prepared at a negotiating session

1  in July to provide a counter proposal?  Answer, we had

2  suggested having a meeting on July 10 to do such.

3       Question, but you just testified that you were prepared

4  if there were to be a negotiating session in July to make a

5  counter proposal, correct?  Answer, yes.

6       Question, okay.  Did you make any counter proposals at

7  the meetings in July 10 or July 11?  Answer, no.

8       Question, did you have at that time the counter proposal

9  to make?  Answer, can I consult with counsel?  Question, no,

10 it's a pending question.  I would like you to answer it first.

11 Mr. Sherwood says, I would just -- if it involves privileged

12 communications.  Witness, that is the point.  I discussed such

13 a proposal with counsel.  Question, I'm sorry, it involved

14 discussions with counsel.  And you go on.

15      And now let's go to Page 84, 19.

16 A    Excuse me?

17 Q    Were you asked those questions and did you give those

18 answers?

19 A    Yes.

20 Q    Okay.  Now go to Page 84, Line 19.  Question, did you

21 have a counter proposal to make?  Answer, yes.

22      Question, but you did not make the counter proposal,

23 correct?  Answer, correct.

24      Were you asked those questions and did you give those

25 answers?

1  A    Yes.

2  Q    Now, let me -- you can take that down.  I believe you

3  were asked by counsel about the provisions of the Michigan

4  Constitution which at sometimes has been called the pension

5  clause.  Do you -- do you know of something called a pension

6  clause?

7  A    Yes.

8  Q    Okay.  And it's -- I think it's Article -- Article 9,

9  Section 24 if I recall correctly.  Is it the position of

10 AFSCME that the accrued pensions, investment pensions of city

11 retirees can never be cut back?

12          MS. LEVINE:  Objection, Your Honor.  Calls for a

13 legal conclusion.

14          THE COURT:  Overruled.  Please answer.

15 Q    Is that the union's position?

16 A    I'm not a lawyer but that's our position, yes.

17 Q    Okay.  And that's something you believed back in June?

18 A    It is.

19 Q    And in July?

20 A    Yes.

21 Q    And today?

22 A    Yes.

23 Q    Have you advised any of your employees to waive their

24 constitutional rights?

25 A    I have not

1  Q    Is the union prepared to advise people to waive -- waive

2  their constitutional rights?

3            THE COURT:  Don't answer that question.

4            MR. STEWART:  I'm sorry?  Okay.  You said not to

5  answer the question.

6            THE COURT:  Yeah, I -- I don't want the witness to

7  answer that question.  You can ask him that question as it

8  pertained to pre-petition.

9            MR. STEWART:  Yes.

10           THE COURT:  But not Monday.

11 Q    Limiting us to all days before and -- and including July

12 18 of this year, was -- excuse me, was your union prepared to

13 advise its members to waive their constitutional rights?

14 A    No.

15           MR. STEWART:  Thank you.  That's all I have.

16           MS. LEVINE:  Your Honor, brief redirect.

17           THE COURT:  Uh-huh.

18                    REDIRECT EXAMINATION

19 BY MS. LEVINE:

20 Q    Just a couple of questions, Mr. Kreisberg.  With regard

21 to the deposition testimony that you were just read with

22 regard to retiree health.  It -- it sounded like you actually

23 had a written proposal sitting in your desk drawer that you

24 just didn't give to anybody.  Did you have thoughts about a

25 proposal, or did you actually have a physical written fully

1  blown proposal?

2  A    I had thoughts about a proposal that I discussed with

3  counsel.

4  Q    And did you want to have those discussions with the city

5  to see whether or not some of your thoughts would make sense

6  in a counter proposal?

7  A    Yes.

8  Q    Same question with regard to the pension issues.  Did you

9  have some thoughts about the pension proposal that was made by

10  the city that you wanted to discuss with the city to see if it

11  made sense?

12  A    Yes.

13  Q    And in addition to that did you also require additional

14  information to make those thoughts more formal into what might

15  be deemed to be an actual written formal counter proposal?

16  A    Yes.

17  Q    You were asked by counsel if -- if AFSCME was willing to

18  advise its members to waive its constitutional rights.  Do you

19  recall that testimony?

20  A    I do.

21  Q    Under the -- under the February 12th collective bargaining

22  agreement on a go forward basis, were there changes to pension

23  benefits?

24  A    Yes.  The TA reduced post effectively the pension

25  accruals of active employees.

 1  Q    And did it also permit for certain pensions for new hires

 2  to get a defined contribution plan?

 3  A    It gave the -- the city the authority to establish a

 4  defined contribution plan.

 5  Q    And did you think that making those changes violated the

 6  pension clause?

 7  A    I did not.

 8  Q    In addition to that, in -- in the example we were

 9  discussing yesterday in Illinois, where the -- there was a

10  concern that the proposed changes violated a constitutional

11  right.  Do you recall that discussion?

12  A    I do.

13  Q    Did you along with the AFSCME locals involved there

14  negotiate revisions to retiree benefits consistent with the

15  current form of the statute?

16  A    Yes.

17  Q    And were those changes implemented?

18  A    Yes.

19  Q    And -- and was there also a reservation of right that

20  allowed the local there to continue to preserve its

21  constitutional rights?  Continue to litigate over the issue of

22  whether or not their constitutional rights were abridged?

23  A    Yes.  The agreement was without prejudice to a right to

24  continue the litigation challenging the constitutionality of

25  the law.

1  Q     You were showed a page in the tentative agreement where

2  the unions agreed not to support the retirees in connection

3  with any grievance or other claims.  Do you recall that?

4  A     I do.

5  Q     In Illinois, isn't it true that the named plaintiff there

6  is an individual retiree?

7  A     I believe so, yes.

8  Q     And who is paying for the cost of that litigation?

9  A     The union is, the AFSCME and as well as other unions are

10 challenging it as well.

11 Q     One more follow up question.  How long did the

12 negotiations take for the tentative agreement, recognizing

13 that it was Thanksgiving and Christmas and we weren't in a

14 pre-bankruptcy filing regime.  But actual days of negotiation,

15 about how long did it take to negotiate that coalition

16 agreement?

17 A     Yeah, I really don't know the number of days the parties

18 met.  But it -- it occurred over a period of a few months, the

19 negotiations.  But there's -- in those negotiations like many

20 others there's a period of intense activity which is probably

21 about 60 to 90 days.

22          MS. LEVINE:  Thank you.  No further questions, Your

23 Honor.

24          MR. STEWART:  If I might, Judge, just a few raised

25 by the questions.

```
 1              THE COURT:  Yes, sir.

 2                    RECROSS EXAMINATION

 3  BY MR. STEWART:

 4  Q    How long did the negotiations in Illinois take?

 5  A    The negotiations in Illinois over the retiree health

 6  care?

 7  Q    What you just talked about.

 8  A    They were part of a master agreement involving many many

 9  issues.

10  Q    And how long did they take?

11  A    I believe they lasted over a year.

12  Q    Okay.  And you were asked about the tentative agreement.

13  Were vested pension rights reduced under the tentative

14  agreement?

15  A    Not at all.

16  Q    Were vested pension rights reduced under the tentative

17  agreement?

18  A    Maybe I didn't understand the last question.  Did you

19  just repeat the question twice?

20  Q    And maybe I just repeated myself.  Were any vested rights

21  to be reduced under the tentative agreement?

22  A    Not that I'm aware of, no.

23  Q    And is that why in your opinion there is no violation of

24  the pension clause?

25  A    Yes.
```

1          MR. STEWART:  Thanks.  That's all I have.

2          THE COURT:  In one of your answers, or maybe more

3   than one, you used the phrase TA.  Is that tentative

4   agreement?

5   A    Yes, sir.

6          THE COURT:  All right.  Any more questions for the

7   witness?  You may step down, sir, and you are excused.

8   A    Thank you.

9       (WITNESS STEVEN KREISBERG WAS EXCUSED AT 9:40 A.M.)

10          THE COURT:  Thank you for your testimony.

11          MR. DECHIARA:  Good morning, Your Honor.  Peter

12   Dechiara from the law firm of Cohen, Weiss, and Simon, LLP for

13   the United Auto Workers International Union.  The UAW for its

14   first witness calls Michael Nicholson who is out in the hall

15   and I will go get him.

16          THE COURT:  Thank you.

17          THE WITNESS:  Good morning, Your Honor.

18          THE COURT:  Step forward, please.  Raise your right

19   hand.

20       (WITNESS MICHAEL NICHOLSON WAS SWORN)

21          THE COURT:  Please sit down.

22          MR. DECHIARA:  Your Honor, before we begin, I'm

23   going to be referring with the witness to a couple of exhibits

24   in the UAW exhibit book.  If I could ask the witness to please

25   locate the UAW exhibit book that's on the table there.  And if

1    I may, I'll --

2              THE COURT:  Yes, please.

3                        DIRECT EXAMINATION

4    BY MR. DECHIARA:

5    Q     Good morning.

6    A     Good morning.

7    Q     Would you please state your full name for the record?

8    A     Michael Brendan Nicholson.

9    Q     By whom are you employed?

10   A     International Union, UAW.

11   Q     And in what position?

12   A     General counsel.

13   Q     Does the UAW have any members who may be affected by this

14   proceeding?

15   A     Yes.  We have members who are not employees of the City

16   of Detroit, but are employees and retirees of the Detroit

17   Public Library which is a separate municipal corporation but

18   whose employees and retirees participate in the Detroit

19   general retirement system.

20        In addition, we have employees and retiree -- employee --

21   employee and retiree members who work for the City of Detroit

22   Law Department as lawyers, some Detroit Water and Sewer

23   Department employees, some civilian police investigators, some

24   paralegals, and I may be missing something, but I think that's

25   about the -- the size of the list.

1  Q    So about?

2  A    You know, less than 200 employees.  Less than 200

3  retirees.  I don't have an exact count, but to give you an

4  idea of the magnitude, Your Honor.

5         THE COURT:  Okay.  Can you point that microphone

6  more right at you?  You can adjust the --

7  A    Like this?

8         THE COURT:  Yes.  That's better.

9  A    Okay.

10        THE COURT:  Don't -- don't speak too close to it,

11  but it needs to be pointed right at you.

12  A    All right.  I'll look for your reaction to see if I'm

13  talking too loud.

14        THE COURT:  Okay.

15  Q    Where and when did you go to law school?

16  A    I attended the University of Michigan Law School and I

17  graduated with an honors J.D. degree in 1977.

18  Q    And can you recount for us briefly your professional

19  career since law school?

20  A    Having left law school, I -- my first job was with the

21  appellate court branch of the National Labor Relations Board

22  at their headquarters in Washington, D.C.  I argued cases in

23  the various United States Courts of Appeals around the

24  country.

25        I also, while I was there, took up an interest in

1  bankruptcy law.  They were looking for people in a branch

2  called the -- the special litigation branch to help on

3  bankruptcy matters.  And so I did that.  That was actually my

4  first involvement with bankruptcy as a lawyer for the labor

5  board.  I worked for the labor board until March 1980.

6  Q    And what did you do next?

7  A    I was hired as a lawyer by International Union, UAW.  I

8  had clerked there during law school.

9  Q    And how long did you stay at the UAW?

10  A    That time I stayed from 1980 until 2000, I believe.  2000

11  or 2001.  And --

12  Q    And during that period what -- what kind of work did you

13  do at the UAW?

14  A    The first -- continuing my theme of -- I did a lot of

15  different kinds of work, but one of the first things I

16  remember when I went there was I got in on the tail end of the

17  Chrysler, I won't call it a bankruptcy because it wasn't in

18  Bankruptcy Court, but it was a restructuring through Congress.

19      Learned about retiree insurance issues there for the

20  first time before there was an OPEB, before that term existed.

21  I worked on that.  We went into a severe financial crisis in

22  the auto industry almost with my starting.

23      The UAW when I hired in had a million and a half members

24  and that started a decline, mostly in the parts industry, but

25  also otherwise in a lot of business failures, a lot of

1  bankruptcies.  And I dealt with those issues and the impacts

2  on employees and retirees.

3  Q    Were you involved in any legislative activities while you

4  were at the UAW in that period?

5  A    I was.  I was basically -- because I was the lead

6  bankruptcy lawyer in the eighties for the UAW, I was involved

7  in a number of high profile cases, one of which was LTV.  Your

8  Honor may remember that.  It wasn't in this Court, it was in

9  the Southern District of New York.

10     And the case began by the debtor which was a conglomerate

11 and had steel mills where the steel workers were the union,

12 but also had an aerospace division in Texas where we were the

13 union.  The debtor stopped paying retiree health care

14 immediately upon filing and there was immediate reaction in

15 Congress.  An emergency piece of legislation was passed

16 reversing that decision essentially.

17     And then longer term legislation was considered and

18 enacted.  I was at work directly with Senator Metzenbaum's

19 staff who was the sponsor of the bill that included among

20 other things Section 1114 of the Act and I actually drafted

21 significant portions of 1114 as well as the Senate report that

22 accompanied it.

23 Q    What did you do after 2000?

24 A    I retired from the UAW.  I went to work for the office of

25 the election administrator of -- for the International

1  Brotherhood of Teamsters.  That takes a little bit of

2  explanation, but not much.

3      So the Justice Department had sued the Teamsters under

4  the Racketeering and Corrupt Organizations Act back in the

5  late eighties I think.  And to -- in an effort to remove the

6  influence of organized crime in the Teamsters union.

7      And that was settled with a consent decree that was

8  administered and still is administered.  It's still alive

9  today by the Justice Department.  And one of the pieces of the

10  consent decree was that Justice Department and Court approved

11  monitors would monitor the International officer elections of

12  the Teamsters and issue decisions.

13      So I ran with Mr. Wertheimer who was the election

14  administrator appointed directly by Justice.  I was the

15  general counsel of that.  I ran a team of lawyers and

16  investigators around the country dealing with issues from as

17  mundane as, you know, whether an election was run properly, a

18  local union delegate election to issues of alleged -- alleged

19  corruption.  And I investigated, I deposed, and I ran a team

20  of about 30 or 40 people all around the U.S.  Who were mostly

21  lawyers, but some Justice -- or some labor department

22  investigator types as well.

23  Q    And how long did that job last?

24  A    About -- I did that until -- I think I must have started

25  there, I must have started there in 2001, so it was about

1  three years.  So I ended that in 2004.  The election was held,

2  we certified the results, finished our forensic accounting and

3  all -- all the work that went with this, a lot of work.  And

4  the UAW asked me to come back and I did.  I returned to the

5  UAW.

6  Q    And how long did you remain at the UAW?

7  A    Not long.  I was there about 19 months as I recall and

8  then I was offered a tenured professorship at Indiana

9  University which I accepted.

10 Q    And while you were at -- while you were at Indiana

11 University did you also perform legal work?

12 A    I was allowed to do some work on the side under my

13 contract and I started out in a full time position.  I worked

14 also part time for a while when I got involved in some very

15 interesting legal work and they allowed me to work part time

16 in addition to teaching the courses that I taught.

17 Q    What is the -- the legal work that you did?

18 A    The legal work I did was pretty much the same kinds of

19 things that I had specialized in.  So I -- I was there until

20 2010.  So it's about a six year period part full time, part

21 part time.  And I worked on retiree insurance litigation.  I

22 worked on the Dana Chapter 11 which worked on with people at

23 Jones, Day.  I know a couple of the people sitting in the

24 courtroom from that.  And we had a successful resolution of

25 that Chapter 11.

1    We recovered -- we recovered $723,000,000 that went into

2  a VEBA fund for retiree health care.  And that VEBA actually

3  was in some ways, if you looked at it at that point in time at

4  the onset, better funded than the VEBA's that were eventually

5  -- came out of the General Motors, and Chrysler, and Ford

6  situations.  I was very proud of that.

7  Q    And then when did you return to the UAW again?

8  A    I returned to the UAW in 2010.  I finished up my -- my

9  courses and I was offered a job by the newly elected President

10 of the UAW, Bob King to come and be his general counsel.

11    One of the -- I had gotten to know Bob from working on

12 the Rouge Steel bankruptcy which is local.  But it was filed

13 in Bloomington, Delaware and also a successful, very

14 successful result.  That steel mill is still operating and the

15 retirees are still getting their retiree insurance.

16    And Bob got to know me through working on that and asked

17 me to come back and be his general counsel and I accepted.

18 Gave up my tenure and left Indiana University.

19 Q    Over the years that you've been at the UAW, have you

20 engaged in any types of negotiations?

21 A    Yes.

22 Q    Can you tell us what types of negotiations you've been

23 involved in?

24 A    Many kinds.  First of all, collective bargaining

25 negotiations by which I mean negotiations for collective

1  bargaining agreements which typically run in cycles.  They

2  could be three years, they could be four, they could be five.

3  The law doesn't set a -- a fixed term.

4      So that's the most typical kind of collective bargaining.

5  A person in my position did not do collective bargaining of

6  that type except for major companies.  And my predominant

7  assignment for that kind of collective bargaining over the

8  years, really over the 20 year span I was there was for Ford

9  Motor Company.  I worked with the UAW's lawyer at the Ford

10 Motor Company negotiations.

11 Q    Were you involved in any other types of negotiations in

12 your years at the UAW?

13 A    Many.  We had plant closing negotiations which are a type

14 of collective bargaining under the National Labor Relations

15 Act dealing with plants that are closing or relocating.  There

16 may be benefits issues.  There's all kinds of issues that have

17 come up, transfer rights.  I did that kind of negotiations.

18     Also there's a whole another branch of negotiations that

19 aren't collective bargaining negotiations per say but are

20 negotiations in relationship to litigation.  I did much of

21 that.  Much -- I'd say more of that than collective bargaining

22 negotiations.

23     And then bankruptcy itself is a sort of a sub -- a subset

24 of that.  Bankruptcy is a kind of litigation in a way.  And

25 the lead up to bankruptcy is kind of in some ways like the

 1  lead up to regular litigation.  There's differences too, but

 2  bankruptcy insolvent -- let's -- let's use the term insolvency

 3  negotiations.  I did a lot of insolvency negotiations over the

 4  years.  That was my predominant area of expertise over the

 5  years.

 6  Q    Have you been involved on behalf of the UAW in

 7  negotiations regarding employee benefits?

 8  A    Yes, I have.

 9  Q    Can you give us any examples?

10  A    I -- two come to mind.  One reminds in -- me in some ways

11  of this case.  It was one of my first ones.  That was the

12  first case in which I was a co-chair of a creditors'

13  committee.  I'd served on -- served on a number of creditors'

14  committees over the years.

15      I was co-chair of the -- the UAW was co-chair, I was the

16  person sitting.  It was an institutional appointment on that

17  committee.  And it was a -- a heavy -- heavy earth moving

18  equipment division of General Motors.  It was spun off.

19      And a few years after it was spun off, with the

20  management in place that was there under General Motors went

21  bankrupt, filed -- filed for bankruptcy.  And the UAW and the

22  other creditors, none of them labor, we were the only labor --

23  labor creditor, determined through our experts and our lawyers

24  and our own knowledge of the business, that the business was

25  under capitalized by General Motors.  That the current

1  management had a conflict of interest and they were reluctant

2  or would refuse to sue -- the debtor, would refuse to sue

3  General Motors.

4      And so the creditors' committee authorized and our

5  lawyers filed a lawsuit, an equitable subordination lawsuit

6  attacking the -- the setting up of this company as an under

7  capitalized company.  We -- that resulted in a recovery, a

8  settlement, and a recovery that funded a plan that treated

9  creditors very well.

10     And we -- had we not acted, because the debtor refused to

11 act against somebody who was jointly responsible, the debtors

12 would have -- or the creditors would have received virtually

13 nothing.

14     And the other case is -- and also bears some similarities

15 to this.  It's important.  It's actually -- I'm very proud of

16 this too.  This is the first VEBA that I know of that was ever

17 set up.

18     Allis Chalmers.  Allis Chalmers was a company that at one

19 point had tens of thousands of workers and minimal number of

20 retirees.  And over time the balance shifted, the company

21 shrank, they sold off one product line after another.

22     And at the time I got involved they had 12,000 retirees

23 and less than 1,000 workers, the bulk of which on the hourly

24 side were UAW.  They hired Joe Califano who was LBJ's

25 secretary of HEW to come in and talk to us, a good Democrat

1  so a friend of ours.

2      And told us -- they told us they couldn't afford retiree

3  health care on a cash flow basis, it was going to kill them.

4  And we talked about it and it was my advice that we asked them

5  to pay for an investment banker. We at that point, really had

6  no dealings with investment bankers because I had thought that

7  the best deal for our members active and retired, would be if

8  the company was sold as a going concern.

9      What was left was a viable company. And that the

10 proceeds would be used at that point to fund retiree health

11 care, pay out the creditors a premium as well. And we

12 accomplished that and funded a VEBA for those retirees. Most

13 of them have died off now, but there's still some left and the

14 VEBA is still alive and paying retiree health care. That was

15 in -- around 1985, '86 that that started.

16     So that -- that is a case that in the Chapter 11 side, is

17 -- is instructive and in fact was a paradigm in many ways for

18 subsequent events. Many VEBA's have been negotiated. OPEB

19 still wasn't a term of art at that time.

20     It became a term of art when the Financial Accounting

21 Standards Board passed FAS 106 which required companies to

22 book unfunded retiree health care liability and then the flood

23 gates were open in terms of this becoming a live issue in the

24 private sector side, not on the public side.

25     We don't have a lot of public members, we have some.

1 Obviously Detroit and State of Michigan and some others around

2 the country.  But that in -- in many ways that case was a -- a

3 paradigm for what was to come in the following decades.

4 Q    Has the UAW to your knowledge ever been involved in

5 settling retiree benefit disputes outside of bankruptcy?

6 A    Yes, we have.

7 Q    And can you explain how that works?

8 A    Yes.  So we often, very often in ongoing bargaining

9 relationships with companies, are met with bargaining demands

10 to -- in collective bargaining negotiations, to reduce retiree

11 health care benefits for retirees who are already retired.

12      And we have -- our union has historically taken the

13 position based on a very to us, where this shows how much

14 inside base of all this is, I guess, but a very significant

15 and important footnote in, whose number I remember Footnote

16 20, in Allied Chemical Workers v Pittsburgh Plate Glass.  I

17 think it's in Volume 414 of the U.S. Report.

18      And that footnote says that it's about whether retiree

19 benefits for those already retired or what are called

20 mandatory bargaining subjects under the National Labor

21 Relations Act.  And it says they are not.

22      And in this Footnote 20 even more significant in some

23 ways to us, is a statement that with respect to already vested

24 benefits as a matter of law, federal labor law, retirees have

25 to individually consent to have their vested benefits reduced.

1 Unions or anybody else, their neighbor, the retiree

2 association, nobody has the right to do it for them unless

3 they give them that right.  They have to agree themselves.

4      So we have taken the position historically when employers

5 address us, come to us with this, at the onset especially in

6 collective bargaining negotiations, that those are things that

7 we can't bargain about.  The Supreme Court says they're

8 protected.

9      However, we live in a real world.  And if we are -- if we

10 are convinced, and I know this from countless cases that I've

11 been involved in, if we are convinced that there are risks

12 inherent in the situation, and that those risks require a

13 consideration of making a deal, some sort of compromise that

14 would put our retirees in a better position long run -- in the

15 long run, then we are open to negotiations.  But always with

16 the caveat that the results because of <u>Pittsburgh Plate Glass</u>

17 have to be accomplished through a class action approval

18 process always.

19      And all the settlements that we've reached in -- in that

20 kind of litigation, and even sometimes pre-litigation talks

21 are -- are couched in that -- with that condition, very

22 important condition to us.  You'll note as an analog, Judge,

23 1114 has a provision in it, I remember at the table being the

24 scribe of this sentence that says in 1114 unions are the

25 authorized representative and can negotiation, this is not a

1  quote, but can -- they can negotiation the reductions.

2      It was our idea to put that in there so that 1114 as a

3  process, Chapter 11 as a process could, you know, it's kind of

4  a quick moving -- can be quick moving process, especially 1113

5  and 1114.  And they're comparative to each other in some ways.

6      And we wanted to -- we -- we thought it should be clear

7  and we convinced our friends on capitol hill and I think the

8  lobbyists for the other side as well that that was a good

9  idea.

10      But outside of Chapter 11, you have to have this class

11  action process.  And what we do is, so you can understand our

12  thinking, we look at the types of risks that are involved.

13  And there are two basic kinds of risks.

14      There's insolvency risk and there's litigation risk.

15  Litigation risk is the risk that the employer either has sued

16  or will sue and sue the retirees, sue the union, and ask for a

17  reduction in benefits because the benefits aren't vested.  Ask

18  the Court to say the benefits aren't vested.  That's a

19  litigation risk.

20      Insolvency risk is a risk of collection.  That's what we

21  were facing in Allis Charmers by the way.  It was insolvency

22  risk.  They never even -- they admitted they owed them

23  lifetime retiree health care benefits that they couldn't

24  change.

25      But we were faced with insolvency risk and we either

1  could deal them now or face a company that was going to, we

2  thought, increasingly shrink in terms of its asset value.  And

3  at the end of the day the cash would run out and we wouldn't

4  be able to pay.

5       So we -- we were the ones who initiated that process.  We

6  suggested Chapter 11 to them and they ultimately agreed.  And

7  -- and so those are the kinds of -- that's the kind of

8  thinking that -- and I'm sorry about running on, but that's --

9  it's a complex area.  That's the kind of thinking we engage in

10 in deciding whether to negotiate about retiree health care.

11      But you got to understand what negotiation means.  It --

12 it -- the caveat about class action approval is critical and

13 it's driven in our view by the requirement of Footnote 20 in

14 <u>Pittsburgh Plate Glass</u>.

15      No one has ever really quarreled with us on the -- in the

16 settlement fund on that.  That's how when we settle we always

17 do it on a class action basis.

18 Q    You've testified about various negotiations regarding

19 insolvency that the UAW has been engaged in.  Do you know

20 whether the Jones, Day law firm has ever been on the other

21 side of those negotiations?

22 A    Yes, yes.  They weren't, you know, a lot of -- there's a

23 lot of law firms that do this.  Jones, Day does it.  And with

24 us there were two cases that I can think of, Dana first of

25 all,

1      They were the lead counsel, Corrine Ball was the -- the

2  lead counsel of the lead counsel firm, Jones, Day.  Andy

3  Cramer was the sort of co-lead counsel.  He's a person we at

4  the UAW greatly respect.  He's unfortunately passed away a

5  little bit ago.  He's a deal maker par excellence and we miss

6  him.

7      And the other -- and that resulted as I said in a -- in a

8  very well funded VEBA.  Also all the plants really kept open.

9  We have a good collective bargaining relationship with this

10  company, Dana.  It's a -- it's a real positive.  So that's

11  one.

12      And then on the tail end of the General Motors, I was

13  gone -- I was not at the UAW for the GM and Chrysler 11's.

14  But there has been some spallo on litigation in -- from

15  General Motors that some of it in the Bankruptcy Court, some

16  of it is now pending in this Court.  And although Jones, Day

17  was not the lead counsel, was not counsel according to the

18  appearance sheet that I looked at it in the out of Court VEBA

19  -- sorry I'm confusing two things.

20      Let me start over.  There -- General Motors filed Chapter

21  11 as everyone in this city knows.  A deal was reached.  The

22  company survived under new ownership.

23      Following on from that, there was a dispute between the

24  UAW and General Motors about whether 450,000,000 additional

25  dollars was owed to the GM VEBA.  Litigation was had,

1  commenced in both the Bankruptcy Court here in the Eastern

2  District of Michigan.  The Bankruptcy Court ruled that the

3  litigation should proceed here, it's pending in front of Judge

4  Cohn.  To this day we're waiting -- pending on dispositive

5  motions.

6      And Jones, Day was involved, but our primary -- my

7  primary dealing with Jones, Day on that was -- was trying to

8  see if a settlement could be negotiated and talk to the other

9  side, and talk to Mr. Cramer and we determined we were too far

10  apart.  And so -- and we haven't really pursued that.

11      So Dana and General Motors but not really the -- the

12  heart of the bankruptcy, but a follow -- follow on piece of

13  litigation.  That's -- that's my knowledge about Jones, Day.

14      There are other Jones, Day matters that I have been

15  personally involved in.  Continental Tire and some other ones

16  I'm probably missing, but that is -- we do have some dealings

17  with Jones, Day, yes.

18      And we were -- and I'll say this.  When -- when the --

19  because of our positive relationship with Mr. Cramer,

20  particularly we didn't know for sure when this process started

21  at Detroit before the filing, the sort of lead up to the

22  process until the filing.  We -- we wondered whether that, you

23  know, positive relationship would -- would continue or not.

24  Q    Did you attend the June 14th, 2013 meeting where Mr. Orr

25  presented his document called proposal to creditors?

1  A    I did.

2  Q    What's your recollection of that meeting?

3  A    Well, there was a book that was passed.  My guess is,

4  it's in evidence.  And they walked through the book and

5  described the various pages and the explanation passed back

6  and forth between various people.

7      Up on a dais, it was held in a room out at the airport.

8  There was a dais and -- and a number of representatives from

9  Jones, Day and some of the other professional firms that are

10  in the case today, where they were talking and they made a

11  presentation.  People listened.  And then at the end of the

12  listening they -- there were cards that were passed out if

13  people wanted to ask questions and people filled in cards.

14  Q    Were --

15  A    And they were read out, not by the questioners, but by

16  the people on the dais and -- and answered.

17  Q    Were the people who were invited to attend the meeting

18  allowed to speak freely during the meeting?

19  A    They weren't allowed to speak at all.

20  Q    In any of your prior experiences in negotiations, had you

21  ever attended or participated in negotiations where one side

22  wasn't allowed to speak freely?

23  A    With respect to all the various kinds of negotiations, I

24  have testified to just now, and if there's any others I've

25  missed, any negotiations of any type, I have never ever been

1  in negotiations where only one side speaks.

2  Q    At the June 14th meeting, was Mr. Orr asked about Article

3  9, Section 24, of the Michigan Constitution?

4  A    He was.

5  Q    Do you recall whether he gave a response and if so what

6  it was?

7  A    It -- it was something to the effect that -- that, you

8  know, the question was something like does that -- how does

9  that affect what you want to do.  Because the book they passed

10 out said they wanted to cut pension benefits.

11     And he said well, it might take legislative action or

12 agreement.  And that was the extent of it, it was a very short

13 answer.

14 Q    After the June 14th meeting, did you report back to the

15 UAW leadership about Mr. Orr's proposal?

16 A    I did.

17 Q    And what was -- can you describe that interaction that

18 you had with the UAW leadership?

19 A    Yes.  I talked to our President Bob King directly one on

20 one.  I reported what happened.  He asked me to be --

21 personally lead our effort despite the small number of

22 retirees we had because we care deeply about what happens to

23 the City of Detroit, and its citizens, and its retirees, and

24 its employees.  And it's our home.  And he said, let's do

25 everything we can to protect the retirees and let's try to

1  play a constructive role in trying to bring a resolution of

2  this.

3  Q    Did you attend a June 20th meeting regarding the proposal

4  that the emergency manager had made?

5  A    I did.

6  Q    And was the same procedure that you testified about

7  concerning the June 14th meeting in place at the June 20th

8  meeting, i.e. that attendees were not allowed to speak freely,

9  but had to submit cards?  Was that same procedure in place?

10 A    It was.  The dynamics of the meeting were just a little

11 different.  I just thought of this sitting here now.  In the

12 airport meeting the -- the city professionals were up -- up on

13 the dais overlooking us.  And this meeting happened to be in

14 an amphitheater in the 13th floor of the city county building

15 and everybody was looking down on them like an operating room

16 where the surgeons all look -- the surgeon students look down

17 at the operating table.  So it was a little different.

18     But the card thing was exactly the same.  If you had a

19 question -- Mr. Orr wasn't there.  So it was led by Heather

20 Lennox and some other Jones, Day and other professional

21 people.  But the same process was there, they passed out

22 cards.

23 Q    And did you submit any question cards at that meeting on

24 June 20th?

25 A    I -- I submitted two question cards.

1  Q    Okay.  I'd like to draw your attention to Exhibit 623.

2  It's -- it should be in the book behind you.  And if we can

3  have it on the screen as well.

4  A    This.

5  Q    The image on the screen is in black and white and it's

6  hard to read.

7  A    That's kind of blacked out in the corner, so --

8  Q    Right.  But the book, the hard copy book has it in color.

9            MR. DECHIARA:  And, Your Honor, I -- the -- the

10  Court has been submitted copies in color that are legible.

11  A    Are you ready, Your Honor?  You've got it?

12  Q    Since -- Mr. Nicholson, since legibility of the -- of the

13  image on the screen is -- is limited and since -- since it's

14  in handwriting, I would just ask you to -- to read into the

15  record the -- the question that you submitted and Exhibit 23

16  is a two page document.

17       So let me first ask you to read the -- the first one.

18  It's -- it's stamped at the bottom UAW 0302.  Can you read

19  what your question was on that page?

20  A    That's actually two questions on that one card.  And the

21  first -- and as you can see, there's a little cut off at the

22  bottom, but I can help piece that together.

23       So question one is, how does the emergency manager

24  propose to compromise the rights to pension payments which are

25  protected by the Michigan Constitution?

1       Question number two was, how could Governor Snyder

2   authorize a Chapter 9 filing by the city without violating

3   Article 9, Section 24 of the Michigan Constitution given the

4   announced intention and then I believe the words are of the EM

5   to impair and diminish pension benefits.

6       You can see the ish and the D in front of -- in front of

7   pension.  That's diminish and you can see the R and the

8   capital I and so on on impair before the -- it's not a

9   preposition, whatever the word is sorry, but -- but that --

10  that's basically what it says.

11  Q   Do you recall whether you received a response to those

12  questions that you posed at that meeting?

13  A   Heather Lennox responded to that.

14  Q   Do you recall what she said?

15  A   Yeah.  I -- I will tell you.  And I'm going to take it

16  one question at a time here.

17      Basically the response on the first one was kind of a

18  non-response.  I didn't really understand --

19          THE COURT:  Just tell us what she said, sir.

20  A   Okay, I will.  I will.  Let me think.

21  Q   Well, let me ask you, do you have a verbatim recollection

22  of what she said?

23  A   I don't have a verbatim recollection.

24  Q   What's your best recollection of what she said?

25  A   My best recollection is she said something like, well

1  we're just -- that's something we're just going to have to

2  deal with.  Something like that.  And that is not verbatim.

3     And then on the second question, I had a more specific

4  recollection about Governor's Snyder's authorization.  And

5  with respect to that, Ms. Lennox said, it's a two -- and again

6  this is not verbatim, but it's very close.

7     It's really a two part process.  The Governor authorized

8  this bankruptcy and then what happens to the pensions just --

9  is just something that happens in the Chapter 9 proceeding.

10  So they don't happen together, it's a two part process.  I

11  remember that phrase.  And I -- I heard that.

12  Q  Let me now turn you to the second question card, the one

13  that's stamped at the bottom UAW 0303.  Can you read into the

14  record what the questions are on that card?

15  A  Yes.  This is a -- sorry about the complexity of this,

16  but there is a -- three questions with a sub part in the first

17  one.  So we'll take it in terms of reading one sentence at a

18  time.

19     The first sentence is, does the emergency manager law

20  under which Mr. Orr was appointed, grant my union, and it's

21  the UAW, the authority to A, negotiate over, and B, compromise

22  either X, OPEB for present retirees or Y, pension benefits

23  already accrued by present and/or future retirees.

24     The second sentence says, please explain and cite me to

25  the basis for any such authority.

1    And the third sentence says, if the answer to either of

2  the above is no, who does Mr. Orr propose to negotiate with.

3  Q    And do you recall whether there was a response given to

4  those questions?

5  A    The response was, in -- in so many words, that they

6  didn't have any doubt about the -- the ability of the -- Mr.

7  Orr to negotiate.  It was up to the other side to figure out

8  what to do.  It was our problem in other words.

9    And that's not what I was asking.  I wasn't asking

10  whether it was our problem.  I was asking legally what --

11    THE COURT:  You've answered the question, sir.

12  A    Okay.  Thank you.

13    MR. DECHIARA:  Your Honor, Exhibit 623 is already in

14  evidence, I won't move it into evidence.

15  Q    Mr. Nicholson, was the UAW willing to negotiate with the

16  emergency manager over reduction in accrued pension benefits

17  for its members?

18  A    No.

19  Q    Why not?

20  A    At the meeting that we just -- the June 20th meeting, I

21  spoke after -- and I said -- I said our position on this.  So

22  you didn't ask me that, but I'll tell the Court.

23    THE COURT:  No, the simple question was, why not?

24  Please answer that question.

25  A    Okay, I will.  The Michigan Constitution, Article 9,

1   Section 24 which we believe is binding on the UAW and binding

2   on all citizens of Michigan including the Governor, precludes

3   impairment or diminishment of pension benefits.

4        And in our view it would be a violation of law for us to

5   do that.  And I also believe that only the citizens of the

6   State of Michigan through the amendment process with respect

7   to their Constitution, have the authority to change that legal

8   fact.  And that has not happened.  And the Governor can't

9   amend the Constitution, nor can Mr. Orr.  They're not

10  authorized to do so under our law, our basic law in this

11  state.

12  Q    You testified earlier about OPEB, other post employment

13  benefits.  Do you recall using that phrase?

14  A    Yes.

15  Q    Was the UAW willing to participate in the resolution of

16  OPEB issues with the emergency manager?

17  A    Yes.

18  Q    What was the UAW prepared to do?

19  A    While the pre-bankruptcy -- let's talk about the

20  pre-bankruptcy period.  I think -- and -- and limit it to

21  that.  And if you want --

22  Q    Right.  That's all I'm asking about, pre -- pre-July 18.

23  A    Right.  I previously told you, Your Honor, about this

24  process that we go through in figuring out whether we have an

25  employer who is --

1          THE COURT:  The question was, what are you -- what

2  were you willing to do?

3  A    Okay.  Well, we went through this process that I

4  described and evaluated the city.  And we -- and we looked at

5  the -- the -- we didn't have access to the data room.  And I

6  think you'll remember that.

7          THE COURT:  Again sir, you're going beyond the

8  question.

9  A    Okay.  We --

10          THE COURT:  What were you willing to do?

11  A    Based on our analysis of the situation, I told lawyers

12  for Jones, Day at a meeting on July 11th that the UAW was

13  willing to engage in a class action process to deal with and

14  try to resolve the OPEB issue and take leadership in that role

15  since we, more than any other union in the country, have dealt

16  -- had to -- had to deal with that issue.  And I asked Mr.

17  Miller, Evan Miller, I -- I said you know, there's a process

18  Evan, to deal with this --

19  Q    Who is Evan Miller?

20          THE COURT:  And again -- again you're going beyond

21  the question.

22  A    All right.  I'll let my counsel fill in.  Trying to move

23  -- move this along, Your Honor.

24          MR. DECHIARA:  Your Honor, I'm going to refer the

25  witness next to Exhibit 624 which is currently not in

1  evidence.  I've spoken to counsel for the city.  I understand

2  they have no objection, so I would now move Exhibit 624 into

3  evidence.

4          THE COURT:  Any objections?

5          MR. STEWART:  Hold on a minute.  Oh, no, no

6  objection.

7          THE COURT:  It is admitted.

8      (UAW Exhibit 624 was admitted)

9  Q    Mr. Nicholson, can you either look on the screen or turn

10  in your book to Exhibit 624?  And I would first ask you, it's

11  a three -- it's a three page document.  Can you identify what

12  each of the pages are?

13  A    It's actually a four page document.

14  Q    Thank you.

15  A    And it's -- it's an affidavit that I swore to on July

16  18th, 2013 with two exhibits that are identified in the text of

17  the affidavit.

18      (UAW Exhibit 624 was identified)

19  Q    Okay.  Can you identify the third page?  The page that

20  says Exhibit A on it.

21  A    Yes.  That's an email from David Birnbaum of Jones, Day

22  to me dated June 28th, 2013.

23  Q    Okay.  And now I'd like you to turn the page to the last

24  page of the exhibit and ask you to identify what that document

25  is.  The one that says Exhibit B on it.

1  A    That's an email I sent to Mr. Merrett and Mr. Birnbaum at

2  Jones, Day on July 9, 2013 in advance of the meetings that

3  were scheduled and that we were planning to attend with

4  representatives of the city on July 10 and 11, 2013.

5  Q    Okay.  I'd like to direct your attention to the first

6  paragraph of that email that's marked as Exhibit B.  It

7  states, UAW has requested access to the City of Detroit data

8  room maintained by your firm.  You have responded by

9  proffering a proposed non-disclosure agreement and release and

10  have made UAW's execution of such documents a condition of our

11  access to the data room.  Do you see that language that I just

12  read, Mr. Nicholson?

13  A    I do.

14  Q    And what was the UAW's position in regard to the

15  requested non-disclosure agreement?

16  A    Well, we had -- to that point not agreed to sign it.  Our

17  counsel, Cohen, Weiss, and Simon, had thought we should.  But

18  I said no, this is a public -- said to them, no, this is a

19  public proceeding involving a public entity and it should be

20  transparent and open and there should not be some secret data

21  room.  I can accept that in a Chapter 11 proceeding with a

22  private entity, but not with a public entity.

23        So but the second paragraph asked them -- you asked our

24  position at this time, but we asked them to explain the basis

25  for that condition of signing confidentiality.

1  Q      Right.  And let me --

2  A      We asked them to explain.

3  Q      Let me just direct your attention to the last sentence of

4  the second paragraph.  It says, "I would like to understand

5  the basis for withholding data room information with respect

6  to the City of Detroit based on claims of confidentiality".

7  Do you see -- do you see that sentence there, I just read, Mr.

8  Nicholson?

9  A      I do.

10  Q      Did you get a response to that statement?

11  A      Never.

12  Q      Was the UAW allowed access to the data room prior to the

13  bankruptcy filing?

14  A      Unless we refused -- unless we agree to sign the

15  confidentiality agreement and release, we were not allowed

16  access and we did not sign the confidentiality agreement and

17  release.  And this Court, as Your Honor knows, subsequently --

18  it was subsequently removed as a condition for access.

19  Q      Okay.  And just to be clear on your answer, before the

20  bankruptcy filing, did the UAW -- was the UAW given access to

21  the data room?

22  A      No.

23  Q      In your experience, how important is it in negotiations

24  over retiree benefits to have access to relevant information?

25  A      It is absolutely essential.

1  Q    Let me now refer --

2  A    Good faith negotiations cannot occur without access to

3  information.  As a matter of fact, under the National Labor

4  Relations Act that's a basic tenant of the national labor law.

5  And -- and especially when an employer is claiming inability

6  to pay.  That's a condition precedent to any good faith

7  negotiations.  And we were denied access here.

8            THE COURT:  Okay.  I think you've answered the

9  question, sir.

10  A    Thank you, Your Honor.

11  Q    Let me now refer you to Paragraph 4 of Exhibit 624.  If I

12  -- if I could have that exhibit on the screen.  It's the big

13  paragraph in the middle.

14  A    Yes.

15  Q    Do you see that paragraph, Mr. Nicholson?

16  A    I do.

17  Q    Okay.  I'm going to refer you to the sixth line that on

18  the right side of the line there's a sentence that begins,

19  please tell me what.  Do you see that?

20  A    Are you going to highlight it?  I see it.  Give me a

21  second.

22  Q    Sure.

23  A    It actually helps a lot if you highlight it because it's

24  kind of squeezed.

25  Q    Okay, yeah.  If the -- the rest of the paragraph could be

1  highlighted.

2  A    Well, you want to ask me about the first sentence that

3  you've highlighted?

4  Q    Yes.

5  A    Please tell me what authority your firm and/or Mr. Orr

6  gives the UAW the right to compromise vested benefits --

7  benefits, sorry, despite the contrary provisions of Article 9,

8  Section 24.  It's very similar to the question I asked at the

9  June 20 meeting.

10 Q    And I'm not going to read them out loud into the record.

11 It's in print, and it's highlighted on the screen.  And -- and

12 Mr. Nicholson you could read those questions yourself.

13      And my -- my question is, did you ever receive a response

14 from Jones, Day or the emergency manager to the questions that

15 are set forth in that paragraph?

16 A    Never.

17 Q    Let me now refer to the last paragraph of the -- the

18 exhibit and the last sentence of the last paragraph.  It says,

19 your full answers to the questions posed in the foregoing

20 paragraphs of this message will help the UAW determine the

21 scope of any such negotiations and the UAW's decision

22 regarding it's representative capacity in them about which

23 your firm has inquired.  Do you see that sentence?

24 A    I see it.

25 Q    What did you mean when you wrote that?

1  A    I wrote it and I meant that.  We were trying to

2  understand their point of view with respect to the ability to

3  conduct negotiations and our ability to compromise.

4       And we were trying to make decisions, we were -- I -- I

5  was the lead person here for the UAW.  And I personally was

6  trying to make decisions about whether we had a bargaining

7  partner here or not.

8       And this was part of my inquiry and thought process which

9  continued -- which I intended to continue put it that way.  At

10 that point at the July 10th and 11th meetings, key to

11 understanding the -- my motivation in asking that question and

12 saying what you've got highlighted there, your full questions,

13 et cetera, that sentence, is the fact that this was the day

14 before the July 10th and the 11th meetings.  We were going to

15 talk about pensions on the 10th and OPEB on the 11th.

16      So I sought that inquiry.  I -- I posed that inquiry but

17 never really got a response.  Never got a response at all to

18 anything in this email.  It went unresponded to.  My sworn

19 affidavit that was filed in the State of Michigan, Circuit

20 Court for the County of Ingham was un -- un -- unopposed.

21 Nobody said it was untrue.  It is true.  So, the next thing

22 that happened was, we showed up for the meeting on July 10th.

23 Q    Okay.  You anticipated my next question.  You attended

24 the July 10th meeting?

25 A    I went to the city -- I went to the City of Detroit city

1  county building to attend it and was in the room for a brief

2  period of time, also talked to Mr. Miller for a short period

3  of time out in the hall before.

4  Q    Who is Mr. Miller?

5  A    Mr. Miller is a partner at Jones, Day who is an ERISA

6  partner.

7  Q    And what happened at the July 10th meeting during the time

8  you were there.

9  A    Well, out in the hall -- out in the hall before the

10 meeting, this will not take long because I basically had to

11 leave the meeting.  Out in the hall before the meeting Mr.

12 Miller asked me if I -- if he could engage in an off the

13 record discussion with me and I said, Evan, I don't think this

14 is the time for that.

15     We have to do what we have to do here.  And so I don't

16 think this is the time, but I appreciate that.  Then we walked

17 into the meeting.

18     I saw Ed Hammond, a partner at Clark, Hill.  They're, I

19 presume, representing the retirement systems.  Ed and I know

20 each other.  We were -- worked together very closely to

21 resolve the Rouge Steel bankruptcy.  And especially on pension

22 issues and retiree health care issues.

23     And I exchanged pleasantries with Ed and he said to me,

24 you know, Mike, you should check out the legislative history

25 of ERISA which I know a fair amount -- amount about.  And --

1  but I wasn't aware of this piece.

2      And he said, Congress made clear in that legislative

3  history that the reason it didn't extend the pension guarantee

4  system to state and city employees was because it believed

5  that states and cities would stand behind their pension

6  promises.  And I said thank -- thank you for that.  I

7  appreciate that.  Then we sat down.

8          THE COURT:  Excuse me one second.  Is there

9  something you want to say, sir?

10          MR. STEWART:  Your Honor, I think -- I think maybe a

11  question and answer approach might work better here.  So I

12  would actually move to strike Mr. Nicholson's last testimony

13  and maybe we can move things along more quickly if we did it

14  that way.

15 A    I'll try to stick with question and answer, Your Honor.

16          THE COURT:  A good idea.  The Court will strike the

17  last answer, it was hearsay.

18          MR. DECHIARA:  Well, Your Honor, the witness was

19  just recounting what the conversation was he had with this

20  individual.  I don't believe that -- we're not submitting it

21  for the truth of what the other individual --

22          THE COURT:  What's the relevance of it then?  The

23  evidence is stricken.

24          MR. DECHIARA:  It's --

25          THE COURT:  Please proceed in question and answer

1  format.

2  Q    What else do you recollect from that meeting?

3  A    The meeting began -- the meeting was conducted by well,

4  such as it was.  I was there for a short period of time.

5  David Heiman, a partner at Jones, Day began the meeting by

6  saying, if you're -- and this is not verbatim, but this is --

7  this is the nub of it.

8       If you want to attend this meeting you have to agree that

9  this is a Rule 408 meeting, protected by Rule 408 of the

10 Federal Rules of Evidence.

11 Q    And what was your understanding of what that meant?

12 A    He meant that what happened in the meeting could not go

13 here, or perhaps elsewhere in terms of evidence or perhaps

14 other things, I don't know.  I responded and told him that the

15 UAW was not willing to accept that condition as a condition of

16 participation in the meeting because we believed again that

17 this should be an open process.  We're dealing with public

18 employees and we have to be able to tell our members what

19 we're doing.  We don't want to have secret meetings.

20      And we want -- and we also thought it was relevant for

21 what might happen down the road.  So I -- it was all very

22 polite, but I said I'm sorry, I can't accept those conditions

23 and I left.

24 Q    Did you attend the July 11th meeting the next day?

25 A    I did.

1    Q    Do you recall what the subject of that meeting was?

2    A    It was announced to be a meeting about retiree health

3    care OPEB.

4    Q    Okay.  Was Mr. Orr present at the July 11th meeting?

5    A    He was not present at the July 10 or 11 meetings when I

6    was in the room.  And I was in the room for all of the July 11

7    meeting.

8    Q    Do you recall a presentation by the Jones, Day attorneys

9    at the July 11th meeting?

10   A    Yes.

11   Q    And what's your recollection of the substance of that

12   presentation?

13   A    Evan Miller walked through their proposal on OPEB

14   benefits.  On -- and on health care benefits.

15   Q    Did you speak at the meeting?

16   A    I did.

17   Q    And do you recall what you said?

18   A    I spoke several times.  I asked some questions.  But at

19   the beginning before we got into the substance of OPEB in

20   response to Mr. -- Mr. Heiman said we're not going to impose a

21   408 condition on participation in the meeting.  And I said

22   that's good because I thought of a -- another reason why it

23   would be inappropriate because if this was evidence -- if --

24   it would be evidence -- it would important to look at what

25   happened because of Bildisco.  I said that

1  Q    But --

2  A    And then I spoke later in the meeting as well.

3  Q    What -- what are you referring to, by the word Bildisco?

4  A    Bildisco is a Supreme Court decision about rejection of

5  agreements pre 1113 of the Bankruptcy Code and it talks about

6  how a Court should look at what happened in dealings between

7  the parties in negotiations so to speak.

8  Q    I'm sorry, I interrupted you.  You were -- you were

9  recounting what you said at the July 11th meeting.

10 A    I spoke again after we were well into the discussion of

11 retiree health care benefits and health benefits in general.

12 Q    And --

13 A    Do you want me to say what I said or --

14 Q    Yes, recount what you said.

15 A    I'm trying to stick to the Q and A, so -- I -- several

16 questions.  And my first question as I recall was to Mr.

17 Miller because he was really the presenter.  Was could the

18 city having if this -- if this were to be, this program that

19 they were proposing were imposed in any way by agreement or

20 otherwise, would the city be free in the city's eyes to

21 eliminate the reduced benefits at any time and he said yes, it

22 would.  That was -- and then I spoke again shortly thereafter.

23 Q    What did you say then?

24 A    Okay.  I said, what recovery would there be for lost

25 benefits.  In other words the difference between a reduced

1 benefit level and the benefits that were in place at the time

2 the chapter -- at the time -- we weren't in Chapter 9. We

3 were trying to avoid Chapter 9.

4      But under a deal what would -- what would happen to that

5 differential between the benefits as they were and the

6 benefits at the reduced level. Would there be a recovery for

7 workers. And Mr. Miller said, no.

8 Q    Do you recall having any other interchanges --

9 A    I said, and I responded, that's very unusual. That's

10 certainly not the way it works in 1114 which I know a little

11 bit about.

12 Q    Did you have any other interchanges with Jones, Day

13 attorneys on July 11th?

14 A    Yes.

15 Q    Can you tell us what those were?

16 A    At the -- near the conclusion of the meeting, I spoke up.

17 I started to talk about this earlier, but near the conclusion

18 of the meeting, I having thought about this issue going into

19 the meeting, looked at Mr. Miller and said, Evan, I want you

20 to go back and tell Mr. Orr that the UAW -- well, let me stop.

21      I -- I said Evan, there's a way to deal with this despite

22 the fact that we have this issue of being able to bargain or

23 not bargain for retirees. You know what it is. And he said

24 yes, class action.

25      And I said, that's right. And I said, you should go back

1  and tell Mr. Orr that the UAW which has a lot of experience in

2  doing that, is willing to engage and lead in that process with

3  you in order to avoid a bankruptcy proceeding.  And please go

4  back and present that to Mr. Orr and get back to me because we

5  are serious about that.

6  Q    And between July 11 when you made that statement to Mr.

7  Miller, and July 18th when the bankruptcy was filed, did you

8  receive any response from the emergency manager or from Jones,

9  Day regarding the UAW's proposal to have a class action

10 process put in place?

11 A    Never.

12 Q    To what extent were there what you would consider, given

13 your experience, to -- to what extent were there what you

14 would consider negotiations over pension benefits at the June

15 14th, the June 20th, and the July 11th meetings?

16 A    There were two significant deficits that precluded

17 negotiations but each of which could have been taken out of

18 the way.  The first was access to information unimpeded by

19 secrecy.  That was not taken away.

20      The second was a process because --

21           THE COURT:  I think your lawyer wants to say

22 something to you.

23           MR. DECHIARA:  Thank you, Your Honor.

24 A    I'm sorry, I apologize.

25 Q    Specifically in my question I'm talking about to what

1  extent do you believe there were negotiations over accrued

2  pension benefits?

3  A    Did I -- if I misunderstood you about pension, I'm sorry.

4  I -- I must not have heard --

5  Q    That's fine.  But now that I've clarified the question,

6  can you answer it?

7  A    The question is, were there discussions about pension

8  benefits.

9         THE COURT:  No, that's not the question.

10 Q    The question is, to what extent in your experience, given

11 your experience --

12 A    Yes.

13 Q    Were there what you would consider to have been

14 negotiations over accrued pension benefits at the meetings

15 that you attended?

16 A    As far as the UAW was concerned, no.  And in our view

17 there could not have been because it would have been contrary

18 to Michigan's basic law, the Constitution.

19 Q    And now let me ask you the same question, but instead of

20 limiting it or instead of referring to accrued pension

21 benefits, let me ask you to what extent do you believe there

22 were negotiations over OPEB?

23 A    And this is what I started to answer before and I

24 apologize to the Court for mishearing the question.  We tried

25 to start negotiations.  There could have been -- there were

1  impediments.

2          THE COURT:  That's not the question.

3  A    Were there negotiations?

4          THE COURT:  To what extent were there negotiations.

5  A    We asked to be involved in negotiations.  We invited the

6  city to --

7          THE COURT:  And this is not a question about your

8  attitude or your intent.

9  A    But it's about --

10          THE COURT:  The question is to what extent were

11  there negotiations?

12  A    The first step in negotiations --

13          THE COURT:  I want to tell you, sir --

14  A    Okay.

15          THE COURT:  This question and the last question are

16  probably the most important questions you are asked here this

17  morning.

18  A    I understand.

19          THE COURT:  To what extent were there negotiations.

20  A    There were.  And in our view the first step --

21          THE COURT:  Were what?

22  A    There were negotiations that we tried to initiate with

23  the city over OPEB.  We invited them to negotiate through a

24  class action process.  The first step in negotiations is to

25  ask the other side to participate in the process, process that

1  will lead to a resolution.

2      We asked.  We asked that be taken back to Mr. Orr and Mr.

3  Orr never responded to us, nor did his lawyers ever.  That's

4  my answer.

5  Q    And given the lack of response by Mr. Orr, was what

6  occurred -- what actually occurred, were those negotiations?

7  A    In my view the first step in negotiations is to ask, but

8  following --

9           THE COURT:  Again you're not answering -- you're not

10  answering the questions.

11  A    Okay.  All right.

12           THE COURT:  Given your --

13  A    They never took us up on it, put it that way.

14           THE COURT:  Given your perception of what actually

15  happened, and your understanding of what negotiation means,

16  that phrase, that term means, to what extent was what happened

17  negotiation in your opinion?

18  A    I have to explain what I mean by negotiations to answer

19  that, Your Honor.

20           THE COURT:  No, you don't.  You just have to tell me

21  the extent to which it was negotiation.

22  A    The first step in negotiations --

23           THE COURT:  Okay.  This -- this answer you've

24  already given me.  If that's your answer, we'll move on.

25  Q    Mr. Nicholson, are you familiar with the Flowers

1 litigation?

2 A    One second.

3          THE COURT:  What's the matter, sir, do you need a

4 minute?

5 A    I do.

6          THE COURT:  All right.  We'll take a recess until

7 10:55.

8      (WITNESS MICHAEL NICHOLSON WAS TEMPORARILY EXCUSED AT

9 10:55 A.M.)

10          THE CLERK:  All rise.  Court is in recess.

11      (Court in Recess at 10:39 a.m.; Resume at 10:56 a.m.)

12          THE CLERK:  All rise.  Court is in session.  Please

13 be seated.

14      (WITNESS MICHAEL NICHOLSON RESUMED THE STAND AT 10:56

15 A.M.)

16          THE WITNESS:  Your Honor --

17          THE COURT:  One second.  It looks like everyone is

18 here.  Sir.

19          THE WITNESS:  There's two things I need to tell you

20 about my testimony if you'll give me permission.

21          THE COURT:  Any objection?

22          MR. STEWART:  No.  No objection, Your Honor.

23          THE WITNESS:  First of all, Your Honor, I just -- I

24 want to make the Court aware that my -- I'm trying to stay

25 focused on this, but I just learned this morning -- this

1  morning that my brother is in the hospital with end stage

2  liver cancer.  And I want to be with him.  So I'm trying to

3  stay on task here, okay?

4          THE COURT:  Okay.

5          THE WITNESS:  And -- but I think you should know

6  that because you have to judge my credibility and my frame of

7  mind.

8          THE COURT:  Right.

9          THE WITNESS:  The -- the second thing I want you to

10  know if there's something -- an additional thing I remembered

11  about I should have responded to it about the July 11th

12  meeting.  And with your permission, I'll tell you so you have

13  a complete story, but it's up to you.

14          THE COURT:  Go ahead.

15          THE WITNESS:  So, after I asked Mr. Miller to go

16  back to Mr. Orr and tell him the UAW was willing to engage in

17  a class action type process, something would culminate that to

18  resolve retiree health care out of bankruptcy.

19      Mr. Heiman -- Heiman, I'm sorry, said there isn't time

20  for that.  And I said, there is time, we got this resolved

21  very quickly in a number of cases including Ford, and GM, and

22  Chrysler.

23      That was the last discussion we had.  So the negotiations

24  such as they were, there was nothing beyond that point.  There

25  was an ask, an invitation, but no acceptance.

1   BY MR. DECHIARA:

2   Q    The last topic, Mr. Nicholson.  I'm going to ask you

3   about July 18th.  But let me first ask you some questions to

4   set the stage.  Are you familiar with the Flowers litigation?

5   A    Yes.

6   Q    And what was -- what was or is the UAW's role in the

7   Flowers litigation?

8   A    First of all, I conceived of the idea of the basic

9   premise and theory behind the litigation.  That's the first

10  part of the role.

11       Second, the UAW funds the attorney for the Flowers

12  plaintiffs.

13       Third, the UAW cooperates and lends assistance to those

14  attorneys.  However, those attorneys make their own mind up

15  with respect to representing their clients.  So that's the

16  answer.

17  Q    And do you know Bill Wertheimer, counsel to the Flowers

18  plaintiffs?

19  A    I've known Bill for decades.

20  Q    Okay.  Are you aware that the Flower plaintiffs moved for

21  a preliminary injunction?

22  A    Yes, I am aware of that.

23  Q    And are you aware of the date that the preliminary

24  injunction was scheduled to be held?

25  A    Yes.  It was scheduled by the Ingham County Circuit Court

1  to be heard on July 22nd.

2  Q    Okay.  And do you recall working with Mr. Wertheimer on

3  reply papers for that preliminary injunction motion?

4  A    Yes.  Bill came to my office at UAW solidarity house on

5  July 18th and we worked on finalizing a reply brief and I also

6  signed the affidavit which is -- which was notarized and is in

7  the record as Exhibit 624 that day.

8  Q    Now on that day, did you become aware that the retiree

9  system in its -- its lawsuit had filed papers for an ex parte

10 TRO?

11 A    We received a call.  Bill and I were in my office along

12 with our law clerk, great law clerk at the time, Kristin

13 White, working busily away on the reply brief which had to be

14 filed that day, July 18th.  So that was why we were there,

15 because it had to be driven up to Lansing as I understand it.

16      And we had a call during that day to that effect, that

17 they were going to Court and seek an ex parte restraining

18 order restraining the city from filing a Chapter 9 petition

19 because they had heard --

20          THE COURT:  All right.  Sir, you've answered the

21 question.

22 A    I'm sorry.

23 Q    Did you and Mr. Wertheimer that afternoon have a

24 discussion about the retiree systems seeking a ex parte TRO?

25 A    Yes.

1  Q    And can you recount the conversation that you and Mr.

2  Wertheimer had on that subject?

3  A    Yes.

4          MR. STEWART:  I just -- it's a proper question,

5  however, there's going to be a waiver here.

6          MR. DECHIARA:  Your Honor, first of all, Mr.

7  Wertheimer is counsel for the Flowers plaintiffs, Mr.

8  Nicholson is counsel for the UAW.  But I'm not asking for any

9  -- any discussion of any legal issues, just a discussion of

10 this event in a -- in a separate lawsuit.  And -- and it's

11 foundational, Your Honor.  It's -- it's -- it's --

12          THE COURT:  Then proceed.

13          MR. DECHIARA:  Thank you.

14 A    The question, can you repeat it?

15 Q    Can you recount your conversation with Mr. Wertheimer on

16 the subject of the retiree systems seeking the ex parte TRO

17 that you had been informed of?

18 A    We were told they were going to Court that afternoon in

19 front of Judge Aquiline.  Bill and I decided that since we had

20 to go to Lansing anyway and since that Court hearing was

21 probably going to be pretty important, that we ought to finish

22 the reply brief in the car and drive it up -- drive up there

23 right now so we got there in time for the hearing and that's

24 what we did.

25 Q    And did you have any discussion with Mr. Wertheimer about

1  whether the state should be notified of the ex parte TRO?

2  A    Yes.

3  Q    What -- can you recount that discussion?

4  A    We finished the brief on the -- I was sitting in the back

5  seat typing away on my laptop.  We finished the brief.

6  Q    This is in the car to Lansing?

7  A    The car on the way to Lansing.  And Bill asked me Mike,

8  do you think we should notify the state.  And I took it as an

9  ethical question, a practical -- what I would call in my

10 terms, practical ethics.  What's the right thing to do.

11      And I said yeah, Bill, I think we have to, it's not in

12 our interest, but I think we have to do that, that's the right

13 thing to do and he agreed.  And he proceeded to call the state

14 Attorney General's office and tell them that we were going to

15 be there even though it wasn't our motion and that there was

16 an ex parte motion being brought.

17      We didn't know ahead of time what was going to happen in

18 Court.  Bill ended up asking for relief because we had just

19 filed the reply brief and it was now a fully briefed

20 preliminary injunction motion.

21 Q    How do you know -- how do you know Mr. Wertheimer called

22 the state attorneys?

23 A    I heard him talking to them while I was in the car.  And

24 then -- and he actually had two calls with them and we

25 discussed it in the interim.  I also know because I talked to

1  the state Attorney General, the lawyer for the state, not Mr.

2  Schuette, but the lawyer for the state Attorney General, Mr.

3  Canzano.  And he told me Bill called and I told him and he

4  told me how much he appreciated Bill's ethical behavior.

5      And I said well, I was part of that and I was part of

6  that decision too.  And he said well, I appreciate you doing

7  that as well.

8  Q    Do you know what time on July 18th Mr. Wertheimer called

9  the state to notify them of the TRO hearing?

10 A    I can put it within about a ten minute window because I

11 know --

12 Q    What time?

13 A    Around 3:35.

14 Q    P.M.?

15 A    Yes.

16 Q    And how can you put it in such a tight window?

17 A    Because I remember a sequence of events, one of which is

18 -- is an email I sent that nails down the time.  It was

19 between the first and the second conversation Mr. Wertheimer

20 had with the Attorney General's office.

21     I've also seen Mr. Wertheimer's cell phone records that

22 confirm that.  But that -- but I have my own memory of it as

23 well.  And I also know from talking to Mr. Canzano because he

24 is of the same view as to the time.

25          MR. DECHIARA:  No further --

1  A    I talked to Mr. Canzano about that this morning.

2          MR. DECHIARA:  No further questions on direct.

3                      CROSS EXAMINATION

4  BY MR. STEWART:

5  Q    Good morning, Mr. Nicholson.

6  A    Good morning.

7  Q    Could we first put up Exhibit 105?  Mr. Nicholson, are

8  these notes that you took at the July 11 meeting?

9  A    They're notes I typed, yes.

10     (City Exhibit 105 was identified)

11 Q    You typed them at the time?

12 A    During the meeting.

13 Q    And why did you prepare them?

14 A    I prepared them because I was -- it turns out -- I

15 thought I wasn't -- didn't take notes at that meeting.  When I

16 found this document, I recalled that I did.  And I prepared

17 them to record some of what happened.  It's very much

18 shorthand about what happened.

19         MR. STEWART:  I'd move -- I move the admission of

20 Exhibit 105.

21         THE COURT:  Any objections?

22         MR. DECHIARA:  No objection.

23         THE COURT:  105 is admitted.

24     (City Exhibit 105 was admitted)

25 Q    Mr. Nicholson, just a couple of things.  First of all

1  just the chronology so that I understand it.  You attended the

2  June 14 meeting, correct?

3  A    Yes.

4  Q    And the June 20th meeting, correct?

5  A    Yes.

6  Q    Your union funded and you said you were a participant in

7  the thinking about the Flowers litigation?

8  A    Yes.

9  Q    That was brought July 3rd?

10  A    I believe that's right.

11  Q    And you began thinking of that before July 3rd, correct?

12  A    Yes.

13  Q    Probably about a week before July 3rd?

14  A    I -- what led me to start thinking about it --

15  Q    Well, just when -- when did you --

16        THE COURT:  The question was when did you start

17  thinking it?

18  A    I -- when I -- I can't think of the exact date, but I

19  know the event.

20        THE COURT:  Approximately.

21  A    I'll have it just a minute, I'm just lining up a

22  sequence.

23        THE COURT:  While he's thinking, can we have a copy

24  of Exhibit 105 which was just admitted?

25        MR. STEWART:  Yes, Your Honor.

1              THE COURT:  If not at this moment, then at some

2    point, please.

3              MR. STEWART:  I believe we have extras, Your Honor.

4    Let me get it from our -- may I approach, Your Honor?

5              THE COURT:  Yes.  Do you have an answer, sir?

6    A    Yes.  Within a few days after the June 14th meeting is

7    about the best I can put it -- put it to, Your Honor.

8    Q    Okay.  So let me go back.  You were at the June 14

9    meeting.

10   A    Yes.

11   Q    Within a few days you began thinking of a lawsuit,

12   correct?

13   A    Yes.

14   Q    You went to the June 20th meeting?

15   A    Yes.

16   Q    Lawsuit was filed July 3rd?

17   A    I think that's the date it was filed, yes.

18   Q    You were involved in the thinking behind and the work of

19   the lawsuit?

20   A    Yes.

21   Q    The UAW paid the lawyers for the lawsuit?

22   A    Yes.

23   Q    Mr. Flowers was a UAW member?

24   A    A proud UAW member.

25   Q    And didn't -- you did not at any point tell the city its

1  lawyers that the UAW was behind this lawsuit, did you, until

2  your deposition when I asked you that question?

3  A    I don't think I was asked, but no, I think that's right.

4  The first time I told them was when you asked me the question

5  in the deposition, I said yes.

6  Q    And then on -- on July 10 there were two meetings.  One

7  in the morning, one in the afternoon.

8  A    I was not invited to a meeting in the afternoon.  I heard

9  there was one for police and fire workers.

10 Q    And at the beginning of the July 10 meeting Mr. Heiman of

11 Jones, Day invoked Rule 408 of the Federal Rules of Evidence,

12 correct?

13 A    Uh-huh.

14 Q    And you understand that that rule is a rule designed to

15 insure the privilege that attend to settlement negotiations,

16 correct?

17 A    Yes.

18 Q    You would not agree to that, so you did not attend the

19 meeting, right?

20 A    I would not agree to accepting that as a condition of

21 attending and therefore I excused myself because they were

22 free to impose whatever conditions they want, I suppose.

23 Q    So you decided to not accept the conditions and not

24 attend the meeting?

25 A    That's right.

1  Q     Okay.  And by the way you mentioned the data room.  There

2  was a non-disclosure agreement that had to be executed before

3  the filing of the petition in this case, before one could

4  access the data room.  Do you remember your testimony about

5  that?

6  A     Yes.

7  Q     And you decided not to sign that non-disclosure

8  agreement, correct?

9  A     That's right.

10  Q     And as a result you did not have access to the data room,

11  correct?

12  A     Correct.

13  Q     Other unions did sign the non-disclosure agreement.

14  A     I don't know that for a fact.

15  Q     You don't know --

16  A     I would not be surprised if they did, but I don't know

17  that for a fact.

18  Q     Don't speculate.  If you don't know, just tell me.

19  A     I don't know that for a fact, I know what we did.

20  Q     On the -- on the morning of July 10 did other unions

21  proceed to attend that meeting?

22  A     When I left the room, there was Mr. Kreisberg for AFSCME.

23  He may have had somebody with him.  And at that point I wasn't

24  sure who on the police and, you know, July 10th.  I was in that

25  for such a short period of time, actually the only -- the only

 1  parties other than the debtor's representatives that I --

 2  sorry, the city's representatives that I remember being there

 3  were Clark, Hill people and Mr. Kreisberg.  I'm sure -- I know

 4  there were others in the room, but I -- I didn't know a lot of

 5  these people at that point in time.

 6  Q    Okay.  All right.  And then you mentioned a meeting on

 7  July 11, correct?

 8  A    That's correct.

 9  Q    You attended and those are your notes, right?

10  A    That's correct.

11  Q    Okay.  Now so our chronology from the time of that first

12  meeting from June 14th to July 11th is what, four weeks?

13  A    Whatever the calendar says.  It's about 28 days maybe.

14  Q    Uh-huh.  Now you mentioned various discussions you had

15  with lawyers for the city and in particular lawyers from

16  Jones, Day.  Do you remember your testimony on that?

17  A    I think I remember what I testified to this morning, yes.

18  Q    Okay.  That was Mr. Heiman?

19  A    I remember saying what Mr. Heiman said at the July 11th

20  meeting.  I think I just said that part of it when I just --

21  we just came back from break and -- and a little bit before

22  about David saying at the beginning of the meeting that he

23  wasn't imposing a Rule 408 condition for attendance.

24  Q    Well, you also -- and Mr. Miller.  You testified you

25  talked to Mr. Miller?

1  A     Well --

2  Q     Yes, sir, yes or no, did you --

3  A     On the 11th?

4  Q     At any time before the filing -- between the 14th and the

5  filing of the petition, did you or did you not talk to Mr.

6  Miller?

7  A     Yes.

8  Q     Okay.  And he -- did at any time did Mr. Miller tell you

9  he was not willing to talk with you some more?

10  A     He didn't utter those words.

11  Q     Did Mr. Heiman utter those words?

12  A     No.

13  Q     Now you testified about -- put up 38, please.  You

14  testified about something called a VEBA?

15  A     That is correct.

16  Q     That is a Voluntary Employee Beneficiary Association?

17  A     That's what the acronym stands for.

18  Q     And those are -- that's the class action mechanism that

19  you proposed?

20  A     A VEBA is --

21  Q     Sir, yes or no?

22  A     No, it is not per say limited to class actions, it's

23  often the result of a class action retiree insurance

24  settlement.

25  Q     Okay.  And when you --

1  A    It can also result from a bankruptcy resolution through

2  1114.

3  Q    Uh-huh.

4  A    In Chapter 11's.

5  Q    Uh-huh.  And at the time you'd had these discussions, was

6  the city in bankruptcy?

7  A    The city filed bankruptcy --

8  Q    Sir, yes or no.  At the time of your discussions before

9  July 18, was the city in bankruptcy, or was the city not in

10  bankruptcy?

11  A    The city was not in bankruptcy until --

12  Q    Thank you.

13  A    -- 4:06 p.m. on July -- on July 18th, 2013.

14  Q    Now, these class action resolutions that you told us

15  about.  You mentioned the one in Dana.

16  A    That's right.  That was not a class action resolution,

17  that was a Chapter 11 resolution reached through 1114.

18  Q    And how long --

19  A    Dana was a Chapter 11.  Your firm worked on it with us.

20  Q    Uh-huh.  And it took about a year?

21        THE COURT:  Excuse me one second.  Again, Mr.

22  Nicholson, I have to ask you please just answer the question.

23  A    Well, he said Dana was a -- a class action and it's not

24  right.  So I want to make sure you understand what the facts

25  are, Your Honor.  That's why I'm answering the way I am.

1          THE COURT:  I appreciate that very much, but your

2    job is just to answer the question.

3    A    All right.

4          MR. DECHIARA:  Your Honor, I think what the witness

5    is trying to say is, the question assumed a fact that was

6    contrary to fact.  So he was trying to explain.

7          THE COURT:  And I -- and I appreciate that.  But his

8    job is just to answer the question.  If he can't answer the

9    question, he should say that.  All right.  So let's try to

10   proceed on that basis.

11   A    I know it's not my job to object to the form of the

12   question, Your Honor.  But -- and I hear what you're saying

13   and I will comply.

14          THE COURT:  Go ahead, sir.

15   Q    Dana took about one year to resolve?

16   A    It depends on when you start counting.

17   Q    Uh-huh.  From the time negotiations began until the time

18   you were done in Dana was about one year, isn't that true?

19   A    That is not my recollection sitting here today, but I

20   don't -- I did not refresh myself on that particular question.

21   Q    Now you mentioned the VEBA that was done in General

22   Motors?  That took over one year, did it not?

23   A    There were three VEBA settlements in General Motors, Your

24   Honor, which one?

25          THE COURT:  Please answer the question.

1  A    I -- you have to tell me which VEBA settlement you mean.

2  Q    The one that this Court approved on March 2006.  That was

3  after a one year negotiation process, wasn't it?

4  A    This Court never approved a VEBA settlement in 2006.

5  Q    The Eastern District of Michigan did not?

6  A    This is a -- the Bankruptcy Court, not the District

7  Court.

8  Q    All right.

9         THE COURT:  Apart from that distinction --

10 A    Yes.

11        THE COURT:  Perfectly valid.  Did it take a year, or

12 over a year?

13 A    I was not involved in that case.

14        THE COURT:  You don't know?  Just say I don't know.

15 A    No, I don't know.

16 Q    And you're aware of the VEBA in Goodyear.  Do you know

17 about that?

18 A    I heard -- read about it in the newspapers, that's all.

19 Q    Do you know that took 22 months?

20 A    I don't know.

21 Q    So I have up on the screen Exhibit 38.  And that I'd

22 represent to you is a chart showing the cash forecast the city

23 had through the end of its 2014 fiscal year.  Starting in July

24 of 2013, what is the city's cash -- cash -- cash position

25 after one year?

1          MR. DECHIARA:  Objection, Your Honor, it's beyond

2    the scope of direct.  There's no foundation that this witness

3    can testify about the city's cash flow position.

4          THE COURT:  The objection is sustained.  You can

5    represent to the witness what the exhibit says if you want to.

6          MR. STEWART:  Well, I think I made my point.  I'm

7    going to sit down.  Thank you, Mr. Nicholson.  That's all I

8    have.

9          THE COURT:  Any more questions for the witness?

10         MR. DECHIARA:  No redirect.

11         THE COURT:  All right.  Sir, you're excused.  Thank

12   you very much for your testimony.

13   A    Thank you.

14        (WITNESS MICHAEL NICHOLSON WAS EXCUSED AT 11:16 A.M.)

15         MR. WERTHEIMER:  Your Honor, I have to go get our

16   next witness.  It will take me just a few minutes.

17         THE COURT:  Okay.  Please raise your right hand.

18        (WITNESS JANET WHITSON WAS SWORN)

19         THE COURT:  Please sit down.

20                      DIRECT EXAMINATION

21   BY MR. WERTHEIMER:

22   Q    Would you state your name and address, please?

23   A    Janet Whitson, 25260 East Deborah, Redford, Michigan.

24   Q    You are one of the plaintiffs in what we've been calling

25   the Flowers litigation?

1    A    I am.

2    Q    How old are you, Ms. Whitson?

3    A    Sixty-six.

4    Q    And are you retired?

5    A    Yes.

6    Q    Where are you retired from?

7    A    The Detroit Public Library.

8    Q    And when did you retire?

9    A    2002.

10   Q    How old are you now?

11   A    Sixty-six.

12   Q    Could you briefly tell the Court how you came to be a

13   plaintiff in the Flowers litigation?

14   A    On the Local 2200 list serve there was a query, asking if

15   someone would be interested in volunteering to be on the part

16   of the lawsuit and I volunteered.

17   Q    And Local 2200 is the UAW local that represents the

18   active librarians?

19   A    Yes.

20   Q    When did you begin working at the public library?

21   A    May of 1969.

22   Q    At that point what education did you have beyond high

23   school?

24   A    I had a Bachelor's Degree in history from the University

25   of Detroit.

1  Q    And when did you obtain that Bachelor's Degree?

2  A    May 3rd of 1969.

3  Q    So you started right in at the library right out of

4  college?

5  A    Yes.

6  Q    What did you hire in as?

7  A    A pre-professional librarian.

8  Q    When you hired in as a pre-professional librarian, did

9  you make any kind of commitment to the library as to education

10 you would have to undergo?

11 A    Yes.

12 Q    And what was that commitment?

13 A    That I would complete my library degree in six years.

14 Q    And did you do that?

15 A    Yes, I did.

16 Q    What degree did you obtain?

17 A    A Master's in library science.

18 Q    And where did you obtain it from?

19 A    At the University of Michigan.

20 Q    And when did you obtain your Master's?

21 A    In 1972.

22 Q    And you're working all this time at the library?

23 A    Yes, I was.

24 Q    Did you receive any other education beyond that during

25 your years at the library?  That is beyond the Master's?

1  A    Yes, I did.

2  Q    Briefly tell us what that is.

3  A    I have a post-Master's specialist in archival

4  administration from Wayne State University.

5  Q    And when did you obtain that?

6  A    In 1987, I believe.

7  Q    Now I'd like to ask you just a couple of questions about

8  your work at the library.  When you first started work in

9  1969, did you work in one or -- one of the branches?

10  A    Yes, I did.

11  Q    And for how long a period did you work in the branches?

12  A    Initially from 1969 to 1980.

13  Q    And how many different branches did you work in in that

14  11 year period?  Just approximately.

15  A    Five.

16  Q    What did you do at that point?  Or where did you work

17  from that point forward, from 1980?

18  A    I was at the main library.

19  Q    And what were you doing -- let -- let me back up.  Just

20  generally tell us what you did at the branches, what kind of

21  library work?

22  A    I initially was a young adult librarian.  I specialized

23  and worked with teenagers, but I did reference work and book

24  selection.  And really that's it, book selection, reference

25  work.  We did the collections, worked with the public, that

1  type of work.

2  Q    Okay.  When you went down to the main library in 1980,

3  and that's the library on Woodward?

4  A    Yes.

5  Q    How long did you remain at the main library the first

6  time you were working there?

7  A    Five years.

8  Q    And just briefly tell us what you did there.

9  A    I again was -- there I was an adult librarian.  Worked in

10  with -- those were special collections.  So working with the

11  subject matter and those collections.  General information was

12  sports, cooking, gardening, and biography.  And the Burton

13  historical collection was local history and genealogy.

14  Q    What was your position relative to the Burton historical

15  collection?

16  A    At that point I was a librarian too in that department.

17  Q    Did you then go back out into the branches for a few

18  years?

19  A    Yes.  I was promoted and went out to the branches.  I

20  went out to Franklin branch.

21  Q    And how long did you stay out in Franklin or in another

22  branch?

23  A    Three years.

24  Q    Did you then come back to the main library?

25  A    I was promoted to manager of the rare books collection.

1  Q    Would you tell the Court what that -- what that means or

2  what that entails?

3  A    Well, I had received that special collections training,

4  so I went to the Burton historical collection -- I went to the

5  rare books collection as manager and that was really the

6  greatest job in the State of Michigan.  And I had --

7  Q    For a librarian?

8  A    For a librarian.  I handled rare materials.  George

9  Washington's diary incunabula.  Books from the first 50 years

10 of printing, illuminated manuscripts, papyrus fragments,

11 Babylonian clay tablets.

12 Q    Okay.

13 A    It was extraordinary.  It was great, great materials to

14 handle.

15 Q    And then you retired in 2002?

16 A    Yes.

17 Q    About how old were you at the time you retired?

18 A    Fifty-five.

19 Q    Did you have any physical problems that led to your

20 retirement?

21 A    I went out on a medical disability.

22 Q    And just briefly tell us what that physical problem was.

23 A    Two failed back surgeries.

24 Q    You have, I take it, remained retired since -- since '02?

25 A    Disabled since '02

1  Q    Do you receive a pension from the library?

2  A    Yes.

3  Q    Approximately how much do you receive a month?

4  A    Twenty-five hundred dollars.

5  Q    Do you also receive Social Security?

6  A    Yes, I do.

7  Q    Approximately how much do you receive Social Security?

8  A    Just about 2,000.

9  Q    Do you have any other sources of income?

10 A    No, I don't.

11 Q    Do you have an IRA?

12 A    No.

13 Q    Do you have any substantial monies in the bank?

14 A    No.

15 Q    Do you have any equity in your home?  Let me ask you, do

16 you own your home?

17 A    Yes.  It has a mortgage, but --

18 Q    Do you have any equity in your home such that you could

19 do a reverse mortgage or get money out of it?

20 A    No.

21 Q    What is your marital status?

22 A    I'm divorced.

23 Q    Do you have children?

24 A    Two sons.

25 Q    Are they grown?

 1  A    Yes.

 2  Q    Do they have their own families?

 3  A    Yes.

 4  Q    Do they provide you with any financial support?

 5  A    No, they don't.

 6  Q    Are you able to go back out into the work force now?

 7  A    No.

 8  Q    Why not?

 9  A    I have a difficult time walking and standing.

10  Q    Do you have health insurance now?

11  A    Yes.

12  Q    Do you have Medicare?

13  A    Yes.

14  Q    Do you pay for Part B of Medicare?

15  A    Yes.

16  Q    Okay.  And that's about $100.00 a month?

17  A    Yes.

18  Q    Do you currently have health care through the city?

19  A    Yes.

20  Q    And are there co-pays for that?  That is do you pay

21  something for that?

22  A    Yes.

23  Q    Approximately how much do you pay?

24  A    Right now it's $85.00 a month out of my check.

25            MS. KOVSKY-APAP:  Your Honor, we object to the

1  relevance of this line of questioning.  It doesn't seem to

2  have anything to do with the city's eligibility.

3          MR. WERTHEIMER:  Your Honor, I'm done with this line

4  of questioning.  The -- the relevance is, I think that we are

5  entitled to put a face on the retirees who were litigious thus

6  forcing the emergency manager to file bankruptcy.

7          THE COURT:  I'll permit it to stand.  Go ahead.

8          MR. WERTHEIMER:  Thank you.

9  Q    During the time you worked at the library, did you hold

10 any office with the -- the local union?

11 A    Yes.

12 Q    What offices did you hold and approximately when?

13 A    In the early eighties, I was unit secretary for the --

14 what we refer to as the POOL unit, but is the professional

15 organization of librarians.  And I was Vice President of the

16 amalgamated Local 2200 and then I was President for nine

17 years.

18 Q    What were the approximate nine years that you were

19 President?

20 A    1993 to 2002.

21 Q    And finally I asked you how you came to be a plaintiff in

22 the Flowers litigation.  Why did you agree to become a

23 plaintiff in the Flowers litigation?

24 A    Well, I had always understood that my pension was

25 protected by the -- just always understood it was protected by

1  state law.  And suddenly it seemed to be in jeopardy when I

2  was reading the paper over the summer.  So I felt I better get

3  involved.

4  Q    Are you a litigious person?

5  A    No, not really.

6  Q    Have you ever sued anyone?

7  A    I had to in my divorce.

8         MS. KOVSKY-APAP:  Objection, relevance.

9         THE COURT:  The objection is sustained.

10        MR. WERTHEIMER:  I have nothing further.  Thank you,

11  Your Honor.  Thank you, Ms. Whitson.

12  A    Uh-huh.

13                    CROSS EXAMINATION

14  BY MS. KOVSKY-APAP:

15  Q    Ms. Whitson, my name is Deb Kovsky-Apap.  I'm one of the

16  lawyers for the city.

17        THE COURT:  I'm sorry, would you repeat your name,

18  please?

19        MS. KOVSKY-APAP:  Sorry, Deborah Kovsky-Apap.

20  Q    Ms. Whitson, you testified that you were a librarian with

21  the Detroit Public Library for approximately 32 years, is that

22  correct?

23  A    Yes.

24  Q    And it's your understanding that the Detroit Public

25  Library is a separate municipal corporation from the city, is

1    that right?

2    A    Yes.

3    Q    But employees of the Detroit Public Library are eligible

4    for pensions under the city's general retirement system,

5    correct?

6    A    Yes.

7    Q    And you said that when you were actively employed you

8    were a member of UAW Local number 2200?

9    A    Yes.

10   Q    And that's a collective bargaining unit?

11   A    Yes.

12        THE COURT:  Could you speak more into the mike for

13   me?  There you go.

14   Q    Can you tell me who does Local 2200 represent?

15   A    Right now?

16   Q    Or at the time that you were a member?

17   A    The time that I was a member, it -- it changes.  It's an

18   amalgamated local.  But at the time that I was a member, it

19   had the librarians 1, 2, and 3 in a unit that was called the

20   Professional Organization of Librarians.  It had the librarian

21   managers and coordinators in a unit that was called the

22   Association of Professional Librarians.  It had the skilled

23   trades at the -- at the Detroit Public Library.  It had a

24   health and safety unit sometimes that was called SEMCOSH.  And

25   it represented some of the doctors from the City of Detroit.

1  Q     Local 2200 represented only active employees, correct?

2  A     Correct.

3  Q     To your understanding, as a former President of Local

4  2200, was the union authorized to enter into agreements to

5  bind retirees without their consent?

6  A     I didn't hear all of your question.

7  Q     To your understanding, was Local 2200 authorized to enter

8  into agreements to bind retirees without their consent?

9  A     No.

10         MR. WERTHEIMER:  Your Honor, I think this is asking

11  her for a legal opinion, or at a minimum an -- an opinion that

12  may be outside any area she dealt with at the local.  There's

13  no evidence that she ever had to deal with this issue during

14  the time that she was --

15         THE COURT:  Well, she -- she was President.

16         MR. WERTHEIMER:  Yes.

17         THE COURT:  If she doesn't know, she can say so.

18         MR. WERTHEIMER:  That's fine.

19         THE COURT:  Please answer the question.

20  A     I don't know.

21  Q     You mentioned that when you were at the Detroit Public

22  Library you served as the manager of the rare books

23  collection.  Do you recall that?

24  A     Yes.

25  Q     And that's part of the Burton historical collection?

1  A    Yes.

2  Q    That's an important resource for scholars and

3  researchers, isn't it?

4  A    It is.

5  Q    And since your retirement, you continue to be involved in

6  organizations related to books and libraries, correct?

7  A    Yes.

8  Q    You're the immediate past President and librarian of the

9  Irish Genealogical Society of Michigan?

10  A    That's true.

11  Q    And that's an organization that focuses on research,

12  genealogical research?

13  A    Yes.

14  Q    And the Detroit Public Library is one of the resources

15  that may be used by organizations such the Irish Genealogical

16  Society?

17  A    Yes.

18  Q    You were also the Vice President of the Book Club of

19  Detroit, is that correct?

20  A    Yes.

21  Q    And is it fair to say that the Book Club of Detroit is a

22  non-profit association of Detroit area biblio files who

23  assembly periodically for the purpose of stimulating a mutual

24  interest in books, manuscripts, and prints?

25  A    Yes.

1  Q    And the book club frequently co-sponsors events with

2  libraries and collections such as the Burton historical

3  collection, is that right?

4  A    Yes.

5  Q    And you said that's part of the Detroit Public Library,

6  correct?

7  A    Wait a minute.  Go back and ask me that question again.

8  Q    Sure.  The book club frequently co-sponsors events with

9  libraries and collections such as the Burton historical

10  collection?

11  A    Yes, it does.

12  Q    And you said that the Burton historical collection is

13  part of the Detroit Public Library, correct?

14  A    Yes.

15  Q    So it's fair to say that you are currently a user of

16  Detroit Public Library services, is that right?

17  A    Yes.

18  Q    And you believe in the importance of libraries to a

19  community, correct?

20  A    I do.

21  Q    As a librarian in Detroit, were you aware that for some

22  Detroiters the public library is their only source of books

23  and internet access?

24  A    Yes.

25  Q    As a former employee and current user of the Detroit

1   Public Library, are you aware that -- of how the Detroit

2   Public Library is funded?

3   A      How it's currently funded?

4   Q      Or how it has been funded in the past.

5   A      I'm generally aware of how it's been funded in the past.

6   Q      Are you aware that the Detroit -- is it -- is it your

7   understanding that the Detroit Public Library has been funded

8   through property taxes?

9   A      That's one of its sources of funding, yes.

10  Q      Are you -- I'm sorry, I didn't mean to cut you off.

11  A      I'm aware that property taxes are one of its sources of

12  funding.

13  Q      Are you aware that the property taxes funding the library

14  have decreased significantly in recent years?

15  A      I think that's possible.  I'm not aware of to what extent

16  that's true.

17  Q      Did you become aware around March 2011 that the Detroit

18  Public Library laid off approximately 20% of its staff?

19  A      I'm not aware on the figure of 20%.

20  Q      Were you aware of any lay offs around that time period?

21  A      Only what I might have heard from fellow retirees.  I

22  have been retired since 2002.

23  Q      As a current user of Detroit Public Library services, did

24  you become aware in late 2011 that four branches of the

25  Detroit Public Library were closed due to a budget shortfall?

1  A    No.

2  Q    As a user of Detroit Public Library services are you

3  aware that certain branches of the Detroit Public -- Public

4  Library are currently operating on reduced hours?

5  A    Not aware of the extent of the reduced hours at four

6  particular branches, no.

7  Q    Is it your understanding that the City of Detroit's

8  financial problems have affected its ability to deliver

9  library services to the residents of Detroit and other users

10  of the Detroit Public Library?

11  A    The library runs on a mileage.  And I'm not sure how much

12  the -- the city's finances have influenced the library so no,

13  I'm not aware of that.

14  Q    No one has yet made a proposal to you regarding a

15  specific amount by which any retiree pension or other benefits

16  would be reduced, have they?

17  A    No.

18       MS. KOVSKY-APAP:  Thank you.  I have no further

19  questions.

20       MR. WERTHEIMER:  Nothing further, Your Honor.

21       THE COURT:  You are excused, Ma'am.  Thank you very

22  much for your testimony.

23  A    Thank you.

24       (WITNESS JANET WHITSON WAS EXCUSED AT 11:38 A.M.)

25       THE COURT:  Who is your next witness, sir?

1            MR. WERTHEIMER:  I call Andy Dillon.

2            THE COURT:  Please raise your right hand, sir.

3       (WITNESS ANDY DILLON WAS SWORN)

4            THE COURT:  Please sit down behind you.

5            MR. WERTHEIMER:  Your Honor, William Wertheimer on

6   behalf of the Flowers plaintiffs and also the UAW as to

7   examining this witness.

8        Before I begin, I would request permission from the Court

9   to examine Mr. Dillon pursuant to Federal Rule of Evidence

10  611(c)(2).

11           THE COURT:  Any objections?

12           MS. NELSON:  No objections, Your Honor.

13           THE COURT:  For the city?

14           MR. SHUMAKER:  We have no objection, Your Honor.

15           THE COURT:  All right.  Your motion is granted.

16           MR. WERTHEIMER:  Thank you.

17                       DIRECT EXAMINATION

18  BY MR. WERTHEIMER:

19  Q    Good morning, Mr. Dillon.

20  A    Good morning.

21  Q    You are appearing here pursuant to subpoena, are you not?

22  A    Yes.

23  Q    And you have been the state Treasurer of the State of

24  Michigan for a period of time?

25  A    Yes.

1  Q    When did you become state Treasurer?

2  A    I believe January 1 of 2011.

3  Q    And what was your last day as state Treasurer?

4  A    October 31 of '13.

5  Q    So just last week?

6  A    Right.

7  Q    Okay.  Would it be fair to say that you have been -- that

8  as state Treasurer, you were involved in the problems of the

9  state dealing with the city's financial situation from your --

10 the beginning of your -- of being state Treasurer?

11 A    Yes.

12 Q    Okay.  Could you generally characterize for us what that

13 involvement has been from the beginning?

14 A    The city was in emergency.  We inherited some that were

15 in emergency, our school district.  We worked closely with the

16 manager in those instances.  For those that were finding

17 themselves getting in financial trouble, we tried to work with

18 them to keep them out of financial trouble.  So it would vary

19 depending on the condition that you found in the various

20 school district or city.

21 Q    All right.  Did you stay involved in -- in issues

22 relating to the City of Detroit from the beginning of your

23 tenure as state Treasurer until your end last week?

24 A    Yes.

25 Q    Okay.  I want to direct your attention to a few discreet

1  periods of time and ask you some questions about that.  And

2  the first period is around March of 2012.  Do you recall

3  generally what was going on at that point in time?

4  A    I believe we had completed a review and were working on

5  negotiating a consent agreement with the City of Detroit.

6  Q    Okay.  And what were the results of those negotiations?

7  A    We ultimately reached agreement on something called a

8  financial stability agreement.

9  Q    When was that?

10  A    I believe the final day was around April 4 of 2012.

11  Q    So the negotiations would have been ongoing in March of

12  2012?

13  A    I believe so, yes.

14  Q    And your part of the negotiating team for the state,

15  negotiating with the city?

16  A    Correct.

17  Q    And it was an arm's length negotiations that is

18  adversarial not in the bad sense of the word?  They had their

19  position, you had yours?

20  A    That's right.

21  Q    Would that be fair?

22  A    Yeah.

23  Q    Okay.  And you were using the Jones, Day law firm to

24  represent the state at that point in time, were you not?

25  A    I actually don't think so, although they were involved.

1  We had a relationship with Miller, Buckfire.  And I believe

2  that Miller, Buckfire reached out to Jones, Day for legal

3  advice.  So there was a role, but they were not, to my memory

4  -- I -- I don't recall a contractual relationship between the

5  state and Jones, Day.

6  Q    When you say you don't recall a contractual relationship,

7  is that another way of saying you weren't paying them?

8  A    I believe that's correct.

9  Q    Okay.  But they were providing work for you on a pro bono

10 or some other kind of basis, were they not?

11 A    I believe that to be true.

12 Q    They were putting together drafts of the consent

13 agreement, were they not?  That is Jones, Day.

14 A    Yeah.  But we did have counsel, Michigan based counsel

15 that was in the room negotiating the document.  But we were

16 getting input and advice from Jones, Day, yes.

17 Q    Did that advice include actual drafts of the consent

18 agreement from Jones, Day as opposed to your in house people

19 in March of 2012?

20 A    I believe so.

21 Q    And you indicated Buckfire.  They were also assisting the

22 state in those negotiations with the city, correct?

23 A    Correct.

24 Q    Did you ever talk or did you have any understanding as to

25 why Jones, Day was doing what they were doing?  That is

1  providing legal services for you and not billing you whatever

2  their hourly rate was at the time?

3  A    We were working with Ken Buckfire at the time to make a

4  consent agreement that would work and function for the city.

5  And he had a relationship with Jones, Day and -- and would

6  seek their advice.

7  Q    Didn't you understand that let's start with Mr. Buckfire.

8  That Mr. Buckfire, was he being paid by the state?

9  A    I think there's a brief window of time where he had a --

10  a short term contract.

11  Q    Did you assume that Mr. Buckfire and his -- on behalf of

12  his firm when he was helping you out in March of 2012, was

13  looking for more work in the future relative to the City of

14  Detroit?

15  A    I think he was very interested in having a role with

16  Detroit going forward, yes.

17  Q    And didn't you assume the same with Jones, Day?

18  A    Yes.

19  Q    Did you have discussions in March of 2012 about the

20  possibility of a Chapter 9 filing at that time?

21  A    I don't recall and -- I don't recall.

22  Q    Can you put up 852?  And can you go to the second --

23  well, let's start.

24            MR. SHUMAKER:  Objection, Your Honor.  We have a

25  hearsay objection.

1    THE COURT:  We don't have -- we don't quite have a

2  question yet, so let's get a question and then I'll take your

3  objection.

4  Q    Let me -- let me do it a different way based on the

5  objection and -- and what I'm saying here.  I'm going to show

6  you -- forget what's on the screen, Mr. Dillon, if you would.

7  I'm going to show you what's been marked for identification

8  purposes --

9    THE COURT:  I need you to be by the microphone.

10    MR. WERTHEIMER:  I'm sorry.

11  Q    I'm going to show you what's been marked for

12  identification purposes as Exhibit 852.  And ask you to take a

13  look at the second page of it in the middle.  And -- and read

14  it to yourself.  And my question is going to be whether that

15  refreshes your memory as to whether there might not have been

16  discussions involving Jones, Day people and others about the

17  possibility of filing Chapter 9 in March of 2012?

18    MS. NELSON:  May I see it, please before it's handed

19  to the witness?

20    THE COURT:  You can see it after it's handed to the

21  witness.

22  Q    Take a look at whatever you need to put it in context.

23    THE COURT:  Mr. Wertheimer, I have to insist that

24  anything you say to the witness be from the lectern so that

25  it's on the record.

1           MR. WERTHEIMER:  Sorry.

2    Q    I was just telling you, Mr. Dillon, take a look at any of

3    it that you need to put it in context.  But the part I'm

4    asking you to take a look at to see if it refreshes your

5    recollection as to what was going on then is in the middle of

6    the second page of the document.

7           THE COURT:  And did you represent that that is

8    exhibit what, I'm sorry?

9           MR. WERTHEIMER:  852.

10          THE COURT:  Do you have that exhibit, Ma'am?

11          MS. NELSON:  Oh, yes, I do, Your Honor.  I didn't

12   realize that's what he was referring to.

13          THE COURT:  All right, then we're all set.

14   A    This refreshes my memory.  I didn't read Page 2.  Do you

15   want me to?

16   Q    Yeah.  Yeah, go ahead and read Page 2.

17   A    Okay.

18   Q    Mr. Dillon, does having read the proposed Exhibit 852

19   refresh your memory on the issue that I was asking about?

20   A    It does.

21   Q    Okay.  And what is your memory now as to Chapter 9 filing

22   -- a Chapter 9 filing being discussed by you, other people for

23   the state, and lawyers from Jones, Day in March of 2012?

24   A    I mean it was a topic of conversation, but the -- you

25   know, even the thought at that time was that we did want to

1  get to a consent agreement.  We didn't want to declare an

2  emergency.  And Chapter 9 was always out there as an issue but

3  it wasn't front and center.

4  Q    And Jones, Day was involved in those discussions?

5  A    I don't recall if they were physically present, but I

6  believe that yes, in the background they were looking at

7  versions of agreements that were being drafted and obviously

8  from reading that they were looking at the options for a

9  Chapter 9.

10  Q    Okay.  Let me -- can you put up 851, please?  And I

11  believe it has been admitted.  Mr. Dillon, this is a -- the

12  first page is an email from Corrine Ball to L. Marcero at

13  Huron Consulting.  Can you tell us, first of all, who Corrine

14  Ball is?

15  A    She's an attorney at Jones, Day.

16  Q    And who is L. Marcero?

17  A    She works for Huron Consulting.  She's a -- she lives in

18  the Detroit area and was advising us on working through these

19  issues with the City of Detroit.

20  Q    And -- and Huron Consulting is a separate entity from

21  Miller, Buckfire?

22  A    Yes.

23  Q    Any relationship between the two as far as you know?

24  A    Not as far as I know.

25  Q    Okay.  If you could put up the second page of 851.  If

1  you look at the top, Mr. Dillon, this is a email from Corrine

2  Ball at Jones, Day to L. Marcero.  Am I pronouncing it right?

3  A    I think it's Laura Marcero.

4  Q    Laura Marcero.  And in the email Laura is saying to

5  Corrine, if at all possible, can you call me.  I need to link

6  you into a Chapter 9 conversation with Andy very quickly.  Do

7  you recall ever being linked in to such a conversation?

8  A    I don't have a specific memory of that.

9  Q    Do you have a general memory of it?

10 A    No.  I mean to me I think from reading that memo and

11 refreshing my memory a little bit, it was about whether or not

12 the city would be eligible if in fact a Chapter 9 became

13 something that had to happen in the view of -- of the folks at

14 the table.

15 Q    Okay.

16 A    But it wasn't our priority, it was always a last resort

17 option for us.

18 Q    I want to direct your attention now to December 2012 and

19 January 2013.  In other words nine months later or so.  Were

20 you involved in the hiring of Kevyn Orr as emergency manager?

21 A    Yes.

22 Q    And Kevyn Orr up to then had been a partner at Jones,

23 Day, had he not?

24 A    To my knowledge.

25 Q    And would you tell the Court generally what your

1  involvement was?

2  A    The first time I believe I ever met Kevyn Orr was around

3  the January 29th date where we interviewed, I believe, five or

4  six different law firms as potential restructuring firms for

5  the City of Detroit.  He was one of the members on the team

6  from Jones, Day.

7       We did all of those interviews in one day, so I think

8  give or take each interview with each firm lasted around an

9  hour, it could have been a little more for each firm.  That

10 was the first time I met him.

11 Q    Okay.  Did you recommend that he be hired?

12 A    I got a phone call from Richard Baird who asked me what I

13 thought about Kevyn.  I thought he was impressive in the

14 meeting and should be someone that we considered.

15 Q    Were you concerned at the time that he was with Jones,

16 Day and that Jones, Day had been advising the state for up to

17 a year on this issue of how the state was going to deal with

18 the Detroit financial situation?

19          MS. NELSON:  Objection, assumes facts not in

20 evidence.  There's no indication that Jones, Day had been

21 providing advice to the state for up to a year.

22          THE COURT:  Well, the objection is overruled.

23 Please answer the question if you can.

24 A    Not terribly.  There was a -- a review team that was

25 involved in interviewing all the firms.  It wasn't just my

1  decision to make, so I thought they would have to stand on

2  their own as the -- as the law firm of choice.

3  Q    Well, does -- does the beginning of your answer being not

4  terribly mean that there was some concern?

5  A    It could have an appearance of impropriety which I

6  recognized and -- and gave consideration to.  And in fact

7  because when ultimately they were hired, I believe there were

8  six to eight people on the panel.  I actually held my vote

9  back to let the group move on their own because I was one of

10  two people that even knew that they were being considered.

11  Q    Okay.

12  A    Or that Kevyn was being considered.

13  Q    What -- did you recognize the same or even more extreme

14  propriety issues when in March or April of 2013 with Kevyn Orr

15  in place, there was a consideration as to hiring the Jones,

16  Day law firm now as counsel for the city through the emergency

17  manager as opposed to being counsel for the state as it had

18  been in the past?

19  A    I thought the sequence was that Jones, Day was hired

20  before Kevyn was announced is my memory.

21  Q    Whatever the sequence was, did you have the same concerns

22  with propriety relative to the hiring of Jones, Day as you did

23  as to the potential hiring of Kevyn Orr?

24  A    No.  Because there was -- there was quite a few people

25  that were on the hiring team.  And -- and I didn't cast -- it

1  was unanimous vote for Jones, Day and I withheld my vote and I

2  was careful not to kind of push any particular firm that day

3  because I knew that Kevyn was a possible EM candidate.  And I

4  -- I was also informed that Kevyn withdrew from pushing Jones,

5  Day to get the contract in Detroit.

6  Q   So that it was -- it was done without the help of Kevyn

7  Orr as far as you knew?

8  A   I was advised that the firm was hired that -- or was

9  advised by Rich Baird that the hiring of Kevyn Orr would

10 neither help or hinder their efforts to become the

11 restructuring counsel for the City of Detroit.

12 Q   Who is Braum Stibitz?

13 A   He works for me in treasury.

14 Q   Or past tense?

15 A   Yes.

16 Q   Worked.  Sorry.  What was his position in April of 2013?

17 A   And I forget the exact title, but he was my right hand

18 guy.  He didn't have the title of Chief of Staff, but he

19 functioned that way.

20 Q   Okay.  And what about Terry Stanton?

21 A   Terry is a public information officer for the Department

22 of Treasury.

23 Q   Were you aware that in April of 2013, Terry Stanton

24 authored an email to Braum Stibitz that took issue with Jones,

25 Day being hired as the attorneys for the city?

1 | A    I don't recall that.

2 | Q    Let me put --

3 |        THE COURT:  Excuse me, Mr. Wertheimer.  How much

4 | longer will you be on your direct examination of the witness?

5 |        MR. WERTHEIMER:  Half hour.

6 |        THE COURT:  All right.  In that event, we'll take

7 | our lunch break now and reconvene at 1:30.  Everyone please

8 | stand by for me for one second while I consult.

9 |    All right.  Everyone please stand by while Mr. Dillon

10 | makes his exit.

11 |    (WITNESS ANDY DILLON WAS TEMPORARILY EXCUSED AT 12:02

12 | P.M.)

13 |        THE COURT:  And we'll be in recess until 1:30.

14 |        THE CLERK:  All rise.  Court is in recess.

15 |    (Court in Recess at 12:02 p.m.; Resume at 1:30 p.m.)

16 |        THE CLERK:  All rise.  Court is in session.  Please

17 | be seated.  Recalling case number 13-53846, City of Detroit,

18 | Michigan.

19 |        THE COURT:  It appears that everyone is here.  Sir,

20 | you may proceed.

21 |        MR. WERTHEIMER:  Thank you, Your Honor.

22 |    (WITNESS ANDY DILLON RESUMED THE STAND AT 1:30 P.M.)

23 | BY MR. WERTHEIMER:

24 | Q    Can you put 835 on the screen?  Mr. Dillon, as I recall

25 | it when we left I was asking you some questions about who

1  Braum Stibitz was and Terry Stanton.  And you had answered

2  those questions.  Do you recall that?

3  A    Yes.

4  Q    Would you take a look at what's on your screen and on the

5  big screen?  It's an email from Braum Stibitz who I think you

6  identified -- or I'm sorry, to him from Terry Stanton from

7  April of 2013.

8          MR. STEWART:  Objection, Your Honor, hearsay.

9          MS. NELSON:  Same objection, Your Honor.

10          THE COURT:  Again let's -- let's wait until we have

11  an actual question and then I'll take your objection.

12  Q    Have you seen that document before, Mr. Dillon?

13  A    I don't believe I have.

14  Q    Do you recall -- would you -- well, let me ask it this

15  way.  Do you recall Terry Stanton or anyone else at treasury

16  raising the issue of the appearance of impropriety in the city

17  hiring Jones, Day to be its lawyer at around this time, March

18  or April of 2013?

19  A    I don't recall that.

20  Q    You don't recall any internal discussions relative to it?

21  A    No.

22  Q    Mr. --

23          THE COURT:  Can we take this document down, please?

24          MR. WERTHEIMER:  Yes, we can take it down.

25  Q    Mr. Stibitz never raised it with you?

1  A    I don't recall that.

2  Q    Again, I want to make sure we're on the same wave length.

3  Leaving aside the email, do you recall ever Mr. Stibitz

4  raising with you generally the issue of the appearances of

5  Jones, Day being hired as the city's attorney in the spring of

6  2013?

7  A    I don't specifically recall that, no.

8  Q    Do you generally recall it?

9  A    No.

10 Q    Do you recall being concerned about that issue yourself

11 at that point in time?

12 A    It was an issue that I gave some consideration to, yes.

13 Q    And did -- I was unclear on your testimony from -- from

14 this morning, did -- was that the reason that you abstained

15 from a particular vote?

16 A    I just held my vote back and it ended up being a

17 unanimous vote.  But yeah, I intentionally tried not to lead

18 the outcome of that vote, so I held my opinion back.

19 Q    And this was a vote on Jones, Day being selected as the

20 city's attorneys?

21 A    Right.

22 Q    It would have occurred sometime in the spring of 2013?

23 A    Right.

24 Q    Did you have any discussions with your staff before you

25 decided to do that about that issue?  That is the issue of

1 abstaining or in some way not voting as a -- for -- for the

2 reason you stated?

3 A    I did not.  I kept that to myself.

4 Q    Okay.  Would you put 858 up, please?  Mr. Dillon, this is

5 an email that you sent to the Governor, July 8, 2013.  Do you

6 recall you were questioned about this at your deposition?

7 A    Yes.

8 Q    And I'm not going to go over the entire email, but I just

9 have a question or two on it.  Would I be correct in recalling

10 that you testified that the recent suits against you and me in

11 that last sentence in the first paragraph would have been a

12 reference to the Flowers and Webster lawsuits?

13 A    It was logical to conclude that based on reading it and

14 putting it in the time frame, yes.

15 Q    All right.  And part of the logic being you did know

16 about those lawsuits at that time, correct?

17 A    I believe so.

18 Q    And you also knew that a hearing was scheduled for a

19 preliminary injunction in those cases, did you not?

20 A    At that time I can't say that I did.

21 Q    All right.  By a couple of days thereafter you did?

22 A    I don't have specific memory of that.  But I knew at some

23 point there was a hearing scheduled.

24 Q    Okay.  Before the date of the hearing?

25 A    Yes.

1  Q    In other words you knew that there was a hearing

2  scheduled in the future?

3  A    Right.

4  Q    In the Flowers and Webster cases, correct?

5  A    Correct.

6  Q    If you'd take a look -- now if you would put up 834,

7  please.  Let me -- I -- I apologize, Mr. Dillon.  Let me just

8  go back a second.

9      Would it also be correct that by July 15th you knew that

10 there was a schedule in place and per that schedule the

11 bankruptcy would be filed on July 19th, is that correct?

12 A    I don't have a specific memory of the date of the filing,

13 but I do remember prior to that filing date that was in the

14 schedule that we were presented with, a pretty detailed

15 schedule about what a Chapter 9 would look like and all the

16 events that would have to transpire.

17 Q    All right.  And do you recall that whatever the details

18 of that schedule that you don't recall, do you recall that in

19 fact the bankruptcy was filed a day before the dates in that

20 document?

21 A    I believe that to be true, yes.

22 Q    Okay.  Now if you'll take a look.  This is an email that

23 you sent the next day, that is after the July 8 email to the

24 Governor, is it not?

25 A    I believe so, yes.

1  Q    And by the way just for the record, that the email from

2  the 8th is an email from you to the Governor?

3  A    Correct.

4  Q    Okay.  In this email on the 9th, you indicate -- I'm --

5  I'm looking at the last paragraph.  The second of the three

6  sentences.  You say to the Governor on July 9, we remain in

7  many ways at the informational stage.  That was a true

8  statement when you made it, was it not?

9  A    I believe so, yes.

10 Q    Did anything happen that you knew of between July 9th and

11 July 18th to take it out of the informational stage?

12 A    We were getting more information and the numbers kept

13 getting worse for the funding level of the pension fund.  As

14 we learned new facts, the -- the health of the pension funds

15 seemed to be getting worse.

16 Q    Are you suggesting that you learned these facts after

17 July 9?

18 A    I don't have specific memories, but in reading these

19 emails they refresh my memory that information was flowing in

20 as I was sending them to him.

21 Q    Well, how about you didn't get that information in the

22 next day, did you, by the 10th?

23 A    I -- I'd want to go back and read the one from the 8th.  I

24 think you're --

25 Q    I'm sorry, go ahead.  Will you put up that one which is

1  -- I'm sorry, 858.  Go ahead.  You say you wanted to read that

2  one?

3  A    The day I sent this I believed I was going to learn more

4  information.  I don't recall now if it actually happened on

5  that date or not.

6  Q    Okay.  Do you recall communicating to the Governor's

7  office just before July 12th that a more deliberative approach

8  should be taken at the Governor's end relative to authorizing

9  a bankruptcy?

10  A    I don't have a specific memory of that, no.

11  Q    Would you put up 625, please?  Mr. Dillon, I'm going to

12  -- this has been introduced as Exhibit 625.  I'm going to

13  direct your attention to the -- the second email there, not

14  the top one, but the second one that goes on for three

15  paragraphs.

16       To the first paragraph about halfway down.  And by the

17  way, this is July 12.  And this is from Mike Gadola.  And he's

18  saying, I spoke to Rich this morning and he informed me that

19  last night he had a discussion with Andy and the LG about the

20  exchange of letters.  Rich now favors as I do, a more

21  deliberative approach at the Governor's end.  He indicates

22  Andy and the LG are on board with that approach.  Does that

23  refresh your memory on that issue?

24  A    I have a vague recollection of this email.

25  Q    All right.

1  A    Or that --

2  Q    But my question is as to the broader issue.  Do you

3  recall communicating in one way, shape, or form, whether

4  through Baird much more directly with Snyder -- excuse me,

5  with Governor Snyder, do you recall communicating to the

6  Governor's office at around this time your view as the state

7  Treasurer that a more deliberative approach at the Governor's

8  end was in order as of July 12?

9  A    From reading this, it's -- I don't have a clear

10 recollection of this conversation, but I have no reason to

11 believe that this is not an accurate description of a call I

12 had with Rich Baird and the LG.

13 Q    Okay.  Fair enough.  If you look down in the next

14 paragraph, and again this is from Mike Gadola to Mr. Muchmore

15 and John Roberts.

16     He supplies some additional reasons for this approach

17 including, I'm about halfway down, the conditions could also

18 include such items as pre-approval for anything having to do

19 with vested pension benefits.  Do you recall Mr. Gadola taking

20 that position at around this time?

21 A    I believe I had conversations with Mike Gadola in this

22 time frame that I believe is subject to the lawyer client

23 privilege, attorney/client.

24 Q    Well, I -- I will indicate to you, Mr. Dillon, that this

25 document has been produced and that the attorney/client

1 privilege has been waived as to this document.

2 A    I don't know if I was copied on it.

3          MS. NELSON:  If I may respond.  If I may respond,

4 Your Honor.  This is not a communication from the attorney to

5 Mr. Dillon.  This was to Mr. Muchmore and then to Baird.  So,

6 Mr. Dillon is testifying about separate conversations in

7 response to Mr. Wertheimer's question that were separately

8 attorney/client privilege.

9          MR. WERTHEIMER:  I think that's correct actually.

10          THE COURT:  Okay.

11 Q    Do you recall having discussions with -- may I back up?

12          MR. WERTHEIMER:  For the record, I would take an

13 exception based on the arguments we've previously made as to

14 the applicability of the attorney/client privilege to

15 communications involving public officials, et cetera.

16 Q    Do you recall having discussions at around this time with

17 the Jones, Day law firm relative to contingencies being placed

18 on the bankruptcy?

19 A    Yes.

20          MS. NELSON:  Same objection, Your Honor,

21 attorney/client privilege as to their content.

22          MR. SHUMAKER:  The city joins in the objection.

23          MR. WERTHEIMER:  I'm not going to go any further

24 than -- than his yes response.

25          THE COURT:  All right.

1  Q    I'm going to show you a document, Mr. Dillon that has

2  been marked for identification purposes as UAW 626.  And ask

3  you if you can identify it as an email that you sent to Braum

4  Stibitz who you've already identified and others on July 10,

5  2013?

6  A    Yes, I recall this.

7       (UAW Exhibit 626 was identified)

8            MR. WERTHEIMER:  Move for its admission.

9            THE COURT:  What was the number again, sir?

10           MR. WERTHEIMER:  626.

11           THE COURT:  Any objections?

12           MS. NELSON:  No objections.

13           MR. SHUMAKER:  No objection, Your Honor.

14           THE COURT:  It is admitted.

15      (UAW Exhibit 626 was admitted)

16 Q    Put it up.  I want to direct your attention -- I'm -- I'm

17 going to go through it to some extent with you, Mr. Dillon.

18 It begins -- or you begin by saying, I would like to get a

19 response to the proposed Orr letter out tomorrow about noon.

20 Would I be correct in understanding that the proposed Orr

21 letter is his letter seeking authorization to file bankruptcy

22 to you and the Governor?

23 A    Yes.

24 Q    And this is dated July 10, correct?

25 A    Yes.

1  Q    Do you recall when you received the draft of the proposed

2  Orr letter that you would have been working from when you

3  created 626?

4  A    Not specifically, no.

5  Q    That day, a day before?  I mean was it a tight --

6  A    Yes.

7  Q    Fairly tight time frame?

8  A    Yes.

9  Q    How did you come to receive it?

10 A    I believe it came in via email.

11 Q    From whom?

12 A    I don't recall.

13 Q    From someone at the emergency manager's end, or was it

14 already being distributed at the state if you recall?

15 A    I don't recall.

16 Q    Do you recall the context at all of how you received it?

17 A    No.  I -- I had been briefed on the schedule.  I was

18 aware things were going to be in motion.

19 Q    To your knowledge, were other people at the state end

20 being provided with a copy of the draft authorization?

21 A    Not to my knowledge.

22 Q    As far as you knew it was only you?

23 A    Well, treasury.

24 Q    Did you think there was anything untoward with Orr asking

25 for your input into his request to you for something that you

1  and the Governor would need to act on?

2  A    No.  I thought it was a courtesy.

3  Q    You thought it was a courtesy, is that right?

4  A    Yes.

5  Q    You felt free, did you not, to suggest changes both

6  typographical if you will, and substantive, did you not?

7  A    Apparently, yes.

8  Q    Okay.  Fair enough.  And in fact Mr. Orr if you -- I

9  don't know if we can get two on the screen at once, but if we

10  take a look at Mr. Orr's authorization of July 16 which is

11  Exhibit 28 for example.  Your point number one back to 626 is

12  that you think initiates should be initiatives.  That is that

13  it was just a mistake in the word choice, correct?

14  A    Yes.

15  Q    And if you look at Exhibit 28, he agreed and changed the

16  word to initiatives near the end of the second full paragraph

17  on Page 2, did he --

18         MS. NELSON:  Your Honor, I'm going to object.  First

19  of all, it calls for hearsay.  There's no foundation that this

20  was even communicated to Mr. Orr ultimately or even back to

21  anyone who prepared Exhibit 28 for what Mr. Orr accepted or

22  didn't accept.

23         THE COURT:  The objection is overruled.  You may

24  proceed.

25         MR. WERTHEIMER:  Thank you.

1  Q    Let me ask you, however, you did communicate your changes

2  to Stibitz.  We know who he is, correct?

3  A    Correct.

4  Q    Who is Saxton, Tom Saxton?

5  A    He works for treasury as well.

6  Q    And what does he do there?

7  A    He's the Deputy Treasurer.

8  Q    And Mr. Headen?  Who is Mr. Headen?

9  A    He's the lawyer that works within Treasury Department.

10 Q    Okay.  Did you in one way or another assume that your

11 people would have got your input back to Mr. Orr?  In other

12 words you weren't doing some academic exercise, were you?

13 A    At this point I thought that this would be transformed

14 into a letter written by Fred Headen which never transpired.

15 Q    Okay.  And so you thought at this point Headen was going

16 to write a letter back to Orr?

17 A    I thought we would send a letter back to whoever sent

18 this to us.

19 Q    And which you would point out the things that you thought

20 should be changed?

21 A    I shared with them my views and expected that they might

22 have some of their own thoughts as well.

23 Q    Okay.  What did happen to the changes that you were

24 suggesting?  Did -- tell -- tell us what your knowledge is as

25 to how if at all these suggestions were communicated back to

1 Mr. Orr?

2 A     There was a phone call, but not to Mr. Orr.  Excuse me.

3 Q     Who -- who called who?

4 A     There was a conference call with a few people from my

5 staff as well as the Jones, Day lawyers.

6 Q   So you get on to a conference call with you, your staff

7 people, and Jones, Day lawyers and during that conference

8 call, you communicate the contents of this email which is now

9 626 back to Orr through the Jones, Day lawyers, do I

10 understand that correctly?

11          MS. NELSON:  Objection, attorney/client privilege.

12          MR. SHUMAKER:  Same objection, Your Honor.

13          MR. WERTHEIMER:  Your Honor, the privilege has been

14 waged -- waived as to this document.

15          THE COURT:  The question merely summarized what the

16 witness previously said, so I'll permit it.  Please answer the

17 question, sir.

18 A     I spoke to some lawyers over the phone with Jones, Day.

19 What they communicated to Kevyn, I don't know.

20 Q     Fair enough.  But what you -- you had -- I assume you had

21 in front of you the contents of your email?

22 A     I believe I did.

23 Q     And you communicated those contents to the Jones, Day

24 lawyers?

25 A     I did.

1  Q    And you communicated them for the purpose of getting back

2  to Orr your comments relative to his request for an

3  authorization?

4  A    I don't know that I made that leap but, sure.  They were

5  obviously involved in this issue for Mr. Orr.

6  Q    All right.

7  A    And how they communicated with him, I have no personal

8  knowledge.

9  Q    All right.  They're competent counsel and you assumed

10  that they would have communicated back to the client what the

11  treasury secretary was suggesting.  Would that be fair?

12  A    That would be fair.

13  Q    Okay.  Thank you.  And if you look at 626, your third

14  point is no mention of GRS.  And then your question is why.

15  Am I reading that right?

16  A    Yes.

17  Q    What is GRS?

18  A    General employee retirement system.

19  Q    Okay and that got put into the authorization request, did

20  it not?

21  A    I believe it did.

22  Q    And it's just to be clear for the record, if you -- if we

23  look at the authorization letter, Page 4, the third full

24  paragraph, there's now a paragraph relating to GRS and other

25  things, correct?

1  A    I didn't read it right now, but that's my memory.

2  Q    Okay.  And that was not in your memory, I would -- is

3  your memory that that was not in the draft that you were

4  looking at?

5  A    Yes.  That's my memory.

6  Q    Okay.  Now I won't match up all the other things, but --

7  but let me just ask kind of a summary question that I think

8  will -- we can then figure it out from the record.

9      Would it be fair to say that all the suggestions you made

10  in your July 10 -- or that are recorded in your July 10 email,

11  are things that were not in the version that you were looking

12  at?  In other words you're suggesting additions or changes to

13  what was in the Orr draft at the time you were looking at it,

14  would that be fair?

15  A    I think it's an overly broad description.  I read a

16  document, here's my thoughts.

17  Q    Okay.

18  A    Sometimes it was an omission, sometimes it was a failure

19  to hit on a theme.

20  Q    All right, fair enough.  I want to direct your attention

21  now to the second page of your Exhibit 626, number 10.  You

22  say here I, Andy Dillon, don't think we are making the case

23  why we are giving up so soon to reach an out of Court

24  settlement.  That was a true statement of yours at the time

25  you made it, was it not?

1  A     That's what I believed at the time.

2  Q     And you then said, looks premeditated, did you not?

3  A     Yes.

4  Q     Period, a two word sentence.  You believed that to be

5  true when you wrote it -- when you typed it down on to your

6  computer on the 10th, did you not?

7  A     Yes.

8  Q     Then you go on to say, I think we need to say facts got

9  worse as we dug into the numbers.  And I believe there is a

10  State Court option to get retirees into a class (we don't

11  acknowledge that) and why is that impractical?  That was a

12  correct statement of your thinking at the time, was it not?

13  A     Yes.

14  Q     You believed that there was a State Court option to get

15  retirees into a class and that it was not impractical?

16  A     That's what I believed at the time.  I was never apprised

17  to know if that was ultimately the case.

18  Q     All right.  Then you say, we don't even say they rejected

19  the city's proposal.  That was true as far as you knew it at

20  the time.  That is that was not being said in Orr's

21  authorization request, correct?

22  A     Correct.

23  Q     Then you say, I think we may want to take it or -- I'm

24  sorry.  I think we may want a take it or leave it demand

25  before we pull this trigger.  First of all, is the trigger the

1  Chapter 9 filing?

2  A    Yes.

3  Q    And did you mean by take it or leave it demand that the

4  -- that Orr or somebody on his behalf should make such a

5  demand before the Chapter 9 was filed?

6  A    I thought that might have been beneficial.

7  Q    Then you say, I agree with the recommendation.  Are you

8  referring now to the recommendation to proceed to bankruptcy?

9  A    Yes.

10 Q    But I don't think we make the case.  Was that true on

11 July 10?  You did not think that Orr had made the case?

12 A    In the document that I read.

13 Q    Now and I -- would I be correct in assuming that the

14 information that's included here under your number 10 on Page

15 2 of 626, that you communicated that in this conference call

16 you had with Jones, Day shortly either on July 10, or shortly

17 thereafter?

18 A    I believe that's true.

19 Q    You didn't leave any of it out?

20 A    I don't know if I went into as much detail here, but I

21 think I would have made the point.

22 Q    Then finally down at the bottom, you say after this

23 letter is revised, let's work on Governor's response.  By

24 Governor's response you meant the response that the Governor

25 would make either authorizing or not, or conditioning or not

1  to Mr. Orr's letter, did you not?

2  A    That's what I meant, yes.

3  Q    So you were of the view at that point -- let me -- sorry.

4  And you then indicated at end just for completion, that these

5  were just your initial thoughts, correct?

6  A    Correct.

7  Q    Did you have any further input into the Orr authorization

8  request beyond what's on this document between July 10 and

9  July 16 when he submitted it to the Governor?

10  A    I don't believe so.

11  Q    Now back to the Governor's response.  You're saying we're

12  going to revise this letter and then we're going to work on a

13  response to it, correct?

14  A    Correct.

15  Q    And as I understand it based on what you say you talked

16  to Mr. Gadola about, the response -- well, you tell me.  What

17  was the response going to be at that point?

18  A    I wanted to finish this before we got to that.

19  Q    One step at a time?

20  A    That's right.

21  Q    All right.  But one step at a time.  But you're on both

22  sides of each of the steps, would that be fair?

23  A    Actually not.

24  Q    Well, you're helping to create the authorization request,

25  correct?

1  A    I shared comments about it.

2  Q    And you're -- oh, okay.  You're hoping to be involved in

3  what the Governor's response will be, correct?

4  A    I don't know if I agree with the word hoping or thought.

5  It may fall on to my duty list.

6  Q    Fair enough.  All right.  But do I take your answer to

7  mean, or can I conclude from it that in fact you were not

8  involved in what became the Governor's response, the July 18

9  document?

10  A    That's correct, I was not.

11  Q    Is that correct?  You were not?  You were out of the loop

12  on that?

13  A    Yes.

14          MR. WERTHEIMER:  Okay.  Can I have just one minute,

15  Your Honor?

16          THE COURT:  Yes, sir.

17  Q    Back with just one clean up question, Mr. Dillon.  Back

18  to questions and your answers relative to your not

19  participating in the vote where Jones, Day was hired.  Do you

20  recall that?

21  A    Yes.

22  Q    Did you -- first of all, what board was this that was

23  deciding that ostensibly at least deciding that issue?

24  A    I don't remember all the attendees, but there were people

25  from the City of Detroit there, there was people from treasury

1  there.  There might have even been some members of the

2  financial advisory board there.

3  Q    Was that what it was?  Was that the body voting,

4  financial advisory board?

5  A    It was not a formal entity.  It was --

6  Q    Oh, okay.  It was just an informal group of people?

7  A    Right.

8  Q    At the point that you decided not to vote, did you

9  communicate to the other people who were voting that Jones,

10  Day had been actively involved in providing legal assistance

11  to the state in March of 2012 or any other time?  In other

12  words that they had previously done work on this case for a

13  client different than the City of Detroit and a rather big

14  client?

15  A    Well, this case I don't understand that.  Can you explain

16  that?

17  Q    I'm sorry.  I kind of loaded it up.  I apologize.  Did

18  you communicate to the other members of the board at the time

19  that you were deciding not to vote, based at least in part on

20  your concern about the appearance of things, did you

21  communicate to the other members of -- of the people voting,

22  that Jones, Day had been actively representing the state in

23  March of 2012?

24          MS. NELSON:  I'm going to object again, Your Honor.

25  That assumes facts not in evidence.  That was not the

1  Treasurer's testimony.

2          MR. WERTHEIMER:  It certainly was and it's all over

3  the --

4          THE COURT:  Objection is overruled.

5          MR. WERTHEIMER:  Sorry.

6  A    I didn't reference that they played a role in the

7  negotiation of the consent agreement.

8  Q    You just abstained?  Silently, you didn't --

9  A    Yeah.

10          MR. WERTHEIMER:  Yeah, okay.  That's all I have, Mr.

11  Dillon.  Thank you very much.

12                    DIRECT EXAMINATION

13  BY MS. LEVINE:

14  Q    Good afternoon, Mr. Dillon.  Sharon Levine, Lowenstein,

15  Sandler for AFSCME.  Just a couple of questions.

16          During the period of time that you were Treasurer, did

17  you report to the Governor?

18  A    Yes.

19  Q    And did there come a point in time, actually either

20  before or after you became Treasurer that you began to think

21  that Detroit was insolvent or to avoid the need for a legal

22  conclusion financially distressed?

23  A    Yes.

24  Q    And when was that?

25  A    Well, pretty much from day one, but it continued to get

1  worse over the two year window.

2  Q    And what were some of the indicators that caused you to

3  think that Detroit was financially in distress?  Did it

4  include the blight?

5  A    Sure.

6  Q    Conditions with regard to the police and fire services?

7  A    Yes.

8  Q    Did you -- did you review any financial documentation in

9  that regard?

10  A    In what regard?

11  Q    Numbers relating to Detroit's cash flow?

12  A    Yes.

13  Q    What did you review?

14  A    Cash flow forecast that we requested to be developed.

15  Q    By whom?

16  A    By the city.

17  Q    By whom for the city?

18  A    Well, we had invited Ernst and Young to participate and

19  help the city develop its cash flow forecast.

20  Q    When did you retain -- when was Ernst and Young retained?

21  A    I don't recall specifically.

22  Q    Were they retained by the city, or by the state, or by

23  somebody else?

24  A    I'd have to guess, but I believe the city.

25  Q    Did there come a point in time also when Miller, Buckfire

1  was retained?

2  A     By the city?

3  Q     Well, by anybody in connection with the Detroit

4  situation.

5  A     Yes.

6  Q     And when was that?

7  A     There was a short period of time, I don't know when it

8  began, but in the early part of 2012 they were hired for a

9  specific project.  And then --

10  Q     By the -- by the state?

11  A     I believe by the state, yes.

12  Q     And at the conclusion of that project, were they then

13  retained at some point in time by the city?

14  A     About a year after.

15  Q     But in 2012, E & Y, or Ernst and Young was just retained

16  by the state and continued to be retained by the -- I'm sorry,

17  just retained by the city and continued to be retained by the

18  city, correct?

19  A     I believe that's right.

20  Q     Did there come a point in time when Conway, MacKenzie was

21  retained?

22  A     Yes.

23  Q     And when was that?

24  A     I don't recall the specific date.  It would have been

25  early 2013, I believe.

1  Q    And by whom were they retained?

2  A    The city.

3  Q    Did any of these professionals, E & Y, Miller, Buckfire

4  or Conway, MacKenzie during 2012, and I guess it wouldn't be

5  Conway, MacKenzie because they hadn't been retained yet, do

6  what's known as a bottom's up analysis?

7  A    I don't recall that term of art.

8  Q    Do you have an understanding of what a bottom's up

9  analysis is as opposed to a top down analysis?

10  A    Why don't you describe it to me, that would be safer.

11  Q    Did any of these professionals actually instead of

12  relying on numbers provided to them by city officials or

13  others, actually go in and stress test the numbers?

14  A    I believe so.

15  Q    And who was that?

16  A    I think it would have been a combination of E & Y and

17  Conway.

18  Q    And when did Ernst and Young prepare this bottom's up

19  analysis?

20  A    We didn't use that term, so their engagement grew over

21  time as the situation got worse and -- and as they were there

22  longer they started to get better -- better numbers and

23  understand the environment better.  And then let's say from

24  January of '13, you know, through May or June, there was a lot

25  of effort to put together a ten year forecast for the city

1  that was based on a lot of effort to dig under and understand

2  the numbers.

3  Q    And that took place starting in January of 2013, but not

4  earlier?

5  A    I believe earlier.  I think as E & Y was there, the

6  longer they were there, the better comfort they got.  So we --

7  we always relied and looked at the cash flow forecast and some

8  understanding of the city's profit and loss statement.  So I

9  mean it was -- started from day one really.  But the numbers

10  got more refined as we learned more.

11  Q    Did anybody look behind -- did anybody look behind the

12  numbers in terms of finding other sources of revenue for the

13  city?  For example we've heard a lot of talk about uncollected

14  taxes.  Did E & Y or any of the professionals actually go in

15  and dig into those numbers directly?

16  A    Conway -- I mean everyone in treasury did.  And we had --

17  we were working on a partnership with the city where the state

18  would help them collect their taxes.  We did go look at their

19  outstanding receivables to see if there's monies that could be

20  collected there.

21      That probably was 2011, maybe 2012 when that happened.

22  Conway, MacKenzie did a study of all the cash collection

23  operations.  I don't recall when that project happened.  And

24  then E & I was -- E & Y was on the ground for pretty much the

25  entire time.  And I wasn't on the ground with them, so I don't

1  know all the areas that they paid attention to.

2  Q    But you were concerned about the revenue stream from the

3  City of Detroit going back all the way to the time you took

4  office in 2011?

5  A    Yes.

6  Q    State shared revenue.  For every year that you were in

7  office, did the state share revenue provided to Detroit

8  diminish?

9  A    I believe it actually grew.

10  Q    The state shared revenue?

11  A    Maybe the first year.  The first year might have been a

12  cut and then after that I think it grew every year from that.

13  Q    Do you recall what the number was the first year?

14  A    I do not.

15  Q    Do you recall what the number was that -- the second or

16  third year?

17  A    No.

18  Q    What makes you think it grew?

19  A    I just remember the state's economy began turning around

20  and -- and the initial cuts from the first year the Snyder

21  administration was kind of the bottom.  And the revenues with

22  the state started to increase from that point forward.

23  Q    But isn't the state shared revenue also tied to the city

24  population and wasn't Detroit losing population?

25  A    I'm not totally familiar with the state shared statutory

1  formulation.  But I do believe it's tied to revenue.  And when

2  Detroit fell below a million, that was a relevant number for

3  the city.  I don't know in that sense this number took place

4  and when the new numbers were relied upon.

5  Q    So would it be fair to say then that you're not really

6  sure whether or not the state shared revenue to Detroit grew,

7  or shrank, or stayed the same?

8  A    I would rather see the numbers, yes.

9  Q    Were you involved in the selection of E & Y on behalf of

10  the city back in 2012?

11  A    Well, I think they were brought in before '12.

12  Q    Were you involved in the selection of Miller, Buckfire on

13  behalf of the state in 2012?

14  A    Yes.

15  Q    And were you involved in the selection of Miller,

16  Buckfire on behalf of the city about a year later?

17  A    Yes.

18  Q    And were you involved in the selection of Conway,

19  MacKenzie for the city in 2013?

20  A    Yes.

21  Q    How long did the interview process last with Miller,

22  Buckfire before they were actually retained by the city?

23  A    I don't recall.

24  Q    Do you recall how long the interview process took with

25  Conway, MacKenzie before they were actually retained by the

1  city?

2  A    Not specifically, but it was hours.

3  Q    You met them and hired them on the spot?

4  A    No, no.  It was hours and it took several meetings.

5  Q    Over what time frame, do you know?

6  A    The process -- I don't recall specifically, but it was

7  not a matter of days.  It was several -- it was a competitive

8  process and there was a lot of meetings.  And a lot of time

9  was spent on that.

10 Q    Same thing with choosing Miller, Buckfire, several

11 meetings, competitive process, a lot of days?

12 A    Not quite the same with Miller, Buckfire.

13 Q    How many -- how many investment bankers were interviewed

14 during the process that resulted in Miller, Buckfire being

15 retained by the city?

16 A    I don't recall.

17 Q    More than two?

18 A    I don't recall a formal interview process like we had

19 with the law firms, or the accounting firms, or the

20 restructuring firms.

21 Q    So it's possible it was just Miller, Buckfire that was

22 considered and ultimately retained?

23 A    I don't recall if no one else was considered, but it's

24 possible.

25 Q    Now were you involved in the selection of Jones, Day?

1  A     Yes.

2  Q     And there were several law firms that were considered

3  along with Jones, Day?

4  A     Correct.

5  Q     And the interview took place on January 29?

6         MS. NELSON:  Your Honor, asked and answered.

7         THE COURT:  Many times.

8         MS. LEVINE:  I'll move on.

9  Q     When did you personally become first aware of Jones,

10 Day's interest in serving as counsel for the city?

11 A     For what purpose?

12 Q     For any purpose.

13 A     Well, they had some role during the efforts to negotiate

14 a consent agreement.  So that suggested to me that they had an

15 interest in this case.

16 Q     Back in 2012?

17 A     Right.

18 Q     Was it earlier than 2012?

19 A     Could have been December even, but I don't recall

20 specifically when it started.

21 Q     Now I don't want to go through again the entire interview

22 process with -- with Kevyn Orr, but Kevyn Orr first became

23 considered on 1-29-13, is that correct?

24 A     By me it would have been later.  It would have been after

25 Rich Baird called to ask me if I thought he could be a

1  candidate.

2  Q    But the state was considering him effective as of the

3  interview date with Jones, Day, correct?

4  A    After the -- that date.  I don't recall the day I got a

5  phone call.

6  Q    And he was formally retained on March 25?

7  A    That sounds right.

8  Q    And there was an interview process and negotiation back

9  and forth between January 29 and March 25, correct?

10 A    Correct.

11 Q    There was some discussion earlier with regard to Jones,

12 Day working on the consent decree and some other Miller,

13 Buckfire working perhaps for the state and then for the city.

14 Did the state or any entity affiliated with the state or any

15 of its officers fund any of the professionals currently

16 involved in this case, Jones, Day, Conway, MacKenzie, Miller,

17 Buckfire, or E & Y?

18 A    Could you restate the question?

19 Q    Did the state or any entity affiliated with the state, or

20 its officers, at any time fund any of the professionals

21 retained by the city in this case, Jones, Day, Conway,

22 MacKenzie, Miller, Buckfire, E & Y?

23 A    Yes.  For those units we contributed to the city's cost

24 of retaining them.

25 Q    So the state itself?

1  A    Yes.

2  Q    Anybody on behalf of the state or affiliated with the

3  state or any of its officers?

4  A    I don't know if I understand the question, but treasury

5  was -- appropriated some money from the legislature for me to

6  assist local units of government retain professionals that can

7  help them navigate financial difficulties.

8  Q    Well, there -- there was some testimony earlier that the

9  NERD fund for example, contributed to defray some of Kevyn

10  Orr's expenses.  Were there any other entities affiliated with

11  the state or any officer of the state that helped defray the

12  costs of the professionals retained by the city in this case?

13  A    I'm not aware of any other funds.

14  Q    Okay.  Are you familiar with the June 14 proposal to

15  creditors made by the EM in this -- the emergency manager in

16  this case?

17  A    Yes.

18  Q    Did you -- and by EM I mean emergency manager as we have

19  a shorthand.  Did you review that proposal for creditors

20  before it was made on June 14?

21  A    I don't believe so.

22  Q    When was the first time that you saw it?

23  A    I believe when I attended it.

24  Q    When you attended the June 14 meeting?

25  A    Right.

1   Q     Did you see that there was a time line at the back of

2   that proposal that concluded on July 19?

3   A     I don't recall that.

4   Q     Does a -- does a time line running from the June 14

5   meeting through July 19 ring a bell?

6   A     I believe I recall a time line that was scheduled for the

7   process and that sounds about right.

8   Q     And was it your understanding that there were to be

9   negotiations with various stakeholders between June 14 and

10  July 19 as a precursor to the Chapter 9 filing?

11  A     Yes.

12  Q     And what's your understanding of the total debt in

13  Detroit?

14  A     About 18,000,000,000.

15  Q     Did you think it was reasonable to schedule negotiations

16  with the various stakeholders of $18,000,000,000 of debt for

17  one month and three or four days?

18  A     I don't think I passed judgment on that.  I knew it was

19  an aggressive schedule.

20  Q     Okay.  You've previously testified that you were

21  concerned about Detroit's finances virtually from the time you

22  took office back in 2011, correct?

23  A     Correct.

24  Q     And that there were various restructuring professionals

25  in and around the Detroit situation.  Some dating back to even

1  as far as December 2011, but coming through straightforward

2  till the filing of the bankruptcy in -- in July of 2013,

3  correct?

4  A    Correct.

5  Q    And in response to some questions by Mr. Wertheimer, you

6  testified to the fact that Chapter 9, while not necessarily

7  being considered, was in the background at least since April

8  of 2012, correct?

9  A    I believe I testified to that, sure.

10 Q    So knowing what one of the precursors to a Chapter 9 is

11 to try and negotiate with your various stakeholders prior to a

12 filing, why didn't negotiations start with these various

13 stakeholders back in April of 2012?

14 A    Of '12?

15 Q    Uh-huh.

16 A    Our hope was to avoid emergency and to get to a consent

17 agreement back in '12.

18 Q    Were you negotiating with municipal bond holders and

19 others with regard to -- the consent decree didn't solve the

20 debt problem?

21 A    No.

22 Q    Were you negotiating with the stakeholders back in 2012?

23 A    No.  We were negotiating with the city to see if we could

24 reach an agreement that would give them a chance to

25 restructure the city.

1  Q    Did you encourage the city during the period of time that

2  you were negotiating with the city to be also negotiating with

3  their stakeholders?

4  A    I don't have a specific memory about that.

5  Q    There were negotiations in late 2011, early 2012 with a

6  coalition of unions for Detroit with regard to a concessionary

7  agreement.  Are you familiar with that?

8  A    Yes.

9  Q    And there were about 30 unions that participated in those

10 concessionary negotiations, is that your understanding?

11 A    I'm aware that the city was negotiating something that I

12 think were described as TSA's.  Who was involved, I don't

13 remember each name of each union.

14 Q    But it was a coalition of unions?

15 A    Yes.

16 Q    It wasn't just one union.  And on the other side of the

17 table was city, correct?

18 A    Correct.

19 Q    And involved in that on behalf of the city was E & Y,

20 correct?

21 A    Yes, they were there.

22 Q    Do you recall who the person was at E & Y who was

23 involved in that?

24 A    I believe Gaurav Malhotra.

25 Q    And as a result of those negotiations, there was a

1  consensual agreement that was actually reached, isn't that

2  correct?

3  A    Between the city and the unions, yes.

4  Q    And the unions ratified the agreement so approximately

5  4,000 plus city employees voted in favor of the agreement, is

6  that correct?

7  A    I don't believe every union ratified.

8  Q    To your knowledge did most of the unions ratify?

9  A    I don't recall.

10 Q    Would you be surprised if I told you that the unions

11 actually ratified?

12 A    Yeah, because my memory was that not all of them

13 ratified.

14 Q    Was the -- was the agreement brought before the city

15 council for ratification?

16 A    I don't remember.

17 Q    Well, did you tell the city, you personally tell the city

18 not to ratify this agreement and not to agree to the terms and

19 conditions of this collective bargaining agreement?

20 A    I didn't think that those agreements would work for the

21 city, so I was not supportive of them.

22 Q    Why is that?

23 A    Because I didn't think -- well, I sought expert advice on

24 and had them reviewed.  And there was several issues that

25 surfaced and the advice I received was that these agreements

1  won't work for the city.

2  Q    And was one of the pieces of that advice that it would be

3  bad for the city to enter into a three year collective

4  bargaining agreement if it wanted to file Chapter 9 to

5  jettison the pensions?

6  A    No.  I mean --

7  Q    Who did you seek advice from?

8  A    Huron was involved looking at them.  I believe they had

9  some --

10  Q    But so Huron, a financial consulting firm, took a look at

11  these and said they were bad while E & Y, a consulting firm

12  that you were also involved with took a look at these and said

13  that they were good, is that what was happening?

14  A    I can't tell you what E & Y's professional opinion was on

15  those agreements.  The mere fact that he was there with the

16  city doesn't mean that E & Y was putting their seal of

17  approval on those TSA's.

18  Q    What were they advising the city in the room, if not how

19  to get to a consensual agreement that made sense for the city?

20  A    I -- I don't -- I wasn't a part of the relationship

21  between the Mayor, and the COO, and E & Y.  Maybe they were

22  there just to provide numbers, or -- I wasn't there, I can't

23  tell you.

24  Q    When did it first come to your attention -- or when did

25  you first -- well, let me ask the question a different way.

1  Are you of the belief right now that the pensions are under

2  funded?

3  A     I believe they are.

4  Q     And do you believe that's part of the reason why you

5  would view Detroit as insolvent?

6  A     It's a contributing factor.

7  Q     And when did you first reach the conclusions that the

8  pensions were under funded and that was a contributing factor?

9  A     It would have been the spring probably of '13.

10 Q     At no time prior to the spring of '13 did you have a

11 concern about the vested pension benefits and the cost of

12 maintaining the vested pension benefits?

13 A     I don't recall when that first became an issue for me.

14 From day one, it was the unfunded health care liability that

15 to me was really the big challenge for the city.

16 Q     And --

17 A     And the level of the pensions, the numbers seemed to move

18 quite a bit, but the funds themselves were advertising

19 themselves at over 90 and over 80% funded.  If that was true,

20 that would not have been alarming to me.  It's not perfect,

21 but not bad.  There's a lot of pension funds worse funded than

22 that.

23 Q     When did you first reach the conclusion that the health

24 benefits were under funded?

25 A     Early on.  We knew it was a big number from --

1   Q     2011?

2   A     -- the first day I started, yeah.

3   Q     Did you start talking to the city about negotiating with

4   the unions or others with regard to solving that problem back

5   in 2011?

6   A     We had discussions dating from the very beginning about

7   that issue, yes.

8   Q     Did you have discussions with anybody besides the city?

9   In other words with the actual stakeholders with regard to

10  that issue?

11  A     With lawyers and some of the consultants working with the

12  city, we had those discussions.  But that's --

13  Q     Did you talk to the unions?  Did you talk to any

14  retirees?  Did you talk to anybody who was actually receiving

15  health benefits with regard to those issues?

16  A     I did.  I met with various union officials throughout

17  this two and a half year window.

18  Q     Did you participate in the negotiations that led to the

19  concessionary agreement in February of 2012?

20  A     No.

21  Q     Why not?

22  A     I don't recall being invited.

23  Q     If the issue was health care, did you pick up the phone

24  and call anybody about that and suggest that maybe you should

25  be involved in that?

1  A     I didn't ask to be at the table.

2  Q     After the proposal for creditors disseminated, there was

3  a time frame from June 13th, 14th, to July 19th to negotiate

4  with all of these stakeholders.  Do you recall that?

5  A     I do.

6  Q     Do you believe it was practical to believe that there

7  could be resolutions reached with all of these stakeholders

8  during that short period of time?

9  A     Can you rephrase it?  Or just repeat it.  Just --

10  Q     Do you believe it was possible to reach an agreement with

11  all of the city's stakeholders between June 14th, and July 19th?

12  A     Possible, yes.

13  Q     Okay.  As you -- as the deadline approached and there was

14  a lot of testimony that you gave earlier with regard to back

15  and forth over the authorization letter to Kevyn Orr to file

16  Chapter 9 and it looked more likely that a Chapter 9 was going

17  to be filed.  Was there any thought given to the city funding

18  a period of time for Detroit to engage in more meaningful,

19  more productive negotiations for another 60, 30, 90 days in

20  order to allow the stakeholders a real opportunity to engage

21  in a back and forth negotiation to try and solve these

22  problems before rushing into Chapter 9?

23  A     I'll tell you the thing that troubled me the most was

24  when they put together the ten year plan that talked about

25  investing in the city which is important for it to turn around

1 eventually.  That the recovery for the unsecured creditors was

2 so low I didn't know how anyone practically could cut a deal

3 and walk out of the settlement room accepting something based

4 on those numbers.  I became very skeptical that an out of

5 Court solution could happen.

6 Q    Did you ever suggest that perhaps there should be some

7 funding to provide a limited further longer period of time to

8 better develop a proposal that could actually form the basis

9 of a successful out of Court plan of adjustment?

10 A    I was not optimistic that you could reach it out of Court

11 after the numbers kept getting worse and when you saw the

12 potential recovery, I just don't know practically how the

13 unsecured creditors could accept that practically.  And that's

14 probably the biggest influence on me.

15 Q    So then at no point from 2011 through the filing of the

16 Chapter 9 did you actually sit down and participate in and

17 engage in negotiations with the stakeholders of the City of

18 Detroit, personally?

19 A    It's overly broad.  I mean I had various meetings with

20 some union -- union representatives during those windows of

21 time where we discussed various matters.  I think I'd need a

22 little more definition to the question.

23 Q    Well, there was a proposal for creditors that came out on

24 June 14th.  What you're saying was a proposal that nobody could

25 possibly agree to, so you viewed it as impractical.  But

1  Detroit's financial condition had been deteriorating for the

2  whole time that you'd been in office if I'm understanding your

3  testimony correctly.  So at any point in time did you suggest

4  to anybody now is the time for us to get in front of this

5  situation, make a proposal, and start negotiating?

6  A    I don't believe so.

7        MS. LEVINE:  Thank you.  No further questions.

8        THE COURT:  Other questions for Mr. Dillon?

9                    DIRECT EXAMINATION

10 BY MS. GREEN:

11 Q    Good afternoon, Mr. Dillon.  Jennifer Green on behalf of

12 the general and the police and fire retirement systems.

13      I'd like to follow up on some questions that Ms. Levine

14 just asked.  Can we pull up UAW Exhibit 626?  The second page.

15 Paragraph 10 -- no, 11, Paragraph 11.  At the bottom these are

16 your comments, correct, to the authorization letter -- or I'm

17 sorry, the recommendation letter by Kevyn Orr?

18 A    Yes.

19 Q    And you note here you think it should say there's a

20 fundamental reality that after fully estimating the city's

21 liabilities, the pennies on the dollar outcome for unsecured

22 creditors make it practically impossible for them to accept

23 KO's offer.  Is that the sentiment that you were referring to

24 just a moment ago when you said that you thought that

25 basically the recovery was so low that it would be impossible

1  for anyone to accept it?

2  A    Yes.

3  Q    Do you know if anyone else in -- in the state or city

4  shared your view that a pennies on the dollar offer was really

5  a non-starter?

6  A    I don't have a specific memory on that.

7  Q    The paragraph just prior to this, Paragraph 10, you had

8  made a statement, I believe there's a State Court option to

9  get retirees into a class.  We don't acknowledge that and why

10 is that impractical?

11      I believe your testimony was that you were never

12 ultimately briefed on why that was the case.  But did you ever

13 ask about this particular option on the conference call that

14 you had just later on July 10th?

15 A    I don't recall.

16 Q    So you never got an explanation to your question as to

17 why that State Court class action option was impractical?

18 A    I don't recall having that conversation in that call.

19 Q    Do you know if anyone else shared your view with the

20 State Court option that no one had fully explained why that

21 was not a practical option?  Anyone at the state or city?

22 A    I don't recall any discussions on it.

23 Q    At the bottom of the letter, it says after this letter is

24 revised, let's work on the Governor's response.  And you knew

25 as of July 10th then as the date of this email that the Chapter

1  9 filing was going to be filed on July 19th, correct?

2  A    I don't think I acknowledged that the exact date, but I

3  remember seeing a time schedule that that date was likely in

4  that schedule.

5  Q    And the time line that you're referring to, do you -- do

6  you recall who you got that from?

7  A    Who was that?  Whenever our weekly Monday meetings, I

8  believe, with the Governor and Kevyn and miscellaneous people

9  from the Governor's office and treasury.  And possibly some of

10  the consultants.

11  Q    Do you recall if the time line was given to you from

12  someone by the city, or someone from the state?

13  A    From the city.

14  Q    Do you recall if it was a time line prepared by Bill

15  Nowling?  Does that name ring a bell?

16  A    It does.  I don't believe it came from him.

17  Q    I'm sorry, what?

18  A    I don't recall it coming from Bill.

19  Q    Do you know if it came from Sarah Wurfel, the Governor's

20  press secretary?

21  A    It -- I don't recall that it came from her.

22  Q    Okay.  If I showed you a copy of the time line would you

23  recognize the time line or --

24  A    Yeah, I mean there's some press and media coverage tied

25  to this -- the time line.  But the relevant time line to me

1  was the actual if there's going to be a filing, a filing and

2  all the steps that follow a filing.  I do recall the

3  conversations about doing media issues, but that wasn't

4  relevant to me.

5  Q   You stated though after this, after let's get to work on

6  the Governor's response, that you were then left out of the

7  loop.  Why was that?

8  A   I never had a discussion, but I think the Governor

9  decided he was going to do it himself.

10 Q   Was there ever a version of Kevyn Orr's recommendation

11 letter with a contingency placed in it?

12 A   I don't know.  I don't recall it in the version that I

13 read.

14 Q   In -- in any subsequent version?

15 A   I'm sorry?

16 Q   Was there a subsequent version that may have contained

17 the contingency?

18 A   I don't recall that.

19 Q   Do you ever recall seeing a version of the Governor's

20 letter that had a contingency placed in it?

21 A   No.

22 Q   In the July 8th email to the Governor, you mentioned that

23 there was financial information forthcoming from certain

24 financial consultants regarding the pension under funding.

25 Who were the consultants that you were referring to?

1   A    Milliman and probably Conway, MacKenzie.

2   Q    And that would be Chuck Moore from Conway, MacKenzie?

3   A    Right.

4   Q    Were you at all involved in the pension task force with

5   Chuck Moore?

6   A    No.

7   Q    Were you aware of that group?

8   A    I don't recall.

9   Q    Do you know if anyone from the state had anything to do

10  with the formation of the pension task force?

11  A    I don't recall.

12  Q    Did they -- did that task force in any way report to

13  anyone at the State of Michigan?

14  A    I don't believe so.

15  Q    When was the first time that you recall a financial

16  advisor telling you that the pensions would have to be cut

17  significantly?

18  A    I don't recall specifically.

19  Q    Do you recall who that would have been?

20  A    I believe it would have been in the spring and we would

21  have Friday meetings before Kevyn was on board with Chris

22  Andrews and Jack Martin and the various consultants.  It was

23  probably the first time it came up that the pension fund

24  numbers were not what they thought they were.

25  Q    Can you put a finer point at all?  Would it have been

1  May, April?

2  A     I'd be guessing.

3  Q     Do you know if it was before Kevyn Orr came on board as

4  emergency manager?

5  A     I don't recall.

6  Q     Do you remember in June of 2013 receiving advice that the

7  pensions would have to be reduced and that the only way to do

8  that would be in a Chapter 9 proceeding?

9  A     I received advice on that date?

10 Q     Do you recall receiving advice in June of 2013 that the

11 pensions would have to be cut significantly and that a way to

12 do that would be a Chapter 9 filing?

13 A     I'm sorry, I don't mean to be difficult, but did I

14 receive advice or information --

15 Q     Do you recall receiving that advice?

16 A     No, not specifically.

17 Q     Can we pull up Exhibit 870, please?  I'd like to draw

18 your attention to the middle of the page.  There's an email

19 that says from Kevyn Orr to Andy Dillon on June 7th, 2013.  Do

20 you recollect getting this email?

21       (Retirement Systems' Exhibit 870 was identified)

22 A     It might be helpful if I could read more of it.

23 Q     Yup, no problem.  The next page contains the substance of

24 the email.

25 A     Can I see a hard copy?  It might be easier.

1          MS. GREEN:  Your Honor, can I approach?

2          THE COURT:  Yes.

3  A    Okay.  Can we restate the question?

4  Q    Do you recall getting an email on June 7th from Kevyn Orr?

5  A    I don't have specific memory of this email.

6  Q    On the second page of the email there is a bullet point 3

7  under GRS.  And it says based on this, we anticipate a -- a

8  significant reduction in already accrued benefits will be

9  required in order to get required contributions to the level

10  of available cash to service the UAAL.  It appears that this

11  may only be possible in a Chapter 9 proceeding.

12          Do you recall receiving at least this portion of the

13  email in June of 2013?

14  A    I don't recall seeing this language, no.  And it's

15  possible I did, I just don't have a specific memory of it.

16  Q    But suffice it to say that by July you were -- you had

17  advised the Governor that you -- some financial consultant had

18  told you that there would have to be significant cuts to the

19  pensions, correct?

20  A    The numbers for the pension funds were very volatile.  I

21  remember just not having a lot of confidence in -- in really

22  what was the number.  And so I was worried about them, but I

23  never felt like we had a number that we could rely upon.

24          MS. GREEN:  And, Your Honor, just a matter of

25  housekeeping, 870 has been used, but I don't know that it has

1  been formally moved for admission, so I'd seek to move for its

2  admission.

3          THE COURT:  Any objections to 870?

4          MS. LEVINE:  Well, Your Honor, I don't believe an

5  appropriate foundation has been laid through this witness.  He

6  doesn't recall this email at all.  And I don't believe it

7  would be appropriate to admit it through his testimony.

8          MS. GREEN:  Can I respond?  He did say he recalled

9  receiving it.  I don't -- he didn't recall the exact sentence

10 that was -- that I drew his attention to.  And Kevyn Orr

11 testified that he recalled receiving it and we had established

12 foundation through that way.

13         THE COURT:  Do you recall receiving this email, sir?

14 A    Well, I see my name on here.  I don't have a specific

15 memory of this document.

16         THE COURT:  Is there some doubt about it's

17 authenticity, Ma'am?

18         MS. LEVINE:  I have nothing -- no, Your Honor, at

19 this point.

20         MR. SHUMAKER:  It is hearsay, Your Honor.

21         MS. GREEN:  Your Honor, if I may respond to that.

22 At least a portion of the email, it is an email directly from

23 Kevyn Orr and we've already established through other emails

24 that that is a party admission, so I'm not exactly sure what

25 the hearsay argument is based on.

1          THE COURT:  May I see it, please?  I don't want the

2     one with all your markings on it.  Is there a -- is there a

3     clean one?

4          MS. GREEN:  There is a clean one.

5          THE COURT:  What number is it again?

6          MS. LEVINE:  Take Mr. Dillon's.

7          THE COURT:  Oh, yes, let me just have Mr. Dillon's,

8     that will work.

9          MS. GREEN:  And, Your Honor, if I may add one more

10    thing.  We've argued in other situations including the city

11    that statements by the financial advisors are being considered

12    party admissions and this is an email from Chuck Moore of

13    Conway, MacKenzie, clearly a party admission.

14         THE COURT:  The Court will admit 870 into evidence.

15    Hold on one second, please.  Can we keep this one?  We don't

16    appear to have it.  Okay.  Can you put the number on there so

17    it will have a number?  Okay.

18    (Retirement Systems' Exhibit 870 was admitted)

19    Q    And if we may pull up Exhibit 834.  You were already

20    questioned a little bit about this email.  I believe that you

21    testified at your deposition the reason you were telling the

22    Governor that you were still in the informational stage was

23    because as you explained the building block is what the funded

24    status was and that issue was fluid, correct?

25         And I believe you further explained that if you're going

1  to reach a settlement with your creditors, it's important to

2  understand what's the funding level.  From there you can start

3  to figure out how do you solve the equation going forward.  Do

4  you recall that?

5  A    Yes.

6  Q    And yet you admit that at this time in July 9th there was

7  no clear understanding of what that level of under funding

8  was, correct?

9  A    For me personally.

10 Q    Do you know anyone else that had a clear understanding at

11 the city or state?

12 A    Well, I believe Chuck Moore was working closely with

13 Milliman and I think he had a pretty clear understanding of

14 where he thought the funding was.  I think he and Kevyn

15 were --

16 Q    But you personally were not convinced?

17 A    I hadn't seen what I thought were final numbers that gave

18 me a good sense of really what was the funding status of the

19 pension plans.

20 Q    And at this time on the email it says that the -- the

21 actual number was not going to be shared as far as the amount

22 and how that would impact the creditors, is that right?  I'm

23 not reading it verbatim.  It doesn't say that, I'm

24 summarizing.

25 A    My understanding that if Kevyn were to meet with them is

1  really just get to what was the funded level.  What's --

2  what's the status.  And from there you can start to translate

3  what may or may not need to happen to get the pension fund to

4  be solvent going forward.

5  Q    But you're -- what you were saying in this email was he

6  was not going to be translating that into an impact on

7  retirees or employees vested rights, correct?

8  A    I thought it best that they come to an agreement.

9  There's a lot of different ways to measure the funding status,

10  the number of years that you're smooth, and what's your

11  amortization rate, and I thought it best to at least see if

12  there's common ground on what the funding level is based on

13  some agreed upon criteria.  But from there then you -- the

14  math kind of falls in place.

15  Q    But at this time there was no number agreed upon as to

16  what the impact would be on the individual retirees, correct?

17  A    Not that I was aware.

18  Q    And that number was thus not going to be shared with

19  anyone at the meeting the following day, correct?

20  A    That was my understanding.

21  Q    You also note at the bottom of the -- the last sentence

22  of the first paragraph.  Because pensions have such a long

23  life, there are lots of creative options we can explore to

24  address how they will be treated on restructuring.  Did you

25  ever explore any of these creative options with the retirement

1  systems?

2  A     No.

3  Q     Did you ever explore any of these creative options with

4  any of the unions or the retirees?

5  A     No.

6  Q     Did you ever prepare a proposal with any of these

7  creative options and then share that proposal with the

8  retirement systems or the unions?

9  A     No.

10 Q     Now this email also says that you expect to get better

11 financials on Thursday which I believe is the middle

12 paragraph.  Who were you expecting to receive better

13 financials from on Thursday?

14 A     I don't specifically recall from the city.

15 Q     You were also asked just a moment ago about whether or

16 not you thought anything changed between the date of this

17 email on July 9th and the filing on the 18th.  Because in this

18 email you stated you thought were in the informational stage.

19 Do you recall that testimony?

20 A     Let's rephrase the question if we can.

21 Q     You were asked by Mister, I think it was Mr. Wertheimer

22 asked you what changed between July 9th and July 18th to take

23 you out of the informational stage.  Do you recall that

24 question?

25 A     I do.

1  Q    And -- and I believe you said something different today

2  than you said in your deposition.  Today you -- do you recall

3  what you said exactly?

4  A    I think it had something to do with that the pensions to

5  me weren't the major driver in the decision whether or not to

6  file.  That, you know, out of 18,000,000,000 this was

7  somewhere, depending on what the union's position was versus

8  the city's, that number was relevant but not a driving factor

9  for whether or not 9 was necessary.

10  Q    So it sounds like your answer has less to do with what my

11  question was.  My question was, do you admit that nothing

12  changed between July 9th and the 18th to take out -- take you

13  out of what you were referring to as the informational stage.

14  A    As it related to the pension?

15  Q    Yes.

16  A    Yes, nothing -- I don't recall having new numbers that

17  came in that made me want to call the Governor and say hey,

18  things are better or things are worse.

19  Q    So nothing changed and you were still in the

20  informational stage the following week, right?

21  A    I believe so.

22  Q    You've testified before that you believed there was a

23  "general understanding" that there was a constitutional

24  protection of pensions that was understood by folks from day

25  one.  And this was the premise of all discussions that we had,

1  correct?

2  A    Correct.

3  Q    And you also testified that the Governor and Kevyn Orr

4  both understood that this constitutional protection existed,

5  correct?

6  A    Yes.

7  Q    And I think you even explained that this presumption was

8  discussed early on and it was understood by people that there

9  was this provision that you had to grapple with, correct?

10 A    The conversation that I had dealt with that the state

11 wasn't liable for pension liabilities of a particular city.

12 That was discussed.  There was also the general understanding

13 that this provision existed in the Constitution.

14 Q    Okay.  I'll get to both.  The first question is, when was

15 the first time that you recall learning of this constitutional

16 protection?

17 A    I don't recall.

18 Q    Do you know if it was during your time as Treasurer, or

19 would it have been something that you knew from your

20 background when you were in the legislature?

21 A    I think it predated my time at the treasury.

22 Q    Okay.  And in fact do you recall citing this

23 constitutional protection to any of the unions or retirees

24 that you met with prior to the bankruptcy filing?

25 A    I don't recall that.

1  Q    And then you also just said that there was a component of

2  your discussions related to whether the state had to provide

3  funding, correct?

4  A    That was a concern early on and because we have other

5  cities and units that are beyond just Detroit.  So it was a

6  concern did the state have any credit exposure to failed

7  pensions at the local level.

8  Q    And in any of these meetings or conversations, do you

9  recall Kevyn Orr ever asking the state to contribute money

10  toward the pension under funding for the City of Detroit?

11  A    I don't recall that.

12  Q    Do you recall if anyone else from his team asked the

13  state if it would contribute funding for the City of Detroit's

14  pension under funding?

15  A    I believe the question was asked.

16  Q    And who asked the question?

17  A    I don't recall.

18  Q    Do you recall what the answer was?

19  A    I think -- well, I recall saying that I don't think A,

20  the state can't lend credit to local units of government.  So

21  constitutionally we're prohibited from doing that.  And then

22  my comment was, I don't ever see the situation where the state

23  legislature would appropriate money to shore up liabilities of

24  the city.

25  Q    So you're constitutionally prohibited from what?

1   A    Lending credit from the state to local units.

2   Q    And that was a constitutional prohibition that you

3   thought was appropriate to enforce even in the case of the

4   Chapter 9 proceeding?

5   A    I was responding to a question from someone that said

6   will the state contribute money.  And I gave them two reasons

7   why I didn't think that would ever happen.

8   Q    Did you think that the state's constitutional prohibition

9   against lending credit was more important than the state

10  constitutional prohibition against impairing or diminishing

11  pension benefits?

12  A    I don't think it's appropriate to compare them in terms

13  of importance.  I think the Courts will ultimately decide what

14  they want as it relates to pensions meanings and what their

15  rights are.  But I was pretty clear as Treasurer that I

16  couldn't lend credit to local units of government, that I was

17  prohibited from doing that.

18  Q    But the Courts could have decided if you did lend credit

19  perhaps the Court could also decide that issue, correct?

20  A    I swear an oath to uphold the Michigan Constitution when

21  I took this position and I intend to follow that rule, or I

22  did.

23  Q    So if there was a prohibition in the Michigan

24  Constitution that you think directly constrained your actions,

25  you would find that to be a violation of your oath of office?

1  A    If I lend -- as Treasurer lend credit to local government

2  when the Michigan Constitution says that I can't do that, then

3  I would feel that yes, I violated my constitutional

4  obligations.

5  Q    But you don't feel the same way about Article 9, Section

6  24 of the Michigan Constitution?

7           MS. LEVINE:  Objection, Your Honor, argumentative

8  and vague.

9           THE COURT:  I'll permit it.  What's your answer,

10 sir?

11 A    I don't know that that provision influenced any way

12 whether the Governor was -- I don't think it blocks him or

13 prevent him from authorizing a Chapter 9.  We had it in

14 Article 72.  We had it in Public Act 4.  We had it in Public

15 Act 436.  That's always been out there.

16 Q    You mean the power to permit a Chapter 9?

17 A    Yes.

18 Q    And there's also the power to place a contingency on a

19 Chapter 9, correct?

20 A    I believe that's in 436.

21 Q    And we looked at an email earlier where it was discussed

22 whether or not such a condition should be placed on this

23 filing, correct?

24 A    I believe that.

25 Q    It was an email dated July 12th.  Do you know ultimately

1  why no contingencies were placed on the Chapter 9 filing?

2  A    Just from what I read in the Governor's letter.

3  Q    You were never briefed afterward?

4  A    No.

5  Q    As for the bankruptcy timing, the July 19th date that was

6  picked, it was your understanding that that date was picked

7  because in part the Governor had a desire that if you're going

8  to do a Chapter 9, he wanted it to be fast and efficient,

9  correct?

10  A    Uh-huh.

11  Q    So was that the primary driver of the July 19th date and

12  why it was ultimately decided upon?

13  A    Well, I -- I can't speak to why that specific date was

14  picked.  I -- I was aware that it was being considered, the

15  filing was being considered.  And I do know that there was a

16  sequence of events, dates that followed months after the

17  actual filing.  And there was a briefing to the Governor if --

18  you know, all these events have to transpire the filing and

19  how that landed on that particular date, I don't -- I was

20  never briefed specifically on why that date.

21  Q    But your understanding was in general it was supposed to

22  be fast and efficient?

23  A    That's what the Governor wanted.

24  Q    Was that in part driven by trying to get it done within

25  the 18 months of the emergency manager's appointment?

1  A    You'd have to ask the Governor that, but it would make

2  sense to me.

3  Q    Were you ever privy to any conversations where that time

4  line was discussed for that reason?

5  A    I don't recall that.

6  Q    The time line that we've discussed, you said that you had

7  meetings and you were briefed on the time line?

8  A    Yes.

9  Q    Was there ever a back up time line that you saw a copy

10  of?

11  A    There was a understanding that these dates could slip or

12  move.

13  Q    And it did, right?

14  A    But I didn't see an alternative schedule.  This was the

15  one that was mapped out.

16  Q    Okay.  But it did move by one day?  The bankruptcy filing

17  was delayed by one day.

18  A    I don't dispute that.  I don't have specific memory of

19  the date that it was supposed to be filed and the original

20  time line.  But I have a vague memory that -- that might have

21  been pulled up.

22  Q    Okay.  Did you attend a meeting in June of 2012 with the

23  Governor and Ken Buckfire of Miller, Buckfire and any

24  attorneys from Jones, Day?

25  A    In June of '13?

1  Q    2012.

2  A    '12.  June of 2012, Miller, Buckfire, Jones, Day, the

3  Governor and I?

4  Q    Yes.

5  A    I don't recall.

6        THE COURT:  All right.  We have to stop now.  How

7  much longer will you be?

8        MS. GREEN:  I actually had just like one more

9  question.  If you want, I can finish it or I can go --

10       THE COURT:  Okay.  One more question.

11 Q    With respect to the meeting that we just discussed, do

12 you recall receiving memos from Jones, Day relating to the

13 pension obligations back in 2012?

14 A    I don't have a specific memory of it.

15 Q    Do you recall --

16 A    And actually let's be clear.  What pension obligation

17 certificates, or what?

18 Q    The constitutional protections of pension obligations in

19 Michigan.

20 A    I don't recall.

21 Q    Do you recall receiving any memos relating to Chapter 9

22 filings for the City of Detroit?  Memos on that topic?

23 A    Not specifically.

24       THE COURT:  All right.  We have to stop now.  We do

25 not have Court tomorrow.  We'll reconvene Thursday morning at

1   9:00.  At that time if I could get a representation from the

2   objectors group as to how long you think your closing

3   arguments will be, that will help me a lot.  We are still

4   researching the issue of courtrooms for next week, so I hope

5   to have some further information for you about that.  And

6   we'll be in recess.

7        (WITNESS ANDY DILLON WAS EXCUSED AT 3:00 P.M.)

8            THE CLERK:  All rise.  Court is adjourned.

9        (Court Adjourned at 3:00 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7  We certify that the foregoing is a correct transcript from the

8  electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 11-8-13
    Letrice Calloway

12

13

14

15

16

17

18

19

20

21

22

23

24

25