| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |

**STIPULATION FOR ENTRY OF SUPPLEMENT TO SECOND AMENDED FINAL PRE-TRIAL ORDER**

Pursuant to Local Rule 7016, (i) The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees ("**AFSCME**") and (ii) the City of Detroit ("**City**", and together with AFSCME, the "**Parties**") have conferred and hereby stipulate to entry of the attached supplemental order (the "**Supplemental PTO**", attached hereto as **Exhibit 1**) regarding the Second Amended Final Pre-Trial Order dated November 10, 2013 [Docket No. 1647] (the "**Second Amended PTO**"). The Supplement includes the following deposition designations and counter-designations to the Gaurav Malhotra September 20, 2013 deposition transcript, which designations were included in the original Amended Final Pre-Trial Order [Docket No. 1354], but inadvertently omitted from the Second Amended PTO:

**Gaurav Malhotra, September 20, 2013**

    **1. Consolidated Designations**

    44:21–45:17
    54:22–55:12
    56:9–57:1
    86:20–23

    **2. City's Counter-Designations**

    45:18 - 46:1

The relevant pages from the Gaurav Malhotra, September 20, 2013 deposition transcript are attached as **Exhibit 2** hereto for the Court's reference. The Parties respectfully request entry of the Supplemental PTO at the Court's convenience.

Dated: November 13, 2013

<div style="margin-left: 45%;">

**LOWENSTEIN SANDLER LLP**
/s/ *Sharon L. Levine*
Sharon L. Levine, Esq.
Philip J. Gross, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-6247 (Facsimile)
slevine@lowenstein.com
pgross@lowenstein.com

-and-

Herbert A. Sanders, Esq.
THE SANDERS LAW FIRM PC
615 Griswold St., Suite 913
Detroit, MI 48226
(313) 962-0099 (Telephone)
(313) 962-0044 (Facsimile)
hsanders@miafscme.org

-and-

Richard G. Mack, Jr., Esq.
MILLER COHEN, P.L.C.
600 West Lafayette Boulevard
4th Floor
Detroit, MI 48226-3191

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub-Chapter 98, City of Detroit Retirees*

/s/ Bruce Bennett
Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street

</div>

-2-

Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com
Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)

MILLER, CANFIELD, PADDOCK
        AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

*Counsel for the City of Detroit, Michigan*

# EXHIBIT  1

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 9 |
|  | ) |  |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
|  | ) |  |
| Debtor. | ) | Hon. Steven W. Rhodes |
|  | ) |  |

## SUPPLEMENTAL ORDER REGARDING SECOND AMENDED FINAL PRE-TRIAL ORDER

Having been advised in the premises and having considered the stipulation between the City and AFSCME (the "**Stipulation**") to entry of a supplement to the Second Amended Final Pre-Trial Order dated November 10, 2013 [Docket No. 1647] (the "**Second Amended PTO**").

IT IS ORDERED THAT:

1.      The Stipulation is GRANTED as set forth herein.

2.      The following deposition designations and counter-designations are deemed to be part of the Second Amended PTO:

**Gaurav Malhotra, September 20, 2013**

### 1.  Consolidated Designations

44:21–45:17
54:22–55:12
56:9–57:1
86:20–23

### 2.  City's Counter-Designations

45:18 - 46:1

# **EXHIBIT 2**

1          IN THE UNITED STATES BANKRUPTCY COURT

2              EASTERN DISTRICT OF MICHIGAN

3                  SOUTHERN DIVISION

4

5     -------------------------------x

6                                    :

7     In re                          : Chapter 9

8     CITY OF DETROIT, MICHIGAN,      : Case No. 13-53846

9                  Debtor.           : Hon. Steven W. Rhodes

10    -------------------------------x

11

12          The videotaped deposition of GAURAV

13    MALHOTRA, called for examination, taken pursuant to

14    the Federal Rules of Civil Procedure of the United

15    States District Courts pertaining to the taking of

16    depositions, taken before JULIANA F. ZAJICEK, CSR No.

17    84-2604, a Certified Shorthand Reporter of said State

18    of Illinois, at the offices of Jones Day, Suite 3500,

19    77 West Wacker Drive, Chicago, Illinois, on

20    September 20, 2013, at 9:30 a.m.

21

22

23

24

```
 1   APPEARANCES:

 2        JONES DAY,
          (51 Louisiana Avenue, N.W.,
 3        Washington, D.C. 20001-2113,
          202-897-3939), by:
 4        MR. GEOFFREY S. STEWART,
          gstewart@jonesday.com;
 5        MR. CHRISTOPHER DiPOMPEO,
          cdipompeo@jonesday.com,
 6
               appeared on behalf of the Debtor
 7             and the witness;

 8        LATHAM & WATKINS LLP,
          (355 South Grand Avenue,
 9        Los Angeles, California 90071-1560,
          213-485-1234), by:
10        MR. WAYNE S. FLICK,
          wayne.s.flick@lw.com,
11
               appeared telephonically on behalf of
12             Ernst & Young;

13        DENTONS,
          (233 South Wacker Drive, Suite 7800,
14        Chicago, Illinois 60606-6306,
          312-876-2572), by:
15        MS. LEAH R. BRUNO,
          leah.bruno@dentons.com;
16        MS. MELISSA A. ECONOMY,
          melissa.economy@dentons.com,
17
               appeared on behalf of Retirees Committee;
18
          COHEN WEISS AND SIMON LLP,
19        (330 West 42nd Street,
          New York, NY 10036-6979,
20        212-356-0216), by:
          MR. PETER D. DeCHIARA,
21        pdechiara@cwsny.com,

22             appeared telephonically on behalf of the
               International Union, UAW;
23

24
```

13-53846-tjt   Doc 1701   Filed 11/13/13   Entered 11/13/13 14:56:10   Page 8 of 18

1   APPEARANCES: (Continued)

2       LOWENSTEIN SANDLER LLP,
        (65 Livingston Avenue,
3       Roseland, New Jersey 07068,
        973-597-2346), by:
4       MR. S. JASON TEELE,
        steele@lowenstein.com,

5
            appeared on behalf of AFSCME;
6
        CLARK HILL PLC,
7       (151 South Old Woodward, Suite 200,
        Birmingham, Michigan 48009,
8       248-642-9692), by:
        MR. JOHN R. STEVENSON,
9       jstevenson@clarkhill.com,

10          appeared telephonically on behalf of the
            Police and Fire Retirement System of the
11          City of Detroit and the General Retirement
            System of the City of Detroit;
12
        WEIL, GOTSHAL & MANGES LLP,
13      (767 Fifth Avenue,
        New York, New York 10153,
14      212-310-8257), by:
        MS. DANA KAUFMAN,
15      dana.kaufman@weil.com,

16          appeared telephonically on behalf of
            Fidelity Guaranty Insurance Company;
17
        LIPPITT O'KEEFE, PLLC,
18      (370 East Maple, 3rd Floor,
        Birmingham, Michigan 48009,
19      248-646-8292), by:
        MR. RYAN C. PLECHA,
20      rplecha@lippittokeefe.com,

21          appeared telephonically on behalf of the
            Detroit Retired Police and Fire Fighters
22          Association, Detroit Retired City
            Employees Association, Don Taylor,
23          individually and as president of the
            RDPFFA, and Shirley Lightsey, individually
24          and as president of the DRCEA;

```
 1   APPEARANCES: (Continued)

 2        STROBL & SHARP, P.C.,
          (300 East Long Lake Road, Suite 200,
 3        Bloomfield Hills, Michigan 48304-2376,
          248-540-2300), by:
 4        MS. MEREDITH E. TAUNT,
          mtaunt@stroblpc.com,
 5             appeared telephonically on behalf of the
               Retired Detroit Police Members
 6             Association.

 7

 8

 9

10   REPORTED BY:  JULIANA F. ZAJICEK, C.S.R.
                   CERTIFICATE NO. 84-2604.
11

12

13

14

15

16

17

18

19

20

21

22

23

24
```

1    A.    I think that generally is what's

2  reflective in the forecasts with respect to that there

3  is a -- a reduction in the pace of the decline over

4  the -- in the outer years.  I think that is currently

5  reflective in the forecast.

6    Q.    But there are no scenarios that would

7  include an actual rise in the population, is that

8  correct?

9    A.    I don't recall.

10    Q.    You would agree that if the population

11  does grow, it would affect the results of any

12  forecasts, correct?

13    A.    If you change the assumptions, the numbers

14  will change, yes.

15    Q.    And, in fact, it could dramatically affect

16  it, correct?

17    MR. STEWART:  Objection.

18  BY THE WITNESS:

19    A.    I don't know about that.

20  BY MS. BRUNO:

21    Q.    Returning to your declaration in

22  Paragraph 10, it states that, "The work conducted by

23  Ernst & Young developing the cash flow forecasts as

24  well as the ten-year projection" -- "projections,"

1    excuse me, "were limited to the City's general fund,"

2    is that correct?

3          A.      That is correct.

4          Q.      In other words, the projections assume

5    that there are no other funds available to the City

6    beyond the general fund, is that correct?

7          A.      It -- it assumes that the general fund

8    will not have additional funds from other funds, yeah,

9    that's generally correct.

10         Q.      What about the City having available --

11   other available funds outside of the general fund?

12         A.      The City has multiple funds outside the

13   general fund.  The main one is the water and sewer,

14   which we did not perform a ten-year projection on the

15   water and sewer funds.  My understanding is that those

16   funds are not necessarily available to the general

17   fund.

18         Q.      To the general fund that may be correct,

19   but it would be available to the City, would it not?

20         MR. STEWART:  Objection.

21   BY THE WITNESS:

22         A.      It would be available to the City for the

23   purposes those funds were raised for, which is

24   generally maintenance and capital improvements on the

    1   water and sewer side.

    2   BY MS. BRUNO:

    3       Q.    Let's backtrack a little bit.  I think

    4   we've gone in a different direction than I'm trying to

    5   focus on.

    6             My question to you is:  The forecasts that

    7   you provided in this declaration are limited solely to

    8   the general fund, is that correct?

    9       A.    They are generally limited to the general

   10   fund, other than if they were other enterprise funds

   11   the City was subsidizing, like the Department of

   12   Transportation, those would have been included in the

   13   general fund as it is a -- a fund that the City

   14   subsidizes and has historically subsidized.

   15       Q.    So you would agree, though, that subject

   16   to your exception there that the assumptions and

   17   forecasts provided in this declaration do not take

   18   into account other funds available to the City?

   19       MR. STEWART:  Objection.

   20   BY THE WITNESS:

   21       A.    You have to rephrase your question.

   22   BY MS. BRUNO:

   23       Q.    The forecasts and cash flows, the

   24   projections, the information that is discussed in your

1    your prior deposition, I'll hand it to you.  It was

2    the Proposal For Creditors --

3         A.    Okay.

4         Q.    -- dated June 14.

5              And I believe the assets are identified on

6    90.  And it is 90 of the computer generated numbers on

7    the bottom.

8              And on pages 90 through 96, the

9    presentation discussed various assets that the City

10   could derive some cash benefit from, correct?

11        MR. STEWART:  Objection.

12   BY THE WITNESS:

13        A.    Yes.

14   BY MS. BRUNO:

15        Q.    And, well, I don't want to quarrel or even

16   discuss with you what the actual specific value of any

17   one of those assets are, but you would agree that the

18   implementation of any of these proposals would improve

19   the City's cash position, would it not?

20        MR. STEWART:  Objection.

21   BY THE WITNESS:

22        A.    Here is what I would say.  The current

23   ten-year projections right now do not include any

24   incremental proceeds that could be available to the

1    City from asset sales.  And that's where I -- because

2    that's what's very clearly laid out in the proposal.

3              If there are proceeds available that are

4    available to the City, those numbers would change.

5    But I can at least highlight and articulate what the

6    assumptions are with respect to the ten-year forecast

7    that the City has put out.

8    BY MS. BRUNO:

9         Q.      And so your assumptions include that none

10   of these assets will be disposed of in any way, is

11   that correct?

12        A.     That's generally correct.

13        Q.     Sticking with Exhibit No. 4 before you, if

14   you'd turn to page 80 of the document.  I'm sorry.  I

15   should say 87 of the computer generated numbers.

16             And this is a portion of the presentation

17   that discusses increasing the tax collection.  You

18   look like you are on a different page than I am here.

19        A.     87.

20        Q.     You've got it?

21        A.     Yes.

22        Q.     You would agree that increasing the tax

23   collection rates and improving the collection of past

24   due taxes could materially improve the City's

1   financial position, could it not?

2        MR. STEWART:  Objection.

3   BY THE WITNESS:

4        A.    Yeah, I can't answer that because I do not

5   know the magnitude of what you are referring to in

6   terms of your question and what the definition of

7   material is.

8   BY MS. BRUNO:

9        Q.    Well, the presentation here, the June 14th

10  presentation discussed at the fourth bullet down

11  identifies approximately $250 million of unpaid or

12  outstanding tax debts.  If those debts would be --

13  could be addressed and collected, that would be a

14  material improvement in the cash position, would it

15  not?

16       MR. STEWART:  Objection.

17  BY THE WITNESS:

18       A.    This amount that has been identified by a

19  third party, Compuware, for $250 million, I do not

20  know what portion of it has been included specifically

21  in the work with respect to collection efforts that

22  Conway MacKenzie has done, but my assumption is it

23  wouldn't have been to the magnitude of $250 million.

24            So, if $250 million were collected, it

1  would improve the overall profile is my assumption.

2  BY MS. BRUNO:

3       Q.    I have heard estimates that a more

4  accurate estimate of outstanding tax debt is

5  significantly higher than $250 million.

6            Are you familiar with these higher

7  estimates that are being discussed?

8       MR. STEWART:  Objection.

9  BY MS. BRUNO:

10      Q.    Have been discussed?

11      MR. STEWART:  Objection.

12 BY THE WITNESS:

13      A.    No.

14 BY MS. BRUNO:

15      Q.    You have not heard that the outstanding

16 tax debt available to the City could be as much as

17 $700 million?

18      A.    I have not heard that, that I recall.

19      Q.    To be clear, your forecasts don't account

20 for the collection, any type of truly significant to

21 this degree of outstanding debt, is that correct?

22      MR. STEWART:  Objection.

23 BY THE WITNESS:

24      A.    That's correct.

1   inadvisable for the City to file Chapter 9?

2        A.    No.  EY specifically, our team analyzed

3   that given all of the concessions, the active work

4   force and the cost reduction efforts that had been

5   taking place in addition to some of the efforts with

6   respect to reducing the active work force as well as

7   wage reductions and combined with the declining

8   revenues, that a rationalization or a restructuring of

9   the long-term liabilities of the City may be required.

10  But EY did not specifically have an input whether

11  Chapter 9 was or was not the only alternative.

12       Q.    Going back in time just a little bit, in

13  2011 and 2012, an agreement in principle, it is called

14  a tentative agreement, was reached between the City of

15  Detroit and the unions representing its active

16  employees, is that correct?

17       A.    Yes, that is my understanding.

18       Q.    And E&Y was involved in the negotiations

19  leading to that tentative agreement, is that right?

20       A.    E&Y was involved in assisting quantify

21  some of the savings in conjunction and collaboration

22  with the City as the City negotiated with the -- its

23  unions.

24       Q.    And based on your involvement, are you