UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

------------------------------------------------------- x
In re:                                                  :
                                                        :  Chapter 9
CITY OF DETROIT, MICHIGAN,                              :  Case No.: 13-53846
                                                        :
                           Debtor.                      :  Hon. Steven W. Rhodes
                                                        :
------------------------------------------------------- x

**SUPPLEMENTAL BRIEF OF INTERNATIONAL UNION, UAW
REGARDING GOOD FAITH BARGAINING**

The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") submits this supplemental brief regarding (1) whether the case law that addresses good faith negotiation under 11 U.S.C. §§ 1113 and 1114 and in labor law, should apply when determining eligibility under 11 U.S.C. §109(c), and (2) if so, how that case law suggests that the issue should be resolved in this case.

## Argument

**I.   "Good faith" Under Section 1113 and 1114 and Non-bankruptcy Labor Law is Instructive in Determining Eligibility Uunder 11 U.S.C. § 109(c)**

The obligation to conduct good faith bargaining is a cornerstone of federal labor law and fundamental to collective bargaining. A debtor's good faith bargaining is also integral to the substantive requirements of Sections 1113 and 1114 of the Bankruptcy Code, which were enacted to address, respectively, the rejection of collective bargaining agreements ("CBAs") and the modification of retiree health and life insurance benefits in chapter 11. Under the National Labor Relations Act, collective bargaining is defined to include "the mutual obligation of the employer and

the representative of the employees to meet at reasonable time and confer in good faith with respect to" terms and conditions of employment or the negotiation of an agreement. *See* 29 U.S.C. § 158(d).

Drawing upon federal policies promoting collective bargaining, Congress enacted Section 1113 in order restore collective bargaining as the primary means of resolving the debtor's CBA issues. *See In re Maxwell Newspapers, Inc.*, 981 F.2d 85, 90 (2d Cir. 1992) (statute's "entire thrust" is to "ensure that well-informed and good faith negotiations occur in the market place, not as part of the judicial process."). *See also In re Century Brass Prods., Inc.*, 795 F.2d 265, 273 (2d Cir. 1986) (citing legislative history that Section 1113 "'places the primary focus on the private collective-bargaining process and not in the courts.'").[1] Thus, Section 1113 interposed the requirement that a debtor undertake good faith negotiations *before* commencing litigation to reject a CBA. Specifically, the statute requires that the debtor meet, at reasonable times, with the labor organization "to confer in good faith" in an attempt to reach mutually satisfactory modifications. *See* 11 U.S.C. § 1113(b)(1),(2); 11 U.S.C. § 1114(f)(2). *See generally*, *In re Pinnacle Airlines, Inc.*, 483 B.R. 381, 404-6 (Bankr. S.D.N.Y. 2012) (describing procedures under Section 1113).[2]

---

[1] Section 1113 was enacted to change the rules for rejection of a CBA following the Supreme Court's ruling in *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 526 (1984), that a debtor could reject a collective bargaining agreement under a permissive standard showing only that the CBA burdened the estate and that the balance of the equities favored rejection.

[2] The procedures and requirements under Section 1114 operate in a similar manner where a debtor seeks to modify retiree benefits. *See In re Horsehead Indus., Inc.,* 300

The courts have construed the duty to bargain in good faith as an obligation to conduct bargaining with an "'open mind and a sincere desire to reach agreement'". *E.g., NLRB v. Montgomery Ward & Co.*, 133 F.2d 676, 686 (9th Cir. 1943). *See also id.* (duty to bargain means participating actively "so as to indicate a present intention to find a basis for agreement"). Michigan public sector labor law incorporates a comparable duty to bargain patterned after federal labor law. *Detroit Police Officers Ass'n v. City of Detroit*, 214 N.W. 2d 803, 807-09 (1974). *See also id.* at 808 (good faith bargaining requirement "is simply that the parties manifest such an attitude and conduct that will be conducive to reaching an agreement"). The courts apply a similar standard under Section 1113. *See e.g., In re Walway,* 69 B.R. 967, 973 (Bankr. E.D. Mich. 1987) (good faith bargaining requires "conduct indicating an honest purpose to arrive at an agreement as the result of the bargaining process."); *In re Blue Diamond Coal Co.,* 131 B.R. 633, 646 (Bankr. E.D. Tenn. 1991).

The standards for good faith labor negotiations serve several goals under labor law that are relevant to chapter 9 eligibility: fostering the conditions for achieving a consensual resolution; establishing rules that are known to all participants; and ensuring that the law functions as intended, specifically, that meaningful negotiations are in fact conducted and that the alternative "impracticality" standard under Section 109(c)(5)(C) does not become a mere default option that effectively eliminates the

---

B.R. 573, 583 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.,* 134 B.R. 515, 519-20 (Bankr. S.D.N.Y. 1991).

"good faith negotiation" requirement of Section 109(c)(5)(B).[3] Under Section 1113, court-imposed rejection is intended as a last resort, after negotiations have failed to produce an agreement. Chapter 9 is also supposed to be a last resort. For rejection under Section 1113, and chapter 9, to truly be last resorts, then a requirement for negotiations that precedes court intervention must be an effective one and Congress has signaled as such by requiring, in both instances, "good faith" negotiations.[4]

The courts determine good faith by the examining the facts and circumstances of each case. *See NLRB v. Truitt Mfg. Co.*, 351 U.S. 152 153-5 (1956); *see also Calex Corp. v. NLRB*, 144 F. 3d 904, 909 (in determining good faith, court examines the "overall conduct of the parties"). Similarly, under Section 1113, the courts employ a case by case analysis, reviewing the totality of the circumstances in the context of the statutory requirements. *E.g., In re Delta Airlines*, 342 B.R. 684, 692 (Bankr. S.D.N.Y. 2006).

---

[3] For chapter 9, the "good faith" requirement under Section 109(c) serves "[i]mportant constitutional issues that arise when a municipality enters the bankruptcy arena" by requiring that, "before rushing to" bankruptcy court, the municipality first sought to negotiate in good faith concerning the treatment the creditors may be expected to receive under a plan. *In re Cottonwood Water and Sanitation Dist.,* 138 B.R. 973, 979 (Bankr. D. Colo. 1992).

[4] There are important differences, however. Section 1113 takes place in a chapter 11 case. Thus, the two statutory phases—bargaining and, if necessary, litigation—both take place under circumstances where eligibility to use federal bankruptcy power is not at issue. In chapter 9, where state authorization serves the "gatekeeping" function, whether and to what extent federal bankruptcy power will ultimately be used cannot be known at the pre-bankruptcy stage. Even so, in each case, the good faith standard is directed to the parties' intent and conduct, and to that extent the good faith labor bargaining standards are instructive in determining eligibility.

The cases establish certain basic elements that fulfill the standards of honest purpose and sincere attempt to reach agreement required for good faith bargaining. In the seminal case of *Truitt Manufacturing*, for example, the Supreme Court ruled that an employer that withheld financial information to substantiate its claim that it could not afford a wage increase proposed by the union had engaged in bad faith bargaining:

> "Good faith bargaining necessarily requires that claims made by either bargainer should be honest claims. This is true about an asserted inability to pay in increase in wages. If such an argument is important enough to present in the give and take of bargaining, it is important enough to require some sort of proof of its accuracy."

*Truitt Mfg.*, 351 U.S. at 152-53. Section 1113 expressly requires that a debtor's proposal be based on "the most complete and reliable information" available and be submitted to the union with information necessary to evaluate the proposal. 11 U.S.C. § 1113(b)(i)(A),(B). Where an employer does not fulfill these requirements, the debtor's rejection motion will be denied. *See In re Mesaba Aviation, Inc.*, 341 B.R. 693, 717 (Bankr. D. Minn. 2006).

In addition, courts have denied CBA rejection motions under 1113 where the debtor remains intransigent in its proposal for modifications. *See In re Pinnacle Airlines*, 483 B.R. at 422-23 (debtor's motion to reject CBA denied where debtor made no movement from its initial aggregate savings demand); *see also Delta Airlines*, 342 B.R. at 697 (holding, as a general matter, that a debtor that "steadfastly maintains" that its initial proposal is non-negotiable does not comply with the "good faith" requirement under Section 1113, and denying rejection motion.)

These standards—evidencing a sincere attempt to reach agreement through a willingness to compromise, and substantiating proposals for concessions with credible

information sufficient for the counter party to evaluate and respond—can readily be applied to determine good faith negotiations under Section 109(c) because the objectives are comparable—to reach an agreement that avoids court intervention.

## II. The City Did Not Conduct Good Faith Negotiations

Under these standards, the City clearly failed to conduct good faith negotiations. First, strategically negotiating "in the shadow of chapter 9," as it is evident the City planned to do and did, is the very antithesis of conducting good faith bargaining. Rather than demonstrating a true "present" intent to reach agreement outside of bankruptcy based on credible information presented in an atmosphere that would foster a dialogue, the rollout of the Creditor Proposal and the ensuing meetings instead reflected activity designed for a chapter 9 filing. To begin with, the Creditors' Proposal, reflecting an ambitious 10-year program that radically revamped the City's spending priorities by sacrificing protected benefits, was a challenging vehicle for conducting negotiations. Whether the object is a new agreement under labor law or a modified CBA under Section 1113, good faith bargaining is premised on the parties understanding the objective. Here, the EM presented a creditors recovery proposal embedded in (and based upon) a broad, 10-year revitalization plan. If creditors were expected to respond with their own revitalization plans reflecting different spending priorities, it is inconceivable that proposals of that nature could be prepared—let alone discussed—within the meager three-week period the EM allowed prior to his arbitrary evaluation period. If all the EM expected were responses to the narrowly focused creditors recoveries, then his proposal was, in fact, a "take it or leave it" proposal because the recoveries were driven by the revamped spending priorities and the City's

insistent assertions that they were simply treating everyone the same.[5] Moreover, an "honest" claim requires credible substantiation.[6] Here, the data room information was incomplete and (as it turned out) inappropriately restricted. The single pension underfunding figure that drove the pension proposal bordered on misleading—in any event, not explained by its architects. Indeed, the forward-looking revitalization plan was premised on myriad assumptions about the expenditures that were worked into the plan—all forecasts and predictions. It is difficult to imagine that the entire $1.25 Billion program did not contain some elements about which reasonable minds could differ in terms of whether they were services that would make Detroit more attractive to residents and businesses (a goal which itself involved predictions about what will spur growth and economic recovery).[7]

Moreover, signs of willingness among the stakeholders to discuss aspects of the proposal even in the time permitted were rebuffed. We know that the UAW's general counsel approached the EM's professionals with a suggestion for a framework to

---

[5] We know that, one month earlier, Mr. Orr viewed his preliminary plan as not negotiable, Mr. Orr testified that he probably would not have accepted any counter that did not cut accrued pensions in any event. October 29, 2013 Transcript, p. 95. In any event, the City's proposal depended on *federal* bankruptcy law to find that the creditors were "the same." The City was not obliged to offer such treatment.

[6] The EM's declaration at the public meeting that pension benefits were "sacrosanct" at the same time that his June 14 Creditor Proposal was nearing completion is certainly antithetical to the assertion of an "honest" claim.

[7] The asserted privileges by both the City and the State during the eligibility litigation only confirm that their pre-bankruptcy effort was marked by deliberate restriction and control of information rather than a sincere effort to engage in informed, meaningful negotiations.

- 7 -
13-53846-tjt    Doc 1709    Filed 11/13/13    Entered 11/13/13 20:53:51    Page 7 of 8

discuss OPEB benefits. He was told that there "wasn't time," in effect a refusal to bargain. Fundamental questions about the unions' authority to engage in discussions regarding accrued pensions protected by the Michigan constitution went unanswered. November 5, 2013 Transcript, pp. 56, 69. A team focused on a present intention to "find a basis for agreement" and a "sincere desire" to reach agreement would have answers to such basic questions at the ready, and would not simply dismiss constructive suggestions. Clearly, the City was not interested in reaching an agreement outside of bankruptcy and thus not sincere in their efforts to find a basis for an agreement. Instead, they preferred to orient their discussions to the bankruptcy process. In short, the City breached basic premises of good faith negotiations and is ineligible for chapter 9.

## CONCLUSION

For the foregoing reasons, and those set forth in the Amended Objection, the City's chapter 9 petition should be dismissed.

Dated: New York, New York
November 13, 2013

| /s/ Babette A. Ceccotti<br>Cohen, Weiss and Simon LLP<br>Babette A. Ceccotti<br>330 West 42nd Street<br>New York, New York 10036-6979<br>T: 212-563-4100<br>bceccotti@cwsny.com | Niraj R. Ganatra (P63150)<br>Michael Nicholson (P33421)<br>8000 East Jefferson Avenue<br>Detroit, Michigan 48214<br>T: (313) 926-5216<br>nganatra@uaw.net<br>mnicholson@uaw.net |
|---|---|

*Attorneys for International Union, UAW*