1                UNITED STATES BANKRUPTCY COURT
                 EASTERN DISTRICT OF MICHIGAN
2                    SOUTHERN DIVISION

3  IN THE MATTER OF,              Case No. 13-53846
                                 Detroit, Michigan
4  CITY OF DETROIT, MI           November 8, 2013
   _____/ 9:00 a.m.
5
               IN RE:  ELIGIBILITY TRIAL CLOSING ARGUMENTS
6            BEFORE THE HONORABLE STEVEN W. RHODES
             TRANSCRIPT ORDERED BY: SHANNON DEEBY, ESQ.
7
   APPEARANCES:
8
   For the City of Detroit, MI:  GEOFFREY IRWIN, ESQ.
9                                GEOFFREY STEWART, ESQ.
                                 GREGORY SHUMAKER, ESQ.
10                               THOMAS CULLEN, JR., ESQ.
                                 MIGUEL EATON, ESQ.
11                               Jones, Day
                                 51 Louisiana Avenue, N.W.
12                               Washington, D.C. 20001-2113
                                 202-879-3939
13
                                 BRUCE BENNETT, ESQ.
14                               Jones, Day
                                 555 South Flower Street
15                               Fiftieth Floor
                                 Los Angeles, CA 90071-2452
16                               213-243-2382
17                               ROBERT HERTZBERG, ESQ. (P30261)
                                 DEBORAH KOVSKY-APAP, ESQ.
18                               (P68258)
                                 Pepper, Hamilton
19                               4000 Town Center
                                 Suite 1800
20                               Southfield, MI 48075-1505
                                 248-359-7333
21
                                 PETER ELLSWORTH, ESQ. (P23657)
22                               Dickinson, Wright
                                 215 S. Washington Square
23                               Suite 200
                                 Lansing, MI 48933-1816
24                               517-371-1730
25

```
 1  For State of Michigan:        MATTHEW SCHNEIDER, ESQ.
                                  (P62190)
 2                                Chief Legal Counsel
                                  Attorney for State of Michigan
 3                                Michigan Department of
                                  Attorney General
 4                                P.O. Box 30754
                                  Lansing, MI 48909
 5                                517-373-0126

 6                                STEVEN HOWELL, ESQ. (P28982)
                                  Special Assistant Attorney
 7                                General
                                  Dickinson, Wright
 8                                500 Woodward Avenue
                                  Suite 4000
 9                                Detroit, MI  48226-3425
                                  313-223-3033
10
    For Michigan Council 25 of    SHARON L. LEVINE, ESQ.
11  the American Federation of    JOHN SHERWOOD, ESQ.
    State, County and Municipal   Lowenstein, Sandler, LLP
12  Employees (AFSCME), AFL-CIO   65 Livingston Avenue
    and Sub-Chapter 98, City of   Roseland, NJ 07068
13  Detroit Retirees:             973-597-2500

14  For Detroit Retirement        ROBERT D. GORDON, ESQ. (P48627)
    Systems - General Retirement  JENNIFER GREEN, ESQ.
15  System of Detroit, Police and Clark, Hill, PLC
    Fire Retirement System of     151 S. Old Woodward Avenue
16  the City of Detroit:          Suite 200
                                  Birmingham, MI 48009
17                                248-988-5882

18                                RONALD KING, ESQ. (P45088)
                                  Clark, Hill
19                                212 East Grand River Avenue
                                  Lansing, MI 48906
20                                517-318-3015

21

22

23

24

25
```

```
 1  For the Detroit Fire Fighters    BARBARA PATEK, ESQ. (P34666)
    Association, the Detroit         JULIE BETH TEICHER, ESQ.
 2  Police Officers Association      (P34300)
    and the Detroit Police          DAVID EISENBERG, ESQ. (P68678)
 3  Lieutenants and Sergeants        Erman, Teicher, Miller, Zucker
    Association:                     & Freedman
 4                                   400 Galleria Officentre
                                     Suite 444
 5                                   Southfield, MI 48034
                                     248-827-4100
 6
    For International Union, UAW:    BABETTE A. CECCOTTI, ESQ.
 7                                   PETER D. DECHIARA, ESQ.
                                     THOMAS CIANTRA, ESQ.
 8                                   Cohen, Weiss, and Simon, LLP
                                     330 West 42nd Street
 9                                   New York, NY 10036-6976
                                     212-356-0227
10
    For the Detroit Retired         THOMAS MORRIS, ESQ. (P39141)
11  City Employees Association,      Silverman & Morris
    Retired Detroit Police and      30500 Northwestern Highway
12  Fire Fighters Association,       Suite 200
    Shirley V. Lightsey, and        Farmington Hills, MI 48334
13  Donald Taylor (Retiree          248-539-1330
    Association Parties):
14                                   RYAN PLECHA, ESQ. (P71957)
                                     Lippitt, O'Keefe
15                                   370 East Maple Road
                                     3rd Floor
16                                   Birmingham, MI 48009
                                     248-646-8292
17
    For the Official Committee of   MATTHEW E. WILKINS, ESQ.
18  Retirees:                        (P56697)
                                     Brooks, Wilkins, Sharkey &
19                                   Turco, PLLC
                                     401 S. Old Woodward Avenue
20                                   Suite 400
                                     Birmingham, MI 48009
21                                   248-971-1711

22                                   CLAUDE D. MONTGOMERY, ESQ.
                                     ANTHONY ULLMAN, ESQ.
23                                   ARTHUR RUEGGER, ESQ.
                                     Dentons
24                                   1221 Avenue of the Americas
                                     New York, NY 10020-1089
25                                   212-768-6700
```

```
 1                                 SAM ALBERTS, ESQ.
                                   DAN BARNOWSKI, ESQ.
 2                                 Dentons US LLP
                                   1301 K Street, N.W.
 3                                 Suite 600 East Tower
                                   Washington, D.C. 20005-3364
 4                                 202-408-7004

 5   For the Retired Detroit       LYNN M. BRIMER, ESQ. (P43291)
     Police Members Association:   MEREDITH TAUNT, ESQ. (P69698)
 6                                 MALLORY FIELD, ESQ. (P75289)
                                   Strobl & Sharp, P.C.
 7                                 300 East Long Lake Road
                                   Suite 200
 8                                 Bloomfield Hills, MI 48304-2376
                                   248-540-2300
 9
     For the Flowers Plaintiffs -  WILLIAM A. WERTHEIMER, ESQ.
10   Robert Flowers, Michael Wells, (P26275)
     Janet Whitson, Mary Washington 30515 Timberbrook Lane
11   and Bruce Goldman:            Bingham Farms, MI 48025
                                   248-644-9200
12
     For Ambac Assurance           DANIEL WEINER, ESQ. (P32010)
13   Corporation:                  Schafer & Weiner
                                   40950 Woodward Avenue
14                                 Suite 100
                                   Bloomfield Hills, MI 48304
15                                 248-540-3340

16   Court Recorder:               Letrice Calloway

17   Transcriber:                  Deborah L. Kremlick

18

19   Proceedings recorded by electronic sound recording, transcript
     produced by transcription service.
20

21

22

23

24

25
```

1  (Court in Session)

2  THE CLERK: All rise. Court is in session. Please

3  be seated. Case number 13-53846, City of Detroit, Michigan.

4  MR. IRWIN: Good morning, Your Honor. For the

5  record, Geoff Irwin, Jones, Day on behalf of the city.

6  Just one housekeeping matter. I think we've -- we've

7  talked about this a couple of times. Both objectors and the

8  city have deposition designations that we wish to submit in

9  hard copy and I think in a few instances, by video as well.

10 So I have them here if you'd like me to hand them up.

11  THE COURT: Okay, please.

12  MR. IRWIN: And we will be submitting a revised

13 pre-trial order which will conform to dep designations in a

14 pre-trial order too while we are handing up.

15  THE COURT: Okay.

16  MR. RUEGGER: Your Honor, for the record Arthur

17 Ruegger from Dentons on behalf of the retirees committee. We

18 have four copies of the Moore deposition which is marked as

19 Exhibit 456 with everyone's designations, and cross

20 designations, and the Bowen deposition marked as 455 equally

21 with cross designations.

22  We also have, Your Honor, the video deposition of Mr. Orr

23 on September 16th and October 4th marked as Exhibit 446. And

24 the Bing deposition marked as 447. There are only two copies

25 of these disks right now, Judge, but with your permission

1 | we'll hand up two more later on.

2 |          THE COURT:  Okay.  Thank you.

3 |          MR. RUEGGER:  One -- one final issue, Your Honor.

4 | And we don't need a ruling on this yet.

5 |     The pre-trial order that Mr. Irwin submitted contains

6 | only the exhibits that were a part of the original pre-trial

7 | order.  As everyone here knows, a number of exhibits have been

8 | offered and some accepted since that list went in.  We'd like

9 | to help the Court as best we can with a list of those

10 | supplemental exhibits which have been discussed, whether

11 | they've been accepted or -- or rejected during the course of

12 | the trial if that will help the Court.  And we would -- could

13 | submit that next week.  But if Your Honor has any other

14 | procedure we're happy to oblige.

15 |          THE COURT:  We've maintained a list of the admitted

16 | exhibits that were not admitted pre-trial that were admitted

17 | during the course of the trial.  And so at lunch time I would

18 | propose to just give you that list and ask you if we have it

19 | right.

20 |     Are there exhibits on the list that shouldn't be on the

21 | list, or are there exhibits that aren't on the list that

22 | should be.  And ask you all to review that over the lunch

23 | hour, compare it to your own notes regarding admitted

24 | exhibits, and then we'll discuss that further this afternoon.

25 |          MR. RUEGGER:  Very well

1        THE COURT:  That's -- that's the help I need.  And

2   then of course what we'll do, is go through our copies of the

3   exhibit books that we have here and just remove the exhibits

4   that are in there that were not admitted into evidence and --

5   and not consider them.

6        MR. RUEGGER:  Thank you, Your Honor.

7        THE COURT:  Okay.  Are we ready to proceed with the

8   closing arguments now?  Okay, let's do that.

9        MR. SCHNEIDER:  Good morning, Your Honor.  Matthew

10  Schneider on behalf of the State of Michigan.

11       May it please the Court.  Years ago the people of

12  Michigan and the citizens of this city started to learn that a

13  tremendous and terrible storm was headed toward the City of

14  Detroit.  And this was no secret.

15       The people of Michigan, the citizens of Detroit, and the

16  city could see what was headed their way.  And throughout this

17  trial we've heard the evidence that this storm was coming.

18       Exhibit 21, please.  In the City of Detroit's preliminary

19  review findings, it indicates that since 2006, the city has

20  been experiencing significant financial problems caused by the

21  loss of residence, the financial challenges of the automobile

22  industry, the destructions in the financial markets, and the

23  overall economic issues faced by the country.  You can take

24  that down.

25       So with that in mind in January of 2011, Governor Snyder

1 takes office.  And he begins to read these weather reports.

2 The weather reports in this case are cash flow reports.  And

3 they are forecasting the storm.

4      And the Governor realizes as he testifies that there is a

5 serious cash flow problem.  And the Treasury Department is

6 also reviewing these weather reports.  And in December 2011

7 they conduct a preliminary review of the city's finances.  And

8 the conclusion is, significant cash flow shortages, long term

9 debt liabilities, $12,000,000,000 not including almost

10 5,000,000,000 in interest owed.

11      The long term bond rating, the city is in junk status.

12 And the city has no adequate plan to fix the deficit.  There

13 is probable financial stress and there is need of a financial

14 review team.

15      Exhibit 21, second page.  And the preliminary review

16 indicates that the inability of the city to avoid fund

17 deficits, recurrent accumulated deficit spending, severe

18 projected cash flow shortages resulting in an improper

19 reliance on inter fund and external borrowing, the lack of

20 funding of the city's other post-retirement benefits, and

21 increasing debt of the city calls for a financial review team.

22 You can take that down.

23      So in December 2011, the Governor appoints a financial

24 review team.  And this review team produces another weather

25 report.  In March of 2012, the weather report indicates that

1 the City of Detroit is in a condition of severe financial

2 distress.

3 The conclusions are that the general fund deficit is

4 increasing. Moody's is downgrading approximately two five --

5 2.5 billion of the city's debt. Some of it five to six levels

6 below investment grade. The city is facing a significant

7 depletion of its cash and the forecast is a negative cash

8 balance.

9 Exhibit 22. Because this conclusion is that the City of

10 Detroit is in a condition of severe financial stress, the next

11 step is that a consent agreement between the city and the

12 state is attempted. You can take it down.

13 The Governor testified that he worked very hard to get

14 this done but by the fall the city was not living up to -- to

15 its part of the obligations. And so, Your Honor, the

16 impending storm here is not getting better, it is getting

17 worse. And in February of 2013, another financial review is

18 done. And what does this weather report show us, Exhibit 25?

19 There is a cash crisis.

20 The city continues to experience a significant depletion

21 of its cash. Projections have estimated accumulative cash

22 deficit in excess of $100,000,000 by June 30, 2013 absent

23 implementation of financial counter measures which aren't on

24 the horizon.

25 Over $14,000,000,000 in liabilities are facing the city

1  and the city has no workable plan.  And what does the Governor

2  call this?  He says that the city is hemorrhaging cash.

3       What else is going on with the city at this time?  The

4  evidence in this case shows a lot else is going on.  The

5  streetlights aren't working.  Forty percent of them are out in

6  the first quarter of 2013.

7       Ambulances aren't responding in time.  Detroiters are

8  waiting 58 minutes for police to respond to calls.  There is

9  78,000 abandoned buildings.  The evidence shows that the

10 health, safety, and the welfare of the citizens of Detroit are

11 at risk.

12      And this is what caused the appointment of the emergency

13 manager.  Throughout this whole process, the state and the

14 city are working together.  They are working together in a

15 partnership to survive this storm.

16      And also throughout this whole process, the state and

17 city are receiving financial advice.  And some of this is

18 unsolicited.  Miller, Buckfire is offering advice, Jones, Day,

19 Miller, Canfield, Dykema, Huron Consulting, Ernst and Young,

20 Conway, MacKenzie.  Some of this is unsolicited advice, pro

21 bono, for free.

22      Mr. Dillon testified, this is not unusual.  Ultimately

23 the storm arrives and the Governor says, this is the last

24 resort.  Because people are suffering.  The 700,000 citizens

25 of Detroit are suffering and his overriding concern is for the

1  citizens.  And because of that, he authorized -- authorizes to

2  file for Chapter 9 protection.

3      So what is the objectors' theory of this case?  Their

4  theory appears to be don't go speaking with weather experts

5  too early or consultants because that must mean you want the

6  storm to come.  Their theory is apparently that the state or

7  the city shouldn't consider the last resort and don't be

8  prepared.  Don't even ask whether you need a raincoat.

9  Because if you buy a raincoat, or you ask someone whether you

10  need a raincoat, then you want the storm to come.

11      This makes no logical sense.  Doesn't it make sense that

12  when you have a storm of this magnitude coming toward you, you

13  want all the help you can get?  So was the state working with

14  the city?  Were consultants involved?  Of course they were for

15  the benefit of the citizens of Detroit.

16      If you saw this storm coming toward you, isn't this what

17  you'd expect out of your government?  You would expect

18  planning, you'd expect cooperation, you'd expect your

19  government leaders to prepare and plan and be ready for

20  anything.  And that is just responsible government.  Like any

21  good government, it would be foolish to go alone.  It would be

22  irresponsible to fail to prepare.

23      The evidence in this case shows that the city and the

24  state prepared for the worst, but they hoped for the best.

25  And as Mr. Orr testified, we pray for peace, but prepare for

1  war.

2      The objectors apparently want to punish the Governor or

3  the Treasurer for contingency planning, for doing their jobs

4  to protect the people of Detroit.  But working together was

5  the right thing to do.

6      The evidence in this case shows that this was never about

7  pre-determining a Chapter 9 filing.  This was only about

8  careful consideration.

9      So then it begs the question, what is this trial about?

10  It's about eligibility.  It's about whether the City of

11  Detroit is eligible for bankruptcy, that's it.  It is not

12  about when Jones, Day and Miller, Buckfire became involved to

13  give advice on how to weather this storm.  It is not about

14  whether Kevyn Orr has a background as a bankruptcy lawyer.  It

15  is not about whether a Judge in Ingham County had set a

16  hearing.  It's not about whether the Governor decided to

17  authorize a filing a day before than his communications staff

18  had planned.  And it's definitely not about all the other

19  confirmation arguments that the objectors have raised.

20      It is about eligibility and the facts and the evidence

21  show that the city is eligible for bankruptcy protection.  So

22  let's look at the law.

23      To be eligible for bankruptcy, we have to look at Section

24  109(c)(2) of the Bankruptcy Code which states that an entity

25  may be a debtor if such entity is specifically authorized to

1  be a debtor by a governmental officer empowered by state law

2  to authorize a filing.  That process is governed by state law.

3       So determine -- to determine who is the governmental

4  officer empowered by state law, we have to look at the state

5  law PA436.  And Section 18(1) describes this process.  It

6  effectively states that the process is that the emergency

7  manager recommends a filing to the Governor and the Treasurer.

8       Second, if the Governor approves, he informs the

9  emergency manager and Treasurer in writing.

10      Third, the Governor may place contingencies on the filing

11 but he does not have to.

12      And fourth, upon receipt of the written approval, the

13 emergency manager may file.

14      Well, Your Honor, that's what happened in this case.

15 There is really no serious dispute that that happened.

16 Exhibit 28, which is Mr. Orr's letter and Exhibit 29, which is

17 the Governor's letter, comply with PA436.

18      The statutory process was followed in this case to the

19 letter.  And the objectors cannot refute that.  They can't

20 argue that the authorization process failed to follow that

21 statute.  And they can't seriously refute that the city is out

22 of cash.  So they have to refute everything else, even things

23 that have nothing to do with eligibility.  And that is truly

24 the theory of their case.

25      I want to object -- address some of the objectors'

1   arguments.  And I'd like to go through five separate issues.

2       Number one, the objectors say that the purpose of the

3   appropriation provision in PA436 was to make it referendum

4   proof.  And therefore that violates the referendum clause.

5       Well, first of all, as been -- as it has been argued in

6   this Court, it is improper to speculate on the motives of the

7   legislature.  And the MUCC v Secretary of State case tells us

8   that.

9       Now Howard Ryan did indicate that one of the motives was

10  for proofing it.  Okay.  But who did the objectors really cite

11  to for the motive to make this referendum proof?  They present

12  emails from March 2 and 3.  They're talking about Jones, Day

13  lawyers talking about this.

14      Well, that's all very interesting, but those Jones, Day

15  lawyers are not legislators.  And they are not the Governor.

16  The Governor signed the bill and he testified no, that was not

17  his purpose.

18      The Governor testified that the purpose was to pay the

19  emergency managers.  And the Treasurer indicated as much as

20  well.  To pay for emergency managers -- managers not just for

21  Detroit.  Because there were seven or eight emergency

22  managers.  This is a statewide problem, not just a situation

23  in this city.  And it's to pay consultants to get through the

24  fiscal year.

25      And -- and, Your Honor, you can look at the language of

1  the statute to find out exactly what those appropriation

2  provisions said.  But the testimony from the Governor and the

3  Treasurer was that the purpose really was to respond to the

4  criticism from cities because you had put an EM in place and

5  then you would make the city pay for it.  And the improvement

6  in this was, that's not appropriate.  Let's have the state pay

7  for the EM so that we don't put that burden on the city, or

8  the school district.

9      But most significantly as the Governor testified, after

10  PA436 was done, he later signed another appropriations bill.

11  And in that appropriations bill, he funded emergency managers.

12  So the appropriation was put back in later.

13      So if the purpose of the appropriation was to proof it

14  from referendum, why would they put in an appropriation again

15  in a later bill?  That's why this doesn't -- their theory

16  makes no logical sense.

17      The second point I'd like to make is that the objectors

18  argue that the Governor acted with bad faith effectively by

19  rushing this filing.  But the facts and the evidence just

20  don't support that.

21      We look at the evidence, we look at what the Treasurer

22  said, and we look at what the Governor said.  He testified

23  that he went back literally since the time he became Governor,

24  he reviewed the financial review team reports.  He reviewed

25  the 45 day report.  He reviewed other items.  And he worked

1 diligently to go through this process in good faith and that

2 is what he said.

3      He said that he reviewed this file himself.  The evidence

4 shows that the Governor took careful, and thoughtful, and

5 deliberate consideration about this.

6      Point number three, the objectors argue that the

7 Governor's failure to place a contingency in his authorization

8 excluding pensions was either sinister, or unconstitutional,

9 or both.  Well, we know why the Governor did this.  The

10 evidence is what he said.

11      He testified, we're in a crisis mode.  We have serious

12 issues here.  And contingencies could cause more delays, more

13 concern, more complexities to an already complex case.  The

14 Governor said that he has confidence in the judicial process

15 and he himself asked that the statement be added that any plan

16 has to be a legal plan.

17      To get into the legal system so the appropriate people

18 can decide.  And that is what he said.  It doesn't matter

19 whether the Governor's legal counsel, Mr. Gadola, thought

20 contingency should be included because the statute provides

21 that the Governor makes that decision.  The Governor, himself,

22 after careful thought, chose not to place contingencies.  And

23 this was allowed and appropriate under the law.

24      Point number four.  The objectors argue that the state

25 had some sort of scheme to end a run -- end run around the

1  Constitution, the pension clause, in order to cut the pensions

2  of retirees.

3       Well, again, let's look at the facts.  The facts are both

4  the Governor and the Treasurer explained, even if you take out

5  this 3.5 billion dollars in pension fund liability, the city

6  is still 14,000,000,000 or $15,000,000,000 in debt.  It is

7  inconceivable that the purpose of seeking a Chapter 9 filing

8  is to get the pensions.

9       Even Mr. Dillon testified that the problem that the

10  pensions was underfunded, the health care liability was in an

11  even bigger problem.  So the pensions can't be the target.

12       Point number five.  The objectors want this Court to

13  believe that there was some sort of alliance between the

14  consultants, and the state, and the city to drive the city

15  into Chapter 9.

16       And we've seen these emails from the consultants and the

17  lawyers talking about a Chapter 9 filing.  You know, these

18  consultants and the lawyers, they can talk all they want and

19  if we had a nickel for every time a lawyer gave free advice,

20  we'd all be wealthy.

21       But ultimately it's not those consultants' decision to

22  authorize the filing, it is the Governor's decision.  So the

23  best evidence is the Governor's testimony.  He said that lots

24  of people were talking about Chapter 9.  There were

25  contingency plans going back quite some time.  So why do we

1  have contingency plans?  It's because it's a contingency.

2  It's not our goal.

3      The Governor said, you needed to be thoughtful about

4  this.  And he said that the serious discussion of Chapter 9

5  was the week before the authorization.  The Treasurer also

6  presented evidence why this argument is meritless.

7      In Ms. Brimer's last question, her last few questions of

8  Mr. Dillon really spelled this out.  And this goes to the

9  heart of what the objectors' theory is.  The question was,

10 about as early as March 2012 were people at the state and

11 consultants speaking about the filing for Chapter 9?  Well,

12 let's remember what the Treasurer said.  He said, it was

13 always a last resort.

14     If we were thinking of Chapter 9, we wouldn't have gone

15 into a consent agreement.  Because you can't get into Chapter

16 9 through the consent agreement route.  And that's what the

17 statute says.

18     So to agree with this conspiracy theory, then you must

19 conclude that the entire consent agreement process was just a

20 charade.  The problem for the objectors is there is no

21 evidence of that.  In fact the evidence proves otherwise.

22     The evidence proves that the state didn't want to rush

23 into Chapter 9.  The state even wanted to avoid a declaration

24 of financial emergency because the state wanted the locals to

25 work it out.  That's what the testimony in this case was.

1  That was the purpose of the consent agreement.  And both the

2  Governor and the Treasurer explained that.

3      The objectors argue much more.  And the city will address

4  those points and Mr. Bennett will be up here in just a moment

5  to do so.

6      So let me conclude by saying this, Your Honor.  This

7  world is full of critics.  The objectors can criticize the

8  Governor, and the state, and the Treasurer, and the emergency

9  manager because they don't like where they think this case is

10 heading.

11     But this eligibility case isn't about their critiques.

12 The witness testimony shows that it's about leadership.  By

13 authorizing a Chapter 9 filing, the Governor took on an

14 enormous task.  He saw that the problem was getting worse and

15 no one was solving it.

16     He showed leadership by making the hard decision to

17 authorize the filing.  That's not a showing of bad faith,

18 that's good faith.  It's good faith to step up and do what

19 needed to be done to protect the health and the safety of the

20 citizens of Detroit.

21     The evidence in this case shows that Chapter 9 was always

22 a last resort.  Unfortunately the deplorable financial facts

23 of this case required that it come to that.  This city is

24 eligible for bankruptcy.

25              THE COURT:  Thank you, sir.

1          MR. BENNETT:  Good morning, Your Honor.  I think --

2     while I will be using the screen, I will be talking a lot

3     about Exhibit 43, so if the -- if you want to get that handy,

4     it might --

5          THE COURT:  Okay.

6          MR. BENNETT:  It might make some sense.

7          THE COURT:  One second, please.

8          MR. BENNETT:  Okay.

9          THE COURT:  Okay.

10          MR. BENNETT:  All right.  First of all, I'm going to

11    try really hard not to repeat any --

12          THE COURT:  Would you point the mike right at you?

13          MR. BENNETT:  I'm going to try really hard not to

14    repeat any of the things that we've just heard or cover any of

15    the same subjects.  Frankly the city is in exactly the same

16    place as the state in those points.

17     I will add one comment which is that in the careful

18    exegesis of all of the emails about what was going on around

19    the Governor at various points in time, it's been pointed out

20    that there have been lots of different opinions expressed by

21    different actors.  And I frankly take that as comforting.

22    Internal debate, free internal debate is a good thing.

23     I would be much more concerned and frankly with this

24    administration, surprised if everybody wouldn't say a thing

25    until the Governor said what he wanted to do and then they

1  said okay.  So, I think we have in the -- in all of the

2  internal debate where people are talking about suggestions

3  that may or may not have been adopted along the way, we're

4  seeing an additional sign of a healthy process and an

5  additional reflection of good faith.

6      I want to begin by finding our way through the math

7  because while the testimony has been quite wide ranging and

8  some of the points are a little bit open ended, there is a

9  certain amount of business that we have to do.  And that

10  business is to work our way through 109(c) and determine

11  whether the City of Detroit is authorized to be a debtor under

12  Chapter 9.  I think just to check the box, I don't think

13  there's any dispute with respect to (c)(1) that it is a

14  municipality.  The city is a municipality.

15      Number two, second requirement, we've heard about

16  specific authorization from the state this morning.  It was

17  also of course a subject touched on extensively during the

18  arguments concerning legal issues.  I am not going to repeat

19  any of those arguments today.  I don't think Your Honor wants

20  me to.  Of course I'd be happy to answer any questions you may

21  have.

22      We then reach 109(c)(3) which is whether or not the city

23  was insolvent.  I'm going to have some very brief comments on

24  that question.  But I do want to point out that only one

25  objector actually put the issue -- put insolvency in issue.

1  They -- this was AFSCME.

2      They made certain promises about what they would prove in

3  the context of their trial brief and opening statement.  And I

4  didn't see them prove anything.  But it is our burden, we will

5  cover -- we will demonstrate that we have met our burden, but

6  it may be that we can do this in a relatively condensed way

7  because I'm not sure there's a dispute anymore.  And -- and --

8  and perhaps we'll get some help about that when the AFSCME

9  representative reaches the podium.

10      The fourth issue is whether or not the city desires to

11  effect a plan to adjust its debts.

12      And then the fifth issue is the disjunctive tests

13  concerning practicability of negotiations and good faith.

14      Those are the specific things we need to do to move from

15  here to the next phase of the case.  Now woven through some of

16  the objections was an argument that Section 921, good faith

17  was also an issue which of course opened up a few additional

18  doors for testimony.

19      I'm going to try to cover 921 good faith in the context

20  of the discussions relating to 109(c)(5)(B) because I think

21  the overlap is so great that to try to do it separately would

22  just take too much time.

23      So let's begin with the issue of whether or not Detroit

24  is insolvent.  At the opening I promised that our witnesses

25  would present a mountain of evidence showing that the City of

1 | Detroit was insolvent and it wasn't pretty, but it turns out

2 | that we did in fact do that.  I will take through very -- take

3 | us through a little bit of it in a minute.

4 |     As I said before, this evidence was not rebutted by any

5 | evidence introduced by anybody else.  So let's just cover a

6 | few of the very very key points that are suggested by the

7 | statute and we'll cover a little more later.

8 |     First of all, Mr. Buckfire testified that when he took a

9 | hard look at -- at -- at liquidity in May, he found that the

10 | city's position was on a razor's edge.  And that was at a time

11 | when vendors were not being paid on schedule.  That there was

12 | involuntary deferral of vendor payments.

13 |     Then Mr. Malhotra got a lot more technical but just to

14 | get one glimpse of his testimony, Exhibit 38, please.  I'm

15 | sure everybody remembers this chart, the two different lines,

16 | the light blue line which is if you were paying all of your

17 | debts how much cash you would have left.  And of course that's

18 | below the break even line at every point on the chart.

19 |     And then there's the darker line which shows the cash

20 | flow situation given the cash conservation steps that the city

21 | took.  And by those cash conservation steps, they weren't

22 | saving money so that you had more money to pay creditors, it

23 | was testified that the cash conservation steps were not paying

24 | debts as they become due.  And -- and most prominent of course

25 | is the decision by the city not to make the June -- I think it

1  was due on the weekend, June 15th payment on the -- of

2  principal on the COPs.

3      But at the same point -- point in time, as not only Mr.

4  Buckfire, but I think Mr. Malhotra testified there was also

5  deferrals in the trade payment area.  And there is now other

6  problems that may well occupy some time later in the case that

7  the city's cash position was -- was calculated based upon a

8  past commingling of certain other -- money from certain other

9  accounts.  So there was roughly 103,000,000, the number sticks

10 in my head, could be off by a little bit of cash that was

11 really from other funds that could be called back at -- or

12 could conceivably be called back at any point in time.

13     But it's not technically right to say that that money

14 should be regarded as part of the city's cash balance.  That's

15 another form of borrowing.  And so to make it, to -- to

16 actually not hit the wall, the city was not paying its debts

17 as they become due.

18     Now, let's not be content with this horrifying snapshot.

19 Let's take a look at Mr. Orr's budget for fiscal '14 to see

20 what the situation looked going out from the vantage point of

21 June of this year.

22     This exhibit was displayed during Mr. Orr's testimony.

23 Again, in the interest of time, I'm just going to zero in on

24 the numbers at the bottom, but you can blow them off as fine.

25 And note the -- the surplus (deficit) before concessions.

1   That's the kind of general fund deficit, the $379,000,000

2   number that the city was facing if nothing changed for the --

3   the 2014 fiscal year.

4       That's a big number.  It's not -- you're not going to get

5   there by the way with contract changes that the unions may be

6   proud of that they negotiated pre-petition and weren't

7   implemented.  The highest savings number, multi year savings

8   number, I ever heard attached to those was a little over

9   $100,000,000.  And that was over the entire term of the

10  contract.

11      So this is a number that -- that there was no non-debt

12  adjustment mechanism to address.  And no evidence was adduced

13  concerning any conceivable non-debt adjustment approach to

14  creating some form of balance on a cash flow basis to the

15  city's financial affairs in '14.

16      But the sterile numbers only understate the problem.  We

17  also proved what this means, what this -- what the reality is

18  faced by citizens because of the fact the city's budget is so

19  stressed.  And some of that was covered in the state's

20  opening, not going to repeat it.  I'm of course referring to

21  Chief Craig's testimony and I'm going to skip over the

22  different points and just say the cases actually look at the

23  things that -- that Chief Craig talked about as reflective of

24  something called service insolvency.

25      Why do the cases talk about service insolvency and say

1  it's relevant?  Well, that's kind of for the cases where the

2  -- the municipality is somehow managing to pay its debts and

3  maybe not having deferrals, but is not providing adequate

4  services.  So it means that the money it should be spending

5  would render it insolvent.

6      In our case, it tells us that even the numbers that get

7  to the three seventy-nine negative are not generating an

8  adequate result for citizens.  So the inference is, is that

9  the $379,000,000 number actually understates the extent of the

10  problem.

11      Detroit is one of those situations where the insolvency

12  tests are made without regard to the fact that the services

13  being provided are not adequate by any measure.  And when you

14  consider that making them adequate will cost more money, it

15  only means the situation is far worse.

16      My first reference to the proposal for creditors is a

17  chart -- is a chart on Page 34.  This is the chart that

18  quantifies what Chief Craig is talking about, or says the same

19  thing from a different perspective.  And I want to just zero

20  in on the bottom line.

21      And -- and one thing I'm going to say over and over

22  again, Your Honor's going to be tired of hearing it by the

23  time I'm done, but it's important for emphasis.  This chart's

24  in evidence.  No one said a word, no evidence was adduced that

25  there's anything inaccurate, incomplete, or misleading about

1    this chart.

2       And the bottom line shows the percentage of revenues in

3    the general fund that are devoted to paying legacy liabilities

4    in the general fund.  And what it means in the 2013 fiscal

5    year just ended, is that when the city walks up to a taxpayer

6    and collects a dollar of taxes, there is only 57 1/2 cents

7    that's going to be spent on services for that resident.  That

8    that residence is going to get today.

9       And I'm going to use Chapter 11 analogies a lot during

10   this case, but if we had a situation where -- where we had a

11   store that was in bankruptcy and the -- the reality was was

12   that -- that the dollar in that store was only going to give

13   the customer 57 1/2 cents worth of goods, and there's a store

14   down the street where the customer is going to get 84 or 85

15   cents, just turns out to be about what the average is for well

16   managed cities, out of the dollar they spend in the store, we

17   have a reorganization problem in our store that needs to be

18   fixed.

19      That's bad enough.  But because of increases in pension

20   contributions that would be required if things aren't fixed,

21   and escalation of other numbers over time like OPEB's, this

22   problem gets worse, and worse, and worse, and worse in future

23   years.  This has to be addressed.  This cannot be ignored.

24      Finally, there's one more dimension to this -- to the

25   city's insolvency that we have to talk about.  And it's the

1   close in problems that the city was confronting in and around

2   June.

3       We already talked about the fact that the city had its

4   first payment default on borrowed money indebtedness by

5   foregoing the principal payment with respect to the COPs.  The

6   full repercussions of that were not yet known, but they were

7   dealing with that and the clock was ticking on it.

8       It was known that that was an additional default that

9   might give additional rights to the swap counter parties.  And

10  as Your Honor knows, there was testimony that there was a

11  series of negotiations started, actually a little before the

12  June 14th presentation.  This is the 60 days of negotiations

13  that Mr. Orr was testifying about and other people criticized

14  him for not including prior negotiations that were actually

15  triggered by something different.

16      And a settlement was reached with the swap counter

17  parties right about the, you know, kind of in and around the

18  same time.  But Syncora was initiating a campaign initially

19  letter writing, ultimately in litigation to seize the casino

20  revenues, notwithstanding the swap counter parties' agreement

21  to leave them available to the city.

22      And of course that -- Syncora's campaign wasn't actually

23  stopped until this Court decided that the automatic stay

24  applied.  So that campaign actually lasted even into the

25  Chapter 9 case to a degree and of course there's still an

1  appeal.

2      So when we evaluate as we're going to have to in a few

3  minutes, the reasonableness of the city's position concerning

4  what a negotiation period should be and what we should try to

5  accomplish out of Court.  There are three things that were

6  clearly on the city's mind and have to be on the mind of

7  anyone evaluating that.

8      One is, the 15th, June 15th was the first payment default

9  on public debt.  Second is, that created additional covenant

10  defaults under the swap.  Third is, that Syncora, at least,

11  even though a deal was getting done with respect to the swap

12  banks, Syncora was seeking to cut off the casino cash.

13      I'm going to stop here because again only AFSCME

14  contended that the city was not insolvent.  And neither it nor

15  the others who have joined it on some questioning on this

16  question -- on this issues, has adduced any evidence that

17  counters anything that the city introduced.

18      And so if I have to review -- cover -- cover this topic

19  more, I'll cover it on reply.  Suffice it to say we don't --

20  we don't think there is fair ground to dispute that the city

21  is insolvent within the meanings -- within the relevant

22  definition of the statute.

23      The next place, staying in order, is whether the city

24  desires to affect a plan to adjust its debts.  Again, proposal

25  for creditors, Exhibit 43 is in evidence.  At the opening I

1 | said that the plan proposal speaks for itself. I said it was

2 | reasonably detailed. I said it contained the classification

3 | scheme. I said it included a term sheet for notes to be

4 | distributed to creditors, and I said it defines treatment for

5 | all classes.

6 | And the objectors seem to disagree with that. They

7 | contend that there isn't a specific proposal on reduction of

8 | pension benefits. And sometimes this argument or this

9 | statement is accompanied by just a citation of half of one

10 | sentence that's in the document. But other times the -- even

11 | looking at the entire paragraph that seems to be the

12 | contention.

13 | So let's do a little work ourselves and see if we can

14 | figure out what the treatment that is proposed in the plan is.

15 | Because I think we can do it with Exhibit 43 in a couple of

16 | minutes. So if I could have Exhibit 43, Page 109, please.

17 | And if you would do me a favor and leave it open for now. But

18 | -- but later we're going to block just a part on pension,

19 | unfunded pension liabilities.

20 | One of the points Mr. Robbins made, and his testimony on

21 | this was a little bit -- it moved around a little bit during

22 | the testimony. Was he said well, other -- treatments of other

23 | classes, there's a specific treatment provision, but there

24 | isn't in the section of claims for unfunded pension

25 | liabilities.

1       So let's try to figure out if we can figure out what he's

2  talking about.  So going up to the top, claims under unsecured

3  general obligation bonds and notes, the treatment says and I

4  quote, "exchange for a pro rata (relative to all unsecured

5  claims) principal amount of new notes".

6       All right.  Let's go to the next paragraph.  Another

7  class of unsecured creditors.  This is claims of service

8  corporations.

9       And by the way, note here that we don't say this is the

10  treatment of the COPs.  Now why don't we do that?  Well,

11  because the COPs are obligations of trusts.  Trusts in turn

12  are beneficiaries of contracts between the city and service

13  corporations.  So from the perspective of the city, these

14  technical details have a tendency to matter, from the

15  perspective of the city, the counter party is the service

16  corporations, the relevant -- relevant obligation is the

17  city's obligation to the service corporations.

18       So we focus on that and we say treatment.  Exchange for a

19  pro rata (relative to all unsecured claims) principal amount

20  of new notes.

21       By the way the next paragraph says the same thing, we'll

22  skip it just for time purposes.  Now could we blow up the

23  section, claims for unfunded pension liabilities?  And

24  skipping to the middle paragraph it says, claims for the

25  underfunding will be exchanged for, this will sound a little

1 | familiar, for a pro rata relative to all unsecured claims

2 | principal amount of new notes.

3 | So first of all, if Mr. Robbins found the other

4 | discussions sufficiently informative and in a specification --

5 | specification of treatment, I am having a hard time

6 | understanding how he did not find the specification of

7 | treatment with respect to unfunded pension liabilities hard to

8 | understand.

9 | Well, let's stay here because I think we can learn a

10 | little more if we read words and take a look at other parts of

11 | the document.  First of all, very much like the situation with

12 | service corporations, when we reach unfunded pension

13 | liabilities, we have to pause and think about what exactly is

14 | the city's remaining liability with respect to pensions.

15 | Because the pension funds are not funded at zero.  There is

16 | funding in both pension funds.

17 | I thought there was going to be a big dispute over it,

18 | how much the underfunding was.  Of course that dispute didn't

19 | show up in this courtroom.

20 | So let's look at the first paragraph, or excuse me, the

21 | first bullet point, it's not quite a paragraph.  The first

22 | sentence says as set forth above and is material earlier in

23 | the presentation that we won't bother visiting, preliminary

24 | analysis indicates that the underfunding in GRS and PFRS is

25 | approximately 3.5 billion.  I'll show you the number in a

1  minute.

2      At this level of underfunding, the city would have to

3  contribute approximately 200,000,000 to 350,000,000 annually

4  to fully fund current accrued vested benefits.  Again, more

5  information about how the city views its obligation relative

6  to pension.  That's what we're focusing on, the city's

7  obligation.

8      And then the statement which was hard for everyone to

9  make but is driven by math, we'll come to that soon.  Such

10 contributions will not be made under the plan.  Okay.  So the

11 city has obligations to make contributions.  Note, that's what

12 we're talking about.

13     We're not talking about the individual pension benefits

14 yet because to the city that's not the problem.  The city's

15 problem is, obligations to make contributions on account of

16 underfunding.

17     So next sentence.  Claims for the underfunding will be

18 exchanged for a pro rata relative to all unsecured claims

19 principal amount of new notes.

20     Okay.  First of all, this sentence talks about claims for

21 underfunding.  Those familiar with the pension system, and Mr.

22 Robbins surely must be assumed to be familiar with the pension

23 system knows, this is part of the formula.  There is existing

24 funding which is another part of the formula.

25     Now, let's pause for a second.  Is this sentence really

1  mysterious about what we're talking about when we say a pro

2  rata relative to all unsecured claims, principal amount of the

3  new notes.  Well, we know that the principal amount of the new

4  notes is capped at 2,000,000,000.  That's something that's

5  also in the exhibit.

6      But let's just take a quick look at Page 98.  Because the

7  fact of the matter is, no one expected the creditors to guess

8  what we were talking about when we said pro rata portion of

9  unsecured claims.  And there's a box at the lower left corner

10  of the page.  And all in one place is the estimated claim

11  amounts for every single class of unsecured claims.

12      In a way some of these numbers have a little bit of a

13  false precision because with respect to OPEB liability as

14  disclosed in other parts, it's an estimate.  With respect to

15  pension unfunded liability, it's an estimate.  Under the

16  pension unfunded liability, it's an estimate.

17      But Mr. Robbins is a bankruptcy professional.  And this

18  Court is a bankruptcy professional.  And we've seen plans that

19  say we think claims in all of the different categories are

20  these.  And creditors and the debtor are going to have to deal

21  with some uncertainty about what's in each of the categories.

22  But it's normal to spell out the different categories so

23  people have some visibility as to what's in a broad pool.  And

24  then it's just as normal to specify here is what is going to

25  be distributed to that pool of creditors.

1        So what have we shown?  We demonstrated that we've

2   specified what's going to be given to the pool of creditors.

3   They don't like it, we'll come to that in a second.  And we

4   specified what the pool of creditors look like, its goal

5   there.

6        So to the extent that one of the objections is there was

7   no proposal, therefore that the county doesn't intend to

8   affect a plan of a judge -- a plan to adjust its debts, I

9   submit that the Exhibit 43 in fact contains a proposal and

10  it's quite precise with respect to the city's obligation to

11  provide funding in respect to pensions.

12       Now, let's return to Page 109 because we have one more

13  sentence we have to deal with.  It's everyone's favorite

14  sentence, or half of it's everyone's favorite sentence.  But

15  it turns out it's not the sentence about treatment.

16       This sentence is about consequences.  This sentence says

17  again, it should be completely obvious to Mr. Robbins, it's

18  completely obvious to me, I think it's completely obvious to

19  the Court, but we weren't only talking to Mr. Robbins, we were

20  talking to other people that might have a lower degree of

21  sophistication.

22       And so we explained because the amounts realized on the

23  underfunding claims, part of the equation, not the whole

24  equation, will be substantially less than the underfunding

25  amount, there must be significant cuts in accrued vested

1  pension amounts for both active and currently retired persons.

2      So what are we saying there?  We're saying a consequence

3  of the fact that the city's distribution on account of this

4  claim is going to be less than the amount that the pension

5  funds were expecting to receive by the city, something has to

6  give.  And that is pension amounts.

7      We didn't say which and when.  And there's two reasons

8  why one might expect that you wouldn't.  One, it's

9  presumptuous.  This is an issue as to which in a lot of ways

10  the city's indifferent.  Legally indifferent, not necessarily

11  emotionally indifferent, but legally indifferent.

12      And there's all kinds of reasons why the pension

13  adjustments, and in fact it's kind of traditional, why the

14  pension adjustments wouldn't meet standards like uniform

15  treatment for all persons in a class.  Because there might be

16  very legitimate social reasons for inflicting relatively less

17  impairment on older people and more impairment on younger

18  people.  And in fact that pattern is -- persists all the time,

19  but it might or might not be legal.

20      Viewing the world this way, which is correct as a matter

21  of law, also creates flexibility for the parties to deal with

22  the consequences of the distribution on the claims asserted

23  against the city in ways that might make more sense than those

24  that could be required by law if you looked at it a different

25  way and quite frankly not the way technically correctly as far

1  as I'm concerned.  And I actually think that the funding --

2  pension funds' counsel agrees with this analysis, but maybe

3  we'll hear.

4     Okay.  So the summary with respect to this point, the

5  pension claims themselves will have to be adjusted, but the

6  city saw no reason to unilaterally decide that.  The city's

7  issue is not about that.  The city's issue is about much it

8  will have to pay and the distribution, proposed distribution

9  on account of the pension underfunding claim is very

10  specifically laid out.

11     Last couple of points on the issue of the city's desire

12  to adjust its debts or to effect a plan to adjust its debts.

13  There -- I think there is the assertion, it's covered in our

14  briefs very briefly here, that the -- that there's a -- a --

15  that the plan as proposed can't be confirmed, so it's a plan

16  that doesn't count.

17     And I think I covered this in oral argument, the plan

18  clearly, we believe, can be confirmed.  We understand there

19  are legal disputes.  We -- we understand that there is an

20  assertion that the pensions clause of the Michigan

21  Constitution precludes impairment.  Your Honor knows our

22  position on that.  The subject of bankruptcies includes

23  clearly priorities of claims, rights to distributions,

24  consequences -- bless you, consequences of when there's not

25  enough to go around and discharges.

1      This is at the core of things that are the subject of

2  bankruptcies.  A declaration that a claim is not impaired is

3  inconsistent with that.  That is a part of federal law that is

4  not limited by -- by powers reserved to the states.

5      It was also asserted in papers, again no testimony, that

6  because there was a dispute as to the amount of the pension

7  claim, pension underfunding claim, and if that wasn't settled,

8  the plan could not be confirmed.  Of course that's not the

9  case.  The Bankruptcy Code is specifically structured to allow

10 subsequent determination of claims even after a plan is

11 confirmed.  But that was all premised on the idea that Your

12 Honor was going to hear some proof that the city's estimate

13 was wrong.

14     You heard no such proof.  So for purposes of today, there

15 actually isn't a dispute of the amount of the underfunding

16 claim.  And I think it's worth pointing out that when the city

17 says the underfunding claim is 3.5 billion dollars and it's

18 making a distribution based upon 3.5 billion dollars, it's

19 strange for the pension funds to be saying it's really less.

20 Because the consequences are that you would get a lower

21 distribution if the underfunding amount was less than the

22 estimate that the city believes is right.

23     But nevertheless we found ourselves clearly as a

24 historical matter in that strange place.  I'm not sure based

25 upon the evidence introduced that we are in that strange place

1  anymore.

2      So with respect to this part, the city's demonstrated the

3  desires to effect the plan.  The plan is a -- is an outline --

4  that's all that's required, but it's actually more fleshed out

5  than that.  An outline of a plan that can be confirmed.  We do

6  think it's confirmable.  I've also said before, that it will

7  change, that's -- that's also clear.

8      And -- and I'm not going to come back to this point, but

9  there's a -- there's -- there's an argument actually supported

10  by the cases that when considering the requirements for good

11  faith negotiations under -- under Bankruptcy Code Section

12  109(c)(5), that you also have to demonstrate that the plan you

13  started with is a plan of adjustment that could conceivably be

14  confirmed under Chapter 9.  I think I've dealt with that

15  issue, I'm not going to return to it in the interest of time.

16      But this brings us to an important aside.  And -- and I'm

17  not again going to repeat, but I endorse the state's argument

18  that from the very beginning of this case, or from the very

19  beginning of the -- of the Governor's administration when they

20  focused on the situation in Detroit, that it was prudent as a

21  matter of common sense, sensible planning, and because

22  everyone else in the world was talking about it, to look at

23  Chapter 9 as -- as something that might some day, if

24  circumstances didn't get better, have to be considered for the

25  City of Detroit.

1       The aside is to -- to basically inform the Court that

2  actually the law that we just talked about, the law pressed by

3  the opposition that the plan, that the -- that the city has to

4  start with, is a plan that is a plan of adjustment, or an

5  outline of a plan of adjustment that could be confirmed.

6  That's actually a legal command that when you're confronting a

7  municipality that has financial difficulties you have to start

8  with Chapter 9.

9       Because if you don't understand what the rights, and

10 powers, and obligations of a municipality are under Chapter 9,

11 and what a plan adjustment would have to look like in the case

12 of a Chapter 9 case, you can't start.  So in addition to all

13 of the, you know, very practical observations, and the fact

14 that it's very sensible to pay attention to the same law that

15 frankly your creditors are paying attention to when they're

16 thinking about what they might have to do in an out of Court

17 scenario, in this one circumstance the law actually commands

18 an early look at the statute.  So I think that if the law

19 commands an early look at the statute, an early look at the

20 statute cannot constitute evidence of a lack of good faith by

21 anybody.

22            THE COURT:  Before you go on, this question.  So is

23 it the city's position that with regard to the pension

24 liability underfunding, the creditors -- the only creditors

25 were the two plans and not the retirees themselves?

1        MR. BENNETT:  Your Honor, I think that's -- at the

2   end of the day, I think that's probably right.  We expect it

3   to be disputed, we understand it will be disputed.  I think

4   you will find that the -- the -- the -- I think you should ask

5   them when they reach the podium.

6        We think that's right.  That by the way, is the reason

7   that the first people we asked about whether they could

8   represent retirees in discussions that would ultimately affect

9   their pensions was them.  And they basically told us that we

10  can fight to preserve our claims, but we can't compromise

11  them.

12        THE COURT:  Well, all right.  I will -- I will look

13  forward to your discussion of how this impacts your argument

14  regarding impracticality.

15        MR. BENNETT:  We'll get there.  Okay.  Well, we're

16  there.  Impracticality.

17      You know, back to the -- coming back to the opening

18  argument, we started with, and we'd start with again, the

19  number of bond issues that the city has.  The fact that bond

20  holders have the right, each individually, to consent to any

21  impairment of their principal amount or of their interest.

22      And the -- the -- the one -- one place where you can

23  find, I said this at opening also, a list of all the different

24  issues, and demonstrate how numerous they are, are in the

25  appendix to the proposal for creditors.  There's a complete

1 list.

2    There's also -- it also reveals that many are insured,

3 but some are not which is an additional complication.  Mr.

4 Buckfire testified that although talking to the insurers was a

5 place to start, his -- his view was, because it's also the

6 law, that they could just make recommendations and there were

7 some issues as to which, according to this book, it's true,

8 there were no -- there -- there are no insurers.

9    And so ultimately if an insurer is going to recommend

10 something and you're going to send it out to a vote, you're

11 going to get some yes votes and that's great but there's

12 nothing you can do with respect to the no votes under

13 applicable non-bankruptcy law.

14    And so with respect to the bond holders, while there was

15 someone to talk to to get started, there was no way to get all

16 the way home.  And no one has suggested that there was a way

17 to go all the way home.

18    So -- but the -- and the second part we said at opening,

19 and again I'm -- I'm not going to repeat it here, is that

20 frankly that's the end of the inquiry.  Because

21 impracticability with any one class means that out of Court

22 negotiations are impracticable.

23    There are cases that say this, they're cited in our

24 papers.  I also spent some time thinking with the Court about

25 the problem about, you know, how you would go about it if you

1   thought that you still had to conduct good faith negotiations

2   with a group you could negotiate with, but you have another

3   group that you couldn't negotiate with and where it leads you

4   is delay for no purpose.

5        Ultimately you wind up having to be in a Chapter 9 case

6   anyway.  And whenever we talk about delay as -- as a -- as an

7   answer, let's go back to the undisputed fact that we had a

8   very severe insolvent situation that was also unstable.  The

9   instability being the recent default, the Syncora activities,

10  and the other things that -- and the delayed trade payments.

11       So the -- so delay isn't an answer for anything.  In the

12  context where there is actual near term prechter, there --

13  there is a serious problem that has to be addressed.

14       So the next step is were negotiations -- excuse me, there

15  should be no next step, but the next step in the event that

16  the Court decides, and I think this would be wrong, and

17  against the cases, that impracticability of one class is not

18  determinative.  That it -- that it has to be impractical with

19  every class which would mean that you have to conduct good

20  faith negotiations with classes where it is practicable.  We

21  then deal with the assertion by the -- the different retiree

22  groups that somehow negations in this case were practicable.

23       And I think there's -- there's a -- a -- three different

24  reasons why negotiations with the -- with the different

25  employee groups are impracticable.  And the first, which will

1  also apply to the retiree the -- excuse me, the two funds, is

2  the -- is the testimony of Mr. Taylor.  I think best

3  represented by the testimony of Mr. Taylor, but represented by

4  the testimony of other witnesses.

5       He said a couple of things that are relevant to the

6  subject of impracticability, we'll cover more of them.  But

7  right now I want to zero in on -- on what he said after he

8  acknowledged that he did not have the authority to bind any

9  retirees.

10      He said, he was nevertheless willing to conduct

11  negotiations.  Let's put aside for a second what negotiations

12  really mean with someone who's not authorized to bind anyone.

13  But he's ready to conduct negotiations and if he actually got

14  to the point with the city that there was a proposal for

15  modification of benefits that he -- that he was okay with, he

16  would recommend it to retirees.

17      And -- and -- and I don't remember if he was asked or he

18  volunteered, that what would have -- have to happen next, he

19  said there'd be a vote.  So what does a vote mean in this

20  context?  Again, out of Court.

21      It means that those who vote yes, I suppose, supposed to

22  be some form of solicitation materials, would be bound.  And

23  that would be a partial solution to the problem.  That would

24  be progress.  But everyone who voted no wouldn't be bound.

25  Well, what happens then?

1          THE COURT:  Well, but -- but this assumes that your

2    negotiation is with the retirees because they're creditors.

3          MR. BENNETT:  I -- I -- I understand.

4          THE COURT:  A point you weren't willing to --

5          MR. BENNETT:  I'm going to get to that.

6          THE COURT:  -- a moment ago.

7          MR. BENNETT:  Okay.  I'm not going to forget the

8    issue.  I'm talking about the people who stepped forward and

9    said, you should have talked to us.  Okay.

10         And Your Honor, this is exactly the situation we faced

11   with the bond holders.  That if -- if this is -- if -- if we

12   ultimately at the end of the day have to negotiate with

13   retirees and there is ultimately a retiree vote on some basis,

14   the fact that you could have a vote at some point out of Court

15   doesn't solve your problem.  You need to get the centers as

16   well.

17         Let's get to the retiree funds.  They said, they told us,

18   I think -- can we skip to the chart?  And I need a blow up the

19   top so I can find them.  Oh, there they are.

20         The police and fire retiree systems.  They're all --

21   they're all the way --

22         THE COURT:  I see it, sir.

23         MR. BENNETT:  Okay.  And --

24         THE COURT:  And I see the other one too.

25         MR. BENNETT:  Okay.  All right.

1        THE COURT:  The General Retirement Systems is the

2   other one you were looking for?

3        MR. BENNETT:  Right.

4        THE COURT:  Okay.

5        MR. BENNETT:  Okay.  I can't -- I'm -- the fire is

6   covered.  They either didn't respond or said no.  They

7   verbally responded.  You can ask them what their response was,

8   that they don't have the power to bind retirees.

9        Okay.  We'll talk about, by the way, what they did

10  because that may be important too.  Okay.  So with respect to

11  the first point, that every -- that even the people who -- who

12  stood up here and said, you should talk to me even though I

13  don't have authority.  At the end of the day, they led to a

14  place that did not give you retiree votes.

15       Again, we could stop here.  This is impracticability, the

16  same kind of impracticability as the bonds demonstrated also

17  with respect to the holders of retiree claims if we have to

18  talk to them.  And -- and if our -- if the objectors say we

19  don't have to talk to them, we'll get to that in a second.

20       Second, I was going to talk about this chart, so we can

21  leave it up.  The responses that -- that the city actually

22  received to the basic inquiry concerning whether the unions or

23  pension funds were actually in a position to represent

24  retirees, also demonstrates impracticability.  That alone.

25       So even if they say, and they -- but they didn't, I mean

1  they didn't say if -- we can talk and recommend.  That's not

2  actually what they said.  What they actually said, and you

3  have a big exhibit of the letters is, not us, we don't

4  represent them.  That's what they said to the city when they

5  were asked the question.

6      They didn't say to the city, we can't represent them as a

7  formal matter, but we have found ways to get around that which

8  I think was the testimony of some of the witnesses.  What they

9  said was, no, we don't represent them.  What you heard

10 testimony from -- from one of the -- the next to the last

11 witness yesterday, was that maybe as a matter of law they

12 couldn't have even represented retirees.

13     But I -- I submit that the actual letters which are in

14 evidence demonstrate that confronted with a broad statement,

15 we do not represent retirees or cannot represent retirees, is

16 another indication of impracticability, again, assuming for

17 the moment that retirees are even needed which they say they

18 are.  But --

19     And then finally, the third reason why I think in this

20 case you can find impracticability by the unions are the

21 numerous statements kind of throughout the record, starting

22 with the -- the briefs filed by the UAW, which I pointed out

23 at opening argument.  The briefs filed by the retiree

24 committee, the brief retiree committee proclaims that it's bad

25 faith even to ask for a impairment of the underfunding claims.

1    The UAW said in their briefs they would never agree to an

2   impairment of the underfunding claims because of the

3   non-impairment provision with respect to contracts.  And then

4   others at the trial, Ms. Lightsey, Mr. Taylor, Mr. Nicholson,

5   these are persons who said they would have represented

6   retirees but would have never agreed to a plan that modified

7   vested pension benefits.

8    And, Your Honor, in some instances, they actually said

9   that from the witness stand.  In other instances, it's found

10  in the interrogatory responses that they filed in discovery.

11  Some of them were projected here and this is a good time to

12  come -- to start coming back to the retiree funds because we

13  have their interrogatory responses that I think covers Your

14  Honor's question.

15   This is -- this is -- Exhibit 79.  Okay.  And I want to

16  go to Page 10.  Is that the first page?  Yes, Page 10 is the

17  first page.  Okay.  Paragraph 3, if you could blow it up.

18   Please describe any authority delegated to or otherwise

19  possessed by the trustees of GRS.  And -- and, Your Honor,

20  I'll take you through the GRS section.  There's an exactly

21  parallel set of questions for the uniformed pension fund the

22  PFRS.  So I'll do it once as opposed to twice to save time.

23   To eliminate or reduce on a prospective basis only, the

24  benefits, rights, and features of the pensions provided to GRS

25  participants who were already retired or terminated from the

1 City of Detroit.

2    And their response.  If you'd go -- I think we have to

3 read most of it.  Because first of all, GRS doesn't think this

4 is a direct enough question and so they object.  Because it's

5 incomprehensible.  Because the phrase is they don't understand

6 what any authority delegated to, otherwise possessed,

7 eliminated or reduced.  They don't know what any of those

8 words mean.  That's the first response.  So if we're going to

9 gauge constructive, you know, negotiations, this is part of

10 what we were dealing with.

11    Due to this imprecision, it is difficult to ascertain

12 what information is sought by the interrogatory.  And the GRS

13 is effectively asked to speculate as to its meaning which may

14 or may not include requests for legal conclusions.  The GRS

15 objects to this inquiry.  Okay, skip the rest of this.

16    Now let's move over to when they finally say the answer

17 is on the top of Page 11.  Well, let's go up to the last

18 objection to it, I'm sorry.  The last objection to the

19 interrogatory, GRS also objects to this interrogatory because

20 it assumes the existence of authority to act in contravention

21 of Article 9, Section 24 of the Michigan Constitution of 1963,

22 the pension clause that prevents any impairment or

23 diminishment of accrued financial benefits which authority

24 does not exist.

25    Okay.  Let's go to the next paragraph.  Now by the way, I

1   -- I -- I hope Your Honor is keeping track.  The -- the

2   interrogatory started on Page 10.  And we got to the answer

3   kind of in the middle of Page 11.

4       Subject to and without waiving the foregoing objections,

5   GRS states at no time from 2004 to the present have the

6   trustees of GRS had or been delegated authority to eliminate

7   or reduce on a prospective basis, the basis the benefits,

8   rights, and features including but not limited to the elements

9   of the pension formula of the pensions provided to GRS

10  participants who are already retired or terminated from the

11  city because the pension clause prohibits the elimination or

12  reduction of approved financial benefits of GRS participants

13  who are already retired, terminated from employment with the

14  city.

15      So what we have from the retiree committee, Your Honor,

16  is an admission that they aren't going to do anything that

17  they interpret as impairing or modifying pensions.  And so I

18  think frankly the third reason why Your Honor can find that

19  negotiations were impracticable as to retiree groups if that's

20  the question, and we don't even think you reach that question,

21  is that all of the different places you would think to go if

22  you think it's the funds, and frankly initially we did, you

23  would say to the funds, try to talk about something.  I think

24  we know they won't talk.

25      If you -- if you -- if you think it's the retirees, we

1  have explained that number one, we got a whole bunch of

2  letters that said we're not the right persons to talk to you.

3  And secondly, we got a -- even those people who said

4  notwithstanding our lack of authority, we would still like to

5  talk to you, they have all said we are working to a

6  recommendation.  The next step would be a vote.  And that

7  still would not give the -- the city any means to deal with

8  persons who choose to vote no, or actually more importantly,

9  persons who don't vote at all.

10      Now there's one exception to this, I guess.  And -- and

11  that is, it was asserted that there is a class action

12  mechanism that would conceivably have resolved the problems

13  with respect to the unions.  I actually want to hear exactly

14  what that mechanism is that was proposed.  And so while I am

15  prepared to discuss why a class action mechanism was not

16  practicable at all, particularly in light of the fact -- the

17  financial pressures that the city was confronting, I think

18  it's best if I hear exactly what the objectors had in mind

19  before responding.

20      Take a sip of water before turning to good faith.  It's

21  warmer in here than it was yesterday.  Okay.

22          THE COURT:  Excuse me one second.  Is that someone's

23  electronic device?  Is it off now?  Yes?  Okay.

24          MR. BENNETT:  Okay.  As I said before, and I think

25  it's important, at least as far as eligibility is concerned,

1  perhaps not with respect to 921, Your Honor's opinion can stop

2  here because the -- as Your Honor knows, the requirements in

3  109(c)(5) are disjunctive if negotiations are impracticable,

4  whether or not negotiations proceeded or whether negotiations

5  were in good faith are just not issues for the Court to be

6  concerned with.

7       And of course the legislative history of -- of the

8  impracticability prong is that it was designed for big cities.

9  New York was actually the pragmatic example that everyone was

10 concerned about at the time.  Where it was just understood

11 that when dealing with a situation as large as this one, as

12 large as New York which by the way was smaller than, at least

13 in nominal terms, than this is now, is a -- is a -- is enough

14 of a reason to recognize that in a lot of large city cases,

15 the negotiation prong is not going to be terribly relevant

16 because impracticability is the reality as it is here for all

17 the reasons we've described.

18      But nevertheless -- well, I should start with there's two

19 clauses actually to 109(c)(5)(B).  The first is, it deals with

20 negotiations in good faith.  And the second is, creditors

21 holding at least the majority in amount of the claims of each

22 class that such entity intends to impair under a plan in a

23 case under such chapter, well, I think it's stipulated that we

24 didn't get a majority in any class.  And we certainly didn't

25 get the retiree funds, or the retirees to agree to a plan.  So

1  we met the second half, and -- and I think there's no dispute

2  about that.

3      The -- the -- now we have to talk about whether the city

4  has negotiated in good faith with creditors.  And I think Your

5  Honor, the city's good faith in the negotiations and in this

6  whole process is demonstrated by what it did.

7      And I'm actually going to start with the process of

8  generating the proposal for creditors.

9          THE COURT:  Again, I have to ask you to pause here.

10  It -- it strikes me as factually impossible for it to be

11  impracticable for that party to negotiate with other parties

12  in any circumstance, and to negotiate with them in good faith.

13          MR. BENNETT:  You know, I -- I think the -- I -- I

14  disagree.  I think that the -- the -- the -- the view of the

15  professionals, and can we put up for just a second, Exhibit

16  413, Page 13.

17          THE COURT:  I'm sorry, page what?

18          MR. BENNETT:  Exhibit 413 -- 418, Page 13.  I'm --

19  I'm more using this to kind of organize the topic than -- than

20  for the evidentiary value which will come later.  But I think

21  anyone who looked at the situation back at the beginning

22  thought this, that's on this chart.

23      They -- everyone understands that if you can have an out

24  of Court solution, it's a great thing for all the reasons

25  listed on this chart.  And it's really, really, really hard to

1  say to yourself or to anybody else given all of the potential

2  advantages of an out of Court solution of saying, it's

3  impossible.

4      So look at the next part.  The -- you know, it's also a

5  recognition like -- I guess I want to say it this way.  The

6  first part benefits of well planned out of Court restructuring

7  in that list, that's all the stuff you know in your heart.

8      The next section, consensus or near consensus is

9  necessary for a successful out of Court restructuring.  And

10  then the thing in Italics is really an understatement.  It's

11  extremely difficult to achieve and practice.

12      In your head you know it's nearly impossible.  But you

13  hate to say it's impossible.  And so even in circumstances

14  where this is how you evaluate the situation, and I believe

15  that -- that -- that -- that Page 13 of Exhibit 418 is how

16  every really qualified insolvency professional who knows

17  anything about Chapter 9 would look at this situation.  You

18  get to the end and you say okay, I'm going to try anyway.

19      But you could -- you could have given the circumstances

20  of this city, you could easily have written this page that

21  said out of Court situations are preferred and unfortunately

22  it will not be possible here.  And that would have been true

23  too.

24      So I think the -- the -- the -- what the city did was

25  they said, this is extremely difficult to achieve, but we're

1  going to try anyway.  So I think you absolutely can believe in

2  your head that this is never going to work, but try anyway.

3  And that's what I think the situation is in this case.

4       So let's talk about what the city did.  And let's see

5  whether it's reflective of a good faith attempt,

6  notwithstanding what may well have been insurmountable odds.

7       What you heard testimony about from multiple witnesses

8  from Mr. Moore, from Mr. Malhotra, from -- from -- from Mr.

9  Buckfire, and a little bit from the outside looking in from

10 Mr. Dillon, was that there was a lot of effort, probably

11 beginning a long time ago, but really intensifying at the

12 beginning of '13 by professionals as they were hired to study

13 the situation carefully and get up to speed.

14      And one of the things that you also heard several times

15 in testimony of several witnesses, that many of the people

16 involved at one point or another, were surprised at what they

17 found.  And none of the surprises were positive.  You heard

18 that with Mr. Buckfire when he got the liquidity numbers in

19 May, you heard Mr. Dillon talk about the numbers kept getting

20 worse.  You talked about -- Mr. Malhotra said it in a number

21 of different ways.

22      And -- and that is a theme that I think Your Honor has to

23 also keep coming back to which is this situation, the economic

24 situation.  Whatever people thought it was going to be it

25 ultimately looked worse than everyone's initial impressions.

1   So they determined what they thought the situation was,

2   and then they developed the June 14th proposal.  Now, the June

3   14th proposal is really important because number one, it's in

4   evidence.  And number two, when we go through not every page,

5   but I'm going to go through the sections and explain their

6   significance.

7   It's important to remember that with one exception that

8   I'll get to and discuss having to deal with the section on

9   assets, throughout all of the testimony of all of the

10  witnesses that came here, no one objected to any of the

11  findings, conclusions, and data that is contained in this

12  report.  And as importantly, no one objected to the math.

13  And so I think this proposal stands frankly as a monument

14  to the city's good faith in this process.  And I'm going to

15  show you why.

16  The book is divided into sections and frankly the

17  sections are a progression.  The first 40 pages is about the

18  current financial condition of the city with some emphasis on

19  the services that are being provided to the residents.  It

20  covers the economic service -- the economic circumstances, the

21  tax base, legacy liabilities, deficiencies of service

22  delivery.

23  As I said before, no one adduced any evidence that

24  anything contained in these pages is incorrect in any respect,

25  and it's a horrifying story.  I'm sure Your Honor has looked

1 | at it.

2 |     But now let's look at Page 41. Page 41 is a statement of

3 | key objectives. It's what the city is trying to accomplish.

4 | Nobody even mentioned it. But it's really important when

5 | assessing the good faith of the city. Let's look at what it

6 | says. If we can blow it up a little bit.

7 |     It starts with to the fullest extent possible under all

8 | the circumstances. All the circumstances recognizing that

9 | things aren't so good.

10 |     The first item, provide incentives and eliminate

11 | disincentives for businesses and residents to locate and/or

12 | remain in the city. The city cannot stabilize or pay

13 | creditors meaningful recoveries if it continues to shrink.

14 | Achieving this goal requires improvements in city services,

15 | particularly the area of public policies. Public safety and

16 | tax reform to reduce the cost of living in the city and to

17 | more closely approximate costs of living in nearby areas.

18 |     No one took issue with this. That a fundamental problem

19 | for the city is fixing delivery of services and -- and

20 | actually reforming taxes. Neither one of these things are

21 | good for creditors because both of them cost money.

22 |     And going back, I said I was going to use a Chapter 11

23 | analog. We know that there are some cases that come to Court

24 | and they advertise the business is just fine, we just have a

25 | debt problem. I'm not sure I've ever really seen a case where

1 that's been true, but there are cases that are portrayed that

2 way.

3     This is not one of them. This is a case that requires a

4 rehabilitation and a debt restructuring at the same time. And

5 we're saying it right there and we're saying it's going to

6 cost money. No one walked into this Court and said that's

7 wrong.

8     Next point. Maximize recoveries for creditors. But

9 there's a recognition. Since the city will not generate

10 sufficient cash to pay all liabilities, alternatives have to

11 be considered. No one walked into this Court and said that

12 was wrong.

13     Go to the next section. We recognized that it's

14 important to provide affordable pension and health insurance

15 benefits, affordable, what the city can afford in restructured

16 governance of pension arrangements. It didn't come up here,

17 but it's in the book. There's been some problems there.

18     Next, eliminate blight to assist in stabilizing and

19 revitalizing neighborhoods and communities within the city.

20 No one objected. No one says this is wrong.

21     Next, reform city government operations to improve

22 efficiency and reduce costs. In many areas longer term

23 benefits will require immediate increases in capital

24 investments. No one said this is wrong.

25     Maximize collection of taxes and fees that are levied and

1  imposed.  We've heard complaints that there's insufficient

2  attention to this, but no one noted it's in the key objectives

3  that it is part of the plan.

4      And lastly, generate value from city assets where it's

5  appropriate to do so.  And we're going to talk more about

6  that.  We've been up front about that from day one.

7      So, with all of the contentions that the city is acting

8  in bad faith, there hasn't been and there can't be a

9  contention that the city understands what the objectives of

10  this exercise is, and has identified the correct ones because

11  there is no evidence to the contrary.

12      Pages 43 to 50, we're not going to look at them because

13  we've talked about the city, but it's a review of the city

14  budget for the past several years.  Again, less important with

15  this -- this section, but there's no evidence in the record

16  that anything contained in these pages is wrong in any

17  respects.

18      But now let's do pause and take a look at Page 51.

19  Fifty-one is one of those pages that I'm sure, although I

20  don't know, the Governor's office looked at and was horrified.

21  What this page does is it looks at -- at five years of fiscal

22  actuals and we can blow it up for Your Honor if you don't have

23  it in front of you.  But I wasn't planning to.

24      And then -- then forecast going forward for the next five

25  years based on nothing changing.  No debt restructuring.  Keep

1  things the way they are.  And you have progressively building

2  budgets -- budget deficits in every single year.  No one

3  introduced any evidence that there's anything inaccurate about

4  this page.

5       Pages 53 to 60 then go and say well, what has it already

6  done to address these problems?  And there's a discussion

7  about the consent agreement, the appointment of the emergency

8  manager, and many things.  There's another part to pages -- in

9  Pages 53 and 60 that are worth dwelling on because they're

10  partly relevant to what's going on here.

11       Which is there's a summary of things that emergency

12  managers have been trying to do in other jurisdictions that

13  were precipitated litigation, some of which have the effect of

14  imposing limitations on emergency managers' powers and

15  affecting their ability to accomplish things that would have

16  to be accomplished in the City of Detroit.  Suggesting, of

17  course, that there were true limitations to what could be

18  accomplished out of Court as we've discussed in the context of

19  the impracticability section.  No evidence introduced that

20  anything contained in that section is inaccurate in any way.

21       Pages 61 to 78 talk about what has to be done to address

22  the rehabilitation part of the program.  And again in a

23  Chapter 11 example, everybody recognizes that you have to keep

24  the business going and keep the customers coming in the door

25  and to continue to keep your customers happy.

1      It's not any different in a city, particularly one that

2  has confronted declining population for as long as everyone

3  can remember.  Pages 61 to 78 is a proposal for addressing

4  those things.  And no evidence was adduced at this hearing

5  that anything contained in Pages 61 to 78 is incorrect,

6  unreasonable, imprudent, unnecessary, in any way.

7      Pages 79 to 82 only bear a short mention because this is

8  one area where there is no specific proposal.  There is the

9  general recognition that taxes have to go down rather than up.

10  And of course the only thing -- there's -- there's no specific

11  proposal with respect to that.  They will have to be some day,

12  but the point here is, is that in many cases it is asserted

13  that a debtor is not eligible because it can go solve its

14  problems by raising taxes.

15      And of course not a single witness has presented himself

16  or herself to Your Honor and suggested that that is a solution

17  to the problems of the City of Detroit for reasons described

18  elsewhere in the report, it is not.

19      And finally -- well, not finally, but we've now reached

20  the section where there's been some controversy which is the

21  -- which is realization of value of assets on Pages 83 to 89.

22  And first, I want to talk about complaints that weren't made.

23      There was no complaint that an asset is missing.  The --

24  the -- the report covers the -- the assets that people at the

25  very beginning of the case were thinking about as places where

1  value might be extracted to help out with the creditor

2  situation.  And no one testified that one was missing or

3  hidden.

4       There's also no testimony by anyone that the information

5  presented with respect to the various assets is inaccurate or

6  incomplete in any way.  The specific complaint from Mr.

7  Robbins, and frankly it was -- we'll come to this in more

8  detail later, but Mr. Robbins had lots of complaints about

9  there wasn't enough information, or at least the -- the -- the

10 testimony was elicited from him that he needed more

11 information.

12      Then he qualified that by saying, well, we needed more

13 information because any time you look at information more

14 questions come up and we have to ask for more.  And then he

15 was asked well, what additional information did you really

16 need.  And the only specific category he could think of was

17 values of assets -- values of the assets.

18      So I want to cover this in two different ways.  First of

19 all, it's worth asking would creditors have credited a city

20 value on any of those assets if they had offered one at that

21 stage in the case.

22      I have been doing this for a really long time.  I am

23 waiting to see a case where a debtor puts a value on assets

24 and the creditors immediately respond, gee, those are great,

25 we'll use them and not dispute them.  I'm pretty sure Your

1 Honor hasn't seen that case yet either.

2      But in any event, the -- the -- Mr. Buckfire's testimony

3 demonstrated that there were really only two of the listed

4 assets that can contribute material value to resolving

5 creditor -- creditor problems in this case or the city's

6 problems in this case.  And the reality is, is that both of

7 those involve publicly known circumstances is the best way I

8 can put it, the cloud value.

9      So even if you create theoretical valuations, or

10 appraisals, or -- or -- or try to, you know, kind of come to

11 values of assets that turn out to be very difficult to value

12 to begin with, there are what I'll call other issues.

13      First, with respect to DWSD as is explained in the

14 proposal for creditors, realizing value from DWSD for the

15 benefit of creditors involves a very complex transaction with

16 -- with surrounding governmental units.  A topic by the way

17 that I think has been a subject of discussion for more than

18 five years.  And it involves a lot of competing concerns of

19 the other municipalities and desires to pay less when the city

20 would want more.

21      And secondly, as we pointed out in oral argument, the

22 second category is the art, the Detroit Institute of Art and

23 the collection contained therein.  And as I pointed out there,

24 we are currently operating under an Attorney General opinion

25 that says the city can't realize any value from it.  And that

1 is probably not the only, but it's a significant issue with

2 respect to the asset, but it's probably not the only issue

3 that is relevant for consideration.

4      So the reality is with these assets as with so many more

5 in so many other cases that we've all been a part of, there

6 are tremendous uncertainties as to what the true value

7 realization potential is.  It's in a really big range.

8      And it may well be and in fact we can -- we should in a

9 second, cross reference to another part of the presentation,

10 recognize that these things might not be resolved in -- during

11 the pendency of any Chapter 9 case, and there might have to be

12 an agreement that deals with allocations of values as if and

13 when realized on a sensible basis.  Not exactly an unheard of

14 plan term.

15      In our own way, maybe not artfully enough, we signaled

16 that.  And so if Your Honor goes to the book, and I didn't

17 prepare the pages to be presented, but I'll just give people

18 references so that they can go to the right place if they need

19 to.  In a description of the note that is -- was intended to

20 be distributed pro rata to unsecured creditors, there are a

21 couple of terms that deal with these uncertainties.

22      In particular there are two kinds of participation

23 payments that are prescribed by the note.  One deals with

24 revenues, and one deals with designated assets which weren't

25 defined, but that was something that people could talk about

1        And the idea was that if as and when monies were

2    received, 70% would be devoted to creditor recoveries and 30%

3    would be retained by the city.  Which also by the way answers

4    one of Mr. Robbins' complaints about there wasn't an incentive

5    for the city actually to realize value.  Thirty percent was

6    part of that.

7        But another part of that, of course, is the possibility

8    that exists in many cases for post effective date supervision

9    by Courts.  It will surprise some people, but believe it or

10   not, the Orange County Chapter 9 case was open for about a

11   decade after the plan was confirmed and it was reopened last

12   year because some loose end developed that had to be closed.

13       So in any event, we -- in its own way the proposal

14   anticipates the reality that many had to have recognized that

15   asset values at this point in time were really hard to

16   deliver, would not be precise, and in any event would not

17   necessarily represent a number that would effectively result

18   in a distribution.  That that information might come much much

19   later.

20            THE COURT:  What page was that on?

21            MR. BENNETT:  It's asset distribution proceeds, Page

22   108, about one-third from the top.

23            THE COURT:  Thank you.

24            MR. BENNETT:  And the -- and the provision relating

25   to sharing of -- of improvement in gross revenues is -- is on

1    the prior page.  It's 107 on the bottom.

2         Okay.  So after the description of assets we come to the

3    ten year projections.  And here again no evidence at all was

4    introduced that says anything about the assumptions on which

5    the projections were based, or the number crunching and the

6    math that actually generates the results are wrong in any way.

7    And -- and really in this section the assumptions are

8    summarized and then math takes over.

9         We should -- let's take a look at Page 98, just very very

10   briefly once again.  Page 98 where there is the -- the box of

11   estimated claim amounts, is also the place where we show

12   available cash under the first ten years that is generated by

13   the model and the assumptions that are listed in that section.

14        And if you'll -- if you could blow -- blow up the box

15   above the box we saw last time.  So the one that goes all the

16   way across the page.  Okay.

17        So the first line is funds available for unsecured

18   creditors based upon city operations and city tax collections.

19   Further demonstrating that nobody was hiding the ball about

20   the importance of asset sales as -- or asset monetization as a

21   potential source of recovery in the case, there's a line that

22   shows that there -- there may or may not be something.  TBD of

23   course means to be determined.

24        And then the bottom line, funds that we know are

25   available for unsecured claims.  And then notice the last two

1  words, with opportunities, recognizing that it's hoped that

2  things will be better.  That's why there's the revenue sharing

3  provision in the other sections.

4      But as I said before, at this point the math has taken

5  over.  And it is these numbers, the numbers we know we're

6  going to have that drive the next section which is treatment.

7  We've already discussed the plan.  I don't think there's any

8  more reason to discuss it.  As I said before, it's driven by

9  the numbers, it is complete, covers all the contingencies

10 people are concerned about.  It may not cover them the way

11 they want, and we'll come to that in a second, but no one is

12 hiding the ball.  Every issue that anyone has ever talked

13 about in this Court that has to be dealt with in this case, is

14 highlighted here, a reflection of good faith, not bad faith.

15     On -- there's another section on post -- post plan

16 governance recognizing that that's another subject that has to

17 be addressed, it got no attention here.  So the proposal

18 itself shows that the city's professionals did a lot of work.

19 It shows that the results were driven by math that no one

20 challenges, and at this point, and I can skip it now because

21 we went there already, I wanted to make the point that

22 everyone involved understood that the negotiations were likely

23 to fail because it was impracticable to expect that you could

24 achieve a negotiated solution in this case.

25     And by the way, Mr. Dillon said something that I think --

1  but of course the evidence doesn't show directly, that

2  everybody else also understood, which is as the numbers got

3  worse, everyone testified in varying ways that the numbers got

4  worse and the negative surprises.  The chances that a deal

5  could be worked out out of Court actually decreased because

6  it's harder to get a deal done when there's low recoveries

7  than a deal done when there's relatively higher recoveries.

8      And I don't think at any time people thought the

9  recoveries could be great.  But I think that when you look at

10  the recoveries that are -- are projected and the plan

11  provisions that are included in the June 14th proposal, what

12  you're seeing is the lowest situation, or the worst situation

13  anyone envisioned at any point in the process.

14      So to the extent that back on January 29th, there is

15  optimism in the Jones, Day report that, you know, all these

16  great things can happen if you can get something done out of

17  Court, and it's very difficult, because the numbers went down

18  from there, I think people felt even worse about the

19  prospects.  But as I said before, they tried anyway and they

20  tried hard.

21      Okay.  Well, notwithstanding the reservations that this

22  was going to be very hard if not impossible, a meeting was

23  scheduled, presentation was finalized, a meeting was

24  scheduled.  Many many people were invited to that meeting.  I

25  think the testimony is uniform on that

1      Some people managed not to get an invitation.  I frankly

2  think that the -- that the broad array of people who weren't

3  invited was a reflection of good faith as opposed to bad faith

4  and the fact that a few -- we missed a few, I don't think

5  reflects any -- any lack of good faith.

6      There was a big room at the first meeting, very clearly

7  no negotiations were intended there.  And so all the testimony

8  about how there were no negotiations at the first meeting, I

9  stipulate to that.

10      I will point out that everyone testified that all

11  questions were answered.  Some people testified they didn't

12  ask questions.  Some people testified that there was a card

13  system used because of -- frankly because of the size of the

14  room, it was a pretty reasonable thing to do.

15      But the fact that some people were discouraged from

16  asking questions frankly is not evidence of the city's bad

17  faith.  That certain professionals might have decided not to

18  ask questions for whatever reasons, certainly is not a

19  reflection of the city's bad faith, but that obviously could

20  have impeded progress to a degree.

21      At the end of the initial presentation the city discussed

22  what it was going to do next.  And if we can have Exhibit 44,

23  Page 61.  Your Honor's seen it before, I'm not going to read

24  it.

25      I'm going to only point to the words initial round of

1  discussions with stakeholders.  No one ever said we're going

2  to negotiate a plan in four weeks or else.  But what is said

3  is, we're going to have an initial round of discussions with

4  stakeholders.  And then we're going to evaluate where we are.

5      So now you've got a city that said, I've got a really bad

6  situation, the numbers clearly show that.  No one denies that.

7  We're going to make a shot because in -- because in our hearts

8  we would love to have an out of Court deal even if in our

9  heads we think it's impossible.

10     So let's see what the initial reactions are to what we

11  are proposing.  And we are proposing something by the way

12  backed with a huge amount of information and backed with a

13  progression that explains exactly how we got to the place

14  where we got.

15     I'm going to ignore for the time being and hold for

16  reply, the whole potential confusion over the subject of

17  whether there were negotiations or not at different stages.

18  But I think the testimony showed that everyone understood, or

19  that many, not everyone, many understood -- actually the most

20  important people understood that the city representatives were

21  looking for feedback.  No one denies that.

22     And in fact a list of some of the witnesses.  Nicholson

23  acknowledges this, Kreisberg acknowledged this.  By the way,

24  they were actually the most professional negotiators involved

25  back at that point in time along with Mr. Robbins.  We'll get

1  to in a second.

2      And -- and Kreisberg is a person who understood that a

3  counter proposal was kind of the right next step.  Because

4  Kreisberg testified that he actually had worked out a counter

5  proposal of some sort, he just decided not to present it.  I

6  don't know if he would have presented it, it would have

7  changed anything, but it would have been more information for

8  the evaluation that the city said was going to follow.

9      Robbins testified that the proposal itself with all of

10  the flaws that he asserted are in it, signaled that the city

11  wanted to negotiate and have discussions.  He used both of

12  those words, although I don't have the official transcript, it

13  was just yesterday.

14      But he also volunteered that he didn't think the city's

15  proposal was serious.  And he said -- and the reasons when he

16  asked about that he said well, there was no incentive to

17  actually realize monetization with respect to assets.  Your

18  Honor can create your own judgment on that.  And that there

19  was no requirement in the -- in the notes to pay on maturity

20  if asset sales and if the distributions didn't happen.

21      Well, again, that's a function of the math.  There are

22  projections that shows how much cash is available.  It's

23  already being used for interest on the note.  There's a

24  separate provision saying some of it's going to be used for

25  purposes of supplementing OPEB benefits.  It wasn't a lot of

1  money.  But again, those were thoughts he kept to himself.  He

2  didn't ask questions or discuss.

3      As I said before, at this evaluation period what was

4  going to happen.  Well, a lot of things could have happened.

5  It might have been unlikely, but one thing could have happened

6  is, the germ of an idea, or the possibility of agreement might

7  have emerged and it would have been pursued.

8      The other thing that could have happened is, is that

9  there was no prospect of an agreement and the objective

10  judgment that things were -- were impracticable would be

11  confirmed.  But one thing should not be surprising, is that

12  work on both contingencies proceeded at all times.  Because

13  remember, the backdrop was an insolvent city with a number of

14  recent events that created instability.  And no one could

15  ignore that.

16      And Mr. Nowling's schedule is part of normal

17  pre-bankruptcy planning, nothing more, nothing less.  And

18  pre-bankruptcy planning is not a reflection of a lack of good

19  faith, it's a reflection of sensibly managing your affairs in

20  circumstances where you're under extreme financial pressure

21  and you know that the only proposal that you can afford isn't

22  so great.

23      There was testimony about other large group meetings.

24  There was testimony about in the hall meetings.  There was a

25  lot of -- there was at least some testimony about all of the

1   meetings that were happening on the bond holder side.  And

2   there too, there was big meetings and small meetings, and

3   individual meetings.  There were lots and lots and lots of

4   meetings during the four week period of time.

5       Again, whether or not negotiations occurred, discussions

6   did occur.  And multiple requests for feedback were made,

7   they're in the record.

8       Robbins actually says the same thing a little bit

9   differently.  You know, he -- he -- he doesn't say that

10  feedback was attracted, I think I mentioned before he said it

11  was implicit in the proposal.

12      But what I think for these purposes, I want to go back to

13  that testimony that -- that these three experienced

14  negotiators at a minimum two on the labor side, one an

15  investment banker representing labor side, they knew that a

16  negotiation that the city was trying to start negotiation.

17  And they just didn't accept the invitation.

18      So I -- I think again we ask ourselves two questions.

19  One, how does a dialogue get started.  And two, what is the --

20  the city supposed to do, what is a good faith city supposed to

21  do when the dialogue doesn't get started?  Well, I think it's

22  incredibly obvious that the way a dialogue has to -- has to

23  get started, is that when -- when you get a proposal from

24  someone and you don't like it, but you want to or need to make

25  a deal with that person, you make a counter proposal.

1    I -- I -- very short digression, we're in Motor City.  So

2  let's talk about how people go about buying cars which should

3  be familiar to everyone in this room except a couple of New

4  Yorkers who may never have owned one.

5    You go to a dealer.  There's a sticker on the car.  And

6  let's say you like the car.  You don't want to pay the sticker

7  price ever.  What do you have to do to find out what the real

8  price of the car is going to be and if you're going to be able

9  to buy it.

10    The dealer, the sales person, or the manager says, how

11  much are you willing to pay for the car.  And you have to tell

12  them, you have to make an offer, otherwise you're not going to

13  buy the car.  That's how a dialogue gets started.

14    No one ever answered the question which Robbins

15  understood was on the table, which Kreisberg understood was on

16  the table, which Nicholson understood was on the table, and

17  many other people may have understood on the table as well.

18  Which is okay, in light of all this data, the progression, the

19  argument, the presentation about what the problems are, which

20  is not contested at all in this hearing.  It had five months

21  to decide that there was something wrong with this.

22    Propose something else that you like better that works.

23  That never happened.  And actually what did happen, the

24  evidence shows, the interrogatory responses told, is that to

25  the questions with respect to pension retirees, whether the

1  response is from the -- the -- the two funds, any one of the

2  retiree representatives who say we should have negotiated with

3  them, the response was, I'll pay zero because their statement

4  was, no impairment at all.

5      I don't think this is that hard.  Other city creditors

6  knew how to respond.  From Mr. Orr we have the testimony about

7  the negotiations with the swap banks and the 60 days, the

8  roughly 60 day period beginning from the time when everyone

9  started to understand there was going to be a default on the

10  COPs.

11      Buckfire testified, and it's in the record, that some of

12  the GO insurers actually did submit a written out offer, a

13  competing framework.  It wasn't acceptable but they submitted

14  something.

15      He also testified that someone else had half a proposal.

16  I think he called it half a proposal.  It was -- it was -- it

17  was verbal.  But other professionals who Mr. Robbins would say

18  he is as qualified as, or in the same league with, knew what

19  to do if there was any hope at all of starting a dialogue.

20      So now we get to the next -- the next part of the

21  question.  What is a good faith city supposed to do when

22  confronted with counter parties that said to the city, you

23  have miscalculated the pension underfunding claim, said it's

24  too high as opposed to too low.  But no impairment will be

25  acceptable.  As I said in the vernacular of the car buyer,

1  zero.

2      And some of them they say they don't -- they don't even

3  really represent the employees as reflected by the

4  interrogatory responses which are admissions.  This is really

5  important.  There is no answer to that question in the

6  evidence, none.

7      The answer that well, spend more time.  There's two

8  responses to spend more time.  One is the city didn't have

9  more time.  There were other pressures.  This wasn't just

10 about a negotiation however long it could be.  It was a

11 constant tension between spending more time in negotiations

12 and incurring more financial instability risk.

13     But the second part is, what would more time have led to.

14 There was no evidence of any overt indication that the city

15 could have looked at and said, there's a path to a deal.

16     With respect to UAW, there's an additional complication

17 we now know, didn't know then, that the UAW was secretly

18 financing a lawsuit, the Flowers case.  By the way, the UAW is

19 the one that in their brief, their trial brief for this

20 proceeding says, they were never going to make a deal because

21 they would never ever ever compromise on pension claims.

22 Three times in their trial briefs they say that.  There is no

23 answer to the question as to what a good faith city is

24 supposed to do in response to that position.  That works, that

25 makes things better.

1        And then we have Mr. Robbins and his client the funds.

2    Now remember how those discussions ended.  Robbins has a

3    meeting with city representatives and they are talking about a

4    process for trying to reach agreement.  What steps are we

5    going to take?  What things are we going to try to talk about?

6    Really due diligence points.  They actually weren't even

7    talking about an agreement.

8        I'm going to call those things the shape of the table.

9    So Mr. Robbins says -- is trying to talk about the shape of

10   the table.  And he says back, I need eight days to discuss

11   with my client my authority and my recommendations concerning

12   the shape of the table.

13       Mr. Robbins knows the city has already defaulted on some

14   of its debt.  Mr. Robbins may or may not know, or maybe didn't

15   ask about what was going on with Syncora.  I don't know.  But

16   Mr. Robbins knows that there's an emergency and Mr. Robbins

17   knows a valuation is starting soon.  But he says, I'll get

18   back to you in eight days.

19       And what happens during those eight days?  Well, with or

20   without Mr. Robbins' knowledge, don't know what was going on

21   inside the funds as to what they were really talking to each

22   other, his client initiates litigation against the city.  I

23   don't understand why Mr. Robbins was surprised by the timing

24   of the filing.  In fact I don't know how anyone could have

25   been under all the circumstances.

1    On some -- some other points that I'm going to do a

2    little anticipating now, but only a little.  About the kinds

3    of objections that we expect to see to the good faith of the

4    city.  But I don't think I have a vivid enough imagination to

5    figure out all of them.

6        One is, not enough information was provided.  We talked

7    about that already in a number of places we've talked about

8    it.  Robbins is so far as I can tell, the only specific

9    testimony about information that was missing.  There is no

10   doubt that more can always be provided, more is always

11   provided, and another thing I've never had happen to me yet in

12   my professional career, is where an adverse party has said,

13   enough, I have enough information.  Just never happened to me

14   yet.  I don't expect it to happen for the rest of the case.

15       But the fact that there is more information that is

16   always available does not mean negotiations aren't supposed to

17   start.  Enough information will never be available.

18       By the way, the only person who was really asked about

19   the operation of the data room was Mr. Robbins and he

20   testified that Miller, Buckfire had been responsive and he was

21   generally satisfied with the way it was working, although

22   admittedly he said, and it's true, the city was having

23   problems coming up with some of the information he was

24   requesting.

25       Filing on July 18th instead of July 19th.  The Ingham

1  County -- it's one thing about the Ingham County forum that I

2  think everyone would have to stipulate to.  There is nothing

3  about what was going on in the Ingham County forum that was

4  going to solve the city's problems.  It was only going to make

5  the situation worse.

6      To me that's the -- an example of the beginning of

7  uncoordinated creditor action that bankruptcy laws are

8  designed to supplant.  And bankruptcy laws do supplant.  And

9  so by filing this case here, when the city was already facing

10 time pressure, already had been through the period of time it

11 told everyone it was going to have discussions based on which

12 it would conduct an evaluation, and where everything that it

13 heard confirmed the fears that -- that things were as

14 impractical as their heads told them, it was not only in good

15 faith, but it was sensible to engage a forum that not only had

16 exclusive jurisdiction to decide all the questions that

17 someone was trying to raise in Ingham County, but could

18 actually and did actually have the power to solve -- help

19 solve the city's problems.  That can't possibly be in bad

20 faith.

21     I expect to hear that the city did not negotiate in good

22 faith because it took at face value the retiree

23 representatives' disclaimer of authority to negotiate.

24 Because what you've heard here, is that while they can't

25 change their interrogatory responses and the letters that they

1 | sent which said we can't negotiate, don't have authority, have

2 | never sought authority.

3 | They appear to contend that the city should have figured

4 | out that they didn't mean it.  I think you've heard testimony

5 | that we thought they did mean it.  But let's assume that there

6 | was a misunderstanding.

7 | If there was a misunderstanding, it was a

8 | misunderstanding created by the written letters which don't

9 | admit an exception to the statements that were made, or don't

10 | admit to the existence of a work around to the statements that

11 | are made.  I don't think it was a misunderstanding, but if

12 | there was a misunderstanding, that does not reflect bad faith.

13 | Another point that I -- I think we will hear was that the

14 | proposal that was made was not acceptable.  You've already

15 | heard the retiree committee, any proposal that involves any

16 | impairment to pension benefits was not going to be acceptable.

17 | To Mr. Montgomery's cross examination of Mr. Buckfire and

18 | he wasn't here of course at the very beginning, but drawing

19 | inferences from his cross examination, it sounds like the

20 | retiree representatives didn't like the interest rate.  It

21 | sounds like the retirement on the note.  It sounds like the

22 | retiree representatives didn't like that the principal amount

23 | was 2,000,000,000 as opposed to a different number.  It sounds

24 | like the retiree representatives didn't like the Dutch auction

25 | mechanism.

1    Those things are good to hear.  They would have been

2    better to hear if there was any chance of -- of having a

3    consensual solution back at the time when the proposal was

4    made and a discussion -- period for discussion with creditors

5    was going on.  There is no evidence that any creditor stood up

6    and made any of the points that Mr. Montgomery made in his --

7    or tried to make in his cross examination of -- of Mr.

8    Buckfire at any time during the negotiation period.

9    Again, perhaps they were under no obligation.  Your

10   Honor, once observed to me that the good faith requirement

11   points to the city and it does.  But the question is, in the

12   absence of the kind of feedback that I guess the retiree

13   committee is now effectively admitting, is the kind of things

14   people talk about when they receive a proposal, speaks volumes

15   to the question of what a good faith city is supposed to do

16   when it doesn't get that feedback.

17   City representatives at meetings were not "authorized to

18   negotiate".  And -- and I think the testimony from the

19   witnesses was a little clear when that question was sprung --

20   unclear when the question was sprung at them.  Some said, you

21   know, well, I work for Mr. Orr, he wasn't there.  But the

22   reality is, is that the representatives of the city were there

23   to collect feedback and figure out what to do about it.

24   And they have the ability to make a recommendation to a

25   single person who yea or nay and sometimes with government

1 approval depending upon the amounts of money at stake, could

2 actually instantly or very promptly respond.  That Mr. Orr was

3 not in the room is -- does not make a difference.  He sent

4 people to collect feedback to figure out what the next step

5 should be.  That should be sufficient.

6     No one proved, Your Honor, and -- and I'm going to be

7 slightly going over matters that the state covered, so I'll be

8 very brief.  No one proved that the filing of the Chapter 9

9 case was preordained, or planned, or implemented without

10 considering approvals.

11     I said before the fact that state -- the state, the

12 professionals who ultimately represent the city looked at

13 Chapter 9, realized that the city might be headed there, and

14 thought about that, doesn't show a lack of good faith, it

15 shows two things.  It shows a lack of prudent and practical

16 planning, and as I pointed out, it may also show due regard

17 for the law.

18     I think this is a -- I think -- while there will be, I'm

19 sure, other assertions of indicia of lack of good faith that

20 arose at different points in the process, I think I will save

21 that for reply, because I think I'm also a little bit

22 overstaying the time I reserved for myself.

23     For a very short summary.  First of all, I want to harken

24 back to where I started.  That there's a list of five things.

25 109(c)(1), (2), (3), (4), (5) that Your Honor has to make

1  decisions on to demonstrate to find that the city is eligible.

2       I think the evidence overwhelmingly demonstrates that the

3  city is eligible, that there's been no effective rebutting of

4  the -- of the city's prima facie case on any of the points.

5  And this Court could clearly find in the alternative that it

6  was impracticable and the city tried anyway.  And everything

7  they did in that process was in good faith and did not exhibit

8  any lack of good faith.  And I think for the same reason,

9  there is no basis for dismissing the case under 921.

10      I think it is important in -- in listening to the

11 argument you're about to hear, whether any of the complaints

12 about the process are followed with, and if this particular

13 thing was done differently, the city's problems would be

14 solved as follows.

15      The second half has never been a part of the dialogue.

16 If you scour through all of the pre-trial briefs that were

17 filed, AFSCME recognizes that it's something they have to say,

18 or a topic they have to address.  And then they address it by

19 saying well, there were lots of ways that the city could have

20 avoided bankruptcy if they just talked some more.

21      Well, lots of unspecified ways don't cut it anymore.  If

22 there is a assertion that there was a fork at the road where

23 the city acted in any way lacking complete good faith, and

24 could have acted differently, they should specify what the

25 city should have done differently, and what consequence of

1  that act would have made this proceeding unnecessary and

2  redundant.

3      That question has never been answered.  And that's the

4  most important question before you.  I think the facts are

5  overwhelming, the city should -- the Court should determine

6  the city is eligible and the case should not be dismissed

7  under 921.  I'm happy to answer any questions Your Honor might

8  have.

9          THE COURT:  Thank you, sir.  And who is going first

10  on the objectors side?

11          MS. LEVINE:  We are, Your Honor.

12          THE COURT:  So I'll ask you your preference.  Would

13  you like to take an hour and a half now for what would be an

14  early lunch break, or do you want to plow ahead after a 20

15  minute recess?

16          MR. MONTGOMERY:  Your Honor, if I may make an

17  inquiry of the Court.  Which is initially when would you

18  otherwise plan to take the lunch break for today?

19          THE COURT:  Probably after the first of the

20  arguments.  That's why I was leaving it up to Ms. Levine.

21          MR. MONTGOMERY:  Your Honor, whatever Ms. Levine

22  wants to do, we'll follow.  If she wants to take a break now.

23          THE COURT:  I agree, it's all on you.

24          MS. LEVINE:  Okay.  We'll start.

25          THE COURT:  Okay.  Well, I would like to take a 20

1  minute break at this point.  Is that okay?

2          MS. LEVINE:  If we -- if we take lunch then does

3  that obviate the 20 minute break and maybe gets out a little a

4  bit earlier on Friday?

5          THE COURT:  It would.

6          MS. LEVINE:  Then we will eat lunch.

7          THE COURT:  All right.  It's 11:15.  We'll reconvene

8  at 12:45, please.

9          MS. LEVINE:  Thank you.

10         THE CLERK:  All rise.  Court is in recess.

11      (Court in Recess at 11:14 a.m.; Resume at 12:48 p.m.)

12         THE CLERK:  All rise.  Court is in session.  Please

13  be seated.  Recalling case number 13-53846, City of Detroit,

14  Michigan.

15         MS. LEVINE:  Good afternoon, Your Honor.  Sharon

16  Levine, Lowenstein, Sandler for AFSCME.

17         THE COURT:  You may proceed.

18         MS. LEVINE:  Thank you, Your Honor.  Your Honor,

19  based on these facts, Detroit is not eligible to be a debtor

20  under Chapter 9 of the Bankruptcy Code.

21      Under the Bankruptcy Code, in Chapter 11, it works

22  because of transparency and because there's value creation for

23  all of the constituents.  There's an exchange for the

24  automatic stay.  There is a fish bowl.

25      The private sector company defaults, creditors understand

1 how bankruptcy works.  The bonds get equity or get

2 restructured debt, vendors get equity and they get to keep a

3 customer.  And even if you're part of the cadre of -- of costs

4 that have to get kicked to the curb, like -- like the

5 pensioners or the retirees, there's safety nets in the private

6 sector that -- that protect against that.

7     There's the Pension Benefit Guaranty Corp which provides

8 federal insurance.  The is multi employer pension plans.

9 There are VEBA's.  There's COBRA.  It's not as if you're --

10 you're left there with no pension and no Social Security.

11     Here, Your Honor, in Detroit, there is no such safety

12 net.  And while we heard you ask Mr. Orr whether or not he had

13 asked the Governor for that help and we certainly heard the

14 Governor say that he doesn't have to provide that help because

15 the bankruptcy process will take care of it.  As we sit here

16 today, there is no -- there is no visibility on that issue.

17     We'd respectfully submit that operating outside of a fish

18 bowl but under a cloak of secrecy, leaves folks with a limited

19 understanding of what's happening, why it's happening, and why

20 it's happening now.  And particularly troubling here, Your

21 Honor, is -- and we've heard the testimony and then we just

22 heard the state and the city acknowledged in their closings,

23 when the Governor took office, when the Treasurer took office

24 in 2011, they were -- they already had their eye on Detroit,

25 they already believed it to be financially distressed.

1       There was a slow decline that the state believed was

2   occurring, that the Governor believed was occurring at that

3   time which didn't result in an emergency or a crisis on June

4   14 when the proposal for creditors was made and an emergency

5   that necessitated a July 19 or a July 18 filing.  There was a

6   multi year decline where the Governor chose to do nothing and

7   Detroit suffered the consequences.  That is not -- that's not

8   impractical and that's not good faith.

9       Turning first, Your Honor, to insolvency.  You know,

10  there's a little bit of tongue in cheek when we talk about the

11  fact that the city needs to prove insolvency because we're not

12  -- you know, we're not immune to the fact that there clearly

13  is blight and no lights.  And we'd like to see more from the

14  police and from the fire.  And we'd like to help them be able

15  to do more to -- to make the -- to make this city safer.

16      But under Bankruptcy Code Section 109, only one type of

17  debtor has to prove insolvency at the beginning of the case

18  and that's a municipality.  And we would respectfully submit

19  that that makes sense because of how unusual this is and how

20  scary this is for its citizens.

21      So for the city to say, sort of tongue in cheek that of

22  course we wouldn't expect them to offer evidence of value at

23  the start of the case, you need to negotiate those values and

24  do that at the end of the case.  That works.  We've done that,

25  that works in a Chapter 11.

1    But that doesn't work in the Chapter 9 context, Your

2  Honor.  So if I owe a dollar and I choose not to pay it, even

3  if I have it, that doesn't make me insolvent.  If I have an

4  asset and I choose not to pay that dollar because the Governor

5  through the Attorney General has told me not to sell or

6  dollarize that asset, that doesn't make me insolvent.

7    And if the police chief gets on the stand and despite the

8  fact that the testimony is compelling, and it is compelling,

9  how much he wants to improve the city.  Or even frankly I

10  found particularly compelling, Your Honor, the retired

11  librarian who -- who loved the library and who -- and who was

12  very compelling in the sadness that she felt that some of the

13  libraries were being closed.  That's not proof of insolvency,

14  that's anecdotal.

15    And what -- and what -- and if you listen to what Captain

16  Craig said on cross examination, he has not given the city a

17  budget.  We don't know what the hole is.  We don't know what

18  the path is to fix it and we don't know how much it's going to

19  cost.

20    We know they're going to take from the retirees.  We know

21  they're going to take from the active employees.  We know

22  they're going to take, but we don't know what -- whether or

23  not it's going to fix anything, and how it's going to be used,

24  and what that taking is going to mean.

25    Your Honor, we've also heard anecdotal evidence about the

1  fact that we can't collect taxes.  And that therefore we -- we

2  don't know what our revenue stream.

3      My co-counsel Richard Macks lives in the city and he pays

4  his taxes.  And we went through this thing, this 109 pages

5  together.  We don't understand who is not paying, and why

6  they're not paying, and whether or not that's valid.

7      Now it may be, Your Honor, that, you know, we see the

8  blight and we see the problems.  And we're not saying that

9  those aren't real issues.  And we're not saying that -- that

10 Detroit doesn't have, you know, issues with tax collection.

11 But what we are saying is, a municipality for a very important

12 and compelling reason has the burden of proof and they haven't

13 proved it here.

14     We don't see valuations.  We don't see appraisals.  We

15 don't see actuarial reports.  We don't see any expert reports

16 with regard to the shortfall -- alleged shortfall in the

17 vested pension benefits or otherwise.  And we have heard that

18 that's for strategic reasons.

19     But let's assume -- but -- but even if that is, Your

20 Honor, we still have a Chapter 9 municipality and a Chapter 9

21 municipality to be eligible must -- must prove solvency.  And

22 even if Your Honor disagrees with us that we need expert

23 testimony on that which we believe you do, then we need to

24 take a look at what factual evidence they've given us.  Okay.

25     They've put up slides that say these are the numbers and

1    they say we haven't refuted them, but that's not true, Judge.

2    We absolutely have.  They've -- they've offered the testimony

3    particularly of Ernst and Young, of E & Y.  And those -- and

4    E & Y has been involved with the city according to Mr. Dillon

5    in 2012 and maybe even as early as 2011 because E & Y

6    participated in the concessionary bargaining negotiations with

7    labor.  Okay.

8        So E & Y is the guy that everybody is telling us has

9    really gotten underneath the numbers.  We didn't agree that

10   the terminology was a bottoms up terminology, but we did agree

11   that E & Y was the guy that got underneath the numbers.

12       So why when E & Y took the stand, are they relying on

13   audited financial statements from non-testifying CPA's?  Or

14   even more confusing, if the theory is that we need an

15   emergency manager because the -- because the city is being

16   mismanaged by itself, why is E & Y relying on untestifying,

17   untested city employees to provide the information that

18   they're relying on.

19       Either -- either they're a fact witness and they're doing

20   their own fact checking, bottoms up, true digging in and

21   understanding the numbers, or they're an expert and they're

22   really offering expert testimony.  We have neither.  We have

23   neither, Your Honor.  They haven't demonstrated insolvency.

24   Okay.

25       So we have a flock of financial consultants who have been

1  involved in this process for at least since the middle of

2  2012.  And it's frankly baffling to the stakeholders that they

3  want to cut claims, that they want to cut jobs, that they want

4  to cut retiree health, that they want to cut pensions, but

5  they don't have an indication for us yet as to what is that

6  hole that they need to fill.

7      And frankly, Your Honor, unlike some cities that find

8  themselves distressed, Detroit is in a solvent state.  So if

9  we have a Governor who is starving the city and then delaying

10  taking action with regard to the stakeholders, that is not, we

11  would respectfully submit, proof of insolvency.

12      We were -- we heard colloquy on the stand actually, Your

13  Honor, and I think Your Honor actually questioned Mr. Orr with

14  regard to why he didn't ask the Governor specifically for the

15  3.5 -- or why he didn't remember whether or not he asked the

16  Governor for the 3.6 billion to fill the pension hole.  Your

17  Honor, I have kids, they know when not to ask.

18      Your Honor, with regard to good faith and with regard to

19  the negotiations.  AFSCME and others sought to meet with the

20  emergency manager on the day, the very day he was appointed.

21  Ed McNeil went to his office and when he couldn't get into the

22  office, he posted a letter to the door requesting a meeting

23  with the coalition of unions that wanted to meet with him.

24      AFSCME and others, including Mr. Kreisberg went to all

25  four of the presentations that were offered.  AFSCME and

1  others signed a confidentiality agreement to access the data

2  room to get access to information.  AFSCME sent information

3  requests requesting reasonable financial, cost, health

4  benefit, retiree health, pension information.

5      Mr. Kreisberg testified that despite the fact that there

6  was some colloquy during his deposition that may have

7  indicated otherwise, he did want to meet and he was trying to

8  get information from the city with regard to what might

9  constitute the underpinnings of a successful proposal, or a

10  successful counter proposal.  And that was not forthcoming.

11      There were no meetings.  There were no responses to those

12  inquiries.  And in addition to that, there was not sufficient

13  information in the data room as of the filing date to make a

14  reasonable counter proposal.

15      In fact we're not sure, Your Honor, and we would

16  respectfully submit that Your Honor find, that this proposal

17  isn't a proposal.  We saw some of the pages that the city

18  pointed us to during their opening, but if you look at this

19  proposal, and you're a retiree counting on health benefits,

20  you don't know what your new benefits are going to be.  You

21  don't know what benefits are going to be cut.  And you don't

22  know how much the city is saving because they're making those

23  changes.  So you can't really counter or offer something

24  different or potentially less devastating to you.

25      Same with regard to the pension, including vested pension

1 benefits.  You don't know what's going to be cut, you don't

2 know what your pension benefit is going to be.  And you don't

3 know what the savings are as a result of those cuts.  In fact

4 with regard to the pensioners, you don't even know if you're

5 considered a creditor.

6      With regard to jobs, Your Honor, you don't know if you're

7 going to have one.  And you don't know what they're going to

8 save by outsourcing your job or by eliminating it.  How can

9 you make a counter proposal without these very basic simple

10 facts?

11      And equally telling, equally telling is that we've seen a

12 plethora of information and evidence with regard to the fact

13 that people were reviewing and looking at whether or not you

14 could terminate the pensions through the use of Chapter 9 way

15 back into 2012.

16      Not one shred of evidence, Your Honor, not one shred of

17 evidence on how you conduct the good faith negotiations you

18 need to conduct to be a Chapter 9 debtor consistently with

19 whatever rights you want to reserve under PA436.  Not one

20 shred of evidence on how they could actually facilitate those

21 discussions.

22      We would respectfully submit that the arguments with

23 regard to impractical also go to bad faith and a -- and a lack

24 of -- and a lack of authority.  They've admitted financial

25 distress at least as of the time the Governor took office in

1  2011, yet the state created a situation where there was only

2  one month and four days that we could do these negotiations.

3  They did not, the Governor did not before June 14th, encourage

4  negotiations with stakeholders.

5      We heard testimony from the bevy of consultants that

6  there were no discussions with the bonds before the -- before

7  the -- before the EM was appointed.  There were no discussions

8  with vendors.  There were no discussions on the pensions.

9  There were no discussions with the retirees.

10     And when there were discussions, with a coalition of

11 unions led by Ed McNeil and others that resulted in a

12 concessionary agreement where the city sat in the room and

13 worked hard for several months and frankly it could have been

14 done shorter, if it needed to be done shorter as a precursor

15 to Chapter 9 and where E & Y, the one -- the one consultant

16 that the -- the state has testified is the guy that knows the

17 numbers, sat in the room and participated in those

18 discussions.  When that negotiation concluded, the state said

19 no.

20     And not only were there no negotiations with retirees,

21 Your Honor, but you heard testimony from at least two of the

22 -- two of the witnesses that you can do settlements with

23 retirees.  You can do settlements through class actions, you

24 can do settlements as Mr. Kreisberg testified actually

25 occurred here in Detroit by -- by having the unions as part of

1  the concessionary bargain, which by the way dealt with retiree

2  health and dealt with pensions.  Also have the unions agree

3  not to fund retiree litigation.

4      There's no retiree with 18,000 or $19,000 in pensions

5  undertaking a Supreme Court challenge to -- to litigation.

6  And for the city to say they're surprised to learn that in

7  like -- like with AFSCME in Illinois, or with the Flowers

8  litigation that that wasn't being funded by the retiree, is --

9  is just -- is frankly disingenuous.  Not only -- not only do

10 they know it, Your Honor, they participated in the settlement

11 negotiations that resulted in how to stop it.

12     Your Honor, as you approach Chapter 9, one of the

13 criteria under Chapter 9 is that you enter into an agreement

14 that is approved by a majority of your creditors.  That is

15 completely consistent with the concept of a pre-packaged

16 bankruptcy in a Chapter 11 context.  And it's a good thing to

17 do because it vests people like the labor negotiation vested

18 people in the making better of the problem.

19     They're owning, they're owning the resurgence of Detroit

20 as opposed to being discarded by the Governor's view of what

21 that resurgence should look like.  But instead of that, Your

22 Honor, we're doing things where we're kicking people off to

23 the side and disenfranchising them.  And that's not the proper

24 way to be using Chapter 9.

25     Outside of bankruptcy if you say the bond holders can't

1 consent because the indentures or the loan documents require

2 100% consent, then you get to one-half in number and

3 two-thirds in dollar amount.  You don't even have to do that

4 in Chapter 9.  In Chapter 9, you only need a majority.

5      If you say that the insurance carriers, that the bond

6 insurers aren't getting to consent, same thing, Your Honor.

7 You only need a majority.  You don't even need the high bar

8 that you have in Chapter 11 for a pre-package.  In a Chapter 9

9 it's only a majority of the creditors.

10      They didn't get to a majority of the creditors because

11 they didn't spend sufficient time with those creditors to do

12 those negotiations.  And by sufficient time we don't mean two

13 years, we just mean more than a month and five days.  They

14 took more time, Your Honor, the Governor took more time to

15 interview the consultants that were hired to help the city

16 with its restructuring than they took to negotiation the

17 restructuring itself.  That's absurd.

18      Your Honor, you're being asked today here to set a very,

19 very dangerous precedent, not only for Detroit, but if the

20 Governor is allowed to create a self -- a slow decline with no

21 real emergency and just wait until we're at the precipice and

22 then say oh, we have to do something, and now with that self

23 created emergency, be able to use Chapter 9 to further what

24 might be because we're under this -- this cloak of -- of lack

25 of transparency, an agenda that is not truly a financial

1  agenda, but a political agenda, a bi-partisan agenda, a

2  socioeconomic agenda, a racial agenda, Your Honor, you're

3  going to be put in a situation where this will allow the

4  Governor to do this to any city in -- in Michigan and it will

5  be a road map for Governors across the country to use Chapter

6  9 by creating a self created emergency to deal with issues

7  that are unrelated to really truly solving the financial woes

8  of particular cities.

9      And the facts in Detroit are particularly egregious.

10  Because in addition to not doing anything, trying to negotiate

11  with the stakeholders all during 2012, they actually stopped

12  the one stakeholder that begged the city to negotiate with

13  them which was labor.  We had concessionary agreements by 30

14  unions that were approved with the city with E & Y in the room

15  and the state said no.  And then they went one step further.

16  They negotiated a consent decree.

17      And the only substantive right other than technical

18  assistance that they're giving to themselves in that consent

19  decree, is the right to veto labor agreements.  And the only

20  reference to the Constitution in that consent decree, Your

21  Honor, is not to the pension clause, it's to the fact that the

22  Constitution limits funding.  We can't help the city

23  financially, it's silent on the pension clause.

24      And what happens after the consent decree?  The -- the --

25  the Governor enacts 436.  What's the only thing that 436 does

1  here?  Is it stops negotiations.  So now we have the

2  consultants in a pretzel trying to figure out how they can

3  conduct good faith negotiations as required as a precursor to

4  Chapter 9 while simultaneously not waiving rights under PA436.

5       Now I would respectfully submit that had they spent one

6  scintilla of time working on the problem the way they did on

7  getting rid of the pensions, they could have come up with a

8  creative solution.  But that road block was put there by the

9  state and blocks the ability of Detroit to reasonably be here.

10      We understand, Your Honor, that this is a hard situation.

11  We --

12          THE COURT:  What -- what was the Governor's

13  motivation in your view?

14          MS. LEVINE:  Your Honor, I don't -- I'm not -- I'm

15  speculating.  I've heard -- I've heard from our constituents.

16          THE COURT:  The evidence to suggest what his

17  motivation was other than to help the city, is there?

18          MS. LEVINE:  Your Honor, the -- the -- actually we

19  think the evidence is to the contrary.  We think that there's

20  accumulation of evidence that says that starting back in 2011

21  he was aware of this financial condition and has not done

22  anything other than create this emergency here.  And what was

23  in his mind?

24          THE COURT:  For what purpose though?

25          MS. LEVINE:  I'd be speculating.  But I -- but I'd

1  be speculating also to say it was just out of altruism with

2  regard to the financial situation of Detroit.

3      And, Your Honor, I would also respectfully submit that

4  regardless of that motivation, if this really is all you have

5  to do to prove impractical -- to prove it's impractical, just

6  to wait for the time period to pass till you get to a

7  precipice, it couldn't possibly be surprising to all of these

8  financial consultants that we were reaching the point in time

9  when the bond holders were going to call a default, or where

10 the bond insurers were going to call a default.  That just

11 makes no sense.  Okay.

12     And while it might -- the EM might not have been

13 appointed until March, all these consultants were involved

14 since 2012.  If what we're saying here, Your Honor, is that we

15 can use Chapter 9, potentially just to get rid of the pensions

16 and the retirees, who aren't like -- who are not going to

17 share in the upside, or potentially get rid of some of the

18 bond debt or other debt who aren't going to share in the

19 upside, that's an -- that's an improper use under this factual

20 setting.

21     It's unconstitutional to use -- to apply Chapter 9 in

22 this way, Your Honor.  It's unconstitutional under the state

23 constitution to get rid of the pensions in this way.  It's

24 unconstitutional to apply Chapter 9 as a work around for

25 PA436.

1      We would respectfully submit it's an unconstitutional

2   application to use Chapter 9 to jettison legacy liabilities

3   without any safety net for those recipients.  And we would

4   respectfully submit, Your Honor, it's a terrifying use of

5   Chapter 9.  Thank you.

6           MR. GORDON:  Good afternoon, Your Honor.  Robert

7   Gordon of Clark, Hill on behalf of the Detroit Retirement

8   Systems.

9      Your Honor, similar to when we had oral argument back on

10   October 15th, if I may, I just want to give a little bit of a

11   road map if I may as to the sequencing of -- of closing

12   arguments following Ms. Levine at this point.

13      Consistent with the opening arguments, Your Honor, will

14   recall, Ms. Green from our office was sort of cast by all of

15   the objectors on behalf of all of the objectors because of her

16   singular facility with all of the volume of -- of evidence,

17   and facts, and documents, to construct and -- and present to

18   the Court a timeline of the evidence that was intended to be

19   introduced and that had been adduced in discovery.

20      Consistent with that, she has been essentially asked to

21   again provide to the Court an enhanced form of her timeline to

22   review with the Court succinctly to review what evidence has

23   indeed been introduced in this trial with highlighting, and

24   this is the enhanced part of it, highlighting the specific

25   facts, pertinent facts that have been developed during the

1   trial that weren't in the original timeline.

2       So with that, Your Honor, the -- the suggestion is that

3   Ms. Green would provide the enhanced timeline on behalf of all

4   of the objectors.  I would then provide some limited comments,

5   legal arguments on behalf of the retirement systems, and then

6   it would be followed by a -- a number of the other objectors

7   including in a particular order.  If the Court wants to know,

8   I can give you that as well.

9           THE COURT:  That's fine.

10          MR. GORDON:  Okay.  As I understand it --

11          THE COURT:  On one condition.

12          MR. GORDON:  Yes, Your Honor.

13          THE COURT:  Ms. Green, succinct doesn't mean talk

14  fast.

15          MS. GREEN:  I have the word slow written on the

16  cover.

17          THE COURT:  Because I want to -- I want to

18  comprehend what you're saying.

19          MS. GREEN:  I can't talk as fast as Ms. Levine

20  either, so I won't.

21          THE COURT:  Okay, fair enough.

22          MR. GORDON:  Duly noted for everyone.  If I misstate

23  the -- the order of objectors, I will apologize.  But for the

24  Court's assistance, my understanding is that after the

25  retirement systems, then the retired Detroit Police Members

1  Association would be next, and then the UAW, then the Flowers

2  plaintiffs, then the public safety unions, then uniform and

3  non-uniform retiree associations, including Ms. Lightsey and

4  Mr. Taylor, and then the retiree committee.  If I got that

5  correct.  Thank you, Your Honor.

6       THE COURT:  That's fine.  Thank you.  Thank you for

7  your work in organizing that.

8       MS. GREEN:  Good afternoon, Your Honor.  Jennifer

9  Green on behalf of the retirement systems.

10      The objecting parties began trial on the 23rd of October

11  by showing a similar timeline of what we believed the evidence

12  would show at trial.  And we believed that evidence would show

13  that there was never an intent to actually negotiate prior to

14  the bankruptcy filing and that it was a foregone conclusion

15  before any of those negotiations or alleged negotiations took

16  place that the end game would be Chapter 9.

17      And we believe that timeline that now includes more

18  evidence that was adduced at trial, in addition to new

19  documents that were produced during trial, will indeed show

20  that.  And I will look quickly through some portions that I'm

21  sure are undisputed by this point, but they are included for

22  your reference.

23      At trial the Governor testified that this process has

24  been a two and a half year effort which was consistent with

25  his previous accurate characterization.  In March of 2011, PA4

1  was signed into law.  In February of 2012, as Ms. Levine just

2  stated, the coalition of 30 unions ratified a concessionary

3  agreement that was later blocked by the state.  And in

4  February of 2012, Stand Up for Democracy filed a petition to

5  invoke a referendum on PA4.  Within just days of that, Stand

6  Up for Democracy's petition, there were already discussions

7  about how to insulate PA -- what became PA436 later from

8  referendums.

9       At about the same time, Jones, Day and the State of

10  Michigan began to work together on issues relating to the

11  possible repeal of PA4 and the consent agreement.  And we have

12  exhibit number 849 here that discusses that.

13       On March 23rd, Treasurer Dillon admitted at trial that a

14  possible Chapter 9 for the city was discussed as far back as

15  the spring of 2012.  And at that time Huron Consulting,

16  Miller, Buckfire, and Jones, Day lawyers were also discussing

17  a potential Chapter 9.

18            THE COURT:  Something you'd like to say, sir?

19            MR. IRWIN:  Your Honor, I -- I am extremely

20  reluctant to interrupt during summation, but I don't believe

21  that Exhibit 852 is in evidence.

22            THE COURT:  Oh.

23            MR. IRWIN:  It is not on the Court's list of

24  documents provided to us during the break.  We have tracked

25  these things quite carefully and we don't believe this is in

1  the record.  We believe it was discussed with a witness but

2  never offered.  And we have an objection to it in the

3  pre-trial order.

4          MS. GREEN:  I believe --

5          MR. MONTGOMERY:  I believe, Your Honor, on our list

6  has 852 which is also Bowen deposition exhibit number 14 as

7  having been admitted --

8          MS. GREEN:  Uh-huh.

9          MR. MONTGOMERY:  -- in the trial.  That's on our

10  master list.

11          MS. GREEN:  I will say, Your Honor, when putting

12  this together we double checked every exhibit we included in

13  closing as having been admitted.

14          THE COURT:  Do you have a date for the admission?

15          MR. MONTGOMERY:  Yellow highlight means what?

16          MS. GREEN:  Either day six or day seven.

17          THE COURT:  Six or seven was the response?  Well, I

18  think rather than take the time to try to dig into the record

19  to see if it was admitted or not, we'll let Ms. Green continue

20  with the understanding that any references to it will be

21  stricken if it was not admitted into evidence.

22          MR. IRWIN:  Your Honor, if there are additional

23  documents with this issue, I -- I would feel the need to in

24  fact raise the same objection.

25          THE COURT:  Absolutely you should, absolutely.

1        MS. GREEN:  I believe this was admitted into

2   evidence during Treasurer Dillon's testimony.

3        THE COURT:  Okay, that helps.

4        MS. GREEN:  That date, I think is the right day.

5   Later that same day Huron Consulting emailed Jones, Day

6   discussing a Chapter 9, stating I need to link you into a

7   Chapter 9 conversation with Andy very quickly, referring to

8   Andy Dillon.

9        On April 4th, 2012, the city entered into the consent

10  agreement which Jones, Day had helped craft with the State of

11  Michigan.

12       In June of 2006 -- or 2012, Heather Lennox of Jones, Day

13  and Ken Buckfire met with Governor Snyder and they pulled

14  together some memos that they had prepared for Andy Dillon,

15  including some of the topics that are relevant to these

16  proceedings, including a comparison of PA4 in Chapter 9, a

17  memorandum on constitutional protections and pension, and an

18  analysis of filing requirements of Section 109(c)(5) of the

19  Bankruptcy Code regarding impracticability and negotiating in

20  good faith.

21       And we raise these, Your Honor, not to -- this isn't a

22  Jones, Day led conspiracy argument.  The fact of the matter

23  is, that we think things like this relate to whether or not it

24  was good faith to wait until 34 days before filing when these

25  issues were clearly on the horizon back in 2012 as Ms. Levine

1  just argued as well.

2      In July of 2012, Miller, Buckfire was hired by the state

3  to perform a 60 day review of the city's financial condition.

4  And at that time Miller, Buckfire, Ken Buckfire from Miller,

5  Buckfire testified that he was approached by Jones, Day and

6  that one of the partners had wanted to meet -- or that she

7  wanted to introduce one of her partners who was the lead

8  bankruptcy partner for Orange County which was a successful

9  Chapter 9.

10      In October 2012, before PA4 was rejected by the voters,

11  the Treasury Department and the Governor's office began

12  discussing creation of a new emergency manager statute in case

13  the referendum passed.  This testimony comes from the

14  deposition of Howard Ryan that has been submitted to Your

15  Honor.  He did not testify live.

16      In 2012 December, PA436 was introduced in the Michigan

17  legislature and passed shortly thereafter.  PA436 was

18  insulated from a public referendum because it had an

19  appropriation in the amount of 5,000,000 -- just over

20  $5,000,000.  And as you heard Treasurer Dillon testify, that

21  covered a small portion of the budget for only the City of

22  Detroit's consultants.  This was not enough money to even

23  cover other emergency manager situations across the State of

24  Michigan.

25      Howard Ryan, a state 30(b)(6) witness, testified very

1 candidly that the reason that the appropriation language was

2 put in there was so that it would not be defeated by a

3 referendum.

4      In January of 2013, Miller, Buckfire was re-engaged and

5 at this time Miller, Buckfire discovered that the DIA art

6 collection was a potential asset capable of monetization.

7 However, there were no actions taken on the DIA artwork until

8 August 5th.  At the same time Miller, Buckfire was asked by

9 Treasurer Dillon to make arrangements for the city and state

10 officials to interview Jones, Day and seven other law firms

11 that were interested in serving as restructuring counsel.

12      At the end of the month an internal email at Jones, Day

13 shows as though they were acting like a Chapter 9 was already

14 the plan.  There is an email from that date that states, it

15 should also prove interesting that Miller, Buckfire has said

16 no one wants this bankruptcy to go the way of JEFFCO.  And

17 there's also a caution at the bottom, that when they do their

18 pitch to avoid alienating the state and not to mention that if

19 something were to happen with the city's pensions, that the

20 state would probably step up to deal with but thus far has

21 failed to concede this point.

22      At the pitch, and we've all seen the presentation, so I

23 will skip through these very quickly.  The strategy was laid

24 out.  Negotiating in the shadow of a Chapter 9 and attempting

25 to bolster eligibility for and success in a Chapter 9

1 proceeding by establishing a good faith record of seeking

2 creditor consensus, was one thing that was laid out.

3     And these are the speaker notes from the pitch

4 presentation and it states, this will deflect any eligibility

5 complaints based on alleged failure to negotiate or bad faith.

6 Further it blatantly says, if needed Chapter 9 could be used

7 as a means to further cut back or compromise accrued financial

8 benefits otherwise protected by the Michigan Constitution.

9     Shortly thereafter, Richard Baird reaches out to Jones,

10 Day to inquire about hiring Kevyn Orr as the emergency

11 manager.  On January 31st, Orr calls PA436 a clear end run

12 around the prior initiative that was rejected by the voters.

13 And although the new law provides a thin veneer of a revision,

14 it is essentially a redo of the prior rejected law.

15     That same day Jones, Day opines that it seems the ideal

16 scenario would be that Snyder and Bing both agree that the

17 best option is simply to go through an orderly Chapter 9.  In

18 February, Mayor Bing was -- Mayor Bing was approached by

19 Richard Baird regarding Kevyn Orr as a candidate for the EM

20 position.  And Mayor Bing recalls that the only qualification

21 -- qualification he was offered about Orr was his bankruptcy

22 experience.

23     In March, the Governor declared a local emergency, a

24 local financial emergency.  Kevyn Orr was appointed emergency

25 manager, and in April, Jones, Day was engaged as legal counsel

1  for the city.

2      On April 18th, Don Taylor has a face to face meeting with

3  Kevyn Orr and several other members of the Retired Detroit

4  Police Officers and Fire Fighters Association.  And Kevyn Orr

5  told Mr. Taylor at that time that pension benefits are

6  protected under the Michigan Constitution.

7      Mr. Taylor testified at trial, I asked him about the

8  pensions of retirees.  He said that he was fully aware that

9  the pensions were protected by the state constitution and he

10  had no intention of trying to modify, or set aside, or change

11  the state constitution.

12      A month later the emergency manager was quoted as saying,

13  the public can comment on the city's financial and operating

14  plan, but this isn't -- we all heard this in Court a thousand

15  times, but this isn't a plebocite, we are not like negotiating

16  the terms of the plan.

17      In May, the city met with Christie's, but Kevyn Orr

18  testified that he told them to go away.  Buckfire met with

19  Christie's in May and again failed to retain them until after

20  the bankruptcy filing.  He retained them on August 5th.

21      At trial Buckfire denied telling the DIA board members

22  about an imminent bankruptcy filing, although Buckfire was

23  later impeached on that point with an email recounting a

24  meeting between himself and board member David Meador.

25      On June 5th, Chuck Morris sent an email to Kevyn Orr

1  stating that the pension underfunding is so large that Chapter

2  9 is the only way to deal with it.  Thus, the city knew at

3  least as of June 5th that "a significant reduction was

4  necessary".  And two days after this email, Kevyn Orr

5  forwarded that email to Treasurer Dillon alerting him of the

6  situation.

7      On June 10th, Kevyn Orr held his first public meeting

8  pursuant to his statutory duties under PA436.  And when asked

9  a question from an audience member regarding pension benefits,

10  Orr told the public that the benefits are sacrosanct and

11  cannot be touched.

12      (Video Being Played at 1:24 p.m.; Concluded at 1:25 p.m.)

13      On June 10th, Orr's assertion that accrued benefits are

14  sacrosanct is consistent with what he told Don Taylor, the

15  President of the RDPFFA in their meeting in April.  But it is

16  inconsistent with what Orr proposes at the proposal for

17  creditors meeting that occurs just four days later.

18      Orr admitted on the stand that he never corrected this

19  misinformation.  So at best the city mistakenly gave

20  misinformation to the very class of creditors it was supposed

21  to be negotiating with, or at worse, the city outrightness led

22  the retirees into thinking that their pensions were safe.

23      Three days after telling the retirees at the public

24  meeting that their pensions could not be touched, Mr. Orr gave

25  an interview with the *Detroit Free Press* and expresses his

1 intention to evade the pension clause through a federal

2 Chapter 9 bankruptcy proceeding.

3     The following day the emergency manager held the meeting

4 at the Detroit Metropolitan Airport and presented the proposal

5 for creditors. Attendees at this meeting all testified that

6 it was announced that this was not a negotiation. And I

7 believe Mr. Orr also admitted during trial that indeed the

8 meetings on the 10th, and the 14th, and the 20th were not

9 negotiations, they were merely presentational.

10     And this is when the city admitted for the first time

11 that it fully intended to impair and diminish accrued

12 financial benefits. However, this was buried 109 pages into

13 the proposal.

14     At the end of the proposal the city laid out a timeline.

15 It gave 34 days for the informational stage as well as the

16 negotiations to take place. It is the objecting parties'

17 position that a four week time frame was inadequate. Buckfire

18 testified they'd been working around the clock for months on

19 the proposal for creditors, but the state quotas were given

20 just three weeks to review the data and then negotiation

21 within that compressed time frame.

22     As Ms. Levine mentioned earlier, the city could have been

23 negotiating since 2012. Chapter 9 had been contemplated since

24 2012.

25     And the state raised an issue this morning about

1  preparing for the storm and –– and buying a raincoat and

2  umbrella and all of that.  But it's as though they knew the

3  storm was coming for two years, but then only gave 34 days for

4  people to get ready which we think was unfair because to argue

5  that it was impracticable when they knew all along that they

6  had this time, was not good faith.

7      In June 17th the initial rounds of stakeholder

8  negotiations were set to start.  And somehow the pension

9  people that were involved were supposed to know that the city

10  was expecting them to negotiate even though Orr had told Don

11  Taylor of the RDPFFA that pensions would not be cut.  And he

12  later asserted on June 10th again, that pensions would not be

13  touched.

14      The vast majority of the retirees were not even aware of

15  the creditor proposal because the city admitted, Mr. Orr

16  admitted, that it did not mail them each a copy of it.  The

17  city had also informed people that attended the meeting on the

18  14th that it was not a negotiation and the city and state

19  witnesses all admitted that the proposal did not identify the

20  amount to which the pensions would be reduced.  And in fact to

21  date the city has never put an exact dollar amount on the

22  level of intended cuts.

23      On June 20th, the data room was opened, but as witnesses

24  testified, it was not fully populated.  Brad Robbins testified

25  it was missing key information such as data regarding the

1  city's assets.  And he also testified that the first step in

2  any restructuring negotiation is investigating the

3  affordability issue and reviewing the relevant data.

4      He referenced the <u>American Airlines</u> case where the debtor

5  had claimed the pensions could not be afforded, but he and his

6  team were able to restructure the pensions and keep the

7  benefits intact.  This morning I believe Mr. Bennett said that

8  was the only example, the asset information, but Mr. Robbins

9  did testify several times that financial data relating to

10  whether or not the pensions were indeed incapable of moving

11  forward, is the information he was looking for.

12     On June 27th the city sent a letter to the UAW thanking

13  them for their time.  And in that letter even the city

14  acknowledged that the unions would need more information.  Mr.

15  Bennett said this morning that no one except Mr. Robbins had

16  asked for more information and that is not true as the city

17  admits in this letter that the UAW had asked for more

18  information.  And the date is interesting because it's June

19  27th which is already outside of the one week time period the

20  city had given for an informational swap.

21     In June of 2013, Orr testified that he had authorized his

22  team to start preparing a potential Chapter 9 filing, in late

23  June or early July.  Malhotra admitted at trial that his

24  declaration was being drafted by late -- by late June.  On

25  July 3rd, Robbie Flowers, Gracie Webster, and Veronica Thomas

1  commenced their lawsuits.

2      And while Orr testified at trial that these lawsuits made

3  clear to him that the parties are not interested in

4  negotiating, this testimony is undermined by the fact that

5  several witness testified that the city was expecting lawsuits

6  and expecting challenges to PA436.  Exhibit 403 noted that

7  opponents were lining up to challenge PA436.  Dillon testified

8  that they not only expected these lawsuits, they had planned

9  for them in advance.

10     Further, Orr admitted that he ignored these lawsuits for

11 three weeks.  In other words he ignored them during the time

12 period that the city had given for the alleged negotiations.

13 Therefore I don't know how these lawsuits could have impacted

14 the negotiations.  Further, there were only a handful of

15 plaintiffs at issue and there were plenty of other parties the

16 city could still be negotiating with.

17     And lastly, the retirement systems lawsuit was filed

18 after the time period the city dedicated to negotiations, so

19 their lawsuit also could not have impacted any of the

20 so-called negotiations.

21     Therefore, we believe the evidence adduced at trial

22 showed that the city had no intention of ever negotiating with

23 creditors.  You saw a timeline dated July 8, 2013, where the

24 city had already determined its Chapter 9 petition would be

25 filed on July 19th.  The timeline created had a filing date

1  despite the fact that creditor meetings had not even yet

2  occurred.   Therefore, we believe that shows that it was a

3  foregone conclusion before the creditor meetings ever took

4  place that the end game was a Chapter 9 filing on the 19th.

5       This is a copy of the communications roll out that was

6  admitted into evidence.  And as of July 8, the city's position

7  is, that we negotiated in good faith, we presented a

8  comprehensive restructuring plan, but at this point it would

9  be impractical to continue discussions out of Court because it

10  is clear that we will be able to reach -- we'll be able to

11  reach agreement with some of our creditors only through a

12  Court supervised process.  However, the creditor negotiations

13  had -- the meetings had not even taken place and this was

14  already their position.  And further as of July 8th, July 19th

15  was clearly the date already set forth as the filing date.

16       THE COURT:  Well, how do you deal with the city's

17  argument that this timeline was merely a contingency?

18       MS. GREEN:  The slide.

19       THE COURT:  Okay.

20       MS. GREEN:  Orr and Buckfire both characterize this

21  timeline as a contingency, however, on cross exam they were

22  forced to admit that nowhere on the face of the timeline does

23  it say contingency plan.  Further, there were no other

24  contingency plans produced or admitted that he knew of no

25  other alternative timeline out of the hundreds of pages of

1    documents that were produced by the city.

2        And when asked about the timeline, Treasurer Dillon said,

3    I didn't see an alternative schedule.  This was the one that

4    was mapped out.

5        On July 8th, as set forth in Exhibit 452, they had already

6    mapped out the communications message that it would be

7    impractical to continue discussions.  But the only meetings

8    that had taken place at that time were the June 10th, 14th, and

9    20th meetings which Mr. Orr testified were merely informational

10   and presentational.  That is direct evidence that there was no

11   intention of actually negotiating at the upcoming stakeholder

12   meetings being held on July 9th, 10th, and 11th because the

13   decision to file had been made regardless.

14       The key filing messages also took the position that

15   before any creditor meetings, the negotiations would be

16   impracticable.  But this ignores these facts.

17       The city carries the burden of proof.  It actually has to

18   prove that it was impracticable to negotiate which it cannot

19   do because the city did nothing to reach out to active or

20   retired employees.  Orr admitted the city did not mail

21   letters, did not mail informational materials to retirees or

22   active employees.

23       He admitted the city did not create a special web site to

24   communicate with these stakeholders.  He admitted they didn't

25   reach out over the telephone.  They didn't post public

1  notices, they didn't use the media to communicate with these

2  stakeholders.

3      The city also did not break the retirees into smaller sub

4  groups that could be negotiated with directly.  Mr. Orr

5  testified that he thought perhaps Ed Miller at his firm had

6  done so, however, none of the witnesses at trial confirmed

7  this.  And Ken Buckfire testified that while this idea was

8  raised, he was told by David Heiman and Heather Lennox at

9  Jones, Day that this would be impracticable to do and so no

10  one bothered to try.

11      The city has repeatedly said that negotiations were

12  impracticable because no one would represent retirees.  But

13  the city had several viable options that they could have taken

14  advantage of.  Namely, the DRCEA, the RDPFFA, the retirement

15  systems, and the pension task force.

16      Shirley Lightsey testified on behalf of the DRCEA.  She

17  told the Court that she introduced herself to Kevyn Orr as the

18  President of the DRCEA at a meet and greet in April.  That

19  organization represents between 7,600 and 7,800 of the 12,000

20  retired general employees, roughly 63 to 65%.

21      She testified that her organization has the power to

22  appoint committees and call special meetings.  It has a web

23  site, its members can be communicated with via telephone,

24  email, and in writing.  She also testified that her

25  organization provides information to even non-member retirees.

1  Thus the DRCEA could have been utilized to mobilize the

2  general retirees.  And while the DRCEA could not itself bond

3  the members, its infrastructure could have been used to

4  communicate with those people and then the members themselves

5  could vote.

6      But the city never utilized the DRCEA.  And in fact

7  Shirley Lightsey was not even invited to the June 14th proposal

8  for creditors meeting as she testified.

9      The RDFPPA, it should be RDPFFA, represents 6,500 out of

10 the 8,000 retired police and fire fighters which is over 80%

11 of the retired police and fire fighters.  That organization

12 has a web site, holds monthly meetings, circulates a monthly

13 magazine, and has lines of communication to all of its

14 members.

15     Mr. Taylor, the President, testified that his group has

16 negotiated reductions in benefits in the past.  And he

17 explained in detail a prior situation where his group came up

18 with a compromise, the members voted, and a settlement was

19 reached.  But this organization was also not utilized by the

20 city and in fact its President was misinformed by both Andy

21 Dillon the state Treasurer, and the emergency manager that

22 their pensions would not be touched.

23     Mr. Taylor testified that he passed this information on

24 to his membership who were then lulled into inaction.  You may

25 recall there was an exchange where Mr. Taylor was asked why he

1  didn't ask questions at the meeting.  And he said because I

2  was told that our pensions were not going to be touched.

3       The city also could have used the pension task force

4  which is currently comprised of representatives from Milliman,

5  the actuarial firm, Conway, MacKenzie, and Jones, Day.  There

6  are no representatives from the retirement systems, Gabriel

7  Roeder, Greenhill, the unions, or any of the retiree groups

8  that I just mentioned.  They were never asked to join the task

9  force.  And if they were, if the city was serious about

10  restructuring efforts, or implementing new cash flow

11  strategies to avoid having to impair, these different groups

12  of people could have been reached out to as a way to

13  negotiate.

14       Treasurer Dillon himself admitted there are lots of

15  creative options given the long life of a pension fund.  But

16  he also admitted that none of these creative options were ever

17  raised with the unions, the retirees, or with the retirement

18  systems themselves.

19       In addition Mark Diaz, a trustee of the retirement

20  systems testified yesterday that the systems themselves could

21  have been used as a partner to communicate to the retirees.

22  The systems have a data base of all the retirees, they have a

23  web site, and they can "very easily communicate with all of

24  the individual people".  But when Mr. Diaz was asked if the

25  city ever requested that the systems infrastructure be used in

1  this manner he said no, not at all.

2      And lastly with respect to the bond holders, Mr. Buckfire

3  admitted that with respect to those negotiations, he knew all

4  of the bond trustees and their insurers, those parties were

5  "organized" and that they could be relied on to speak for, if

6  not actually vote the interest of the underlying bond holders.

7      Similar to what Ms. Levine just argued, the position is,

8  that the city should not be permitted to have created an

9  environment of impracticability and then use that

10  impracticability as its excuse for refusing to negotiate.  And

11  the point is, if they knew back in 2012 that Chapter 9 was

12  being contemplated, then why did we wait till 34 days before

13  the filing to begin.

14      And if that is the way that 109(c)(5) works, then in

15  essence good faith negotiations and impracticability

16  provisions may as well be read out of the Code if all we have

17  to do is make a conclusory statement that negotiations are

18  impracticable without actually proving that those negotiations

19  were in fact an impracticability.

20      On July 9th, Treasurer Dillon wrote to the Governor of the

21  State of Michigan and as you know it's used a lot at trial.

22  But it highlights that as of July 9th, the Treasurer believed

23  that we were still in the informational mode, not in the

24  decision making mode.  And yet when he was asked what changed

25  between July 9th and July 18th, he said that nothing changed to

1  take them out of the mere informational stage.  It obviously

2  -- key decisions were being made just a week later because the

3  filing was on July 18th.

4      On July 9th, as Mr. Dillon said, they were in the

5  informational mode.  The level of underfunding in the pension

6  systems was still being debated and Mr. Dillon testified to

7  that.  And how much the actual reduction would be for the

8  retirees was still unknown.  Dillon and Orr both admitted that

9  it would be impossible to negotiate when these numbers were

10  not known.

11      Mr. Dillon admitted if you're going to reach a settlement

12  with your creditors, it's important to understand what's the

13  level, what's the funding level.  He also admitted that they

14  did not know these numbers during the week of the alleged

15  creditor negotiations which took place on July 10th and 11th.

16  And to date they still don't know the exact numbers he

17  admitted.

18      On July 10th, the same day that the creditor negotiations

19  were allegedly taking place, the recommendation letter by

20  Kevyn Orr is already being authored by Treasurer Dillon and

21  others.  Dillon admitted that the July 19th filing date had

22  already been decided as of this date on July 10th when they

23  were writing the recommendation letter.  And he testified

24  about a detailed timeline and schedule that had been

25  circulated.

1    However, that same week Dillon was very skeptical about

2  whether the city had adequately made the case for a Chapter 9

3  and he raised his concerns with Kevyn Orr's team on a

4  conference call and he laid them out in an email.  He stated,

5  I don't think we are making the case.  Why are we giving --

6  why we are giving up so soon to reach an out of Court

7  settlement.  Looks premeditated.

8    He also says, I believe there is a State Court option to

9  get retirees into a class.  We don't acknowledge that and why

10  is that unpractical.

11    That I believe is the State Court class action option

12  that was testified to by Michael Nicholson of the UAW.  And

13  Treasurer Dillon said that no one ever explained to him why

14  that option was not practical.  He also states, I think we may

15  want a take it or leave it demand before we pull this trigger.

16  I agree with the recommendation, but I still don't think we

17  make the case.

18    And at the end he said, the pennies on the dollar outcome

19  for unsecured creditors make it practically impossible for

20  them to accept KO, Kevyn Orr's offer.  And Treasurer Dillon

21  also testified that the recoveries were so low that it seemed

22  to be that negotiations were expected to be unfruitful.

23    On July 10th and 11th, the creditor meetings took place.

24  The retirement systems met with attorneys from Jones, Day

25  regarding the city's finances.  The EM did not attend.  Brad

1  Robbins did attend and he testified yesterday that he did not

2  observe or participate in any negotiations regarding the

3  city's financing and that the meetings were purely

4  informational.

5      And this is consistent with Treasurer Dillon's report to

6  the Governor that as of this time frame, he considered

7  themselves to be still in the informational mode.  It is also

8  consistent with the city and state's communications roll out

9  which had already adopted the excuse that negotiations were

10 going to be impractical.

11     On July 12th the Governor's legal counsel, Mike Gadola of

12 the Attorney General's office, Treasurer Dillon, Lieutenant

13 Governor Brian Calley, and Richard Baird were all urging that

14 a more deliberative approach be taken with respect to the

15 Chapter 9 filing.  They specifically urged that a condition be

16 placed on the bankruptcy filing.  And they even more

17 specifically urged that a condition be placed on the

18 bankruptcy filing with respect to the vested pension benefits.

19     On July 12th, the Detroit Firefighters Association sent a

20 letter to the emergency manager asking for more specific

21 information on pension benefit restructuring as soon as

22 possible.  They noted that they have had two meetings with the

23 city where pension benefits were addressed and still have only

24 a general observation that pension benefits must be reduced.

25 Mark Diaz testified that no specific proposals were ever --

1  ever given.

2      On July 15th, just a few days before the bankruptcy

3  petition was filed, the Webster defendants filed a response

4  brief in the State Court action.  There was a hearing

5  scheduled for -- it should be July 22nd which was the following

6  Monday.  The State Court -- or the state asserted in its

7  response that a bankruptcy filing was still only a

8  possibility, that the plaintiffs' claims were unripe, and

9  premature, and based on a speculative threat of future injury.

10  However, as we all know, there was already a recommendation

11  letter and an authorization letter being worked on and the

12  decision had actually been made to allow the filing.

13      On July 16th, Mr. Orr submitted the bankruptcy

14  recommendation letter to Governor Snyder and Treasurer Dillon.

15  And it stated in that letter that dramatic but necessary

16  benefit modifications would be needed.

17      Governor Snyder acknowledged when he testified that he

18  read the letter before authorizing the filing.  And he

19  admitted that he knew that the city's request for an

20  authorization included that dramatic cuts to accrued benefits

21  would be part of any Chapter 9.

22      On July 17th, the day before the bankruptcy filing, the

23  DPSU received correspondence from the city thanking them on

24  behalf of the emergency manager for their strong cooperation

25  and their good faith negotiations regarding the difficult

1   issue of pension restructuring.

2        On July 17th the retirement systems filed their lawsuit

3   against the Governor and the emergency manager.  The complaint

4   was served on the Governor's office and the EM's office in

5   Detroit.  And that night the exhibit that you saw was the

6   Sarah Wurfel timeline circulated throughout the state without

7   -- throughout the state officials.  And at 6:23 on July 17th,

8   the plan was still to file on Friday, July 19th.

9        However, the following day, as you heard Mr. Nicholson

10  from the UAW testify, the retirement systems went to Ingham

11  County Court seeking a TRO.  The AG's office received a phone

12  call stating that the retirement systems were in the State

13  Court seeking a TRO, 3:47 the Governor emailed the

14  authorization letter, and at 4:06, Orr changed the date on the

15  filing papers, hand wrote in an 18, and filed the petition.

16  And at 4:10 the Attorney General appeared at the TRO hearing.

17  Orr admitted that he had been counsel, it would be

18  irresponsible not to file sooner rather than later given all

19  of the lawsuits.

20       In authorizing the bankruptcy with no conditions.  The

21  Governor ignored the advice of his own counsel at the AG's

22  office to further probe the conclusions in Orr's letter,

23  undertake due -- due diligence to confirm the eligibility

24  requirements had been met, and to place a condition on the

25  bankruptcy filing with respect to pension benefits.  That's

1 Exhibit 625 that we just looked at.

2      But the Governor testified he chose not to impose any of

3 these conditions because he did not want to create more

4 delays.  As Treasurer Dillon testified, the reason the July

5 19th filing date was originally chosen was because the Governor

6 wanted the process to be "fast and efficient".  However, due

7 to the desire for the Chapter 9 case to be fast and efficient,

8 adequate time was not given for the negotiation process to be

9 undertaken.

10      The Chapter 9 case was filed despite the fact that as

11 Chuck Moore testified, the actuarial numbers were still being

12 refined.  Mr. Buckfire cautioned that the Milliman reports,

13 which the city relied upon to state the 3.5 billion dollar

14 underfunding number, cautioned on their face that a "more

15 robust projection model could vary the results".  And

16 Treasurer Dillon stated that he also was not confident in the

17 pension underfunding numbers and that they were a moving

18 target.

19      In addition to the primary assets were still an unknown,

20 the Water and Sewage Department, and the city owned artwork at

21 the DIA which the objecting parties would submit is in large

22 part due to the fact that knowing the process was going to

23 take several months, the city waited until after the petition

24 date to even begin that process.

25      And in conclusion, because the city did not negotiate in

1   good faith, did not prove that the negotiations were in fact

2   impracticable, and instead filed this bankruptcy in bad faith

3   to evade the pensions clause, this case must be dismissed, or

4   the city must be forced to cure its bad faith by seeking new

5   authorization with a proper contingency under PA436 for the

6   pension benefits.  Thank you.

7           THE COURT:  I want to get back to that Exhibit 852

8   issue.  Is it possible that that exhibit was the same document

9   as an exhibit with a different number that was admitted?

10          MS. GREEN:  It could be 202, 2, 0 -- that is very

11  possible.  We had several that were --

12          THE COURT:  Can you check that out and let us know?

13          MS. GREEN:  Yes, I will.

14          MR. IRWIN:  Can I briefly be heard on that, Your

15  Honor?  We -- we -- it's hard to do this on the fly, so I have

16  a little bit more information at this time.

17      It is true 852 was used by Mr. Wertheimer.  It was used

18  during the Dillon examination.  It was an attempt to refresh

19  his recollection.

20          THE COURT:  Right.

21          MR. IRWIN:  It was not refreshed, and it was not

22  offered, and it was not admitted.  That is on November 5th and

23  the lines are Page 126, Line 25, to Page 129, Line 5.  It was

24  not offered, it was not accepted.

25          THE COURT:  All right.  Well, check to see if it was

1   another -- if it -- if the document itself is another exhibit

2   that was admitted and let us know.  202 is in, but the

3   question is, is it the same as 852.

4       Okay.  And -- and before we go to the next argument, are

5   there any other exhibit discrepancies?

6           MR. IRWIN:  There is one, Your Honor.  Exhibit

7   number 452.

8           THE COURT:  Yes.

9           MR. IRWIN:  This was the email from Mr. Nowling that

10  attached the timeline.  And -- and Ms. Green referred to it.

11  There was examination on that exhibit during the hearing,

12  however, again, and this was a -- a pattern to some degree,

13  was discussed, there was an objection to it in the pre-trial

14  order, and it was moved on before that objection -- before the

15  exhibit was offered, so that the objection could be ruled on.

16  And it is therefore not in the record.  It is not on the

17  Court's for that reason, we believe, indication of the

18  exhibits that are in evidence.

19          THE COURT:  Uh-huh.  Was 452 one of the exhibits in

20  Ms. Green's --

21          MR. IRWIN:  It was.

22          THE COURT:  -- slide show?

23          MR. IRWIN:  Those were the only two that I saw, Your

24  Honor, 852 and 452.

25          MS. GREEN:  That one also may have been a duplicate.

1  It's also the same as 831 which -- it's just hard because

2  other people have different numbers for the same exhibit.

3          THE COURT:  Right.

4          MS. GREEN:  But I believe it's the same as 831 which

5  is in evidence.

6          MR. IRWIN:  831, I have not in evidence, Your Honor,

7  according to your list for the same reasons.

8          THE COURT:  And it's not in the pre-trial order?

9          MR. IRWIN:  It is not.  It is in the pre-trial order

10 with an objection.

11         THE COURT:  Okay.

12         MR. WERTHEIMER:  Your Honor, for the record --

13         THE COURT:  In order for you to be on the record,

14 you need to be near a microphone.

15         MR. WERTHEIMER:  For the record William Wertheimer

16 for the Flowers plaintiffs.  Your Honor, my memory is

17 consistent in part with counsel's relative to 852.

18         THE COURT:  Well, memory doesn't matter.  What

19 matters is what's on the record.  Have you checked --

20         MR. WERTHEIMER:  I understand and it --

21         THE COURT:  Have you checked the record?

22         MR. WERTHEIMER:  I have not checked the record.  But

23 I believe the representation that his memory was not refreshed

24 is incomplete.  My memory is, he admitted the facts that Ms.

25 Green pointed to on the exhibit.

1          THE COURT:  All right.  Well, let me just ask, are

2    there any other exhibits that are not on the list that we had

3    passed around at lunch that anyone thinks was admitted into

4    evidence?

5          MR. RUEGGER:  Good afternoon, Your Honor.  Arthur

6    Ruegger from Dentons on behalf of the retiree committee.

7      I have been provided a list of several exhibits that the

8    notes of our team that they indicate that they were admitted.

9    I'd like to verify that before I bother the Court with it.

10   I'd also like to --

11         THE COURT:  How will you verify it?

12         MR. RUEGGER:  I'd like to check what transcript,

13   informal transcript references we have, Judge.

14         THE COURT:  Okay, fair enough.

15         MR. RUEGGER:  Thank you.

16         THE COURT:  Any others?  Okay.  Are there any

17   exhibits on -- that were on our list that you don't think were

18   admitted into evidence anyone?

19         MR. IRWIN:  Not from the city, Your Honor.  The --

20   the Court's list virtually tracks ours verbatim.

21         MR. RUEGGER:  We have no problem with the exhibits

22   on your list, Your Honor.

23         MR. IRWIN:  All right.

24         THE COURT:  All right.  Who's next?  Mr. Gordon,

25   yes, of course.  Go ahead.

1            MR. GORDON:  Thank you, Your Honor.  Robert Gordon

2    on behalf of the Detroit Retirement Systems.  I will do my

3    very best to not repeat any of what Ms. Green has provided.

4            THE COURT:  Oh, before -- on that subject before you

5    actually launch here, we need to have a hard copy of that

6    slide presentation marked as an exhibit, not for purposes of

7    admission, but just for purposes of identification so that it

8    can be included in the record of the case for -- for

9    completeness purposes.  So what -- do you have an exhibit

10   number that you would use for that?

11           MS. GREEN:  I believe it would be 873.

12           THE COURT:  Okay.  Go ahead, sir.

13           MR. GORDON:  Thank you, Your Honor.  I know that

14   others will want to make a number of -- of comments about the

15   -- the evidence.  I'm going to try to keep my comments fairly

16   limited as a result to allow others to express their -- their

17   points of view as well.

18        As a sort of I guess a housekeeping matter, if I may,

19   Your Honor, to begin with, I thought I had heard in the

20   presentation by counsel for the city, essentially a suggestion

21   that there has been no objection made to the asserted

22   underfunding liability in a particular document of -- prepared

23   at one time by Milliman.

24        I would like to make clear for the record that it is not

25   our impression that this is an evidentiary hearing about what

1  the underfunding level is, or was at the time of the petition,

2  or is or was today.  That document was not introduced for that

3  purpose.  There has been no expert testimony on that point and

4  we reserve all rights as to that.

5      Indeed, it is impossible we would submit to determine

6  what the underfunding level is unless you know what treatment

7  is going to be made of the pension systems, whether they're

8  going to be frozen and closed, or whether the defined benefit

9  plans are going to be continued, and that has yet to be

10  determined.  So we reserve all rights on that, Your Honor.

11      In fact, the document that was submitted from Milliman,

12  had a caveat in it by Milliman that if they had more robust

13  data to work with their calculations may vary.  So in -- in

14  itself it -- it indicates that it's not a very reliable

15  document.  But again for all the other reasons I just stated,

16  we submit that there has not been any -- that there shouldn't

17  be any interpretation that -- that any of the parties here,

18  and particularly the retirement systems, agree to the

19  underfunding level asserted in that one document, Your Honor.

20      Your Honor, we don't dispute that prior to the city

21  filing its bankruptcy petition the city was experiencing

22  financial distress.  And whether or not that financial

23  distress constitutes insolvency for purposes of Section

24  109(c)(3) of Bankruptcy Code, is -- is only one issue.  And I

25  will not opine on whether the city met its burden of proof on

1   that issue, since we did not specifically raise the insolvency

2   issue.

3       But there is another issue here under 109(c)(5) which is

4   how did the state and the city proceed to address the

5   situation.  And this is very important because the Bankruptcy

6   Code does require specifically that a municipality proceed in

7   a specific fashion before it takes the extraordinary step of

8   filing for bankruptcy.  And these are important requirements,

9   they are not merely pro forma.

10      And this is where we submit that the city's argument

11  really breaks down.  Because if you pull back from the -- the

12  -- the -- the huge amount of evidence that's been introduced

13  here, as Ms. Green has -- has shown through her slides, the

14  fact of the matter is, that the city and the state over many

15  many months analyzed the financial and operational situation

16  of the City of Detroit, a very complex undertaking when you're

17  talking about a city of 700,000 residents.  It devoted

18  significant resources in analyzing those issues.

19      And then they made a proposal on June 14th and within 34

20  days it filed a bankruptcy.  If you just pull back and look at

21  those simple facts, there simply was not time for good faith

22  negotiations.

23      Now, there was testimony by the retirement systems

24  through Mr. Robbins about the inability to have good faith

25  negotiations during that 34 day period.  And there was some

1  reference to that this morning by the city's counsel.  And I

2  want to make sure that the characterization of the testimony

3  is accurate.

4      There was some suggestion that financial advisors are

5  never satisfied with the amount of information that they have

6  and things of that nature.  Mr. Robbins did not testify that

7  he had adequate information but not optimal amounts of

8  information.  Mr. Robbins testified clearly and unequivocally

9  that he did not have adequate information with which to begin

10 negotiations.  And that the proposal such as it was on June

11 14th, and I say such as it was because it did not even include

12 a proposal for how the pension systems, the pension plans

13 would be treated on a go forward basis, was not really a -- a

14 serious proposal and that information was needed.

15     Now counsel for the city has also suggested that no one

16 disputed the facts in the proposal and no one asked any

17 questions.  That simply isn't true.  Now, maybe at the airport

18 on June 14th in a room of 200 people, when people were provided

19 for the first time with 120 page document, not a lot of

20 questions were asked.

21     But the evidence is clear, there were due diligence

22 sessions on June 25th, and on July 9th, and July 10th with

23 financial advisors.  And I am sure lots of questions were

24 being asked.  I was in those rooms as well.  There were lots

25 of questions being asked about the financials.

1    Mr. Robbins testified among other things that there was

2 not information in the proposal or in the data room regarding

3 significant assets. One of those assets is the cash flows

4 from the Detroit Water and Sewage Department.

5    Counsel for the city indicates that seeking information

6 regarding the cash flows from a potential transaction from the

7 water authority is really not a fair ask because that's

8 something that's been discussed for many years and it may or

9 may not come to fruition. We want to be clear here. That's

10 not the information that was missing from the June 14th

11 forecasts.

12    What was missing from those forecasts were the actual

13 existing cash flows from the DWSD to the city that exist as of

14 today. Very substantial cash flows. They're not in the

15 projections. That was also testified to by Mr. Buckfire

16 himself. Mr. Buckfire also testified that there were no fair

17 market value analyses of any of the assets.

18         THE COURT: I thought the evidence was that the

19 DWSP provided -- or DWSD provided no net cash flow to the

20 city. Am I wrong about that?

21         MR. GORDON: That's not correct, Your Honor. It

22 depends on how you look at the cash flows. There -- there is,

23 if I understand it correctly, and I may get this number wrong,

24 but I think there's approximately $80,000,000 that flows from

25 DWSD just to support the -- the employee and -- and legacy

1  obligations.  And there may be additional amounts that come to

2  the city but I'm not exactly sure how much that is.  But there

3  definitely are cash flows from DWSD to the city and/or the

4  pension systems that are not in the cash flows at all.

5        THE COURT:  So what you're referring to is what the

6  city paid -- excuse me, what the department pays to the city

7  for retirement funding.

8        MR. GORDON:  That's correct, Your Honor.  The

9  proposal does not propose those cash flows to continue --

10        THE COURT:  I do recall that.

11        MR. GORDON:  -- to the pension systems, nor do they

12  come to the general fund in the cash flow forecasts.

13        THE COURT:  But I don't recall any evidence that the

14  water department provided funding to the city for any other

15  purpose.  Have I missed something?

16        MR. GORDON:  I'm not -- I'm not certain whether the

17  evidence did provide that, Your Honor.

18        THE COURT:  All right.

19        MR. GORDON:  I can't comment on that.  But there --

20        THE COURT:  All right.

21        MR. GORDON:  As I said, there is a -- is a

22  substantial amount that comes to the pension systems that in

23  the proposal from June 14th there is no discussion of those

24  amounts coming to the pensions any further, nor do they come

25  into the -- the forecasts in any way, shape, or form.

1          Your Honor, if I may, I just want to comment on a couple

2     of other items that I think particularly pertain to the

3     retirement systems.  Mr. Dillon, who as we know was the state

4     Treasurer at all times relevant to this matter, indicated in

5     an email dated July 9, 2013, I think it's marked as Exhibit

6     834, that and I quote, "because pensions have such a long

7     life, there are a lot of creative options we can explore to

8     address how they will be treated in a restructuring".

9          And in that same email he further indicates a desire to

10    explore ways to avoid negatively impacting pensions.  In

11    counter point to Mr. Dillon's views, we have the pension task

12    force.  And the pension task force as we understand it

13    consists of two personnel from the Milliman firm, Mr. Moore

14    from Conway, MacKenzie, and several other non-actuarial

15    professionals.

16         Now, there is a document Exhibit 870 that is in evidence

17    that reflects some of the activities of the pension task

18    force.  And it indicates that scenarios were run by Milliman

19    based on assumptions provided to them by Conway, MacKenzie

20    and/or others on behalf of the city.

21         The exhibit shows that an assumption is being

22    unilaterally made by the pension task force that the General

23    Retirement System Plan ought to be frozen, which by the way,

24    would drive up the underfunding level of that plan

25    exponentially.  And a conclusion is then drawn that a

1  significant reduction in accrued pension benefits is required

2  and that I quote, "it appears this may only be possible in a

3  Chapter 9 proceeding".

4          THE COURT:  And what are those two exhibits again?

5          MR. GORDON:  That would be Exhibit 870, Your Honor.

6          THE COURT:  That's the task force document?

7          MR. GORDON:  That's correct.  And the quote from Mr.

8  Dillon is Exhibit 834.

9      What is remarkable about this, Your Honor, I would

10 submit, is that the pension task force simply assumed that

11 accrued benefits must be impaired without ever asking the

12 people who would know.  The retirement systems and their

13 actuaries Gabriel Roeder.  They never asked the retirement

14 systems and Gabriel Roeder about this.  They never came to the

15 retirement systems and Gabriel Roeder with a business plan and

16 said, here's our proposal, here are the needs of the city in

17 terms of diverting cash flows to reinvesting in the city and

18 so forth and is there a way that we can do this and perhaps

19 restructure or reschedule employer contributions in a way that

20 will not impair or diminish the -- the -- the pension

21 benefits, but will accommodate our business plan.

22     That discussion was never had.  Nor was there any such

23 discussion in conjunction with Greenhill and Mr. Robbins whose

24 experience in preserving pensions in American Airlines and

25 other bankruptcy cases, might have been of some assistance

1    here.

2        Counsel for the city suggests this morning that there's

3    no evidence in the record that having such discussions would

4    have led to a solution.  And the problem is we'll never know.

5    They never tried.  The suggestion is that impracticability is

6    a completely subjective determination to be made by the

7    municipality alone.  We suggest that that's inappropriate.

8        Now based on the city's purely internal conclusion that

9    the city -- purely internal conclusion that -- that accrued

10   benefits must be impaired, the city further concludes that

11   negotiation with the retirement systems is impracticable

12   because the retirement systems are constrained by the pensions

13   clause of the state constitution to not negotiate any

14   impairment or diminishment of the accrued benefits.

15       As I just indicated, there were other discussions that

16   could have been had about how to perhaps modify employer

17   contribution schedules, or do something that didn't

18   necessarily involve impairing and diminishing the -- the

19   benefits over the long term, but there was no such discussion.

20       So the city uses an untested internally created premise

21   that benefits must be impaired to then make a further, I would

22   submit, infirm conclusion that negotiations with the

23   retirement systems are futile and impracticable.  While this

24   exercise is convenient for the city, it does not stand up to

25   scrutiny from a legal perspective and does not meet the test

1 of Section 109(c)(5)(C) of the Bankruptcy Code.

2      Your Honor, what is also particularly remarkable in this

3 regard we would submit is that the evidence shows that the

4 state and the city were aware of the pensions clause, but

5 instead of trying to determine if they could accommodate the

6 pensions clause in their restructuring plan, they essentially

7 just assumed that they could not without speaking to the

8 retirement systems and their professionals and instead decided

9 to just take their chances on being able to run roughshod over

10 the pensions clause and the state constitution in this Chapter

11 9 case.

12      Now this argument ends up being rooted very much in the

13 arguments that we made on October 15 that in order to have

14 valid state authorization for the bankruptcy, that there must

15 be a condition that -- that respects and upholds the pensions

16 clause.

17           THE COURT:  We need not repeat here which -- but I

18 do want to ask you this question.  What inference do I draw

19 here in -- in the context of this trial from the fact that

20 your client submitted no evidence that there was a viable way

21 for the city to propose a restructuring of its retirement

22 program?

23           MR. GORDON:  Well, Your Honor, I think that that's

24 -- if I may say so, sort of putting the shoe on the wrong

25 foot.  If the city had come to us and asked to have that

1   conversation we would have been happy to have that

2   conversation with them.

3       There never was an opportunity to.  As we said, there was

4   34 days from the date that a proposal was put on the table at

5   the airport to the day that the bankruptcy was filed.  In

6   fact, I -- I hesitate to mention this because this is an

7   evidentiary hearing, but I -- the general counsel for the

8   General Retirement Systems actually reached out to the

9   emergency manager earlier than that to try to have a meeting

10  and was rebuffed because it didn't fit the timeline that the

11  emergency manager was on or his schedule.  So there really

12  wasn't an opportunity for us to -- to ever have that

13  discussion.

14          THE COURT:  Well, but whether there was an

15  opportunity to have the discussion or not, my question wasn't

16  that so much as what do I do with the fact that there is no

17  evidence that there was a viable alternative plan?

18      I don't know whether there is or not.  All I know is

19  what's here in the evidence.  And you didn't submit any

20  evidence that there was a viable alternative plan.  What

21  inference do I draw from that, that's the question.

22          MR. GORDON:  Excuse me.  I think what you -- what

23  the testimony was of Mr. Robbins was that -- and this -- and

24  this highlights the problem which is not a problem that we

25  have created.  The problem is that we don't have enough

1 information.

2      And -- and I'm not casting aspersions on the city or its

3 professionals in that regard.  It's a difficult process.  It's

4 a complicated process.  But the process needed to play out and

5 it didn't.

6           THE COURT:  Uh-huh.

7           MR. GORDON:  So there was never enough information

8 there.  But what Mr. Robbins, I believe indicated, was that

9 based upon the information that he had and has, it is not

10 clear that there needs to be an impairment and diminishment of

11 the pension -- accrued pension benefits in order to

12 restructure here.

13      But beyond that, we can't go further than that yet

14 because we don't have all of the information, Your Honor.  I

15 don't know if I'm answering the question.

16           THE COURT:  No, but isn't -- isn't -- yeah.  No,

17 that -- that's good.  But isn't it -- isn't -- isn't the

18 underfunding, underfunded liability here according to the

19 retirement systems own experts at least a billion and

20 something?

21           MR. GORDON:  That's a difficult question.  You know,

22 it depends again on whether the pension systems, the defined

23 benefit plans are kept open or are frozen and closed.  I think

24 it is --

25           THE COURT:  Uh-huh.

1          MR. GORDON:  I wouldn't want to -- I wouldn't want

2    to speculate on that.  But let's assume that it's -- it's over

3    a $1,000,000,000.  Okay.  It's a, as -- as Mr. Dillon himself

4    said, it's a long term issue.

5          THE COURT:  Uh-huh.

6          MR. GORDON:  The liabilities can rise and fall.  The

7    performance of the investments can rise and fall.  There are

8    -- and again, I think because it's a long term issue there can

9    be flexibility in the way it's approached.  And it -- and a

10   $1,000,000,000 sounds like a lot money, but it's --

11         THE COURT:  All fair enough, but what -- what

12   prevented your client from making a proposal based on its view

13   of what the reasonable assumptions were as necessary to create

14   a proposal, given that there is some level of underfunding

15   that its own experts have found.

16         MR. GORDON:  Right.  But if you don't know what the

17   true cash flows are, and you don't know what the opportunities

18   for monetization of assets are --

19         THE COURT:  Uh-huh.

20         MR. GORDON:  -- to try to negotiate against yourself

21   as to how much you should be deferring, what you should be

22   getting paid, is really negotiating against yourself.  It's

23   impossible to do.  You need to have the full picture or at

24   least a reasonably full picture.

25         I understand Mr. Bennett's concern that, you know,

1 financial advisors never have enough information.  This is not

2 that situation.  The -- there were major pieces of information

3 that were missing here that made it impossible quite frankly,

4 to have that discussion at this stage.

5          THE COURT:  All right.

6          MR. GORDON:  Your Honor, I -- I don't want to -- and

7 I'm sure you don't want me to repeat arguments relative to

8 109(c)(2) that really are the same types of arguments that

9 support in our opinion a finding that the petition was filed

10 in bad faith under 921(c) because it seeks to impermissibly

11 abrogate the protections of the pensions clause.  So with

12 that, Your Honor, I have no further comments.

13          THE COURT:  All right.

14          MR. GORDON:  Thank you.

15          THE COURT:  Who is next?

16          MR. GORDON:  Your Honor, if I may, I just wanted to

17 make one more comment.

18          THE COURT:  Oh, okay.

19          MR. GORDON:  Mr. King apprised me that I should make

20 this point and I agree.  I just want to make the record clear

21 that prior to June 14th, before we saw that proposal, there was

22 no information or indication from the city or the state to the

23 retirement systems that there would be a -- a seeking of an

24 impairment or diminishment of the accrued pension benefits of

25 the pension plans.  Thank you.

1          MS. BRIMER:  Good afternoon, Your Honor.  Lynn M.

2   Brimer appearing on behalf of the Retired Detroit Police

3   Members Association.

4       Your Honor, I'd like to address three points with the

5   Court this afternoon.  The first, the spending provision that

6   was added to PA436, the evidence has established was in fact

7   meaningless and was adopted in order to disregard the will of

8   the electorate with the intent of avoiding the people's right

9   of referendum.

10      The second, even if the spending provision is deemed by

11  this Court to have been appropriate, PA436 nonetheless

12  violates Article 2, Section 9 of the Michigan Constitution as

13  a re-enactment of a law previously properly referred to the

14  referendum process and defeated by the -- on referendum that

15  was then not re-subjected to the people.

16          THE COURT:  Okay.  Ms. Brimer, you've already argued

17  that one, right?

18          MS. BRIMER:  There is though one piece of evidence

19  that has not been -- that has not been objected to, that has

20  not been presented to the Court that I would like to review

21  with the Court very briefly, Your Honor.

22          THE COURT:  Okay.

23          MS. BRIMER:  Okay.

24          THE COURT:  I'll let you argue the evidence, but I

25  don't want to re-argue the point of law.

1          MS. BRIMER:  I -- I understand that, Your Honor.

2          THE COURT:  Okay.

3          MS. BRIMER:  And then finally, that the evidence

4   does in fact establish a lack of good faith and a

5   pre-determination by the EM's advisors that a Chapter 9 was in

6   fact inevitable.

7       Your Honor, this morning we heard from Mr. Schneider that

8   there was an impending storm heading for the City of Detroit.

9   And that a review of the weather reports indicated that the

10  city's cash flow was in despair.  In fact I would probably

11  argue that those of us in the courtroom who live in and near

12  the City of Detroit would probably not disagree that the

13  weather reports for the City of Detroit sadly have in fact

14  deteriorated over the past few years.

15      However, an impending storm and poor weather reports are

16  simply not a basis for the state, the Governor, and the

17  Treasurer to disregard the constitutional rights of the

18  citizens of the State of Michigan.

19      Despite the fact that Mr. Schneider discussed some case

20  law, I will, Your Honor, disregard it, because we have, I

21  believe, all briefed and properly briefed all of those issues.

22      With respect to the spending provision, Your Honor, we do

23  have a few critical facts that are worth reviewing with the

24  Court.  First we know that on February 29, 2012, PA4 was

25  referred for a referendum vote.  We also know, and this Court

1  has reviewed numerous times, so I will not bring up again,

2  that within three days of that referral, the attorneys at

3  Jones, Day were counseling Treasury and the State of Michigan

4  with respect to the passage of new legislation with a tacked

5  on spending provision in order to render the new law

6  referendum proof.

7      Eventually on November 6, 2012, PA4 was in fact rejected

8  by the people of the State of Michigan.  Within 39 days, the

9  new bill was approved by the Senate and within 50 days of

10  rejection, the new law PA436 was signed by the Governor.

11      Now we've discussed that that new law contains two

12  spending provisions.  One for $5,000,000 to cover the

13  consultants and one for $780,000 to cover the salaries of the

14  EM's.

15      We also know from Mr. Buckfire who testified that a

16  $7,000,000 cushion was almost nothing for the City of

17  Detroit's budget.  The Governor testified that the state's

18  budget is $40,000,000 rendering this appropriation .014% of

19  the state's budget.

20      We also know that both the Governor and the Treasurer

21  testified that they did nothing to review any of the financial

22  analysis associated with these spending provisions.  In fact

23  they were more interested, Your Honor, in pushing this piece

24  of legislation through than insuring that the appropriation

25  was sufficient to cover the spending provisions.

1    Mr. Schneider this morning in fact indicated and told us

2  that the state was in fact forced to seek additional

3  appropriations for the fiscal year 9-30-13 in connection with

4  PA436.

5    Mr. Dillon testified that by June 11, he was seeking

6  re-negotiation of the professionals' contract in connection

7  with the consultants and their $5,000,000 appropriation.

8    And Mr. Baird testified in Exhibit 458 which has been

9  admitted into evidence, demonstrates that he determined that

10  the professionals would need approximately 75.2 million

11  dollars for this case.  A far cry, Your Honor, from the

12  $5,000,000 spending provision that was tacked on to PA436.

13    In fact, on cross examination by Mr. Ullman, Mr. Orr in

14  fact testified that he understood that the spending provisions

15  were added to PA436 to resolve the possibility of another

16  referendum.

17    Finally, Your Honor, Mr. Howard Ryan, the state's own

18  30(b)(6) witness, the witness they selected to appear at

19  deposition and testify on behalf of the state, testified at

20  Page 46 of his deposition which has in fact been admitted into

21  evidence, that the spending provision was added to PA436

22  specifically to avoid a new referendum.

23    There's no evidence and Mr. Dillon testified that even

24  the provision relative to the salaries of the EM's was only

25  for those EM's that were then appointed.  No projections, no

1  analysis of whether or not it would cover the EM's and at that

2  point in time they knew they were going to be hiring certainly

3  an emergency manager for the City of Detroit.

4      This simply was a spending provision that in the short

5  period of time that the state had to get this law passed, that

6  they put into play in order to avoid a referendum.

7          THE COURT:  One second, please.  Does someone have

8  Mr. Ryan's deposition I can look at?  Apparently ours has

9  already gone back to our office.

10          MS. BRIMER:  I do, Your Honor, and I have pulled out

11  the relevant page.  But I can put this back in and give the

12  Court my entire copy.

13          THE COURT:  Okay.  I'll give it right back to you.

14  I just want to see it.

15          MS. BRIMER:  Would you just like Page 436, Your

16  Honor -- 46?

17          THE COURT:  Page 46, yes, please.

18          MS. BRIMER:  Yes, if I may.

19          THE COURT:  Stand by.  Thank you.  I will return

20  this to you now.

21          MS. BRIMER:  Your Honor, given the speed with which

22  the new law was passed, the lack of any financial analysis by

23  either the Governor or the Treasurer, it's clear that those

24  spending provisions were added on simply to insure that the

25  state would have a law by which they could appoint an

1 emergency manager who would have the authority to file this

2 Chapter 9.

3    Even assuming, Your Honor, that those spending provisions

4 are deemed by the Court to be appropriate, the law is

5 nonetheless unconstitutional under the second paragraph of

6 Article 2, Section 9 which provides that no law that has been

7 properly referred on the referendum can be then enacted

8 without being referred to the people.

9    And if I may refer the Court to Exhibit 205. There are

10 two reasons why, Your Honor, we believe that even if the

11 spending provisions are appropriate, it's still nonetheless --

12 if -- if we could go to Page 20.

13        MR. SCHNEIDER: Your Honor, if I could. I -- I -- I

14 don't recall that this was entered into evidence.

15        MS. BRIMER: This was not objected to, Your Honor,

16 at pre-trial and I understood the exhibits not objected to

17 were accepted into evidence.

18        MR. SCHNEIDER: I'm sorry, Mr. Irwin indicates that

19 it may be.

20        MS. BRIMER: Page --

21        MR. SCHNEIDER: Yeah.

22        THE COURT: Hold on. I'll check.

23        MR. IRWIN: There was no objection pre-trial, Your

24 Honor, to 205.

25        THE COURT: It has been admitted.

1          MS. BRIMER:  Thank you, Your Honor.

2          THE COURT:  So go ahead.

3          MS. BRIMER:  Section 23, Page 19, I think it is.  So

4    the relevant provision in this instance, Your Honor, are the

5    provisions relative to the filing of a bankruptcy and this is

6    a red line version of PA4 and a comparison with PA436.  And it

7    may well just be -- we're taking that down.

8          And you'll notice, Your Honor, it's two sections.  And

9    put the other page next to it.  Well, no, just the next page.

10   There's only one change and it's a meaningless change in the

11   Chapter 9 filing provisions from PA4 to PA436.  That's the

12   entire provision.

13         There's one change.  And it provides that the Governor

14   may place contingencies on a local government in order to

15   proceed under Chapter 9.  And the reason I would express to

16   the Court that I believe this is a meaningless addition and

17   does not do any more than reenact the prior law, because

18   there's no prohibition in PA4 from placing contingencies.  So

19   this is just a redo with a minor change with an attempt to

20   remove this from the people's right of referendum or their

21   right to review a law that has been referred to referendum.

22         We did hear some testimony, Your Honor, from the Governor

23   that there were changes, new options in PA436 for the cities.

24   However, as applied in this case, Your Honor, the state took

25   specific steps to insure that those options would not be

1  available to the city and the citizens of Detroit.

2      PA436 became effective on March 29th.  The state announced

3  the selection of Mr. Orr as the emergency manager who would be

4  appointed over the city.  He entered a contract on March 25th,

5  a Friday.  In order to insure that he was enacted as an

6  emergency manager under PA72 which did not afford these

7  options to the city, and would automatically become the

8  emergency manager with this broad authority to file a Chapter

9  9 under PA436 without affording the city any opportunity to

10  take advantage of the purported changes and options in the new

11  enacted law, a clear attempt, Your Honor, to disregard the

12  will of the people.

13      If all it takes, Your Honor, is the inclusion of a minor

14  change or the tacking on of a spending provision, then we have

15  simply read the second paragraph of Article 2, Section 9 out

16  of the Michigan Constitution.

17      Now with respect to the history of this filing, and the

18  fact that I would assert that there has been bad faith on the

19  part of the emergency manager's consultants, and a

20  pre-determination that a Chapter 9 would be filed, I think the

21  record is replete with that evidence.

22      We have numerous emails dating back at least until March

23  of 2012 where Jones, Day and Miller, Buckfire are gratuitously

24  offering their services to the state, advising the state on

25  how to pass a new piece of legislation that would insure that

1 a Chapter 9 would be -- that the city would be able to file a

2 Chapter 9 without any push back from the citizens.  We know

3 that Jones, Day invested at least 1,000 hours on this project.

4      And we do have Mr. Dillon telling us that from time to

5 time other counsel and consultants may have provided pro bono

6 services and I can understand that.  However, what we don't

7 have, Your Honor, despite the numerous emails from the Jones,

8 Day attorneys, the law firm that the emergency manager was a

9 partner at, the law firm that the emergency manager continued

10 to provide communications between Mr. Baird, the Governor, and

11 himself, with his partners even after he was aware that he was

12 the preferred candidate, we have no email in the record from

13 any other consultants recommending a Chapter 9.

14      Mr. Dillon advised us that at this very same period in

15 time he was working with Steve Liedel from Dykema.  And we

16 also know that Miller, Canfield was advising the city.  We

17 have no emails, no information to suggest that any other

18 consultants were recommending that the city drive -- that the

19 state drive the city into this Chapter 9.

20      We know from Mr. Dillon that Mr. Buckfire is the

21 individual or the party that brought Jones, Day to the state.

22 We know from the email communications that Mr. Buckfire

23 provided Jones, Day with the interview questions, drafted the

24 RFP that Jones, Day would be responding to, and was hired

25 prior to Jones, Day's involvement so he had some influence

1 over the process.

2     We can conclude, Your Honor, that from day one of the

3 involvement of the -- the consultants, they have been

4 advocating for the filing of a Chapter 9.  It became a

5 foredrawn conclusion from the day they were retained as the

6 city's restructuring counsel and the Court should also take

7 into consideration that Mr. Buckfire and Mr. Dillon both

8 testified that at no point in time did anyone advise the city,

9 and it was the city who initially engaged Jones, Day, that

10 Jones, Day had been working with Miller, Buckfire and/or the

11 state in drafting the consent resolution.

12     So in conclusion, Your Honor, not only do we have an

13 authorization from the Governor based on an unconstitutional

14 law, we have no evidence that the emergency manager and his

15 consultants have met the burden of demonstrating that they

16 have been engaged in good faith negotiations intending -- and

17 that they were intending anything other than the filing of

18 this Chapter 9.

19     The Chapter 9, Your Honor, that the Jones, Day attorneys

20 communicated with the emergency manager was the Chapter 9 that

21 we, the Jones, Day personnel would like to see.  Thank you.

22         THE COURT:  Thank you.  We'll take a recess now

23 until 2:55, please.

24         THE CLERK:  All rise.  Court is in recess.

25     (Court in Recess at 2:37 p.m.; Resume at 2:55 p.m.)

1       THE CLERK:  Court is in session.  Please be seated.

2       THE COURT:  One second, please.  We have -- we have

3  determined that Exhibit 452 was not admitted into evidence

4  even under another number.  So in the circumstances, I will

5  strike from the slide show which has been marked for

6  identification purposes as Exhibit 873, the one slide that

7  does refer to 452.  Ms. Green, can you arrange for that,

8  please?

9       MS. GREEN:  Yes, Your Honor.

10      THE COURT:  All right.  Now let me ask counsel for

11  the city, with that slide stricken, do you have any objection

12  to the Court using during its deliberations, Ms. Green's slide

13  show?

14      MR. IRWIN:  No, Your Honor.

15      THE COURT:  All right.  Will you make that available

16  to the Court, please with that change.

17      MR. IRWIN:  There was 852 as well.  Would that --

18  would the same investigation be conducted with regard to that

19  exhibit?

20      THE COURT:  We have determined that that was not

21  admitted either.

22      MR. IRWIN:  Right.  So with -- could -- both of

23  those two slides then the city has no objection.

24      THE COURT:  That's right.  There was a slide on that

25  one too.

1          MS. GREEN:  If I may respond, Your Honor.  852 is a

2    duplicate of 845.  We just pulled some of the transcripts.

3    There is a reference to Exhibit 845, Ms. Brimer used it, Your

4    Honor.  I think this exhibit is in evidence.  I believe it's

5    845.  That was --

6          THE COURT:  You think 845 was admitted?

7          MS. GREEN:  I thought so.  It says it was already in

8    evidence as of the date of her line of questioning.  And

9    that's a duplicate --

10          THE COURT:  Is that on -- is that on the Court's

11    list?

12          MR. IRWIN:  It's not, Your Honor.  Just because Ms.

13    Brimer says and represents that it's in evidence does not mean

14    it's in evidence.  And 845 on our list again is consistent

15    with what counsel is saying, was in fact used, but it was

16    never offered and our objection was never heard.

17          MS. GREEN:  If I could continue.  The Judge -- or

18    Your Honor had asked that the retiree committee and the city

19    get together one weekend to come up with -- there were some

20    issues with all the different exhibits.

21          And my understanding was that there was a meeting over

22    the weekend in the courthouse and I was given a list of

23    exhibits marked at trial after that meeting.  My understanding

24    was that this was the agreed upon list of exhibits.

25          I spoke with Mr. Irwin over the break and he said that

1  that was not his understanding, however, many objecting

2  parties all believed that this was the list of exhibits marked

3  at trial.  And I checked every slide against what I believed

4  to be was the agreed upon --

5        THE COURT:  Well, but -- but the fact that there was

6  an agreement on what exhibits were marked with what numbers

7  doesn't mean that there was an agreement on their admission

8  into evidence.

9        MS. GREEN:  My understanding was that this was the

10  list agreed upon as used at trial, admitted into evidence.

11  But Mr. Irwin said that that is not the case.

12      There were several of us that were of that understanding,

13  that that's what the agreed upon list was supposed to be.  And

14  I also thought, and I have not looked yet through the record,

15  that the Bill Nowling timeline was used and admitted as a

16  party admission because it was Kevyn Orr's press secretary.  I

17  have not yet looked through the transcript, I just received

18  some of the transcripts.

19        THE COURT:  What exhibit is that?

20        MS. GREEN:  Well, it's a duplicate.  It's 452 and

21  there's also 831.  And it may be others.  It may be a UAW

22  exhibit as well because we all had a lot of the same exhibits.

23        THE COURT:  Well, if you can show me that any of

24  those was admitted, we're all set.  Otherwise we look for what

25  we look for.  As to what your understanding was, unless it's

1 on the record as an agreement, I -- I can't really give it

2 much weight. So, I'll ask you to submit the slide show of

3 your closing argument without the two slides that address

4 these -- these two exhibits which were not admitted into

5 evidence.

6         MS. GREEN: Okay. Thank you, Your Honor.

7         MR. IRWIN: Your Honor, may I briefly be -- be heard

8 on that? We -- we were in fact in Court, or one of the

9 lawyers from the Dentons firm was here that weekend. And we

10 were stuffing exhibit binders, updating the Court's collection

11 of exhibits to make sure those binders were accurate.

12     We have never exchanged a list of exhibits where there

13 was some agreement in terms of what is in evidence or not.

14 And I am not impugning Ms. Green's intent. Whether she relied

15 on that document that objectors have been circulating is not

16 my issue. I am simply making the observation that it is not

17 in evidence.

18         THE COURT: All right.

19         MR. IRWIN: And may I make a -- a related point,

20 Your Honor? And I'm not asking the Court to -- to rule on

21 this. I just want to correct something.

22     I understood Ms. Brimer to make the point with respect to

23 the -- the Howard Ryan deposition testimony. I think she said

24 it's in evidence and that is right. It is one of the

25 transcripts that we submitted. I think it was an agreement

1   between the state and Ms. Brimer to avoid the need for Mr.

2   Ryan to testify live.

3       We did make very limited objections to the testimony that

4   she has referred to and those have not been waived.  Again I'm

5   not asking the Court to rule on them, I just don't want there

6   to be any mistake in terms of what has been stipulated into

7   the record or not.

8           THE COURT:  Where do I find those objections?

9           MR. IRWIN:  They were in the pre-trial order.

10          THE COURT:  In the pre-trial order.

11          MR. IRWIN:  Yes.

12          THE COURT:  All right.  Thank you, I'll consider

13  that.  Okay, sir.

14          MR. CIANTRA:  Thank you and good afternoon, Your

15  Honor.  Thomas Ciantra, Cohen, Weiss, and Simon, LLP for the

16  International Union UAW.

17      Let me start, Your Honor, by thanking the Court for its

18  consideration and courtesy during the past few weeks of this

19  trial.  It has been most appreciated.

20      Begin, Your Honor, by noting the interest and role of the

21  UAW in these proceedings as Mr. Nicholson, the union's general

22  counsel testified.  The UAW represents a relatively small

23  number of employees of the City of Detroit.  It has obviously

24  taken an outside interest in these proceedings.

25          And as Mr. Nicholson testified, the union's President has

1    directed that -- that the union's resources and its expertise

2    in the restructuring area in particular, be brought to bear to

3    assist in and provide a catalyst for hopefully a consensual

4    resolution of a number of the issues that have been raised in

5    these proceedings and have been the subject of discussion and

6    concern up -- up to and -- up to the date of the filing and to

7    the present day.

8        And there are a couple of reasons for that, Your Honor.

9    The first is of course the obvious reason that Detroit is home

10   for the UAW and it has an obvious interest in the

11   revitalization and rebirth of -- of -- of the city.

12       The second interest is -- is also, I think, obvious.  And

13   that is in the protection of the rights of Detroit's active

14   and retired employees in their post-retirement benefits, in

15   their medical benefits that are obviously critical, and in

16   their pension benefits that are constitutionally protected

17   here in Michigan under Article 9, Section 24 of the

18   Constitution.

19       And it is those rights that the UAW is most vigorous in

20   seeking to have vindicated here.  Because they are at threat.

21   And with respect to that, and in response to observations by

22   the city, the city's apparent surprise that the UAW is

23   supporting the Flowers litigation to assert and protect the

24   rights of those -- of those retirees, we do not shy from and

25   indeed we rise to the challenge of defending the interests of

1 those retirees and employees in these -- in this extremely

2 critical area.

3      The record, we would submit of this trial, has

4 demonstrated that the approach of the present state

5 administration towards Detroit's fiscal crisis is based upon

6 it seems three elements.  One, is taking the position that

7 there will be no financial support by the state for the city's

8 reorganization.

9      The second is of course the use of the extraordinary

10 powers provided by PA436 to displace local elected leadership.

11      And the third component is through the working of the

12 emergency manager selected by the Governor under that law to

13 use Chapter 9 to vitiate the constitutional protection of

14 pension benefits so that in effect the financially vulnerable

15 retirees and employees of the city may be made to finance a

16 rather extensive restructuring plan that the emergency manager

17 has promulgated.  No one, I think, can deny that there is a

18 fiscal problem here.  No one can deny that there is a need for

19 reinvestment.  The question is, who is going to pay for that.

20      And as we have submitted, Your Honor, the option of

21 forcing the retirees to pay for that through a decision to

22 cease funding their pension benefits, is -- is a null set.  It

23 is inconsistent with the protections provided by the state

24 constitution and as we have argued is a legal matter.  The

25 Chapter 9 authorization is invalid for that reason alone.

1      The -- the trial evidence has made it clear obviously

2  that the Governor was well aware of the intent of the

3  emergency manager.  In the filing he was provided with a copy

4  of the June 14 creditors' proposal and was familiar with its

5  terms beforehand.

6      In short, we submit that the Governor and the state

7  cannot use bankruptcy to take away the pension benefits.  He

8  -- the state -- the state's executive leadership and its

9  legislature cannot change the Constitution.  Only the people

10 of the State of Michigan can do that.

11     The strategy that the city has -- the city acting through

12 the emergency manager has taken in this respect, was

13 foreshadowed quite extensively in the January 29th -- what's

14 been referred to the pitch book that the Jones, Day law firm

15 made in support of its candidacy to be hired as restructuring

16 counsel.

17     And if I could have Exhibit 600 which is I guess the --

18 the UAW's admission of that.  And if we could go to Page 57 of

19 that.  And there we see that the -- a discussion of the -- the

20 Chapter 9 process and the intent here.

21     Counsel notes, plans of adjustment address narrow range

22 of economic compromises.  That's what a plan of adjustment is.

23 It's an effort to compromise outstanding debt obligations.

24 And then it goes on to note that other fundamental changes

25 must occur outside of the plan context.

1       The -- the -- the -- the presentation goes on to note,

2   final bullet point, the city should take advantage of its

3   opportunity for long term comprehensive solutions.  And it

4   should do so by using the force of Chapter 9 to negotiate with

5   creditors.  It should use the tools of Chapter 9 to develop

6   and fund a large scale revitalization program.

7       THE COURT:  What does the language negotiating in

8   Chapter 9 or its shadow mean?

9       MR. CIANTRA:  It means that either you negotiate in

10  Chapter 9, or with the threat of it to try to extract

11  concessions from creditors that can -- that can fund something

12  that a large scale revitalization plan that goes beyond a

13  narrow adjustment of creditor relations.  That's what the city

14  is looking at.  That's what the city proposed --

15      THE COURT:  So are you being critical of the city

16  for its plan, or critical of Jones, Day for suggesting to the

17  city a plan to threaten Chapter 9 to negotiate retirement

18  benefit concessions?

19      MR. CIANTRA:  Yes, Your Honor.  Because the -- the

20  -- the pension benefits are protected by the Constitution,

21  they cannot be reduced.  That -- that should have been a third

22  rail in this -- in this process.

23      What they have done is used the Chapter 9 process, used

24  the threat of Chapter 9, to -- to put the pension benefits at

25  play --

1     THE COURT:  So it would have been impracticable for

2   the city to negotiate with retirees regarding pension

3   benefits?

4     MR. CIANTRA:  It -- it may have -- it may have been

5   difficult, Your Honor, and as -- as I -- I will go on to point

6   out, obviously with respect to the unions, the unions are not

7   in a position as a matter of law to negotiate for retirees.

8   That is clear.  That was clear to Jones, Day at the outset of

9   that process.

10     THE COURT:  Well, but apart from that, what I'm

11   hearing you say, is that it would not have been good faith for

12   the city to even attempt to negotiate with retirees directly

13   on -- on impairing their benefits.

14     MR. CIANTRA:  Yes, Your Honor, from the outset.

15   That was bad faith.  They should not have been looking to

16   reduce those accrued pension liabilities.  They should not

17   have been looking to use Chapter 9 as leverage for that.

18     THE COURT:  Or even the shadow of Chapter 9.

19     MR. CIANTRA:  Yes.  Or even the shadow of Chapter 9.

20   That's -- those were -- those are inviolate.

21     THE COURT:  And that's true even -- and that's true

22   even though Chapter 9 requires as a condition of eligibility,

23   good faith negotiations or its impracticability --

24   impracticability.

25     MR. CIANTRA:  And it requires that -- that the --

1  the filing be specifically authorized.  And we have maintained

2  as a matter of law --

3          THE COURT:  Well, but that -- that -- that's not my

4  question.

5          MR. CIANTRA:  That cannot happen --

6          THE COURT:  My question was, in order to file they

7  have to -- they have to either negotiate in good faith, or

8  show that that would have been impracticable.

9          MR. CIANTRA:  And what would have been --

10          THE COURT:  You say they could do neither one in

11  regard to this specific obligation because of the Michigan

12  Constitution.

13          MR. CIANTRA:  Correct, correct.  They could have

14  negotiated about a lot of things and -- and so we'll go on, I

15  think there -- there were openings for negotiations about for

16  example other post-employment benefits that were not taken up.

17  But the pensions -- the pensions were the third rail.

18          THE COURT:  So they could have negotiated regarding

19  health -- health benefits?

20          MR. CIANTRA:  Yes.  And -- and --

21          THE COURT:  Okay.

22          MR. CIANTRA:  Yes.  So as -- as the process

23  developed obviously the emergency manager was selected by the

24  emergency loan -- the emergency loan board which is comprised

25  of an appointee of the Governor, the Treasurer, and two of his

1  deputies.

2      The emergency manager's vision and chemistry according to

3  Mr. Baird, and this is from Exhibit 807 were obviously seen as

4  aligned with those of the state administration.  Obviously

5  during this process the Governor and Mr. Orr conferred very

6  frequently, both in formal meetings and in one on one

7  discussions.  And they had obviously multiple discussions

8  ahead of time with respect to the Detroit bankruptcy filing.

9      Throughout this process, however, the city and the state

10 have pretty consistently sought to limit access, limit public

11 access to those deliberations and to relevant information.

12 The city sought to limit access to its data room on the

13 execution of a -- a non-disclosure agreement.  The state

14 initially stated an aggressive position with respect to

15 executive privilege concerning its role in this process.

16 There is of course the common interest agreement that has been

17 the subject of litigation and repeated assertions of the

18 attorney/client privilege during these proceedings to shield

19 from -- from public scrutiny questions of the state support or

20 its willingness to support the restructuring as well as

21 discussions of the protection of the pension benefits.

22      The -- the -- as -- as I mentioned, the -- the -- the

23 Governor was well aware in advance of Mr. Orr's demand that

24 accrued pension benefits be cut in the proposal to creditors.

25 He was provided with drafts of that proposal to review.  And

1  in fact as shown in Exhibit 814, Treasurer Dillon had played a

2  fairly extensive role with respect to editing and revising the

3  very request for authorization for the filing that Mr. Orr

4  subsequently made.

5      So, the -- the -- the creditors' plan that was submitted,

6  this extensive and -- proposal, a hundred and some odd page

7  proposal, was not as I said, focused on a narrow range of

8  economic compromises with -- with creditors.  But it is

9  instead a -- a ten year comprehensive restructuring plan for

10  the city.

11      And it is as discussed on that -- in that pitch book.

12  And -- and -- and an effort to take advantage of the

13  opportunity for long term comprehensive solutions that is

14  presented by the finance -- by this financial crisis and by

15  this Chapter 9 filing.

16      Now the -- the -- the plan's details of course as we --

17  we heard, involved the spending of over one and a quarter

18  billion dollars over ten years in various reinvestment and

19  renewal projects.  And where is the money coming from for

20  that?  Well, that was -- came out pretty clearly in the

21  testimony of Mr. Moore.

22      The city has taken the position that it cannot

23  effectively raise taxes, that the share of revenue that is

24  received from the state is declining, and that as a

25  consequence, a substantial amount of that funding is going to

1  come from impairing the -- the city's existing debt, its bond

2  debt, and the -- its obligation to fund pension benefits and

3  other post-employment benefits.

4    The Governor has made clear and in fact I think that is

5  reflected in the -- the creditor proposal, that the city must

6  solve its own problems.  And that -- that state aid would not

7  be forthcoming with respect to the city's legacy obligations.

8        THE COURT:  And -- and what's the UAW's position on

9  where any pension underfunding liability should be paid from?

10       MR. CIANTRA:  Well, it -- it -- it remains to be

11  seen, Your Honor, frankly whether the -- whether the city has

12  claims against the state with respect to those obligations.

13       THE COURT:  Uh-huh.

14       MR. CIANTRA:  I think that is something that has to

15  be pursued.  It has to be investigated, it has to be

16  discussed.

17    So under the proposal, contributions to the retirement

18  plan would cease and as a result there would have to be cuts

19  unspecified in the proposal.

20       THE COURT:  Of course there's nothing about a

21  finding of eligibility that would preclude the city from that

22  investigation and/or litigation if appropriate, is there?

23       MR. CIANTRA:  That -- I suppose strictly speaking as

24  a matter of law, not.  But under the circumstances of how the

25  -- the city is -- is being run by an emergency manager --

1          THE COURT:  Uh-huh.

2          MR. CIANTRA:  I think there's -- there's a question

3     there.

4          THE COURT:  Uh-huh.

5          MR. CIANTRA:  A question of -- of interests of whose

6     interests are being served by that.

7          THE COURT:  Conflict of interest?

8          MR. CIANTRA:  Yeah.  So what --

9          THE COURT:  And any other source other than a claim

10    against the estate?

11         MR. CIANTRA:  I'm sorry, Your Honor, did not hear

12    that.

13         THE COURT:  Yeah, any other source for funding the

14    underfunded liability, pension liability, than a potential

15    claim against the State of Michigan?

16         MR. CIANTRA:  Well, presumably as has been

17    discussed, there are various assets that the city has that

18    could be monetized that -- that could be used to pay its

19    obligations.  But certainly a potential claim against the

20    state has to be something that has to be considered.

21         THE COURT:  Okay, thank you.

22         MR. CIANTRA:  Now with respect to the particular

23    proposal that was being made to creditors, the -- we would

24    submit that the position of retirees or employees with respect

25    to that is quite a bit different than the perspective or

1  position of bond holders or their insurers.

2     For the -- for the bond holders or the insurers, their

3  insurers, it's a cents on the dollar question.  It's how much

4  -- how much of that note is going to be theirs and how much of

5  their debt is that note going to cover.  That is what their

6  issue is, it is dollars and cents.  It's a -- it's a bean

7  cutting exercise for them.

8     For the employees it's quite a bit different.  For the

9  employees, it's a matter of unpacking a proposal that

10 discusses underfunding of the pensions, but does not in -- in

11 fact at the time could not translate into any meaningful

12 numbers in terms of what that would mean on a day to day basis

13 in terms of reduction of benefits.

14    It is as -- as -- as we submit, in effect a -- a -- a

15 plan to use in part the pension underfunding claims, to not

16 pay them, and to use those funds to -- to fund the

17 revitalization of the city under this plan.  And so what --

18 what are these pensions that are at issue?

19    As the Governor testified, he estimated --

20        THE COURT:  Let me -- let me ask you to pause there

21 and answer the city's assertion that its revitalization is

22 necessary for it to get back into a position where it doesn't

23 continue to underfund pension liabilities?

24        MR. CIANTRA:  Well, as I said at the outset, Your

25 Honor, you know, there is obviously a hole here.  It's a --

1 | it's a bankruptcy that's -- it's like doughnut there's always

2 | a hole, right. It has to be filled.

3 |       THE COURT: True.

4 |       MR. CIANTRA: Okay. The question is, where is it

5 | going to be filled? Who is going to be paying for it and

6 | where is it going to come from, all right.

7 |     And it's our position that the -- the pensions are a

8 | third rail, that's -- that's a piggy bank that they cannot

9 | touch. There are other sources that they have both with

10 | respect to their existing creditors and elsewhere that they

11 | can use.

12 |       THE COURT: For -- for revitalization --

13 |       MR. CIANTRA: Yes.

14 |       THE COURT: In addition to plugging this doughnut

15 | hole?

16 |       MR. CIANTRA: Right.

17 |       THE COURT: Okay.

18 |       MR. CIANTRA: The -- the position and -- and there

19 | was some testimony I think from -- from Mr. Buckfire with

20 | respect to this. That the -- the pensioners find themselves

21 | -- that the -- that the city is -- is -- is treating everyone

22 | the same. We're treating all unsecured creditors the same.

23 |     It -- frankly it ignores social reality. Obviously the

24 | bond -- bond holders are relatively sophisticated financial

25 | investors. They are paid for taking on risk. And that I

1   think is pretty well reflected in the interest rates that

2   you'll see at the back of the creditor proposal with respect

3   to the bond rates.  It's a market.

4       As the city's bond rating has fallen as Mr. Bennett

5   outlined in his -- in his opening, the rates that the city has

6   had to pay have -- have risen.  And investors have taken on

7   that risk knowingly.

8           THE COURT:  Well, but isn't this kind of equitable

9   argument, one that's more appropriately focused at plan

10  confirmation when and if cram down becomes necessary and the

11  issue is whether the plan is fair and equitable?

12          MR. CIANTRA:  I -- it certainly -- it certainly is

13  relevant there, Your Honor.  I also, however, think it's

14  relevant here in terms of the good faith of proposing a

15  proposal that treats these folks the same.

16          THE COURT:  Okay.

17          MR. CIANTRA:  Because as a practical matter, Ms.

18  Whitson who testified, or Mr. Taylor who testified, were not

19  in the same position as some bond holder who could diversify

20  these investments.  They're stuck.  And they don't have a

21  backstop.

22      This is not like a -- the airline case that Mr. Robbins

23  testified to where the Federal Government has provided an

24  insurance safety net for single employer defined benefit

25  pension plans.  There is no safety net to those benefits here.

1       And unlike -- unlike the bond holders.  As Mr. Buckfire

2   testified, a substantial number of those bond issues are

3   insured.  They are the -- they are the economic party that's

4   at risk.  Those insurers.  That's why he was negotiating with

5   them.

6       It's not a matter of having as a practical matter, to

7   negotiate with thousands of -- of little old ladies in

8   Pasadena, or thousands of mutual funds.  It's a matter of

9   dealing with the insurers who are taking on the economic risk

10  of default.

11      Let me turn to the -- the question of good faith in the

12  negotiations.  The city and the state we submit, created

13  conditions under which a consensual resolution became all but

14  impossible.  And we think the evidence supports the conclusion

15  that the reason for that is that the emergency manager had

16  determined that he wanted to obtain the tools that were

17  provided by Chapter 9 to -- to -- to push through the -- the

18  -- the plan of restructuring that is set out in the creditor

19  proposal.

20      You can't simply create circumstances that make a

21  consensual resolution impossible and then complain that you

22  didn't have a consensual resolution.  All right.  As Mr.

23  Buckfire testified, the June 14th creditor proposal was a

24  bombshell.  That's his word, not mine.

25      Indeed just days before the emergency manager had told --

1  spoken in a public meeting here and stated in response to a

2  retiree's direct question, that pension benefits were

3  sacrosanct.  Yet on the 14th obviously the proposal was quite a

4  bit different.

5      And there was a -- a -- an extensive, a -- a very

6  abbreviated rather, schedule for discussions that was set out

7  in that proposal.  And it's been discussed by -- by many and

8  I'm not going to go -- go through the details.  But the

9  obvious fact is that the -- the emergency manager set a

10  abbreviated period, a little over a month for discussions with

11  stakeholders to take place before an -- before his evaluation

12  period and then a -- an expected conclusion of this process on

13  the -- the 19th of July.

14      So despite the fact that obviously as the testimony was,

15  that months of work went into the production of the financial

16  reports and the creditor proposal, the discussion period was

17  very short indeed.  And there were very few meetings that were

18  held to -- where that proposal could be discussed and

19  digested, much less actually negotiated.

20      That has been the subject of much discussion previously

21  in Ms. Green's timeline with respect to those meetings and the

22  conditions under which they were taken -- had taken place.  I

23  think they are well known to the Court and I'm not going to --

24  to dwell on them here.

25      But the fact that the emergency manager did not attend

1  all the meetings and did not send anyone who could actually

2  negotiate an agreement is, I think, telling.  Now the city

3  contends well, it wasn't any big deal, someone could have gone

4  back to the emergency manager and relayed whatever proposal

5  might have been made and -- and there could have been further

6  discussions and progress could have been made.

7      But the fact of the matter is that of course the city was

8  -- and the emergency manager were insisting on a highly

9  abbreviated time schedule.  So if you want work to get done on

10  that type of a schedule, it's important to send people to

11  meetings who can actually get work done rather than just carry

12  information back to home base as it were.

13      There were -- the -- the -- the process of discussion

14  limited by information issues as was previously noted and as

15  seen on Exhibit 814, the city even acknowledged to my client,

16  the UAW, that it needed time and information to review the

17  proposal.  That was on June 27th.  That's already almost two

18  weeks into this process.  As noted the city conditioned access

19  to the data room on -- on the execution of a non-disclosure

20  agreement which we believe it improper given the -- the public

21  nature of what's at issue here.  And even the Treasurer, Mr.

22  Dillon, in his email of July 9th, that's Exhibit 834, noted

23  that in many ways we were still in the "informational" stage.

24      So there are a lot of obstacles that existed to getting a

25  consensual agreement done here.  The time frame, and the

1  information issues being two notable -- two notable issues.

2      The city also in this connection did not address the

3  legitimate concerns that the unions raised with respect to

4  their ability to negotiate at least with respect to the

5  pension obligations.  The basis of that concern really was

6  obvious as Mr. Nicholson and Ms. Gurewitz testified.  Just as

7  a matter of pretty simply labor law, unions collective

8  bargaining responsibilities extend to units of active

9  employees.  The city was well aware of that.

10     And -- and the UAW demanded that the city provide the

11  basis for its contention that the union could lawfully

12  negotiate over those benefits, especially given their

13  constitutional protection.  That -- that's in Exhibit 624, the

14  affidavit that Mr. Nicholson presented in the Flowers case in

15  Exhibit B.

16     Yet the city provided no response.  It provided no -- no

17  explanation of its contention that it could legitimately seek

18  to have the unions negotiate over those benefits.  And of

19  course it -- it never modified its proposal.  Indeed Mr. Orr

20  testified that he probably -- "probably would not have

21  accepted a counter proposal that left pension benefits intact

22  in any event".

23     When Mr. Dillon testified the other day, he noted that in

24  his view the OPEB liability was more of a concern.  That it

25  was at least as I have his testimony, the big challenge.  Why?

1  Because it was not funded at all.

2      And if we recall the -- the chart that counsel for the

3  city showed of the outstanding unsecured claims, obviously

4  that OPEB number is -- is bigger even than the pension

5  underfunding number that the -- that the city had claimed. All

6  right.

7      Mr. Nicholson testified that on the 11th of July, the

8  meeting attended by city representatives, that he spoke with

9  Evan Miller of Jones, Day.  Mr. Miller is one of the leading

10 bankruptcy practitioners in the United States, a benefits

11 practitioners in the United States.  A person of substantial

12 knowledge in this area.

13     And as Mr. Nicholson testified, he told Mr. Miller,

14 there's a way, you know, that we can get at solving the OPEB

15 issue.  And as Mr. Nicholson testified, Mr. Miller answered --

16 finished his sentence, yeah.  He said the class action method.

17     As Mr. Nicholson testified, that was the way or has been

18 the -- the tool that has been used by UAW and another -- a

19 number of other unions to reach comprises over retiree health

20 obligations in different circumstances.  And it provided

21 frankly a framework for negotiation of that issue that could

22 work to a conclusion, that could get you to a conclusion.

23     As Mr. Nicholson testified, the first step in any

24 negotiation is to invite the -- the other side to participate

25 in a process that can be expected to lead to a resolution.

1  That's what he was doing with Mr. Miller.

2      The city didn't take him up on that.  And in fact the

3  Treasurer, Mr. Dillon, in Exhibit 626, just -- just a couple

4  days before Mr. Nicholson's meeting with Mr. Miller, he

5  acknowledges that that structure coming up with a class action

6  as a way to deal with retiree benefit obligations, is an -- an

7  option.  And it appears at point ten, I think it's the next

8  page if you -- if you would of that exhibit.

9      All right.  I knew that was too fancy for me, Your Honor.

10  Let me -- I can just talk about the exhibit the old fashioned

11  way.  He acknowledged --

12          THE COURT:  Mr. Wertheimer seems to have it for you,

13  sir.

14          MR. CIANTRA:  Well, I -- no, I have the document.

15          MR. WERTHEIMER:  Okay.

16          THE COURT:  What does it say?

17          MR. CIANTRA:  He says well, I'll just read it.  It's

18  point -- it's point ten and he's talking about the -- the

19  draft letter to -- that Mr. Orr has circulated requesting

20  authorization.

21          THE COURT:  Uh-huh.

22          MR. CIANTRA:  He says, I don't think we are making

23  the case why we are giving up so soon to reach an out of Court

24  settlement.  Looks premeditated.

25      I think we need to -- need to say facts got worse as we

1 | dug into the numbers and I believe there is a State Court

2 | option to get retirees into a class. We don't acknowledge

3 | that. And why is that impractical? Then he goes on, we don't

4 | say they even rejected the --

5 |         THE COURT: Uh-huh.

6 |         MR. CIANTRA: -- city's proposal, et cetera.

7 | Mr. Dillon was aware of that option. Jones, Day lawyers

8 | were certainly aware of that option. Mr. Miller finished Mr.

9 | Nicholson's sentence. That was a structure that would have

10 | provided a way to get to an agreement on that issue. And an

11 | issue that obviously was a -- a $5,000,000,000 issue, at least

12 | as reflected in the -- the city's proposal.

13 | As Mr. Nicholson said, you need to create as a first step

14 | in a negotiation, an understanding, the other side, as to what

15 | the process is that's going to be followed and an agreement

16 | that that process is something that's going to lead to a

17 | resolution.

18 | Contrast this in fact with the process that the city

19 | asked parties to undertake with respect to negotiation of the

20 | pension issue, all right. The city through the cross

21 | examination of Mr. Robbins just the other day, indicated

22 | essentially that it was following that same approach. It

23 | wanted to get Mr. Robbins to agree to a process for

24 | discussion.

25 | And its -- and its proposed construct was well, we start

1    by getting the actuaries for both sides, for all these parties

2    to agree on what the underfunding number actually is.  Then we

3    get financial advisors to agree on how much the city can pay

4    and then we go from there.  We figure out what can we pay for,

5    what can be afforded, what cannot.

6        And there was discussion between Mr. Robbins and -- and

7    counsel for the city because Mr. Robbins thought gee, step two

8    should be what -- what we focus on first rather than getting

9    the actuaries involved.  But the same idea.  Here's a process,

10   here's how you begin to constructively deal with that issue.

11       But here with respect to the pension issue, all right,

12   the city was at no point in this process able to get to step

13   one because its actuaries had not finished the work.  So there

14   -- there was no way to undertake that process here, all right.

15       You know, as Mr. Dillon said in -- in the email that I

16   quoted from before, Exhibit 434, we remain in many ways at the

17   informational stage with respect to the pensions.  And as the

18   deposition excerpts from Mr. Moore, I think made quite clear,

19   this is at really page -- Pages 149 through 151.  The city's

20   actuaries hadn't completed their work.

21       They didn't know what the underfunding number was.  And

22   so again, how -- how even under the city's construct for --

23   for these negotiations to take place, could you have had it

24   meaningfully take place.

25       We'd submit that for those reasons there was no -- there

1 was no good faith negotiation here.  It was impossible.  The

2 city created the impossibility that it's complaining of.

3      Now were they impractical?  Well, I don't -- I don't

4 believe so.  The Detroit financial crisis was well known for a

5 period of years.  There is no reason why these issues could

6 not have been addressed beforehand to have permitted the type

7 of -- these type of processes that Mr. Nicholson talked about

8 and that Mr. Robbins talked about to -- to take place.

9      And indeed here the -- the unions had -- had a history of

10 coalition bargaining over concessions.  There was a lot of

11 testimony with respect to the 2011, late 2011 early 2012

12 concessionary agreement that was negotiated by a coalition of

13 30 -- 30 labor organizations including the UAW Locals.  There

14 is the possibility as I mentioned of a potential class action

15 resolution with respect to the OPEB issues.  And as we

16 discussed, obviously the -- the city could have -- could well

17 have undertaken negotiation with the bond holders who -- who

18 hold the fundamental economic interest here as -- as Mr.

19 Buckfire testified substantially all of the bond -- bond

20 holders were insured by -- by one of six insurance companies

21 that are identified in the -- in the June 14th proposal.

22      They obviously hold the economic interest.  They

23 obviously were the parties, the discreet parties to negotiate

24 with.

25      The -- the Governor as we said, knew that the emergency

1  manager intended to impair pensions as part of any Chapter 9

2  filing.  And he also knew that under PA436 he could have

3  conditioned his approval of that on protection of those

4  constitutionally protected benefits.  And in fact his counsel

5  advised him to place conditions on the filing.  And

6  specifically identified potential conditions with respect to

7  anything having to do with vested pension benefits.  That's in

8  Exhibit 625.

9      But the Governor rejected that advice and he in effect

10  turned that issue over to this Court.  He did not consider the

11  requirements of state law in authorizing the filing.  And he

12  left it to the Federal Bankruptcy Court to sort out whether

13  those accrued pension obligations could be reduced.

14      And we submit, Your Honor, that that is not appropriate

15  authorization under the statute.  The Governor's statement in

16  his July 18th letter that the plan of adjustment must be

17  legally executable under Section 943(b)(4), was insufficient

18  because of course the Governor knew that the emergency manager

19  was pursuing the pension proposal as part of the -- of the

20  filing.

21      And 943(b)(4) which applies to confirmation of the plan

22  of adjustment does not provide the requisite gatekeeping

23  authorization that is required, we submit, under 109(c)(2).

24  Effectively an evasion of responsibility with respect to the

25  obligation to support the Michigan State Constitution

1      Finally, Your Honor, I just want to reiterate where I

2  started.  And that is that the UAW is committed to playing a

3  constructive role here, no matter what the result is in this

4  -- on this issue.  And it is fully prepared to bring to bear

5  the restructuring expertise that it has developed in the

6  assistance of this Court and to hopefully serve as a catalyst

7  for consensual resolution.  Thank you.

8          THE COURT:  Thank you, sir.  Before we continue,

9  let's do a -- a head count of how many more final closing

10  arguments we have.  One, two, three, four.  We're running over

11  time here, so I'm going to ask you to keep them as concise as

12  possible because we also have rebuttal arguments.

13          MR. WERTHEIMER:  William Wertheimer, Your Honor, on

14  behalf of the Flowers plaintiffs and I will keep it brief.

15  And particularly not -- try not to repeat anything that

16  counsel for the UAW just said, either directly or indirectly.

17      But -- but one point I think does need to be made and

18  that is from the beginning the position of the Flowers

19  plaintiffs has been that the Governor and the Treasurer were

20  attempting to use Chapter 9 to avoid the requirements of

21  Article 9, Section 24.

22      And that that legally constituted a tort.  And that that

23  made their -- that -- that impacted on the eligibility issue

24  under 109(c)(2).  Simply put, and consistent with what counsel

25  for the UAW said, and in contra distinction to what was said

1  by the Attorney General, the tort claim is that the Governor

2  has allowed his political position to influence his legal

3  position.  And has done that from the beginning.  And that

4  that constitutes a tort.

5      We're not saying that the Governor did anything evil,

6  we're not saying that the Governor conspired with Treasurer

7  Dillon.  What we are saying is, that from the beginning, the

8  Governor has taken the position that his political position

9  has been no financial support from the state.  And that has

10  driven everything that has happened here.

11      I'll just go over briefly the points that the state made

12  this morning relative to those -- that claim.  The state made

13  five points.  The first had to do with referendum and Ms.

14  Brimer dealt with that, I won't speak to it at all.

15      The second had to do with the allegation that there was a

16  bad faith rush to file.  I won't repeat anything that's been

17  put up on the board.  I think we all kind of know what

18  happened when.  I would just add two things relative to that

19  rush to file.

20      One, not only is it clear that the move from the 19th to

21  the 18th was because we were in Court on the 18th, it's also

22  clear that scheduling the bankruptcy for the 19th was done

23  because we filed on the 3rd and had a hearing scheduled for the

24  following Monday.  There is all kinds of evidence to support

25  that.

1        Second point, there is no --

2            THE COURT:  Let me ask you to pause there.

3            MR. WERTHEIMER:  Yes.

4            THE COURT:  I think in my experience it's fair to

5    say that many many bankruptcy filings, maybe even most

6    bankruptcy filings are precipitated by creditor action.  And

7    so even if this one was, why is that evidence of bad faith?

8            MR. WERTHEIMER:  Because this is different, Your

9    Honor.  I made that point before and I recognize it as being

10   true.

11       This is a Governor who is taking action when he's taking

12   action in order to avoid a State Court Judge coming out with a

13   decision which will require him to do something that he

14   doesn't want to do.  We now know --

15           THE COURT:  Well, why is that different than every

16   other bankruptcy?  I mean people file Chapter 13 to --

17           MR. WERTHEIMER:  Because the Governor took an

18   oath --

19           THE COURT:  Because they don't want their --

20           MR. WERTHEIMER:  I'm sorry.

21           THE COURT:  -- homes foreclosed, or they don't want

22   their cars repossessed, or -- or they file Chapter 7 because

23   they're tired of the phone calls, all of which are perfectly

24   legal actions by those creditors to be taking regarding debts

25   that -- that debtors promised to repay.

1          MR. WERTHEIMER:  We think it is different when it is

2     a Governor rushing to Court in order to avoid a State Court

3     decision that he believes will be politically damaging to him

4     and will make it more difficult for him to maintain his

5     political position that -- that there should be no financial

6     support from the state and that this bankruptcy should go

7     forward without condition.

8          THE COURT:  Okay.

9          MR. WERTHEIMER:  We think it's qualitatively

10    different.

11         Let me move on to the third point that the state made.

12    And that had to do with our claim that -- that the Governor at

13    a minimum had an obligation to put contingencies on.  What do

14    we know now we didn't know at the start of this case relative

15    to that?

16         We know that all of the Governor's advisors agreed with

17    us.  Because we now have the document that was being withheld

18    based on the attorney/client privilege.

19         The fourth point they made, or the AG made this morning,

20    was to characterize what we're claiming is -- is some kind of

21    a -- essentially they're saying, we're claiming that this is

22    some kind of scheme to end run 924 to save three and a half

23    billion dollars when there's $18,000,000,000 at stake, that

24    doesn't make any sense.  That's not what we're claiming.

25         We're not suggesting that the Governor started the whole

1  process.  We're not suggesting that the Governor is not in

2  good faith generally in attempting to deal with the Detroit

3  problem.  We've never claimed that.  That's just a false

4  issue.

5      All we have claimed is that as to 924 and that pension

6  obligation, the Governor -- Governor from day one has acted in

7  his own interests and not in the interests of the citizens of

8  the State of Michigan, pure and simple.

9      The fifth point they make is that they try to

10  characterize what we're claiming as some sort of crazy

11  conspiracy among Jones, Day, Miller, Buckfire, the state, the

12  city.  No.  It's very simple.  And it goes back to what we

13  claim the Governor has been doing from the beginning.

14      And if we take a look just at a couple of documents which

15  haven't been referenced at different points in time, if you go

16  to June of 2012, document 844, you have Heather Lennox of

17  Jones, Day saying I'm going with Ken Buckfire, Miller,

18  Buckfire, to talk to the Governor Richard Snyder in Michigan

19  tomorrow.

20      And what's the attachment that she's bringing with her

21  per somebody's request?  Among others, a memo on Michigan

22  constitutional pension plan protections.  Everybody in this

23  courtroom knows what that memo said.

24      That's June of 2012, Jones, Day is providing pro bono,

25  it's too late in the day for me to make a joke about that, but

1   pro bono work to the -- to the State of Michigan at this point

2   and that's what they're doing in June of 2012.

3       Now move forward to February of 2013, this year.  Richard

4   Baird, Exhibit 810.  He's communicating with Kevyn Orr.  And

5   he says, that clearly establishes that you are already

6   behaving as an agent of the state.

7       That's not a slip of the tongue.  That's part of the

8   whole game plan.  Orr is from Jones, Day, Jones, Day has been

9   on board from the beginning.  Even little pieces, and I'll

10  stop with this, Judge, in terms of these other exhibits.  Even

11  little pieces, in the opening briefs I think both AFSCME and

12  the UAW talked about a Jones, Day partner's article that was

13  circulating in the bankruptcy world that I knew nothing about

14  at that point relative to how municipalities and states could

15  get out from under pension obligations.

16      And the claim was made by the UAW, by AFSCME, by others

17  ah, ha.  Well, there's an exhibit in evidence in which Kevyn

18  Orr is provided with a copy of that as part of this whole

19  process.  It all fits.  It is what happened.  This totally

20  innocent explanation is not consistent with reality.

21      And then finally let me bring you to just about two or

22  three weeks ago.  We're all in Court and the Court asked Mr.

23  Bennett a question relative to -- and I don't want to

24  characterize it because I'm not sure exactly what it was, but

25  something that brought at issue whether the city was going to

1   be making a claim against the state.  Something similar to

2   what counsel for the UAW was talking about just a few minutes

3   ago.

4       If you will recall, Mr. Bennett did not answer the

5   Court's question as to his client, the city.  He said, he gave

6   you Jones, Day's opinion.  And guess what?  Jones, Day's

7   opinion is, the state isn't liable.  There's a serious

8   conflict related to that, an obvious conflict.

9       The AG concluded by saying that the Governor had

10  expressed leadership and made a hard decision.  He has done

11  exactly the opposite.

12      He has made no decision.  He hasn't even made a decision

13  under state law.  He hasn't said -- at least the Attorney

14  General, Mr. Schuette or Attorney General Schuette has taken a

15  legal position -- taken a position, not Governor Snyder.

16      Why?  Because it's not in his political interest to do

17  so.  And therefore he says, I have no position, I defer to Mr.

18  Orr, and I know what he's going to do.  He's going to take it

19  to Bankruptcy Court and it's going to be trumped and guess

20  what?  You then can make the decision instead of the Governor

21  of the State of Michigan.  That's not right.  Thank you.

22          THE COURT:  Thank you, sir.

23          MS. PATEK:  Good afternoon, Your Honor.  Barbara

24  Patek on behalf of the Detroit Public Safety Unions.

25          I want to start with one brief housekeeping matter given

1  this issue that's come up about the exhibits.  I'm not going

2  to put any exhibits up, but I do have my timeline and I have

3  in that I moved for the admission of both 714 and 717

4  yesterday based upon Mr. Malhotra's identification of the

5  city's.  And I thought they were both admitted.  They're not

6  on the -- on the list, only 717 is.

7      So I'm going to proceed as if it's only 717, the point if

8  there's one concessionary agreement.  And the record will bear

9  out, you know, as to whether they're both in.

10     With that, may I ask if you can put up -- and we will

11  mark this as -- as 723 and provide the Court with a -- with a

12  hard copy as well.

13         THE COURT:  Is this different from the timeline you

14  used in your opening?

15         MS. PATEK:  It is very similar.  We've just filled

16  in some of the --

17         THE COURT:  Okay.

18         MS. PATEK:  -- evidence.  And there's a couple

19  additional facts.  And -- and for the Court's convenience,

20  what's in blue is what's added.  So that you can easily see

21  what's --

22         THE COURT:  Oh, okay.  Thank you.  723 you say?

23         MS. PATEK:  Yes.  As the Court is aware, you know,

24  at the time of the first day hearings, the Detroit Public

25  Safety Unions did come into the Court supporting the city's

1  request for the benefit of the automatic and the extension of

2  the automatic stay.  In fact attempting as they have tried to

3  be for the last several years, a willing partner in the city's

4  effort to restructure itself.

5      However, at that time we reserved our rights on

6  eligibility and -- and we're here today to address that issue.

7  And I want to start with the debtor that the Court raised with

8  -- I'm trying to remember who it was now, but you asked a

9  question about why would the Governor have done that, what

10  would have been his purpose in sort of delaying and let the

11  city continue to deteriorate.

12      And I'm going to try to propose an answer to that

13  question.  And -- and --

14          THE COURT:  I put Ms. Levine on -- Levine on the

15  spot.

16          MS. PATEK:  -- so I don't know if this bails her out

17  or not, but I'm going to take -- take a stab at it.  First of

18  all, it goes without saying that we're in Chapter 9 so

19  inherently people get here one way or the other through

20  politicians.

21      Second, I think that there is a -- a very human instinct

22  to try to control the process and whether it's Governor

23  Snyder, or Treasurer Dillon, or the emergency manager, or

24  Mayor Bing, when you are in a position of having public

25  responsibility, the instinct is always to control the process

1  so that it comes out consistent with your view of what the

2  public interest is.

3      Which brings me to my first point which is, first of all,

4  I think the constitutional issues hovering above us here

5  today, again it shows the -- the wisdom of the checks and

6  balances built into our federal system and the states' rights

7  and the  -- and the Federal Government's rights.

8      But the second, it also shows the wisdom and perhaps the

9  constitutional necessity of Section 109 and in particular

10  109(c) which provides a number of transparent and consensual

11  ways for people to attempt to work out their -- the adjustment

12  issues outside of Chapter 9.

13      I -- I have a couple of points to make and I will try to

14  be quick and -- and go through my timeline here.  And they are

15  as follows.

16      First, the active members of the Detroit Public Safety

17  Unions are both the providers as we've heard many times and

18  from many witnesses in this Court, of the indispensable

19  essential fire and police services that are necessary for the

20  city to continue on.  And they are also holders of a

21  potentially significant portion of what the city claims is a

22  3.5 billion dollar underfunded pension liability.

23      We believe that the 35 day window that the city gave is

24  inadequate.  I will also show based on our timeline, that it's

25  undisputed that not only did the city choose not to negotiate

1  with this important stakeholder as its condition was

2  deteriorating, but it used every tool in its legal and

3  political tool kit to in fact prevent such negotiations.

4      Treasurer Dillon told us yesterday that there were a lot

5  of creative ways that these problems could be solved and I

6  will talk about those in a few moments.  But I will say that

7  we believe that in order to solve this problem, and knowing

8  what it knew, and obviously doing the careful planning that it

9  was doing, that the city had an obligation to begin

10 negotiations much much sooner.

11     Why didn't they?  I'm not certain.  Part of it may be

12 that this -- that this is a political process.  Part of it is

13 perhaps there was a perceived mistrust in the case of labor

14 with their negotiating partner.

15     But I'm going to suggest to the Court that they passed up

16 an opportunity to begin to solve a significant portion of the

17 -- this process in the very way that I suggested to the Court

18 when we came here on the first day of the trial, that made it

19 inevitable that they would be able to come before the Court

20 and tell it that it was impractical for -- for this problem to

21 be solved outside of bankruptcy.

22     When on June 14th the city at that first meeting of

23 creditors outside of bankruptcy dropped the claimed 3.5

24 billion dollar elephant on the active employees, the retirees,

25 and the pension systems, and -- and gave it 35 days to sort of

1  swallow it whole or else, I think they -- they set any

2  possible negotiations up for failure.

3      And with respect to the active public safety unions, I

4  want to go back on my timeline to the negotiation of the

5  concessionary agreements in December of 2011 and January of

6  2012 when by which time it was clear that there were serious

7  financial issues in the City of Detroit.  Those exhibits were

8  negotiated.  Mr. Malhotra indicates he was there when they

9  were negotiated.  Ms. Gurewitz talked about the negotiation of

10  the agreements in advising her clients.

11      And the state elected not to have those agreements become

12  effective.  And the -- and the reasons were several fold, but

13  I -- I believe one of the suggestions was that they wanted to

14  maintain flexibility.  That is if they extended the length of

15  the -- the collective bargaining agreements it would somehow

16  restrict their ability to restructure.

17      I'm going to suggest to the Court given what Public Act 4

18  said, given what Public Act 436 says, and given Section 365

19  and the tools available in Chapter 9, if that became an

20  inevitability that that is a false construct.  There were

21  tools that allowed them to modify and/or reject those

22  agreements and for them to suggest and leave savings on the

23  table so that they could proceed in a certain way, I -- I -- I

24  think is some early evidence of a potential lack of good faith

25  negotiations in this case.

1       I then want to fast forward into the time period before

2   the emergency manager took --

3               THE COURT:  Before you change slides --

4               MS. PATEK:  Yes.

5               THE COURT:  If you were about to, our notes do show

6   that Exhibit 714 was not admitted.

7               MS. PATEK:  Correct.  That's the one I mentioned

8   when we first started as the housekeeping matter.  So I --

9   I --

10              THE COURT:  But I just want to --

11              MS. PATEK:  -- it's perfectly possible that I

12  misspoke and my notes are incorrect and I'm -- I'm not going

13  to put it up.

14              THE COURT:  I want to confirm that for you.  So I

15  will have to ask you to change that slide before you submit it

16  to the Court.

17              MS. PATEK:  We -- we will.  With respect to March

18  25th, that's the date, and Mr. Diaz testified about this, Mr.

19  Dillon testified about his efforts to prevent any Act 312

20  awards from being issued.  The award itself is in evidence

21  pursuant to the agreement reached with Jones, Day that we're

22  looking at the contractual terms, not any comments made by the

23  arbitrator unrelated to that.

24      That agreement was reached on March 25th.  And that's also

25  the day that Kevyn Orr assumed the role of the emergency

1 financial manager under former Act -- Public Act 72.

2     As Mr. Dillon conceded when he was on the witness stand

3 yesterday, that timing eliminated the city's right to elect

4 the neutral evaluation process, or the negotiated solution

5 that is provided for under Public Act 436 by instead

6 triggering the provision that would make Mr. Orr automatically

7 the emergency manager of the City of Detroit when Public Act

8 436 became effective a few days later.

9     I would suggest given the careful planning that -- that

10 has been demonstrated through the evidence that the Court has

11 seen, that -- that that timing was not an accident.

12     I want to go now to the next slide.  And the next date we

13 have is that effective date of Public Act 436, March 28th.

14 Both Mr. Diaz, the President of the Detroit Police Officers

15 Association, and Ms. Gurewitz told the Court that as of that

16 date all negotiations with the Public Safety Unions ceased.

17     And in fact Ms. Gurewitz testified that her clients, the

18 Command Officers Association in fact had Act 312 hearings

19 scheduled but put them off because the city was negotiating in

20 what she believed were productive negotiations.  I will leave

21 it to the Court to decide whether or not that was again

22 perhaps some lack of good faith in terms of trying to get to a

23 certain time period where they could suspend their obligation

24 to negotiate.

25     Very shortly thereafter the -- in fact about two and a

1  half weeks later, the city filed its emergency motion seeking

2  to dismiss the pending Act 312 proceedings for two of the

3  public safety unions, the Command Officers Association, and

4  the Police Lieutenants and Sergeants Association.  That the

5  opinion upholding that dismissal and the dissenting opinion

6  are Exhibit 718, which is in evidence.  Ms. Gurewitz testified

7  about that.  And that opinion came down on June 14th, the very

8  same day that the meeting of creditors took place at the

9  airport.

10      I don't want to go over what happened at the individual

11  creditor's meetings, but instead I want to focus on the Public

12  Safety Unions, so if we can go ahead to the next slide.

13      My June 25th date in fact by virtue of some agreements, we

14  don't have that evidence, but I think that June 30th covers it.

15  We had reached some stipulations with the city to shorten our

16  proofs.  That the existing -- is collective bargaining

17  agreements between the city and the DFFA and the city and the

18  Lieutenants and Sergeants expired.  As Ms. Gurewitz testified

19  the command officers have not had a collective bargaining

20  agreement since 2010 and were in fact essentially at will

21  employees at that time.

22      The very next day Chief Craig assumed his job as Detroit

23  Police Chief.  And I think on the issue of whether or not the

24  Detroit Public Safety Unions, and we don't have specific

25  evidence on the -- the fire fighters here, but I think that --

1  that the evidence on the police unions is -- is sufficient to

2  cover the waterfront here.

3      Every witness who was asked testified that the Detroit

4  Police Officers Association, the various bargaining units,

5  first of all, that -- that the membership were under paid.

6  That their working conditions were deplorable.  And

7  nevertheless Chief Craig testified that the Detroit Police

8  Officers Association and the other bargaining units had in

9  fact reached out to him and that there were negotiations.  And

10  there was a lot of flexibility demonstrated.

11      And in fact in terms of issues on the restructuring that

12  did not involve dollars going into the pockets of these

13  Detroit Public Safety Union members, they were working

14  diligently in the restructuring and as we heard from Mr. Diaz

15  yesterday, even before Chief Craig came on board, the Detroit

16  Police Officers Association was reaching out to him to try to

17  find out what they -- they could do.

18      So to suggest that the city did not have a willing

19  partner here, I think, and to suggest that it did not have an

20  opportunity, particularly with, and I believe it was Mr.

21  Buckfire who -- who I -- I questioned about this, where they

22  had these collective bargaining agreements that were expiring,

23  to try to obtain some concessions.

24      There are creative ways perhaps without impairing

25  existing vested pension benefits, to try to begin to solve

1  this puzzle so that people wouldn't on June 14th be faced with

2  having to swallow the elephant whole.  And in that regard as I

3  think the Court has heard, the active Detroit Public Safety

4  Unions have the folks who are out there working in the street

5  who have accruing, but not vested and therefore not

6  constitutionally protected pension benefits.  They have

7  members who have vested and constitutionally protected accrued

8  pension benefits.  And there are those who have dropped.  That

9  is who are actually receiving what amounts to a pension

10 payment into a separate account that they'll -- they can't

11 touch until they get to retirement.

12     For -- for whatever reason the city elected not to engage

13 these folks, and if we can go now to the next slide.  We have,

14 and I don't want to belabor this because I know this has been

15 up a number of times.  But there was the letter that was sent

16 on July 12th and I think we can all agree by now that -- that

17 -- that July 12th was likely too late given what the rest of

18 the evidence shows.

19     But the four public safety unions got together and the

20 Court heard Ms. Gurewitz testify yesterday that she was part

21 of advising them in terms of obtaining bankruptcy counsel, in

22 terms of trying to form a coalition.  And sent a letter

23 together to -- to the city asking and indicating a desire to

24 make a counter proposal, to -- asking for some more concrete

25 information.

1    And the response by the city was a letter dated July 17th,

2   after Mr. Orr had sought his authorization to file, and only a

3   day before the bankruptcy petition was filed, thanking them

4   for their strong cooperation in the city's restructuring

5   efforts.

6    I would suggest to the Court on the issues of -- of good

7   faith and impracticability that here the city for whatever

8   reason passed up an opportunity to begin to address this

9   problem in a constructive way, more than a year before the --

10  the June 14th meeting of creditors.  Actively refused to engage

11  one of its most important partners in the restructuring.  And

12  instead rather than treating them as I think somebody in my

13  office suggested, you know, we're like the landlord.  They

14  really need us and -- and -- and should be engaging us.

15    They -- they were treated like general unsecured debt and

16  were repeatedly told, we don't have to negotiate with you and

17  we don't have to bargain with you.  And I think that -- that

18  timeline and that series of events together with the other

19  legal questions that have to be resolved, should help inform

20  this Court's decision as to whether or not the city in fact

21  engaged in good faith negotiations or has successfully shown

22  impracticability when they had opportunity when it was clearly

23  not impractical to engage certainly one of -- certainly the

24  Public Safety Unions and probably the other unions based upon

25  what we've heard as well in bargaining that could have begun

1   to solve the -- the problem that we're now all facing in the

2   Court today.  Thank you.

3           THE COURT:  Thank you.

4           MR. IRWIN:  Your Honor, briefly.  The city would

5   simply request a copy of -- of the timeline with -- with the

6   removal of the reference to Exhibit 714.  The city has no

7   objection.

8       There's one other correction that the city would request,

9   however, on the -- on the second page of the timeline there

10  was a reference to an Exhibit 869.  I think it's just an

11  administrative problem.  869 is not in the record.  It's an

12  email and I believe it was -- it was in reference to a -- a

13  Kevin Orr video clip that just needs to be fixed.

14          MS. PATEK:  Okay.

15          MR. IRWIN:  So it's just a question of fixing the

16  reference to 869.

17          THE COURT:  I'll ask the two of you to work on that

18  and -- and then provide a copy to city's counsel and the

19  Court, please.

20          MR. IRWIN:  Thank you, Your Honor.

21          THE COURT:  Sir.

22          MR. PLECHA:  Good afternoon, Your Honor.  Ryan

23  Plecha on behalf of the retiree association parties.

24      Your Honor, with my time today, I would like to spend it

25  discussing and highlighting the evidence as it relates to the

1 retirees.  No one in this case has disputed the city's

2 pre-petition intent to impair the class of retirees under a

3 plan of adjustment.

4     Therefore under Section 109, it is clear that the city

5 must either obtain agreement from a majority of the retirees,

6 negotiate with the retirees in good faith, or prove that

7 negotiations with retirees was impracticable.  The city cannot

8 prove or meet any of these burdens.

9     It is clear that the city in fact did not reach an

10 agreement with the majority of retirees.  The city did not,

11 nor does it claim that it negotiated in good faith with

12 retirees.  And finally, the city has failed to satisfy its

13 burden of proving that negotiations were in fact

14 impracticable.

15     Your Honor, the testimony presented throughout the trial

16 is clear that the city did not negotiate with retirees.  Ms.

17 Lightsey and Mr. Taylor unequivocally testified that the city

18 did not negotiate with the DRCEA or the RDPFFA.  The city did

19 not respond to the DRCEA's request for retiree specific

20 meetings.  It did not even invite the DRCEA to the June 14th

21 meeting and in fact has never provided a copy of the June 14th

22 proposal to creditors directly to the DRCEA.

23     As others have said today, Mr. Taylor did request and in

24 fact had a meeting with Mr. Orr regarding retiree issues.  In

25 this meeting Mr. Orr told Don Taylor, representative of the

1 RDPFFA, that the retirees on the police and fire side's

2 benefits and health care were not at risk.  He essentially

3 told the police and fire retirees that they had protection

4 from the oncoming financial storm or had protection from the

5 upcoming war and need not worry.

6      After making this inaccurate statement to Mr. Taylor, the

7 city ignored multiple requests from the retirees belonging to

8 the RDPFFA for specific meetings.

9           THE COURT:  Can you remind the Court when that

10 meeting was with Mr. Taylor?

11           MR. PLECHA:  I believe it was April 18th.

12           THE COURT:  Thank you, sir.

13           MR. PLECHA:  You're welcome, Your Honor.  Therefore

14 the only individual meeting that was held specifically with

15 retirees was based solely on this information.  This in no way

16 can constitute negotiations, let alone good faith

17 negotiations.

18      Therefore, Your Honor, the city did not introduce any

19 evidence to support a claim that the city actually negotiated

20 with retirees or their representatives.  Your Honor,

21 negotiations with the retirees was practicable through the

22 DRCEA and the RDPFFA.  However, Your Honor, instead of

23 attempting to negotiate with retirees in good faith, the city

24 instead attempted to create a paper case of impracticability.

25      This tactical scheme was predicated on the city's red

1 herring argument that because there was no negotiating partner

2 that could unilaterally -- unilaterally bind the retirees,

3 negotiations were impracticable. This is not the appropriate

4 legal standard for determining whether negotiations were

5 impracticable.

6      The city documented this alleged impracticability by

7 requesting various union representatives represent retirees,

8 all the while knowing they were not the appropriate parties to

9 do so. The city's purpose of this campaign was to add to the

10 paper record in case of impracticability.

11      The city has presented to Your Honor multiple times, a

12 chart alleging impracticability on these grounds representing

13 whether various groups would represent retirees with checks,

14 X's, and dashes. Further, the city beat the drum of

15 impracticability through repetitive testimony of Mr. Orr that

16 no unions would represent the retirees.

17      Well, Your Honor, the city was asking the wrong person.

18 It may be true that they knocked on many doors. Not only did

19 they not knock on the correct door, representatives from the

20 DRCEA and the RDPFFA in fact requested to be that party that

21 they were looking for to represent and negotiate on behalf of

22 the retirees.

23      Both Ms. Lightsey and Mr. Taylor testified that they

24 responded to the very same letters that the city sent to the

25 unions and in fact requested to represent retirees in

1 negotiations with the city.  Both associations requests for

2 those meetings were denied or never followed through on.

3          THE COURT:  Okay.  But legally speaking, why are

4 those organizations in a better position to negotiate as

5 partners with the city than any other potential partner that

6 the city did seek out?

7          MR. PLECHA:  Your Honor, these associations each

8 have been in existence for over 50 years.  They have lines of

9 communication open to provide information to their members,

10 get information back from their members.  They have a

11 mechanism in place to get the appropriate votes and

12 information necessary to provide that to the Court to show

13 that there is an agreement or there is not an agreement.

14     Under 109 the requirement is that a majority of a class

15 agrees to it.  That's solely for the purpose of eligibility,

16 that's not for plan confirmation.  We could have sent out

17 through the associations these requests for votes on a plan

18 that was negotiated by the associations, they could be sent

19 back to the Court or the associations to show whether there

20 was in fact an agreement possible.

21     The city's plan to create its own impracticability fails

22 because of the association's presence, history, and desire to

23 represent retirees.  As been shown through the evidence and

24 testimony, and I just said, the retirees associations, the

25 DRCEA has been in existence for over 50 years.  They have

1 served as the watchdogs and sole voice of general retirees.

2 They have obtained the benefit enhancements applicable to all

3 general city retirees through the city council budget

4 proceedings which it was formally invited to and participated

5 in.

6        That attendance was set forth in the city charter.  The

7 DRCEA has over 7,600 members and represents all general city

8 retirees regardless of membership.

9        The evidence is very similar as it relates to the RDPFFA.

10 They as well have been in existence for over 50 years.  They

11 have served as the united voice of police and fire retirees.

12        The RDPFFA in fact has engaged in concessionary

13 negotiations which were implemented and impacted all police

14 and fire retirees within a particular class.  The RDPFFA has

15 also bound retirees in an agreement through consent of the

16 police and fire retirees.

17        They as well have the similar invitation to, and in fact

18 participated in city council proceedings.  They also have

19 frequent communications with their retirees.

20        Despite all this, Mr. Orr and his team at the city chose

21 not to inform themselves of the associations or take any steps

22 to acknowledge the existence of any group that could foil its

23 impracticability scheme.  This impracticability scheme was

24 coupled with an extraordinarily aggressive timetable that has

25 been discussed by other objectors which I will not get into.

1    Therefore, the city cannot now claim impracticability

2  based on its own self imposed timeline.  It's also important

3  to note that Ms. Lightsey's letter to Mr. Orr still remains

4  unanswered as to the time of filing.

5    Each of the associations were capable of negotiations.

6  As testified to by Ms. Lightsey, the DRCEA's board includes a

7  former city budget director, a former city personnel manager,

8  a former director of labor relations who is also in charge of

9  benefits, and a former trustee of the pension funds.  These

10  are the people that would be negotiating on behalf of the city

11  had there not been an emergency manager and had those

12  individuals not retired from the city.

13    The associations in fact are the eyes and ears of

14  retirees.  The associations are trusted by their members who

15  have turned to them for decades to receive benefit assistance,

16  and information.  The majority of all retirees of either the

17  DRCEA or the RDPFFA are members of the representative

18  associations.  And two-thirds of all retirees are a member of

19  one association or the other.

20    As I said previously, Your Honor, 109 does not envision

21  unanimous consent.  109(c)(5)(A) would be satisfied with only

22  agreement of a majority of retirees.  Given that the

23  associations together represent two-thirds of all retirees,

24  they were in fact in a position to solicit and obtain

25  agreement of a majority of the retirees.

1    That would have not been impracticable if the city had

2   negotiated in good faith.  Therefore, Your Honor, the evidence

3   does show that negotiation with retirees through the

4   associations was practicable.

5    Your Honor, the requirements of 109(c)(5) cannot be met

6   by clearly just the city acknowledging that it was difficult

7   in deciding not to engage or attempt to engage in any

8   negotiations.  109 was intended by Congress to require that a

9   municipality seeking to reorganize under Chapter 9 exhaust the

10  possibility of a negotiated resolution with each class of

11  creditors.

12   As for retirees who merit recognition as a class due to

13  the constitutional protections of their pensions, the evidence

14  has showed that the timeline, the avoidance of the city, of

15  the retiree associations, was not in good faith and that

16  negotiations were practicable.

17   Further, Your Honor, the discovery responses cited to by

18  the city were in fact post-petition.  Mr. Taylor testified

19  that he never provided his position to the city as did Ms.

20  Lightsey.  So the city at the time of filing its petition had

21  no knowledge of these alleged positions.  They may be true,

22  but the city did not know.  The city did not ask.  Quite

23  frankly the city did not care because it did not comply with

24  its plan.  Thank you, Your Honor.

25   THE COURT:  Thank you.  At this time I think it's in

```
 1  everyone's best interest to take a brief break, ten minutes

 2  and we'll reconvene at 4:35 please.

 3           THE CLERK:  All rise.  Court is in recess.

 4        (Court in Recess at 4:34 p.m.; Resume at 4:35 p.m.)

 5           THE CLERK:  Court is in session.  Please be seated.

 6           THE COURT:  It looks like there are some people who

 7  aren't here.  Should we wait, or should we plow on ahead?

 8           MR. MONTGOMERY:  Your Honor, I think it may be a

 9  function of my simply being the last man standing.

10           THE COURT:  All right.  All right.  You may proceed,

11  sir.

12           MR. MONTGOMERY:  Thank you, Your Honor.  I'm going

13  to try in my time this afternoon to try to tie the evidence

14  that came through in seven days of testimony to our specific

15  theories of the case, not in the -- necessarily in the -- in

16  the broadest sense, but with -- to the specific points we are

17  trying to make, mentioned first in our opening and then that

18  we think are important here.

19      Now we know of course that the backdrop for point one in

20  this whole discussion is the authorization question.  Now the

21  legal question on whether or not --

22           THE COURT:  Can I ask you not to repeat the

23  arguments of your --

24           MR. MONTGOMERY:  Yes, exactly.  We're not going

25  there, we're not going there.
```

1          THE COURT:  Okay.

2          MR. MONTGOMERY:  This is just nothing but context

3    and there's no dispute as to the existence of authorization

4    letters.

5        There is a dispute as to whether or not that

6    authorization violates that, that's argued legally, but we

7    also argue specifically that there was an -- an intent to

8    violate the pending clause, Your Honor.  And so the question

9    is, is there proof of intent, all right.

10        Now, the first step --

11          THE COURT:  The theory being that would go to good

12    faith?

13          MR. MONTGOMERY:  Yes, Your Honor.  And it would go

14    to whether or not -- if there was an -- an intention to

15    violate a state law, specifically the Constitution, does that

16    somehow affect or infect the actual grant of authorization

17    itself.  Meaning that if there were no intent to violate a

18    law, it's a pure legal issue.

19        If there is an intent to violate -- violate the law, does

20    that render the act void ab initio.  That's something we've

21    argued.  We think you need to know the facts before you can

22    actually apply that issue.

23          THE COURT:  So there's a different consequence if

24    there's intent versus no intent?

25          MR. MONTGOMERY:  We believe there is, Your Honor

1  Because --

2          THE COURT:  Okay.

3          MR. MONTGOMERY:  -- the question.  We do.

4          THE COURT:  Go for it.

5          MR. MONTGOMERY:  And so whether we're right or we're

6  wrong, we need to have the facts in front of you.

7          THE COURT:  Uh-huh.

8          MR. MONTGOMERY:  All right.  Now where do we start?

9  Of course the city admitted to you in oral argument and it

10 admitted in its admissions that it intended to diminish or

11 impair accrued financial benefits of the participants and

12 the --

13         MR. GORDON:  Retirement system objection, please.

14 If you're going to make that statement at least read it

15 correctly.

16         MR. MONTGOMERY:  Fair enough, sir.  The admission of

17 the city was that --

18         THE COURT:  Hold on.  Sir, is that your electronic

19 device?

20         A VOICE:  Yes, I apologize, Your Honor.

21         THE COURT:  Please turn it off.  Is everyone's

22 electronic device off?  All right.  I'll assume from silence

23 that the answer is yes.  You may proceed.

24         MR. MONTGOMERY:  What did the city admit?  Admit

25 that the city intends to seek to diminish or impair the

1   accrued financial benefits of the participants in the

2   retirement systems through this Chapter 9 case, response

3   admitted.

4       Now, that is the beginning of the process.  The city

5   knows it's trying to do something that on its face appears to

6   violate the constitutional provision.  Now we think intent can

7   be shown not just by the statement that they intend to do so

8   here, but that they had intended to do so for time.  And it

9   was part of the planning process leading up to the Chapter 9.

10      Now we also have to show you various other topics which

11  we -- I will touch on.  There's a rightness question that Your

12  Honor needed to hear from us on.  We think the evidence on

13  rightness is in and we'll explain how.

14      Second, is we have an alternative explanation for the

15  specific timeline that has appeared.  We think that the

16  financial information, and we will show you how, that is in

17  evidence shows that July or early August at the latest, was

18  the right time for the city to file a Chapter 9 if it was

19  going to.  And we think the evidence will support the debtor

20  understand that.  And it -- and it must have understood it

21  long ago.

22      The next thing we have to show you, and we think we do,

23  is that there is in fact no plan of adjustment.  You may

24  recall that Mr. Bennett said he was going to prove that there

25  was a plan of adjustment in his opening.  We said we were

1   going to prove there was no plan of adjustment in our opening.

2   We think the evidence supports our view of it.  We're going to

3   try to show you how today.

4        We're also going to try to show you that related to that

5   question that there were insufficient disclosures.  We're

6   going to show you that what -- some disclosures were

7   misleading.  We're going to show you that there was a general

8   desire to avoid asset sales.  That is both intentional and

9   accidental.  We believe the evidence will support that.

10       We're going to show you that the proposal was not fair

11  and even handed.  We think that is part of the good faith

12  standard.

13       We're going to show you that part of this whole drama is

14  that the person who was chosen to lead this march towards

15  Chapter 9 really could only do that.  The qualifications of

16  this very talented individual, Mr. Orr, related to nothing

17  other than leading a march to Chapter 9.

18       We'll also try to show you some credibility challenges

19  which we think relates to the question of whether or not the

20  debtor has been exercising good faith, not just vis-a-vis the

21  creditors in general, but with respect to retirees

22  specifically.  And then we will conclude.

23       Now, Mr. Orr again, a well educated, legal degree

24  individual, made a statement on June 10 in response to a

25  question that the state constitution and state case law says

1  that vested pension rights are sacrosanct, they can't be

2  touched.  Now why do I think that's of interest to the Court

3  with respect to the question of intent?

4      First, it is a statement of importance.  The use of the

5  word sacrosanct suggests it cannot be touched.  It's too

6  important or too respected.  One might turn to a dictionary,

7  Webster's on line dictionary or something like that, and find

8  a definition like too important and respected to be changed or

9  criticized.  That's from Webster's on line.

10     You will also see that he purports to have an

11 understanding of law, perfectly logical for a lawyer to have

12 an understanding of law.  So he knows what the law is, he

13 knows what the Constitution is.  And he knows that vested

14 pension rights are part of that constitutional protection and

15 he knows that it's so important that he uses the word

16 sacrosanct.  And then he adds the practical statement that in

17 the environment he found himself in on June 10, they couldn't

18 be touched.

19     However, the proposal he made in fact on June 14th, has as

20 is demonstrated in Exhibit 408, Page 109 which is the June 14

21 proposal, with respect to pensions is the clause that has been

22 cited to Your Honor before, but it simply says of importance,

23 because the amounts realized on the underfunding claims will

24 be substantially less than the underfunding amount, there must

25 be significant cuts in accrued vested pension amounts for both

1  active and currently retired employees.  The people that my

2  committee represents.

3       Now, this proposal, June 14 is four days after Mr. Orr

4  made the video tape statement.  It's impossible for me, and I

5  suggest for the Court to infer, that Mr. Orr changed his mind

6  between June 10 and --

7            THE COURT:  Just a question about the record.  Is

8  the video tape of June 10th in the record or a transcript of

9  it?

10           MR. MONTGOMERY:  I believe it is, Your Honor.

11           THE COURT:  Do you have a number, or does anyone

12  have a number?

13           MR. MONTGOMERY:  Hang on.  The --

14           MS. GREEN:  It is in the record a transcription and

15  a video.  I believe it is 871.  I have copies of the CD with

16  me today to update it in the binder so you have a video clip

17  and the transcription if you --

18           THE COURT:  I'm sorry, the video clip is what?

19           MS. GREEN:  871.

20           THE COURT:  It's part of 871?

21           MS. GREEN:  The video clips are all on a CD with --

22           THE COURT:  Or, they're on a CD.

23           MS. GREEN:  Yes.

24           THE COURT:  Is that one of the ones that was given

25  to me today, or where is -- where is the CD?

1          MS. GREEN:  I have the CD's.  The transcriptions

2    were already in the binder.  But I have the CD's themselves

3    today.

4          THE COURT:  Okay.

5          MS. GREEN:  To update the binder.

6          THE COURT:  So are we going to get those?

7          MS. GREEN:  I have them with me today to give to the

8    Court.

9          THE COURT:  Okay.  Good, thank you.  You may

10   proceed, sir.

11         MR. MONTGOMERY:  Thank you.

12         THE COURT:  Something you wanted to say, sir?

13         MR. IRWIN:  Well, there were -- there were

14   completeness designations from the city as well.  I believe

15   they were in the transcript, I just wanted to confirm that

16   they were on the video as well.

17         THE COURT:  Is that right, Ms. Green?

18         MR. IRWIN:  The city's completeness designations

19   that were on the transcript on the -- on the video too.

20         MS. GREEN:  Yes.  There was a counter designation by

21   the --

22         MR. IRWIN:  Yeah, they're all there.

23         THE COURT:  So they are on the CD or the DVD also?

24         MS. GREEN:  Yes.

25         THE COURT:  Okay.

1        MR. MONTGOMERY:  Thank you, Your Honor.  The

2   inference I was suggesting the Court might draw from the

3   timing of this statement and the timing of the June 14th

4   proposal, is that Mr. Orr already knew that the June 14th

5   proposal was going to have either language like this, or the

6   intention expressed by this document which is of course the

7   June 14th proposal.

8        Now, we further suggest that it was the June 10 statement

9   that meant little to Mr. Orr despite the fact that he was

10  talking about the Constitution as someone who had a legal

11  education, despite the fact that as the emergency manager he

12  had taken an oath to uphold that Constitution, and despite the

13  fact that he was trying to answer a question posed by an

14  ordinary human being.  What are you doing to me?  Pensions

15  aren't going to be touched is effectively what he said.  A

16  lie, he knew better.  I think that that's only one example of

17  the lack of good faith in the process of dealing with

18  creditors associated with the city of Michigan.

19       Now we also believe that in the process of the request

20  for authorization, you will find the key to the prior intent

21  to violate the state constitution with respect to pensions.

22  You will notice that the very first sentence on Page 6 of

23  Exhibit 28, and we use this two page because we'll come back

24  to it and there is no point in repeating it, it says as a

25  first step in this process, I worked with the city advisors to

1 develop a financial and operating plan for the city, the

2 financial and operating plan, which placed the city's

3 challenges in context and defined a series of key

4 restructuring goals and initiatives. All right.

5     Now, this is Exhibit 28 at Page 6. Now the same document

6 may appear as Exhibit 407. Now, 407, Page 21 is the same as

7 the operating and financial plan.

8     This plan put forward on May 12, 2013, recognizes, and

9 here I've highlighted language of interest to me, although the

10 entire sentences are there, recognizes that legacy liabilities

11 must be evaluated as part of the city's comprehensive

12 restructuring. Significant and fundamental debt relief must

13 be obtained to allow the city's revitalization to continue and

14 succeed.

15     Okay. So what. Well, the -- first, this is the same

16 plan that was not a plebocite. This is the same plan that was

17 not negotiable. And we say to you that this is the same plan

18 that thinks that the pension number is only $646,000,000.

19     A statement from Exhibit 407, Page 37 says, as of June

20 30, 2011, the most recent actuarial reports provided to the

21 city by the pension funds showed the pension UAAL, unfunded

22 actuarial accrued liability, at $646,000,000. But the

23 emergency manager then speculated that with utilizing more

24 current assumptions -- excuse me, more current data and/or

25 more current assumptions could cause that deficiency to rise

1    into the billions of dollars.

2        So he's thinking about this at the time of the May 12th,

3    again before June 10, and certainly before June 14.  And he's

4    thinking this problem is temporarily defined as a $646,000,000

5    problem, but it could rise to $1,000,000,000 or more problem.

6        And so he says to all of us, or to those who were given

7    access, annual payment on accounts of these legacy liabilities

8    are expected to increase in the future if no action is taken

9    to modify them.  If no action is taken to modify them, he

10   thinks the problem gets worse.

11       Now, in his cross with Mr. Ullman on October 28 --

12           MR. BENNETT:  Excuse me, Your Honor.  If you're

13   reading, I don't need to object, but he misread this sentence

14   again.  But if you're reading, I won't object.

15           THE COURT:  I am it says mitigate.  Go ahead.

16           MR. MONTGOMERY:  Thank you, Your Honor.  The -- the

17   testimony by Mr. Orr in response to cross examination, is that

18   pensions and pension benefits had to be cut back and that he

19   had made that conclusion on or before May 12.  Why do I say

20   that?

21       So this is cross by Mr. Ullman.  At trial we don't have

22   the formal, so we think this is what your transcript will show

23   when you get it, that on -- on October 28th.  So he was asked

24   the following question by Mr. Ullman.

25       Okay.  So that we're clear at this point in time, and

1  that's referring to May 12th, you had made the determination

2  that in your view vested pension benefits of Detroit's

3  retirees had to be cut back, is that right?  Answer by Mr.

4  Orr, I think that's a fair characterization of what we --

5  we're saying -- we are saying.

6      Now, Your Honor, now we have Mr. Orr saying on June 14th

7  they must be cut.  We having had concluded on May 12th that

8  they must be cut, but on June 10th he told somebody who was

9  relying on the state appointed official to tell him the truth

10  about what was happening in the world, they were sacrosanct,

11  couldn't be touched.

12      Now in addition to this particular -- let me just skip

13  right back.  In addition to which we've already done this,

14  that all makes sense now from -- from May 12, June 14, Mr. Orr

15  had made the decision, his counsel admitted it for him in the

16  admissions.  So that part of the -- the record is clear, they

17  intended to do something to the Constitution, violate it.

18      Now, the same information was sent to the Governor,

19  meaning Mr. Dillon said that he told the Governor on July 8th

20  by email that the view of the consultants is that current

21  pensions have to be cut significantly.  I believe that the

22  only logical inference there is that he was talking about the

23  consultants for the City of Detroit.

24      So that the Governor understood that this is where the

25  city's advisors were going.  That intention is reflected in

1   the June 14 proposal.  And therefore when the Governor issues

2   his recommendation in response to -- issues his authorization

3   in response to the recommendation that references the May 12

4   plan, that there is no doubt that cutting pensions benefits is

5   part of the scenario.

6        Now, everybody understood this and in fact Mr. -- some of

7   the advisors for the Governor are suggesting they place

8   conditions because they know this is coming.  Specifically

9   conditions could also include such items as preapproval for

10  anything having to do with vested pension benefits.

11       Well, the only reason to even contemplate doing that is

12  because it might be a politically sensitive issue, I suggest

13  to the Court, or it might be unconstitutional for the -- for

14  the Governor to support such an effort.  And so his advisors

15  are saying, give yourself a way out, put conditions on it,

16  make sure the emergency manager doesn't do anything that

17  you're uncomfortable with.

18       But he doesn't do that.  He gives an unconditional

19  authorization knowing that the emergency manager of the

20  biggest municipal bankruptcy in the history of the country and

21  certainly the largest in the State of Michigan, wanted to

22  violate the state's constitution and he said okay.

23       Now, this notion that the Governor understood and that it

24  -- from at least May 12 it was fixed, is merely reflective, we

25  think the evidence will suggest to you, of a longer running

1  thought process by those who are talking directly to, or

2  indirectly to the Governor.  Of course I start my reference in

3  that regard with -- with respect to the Jones, Day pitch book.

4      Now, the significance of the pitch book is not that

5  Jones, Day had reached the conclusion as appears on Page 418

6  -- Page 41, Exhibit 418 if needed Chapter 9 could be used as a

7  means to further cut back, compromise accrued financial

8  benefits otherwise protected by the Michigan Constitution.

9  The fact that they reached that legal conclusion is not what I

10 say to you is important.

11     It's the fact that that view was shared with all of the

12 other actors in the drama.  This was available and part of the

13 process at the interview.  Mr. Orr himself was part of this

14 process.  He knew this was the going in game plan.

15     We know from other -- other testimony and the timeline

16 that Miller, Buckfire was aware of this kind of information.

17 In fact Miller, Buckfire had even told them what kinds of

18 questions to answer if I recall the timeline correctly.

19     Now, so we have advisors saying that if you really want

20 to cut pension benefits you can only do that in Chapter 9

21 because of the Michigan Constitution.  We've got an emergency

22 manager who understands that both legally, because he's a

23 lawyer, and practically because he says he needs to do it.

24     When are you going to take this on?  What -- what makes a

25 logical time to do this?  Well, let's look at the City of

1 | Detroit as if it was an ordinary debtor.  What do you do with

2 | an ordinary debtor?  You say well, gee, what -- what are its

3 | cash flows, what are its assets, what might make a sense of

4 | good timing.

5 | Well, Mr. Buckfire on direct told us that the city relies

6 | on four primary streams of revenue, gaming tax revenue, state

7 | revenue share, property tax, and income tax.  He then told us

8 | property tax income in particular comes in on a quarterly

9 | basis because that's when assessments are made and income

10 | taxes come in likewise in a fairly irregular fashion.

11 | So that to me says that a bankruptcy plan is going to try

12 | to figure out well, when does cash peak and when does it

13 | trough.  When are liabilities high, when are they trough.

14 | Well, we think, Your Honor, that the answer is, July and

15 | August is when cash rises.

16 | So all of a sudden it dawned on me as it probably did the

17 | Jones, Day advisors when they were thinking about this whole

18 | process, as I'm sure instinctively it's true for you as an

19 | observer of the bankruptcy process, Your Honor, that June --

20 | July or August was the logical time for a Chapter 9 filing to

21 | occur.  And that whoever was looking at the cash flows of the

22 | city would know that.

23 | And E & Y had been looking at the cash flows of the city

24 | for over a year prior to the appointment of Mr. Orr as

25 | emergency manager.  Miller, Buckfire had been there twice

1  before the appointment of the emergency manager.  The

2  financial people all understood the cash flow timing question.

3  They may not have liked the curve, but they knew the bumps.

4  And so if you're going to file at the right time you do it

5  when cash is king.

6      So when is cash king?  Well, according to Exhibit 75,

7  which was the short term cash flow associated with the May 12

8  report, you will see that July cash is $142,000,000 of

9  operating receipts.  And August there's $254,000,000 of

10  operating receipts.  And then it drops back down

11  significantly.

12      Well, what does that tell me?  Well, that sometime

13  between July and August all things being equal, that's when

14  you want to file because that's when the greatest amount of

15  cash is going to come in.

16      So this notion that a July filing appeared out of thin

17  air in late June, early July of 2013 is wrong.  Whoever was

18  looking at these issues knew that this was the only logical

19  time if you were going to do it in the 12 months of 2013 to do

20  it.  And I suggest to Your Honor that's exactly what you will

21  see when you look at the evidence, the inference you will make

22  that July or August is the logical time.  Come back to that in

23  a moment.

24      Let me just quickly get out of the way the rightness

25  issue.  You have testimony from Ms. Lightsey, and Mr. Taylor,

1    and Ms. Whitson about their reliance -- or excuse me, their

2    participation in the pension systems, their receiving health

3    care benefits and that each of them has had some measurable or

4    demonstrable impact already.

5        Now, the other thing I want to suggest to you with

6    respect to rightness is that the city's testimony is

7    unequivocal that but for water and sewer, the city had made no

8    pension contribution since 2011.  So it's already violating

9    the second clause of the pension constitution when Mr. Orr

10   takes office and that doesn't change.

11       Now, I want to skip that.  I'm going to ignore that last

12   one.  Here we go.

13       On the question of whether or not the Jones, Day and Andy

14   Dillon discussion is theoretical with respect to Chapter 9,

15   I'd point the Court's attention to Exhibit 851 which is a

16   March 23 email from Corrine Ball to Laura Marcero of Huron

17   Consulting.  One of the people that was helping the Treasurer

18   in this time frame.  And this is a full year before the

19   appointment of Mr. Orr, a full year.

20       In which they say in response to a question, "however, we

21   point out that you will need executives in place in the -- in

22   the Chapter 9 case.  You need a practical as well as legal

23   response.  We think having the CRO structure with CFO, COO in

24   place from the first day of a Chapter 9 would enhance the

25   position of continuing the case".

1    All right.  So a year in advance of any possible filing

2  they're telling the consultants to make sure you have people

3  in place who can actually run a filing.  Well, why would you

4  say that if it was in response to a purely theoretical

5  question.  I submit that they're actually thinking about a

6  Detroit bankruptcy.  It doesn't happen for well over another

7  year, but they're already thinking about it for real.

8    Now, Mr. Orr is clearly part of this process because

9  before -- let's roll forward nine months.  His -- his people

10  are talking about Chapter 9 and talking about it perhaps

11  theoretically, perhaps practically.  There is no in fact

12  filing happening.

13    But Mr. Orr is asked where is he up -- on updating our

14  Chapter 9 paper with new decisions.  That tells us, we ask the

15  Court to infer, that one, Mr. Orr was personally familiar with

16  the Chapter 9 studies that Jones, Day was doing, and that in

17  fact he was part of the process because he was being asked by

18  one of his partners where are they on updating it.  And how

19  could he possibly know that if he wasn't involved directly.

20    So now what's happening?  So we know that Jones, Day is

21  -- and Mr. Orr are discussing Chapter 9 before their pitch.

22  We know it's going to -- we've seen the pitch book.  It's been

23  referenced by other people, so I don't need to repeat that.

24    So then they go and tell again a consultant with respect

25  to 870, roll forward another six months, the same conclusion.

1  Based on this we anticipate a significant reduction and

2  already accrued benefits will be required in order to get

3  contributions to the level of available cash to service the

4  UAAL.  It appears this may only be possible in a Chapter 9

5  proceeding.

6      Now this is June 5.  This is again before the June 10

7  statement, it's before the June 14 proposal, but it's after

8  the May 12 financial and operating plan.

9      I'll turn back to the request for authorization, Your

10 Honor.  The last bullet which was -- which appears there, it

11 says the city's negotiations with the counter parties to its

12 pension related swap contracts which have been ongoing since

13 2012, intensified in recent weeks and included, and then he

14 goes on to describe what actually happens.

15     But for our purposes, Your Honor, the importance is that

16 they are talking with serious creditors owed a lot of money by

17 the City of Detroit back in 2012 and the discussions are now

18 accelerating.  They're accelerating because they want this

19 issue out of the way when they file.  They know they're going

20 to file.

21     Now, you -- you may recall I just suggested that July or

22 August was the only logical time frame.  That people had been

23 making the decisions on how to get there, managing the

24 process, and that when they put out the executive summary of

25 the June 14 proposal unknowingly I think to most people, I was

1   not here at the time, they're telling us that July 19 is the

2   deadline.  They give themselves three weeks to honor requests

3   -- excuse me, seven days to honor requests for additional

4   information.  They give themselves a month more or less to

5   engage in negotiations.

6       Again one of the parties they've been negotiating with

7   since 2012 by the time this was coming up.  And they say

8   evaluate July 19.  July 19 happens to correspond with

9   testimony that that was the roll out date.  All right.

10      So the only thing that really happens to knock this plan

11  schedule off of a July or August filing, we submit that if

12  it's July, is the fact that the Flowers and retirement system

13  filed litigation.  And what did that -- what impact did that

14  have?  It moved it up by a day.

15      So all this great tamise about oh, the world came to an

16  end when we got sued, no.  It had one 24 hour day's impact on

17  what the city had already been planning, the Chapter 9.

18      Now, switching topics.  Is there a plan of adjustment?

19  We know that -- oh, sorry, Your Honor.  Let me back up for

20  half a second.  I forgot that the acceleration was due only to

21  the TRO litigation and that Mr. Orr conceded that in his

22  deposition which is part of the record and it says in response

23  to Mr. Ullman again asking questions.

24      Is there a particular reason that the bankruptcy filing

25  was made at 4:06 in the afternoon of the same day a TRO was

being heard in the State Court other than to get a jump on the

State Court ruling?  Mr. Shumaker objected as to form.  Mr.

Orr however answered, not to the best of my knowledge.  And he

would know better than anyone else because he was the man in

charge.

Now Mr. Bennett told us that we had to look at, you know,

what boxes did we need to check off -- check off.  And one of

them is, we believe, is there a plan of adjustment.  And the

reason there needs to be a plan of adjustment is of course

109(c)(4) mentions it.  But 109(c)(5)(A) says, impair under a

plan.  We submit that's a plan of adjustment.

109(c)(5)(B) says, intends to impair under a plan.  We

submit that's a plan of adjustment.  And then impracticality

or fraudulent transfer.  There's no issue with respect to

somebody gaining a fraudulent transfer.  That's come up in the

evidence, but all the others have been disputed.

Now, Mr. Orr in his deposition testimony again designated

for the record says, and this is a summary but precise quote

from the deposition, "we never called this a plan.  We never

called this a deal.  We always called it a proposal because we

were open for discussion".

Well, that doesn't sound like a plan of adjustment, but

maybe we can turn it into one if we do enough of the other

things.  The Governor, who authorized the filing, said on

cross examination by Mr. Wertheimer on October 28th, again we

1  think that is what the transcript is going to say.  This is

2  our understanding of what it will show.

3      Well, no plan of adjustment has been presented so that

4  would be speculative.  No plan of adjustment.  So the most

5  important officer in the State of Michigan said there's not a

6  plan adjustment in connection with approving the filing of a

7  Chapter 9 proceeding by the City of Detroit.

8      Now, maybe that's a so what because with the right amount

9  of negotiations you can turn it into something.  Well,

10  Treasurer Dillon testified on November 5 in response to

11  questions by Ms. Levine, again this is what we think the --

12  the final transcript will say.  This -- I'll tell you the

13  thing that troubled me the most was when they put together the

14  ten year plan to talk about investing in the city which is

15  important for it to turn around eventually.  That the recovery

16  for unsecured creditors was so low I didn't know how anyone

17  practically could cut a deal and walk out of the settlement

18  room accepting something based on those numbers.  DOA is

19  another way of saying it.

20      It wasn't supposed to be acceptable.  It couldn't be

21  acceptable.  It -- in fact the Treasurer again, a man deeply

22  emeshed in financial issues for the State of Michigan,

23  absolutely understanding how to negotiate, financial number

24  says, he doesn't know how anybody could do it.

25      We suggest to you that that is not only irrelevant to the

1  plan side of the question, it's irrelevant to the good faith

2  negotiation side.  If you put something on the table that

3  nobody can accept, where is the good faith in the -- in the

4  offer?  Where is the good faith in the proposal?  Where is the

5  fair disclosures that make it possible or reasonable for the

6  person to accept it?

7      Now in order to sort of get into this posture they needed

8  to have numbers bigger than the $15,000,000,000 that shows up

9  in the May 12 report.  Well, what grew between May 12 and June

10  14?  Well, the pension number grew between May 12 and June 14.

11      You may recall, I showed you slide earlier, there was

12  $646,000,000 on May 12.  It's three and a half billion dollars

13  by the time Mr. Orr files his declaration on July 18th.

14      This is Footnote 3 to Mr. Orr's declaration in which he

15  identifies his proposal and says that he has identified

16  obligations consisting of and he points out 3.5 billion in

17  underfunding pension liabilities.  That's 3,000,000,000 higher

18  than appeared in the May 12 proposal.  That's how he gets to

19  $18,000,000,000.

20      Now is that a hard number?  No, it's a preliminary

21  number.  How do we know it's a preliminary number?  Because

22  the June 14 proposal tells us it's a preliminary number.

23  Claims for unfunded pension liabilities appearing at 109, as

24  set forth above, preliminary analyses indicates that the

25  underfunding in the GRS and the PFRS is approximately 3.5

1  billion dollars.

2      The rest of the sentence everybody has quoted many times.

3  That is, at this level of underfunding, the city would have to

4  contribute approximately 200,000,000 to 350,000,000 annually

5  to fund currently accrued vested benefits.  Such contributions

6  will not be made under this plan.  Just in case there was any

7  doubt they -- they aren't doing anything to contribute to the

8  historically accrued vested pension benefits, nothing in the

9  plan other than a share of a note ends up dealing with that

10  issue.

11      Now, Mr. Moore confirmed in his deposition on September

12  18, again this is designated in the record, that the city, I'm

13  going to paraphrase before I quote, city's actuaries had not

14  completed their work.

15      He actually said, "the city and most importantly its

16  actuary has not completed its analysis on the unfunded pension

17  -- unfunded position".  All right.

18      Now, so that's preliminary.  So for some reason it was

19  important to make that number bigger on June 14th than it had

20  been on May 12, even though no completed analyses have doing.

21  Well, why?  Because it's part of the process of making the

22  problem look as bad as it can.  It may be that bad, Your

23  Honor.  I don't know the answer to that question.

24      But why did they have to jump?  The reason they had to

25  jump is they had to justify the position that they were going

1  to cut vested pension benefits.

2      Again Mr. Bowen from Milliman confirms that they hadn't

3  done their work.  He says on 9-24 in response to a question

4  that was, has Milliman done yet a -- a plan valuation of the

5  assets and liabilities of the -- either the police and fire

6  fund or the general pension fund?  He starts to answer, the

7  actual -- Mr. Miller objects to form.  And the witness says

8  yeah, the actuary typically doesn't value the assets, we are

9  provided information from the system and we report the assets

10 in conjunction with liabilities.  As I said, we are in process

11 of doing a replication of each of the two systems.  You can't

12 reach a conclusion until you know what your starting point is

13 and the actuary hadn't finished his work on what the starting

14 point was.

15     Now, the -- there's a second question that sort of comes

16 up in the question of whether or not the information in the

17 June 14 proposal is misleading in any way with respect to

18 pensions.  Now, Exhibit 419 which is the legacy proposal if I

19 am not mistaken, which is put out after the June 14 proposal

20 is put forward, if I've got my timing right.  It says

21 approximately 650,000,000 of unfunded liability as of fiscal

22 year 2012 of which only 250,000,000 relates to the general

23 fund.

24     Well, what's the significance of that?  Well, this is

25 referring to DWSD.  DWSD has a significant share of the UAAL,

1 $250,000,000 divided by the $650,000,000 is the 38.5% that

2 Your Honor may remember was bandied about with respect to Mr.

3 Moore's testimony -- Mr. Orr's testimony, I'm sorry.

4    Just in case Your Honor has a question as to where this

5 number might have come from, well, if you look at the

6 actuarial liabilities as of June 11 which is Exhibit 68

7 admitted by the city at Page B3, you'll see that unfunded

8 accrued -- actuarially accrued liabilities for the water and

9 sewage are $247,000,624.  And the total for the GRS of the

10 liabilities, unfunded actuarial accrued liabilities is

11 $639,871,000.  And it just so happens that if you do the math

12 you again end up with a 38 plus percent number.

13    So Mr. Bing in his document, the actuaries all sort of

14 agree that 38% is the right share on a smaller number.  And

15 you may recall that Mr. Orr said it would slide.  He -- there

16 was some confusion as to whether it was six fifty, or 60%.

17 But the bottom line was, it moves with the size of the number

18 and 38% is what both Mr. Bing thought as in his proposal, and

19 what the actuaries thought when they made their assessment in

20 2011.  Those are consistent.  So whether they're right or

21 they're wrong, they had a consistent world view.

22    It's misleading to suggest that DWSD contributions -- or

23 excuse me, that the GRS participants who worked for, or worked

24 now, or worked in the past for Detroit Water and Sewer

25 Department were being funded by tax dollars from the general

1  fund.  They were in fact coming from the DWSD itself.  And

2  DWSD itself was making money.  So we say that is a misleading

3  observation.

4      Again, the suggestion here is that tax dollars are what's

5  servicing the legacy debt.  The city has over 18,000,000,000

6  in accrued obligations.  We've shown that the number rose from

7  fifteen to eighteen.  They said over 6.4 billion in

8  obligations are backed by enterprise revenues, but that

9  doesn't count the legacy obligations, so again the implication

10  is that -- is that those obligations come to the city through

11  the general fund and that tax dollars are paying for it.

12      Now, one of the things that is missing throughout all of

13  this again, we say adversely affecting whether or not this is

14  a plan of adjustment, whether or not it's submitted in good

15  faith, is there was a hole that Mr. Buckfire confirmed during

16  his cross examination with respect to the absence of

17  appraisals, the absence of valuations, the absence of

18  historical cost information in the June 14 proposal, and that

19  it wasn't provided in the data room.

20      And so what does this mean?  Because you know the book

21  had a listing of assets that were non-core, I believe was the

22  answer, but no valuations were given.  So the Detroit Water

23  and Sewer Department, no values of potentially realizable

24  nature or otherwise are actually described in the June 14

25  proposal.

1      The Coleman A. Young airport, again no values associated

2   with that described.  The same with the Detroit Windsor

3   tunnel.  The same for Belle Isle park.  Same for the Detroit

4   Institute of Arts.  No numbers given with respect to what

5   might be -- might be the largest single asset owned by the

6   City of Detroit.

7      City owned land, again no values.  Parking operations, no

8   values.  The Joe Louis Arena, no values.  And, you know, I

9   don't know all the assets of the city, so I said have -- is

10  there anything they might have missed.  I don't know.

11     Well, no values.  Not even the Detroit Zoo, again, I

12  don't even know what it's worth.  I don't know if it's worth a

13  dime, or a lot.  But there was no effort by the city to be

14  exhaustive with respect to assets that might form a basis of

15  recovery.

16     Now you may recall that Mr. Bennett said he was going to

17  show that a trust owned the art.  There was no testimony that

18  came in reflecting a trust owning the art.  In fact Mr. Orr on

19  cross said in response to the following question, is correct,

20  the word it is missing, is correct that the City of Detroit

21  owns certain pieces of art that are maintained at the Detroit

22  Institute of Arts?  Mr. Orr's answer, yes.

23     Question, and this is art talking about the art that the

24  city owns itself, right?  Not art that is subject to any kind

25  of public trust?  Yes, was Mr. Orr's answer.  So again one of

1   the things that Mr. Bennett said he was going to show simply

2   disappeared.

3       Now art again might be a huge issue.  In response -- on

4   direct Mr. Buckfire says, that before his engagement in

5   January he had no knowledge despite his prior visits to the

6   City of Detroit about art.

7       He says well, back in January when we first began our

8   engagement, we discovered and we had not known this before,

9   that the City of Detroit actually does own the building and

10  the art collection of the Detroit Institute of Arts which is

11  operated on the city's behalf by the DIA corp which is the

12  founder society as a contractor to the city.

13      So two witnesses established that this is city owned art.

14  Efforts to appraise, value, get a handle on.  Mr. Orr says in

15  response to questioning he says, yes, he ultimately retained,

16  I'm not reading now, he retained Christie's in August.  So how

17  did he answer that question?

18      Question, and Christie's has been retained, correct?

19  Answer, Christie's has been retained, correct.  And they were

20  retained in August, is that right?  Answer, I believe -- well,

21  let's get the sequence.  I believe they were initially

22  requested to come out and I told them to go away.  We retained

23  them.

24      The Court, Mr. Orr, please just answer the question.

25  Were they retained in August?  I don't recall a specific date.

1  I think it was August.

2      So two things we think the Court should infer from this.

3  One, that August is in fact the date they were hired, and two,

4  Mr. Orr consciously told a potential appraiser of value to go

5  away.  Why would you do that?

6          THE COURT:  I have to interrupt you here and ask you

7  how much longer you'll be.

8          MR. MONTGOMERY:  I have a few more minutes, Your

9  Honor.

10          THE COURT:  A few, sure.

11          MR. MONTGOMERY:  But actually, Your Honor, just tell

12  me how much time you want me to take and I will take that

13  amount of time.

14          THE COURT:  Well, I want to be fair to Mr. Bennett's

15  rebuttal and --

16          MR. MONTGOMERY:  Okay.  So let me rocket through to

17  my last couple of slides.

18          THE COURT:  All right.

19          MR. MONTGOMERY:  All right.  The reason for asking

20  the question about why would you delay is because again the

21  advisors had said that is Jones, Day, and Exhibit 418, Page 31

22  in their speaking notes, make sure that the listeners learn

23  that asset monetization outside of a bankruptcy may implicate

24  eligibility requirement that the city be insolvent, e.g.

25  measured by short term cash

1    How could that be?  Well, if you sell assets you have

2  cash.  You can pay your debts when they come due, you're not

3  insolvent.  I guess you don't want to sell valuable assets.

4    Again, with respect to the negotiating point.  It's

5  important, highlighted by others, that the word negotiations

6  applies only to the swap counter parties, it doesn't apply to

7  GRS, PFRS and debt insurers.  It doesn't apply to GRS, PFRS,

8  and unions.  And it doesn't apply to business people and

9  unions in general on those three dates July 10, July -- three

10  sets of meetings on July 10 and July 11.

11    Seen that before.  Again, the city has wanted to design

12  and restructure.  They sometimes use different words for cuts.

13  They twice in the discussions talk about restructure and

14  redesign of benefits to a level the city can afford.  Again,

15  what did that mean in the context of the June 14 proposal?

16  How do you deal with the underfunding?

17    Well, they said they had $803,000,000 available.  Total

18  estimated unsecured claims 11,000,000,000, so there's a

19  fraction there.  You would multiply that fraction times the

20  pensions and come up with an assessment.

21    Well, what's the math on that?  All right.  Eight hundred

22  and three million divided by 11,000,000,000 is 7.2% -- 7.02%.

23  Divide -- times it -- times the unsecured creditor side of

24  that world that relates to pensions and OPEB, you come up with

25  $645,000,000 total based on the -- the cash flows -- as rather

1  obligations.

2     What is the total for pensions against 7%, two hundred

3  and forty-three.  Two hundred and forty-three is obviously

4  less than three and a half billion.  Hard not to have an

5  impairment.

6     Okay.  I'm going to skip the further math.  I want to

7  just point out with respect to negotiations that with respect

8  to the bond holder question on the water and sewer side that

9  it was impractical to negotiate with them.  There were four

10  insurers of the sewage disposal system.  There were three

11  insurers of the water system.  Combined they had five insurers

12  total for 6.4 billion dollars of debt.  Doesn't sound like an

13  impossible group to have a conversation with.

14     The note we said was not fair.  We identified on cross

15  and we'd point out to Your Honor here that how could it be

16  fair that percent and a half, there's no support for it as a

17  market rate.  No obligation to pay any amounts other than

18  revenue participation payments, no obligation to go sell any

19  assets.

20     A division if as and -- if as and when there were

21  proceeds.  And here's the one that bothers me the most about

22  the proposal worse than the interest rate, worse than the

23  note.  This concept that the retirees should fight each other

24  for the cash which is what the Dutch auction means.  It's a

25  well tried and trued phenomenon where you have people bidding

1  in their debt in order to receive a pile of cash.

2      Well, a guy or the person who bids the lowest -- the

3  highest amount of debt for the lowest amount of cash, he gets

4  the cash without getting the retirees that are 80% of the

5  obligations to fight among themselves for cash proceeds.  How

6  is that fair and even handed as a starting point?

7      Talked about Mr. Dillon.  Now here's an important point.

8  And I suggested to you earlier that this was all about a

9  bankruptcy case from the beginning.  Mr. Orr, a very talented

10  and well educated man, was supposed to fit in the requirements

11  of 436, Section 9.  Shall have a minimum of five years

12  experience and demonstrable expertise in business, financial

13  from local or state budgetary matters.

14      This is his qualifications we say the evidence suggests

15  that he was litigation and a bankruptcy restructuring lawyer

16  practicing with Jones, Day.  He never worked for a

17  corporation.  He once oversaw the sale of a -- a country club.

18  Worked for the office of the U.S. Trustee.

19      With respect to financial matters, he's not a CPA, an

20  MBA, or an investment banker.  And we suggest to you that

21  other than being a bankruptcy and restructuring lawyer, no

22  particular expertise in finance.  And with respect to local or

23  state budgetary matters, never ran a city or had budgeting

24  responsibility for either state or city.

25      But he was a very good bankruptcy lawyer, Your Honor, and

1 he knew how to take the case into bankruptcy with a very

2 skilled and excellent team to go with him.  And he was from

3 the beginning committed to working with the Governor's office

4 in lock step, point to Exhibit 401.

5    On the 22nd, he acknowledged that he was being looked at,

6 he was being looked at, who knows what he thought, but he was

7 being looked at as an agent of the state.  They weren't going

8 o do things without his consent, Exhibit 619 suggests that.

9 And by the way they wanted to hide it because they were going

10 to we'll broker a meeting via note between you and the Mayor's

11 personal assistant who was not foiable, F-o-i-a, ble, foiable

12 meaning not subject to discovery.

13    Same man thought it was an indirect -- the -- the prior

14 initiative was an end around of an initiative that was

15 rejected by the voters in November.  That the new law was a

16 thin veneer.  This is all going to what this man's

17 understandings are.

18    During his deposition he recalled telling the Governor

19 and his staff in general that one of the purposes, I'm not

20 saying the only purpose, one of the purposes or intentions of

21 Chapter 9 filing would be to allow you to cut back pension

22 benefits.  We probably had that discussion.  I don't recall

23 anything specific, be probably did.  That appears.

24    And we know he said trump.  This is one of the places

25 where he used the word trump, his deposition testimony.  He

1  said, question, you said this -- in this report, referring to

2  the June 14 proposal that you don't believe there is an

3  obligation under our state constitution to pay pensions if the

4  city can't afford it.

5      That's not what he said on June 10.  Answer, the reason

6  we said it that way is to quantify the bankruptcy question.

7  We think federal supremacy trumps state law.  Answer, yes.

8  You don't deny making that statement?  No.  I think I've said

9  it several times.

10          THE COURT:  All right.  Let me ask you to wrap up,

11  please.

12          MR. MONTGOMERY:  Okay.  This is the same man, of

13  course, who said on June 10 that it couldn't be trumped.  We

14  -- we think that -- that was an accident, that last one.  The

15  -- we think that the conclusion that Your Honor -- we think

16  the logical inferences to be drawn by the Court are that the

17  players, in particular the emergency manager lacks the

18  requisite intent to be a good faith actor in this drama, and

19  that therefore you must find that the city is not eligible.

20  Thank you.

21          THE COURT:  Rebuttal.

22          MR. SCHNEIDER:  Your Honor, both the city and the

23  state have rebuttal.

24          MR. BENNETT:  About how much time are you

25  contemplating, Your Honor?

1          THE COURT:  As little as you think is necessary for

2    your rebuttal purposes.

3          MR. BENNETT:  Well, I'm going to look around and

4    make an estimate.  I think it's under an hour, but I'm sure

5    it's more than a half an hour.  And I will say that that last

6    presentation was rather spectacular and I ordinarily wouldn't

7    spend much time on it, but inasmuch as it accuses the

8    Governor, the Treasurer, and Mr. Baird, and Mr. Orr even more

9    explicitly of lying in this courtroom, I think I should go

10   through it with some care.

11       So I think what I would propose at this point, unless you

12   really want to do it tonight, it's a close call for you, I'll

13   come back.  But if you want me to go forward, I'll go forward.

14         THE COURT:  Mr. Schneider, how long are you going to

15   be?

16         MR. SCHNEIDER:  I would probably add 10 to 15

17   minutes on top of that.

18         THE COURT:  What do the attorneys on the objecting

19   side prefer on this issue?  Stay or come back on Tuesday?

20         MR. MONTGOMERY:  Your Honor, the objectors have all

21   suggested that notwithstanding the fact that I will miss the

22   last flight back out of the city, we'd rather finish.

23         THE COURT:  Okay.  That -- that's my preference as

24   well.  It's now 5:35, I want to give the two of you a hard

25   deadline arbitrarily of 6:30.

1          MR. BENNETT:  Okay.  I'll figure out the best way to

2   do this.

3          Your Honor, will forgive me if this is not quite as

4   organized as I was -- would ordinarily like to be.  Let's

5   start with the last presentation first.

6          I want to start with the premise.  I think the purpose

7   was it was said to prove that there was an intent to impair

8   pensions.  And if there was an intent -- excuse me, intent to

9   seek to impair pensions.  That's an important difference.

10         And if there was an intent to seek to impair pensions,

11  that that somehow was different than if a Chapter 9 case was

12  commenced and then it had to impair pensions.  I'm not sure

13  that makes any sense at all.  And I think the premise has to

14  be wrong.

15         In any event, I apologize that we are going back to the

16  constitutional argument, but it's necessary to do so.  As Your

17  Honor will remember, it is the city's position and it is

18  correct that the pensions clause is the same in all functional

19  respects to the contracts clause.  And so all contracts,

20  pension contracts and -- and other contracts are protected by

21  state constitutions and in fact by the federal constitution

22  from amendment and -- and from -- from impairment, excuse me,

23  by the state.

24         When an entity resorts to Chapter 9 following Justice

25  Cardozo's reasoning, following the ultimate holding in

1  Deacons, and following the practice in Chapter 9 cases for as

2  long as there have been Chapter 9 cases, the Bankruptcy Court

3  acts to impair contracts.  That's how it impairs bonds.

4      The ascending antecedent as I think Justice Cardozo put

5  it, or all of the prefatory steps are not relevant.  When

6  you're in trouble you can ask for help.  So if as we have

7  demonstrated, the numbers showed that the City of Detroit

8  could not pay its debts as they become due and going forward

9  could not pay its debts as it's become due on the pension and

10  OPEB side even if it didn't have any bond indebtedness it was

11  in a position where it needs help.

12      That the state authorizes Detroit to get help from the

13  Federal Government.  So that the Federal Government can assist

14  with the problem or address the knot in the words of Cardozo.

15  Whether they intend to do it, or don't intend to do it,

16  doesn't matter.

17      The relevant actor if in fact pensions are to be impaired

18  in this case, if in fact the underfunded amount is not to be

19  paid in full in this Chapter 9 case, and we've said both are

20  very likely results and were within the contemplation of the

21  people who put together the June 14th presentation and the

22  filing, it makes no difference at all.

23      Neither Mr. Orr, Governor Snyder, nor I, nor David

24  Heiman, my partner, are going to be impairing pensions.

25  Unfortunately if it's going to happen that's your job and the

1  reviewing Courts that are going to come later.

2      So the entire -- the entire --

3          THE COURT:  I have to stop you there.  What do I do

4  about the representation that Mr. Orr made at the June 10th

5  meeting to the retiree in response to his question that

6  pensions are sacrosanct and not to be touched.  And his

7  further representation that there was a 50/50 chance of filing

8  bankruptcy?

9          MR. BENNETT:  Okay.

10          THE COURT:  Were those statements misleading?

11          MR. BENNETT:  Can you please put up the actual

12  statement that Mr. Orr made that was utilized in the

13  presentation just now?  Your Honor, that statement -- no, I

14  want the quote, not the clip.

15      Your Honor, that statement may well have been

16  inappropriately timed.  I don't have the words around it, it

17  would be one of the things I would do before Tuesday --

18  Tuesday morning.

19      Technically inelegant but also true.  He says the state

20  constitution and state law, case law says that vested pension

21  rights are sacrosanct, they can't be touched.  That is what

22  the state constitution and state case law says in a very

23  non-technical and actually slightly imprecise sense.

24      He doesn't talk about the Constitution.  Now, would I --

25  so would I have liked him to say --

1          THE COURT:  Well, but the -- but the retiree wanted

2     to know what was going to happen to his pension benefits,

3     right?

4          MR. BENNETT:  Your Honor, I -- I am absolutely --

5     Mr. Orr, during the many many past months has probably been

6     one of the most carefully monitored actors in this entire

7     case.  I am sure there are quotes of endless, endless, endless

8     things that he has said.

9       This may not be the moment where he used the best words.

10    I don't remember enough of the context on both ends.  I know

11    that if there was a -- if Your Honor believes that this

12    statement without more was misleading, it was corrected three

13    days later by their own exhibits.  And it was certainly

14    corrected four -- four days later when the proposal for

15    creditors dated on the 14th, the moment the meeting was over

16    was put on the worldwide web.  So I -- I --

17         THE COURT:  I'm sorry, what happened the moment the

18    meeting was closed?

19         MR. BENNETT:  The entire proposal was put on the

20    web.

21         THE COURT:  Not after this meeting, after the next

22    meeting.

23         MR. BENNETT:  After -- on the 14th.

24         THE COURT:  But not on the 10th.

25         MR. BENNETT:  Not on the 10th.  So there is a --

1   there is a, at maximum, a three or four day period where there

2   was misinformation or frankly a accurate but potentially not

3   complete statement was in the -- was in the record.

4        And that meeting had 200 people in it.  So it's bad but

5   there are 685,000 residents of the City of Detroit.  There are

6   23,000 retirees.  Mistakes happen, I can't do anything about

7   this one.  I don't --

8             THE COURT:  What about the comment that there was a

9   50/50 chance of filing bankruptcy?

10            MR. BENNETT:  I think that -- I don't know if Mr.

11  Orr was questioned about that comment.  I think that was a

12  very optimistic view of the situation, but he is absolutely

13  entitled to be optimistic.

14            THE COURT:  Well, but doesn't it raise a question

15  about whether that's what he really thought?

16            MR. BENNETT:  Does what raise a question as to

17  whether that's what he really --

18            THE COURT:  That statement.

19            MR. BENNETT:  He was -- he was hoping that the

20  negotiations would succeed.

21            THE COURT:  Well, but the question is that on June

22  10th, did he really believe there was a 50% chance that they

23  would succeed?

24            MR. BENNETT:  Your Honor, I'm the wrong person to

25  ask that question.  You would have to ask him.  This was --

1              THE COURT:  You're his lawyer.

2              MR. BENNETT:  At this point in time, it is -- it is

3    before --

4              THE COURT:  You're his lawyer.

5              MR. BENNETT:  Yeah, but this is -- but this is a

6    judgment everybody gets to make based upon really what they

7    think about the people that they know and don't know.  And

8    this is before the presentation is made and before there's

9    been any feedback by anybody.

10       So I -- I -- and certainly it's inappropriate for me to

11   add to the record as to whether or not the 50/50 statement was

12   anything but his belief --

13             THE COURT:  No, I understand that.  And perhaps my

14   question is a little imprecise and inelegant.  But the -- what

15   I'm really asking is, what evidence is there in the record

16   that that is what he genuinely believed as opposed to

17   knowingly misled --

18             MR. BENNETT:  I -- I'm not aware that there's --

19             THE COURT:  -- a crowd.

20             MR. BENNETT:  I'm not aware that there's any

21   evidence either way about that.

22             THE COURT:  All right.

23             MR. BENNETT:  But given that the assertion is that

24   that was bad faith, I would think that's not our problem,

25   that's the objectors' problem, that there's no evidence in the

1  record on that point.

2         THE COURT:  Well, all right.  Let me just ask the --

3  the next question.  Which is, assuming that both of those

4  questions were misleading, what impact does that have, or

5  should that have on the Court's analysis of good faith here?

6  Because that's ultimately the point, the -- the element.

7         MR. BENNETT:  Your Honor, it should have no impact

8  at all.  The -- you have seen a mountain of evidence of a

9  careful deliberative process to pull together the very best

10  reorganization proposal for the City of Detroit that anyone

11  could put together.  You saw it, it was presented to a wide

12  variety of -- of representatives of retirees.  By the way,

13  acting in capacities with respect to the OPEB's and acting in

14  capacities with respect to the pensions.

15      And you have found that notwithstanding after there was

16  no confusion about what the plan was all about and

17  notwithstanding prior statements, you will have found that

18  everybody responded either, I cannot represent retirees, or I

19  cannot represent retirees, and I would never represent them to

20  impair pension benefits because they are -- they are not to be

21  impaired.

22      So, against that factual background, was there anything

23  that the city did in negotiations that means it did not

24  negotiate in good faith.  Is there anything about a statement

25  four days before any discussions ever started that reflects on

1  to the subsequent negotiations?

2      How could it?  Because any conceivable misunderstanding

3  was completely and totally vitiated either three days later or

4  four days later, depending upon which set of statements you

5  want to pick.  And in all events, everything else happened

6  afterwards.

7      I just can't get there from here.  I think that the --

8  that -- that number one, mistakes happen.  They happened all

9  over the place.  And more will.

10      But in this instance nothing that happened before the

11  negotiations even started can inform whether or not the city

12  conducted negotiations in good faith.  And nothing about those

13  statements affected the course of the negotiations.  And

14  there's no evidence at all that suggested that they did.  It

15  was a good effort to try to -- to try to impeach or impair Mr.

16  Orr, but it was not -- did not address anything about the

17  negotiations that followed.

18      I think the other points with respect to the presentation

19  you just saw is that there is massive amounts of testimony in

20  the record that go directly contrary to all of the -- to all

21  of the inferences you were asked to accept.  This is going to

22  be an incomplete list.

23      But as to the timing of the filing and the motivations

24  from the filing from a financial perspective you have the

25  testimony of Malhotra, the testimony of Buckfire.  It is also

1  supported to some extent by testimony of Dillon and testimony

2  of Orr.

3      With respect to the absence of -- of a scheme to march

4  toward a Chapter 9 filing with specific intent to impair

5  pensions from 2012, you have the testimony of the Governor,

6  the testimony of Dillon, the testimony of Baird, the testimony

7  of Orr, the testimony of Buckfire.  And in addition, probably

8  the most compelling piece of -- piece of evidence because it

9  exists from way back when, and no one can change it, is the

10 entry into the consent agreement itself.

11     As was pointed out by Mr. Dillon in -- in his testimony,

12 but also appears from the face of the consent agreement if you

13 read it, under the consent agreement, there is no conceivable

14 way that the city could file a Chapter 9 case.  The consent

15 agreement is -- and it represents directions or agreed

16 directions toward an alternative path.

17     As the testimony revealed there were a long list of

18 things the city had to accomplish which the authors of the

19 consent agreement thought would solve the city's financial

20 problems.  Unfortunately nearly none and maybe none of those

21 things were actually accomplished.

22     But when the state entered into that agreement they were

23 clearly hoping that it were -- was.  And if anything the entry

24 of a consent agreement was a huge delay of addressing a

25 potential Chapter 9, and was viewed -- I know the testimony

1    said it was viewed as a reason for avoiding a Chapter 9.

2        Swap negotiations since 2002.  I think there's testimony

3    in the record that the --

4            THE COURT:  2012?

5            MR. BENNETT:  I'm sorry, 2012.  That there was a

6    downgrade that triggered the early negotiations with the swap

7    counter parties at the beginning of 2012.  Because the -- the

8    restructuring in twenty -- in 2009 included a default under

9    the swaps in the event that there was a downgrade in the

10   city's credit rating.

11       That downgrade happened in -- in 2012.  I do not remember

12   the month.  I don't know if it's in the record.  So the

13   reference in the -- in the -- to negotiations since 2012, had

14   nothing to do with an anticipated filing and nothing to do

15   with the additional COPs payment default that was resulting in

16   another covenant default.  It is not an advanced negotiation

17   with respect to a potential Chapter 9 case.

18       As was testified by Mr. Buckfire, actually both on cross

19   and on redirect, insurers do not control consent of the debt

20   instruments and if you look a little more closely at the

21   charts, not all debt issues are insured.  The insurers are

22   sitting exactly in the same place as I will get to in the case

23   of the -- some of the other presentations, they're in exactly

24   the same place as the retiree associations.  They're in a

25   position to communicate.  They may be in a condition to make a

1    recommendation.  They don't vote.  They can't deliver votes.

2    They can't do anything about non-consenting voters.

3        Eligibility in asset sales.  I actually thought that the

4    record fleshed out quite clearly where that whole thing came

5    about.  It was a question by Miller, Buckfire I think to all

6    of the people presenting to address whether assets sales have

7    anything to do with eligibility.

8        I think Mr. Malhotra gave the best testimony on this.  I

9    will tell you, Your Honor, what I -- my response would have

10   been which is only in a courtroom with a Judge who doesn't

11   understand economics.  And so I wouldn't be worried about it

12   for a minute.

13       But we know that the question was a question that wanted

14   to be addressed.  The -- the showing of speaker notes without

15   a witness ever having said that the speaker said the things

16   that were in the speaker notes, I think goes beyond the

17   record.  The speaker notes were not passed out.  The

18   presentation was passed out.  There was no reference to this

19   issue at all.

20       I am told by my colleague Mr. Schneider that the Detroit

21   Zoo isn't in Detroit.  The other point with respect to that

22   because it was kind of funny at the time, there was some

23   discussion -- I think in a newspaper or something someone

24   talked about the Detroit Zoo.  I remember someone making a

25   joke that -- that whoever thought Detroit -- the Detroit Zoo

1  was an asset didn't recognize that animals eat.  And

2  accordingly it was a liability, not an asset which I suspect

3  is -- so if that's the asset that we -- that -- that we missed

4  on the list of assets, even if it is in Detroit, I'm pretty

5  sure it belongs on the liability side and not in the asset

6  side.

7       You know, whether it's a plan or not a plan, I think

8  there's been lots of comments that I think each and every one

9  was taken out of context about whether the plan was not a

10  plan.  Again, if I had the time, I'd go find the context for

11  all those comments.  I think -- I think frankly Your Honor is

12  perfectly well suited to figure out whether -- and by the way

13  the cases require an outline of a plan of adjustment that can

14  be confirmed.

15       They're actually pretty clear by that like -- in that

16  way.  They don't require a fully fleshed out plan of

17  adjustment.  That argument has been made before and rejected

18  before by every single Court that considered the question.

19       Your Honor, has seen enough plans.  Your Honor has seen

20  enough plans and the summaries and disclosure statements.

21  Your Honor will be able to tell whether or not the proposal

22  that was made on June 14th is a sufficiently detailed outline

23  of a plan of -- of adjustment that is appropriate under

24  Chapter 9 and frankly I think that's an issue for you, not for

25  anybody else.

1    I'm going to move to some of the comments that were made

2   by Mr. Ciantra.  And first of all, the -- there was a -- there

3   was a criticism that he made about the fact that in the

4   pre-filing negotiation environment a non-disclosure agreement

5   was required as condition to access for the data room.

6    Whether or not it was appropriate to continue to require

7   that after the filing of the Chapter 9 case as the proposal to

8   creditors appendix reveals, there were -- I want to do the

9   math, including water and sewer because I think it would be

10   appropriate to include it for these purposes, a little less

11   than $10,000,000,000 of publicly traded debt securities out

12   there in the universe.

13    If you're going to -- to make a data room available to

14   anyone without publishing the whole thing on the internet, I

15   think it's appropriate to have confidentiality agreements in

16   place.  Yes, it turns out some of the bonds are held by widows

17   and orphans too.

18    The social reality as a method of classification and

19   treatment.  That was fascinating.  You know, we're going to

20   have to read the bankruptcy -- bankruptcy law very carefully

21   for purposes of determining who is entitled to what as

22   distribution in this case.

23    And it's going to turn out that there are going to be

24   lots of arguments that -- that debts other than pension claims

25   are also entitled to priority that the June 14th proposal does

1  not accord them.

2      While we were here today, I read an email report that a

3  declaratory judgment action has been filed on behalf of the

4  UTGO, the unsecured UTGO's that we classified as unsecured,

5  claiming since they almost have a security interest they

6  should be regarded as secured and their distributions should

7  come off the top.  That will -- if that lawsuit succeeds, the

8  $830,000,000 number that was misused in the distribution

9  example, I'll come back to that in a second, will be reduced

10  by a number that's roughly $500,000,000.

11      And so there are going to be collisions everywhere over

12  this.  I have not yet seen a basis for distinguishing

13  classification claims based on social reality.  I mention that

14  as a reason why the city perhaps does not want to be in the

15  business of unilaterally dealing with the consequences of a

16  reduction of the -- excuse me, of the change in unfunded

17  amount based upon the distribution contemplated under the

18  plan.  If I missed it in the Bankruptcy Code, someone should

19  give me the reference.

20      Dillon's remarks concerning that he was still in the

21  information gathering stage, on several occasions in Mr.

22  Dillon's testimony he recognized that that was a description

23  as to him.  He fully understood others closer to the situation

24  knew more.

25      The issue -- and -- and -- and -- and all of the

1 discussions from the -- from the United Auto Workers were very

2 interesting.  Because Exhibit 32 includes the United Auto

3 Workers letter which states, and just let me grab it a second.

4 I have -- I have it here.

5        The union does, however, represent current retirees and

6 has no authority to negotiate on their behalf.  Not bind, not

7 -- just we have no authority to negotiate on behalf.

8        So it's first of all, extraordinarily interesting that a

9 person who writes that letter with no qualification, it's part

10 of Exhibit 32, how they can complain about anything that

11 happened in negotiations.  One of the things they complain

12 about many other people do, is the -- is the fact that the

13 so-called concessionary bargain back at the beginning of -- of

14 2012 was not put into effect.

15        For some reason the unions believe that that entire

16 episode represents a great success.  I think we know in

17 retrospect that that entire episode was a great failure.  Huge

18 amounts of time and effort was devoted in an attempt to have a

19 concessionary bargain with a wide variety of unions and at the

20 end of the day the economic results were a drop in the bucket,

21 certainly by comparison to the extent of Detroit's problems

22 however you choose to measure them.

23        That is not a success.  That the -- that the Governor's

24 office had not analyzed it and that others analyzed it and

25 said look, I -- it may have been the best you can do, this

1    just doesn't work for the City of Detroit.  It is not a bad

2    thing, it is probably a good thing.

3         The other assertion that was made that I have to spend

4    just a little bit of time on, is the class action device.  The

5    class action device has been proposed as the perfect way to

6    resolve the problem with retirees.

7         Now by the way, again this is asserted as -- as a counter

8    to the argument on the issue of -- of impracticality and --

9    and Your Honor, actually missed additional points, the ones

10   that I said this morning were probably enough relating to your

11   question of you know, what are the consequences if it turns

12   out that the -- that the pension funds or the two people you

13   have to deal with in the pension context.

14        Well, first of all, no one stood up and said you were

15   right.  Everyone still talked about themselves as being

16   relevant actors.  And that's because that's consistent with

17   the pre-filing atmosphere.

18        But the second part is, is the retirees still become

19   relevant with respect to OPEB's and with respect to OPEB's

20   there is no intervening structure.  And as we've revealed many

21   times before, and it's not our favorite fact, those are

22   essentially completely unfunded.

23        So -- so when they talk about a class action approval

24   also they're only talking about the -- the OPEB side of the

25   question, I think, because these same people have also refused

1  to ever be part of an out of Court deal that -- that impairs

2  pension claims.  But maybe it applies to both.

3       The fact of the matter is, if you page through the cases

4  and we can give -- send you a list of citations if you want

5  them.  If you don't, it's okay.

6       It turns out that these things take a year to 22 months

7  for the examples that we were able to find when we looked in

8  the cases and we were able to use the dates in the cases to

9  figure out how long it is -- it takes to get a class action

10  settlement approved in these contexts where it's a mandatory

11  non-opt out class.

12       I was given a list of the things that have to happen in

13  order to get from here to there, or from an agreement to

14  there.  First of all, the union, in this case I guess, more

15  unions and the city negotiate to reach a tentative agreement.

16  We have no idea how long that would happen, no one has ever

17  put on any evidence to say that we were two or three weeks

18  away back then in -- in July.

19       I think the evidence seems to suggest we were at best

20  months away.  And I say at best because I don't think we were

21  anywhere.

22       Second, you need an independent counsel for the retirees

23  because the people who actually negotiate the deal, their view

24  isn't enough.  The retirees' independent counsel has to

25  investigate the settlement.

1        THE COURT:  I think I have to cut you off here

2   because there was really no evidence on either side of any of

3   this.

4        MR. BENNETT:  This is actually law.  This is just

5   what the -- the -- the legal requirements in order to get a

6   settlement done.  I don't -- I think that Your Honor, if I had

7   -- if I had -- if I was going to brief it, I'd just take it

8   right out of cases.  I would not call a fact witness for any

9   of this.  But if you want me to stop, I'll stop.  This is --

10  this is not -- these are not -- this is just right out of

11  cases.

12       THE COURT:  All right.  I will accept it from you on

13  that premise.

14       MR. BENNETT:  Okay.

15       THE COURT:  But with the understanding that we have

16  no evidence on the specifics of what's required or how long it

17  would take.

18       MR. BENNETT:  Okay.

19       THE COURT:  Any of these steps.

20       MR. BENNETT:  I'm happy to just -- just not go

21  further and -- and submit a list of cases with no commentary

22  if that would make you more comfortable.

23       THE COURT:  I don't want any post-hearing briefing.

24  Because that will add a month to our process here.

25       MR. BENNETT:  Then let me just -- let me just run

1  down -- let me just run the list of the procedures that have

2  to be followed.  These are just procedures that have to be

3  followed.

4      At -- at that point you can bing a non-opt out class

5  action lawsuit against the city in order to get this created.

6  This -- the -- that's the next thing you file in Court after

7  you've got independent counsel and you're at that stage.

8      Then you have a class certification proceeding.  Then you

9  have preliminary approval of the agreement.  Then you have a

10  notice process.

11      MR. CIANTRA:  Your Honor, I'm going to object at

12  this point.  You know, this is -- really should have been a

13  rebuttal case.  If they wanted to put on someone that had --

14  had knowledge as to how these proceed -- proceeds, this should

15  have been done on rebuttal.

16      THE COURT:  Well, I'm not sure I can sustain that

17  because none of this was put in evidence as part of the

18  objectors' case.

19      MR. CIANTRA:  Mr. Nicholson testified that he

20  offered this opportunity, this structure, to Mr. Bennett's

21  partner, Mr. Miller.  That it was discussed.  It was a -- a

22  way that he testified they had settled these issues in the

23  past.  If they wanted to make an argument that this was

24  impractical, they should have called rebuttal testimony.

25      THE COURT:  Well, that's good as far as it goes.

1  except that Mr. Nicholson did not testify as to what the

2  various steps were and how they would work in this context.

3       MR. CIANTRA: They could have asked him.

4       THE COURT: Well, but so could you. It was -- it

5  was part of your defense to this case.

6       MR. CIANTRA: Well, I -- I made a -- we -- we

7  presented evidence that this proposal was presented to the

8  city, but they did not respond to it. They did not take us up

9  on that.

10      THE COURT: I'll permit this with the understanding

11  that we're just talking about how this would work legally.

12      MR. BENNETT: Okay. I think all the following by

13  the way is in the Federal Rule of Civil Procedure that governs

14  class actions. But one of my partners will give us the rule

15  citation and -- and I will demonstrate that I'm not testifying

16  from the lectern.

17      THE COURT: You mean Rule 23?

18      MR. BENNETT: No. Your Honor, I think that what I

19  will do is just say, peruse Rule 23 and then we'll move on.

20  All of -- all of these things are in there. All the rest of

21  them are. The others are from the cases.

22    Okay. I'm now going to turn to the -- to Mr. Gordon's

23  argument. I think that -- that may make the most sense.

24    Okay. First of all, again the -- the -- I think we

25  indicated that both funds -- we -- we demonstrated that those

1  funds from their interrogatory responses said that they could

2  not negotiate impairment and would not negotiate impairment.

3      I think that Mr. Gordon misstated the position that I

4  think I very -- very clearly stated this morning.  We fully

5  understand that there are many people who may object to the

6  3.5 billion dollar number.  My point was, was there was no

7  evidence in the record suggesting any other number this

8  morning -- excuse me, during the trial.  And that remains

9  true.

10     So for purposes of this hearing, the only number in

11  evidence is the 3.5 billion dollar number split in the two

12  ways as -- split in two as described in the June 14th

13  presentation.  And that's the number we're working with.

14     We -- we also indicated it is in the record that the

15  retirees committee have a different and lower number as of the

16  end of the school year of 2012.

17          MR. MONTGOMERY:  Objection, Your Honor.  I'm sorry,

18  you are definitely -- we never offered a different number in

19  any evidence or any written submission to this Court.  This

20  goes right to the thing you told me not to ask Mr. Buckfire

21  about.

22          MR. BENNETT:  It was in the slides that he

23  projected.

24          THE COURT:  All right.  The record will reflect what

25  it does.  Let's move on.

1          MR. BENNETT:  Okay.  And again the point with

2    respect to the -- to -- to the exhibit, Exhibit 43.  Was that

3    if -- if there was anybody in the objectors' group who thought

4    that the premises of the proposal were false, misleading, or

5    wrong, the -- the -- the -- we expected evidence suggesting

6    the same.  That of course didn't happen.

7          And finally, I don't remember if was on -- on this point,

8    I don't remember whether it was Mr. Gordon, but Your Honor

9    engaged one of the objectors on the whole subject of well, if

10   you didn't think that the city's premises that were behind its

11   plan were correct, why didn't you propose a plan, or I think

12   you actually said what inference am I to draw from the fact

13   that you didn't produce an alternative scenario.

14         And the answer, it's not a matter of inference, it's

15   decisive.  The fact that they didn't means there isn't another

16   alternative that Your Honor can lawfully consider.

17         By the way, it should not be surprising that a way to --

18   to object to eligibility when you think that the city's plan

19   isn't a good plan, or isn't an accurate plan, is to actually

20   generate a different one.  In the early ages of -- the early

21   stages of the Stockton proceedings, one of the objectors

22   actually did object to the Stockton business plan, or -- or

23   projections and they generated their own.

24         Valeo was all about alternative projections based upon,

25   you know, correcting erroneous business decisions, or

1  erroneous municipal decisions made two years in the past.  So

2  if you go read the cases and -- and watch how other people

3  have successfully or unsuccessfully objected to eligibility,

4  if the reason you're objecting is because the premises were

5  wrong, you should bring different premises to the Court and

6  prove them.

7      As to Mr. Robbins, we were very careful.  Mr. Robbins

8  certainly did say he didn't have enough information.  But when

9  he was pressed on the point, he said only -- he identified

10 only one specific area where he didn't have adequate

11 information and that was asset sales.

12     All of the rest of the testimony was about generalized

13 complaints of lack of information.  And frankly that testimony

14 was significantly blunted by Mr. Robbins' own admissions that

15 as if and when they asked for more data, Miller, Buckfire was

16 pretty receptive in getting it to them and that a lot of the

17 additional things that were requested were things that -- that

18 came about because as you read information, additional

19 questions are raised and there's nothing about that that is

20 unusual.

21     You know, the -- the -- the -- also the assertion by the

22 retiree committee that we didn't negotiate with them with

23 enough.  Mr. Robbins was their agent.  He --

24          MR. MONTGOMERY:  Excuse me, Mr. Bennett.  I think

25 you meant retirement system, not retiree committee.

1          MR. BENNETT:  I'm sorry, I apologize.  The

2    retirement systems.  Mr. Robbins was their agent, okay.  He

3    knows what the -- what the projections mean.  He testified

4    that we -- that the city was pretty clearly starting to --

5    trying to start negotiations.

6          And his response was, I need eight days to figure out

7    what my authority is to negotiate what we're going to be

8    talking about.  What I called the shape of the table.  So at

9    this point in time given that we -- we have not only with

10   respect to the -- the two retirement funds, we have actual

11   evidence that number one, they weren't confused about whether

12   negotiations were sought.  Number two, talks about certain

13   things actually started.  Number three, at the end what had

14   happened was there was a discussion about what we're going to

15   talk about next and the actor says, I need eight days to find

16   out what my client is going to authorize me to do and in that

17   period there was a lawsuit.

18         So of all of the places to be standing up here and

19   saying, there were no negotiations, the city discovers

20   negotiations.  The last that should be heard from is the

21   retiree -- is the retiree funds -- excuse me, the retirement

22   funds.

23         They had perhaps one of the most qualified advisors who

24   admitted that he understood exactly what's going on.  We

25   understand exactly what he did.  And then we come to the

1  question which I foreshadowed this morning should be answered

2  with evidence and isn't.  Which is exactly what is it that a

3  good faith city has to do more than what it did in response to

4  the fact pattern it was presented with with the retirement

5  funds.

6      This is in the negotiations.  This isn't before the

7  negotiations.  This is at a time where everybody knows the

8  city's looking for feedback over a four week period and then

9  figuring out what it's going to do during a time the

10  undisputed evidence demonstrates the city was under financial

11  distress.

12      It was the retiree funds that said -- that you asked what

13  inference should be drawn.  Okay.  Given -- given the -- the

14  -- given that Mr. Robbins of all people was about the most

15  qualified actor from the financial side on -- on the retiree

16  side of the equation, that -- and that he's not only had the

17  negotiation period, but till now to decide whether or not

18  there was anything wrong with the -- with the June 14th

19  presentation and that the financial data should be looked at

20  differently.  The fact that nothing was presented by him or

21  anybody else is decisive, not just the basis of an inference.

22      A couple more things.  It was more than four hours, Your

23  Honor.  I -- I -- I have to spend some time because you're

24  going to take them away with you, with -- with what is going

25  to be new Exhibit 873.  And that is the -- the slides that

1  were shown on -- that were -- that were shown by -- by Ms.

2  Green.  And if they're still available -- are those slides

3  still available?  The slides that -- that you -- that Ms.

4  Green put up?

5          THE COURT:  You mean -- you mean to be projected?

6          MR. BENNETT:  Yeah, to be projected.

7          THE COURT:  Are they available to be projected?

8          MS. GREEN:  Yes.

9          THE COURT:  Apparently so.

10          MR. BENNETT:  Well, I'm just going to skip to a --

11  to -- to -- to a -- to a few.  I'm going to skip the

12  evidentiary issue because that's been dealt with.  Okay.  I

13  would like to go to 13.

14          THE COURT:  Slide number 13?

15          MR. BENNETT:  Slide -- page number -- it has -- they

16  have page numbers at the bottom.

17          THE COURT:  Page number 13?

18          MR. BENNETT:  Slide number 13, at page number 13.

19  Why don't I start and I hope he catches up with me.

20      The slide number 13 is the -- is the testimony of Howard

21  Ryan which Your Honor asked about and -- and putting the

22  objections aside for the second -- for a second, this

23  testimony is completely irrelevant.

24      Because in the -- in the unlikely event that we actually

25  are -- are interested notwithstanding the Michigan cases, and

1  the intent of the legislature in adding the appropriation

2  provisions, the -- the -- the way you find out is asking the

3  legislators who voted for it.  And so it's a huge evidentiary

4  problem but frankly it's the objectors' evidentiary problem.

5       And I can't imagine that you could make the decision as

6  to what the intent of the legislature was in adding the

7  appropriation provisions until you elicited testimony from at

8  least a majority of the majority of each house that voted for

9  it.

10       There may be an argument, you've got to talk to all of

11  them.  But the bottom line is, is that the -- that someone

12  from outside the process, an advisor, I have no idea how he

13  knows, but it seems to me that it's the worst kind of hearsay

14  or speculation as to what -- why the legislature passed a law

15  with -- with certain provisions as opposed to didn't -- passed

16  it with others.

17            THE COURT:  Well, but how do I deal with the fact

18  that this witness, Mr. Ryan --

19            MR. BENNETT:   Yes.

20            THE COURT:  -- was the state's 30(b)(6) witness?  He

21  was the representative of the state to answer these questions.

22            MR. BENNETT:  Your Honor, I think he's --

23            THE COURT:  I mean he could have said, I don't know,

24  but he didn't.

25            MR. BENNETT:  Well, he's at best the executive's

1  30(b)(6) witness.  I don't think and I -- and I think this is

2  something that Mr. Snyder should deal with.  I don't think --

3          THE COURT:  Oh, all right, that's fine.

4          MR. BENNETT:  And -- and the executive of course

5  testified himself as to what -- that's -- that's the Governor.

6  But the law doesn't become law until the legislature passes it

7  both houses and the Governor signs it.  So there's a lot of

8  empty boxes in terms of intent that we have no idea what their

9  intent was.  And you're being asked to presume that the intent

10  was to do something unconstitutional which we pointed out it

11  isn't even really a constitutional question.

12      As to -- as opposed to do something absolutely legitimate

13  which is to allocate funds to the municipalities who are

14  subjected to it at the jurisdiction of an emergency manager

15  don't have to pay for it by themselves.

16      The next slide I'd like you go to is 15.  That's 16.

17  That's still 16.  The one that's -- that one.

18      This was the slide that -- that -- that Ms. Green said

19  demonstrated that it was part of the drive, the -- the -- the

20  preordained drive to Chapter 9.  But she forgot to read the --

21  the -- the first three line highlighted block.

22      Questions that Miller, Buckfire has drafted for review.

23  First one, given the issues that Detroit faces, how can they

24  address them outside of Chapter 9?  I don't think I have to

25  say more.

1      Slide 22, please.  Moved a little quicker when Ms. Green

2  was asking.  May 12, the May 12, we are not like negotiating

3  the terms of the plan.  Once again, it was not anchored to the

4  place where the testimony has anchored it which is this is not

5  referring to the June 14th plan.  The testimony is perfectly

6  clear and actually the statement in context was perfectly

7  clear.  It was -- it was relating to the 45 day report under

8  the law.

9      Next page, Page 23, please.  I'm not sure I'm pronouncing

10  his name right, David Meador.  The record actually doesn't say

11  and the email certainly doesn't say where David Meador came up

12  with the idea that there might be a filing coming in July.

13      As I indicated to -- to -- to Your Honor before, there

14  was rampant speculation everywhere where this was headed.

15          THE COURT:  This is 23, were you looking for 22?

16          MR. BENNETT:  This is 23, this is the one I'm -- I'm

17  sorry, this is 21.

18          THE COURT:  Twenty-three, okay.

19          MR. BENNETT:  I'm sorry.  This is the -- the email.

20  I'm sorry, this is the right one.

21          THE COURT:  Okay.

22          MR. BENNETT:  Okay.  So there is -- the evidence

23  does not actually say that -- that Mr. Meador got this from

24  Mr. Buckfire.  We actually don't know where he got it.

25      Next slide, number 26.  Your Honor raised this issue.  My

1  only point here is that whatever -- whatever

2  misrepresentations or inadequate disclosures Mr. Orr gave on

3  June 10th, it was corrected three or four days later.

4      Moving on to 29, please.  This is about the last point

5  the city could have been negotiating since 2012 when it knew

6  there was a financial crisis.  Your Honor, this is the Valeo

7  decision, or another version of the Valeo decision.

8      If Your Honor will recall, the objecting parties in Valeo

9  said that -- that if Valeo had done things differently two

10 years before their budgeting process they really wouldn't be

11 in trouble.  And the Valeo Judge ultimately decides what I

12 think Your Honor knows, which is there not a bankruptcy case

13 in the world that doesn't start with some mistakes at some

14 period of time.

15     And they decide that no, you do not disqualify yourself

16 for Chapter 9 relief forever if you make a -- if you budget

17 too much or spend too much in a particular year.  I think

18 frankly Judge Klein in Stockton is even stronger on this

19 point.

20     The idea that in 2012 the -- the state should have

21 commenced negotiations that had to be fashioned on a Chapter 9

22 plan because that's the law according to your objectors,

23 instead signed the consent agreement which gave the city the

24 ability to work out its problems away from a courthouse cannot

25 possibly be a basis for the city losing its ability to file

1   Chapter 9 when the consent agreement process failed.  We've

2   got at least two cases that say that, there are probably more.

3       Page 30.  I don't know how to -- how to reconcile items

4   1, and 2, and 3.  One and 2 of this chart with the idea that

5   Your Honor's been presented that the right thing by the

6   objectors that the right thing for the city to do was talk to

7   the unions and talk to the retiree groups.

8       They -- the -- the -- I'm sorry, the introductory

9   language.  The initial rounds of stakeholders negotiations are

10  set to start.  Somehow the pensioners were supposed to know

11  the city was expecting them to negotiate over the pensions

12  even though, and then number two, the vast majority of

13  retirees were not aware of the proposal as the city admitted

14  it did not mail each of them a copy.

15      Well, they've got to decide which way it is.  If the

16  reality is that the retirees themselves were the actual

17  players who had to be involved and had to be informed, then

18  they've admitted impracticability.  And if it's not the

19  retirees who have to be involved and someone else, they have

20  to own up to their letters that said it's not us.  We don't

21  have authority, we're not going to negotiate.

22      And this constant straddling between the two is another

23  demonstration that we are dealing with an impracticability

24  situation.  In any event as I said earlier, the proposal went

25  on a web site accessible to everyone the moment the meeting

1  was over.

2          THE COURT:  Mr. Schneider is concerned that you're

3  eating now into his time.

4          MR. SCHNEIDER:  I probably am.

5          MR. BENNETT:  Would you give me five minutes?

6          THE COURT:  He wants five minutes.

7          MR. BENNETT:  Your Honor, I ask that you be

8  exceptionally careful in reading the -- these slides.  Because

9  they themselves reveal more information if they're read

10 carefully and they -- and if you look at the record in many

11 cases, inferences drawn from them are misleading in light of

12 the overall record.  If Your Honor has any questions, I'll be

13 happy to deal with, otherwise I'm not done, but I guess I've

14 got to be.

15         THE COURT:  All right.  Thank you.

16         MR. SCHNEIDER:  Your Honor, most revealing about

17 what the objectors have said in their closing arguments, in

18 order to rebut their arguments I think is what they didn't

19 say.  Because the objectors argued in their closing that the

20 pensions have been impaired.

21     So tell us which witness actually testified in this case

22 that his or her pension was actually impaired.  None, because

23 that witness does not exist.  Impairment means actual

24 impairment and not a single pension has been impaired.

25     The objectors also didn't cite a single case or testimony

1  saying that the good faith of the Governor, or the Treasurer,

2  or any state actor is even relevant.  Good faith is about the

3  good faith of the debtor.  And even if it is about the

4  Governor, there's plenty of evidence in the record to support

5  his good faith.

6      The objectors also didn't explain what Mr. Dillon really

7  said.  Can we have 626 up on -- on the projector?  In

8  Paragraph 10 of 626, this is -- go to the next page.  Bring up

9  Paragraph 10.

10     First of all, this isn't a communication from Dillon to

11 Orr, okay.  It's -- it's Mr. Dillon's suggestions basically

12 through his legal counsel.  He says, looks premeditated.  That

13 doesn't mean that it is.  Looks premeditated.  In fact the

14 evidence in this case shows that the opposite is true, it's

15 not premeditated.  So don't make it look that way.

16     But look at this last sentence.  I want to -- if you can

17 highlight that last sentence.  This is the -- the sentence

18 that Ms. Green in her testimony didn't highlight.  I agree

19 with the recommendation, but I don't think we make the case.

20     Translation, this case has been made.  The city is

21 eligible, so say so.  Okay.  I agree.  Now just -- would you

22 just say so because it's been made.

23     And this is also shown in Mr. Dillon's testimony.  Mr.

24 Wertheimer asked Mr. Dillon, was it true on July 10 you didn't

25 think that Orr had made the case?  And what is his response?

1  In the document that I read.

2      So Dillon is just -- Mr. Dillon is just saying yeah, in

3  this particular document, the case wasn't made.  But that's

4  not to say that the case wasn't made.

5      Next, Mr. Bennett talked a little bit about the

6  appropriations provisions.  If the objectors here are arguing

7  that it's a bad faith filing due to some alleged improper

8  motive, there is no evidence that these appropriations were

9  added to allow the Governor to authorize this particular

10 bankruptcy.  So this particular filing couldn't have been done

11 in good faith.

12     Now as to Howard Ryan, well, he is the legislative

13 liaison for the Department of Treasury.  And 30(b)(6) is

14 really a discovery tool.  That's -- but this trial depends on

15 witnesses, not a 30(b)(6) discovery tool.

16     And you -- you can effectively override that testimony,

17 or basically you'd be using it to impeach him, with the

18 Governor's testimony.  Now, Howard Ryan, legislative liaison,

19 never a member of the House, never a member of the Senate and

20 definitely didn't sign this bill.  And the Governor did sign

21 the bill and he would know.

22     And he testifies, and his motives are clear, it was done

23 through the appropriation to pay for the emergency managers

24 because cities were upset that they were stuck with these

25 bills.  Now Ms. Brimer calls this appropriation the 5.7

1  million dollar appropriation meaningless. What does the

2  Governor testify to? And that's what we have to look at in

3  this case. The testimony, the evidence.

4      He says, of course that appropriation provision is

5  significant. Every taxpayer dollar is significant. And what

6  Mr. Dillon and the Governor said, is we needed that money in

7  this -- we're halfway through the fiscal year, so we needed to

8  appropriate that money. Do you have any questions about that,

9  Your Honor?

10      THE COURT: Yes. How -- how do I reconcile just

11  from a credibility perspective, Mr. Ryan's testimony and the

12  Governor's testimony?

13      MR. SCHNEIDER: Well, the live witness here, the

14  Governor, was asked under oath, in front of you and explained

15  his provisions. They're his -- his viewpoint.

16      If you're trying to reconcile this who had -- who would

17  really know better. Who has the most experience in signing

18  the bill? Who made the appropriation happen? And also who

19  signed the later bill to have another appropriation so that we

20  could pay for these emergency managers? That was the

21  Governor. And he's the one who did that.

22      THE COURT: Well, but doesn't that later bill raise

23  or even amplify the question about why it was necessary to put

24  an appropriation in the first bill?

25      MR. SCHNEIDER: It was necessary because they were

1  halfway through the fiscal year and they had to pay for these

2  emergency managers.  That was the --

3          THE COURT:  But why not have a separate

4  appropriations bill so that the people's right to a referendum

5  could be preserved?  Why not do that?

6          MR. SCHNEIDER:  Because the legislative process in

7  Lansing, it's not -- the Governor testified this is the most

8  efficient way to go on to this, to do it.  And I can -- you

9  know, it's not in the record --

10          THE COURT:  Efficiency trumping the people's right

11  to referendum, is that -- is that your answer?

12          MR. SCHNEIDER:  No, Your Honor.  It's not --

13          THE COURT:  You just said --

14          MR. SCHNEIDER:  What's the most efficient way to get

15  a bill made into law?  Get the appropriation put in the bill

16  and pass it.

17          THE COURT:  No, I understand the efficiency of it.

18  But -- but what I'm hearing you say, is that the efficiency of

19  it was more important than allowing the people their right to

20  referendum, especially considering that just a month before

21  they had expressed a will on this subject.

22          MR. SCHNEIDER:  Well, and that's not what I'm

23  saying.  They did express a will on that subject and that's

24  why there were different changes put into the bill to fix it.

25  There were plenty of other -- as the Governor explained, there

1 were plenty of other fixes in that bill.

2          THE COURT:  Granted, but -- but my question is a

3 different one.  What -- why as a matter of law does the need

4 for efficiency, which is what you assert is the grounds for

5 including the appropriation in -- in PA436.  What -- what

6 justifies that in trumping the people's right to a referendum,

7 especially given that they had just expressed a will on the

8 subject.  There were differences, but they had just expressed

9 a will on the subject.

10          MR. SCHNEIDER:  The basis of that question assumes

11 that if you don't have a separate bill, then that's a

12 trumping.  But that's not the case.  You -- you don't trump

13 the people's will --

14          THE COURT:  Am I missing something?  Doesn't the

15 Constitution say that there's the right of referendum unless

16 there's an appropriation in the bill?

17          MR. SCHNEIDER:  Yes.

18          THE COURT:  So putting an appropriation in the bill

19 has the effect of denying the right of what would otherwise be

20 a right of referendum, right?

21          MR. SCHNEIDER:  But plenty of bills have

22 appropriations.

23          THE COURT:  Do they?

24          MR. SCHNEIDER:  Yes.

25          THE COURT:  There's no evidence of that, is there?

1          MR. SCHNEIDER:  Well, I think the Court can take

2   judicial notice of that.

3          THE COURT:  Well, all right.  Let's assume that's

4   true.  Does that prove anything more than the legislature

5   often violates the right of referendum?

6          MR. SCHNEIDER:  You do not violate the right of

7   referendum by putting an appropriation in a bill.  <u>MUCC v</u>

8   <u>Secretary of State</u> indicates as such.  It's -- if you put --

9   Your Honor, if you violated the Constitution every time you

10  put an appropriation in a bill, we'd never have any money to

11  run this government.  Because then --

12         THE COURT:  But you could have appropriations bills

13  which you actually did here.

14         MR. SCHNEIDER:  That's true.  And we could spend --

15  the legislature in Lansing could spend all its time passing

16  appropriations bills and not passing other bills.  So let's

17  not put appropriations in here, we have to wait and put it in

18  a different appropriations bill.

19      This bill, the evidence is, was at the middle of the

20  fiscal year.  So if they didn't put this appropriation --

21         THE COURT:  Well, but so was the later one.

22         MR. SCHNEIDER:  If they didn't put this

23  appropriation bill in this bill then --

24         THE COURT:  Uh-huh.

25         MR. SCHNEIDER:  Then the fiscal year would have run

1  out.  They wouldn't have been able to get through to this.

2          THE COURT:  But that assumes the wouldn't pass PA437

3  which had an appropriation for PA436.

4          MR. SCHNEIDER:  What I'm saying is --

5          THE COURT:  Why not do that given the will that the

6  people of this state had just expressed a month earlier?  Why

7  not?

8          MR. SCHNEIDER:  Because it's not unconstitutional or

9  improper to put -- let me explain.  It's not improper to put

10  an appropriation in a bill.

11          THE COURT:  Apart from misuse of propriety and

12  constitutionality, why not do that?

13          MR. SCHNEIDER:  Why not do what, Your Honor?  Put it

14  in a separate bill and --

15          THE COURT:  Put it in PA437 and bump the -- the

16  other ones down the line one number.

17          MR. SCHNEIDER:  Because I think the evidence is, is

18  by that time that would -- the legislature wouldn't have been

19  able to do that until the spring time.  And whether the --

20          THE COURT:  I didn't hear that.

21          MR. SCHNEIDER:  Whether that's in the record or

22  not --

23          THE COURT:  Can't the legislature pass an

24  appropriations bill mid term any time it likes?  It did that.

25          MR. SCHNEIDER:  Not when they're in recess.

1          THE COURT:  Well, but -- but the next vote after it

2    took the vote on PA436 could be on PA437 appropriating money

3    for PA436.  Why not?

4          MR. SCHNEIDER:  I think you're --

5          THE COURT:  The people had just spoken a month

6    before.

7          MR. SCHNEIDER:  And yes, they had spoken.  And

8    that's why there were changes put into this bill.

9          THE COURT:  All right.  I think we're going in

10   circles at this point.  Anything further?

11         MR. SCHNEIDER:  Yes, hold on.  There was some

12   testimony about why the Treasurer stopped the tentative

13   agreement in February 2012.  Mr. Dillon testified to that.  He

14   explained that he received expert advice on the agreements.

15   There were several issues raised.  He didn't think the

16   agreements would work for the city, so he wasn't supportive.

17   And it's really as simple as that.

18        Finally, this whole issue about as Mr. Dechiara explained

19   in his theory in his cross of Mr. Orr about kind of this --

20   this theory of the state conspiring with the city in bad faith

21   and kind of to drive in the city into Chapter 9.

22        I think, Judge Rhodes, you asked the correct question.

23   To what end?  I mean why?  What does the Governor or the

24   Treasurer gain by this?  By kind of engineering a bankruptcy.

25   I mean what purpose does that serve?  The objectors never

1  explained that.  And this is my last point.

2      Mr. Wertheimer says, it's a political motive.  What

3  political juice does the Governor get out of doing this?  I

4  mean that makes no logical sense.  He testified -- testified

5  about his motive.

6          THE COURT:  And I really do have to ask for silence

7  from those who are watching these proceedings.  Thank you.

8          MR. SCHNEIDER:  I think that's an indication, Your

9  Honor, if somebody mentions -- or rumblings in the courtroom

10  that it's not a popular move.  In other words, why would this

11  be like a politically popular thing to do?  That's not why it

12  was done.

13      The Governor testified about his motive, to help the

14  citizens of Detroit.  And that's the evidence in this record.

15  Now the political theories and arguments of the counsel,

16  they're not evidence.  And no witness testified otherwise.

17      So although Mr. Montgomery urges you to make inferences

18  of what should be about bad faith.  Mr. Wertheimer does the

19  same.  I don't want you to do that, Your Honor.  You don't

20  have to make those inferences, just look at the evidence and

21  the testimony and the Governor's testimony refutes that.  I

22  think I've run out of time.

23          THE COURT:  Yes.  And -- and more.  Okay.  So we'll

24  be in recess.  I'm going to take this matter under advisement.

25  Is there anything else I need from you?  You're going to give

1 me the documents that have been marked with numbers that are

2 the slide shows from this afternoon. When -- when can we

3 expect those?

4          MS. GREEN: You wanted an updated slide deck and I

5 presume the Court is closed on Monday?

6          THE COURT: We are -- we are closed on Monday.

7          MS. GREEN: Okay.

8          THE COURT: Okay. All right. Please try to get

9 them to me as promptly as possible.

10          MR. MONTGOMERY: Your Honor, does that include

11 non-commonly placed slides --

12          THE COURT: Yeah, I want all -- all of the ones

13 marked for identification purposes and submitted to me. But

14 to the extent they need to be corrected because of the

15 inaccuracies we've pointed out, or -- or to the extent they

16 mention exhibits not in evidence, they need to be corrected.

17     And just for the record, technically the matter isn't

18 under advisement until the time for you to submit the briefs

19 that I earlier allowed has expired which I think is Wednesday,

20 right?

21          MS. PATEK: Your Honor, Mr. Irwin and I have already

22 taken care of -- mine are corrected. I -- we will have a hard

23 copy here on Tuesday and we can also email them if that's

24 better.

25          THE COURT: We -- we prefer not to use email for

1   this purpose, so a hard copy, please.  Anything further from

2   anyone?  We're in recess.  Thank you all very much.

3               THE CLERK:  All rise.  Court is adjourned.

4       (Court Adjourned at 6:35 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5

6

7  We certify that the foregoing is a correct transcript from the

8  electronic sound recording of the proceedings in the

9  above-entitled matter.

10

11  /s/Deborah L. Kremlick, CER-4872          Dated: 11-14-13
    Letrice Calloway

12

13

14

15

16

17

18

19

20

21

22

23

24

25