UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,     .      Docket No. 13-53846
        MICHIGAN,            .
                             .      Detroit, Michigan
                             .      November 14, 2013
                  Debtor.    .      11:01 a.m.
. . . . . . . . . . . . . . .

HEARING RE. DEBTOR'S MOTION PURSUANT TO SECTIONS 105
AND 107(b) OF THE BANKRUPTCY CODE FOR AN ORDER
AUTHORIZING THE DEBTOR TO FILE FEE LETTER UNDER SEAL IN
CONNECTION WITH THE DEBTOR'S POST-PETITION FINANCING MOTION
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  BRAD B. ERENS
                       77 West Wacker
                       Chicago, IL  60601-1692
                       (312) 782-3939

                       Jones Day
                       By:  ROBERT W. HAMILTON
                       325 John H McConnell Blvd., Suite 600
                       Columbus, OH  43215
                       (614) 469-3939

For Financial          Williams, Williams, Rattner &
Guaranty Insurance       Plunkett, PC
Corporation:           By:  MARK R. JAMES
                       380 North Old Woodward Avenue, Suite 300
                       Birmingham, MI  48009
                       (248) 642-0333

For David Sole:        Jerome D. Goldberg, PLLC
                       By:  JEROME GOLDBERG
                       2921 East Jefferson, Suite 205
                       Detroit, MI  48207
                       (313) 393-6001

For Syncora            Kirkland & Ellis, LLP
Holdings, Ltd.,        By:  STEPHEN HACKNEY
Syncora Guarantee,     300 North LaSalle
Inc., and Syncora      Chicago, IL  60654
Capital Assurance,     (312) 862-2074
Inc.:

APPEARANCES (continued):

| | |
|---|---|
| For Detroit Retirement Systems - General Retirement System of Detroit, Police and Fire Retirement System of the City of Detroit: | Clark Hill, PLC By: ROBERT D. GORDON 151 South Old Woodward, Suite 200 Birmingham, MI 48009 (248) 988-5882 |
| For National Public Finance Guarantee Corporation: | Sidley Austin, LLP By: GUY S. NEAL 1501 K Street, N.W. Washington, DC 20005 (202) 736-8041 |
| For Assured Guaranty Municipal Group: | Chadbourne & Parke, LLP By: SAMUEL S. KOHN 30 Rockefeller Plaza New York, NY 10112 (212) 408-1060 |
| For Official Committee of Retirees: | Dentons By: CAROLE NEVILLE 1221 Avenue of the Americas New York, NY 10020-1089 (212) 768-6889 |
| For Ambac Assurance Corporation: | Arent Fox, LLP By: CAROL CONNOR COHEN 1717 K Street, N.W. Washington, DC 20036 (202) 857-6054 |
| For Michigan Council 25 of the American Federa- tion of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub- Chapter 98, City of Detroit Retirees: | Lowenstein Sandler, LLP By: JOHN K. SHERWOOD 65 Livingston Avenue Roseland, NJ 07068 (973) 597-2538 |
| For Barclays: | Cravath, Swaine & Moore, LLP By: DANIEL SLIFKIN Worldwide Plaza 825 Eighth Avenue New York, NY 10019-7475 (212) 474-1438 |

Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2     be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Good morning.  I'd like to begin with

4     the motion to seal, please.

5          MR. ERENS:  Good morning, your Honor.  Brad Erens,

6     E-r-e-n-s, of Jones Day on behalf of the city.  Would your

7     Honor like any appearances before we start?

8          THE COURT:  That's probably a good idea.  So if

9     you're planning to address the Court regarding this motion,

10    can you put your appearance on the record now, please?

11         MR. JAMES:  Good morning, your Honor.  Mark James on

12    behalf of Financial Guaranty Insurance Company.

13         THE COURT:  Yes, sir.

14         MR. GOLDBERG:  Jerome Goldberg on behalf of

15    interested party David Sole.

16         THE COURT:  I do have to ask you to speak into a

17    microphone for me either at the table or, if it's more

18    comfortable for you, at the lectern.

19         MR. GOLDBERG:  Yes, your Honor.  Should I redo it,

20    your Honor?  Jerome Goldberg on behalf of interested party

21    David Sole.

22         THE COURT:  Thank you, sir.

23         MR. GOLDBERG:  Thank you.

24         MR. GORDON:  Good morning, your Honor.  Robert

25    Gordon of Clark Hill on behalf of the Detroit Retirement

1 | Systems.

2 |     MR. HACKNEY:  Good morning, your Honor.  Stephen
3 | Hackney on behalf of Syncora.

4 |     MR. NEAL:  Good morning, your Honor.  Guy Neal,
5 | Sidley Austin, on behalf of National Public Finance Guarantee
6 | Corporation.

7 |     MR. KOHN:  Good morning, your Honor.  Samuel Kohn of
8 | Chadbourne & Parke on behalf of Assured Guaranty Municipal
9 | Corp.

10 |     MS. NEVILLE:  Good morning, your Honor.  Carole
11 | Neville from Dentons on behalf of the Retiree Committee.

12 |     MS. CONNOR COHEN:  Good morning, your Honor.  Carol
13 | Connor Cohen from Arent Fox on behalf of Ambac Assurance
14 | Corporation.

15 |     MR. SHERWOOD:  Good morning, your Honor.  Jack
16 | Sherwood, Lowenstein Sandler, on behalf of AFSCME.

17 |     MR. HAMILTON:  And on this side of the room, your
18 | Honor, Robert Hamilton of Jones Day on behalf of the City of
19 | Detroit.

20 |     MR. SLIFKIN:  And good morning, your Honor.  Daniel
21 | Slifkin of Cravath, Swaine & Moore on behalf of Barclays.

22 |     THE COURT:  Okay.  Go ahead, sir.

23 |     MR. ERENS:  All right.  This is the motion of the
24 | city to file under seal a fee letter in connection with the
25 | debtor's proposed post-petition financing under 107(b) of the

1   Bankruptcy Code and Rule 9018 as confidential commercial

2   information of both the city and of Barclays.  Barclays is,

3   again, the proposed lender under the post-petition facility.

4          Your Honor, as we indicated in the seal motion,

5   there are really two relevant parts of the fee letter.

6   There's the provision that provides for so-called market

7   flex, which is a provision that allowed Barclays in

8   syndication of the loan, which they're entitled to do, to

9   agree under limited circumstances to an increase of, among

10  other things, the interest rate on the loan, and the point of

11  sealing the fee letter is if that market flex or increased

12  interest rate were publicly disclosed, parties who might be

13  syndication parties, parties who would buy the loan in

14  syndication, would know the amount of increase that Barclays

15  could agree to and naturally would agree -- or excuse me --

16  would request the maximum amount of the increase in the

17  interest rate.  That, of course, would cause the city to pay

18  an increased interest rate under the loan if approved, so

19  that is the reason, at least from the city's perspective, we

20  would like that information to remain confidential.

21          The second part of the fee letter --

22          THE COURT:  What is that potential increase?

23          MR. ERENS:  I'm sorry.

24          THE COURT:  What is that potential increase?

25          MR. ERENS:  The amount?  That is the -- that is

1    exactly the issue that the city would like to remain

2    confidential because parties who might buy the loan right now

3    know there is some increase but don't know how much, and so

4    if you are a party thinking of participating in the loan and

5    you knew the city and Barclays could agree to an increase in

6    the amount of the interest rate of "X," let's just say, you

7    would ask for "X."

8         THE COURT:  Okay.

9         MR. ERENS:  And the city obviously has a desire to

10   keep the interest rate as low as possible.

11        The second part of the fee letter provides for the

12   commitment fee that Barclays is owed in connection with

13   arranging the loan.  For reasons set forth in the seal motion

14   and we can describe in more detail through testimony today,

15   the disclosure of that fee also potentially could have the

16   effect of increasing the cost of the loan to the city.

17   Barclays also considers that information to be proprietary

18   and, therefore, commercial -- confidential commercial

19   information that the Court should protect it from disclosure

20   pursuant to 907 -- excuse me -- 107(b) and 9018.

21        We have a variety of objections on the motion.  I

22   think it's important to note one thing, your Honor, because

23   there may be some misconception among the objectors.  The

24   city is not seeking court approval of the commitment fee.

25   Since 363 does not apply in a Chapter 9, the city has the

1   authority to pay the fee without court authority, and, in
2   fact, as indicated in our underlying motion for the
3   financing, which is up on the 10th, the city already has paid
4   half of the fee and before that hearing will have paid the
5   remainder of the fee.  So as your Honor takes up the post-
6   petition financing on the 10th or thereafter, there's a
7   question as to how relevant that fee really will be because
8   it will have been paid and will remain paid regardless of
9   whether your Honor approves or does not approve the
10  financing, so we thought it was important to clarify that
11  point.
12          THE COURT:  So the city is committed to pay this
13  commitment fee whether the loan is approved or not?
14          MR. ERENS:  That's correct.  And the city has paid
15  half of it and will pay the remainder prior to the hearing on
16  the financing.
17          Another point, of course, which is implicit but we
18  thought was important to mention at the beginning of the
19  hearing, the city and Barclays, of course, are more than
20  willing to share the fee letter with your Honor in camera.
21  We have not done that yet but are happy to do so today.
22          Pursuant to your court's notice, we have brought
23  witnesses for this hearing.  We have a witness from Barclays,
24  and we have a witness from the city or on behalf of the city,
25  the witness from Miller Buckfire, the city's investment

```
 1   banker.  So unless your Honor has more questions or comments,
 2   we would propose we go directly to the direct testimony,
 3   which would begin with the Barclays witness.
 4        THE COURT:  Thank you.  Stand by, please.  Is there
 5   any objection to going straight to testimony here?  All
 6   right.  So as not to unduly extend these proceedings, I
 7   wonder if I could ask all of you who object to agree upon one
 8   of you to do the cross-examination.  And what we'll do is
 9   we'll hear the testimony, and -- hold on.  Hold on.  What
10   we'll do is we'll hear the testimony, and then we'll take a
11   little break, and you can consult among yourselves and decide
12   who's going to do it.  Okay?  Sir.
13        MR. SLIFKIN:  May I proceed, your Honor?
14        THE COURT:  Yes.
15        MR. SLIFKIN:  Yes.  Let me reintroduce myself.  I'm
16   Daniel Slifkin of Cravath, Swaine & Moore, and I represent
17   Barclays.
18        THE COURT:  And how do you spell that, sir?
19        MR. SLIFKIN:  It's S for Sam l-i-f for Frank k-i-n,
20   first name Daniel.  And with the Court's permission, we would
21   call Mr. James Saakvitne to the stand, and I'll spell that --
22        THE COURT:  Okay.
23        MR. SLIFKIN:  -- for you, too.
24            JAMES SAAKVITNE, WITNESS, SWORN
25        THE COURT:  All right.  Please sit down.
```

1          MR. SLIFKIN:  May I, your Honor?

2          THE COURT:  Yes, yes.

3                    DIRECT EXAMINATION

4    BY MR. SLIFKIN:

5    Q    Could you please state your name and spell it for the

6    record?

7    A    Sure.  James Saakvitne, and that's spelled S like Sam

8    a-a-k-v-i-t-n-e.

9    Q    And do you go by Jay?

10   A    Yes.

11   Q    So, Mr. Saakvitne, by whom are you employed?

12   A    By Barclays Capital.

13   Q    And what is your position at Barclays?

14   A    I'm a managing director and head of the municipal credit

15   group.

16   Q    Can you generally describe what your experience has been

17   at Barclays in the financing area?

18   A    Sure.  So I've been at Barclays for a little over four

19   years running the municipal credit group, and we provide

20   loans, letters of credit, liquidity facilities to a range of

21   municipal and not for profit entities.  Right now the

22   portfolio is approximately $7 billion or about 70 clients.

23   Q    And is municipal financing your sole focus?

24   A    Yes.

25   Q    Prior to Barclays, did you have previous experience in

1  this area?

2  A   I did.  I was at JPMorgan for 19 years, and the last 10

3  years there I ran the municipal credit group, and while there

4  we had a portfolio of about $30 billion of likewise loans,

5  liquidity facilities, letters of credit.

6  Q   Okay.  Now, let's focus on the proposed financing for the

7  City of Detroit.  Do you have a personal involvement in that

8  transaction?

9  A   I do.

10  Q   For the benefit of the Court, could you describe

11  generally what you did on the proposed transaction?

12  A   Sure.  So I was an integral part of the financing team.

13  I was -- once we received the request from the city for

14  proposals, I was involved in structuring and pricing and

15  then, once we received the mandate, in negotiation, in

16  working closely with lawyers on documentation, so I've been

17  involved from the start from it.

18  Q   And were you involved personally in negotiations with

19  advisors for the city?

20  A   Yes.

21  Q   Now, is this, in your experience, a standard type of

22  municipal deal?

23  A   No.  It's quite unique.  It's the first ever post-

24  petition financing for a municipality.

25  Q   So what particular element is unusual, from your

1  perspective, of municipal financing?

2  A   Well, this is really effectively a hybrid between a

3  typical municipal credit deal secured by a revenue stream and

4  by a post-petition financing where suddenly you're involved

5  with other creditors, with Bankruptcy Court, this whole

6  process, that is not typical for a municipal facility.

7  Q   Did you -- do you have personal experience with respect

8  to post-petition financing?

9  A   Not prior to this transaction.

10  Q   Okay.  Did you pull in from within your colleagues at

11  Barclays people with post-petition financing experience?

12  A   Yes.  Barclays is one of the top three providers of DIP

13  financing, and we have a dedicated team, and we worked

14  closely with them.  They were very much a part of the team on

15  this transaction.

16  Q   How did Barclays become involved in this process?

17  A   Like every investment bank involved in public finance,

18  we've been following closely the situation in Detroit as it

19  unfolded.  In late August we were approached by Miller

20  Buckfire saying that they were going to -- the city was going

21  to be sending out a request for proposals for post-petition

22  financing; that we would need to sign a nondisclosure

23  agreement if we were going to receive that, so we did sign a

24  nondisclosure agreement.  We received the request for

25  proposal in early September.  We worked on it and then

1    submitted it in the middle of September.

2    Q    Okay.  Are you aware whether or not there were other

3    bids?

4    A    Well, certainly the press -- it's been talked about in

5    the press that the city went out to approximately 30 or more

6    different bidders, and then it's been in the press that

7    supposedly there were 16 submissions.

8    Q    Have you seen any of the other bids?

9    A    No.

10   Q    Did you see any of the other bids or anyone at Barclays

11   see those bids during this process?

12   A    Not at all.

13   Q    Did Barclays share its bid with any of its competitors

14   during this process?

15   A    No.

16   Q    Have you shared your bid with your competitors since the

17   city signed the agreement with Barclays?

18   A    No.

19   Q    So, again, when did the city ultimately select Barclays'

20   proposal?

21   A    Well, it was a -- it was a bit of an iterative process,

22   but the commitment letter itself was signed -- I want to say

23   on October 6th.  I may have that date off by a couple of

24   days, but -- so it was -- basically that was the --

25   Q    Okay.

1   A   -- end of September, beginning of October.

2   Q   Let me ask you a few questions about the terms of the

3   agreement.  I'm just going to ask you to answer these "yes"

4   or "no" because while the question of confidentiality is sub

5   judice, obviously we don't want to reveal anything while the

6   Court is still deciding.  So are you personally familiar with

7   the fee letter which is the subject of today's hearing?

8   A   Yes.

9   Q   Okay.  And are you familiar with the specific terms of

10  that fee letter?

11  A   Yes.

12  Q   Are you familiar with the market flex term?

13  A   Yes.

14  Q   And are you familiar with the fee term?

15  A   Yes.

16  Q   Again, do you have an understanding of how Barclays

17  calculated the fee that appears in the letter?

18  A   Yes.

19  Q   And let me just go back to a point that Mr. Erens made in

20  his opening.  Is it, in fact, your understanding that the fee

21  is payable irrespective of whether the transaction is

22  approved?

23  A   Yes.

24  Q   And has Barclay received 50 percent of that fee?

25  A   We have.

1  Q   Okay.  So now let's turn to the market flex term.  Just

2  explain generally what a market flex term is.

3  A   So market flex really came into the market, especially

4  the corporate market, in the 1990s, and the idea is that when

5  a financial institution agrees to underwrite a loan or a

6  financing where they commit early on prior to the funding

7  period but with the expectation that they're going to sell

8  and distribute it, at the time when they give their initial

9  pricing for the deal, they have an expectation for what the

10 market is going to need to buy that piece of paper on the

11 closing date whether the closing date be two weeks or four

12 weeks or six weeks and then future.  What market flex is

13 doing is it's a provision that if the underwriter needs to

14 change the terms of the deal so that they can actually

15 successfully syndicate it on or around the pricing date, it

16 gives them the ability to do that under certain parameters.

17 So, for example, if the -- if it just turns out that they've

18 misread the market or if there's been a widening in credit

19 spreads in the interim, then, therefore, they can revise the

20 market accordingly.

21 Q   And does the proposed transaction with Barclays

22 contemplate syndication?

23 A   It does.

24 Q   Okay.  And what is Barclays' current intent with respect

25 to syndication of the loan?

1    A    We do plan to syndicate a portion of the loan.

2    Q    Okay.  Now, can market flex contain more than one

3    particular provision?

4    A    Certainly.  It can be any range of terms which help

5    enable the facility to be successfully marketed, syndicated.

6    Q    And I take it that, in fact, the fee letter includes a

7    market flex provision of some type?

8    A    Yes.

9    Q    Does that specific market flex provision at issue today

10   include the possibility of the interest rate being adjusted

11   upwards?

12   A    It does.

13   Q    In your experience, Mr. Saakvitne, are the details of

14   market flex terms typically kept confidential?

15   A    Yes, they are.

16   Q    Why is that?

17   A    They're kept confidential because if the market to whom

18   we are trying to syndicate the facility or any underwriter is

19   trying to syndicate the facility is aware of them, then they

20   will demand those highest possible provisions.  It's almost

21   like if you decide you want to buy a car and you walk onto a

22   car lot, you're not going to say to the car salesman, "Gee, I

23   really like this car.  I'm willing to pay $15,000 for it, but

24   let's start at 10,000, and let's see if you'll sell it to me

25   for 10,000."  Obviously the car salesman -- you've just shown

1    your hand, and the car salesman will say, "I'm sorry.  The

2    cost -- price on that car is 15,000."  It's a very similar

3    thing.  We want to keep the provisions secret so that we can

4    get the city the lowest cost.

5    Q    Okay.  So in the ordinary course, does Barclays itself

6    seek to maintain the confidentiality of market flex terms?

7    A    Absolutely.

8    Q    Can you provide us with any examples of financings --

9    recent financings where market flex was kept confidential?

10   A    Sure.  Just -- well, particularly within the DIP area,

11   I'll just throw out a few names, which would be the Tribune;

12   New Page, which is a paper company; Patriot Coal; and then

13   ResCap, which was part of the financing vehicle for General

14   Motors.  Those were all ones where it was kept under seal,

15   kept confidential.

16   Q    Okay.  Have you sought up till this hearing to maintain

17   the confidentiality of the Detroit -- I'll call it the

18   Detroit market flex provision?

19   A    We have.  Actually, in our commitment letter, we made

20   provisions for the fee letter to remain confidential.

21   Q    So you described generally what might happen with your

22   car example if a market flex term is made public or at least

23   available to competitors, people who might be in the

24   syndicate, you know.  Do you, in fact, have that fear in the

25   case of Detroit?

1  A   Yes, yes, absolutely, especially because in this

2  situation there's no ongoing market precedent for what the

3  correct pricing should be for a municipal DIP, so, therefore,

4  it's very important for us to be able to control the

5  information to be able to get the lowest possible price for

6  the city.

7  Q   Let me turn now to the fee provision in the letter.  I

8  take it there is provision for a specific fee in the letter.

9  A   There is.

10  Q   What does that fee cover?

11  A   You know, the fee covers a number of things.  It covers

12  the risk that we are taking to -- where we're committing to

13  fund the entire $350 million.  Even if the syndication fails

14  completely, Barclays is still on the hook for the $350

15  million.  It also covers the up front work we did on

16  structuring the deal.  We're paying our bank counsel out of

17  that fee.  It covers the work we're going to do on

18  syndicating the deal, so it's -- and then it also -- some

19  portion of it -- excuse me -- would be Barclays -- a portion

20  of Barclays' profit on the overall transaction.

21  Q   In your experience, are such fees, as you've described,

22  typically kept confidential?

23  A   They are.

24  Q   Okay.  And why is that?

25  A   They're kept confidential because the banks who put

1  together syndicated deals -- typically it's part of their

2  overall business strategy and business structure as to how

3  they want to be compensated and how much they want in the up

4  front fee versus how much they want in the ongoing running

5  fee, et cetera, so it's part of the --

6         THE COURT:  I'm sorry.  How much they want in what?

7         THE WITNESS:  I'm sorry.  In the interest rate, in

8  the ongoing running fee typically, so, yes, it is -- it's

9  commercial information that we'd keep confidential.

10 BY MR. SLIFKIN:

11 Q   And in the ordinary course, does Barclays keep that

12 confidential?

13 A   We do.

14 Q   If this fee information were to be available to your

15 competitors, how would that impact your business?

16 A   Our concern is that it would put us at a competitive

17 disadvantage because now going forward our competitors can

18 say, "Ah, we know how much Barclays charges up front to

19 provide a DIP like this," whether it be a corporate DIP or a

20 municipal DIP, and that in a competitive situation -- and

21 frequently these DIP financings are competitive situations --

22 it will give our competitors a better ability to have an

23 advantage over us because they know more about the black box

24 of our pricing.

25 Q   Does Barclays get to see its competitors' fee

1  information?

2  A    No.

3  Q    You also mentioned the methodology for determining fees.

4  Is that also something that Barclays maintains

5  confidentiality on?

6  A    We do.

7  Q    Okay.  And why is that?

8  A    Again, it just comes down to the more information you

9  give about how our overall pricing works, the more possible

10  it is for a competitor to break it apart and to tease it out

11  and figure out and, therefore, give them a competitive

12  advantage against Barclays.

13  Q    Now, in some of the objections that were filed in

14  response to the motion, there was a suggestion that the, in

15  fact, municipal deals tend to be public.  Is that correct, in

16  your experience?

17  A    Well, different components of municipal deals are, and

18  that's where it's actually worth talking about sort of what

19  kind of deal is this because, you know, for a typical

20  municipal bond underwriting, the underwriting fees of the

21  underwriter would be public, but this is not a public bond

22  deal.  This is a private placement, and it's really more akin

23  to a traditional bank loan.  Yes, we chose in our bid to

24  structure it as a note instead of a loan.  That was really

25  more for booking purposes.  To give you some examples, when

1    we provide a direct purchase of a loan, we don't make -- to a

2    municipality, we don't make our fees public on that, nor do

3    our competitors on their deal.  Likewise, when I provide

4    letters of credit and liquidity facilities on municipal

5    bonds, we put the fees associated with those in a separate

6    fee letter, and that fee letter is not disclosed to the

7    public.  And this is actually important because for municipal

8    bonds the MSRB, which is the Municipal Securities Rulemaking

9    Board, has very strict requirements under G-34 as to what has

10   to be disclosed to investors, and they've come out and said,

11   yes, the bank fees do not have to be disclosed.  They're not

12   posted on the website that MSRB maintains.

13   Q   Do you have an understanding of whether fees are

14   disclosed typically in DIP financing?

15   A   I do have an understanding, and they are not typically

16   disclosed.

17   Q   Okay.  With respect to the fees in the Detroit fee

18   letter, the Detroit Barclays fee letter, in Barclays' view,

19   could disclosure of that fee have an impact on the financing

20   itself?

21   A   We think that it could.  It has the possibility -- in

22   fact, I think more than the possibility -- the probability

23   that investors, if they see the up front fee, are going to --

24   when I say "investors," I mean the people to whom we're going

25   to syndicate the loan -- will try to take a disproportional

1  share of that, and that would affect it.

2  Q   Can you explain what you -- well, let me back up for a

3  second.  Are you personally familiar with negotiating with

4  members of a syndicate?

5  A   Yes.  I've done that.

6  Q   Okay.  So explain to us how it is you think those

7  negotiations would be affected by disclosure of the fees in

8  the fee letter?

9  A   So the way that the negotiations would be affected is

10 that obviously any member of the syndicate wants to be --

11 feel that they're being treated fairly.  They want to feel as

12 though they're getting similar compensation for the risk that

13 they're taking from any other bank.  If they see our up front

14 fee, which, you know, I've talked earlier about the number of

15 different things that that provides compensation for, then

16 they can just determine, oh, well, we think that all of that

17 should be allocated towards risk and not towards deal

18 creation, administration, legal fees, et cetera, and that

19 they would put in a demand for that whole up front fee, which

20 really would not be -- it wouldn't make sense for Barclays to

21 be able to share in that way.

22 Q   Okay.  There was some suggestion in opening that

23 revealing the fee to members or potential members of the

24 syndicate could raise the cost to the city.  Do you agree

25 with that or not?

1  A   Well, I do agree because the reason for that is it really

2  ties in with the market flex, and the risk is that if the

3  syndicate members know the amount of the up front fee and if

4  they then are told that they are not a -- we're not able to

5  share that with them because it's being used to compensate us

6  in other ways, that may put more -- give them more motivation

7  to press for a higher interest rate, which would, therefore,

8  increase the likelihood that we had to kick in on the market

9  flex.  It's almost like on a mortgage where the syndicate

10 members -- it's like on a mortgage where if you get more --

11 if you get lower points up front, then you have to pay a

12 higher rate on your mortgage.

13 Q   Does Barclays intend to, you know, share all of its

14 commitment fee or all of its fees with the potential

15 syndicate members?

16 A   We wouldn't be able to share all of it because there are

17 just a number of things which that up front fee compensates

18 us for that these other syndicate people didn't do.  That

19 being said, we may or may not choose to share some of it.

20 We'll just have to see how the syndication goes.

21 Q   Would you share all of it?

22 A   No.

23 Q   How likely do you think it is that were the fee to be

24 revealed, the market flex provision would kick in and the

25 rate to the city would be higher?

1   A   I think it's definitely an increased probability.  As to

2   how likely, I'm not sure.

3   Q   Okay.  Fair enough.  When Barclays entered into the

4   agreement with the city, did you have an expectation as to

5   whether the fee would be made public?

6   A   We fully expected that it -- we certainly expected that

7   it would not be made public.

8   Q   And did you do anything -- did you do anything to protect

9   yourself in that regard?

10  A   We did actually.  We put in the commitment letter that

11  the fee letter would remain confidential and that the city

12  would take efforts to have the fee letter be under seal.

13  Q   Had you been told prior to entering into this transaction

14  that, in fact, the fee would be made public, would that have

15  affected your approach to the transaction at all?

16  A   Very much.  We actually -- it would have very much raised

17  the possibility that we would not have chosen to submit a

18  bid.  If we did choose to submit a bid, we would have almost

19  certainly increased the up front fee.

20  Q   Okay.  Now, you've told us about competitive advantages.

21  You've told us about confidentiality.  You explained the

22  potential impact on the city.  Is there anything else, in

23  your view, that -- any other impact that may result from the

24  commitment fee being made public?

25  A   I believe there is actually, and I think that it's a more

1   macro impact.  The corporate DIP financing field is certainly

2   an active one, and it's one where lenders choose to lend to

3   corporate DIP's because they -- there's a history of fees

4   being kept confidential.  This is the first muni post-

5   petition financing.  I hope very much it's the last one in a

6   long time, but if it's not, we certainly want to keep the

7   field open so that if there is a demand for future municipal

8   post-petition financings, that financial institutions will be

9   motivated to bid, and part of their motivation is knowing

10  that their fees will be confidential.

11           MR. SLIFKIN:  Thank you very much.  I have no

12  further questions at this time, your Honor.

13           THE COURT:  All right.  We'll reconvene at 11:40 for

14  cross-examination.

15           THE CLERK:  All rise.  Court is in recess.

16      (Recess at 11:31 a.m., until 11:40 a.m.)

17           THE CLERK:  All rise.  Court is in session.  Please

18  be seated.  Recalling Case Number 13-53846, City of Detroit,

19  Michigan.

20           THE COURT:  Go ahead, sir.

21           MR. SHERWOOD:  Your Honor, Jack Sherwood, for the

22  record, from Lowenstein Sandler, counsel for AFSCME, and I

23  have been asked to try to coordinate our cross-examination.

24           THE COURT:  Okay.  Thank you, sir.

25                          CROSS-EXAMINATION

1  BY MR. SHERWOOD:

2  Q   Mr. Saakvitne, is that right?

3  A   Yes.

4  Q   How's that?

5  A   Okay.

6  Q   Let me start by asking about some of the precedent that

7  you talked about on direct.  I think you mentioned the ResCap

8  case and Patriot Coal; correct?

9  A   Yes.  Yes, that's right.

10 Q   And those were two Chapter 11 bankruptcy situations where

11 the fee letters were kept private.  Was that your testimony?

12 A   That's correct.

13 Q   Are you aware that in both of those cases the fee letters

14 were actually filed on the docket of the bankruptcy case with

15 certain terms redacted?

16 A   I wasn't aware of that, but -- so, no, I wasn't aware of

17 that.

18 Q   Okay.  And were you also aware that in both of those

19 cases, the debtor and the DIP lender disclosed the aggregate

20 amount of fees that they were charging in connection with the

21 loan?

22 A   I'm not aware of that.

23 Q   But you are aware that in this case Barclays is not

24 willing to disclose the aggregate amount of its fees and has

25 not done so in connection with this loan?

1    A    That's correct.

2    Q    And are you aware that in the ResCap case before Judge

3    Glenn in the Southern District of New York that Barclays was

4    the DIP lender?

5    A    Yes, I am aware.

6    Q    And did you do any review of the Barclays order or the

7    Barclay -- I'm sorry -- the ResCap order or the ResCap docket

8    in preparation for your testimony today?

9    A    No, I did not.

10   Q    Are you also aware that in both ResCap and Patriot

11   Coal -- now, do you know Patriot Coal was a Southern District

12   of New York case, too; correct?

13   A    I wasn't involved in that, so --

14   Q    Okay.  In both of those cases --

15             THE COURT:  Wasn't venue transferred?

16             MR. SHERWOOD:  Yeah.  That was -- it was Judge --

17   but I think Judge Chapman signed the order, for the record,

18   in Patriot Coal.  There was a famous opinion on venue in that

19   case.

20             THE COURT:  So maybe that was after the DIP

21   financing?

22             MR. SHERWOOD:  I believe so because I -- and just

23   for the record, your Honor, both of the orders that were

24   cited with docket number in the city's brief are available

25   for public consumption.

1    BY MR. SHERWOOD:

2    Q    So in this case, Barclays is not even prepared to

3    disclose its aggregate fees; correct?

4    A    That's correct.

5    Q    And it's certainly not willing to post its fee letter on

6    the Court's docket; correct?

7    A    I believe that's correct.  We're asking that it be under

8    seal, so --

9    Q    Okay.  Are you familiar with the types of fees that were

10   charged by Barclays in the ResCap case?

11   A    No, I'm not.

12   Q    Well, in looking at those, there's reference to a

13   structuring fee, an underwriting fee, a work fee, an agency

14   fee, three types of up front fees, and collateral agency

15   fees.  Do those terms sound familiar to you?

16   A    They do.

17   Q    Now, on direct you talked about getting 50 percent of

18   your fee in this case; correct?

19   A    Paid already, yes.  That's correct.

20   Q    Okay.  You've gotten paid.  Is that the only type of fee

21   that Barclays is getting in connection with this proposed DIP

22   financing?

23   A    The up front fee?  I'm sorry.  Can you -- I don't quite

24   understand your question.  I'm sorry.

25   Q    Well, it's hard because I don't have the fee letter, so

1    I'm just trying to, you know, work off of your testimony, and
2    there was testimony about your -- you having been paid 50
3    percent of a fee.
4    A    There's only one fee of which we've received 50 percent.
5    Is that -- I hope I'm answering your question.
6    Q    Okay.  So without disclosing the terms of the fee letter,
7    are you saying that there is one fee and one fee only that is
8    payable to Barclays in connection with this proposed
9    facility, and you've received half of that?
10   A    That's correct.
11   Q    And is that the only fee that Barclays will be entitled
12   to collect during the entire course of the DIP loan?
13   A    That is correct.
14   Q    Okay.  So there's no -- so is there a difference between
15   a structuring fee and an underwriting fee?
16   A    There --
17   Q    Let me -- what's that fee called?  What are you calling
18   that fee under this deal?
19   A    We're calling that fee the commitment fee.
20   Q    Okay.
21   A    The reality is that it covers a whole number of different
22   tasks and risks, et cetera.  We chose not to subdivide it
23   into four or five separate fees.  We could have, but we just
24   kept it simple and just called it one fee.
25   Q    And in addition to that fee, is Barclays entitled to

1  reimbursement of expenses?

2  A    We are paying bank counsel fee, legal fees out of pocket,

3  out of our own pocket.

4          THE COURT:  Answer the question "yes" or "no."

5          THE WITNESS:  I'm sorry.  Can you repeat the

6  question because I just want to make sure I get it right?

7  BY MR. SHERWOOD:

8  Q    In addition to the commitment fee that we spoke of, is

9  Barclays entitled to reimbursement for its out-of-pocket fees

10  and expenses from the city?

11  A    Yes.

12  Q    Okay.  So the commitment fee that we spoke of does not

13  include reimbursement of out-of-pocket fees and expenses to

14  Barclays; correct?

15  A    Correct.

16  Q    And has a projection been done and delivered to the city

17  of what those out-of-pocket fees and -- let's just say

18  expenses will be?

19  A    No.

20  Q    And those --

21          THE COURT:  Excuse me.  I have to ask what the

22  relevance of this is to whether the fee letter itself should

23  be confidential.

24          MR. SHERWOOD:  I just wanted to get an idea of what

25  the total universe of fees that we're not knowing about might

1  be, and I think I'm pretty much -- I think I've gotten my

2  answer.

3          THE COURT:  Okay.

4  BY MR. SHERWOOD:

5  Q   You'd agree, would you not, that in determining the

6  reasonableness of a financing commitment, that the level of

7  fees being charged is relevant to that determination?

8  A   Yes.

9  Q   And that was certainly considered by the city in its

10 decision of whether or not to choose Barclays as its lender

11 in this case?

12 A   I would assume so.

13 Q   Now, I think you said on direct that in a Chapter 11

14 context, the standing operating procedure is for a DIP lender

15 to not disclose its fees?

16 A   That's my understanding.

17 Q   And that's not based on your experience, though, because

18 I think you testified that you're kind of new to the DIP

19 lending world, and your experience is in the non-bankruptcy

20 municipal finance world; is that right?

21 A   That's right.

22 Q   So that testimony is based on understandings that you got

23 from some of your colleagues at Barclays?  Is that fair to

24 say?

25 A   Yes.  That's right.

1  Q   And are you based in -- where are you based?

2  A   New York.

3  Q   Okay.  And Barclays has substantial experience lending on

4  a DIP basis in the Southern District of New York.  Is that

5  fair to say?

6  A   That's my understanding.

7  Q   Would it surprise you to learn that under the local rules

8  of the Southern District of New York that all pricing and

9  economic terms including fees, commitment fees and any other

10 fees, are required to be disclosed in any DIP financing

11 application?

12 A   That would surprise me.

13        THE COURT:  Is your representation accurate,

14 counsel?

15        MR. SHERWOOD:  Local Rule 4001-2, contents of a DIP

16 motion, added to the provisions set forth in Bankruptcy Rule

17 4001(b)(1)(B) and (c)(1)(B) and (d)(1)(B), Item 3, "pricing

18 and economic terms, including letter of credit fees,

19 commitment fees, any other fees, and the treatment of costs

20 and expenses of the lender, any agent of the lender, and

21 their respective professionals."  I just read from the local

22 rules for the Southern District of New York.

23 BY MR. SHERWOOD:

24 Q   Would you agree that the standard practice for DIP loans

25 in a Chapter 11 context outside of Chapter 9, Chapter 11

1  context, is that the DIP lender must fully disclose all of

2  its fees that it's charging in connection with a loan as part

3  of the application that it files with the Court?

4  A   That's not consistent with what I've been told by my

5  colleagues.

6  Q   Have you learned anything from your colleagues about

7  their experience in dealing with creditors' committees in

8  Chapter 11?

9  A   Yes.

10 Q   And is it your understanding that in a typical Chapter 11

11 case where there is an unsecured creditors' committee and the

12 debtor is looking to get a DIP loan, that the committee and

13 its professionals are very concerned about the fees being

14 paid by the estate in order to secure that DIP loan?

15 A   Yes.

16 Q   And in that situation, is it also commonplace for the

17 debtor to fully disclose all fees, expenses, charges, et

18 cetera, being paid by the debtor as part of that DIP

19 facility?

20      MR. SLIFKIN:  Objection, your Honor.  To whom?

21 Fully disclosed to whom?

22      MR. SHERWOOD:  To the creditors' committee.

23      THE WITNESS:  It's my understanding that Barclays

24 frequently does that for professional eyes.

25      THE COURT:  For professional what?

1          THE WITNESS:  I'm sorry.  Professional eyes only.

2    BY MR. SHERWOOD:

3    Q    Let me ask you about your testimony with respect to your

4    expectation that the terms of the fee letter will remain

5    confidential.  Do you remember that testimony?

6    A    Um-hmm, I do.

7    Q    Okay.  Isn't it true that the commitment letter provides

8    that the confidentiality obligation on the part of the city

9    is qualified in some respects?

10   A    Yes.  We -- yes.

11   Q    Okay.  And one of those qualifications is to the extent

12   required by applicable law.

13   A    Yes.

14   Q    And are you familiar with that language?

15   A    Um-hmm.

16   Q    And another qualifier is as required by the Bankruptcy

17   Court.  Would you agree that that's a qualifier under the

18   commitment letter?

19   A    I would.

20   Q    Okay.  And I think also in the commitment letter there is

21   an agreement by the city to limit its disclosures to the

22   minimum necessary in seeking approval of the transaction;

23   correct?

24   A    Yes.

25   Q    So that is the extent of the committee's commitment to

1  Barclays with respect to confidentiality.  It is to try to

2  limit the disclosures to the minimum necessary in seeking

3  approval of this transaction; true?

4  A    True.

5  Q    Okay.  And to the extent that the Bankruptcy Court or

6  applicable law requires the city to disclose the fee letter,

7  then they did their best, and that's okay; right?  Isn't that

8  the terms of the deal?

9  A    That's the terms of the deal.

10  Q    So to the extent that applicable law or a Bankruptcy

11  Court requires disclosure, it's not like the financing is

12  going away.

13  A    Correct.

14  Q    Fair?

15  A    Correct.

16  Q    Now, in terms of syndication, I believe the commitment

17  letter says that Barclays reserves the right to do a

18  syndication after the deal is approved.  Fair?

19  A    That's correct.

20  Q    So Barclays is not obligated to try to syndicate this

21  loan; true?

22  A    Correct.

23  Q    Now, I know you testified that it's your intention, but

24  it's certainly not Barclays' obligation.  And if the

25  syndication fails, Barclays is still committed; true?

```
 1   A   That's correct.
 2   Q   In paragraph 1 of the commitment letter, Barclays is
 3   described as the sole lead arranger, sole bookrunner, sole
 4   syndication agent.  Those terms mean anything --
 5   A   Yes.
 6   Q   -- to you?  Yes?
 7   A   Yes.
 8   Q   What is all that?  Can you just give one sentence on what
 9   a sole lead arranger is, a sole bookrunner, a sole
10   syndication agent?
11   A   Sure.  The sole lead arranger basically means we
12   structure the deal ourselves.  The sole bookrunner sort of
13   ties in with sole syndication agent meaning that we're the
14   one who will go out and find other lenders for the deal, and
15   the sole underwriter means that we're the sole entity who
16   says at the time of the commitment letter, we will write you
17   a check for $350 million regardless of whether or not we're
18   successful on the syndication.
19   Q   And all of Barclays' roles -- they don't get separate
20   fees for each role.  They're all -- all those roles are
21   satisfied by the one fee; right?
22   A   That's correct.
23   Q   Okay.  So, now, Barclays -- you were competing with, say,
24   15 other potential DIP lenders in this transaction; isn't
25   that right?
```

1    A    That's what the press has said, that there were a total

2    of 16 submissions.

3    Q    Okay.  So you knew when you were making your submission

4    to the city that the city was comparing your terms and

5    conditions with many others.

6    A    We expected that to be the case.

7    Q    And you expected that your fees, right, your fee letter

8    would be compared with the fee letters of these many other --

9    A    Yes.

10   Q    -- prospective lenders?  And you knew during this process

11   that the city was looking for the best terms of pricing;

12   right?

13   A    That was our expectation.

14   Q    And pricing in this context is sort of a combination of

15   interest rate and fees; right?

16   A    Yes.  That's correct.

17   Q    Is there anything else that would be included in pricing

18   of a loan of this type?

19   A    Not really in pricing.  I was just going to say there

20   could be other terms that the city might take into account.

21   Q    Nonfinancial terms.

22   A    Correct.

23   Q    Okay.  So -- but in terms of the financial terms, the key

24   ones are interest rate and fees --

25   A    Correct.  That's right.

1   Q   -- right?  So if the fees are really high but the
2   interest rate is low, that doesn't necessarily mean that, you
3   know, the pricing is good?
4   A   That's right.
5   Q   Okay.  Now, in the DIP loan application that the city
6   filed, interest is disclosed at LIBOR plus 250 basis points
7   or three and a half percent.  Are you familiar with that
8   disclosure by the city in the motion?
9   A   Yes.
10  Q   And that sounds right to you; right?
11  A   Yes.
12  Q   Now, and Barclays has committed to provide a loan at that
13  interest rate, have they not?
14  A   Subject to the market flex.
15  Q   Subject to the market flex.  Okay.  So I want to kind of
16  understand that.  Well, let me just -- in the motion the city
17  says if the market flex provisions are exercised, the pricing
18  on the DIP will still be below what is typical for a DIP
19  financing.  Do you agree with that statement?
20  A   DIP financings can be priced all over the place depending
21  on the situation, so I'm not sure by what standard they're
22  comparing that against.
23  Q   Okay.  I'm just representing to you that that was said by
24  the city's investment banker, Miller Buckfire, in paragraph
25  10 of his declaration.  I want to know whether you agree or

1    disagree with that.

2  A    It's hard to agree or disagree.

3  Q    Okay.

4  A    It's not --

5  Q    So does the -- so the market flex term of the -- is that

6    contained in the fee letter?

7  A    That's right.

8  Q    And it's nowhere else in the loan documents, to your

9    knowledge?

10  A    That's correct.

11  Q    Okay.  And this term gives Barclays the right to raise

12    the interest a little bit?

13  A    That's correct.

14  Q    And --

15         MR. SLIFKIN:  Your Honor, I just want to -- I'm sure

16    you're aware of this, but we're getting pretty close to

17    disclosing the -- asking to disclose the information that is

18    sub judice.

19         MR. SHERWOOD:  I think the Court asked that

20    question, and I understand that you're not going to give me

21    the level of flexibility --

22         THE COURT:  I permitted the question because the

23    phrase "a little bit" is so vague as to be meaningless.

24         MR. SLIFKIN:  Thank you, your Honor.

25    BY MR. SHERWOOD:

1  Q   So I guess what -- just to summarize what we can
2  understand now, you know, based on not seeing the fee letter
3  or the -- or understanding the market flex provision, at this
4  point Barclays has made a commitment to make a loan to the
5  city for -- at a rate of three and a half percent with sort
6  of this caveat that that three and a half percent might be
7  bumped up a bit if this market flex provision has to kick in.
8  Is that fair?
9  A   That's fair.
10 Q   And do you consider it confidential to -- or does the
11 market -- does the fee letter contain provisions that say
12 when the market flex provision is going to kick in?
13          MR. SLIFKIN:  Your Honor, can I ask that to be
14 answered "yes" or "no"?
15          MR. SHERWOOD:  That's all I was looking for, your
16 Honor.
17          THE WITNESS:  Yes, it does.
18 BY MR. SHERWOOD:
19 Q   Okay.  I just want to understand what the moving parts
20 are on the market flex provision, and I think -- I'm assuming
21 that it's -- you know, when it kicks in and then if it kicks
22 in, how much.  Yes?
23 A   Yes.
24 Q   Now, you'd agree that to the extent that Barclays cannot
25 syndicate this loan, Barclays is still on the hook for the

1  entire amount of the DIP loan.

2  A    Yes.

3  Q    And in terms of -- in terms of Barclays' desire to keep

4  these terms confidential, is it fair to say that you want to

5  do this so that you have an advantage in your negotiations

6  with the potential parties that you're negotiating with on

7  the syndication?

8  A    We want to do it to give the city the lowest possible

9  interest rate so that, therefore, it's the city's advantage

10  relative to the parties who are negotiating.  It's really

11  between the -- it's ultimately between the city and the

12  lenders, not between Barclays and the lenders.

13  Q    Well, it's also in Barclays' favor because to the extent

14  that Barclays does not have to give away some of its fees in

15  connection with this case to someone else in the syndication,

16  Barclays gets to keep those.  It's not going to give them

17  back to the city, is it?

18  A    No, we won't.

19  Q    Okay.  So it is in Barclays' advantage to not have the

20  potential syndicate lenders know what Barclays is getting in

21  terms of the gross fee in this case; true?

22  A    I'm not sure I do agree just because there's only a

23  certain amount of the fee that we would be able to -- or

24  willing to choose to give up without being fairly compensated

25  for what we have provided to date and that, therefore,

1    anything beyond that would really -- would be more likely to
2    tie into the market flex than the interest rate.
3    Q    All right.  But let's say that I'm a prospective
4    syndicator and I'm going to buy half of this loan, and I know
5    that you have "X" amount of dollars over and above your cost
6    that you've -- you're obviously not going to give away to
7    play with.  I'm going to say give me half of that.  I mean
8    that would be my position because I know what you have in
9    terms of excess.  I know what your profit is for the
10   commitment.
11   A    Well, but you wouldn't know what our costs were out of
12   the up front fee.  It would be a random choice on your side
13   as to how much of that is appropriate for Barclays to keep
14   and how much should be shared in the syndication.  There's no
15   formula for that.
16   Q    Does the fee letter distinguish between -- does the fee
17   letter -- and you can answer this "yes" or "no," and I'll
18   give you guys a chance to object, but does the fee letter --
19   if I read the fee letter right, would I be able to determine
20   how much Barclays' actual costs were by just reading that fee
21   letter?
22   A    No.
23   Q    I think you said something about -- on direct about in
24   the municipal finance context that fees are routinely not
25   disclosed.  Is that fair to say?

1    A    Bank fees --

2    Q    Bank fees.

3    A    -- are routinely not disclosed whether it be for a loan

4    or a letter of credit enhancing municipal bonds, et cetera.

5    Q    Are fees of lenders who do business with a city or a

6    state or county -- are those fees disclosed in any contexts?

7    A    Not typically.

8    Q    Can they be learned through like Freedom of Information

9    Act?  If I went to -- filed a Freedom of Information Act

10   request, could I be able to learn how much my city or town or

11   state is paying to its lenders on bond issuances and so

12   forth?

13   A    I'm just not sure.  I don't know enough about the Freedom

14   of Information Act.

15   Q    Do you know what MSRB is?

16   A    Absolutely, yes.  I think I referenced it in my

17   testimony.

18   Q    I think you did, too.  Can you just tell me what that

19   means, what that acronym stands for?

20   A    Oh, sure.  It's the Municipal Securities Rulemaking

21   Board.

22   Q    Okay.  And is it your testimony that that board prohibits

23   the disclosure of underwriting fees?

24   A    No.  I don't think that's what I said.  I think what I

25   said was that -- first of all, was that they permit that the

1  fees paid to banks for credit facilities do not have to be
2  disclosed so that, therefore, on their website, which is the
3  EMMA website, we'll post a letter of credit.  We'll post
4  reimbursement agreement, standby bond purchase agreement, but
5  we'll have the fees in a separate fee letter, and that is not
6  posted.
7  Q   Okay.  It says they don't have to be disclosed.  It
8  doesn't mean that they're never disclosed.
9  A   Correct.
10 Q   You also testified, I think, at the end that it was your
11 expectation that this fee letter would be kept private and
12 that had you known that the fee letter would be public, you
13 would have made the fee higher.
14 A   Um-hmm.
15 Q   Does that sound right?
16 A   That is right.
17 Q   But you gave that testimony knowing that the commitment
18 letter provides that at the end of the day, it is applicable
19 law or the bankruptcy judge that is going to decide whether
20 or not this fee letter gets disclosed; right?
21 A   That's right.
22 Q   Just one more thing going back to the discussions.  You
23 negotiated this with Miller Buckfire; right?
24 A   Um-hmm.
25 Q   During the course of --

1  A   I'm sorry.  I'm sorry.

2          THE COURT:  Is your answer "yes"?

3          THE WITNESS:  Yes.  I'm sorry.

4  BY MR. SHERWOOD:

5  Q   During the course of your discussions with Miller

6  Buckfire, was there any back and forth with respect to

7  particular terms concerning the Barclays commitment?

8  A   Yes, there were.

9  Q   Okay.  So it wasn't as though you made a commitment and

10 that was the end of the discussion?

11 A   That's correct.

12 Q   And while you were having that back and forth with Miller

13 Buckfire, was it your understanding that Miller Buckfire was

14 talking to other potential lenders and having similar

15 conversations?

16 A   It was our assumption but not our understanding.

17 Q   And just one last question, and then I'm going to have to

18 consult with my colleagues over here to see if I'm really

19 done, but in terms of the market flex and the possibility

20 that if that kicks in the interest rate may rise, you don't

21 know for certain whether or not that market flex will kick in

22 if the fee letter is made public, do you?

23 A   We don't know for certain.

24 Q   Thank you.

25         MR. SHERWOOD:  Can I have one second, your Honor?

1          THE COURT:  Yes, yes.  Take your time.

2          MR. SHERWOOD:  Let me just consult with the team

3    over here.

4          THE COURT:  Take your time.

5    BY MR. SHERWOOD:

6    Q    I'm going to ask a question, but before I do, I want --

7    this is -- this relates to the market flex and its relation

8    to the total amount of the fee being charged by Barclays

9    under the DIP loan.  And this is just a "yes" or "no"

10   question, and, you know, I'm just giving counsel a heads-up.

11   Has Barclays done an analysis which compares the percentage

12   of the market flex as compared to the total commitment fee?

13   "Yes" or "no"?

14   A    No.

15         MR. SHERWOOD:  I do have -- your Honor, before I sit

16   down, I would like to move to strike the testimony of this

17   witness as it relates to DIP financing as he's got no

18   personal knowledge or experience in this area.  He did

19   testify that it was his understanding that nondisclosure was

20   the rule in Chapter 11 DIP financings.  I think that's wrong

21   for a lot of reasons, but I also think that it's certainly

22   not something that this witness is --

23         THE COURT:  Well, does your motion to strike include

24   the testimony he gave in response to your questions, of which

25   there were several?

1            MR. SHERWOOD:  Well, I don't know which questions

2    you're talking about.  I mean I asked -- I asked --

3            THE COURT:  The questions you asked him about his

4    knowledge of DIP financing, of which there were several.

5    Does your motion include that or not?

6            MR. SHERWOOD:  Can I consult before answering that?

7            THE COURT:  Of course.

8            MR. SHERWOOD:  Your Honor, I think the consensus is

9    to withdraw the motion.  I think we've impeached the witness

10   on that issue, and --

11           THE COURT:  All right.

12           MR. SHERWOOD:  -- we'll argue that later.

13           THE COURT:  All right.

14           MR. SHERWOOD:  Thank you, sir.

15           THE COURT:  Redirect.

16           MR. SLIFKIN:  If I may stand here, I'll be very

17   brief, your Honor.

18           THE COURT:  Oh, no.  Stand at the lectern for me,

19   please.

20           MR. SLIFKIN:  Certainly.

21                      REDIRECT EXAMINATION

22   BY MR. SLIFKIN:

23   Q   You were asked on cross-examination whether you knew for

24   certain that disclosure of the fee letter would lead to the

25   triggering of the market flex.  Do you recall that?

1  A   I do.

2  Q   Okay.  And you said you don't know for certain.  Do you

3  recall that?

4  A   Correct, yes.

5  Q   Okay.  In your view, however, how likely is it that the

6  market flex would be triggered under those circumstances?

7  A   I think it's very likely just given the motivation of the

8  people -- the investors in this loan, lenders.  Their

9  motivation is to make as much money as possible.

10         MR. SLIFKIN:  Thank you very much.  I have nothing

11  further, your Honor.

12         THE COURT:  I have a question for you, sir.  Why is

13  it that the commitment fee would have been higher, as you

14  testified, if you had known in advance that the fee letter

15  would have been made public?

16         THE WITNESS:  The thinking behind that, your Honor,

17  is that recognizing that the investors to whom we syndicate

18  the loan, the other banks, et cetera, are likely to try to

19  get a piece of that once they know what it is, then we would

20  have had to price that in better in terms of putting that.

21  The other thing is -- if you don't mind my continuing for one

22  second, is that had it been -- had we known this would be

23  disclosed, we probably would have had to split the fee, you

24  know.  He mentioned, you know, the underwriting fee, the

25  admin fee, the syndication fee, et cetera, and to parse it

1 out more specifically because that would have at least put us
2 in a better position.
3        THE COURT:  Um-hmm.  Does the fee letter provide
4 for -- start over.  Do any of your agreements with the debtor
5 provide for a higher commitment fee in this case should the
6 Court deny this motion?
7        THE WITNESS:  No.  None of them do.
8        THE COURT:  Did you request of the city that your --
9 that any fee letter that is eventually agreed to be made the
10 subject of a confidentiality order before you made a bid or
11 as a condition of the bid?
12        THE WITNESS:  No, we did not.
13        THE COURT:  Did you consider doing that?
14        THE WITNESS:  No, I don't think we did.
15        THE COURT:  Are you feeling now like maybe that
16 would have been a good idea?
17        THE WITNESS:  In all honesty, I mean --
18        THE COURT:  Of course, in all honesty.
19        THE WITNESS:  In all --
20        THE COURT:  You took an oath.
21        THE WITNESS:  I'm sorry, but it's very important to
22 us to -- this may sound -- it's very important to us to be
23 there to help the city.  I don't think that even if this had
24 been made public -- I'm sorry if that sounds --
25        THE COURT:  Well, hold on.

1          THE WITNESS:  Okay.

2          THE COURT:  What's very important to you is to make

3    money.

4          THE WITNESS:  Yes, but I don't think that we

5    necessarily would have chosen to put in a provision that said

6    if the Court ruled one way that we would walk away from our

7    commitment.

8          THE COURT:  Is it fair to say that the thrust of

9    your commercial interest -- Barclays' commercial interest in

10   maintaining the confidentiality of the fee letter is that if

11   competitors see it, they will use that to their advantage in,

12   what, future deals?

13         THE WITNESS:  That's right.

14         THE COURT:  And by that you mean undercut your fee

15   structure?

16         THE WITNESS:  Yes.

17         THE COURT:  Of course, that would be good for your

18   customers, wouldn't it?

19         THE WITNESS:  They could end up with a lower cost,

20   yes.

21         THE COURT:  So heaven forbid there should be any

22   future Detroits, but if there are, making this letter public

23   would help them, wouldn't it?

24         THE WITNESS:  Not necessarily, your Honor.

25         THE COURT:  Okay.  Why not?

1          THE WITNESS:  Because right now the standard, as I

2     had been -- as I believed in DIP's, is that there's not

3     public disclosure of fees.  There may be disclosure to

4     committees, et cetera.  The concern is that if -- going

5     forward on a municipal DIP that if all fees are going to be

6     made public, that may put a real chill in the market and

7     disincent lenders from being willing to show their pricing

8     model.

9          THE COURT:  Um-hmm.  So much for being willing to

10    help the city, huh?  All right.  Any more questions for the

11    witness?  Sir, you may step down.  Thank you.

12       (Witness excused at 12:24 p.m.)

13         MR. HAMILTON:  Good afternoon, your Honor.  Robert

14    Hamilton of Jones Day on behalf of the City of Detroit.  We

15    have one witness to call, Mr. Doak, from Miller Buckfire.  I

16    expect his testimony to be very brief.  I would suggest we go

17    ahead and get it taken care of now.

18         THE COURT:  Yes, please.

19         MR. HAMILTON:  Call Mr. James Doak.

20            JAMES DOAK, DEBTOR'S WITNESS, SWORN

21         THE COURT:  All right.  Please sit down.

22                    DIRECT EXAMINATION

23    BY MR. HAMILTON:

24    Q    Could you state your name for the record, sir?

25    A    James Leland Doak.

1  Q   Mr. Doak, where are you employed?

2  A   I am employed at Miller Buckfire & Co., a Stifel Company.

3  Q   How long have you --

4        THE COURT:  Would you spell -- I'm sorry.  Would you

5  spell your last name for us?

6        THE WITNESS:  Sure.  D-o-a-k.

7        THE COURT:  Go ahead, sir.

8  BY MR. HAMILTON:

9  Q   And how long have you been at Miller Buckfire?

10 A   I've been with Miller Buckfire and its predecessor firms

11 for about 13 years.

12 Q   And what is your current position at Miller Buckfire?

13 A   I'm a managing director at Miller Buckfire.

14 Q   And during the course of your career at Miller Buckfire,

15 what has been the nature of your work?

16 A   I represent companies and other issuers of debt as well

17 as their stakeholders around distressed financial situations

18 assisting them with a variety of investment banker-related

19 tasks, asset sales, refinancings, financings, restructurings,

20 and then also advising stakeholders and potential buyers and

21 lenders in those situations as well.

22 Q   And in the course of doing those services, have you had

23 the occasion to run a process to solicit financing and other

24 capital in restructurings?

25 A   Yes, I have.  Most situations that we become involved in

1    at some point have a solicitation process for capital.

2    Sometimes that takes the form more of a sale process, and

3    sometimes that takes a solicitation of an equity or debt

4    financing process.

5    Q    And before you joined Miller Buckfire, where did you

6    work?

7    A    Before Miller Buckfire, I -- and its predecessors, I was

8    an investment banking analyst at Goldman Sachs.

9    Q    And just briefly, did you -- where did you get your

10   educational degrees from and when?

11   A    Sure.  I have a JD from Harvard Law School in 2000.  I

12   also have a masters in business administration from Harvard

13   also granted in 2000, and my undergraduate is -- was from

14   Harvard College, an AB, and that was in 1994.

15   Q    Were you involved in the process of obtaining proposals

16   for post-petition financing for the City of Detroit here?

17   A    Yes, I was.

18   Q    What was your role in that process?

19   A    I was intimately involved in all aspects of the process

20   for my client, the City of Detroit.  Going from the starting

21   point of figuring out what the solicitation process would

22   look like, determining who the contacted parties would be,

23   contacting those parties, explaining to them the solicitation

24   process, receiving indications of interest, proceeding with

25   due diligence questions that the various parties and their

1    advisors had, receipt of proposals, a determination of which

2    parties would proceed forward in the process, creation of

3    subsequent requests for definitive proposals, receipt of

4    those proposals, and evaluation of how then we should spend

5    our time in getting to the final proposal, which was the

6    Barclays proposal.

7    Q    And were you involved in the negotiations with Barclay of

8    the financing proposal that is the subject of our underlying

9    motion here?

10   A    Yes, I was.

11   Q    Would it be fair to characterize your role as the lead

12   negotiator for the City of Detroit in connection with the

13   negotiations with Barclays?

14   A    I would say I was one of the negotiators.  I'm on the

15   finance and businessing structure side.  The city had other

16   parties involved.

17   Q    Okay.  Are you familiar with the concept that's been

18   discussed today of market flex in these type of financing

19   facilities?

20   A    Yes, I am.

21   Q    Why is the concept -- or why is the provision of market

22   flex provisions in such financing facilities important, in

23   your judgment?

24   A    Um-hmm.  Well, market flex is a critical component of a

25   proposal that comes in a fully underwritten deal that allows

 1  a would-be financing party to put the best possible terms in
 2  front of the issuer or borrower and at the same time allow
 3  the parties to allocate the risk associated with the
 4  syndication process.  If we didn't have market flex, then
 5  would-be underwriters would be forced to assume or would be
 6  pressured to assume a -- you know, worser possible scenarios
 7  in coming up with financing, and also to the extent that they
 8  assume better proposals, the parties would not know exactly
 9  how best to manipulate the process or negotiate with other
10  parties in the syndication process, so it's an important give
11  and take that gives the issuer the opportunity to achieve the
12  best possible financing while at the same time having the
13  confidence that the proceeds can be raised.
14  Q    In your experience, are market flex provisions usually
15  kept confidential?
16  A    Yes.  In -- yes.
17  Q    Why is that?
18  A    Market flex provisions and their nature, how exactly they
19  will come into effect, which particular terms they relate to,
20  noneconomic and economic, are kept confidential because it
21  allows the underwriter and the arranger as much flexibility
22  as possible to derive the lowest possible cost of financing
23  for the issuer while at the same time achieving their
24  syndication goals.  If we just posted on the billboard, you
25  know, what the terms were, then you start the dialogue with

1  would-be investors at the high part of the range rather than

2  what the announced financing would be.

3  Q   All right.  So are you familiar with the market flex

4  provisions that are contained in the fee letter in this case

5  with Barclays?

6  A   Yes, I am.

7  Q   Were you involved in negotiating those provisions?

8  A   Yes.

9  Q   If those provisions, the market flex provisions, in the

10  fee letter were disclosed to the general public in this case,

11  would that have the potential for adverse economic

12  consequences for the City of Detroit?

13  A   Yes, it would.

14  Q   Could you explain why?

15  A   It would have the potential for negative economic

16  consequences because the provisions relate to, amongst other

17  terms, the factors of the interest rate that the city will

18  have to pay as it goes forward in this financing process, and

19  if those terms are publicly announced, then Barclays will

20  have to go to market and be discussing with would-be

21  investors, you know, how much off the max they'll, you know,

22  have to be in order to achieve their syndication goals rather

23  than what would be best for the city, which is starting with

24  the announced price and determining what they need to do to

25  achieve their syndication goals.

1  Q   During the negotiations with Barclays, did Barclays take

2  a position as to whether or not the contents of the fee

3  letter should remain confidential?

4  A   Yes.

5  Q   What was their position?

6  A   Their position was that the provisions of the fee letter

7  in its entirety should remain confidential.

8  Q   During those negotiations, did the parties discuss what

9  would happen if the Bankruptcy Court were to require the

10  submission of the fee letter as part of its adjudication of

11  the financing motion?

12         MR. SHERWOOD:  Objection.  It's irrelevant.  It's

13  dealt with in the commitment letter.  There are no

14  consequences.

15         MR. HAMILTON:  Well, that's where I was going, your

16  Honor.

17         THE COURT:  All right.  You may go there.

18         THE WITNESS:  Well, we -- the commitment letter says

19  what it says, and --

20  BY MR. HAMILTON:

21  Q   What does it say that the City of Detroit is required to

22  do if the Bankruptcy Court wants to see the fee letter?

23  A   Well, we -- pursuant to the exclusions to the

24  confidentiality provisions, we would present the fee letter

25  to the Bankruptcy Court.  These provisions, in my experience,

1  are sometimes, you know, provided to a smaller set of people

2  than the entire world.

3  Q   Does the -- those provisions in the commitment letter

4  that require the fee letter to be submitted to the Court

5  confidentially, do they require the City of Detroit to file a

6  motion to have the fee letter submitted under seal?

7  A   Yes, they do.

8  Q   All right.  And has the city complied with that

9  obligation in the commitment letter?

10 A   Yes, the city has.

11         MR. HAMILTON:  I have no further questions, your

12 Honor.

13         THE COURT:  Thank you, sir.  Are you going to be

14 proceeding with the cross-examination, and would you like a

15 few minutes?

16         MR. SHERWOOD:  It's up to the Court, your Honor.  If

17 you want to get this done, I'm prepared to go forward.  If

18 you want to take a break, then --

19         THE COURT:  All right.  Let me ask you to do that

20 then.

21         MR. SHERWOOD:  Could I have a few minutes?

22                    CROSS-EXAMINATION

23 BY MR. SHERWOOD:

24 Q   Mr. Doak, is that --

25 A   Yes.

1  Q   The city and Barclays will be asking the Bankruptcy Court

2  to enter an order approving this financing; is that right?

3  A   Yes.

4  Q   And as part of that order, it will ask the Court to make

5  a finding that the city and Barclays were dealing in good

6  faith and at arm's length; correct?

7  A   I haven't read the order.

8  Q   Okay.  In your experience, is it kind of important to a

9  DIP lender that it be considered a good faith lender?

10 A   Yes.

11 Q   Okay.  You were here for the prior examination, and I

12 quoted from your declaration where you said that you were of

13 the belief that even if the market flex provisions are fully

14 exercised, the pricing of this post-petition financing would

15 still be below what is typical for a post-petition bankruptcy

16 financing.  Do you remember writing that in your declaration?

17 A   Yes.

18 Q   And is that still your testimony?

19 A   Yes.

20 Q   In your work at Miller Buckfire, I assume you do work --

21 you've done a lot of DIP financings.  Do you guys normally

22 work for the borrower, the debtor?

23 A   Most often we work for the borrower.

24 Q   Okay.  And when you're analyzing potential DIP loans in a

25 Chapter 11 context, don't you have access to public

1  information that sets forth terms and conditions of DIP loans

2  in other big cases?

3  A    Yes.

4  Q    And in the performance of your duty as an investment

5  banker for the city, you routinely refer to these databases

6  to see what the marketplace is doing; correct?

7  A    Yes.

8  Q    And you'd agree, would you not, that in a typical Chapter

9  11 case, it's pretty common for the debtor to have to

10  disclose what the fees are that it's going to pay in

11  connection with its proposed DIP loan, would you not?

12  A    The economics of the loan are there's elements that are

13  frequently disclosed and there's elements that are held back,

14  held under seal, provided only to professionals.  It depends

15  on the situation.

16  Q    But you'd agree that the situations where information is

17  held back, that's the exception.  That's not the norm.

18  A    It would depend on which particular economics you're

19  talking about as in the typical -- because in the typical

20  Chapter 11 setting, the debtor needs court approval to pay

21  the commitment fee, that commitment fee is normally

22  disclosed.

23  Q    And would you agree that the standard practice in the

24  Southern District of New York, for example, is to disclose

25  all types of fees that are being paid by the debtor in

1  connection with the loan?

2  A    I don't have sufficient -- I have not sufficiently

3  reviewed Southern District, you know, recent cases to make

4  that statement.

5  Q    But generally you would counsel one of your borrowers to

6  comply with the rules of that court when it was filing an

7  application for financing in that court; right?

8  A    I'm the finance guy, not the legal guy.

9  Q    Okay.  During the course of your negotiations with

10  Barclays and the 15 other potential lenders, is it fair to

11  say that each of the other 15 potential lenders disclosed to

12  you the full terms and conditions, including fees and market

13  flex, with respect to their loans?

14  A    No.

15  Q    Okay.  How did you know what the other 15 were proposing?

16  A    The 16 total proposals that we received on our original

17  deadline arrived in a variety of formats, and some were

18  commitments for a portion of the facility.  Some were

19  commitments for the entire facility.  So some had enough

20  definition so that we could answer that question, and some

21  did not.

22  Q    Okay.  But at least some of them disclosed what the fees

23  were that they were going to charge together with the

24  interest rate?

25  A    Yes.

1  Q   So you -- so I think you talked about pricing, and I
2  think we talked about pricing.  Pricing includes a
3  combination of the fee and the interest rate; correct?
4  A   In various components, and then there's other terms of
5  the financing you have to take into account, yes.
6  Q   And from your perspective, as the investment banker for
7  the city, it was important for you to know which of -- what
8  the pricing terms were with respect to this loan; correct?
9  A   Yes.
10 Q   And in your experience in Chapter 11 when you're
11 representing a borrower, isn't it commonplace for a
12 creditors' committee to investigate pricing of a DIP loan?
13 A   Yes.
14 Q   And as debtor's professional in the Chapter 11 context,
15 you give that information to the committee's counsel and its
16 financial advisors; right?
17 A   In many contexts, yes.
18 Q   In the other proposals that you considered other than
19 Barclays, did those proposals include commitment fees as well
20 as reimbursement of professional fees and expenses?
21 A   Yes.
22 Q   And did any of the other proposals provide any type of
23 estimates or caps with respect to the professional fees and
24 expenses that would be charged against the loan over and
25 above the commitment fee?

1   A   I don't recall any caps.

2   Q   In terms of the market flex, would it be possible for

3   Barclays to give up some of its commitment fee to people in

4   the syndicate or as part of the syndication -- would it be

5   possible for Barclays to give up some of its commitment fee

6   as opposed to getting someone in the syndicate to raise the

7   interest rate?

8   A   Could you try that again?  Could you --

9   Q   So if Barclays goes out to a potential financial party

10  that it wants to join the syndication and that potential

11  financial party says, "I'm not willing to do it at this

12  interest rate.  I want more money from the city," can

13  Barclays, in turn, say, "In lieu of that, I'll give you

14  some -- an up front fee"?  Is that hypothetically possible?

15  A   That is possible, yes.

16  Q   Does that happen?

17  A   Yes.  In my experience, a syndication process typically

18  has a number of different terms in play, and that's one of

19  the reasons why, you know, firms like Barclays and others are

20  great at what they do.  They are able to manage those

21  competing interests of various parties to achieve the best

22  overall results for their clients.

23  Q   And you would agree generally that in addition to the

24  objective of trying to save the city from this market flex

25  possibility on the interest, one of the objectives here in

1  keeping this fee letter confidential is so that Barclays can

2  make more money; isn't that right?

3  A   Well, it's not my objective.  It's not the city's

4  objective.

5  Q   No.  I understand that.

6  A   The city's objective is to --

7  Q   But from --

8  A   -- achieve the lowest overall cost of financing.

9  Q   No, but from Barclays' perspective, it's so it can make

10 money in its negotiations with potential parties to the

11 syndication.

12       MR. HAMILTON:  Object.  Argumentative.  Wrong

13 witness.

14       THE COURT:  If the witness knows, he can testify.

15 Can you answer that question?

16       THE WITNESS:  I mean Barclays is providing this.  I

17 can't speak to what's going to happen at Barclays if they are

18 in a position where they are not achieving their syndication

19 thresholds and they are going to have to make a determination

20 as to how they are going to deploy the various provisions of

21 the flex as well as their commitment fee as well as thinking

22 about their cost of capital in determining where they want to

23 get to on selling down the commitment.

24 BY MR. SHERWOOD:

25 Q   Are you saying that Barclays can raise its commitment

1  fee?

2  A    No.

3  Q    So their commitment fee is fixed today; right?

4  A    Yes, it is.

5  Q    And the only thing that isn't fixed arguably is the

6  interest rate?

7  A    On pricing there's an -- elements of the interest rate,

8  that provision, that remain open.

9        MR. SHERWOOD:  Let me have a moment, your Honor.  I

10  think I'm --

11        THE COURT:  Yes, sir.

12        THE WITNESS:  Thank you.

13        MR. SHERWOOD:  Thank you, your Honor.

14        THE COURT:  Any redirect?

15        MR. SHERWOOD:  I have no further questions.

16        MR. HAMILTON:  No redirect, your Honor.

17        THE COURT:  Sir, you may step down.  Thank you for

18  your testimony.

19     (Witness excused at 12:47 p.m.)

20        THE COURT:  No further witnesses for the city or

21  Barclays?

22        MR. HAMILTON:  No, your Honor.  We rest on the

23  evidentiary presentation.

24        THE COURT:  Any witnesses for any of the objecting

25  parties?  Closing arguments, please.

1        MR. HAMILTON:  Your Honor, the City of Detroit would

2    waive a closing and reserve time for rebuttal.

3        THE COURT:  Okay.  And for this I'll let any of the

4    objecting parties argue.

5                          CLOSING ARGUMENT

6        MR. JAMES:  Good afternoon, your Honor.  Again, for

7    the record my name is Mark James.  I'm here on behalf of --

8    well, FGIC we call it, your Honor.  That's Financial Guaranty

9    Insurance Company.

10        Your Honor, I know the Court has had a chance to

11    review our paper, and as you've derived from our paper, all

12    we're asking for is for the confidential disclosure of the

13    fee letter and the engagement letter to FGIC and to its

14    professionals, including counsel and its financial advisors,

15    so they can analyze the pricing contained in those documents

16    in respect to the overall proposed DIP facility.  FGIC is not

17    going to and agrees to not disclose this to its insureds, to

18    any of the parties, to the general public.  It's not going to

19    post this on its website.  It's going to keep this

20    confidential.

21        THE COURT:  Well, but what are you going to do if

22    you find grounds to object to the terms in the fee letter?

23        MR. JAMES:  Your Honor, then we would seek to file

24    our objections under seal so that those objections are not

25    known to the general public.  We will do what we can to

1    protect this information that's disclosed in the letters.

2    We'll do the same thing the city is doing right now, your

3    Honor.  We will do what we can and what the Court allows to

4    prevent the general dissemination of this information.

5          Your Honor, we have asked for this obviously before

6    the motion was heard.  We did receive a document very late

7    last night seeking to deal with this issue, a proposed

8    confidentiality agreement, that, frankly, was so one-sided

9    that it made serious consideration impossible.  We received

10   this at about 11:34 last evening, your Honor.

11         I believe the Court has the ability to fashion the

12   relief that FGIC is asking for pursuant to Section 105(a) of

13   the Code, your Honor.

14         THE COURT:  What do I do --

15         MR. JAMES:  I don't --

16         THE COURT:  What do I do about what appears to be

17   plain language in Section 107(b), "the bankruptcy court shall

18   protect any entity with respect to a trade secret or

19   confidential research, development, or commercial

20   information"?

21         MR. JAMES:  Your Honor, I think that the -- just

22   limited to FGIC, your Honor, I think the relief that we're

23   seeking is not incompatible with 107(b).  That says that the

24   Court has an obligation to protect.  We're not asking for

25   wholesale general dissemination of this information.  We're

1  asking, as Mr. Doak had stated, for very limited disclosure

2  to professionals, to FGIC, to its financial advisors, and to

3  its counsel, for the sole purpose of analyzing --

4         THE COURT:  How many such people are there?

5         MR. JAMES:  Individuals or firms?

6         THE COURT:  How many such people are there?

7         MR. JAMES:  I don't know an answer to that question.

8         THE COURT:  Well, are we talking about four people

9  or twenty-four people or a hundred and twenty-four people?

10        MR. JAMES:  I think it's probably less than 124

11 people, your Honor.

12        THE COURT:  How many people?  Well, you get the

13 point.

14        MR. JAMES:  Yes.

15        THE COURT:  The point is the more people, the more

16 likelihood there is of breach.

17        MR. JAMES:  I understand that, your Honor.  I do.

18 And I -- you know, I can't --

19        THE COURT:  Where's the protection if there's

20 breach?

21        MR. JAMES:  Well, if the Court orders FGIC and its

22 financial advisors and its counsel not to disclose this

23 information, they'd be subject to contempt.

24        THE COURT:  Then someone is going to have to prove a

25 contempt case?

1          MR. JAMES:  Yes.

2          THE COURT:  And, besides, the damage is done at that

3    point.

4          MR. JAMES:  I suppose that's correct, your Honor,

5    but we are dealing with professionals.  We're dealing with

6    people who deal with confidential information as a matter of

7    course.  Counsel -- both my firm, Williams, Williams, Rattner

8    & Plunkett, and the New York firm that's representing FGIC --

9    that's Weil Gotshal -- that's what we do.  We maintain the

10   confidences of our clients.  We are -- we have ethical -- as

11   you know, we have ethical obligations not to disclose

12   information.  This would be no different than protecting a

13   client's confidences, your Honor.

14         THE COURT:  Okay.

15         MR. JAMES:  Thank you, your Honor.

16                    CLOSING ARGUMENT

17         MR. GOLDBERG:  Good morning, your Honor.  Jerome

18   Goldberg.  I'm here on behalf of interested party David Sole.

19   I'll be brief, your Honor.

20         I was struck by the testimony that said that Barclay

21   is charging a fee to cover -- because of its risk-taking.  In

22   my -- and I understand that we're not here to analyze this

23   deal today, but when I looked at the deal, it was pretty

24   clear to me that ultimately cost of this deal is going to

25   be borne by the taxpayers of the city and by the residents of

1  the city, which include my client and actually include
2  myself.  When I calculated it that approximately for six
3  years after bankruptcy 20 percent of income tax revenues for
4  the City of Detroit are going to be used to pay Bank of
5  America, to pay off Bank -- to pay off this loan to pay off
6  Bank of America and UBS, two banks, 20 percent of tax
7  revenues, and there's also a lien, of course, on the casino
8  tax revenues.  To me when I looked at the deal, it's the
9  people of the city that are going to be paying on this deal
10  for years to come, not just during the bankruptcy but even
11  more afterwards at a higher interest rate than was disclosed
12  today.  The idea that the people of the city are not entitled
13  to know the full terms of this deal when they're going to be
14  paying for this deal for years to come just struck me as
15  unconscionable.  It also struck me a violation of the Freedom
16  of Information Act, which applies to Michigan.  I looked at
17  the FOIA, and interestingly enough, the testimony was that
18  the confidentiality was subject to applicable law.  I looked
19  at the exemptions under FOIA, and there is no exemption for
20  fees associated with a deal like this.  The closest exemption
21  I found was 15.243(i), which covers, "A bid or proposal by a
22  person to enter into a contract or agreement, until the time
23  for the public opening of bids or proposals, or if a public
24  opening is not to be conducted, until the deadline for
25  submission of bids or proposals has expired."  Well, as they

```
 1    testified, the deadline for submitting the bids has expired.
 2    Under Michigan law -- under Michigan law, which favors --
 3    which covers the FOIA, which says the people shall be
 4    informed so they may participate in the democratic process,
 5    there is a duty to disclose, and under the FOIA, if it's not
 6    specifically covered by an exemption, it has to be disclosed.
 7    So the point I would say is it's the people of the city that
 8    are going to be paying for this deal.  And, again, I'm not
 9    here to debate the merits of the deal, but I have severe
10    questions about it.  It's the people that are committing our
11    tax dollars for years to come to pay off a couple of banks
12    basically with a small number -- about one-third going to
13    services, and for the people to be asked to pay off a deal
14    like this without even knowing the fees that a bank like
15    Barclays is charging seems to me unconscionable and illegal
16    under Michigan law, and I would ask you to -- and, moreover,
17    it's not going to cut the deal whatsoever.  And even the
18    market flex, the fact is they're committed to an interest
19    rate.  They're trying to get the market flex to get a
20    slightly better deal from what I heard.  They're still
21    committed to the deal.  So I would ask you to reject this.  I
22    think that it really would be an insult to the people of the
23    city to not get the full terms of this deal both because
24    we're paying for it and we're entitled to know.  Thank you.
25                         CLOSING ARGUMENT
```

1    MR. SHERWOOD:  Your Honor, I think when you talk
2  about confidential commercial information, I think you got to
3  deal with expectations.  What is the expectation of someone
4  coming into a bankruptcy case, and what is it, and what
5  should it be.  You know, any attorney who works for a
6  committee, a financial advisor, counsel for the debtor, they
7  have to disclose their rates, their hourly rates and so
8  forth.  They don't do -- they don't do that on their website.
9  They don't -- that's not public information, but when you
10  walk into a Bankruptcy Court and you make a loan, you have to
11  disclose the information, and full disclosure of fees is the
12  rule.  It's not the exception.  It is the rule.  It is the
13  rule, and I know I've cited -- in my questioning I talked
14  about the Southern District of New York, and I know that that
15  is not binding here, and your Honor can take it or leave it,
16  but they cite to all these cases in the Southern District of
17  New York, and in that district it is written into the local
18  rule that these fees -- all fees, not just non-sensitive
19  fees, all fees have to be disclosed, and that's why -- and
20  just for someone to come in and say, well, this is different
21  doesn't carry the burden, and I don't think they did it.

22    They cite to ResCap and Patriot Coal.  It's a matter
23  of public record.  Both of those cases had a lot more
24  disclosure than is projected here.  They put the fee letters
25  on the court docket.  It's part of the order that they cite

1   to.  And they did disclose in those Chapter 11 cases the

2   aggregate amount of fees, and the city is not willing to do

3   that here.  And obviously in order for any financial party in

4   interest in a DIP financing context to analyze the bona fides

5   of that DIP financing, fees charged on the loan is a huge

6   issue because, you know, the only -- one of the main things

7   that the parties who are arguably or potentially below them

8   in the waterfall in this case want to know is what are the

9   terms and conditions of payment to the Barclays or whoever

10  that's above me, and the fees and the interest rate is

11  obviously something that anybody who is a creditor of the

12  city deserves to know.  And I think layer on top of that that

13  this is a deal with a city and the general understanding that

14  transactions with cities are a matter of public record, the

15  expectation just wasn't there, so it isn't confidential

16  commercial information because there's no way that Barclays

17  could reasonably expect it to be, and the agreement bears

18  that out because the commitment letter -- the confidentiality

19  commitment in the commitment letter at paragraph 8 has

20  qualifications, to the extent permitted by applicable law, as

21  required by the Bankruptcy Court, and the only commitment on

22  the part of the city, which they fulfilled, was to try, and

23  they tried, but to the extent your Honor or applicable law

24  requires disclosure, everything is fine.  Barclays is still

25  here.  There is the threat of the interest rate going up, but

 1   even if that happens, Barclays -- or Miller Buckfire has

 2   testified that it's still below the range of a DIP financing.

 3   Barclays' syndication is optional.  It reserves the right to

 4   syndicate, so it's not necessarily going to happen.

 5           I think the common practice is full disclosure.

 6   It's especially important in a case like this, and the city

 7   has not made the case for confidentiality.  The city has

 8   taken a very extreme view here.  On behalf of AFSCME, we

 9   think that they have not made the case, and there should be

10   full disclosure like in the normal situation, but if the

11   Court -- and the Court should definitely not grant the motion

12   as submitted.  There are ways to protect confidentiality, but

13   certainly AFSCME and every financial party in interest in

14   this case deserves to analyze what this fee letter says just

15   like the city had a chance to do it and its professionals had

16   a chance to do it.  Miller Buckfire saw proposals from 16

17   different proposed lenders that had all of this information.

18   To say that the stakeholders and their representatives can't

19   see the same information is wrong.  Thank you.

20                      CLOSING ARGUMENT

21           MR. NEAL:  Good afternoon, your Honor.  Guy Neal,

22   Sidley Austin.  We filed a joint objection.  Just real brief,

23   you have National Public Finance Guarantee Corp., you have

24   Assured Guaranty Municipal Corp., and you have Ambac as well.

25   Taken together, your Honor, that's almost about $5 billion

1    worth of municipal bonds outstanding that those three

2    entities insure ranging from water and sewer system bonds,

3    unlimited tax general obligation bonds, limited tax bonds,

4    parking bonds, and the like.  I can go on, but the litany is

5    not relevant for this purpose.

6          Your Honor, we have a strong overarching vital

7    economic interest in the future of the city.  Our clients

8    will be insuring these bonds hopefully for a very long period

9    of time, and, as such, as creditors and the public generally,

10   as you heard from Mr. Goldberg, are entitled to a transparent

11   and open process in evaluating the proposed post-petition

12   facility.  That transparency, of course, would be materially

13   disturbed should the seal motion be granted.

14         An open and transparent process necessitates full

15   disclosure concerning the terms of the facility.  I'm going

16   to focus less -- and I'll be very brief, your Honor.  I'll

17   wrap up in a couple minutes.  I'm going to focus less on the

18   market flex and more on the fees because I think, your Honor,

19   that's where your questions to the Barclays witness were

20   directed to.  Where is the disadvantage in this process in

21   the full and open disclosure of those fees?  Perhaps not a

22   breakdown, but the aggregate amount of those fees, and you

23   heard Mr. Sherwood recite the precedent in the Southern

24   District and in other cases in which the total amount of

25   those fees are disclosed.  In fact, those fee letters are, in

1    fact, on the docket.

2          The main interest that was advanced by Barclays is

3    this could be a competitive disadvantage in future post-

4    petition borrowings in the municipal bond Chapter 9 arena.

5    Well, of course, as everyone concedes, this has never been

6    done before, and I don't think precedent should be set that

7    going forward in a municipal context, number one, a Chapter 9

8    context, number two, that there should be a precedent that

9    the total cost of this facility, the total cost of this

10   facility should be kept under wraps.

11         Next I'm going to just turn and close with the issue

12   that FGIC's counsel raised, and that is the proposed

13   confidentiality agreement, which was floated last night

14   around 11:30 for advisors' eyes only.  That doesn't work,

15   your Honor.  It also contains an indemnity provision such

16   that if my law firm signed it, we'd have to indemnify

17   Barclays.  And, in fact, your Honor, the only other time I

18   was front of you, your Honor, that was the end of August in

19   the context of the city's requirement that we had to sign an

20   indemnity to get access to the Milliman materials, and your

21   Honor quickly made it plain that that should be opened up,

22   the data room and all Milliman materials.  In the absence of

23   a strict confidentiality agreement which rather handcuffs

24   your ability to not only evaluate the information because you

25   can't turn to your financial advisors under their proposed

1  confidentiality, but it also handcuffs your ability to use

2  that information, and we join with FGIC's counsel that to the

3  extent such information may ultimately be used, if you don't

4  open it all up, your Honor -- to the extent it will

5  ultimately be used if it's not opened up, certainly that can

6  be filed under seal.

7       So, your Honor, in closing, I think you said it

8  best.  When you talk about -- or when Barclays talks about

9  needing to keep this information or to provide for

10 flexibility, you said "a little bit" is so vague as to be

11 meaningless, your Honor, so vague as to be -- or to render

12 incapable of any effective analysis, and we do think a

13 transparent process should be strongly encouraged and should

14 be, frankly, the precedent going forward, so thank you for

15 your time.

16                    CLOSING ARGUMENT

17       MR. KOHN:  Good afternoon, your Honor.  Samuel Kohn

18 of Chadbourne & Parke on behalf of Assured Guaranty Municipal

19 Corp.  We're one of the bond insurers that joined in the

20 objection with National.

21       First of all, your Honor, I would like to address

22 your Honor's question about 107(b), and it's a very good

23 question because the words "confidential commercial" --

24 "confidential research, commercial information" is -- it

25 could be considered confidential research, development, or

1    commercial information.  Now, the question is how

2    confidential is it really.  Barclays is a bank.  They take

3    risks.  They knew that there is a risk, and they priced that

4    risk in this becoming public because if it was really

5    confidential, they would have not -- they would have had

6    conditions that they were not going to go forward; that it

7    shouldn't be disclosed in any event -- in all events, but the

8    fact that they allowed some outs and understood that --

9    they're a bank.  They're in the business of risk.  They

10   priced their risk, and that means that pricing of that risk

11   is not confidential within the meaning of 107(b).

12   Confidential -- 107(b), the confidential commercial

13   information, means confidential, that they're really going to

14   get harmed.  This is a question of more profit for Barclays

15   or less profit for Barclays versus transparency and fairness

16   for everybody to evaluate whether the city is exercising

17   their reasonable business judgment in choosing this financing

18   and the DIP financing.  That's why it's critical.

19          Now, if it doesn't get -- if it doesn't get

20   disclosed, people -- the notice and opportunity for people to

21   object to the financing will be handicapped because we're not

22   going to know.  We're not going to know if it's reasonable or

23   fair under the standards of Section 364, and, your Honor, I

24   would -- you know, I would say that this is a Chapter 9 case,

25   of course, but 364 is included in 901.  Everything related to

1  64, all rules, all standards of Chapter 11 should be applied

2  in Chapter 9 because of the words that 364 is in 901, and in

3  Chapter 11 even the testimony that -- it was brought out in

4  cross-examination, of course, that in Chapter 11 this doesn't

5  happen.

6         And, your Honor, I just want to say one last thing

7  is that this is the first -- this is the first Chapter 9

8  post-petition financing.  You will be setting precedent here,

9  and people will look to your case, to Detroit, whether this

10 is -- whether 364 is included in 901 except for confidential

11 fee letters or whether the standards of Chapter 11 apply.

12 Thank you, your Honor.

13                    CLOSING ARGUMENT

14         MR. GORDON:  Good afternoon, your Honor.  Robert

15 Gordon on behalf of the Detroit Retirement Systems.  I'm

16 pleased to report to the Court that I will, due to the time,

17 just concur and join in the other closings.  I have nothing

18 further to add.  Thank you, your Honor.

19         THE COURT:  Thank you.  Anyone else on the objecting

20 side?  Rebuttal, sir.

21         MR. HAMILTON:  Thank you, your Honor.

22                   REBUTTAL ARGUMENT

23         MR. HAMILTON:  Three overall points, your Honor.

24 First is a procedural matter.  We're here on a motion to file

25 the fee letter under seal with the Court.  I do not believe

1  we are here today on a motion for a protective order filed by
2  either the City of Detroit or Barclays as to what
3  conditions -- under what conditions we would turn over the
4  fee letter to objectors in discovery.  In other words, we're
5  not here today to present to you a dispute because we
6  couldn't work out a confi where everybody would be in
7  agreement.  Hopefully, we will be able to work out a confi.
8          THE COURT:  Okay.  So what happens if the motion is
9  denied?
10         MR. HAMILTON:  Then a confi kind of becomes
11  irrelevant because if the motion is denied, it would be
12  publicly available.  If the motion were approved, then we
13  have to work out the terms under which the portions of the --
14  whatever portions of the fee letter we're going to disclose
15  in discovery are going to be disclosed under terms of
16  confidentiality agreements.  If we can't work it out amongst
17  us, we may have to come back to your Honor to resolve those
18  disputes as to what the confi should say and what it
19  shouldn't, whether it should have an indemnity provision or
20  whether it shouldn't, but that's not here today.  The issue
21  today is whether the fee letter should be disclosed to the
22  entire public in general, not to the objectors in discovery
23  under the terms of a confi.
24         Second, many of the questions on cross and all of
25  the arguments tended to merge or conflate what are two

1  distinct issues we think, at least from the City of Detroit's

2  perspective.  The fee letter has two components.  It has the

3  market flex provisions, and it also references the commitment

4  fee that the City of Detroit has already agreed to pay to

5  Barclays.  The analysis, I think, of those two provisions are

6  different in terms of the confidentiality arguments and the

7  public disclosure arguments that have been made.

8       With respect to market flex, the evidence in the

9  record is unrebutted.  It would cause -- has the potential to

10  cause substantial economic detrimental consequences to the

11  City of Detroit if the market flex provisions are made

12  publicly available to the general public because potential

13  participants in the syndication of this financing facility

14  will then demand close to or not the cap that's set forth in

15  the market flex provisions resulting in the City of Detroit

16  and, therefore, all its residents paying a much higher

17  interest rate than they would otherwise.  That is the

18  economic detriment that we are trying to avoid, and that

19  evidence is unrebutted.

20       THE COURT:  But how do you deal with the argument

21  that says democracy is inefficient?

22       MR. HAMILTON:  Your Honor, I have an argument for

23  that.  Here's how I deal with it, and I want to comment on

24  counsel's -- one of the -- the second counsel's comments

25  about FOIA.  There are no -- we have not done an exhaustive

1  analysis nor have we briefed it for the Court, but I think we

2  could all agree there are no provisions in Michigan's FOIA

3  that directly address this particular situation, and so if a

4  FOIA request were to be made, there might be litigation as to

5  what extent the Barclays proposal and the market flex

6  provision falls within an exception under Michigan's FOIA.

7          THE COURT:  Well, without losing sight of my

8  question to you, isn't FOIA set up such that everything is

9  disclosed except for specially -- specifically identified

10 types of information?

11         MR. HAMILTON:  That's correct, your Honor.  And what

12 I was going to make a reference to was counsel's suggestion

13 that there is an exception in FOIA for bids in an auction

14 process, and they said up until the time the bidding is

15 closed, the information is not discoverable under FOIA;

16 right?  And then once the bidding is closed, there's no

17 economic detriment to the city or to the government to

18 disclosing the information, and it's disclosed.  By analogy

19 here, once the syndication is closed, there is no economic

20 detriment to the City of Detroit if the market flex

21 provisions are revealed to the public, but until the

22 participation, the syndication of this facility is closed,

23 there is detriment to the City of Detroit, and by analogy --

24         THE COURT:  So you're arguing that the bidding that

25 FOIA refers to is the syndication bidding, not the bidding to

 1    the city regarding the underlying financing?

 2            MR. HAMILTON:  Your Honor, I wasn't making a literal

 3    argument.  It was by analogy.  The point is -- you made the

 4    point about democracy.

 5            THE COURT:  Well, but FOIA doesn't work by analogy.

 6    Either the information is exempted or it isn't.

 7            MR. HAMILTON:  That's correct, your Honor.  I think

 8    a legal argument could be made in the proper forum under FOIA

 9    that the market flex provisions do not need to be disclosed

10    under FOIA until the syndication process is completed, and

11    certainly our argument would be, in response to your

12    question, as a matter of democracy it is in the interest of

13    the residents, of the citizens of the state -- of Detroit not

14    to disclose the market information to them until after the

15    syndication process is over because they'll get a lower

16    interest rate as a result.  It's in their interest.  That is

17    the same principle why you don't disclose bids to the public

18    until after the bidding is closed.  That's how you reconcile

19    the democratic viewpoint that you have to disclose everything

20    to your citizens with the practical reality of it's not

21    really in their interest to know this information until after

22    the bidding is closed.

23            THE COURT:  Well, but how do they participate in the

24    process unless they have all the information?

25            MR. HAMILTON:  That's where confis come in.  That's

1   where in a Chapter 11 --

2           THE COURT:  Where what comes in?

3           MR. HAMILTON:  That's where confidentiality

4   agreements come in.  That's where the litigants --

5           THE COURT:  Oh, confi.  Got it.

6           MR. HAMILTON:  -- the professional advisors can see

7   it.  You can get expert testimony as to whether or not the

8   market flex provisions are above market or below market or

9   are improper somehow without disclosing on the public record

10  what the cap is, and that will maximize everybody's interest.

11  It will protect the city's residents because they'll get the

12  best interest rate possible, and you'll still get the expert

13  testimony you need.  If, in fact, any of the objectors decide

14  to argue that the market flex provisions are improper

15  somehow, you can still get that expert testimony through

16  declarations under seal, through general references without

17  disclosing the actual cap figure on the record in court.

18          THE COURT:  So this foresees objections under seal,

19  a closed courtroom?

20          MR. HAMILTON:  Unlikely.  It's possible, your Honor,

21  unlikely.  I think it is unlikely that --

22          THE COURT:  Well, it's only unlikely because you

23  don't think they'll have any grounds to object to the flex

24  position.

25          MR. HAMILTON:  On the market flex provision, the

1   only testimony in the record is that it's below market even

2   with the market flex provisions.  If they want to challenge

3   that, they can, and you can do that with expert testimony

4   without disclosing the actual figure in open court.  It can

5   be done, and it's in everybody's interest to do it that way,

6   particularly the residents of Detroit, because that'll get

7   them a lower interest rate.  That's the unrebutted testimony

8   from today's hearing.

9           The second aspect of the fee letter is the

10  commitment fee as opposed to the market flex, and this is

11  largely Barclays' concern, their confidential commercial

12  information of what the commitment fee is they charge and

13  what we agreed to pay.  I would point out that the City of

14  Detroit got the approval of the State of Michigan to pay that

15  commitment fee from the treasurer's department at the State

16  of Michigan.  It is improper for any of the counsel to say

17  what the common practice here is with respect to the

18  disclosure of the commitment fee because, as the unrebutted

19  testimony is and as everybody is aware, this is the first

20  time you've ever had a post-petition financing facility in

21  Chapter 9.  364(b) does not apply in Chapter 9.  The City of

22  Detroit can go out and get unsecured financing from Barclays

23  or anybody else and pay whatever commitment fee it wants and

24  do that without even getting your Honor's approval under

25  364(b) because it doesn't apply in Chapter 9.  It's only

1  because we need to -- we need to grant superpriority

2  administrative status and liens to get the financing that we

3  have to come to your Honor and ask for it, but to say that

4  the normal practice in Chapter 9 is to have to disclose the

5  commitment fees is just flat out wrong empirically,

6  historically because it's never been done before and

7  logically because 364(b) doesn't apply, and neither does 363.

8  When he talk -- when counsel talks about what was happening

9  in ResCap and in Patriot and any other Chapter 11 case,

10  you're dealing with a situation where 363 applies, and the

11  debtor is prohibited by 363 from paying a commitment fee

12  unless it first gets Bankruptcy Court approval because it's

13  out of the ordinary course of business, and so in order to

14  get Bankruptcy Court approval, you have to tell the Court

15  what you're asking the Court to approve.

16       THE COURT:  And what's the approval you're asking

17  for here?

18       MR. HAMILTON:  Granting super administrative -- the

19  need -- the necessity of granting super administrative

20  priority status and liens in order to obtain the financing we

21  need in order to fund the forbearance agreement, assuming

22  it's approved, and --

23       THE COURT:  So you're not going to ask the Court to

24  approve the interest rate?

25       MR. HAMILTON:  That will be part of the approval

1  process.

2  THE COURT:  So you are going to ask the Court to

3  approve the interest rate?

4  MR. HAMILTON:  Interest rate separate from

5  commitment fee, your Honor, yes.  The interest rate is part

6  of the financing.

7  THE COURT:  Well, but your own witnesses testified

8  that they are intimately interrelated.

9  MR. HAMILTON:  I believe he said in their pricing it

10  was interrelated.  Now when we come to you and ask for

11  approval, even if you disapprove the financing, we still got

12  to pay the commitment fee.  It's done.  The commitment fee

13  is --

14  THE COURT:  You don't want to hear my comment on

15  that.

16  MR. HAMILTON:  I understand your Honor's

17  frustration, and, quite frankly, the commitment fee, while

18  technically it's not relevant in that regard -- we're going

19  to pay it either way -- it is arguably, as counsel suggested,

20  relevant to the good faith finding.  If you're paying some

21  exorbitant commitment fee to Barclays, you might find this

22  was not done in good faith.

23  THE COURT:  So how do I litigate that without giving

24  it to the objecting parties?

25  MR. HAMILTON:  We can give it to the objecting

1  parties under a confi.  We just shouldn't tell the entire
2  public.  Again, today is just to file the letter under seal.
3  We aren't saying they can't get the commitment fee figures
4  under a confi under any circumstances.  That should be worked
5  out between us, Barclays, and the objectors, and we believe
6  that we've offered, I believe -- we've suggested that if
7  objectors want to share it with professionals, including
8  expert witnesses, to give testimony as to whether or not the
9  commitment fee is above or below market, that ought to be
10  able to be worked out.  What we're saying today is it should
11  not be filed on the public docket for all the reasons that
12  Mr. Saakvitne detailed on the stand.  And that's the end of
13  my argument, your Honor.
14        THE COURT:  All right.  Thank you.  Did you want to
15  speak, sir?  Go ahead.  I apologize.  Go ahead.
16        MR. SLIFKIN:  May I have a moment?  Thank you, your
17  Honor.
18                  REBUTTAL ARGUMENT
19        MR. SLIFKIN:  I'll be brief, but let me just echo
20  what counsel for the city said with respect to there being,
21  you know, all sorts of different issues being raised here
22  which actually all apply to some different motions before
23  your Honor and some motions that I believe haven't even been
24  made yet with respect to confidentiality orders.  The motion
25  here is a motion under 107(b).  The issue under the statute

1   is whether this document contains confidential commercial

2   information, and the issue under the statute is is that

3   something where disclosure would cause commercial injury to

4   an interested party, would it provide an unfair advantage to

5   the competitors of that party.  If the answer is "yes" to

6   those questions, then the statute says the Court shall seal

7   it.  It is left for another day whether or not in order to

8   facilitate your Honor's decision-making it ought to be given

9   to objectors, other interested parties, and the position of

10   Barclays on that is that can be handled through appropriate

11   confidentiality orders and stipulations and orders.  You

12   should be aware, your Honor, that, you know, there, of

13   course, is the committee of retirees and so forth, and we

14   understand their position, but many of the people who came to

15   argue at this podium today such as FGIC, such as Syncora, and

16   I believe others have made plain in their own papers that

17   they put in competing post-petition financing bids at the

18   time Barclays did, so by their own admission they are

19   competitors of Barclays.  No one today has said we're not a

20   competitor.  No one has said we're not going to be in future

21   syndication -- future DIP situations nor have they said

22   they're not going to try and purchase some of the securities

23   in a potential syndication.

24         THE COURT:  Well, but where's the competitive harm

25   from disclosure?

1      MR. SLIFKIN:  The competitive harm from disclosure
2  of the fee is that people will now know what Barclays' fees
3  are, what its structure is, what its methodology is, so that
4  they can --
5      THE COURT:  So it drives down the fee.
6      MR. SLIFKIN:  I'm sorry.
7      THE COURT:  So it drives down everyone's fees.
8      MR. SLIFKIN:  Potentially.  That's --
9      THE COURT:  Wouldn't your witness --
10     MR. SLIFKIN:  -- not entirely clear, your Honor.
11     THE COURT:  Wouldn't your witness testify then or
12 didn't your witness testify that that would just have the
13 effect of increasing the interest rate?
14     MR. SLIFKIN:  Potentially.  We don't know what's
15 going to happen, your Honor, but the standard is commercial
16 injury, commercial injury to Barclays, unfair competitive
17 advantage to Barclays' competitors.  That's the standard in
18 the statute.
19     THE COURT:  Right, but that would be in the next
20 case; right?  There would be no competitive injury to
21 Barclays in this case.
22     MR. SLIFKIN:  Well, that's not entirely clear, your
23 Honor.  It's still open for these people to come in and
24 propose an alternative DIP financing.
25         THE COURT:  It is?

1          MR. SLIFKIN:  They can come in and do it if they
2   like.  There's nothing to prevent them.
3          THE COURT:  Except that the city wouldn't listen to
4   it.
5          MR. SLIFKIN:  I can't speak for the city.  Depends
6   what terms they offer, your Honor, but none of that matters.
7   None of that matters with respect to what the statute says.
8   The statute talks about commercial information, right, as it
9   talks about trade --
10          THE COURT:  Confidential commercial information,
11   yes.
12          MR. SLIFKIN:  -- as it talks about trade secrets and
13   so on and so forth.  It may be that there's no harm from
14   revealing a trade secret in this proceeding, but it could
15   well be harmful in some other competitive environment.  It's
16   no different here, your Honor.
17          THE COURT:  Question.  Where's the harm to Barclays
18   if this is disclosed in this case?  What I heard was
19   competitors will know what the fee structure is and will
20   underbid it in the next case.
21          MR. SLIFKIN:  Yes.
22          THE COURT:  Okay.  So Barclays will have to lower
23   its fees in the next case, but wouldn't that just have the
24   impact of increasing the interest rate in the next case to
25   make up for it?

1    MR. SLIFKIN:  I can't say that, your Honor.  I don't
2  know that.

3    THE COURT:  What your witness said --

4    MR. SLIFKIN:  Well, I'm not sure that is entirely
5  what he said, your Honor.

6    THE COURT:  Tell me what you think he said then.

7    MR. SLIFKIN:  I think he said that it would chill
8  the entire market; right?  I understand what your Honor --

9    THE COURT:  Okay.  Okay.  It'll chill the entire
10  market.  How is that injury to Barclays?  Hurts a lot of
11  debtors in possession.  Hurts the next Detroit case, heaven
12  forbid.

13    MR. SLIFKIN:  As your Honor said quite correctly,
14  Barclays is in the business -- has for its shareholders to
15  make money.  If Barclays is impaired in making money in any
16  situation, that is a competitive injury.  It just is.

17    THE COURT:  It can't find someplace else to lend
18  $350 billion?

19    MR. SLIFKIN:  Million.

20    THE COURT:  Million.

21    MR. SLIFKIN:  Million, million, million.

22    THE COURT:  Correction accepted.

23    MR. SLIFKIN:  They're in the municipal lending
24  business, your Honor.  That's the business they're in.

25    THE COURT:  Well, but they're in lots of businesses.

1        MR. SLIFKIN:  Well, yeah, but --

2        THE COURT:  Yeah.

3        MR. SLIFKIN:  -- under that analysis, then nobody

4   ever suffers commercial injury because you could always just

5   go into a different business; right?  That I think proves too

6   much.  I think we have to take as granted as a baseline the

7   business that Barclays is in and whether this business will

8   be harmed or not.

9        THE COURT:  Where's the reasonable expectation of

10  privacy given FOIA?

11       MR. SLIFKIN:  Well, FOIA is something that I --

12  certainly Michigan FOIA is not something on which I would

13  claim any expertise.  It is by no means clear to us that FOIA

14  applies here.

15       THE COURT:  Why wouldn't it?

16       MR. SLIFKIN:  Well, I believe -- again, I haven't --

17  I'm not personally involved in this, but I understand that

18  Barclays is sending a FOIA confidentiality letter or may have

19  already done so to the city, and that issue needs to be

20  litigated, you know, in the future.  I don't think -- I don't

21  think one can -- ought to predict that ultimate analysis in

22  order to decide this motion and essentially then moot that

23  analysis like rather than have that analysis play out in the

24  appropriate forum with the appropriate, you know, ability to

25  defend yourself.

1        THE COURT:  What if the Court determines that it's
2    reasonably clear that this is disclosable under FOIA?  Then
3    where's the reasonable expectation --
4        MR. SLIFKIN:  Well, you see, that's --
5        THE COURT:  -- of confidentiality?
6        MR. SLIFKIN:  -- what I believe the Court should not
7    do.  I think that would be inappropriate, you know.  We
8    know --
9        THE COURT:  Why?
10        MR. SLIFKIN:  Why?  Because --
11        THE COURT:  Why not just read the statute and see if
12    it applies or not?
13        MR. SLIFKIN:  Because under FOIA there are certain
14    procedures and certain protections and certain submissions
15    the parties can make, and I believe that it's only
16    appropriate in the interest of due process for that to be
17    followed.
18        THE COURT:  And can you name one that might help
19    your client here other than the one that the city identified?
20        MR. SLIFKIN:  Well, as I said, you have me at a loss
21    because I haven't prepared on FOIA.  I prepared on 107(b).
22        THE COURT:  It's not me that has you at a loss,
23    counsel.
24        MR. SLIFKIN:  I'm sorry, your Honor.
25        THE COURT:  It's not me that has you at a loss.

1          MR. SLIFKIN:  Well, you appear to be --

2          THE COURT:  I'd like --

3          MR. SLIFKIN:  -- prejudging the FOIA issue, and I

4    don't think that's appropriate, your Honor.  I think the

5    record that is here today is the -- in these municipal

6    financings, right -- this stuff is kept confidential.  Now,

7    is it kept confidential in debtor in possession municipal

8    financings?  Well, there's no history on that, your Honor.

9    Is it kept --

10         THE COURT:  Well, you accept the proposition that

11   there's no history of that in Chapter 9 DIP financings.

12         MR. SLIFKIN:  In Chapter 9.  I was about to say that

13   in Chapter 11, you know, whatever the local rules of the

14   Southern District of New York say, we know that there are a

15   whole series of cases --

16         THE COURT:  Well, given --

17         MR. SLIFKIN:  -- where this information is filed

18   under seal.

19         THE COURT:  Given what counsel for the city has said

20   here today about the approval that's being requested under

21   Section 364 in this case, why should the rule be any

22   different here than in Chapter 11 where the approval is

23   functionally equivalent?

24         MR. SLIFKIN:  I'm not suggesting the rule should be

25   any different.  That's why we've cited a series of cases

```
 1   where this is sealed.  The rule is 107(b).  The rule is
 2   exactly the same.  It's 107(b).  There are numerous courts
 3   who have accepted that this is confidential information under
 4   107(b), and --
 5           THE COURT:  You interpret the Southern District of
 6   New York rules differently?
 7           MR. SLIFKIN:  No.
 8           THE COURT:  What am I missing here?
 9           MR. SLIFKIN:  That's simply the boilerplate local
10   rules.  It doesn't say we're writing out 107(b).  The
11   107(b) -- that's just like this is the presumption.  Okay.
12   That's not controversial.  We understand that's the
13   presumption.  Then you go to 107(b) and say if it's
14   confidential commercial information, which numerous courts
15   have said this is, then you go to the second part, it shall
16   be sealed, and the Second Circuit, which obviously governs
17   there, has been very clear that is mandatory.
18           THE COURT:  What one Chapter 11 case do you think is
19   the strongest case for your position here?
20           MR. SLIFKIN:  Would you allow me just to pull up
21   those papers?
22           THE COURT:  Yes, of course.
23           MR. SLIFKIN:  We would refer your Honor -- you have
24   to give me a moment because I'm getting used --
25           THE COURT:  Okay.  Take your time.
```

1          MR. SLIFKIN:  -- to my new glasses.

2          THE COURT:  Okay.

3          MR. SLIFKIN:  We would refer your Honor in

4    particular to <u>Re. in Tribune</u> in the District of Delaware.

5          THE COURT:  Have you got a case number on that?

6          MR. SLIFKIN:  Yes, your Honor.  It's Case Number 08-

7    13141.

8          THE COURT:  And a particular docket -- a docket --

9          MR. SLIFKIN:  Docket Entry 62.

10          THE COURT:  I'm sorry.

11          MR. SLIFKIN:  Docket Entry 62 in that case.

12          THE COURT:  62.  Okay.

13          MR. SLIFKIN:  And that's Bankruptcy Court for the

14    District of Delaware, December 10th, 2008.

15          THE COURT:  I'll have a look at that.

16          MR. SLIFKIN:  Thank you very much, your Honor.

17          THE COURT:  Thank you.  Okay.  I will take this

18    under advisement until 2:30, and we will get this matter

19    resolved at that time before we hear the one motion that is

20    left for the two o'clock call, which is the bar date motion.

21          I do want to ask counsel to cooperate with us with

22    this.  It appears that after the conclusion of last Friday's

23    eligibility hearing, there were things left in the courtroom,

24    and all of that stuff really needs to be removed from the

25    courtroom right away today because, as you know, we are just

1    guests here, and so we'd like to leave the courtroom in the

2    same condition in which it was presented to us, and so really

3    anything that is left at the conclusion of court today will

4    have to be disposed of, so please take everything out.  And

5    we'll be in recess or not --

6            MR. SHERWOOD:  Very briefly, your Honor, I just

7    wanted to politely remind the Court that there was another

8    motion on the 11 o'clock docket.

9            THE COURT:  Oh, there was.  That's right.  I forgot

10   that.  All right.  Well, let's take that up at 2:30 as well.

11   Is that all right?

12           MR. SHERWOOD:  Very well.

13           THE COURT:  And let's be sure we know what that was.

14   That's the discovery motion, yes.  All right.  So we'll do

15   that one before we do the bar motion.

16           MR. SHERWOOD:  Absolutely.

17           THE COURT:  Thank you for reminding me of that, and

18   now we will be in recess.

19           THE CLERK:  All rise.  Court is in recess.

20       (Recess at 1:33 p.m. until 2:30 p.m.)

21           THE CLERK:  Court is in session.  Please be seated.

22   Recalling Case Number 13-53846, City of Detroit, Michigan.

23           THE COURT:  The matter is before the Court on a

24   motion filed by the city for an order allowing it to file on

25   the Court's docket its fee letter from Barclays under seal

1   under 11 U.S.C., Section 107(b).  That section states in

2   pertinent part, quote, "On request of a party in interest,

3   the bankruptcy court shall protect an entity with respect to

4   a trade secret or confidential research, development, or

5   commercial information," close quote.

6        In response to the motion, several objections were

7   filed.  By its plain language, the statutory -- the statute

8   is mandatory in regard to confidential commercial

9   information, and so the issue before the Court is whether

10  this fee letter is confidential commercial information.  More

11  specifically, the issue is whether it is confidential.

12       The Court concludes that when the information is in

13  the hands of a Michigan city, as here, its confidentiality is

14  controlled by law, and in Michigan that law is the Freedom of

15  Information Act.  Under that act, information in the hands of

16  a Michigan city, as here, is subject to full disclosure

17  unless it is exempt from disclosure under MCLA 15.243.  The

18  Court concludes that none of the exemptions in that section

19  apply to this fee letter, and, therefore, it is subject to

20  disclosure, and, therefore, it is not confidential.  The

21  closest subsection is -- of those that establish exemption is

22  Subsection (i), but that subsection only exempts bids or

23  proposals until the deadline for submission has expired.  In

24  this case, even if the fee letter qualifies as a bid or a

25  proposal, which seems to the Court dubious, it is, in any

1  event, clear that the time for submission has passed.  All of

2  the witnesses here testified that the city is committed to

3  its agreement with Barclays subject only to approval of the

4  Court.  Therefore, the Court concludes that this fee

5  agreement would be subject to the Michigan Freedom of

6  Information Act and, therefore, is not, as a matter of law,

7  confidential.

8          Given that this information is subject to disclosure

9  under the Michigan Freedom of Information Act, the fact that

10  Barclays for its own competitive reasons wants it to be

11  confidential or thinks that it should be or has even

12  pronounced it to be confidential is really quite irrelevant.

13  It's even irrelevant that the city may have agreed to keep it

14  confidential because there's nothing in the Freedom of

15  Information Act that exempts material that is subject to a

16  confidentiality agreement between a private party and a

17  public institution like the City of Detroit or that permits

18  enforcement of such a confidentiality agreement.

19          Now, could the State of Michigan decide that because

20  of the potential costs of the disclosure of an agreement like

21  this, the Freedom of Information Act should be amended to

22  provide for the nondisclosure and for the confidentiality of

23  these agreements?  Of course, it could, but any such

24  agreement would be subject itself -- or excuse me -- any such

25  amendment itself would be subject to the democratic process.

1    Nevertheless, at this point in time, it's clear enough that

2    there is no such exemption from Michigan's Freedom of

3    Information Act and that, therefore, this letter is not

4    confidential commercial information.  Accordingly, the motion

5    is denied.  The Court will prepare an order.

6         (Proceedings concluded at 2:36 p.m.)

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| James Saakvitne | 10 | 25 | 47 | |
| James Doak | 51 | 58 | | |

EXHIBITS:

   None

| | |
|---|---|
| Closing argument by Mr. James | 66 |
| Closing argument by Mr. Goldberg | 69 |
| Closing argument by Mr. Sherwood | 71 |
| Closing argument by Mr. Neal | 74 |
| Closing argument by Mr. Kohn | 77 |
| Closing argument by Mr. Gordon | 79 |
| Rebuttal argument by Mr. Hamilton | 79 |
| Rebuttal argument by Mr. Slifkin | 88 |

        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.

/s/ Lois Garrett                    November 20, 2013

_____             _____
Lois Garrett