# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---

SYNCORA GUARANTEE INC.,

                Plaintiff,

          v.

UBS AG, SBS FINANCIAL PRODUCTS
COMPANY, LLC, and MERRILL LYNCH
CAPITAL SERVICES, INC.,

                Defendants.

Index No. _____

**COMPLAINT**

---

Plaintiff Syncora Guarantee Inc. ("Syncora"), by and through its undersigned attorneys, brings this complaint on knowledge as to its own acts and on information and belief as to all other matters.

### Nature of this Action

1. Syncora brings this action for declaratory and injunctive relief against UBS AG ("UBS"), SBS Financial Products Company, LLC ("SBS"), and Merrill Lynch Capital Service, Inc. ("MLCS") as successor to SBS pursuant to certain Transaction Transfer Agreements (collectively, the "Swap Counterparties"), the counterparties to the Detroit General Retirement System Service Corporation and the Detroit Police and Fire Retirement System Service Corporation (collectively, the "Corporations") in certain interest-rate swap contracts and associated agreements (the "Swap Agreements"). Syncora is an express third party beneficiary of the Swap Agreements, and it insures the Corporations' payment of amounts due under the Swap Agreements to the Swap Counterparties.

2. The Swap Counterparties and the Corporations entered into the Swap Agreements—and Syncora insured the Swap Agreements—as part of an integrated series of transactions under which the Corporations issued Pension Obligation Certificates of Participation ("COPs") in order to increase the funding of the City of Detroit's (the "City") primary public pension funds. Syncora also insures the Corporations' payment of amounts due on the COPs.

3. Because the COPs were originally issued primarily with floating rate debt, the Corporations entered into the Swap Agreements in order to fix the amount of interest they would have to pay, providing the Corporations (and Syncora as insurer) with cost-certainty and, accordingly, a more manageable level of risk. For this very reason, Syncora negotiated numerous contractual provisions that require the Swap Counterparties and Corporations to obtain Syncora's written consent to any amendment, modification, waiver or early termination of the Swap Agreements. Indeed, the Swap Agreements provide that any action taken without Syncora's consent is void and of no effect.

4. On July 15, 2013, the Swap Counterparties, the Corporations, and the City entered into an agreement (the "Forbearance Agreement") that, *inter alia*, grants the City the option to issue a direction to the Swap Counterparties to terminate the Swap Agreements at any time prior to March 13, 2014. The Swap Counterparties represent in the Forbearance Agreement that is their "view" that "each of SBS and UBS has the right to designate an Early Termination Date for the related Swap Agreements." The Swap Counterparties have also asserted in the Forbearance Agreement that SBS "is required to exercise [the right to terminate its Swap Agreements] at the direction of MLCS."

5. The Swap Counterparties' representation in the Forbearance Agreement that they have the right to terminate the Swap Agreements is inconsistent with the terms of the Swap

2

Agreements themselves which provide that Syncora's prior written consent is required prior to the designation of any Early Termination Date for the Swap Agreements. The Forbearance Agreement cannot amend, modify or waive Syncora's rights under the Swap Agreements as any such amendment, modification or waiver would require Syncora's consent which was never sought nor given. Therefore, any termination of the Swap Agreements by the Swap Counterparties—including any designation of an Early Termination Date—would require that they first obtain Syncora's consent as the Swap Agreements expressly provide.

6. In light of the statements by the Swap Counterparties in the Forbearance Agreement, Syncora has serious and well-founded concern that the Swap Counterparties will soon purport to terminate the Swap Agreements without having obtained Syncora's required consent. If the Swap Agreements were permitted to be terminated without Syncora's consent, it would eliminate the cost certainty that the Corporations currently enjoy and, consequently, expose Syncora—as the insurer of the COPs obligations—to substantial interest rate risk for which it did not bargain. That risk to Syncora is acute in the current interest rate environment.

7. Accordingly, by this action Syncora seeks (i) a declaration that (A) the Swap Counterparties may not terminate the Swap Agreements without Syncora's consent, (B) any purported termination of the Swap Agreements by the Swap Counterparties without Syncora's prior written consent will be void *ab initio* and of no force or effect, and (ii) a permanent injunction preventing the Swap Counterparties from terminating the Swap Agreements without obtaining Syncora's prior written consent.

### The Parties

8. Plaintiff Syncora Guarantee Inc. (formerly known as XL Capital Assurance, Inc.) is a New York corporation with its principal place of business in New York, New York, is a

monoline financial guarantee insurer that provides insurance and credit enhancement for various debt issuers.

9. Defendant UBS AG is a Swiss joint-stock company with its principal place of business in Switzerland.

10. Defendant SBS Financial Products Company, LLC is a Delaware limited liability corporation with its principal place of business in New York, New York.

11. Defendant Merrill Lynch Capital Services, Inc. is a Delaware corporation with its principal place of business in New York, New York.

## Jurisdiction and Venue

12. This Court has jurisdiction over the Swap Counterparties because they consented to jurisdiction in New York State Court, are authorized to do business in New York, and are doing substantial business in New York with permanence and continuity. Additionally, SBS and MLCS are headquartered in New York.

13. Venue in this county is proper pursuant to CPLR § 503 because at least one of the parties resides in New York County at the time this action is being commenced.

## The Facts

### *The Corporations Enter Into The COPs Transactions And Swap Agreements*

14. Beginning in 2005, facing a large shortfall in the funding of its public pensions, the City arranged to enter into a series of transactions designed to raise more than $1.4 billion through a series of off-balance-sheet transactions. To do so, the City first arranged to have the Corporations organized as Michigan non-profit corporations. The Corporations then created and used two funding trusts as vehicles through which the Corporations could issue and sell debt obligations, known as COPs, to the investing public.

15. In very basic terms, investors paid the Corporations for the COPs, and the Corporations forwarded those investment proceeds to the City. At the same time, the City entered into a "service contract" with each of the Corporations, pursuant to which the City paid to the Corporations the amounts owed under the COPs (the "Service Contracts").

16. In return for their investment proceeds, the COPs investors were promised payments of principal and interest, with a floating interest rate. The Corporations' ability to pay the COPs is totally dependent on the Service Contracts with, and revenue assignments from, the City. If the City fails to honor those contracts or assignments, the Corporations have no ability to pay COPs holders. To make the COPs more attractive to investors, the Corporations arranged for the purchase of insurance against a payment default on the COPs. Syncora provides this insurance.

17. To protect against what could have been uncapped interest rate exposure on the COPs depending on the movement of interest rates over time, the Corporations hedged that risk by entering into the Swap Agreements with UBS and SBS (with MLCS subsequently assuming certain of the rights and duties of SBS pursuant to certain Transaction Transfer Agreements). The Swap Agreements were structured such that the Corporations were obligated to make quarterly fixed payments to the Swap Counterparties while the Swap Counterparties, in exchange, were obligated to make quarterly floating payments tied to a LIBOR interest rate index, with a net payment being due to either the Corporations or the Swap Counterparties depending on the prevailing interest rates.

18. The basic idea of the Swap Agreements was to set the Corporations' overall interest rate obligations in respect of the COPs at a fixed amount, regardless of whether the

Corporations paid some or all of that interest amount to the COPs investors or to the Swap Counterparties.

19. So, for example, if the agreed upon fixed amount were 6% and if prevailing interest rates were 4%, the Corporations would, in effect, pay 4% to the COPs investors and 2% to the Swap Counterparties, setting the Corporations' exposure at 6%. On the other hand, if prevailing interest rates rose to 9%, while the Corporations would pay 9% on the COPs, they would receive funds equal to 3% from the Swap Counterparties, ensuring that the Corporations net payment would still be only 6%. As an insurer of the COPs, Syncora also benefits from this arrangement.

20. For the benefit of the Swap Counterparties, the Corporations also acquired from Syncora insurance against the Corporations' non-payment of amounts due under the Swap Agreements.

*Syncora's Protections Relating to the Swap Agreements*

21. Wary of losing the valuable protection that the Swap Agreements provided against the impact of interest rate movements on the Corporation's COP obligations and thus Syncora's potential insurance liabilities, Syncora ensured in the Amended and Restated Schedules to the Swap Agreements (the "Swap Schedules") that it "shall be an express third-party beneficiary ... of this Agreement" with the power to enforce and police the Swap Agreements. *See* UBS Swap Schedules at Part 5(xi); SBS Swap Schedules at Part 5(k). Syncora also negotiated extensive consent rights as a condition precedent to any termination of the Swap Agreements by either the Swap Counterparties or the Corporations.

22. For example, the Swap Schedules provide that, if there is a Termination Event or an Event of Default (as those terms are defined in the Swap Agreements), neither the Corporations nor the Swap Counterparties "shall designate an Early Termination Date pursuant

6

to Section 6 of this Agreement ... without the prior written consent of the Swap Insurer." Syncora is the only Swap Insurer under the Swap Agreements. *See* UBS Swap Schedules at Part 5(i); SBS Swap Schedules at Part 5(a). The Swap Schedules go on to confirm that even if the Swap Counterparties were to designate an Early Termination Date as to other transactions, that designation shall not apply to the Swap Agreements "unless expressly provided in such designation and agreed to in writing by the Swap Insurer." *See* UBS Swap Schedules at Part 5(xiv); SBS Swap Schedules at Part 5(n).

23. Similarly, Paragraph 8(b) of the Swap Agreements, as amended, provides that "[n]o amendment, modification or waiver in respect of this Agreement or any Credit Support Document will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties and the Swap Insurer." Accordingly, the Swap Agreements also may not be amended, modified or waived without Syncora's consent.

24. There have been multiple Termination Events and/or Events of Default under the Swap Agreements arising from recent events in the City of Detroit, including continuing cross defaults caused by the City's failure on June 17, 2013 to make a $40 million payment to the Corporations that was necessary for them, in turn, to meet their obligations in connection with the COPs. The existence of these Events of Default and/or Termination Events are not in dispute by any of the parties to this action. Indeed, the Swap Counterparties themselves represented in the Forbearance Agreement that "one or more Events of Default and/or Additional Termination Events has occurred" under the Swap Agreements.

25. Thus, under the plain language of the Swap Agreements, neither the Swap Counterparties nor the Corporations may designate an Early Termination Date for the termination of the Swap Agreements unless they first obtain Syncora's prior written consent.

7

*Agreement To Terminate The Swap Agreements*

26. On July 15, 2013, the Swap Counterparties, the Corporations and the City entered into the Forbearance Agreement. Among other things, the Forbearance Agreement provides the City with the option to issue an "Optional Termination Notice" to the Swap Counterparties that would direct them to exercise their so-called "Optional Termination Right" to terminate the Swap Agreements as of a termination date set forth in the Notice. The City must exercise the option on or before March 13, 2014.

27. At the time the City exercises the option, the Forbearance Agreement provides that it must pay to the Swap Counterparties a specified buy-out amount that is either 75%, 77% or 82% of the value of the Swap Agreements, depending on when the option is exercised. The earlier that the City issues its Optional Termination Notice directing the Swap Counterparties to terminate the Swap Agreements, the lower the buy-out amount, rendering it likely that the City will issue such a notice shortly.

28. As part of the Forbearance Agreement, the Swap Counterparties represent that it is "the view of the Swap Counterparties that ... each of SBS and UBS has the right to designate an Early Termination Date for the related Swap Agreements" and that they have "the right (but not the obligation) to terminate the Swap Agreements as described in" enumerated sections of the Swap Schedules. The Swap Counterparties have also asserted in the Forbearance Agreement that SBS "is required to exercise [the right to terminate its Swap Agreements] at the direction of MLCS."

29. However, the Swap Counterparties representations in the Forbearance Agreement that they have the right to designate an Early Termination Date for the Swap Agreements is contradicted by the terms of the Swap Agreements themselves which provide, as described above, that neither the Swap Counterparties nor the Corporations "shall designate an Early

8

Termination Date … without the prior written consent of the Swap Insurer [*i.e.*, Syncora]." The existence of Syncora's consent right is not mentioned in the Forbearance Agreement nor do any of the enumerated provisions from the Swap Agreements referenced in the Forbearance Agreement include the sections that provide for Syncora's consent rights.

30. Nor can the Forbearance Agreement be interpreted as amending, modifying or waiving Syncora's consent right under the Swap Agreements. As described above, any amendment, modification or waiver of the Swap Agreements would require Syncora's consent. No such consent was sought or provided in connection with the Swap Counterparties entry into the Forbearance Agreement.

31. Syncora thus has immediate and serious concerns that the Swap Counterparties will imminently purport to designate an Early Termination Date and terminate the Swap Agreements without first obtaining Syncora's written consent.

32. Syncora would suffer serious and irreparable harm if the Swap Agreements were terminated without its consent. Termination of the Swap Agreements would eliminate the cost certainty that the Corporations currently enjoy and, consequently, expose Syncora—as the insurer of the COPs obligations—to substantial interest rate risk for which it did not bargain. That risk to Syncora is particularly acute in the current environment when interest rates are on the rise and the protection against rising interest rates is thus of paramount importance.

33. Syncora therefore brings this action seeking a declaratory judgment and permanent injunction to protect its important and valuable contractual rights under the Swap Agreements.

## Causes of Action

### First Cause of Action
### (Declaratory Judgment)

34. Syncora repeats and re-alleges the allegations in paragraphs 1 through 33.

35. An actual and justiciable controversy exists amongst the parties.

36. The Swap Counterparties have asserted in the Forbearance Agreement that "each of SBS and UBS has the right to designate an Early Termination Date for the related Swap Agreement" and that they have "the right (but not the obligation) to terminate the Swap Agreements." The Swap Counterparties have also asserted in the Forbearance Agreement that SBS "is required to exercise [the right to terminate its Swap Agreements] at the direction of MLCS."

37. In contrast, it is Syncora's position that, as set forth in the express terms of the Swap Agreements, the Swap Counterparties may not "designate an Early Termination Date … without the prior written consent of the Swap Insurer [*i.e.*, Syncora]." Syncora has never consented to an amendment, modification or waiver of this consent right and it therefore remains in force and effect.

38. Upon information and belief, the Swap Counterparties will shortly purport to designate an Early Termination Date and terminate the Swap Agreements in contravention of the express terms requiring Syncora's prior consent.

39. Accordingly, Syncora respectfully seeks a judgment declaring that (A) the Swap Counterparties may not terminate the Swap Agreements without Syncora's consent, (B) any purported termination of the Swap Agreements by the Swap Counterparties without Syncora's prior written consent will be void *ab initio* and of no force or effect.

## Second Cause of Action
### (Permanent Injunctive Relief)

40. Syncora repeats and re-alleges the allegations in paragraphs 1 through 39.

41. The Swap Counterparties have asserted in the Forbearance Agreement that "each of SBS and UBS has the right to designate an Early Termination Date for the related Swap Agreement" and that they have "the right (but not the obligation) to terminate the Swap Agreements." The Swap Counterparties have also asserted in the Forbearance Agreement that SBS "is required to exercise [the right to terminate its Swap Agreements] at the direction of MLCS."

42. In contrast, it is Syncora's position that, as set forth in the express terms of the Swap Agreements, the Swap Counterparties may not "designate an Early Termination Date … without the prior written consent of the Swap Insurer [*i.e.*, Syncora]." Syncora has never consented to an amendment, modification or waiver of this consent right and it therefore remains in force and effect.

43. Upon information and belief, the Swap Counterparties will shortly purport to designate an Early Termination Date and terminate the Swap Agreements in contravention of the express terms requiring Syncora's prior consent.

44. Syncora would suffer irreparable harm if the Swap Agreements were terminated without its consent. Termination of the Swap Agreements would eliminate the cost certainty that the Corporations currently enjoy and, consequently, expose Syncora—as the insurer of the COPs obligations—to substantial interest rate risk for which it did not bargain.

45. Accordingly, Syncora respectfully seeks an order permanently enjoining the Swap Counterparties from terminating the Swap Agreements without obtaining Syncora's prior written consent.

## Prayer for Relief

Syncora respectfully requests a judgment:

(a) declaring that the Swap Counterparties may not terminate the Swap Agreements without Syncora's consent;

(b) declaring that any purported termination of the Swap Agreements by the Swap Counterparties without Syncora's prior written consent will be void *ab initio* and of no force or effect;

(c) permanently enjoining the Swap Counterparties from terminating the Swap Agreements without obtaining Syncora's prior written consent; and

(d) providing such other relief as this Court deems just and proper.

DATED: New York, New York
July 24, 2013

           QUINN EMANUEL URQUHART &
           SULLIVAN, LLP

By: _____
Jonathan E. Pickhardt
Susheel Kirpalani
Jake M. Shields
Nicholas J. Calamari
51 Madison Avenue, 22nd Floor
New York, New York 10038
(212) 849–7000

*Attorneys for Syncora Guarantee Inc.*

12

13-53846-tjt    Doc 1822-2    Filed 11/26/13    Entered 11/26/13 12:03:51    Page 13 of 13