## UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### (Southern Division)

| | | |
|---|---|---|
| In re | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846-swr |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |

## OBJECTION OF HYPOTHEKENBANK FRANKFURT AG, HYPOTHEKENBANK FRANKFURT INTERNATIONAL S.A., ERSTE EUROPAISCHE PFANDBRIEF- UND KOMMUNALKREDITBANK AKTIENGESELLSCHAFT IN LUXEMBURG S.A., AND FMS WERTMANAGEMENT SERVICE GMBH AS SERVICER TO FMS WERTMANAGEMENT TO MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A., a Luxembourg stock corporation (collectively, "EEPK"), and FMS Wertmanagement Service GmbH, as servicer to FMS Wertmanagement ("FMS" and together with EEPK, the "Objectors"), by their respective undersigned attorneys, hereby file this Objection to Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (the "Financing Motion").[1] In support hereof, the Objectors state the following:

---

[1] EEPK was a co-movant in the motion seeking leave to conduct discovery concerning the Financing Motion (Docket No. 1640) (the "Discovery Motion"). At the November 14, 2013, hearing on the Discovery Motion, the City agreed, on the record, to extend the time for EEPK and other known objectors to the Financing Motion that desired to take discovery to respond to the Financing Motion through November 27, 2013.

# I.  Background

1.     On July 18, 2013 (the "Petition Date"), the City of Detroit, Michigan (the "City") commenced a case under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code").

2.     Each of the Objectors holds certificates of participation (the "COPs") supported by services contracts between the City and each of the General Retirement System Service Corporation and the Police and Fire Retirement Service Corporation (collectively, the "Service Corporations").

3.     On the Petition Date, the City filed a motion seeking entry of an order authorizing the assumption of a Forbearance and Optional Termination Agreement dated July 15, 2013 by and among the City, the Emergency Manager,[2] and the Service Corporations, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc. (the "Swap Counterparties"), on the other (the "Forbearance Agreement"), pursuant to section 365(a) of the Bankruptcy Code and approving of the settlements contained in the Forbearance Agreement pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (Docket No. 17, as corrected at Docket No. 157) (the "Settlement Motion").  The Forbearance Agreement was entered into just three days before the Petition Date.  EEPK (Docket No. 246), FMS (Docket No. 364), and numerous other creditors and parties in interest objected to the Settlement Motion.

4.     In late August 2013, in connection with depositions being taken by the Objectors and other objecting parties with respect to the Settlement Motion, the City revealed that it intended to obtain post-petition financing in order to pay the substantial termination fee the City proposes to pay to the Swap Counterparties under the Forbearance Agreement.  While the Settlement Motion and related affidavits explained the importance, in the City's view, of

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them in the Financing Motion.

unfettered access to the taxes owing to the City in respect to the gross receipts earned by each of the City's three casinos (the "Casino Revenue") and the risk, in the City's view, that such unfettered access could be disrupted if the Forbearance Agreement was not approved, neither the Settlement Motion nor the supporting affidavits revealed that after obtaining approval of the Forbearance Agreement, the City intended to seek to obtain new financing secured, in part, by the Casino Revenues.

5. The hearing on the Settlement Motion was scheduled to occur in September 2013. The City did not have a commitment to provide financing to pay the termination fee to the Swap Counterparties as of the time of the settlement hearing, and the hearing on the Settlement Motion was continued.

6. On November 5, 2013, the City filed the Financing Motion and this Court scheduled a combined hearing on the Settlement Motion and Financing Motion for December 10, 2013, and, if necessary, December 11 & 12, 2013.

## II. The Proposed Financing

7. Through the Motion, the City seeks to have this Court authorize it to obtain senior secured post-petition financing on a superpriority basis in an amount up to $350 million pursuant to a Commitment Letter dated October 6, 2013, by and between the City and Barclays Capital, Inc. ("Barclays"). Barclays and the City also have entered into an Engagement Letter for Exit Financing dated October 6, 2013, pursuant to which Barclays is also given the right to act as exclusive and sole bookrunner, underwriter, and placement agent with respect to notes or bonds the City may distribute in connection with a plan of adjustment. A true and correct copy of the Engagement Letter for Exit Financing is attached hereto as <u>Exhibit A</u> and incorporated herein by reference.

3

8.    The Financing Motion indicates that the City intends to use the proceeds of the proposed post-petition financing to (a) pay the termination fee to the Swap Counterparties in accordance with the Forbearance Agreement and (b) to reinvest in the City by (i) upgrading information technology systems, (ii) purchasing new equipment for the City's police and fire departments, and (iii) removing blight.  However, the City has stated that the "primary reason" for seeking post-petition financing is to pay the termination fee to the Swap Counterparties. *See* *"Detroit Post-Petition Financing, Briefing Materials Prepared for City Council Closed Session"* dated October 17, 2013, attached hereto as Exhibit B at p.  5.

9.    The post-petition financing will be evidenced by, among other things, a Swap Termination Note and a Quality of Life Note.  The proceeds from the Swap Termination Note will be used to fund the termination fee to be paid to the Swap Counterparties if this Court approves the Settlement Motion.  The City alleges that the proceeds from the Quality of Life Note will be used to fund "certain key investment initiatives of the City."

10.    The Financing Motion does not indicate the amount of the termination fee that will be required to be paid to the Swap Counterparties and, prior to filing the Financing Motion, the City has taken inconsistent positions with respect to the amount of that fee.  In the Settlement Motion, the City asserted that the amount of the termination fee would be approximately $296.5 million (Settlement Motion at p. 27) and that the Settlement Agreement would result in a discount in excess of $70 million.  Id.  More recently, the City indicated in its written presentation to the City Council dated October 17, 2013, about the post-petition financing that the amount of the Swap Termination Note would be approximately $210 million and the amount of the Quality of Life Note would be approximately $140 million.  Exhibit B at p. 6.  However, drafts of the press release about the post-petition financing prepared by the Emergency

Manager's office indicate that approximately $230 million of the post-petition financing would be used to pay the swap termination fee and $120 million would be used to fund investments in the City. *See* Draft Press Release dated October 11, 2013, attached hereto as Exhibit C.[3] Moreover, in the Financing Motion, the City states that the amount of the discount to the termination fee resulting under the Settlement Agreement will only be $50 million. *See* Financing Motion ¶ 6 at p. 5.

11. Under the proposal, the Quality of Life Note is to be secured by: (a) a first priority lien on (i) the Casino Revenue and (ii) all net proceeds of the voluntary disposition or monetization of any City owned assets which generates net cash proceeds exceeding $10 million (the "Asset Proceeds Collateral"). The lien on the Asset Proceeds Collateral will also secure the Swap Termination Note on a *pari passu* basis. In addition to the lien on the Asset Proceeds Collateral, the Swap Termination Note will be secured by a first priority lien on the income tax revenue of the City (the "Income Tax Revenue").

12. Thus, if the Settlement Motion and Financing Motion are approved, the City will be permitted to pay between $210 and $230 million to the Swap Counterparties on account of an alleged lien against the Casino Revenues, which payment will be funded by the proposed financing, and, rather than having the Swap Counterparties asserting liens solely against the Casino Revenues, the City will have granted liens in connection with consummation of the proposed post-petition financing transaction, against the Casino Revenues, proceeds from the monetization (through sales or otherwise) of assets resulting in proceeds in excess of $10

---

[3] Notably, one justification contained in the draft press release was removed at the insistence of Miller Buckfire, the City's investment banker. Specifically, the draft press release noted that the post-petition financing would "afford the City additional resources from which to make remittances to creditors, including retirees." James Doak of Miller Buckfire stated that he had "a real issue with the third bullet under purpose [and that] the document should NOT be released in its present form." *See Email from James Doak to Dana Gorman and Bill Nowling* attached hereto as Exhibit D and incorporated herein by reference.

million, and its Income Tax Revenue. The City estimates in the Financing Motion that the Casino Revenues for fiscal year 2013 totaled approximately $178,845,132, and that Income Tax Revenue for fiscal year 2013 totaled approximately $232,412,196. Financing Motion ¶ 48 at p. 38.

13.     Provided the City does not default, the proposed post-petition financing will mature on the earlier of (a) the effective date of a confirmed plan or (b) the date that is two and one-half years after the Closing Date.

14.     There are substantial fees that the City is required to pay in connection with the post-petition financing. First, the commitment fee required to be paid to Barclay's is $4,375,000, of which the City already paid $2,187,500 on or about October 15, 2013. *See* invoice and related documents attached hereto as Exhibit E and incorporated herein by reference. The commitment fee is required to be paid regardless of whether the post-petition financing ever closes (or is approved by this Court) and is in addition to other fees and costs, including Barclays' attorneys' fees, which the City will be required to pay. In addition, upon information belief, Miller Buckfire, the City's investment banker, will receive a fee of equal to 0.15% of the gross proceeds of the post-petition financing, which is in addition to the other compensation Miller Buckfire is receiving for its work on behalf of the City. *See* partially executed Amendment to Miller Buckfire agreement and related email correspondence from Kevyn Orr to Andrew Dillon and Tom Saxon regarding the same, attached hereto as Exhibit F. Assuming the full amount of the post-petition credit facility is $350 million, as is presently contemplated, it appears that Miller Buckfire will receive a payment in the amount of $525,000.

15.     On October 11, 2013, the Emergency Manager sought authorization from the City Council to obtain the post-petition financing. The City Council rejected the Emergency

Manager's request and, in a Resolution dated October 25, 2013, and filed with this Court at Docket No. 1396 (the "City Council Resolution"), the City Council noted that there was "no guarantee that replacement funding will be available by this lender or any other lender when these loans mature," that the deal "would transform a soft liability into a firm liability at a time in the interest rate cycle when the Swap liability could actually start to decline," and, because the City was being required to pledge not only the Casino Revenue but also the Income Tax Revenue to secure the loan, the financing would give the lender "too much power and control over the City's revenues and future and limit the City's ability to negotiate or resolve other claims in bankruptcy." City Council Resolution at p. 2.

16.    The City Council Resolution further noted that in an article published in the *Bond Buyer*, a member of Municipal Market Advisors commented that the financing deal seemed to be "'a very good deal for the lender and swap counterparties but less so for the City's unsecured creditors and its residents. The seeming lack of a tangible recovery plan that improves Detroit's revenues over the period of the loans renders us skeptical about the [C]ity's ability to repay an amount of this magnitude in a short time frame without causing additional stress to the detriment of city residents and unsecured creditors that may have their recoveries tied to the [C]ity's financial performance." City Council Resolution at p. 2 (citing *Bond Buyer*, October 21, 2013, "Detroit Council Rejects DIP Loan").

### III.    Argument

#### A.    Introduction

17.    The City cannot demonstrate that the proposed post-petition financing meets the standards that have been established for obtaining post-petition financing secured by liens and superpriority administrative claims pursuant to section 364(c) of the Bankruptcy Code.

18.     Moreover, given the substantial impact of the proposed post-petition financing and the liens the City proposes to grant on substantially all of its major assets and on its two most stable revenue streams, the proposed post-petition financing should only be considered in connection with a plan of adjustment, after full disclosure is made to creditors, and where the impact of the proposed financing can be evaluated in connection with proposed distributions to creditors as well as fully developed  proposals and projections from the City with respect to the benefits that will result from its planned investments in the City.

19.     Granting the City's request now, before a plan of adjustment has been filed and where substantial questions exist about the City's plan for revitalization and the City's plan for asset monetization may result in substantial impairment of the City's ability to make distributions to creditors.  As such, when viewed with the piecemeal approach of the City, to date, in seeking court approval of transactions that may affect the ultimate treatment of creditors under a plan of adjustment in this case without seeking creditor input before proposing a transaction, such as the public lighting transaction and the Forbearance Agreement, as well as entering into transactions outside of Court affecting major City assets, such as the Belle Isle lease transaction, the proposed post-petition transaction appears to be part of an effort by the City to set the terms of the plan of adjustment before one is filed with this Court.

20.     This Court should refuse to approve a post-petition financing transaction that grants liens against the majority of the City's tangible assets and its most stable sources of revenue, where the majority of the proceeds of the financing will be used to pay creditors' claims whose security interests have been called into question, and which will provide the City with a limited amount of cash to reinvest in an unspecified manner in the City and for which reinvestment the City has not developed viable projections as to the effect, if any, such

8

reinvestment will have on the future of Detroit. The proposed financing creates a significant risk that the revitalization process and the proposed post-petition financing will be used to boot strap a plan of adjustment which subsidizes revitalization by cuts to recoveries to which creditors otherwise would be entitled under the Bankruptcy Code, and, as such, is tantamount to an impermissible *sub rosa* plan. Accordingly, the Financing Motion should be denied.

**B.      The City Cannot Meet the Standard for Approval of Post-Petition Financing Secured by Liens and a Superpriority Administrative Expense Claim Pursuant to Section 364(c) of the Bankruptcy Code**

21.      Section 364(c) of the Bankruptcy Code provides:

(c)      If the trustee is unable to obtain secured credit allowable under section 503(b)(1) of this title as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt--

(1)      with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2)      secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)      secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

22.      Section 364(c) of the Bankruptcy Code applies in chapter 9 cases.  11 U.S.C. § 901(a).

23.      Generally, in the chapter 11 context, courts have looked to the following factors to determine whether to approve post-petition financing: (1) whether the financing is an exercise of sound and reasonable business judgment; (2) whether the financing is in the best interests of the estate and its creditors; (3) whether the credit transaction is necessary to preserve assets of the estate, and is necessary, essential and appropriate for the continued operation of the debtor's business; (4) whether the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lender; and (5) whether the financing was

9

negotiated in good faith and at arm's length between the debtor and the lender. *In re Farmland Industries, Inc.*, 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) (utilizing factors drawn from *In re WorldCom, Inc.*, 2002 WL 1732646 (Bankr. S.D.N.Y. 2002); *In re Phase-I Molecular Toxicology, Inc.*, 285 B.R. 494 (Bankr. D.N.M. 2002); *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Col. 1997); and *In re The Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987)); *Bland v. Farmworker Creditors (In re Bland)*, 308 B.R. 109, 113-114 (S.D. Ga. 2013).

24.     While section 903 of the Bankruptcy Code provides that "[t]his chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality" and section 904 of the Bankruptcy Code provides that, "[n]otwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with . . . any property or revenues of the debtor," 11 U.S.C. § 904, sections 903 or 904 do not exempt a municipality from the standard inquiry into a proposed post-petition financing facility and consideration of the factors normally analyzed in a chapter 11 case.

25.     Moreover, certain factors considered by the courts in determining whether to approve post-petition financing in the chapter 11 context, are expressly included in the inquiry a court must make in chapter 9 cases in connection with confirmation of a plan of adjustment. Specifically, at confirmation, the City must prove that the plan is in the best interests of creditors, 11 U.S.C. 943(b)(7), and, if a class of creditors votes to reject the plan of adjustment, the City must prove that the chapter 9 plan is fair and equitable. 11 U.S.C. §§ 901(a) & 1129(b)(1).

26.     In evaluating whether a chapter 9 plan meets the "best interests of creditors" requirement, bankruptcy courts consider whether "the Plan affords all creditors the potential for

the greatest economic return from Debtor's assets." *In re Barnwell Cnty. Hosp.*, 471 B.R. 849, 869 (Bankr. D. S.C. 2012). Case law indicates that the "best interests of creditors" standard requires a chapter 9 debtor to prove that it has maximized the value of its primary assets and utilized its powers under state law to enhance creditor recoveries. *See In re Sullivan Cnty. Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 78 (Bankr. D. N.H. 1994) (emphasis added); *Fano v. NewPort Heights Irrigation Dist.*, 114 F.2d 563, 566 (9th Cir. 1940). Collier cites *Fano* for the proposition that a chapter 9 plan "is not fair and equitable and is not in the best interest of creditors" where "a debtor that had invested heavily in improvements in its facilities at a time when it was unable to pay the claims of its bondholders cannot rely on its cash-poor position resulting from the investment as a reason why it should pay less to bondholders, because the bondholders should not be required in effect to subsidize the improvements." 6-943 Collier on Bankruptcy ¶ 943.03 *citing Fano*, 114 F.2d at 565-66.

27.     In light of this case law and the express provisions of chapter 9 applicable to plan confirmation, it would be improper for this Court to refuse in a chapter 9 case to analyze the factors typically considered when a chapter 11 debtor seeks approval of post-petition financing. To find otherwise, would permit municipalities to accomplish through the device of post-petition financing that which municipalities cannot accomplish through a plan of adjustment.

28.     Applying the factors to the proposed financing, the City cannot meet its burden of proof.

29.     First, with respect to business judgment, in the objections to the Settlement Motion, EEPK, FMS, and certain other objecting creditors and parties in interest challenged the propriety of the Forbearance Agreement and the settlement contained therein, and have asserted that the City cannot satisfy the factors that apply to settlement agreements in the Sixth Circuit.

*See Bauer v. Commerce Union Bank*, 859 F.2d 438, 441 (6th Cir. 1988) (holding a court must weigh the conflicting interests of all relevant parties and consider the following factors: (1) the probability of success on the merits of litigation, (2) the litigation's complexity, (3) the litigation's attendant expense, inconvenience, and delay, and (4) the views of creditors).[4] If the Settlement Motion is denied, as the Objectors believe it should be, the primary purpose of the post-petition financing (e.g., providing funds to pay the termination fee to the Swap Counterparties) will no longer exist.

30.    Moreover, the City has refused to provide any information as to how it will use the proceeds from the Quality of Life Loan and, upon information and belief, the City does not have viable analysis as to what, if any, benefit will accrue to the City or creditors and parties in interest if approximately $120 million of the financing is reinvested in the City. In the chapter 11 context, detailed information concerning the use of loan proceeds is usually provided in the form of a budget. Without information as to how the City intends to use the proceeds from the Quality of Life Loan, it is impossible to determine whether the City has exercised reasonable business judgment as to the Quality of Life Loan.

---

[4] The conclusion that the settlement standard should apply to the Settlement Motion and Forbearance Agreement is supported by the City's lengthy discussion of the standard for approval of a settlement in the Settlement Motion as well as the City's request for an evidentiary hearing on the Settlement Motion. Moreover, to the extent the settlement factors may not apply in a chapter 9 case even though nothing in the Bankruptcy Code says that Rule 9019 is inapplicable in a chapter 9 case, the filing of a motion seeking approval under the Bankruptcy Rule 9019 standard constitutes consent by the City to review of the proposed settlement under the normal standards for obtaining court approval of settlement agreements. *See In re City of Stockton*, 486 B.R. 194, 199 (Bankr. E.D. Cal. 2013)("When a chapter 9 debtor files a Rule 9019 motion to have the court approve a compromise or settlement, the municipality 'consents' for purposes of § 904 to judicial interference with the property or revenues of the debtor needed to accomplish the proposed transaction"); *see also In re Barnwell County Hosp.*, 491 B.R. 408, 417 (Bankr. D.S.C. 2013).

31.     As to the factor of the best interests of the estate and its creditors, the potential for recovery to creditors is likely to be diminished because the proceeds from the sale of its unencumbered assets and certain revenue streams, including the City's currently unencumbered Income Tax Revenue, will serve as collateral for the financing. The Casino Revenue, which the Swap Counterparties assert is encumbered by liens, will also continue to be encumbered even after the termination fee is paid to the Swap Counterparties. The City should not be permitted to grant such liens (as well as the exclusive right to act in connection with exit financing) absent a clear explanation as to the effect of doing so on creditors' ultimate recovery in this case and the benefits that will result from using borrowed money to achieve the City's revitalization aspirations. As it stands now, granting liens on the City's most stable sources of revenue and any proceeds from monetization of the City's assets appears certain to diminish the ultimate recovery of creditors in this case.

32.     As to the third factor, whether the credit transaction is necessary to preserve assets of the estate, and is necessary, essential and appropriate for the continued operation of the debtor's business, the City does not claim that it needs the post-petition financing in order to continue to provide services to the City's residents and to continue to function. The City's current cash flow is more than sufficient for that purpose because, as of September 30, 2013, the City had an unrestricted cash balance of $128.5 million, the City had positive net cash flow of $140.3 million during the first quarter of fiscal year 2013, and the City's unrestricted cash balance exceeded the first quarter forecast by $56.7 million. *See Quarterly Report with Respect to the Financial Condition of the City of Detroit* dated October 15, 2013, attached hereto as Exhibit G.

33.     While reinvestment in the City undoubtedly will be a component of any plan of adjustment proposed by the City, there is no need for the City to start that process immediately with borrowed funds and without full consideration and analysis of how the action will affect creditor recoveries. If borrowing funds is necessary to revitalization (as opposed to continued operations-- for which the City does not contend the financing is necessary) and to fund a settlement with the Swap Counterparties, such financing should only be authorized in connection with a plan of adjustment and the substantial protections afforded to creditors in the plan confirmation process.

34.     The fact that the City may desire to engage in certain revitalization efforts is not a sufficient basis for this Court to approve the proposed post-petition financing. The fact is that the financing is not necessary for the City to continue operations and the lack of immediate necessity to operations standing alone constitutes a sufficient basis for denying the Financing Motion. *In re MSR Hotels & Resorts, Inc.*, 2013 WL 5716897 (Bankr. S.D.N.Y. October 1, 2013) at * 26 ("A debtor may not obtain approval for extending secured credit unless it first establishes that it is otherwise unable to reasonably obtain unsecured credit, and the credit is necessary for continued operation.") (citing *In re Barbara K. Enterprises*, 2008 Bankr. LEXIS 1917 at * 23 (Bankr. S.D.N.Y. June 16, 2008)).

35.     As to the factor of whether the terms of the financing are fair, reasonable, and adequate, given the circumstances of the City and proposed lender, the extent of the collateral being given to secure the proposed loan is not fair or reasonable. A lender should not be granted liens against collateral potentially worth billions of dollars to secure a loan of $350 million.

36.     Finally, it is unclear whether the post-petition financing was entered into in good faith and negotiated at arm's length, and whether the City entertained proposals that were

superior to the Barclays' proposal. Discovery is proceeding on this and other issues related to the post-petition financing.

**C.** **The Post-Petition Financing Should be Rejected as Part of an Impermissible Effort by the City to Accomplish through Piecemeal Transactions that Which Would be Prohibited at Plan Confirmation, an Effort Which is Tantamount to an Impermissible *Sub Rosa* Plan**

37.     Since the Petition Date, the City has embarked on a course of conduct aimed at disposing of its assets and engaging in piecemeal revitalization efforts with minimal input from creditors and parties in interest and without the protections afforded to creditors through the plan confirmation process. It appears that the City is determined to effectuate revitalization of the City without creditor input and without working to minimize creditor loss. Among other things, the City has negotiated a public lighting transaction that, if approved, will result in a lien being granted against utility tax revenues, has negotiated a lease for Belle Isle without any input from creditors, and has negotiated the proposed post-petition financing transaction which, if approved, will result in liens being granted against all of the City's assets, to the extent monetized, as well as the City's income tax revenue and the Casino Revenues. All of this will occur, if approved, despite strident opposition from the majority of the City's creditors and before the City even files a plan of adjustment.

38.     All of these issues would be much better addressed in connection with confirmation of a plan of adjustment, where the City will be required to provide creditors and parties in interest with adequate information concerning the transactions contemplated thereunder and the Court will be able to balance the City's desire to revitalize with the requirements of the Bankruptcy Code that protect creditors.

39.     For example, as detailed in Section III., B., *supra.*, it is clear that in the plan confirmation context, the City would be required to demonstrate that the plan is in the best

15

interests of creditors and, if a class of creditors voted to reject the plan, that the plan is fair and equitable. The City would not be permitted to invest heavily in improvements to the detriment of creditors in connection with plan confirmation.

> [A Chapter 9] plan that makes little or no effort to repay creditors over a reasonable period of time may not be in the best interest of creditors. For example, a debtor that had invested heavily in improvements in its facilities at a time when it was unable to pay the claims of its bondholders cannot rely on its cash-poor position resulting from the investment as a reason why it should pay less to bondholders, because the bondholders should not be required in effect to subsidize the improvements. Such a plan is not fair and equitable and is not in the best interest of creditors.

6 Collier on Bankruptcy ¶ 943.03 (citing *Fano v. Newport Heights Irrigation Dist.*, 114 F.2d 563 (9th Cir. 1940)). In order to determine whether a proposed treatment of creditors is fair:

> [T]he court must have before it data which will permit a reasonable, and hence an informed, estimate of the probable future revenues available for the satisfaction of creditors. And where, as here, different classes of creditors assert prior claims to different sources of revenue, there must be a determination of the extent to which each class is entitled to share in a particular source, and of the fairness of the allotment to each class in the light of the probable revenues to be anticipated from each source. To support such determinations, there must be findings, in such detail and exactness as the nature of the case permits, of subsidiary facts on which the ultimate conclusion of fairness can rationally be predicated.

*Kelley v. Everglades Drainage Dist.*, 319 U.S. 415, 420 (1943).

40.     Proposals like those contained in the Settlement Motion, the Financing Motion, the motion seeking authority to enter into the public lighting transaction, and the City's decision to enter into the Belle Isle lease, are precisely what the fair and equitable and best interests tests are designed to address, and the City should not be able to short-circuit the confirmation process through an approach of addressing assets and liabilities piecemeal such that the disposition and monetization of all assets and sources of creditor recoveries will have been determined in advance of the City even filing a plan of adjustment.

41. The Objectors believe that the piecemeal approach is tantamount to an impermissible *sub rosa* plan and that the City's intent is to use the piecemeal approach to ensure that only minimal revenues and assets are left as sources of recovery for the City's existing creditors by the time of plan confirmation. *See In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) ("The bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization about evade confirmation requirements"); *Pension Benefit Guaranty Corp. v. Braniff Airways Inc. (In re Braniff Airways, Inc.)*, 700 F.2d 935, 940 (5th Cir. 1983) ("The reason *sub rosa* plans are prohibited is based on a fear that a debtor in possession will, in effect, short circuit the requirements of [C]hapter 11 for confirmation of a reorganization plan"); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303 (5th Cir. 1985) (recognizing that disposal of crown jewel asset might, in some circumstances, amount to a *sub rosa* plan).

42. The Objectors submit that the City and the creditors and parties in interest in the City's bankruptcy case would be better-served by addressing all of these issues at the same time in connection with a plan of adjustment as opposed to addressing transactions involving substantial assets and revenues in a piecemeal fashion and outside of the plan confirmation process.

### Reservation of Rights

43. Discovery related to the Financing Motion is ongoing. The Objectors reserve the right to supplement, amend, or modify this Objection based on that discovery and further reserves the right to join in objections to the Financing Motion that may be filed by other creditors and parties in interest.

WHEREFORE, Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A., and FMS Wertmanagement Service GmbH, as servicer to FMS Wertmanagement, respectfully request that this Court deny the Financing Motion and grant them such other and further relief as is just and proper.

November 27, 2013.

Respectfully submitted,

/s/ Howard S. Sher
Howard S. Sher, Esquire
Jacob & Weingarten, P.C.
Somerset Place
2301 W. Big Beaver Road, Suite 777
Troy, Michigan 48084
Tel: (248) 649-1200
Fax: (248) 649-2920
E-mail: howard@jacobweingarten.com

Vincent J. Marriott, III, Esquire
Ballard Spahr LLP
1735 Market Street, 51st Floor
Philadelphia, Pennsylvania 19103
Tel: (215) 864-8236
Fax: (215) 864-9762
E-mail: marriott@ballardspahr.com

-and-

Matthew G. Summers, Esquire
Ballard Spahr LLP
919 North Market Street, 11th Floor
Wilmington, Delaware 19801
Tel: (302) 252-4428
Fax: (302) 252-4466
E-mail: summersm@ballardspahr.com

*Attorneys for Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A.*

18

/s Rick L. Frimmer

Rick L. Frimmer
Schiff Hardin LLP
233 South Wacker Drive, Suite 6600
Chicago, IL 60606
Tel: (312) 258-5511
Fax: (312) 258-5600
E-mail: rfrimmer@schiffhardin.com

*Attorneys for FMS Wertmanagement Service
GmbH, as servicer to FMS Wertmanagement*

# EXHIBIT A

**BARCLAYS CAPITAL INC.**

**PERSONAL AND CONFIDENTIAL**

October 6, 2013

The City of Detroit, Michigan
c/o Norma Corio
Co-President and Managing Director
Miller Buckfire & Co., LLC
601 Lexington Avenue, 22nd Floor
New York, New York 10022

<u>Engagement Letter for Exit Financing</u>

Dear Ms. Corio:

The City of Detroit, Michigan (the "**City**" or "**you**") has advised Barclays Capital, Inc. ("**Barclays**" and together with the City, the "**Engagement Parties**") that the City filed a voluntary petition on July 18, 2013 seeking relief under the provisions of chapter 9 of title 11 of the United States Code in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "**Bankruptcy Court**"). The City's bankruptcy case bears Case No. 13-53846 (the "**Bankruptcy Case**").

You have further advised us that you currently anticipate that the City will issue (or another entity will issue on behalf of the City) notes or bonds or similar securities or evidences of indebtedness, through public distribution or private placement or otherwise (the "**Exit Notes**"), pursuant to a plan of adjustment in the Bankruptcy Case or otherwise (the "**Exit Financing**"), the proceeds of which will be used to repay debt incurred during the Bankruptcy Case (including, without limitation, the Post-Petition Facility but excluding debt in respect of the Detroit Water and Sewerage Department) and, if necessary, pay other debt and claims outstanding at the time the City exits the Bankruptcy Case.

1.    Engagement

(a)    This letter agreement (this "**Engagement Letter**") is to confirm your and our understanding with respect to our engagement in respect of the Exit Financing.

(b)    Subject to the terms and conditions of this Engagement Letter, you agree that Barclays will have the right (but not the obligation) to act as exclusive and sole bookrunner, underwriter and/or placement agent (or any similar role applicable to the specific form of Exit Financing) with respect to the Exit Financing as set forth in this Engagement Letter. Pricing in respect of the Exit Financing will reflect competitive market rates as of the time of the Exit Financing.

- 1 -

[[3430711]]



DTPPF00009766

(c)  You shall have no right to appoint any other financial institution to act as bookrunner, underwriter and/or placement agent (or any similar role applicable to the specific form of Exit Financing), no other financial institution shall have any title or role, and no other financial institution shall receive any consideration, in each case, in connection with the Exit Financing, including with respect to any direct sale or other form of transaction.

(d)  Barclays's advertising name will appear at the bottom center of the front page of any offering or information memorandum related to the Exit Financing. Barclays shall have the sole responsibility, subject to input from the City, to (i) establish the schedule for investor meetings, (ii) coordinate all pre-marketing activity, (iii) coordinate roadshow logistics, (iv) coordinate the final determination of the interest rate to be recommended in connection with the Exit Financing, (v) coordinate the final allocation of any commitments or notes issued in connection with the Exit Financing, (vi) if applicable, act as billing and delivery agent and (vii) if applicable, act as stabilization agent.

(e)  Our engagement hereunder, and our right to act in respect of the Exit Financing, is on an exclusive basis. During the term of this Engagement Letter (which shall continue until terminated pursuant to Section 9), you and your agents and representatives will not approach, initiate, solicit or enter into any discussions or negotiations with or mandate or appoint any bank or financial institution or other person or entity to arrange or participate in any Exit Financing, including, without limitation, through the issuance, offering or sale of any debt securities (whether or not similar to the Exit Financing) to, or the incurrence of loans from, any third parties, in each case except through Barclays or its designated affiliates. Notwithstanding anything herein to the contrary, to the extent the City violates this Section 1(e), Barclays' sole and exclusive remedy is the fee provided for in Section 6(c) hereof.

(f)  Notwithstanding any other provision of this Engagement Letter, you acknowledge that Barclays will not render any tax, accounting, legal or regulatory advice in connection with any Exit Financing, and you acknowledge that you will consult with and rely on your own advisors regarding those matters.

2.  Cooperation

(a)  In connection with the Exit Financing, the City will co-operate fully with Barclays and its counsel in connection with, and cause its agents, representatives and advisors to be reasonably available for, due diligence and drafting meetings and make available to Barclays any other documentation Barclays may reasonably request in respect of the Exit Financing, subject to applicable laws and regulations governing the provision and disclosure of such information.

(b)  In anticipation of the final sale of the Exit Notes to Barclays in respect of a distribution subject to Paragraph (b) of Securities and Exchange Commission Rule 15c2-12, as amended ("Rule 15c2-12"), but only if Rule 15c2-12 is applicable to such offering and sale, the City shall prepare a preliminary official statement (the "Preliminary Official Statement"), in the form required by then-current market

- 2 -

[[3430711]]

practice and in order to comply with all securities and state laws requirements at the time of the sale date and the delivery date of the Exit Notes. The City shall, by no later than the date required by then-current market practice or securities or state law requirements (i) deliver to Barclays, in such manner as Barclays and its counsel shall reasonably request, a sufficient number of copies of the Preliminary Official Statement in "final" form as required by Paragraph (b)(1) of Rule 15c2-12. The City shall deliver, or shall cause to be delivered, to Barclays, at or prior to the delivery date of the Exit Notes, a sufficient number of copies of the final Official Statement in substantially the form of the Preliminary Official Statement with only such changes and insertions therein from the Preliminary Official Statement as shall have been approved by Barclays, to enable Barclays to comply with Rule 15c2-12. The City will not be required to provide any "10b-5 representations" with respect to the Preliminary Official Statement, but shall only be required to deem the Preliminary Official Statement final in accordance with the terms of Rule 10b-5. For the avoidance of doubt, the City shall be required to provide customary "10b-5 representations" with respect to the final Official Statement.

(c)     To the extent required by law, the City will enter into one or more agreements or other legally binding continuing disclosure obligations for the benefit of the holders of the Exit Notes, obligating the City to provide secondary market disclosure as required by Rule 15c2-12.

(d)     The City will furnish such information, will execute and deliver such instruments and documents and will take such other action in cooperation with Barclays as Barclays may reasonably request at no cost to the City to: (i) qualify the Exit Notes for offer and sale under the "Blue Sky" or other securities laws and regulations of such states and other jurisdictions of the United States of America as Barclays may (in its sole discretion) designate; (ii) determine the eligibility of the Exit Notes for investment under the laws of states and other jurisdictions as Barclays may (in its discretion upon consultation with, and agreement of the City) designate, and to provide for the continuance of such qualifications or exemptions in effect for so long as required for distribution of Exit Notes; and (iii) allow Barclays to sell the Exit Notes, each in accordance with, in accordance with market practice and securities and state law at such time.

(e)     The City shall engage nationally recognized bond counsel ("Bond Counsel") and Bond Counsel shall provide, at closing, an opinion, reasonably acceptable to Barclays, with respect to the validity of the Exit Notes and, if applicable, the exclusion from gross income of the owners of the Exit Notes of interest payable on the Exit Notes, for federal income tax purposes and to the effect that the Exit Notes are exempt from registration under the Securities Act and the related financing documents are exempt from qualification under the Trust Indenture Act of 1939, as amended.

(f)     The City shall, to the extent required by law, properly and timely file, with the assistance of Bond Counsel, Form 8038-G with the Internal Revenue Service pursuant to Section 149(e) of the Internal Revenue Code.

- 3 -

[[3430711]]

(g)     The City shall, if applicable, provide a non-arbitrage certificate or tax regulatory agreement prepared by Bond Counsel, which shall set forth the facts, estimates and circumstances sufficient to satisfy the criteria which are necessary under the Internal Revenue Code, to support the opinion of Bond Counsel that the interest on the Exit Notes is excludable from gross income to the beneficial owners thereof under the Internal Revenue Code, if such Exit Notes are issued on a tax-exempt basis.

(h)     If the Exit Notes are issued on a tax-exempt basis, the City shall make all customary covenants required by Barclays with respect to the tax-exempt status of the Exit Notes, including, without limiting the foregoing, covenants to the effect that (i) the City will not take, or omit to take, any action lawful and within its power to take, which action or omission would cause interest on any Exit Note to become subject to federal income taxes, (ii) the City will not permit any of the proceeds of the Exit Notes to be used in any manner that would cause any Exit Notes to constitute a "private activity bond" within the meaning of Section 141 of the Internal Revenue Code, (iii) the City will not permit any of the proceeds of the Exit Notes or other moneys to be invested in any manner that would cause any Exit Note to constitute an "arbitrage bond" within the meaning of Section 148 of the Internal Revenue Code or a "hedge bond" within the meaning of Section 149(g) of the Internal Revenue Code and (iv) the City will comply with the provisions of Section 148(f) of the Internal Revenue Code relating to the rebate of certain investment earnings at periodic intervals to the United States of America.

(i)     Documentation in respect of the Exit Financing will contain such conditions precedent, representations, warranties, events of default and other terms and conditions as may be agreed among the parties, and which are customary for transactions of this nature.

(j)     The City shall provide such additional legal opinions, instruments and other documents as Bond Counsel, Barclays or Barclays's counsel may reasonably request in order to conform to then-current market practice, or to satisfy Barclays's internal policies or to comply with all securities, tax and state laws requirements and all other laws, rules and regulations applicable to a public offering of this type.

3.      Clear Market

        You agree that you will ensure that no mandate or authorization to arrange any Exit Financing in the capital or financial markets shall be awarded to any financial institution or group of financial institutions other than to Barclays in accordance with this Engagement Letter. Notwithstanding anything herein to the contrary, to the extent the City violates this Section 3, Barclays' sole and exclusive remedy is the fee provided for in Section 6(c) hereof.

4.      No Commitment

(a)     Barclays shall not be obliged by this Engagement Letter to underwrite, purchase, syndicate or place the Exit Notes or any other debt or provide any other financing. If an offering of Exit Notes is undertaken, or any other debt financing is arranged, the

- 4 -

[[3430711]]

DTPPF00009769

13-53846-tjt    Doc 1835    Filed 11/27/13    Entered 11/27/13 09:56:39    Page 24 of 95

contractual arrangements will be reflected in one or more underwriting, purchase, credit or other agreements between the City and the parties thereto (each, a "**Financing Agreement**"). You acknowledge that Barclays will have no obligation to buy or place the Exit Notes or to arrange or participate in the making of any other financing available, in each case, except upon signing of such definitive agreements.

(b)     The execution of any Financing Agreement will be subject, in the complete discretion of Barclays, to, among other things, (i) satisfactory completion of a due diligence review, (ii) the receipt of all necessary internal and external approvals (including internal commitment committee approval), (iii) market conditions which, in Barclays's judgment, are satisfactory, and (iv) compliance by the City with this Engagement Letter and such definitive agreements. Each Financing Agreement will be consistent with this Engagement Letter to the extent permitted by law and otherwise will include the final terms of the financing, including the transaction size, structure and pricing terms, as well as other reasonable and customary terms and conditions agreed to by the City, including provisions relating to indemnity, conditions precedent for the agreement to become effective and certain termination events. The provisions of this Section 4(b) shall remain effective until a Financing Agreement is executed and thereafter this Section 4(b) shall be superseded by such Financing Agreement to the extent provided for therein.

5.     Conflicts of Interest

You acknowledge that Barclays is engaged in securities trading and brokerage activities, as well as providing investment banking and financial advisory services. In the ordinary course of trading and brokerage activities and the production of research, Barclays and its affiliates may at any time hold positions, and may trade or otherwise effect transactions, for their own account or the accounts of customers, in debt securities of entities that may be involved in the transactions contemplated hereby. You acknowledge and agree that Barclays may be prevented, by reason of law, duties of confidentiality owed to other persons, the rules of any regulatory authority or Barclays's internal controls, from using or disclosing to you any information known to Barclays in connection with this Engagement Letter or the transactions contemplated hereby. You agree, so as expressly to override any duties, obligations or restrictions which would otherwise be implied by law or regulation, that in carrying out this Engagement Letter, Barclays will not be required to have regard to or rely on any material information from other clients which is confidential which may be relevant to you or any material information obtained by Barclays while acting for another client which has interests which conflict with your interests in relation to the transactions contemplated hereby.

6.     Fees; Expenses

(a)     You agree to pay to Barclays an aggregate underwriting discount, placement fee, initial purchaser's discount or arrangement fee with respect to the Exit Financing (the "**Underwriting Spread**") equal to (i) in the event the Exit Financing receives at least one investment grade public rating from either Moody's Investors Service or Standard & Poor's, 0.50% of the aggregate principal amount of the Exit Financing and (ii)

- 5 -

otherwise, 0.75% of the aggregate principal amount of the Exit Financing, in each case to be deducted from the gross proceeds thereof.

(b) In addition to the Underwriting Spread, whether or not an Exit Financing is completed or any financing is arranged, you shall pay all reasonable and documented out-of-pocket costs and expenses of Barclays, if any, in connection with the Exit Financing; including the reasonable fees, expenses and disbursements of legal counsel. You agree that you shall be responsible for all your own legal, accounting and other agents' or advisors' fees and costs, including all other expenses related to the transactions contemplated hereby.

(c) In the event that you or any person on behalf of you completes an Exit Financing or any bond, note, bank, bridge or other syndicated credit or other financing in lieu of the Exit Financing (collectively, the "**Alternative Financing**") the proceeds of which are to be used in whole or in part to repay debt incurred during the Bankruptcy Case (including, without limitation, the Post-Petition Facility) and/or pay other debt and claims outstanding at the time the City exits the Bankruptcy Case, in each case, without providing Barclays the right to provide, arrange, place or underwrite such Exit Financing or Alternative Financing, then you agree, unless Barclays has terminated this Engagement Letter or breached its obligation to provide the Exit Financing on the terms set forth herein, to pay to Barclays an amount equal to 0.75% of the aggregate outstanding amount of the Post-Petition Facility immediately prior to the time the City exits the Bankruptcy Case, which payment will be made on the date of the closing of such Exit Financing or Alternative Financing from the proceeds of thereof.

(d) To the extent applicable, all amounts payable hereunder are exclusive of value-added tax or any similar taxes ("VAT"). All amounts charged or required to be reimbursed hereunder will be invoiced together with VAT, where required, and such VAT shall be for your account. In addition, all such amounts shall be paid free and clear of, and without any deduction or withholding for or on account of, any current or future taxes, levies, imposts, duties, charges or other deductions or withholdings levied in any jurisdiction from or through which payment is made or where the payer is located, unless such deduction or withholding is required by applicable law, in which event, you agree to pay additional amounts so that the persons entitled to such payments will receive the amount that such persons would otherwise have received but for such deduction or withholding.

7. Information

(a) You agree to use your best efforts, to the extent permitted by law, to (a) furnish or cause to be furnished to Barclays such information as Barclays may reasonably request for inclusion in any document to be used in connection with the Exit Financing (all such information so furnished being the "**Information**"), (b) provide all information to Barclays and its advisors as Barclays shall, and such advisors shall, reasonably request in connection with legal and business due diligence, and (c) furnish or cause to be furnished to Barclays all information concerning the transactions contemplated hereby and the operations and affairs of the City which is,

- 6 -

[[3430711]]

in the opinion of Barclays, material to the proper performance under this Engagement Letter and all such further information as Barclays may reasonably request. You recognize and confirm that Barclays (a) will rely on the Information and on information available from generally recognized public sources in performing the services contemplated by this Engagement Letter without having independently verified the same, (b) does not assume responsibility for the accuracy or completeness of the Information and (c) will not make an appraisal of any assets or liabilities of the City. You will promptly advise Barclays in writing if you become aware that any Information previously provided has become inaccurate or misleading in any material respect or is required to be updated in any material respect.

(b)     Barclays may share any Information and any other information or matters relating to you and the transactions contemplated hereby with any of their affiliates, and any such affiliate may likewise share information relating to you and the transactions contemplated hereby with Barclays, in each case, on a confidential and need-to-know basis in connection with the transactions contemplated hereby.

8.     Indemnity.

(a)     You agree to indemnify and hold harmless Barclays (in each case, for itself and for each Indemnified Party) and its affiliates and their respective directors, officers, employees, agents and controlling persons (Barclays and each such person being an "Indemnified Party") from and against any and all losses, claims, damages, liabilities, costs and expenses whatsoever, joint or several, to which any such Indemnified Party may become subject caused by, relating to or arising out of any untrue statement or alleged untrue statement of a material fact contained in the final Official Statement, furnished or made available by you or your agents or representatives or the omission or the alleged omission to state therein a material fact necessary in order to make the statements therein not misleading, in the light of the circumstances under which they were made; provided, however, that the City will not be liable in any such case to the extent that any such loss, claim, damage, liability or action arises out of or is based upon an untrue statement or omission or alleged untrue statement or omission made in the Official Statement either (a) in reliance upon and in conformity with written information supplied to the City by Barclays specifically for inclusion therein, unless the City has independent knowledge as to the truth of such written information, or (b) contained under the captions "BOOK-ENTRY ONLY SYSTEM," "TAX EXEMPTION," "RATINGS," or "UNDERWRITING" or similarly titled sections except to the extent that information under such captions was based upon information supplied by, or solely within the independent knowledge of, the City, and will reimburse each Indemnified Party to the extent permitted by law for all expenses (including counsel fees and expenses) as they are incurred by an Indemnified Party in connection with the investigation of, preparation for or defense of any pending or threatened claim or any action or proceeding arising therefrom, whether or not such Indemnified Party is a party thereto and whether or not such claim, action or proceeding is initiated or brought by or on behalf of the City and whether or not the City is a party thereto. You shall not be liable to any Indemnified Party under clause (ii) of the foregoing indemnification provision to the extent that any loss, claims, damage, liability or expense which is determined by a non-

- 7 -

[[3430711]]

appealable judgment of a court of competent jurisdiction to have resulted from such Indemnified Party's willful misconduct or gross negligence. You also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to the City or any of its agents or representatives related to or arising out of the appointment of Barclays pursuant to, or the performance by Barclays of the services contemplated by, this Engagement Letter except to the extent that a non-appealable judgment of a court of competent jurisdiction determines that any loss, claim, damage or liability has resulted from Barclays's willful misconduct or negligence; including, without limitation, any material omission or misstatement provided by Barclays provided by it to the City for inclusion into the final Official Statement. In no event shall any Indemnified Party be liable for consequential damages which may be alleged to arise out of or in connection with this Engagement Letter or the transactions contemplated hereby or relating or in any way arising from any proposed or actual use of the proceeds from the Exit Financing or any related matter.

(b)     You agree to notify Barclays promptly after becoming aware of the assertion against you or any of your agents or representatives, or after receipt of notice of the assertion against any other person, of any claim or the commencement of any such action or proceeding relating to any transaction contemplated by this Engagement Letter or its engagement hereunder.

(c)     You agree that, without Barclays's prior written consent, you will not settle, compromise or consent to the entry of any judgment in any pending or threatened claim, action or proceeding in respect of which (i) Barclays or any other Indemnified Party is an actual or potential party to such claim, action or proceeding or (ii) indemnification could be sought under the indemnification provision of this Engagement Letter (whether or not Barclays or any other Indemnified Party is an actual or potential party to such claim, action or proceeding) unless such settlement, compromise or consent includes an unconditional release of each Indemnified Party from all liability arising out of such claim, action or proceeding and does not include a statement as to an admission of fault, culpability or failure to act by or on behalf of any Indemnified Party. Except as set forth above, you further agree that you have no right to settle, compromise, negotiate, consent, make any representation or do anything on behalf of Barclays in any pending or threatened claim, action, or proceeding.

(d)     Neither Barclays nor any of its affiliates shall be liable hereunder for any action, failure to act or breach of this Engagement Letter by any person other than itself and nothing in this Engagement Letter or the nature of our services shall be deemed to create a fiduciary or agency relationship between Barclays or its affiliates, on the one hand, and the City or any of its agents or representatives, on the other hand. Furthermore, you agree that you will not institute, support and participate in claims in respect of this Engagement Letter brought personally against any employee, partner, servant or agent of Barclays.

– 8 –

[[3430711]]

9.    Termination

This Engagement Letter shall terminate on the closing of an Exit Financing or an Alternative Financing. This Engagement Letter may be terminated at any time by Barclays upon at least three business days' prior written notice thereof to that effect. The provisions contained herein relating to confidentiality, the payment of fees, any accrued rights and liabilities and indemnification will survive any such termination.

10.   Miscellaneous

(a)   You acknowledge and agree that Barclays has been retained to act for the City to the extent provided herein.

(b)   This Engagement Letter may not be assigned by you without the prior written consent of Barclays.

(c)   You agree that this Engagement Letter including, without limitation, any advice rendered hereunder, is for your confidential use only and will not be disclosed by you to any person other than to your agents, representatives, officers, directors and advisors in connection with the Exit Financing on a confidential and "need to know" basis, except that, following your acceptance hereof, and after providing prior written notice to Barclays and with appropriate redactions as reasonably requested by Barclays, you may make such public disclosures of the terms and conditions hereof as you are required by law, court of law (including the Bankruptcy Court) or legal or regulatory process to make (including as required under Michigan P.A. 436 or Section 36a of the Michigan Home Rule City Act). You agree that you will permit Barclays to review and approve any reference to Barclays contained in any press release, filing or similar public disclosure made in connection herewith or any such press release, filing or public disclosure required to be reviewed and/or approved by Barclays under any applicable law or regulation prior to public release. You acknowledge that Barclays may, at its option, place an announcement in such newspapers and periodicals as it may choose describing its role in connection with the Exit Financing.

(d)   This Engagement Letter shall be governed by, and construed in accordance with, the laws of the State of Michigan.

(e)   This Engagement Letter is issued for your benefit only and no other person or entity (other than the Indemnified Persons) may rely hereon.

(f)   Each of the Engagement Parties hereby irrevocably and unconditionally:

    (i)   submits, for itself and its property, (a) during the pendency of the Bankruptcy Case, to the exclusive jurisdiction of the Bankruptcy Court and (b) after the Bankruptcy Case has been closed, to the non-exclusive jurisdiction of (1) the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and (2) the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan and, in each case of the foregoing, any appellate court from any

- 9 -

DTPPF00009774

such court, in any action, suit, proceeding or claim arising out of or relating to this Engagement Letter or the transactions contemplated hereby, the performance of services contemplated hereunder, or for recognition or enforcement of any judgment, and agrees that all claims in respect of any such action, suit, proceeding or claim may be heard and determined in such court; provided that suit for the recognition or enforcement of any judgment obtained in any such court may be brought in any other court of competent jurisdiction,

(ii) waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of venue of any action, suit, proceeding or claim arising out of or relating to this Engagement Letter, the transactions contemplated hereby or the performance of services contemplated hereunder in any such court,

(iii) waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of any such action, suit, proceeding or claim in any such court,

(iv) agrees to commence any such action, suit, proceeding or claim in such courts, as applicable and

(v) agrees that service of any process, summons, notice or document by registered mail addressed to the City or Barclays, as applicable, shall be effective service of process for any such action, suit, proceeding or claim brought in any such court.

(g) You agree, on behalf of yourself and your agents and representatives, that the foregoing provisions of Section 10(f) above shall also apply to your agents and representatives to the same extent as to you, and Barclays's obligations hereunder are being made in reliance on the foregoing.

(h) **EACH OF THE ENGAGEMENT PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY ACTION, SUIT, PROCEEDING, CLAIM OR COUNTERCLAIM BROUGHT BY OR ON BEHALF OF ANY PARTY HERETO ARISING IN CONNECTION WITH OR AS A RESULT OF ANY MATTER REFERRED TO IN THIS ENGAGEMENT LETTER OR THE PERFORMANCE OF SERVICES HEREUNDER.**

(i) If any term, provision, covenant or restriction in this Engagement Letter is held by a court of competent jurisdiction to be invalid, void or unenforceable or against public policy, the remainder of the terms, provisions, covenants and restrictions contained herein shall remain in full force and effect and shall in no way be affected, impaired or invalidated. You and Barclays shall endeavor in good faith negotiations to replace the invalid, void or unenforceable provisions with valid and enforceable provisions the economic effect of which comes as close as possible to that of the invalid, void or unenforceable provisions.

[[3430711]]

DTPPF00009775

(j)    This Engagement Letter may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page of this letter by facsimile transmission shall be as effective as delivery of a manually signed counterpart hereof.

*[The remainder of this page intentionally left blank]*

- 11 -

[[3430711]]

Please confirm that the foregoing correctly sets forth our agreement by signing and returning to Barclays a duplicate copy of this Engagement Letter enclosed herewith.

Very truly yours,

BARCLAYS CAPITAL INC.

by _____

Name: John Gerbino
Title: Managing Director

Accepted and agreed to as of
the date first written above:

THE CITY OF DETROIT, MICHIGAN

By _____
Name: KEVYN D. ORR
Title: EMERGENCY MANAGER

- 12 -

[[3430711]]

DTPPF00009777

# EXHIBIT B

CONFIDENTIAL

# DETROIT POST-PETITION FINANCING

Briefing Materials Prepared for City Council Closed Session

October 17, 2013





DTPPF00012993

# TABLE OF CONTENTS

1.  Discussion

2.  Financing Term Sheets

1

 MILLER BUCKFIRE
*A Stifel Company*

DTPPF00012994

CONFIDENTIAL

# DISCUSSION



DTPPF00012995

CONFIDENTIAL

# SITUATION OVERVIEW

- Over the last month, the Office of the Emergency Manager and financial and legal advisors to the City of Detroit ("City" or "Detroit") have conducted a competitive process to source financing for the City

- The City contacted over 50 commercial lending institutions, investment banks and investment funds, seeking proposals for up to $350 million in Post-Petition Financing (the "Financing")

- The City indicated to potential lenders that the Financing would be used principally to fund: i) the City's obligations with respect to the certain optional swap terminal rights under the Forbearance and Optional Termination Agreement (the "Forbearance Agreement") and ii) the City's reinvestment initiatives

- The City proposed a two-loan or bond facility structure, consisting of a "Swap Termination Note" and a "Quality of Life Note", addressing each principal use, but indicated that it would be willing to consider alternative structures

  - The Swap Termination Note would be sized to meet the City's financing needs with respect to the exercise of its termination rights under the Forbearance Agreement, currently estimated to be approximately $210,000,000

  - Quality of Life Note, constituting the remaining $140,000,000 of the Financing, would be used for purposes permitted by law, including, without limitation, to fund expenditures that are designed to contribute to the improvement of the quality of life in the City

- After review and negotiation between the City and prospective lenders, the Emergency Manager, in consultation with the City's advisors, chose a financing proposal from Barclays Capital as the most advantageous based on structure and pricing

- As required under Michigan Public Act 436 of 2012, the proposed financing has been submitted to the Detroit City Council, which has 10 days to approve or disapprove the financing



DTPPF00012996

CONFIDENTIAL

# BACKGROUND TO THE TRANSACTION

- The City raised approximately $1.4 billion through the issuance of certificates of participation to fund its pension trusts in 2005 and 2006

  - $800 million of the certificates were floating rate instruments

  - To fix the effective interest rate the City would have to pay over the next 30 years, the City entered into corresponding interest swaps (the "Swaps") with Bank of America Merrill Lynch and UBS (the "Swap Counterparties")
    - The Swap Counterparties committed to pay the City a floating rate matching the coupon on the floating rate instruments. The City committed to pay the Swap Counterparties a fixed rate payment
    - In an event of default, the Swap Counterparties have the right to terminate the Swaps and demand the City pay the Mark-to-Market value of the Swaps

- A decline in the City's credit rating in 2009 created an event of default under the Swaps

  - The City and Swap Counterparties negotiated an amendment and a collateral agreement

  - As part of these agreements, the Swaps received a security interest in the City's gaming tax revenues and a custodial arrangement was set up that gathers and directs the City's gaming tax revenues. The gaming tax revenues are released to the City as long as the City performs its obligations under the Swaps

- In early 2012, an additional credit downgrade again led to an event of default under the Swaps

  - The City and the Swap Counterparties began discussions, but no agreements were executed

  - Subsequent events, including the finding of a financial emergency and the appointment of an emergency manager, also qualified as events of default

- In May 2013, recognizing the City's financial distress and limited projected liquidity and the approaching onset of active restructuring process, the City sought to settle with the Swap Counterparties

4


MILLER BUCKFIRE
A Stifel Company

DTPPF00012997

# BACKGROUND TO THE TRANSACTION (CONT'D.)

■ After extensive negotiation, on July 15 the Emergency Manager executed the Forbearance Agreement with the Swap Counterparties, agreeing that:

 – The City will continue to pay its obligations under the Swaps and agrees not to challenge the Swaps

 – The City has access to the gaming tax revenues

 – The City can elect to voluntarily terminate the Swaps at a discount to the Mark-to-Market value if it can raise the required cash to fund the payment. *This is the primary reason the City began the process of soliciting financing and the largest single use of financing proceeds*

 – As the Court approval process for the Forbearance Agreement has been delayed, the City and the Swap Counterparties have agreed to push back the deadline dates associated with the discounted payoff:[1]

  • Up and through December 31, 2013, the City can retire the Swaps at 75% of the MTM value

  • From January 1, 2014 through June 30, 2014, the City can retire the Swaps at 82% of the MTM value

 – The Forbearance Agreement runs through September 30, 2014 (this date has also been extended). If the Swaps are outstanding at that time, the City and the Swap Counterparties will have to negotiate next steps

■ The Bankruptcy Court has not yet ruled on whether the City can assume the Forbearance Agreement

 – A number of parties have objected to the Forbearance Agreement for a variety of stated reasons. Many parties included the absence of a financing commitment as a reason for their objections

 – The Court must (1) approve the Forbearance Agreement, (2) determine that the City is eligible for Chapter 9 protection and (3) approve the Financing, before the City can close on the Financing

---

(1) Terms herein are currently under discussion with the Swap Counterparties and would be reflected in an additional amendment to the Forbearance Agreement.

5



13-53846-tjt   Doc 1835   Filed 11/27/13   Entered 11/27/13 09:56:39   Page 39 of 95

# SELECTED ECONOMIC TERMS OF THE FINANCING[1]

| | |
|---|---|
| **FACILITY SIZE & STRUCTURE** | ▪ Up to $350 million comprised of two Notes:<br>  – Swap Termination Note – Approximately $210 million based on current Swap valuations<br>  – Quality of Life Note – Approximately $140 million (remainder of facility) |
| **COMMITMENT** | ▪ Fully underwritten: Subject to terms, Barclays has committed to fund the full amount of the Financing |
| **MATURITY** | ▪ Earliest of (i) dismissal of the Chapter 9 case, (ii) effective date of a Plan of Adjustment under Chapter 9, and (iii) 30 months from Closing of the Financing |
| **AMORTIZATION** | ▪ None prior to maturity |
| **OPTIONAL REDEMPTION** | ▪ Year 1: Redeemable at par plus a make-whole through end of Year 1<br>▪ Thereafter: Redeemable at par |
| **PRICING** | ▪ LIBOR + 250 bps (100 bps LIBOR floor)<br>▪ Pricing is subject to market flex provisions<br>▪ Tax exemption of interest to be determined |
| **EXPENSES** | ▪ City responsible for out-of-pocket expenses |

---

[1] Council members should review Emergency Manager Order 17 and attachments, received October 11, 2013, for a more comprehensive description of the Financing.

MILLERBUCKFIRE
*A Stifel Company*

DTPPF00012999

# SELECTED LEGAL TERMS OF THE FINANCING[1]

| COLLATERAL | <ul><li>Swap Termination Note: Priority lien on income tax revenues<br>   – In a Default, Noteholders can collect up to $4 million a month to pay interest and principal</li><li>Quality of Life Note: Priority lien on wagering tax revenue and second priority lien on income tax revenue<br>   – In a default, Noteholders can collect up to $4 million a month to pay interest and principal</li></ul> |
|---|---|
| COLLATERAL ADMINISTRATION | <ul><li>City shall deposit all pledged tax revenues in a lockbox account</li></ul> |
| MANDATORY PREPAYMENTS | <ul><li>Asset monetization net proceeds in excess of $10 million</li><li>Asset monetizations are not required and cannot be forced by the Noteholders</li></ul> |
| SELECTED COVENANTS | <ul><li>City wagering and income tax revenue must each be above $30 million for any rolling three-month period</li><li>City cannot cease to be under control of an Emergency Manager for a period of thirty days, unless a Transition Advisory Board or a consent agreement with the State has been established</li></ul> |
| MATERIAL CLOSING CONDITIONS | <ul><li>Approval by Emergency Manager in compliance with Act 436 and Act 279</li><li>Emergency Loan Board authorization under 36a</li></ul> |

---

[1] Council members should review Emergency Manager Order 17 and attachments, received October 11, 2013, for a more comprehensive description of the Financings.

MILLER BUCKFIRE
*A Stifel Company*

DTPPF00013000

CONFIDENTIAL

# USE OF PROCEEDS

| SWAP TERMINATION NOTE | QUALITY OF LIFE NOTE |
|---|---|
| ■ Net proceeds of the Swap Termination Note will fund the termination payment of the Swaps | ■ Identified uses of the net proceeds from the Quality of Life Note and the net savings in debt service from retiring the Swaps include: |
| ■ The termination payment will be calculated immediately in advance of the payment date per the terms of the Swap Settlement, based on the Forward LIBOR Curve (the capital market's expectations for future short term interest rates) | – Blight remediation<br>– Public Safety Hiring, Fleet and Other Capital Expenditures<br>– Citywide Information Technology Infrastructure |
| ■ As of September 30, 2013, the MTM value of the Swaps was $277.3 million (75% would be $208 million) | – Finance functions improvement, IT and reorganization<br>– GSD Capital Expenditures and Space Consolidation<br>– Planning and Development transition<br>– Public Lighting Department decommissioning expenditures |

MILLER BUCKFIRE
*A Stifel Company*

DTPPF00013001

# PROCESS OVERVIEW

| OCTOBER 2013 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | Th | F | S |
| | | 1 | 2 | 3 | 4 | 5 |
| 6 | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 | 25 | 26 |
| 27 | 28 | 29 | 30 | 31 | | |

| NOVEMBER 2013 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | Th | F | S |
| | | | | | 1 | 2 |
| 3 | 4 | 5 | 6 | 7 | 8 | 9 |
| 10 | 11 | 12 | 13 | 14 | 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

| DECEMBER 2013 | | | | | | |
|---|---|---|---|---|---|---|
| S | M | T | W | Th | F | S |
| 1 | 2 | 3 | 4 | 5 | 6 | 7 |
| 8 | 9 | 10 | 11 | 12 | 13 | 14 |
| 15 | 16 | 17 | 18 | 19 | 20 | 21 |
| 22 | 23 | 24 | 25 | 26 | 27 | 28 |
| 29 | 30 | 31 | | | | |

| OCTOBER | NOVEMBER |
|---|---|
| ■ City Council reviews Financing | ■ Hearing on Forbearance Agreement |
| ■ City and Barclays finalize definitive documentation | ■ Hearing on Post-Petition Financing Motion |
| ■ City files Post-Petition Financing Motion | ■ Emergency Loan Board approval |
| ■ Chapter 9 Eligibility Hearings and Trial | ■ Closing and funding of Financing |
| | ■ Payment of Swap Termination |

MILLER BUCKFIRE
*A Stifel Company*

DTPPF00013002

13-53846-tjt   Doc 1835   Filed 11/27/13   Entered 11/27/13 09:56:39   Page 43 of 95

CONFIDENTIAL

# FINANCING TERM SHEETS



DTPPF00013003

*Set forth below is a summary of certain key terms for the Quality of Life Note (as defined below). This summary of indicative terms and conditions (this "Term Sheet") does not purport to summarize all terms of the Quality of Life Note and related documentation.*

## 1. PARTIES AND TRANSACTIONS

| | |
|---|---|
| Issuer: | The City of Detroit (the "City"). On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears case number 13-53846 (the "Bankruptcy Case") and has been assigned to the Honorable Steven W. Rhodes. The order for relief has not yet been entered; objections are pending. |
| Purchaser and Sole Lead Arranger: | Barclays Capital Inc. |
| Note Agent: | Barclays Capital Inc. |

## 2. TYPE AND AMOUNT OF FACILITY

| | |
|---|---|
| Type and Amount: | A Note Purchase Agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Quality of Life Note" or the "Note" and, together with (i) the Swap Termination Note or (ii) the Replacement Swap Transaction, as applicable (as selected by the City), the "Post-Petition Facility") in an aggregate principal amount of up to $350,000,000, minus the amount of the Swap Termination Note (as defined in the Swap Termination Note Term Sheet) or the Upfront Amount in respect of the Replacement Swap Transaction (each as defined in the Replacement Swap Transaction Term Sheet), as applicable (the "Facility Amount"). |
| Purposes: | Proceeds from the issuance of the Quality of Life Note shall be used for purposes permitted by law, agreed upon between the City and the Purchaser in the QOL Note Documents and approved by the Bankruptcy Court, including, without limitation, to fund expenditures that are designed to contribute to the improvement of the quality of life in the City. |

| | |
|---|---|
| Maturity: | The Note will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a plan of adjustment for the City, (c) the date on which maturity of the Note is accelerated pursuant to the QOL Note Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "Maturity Date"). |
| Tax-exemption of Interest: | To be determined. |
| Closing Date: | The Closing Date shall be not later than the second business day after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "Post-Petition Financing Order"), authorizing the Post-Petition Facility, authorizing the City to enter into the QOL Note Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, (ii) the Bankruptcy Court having entered an order for relief in the Bankruptcy Case and (iii) the date on which all conditions precedent to the issuance of the Note under the QOL Note Documents and the issuance of the Swap Termination Note are satisfied and the Swap Termination Note shall have been issued in accordance with the terms of the ST Note Documents (as defined below). |
| Note Purchase Date: | The Closing Date. |

## 3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
| Spread: | 250 basis points, subject to the terms of the Default Interest Rate set forth below. |
| Note Interest Rate: | 1-month LIBOR plus the Spread. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum. The Post-Petition Facility shall be subject to market flex provisions. |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Note in full on the Maturity Date, at the election of the Purchaser, the initial Spread shall be increased by 200 basis points. |

DTPPF00013005

| | |
|---|---|
| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Note (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |
| Optional Redemption: | The Note may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Note Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by Asset Proceeds Collateral (as defined below) not required to be used to redeem the Note may occur without premium or penalty at any time upon 10 business days' prior written notice. |
| Mandatory Redemption: | The City shall utilize all net proceeds of the voluntary disposition or monetization of any City owned asset (the "Asset Proceeds Collateral") which generates net cash proceeds exceeding $10 million to redeem the Note and the Swap Termination Note on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Principal outstanding in respect of the Note will be due and payable in full upon the Maturity Date. |
| Assignment and Participation: | The Purchaser may assign all or a portion of the Note to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). In addition, the Purchaser shall be entitled to sell participations in the Note without the consent of the City. |

## 4. COLLATERAL AND PRIORITY

| | |
|---|---|
| Collateral: | The obligations owing by the City under the Post-Petition Facility with respect to the Quality of Life Note shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by (i) a first priority lien on (a) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax |

DTPPF00013006

Revenue") and (b) the Asset Proceeds Collateral and (ii) a second priority lien on the income tax revenues of the City (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, the "Quality of Life Note Collateral"). The lien on (i) the Asset Proceeds Collateral shall also secure the Swap Termination Note on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Swap Termination Note on a first-priority basis.

The QOL Note Documents will require that Pledged Wagering Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Wagering Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the QOL Note Documents shall limit the amount of Pledged Wagering Tax Revenue required to be applied to the outstanding amounts owing with respect to the Quality of Life Note during the continuation of an Event of Default to $4 million per month. The City shall be authorized to use all other Pledged Wagering Tax Revenue for any purpose permitted by law, without limitation, during the continuation of an Event of Default.

The QOL Note Documents will require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the QOL Note Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Note during the continuation of an Event of Default to $4 million per month, all of which shall be applied to redeem the Swap Termination Note until such Note is paid in full and thereafter, such amounts (in addition to $4 million per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Quality of Life Note. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

| | |
|---|---|
| Super-Priority of | Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), |

DTPPF00013007

| | |
|---|---|
| Note: | the Note shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims. |
| Events of Default: | Usual for municipal financings, and others to be reasonably specified by the Purchaser, including, without limitation, nonpayment of principal, interest or other amounts; non-performance of covenants and obligations; incorrectness of representations and warranties in any material respect; cross default in respect of a payment or payments of post-petition debt exceeding $25 million or cross acceleration in respect of post-petition debt in an outstanding aggregate principal amount exceeding $25 million; material post-petition judgments involving liability in an amount exceeding $25 million; actual or asserted invalidity or unenforceability of any QOL Note Document; written assertion by an authorized officer of the City (or any person or entity acting on behalf of or having jurisdiction over the City) that any QOL Note Document or court order with respect thereto is invalid or otherwise not binding on the City; dismissal of the Bankruptcy Case; reversal or modification in a manner adverse to the Purchaser of the order for relief by entry of an order that is not stayed; the City's filing of, consent to or lack of timely opposition to a motion seeking dismissal of the Bankruptcy Case; granting of any super-priority claim (other than as permitted under the QOL Note Documents); entry of an order without the prior written consent of the Purchaser amending, supplementing or otherwise modifying the Post-Petition Financing Order in a manner adverse to the Purchaser, or reversal, vacation or stay of the effectiveness of the Post-Petition Financing Order; cessation of liens or super-priority claims granted in respect of the Note to be valid, perfected and enforceable in all respects with the priority described herein; failure of the Pledged Wagering Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Wagering Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; failure of the Pledged Income Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Income Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; and the city ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established. |
| Remedies: | Upon any Event of Default, the Purchaser may declare the principal of the Note to be immediately due. Payment of such accelerated principal shall be made by the City on a monthly basis |

DTPPF00013008

on a level debt basis equivalent to $4 million per month (or, following repayment in full of the Swap Termination Note, $8 million per month, as set forth above under the heading "Collateral"), plus the pro-rata proceeds of any Asset Proceeds Collateral.

| | |
|---|---|
| Prohibition of Additional Borrowings: | The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the collateral securing the Post-Petition Facility. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Quality of Life Note or the Swap Termination Note. |

## 5. CERTAIN OTHER PROVISIONS

| | |
|---|---|
| Documentation: | Each in form and substance satisfactory to the Purchaser: |

- Note Purchase Agreement
- DTC-eligible Note, issued in denominations of not less than $100,000
- State law validity opinion for Note (with appropriate carve-outs in respect of pledge and priority), including tax treatment of Note, no registration of Note under federal securities laws and no governmental immunity under State law with respect to actions to enforce Note
- State law supplemental opinion in respect of transaction documents, including City's status, right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority)
- Bankruptcy opinion including (i) the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Order is effective to create a valid and perfected pledge of the collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion)
- Local emergency financial assistance loan board approval of

DTPPF00013009

Note terms and conditions

- All necessary approvals from the Bankruptcy Court for the Note and security interests in the Note Collateral, including lifting of automatic stay and "good faith" finding
- Custodial undertaking and/or other lockbox agreement with respect to Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Ordinances and resolutions of governing bodies and consent of state officers, including Emergency Manager, whose consent is required by applicable law for issuance of Note, entry into QOL Note Documents and grant of Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, with obligations delivered in accordance with applicable law
- Other financing documents to be determined by Purchaser's counsel and City's counsel

Definitive documentation in respect of the Note will contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions to be reasonably specified by the Purchaser.

The foregoing documents are collectively referred to herein as the "QOL Note Documents".

|                        |                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                                      |
| ---------------------- | --- |
| Conditions Precedent:  | Usual for municipal financings, and others to be reasonably specified by the Purchaser (but in no event to include any financial performance covenants or Bankruptcy Case milestones not expressly set forth herein) including, without limitation, execution and delivery of the QOL Note Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue; entry by the Bankruptcy Court of an order for relief in the Bankruptcy Case within 90 days after the Commitment Date; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions in form |

DTPPF00013010

and substance consistent with the documentation requirements set forth in Section 5 hereof; officers' and public officials' certifications; delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; payment of fees and expenses; effectiveness of definitive documentation in respect of the Swap Termination Note (the "ST Note Documents") reasonably satisfactory to the Purchaser; satisfaction of conditions precedent to the issuance of the Swap Termination Note; accuracy of representations and warranties in all material respects; termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and certain other counterparties (the "Swap Agreements"); and absence of defaults.

The Purchaser agrees, in connection with any termination of the Swap Agreements, that it will provide to the Swap Agreement counterparties a letter stating, to the extent true, that (i) it has received all documents responsive to the conditions precedent to funding under the Post-Petition Facility except for evidence that the Swap Agreements have been terminated, and (ii) the Purchaser is not aware of anything that would result in the funding of the Post-Petition Facility not occurring on the termination date of the Swap Agreements.

| | |
|---|---|
| Authority to Borrow: | Prior to the Closing Date, the City shall have received authorization from the Emergency Loan Board under Section 36a of the Home Rule City Act. |
| City Consent to Jurisdiction: | The City shall consent pursuant to Bankruptcy Code section 904 to the jurisdiction of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder. |
| Restrictions on Dismissal of Bankruptcy Case: | The Post-Petition Financing Order will require payment of all amounts outstanding under the Post-Petition Facility prior to and notwithstanding dismissal of the Bankruptcy Case, unless otherwise agreed to by the Purchaser, and that the Bankruptcy Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce the Post-Petition Financing Order. The City will covenant that it will not seek to invalidate or refute the enforceability of any QOL Note Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case. |
| Absence of Fiduciary | The City acknowledges that the transactions described in this |

DTPPF00013011

| | |
|---|---|
| Relationship: | document are arms'-length commercial transactions and that the Purchaser is acting as principal and in its best interests. The City is relying on its own experts and advisors to determine whether the transactions described in this document are in its best interests. The City agrees that the Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Purchaser, on the one hand, and the City, on the other hand. In addition, the Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City that may be the subject of the transactions described in this term sheet. |
| | Please note that the Purchaser and its affiliates do not provide tax, accounting or legal advice. |
| Yield Protection, Taxes and Other Deductions: | The QOL Note Documents shall contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed). |
| Expenses: | The Purchaser shall be responsible for its expenses (including fees, disbursements and other charges of counsel) in connection with the preparation, execution and delivery of the QOL Note Documents. The City shall pay all reasonable out-of-pocket expenses of the Purchaser (including the fees, disbursements and other charges of counsel) in connection with the enforcement, and any amendment or waiver, of the QOL Note Documents. |
| Indemnification: | To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the Note proceeds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities |

DTPPF00013012

or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities.

| | |
|---|---|
| Purchaser Contacts: | John Gerbino, Managing Director<br>James Saakvitne, Managing Director<br>Peter Joyce, Director<br>Barclays Capital Inc.<br>745 Seventh Avenue, 19th Floor<br>New York, NY 10019<br>212 526 3466<br>john.gerbino@barclays.com<br>james.saakvitne@barclays.com<br>peter.joyce@barclays.com |
| Purchaser Counsel: | Purchaser's counsel will be responsible for drafting the Note Purchase Agreement.<br><br>George E. Zobitz, Esq.<br>Cravath, Swaine & Moore LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019-7475<br>212 474 1000<br>F 212 474 3700<br>jzobitz@cravath.com |
| Michigan Counsel: | Ann D. Fillingham, Esq.<br>James P. Kiefer, Esq.<br>Courtney F. Kissel, Esq.<br>Dykema Gossett PLLC<br>Capitol View<br>201 Townsend Street, Suite 900<br>Lansing, MI 48933<br>517 374 9100<br>F 517 374 9191<br>AFillingham@dykema.com<br>jkiefer@dykema.com<br>ckissel@dykema.com |
| Governing Law: | Michigan. |
| Jurisdiction and Venue: | The Bankruptcy Court, unless the Bankruptcy Court does not have jurisdiction, in which case, the parties shall consent to the non-exclusive jurisdiction of the courts of the State of New York and |

DTPPF00013013

the United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

DTPPF00013014

*Set forth below is a summary of certain key terms for the Swap Termination Note (as defined below). This summary of indicative terms and conditions (this "Term Sheet") does not purport to summarize all terms of the Swap Termination Note and related documentation.*

## 1. PARTIES AND TRANSACTIONS

Issuer:

The City of Detroit (the "City"). On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears case number 13-53846 (the "Bankruptcy Case") and has been assigned to the Honorable Steven W. Rhodes. The order for relief has not yet been entered; objections are pending.

Purchaser and Sole
Lead Arranger:

Barclays Capital Inc.

Note Agent:

Barclays Capital Inc.

## 2. TYPE AND AMOUNT OF FACILITY

Type and Amount:

A Note Purchase Agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Swap Termination Note" or the "Note" and, together with the Quality of Life Note, the "Post-Petition Facility") in an aggregate principal amount sufficient to pay amounts required under the Forbearance and Optional Termination Agreement dated as of July 15, 2013, among the City, the Emergency Manager of the City, the Detroit General Retirement System Service Corporation, the Detroit Police and Fire Retirement System Service Corporation, on the one hand, and UBS AG and Merrill Lynch Capital Services, Inc., on the other (as amended, the "Forbearance Agreement") to terminate the underlying swaps. The sum of the amount of the Swap Termination Note and the amount of the Quality of Life Note shall not exceed $350,000,000 (the "Facility Amount").

Purposes:

The Swap Termination Note may be used by the City to pay amounts required under the Forbearance Agreement to terminate the underlying swaps as approved by the Bankruptcy Court.

DTPPF00013015

| Maturity: | The Note will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a plan of adjustment for the City, (c) the date on which maturity of the Note is accelerated pursuant to the ST Note Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "Maturity Date"). |
| --- | --- |
| Tax-exemption of Interest: | To be determined. |
| Closing Date: | The Closing Date shall be not later than the second business day after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "Post-Petition Financing Order"), authorizing the Post-Petition Facility, authorizing the City to enter into the ST Note Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, (ii) the Bankruptcy Court having entered an order for relief in the Bankruptcy Case and (iii) the date on which all conditions precedent to the issuance of the Note under the ST Note Documents and the issuance of the Quality of Life Note are satisfied and the Quality of Life Note shall have been issued in accordance with the terms of the QOL Note Documents (as defined below). |
| Note Purchase Date: | The Closing Date. |

3. CERTAIN PAYMENT PROVISIONS

| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
| --- | --- |
| Spread: | 250 basis points, subject to the terms of the Default Interest Rate set forth below. |
| Note Interest Rate: | 1-month LIBOR plus the Spread. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum. The Post-Petition Facility shall be subject to market flex provisions. |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Note in full on the Maturity Date, at the election of the Purchaser, the initial Spread shall be increased by 200 basis points. |

DTPPF00013016

| | |
|---|---|
| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Note (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |
| Optional Redemption: | The Note may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Note Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by Asset Proceeds Collateral (as defined below) not required to be used to redeem the Note may occur without premium or penalty at any time upon 10 business days' prior written notice. |
| Mandatory Redemption: | The City shall utilize all net proceeds of the voluntary disposition or monetization of any City owned asset (the "Asset Proceeds Collateral") which generates net cash proceeds exceeding $10 million to redeem the Note and the Quality of Life Note on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Principal outstanding in respect of the Note will be due and payable in full upon the Maturity Date. |
| Assignment and Participation: | The Purchaser may assign all or a portion of the Note to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). In addition, the Purchaser shall be entitled to sell participations in the Note without the consent of the City. |

## 4. COLLATERAL AND PRIORITY

| | |
|---|---|
| Collateral: | The obligations owing by the City under the Post-Petition Facility with respect to the Swap Termination Note shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by a first priority lien on: (i) the Asset Proceeds Collateral and (ii) income tax revenues of the City (the "Pledged Income Tax Revenue" and together with the Asset Proceeds Collateral, the "Swap Termination Note Collateral"). The lien on the Asset Proceeds Collateral shall also secure the Quality of Life Note on |

DTPPF00013017

a pari passu basis. The Quality of Life Note shall be secured by a second lien on the Pledged Income Tax Revenue.

The ST Note Documents will require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the ST Note Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Note during the continuation of an Event of Default to $4 million per month. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

| | |
|---|---|
| Super-Priority of Note: | Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2), the Note shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims. |
| Events of Default: | Usual for municipal financings, and others to be reasonably specified by the Purchaser, including, without limitation, nonpayment of principal, interest or other amounts; non-performance of covenants and obligations; incorrectness of representations and warranties in any material respect; cross default in respect of a payment or payments of post-petition debt exceeding $25 million or cross acceleration in respect of post-petition debt in an outstanding aggregate principal amount exceeding $25 million; material post-petition judgments involving liability in an amount exceeding $25 million; actual or asserted invalidity or unenforceability of any ST Note Document; written assertion by an authorized officer of the City (or any person or entity acting on behalf of or having jurisdiction over the City) that any ST Note Document or court order with respect thereto is invalid or otherwise not binding on the City; dismissal of the Bankruptcy Case; reversal or modification in a manner adverse to the Purchaser of the order for relief by entry of an order that is not stayed; the City's filing of, consent to or lack of timely opposition to a motion seeking dismissal of the Bankruptcy Case; granting of any super-priority claim (other than as permitted under the ST Note Documents); entry of an |

DTPPF00013018

order without the prior written consent of the Purchaser amending, supplementing or otherwise modifying the Post-Petition Financing Order in a manner adverse to the Purchaser, or reversal, vacation or stay of the effectiveness of the Post-Petition Financing Order; cessation of liens or super-priority claims granted in respect of the Note to be valid, perfected and enforceable in all respects with the priority described herein; failure of the Pledged Income Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Income Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; and the city ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established.

|                          |                                                                                                                                                                                                                                                                                             |
|--------------------------|---------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
| Remedies:                | Upon any Event of Default, the Purchaser may declare the principal of the Note to be immediately due. Payment of such accelerated principal shall be made by the City on a monthly basis on a level debt basis equivalent to $4 million per month, plus the pro-rata proceeds of any Asset Proceeds Collateral. |
| Prohibition of Additional Borrowings: | The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the collateral securing the Post-Petition Facility. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Swap Termination Note or the Quality of Life Note. |

DTPPF00013019

## 5. CERTAIN OTHER PROVISIONS

Documentation:
Each in form and substance satisfactory to the Purchaser:

- Note Purchase Agreement
- DTC-eligible Note, issued in denominations of not less than $100,000
- State law validity opinion for Note (with appropriate carve-outs in respect of pledge and priority), including tax treatment of Note, no registration of Note under federal securities laws and no governmental immunity under State law with respect to actions to enforce Note
- State law supplemental opinion in respect of transaction documents, including City's status, right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority)
- Bankruptcy opinion including (i) the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Order is effective to create a valid and perfected pledge of the collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion)
- Local emergency financial assistance loan board approval of Note terms and conditions
- All necessary approvals from the Bankruptcy Court for the Note and security interests in the Swap Termination Note Collateral, including lifting of automatic stay and "good faith" finding
- Custodial undertaking and/or other lockbox agreement with respect to Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Ordinances and resolutions of governing bodies and consent of state officers, including Emergency Manager, whose consent is required by applicable law for issuance of Note, entry into ST Note Documents and grant of Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with Pledged Income Tax Revenue and Pledged Wagering Tax Revenue

DTPPF00013020

- Written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, with obligations delivered in accordance with applicable law
- Other financing documents to be determined by Purchaser's counsel and City's counsel

Definitive documentation in respect of the Note will contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions to be reasonably specified by the Purchaser.

The foregoing documents are collectively referred to herein as the "ST Note Documents".

|                      |                      |
|----------------------|----------------------|
| Conditions Precedent: | Usual for municipal financings and Chapter 11 debtor-in-possession financings, and others to be reasonably specified by the Purchaser (but in no event to include any financial performance covenants or Bankruptcy Case milestones not expressly set forth herein) including, without limitation, execution and delivery of the ST Note Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue; entry by the Bankruptcy Court of an order for relief in the Bankruptcy Case within 90 days after the Commitment Date; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions in form and substance consistent with the documentation requirements set forth in Section 5 hereof; officers' and public officials' certifications; delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; payment of fees and expenses; effectiveness of definitive documentation in respect of the Quality of Life Note (the "QOL Note Documents") reasonably satisfactory to the Purchaser; satisfaction of conditions precedent to the issuance of the Quality of Life Note; accuracy of representations and warranties in all material respects; termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and certain other counterparties (the "Swap Agreements"); and absence of defaults. |

The Purchaser agrees, in connection with any termination of the Swap

DTPPF00013021

Agreements, that it will provide to the Swap Agreement counterparties a letter stating, to the extent true, that (i) it has received all documents responsive to the conditions precedent to funding under the Post-Petition Facility except for evidence that the Swap Agreements have been terminated, and (ii) the Purchaser is not aware of anything that would result in the funding of the Post-Petition Facility not occurring on the termination date of the Swap Agreements.

| | |
|---|---|
| Authority to Borrow: | Prior to the Closing Date, the City shall have received authorization from the Emergency Loan Board under Section 36a of the Home Rule City Act. |
| City Consent to Jurisdiction: | The City shall consent pursuant to Bankruptcy Code section 904 to the jurisdiction of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder. |
| Restrictions on Dismissal of Bankruptcy Case: | The Post-Petition Financing Order will require payment of all amounts outstanding under the Post-Petition Facility prior to and notwithstanding dismissal of the Bankruptcy Case, unless otherwise agreed to by the Purchaser, and that the Bankruptcy Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce the Post-Petition Financing Order. The City will covenant that it will not seek to invalidate or refute the enforceability of any ST Note Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case. |
| Absence of Fiduciary Relationship: | The City acknowledges that the transactions described in this document are arms'-length commercial transactions and that the Purchaser is acting as principal and in its best interests. The City is relying on its own experts and advisors to determine whether the transactions described in this document are in its best interests. The City agrees that the Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Purchaser, on the one hand, and the City, on the other hand. In addition, the Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City that may be the subject of the transactions described in this term sheet. |
| | Please note that the Purchaser and its affiliates do not provide tax, accounting or legal advice. |

DTPPF00013022

| | |
|---|---|
| Yield Protection, Taxes and Other Deductions: | The ST Note Documents shall contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed). |
| Expenses: | The Purchaser shall be responsible for its expenses (including fees, disbursements and other charges of counsel) in connection with the preparation, execution and delivery of the ST Note Documents. The City shall pay all reasonable out-of-pocket expenses of the Purchaser (including the fees, disbursements and other charges of counsel) in connection with the enforcement, and any amendment or waiver, of the ST Note Documents. |
| Indemnification: | To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the Note proceeds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities. |
| Purchaser Contacts: | John Gerbino, Managing Director<br>James Saakvitne, Managing Director<br>Peter Joyce, Director<br>Barclays Capital Inc.<br>745 Seventh Avenue, 19th Floor<br>New York, NY 10019<br>212 526 3466<br>john.gerbino@barclays.com<br>james.saakvitne@barclays.com<br>peter.joyce@barclays.com |
| Purchaser Counsel: | Purchaser's counsel will be responsible for drafting the Note Purchase |

DTPPF00013023

Agreement.

George E. Zobitz, Esq.
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019-7475
212 474 1000
F 212 474 3700
jzobitz@cravath.com

Michigan Counsel:    Ann D. Fillingham, Esq.
James P. Kiefer, Esq.
Courtney F. Kissel, Esq.
Dykema Gossett PLLC
Capitol View
201 Townsend Street, Suite 900
Lansing, MI 48933
517 374 9100
F 517 374 9191
AFillingham@dykema.com
jkiefer@dykema.com
ckissel@dykema.com

Governing Law:    Michigan.

Jurisdiction and
Venue:    The Bankruptcy Court, unless the Bankruptcy Court does not have jurisdiction, in which case, the parties shall consent to the non-exclusive jurisdiction of the courts of the State of New York and the United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.

DTPPF00013024

# EXHIBIT C

PRIVILEGED AND CONFIDENTIAL
DRAFT - NOT FOR IMMEDIATE RELEASE

### City of Detroit Receives Commitment for up to $350 Million of Post-Petition Financing

*Commitment from Barclays to Assist with Reducing City's Financial Burden
and Investing in Ongoing Revitalization of Detroit*

DETROIT, Oct. 11, 2013 – Kevyn Orr, the Emergency Manager for the City of Detroit ("Detroit" or the "City"), today announced that the City has received a commitment for senior secured post-petition financing of up to $350 million from Barclays. The proceeds of the financing will benefit the ongoing restructuring of Detroit in several ways:

- Allow the City to capture a large discount – estimated to be more than $60 million – on the settlement of certain pension debt interest rate swap obligations;
- Save the City tens of millions of dollars of annual debt service;
- Afford the City additional resources from which to make remittances to creditors, including retirees;
- Provide additional cash for investment in Detroit's delivery of municipal services to its businesses and 700,000 residents, including blight removal, public safety initiatives and technology infrastructure improvements.

"Today is another important step in the continued revitalization of Detroit," Orr said. "We said at the outset of this process that we are committed to improving the financial condition of Detroit and the lives of its 700,000 citizens, and our team worked tirelessly to bring this significant post-petition financing to bear. We are very encouraged by the level of interest we received from the financial community, its implicit support of the work we are doing and their desire to participate in the ongoing recovery of one of America's great and vibrant cities."

Approximately $230 million of the post-petition financing will be used to exercise termination rights on certain pension debt interest rate swap obligations. The balance of the financing – approximately $120 million – will be used to advance certain key investment initiatives of the City aimed at improving basic services to Detroit's residents and businesses and the technology infrastructure of the City's government.

The City, in conjunction with its financial advisor, Miller Buckfire & Co., and legal advisor, Jones Day, conducted a highly competitive financing process over the past month, contacting more than 50 institutions with experience in municipal or special credit situations. Detroit received 16 high-level financing proposals from leading financial institutions such as local and national commercial banks, investment banks and hedge funds, among which were many of the City's financial creditors. After extensive review and negotiation between the City and prospective lenders, the Emergency Manager, in consultation with the City's advisors, chose the Barclays proposal as the most advantageous based on structure and pricing.



DTPPF00013042

PRIVILEGED AND CONFIDENTIAL
DRAFT - NOT FOR IMMEDIATE RELEASE

Terms of the Financing

The financing commitment from Barclays in the amount of up to $350 million carries an interest rate of London Interbank Offered Rate (LIBOR) + 2.5% (with a 1% LIBOR floor), subject to market flex. The outside maturity date for the financing is two years and six months from the closing date, with a commitment fee in connection with the financing due from the City. The financing is secured by a pledge of income tax revenues, wagering tax revenues and net cash proceeds from any potential monetization of City assets that exceeds $10 million. Asset monetizations are not required. Barclays will be given a claim on the borrowing that has priority over all administrative expense claims, all other post-petition claims, and prepetition unsecured claims.

Approval Process and Closing Conditions

The financing will be issued as Financial Recovery Bonds under Section 36a of the Home Rule City Act. As required under Michigan Public Act 436 of 2012, the proposed financing has been submitted to the Detroit City Council, which has 10 days to approve or disapprove the financing. The City also will seek the approval of the emergency financial assistance loan board. Finally, the financing will be subject to the approval of the United States Bankruptcy Court for the Eastern District of Michigan. The City intends to file a motion with the Court in late October for a hearing in November. The closing of the financing commitment is subject to, among other conditions, the entry of an order of relief in the bankruptcy case, exercise of termination rights under Forbearance Agreement, and bankruptcy court approval of the financing transaction

#    #    #

**Contact:**

Bill Nowling
Office of Emergency Manager, City of Detroit
(Office) 313-628-0950
(Mobile) 313-670-6164

DTPPF00013043

# EXHIBIT D

| From: | Dana Gorman [DTG@ABMAC.COM] |
|---|---|
| Sent: | Friday, October 11, 2013 6:16 PM |
| To: | Doak, James (Miller Buckfire); Bill Nowling <NowlingB@detroitmi.gov> (NowlingB@detroitmi.gov) |
| Cc: | Buckfire, Kenneth (Miller Buckfire) |
| Subject: | RE: Post-petition financing press release |

I saw that extra space is well. Attached is the release as it currently stands, just so everyone sees it.

**From:** Doak, James [mailto:james.doak@millerbuckfire.com]
**Sent:** Friday, October 11, 2013 2:14 PM
**To:** Dana Gorman; Bill Nowling <NowlingB@detroitmi.gov> (NowlingB@detroitmi.gov)
**Cc:** Buckfire, Kenneth (Miller Buckfire)
**Subject:** RE: Post-petition financing press release

Understand.

There is an extra space after the word Barclays.

But we have a real issue with the third bullet under purpose – the document should NOT be released in its present form.

Ken and I can discuss with whomever wanted it inserted.

**James Doak**

Managing Director

Miller Buckfire | A Stifel Company

..............................................................................

**Direct:** +1.212.895.1829 | **Fax:** +1.212.895.1835

**E-mail:** james.doak@millerbuckfire.com | www.millerbuckfire.com

..............................................................................

601 Lexington Avenue, 22nd Floor | New York, NY 10022

1

EXHIBIT
D

# EXHIBIT E

 **BARCLAYS**

Barclays Capital Inc.
745 Seventh Avenue
New York, NY 10019

## INVOICE

**To:** The City of Detroit, Michigan

**Address:** 2 Woodward Avenue
Suite 1126
Detroit, MI 48226

**Phone:** 313-224-3400

**Date:** October 12, 2013

| DESCRIPTION | AMOUNT |
|---|---|
| Partial Payment (50%) of Commitment Fee related to Post-Petition Bond Financing | $2,187,500.00 |
| | |
| Total Due | $2,187,500.00 |



**Barclays Capital Inc. Wire Instructions**

PI

PII

Reference: City of Detroit, Michigan
Attn: Richard Sentochnik, 212-528-1061

If you have any questions about this invoice, please contact:

John Gerbino
Barclays Capital Inc.
Managing Director
john.gerbino@barclays.com
Telephone: 212-526-3466
Fax: 917-265-0652

1

EXHIBIT

**MEMO WIRE**
**10/15/2013**

|  |  | **AMOUNT** |
|---|---|---|
| **FROM:** | **1000 FUND** | **2,187,500.00** |
| **TO:** | **Barclays** | **2,187,500.00** |

```
PII
```

Reference: Detroit DIP
Attn: Sunny Jasper So

*JE# [JE to be provided by Finance and attached to wire memo same day]*

*MGlamer 10/15/13*

_____
**APPROVED**

_____
**CFO/COO Approval**



**Detailed Transaction**

| Number | Type | Method | Value Date | Send Date | Currency | Amount | Account | Status |
|---|---|---|---|---|---|---|---|---|

Bank ID: CMCAPROD

| 15782 | Wire Collection | FED | 10/15/2013 | 10/15/2013 | USD | 2,187,500.000 | | Confirmed |

Bene Name: City of Det Gen Acct
Corr Bank Name:
Corr Bank ID:

Bene ID: 2382
Corr Bank Addr:
Bene Type: Checking
Bene Addr:

Thru Bank Name:
Thru Bank ID:
Thru Bank Addr:

Bene Bank Name: Chase Manhattan Bank
Bene Bank ID: 021000021
Bene Bank Addr:

Bank Conf #: 131015100924
Reference #: 002022
MB Conf #: <Not Assigned>
Rate: 1.00000000
USD Equivalent: 2,187,500.000
FX Contract #:
Source: Template Bank 2 - 0100 - C
By Order Of: City of Detroit Central Clearing
Company Entry Description:
Company Discretionary Data:
Company Identifier:

Addenda:
Details:
Account Name: City of Detroit Central Clearing

| 15783 | Wire Disbursement | FED | 10/15/2013 | 10/15/2013 | USD | 2,187,500.000 | | Confirmed |

Bene Name: BARCLAYS
Corr Bank Name:
Corr Bank ID:

Bene ID: GLA111569
Corr Bank Addr:
Bene Type: Checking
Bene Addr:

Thru Bank Name:
Thru Bank ID:
Thru Bank Addr:

Bene Bank Name: Bank of New York
Bene Bank ID: 021000018
Bene Bank Addr: 48 Wall Street
New York, NY 10286

Bank Conf #: 131015100923
Reference #: 002024
MB Conf #: <Not Assigned>
Rate: 1.00000000
USD Equivalent: 2,187,500.000
FX Contract #:
Source: Scratch
By Order Of:
Company Entry Description:
Company Discretionary Data:
Company Identifier:

Addenda:
Details: BANK OF NEW YORK ACCT NAME:BZW REF:DETROIT DIP ATTN:SUNNY JASPER SO
Account Name: City of Detroit Central Clearing

DTPPF00012213

```
+------------------------------------------------------------------------------+
|                      Final Payment Register DRMS Version                      |
|                               City of Detroit                                |
|                           October 15, 2013 13:15                             |
|------------------------------------------------------------------------------|
|              Name: FIN A/P 9657          Bank Account: City of Detroit A/P Disbu |
|  Payment Document: INTERNAL WIRE         Payment Date: 15-OCT-13             |
|   Document Order: Supplier Name          Maximum Outlay:                     |
|    Maximum Payment:                       Minimum Payment:                   |
|     Payment Method: Wire                 Pay Only When Due: No               |
|    Pay Through Date: 16-OCT-13           Zero Payments Allowed: No           |
| Bank Account Currency: USD               Zero Invoices Allowed: No           |
| Payment Batch Currency: USD                    Pay Group:                    |
|    Exchange Rate Type:                    Priority Range:  Low: 99   High: 1  |
|                                               Exchange Rate:                 |
|------------------------------------------------------------------------------|
|   Payment Batch Total: 2,187,500.00      Number of Set Up Documents: 0       |
|                                          Number of Overflow Documents: 0     |
|                                          Number of Negotiable Documents: 1   |
+------------------------------------------------------------------------------+
```

DTPPF00012217

| Document Number | Voucher Number | Status | Supplier Name | Supplier Site | Address | Supplier Bank Account Num | Document Amount |
|---|---|---|---|---|---|---|---|
| 72105 | | Negotiable | BARCLAYS CAPITAL INC | NEW YORK | 745 SEVENTH AVENUE NEW YORK NY 10019 United States | | 2,187,500.00 |
| | | | | | | Payment Batch Total | 2,187,500.00 |

*** End of Report ***

# EXHIBIT F

**To:** dillona2[dillona2@michigan.gov]; saxont[saxont@michigan.gov]
**From:** Kevyn Orr
**Sent:** Tue 8/27/2013 5:40:39 PM
**Subject:** Fwd: Addendum with correct spelling
<u>Addendum with correct spelling (74.0 KB)</u>

Andy and Tom,

Attached is an addendum to the Miller Buckfire retention agreement. It includes a fee of 0.15% of any gross DIP financing proceeds for Miller Buckfire's effort related to procuring a DIP. It is my understanding that Miller Buckfire discussed this with you a few weeks ago and that this addendum is consistent with those discussions. If so, please confirm that I am authorized to sign this document at your earliest convenience. Thank you.

Best,
Kevyn



EXHIBIT

DTPPF00018902

## ADDENDUM #1 TO CHANGE ORDER #1

Reference is made to that certain amendment, dated July 16, 2013 (the "Amendment"), amending the Services Contract, dated as of January 9, 2013, between City of Detroit, Michigan and Miller Buckfire & Co., LLC (the "Original Contract" and as modified by the Amendment, the "Contract"). Capitalized terms used, but not otherwise defined in this Addendum #1 to the Contract have the respective meanings ascribed to them in the Contract. Except as modified by this Addendum, all terms and conditions of the Contract shall continue in full force and effect and be unaffected by this Addendum.

Exhibit A and Exhibit B of the Contract contemplated that the City may from time to time request that Contractor provide Services in respect of identified Financings.

Accordingly, the City hereby requests that Contractor provide the City, and Contractor hereby agrees to provide, the Financing Services identified in the Contract in respect of a debtor in possession Financing proposed to be raised by the City.

The City hereby agrees to pay Contractor a financial advisory fee of 0.15% of the gross proceeds of such debtor in possession Financing, which fee shall be contingent upon and payable at the closing of such Financing.

It is understood and agreed that nothing contained herein shall constitute an expressed or

1

implied commitment by Contractor to act in any capacity or to underwrite, place or purchase any financing or securities.

This Addendum #1 and the Contract are hereby approved and ratified in all respects as valid and binding obligations of Contractor and the City.

In witness whereof, the parties have executed this Addendum #1 to the Contract as of August 5, 2013.

Contractor:
Miller Buckfire & Co., LLC

By: *Kenneth A Buckfire*
    Kenneth A. Buckfire
    President

City of Detroit

By:_____
    Kevin Orr
    Emergency Manager
    City of Detroit

2

DTPPF00011395

# EXHIBIT G

# QUARTERLY REPORT WITH RESPECT TO THE FINANCIAL CONDITION OF

## THE CITY OF DETROIT

October 15, 2013

This quarterly report covers the period from July 1, 2013 through September 30, 2013 (the "Reporting Period") and addresses the financial condition of the City of Detroit.

**Local Financial Stability and Choice Act (Michigan Public Act 436 of 2012) ("PA 436")**

Section 9(5) [MCL § 141.1549(5)]

*The emergency manager shall submit quarterly reports to the state treasurer with respect to the financial condition of the local government in receivership, with a copy to the superintendent of public instruction if the local government is a school district and a copy to each state senator and state representative who represents that local government. In addition, each quarterly report shall be posted on the local government's website within 7 days after the report is submitted to the state treasurer.*



DTPPF00020192

**Emergency Manager's Comments on the Financial Condition of the City of Detroit**

The financial condition of the City of Detroit continues to be dire. On July 18, 2013, the City filed for relief under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code"). The City has stopped making payments related to unsecured funded debt and legacy liabilities, with the exception of retiree healthcare benefits, which the City has continued to pay in the ordinary course, and certain important vendors. ~~The City is in the process of seeking a $350 million post-petition bankruptcy loan (the "Restructuring Financing"); however, the projections included herein do not reflect the impact of such transaction.~~

General Fund cash flows and liquidity results for the first quarter of fiscal year 2014 (See Appendix A)

The City's 2014 fiscal year runs from July 1, 2013 through June 30, 2014. At the beginning of fiscal year 2014, the City's General Fund had cash of $71.3 million before accumulated property tax distributions in the amount of $35.3 million, resulting in a net unrestricted cash balance of $36.0 million. Based upon actual results for the first quarter of fiscal year 2014 (i.e., the three months ended September 30, 2013), the City had positive net cash flow of $140.3 million. This resulted in cash balance of $211.6 million, as of September 30, 2013, before deducting accumulated property tax distributions of $83.1 million (preliminary estimate), leaving net ending unrestricted cash balance of $128.5 million. This unrestricted cash balance exceeded the first quarter forecasted balance by $56.7 million.

The positive cash flow in the first quarter was mostly driven by the collection of more than $237 million of summer property taxes. Historically, the first quarter of the fiscal year has been the high point in cash for the General Fund. The General Fund's portion of the property taxes collected by the City is approximately $50 million; the remainder is collected by the City on behalf of other taxing authorities (e.g. Wayne County, Detroit Public Schools, State Education Trust, etc.). During the first quarter, the City continued to make payments related to certain LTGO debt, UTGO debt, and certificate of participation interest rate swaps, that constitute secured debt. Amounts paid related to these obligations were $6.2 million, $1.3 million, and $16.9 million, respectively. While the City has continued to make payments related to health coverage for retirees, the General Fund did not make pension contribution either to the General Retirement System ("GRS") or the Police and Fire Retirement System ("PFRS"). The City did not make any payments on unsecured bond debt during the first quarter.

When comparing the forecasted and actual cash flows for the first quarter of fiscal year 2014, the major variances were as follows:

- $13.7 million positive variance in gaming taxes related to timing and partially off-set by the $4.2 million June swap payment made in July;

DTPPF00020193

- $13 million positive variance in other receipts primarily due to grant receipts, voided checks due to the chapter 9 filing, and a payment from Detroit Public Schools to the Public Lighting Department;
- $20 million negative variance in refinancing proceeds due to refinancing bond escrow funds not being released as forecast; and
- $44 million positive variance resulting from not making forecasted pension contributions.

General Fund cash flows and liquidity projections for the second quarter of fiscal year 2014 (ending December 2013) (See Appendix A)

The second quarter of fiscal year 2014 is projected to result in a General Fund net cash flow of negative $82.3 million, resulting in a December 31, 2013 cash balance of $129.3 million before accumulated property tax distributions of $82.4 million, or a $46.8 million unrestricted cash balance net of distributions. The forecast for the second quarter assumes that $20 million is released from the refinancing bond escrow funds. The forecast also assumes that the Postpetition Financing is not obtained or available during the second quarter of fiscal year 2014.

Preliminary unaudited revenues and expenditures for the first quarter of fiscal year 2014 (See Appendix B)

The revenues and expenditures report includes entries that have not been posted in the general ledger and encumbrances. This manner of presentation provides the most up to date data on revenues and expenditures. Unposted entries are preliminary and subject to review before they are finalized; therefore, actual results will likely be different from the preliminary results presented herein, and those difference may be material.

Preliminary unaudited General Fund revenues and expenditures for the first quarter ended September 30, 2013 result in a surplus of $55.8 million. Year-to-date revenues are approximately $22 million lower than last fiscal year mostly related to declining trends in property and other taxes and the reallocation of the utility users' taxes to the new Public Lighting Authority. Operating expenditures have declined by approximately $11 million, largely due to a reduction in employee headcount, from 10,325 city employees as of September 30, 2012 to approximately 9,322 city employees as of September 30, 2013.

**Emergency Manager Actions Regarding Restructuring Process**

Background

As described in the initial quarterly report pursuant to section 9(5) of the PA 436 dated July 15, 2013 (the "First Quarterly Report"), the Emergency Manager began the process of developing a comprehensive restructuring plan for the City, and addressing the City's other urgent needs, immediately upon the Emergency Manager's appointment. The Emergency Manager has taken decisive action to improve public health and safety by taking steps to update outdated and poorly maintained emergency vehicles, information technology infrastructure and facilities and address other longstanding

DTPPF00020194

needs of the City. These activities are described in the First Quarterly Report and include, among other things, opening the Detroit Public Safety Headquarters, hiring a new Chief of Police and developing and pursuing a plan to fix streetlights and address the City's outdated power grid.

To assist in this process, the Emergency Manager spent significant time from the outset of his appointment working with the City's financial and legal advisors to cast a critical eye on all of the City's financial obligations and operational issues to develop a realistic assessment of the City's problems, obstacles, needs and opportunities. As noted in the First Quarterly Report, the goal of this process was to develop a comprehensive plan to: (a) ensure that the City is able to provide for or procure governmental services essential to the health, safety and welfare of its citizens; (b) assure the fiscal accountability and stability of the City; and (c) promote private investment in the City and the revitalization of the community in a sustainable fashion.

One of the first steps was the development of a financial and operating plan for the City (the "Financial and Operating Plan"), which placed the City's challenges in context and defined a series of goals and initiatives. The Financial and Operating Plan, dated May 12, 2013, was submitted to the State Treasurer as required by section 11(2) of PA 436 on May 13, 2013 and is available on the City's website at http://www.detroitmi.gov/EmergencyManager/Reports.aspx.

Continuing to build on these actions, the Emergency Manager and his advisors developed and presented a detailed restructuring proposal to creditors on June 14, 2013 (the "Restructuring Proposal"). The 128-page Restructuring Proposal details a thorough overhaul and restructuring of the City's operations, finances and capital structure. The Restructuring Proposal also proposes recoveries for each creditor group. The proposal is based on ten-year projections that provide a realistic basis for evaluating the City's financial wherewithal to satisfy creditors' claims and achieve the City's restructuring goals. The Restructuring Proposal is described in the First Quarterly Report and is available on the City's website at http://www.detroitmi.gov/EmergencyManager/Reports.aspx.

As noted in the First Quarterly Report, following the presentation of the Restructuring Proposal to approximately 150 creditor representatives on June 14, 2013, the City conducted a series of individualized meetings with its organized and represented creditor constituencies to: (a) provide them with additional details on the financial condition of the City, (b) describe key assumptions used to develop the ten-year projections underlying the Restructuring Proposal, (c) provide a forum to answer questions from creditors; (d) solicit responses and counter-proposals from the various constituencies and (e) negotiate in good faith regarding the City's Restructuring Proposal.

<u>General Actions Since the First Quarterly Report</u>

Since the submission of the First Quarterly Report, the Emergency Manager, his staff and outside advisors have continued to dedicate significant time and energy addressing the City's financial and operational emergency. Meetings with interested parties, state and federal government officials, professional advisors and creditors occur numerous times each week, if not daily.

DTPPF00020195

In support of the City's restructuring, the Emergency Manager issued several important orders that promote the health, safety and welfare of the City's residents and visitors. These orders also were designed to assist the Emergency Manager in his efforts to analyze the factors and circumstances contributing to the City's financial emergency. Since the submission of the First Quarterly Report, the Emergency Manager has entered orders consistent with PA 436 that: (a) approved a trust fund mechanism to collect and hold certain City revenue sources dedicated to reconfiguring the City's streetlight footprint to provide reliable public lighting service and make the streets safer for Detroit citizens under the management of the new Public Lighting Authority; (b) suspended certain City ordinances in order to streamline contractors' ability to obtain the permits needed to demolish blighted, abandoned or dangerous residential structures in a prompt, safe and cost efficient manner; and (c) directed certain City employees to provide various records, books, documents and data related to the finances and operations of the Detroit General Retirement System and Detroit Police and Fire Retirement System to assist in evaluating the fiscal soundness of the retirement systems. These orders are consistent with the initiatives outlined at the Restructuring Proposal and reflect meaningful steps taken with respect to the issues facing the City. These orders, in addition to all prior and future orders, are available on the City's website at http://www.detroitmi.gov/EmergencyManager/Orders.aspx.

The Emergency Manager continued to evaluate and, where appropriate, pursue opportunities relating to the City's assets. For example, after a series of negotiations, the Emergency Manager entered into a lease with the State with respect to Belle Isle Park (the "Belle Isle Lease") on September 30, 2013. Thereafter, on October 1, 2013, the Belle Isle Lease was approved by the Governor pursuant to section 12(1)(r) of PA 436 and was submitted to the Detroit City Council for review and approval in accordance with section 19 of PA 436 on October 3, 2013. Under the proposed lease transaction, the State, through its Department of Natural Resources, will lease Belle Isle Park from the City and enhance its management, operation and maintenance for the benefit of the City and the general public. This will result in an anticipated savings of over $6 million each fiscal year to the City. In addition to removing a cost center from the City's budget, the Belle Isle Lease contemplates that the State will upgrade and enhance, among other things, Belle Isle's roads, bridges, landscaping and hardscaping during the course of the Belle Isle Lease. The City further benefits from the Belle Isle Lease because, at its conclusion, any improvements become property of the City without any cost to the City. On October 14, 2013, Detroit City Council disapproved the Belle Isle Lease and approved an alternative proposal. Pursuant to section 19(2) of PA 436, the Belle Isle Lease and the Detroit City Council's alternative proposal will be submitted to the local emergency financial assistance loan board for consideration. Under section 19(2) of PA 436, within 30 days, the local emergency financial assistance loan board "shall approve the proposal that best serves the interest of the public."

Finally, on September 30, 2013, the Emergency Manager submitted to the Governor and other public officials his initial report in accordance with section 17 of PA 436 (the "Six Month Report"). Among other things, the Six Month Report included the following information for the reporting period of March 25, 2013 through August 31, 2013: (a) expenditures made, approved or disapproved by the Emergency Manager in excess of $5,000; (b) contracts awarded or approved by the Emergency Manager with a cumulative value of in excess of $5,000; (c) loans sought, approved or disapproved by the Emergency

DTPPF00020196

Manager that have a cumulative value of $5,000 or more; and (d) new positions created, vacancies filled and positions eliminated by the Emergency Manager. The Six Month Report is available on the City's website at http://www.detroitmi.gov/EmergencyManager/Reports.aspx.

### Filing Petition for Chapter 9

As noted above, following the presentation of the Creditor Proposal on June 14, 2013, the Emergency Manager conducted a series of meetings with representatives of various creditor constituencies. Unfortunately, these efforts did not result in either: (a) sufficient consensual savings from major creditor constituencies to ameliorate the City's financial emergency; (b) sufficient contract amendments to successfully restructure the City's finances; or (c) the realistic prospect of any such consensual agreements in the near term (if at all). Given the vast and fragmented pool of potential creditors, it was impossible to negotiate a consensual restructuring outside of a court process. Moreover, many key parties to these negotiations were unrepresented, such as retirees and uninsured bondholders. Even where creditors were available to participate in negotiations, certain parties rejected the City's proposals outright, while others made untenable and unworkable counterproposals that contemplated that their particular group would not be impaired in the restructuring process.

Unable to reach a workable out-of-court solution, and with no prospect of being able to do so, the Emergency Manager delivered a letter to the Governor and the State Treasurer on July 16, 2013, pursuant to section 18(1) of PA 436 (the "Recommendation Letter"), recommending and requesting that the City be authorized to seek relief under chapter 9 of the Bankruptcy Code. The detailed rationale for this recommendation and request is set forth in the Recommendation Letter. A copy of the Emergency Manager's Recommendation Letter is available on the State's website at http://michigan.gov/documents/snyder/Detroit_EM_Kevyn_Orr_Chapter_9_Recommendation_427831_7.pdf.

On July 18, 2013, the Governor delivered a letter to the Emergency Manager and the Treasurer (the "Authorization Letter") authorizing the City to commence a bankruptcy case under chapter 9 of the Bankruptcy Code. In the Authorization Letter, the Governor agreed with the Emergency Manager that chapter 9 offers the only feasible alternative to fix the City's finances and to complete a sustainable restructuring for the benefit of Detroit's 700,000 residents. Based on the Emergency Manager's Recommendation Letter, the Governor determined that: (a) the City cannot meet its basic obligations to its citizens; (b) the City cannot meet its basic obligations to its creditors; (c) the City's failure to meet its obligations to its citizens – leading to a dwindling population and tax base – is a primary cause of its inability to meet its obligations to its creditors; and (d) the only feasible path to ensuring the City will be able to meet obligations in the future is to have a successful restructuring under the federal bankruptcy process. Each of these determinations was explained in detail in the Governor's Authorization Letter, which is available on the State's website at http://www.michigan.gov/documents/snyder/Governor_Snyder_Chapter_9_Authorization_427830_7.pdf.

Upon receiving the Authorization Letter, the Emergency Manager issued an order directing the commencement of the City's chapter 9 bankruptcy case. Consistent with these approvals, on July 18,

DTPPF00020197

2013 (the "Petition Date"), the City filed a voluntary petition under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"), which case is captioned *In re City of Detroit, Michigan*, Case No. 13-53846 (the "Bankruptcy Case"). Along with its voluntary petition, the City filed various other papers, including the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Orr Declaration"). The Orr Declaration explains the history of the City's financial and operational problems, details the dire circumstances facing the City and provides support for the City's eligibility to be a chapter 9 debtor under the Bankruptcy Code. The Orr Declaration, along with other Bankruptcy Case filings and other information relevant to the Bankruptcy Case can be found on the website of the City's claims and noticing agent at www.kccllc.net/Detroit (the "Restructuring Website").

On July 19, 2013, Bankruptcy Judge Stephen W. Rhodes was assigned to the Bankruptcy Case by the Chief Judge of the United States Court of Appeals for the Sixth Circuit.

It is the intent of the Emergency Manager to move the Bankruptcy Case as expeditiously as possible to complete an adjustment of the City's debts under the Bankruptcy Code by no later than September 2014. Completing the Bankruptcy Case in a timely and efficient manner is important to the City's revitalization and reinvestment activities because it will free the City from burdensome and unsustainable debt obligations and allow it to reinvest in the City's operations and infrastructure, which will in turn attract new businesses and residents to the City and promote the health, safety and welfare of the public.

Activities in the Bankruptcy Case

Since filing the Bankruptcy Case, the Emergency Manager has coordinated the City's legal strategy related to bankruptcy with his professional advisors. The Emergency Manager is committed to advancing the bankruptcy process as promptly and efficiently as possible to complete a sustainable adjustment of the City's debts. From the outset, the Emergency Manager has exercised the City's rights, and fulfilled the City's obligations, to pursue these goals. Certain of the primary activities to date in the Bankruptcy Case are summarized below:

*Administrative Matters*

Since the Petition Date, the Emergency Manager has taken steps to preserve the benefits and protections afforded by the automatic stay imposed by sections 362 and 922 of the Bankruptcy Code (the "Chapter 9 Stay"). For example, at the outset of the Bankruptcy Case, the City obtained orders of the Bankruptcy Court (a) confirming the application of the Chapter 9 Stay to the City and its officers and inhabitants and (b) extending the protections of the Chapter 9 Stay to, among others, non-director City employees and certain State officials. The Chapter 9 Stay provides the City with an important "breathing spell" to address the City's financial circumstances and craft a plan of adjustment without interference from adverse creditor actions.

DTPPF00020198

The Emergency Manager also has fulfilled other administrative requirements necessary to pursue the prompt conclusion of these cases. For example, on September 30, 2013, the City filed a 3,000-plus page list of potential creditors and their claims, consistent with sections 924 and 925 of the Bankruptcy Code. On October 1, 2013, the City filed a motion to establish certain bar dates for the filing of proof of claims. The Emergency Manager intends to move promptly to establish a claims resolution process. This will allow the City to establish the claims that will be addressed in its plan of adjustment.

*Retiree Committee*

Since the Petition Date, the Emergency Manager has continued to participate in negotiations with the City's creditors and other interested parties with the goal of reaching consensus, to the fullest extent possible, on the terms of a plan of adjustment. In support of these discussions, at the outset of the Bankruptcy Case, the City requested the appointment of an official committee of retired employees (the "Retiree Committee") to represent the interests of retirees in these negotiations. Prior to the commencement of the Bankruptcy Case, no party was empowered to represent the City's retirees — holders of billions of dollars of legacy claims that must be addressed in any restructuring. On August 2, 2013, the Bankruptcy Court entered an order directing the appointment of the Retiree Committee, which was formed on August 22, 2013. Since that time, the City has engaged in regular discussion of restructuring issues with the Retiree Committee and its advisors.

*Eligibility*

At this stage in the Bankruptcy Case, the primary issue before the Bankruptcy Court is whether or not the City is eligible to be a chapter 9 debtor under the Bankruptcy Code. This requires, among other things, the Bankruptcy Court determine whether: (a) the City is a municipality; (b) the City was specifically authorized to be a debtor by state law; (c) the City is insolvent; (d) the City desires to effectuate a plan to adjust its debts; and (e) either (i) the City negotiated in good faith with its various creditor constituencies or (ii) it was impracticable to negotiate with the City's creditors. To resolve this threshold issue of eligibility without delay, the Emergency Manager requested that the Bankruptcy Court expedite the process of identifying and adjudicating any objections to eligibility. In response, Judge Rhodes established a prompt timeline to determine whether the City is eligible to be a debtor under chapter 9 of the Bankruptcy Code. This resulted in over 100 objections to the City's eligibility within the first month of the Bankruptcy Case.

Within days of the eligibility objections being filed, the City and the objecting parties (the "Objectors") exchanged written discovery requests. Within approximately two weeks, the City produced over 10,000 documents in response to over 100 document requests, in addition to responding to over 150 interrogatories and nearly 50 requests for admission from the various Objectors. In addition to the fast-paced and voluminous discovery, the Bankruptcy Court has conducted nearly a dozen hearings related to the City's eligibility, ranging from discovery and privilege disputes to substantive legal arguments related to the Bankruptcy Court's Constitutional authority to decide whether the City is eligible to be a chapter 9 debtor. In a compressed period, numerous depositions have been taken of various City employees and professional advisors, the Mayor, the Emergency Manager and certain State officials, as

DTPPF00020199

well as depositions of certain of the Objectors or their representatives. Oral argument before Judge Rhodes on purely legal issues associated with eligibility are scheduled to begin on October 15, 2013. A bench trial before Judge Rhodes on the factual basis for the City's chapter 9 eligibility is scheduled to begin on October 23, 2013.

*Swap Settlement*

Immediately prior to the Petition Date, the Emergency Manager reached a consensual resolution with the counterparties to the City's interest rate swap agreements to eliminate one of the City's largest secured obligations at a discount and ensure ongoing access to critical casino revenues that were pledged to support the swap arrangements. This agreement is memorialized in a Forbearance and Optional Termination Agreement (the "FOTA") between the City and the swap counterparties. On the Petition Date, the City filed a motion with the Bankruptcy Court to assume the FOTA under section 365 of the Bankruptcy Code and approve the parties' settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Settlement Motion"). There has been significant opposition to the Settlement Motion, particularly from Syncora Guarantee, Inc. and other monoline insurers, which has resulted in litigation regarding, among other things, the appropriateness of the compromises in the FOTA, the swap counterparties' ability to consummate the FOTA and the City's ability to pay for the settlement. This litigation is ongoing and currently is expected to be set for an evidentiary hearing in November 2013. In the meantime, the parties are participating in Court-ordered mediation in an effort to resolve or narrow their disputes, and the City is working to obtain Postpetition Financing pursuant to section 364 of the Bankruptcy Code to assist in the funding of the settlement and other contemplated restructuring and reinvestment activities.

*Mediation*

In addition to mediation of the swap settlement disputes, substantial time and effort has been devoted by the Emergency Manager and his staff and advisors to negotiate other key restructuring issues through a mediation program established by the Bankruptcy Court to facilitate these efforts. In particular, Judge Rhodes appointed Judge Gerald E. Rosen, Chief Judge for the United States District Court for the Eastern District of Michigan, as the mediator for the City's Bankruptcy Case. In turn, Judge Rosen appointed six additional mediators, each focusing on different elements of the City's restructuring and reorganization activities. To date there have been multiple mediation sessions and numerous written submission related to, among other things, the City's core restructuring and reorganization initiatives outlined in the Restructuring Proposal, as well as labor and pension matters. The Emergency Manager has embraced the mediation process.

Outside of the mediation sessions, the City has continued to engage in ongoing dialog with its unions, pension systems, debtholders (trustees, individual holders and ad hoc groups), the Retiree Committee and other interested parties to advance key restructuring issues. The Emergency Manager and his staff and advisors will continue to meet with creditors and interested parties with the goal of developing, to the fullest extent possible, a consensual plan that addresses the City's operational and financial restructuring needs.

*Plan of Adjustment*

The Bankruptcy Court set a deadline of March 1, 2014 for the City to file a plan of adjustment in the Bankruptcy Case. The Emergency Manager intends to file the City's proposed plan of adjustment and related disclosure statement in advance of this deadline by the Bankruptcy Court — with the goal of filing these documents by the end of December 2013.

**Appendices**

A.   Cash Flow Actuals and Projections for the Period Jul-Sep 2013
B.   Preliminary Unaudited Revenues and Expenditures for Q1 Fiscal Year 2014

DTPPF00020201

Appendix A

## Cash Flow Actuals and Projections for the Period Jul-Sep 2013

| $ In millions | FY 2014 Forecast Q1 | FY 2014 Actual Q1 | Variance Q1 | FY 2014 Forecast Q2 | 3A + 3F FY 2014 |
|---|---|---|---|---|---|
| **Operating Receipts** | | | | | |
| Property taxes | $ 223.1 | $ 237.6 | $ 14.5 | $ 30.2 | $ 267.8 |
| Income & utility taxes | 73.7 | 68.6 | (5.0) | 74.9 | 143.6 |
| Gaming taxes | 37.7 | 51.4 | 13.7 | 40.7 | 92.1 |
| Municipal service fee to casinos | 7.6 | 7.3 | (0.3) | 8.0 | 15.3 |
| State revenue sharing | 61.4 | 60.6 | (0.8) | 30.9 | 91.5 |
| Other receipts | 79.0 | 92.0 | 13.0 | 77.2 | 169.2 |
| Refinancing proceeds | 20.0 | - | (20.0) | 20.0 | 20.0 |
| Total operating receipts | 502.5 | 517.5 | 15.1 | 281.9 | 799.4 |
| **Operating Disbursements** | | | | | |
| Payroll, taxes, & deductions | (84.1) | (89.2) | (5.0) | (90.9) | (180.1) |
| Benefits | (46.4) | (45.8) | 0.6 | (48.8) | (94.6) |
| Pension contributions | (44.0) | - | 44.0 | (12.7) | (12.7) |
| Subsidy payments | (18.9) | (8.4) | 10.4 | (13.5) | (22.0) |
| Distributions - tax authorities | (135.3) | (103.9) | 31.4 | (23.3) | (127.2) |
| Distributions - UTGO | (12.0) | - | 12.0 | - | - |
| Distributions - DDA increment | - | - | - | (8.0) | (8.0) |
| Income tax refunds | (5.2) | (5.0) | 0.2 | (2.5) | (7.5) |
| A/P and other miscellaneous | (103.4) | (101.7) | 1.7 | (146.8) | (248.6) |
| Sub-total operating disbursements | (449.4) | (354.1) | 95.3 | (346.6) | (700.7) |
| POC and debt related payments | (17.4) | (23.2) | (5.8) | (17.6) | (40.8) |
| Total disbursements | (466.8) | (377.2) | 89.5 | (364.2) | (741.5) |
| Net cash flow | 85.7 | 140.3 | 104.6 | (82.3) | 57.9 |
| Beginning cash balance | 71.3 | 71.3 | (0.0) | 211.6 | 71.3 |
| Net cash flow | 35.7 | 140.3 | 104.6 | (82.3) | 57.9 |
| Cash before required distributions | $ 107.0 | $ 211.6 | $ 104.6 | $ 129.3 | $ 129.3 |
| Accumulated property tax distributions | (35.2) | (83.1) | (47.9) | (82.4) | (82.4) |
| Cash net of distributions | $ 71.8 | $ 128.5 | $ 56.7 | $ 46.8 | $ 46.8 |
| *Memo:* | | | | | |
| Refunding bond proceeds in escrow | 51.7 | 79.5 | 27.8 | 59.5 | 59.5 |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd |

DTPPF00020202

Preliminary Unaudited Revenues and Expenditures for Q1 Fiscal Year 2014

| ($ in millions) | FY13 Q1 | FY14 Q1 | FY14 - FY13 Q1 Difference |
|---|---|---|---|
| **Revenues** | | | |
| Property Taxes | $ 62.2 | $ 51.5 | $ (10.7) |
| Municipal Income Tax | 53.3 | 50.9 | (2.5) |
| Wagering Taxes | 45.4 | 43.7 | (1.7) |
| Utility Users' and other taxes | 3.9 | 0.3 | (3.6) |
| Licenses, Permits and Inspection Charges | 5.8 | 0.9 | (4.9) |
| State Revenue Sharing | 43.3 | 44.2 | 0.8 |
| Sales and Charges for Services | 14.5 | 15.4 | 0.9 |
| Revenue from Use of Assets | 0.8 | 1.2 | 0.3 |
| Parking/court fines and other revenue | 11.3 | 10.3 | (1.0) |
| General Fund and Other Contributions | 1.2 | 1.8 | 0.5 |
| Grant Revenue | - | - | - |
| Transfers In | 0.1 | 0.1 | (0.0) |
| **Total Revenues** | 242.0 | 220.2 | (21.9) |
| **Expenditures** | | | |
| Salaries & Wages | (75.7) | (63.5) | 12.3 |
| Overtime | (7.7) | (8.3) | (0.5) |
| Pensions | (13.5) | (13.7) | (0.2) |
| Benefits | (44.5) | (36.0) | 8.5 |
| Professional and contractual services | (1.1) | (9.4) | (8.2) |
| Materials & Supplies | (10.0) | (6.4) | 3.7 |
| Utilities | (0.7) | (1.7) | (1.0) |
| Purchased Services | (1.1) | (3.5) | (2.4) |
| Risk,management and Insurance | (0.7) | (1.1) | (0.4) |
| Other expenses | (4.1) | (6.7) | (2.6) |
| Debt Service | (3.5) | (0.4) | 3.2 |
| Contributions | (11.7) | (12.0) | (0.3) |
| Transfers Out | (1.2) | (1.8) | (0.5) |
| **Total expenditures** | (175.7) | (164.4) | 11.4 |
| **Deficit (excl. financing proceeds)** | 66.3 | 55.8 | (10.5) |
| Financing proceeds | 138.6 | - | (138.6) |
| **Total surplus (deficit)** | $ 204.9 | $ 55.8 | $ (149.1) |

DTPPF00020203

# CERTIFICATE OF SERVICE

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
(Southern Division)

In re

CITY OF DETROIT, MICHIGAN,

        Debtor.

_____/

Chapter 9

Case No. 13-53846-swr

Hon. Steven W. Rhodes

## CERTIFICATE OF SERVICE

I, Lynnea Koerber, state that on November 27, 2013, I did file a copy of Objection Of Hypothekenbank Frankfurt Ag, Hypothekenbank Frankfurt International S.A., Erste Europaische Pfandbrief- Und Kommunalkreditbank Aktiengesellschaft In Luxemburg S.A., And Fms Wertmanagement Service Gmbh As Servicer To Fms Wertmanagement To Motion Of The Debtor For A Final Order Pursuant To 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, And 922 (I) Approving Post-Petition Financing, (II) Granting Liens And Providing Superpriority Claim Status And (III) Modifying Automatic Stay and Certificate Of Service with the clerk of the Court using the ECF System and I hereby certify that the Courts ECF system has served all registered users.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 27, 2013

/s/ Lynnea Koerber
Lynnea Koerber
howard@jacobweingarten.com