UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

**THE MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO AND SUB-CHAPTER 98, CITY OF DETROIT RETIREES' OBJECTION AND JOINDER TO OBJECTION TO DEBTOR'S POST-PETITION FINANCING MOTION**

The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO and Sub-Chapter 98, City of Detroit Retirees (the AFSCME retiree chapter for City of Detroit retirees) ("**AFSCME**") -- the representative of the interests of between at least forty and fifty percent (40-50%) of the about 11,943 retired City of Detroit (the "**Debtor**") non-uniformed retired employees and about 2,523 active City employees, or about seventy percent (70%) of the active non-uniformed union-represented employees -- through its undersigned counsel, hereby submits this (I) objection (the "**Objection**") to the *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* [Docket No. 1520] (the "**Financing Motion**") [Docket 1521]; and (II) joinder ("**Joinder**") to the objection to the Financing Motion (the "**Financing Objection**") filed by Erste Europaische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A., FMS Wertmanagement, Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., dated November 27, 2013 [Docket No. 1835]. AFSCME joins in, adopts and incorporates as if fully set forth

herein all the legal and factual arguments set forth in the Financing Objection, and reserves all rights to assert any additional factual and legal arguments asserted by other parties in further briefing and/or at trial on the Financing Motion. In further support of this Objection and Joinder, AFSCME respectfully states as follows:

**GENERAL BACKGROUND**

1. On July 18, 2013 (the "**Petition Date**"), the City filed a petition for relief in this Court, thereby commencing the instant chapter 9 proceeding.

2. On November 5, 2013, the City filed the Financing Motion.

3. Pursuant to the Financing Motion, the City has entered into a commitment letter and fee letter with Barclays Capital Inc. ("**Barclays**" or the "**Purchaser**") to proceed with a proposed super-priority post petition financing transaction totaling up to $350,000,000.00 (the "**Financing Transaction**" or "Post Petition Financing") comprised of two series of secured bonds, the "**Swap Termination Bonds**" and the "**Quality of Life Bonds**" (collectively, the "**Bonds**"). Pursuant to the fee letter (which this Court ordered the City to release after objections to maintaining such information under seal), Barclays has (or will) earn approximately $4.375 million under the proposed Financing Transaction.

4. The Bonds will have priority over all (i) administrative expenses, (ii) post petition claims, and (iii) prepetition unsecured claims and will be secured by liens on (a) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos and/or the income tax revenues of the City, and (b) the net proceeds derived from the voluntary disposition or monetization of any City owned asset which generates net cash proceeds exceeding $10,000,000.

5. AFSCME understands that the Debtor intends to issue Swap Termination Bonds in the approximate principal amount of $230 million and utilized, should the Court approve the

forbearance and optional termination agreement reached between the City and its swap counterparties UBS AG ("**UBS**") and Merrill Lynch Capital Services, Inc. ("**MLCS**"), to immediately pay UBS and MLCS to terminate the swap agreements to the benefit of sophisticated creditors making strategic investment and lending decisions, such as UBS and MLCS, as opposed to victim creditors like retirees with limited - and now at risk - pensions.

6. AFSCME further understands that the City intends to utilize the Quality of Life Bonds to fund certain unspecified improvements in the City's service delivery and other functions, although the funds apparently are not intended to be utilized to create new revenue and the Financing Motion lacks detail or specific requirements as to how these funds are to be utilized.

7. Prior to the filing of the Financing Motion, on October 25, 2013, the Detroit City Council filed a resolution [Docket No. 1396] (the "**City Council Resolution**") disapproving the proposed Financing Transaction (the "**Financing Transaction**"). The City Council Resolution raised a number of troubling concerns about the proposed financing, including that (i) Barclays is requiring the City pledge to its major and most stable tax revenues and significant asset sales (over $10 million) to secure the transaction; (ii) the financing seems to mainly benefit UBS and MLCS and takes a fixed rate obligation of the City and swaps it for a variable rate loan; and (iii) it is difficult to determine if the use of the funds from the Quality of Life Bonds will be prudent.

## **JOINDER AND OBJECTION**

8. Investment banks, like UBS and MLCS, who will profit from the Financing Transaction (if approved) and paid on their claims at only a slight discount despite never establishing their secured claim status, got the City into economic trouble in the first place,

helping to create the financial conditions leading to this bankruptcy when the City entered into complex swap financial transactions which the City could not afford..

9. Now, the City and Barclays propose a similar deal which locks up significant revenue and City assets without any negotiations with key creditor constituencies regarding the Financing Transaction and proposed assets to be encumbered.

10. Even assuming, for arguments sake, that payoff of UBS and MLCS via the Swap Termination Bonds makes financial sense (despite UBS and MLCS having failed to establish themselves as secured creditors), while AFSCME appreciates the City's stated intention of utilizing certain portions of the Quality of Life Bonds to make a meaningful investment into the City's infrastructure and labor requirements, this portion of the Financing Transaction appears to be more of an afterthought designed to lead parties to believe the transaction is not just for the benefit of big banks, hence the carefully vetted name "Quality of Life Bonds". However, AFSCME notes that the City vaguely states in the Financing Motion that the "City may ultimately decide to apply the proceeds of the Quality of Life Financing to pursue an array of specific projects."

11. The City is supposed to be negotiating in good faith with AFSCME and other key creditors in mediation and otherwise regarding the terms of a consensual plan of adjustment, yet the City seems intent on literally "giving away the store" prior to even filing a proposed plan of adjustment, leaving the City with few (if any) remaining unencumbered assets and at a time when the City has suspended its most significant ongoing payment obligations.

12. AFSCME remains critically concerned that the Debtor continues to march towards a plan of adjustment and exit from this bankruptcy case in a manner that first allows assets and funds which should better and more properly be utilized as part of a comprehensive

plan of adjustment to fund, among other things, vested pension benefits and other creditors' recoveries. The City should not be permitted to bind its assets for possibly years to come without any indication as to how the City will ultimately pay down newly created secured debt not properly agreed to or vetted through a plan process.

13. The City of Detroit is not a corporation, but a public body answerable to its citizens, including active and retired AFSCME employees and other citizens that have elected representatives to serve in the very City Council which has rejected this Financing Transaction for all the reasons set forth in the City Council Resolution. Thus, unlike other City post petition transactions (including the Public Lighting Authority transaction) which have obtained the City Council's stamp of approval, the voice of the people has loudly and clearly spoken with regard to the Financing Motion.

14. Moreover, creating more long term debt while funneling millions of dollars in profits to banks like Barclays, UBS and LMCS over and to the exclusion of vested pension benefits and outside of a plan of adjustment – is, simply put, an unfair use of chapter 9.

15. The Debtor is asking this Court to approve financing that provides as collateral and security substantial tax revenues and assets both during the bankruptcy and potentially for years under an exit facility that will take out the principal debt incurred in the Financing Transaction. It was just this type of long term debt that the Debtor claims created its current financial crisis.

16. Courts have found that post petition financing should not permit post petition lenders to exercise excessive control over a debtor. *See*, *e.g.*, *In re Barbara K. Enterprises, Inc.,* Case No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) ("The Court is aware that its normal function in reviewing requests for post-petition financing is to

defer to a debtor's own business judgment so long as a request for financing does not leverage the bankruptcy process and unfairly cede control of the reorganization to one party in interest"); *In re Berry Good, LLC*, 400 B.R. 741, 747 (Bankr. D. Ariz. 2008) ("[C]ourts look to whether the proposed terms would prejudice the powers and rights that the Code confers for the benefit of all creditors, thereby leveraging the chapter 11 process by granting a lender excessive control over the debtor or its assets to the prejudice of other parties in interest."). Given the very generous collateral package proposed to be granted to Barclays (discussed in the Financing Objection) and the aggressive default provisions (discussed in the City Council Resolution), Barclays will simply wield too much control over the City's financial future.

17. Furthermore, as expressed by Municipal Market Advisors (a leading independent strategy, research and advisory firm in the tax-free municipal bond industry) and as AFSCME expects will be demonstrated in the upcoming depositions and facts to be adduced at trial, the Financing Transaction appears to be "'**a very good deal for the lender and the swap counterparties but less so for the city's unsecured creditors and its residents**.' . . . 'The seeming lack of a tangible recovery plan that improves Detroit's revenues over the period of the loans renders us [Municipal Market Advisors] skeptical about the city's ability to repay an amount of this magnitude in a short time frame without causing additional stress to the detriment of city residents and unsecured creditors that may have their recoveries tied to the city's financial performance." *See Detroit Council Rejects DIP Loan,* The Bond Buyer (Oct. 21, 2013) (emphasis added)*, available at* http://www.bondbuyer.com/issues/122_203/detroit-council-rejects-dip-loan-1056664-1.html.

18. Moreover, the primary purpose (evidenced by nearly two-thirds of the Financing Transaction proceeds) for this financing is to improve or benefit the position of UBS and MLCS

and to entrench Barclays (and with it, the potential for Barclays to earn additional millions in fees on the necessary exit facility). Courts in the chapter 11 context have indicated that post-petition financing should not be authorized if its primary purpose is to benefit or improve the position of a particular creditor or lender. *See, e.g.*, *Mid-State Raceway, Inc.*, 323 B.R. 40, 59 (Bankr. N.D.N.Y. 2005) ("[B]ankruptcy courts do not allow terms in financing arrangements that convert the bankruptcy process from one designed to beneift all creditors to one designed for the unwarranted benefit of the post-petition lender.") (internal citations omitted); *In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); *In re R.H. Macy & Co.*, 170 B.R. 69, 74 (Bankr. S.D. N.Y. 1994) (it is also a fundamental policy of bankruptcy law that debtor has "an affirmative, overarching duty to reorganize and maximize estate assets for the benefit of all creditors," not just a select few); *In re Ames Dep't Stores*, 115 B.R. 34, 39 (Bankr. S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate"); *In re Tenney Vill. Co., Inc.*, 104 B.R 562, 568 (Bankr. D.N.H. 1989) (debtor-in-possession financing terms must not "pervert the reorganizational process from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit" of the secured creditor).

19. Given that the City has apparently already diverted more than $95 million in debt payments (including amounts owed to bonds and pension obligation certificates) with little transparency (*see Detroit Diverts Millions in Debt Payments to Pay for Restructuring Consultants, Lawyers*, Detroit Free Press (Nov. 12, 2013), *available at* http://www.freep.com/article/20131112/NEWS01/311120105/Kevyn-Orr-restructuring-debt-government), and further given the City and Emergency Manager's apparent *carte blanche*

authority under the Financing Transaction to utilize the proceeds of the Quality of Life Bonds as they see fit, there is simply no reason why this financing, which severely hampers potential recoveries to all creditors under any proposed plan of adjustment, must go forward now when the City intends to file a proposed plan of adjustment expeditiously, at which point division of assets and future City revenues can be appropriately addressed on a global basis.

WHEREFORE, AFSCME respectfully requests that for the reasons set forth herein and in the Financing Objection, the Financing Motion be denied and for such other and further relief as the Court deems proper.

Dated: November 27, 2013

**LOWENSTEIN SANDLER LLP**
By: /s/ *Sharon L. Levine*
Sharon L. Levine, Esq.
Philip J. Gross, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068
(973) 597-2500 (Telephone)
(973) 597-6247 (Facsimile)
slevine@lowenstein.com
pgross@lowenstein.com

-and-

Herbert A. Sanders, Esq.
THE SANDERS LAW FIRM PC
615 Griswold St., Suite 913
Detroit, MI 48226
(313) 962-0099 (Telephone)
(313) 962-0044 (Facsimile)
hsanders@miafscme.org

-and-

Richard G. Mack, Jr., Esq.
MILLER COHEN, P.L.C.
600 West Lafayette Boulevard
4th Floor
Detroit, MI 48226-3191

*Counsel to Michigan Council 25 of the American Federation of State, County and Municipal Employees (AFSCME), AFL-CIO and Sub-Chapter 98, City of Detroit Retirees*