**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **In re** | : | **Chapter 9** |
| **CITY OF DETROIT, MICHIGAN,** | : | **Case No. 13-53846** |
| **Debtor.** | : | **Hon. Steven W. Rhodes** |

**OBJECTION OF FINANCIAL GUARANTY INSURANCE COMPANY TO MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY**

## Table of Contents

PRELIMINARY STATEMENT ....3

FACTUAL BACKGROUND ....4

THE COURT SHOULD DENY THE DEBTOR'S REQUEST FOR POSTPETITION FINANCING ....7

I. The Postpetition Financing Is Not Available to the City Because One of the Conditions Precedent to Closing Cannot be Satisfied ....7

II. The Postpetition Financing Should Not Be Approved Because it Is Not Necessary or Sufficient to Fund the City's Long-Term Reinvestment Initiatives and Amounts to an Impermissible *Sub Rosa* Plan ....8

A. Legal Standards Governing Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code ....9

B. The Reinvestment Initiatives Should Be Addressed and Financed as Part of a Comprehensive Plan of Adjustment ....11

C. The Postpetition Financing Is an Impermissible *Sub Rosa* Plan....14

CONCLUSION ....18

Financial Guaranty Insurance Company ("**FGIC**") files this objection (the "**Objection**") to the *Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (i) Approving Post-Petition Financing, (ii) Granting Liens and Providing Superpriority Claim Status and (iii) Modifying Automatic Stay* [Docket No. 1520] (the "**Motion**"). In support of this Objection, FGIC respectfully states as follows:

## PRELIMINARY STATEMENT

1. The City of Detroit (the "**City**") needs aggressive and comprehensive remedial measures to improve the quality and efficiency of many of the City's services and operations. The safety and welfare of the City's residents have been compromised, and conditions continue to further deteriorate. If the City has any hope of improving these citizens' living conditions, as well as attracting new individuals and businesses (whose presence is essential if the City is to grow and prosper), then significant steps must be taken to improve City functions and conditions.

2. Desperate times, however, do not justify imprudent transactions. Now more than ever the City must protect and use with caution what limited resources it has and ensure the integrity of the chapter 9 process by adhering to the requirements imposed by the Bankruptcy Code and applicable law. Any reinvestment plan must fall within these guidelines, or else the City's restructuring cannot succeed.

3. Unfortunately, the City has decided to begin funding its reinvestment plan by incurring short-term financing, even though it appears the City has excess funds to start implementing many recovery initiatives now. Any financing facility incurred now will likely need to be replaced within a few months (the City's targeted bankruptcy emergence timeframe) with a longer term exit facility. Financing of the kind proposed here may very well be an

integral part of an overall exit strategy, but implementing this interim measure will cost the City additional fees and expenses and is unlikely to benefit meaningfully the City's reinvestment strategy at this time. Moreover, the majority of financing proceeds (approximately two thirds) are dedicated to pay off two of the City's creditors ahead of the City's chapter 9 plan, instead of financing the City's reinvestment initiatives. The City has failed to demonstrate the necessity of these proposed actions. There are also contractual and legal conditions the City cannot satisfy, no matter how important the funding.

4. The City is attempting to address, outside of a plan, issues that can and should only be dealt with pursuant to a plan. Matters involving creditor and asset treatment must be resolved through the confirmation process. The proposed postpetition financing must be denied.

## FACTUAL BACKGROUND

5. On November 5, 2013, the City filed the Motion seeking approval of $350 million in Pospetition Financing.[1] (Mot. 26.) The City plans to use approximately $237.8 million of the Postpetition Financing (the "**Swap Termination Financing**") to fund payment of the Optional Termination Amounts to the Swap Counterparties under the Forbearance Agreement. (*Id.* at ¶¶ 15-16.)[2] The City plans to use the remaining approximately $112.2 million (the "**Qualify of Life Financing**"), less fees and expenses, to fund an array of Reinvestment Initiatives aimed at improving City services and conditions, which the City

[1] Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

[2] A more expansive description of the factual background relevant to the Forbearance Agreement and the Swap Termination Financing is set forth in the *Limited Objection of Financing Guaranty Insurance Company to Motion of Debtor for Entry of an Order (i) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (ii) Approving Such Agreement Pursuant to Rule 9019, and (iii) Granting Related Relief* [Docket No. 360] (the "**Limited Forbearance Objection**").

US_ACTIVE:\44367609\8\45259.0007

estimates will ultimately cost the City approximately $1.25 billion over the next ten years. (*Id*. at ¶ 21.)

6. In connection with closing on and operating under the Postpetition Financing, the City will incur certain fee and expense obligations. By the date of the hearing on the Motion, the City will have paid in full to the postpetition lender a commitment fee in connection with the Postpetition Financing equal to $4,375,000, 50% ($2,187,500) of which it has already paid. (Fee Letter § 1; Mot. ¶ 39.)[3] Further, the City agreed to pay the postpetition lender an additional fee in the event the City does not use the postpetition lender as its exclusive placement agent in connection with any exit financing. (Mot. at 1-2, fn. 1, ¶ 39.) The City will also be responsible for other expenses related to the Postpetition Financing, including professional fees and expenses and the cost of printing and preparing the Bonds. (*Id*. at ¶ 56.)

7. Repayment of the Quality of Life Financing and the Swap Termination Financing is proposed to be secured by a lien on the Casino Revenues (as defined in the Limited Forbearance Objection) and certain of the City's income tax revenue, respectively. (*Id*. at 30-31.) In addition, the terms of the Postpetition Financing provide that "[t]he City shall utilize all net proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10,000,000 (the "**Asset Proceeds Collateral**")" to repay the Bonds issued pursuant to the Postpetition Financing. (*Id*. at 29.)[4]

[3] A copy of the Fee Letter is attached as Exhibit A to the *Notice of Filing of Fee Letter in Connection with the Motion* [Docket No. 1761], which the City filed on November 18, 2013.

[4] The City's description of the use of Asset Proceeds Collateral is unclear regarding whether *all* net proceeds of transactions exceeding $10 million must be used to redeem the Bonds, or only the amount of proceeds that exceeds $10 million.

8. One of the conditions precedent to the closing of the Postpetition Financing is "the termination in whole of the Swap Agreements," certain of which, as explained in greater detail in the Limited Forbearance Objection, are insured by FGIC. (*Id*. at 28.)[5] Assuming the Postpetition Financing closes, it will mature on the effective date of the City's plan of adjustment (*Id*. at 26), which the City intends to file by the end of the year.[6]

9. The City's most recent cash flow forecast, which does not take into account proceeds of the Quality of Life Financing, provides for $170.1 million to be spent on certain of the Reinvestment Initiatives during fiscal year 2014, such as blight removal, technology infrastructure and capital expenditures, and shows that, even accounting for such expenditures, the City will be cash flow positive through April 2014. (*See* Monthly Cash Flow Forecast for FY 2014, dated October 3, 2013 (the "**October 3rd Cash Flows**") 3, 7, 9.) In addition, the Emergency Manager's most recent quarterly report indicates that the City's actual cash net of accumulated property tax distributions as of September 30, 2013 was $128.5 million, which is $35 million more than the $93.5 million projected for September 2013 in the October 3rd Cash Flows. (*See* Quarterly Report of the Emergency Manager, dated October 15, 2013 (the "**Quarterly Report**") 3; October 3rd Cash Flows 3.) Although the City has not made an updated cash flow forecast available to creditors since the release of the Quarterly Report, this suggests that, even without the Quality of Life Financing, the City can continue funding reinvestment measures and may maintain positive cash flows through June 2014.

---

[5] *See also* Qualify of Life Note Term Sheet, Ex. A to Commitment Letter (Mot. Ex. 6A) § 5; Swap Termination Note Term Sheet, Ex. B to Commitment Letter (Mot. Ex. 6A) § 5; Bond Purchase Agreement (Mot. Ex. 6B) § 8(i)(i).

[6] *See* 8/2/13 Tr. at 42:1 – 42:8 ("Our view is that time is our enemy . . . it is our hope and desire that we will file a plan by year end, which is well in advance of the [March 1, 2014] deadline [the court has] set.").

## THE COURT SHOULD DENY THE DEBTOR'S REQUEST FOR POSTPETITION FINANCING

### I. The Postpetition Financing Is Not Available to the City Because One of the Conditions Precedent to Closing Cannot be Satisfied

10. The Court should deny the Motion because the City will not be able to access the Postpetition Financing. One of the conditions precedent to the closing of *both* the Swap Termination Financing and the Quality of Life Financing is the termination in whole of the Swap Agreements. (Mot. 27-28.) However, the Swap Counterparties are not able to effect a termination of the Swap Agreements that results in a termination amount payable to the Swap Counterparties without insurer consent, which was not originally sought from nor since granted by FGIC or Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "**Syncora**") (the two applicable insurers).

11. Although the City has indicated that it is prepared to issue the Optional Termination Notice pursuant to the Forbearance Agreement (to direct the Swap Counterparties to terminate) promptly upon the approval of the Motion (Mot. ¶ 15), the Swap Counterparties cannot terminate the Swap Agreements in the manner contemplated by the Forbearance Agreement. As set forth in greater detail in FGIC's Limited Forbearance Objection, the Swap Counterparties cannot exercise their rights under the Optional Termination Provisions to terminate without insurer consent *and* collect an early termination payment in the form of the Optional Termination Amounts. (Limited Forbearance Obj. ¶ 21.) Thus, the transaction contemplated by the Forbearance Agreement simply does not work under the governing documents. All of the Swap Counterparties' other applicable termination rights under the Swap

Agreements which permit them to receive a termination payment require insurer consent. (*Id.* at ¶ 23.)[7]

12. To date, FGIC has not provided its consent because, as explained in the Limited Forbearance Objection, it is inappropriate for the City to resolve the treatment of two of its thousands of creditors before the City's eligibility as a chapter 9 debtor has been determined and, more importantly, before the City has developed and filed a comprehensive plan of adjustment. (*Id.* at ¶ 25.)[8] As set forth in greater detail in Section II.C(i), *infra,* the City's attempts to justify this special treatment of the Swap Counterparties outside and ahead of the plan process are unavailing.

13. Because the Swap Counterparties cannot terminate the Swap Agreements as contemplated, one of the conditions precedent to the Postpetition Financing cannot be satisfied. Accordingly, the Postpetition Financing is not available to the City as a source of funding, and the Motion should be denied.

## II. The Postpetition Financing Should Not Be Approved Because it Is Not Necessary or Sufficient to Fund the City's Long-Term Reinvestment Initiatives and Amounts to an Impermissible *Sub Rosa* Plan

14. Even if the Postpetition Financing was available, the Motion should still be denied because the City has failed to satisfy the legal standards governing approval of postpetition financing pursuant to section 364(c) of the Bankruptcy Code. Because the City's Reinvestment Initiatives are an extensive project that will require long-term financing to implement, and which the City has sufficient resources to begin executing now, there is no basis for the City to incur the expense of short-term, postpetition financing. In addition, the

[7] Of course, if no termination amount is owed, then the financing is unnecessary.

[8] Upon information and belief, Syncora also has not consented to the termination of the Swap Agreements for these and other reasons.

Postpetition Financing is an impermissible *sub rosa* plan that provides preferential treatment to the Swap Counterparties and provides for the disposition of key assets outside of a plan process.

**A. Legal Standards Governing Postpetition Financing Pursuant to Section 364(c) of the Bankruptcy Code**

15. Section 901(a) of the Bankruptcy Code provides that section 364(c) applies in chapter 9. 11 U.S.C. § 901(a). Thus, it is clear that courts have the authority, and in fact are required, to approve municipal debtors' postpetition financings pursuant to section 364(c) of the Bankruptcy Code, notwithstanding certain limitations on courts' jurisdiction imposed by section 904. There is no applicable precedent regarding the standard for approval of postpetition financing in a chapter 9 case.[9] Legal authority in the context of chapter 11 cases, however, is instructive (and relied upon by the City in the Motion).

16. Although bankruptcy courts often defer to a debtor's business judgment when considering approval of certain actions to be taken during the bankruptcy case, courts maintain "an important oversight role" and "a significant amount of discretion" regarding whether to approve postpetition financing. *In re Barbara K. Enterprises, Inc.*, 2008 WL 2439649 at *14 (Bankr. S.D.N.Y. June 16, 2009). Courts are especially vigilant with respect to requests for financing pursuant to sections 364(c)(1) and 364(c)(2) of the Bankruptcy Code because these provisions allow a debtor to grant a postpetition lender "superpriority" status, meaning priority over all prepetition unsecured creditors and all administrative expenses incurred

[9] In the only example of postpetition financing in a chapter 9 case found, the United States Bankruptcy Court for the Southern District of Alabama entered an order approving a municipal debtor's request for postpetition financing in the amount of up to $155,750 for the purpose of obtaining a trash loader to conduct the collection of trash for its citizens. *Mot. for Approval of Post-Petition Financing, In re City of Prichard, Alabama*, Case No. 99-13465 (Bankr. S.D. Ala. July 14, 2000) [Docket No. 84]; *In re City of Prichard, Alabama*, Case No. 99-13465 (Bankr. S.D. Ala. Aug. 15, 2000) [Docket No. 106]. There was no written opinion, however, discussing the standard applied by the court, and the order is similarly devoid of any such discussion.

during the bankruptcy case, as well as a lien on any unencumbered property. 11 U.S.C. §§ 364(c)(1), (2). As such a request generally results in a debtor committing its already limited assets to repaying a postpetition lender, at least one court has recognized that "[a]ppropriate circumstances justifying [section 364(c)'s] invocation are rare." *In re Western Pacific Airlines, Inc.*, 223 B.R. 567, 573-74 (Bankr. D. Colo. 1997). Thus, "courts require the debtor to basically show why 'super-priority' financing is a good idea." *Bland v. Farmworker Creditors*, 308 B.R. 109, 114 (S.D. Ga. 2003).

17. The importance of a court's role in assessing the propriety of proposed financing pursuant to section 364(c) in the context of chapter 9 is underscored by the fact that section 364(b) does not apply in chapter 9, while section 364(c) does. *See* 11 U.S.C. § 901(a). Section 364(b) provides that "[t]he court, after notice and a hearing, may authorize the [debtor in possession] to obtain unsecured credit or to incur unsecured debt other than [in the ordinary course of business], allowable under section 503(b)(1) of [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(b). Thus, a chapter 9 debtor is exempt from seeking court approval for granting postpetition lenders administrative expense status. By contrast, in recognition of the risk that moving postpetition lenders "further up the repayment priority scale can come at a lower-priority creditor's expense," court approval is required in a chapter 9 case for granting "superpriority" status or liens on unencumbered assets pursuant to section 364(c). *Bland*, 308 B.R. at 113.

18. To determine whether a debtor has proven that postpetition financing pursuant to section 364(c) is appropriate, bankruptcy courts generally consider the following seven factors: (1) whether the proposed financing is an exercise of sound and reasonable business judgment; (2) whether alternative financing is available on any other basis; (3) whether

the proposed financing is in the best interests of the estate and its creditors; (4) whether any better offers, bids, or timely proposals are before the court; (5) whether the proposed financing is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the debtor's business; (6) whether the terms of the proposed financing are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender; and (7) whether the proposed financing agreement was negotiated in good faith and at arm's length between the debtor and the proposed lender. *Id.* at 113-14 *citing In re Farmland Industries, Inc.*, 294 B.R. 855, 880 (Bankr. W.D. Mo. 2003). These factors are not satisfied where, as here, the financing is not a prudent measure to accomplish the debtor's objectives and the financing amounts to a *sub rosa* plan that provides for the treatment of particular creditors and assets without satisfying applicable confirmation requirements, at the expense of other creditors.

### B. The Reinvestment Initiatives Should Be Addressed and Financed as Part of a Comprehensive Plan of Adjustment

19. Although FGIC does not dispute that the City faces long-term liquidity challenges with respect to funding the Reinvestment Initiatives– which FGIC does not deny are essential to the quality of life of the City's citizens as well as to any successful restructuring of the City – the City has failed to demonstrate that the Quality of Life Financing is immediately necessary. If the City maintains its proposed schedule and files a plan of adjustment by the end of the year, it should have long-term financing in place within the next few months.[10] In the meantime, the City's latest projections show that, even without the Quality of Life Financing, the City has sufficient cash through at least April 2014 (and potentially June 2014) to not only

[10] The City disclosed that it has already agreed to employ the postpetition lender in connection with any financing the City may seek in connection with its exit from chapter 9. (Mot. 1-2, n.1.)

continue operating, but also to begin funding certain Reinvestment Initiatives. More specifically, the October 3rd Cash Flows provide for $126.3 million in total expenditures on Reinvestment Initiatives through April 2014 (and $170.1 million through June 2014). Thus, in a very real sense, the contemplated Reinvestment Initiatives are already being financed by the unsecured creditors not receiving current principal and interest payments while the City is in bankruptcy.

20. Based on the foregoing, the City has failed to demonstrate that the Quality of Life Funding is immediately necessary for the City to operate and preserve its assets. *See In re Barbara K. Enterprises, Inc.*, 2008 WL 2439649 at *8 (Bankr. S.D.N.Y. June 16, 2009) ("A debtor may not obtain approval for extending secured credit until it first establishes that it is otherwise unable to reasonably obtain unsecured credit and the credit is *necessary for continued operation*.") (emphasis added); *see also Bland v. Farmworker Creditors*, 308 B.R. 109, 113 (S.D. Ga. 2003) (noting that the "§ 364 option" is indispensable when "a debtor can face *immediate liquidation* (rather than reorganization) without it, and unsecured creditors can lose the most with that result") (emphasis added); *In re Mayco Plastics, Inc.*, 379 B.R. 691, 699 (Bankr. E.D. Mich. 2008) (finding that the debtor demonstrated a need for postpetition financing pursuant to section 364(c) where "it had a *significant and immediate liquidity problem*" and if it did not obtain such financing "it was clear that a *sudden shut down* of production was *imminent*") (emphasis added); *In re Western Pacific Airlines, Inc.*, 223, B.R. 567, 573-74 (Bankr. D. Colo. 1997) (authorizing the grant of "superpriority" status to lenders pursuant to section 364(c)(1) where the only alternative was "the *immediate collapse* of the Debtor as a going concern," and "[t]he prospects for recovery by the creditors in a liquidation [were] dim") (emphasis added); *In re Crouse Group, Inc.*, 71 B.R. 544, 550 (Bankr. E.D. Pa. 1987) (noting that cases approving lending pursuant to section 364(c) include "*clear findings on the necessity of the funds*, an

absence of alternatives, and a weighing of the wisdom of the funding agreements") (emphasis added).

21. Moreover, it is not clear that the cost of incurring the Postpetition Financing is justified. As the City notes, the Reinvestment Initiatives are "wide-ranging and will take years to fully accomplish." (Mot. ¶ 20; Moore Decl. ¶ 8.) In fact, the City anticipates that it will spend approximately $1.25 billion over the next *ten years* on the Reinvestment Initiatives. (Mot. ¶ 21; Moore Decl. ¶ 9.) Given the enormity of this anticipated investment – in terms of cost, time, and complexity – FGIC agrees that the City needs to "look beyond its coffers" for funding. (*Id.*) However, the City has not shown how an additional, short-term $112 million investment, the proceeds of which will be exhausted by June 2014 (if approved),[11] will enable it to make any significant progress with this project. In addition, given that the Quality of Life Financing will mature on the effective date of a confirmed plan of adjustment for the City, which could occur within the next few months under the City's expedited plan of adjustment timetable, such financing is not likely to have a meaningful impact on the preservation of the City's assets. *See In re Phase-I Molecular Toxicology Inc.,* 285 B.R. 494, 496 (Bankr. D. N.M. 2002) (noting that the short term of the proposed postpetition financing "rais[ed] concerns that the proposed lending will do little towards preserving assets of the estate"). FGIC submits that, given the long-term, complicated and expensive nature of the Reinvestment Initiatives, and the fact that a significant portion of City funds already are available and devoted to improving City conditions, sound and reasonable business judgment dictates that the remainder of the Reinvestment Initiatives should be addressed and financed as part of the City's comprehensive plan of

[11] The City claims that it is "prepared to move forward with the closing of the Postpetition Financing promptly upon the approval of this Motion." (Mot. ¶ 15.) In addition, the City plans to spend the approximately $112 million in Quality of Life Financing at a rate of $20 million per month (beginning in January 2014), meaning it will be exhausted within six months. (*Id.* at ¶ 22.)

adjustment. The City has failed to demonstrate why it is necessary to incur the costs associated with *both* interim and exit financing. The City will have paid the postpeititon lender a $4,375,000 commitment fee by the date of the hearing on the Motion (as discussed in ¶ 6, *supra*), and will be responsible for other fees and expenses. (Mot. ¶¶ 39, 56.) The City will incur additional debt service, fee and expense obligations in connection with any exit financing, and the City has already agreed to pay the postpetition lender an undisclosed fee in the event it fails to use the postpetition lender as its exclusive placement agent in connection with any such financing. (*Id.* at 1-2, fn. 1.)

### C. The Postpetition Financing Is an Impermissible *Sub Rosa* Plan

22. The Postpetition Financing also should not be approved because it constitutes an impermissible *sub rosa* plan in that it (i) provides for the treatment of two the City's thousands of creditors outside and ahead of a plan of adjustment and (ii) uses significant asset sale proceeds to repay the Postpetition Facility instead of prepetition creditors.

23. Caselaw explicitly prohibits a debtor from using postpetition financing to establish a *sub rosa* plan. The Fifth Circuit articulated the prohibition against *sub rosa* plans in the oft-cited *Braniff Airways* case, holding that "[t]he debtor and the Bankruptcy Court should not be able to short circuit the requirements of Chapter 11 for confirmation of a reorganization plan by establishing the terms of the plan *sub rosa* in connection with a sale of assets." *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983). Although decided in the context of a sale of a debtor's assets, courts have applied the *Braniff* holding to postpetition financings pursuant to section 364. *See, e.g., In re Belk Properties, LLC*, 421 B.R. 221, 225 (Bankr. N.D. Miss. 2009) (denying a postpetition financing proposal because it "loosely dictates the manner in which existing creditors of the bankruptcy estate are to be treated," which "violates the holding of *Braniff* because it achieves the same effect as a *sub rosa* Chapter 11 plan of reorganization").

This means that, "[t]he bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements." *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992). In guarding against proposed financings that impermissibly attempt to dictate the terms of a plan, courts "have focused their attention on proposed terms that would tilt the conduct of the bankruptcy case [or] prejudice, at an early stage, the powers and rights that the Bankruptcy Code confers for the benefit of all creditors." *In re Ames Department Stores, Inc.*, 154 B.R. 24, 37 (S.D.N.Y. 1990); *see also In re Mid-State Raceway, Inc.* 323 B.R. 40, 62 (Bankr. N.D.N.Y. 2005) (denying certain components of a financing offer that included a secured exit loan to fund operations of the reorganized debtor and provided for the lender to receive equity in the reorganized debtor, noting that "this Court agrees with the courts that have refused to allow a debtor to circumvent the confirmation process, which is central to the Code . . . the Court feels strongly that it is important that all interested parties be permitted to consider a disclosure statement and a plan as part of a formal confirmation process").

24. Further, caselaw mandates that section 364 financing should not be approved where there is evidence that its purpose is to benefit a prepetition creditor instead of the debtor, at the expense of the debtor's other creditors. *See In re Aqua Associates*, 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) ("[C]redit should not be approved when it is sought for the primary benefit of a party other than the debtor."); *In re Ames Department Stores, Inc.*, 154 B.R. 24, 39 (S.D.N.Y. 1990) ("[A] proposed financing will not be approved where it is apparent that the purpose of the financing is to benefit a creditor rather than the estate."); *In re Tenney Village Co., Inc.*, 104 B.R. 562, 568 (Bankr. D. N.H. 1989) (denying request for postpetition financing pursuant to section 364 where proposed agreement "would pervert the reorganizational process

from one designed to accommodate all classes of creditors and equity interests to one specially crafted for the benefit of the Bank and the Debtor's principals who guaranteed its debt"). In addition, in considering whether financing pursuant to section 364(c) is appropriate, courts consider whether "the result . . . put[s] any creditor at substantially greater risk than any creditor faces if the loan is not made." *In re Western Pacific Airlines, Inc.*, 223, B.R. 567, 573-74 (Bankr. D. Colo. 1997).

(i) *The Swap Counterparties Should Be Treated Pursuant to the City's Plan of Adjustment*

25. Assuming the Swap Counterparties could terminate the Swap Agreements as contemplated by the Forbearance Agreement, the City is proposing to use approximately $237.8 million of the Postpetition Financing to fund payment of the Optional Termination Amounts to the Swap Counterparties under the Forbearance Agreement. (Mot. ¶¶ 15-16.) However, this treatment of the Swap Counterparties must be decided as part of the plan confirmation process.

26. The purported benefits of the Forbearance Agreement, which have not yet been proven, do not justify allowing the City to crystalize the treatment of the Swap Counterparties outside of the plan process, potentially unfairly and irreversibly prejudicing other creditors. *Ames*, 154 B.R. at 37. As set forth in greater detail in the Limited Forbearance Objection, the City has not demonstrated that the Swap Counterparties would take action to "trap" the Casino Revenues, absent the Forbearance Agreement. (Limited Forbearance Objection ¶¶ 17-18.) Thus, funding the transactions contemplated by the Forbearance Agreement with the Swap Termination Financing is not necessary for the City to operate or preserve its assets, *Bland*, 308 B.R. at 114 *citing Farmland*, 294 B.R. at 880. The City has given no credible reason why a release of the Swap Counterparties' lien on the Casino Revenues in


exchange for a discounted termination payment cannot be included as part of a chapter 9 plan, and funded by a long-term exit facility (which the City needs anyway) that also has substantially lower annual debt service obligations than the Swap Agreements. (Mot. ¶ 55-56.) Particularly given that the City intends to file a chapter 9 plan by the end of the year, the Court should consider the treatment of the Swap Counterparties in the context of the City's overall plan of adjustment.

(ii) *The Postpetition Financing Deprives Prepetition Creditors of Significant Asset Sale Proceeds*

27. The Postpetition Financing would take from prepetition creditors a potentially significant source of recovery originally promised by the City in plan negotiations. This is particularly concerning given that the City's resources are scarce, and creditors have little, if any, information with respect to the source(s) or amount of their ultimate recoveries. The City's "Proposal for Creditors," dated June 14, 2013 (the "**Proposal**") identified asset disposition proceeds as a source of recovery for the City's unsecured creditors. (Proposal 108.) Yet, the terms of the proposed Postpetition Facility provide for "all net proceeds derived from a transaction or series of related transactions involving the voluntary disposition or monetization of any City owned asset which generates net cash proceeds from such transaction or series of transactions exceeding $10,000,000" to be used to repay the Postpetition Financing. (Mot. 29.) Removing the Assets Proceeds Collateral from being available to repay unsecured creditors and designating them as a source of repayment for the Postpetition Financing certainly "dictates the manner in which existing creditors of the bankruptcy estate are to be treated" and must be considered as part of the confirmation process. *Belk*, 421 B.R. at 225.

## CONCLUSION

28. Based upon the foregoing, FGIC respectfully requests that the Court deny the Motion and grant such other and further relief as the Court may deem just and proper.

Dated: November 27, 2013
Birmingham, Michigan

/s/ Mark R. James
Ernest J. Essad Jr.
Mark R. James
WILLIAMS, WILLIAMS, RATTNER & PLUNKETT, P.C.
280 North Old Woodward Avenue, Suite 300
Birmingham, MI 48009
Telephone: (248) 642-0333
Facsimile: (248) 642-0856
Email: EJEssad@wwrplaw.com
Email: mrjames@wwrplaw.com

– and –

Alfredo R. Pérez
WEIL, GOTSHAL & MANGES LLP
700 Louisiana Street, Suite 1600
Houston, TX 77002
Telephone: (713) 546-5000
Facsimile: (713) 224-9511
Email: alfredo.perez@weil.com

*Attorneys for Financial Guaranty Insurance Company*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **In re** | : | **Chapter 9** |
| **CITY OF DETROIT, MICHIGAN,** | : | **Case No. 13-53846** |
| **Debtor.** | : | **Hon. Steven W. Rhodes** |

## CERTIFICATION OF SERVICE

I hereby certify that on November 27, 2013 the *Objection of Financial Guaranty Insurance Company to Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay* was filed and served via the Court's electronic case filing and noticing system to all parties registered to received electronic notices in this matter.

/s/ Mark R. James
Mark R. James (P54375)
Attorney for Financial Guaranty Insurance Company
Williams, Williams, Rattner & Plunkett, P.C.
380 North Old Woodward Ave., Suite 300
Birmingham, MI 48009
(248) 642-0333
mrj@wwrplaw.com

Dated: November 27, 2013