# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                           Case No. 13-53846

CITY OF DETROIT, MICHIGAN                         In Proceedings Under
                                                  Chapter 9
                        Debtor.

                                                  Hon. Steven W. Rhodes

_____/

## OBJECTION OF AMBAC ASSURANCE CORPORATION TO MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

Ambac Assurance Corporation ("Ambac"), a creditor and party in interest in the above-captioned case, files this objection ("Objection") to the Motion of Debtor (the "City") for entry of an Order (i) approving Post-Petition Financing; [1] (ii) granting liens and providing superpriority claim status and (iii) modifying automatic stay [Dkt. No. 1520] (the "Motion"). In support of the Objection, Ambac respectfully submits as follows:

## Preliminary Statement

1.      No one would dispute that the City of Detroit has serious problems, and must address public safety and health, including equipment and personnel for its

_____
[1] Capitalized terms in this Objection that are not defined have the same definitions as the capitalized terms in the Motion.

police and fire departments, and its technology infrastructure. Ambac fully supports the City's need to maintain essential services on behalf of its citizens, especially in these very important areas.

2.      Despite the clear need for these essential services, the Motion should be denied because the City simply has not established that the Post-Petition Financing would in fact fund these services or that it represents an efficient vehicle for doing so. The Motion leaves grave doubts as to whether the funds raised using this unprecedented chapter 9 device would in fact be spent on the compelling public welfare initiatives touted by the City. First, the City concedes that the bulk of the funds would be spent to repay – in cash and outside of a plan of adjustment – a prepetition obligation of questionable validity.[2]  Under these circumstances, it is palpably improper to repay prepetition claims selectively from superpriority post-petition borrowing at the expense of prepetition creditors. Second, the City asserts that it intends to use the balance of the funds for "quality of life" spending, but stops conspicuously short of assuring its creditors and this Court that it will actually do so.

_____

[2]  The urgency to settle the prepetition claim using hastily obtained Post-Petition Financing is particularly suspect because the City has repeatedly represented to the Court and its creditors that it intends to file a plan of adjustment by the end of December – a little more than a month from now. It seemingly intends to do so despite little or no creditor support, and despite having failed to develop any consensus whatsoever around its business plan or any possible plan of adjustment. At the same time, it is taking plan-like steps in advance of proposing a plan that will limit the City's flexibility in the plan, but without the protections of the plan process afforded by the Bankruptcy Code. This Motion is yet another example.

In fact, it reserves the right to spend the funds on "any lawful purpose." Third, to the extent the City suggests that it may spend the funds for what appear to be essential services directed to public health and safety, it provides little or no details to explain how these expenditures would be implemented, whether they would be cost-effective, whether certain of the expenditures are truly necessary during the case, and how the amount to be raised and spent was determined.

3.      Given the defects in the factual record supporting the Motion, the City cannot meet the high standard applicable to the extraordinary remedy it seeks. Congress has made clear that post-petition superpriority financing must meet the primary purpose of municipal bankruptcy proceedings: "to allow a municipal unit to continue operating while it adjusts or refinances creditor claims with minimum (and in many cases, no) loss to its creditors."[3] The Post-Petition Financing must, therefore, represent the most appropriate and cost-effective means to fund *essential services*, while at the same time serving the best interests of the City's creditors.

4.      As detailed below, in order to evaluate whether these requirements are met, this Court should apply a stringent multi-factor test that considers, among other things, whether the proposed transaction is necessary to maintain essential services, is fair, reasonable and equitable, and is in the best interests of the creditors. Tellingly, the City inserted a number of these findings into the proposed order, thereby

_____

[3] H.R. Rep. No. 95-595, at 263 (1977); *see also* H.R. Rep. No. 94-686, at 524 (same).

acknowledging this is the applicable legal standard. At a minimum, if the City is to meet its evidentiary burden, it must commit to a specific use for the borrowed funds, and provide evidence that it will spend the borrowed money based on a well-conceived, cost-effective, and concrete plan to maintain essential services to its citizens during the course of the bankruptcy case. The City has not done so.

5.      The application of the correct legal standard is particularly important given the high precedential value of this Court's ruling. This case presents one of the first times that a municipality has petitioned a bankruptcy court for post-petition financing. And never before has a municipality asked a court to approve post-petition financing of such magnitude, over the objections of creditors. This case therefore offers the Court a unique opportunity to craft the framework that it – and likely future courts – will use to evaluate municipal requests for post-petition financing.

## Relevant Factual Background

6.      The City seeks Post-Petition Financing totaling up to $350,000,000.00, which will be obtained through the issuance of two series of secured bonds: the Swap Termination Bonds and the Quality of Life Bonds. Motion ¶ 6.

7.      The City asserts that the Swap Termination Bonds will allow it to capture a negotiated discount to its obligations under the Forbearance Agreement, resulting in savings of approximately $50 million. Motion ¶ 16. The City further

contends that it will realize significant additional savings because the City's debt service on the Post-Petition Financing, which is interest only during its term, is $12 million per year, as compared to the nearly $50 million per year it was paying under the Swap Agreement.  Motion ¶ 17.[4]

8.      The City states that the proceeds of the Quality of Life Bonds will be used at the rate of approximately $20 million per month, beginning in January 2014, to "advance certain key investment initiatives of the City, including but not limited to, essential investments in blight removal, public safety, and technology infrastructure."  Motion ¶ 7.  However, the City does not commit to using the funds for these purposes.  Instead, under the Quality of Life Bond Purchase Agreement, the City may use the proceeds "for purposes permitted by law, agreed between the City and the Purchaser in the QOL Bond Documents and approved by the Bankruptcy Court, as more specifically provided in the QOL Bond Documents."  Quality of Life Bond Purchase Agreement, at 4.

---

[4] The savings suggested by this comparison are illusory.  The City disregards the fact that, at the end of the term of the Post-Petition Financing, the City will owe the entire $350 million principal, which will need to be refinanced at an undetermined interest rate and on undetermined terms.  The swap payments, in contrast, will decrease in amount as interest rates inevitably rise.  *See* Wallace C. Turbeville, "*The Detroit Bankruptcy*," Dêmos, November 2013, at 31-32, *available at* http://www.demos.org/sites/default/files/publications/Detroit_Bankruptcy-Demos.pdf (noting that it is "highly unlikely" that the current interest rate environment will persist, and that it is "perfectly logical to conclude that the probability of higher rates in the future is much greater than the probability of lower rates.").  This comparison assumes, moreover, that the City's swap obligations are valid, which they are not.  *See infra,* ¶ 35.

9.      The Motion seeks an Order under section 364(c) of the Bankruptcy Code authorizing the City to (a) obtain senior secured Post-Petition Financing on a superpriority basis and on the terms set forth in the Commitment Letter, Bond Purchase Agreements, and Financial Recovery Bond Trust Indenture (the "Financing Documents"); (b) perform all acts contemplated by the Financing Documents; (c) grant the Purchaser automatically attached and perfected security interests in and liens on the Collateral on the terms described in the Purchase Agreements; and (d) grant superpriority administrative expense claim status to the Purchaser's claim with respect to the Post-petition Financing.  The City further asks the Court to vacate or modify the automatic stay to the extent necessary to implement and effectuate the terms and provisions of the Purchase Agreements and Proposed Order.  Motion, pp. 2-3.

## ARGUMENT

10.     Courts applying Section 364(c) to Chapter 11 post-petition financings have developed a number of factors that they consider in determining whether to approve special treatment for the lender.  In applying those factors here, the Court should take into account the unique features of Chapter 9, language in Section 943(b)(7) that is identical to a key factor in the Section 364(c) test, and the legislative history of the amendment by which Section 364(c) was incorporated into Chapter 9.

11.     When viewed through this framework, it becomes clear that the City's Motion must be denied.  Borrowing to fund the termination of the Swap Agreements is unnecessary, because the Swap Agreements were void *ab initio,* and the security purportedly provided to the swap counterparties is not valid.  The balance of the borrowing fails the statutory test because the City has failed to specify a specific use for the funds, and even to the extent it has suggested possible uses, has failed to provide an adequate explanation regarding how and when the funds will be spent. Nor is it clear how the City determined the amount of the Quality of Life Bonds.  As a consequence, the City has failed to meet its burden of showing that the proposed borrowing is in the best interests of the debtor and its creditors, and is the most appropriate and cost-effective means to fund essential services.

**A.     In Evaluating the Motion, the Court Should Determine Whether the Superpriority Loan Proceeds Will be Spent to Maintain Essential Services to Citizens and if so, Will be Used in a Manner that Maximizes Returns to Creditors.**

**1.     The Section 364 Standard Developed in Chapter 11 Cases Must be Applied in Light of the Unique Features of Chapter 9.**

12.     Section 364(c) of the Bankruptcy Code, made applicable to this case by Section 901, provides that if a debtor is unable to obtain unsecured credit as an administrative expense, the Court may, after notice and a hearing:

authorize the obtaining of credit or the incurring of debt—

(1)    with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title,

(2)    secured by a lien on property of the estate that is not otherwise subject to a lien, or

(3)  secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

13.    Courts applying this provision in Chapter 11 cases have developed a number of factors that they consider to determine whether a post-petition financing transaction under section 364 is appropriate.  These factors include (a) whether the proposed financing is an exercise of the debtor's sound and reasonable business judgment; (b) whether alternative financing is available on any other basis; (c) whether the financing is in the best interests of the estate and its creditors; (d) whether any better offers, bids, or timely proposals are before the court; (e) whether the transaction is necessary to preserve the assets of the estate, and necessary, essential, and appropriate for the continued operation of the debtor's businesses; (f) whether the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender; and (g) whether the financing agreement was negotiated in good faith and at arm's length between the debtor, on the one hand, and the agents and lenders, on the other hand.  *See*, *e.g.*, *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-14 (D. S.C. 2003); *In re*

*Farmland Indus., Inc.*, 294 B.R. 855, 879-80 (Bankr. W.D. Mo. 2003); *In re Phase–I Molecular Toxicology, Inc.,* 285 B.R. 494, 495 (Bankr. D.N.M. 2002); *In re WorldCom, Inc.,* 2002 WL 1732646, at *2-3 (Bankr. S.D.N.Y. 2002); *In re Western Pacific Airlines, Inc.,* 223 B.R. 567, 572 (Bankr. D. Colo. 1997); *In re The Crouse Group, Inc.,* 71 B.R. 544, 549-50 (Bankr. E.D. Pa. 1987). The City cannot seriously dispute that these factors are applicable because it incorporates findings on many of them in its proposed Order. Order at 6-7.

14.     The City's Motion appears to be the first ever contested municipal post-petition financing, and as a consequence, there is no case law applying Section 364(c) in Chapter 9. But there is no reason why some of the foregoing factors should not apply in the same manner in a Chapter 9 as they are applied in a Chapter 11. The City must, for example, as in a Chapter 11, meet its burden of demonstrating that alternative financing is not available; that no better offers, bids, or timely proposals are before the Court; that the terms of the proposed financing are fair, reasonable, and adequate given the circumstances; and that the proposed transaction was negotiated in good faith and at arm's length.[5]

---

[5] Ambac expects that other creditors will raise issues with respect to the Motion based on some or all of these factors, and therefore, in the interest of space, Ambac will not address them. Ambac's silence with regard to these factors should not be construed as reflecting its agreement that the City has satisfied these factors in the Motion.

15.     Other factors, however, must take into account the significant differences between a corporate debtor and a municipality.  A factor common to nearly all of the Chapter 11 cases, for example, is whether the post-petition financing is in the best interests of the debtor and its creditors.  *Bland*, 308 B.R. at 113 (including factor); *Farmland*, 294 B.R. at 879 (same); *Phase-I*, 285 B.R. at 495 (debtor bears burden of proving, *inter alia*, that "financing is in the best interest of the estate and its creditors" (citation omitted); *Worldcom*, 2002 WL 1732646 at *2-3 (considering whether the absence of post-petition financing would "immediately and irreparably harm the Debtors, their estates, and their creditors."); *Western Pacific*, 223 B.R. at 572 (considering whether the financing would be in the best interests of the estate and its creditors); *Crouse*, 71 B.R. at 550 (discussing creditor interests in considering whether the financing would be "fair, reasonable, and adequate.").  A similar factor – whether the transaction is necessary to preserve the assets of the estate, and necessary, essential, and appropriate for the continued operation of the debtor's businesses – is likewise a factor used in virtually all of the Chapter 11 cases.  *See id.*  In applying these factors, the significant differences between a corporate debtor and a municipality must be taken into account.

16.     In a corporate bankruptcy, both the debtor and its creditors have an interest in avoiding liquidation, and both have an interest in ensuring a profitable enterprise so that the creditors will get paid over time.  Likewise, a corporation may

exercise reasonable business judgment in borrowing under Section 364 to avoid liquidation, or to address capital needs necessary to ensure the business's profitability. In both instances, the borrowing will typically also be in the interests of the corporation's creditors. But a city is not a business. It has no equity holders, it may not liquidate, and it is not structured around a profit motive. Its sole "business" is to provide essential services to its citizens. *See generally In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 31-35 (Bankr. D. Colo. 1999) (discussing differences). As a consequence, the alignment that typically exists between the debtor and the creditors in a Chapter 11 post-petition financing may not exist in a Chapter 9 – for the creditors, the borrowing may simply layer on another tranche of debt above them. Accordingly, the Court should apply both the "best interests of creditors" factor, and the factor requiring the Court to consider the necessity of borrowing to preserve the debtor's assets and to continue its operations, by reference to the unique features of Chapter 9.

### 2. Section 943(b)(7) Provides Guidance for Applying the "Best Interests of Creditors" Test under Section 364

17.    Reflecting the differences between Chapter 11 and Chapter 9, and the significant tension between the interests of creditors and the Chapter 9 debtor's need to maintain essential municipal services, the Chapter 9 confirmation test in Section 943 incorporates a "best interests of creditors" factor that is not present in the Chapter 11 confirmation test in Section 1129. 11 U.S.C. § 943(b)(7). The case law under

Section 943 applying this factor thus provides guidance for applying the best interests of creditors test under Section 364.

18.     The "best interest of creditors" factor in Section 943 is meant to protect creditors, in view of the fact that "[i]n a Chapter 9 case, the confirmation of a plan is a significant event" that results in a discharge of the municipal debtor from all debts as of the time when the plan is confirmed. *Matter of Sanitary & Imp. Dist. No. 7, Lancaster Cnty., Neb.*, 112 B.R. 990, 994 (Bankr. D. Neb. 1990); *see also* 11 U.S.C. § 944(a), (b). In evaluating whether a Chapter 9 plan meets the "best interest of creditors" requirement, bankruptcy courts consider whether "the Plan affords all creditors the potential for the greatest economic return from Debtor's assets." *In re Barnwell Cnty. Hosp.*, 471 B.R. 849, 869 (Bankr. D.S.C. 2012); *In re Bamberg Cnty. Mem'l Hosp.*, No. 11-03877, 2012 WL 1890259, *8 (Bankr. D.S.C. May 23, 2012). At a minimum, the best interests of creditors requirement in Section 943(b)(7) requires that a city's proposed plan "provide a better alternative for creditors than what they already have." *Mount Carbon*, 242 B.R. at 34. The test has been described as a "'floor requiring a reasonable effort at payment of creditors by the municipal debtor.'" *In re Pierce County Housing Authority*, 414 B.R. 702, 718 (quoting *Mount Carbon*, 242 B.R. at 34); *see also W. Coast Life Ins. Co. v. Merced Irr. Dist.*, 114 F.2d 654, 678 (9th Cir. 1940) (in applying test, court considered

whether the creditors' recovery was "all that could reasonably be expected in all the existing circumstances").

19.     As stated by Colliers:

> [S]ince the test is designed to protect the dissenting minority of a class that has accepted the plan, one must not be so carried away with the potentially adverse consequences of the alternative to a chapter 9 plan that one reaches the conclusion that any plan is better than the alternative.  A plan that makes little or no effort to repay creditors over a reasonable period of time may not be in the best interest of creditors.  For example, *a debtor that had invested heavily in improvements in its facilities at a time when it was unable to pay the claims of its bondholders cannot rely on its cash-poor position resulting from the investment as a reason why it should pay less to bondholders, because the bondholders should not be required in effect to subsidize the improvements*.  Such a plan is not fair and equitable and is not in the best interest of creditors.

*See* Colliers on Bankruptcy § 943.03[7][a] (emphasis added).

20.     Thus, when reviewing Chapter 9 plans of adjustment, courts balance the municipal debtor's interest in retaining sufficient funds to operate and provide essential services with creditors' interests in having their debts repaid.  When a municipality's plan of adjustment maximizes returns to creditors, the plan is approved.  *See Barnwell County Hosp.,* 471 B.R. at 869 (plan satisfied "best interests of creditors" test where it maximized return on creditor claims by providing for sale of debtor's assets as going concern and by devoting net proceeds of sale and all of debtor's cash, accounts receivable and other assets which remained after closing to payment of debtor's creditors); *In re Connector 2000 Ass'n, Inc.,* 447 B.R. 752, 765-

66 (Bankr. D. S.C. 2011) (debtor's proposed Chapter 9 plan was in the "best interests of creditors" where it afforded creditors the potential for greatest economic return based on projected net revenues that appeared to be reasonable).

21.     But when the debtor has engaged in pre-plan spending that was subsidized unnecessarily by cuts to creditor recoveries, the best interests of creditors test is not satisfied and the plan must be rejected.  *See Fano v. Newport Heights Irrigation Dist.*, 114 F.2d 563, 564–66 (9th Cir. 1940) (Chapter 9 debtor's infrastructure spending "of at least twice the sheer necessity of the situation" to be subsidized by cuts to creditor recoveries rendered plan of adjustment non-confirmable because "it would be highly unjust to allocate their cost to the bondholders" and such plan treatment was neither fair and equitable nor in the best interest of creditors); *see also Pierce Cnty. Hosp.*, 414 B.R. at 718-719 (plan rejected as violation of best interests of creditors test where plan would preclude creditors from investigating and pursuing all potential sources of recovery).  Significantly, Congress expressly endorsed the holding in *Fano* when making revisions to Chapter 9 in 1978:

> The best interests of creditors test does not mean liquidation value as under chapter XI under the Bankruptcy Act.  In making such a determination, it is expected that the court will be guided by standards set forth in *Kelley v. Everglades Drainage District*, 319 U.S. 415 (1943) and *Fano v. Newport Heights Irrigation District*, 114 F.2d 563 (9th Cir. 1940), as under the present law, the bankruptcy court should make findings as detailed as possible to support a conclusion that this test has been met.

124 Cong. Rec. H 11,100 (daily ed. Sept. 28, 1978); S 17,417 (daily ed. Oct. 6, 1978).

22.    Thus, Chapter 9 recognizes – and the case law confirms – that a municipality has a responsibility to its creditors to ensure that the plan not only benefits its citizens, but also maximizes returns to creditors.  The Section 364 "best interests of creditors" test should be interpreted in the same way as the Section 943 "best interest of creditors" test.  The Court should evaluate the contemplated borrowing to determine whether the manner in which the loan proceeds will be spent to maintain essential services maximizes the returns to creditors.

### 3.    The Legislative History Reflects Congress's Intent Regarding the Proper Interpretation of Section 364 in Chapter 9

23.    The legislative history of the amendment by which Section 364 was incorporated into Chapter 9 confirms that in Chapter 9, a court should evaluate a proposed post-petition financing by balancing a city's need to maintain essential services during the bankruptcy case against the interests of its creditors.

24.    For many decades, the Bankruptcy Code and its predecessors did not provide for post-petition financing by a municipal debtor.  When Congress finally altered this situation in 1976, it stated explicitly that it was doing so only for a very specific purpose:  to allow municipalities to borrow money during a bankruptcy

proceeding in order to maintain essential government services directed to public safety and public health.[6]  As stated in Senate Report 94-459:

> The present Chapter 9 makes no provision for the issuance of debtor's certificates.  This is a most serious omission *as the municipal debtors must maintain essential city services* directed to public safety and public health during the reorganization process.

Sen. Rep. 94-459, at 14 (1975) (emphasis added); *see also id.* at 19 (explaining that the provision permits the court to authorize issuance of debt certificates on special terms to provide "short term funding for essential governmental services."); H. Rep. 94-686, at 8 (1975), *reprinted in* 1976 U.S.C.C.A.N. 539, 546 (the bill gives the court power to authorize the issuance of certificates of indebtedness to preserve the tax base for creditors while continuing to provide essential government services).

25.      Similarly, former Judge Patchan testified at a hearing held in 1975 on the 1976 amendment that the incorporation of Section 364 was the "principle beneficial feature of the bill" and suggested that municipalities should be permitted to borrow and displace existing priorities *in amounts necessary to ensure maintenance of the "public safety and public health" of the citizens*.  Adjustment of Debts of Political Subdivisions and Public Agencies and Instrumentalities: Hearing on S. 2597 Before the Subcommittee on Improvements in Judicial Machinery of the S.

---

[6] Section 364 was first incorporated into Chapter 9 in 1976, as part of Congress's effort to address the financial crisis in New York City.  Pub. Law No. 94-260, § 82(b)(2).  The 1976 revision was incorporated into the Bankruptcy Code in 1978 in almost identical form.  Pub. Law No. 95-958, § 901(a).

Committee on the Judiciary, 94 Cong. 186, 246 (1975) ("Hearing on S. 2597") (emphasis added). Then Assistant Attorney General Antonin Scalia added that the section "allows the debtor to continue essential government services during bankruptcy that it *could not have maintained through tax revenues alone*." *Id.* at 199-200, 208 (emphasis added).

26.     In the same bill by which Congress incorporated Section 364 into Chapter 9 of the Bankruptcy Code in 1978, Congress explained that the primary purpose of municipal bankruptcies is "to allow the municipal unit to continue operating while it adjusts or refinances creditor claims with minimum (and in many case, no) loss to its creditors." H.R. Rep. No. 95-595, at 263 (1977). The 1978 legislative history also manifests Congress's view that "[c]reditors must be provided, under the plan, the going concern value of their claims. The going concern value . . . is intended to provide more of a return to creditors than the liquidation value if the city's assets could be liquidated like those of a private corporation." S. Rep. 95-989, 113, 1978 U.S.C.C.A.N. 5787, 5899 (1978).

27.     Finally, the legislative history reflects Congress's contemplation that the court would approve post-petition financing for the maintenance of essential services during the bankruptcy case only if the borrowing is a matter of last resort. Assistant Attorney General Scalia testified, for example, "We anticipate, of course, that the court would not grant such approval [of certificates of indebtedness] unless the court

was satisfied that the city was taking all feasible steps to place its fiscal affairs on a sound basis." Hearings on 2597, at 200, 208. Similarly, Dean King noted that before allowing the municipality to borrow, the court would have to find "that there is no other source for such funds." *Id.* at 271 (statement of Lawrence P. King, then Dean of New York University School of Law); *see also id.* at 199-200, 208 (borrowing should be authorized only when needed for services "that could not [be] maintained through tax revenues alone.").

28.     Thus, Congress authorized post-petition financing for municipalities for an express and narrow purpose – so that they could borrow funds necessary to maintain essential services for their citizens during the course of a bankruptcy case. And Congress made clear that the kind of expenses that were appropriate for post-petition borrowing were essential operating expenses, not long-term capital expenses. The purpose for post-petition financing must be evaluated in the context of the primary purpose of municipal bankruptcies, as framed by Congress: to allow a municipality to continue operating while adjusting its debts with little or no loss to creditors (and not to finance its future).

### 4.     Section 904 Does Not Compel the Court to Rubber-Stamp the City's Post-Petition Financing Irrespective of the Need for and Uses of the Borrowed Proceeds.

29.     As the foregoing demonstrates, the City has the burden of meeting the Chapter 9 test for obtaining approval of superpriority section 364 financing,

including the need to show that the funding sought is to maintain essential services and cannot otherwise be obtained without Section 364 priority treatment. The Court has the power and the duty to review carefully any such funding request, and nothing in Section 904 of the Bankruptcy Code precludes such review.

30.     Section 904 precludes the Court from interfering with any of the political or governmental powers of the debtor, any of the property or revenues of the debtor, or the debtor's use or enjoyment of any income-producing property, *unless the debtor consents* or the plan so provides. The purpose of Section 904 is to circumvent possible objections to municipal bankruptcies based on the Tenth Amendment, which reserves to the States all powers not delegated to the federal government. *In re Cnty. of Orange*, 179 B.R. 195, 200 n.12 (Bankr. C.D. Cal. 1995). At the same time, to avoid allowing the Tenth Amendment concerns to undermine the purpose of the federal bankruptcy regime, the statute expressly permits judicial interference when the debtor consents. *Id.* at 200.

31.     Here, the City has consented to the Court's "interference" by requesting the Court's approval to provide the Purchaser with superpriority status under Section 364(c). Congress clearly contemplated that in these circumstances, the bankruptcy court would necessarily be involved. Thus, Congress explained when incorporating Section 364 into Chapter 9 of the Bankruptcy Code in 1978 that it was not including Sections 364(a) and (b) because the court should not have the ability to

supervise borrowing by the municipality "in instances in which none of the special bankruptcy powers are involved." H.R. Rep. 95-595, at 394-95 (1997), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6350. However, "when the municipality needs special authority, such as subordination of existing liens, or special priority for the borrowed funds . . . the court will become involved in the authorization." *Id.* And at least one witness testified that, under Section 364 as enacted, the bankruptcy court would be required to determine if a proposed use complies with the underlying purpose of Section 364 to allow the municipality to maintain essential services. Hearings on 2597 at 271 (statement of Dean King).

32.     Judge Klein addressed a similar issue in *In re City of Stockton, Cal.*, 486 B.R. 194, 198-99 (Bankr. E.D. Cal. 2013). There, the issue was whether a municipal debtor must obtain court approval of a settlement pursuant to Federal Rule of Bankruptcy Procedure 9019, or whether Section 904 made such approval unnecessary. Judge Klein ultimately concluded that Section 904 gives the debtor freedom to decide to ignore or follow Rule 9019, but that "[w]hen a chapter 9 debtor files a Rule 9019 motion to have the court approve a compromise or settlement, the municipality 'consents' for purposes of § 904 to judicial interference with the property or revenues of the debtor needed to accomplish the proposed transaction." *Id.* at 199.

33.     Having invoked the Court's authority in order to take advantage of the "special bankruptcy powers" afforded by Section 364(c), the City has consented to having this Court "interfere" with its property and the use of its money.  And under the standard applicable under Section 364(c), as discussed above, that means the Court will be required to determine whether the Post-Petition Financing is necessary to maintain essential services for the citizens of Detroit during the case, whether the proposed use of the funds – assuming the City is in fact willing to commit to a use – is the most cost-effective way to provide the proposed services, and whether the financing and its uses maximize the returns to creditors.

### B.     Post-Petition Financing to Fund the Termination of the Swap Agreements is Unnecessary and Fails to Satisfy the Statutory Criteria

34.     As discussed in detail in Ambac's objection to the City's motion to approve the Forbearance Agreement, the City's swap obligations are void *ab initio* because they do not meet the requirements of state law; the City's casino revenue was pledged in support of the swap obligations in violation of state law, and even to the extent the swap counterparties had a valid lien prepetition, that lien was cut off with respect to casino revenue acquired by the City post-petition.  *See* Corrected Objection to Motion to assume Lease or Executory Contract/Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy

Code, (II) Approving Such Agreement Pursuant to Rule 9010, and (III) Granting

Related Relief [Dkt. 410], which Ambac incorporates herein by reference.

Numerous other parties have also objected to the Forbearance Agreement on these

and other grounds.  Consequently, the Post-Petition Financing to fund the termination

of void swap obligations is unnecessary, contrary to the interests of both the debtor

and the creditors, and does not reflect reasonable business judgment by the City.[7]

35.     Moreover, even assuming for purposes of argument that the Court were

to reject all of the objections to the motion to approve the Forbearance Agreement,

the Post-Petition Financing should not be approved for purposes of funding the

termination of the Swap Agreements.  As discussed above, Congress incorporated

Section 364 into Chapter 9 only to permit a municipality to maintain essential

government services during a bankruptcy proceeding.  Funding a settlement with a

prepetition creditor plainly does not qualify.

36.     The City proposes to spend approximately $230 million to fund the

swap termination.  These funds will not be used to ensure maintenance of the public

safety and public health of the citizens of Detroit during the pendency of the case, as

Congress intended, but instead will be used to fund the early termination of the Swap

Agreements pursuant to the Forbearance Agreement.  In other words, the City seeks

---

[7] At a minimum, if the Court denies the motion to approve the Forbearance
Agreement, the City will be required to reevaluate the amount of Post-Petition
Financing it needs.  And if the amount changes, the terms of the transaction and the
merits of the Post-Petition Financing will have to be reassessed.

to borrow funds from one financial entity on a superpriority basis so that it can pay

those funds to other financial entities to satisfy a prepetition obligation. This is

clearly not an intended purpose for municipal post-petition financing – paying off a

prepetition creditor indisputably does *not* constitute the provision of essential

services.[8] And while the City asserts that the transaction could result in savings to

the City, those savings appear to be illusory (*see supra,* n. 4). In any event, the City

fails totally to explain how, when, or in what manner those funds will be used to

maintain essential services directed to public health and safety for Detroit's citizens.

Accordingly, the Motion must be denied to the extent the Post-Petition Financing is

proposed to be used to fund the termination of the Swap Agreements.

      **C.**    **The City Has Failed to Meet its Burden of Proving that the "Quality of Life" Borrowing Satisfies the Requirements of Section 364.**

            **1.**    **The City Has Not Committed to a Use of the Funds it Seeks to Borrow for Any "Quality of Life" Spending**

37.      The City suggests various potential uses of the proceeds of the Quality

of Life Bonds – public safety, information technology upgrades, and blight removal –

but does not *commit* to use the funds for those purposes. Indeed, in its Motion, the

City acknowledges that it "may ultimately decide to apply the proceeds of the

---

[8] It is also improper under these circumstances because it would result in selective repayment of one pre-petition creditor, using post-petition superpriority borrowing, at the expense and to the detriment of other pre-petition creditors.

Quality of Life Financing to pursue an array of specific projects." Motion ¶ 23. In the Quality of Life Bond Purchase Agreement, the City is even less explicit, agreeing with Barclays that it can use the money for *any* "purposes permitted by law, agreed between the City and the Purchaser in the QOL Bond Documents and approved by the Bankruptcy Court, as more specifically provided in the QOL Bond Documents." Quality of Life Bond Purchase Agreement, at 4. The QOL Bond Documents, which purportedly specify the permitted uses of the funds, also do not commit the City to spending the funds in any particular way. Thus, the City seeks to borrow $120 million – to the detriment of existing creditors – without making any specific or binding commitment regarding how the funds will be used. The absence of a commitment is fatal to the Motion in at least two respects.

38.     First, the City proposes to pledge its wagering tax revenue as collateral for the Quality of Life Bonds, but knowing how the funds will be used is essential to evaluating whether this legally can be done. The Michigan Gaming Control and Revenue Act (the "Gaming Act") authorizes the City to use gaming tax revenue for only eight specific purposes. Mich. Comp. Laws § 432.212(3)(a).[9] The City may not

---

[9] Wagering tax revenue can be used for (a) the hiring, training, and deployment of street patrol officers; (b) neighborhood and downtown economic development programs designed to create local jobs; (c) public safety programs such as emergency medical services, fire, department programs, and street lighting; (d) anti-gang and youth development programs; (e) other programs that are designed to contribute to the improvement of the quality of life in the city; (f) relief to the

use any of the funds it collects under the Gaming Act for a purpose that is not specifically enumerated. *See* Mich. Comp. Laws § 432.212(11) ("Payments to a city . . . *shall* be used by the city for the purposes listed in subsection (3)(a)." (emphasis added)). Without a commitment to use the funds for a particular purpose, the Court cannot evaluate whether the wagering taxes are being pledged ("used") for one of the enumerated permissible purposes, and thus, is not in a position to approve the Motion.

39.     Second, in the absence of a commitment by the City to use the proceeds of the Quality of Life Bonds for any particular purpose, the Court cannot evaluate whether the requirements of Section 364 are satisfied by the proposed borrowing. Certainly, the Court cannot conclude that the funds will be used only for essential services directed to public health and safety, as Congress intended, unless the City commits to such a purpose. And without any commitment whatsoever, the Court cannot determine whether the intended use is in the best interests of the debtor and the creditors, or whether it reflects the City's reasonable business judgment. Nor can it determine whether the transaction is necessary to preserve the assets of the debtor, or necessary, essential, and appropriate for the City's continued operation.

---

taxpayers of the city from 1 or more taxes or fee imposed by the city; (g) the costs of capital improvements; and (h) road repairs and improvements. Mich. Comp. Laws § 432.212(3)(a).

40.     In the absence of a firm and binding commitment to a specific use for the proceeds of the Quality of Life Bonds, the City's Motion cannot be granted.

**2.     The City Has Made No Showing that It Will Use the Borrowed Funds Cost-Effectively in order to Maintain Essential Services in a Manner that Maximizes Returns to Creditors.**

41.     As discussed above, under Section 364, the City has the burden of proving that it has balanced the need to borrow to provide essential services to its citizens with the rights of municipal creditors.  At a minimum, this requires the City to demonstrate that it will spend the borrowed funds in a cost-effective manner.  The Motion fails to disclose any of the necessary factual information, let alone make this showing.

42.     As an initial matter, it is impossible for the City to show that it will spend the borrowed funds in a cost-effective manner when it has not even committed to how it will use the funds.  But even to the extent that the City has suggested *possible* uses of the funds, it has failed to make the requisite showing.  Thus, the City has not said it requires funds to maintain specifically identified essential services for the citizens of Detroit; that it has developed a plan for how to maintain those essential services; that the plan will require the City to expend "X" to maintain those essential services; that those expenditures will have "Y" result; and that expending "X" in borrowed funds is a cost-effective means of maintaining those essential services

generating "Y" result and is therefore in the best interests of the debtor and its creditors.

43.     This lack of detail is especially troublesome in view of the fact that most of the expenditures they suggest, such as for technology infrastructure and blight removal, are actually for long-term capital projects, not for the kind of essential operating expenses contemplated by the legislative history.  These kinds of expenditures require detailed and careful long-term planning, and impose an especially high burden on the City to demonstrate that it meets the requirements under Section 364(c).

44.     Despite having made no commitment to any particular use, or otherwise having provided details about the intended use of the borrowed funds, the City contends in the Motion that it plans to spend the proceeds of the Quality of Life Bonds at the rate of $20 million per month, beginning in January 2014.

45.     Ambac does *not* challenge the City's need to spend money to maintain essential services for public health and safety.  In particular, Ambac affirmatively supports the suggested uses mentioned in the Motion relating to the DPD, DFD, and EMS, and Information Technology Services.  Even as to these suggested matters, however, the City has provided little or no details.  For example, the Motion does not indicate whether the City has begun the procurement process for modernizing the DPD's vehicle fleet and obtaining new vehicles for the Department, or for purchasing

bullet proof vests, tasers, and new and modern fire-fighting equipment. And the City has not demonstrated that it is truly feasible that the procurement process for any of these items can be completed in only a month, to permit spending to begin as soon as January 1.

46.     The City also suggests it may spend the borrowed funds on blight removal. Ambac does not challenge that blight removal is essential to the City's future and must be addressed. But the paucity of details in the Motion concerning this area is particularly troubling, including details as to whether and what level of blight removal is necessary to maintain essential services during the course of the case. Ambac understands that work in the hardest hit areas will be funded by a federal grant. However, the Motion includes no evidence that the City has a plan for conducting blight removal in the remaining areas, or has, for example, contacted contractors qualified to do this work. The City *has* advised the creditors that the approval process for conducting blight removal is unnecessarily protracted,[10] and that it plans to revise that process, but has it has not stated that it has taken any steps to do so, or that it has otherwise developed a comprehensive plan to remove blight in a manner calculated to maximize value to creditors (*i.e.*, minimizing cost while maximizing impact). To the contrary, Charles Moore states in his declaration that the "City continues to investigate and determine the most effective way to accomplish

---

[10] *See*, *e.g.*, City of Detroit Proposal for Creditors, June 14, 2013, at 17 (noting the many legal and other challenges facing blight removal).

blight removal, including which geographic areas to focus its efforts on and other factors." Moore Dec. ¶ 20. In other words, the Motion is silent on these matters because the City has not yet developed a final and executable plan of action. Given that this is the case, the Motion provides no basis for a conclusion that the City needs to incur this new debt with a superpriority lien at this time, or that the City's expectation of spending $20 million per month starting January 1 is reasonable, efficient, or in the best interests of the debtor and the creditors. Quite simply, neither the Court nor the creditors have sufficient information with which to evaluate whether the expenditure of funds on blight removal *at this time* – if that is what the City *chooses* to do with the borrowed funds – is in the best interests of the debtor or the creditors, or necessary to the City's continued operations.

47. The many questions about the City's plans – or lack thereof – raise additional concerns regarding the structure of the Post-Petition Financing. For example, the overall structure of the transaction suggests it is outright wasteful. Under the terms proposed, the City will receive a lump-sum payment from Barclays once the transaction closes. A portion of the funds will be used to pay the Swap Termination Fees – assuming the Forbearance Agreement is approved – but the remainder (the Quality of Life portion) will be held in an account under the Indenture. Those funds will remain in the account and be invested in a liquid investment, providing a very low interest rate, until the money is used for essential

services. At the same time, the City will be paying Barclays interest of at least 3.5% and perhaps as much as 6.5%, which means that the City will be paying significantly more interest to Barclays than the City will earn on the funds. The City fails to explain why it structured the transaction in this manner, as opposed to structuring it as a line of credit so that the City would draw down – and pay interest on – the funds, only as and when the funds are needed.

>    **3.      The Motion should be Denied Because the City Has Not Shown that Borrowing is Needed to Maintain Essential Services for its Citizens.**

48.      The City has provided the creditors with updated cash flow projections that include the proceeds of the proposed Post-Petition Financing. Those projections reflect that the City actually intends to spend approximately $400 million between now and June 2015 on its Reinvestment Initiatives and, having done so, it will still have $61 million in surplus cash. Thus, even without $120 million Quality of Life Bonds, the City has cash available to fund some $300 million in Reinvestment Initiatives and still retain a surplus. In addition, the City's future cash flow projections reflect substantial multi-year cash surpluses. The City has simply failed to provide that the borrowing it proposes is necessary at this time.

49.      As discussed above, leaving aside the fact that the City has not committed to using the proceeds of the Quality of Life Bonds for a specific purpose, there are numerous questions as to whether and how the City can spend money as

rapidly as it proposes for *any* purpose, due to its lack of concrete plans. In view of these many questions, and the spending already proposed for Reinvestment Initiatives in the City's projections, the Motion is conspicuously lacking any demonstration that the City has any plan at all, much less a well-conceived, cost-effective, and concrete plan for spending the additional $120 million it seeks to borrow from the Purchaser for Reinvestment Initiatives. Without such a demonstration, it is not possible for either the creditors or the Court to evaluate whether the Post-Petition Financing is in the best interests of the debtor and creditors, and necessary to preserve the debtor's assets and continue its operations.

### D. If the Court Approves the Post-Petition Financing, the Order Should Clarify that Superpriority is Not Granted Over Any Claims Payable From Restricted Funds.

50. If, despite the Objectors' concerns, the Court nevertheless decides to approve the Post-Petition Financing and grant a Superpriority Claim in favor of the Purchaser, the Order should clarify that the Superpriority Claim would not be superior to any claim payable from Restricted Funds. As detailed below, Ambac and other bond insurers have commenced adversary proceedings in which they assert that the portion of *ad valorem* taxes required by state law to be segregated and set aside for the payment of Unlimited Tax and Limited Tax General Obligation Bonds represents restricted funds ("Restricted Funds").

51.     At a minimum, a carve-out should be put in place temporarily pending

resolution of the adversary proceedings.  The adversary proceedings seek a

declaration that state law requires the City to segregate the Restricted Funds and not

use them for any purpose other than payment of the obligations evidenced by the

Unlimited Tax and Limited Tax General Obligation Bonds.  The adversary

proceedings also seek a declaration that the City may not grant a Superpriority Claim

or any other interest under Section 364 as a component of the relief sought in this

Motion, or otherwise, that would impair plaintiffs' interests in the Restricted Funds.

The request for this declaration is necessary because the City's Motion does not

specify the funds from which the Superpriority Claim would be satisfied, and the

Restricted Funds may, therefore, be inadvertently affected by the outcome of the

Motion.[11]

52.     Accordingly, in the event the Motion is granted, Ambac respectfully

requests that the Court carve out the Restricted Funds from the scope of the revenues

that may be used to satisfy the Superpriority Claim, in order to avoid prejudice to the

rights of the plaintiffs in the adversary proceedings until those proceedings are

adjudicated.  To that end, the Order should incorporate the following language:

> Pending the adjudication of Ambac Assurance Corporation v. City of
> Detroit Michigan, et al., Case No. 13-05310, and National Public
> Finance Guarantee Corporation, et al. v. City of Detroit, Michigan, et
> al., Case No. 13-05309, and further Order of this Court, nothing herein

---

[11] The City does not appear to request a lien upon the Restricted Funds.

or in any of the Financing Documents shall grant or be deemed to grant in favor of the Purchaser, the Indenture Trustee, the Bondholders, or any other party, a lien on, interest in, or superpriority claim against (including, without limitation, any Lien or Superpriority Claim) the proceeds of *ad valorem* taxes levied or pledged in connection with, and to secure the repayment of, unlimited tax general obligation bonds and limited tax general obligation bonds.

53.    Absent such clarification and carve-out, Ambac's and other bond insurers' rights, as asserted in the adversary proceedings, may be prejudiced before their timely adjudication.

## Conclusion

54.    For the foregoing reasons, Ambac requests that the Motion be denied.

Respectfully Submitted,

**ARENT FOX LLP**

Dated:  November 27, 2013         By:  /s/ Carol Connor Cohen
                                  CAROL CONNOR COHEN
                                  CAROLINE TURNER ENGLISH
                                  RALPH A. TAYLOR, JR.
                                  LEAH MONTESANO (application for
                                  admission pending)
                                  1717 K Street, NW
                                  Washington, DC  20036-5342
                                  (202) 857-6054
                                  Carol.Cohen@arentfox.com

                                  DAVID L. DUBROW
                                  MARK A. ANGELOV
                                  1675 Broadway
                                  New York, NY 10019
                                  (212) 484-3900

                                  and

**SCHAFER AND WEINER, PLLC**
DANIEL J. WEINER (P32010)
BRENDAN G. BEST (P66370)
40950 Woodward Ave., Ste. 100
Bloomfield Hills, MI  48304
(248) 540-3340
bbest@schaferandweiner.com

*Counsel for Ambac Assurance Corporation*

## CERTIFICATE OF SERVICE

I hereby certify that on this 27th day of November, 2013 the foregoing Objection of Ambac Assurance Corporation to Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing; (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay was filed with the Court's electronic case filing and noticing system and served on all parties registered to received electronic notices in this matter.

/s/ Carol Connor Cohen