UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  Chapter 9
 Case No. 13-53846

City of Detroit, Michigan,

 Debtor.
_____/

**<u>INTERESTED PARTY DAVID SOLE'S OBJECTION TO DEBTOR'S MOTION FOR A FINAL ORDER APPROVING POST-PETITION FINANCING, GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND MODIFYING AUTOMATIC STAY [DOCKET 1520]</u>**

Now comes Interested Party David Sole and for his Objection to Debtor's Motion for a Final Order Approving Post-Petition Financing, Granting Liens and Providing Superpriority Claims Status and Modifying Automatic Stay [Docket 1520], states as follows:

## INTRODUCTION

The Emergency Manager and his attorneys are asking this Court to approve a $350 million loan from Barclays Bank, with the bulk of the loan, $237.9 million or more, earmarked to pay off two banks, Bank of America and UBS, on interest rate swaps for which these banks have already netted $250 million from 2008 – 2012 without providing one service to the community. Under terms of the Barclays loan, 20% of the City of Detroit's income tax revenues, $48 million per year for seven to nine years post-bankruptcy, will be used to pay off Bank of America and UBS, two banks notorious for their subprime mortgage practices which had especially horrific consequences in the City of Detroit, as well for their misdoings in the municipal bond market. The remainder of the loan, while couched as a "Quality of Life" loan aimed at providing services for Detroiters, in fact is a veiled attempt to place a lien on casino tax dollars to pay off the multi-million bill for contractors that Jones Day has brought into Detroit who have profited off the so-

1

called "restructuring" being carried out by the Emergency Manager and his former employer, Jones Day.

Interested Party David Sole respectfully requests this honorable Court to reject this outrageous deal which will leave Detroiters suffering under an onerous debt to the banks for years to come, long after Emergency Manager Orr and his cohorts have returned to their palatial homes outside the City and Governor Snyder has moved on. These issues are further discussed below.

## BARCLAY LOAN DETAILS

1. According to the Emergency Manager's own motion, Docket [1520] paragraph 10, the Barclays loan will be used to pay off $290 million in termination fees to Bank of America and UBS on interest rate swaps entered into with the banks beginning in 2006, at 82 cents of each dollar owed, for a total amount of $237.8 million.

2. The termination fee is calculated by determining the difference between the interest rate paid by the City of Detroit on floating rate Pension Obligation Certificates (.34 margin plus the 3 month Libor rate) and the fixed rate the City of Detroit pays Bank of America and UBS (6.323%) under the Swap agreements, and then projecting that difference over the sixteen years remaining on the Swap term. **Exhibit 1, attached**.

3. Because the three month Libor fell to almost zero beginning in 2008, from 2008 through 2012 (**See Exhibit 2**), the City of Detroit paid UBS and Bank of America $247.5 million in profit on the interest rate swaps. **Exhibit 3, Orr deposition p 314**.

4. In his deposition, Emergency Orr testified that in his June 14, 2013 financial report to creditors he reported that the negative fair value of the interest rate swaps (amount

2

owed to Bank of America and UBS based on a termination at that time) was $343.6 million as of May 31, 2013. **Id. p 315**.

5. In fact, the three month Libor has fallen from .273 in May of 2013 to .242 in November 2103, indicating the negative fair value of the swaps has grown since May 31, and likely would be at least $350 million. (**See Exhibit 2**)

6. 82% of $350 million is $287 million, meaning the amount of the $350 million Barclay loan earmarked to pay off Bank of America and UBS on the swaps would be approximately that amount, leaving only $63 million for so-called "Quality of Life" improvements.

7. Under the terms of the Barclay loan for which the Emergency Manager seeks approval, as soon as the bankruptcy concludes, the City of Detroit will immediately be required to redeem the $350 million Barclays' loan. If the City cannot pay Barclay's the redemption, the City of Detroit will be in default, and the interest rate on the loan will rise to a minimum of 5.5% (**Exhibit 4, attached, loan terms**), and a potential rate of 8.5% (**Exhibit 5, attached, Barclay's commitment letter**).

8. The $237.8 to $287 million of the Barclay loan earmarked for swap termination payments will be payable at $4 million per month or $48 million per year, and guaranteed by a first lien on Detroit's income tax revenues which totaled $232,412, 196 for the year 2013, as well as by the proceeds of any City of Detroit asset sales of $10 million or more. See Emergency Manager Motion, [Docket 1520]. (**See Exhibit 4**) That means that over 20% of Detroit's income tax revenues for the next six to eight years will be earmarked to settle with Barclays for paying off Bank of America and UBS.

3

9. An additional $4 million per month will be deducted from casino tax revenues to pay off the "Quality of Life" loan, payable out of a lien on casino tax dollars.

10. On October 24, 2013, Emergency Manager

11. Orr authorized finance director Hartzell to shift $95 million in appropriations in the General Fund, including appropriations for the police criminal investigation bureau, emergency medical services, firefighting operations, police operations and many other core city functions, to the "general restructuring account." **Exhibit 6, attached**. On information and belief, much of this $95 million taken from appropriations for city services will be used to pay consultants.

12. The "Quality of Life" financing included in the Barclays loan in reality appears to be a method to finance this restructuring cost and payment of consultants, guaranteeing these payments out of casino tax dollars in the guise of providing services to the Detroiters.

13. In addition, $4.375 is allocated pursuant to the Barclays deal as payment of "fees" to Barclays. The Emergency Manager has already paid a good part of these fees even without City Council or Court approval. **Exhibit 5, attached**.

I. **APPROVAL OF THE BARCLAY'S LOAN DOES NOT REPRESENT GOOD BUSINESS JUDGMENT AND IS COMPLETELY ADVERSE TO THE INTEREST OF THE RESIDENTS OF DETROIT**

A. **THE AUTOMATIC STAY PREVENTS THE USE OF POST-PETITION CASINO TAX DOLLARS TO ENFORCE THE SWAP COUNTER-PARTIES "LIEN"**

The Barclays loan is completely adverse to the interest of the residents of Detroit, diverting 20% of income tax dollars to repay Bank of America and UBS on questionable interest rate swaps that were at the minimum terrible deals for the City and are potentially laced with fraud or even criminal misconduct. It does not reflect sound and prudent business judgment on

the part of the City of Detroit, is not reasonable under the circumstances and is not in the best interest of the City of Detroit and its creditors.

First of all, this honorable Court has held up to this point that the Interest Rate Swaps are unsecured debt, as payment of the casino tax dollars to secure the Swaps is subject to the Automatic Bankruptcy Stay. **[Docket 670] Exhibit 7, attached**. While the Court's order was without prejudice to the right of any party to seek relief from the stay under Section 362(d), on information and belief, at this point no party has sought such relief, the automatic stay relative to the payment of post-petition casino tax dollars is still in effect, and thus the Swaps are unsecured debt. In addition, Interested Party David Sole submits that the casino tax revenues used to secure the Swaps do not qualify as special revenues exempt from the stay, as the casino tax dollars by statute are for public purposes, and not earmarked for the payment of debt service. **[See Docket 361, Objection to City of Detroit's Motion for Approval of Forebearance Agreement]**

If the automatic stay is in effect with regard to the Swap counter-parties' lien on casino tax dollars, the Barclays loan is clearly not in the interest of the debtor or the other creditors. Emergency Manager Orr has stated that he is offering unsecured debtors, including retirees who worked their entire lives for the City, 16 cents for every dollar owed. A financial agreement that removes that Swaps from the bankruptcy based on paying them 82 cents for each dollar owed, on a deal laced with potential wrongdoing, is outrageous and simply cannot be justified by any means. The only possible explanation is that Emergency Manager Orr's former employer and the City's current law firm, Jones Day, lists Bank of America as one of its clients. **Exhibit 3, Orr deposition, p 325**.

B.     **THE SWAPS ARE SUBJECT TO EQUITABLE SUBORDINATON OR DISALLOWANCE BASED ON MISCONDUCT BY BANK OF AMERICA AND UBS IN CONNECTION WITH THE INTEREST RATE SWAPS**

In addition, because of the potential that there was fraudulent conduct by Bank of America and UBS in connection with the Swaps, even if they were secured debt, they potentially could be subject to equitable subordination under Section 510(c) or disallowance under Section 502(b)(1). This argument was made more fully in Interested Party David Sole's Objection to the City of Detroit's Motion for Approval of Forbearance Agreement. **[Docket 361].**

In his deposition of August 30, 2013, Emergency Manager Orr testified that he was aware of issues that have been raised in the use of the ISDA Fix to calculate termination fees for interest rate swaps (the method used in the instant case, see Exhibit 1), as well as with the use of the LIBOR by Bank of America and UBS as the index for floating rate bonds. **Exhibit 3, Orr deposition p 321**.

Emergency Manager Orr testified that he was aware there was a final judgment levied against UBS for rigging with regard to municipal bonds. He further testified that he was aware that Bank of America has also been investigated for possible rigging with regard to the municipal bond market. **Id. pp 322, 323**.

Emergency Manager Orr testified that he consulted with his counsel, Jones Day, in light of these investigations, as to whether there may be issues surrounding potential concerns in connection with the City of Detroit Swap Agreement with Bank of America and UBS. Emergency Manager Orr testified that Jones Day represents Bank of America. **Id. pp 324, 325**.

Emergency Manager Orr testified that he was aware of prosecutions related to UBS executives who were involved in the municipal bond market. **Id. p 326**. Emergency Manager Orr testified that under PA 436 he has the authority to make criminal referrals to appropriate prosecutorial authorities, and that there may or may not be investigations related to the matters

described above, namely illegal activity by UBS and Bank of America in connection with municipal bonds.  **Id. pp 326-328**.

Emergency Manager Orr testified that he has not approached the Securities and Exchange Commission to conduct any investigation of the Swaps in light of their extensive investigations of UBS and Bank of America.  **Id. p 331**.

Unfortunately, despite Emergency Manager's Orr admitted awareness of fraud and misconduct by UBS and Bank of America in connection with the municipal bond market, Emergency Manager Orr, rather than conducting an investigation of these banks in connection with the Swap deals that could potentially lead to the amounts owed them being drastically reduced, instead has opted to attempt to remove the Swaps from the bankruptcy.  He is proposing to pay Bank of America and UBS termination fees amounting to 82 cents on the dollar, and to enter into financing that will indenture City of Residents to the tune of having 80% of income tax revenues for the first six to eight years post-bankruptcy turned over to Barclays to cover the payments to UBS and Bank of America.

Orr has also opted to never look into the circumstances that occurred in connection with the City of Detroit being locked into the Swaps.  For example, Sean Werdlow, Chief Financial Officer of the City of Detroit at the time the Swaps were negotiated, received a job with one of the counterparties, SBS (which is backed by Bank of America) shortly after the deal was consummated.  Representatives of Fitch and Standard of Poors were at the City Council table encouraging the City of Detroit to enter into the Swaps**. Exhibit 8, attached (Orr deposition Exhibit 10).**  And Mayor Kilpatrick, who is now serving time in prison for corruption, was given an award by Wall Street for his role in getting the Swaps adopted by the City of Detroit.

7

13-53846-tjt    Doc 1857    Filed 11/27/13    Entered 11/27/13 16:34:30    Page 7 of 11

It should be noted, that after being presented the Barclays Loan Deal for approval, the Detroit City Council passed a resolution rejecting the deal which it filed with the Bankruptcy Court. [Docket 1396] **Exhibit 9, attached**. The City Council also passed a resolution calling on the SEC to investigate wrongdoing by the banks in connection with both sub-prime mortgage lending in the City of Detroit (the hardest hit city in the US by sub-prime predatory mortgage lending by the banks as outlined in Docket 361) and wrongdoing by the banks in connection with issuing municipal bonds and specifically interest rate swaps to the City. **Exhibit 10, attached**.

Attached to this brief are excerpts from the recently issued study issued by Demos, a New York public policy institute (www.demos.org) prepared by Senior Fellow, Wallace C. Turbeville, a former Vice President at Goldman Sachs who worked in their Municipal Bond Department. **Exhibit 11, Turbeville CV**. Mr. Turbeville. The report notes in part that the Swap deals were particularly ill suited for a city of Detroit, and that a strong case can be made that the banks that sold these Swaps may have breached their eithical, and possibly legal, obligations to the city in executing these deals. Mr. Turbeville states: "The emergency manager's plan to pay the swap termination fees outside of the bankruptcy process should be abandoned. The bank counterparties should be made to bear the consequences of the original swap transaction, and they should be pushed to forego their projected profit (the measure of the termination payment) given the large profits they have already earned as a result of the unusually low interest rates that resulted from the financial crash." **Exhibit 12, Demos report, pp 5, 7**.

For all these reasons, the Barclays loan deal should be rejected in so far as it applies to payment of Swap termination fees.

**C.     EVEN IF THIS COURT WAS TO RULE THAT CASINO TAX DOLLARS**
**D.     ARE SPECIAL REVENUES NOT SUBJECT THE AUTOMATIC STAY, PURSUANT TO 928 THE FUNDS MUST BE UTILIZED TO FUND OPERATIONS RATHER THAN PAY DEBT**

11 USCS § 928, Post petition effect of security interest, states:

(a) Notwithstanding section 552(a) of this title [11 USCS § 552(a)] and subject to subsection (b) of this section, special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case.

(b) Any such lien on special revenues, other than municipal betterment assessments, derived from a project or system shall be subject to the necessary operating expenses of such project or system, as the case may be.

First of all, a reading of this section, in conjunction with Section 902 of the bankruptcy code which defines special revenues, lends credence to the argument advanced by Interested Party David Sole in his Response to the City of Detroit's Motion for Approval of Forebearance agreement [**Docket 361**], that the casino tax dollars do not qualify as special revenues since they are not earmarked for a particular project, and especially not for the payment of debt service or Swaps, but rather for general public purposes.

MCL 432.201 et seq., the Michigan Gaming Control and Revenue Act restricts the use of casino tax dollars. Section 12(1) of the Wagering Tax Revenue Statute allows the state to collect an 18% wagering tax from casinos and Section 12(3)(a) allows the state to allocate 55% thereof to the city in which the casino is located for use in connection with the following:

> (i) The hiring, training, and deployment of street patrol officers.
> (ii) Neighborhood and downtown economic development programs designed to create local jobs.
> (iii) Public safety programs such as emergency medical services, fire department programs, and street lighting.
> (iv) Anti-gang and youth development programs.
> (v) Other programs that are designed to contribute to the improvement of the quality of life in the city.
> (vi) Relief to the taxpayers of the city from 1 or more taxes or fees imposed by the city.
> (vii) The costs of capital improvements.
> (viii) Road repairs and improvements.

Before casino tax dollars can be applied to pay off a lien on interest rate swaps, pursuant to Section 928(b), they must be applied for the operation of the system or projects for which they are intended. They must be applied to: the hiring, training, and deployment of street patrol officers; neighborhood and downtown economic development programs designed to create local jobs; public safety programs such as emergency medical services, fire department programs, and street lighting, anti-gang and youth development programs, other programs that are designed to contribute to the improvement of the quality of life in the city; relief to the taxpayers of the city from 1 or more taxes or fees imposed by the city; the costs of capital improvements; and road repairs and improvements.

It is only after all uses of the casino tax dollars for these projects are exhausted, that they can be used to pay off the Swap liens. Since the basis for bankruptcy in the City of Detroit is the lack of funds to supply these necessary services, and the Emergency Manager is even proposing a special loan to fund these services, he could not argue that there are excess funds following the supplying of these services that are mandated by the Michigan Gaming Statute.

Therefore, the Swaps must be treated as unsecured loans, subject to a much lower payment than the 85 cents on the dollar which the Emergency Manager aims to fund with a 20 lien of income tax revenues over the first 6-8 years post-bankruptcy. This is another basis for rejecting the Barclay's loan deal.

III. **THE "QUALITY OF LIFE" COMPONENT OF THE BARCLAYS' LOAN IS A VEILED ATTEMPT TO ILLEGALLY UTILIZE CASINO TAX DOLLARS TO PAY RESTRUCTURING COSTS AND ESPECIALLY CONSULTANTS**

On October 24, 2013, Emergency Orr authorized finance director Hartzell to shift $95 million in appropriations in the General Fund, including appropriations for the police criminal investigation bureau, emergency medical services, firefighting operations, police operations and

many other core city functions, to the "general restructuring account."  **Exhibit 6, attached**.  On information and belief, much of this $95 million taken from appropriations for city services will be used to pay consultants.

The "Quality of Life" financing included in the Barclays loan in reality appears to be a method to finance this restructuring cost and payment of consultants, guaranteeing these payments out of casino tax dollars in the guise of providing services to the Detroiters.  Basically, casino tax revenues are not to be used to provide new services to Detroiters, but rather, to replenish funds that were grabbed to pay consultants.

As outlined above, nothing in the Casino Tax Act provides for the use of the funds for the payment of "restructuring costs" earmarked for the payment of consultant fees in bankruptcy.

WHEREFORE:  Interested Party David Sole respectfully requests that the City of Detroit's Motion for a Final Order Approving Post-Petition Financing, Granting Liens and Providing Superpriority Claims Status and Modifying Automatic Stay [Docket 1520]be denied.

>Respectfully submitted,
>
>JEROME D. GOLDBERG, PLLC
>
>By:  */s/ Jerome D. Goldberg*
>Jerome D. Goldberg (P61678)
>Attorney for David Sole, Party in Interest
>2921 East Jefferson, Suite 205
>Phone: 313-393-6001
>Fax: 313-393-6007
>Email: apclawyer@sbcglobal.net

DATED:  November 27, 2013