# EXHIBIT 3

1 entered into, correct?
2    **MR. JURGENS:** Objection to form.
3    **MR. SHUMAKER:** Objection, form.
4 **A.** Here again, as I've said a couple of times today, I'm
5 going to stay away from legal conclusions as to
6 whether or not a lien would or would not have existed.
7 There are equitable liens that arise ex contractu
8 outside of law. There are other issues, but suffice
9 it to say this agreement seemed to impose a lien as a
10 matter of the agreement on the casino revenue.
11    **BY MS. GREEN:**
12 **Q.** Okay. You're not claiming any equitable lien?
13    **MR. JURGENS:** Objection.
14 **A.** We're not claiming a lien. We've done an analysis,
15 and there have been several memos that have gone back
16 and forth from counsel analyzing a number of different
17 issues at law and at equity. We -- there's -- me,
18 personally, under our agreement, there's no -- been no
19 assertion of an equitable lien.
20    **MS. GREEN:** I have nothing further then.
21    **THE WITNESS:** Sure.
22    Do you need -- you need this, don't you?
23 Is this -- did you -- excuse me. Did you mark this?
24    **MS. GREEN:** We can mark it as an exhibit.
25 I don't know that anyone has marked it yet. We can

1 mark it as Exhibit 7.
2    **MARKED FOR IDENTIFICATION:**
3    DEPOSITION EXHIBIT 7
4    3:20 p.m.
5    (Discussion off the record at 3:20 p.m.)
6    (Back on the record at 3:20 p.m.)
7    **MS. GREEN:** I thought maybe it was earlier
8 and I just didn't know.
9    **THE WITNESS:** No, I don't think it was.
10    **MS. GREEN:** It's hard to hear down there.
11    **THE WITNESS:** We talked about the
12 collateral agreement.
13    **MS. GREEN:** We did. Okay.
14    **VIDEO TECHNICIAN:** Do we need to go off the
15 record for the second or are we staying on? Are you
16 asking questions?
17    **MS. GREEN:** Oh, were we on?
18    **THE WITNESS:** We can shut up.
19    **MR. SHUMAKER:** Why don't we go off for one
20 minute to get ourselves together.
21    **VIDEO TECHNICIAN:** All right. Thank you.
22    The time is 3:20 p.m. We are off the
23 record.
24    (Recess taken at 3:20 p.m.)
25    (Whereupon Lally Gartel and Stephen Hackney

1 left the deposition at 3:21 p.m.)
2    (Back on the record at 3:22 p.m.)
3    **VIDEO TECHNICIAN:** We are back on the
4 record at 3:22 p.m.
5    **EXAMINATION**
6    **BY MR. GOLDBERG:**
7 **Q.** How are you doing, Mr. Orr?
8 **A.** Hello, Mr. Goldberg. How are you?
9 **Q.** We met before. I'm Jerome Goldberg. I represent
10 David Sole, who's an interested party, he's a retiree,
11 along with his wife, who's also a retiree.
12    **MR. GOLDBERG:** First of all, I want to just
13 go on the record and thank Kirkland & Ellis and the
14 other attorneys for their patience and their working
15 with other attorneys in this case, and especially
16 someone like me who represents a very different point
17 of view and that they were objective and fair their --
18 in accommodating all the objectives here.
19    **BY MR. GOLDBERG:**
20 **Q.** Let me begin by asking just a few questions just so we
21 can put some of this into perspective. I want to call
22 your attention to Exhibit 3.
23 **A.** Yes. Okay.
24 **Q.** On page 34 of Exhibit 3, there's a chart here that
25 references expenditures from the years 2008 to 2012?

1 **A.** Yes.
2 **Q.** And it indicates -- first of all, I just had a
3 question. Under the POCs, t has POC Swap GF, I
4 assume that means general fund?
5    **MR. SHUMAKER:** Counsel, I think you may be
6 pointing to a different page than the witness has in
7 front of him.
8    **BY MR. GOLDBERG:**
9 **Q.** It's page 34 in mine. Which one did I give you? I'm
10 talking about the June 14th, 2013.
11    **MR. SHUMAKER:** Yeah, there's an executive
12 summary and then there's a bigger one. Are you
13 looking at the bigger one?
14    **MR. GOLDBERG:** I have copies of what I'm
15 looking at.
16 **A.** These are the executive summaries.
17    **MR. GOLDBERG:** Why don't I mark these and
18 that will make it easier.
19    **THE WITNESS:** And the larger one is this
20 one.
21    **MR. SHUMAKER:** The larger one is Orr
22 Number 6. Take a look at that.
23    **MR. GOLDBERG:** Sure. Yeah, this is the one
24 I'm looking at.
25    **THE WITNESS:** That's the one, the larger

1 one.
2 BY MR. GOLDBERG:
3 Q. Okay. So Exhibit Number 6.
4 A. Okay. Mr. Goldberg, which page were you at?
5 Q. Page 34.
6 A. Of the original document?
7 Q. Yes.
8 A. Okay.
9 Q. Here we go, that chart, 34. And it's a chart that
10 says study that -- lists for fiscal years ended actual
11 expenditures for 2008 to 2012; is that correct?
12 A. Yes.
13 Q. I just want to be clear. It has under POC Swaps GF.
14 That means general fund?
15 A. Yes.
16 Q. EF, is that enterprise fund?
17 A. Enterprise fund excluding department of
18 transportation.
19 Q. And I'm trying to understand, does that mean that part
20 of the POC Swaps are paid -- a small part is paid from
21 the enterprise fund?
22 A. Yes. You'll see the corresponding numbers show for
23 those categories.
24 Q. Okay. And I totaled up the years from 2008, 2012. It
25 appears that $247.5 million was paid on for the POC

Page 314

1 Swaps during those years.
2 A. I don't have that total in front of me, but I'm going
3 to take it that that's the accurate number.
4 Q. It appears that it's usually about between 45 to 50
5 million a year.
6 A. Right, if you average 5, 10, 15, 20.
7 Q. Just so we're clear, I mean, that 247 million, none of
8 that went to turn on any lights in the City of
9 Detroit, did it?
10 MR. SHUMAKER: Object to the form.
11 A. It was legacy expenditures, debt service.
12 BY MR. GOLDBERG:
13 Q. It basically went to UBS and to Bank of America. It
14 was their reward for betting correctly on a hedge bet,
15 right?
16 MR. JURGENS: Objection to form.
17 MR. SHUMAKER: Objection to form.
18 A. Yeah, I'm going to stay away from characterizing it as
19 a reward. There were payments made pursuant to
20 existing certificates of participation at that time.
21 BY MR. GOLDBERG:
22 Q. And it was based on, as we talked about before, that
23 the difference between the interest rate on the
24 floating rate Swaps -- on the floating rate COPs and
25 the fixed rate that the -- that the City was obligated

Page 315

1 to pay the Swap counterparties, correct?
2 A. Yes --
3 MR. SHUMAKER: Objection to form.
4 A. -- as we discussed earlier today.
5 BY MR. GOLDBERG:
6 Q. Just so I'm clear, the -- what we're talking about
7 with the optional termination event. The exhibit --
8 the same exhibit you're referencing -- let's just get
9 this -- I want to call your attention to page 28.
10 A. Of the same exhibit?
11 Q. Same exhibit.
12 A. Okay.
13 Q. Am I correct in the -- that that reflects that as of
14 May 31, 2013, according to your proposal for
15 creditors, the negative fair value of the Swaps was
16 $343.6 million?
17 A. That's what it says. Recent valuations established
18 the negative fair value --
19 COURT REPORTER: I'm sorry. You're reading
20 way too fast.
21 THE WITNESS: I'm sorry.
22 A. Recent valuations established. The negative fair
23 value of the Swaps at approximately 343.6 million as
24 of May 31st.
25 BY MR. GOLDBERG:

Page 316

1 Q. So in the optional termination policy that's part of
2 the forbearance agreement, f the City was to pay the
3 initial payment, the City would still owe 264 -- we'd
4 be paying 264 million approximately on the Swaps?
5 MR. SHUMAKER: Objection to form.
6 BY MR. GOLDBERG:
7 Q. We'd be paying 75 percent of whatever the termination
8 amount is at that point?
9 A. Well, it's 75 percent of termination amount at that
10 point, which I believe has since declined from
11 May 31st.
12 Q. Why do you say it's declined?
13 A. Because interest rates have shifted, and so at any
14 given time we'd have to value the interest rate
15 formula at the time you choose to exercise the
16 optional termination provision of the forbearance
17 agreement.
18 Q. The interest rate that we're talking about on the Swap
19 is linked to the LIBOR; isn't that correct?
20 A. Yes.
21 Q. The three-month LIBOR?
22 A. Yes. I believe so.
23 Q. I pulled the three-month LIBOR historical index. It
24 indicated that as of -- might as well as mark this as
25 an exhibit.

1     MR. GOLDBERG: Can you mark this as an
2  exhibit?
3     **MARKED FOR IDENTIFICATION:**
4     **DEPOSITION EXHIBIT 8**
5     **3:29 p.m.**
6  BY MR. GOLDBERG:
7  Q.  It appears that as of August of 2013, the three-month
8  LIBOR rate was .2655 percent?
9     MR. SHUMAKER: Objection, foundation.
10 A.  Is there -- if you're talking about --
11 BY MR. GOLDBERG:
12 Q.  Under 2013.
13 A.  2013, a specific category in August which reads
14 **0.26550.**
15 Q.  Right. So it's actually gone down since July of 2013
16 according to this chart.
17 A.  Yes. Did I say up before?
18 Q.  You had indicated that the interest rates -- right,
19 that the -- I mean, if it goes down, the City owes
20 more; isn't that correct?
21 A.  Right.
22 Q.  Just so we're clear again, that 200 -- whatever --
23 whether the figure is 247 million or 200 million, the
24 optional termination payment is not going to be -- the
25 City gets no direct benefit from that payment?

1     MR. JURGENS: Objection.
2     MR. SHUMAKER: Objection to form.
3  A.  Well --
4  BY MR. HACKNEY:
5  Q.  Let me be -- strike that question.
6     No lights get turned on from that money.
7  That's money that comes out of the City budget.
8     MR. SHUMAKER: Same objection.
9  A.  Well, it's money -- yeah, I would say that it's money
10 that the City is obligated to pay in some fashion, but
11 to the extent we get a discount, the City benefits.
12 BY MR. GOLDBERG:
13 Q.  I heard before the testimony, and I think it's pretty
14 obvious, that the City does not have the money on hand
15 to pay that termination amount, correct?
16    MR. JURGENS: Objection to form.
17 A.  Yes, I'm told that is correct.
18 BY MR. GOLDBERG:
19 Q.  And to do so it's going to have to float another bond
20 or some kind of loan?
21 A.  Well, it would have to in some fashion derive some
22 funding from the capital markets, yes.
23 Q.  Okay. I read something, and I heard the same figures
24 floated here. I read an article in the Detroit News
25 and I heard the same -- I wasn't able to come

1  yesterday due to an illness of my wife, but --
2  A.  Oh, I'm sorry.
3  Q.  -- they were talking about a $350 million bond of some
4  kind that is being looked into being floated, correct?
5  A.  Here again, I want to be careful. It's unclear
6  whether or not it is a bond.
7  Q.  Okay.
8  A.  What is clear is there's some post petition financing
9  proposal which are quite sensitive, but that number is
10 not an unreasonable number and it has been mentioned
11 about in the press.
12 Q.  And is it reasonable to say that that 2 -- 350 million
13 is not going to come free to the City?
14 A.  No. The City will have to finance it in some fashion.
15 Q.  I mean, I did a little research myself and looked up a
16 bond in Ann Arbor that was recently financed for
17 340 million at 4 percent which is, I would think we
18 both agree, was a good interest rate --
19 A.  Um-hm.
20 Q.  -- and the -- Ann Arbor would be paying 230 million in
21 interest on that bond over a 25-year period.
22 A.  Here again, Mr. Goldberg, I want to be very careful.
23 Without representing or agreeing that the post
24 petition financing that's being discussed will take
25 the characteristic of a bond.

1  Q.  No problem. But either way, we are in agreement that
2  that financing -- we don't have -- the City does not
3  have a source for -- it doesn't have a relationship
4  with the Fed that the banks have where it gets a zero
5  qualitative easing and zero percent loans, does it?
6  A.  The City does not -- is not a qualified financial
7  institution to go to the Fed discount window nor does
8  it have an extra several hundred million dollars in
9  its funds.
10 Q.  Let me ask another question. I want to call your
11 attention to the forbearance agreement.
12 A.  Yes.
13 Q.  Which exhibit is that?
14 A.  That's Exhibit 2.
15 Q.  Let me call your attention to page 14.
16 A.  Yes.
17 Q.  And it indicates under mid-market amount --
18 A.  Yes.
19 Q.  -- am I reading it correctly to say that the -- when
20 the optional termination goes into effect, assuming it
21 goes into effect, that the calculation on what's owed
22 on the Swap that's the basis for the termination is
23 based on the ISDA fix 3?
24    MR. SHUMAKER: Objection to form. The
25 document speaks for itself.

BY MR. GOLDBERG:

Q. Okay.

A. Yeah, here again, the document speaks to itself and it says methodology that is agreed to by the City and based upon the present value as it speaks to the rest of the document, yes.

Q. Have you looked into the fact that there's a lot of literature out now that's exposing a pretty large scandal with reg -- regard to the ISDA fix that involves and implicates both Bank of America and UBS?

MR. JURGENS: Object to form.

A. Without characterizing the nature of the literature, I think it's safe to say that I am aware of some issues that have been discussed regarding ISDA, fixed.

BY MR. GOLDBERG:

Q. Are you aware also of issues that have come out with regard to the LIBOR, specifically with regard to UBS and Bank of America in the setting of using the LIBOR as a standard?

MR. JURGENS: Objection to form.

A. I am aware that in the past years there have been some questions raised regarding the LIBOR for certain financial institutions, yes.

BY MR. GOLDBERG:

Q. Has that affected your analysis of how to deal with

Page 322

the Swap counterparties in terms of the -- the forbearance agreement?

A. No.

Q. The fact that it's potential fraud was involved in the setting of these --

MR. JURGENS: Objection to form.

MR. SHUMAKER: Objection to form.

A. Mr. Goldberg, I'm going to defer from accepting the characterization of potential fraud. It is -- it is as reported.

BY MR. GOLDBERG:

Q. Okay. That's fine.

Are you also aware that the -- that UBS was -- let me find that.

Are you aware that UBS has been sued by the Securities and Exchange Commission for rigging in regard to municipal bonds?

A. In past years?

Q. That there was a final judgment -- yes, in past years.

A. Yes.

Q. Are you aware of the final judgment that was -- there was a final judgment on a case that was filed on -- it's 112539 -- that -- and that one of the bonds that actually was involved in that case was the Detroit water and sewage bond case?

A. I had heard that. I have not read the final judgment.

Q. Well, I'd be glad to pass you down a copy.

MR. GOLDBERG: Why don't we mark this.

MARKED FOR IDENTIFICATION:

DEPOSITION EXHIBIT 9

3:36 p.m.

BY MR. GOLDBERG:

Q. Are you aware that Bank of America has been investigated for potential rigging with regard to the municipal bond market?

MR. JURGENS: Objection to form.

A. I am aware that Bank of America has been investigated. The exact specifics of the investigation I am not aware of.

BY MR. GOLDBERG:

Q. In light of these investigations that deal with rigging of the municipal bond market, was that taken into consideration by the City in how to approach the question of this forbearance agreement and potential action on these Swaps?

A. Perhaps you could be more specific in what way you're asking whether that was taken into consideration.

Q. I mean, there, in fact, was fraud -- based on the fact there, at least an indication of fraudulent activity by both Bank of America and UBS within the

Page 324

municipal bond market. Has there been any investigation as to whether or not that was the case with -- with regard to the Swaps associated with the POCs?

MR. JURGENS: Objection to form.

MR. SHUMAKER: Objection to form, foundation.

A. Yeah, first, it's not clear that there was fraud with respect to POCs. I think your prior question concerning Bank of America concerned bonds at DWSD that as my understanding are not implicated by this process, meaning the forbearance agreement, but have we calculated and analyzed the possibility that there may be issues surrounding potential concerns in connection with the Swap agreement, the answer is yes.

BY MR. GOLDBERG:

Q. And who was -- who were those discussions with in terms of whether or not to pursue that?

A. I would have had discussions with my counsel.

Q. When you say your counsel, who do you mean?

A. My attorneys.

Q. Jones Day, is that --

A. Well, Jones Day. We also have local counsel that's involved that's sitting here, Pepper Hamilton, and others.

1  Q.  I mean, isn't Jones Day -- doesn't Jones Day represent
2  this Bank of America as one of its clients on its Web
3  site?
4  A.  Yes, Jones Day does represent Bank of America.
5  Q.  How could Jones Day investigate one of its own clients
6  for potential fraud?
7      MR. SHUMAKER: Objection, form.
8      MR. JURGENS: Objection, form.
9  A.  I am today, Mr. Goldberg, a client of Jones Day. The
10  specific practices of Jones Day regarding its
11  investigations, I would suggest that you refer to
12  them.
13      BY MR. GOLDBERG:
14  Q.  Okay. I'm just saying you utilize them --
15  A.  Yes, I do.
16  Q.  -- for their -- for their advice on whether or not to
17  conduct such an investigation. I'm trying to ask you
18  as your -- in your independent position as emergency
19  manager, wouldn't you think that a law firm that
20  represents the precise person you're asking to
21  investigate for fraud could not give you an
22  objective appraisal?
23  A.  No.
24      MR. JURGENS: Objection to form.
25      MR. SHUMAKER: Objection to form.

1  A.  No. In my experience, having worked now at three
2  different law firms, I have seen situations where law
3  firms are fully capable of investigating clients, yes.
4      BY MR. GOLDBERG:
5  Q.  Are you aware that three executives of UBS were in --
6  recently jailed that -- who were involved in municipal
7  bond division were recently jailed?
8  A.  I'm aware that there were prosecutions related to UBS.
9  I wasn't aware of the exact number or who they are.
10  Q.  Okay. I do have -- now, I'm not privy to much on that
11  either, but I do have articles that do cite that.
12  A.  Okay.
13  Q.  And they cited three people who were just convicted in
14  July of this year.
15  A.  Okay.
16  Q.  Are you aware that Bank of -- an executive of Bank of
17  America in its municipal bond division was indicted in
18  2012?
19  A.  I don't recall if I was aware of that.
20  Q.  Okay. Let me just ask under -- pursuant to the Public
21  Act 436 section 13 -- section 16, aren't you mandated
22  to conduct a criminal investigation, or at least to
23  refer potential suspicion of criminal investigation to
24  the Attorney General in connection with -- if there's
25  any kind of criminal activity associated with the

1  financial crisis in Detroit?
2  A.  Yes. To be clear, under 436 I have no independent
3  prosecutorial authority, but I do have the authority
4  to make criminal referrals to appropriate
5  prosecutorial authorities.
6  Q.  In light of the cost to the City of the Swaps and the
7  continuing costs, which we al acknowledge will be
8  substantial even in light of the forbearance
9  agreement, have you made any referral to at least do
10  a -- conduct an investigation based on the evidence
11  that, that -- I'm not accusing them of criminal
12  activity in these activities. I have no basis for
13  doing that, but on the other hand that fact that
14  their -- some of their top executives in this area
15  have been convicted would at least lead me to wan: to
16  take a look at that in light of Detroit's situation.
17      MR. JURGENS: Objection to form.
18      MR. SHUMAKER: Objection, form.
19  A.  Yeah, it is a run-on question, Mr. Goldberg, but let
20  me say this. We are -- we have an -- analyzed to the
21  degree and looked at everything significantly related
22  to this transaction. Any --
23      BY MR. GOLDBERG:
24  Q.  Have or have not? I'm sorry.
25  A.  We have. We have.

1  Q.  Okay.
2  A.  If there appears to be a basis for making a criminal
3  referral of any kind related to anything that falls
4  under my purview of 436, I will do that.
5  Q.  But at this point nothing -- there hasn't even been a
6  request for such an investigation?
7  A.  I would be careful about -- I -- I have asked -- there
8  are matters that are under investigation that may or
9  may not implicate the subject matters you're talking
10  about. I'm going to defer to speak about them
11  further.
12  Q.  Okay. Are you familiar with the circumstances that
13  led to the 2005 Swap?
14  A.  I'm familiar with what I've read. I wasn't here in
15  the City at the time.
16  Q.  Do you know why Moody's -- not Moody's -- Fitch and
17  Standard & Poor's would have been at the table along
18  with UBS when this -- when this was discussed?
19  A.  First, I don't know that they were at the table and,
20  secondly, if they were, I do not know why they would
21  have been.
22  Q.  Well, I do have a photograph of them at the table
23  which I'd be glad to share with you --
24  A.  Okay.
25  Q.  -- from the Michigan Citizen. It was taken at that

1 time. Let me see if I can find that.
2    MR. GOLDBERG: Here. I can mark this.
3    MARKED FOR IDENTIFICATION:
4    DEPOSITION EXHIBIT 10
5    3:43 p.m.
6    BY MR. GOLDBERG:
7 Q.  This is a photograph taken by the -- it was in the
8 Michigan Citizen July 31st, 2005, it reflects a
9 picture of Sha -- Sean Werdlow, Stephen Murphy of
10 Standard & Poor -- Poor's, Joe Keefe -- Joe O'Keefe of
11 Fitch, the Deputy Mayor, Anthony Adams, and the -- and
12 the -- and -- and the representative of SBS at the
13 table.
14    MR. SHUMAKER: Is there a question?
15    BY MR. GOLDBERG:
16 Q.  Sure. I was asking why would Moody -- why would
17 Standard & Poor and Fitch be at the table?
18    MR. SHUMAKER: Objection, foundation, form,
19 document speaks for itself.
20 A.  Yeah, Mr. Goldberg, this purports to be a document
21 showing some of these members at counsel table. I
22 have no idea -- I wasn't here, and I have no idea what
23 the discussions were and whether or not it's
24 accurately represented to be something related to
25 this. This document speaks for itself.

1    MR. SHUMAKER: Object to form, foundation.
2 A.  I wasn't here in the City at the time. I have no
3 idea.
4    BY MR. GOLDBERG:
5 Q.  Okay. That's fine.
6    Have you approached the Securities and
7 Exchange Commission to conduct any kind of
8 investigation of the Swaps in light of their extensive
9 investigations of UBS and Bank of America?
10    MR. JURGENS: Objection to form.
11 A.  Yeah, here again, any -- your question is have I? I
12 think I can answer your question. I think the answer
13 is no.
14    BY MR. GOLDBERG:
15 Q.  Okay. And you haven't approached them to intervene in
16 the bankruptcy which they have a right to do as we
17 both know under the bankruptcy code?
18 A.  I would hazard a guess that the Security and Exchange
19 Commission is aware of Detroit's bankruptcy.
20 Q.  But you have not approached them to aid you in doing a
21 proper investigation of the Swaps?
22 A.  No. I -- I think they're fully capable of determining
23 what they should do within their mission.
24 Q.  Have you looked into the mortgage practices of Bank of
25 America that -- in light of the financial crisis of

1    BY MR. GOLDBERG:
2 Q.  So you haven't done really any substantive
3 investigation on what the circumstances were that --
4 that why -- that put the City into the pension
5 obligations with certificates and Swap --
6    MR. SHUMAKER: Objection to form.
7    BY MR. GOLDBERG:
8 Q.  -- when they first were initiated in 2005?
9 A.  Yeah, all I can say is this -- this picture appears to
10 be what it purports to be and speaks for itself. I
11 don't know if it's accurate or not.
12 Q.  Let me just ask one quick -- that I was kind of
13 curious about, personally. It appears that there
14 was -- the first COP and Swap was in 2005. Then they
15 were terminated and a new one -- new COPs and Swaps
16 were placed in 2006. Is that your understanding?
17 A.  I don't know if that's my understanding. I know there
18 were -- there were two series that went on. I'm going
19 to be careful with the question of replacing them, but
20 let's go with your question.
21 Q.  Okay. I guess my curiosity is why the banks would pay
22 a termination fee of 2.7 million, according to those
23 documents, to the City to then have them
24 renegotiate -- replaced?
25 A.  Mr. Goldberg --

1 Detroit?
2    MR. JURGENS: Objection to form.
3    MR. SHUMAKER: Objection to form.
4    MR. ESSAD: Objection to relevance.
5 A.  I don't think my duties under 436 would specify to
6 look into the mortgage crisis, so the answer is no.
7    BY MR. GOLDBERG:
8 Q.  But you would agree with me that the mortgage crisis
9 and the subprime lending crisis is a major contributor
10 to Detroit's financial crisis, would you not?
11    MR. SHUMAKER: Object on to form,
12 foundation.
13 A.  Mr. Goldberg, I don't know if it was or wasn't.
14    BY MR. GOLDBERG:
15 Q.  You don't know if it was or it wasn't?
16 A.  No. I've -- I've heard reports that there was
17 disproportionate mortgage foreclosures and so on and
18 so forth, but I've made no conclusion as to whether or
19 not that was a major contributor to Detroit's
20 financial crisis.
21 Q.  I've got you. Well, let me -- let me run this --
22    (Whereupon Vincent Marriott and Matthew
23    Summers left the Deposition at 3:47 p.m.)
24    MS. ENGLISH: Can we go off the record for
25 one second, please?

1    **VIDEO TECHNICIAN:** We are off the record.
2  The time is 3:47.
3    (Recess taken at 3:47 p.m.)
4    (Back on the record at 3:48 p.m.)
5    **VIDEO TECHNICIAN:** Back on the record at
6  3:48 p.m.
7    **BY MR. GOLDBERG:**
8  Q.  I'm sorry, I didn't bring that report with me.
9    So your public -- your statement to me is
10  you're not clear whether the subprime mortgage crisis
11  in Detroit was a factor in Detroit's financial crisis?
12  A.  No. My statement --
13    **MR. SHUMAKER:** Objection to form.
14  A.  **My statement to you -- I believe your question was,**
15    **was it a major factor, and I said I understand there**
16    **have been reports, allegations, and stories that there**
17    **was disproportionate mortgage foreclosure in the City**
18    **of Detroit. I don't know if that was a major factor**
19    **in its financial crisis.**
20    **BY MR. GOLDBERG:**
21  Q.  And you haven't looked into that issue independently?
22  A.  No, I've not looked into it independently.
23  Q.  Even though the banks -- the same banks that are
24    claiming all these Swaps were directly involved in the
25    subprime mortgage crisis?

1    **MR. JURGENS:** Objection to form.
2  A.  **Here again, your characterization was directly**
3    **involved. My mission in this forbearance agreement is**
4    **look at whether or not this is in the best interest of**
5    **the City at the time.**
6    **BY MR. GOLDBERG:**
7  Q.  Sure.
8  A.  **It seems to be as you and I have discussed before,**
9    **several times now, that you have expressed concerns**
10    **about a broader issue regarding banks involvement with**
11    **the mortgage foreclosure crisis in the City of**
12    **Detroit. In my opinion, that's not directly related**
13    **to the issue that we have at hand in the forbearance**
14    **agreement.**
15  Q.  Let me just ask you one other question. We've been
16    talking about alternative sources of financing.
17    You're familiar with the last CAFR?
18  A.  Yes.
19  Q.  Are you familiar with the -- what the 82 million in
20    chargebacks means in this CAFR that the City is
21    paying?
22  A.  Yes, I think I have some understanding.
23  Q.  What is your understanding of it, sir?
24  A.  That there's a certain obligation on the City to pay
25    some money out based upon an analysis of either

1    overcharges or obligations that it has to other --
2  other organizations and entities.
3  Q.  Are you aware that chargebacks specifically deal with
4    chargebacks to the County that the County buys -- pays
5    the City for foreclosed tax -- foreclosed properties,
6    then sells them, and the City s responsible for the
7    difference between what they're sold for and what
8    the -- what originally was paid to the City?
9  A.  Yes, as I said --
10    **MR. SHUMAKER:** Objection, form, foundation.
11  A.  **As I said, it's a process by which the City has**
12    **obligations to other organizations and entities.**
13    **BY MR. GOLDBERG:**
14  Q.  Are you aware that the state has hundreds of -- at
15    least 200 million dollars available in the Hardest --
16    Helping Hardest Hit funds that could be used to pay
17    off delinquent property taxes?
18  A.  **I've heard that representation before in terms of the**
19    **Hardest Hit funds. What I am aware of is that the**
20    **City is entitled to get 52 million dollars of the**
21    **late -- latest one hundred million dollar transfer of**
22    **the Hardest Hit funds for blight remediation.**
23  Q.  That's true. Which affects -- affects your general
24    proposal in terms of the cost of blight, correct?
25  A.  **Well, it helps us in terms of getting at the cost of**

1    **blight as quickly as possible.**
2  Q.  But my question was a little different on that.
3  A.  Um-hm.
4  Q.  Have you intervened with Governor Snyder who you --
5    who you're -- your appointor --
6  A.  Right.
7  Q.  -- to secure the release of these Hardest Hit funds to
8    pay off property taxes which would both stabilize
9    communities to keep people n their homes and
10    stabilize the City budget by avoiding the need to pay
11    80 million in chargebacks?
12    **MR. SHUMAKER:** Objection, foundation.
13  A.  **It is not -- it is not -- it has been made clear to me**
14    **that it is not clear to me that, one, we'd have access**
15    **to those funds and that those funds can be**
16    **appropriately used for that purpose.**
17    **BY MR. GOLDBERG:**
18  Q.  It's not?
19  A.  **It's -- it's not clear. That's --**
20  Q.  Well, I'll send you some literature on that so you can
21    clarify that.
22  A.  Okay.
23    **MR. GOLDBERG:** Okay. Okay. Thank you very
24  much.
25    **THE WITNESS:** Thank you very much.

1    **VIDEO TECHNICIAN:** All set?
2    **THE WITNESS:** All done? Okay. Thank you
3    very much.
4        **VIDEO TECHNICIAN:** This concludes today's
5    deposition. The time is 3:52 p.m. We are off the
6    record.
7        (The deposition was concluded at 3:52 p.m.
8        Signature of the witness was not requested by
9        counsel for the respective parties hereto.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 338

1                    CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN )
3                            ) SS
4    COUNTY OF OAKLAND)
5
6            I, CYNTHIA C. MENDENHALL, certify that this
7        deposition was taken before me on the date
8        hereinbefore set forth; that the foregoing questions
9        and answers were recorded by me stenographically and
10       reduced to computer transcription; that this is a
11       true, full and correct transcript of my stenographic
12       notes so taken; and that I am not related to, nor of
13       counsel to, either party nor interested in the event
14       of this cause.
15
16
17
18
19
20       _Cynthia C. Mendenhall_
21
22           CYNTHIA C. MENDENHALL, CSR 5220
23               Notary Public,
24               Oakland County, Michigan.
25       My Commission expires:  April 5, 2017

13-53846-tjt    Doc 1857-3    Filed 11/27/13    Entered 11/27/13 16:34:30    Page 9 of 21

# EXHIBIT 4

*Set forth below is a summary of certain key terms for the Quality of Life Note (as defined below). This summary of indicative terms and conditions (this "Term Sheet") does not purport to summarize all terms of the Quality of Life Note and related documentation.*

## 1. PARTIES AND TRANSACTIONS

Issuer:

The City of Detroit (the "City"). On July 18, 2013 (the "Petition Date"), the City filed a voluntary petition for relief under chapter 9 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), in the U.S. Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"). The City's bankruptcy case bears case number 13-53846 (the "Bankruptcy Case") and has been assigned to the Honorable Steven W. Rhodes. The order for relief has not yet been entered; objections are pending.

Purchaser and Sole
Lead Arranger:

Barclays Capital Inc.

Note Agent:

Barclays Capital Inc.

## 2. TYPE AND AMOUNT OF FACILITY

Type and Amount:

A Note Purchase Agreement governing the one-time purchase of a security structured as a senior secured superpriority Chapter 9 debtor financing under section 364(c) of the Bankruptcy Code (the "Quality of Life Note" or the "Note" and, together with (i) the Swap Termination Note or (ii) the Replacement Swap Transaction, as applicable (as selected by the City), the "Post-Petition Facility") in an aggregate principal amount of up to $350,000,000, minus the amount of the Swap Termination Note (as defined in the Swap Termination Note Term Sheet) or the Upfront Amount in respect of the Replacement Swap Transaction (each as defined in the Replacement Swap Transaction Term Sheet), as applicable (the "Facility Amount").

Purposes:

Proceeds from the issuance of the Quality of Life Note shall be used for purposes permitted by law, agreed upon between the City and the Purchaser in the QOL Note Documents and approved by the Bankruptcy Court, including, without limitation, to fund expenditures that are designed to contribute to the improvement of the quality of life in the City.

| | |
|---|---|
| Maturity: | The Note will mature on the earliest to occur of (a) dismissal of the Bankruptcy Case, (b) the effective date of a plan of adjustment for the City, (c) the date on which maturity of the Note is accelerated pursuant to the QOL Note Documents and (d) the date that is two years and six months after the Closing Date (hereinafter defined) (in any event, the "Maturity Date"). |
| Tax-exemption of Interest: | To be determined. |
| Closing Date: | The Closing Date shall be not later than the second business day after the last to occur of (i) the Bankruptcy Court having entered an order in form and substance satisfactory to the Purchaser (the "Post-Petition Financing Order"), authorizing the Post-Petition Facility, authorizing the City to enter into the QOL Note Documents and authorizing and directing the City to perform its obligations thereunder that has not been stayed, reversed or vacated and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Purchaser, (ii) the Bankruptcy Court having entered an order for relief in the Bankruptcy Case and (iii) the date on which all conditions precedent to the issuance of the Note under the QOL Note Documents and the issuance of the Swap Termination Note are satisfied and the Swap Termination Note shall have been issued in accordance with the terms of the ST Note Documents (as defined below). |
| Note Purchase Date: | The Closing Date. |

3. CERTAIN PAYMENT PROVISIONS

| | |
|---|---|
| Scheduled Amortization of Principal: | None prior to the Maturity Date. |
| Spread: | 250 basis points, subject to the terms of the Default Interest Rate set forth below. |
| Note Interest Rate: | 1-month LIBOR plus the Spread. LIBOR at all times shall include statutory reserves and shall be deemed to be not less than 1.00% per annum. The Post-Petition Facility shall be subject to market flex provisions. |
| Default Interest Rate: | Upon the occurrence of an Event of Default, including the failure by the City to redeem the Note in full on the Maturity Date, at the election of the Purchaser, the initial Spread shall be increased by 200 basis points. |

| Interest Payment Date: | Each LIBOR reset date, the date of any redemption of the Note (in whole or in part) and the Maturity Date. Interest shall be calculated on the basis of the actual number of days elapsed in a year of 360 days. |
|---|---|
| Optional Redemption: | The Note may be called for redemption in whole or in part on any business day upon 10 business days' prior written notice (i) at any time on or before the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest and a make-whole premium (which shall be the amount of interest to and including the first anniversary of the Closing Date calculated at the then-current Note Interest Rate) and (ii) at any time after the first anniversary of the Closing Date, at a redemption price of 100% of the principal amount, plus accrued and unpaid interest, without premium or penalty. Notwithstanding the foregoing, partial redemptions funded by Asset Proceeds Collateral (as defined below) not required to be used to redeem the Note may occur without premium or penalty at any time upon 10 business days' prior written notice. |
| Mandatory Redemption: | The City shall utilize all net proceeds of the voluntary disposition or monetization of any City owned asset (the "Asset Proceeds Collateral") which generates net cash proceeds exceeding $10 million to redeem the Note and the Swap Termination Note on a ratable basis upon 10 business days' prior written notice to the Purchaser as and when such net proceeds are received by the City. Principal outstanding in respect of the Note will be due and payable in full upon the Maturity Date. |
| Assignment and Participation: | The Purchaser may assign all or a portion of the Note to a group of banks, financial institutions and other institutional lenders identified by the Purchaser in consultation with and with the consent of the City, such consent not to be unreasonably withheld, delayed or conditioned (it being agreed that the City's consent shall be deemed to have been given if the City has not responded within five (5) business days of an assignment request). In addition, the Purchaser shall be entitled to sell participations in the Note without the consent of the City. |

## 4. COLLATERAL AND PRIORITY

| Collateral: | The obligations owing by the City under the Post-Petition Facility with respect to the Quality of Life Note shall, pursuant to section 364(c) of the Bankruptcy Code, be secured by (i) a first priority lien on (a) taxes owing to the City in respect of the gross receipts earned by each of the City's casinos (the "Pledged Wagering Tax |

Revenue") and (b) the Asset Proceeds Collateral and (ii) a second priority lien on the income tax revenues of the City (the "Pledged Income Tax Revenue", and together with the Pledged Wagering Tax Revenue and the Asset Proceeds Collateral, the "Quality of Life Note Collateral"). The lien on (i) the Asset Proceeds Collateral shall also secure the Swap Termination Note on a pari passu basis and (ii) the Pledged Income Tax Revenue shall secure the Swap Termination Note on a first-priority basis.

The QOL Note Documents will require that Pledged Wagering Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Wagering Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the QOL Note Documents shall limit the amount of Pledged Wagering Tax Revenue required to be applied to the outstanding amounts owing with respect to the Quality of Life Note during the continuation of an Event of Default to $4 million per month. The City shall be authorized to use all other Pledged Wagering Tax Revenue for any purpose permitted by law, without limitation, during the continuation of an Event of Default.

The QOL Note Documents will require that the Pledged Income Tax Revenue be deposited into one or more bank accounts (such bank accounts, the "Income Tax Revenue Accounts"), which bank accounts shall be subject to control agreements in favor of the Purchaser, provided, however, that the QOL Note Documents shall limit the amount of Pledged Income Tax Revenue required to be applied to the outstanding amounts owing with respect to the Swap Termination Note during the continuation of an Event of Default to $-- million per month, all of which shall be applied to redeem the Swap Termination Note until such Note is paid in full and thereafter, such amounts (in addition to $4 million per month of Pledged Wagering Tax Revenue) shall be applied to redeem the Quality of Life Note. The City shall be authorized to use all other Pledged Income Tax Revenue to fund the operations of the City, without limitation, during the continuation of an Event of Default.

The Post-Petition Financing Order shall provide, among other things, that it constitutes sufficient and conclusive evidence of the validity, perfection, priority and enforceability of the liens granted thereunder, with the priority described therein, without the necessity of filing or recording any statement, mortgage, notice or other instrument or document which may otherwise be required under state or other non-bankruptcy law.

Super-Priority of    Pursuant to Bankruptcy Code sections 364(c), 503 and 507(a)(2),

| | |
|---|---|
| Note: | the Note shall have priority over all administrative expenses, over all other postpetition claims and over all prepetition unsecured claims. |
| Events of Default: | Usual for municipal financings, and others to be reasonably specified by the Purchaser, including, without limitation, nonpayment of principal, interest or other amounts; non-performance of covenants and obligations; incorrectness of representations and warranties in any material respect; cross default in respect of a payment or payments of post-petition debt exceeding $25 million or cross acceleration in respect of post-petition debt in an outstanding aggregate principal amount exceeding $25 million; material post-petition judgments involving liability in an amount exceeding $25 million; actual or asserted invalidity or unenforceability of any QOL Note Document; written assertion by an authorized officer of the City (or any person or entity acting on behalf of or having jurisdiction over the City) that any QOL Note Document or court order with respect thereto is invalid or otherwise not binding on the City; dismissal of the Bankruptcy Case; reversal or modification in a manner adverse to the Purchaser of the order for relief by entry of an order that is not stayed; the City's filing of, consent to or lack of timely opposition to a motion seeking dismissal of the Bankruptcy Case; granting of any super-priority claim (other than as permitted under the QOL Note Documents); entry of an order without the prior written consent of the Purchaser amending, supplementing or otherwise modifying the Post-Petition Financing Order in a manner adverse to the Purchaser, or reversal, vacation or stay of the effectiveness of the Post-Petition Financing Order; cessation of liens or super-priority claims granted in respect of the Note to be valid, perfected and enforceable in all respects with the priority described herein; failure of the Pledged Wagering Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Wagering Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; failure of the Pledged Income Tax Revenue to maintain a minimum level of receipts of $30 million for any rolling 3-month period and the Income Tax Revenue Accounts to maintain a minimum aggregate value of $5 million at all times; and the city ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement reasonably determined by the Purchaser to ensure continued financial responsibility shall have been established. |
| Remedies: | Upon any Event of Default, the Purchaser may declare the principal of the Note to be immediately due. Payment of such accelerated principal shall be made by the City on a monthly basis |

on a level debt basis equivalent to $4 million per month (or, following repayment in full of the Swap Termination Note, $8 million per month, as set forth above under the heading "Collateral"), plus the pro-rata proceeds of any Asset Proceeds Collateral.

**Prohibition of Additional Borrowings:** The City will covenant that it will not obtain or seek to obtain any additional financing, including without limitation, any additional swap transaction, that (a) would have a senior payment priority to the Post-Petition Facility or (b) is secured by a lien on any of the collateral securing the Post-Petition Facility. The Post-Petition Financing Order shall provide, among other things, that no Asset Proceeds Collateral shall be used for any purpose other than the payment of amounts outstanding in respect of the Quality of Life Note or the Swap Termination Note.

## 5. CERTAIN OTHER PROVISIONS

**Documentation:** Each in form and substance satisfactory to the Purchaser:

- Note Purchase Agreement
- DTC-eligible Note, issued in denominations of not less than $100,000
- State law validity opinion for Note (with appropriate carve-outs in respect of pledge and priority), including tax treatment of Note, no registration of Note under federal securities laws and no governmental immunity under State law with respect to actions to enforce Note
- State law supplemental opinion in respect of transaction documents, including City's status, right, power and authority, execution and delivery, no further consents and enforceability under State law (with appropriate carve-outs in respect of pledge and priority)
- Bankruptcy opinion including (i) the Post-Petition Financing Order has been entered by the Bankruptcy Court after due notice and is in full force and effect in accordance with its terms and has not been amended, stayed, vacated or rescinded and (ii) subject to and only to the extent provided in the Post-Petition Financing Order, as long as the Bankruptcy Case is pending, the entry of the Order is effective to create a valid and perfected pledge of the collateral in favor of the Purchaser (it being understood that such opinion will state that no opinion is expressed with respect to any amendment, modification, vacation or stay with respect to the Post-Petition Financing Order after the date of such opinion)
- Local emergency financial assistance loan board approval of

Note terms and conditions

- All necessary approvals from the Bankruptcy Court for the Note and security interests in the Note Collateral, including lifting of automatic stay and "good faith" finding
- Custodial undertaking and/or other lockbox agreement with respect to Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Ordinances and resolutions of governing bodies and consent of state officers, including Emergency Manager, whose consent is required by applicable law for issuance of Note, entry into QOL Note Documents and grant of Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Amendment or repeal by an order of the Emergency Manager of any existing City ordinance or City resolution conflicting with Pledged Income Tax Revenue and Pledged Wagering Tax Revenue
- Written approval of the Emergency Manager, and full compliance with Michigan P.A. 436 and Act 279, with obligations delivered in accordance with applicable law
- Other financing documents to be determined by Purchaser's counsel and City's counsel

Definitive documentation in respect of the Note will contain representations, warranties, affirmative and negative covenants, waiver of sovereign immunity, waiver of jury trial and other terms and conditions to be reasonably specified by the Purchaser.

The foregoing documents are collectively referred to herein as the "QOL Note Documents".

Conditions Precedent:

Usual for municipal financings, and others to be reasonably specified by the Purchaser (but in no event to include any financial performance covenants or Bankruptcy Case milestones not expressly set forth herein) including, without limitation, execution and delivery of the QOL Note Documents satisfactory in form and substance to the Purchaser, including in respect of the Pledged Income Tax Revenue and Pledged Wagering Tax Revenue; entry by the Bankruptcy Court of an order for relief in the Bankruptcy Case within 90 days after the Commitment Date; entry by the Bankruptcy Court of the Post-Petition Financing Order satisfactory in form and substance to the Purchaser, which Post-Petition Financing Order shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified in a manner adverse to the Purchaser without the prior written consent of the Purchaser; delivery of legal opinions in form

and substance consistent with the documentation requirements set forth in Section 5 hereof; officers' and public officials' certifications; delivery of documentation and other information to the Purchaser to the extent required by any applicable "know your customer" and anti-money-laundering rules and regulations, including, without limitation, the Patriot Act; payment of fees and expenses; effectiveness of definitive documentation in respect of the Swap Termination Note (the "ST Note Documents") reasonably satisfactory to the Purchaser; satisfaction of conditions precedent to the issuance of the Swap Termination Note; accuracy of representations and warranties in all material respects; termination in whole of certain existing swap transactions previously entered into between each of the Detroit Police and Fire Retirement System Service Corporation and the Detroit General Retirement System Service Corporation and certain other counterparties (the "Swap Agreements"); and absence of defaults.

The Purchaser agrees, in connection with any termination of the Swap Agreements, that it will provide to the Swap Agreement counterparties a letter stating, to the extent true, that (i) it has received all documents responsive to the conditions precedent to funding under the Post-Petition Facility except for evidence that the Swap Agreements have been terminated, and (ii) the Purchaser is not aware of anything that would result in the funding of the Post-Petition Facility not occurring on the termination date of the Swap Agreements.

| | |
|---|---|
| Authority to Borrow: | Prior to the Closing Date, the City shall have received authorization from the Emergency Loan Board under Section 36a of the Home Rule City Act. |
| City Consent to Jurisdiction: | The City shall consent pursuant to Bankruptcy Code section 904 to the jurisdiction of the Bankruptcy Court to enter the Post-Petition Financing Order and to enforce the City's obligations thereunder. |
| Restrictions on Dismissal of Bankruptcy Case: | The Post-Petition Financing Order will require payment of all amounts outstanding under the Post-Petition Facility prior to and notwithstanding dismissal of the Bankruptcy Case, unless otherwise agreed to by the Purchaser, and that the Bankruptcy Court or the United States District Court for the Eastern District of Michigan shall retain jurisdiction to enforce the Post-Petition Financing Order. The City will covenant that it will not seek to invalidate or refute the enforceability of any QOL Note Document or the Post-Petition Financing Order, notwithstanding the dismissal of the Bankruptcy Case. |
| Absence of Fiduciary | The City acknowledges that the transactions described in this |

| | |
|---|---|
| Relationship: | document are arms'-length commercial transactions and that the Purchaser is acting as principal and in its best interests. The City is relying on its own experts and advisors to determine whether the transactions described in this document are in its best interests. The City agrees that the Purchaser will act under this document as an independent contractor and that nothing in this document, the nature of the Purchaser's services or in any prior relationship will be deemed to create an advisory, fiduciary or agency relationship between the Purchaser, on the one hand, and the City, on the other hand. In addition, the Purchaser may employ the services of its affiliates in providing certain services in connection with the transactions described in this document and may exchange with such affiliates information concerning the City that may be the subject of the transactions described in this term sheet.

Please note that the Purchaser and its affiliates do not provide tax, accounting or legal advice. |
| Yield Protection, Taxes and Other Deductions: | The QOL Note Documents shall contain customary provisions for lending transactions, including, without limitation, in respect of breakage and redeployment costs, increased costs, funding losses, capital adequacy, illegality and requirements of law and requirements of Basel III and the Dodd-Frank Wall Street Reform and Consumer Protection Act. All payments shall be free and clear of any present or future taxes, withholdings or other deductions whatsoever (other than customary exceptions to be agreed). |
| Expenses: | The Purchaser shall be responsible for its expenses (including fees, disbursements and other charges of counsel) in connection with the preparation, execution and delivery of the QOL Note Documents. The City shall pay all reasonable out-of-pocket expenses of the Purchaser (including the fees, disbursements and other charges of counsel) in connection with the enforcement, and any amendment or waiver, of the QOL Note Documents. |
| Indemnification: | To the extent permitted by law, the City shall indemnify the Purchaser, and their respective affiliates, partners, directors, officers, agents and advisors and hold them harmless from and against all liabilities, damages, claims, costs, expenses (including reasonable fees, disbursements, settlement costs and other charges of counsel) arising out of, or in connection with, the Post-Petition Facility or the Bankruptcy Case (to the extent related to the Transactions) and the City's use of the Note proceeds or the commitments whether or not the City is a party to any such claim and regardless of whether such claim is brought by the City; provided that such indemnity shall not, as to any indemnitee, be available to the extent that such losses, claims, damages, liabilities |

or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such indemnitee. This indemnification shall survive and continue for the benefit of all such persons or entities.

| | |
|---|---|
| Purchaser Contacts: | John Gerbino, Managing Director<br>James Saakvitne, Managing Director<br>Peter Joyce, Director<br>Barclays Capital Inc.<br>745 Seventh Avenue, 19th Floor<br>New York, NY 10019<br>212 526 3466<br>john.gerbino@barclays.com<br>james.saakvitne@barclays.com<br>peter.joyce@barclays.com |
| Purchaser Counsel: | Purchaser's counsel will be responsible for drafting the Note Purchase Agreement.<br><br>George E. Zobitz, Esq.<br>Cravath, Swaine & Moore LLP<br>Worldwide Plaza<br>825 Eighth Avenue<br>New York, NY 10019-7475<br>212 474 1000<br>F 212 474 3700 |
| Michigan Counsel: | Ann D. Fillingham, Esq.<br>James P. Kiefer, Esq.<br>Courtney F. Kissel, Esq.<br>Dykema Gossett PLLC<br>Capitol View<br>201 Townsend Street, Suite 900<br>Lansing, MI 48933<br>517 374 9100<br>F 517 374 9191<br><br>jkiefer@dykema.com |
| Governing Law: | Michigan. |
| Jurisdiction and Venue: | The Bankruptcy Court, unless the Bankruptcy Court does not have jurisdiction, in which case, the parties shall consent to the non-exclusive jurisdiction of the courts of the State of New York and |

the United States District Court located in the Borough of Manhattan in New York City and of the courts of the State of Michigan and the United States District Court for the Eastern District of Michigan.