# EXHIBIT 5

BARCLAYS CAPITAL INC.

**PERSONAL AND CONFIDENTIAL**

October 6, 2013

The City of Detroit, Michigan
c/o Norma Corio
Co-President and Managing Director
Miller Buckfire & Co., LLC
601 Lexington Avenue, 22nd Floor
New York, New York 10022

$350,000,000 Post-Petition Bond Financing— Fee Letter

Dear Ms. Corio:

Reference is made to the Commitment Letter dated the date hereof (the "Commitment Letter") between the City of Detroit, Michigan (the "City" or "you") and Barclays Capital Inc. ("Barclays", "we" or "us"). Terms used but not defined in this letter agreement shall have the meanings assigned to them in the Commitment Letter (including the exhibits thereto). This Fee Letter is the "Fee Letter" referenced in the Commitment Letter. By accepting the Commitment Letter, you agree to pay (or cause to be paid) the fees set forth in this Fee Letter in accordance with the other terms and conditions set forth therein.

1.      Post-Petition Facility

As consideration for Barclays's commitment with respect to the Post-Petition Facility under the Commitment Letter and agreement under the Commitment Letter to structure, arrange and syndicate the Post-Petition Facility, you agree to pay to Barclays, solely for its own account, a commitment fee (the "Commitment Fee") equal to the sum of (a) 1.25% of the aggregate principal amount of the Quality of Life Note and (b) 1.25% of the aggregate principal amount of the Swap Termination Note; provided, however, that the aggregate Commitment Fee in respect of the Post-Petition Facility shall be no less than $750,000. The Commitment Fee shall be earned in full on the date upon which the City delivers its signed signature page to the Commitment Letter to Barclays, regardless of whether any debt is issued or whether the transactions contemplated by the Commitment Letter are consummated, and shall be due and payable to Barclays as follows: (a) 50% on the date hereof and (b) 50% on the earlier of (i) 60 days from the date hereof and (ii) the Closing Date. You acknowledge that a subsequent fee in an amount to be determined by Barclays and agreed to by you shall be required in respect of any additional facility or any amendment to the Post-Petition Facility entered into between you and Barclays (or its affiliate) that has the effect of extending the Maturity Date of the Quality of Life Note or the Swap Termination Note. Further, you acknowledge that, in the event we or our affiliates act in any other capacity with respect

to the Post-Petition Facility, any fees owed to us in connection therewith that are agreed to by you shall be in addition to any fees payable to us hereunder.

The Participants' (including the Purchaser's) several commitments to provide the Post-Petition Facility are conditioned upon the payment on or prior to the Closing Date of the fees described in this Section 1 and any other fees required to be paid under the Commitment Letter, but the consummation of the Transactions is not a condition of the payment of the fees.

2. <u>Fees Generally; Expenses</u>

All fees payable hereunder will be payable in U.S. dollars in immediately available funds to the Purchaser, the Arranger, the Note Agent and/or the other Participants (as applicable) for their own accounts, or as directed by them, in any such case, free and clear of and without deduction for any and all present or future applicable taxes, levies, imposts, deductions, charges or withholdings, and all liabilities with respect thereto (with appropriate gross-up for withholding taxes) and will not be subject to reduction by way of setoff or counterclaim. You agree that, once paid, the fees or any part thereof payable hereunder or under the Term Sheets shall not be refundable under any circumstances regardless of whether the transactions contemplated by the Commitment Letter are consummated or the Post-Petition Financing Order is entered by the Bankruptcy Court. All fees payable hereunder shall not be subject to any contingency or condition (except as expressly set forth in this Fee Letter) and shall be in addition to reimbursement of Barclays's out-of-pocket expenses (to the extent required to be reimbursed under the terms of the Commitment Letter). You agree that we may, in our sole discretion, share all or any portion of the fees payable hereunder to us with any other Participant.

3. <u>Market Flex</u>

You hereby agree that the Purchaser may, after consultation with you, make any or all of the following changes, which will be approved by the Bankruptcy Court in the Post-Petition Financing Order and will require no additional authorizations or approvals, to the Post-Petition Facility (in respect of either or both of the Quality of Life Note and the Swap Termination Note, to be determined in the sole discretion of the Purchaser), at any time, and from time to time (including after the Closing Date), if the Purchaser determines, in its discretion and in consultation with you, that (i) such changes are reasonably necessary to facilitate the Successful Syndication (as defined below) of the Post-Petition Facility within 90 days after the Closing Date or (ii) a Successful Syndication on the terms set forth in the Term Sheets is unable to be achieved within 90 days after the Closing Date:

(i) the LIBOR floor may be increased by up to 1.00% per annum; and

(ii) the weighted average interest rate margins under the Post-Petition Facility (taken as a whole) may be increased by up to 2.00% per annum.

2

In the event that the Closing Date has occurred and the Note Documents have been executed and delivered prior to the Successful Syndication of the Post-Petition Facility, you hereby agree, at your own expense, to take all such action as may be required in order to effect any amendments to the Post-Petition Facility, or other changes, as may be necessary or reasonably requested by the Purchaser to document any changes pursuant to this Section 3. You further agree to reasonably cooperate with us with regard to immaterial changes requested by potential Participants prior to the Successful Syndication of the Post-Petition Facility. The Purchaser's commitment in the Commitment Letter is subject to the agreements set forth in this Section 3, and the provisions of this Section 3 will survive the closing of the Post-Petition Facility and the execution and delivery of the Note Documents.

For purposes hereof, a "Successful Syndication" shall mean one in which the Purchaser and its affiliates are able to achieve a targeted hold level of no more than $175,000,000 of the Post-Petition Facility (taken as a whole).

4.  General

This Fee Letter shall not be assignable by you, and your rights and obligations hereunder may not be assigned or delegated, without the prior written consent of Barclays, and any attempted assignment without such consent shall be void. This Fee Letter may not be amended or any provision hereof waived or modified except by an instrument in writing signed by each of Barclays and you. This Fee Letter may be executed in any number of counterparts, each of which shall be deemed an original and all of which, when taken together, shall constitute one agreement. Delivery of an executed counterpart of a signature page of this Fee Letter by facsimile transmission or other electronic transmission (in "pdf" or "tif" format) shall be effective as delivery of a manually executed counterpart of this Fee Letter. This Fee Letter, the Commitment Letter and the Term Sheets are the only agreements that have been entered into among us with respect to the Post-Petition Facility and set forth the entire understanding of the parties with respect thereto. This Fee Letter, the Commitment Letter and the Term Sheets supersede all prior understandings, whether written or oral, between us with respect to the Post-Petition Facility. This Fee Letter is intended to be solely for the benefit of the parties hereto and is not intended to confer any benefits upon, or create any rights in favor of, any person other than the parties hereto. This Fee Letter and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Fee Letter and the transactions contemplated hereby shall be governed by, and construed in accordance with, the laws of the State of Michigan. Barclays may perform the duties and activities described hereunder through any of its affiliates and the provisions of Section 4 of the Commitment Letter shall apply with equal force and effect to any of such affiliates so performing any such duties or activities.

In addition, please note that neither the Purchaser nor the Arranger nor any of their respective affiliates provides tax, accounting or legal advice.

3

You agree that you will not disclose, directly or indirectly, this Fee Letter or the contents hereof other than as permitted by the Commitment Letter.

It is understood and agreed that this Fee Letter shall not constitute or give rise to any commitment, undertaking or obligation on the part of Barclays or its affiliates to purchase any note or provide any financing in respect of the Post-Petition Facility; such an obligation shall arise only under the Commitment Letter (subject to the conditions and limitations set forth therein) if accepted in accordance with its terms.

The provisions of this Fee Letter will survive the expiration or termination (including, if applicable, in the event the Post-Petition Financing Order is not entered by the Bankruptcy Court) of the Commitment Letter (including any extensions thereof) and the funding of the Post-Petition Facility.

[The remainder of this page intentionally left blank]

4

# EXHIBIT 6



CITY OF DETROIT
BUDGET DEPARTMENT
ADMINISTRATION

(5)

RECEIVED

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVENUE, SUITE 1100
DETROIT, MICHIGAN 48226
PHONE: 313•224•6260 TTY:311
FAX: 313•224•2827
WWW.DETROITMI.GOV

TO:    Kevyn Orr, Emergency Manager

FROM:  Brent Hartzell, Interim Budget Director

DATE:  October 24, 2013

RE:    **Request for Amendment to the FY 2014 Budget of the City of Detroit
       (with appropriation revisions in consultation with Ernst & Young)**

At your direction, debt service appropriations for pension obligation certificates and limited tax general obligation debt for which principal and interest are not being remitted during the Chapter 9 bankruptcy filing are to be reallocated for general operational restructuring purposes. These debts include pension obligation certificates and several obligations backed by limited tax general obligation revenues.

Accordingly, pursuant to your authority under Emergency Order 12 and section 12(1)(b) of Michigan Public Act 436 of 2012, the Budget Department requests that you amend the City's FY 2014 Budget to shift $95,686,548 from various appropriations in the General Fund (see attached resolution) to the general restructuring account (Appropriation 13224). A subsequent amendment will reallocate authority within grant and enterprise funds to the extent necessary. Once decisions are made in placing specific authority within designated agencies, reallocation amendments from the restructuring account will also be required.

Confirmation of your intent and approval of this reallocation are hereby requested.

cc: Shani Penn, Chief of Staff to the Emergency Manager
    Sonya Mays, Senior Advisor to the Emergency Manager
    Gary Brown, Chief Operating Officer
    John Naglick, Finance Director and Acting Chief Financial Officer
    Portia Roberson, Corporation Counsel
    City Council Members
    Irvin Corley, City Council Legislative Policy Division
    Adam Hollier, Legislative Liaison, Mayor's Office

**BY THE EMERGENCY MANAGER:**

**RESOLVED,** pursuant to Emergency Order 12 and section 12(1)(b) of Michigan Public Act 436 of 2012 and to ensure legal authorization of additional costs for restructuring activities, that the FY 2014 Budget of the City of Detroit be and is hereby amended as follows:

**FROM LTGO-SERVICED INDEBTEDNESS:**

| | |
|---|---:|
| Decrease Appropriation No. 00852, Claims Fund (Insurance Premium) | $ 13,630,500 |
| Decrease Appropriation No. 00993, DDA Bonds 1997 | $ 1,369,400 |
| Decrease Appropriation No. 12129, 800 MHz Project Debt Service | $ 34,953,272 |

**FROM PENSION OBLIGATION CERTIFICATES:**

| | |
|---|---:|
| Decrease Appropriation No. 00024, Central Data Processing (ITS) | $ 314,898 |
| Decrease Appropriation No. 00028, Administration (DPW) | $ 48,199 |
| Decrease Appropriation No. 00058, Administration (Finance) | $ 80,924 |
| Decrease Appropriation No. 00060, Assessments Division (Finance) | $ 370,326 |
| Decrease Appropriation No. 00061, Purchasing Division (Finance) | $ 107,998 |
| Decrease Appropriation No. 00063, Treasury Division (Finance) | $ 248,405 |
| Decrease Appropriation No. 00064, Executive Mgmt. and Support (Fire) | $ 256,683 |
| Decrease Appropriation No. 00065, Ordinance Enforcement (Fire) | $ 472,482 |
| Decrease Appropriation No. 00067, Emergency Medical Services (Fire) | $ 2,223,265 |
| Decrease Appropriation No. 00068, Administration (DHWP) | $ 126,812 |
| Decrease Appropriation No. 00096, Executive Office (Mayor) | $ 264,113 |
| Decrease Appropriation No. 00102, Parking Violations Bureau (Muni. Pkg.) | $ 272,260 |
| Decrease Appropriation No. 00105, Administration (Human Resources) | $ 108,407 |
| Decrease Appropriation No. 00106, Personnel Selection (Hum. Resources) | $ 28,391 |
| Decrease Appropriation No. 00111, Labor Relations (Hum. Resources) | $ 130,266 |
| Decrease Appropriation No. 00111, Police Commission (Police) | $ 312,798 |
| Decrease Appropriation No. 00112, Police Executive (Police) | $ 729,631 |
| Decrease Appropriation No. 00115, Human Resources Bureau (Police) | $ 290,215 |
| Decrease Appropriation No. 00118, Criminal Investigation Bureau (Police) | $ 4,675,247 |
| Decrease Appropriation No. 00119, Management Services Bureau (Police) | $ 793,726 |
| Decrease Appropriation No. 00123, Administration (PLD) | $ 89,419 |
| Decrease Appropriation No. 00127, Engineering (PLD) | $ 123,781 |
| Decrease Appropriation No. 00128, Street Lighting (PLD) | $ 707,857 |
| Decrease Appropriation No. 00129, Operating Division (PLD) | $ 143,790 |
| Decrease Appropriation No. 00131, Heat and Power Production (PLD) | $ 197,200 |
| Decrease Appropriation No. 00181, Conduct of Elections (Elections) | $ 257,109 |
| Decrease Appropriation No. 00182, Investigation of Complaints (Ombuds.) | $ 66,287 |
| Decrease Appropriation No. 00183, Land Use Controls (BZA) | $ 28,274 |
| Decrease Appropriation No. 00226, Budget Dept. Operations (Budget) | $ 116,077 |
| Decrease Appropriation No. 00245, Accounts Div.-Administration (Finance) | $ 391,146 |
| Decrease Appropriation No. 00247, Accounts-City Income Tax Ops. (Finance) | $ 273,977 |
| Decrease Appropriation No. 00250, Protection of Human Rights (Hum. Rights) | $ 29,334 |
| Decrease Appropriation No. 00261, Auditing Operations (Auditor Gen.) | $ 92,231 |
| Decrease Appropriation No. 00265, City Clerk Ops. (City Clerk) | $ 97,553 |
| Decrease Appropriation No. 00269, City Legislative Functions (Council) | $ 282,263 |
| Decrease Appropriation No. 00277, Detroit Bldg. Authority (Non-Dept.) | $ 70,169 |
| Decrease Appropriation No. 00393, District Court (36th Dist. Ct.) | $ 216,825 |

| Decrease Appropriation No. 00537, Rape Counseling Unit (Police) | $ | 23,074 |
|---|---|---|
| Decrease Appropriation No. 00715, Vehicle Mgmt. and Supply (Fire) | $ | 125,606 |
| Decrease Appropriation No. 00718, Fire Fighting Operations (Fire) | $ | 7,260,078 |
| Decrease Appropriation No. 00760, Commun. & Systems Support (Fire) | $ | 241,690 |
| Decrease Appropriation No. 00832, Dept. Accounting Operations (Finance) | $ | 116,377 |
| Decrease Appropriation No. 00833, Employee Services (Hum. Resources) | $ | 307,364 |
| Decrease Appropriation No. 00854, Hearings & Policy Dev. (Hum. Rsrcs.) | $ | 9,810 |
| Decrease Appropriation No. 00880, Police Athletic League (Police) | $ | 25,035 |
| Decrease Appropriation No. 00883, Development-City (PDD) | $ | 24,249 |
| Decrease Appropriation No. 00910, City Engineer (DPW) | $ | 66,966 |
| Decrease Appropriation No. 00922, Council President Office (Council) | $ | 7,203 |
| Decrease Appropriation No. 00923, Council Member Office 1 (Council) | $ | 6,216 |
| Decrease Appropriation No. 00924, Council Member Office 2 (Council) | $ | 6,216 |
| Decrease Appropriation No. 00925, Council Member Office 3 (Council) | $ | 6,216 |
| Decrease Appropriation No. 00926, Council Member Office 4 (Council) | $ | 6,216 |
| Decrease Appropriation No. 00927, Council Member Office 5 (Council) | $ | 6,216 |
| Decrease Appropriation No. 00928, Council Member Office 6 (Council) | $ | 6,216 |
| Decrease Appropriation No. 00929, Council Member Office 7 (Council) | $ | 6,216 |
| Decrease Appropriation No. 00930, Council Member Office 8 (Council) | $ | 6,216 |
| Decrease Appropriation No. 04739, General Revenue-Non-Dept. (Non-D) | $ | 201,732 |
| Decrease Appropriation No. 09112, Enhanced E-911 (Police) | $ | 295,941 |
| Decrease Appropriation No. 10082, Operations (Police) | $ | 14,120,763 |
| Decrease Appropriation No. 10151, Casino Municipal Services (Fire) | $ | 258,904 |
| Decrease Appropriation No. 10152, Casino Municipal Services (Police) | $ | 531,685 |
| Decrease Appropriation No. 10397, Board of Ethics (Non-Dept.) | $ | 13,886 |
| Decrease Appropriation No. 11040, Administration (Police) | $ | 127,683 |
| Decrease Appropriation No. 11041, Technical Services Bureau (Police) | $ | 2,235,657 |
| Decrease Appropriation No. 11042, Legal Affairs/Training (Police) | $ | 865,209 |
| Decrease Appropriation No. 11159, Blight Violations Adjudic. (DAH) | $ | 41,333 |
| Decrease Appropriation No. 11195, Risk Management Council (Auditor Gen.) | $ | 16,695 |
| Decrease Appropriation No. 11656, Recreation Mgmt. (Recreation) | $ | 49,083 |
| Decrease Appropriation No. 11657, Busin. Ops. & Suppt. Svcs. (Recreation) | $ | 24,213 |
| Decrease Appropriation No. 11663, Recreation Operations (Recreation) | $ | 225,803 |
| Decrease Appropriation No. 11665, Belle Isle Operations (Recreation) | $ | 8,433 |
| Decrease Appropriation No. 11825, Administration (GSD) | $ | 76,777 |
| Decrease Appropriation No. 11830, Facilities & Grounds Maint. (GSD) | $ | 327,551 |
| Decrease Appropriation No. 11831, Inventory Management (GSD) | $ | 36,422 |
| Decrease Appropriation No. 12146, Business License Center (BSEE) | $ | 36,353 |
| Decrease Appropriation No. 12153, Fleet Management (GSD) | $ | 761,572 |
| Decrease Appropriation No. 12154, General Services-Street Fund (GSD) | $ | 211,958 |
| Decrease Appropriation No. 13125, Media Services/Comunic. (Non-Dept.) | $ | 49,669 |
| Decrease Appropriation No. 13152, Street Maint. Garage (GSD) | $ | 131,603 |
| Decrease Appropriation No. 13161, Environmental Affairs Dept. (BSEE) | $ | 24,618 |
| Decrease Appropriation No. 13168, Real Estate & GIS (PDD) | $ | 35,474 |
| Decrease Appropriation No. 13174, Strategic Planning/Grants (Recreation) | $ | 6,482 |
| Decrease Appropriation No. 13336, Ground Maintenance (GSD) | $ | 222,123 |
| Decrease Appropriation No. 13530, Office of the Inspector General (OIG) | $ | 79,902 |
| Decrease Appropriation No. 13532, Homeland Security Ops. (Police) | $ | 15,489 |
| Decrease Appropriation No. 13567, Animal Control (Police) | $ | 109,668 |

Decrease Appropriation No. 13608, Pension & Employee Benefits (Non-Dept.)   $   244,371
Decrease Appropriation No. 13637, Elected Officials Compensation (Non-Dept.)  $   136,725

TO GENERAL RESTRUCTURING NEEDS:
Increase Appropriation No. 13224, Restructuring Consolidation

$  95,686,548

**AND BE IT FURTHER RESOLVED**; that the Finance Director be and is hereby authorized to increase the necessary accounts and honor vouchers in accordance with the forgoing communication and regulations of the City of Detroit.

10/25/13

Kevyn Orr
Emergency Manager
City of Detroit



# EXHIBIT 7



UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

City of Detroit, Michigan,

      Debtor.

_____/

Chapter 9
Case No. 13-53846
Hon. Steven W. Rhodes

Order Regarding Casino Revenues and Automatic Stay

For the reasons stated in open court today, the Court concludes that the Casino

Revenues are property of the estate and are subject to the automatic stay of 11 U.S.C.

§ 362(a)(3). This order is without prejudice to the right of any party to seek relief from

the stay under 11 U.S.C. § 362(d).

It is so ordered.

**Signed on August 28, 2013**

                                   **/s/ Steven Rhodes**
                                   **Steven Rhodes**
                                   **United States Bankruptcy Judge**

# EXHIBIT 8


# SIGN PETITION TO REQUEST US DOJ FRAUD
# INVESTIGATION OF UBS RE:
# PREDATORY $1.5 BILLION DETROIT LOAN



*PREDATORY LENDING: Jan. 31, 2004: Wall Street ratings agenices reps Joe O'Keefe of Fitch Ratings (speaking), and Stephen Murphy of Standard and Poor's (to his left), foisted $1.5 BILLION loan on city of Detroit. Also shown in photo (l) then Detroit CFO Sean Werdlow, who left the Kilpatrick administation later that year to take a job with UBS 'minority partner Siebert, Brandford & Shank as managing director, and (r) then Deputy Mayor Anthony Adams. Photo by Diane* **Bukowski**

*VOD requested investigation by USDOJ, no response yet*

**By Diane Bukowski July 3, 2013**

*Voice of Detroit has submitted the following request to the U.S. Department of Justice for a criminal fraud investigation related to the 2005 $1.5 Billion Pension Obligation Certificates loan*



***UBS AG CEO Sergio Ermatti***

# EXHIBIT 9

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

City of Detroit, Michigan,

Debtor.

_____/

Chapter 9
Case No. 13-53846
Hon. Steven W. Rhodes

Notice of Filing by Detroit City Council of
Resolution Regarding The Emergency Manager's
Post-Petition Financing Proposal

Now Comes the Detroit City Council and hereby gives notice of the adoption of the

attached Resolution Regarding The Emergency Manager's Post-Petition Financing Proposal, and

its filing with this Court.

October 25, 2013

By: Saunteel Jenkins, President
Detroit City Council

# TRUE COPY CERTIFICATE

STATE OF MICHIGAN, } ss.
    City of Detroit }

### CITY CLERK'S OFFICE, DETROIT

I,     *Janice M. Winfrey*    , City Clerk of the City of Detroit, in said

State, do hereby certify that the annexed paper is a **TRUE COPY OF**  **RESOLUTION**

adopted (passed) by the City Council at session of

             October 25,            20 13

and approved by Mayor

                                       20

as appears from the Journal of said City Council in the office of the City Clerk of Detroit, aforesaid;
that I have compared the same with the original, and the same is a correct transcript therefrom, and of the
whole of such original.

                              In Witness Whereof, I have hereunto set my hand
                                  and affixed the corporate seal of said City, at

                     Detroit, this                 25th

                     day of          October         A.D. 20 13

                                                   CITY CLERK

**A RESOLUTION BY COUNCIL MEMBER** _____

## RESOLUTION REGARDING THE EMERGENCY MANAGER'S
## POST PETITION FINANCING PROPOSAL

**WHEREAS**    On October 11, 2013, the Emergency Manager Kevyn Orr (EM) filed with the City Clerk for transmission to the City Council *Order No. 17 – Approval of Post-Petition Financing* for the issuance of Financial Recovery Bonds (Secured Financing) pursuant to Sec. 36a of the Home Rule City Act, 279 PA of 1909, as part of the EM's ongoing restructuring and settlement strategies being advanced through the City's Chapter 9 bankruptcy proceedings, *In Re City of Detroit*, United States Bankruptcy Court for the Eastern District of Michigan, Case No. 13-53846. More specifically, the financing from the proposed transaction would refinance the interest rate Swap Agreements at 75% to 82% of their purported value and include additional financing to provide the City of Detroit with funds to use for City service improvement projects; and

**WHEREAS**    The proposed Debtor-in-Possession Financing transaction is an extremely complex deal on a number of fronts that does not seem to be in the best interest of the City. The key terms include a maximum principal aggregate amount of $350 million dollars at a floating interest rate with a maturity date no later than two and one half years from the date of issuance, although it is quite possible that the loans would mature as early as November 2014. Essentially, if the proposed transaction is consummated the City will be taking a fixed rate loan and swapping it for a variable rate loan putting the City in the same predicament that the original Swaps were supposed to cure, and seems to primarily benefit the two Swap counterparties Bank of America and UBS; and

**WHEREAS**    It cannot be emphasized enough that this lending is of a very temporal nature; the maturity date of the loans is estimated by the Emergency Manager to be some time between November 2014 and May 2016. There is no guarantee that replacement funding will be available by this lender or any other lender when these loans mature in as little as one year placing the City into a very foreseeable default position triggering onerous default penalty provisions; and

**WHEREAS**    Miller Buckfire has indicated that the City will save approximately $35M per year in financing costs by accepting this deal; however, these savings are achieved by making interest only payments on these new loans. The City's underlying principal debt will not decrease under this proposal; rather, it is a mere stop gap measure until permanent financing is found; and

**WHEREAS**    It has been indicated that the impetus for this transaction is to ensure the continued flow of casino tax revenues to the City throughout the bankruptcy process; however, this seems to disregard Judge Rhodes' order

1

that essentially accomplished the same thing by providing that the casino revenue is the property of the bankruptcy estate and therefore subject to the automatic stay; and

**WHEREAS**    This Post-Petition financing appears to be an attempt to keep the Swaps out of the bankruptcy proceeding instead of challenging the Swaps counterparties' tenuous status as secured creditors. The counterparties' senior creditor status was achieved by pledging the casino wagering taxes to collateralize the underlying Swap agreements. According to MCL 432.212(2), the use of casino wagering taxes for such a pledge appears impermissible. Rather than seeking a declaration of this position by the Court, this deal would transform a soft liability into a firm liability at a time in the interest rate cycle when the Swap liability could actually start to decline; and

**WHEREAS**    Not unlike the Swap Agreements that have been universally recognized as a bad deal for the City, Barclays is requiring the City to pledge its major revenue in order to secure this transaction. The City will have to pledge not only its casino wagering tax revenue but also its income tax revenue. These are the City's two most stable general fund revenue sources. Barclays is also requiring prepayment of any asset monetization net proceeds over $10M. *This would give Barclays too much power and control over the City's revenues and future and limits the City's ability to negotiate or resolve other claims in bankruptcy*; and

**WHEREAS**    Municipal Market Advisors support the thought that proposed financing is more advantageous to the financiers. They indicate that the loans seem to be "a very good deal for the lender and the swap counterparties but less so for the [C]ity's unsecured creditors and its residents. The seeming lack of a tangible recovery plan that improves Detroit's revenues over the period of the loans renders us skeptical about the [C]ity's ability to repay an amount of this magnitude in a short time frame without causing additional stress to the detriment of city residents and unsecured creditors that may have their recoveries tied to the [C]ity's financial performance."[1]; and

**WHEREAS**    The default provisions within the proposed agreement are very aggressive and easily triggered. The default provisions are broad and include the following: the agreement calls for the City to remain under some level of state control, *i.e.*, emergency manager, consent agreement, or transition advisory board. Additionally, a mere assertion by any person or entity acting on behalf of or having jurisdiction over the City that any Quality of Life loan is not binding, would trigger a default; and

**WHEREAS**    The $350M Post-Petition Financing includes a Quality of Life Loan; these newly borrowed funds are proposed to be used to make certain unspecified improvements in City government. From the information provided thus far, it appears that none of the proceeds will be used to create new

---

[1] *Bond Buyer*, October 21, 2013, "Detroit Council Rejects DIP Loan"

2

13-53846-swr   Doc 1396   Filed 10/25/13   Entered 10/25/13 16:14:29   Page 4 of 6
13-53846-tjt   Doc 1857-4   Filed 11/27/13   Entered 11/27/13 16:54:30   Page 19 of 22

revenue. If the City is ever to achieve a stronger financial position, strengthening revenues and revenue collection under the City's control is key. Additional revenues will improve the quality of life for citizens as it will provide funds for City services. It is difficult without additional information to determine whether the use of these funds would be prudent investments. Additionally, it would be unwise to incur more debt to facilitate the payment of costly consultants; and

**WHEREAS**    Pursuant to Sec. 19 of Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1541, *et seq.*, City Council had the authority to approve or disapprove this proposed transaction within ten (10) days from the date of submission by the EM, or by October 21, 2013. If Council votes to disapprove, it must submit an alternative proposal to the local emergency financial assistance loan board that would yield substantially the same financial result for the City as the EM's proposal within seven (7) days of its disapproval. If Council does not act, within the ten (10) day timeframe, the EM's proposed transaction is considered approved under the relevant statute; and

**WHEREAS**    Upon receipt of the proposal, City Council, in addition to its own individualized study of the transaction, requested its Legislative Policy Division (LPD) to review the documents related to the proposed transaction. LPD immediately consulted with the City's financial and legal consulting firms principally responsible for crafting the transactional documents on the City's behalf, Miller Buckfire and Jones Day. Since the beginning of LPD's review, numerous questions have been submitted to the consultants and although some information has been provided, a host of uncertainties and unanswered questions remain; and many of these questions simply cannot be answered adequately within the short window allotted for City Council's consideration under the aforementioned statute. Additionally, many critical issues remain unresolved until decisions by the Bankruptcy Court or other courts are made; and

**WHEREAS**    Despite Council's diligent efforts, the complexities of the proposed transaction coupled with its uniqueness (to date the single largest municipal bankruptcy filed in the United States), and the precedent setting ramifications of decisions related to this bankruptcy financing instrument, the lack of available independent subject matter experts in municipal financing arrangements of this type to properly vet the transaction, combine to make it impractical to meet the compressed statutory deadline in any competent, meaningful way; and

**WHEREAS**    In addition to not being able to properly vet the proposed transaction given the information provided, the abbreviated timeframe also constrains Council's authority to propose a reasonable or credible alternate proposal under MCL 141.1559(2); and

**WHEREAS**    Based on the foregoing information, it appears that the deal being brokered is being done in order to set a precedent for how municipal

bankruptcies work to facilitate future bankruptcies in other cities rather than to broker the best deal for the City of Detroit, thus putting the interests of lenders before the interests of the City and its residents. The goal seems to be to ensure the protection of the lenders at the detriment of all other interested parties. By settling all claims against the counterparties, the City would surrender any ability to challenge the legality of any of the actions taken regarding the original Swap Agreement, as well as any ability to challenge the City's receivership status, the counterparties' creditor status or the appropriateness of the pledging of revenues; and

**WHEREAS**     The City Council has received an alternative to the proposed Post-Petition Financing. The proposal attempted to improve upon some of the terms of the proposal proffered by the Emergency Manager. The untimely receipt of the proposal, however, does not allow City Council to obtain the expertise necessary to properly vet the alternative proposal. The seven (7) day limitation created by P.A. 436 of 2012 places an unrealistic time frame in which to solicit and consider a counteroffer to a proposal that took months to create. **NOW THEREFORE BE IT**

**RESOLVED**    That the Detroit City Council is in receipt of *Order No. 17 – Approval of Post-petition Financing* for the issuance of Financial Recovery Bonds (Secured Financing) which has triggered the provisions of Sec. 19 of Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL 141.1541, *et seq.*, granting City Council the authority to vote on the proposed transaction; and **BE IT FURTHER**

**RESOLVED**    If obtained, it is strongly urged that any funds from the Quality of Life Loan be used to strengthen revenues and revenue collections by improving the collection systems for income tax, property tax and the property assessment. Hardware improvements as well as staffing level increases in the Finance Department and the Law Department will send a message to non-payers *that not paying what is owed is no longer an option*; and **BE IT FURTHER**

**RESOLVED**    That the Detroit City Council has voted to disapprove Mr. Orr's proposed transaction and would ask that Judge Rhodes determine whether counterparties are indeed secured creditors in light of the Michigan statute that prohibits the use of wagering taxes in transactions collateralizing swap agreements and whether the instant settlement with the counterparties are in the best interest of the City in light of surrounding circumstances as discussed above; and **BE IT FINALLY**

**RESOLVED**    That a copy of this resolution be forwarded to Judge Steven Rhodes, Governor Rick Snyder, State of Michigan Department of Treasury, Emergency Manager Kevyn Orr, Municipal Loan Board and Mayor Dave Bing.

4

13-53846-swr   Doc 1396   Filed 10/25/13   Entered 10/25/13 16:14:29   Page 6 of 7
13-53846-tjt   Doc 1857-4   Filed 11/27/13   Entered 11/27/13 16:54:30   Page 21 of 22

October 25, 2013

13-53846-swr   Doc 1296   Filed 10/25/13   Entered 10/25/13 16:31:29   Page 7 of 7
13-53846-tjt   Doc 1857-4   Filed 11/27/13   Entered 11/27/13 16:34:30   Page 22 of 22