# UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| In re: ) | |
| ) | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, ) | |
| ) | Case No. 13-53846 |
| Debtor. ) | |
| ) | |
| ) | Hon. Steven W. Rhodes |
| ) | |

**OBJECTION OF NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION TO MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY**

National Public Finance Guarantee Corporation ("National"), by and through its undersigned attorneys, hereby submits this objection (the "Objection")[1] to the Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay [Docket No. 1520]

---

[1] Additionally, National hereby joins in U.S. Bank National Association's *Limited Objection and Reservation of Rights with Respect to the Debtor's Motion for Entry of an Order (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Super-Priority Claim Status and (III) Modifying the Automatic Stay* [Docket No. 1797] (the "Water/Sewer Trustee Limited Objection"), and adopts and incorporates the arguments and reservation of rights in the Water/Sewer Trustee Limited Objection as if set forth in this Objection.

(the "Financing Motion").[2] In support of this Objection, National respectfully submits as follows:

## Introduction

1. National is a municipal bond insurer and a creditor and party in interest in this chapter 9 proceeding. In particular, National has insured several bonds totaling approximately $2.4 billion issued by the City of Detroit (the "City") and City authorities, including unlimited tax general obligation bonds, water supply system bonds, and sewage disposal system bonds. These bonds represent long-term obligations of the City. With this significant stake in Detroit's success, National has a strong financial interest in seeing the City stabilize and thrive.

2. National files this Objection primarily to address two (2) concerns: (i) the City should be transparent in terms of how it spends the Quality of Life Bonds proceeds (at the City's proposed pace of $20 million per month) to enable Detroit's stakeholders to determine whether or not the borrowed funds are being used on essential City services; and (ii) if the Court approves the Postpetition Financing, the Proposed Order should clarify that any section 364(c)[3] superpriority claim granted in favor of the Purchaser, Indenture Trustee or Bondholders shall not

---

[2] Capitalized terms undefined herein shall have the meanings ascribed to them in the Financing Motion.

[3] All section references herein are references to the Bankruptcy Code unless otherwise noted.

be satisfied or payable from the proceeds (the "Restricted Funds") of *ad valorem* taxes levied or pledged specifically to secure repayment of the unlimited tax general obligation bonds (collectively, the "Unlimited Tax Bonds"), pending resolution of the issues raised in the Adversary Proceeding (as defined below).[4] The Financing Motion should be denied unless the concerns regarding reporting, and the clarification related to the Restricted Funds raised by this Objection are resolved.

**Argument**

3. To obtain approval of the Postpetition Financing, the City must demonstrate that it was unable to obtain financing on an unsecured basis and that its entry into the financing is an exercise of the City's reasonable business judgment. (Financing Motion ¶¶ 51, 54.)

4. The City's request for post-petition financing is unique in the context of chapter 9. Courts in chapter 11 cases consider various factors in deciding whether to approve post-petition financing under Section 364 (which are

---

[4] In addition, if the Forbearance Agreement Approval Motion is denied, the Swap Termination Bonds portion of the Post-Petition Financing should be denied. National has joined [Docket No. 353] in an objection to the Forbearance Agreement Approval Motion filed by Ambac Assurance Corporation [Docket No. 348, corrected by Docket No. 410] (the "Swap Objection"). The Swap Objection raises serious concerns regarding the propriety of the City's entry into the Forbearance Agreement, which essentially locks the City into treating and paying the claims under the Swap Agreements as allowed secured claims. As set forth in the Swap Objection, the City has several strong and meritorious arguments that the alleged claims and liens of the swap counterparties are *void ab initio*.

3

instructive in chapter 9), including whether (a) the financing is in the best interests of the estate and its creditors and (b) whether the transaction is necessary to preserve the assets of the estate, and is necessary, essential, and appropriate for the continued operation of the debtor's businesses.  See, e.g., Bland v. Farmworker Creditors, 308 B.R. 109, 113 (S.D. Ga. 2003); In re Farmland Indus., Inc., 294 B.R. 855, 879-80 (Bankr. W.D. Mo. 2003).  In describing the bill that incorporated section 364 into chapter 9, Congress made clear that the "primary purpose of chapter 9 is to allow a municipal unit to continue operating while it adjusts or refinances creditor claims with minimum (and in many cases, no) loss to its creditors."  H.R. Rep. No. 95-595, at 263 (1977); see also H.R. Rep. No. 94-686, at 524.  The Financing Motion, and this Objection, should be viewed through this narrow lens.

5.  The City cites Ames Dept Stores, Inc. for the proposition that the Court has the discretion to grant the Postpetition Financing provided that the financing terms do not leverage the bankruptcy process and the purpose of the financing is to benefit the City, its citizens and its creditors.  (See Financing Motion ¶ 54, citing Ames Dept. Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).)  The City cannot satisfy this standard if it does not resolve the concerns raised in this Objection.  Transparency and accountability certainly benefit the City, its citizens and its creditors.  Similarly, the requested carve out of the

4

2645777.1
13-53846-tjt    Doc 1863    Filed 11/27/13    Entered 11/27/13 17:16:58    Page 4 of 18

Restricted Funds pending the resolution of the Adversary Proceeding will ensure that the Postpetition Financing does not leverage the bankruptcy process to National's detriment, and allows for the full resolution of the issues raised in the Adversary Proceeding.

    **A.    The City Should Provide Detailed Reports On How It Actually Spends The Quality Of Life Bond Proceeds**

    6.    Transparency is of paramount importance in chapter 9, particularly given the jurisdictional limitation on a bankruptcy court's authority to interfere with a municipal debtor's use of its resources. This jurisdictional limitation, however, is not absolute. The manner in which a municipal debtor conducts its affairs and manages its resources during the pendency of a chapter 9 case is subject to review and scrutiny by creditors and the bankruptcy court at confirmation. As Judge Klein recently observed in the chapter 9 case involving the City of Stockton, "[i]n short, the capital market creditors have, in effect, given notice that they reserve the right to litigate the debtor's conduct and management and spending choices during the case at the time of plan confirmation. *That is the limiting principle and the protection to which they are entitled*." In re City of Stockton, 486 B.R. 194, 200 (Bankr. E.D. Cal. 2013) (emphasis added).

    7.    Assessment of the consequences of a municipal debtor's spending is not simply left to the political process in a chapter 9 case, nor can a municipality hold up section 904 as a shield to block inquiry into, or an evaluation

5

2645777.1
13-53846-tjt    Doc 1863    Filed 11/27/13    Entered 11/27/13 17:16:58    Page 5 of 18

of, its actions leading up to confirmation—the day of reckoning is plan confirmation. To the extent the borrowed funds are not used for essential services and do not improve the quality of life in the City, or are used to prefer one group of creditors over another, the City's potentially improper spending may raise a host of confirmation issues, including whether a plan of adjustment that ratifies such improper spending (i) has been proposed in good faith, (ii) is fair and equitable to dissenting creditors and (iii) is in the best interests of creditors.[5]

8. Chapter 9 recognizes—and case law confirms—that a municipality has a responsibility to ensure that the plan not only benefits its citizens, but also maximizes returns to creditors. When a municipal debtor engages in pre-plan spending that is subsidized unnecessarily by cuts to creditor recoveries, the best interests of creditors test is not satisfied and the plan must be rejected. See Fano v. Newport Heights Irrigation Dist., 114 F.2d 563, 564-66 (9th

---

[5] The "best interest of creditors" test in section 943 is meant to protect creditors because, in chapter 9, the confirmation of a plan is a significant event that results in a discharge of the municipal debtor from all debts as of the time when the plan is confirmed. 11 U.S.C. §§ 943(b)(7), 944(a), (b). The best interests test has been described as a "floor requiring a reasonable effort at payment of creditors by the municipal debtor." In re Pierce County Hous. Auth., 414 B.R. 702, 718 (Bankr. W.D. Wash. 2009) (quoting Mount Carbon Metro. Dist., 242 B.R. 18, 34 (Bankr. D. Colo. 1999)); see also W. Coast Life Ins. Co. v. Merced Irr. Dist., 114 F.2d 654, 678 (9th Cir. 1940) (in applying best interests test, court considered whether the creditors' recovery was "all that could reasonably be expected in all the existing circumstances").

6

Cir. 1940) (chapter 9 debtor's substantial infrastructure spending, subsidized by cuts to creditor recoveries, rendered plan of adjustment non-confirmable because "it would be highly unjust to allocate their cost to the bondholders" and such plan treatment was neither fair and equitable nor in the best interest of creditors); see also In re Pierce County Hous. Auth., 414 B.R. 702, 718-719, 721 (Bankr. W.D. Wash. 2009) (plan rejected as violation of best interests of creditors test where plan precluded creditors from investigating and pursuing all potential sources of recovery).

9. Disclosure regarding how the City actually spends the Quality of Life Financing now will aid the Court and the City's creditors in evaluating any plan of adjustment the City may file. The City's stakeholders should not be forced to resort to formal discovery to obtain basic information regarding how the borrowed funds were expended.

(i) Reporting Should be Sufficiently Detailed to Allow the Court, Creditors And Citizens to Assess How the Borrowed Funds Are Utilized.

10. The Court can and should require the City to: (a) make available to creditors and citizens its detailed plan, and budget if available, regarding how the City intends to spend the Quality of Life Bonds proceeds (which the City presumably has prepared given it proposes to spend $100 million between January and May 2014); (b) make publicly available detailed reporting regarding how the City actually spends the Quality of Life Bonds proceeds; and (c) make

7

such detailed reporting available in "real time" including through updating, on a rolling basis, the City's 13-week cash flow projections (which cash flow projections the City has previously prepared and produced).

11. The City proposes to spend the proceeds of the Quality of Life Bonds (at the rate of $20 million per month) for any and all "*purposes permitted by law*, including to fund expenditures designed to contribute to the improvement of the quality of life in the City . . . ."[6] While the City states that it *intends* to devote the proceeds of the Quality of Life Bonds to three primary areas consisting of "public safety, information technology upgrades, and blight removal" (Financing Motion ¶ 23), there is no assurance the City will actually spend the borrowed funds on these essential needs. And the City's current reporting, if continued, will not provide the Court or the City's stakeholders with the ability to assess whether the borrowed funds are being spent on these essential needs (which, as noted above, may impact plan confirmation directly).

---

[6] See, e.g., Financing Order ¶ D(iii) (emphasis added) (containing a proposed finding that City has agreed to use the proceeds of the Quality of Life Bonds "for purposes permitted by law, including to fund expenditures designed to contribute to the improvement of the quality of life in the City"); Financing Motion Exhibit 6A Commitment Letter, Quality of Life Note Term Sheet, at 1 (stating that the Quality of Life Bonds proceeds "shall be used for purposes permitted by law, agreed upon between the City and the Purchaser in the QOL Note Documents and approved by the Bankruptcy Court, including, without limitation, to fund expenditures that are designed to contribute to the improvement of quality of life in the City").

12. Required reporting should include actual project descriptions, the activities specifically funded, any anticipated future project expenditures, and how the specific projects contribute to improvement of the quality of life in the City. This reporting should also include an update regarding the status of various reinvestment initiatives that the City indicates it is pursuing, including the efforts of the "blight" task force.[7]

13. The Emergency Manager is unlikely to include such detailed reporting in his published reports unless the Court so orders. The Emergency Manager publishes two (2) financial reports pursuant to P.A. 436. Pursuant to section 9(5) of P.A. 436, the Emergency Manager is required to provide a quarterly report on the financial condition of the City (the "Quarterly Report"). The most recent Quarterly Report was submitted on October 15, 2013 for the period from

---

[7] There has been a lack of informational transparency by the City throughout this chapter 9 process, as evidenced most recently by the belated disclosure of the fees already paid to Barclays in connection with the Postpetition Financing (as discussed herein). For example, the City should be producing (on a regular basis): updated bank account information, updated revenue forecasts, an updated business plan and financial projections, reports on operational improvements and efficiencies that have been realized or are in process, regular updates as to the status of the DIA artwork assessment, the ultimate assessment regarding the value of the DIA artwork collection, and assessments of any other assets that may be monetized to fund reinvestment initiatives and/or plan recoveries. Rather than provide such information, the City seems singularly focused on meeting its own self-imposed deadline to file a plan of adjustment by year end (with or without creditor support) instead of providing the type of material information that could facilitate resolutions and form the basis for a consensual plan.

July 1, 2013 through September 30, 2013 (attached hereto as Exhibit A).[8] The Quarterly Report does not contain any detail regarding specific expenditures, and instead summarizes the status of this case and provides a high-level unaudited *pro forma* summary of revenues and expenditures.

14. The Emergency Manager is also required, pursuant to section 17 of P.A. 436, to provide what could be characterized as an "operating" report every three months (the "<u>Operating Report</u>" and collectively, with the Quarterly Reports, the "<u>Financial Reports</u>"). On September 30, 2013, the Emergency Manager filed the first Operating Report for the period from March 25, 2013 through August 31, 2013.[9] While the Emergency Manager is required under P.A. 436 to include in the Operating Report, among other things, a "description" of each expenditure made or approved in excess of $5,000.00 and the source of funds for such expenditure, the Emergency Manager has, to date, only provided vague "listings" of expenditures rather than true "descriptions."

---

[8] Available at: http://www.detroitmi.gov/EmergencyManager/Reports.aspx

[9] Available at: http://www.detroitmi.gov/EmergencyManager/Reports.aspx. The first Operating Report covers six months, subsequent Operating Reports are to be filed every three months. P.A. 436 § 17; MCL § 141.1557.

15. In the Emergency Manager's first Operating Report, for example, two extremely significant expenditures, apparently from general obligation bond funds, were listed as follows:

| Fund | Agency | Vendor | Amount |
|---|---|---|---|
| 4513 General Obligation Bond Fund – Series 2010 | D23010 Administration | Detroit Building Authority | $11,569,505 |
| 4513 General Obligation Bond Fund – Series 2010 | D23130 General Accounting | Detroit Building Authority | $8,086,127 |

(See Emergency Manager Report Pursuant to Section 17 of Local Financial Stability and Choice Act September 30, 2013, at 24 (excerpt annexed hereto as Exhibit B).) From these listings, it is virtually impossible to discern how the City spent almost $20 million. A review of the September 30, 2013 Operating Report reveals various additional listings of line item entries with almost no detail whatsoever as to the nature of the expenditures.

16. In addition to the requested budget and reporting information, the City should provide access to the financial information it is required to produce pursuant to the Bond Purchase Agreements and the Indenture. Under section 19 of both Bond Purchase Agreements, the City has agreed to provide the Purchaser with "all information with respect to the City and the transactions contemplated [by the Bond Purchase Agreements] . . . , including such financial information and projections as Purchaser may reasonably request in connection with the structuring,

11

2645777.1
13-53846-tjt    Doc 1863    Filed 11/27/13    Entered 11/27/13 17:16:58    Page 11 of 18

arrangement and syndication of the Bonds". Providing such information will not be burdensome for the City as it is already obligated to compile the information.

        (ii)    <u>Reporting Should Be Made in "Real Time."</u>

17. The City can provide the requested reporting as part of its 13-week cash flow projections, which it previously prepared and provided to creditors, as well as in the reports the Emergency Manager is obligated to prepare under applicable state law. Given the City's stated intent to file a plan of adjustment before the end of this year, the City's current timeline for issuing the Financial Reports does not provide an adequate opportunity for review. Under P.A. 436, the Emergency Manager submits the Financial Reports every three (3) months. The Emergency Manager has, to date, submitted the Financial Reports approximately one (1) month in arrears. On this timetable, the Emergency Manager's first Financial Report covering the use of the Quality of Life Bonds proceeds may not be disclosed until four (4) months after the funds had been spent. There should not be such a significant delay in the provision of this crucial information.

18. National, and other parties, have reason to be concerned with the City's willingness to disclose its financial decisions in a timely fashion and the manner in which the City spends its money, as evidenced by the City's previously-undisclosed entry into the Barclay's Fee Letter. The terms of the Fee Letter only came to light after the Court denied the City's request to file it under seal following

12
2645777.1
13-53846-tjt    Doc 1863    Filed 11/27/13    Entered 11/27/13 17:16:58    Page 12 of 18

objection by various parties, including National. In the Fee Letter, the City has obligated itself to pay a commitment fee of approximately $4,375,000. The City has already paid half of this commitment fee, and will have paid the entire commitment fee <u>prior</u> to the hearing on the Financing Motion.[10]

19. Even more concerning is that the vast majority of the commitment fee—approximately $3 million of the $4.375 million total—is attributable to the Swap Termination Bonds, which may never be issued if the Court does not approve the Forbearance Agreement Approval Motion. As the Court knows, the Forbearance Agreement Approval Motion is subject to multiple objections. If that motion is denied, the City will have already given approximately $3 million to Barclays on account of a failed transaction—money which could have been used to revitalize the City.

    (iii)  <u>The Court Has the Discretion And Authority to Impose Reporting Obligations.</u>

20. Section 904 does not limit, and section 364 and <u>Ames Dept. Stores, Inc.</u> embrace, the Court's authority to impose reporting obligations (beyond what is required under applicable state law) on the City in respect of its use of the Quality of Life proceeds. As noted above, the creditors and citizens of the City have a right to know how the money is spent, and those decisions are subject to

---

[10] According to the terms of the October 6, 2013 Fee Letter, the commitment fee is due "(a) 50% on the date hereof and (b) 50% on the earlier of (i) 60 days from the date hereof and (ii) the Closing Date." (Fee Letter at 1 [Docket No. 1761].)

13

review at confirmation.  See In re City of Stockton, 486 B.R. at 200.  Disclosure now will aid this process later.

21.  The City has expressly consented, under section 904, to the Court's jurisdiction with respect to the financing.  (See Financing Motion at 35.)  Such consent should be broadly interpreted given what the City is asking the Court to do, and the legal basis upon which the City is seeking relief.  In this regard: (i) the financing is *conditioned upon* "entry of findings by this Court that such financing is in the best interests of the City" (see Financing Order ¶ F(i)); and (ii) the City expressly relies upon the legal standard articulated by Ames Dept. Stores, Inc. that the Court has "discretion under Section 364 of the Bankruptcy Code to permit debtors to exercise reasonable business judgment so long as (a) the terms of the financing agreement do not leverage the bankruptcy process and powers and (b) the financing agreement's purpose is primarily to benefit the estate and not a party in interest." (Financing Motion ¶ 54, citing Ames Dept. Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990).)  The requested disclosures are in the best interests of the City, its citizens and its creditors because they allow for transparency and accountability and ensure compliance with the Ames Dept. Stores, Inc. standard upon which the City relies in the Financing Motion.

14
2645777.1
13-53846-tjt    Doc 1863    Filed 11/27/13    Entered 11/27/13 17:16:58    Page 14 of 18

### B. The Financing Order Should Clarify That Any Superpriority Claims Shall Not be Paid From Restricted Funds

22. The Proposed Order should be clarified to provide that no claim or interest granted in favor of the Purchaser, Indenture Trustee or Bondholders in respect of the Postpetition Financing be payable from the Restricted Funds pending the resolution of the issues raised in the Adversary Proceeding.[11]

23. It does not appear that the City is asking the Court to grant a lien upon or interest in the Restricted Funds in connection with the Postpetition Financing. The City does, however, request that the Court grant a Superpriority Claim in favor of the Purchaser, Indenture Trustee and Bondholders, and the Proposed Order does not specify the funds from which such Superpriority Claim could be paid or satisfied.

24. Given the pending Adversary Proceeding, National respectfully requests that the following clarifying language be added to the Proposed Order:

> Nothing herein or in any of the Financing Documents shall grant or be deemed to grant in favor of the Purchaser, the Indenture Trustee, the Bondholders, or any other party, a lien on, interest in or superpriority claim against (including, without limitation, any Lien or Superpriority

---

[11] On November 8, 2013, National and Assured Guaranty Municipal Corp. commenced an adversary proceeding (the "<u>Adversary Proceeding</u>") by filing a Complaint for Declaratory Judgment and Order seeking, among other things a declaration that the Restricted Funds cannot be used for any purposes other than repaying holders of the Unlimited Tax Bonds [Adv. Pro. No 13-05309].

15

Claim) the proceeds of *ad valorem* taxes levied or pledged specifically to secure the repayment of unlimited tax general obligation bonds; provided, however, that the foregoing is without prejudice to the City's right, upon notice and an opportunity for parties in interest to be heard, to seek a modification of this decretal sentence upon resolution of the issues raised in the Adversary Proceeding commenced on November 8, 2013 by National Public Finance Guarantee Corporation and Assured Guaranty Municipal Corp.

25. National believes that this clarification is necessary to preserve the status quo and the parties' rights with respect to the Restricted Funds pending the resolution of the Adversary Proceeding. If the Court is inclined to approve the Post-Petition Facility, National respectfully requests that the Court include such clarifying language in the Proposed Order.[12]

---

[12] The City's proposed lender, Barclays, will not be prejudiced by this clarification because Barclays has already publicly acknowledged the special character of the Restricted Funds. In a Municipal Credit Research report dated August 7, 2013 distributed by Barclays, Barclays advised investors that, in its view, the Unlimited Tax Bonds should be treated as secured special revenue bonds in this chapter 9 proceeding.

WHEREFORE, National respectfully request that the Court deny the Financing Motion unless the concerns raised by this Objection are resolved and grant such other and further relief as is just and proper.

Dated: November 27, 2013

Respectfully submitted,

**JAFFE RAITT HEUER & WEISS, P.C.**

By: /s/ Paul R. Hage .
Louis P. Rochkind (P24121)
Paul R. Hage (P70460)
2777 Franklin Road, Suite 2500
Southfield, MI 48034
Tel: (248) 351-3000
Fax: (248) 351-3082
Email: lrochkind@jaffelaw.com
Email: phage@jaffelaw.com

and

**SIDLEY AUSTIN LLP**

Jeffrey E. Bjork
555 West Fifth Street, Ste. 4000
Los Angeles, CA 90013
Tel: (213) 896-6000
Fax: (213) 896-6600
Email: jbjork@sidley.com

Guy S. Neal
1501 K Street, N.W.
Washington, DC 20005
Tel: (202) 736-8000
Fax: (202) 736-8711
Email: gneal@sidley.com

*Attorneys for National Public Finance Guarantee Corporation*