

COLEMAN A. YOUNG MUNICIPAL CENTER
2 WOODWARD AVE., SUITE 1126
DETROIT, MICHIGAN 48226
PHONE 313•224•3703
FAX 313•224•4433
WWW.DETROITMI.GOV

October 15, 2013

Mr. Andrew Dillon
State Treasurer and Chair,
Michigan Department of Treasury
Bureau of Local Government Services
4th Floor Treasury Building
430 West Allegan Street
Lansing, MI 48992

Dear Mr. Dillon:

I enclose the quarterly report of the Emergency Manager of the City of Detroit as required by Section 9(5) of the Local Financial Stability and Choice Act (Michigan Public Act 436 of 2012). The report details the financial condition of the City for the quarterly period of July 1, 2013 through September 30, 2013.

Respectfully submitted,

Kevyn D. Orr
Emergency Manager, City of Detroit

Enclosure

cc:  Mr. Roger S. Fraser, Deputy Treasurer
     Mr. Edward B. Koryzno, Administrator, Office of Fiscal Responsibility

*State Representatives*            *State Senators*
The Hon. Brian Banks               The Hon. Coleman Young, II
The Hon. Alberta Talabi            The Hon. Bert Johnsen
The Hon. John Olumba               The Hon. Morris W. Hood, III
The Hon. Rose Mary Robinson        The Hon. Virgil Smith
The Hon. Fred Durhal               The Hon. Tupac A. Hunter
The Hon. Rashida Tlaib
The Hon. Thomas Stallworth
The Hon. David Nathan
The Hon. Harvey Santana
The Hon. Phil Cavanagh

KEVYN D. ORR, EMERGENCY MANAGER

# QUARTERLY REPORT WITH RESPECT TO THE FINANCIAL CONDITION OF THE CITY OF DETROIT

October 15, 2013

This quarterly report covers the period from July 1, 2013 through September 30, 2013 (the "Reporting Period") and addresses the financial condition of the City of Detroit.

**Local Financial Stability and Choice Act** (Michigan Public Act 436 of 2012) ("PA 436")

Section 9(5) [MCL § 141.1549(5)]

*The emergency manager shall submit quarterly reports to the state treasurer with respect to the financial condition of the local government in receivership, with a copy to the superintendent of public instruction if the local government is a school district and a copy to each state senator and state representative who represents that local government. In addition, each quarterly report shall be posted on the local government's website within 7 days after the report is submitted to the state treasurer.*

## Status of the Financial Condition of Detroit
## July 1, 2013 – September 30, 2013

**Emergency Manager's Comments on the Financial Condition of the City of Detroit**

The financial condition of the City of Detroit continues to be dire. On July 18, 2013, the City filed for relief under chapter 9 of title 11 of the United States Code (the "Bankruptcy Code"). The City has stopped making payments related to unsecured funded debt and legacy liabilities, with the exception of retiree healthcare benefits, which the City has continued to pay in the ordinary course, and certain important vendors. The City is in the process of seeking a $350 million post-petition bankruptcy loan (the "Postpetition Financing"); however, the projections included herein do not reflect the impact of such transaction.

General Fund cash flows and liquidity results for the first quarter of fiscal year 2014 (See Appendix A)

The City's 2014 fiscal year runs from July 1, 2013 through June 30, 2014. At the beginning of fiscal year 2014, the City's General Fund had cash of $71.3 million before accumulated property tax distributions in the amount of $35.3 million, resulting in a net unrestricted cash balance of $36.0 million. Based upon actual results for the first quarter of fiscal year 2014 (i.e., the three months ended September 30, 2013), the City had positive net cash flow of $140.3 million. This resulted in cash balance of $211.6 million, as of September 30, 2013, before deducting accumulated property tax distributions of $83.1 million (preliminary estimate), leaving net ending unrestricted cash balance of $128.5 million. This unrestricted cash balance exceeded the first quarter forecasted balance by $56.7 million.

The positive cash flow in the first quarter was mostly driven by the collection of more than $237 million of summer property taxes. Historically, the first quarter of the fiscal year has been the high point in cash for the General Fund. The General Fund's portion of the property taxes collected by the City is approximately $50 million; the remainder is collected by the City on behalf of other taxing authorities (e.g. Wayne County, Detroit Public Schools, State Education Trust, etc.). During the first quarter, the City continued to make payments related to certain LTGO debt, UTGO debt, and certificate of participation interest rate swaps, that constitute secured debt. Amounts paid related to these obligations were $6.2 million, $1.3 million, and $16.9 million, respectively. While the City has continued to make payments related to health coverage for retirees, the General Fund did not make pension contribution either to the General Retirement System ("GRS") or the Police and Fire Retirement System ("PFRS"). The City did not make any payments on unsecured bond debt during the first quarter.

When comparing the forecasted and actual cash flows for the first quarter of fiscal year 2014, the major variances were as follows:

- $13.7 million positive variance in gaming taxes related to timing and partially off-set by the $4.2 million June swap payment made in July;

- $13 million positive variance in other receipts primarily due to grant receipts, voided checks due to the chapter 9 filing, and a payment from Detroit Public Schools to the Public Lighting Department;
- $20 million negative variance in refinancing proceeds due to refinancing bond escrow funds not being released as forecast; and
- $44 million positive variance resulting from not making forecasted pension contributions.

General Fund cash flows and liquidity projections for the second quarter of fiscal year 2014 (ending December 2013) (See Appendix A)

The second quarter of fiscal year 2014 is projected to result in a General Fund net cash flow of negative $82.3 million, resulting in a December 31, 2013 cash balance of $129.3 million before accumulated property tax distributions of $82.4 million, or a $46.8 million unrestricted cash balance net of distributions. The forecast for the second quarter assumes that $20 million is released from the refinancing bond escrow funds. The forecast also assumes that the Postpetition Financing is not obtained or available during the second quarter of fiscal year 2014.

Preliminary unaudited revenues and expenditures for the first quarter of fiscal year 2014 (See Appendix B)

The revenues and expenditures report includes entries that have not been posted in the general ledger and encumbrances. This manner of presentation provides the most up to date data on revenues and expenditures. Unposted entries are preliminary and subject to review before they are finalized; therefore, actual results will likely be different from the preliminary results presented herein, and those difference may be material.

Preliminary unaudited General Fund revenues and expenditures for the first quarter ended September 30, 2013 result in a surplus of $55.8 million. Year-to-date revenues are approximately $22 million lower than last fiscal year mostly related to declining trends in property and other taxes and the reallocation of the utility users' taxes to the new Public Lighting Authority. Operating expenditures have declined by approximately $11 million, largely due to a reduction in employee headcount, from 10,325 city employees as of September 30, 2012 to approximately 9,322 city employees as of September 30, 2013.

**Emergency Manager Actions Regarding Restructuring Process**

Background

As described in the initial quarterly report pursuant to section 9(5) of the PA 436 dated July 15, 2013 (the "First Quarterly Report"), the Emergency Manager began the process of developing a comprehensive restructuring plan for the City, and addressing the City's other urgent needs, immediately upon the Emergency Manager's appointment. The Emergency Manager has taken decisive action to improve public health and safety by taking steps to update outdated and poorly maintained emergency vehicles, information technology infrastructure and facilities and address other longstanding

needs of the City. These activities are described in the First Quarterly Report and include, among other things, opening the Detroit Public Safety Headquarters, hiring a new Chief of Police and developing and pursuing a plan to fix streetlights and address the City's outdated power grid.

To assist in this process, the Emergency Manager spent significant time from the outset of his appointment working with the City's financial and legal advisors to cast a critical eye on all of the City's financial obligations and operational issues to develop a realistic assessment of the City's problems, obstacles, needs and opportunities. As noted in the First Quarterly Report, the goal of this process was to develop a comprehensive plan to: (a) ensure that the City is able to provide for or procure governmental services essential to the health, safety and welfare of its citizens; (b) assure the fiscal accountability and stability of the City; and (c) promote private investment in the City and the revitalization of the community in a sustainable fashion.

One of the first steps was the development of a financial and operating plan for the City (the "Financial and Operating Plan"), which placed the City's challenges in context and defined a series of goals and initiatives. The Financial and Operating Plan, dated May 12, 2013, was submitted to the State Treasurer as required by section 11(2) of PA 436 on May 13, 2013 and is available on the City's website at http://www.detroitmi.gov/EmergencyManager/Reports.aspx.

Continuing to build on these actions, the Emergency Manager and his advisors developed and presented a detailed restructuring proposal to creditors on June 14, 2013 (the "Restructuring Proposal"). The 128-page Restructuring Proposal details a thorough overhaul and restructuring of the City's operations, finances and capital structure. The Restructuring Proposal also proposes recoveries for each creditor group. The proposal is based on ten-year projections that provide a realistic basis for evaluating the City's financial wherewithal to satisfy creditors' claims and achieve the City's restructuring goals. The Restructuring Proposal is described in the First Quarterly Report and is available on the City's website at http://www.detroitmi.gov/EmergencyManager/Reports.aspx.

As noted in the First Quarterly Report, following the presentation of the Restructuring Proposal to approximately 150 creditor representatives on June 14, 2013, the City conducted a series of individualized meetings with its organized and represented creditor constituencies to: (a) provide them with additional details on the financial condition of the City, (b) describe key assumptions used to develop the ten-year projections underlying the Restructuring Proposal, (c) provide a forum to answer questions from creditors; (d) solicit responses and counter-proposals from the various constituencies and (e) negotiate in good faith regarding the City's Restructuring Proposal.

General Actions Since the First Quarterly Report

Since the submission of the First Quarterly Report, the Emergency Manager, his staff and outside advisors have continued to dedicate significant time and energy addressing the City's financial and operational emergency. Meetings with interested parties, state and federal government officials, professional advisors and creditors occur numerous times each week, if not daily.

In support of the City's restructuring, the Emergency Manager issued several important orders that promote the health, safety and welfare of the City's residents and visitors. These orders also were designed to assist the Emergency Manager in his efforts to analyze the factors and circumstances contributing to the City's financial emergency. Since the submission of the First Quarterly Report, the Emergency Manager has entered orders consistent with PA 436 that: (a) approved a trust fund mechanism to collect and hold certain City revenue sources dedicated to reconfiguring the City's streetlight footprint to provide reliable public lighting service and make the streets safer for Detroit citizens under the management of the new Public Lighting Authority; (b) suspended certain City ordinances in order to streamline contractors' ability to obtain the permits needed to demolish blighted, abandoned or dangerous residential structures in a prompt, safe and cost efficient manner; and (c) directed certain City employees to provide various records, books, documents and data related to the finances and operations of the Detroit General Retirement System and Detroit Police and Fire Retirement System to assist in evaluating the fiscal soundness of the retirement systems. These orders are consistent with the initiatives outlined at the Restructuring Proposal and reflect meaningful steps taken with respect to the issues facing the City. These orders, in addition to all prior and future orders, are available on the City's website at http://www.detroitmi.gov/EmergencyManager/Orders.aspx.

The Emergency Manager continued to evaluate and, where appropriate, pursue opportunities relating to the City's assets. For example, after a series of negotiations, the Emergency Manager entered into a lease with the State with respect to Belle Isle Park (the "Belle Isle Lease") on September 30, 2013. Thereafter, on October 1, 2013, the Belle Isle Lease was approved by the Governor pursuant to section 12(1)(r) of PA 436 and was submitted to the Detroit City Council for review and approval in accordance with section 19 of PA 436 on October 3, 2013. Under the proposed lease transaction, the State, through its Department of Natural Resources, will lease Belle Isle Park from the City and enhance its management, operation and maintenance for the benefit of the City and the general public. This will result in an anticipated savings of over $6 million each fiscal year to the City. In addition to removing a cost center from the City's budget, the Belle Isle Lease contemplates that the State will upgrade and enhance, among other things, Belle Isle's roads, bridges, landscaping and hardscaping during the course of the Belle Isle Lease. The City further benefits from the Belle Isle Lease because, at its conclusion, any improvements become property of the City without any cost to the City. On October 14, 2013, Detroit City Council disapproved the Belle Isle Lease and approved an alternative proposal. Pursuant to section 19(2) of PA 436, the Belle Isle Lease and the Detroit City Council's alternative proposal will be submitted to the local emergency financial assistance loan board for consideration. Under section 19(2) of PA 436, within 30 days, the local emergency financial assistance loan board "shall approve the proposal that best serves the interest of the public."

Finally, on September 30, 2013, the Emergency Manager submitted to the Governor and other public officials his initial report in accordance with section 17 of PA 436 (the "Six Month Report"). Among other things, the Six Month Report included the following information for the reporting period of March 25, 2013 through August 31, 2013: (a) expenditures made, approved or disapproved by the Emergency Manager in excess of $5,000; (b) contracts awarded or approved by the Emergency Manager with a cumulative value of in excess of $5,000; (c) loans sought, approved or disapproved by the Emergency

Manager that have a cumulative value of $5,000 or more; and (d) new positions created, vacancies filled and positions eliminated by the Emergency Manager. The Six Month Report is available on the City's website at http://www.detroitmi.gov/EmergencyManager/Reports.aspx.

Filing Petition for Chapter 9

As noted above, following the presentation of the Creditor Proposal on June 14, 2013, the Emergency Manager conducted a series of meetings with representatives of various creditor constituencies. Unfortunately, these efforts did not result in either: (a) sufficient consensual savings from major creditor constituencies to ameliorate the City's financial emergency; (b) sufficient contract amendments to successfully restructure the City's finances; or (c) the realistic prospect of any such consensual agreements in the near term (if at all). Given the vast and fragmented pool of potential creditors, it was impossible to negotiate a consensual restructuring outside of a court process. Moreover, many key parties to these negotiations were unrepresented, such as retirees and uninsured bondholders. Even where creditors were available to participate in negotiations, certain parties rejected the City's proposals outright, while others made untenable and unworkable counterproposals that contemplated that their particular group would not be impaired in the restructuring process.

Unable to reach a workable out-of-court solution, and with no prospect of being able to do so, the Emergency Manager delivered a letter to the Governor and the State Treasurer on July 16, 2013, pursuant to section 18(1) of PA 436 (the "Recommendation Letter"), recommending and requesting that the City be authorized to seek relief under chapter 9 of the Bankruptcy Code. The detailed rationale for this recommendation and request is set forth in the Recommendation Letter. A copy of the Emergency Manager's Recommendation Letter is available on the State's website at http://michigan.gov/documents/snyder/Detroit_EM_Kevyn_Orr_Chapter_9_Recommendation_427831_7.pdf.

On July 18, 2013, the Governor delivered a letter to the Emergency Manager and the Treasurer (the "Authorization Letter") authorizing the City to commence a bankruptcy case under chapter 9 of the Bankruptcy Code. In the Authorization Letter, the Governor agreed with the Emergency Manager that chapter 9 offers the only feasible alternative to fix the City's finances and to complete a sustainable restructuring for the benefit of Detroit's 700,000 residents. Based on the Emergency Manager's Recommendation Letter, the Governor determined that: (a) the City cannot meet its basic obligations to its citizens; (b) the City cannot meet its basic obligations to its creditors; (c) the City's failure to meet its obligations to its citizens – leading to a dwindling population and tax base – is a primary cause of its inability to meet its obligations to its creditors; and (d) the only feasible path to ensuring the City will be able to meet obligations in the future is to have a successful restructuring under the federal bankruptcy process. Each of these determinations was explained in detail in the Governor's Authorization Letter, which is available on the State's website at http://www.michigan.gov/documents/snyder/Governor_Snyder_Chapter_9_Authorization_427830_7.pdf.

Upon receiving the Authorization Letter, the Emergency Manager issued an order directing the commencement of the City's chapter 9 bankruptcy case. Consistent with these approvals, on July 18,

2013 (the "Petition Date"), the City filed a voluntary petition under chapter 9 of the Bankruptcy Code in the United States Bankruptcy Court for the Eastern District of Michigan (the "Bankruptcy Court"), which case is captioned *In re City of Detroit, Michigan*, Case No. 13-53846 (the "Bankruptcy Case"). Along with its voluntary petition, the City filed various other papers, including the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code (the "Orr Declaration"). The Orr Declaration explains the history of the City's financial and operational problems, details the dire circumstances facing the City and provides support for the City's eligibility to be a chapter 9 debtor under the Bankruptcy Code. The Orr Declaration, along with other Bankruptcy Case filings and other information relevant to the Bankruptcy Case can be found on the website of the City's claims and noticing agent at www.kccllc.net/Detroit (the "Restructuring Website").

On July 19, 2013, Bankruptcy Judge Stephen W. Rhodes was assigned to the Bankruptcy Case by the Chief Judge of the United States Court of Appeals for the Sixth Circuit.

It is the intent of the Emergency Manager to move the Bankruptcy Case as expeditiously as possible to complete an adjustment of the City's debts under the Bankruptcy Code by no later than September 2014. Completing the Bankruptcy Case in a timely and efficient manner is important to the City's revitalization and reinvestment activities because it will free the City from burdensome and unsustainable debt obligations and allow it to reinvest in the City's operations and infrastructure, which will in turn attract new businesses and residents to the City and promote the health, safety and welfare of the public.

Activities in the Bankruptcy Case

Since filing the Bankruptcy Case, the Emergency Manager has coordinated the City's legal strategy related to bankruptcy with his professional advisors. The Emergency Manager is committed to advancing the bankruptcy process as promptly and efficiently as possible to complete a sustainable adjustment of the City's debts. From the outset, the Emergency Manager has exercised the City's rights, and fulfilled the City's obligations, to pursue these goals. Certain of the primary activities to date in the Bankruptcy Case are summarized below:

*Administrative Matters*

Since the Petition Date, the Emergency Manager has taken steps to preserve the benefits and protections afforded by the automatic stay imposed by sections 362 and 922 of the Bankruptcy Code (the "Chapter 9 Stay"). For example, at the outset of the Bankruptcy Case, the City obtained orders of the Bankruptcy Court (a) confirming the application of the Chapter 9 Stay to the City and its officers and inhabitants and (b) extending the protections of the Chapter 9 Stay to, among others, non-director City employees and certain State officials. The Chapter 9 Stay provides the City with an important "breathing spell" to address the City's financial circumstances and craft a plan of adjustment without interference from adverse creditor actions.

The Emergency Manager also has fulfilled other administrative requirements necessary to pursue the prompt conclusion of these cases. For example, on September 30, 2013, the City filed a 3,000-plus page list of potential creditors and their claims, consistent with sections 924 and 925 of the Bankruptcy Code. On October 1, 2013, the City filed a motion to establish certain bar dates for the filing of proof of claims. The Emergency Manager intends to move promptly to establish a claims resolution process. This will allow the City to establish the claims that will be addressed in its plan of adjustment.

*Retiree Committee*

Since the Petition Date, the Emergency Manager has continued to participate in negotiations with the City's creditors and other interested parties with the goal of reaching consensus, to the fullest extent possible, on the terms of a plan of adjustment. In support of these discussions, at the outset of the Bankruptcy Case, the City requested the appointment of an official committee of retired employees (the "Retiree Committee") to represent the interests of retirees in these negotiations. Prior to the commencement of the Bankruptcy Case, no party was empowered to represent the City's retirees — holders of billions of dollars of legacy claims that must be addressed in any restructuring. On August 2, 2013, the Bankruptcy Court entered an order directing the appointment of the Retiree Committee, which was formed on August 22, 2013. Since that time, the City has engaged in regular discussion of restructuring issues with the Retiree Committee and its advisors.

*Eligibility*

At this stage in the Bankruptcy Case, the primary issue before the Bankruptcy Court is whether or not the City is eligible to be a chapter 9 debtor under the Bankruptcy Code. This requires, among other things, the Bankruptcy Court determine whether: (a) the City is a municipality; (b) the City was specifically authorized to be a debtor by state law; (c) the City is insolvent; (d) the City desires to effectuate a plan to adjust its debts; and (e) either (i) the City negotiated in good faith with its various creditor constituencies or (ii) it was impracticable to negotiate with the City's creditors. To resolve this threshold issue of eligibility without delay, the Emergency Manager requested that the Bankruptcy Court expedite the process of identifying and adjudicating any objections to eligibility. In response, Judge Rhodes established a prompt timeline to determine whether the City is eligible to be a debtor under chapter 9 of the Bankruptcy Code. This resulted in over 100 objections to the City's eligibility within the first month of the Bankruptcy Case.

Within days of the eligibility objections being filed, the City and the objecting parties (the "Objectors") exchanged written discovery requests. Within approximately two weeks, the City produced over 10,000 documents in response to over 100 document requests, in addition to responding to over 150 interrogatories and nearly 50 requests for admission from the various Objectors. In addition to the fast-paced and voluminous discovery, the Bankruptcy Court has conducted nearly a dozen hearings related to the City's eligibility, ranging from discovery and privilege disputes to substantive legal arguments related to the Bankruptcy Court's Constitutional authority to decide whether the City is eligible to be a chapter 9 debtor. In a compressed period, numerous depositions have been taken of various City employees and professional advisors, the Mayor, the Emergency Manager and certain State officials, as

well as depositions of certain of the Objectors or their representatives. Oral argument before Judge Rhodes on purely legal issues associated with eligibility are scheduled to begin on October 15, 2013. A bench trial before Judge Rhodes on the factual basis for the City's chapter 9 eligibility is scheduled to begin on October 23, 2013.

*Swap Settlement*

Immediately prior to the Petition Date, the Emergency Manager reached a consensual resolution with the counterparties to the City's interest rate swap agreements to eliminate one of the City's largest secured obligations at a discount and ensure ongoing access to critical casino revenues that were pledged to support the swap arrangements. This agreement is memorialized in a Forbearance and Optional Termination Agreement (the "FOTA") between the City and the swap counterparties. On the Petition Date, the City filed a motion with the Bankruptcy Court to assume the FOTA under section 365 of the Bankruptcy Code and approve the parties' settlement under Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Settlement Motion"). There has been significant opposition to the Settlement Motion, particularly from Syncora Guarantee, Inc. and other monoline insurers, which has resulted in litigation regarding, among other things, the appropriateness of the compromises in the FOTA, the swap counterparties' ability to consummate the FOTA and the City's ability to pay for the settlement. This litigation is ongoing and currently is expected to be set for an evidentiary hearing in November 2013. In the meantime, the parties are participating in Court-ordered mediation in an effort to resolve or narrow their disputes, and the City is working to obtain Postpetition Financing pursuant to section 364 of the Bankruptcy Code to assist in the funding of the settlement and other contemplated restructuring and reinvestment activities.

*Mediation*

In addition to mediation of the swap settlement disputes, substantial time and effort has been devoted by the Emergency Manager and his staff and advisors to negotiate other key restructuring issues through a mediation program established by the Bankruptcy Court to facilitate these efforts. In particular, Judge Rhodes appointed Judge Gerald E. Rosen, Chief Judge for the United States District Court for the Eastern District of Michigan, as the mediator for the City's Bankruptcy Case. In turn, Judge Rosen appointed six additional mediators, each focusing on different elements of the City's restructuring and reorganization activities. To date there have been multiple mediation sessions and numerous written submission related to, among other things, the City's core restructuring and reorganization initiatives outlined in the Restructuring Proposal, as well as labor and pension matters. The Emergency Manager has embraced the mediation process.

Outside of the mediation sessions, the City has continued to engage in ongoing dialog with its unions, pension systems, debtholders (trustees, individual holders and ad hoc groups), the Retiree Committee and other interested parties to advance key restructuring issues. The Emergency Manager and his staff and advisors will continue to meet with creditors and interested parties with the goal of developing, to the fullest extent possible, a consensual plan that addresses the City's operational and financial restructuring needs.

*Plan of Adjustment*

The Bankruptcy Court set a deadline of March 1, 2014 for the City to file a plan of adjustment in the Bankruptcy Case. The Emergency Manager intends to file the City's proposed plan of adjustment and related disclosure statement in advance of this deadline by the Bankruptcy Court — with the goal of filing these documents by the end of December 2013.

**Appendices**

A. Cash Flow Actuals and Projections for the Period Jul-Sep 2013
B. Preliminary Unaudited Revenues and Expenditures for Q1 Fiscal Year 2014

# Cash Flow Actuals and Projections for the Period Jul-Sep 2013

| $ in millions | Forecast Q1 | FY 2014 Actual Q1 | Variance Q1 | FY 2014 Forecast Q2 | 3A + 3F FY 2014 |
|---|---|---|---|---|---|
| **Operating Receipts** | | | | | |
| Property taxes | $ 223.1 | $ 237.6 | $ 14.5 | $ 30.2 | $ 267.8 |
| Income & utility taxes | 73.7 | 68.6 | (5.0) | 74.9 | 143.6 |
| Gaming taxes | 37.7 | 51.4 | 13.7 | 40.7 | 92.1 |
| Municipal service fee to casinos | 7.6 | 7.3 | (0.3) | 8.0 | 15.3 |
| State revenue sharing | 61.4 | 60.6 | (0.8) | 30.9 | 91.5 |
| Other receipts | 79.0 | 92.0 | 13.0 | 77.2 | 169.2 |
| Refinancing proceeds | 20.0 | - | (20.0) | 20.0 | 20.0 |
| **Total operating receipts** | **502.5** | **517.5** | **15.1** | **281.9** | **799.4** |
| **Operating Disbursements** | | | | | |
| Payroll, taxes, & deductions | (84.1) | (89.2) | (5.0) | (90.9) | (180.1) |
| Benefits | (46.4) | (45.8) | 0.6 | (48.8) | (94.6) |
| Pension contributions | (44.0) | - | 44.0 | (12.7) | (12.7) |
| Subsidy payments | (18.9) | (8.4) | 10.4 | (13.5) | (22.0) |
| Distributions - tax authorities | (135.3) | (103.9) | 31.4 | (23.3) | (127.2) |
| Distributions - UTGO | (12.0) | - | 12.0 | - | - |
| Distributions - DDA increment | - | - | - | (8.0) | (8.0) |
| Income tax refunds | (5.2) | (5.0) | 0.2 | (2.5) | (7.5) |
| A/P and other miscellaneous | (103.4) | (101.7) | 1.7 | (146.8) | (248.6) |
| Sub-total operating disbursements | (449.4) | (354.1) | 95.3 | (346.6) | (700.7) |
| POC and debt related payments | (17.4) | (23.2) | (5.8) | (17.6) | (40.8) |
| **Total disbursements** | **(466.8)** | **(377.2)** | **89.5** | **(364.2)** | **(741.5)** |
| Net cash flow | 35.7 | 140.3 | 104.6 | (82.3) | 57.9 |
| Beginning cash balance | 71.3 | 71.3 | (0.0) | 211.6 | 71.3 |
| Net cash flow | 35.7 | 140.3 | 104.6 | (82.3) | 57.9 |
| **Cash before required distributions** | **$ 107.0** | **$ 211.6** | **$ 104.6** | **$ 129.3** | **$ 129.3** |
| Accumulated property tax distributions | (35.2) | (83.1) | (47.9) | (82.4) | (82.4) |
| **Cash net of distributions** | **$ 71.8** | **$ 128.5** | **$ 56.7** | **$ 46.8** | **$ 46.8** |
| *Memo:* | | | | | |
| Refunding bond proceeds in escrow | 51.7 | 79.5 | 27.8 | 59.5 | 59.5 |
| Reimbursements owed to other funds | tbd | tbd | tbd | tbd | tbd |

($ in millions)

| | FY13 Q1 | FY14 Q1 | FY14 - FY13 Q1 Difference |
|---|---|---|---|
| **Revenues** | | | |
| Property Taxes | $ 62.2 | $ 51.5 | $ (10.7) |
| Municipal Income Tax | 53.3 | 50.9 | (2.5) |
| Wagering Taxes | 45.4 | 43.7 | (1.7) |
| Utility Users' and other taxes | 3.9 | 0.3 | (3.6) |
| Licenses, Permits and Inspection Charges | 5.8 | 0.9 | (4.9) |
| State Revenue Sharing | 43.3 | 44.2 | 0.8 |
| Sales and Charges for Services | 14.5 | 15.4 | 0.9 |
| Revenue from Use of Assets | 0.8 | 1.2 | 0.3 |
| Parking/court fines and other revenue | 11.3 | 10.3 | (1.0) |
| General Fund and Other Contributions | 1.2 | 1.8 | 0.5 |
| Grant Revenue | - | - | - |
| Transfers in | 0.1 | 0.1 | (0.0) |
| **Total revenues** | 242.0 | 220.2 | (21.9) |
| **Expenditures** | | | |
| Salaries & Wages | (75.7) | (63.5) | 12.3 |
| Overtime | (7.7) | (8.3) | (0.5) |
| Pensions | (13.5) | (13.7) | (0.2) |
| Benefits | (44.5) | (36.0) | 8.5 |
| Professional and contractual services | (1.1) | (9.4) | (8.2) |
| Materials & Supplies | (10.0) | (6.4) | 3.7 |
| Utilities | (0.7) | (1.7) | (1.0) |
| Purchased Services | (1.1) | (3.5) | (2.4) |
| Risk management and insurance | (0.7) | (1.1) | (0.4) |
| Other expenses | (4.1) | (6.7) | (2.6) |
| Debt Service | (3.5) | (0.4) | 3.2 |
| Contributions | (11.7) | (12.0) | (0.3) |
| Transfers Out | (1.2) | (1.8) | (0.5) |
| **Total expenditures** | (175.7) | (164.4) | 11.4 |
| **Deficit (excl. financing proceeds)** | 66.3 | 55.8 | (10.5) |
| Financing proceeds | 138.6 | - | (138.6) |
| **Total surplus (deficit)** | $ 204.9 | $ 55.8 | $ (149.1) |