UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |
| | | Related to Dkt. No. 1520 |

**OBJECTION OF THE DETROIT RETIREMENT SYSTEMS TO THE MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY**

The Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit (together, the "Retirement Systems") hereby file this objection to the Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (the "Financing Motion") [Dkt. No. 1520], stating as follows:[1]

---

[1] This Objection is filed subject to the reservations of rights in the Appearances filed by the undersigned counsel in this case, including the Retirement Systems' right to argue that this Court lacks subject-matter jurisdiction.

## Preliminary Statement

1. The Retirement Systems object to the Financing Motion and approval of the $350 million debt facility (the "Debt Facility") proposed therein on the following grounds, as described more fully below:

- **Improper Purpose:** A primary purpose of the Debt Facility is to pay off the Swap Counterparties' asserted secured claims.[2] The Retirement Systems, among other parties, dispute that the Swap Counterparties' claims are secured by valid and enforceable liens. Accordingly, the Retirement Systems dispute the need to encumber assets of the City to obtain the Debt Facility to pay off these claims.

- **Lack of Business Justification:** In order to ensure swift payment to the Swap Counterparties (for which, as stated above, there is no reasonable business justification), the City appears to have made crucial sacrifices to key terms of the financing—to the overall detriment of the City and its creditors.

- **Unreasonably High Costs:** The proposed cost of the Debt Facility appears to be unreasonable: a likely non-default interest rate of approximately 6.5%, a default interest rate of 8.5%, and a sizeable commitment fee in the approximate amount of $4,375,000 (non-refundable and payable regardless of whether the Court approves the Financing Motion)—despite having limited risk, in light of: **(i)** a collateral package that grants Barclays first priority liens on the City's two most stable income streams, with annual <u>recurring</u> revenues in excess of approximately $400 million, along with a first priority lien in the net proceeds from any sales or leasing of City assets exceeding $10 million; **(ii)** the City's proposed grant of super-priority status to Barclays' claims under 11 U.S.C. § 364(c)(1); **(iii)** a very short maturity date that will not exceed the end of this case; and **(iv)** Barclays being designated the exclusive placement agent for any exit financing in this case (and thus being in a position to control its own refinancing, as well as benefitting twice from this transaction). This

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Financing Motion.

comment is subject to conducting discovery to determine the market and whether the cost of this financing indeed falls within the reasonable business judgment of the City.

- **Improper Exclusivity:** As stated, the transaction includes granting Barclays the exclusive right to serve as the placement agent for any exit financing for the City in this case—an extraordinary grant at this stage in the case that appears to be an unwarranted and improper ceding of control of an important aspect of the case to a third party. The City should be able to seek the most advantageous exit financing, as needed, from whatever source.

- **Vague Proposed Uses:** If the Swap Counterparties are determined to be unsecured creditors and the Forbearance Agreement is not approved, the amount of the Debt Facility apparently does not decline to a fixed amount required to fund specific items in specific amounts pursuant to the Quality of Life Bonds; instead, the full $350 million simply shifts and is allocated to the Quality of Life Bonds. However, there is no defined budget and identified use of proceeds for the Quality of Life Bonds, whether in the amount of $125 million or $350 million. Moreover, the language of the Financing Motion appears to indicate that the proceeds of the Quality of Life Bonds may be used for other unidentified purposes. This imprecision is unacceptable to support a request to encumber assets and obtain financing.

- **Lack of Proper Approvals:** Upon information and belief, to date, the Emergency Loan Board has not approved the Debt Facility under Public Act 436 and the Home Rule City Act; therefore, approval by this Court may run afoul of Bankruptcy Code section 903, as requisite state approval has not been granted.

## Legal Standard

2. The Financing Motion is brought pursuant to Bankruptcy Code section 364(c). Section 364(c) is fully and unconditionally incorporated into Chapter 9 pursuant to 11 U.S.C. § 901. This subsection expressly grants the court discretion to authorize secured financing if and only if certain conditions are met.

10322623.4 14893/165083

Courts typically require the debtor to demonstrate that: (1) it is unable to obtain unsecured financing pursuant to section 364(b); (2) the financing is necessary to preserve the assets of the estate; and (3) the terms of the financing are fair, reasonable, and adequate given the circumstances of the borrower and lender. *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987). Other factors considered include whether the financing is in the best interests of the estate and its creditors, whether any better offers, bids, or proposals exist, and whether the financing is necessary and appropriate for the operation of the estate and preservation of assets. *In re Farmland Indus., Inc.*, 294 B.R. 855, 879-80 (Bankr. W.D. Mo. 2003). According to *Collier on Bankruptcy*, "[c]ourts may refuse to authorize the borrowing where the terms are too onerous, amount to the lender's take-over of the estate's property . . . or constitute a *sub rosa* plan." 6 COLLIER ON BANKRUPTCY, ¶ 364.04[2] (16th Ed. Rev. 2013).

3. The key question is whether the City has proven that this proposed secured financing satisfies the business judgment test, as required by section 364(c). The City has previously suggested in open court in the case that, by virtue of section 904 of the Bankruptcy Code—which generally prohibits bankruptcy court interference with the debtor's "political or governmental powers", the debtor's property or revenues, or the debtor's use of income-producing property—this Court has no authority to question the City's business judgment in connection

10322623.4 14893/165083

with obtaining post-petition financing under section 364(c). Such an interpretation would render section 364(c) meaningless in the Chapter 9 context. The City has cited no authority—none— for the proposition that courts are to analyze proposed financing transactions under section 364(c) differently if the bankruptcy case is under Chapter 9. The City's suggestion would render the Court nothing more than a "rubber stamp" in the process, which is not supported by the Code.

4. The Financing Motion admits as much, correctly citing case law establishing that the City must meet the "reasonable business judgment" standard in order for the Court to approve its post-petition financing under section 364(c), and that courts will defer to a debtor's reasonable business judgment when entering into financing transactions under 11 U.S.C. § 364(c) only when the financing transaction is in the best interests of the debtor and its creditors. *In re Trans World Airlines, Inc.* 163 B.R. 964, 974 (Bankr. D. Del. 1994); Financing Motion, ¶ 54.

5. In recent hearings, the Court raised the question of whether assessing the business judgment of the City in seeking the Debt Facility might constitute interference with the City's political or governmental powers, in violation of section 904(1). Obviously, the City is a governmental entity, and any activity it undertakes could be viewed as an exercise of its governmental powers. However, defining "governmental powers" so broadly would completely vitiate the analysis

under section 364(c) and, indeed, may swallow the entirety of Chapter 9. As such, it is too broad and imprecise.

6. While there does not appear to be any case law on point as to what constitutes a governmental power protected by section 904, the Retirement Systems submit that there are activities of a Chapter 9 debtor that, while representing an exercise of governmental power generally, are more properly viewed as activities that directly or materially impact and implicate the rights of creditors in the bankruptcy case, that affect the reorganization process and the integrity of the Chapter 9 process, or that are fundamentally related to the adjustment or restructuring of debts or other core functions of the bankruptcy court. And to the extent that a matter involves such an aspect, it should fall fairly within the purview of the bankruptcy court.

7. The Financing Motion in particular falls squarely within the core function of the bankruptcy court and Chapter 9 process. The Court is being asked to determine whether the terms of a proposed secured financing that will encumber assets that might otherwise be available for creditors are appropriate (a core issue) and whether the treatment of the Swap Counterparties as secured creditors and the early payment of their prepetition debts at an 18% discount is an appropriate restructuring of the Swap Counterparties' debts (a core question at the heart of the

10322623.4 14893/165083

Chapter 9 process). These are issues as to which the City bears the burden of proof.

8. Moreover, section 904's prohibition against interference with the debtor's governmental power is subject to the caveat "unless the debtor consents." Here, the City has submitted itself to the jurisdiction of the Court and is seeking the benefits of Bankruptcy Code section 364(c). As such, it seems plain that the City has consented to the Court's scrutiny of the transaction, under the business judgment standard, and there is no basis to circumscribe the Court's consideration of any aspect that impacts its consideration of whether reasonable business judgment supports the transaction as a whole. *See, e.g., In re City of Stockton*, 486 B.R. 194, 199 (Bankr. E.D. Cal. 2013) ("When a chapter 9 debtor files a 9019 motion to have the court approve a compromise or settlement, the municipality 'consents' for purposes of § 904 to judicial interference with the property or revenues of the debtor needed to accomplish the proposed transaction.").

## Objection

I. **The Proposed Debt Facility Should Not Be Approved Because It Improperly Benefits the Swap Counterparties to the Detriment of the City and Its Creditors**

9. It is readily apparent that one of the primary purposes of the proposed Debt Facility is to benefit the Swap Counterparties, who will receive approximately $230 million of the proposed $350 million Debt Facility proceeds in

connection with the termination of the Swap Agreements. Financing Motion, ¶ 16. The City touts the 18% "discount" on the termination payments as evidence that this $230 million payoff is in the best interests of the City and its creditors. *Id.* However, in doing so, the City ignores the fact that: (1) it is entirely unclear that the City is under any obligation to terminate the Swaps at this time, and with interest rates projected to increase, the termination payment may accordingly decrease over time; and (2) paying the Swap Counterparties 82 cents on the dollar on their claims for termination payments could only be considered a "discount" if such entities would otherwise be entitled to 100 cents on the dollar as fully secured creditors, which the Retirement Systems (among many other creditors and parties-in-interest) vigorously dispute.[3] If the Swap Counterparties are determined to be general unsecured creditors, a payment of 82 cents on the dollar would likely

---

[3] *See* Objection of the Detroit Retirement Systems to the Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of That Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief [Dkt. No. 370] (the "<u>Swap Settlement Objection</u>") and Supplemental Objection of the Detroit Retirement Systems to the Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of That Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief [Dkt. No. 973] (the "<u>Supplemental Swap Settlement Objection</u>"). The Retirement Systems fully incorporate herein each of their arguments made in their Swap Settlement Objection and their Supplemental Swap Settlement Objection relating to the impropriety of the Assumption Motion and Forbearance Agreement and reserve all rights.

represent an unjustifiable windfall of multiple times the recovery for other general unsecured creditors.

10. In short, if there is no obligation to make a termination payment at this time or if the Swap Counterparties are not entitled to treatment as secured creditors, then the Swap Forbearance Agreement cannot be approved under Bankruptcy Rule 9019, and the portion of the Debt Facility comprising the Swap Termination Bonds is not supported by any reasonable business judgment.

11. In their Swap Settlement Objection and Supplemental Swap Settlement Objection, the Retirement Systems raise, among other issues, critical legal arguments that the Swap Counterparties simply are not secured creditors and are not entitled to better treatment than other general unsecured creditors. Those arguments, focused on the legal conclusion that the Swap Counterparties do not have a postpetition lien in the casino tax revenues (the "Casino Revenue"), include the following:

> (a) the Casino Revenue, while likely constituting excise taxes for purposes of Bankruptcy Code section 507(a), does not constitute *special* excise taxes under section 902(2) that would be subject to the provisions of section 928(a) granting a postpetition lien;
>
> (b) even if the Casino Revenue constitutes special excise taxes, the protections of section 928(a) do not apply to grant a postpetition lien in the Casino Revenues to the Swap Counterparties because their debt is not special revenue bondholder debt;

(c) since section 928(a) does not apply, section 552(a) does apply and cuts off any valid prepetition lien that the Swap Counterparties may have had in prepetition Casino Revenue, since (i) the asserted lien is a consensual lien subject to section 552(a) and not a statutory lien, and (ii) any postpetition Casino Revenue is not the proceeds, product, or offspring of prepetition Casino Revenue (*i.e.*, the prepetition collateral); and

(d) the asserted prepetition lien of the Swap Counterparties in the Casino Revenue is invalid in any event because it is not a kind of lien that is authorized under the Michigan Gaming Control and Revenue Act. M.C.L. § 432.212.[4]

12. Based on the foregoing, the Forbearance Agreement should not be approved by the Court under Bankruptcy Rule 9019 or otherwise. No valid purpose would be served by issuing the Swap Termination Bonds. Accordingly, it cannot be validly argued that the City's proposed issuance of same is supported by reasonable business judgment. The City's proposal to take on this massive Debt Facility (on such unfavorable terms, as described below) for the primary purpose of validating its liability to and paying off the Swap Counterparties—in lieu of challenging their secured status in this Court—is not in the best interests of the City or its creditors. As one of the cases cited by the City in support of the business judgment rule, *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 39 (Bankr.

---

[4] The City appears to recognize the Retirement Systems' (and Ambac's) argument in this regard by providing in its Request for Proposal and Term Sheet for the proposed Debt Facility that the Casino Revenue would be pledged to secure only the Quality of Life Note, and *not* the Swap Termination Note. Financing Motion, ¶ 47, p. 30-32.

S.D.N.Y. 1990), recognizes, if the primary purpose of the financing is to benefit a particular creditor over the debtor or its other creditors, the financing should not be approved by the bankruptcy court under section 364(c).

## II. Subject to Discovery, the Proposed Debt Facility Should Not Be Approved Because It Appears to Be Improperly Priced

13. Furthermore, the City cannot meet the *Crouse* standard for borrowing under section 364(c) because the terms of the proposed Debt Facility are not fair or reasonable, but instead is unreasonably lucrative for Barclays. The City concedes that during the selection process it gave "significant weight" to the quickness with which the deal could close so that it could take advantage of the "discounted" termination payment under the Forbearance Agreement. Financing Motion, ¶ 37. Indeed, as described more fully below, the City appears to have made significant sacrifices with respect to other key components of the deal—such as the overall cost of the facility and the control of the exit facility granted to Barclays—in order to benefit the Swap Counterparties, to the detriment of the City and its other creditors.

14. With respect to cost, the Financing Motion describes the cost of the Debt Facility as "interest at 1-month LIBOR plus 250 basis points," with the LIBOR deemed at all times to be at least 1%, which equates to a total effective interest rate of 3.5%. Financing Motion, ¶ 47, p. 28. This 1% LIBOR "floor" is

10322623.4 14893/165083

over five times the current 1-month LIBOR rate.[5] Further, such interest rate can be "increased by 200 basis points" upon an event of default, bringing the effective interest rate to 5.5%. *Id.* However, the Fee Letter between the City and Barclays contains a "Market Flex" provision, which allows for Barclays to raise the LIBOR floor as much as another 1% and the weighted average interest rate margins as much as an additional 2% in the event that Barclays determines that such increases are "reasonably necessary to facilitate the Successful Syndication . . . of the Post-Petition Facility within 90 days after the Closing Date." *See* Fee Letter, Dkt. No. 1791, ¶ 3. "Successful Syndication" is defined as the ability of Barclays to "achieve a targeted hold level of no more than $175,000,000" of the Debt Facility. *Id.* Thus, at any time prior to the 90th day after closing, Barclays would be permitted to unilaterally raise the cost of the Debt Facility to an effective rate of 6.5% if it deems such action necessary to sell off half of the debt by the end of the 90 days. This 6.5% interest rate is nearly double the 3.5% interest rate cited in the Financing Motion as the cost of the Debt Facility and is even a full percentage point higher than the original proposed default interest rate. Should the City then default on the Debt Facility and Barclays imposes a default interest rate on top of the maximum interest rate pursuant to the Market Flex provision of the Fee Letter, the City would likely be facing a default interest rate of 8.5%.

---

[5] As of November 22, 2013, the 1-month LIBOR rate for U.S. dollars was .17%. *See* http://www.bloomberg.com/quote/US0001M:IND.

15. Barclays directly benefits from the Commitment Fee of 1.25% of the aggregate principal amount of each of the Swap Termination Note and the Quality of Life Note. *See* Fee Letter, ¶ 1. Assuming a principal loan amount of $350 million, this equates to a commitment fee of $4,375,000, half of which has already been paid to Barclays as required under the Fee Letter. *See id.;* Financing Motion, ¶ 39. This commitment fee is completely non-refundable, even if no Debt Facility is ever issued—whether due to this Court's determination that the City is ineligible for Chapter 9 relief, or for any other reason.[6] *See* Fee Letter, ¶ 1.

16. Such unfavorable interest rates might be justifiable if it properly reflected the collateral risk; however, here, the risk is not commensurate, and the interest rate appears to be inordinately high. Under the terms of the Debt Facility, and pursuant to 11 U.S.C. § 364(c)(2), the City proposes to grant Barclays first priority liens on both the City's casino tax revenue and its income tax revenue to secure payment on the bonds. Financing Motion, ¶ 47, p. 30-32. The Detroit City Council, in its rejection of the proposed Debt Facility, noted that the casino tax revenue and the income tax revenue are the City's two most stable general fund

---

[6] Among other conditions precedent for the Debt Facility is the entry of an order for relief in the bankruptcy case. *See* ¶ 5 of Term Sheets for Quality of Life Note and Swap Termination Note, respectively, filed as Exs. A and B to the "Commitment Letter," which is itself filed as Ex. 6A to the Financing Motion.

10322623.4 14893/165083
13-53846-tjt    Doc 1867    Filed 11/27/13    Entered 11/27/13 18:38:25    Page 13 of 18

revenue sources.[7]  Moreover, these are *annually recurring* revenues, so to the extent that a secured creditor were to execute upon the revenues in a given year, they replenish and become available for execution again in subsequent years. Barclays will require the City to place both its casino tax revenue and income tax revenue into separate bank accounts which will be controlled by Barclays pursuant to control agreements which will be executed between Barclays and the City. Financing Motion, ¶ 47, p. 30-32.  Further, the terms of the Debt Facility mandate that any net proceeds exceeding $10 million stemming from the sale or lease of any assets of the City must be applied toward redeeming the bonds.  Financing Motion, ¶ 47, p. 29.  Apart from control over the City's income tax revenue, gaming tax revenue, and proceeds of asset sales, pursuant to 11 U.S.C. § 364(c)(1), the City also proposes to grant Barclays super-priority status over all administrative expenses, post-petition claims, and pre-petition unsecured claims. *Id.* at p. 32.

17.    Further mitigating any risk for the lenders in connection with the Debt Facility is the fact that the maturity dates of the bonds to be issued are, at the latest, two and a half years from the closing date and do not exceed the end of the bankruptcy case.  Financing Motion, ¶ 47, p. 26.  The bonds would mature upon

---

[7]    *See* Notice of Filing by Detroit City Council of Resolution Regarding The Emergency Manager's Post-Petition Financing Proposal ("City Council Resolution"), Dkt. No. 1396, p. 4.

- 14 -
10322623.4 14893/165083
13-53846-tjt    Doc 1867    Filed 11/27/13    Entered 11/27/13 18:38:25    Page 14 of 18

the effective date of the City's confirmed plan of adjustment, and thus the maturity dates could potentially be much sooner. *Id.*

18. In the event such financing is unavailable upon maturity of the bonds, the City will be exposed to a significant risk of default, which could do further harm to the recoveries of the City's unsecured creditors. In the event the City defaults on the bonds, Barclays will be permitted to take $4 million each month from both the casino tax revenue account and the income tax revenue account until the debt is repaid in full. Financing Motion, ¶ 47, p. 30-32. Thus, Barclays' worst-case scenario in the event of default is directing $8 million per month to itself—from bank accounts under its control and which will be continually funded—to be applied towards the debt until it is fully repaid. Thus, Barclays is exposed to minimal collection risk in the event of default.

19. Nevertheless, despite how little risk exposure exists for Barclays, the terms of the Debt Facility still subject the City to a likely non-default interest rate of 6.5%, strongly suggesting that the proposed Debt Facility may not in the best interests of the City or its creditors.

### III. The Proposed Debt Facility Should Not Be Approved Because It Improperly Cedes Control Over Exit Financing to Barclays

20. Barclays reaps another significant benefit from the lop-sided terms of the Debt Facility. The Commitment Letter entered into between the City and Barclays on October 6, 2013 states that Barclays shall have the exclusive right to

serve as the placement agent to provide exit financing, and so Barclays not only controls the risk of default but is well-positioned to all but dictate the terms of the City's inevitable exit financing to Barclays' benefit.[8]  Of course, this also means a second commitment fee and other loan fees for Barclays at confirmation.

21.     The granting to Barclays of an exclusive right to serve as the placement agent for any exit financing in this case is also troubling insofar as there does not appear to be any corresponding benefit to the City of ceding control to Barclays over such an important aspect of the case.  Absent such corresponding benefit, the City should be permitted to seek exit financing from the most advantageous source, which may or may not be Barclays.

IV.    **Without More Detail, the Proposed Debt Facility Should Not Be Approved Because It Does Not Adequately Explain a Quality of Life Note That Could Range Widely from Approximately $120 Million to $350 Million and Does Not Strictly Limit Its Use to Reinvestment in the City**

22.     The amount of the Quality of Life Bonds is simply defined as $350 million minus the amount of the Swap Termination Bonds.  Financing Motion at 26.  The Financing Motion contemplates approximately $230 million of Swap Termination Bonds (and, thus, $120 million of Quality of Life Bonds).  However, as discussed above, the Swap Termination Bonds should not be approved.  If they

---

[8]     *See* Commitment Letter, ¶ 1, attached as Exhibit 6A to the Financing Motion.

10322623.4 14893/165083
13-53846-tjt    Doc 1867    Filed 11/27/13    Entered 11/27/13 18:38:25    Page 16 of 18

are *not* approved, then the Quality of Life Bond amount would increase virtually 3-fold to $350 million. While the Retirement Systems do not dispute the need of the City to reinvest in itself in the ways described in the Financing Motion, the City provides no explanation at all as to how $350 million of Quality of Life Bonds would be used, nor why such a large financing facility is needed at this juncture in the case. The City has not demonstrated that "shovel-ready" improvement projects exist to put $350 million to work before plan confirmation.

23. In addition, the Financing Motion is somewhat imprecise in describing the uses of the Quality of Life Bond proceeds. At paragraph 7, page 5, it indicates uses for "but not limited to" essential investments. Similarly, at paragraph 47, page 26, it indicates uses for "without limitation" quality of life improvements. This language is inappropriately vague and dilutive of the stated purpose of the borrowing and should be clarified in order for the Court and parties in interest to assess whether the requested financing is indeed in the best interests of the City and its creditors and is an exercise of reasonable business judgment.

**V.    The Proposed Debt Facility Should Not Be Approved Because, Upon Information and Belief, It Has Not Been Approved by the Emergency Loan Board**

24. As described in paragraph 42, page 23 of the Financing Motion, the Emergency Loan Board must approve the Debt Facility under section 19 of Public Act 436 and under section 36a of the Home Rule City Act. Upon information and

belief, to date, the Emergency Loan Board has not approved the Debt Facility. Therefore, pursuant to Bankruptcy Code section 903, at a minimum, this Court should not consider and approve the Debt Facility on any basis unless and until approved by the Emergency Loan Board under applicable state law.

25. Based on the foregoing, the Retirement Systems respectfully request that the Financing Motion be denied.

### Reservation of Rights

26. As discovery is still being conducted in this matter, the Retirement Systems reserve the right to amend, supplement, or otherwise modify this Objection based upon such discovery.

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

*Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

Dated: November 27, 2013