# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |
|  | ) **Re: Docket No. 1520** |

## OBJECTION OF SYNCORA GUARANTEE INC. AND SYNCORA CAPITAL ASSURANCE INC. TO MOTION OF THE DEBTOR FOR A FINAL ORDER PURSUANT TO 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 AND 922 (I) APPROVING POST-PETITION FINANCING, (II) GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND (III) MODIFYING AUTOMATIC STAY

Dated: November 27, 2013

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200

David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Hills, Michigan 48304
Telephone: (248) 646-5070
Facsimile: (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

# Table of Contents

Page

Preliminary Statement..................................................................................1

Background...................................................................................................5

Objection...................................................................................................11

I.     The Barclays DIP Does Not Meet the Standards for Approval of Postpetition Financing Under Section 364 of the Bankruptcy Code........................................................................................................12

          1.     The City Did Not Exercise Sound Business Judgment When It Decided that It Needed to Borrow Money to Finance Its Reinvestment Initiatives Prior to Consideration of a Plan of Adjustment.....................................17

          2.     The Barclays DIP Is Not in the Best Interests of the City or its Creditors............................................................19

          3.     The Terms of the Barclays DIP Are Not Fair, Reasonable, and Adequate Given the Circumstances...............21

          4.     The Barclays DIP Should Not Be Approved Because Better Financing Is Available. ..................................24

          5.     The DIP Motion Should be Denied, and the Parties Are Not Entitled to a Good Faith Finding under Section 364(e) of the Bankruptcy Code, Because the Barclays DIP Violates Syncora's Rights and Applicable Michigan Law..........................................................................26

II.    The City's Attempts to Hurriedly Rush Through a Series of One-Off Transactions Is an Attempt to Avoid Plan Confirmation Standards Designed to Protect Creditors.................................32

III.   The Court Should Engage in a Fulsome Review of the DIP Motion with a Focus on Whether the City's Relief Requested Accords with the Purposes and Policies of Chapter 9...........................36

     A.     The DIP Motion Should Be Evaluated in Reference to the Purposes and Policies of Chapter 9....................................36

i

B.     History of Chapter 9 ...................................................................37

    1.     Congress Originally Enacted Chapter 9 to Facilitate
         Consensual Debt Adjustment Agreements with Majority
         Creditor Support.......................................................................37

    2.     Early Constitutional Challenges Illustrate that the
         Controlling Purpose of Chapter 9 Is to Provide a Forum
         Where Distressed Cities Can Meet with Creditors Under
         the Necessary Control and Assistance of the Judiciary in
         an Effort to Effect a Mutually Advantageous Adjustment
         of Their Debts. ........................................................................40

    3.     Early Applications of Chapter 9 Reaffirm That a
         Municipality's Plan of Adjustment Cannot Subsidize
         Public Improvement Projects at the Expense of Creditor
         Recoveries. ..............................................................................43

    4.     The 1976 and 1978 Amendments to Chapter 9 further
         reaffirm its first principles. .....................................................46

    5.     The 1988 Amendments to Chapter 9 Underscore How
         Congress Intended the Chapter 9 Process to Balance
         Creditors' Reasonable Expectations of Minimal Losses
         with a Municipality's Need to Continue Essential Public
         Operations. ..............................................................................50

C.     The City's Approach Conflicts with the Purposes and Policies
     Behind Chapter 9.................................................................................53

# Table of Authorities

**Page(s)**

**Statutes**

11 U.S.C. § 105.................................................................................1, 54

11 U.S.C. § 362.................................................................................1, 54

11 U.S.C. § 364.................................................................................passim

11 U.S.C. § 364(c)............................................................................11, 14

11 U.S.C. § 364(e).............................................................................1, 54

11 U.S.C. § 364(f)..................................................................................1

11 U.S.C. § 503.................................................................................1, 54

11 U.S.C. § 507(a)............................................................................1, 54

11 U.S.C. § 510(a)...........................................................................29, 30

11 U.S.C. § 901(a)...............................................................................29

11 U.S.C. § 904.....................................................................1, 3, 14, 54

11 U.S.C. § 921.................................................................................1, 54

11 U.S.C. § 922.................................................................................1, 54

11 U.S.C. § 928..........................................................................50, 51, 52

11 U.S.C. § 943(b)(7).............................................................................34

2012 P.A. 436....................................................................................passim

Mich. Comp. Laws Ann. § 141.1552.............................................................30

Mich. Comp. Laws Ann. § 141.1559..........................................................30, 31

## Cases

*Ashton v. Cameron Cnty. Water Improvement Dist. No. 1*,
298 U.S. 513, 533–43 (1936) ............................................................... passim

*Bland v. Farmworker Creditors*,
308 B.R. 109, 113–14 (S.D. Ga. 2003) ................................................. 13, 24

*Fano v. Newport Heights Irrigation Dist.*,
114 F.2d 563, 566 (9th Cir. 1940) ............................................. 43, 44, 45, 51

*In re Adams Apple, Inc.*
(9th Cir. 1987) ............................................................................................27

*In re Addison Cmty. Hosp. Auth.*,
175 B.R. 646, 650 (Bankr. E.D. Mich. 1994) ...............................................53

*In re Ames Dep't Stores, Inc.*,
115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990) ............................................. 11, 15

*In re Barnwell Cnty. Hosp.*,
471 B.R. 849, 869 (Bankr. D. S.C. 2012) .....................................................35

*In re Braniff Airways, Inc.*,
700 F.2d 935, 940 (5th Cir. 1983) ...............................................................32

*In re Crouse Group, Inc.*,
71 B.R. 544 (Bankr. E.D. Pa. 1987) ................................................ 14, 22, 25

*In re DB Capital Holdings, LLC*,
454 B.R. 804, 822 (Bankr. D. Colo. 2011) ...................................................24

*In re Defender Drug Stores, Inc.*,
145 B.R. 312, 317–18 (B.A.P. 9th Cir. 1992) ........................................ 28, 33

*In re EDC Holding Co.*,
676 F.2d 945, 948 (7th Cir. 1982) ...............................................................27

*In re Farmland Indus., Inc.*,
294 B.R. 855, 879–80 (Bankr. W.D. Mo. 2003) ..........................................13

*In re Holly's, Inc.*,
140 B.R. 643, 668 (Bankr. W.D. Mich. 1992) ..............................................30

*In re Iridium Operating LLC*,
478 F.3d 452, 466 (2d Cir. 2007) ........................................................ 32, 34

*In re Jefferson Cnty., Ala.*,
482 B.R. 404, 439 (Bankr. N.D. Ala. 2012)........................................ 51, 52

*In re Lantana Motel*,
124 B.R. 252, 255 (Bankr. S.D. Ohio 1990) ................................................30

*In re Mosello*,
195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ................................................20

*In re Pierce Cnty. Hous. Auth.*,
414 B.R. 702, 718 (Bankr. W.D. Wash. 2009) ............................................34

*In re Roblin Indus., Inc.*,
52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985)..................................................19

*In re Sky Valley, Inc.*,
100 B.R. 107, 115 (Bankr. N.D. Ga. 1988)..................................................14

*In re Sterling Min. Co.*,
2009 WL 2514167, at *3—5 (Bankr. D. Idaho Aug. 14, 2009) ...................13

*In re Swallen's, Inc.*,
269 B.R. 634, 638 (B.A.P. 6th Cir. 2001) ....................................................33

*In re Swedeland Dev. Grp., Inc.*,
16 F.3d 552, 564 (3d Cir. 1994) ..................................................................20

*In re Texlon Corp.*,
596 F.2d 1092, 1098–99 (2d Cir. 1979) ......................................................19

*In re Trans World Airlines, Inc.*,
163 B.R. 964 (Bankr. D. Del. 1994)............................................................14

*Kelley v. Everglades Drainage Dist.*,
319 U.S. 415 (1943)....................................................................................45

*New York Life Ins. Co. v. Revco D.S., Inc.*,
901 F.2d 1359, 1364 (6th Cir. 1990) ........................................................26

*Official Committee of Unsecured Creditors v. Goold Electronics Corp.*,
1993 WL 408366 (N.D. Ill. Sept. 23, 1993).................................................27

*U.S. v. Bekins*,
304 U.S. 27, 53–54 (1938) ................................................................ passim

*W. Coast Life Ins. Co. v. Merced Irrigation Dist.*,
114 F.2d 654, 678 (9th Cir. 1940) .................................................34

**Constitutional Provisions**

124 Cong. Rec. H11, 699 (daily ed. Oct. 27, 1977) (statement of Rep.
Edwards) ........................................................................................49

H.R. Rep. No. 100-1011 ........................................................... 50, 52, 53

H.R. Rep. No. 94-686 ............................................................... 38, 46, 47

H.R. Rep. No. 95-595 ............................................................48

Municipal Bankruptcy Act of 1934, Pub. L. No. 251, 48 Stat. 798 ............... passim

Municipal Bankruptcy Act of 1937, Pub. L. No. 302, 50 Stat. 653 ................ 41, 48

**Other Authorities**

6 *Collier* ¶ 943.03 (16th ed.)....................................................45

*Chapter 9 of the Bankruptcy Code: A Solution in Search of a Problem*,
27 Yale J. on Reg. 351, 362–69 (2010)..........................................38

*Municipal Debt Adjustment and the Supreme Court*,
46 Yale L.J. 199, 199-202 (1936) ..................................................38

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "Syncora") file this objection to the Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(C)(1), 364(C)(2), 364(E), 364(F), 503, 507(A)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay, dated November 5, 2013 [Dkt. No. 1520] (the "DIP Motion"). In support of its objection, Syncora respectfully states as follows:

### Preliminary Statement

1.      The postpetition financing at issue in the DIP Motion is unprecedented in Chapter 9 both in its size and its scope. This facility has two purposes: (a) finance the payoff of the Swap Counterparties;[1] and (b) provide a downpayment on wide-ranging reinvestment initiatives designed to bring about, as the City of Detroit (the "City" or "Detroit") describes it, a "renaissance." (DIP Mot. ¶ 19.)

2.      While Syncora acknowledges that the City faces real challenges, Chapter 9 is not, as the City apparently believes, intended to serve as a vehicle for financing a municipality's "renaissance" by green-lighting public spending projects without regard to how such spending affects creditors. (DIP Mot. ¶ 19)

---

[1]      Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the DIP Motion.

(noting that "without significant reinvestment . . . [Detroit's] renaissance is not possible"). Rather, Chapter 9 is, first and foremost, a <u>debt adjustment process</u>. And the legislative history, case law, and structure of Chapter 9 each affirm, time and again, that the primary purpose of Chapter 9 is to facilitate a mutually agreeable plan of adjustment that minimizes creditor losses while simultaneously allowing for the survival of the municipality and the continued provision of necessary public services.

3. Disregarding the purpose of, and policies behind, Chapter 9, the DIP Motion is yet another attempt by the City to hurriedly advance a complicated financial transaction that addresses plan-related issues — namely, the appropriate payouts to creditors, the City's right to grant primary liens, and the City's attempt to "kick-start" a ten-year, $1.25 billion spending campaign funded by $650 million of Chapter 9-imposed creditor losses. Yet, by asking the Court to approve a transaction that effectively implements the City's soon-to-be-filed plan of adjustment, the City threatens to short-circuit plan confirmation requirements that ensure fairness to creditors. This approach is particularly troublesome given that the City has not provided creditors with the necessary information to assess a number of significant questions, such as how it intends to value its largest assets (*e.g.*, the City's art collection) and the size of its pension and OPEB claims.

4.     While the Bankruptcy Code has many benefits for municipal debtors, those benefits come with the burden that they be employed in the best interests of creditors.  Although the City can borrow money without Court approval, here the City has asked the Court not only to authorize a section 364(c) credit transaction but also to make specific findings regarding the <u>need</u> for such postpetition financing, the <u>use</u> of the proceeds "to fund expenditures designed to contribute to the improvement of the quality of life in the City," and, critically, good faith for section 364(e) purposes.  (DIP Mot. Ex. 1 at ¶¶ D, F, 22.)  As a result of the City's chosen course of action, the DIP Motion at a minimum must be evaluated in reference to the requirements imposed by section 364 of the Bankruptcy Code.

5.     In an attempt to avoid the requirements of section 364, the City claims that section 904 of the Bankruptcy Code requires heavy deference to the City's "business judgment" regarding the needs of its citizenry.[2]  Contrary to the City's claims, section 904 of the Bankruptcy Code does not inoculate the City's decisions

---

[2]  Notably, the only <u>elected</u> officials to pass judgment on the City's borrowing and spending proposals — the City Council — unanimously voted to reject the relief sought in the DIP Motion.  The City Council determined that the proposed financing "does not seem to be in the best interest of the City," "seems to primarily benefit the two Swap Counterparties," "give[s] Barclays too much power and control over the City's revenues and future and limits the City's ability to negotiate or resolve other claims in bankruptcy," and will not result in the creation of new revenue such that "it is difficult without additional information to determine the [spending] would be prudent investments." (Resolution Regarding the Emergency Manager's Post Petition Financing Proposal [Dkt. No. 1396] (the "<u>City Council Resolution</u>").)

from any review.  Instead, the Court must determine whether, among other things, the DIP Motion is:    (a) a sound exercise of the City's business judgment; (b) necessary and essential for the continued operation of the City; and (c) in the best interests of the City's creditors.  The DIP Motion does not satisfy any of these requirements.

6.    First, the City has failed to show that the proposed borrowing is in the best interests of its creditors, many of whom are objecting.  Second, the City's motion fails to establish that other monies are not available to address its short-term needs while the City and its creditors craft a mutually agreeable plan of adjustment.  Nor can the City make such a showing in light of the <u>hundreds</u> of millions of dollars it has accumulated in cash since June 2013 and in recently received federal and private grant monies.  Third, the City has failed to follow the statutory requirements of P.A. 436.  Fourth, the DIP Motion is inextricably tied to the Assumption Motion — another hurried transaction that has garnered widespread creditor objection and should be denied in its own right.

7.    Although it is possible to assess the Barclays DIP (as defined below) within the framework required by section 364, Syncora submits that, when considering a transaction that has significant plan implications (*i.e.*, the DIP Motion), the better approach is to assess the transaction in reference to confirmation standards.  For instance, the Court should consider whether the City's

postpetition borrowing comports with the "best interests of creditors" test. To satisfy this test, the City must show, among other things, that the transaction affords all creditors the potential for the greatest economic return from its assets.

8.    Syncora therefore objects to the DIP Motion and respectfully requests that the Court either deny or defer ruling on the DIP Motion until the City better explains how the Barclays DIP fits into its proposed plan of adjustment.

### Background

9.    In June 2013, the City entered into secret negotiations with the Swap Counterparties. The result of these negotiations was the Forbearance Agreement, which purportedly provided the City with unfettered access to the casino tax revenues and the ability to unilaterally terminate the Swaps. Though the City claimed that the Forbearance Agreement was in the best interests of its creditors, its motion to assume the Forbearance Agreement [Docket No. 17] (the "Assumption Motion") generated widespread creditor hostility. In the face of this hostility, the City decided to postpone the hearing on the Assumption Motion. Consequently, the Assumption Motion — previously characterized by the City as a time-sensitive, essential step that could tolerate not even the slightest delay — has remained pending for more than four months. (Assumption Mot. Ex. 5, Affidavit of Kevyn D. Orr ¶ 22.)

5

10.    Rather than reconsider the wisdom of the Forbearance Agreement, the City has instead chosen to double-down.   Beginning in September, the City solicited bids to obtain the financing necessary to exercise the early termination option in the Forbearance Agreement.   As part of the solicitation process, the City sought and obtained proposals from various lenders to secure postpetition financing.

11.    On October 11, 2013, the City announced that it had received a $350 commitment from Barclays Capital Inc. ("Barclays") for the  postpetition financing (the "Barclays DIP").   The City did not, however, procure this financing simply to terminate the Swaps.   Instead, the City went a step further and borrowed another $110 million — in addition to the approximately $240 million to terminate the Swaps (the "Swap Termination Financing") — to fund certain spending programs relating to the City's "renaissance" (the "Quality of Life Financing").   (DIP Mot. ¶¶ 14-16, 19.)   Specifically, the City intends to use the Quality of Life Financing on blight removal, public safety, and technology infrastructure.   (*Id*. ¶ 7.)   The City notes, however, that it "may ultimately decide to apply the proceeds to pursue an array of specific projects."   (*Id*. ¶ 23.)

12.    The Barclays DIP includes the following terms:

- The City will be obligated to pay the full Commitment Fee of $4.375 million even if the Barclays DIP is not approved.[3]

- The City has already engaged Barclays to provide exit financing and, if it does not, it must pay Barclays another fee.

- The City will pledge its income and wagering tax revenues as collateral, as well as proceeds from assets sales that exceed $10 million.

- The Barclays DIP has a floating interest rate with a 3.5% variable interest rate floor that is subject to a market flex provision which could result in the actual minimum interest rate being as high as 6.5%.

(*Id*. ¶ 47; Ex. B, Exit Engagement Letter § 6(c); Fee Letter [Docket No. 1761].)

13.    On the same day that the City announced the Barclays DIP, the City submitted that proposal and the emergency manager's proposed order number 17 to the City Council.  (*Id*. ¶ 43.)  As part of this submission, the City provided the City Council with certain of the terms of the Barclays DIP.  (*Id*. ¶ 43.)  The City did not, however, provide two of the term sheets referenced in the Barclays DIP, nor did it initially provide the commitment or fee letters themselves.

14.    Under P.A. 436, the City Council had ten days to review the Barclays DIP and decide whether to approve or reject that proposed transaction.  (*Id*. ¶ 41.) To better understand this complex transaction, the City Council submitted

---

[3]    The City did not disclose in the DIP Motion that it has <u>already paid</u> half of this fee to Barclays.  (Ex. A, Hr'g Tr. 8:14-16, Nov. 14, 2013, 11:01 ET.)

numerous questions to the City's advisors. (City Council Resolution at 3.) And while the City's advisors provided "some information," the City Council was left with "a host of uncertainties and unanswered questions." (*Id*.)

15. On October 21, 2013, the City Council held a hearing to discuss the merits of the Barclays DIP. Not one of the City's legal or financial advisors deigned to appear at the hearing to answer any of the City Council's questions regarding the credit facility. Many of the City Council members also expressed concern that the Barclays DIP put the interests of the Swap Counterparties above those of the City's citizens. At the conclusion of the hearing, the City Council — the only <u>elected</u> officials to pass judgment on the City's borrowing and spending proposals — unanimously voted to reject the Barclays DIP. In its resolution, the City Council made the following findings, among others:

- "The proposed Debtor-in-Possession Financing transaction is an extremely complex deal on a number of fronts ***that does not seem to be in the best interest of the City***."

- The Barclays DIP appears to be "***putting the interests of lenders before the interests of the City and its residents***. The goal seems to be to ensure protection of the lenders at the detriment of all other interested parties."

- The Barclays DIP "seems to primarily benefit the two Swap counterparties Bank of America and UBS."

- "There is no guarantee that replacement funding will be available by this lender or any other lender when these loans mature in as little as one year ***placing the City into a very foreseeable default position*** triggering onerous default penalty provisions."

8

- "Not unlike the Swap Agreements that have been universally recognized as a bad deal for the City, Barclays is requiring the City to pledge its major revenue in order to secure this transaction. The City will have to pledge not only its casino wagering tax revenue but also its income tax revenue. These are the City's two most stable general fund revenue sources. Barclays is also requiring prepayment of any asset monetization net proceeds over $10M. *This would give Barclays too much power and control over the City's revenues and future* and limits the City's ability to negotiate or resolve other claims in bankruptcy."

- "[I]t appears that none of the proceeds [from the Quality of Life Bonds] will be used to create new revenue. If the City is ever to achieve a stronger financial position, strengthening revenues and revenue collection under the City's control is key. . . . *It is difficult without additional information to determine whether the use of these funds would be prudent investments. Additionally, it would be unwise to incur more debt to facilitate the payment of costly consultants*."

(City Council Resolution at 1-4 (emphasis added).)

16.     After the City Council rejected the Barclays DIP, Syncora presented the City Council with an alternative proposal that contained more favorable postpetition financing terms than the Barclays DIP on October 23, 2013. Syncora and the City Council then engaged in good faith negotiations during which they exchanged several different proposals. Although the City Council believed that Syncora's alternative proposal was "clearly an improvement over Barclays,"[4] the council determined that it did not have time to fully vet Syncora's proposal and

---

[4]     Ex. C, Email from Anne Marie Langan to Todd Snyder (Oct. 25, 2013, 14:09 ET).

ultimately decided not to offer an alternative proposal. Even though the City was made aware of Syncora's proposal, it did not, at any point, approach Syncora to explore this financing alternative. Given the time constraints, as well as the City Council's concerns with the Barclays DIP, the City Council implicitly offered a "no transaction" option to the emergency financial assistance loan board (the "Loan Board") as its "alternate proposal" under P.A. 436. (City Council Resolution at 4.)

17. Notwithstanding the widespread opposition to the Assumption Motion and the City Council's rejection of the Barclays DIP, the City has decided to move forward on both. In doing so, however, the City imposes important strategic limitations on its future conduct, including the following:

- The Barclays DIP encumbers previously unencumbered assets and frustrates the monetization of certain key assets (e.g., the City's art collection).

- The Barclays DIP invites yet another group of creditors to this Chapter 9 case. And these creditors will have liens and superpriority status, effectively subordinating existing creditors.

- The Barclays DIP grants liens that are actually broader than the current liens of the Swap Counterparties on the casino tax revenues.

- The Barclays DIP does not provide the City with the possibility to extend its financing. Instead, any refinancing must be part of the City's plan of adjustment.

- The City cannot dismiss the bankruptcy case because the Barclays DIP would then mature.

10

- The City's 3.5% variable interest rate on the Barclays DIP is subject to a market flex provision which could result in the actual minimum interest rate being as high as 6.5%.

- The Barclays DIP restricts the City's ability to access the capital markets again during this Chapter 9 case.

## Objection

18.    Although the Court has discretion under section 364 of the Bankruptcy Code to authorize certain postpetition debtor credit transactions, courts have also recognized "that their discretion is not unbridled." *See* 11 U.S.C. § 364(c) (stating that the Court "<u>may</u> authorize" certain credit transactions) (emphasis added); *In re Ames Dep't Stores, Inc*., 115 B.R. 34, 37 (Bankr. S.D.N.Y. 1990).    In particular, the City must demonstrate that the Barclays DIP is "necessary," that the terms of the transaction are "fair, reasonable, and adequate," and that the borrowing is in the best interests of its creditors.  These checks on postpetition borrowing are especially important where, as here, notwithstanding the City Council's rejection of the deal, the City has asked the Court to approve its incurrence of another $350 million of funded debt to facilitate a contested $240 million settlement payment, and $110 million of pre-plan "renaissance" spending that is unprecedented in the history of Chapter 9.  To be sure, not a single case cited by the City as authority in the DIP Motion involved court approval of a credit transaction that even mildly resembles the proposed uses of the Barclays DIP proceeds.

19.     As discussed below, the Barclays DIP does not meet the section 364 requirements because:  (a) it is not a sound exercise of the City's business judgment; (b) it is not necessary, essential, or appropriate to preserve the City's assets and continue the operation of the City; (c) the proposed transaction is not in the best interests of the City's creditors (d) the terms of the Barclays DIP are not fair, reasonable, and adequate under the circumstances; (e) the City had a better offer available; (f) the City failed to comply with P.A. 436 in its interactions with the City Council; and (g) the City intends to utilize the Barclays DIP for an improper purpose.

## I.     The Barclays DIP Does Not Meet the Standards for Approval of Postpetition Financing Under Section 364 of the Bankruptcy Code.

20.     When evaluating whether a postpetition financing proposal satisfies section 364 of the Bankruptcy Code, courts consider the following factors:

>  a.     Whether the proposed transaction is an exercise of the debtor's reasonable business judgment;
>
>  b.     Whether alternative financing is available on any other basis;
>
>  c.     Whether the proposed transaction is in the best interests of both the estate and its creditors;
>
>  d.     Whether any better offers, bids, or timely proposals are before the court;
>
>  e.     Whether the transaction is necessary, essential, and appropriate to preserve estate assets and for the continued operation of a debtor's business;

f.      Whether the terms of the proposed financing are fair, reasonable, and adequate given the circumstances; and

g.      Whether the proposed transaction was negotiated in good faith and at arm's length (collectively, the "Farmland Factors").

*See, e.g.*, *In re Farmland Indus., Inc.*, 294 B.R. 855, 879–80 (Bankr. W.D. Mo. 2003) (collecting cases); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003) (applying the Farmland Factors); *In re Sterling Min. Co.*, 2009 WL 2514167, at *3-5 (Bankr. D. Idaho Aug. 14, 2009) (same).

21.     The Farmland Factors are based on the requirement inherent in section 364 that any postpetition financing be necessary, essential, and appropriate to preserve estate assets while also allowing for the continued operation of a debtor's business.  And, while these factors are most often applied in the Chapter 11 context (*i.e.*, where a debtor obtains postpetition financing to ensure that it has sufficient liquidity to operate the business during the case), the legislative history and case law surrounding Chapter 9 also support their application to the Barclays DIP.

22.     In the DIP Motion, the City implicitly argues against the application of the Farmland Factors in favor of a much narrower standard — namely, that it need only demonstrate that the Barclays DIP was a sound exercise of its business judgment.  (DIP Mot. ¶ 54.)  However, the City's argument for such a narrow standard is belied by the very cases it relies upon in the DIP Motion.  For example, as part of the DIP Motion, the City cites *In re Crouse Group, Inc.,* 71 B.R. 544

13

(Bankr. E.D. Pa. 1987). Notably though, in that case, the court <u>rejected</u> the debtor's argument that the court should merely defer to the debtor's judgment in reviewing the proposed section 364(c) transaction. *Id*. at 550. Instead, the court held that the debtor also needed to establish that the transaction was fair, reasonable, and adequate under the circumstances, and that the credit transaction was necessary to preserve assets of the estate. *Id*. at 551. The *Crouse* court ultimately denied the proposed section 364(c) transaction. *Id*. Similarly, the City cites *In re Trans World Airlines, Inc.*, 163 B.R. 964 (Bankr. D. Del. 1994) for the proposition that the Court should defer to the City's business judgment. (DIP Mot. ¶ 54.) As a threshold matter, *Trans World Airlines* is not even a postpetition financing case. Moreover, as in *Crouse*, the *Trans World Airlines* dicta also looked beyond the debtor's business judgment and relied on the transaction at issue being in the best interests of the creditors. *Trans World Airlines*, 163 B.R. at 974.

23. Consistent with the narrow standard that the City proposes, it has also insisted that the Court may not even consider evidence regarding the City's purported need for the funds.[5] For example, during the November 14, 2013,

---

[5] Section 904 of the Bankruptcy Code does not, as the City claims, prohibit the Court's review into the uses of the Quality of Life Financing. Where, as here the City consented to the Court's review of its action, the Court may assess whether the Quality of Life Financing satisfies the best interests of creditors test that is part of section 364 of the Bankruptcy Code. Yet another case relied upon by the City, *In re Sky Valley, Inc.*, supports this proposition. *See* 100 B.R. 107, 115 (Bankr. N.D. Ga. 1988) (making an express finding that the section

hearing, counsel for the City stated that, "in connection with the 364 motion, [the Court] will hear and adjudicate our business judgment as to whether or not we needed to borrow the money . . . and whether or not the terms on which we want to borrow that money are reasonable and in everybody's best interest." (Ex. D, Hr'g Tr. 20:3–8, Nov. 14, 2013, 14:36 ET.) Indeed, the Court cannot possibly determine whether the City needed to borrow money unless it inquires into how that money will be used.

24. The City's proposed standard is also contradicted by the DIP Motion and its representations to the Court. For example, in the DIP Motion, the City cites *In re Ames Dept. Stores, Inc.* for the proposition that "courts have discretion under section 364 of the Bankruptcy Code to permit debtors to exercise reasonable business judgment so long as . . . the financing agreement's purpose is primarily to benefit the estate and not a party in interest." (DIP Mot. ¶ 54.) Of course, the Court can only assess the purpose of the financing agreement if it may also inquire into the use of the financing proceeds. Purpose is, in other words, inextricably tied to use.

25. Additionally, in the DIP Motion, the City provides some high-level information regarding the City's need for, and use of, the Barclays DIP proceeds.

364 credit transaction was "in the best interests of creditors," including unsecured and subordinated creditors).

15

However, if, as the City is likely to claim, the Court is not permitted to inquire into the City's use of those proceeds, then there would have been no need to explain how it intends to utilize those proceeds.

26.    Thus, while it is true that there is some uncertainty surrounding exactly which standard governs the Barclays DIP — mainly because a transaction like the Barclays DIP has never been considered in the Chapter 9 context[6] — even the City concedes that the Court must nevertheless inquire into the City's need for the funds and whether the transaction meets the best interests of creditors test. Although Syncora submits that the Farmland Factors provide the proper framework to assess the Barclays DIP, even under a more limited standard that simply considers the best interests of creditors and the City's need for the borrowed funds, the DIP Motion does not satisfy the requirements under section 364 of the Bankruptcy Code.

---

[6]    In its analysis of the Barclays DIP, Moody's recognizes the unprecedented nature of the City's proposed postpetition financing.  (Ex. E, Moody's Report at 1 ("In the municipal sector, however, DIP financings are unprecedented. Detroit is likely the first local government to propose this type of post-petition financing structure as it continues to navigate the Chapter 9 bankruptcy process, while balancing the competing interests of operating an insolvent city and negotiating with a variety of creditors.").)

1. **The City Did Not Exercise Sound Business Judgment When It Decided that It Needed to Borrow Money to Finance Its Reinvestment Initiatives Prior to Consideration of a Plan of Adjustment.**

27.     In the DIP Motion, the City claims that its "decision to obtain the Postpetition Financing is well supported by sound business judgment and should be approved." (DIP Mot. ¶ 7.) According to the City, "[w]ithout borrowed funds, there is a material risk that the City would have to substantially cut back or eliminate its reinvestment efforts *in the near-term*, and the City's ability to invest in the future would continue to be hamstrung and imperiled by the City's ongoing financial constraints." (DIP Mot. ¶ 22 (emphasis added).)

28.     As demonstrated below, however, the City does not actually need to borrow the money in the short-term to pursue substantial reinvestment initiatives. As a result, the Barclays DIP is neither necessary nor a sound exercise of business judgment.

29.     To begin, the City is set to receive more than $350 million in federal and private grants over the next two years. These grants includes: $152.6 million for demolishing blighted properties, revitalizing neighborhoods, and redeveloping Detroit; $25 million to hire 150 firefighters and purchase arson detection equipment; $1.9 million to hire new police officers; $600,000 to improve the police IT system; $155.5 million to improve transportation systems; $22.1 million to help create a 21st century Detroit; and 100 new police cars and 23 ambulances

17

are being donated by Downtown Detroit. (Ex. F, Funding for Detroit Announced on Sept. 27, 2013; Ross Benes, *Detroit Welcomes New Ambulances, Police Cars Donated By Local Businesses* (Aug. 23, 2013, 2:49 PM), http://www.crainsdetroit.com/article/20130822/NEWS/130829932/.) Significantly, much of this federal and private grant money is intended for the very reinvestment initiatives that the City has identified in its DIP Motion — blight remediation, public safety, and IT upgrades. In short, the City already has at its disposal hundreds of millions of dollars in federal funds that are earmarked <u>specifically</u> for the purposes the City has identified as mission critical.

30. In addition, the City has conceded that many of the reinvestment initiatives that it plans to institute are not yet ready for implementation. With respect to blight remediation, for example, the City has noted that "it continues to investigate and determine the most effective way to accomplish blight removal, including which geographic areas to focus its efforts on and other factors . . . ." (DIP Mot. ¶ 32.) Similarly, with respect to IT services, the City "will *begin* the process of issuing a 'request for proposals' and selecting a new system in 2014" and anticipates significant implementation efforts to occur at some unspecified time. (DIP Mot. ¶ 30.) Along these same lines, the City has also conceded that it "may ultimately decide to apply the proceeds of the Quality of Life Financing to pursue an array of specific projects . . . ." (DIP Mot. ¶ 23.) In short, the City itself

18

has not fully mapped out how it will use the very monies it seeks to borrow and thus refused to bind itself to spending the money in any particular fashion.

31.     Finally, upon its filing for bankruptcy (and, in the case of the COPs, before filing), the City stopped paying certain of its unsecured creditors.  As a result, the City's cash flow is better than it has been in many years.  Between June 2013 and September 2013, for example, the City's cash on hand increased from $36 million to $128.5 million.  (*Compare* Ex. G, Cash Flow Variance Report June 2013, *with* Ex. H, Cash Flow Variance Report FY 2014.)  Consequently, if the City believes that it has a present and immediate need to devote money to these reinvestment initiatives, the more prudent business decision is to invest available funds (and the aforementioned grant money) rather than plunge further into debt.

32.     In light of the above, the City cannot meet its burden of demonstrating that the Quality of Life Financing is necessary or a sound exercise of business judgment.

### 2.     The Barclays DIP Is Not in the Best Interests of the City or its Creditors.

33.     Under section 364 of the Bankruptcy Code, courts must consider whether the proposed financing is in the best interests of the City's creditors.  *In re Roblin Indus., Inc.*, 52 B.R. 241, 244 (Bankr. W.D.N.Y. 1985) (citing *In re Texlon Corp.*, 596 F.2d 1092, 1098–99 (2d Cir. 1979)).  As the City explains in the DIP Motion, it intends to utilize $110 million for the Quality of Life Financing, which

will be utilized to "kick-start" the City's reinvestment initiatives. (DIP Mot. ¶ 22.) However, the Quality of Life Financing violates section 364 because it is not in the best interests of the City's creditors.

34.     Though the City claims that its reinvestment initiatives could "potentially improve recoveries for creditors," the City has not offered any concrete evidence that incurring additional debt for this purpose will generate any long-term upside for the City's creditors.   (DIP Mot. ¶ 20.)   In fact, the only evidence that the City offers are Mr. Moore's conclusory statements that the City's proposed ten-year, $1.25 billion reinvestment campaign will reverse downward trends in the City's fiscal and economic outlook.   (Moore Dec. ¶¶ 9–10.)   The Moore Declaration does not demonstrate how such expenditures would actually strengthen the City's tax base, reverse the flow of residents leaving the City, increase creditor recoveries, or improve the City's fiscal outlook in the long term. *Cf. In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (rejecting argument that property to be developed under postpetition loan "is increased in value simply because a debtor may continue with construction which might or might not prove to be profitable"); *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) (denying motion to authorize postpetition loan to develop property because "the debtors' development scheme is beset by uncertainty and risk, and the ultimate outcome of the project is a matter of speculation based upon assumptions

which cannot be quantified or verified by objective evidence"). Moreover, the City has offered no other evidence showing how the "renaissance" spending benefits creditors in either the short- or long-term. To the contrary, the City's own financial projections show <u>no</u> increase in revenues at <u>any</u> time in the next ten years. (*Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [Docket No. 11] Ex. A (the "<u>Creditors Proposal</u>"), at 48.)

35. Tellingly, in its analysis of the Barclays DIP, Moody's also noted that, while "[c]orporate DIPs loans can support positive creditor outcomes . . . the impact of Detroit's plan is uncertain." (Ex. E, Moody's Report at 2.) In fact, Moody's concluded that "the ultimate creditor impact of Detroit's financing proposal, assuming it is approved at both the state and federal level, is unclear given the multitude of contingencies that remain." (*Id.*)

36. Accordingly, the City has failed to satisfy the requirement under section 364 of the Bankruptcy Code that postpetition financing be in the best interests of *both* the City and its creditors.

**3.    The Terms of the Barclays DIP Are Not Fair, Reasonable, and Adequate Given the Circumstances.**

37. Another factor that courts consider in evaluating postpetition financing is whether the terms of a proposed section 364 credit transaction are fair,

reasonable, and adequate given the circumstances. *In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987).

38.     The City is quick to point out the benefits of the Barclays DIP, but it is not as forthcoming in the DIP Motion as to the costs. Financial and transactional costs not discussed in the DIP Motion include (but are not limited to):

- A minimum 3.5% variable interest rate on the Barclays DIP that is subject to a market flex provision which could result in the actual minimum interest rate being as high as 6.5%;

- A one-time commitment fee in the amount of $4.375 million even if the Barclays DIP is not approved; and

- A minimum exit financing fee in the amount of $2.625 million even if the City refinances with an entity other than Barclays.

39.     Further, the City has assumed that the present market value of the Swaps Termination Payment is $290 million and that, by terminating the Swaps under the Forbearance Agreement at an 18% discount factor, it will achieve a $52.2 million discount. (DIP Mot. ¶ 16.) The City asserts that "this fact alone supports a finding that the Postpetition Financing is in the best interests of the City." (*Id*. ¶ 55.)

40.     Although the Barclays DIP terminates on its own terms no more than two and one-half years after the closing date, no one — the City included — anticipates that the City will actually repay the Barclays DIP in full upon maturity from its own coffers. Instead, the City has signaled its intent to refinance the

Barclays DIP upon its exit from Chapter 9, thereby assuming additional financing costs (e.g., interest payments) well into the future. (*See* Ex. B, Exit Engagement Letter.) Yet the City has not disclosed any aspect of such costs — e.g., an estimated interest rate, maturity, and collateral package for an exit facility — the absence of which obscures the true costs of the Barclays DIP.

41. Finally, in addition to the foregoing, Syncora submits that the following changes should be made to the Proposed Order:[7]

- limiting the authority for the Purchaser, Indenture Trustee, and Bondholders to file and obtain documents to perfect their liens to only those actions that are "reasonably necessary" to perfect such liens (*see* Proposed Order ¶ 14);

- providing the City with the ability to cure an Event of Default (*see* Proposed Order ¶ 20);

- removing that "approval of the Post-Petition Facility by the [Loan] Board under Act 436 is not required to authorize the City to enter into the Bond Documents" (*see* Proposed Order ¶ G);[8]

- removing the City's obligation to authorize its own advisors to cooperate with the Indenture Trustee (*see* Proposed Order ¶ 25);

- removing the limitations preventing the City from seeking additional postpetition financing that could be secured by the

---

[7]  Capitalized terms used in this paragraph have the meanings ascribed to them in the Proposed Order.

[8]  Approval of the Barclays DIP by the Loan Board is required under section 36a of the Home Rule City Act and section 19(2) of P.A. 436. (*See* DIP Motion ¶ 42.) To the extent the Loan Board does not approve the Barclays DIP prior to the hearing on the DIP Motion, Syncora reserves the right to object to the DIP Motion on these grounds.

Collateral or that would have a senior or equal payment priority to the Quality of Life Bond or Swap Termination Bond (*see* Proposed Order ¶ 15; Bond Purchase Agreement § 7(d));

- removing the terms "indefeasible" and "indefeasibly" from paragraphs 15, 16, 19, 34, and 36 of the Proposed Order;

- stating that any liens granted pursuant to the DIP Motion attach when the Barclays DIP transaction closes as opposed to upon entry of an order (*see* Proposed Order ¶ 6);

- clarifying that any liens granted on any property pursuant to the DIP Motion extend only as far as the City's property interest in the applicable property (e.g., only to the extent of the City's contingent rights) at issue as determined by a final non-appealable order (*see* Proposed Order ¶ 6); and

- clarifying that a finding that the DIP lenders acted in "good faith" under section 364(e) of the Bankruptcy Code (and, to be clear, they have not) protects only the validity of the debt incurred and the liens granted pursuant to the DIP, but does not prevent any other transaction from being overturned in the event the order authorizing the DIP facility is approved (*see* Proposed Order ¶¶ 22-23).

**4.      The Barclays DIP Should Not Be Approved Because Better Financing Is Available.**

42.     When evaluating postpetition financing proposals, courts consider whether better alternatives are available. *Bland v. Farmworker Creditors*, 308 B.R. 109, 113–14 (S.D. Ga. 2003) (requiring that debtor show, among other things, that there are no "better offers, bids, or timely proposals are before the court"); *In re DB Capital Holdings, LLC*, 454 B.R. 804, 822 (Bankr. D. Colo. 2011) (same). Where better alternatives are available, courts have found that the proposed postpetition financing is not "fair, or reasonable, or adequate to the other Debtors

24

or to other creditors." *See, e.g., In re Crouse Grp., Inc.*, 71 B.R. 544, 551 (Bankr. E.D. Pa. 1987).

43.     As noted above, immediately after the City Council rejected the Barclays DIP, Syncora approached the City Council regarding an alternative proposal.  After several days of discussions, Syncora submitted a proposal that improved upon the Barclays DIP in several material respects, including the following terms:

     a.     A 20 basis point interest rate reduction, resulting in a net savings to the City of nearly $1 million per year over the term of the loan;

     b.     An option for the City to extend the termination date;

     c.     No restriction on the City's use of borrowed funds; and

     d.     No Event of Default "if the City ceases to be under the control of an emergency manager for a period of thirty (30) days unless a Transition Advisory Board or consent agreement . . . shall have been established."

(Ex. I, Syncora Proposal at 2.)

44.     Although the City was made aware of this proposal, it makes no mention of it in the DIP Motion.  Nor did it, at any point, approach Syncora to explore this proposal.  Nevertheless, Syncora remains willing and able to provide the City with the funds sought under the Barclays DIP on more favorable terms.  Accordingly, given that similar postpetition financing with better terms is available, the Barclays DIP should not be approved.

**5. The DIP Motion Should be Denied, and the Parties Are Not Entitled to a Good Faith Finding under Section 364(e) of the Bankruptcy Code, Because the Barclays DIP Violates Syncora's Rights and Applicable Michigan Law.**

45.     Section 364(e) of the Bankruptcy Code provides that, in the absence of a stay pending appeal, a lender is protected from the effects of a reversal or modification on appeal of an authorization to obtain credit or incur debt under section 364, or of a grant of a priority or a lien in such a financing, if the lender acted in good faith.  *E.g.*, *New York Life Ins. Co. v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 901 F.2d 1359, 1364 (6th Cir. 1990) ("[T]he proper inquiry under § 364(e) is: (1) whether the creditor attempting to challenge authorization of credit obtains a stay pending appeal; and (2) whether the postpetition lender extends credit in good faith.").

46.     Here, the parties are not entitled to the requested section 364(e) good faith finding.  In order for section 364(e) of the Bankruptcy Code to apply the Court must make an explicit finding of good faith.  *Revco D.S.*, 901 F.2d at 1366 (holding that "an implicit finding of 'good faith' in a § 364(e) context is insufficient and that 'good faith' under that section should not be presumed").  No such finding can be made because, as set forth herein, the City has not provided the Court with sufficient information to determine whether or not the funds loaned under the Barclays DIP have in fact been extended in good faith.

47.     Additionally, the parties are not entitled to a good faith finding because the funds sought will be used for improper purposes, namely the: (a) violation of Syncora's consent rights and the Waterfall (as defined below); and (b) circumvention of the requirements under section 36a of the Home Rule City Act and P.A. 436.  "Where it is evident from the loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code, the lender is not in good faith."  *In re EDC Holding Co.*, 676 F.2d 945, 948 (7th Cir. 1982); *Official Committee of Unsecured Creditors v. Goold Electronics Corp.*, 1993 WL 408366 (N.D. Ill. Sept. 23, 1993) (same); *see also In re Adams Apple, Inc.* (9th Cir. 1987) ("A creditor fails to act in good faith if it acts for an improper purpose.").   Accordingly, both the DIP Motion and the requested good faith finding should be denied.

### a.     The City Seeks to Use the Barclays DIP Proceeds for an Impermissible Purpose.

48.     As more fully set out in the Assumption Objection,[9] the Forbearance Agreement cannot be approved because the City seeks to eviscerate Syncora's third-party consent rights and rights to direct the Swap Counterparties in certain

---

[9]     *Objection of Syncora Guarantee Inc. and Syncora Capital Assurance Inc. to Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of That Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(A) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant Rule 9019, and (III) Granting Related Relief* [Docket No. 366] (the "Forbearance Objection").

actions, as well as bypass a contracted-for priority payment scheme. *See, e.g.*, Assumption Objection ¶ 31; *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317–18 (B.A.P. 9th Cir. 1992) (examining the legality of a DIP enhancement fee provision and approving DIP where court was satisfied that "neither the extension order nor the enhancement fee, by themselves, enable [the lender] to control the actions of the debtor *nor prevent other parties from exercising their rights*") (emphasis added). Notably, the City fails to address in the DIP Motion any of these critical problems or, for that matter, any other problems raised in the various other objections filed in response to the Assumption Motion.

49. Additionally, the Swap Termination Payment violates the priority hierarchy set forth in section 8.03 of the Service Contracts[10] (the "<u>Waterfall</u>") and incorporated by section 14.14(a) of the Collateral Agreement. The Waterfall provides, in pertinent part, that payments made under the Service Contracts shall be made in the following order: interest on COPs and periodic Swap Payments; payments of COP principal; and finally, swap termination payments. (Service Contracts § 8.03.) Importantly, swap termination payments are *junior* to the payment of the outstanding principal and interest on the COPs. (*Id.*) Because the City defaulted on a $40 million June 2013 COP-related principal and interest

---

[10] Capitalized terms used in this paragraph and not otherwise defined herein have the meanings ascribed to them in the Forbearance Objection.

payment, Syncora paid approximately $23.1 million to COP holders on account of its obligations as a COP insurer. As a result, Syncora is subrogated to the rights of the COP holders on account of the June 2013 missed payment, and likewise to the enforcement of the Waterfall with respect thereto. (Service Contracts T&C § 7.03) ("An Insurer making a Credit Insurance Payment shall be subrogated to the rights of Certificateholders . . . to receive the Related Service Payment and shall be entitled to exercise all rights and remedies that the Person to which it is the subrogee would have otherwise been entitled to exercise."); (Trust Agreement T&C § 8.24) (same). Syncora is also entitled to enforce the Waterfall on account of its rights as a third-party beneficiary. (*See, e.g.*, Service Contracts T&C § 9.12 (providing that "Insurers are third party beneficiaries of the Service Contract[s]" with "the right to enforce the respective promises made in the Service Contract as if such promises were made directly to them").) Since the City has not yet cured the June 2013 missed payment, making the Swap Termination Payment now would violate Syncora's rights.[11] (Service Contracts § 9.12.)

50. The Waterfall is also protected by section 510(a) of the Bankruptcy Code, which is incorporated into Chapter 9 by section 901(a) of the Bankruptcy

---

[11] It should also be noted that Syncora is not just a COP insurer — it is also a COP holder. As a result, when the City missed the June 2013 payment, Syncora also lost money—money that it will not be able to recover if the City is able to evade the Waterfall.

Code.  Section 510(a) of the Bankruptcy Code provides that "[a] subordination agreement is enforceable . . . to the same extent that such agreement is enforceable under applicable non-bankruptcy law."  The Waterfall is a subordination agreement.  *See, e.g.*, *In re Holly's, Inc.*, 140 B.R. 643, 668 (Bankr. W.D. Mich. 1992) (defining a subordination agreement to mean "a contract in which a creditor (the 'subordinated' or 'junior' creditor) agrees that the claims of specified senior creditors must be paid in full before any payment on the subordinated debt may be made to, and retained by, the subordinated creditor"); *In re Lantana Motel*, 124 B.R. 252, 255 (Bankr. S.D. Ohio 1990) (noting that subordination agreements provide "that subordinated creditor's right to payments will be subordinated to rights of another claimant").  The City has not demonstrated that either the Service Contracts or the Waterfall are unenforceable under state law.  Therefore, the Waterfall is equally enforceable in these proceedings, and the City's proposal to violate such subordination agreement through the Barclays DIP should be denied.

### b.     The City Has Not Complied with Michigan Law Regarding the Issuance of Financial Recovery Bonds.

51.     In addition, the City is attempting to circumvent the requirements of the P.A. 436.  Under P.A. 436, the emergency manager must submit for City Council approval any action purporting to "sell, lease, convey, assign, or otherwise use or transfer the assets, liabilities, functions, or responsibilities of the local government."  Mich. Comp. Laws Ann. §§ 141.1552, 141.1559.  After such a

proposal is submitted, the City Council has 10 days from the date of submission of the proposal to approve or disapprove the action. If disapproved, the City Council must, within seven days, propose an "alternative proposal that would yield substantially the same financial result as the action proposed by the emergency manager." Mich. Comp. Laws Ann. § 141.1559.

52. On October 21, 2013, the City Council unanimously rejected the Barclays DIP. (*See* City Council Resolution.) As noted above, in its resolution, the City Council stated that "numerous questions have been submitted to the consultants and although some information has been provided, a host of uncertainties and unanswered questions remain" regarding the Barclays DIP. (*Id.* at 3.) One key piece of information that the City never provided to the City Council was the Barclays fee letter.

53. The failure of the City to provide the City Council with the Barclays fee letter had a material impact on the P.A. 436 process. To begin, it meant that the City deprived the City Council of all of the necessary information to understand and evaluate the economic terms of the Barclays DIP. In addition, the City Council could not effectively craft an "alternative proposal," as it was required to do under P.A. 436, and implicitly offered a "no transaction" proposal instead. (Motion to Seal [Docket No. 1521] ¶ 3 (noting that Fee Letter "contains confidential commercial information regarding the potential cost to the City of the

financing and commercially sensitive detail regarding how to calculate such potential cost").)  Indeed, because the City Council had to make a proposal that would "yield substantially the same financial result" as the emergency manager's proposal, the absence of the fee letter is in conflict with P.A. 436's requirements.

## II.  The City's Attempts to Hurriedly Rush Through a Series of One-Off Transactions Is an Attempt to Avoid Plan Confirmation Standards Designed to Protect Creditors.

54.    The DIP Motion is yet another example of the City asking the Court to approve plan-like transactions outside the plan of adjustment context.  (*See also* Syncora Objection to PLA Motion [Docket No. 1557].)  The reason for this is clear:  the City realizes that it cannot meet the procedural and substantive plan confirmation requirements designed to protect creditors from precisely this kind of amorphous transaction.  The DIP Motion is just the latest iteration.

55.    The Bankruptcy Code prevents debtors from entering "into transactions that will, in effect, 'short circuit the requirements of chapter 11 for confirmation of a reorganization plan.'"  *In re Iridium Operating LLC*, 478 F.3d 452, 466 (2d Cir. 2007) (citations omitted).  Such transactions often dictate the terms of a future plan of restructuring or alter creditors' rights without otherwise requiring the satisfaction of the disclosure and confirmation standards of the Bankruptcy Code.  *In re Braniff Airways, Inc.*, 700 F.2d 935, 940 (5th Cir. 1983). It is well-established, however, that "a bankruptcy court cannot issue orders that

bypass the requirements of [the Bankruptcy Code], such as disclosure statements, voting, and a confirmed plan, and proceed to a direct reorganization." *In re Swallen's, Inc.*, 269 B.R. 634, 638 (B.A.P. 6th Cir. 2001). Although fashioned as a request for postpetition financing under section 364 of the Bankruptcy Code, the DIP Motion in reality seeks plan-like relief outside of the Chapter 9 confirmation process. *See e.g.*, *In re Defender Drug Stores, Inc.*, 145 B.R. 312, 317 (B.A.P. 9th Cir. 1992) ("The bankruptcy court cannot, under the guise of section 364, approve financing arrangements that amount to a plan of reorganization but evade confirmation requirements.").

56.     As the City details in its DIP Motion, it intends to utilize the $350 million in DIP Financing to terminate the Swaps and implement its restructuring plan set forth in the Creditors Proposal. While the City does not describe exactly what the Quality of Life Financing will be used for, it does emphatically state that these funds will "kick-start" its ten-year, $1.25 billion reinvestment spending campaign. (DIP Mot. ¶¶ 21–22.) That is, before the City has even filed a plan of adjustment, it is asking the Court to approve what undoubtedly will be detailed in a "Means for Implementation of the Plan" section of the City's forthcoming plan and related disclosure statement. To "kick-start" plan components pursuant to the DIP Motion puts the cart before the horse and directly circumvents the procedural and substantive safeguards Chapter 9 affords creditors. This approach is especially

33

problematic because the City intends to encumber previously unencumbered assets to fund the open-ended revitalization projects to the detriment of creditor recoveries.[12]

57.    At minimum, the Court should evaluate the DIP Motion through the lens of plan confirmation requirements.  In *Iridium*, for example, the Second Circuit held that it was appropriate to evaluate pre-plan transactions with an eye toward confirmation standards — in that case, the absolute priority rule.  478 F.3d 452, 463-64 (2d Cir. 2007).  Here, even if the City is allowed to bypass the procedural safeguards (i.e., voting and "adequate disclosure") relating to plan confirmation, the Court should nevertheless consider whether the City's proposed course of action comports with certain substantive confirmation safeguards such as the "best interests of creditors" test.  11 U.S.C. § 943(b)(7).

58.    For section 943(b)(7) purposes, "[t]he 'best interest' test has been described as a 'floor requiring a reasonable effort at payment of creditors by the municipal debtor.'"  *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 718 (Bankr. W.D. Wash. 2009) (citations omitted); *see also W. Coast Life Ins. Co. v. Merced Irrigation Dist.*, 114 F.2d 654, 678 (9th Cir. 1940) (noting that a plan is in "the best

---

[12]    As part of the plan of adjustment process, creditors will be receiving a recovery note or some other type of consideration that it paid out over time post-emergence.  As a result, creditor returns will be subject to a number of risks, including the City's long-term operations and revitalization implementation.

interests of creditors," if the creditors' recovery was "all that could reasonably be expected in all the existing circumstances"). In evaluating whether a plan of adjustment meets the "best interests of creditors" requirement, bankruptcy courts consider whether "the Plan affords all creditors the potential for the greatest economic return from Debtor's assets." *In re Barnwell Cnty. Hosp.*, 471 B.R. 849, 869 (Bankr. D.S.C. 2012). Here, however, the City has not yet valued its largest asset — the City's art collection — nor has it determined the size of its pension and OPEB claims. This information is necessary to any assessment of what amounts are fairly available to the City and its creditors, and consequently, whether the DIP Motion meets the "best interests" test.[13]

59. Rather than step knowingly into the void, the Court should either defer consideration until the plan confirmation stage — or import plan confirmation safeguards into its consideration under section 364 of the Bankruptcy Code.

---

[13] For these reasons, Syncora respectfully submits that certain case management protocols in respect of the plan confirmation process may be necessary to ensure that basic notions of due process are respected. Given the size, complexity, and speed of this Chapter 9 case, as well as the City's failure to make any meaningful progress in respect of the foregoing open issues, Syncora reserves the right to seek appropriate relief insofar as the parties cannot reach agreement on a schedule forward.

35

### III. The Court Should Engage in a Fulsome Review of the DIP Motion with a Focus on Whether the City's Relief Requested Accords with the Purposes and Policies of Chapter 9.

#### A. The DIP Motion Should Be Evaluated in Reference to the Purposes and Policies of Chapter 9.

60.     One of the central issues in this case generally is the Court's authority to review the City's ability to allocate municipal funds to support its proposed public spending campaign.  The City has made clear its view that the Court can have only a limited role in any such determination.  According to the City, the Court has no authority to inquire into the how the City intends to use public funds or why it believes it needs them in the first instance.  (Ex. D, Hr'g Tr. 19:21-23, Nov. 14, 2013, 14:36 ET ("That does not mean that this Court will sit in review of the city's business judgment on the underlying money that is needed.").)  This narrow view, however, does not comport with the purposes and policies of Chapter 9 or, as a practical matter, with the analysis that the Court must perform when analyzing the City's proposed plan of adjustment.

61.     As described in greater detail below, since Chapter 9's inception, both Congress and courts have consistently maintained that the primary purpose of Chapter 9 is to allow a municipal debtor to continue operations while it adjusts or refinances creditor claims with a minimum (or in many cases, no) loss to its creditors.  Proposed transactions that diminish creditor recoveries thus must fairly balance creditors' reasonable expectations of minimal losses with a municipality's

36

need to continue operations. Those transactions and plans that unfairly favor public spending to the detriment of creditor recoveries violate the purpose and policies of Chapter 9 and fail to satisfy the "fair and equitable" and "best interests of creditors" tests that are pre-conditions to emergence.

62.     Before a court can evaluate whether a proposed action comports with the standards of Chapter 9, a municipal debtor must demonstrate how it intends to treat creditors — a demonstration that, more often than not, occurs in the context of a plan confirmation proceeding. As a result, transactions, such as this one, that significantly affect creditors' recoveries must be evaluated as part of, or at least in reference to, a plan of adjustment and the history and purposes of Chapter 9.

### B.     History of Chapter 9

63.     As noted above, the purpose and policies of Chapter 9 inform the standard that the Court should employ when reviewing the DIP Motion and any plan of adjustment it proposes. Thus, given the importance of Chapter 9's purpose and policies, the following section summarizes the pertinent history of Chapter 9, highlighting the relevant legislative history and case law.

### 1.     Congress Originally Enacted Chapter 9 to Facilitate Consensual Debt Adjustment Agreements with Majority Creditor Support.

64.     The concept of municipal bankruptcy in the United States first arose in 1934 in the midst of the Great Depression. *See generally*, *U.S. v. Bekins*, 304

U.S. 27, 53–54 (1938); *Ashton v. Cameron Cnty. Water Improvement Dist. No. 1*, 298 U.S. 513, 533–43 (1936) (Cardozo, J., dissenting).[14]   During that time, municipalities were devastated by plummeting real estate values, disappearing tax receipts, and unsustainable debt service obligations.  *Ashton*, 298 U.S. at 533–34 (Cardozo, J., dissenting).   At the time, creditors of defaulting municipalities generally had no recourse except *mandamus* actions to compel the municipality to raise taxes.  *Id.* at 534.   In reality though, this remedy was "mere futility" given that tax resources were already maxed out.  *Id*.

65.    Out of options, defaulting municipalities and their creditors often entered into debt adjustment agreements.   These agreements allowed defaulting municipalities to postpone payments and avoid legal action.  *Id.*[15]   At the same time, creditors — who realized that municipalities could not pay them back in full — believed that these agreements could maximize their recoveries.  *Id*.

66.    Though this strategy was initially successful, municipalities soon encountered the "holdout" problem — namely, when a small minority of objecting

---

[14]    *See also* H.R. Rep. No. 94-686, at 541–44 (1975) (discussing the purposes and history of Chapter 9); Omer Kimhi, *Chapter 9 of the Bankruptcy Code: A Solution in Search of a Problem*, 27 Yale J. on Reg. 351, 362–69 (2010) (discussing the history of Chapter 9); George H. Dession, *Municipal Debt Adjustment and the Supreme Court,* 46 Yale L.J. 199, 199-202 (1936) (discussing the historical context of the Municipal Bankruptcy Act of 1934).

[15]    *See also* Kimhi, *supra* note 14, at 363.

creditors strategically resisted a negotiated debt readjustment agreement that had garnered majority creditor support. *See id.*[16] Holdouts were able to insist on, and sometimes even realized, payment in full. *See id.* Consequently, the majority of creditors who had been able to reach an agreement with municipalities ultimately refused to go forward with the restructuring, fearing that "to yield in one situation [would] encourage hold-outs in others."[17] As a result, debt readjustment agreements no longer became a viable restructuring solution.

67. In response, Congress enacted Chapter 9 of the Bankruptcy Act, Municipal Bankruptcy Act of 1934, Pub. L. No. 251, 48 Stat. 798 (the "1934 Municipal Bankruptcy Act"), which authorized municipalities to file for bankruptcy and, under certain conditions, bind both consenting *and* dissenting creditors to the terms of a debt adjustment agreement. *See* 1934 Municipal Bankruptcy Act § 80(d). Municipal debtors and creditors alike welcomed the adoption of a process that was designed to make creditors as close to whole as possible and enabled municipalities to continue necessary operations.

---

[16] *See also* Dession, *supra* note 14, at 203 ("The past few years yield numerous instances where settlements acceptable to an overwhelming majority were considerably delayed, if not upset completely, by relatively infinitesimal minorities.")

[17] Dession, *supra* note 14, at 203.

68.     Notably though, the scope of Chapter 9 was deliberately narrow, and crafted such that a municipality could not invoke Chapter 9 unless a majority of its creditors had previously agreed to a debt adjustment plan. *Id*. at § 80(a). In practice, this required municipal debtors to demonstrate that they faced genuine holdout problems. Where a municipality was able to demonstrate the requisite support, a plan of adjustment still required that (a) creditors holding at least 75% of the aggregate amount of indebtedness accept the plan, (b) it be "fair, equitable, and for the best interests of its creditors," (c) it not "discriminate unfairly in favor of any class of creditors," and (d) it be offered in good faith. *Id*. at § 80(d)-(e).

**2.      Early Constitutional Challenges Illustrate that the Controlling Purpose of Chapter 9 Is to Provide a Forum Where Distressed Cities Can Meet with Creditors Under the Necessary Control and Assistance of the Judiciary in an Effort to Effect a Mutually Advantageous Adjustment of Their Debts.**

69.     Shortly after its enactment the Supreme Court in *Ashton* struck down the Municipal Bankruptcy Act of 1934 as an unconstitutional exercise of federal control over the states in violation of the Tenth Amendment. 298 U.S. at 531.

70.     In an oft-cited dissent, Justice Cardozo examined the history and purposes underlying Chapter 9. To begin, Justice Cardozo observed that Chapter 9 is like the rest of bankruptcy law in that it is a process to adjust the rights and obligations between a distressed debtor and its creditors. *Id*. at 542–43 (Cardozo, J. dissenting). He also examined the legislative history of Chapter 9 and concluded

that "[t]he controlling purpose of [Chapter 9] is to provide a forum where distressed cities . . . may meet with creditors under the necessary judicial control and assistance in an effort to effect an adjustment of their financial matters upon a plan deemed *mutually advantageous*." *Id.* at 541 (emphasis added). Significantly, while Justice Cardozo's articulations of the purpose and scope of Chapter 9 were offered in a dissent, they have been quoted approvingly by Congress, the courts, and advocates ever since.[18]

71. In an attempt to remedy the constitutional defects in the Municipal Bankruptcy Act of 1934, Congress passed the Municipal Bankruptcy Act of 1937, Pub. L. No. 302, 50 Stat. 653 (the "Municipal Bankruptcy Act of 1937"). Though this act contained material changes from its predecessor, it reaffirmed that a confirmable plan must be "fair, equitable, and for the best interests of the creditors and . . . not discriminate unfairly in favor of any creditor or class of creditors" and offered in good faith. Municipal Bankruptcy Act of 1937 § 83(e).

72. The constitutionality of the Municipal Bankruptcy Act of 1937 was immediately challenged and upheld in *Bekins*, which relied heavily on Justice

---

[18] *See, e.g.*, Ex. J, Hr'g Tr. 157:20-24, Oct. 15, 2013 (stating that Cardozo's dissent is "very, very clear thinking, elegantly written about exactly the problem we have in this courtroom today, and I think it's awfully persuasive . . . ."); *id.* at 146:7-10 ("A very careful analysis of . . . the Cardozo dissent in *Ashton* is going to provide us with the guidepost to answer a lot of the questions that may not be constitutional questions but that are ultimately resolved by those cases.").

Cardozo's dissent in *Ashton*. *U.S. v. Bekins*, 304 U.S. 27 (1938). To begin, the Court invoked Justice Cardozo's recitation that "the 'subject of bankruptcies' was nothing less than 'the subject of the relations between an insolvent or nonpaying debtor, and his creditors, extending to his and their relief.'" *Id*. at 47. The Court then quoted the same legislative record that Justice Cardozo relied upon in *Ashton*:

> [Chapter 9] gives a forum to enable those distressed taxing agencies which are capable of reorganization, to meet their creditors under necessary judicial control and guidance and free from coercion, and to affect such adjustment on a plan determined to be mutually advantageous.

*Id*. at 51.

73.     Building upon Justice Cardozo's dissent, *Bekins* laid the foundation for subsequent Chapter 9 jurisprudence. Significantly, it recognized that Chapter 9 was intended to provide distressed municipalities with a forum to negotiate mutually advantageous debt adjustment agreements that would allow for the municipality to survive and repay creditors as much as reasonably could be expected under the circumstances. Just as significantly, neither *Bekins* nor Justice Cardozo's dissent contemplate that Chapter 9 should be used as a means to implement a municipality's *unilateral* "renaissance" that is funded by substantial, non-consensual cuts to creditor recoveries.

42

### 3. Early Applications of Chapter 9 Reaffirm That a Municipality's Plan of Adjustment Cannot Subsidize Public Improvement Projects at the Expense of Creditor Recoveries.

74. Following *Bekins*, several distressed municipalities used Chapter 9 in an attempt to adjust their debt obligations. The early applications of Chapter 9 are notable in that they illustrate how courts carefully balanced a municipality's need to continue essential operations with its creditors' notions of fairness and a reasonable expectation of minimal losses.

75. For example, in *Fano v. Newport Heights Irrigation Dist.*, the court examined whether a municipality could, via a plan of adjustment, force its creditors to accept reduced recoveries and still satisfy the "fair and equitable" and "best interests of creditors" standards. 114 F.2d 563, 566 (9th Cir. 1940). In that case, a municipal irrigation district had defaulted on interest payments to its bondholders. *Id*. at 564. As part of the contested plan confirmation, the municipality argued that it was unable to collect sufficient taxes and thus could not satisfy its debt service obligations. In response, the bondholders argued that the missed interest payments resulted from the municipality's (a) failure to monetize certain assets and (b) excessive expenditures on repairs, maintenance, and construction of its irrigation system. *Id*. The evidence demonstrated that the municipality had not merely repaired and maintained its irrigation system, but had instead "practically rebuilt [the irrigation system] in a manner more substantial

43

than the original construction" and was, as the court described it, "top-heavy and extravagant . . . of at least twice the sheer necessity of the situation." *Id*. at 565.

76.     Though recognizing that the municipality did not have sufficient funds to meet its debt service obligations, the *Fano* court found that the deficit "has been caused by the reconstruction of the [irrigation] system and the diversion of tax moneys to the payment therefor." *Id*.   Additionally, the court found that the municipality owned certain unencumbered, non-monetized assets that exceeded the amount of its indebtedness as a result of such public improvement investments, and that "it would be highly unjust to allocate their cost to the bondholders." *Id.* Based on these two pieces of the evidence — *i.e.,* the municipality's excessive revitalization project and its failure to monetize certain assets — the *Fano* court ultimately held that the municipal debtor's plan of adjustment was not fair, equitable, or in the best interest of the creditors. *Id.* at 564–66.

77.     Latching on to the court's comments surrounding the excessive refurbishing of the irrigation systems, commentators have interpreted *Fano* to stand for the proposition that a Chapter 9 plan is not fair and equitable if it provides for excessive investments in facility improvements to the detriment of creditors:

> [A Chapter 9] plan that makes little or no effort to repay creditors over
> a reasonable period of time may not be in the best interest of creditors.
> For example, a debtor that had invested heavily in improvements in its
> facilities at a time when it was unable to pay the claims of its

bondholders cannot rely on its cash-poor position resulting from the investment as a reason why it should pay less to bondholders, because the bondholders should not be required in effect to subsidize the improvements. Such a plan is not fair and equitable and is not in the best interest of creditors.

6 *Collier* ¶ 943.03 (16th ed.).

78.     In *Kelley v. Everglades Drainage Dist.*, the Supreme Court recognized that courts have a "duty of appraising [a plan's] fairness, and of making the findings necessary to support such an appraisal." 319 U.S. 415, 418 (1943). There, bondholders appealed the confirmation of a Chapter 9 plan on grounds of unfair discrimination. The *Kelley* court observed that the ultimate determination of fairness requires factual findings by the bankruptcy court:

> In order that a court may determine the fairness of the total amount of cash or securities offered to creditors by the plan, the court must have before it data which will permit a reasonable, and hence an informed, estimate of the probable future revenues available for the satisfaction of creditors. And where, as here, different classes of creditors assert prior claims to different sources of revenue, there must be a determination of the extent to which each class is entitled to share in a particular source, and of the fairness of the allotment to each class in the light of the probable revenues to be anticipated from each source. To support such determinations, there must be findings, in such detail and exactness as the nature of the case permits, of subsidiary facts on which the ultimate conclusion of fairness can rationally be predicated.

*Id.* at 420.

79.     The *Fano* and *Kelley* courts recognized early in the history of Chapter 9 that municipal debtors carry the legal and evidentiary burden of demonstrating that plans are (a) fair and equitable, (b) in the best interests of creditors, and (c) not

45

unfairly discriminatory. In order to honor these holdings in the DIP Motion, the City must demonstrate that its proposed reinvestment spending, funded by reduced creditor recoveries, does not conflict with Chapter 9's mandate to minimize creditor losses to protect creditors from a municipal debtor's overreach; only by meeting these standards now will the City be assured that it can submit a confirmable plan.

### 4. The 1976 and 1978 Amendments to Chapter 9 further reaffirm its first principles.

80.     For the next 40 years, Chapter 9 remained largely unchanged.   In 1975, however, New York City experienced an economic crisis that brought about certain changes to Chapter 9.   Recognizing that large municipalities could not access Chapter 9 because they could not secure support from 51% of their creditors prepetition, Congress enacted several amendments to Chapter 9 (collectively, the "1976 Amendments").   H.R. Rep. No. 94-686, at 543.   When enacting these amendments, Congress explicitly stated that it intended "to follow current law as much as possible, in order that the [1976 Amendments] not be such a departure from settled principles that the changes would have an unsettling effect on other municipalities and their bondholders."   *Id.*   Congress also expressly reaffirmed that "the need for and the purpose of [Chapter 9] have remained unchanged in the 42 years since the first Municipal Bankruptcy Act [of 1934] was passed," quoting the same legislative history cited by Justice Cardozo in *Ashton* and the *Bekins* court:

46

> The controlling purpose of [Chapter 9] is to provide a forum where distressed cities, counties, and minor political subdivisions . . . of their own volition, free from all coercion, may meet with their creditors under the necessary judicial control and assistance in an effort to effect an adjustment of their financial matters upon a plan deemed mutually advantageous.

*Id*. (citing H.R. Rep. No. 207, 73d Cong., 1st Sess. 1 (1933)).

81.  The 1976 Amendments to Chapter 9 furthered this controlling purpose and made it more responsive to changes in municipal finance. For example, Congress made Chapter 9 more accessible by eliminating the prepetition majority support requirement in favor of an affirmative obligation to negotiate in good faith unless such negotiations prove impracticable. Additionally, Congress gave municipalities the opportunity to incur postpetition indebtedness with the expectation that such financing would improve creditor recoveries by ensuring that essential government services continue during the Chapter 9 case. With respect to postpetition financing, Congress reasoned that:

> [B]y facilitating borrowing to meet current expenses, the court was actually preserving former secured creditors' collateral by preserving the business as a going entity. Thus, there was no actual or effective taking of property prohibited by the Fifth Amendment in giving new security that would prime the former liens of secured creditors. In the municipal context, this reasoning is similarly applicable. While the 'business' of government will continue whether it is insolvent or not, without cash to continue to provide essential government services, the only asset available for the creditors, the municipality's tax base, may be seriously eroded by flight of the city's businesses and residents.

H.R. Rep. 94-686, at 546–47.

Congress thus gave municipalities the ability to access postpetition financing to serve the dual purposes of Chapter 9 — survival of the municipality and minimizing creditor losses.

82. In 1978, Congress rolled out additional changes to Chapter 9 (the "1978 Amendments") that were also not meant to modify its original purpose:

> Chapter 9 provides a workable procedure so that a municipality of any size that has encountered financial difficulty may work with its creditors to adjust its debts . . . Chapter 9 provides essentially for federal court protection, and supervision of a settlement between the debtor municipality and a majority of its creditors. A municipal unit cannot liquidate its assets to satisfy its creditors totally and finally. Therefore, the primary purpose of Chapter 9 is to allow the municipal unit to continue operating while it adjusts or refinances creditor claims with minimum (and in many cases, no) loss to its creditors.

H.R. Rep. No. 95-595, at 6221 (1977).

83. The 1978 Amendments also reaffirmed Congress's commitment that a Chapter 9 plan of adjustment must be offered in good faith, fair and equitable, in the best interests of the creditors, and not unfairly discriminatory in favor of any class of creditors.[19] Congress did, however, change the circumstances under which each test would be applied. Specifically, Congress incorporated a modernized "cram down" provision of Chapter 11 into Chapter 9 which enabled municipalities to confirm a plan of adjustment over the objection of a dissenting class of impaired

---

[19] *Compare* 1934 Municipal Bankruptcy Act § 80(e), 1937 Municipal Bankruptcy Act § 83(e), *and* Pub. L. No. 94-260, § 94(b)(1), 90 Stat. 315 (1976), *with* Pub. L. No. 95-598, §§ 901(a), 943(b)(1), 1129(b)(1), 92 Stat. 2549 (1978).

creditors. Municipalities could only do so, however, if the plan was "fair and equitable" and did not "unfairly discriminate" in respect of such creditors. When describing the mutually advantageous aspects of "cram down" in the Chapter 11 context, Rep. Edwards reiterated that a plan still needed to satisfy the base-line standard of fairness:

> For both debtors and creditors, the requirements for a reorganization plan are made more flexible, and the court is given the power to confirm the plan even though some creditors do not like the plan, so long as the plan meets certain statutory criteria of fairness. This is very important. ***This way creditors get more than if the business went into straight liquidation***.

124 Cong. Rec. H11, 699 (daily ed. Oct. 27, 1977) (statement of Rep. Edwards).

84.     Put slightly differently, Congress did not intend "cram down" to alter the mutually advantageous nature of a Chapter 9 restructuring. To the contrary, Congress sought to enhance creditor recoveries through cram down. Indeed, the incorporation of cram down into Chapter 9 merely reaffirms the original maxim that a recalcitrant group of minority creditors should not be able to block an otherwise consensual, mutually advantageous debt adjustment agreement.

**5. The 1988 Amendments to Chapter 9 Underscore How Congress Intended the Chapter 9 Process to Balance Creditors' Reasonable Expectations of Minimal Losses with a Municipality's Need to Continue Essential Public Operations.**

85.    In 1988, Congress enacted a series of amendments to Chapter 9 meant to balance creditors' reasonable expectations with a municipality's need to continue essential operations.[20]

86.    In relevant part, Congress added section 928 of the Bankruptcy Code. Section 928(a) affords special protection to creditors holding prepetition liens on special revenues by authorizing the continuation of such liens on postpetition special revenue.  Section 928(b), however, limits the scope of section 928(a) rights by prioritizing payments of "necessary operating expenses" in connection with the project or system generating the special revenues upon which a section 928(a) lien attaches.  That is, section 928 of the Bankruptcy Code protects a creditor's rights to postpetition special revenues after subtracting the amount necessary to maintain "day-to-day expenses required to keep [the special revenue project] operating for the relatively short time between the filing of the [municipality's] bankruptcy and a

---

[20]    *See* Pub. L. No. 100-597, 102 Stat 3028 (1988); H.R. Rep. No. 100-1011, at 4116 (1988) ("Concern has been voiced in recent years that some of [Chapter 9's] general bankruptcy provisions—most prominently the avoidance under section 552(a) of the Bankruptcy Code of a lien resulting from a pre-petition security interest on property acquired post-petition—are inconsistent with the principles of municipal finance, particularly with respect to public works projects financed by revenue bonds.").

50

final resolution of its case." *In re Jefferson Cnty., Ala.*, 482 B.R. 404, 439 (Bankr. N.D. Ala. 2012); *id.* at 437 ("From this legislative history, the following is part of the perimeter of what is contained within § 928(b)'s 'necessary operating expenses.' It includes for a given period of time those that are (1) expended to keep the system or project operating in the sense that the system or project is kept in good repair and generating the special revenues, ***not improvements or enhancement* . . . .")** (emphasis added).

87.     Section 928 is thus a microcosm of Congress's intended creditor-debtor balance in Chapter 9. Section 928(a) evidences Congress's intent to protect certain bargained-for, prepetition creditor expectations while section 928(b) represents Congress's understanding that a municipal debtor must continue to expend resources — including special revenues subject to a section 928(a) lien — necessary to (i) continue delivering essential public services <u>and</u> (ii) maintain the applicable system to facilitate the repayment of certain creditors. What remains after subtracting section 928(b) (necessary operating expenses) from section 928(a) (prepetition creditor bargain) is arguably "all that the creditors can reasonably expect under the circumstances," or that which is "fair and equitable" within the meaning of Chapter 9 plan confirmation jurisprudence. *Fano*, 114 F.2d at 565–66.

88.     The legislative history surrounding section 928 underscores how Congress intended for Chapter 9 to be a mutually beneficial process that advanced

two distinct policy objectives: minimizing or eliminating creditor losses and the continued operation of the municipal debtor. In particular, Congress viewed the 928(b) necessary operating expense carve out "important because payment of operating expenses — those necessary to keep the project or system going — must be protected so that the project or system can be maintained in good condition to **repay bondholders** (and, importantly, to provide residents of the municipality with the service the project or system is meant to deliver)." H.R. Rep. No. 100-1011, at 4122 (emphasis added); *Jefferson Cnty.*, 482 B.R. at 441 ("The standard is that which allows a project or system to be in good condition to enable it to keep 'going' to 'generate revenues to repay bondholders' and to provide the services to the system's or project's customers."). Congress believed that, once minimum necessary operating expenses are funded, municipal debtors should make creditors as close to whole as possible.

89. This framework is consistent with Chapter 9's first principles whereby a Chapter 9 debtor must abide by its dual duties of continuing essential public operations while repaying creditors as much as possible under the circumstances — not sacrificing the latter in favor of a billion-dollar revitalization campaign. *See Jefferson Cnty.*, 482 B.R. at 437 (recognizing that "improvements or enhancements" to public projects or systems do not constitute "necessary operating expenses"). Indeed, Congress understood that without section 928 of the

52

Bankruptcy Code, certain creditors would "ultimately receive much less than they thought to be the value"[21] of their prepetition bargain, an outcome unfair to creditors that Congress sought to remedy. *See also In re Addison Cmty. Hosp. Auth.*, 175 B.R. 646, 650 (Bankr. E.D. Mich. 1994) ("The purpose of chapter 9 is to allow municipalities the opportunity to remain in existence through debt adjustment and obtain temporary relief from creditors.").

### C. The City's Approach Conflicts with the Purposes and Policies Behind Chapter 9.

90. Thus far, the City has not exhibited any desire to work within the framework established by Chapter 9 and instead appears content to rush forward with a series of one-off transactions with plan-like implications. The allure of such a strategy is clear. If, by the time the City proposes its plan of adjustment, it has already allocated the majority of possible revenue, it will be able to move forward with its $1.25 billion reinvestment without needing to allocate any money to creditor recovery. In so doing, however, the City will not be able to propose a plan of adjustment that is fair and equitable, and in the best interests of the creditors, meaning that the City may not be able to emerge from bankruptcy.

91. Obviously, the City does not believe it will be trapped in bankruptcy. Instead, its strategy is to pledge away its assets and revenue streams and <u>then</u>

---

[21] H.R. Rep. No. 100-1011, at 4118.

determine what recoveries for creditors are fair by reference to what remains. In this way, fairness to creditors becomes a self-fulfilling prophecy — what is fair to creditors is what the City says is fair after it has finished spending money on itself. But Chapter 9 does not suggest that "fairness" is a subjective concept to be determined by the City, but rather an objective one to be determined by a bankruptcy court. And the Court cannot evaluate fairness without understanding how the City's actions serve the dual purposes of Chapter 9: minimizing creditor losses and continued provision of necessary public services.

## Conclusion

92.     For the foregoing reasons, Syncora respectfully respects that the Court deny the City's motion to approve postpetition financing, granting liens and providing superpriority claim status, and modifying the automatic stay pursuant to sections 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921, and 922 of the Bankruptcy Code.

*[Remainder of this page intentionally left blank]*

Dated: November 27, 2013

/s/ *Ryan Blaine Bennett*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:   (312) 862-2000
Facsimile:    (312) 862-2200

- and -

David A. Agay
Joshua Gadharf
MCDONALD HOPKINS LLC
39533 Woodward Avenue
Bloomfield Hills, Michigan 48304
Telephone:  (248) 646-5070
Facsimile:   (248) 646-5075

*Attorneys for Syncora Guarantee Inc. and*
*Syncora Capital Assurance Inc.*

55