**<u>Exhibit E</u>**

**Moody's Report**

## Moody's
### INVESTORS SERVICE

**SPECIAL COMMENT**

Rate this Research ›

**Table of Contents:**

DETROIT'S DIP PROPOSAL DIFFERS
SUBSTANTIALLY FROM ITS CORPORATE
PREDECESSORS                          1
CORPORATE DIPS CAN SUPPORT
POSITIVE CREDITOR OUTCOMES, BUT
THE IMPACT OF DETROIT'S PLAN IS
UNCERTAIN                             2

**Analyst Contacts:**

CHICAGO                    +1.212.553.1653

Genevieve Nolan           +1.312.706.9957
*Assistant Vice President - Analyst*
genevieve.nolan@moodys.com

NEW YORK                   +1.212.553.1653

Jack Dorer                 +1.212.553.1332
*Managing Director*
jack.dorer@moodys.com

Alfred Medioli            +1.212.553.4173
*Vice President/Senior Credit Officer*
alfred.medioli@moodys.com

# Detroit: DIPing its Toe into a Corporate Bankruptcy Tool

On October 11, 2013 the City of Detroit's Emergency Manager (EM) Kevyn Orr issued an order, approving a Debtor-In-Possession (DIP) financing proposal. DIP financings are commonly used in the corporate sector to inject liquidity into a bankrupt entity, with the objective of paving the way for eventual recovery. In the municipal sector, however, DIP financings are unprecedented. Detroit is likely the first local government to propose this type of post-petition financing structure as it continues to navigate the Chapter 9 bankruptcy process, while balancing the competing interests of operating an insolvent city and negotiating with a variety of creditors.

The proposed Detroit DIP financing draws from the corporate playbook with respect to most structural terms, but it differs from a typical private-sector DIP financing in important ways. Perhaps most significant is the stated use of proceeds, which highlights the difference of Detroit's insolvency, and options for recovery, from the typical bankrupt corporate. Ultimately, because of the lack of precedent in the municipal market and the key differences in Detroit's proposal, it is too early to assess the impact of the proposal on the city's finances and existing bondholders.

## Detroit's DIP financing proposal differs substantially from its corporate predecessors

The $350 million post petition financing proposed by Detroit comprises two notes that would be repaid over a 30 month maximum final maturity period, at a rate of one month LIBOR plus 250 basis point spread.

» The "Swap Termination Note", which is estimated to total $230 million, will be used to pay off outstanding swaps at approximately 75% of termination value. The pledged revenues comprise a super-priority lien on income tax revenues, up to $4 million per month in the event of a default, along with the proceeds of a sale or lease of a city asset in excess of $10 million.

» The "Quality of Life Note", generating the remaining $120 million of proceeds, will provide working capital for the city. The note's pledged revenues comprise a super-priority lien on casino gaming taxes, as well as a second lien on income tax revenues, both in amounts of up to $4 million per month in the event of a default, and the excess from asset sales over $10 million. Planned use of these proceeds is reported to include enhancement to public safety, technology infrastructure, and blight removal.

Some structural aspects of the city's proposal reflect typical corporate practice, including the super priority pledge; the short tenure for repayment; and the small size of the financing relative to outstanding debt, with the note par amount sized to 5% of the city's outstanding debt, or 2% of its liabilities inclusive of unfunded pension and OPEB costs. However, key differences remain, including the type of facility, type of asset pledged and the proposed use of proceeds, as described below.

» **Type of Facility**: Private sector DIP financings are bank lending facilities, similar to revolving lines of credit and are not bond-based. Detroit, on the other hand, is proposing a fully-funded note structure, with the expectation that proceeds from asset sales or leases in excess of $10 million will be the primary source of repayment, thereby freeing up pledged tax revenues as a source of operating cash flow upon note maturity.

» **Type of Asset Pledged**: The key assets securing a corporate DIP loan are generally tangible assets for which a market value can be reasonably estimated and the loan is normally sized to provide asset coverage substantially in excess of the new funding commitment. Detroit is proposing a stream of two cash flows, in addition to yet-to-be-realized proceeds from the sale or lease of assets. The income and wagering taxes combined are estimated to provide a healthy 2.64 times coverage. While the city has some assets that could be sold off or leased, with the proceeds used to repay the note, the assets are either tied to core operating functions, difficult to value, or some combination of the two, underscoring that a municipality is a going concern and has only limited options to turn to asset liquidation in bankruptcy as compared to a corporation. In that context, Detroit's DIP financing is more naturally secured by a pledge of certain future tax revenue collections rather than hard assets.

» **Proposed Use of Proceeds**: Detroit's proposed DIP financing plan would immediately deploy 100% of the transaction proceeds. Corporate DIPs loans are traditionally used to provide operating financing and liquidity. Accordingly, one would not normally expect to see a corporate entity draw 100% of the DIP commitment at closing. In Detroit's case, the utilization of all note proceeds highlights the city's ongoing narrow cash position that persists despite already ceasing all debt service payments on liabilities deemed unsecured by the state-appointed emergency manager, as well as deferral of the city's employer contributions to its two pension funds.

## Corporate DIPs loans can support positive creditor outcomes, but the impact of Detroit's plan is uncertain

Corporate DIP financing plans can be a credit positive by providing liquidity that facilitates continued operations, maintains the value of the franchise and potentially paves the way for eventual emergence of the firm from bankruptcy. However, the ultimate credit impact of Detroit's DIP financing proposal, assuming it is approved at both the state and federal level, is unclear given the multitude of contingencies that remain.

**First, the credit impact of the plan on the city's financial position will likely be determined by the ultimate source of repayment for the DIP notes**. Should the city successfully complete the DIP financing plan, it will terminate the outstanding swap agreement associated with the Series 2006 Certificates of Participation. As a result, it is expected that the city will no longer make payments to the counterparties, which are projected to total $50.6 million annually through 2017. Should the city ultimately repay the notes with proceeds from an asset sale or lease, then the General Fund will retain the tax revenues for general operating expenses. The city will also have gained the $120 million in Quality of Life proceeds and will have eliminated the risk of a potential termination payment. However, should the city be required to repay the note with casino and income tax revenues, then $48

13-53846-tjt   Doc 1870-6   Filed 11/27/13   Entered 11/27/13 21:22:45   Page 3 of 5

million will be set aside annually from each tax revenue source until the note is paid. Ultimately, the total investments of $120 million from the Quality of Life note and the annual cash flow of $96 million to the general fund from the two tax revenue sources are not immaterial compared to the city's estimated 2013 General Fund revenues of $1.1 billion, however there is significant uncertainty related to execution of asset sales that is required for the tax revenues to be freed up.

**Second, it is unclear if the DIP financing's super priority claim on general fund tax revenues would impact existing bondholders.** While the enforceability of a super senior DIP financing for a municipality has not been tested, this pledge could result in a modest reduction of resources available to satisfy defaulted GO, GOLT and COPs bondholders, while also demonstrating a diminished willingness to honor the city's full faith and credit pledge and deterring future creditors from lending to the city. However, should the notes be repaid in full from proceeds from the sale or lease of a city asset, the plan could clear all claims on casino revenue, ultimately improving the position of general obligation and related securities bondholders over the medium term.

**Finally, Detroit's path to solvency and emergence as a financially stable city will take much longer than the 2.5 years expected period of the DIP financing.** The DIP plan may result in additional medium to long-term implications for the city's finances and debt portfolio, especially as it continues crucial negotiations with creditors in the Chapter 9 process. Should it be approved in conjunction with the current forbearance agreement with the counterparties to the city's outstanding swap agreements, the DIP financing plan would result in an unhedged variable rate position on its Series 2006 Certificates of Participation. While any near term cash flow impact is negated so long as the city continues to default on debt service payments, it is unclear as to whether the unhedged position may impact any potential settlements during negotiations with creditors. With respect to the larger negotiating process, it is not known how the completion of the DIP financing proposal could incentivize other creditors to come forth and negotiate with the city. Within the Chapter 9 process specifically, the plan may help illustrate the city's claim that it negotiated in good faith and is thus eligible to proceed under the federal restructuring framework. Finally, the city may be exposing itself to refinancing risk should it be unable to repay the notes within the stated time frame.

Rate this Research »

Report Number: 160112

Authors
Genevieve Nolan
Al Medioli

Production Associate
Sarah Warburton

© 2013 Moody's Investors Service, Inc. and/or its licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S INVESTORS SERVICE, INC. ("MIS") AND ITS AFFILIATES ARE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND CREDIT RATINGS AND RESEARCH PUBLICATIONS PUBLISHED BY MOODY'S ("MOODY'S PUBLICATIONS") MAY INCLUDE MOODY'S CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL, FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS AND MOODY'S OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. CREDIT RATINGS AND MOODY'S PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND CREDIT RATINGS AND MOODY'S PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. NEITHER CREDIT RATINGS NOR MOODY'S PUBLICATIONS COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS AND PUBLISHES MOODY'S PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process. Under no circumstances shall MOODY'S have any liability to any person or entity for (a) any loss or damage in whole or in part caused by, resulting from, or relating to, any error (negligent or otherwise) or other circumstance or contingency within or outside the control of MOODY'S or any of its directors, officers, employees or agents in connection with the procurement, collection, compilation, analysis, interpretation, communication, publication or delivery of any such information, or (b) any direct, indirect, special, consequential, compensatory or incidental damages whatsoever (including without limitation, lost profits), even if MOODY'S is advised in advance of the possibility of such damages, resulting from the use of or inability to use, any such information. The ratings, financial reporting analysis, projections, and other observations, if any, constituting part of the information contained herein are, and must be construed solely as, statements of opinion and not statements of fact or recommendations to purchase, sell or hold any securities. Each user of the information contained herein must make its own study and evaluation of each security it may consider purchasing, holding or selling.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY SUCH RATING OR OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

MIS, a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MIS have, prior to assignment of any rating, agreed to pay to MIS for appraisal and rating services rendered by it fees ranging from $1,500 to approximately $2,500,000. MCO and MIS also maintain policies and procedures to address the independence of MIS's ratings and rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold ratings from MIS and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Shareholder Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

For Australia only: Any publication into Australia of this document is pursuant to the Australian Financial Services License of MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657AFSL 336969 and/or Moody's Analytics Australia Pty Ltd ABN 94 105 136 972 AFSL 383569 (as applicable). This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a representative of, a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001. MOODY'S credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail clients. It would be dangerous for retail clients to make any investment decision based on MOODY'S credit rating. If in doubt you should contact your financial or other professional adviser.



13-53846-tjt    Doc 1870-6    Filed 11/27/13    Entered 11/27/13 21:22:45    Page 5 of 5