## Exhibit J

**Hr'g Tr., Oct. 15, 2013**

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:  CITY OF DETROIT,         .        Docket No. 13-53846
        MICHIGAN,                .
                                 .        Detroit, Michigan
                                 .        October 15, 2013
                    Debtor.      .        10:00 a.m.
. . . . . . . . . . . . . . . .


HEARING RE. OBJECTIONS TO ELIGIBILITY TO CHAPTER 9 PETITION
            BEFORE THE HONORABLE STEVEN W. RHODES
            UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:      Jones Day
                     By:  BRUCE BENNETT
                     555 South Flower Street
                     Fiftieth Floor
                     Los Angeles, CA  90071-2452
                     (213) 243-2382

For the State of     Michigan Department of Attorney General
Michigan:            By:  MARGARET A. NELSON
                     P.O. Box 30758
                     Lansing, MI  48909
                     (517) 373-1124

For AFSCME,          Lowenstein Sandler, LLP
AFL-CIO, and Sub-    By:  SHARON L. LEVINE
Chapter 98, City     65 Livingston Avenue
of Detroit           Roseland, NJ  07068
Retirees:            (973) 597-2374

For Detroit          Clark Hill, PLC
Retirement Systems-  By:  ROBERT GORDON
General Retirement   151 South Old Woodward, Suite 200
System of Detroit,   Birmingham, MI  48009
Police and Fire      (248) 988-5882
Retirement System
of the City of
Detroit:

APPEARANCES (continued):

```
For the Official    Dentons
Committee of        By:  CLAUDE D. MONTGOMERY
Retirees:           620 Fifth Avenue
                    New York, NY  10020
                    (212) 632-8390

For the Inter-      Cohen, Weiss & Simon, LLP
national Union,     By:  BABETTE A. CECCOTTI
UAW:                     PETER D. DECHIARA
                    330 West 42nd Street, 25th Floor
                    New York, NY  10036-6976
                    (212) 356-0227

For the Flowers     Law Offices of William A. Wertheimer
Plaintiffs:         By:  WILLIAM WERTHEIMER
                    30515 Timberbrook Lane
                    Bingham Farms, MI  48025
                    (248) 644-9200

For the Detroit     Erman, Teicher, Miller, Zucker &
Fire Fighters          Freedman, P.C.
Association, the    By:  BARBARA A. PATEK
Detroit Police      400 Galleria Officentre, Suite 444
Officers Associa-   Southfield, MI  48034
tion and the        (248) 827-4100
Detroit Police
Lieutenants &
Sergeants
Association:

Interested          KRYSTAL CRITTENDON
Party:              19737 Chesterfield
                    Detroit, MI  48221

For Retired         Strobl & Sharp, PC
Detroit Police      By:  LYNN M. BRIMER
Members             300 East Long Lake Road, Suite 200
Association:        Bloomfield Hills, MI  48304-2376
                    (248) 540-2300

For Detroit         Silverman & Morris, PLLC
Retired City        By:  THOMAS R. MORRIS
Employees           30500 Northwestern Highway, Suite 200
Association,        Farmington Hills, MI  48334
Retired Detroit     (248) 539-1330
Police and Fire
Fighters Association,
Shirley V. Lightsey,
and Donald Taylor:
```

APPEARANCES (continued):

For David Sole:        Jerome D. Goldberg, PLLC
                       By:  JEROME GOLDBERG
                       2921 East Jefferson, Suite 205
                       Detroit, MI  48207
                       (313) 393-6001

For the United         U.S. Department of Justice
States:                Civil Division
                       By:  MATTHEW J. TROY
                       P.O. Box 875
                       Ben Franklin Station
                       Washington, D.C.  20044
                       (202) 514-9038

For Center for         Vanessa G. Fluker, Esq., PLLC
Community Justice       By:  VANESSA G. FLUKER
and Advocacy:          2921 East Jefferson, Suite 200
                       Detroit, MI  48207
                       (313) 393-6005


Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  All rise.  Court is in session.  Please

2     be seated.  Case Number 13-53846, City of Detroit, Michigan.

3          THE COURT:  Good morning, everybody.  I'd like to

4     take appearances from the attorneys who will be speaking here

5     today first.  Can we do that?

6          MR. BENNETT:  Thank you, your Honor.  Bruce Bennett,

7     Jones Day, on behalf of the city.

8          MS. NELSON:  Good morning, your Honor.  Assistant

9     Attorney General Margaret A. Nelson on behalf of the State of

10    Michigan.

11         MS. LEVINE:  Good morning, your Honor.  Sharon

12    Levine, Lowenstein Sandler, for AFSCME.

13         MR. GORDON:  Good morning, your Honor.  Robert

14    Gordon of Clark Hill on behalf of the Detroit Retirement

15    Systems.

16         MR. MONTGOMERY:  Good morning, your Honor.  Claude

17    Montgomery, Dentons U.S., for the Official Committee of

18    Retirees.

19         MS. CECCOTTI:  Good morning, your Honor.  Babette

20    Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW.

21         MR. WERTHEIMER:  Good morning, your Honor.  William

22    Wertheimer on behalf of the Flowers plaintiffs.

23         MS. PATEK:  Good morning, your Honor.  Barbara Patek

24    of Erman, Teicher, Miller, Zucker & Friedman on behalf of the

25    Detroit Public Safety Unions.

1    MS. CRITTENDON:  Good morning, your Honor.  Krystal
2  Crittendon, interested party.

3    MS. BRIMER:  Good morning, your Honor.  Lynn M.
4  Brimer appearing on behalf of the Retired Detroit Police
5  Members Association.

6    MR. MORRIS:  Good morning, your Honor.  Thomas
7  Morris of Silverman & Morris on behalf of the Retiree
8  Association parties.

9    MR. GOLDBERG:  Good morning, your Honor.  Jerome
10  Goldberg on behalf of interested party David Sole.

11    MR. TROY:  Good morning, your Honor.  Matthew Troy,
12  Department of Justice, Civil Division, on behalf of the
13  United States.  It is not my intention to speak this morning,
14  your Honor, unless you have specific questions regarding our
15  filing from Friday.

16    THE COURT:  Thank you, sir.  Mr. Gordon.

17    MR. GORDON:  Thank you, your Honor.  I just wanted
18  to provide the introduction relative to our proposed
19  allocation of the time and order of presentation here this
20  morning.  As your Honor can see from the document that was
21  filed, there are 11 objectors who wish to speak, and, of
22  course, they all have important points to make, but -- and we
23  very much appreciate the cooperation amongst all of them.  It
24  was a good and constructive process.  Not only was that easy,
25  but everyone has been very cooperative, and we've allocated

1  the time accordingly to various parties to have the

2  opportunity to speak today.

3       You will note, your Honor, a couple things.  One, we

4  did not allocate the full 120 minutes in the morning.

5  There's a few minutes left over.  Similarly, in the afternoon

6  there's about five minutes left over of the 90 minutes.

7  That, of course, is not intended to necessarily waive our

8  opportunity to have the full time, but we thought that would

9  build in some flexibility and some error margin as people

10 stand up and sit down to make sure that we fit within the

11 time frame.

12      Also, as footnote one indicates, the presentation

13 order does not necessarily tie -- correspond discretely with

14 each of the issues as listed in your scheduling order, your

15 Honor.  There is some correlation, but various parties, as

16 the Court, I'm sure, can understand, have a number of issues

17 that they would like to address.  There will be some overlap.

18 The parties are going to try to overlap as little as

19 possible, but it was not really feasible to try to identify

20 discrete issues that each party was going to take on, so

21 instead the hope is that as each party comes to the podium,

22 they'll try to give you a little bit of a road map as to the

23 particular issues that they're going to touch upon.

24      THE COURT:  Thank you, and thank you for your

25 extraordinary effort in coordinating this.  I'm sure it was a

 1  challenge.  And I also want to thank all of the attorneys for

 2  cooperating with Mr. Gordon and with the Court in trying to

 3  organize this as best we can.  So we're going to start then

 4  with AFSCME's counsel, and we're going to try to run the

 5  timing mechanism for your convenience.  Kelli, have we got

 6  that available?  I'm sorry.

 7       MS. LEVINE:  They were teasing me that if I'm

 8  nervous, it'll take 20 minutes, but if I remember to speak

 9  slowly, it'll take 35.

10       THE COURT:  Okay.  So for 35 minutes you may

11  proceed.

12       MS. LEVINE:  Thank you, your Honor.  First, we

13  appreciate the opportunity.  We think these issues are

14  extremely important, and we're glad that we have the

15  opportunity to speak.  Second, as Mr. Gordon correctly noted,

16  the parties who are speaking here today have made a concerted

17  effort to divide up the time and to try not to duplicate our

18  comments, so in that regard we're reserving the right to rely

19  on the filed objections along with the other arguments of

20  other counsel simply because we won't have time to do it all

21  ourselves.

22       With that, your Honor, we started this endeavor by

23  looking at PA 436 specifically concerned, as you might

24  imagine, with the pension issues and with the fact that we

25  believe that the Michigan Constitution provides for

1   protections for vested pension benefits, and then that

2   potentially conflicted with PA 436, and, therefore, we

3   started looking at the issue of whether PA 436 was, in

4   fact -- was, in fact, unconstitutional in that it allowed a

5   Chapter 9 filing in light of the pensions -- in light of the

6   pension restriction in the Constitution.

7          In addition to that, we were looking at the

8   governor's authorization in allowing the Chapter 9 filing in

9   light of PA 436 and in light of the Michigan Constitution and

10  grappling with the issue of whether or not that authorization

11  without any contingencies caused this Chapter 9 filing to be

12  unconstitutional as applied.

13         In addition to that, we grappled with the ripeness

14  issue as to whether or not all of these issues should be

15  raised now or whether they should be raised in connection

16  with a plan of adjustment, specifically, your Honor,

17  grappling with the issue as it was presented to us by our

18  members where we have folks literally sitting at their

19  kitchen table deciding whether or not they can take medicine

20  today or do they have to start taking it every other day, do

21  they feed themselves, do they feed their children, do they

22  pay rent, so we came to this Court anxious to have some of

23  these issues decided quickly.

24         On top of that, as it turns out, involved in the

25  mediations and the other efforts with regard to the serious

1   issues that are confronting Detroit, we do think

2   understanding your Honor's views of the rules of the game

3   could be useful for the parties in that process, but that's

4   really by way of introduction because what we've done, your

5   Honor, in addition to that, is we started researching how we

6   thought PA 436 fit in the overall scheme of Chapter 9 and, in

7   looking at those issues, delving into whether or not Chapter

8   9 itself was, in fact, unconstitutional, which is what we

9   will address before your Honor this morning.  And I'd like

10  to, with the Court's permission, set the table a little bit

11  but promise to get into Bekins and some of the cases that are

12  cited by folks who disagree with our views later on in the

13  comments.

14          So I'd ask you, your Honor, to come back with me, if

15  you will, to elementary and high school when we first started

16  talking about what the Constitution is and what it means,

17  and, respectfully, when we go back, we remember that the

18  framers of the Constitution were fleeing an oppressive,

19  overbearing, centralized government.  So when we started

20  looking at how we framed our Constitution, we were very

21  careful to make sure that there was a federal Constitution

22  that was extremely limited only to specific rights that we

23  believed should transcend every single state in the union,

24  and we've come to call those the unalienable rights, and they

25  refer to things like freedom of speech and freedom of

1  religion.  And under the Tenth Amendment, your Honor,
2  everything else is reserved for the states, so specifically
3  reserved for the states are the state municipal governments'
4  rights to handle their own financial management.  And this is
5  done, your Honor, not to protect the states, which would have
6  been as suggested by the New Jersey plan, but was actually
7  done to protect the individual citizens, as suggested by the
8  Virginia plan, and the specific rationale behind protecting
9  the individual citizens was in order to have accountability
10 from our government and particularly, more importantly, from
11 our local governments, which were viewed as being more
12 accessible to the citizens that they were -- that they were
13 supposed to be taking care of.  So, for example, if somebody
14 infringes on my right of free speech or my right of freedom
15 of religion, I know I point my finger to D.C., and I look at
16 the federal government, and I say to the federal government,
17 who is accountable for those federally protected rights,
18 "Make them stop," but if somebody says to me that there's an
19 inappropriate use of the power over the financial management
20 of a state municipality, of, for example, Detroit, I look to
21 my local government.  I look to my local politicians and my
22 local leaders, and I say, "I'm holding you accountable," and
23 we saw that working well very recently with the mayor of
24 Detroit -- with the prior -- apologies -- prior mayor of
25 Detroit, so this direct accountability, which is a

1  cornerstone of how we -- of how we run our country and how we

2  run this democracy, is there for a reason, and it's not there

3  to protect the states.  It's there to protect the citizens.

4  The Constitution doesn't start "We the states."  It doesn't

5  say, "I the general federal government."  It starts, "We the

6  People."  So now, as we indicated in our brief, we believe

7  there is what we've called this unholy alliance between the

8  state giving authorization to the federal government to run

9  this Chapter 9 process.  And what we said there, your Honor,

10 is that the states are, in essence, ceding the responsibility

11 and the accountability for their own financial management, so

12 by turning over under Chapter 9 to the federal government and

13 being able to hide behind the bankruptcy process and this

14 Court, we lose that accountability that's a cornerstone of

15 what our Constitution requires of us, and we've seen that

16 already.  We saw that debtor's counsel correctly noted in an

17 internal e-mail exchange back in January of 2013 that making

18 this a federal issue provides political cover, and we've seen

19 it in the depositions where we're talking to the EM and the

20 governor, and they are talking about the fact that they're

21 not exactly sure what's going to happen with the pensions.

22 The bankruptcy process takes care of that.  And we would

23 respectfully submit, your Honor, that we're seeing play out

24 in real time and real life the exact loss of accountability

25 that the Constitution was designed to protect, so --

1          THE COURT:  Well, but hasn't state consent been a

2     cornerstone of the Supreme Court's Tenth Amendment

3     jurisprudence?

4          MS. LEVINE:  Your Honor, we'll talk about the

5     consent in Bekins, and we don't believe that what we're

6     saying here today is inconsistent with state consent.  And if

7     your Honor will give me a little bit more leeway, we'll reach

8     that point --

9          THE COURT:  Sure.

10          MS. LEVINE:  -- because we understand the issue.  So

11     one of the comments that's being made is that in order for

12     there to be -- that the reason why we can't do it at the

13     state level, the reason why the state municipal governments

14     can't do it is because it violates the contract clause, and

15     by violating the contract clause, you can't do a plan of

16     adjustment unless you have a hundred percent consent.

17          Now, we would respectfully submit, your Honor, that

18     there's two responses to that, and they are -- and I'll admit

19     they're diametrically opposed, but under either response you

20     don't get to the place where you get to take it away from the

21     states.  Number one, if you believe, as suggested, that you

22     need a hundred percent consent at the state level because of

23     the contract clause, then we would respectfully submit that

24     the states can't cede control to the federal government and

25     then suddenly it becomes legal to do a plan of adjustment

1   without a hundred percent consent.  And, your Honor, in doing
2   that, we're actually just reading from the Constitution
3   itself.  The contract clause is in Section 10 of Article I of
4   the Constitution.  Section 10, Article I, of the Constitution
5   has three subsections, one, two, and three.  In the first
6   section, it talks about no state shall enter into treaties
7   with foreign countries, print money, and it's the contract
8   clause.  Under sections two and three, not where the contract
9   clause sits, it says, "No State shall without the consent of
10  Congress," so by the plain reading of the Constitution, if
11  "no state shall" means no state shall, then no state shall do
12  it with or without the consent of Congress, and the framers
13  clearly understood that if they wanted the states to be able
14  to do it with the consent of Congress, they could have done
15  what they did in the two other subsections and basically
16  said, okay, instead we'll do it -- we'll do it with a federal
17  municipal bankruptcy statute where the federal government
18  will consent, and, therefore, you can violate the contract
19  clause.  So our first point is under the contract clause, "no
20  state shall" means no state shall, and if we're going to be
21  intellectually honest with ourselves, that applies regardless
22  of whether or not Congress consents because it's not, as in
23  Section 10, the second and the third paragraph, "No State
24  shall without the consent of Congress."
25          THE COURT:  What Supreme Court case law supports

1    this interpretation?

2         MS. LEVINE:  Your Honor, we respectfully submit that

3    it's Ashton.

4         THE COURT:  The case that Bekins overruled?

5         MS. LEVINE:  Well, we don't believe that Bekins

6    overruled it, and if I can keep going, the alternative

7    approach -- and, frankly, the plain meaning of the statute we

8    don't believe yet -- or I'll admit we haven't found yet a

9    constitutional case that comes right out and says it is or it

10   isn't done this way, but it is the plain reading of the

11   Constitution, which we thought was --

12        THE COURT:  Okay.

13        MS. LEVINE:  -- a good place to start.  But moving

14   past that, let's assume -- and we believe the better answer

15   is that there has to be a way to adjust debts.  Then we go

16   back to where we started, your Honor, which is this is

17   absolutely a state municipal right.  What Bekins was looking

18   at -- and remember Bekins was decided in -- right in the

19   middle of the Great Depression.  Okay.  And so up until

20   the -- up until just before Bekins was decided, there was no

21   municipal federal bankruptcy law at all.  It wasn't really

22   contemplated by the framers, and I'll get into that a little

23   bit more in a minute, but what Bekins found was we now have

24   this new federal municipal bankruptcy law.  There is no state

25   counterpart, so the only option that's available to the state

1   and the only way that the state can be accountable to its
2   citizens to fix this problem if there is no other option
3   available is to then consent to the federal court stepping in
4   and doing this.  Consistent with that, your Honor, we
5   believe, is Asbury Park, and we would respectfully submit
6   that Asbury Park was decided after Bekins.  It was decided --
7   it wasn't a unanimous decision, but there was only one
8   concurrence, so there was no dissent.  It was drafted by
9   Judge Frankfurter, hardly, you know, a slouch, and it
10  specifically upheld Bekins but further found that a state --
11  in that case, New Jersey -- could correctly under its state
12  municipal authority do a plan of adjustment that did not
13  require 100 percent of consent, and in dealing with this
14  issue, it found that to be consistent with Bekins because
15  Bekins was looking at a situation where there was no state
16  alternative for the state to choose, and the state only had
17  one alternative, and it made the alternative to rely on the
18  federal statute.  And it further found -- and I'm going to
19  quote just for a moment, Judge, but in dealing with this
20  issue, the Court posed and then answered this very question.
21  "Can it be that a power that was not recognized until 1938,"
22  which is a federal municipal bankruptcy law, "when so
23  recognized, was carefully circumscribed to reserve full
24  freedom" -- that's how Bekins interprets it -- "to the States
25  has now been completely absorbed by the Federal Government -

1    that a State which, as in the case of New Jersey, has after

2    long study devised elaborate machinery for the autonomous

3    regulation of problems as peculiarly local as the fiscal

4    management of its own household, is powerless in this field?

5    We think not."  And we think that's very telling, your Honor.

6    And by the way, Asbury Park is still good law.  Like Bekins,

7    which it is consistent with, it has not been overruled, so

8    the -- then we were grappling with, well, why hasn't anybody

9    looked at this issue.  What happened after Asbury Park was

10    that the Bankruptcy Act incorporated a federal municipal

11    bankruptcy statute, which is a predecessor to 903, which

12    specifically includes a provision that provides, like 903,

13    that no state can enter into a plan of adjustment unless

14    there is a hundred percent consent.  We find that interesting

15    that it's the federal statute.  Basically, that's Article --

16    that's Chapter 9 saying Chapter 9 is constitutional, and the

17    states can't enter into an alternate separate plan of

18    adjustment with less than a hundred percent because Chapter 9

19    says so.  It's a circular argument, we would submit, your

20    Honor, that can't possibly be the reason why the states can't

21    enter into a plan of adjustment, especially in light of

22    Asbury Park, with less than a hundred percent consent.

23        In addition to that, the other telling conclusion in

24    Asbury Park was when they addressed head on the issue of the

25    contract clause, they determined that the contract clause is

 1  not violated when you don't actually violate the underlying
 2  contract.  They were analogizing it to like the property
 3  rights, so while you have a contract right and that can't go
 4  away or you have a property right and that can't go away,
 5  what they were talking about in Asbury Park was what's the
 6  remedy, and the remedy in a Chapter 9 -- and we would
 7  respectfully submit the remedy in a state -- appropriate
 8  state plan of adjustment is to take what is now a valueless
 9  right -- contract right because the state municipality is
10  insolvent and create a plan of adjustment that, like in the
11  corporate bankruptcy setting, creates value for a right that
12  had no value.  We're not doing away with the contract, and a
13  lot of the cases that come after that -- for example, United
14  Trust that talks about taking away the bonds or changing the
15  bonds -- Asbury Park says you're not taking away the
16  contract, you're not taking away the bonds, you're not taking
17  away our retiree benefits.  All you're doing is you're
18  saying, "Look, there's not enough money here to pay for it.
19  We can't get it through taxation.  We need to -- we need to
20  fashion a remedy."  And that, your Honor, we would
21  respectfully submit is consistent with Bekins, with Asbury
22  Park, and with an appropriate reading of the contract clause.
23          Turning now to the bankruptcy clause, there is a --
24  there is a provision that provides for a national bankruptcy
25  statute.  How can Chapter 9 be unconstitutional if we have

1  a -- if we have a bankruptcy clause that says there's a

2  national uniform bankruptcy statute?  Number one, we're

3  directing our comments specifically at Chapter 9.  We're not

4  saying there is no statute that could be -- that could fit

5  within the parameters.  But that said, one of the things we

6  would observe about the bankruptcy clause is when the framers

7  framed the Constitution, it was inconceivable to them that

8  there would be a national municipal bankruptcy law.  To this

9  day there is no national municipal bankruptcy law in the EU.

10  And while Chapter 11 provides a very viable way to enable

11  commerce and Chapter 7 provides a very viable way for there

12  to be a fresh start -- and we've avoided debtor's prison and

13  all of the things that the framers were focused on at the

14  time -- there was no -- and there wasn't until the Great

15  Depression a national municipal bankruptcy law.

16          Second, we think there's a problem with Chapter 9

17  specifically because the requirement of the national

18  bankruptcy law is that it be uniform, so whether I'm here in

19  Detroit or in any other state or city in the country, I know

20  what the -- I know what the criteria is to be a corporate

21  debtor.  It's right in the Code.  I know what the criteria is

22  to be a Chapter 7 debtor.  It's right in the Code.  But

23  because Chapter 9 is struggling with the difference of the

24  separation of what's a federal power and what's a state

25  power -- and we respectfully submit struggling in a way that

1 didn't work -- Chapter 9 is not a uniform statute. There are

2 some states that have objective standards so that everybody

3 in their particular state has to meet a certain criteria in

4 order to be a Chapter 9 debtor. There are some states that

5 don't even have the ability to be a Chapter 9 debtor, and

6 then there are some states, like Michigan, where even though

7 there's a statute that purports to authorize Chapter 9

8 filings, it is completely and totally subjective with regard

9 to who qualifies, whether they get authorization to file, and

10 whether or not there are any contingencies that are attached

11 to what they do when they're in that filing.

12             THE COURT: Okay. So how do you distinguish the

13 cases that uphold the nonuniformity of exemptions in Chapter

14 7?

15             MS. LEVINE: Your Honor, one of the -- two responses

16 to that. First of all, we understand the case law that says

17 that you can have conformity in a geographic location, so we

18 understand, for example, that if every state had an objective

19 standard the way every state has its own exemptions in

20 Chapter 7, that that could meet the criteria for uniform

21 standards, but we're saying something different. In Chapter

22 9 we don't know that every state has a standard or that

23 they -- and if they don't have a -- and if they don't have a

24 standard for becoming a Chapter 9 debtor, there is no default

25 back to that which is provided under the Code. In other

1   words, in Chapter 7, if I like Detroit's exemptions, I use

2   Detroit's exemptions.  If I like the federal exemptions, I

3   use the federal exemptions.  But there is no place where I

4   don't get to be a debtor or I don't get exemptions.

5           THE COURT:  Well, but still the question remains how

6   does a nonuniformity among states in authorizing or not

7   authorizing Chapter 9 or in having different standards for

8   seeking Chapter 9 protection make the federal law nonuniform?

9           MS. LEVINE:  Well, your Honor, if you take that to

10  its natural conclusion, you can say that I have a federal law

11  that basically says you can do whatever you want, but because

12  I'm saying you can do whatever you want to everybody, it's

13  uniform.  We would respectfully submit that that doesn't --

14          THE COURT:  Isn't that just about what the Chapter 7

15  exemption cases say?  Beyond that, federal law outside of

16  Chapter 9 applies state property law, generally speaking,

17  and, of course, the property law differs from state to state

18  to state.

19          MS. LEVINE:  Yes.  And that goes back to the line of

20  cases that talk about geographic, that they can be -- that

21  they can be uniform within a geographic area.  The difference

22  between all of those cases -- and then I'll let the point

23  rest because you are the Judge, and we may have to agree to

24  disagree --

25          THE COURT:  I'm just asking questions.

1        MS. LEVINE: But the -- but we view that, as I said

2   earlier, that those exemptions, those criteria are published.

3   Okay. So even if I know that I'm not going to follow -- that

4   if I'm going to follow state law with regard to UCC

5   priorities or if I'm going to follow state law with regard to

6   exemptions, in a specific geographic area I know exactly what

7   that is. In the states that have the subjective test with

8   regard to whether or not to file a Chapter 9, Detroit has a

9   different standard than Lansing and has a different standard

10   than other cities, and that's the issue, and the issue -- and

11   not only that, but none of those cities know what that

12   standard is. And I'll leave it there.

13        THE COURT: Okay.

14        MS. LEVINE: Your Honor, the other argument that's

15   out there is, well, doesn't the state have -- doesn't the

16   state have the ability to cede control if there's federal

17   aid. Your Honor, we would respectfully submit that's a very

18   different situation. If you're looking at a situation, for

19   example, like Sandy or like Katrina where the federal

20   government is saying we're going to give you money under

21   specific terms and conditions, that's different. Nobody is

22   saying to Detroit or nobody is saying to every single Chapter

23   9 debtor if you file Chapter 9, you get "X" amount of money

24   from the United States of America, and in exchange for that,

25   you have to follow these certain rules. There's a difference

1  between entering into a contract for money and for support

2  than ceding control just to do the plan of adjustment with no

3  financial support.

4       THE COURT:  Well, but the cases in which the Supreme

5  Court has held the Tenth Amendment is violated by the federal

6  government or the federal government's legislation involve

7  what's called commandeering.  Is there any of that here?

8       MS. LEVINE:  Well, your Honor, we think that's -- we

9  think that is, in part, what is happening here.  The

10 commandeering is they're taking away the state's right or

11 the -- to do their own financial management.

12      THE COURT:  But only because the state showed up.

13      MS. LEVINE:  But that's not true, and this is where

14 we go back to the Bekins --

15      THE COURT:  Is there anything in Chapter 9 that

16 compelled the state to authorize the city to file this case?

17      MS. LEVINE:  Yes, and this is -- and this is where

18 the argument comes.  Okay.  In Bekins there was no state

19 alternative at all.  In Asbury Park -- so, therefore, the

20 Bekins Supreme Court made the decision that the state had no

21 choice if it wanted to adjust its debt but to come to the --

22 but to come to the federal court.  In Asbury Park there was a

23 state alternative to the federal statute that was -- and that

24 was permitted by both the federal statute and the state

25 statute, so the arguments outside of the federal statute that

1   said you can't go to federal -- you can't do it statewide,

2   you have to go to federal court under the commerce clause and

3   otherwise, were rejected for some of the reasons that we're

4   discussing here today.  In Chapter 9 four year -- or the

5   predecessor to Chapter 9, four years after <u>Asbury Park</u>, the

6   Bankruptcy Code in its municipal statute said we can adjust

7   debts at the federal level if you use the Bankruptcy Act, now

8   the Bankruptcy Code, but you, states, cannot because of how

9   we read the commerce clause only -- state municipal

10  governments cannot adjust debt except with a hundred percent

11  consent, so what the -- so what Chapter 9 says to the

12  governor is if you want to do a plan of adjustment without a

13  hundred percent consent, you must come to the federal

14  government, number one.  Number two, your Honor --

15          THE COURT:  Well, but the commandeering cases

16  address situations where the state and -- the federal

17  government imposes on the state to carry out some federal

18  program, some federal policy.  How does that work here?  So,

19  for example, in the New York case, which involved the waste,

20  right, nuclear waste or whatever, the state was forced to

21  take title to it under certain circumstances, and the Court

22  held that the state couldn't be imposed upon to do that to

23  carry out the federal policy of how to dispose of this waste.

24  How is that analogous here?

25          MS. LEVINE:  Well, your Honor, the reason why we

1  believe it's analogous is because in order to do a plan of
2  adjustment, arguably there's no other way to do that without
3  using Chapter 9 unless you have a hundred percent consent,
4  and that's the commandeering.  The requirement that there be
5  a hundred percent consent unless you're the federal
6  government means that the state has no ability to do a plan
7  of adjustment unless it cedes control to the federal
8  government and to the bankruptcy process.

9  Your Honor, I'm coming up on time.  If I -- unless
10 your Honor has more questions, if I could just close briefly.

11 THE COURT:  Well, the other question I have for you
12 is what about the cases that hold that the lower courts are
13 to apply Supreme Court precedent until the Supreme Court
14 itself overrules it, and this is, of course, the Bekins case?

15 MS. LEVINE:  Well, your Honor, our -- we would
16 respectfully submit that Asbury Park was decided after
17 Bekins.  Right now where the Supreme Court sits is that
18 Bekins stands for the proposition that in the face of no
19 state alternative, which is what existed there, you can turn
20 to the federal statute.  Asbury Park stands for the
21 proposition that side by side an appropriate municipal
22 bankruptcy law and an appropriate state law, that's where the
23 state gets to choose, and if the state, as it did in Asbury
24 Park, chooses an appropriate state law that does permit for
25 the adjustment of debt, then the state is accountable to its

1  citizens.  If the state chooses the municipal law, then the

2  state is accountable to its citizens.  But either way, it's a

3  true state decision.  Consistent with both of those cases, we

4  find ourselves here in Detroit with a situation where there

5  is prohibited by Chapter 9, we believe unconstitutionally, no

6  ability to have that second state decision.

7      THE COURT:  Just so I understand, your argument is

8  that the current Chapter 9 is different enough from Bekins

9  because of its exclusivity that Bekins is not binding on this

10 Court.

11     MS. LEVINE:  Correct, and secondarily that Bekins

12 never reached the issue because regardless of whether or not

13 Bekins had an inappropriate -- the Bekins statute had an

14 inappropriate clause, the state wasn't looking to have a

15 separate -- you know, here we have PA 436 looking to try and

16 pigeonhole itself into the strictures of Chapter 9 reviewing

17 Chapter 9 as unconstitutional.

18     Your Honor, we believe your Honor is faced with a

19 difficult decision here.  We understand that Detroit is --

20 all that's happening here is difficult.  Detroit is in dire

21 financial straits, and it's not lost on any of us that the

22 decisions that you make with regard to the criteria for

23 eligibility, particularly with regard to Chapter 9, will have

24 implications for blighted cities throughout the United

25 States.  We also understand that constitutional issues are

1   difficult issues.  We heard -- you know, we've been grappling

2   since 9/11, for example, with the balancing between homeland

3   security and individual privacy rights.  We started talking

4   earlier about the First Amendment, and as a society we

5   grapple between where does First Amendment end and where does

6   a hate crime, for example, begin.  This is no less an

7   important constitutional issue because of the impact this

8   will have on state sovereignty and the ability of its

9   citizens to hold its own municipal leaders accountable.

10       Your Honor spent a long time listening to a lot of

11  individual objectors here in this courtroom talk about how

12  bad they felt things were in Detroit trying to deal with the

13  fact that their firemen were using garden hoses, you know,

14  street lights are out, all of these things, and your Honor

15  was clearly sympathetic.  And it was -- and concluded that

16  hearing, we believe correctly so, by saying that this was a

17  great day for democracy, but we would also add, your Honor,

18  that despite the fact that these things are at the forefront

19  of your mind and you want to do what's right, that doesn't

20  necessarily mean that you can do what's expedious -- what's

21  expedient.  Democracy is hard, and we would respectfully ask

22  that your Honor consider these issues with the same depth and

23  consideration that you've considered everything in this case

24  to date.  Thank you.

25       THE COURT:  Thank you.  Mr. Montgomery also for 35

1  minutes.

2          MR. MONTGOMERY:  Yes, sir.  Thank you.

3          THE COURT:  You may begin.

4          MR. MONTGOMERY:  Good morning.  Your Honor, my task

5  today is to discuss with you constitutionality as applied,

6  the standing and ripeness issue that the U.S. government has

7  posed to our constitutionality as applied to argument, and to

8  identify for you the predicate of that unconstitutionality as

9  applied, which, of course, we believe is the unconstitutional

10  behavior of Emergency Manager Orr and the governor in the

11  context of PA 436.

12          I'd like to set the stage briefly for you, your

13  Honor, on the question of standing by setting up two lines

14  of -- view of history here.  One is that in 1963 the State of

15  Michigan amended its Constitution to protect the pensions of

16  municipal workers.  Partly in reliance on that protection, a

17  small minority of the millions of people who have lived and

18  worked in the city went to work directly for the city.  Of

19  those, thousands of people who worked, about 23,000 people

20  are alive today who are retirees of the City of Detroit,

21  their beneficiaries and surviving spouses.

22          Now, those 23,000 people have been, in our view,

23  stalked by the emergency manager, who, with the blessing and

24  support of his advisors, has proposed to eliminate pensions

25  through a Chapter 9 process.  On July 16th the emergency

1  manager sought permission from the governor to file a Chapter

2  9.  On July 18 the governor, with full knowledge of the plans

3  of his emergency manager, gave unconditional permission to

4  the emergency manager to file that Chapter 9 petition.  And

5  the first overt harm has, in fact, now been announced.  On

6  October 11, the city mailed its books to the retirees

7  announcing the termination of the retiree health insurance

8  program for those same 23,000 people.

9       Now, the committee that I represent, your Honor,

10  consists of nine individuals, including retirees, deferred

11  vested, retirement eligible, surviving spouses and

12  beneficiaries, all of whom are protected by the pension

13  clause, all of whom are adversely affected by the harm that

14  was just announced by the city.  Each has or represents

15  vested accrued pension benefits, and they are participants in

16  the city's retirement health system.

17       The retiree committee consists of creditors

18  appointed by the U.S. Trustee to act in connection with the

19  case under 1102 and we think, therefore, have standing under

20  1109.  Now, the 1109 standing of being an interested party

21  may not be sufficient for either standing or ripeness on a

22  constitutionality issue, but we say to you -- we ask your

23  Honor to look at the current situation in the following

24  analogy.  When can somebody turn and defend themselves when

25  they are being threatened with harm?  We think that you don't

1   actually have to wait until the harm has befallen you if the

2   threat is imminent, if the threat is capable of redress by

3   the Court, and it is identifiable.  The redress by the Court

4   is, of course, denial of eligibility to the city.  The threat

5   is loss of pensions as announced by the emergency manager.

6          THE COURT:  Of course, if eligibility is denied, the

7   city is also denied its right to deal with all of its other

8   debts, isn't it?

9          MR. MONTGOMERY:  Your Honor, that may be a temporary

10  delay because if your Honor holds that the current

11  authorization papers are not constitutional or if accepted,

12  despite their lack of constitutionality, the challenge to

13  Chapter 9 becomes insurmountable, we think that the

14  reasonable thing this Court could do if it were so inclined

15  would be to deny the city its eligibility for the reasons of

16  the challenge to the pension clause and then invite the city

17  to come back with either a conditional acceptance by the

18  governor or otherwise correct their manifest intent to

19  violate Article IX, Section 24.

20         THE COURT:  Well, what do I do if in Detroit two, as

21  you propose, the bondholders come in waving the state

22  contracts clause?

23         MR. MONTGOMERY:  Well, your Honor, first, we think

24  that there is a difference between Article IX, Section 24,

25  and both the federal contracts impairments clause and the

1    state's own contracts impairment clause.  We think that can

2    be found in two places.  First, there are extra words that

3    can be found in Article IX, Section 24.  In its entirety,

4    Article IX, Section 24, has a phrase that appears at the end,

5    which says "shall not be diminished or impaired thereby," the

6    entire phrase, if I may, your Honor, "The accrued financial

7    benefits of each pension plan and retirement system of the

8    state and its political subdivisions shall be a contractual

9    obligation thereof which shall not be diminished or impaired

10   thereby," and, of course, your Honor, the second funding

11   clause, which is, "Financial benefits arising on account of

12   service rendered in each fiscal year shall be funded during

13   such year and such funding shall not be used for financing

14   unfunded accrued liabilities."  Your Honor, that is, to my

15   mind, certainly textually quite different than the state's

16   own simple contract impairment clause, and we think

17   meaningfully it's different.  What Section -- Article IX,

18   Section 24, does for -- in our view, your Honor, is tell the

19   state that no matter what you are doing, you cannot take a

20   step to adversely affect those accrued financial benefits,

21   and we cite, of course, the Seitz case, which is the judicial

22   probate case in which judges in the State of Michigan asked

23   for protection of their pensions, and the Michigan Supreme

24   Court agreed.  We think it's also consistent with the

25   Musselman case, which the Michigan Supreme Court said that,

1  again, the funding of retirement benefits that were otherwise

2  protected or protectable had to be done, and the state could

3  not take any action to not do that.  Now, of course, that's a

4  mandamus case in which the Court denied mandamus, but the

5  legal proposition was squarely stated.

6        We also think the advisory opinions that the Court

7  entered with respect to the tax exempt nature of retirement

8  benefits clearly show that the Michigan Supreme Court looks

9  to see if the state is doing something to impair the actual

10 benefit.  And that particular advisory opinion dealing with

11 the tax exempt nature of retirement benefits, the Michigan

12 Supreme Court said, no, merely taxing you or removing the

13 special exemption is not an impairment of the financial

14 benefit itself, so we step back and we ask your Honor to say,

15 okay, is a plan proffered by the emergency manager with the

16 knowledge and support or blessing of the governor authorized

17 by a statute an unconstitutional series of events?  Is the

18 emergency manager's action unconstitutional, is the

19 governor's action unconstitutional, or is the statute itself?

20 Knowing that there is a judicial predilection for the

21 narrowest possible reading of major problems, we submit to

22 you that your Honor can start with the emergency manager's

23 plan.  Stop it.  No eligibility if the emergency manager's

24 plan is to be put forward.  If that isn't enough because the

25 governor authorized it, then you have to challenge the

1  governor.

2          THE COURT:  Let me rewind the clock here just --

3          MR. MONTGOMERY:  Sure.

4          THE COURT:  -- a couple of minutes and ask you about

5  this nonimpairment provision in the Constitution.  The

6  question we all are struggling with is what is the meaning,

7  the substantive meaning of that provision in the context of a

8  political subdivision that doesn't have the money to comply

9  with it?  What's the meaning of it?

10          MR. MONTGOMERY:  First, I think this might be a good

11  opportunity to agree with your Honor that impairment in the

12  classic sense is something the Bankruptcy Code, of course,

13  has dealt with for many years by saying the allocation of

14  assets is not all by itself impairment.  I think we -- I

15  think it's fairly well established that just because a

16  creditor gets less than a hundred cents does not mean that

17  their contract is impaired.  On the other hand --

18          THE COURT:  I thought that's exactly what it meant.

19          MR. MONTGOMERY:  That's if the state does it, but

20  that's not that the -- remember the -- it was not a taking of

21  property by the federal government to authorize the

22  Bankruptcy Code.  It was --

23          THE COURT:  Oh, if that's what you mean --

24          MR. MONTGOMERY:  Yes.

25          THE COURT:  Absolutely.

1          MR. MONTGOMERY:  Totally.

2          THE COURT:  Absolutely, sure.

3          MR. MONTGOMERY:  But it is a taking of property if

4     the emergency manager says to its retirees, "I, either by

5     virtue of a plan I put in or otherwise, am taking your right

6     to receive pension benefits in the future," which is what he

7     is proposing.  He is not merely proposing to alter the

8     funding system in violation of Article IX, Section 24.  He is

9     proposing to actually eliminate or reduce already accrued

10    financial benefits.

11         THE COURT:  Right, so what's -- how do we give

12    meaning to nonimpairment, as you propose is constitutionally

13    required, if the city doesn't have the money to pay?  What

14    does it -- what's the meaning of that requirement?

15         MR. MONTGOMERY:  Well, your Honor, I think that if

16    there is to be some allocation -- let's back up for half a

17    moment.  Let us assume for the moment that, in fact, the city

18    has proposed to utilize all of its assets to deal with it, so

19    we're not talking about a situation in which the city has

20    capacity on its balance sheet or cash flows to deal with

21    something that it just refuses to do.  We think that the

22    proper answer is not for the federal government to invite the

23    state to violate its own Constitution but to have the state

24    adjust its own laws, have the state, using its people, its

25    either constitutional ratification process or the state

1    through its legislative process create the system for

2    adjustments that Asbury Park tells us is still at least

3    viable.  Putting that aside, whether or not Asbury Park is or

4    is not still --

5         THE COURT:  Well, but hang on, Mr. Montgomery.  If

6    the pension right is as inviolate as you say it is, the

7    legislature can't adjust the pensions either.

8         MR. MONTGOMERY:  No, but it can adjust other

9    people's assets, other people's entitlements.  It can make

10   the accommodations to its Constitution that may be required.

11   It has the capacity to levy.  It has the capacity to change

12   property rights.  The state legislature has those property --

13   and the only thing we are asking this Court to consider --

14        THE COURT:  Well, let me ask this question then.

15        MR. MONTGOMERY:  Yes, sir.

16        THE COURT:  Is it your position that because of this

17   nonimpairment requirement in the Michigan Constitution, the

18   State of Michigan is a guarantor of retirees' pension rights?

19        MR. MONTGOMERY:  We have not garnered nor do we

20   propose to express a view today whether or not the state is a

21   guarantor.  What we are proposing to express a view today is

22   that no state actor can do something in violation of the

23   state Constitution and have that act be other than void ab

24   initio.  And if those acts are void ab initio, the requisite

25   authorizations either don't exist or, if this Court has the

1    power to accept those authorizations notwithstanding their

2    unconstitutionality under Michigan law, then your Honor is

3    engaged not in aiding the sovereignty of the state, as

4    suggested was required by Bekins, but you are aiding -- you

5    are going in the direction of derogation of the sovereignty

6    of the state.  And why do I say that?  Because you are

7    telling the people of Michigan they can't control their own

8    Constitution, they can't control their own legislature, they

9    can't control their own executive officers, and we think that

10   is a pure Tenth Amendment problem.

11          You mentioned earlier in discussion with Ms. Levine

12   the commandeering issue.  It is absolutely true, as you have

13   identified, that first states must act in aid, not in

14   derogation of sovereignty.  That's the Bekins.  Under Printz

15   they can't compel a state official to do something that is

16   otherwise the subject of a federal program.  They can invite,

17   they can entice, but they can't commandeer.  That's the

18   Printz -- that's the Brady Bill decision.  And in the New

19   York versus United States case, which, again, your Honor

20   identified, you can't compel ownership of radioactive waste.

21   Again, you can create programs, you can create enticements,

22   you can create an exhaustive federal regulatory scheme that

23   keeps the states out of regulating the business, but here the

24   federal government can't, by virtue of the Tenth Amendment,

25   keep the states out of regulating the financial obligations

 1   of its citizens.  It can't keep the states out of the

 2   business of deciding when their elected officials can or

 3   cannot do something, and it is that issue that causes the as

 4   applied problem as opposed to the facial and validity issues

 5   that were raised by AFSCME in the arguments of Ms. Levine.

 6   We think it --

 7            THE COURT:  I want to -- well, I want you to focus

 8   on why the mere filing of this case resulted in an imminent

 9   threat to the pension rights of the retirees of the city

10   because the filing itself didn't result in anyone's payments

11   being reduced; right?

12            MR. MONTGOMERY:  Well, I will note for you they --

13   on the healthcare side, they apparently are.

14            THE COURT:  Well, but that's not a result of the

15   Chapter 9.

16            MR. MONTGOMERY:  Well, actually, I don't think that

17   could be done under state law because these are all

18   collectively bargained -- or mostly collectively bargained,

19   and to the extent they were collectively bargained,

20   they're --

21            THE COURT:  Well, but with or without the Chapter 9,

22   Mr. Orr was free to do that or not under state law.

23            MR. MONTGOMERY:  Or not under state law.

24            THE COURT:  There's nothing about Chapter 9 that

25   impacts his decision to do that.  He hasn't asked, at least

1    as far as I know, the Court's permission to do that.

2         MR. MONTGOMERY:  No.  As far as we know, he hasn't

3    asked either.  So if I may answer the question, which, if I

4    understood it correctly, was why is the mere filing --

5         THE COURT:  An imminent injury.

6         MR. MONTGOMERY:  -- an imminent threat, first, I go

7    back to the factual predicate that I think underlays this,

8    that the mere threat of filing -- excuse me -- the mere

9    threat of a filing is not the harm all by itself, but it was

10   preceded by an announced plan, the June 14 proposal, and a

11   series of other events that the emergency manager undertook

12   and statements made, which evidenced -- evidenced -- a desire

13   to violate the state Constitution.  Now, the only way in the

14   emergency manager's own mind that he can do that is if he has

15   access to the Bankruptcy Court because he believes it will

16   trump the state constitution with respect to pension

17   protections.  Now, right or wrong, it is the -- it is the

18   threat that those pension benefits will be eliminated as part

19   of a plan, a series of steps of which have already been

20   undertaken, the most recent of which was the filing of the

21   Chapter 9 petition.  The problem we face, at least in my

22   view, your Honor, is that the world that you face today for

23   deciding whether or not the emergency manager's actions are

24   or are not constitutional under Michigan law is different in

25   the eligibility context than we think you're going to be

1  faced with at a plan confirmation context.  Once you're

2  inside the box of bankruptcy -- excuse me -- everyone,

3  putting aside whether -- how vigorously we will try to get

4  state law to say something different, but everyone seems to

5  suggest that the priority schemes and the allocation schemes

6  of the Bankruptcy Code preclude a contrary result that would

7  be allowable under state law.

8          THE COURT:  Oh, but you're going to fight that.

9          MR. MONTGOMERY:  But, your Honor, I've lost before,

10  and I might lose again.  The issue of --

11          THE COURT:  Well, but if you lose, it will be on

12  legal grounds.

13          MR. MONTGOMERY:  But, your Honor, it will be.  If we

14  are fighting this issue at the back end of the case and we

15  are arguing, as we will if we are required to, that

16  notwithstanding 109, that the emergency manager can't propose

17  a plan in good faith in which he violates his constitutional

18  rights for --

19          THE COURT:  Constitutional obligations, yeah.

20          MR. MONTGOMERY:  Constitutional obligations.  I

21  apologize.  For that to be a viable argument, in effect, you

22  have to rule today, your Honor, that it would be a violation

23  of his constitutional obligations because if it's not a

24  violation in the context of adhering to the Bankruptcy Code

25  provisions, which some cases say only provide with respect to

1  prospective obligations -- that is, a new pension plan would

2  be subject to the protections -- well, we're not talking

3  about a new pension plan, your Honor.  We're talking about

4  one that's been around for 60 or 70 years now, and we're

5  talking about a retirement plan that has people who are a

6  hundred years old.

7         THE COURT:  Suppose the plan is confirmable because

8  it results in the consent of those impaired after

9  negotiation.

10         MR. MONTGOMERY:  Your Honor, if our understanding of

11  the law is correct, it's going to be very hard for a state

12  official to agree in good faith to propose a plan that

13  impairs financial benefits without a hundred percent of the

14  retirees consenting either under 109 or under state law, and

15  so the -- in order to get to the point where a less than 100-

16  percent majority of the retirees are accepting the plan, you

17  have to have decided that state law doesn't control the

18  exercise of those rights.

19         THE COURT:  Suppose you or one of your objecting

20  colleagues decides to assert that the Michigan Constitution

21  requires the state to guarantee the federal -- the retirees'

22  pension.

23         MR. MONTGOMERY:  Well, your Honor, the -- again, you

24  are asking for advisory hypotheticals here, but --

25         THE COURT:  Well, but that's what looking at

1   ripeness is all about.

2           MR. MONTGOMERY:  The issue will be then not whether

3   or not the bankruptcy process has harmed the retirees because

4   it will have -- if the state is a guarantor or arguably a

5   guarantor, it must be sued, query whether or not that lawsuit

6   can be brought in the Bankruptcy Court or some other place,

7   and, secondly, the -- under the <u>Sittler</u> case, I believe,

8   there is a question of whether or not there's a cause of

9   action for damages for unconstitutional behavior.  There may

10  be a remedy, an injunction against unconstitutional behavior,

11  but the Michigan Supreme Court has not yet adopted a per se

12  rule that says if there is a violation of the state

13  Constitution --

14          THE COURT:  Suppose the state agrees that the

15  Constitution obligates it to guarantee the city's pension

16  obligations.

17          MR. MONTGOMERY:  Then the state will have remedied

18  the harm caused by the bankruptcy, your Honor, but the harm

19  was still being caused by the bankruptcy.

20          THE COURT:  What harm?

21          MR. MONTGOMERY:  The harm was the diminution of

22  pension benefits.

23          THE COURT:  Well, but if the state backs it up,

24  there's no diminution.

25          MR. MONTGOMERY:  Yeah.  If, as part of a plan of

1    arrangement, the state backstops -- you're right, your

2    Honor -- then the -- this is like a situation --

3            THE COURT:  Okay.  Okay.  If I'm right about that,

4    then why is the issue ripe now as opposed to then?

5            MR. MONTGOMERY:  This is like the landlord case, if

6    I may, your Honor, in which the -- I think it's Bennett

7    versus City of San Jose, which, if I may, your Honor, since

8    we didn't brief this issue, I can give you the cite for, but

9    as I'm looking for the citation, I believe that case stands

10   for the proposition that a landlord need not await the actual

11   failure to collect more rent than he could under the new

12   ordinance.  He's allowed to challenge the ordinance when it's

13   being passed.  All right.  We think this situation is very

14   similar to that.  We have a situation in which the emergency

15   manager has undertaken an act, has sought the aid of this

16   Court, and the question is do we have to wait for this Court

17   to, in effect, put it to us before --

18           THE COURT:  No, no.  The question isn't that.  The

19   question is do you have to wait for the emergency manager to

20   actually propose a plan that impairs pensions -- that's the

21   question -- and then object to that on constitutional

22   grounds.

23           MR. MONTGOMERY:  In the Thomas More Law Center case,

24   your Honor, the -- which is the commerce clause challenge to

25   minimum coverage provisions under the Affordable Care Act,

1 three and a half years in advance, the Sixth Circuit found

2 standing because notwithstanding the fact that it was a long

3 way off and many things could occur, including Congress

4 changing the law, different rules being applied, that was

5 enough because there was nothing the party asserting the

6 claim had to do in order to become injured.  Now, yes, there

7 were things that any member of the law center group could do

8 that could escape the harm, but the fact that they had to

9 undertake affirmative steps to escape the harm was enough.

10        Here the only thing we can do to escape the harm

11 which the emergency manager has announced he will undertake

12 is to escape, and the only way to escape is through the gates

13 that your Honor is standing at the door of.  You are the

14 keeper of the protection for the retirees.  You are the one

15 who can stop the emergency manager from doing what is

16 unconstitutional under Michigan law.  And apparently, by the

17 way, both the state and the city are inviting you to rule on

18 constitutionality issues, you know.  They are perfectly

19 comfortable with your going down that road, your Honor, and

20 notwithstanding our hesitancy --

21        THE COURT:  Does that make an otherwise not ripe

22 issue ripe?

23        MR. MONTGOMERY:  No, obviously not, your Honor, but

24 we do think that where there's -- where the voluntary

25 cessation by the city or the temporary cessation or the

 1   temporary abandonment of its statements that, oh, we are

 2   going to impair the pensions does not create a situation that

 3   moots the controversy nor do we think it eliminates the

 4   ripeness of the controversy because your Honor can still see

 5   the identifiable harm and can still issue an order that

 6   redresses that identifiable harm by telling the city it may

 7   not enter the portals of your courtroom.

 8           Now, your Honor, I think we have, in effect,

 9   distinguished the Barnwell case, which is cited by, I

10   believe, the U.S. government, because that was an ad hoc

11   committee of citizens instead of an 1102 committee.  Here

12   we're clearly creditors.  Here 1109 grants us statutory

13   standing as parties of interest, and I think we have

14   indicated to you that the harm is factual, imminent, and you

15   are at the gates.

16           One other thing I might want to sort of identify in

17   this ripeness issue, why now as opposed to what, why later,

18   of course, your Honor is familiar with the City of Stockton

19   case, and we are not urging you to adopt that case obviously,

20   but it does suggest that once in Chapter 11, the State of

21   California couldn't decide which rules it was going to

22   follow.

23           THE COURT:  Chapter 9?

24           MR. MONTGOMERY:  Right, in Chapter 9, the same thing

25   your Honor might decide here; that is, once inside Chapter 9,

1  the city is not free to do whatever it wants to do except
2  with respect to its own property and its own future
3  governance.  That you cannot touch in any way, shape, or
4  form, but that doesn't mean that you have to approve a plan
5  that violates what your Honor thinks are the rules of the
6  road.  And it is that danger that you would be called upon to
7  make a ruling inconsistent with Michigan law at the back end
8  of the case that has us asking you at the front end of the
9  case to prevent the city from engaging in that dialogue.
10          Now, the -- I think worth making as a final, if you
11  will, point -- and, again, later this afternoon you will hear
12  a more fulsome discussion, I believe, on all of the issues
13  associated with PA 436, but I think the void ab initio issue
14  is important to our constitutionality position; that is, were
15  it not for the fact that under Michigan law an
16  unconstitutional act is considered void ab initio, we think
17  you might be able to go down the road of accepting the
18  authorization papers as having been legitimately delivered to
19  your Honor without fear of violating our view of how Chapter
20  9 would be unconstitutional as applied; that is, if Michigan
21  law did not regard unconstitutional acts as void ab initio,
22  then all you would be faced with is a remediable situation
23  rather than an absence of action or an absence of
24  authorization action.  And with respect to the void ab initio
25  cases, we have cited those in our brief, your Honor, and we

 1   think that you should accept as a truism, if you will, the

 2   simple words actually uttered by Attorney General Schuette in

 3   his paper that the city lacks authority under Michigan law to

 4   propose a plan that diminishes accrued pension rights.  It

 5   similarly lacks power to consent to any proposed action that

 6   would violate the Michigan Constitution.  The proposed action

 7   was the petition.  The proposed action was the petition as

 8   part of a plan to eliminate the pension rights induced -- the

 9   emergency manager got the governor to say yes to an act that

10   was unquestionably contrary to the pension clause.  As a void

11   ab initio act, that means that the legitimacy of the filing

12   is called into question, pure question of state law for your

13   Honor to rule upon, pure question of whether or not, in fact,

14   the city has obtained valid authorization papers -- pretty

15   hard to be valid if the underlying actions are void ab

16   initio, which is the norm under Michigan law, and we think,

17   therefore, your Honor has two ways to go down the path of

18   blocking eligibility independently of the factual disputes

19   under 109.  One is to hold that it's unconstitutional, the

20   authorization was unconstitutional because it was part of a

21   scheme to eliminate the pension rights or to say even if it

22   wasn't void ab initio, the acceptance of those actions by

23   this Court raise a huge constitutional challenge under the

24   Tenth Amendment to Chapter 9 itself.  Obviously the principle

25   of limiting federal constitutionality challenges would favor

1  finding that the narrower ground would be that the emergency

2  manager couldn't have filed his papers.  And I think, your

3  Honor, just because I must, I just want to argue we are not

4  arguing -- we are not rearguing today all those issues which

5  we were in front of your Honor before several weeks ago about

6  Stern v. Marshall and whether or not the Court should do

7  that.  We are in front of you.  You have determined that you

8  have the power to decide issues of state and federal

9  constitutionality.  We are asking you to exercise that power

10  and to preclude the city's eligibility.

11            THE COURT:  So if you don't -- we have a little time

12  left.  I have some more questions for you.

13            MR. MONTGOMERY:  Sure.  Happy to engage, your Honor.

14            THE COURT:  One is sort of a procedural one.  You

15  mentioned that you didn't brief the ripeness issue.  Would

16  you like an opportunity to do that?

17            MR. MONTGOMERY:  That would be fine, your Honor.

18            THE COURT:  I'd leave it to your discretion.

19            MR. MONTGOMERY:  Yes, yes.

20            THE COURT:  How much time --

21            MR. MONTGOMERY:  We'd be happy to do that, your

22  Honor.

23            THE COURT:  How much time would you like?

24            MR. MONTGOMERY:  Give us a week, your Honor.

25            THE COURT:  Okay.  You have a --

1          MR. MONTGOMERY:  Yeah.  Give us a week.  It'll be --

2     if you don't mind, we'll submit it to you on the first day of

3     the trial.

4          THE COURT:  Okay.  I want to ask you about a couple

5     of entries in the brief that you did file.

6          MR. MONTGOMERY:  Okay.

7          THE COURT:  On page 27, you say -- and I want to

8     quote here.  This is the brief you filed at Docket Number

9     805.

10         MR. MONTGOMERY:  Yes.

11         THE COURT:  You say, "As noted by the Sixth Circuit

12    in City of Pontiac Retired Employees Association, 213 Westlaw

13    4038528 at *1-2, the Michigan legislature evidenced an

14    unconstitutional, and undemocratic purpose in crafting PA

15    436," close quote.  Similarly, on page 29 of that brief you

16    say, "The Michigan legislature, the Governor, and the

17    Emergency Manager have each made clear that abrogation of

18    municipal retirement compensation rights was the legislative

19    intent of the Act," referring to PA 436, "and is a central

20    purpose of this bankruptcy.  That intent also was recently

21    recognized by the 6th Circuit in City of Pontiac Retired

22    Employees Association," same cite at *3.  I have to say, Mr.

23    Montgomery, that I have studied that opinion by the Sixth

24    Circuit several times, and I cannot find these references.  I

25    cannot find where the Sixth Circuit addressed or even

1  suggested anything about the constitutionality of PA 436.  Am

2  I missing something or was this a mistake?

3        MR. MONTGOMERY:  Well, unless my memory fails me,

4  your Honor, I think what we're referring to is the fact that

5  the Sixth Circuit said that PA 4, which was the immediate

6  predecessor of 436, had each of those purposes, your Honor,

7  and that, therefore, by extension --

8        THE COURT:  Perhaps so, but the Court didn't say

9  anything about PA 436.

10        MR. MONTGOMERY:  Well, other than that it was

11  adopted despite the fact that the referendum had overruled PA

12  4 and that it was virtually the same but for -- I believe the

13  phrase was an add-on for --

14        THE COURT:  The Sixth Circuit did not say anything

15  about the purpose or intent of PA 436.

16        MR. MONTGOMERY:  But it did as to 4, your Honor.

17        THE COURT:  It did.

18        MR. MONTGOMERY:  And it says 4 -- 436 is the same as

19  4.  That's how we got there.  Rightly or wrongly, that is how

20  we got there, your Honor.  We say if the Sixth Circuit

21  identified a purpose of PA 4 as being the impairment of

22  pension --

23        THE COURT:  Well, since you're going to file an

24  amended brief --

25        MR. MONTGOMERY:  Yes, sir.

1      THE COURT: -- I want you to tell me very
2 specifically where in this City of Pontiac case the Court
3 said anything or suggested anything about the
4 constitutionality of PA 436.
5      MR. MONTGOMERY: All right. Your Honor, we will --
6      THE COURT: I agree with you it addressed it at
7 length with regard to PA 4 and expressed grave concerns about
8 it, but that's not the act before this Court today, so I
9 invite you to do that in your --
10      MR. MONTGOMERY: Of course.
11      THE COURT: -- new brief.
12      MR. MONTGOMERY: We'll add that discussion to our
13 ripeness supplemental brief.
14      THE COURT: All right. Thank you.
15      MR. MONTGOMERY: Thank you, your Honor.
16      THE COURT: Ms. Brimer, you may proceed for ten
17 minutes, please.
18      MS. BRIMER: Thank you, your Honor. Lynn M. Brimer
19 appearing on behalf of the Retired Detroit Police Members
20 Association. Your Honor, your concluding arguments or
21 discussion with Mr. Montgomery leads directly into the
22 discussion that I will have with you this morning, and that
23 has to do with the constitutionality of PA 436 under the
24 Michigan Constitution, your Honor. And first and foremost,
25 your Honor, I'd like to point out that in our brief we

1    noted -- and we cited the <u>Schimmel</u> case -- we noted that PA

2    436 was passed in what we believe is derogation of the

3    Michigan referendum provision in Article II, Section 9, of

4    the Michigan Constitution.  It is well worth noting at the

5    outset of this discussion, your Honor, that that issue was

6    not addressed by either the city or the State of Michigan in

7    the pleadings they have filed.

8          With that, your Honor -- and I'll address that a bit

9    briefly later, your Honor.  Article I, Section 1, of the

10   Michigan Constitution specifically provides that, "All

11   political power is inherent in the people.  Government is

12   instituted for their equal benefit, security and protection."

13   Consistent with that maxim, Article II, Section 9, of the

14   Constitution specifically provides -- and it's a lengthy

15   provision, your Honor, so I'll read the relevant

16   provisions -- "The people reserve to themselves the power to

17   propose laws and to enact and reject laws, called the

18   initiative, and the power to approve or reject laws enacted

19   by the legislature, called the referendum.  The power of the

20   referendum does not extend to acts making appropriations for

21   state institutions or to meet deficiencies in state funds."

22   As has been noted, your Honor, in a handful of cases that we

23   can find that address this case, this provision of referendum

24   is so significant and vital to our Constitution that Article

25   II, Section 9, further provides that, "No law as to which the

 1  power of referendum properly has been invoked shall be
 2  effective thereafter unless approved by a majority of the
 3  electors voting thereon at the next general election."
 4          As this Court is aware, I'm sure, on November 6,
 5  2012, by referendum, the people of the State of Michigan
 6  rejected Public Act 4 on a vote of 52 to 48 percent.  That
 7  was the Local Government and School District Act --
 8  Accountability Act.  On December 26, Governor Snyder approved
 9  Public Act 436, the Local Financial Stability and Choice Act,
10  a virtually identical law to Public Act 4.
11          In order to avoid subjecting Public Act 436 to
12  referendum, two very minor spending provisions were tacked on
13  at the back end.  Section 34 of the Act provides that for the
14  fiscal year ending 9-30, 2013, $780,000 is appropriated to
15  administer the Act, in essence, to pay the salaries of the
16  emergency managers appointed thereunder, and Section 35
17  provides that $5 million is appropriated for the same time
18  frame for the professionals such as lawyers and financial
19  consultants that are engaged under the Act.  The spending
20  provision was not at all a general spending provision for the
21  State of Michigan but a very limited provision relating
22  directly to the Act.
23          We have researched, your Honor, and cannot find a
24  single instance where the voters of Michigan have
25  specifically rejected a law and shortly thereafter the

1    governor passes a very similar law, if not identical, and

2    tacked on a spending provision in an effort to remove it from

3    the otherwise democratic process of the State of Michigan.

4         There are a handful of cases in Michigan that do

5    address the referendum.  In the case of Kuhn v. Department of

6    Treasury at 384 Mich. 378, 1971, the Michigan Supreme Court

7    specifically provided or held that the phrase in the preamble

8    of that -- the Income Tax Act of 1967, which provides that

9    the Act is for the purpose of meeting deficiencies in state

10   funds was not, in fact, sufficient when at the time the state

11   did not have any state deficiencies in its funding, and,

12   therefore, that provision in the preamble did not, in fact,

13   remove the Income Tax Act of 1967 from the power of

14   referendum.  Unfortunately, in that case the plaintiff had

15   not complied with the requirements for referring the matter

16   to the -- or the law to the referendum, and so the Court was

17   not able to render any further opinion regarding that

18   language and its impact on the -- whether or not that case

19   had -- that law had it been brought to referendum.  However,

20   it's instructive to this Court.  The law at issue in that

21   case had not previously been rejected on referendum, so,

22   therefore, it does have some influence in how this Court

23   should interpret how the Michigan Supreme Court may view the

24   two spending provisions tacked onto Public Act 436.  Public

25   Act 4 had, in fact, been rejected by the state through a

1    proper referendum.  The spending provisions were added on in

2    an effort to remove the case -- the law from the referendum

3    in derogation of the provision in Article II, Section 9,

4    which provides specifically that no law to which the power of

5    referendum had been properly applied shall be effective

6    thereafter unless approved by a majority of the electors

7    voting thereon at the next general election.

8         THE COURT:  Okay.  So I have this question for you

9    regarding this argument, and it's, again, a ripeness question

10   and a standing question.  How does any party have standing to

11   challenge the constitutionality of PA 436 on this ground or

12   why is it ripe until such a party has complied with all of

13   the legal requirements to have a referendum regarding that

14   put on the ballot and it being rejected because the law isn't

15   subject to a referendum because of this appropriations

16   provision?

17        MS. BRIMER:  I don't believe, your Honor, that by

18   adding on the spending provision, which on its face took

19   Public Act 436 out of the referendum provision of the

20   statute -- if that is the case, your Honor, then you have

21   read out the referendum from the Michigan Constitution.  I

22   think this is precisely the mechanism by which the

23   constitutionality of the law now should be challenged.  When

24   that law was then relied upon for purposes of the appointment

25   of an emergency manager, that is precisely, I believe, your

1   Honor, how this would come to a court for review.  On its
2   face, the governor attempted to remove this from the
3   referendum.  It was removed from the referendum, but you
4   can't read that out of the law and read out of the
5   Constitution the second provision, which requires that any
6   law that has been rejected by referendum be resubmitted to
7   the electorate.

8          I see I'm running out of time, your Honor.  What I
9   would like to note, your Honor, is that while you are correct
10  that the Sixth Circuit did not specifically rule on 436 --
11  I've read that case closely several times -- 436 was not
12  before the Court, and, as you'll recall, some of the matters
13  at issue in that case were what precisely is before the Court
14  because some of the arguments had not even been preserved on
15  appeal.  However, I think the tone of the Sixth Circuit when
16  it said, "Apparently unaffected that voters had just rejected
17  Public Act 4, the Michigan Legislature enacted, and the
18  Michigan governor signed, Public Act 436.  Act 436 largely
19  reenacted the provisions of Public Act 4, the law the
20  Michigan citizens had just revoked.  In enacting 436, the
21  Michigan Legislature included a minor appropriations
22  provision, apparently" -- they didn't say "in fact," but
23  "apparently to stop Michigan voters from putting Public Act
24  436 to a referendum."  I think that gives us a tone, and I
25  also think it's noteworthy, your Honor, that despite the fact

1  that the city noted on page 15 of Exhibit A to their

2  consolidated response to the objections that we had raised

3  this specific issue, it is not addressed.  It is not

4  responded to by either the state or the city.  It stands

5  unrefuted at this point, your Honor.

6      THE COURT:  Thank you.

7      MR. GOLDBERG:  Good morning, your Honor.  Jerome

8  Goldberg appearing on behalf of interested party David Sole,

9  who is a city retiree, as is his wife, Joyce Sole.

10     THE COURT:  And you may proceed for ten minutes,

11 sir.

12     MR. GOLDBERG:  Thank you, your Honor.  While I

13 certainly concur with many of the eloquent arguments put

14 forth by counsel prior to myself, I want to approach the

15 issue from a somewhat narrower point of view from the prism

16 of Michigan state law and specifically from the Michigan --

17 how Michigan state law views the issue of statutory

18 construction.

19     As we know, 11 U.S.C. 109 states that a local

20 municipality must be specifically authorized by state law to

21 file a Chapter 9 bankruptcy.  The phrase "authorized by law"

22 refers to the law of the state, and I cited <u>Bekins</u> for that

23 principle.  States act as gatekeepers to their municipalities

24 and access to relief under the Bankruptcy Code.

25     As we all know, the basis for the state law

1    authorizing the filing of this Chapter 9 is Public Act 436,

2    and Public Act 436 has several different provisions that I

3    think it's worth looking at to get an understanding for why

4    we believe the failure to include a contingency to bar the

5    impairment of pensions is violative of state law.  It

6    provides the emergency -- Section 1551(c) provides the

7    emergency manager with the power to carry out the

8    modification, rejection, termination, and renegotiation of

9    contracts.  Section 1552 provides the emergency manager again

10   with the power to reject, modify, or terminate, one, terms of

11   an existing contract.  Section K gives the emergency manager

12   the power to reject, modify, or terminate an existing

13   collective bargaining agreement.  Section 12 contains

14   provisions for the renegotiation of debt, and it's laid out

15   in Section 12.  But what Section 1552(m) -- Section 12(m),

16   when it deals with the question of pensions, it explicitly

17   includes within the section, within the statute, the --

18   states that the emergency manager must fully comply with

19   Article IX, Section 24, of the Michigan Constitution, which

20   is the constitutional prohibition on diminishing or impairing

21   contract.  In addition, Section 1558 states that the governor

22   may place contingencies on a local government in order to

23   proceed.

24          When you view the statute -- the authorizing statute

25   from the prism of the Michigan rules on statutory

construction -- and I cited the <u>Pohutski</u> case, which many --

is the seminal case on statutory construction in the State of

Michigan, <u>Pohutski</u> -- the Michigan Supreme Court in <u>Pohutski</u>

stated, "When parsing a statute, we presume every word is

used for a purpose.  As far as possible, we give effect to

every clause and sentence.  'The Court may not assume that

the Legislature inadvertently made use of one word or phrase

instead of another.'  Similarly, we would take care to avoid

a construction that renders any part of the statute

surplusage or nugatory."  And, in addition, Michigan courts

follow the doctrine of expression unius exclusion alterius,

the expression of one thing is the exclusion of another.

We would submit that in construing Public Act 436 as

a whole, in construing it as a whole, any -- you can't allow

for the filing of a Chapter 9 unless the Chapter 9 includes

the contingency for not impairing the pension rights under

Article 24.  Otherwise it would negate that section or

declare that section void, and that would be an express

violation of the Michigan Rules of Statutory Construction,

which the Court is bound to follow at this stage in the

proceeding because in the eligibility proceeding, it is state

law, state law that is dominant.  We believe, based on --

THE COURT:  But aren't there many, many, many

conditions that the governor could have put on the filing in

order to assure the emergency manager's compliance with state

1  law?

2        MR. GOLDBERG:  There are certainly different --

3        THE COURT:  Equal protection, due process of law,

4  freedom of speech.

5        MR. GOLDBERG:  But what I'm submitting, your

6  Honor --

7        THE COURT:  There are lots of constitutional rights.

8        MR. GOLDBERG:  Certainly.  But what I'm submitting

9  is we have to look at the statute as it is written.  That's

10  what the Michigan courts rule over and over again.  Those are

11  the fundamental rules of statutory construction enunciated by

12  the Michigan Supreme Court in case after case.  In this case,

13  we look at the words of the statute.  We don't read into the

14  statute.  We look at the words of the statute.  This statute

15  contains an explicit guarantee of pensions, a guarantee --

16        THE COURT:  Well, and the governor says --

17        MR. GOLDBERG:  It includes Article IX.

18        THE COURT:  The governor says the filing will comply

19  with state law, doesn't he?

20        MR. GOLDBERG:  Well, the governor may say it, but

21  the governor is not the final arbiter, your Honor.  That's

22  what the Court is for, and what we -- and the governor is not

23  above the law.

24        THE COURT:  Why isn't that a sufficient protection?

25        MR. GOLDBERG:  I'm sorry.

1          THE COURT:  Why isn't that a specific -- a

2    sufficient protection?

3          MR. GOLDBERG:  Why isn't what the governor says a --

4          THE COURT:  No.  Why isn't the fact that this Court

5    will apply state law a sufficient protection?

6          MR. GOLDBERG:  Well, we would submit, your Honor,

7    that state law at this stage of the proceeding, at the

8    authorization stage, is the determinative factor.  Once we go

9    into the -- once you make the eligibility determination, as

10   Mr. Montgomery indicated and as the case law as I've read it

11   indicates as well, that's where federal law -- there's a

12   question of federal supremacy over state law, but at this

13   stage it's state law that is determinative, and the state law

14   in this case explicitly mandates a contingency for the

15   guaranteeing of pensions.  Otherwise we've written that

16   section --

17         THE COURT:  If we're going --

18         MR. GOLDBERG:  -- out of the authorization

19   statute --

20         THE COURT:  If we're going to look at --

21         MR. GOLDBERG:  -- and that's an explicit violation

22   of statutory construction.

23         THE COURT:  If we're going to look at statutory law

24   and every word of it, how do you deal with the city's

25   argument that the word "thereby" in the constitutional

 1  provision only prohibits the impairment of pensions by the

 2  state or its political subdivisions; it does not prohibit the

 3  impairment of pensions by a United States Bankruptcy Court?

 4          MR. GOLDBERG:  That's exactly the point, your Honor.

 5  That's exactly the point.  At this stage of the proceeding,

 6  according to Bekins, according to Harrisburg, and according

 7  to every case I've read, according to Collier's, it's state

 8  law that is determinative.  That's why --

 9          THE COURT:  And that's what I'm asking.

10          MR. GOLDBERG:  That's why the question --

11          THE COURT:  And that's exactly what I'm asking you

12  about.  If we're going to read every word of the statute and

13  apply every word of the statute, including the word

14  "thereby," why doesn't state law permit the Bankruptcy Court

15  to impair pensions?

16          MR. GOLDBERG:  Because the authorization statute

17  that this Court is relying upon, which it has to rely upon

18  because otherwise there would be no Chapter 9 filing, there

19  has to be a specific authorization under state law; correct?

20  I mean there are 20 -- many states don't have one.  You have

21  to rely on the state law.  That state law contains an

22  explicit clause that impair -- pensions cannot be impaired.

23  It's not just written in one place actually.  It's written in

24  two places in that statute.  Again, I'm submitting that down

25  the road, if we get past this eligibility question on this,

1  perhaps what you said is correct.  At that point federal

2  law -- you make the determination based on federal law, but

3  right now you are duty bound to make that determination based

4  on your examination of state law and by applying the state

5  law --

6          THE COURT:  What is the --

7          MR. GOLDBERG:  -- principles of statutory

8  construction.

9          THE COURT:  What is the exact state law language in

10  PA 436 that you rely on?

11          MR. GOLDBERG:  I rely on the language -- here, let

12  me find it right here.

13          THE COURT:  Okay.

14          MR. GOLDBERG:  "The emergency manager shall fully

15  comply with the public employee retirement system investment

16  act and Section 24 of Article IX of the state Constitution,

17  and any actions taken shall be consistent with the pension's

18  qualified status"; that he's -- this emergency manager has to

19  abide by the constitutional impairment.

20          THE COURT:  So my question for you remains if this

21  Bankruptcy Court were to approve a plan -- and I want to say

22  here I have no predisposition on this issue at all.  This is

23  strictly hypothetical legal talk to figure out where we are.

24  If this Court were to approve a plan that impairs pensions --

25  again, not presuming at all that it will -- but if it did, is

1   that the city impairing pensions, or is that the Bankruptcy

2   Court impairing pensions because --

3           MR. GOLDBERG:  That would be impairing --

4           THE COURT:  -- the law prohibits the city from doing

5   it?  There's a question about whether it prohibits the

6   Bankruptcy Court from doing it.

7           MR. GOLDBERG:  That's precisely why I'm making the

8   argument, your Honor.  There is a -- there is a question as

9   to whether -- once we get past the eligibility and this Court

10   is looking at the plan, whether this Court then has the

11   authority under federal law to ignore the state law and state

12   constitutional protection.  I'm not saying it does, but

13   there's at least a question, and a lot of the case law

14   indicates that, but we're not at that stage right now.  We're

15   at the eligibility stage, and clearly at the eligibility

16   stage it's state law that predominates.  It's state law

17   that's determinative, and it's state law that this Court has

18   to look at, not federal law but state law that this Court has

19   to look at in making its determination as to whether the

20   authorization meets the muster.  And what I would submit,

21   that under state law principles, as I indicated, we look at

22   the authorization statute, we look at the plain language of

23   the statute, and we look at the Michigan rules on statutory

24   construction as a -- and there's no way to allow for a filing

25   that would not have a contingency that bars the impairment of

1    pensions.  It's interesting to me you raised before to Mr.

2    Montgomery --

3              THE COURT:  Actually, your time has expired, so I do

4    have to ask you to wrap up.

5              MR. GOLDBERG:  Okay.  Well, I'll make one last

6    point.  You raised very briefly to Mr. Montgomery why not

7    every contract, but, as I indicated, other contracts are

8    provided for the impairment of those contracts under the PA

9    436.  It's the impairment of pensions that's explicitly taken

10   away from the authority of the emergency manager, and I

11   submit because of that that any authorization that doesn't

12   include a contingency barring the impairment of pensions

13   would violate Michigan state law and violate the Bankruptcy

14   Code, in essence, itself.  Thank you.

15             THE COURT:  Thank you.

16             MS. CRITTENDON:  Good morning, your Honor.  Krystal

17   Crittendon, and I want to thank the Court for giving me the

18   opportunity to speak this morning.

19             THE COURT:  Welcome, and you may proceed for five

20   minutes.

21             MS. CRITTENDON:  Thank you, your Honor.  Before the

22   Court goes any further, I would just ask that the Court step

23   back and look at the process and how we got to where we are

24   from a legal foundational standpoint, and to that end, I make

25   three objections, your Honor.

1       First, the City of Detroit does not have a duly
2  appointed emergency manager because there was no EM or EFM
3  law in place at the time that appointment was made.  As the
4  Court knows, in 2011, Public Act 4, commonly known as the
5  Emergency Manager Act, repealed Public Act 72.  In November
6  of 2012, the people of the State of Michigan repealed Public
7  Act 4 by referendum.  Pursuant to Michigan law -- and this is
8  at MCL, Michigan Compiled Law, 8.4 -- "Whenever a statute, or
9  any part thereof shall be repealed by a subsequent statute,
10 such statute, or any part thereof, so repealed, shall not be
11 revived by the repeal of such subsequent repealing statute."
12 In short, that is saying that when PA 4 repealed Public Act
13 72 and PA 4 was then repealed by referendum, PA 72 was not
14 revived.  It did not spring back to life.
15      On March 14, 2013, a contract was purportedly
16 entered into between the State of Michigan and Kevyn Orr
17 appointing him EFM for the City of Detroit.  However -- under
18 PA 72.  However, because PA 72 was not alive at that time,
19 that appointment was not legal and is defective, and for that
20 reason, Mr. Orr is not a duly appointed emergency manager for
21 the City of Detroit.
22      The second argument, even had there been an
23 emergency manager law in place, Mr. Orr would not have been
24 an EFM at the time PA 436 came into place because his
25 contract, the contract between he and the state, was expired

1  on the day that PA 436 came into place, so he would not have

2  been grandfathered in under PA 436.

3         Finally, under Chapter 9 of the Bankruptcy Code,

4  there is no ability for there to be an involuntary

5  bankruptcy, and because the municipality would had to have

6  filed the petition, and in this case the municipality, being

7  the mayor and City Council, did not file the petition, the

8  petition filed by Mr. Orr was defective, and the filing

9  should be dismissed.

10        For those reasons -- and I see that my yellow light

11  is on -- time goes really really quickly when you have five

12  minutes, but I'd answer any questions the Court has.

13        THE COURT:  Hoe much time is left when the yellow

14  goes on, Kelli?  Do you know?

15        THE CLERK:  Three minutes.

16        THE COURT:  It's three minutes, so you only --

17        MS. CRITTENDON:  Okay.

18        THE COURT:  -- had two under green and three under

19  the yellow, so --

20        MS. CRITTENDON:  Okay.  Thank you, your Honor.

21        THE COURT:  -- you may proceed.

22        MS. CRITTENDON:  Mr. Orr's contract at Section 2.2

23  of that contract provides that his contract was effective on

24  Monday, March 25th, and terminated at midnight on Wednesday,

25  March 27th.  Midnight March 27th was a Wednesday morning at

1   12 o'clock a.m. The new emergency manager law, PA 436, did

2   not take place -- did not become effective until Thursday,

3   March 28th. Under 14 -- MCL 141.1572, it provides that an

4   emergency manager or emergency financial manager appointed

5   and serving under state law immediately prior to the

6   effective date of this Act shall continue under this Act as

7   an emergency manager for the local government. Because the

8   City of Detroit was without an emergency manager or emergency

9   financial manager for one full day before the Emergency

10   Manager Act, PA 436, became effective, Mr. Orr could not

11   continue in that capacity, as used in this section, because

12   he was without a contract.

13           Finally, I would just say there are a number of

14   cases under the federal Bankruptcy Court law that talk about

15   involuntary bankruptcies. This is akin to an involuntary

16   bankruptcy when someone other than the City of Detroit, which

17   is its mayor and City Council, filed the petition. And for

18   those reasons, the petition was defective. Section 109 of

19   the Bankruptcy Code talks to the authorization of the state

20   to approve a bankruptcy if filed by a municipality. In this

21   case, that is not what happened. It was the state

22   effectively filing the petition and approving the petition

23   being that the emergency financial manager, assuming that we

24   had one, would be an operative of the state and not an

25   operative of the City of Detroit. Thank you, your Honor.

1    THE COURT:  Is the contract on which you rely in the

2  record of the case?

3    MS. CRITTENDON:  I don't believe it is.  I do have a

4  copy of the contract with me if the Court would like to see

5  it.  I'm assuming that one of the parties --

6    THE COURT:  If you'd like me to consider it, you

7  should --

8    MS. CRITTENDON:  I will file it.

9    THE COURT:  -- file it.

10   MS. CRITTENDON:  I will, and I will file a brief

11  that memorializes everything that was said today.

12   THE COURT:  All right.

13   MS. CRITTENDON:  Thank you, your Honor.

14   MR. MORRIS:  Good morning, your Honor.  Thomas

15  Morris on behalf of the Retiree Association parties.  The

16  Retiree Association parties who I represent include two

17  individuals.  There was some discussion about the committee's

18  standing to raise certain objections.  The committee argued

19  those objections very ably.  We concur in those objections,

20  and that includes the concurrence of those individuals.  We

21  trust that would take care of any standing issue if there

22  were one.  And the comments that preceded us -- preceded me

23  were very ably made, so I'm just going to address a very few

24  points.

25       One is a point the Court -- a question the Court had

 1   raised about the "thereby" language in the pensions clause.
 2   It's important for the Court to note that it's the city that
 3   files any plan, the city that proposes any plan, negotiates
 4   any plan.  Chapter 9 precludes the Court from appointing a
 5   trustee, from converting the case, from interfering with the
 6   city's ability to manage its fiscal affairs.  A case cannot
 7   be filed involuntarily under Chapter 9.  As the Bekins court
 8   said, quoting from the legislative history on page 51, "The
 9   taxing agency itself is the only instrumentality which can
10   seek the benefits of the proposed legislation."  We think
11   it's clear that any action to impair the pensions by the city
12   would, first of all, be improper, but, second of all, it
13   would be the city's action.

14            Now, the city has taken the position that somehow
15   the pensions clause of the Michigan Constitution is
16   preempted, and we disagree with that, but the city can't have
17   it both ways.  They have a theory -- they've made a number of
18   multiple arguments, but they have a theory that once they got
19   into Bankruptcy Court -- or if they get -- are found
20   eligible, then the pensions clause is off.  Well, if that's
21   the case -- and it's not the case, but if that were the case,
22   then it would be the action of the authorization of the
23   filing and the action of the city in filing the case which
24   would be impairing the pensions.  What happens if the city is
25   found ineligible?

1       THE COURT:  Well, but that's true only if as part of

2  eligibility the Court ruled on the issue of pension rights

3  and ruled in the city's favor.

4       MR. MORRIS:  This ties in with arguments that were

5  made by other counsel, and if Public Act 436 enables the city

6  to impair the pensions, then Public Act 436 in that respect

7  is unconstitutional.  It's inconsistent with the pensions

8  clause.  Of course, the pensions clause is part of the

9  Michigan Constitution, the supreme law of our state, and the

10  Public Act 436 must comply with it.  Public Act 436, in fact,

11  gives recognition to the pension clause and acknowledges it,

12  and it even authorizes the governor to make compliance with

13  the pension clause a precondition.  However, that didn't

14  happen in this case, and that's one of the -- one of the

15  issues that has been raised by other counsel.

16       Your Honor, if the city is found to be ineligible,

17  from the standpoint of the retirees, the city will have to

18  make a choice.  It can choose to comply with the pensions

19  clause and not impair pensions, just say we're going to

20  comply with the Michigan Constitution, or it can negotiate

21  with the retirees through their associations.  That process

22  was shortcut here, and that will be one of the factual issues

23  we've raised.

24       Now, if the city goes forward with a plan that does

25  not impair pensions, one of the Court -- one of the questions

1 the Court had was what happens then, what happens if the city

2 just doesn't have the money. Well, there's an issue of

3 whether the state is liable. There's the potential issue.

4 But those are all issues apart from -- they're nonlegal

5 issues. The most the retirees can ask for is that the city

6 doesn't impair the pensions. The ultimate solution for the

7 retirees comes elsewhere. Will the city have -- will the

8 state have to step in to help the city? Will the city have

9 to do other things to raise money? I don't know, but those

10 are beyond our legal issues.

11 Your Honor, the city holds the key on this issue of

12 eligibility. It can agree to comply with the Michigan

13 Constitution or it can negotiate with the retirees and reach

14 a resolution. The proper outcome here is for the city to go

15 back -- as Section 109 intends, go back and either not impair

16 the pensions, which is our preference, or negotiate with the

17 retirees. Thank you.

18 THE COURT: Thank you.

19 MS. FLUKER: Good morning, your Honor. Vanessa

20 Fluker on behalf of Center for Community Justice and

21 Advocacy.

22 THE COURT: Would you repeat your name for me,

23 please?

24 MS. FLUKER: Vanessa Fluker.

25 THE COURT: Okay. Thank you.

1          MS. FLUKER:  F-l-u-k-e-r.  Your Honor, the issue I'm

2     raising today before this Court with respect to eligibility

3     is a failure of the emergency manager to comply with the

4     statutory mandates under PA 436, Section 16, which is

5     actually Section 1556.  That section specifically mandates,

6     and I quote, "an emergency manager shall," not "may," not

7     "might, "shall, on his own -- his or her own or upon the

8     advice of the local inspector if a local inspector has been

9     retained, make a determination as to whether possible

10    criminal conduct contributed to the financial situation

11    resulting in the local government's receivership status.  If

12    the emergency manager determines that there is a reason to

13    believe criminal conduct has occurred, the manager shall

14    refer the matter to the attorney general or local prosecuting

15    attorney for investigation."  There has been some extensive

16    arguments about the tenets of statutory construction, so I

17    won't go through Pohutski step by step, but we're all aware

18    that you must adhere to the plain unambiguous language of the

19    statute.

20          In this particular instance, two of the city's

21    largest creditors, UBS and Bank of America, have been found

22    convicted -- criminally convicted in UBS's case of criminal

23    conduct involving municipal bonds.  In fact, the SEC fined

24    UBS $47,207,180 in Case Number 11-2539, U.S. District Court,

25    New Jersey.  Three UBS executives were indicted and convicted

1    of fraud related to municipal bond rigging, and that was in

2    New York, Southern Division, Case Number 10-1217.  A Bank of

3    America executive was indicted July 19th, 2012, for bid

4    rigging of fraud municipal bonds.  And what's so significant

5    about this, in the criminal conviction with the SEC case, the

6    civil penancy case, it involved a Detroit bond.  This

7    provision cannot be ignored, and the mere fact that it's

8    mandatory because it indicates "shall" is very significant.

9    In fact, it is common knowledge at this point that the

10   emergency manager had knowledge of this information and did

11   not act on it.  In his deposition on August 30th, 2013, he

12   was specifically asked on these issues,

13            "Are you aware of issues that have come out with

14        regard to the LIBOR specifically with UBS and Bank

15        of America in the setting of using the LIBOR as a

16        standard?

17        Answer:  I am aware.

18        Question:  Are you aware that UBS has been sued

19        by the Securities and Exchange Commission for

20        rigging in regard to municipal bonds?

21        In past years?

22        There was a final judgment -- yes, in past

23        years.

24        Answer:  Yes.  I've heard that.  I have not read

25        the final judgment.

1      Question:  Are you aware that Bank of America

2          has been investigated for potential bond rigging

3          with regard to the municipal bond market?

4          Answer:  I am aware that Bank of America has

5          been investigated.  The exact specifics of the

6          investigation I am not aware of."

7      This clearly shows that there is not just a

8  noncompliance with 1556, there's a knowing noncompliance with

9  1556.  There should have been a criminal investigation, which

10  is mandated by the statute, and, in essence, is necessary to

11  even get to the point of making a recommendation for a

12  bankruptcy.  How can you say that we need bankruptcy when you

13  don't know whether there is going to be fraud determined and

14  there may be funds that may be necessary to be paid back to

15  the city that can offset any debt, which also goes to the

16  issue of how are you saying that you're eligible for

17  bankruptcy when you really don't know what the debt is based

18  on the potentiality of fraud in these municipal bond

19  transactions, who are also standing --

20      THE COURT:  Are you saying that the emergency

21  manager, whose term in office is limited by law, was required

22  to await what could be years of litigation to determine these

23  issues and UBS's liability before filing bankruptcy?

24      MS. FLUKER:  I don't think he had to determine years

25  of litigation, but I think that it would be very evident that

 1   you would look at least at the debt that you're alleging that

 2   the city owes, and if there is common knowledge of such

 3   information, which this is -- this is not something that you

 4   have to wait years in litigation.  This has been all over the

 5   news, the Internet, and everything else.  And as he admitted

 6   in his deposition, he was aware of it, and that being the

 7   case, that actually heightens the duty, in addition to the

 8   mandatory language of Section 1556, which says "shall."

 9        THE COURT:  Shall do what?

10        MS. FLUKER:  The statute specifically says the

11   emergency manager shall, on his or her own or upon the advice

12   of a local inspector, make a determination -- there had to be

13   a determination made -- whether there was criminal conduct

14   that affected the financial situation of the city.  Even if

15   he didn't know all this, say for some reason this

16   information -- I see my time is up.  I'll just complete this

17   sentence.  Say this information he had no knowledge of.

18   There was -- we just don't know about it.  He still had a

19   duty to make a determination.  Well, in my estimation,

20   there's been no criminal conduct that contributed to the

21   financial situation of the city.  This provision was not

22   complied with at all, and you cannot try to exercise one part

23   of the statute by totally ignoring and having noncompliance

24   with another.  Therefore, I would request that this Honorable

25   Court deny eligibility for the reasons set forth by all the

1  objectors.

2        THE COURT:  Thank you.

3        MS. FLUKER:  Thank you.

4        THE COURT:  Mr. Gordon, may I have your attention,

5  please?

6        MR. GORDON:  Yes, your Honor.

7        THE COURT:  Are you up next?

8        MR. GORDON:  I am.

9        THE COURT:  Okay.  Do you want to give part of your

10  argument now, or do you want to take a lunch break now and

11  then do your entire argument after lunch?  I leave it to you.

12        MR. GORDON:  If it's okay with the Court, I would

13  prefer the latter, to just start after lunch.

14        THE COURT:  Okay.  All right.  We will take our

15  lunch break now, and we will reconvene in an hour and a half,

16  so that'll be 1:20, please.  Twenty after one we'll

17  reconvene.

18        MR. GORDON:  Thank you, your Honor.

19        THE CLERK:  All rise.  Court is in recess.

20      (Recess at 11:48 a.m., until 1:20 p.m.)

21        THE CLERK:  Court is in session.  Please be seated.

22  Recalling Case Number 13-53846, City of Detroit, Michigan.

23        THE COURT:  Good afternoon, everyone.  It looks like

24  everybody is here.  Actually, Mr. Gordon, with your

25  permission, before I hear from you, I have a follow-up

1   question for one of your colleagues.

2           MR. GORDON:  By all means, your Honor.

3           THE COURT:  Ms. Brimer, would you resume the

4   lectern, please?

5           MS. BRIMER:  Should I bring something with me, your

6   Honor?

7           THE COURT:  Possibly.

8           MS. BRIMER:  I didn't know I was going to the

9   principal's office.

10          THE COURT:  No, no, no.  It's nothing like that.

11  You argued that the enactment of PA 436 violated the people's

12  referendum rights because PA 436 was so similar to PA 4.

13          MS. BRIMER:  Yes, your Honor.

14          THE COURT:  That was your argument.  Was there a

15  statutory basis for that argument, or was it just based on

16  the people's right of referendum?

17          MS. BRIMER:  It's based on the constitutional right

18  of referendum, your Honor.

19          THE COURT:  Okay.  So there's not a statute we

20  should be looking for on that.

21          MS. BRIMER:  Not that I'm aware of, your Honor.

22          THE COURT:  All right.  That was it.

23          MS. BRIMER:  Thank you, your Honor.

24          THE COURT:  That was it.  Okay.  Mr. Gordon.

25          MR. GORDON:  Thank you, your Honor.  Just to give

 1   your Honor a little bit of a road map of the things that I

 2   want to touch upon, if that's of help, I thought I would

 3   touch upon some of the issues regarding the state law

 4   consent, some of the issues that have been raised this

 5   morning, then move on to a discussion of some other

 6   considerations relevant to the difference between the

 7   pensions clause and the contract clause, and then address the

 8   issue of what would happen if the Court ruled in our favor

 9   that the accrued pension benefits cannot be impaired and what

10   that means for the restructuring, and I think I can add some

11   important information there.  And then finally, if there's

12   still time, I would touch upon the collateral estoppel

13   Webster issue, which is in our papers.

14          So, your Honor, we will start with the consent

15   issues under 109(c)(2), and to be clear, in our papers, while

16   we talk -- touch upon the possibility of PA 436 being

17   unconstitutional as applied, the thrust of our papers is that

18   PA 436 needs to be read and can be read in a way that's

19   consistent with the pensions clause and so forth so that

20   there's no need to get to issues of constitutionality.

21   109(c)(2) clearly is an issue that is an issue purely of

22   state law.  It is a threshold issue.  It is an eligibility

23   issue, and we want to emphasize that it stands on its own,

24   and it can't be conflated with plan confirmation issues.

25          THE COURT:  And with apologies, I have to stop you

1    there with this question.  There seems to be a general thread
2    of assumption that whether a state has given authorization
3    under 109(c)(2) is a question of state law, as you just said.
4    I have to say that's not altogether clear to me.  It seems to
5    me there might very well be an argument that the standard as
6    to whether the state has given proper authorization is a
7    federal standard, not a state standard.  Why?  Because in
8    addressing cases in the amendment right next door to Article
9    X -- that is, Article XI -- sorry -- Amendment XI, the 11th
10   Amendment, when we talk about sovereign immunity, the issue
11   of whether a state has given its consent or its waiver of
12   sovereign immunity is a question to be determined by federal
13   law, not state law.
14        MR. GORDON:  Your Honor, in that regard, I think
15   that the Tenth Amendment is different, and it looks first to
16   respect the contours of what is reserved to the states in the
17   first instance, so here I think you have to start with
18   whether there is valid -- I think, at a minimum, the question
19   is is there valid state authorization for submitting a
20   political subdivision of the state to the jurisdiction of the
21   federal government and the federal courts.  I would at least
22   put it that way.  And so that does turn on state law, and we
23   would submit that all portions of state law need to be looked
24   to and harmonized in that regard, and that's sort of the
25   holding of Harrisburg, which we submit is instructive here

 1   and which has not been really in any way refuted by the city.

 2   And even the United States Attorney has stated that Congress

 3   reserved to the state the right to regulate, and I quote,

 4   "under what terms," end quote, its political subdivisions may

 5   avail themselves of Chapter 9, so it really is a matter, I

 6   believe, of state sovereignty, and it's up to the state to

 7   determine how and when a political subdivision can avail

 8   itself, and how it does that is in part expressed by the will

 9   of the people, as embodied in the pension clause, and it

10   needs to be respected.

11           The response of the city and the state is on two

12   levels.  One, first of all, it is asserted that the actions

13   of the governor in authorizing do not conflict with the

14   pensions clause because the authorization itself didn't

15   create any impairment and that it's unclear whether the city

16   will ultimately seek to impair, and if such impairment

17   occurs, it won't be the city or the state that has done it.

18   It'll be the Bankruptcy Court.  Respectfully, we say that

19   those arguments are all unavailing.  First of all, one of the

20   things that I think has not been made clear this morning is

21   some of the things that have come out in discovery.  I don't

22   actually think these things are relevant, but I'll get to why

23   I think they're not relevant in a minute, but I think it's

24   important for the Court to know that in discovery propounded

25   by the Retirement Systems or conducted by the Retirement

1  Systems, the city has admitted that it was an explicit intent

2  in the restructuring plan proposed in June and in the

3  bankruptcy recommendation letter submitted on July 16th by

4  Mr. Orr that accrued pension benefits needed to be impaired.

5  The city has also admitted in admissions that its intent in

6  the Chapter 9 case is to impair and diminish accrued pension

7  benefits, so there is absolutely nothing speculative about

8  that.  The governor has also testified that he was aware that

9  accrued pension benefits may be impaired.  He also testified

10  that he understood that he could put conditions on the

11  consent and authorization and that he chose not to.  Mr. Orr

12  also testified that he could not guarantee that if a

13  consensual plan couldn't be achieved, that he would not

14  resort to cramdown provisions in order to cram down upon the

15  retirees.  So there really is nothing speculative here, and

16  for anyone to say that it is speculative is really -- I mean

17  it just is not -- it's just not factual.

18         THE COURT:  Well, but what would be the --

19         MR. GORDON:  The other thing is that --

20         THE COURT:  What would be the impact on that

21  argument if the state, under this Constitution, does have a

22  legal constitutional obligation to guarantee the pension

23  payments, an issue not yet determined?  And I don't mean to

24  suggest the outcome of that by raising this possibility.

25         MR. GORDON:  Your Honor, I mean if the -- the

1  problem is that today is the day for eligibility, and we

2  don't know that today.  If the state came forward today and

3  said that they would backstop, you know, the full accrued

4  pension benefits, that might be a different situation, but it

5  not being here today, that isn't --

6          THE COURT:  And you're not prepared to say here

7  today that you're not going to request that conclusion, are

8  you?

9          MR. GORDON:  No.  I will not say that, but that's --

10         THE COURT:  That would not be in your client's best

11  interest.

12         MR. GORDON:  Of course not.  Of course not, but that

13  has not been determined today.  The state is not coming

14  forward today.  And eligibility goes to whether this Court

15  even has jurisdiction, and what the city is asking is for the

16  Court to essentially suspend the issue of whether it even has

17  jurisdiction in order to get everybody together, and really

18  you're putting the will of the people and the protections of

19  the Michigan Constitution in jeopardy or being held in the

20  hold while the city wants to move forward with its proposals

21  and bring people to the table, and I would submit that that's

22  inappropriate.  This is an eligibility hearing, and the

23  governor's responsibility is an affirmative responsibility to

24  uphold the Constitution.  To suggest that we don't know

25  what's going to happen down the road reduces his obligation

1   to sort of a wink and nod type of standard, and we submit

2   that that is just inappropriate.  He is to uphold the

3   people's will.

4           THE COURT:  Well, he's to uphold the law.

5           MR. GORDON:  The other thing is, your Honor, that to

6   say that someone other than the state or the emergency

7   manager would be the one impairing the benefits is just not

8   correct.  As the Court well knows, the city is the one that

9   would have to propose the plan.  The Court would not propose

10  the plan.  Essentially what is happening here would be that

11  the governor, through the authorization, is delegating

12  authority that he does not have.  He does not have the

13  authority to abrogate the state Constitution.  By authorizing

14  the emergency manager to pursue the bankruptcy -- again,

15  we're at the eligibility stage -- he cannot give authority to

16  the emergency manager that he does not have, so the question

17  becomes --

18          THE COURT:  The argument is he doesn't have the

19  authority to impair the pensions.

20          MR. GORDON:  That's correct.  If he wanted to do

21  that, he'd have to go get a constitutional amendment.

22          THE COURT:  And -- okay.

23          MR. GORDON:  So he does not have the authority to

24  delegate or to bestow upon anybody else the ability to

25  impair, so the question really is why wouldn't we put a

1    condition today saying that you can move forward in the

2    Chapter 9, but you can't impair the accrued pension benefits?

3    That to us complies with the requirements of the state

4    structure, and there has absolutely been no explanation of

5    why that wouldn't be done today.  We think that's the real

6    question is why wouldn't you -- why wouldn't the governor put

7    that condition in or why can't the Court imply that as a

8    matter of law?

9          If I may, your Honor, I'd like to move on to the

10   pensions versus contracts issue.

11         THE COURT:  Well, hold on one second.  The Sixth

12   Circuit has actually addressed -- I know you're concerned

13   about time --

14         MR. GORDON:  Okay.

15         THE COURT:  -- the issue of how to determine

16   eligibility in bankruptcy, now not in Chapter 9, but it did

17   so in Chapter 13 because there is a factual eligibility issue

18   there, has to do with debt limits, and there are times when

19   creditors say that the debtor's debts are above the debt

20   limits, and, therefore, the debtor is not eligible, so the

21   Sixth Circuit -- the case is Pearson if you're familiar with

22   it.  It says -- it recognizes that at the eligibility stage

23   of a bankruptcy, you don't want to go through the process of

24   fixing claims, but there is this law that sets debt limits,

25   so we have to give it some respect.  So the solution it came

1   up with in that context was we're just going to look at
2   whether the debtor in good faith asserts that its debts are
3   below the debt limit.  And for those of you who want it, it's
4   773 F.2d 751, 773 F.2d 751, a 1985 case from the Sixth
5   Circuit.  Pearson is P-e-a-r-s-o-n.  Why not apply a similar
6   standard to eligibility here?

7           MR. GORDON:  Because there's no good faith issue
8   here.  The question is very simple and can be solved today.
9   Are you going to impair pension -- accrued pension
10  obligations?  You can't.  The law says so.  So put the
11  condition on it today, and we move forward.

12          THE COURT:  So your assertion is that it wouldn't
13  even be a good faith argument by the city.

14          MR. GORDON:  Doesn't matter what their intention
15  actually is.  The condition should be applied today because
16  that is how -- that is the only way a --

17          THE COURT:  It wouldn't be a good faith --

18          MR. GORDON:  -- political subdivision can avail
19  itself --

20          THE COURT:  It wouldn't be a good faith argument for
21  the city to assert that although the Michigan Constitution
22  prohibits it from impairing pensions, it does not prohibit
23  the Bankruptcy Court from impairing pensions.  That would not
24  be a good faith argument?

25          MR. GORDON:  No, your Honor.  I think that that's

1  something that can and should be dealt with today.  Let me

2  give an example.  What if the only debts of the city today --

3  as we stand here today were pension obligations?  Would you

4  say then we should wait and see what happens?  We know what

5  would happen.  Is it any different because there's other

6  creditors in the room?

7          THE COURT:  Well, do we know --

8          MR. GORDON:  I haven't --

9          THE COURT:  Do we know -- do we know what would

10  happen?  Do we know, for example, that there would be no

11  agreed upon negotiation?  Do we know, for example, that the

12  state won't fill in the gap?

13          MR. GORDON:  Well, let's -- I can talk about that.

14          THE COURT:  Now would be the time.

15          MR. GORDON:  If you want to talk about that, I'll

16  skip to that.  I'll skip to that since that seems to be

17  something that is troubling your Honor or at least on your

18  mind.  We have emphasized --

19          THE COURT:  A question.

20          MR. GORDON:  We have emphasized that the Retirement

21  Systems aren't saying the city can't proceed with a Chapter 9

22  case.  It simply must condition the case upon the

23  preservation of the pensions clause.  And certainly in some

24  people's minds this begs the question of whether in the event

25  the Court agreed and ruled that accrued pension benefits may

1    not be impaired, could the city still effectively reorganize

2    and restore itself to financial health through a bankruptcy,

3    and while we've indicated that there is still information

4    that we need -- and it's material information -- we continue

5    to do so -- I believe I can stand here today and say that

6    based upon the information that we do have, it is clear that

7    the city can effectively reorganize even if accrued pension

8    benefits cannot be impaired.

9         Just some thoughts and facts for your Honor.  The

10   city talks about $18 billion in debt, but $6 billion of that

11   $18 billion is special revenues that are supported by the

12   Detroit Water and Sewer System, so now you really have $12

13   billion of debt that needs to be supported by the general

14   fund and other cash flows from the enterprise funds and so

15   forth.  Of that $12 billion of debt, roughly half, six

16   billion, is OPEB healthcare actuarially calculated.  Another

17   two billion is unsecured bond debt.  So fully two-thirds of

18   the $12 billion of debt is very much subject to restructuring

19   and compromise in bankruptcy.  Those are unsecured claims.

20   That's two-thirds of the $12 billion of debt right there.  So

21   there's a tremendous opportunity to unburden the city of the

22   debt obligations -- of these debt obligations and the demands

23   on its cash flow.

24        In addition, although not critical to this position,

25   above the line in the emergency manager's restructuring plan

 1  proposed in June is the swap periodic payment, which is
 2  soaking up $50 million a year in casino tax revenues.  And as
 3  the Court knows -- and, again, I'm not going to argue it
 4  here, but, as the Court knows, the Retirement Systems have
 5  objected to the treatment of the swaps as secured in those
 6  revenues both because the lien is not valid and, even if
 7  valid, it does not reach the post-petition revenues.  Also --
 8  and if it was determined to be an unsecured claim, then you
 9  have a $300 million claim now that is given unsecured status
10  and can also be a compromise in the bankruptcy.

11      Also, it should be kept in mind that we're talking
12  about accrued benefits that need to not be impaired.  There
13  are obviously prospective benefits that could be impaired, so
14  there are a number of different ways that the city can
15  achieve real relief from its debts.  Obviously it spreads the
16  pain in different directions, but we've -- but by looking at
17  it, your Honor, there is absolutely an opportunity to do
18  something.  And when they --

19      THE COURT:  Isn't there also a question of fact as
20  to what the underfunded liability is for pensions?

21      MR. GORDON:  And let me get to that.  It's also
22  critical for the Court to understand that if the Court ruled
23  in our favor and said that there cannot be an impairment of
24  the accrued benefits, that does not mean the Retirement
25  Systems walk away from the table.  The Retirement Systems has

1    said that they are committed to working with the city to be

2    part of the solution here.  That means a number of things.

3    The city has indicated that it needs to devote significant

4    cash flows in the next five years, according to the proposal

5    in June, $1.25 billion in the next five years for

6    reinvestment in the city.  The Retirement Systems don't

7    object to the concept and understand that the city needs to

8    reinvest, but after that five years, that reinvestment is

9    done.  The cash flows of the city become much larger again,

10   and they will improve at five years and the next five years

11   and the next five years.  And the Retirement Systems can be

12   flexible because the Retirement Systems issues, the pension

13   issues, are long-term issues.  They're not short-term issues.

14   So if there are cash flow issues, the Retirement Systems can

15   work with that.  The $3-1/2 billion number that's been thrown

16   out there is not an amount that is due today if the pension

17   systems are not frozen and closed.  That is an actuarial

18   calculation of what will be due over the next 30 years to

19   bring the funding level up to what it needs to be.  That's

20   not the amount that is due on a cash flow basis tomorrow or

21   the next day, so there is flexibility there.

22           Also, it should be understood that over time if the

23   economy improves or interest rates rise, and/or, the

24   underfunding level may go up or down, so there's a lot of

25   things in play there, and when you take that all together,

1  we --

2         THE COURT:  And I certainly appreciate and commend

3  your clients' willingness to work with the city, but

4  prudentially from the standpoint of ripeness apart from

5  constitutional issues, doesn't that suggest putting off until

6  plan confirmation the issue of the constitutional right?

7         MR. GORDON:  Your Honor, again, I would submit that

8  that is conflating eligibility, which is one question, with

9  what can be done under a plan.  If this Court does not have

10  jurisdiction because the authorization was not appropriate,

11  if you're putting -- what you're suggesting -- or the city is

12  suggesting is you're putting the uncertainty -- you're

13  putting at risk a state protected benefit in order to

14  leverage people to get in a room and negotiate.  And I

15  suggest, as a matter of jurisprudence, that is inappropriate.

16         I wanted to also mention, your Honor, other benefits

17  of a ruling in favor of the concept that the pension benefits

18  cannot be impaired.  It, in fact, would help the city in its

19  restructuring in other ways.  Absent a ruling on this issue

20  in favor of the nonimpairment of pension benefits, the

21  parties will struggle to negotiate in the shadows of this

22  unresolved issue.  What will happen is that the parties will

23  have to negotiate on a dual path against the backdrop of

24  still having these arguments under the pensions clause, under

25  Section 943, and so forth that are all or nothing arguments

1   that would -- if ruled on in a certain way, would come to the

2   conclusion that you can't impair us at all.  So it makes the

3   negotiations very difficult, and it also obviously -- as long

4   as that matter is not resolved or if it's not resolved in

5   favor of the pension systems, it becomes -- it makes the case

6   much more litigious and encumbers the entire process.  If the

7   Court rules in our favor -- and, again, these are just, you

8   know, some additional thoughts for the Court because I

9   understand the struggle.  If the Court rules in our favor,

10   there will be less moving parts for the city to deal with and

11   for the parties to deal with, and it makes the negotiation

12   process much more streamlined.  And if at some point in time

13   that decision were reversed and there was a decision that

14   said that the pension clause can be abrogated or impaired in

15   some fashion, having to revise the negotiations at that point

16   and spread the pain around a different way is a lot easier

17   than starting from the other end.  If you start from the end

18   that we're at now, it's very hard, again, for the parties to

19   negotiate.  And if the -- and if it's determined ultimately

20   that you can't abrogate the pension clause, then you're

21   really going back to square one, and we've lost a ton of time

22   in the negotiation process.  We submit that it's much easier

23   to negotiate against a backdrop that says that the pension

24   clause must be upheld.

25         Moreover, a ruling in our favor in that regard helps

1    the city in other ways.  It calms the workforce knowing the

2    accrued and prospective accrued pension benefits will be

3    protected.  This will enable the city to retain its most

4    talented personnel.  In addition, the ultimate commitment of

5    funds to the Retirement Systems as opposed to financial

6    creditors benefits the city because the systems will also

7    invest in the city, as they always have done.  And a majority

8    of the pensioners live within the city and pay taxes and

9    consume goods and services in the city, so the Retirement

10    Systems are an economic engine that really is part of the

11    solution for the city, so I want to address all those.

12          THE COURT:  Well, but so were the bondholders and

13    the bond investors.

14          MR. GORDON:  They don't live in the city, and they

15    aren't putting money back into the city, your Honor.  They

16    are not part of that economic engine, and if they get paid

17    their debt service, there's no --

18          THE COURT:  Hang on.

19          MR. GORDON:  -- guarantee that they're going to

20    reinvest in the city.

21          THE COURT:  Didn't I read in the newspaper that the

22    city just got $350 million?

23          MR. GORDON:  I'm sorry.

24          THE COURT:  Didn't I just read in the newspaper that

25    the city just got $350 million to help with its reinvestment?

1          MR. GORDON:  No, your Honor.  What we read was that

2     there's a proposal to secure unidentified assets at this

3     point but probably to encumber all sorts of assets of the

4     city in order to get $350 million of which 200 million would

5     immediately go out to pay swap participants who don't deserve

6     to get paid anything as a secured creditor, and then the

7     other 150 million is going to be used in some ways that's

8     been unidentified, so basically you're encumbering assets of

9     the city for purposes that don't benefit the city in any

10    demonstrable way at this time, so I would disagree with that

11    characterization.

12         THE COURT:  Okay.

13         MR. GORDON:  So, your Honor, for all those reasons,

14    I think that if the Court were to rule, again, as a pragmatic

15    matter, in favor of finding that this case should not move

16    forward without the condition that there cannot be an

17    impairment and that the pension clause must be upheld, it

18    does not mean this case comes to an end by a long -- quite

19    the opposite.  In our opinion, it makes this case much more

20    manageable.  It makes the negotiations easier.  And it, in

21    our minds, provides a much clearer path to a consensual

22    resolution.

23         THE COURT:  So you think I can find them eligible

24    and find that pensions can't be impaired?  How do I do that

25    because the issue is yes or no, the city is eligible.

1        MR. GORDON: That's correct, your Honor. You would

2  have to -- it would be up to the city to either -- and the

3  state to either agree to -- well, there's a couple different

4  ways.

5        THE COURT: This is the refiling scenario?

6        MR. GORDON: You could either -- you could either

7  rule that the obligation to uphold the pension clause is

8  implied by law because otherwise you don't have valid

9  authorization, there isn't valid state authorization, or you

10  can provide the option to the state and the city to

11  explicitly confirm that process.

12        THE COURT: Oh, I see. So you're saying I can read

13  into the authorization the nonimpairment of pensions even

14  though the governor explicitly rejected that.

15        MR. GORDON: The governor actually didn't. The

16  governor testified that he didn't know whether he had to

17  uphold that, and he decided to choose not to put the

18  condition on it and leave it to the courts, which we suggest

19  is not necessarily appropriate but is --

20        THE COURT: So he rejected the concept of

21  conditioning his authorization on nonimpairment of pensions.

22        MR. GORDON: He did, but he also said he was

23  basically deferring to the courts as to how that should play

24  out, which is ironic because the Webster court has already

25  ruled on that issue.

1    Your Honor, I'll turn to the pensions clause, which

2 is the contracts clause, if I may.

3    THE COURT:  Sure.

4    MR. GORDON:  The concept that the pensions clause is

5 the same thing as the contracts clause just applying to

6 pensions does violence to the language of the pensions

7 clause, as has already been discussed.

8    THE COURT:  Right.

9    MR. GORDON:  I won't get into that.  Obviously we've

10 pointed out that the pensions clause is more specific and

11 that it was enacted long after the contracts clause and that

12 those things together, as a matter of the canons of

13 construction, would indicate that the pension clause must

14 mean something more and something different from the

15 contracts clause.

16    THE COURT:  Right.  So what more and what different?

17    MR. GORDON:  Well, it starts with looking at why and

18 the environment in which these things were done and looking

19 at the actual language of the two clauses.  The contracts

20 clause was adopted back when the government was being formed,

21 and it helps sort of support the structure of the government

22 as it's being developed in terms of federalism and making

23 sure that states don't impair their -- pass laws that impair

24 their own contracts or pass laws that favor their citizens

25 over other citizens.  That was the general nature of it.  And

1    it's directed, you'll note, to the legislature of the state.

2    The state shall not pass laws that will impair contracts.  So

3    that's the contracts clause.  Now you fast forward --

4             THE COURT:  That's the federal contracts clause.

5             MR. GORDON:  And the state, as well as the state

6    contracts clause.  So then you fast forward -- I don't know

7    how long -- 150 years to 1963, and you're talking about the

8    constitutional convention and the pensions clause, and what's

9    going on at that point in time?  Well, pensions are not being

10   funded.  They're underfunded across the state I'm told to the

11   tune of maybe $600 million, and guess what?  Front and center

12   is the City of Detroit that was not paying pensions for its

13   teachers' pensions funds.  So the convention decided it

14   needed to do two things.

15            THE COURT:  Well, at that point they were also not

16   being treated as contracts; right?  They were being treated

17   as gifts I think was the phraseology.

18            MR. GORDON:  As gratuities.  That's correct, your

19   Honor.  So the convention decided it needed to do two things.

20   The convention decided, first of all, to avoid municipalities

21   digging a deeper hole, they were going to put a provision in

22   the Constitution that said that local governmental units will

23   fund their current year's employer contributions in that year

24   to help avoid digging a deeper hole.  Secondly, to protect

25   the accrued and unfunded liabilities and to move away from

 1   the concept that they are a gratuity, the convention said
 2   we're going to call it a contract but not a contract in the
 3   sense of a contract but subject to the bankruptcy.  I mean
 4   there was no -- there was no talk about bankruptcy, nor was
 5   there any talk about the contracts clause in this regard.
 6   They talked about this is going to be a contract that's in
 7   the concept of a solemn binding obligation that will be paid
 8   over time, so it is a contract.  There's a contractual right,
 9   and it shall not be diminished or impaired, meaning it will
10   be paid over time by the state and its political
11   subdivisions.  It is absolute.  There is no -- there is no --
12   as the attorney general's papers say themselves, there is --
13   it's impermeable unlike the contracts clause, which has
14   developed over time to say otherwise.  Now, the difference is
15   in part --
16        THE COURT:  But how can the -- how can the state
17   contract -- how can the state promise that given that under
18   the federal Constitution it can't print money?
19        MR. GORDON:  It's a matter of insuring that what
20   dollars are available are devoted where they need to be
21   devoted.
22        THE COURT:  Suppose there's not enough then.
23        MR. GORDON:  I don't know the answer to that
24   question, your Honor, but that's not the issue we have here
25   today.  As I've told you, I think that there is enough money

1   here.

2           THE COURT:  It's an important issue.

3           MR. GORDON:  There is -- I'm sorry.

4           THE COURT:  It is an important issue.

5           MR. GORDON:  It's an important issue, but --

6           THE COURT:  It demonstrates that there's a

7   constitutional right there.  It is stated there, but what's

8   it worth?  What's it worth?  I mean Ms. Levine posed that

9   question.  What's it worth if the entity that has the

10  obligation doesn't have the means?

11          MR. GORDON:  First of all, I mean every situation is

12  different.

13          THE COURT:  Yeah.

14          MR. GORDON:  Does it have the means today or will it

15  have the means tomorrow, over time?  Musselman, a state

16  Supreme Court case, says, though, that the pension clause

17  cannot be abrogated in the face of financial exigency.

18  That's what it says.  If there's a need to amend the state

19  Constitution, then it needs to be amended, but it can't be

20  abrogated by one branch of the government.  The will of the

21  people has spoken.  The Constitution is a limit, and it

22  circumscribes the power of the government.  The government

23  can't say, "Gee, we've got an exigency here.  I guess we're

24  going to ignore the state Constitution."  It cannot do that.

25  The contracts clause is different, and this is the point --

1 | part of the point is there are contracts and then there are
2 | contracts.
3 |       THE COURT:  Is there any other constitutional right,
4 | state or federal, that is that absolute, any other?
5 |       MR. GORDON:  Sure.
6 |       THE COURT:  And even freedom of the press has its
7 | exceptions.
8 |       MR. GORDON:  Well, you know, if you look at even the
9 | attorney general's papers, you couldn't -- the legislature
10 | can't pass laws that would abrogate freedom of religion,
11 | freedom of speech, things of that nature, and it puts the
12 | pension clause on the same level.  It is absolute in that
13 | regard.  There are contracts, and there are --
14 |       THE COURT:  We have laws that limit speech.  Can't
15 | threaten the President; can't yell "fire" in a crowded
16 | theater.  You can't commit libel.
17 |       MR. GORDON:  So that maybe there's some regulation
18 | on the federal level, but this is a state issue.  It is an
19 | issue that has been -- it is the will of the people of the
20 | state.
21 |       THE COURT:  Even the contracts clause has its
22 | limits; right?
23 |       MR. GORDON:  Contracts clause does.  The reason is
24 | different, though.  There are contracts, and then there are
25 | contracts.  And if you look at, for example, you know, some

contracts fall under the contracts clause, but the pensions
were determined to be different, and that's why you have a
pensions clause.  That's the whole point of it.  The
contracts clause recognizes that when you contract with the
government, there is an inherent reserve police power to act
in the public's welfare, and, therefore, to the extent
necessary, in certain situations they can impair contracts.
That's the contracts clause.  Then you have the pensions
clause.  It doesn't say that it is subject to the contracts
clause.  It elevates pensions to a different level, and the
reason is fairly clear.  If you look at the Musselman case,
in particular, again, Musselman says that Michigan
governmental -- and I quote.  This is from 448 Mich. 503
where it talks about the pension clause being absolute and
that it -- and it recognizes that the pension clause protects
pensions for work performed, so I quote, "Michigan
governmental units do not have the option, however, of not
paying retirement benefits.  Unlike highway construction or
police protection, which a governmental unit can choose to
receive less of, it is impossible to receive less service
from the pensioner.  The pension payment is payment for work
already completed, or deferred compensation," end quote.
What's being referenced there is the complete difference --
the relationship between the public employer and labor is
different than the relationship between the public employer

1   and a bondholder.  A bondholder makes an investment.  There's
2   risk involved.  That is understood, and that risk is factored
3   into the pricing of the bond.  A laborer has -- the
4   relationship with the employer is different.  The laborer
5   works.  The employer pays.  And to the extent that part of it
6   is deferred compensation in the form of a pension, so be it,
7   but it's for -- but what the pension clause protects is
8   accrued benefits.

9         THE COURT:  Isn't there an argument that labor takes
10  risks with its employer, too?

11        MR. GORDON:  Not in the State of Michigan, your
12  Honor, and I want to emphasize that.  Michigan is only one of
13  seven or eight states in the country that has this clause.
14  This is unique to Michigan and the seven or eight other
15  states involved.

16        THE COURT:  Excuse me one second.  I want you to
17  ignore --

18        MR. GORDON:  Oh.

19        THE COURT:  No.  I want you to ignore that yellow.
20  My staff advises me that Ms. Levine didn't use seven of her
21  minutes, so I'm going to yield them to you.

22        MR. GORDON:  Thanks, Sharon.

23        THE COURT:  So reset the clock at ten.  I assume
24  that's okay with you.

25        MR. GORDON:  Yes, absolutely, your Honor.  I can't

1   even remember where we were now.  Where were we?

2          THE COURT:  Oh, I'm sorry.  I interrupted your train

3   of thought.  Well, take another minute to recollect --

4          MR. GORDON:  Oh, yes.  I think I finished that

5   point, I suppose.  It really is that, you know, some contract

6   rights are just contract rights, and other contract rights do

7   rise to the level of property rights, and that's in the

8   United States Trust Company of New York versus New Jersey,

9   the Supreme Court case, 431 U.S. 1.  In Michigan AFT Michigan

10  versus Michigan, 297 Mich. App. 597, the Court held that

11  withheld salary of public school employees constituted the

12  taking of property in violation of substantive due process

13  and the takings clause, so there are relationships,

14  contractual relationships relative to accrued benefits for

15  labor, pension obligations, that are treated as property.

16         THE COURT:  Is there a State of Michigan case that

17  holds that pension rights are property rights?

18         MR. GORDON:  Well, this relates to salary of public

19  school employees.  I don't know --

20         THE COURT:  Right.  So I was asking you about

21  pensions.

22         MR. GORDON:  About pension obligations specifically?

23  I would have to check on that, your Honor, but I believe that

24  there are pension cases in the state that talk about pension

25  rights as property, including in such a situation, as you can

1  imagine, as divorce settlements.  There are pension

2  obligations that become property that get part of a property

3  settlement even, but that's just one example, but I can get

4  you --

5         THE COURT:  Well, we have to be careful here because

6  a contract right is in the bundle of property rights.  Every

7  contract is property of the parties to the contract; right?

8         MR. GORDON:  Yes, your Honor.  I'm not sure that all

9  contract rights rise to the level if they're abrogated of a

10  taking, but here vis-a-vis the pension --

11         THE COURT:  Right.  That's exactly the point.

12         MR. GORDON:  That's right, but the pension clause --

13         THE COURT:  So when the federal, you know,

14  Bankruptcy Court discharges creditors' contract rights

15  against debtors, which we do all day every day, we're not

16  taking the creditors' property rights even though we are

17  discharging those contracts or if we are it's not a Fifth

18  Amendment violation; right?

19         MR. GORDON:  True.  By the same token, there are

20  other property rights that are determined under state law

21  that -- cases such as Butner and Travelers respect the state

22  law property interest, and it flows through the bankruptcy.

23         THE COURT:  Right, but the point is that it has to

24  be a property right under state law over and above what would

25  be the contract right, like, for example, a security

1    interest.

2         MR. GORDON:  Or a state constitutionally protected

3    right that is impermeable we would submit, your Honor.

4         THE COURT:  Okay.

5         MR. GORDON:  It's like a nondischargeable debt, your

6    Honor, and it doesn't mean that it can't be dealt with in a

7    way that doesn't impair it but gets dealt with in a way that

8    is -- you know, provides some flexibility for the

9    reorganizing entity, but it's a nondischargeable debt.

10        THE COURT:  Well, nothing in Chapter 9 provides for

11   any nondischargeable debts, is there?

12        MR. GORDON:  I'm stating it by analogy, your Honor,

13   obviously.

14        THE COURT:  Okay.  All right.

15        MR. GORDON:  By putting the condition on that you

16   can't impair, it becomes a nondischargeable debt essentially,

17   and the state has that authority to place the appropriate

18   conditions on the filing of the bankruptcy to protect the

19   statutory structure.  And it's not just statute.  I mean this

20   is -- the difference here again, this is really unique.  It's

21   not like California or Alabama.

22        THE COURT:  Hypothetically, a state legislature

23   passes a law authorizing municipalities to file Chapter 9 so

24   long as the plan provide -- the municipality's plan provides

25   for a priority of payment, and it turns out that that

 1  priority of payment legislatively required by the state

 2  legislature is different from the Bankruptcy Code.  Let's

 3  assume that.  Would it be your position that no municipality

 4  could file Chapter 9 in that case because the state law

 5  contravenes the superior -- or the supreme federal law?

 6       MR. GORDON:  Well, that's an interesting question

 7  because it sounds more like one of those situations where

 8  once you're in bankruptcy, you have to accept the structure

 9  of the Bankruptcy Code itself, and that highlights --

10       THE COURT:  That's exactly what the city is arguing

11  here.

12       MR. GORDON:  And that highlights the point here that

13  eligibility has to be dealt with at the eligibility stage and

14  that -- and to put off the question of whether you can impair

15  the pension clause leads to those vagaries of questions

16  about, "Well, now we're in bankruptcy.  Does the Bankruptcy

17  Code have vitality and in what regard?"  No.  You don't get

18  to those questions unless you have valid state authorization.

19  You don't have valid state authorization unless you've taken

20  into account what provisions need to be there to protect the

21  state Constitution and other statutes, and that's sort of

22  what Harrisburg talks about.  You may have facial authority

23  under one statute, but you got to look at the other statutes.

24  And in here in this case it's --

25       THE COURT:  So in my hypothetical you would say

1  there's no valid authorization.

2         MR. GORDON:  I would say that the state may be very

3  disappointed if it authorizes and allows the debtor into

4  bankruptcy only to find that the -- that part of the

5  protection goes away.

6         THE COURT:  It's hard for me to be concerned about

7  how the state feels.  Is it your position that there would be

8  no authorization, no proper authorization in that case?

9         MR. GORDON:  Let me understand the hypothetical

10  then.  I know time is short.  The hypothetical is that the

11  state would pass a statute that says that you can file

12  Chapter 9, but the priority of payments is going to be --

13         THE COURT:  But here are the priorities.  Here are

14  the priorities.  You got to pay bonds first, and, you know,

15  you got to pay --

16         MR. GORDON:  Perish the thought.

17         THE COURT:  Sorry?

18         MR. GORDON:  Perish the thought, but go ahead.

19         THE COURT:  Okay.  Perish the thought all you like,

20  but this is the hypo.

21         MR. GORDON:  Yes.

22         THE COURT:  You got to -- you pay the bonds first,

23  and you got to pay trades, and then you got to pay employees'

24  wages, and then you pay pensioners last, and understand,

25  everyone who's listening to this, this is strictly

1   hypothetical.  It's inconsistent with the Bankruptcy Code.

2   I'm sorry.

3           MR. GORDON:  I forgot about the overflow.  Sorry.

4           THE COURT:  Well, and this is being recorded.

5   Anyway, it's inconsistent with the Bankruptcy Code.  However,

6   whatever hypothetical you create, and the governor says, you

7   know, "We've got to comply with state law.  I'm authorizing

8   this bankruptcy, but the municipality's plan has to comply

9   with the state law that sets forth these priorities."  Is

10  that a proper authorization or not?

11          MR. GORDON:  I would say not.

12          THE COURT:  Okay.

13          MR. GORDON:  Well, it's --

14          THE COURT:  Now you're saying that when state law

15  says the priority has to be given to pensions --

16          MR. GORDON:  Well, let me back up.

17          THE COURT:  -- that's not proper if it's

18  inconsistent with the Bankruptcy Code.

19          MR. GORDON:  Actually, I would say -- no.  I would

20  say that the authorization is proper, but, again, a portion

21  of that authorization is actually going to come into conflict

22  with the Bankruptcy Code itself, so I think it's just a

23  flawed concept.  So if you had that provision in there, I --

24  you know what?  The difference is -- let me think about this.

25  I think the difference is the cases such as Vallejo and

1  others dealt with situations where someone tried to cherry

2  pick various provisions of the Bankruptcy Code after they got

3  into bankruptcy.  It didn't involve the actual state

4  authorization.  So here I think if you were presented with

5  that, you would have two choices.  You would either have to

6  acknowledge that state authorization as is and agree to that

7  structure and say that will supersede the Bankruptcy Code

8  because that's the only way the state is allowing you to get

9  into bankruptcy, or you would have to dismiss the case.

10          THE COURT:  Which should I do?

11          MR. GORDON:  In that situation, I think you would

12  give the state the opportunity to decide, but in the first

13  instance, if the state doesn't do anything, you would have to

14  dismiss that case because you don't have the authority to

15  amend the Bankruptcy Code.

16          THE COURT:  I would have to give them the

17  opportunity to revise the authorization?

18          MR. GORDON:  That's correct, your Honor.  They'd

19  either have to amend the --

20          THE COURT:  How could --

21          MR. GORDON:  -- authorization or understand that if

22  they go into --

23          THE COURT:  How could the governor provide an

24  authorization that's inconsistent with the state statute?

25          MR. GORDON:  He couldn't.  He would either have to

1  go back and --

2          THE COURT:  What's there to revise?

3          MR. GORDON:  -- change the statute -- he'd either --

4  he has two choices.

5          THE COURT:  Oh, go back and change the statute.

6          MR. GORDON:  There are two choices.  Either the

7  Court agrees to allow the case to go forward with that

8  structure because that's the only way the state will

9  authorize it and that's what 109(c)(2) talks about, or if

10 this Court for some reason believes that that is in conflict

11 with the Bankruptcy Code, then this -- I guess I don't know.

12 The state could either -- the state would have to go back and

13 amend its statute in some fashion.  I don't really know, but

14 I think that if the state --

15         THE COURT:  Or if it's constitutional, amend its

16 Constitution?

17         MR. GORDON:  Wait.  What couldn't be done is that

18 this Court could not accept the authorization and then say,

19 "I'm cherry picking.  I'm not allowing that part of the state

20 statute to stand because that is the only way that they got

21 into bankruptcy in the first place."  That's my answer, your

22 Honor.  All right.  Can I move on?

23         THE COURT:  You can.

24         MR. GORDON:  We're really out of time here probably,

25 I notice, in a minute, but I just wanted to touch upon

1    collateral estoppel because I promised I would unless your

2    Honor has a different --

3          THE COURT:  No, no.  You argue what you like.

4          MR. GORDON:  As far as collateral estoppel is

5    concerned, your Honor, the city and the state have argued

6    that there was not a full fair opportunity to litigate in the

7    <u>Webster</u> matter.  We've addressed that in our papers.  We

8    believe that that is not accurate.  There was full briefing.

9    Both sides filed cross-motions for summary disposition, so

10    they addressed the merits of the matter.  The Court

11    acknowledged that there had been briefing and oral argument

12    before it entered its order.  The city and the state also

13    argued that there was no privity between the city and the

14    defendants in <u>Webster</u>, but on September 19th, your Honor, the

15    city argued in this court that there was a common interest

16    agreement between the city and the state and that there was

17    common interest with respect to the financial situation of

18    the city and the bankruptcy, so privity is certainly there.

19    And then finally the city and the state argued that the state

20    court doesn't have authority or jurisdiction to rule on

21    eligibility issues.  The <u>Webster</u> court didn't rule on

22    eligibility issues.  It doesn't mention 109(c)(2) of the

23    Bankruptcy Code.  It merely ruled on the interplay between

24    two state statutes, PA 436 and the pensions clause, and ruled

25    that those two had to be harmonized and that, therefore, any

1    authorization of a bankruptcy under PA 436 must comport with

2    the pensions clause or otherwise it was unconstitutional, so

3    it did not infringe on this Court's jurisdiction in that

4    regard.  So we think that collateral estoppel is valid and

5    applies here under the Webster judgment.

6                THE COURT:  Thank you.

7                MR. GORDON:  Thank you, your Honor.

8                MS. CECCOTTI:  Good afternoon, your Honor.  Babette

9    Ceccotti for the UAW.

10               THE COURT:  Good afternoon.

11               MS. CECCOTTI:  And with admittedly some trepidation,

12   I am also going to cover the authorization under state law,

13   and I think -- I guess I'd like to start with just a couple

14   of threshold comments.  First, I think the exchange that

15   you've had with Mr. Gordon and perhaps with others -- and I'm

16   sure it's not going to be limited there -- will probably lead

17   you to conclude that at least some of the issues that you've

18   slated as purely legal will -- are better served awaiting the

19   outcome of the trial.  I'm just -- you know, Mr. Gordon took

20   you through a series of numbers.  There are all kinds of

21   facts and information that are probably best developed

22   through the evidentiary record, and that may well inform your

23   Honor's views of a number of the questions that you've asked

24   here today so far, so I'll just start with that observation.

25   I'd like to just, if I might, also --

1      THE COURT:  Well, just so the record is clear -- and

2   I may have indicated this before even perhaps in writing --

3   it's certainly not the Court's intention to rule on these

4   issues before the trial, and to the extent any of the facts

5   that come out at trial bear on these, sure, they'll be taken

6   into account.

7      MS. CECCOTTI:  Thank you, your Honor.

8      THE COURT:  But I did hold out to all of you that

9   one of the purposes of today's hearing was to see whether

10  there are any genuine issues of material fact in advance of

11  the trial so that you can address those at the trial, and I

12  intend to do that.

13     MS. CECCOTTI:  Thank you, your Honor.  I guess

14  the -- let me just interject another thought into the

15  exchange that you had with Mr. Gordon on your hypothetical, a

16  couple of thoughts.  First, the -- and I will -- I'm going to

17  start and go through this in a little more organized way, but

18  I just wanted to make sure I get this point out.  It's

19  important to keep in mind that as inviolable and as absolute

20  and as definitive as those of us on the objectors' side

21  believe the pension clause is and as much as we believe that

22  it was the right of the citizens of the Michigan -- of

23  Michigan to so provide in adopting it, remember that we are

24  here in the public sector.  We are not in the private sector

25  where there is a federally regulated and federally

1  established pension insurance system so that when plans get

2  underfunded, when plan sponsors are overburdened, there is a

3  system that takes over.  And I would have to say all --

4  certainly the lion's share of the decisions that have come

5  down on this topic arise because of the -- because of the way

6  that that system is constructed.  There's a federal agency

7  that provides a safety net.  You know, there are moral hazard

8  issues.  There's a whole balancing that goes on in that

9  system.  We don't have that here.  Michigan pensioners have

10  Article IX, Section 24.  That's it.  That's what they have.

11  So as, you know, perhaps a -- it might take a bit of a leap

12  to see that that section means what it says and really,

13  really, really means what it says, I think it's important to

14  bear in mind that that is a safety net for pensions for

15  Michigan pensioners.  Okay.

16          So, now, to try to get back a little bit towards

17  more of an organized progression here on the 109(c)(2)

18  issues, the governor, as we've been discussing, had issued

19  the letter of authorization -- the letter of authorization

20  without any contingencies, so I think it's in -- and your

21  Honor asked the question this morning -- a couple of

22  questions this morning that have to do with, you know,

23  where's the impairment and where's the harm and questions of

24  that nature, and why wasn't the governor's reference to 943

25  sufficient.  So I think what's important to do first is take

1    a look at -- briefly just take a look at the authorization

2    letters.  And, again, this is without reference to any

3    testimony or anything else that you're going to hear next

4    week.  You know, just looking at the letters that were

5    attached to Mr. Orr's declaration, the July 16th

6    authorization makes quite plain in his situational

7    overview -- he says for an extended period of time, the city

8    has simply failed to make the investments required to provide

9    its residents with an adequate quality of life as limited

10   resources have been diverted elsewhere.  He says the city's

11   urgent need to address large and growing legacy liabilities

12   and other substantial debts is self-evident.  Failure to

13   address these liabilities will prevent -- excuse me --

14   prevent the city from devoting sufficient resources to

15   providing basic and essential services to its residents.

16   Indeed, significant additional resources are required to

17   improve health and safety.  And he goes on to say that the

18   city must devote a larger share of its revenues to

19   effectively providing basic essential services to current

20   residents, attract new residents and businesses to foster

21   growth and redevelopment, ultimately begin -- and ultimately

22   begin what will be a long process of rehabilitation and

23   revitalization for the city.  The city's debt and legacy

24   liabilities must be significantly reduced to permit this

25   reinvestment.  Plain as day in Mr. Orr's letter.  He

1    incorporates his entire proposal, the -- I don't have the

2    whole thing here.  I've just got some of it.  This is the

3    June 14th proposal.  Goes to the governor, and the governor

4    writes back again providing the authorization and saying in

5    part that he's reaffirming his confidence that Mr. Orr has

6    the right priorities when it comes to the City of Detroit.  I

7    am reassured to see his prioritization of the needs of

8    citizens to have improved services.  I know we share a

9    concern for the public's -- for the public employees who gave

10   years of service to the city and now fear for their financial

11   future in retirement, and I'm confident that all of the

12   city's creditors will be treated fairly in this process.  We

13   all believe that the city's future must allow it to make the

14   investment it needs in talent and infrastructure all while

15   making only promises it can keep.  So I think it's very clear

16   from these letters -- excuse me -- as it is abundantly clear

17   from the proposal that the city is proposing to take

18   resources from what it's calling the legacy liabilities or,

19   fill in the blank, accrued pensions, and divert those

20   resources to the list that Mr. Orr has laid out here,

21   reinvestment and services and the like, so when we talk about

22   not impairing the pensions and who took what action and when

23   does the impairment happen, the governor's letter, we submit,

24   in fact, is the impairment because it has -- the governor is

25   stating that he is acknowledging Mr. Orr's priorities,

1   including the priorities to take money from the pensions and

2   use them to pay other things.  And so when the pension clause

3   talks about -- excuse me.  I'm sorry.  I just lost my brief.

4   I apologize, your Honor.  I think I -- I have it.  So when we

5   talk about the text of Article IX, Section 24, "The accrued

6   financial benefits of each pension plan and retirement system

7   of the state and its political subdivisions shall be a

8   contractual obligation thereof which shall not be diminished

9   or impaired thereby," and we look and we are -- we see that

10  among the records in the constitutional convention is the

11  explanation that Article IX, Section 24, quote, "requires

12  that accrued financial benefits of each pension plan and

13  retirement system of the state and its political subdivisions

14  be a contractual obligation which cannot be diminished or

15  impaired by the actions of its officials or governing body,"

16  the impairment occurs when the governor signs this

17  authorization with no contingencies.  That's when it happens.

18  So not impairing thereby, meaning -- means very specifically

19  this document, and the "this" I'm holding up here now is the

20  governor's consent.  Now, why is --

21          THE COURT:  Oh, but this raises two questions.

22          MS. CECCOTTI:  Sure.

23          THE COURT:  Is there a scenario in which the city

24  would have the ability to meet its pension obligations in the

25  very long term unless it makes the kind of investments that

1  Mr. Orr and Mr. Snyder have suggested should be part of the

2  city's priorities?  That's question number one.  Question

3  number two is actually a much more important question, and

4  that is is question number one a question for now, or is it a

5  question for plan confirmation?

6          MS. CECCOTTI:  It is absolutely a question for now

7  because --

8          THE COURT:  What's the answer then?  How can the

9  city maximize its chance of paying its pension obligations

10  unless it makes the kind of investments that Mr. Orr and Mr.

11  Snyder are talking about?

12          MS. CECCOTTI:  It may be that the investments

13  themselves or the idea for the investments is fine.  The

14  question is can it get there lawfully by taking money from

15  pensioners?  That is the question that the state Constitution

16  answers by saying no.  Now, as Mr. Gordon pointed out or as I

17  think is evident from his presentation, there's a lot of

18  numbers here, Judge.  There were numbers in Mr. Orr's

19  request, his July 16th request.  You're going to hear an

20  awful lot about those numbers and what they are and what they

21  are not, so I would suggest that the notion that we somehow

22  have already today, quote, no reasonable alternative in the

23  words of PA 436 I would suggest very much should await your

24  Honor's review of the evidence on all of that, so --

25          THE COURT:  Okay.

1    MS. CECCOTTI:  I realize it's a question that has

2    been on your mind all day, but I really think unless you

3    really want us up here freelancing numbers -- and you really

4    don't -- that it is best to simply --

5    THE COURT:  I'll grant you that one.

6    MS. CECCOTTI:  Right; right.  But I guess my point

7    is the answer cannot be because the problem seems hard, we're

8    just going to try to find a way to say perhaps that this

9    language doesn't mean what it says because I think once you

10   start down that road, you run into all kinds of problems.

11   You run into the Chapter 9 dual sovereignty problems.  You

12   run into problems of who gets to decide what, right, whether

13   this Court gets to construe Article IX, 24, to, in fact, say

14   it can be invaded.  These are problems that are simply too

15   thorny -- certainly too thorny to start with, and maybe we'll

16   see where your Honor is after the evidence.

17   Okay.  So why isn't the reference to 943(b) enough,

18   and I think -- and I think you've heard it, but just to say

19   it again and hopefully crystalize it a bit, I think the

20   governor assumed in wording the letter the way that he did

21   that somehow this all gets sorted out, and I think that seems

22   to be a lot of the presumption here, and I must say I am not

23   in full company with those who say that once you cross the

24   threshold of 109(c) using state law that somehow you can

25   start, you know, running around employing federal supremacy.

1  I think that that -- we'd probably have a lot more
2  conversations about that with a lot more time with a lot more
3  specificity before we get there.  We think -- and we spent a
4  bunch of time on this in our brief, Judge, and given your
5  handling of the Addison case you probably didn't need all of
6  this, but our view is that you must look -- in order for
7  Chapter 9 to be constitutional, you have to look at all of
8  these pieces that import or give recognition to the state
9  law.  Just to take you back to another colloquy that you had
10  with Mr. Gordon and why I think maybe that the Chapter 13
11  example isn't a good fit here, 109(c) says that an entity may
12  be a debtor under Chapter 9 if and only if such entity is
13  specifically authorized to be a debtor under such chapter by
14  state law.  So while we're all here today obviously under
15  109(c) and 109(c) is in the Bankruptcy Code and so you're
16  right -- the law that must be applied is state law, and the
17  Court decides whether -- you, the Court, you, the Bankruptcy
18  Court, decide under 109(c) whether, in fact, the municipality
19  is specifically authorized to be a debtor under Chapter 9 by
20  state law or by a governmental officer empowered by state
21  law.  And so I think that that may help to distinguish the
22  Sixth Circuit case that you discussed with Mr. Gordon, but it
23  also points out that getting through the door is a state law
24  question.  903 and 904 are obvious limitations on the Court's
25  authority.  943 is a limitation on the plan.  All of these

1    things work together, and I think your Honor's opinion
2    actually in the Addison case on the motion to intervene was
3    exactly right in recognizing the limitations not only of the
4    Court's caution in addressing the questions precisely because
5    of the questions that 903 -- the issues that 903 and 904
6    import into the bankruptcy process, but another observation
7    which takes me back to the letters and the taking of the
8    money from the pensioners and putting it towards something
9    else, which is, I think, your court -- your observation in
10   that case that Chapter 9 is about debt adjustment and should
11   not be overburdened I think applies very well here, too, and
12   I think, again, when we get to the trial and the full array
13   of the plan and everything else comes out and we start
14   talking about that in the evidentiary context, I think that
15   it is at least a question as to whether or not this issue
16   that we're all talking about here is in a narrow sense debt
17   adjustment or whether it is more than debt adjustment and
18   whether that shouldn't inform the Court's caution in ensuring
19   that the state law is being adhered to.
20           And I guess -- and I don't often get to the point of
21   imploring at the podium.  It's not always pretty, but I'm
22   going to break my rule on this whole subject of where is the
23   impairment.  To me it's like a shell game.  Okay.  Under
24   which of these cups is the impairment; right?  Is the
25   impairment -- I've told you where I think the impairment is;

1  right?  I don't think the Court impairs.  The debtor proposes

2  the plan.  Under Chapter 9 only the debtor can propose the

3  plan.  The debtor was supposed to have come up with something

4  that passes muster to meet the 109(c) criteria in advance of

5  getting to this point, and they --

6        THE COURT:  Well, but the proposal of a plan, the

7  filing of a plan which proposes to impair pensions doesn't

8  result in the reduction of anyone's pension check any more

9  than the filing of the case did.

10        MS. CECCOTTI:  Your Honor, I --

11        THE COURT:  That doesn't happen until the Court

12  confirms it under law.

13        MS. CECCOTTI:  And, your Honor, then why are we

14  talking about it?  Why are we talking about it?

15        THE COURT:  Answer that question.

16        MS. CECCOTTI:  If it hadn't been --

17        THE COURT:  I'm having my issues with that very

18  question.  Why are we talking about it?

19        MS. CECCOTTI:  We're talking about it because it's

20  in their proposal.  We're talking about it because it was in

21  the authorization that went to the governor.  We're talking

22  about it because the governor clearly recognized it or at

23  least recognized it sufficiently to draft the letter that he

24  did.  We're talking about it because despite weeks and weeks

25  and weeks, no one has disabused the pensioners of the notion

1  that their pension rights are -- that they are intending to
2  impair their pension rights.  That's why we're talking about
3  it.  It simply does not -- here they are in Chapter 9; right?
4  They're in Chapter 9.  They've got the benefit of the
5  automatic stay.  They've gotten their stay against the pre-
6  petition lawsuits.  They want to have a bar date motion.
7  They're getting all of the -- you know, all of the features,
8  right, of Chapter 9.  And the threshold question that has to
9  be asked is can they be here, and the threshold question can
10  only relate to the form in which they show up on the court's
11  doorstep.  And the form in which they show up on the court's
12  doorstep is the June 14th proposal, which is abundantly clear
13  on the subject of invading -- impairing accrued pensions.
14  What else would the Court -- what else would we be dealing
15  with?  What else would your Honor be dealing with if not for
16  the fact that they evidenced their plan?
17        THE COURT:  I think the answer to that question may
18  be the governor's authorization.  He says we are here to
19  adjust the city's debts in conformity with law.
20        MS. CECCOTTI:  He says that at that end we do that,
21  but what does it mean -- what is supposed to go on before we
22  get there?  It can't be that we have a sort of quasi eligible
23  debtor going through all of the -- you know, using all of the
24  processes I just described and then we have a big
25  conflagration at the end.  I mean it just --

1          THE COURT:  Why not?

2          MS. CECCOTTI:  Chapter 9 presupposes through the

3    front door under state law, specially authorized under -- by

4    state law.  That is what 109(c) says.  It is plain as day.

5    And state law means state law, and it requires giving -- if

6    they hadn't put in this -- the pages --

7          THE COURT:  So in response to my question to Mr.

8    Gordon, you would say that if state law requires a different

9    priority scheme than the Bankruptcy Code, the municipality is

10   eligible only if the Court is willing to enforce that state

11   law priority scheme rather than the Bankruptcy Code priority

12   scheme?

13         MS. CECCOTTI:  I think that I would say that if a

14   state legislature -- we're not talking about the Constitution

15   here.  You're just talking about, in effect, the PA 436 of

16   whatever that state is.  I would say that those are the

17   terms.  We have -- we allow the states -- states have a

18   variety of authorization.  Some of them have no

19   authorization.  It is a state-by-state --

20         THE COURT:  Every bankruptcy case that has addressed

21   that question has held the other way, hasn't it?

22         MS. CECCOTTI:  Well, I don't know the answer to

23   that, your Honor.  In the Chapter 9 context?

24         THE COURT:  Yes, in the Chapter 9 context.

25         MS. CECCOTTI:  Okay.  Well, I --

1          THE COURT:  Every Bankruptcy Court has held once

2     you're in the door, it's the Bankruptcy Code priorities that

3     apply, not the state law priorities --

4          MS. CECCOTTI:  Right.  Well, right.  And now we're

5     getting into the --

6          THE COURT:  -- because the state consents to the

7     Bankruptcy Code or it doesn't.

8          MS. CECCOTTI:  Well, and I would say that a state

9     that passes a law such as your Honor proposed maybe, in fact,

10    looked at those cases and said, no, we don't really want to

11    go there.  We want to -- you know, we'll let you go if it's

12    this other way.  I think the through the door -- once we're

13    in the door -- I know what Harrisburg says.  You know, I have

14    a lot of trouble with it just because I think that the

15    doctrine has not evolved in a sufficiently precise manner.

16    You don't always see what the conflict is.  You have to come

17    up with notions of what the purpose is.  Remember the ancient

18    Supreme Court cases here said bankruptcy is about discharge;

19    right?  So can states have discharge laws?  So we're way, way

20    far away from that now, so I think -- again, I think we'd

21    have to have a lot more conversations about what happens

22    through the door.  Right now we're talking about you're at

23    the door, and you're at the door, and you're presenting

24    yourself, and what you're wearing, right, is something that

25    says we are going to violate Article IX, Section 24.

1     Just want to see if there is anything -- see if I've
2  left anything out here that I wanted to cover.  I have some
3  minutes here.  I guess I could barter away my minutes, Judge,
4  or I could give them to you to barter them away.  Let me just
5  take a quick moment here.  I think -- I mean, again, I think
6  we're going to get to the point of duplication if I continue
7  unless, your Honor, you'd like to ask me anything else.  I
8  think I've hit the points I wanted to hit.

9          THE COURT:  Okay.  Thank you.

10         MR. WERTHEIMER:  William Wertheimer, your Honor, on
11 behalf of the Flowers plaintiffs.  As I'm sure your Honor
12 will recall, although it seems like ages ago now, the Flowers
13 plaintiffs were plaintiffs in one of the state court cases
14 that preceded the bankruptcy, a state court case in which we
15 were making the claim that under state law the governor was
16 required to recognize Article IX, Section 24, if and when he
17 authorized a bankruptcy.  I'm not here to speak on bankruptcy
18 law.  When I heard the reference to Asbury Park, I thought of
19 the street in northwest Detroit.  I'm not a bankruptcy
20 lawyer.

21         THE COURT:  Okay.

22         MR. WERTHEIMER:  I just want to speak briefly on the
23 state law, which it was my understanding at the stay
24 proceedings everybody kind of understood, including the city
25 attorneys, that although our claim was being delayed, it was

1  not being changed in terms of its nature; that is, that this

2  Court would decide as a matter of state law whether this

3  bankruptcy was properly authorized.  It was just that the

4  forum was changing.

5          And I'd just like to make three points as to that

6  state law, three areas where I think this Court can look to

7  what it should do in deciding what I believe is that state

8  law issue; that is, the basic eligibility issue.  If you look

9  at the equivalent of legislative history of Article IX,

10  Section 24 -- that is, the constitutional convention

11  record -- there is certainly references to the fact that has

12  been mentioned here today that it was meant in part to deal

13  with the fact that pensions had been considered not to be a

14  matter of contract, but the only specific reference that I

15  found in that record -- and no one has cited anything to the

16  contrary -- is the comment of Mr. Van Dusen, which I -- with

17  the Court's permission, I'll take the liberty to quote.  It's

18  not long.  "An employee who continues in the service of the

19  public employer in reliance upon the benefits which the plan

20  says he would receive would have the contractual right to

21  receive those benefits" -- he didn't stop there -- "and" --

22  he didn't say "meaning" -- he said "and," in addition -- and

23  I think this goes to what Mr. Gordon was getting at, "and

24  would have the entire assets of the employer at his disposal

25  from which to realize those benefits."  That was the

 1  understanding of Mr. Van Dusen.  There's no contrary
 2  understanding on the record as to what the idea was on behalf
 3  of the people who were writing Article IX, Section 24.
 4  That's point number one, and I think if you look at what
 5  Emergency Manager Orr did in his June 14th proposal, Mr. Van
 6  Dusen, were he alive to take a look at it, would say, "That's
 7  not what I meant," because on June 14th what Mr. Orr proposed
 8  and he continues to propose is the retirees get treated like
 9  any other creditor.  He didn't say words to the effect of
10  "all the assets of the employer," so that's the first piece
11  of state law in the broad sense of the term that I think you
12  can look to.

13       The second piece is the <u>Webster</u> and the <u>Flowers</u>
14  cases and the retirement case.  And I'm not repeating
15  Mr. Gordon's argument relative to collateral estoppel or the
16  res judicata argument.  I'm simply pointing out that as --
17  excuse me -- as Mr. Gordon indicated, that case was fully
18  briefed, and a state court judge looked at the exact issue --
19  well, maybe not exact but very close to the issue that is in
20  front of you, and that state court judge, after full
21  briefing, decided that in a manner consistent with our
22  position.  And I would point out there is no contrary law
23  anywhere.  I recognize this Court -- the cases that say you
24  look to the definitive ruling from the highest state court
25  and all that, but Judge Aquilina's decision -- decisions,

1  well-reasoned, are all that's out there.  She's a state court

2  judge deciding this issue.  That's the second piece of state

3  court law that, as far as I can tell, is out there.

4      There's one other, and that is we have the state

5  attorney general.  This isn't law, but the state attorney

6  general enters an appearance a little late in the game.  The

7  governor has already authorized the bankruptcy.  However, the

8  state attorney general, as an officer of the state, as the

9  chief legal officer of the state, tells this Court that

10  Article IX, Section 24, binds the emergency manager in

11  bankruptcy.  Now, we all know that that gets into the issue

12  of is it at the eligibility stage or the plan stage, and I --

13  that's been dealt with.  My point is simply that a state

14  officer, the attorney general of the state, saying that the

15  emergency manager in bankruptcy is bound by Article IX,

16  Section 24, is consistent and supports our position that the

17  governor, when he goes to authorize that bankruptcy, is also

18  bound by Article IX, Section 24.  And with all due respect to

19  the governor, we think it's up to this Court to hold the

20  governor to that.

21      THE COURT:  All right.  Thank you, sir.

22      MR. WERTHEIMER:  Thank you.

23      MS. PATEK:  Good afternoon, your Honor.  Barbara

24  Patek on behalf of the Detroit Police Command Officers

25  Association, the Detroit Police Lieutenants & Sergeants

1   Association, the Detroit Police Officers Association, and the

2   Detroit Fire Fighters Association defined in this case as the

3   Detroit Public Safety Unions.  As the Court is aware, these

4   are the men and women who provide the police and fire

5   protection that are essential to the survival of the city,

6   and these are exactly the essential services that Chapter 9

7   was designed to preserve and protect.

8           I want to use my time this afternoon to talk a

9   little bit about ripeness, talk very briefly about the

10  supremacy clause and the tension between the supremacy clause

11  and the Tenth Amendment, and then to try to answer some of

12  the questions that the Court has raised with some of the

13  other objectors today.

14          On the issue of ripeness and why this is a question

15  for eligibility, I think that goes to the very nature of

16  Chapter 9, which precisely because of the sovereign immunity

17  and the sovereignty of the State of Michigan, this Court, as

18  it's recognized in so many hearings, is limited in what it

19  can order the city to do.  In that respect, this -- not that

20  every bankruptcy isn't a consensual process and not that

21  every bankruptcy doesn't involve a lot of negotiating.

22  Chapter 9 is unique because it incorporates -- it's a largely

23  consensual process at some level precisely because this Court

24  cannot trump the state's sovereignty in particular

25  situations.  And in that regard, if one talks about imminent

 1  harm, there is -- you know, it's in the record.  Mr. Gordon

 2  alluded to the fact that the stay authorized the city to come

 3  in this court for a very public purpose, and that purpose was

 4  to impair the accrued vested pension rights of its public

 5  servants.  That question, as the city points out in its

 6  papers, no court has ever said they can't do it, and no court

 7  has ever said they can.  It's an unanswered question.  We're

 8  entitled to know what our rights are, and to suggest that by

 9  knowing what our rights are in the door that is to knowing

10  what -- to know what the proper authority is here would

11  somehow skew the process or cause people to walk away from

12  the table I think is wrong.  This is a hard question that the

13  Court has to answer, but the Court is here to follow the law.

14  I think this is -- there is imminent harm to these

15  individuals here, and there's a second piece of that by

16  virtue of the vacuum in which there's no legal precedent on

17  this issue, and that is -- I'm just going to throw out to the

18  Court the idea that this is one of those issues where it's

19  capable of repetition but evading review.  If every time this

20  gets kicked down the road to confirmation, nobody is ever

21  going to know what their rights are when this issue comes up.

22  I submit that Michigan is a little bit unique, but I think

23  that there are plenty of reasons that this issue is ripe for

24  adjudication today.

25          I'd like to take a crack at some of the questions

1    that the Court raised.  You raised the issue of what if the

2    state law requires a different scheme of priorities than is

3    authorized by the Bankruptcy Court.  I think if you step out

4    of the weeds on that question and I think you look at what

5    the Code says here, the state has to give its consent to come

6    into Chapter 9.  And in giving its consent, the state agrees

7    to certain provisions of Chapter 9.  I think a state that

8    authorizes such a scheme simply can't give its consent to

9    come into Chapter 9.  I think that's the simple answer to

10   that question.

11          THE COURT:  So your answer then in that hypo would

12   be not eligible?

13          MS. PATEK:  Correct.  I also think -- the Court

14   asked the question and raised the 11th Amendment, and I'm

15   going to go out on a limb here on this and the question of

16   sovereign immunity because I think the answer to a lot of the

17   issues before the Court and whether or not, in fact, the city

18   can impair these rights or use the Court to impair those

19   rights is in some ways answered by the Code.  Section 106 of

20   the Code addresses the sections of the Code under which the

21   state waives its sovereign immunity.  109 is not one of them,

22   and I think that makes the eligibility issue as it's framed

23   by 109 a question of state law.  And the other place, if

24   we're going to jump ahead to where we'll be down the road,

25   where the state does not waive its sovereign immunity is

 1   under Section 943.  We know there are some places where to

 2   consent to come into this Court and get relief the state has

 3   to agree to conform to the rules.  365 is one of those that

 4   you've got <u>Bildisco</u>.  If you're going to come in and you look

 5   at -- that's a place where the state has to agree, consent to

 6   be governed by the federal rules.  The other place is the

 7   automatic stay.  But when you get down the road to the plan

 8   that only the city can propose, the state does not waive its

 9   immunity, and that --

10        THE COURT:  I think you might be overanalyzing my

11   question about sovereign immunity.  I was only analogizing to

12   the 11th Amendment cases that hold that the issue of whether

13   sovereign immunity is waived is a federal issue, not a state

14   issue.  I didn't mean to suggest, as you appear to understand

15   here, that there is -- that there are 11th Amendment issues

16   in this case.

17        MS. PATEK:  I'm not suggesting that you are, your

18   Honor, but I'm suggesting that -- and this sort of brings us

19   back to where Ms. Levine started out this morning with this

20   concept of -- this very basic concept, and one of the things

21   that makes this case so hard and one of the things that all

22   the commentators agree makes Chapter 9 so hard is this

23   tension.  We have a federalist system.  There are rules of

24   the road that were set up by the founders.  We have a limited

25   system of federal government.  All the other powers are

1    reserved to the states and the individuals.  And there's no
2    question that wasn't done so that we could have big and
3    powerful states.  That was done by the founders so that the
4    individuals close to the ground would have their rights
5    preserved, and I think within the structure of Chapter 9 and
6    within the limits of the Tenth Amendment, that the state
7    simply cannot use Chapter 9 to impair an express
8    constitutional promise.  And I want to talk about that issue
9    for just one moment.  This pensions clause is in a very
10   unusual place.  Okay.  This is -- I think it's fair to say --
11   you talk about there is a contracts clause in the state
12   Constitution just like there's a free speech clause and there
13   are a lot of things that mirror the Bill of Rights, but, as
14   Ms. Levine told us this morning, if somebody is violating my
15   free speech rights, I'm not in state Circuit Court.  I'm
16   looking to the federal courts and the federal government to
17   protect those rights.  If you're talking about fiscal
18   management, then that's a state issue, and in this case this
19   state and the people of this state chose to enshrine that
20   right to vested accrued -- this isn't all pension benefits,
21   this isn't future benefits, just what people have already
22   earned -- in its state Constitution and say those cannot be
23   impaired.
24           The Court asked the question about what if there's
25   not enough money, which sort of brings me back to the first

1    issue I was talking about. This Court has to rule on the

2    legal issue that's before it, and if there's not enough money

3    just like if you're in a Chapter 11 that you don't want to

4    see liquidation, that's a hard question that the creditors,

5    including the pensioners, including my clients, have to

6    answer along with the city and try to solve this problem

7    within the limits of Chapter 9 because if we don't solve the

8    problem, the only remedy is a dismissal.

9          THE COURT: Well, I guess even that answer troubles

10   me because if the Court holds here that there is this pension

11   right that cannot be impaired and because the governor didn't

12   condition this filing on the city recognizing that right in

13   the bankruptcy, what would happen upon dismissal? There'd be

14   this court holding that there's this unconditional absolute

15   right not to have pensions impaired. On behalf of your

16   retirees, you couldn't negotiate that, could you? How could

17   you?

18          MS. PATEK: I can't negotiate that upon my retirees,

19   but I suggest to the Court there is a solution to this

20   problem, and the solution is for the city to come back again

21   and to authorize -- have the state authorize the filing

22   within the confines of the Constitution, and we move forward

23   on that basis. I don't -- I understand that this has -- you

24   know, we talk about the elephant in the room, but the larger

25   part, the healthcare benefits, are not protected, and the

1　city has already said effective yesterday -- and these aren't

2　my clients, but -- we're done providing that.  It's a

3　significant claim.  I don't want to minimize that, but I

4　think it is something, given our constitutional structure,

5　that has to be dealt with in the confines of these

6　proceedings, and there are negotiations.  There's a huge

7　consensual component to this, and that doesn't stop if the

8　Court rules the way that we've asked to rule.

9　　　　I see my time is up.  I just want to wrap up very

10　quickly, and I guess I would say we came into court on the

11　first day, and we supported the city, and we've supported the

12　city in many respects throughout this.  We agree that there

13　should be the stay.  There has been the breathing space.  But

14　I think this is a hard, difficult question.  As Ms. Levine

15　said, democracy is hard.  This restructuring plan has to be

16　devised in accordance with applicable law, and the city on

17　the front end has to agree that it's going to -- it's going

18　to do so, and in the absence of that, I think they're not

19　eligible.  Thank you, your Honor.

20　　　　THE COURT:  All right.  Thanks to each of you.

21　We'll take our afternoon break now and reconvene at 3:20, a

22　half an hour from now, for the city's arguments.

23　　　　THE CLERK:  All rise.  Court is in recess.

24　　　(Recess at 2:50 p.m., until 3:20 p.m.)

25　　　　THE CLERK:  Court is in session.  Please be seated.

1   Recalling Case Number 13-53846, City of Detroit, Michigan.

2           THE COURT:  And it looks like everyone is here.

3           MR. BENNETT:  Good afternoon, your Honor.

4           THE COURT:  Mr. Bennett, you may proceed.

5           MR. BENNETT:  Good afternoon, your Honor.  Bruce

6   Bennett of Jones Day on behalf of the city.

7           THE COURT:  The only thing I would ask of you, sir,

8   is to leave enough time before our closing time today for me

9   to ask some questions of Mr. Todd.  Doesn't need to be now.

10  It can be whenever it's convenient for all of you.

11          MR. BENNETT:  Okay.

12          MR. TROY:  Mr. Troy, your Honor.

13          THE COURT:  Mr. Troy.  I'm so sorry, sir.  And so I

14  want to do that today because I'm not sure what his travel

15  plans are.

16          MR. BENNETT:  Okay.  Your Honor should feel free to

17  interrupt me if you think I'm getting too close to the end.

18  And I actually have one procedural question that I'd like to

19  get settled, too, which really has to do with whether you're

20  expecting or would benefit from oral argument at the

21  beginning of the next -- opening argument at the beginning of

22  the next phase because that's -- so I don't know if --

23          THE COURT:  You mean tomorrow?

24          MR. BENNETT:  No.  On the evidentiary phase

25  beginning next week.

1    THE COURT:  Oh, well not so much oral arguments as

2  opening statements.

3    MR. BENNETT:  Opening statements is what I mean.

4    THE COURT:  Yes.

5    MR. BENNETT:  Okay.  Great.

6    THE COURT:  Yes.  I think opening statements are

7  very important.

8    MR. BENNETT:  Okay.  I want to start with some

9  general comments, some of which are designed to respond to

10  things that came up this morning and some of which I think

11  just help, I think, set the stage for what at least the city

12  believes is happening in this Chapter 9 case.  And I want to

13  start by saying that the purpose of the Chapter 9 case is to

14  adjust the city's debts, and that means all of their debts,

15  obligations evidenced by bonds, obligations under other

16  contracts, obligations to provide healthcare, and pension

17  obligations.  And so that there isn't any confusion, there's

18  been a lot of reference to statements that were made.  I

19  think the statement most cited and the one that I think is --

20  it's the same as all the other ones that have been made -- is

21  that there must be -- the statement was there must be

22  significant cuts in accrued vested benefits.  It's been cited

23  often, and it's true.

24    I want to make a couple of clarifications.  I don't

25  think anyone for the city ever said we were going to

1  eliminate pensions.  This has been about the underfunding

2  amounts.  It is the underfunding amounts that are problems.

3  I think your Honor understands that, but I think it's

4  important to remind everybody else that we've never said that

5  the objective is to eliminate pensions.  The objective is to

6  address the underfunding situation.

7          Now, why did we make that statement?  The

8  statement --

9          THE COURT:  Well, let me just put it right to you.

10  Is it your intent to propose a plan to reduce pensioners'

11  monthly checks?

12          MR. BENNETT:  To be very technical about it, what we

13  have -- what we have -- what we have noted is that it is

14  impossible for the city to fill the underfunding gap in the

15  existing pension trusts, and we have also said that likely

16  requires changing the amounts of pension benefits.  Now --

17          THE COURT:  By "changing," you mean reducing?

18          MR. BENNETT:  Reducing.  Now, I do want to -- I'm

19  going to skip a couple points and then come back.

20  Notwithstanding the fact that the Chapter 11 case has been

21  filed, it remains the city's hope that these adjustments will

22  be achieved on a consensual basis pursuant to agreements

23  reached with the holders of the obligations.  That is still

24  the objective.  And, of course, we are participating in

25  mediation that's intended to facilitate that goal, and,

1  frankly, we'll meet with anyone anyplace anytime to try to

2  achieve that goal.  And we're going to discuss at certain

3  points certain statements that have been made by others in

4  this case about this problem which may suggest that those

5  discussions are going to be particularly difficult, but I

6  want there to be absolutely no confusion about where the

7  city -- where the city stands on this.

8          And by the way, the filing doesn't say how

9  ultimately this case is going to end, whether it's going

10 to -- whether we're going to have a consensual plan, whether

11 we're going to have a nonconsensual plan, whether it'll be

12 partly a consensual plan or partly a nonconsensual plan.  And

13 although the city did make a proposal that certainly

14 contemplated cuts to the underfunding obligation and

15 ultimately to benefits that absolutely is a part of the June

16 14th proposal, it was a proposal in an out-of-court

17 negotiation, and I want to submit -- and we're going to come

18 back to this point later -- it can't possibly be

19 impermissible to ask to reduce benefits, particularly when

20 you can demonstrate a need to do so.  And so far, frankly,

21 that's what the city did pre-petition, and so far that's what

22 the city has done post-petition.  We haven't filed a plan

23 yet.  It will come soon.  And there has not been a request

24 for cramdown, so -- and I think as we get into other parts of

25 the argument -- the fact that we don't quite know what's

1 coming later may have some bearing on some of the legal

2 points that your Honor has talked about and that others have

3 talked about earlier today.

4     THE COURT: Is it the city's position that the State

5 of Michigan does not have the obligation under the Michigan

6 Constitution to guarantee the city's underfunding?

7     MR. BENNETT: I don't know if the city has a

8 position. I will tell you that I have read all of the

9 materials probably more than anyone else in the city's team,

10 and I don't think the state has an obligation to guarantee

11 the pension obligations of a municipality. I think actually

12 when you look at the --

13     THE COURT: Isn't it in the city's best interest to

14 say that -- or to assert that the state does have that

15 obligation?

16     MR. BENNETT: I don't know whether it is or is not

17 in the city's best interest to even take a position on that

18 point, and that's why I said I don't think the city has a

19 position on that point, but I have done a lot of the work,

20 and I think I've made up my own mind as to what I think is

21 there. I do think it's in the city's position that if we

22 could get money from the state, we would want it, and it

23 would be a great thing, and I'm reasonably certain that that

24 sentiment has been expressed on more than one occasion.

25     THE COURT: Well, is there any reasonable prospect

1   that the state will comply with that request in the absence

2   of a legal obligation -- a determined legal obligation?

3              MR. BENNETT:  I don't know the answer to that

4   question.  Thus far the state has been of the view that the

5   city has to reorganize based upon its own financial

6   resources.

7              Okay.  The next point I wanted to touch on is the

8   fact that there are a large array of state and federal

9   statutes that say in all kinds of different ways that the

10  city is obligated to pay its debts.  In fact, they say that

11  the city is obligated to pay its debts in all kinds of

12  different ways.  And the city itself and the state has no --

13  and we'll get into this in much more detail -- no ability in

14  order to overcome those laws or very, very, very limited

15  ability to overcome those laws.  One important point about

16  them that didn't --

17             THE COURT:  You mean comply with those laws?

18             MR. BENNETT:  No.  To overcome them to get past them

19  if they can't pay all of their obligations.  And, again, it's

20  a situation that the city is going to prove it's in, but

21  that's for another hearing.  The point I wanted to make here

22  that I don't think was made earlier today was that a lot of

23  these priorities collide with each other in all kinds of

24  different ways.  We heard, by the way, about the all assets

25  at their disposal comment that was, I guess, from the

1  constitutional convention.  Assuming for a second that that

2  is what was intended, the problem is is that the legislature

3  has also passed a law that describes certain debts -- the

4  obligation to pay certain debts as a, quote, "first budget

5  item," close quote.  I don't remember the rest of the

6  sentence, but those words are there.  There's also other

7  state statutes that don't actually grant a lien but that say

8  proceeds of certain things must be used in certain orders to

9  pay.  And when you sit down and try to figure out in any

10 environment where you don't have enough, how do you fit all

11 these different things together, you run into a problem very,

12 very, very quickly.  And these are the provisions, by the

13 way, that are protected by the federal contracts clause and

14 also by the Michigan contracts clause because many of these

15 provisions are in ordinances or resolutions that form part of

16 bond contracts, and others are in ordinances and resolutions

17 that form part of employment contracts.  So you wind up -- if

18 you look at the world before you even start talking about

19 bankruptcy, you don't just have coherent commands, this is

20 how you pay and this is how you go about doing it and

21 everything works, you have a whole bunch of priorities that

22 actually don't work, and this, frankly, is --

23         THE COURT:  Well, but the objecting parties say all

24 of those contract obligations that have protection merely

25 under the contracts clause, federal or state, can be adjusted

1  consistent with state and federal law, but the pension
2  obligation under the state Constitution is inviolate.
3        MR. BENNETT:  And we'll get to that if you'll give
4  me a chance.  I will explain why --
5        THE COURT:  Okay.
6        MR. BENNETT:  -- they are, in fact, no different,
7  but I guess my point here is that outside of bankruptcy, you
8  have a -- you don't have coherence, and this is really to the
9  whole point of does it really make any sense to have a rule
10  that says if the state conditions its filing a proceeding
11  based upon complying with its priorities, what do you even
12  have.  And in many circumstances, you have something that is
13  just not meaningful in the context of where there's not
14  enough to go around.  I think that's the narrow point for the
15  time being.  We will generalize when we get to the whole
16  issue of how the --
17        THE COURT:  Okay.
18        MR. BENNETT:  -- different clauses work.  I also
19  want to say that contrary to the papers that were filed --
20  and I'm now referring to the UAW's papers -- the June 14th
21  proposal didn't take broad aim at the city's workers and
22  retirees.  It was very, very carefully drafted to try to
23  treat as many classes of creditors the same as we possibly
24  could denying preferences to any except in cases where we
25  were legally compelled to provide them.  We thought and the

1  emergency manager thought that that was the best way to go

2  about the problem that confronted us, and, of course, we're

3  not under any illusion that that's going to be the last word

4  on this question.  There will be negotiations.  There will be

5  a plan filed, which I'm certain will differ from the proposal

6  that was issued on June 14th in part to respond to creditor

7  input, and it will be subjected to enormous and exacting

8  procedures by this Court before it is ever confirmed.

9       I also want to spend just a second about the point

10  that was made using some of the letters, the letters that

11  were exchanged between the emergency manager and the

12  governor.  If your Honor hasn't already, I commend you to

13  read all of them, not just the parts that were quoted.  I

14  think it's -- I think to fairly summarize the points made in

15  both letters, the city has been -- the city services, city

16  residents, the ability of the City of Detroit to be a city

17  that provides adequate services to its residents has

18  gradually been lost as a result of the constant and

19  consistent diversion of current tax revenue paid by current

20  tax revenue to legacy liabilities, including but not limited

21  to pension claims.  That is the problem.  It is not as if

22  everything is fine, let's take some money from pensioners and

23  put it to the benefit of residents to make things better.

24  The diversion already occurred.  State law has been followed.

25  Pensions have not been impaired or diminished.  A consequence

1  has been that the resources available for services, that the

2  resources available for investment have, in fact, been

3  significantly impaired and significantly diminished to the

4  point that lots of the city's infrastructure is no longer

5  serviceable, thus the reference to need for investment.  It's

6  not for the new and wonderful.  It's to put back things that

7  really need to be updated and, in fact, replaced because

8  they're worn out, and it's to restore budgetary items,

9  budgets that have, in fact, been cut too great.  And I think

10  that sense -- if you read the entire document, you will see

11  that that is the historical view of the current situation.

12  Again, it will be proved next week.  And the solution is in

13  part a reinvestment program.  Again, just to be technically

14  correct, it's 1.25 billion over ten years, not over five

15  years.  Five years would be better.  I don't think anyone

16  thinks we can afford it.

17        I think the next point and the last point I'm going

18  to make by way of introduction is really to address one of

19  your Honor's questions, which is what happens if the city

20  can't adjust its debts.  I think we have to start with the

21  following.  Most business owners and residents are smart

22  enough and sophisticated enough to figure out that it's a

23  problem to be the highest -- residents of the highest taxed

24  jurisdiction in the State of Michigan where somewhere between

25  42 and 65 cents of every dollar is spent on something other

1   than services to current residents.  That is not a stable

2   situation.  That is just not going to work out well.  The

3   consequence will be continuing declines in revenue.  It may

4   be that debts of all kinds would be paid for awhile, but

5   ultimately debts of all kinds will not be paid, and no

6   provision of any Constitution will change this.  Thus, the

7   stakes are very high not just for the city but also for its

8   residents and its creditors, and I think that puts a very

9   sharp point on your Honor's question about what is a

10  constitutional provision worth when you're confronting an

11  economic crisis such as this.

12         Unless your Honor wants to hear much about it, I was

13  next going to talk about your jurisdiction to decide the

14  eligibility question, but no one else raised it on oral

15  argument, and since it wasn't raised on oral argument, I'll

16  leave it to the papers unless your Honor has any particular

17  questions with respect to that point.

18         THE COURT:  No.

19         MR. BENNETT:  And I'd like to take the same

20  prerogative that if I intentionally pass over a topic because

21  it wasn't covered today, if it's in our papers, we still care

22  about it.

23         THE COURT:  Of course.

24         MR. BENNETT:  I'm just going to try to use time

25  wisely.  So the first place I'm going to spend some time is

1    on the constitutionality of Chapter 9, and I'm going to do it

2    a little bit differently because I think, frankly, if we do a

3    really careful look at Bekins -- and I'm going to call it

4    Bekins because it's a really big company in California that

5    has -- the name is spelled B-e-k-i-n-s, and everybody calls

6    it Bekins, but I don't know what the correct pronunciation in

7    this particular case is concerned.  A very careful analysis

8    of Bekins -- and believe it or not, the Cardozo dissent in

9    Ashton is going to provide us with the guidepost to answer a

10   lot of the questions that may not be constitutional questions

11   but that ultimately are resolved by those cases.  First, I

12   have to say because it's important that it isn't this Court's

13   place to overrule Bekins.  Bekins has been the law for lots

14   of years.  And as the U.S. Attorney pointed out, it's not

15   only that Bekins hasn't been overruled, it's actually never

16   been challenged or questioned or otherwise suggested to be

17   worthy of reconsideration by anything that the Supreme Court

18   has done.  And, moreover, in all of the discussion that your

19   Honor heard about why Bekins should not be regarded as good

20   law anymore, no one actually said that the -- that Chapter 9

21   has been changed in any material way from the law that was

22   before the Court in Bekins, and that's because in all the

23   ways that mattered it really hasn't changed, not just -- not

24   by a little but really not at all.  However, we don't want

25   the Court to write an opinion that says, well, you feel

1  constrained not to overrule Bekins.  You think it should be

2  overruled.  So I'm going to spend some time talking about why

3  Bekins is absolutely right and why Asbury Park and anything

4  else didn't change anything.

5      Let me start with just a quick word on Asbury Park.

6  Even to the Supreme Court, if you read their own words,

7  Asbury Park is kind of considered an outlier.  It has -- the

8  Supreme Court has never since approved a municipality's

9  modification of its own contract on the basis of emergency or

10  anything else.  Every time it's been asked to, it's basically

11  talked about Asbury as being, number one, confined to its

12  facts and extraordinary situation and not reflective of a

13  broad doctrine.  This same argument was made to Judge Bennett

14  in the Jefferson County case, and he commented on it.  I

15  think we've cited to that case in our papers.  He does an

16  even better job than I just did of explaining why Asbury is

17  an outlier.  It doesn't provide much comfort to any

18  municipality thinking it's going to modify its debts without

19  the help of the Bankruptcy Code and is no good reason to

20  reconsider Bekins.

21      Now, the next thing I want to talk about is what

22  Bekins really does, and the -- a reality that you can find in

23  Bekins if you're looking really hard, but unfortunately you

24  have to look really hard, is that there were two

25  constitutional provisions at stake when the Chapter 9's

1  predecessor was subject to Supreme Court review.  One was the

2  Tenth Amendment, and some people have talked about that.  And

3  the second part was the contracts clause.  And when you read

4  Bekins, the Court kind of touches on all the different

5  features that matter but isn't particularly careful about

6  matching up which features were needed to overcome which

7  constitutional problem.  And, frankly, in there we're going

8  to find the answers to a lot of the -- a lot of the other

9  questions that come up in this case.

10      So let's start with the Tenth Amendment.  Of course,

11  the Tenth Amendment, if you quote the whole thing -- and when

12  your Honor confronted earlier, I'm not sure the first six or

13  so words were quoted, "powers not delegated to the United

14  States by the Constitution, nor prohibited by it to the

15  states are reserved to the states respectively, or to the

16  people."  For starting purposes, "powers not delegated to the

17  United States" are important words, and one of the things

18  Bekins very clearly says is uniform laws on the subject of

19  bankruptcies are delegated to the United States and that laws

20  on the subject of bankruptcies include municipal debt, and I

21  think they used "composition" as opposed to "adjustment," but

22  composition statutes.  So it's actually not a close call that

23  the -- at least as far as the Supreme Court is concerned --

24  and I think that's all that matters for this purpose is that

25  we're going to have a municipal Bankruptcy Code that at least

1  covers subjects of bankruptcy and that those are clearly

2  federal functions.  Where a Bankruptcy Code applicable to

3  municipalities --

4          THE COURT:  Well, but we know from several Supreme

5  Court cases that the mere fact that Congress legislates

6  within its authority does not necessarily by itself mean that

7  it's consistent with the Tenth Amendment.

8          MR. BENNETT:  Well, actually I think --

9          THE COURT:  Right?  You've got _Printz_ --

10         MR. BENNETT:  Well --

11         THE COURT:  -- in New York at a minimum that hold

12 that.

13         MR. BENNETT:  Well, that was the commandeering

14 point.  We'll get to commandeering.  There's no commandeering

15 in the Bankruptcy Code.

16         THE COURT:  Well, I don't mean to suggest that there

17 is, but in the laws that Congress passed that the Supreme

18 Court held unconstitutional there, they were legislating

19 within their commerce clause or other enumerated power.

20         MR. BENNETT:  Okay.  In the radioactive waste case,

21 the New York case, it was because they used means that were

22 inappropriate that offended the solvency -- excuse me --

23 offended the sovereignty of the states.  In the Bankruptcy

24 Code -- in the context of the _Bekins_ case, I think when you

25 read the case, they were worried about something different.

1    They were worried about the -- in <u>Ashton</u> the majority was

2    clearly worried about the bankruptcy parts going too far and

3    intruding on insolvent -- on sovereignty issues that weren't

4    actually close enough to the core bankruptcy problem.  That's

5    where we got the governmental and political powers type

6    exception that we have today, and so -- but I don't think

7    there is -- your Honor is correct.  If the way that the --

8    that Congress chose to legislate on the subject of

9    bankruptcies affecting municipalities was to tell state

10   courts what state courts had to do, then you would

11   conceivably have a problem, but there's nothing about the

12   Bankruptcy Court that tells -- state any things what states

13   have to do.  What the Bankruptcy Code tells courts, what it

14   tells federal courts what they should do when confronted with

15   a municipality that petitions for relief and petitions for

16   relief with proper authorization.  And so I don't think that

17   is -- that doesn't implicate the second half of the Tenth

18   Amendment.  It only implicates the first half of the Tenth

19   Amendment, and, quite frankly, it's protected by it.

20        And this is going to come up with something later.

21   When we think about the issue of priorities -- and that's a

22   word that encompasses lots of different things, and we can

23   break it down further if we need to -- priorities are at the

24   core of the subject of bankruptcy, absolutely solidly in the

25   core, so a point I want to make and we'll come back to is

1  that we're not really dealing with the part of the Bankruptcy

2  Code that gets closest to offending sovereignty.  We are

3  really dealing with -- when we talk about where pension

4  claims stand in the world and where they can be impaired, we

5  are dealing something that is core to the subject of

6  bankruptcies.  It's not at the edge of the things that made

7  the difference between the constitutionality and

8  nonconstitutionality of the Bankruptcy Code under the Tenth

9  Amendment.

10      THE COURT:  Well, I think possibly your colleagues

11  on the other side might take issue with that because they

12  analogize the pension right to a property right, which is a

13  matter of state law, at least under our present Bankruptcy

14  Code.  It probably doesn't need to be, as a matter of

15  constitutional law, but it is.

16      MR. BENNETT:  We will come later, and believe it or

17  not, it's going to be implicated in other aspects of the

18  Chapter 9 case not having anything to do with pensions to

19  where the line is between a priority and a property right.

20  When we talk later -- I'll get to it later.  I have a whole

21  section on why in this instance a pension is an unsecured

22  claim and not a property right.

23      THE COURT:  Okay.

24      MR. BENNETT:  If we -- just to take a short part

25  about it now, as I read the cases, there are some cases that

1   talk about an entitlement to money being a property right,

2   but in every single one of those cases the money was there,

3   so, for example, it was in a bank account and the balance was

4   there.  In another circumstance, you were dealing with a --

5   an entity was reducing the amount of money that was supposed

6   to be paid to an employee, but there was a hundred cent

7   dollars there, and the three percent that was going to be

8   carved out was going someplace else.  There is no

9   constitutional case that deals with a promise that there -- a

10   promise that might or might not be satisfied because there's

11   not enough money and say that kind of a promise is a property

12   right.  So I think that if you -- if we apply carefully the

13   Supreme Court cases -- and when I get to them, I'll remember

14   the citations -- we are going to find that an unsecured

15   promise where the actual sum of money can't be pointed to

16   because it's not there yet, that's not a property right and

17   never has been, and so the Fifth Amendment is not implicated

18   here.  This is absolutely a contracts clause case, and we'll

19   get to the contracts clause -- clauses in a second.

20        Okay.  So I want to -- last point with respect to

21   the Tenth Amendment, of course, Bekins says it's

22   constitutional under the Tenth Amendment.  The Bankruptcy

23   Code, in particular, its part relating to municipalities,

24   it's constitutional under the Tenth Amendment.  It finds that

25   the combination -- that apart from the fact that it's subject

1  to bankruptcies, it finds that the fact that the Code, then

2  the Act, had carefully carved out governmental and political

3  powers, kind of the -- that is, the relationship between a

4  municipality and its subjects -- it's carved that out.  It

5  says that is an appropriate safeguard to states retaining

6  sovereignty, and they say, "And, oh, by the way, there's a

7  consent requirement."  So those two things, the consent

8  requirement, the -- what I'll call the 903-904 carveout, and

9  the fact that the uniform laws on the subject of bankruptcies

10  are fair game for the federal government, those three things

11  are the three points that the <u>Bekins</u> court says it's okay for

12  Tenth Amendment purposes.

13        Now, it's time to work about -- talk about the

14  contracts clause problem.  Your Honor is clearly familiar

15  with what the contracts clause problem is.  You have a

16  contracts clause -- and I have a cheat sheet for everyone.

17  I've provided my colleagues on my left with a copy during the

18  break.  If your Honor --

19        THE COURT:  Sure.

20        MR. BENNETT:  -- will, I'd like to pass up --

21        THE COURT:  If you'd like me to look at it, sure.

22        MR. BENNETT:  -- copies.  And here we have the three

23  clauses that we need to talk about, the federal contracts

24  clause, the state contracts clause, and the pensions clause.

25  As far as the <u>Bekins</u> court is concerned, it's talking only

1  about the federal contracts clause, and where I'm going is

2  it's not going to make any difference.  And what the

3  Bekins -- the Bekins court doesn't think that consent of the

4  state has anything to do with getting beyond this clause

5  probably because it knows that there's no consent out to the

6  contracts clause.  Instead, it finds that the reason why that

7  the municipal bankruptcy act is constitutional is because the

8  entity that is actually impairing or changing contracts is

9  not the state.  It's not the municipality acting by the

10 state.  It is the court itself.  And the key quote is the

11 state invites the intervention of the federal, my word,

12 bankruptcy power to save its agency -- that's really a

13 synonym for municipality -- which the state itself is

14 powerless to rescue.  And the reason the state is powerless

15 to rescue it is because of the contracts clause.  Through its

16 cooperation with the national government, the needed relief

17 is given.  So under -- so as far as Bekins is concerned,

18 under Chapter 9 the federal government, through its courts,

19 is the pertinent actor.

20         Now, you could write this more elegantly, and it

21 wasn't in our briefs because I actually didn't find it until

22 last night, and that is Ashton.  You know, I have to

23 confess --

24         THE COURT:  That is what, sir?

25         MR. BENNETT:  Pardon?

1          THE COURT:  What did you say it was?

2          MR. BENNETT:  <u>Ashton</u>.  Until yesterday I'd never

3    read <u>Ashton</u>.  After all, everybody knew it had been overruled

4    by <u>Bekins</u>.  But I read it last night, and I got to the end,

5    and I realized there was a dissent by Cardozo.  And I read it

6    because it was by Cardozo because he writes really well.  And

7    he took this particular issue head on, and so I'm going to

8    read a lot of sentences from it.  It's on page 142.  And

9    here's what he says.  He, of course, is dissenting, so he's

10   finding the last version constitutional, and he gets to the

11   contract clause problem.  And by the way, one of the things

12   about Cardozo's dissent is that he's also much better about

13   dividing the Tenth Amendment analysis from the contracts

14   clause analysis.  He kind of does it explicitly separately.

15   And he says this.  This is about the contracts clause.  "The

16   act does not authorize the states to impair through their own

17   laws the obligation of existing contracts.  Any interference

18   by the states is remote and indirect."  I'm going to skip

19   some things, some citations and some things that aren't that

20   important, and get to something that's more important.  "If

21   contracts are impaired, the tie is cut or loosened through

22   the action of the court of bankruptcy approving a plan of

23   composition under the authority of federal law.  There, and

24   not beyond in an ascending train of antecedents" -- it's an

25   amazing sentence -- "is the cause of the impairment to which

1   the law will have regard," skipping some citations.

2   "Impairment by the central government through laws concerning

3   bankruptcies is not forbidden by the Constitution.

4   Impairment is not forbidden unless effected by the states

5   themselves.  No change in obligation results from the filing

6   of a petition by one seeking a discharge, whether a public or

7   a private corporation invokes the jurisdiction."  We're going

8   to use that sentence again when we talk about whether -- how

9   much we have to decide today.  "The court, not the

10  petitioner, is the efficient cause of the release."

11          For some reason Cardozo didn't participate in

12  Bekins.  The Bekins court, I think, said the same thing.  I

13  just think they said it a lot less clearly and a lot less

14  elegantly.

15          So I think this is very informative about the right

16  way to think about who is doing what and will become

17  important when we get to the authorization problem, which

18  we're going to be at very soon, but I want to --

19          THE COURT:  Where do you think in Bekins the

20  majority of the court or the court itself said the same

21  thing?

22          MR. BENNETT:  The words I read at the -- I'm sorry.

23  I got to find the back pages.  The words I started with,

24  the -- it's at page 54.  The state invites the intervention

25  of the federal bankruptcy power to save its agency -- means

1  municipality -- which the state itself is powerless to

2  rescue -- that's the reference to the contracts clause.

3  Through its cooperation with the national government, the

4  needed relief is given.  I think the -- I think they're doing

5  exactly the same thing and just managed to do it in a lot

6  fewer words but with -- losing a teeny bit of precision in

7  the process, but it is the same thing.  They are basically

8  adopting the Cardozo view of why the bankruptcy law is

9  constitutional under the contracts clause, the federal

10  contracts clause.

11        And, you know, I quoted these words, but there are

12  words before it and words after it that basically zeroes in

13  on that they're dealing with this particular issue at this

14  particular point in time.  This is just as much as they say.

15        The Bekins court, of course, there's no dissenting

16  opinions.  There's two judges that say they dissent for the

17  reasons expressed by the majority in Ashton.  That's all they

18  do.  And so that may well be one of the reasons why the court

19  was a little bit less careful.  Of course, what Cardozo said

20  isn't precedent.  It's just very, very clear thinking,

21  elegantly written about exactly the problem we have in this

22  courtroom today, and I think it's awfully persuasive, and I

23  think it is reflective, although certainly done better, than

24  the work that was done by the Bekins court.

25        A couple of other constitutional issues before we

move on to the authority points and the different contracts

clauses.  AFSCME does take the position in their papers that

the contracts clause continues to constrain all municipal

bankruptcies.  Of course, the federal contracts clause we

know from the Supreme Court does not.  We'll talk about

whether there's any difference in the state courts soon.  But

why AFSCME takes that position is they know full well that if

the contracts clause is easily bypassed by a municipal

bankruptcy case -- and we think that it is for precisely the

reasoning of Judge -- Justice Cardozo -- then this is over

because the contracts clauses, as we're about to get to, are

very, very similar.  They're almost identical to each other,

and they're identical in all the ways that matter.  We will

go through it very carefully.

There was next the point that was made about

accountability.  I don't think there's any confusion about

accountability.  I think, again, I appeal to Cardozo's

language but also to Bekins on this point.  If you don't like

the powers that a court has in Chapter 9, write your

Congressman.  If you don't like the way Detroit was managed

so that it wound up in Chapter 9, don't let the people who

used to be in office be in office again in Detroit.  If you

don't like the emergency manager and don't think he was

qualified and don't like what he was doing, write the

governor or your state legislator.  There is no

1   accountability question if you break it down in the way that

2   Cardozo broke it down.  And by the way, the other thing

3   Cardozo says and I think also <u>Bekins</u> says, there's nothing

4   wrong with asking.  You have to ask if you're going to do

5   this consensually.  The emergency manager on behalf of the

6   city had to ask the retirement funds directly, retirees more

7   indirectly, to reduce or change benefits in order to

8   accommodate the needs of current city residents and the

9   ability of the city to survive.  They could also ask the

10  Court to exercise its authority to help, too.  That doesn't

11  mean they are the one loosening the knot or cutting the knot.

12          We talked about <u>Asbury Park</u>.  Anti-commandeering

13  cases.  Again, I think -- well, the federal government's

14  brief does a much nicer job on this than I ever could in

15  pointing out that the essence of the commandeering cases are

16  the federal direction to state actors -- in this case, maybe

17  it would be state judges or the emergency manager or the

18  governor -- to do something in a particular way.  And, in

19  fact, the -- that's not what happens.  That is not the

20  structure of Chapter 9 at all.  The structure of Chapter 9 is

21  that there is certain power that is vested in this Court, and

22  that power can be used in certain ways.  Frankly, your Honor

23  can't tell the city what kind of plan to file, but your Honor

24  can say whether or not you will approve a plan that is filed,

25  so the request has to be made by the city, and the power has

1   to be exercised by your Honor.  Again, the city itself is

2   powerless to escape the contracts clause, but it does not --

3   at no point does the federal government say I have a policy

4   that I am going to ask the states or demands that the states

5   implement for me.  That doesn't happen anywhere in Chapter 9,

6   and, frankly --

7       THE COURT:  Well, but Ms. Ceccotti doesn't agree

8   with that.  What she says is Congress says if you want to

9   adjust your debts, we prescribe the priority scheme to the

10  exclusion of the state.  The state can't come in with its own

11  notion of what the priorities should be so that the division

12  of sovereignty that results violates the Tenth Amendment.

13      MR. BENNETT:  Well, first, there's a logical failure

14  there, and it has to do with Asbury Park.  The UAW starts

15  with the proposition that there is some kind of viable state

16  restructuring process that can actually work and that the

17  federal government took it away from them and made the

18  bankruptcy -- the Chapter 9 exclusive.  That isn't reality.

19  Asbury Park, as we've seen, first of all, is an unbelievably

20  exceptional case, which, by the way, the end holding is that

21  that restructuring was done for bonds and made bonds better.

22  That is the holding at the end of the day or the key facts at

23  the end of the day in Asbury Park.  Asbury Park is not and

24  never has been construed to be -- and no one cited any case

25  to your Honor showing that in the period of time before

1  Congress claimed the field for itself that there was any

2  viable municipal debt adjustment opportunity created by what

3  we have to call the Asbury Park exception to the contracts

4  clause.  And if you believe everything in the UAW's belief --

5  brief and believe their interpretation of the pensions

6  clause, it gets even worse, that even if there were -- was

7  Asbury Park wiggle room and then in the absence of the

8  Bankruptcy Code the pensions clause is absolute, you have

9  worse than nothing.  You have worse than the almost

10 meaningless Asbury Park exception.  So I don't think it's

11 coercion for the -- for Congress to say you can't do

12 something that you can't do.  And I think the prohibition on

13 competing state municipal schemes is, frankly, recognition

14 that they're not possible or workable, and, again, no one has

15 been able to show you either before or after that provision

16 of the Bankruptcy Code what this wonderful municipal scheme

17 is out there that would have been a choice.  Cardozo doesn't

18 think there's any choice.  Bekins doesn't think there's any

19 choice.  And that's the same court that decided Ashton, so

20 I -- about the same time actually or Blaisdell was about the

21 same time.  Ashton may have been later.  This is a -- I

22 think -- I don't think Congress coerced anybody.  I don't

23 think that's possible on the facts.

24       Okay.  So to summarize, we've shown that Chapter 9

25 is constitutional and that, in particular, it does not offend

1  the contracts clause in the United States Constitution.  I

2  think along the way we've demonstrated that the state's

3  authorization of a municipality's resort to Chapter 9 for

4  relief from contracts generally does not constitute a state

5  impairment of contract because otherwise no -- not a single

6  Chapter 9 would work.  We have also along the way noted that

7  the filing of a petition itself doesn't constitute impairment

8  of anything in any event and that if there is an impairment,

9  it's by the federal Bankruptcy Court, so now let's look at

10  our contracts clause cheat sheet and try to find out whether

11  there's any difference because of the fact that there's a

12  state contracts clause or because there's a pensions clause.

13           First, with respect to the state contracts clause, I

14  don't think anyone has suggested to the Court that this is

15  any different than the federal contracts clause, and, in

16  fact, there isn't.  There's no difference, and no one

17  suggested it, so -- but, by the way, Justice Cardozo, again,

18  as -- more elegantly and more precisely but -- and the Bekins

19  court both would believe that the state contracts clause --

20  okay -- is also focused on the state.  It doesn't bind the

21  federal government.  And since the federal government is the

22  relevant actor, the state contracts clause does not impose

23  any obstacle at all to a municipality invoking Chapter 9

24  relief.

25           The only thing I want to pause to say is it couldn't

 1    be otherwise because if it were otherwise -- I skipped a

 2    step.  Every state -- at least every state I looked at, so

 3    there may be an exception, but every state has a state

 4    contracts clause.  It's not surprising.  Copied it from the

 5    federal Constitution.  So if it were the case that the

 6    state's contracts clause was different than the federal

 7    contracts clause and that it was a barrier to invoking

 8    Chapter 9 relief, then every single bondholder in every

 9    single -- I should say every single lawyer for every single

10    bondholder in every prior Chapter 9 case has probably been

11    guilty of malpractice because they might have been able to

12    escape their prior Chapter 9 cases -- and there are now

13    hundreds on the books -- on this basis alone.  But, again,

14    for the reasons expressed in <u>Bekins</u> and more elegantly by

15    Judge -- Justice Cardozo, they can't.

16         So now we finally get -- we reach the pensions

17    clause also quoted in front of you, and we say, okay, is this

18    pensions clause any different than --

19         THE COURT:  But hang on.  Isn't there a difference

20    between reconciling the bankruptcy clause with the federal

21    contracts clause on the one hand and trying to reconcile how

22    a state that prohibits itself from impairing contracts with

23    taking advantage of the bankruptcy power that the federal

24    court has enabled -- or that the federal Congress has enabled

25    because of the sovereignty of the state?

1     MR. BENNETT:  No difference.  Why?  Let's remember.

2  The reason why I spent so much time talking about why was the

3  Debt Adjustment Act under the Bankruptcy Act constitutional

4  as far as the federal contracts clause was concerned -- it

5  wasn't about the language of the federal contracts clause.

6  It was because the state isn't an actor.  The federal

7  contracts clause acts only on states.  The relevant actor is

8  the federal government.  It's the Bankruptcy Court.  That was

9  the reason why there was no federal contracts clause problem

10  with the Bankruptcy Act in Bekins, and it was the only

11  reason -- the only part of the opinion that had to do with

12  the federal contracts clause part of the problem.  The state

13  contracts clause acts again only on the state, not on the

14  federal government.  Accordingly, if you believe -- and the

15  Supreme Court has held that the relevant actor for purposes

16  of untying or cutting the knot is the federal Bankruptcy

17  Court and not the state, then the state contracts clause

18  forms no additional barrier to the use of the Bankruptcy Code

19  than the federal contracts clause did.  They are the same,

20  and they are both not relevant for the same reason.

21     THE COURT:  And your position is that it's a matter

22  of federal law that the pertinent actor is the federal court,

23  not the state entity that's in bankruptcy?

24     MR. BENNETT:  The Supreme Court told us along the

25  way to approving the Bankruptcy Act the first -- for

1    municipalities the first time that it's --

2           THE COURT:  So even if the state law were to say

3    it's the city that's the pertinent actor, that's not relevant

4    because it's a federal law question.

5           MR. BENNETT:  Correct.  So for purposes of federal

6    law, the Supreme Court has told us it's the federal

7    Bankruptcy Court that is the relevant actor.

8           So now we get to the pensions clause, and we've got

9    to find that there's a difference.  And I think I want to

10   start here.  This is going to be somewhat repetitive of the

11   brief.  There's nothing in the pensions clause that says

12   anything like, quote, "and the state shall not authorize any

13   municipality to commence a bankruptcy case that would allow a

14   federal court to impair or diminish pension claims."  It just

15   doesn't say that.  And, of course, it is words like that that

16   the objectors are saying have to be imported into the

17   pensions clause.

18          It's hard, I think, because at the end of the day,

19   apart from the fact that the pensions clause is, quote, "more

20   specific," and it's, of course, more specific because they

21   were looking at pensions because the law in Michigan at the

22   time they were looking at the pensions clause was that

23   pensions weren't a contract.  That's the only reason it's

24   more specific.  It wasn't because -- there's no other

25   evidence for why it was more specific.  The only

1   difference -- the only words that are different are the

2   words, quote, "be diminished." Excuse me.  Quote,

3   "diminished or."  That's the only difference.  "Impaired" is

4   used in all of them.  "Prohibition of impairment" is used in

5   all of them.  All of them are absolute about prohibitions of

6   impairment.

7          And I'm going to take this in two steps.  First of

8   all, the objectors say --

9          THE COURT:  Well, but hang on.  There's the next

10  sentence, which you didn't include on here, the next sentence

11  of the pension clause.

12         MR. BENNETT:  Okay.  The funding sentence?

13         THE COURT:  Yes.

14         MR. BENNETT:  Okay.  Well, frankly, that's not

15  focusing on today, and it sounds like it's a --

16         THE COURT:  Well, but the objectors argue that this

17  additional consideration that the Michigan Constitution gave

18  to pensions which it didn't give to contracts elevates it,

19  makes it, if not absolute, more absolute than contracts.

20         MR. BENNETT:  Well, let's talk about -- I

21  specifically wanted to talk about that because --

22         THE COURT:  Okay.

23         MR. BENNETT:  -- first of all, why is it -- we

24  should ask ourselves question number one.  Why is it that the

25  federal contracts clause and the state contracts clause

1   became less than absolutely binding?  It wasn't because of

2   the inadequacies of the language.  It was -- in fact, what

3   the courts have done is they put the word "substantial" in

4   front of the word "contract," so an insubstantial impairment

5   doesn't count, and a substantial impairment has some extra

6   hurdles that you have to go over before you can make it.  So,

7   frankly, if what they were trying to do was to tighten the

8   pensions clause and make it more distinctive -- and if they

9   went to the books because, of course, all of the cases, you

10  know, Worthen versus Thomas, Home Building & Loan Association

11  versus Blaisdell, these are like cases from the mid-'30s, so

12  they were all on the books in 1961 through 1963, so they knew

13  that, and they knew that the problem was the incorporation of

14  the substantialness concept.  So if they were really after

15  solving that problem, why didn't they just put the words

16  right before "impairment" "substantial or insubstantial

17  impairment"?  And they could have tightened it up in the way

18  that it had been loosened.  They could have prohibited

19  substantial and insubstantial impairments.  That would have

20  dealt with -- if they were trying to say we're opting the

21  pensions out of the judge-made doctrines and exceptions that

22  have burdened the federal contracts clause and the state

23  contracts clause, that's how they might do it.

24          Now, by the way, it would be irrelevant to this

25  argument because remember the pensions clause, just like the

1  state contracts clause, just like the federal contracts

2  clause, acts on states and municipalities.  It doesn't act on

3  the Bankruptcy Court.  It doesn't act on the federal

4  government.  And once again, if the right actor -- if the

5  actor that unties the knot or cuts the knot is the federal

6  Bankruptcy Court and the federal government and not the state

7  and not the municipalities, as the Supreme Court says, then

8  the pensions clause, even with the words "substantial or

9  insubstantial" in front of it, doesn't get you all the way

10  home.  What they next needed to do in the pensions clause is

11  to say by enacting the pensions clause and giving it -- and

12  making pensions special, we now want to do something else.

13  We really want to say -- objectors thinks the Constitution --

14  that the convention -- that the conventioneers really wanted

15  to say, well, in a municipality that has material pension

16  claims, they can't resort to a federal court to seek relief.

17  That's what they really want us to find in the pensions

18  clause.  But, frankly --

19        THE COURT:  No, no.  I don't hear that at all.  What

20  I hear is you are welcome to come in that door so long as the

21  city's assets, according to Mr. Dusen, are first allocated to

22  pensions.

23        MR. BENNETT:  Well, if there was a lawyer around

24  there at the constitutional convention who was doing

25  research -- and I suspect that there was -- they should be

1 charged with figuring out that the only way to stop the

2 federal courts -- if there is even a way, but the only way to

3 stop federal courts from having the power to impair contracts

4 that maybe a state can't impair is to cut off the -- is to

5 basically say the state cannot ever go to a federal court for

6 a federal -- then it was called composition, you know,

7 federal debt composition case.

8        And the other point that your Honor should note is

9 that -- and we say this in our papers -- during the entire

10 constitutional convention, for years before and almost

11 continuously thereafter, the State of Michigan had authorized

12 the municipalities to file Chapter 9 cases, so if they were

13 really elevating pensions in the way of taking them --

14 distancing themselves from the federal power to impair them

15 and they knew, open paren, one, that the federal debt

16 composition scheme had been determined to be constitutional

17 by the Supreme Court in part because the federal court was

18 doing the work of impairing contracts and they knew -- they

19 have to be presumed to know that Michigan had opted in and

20 had continuously all through the period -- in fact, I think

21 in our papers we say when they repealed it.  I think they

22 repealed it around 1980 when general authorization was all

23 that was necessary, so they kind of covered the entire

24 period.  No one ever said, gee, we better as hell change

25 this.  And in all of the legislative history of the

1   constitutional convention, you don't have a word about

2   bankruptcy and pensions, and the words that you do have --

3   the words that were quoted to you in the papers just filed --

4   I have to find it. Okay. Here's AFSCME's best quote from

5   the official record of the constitutional convention, 2

6   Official Record, page 3402. This is a new section that

7   requires that accrued financial benefits of each pension plan

8   and retirement system of the state and its political

9   subdivisions be a contractual obligation which cannot be

10   diminished or impaired by the action of its officials or

11   governing body. It's in AFSCME's papers, paragraph -- the

12   new ones, the supplemental papers. Actually, those are

13   amended and restated, paragraph 19, page 11. Same brief,

14   paragraph 142, page 71. Pension benefits constitute, quote,

15   "deferred compensation for work performed which should not be

16   diminished by the employing unit after the service has been

17   performed," close quote. Those are the quotes that you were

18   offered by AFSCME about the seriousness and importance of the

19   work done in the constitutional convention from 1961 to 1963,

20   this against the background where it's been the law of the

21   land, at least as far as the Supreme Court is concerned,

22   since 1930 -- I can't remember exactly.

23         THE COURT: So is it your view that the only

24   effective way that the Michigan Constitution could have

25   provided the protection for pensions that the objectors seek

1 here is by the Constitution prohibiting a Chapter 9 filing?

2 MR. BENNETT: Prohibiting authorization of a Chapter

3 9 filing or -- yes, your Honor. That's exactly what they

4 would have had to do, and that's not the kind of thing that

5 they can do by implication.

6 I want to talk a little bit more because I think

7 there's a lot of stress that's put on the words "diminished

8 or," and there is the assertion that "diminished or" has to

9 be given some meaning, but, frankly, the only meaning it

10 could be given is to somehow expand "impaired." I don't

11 personally think it does expand "impaired," and there's -- I

12 want to point out before moving on with a whole bunch of

13 authority to that effect that it's really dangerous for a

14 court to decide that "diminished or" added anything to

15 "impaired" because if the Court decides that "diminished or"

16 filled some gap that's related to the word "diminished and

17 impaired," then in the next case someone is going to come to

18 your Honor and say, "You know that state contracts clause?

19 There's no 'diminished' there, and 'impaired' has to mean

20 less than 'diminished or impaired' in the pensions clause."

21 So it's actually a good thing that there's law out there on

22 this subject -- we had it in our brief -- that basically says

23 that if you run into one of these problems where you've got a

24 list and you want to say that they all have an independent

25 and separate meaning, you've got to propose an independent

1 and separate meaning for the terms on the list that actually
2 solve the problem. And in this case, trying to find an extra
3 meaning for "diminished or" -- again, it's consistent with
4 its place in the sentence -- does -- creates a mess in the
5 state contracts clause in Article I, Section 10.

6 Apart from that, it turns out that when you go look
7 at the books -- and this is not in our papers because this
8 was an issue raised in the responsive papers -- is that every
9 time we found the definition of "impair" in the cases or in
10 dictionaries, it includes diminishment, which should not be
11 terribly surprising. It's a very common sense answer. But
12 if you want a list -- and you might need them in connection
13 with putting together an opinion -- you could start with the
14 Bank of Minden case, which is a Supreme Court case, 256 U.S.
15 126 at 128. Then if you want to go to the Sixth Circuit,
16 Riverview Health Institute, 601 Fed. 3d 505. Black's Law
17 Dictionary, Webster's Third, and then there's a bunch of
18 state courses -- state cases from other states that all say
19 the same thing. I could read the quotes, but I'll save the
20 time because it really is kind of a commonsensical -- a
21 common -- it's common sense that "impaired" has to include
22 "diminished." "Impaired" is much broader than "diminished,"
23 and every so often this is either a -- there's a rhetorical
24 flourish that works its way in, and this may well be what
25 that is, and that's all it can be.

1          Okay.  Moving on to the issue of whether or not the
2     authorization to file Chapter 9 is ineffective because the
3     emergency manager or the governor recognized that impairment
4     of pension benefits may be necessary.  I don't want to add
5     additional arguments to the constitutional provisions.
6     That's not the purpose of this section.  The purpose of this
7     section is to deal with the point made, I think, by only one
8     or two of the objectors that the -- that there's an
9     instruction to the emergency manager to comply with the
10    pension statute, and that should apply to the filing of a
11    Chapter 9 case as well.  I'm sure your Honor has your own
12    copy of the Local Financial Stability and Choice Act, Act
13    436, and when you look at the -- most importantly, when you
14    look at the Chapter 9 authorization section, there is no
15    instruction that the emergency manager comply with the
16    protections affecting pensions.  By the way, that may well
17    make sense.  There are a whole bunch of other provisions that
18    talk about what the emergency manager is supposed to do out
19    of court, and not surprisingly it talks about him having to
20    comply with many laws and to pay many debts and to do many
21    things.  He resorts to Chapter 9 when he can't accomplish
22    those things out of court.  And if one thought that anything
23    about the emergency manager law meant to say that the
24    emergency manager had to in Chapter 9 continue to not impair
25    pensions, you would think it would belong in the section that

1  is applicable when the emergency manager files Chapter 9.

2  In addition, I think the part that was read to your

3  Honor earlier this morning has a lead-in clause that didn't

4  make it into the record.  It reads, "If the emergency manager

5  serves as sole trustee of the local pension board, all of the

6  following should apply," and that's where the provision that

7  was located was read to you, so there is nothing in the

8  emergency manager law -- and, in fact, the structure of the

9  emergency manager law itself suggests that a lot of bets are

10  off in a Chapter 9 context that may not be -- including

11  things that the emergency manager is supposed to try to

12  accomplish if he's in an out-of-court world.

13  Next argument, failing to condition authorization on

14  nonimpairment of --

15  THE COURT:  One second.  Does that suggest that in

16  order to accomplish what Mr. Orr thinks is necessary to

17  accomplish with regard to pensions, he needs to be a trustee

18  of the plan?

19  MR. BENNETT:  No.  It's that -- no.  He has the

20  right to remove trustees of the plan for other purposes, and

21  these are these extra requirements that are imposed upon him

22  just in those circumstances that it -- I think when your

23  Honor gets a chance to look at it -- what did I do with it?

24  I had it here a second ago, so I'll give you -- let me give

25  the exact section referenced so it's easy to find.

1    THE COURT:  Okay.

2    MR. BENNETT:  The part I read from is in Section

3  12(m), and it is confined to that relatively narrow

4  circumstance.

5    Okay.  First of all, on the issue of whether or not

6  the governor's failure to put conditions on authorization

7  makes the authorization invalid, we indicate in our brief

8  that we don't think that conditions on authorization could be

9  valid, that -- and as I think -- I think I got ahead of

10  myself earlier, so I don't want to take too much time in

11  covering it again now, but we're talking here about one of

12  the core subjects of bankruptcy, which is priorities, who

13  gets paid when there's not enough to go around.  If that's

14  not a core subject of bankruptcy -- not in the core versus

15  related, but if that's not the absolute center of the subject

16  of bankruptcies, I don't know what it is.  And we've cited a

17  lot of law, and your Honor has pointed out there are many

18  cases, none decided the other way, that say particularly in

19  the context of things touching on priorities and who gets

20  paid first and who gets paid second, who doesn't get paid at

21  all, that the -- that you buy the Bankruptcy Code as a whole.

22  You buy the scheme as a whole.  You don't buy parts of it.

23  And in this sense federal law is supreme because once there

24  is a proper bankruptcy case before the Court, it is the

25  federal priority scheme that applies.  It is legitimate that

1    the federal priority scheme applies because it's legislation

2    on the subject of bankruptcies, and because it's legislation

3    on the subject of bankruptcies, it is absolutely supreme,

4    period, end of story.

5         So, as to your Honor's hypothetical, if anyone walks

6    into the federal court and says, "I want federal judicial

7    relief.  I want to use that federal power to untie and cut

8    knots, but I want the ultimate distribution or really any

9    part of the distribution to be conducted in accordance with

10   my terms," whether they're found in a statute or in a state

11   Constitution, it doesn't matter.  The federal law on this

12   issue is supreme, and it's supreme over Constitutions and

13   over statutes, period, end of story.

14        It seems kind of small when done with that to point

15   out that 436 permits but doesn't require conditioning.  We

16   can imagine a whole bunch of conditions that might have been

17   very sensible and that might not offend federal jurisdiction

18   like it could have been -- there could have been suggestions

19   or requirements as to exactly how the emergency manager

20   should interact with other elected representatives or with

21   other people.  Actually, the governor does have one -- it's

22   not quite a condition.  It's a suggestion, but I think he'd

23   be offended if it wasn't followed, which is he wants Mr. Orr

24   to continue to communicate with the governor and the

25   treasurer relating to what he's doing.  So I think we can

1  think of several things that could be -- that you could use

2  for the PA 436 conditioning power that would be perfectly

3  okay, but going in and saying, "Gee, as a matter of this

4  particular state law" -- and, by the way, it's -- the

5  governor would -- to do that, he's got to ignore the

6  conflicts that I discussed earlier between a law that says

7  thou shall not impair this one with another law that says

8  you're the first money out.  It's mind-boggling what he'd

9  have to reconcile, but the instruction would be, yeah, this

10  one we really meant and the others we didn't really mean,

11  follow that one first.  I think that that would be an invalid

12  authorization.  I think the Court would have to say that

13  authorization isn't okay for federal court purposes.  I think

14  as a prudential matter, the federal court should not get

15  involved in a case where the authorization is conditioned in

16  a way that would offend the federal scheme, but understanding

17  that there may be very extreme and difficult circumstances

18  involved, a creative federal court might want to give people

19  some time to kind of take a couple steps back and figure out

20  how to do it better.

21          THE COURT:  Let me ask about Section 943.

22          MR. BENNETT:  I need to get a case if you're going

23  to do that because I -- from the --

24          THE COURT:  This is the Bankruptcy Code.

25          MR. BENNETT:  Yeah.

1        THE COURT:  943(b)(4).

2        MR. BENNETT:  Right.  There's actually one case

3   that's dealt with that previously, and I think it's --

4        THE COURT:  Let me just get my question out.

5        MR. BENNETT:  Okay.

6        THE COURT:  Thank you.  So the question is what does

7   this section mean if it doesn't mean that the state can

8   dictate the priorities?

9        MR. BENNETT:  Because it says "from taking any

10  action necessary to carry out the plan," and I --

11       THE COURT:  What does that -- what does that

12  language mean?  What meaning does it have?  How does it come

13  into effect?

14       MR. BENNETT:  Okay.  I think the best way to work

15  through that is the Sanitary Improvement District Number 7

16  case, 98 B.R. 970, and this is a really fascinating case

17  because the facts gave you every conceivable issue under the

18  sun in terms of the interpretation of this section.  What

19  happened in Sanitary Improvement District is that the debtor

20  had -- you know, had claims against it.  Let's call them a

21  hundred.  I'm using representative numbers, not the actual

22  numbers.  As a result of the bankruptcy case, they issued

23  paper, and I think it was like 60.  Okay.  And the -- but the

24  paper that was 60 had in it a provision that said that if the

25  debtor paid it in full within a certain number -- within a

1    certain number of months -- I think it was 18 months -- after

2    the bankruptcy case is over, it only had to pay 95 cents on

3    the dollar or something like that, and so the creditors came

4    in, and they attacked the whole plan, pointed to a state law

5    that says thou shall pay your bonds.  By the way, there are

6    laws like that in Michigan, too.  And the court decides very

7    easily that the takedown from a hundred to 60, well, that's

8    supremacy clause bankruptcy.  You can do that notwithstanding

9    state law.  What you can't do, though, is because state law

10   says you have to pay bonds at a hundred percent of principal,

11   you can't have the five-percent discount feature because

12   that's -- after the bankruptcy, you issued this new bond, you

13   know, with 60 being the new hundred, but you've said that you

14   can still pay that off at a discount.  That violates

15   943(b)(4).  So what this case illustrates is that this looks

16   at the obligations after they've been restructured and says

17   that the Bankruptcy Court does the restructuring.  By the

18   way, very consistent with the Cardozo and the Bekins view of

19   the world, you -- and you're finished.  The bankruptcy --

20   there's a confirmation order.  New instruments are issued.

21   Those instruments, the ones that you walk out of Bankruptcy

22   Court with, have to be instruments that you can perform in

23   accordance with state law.

24             THE COURT:  So this provision, in your view, says

25   nothing about the requirement of the plan itself or the order

1  confirming plan to comply with state law.

2          MR. BENNETT:  I don't know if there's any case that

3  says that.  There may be.  I think <u>Sanitary and Improvement</u>

4  <u>District Number 7</u> has got it right, that it does not say

5  anything about the Bankruptcy Code restructuring process.  It

6  only acts on the debt that is issued after the case is over.

7          I don't think I have to spend time on it, so I'm

8  going to skip over -- again, it's in our papers.  There's an

9  assertion in the papers that the Tenth Amendment is not

10 reserved -- that the Tenth Amendment reserves every issue

11 relating to municipal pensions to the states.  I think we've

12 dealt with that enough in the constitutional section, and I

13 don't have to deal with -- this really is the -- an argument

14 was built, constructed based upon the fact that in the case

15 of ERISA the federal government didn't make ERISA -- didn't

16 make states or municipalities applicable to ERISA, didn't

17 create the insurance program, PBGC, and the assertion is made

18 because the federal government chose not to go into those

19 areas, they must have done that because they were absolutely

20 precluded from doing so, ergo they are precluded from using

21 the bankruptcy power to modify pensions.  I think that fails

22 logically in a lot of places, but most importantly maybe to

23 start with is that it's not clear that there is no possible

24 way for the federal government to apply the ERISA statute or

25 the PBG statute to state municipalities, maybe to states but

1    not to municipalities, and -- at all, by the way, and that

2    Congress didn't may have reflected political realities at the

3    time and not actual constitutional limitations, so I think

4    the starting point of that argument just fails, and I think

5    we've seen that federal -- that a federal bankruptcy power

6    can be applied by the federal court to obligations.  Pensions

7    are clearly within the federal bankruptcy power, no dispute

8    in the private context.  There's nothing different about

9    Chapter 9 context.  And so there is no such part of the Tenth

10   Amendment that constrains this aspect of the subject of

11   bankruptcies.

12           The next point is a really important one, and I

13   could easily have started with it, and I know your Honor has

14   been concerned with it throughout, which is whether or not

15   your Honor really has to deal with the -- whether or not

16   pensions can be impaired in bankruptcy in the context of

17   authorization.  I hope it's clear to your Honor that the city

18   is perfectly comfortable with you dealing with it now or

19   perfectly comfortable with dealing with it later.  We don't

20   think that this is -- some of these things may be a little

21   bit conceptually difficult and complex, but the

22   constitutional law on the subject is really pretty clear, and

23   so we're prepared to have it decided.  We think that there's

24   only one way to decide it.  There is, though, a way for your

25   Honor to decide not to decide it, which is to find -- and the

1    next to the last sentence I read from Justice Cardozo in his

2    dissent where he says, "just the filing is not doing

3    anything," we say that, too.  It is starting a bankruptcy

4    case.  I have said at the beginning -- I mean it -- there is

5    nothing inevitable.  A cramdown of revisions to pension

6    benefits, a cramdown of a particular treatment of the

7    underfunded portion of the pension obligation is not

8    necessarily the way this case is going to end, and it's not

9    necessarily the next step in this case.  We just don't know.

10   The next -- obviously right now mediation is an important

11   milestone.  The next important milestone is the plan, and

12   since your Honor has been around the Bankruptcy Courts for a

13   good long time, you know that the plan that we file before

14   the end of this year is not likely to be the plan that we

15   ultimately confirm.  It would be actually a good exercise for

16   different people to figure which amended plan is going to be

17   the plan.  The bottom line is nobody really knows.  And so it

18   is possible to adopt Justice Cardozo's view that no change in

19   obligation results from the filing of a petition by one

20   seeking a discharge whether a public or private corporation

21   invokes the jurisdiction and basically say since nobody has

22   done anything yet, we're not going to decide anything more.

23   You could do that.  I will say that the -- I think that the

24   assertion that there is an imminence that -- an imminence of

25   harm represented by the filing of the Chapter 9 case that

 1  requires this Court to act is, frankly, not a fair statement
 2  of the law.  I think one of the more important cases is
 3  Donohue.  It's been cited by objectors.  The most important
 4  part -- Donohue is the Nassau County financial restructuring
 5  case, and the most important part of Donohue that led the
 6  Court to act I think is mentioned by the Court.  It's kind of
 7  near the end of the opinion.  The Court says the law, the
 8  ordinance that gave the county executive all the powers,
 9  "provides expansive and seemingly limitless power to the
10  County Executive without any reasonable restraints other than
11  the procedural mechanism of an executive order."  This case
12  would be a lot simpler if all Kevyn Orr had to do to
13  reorganize the debts of Detroit was to say how he wanted to
14  do it and sign it as an order.  He doesn't think he has that
15  power.  I don't think he has that power.  No one in this room
16  thinks he has this power.  We've talked about the fact that
17  to get to a debt adjustment plan that is nonconsensually
18  confirmed, it has to be filed.  There has to be disclosure
19  statement approved.  There has to be voting.  There has to be
20  more discovery.  There has to be a confirmation hearing, and
21  there has to be an order of this Court.  That is a very
22  different procedure or array of protections than was
23  available in the Donohue case, which is, frankly, the closest
24  case to this one in terms of the kinds of things that we're
25  talking about here.  If your Honor goes through the other

1   cases that have been cited for the proposition of imminent

2   harm, you will find that in all of them there was no judicial

3   step going to occur before the harm might be inflicted.  In

4   all of --

5          THE COURT:  Let me ask that question here.  Can

6   you -- are you willing to identify here on the record or can

7   you identify here on the record any conceivable circumstance

8   in which retiree benefits, pensions won't be impaired by a

9   plan?

10          MR. BENNETT:  You know, your Honor, at this point

11  there are a number of major things that I don't know, and I

12  will say I don't know that there won't be money from outside,

13  although I tend to doubt it.  I don't know that.  I do not

14  know whether there will be -- whether certain other assets

15  will, in fact, be available to the city to address its debts,

16  and I will point out in this regard that while the objectors

17  have cited over and over and over again a pleading filed by

18  the attorney general asserting the primacy of pension claims,

19  they've all managed to have forgotten a formal opinion he's

20  given concerning the accessibility of certain assets in this

21  bankruptcy case, particularly the art, and -- but I have no

22  idea, number one, what's going to happen with that, and I

23  have no idea what the -- whether or not there will, in fact,

24  be a transaction involving the departments of water and

25  sewerage and whether those transactions will deliver material

1    dollars.  So while I'd be kidding myself and kidding the

2    Court and kidding everyone here if I said that I thought it

3    was anything but likely that there would be some impairment

4    of the underfunding claims in this case, it's not fair to ask

5    me and I don't think I could say that there's no scenario

6    where impairment will not be necessary.  I just don't think I

7    can even say that today.

8              THE COURT:  Okay.  Even with that much of a

9    disclosure here, why isn't that enough to say there's an

10   impairment here?

11             MR. BENNETT:  I'm sorry.

12             THE COURT:  Why isn't that enough to say at this

13   point in time there's an impairment?

14             MR. BENNETT:  Well --

15             THE COURT:  There's a sufficient impairment to get

16   past ripeness anyway.

17             MR. BENNETT:  You know, I don't think you can say

18   there's impairment because the Supreme Court has told us

19   there is not.  There won't be impairment, your Honor, until

20   you say so.  Is there a risk of impairment?  There's a risk

21   of impairment.  Is the risk of impairment enough to make this

22   ripe?  And the answer is is that -- I think this is the

23   answer when -- I mean the Donohue case is a good example, but

24   I think it ripples through all the others, which is that if a

25   court is presented with a situation where there's a risk of

1   impairment and the impairment can occur before there's

2   another opportunity or requirement that people show up in

3   front of a judge, then they start thinking about whether

4   there's interim harm, but there's not a single case that has

5   been cited to you that says there is imminent harm in

6   circumstances where no one is going to suffer anything until

7   and unless a court enters an order after notice,

8   opportunities for discovery, opportunities for hearing, and

9   all the other protections that are available in connection

10  with a plan confirmation process in a Bankruptcy Court.  It's

11  just totally different.  The cases are dealing with a totally

12  different situation, particularly the Donohue case.

13          Do you have -- we're 20 minutes to.

14          THE COURT:  Twenty till five.

15          MR. BENNETT:  Do you want to save time for your

16  questions or --

17          THE COURT:  If you want to stop now, and we'll pick

18  it up with the government's attorney, that's fine with me,

19  and then we'll pick up the balance of your argument tomorrow.

20  Is that what you're --

21          MR. BENNETT:  I think it's a good break point.

22          THE COURT:  Okay.

23          MR. BENNETT:  I have very minor things left.

24          THE COURT:  Good.

25          MR. TROY:  Matthew Troy, your Honor, Department of

 1  Justice, Civil Division, on behalf of the United States.  If

 2  it makes any difference to your Honor or the other parties, I

 3  am here for tonight and can be available tomorrow as well.

 4       THE COURT:  I appreciate that, but since you're

 5  here, let's have at it.

 6       MR. TROY:  Fair enough.

 7       THE COURT:  Well, my primary questions relate to how

 8  you address the arguments here that the objecting parties

 9  made in response to your brief regarding ripeness.

10       MR. TROY:  To be honest with you, your Honor, I've

11  only reviewed those very quickly because I filed the brief on

12  Friday and then went back to furlough status.  And on

13  Monday --

14       THE COURT:  That.

15       MR. TROY:  And on Monday --

16       THE COURT:  Well, would it be your preference to

17  have overnight to think about how to respond to the

18  objectors' concerns regarding ripeness?

19       MR. TROY:  Sure.  I can do that.

20       THE COURT:  Would that be your preference?

21       MR. TROY:  That would be, yeah, a more fulsome

22  discussion, I think.

23       THE COURT:  All right.  Then you are excused, and I

24  will hear from you tomorrow regarding that.  Do you want to

25  stop for the day now and pick it up tomorrow?

 1          MR. BENNETT:  Your pleasure, your Honor.  I can keep

 2    going, but I can also stop.  I'm not going to -- I don't

 3    have -- less than 30 minutes left, in fact, significantly

 4    less than 30 minutes left.

 5          THE COURT:  Well, do you think you can finish in the

 6    20 minutes that are left before five?

 7          MR. BENNETT:  I'll try.

 8          THE COURT:  All right.  Then I would invite you to

 9    try.

10          MR. BENNETT:  Let me just get a little bit

11    reorganized.  Okay.  The next topic on my list is collateral

12    estoppel, and, your Honor, I think with respect to collateral

13    estoppel, a couple of points are worth focusing on.  First of

14    all, our very, very first point on this -- and I think it's

15    dispositive -- is that when this case was filed, this Court

16    had the most exclusive jurisdiction it ever gets about

17    anything, absolutely exclusive interest -- exclusive

18    jurisdiction under 1334(a) to decide matters in the case, and

19    eligibility is a matter in the case.  And the assertion by

20    the objectors is that the Webster court really didn't decide

21    eligibility.  The Webster court was deciding some abstract

22    issues of state law.  And, your Honor, two things.  Number

23    one, the objectors can't even say that without mentioning the

24    eligibility determination, and here I'm looking at the

25    funds -- Mr. Gordon's brief at page 32.  The Webster judgment

1  rules squarely on the constitutionality of PA 436 and the
2  governor's authorization of the emergency manager to proceed
3  under Chapter 9 in light of the pensions clause of the
4  Michigan Constitution.  There was absolutely no confusion in
5  the judge's mind or anyone around that courtroom's mind that
6  what they were trying to do was to get an early determination
7  of eligibility.  It might have succeeded, but this case was
8  actually filed first.  And by the way, although the attorney
9  general will probably have more to say about this, there was
10  no adjournment sought for purposes of filing the Chapter 9
11  case, and the transcript shows no such thing.  And they know
12  more about the circumstances than I do, and they can address
13  it tomorrow when it's their turn.
14          But there's an even more important point, which is
15  that the order that was entered by the judge purports to
16  enjoin the emergency manager directing him to have the case
17  dismissed and not file another one, so I just -- I can't
18  abide the assertion and the record does not support the
19  assertion that what happened in that court was not an effort
20  at an eligibility determination, so, number one, that was
21  within the exclusive jurisdiction of this Court.  If it was
22  within the exclusive jurisdiction of this Court, it wasn't
23  within the jurisdiction of that Court to do anything about
24  it, and, therefore, any judgment that was entered after the
25  filing for that reason alone is void.

1          Now, second point we make is that the automatic stay
2     applied as well because the entire event, even though the
3     city was not a party, was an effort to gain control over the
4     city's assets and an effort to enhance collection of the
5     debt.  Again, there can't be much dispute about that, open
6     paren, one, partly because of the way the whole proceeding
7     evolved and how everyone understood it, but more importantly,
8     here again we have the judge explicitly talking about the
9     Chapter 9 case and attempting to stop the Chapter 9 case
10    because of the perception that the Chapter 9 case might
11    impair pensions, and those kinds of acts are clearly within
12    the automatic stay.  Again, I think that the --
13         THE COURT:  Just to be clear, you're talking about
14    the automatic stay of Section 362 --
15         MR. BENNETT:  Yes.
16         THE COURT:  -- the Bankruptcy Code.
17         MR. BENNETT:  Correct, the Bankruptcy Code's
18    automatic stay, or 942.  The other half of it is in the -- is
19    in Chapter 9 as well.
20         Full and fair opportunity to litigate.  Again, I
21    would ask the Court to look at the record in that case.
22    There had been -- it is certainly true that a whole bunch of
23    briefs that were filed -- I don't think the hearing where
24    this all occurred had previously been calendared and noticed
25    to anybody.  The hearing was set on an emergency basis, and

1  someone got on the phone and called for the attorney

2  general's office because they thought it might be a good idea

3  to tell him about it about an hour before the hearing.

4  That's actually not the way things are fully and fairly

5  litigated in any courts I visit, and I don't think that when

6  your Honor ticks through the procedural elements of what

7  happened in that case in Lansing is going to be convinced

8  that there was a full and fair opportunity to litigate.

9          THE COURT:  Let me ask you just a sort of

10  administrative question regarding this.  Do we have in our

11  record here all of the pleadings and papers and dockets and

12  transcripts from that case?

13          MR. BENNETT:  I don't know if they're there yet.

14          MS. NELSON:  I believe I can answer that, your

15  Honor.  Assistant Attorney General Margaret Nelson.  It's my

16  understanding, no, those have not been submitted.  I do have

17  all of the transcripts, which I was prepared to present to

18  the Court when I make my argument, which now appears to be

19  tomorrow.  If the Court would like the submission of the

20  pleadings, we'll be happy to do that, although it's --

21          THE COURT:  Well, my understanding is that some of

22  the pleadings have been attached to various briefs, but I'm

23  just not sure if it's everything.

24          MS. NELSON:  There was only a -- there was --

25          THE COURT:  Just to --

1          MR. BENNETT:  We'll get it in.

2          THE COURT:  Yeah, exactly.  Just to be complete --

3          MS. NELSON:  Yes.

4          THE COURT:  -- let me make my request to you that

5    our record here include everything from that case, including

6    the docket.

7          MS. NELSON:  There's three cases, your Honor.

8          THE COURT:  Okay.

9          MS. NELSON:  And so -- that were filed separately --

10          THE COURT:  Well, but I think the --

11          MS. NELSON:  -- so I will submit everything --

12          THE COURT:  I think the one that's at issue here is

13    the one in which a judgment was entered.

14          MS. NELSON:  Correct.

15          THE COURT:  That's the one I need.

16          MS. NELSON:  So you want everything in the case in

17    which the judgment was entered the next day, including the

18    docket entries.

19          THE COURT:  Thank you.

20          MS. NELSON:  Would you also like the Court of

21    Appeals materials --

22          THE COURT:  Yes.

23          MS. NELSON:  -- because the Court of Appeals

24    materials were --

25          THE COURT:  Yes.

1    MS. NELSON:  -- filed and a stay order entered

2  thereto?

3    THE COURT:  Just for --

4    MS. NELSON:  Webster?

5    THE COURT:  For completeness, yeah.  All right.  I

6  have to -- I have to pause here.  I've been advised that the

7  people in our overflow room couldn't hear this exchange, so I

8  will just restate it for the record.  The attorney general's

9  representative has agreed to provide to the Court in this

10  case the complete record from the Webster litigation not only

11  at the trial court level but at the Court of Appeals level,

12  including all pleadings and papers, transcripts, and docket

13  entries, the docket itself.  You may proceed, sir.

14    MR. BENNETT:  Okay.  Lastly, the last factor with

15  respect to collateral estoppel, your Honor, is the issue of

16  whether or not the judgment would be binding on the city in

17  any event.  Of course, the city was not a party to those

18  proceedings.  The assertion is made that the -- that there is

19  privity between the city and the state because they have a

20  common legal interest in some matters in connection with this

21  Chapter 9 case.  Frankly, I don't think those are the same

22  standard, and I think we covered that in our papers, but I

23  will say one other thing is that to the extent that there --

24  that the plaintiffs in those cases believed that the city was

25  in privity with the state with respect to those cases is an

1    additional reason why the automatic stay applied from the

2    very beginning because if they thought that they were in a

3    case with the state really trying to bind the city, then it

4    is perfectly clear that they violated the automatic stay.

5           I don't think I have any other material topics that

6    I think we need to cover based upon the argument by others.

7    If I've missed something or if your Honor has any questions,

8    I'd be happy to take them.  Otherwise I'll allow the attorney

9    general to take the floor tomorrow.

10          THE COURT:  Um-hmm.

11          MR. BENNETT:  We'll be done early.

12          THE COURT:  Okay.  Good.  We'll be in recess now

13   until 10 a.m. tomorrow morning.

14          MS. NELSON:  Your Honor, before you leave the bench,

15   may I just ask do you want those pleading -- do you want

16   everything submitted electronically?

17          THE COURT:  Yes, yes, in the record of this case.

18   Thank you.

19          THE CLERK:  All rise.  Court is adjourned.

20       (Proceedings concluded at 4:51 p.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett          October 20, 2013
_____     _____
Lois Garrett