UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                               .        Detroit, Michigan
                               .        November 27, 2013
                 Debtor.        .        9:11 a.m.
. . . . . . . . . . . . . .


    HEARING RE. DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I)
    AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM UNDER
    CERTAIN TRANSACTION DOCUMENTS WITH THE PUBLIC LIGHTING
       AUTHORITY AND (II) GRANTING OTHER RELATED RELIEF
                       (DOCKET 1341)
         BEFORE THE HONORABLE STEVEN W. RHODES
         UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  ROBERT W. HAMILTON
                       325 John H McConnell Blvd., Suite 600
                       Columbus, OH  43215
                       (614) 469-3939

For the Public        Miller, Canfield, Paddock & Stone, PLC
Lighting               By:  JONATHAN S. GREEN
Authority:             150 West Jefferson, Suite 2500
                       Detroit, MI  48226
                       (313) 496-7997

For the State of      Dickinson Wright, PLLC
Michigan:             STEVEN G. HOWELL
                       550 Woodward Avenue, Suite 4000
                       Detroit, MI  48226-3425
                       (313) 223-3033

For Syncora           Kirkland & Ellis, LLP
Holdings, Ltd.,       By:  WILLIAM ARNAULT
Syncora Guarantee,    300 North LaSalle
Inc., and Syncora     Chicago, IL  60654
Capital Assurance,    (312) 862-3062
Inc.:

APPEARANCES (continued):

For Ambac:             Arent Fox
                       By:  MARK A. ANGELOV
                       1675 Broadway
                       New York, NY  10019
                       (212) 457-5491

For Erste              Ballard Spahr, LLP
Europaische            By:  VINCENT J. MARRIOTT, III
Pfandbrief-und         1735 Market Street, 51st Floor
Kommunalkreditbank     Philadelphia, PA  19103-7599
Aktiengesellschaft     (215) 864-8236
in Luxemburg, S.A.:

For the Official       Dentons
Committee of           By:  CLAUDE MONTGOMERY
Retirees:              1221 Avenue of the Americas
                       New York, NY  10020-1089
                       (312) 632-8390


Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1    MR. HAMILTON:  Good morning, your Honor.  Again,
2  Robert Hamilton of Jones Day on behalf of the City of
3  Detroit.  We filed our motion.  You received the objections
4  in our -- received the reply from both the City of Detroit
5  and the State of Michigan.  Just in brief, in general
6  background, because it's important to get the facts right
7  here because if we get the facts right, I think most of the
8  objections go away, approximately $40 million a year in --
9    THE COURT:  Excuse me one second, sir.
10    MR. HAMILTON:  Sure.
11    THE COURT:  All right.  We need to pause for a
12  minute to see if we can get CourtCall working.  All right,
13  sir, you may proceed.
14    MR. HAMILTON:  Again, your Honor, for the benefit of
15  those on the phone, Robert Hamilton of Jones Day on behalf of
16  the City of Detroit.  Again, with respect to the City of
17  Detroit's motion to approve the public -- the PLA
18  transaction, I wanted to briefly set forth the facts
19  underlying the motion because those facts are important for
20  resolving the objections that have been made to the motion.
21  In brief, your Honor, the city -- the residents of the City
22  of Detroit currently pay approximately $40 million a year
23  collectively in utility tax revenue.  That tax is collected
24  by public utilities and the resellers of those utilities.
25    There is no dispute by anybody in this courtroom or

1  anybody in the City of Detroit that the city's lighting
2  system is in a complete state of disarray.  The state
3  legislature enacted Public Act 392 to address that issue.
4  Public Act 392 allows for the creation of a Public Lighting
5  Authority, and Public Act 100 requires the city -- if a
6  Public Lighting Authority is created, it requires the city to
7  pay up to $12-1/2 million of the utility tax revenues that it
8  collects to fund the Public Lighting Authority.  That's
9  pursuant to those Michigan state statutes.  The City of
10 Detroit established on February 5th of this year the Public
11 Lighting Authority.  On August 1st of this year, the City of
12 Detroit entered into the original trust agreement that
13 provides for the funding of the Public Lighting Authority.
14 Since entering into the original trust agreement, all --
15 pursuant to that trust agreement, all utility tax revenues,
16 all 40 million bucks, on a monthly basis has been transferred
17 to the trust with all amounts in excess than 12-1/2 million
18 collected by the trust being sent back to the city.  That's
19 pursuant to Public Act 100 and pursuant to the trust
20 agreement, and that is the current state of affairs.  That is
21 the status quo.  And regardless of what this Court does with
22 our motion, those are the facts that exist.  All of the $40
23 million in tax revenues is currently collected and deposited
24 in the trust.  The trust then sends all amounts in excess of
25 one-twelfth of 12-1/2 million every month back to the city.

1          The amended trust agreement and the construction and

2     finance agreement, which we've called the PLA financing

3     agreements in our motion, for which we seek this Court's

4     approval, have no impact at all on the transfer of the $12-

5     1/2 million of utility tax revenues to the PLA and all the

6     excess amounts back to the city.  That already occurs whether

7     or not this motion is approved or not.  What the PLA

8     financing agreements do and why we're asking the Court to

9     approve them is they allow the city to pledge to the PLA and

10    thereby allowing the PLA to pledge to the Michigan Finance

11    Authority, the MFA, those $12-1/2 million in utility tax

12    revenues that the PLA currently receives from the City of

13    Detroit pursuant to Public Act 100.  By pledging those tax

14    revenues that they already receive pursuant to Public Act 100

15    and the trust agreement, the PLA will then be in a position

16    to enter into agreements with the MFA, and then buyers or

17    banks would be buying bonds from the MFA to issue bonds that

18    will enable the PLA to amass the capital to begin a

19    substantial reinvestment in fixing the lighting system in the

20    City of Detroit.  Public Act 100 only allows the PLA to

21    receive $12-1/2 million every year out of the utility tax

22    revenues regardless of how much is pledged by the City of

23    Detroit pursuant to the construction and financing agreement

24    that we're asking for approval of.  All amounts beyond the

25    12-1/2 million that Public Act 100 requires to be funded to

1    the PLA must be returned to the city regardless of whether or

2    not they are pledged pursuant to the construction and

3    financing agreement.

4           We also -- the documents also include an operation

5    and maintenance agreement that will cost the city similar

6    amounts to those that the city would otherwise have expended

7    itself if the city was responsible for maintaining and

8    improving the portions of the public lighting system that the

9    PLA improves if the city had to do that on its own.  In

10   essence, the operation and maintenance agreement does not

11   cost the city more money.  In fact, hopefully it'll save the

12   city money.

13          The way the PLA governance -- the way the PLA is

14   governed, the way it works and the lighting plan has worked

15   is the PLA consists of a five-member board appointed by the

16   city's chief executive and the City Council.  That board, the

17   PLA board, must include a licensed attorney, a licensed

18   engineer, and a CPA or a financial expert under Sarbanes-

19   Oxley.  The PLA must work with the City Council on developing

20   a comprehensive three-year lighting plan which the PLA must

21   adopt every two years.  That's pursuant to Public Act 392,

22   Section 17.  In fact, the City Council has approved the

23   construction and finance agreement and the operation and

24   maintenance agreement and the amended trust agreement that

25   we're asking this Court to approve as well.  The construction

1    and finance agreement obligates the Public Lighting Authority

2    to improve, extend, and repair the public lighting system

3    according to the lighting plan.  It obligates the PLA to

4    complete two pilot project areas by the end of this year

5    subject to operational and funding considerations.  Those two

6    pilot project areas are two ZIP codes in the City of Detroit

7    that are just small areas in the city where the PLA can

8    commence the improvement, extension, and repair of the

9    lighting system in those areas.  That will serve as a model

10   and a test for develop -- for improving the rest of the

11   city's lighting systems.  The construction and finance

12   agreement authorizes the PLA to issue bonds as long as those

13   bonds don't require payment in excess of $12-1/2 million a

14   year and the city agrees not to do anything that might impair

15   the security the bondholders have in the $12-1/2 million of

16   utility tax revenues that are pledged pursuant to the C&F

17   agreement.  This construction and finance agreement cannot be

18   terminated at will, and it expires only when all of the PLA's

19   bond obligations are completed.  The original trust agreement

20   will be replaced by the amended and restated trust agreement.

21   The primary purpose and the only material change in the trust

22   agreement is to add the MFA as a party to the trust

23   agreement.  It is not currently a party to the original trust

24   agreement.  The reason you need to add the MFA is because the

25   MFA is the one issuing the bonds to Citibank for which the

1   proceeds are used to buy the bonds from the PLA under 392,
2   and so MFA needs to be a party to the trust agreement in
3   order to complete the pledging of the liens on the revenues
4   pursuant -- to secure the payment of those bonds.

5          The operation and maintenance agreement that we're
6   asking the Court to approve obligates the PLA to operate and
7   maintain the portions of the public lighting system that have
8   been improved, extended, and repaired by the PLA pursuant to
9   the lighting plan.  It's essentially an outsourcing
10  agreement.  As the PLA completes its improvement, repair and
11  construction in an area usually delimitated by a ZIP code,
12  the PLA will take over the operations and maintenance of the
13  system for that area.  Thus, the amount of lights that the
14  PLA operates and maintains under this agreement will increase
15  over time until the construction is completed.  The PLA has
16  to keep the portion of the system that it is responsible for
17  operations and it has to repair nonfunctioning lights within
18  seven days of it being reported.  The PLA can delegate its
19  responsibilities and will likely do so to DTE Energy.

20         The city will reimburse the PLA for its costs
21  associated with the operation and maintenance as well as
22  paying an administrative fee of $126,250 per month.  The
23  total annual reimbursement by the city to the PLA for the
24  operation and maintenance of the lights that the PLA takes
25  over is capped at $8.024 million adjusted for inflation

1 except for any maintenance necessitated by third-party

2 criminal acts, in which case the city has to foot the bill.

3       The city remains responsible for vegetation

4 maintenance around the public lighting system, and the city

5 remains responsible for costs associated with damage to the

6 lighting system that results from criminal activity.  So, in

7 addition to the $8 million cap on operation and maintenance,

8 we have to pay for damage caused by vandals and mowing the

9 grass.

10       The city will pay the reimbursement cost up front

11 each quarter based on the number of streetlights that it is

12 responsible for maintaining, for example, $9.62 per overhead

13 fed streetlight per month.  At the end of each quarter, the

14 PLA will determine the actual amount expended, and either the

15 PLA will pay the city the difference if the city overpaid, or

16 the city will pay the PLA if the city underpaid except that,

17 again, in no event will the city go over its $8.024 million

18 cap.  Either party can terminate the operation and

19 maintenance agreement on one year's notice for convenience.

20       Based on those facts, we can review the substance of

21 the objections that were filed by the objectors.  In short,

22 we have basically two arguments.  One, we have provided all

23 of the information that is necessary and sufficient for

24 everybody to evaluate this transaction.  We provided all of

25 the relevant legal documents, including the lighting plan,

1   which is attached to the motion.  The city's advisors met

2   with Syncora's and other creditors' advisors on November 12th

3   of this year to discuss the various city improvement

4   projects, including the PLA's plan for the lighting system.

5           Number two, and most important, the PLA tax

6   revenues, the $12-1/2 million a year that we're asking this

7   Court to approve the pledging of, are not available currently

8   to fund any creditor distributions under any plan of

9   adjustment.  That $12-1/2 million already goes now to the

10  trust whether this Court approves the motion or not, so no

11  creditor in this case is adversely affected in any way by

12  pledging these revenues since those revenues are not

13  available to pay creditor -- or to contribute to creditor

14  recoveries going forward.  Because no creditor is adversely

15  affected in any way by pledging these revenues to the trust

16  or to the PLA, no creditor has any reason to file an

17  objection to this motion.  Notwithstanding that, we've

18  already incurred substantial delay as a result of the

19  objections that have been filed by Syncora and others.  It

20  has already delayed the PLA's ability to close on an initial

21  interim $60 million of financing, which was going to be used

22  to complete the initial project for two ZIP codes and start

23  the public lighting improvement for the rest of the area of

24  the City of Detroit, which was supposed to close earlier this

25  month but has been delayed pending resolution of these

1  objections.  That $60 million of interim financing will then
2  be replaced by the long-term financing in March of roughly
3  $210 million of 30-year bonds.  We've already had to delay
4  the $60 million, quote, interim loan, bridge loan, in order
5  to resolve these objections by parties that aren't affected
6  adversely in any way by the relief that we're seeking.  The
7  buyers of the bonds from the MFA, Citibank, who provide the
8  proceeds to the MFA that the MFA will use to buy the bonds
9  from the PLA, have requested that this Court approve the
10 transaction and approve the pledging of the revenues pursuant
11 to 364(c), and, therefore, we are asking this Court to
12 approve it.  This is a necessary step and an essential step
13 and an urgent and important step to improve the lighting in
14 the City of Detroit.  There is absolutely no reason not to
15 approve this motion because nobody is adversely affected in
16 any way by the relief we're asking for, and on that basis we
17 ask the Court to approve the motion.
18      THE COURT:  What's the standard -- the legal
19 standard by which your motion is to be judged?
20      MR. HAMILTON:  Your Honor, as we tried to articulate
21 in our reply brief, we do not believe that the normal
22 Farmland standards that apply for 364(c) in a Chapter 11 case
23 apply here because here we have the unique situation where
24 the liens that we are trying to pledge are not liens on any
25 property that can be used to pay for creditor recoveries.

1  And the Farmland factors generally apply when you're trying

2  to encumber property that would otherwise be available for

3  distribution to creditors.  That is not the case here.

4       THE COURT:  Right.  I got all that --

5       MR. HAMILTON:  Okay.

6       THE COURT:  -- from your papers, but what I didn't

7  quite get was what is my role here --

8       MR. HAMILTON:  It is just --

9       THE COURT:  -- from your perspective?

10      MR. HAMILTON:  It is just to confirm the business

11 judgment of the City of Detroit that it is an appropriate

12 exercise of its judgment to pledge the $12-1/2 million each

13 year that is already sent to the trust, to pledge it -- in

14 addition to sending it to the trust, to pledge it so that

15 that pledge can provide the security for issuing the bonds to

16 Citibank by the MFA.

17      THE COURT:  You asserted that the costs resulting

18 from this transaction, if it's approved, of operations and

19 maintenance is roughly equal to what the city pays now

20 anyway?

21      MR. HAMILTON:  That is our expectation.  It will not

22 be affected by whether this Court approves or disapproves the

23 motion.

24      THE COURT:  Okay.  Where do I find that in the

25 record?

1          MR. HAMILTON:  It follows from -- all the operations

2     and maintenance agreement does is outsource or make the

3     responsibility for performing those services and paying for

4     them the responsibility of the PLA as opposed to the City of

5     Detroit.  Somebody has got to pay for it.  If the PLA -- if

6     we don't outsource it to the PLA, then the City of Detroit

7     has to pay for it.

8          THE COURT:  Right, but how do we know that they are

9     roughly comparable?

10         MR. HAMILTON:  Because the City of -- well, whether

11    or not they're -- it certainly isn't going to cost the city

12    more because we're certainly spending more than $8 million a

13    year now, the City of Detroit is.  When we outsource it to

14    the PLA, our expenses are capped at eight million plus fixing

15    lights that are broken by vandals and mowing the grass, so

16    any way you cut it, it's going to be less than we're spending

17    now because of the $8 million cap.

18         THE COURT:  Where will the -- where will the PLA get

19    the funds if those expenses exceed the amount that the city

20    is obligated to pay?

21         MR. HAMILTON:  From the financing that we're asking

22    the Court to enable to happen by pledging the revenues from

23    the bonds.

24         THE COURT:  All right.  Thank you.

25         MR. HAMILTON:  Thank you, your Honor.

1          MR. HOWELL:  If I may, your Honor, Steven G. Howell,

2    Dickinson Wright, special assistant attorney general,

3    appearing on behalf of the State of Michigan.  I will be

4    brief, your Honor.  The State of Michigan supports and

5    concurs in the city's motion.  Our reply focused on and my

6    comments will be limited to the issue of the commitment of

7    these revenues and that they are unavailable.  The argument

8    has been made that the city has proposed pledging utility tax

9    revenues to finance construction and maintenance of the

10   public lighting system, quote, "that could be used to fund

11   recoveries to creditors," close quote.  We believe this legal

12   argument -- this argument is legally flawed, cannot be

13   sustained because utility tax revenues may only be used for

14   two public safety purposes.  One is the funding of the

15   construction and maintenance of the public lighting system,

16   and two is to retain or hire police officers.

17          The structure that creates this is PA 392, the

18   Public Lighting Authority Act, and PA 100, the City Utility

19   Users Tax.  The Act PA 392, the Public Lighting Authority,

20   was intended to, quote, "create an equitable and reasonable

21   method and means of financing, operating and maintaining a

22   lighting system to supply lighting in sufficient quantities."

23   The structure is set up, as mentioned by Mr. Hamilton, such

24   that the PLA sells its bonds to the Michigan Finance

25   Authority, a state entity.  The Michigan Finance Authority,

1   in turn, markets those and sells those providing the credit
2   support necessary to create a more marketable bond at a lower
3   cost.  Utility tax revenues are then pledged to secure the
4   payment of those bonds.
5           PA 100, the City Utility Users Tax, permits cities
6   that form a lighting authority, as Detroit has, to then levy
7   and collect a utility users tax from the utility customers.
8   Revenues collected under PA 100 may only be used to service
9   the Public Lighting Authority bonds or, if not otherwise
10  pledged to pay the bonds, the revenues must be used to retain
11  or hire police officers.  As mentioned, the maximum amount
12  that comes out of that is $12-1/2 million annually.
13          In addition to putting that cap on, the Municipal
14  Lighting Authority Act provides, and I quote, "The pledged
15  revenues are exempt from being levied upon, taken,
16  sequestered, or applied toward paying the debts and
17  liabilities of the local government."  Then it goes on to say
18  other than the PLA-related costs.  Since the utility tax
19  revenues could never be used to pay the city's creditors, the
20  city is not restricting, removing, or otherwise taking a
21  revenue stream that could be used to fund creditor
22  recoveries.
23          Your Honor, the most fundamental and important
24  function of the city is to provide for the safety and welfare
25  of its residents and visitors.  While quibbling over roof

1 repairs at the Manoogian Mansion is one thing, equating that

2 to addressing a public lighting system that has upwards of 45

3 percent of its lights not functioning in a city challenged by

4 high crime rates is not the kind of discussion we should be

5 having here this morning.  The state and the city believe

6 that the -- that addressing the public lighting deficiencies

7 will aid in reducing the crime rate in the city.  The

8 creation of the statutory framework to facilitate an adequate

9 public lighting system and providing the means to pay for it

10 by directing revenues to that purpose is the essence of the

11 exercise of the political and governmental powers of the

12 state and city.  This framework is one that we would ask this

13 Court to respect, particularly in light of Sections 903 and

14 904, and to do so by granting the city's motion today.  Thank

15 you, your Honor.

16          THE COURT:  Thank you, sir.

17          MR. ARNAULT:  Good morning, your Honor.  Bill

18 Arnault on behalf of Syncora Guarantee and Syncora Capital

19 Assurance.  I wanted to begin, your Honor, by just

20 acknowledging and stating on the record that the purpose of

21 our objection was not to -- we're not objecting to the fact

22 that the city is trying to improve its lighting system.  We

23 recognize that the city has many challenges and that fixing

24 its lighting is one of them.  However, what we're objecting

25 to and the purpose behind our objection is we take issue with

1   the process that the city has engaged in here and the means
2   by which they put it in front of this Court.  You heard today
3   Mr. Hamilton make a number of representations.  In their
4   motion they set forth a number of representations, and in the
5   proposed order they have a number of factual findings that
6   they would like -- that they would like your Honor to make,
7   and yet they have yet to provide any evidence that would
8   support any of the representations today or any of the
9   factual findings that they have set forth in the proposed
10  order, and that's really our biggest concern is this lack of
11  transparency and the fact that we really are at a loss as to
12  what exactly is going on, how much it's going to cost the
13  city, the type of process that it engaged in, the
14  negotiations that occurred that resulted in these transaction
15  documents.  We have yet to see any of that information, so
16  for the city to come in and, for example, ask the Court to
17  enter a Section 364(e) finding of good faith and arm's length
18  negotiations without providing evidence, we feel that that's
19  a failure of process that we would like to see remedied, so
20  what I'd like to discuss with your Honor this morning is the
21  limited discovery that we think that we should be permitted
22  to take in order to explore the representations that the city
23  put forth today and that go directly towards the factual
24  findings that are set forth in the proposed order, and I
25  believe that this actually has two benefits.  First of all,

1   we're still very much in the dark as to what exactly is going

2   on with this transaction.

3            THE COURT:  If you'd like to withdraw that

4   characterization I will permit you to, sir.

5            MR. ARNAULT:  No.  I'm going to stand by that.  We

6   have yet to see the bond documents.  We haven't received any

7   discovery regarding --

8            THE COURT:  We are still very much in the dark.

9            MR. ARNAULT:  Well, we are still very much in the

10  dark.  The process that -- I mean the city came in and talked

11  about that there was a session last week where they provided

12  additional information.  Well, that may be true.  When we

13  object and say that we don't have enough information, for

14  them then to come in and provide some additional information,

15  I don't think that's how the process should work.  In

16  addition, there's still a number of unanswered questions

17  surrounding why they decided to enter into this transaction

18  where -- the terms of the bond documents, why they decided to

19  use the 12.5 all for debt service instead of for O&M

20  purposes.  There are just a number of unanswered questions

21  out there that we believe discovery would shed light on.  In

22  addition --

23           THE COURT:  Let's ask the more fundamental question.

24  Why does Syncora even have a stake in the outcome of this?

25           MR. ARNAULT:  Well, I know that this issue was

1 raised by the city this morning, and they're saying that this

2 really has no impact on credit recovery, but what they're

3 miss -- the point that they're missing is that cash is

4 fungible, so under PA 100, the cash could either go towards

5 the PLA or it could go towards hiring and retaining police

6 officers.

7         THE COURT: Syncora cares about that?

8         MR. ARNAULT: Well, yes, because the quality of life

9 note is 110 or $120 million will be directed towards hiring

10 and retaining police officers, so if they're using money that

11 they could otherwise be using to support the PLA --

12         THE COURT: Do you think I should judge for the city

13 whether this money should go to lighting or police?

14         MR. ARNAULT: Well, that's essentially what they're

15 asking you to do. They're asking you to approve this

16 transaction, that it's in the best interest of the creditors.

17 That's part of the factual findings that they're --

18         THE COURT: What does Section 904 say about that?

19         MR. ARNAULT: Well, Section 904 here says that if

20 the city consents, which they explicitly do in the PLA

21 motion, to the Court's review and approval of the transaction

22 at issue -- and they've implicitly consented by asking your

23 Honor to approve the transaction, say that it's in the best

24 interest of the creditors, say that it's a sound exercise of

25 business judgment, and the 364(e) finding, so they've

1  authorized your Honor to inquire into the uses, the needs,

2  and how exactly they plan to spend this money and to

3  structure the transaction itself.

4        THE COURT:  Of course, the dark you're in doesn't

5  compare to the dark that the citizens of Detroit suffer day-

6  in and day-out and the crime that results from that.  How

7  much --

8        MR. ARNAULT:  We don't dispute --

9        THE COURT:  How much time are you talking about?

10       MR. ARNAULT:  Just enough time to ensure that the --

11       THE COURT:  How much time are you talking about?

12       MR. ARNAULT:  Enough time for the city to provide --

13       THE COURT:  I need a number.

14       MR. ARNAULT:  Two weeks so that the city can provide

15  adequate discovery, we can take depositions and have an

16  evidentiary hearing on this.

17       THE COURT:  Um-hmm.

18       MR. ARNAULT:  We don't -- your Honor, we do not --

19       THE COURT:  How many citizens will be victims of

20  crime in that two weeks?

21       MR. ARNAULT:  Your Honor, we don't dispute that this

22  is an important issue, but at the same time there is a

23  process that the city has to go through in order to make sure

24  that this is the best possible transaction.  If the process

25  is not vetted --

1    THE COURT:  What's the singlemost significant

2  factual question that you want answered from the city that

3  you haven't gotten answered?

4    MR. ARNAULT:  They haven't provided any information

5  at all regarding the negotiation process, and they're asking

6  for a 364(e) finding that it was conducted in good faith and

7  at arm's length.

8    THE COURT:  What specifically do you want to know

9  about that?  Is there something wrong?  Is everything okay?

10  I'm sorry.  What specifically do you want to know about the

11  negotiation process that you don't?

12    MR. ARNAULT:  Well, we'd just like to know, for

13  example, what were the terms that were exchanged back and

14  forth, were there alternative proposals, is there a better

15  proposal out there for the city and for its citizens that may

16  actually be to the city's advantage to explore alternatives

17  because while they may say that this is the best and only

18  possible transaction, we're not sure, so if we wait 14 days

19  or however long, then it may actually inure to the benefit of

20  the citizens because we're coming up with a better structure.

21    THE COURT:  I wonder if you'll ever be satisfied.

22    MR. ARNAULT:  I'm sorry, your Honor.

23    THE COURT:  I wonder if you'll ever be satisfied.

24    MR. ARNAULT:  Oh, no.  We'll be satisfied with

25  adequate discovery and just fully understanding what's going

1    on, so I'm happy to walk through the additional discovery

2    that we think that we would --

3              THE COURT:  Go for it.

4              MR. ARNAULT:  Okay.  So, first of all, as I

5    mentioned, we'd like to conduct discovery relating to the

6    negotiations of the PLA transaction.  Secondly, we'd like to

7    conduct discovery relating to the alternatives that were

8    considered by the city.  We believe that this goes towards

9    whether it was a sound exercise of business judgment and the

10   requirements under Section 364(c).  Third, we'd like to

11   conduct discovery relating to the necessity of the proposed

12   transaction, whether it was actually necessary to opt into

13   the PLA to issue the bonds or whether, for example, they

14   could have used the bridge loans or the proceeds from the

15   bridge loan to get the process started, to conduct a survey

16   which they're required to do under the C&F but we have yet to

17   see, and there's no evidence that they've actually done that.

18   So whether it's actually a better process to conduct a

19   survey, get a better idea of the problem that they need to

20   fix rather than going out and borrowing $160 million

21   straightaway.

22              We'd also like discovery into the intended uses of

23   the proceeds.  For example, we know that blight remediation

24   is a big concern of the city, so we would like to ensure that

25   when they're talking about the fixing the lighting issues,

1  that they're also doing so and they're integrating it within

2  their larger reinvestment initiatives and to make certain

3  that some thought was given to that, so when their --

4          THE COURT:  And you want me to judge that?

5          MR. ARNAULT:  Well, they have asked you to judge

6  that because they've asked you to --

7          THE COURT:  I didn't quite hear that.

8          MR. ARNAULT:  They have asked your Honor to judge

9  whether the uses are in the best interest of the citizens.

10         THE COURT:  What I heard was they want me to judge

11 whether the financing arrangement is in the best interest of

12 the city --

13         MR. ARNAULT:  Well --

14         THE COURT:  -- not the uses to which the resulting

15 financing will be put.

16         MR. ARNAULT:  Well --

17         THE COURT:  That makes me sound a little bit like a

18 mayor and a City Council.

19         MR. ARNAULT:  Well, I mean in some -- that's an

20 interesting question, something that we've been thinking

21 about, but it's this idea that need is inextricably tied to

22 use, so it's difficult to consider whether a transaction is

23 necessary without taking the next step and analyzing whether

24 or how it's being used, so it's difficult to consider need

25 within a vacuum.  You can't consider whether you actually

1    need something --

2            THE COURT:  Well, but doesn't 904 answer that very

3    question?

4            MR. ARNAULT:  Not in this situation, your Honor.  I

5    would say --

6            THE COURT:  I am not permitted to interfere with the

7    city's political and governmental functions, am I?

8            MR. ARNAULT:  No.  Yes, you are, in the situation

9    where the city has explicitly consented to it, I think, in

10   paragraph 24 of their motion and they've asked you to issue

11   findings of fact that go beyond and require you to inquire

12   into exactly how the city --

13           THE COURT:  Can you point to a specific finding that

14   raises this issue, in your view?

15           MR. ARNAULT:  Yeah.  I'd be happy to, your Honor.

16   For example, your Honor, I believe that they asked the

17   Court --

18           THE COURT:  Take your time.  Pick a good one.

19           MR. ARNAULT:  The authorization sought in the motion

20   will benefit the debtor and its citizens and is a sound

21   exercise of the business judgment.  It's in the best interest

22   of the debtor, its creditors, and other parties in interest,

23   and is based on good, sufficient, and sound business purposes

24   and justifications.  I would read that rather broad factual

25   finding to ask your Honor to inquire into how it's being used

1   because only then can your Honor determine whether or not

2   it's in the best interest of the citizens and that it's based

3   on the debtor's sound business judgment.

4           So moving along, we would -- in addition to the uses

5   of the proceeds, there's also just a number of unanswered

6   questions that we would like to depose, for example, Odis

7   Jones, the executive director of the PLA, to understand why,

8   for example, they did not use any of the 12.5 million to

9   contribute to the O&M costs or what they expect the O&M costs

10  to be.  We know that it's capped at 8.5, but there's

11  additional monies that the city will have to contribute,

12  which will also come from the general fund, which could be

13  used to enhance creditor recoveries, which could have an

14  impact on creditor recoveries, which the city did not

15  mention, so there are really a number of issues out there

16  that we think that we still need to explore before we can

17  adequately assess the merit of this transaction and

18  whether -- before it's possible to enter the factual findings

19  that the --

20          THE COURT:  And all that in two weeks?

21          MR. ARNAULT:  We've been moving at a brisk pace,

22  your Honor.  We're happy to keep chugging away.

23          THE COURT:  Anything further?

24          MR. ARNAULT:  No, your Honor.  Thank you.

25          THE COURT:  Thank you.

1          MR. ANGELOV:  Good morning, your Honor.  Mark

2     Angelov for Ambac Assurance Corporation.  We joined in

3     Syncora's objection to the motion to approve the PLA

4     transaction, and I don't want to restate what's already been

5     said on the record before the Court.  What I would like to

6     highlight is one particularly egregious lack of transparency

7     in this proposed transaction, and that is that neither this

8     Court nor the creditors nor any interested party has any idea

9     what the exact terms would be of the bridge loan and the

10    long-term financing that the city is essentially asking this

11    Court to approve as being in good faith negotiated terms.

12          THE COURT:  What terms don't you have, sir?

13          MR. ANGELOV:  Well, we -- not included in the record

14    on this motion -- and we certainly haven't seen it -- are any

15    of the documents relating to --

16          THE COURT:  What terms don't you have, sir?

17          MR. ANGELOV:  The documents relating to the long --

18          THE COURT:  What terms don't you have?

19          MR. ANGELOV:  We don't have the --

20          THE COURT:  You said you don't have terms.  What

21    terms?

22          MR. ANGELOV:  The interest rate, origination fees.

23    The city indicated that it was prepared to close on the

24    bridge loan, and presumably drops of documents were

25    available.  Perhaps a term sheet has been agreed to.  That's

1   not in the record in the motion as well.  And, frankly, we're

2   sympathetic to the need to proceed quickly with this process,

3   but the city could have done more to meet its affirmative

4   burden on this motion, we believe.  They just haven't done

5   so.  There are some very specific factual findings that they

6   seek in -- specifically in Section F of the proposed order.

7           THE COURT:  So you need terms on the bridge loan and

8   the final loan?

9           MR. ANGELOV:  That's right, among other things.

10  There's also lack of --

11          THE COURT:  What other things?

12          MR. ANGELOV:  There's lack of transparency as to the

13  operating costs that are over and above the $12-1/2 million

14  that the city will be committing to the debt service on the

15  long-term financing, and your Honor raised an excellent point

16  that essentially while the city claims that the costs will be

17  equivalent to what the city is spending now, there's simply

18  no evidence in the record, and there are also two

19  components -- significant components of the cost to the city

20  over and above $12-1/2 million that aren't subject to the

21  cap.  The vegetation removal fee or vegetation control fee we

22  understand from some of the documents presented to City

23  Council could be as high as $2 million a year.  And also not

24  mentioned -- not included in the $8 million cap is $1-1/2

25  million a year in administrative fee that gets paid to the

1 | PLA, so the record is simply not complete as to whether other

2 | alternatives have been explored, whether there are better

3 | alternatives, and that ties in directly into the finding that

4 | the city --

5 |        THE COURT:  What other alternative might you

6 | suggest?

7 |        MR. ANGELOV:  Well, simply -- I don't know that we

8 | have enough information at this point to suggest

9 | alternatives, but one possibility, for example, is whether or

10 | not the city really has to proceed with this transaction

11 | where PLA sells bonds to MFA, MFA then goes out and places

12 | them on the market.  With the strong collateral that is being

13 | offered here, $12-1/2 million in hard cash, it begs the

14 | question of whether or not this could not have been

15 | accomplished through a private deal, particularly because the

16 | city is seeking this Court's approval.

17 |        THE COURT:  Hmm, I'm hearing an offer from your

18 | client there.

19 |        MR. ANGELOV:  Again, we don't have enough

20 | information.  If this is something that -- we don't know what

21 | the terms are.

22 |        THE COURT:  No.  No offer, huh?

23 |        MR. ANGELOV:  I'm sure they'd be willing to

24 | entertain it on commercially reasonable terms.

25 |        THE COURT:  Okay.

1      MR. ANGELOV:  Thank you, your Honor.

2      MR. MARRIOTT:  Good morning, your Honor.  Vince

3  Marriott, Ballard Spahr, on behalf of EEPK and affiliates.  I

4  rise really for two reasons, your Honor.  One is to stand on

5  the firing line with Mr. Arnault and Syncora.  I think

6  sometimes Syncora's positions tend to get delegitimized in

7  the sense that Syncora is viewed as a troublemaker in the

8  case and out on its own stirring the pot.  I wanted to make

9  clear that on this and other matters it is not that it has

10  broad creditor support for the positions it's taken and that

11  many of the creditors in the case believe that it's raising

12  important and valid points that need to be taken into

13  account.  Second, just on the 904 --

14      THE COURT:  Well, then let me ask you.  I searched

15  in vain through all of your papers for any case law that

16  suggests that in a Chapter 9 case the Court has the authority

17  to engage in the kind of broad review of a loan transaction

18  as you suggest --

19      MR. MARRIOTT:  Well, let me --

20      THE COURT:  -- you all suggest.

21      MR. MARRIOTT:  Let me --

22      THE COURT:  Do you have a case?

23      MR. MARRIOTT:  Let me respond to that quickly and

24  then get to what my sort of second point is because I want to

25  respond, however hard it is, to your remark about what if a

1    person is killed at that dark street corner that would be lit

2    but for this.  Judge, I'm not aware that there is a whole lot

3    of authority at all.

4          THE COURT:  You're not aware what, sir?

5          MR. MARRIOTT:  That there's a whole lot of authority

6    at all with respect to the standards under which a

7    municipality can get a DIP approved.  I think that this case

8    is unique in that respect, and you'll be making law on what

9    the standards are.

10          I will respond to the 904 versus 364 argument in

11   this way.  I don't have an opinion on whether or not the city

12   could have done this under 904 without coming to you at all.

13   It may very well could have done this without coming to you

14   at all, but I think that participants in the transaction

15   wanted something from you.  The city wanted certain findings,

16   and other participants wanted to know that their liens were

17   blessed.  I don't think the city can have it both ways.  I

18   don't think the city can come in and say, "We want the sort

19   of relief available under 364 and the sort of findings

20   associated with relief granted under 364," and then say, "But

21   you really have to enter those findings, and you really have

22   to grant that relief because we could have -- we have 904

23   that limits your discretion in these areas."  I don't think

24   they can have it both ways.

25          But let me respond, I think, to the hard argument.

1   There's a larger principle at stake here.

2           THE COURT:  Well, but why isn't the reconciliation

3   between 364(c) and 904 simply that the Court reviews the

4   financial aspects of the transaction but not the uses to

5   which the proceeds of the transaction will be put?

6           MR. MARRIOTT:  Judge, I don't know how you make a

7   judgment that it is prudent for the debtor to borrow money

8   without at the same time making a judgment as to whether the

9   use to which it's going to put that money is also prudent.

10          THE COURT:  Well, but why do you assume --

11          MR. MARRIOTT:  I don't know how --

12          THE COURT:  Why do you assume that the first

13  question is within the scope of 364?

14          MR. MARRIOTT:  Well, because the Court has to make a

15  determination about whether the debtor is properly exercising

16  its business judgment in --

17          THE COURT:  Do I?

18          MR. MARRIOTT:  -- borrowing money and granting a

19  lien.

20          THE COURT:  Do I?

21          MR. MARRIOTT:  I believe you do, your Honor.

22          THE COURT:  Why isn't the line -- okay.  The city

23  has decided to borrow money.  The Court reviews the interest

24  rate, other terms for reasonableness as it would in a Chapter

25  11 case.

1      MR. MARRIOTT:  Right.

2      THE COURT:  And to make sure that other creditors

3  aren't prejudiced by those financial terms, but on the issue

4  of whether to borrow the money and what to do with the money,

5  that's political and governmental protected from this Court's

6  review by 904.  What's wrong with that?

7      MR. MARRIOTT:  What's wrong with it, your Honor, is

8  that I don't see how you can assess the reasonableness of the

9  terms of the financing in a vacuum totally separated from the

10  purposes of that financing.  I don't know what interest rate

11  makes sense in the context of a loan, the purpose of which

12  hasn't been established.  I mean a ten-percent interest rate

13  might be fully justified by a loan for one purpose and wildly

14  unjustified for a loan for another purpose.  Repayment terms,

15  same thing.  I mean I think that what's reasonable in terms

16  of financing terms is inexplicably intertwined.

17      THE COURT:  Well, but we know what the purpose of

18  this loan is.

19      MR. MARRIOTT:  Well, we know what its purpose is.

20  What we don't know is whether that -- the specific use to

21  which the city will put the money is the highest and best use

22  of the funds --

23      THE COURT:  Well, but isn't that for the city --

24      MR. MARRIOTT:  -- in this context at this time.

25      THE COURT:  -- to determine?

1      MR. MARRIOTT:  I think it would be for the city to

2  determine if it were proceeding under 904 and not seeking

3  involvement of this Court.  I think the city has invited

4  oversight by asking for findings and relief under 364.  It's

5  consented to oversight by seeking findings and relief from

6  this Court under 364.

7      Can I ask your indulgence for a brief minute to talk

8  about what I see the larger principle here?

9      THE COURT:  Yes, absolutely.

10     MR. MARRIOTT:  Thank you.

11     THE COURT:  I will lay off momentarily.

12     MR. MARRIOTT:  Jump back in at any time.  But I do

13 think there's a larger principle at stake here, Judge, which

14 I will acknowledge is illustrated more starkly by the DIP

15 motion which is coming up but to which this motion --

16     THE COURT:  Which motion we're not arguing today.

17     MR. MARRIOTT:  Which argument we're not arguing

18 today.  Illustrated more starkly but not exclusively by the

19 DIP motion to which this motion is relevant, I think, nobody

20 disputes -- nobody disputes, as far as I know -- I don't --

21 the ultimate need to repair the city's streetlights, to

22 remove blight, to improve public safety, and a thousand other

23 things.  That isn't the issue.  What is at issue, I think,

24 your Honor, is the context, timing, and methodology for all

25 of these things.  Detroit's problems are decades in the

1   making, and a genuine sustainable resolution of these
2   problems will also take decades. Any course of action that
3   is not premised on a comprehensive long view in crafting
4   solutions will not succeed in producing such a genuine
5   sustainable resolution, and this is in the papers but hasn't
6   been really addressed yet. Development of a comprehensive
7   long view solution, one that addresses both the present and
8   future needs of the city while at the same time providing for
9   the fair treatment of legacy creditors --

10          THE COURT: Is the bottom line of this argument that
11  I should wait to do this until plan confirmation?

12          MR. MARRIOTT: It is our view that a piecemeal
13  approach, which is the --

14          THE COURT: I'll take that as a yes.

15          MR. MARRIOTT: Well, yes, but I'm not sure yes fully
16  does justice to my argument. It is, in fact, the argument
17  that addressing the city's problems on a piecemeal haphazard
18  basis that the city has done to date and not just with DIP's,
19  with the swap counterparties, with Belle Isle, with the
20  DIP --

21          THE COURT: So you want the people of the City of
22  Detroit to be in the dark not just for another two weeks but
23  until next summer or fall or winter, whenever we can get a
24  plan confirmed, if we ever do?

25          MR. MARRIOTT: Judge, I think it's better that the

1  solutions of the problems of the city be fixed on a permanent

2  sustainable basis than that bandages be applied here and

3  there which are not long-term solutions but which, in fact,

4  at the end of the day could be antithetical to long-term

5  solutions because it reduces or eliminates the city's

6  flexibility in crafting a plan of adjustment that is workable

7  for the city and acceptable to creditors, and it is our

8  view --

9          THE COURT:  Tell that to the hundreds or thousands

10 of people who are going to be victims of crime while we wait.

11         MR. MARRIOTT:  Judge, again, you know, it's -- that

12 is an argument that is almost unrespondable to because it can

13 be made with respect to almost every problem the city has,

14 and it can be used as a justification for fixing everything

15 now, however ephemeral that fix might be and however

16 antithetical it might be to a more comprehensive solution

17 that will fix this stuff for good, won't have us back here

18 again in five years, won't be the same sort of fix this

19 little piece here, fix this little piece there that's been

20 done by the city up to this point, which has not done a long-

21 term solution, so, you know, I don't have a direct answer to

22 if you don't do this, people will die; if you don't do that,

23 people will die.  Again, it's unanswerable, but what I do

24 think is that it is in the best interest of the city to have

25 a comprehensive long-term sustainable real resolution to its

1  problems.  That's a plan of adjustment.  And to the extent

2  that the city takes piecemeal steps now that foreclose plan

3  of adjustment options, that take this problem out of context

4  and that problem out of context and either devalue or

5  eliminate plan of adjustment options, it's a mistake, and it

6  will not be in the long-term best interest of the city and

7  that lighting and police and blight are best addressed

8  together comprehensively and not piecemeal in which one

9  solution makes another solution harder or impossible.  That's

10 the issue.

11      THE COURT:  So that solution makes me mayor and City

12 Council at the time of plan confirmation.

13      MR. MARRIOTT:  Well, presumably or hopefully -- I

14 mean more than hopefully -- I mean I think we all need to

15 recognize that the only real way out of this is a consensual

16 plan of adjustment that has been negotiated in such a way

17 that if everybody isn't happy, they're at least willing to

18 support the outcome, and the ability to reach a consensual

19 outcome is made more difficult if the city's flexibility to

20 construct terms and solutions has been cut off or hampered by

21 quick fixes that in the aggregate won't survive because

22 they're not part of a more comprehensive solution.  That has

23 been the practice to this point.  This motion, although not

24 necessarily for the reasons you've discussed -- the best

25 example of it is, nevertheless, of a piece with it.  These

1  issues will be raised more starkly and I will be up here

2  again in a couple of weeks or whenever we have the hearing on

3  the DIP motion to make the same points, but I don't think

4  that any of these requests can be reviewed without an eye to

5  the larger picture and whether or not it serves the larger

6  picture or impedes it.  Thank you.  Thank you for letting me

7  get that out.  I have nothing further, your Honor, unless you

8  have further for me.

9          THE COURT:  No.  Thank you, sir.

10         MR. MARRIOTT:  Thank you.

11         MR. MONTGOMERY:  Your Honor, for the Retiree

12  Committee, we actually have a suggestion on how the perceived

13  prejudice that creditors might suffer from this transaction

14  can actually be fixed without going through two weeks or six

15  weeks or to confirmation.  The city states unequivocally in

16  its papers that there is an absolute rock-hard no more than

17  $12-1/2 million ceiling on how much money can be used from

18  utility taxes for the purposes of installing new lights.  We

19  would ask your Honor to actually enforce that in order to

20  avoid prejudice in two particular ways.  Section 105 of the

21  trust agreement, which is Docket Number 1341, has two

22  provisions in it which we think --

23         THE COURT:  I'm so glad you weren't about to say of

24  the Bankruptcy Code.

25         MR. MONTGOMERY:  No, your Honor.  I was actually

1  definitely not going there.

2       THE COURT:  Thank you.

3       MR. MONTGOMERY:  The first is that during 2013, the

4  accumulation that is permitted in the trust fund is

5  $1,783,333 per month, which is a greater rate than a $12-1/2

6  million annual computation.  You may remember that counsel

7  for the city said it's one-twelfth of the $12-1/2 million,

8  but in Section 105(a)(i), the annual rate of that number is

9  21.4, so we ask that your Honor specifically limit the

10  accumulation in the trust fund to the 1.045 million per

11  month, which would translate to 12-1/2.

12       The second thing that we would ask your Honor to do,

13  again, to avoid prejudice on the part of creditors, is that

14  to the extent that there is money in excess of the trust

15  that -- of the funds that go to the retirement escrow fund,

16  the Detroit retirement escrow fund, that that money go

17  straight to the general fund and not go to the PLA fund.

18  Now, the reason we suggest that is that if it goes to the

19  general fund, it will, in fact, be available for use in

20  police and fire, and if it is, in fact, available for use in

21  police and fire, that will have an impact on the budgetary

22  issues that can benefit other creditors, including my

23  clients, who have an interest in having the pension funds and

24  the health and welfare benefits of the city funded.

25       Second thing in that regard we would ask your Honor

1    to do is to the extent that there is excess money in the

2    Detroit retirement escrow fund, that it go straight to the

3    general fund as well, so right now the way it's structured,

4    excess of 12-1/2 goes first to the PLA.  Excess of the PLA

5    goes to general fund.  We suggest that it go straight to the

6    general fund.  If your Honor were to impose that condition in

7    order to avoid prejudice to creditors, in order to deal with

8    this issue that we're locking up $40 million instead of $12-

9    1/2 million, we think you can accomplish both goals -- that

10    is, get the city going on its interim lighting solution, get

11    the city going with respect to the mechanism for funding and

12    borrowing, and at the same time give the creditors maximum

13    flexibility on how the net effect of the extra $38 million

14    can actually be -- $28 million can actually be used, and,

15    your Honor, if you were to do that, that would resolve our

16    objection that, as you know, we did join the Syncora

17    objections, so thank you.

18         THE COURT:  Thank you.  Anyone else on the objecting

19    side?  For the city?

20         MR. HAMILTON:  Your Honor, I'd like to respond, but

21    first I would like -- the counsel for the PLA would like to

22    be heard on behalf of the motion.

23         MR. GREEN:  Good morning, your Honor.  Jonathan

24    Green of Miller, Canfield, Paddock & Stone appearing on

25    behalf of the Public Lighting Authority.  I think this

1  transaction, frankly, is much clearer than parties make out.
2  I want to address it in two ways.  First, I want to talk
3  about the financing.
4          THE COURT:  I have to ask you to pause for a second.
5  Doesn't your firm represent the city?
6          MR. GREEN:  It does.
7          THE COURT:  And the PLA?
8          MR. GREEN:  We do for this transaction, and we have
9  consents.
10         THE COURT:  And that's not a conflict of interest?
11         MR. GREEN:  We have consents, your Honor, and it's
12  not a conflict of interest.
13         THE COURT:  This is a waivable conflict of interest?
14         MR. GREEN:  It's a waivable conflict of interest
15  under our rules, and we do have consents, and it should not
16  be a conflict, your Honor.
17         THE COURT:  Your firm is representing both sides of
18  a transaction, and that's a waivable conflict of interest?
19         MR. GREEN:  We're not representing both sides.  We
20  are not representing the City of Detroit with respect to this
21  transaction.
22         THE COURT:  All right.  Go ahead.
23         MR. GREEN:  Thank you very much, your Honor.
24         THE CLERK:  Please pull the microphone --
25         MR. GREEN:  Of course.  I want to talk about the

1  financing first, the construction and financing agreement,

2  and leave for a moment the O&M agreement.  This transaction

3  is the result of three pieces of legislation, Acts 392 --

4       THE COURT:  I have to ask you not to repeat what has

5  already been stated on the record here.

6       MR. GREEN:  Fair enough, your Honor, and let me put

7  it this way.  With respect to the financing transaction,

8  there is not one way, not one instance in which one dollar of

9  the $12.5 million more or less goes to the city.  The $12.5

10 million under the statute a year goes to the PLA for purposes

11 of financing this transaction, and that is true regardless of

12 what the terms of the ultimate financing are.  If the

13 interest rate is higher, if the term is longer, it doesn't

14 matter what the terms of the ultimate financing are because

15 on a nonrecourse, non-full faith and credit basis, the City

16 of Detroit pledges and does not have access to under any

17 scenario, even if the financing isn't approved, one penny of

18 the $12.5 million.  Every one of those dollars goes to the

19 PLA or bonds issued to the PLA for the purposes of providing

20 the city with public lighting.  There's no discovery,

21 frankly, that's relevant with respect to the transaction, and

22 the reason -- that's true regardless of the terms.  It's true

23 before and after default.  It's true before and after

24 acceleration.  It's true after maturity because those three

25 statutes read together work precisely that way.  What happens

1   is on a monthly basis a monthly portion of the $12.5 million

2   goes to pay the bonds that are issued, and anything remaining

3   up to 12.5 under the trust agreement goes to the PLA.

4   Anything in excess on a monthly basis, on a monthly basis

5   that that allocable portion immediately that month goes to

6   the City of Detroit, so it doesn't matter what the terms of

7   the -- if there's a default and the interest rate increases,

8   your Honor, that means more of the monthly payment will go to

9   pay interest rather than principal, but it doesn't come back

10  to the city under those three statutes for any uses.  In

11  fact, once the bonds have been retired, because that money

12  will no longer be available or needed for the PLA, the income

13  tax chargeable to the residents of Detroit comes down by

14  approximately a corresponding amount, so, again, not one

15  penny more, not one penny less, than twelve point million on

16  an annual basis goes to fund the construction of the public

17  lighting project for the City of Detroit.  City of Detroit

18  has no personal liability.  The PLA has no recourse through

19  the City of Detroit and its assets.  There is no

20  administrative claim that needs to be paid at any time.  The

21  City of Detroit -- it's a pledge created under these three

22  statutes designed to enable a more efficient financing of the

23  public lighting system for the City of Detroit, and you

24  cannot envision a single situation in which one penny more or

25  less than 12.5 million goes.  For instance, addressing

1    Mr. Montgomery's suggestion, the reason, first of all, it's a

2    million seven and not a million four initially is because it

3    wasn't for a full year.  The statute has a $12 million cap.

4    Larger payments for the remainder of 2013 could be made.

5    It's not multiplied by 12 because during that calendar year

6    it won't reach anything like the 12.5.  In year -- starting

7    in 2014, the 12.5 million can be amortized over the 12

8    months.  It's a lower payment, a million four.  But any

9    additional amount of money could not go from the PLA back

10   to --

11            THE COURT:  Million .04.

12            MR. MONTGOMERY:  Yeah, a million .04; a million

13   .041.  And that equals the twelve five.  This happens on a

14   monthly basis.  The money goes to pay the bonds.  Any

15   difference in the monthly pays -- goes to the PLA.  It always

16   adds up to 12.5 million, never a penny more, never a penny

17   less, doesn't matter, doesn't matter at all what the terms of

18   the subsequent financing are.  City never has 12.5 -- never

19   has less than 12.5, has no recourse liability, so taking

20   discovery on that transaction is wholly and completely

21   irrelevant because it can have no impact because it doesn't

22   matter because it's of no concern, so that makes no sense.

23   And, again, if you read 392 -- I won't belabor them -- 393

24   and 394, that's what it adds up to.

25            As far as the O&M and the maintenance agreement,

1   frankly, that is a 904(2) issue as well as the use of the

2   proceeds.  That O&M agreement never needed to be subjected to

3   approval of this Court, and, in fact, if the City of Detroit

4   were amenable, we would withdraw -- we have no objection --

5   the Public Lighting Authority has no objection to the

6   withdrawal of the operation and maintenance agreement from

7   this Court's -- from the request for approval by this Court

8   because that is a contract that could be entered into under

9   904(1) and (2).  It goes -- it's a quintessential

10  governmental service and a use of revenues to provide that

11  lighting.  So my suggestion, your Honor, is that no discovery

12  is necessary because there isn't any scenario where that 12.5

13  changes in any way, shape, or form based on those three

14  statutes and that subject to the agreement of the City of

15  Detroit and your Honor's concurrence, we would withdraw or

16  will have no objection to the withdrawal of the request that

17  this Court approve the O&M agreement because the city under

18  904(1) and (2) is authorized to enter into it without this

19  Court's blessing.

20          THE COURT:  Thank you, sir.

21          MR. GREEN:  Thank you, your Honor.

22          THE COURT:  I want to hear from the city.

23          MR. HAMILTON:  Thank you, your Honor.  Robert

24  Hamilton of Jones Day on behalf of the city.  The common flaw

25  of all of the arguments of the objectors is that, one, the

1  assertion that cash is fungible and somehow the relief we

2  have requested will reduce cash otherwise available either

3  directly or indirectly to their clients in a plan of

4  adjustment.  The same side of that coin worded a little

5  different by Mr. Marriott was we shouldn't do now on a

6  piecemeal basis steps that will foreclose options for payment

7  of creditors in the plan of adjustment down the road.  That

8  is the premise of all of their arguments.  That premise is

9  100 percent false.  It is false for two reasons.  Even if we

10 didn't -- hadn't yet created the PLA, if we hadn't even

11 already created and implemented the original trust agreement

12 and we were coming here and suggesting that we should do that

13 and we needed your Court's approval to do that, the idea that

14 setting up the financing this way would somehow reduce tax

15 money otherwise available to the creditors when we get to the

16 plan of adjustment stage is just wrong.  As the State of

17 Michigan set forth in their paper, in their reply, and in

18 their presentation and as counsel for the PLA just

19 articulated to some extent, the way it works is once you

20 establish the PLA, 12-1/2 million bucks of your utility tax

21 revenues have to go to fund the PLA.  That's where it goes,

22 and that's not reducing an option or a source of revenue

23 available at the plan of adjustment stage.

24         THE COURT:  This is what Mr. Green just said.

25         MR. HAMILTON:  Well, but let me finish.  It's not

1   exactly what he just said.  It's close.  The reason it

2   doesn't affect them is because if you don't fund the PLA, if

3   you don't create it and fund it with the 12-1/2 million, then

4   you have to -- because of Public Act 394, you have to reduce

5   the city's income tax from 2.4 percent to two percent over

6   the next four years, a .4 reduction -- .4-percent reduction

7   in income tax over the next four years.  If, on the other

8   hand, you create the PLA and fund it with 12-1/2 million

9   bucks, which is what we've done, then the city is exempt from

10   the requirement of reducing the income tax from 2.4 to 2.0

11   over the next four years.  They get to keep it at 2.4.  And

12   the statute requires that of that 2.4, .2 percent has to be

13   redirected to the police budget to make up for the fact that

14   you're taking 12-1/2 million out of the police budget to put

15   it in the PLA, which means that the ultimate result is if you

16   create a PLA and fund it, you end -- the City of Detroit ends

17   up with .2 percent more in income tax revenue than it would

18   otherwise have.  We end up with 2.2 percent available to

19   pay -- to provide city services and pay creditors, whereas if

20   we don't do the PLA, all we have is a two-percent tax, so the

21   bottom line is even if we hadn't already established the PLA,

22   if we were coming here asking for your approval to do so, the

23   result would be that by creating the PLA, we are increasing

24   the revenue available to the city to pay creditors in

25   addition to funding the PLA by .2 percent of an income tax.

1    However, you don't even get there because in this instance,
2    we've already created the PLA, so we're already obligated to
3    fund the $12-1/2 million every year.  That's already going.
4    So even if you don't approve this motion, that $12-1/2
5    million will never be available to pay Mr. Marriott's clients
6    at a plan of adjustment stage.  This motion doesn't foreclose
7    any option that is available to be considered in the plan of
8    adjustment process because the 12-1/2 million bucks at issue
9    is already gone.  The only thing we're asking this Court to
10   approve is our pledge about 12-1/2 million as security for
11   repayment of the bonds, but that 12-1/2 million bucks is
12   already gone and not available to creditors.
13        THE COURT:  Right.  If that's all you're asking the
14   Court to do, what's with the finding of fact that was read to
15   me that you want me to approve?
16        MR. HAMILTON:  The finding of fact that was read to
17   you was not verbatim.  The finding of fact is that the
18   pledging of the tax revenues is done in good faith under
19   364(e).  We are not asking you to approve the borrowing.  The
20   borrowing is not done by the City of Detroit.  The borrowing
21   is done by the PLA, which is not within this Court's review.
22   What's within this Court's review is the city's pledge of the
23   tax revenues, but there is no borrowing by the city for this
24   Court to put thumbs up or thumbs down on.  The borrowing is
25   by the PLA.

1        THE COURT:  Is the order you want me to enter

2  attached to your motion?

3        MR. HAMILTON:  I believe it is, yes.

4        THE COURT:  There haven't been any changes in it in

5  the meantime?

6        MR. HAMILTON:  Not that I'm aware of, your Honor.

7        THE COURT:  What do you think of Mr. Green's

8  suggestion?

9        MR. HAMILTON:  The problem with Mr. Green's

10  suggestion -- well, the first problem -- the first one

11  counsel for PLA pointed out.  The reason that it doesn't come

12  out to 1.04 right now is we're making up for the entire year

13  of 2013 in less than 12 months.  The second part of the

14  suggestion ignores the reality that the original trust

15  agreement, the current state of affairs already requires all

16  of the tax revenues, all 40 million, to go to the trust and

17  then the excess over 12-1/2 to come back to us.  That's

18  already the current state of affairs.  The MFA and Citibank,

19  the buyer of the proposed bonds by the MFA, have already

20  structured their transaction on the assumption that doesn't

21  change, so we can't close on a transaction that will result

22  in bonds being sold eventually by the MFA to Citibank if you

23  change -- if you force us to change a trust agreement so that

24  only some of the revenues go to the trust instead of all 40

25  million with the excess coming back to us.

1          THE COURT:  Perhaps I wasn't clear enough in my

2     question.  Mr. Green suggested that the city withdraw its

3     request for approval of the -- I think it's the operating and

4     maintenance contract.

5          MR. HAMILTON:  I got confused on counsel, your

6     Honor.  I thought you were talking about counsel for the

7     Retiree Committee.

8          THE COURT:  Montgomery.  No.

9          MR. HAMILTON:  You're talking Mr. Green for --

10         THE COURT:  Yeah.

11         MR. HAMILTON:  -- the PLA.

12         THE COURT:  He's the one on your side.

13         MR. HAMILTON:  The city is --

14         THE COURT:  He's on your side.

15         MR. HAMILTON:  Yes.  Got it.  My mistake, your

16    Honor.  I'm still trying to get the scorecard straight on

17    this.  The city is amendable to withdrawing the operation and

18    maintenance agreement from the request for the Court's

19    approval.  No one was requiring us to do that.  We thought in

20    order to try and fulfill everybody's demands for full

21    transparency that it was wiser to include the O&M agreement

22    in the body of documents, but technically we don't need the

23    Court's approval of that agreement.  All we need is the

24    Court's approval of our pledging of the revenues so the bonds

25    can be issued.

1        Other than that, I have -- the only other thing I
2    would say, your Honor, with Mr. Arnault's original arguments
3    about you can't make factual findings without facts, I
4    believe he's incorrect because, one, none of the material
5    facts are disputed; two, all of the material facts follow
6    from the laws of the State of Michigan and the contract
7    documents that we've attached to our motion, none of which
8    are disputed, and the third thing I would point out is,
9    consistent with what Mr. Green said, none of the parties here
10   have an economic stake in this whatsoever, so they have no
11   right to insist on discovery, litigation, and a full
12   evidentiary trial in which they have no standing in which to
13   argue.  The amount of money --
14        THE COURT:  They're concerned about the future of
15   the City of Detroit.
16        MR. HAMILTON:  Everybody is concerned about the
17   future of Detroit, but in terms of what they're asking for,
18   they're asking for discovery and an evidentiary hearing on
19   issues that they have no right to raise and this Court
20   doesn't have the ability to review about whether the PLA's
21   deal with the MFA and Citibank is reasonable or not.  You
22   don't have the ability to review that because that's
23   borrowing by the PLA, not by the City of Detroit.  What you
24   have the -- what you have the -- what we've asked you to do
25   is approve the pledging of revenues that are not available to

1 them in any way at all anyway. Why should the City of

2 Detroit and its residents incur the expense and more

3 importantly the delay for discovery and a full-blown

4 evidentiary hearing on something that doesn't affect them by

5 one penny in any way, and nobody has answered that question

6 because there is no answer.

7     THE COURT: All right. There was one more person

8 that wanted to speak, which I will allow for two minutes, and

9 then I'm going to take the matter under advisement.

10     MR. ANGELOV: Your Honor, Mark Angelov for Ambac

11 Assurance Corporation. Frankly, the view that the city and

12 the PLA have of this transaction is somewhat simplistic.

13 Yes, it is true that $12-1/2 million is committed to fund the

14 operation of PLA. However, not all of that money must be

15 dedicated to debt service. The statute caps the debt service

16 permissible at $12-1/2 million, but it also contemplates that

17 administrative expenses and even power can be paid for using

18 that $12-1/2 million. And so to say that there is no way

19 that this -- the resolution of this motion will affect monies

20 that are available to the creditors is simply -- it's

21 simplistic.

22     And as far as the proposed order goes, I would like

23 to read to your Honor the language that -- of the factual

24 finding that the city wants this Court to make. The PLA

25 transaction documents --

1          THE COURT:  I've got it here.  What page are you on?

2          MR. ANGELOV:  This is Section E --

3          THE COURT:  E?  Okay.

4          MR. ANGELOV:  -- of the proposed order.

5          THE COURT:  Hold on.  Okay.  Go ahead.

6          MR. ANGELOV:  The PLA transaction documents are the

7   result of good faith arm's length negotiations among the

8   debtor, the PLA, the MFA, and the initial purchasers of the

9   MFA bonds.  There is no evidence in the record whatsoever

10  concerning those negotiations.

11         THE COURT:  All right.  Thank you.

12         MR. ANGELOV:  Thank you, your Honor.

13         THE COURT:  Mr. Green, I've got to call you back to

14  the lectern.

15         MR. GREEN:  Thank you, your Honor.

16         THE COURT:  I have to ask you in all candor how I

17  can find good faith arm's length negotiations when your firm

18  represents both parties to this transaction, albeit not on

19  the transaction but on a continuing ongoing basis in this

20  case.

21         MR. GREEN:  Okay.  Well, let me --

22         THE COURT:  How can I find that that's good faith

23  arm's length?

24         MR. GREEN:  Let me address, first of all, what the

25  good faith standard is and then apply it to the question you

1    asked.

2              THE COURT:  Good faith arm's length.

3              MR. GREEN:  I was going to -- yes.  Collier's -- I'm

4    looking at Collier's.  It's Volume 3, and I'm going to read

5    because it's -- I think it is instructive.  In 364 --

6    paragraph 364.061, and let me -- yeah -- at 364-32, "The

7    courts disagree as to whether the trial court may make an

8    express finding of good faith.  Some courts so hold while

9    other courts hold that good faith may be presumed, although

10   the presumption may be overcome by evidence in the record

11   below.  Lack of good faith includes" -- this is what we're

12   talking about when we talk about good faith for 364(e)

13   purposes.  "Lack of good faith includes knowledge of the

14   illegality of the transaction, an action taken for an

15   improper purpose such as to gain some advantage in litigation

16   or otherwise, or a failure to reveal material facts to the

17   Court.  Bad faith has also been found where it is evident

18   from the loan agreement itself that the transaction has an

19   intended effect that is improper under the Bankruptcy Code,"

20   and they cite EDC Holding for that.

21             The type of bad faith they are talk -- good faith

22   that is applicable in 364(e) is good faith on those kinds of

23   terms.  This is a financing --

24             THE COURT:  I accept all of that, but --

25             MR. GREEN:  Okay.

1       THE COURT: -- your order or the city's order here

2  says the results of good faith arm's length negotiations.

3  How can I find arm's length negotiations when your firm is on

4  both sides of --

5       MR. GREEN: Your Honor, with all --

6       THE COURT: -- this transaction?

7       MR. GREEN: With all due respect, my firm was not on

8  both sides of this transaction.

9       THE COURT: All right. Fair enough. I'll accept

10  that as a factual matter, but the truth remains that your

11  firm represents both sides of this transaction in this case.

12       MR. GREEN: We are not representing both sides of

13  this transaction in this case. We are not --

14       THE COURT: Your firm represents the City of

15  Detroit.

16       MR. GREEN: Not --

17       THE COURT: Your firm represents the PLA.

18       MR. GREEN: Not --

19       THE COURT: Both in this case.

20       MR. GREEN: We are not representing the City of

21  Detroit in this case with respect to this transaction.

22       THE COURT: But you are on both sides -- you do

23  represent both parties in this case.

24       MR. GREEN: In this case but not with respect to

25  this matter.

1          THE COURT:  So I ask again how can I find arm's

2     length negotiations in that circumstance?

3          MR. GREEN:  I'm representing to the Court that I

4     represented -- we represented the PLA in arm's length

5     negotiations with -- your Honor, look, there isn't -- if the

6     question is merely by virtue of the relationship you

7     described, it could not be in good faith, and I'm not going

8     to be able to convince you otherwise.  I'm here to tell

9     you -- and if it was a factual inquiry to that effect, I

10    would tell you the same thing -- I represented the Public

11    Lighting Authority in this transaction even though we

12    represent the City of Detroit in this case.  And when I look

13    at the standards of good faith negotiations and I look at the

14    discussion about presumptions of good faith negotiations and

15    I look at it in the context of a transaction that has not one

16    bit of impact, not one bit of impact on this transaction --

17    this is a statute, your Honor.  In fact, we wouldn't even

18    need to be before your Honor on the financing piece arguably

19    but for the fact --

20         THE COURT:  Are you going to ask the city to

21    withdraw that, too?

22         MR. GREEN:  No, I'm not going to ask the city to

23    withdraw that.

24         THE COURT:  All right.  I'm going to take this under

25    advisement, and I will give you a decision in 20 minutes, so

1  that'll be 10:55, please.

2          MR. GREEN:  Thank you, your Honor.

3          THE CLERK:  All rise.

4          THE COURT:  Does someone have a written version of

5  the order I can borrow?  All right.  Just hand that to my

6  staff, and we'll be in recess.

7      (Recess at 10:32 a.m. until 11:15 a.m.)

8          THE CLERK:  Court is in session.  Please be seated.

9  Recalling Case Number 13-53846, City of Detroit, Michigan.

10         THE COURT:  One second, please.  Everyone is here.

11  Rule 1.7 of the Michigan Rules of Professional Conduct states

12  in Part (a), "A lawyer shall not represent a client if the

13  representation of that client will be directly adverse to

14  another client, unless:  (1) the lawyer reasonably believes"

15  that -- or "reasonably believes the representation will not

16  adversely affect the relationship with the other client; and

17  (2) each client consents after consultation," close quote.

18  Under this rule, in these circumstances, client consent is

19  not by itself enough.

20             In the circumstances, therefore, the Court is going

21  to suspend its consideration of this motion and give the city

22  and the Public Lighting Authority and any other interested

23  party a brief opportunity to brief this issue or these two

24  issues.

25             Issue number one, whether this rule 1.7(a) of the

1  Michigan Rules of Professional Conduct, requires the Court to

2  disqualify Miller Canfield from its representation of the

3  Public Lighting Authority in this city, the consequence, of

4  course, which would be the denial of this motion and the

5  necessity of the city to start over with its negotiations

6  with the PLA represented by an attorney who doesn't have a

7  conflict of interest.

8          Issue number two, how can the Court -- assuming we

9  get past issue number one, how can the Court find good faith

10  arm's length negotiations as the city requests the Court to

11  find in these circumstances even if we assume and find that

12  the conflict was properly waivable under Rule 7 -- excuse

13  me -- 1.7(a)?

14          In the alternative, of course, the city is free to

15  withdraw this motion.

16          Finally, I'll comment that it was most unfortunate

17  that this issue came to the Court's attention in the way that

18  it did because it is going to result in unnecessary delay.

19  The Court will allow briefs on this matter until a week from

20  today, so that's Wednesday, the 5th.  Wednesday, the 4th.

21  Thank you.  Wednesday, December 4th.  And we'll move on to

22  the next matter.  Oh, at that point, the matter will be under

23  advisement, and I'll just issue a written order.  There will

24  be no further oral arguments.

25          (Proceedings concluded at 11:19 a.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett          November 30, 2013
_____      _____
Lois Garrett