UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                              Chapter 9
                                                    Case No. 13-53846
City of Detroit, Michigan,

    Debtor.
_____/

**INTERESTED PARTY DAVID SOLE'S EXPEDITED MOTION, DUE TO TO CONFLICT OF INTEREST PURSUANT TO MRPC 1.7, TO DISMISS DEBTOR CITY OF DETROIT'S MOTION TO APPROVE FOREBEARANCE AGREEMENT [DOCKET 157]AND TO DISMISS AT LEAST IN PART DEBTOR'S MOTION FOR A FINAL ORDER APPROVING POST-PETITION FINANCING, GRANTING LIENS AND PROVIDING SUPERPRIORITY CLAIM STATUS AND MODIFYING AUTOMATIC STAY [DOCKET 1520]**

Now comes Interested Party David Sole, and in support of his motion to Dismiss Debtor's Motion to Approve Forbearance Agreement [Docket 157] and to Dismiss at least in Party Debtor's Motion for a Final Order to Approve Post-Petition Financing [Docket 1520], due to Conflict in Interest Pursuant to MPRC 1.7 states as follows:

1. Debtor's has filed a Motion to Approve Forbearance Agreement [Docket 157] and a companion Motion to Approve Post-Petition (the Barclay's loan deal) [Docket 1520].

2. Under the proposed forbearance agreement, if approved, the City of Detroit would pay Bank of America and UBS 82% of the termination fees on the 2009 Amended Interest Rate Swaps, on top of the over $250 million Bank of America and UBS have already netted on the Swaps.

3. The termination fees range from $290 million (amount listed in Debtor's Motion, Docket 1520, to $343 million, the amount cited by Emergency Orr in his June 14, 2013 Financial Report to Creditors.

4. That means under the forbearance agreement, the City of Detroit will agree to pay Bank of America and UBS somewhere between $237.8 million to $287 million.

5. The forbearance agreement removes the interest swaps and associated termination fees from the Chapter 9 bankruptcy case.

6. To pay off the termination fees to Bank of America and UBS, the Emergency Manager has secured a $350 million loan from Barclay's Bank, with $237.8 million to $287 million to be used to pay off the termination fees on the swaps, with the remainder to be used to fund "Quality of Life" services for Detroiters.

7. Interested Party David Sole has filed objections both to the City of Detroit's Motion to Approve the Forbearance Agreement [Docket 361] and to the City of Detroit's Motion to Approve the Barclay's loan. [Docket 1857] The hearing on these motion is currently set for December 17-19

8. In his Objections with attached Exhibits, Interested Party Sole argues that the forbearance agreement was not in the best interest of the people of Detroit because the termination amounts and the Swaps themselves could potentially be crammed down in bankruptcy and be subject to forbearance or disallowance on equitable grounds, especially in light of at the least potential fraud or misconduct by Bank of America and UBS in connection with securing the Swaps and the connected Pension Obligation Certificates, as well as misconduct by the banks in connection with precipitating the financial crisis in Detroit through their predatory mortgage lending practices. See Docket 361. See Docket 1857.

9. The 82 cents on the dollar to be paid to Bank of America and UBS is far greater than the 16 cents on the dollar being offered thus far to unsecured creditors and retirees.

10. In addition, at least at this point the payments of termination fees to Bank of America and UBS is subject to the Automatic Stay provisions of the current bankruptcy, and thus far they are unsecured loans.

11. As a result, Interested Party Sole submits that the forbearance agreement should be rejected and the Swaps should be treated the same as other creditors with their fate to be determined during the fairness hearings after the City of Detroit submits its plan.

12. To the extent that the Barclay's loan is to be utilized to pay the termination fees on the interest rate swaps, Interested Party Sole is asking the court to reject this loan.

13. By its terms, as outlined more fully in Interested Party Sole's objection to the loan [Docket 1857], this loan if adopted will have disastrous effects on Detroiters for years to come, earmarking 20% of income tax revenues for payments to Barclays in order to pay off Bank of America and UBS, thus keeping Detroiters enslaved to the banks for years to come.

14. Interested Party Sole is not opposed to the part of the Barclay's loan earmarked for "Quality of Life" improvements for Detroiters, though cautions the Court to examine this part of the loan closely as its real intent appears to pay tens of millions of dollars to consultants whose benefit to the city is dubious at best.

15. In his August 30, 2013 deposition, Emergency Manager Orr, in questioning about allegations of fraud and wrongdoing by Bank of America and UBS in connection with the municipal bond market, admitted that "we have calculated and analyzed the possibility that there may be issues surrounding potential concerns in connection with the Swap agreement, the answer is yes." Exhibit 1, Orr deposition p 324.

16. Emergency Manager Orr, in response to a question of whether he requested a criminal investigation Bank of America and UBS in connection with the Swap deal, in light of the convictions of three UBS municipal bond executives in 2013 and the indictment of a Bank of America executive in 2012, stated that there are matters under investigation that may or may not implicate this subject matter. Id. pp 326, 327.

17. When Emergency Manager Orr was asked with whom discussion took place concerning whether to pursue investigations of potential concerns in connection with the Swap agreements, Emergency Manager Orr stated that he would have had discussions with his counsel, Jones Day. Id., pp 324, 325.

18. Incredibly, Emergency Manager Orr admitted that Bank of America is in fact a client of Jones Day, though he stated he did not see any conflict with Jones Day investigating their own client for fraud or criminal activity. Id. p 325.

19. Bank of America is listed on Jones Day's client list. Exhibit 2, attached.

20. Jones Day has also done a great deal of work for UBS, assisting in bond offerings and real estate purchases. Exhibit 3, attached.

21. Michigan Rule of Professional Responsibility 1.7 Conflict of Interest: General Rule, states:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

  (1) the lawyer reasonably believes the representation will not adversely affect the relationship with the other client; and

  (2) each client consents after consultation.

(b) A lawyer shall not represent a client if the representation of that client may be

materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. When representation of multiple clients in a single matter is undertaken, the consultation shall include an explanation of the implications of the common representation and the advantages and risks involved.

22. The commentary to MRPC 1.7 states:

**Loyalty to a client is also impaired when a lawyer cannot consider, recommend, or carry out an appropriate course of action for the client because of the lawyer's other responsibilities or interests. The conflict in effect forecloses alternatives that would otherwise be available to the client. Paragraph (b) addresses such situations. A possible conflict does not itself preclude the representation. The critical questions are the likelihood that a conflict will eventuate and, if it does, whether it will materially interfere with the lawyer's independent professional judgment in considering alternatives or foreclose courses of action that reasonably should be pursued on behalf of the client. Consideration should be given to whether the client wishes to accommodate the other interest involved.**

23. The commentary to MRPC 1.17 continues:

Conflicts of interest in contexts other than litigation sometimes may be difficult to assess. Relevant factors in determining whether there is potential for adverse effect include the duration and intimacy of the lawyer's relationship with the client or clients involved, the functions being performed by the lawyer, the likelihood that actual conflict will arise, and

the likely prejudice to the client from the conflict if it does arise. The question is often one of proximity and degree.

**For example, a lawyer may not represent multiple parties in a negotiation whose interests are fundamentally antagonistic to each other,** but common representation is permissible where the clients are generally aligned in interest even though there is some difference of interest among them.

24. In the present case, there is clearly conflict between Jones Day's representation of the City of Detroit in negotiations with Bank of America, a client of Jones Day, and possibility UBS as well.

25. One of the factors that should have gone into the negotiation of a forebearance agreement that would remove the interest rate swaps from the bankruptcy proceeding and pay Bank of America and UBS 82 cents on the dollar on their termination fees on swaps, is whether or not the City of Detroit could uncover wrongdoing by Bank of America and UBS in connection with the swaps, that could then be raised as an equitable argument during bankruptcy fairness proceedings for a much lower payment to Bank of America and UBS on the Swaps.

26. Incredibly, while acknowledging the potential basis for such wrongdoing, Emergency Manager Orr relied on Jones Day, Bank of America's lawyers, to conduct such an investigation into wrongdoing and even criminal conduct.

27. Obviously, relying on Jones Day to investigate its own clients for wrongdoing presents a conflict of interest in violation of MRPC 1.7.

28. This conflict is especially critical in the present case, where over 20,000 City of Detroit retirees who worked their entire lives for the city in expectation of a pension

they could live on are now being asked to consider potentially drastic cuts in pensions, and where unsecured creditors are being asked to consider payments of 16 cents on the dollar.

29. In contrast, Bank of America and UBS, two banks who helped precipitate the financial crisis in Detroit with their racist, predatory lending practices which helped result in approximately 100,000 mortgage foreclosures in the city, and who have already profited to the tune of $250 million for betting that a financial collapse they precipitated would lead to a windfall on the swaps, now stand to garner a further heap of money which city of Detroit taxpayers will paying with 20% of income tax revenues for years after the bankruptcy concludes.

30. The commentary to MRPC 1.7 makes clear that it is the duty of the attorney to report the potential conflict to the court.

31. In fact, in this case Interested Party Sole's attorney raised the potential conflict to Emergency Manager Orr in deposition on August 30, 2013.

32. Interested Party Sole's attorney was prompted to raise this motion in part because of the ruling of this honorable court in the lighting motion on November 27, 2013.

33. In addition, Interested Party Sole does not object to the "Quality of Life" section Barclay's loan in so far as it is utilized to provide needed services to Detroit's residents, as Mr. Sole, his spouse (also a City of Detroit retiree) are all residents of Detroit who genuinely appreciate the need to improve services.

34. Interested Sole will be submitting an Ex Parte Motion for Expedited Hearing on this motion simultaneously with the filing of this motion.

DATED: November 12, 2013

Respectfully submitted,

JEROME D. GOLDBERG, PLLC

By: */s/ Jerome D. Goldberg*
Jerome D. Goldberg (P61678)
Attorney for David Sole, Party in Interest
2921 East Jefferson, Suite 205
Detroit, MI 48207
Phone: 313-393-6001
Fax: 313-393-6007
Email: apclawyer@sbcglobal.net