# EXHIBIT 1

one.
BY MR. GOLDBERG:
Q. Okay. So Exhibit Number 6.
**A. Okay. Mr. Goldberg, which page were you at?**
Q. Page 34.
**A. Of the original document?**
Q. Yes.
**A. Okay.**
Q. Here we go, that chart, 34. And it's a chart that says study that -- lists for fiscal years ended actual expenditures for 2008 to 2012; is that correct?
**A. Yes.**
Q. I just want to be clear. It has under POC Swaps GF. That means general fund?
**A. Yes.**
Q. EF, is that enterprise fund?
**A. Enterprise fund excluding department of transportation.**
Q. And I'm trying to understand, does that mean that part of the POC Swaps are paid -- a small part is paid from the enterprise fund?
**A. Yes. You'll see the corresponding numbers show for those categories.**
Q. Okay. And I totaled up the years from 2008, 2012. It appears that $247.5 million was paid on for the POC

Swaps during those years.
**A. I don't have that total in front of me, but I'm going to take it that that's the accurate number.**
Q. It appears that it's usually about between 45 to 50 million a year.
**A. Right, if you average 5, 10, 15, 20.**
Q. Just so we're clear, I mean, that 247 million, none of that went to turn on any lights in the City of Detroit, did it?
MR. SHUMAKER: Object to the form.
**A. It was legacy expenditures, debt service.**
BY MR. GOLDBERG:
Q. It basically went to UBS and to Bank of America. It was their reward for betting correctly on a hedge bet, right?
MR. JURGENS: Objection to form.
MR. SHUMAKER: Objection to form.
**A. Yeah, I'm going to stay away from characterizing it as a reward. There were payments made pursuant to existing certificates of participation at that time.**
BY MR. GOLDBERG:
Q. And it was based on, as we talked about before, that the difference between the interest rate on the floating rate Swaps -- on the floating rate COPs and the fixed rate that the -- that the City was obligated

to pay the Swap counterparties, correct?
A. Yes --
MR. SHUMAKER: Objection to form.
**A. -- as we discussed earlier today.**
BY MR. GOLDBERG:
Q. Just so I'm clear, the -- what we're talking about with the optional termination event. The exhibit -- the same exhibit you're referencing -- let's just get this -- I want to call your attention to page 28.
**A. Of the same exhibit?**
Q. Same exhibit.
**A. Okay.**
Q. Am I correct in the -- that that reflects that as of May 31, 2013, according to your proposal for creditors, the negative fair value of the Swaps was $343.6 million?
**A. That's what it says. Recent valuations established the negative fair value --**
COURT REPORTER: I'm sorry. You're reading way too fast.
THE WITNESS: I'm sorry.
**A. Recent valuations established. The negative fair value of the Swaps at approximately 343.6 million as of May 31st.**
BY MR. GOLDBERG:

Q. So in the optional termination policy that's part of the forbearance agreement, if the City was to pay the initial payment, the City would still owe 264 -- we'd be paying 264 million approximately on the Swaps?
MR. SHUMAKER: Objection to form.
BY MR. GOLDBERG:
Q. We'd be paying 75 percent of whatever the termination amount is at that point?
**A. Well, it's 75 percent of termination amount at that point, which I believe has since declined from May 31st.**
Q. Why do you say it's declined?
**A. Because interest rates have shifted, and so at any given time we'd have to value the interest rate formula at the time you choose to exercise the optional termination provision of the forbearance agreement.**
Q. The interest rate that we're talking about on the Swap is linked to the LIBOR; isn't that correct?
**A. Yes.**
Q. The three-month LIBOR?
**A. Yes. I believe so.**
Q. I pulled the three-month LIBOR historical index. It indicated that as of -- might as well as mark this as an exhibit.

entered into, correct?
MR. JURGENS: Objection to form.
MR. SHUMAKER: Objection, form.
A. Here again, as I've said a couple of times today, I'm going to stay away from legal conclusions as to whether or not a lien would or would not have existed. There are equitable liens that arise ex contractu outside of law. There are other issues, but suffice it to say this agreement seemed to impose a lien as a matter of the agreement on the casino revenue.
BY MS. GREEN:
Q. Okay. You're not claiming any equitable lien?
MR. JURGENS: Objection.
A. We're not claiming a lien. We've done an analysis, and there have been several memos that have gone back and forth from counsel analyzing a number of different issues at law and at equity. We -- there's -- me, personally, under our agreement, there's no -- been no assertion of an equitable lien.
MS. GREEN: I have nothing further then.
THE WITNESS: Sure.
Do you need -- you need this, don't you?
Is this -- did you -- excuse me. Did you mark this?
MS. GREEN: We can mark it as an exhibit.
I don't know that anyone has marked it yet. We can

mark it as Exhibit 7.
MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBIT 7
3:20 p.m.
(Discussion off the record at 3:20 p.m.)
(Back on the record at 3:20 p.m.)
MS. GREEN: I thought maybe it was earlier and I just didn't know.
THE WITNESS: No, I don't think it was.
MS. GREEN: It's hard to hear down there.
THE WITNESS: We talked about the collateral agreement.
MS. GREEN: We did. Okay.
VIDEO TECHNICIAN: Do we need to go off the record for the second or are we staying on? Are you asking questions?
MS. GREEN: Oh, were we on?
THE WITNESS: We can shut up.
MR. SHUMAKER: Why don't we go off for one minute to get ourselves together.
VIDEO TECHNICIAN: All right. Thank you.
The time is 3:20 p.m. We are off the record.
(Recess taken at 3:20 p.m.)
(Whereupon Lally Gartel and Stephen Hackney

left the deposition at 3:21 p.m.)
(Back on the record at 3:22 p.m.)
VIDEO TECHNICIAN: We are back on the record at 3:22 p.m.
EXAMINATION
BY MR. GOLDBERG:
Q. How are you doing, Mr. Orr?
A. Hello, Mr. Goldberg. How are you?
Q. We met before. I'm Jerome Goldberg. I represent David Sole, who's an interested party, he's a retiree, along with his wife, who's also a retiree.
MR. GOLDBERG: First of all, I want to just go on the record and thank Kirkland & Ellis and the other attorneys for their patience and their working with other attorneys in this case, and especially someone like me who represents a very different point of view and that they were objective and fair their -- in accommodating all the objectives here.
BY MR. GOLDBERG:
Q. Let me begin by asking just a few questions just so we can put some of this into perspective. I want to call your attention to Exhibit 3.
A. Yes. Okay.
Q. On page 34 of Exhibit 3, there's a chart here that references expenditures from the years 2008 to 2012?

A. Yes.
Q. And it indicates -- first of all, I just had a question. Under the POCs, it has POC Swap GF, I assume that means general fund?
MR. SHUMAKER: Counsel, I think you may be pointing to a different page than the witness has in front of him.
BY MR. GOLDBERG:
Q. It's page 34 in mine. Which one did I give you? I'm talking about the June 14th, 2013.
MR. SHUMAKER: Yeah, there's an executive summary and then there's a bigger one. Are you looking at the bigger one?
MR. GOLDBERG: I have copies of what I'm looking at.
A. These are the executive summaries.
MR. GOLDBERG: Why don't I mark these and that will make it easier.
THE WITNESS: And the larger one is this one.
MR. SHUMAKER: The larger one is Orr Number 6. Take a look at that.
MR. GOLDBERG: Sure. Yeah, this is the one I'm looking at.
THE WITNESS: That's the one, the larger

MR. GOLDBERG: Can you mark this as an exhibit?
MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBIT 8
3:29 p.m.
BY MR. GOLDBERG:
Q. It appears that as of August of 2013, the three-month LIBOR rate was .2655 percent?
MR. SHUMAKER: Objection, foundation.
**A. Is there -- if you're talking about --**
BY MR. GOLDBERG:
Q. Under 2013.
**A. 2013, a specific category in August which reads 0.26550.**
Q. Right. So it's actually gone down since July of 2013 according to this chart.
**A. Yes. Did I say up before?**
Q. You had indicated that the interest rates -- right, that the -- I mean, if it goes down, the City owes more; isn't that correct?
**A. Right.**
Q. Just so we're clear again, that 200 -- whatever -- whether the figure is 247 million or 200 million, the optional termination payment is not going to be -- the City gets no direct benefit from that payment?

MR. JURGENS: Objection.
MR. SHUMAKER: Objection to form.
**A. Well --**
BY MR. HACKNEY:
Q. Let me be -- strike that question.
No lights get turned on from that money.
That's money that comes out of the City budget.
MR. SHUMAKER: Same objection.
**A. Well, it's money -- yeah, I would say that it's money that the City is obligated to pay in some fashion, but to the extent we get a discount, the City benefits.**
BY MR. GOLDBERG:
Q. I heard before the testimony, and I think it's pretty obvious, that the City does not have the money on hand to pay that termination amount, correct?
MR. JURGENS: Objection to form.
**A. Yes, I'm told that is correct.**
BY MR. GOLDBERG:
Q. And to do so it's going to have to float another bond or some kind of loan?
**A. Well, it would have to in some fashion derive some funding from the capital markets, yes.**
Q. Okay. I read something, and I heard the same figures floated here. I read an article in the Detroit News and I heard the same -- I wasn't able to come

yesterday due to an illness of my wife, but --
**A. Oh, I'm sorry.**
Q. -- they were talking about a $350 million bond of some kind that is being looked into being floated, correct?
**A. Here again, I want to be careful. It's unclear whether or not it is a bond.**
Q. Okay.
**A. What is clear is there's some post petition financing proposal which are quite sensitive, but that number is not an unreasonable number and it has been mentioned about in the press.**
Q. And is it reasonable to say that that 2 -- 350 million is not going to come free to the City?
**A. No. The City will have to finance it in some fashion.**
Q. I mean, I did a little research myself and looked up a bond in Ann Arbor that was recently financed for 340 million at 4 percent which is, I would think we both agree, was a good interest rate --
**A. Um-hm.**
Q. -- and the -- Ann Arbor would be paying 230 million in interest on that bond over a 25-year period.
**A. Here again, Mr. Goldberg, I want to be very careful. Without representing or agreeing that the post petition financing that's being discussed will take the characteristic of a bond.**

Q. No problem. But either way, we are in agreement that that financing -- we don't have -- the City does not have a source for -- it doesn't have a relationship with the Fed that the banks have where it gets a zero qualitative easing and zero percent loans, does it?
**A. The City does not -- is not a qualified financial institution to go to the Fed discount window nor does it have an extra several hundred million dollars in its funds.**
Q. Let me ask another question. I want to call your attention to the forbearance agreement.
**A. Yes.**
Q. Which exhibit is that?
**A. That's Exhibit 2.**
Q. Let me call your attention to page 14.
**A. Yes.**
Q. And it indicates under mid-market amount --
**A. Yes.**
Q. -- am I reading it correctly to say that the -- when the optional termination goes into effect, assuming it goes into effect, that the calculation on what's owed on the Swap that's the basis for the termination is based on the ISDA fix 3?
MR. SHUMAKER: Objection to form. The document speaks for itself.

Page 321

BY MR. GOLDBERG:
Q. Okay.
A. Yeah, here again, the document speaks to itself and it says methodology that is agreed to by the City and based upon the present value as it speaks to the rest of the document, yes.
Q. Have you looked into the fact that there's a lot of literature out now that's exposing a pretty large scandal with reg -- regard to the ISDA fix that involves and implicates both Bank of America and UBS?
MR. JURGENS: Object to form.
A. Without characterizing the nature of the literature, I think it's safe to say that I am aware of some issues that have been discussed regarding ISDA, fixed.
BY MR. GOLDBERG:
Q. Are you aware also of issues that have come out with regard to the LIBOR, specifically with regard to UBS and Bank of America in the setting of using the LIBOR as a standard?
MR. JURGENS: Objection to form.
A. I am aware that in the past years there have been some questions raised regarding the LIBOR for certain financial institutions, yes.
BY MR. GOLDBERG:
Q. Has that affected your analysis of how to deal with

Page 322

the Swap counterparties in terms of the -- the forbearance agreement?
A. No.
Q. The fact that it's potential fraud was involved in the setting of these --
MR. JURGENS: Objection to form.
MR. SHUMAKER: Objection to form.
A. Mr. Goldberg, I'm going to defer from accepting the characterization of potential fraud. It is -- it is as reported.
BY MR. GOLDBERG:
Q. Okay. That's fine.
Are you also aware that the -- that UBS was -- let me find that.
Are you aware that UBS has been sued by the Securities and Exchange Commission for rigging in regard to municipal bonds?
A. In past years?
Q. That there was a final judgment -- yes, in past years.
A. Yes.
Q. Are you aware of the final judgment that was -- there was a final judgment on a case that was filed on -- it's 112539 -- that -- and that one of the bonds that actually was involved in that case was the Detroit water and sewage bond case?

Page 323

A. I had heard that. I have not read the final judgment.
Q. Well, I'd be glad to pass you down a copy.
MR. GOLDBERG: Why don't we mark this.
MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBIT 9
3:36 p.m.
BY MR. GOLDBERG:
Q. Are you also aware that Bank of America has been investigated for potential rigging with regard to the municipal bond market?
MR. JURGENS: Objection to form.
A. I am aware that Bank of America has been investigated. The exact specifics of the investigation I am not aware of.
BY MR. GOLDBERG:
Q. In light of these investigations that deal with rigging of the municipal bond market, was that taken into consideration by the City in how to approach the question of this forbearance agreement and potential action on these Swaps?
A. Perhaps you could be more specific in what way you're asking whether that was taken into consideration.
Q. I mean, if there, in fact, was fraud -- based on the fact there's at least an indication of fraudulent activity by both Bank of America and UBS within the

Page 324

municipal bond market, has there been any investigation as to whether or not that was the case with -- with regard to the Swaps associated with the POCs?
MR. JURGENS: Objection to form.
MR. SHUMAKER: Objection to form, foundation.
A. Yeah, first, it's not clear that there was fraud with respect to POCs. I think your prior question concerns Bank of America concerned bonds at DWSD that as my understanding are not implicated by this process meaning the forbearance agreement, but have we calculated and analyzed the possibility that there may be issues surrounding potential concerns in connection with the Swap agreement, the answer is yes.
BY MR. GOLDBERG:
Q. And who was -- who were those discussions with in terms of whether or not to pursue that?
A. I would have had discussions with my counsel.
Q. When you say your counsel, who do you mean?
A. My attorneys.
Q. Jones Day, is that --
A. Well, Jones Day. We also have local counsel that's involved that's sitting here, Pepper Hamilton, and others.

Q. I mean, isn't Jones Day -- doesn't Jones Day represent this Bank of America as one of its clients on its Web site?
**A. Yes, Jones Day does represent Bank of America.**
Q. How could Jones Day investigate one of its own clients for potential fraud?
**MR. SHUMAKER:** Objection, form.
**MR. JURGENS:** Objection, form.
**A. I am today, Mr. Goldberg, a client of Jones Day. The specific practices of Jones Day regarding its investigations, I would suggest that you refer to them.**
BY MR. GOLDBERG:
Q. Okay. I'm just saying you utilize them --
**A. Yes, I do.**
Q. -- for their -- for their advice on whether or not to conduct such an investigation. I'm trying to ask you as your -- in your independent position as emergency manager, wouldn't you think that a law firm that represents the precise person you're asking to investigate for fraud could not give you an objective appraisal?
**A. No.**
**MR. JURGENS:** Objection to form.
**MR. SHUMAKER:** Objection to form.

**A. No. In my experience, having worked now at three different law firms, I have seen situations where law firms are fully capable of investigating clients, yes.**
BY MR. GOLDBERG:
Q. Are you aware that three executives of UBS were in -- recently jailed that -- who were involved in municipal bond division were recently jailed?
**A. I'm aware that there were prosecutions related to UBS. I wasn't aware of the exact number or who they are.**
Q. Okay. I do have -- now, I'm not privy to much on that either, but I do have articles that do cite that.
**A. Okay.**
Q. And they cited three people who were just convicted in July of this year.
**A. Okay.**
Q. Are you aware that Bank of -- an executive of Bank of America in its municipal bond division was indicted in 2012?
**A. I don't recall if I was aware of that.**
Q. Okay. Let me just ask under -- pursuant to the Public Act 436 section 13 -- section 16, aren't you mandated to conduct a criminal investigation, or at least to refer potential suspicion of criminal investigation to the Attorney General in connection with -- if there's any kind of criminal activity associated with the

financial crisis in Detroit?
**A. Yes. To be clear, under 436 I have no independent prosecutorial authority, but I do have the authority to make criminal referrals to appropriate prosecutorial authorities.**
Q. In light of the cost to the City of the Swaps and the continuing costs, which we all acknowledge will be substantial even in light of the forbearance agreement, have you made any referral to at least do a -- conduct an investigation based on the evidence that, that -- I'm not accusing them of criminal activity in these activities. I have no basis for doing that, but on the other hand that fact that their -- some of their top executives in this area have been convicted would at least lead me to want to take a look at that in light of Detroit's situation.
**MR. JURGENS:** Objection to form.
**MR. SHUMAKER:** Objection, form.
**A. Yeah, it is a run-on question, Mr. Goldberg, but let me say this. We are -- we have an -- analyzed to the degree and looked at everything significantly related to this transaction. Any --**
BY MR. GOLDBERG:
Q. Have or have not? I'm sorry.
**A. We have. We have.**

Q. Okay.
**A. If there appears to be a basis for making a criminal referral of any kind related to anything that falls under my purview of 436, I will do that.**
Q. But at this point nothing -- there hasn't even been a request for such an investigation?
**A. I would be careful about -- I -- I have asked -- there are matters that are under investigation that may or may not implicate the subject matters you're talking about. I'm going to defer to speak about them further.**
Q. Okay. Are you familiar with the circumstances that led to the 2005 Swap?
**A. I'm familiar with what I've read. I wasn't here in the City at the time.**
Q. Do you know why Moody's -- not Moody's -- Fitch and Standard & Poor's would have been at the table along with UBS when this -- when this was discussed?
**A. First, I don't know that they were at the table and, secondly, if they were, I do not know why they would have been.**
Q. Well, I do have a photograph of them at the table which I'd be glad to share with you --
**A. Okay.**
Q. -- from the Michigan Citizen. It was taken at that

time. Let me see if I can find that.
MR. GOLDBERG: Here, I can mark this.
**MARKED FOR IDENTIFICATION:**
DEPOSITION EXHIBIT 10
3:43 p.m.
**BY MR. GOLDBERG:**
Q. This is a photograph taken by the -- it was in the Michigan Citizen July 31st, 2005, it reflects a picture of Sha -- Sean Werdlow, Stephen Murphy of Standard & Poor -- Poor's, Joe Keefe -- Joe O'Keefe of Fitch, the Deputy Mayor, Anthony Adams, and the -- and the -- and -- and the representative of SBS at the table.
**MR. SHUMAKER:** Is there a question?
**BY MR. GOLDBERG:**
Q. Sure. I was asking why would Moody -- why would Standard & Poor and Fitch be at the table?
**MR. SHUMAKER:** Objection, foundation, form, document speaks for itself.
**A. Yeah, Mr. Goldberg, this purports to be a document showing some of these members at counsel table. I have no idea -- I wasn't here, and I have no idea what the discussions were and whether or not it's accurately represented to be something related to this. This document speaks for itself.**

**BY MR. GOLDBERG:**
Q. So you haven't done really any substantive investigation on what the circumstances were that -- that why -- that put the City into the pension obligations with certificates and Swap --
**MR. SHUMAKER:** Objection to form.
**BY MR. GOLDBERG:**
Q. -- when they first were initiated in 2005?
**A. Yeah, all I can say is this -- this picture appears to be what it purports to be and speaks for itself. I don't know if it's accurate or not.**
Q. Let me just ask one quick -- that I was kind of curious about, personally. It appears that there was -- the first COP and Swap was in 2005. Then they were terminated and a new one -- new COPs and Swaps were placed in 2006. Is that your understanding?
**A. I don't know if that's my understanding. I know there were -- there were two series that went on. I'm going to be careful with the question of replacing them, but let's go with your question.**
Q. Okay. I guess my curiosity is why the banks would pay a termination fee of 2.7 million, according to those documents, to the City to then have them renegotiate -- replaced?
**A. Mr. Goldberg --**

**MR. SHUMAKER:** Object to form, foundation.
**A. I wasn't here in the City at the time. I have no idea.**
**BY MR. GOLDBERG:**
Q. Okay. That's fine.
Have you approached the Securities and Exchange Commission to conduct any kind of investigation of the Swaps in light of their extensive investigations of UBS and Bank of America?
**MR. JURGENS:** Objection to form.
**A. Yeah, here again, any -- your question is have I? I think I can answer your question. I think the answer is no.**
**BY MR. GOLDBERG:**
Q. Okay. And you haven't approached them to intervene in the bankruptcy which they have a right to do as we both know under the bankruptcy code?
**A. I would hazard a guess that the Security and Exchange Commission is aware of Detroit's bankruptcy.**
Q. But you have not approached them to aid you in doing a proper investigation of the Swaps?
**A. No. I -- I think they're fully capable of determining what they should do within their mission.**
Q. Have you looked into the mortgage practices of Bank of America that -- in light of the financial crisis of

Detroit?
**MR. JURGENS:** Objection to form.
**MR. SHUMAKER:** Objection to form.
**MR. ESSAD:** Objection to relevance.
**A. I don't think my duties under 436 would specify to look into the mortgage crisis, so the answer is no.**
**BY MR. GOLDBERG:**
Q. But you would agree with me that the mortgage crisis and the subprime lending crisis is a major contributor to Detroit's financial crisis, would you not?
**MR. SHUMAKER:** Objection to form, foundation.
**A. Mr. Goldberg, I don't know if it was or wasn't.**
**BY MR. GOLDBERG:**
Q. You don't know if it was or it wasn't?
**A. No. I've -- I've heard reports that there was disproportionate mortgage foreclosures and so on and so forth, but I've made no conclusion as to whether or not that was a major contributor to Detroit's financial crisis.**
Q. I've got you. Well, let me -- let me run this --
(Whereupon Vincent Marriott and Matthew Summers left the Deposition at 3:47 p.m.)
**MS. ENGLISH:** Can we go off the record for one second, please?

VIDEO TECHNICIAN: We are off the record. The time is 3:47.
(Recess taken at 3:47 p.m.)
(Back on the record at 3:48 p.m.)
VIDEO TECHNICIAN: Back on the record at 3:48 p.m.
BY MR. GOLDBERG:
Q. I'm sorry, I didn't bring that report with me.
So your public -- your statement to me is you're not clear whether the subprime mortgage crisis in Detroit was a factor in Detroit's financial crisis?
A. **No. My statement --**
MR. SHUMAKER: Objection to form.
A. **My statement to you -- I believe your question was, was it a major factor, and I said I understand there have been reports, allegations, and stories that there was disproportionate mortgage foreclosure in the City of Detroit. I don't know if that was a major factor in its financial crisis.**
BY MR. GOLDBERG:
Q. And you haven't looked into that issue independently?
A. **No, I've not looked into it independently.**
Q. Even though the banks -- the same banks that are claiming all these Swaps were directly involved in the subprime mortgage crisis?

MR. JURGENS: Objection to form.
A. **Here again, your characterization was directly involved. My mission in this forbearance agreement is look at whether or not this is in the best interest of the City at the time.**
BY MR. GOLDBERG:
Q. Sure.
A. **It seems to be as you and I have discussed before, several times now, that you have expressed concerns about a broader issue regarding banks involvement with the mortgage foreclosure crisis in the City of Detroit. In my opinion, that's not directly related to the issue that we have at hand in the forbearance agreement.**
Q. Let me just ask you one other question. We've been talking about alternative sources of financing.
You're familiar with the last CAFR?
A. **Yes.**
Q. Are you familiar with the -- what the 82 million in chargebacks means in this CAFR that the City is paying?
A. **Yes, I think I have some understanding.**
Q. What is your understanding of it, sir?
A. **That there's a certain obligation on the City to pay some money out based upon an analysis of either**

**overcharges or obligations that it has to other -- other organizations and entities.**
Q. Are you aware that chargebacks specifically deal with chargebacks to the County that the County buys -- pays the City for foreclosed tax -- foreclosed properties, then sells them, and the City is responsible for the difference between what they're sold for and what the -- what originally was paid to the City?
A. **Yes, as I said --**
MR. SHUMAKER: Objection, form, foundation.
A. **As I said, it's a process by which the City has obligations to other organizations and entities.**
BY MR. GOLDBERG:
Q. Are you aware that the state has hundreds of -- at least 200 million dollars available in the Hardest -- Helping Hardest Hit funds that could be used to pay off delinquent property taxes?
A. **I've heard that representation before in terms of the Hardest Hit funds. What I am aware of is that the City is entitled to get 52 million dollars of the late -- latest one hundred million dollar transfer of the Hardest Hit funds for blight remediation.**
Q. That's true. Which affects -- affects your general proposal in terms of the cost of blight, correct?
A. **Well, it helps us in terms of getting at the cost of**

**blight as quickly as possible.**
Q. But my question was a little different on that.
A. **Um-hm.**
Q. Have you intervened with Governor Snyder who you -- who you're -- your appointor --
A. **Right.**
Q. -- to secure the release of these Hardest Hit funds to pay off property taxes which would both stabilize communities to keep people in their homes and stabilize the City budget by avoiding the need to pay 80 million in chargebacks?
MR. SHUMAKER: Objection, foundation.
A. **It is not -- it is not -- it has been made clear to me that it is not clear to me that, one, we'd have access to those funds and that those funds can be appropriately used for that purpose.**
BY MR. GOLDBERG:
Q. It's not?
A. **It's -- it's not clear. That's --**
Q. Well, I'll send you some literature on that so you can clarify that.
A. **Okay.**
MR. GOLDBERG: Okay. Okay. Thank you very much.
THE WITNESS: Thank you very much.

# EXHIBIT 2

*"Every lawyer and staff person in any Jones Day office anywhere in the world knows that the Firm's values are deeply rooted in putting our clients' interests first in everything we do. Excellent client service is a longstanding, overarching objective of our Firm."*

- Steve Brogan, Managing Partner

Since our beginning in 1893, client service has been a fundamental value of the Firm. Our highest priority is to deliver the best of the Firm to every client engagement. How do we define client service? At Jones Day, providing quality of service means getting the best possible results for our clients by providing technically accurate, creative, and efficient legal services that correlate with our clients' business objectives.

Today, Jones Day acts as principal outside counsel to, or provides significant legal representation for, more than half of the *Fortune* 500 companies. We also serve privately held companies, financial institutions, investment firms, health care providers, retail chains, foundations, educational institutions, and individuals.

Following is a partial list of our clients, most of whom we have been honored to represent for more than 10 years.

Abbott Laboratories
Abercrombie & Fitch Co.
Alcatel-Lucent
Ameren Corporation
American Airlines
American Greetings Corporation
Amway Corporation
Apple Inc.
Axiall Corp.
Bank of America Corporation
Bayer AG
Beiqi Foton Motor Co., Ltd.
BlackBerry
BMW AG
Bombardier
Bon Secours Health System, Inc.
Bridgestone Corporation
The British Land Company PLC
Cardinal Health, Inc.
CBS Corporation
Celgene Corporation
CenterPoint Energy, Inc.
Chevron Corporation
China International Capital Corporation Limited
Chrysler LLC
Citigroup Inc.
ConAgra Foods, Inc.
Cooper Tire & Rubber Company

KeyCorp
Lehman Brothers Holdings Inc.
Lennar Corporation
Liberty Media Group
The Lincoln Electric Company
The Lubrizol Corporation
Macy's
Mag Instrument, Inc.
Materion Corporation
MedImmune, Inc.
Mitsubishi Heavy Industries Ltd.
Morgan Stanley Realty
NACCO Industries, Inc.
Nationwide Insurance Companies
Nikon Corporation
OGE Energy Corp.
Omnicom Group Inc.
Parker Hannifin Corporation
PepsiCo, Inc.
Pershing Square Capital Management, L.P.
Pfizer Inc.
Potash Corporation of Saskatchewan Inc.
Primus Capital Fund
The Procter & Gamble Company
Purdue Pharma, L.P.
Reynolds American Inc.
Rhodia
Richemont International, S.A.

# EXHIBIT 3



**UBS acquires two office building in Paris suburbs**

**June 2007**

Jones Day assisted UBS Investment Bank with the acquisition of two office buildings in the Paris suburbs.

**For additional information about this matter, please contact:**

Jean-Louis Martin

**Client(s):** UBS Investment Bank

**Practice(s):** Real Estate

**Office(s):** Paris

City of South Miami (Florida) Health Facilities Authority Hospital Revenue Bonds, Series 2007 (Baptist Health South Florida Obligated Group).

Hospital Sisters Services issues $290,510,000 Revenue Bonds, Series 2007
Jones Day acted as bond counsel to Hospital Sisters Services in connection with the issuance by the Illinois Finance Authority of Illinois Finance Authority and Wisconsin Health and Educational Facilities Authority Revenue Bonds, Series 2007A, B-1, B-2 and C of $290,510,000 (Hospital Sisters Services, Inc. - Obligated Group).

Merrill Lynch underwrites $450,000,000 bonds for Phoenix Children's Hospital
Jones Day acted as underwriter's counsel to Merrill Lynch in connection with the issuance of $450,000,000 of the Arizona Health Facilities Authority Hospital Revenue Bonds, Series 2007 (Phoenix Children's Hospital).

UBS Financial Services underwrites bonds for Health East project
Jones Day assisted UBS Financial Services as their underwriter's counsel in the offering of $195,000,000 The Housing and Redevelopment Authority of the City of Saint Paul, Minnesota Hospital Facility Revenue Bonds (Health East Project) Series 2005.

Merrill Lynch underwrites bonds for Yuma Regional Medical Center
Jones Day acted as underwriter's counsel to Merrill Lynch & Co. in connection with the offering of $111,205,000 Hospital Revenue Bonds, Series 2004A (Yuma Regional Medical Center) (Auction Rate Securities).

Methodist Healthcare and Methodist Healthcare-Memphis Hospitals issues $250,400,000 Revenue Bonds, Series 2004
Jones Day acted as bond counsel to Methodist Healthcare and Methodist Healthcare - Memphis Hospitals in connection with the issuance of $250,400,000 The Health, Educational, and Housing Facility Board of the County of Shelby, Tennessee Variable Rate Revenue Bonds, Series 2004 (Methodist Healthcare) Auction Rate Securities.

RBC Dain Rauscher and J.P. Morgan Securities underwrite tax-exempt bonds for University of Maryland Medical System
Jones Day acted as underwriter's counsel to RBC Dain Rauscher and J.P. Morgan Securities, Inc. in connection with the offering of $253.86 million Revenue Bonds, University of Maryland Medical System Issue, Series 2004A, 2004B, 2004C and 2004D.