# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-------------------------------------------------------

|  |  |
|---|---|
| In re | : Chapter 9 |
| | : |
| CITY OF DETROIT, MICHIGAN, | : Case No. 13-53846 |
| | : |
| Debtor. | : Hon. Steven W. Rhodes |
| | : |
| | : |

-------------------------------------------------------

## BRIEF OF MILLER CANFIELD AS BOND COUNSEL FOR PLA IN SUPPORT OF MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO ENTER INTO AND PERFORM UNDER CERTAIN TRANSACTION DOCUMENTS WITH THE PUBLIC LIGHTING AUTHORITY AND (II) GRANTING OTHER RELATED RELIEF

# INTRODUCTION

On October 23, 2013, the City of Detroit (the "City") filed a motion in this Court seeking entry of an order authorizing the City to enter into and perform under documents that would allow the Public Lighting Authority (the "PLA") to issue debt so that it could pay for much-needed work improving the street lighting system throughout the City (the "PLA Financing Transaction").

At a hearing on the City's motion, the Court questioned whether Miller, Canfield, Paddock and Stone, P.L.C.'s ("Miller Canfield") representation of the PLA as bond counsel created an impermissible conflict of interest due to Miller Canfield's representation of the City in its currently pending Chapter 9 case requiring disqualification of Miller Canfield from representing the PLA. In short, because the PLA and the City's interests are not adverse, and are, in fact, completely aligned, no conflict exists. Indeed, the City and the PLA are a single entity for purposes of conflict analysis here, so there could not be any conflict under any circumstances. In addition, the City (through Jones Day) and the PLA (through the Allen Law Group), each had independent legal counsel throughout their good-faith negotiations who were fully informed and aware of Miller Canfield's discrete role as bond counsel at all times. And even if the Court were to find a conflict did exist, the parties, with full knowledge, functionally waived any potential conflict to Miller Canfield's role in this transaction. In fact, both the City

and the PLA have filed briefs confirming they have never objected to Miller Canfield's role and do not believe any conflict exists.

There simply is no aggrieved party here. Conflict issues deal with the relationship between law firms and their clients. The clients here are the City of Detroit, represented by Jones Day, and the PLA, represented principally by the Allen Law Group, and both clients oppose the disqualification of Miller Canfield. The State of Michigan opposes the disqualification of Miller Canfield. The purchaser of the bonds, Citibank, has not sought the disqualification of Miller Canfield, and in any case, creditors, as non-clients, have no standing to raise a conflict issue and no interests of the creditors could possibly be affected by this issue.

As Michigan and federal courts have repeatedly found, disqualification of a party's chosen attorney is an "extreme sanction" that should be used only in the most drastic of circumstances, such as where there is a "reasonable possibility that some specifically identifiable impropriety actually occurred and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain the counsel of his choice." *Cozzens v. City of Lincoln Park*, 2009 WL 701709 at *5 (E.D. Mich. Mar. 13, 2009). In this case, there was no conflict, and if the Court were to order Miller Canfield's disqualification, not only would the PLA be deprived of its chosen counsel, but the

entire transaction would be delayed while the PLA sought and educated new counsel, which counsel necessarily would take the same steps Miller Canfield is taking and would deliver essentially the same opinions. The public interest weighs heavily in allowing the City and the PLA to fix the lighting system as quickly as possible, and the Court should allow the parties to do so without any further delay.

## BRIEF FACTUAL BACKGROUND

### A.  Structure of the PLA Financing Transaction

The City has one, and only one, interest in accomplishing the PLA Financing Transaction: to enable the borrowing of money to pay for the street light improvements. The PLA has one, and only one, purpose in the PLA Financing Transaction: to be the instrument through which the City can borrow the money to enable the PLA to make the street light improvements.

The PLA Financing Transaction consists of a double conduit financing structure. The structure is dictated by economics – specifically, by the City's insolvent financial condition. Under this structure, bonds secured by the City's utility users tax revenues will be issued by the PLA and sold to the Michigan Finance Authority (the "MFA"), as a State of Michigan conduit-partner. The MFA, in turn, will sell bonds to a private lender (in this transaction, Citibank) which will lend the funds necessary for the PLA to undertake its statutorily-defined

purpose of financing and constructing improvements to the City's street lighting system.

In a conduit financing, one public entity acts as a conduit-partner for another public entity who is either unable to access the credit market itself or is only able to access the credit market at prohibitive interest rates on account of poor credit. The MFA is able to do this for local governments by providing mechanisms for creating additional statutory security which lenders find attractive, allowing the local unit to access the market and borrow money more cheaply than it can on its own. The MFA works with and on behalf of the local unit to negotiate with credit facility providers, underwriters or investors (in this case, Citibank) to finalize the terms of the borrowing with the local unit. Similar to the relationship between the City and the PLA to effectuate this financing, the MFA facilitates the PLA's access to the market and its interests are aligned with the PLA and the City.

The PLA legislation addresses the City's great need for improved lighting, providing the means for the City to access the markets in spite of the City's poor credit. The City is the principal party-in-interest. The PLA, with its own statutory security, and the MFA, are accommodation parties. The City, the PLA and the MFA are therefore the "borrower" with aligned interests in the PLA Financing Transaction, with Citibank as the lender/purchaser (the "Purchaser"), on the other side of the transaction.

For purposes of effectuating the financing, the City and the PLA are functionally a single entity. For approximately three years prior to the City's bankruptcy filing, the City worked to get legislation passed to authorize the establishment of an entity separate from the City to improve the City's outdated and sorely inadequate street lighting system to serve the needs of the City's residents. In 2012, the State Legislature enacted Act 392, Act 393 and Act 394[1], for the sole purpose of improving the City's street lighting system and financing the costs of such improvements. Pursuant to Act 392, on February 5, 2013, the City established and incorporated the PLA by duly adopting Articles of Incorporation by a majority vote of the City Council. Article VIII, Section 1 of the PLA's Articles of Incorporation codifies the on-going interrelationship between the City and the PLA by requiring that the PLA provide the City Council with a three-year lighting plan every two years, which may be approved or rejected by the City Council. In addition, PLA board members are appointed by the City Council and the Chief Executive Officer (MCL § 123.1273(2)), the PLA is required to submit monthly progress reports to the City (MCL § 123.1275(9)), the PLA must have its business plan approved by the City (MCL § 123.1277), and the City continues to

---

[1] Respectively, Public Act 392 of 2012, the Municipal Lighting Authority Act, as amended, MCL § 123.1261, et seq.; Public Act 393 of 2012, which amended Public Act 100 of 1990, the City Utility Users Tax Act, as amended, MCL § 141.1151, et seq.; and Public Act 394 of 2012, which amended Public Act 284 of 1964, the City Income Tax Act, as amended, MCL § 141.501, et seq.

own the lighting system.  By statute and the PLA's incorporating documents, the interests of the City and the PLA are inseparable and aligned.  The PLA's sole purpose is to provide a means to an end, and the end is to "supply lighting …to [the City]."  MCL § 123.1265(1).

The enabling legislation (Acts 392, 393, and 394) further codifies, and tightly constricts, the relationship between the City and the PLA with respect to the financing of lighting improvements.  Act 392 provides that the PLA may issue bonds to finance the improvements, secured by the City's pledge of the City utility users tax revenues levied pursuant to Act 100 for the payment of the PLA's bonds.  Crucially, the enabling legislation leaves little choice to the City and the PLA with respect to the financing before the Court.  Any financing terms that are negotiated are done so with the private lender (Citibank, the Purchaser).  Indeed, this matter is before the Court because Citibank is requiring an order from this Court with respect to the pledge by the City, pursuant to statute, of utility users tax revenues for payment of the PLA bonds.  Given the structure of this public financing and its principal and predominant reliance on applicable State law authorization and directive, there was little, if anything, to negotiate between the City and the PLA that would result in their interests not being aligned.

**B.      Miller Canfield's Discrete Role as Bond Counsel in the PLA Financing Transaction and the Separate Representation of the City (by Jones Day) and the PLA (by the Allen Law Group)**

Even though the PLA's enabling legislation leaves little discretion to the City and the PLA with respect to the structure of the parties' relationship and the terms of the PLA Financing Transaction, both the City (through Jones Day) and the PLA (through the Allen Law Group) retained separate counsel responsible to negotiate what few matters remained discretionary between those two parties. In fact, the PLA has been represented by the Allen Law Group at all times since March 27, 2013. The Allen Law Group has no relationship with the City in this case other than to act as principal counsel for the PLA in the transaction before the Court. Additionally, it was the Allen Law Group that served, and continues to serve, as the primary counsel for the PLA in its negotiation and documentation of the PLA Transaction Documents[2] that are subject to the approval of this Court. Jones Day, likewise, continues to represent the City and has done so throughout the PLA Transaction.

In order to complete the PLA Financing Transaction, it became necessary to engage bond counsel, and the PLA and MFA[3] engaged Miller Canfield to perform

---

[2] Collectively, the Interlocal Agreement for the Construction and Financing of a Public Lighting System by and between the City and the PLA; the Interlocal Agreement for the Operation, Maintenance and Management of a Public Lighting System by and between the City and the PLA; and the Amended and Restated Trust Agreement by and among the City, the PLA, the MFA and Wilmington Trust, National Association, as Trustee.

[3] With the knowledge of the City, the PLA and the MFA, and their respective counsel, Miller Canfield represented the MFA as bond counsel in connection with

*Continued on next page.*

this discrete role. [4]   The City and the PLA, and their respective independent attorneys, were at all times fully aware of Miller Canfield's separate role in this transaction and its simultaneous representation of the City in the pending bankruptcy proceedings.  In fact, far from objecting, the City and the PLA have filed briefs here objecting to any attempt to disqualify Miller Canfield.

Importantly, Miller Canfield has not represented *either* party in the negotiations required by Act 392 to effectuate the PLA Transaction Documents. Further, negotiations of financing terms are carried out between the public entities and the Purchaser, and, in any event, the financing terms (such as interest rates) are determined by the market.  Miller Canfield did not, and does not, represent Citibank at any time in connection with this transaction.  Miller Canfield's engagement for the PLA was only as bond counsel, as well to ensure that any bankruptcy order approving the PLA Transaction Documents would allow the

---

*Continued from previous page.*

the PLA Financing Transaction until December 2, 2013, when the MFA retained Dickinson Wright to complete the transaction on behalf of the MFA.

[4] The role of bond counsel is to prepare the financing documents authorizing the issuance and sale of the bonds and to render an objective legal opinion with respect to the authorization and issuance of the bonds and as to the tax exempt status of the interest on the bonds under state and federal law.  In addition, bond counsel was asked to prepare and issue legal opinions on behalf of the PLA on bankruptcy issues and implications should the PLA become a Chapter 9 debtor, and provide related advice to the PLA in connection with the Citibank financing.

financing and street light improvements to be carried out by satisfying one of Citibank's conditions precedent to providing the necessary funding.

## ARGUMENT

### A. Disqualification is an Extreme Sanction That Should Only Be Used in Extreme Circumstances That Do Not Exist Here

The decision to disqualify a law firm and prevent a party from employing the counsel of its choice "is not to be dispensed with lightly. A party's right to have counsel of choice is a fundamental tenet of American jurisprudence, and therefore a court may not lightly deprive a party of its chosen counsel." *In Re: Packaged Ice Antitrust Litigation*, 2010 WL 5146384 at *2 (E.D. Mich. Dec. 13, 2010) (denying motion to disqualify for falling "well short of meeting the demanding standard for disqualification"). In fact, "disqualification is an extreme sanction that the court should employ only when there is a reasonable possibility that some specifically identifiable impropriety actually occurred, and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain the counsel of his choice." *Cozzens*, 2010 WL 5146384 at *5 (internal quotation and citation omitted).

As described herein, in this case there is no justification for disqualifying Miller Canfield as there is no conflict between the PLA and the City, and to the extent the Court finds such a potential conflict exists, the parties (represented by separate counsel) functionally waived the conflict and never objected to Miller

Canfield's discrete role as bond counsel in the PLA Financing Transaction. Furthermore, the public interest favors allowing the City, through the PLA, to improve the City's outdated and inadequate street lighting system as quickly as possible. Delaying this much-needed project while the PLA engages another law firm to complete this transaction would substantially harm the very residents this Court is trying to protect without any commensurate advantage to the public interest. *See Board of Regents of Univ. of Neb. v. BASF Corp.*, 2006 WL 2385363 at *11 (D. Neb. Aug. 17, 2006) (holding disqualification unnecessary where disqualification would cause undue delay).

**B.      No Conflict Exists Under Rule 1.7(a) or 1.7(b) of the Michigan Rules of Professional Conduct Because the Interests of the PLA And The City Are Not Adverse**

Rule 1.7(a) of the Michigan Rules of Professional Conduct (the "MRPC") provides in relevant part that "[a] lawyer shall not represent a client if the representation of that client will be directly adverse to another client." Rule 1.7(b) likewise states that "[a] lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests." A client's interests are "directly adverse" or could be "materially limited" for example when one client sues another client. *See, e.g., Employers Mut. Cas. Co. v. Al-Mashhadi*, 2009 WL 2711963 at *12 (E.D. Mich. Aug. 24, 2009).

Furthermore, as here, where the parties' interests are aligned, there is no conflict of interest. *See Ackerman v. Miotke*, 2006 WL 859471 at *3 (Mich. Ct. App. Apr. 4, 2006) (no direct conflict in violation of Rule 1.7(a) of the MRPC between various property owners, represented by the same legal counsel, who were attempting to sell their properties to casino developers in the City). The Northern District of Ohio's decision in *City of Cleveland v. Cleveland Elec. Illuminating Co.*, 440 F. Supp. 193 (N.D. Ohio 1977) *aff'd* 573 F.2d 1310 (6th Cir. 1977) is especially instructive. In *City of Cleveland*, the district court held the defendant's law firm should not be disqualified from representing the defendant against the city despite simultaneously serving as the city's long-time bond counsel because the bond work it provided to the city both prior to and during the litigation was performed on an ad hoc basis and was not adversarial in nature. 440 F. Supp. at 198. The fact that the Court in *City of Cleveland* found that disqualification was not warranted when the rules at that time prohibited even the *appearance* of a conflict (a much more stringent test than the one the Court must apply here) is all the more reason for the Court to allow Miller Canfield's discrete role in this case.

Indeed, not only have none of the parties identified what actual conflict could exist between the PLA and City here, but it cannot be said that Miller Canfield was unable to provide the same quality of legal services as another firm without the purported conflict. In other words, Miller Canfield was free to, and

did, provide the same advice and take the same actions with respect to its representation of the PLA as would any other firm that did not also represent the City in the Chapter 9 case could have taken. It simply cannot be shown that, as required for disqualification, that "any specifically identifiable impropriety *actually occurred*" or that there was even "a reasonable possibility of a conflict." *In Re: Packaged Ice,* 2010 WL 5146384 at *3.

The interests of the City and the PLA in this transaction are completely aligned, and all negotiations of financing terms were between the City (together with the PLA) on one side and Citibank, represented throughout by separate, independent counsel, on the other side. There simply is no conflict under the Michigan Rules of Professional Conduct.

**C.**  **Even if the Court Finds a Potential Conflict Did Exist, Any Conflict Did Not Adversely Affect Miller Canfield's Representation and Both Parties Functionally Waived any Potential Conflict After Consultation With Separate, Independent Counsel**

Even where a conflict of interest exists under Rule 1.7(a) or (b), the conflict can be overcome if a conflicted lawyer reasonably believes that the representation "will not adversely affect [his] relationship with the other client" (Rule 1.7(a)(1)) and/or reasonably believes that "the representation will not be adversely affected" by "the lawyer's responsibilities to another client" (Rule 1.7(b)(1)), and the client(s) consent after consultation.

Miller Canfield strongly believes that its representation of the PLA "will not adversely affect its relationship" with the City and that its discrete role in this transaction was "not adversely affected" by its responsibilities to the City. Quite the reverse, by advancing the transaction through the PLA, the City's interest is served. As described in detail above, Miller Canfield's circumscribed role with respect to the financing before the Court could not, and did not, adversely affect its relationship to the City, including as local counsel with respect to the City's filing for protection under Chapter 9. Likewise, its representation of the City could not, and did not, adversely affect its representation of the PLA. Crucially, both the City and the PLA have filed briefs here opposing any effort to disqualify Miller Canfield, establishing that Miller Canfield's role created no adverse consequences for either the City or the PLA.

In fact, by statute and the PLA's incorporating documents, the interests of the PLA and the City in the PLA Financing Transaction are inseparable and aligned. Both parties are negotiating for the same result. It is true that as a technical detail, in order to accomplish the lighting program, the conduit financing structure is required as is the issuance of bonds, which in turn requires that there be a PLA. This is merely a matter of form, rather than a substantively adverse or competing relationship. Put simply, the City and the PLA are on the same "side" and are virtually one entity for conflict purposes. The financial terms of the bonds

ultimately are dictated by or negotiated with the party taking the credit risk, or in other words, the Purchaser. The Purchaser, in short, establishes the business terms for the financing, and Michigan law in any event strictly defines the terms to this transaction, so there is no adverse "negotiation" between the City and the PLA.

In addition, no violation of Rule 1.7 occurs where the parties have provided informed consent or have waived any potential conflict. *See Edgin v. Cobb*, 2008 WL 2858741 at *5 (E.D. Mich. July 23, 2008). Under the MRPC, "almost all conflicts are consentable." *See In re Packaged Ice Antitrust Litigation,* 2010 WL 5146384 at *10. Furthermore, "[i]t is axiomatic that the client's right to object to an attorney's allegedly adverse representation may be waived." *City of Cleveland,* 440 F. Supp. at 205.

In this case, even though no conflict existed, Miller Canfield took appropriate prophylactic action and obtained an informed and functional waiver of any potential conflict. This is the suggested approach in ABA/BNA Lawyers' Manual on Professional Conduct, 51:106-107. On July 3, 2013, Miller Canfield sent a letter addressed to the Portia Roberson, corporate counsel for the City of Detroit, fully informing the City of Miller Canfield's involvement as bond counsel for the PLA in this transaction. (*See* Exhibit A.) The letter was also sent to, among others, Kevin Orr, the City's Emergency Manger, Thomas L. Saxton, Deputy Treasurer for the State of Michigan, and Joseph L. Fielek, Executive

Director of the MFA. (*Id.*) Thus all parties, at all times, knew the PLA had engaged Miller Canfield, and both the City and the PLA, represented by separate, independent counsel, did not object (and does not now object) to Miller Canfield's discrete role as bond counsel in the PLA Financing Transaction.

Indeed, the Resolution of the Board of the Directors of the Public Lighting Authority authorizing the Issuance and Delivery of Public Lighting Authority Revenue Bonds, adopted by the PLA Board on November 20, 2013 (the "PLA Bond Resolution," attached as Exhibit B), includes a provision appointing Miller Canfield as Bond Counsel to the PLA and consenting to such representation notwithstanding Miller Canfield's representation of the City on bankruptcy and other unrelated matters. Simply put, Miller Canfield discussed its role in the transaction with all of the parties and their counsel, and the Emergency Manager for the City had no concern with Miller Canfield's role as bond counsel to the PLA for this financing. Furthermore, the City and the PLA have both confirmed in briefs to this Court that they have no objections to Miller Canfield's involvement and oppose any efforts to disqualify the firm. Therefore, even if the Court were to find a conflict did exist, the parties functionally waived the conflict after informed consultations with separate counsel. *See City of Cleveland*, 440 F. Supp. at 204-05 (holding that the open and notorious nature of law firm's representation in matters adversarial to a city left no doubt that the city had waived any objections to the

firm continuing to represent the defendant). Miller Canfield's role in this transaction is thus entirely proper.

## D. The Objectors to This Motion Have No Standing to Object to Miller Canfield's Discrete Role as Bond Counsel

Finally, the objectors to this Motion have no standing to raise an objection to Miller Canfield's discrete role in this matter. Indeed, to the extent the Court finds a conflict existed at all (which it should not), it existed between the City and the PLA, *not* with the objectors to the Motion. The objectors' interests were not, and could not have been, adversely affected by any purported conflict, and they suffered no prejudice whatsoever from Miller Canfield's representation of the City and the PLA.

This lack of prejudice is exactly why the comments to Rule 1.7 state expressly that such objections from opposing parties "should be viewed with caution" because they "can be misused as a technique of harassment." *See also Cozzens,* 2009 WL 701709 at *5, *quoting Manning v. Waring, Cox, James, Sklar & Allen*, 849 F.2d 222, 224 (6th Cir. 1988) ("Unquestionably, the ability to deny one's opponent the services of capable counsel, is a potent weapon. Confronted with such a motion, courts must be sensitive to the competing public policy interests of preserving client confidences and of permitting a party to retain counsel of his choice."). Courts have repeatedly found that such challenges raised by opposing parties should be dismissed as a matter of course, and there is no

justification for the Court to find any differently here. *See, e.g., In re Odum,* 2008 WL 7874259 at *2 (Bankr. N.D. Ga. May 28, 2008) (opposing party lacked standing to assert conflict of interest because party could not identify how ethical rule was violated, and only offered speculation about potential future conflicts)*; Doe v. Lee,* 178 F. Supp. 2d 1239, 1243–44 (M.D. Ala. 2001) (plaintiff lacked constitutional standing to seek disqualification of defendant's attorney because she could not demonstrate a cognizable or redressable injury from the alleged conflict).

## E. The PLA and the City Have Engaged in Arms-Length Good-Faith Negotiations

When evaluating whether the City and the PLA engaged in arms-length, good-faith negotiations, the only question this Court must answer is whether the PLA Transaction complies with Acts 392, 393 and 394. Assuming compliance with these Acts, the City and the PLA could not "negotiate" any arrangement other than the financing structure which has been presented to the Court. This defined statutory scheme providing for the financing of the City's lighting system improvements means that not only are the interests of the City and the PLA aligned and that representation of one party is not adverse to the other, but also the dealings between the City and the PLA to effectuate the documents and the financing are necessarily in good faith as they must track the requirements of the Acts. Despite numerous objections, not one party asserted that the PLA Transaction violates these Acts or that it was not an arms-length, good faith

transaction. Indeed, the PLA and the City engaged in arms-length, good faith negotiations as the PLA Transaction can occur one way and one way only – pursuant to, and in accordance with, the Acts.

Unlike private entities, local governments may act, and borrow money, only as authorized by State law. *Hunter v. City of Pittsburgh*, 207 U.S. 161, 178-179 (1907) (municipal corporations are "political subdivisions of the State, created as convenient agencies for exercising such of the powers of the State as may be entrusted to them, [and the State] at its pleasure, may modify or withdraw all such powers"); *Mich. Muni. Liability & Property Pool v. Muskegon County Road Comm'n*, 235 Mich. App. 183 (1999) (standing for the general rule recognized in Michigan that local governments possess no inherent powers, but rather only those powers that are conferred by the State); *See also City of Taylor v. Detroit Edison Co.*, 475 Mich. 109 (2006). Public financings authorized by statute are very different from private, Chapter 11 transactions with which the Court and the bankruptcy community are more familiar. In the Chapter 11 context, and as a general matter in a private financing transaction, almost anything not prohibited by applicable law can be negotiated, documented and carried out by the parties.

In contrast, there is little, if any, leeway in the enabling legislation authorizing the lighting financing. That legislation tightly restricts the structure of the relationships between the public parties to effectuate the transaction. The

enabling legislation codifies, and constricts, the relationship between the City and the PLA with respect to the financing of lighting improvements. Once the City establishes the PLA and pledges the portion of utility users tax revenues to bonds issued by the PLA to finance improvements to the City's street lighting system, the City and the PLA must take the steps provided under Act 392 to effectuate the financing and the lighting improvements. Not only does Act 392 dictate the actions that the City and the PLA must take to finalize the transaction, including the terms that must be documented between the two parties, it sets forth the provisions that must be included in the agreements between the City and the PLA. Simply put, the City, the PLA and the MFA must participate in an Act 392 public lighting financing transaction to effectuate the transaction, and then only on the terms and subject to the conditions described in the legislation.

Furthermore, as argued to the Court on November 27, there is nothing negotiated or documented in the portion of the lighting transaction among the PLA, the MFA and Citibank that could adversely (or, for that matter, beneficially) affect the rights or obligations of the City or its creditors. The Acts assure that, if followed, the City and its residents will receive precisely the same amount of utility user tax revenues on an annual basis, those in excess of $12.5 million, regardless of the terms of the bonds. In this context, compliance with the State statutes governing the only State sanctioned and authorized utility tax-financed

lighting transaction, i.e. finding no illegality in the transaction, should satisfy the "good faith" requirement because nothing else matters in this context and nothing else has a bearing on the City or its creditors. If the transaction is approved by the Court, the City will have no access to $12.5 million annually of the utility tax revenues but will have an improved public lighting system. On the other hand, if the transaction is not approved, the City will have no access to the $12.5 million annually of utility tax revenues (revenues which will still go to the PLA) and will not have an improved public lighting system. The only variable to the City, its residents and its creditors is whether or not the City is going to have an improved public lighting system, and not whether they will have access to the $12.5 million annually.

Consequently, absent failure to comply with the Acts, the Court must conclude that the transaction was in "good faith" within the meaning of section 364(e) of the Bankruptcy Code. Indeed, in a Chapter 11 case involving a private financing, the Sixth Circuit defined good faith under §364(e) to mean "honesty in fact in the conduct or transaction concerned." There is no question that such "honesty" exists here as the City and the PLA strictly complied with the Acts. *See Unsecured Creditors' Comm. v. First Nat'l Bank & Trust Co. of Escanaba (In re Ellingsen MacLean Oil Co., Inc.)*, 834 F.2d 599, 605 (6th Cir. 1987), *cert. denied*, 488 U.S. 817 (1988).

Finally, all of the negotiations were "arms-length negotiations" and no objections were raised at the hearing to suggest otherwise.  The Allen Law Group, on behalf of the PLA, had primary responsibility for preparing the PLA Transaction Documents, and all of the negotiations of the PLA Transaction Documents occurred between the City, represented by Jones Day, and the PLA, represented by the Allen Law Group.  Miller Canfield did not participate in the negotiation of the PLA Transaction Documents and did not represent either the PLA or the City in those negotiations.  As such, the requested finding in the City's proposed order that the PLA Transaction was the result of arms-length good faith negotiations is entirely appropriate.

## CONCLUSION

The City and the PLA simply want to turn the lights back on for thousands of Detroit residents without any further delays.  Their interests are wholly and completely aligned.  The PLA is merely the instrument which the Michigan Legislature has given the City with which to achieve its goal.  The PLA's engagement of Miller Canfield to play a discrete role as bond counsel in facilitating this transaction did not create any conflicts of interest with Miller Canfield's representation of the City in its bankruptcy proceedings, and even if a conflict could arguably exist, both the City and the PLA, each represented by separate counsel, functionally waived the conflict.  The Court should not force the

PLA to abandon its chosen counsel and delay its work while it engages new counsel. Any delay would mean that the lights will stay out that much longer. The Court should instead enter the requested order and allow this transaction to move forward with all due haste.

Respectfully submitted,

MILLER, CANFIELD, PADDOCK AND STONE, P.L.C.

By: /s/Jonathan S. Green
Jonathan S. Green (P33140)
Michael W. Hartmann (P25373)
Scott A. Warheit (P71560)
Miller, Canfield, Paddock and Stone, PLC
150 West Jefferson, Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com

Dated: December 4, 2013

EXHIBIT A

Founded in 1852
by Sidney Davy Miller

# MILLER CANFIELD

**Miller, Canfield, Paddock and Stone, P.L.C.**

MICHIGAN: Ann Arbor
Detroit • Grand Rapids
Kalamazoo • Lansing • Troy
FLORIDA: Tampa
ILLINOIS: Chicago
NEW YORK: New York
OHIO: Cincinnati
CANADA: Toronto • Windsor
CHINA: Shanghai
MEXICO: Monterrey
POLAND: Gdynia
Warsaw • Wrocław

HAROLD W. BULGER, JR.
TEL (313) 496-7507
FAX (313) 496-8450
E-MAIL bulger@millercanfield.com

150 West Jefferson, Suite 2500
Detroit, Michigan 48226
TEL (313) 963-6420
FAX (313) 496-7500
www.millercanfield.com

July 3, 2013

<u>Via fax 313-224-5505/U.S. Mail</u>

Portia Roberson, Esq.
Corporation Counsel
City of Detroit
2 Woodward Avenue – Fifth Floor
Detroit, Michigan 48226

      Re:      Conflict Waiver Regarding Public Lighting Authority

Dear Ms. Roberson:

The purpose of this letter is to request that the City of Detroit ("City") waive a conflict of interest in a proposed transaction between the City, the Public Lighting Authority (the "PLA"), the Michigan Finance Authority (the "MFA") and Amalgamated Bank (the "Bank"). It is our understanding that the PLA and the MFA are exploring a note or bond transaction that will be sold to the Bank (the "Transaction"). As you may know, we represent the City in certain matters involving the City's financial restructuring, labor and employment, and other items.

In the proposed transaction, we have been asked to act as special counsel to the PLA on its obligations and bond counsel to the MFA on the proposed transaction. The obligations of the PLA are secured by revenues from the proceeds of the City's Utility User's Tax. Under the statute that created the PLA, the PLA will issue a note or bond secured by the City's Utility User's Tax revenue (the "Municipal Obligation"), which is required by law to be sold to the MFA. The MFA would acquire the Municipal Obligation with proceeds obtained by selling its own bond or note, secured by the Municipal Obligation, to the Bank. As bond counsel to the MFA and special counsel to the PLA, we would be expected to draft, comment on and/or negotiate a contract and a trust agreement securing the Municipal Obligation. We would also be expected to render opinions regarding the tax status on the Municipal Obligation, the MFA bond or note, and the potential effect a bankruptcy filing of the City would have on the Municipal Obligation, including the ability of a City to use City's Utility User Tax proceeds for purposes other than paying the Municipal Obligation in a proposed bankruptcy plan. The MFA will be acting as a conduit issuer and the MFA bond or note will be a limited obligation payable only from payments made by the PLA on the Municipal Obligation.

As a result of our past history with the City of Detroit and our current engagement by the City of Detroit, we are unable to undertake representation of the MFA or the PLA in the Transaction without consent of City. Accordingly, we request that the City waive any conflict of interest arising from our representation of the MFA or PLA in the proposed Transaction.

Under the Rules of Professional Conduct, by which we are bound, a lawyer may represent a client in a matter directly adverse to another client if (i) the lawyer reasonably believes the representation will not adversely affect the other client; and (ii) each client consents after consultation. While we represent the City on certain legal matters, we would not represent the City in connection with any matters related to the Transaction and assume the City will have its own counsel.

Because of the unrelated nature of our representation of the MFA and PLA in connection with the Transaction, we are confident that we can represent the MFA and PLA without compromising our loyalty to such parties or to the City with respect to unrelated legal matters. We therefore request that the City waive any perceived conflicts and consent to our representation. If at any time during the course of our representation of the MFA and PLA, a dispute arises between such parties and the City which cannot be amicably resolved, Miller Canfield will not represent either party with respect to such unresolved dispute.

If you have no objections to our representations as described herein, kindly confirm this by signing in the space provided below and returning this letter to the undersigned. Since time is of the essence with respect to this request, please call me if you have any questions and to let me know your decision as soon as possible. Your courtesy with respect to this request is greatly appreciated.

Very truly yours,

Miller, Canfield, Paddock and Stone, P.L.C.

By: _____
Harold W. Bulger, Jr.

**Consent and Waiver to Representation of
PLA and MFA in accordance with terms of this letter**

CITY OF DETROIT

By: _____
Portia Roberson
Corporation Counsel

Dated: July __, 2013

cc:    Kevyn D. Orr, Emergency Manager
       Thomas L. Saxton, Deputy Treasurer of the State of Michigan
       Joseph L. Fielek, Executive Director of the Michigan Finance Authority
       Floyd E. Allen, Esq.
       William J. Danhof, Esq.
       Christopher J. Dembowksi, Esq.
       David P. Massaron, Esq.

21317107.1\088888-03795

EXHIBIT B

RESOLUTION OF THE BOARD OF DIRECTORS
OF THE PUBLIC LIGHTING AUTHORITY
AUTHORIZING THE ISSUANCE AND DELIVERY OF
PUBLIC LIGHTING AUTHORITY REVENUE BONDS
AND PROVIDING FOR OTHER MATTERS RELATING THERETO

WHEREAS, the Board of Directors (the "Board") of the Public Lighting Authority, Detroit, Michigan (the "Authority") is a public municipal corporation and public body corporate existing pursuant to Municipal Lighting Authority Act, Act 392, Michigan Public Acts of 2012, as amended ("Act 392"); and

WHEREAS, the Board has determined it is in the best interests of the Authority to issue bonds in an amount not to exceed an aggregate principal amount of $60,000,000 (the "Bonds") for the purposes of constructing a public lighting system as set forth in Interlocal Agreement for the Construction and Financing of a Public Lighting System between the City of Detroit (the "City") and the Authority (the "Financing Agreement"), which Financing Agreement was previously approved by this Board and will become fully effective upon the issuance of the Bonds hereunder; and

WHEREAS, the Board has previously approved an Interlocal Agreement for the Operation, Maintenance and Management of a Public Lighting System between the City and the Authority (the "Operations Agreement") and such Operations Agreement is currently effective; and

WHEREAS, an Amended and Restated Trust Agreement (the "Trust Agreement") among the Authority, the City, the Michigan Finance Authority (the "MFA"), and Wilmington Trust Company, National Association (acting pursuant to the Trust Agreement, the "Revenue Trustee") dated as of the date of the delivery of the initial series of the Bonds, pursuant to which the Revenue Trustee receives and distributes revenues received from the City Utility Users Tax Act, 1990 PA 100, MCL 141.1151 to MCL 141.1177 (the "Utility Revenues") was previously approved by the Board and will become fully effective upon the issuance of the Bonds hereunder; and

WHEREAS, the Authority will enter into a (i) Trust Indenture (the "Trust Indenture") with Wilmington Trust Company, National Association (acting pursuant to the Trust Indenture, the "Bond Trustee") dated as of November 1, 2013, pursuant to which the Bonds will be issued and secured and (ii) a Bond Purchase and Supplemental Agreement with the Michigan Finance Authority and Citibank, N.A. (the "Initial Purchaser"), dated as of the date of sale of the Bonds (the "Supplemental Agreement"); and

WHEREAS, it is necessary to authorize the Executive Director, or his designee, or the Chair, Vice Chair or Treasurer of the Board (each, an "Authorized Officer", and collectively, the "Authorized Officers") to negotiate the sale of the Bonds with the MFA and set forth the terms and conditions upon which the MFA will agree to purchase the Bonds and the interest rates thereof and the purchase price therefor.

NOW, THEREFORE, BE IT RESOLVED BY THE BOARD OF DIRECTORS OF THE PUBLIC LIGHTING AUTHORITY, AS FOLLOWS:

1.     The Board hereby authorizes the issuance, execution and delivery of the Bonds in one or more series to be designated PUBLIC LIGHTING AUTHORITY REVENUE BONDS, with appropriate series designations, in the aggregate original principal amount established by an Authorized Officer, but not to exceed an aggregate principal amount of Sixty Million Dollars ($60,000,000). The Bonds shall be dated as of the date or dates established by an Authorized Officer, and shall be issued for the purpose of providing funds which, together with other available funds, will be used to pay all or a portion of the costs of the Lighting Improvements (as hereinafter defined), including, if determined to be appropriate by an Authorized Officer, to fund a debt service reserve fund in an amount determined by an Authorized Officer and to pay costs related to the issuance of the Bonds. The Bonds shall be serial bonds or term bonds, or both, which may be subject to redemption requirements as shall be established by an Authorized Officer, and the last maturity shall be no later than 30 years from the date of issuance. The Bonds shall bear interest at a variable rate, determined on the basis of an index or some other recognized market procedure, or both, for all or a portion of their term, and the variable rate of interest shall not exceed the lesser of 25% per annum, the maximum rate permitted by law or the maximum rate, if any, specified in the Trust Indenture. Interest on the Bonds shall be payable at such times as shall be specified by an Authorized Officer. The Bonds may be subject to redemption or call for purchase prior to maturity at the times and prices and in the manner as shall be established by an Authorized Officer. The Bonds shall be issued in fully registered form in denominations, shall be payable as to principal and interest in the manner, shall be subject to transfer and exchange, and shall be executed and authenticated, all as shall be provided in the Trust Indenture. The Bonds shall be sold to the MFA for a price to be established by an Authorized Officer plus accrued interest, if any, from the dated date of the Bonds to the date of delivery thereof.

2.     The Authority hereby pledges any interest it has in the Utility Revenues. The Authority ratifies and affirms the pledge of any funds to be held in accounts established under the Trust Indenture, the contents of which by that Trust Indenture are pledged to the repayment of the Bonds and to other payment obligations of the Authority to the Initial Purchaser and its successors under the Supplemental Agreement (the "Other Payment Obligations"). With respect to Other Payment Obligations, the Supplemental Agreement is hereby declared to be an Ancillary Facility within the meaning of Act 392.

The Bonds, and the obligations of the Authority thereunder, including the Supplemental Agreement, shall be revenue bonds or obligations of the Authority and not general obligations of the Authority and shall be paid exclusively from Utility Revenues and other funds held by the Trustee under the Trust Indenture.

No recourse shall be had for the payment of the principal amount of or interest or other obligations on the Bonds or the Supplemental Agreement, or any claim based thereon, against the Public Lighting Authority, or any member or agent of the Board (including, without limitation, any officer or employee of the Authority), as individuals, either directly or indirectly, or, except as specifically provided in the Trust Indenture, Trust Agreement or the instruments entered into in connection therewith.

2

3. The Authority hereby approves, and authorizes any Authorized Officer to execute and deliver, the Trust Indenture and the Supplemental Agreement in substantially the forms on file with the Authority with such changes as determined necessary and advisable by the Authorized Officer. The form of Bonds shall be in substantially the form contained in the Trust Indenture with such changes as shall be approved by the Authorized Officer. Wilmington Trust, National Association is hereby approved to act as Trustee under the Trust Indenture. As required by Section 21(3)(g) of Act 392, the Authority approves the creation of the Bond Payment Fund, Bond Issuance Fund and Construction Fund in the Trust Indenture and approves the deposit of the Utility Revenues received from the Revenue Trustee under the Trust Agreement by the Bond Trustee under the Bond Indenture for payment on the Bonds as provided thereunder and other payment obligations as provided under the Supplemental Agreement.

4. The Authority will construct, improve, enlarge and/or reduce the street lighting system supplying lighting to the City of Detroit in conformance with the Lighting Plan previously approved by the Board, as the same shall be amended from time to time (the "Lighting Improvements"). As required by Section 21(3)(c) of Act 392, the Board hereby states that the Financing Agreement and the Operations Agreement have been entered into and that such agreements provide for the services the Authority is to perform for the City.

5. As required by Act 392, the Authority hereby approves a negotiated sale of the Bonds to the Michigan Finance Authority. Either the Chair, Vice-Chair or the Treasurer of the Board, or the Executive Director is authorized, empowered and directed, in the name and on behalf of the Board, and as its corporate act and deed, to execute the Bonds by manual or facsimile signature and the Authorized Officer is authorized to deliver the Bonds to the MFA in exchange for the purchase price therefor.

6. Either the Chair, Vice-Chair and the Treasurer of the Board and the Executive Director of the Authority, and all other appropriate officers or representatives of the Board or the Authority and each one of them, are authorized to perform all acts and deeds and to execute and deliver for and on behalf of the Board a Sale Order approving the final terms of the Bonds and all other instruments and documents required by this resolution, the Trust Agreement, the Trust Indenture or the Supplemental Agreement, or necessary, expedient and proper in connection with the issuance, sale and delivery of the Bonds, as contemplated hereby.

7. Notwithstanding anything herein to the contrary, an Authorized Officer is hereby authorized to determine and adjust the final Bond details to the extent necessary or convenient to complete the transactions authorized herein, and in pursuance of the foregoing is authorized to exercise the authority and make the determinations authorized pursuant to Section 21(e) of Act 392, including, but not limited to, determinations regarding the form of the Bonds, interest rates, prices, discounts, serial and term maturities, principal amounts, denominations, dates of issuance, interest payment dates, redemption rights, the place of delivery and payment, series designations and other matters necessary to effectuate the sale and issuance of the Bonds authorized herein; provided, however, that the aggregate principal amount of the Bonds shall not exceed the principal amount authorized in Section 1 of this Resolution, the interest rate per annum on any series of Bonds shall not exceed the maximum rate provided by law, and any series of Bonds shall mature not later than 30 years from the date of issuance thereof.

8.    The Authority hereby appoints Miller, Canfield, Paddock and Stone, P.L.C. as Bond Counsel to the Authority for the Bonds, notwithstanding the representation by Miller, Canfield, Paddock and Stone, P.LC. of the MFA in connection with the Local Government Loan Program through which it is anticipated that the MFA will offer to purchase the Bonds. The Authority hereby acknowledges that Miller, Canfield, Paddock and Stone, P.L.C. has provided advice to the City on bankruptcy and other unrelated matters and consents to that unrelated representation.

9.    No issue of Bonds shall be delivered under this Resolution to the MFA pursuant to a bond purchase agreement executed by the Authority after December 30, 2016.

10.    Any resolutions or parts of resolutions or other proceedings of the Board in conflict herewith are hereby repealed insofar as such conflict exists.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

I hereby certify that the attached is a true and complete copy of a resolution adopted by the Board of Directors of Public Lighting Authority on November 20, 2013, in accordance with applicable law, and that the minutes of the meeting at which said resolution was adopted were kept and will be or have been made available to the public in accordance with applicable law.

I further certify as follows:

1.      Present at the meeting were the following Board members:

Maureen Stapleton, John Davis, Cedric Dargin, and Marvin Beatty (via Teleconference)

Absent from the meeting were the following Board members:

Michael Einheuser

2.      The following members of the Board voted for the adoption of the Resolution:

Maureen Stapleton, John Davis, Cedric Dargin

The following members of the Board voted against adoption of the Resolution:

None

RESOLUTION DECLARED ADOPTED.

Chairperson of the Board

21626559.7\088888-03795