UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,        .        Docket No. 13-53846
        MICHIGAN,               .
                               .        Detroit, Michigan
                               .        December 3, 2013
                Debtor.        .        10:00 a.m.
. . . . . . . . . . . . . . .

HEARING RE. BENCH OPINION RE. ELIGIBILITY
BEFORE THE HONORABLE STEVEN W. RHODES
UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  DAVID G. HEIMAN
                       North Point
                       901 Lakeside Avenue
                       Cleveland, OH  44144-1190
                       (216) 586-7175

                       Jones Day
                       By:  BRUCE BENNETT
                       555 South Flower Street
                       Fiftieth Floor
                       Los Angeles, CA  90071-2452
                       (213) 243-2382

                       Jones Day
                       By:  HEATHER LENNOX
                       222 East 41st Street
                       New York, NY  10017
                       (212) 326-3837

                       Pepper Hamilton, LLP
                       By:  ROBERT S. HERTZBERG
                            DEBORAH KOVSKY-APAP
                       4000 Town Center, Suite 1800
                       Southfield, MI  48075-1505
                       (248) 359-7333

For the State of       Dickinson Wright, PLLC
Michigan:              By:  STEVEN G. HOWELL
                       500 Woodward Avenue, Suite 4000
                       Detroit, MI  48226-3425
                       (313) 223-3033

```
APPEARANCES (continued):

For the Official      Dentons
Committee of          By:  CLAUDE MONTGOMERY
Retirees:                  CAROLE NEVILLE
                      1221 Avenue of the Americas
                      New York, NY  10020-1089
                      (312) 632-8390

                      Dentons US, LLP
                      By:  SAM J. ALBERTS
                      1301 K Street, NW
                      Suite 600, East Tower
                      Washington, DC  20005-3364
                      (202) 408-7004

                      Brooks, Wilkins, Sharkey & Turco, PLLC
                      By:  MATTHEW E. WILKINS
                      401 South Old Woodward, Suite 400
                      Birmingham, MI  48009
                      (248) 971-1711

For Detroit Retired   Lippitt O'Keefe, PLLC
City Employees        By:  RYAN C. PLECHA
Association,          370 East Maple Road, 3rd Floor
Retired Detroit       Birmingham, MI  48009
Police and Fire       (248) 723-6263
Fighters Associa-
tion, Shirley V.
Lightsey, and
Donald Taylor:

For AFSCME,           Lowenstein Sandler, LLP
AFL-CIO, and Sub-     By:  SHARON L. LEVINE
Chapter 98, City      65 Livingston Avenue
of Detroit            Roseland, NJ  07068
Retirees:             (973) 597-2374

For Detroit           Clark Hill, PLC
Retirement Systems-   By:  ROBERT GORDON
General Retirement    151 South Old Woodward, Suite 200
System of Detroit,    Birmingham, MI  48009
Police and Fire       (248) 988-5882
Retirement System
of the City of
Detroit:
```

APPEARANCES (continued):

```
For the Detroit       Erman, Teicher, Miller, Zucker &
Fire Fighters             Freedman, P.C.
Association, the       By:  BARBARA A. PATEK
Detroit Police              CRAIG E. ZUCKER
Officers Associa-           EARLE I. ERMAN
tion and the          400 Galleria Officentre, Suite 444
Detroit Police        Southfield, MI  48034
Lieutenants &         (248) 827-4100
Sergeants
Association:

For Retired           Strobl & Sharp, PC
Detroit Police        By:  LYNN M. BRIMER
Members                    MEREDITH E. TAUNT
Association:               MALLORY A. FIELD
                      300 East Long Lake Road, Suite 200
                      Bloomfield Hills, MI  48304-2376
                      (248) 540-2300


Court Recorder:       Letrice Calloway
                      United States Bankruptcy Court
                      211 West Fort Street
                      21st Floor
                      Detroit, MI  48226-3211
                      (313) 234-0068

Transcribed By:       Lois Garrett
                      1290 West Barnes Road
                      Leslie, MI  49251
                      (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1    THE CLERK:  All rise.  Court is in session.  Please
2  be seated.  Case Number 13-53846, City of Detroit, Michigan.
3    THE COURT:  Counsel, would you like to put your
4  appearances on the record, please?
5    MR. HEIMAN:  David Heiman, Jones Day, on behalf of
6  debtors, and with me today are Bruce Bennett and Heather
7  Lennox and Bob Hertzberg as well.
8    MR. HOWELL:  Good morning, your Honor.  Steven G.
9  Howell, Dickinson Wright, special assistant attorney general,
10  appearing on behalf of the State of Michigan.
11    MR. MONTGOMERY:  Good morning, your Honor.  Claude
12  Montgomery of Dentons, and with me are Carole Neville and Sam
13  Alberts from Dentons and Matt Wilkins as local counsel.
14    MR. PLECHA:  Good morning, your Honor.  Ryan Plecha
15  from Lippitt O'Keefe on behalf of the retiree association
16  parties.
17    MS. LEVINE:  Good morning, your Honor.  Sharon
18  Levine, Lowenstein Sandler, for AFSCME.
19    MR. GORDON:  Good morning, your Honor.  Robert
20  Gordon of Clark Hill on behalf of the Detroit Retirement
21  Systems.
22    MS. PATEK:  Good morning, your Honor.  Barbara Patek
23  of Erman, Teicher, Miller, Zucker & Freedman, and with me are
24  Craig Zucker and Earle Erman on behalf of Detroit public
25  safety unions.

1    MS. BRIMER:  Good morning, your Honor.  Lynn M.

2  Brimer appearing on behalf of the Retired Detroit Police

3  Members Association.  With me this morning are Meredith Taunt

4  and Mallory Field.

5    THE COURT:  The Court decided to provide this

6  summary of its written opinion, which it will issue shortly,

7  because it is important to give the people of the City of

8  Detroit the best opportunity to understand what the Court is

9  ruling and why.  I would not call this a brief summary.  It's

10  a bit extended, so settle in, please.  The written opinion

11  will be over 140 pages, and it will address in more detail

12  and with more legal and factual support all of the arguments

13  that have been made regarding eligibility.  I thought this

14  summary would be more accessible.  It is critical to the

15  process, indeed, to any judicial process, that those who are

16  impacted by the Court's ruling have confidence that they were

17  heard and that their arguments and concerns were fully and

18  fairly considered.

19    The matter is before the Court on the parties'

20  objections to the eligibility of the city to be a debtor in

21  this Chapter 9 case under Section 109(c) of the Bankruptcy

22  Code.  The City of Detroit was once a hard-working, diverse,

23  vital city, the home of the automobile industry, proud of its

24  nickname, The Motor City.  It was rightfully known as the

25  birthplace of the American automobile industry.  In 1952, at

1  the height of its prosperity and prestige, it had a

2  population of 1,850,000 residents.  It was building half of

3  the world's cars.

4          The evidence establishes, however, that for decades

5  the City of Detroit has experienced dwindling population,

6  employment, and revenues.  This has led to decaying

7  infrastructure, excessive borrowing, mounting crime rates,

8  spreading blight, and a deteriorating quality of life.  The

9  city no longer has the resources to provide its residents

10  with basic police, fire, and emergency medical services that

11  its residents need for their basic health and safety.  To

12  reverse this decline in basic services and to attract new

13  residents and businesses and to revitalize and reinvigorate

14  itself, the city needs help.

15          The city estimates that its debt is $18 billion.

16  This consists of 11.9 billion in unsecured debt and 6.4

17  billion in secured debt.  It has more than 100,000 creditors.

18  According to the city, this unsecured debt includes $5.7

19  billion for other post-employment benefits through June of

20  2011, which is the most recent actuarial data available; 3.5

21  billion in unfunded pension obligations; $650 million in

22  general bond obligations; $1.43 billion for certificates of

23  participation related to the pensions; $346.6 million for

24  swap contracts, liabilities related to the certificates of

25  participation; and $300 million of other liabilities.  Except

1  for the unfunded pension liability, the parties -- the

2  objecting parties do not seriously challenge the city's

3  estimates of this debt.  The pension plans and others have

4  suggested a much lower pension underfunding amount, perhaps

5  even below $1 billion.  However, the Court concludes that it

6  is not necessary to resolve this issue at this time.

7  Otherwise, the Court is satisfied that the city's estimates

8  of its other liabilities are accurate enough for purposes of

9  determining eligibility, and the Court so finds.

10         For the five years ending with fiscal year 2012,

11  pension payments exceeded contributions and investment income

12  by approximately $1.7 billion for the General Retirement

13  Systems and $1.6 billion for the Police and Fire Retirement

14  Systems.  This, of course, resulted in the liquidation of

15  pension trust principal.

16         Using current actuarial assumptions, the city's

17  required pension contributions as a percentage of eligible

18  payroll expenses are projected to grow from 25 percent for

19  the GRS and 30 percent for the PFRS in 2012 to 30 percent for

20  the GRS and 60 percent for the PFRS by 2017.  Changes in

21  actuarial assumptions would further increase the city's

22  required pension contributions.  During 2012, 39 percent of

23  the city's revenue was used to service legacy liabilities.

24  The forecasts for subsequent years, assuming no

25  restructuring, are 43 percent for 2013 going up to 65 percent

1  for 2017.

2      The Court will now address the transactions referred

3  to as the certificates of participation, often called the

4  COP's, and the swaps associated with them.  These

5  transactions are complex and confusing, and so is the

6  resulting litigation.  The Court will provide only the

7  briefest summary of them at this time.

8      In 2005 and 2006, the city decided to raise $1.4

9  billion for its underfunded pension funds.  A substantial

10  part of this funding was at an interest rate that would float

11  with the market.  If the market interest rate went up, so did

12  the rate on the COP's and vice versa.  As part of the

13  transaction, therefore, the city decided to try to protect

14  itself against interest rates going up, so it entered into a

15  wager.  The more common name for this is a swap, but it's

16  nothing more than a common bet.  If the rate went up, someone

17  would pay the city to help cover the increased interest

18  expense.  If the rate went down, the city would have to pay.

19  In 2008 interest rates dropped dramatically.  As a result,

20  the city lost on the swaps bet.  Actually, it lost

21  catastrophically on the swaps bet.  The city estimates that

22  the damage will be approximately $45 million per year for the

23  next ten years.  The result has been complex and expensive

24  litigation.  In any event, the city estimates that as of June

25  30, 2013, it may owe $480 million from the 2005 COP's and

1    $949 million on the 2006 COP's.  It also has a potential

2    liability in excess of $300 million on the swaps, although

3    the city has serious and substantial challenges to those

4    amounts.

5         Debt service from the city's general fund related to

6    limited tax and unlimited general obligation debt and the

7    COP's was $225 million for fiscal year 2012 and is projected

8    to exceed $247 million in 2013.  The city estimates that 38

9    percent of tax revenues go to debt service rather than city

10   services.  It further estimates that without changes, this

11   will increase to 65 percent within five years.  At the same

12   time, however, tax revenues are going down.  State revenue

13   sharing is also going down.  It has decreased by $161

14   million, 48 percent, since 2002 and by $67 million, 31

15   percent, since 2008.

16        The city has experienced large operating deficits

17   for each of the past seven years.  Through 2013, it has an

18   accumulated general fund deficit of $237 million.  However,

19   this includes the effect of recent debt issuances.  The city

20   borrowed $75 million in 2008, $250 million in 2010, and $129

21   million in 2013.  If the city had not borrowed these amounts,

22   the city's accumulated general fund deficit would have been

23   $700 million through 2013.  In 2012, the city had a negative

24   cash flow of $115 million excluding the proceeds from

25   borrowings.  In March of 2012, to avoid running out of cash,

1    the city borrowed $80 million.  In 2013, the city deferred

2    payments on certain of its obligations totaling $120 million

3    for current and prior year pension contributions and other

4    payments.

5         Absent restructuring, the city projects it will have

6    negative cash flows of $190 million for 2014 increasing to

7    $346 million for 2017.  The city further estimates that by

8    2017 its accumulated deficit will grow to approximately $1.3

9    billion.  The city is not making its pension contributions as

10   they become due.  As of May 2013, the city had deferred

11   approximately $54 million in pension contributions and

12   approximately $50 million on June 30th, 2013, for current

13   year pension contributions.

14        Also, the city did not make the scheduled $39.7

15   million payment on its COP's that were due on June 14, 2013.

16   If the city had not deferred these payments, it would have

17   run out of cash by June 30th, 2013.  Let me repeat that.  If

18   the city had not deferred these payments, it would have run

19   out of cash by June 30th, 2013.  It filed for bankruptcy 18

20   days later.

21        The city will -- the Court will now review the

22   causes and consequences of this.  These are discussed

23   together because it can be hard to tell which is a cause and

24   which is a consequence.  Detroit's population declined to

25   684,800 in December of 2012.  This is a 63-percent decline in

1   population from its peak in 1950.  In June 2000, Detroit's

2   unemployment rate was 6.3 percent.  In June 2010, it was 23.4

3   percent.  In June 2012, it was 18.3 percent.  The number of

4   employed Detroit residents fell from approximately 353,000 in

5   2000 to 280,000 in 2012.

6           The city's credit ratings are below investment

7   grade.  In calendar year 2012, 136,00 crimes were reported in

8   the city.  Of these, 15,200 were violent crimes.  The city's

9   case clearance rate for violent crimes is 18.6 percent.  The

10  clearance rate for all crimes is 8.7 percent.  These rates

11  are substantially below those of comparable municipalities

12  nationally and surrounding local communities.

13          As of April 2013, about 40 percent of the city's

14  88,000 streetlights were not working.  There are

15  approximately 78,000 abandoned and blighted structures in the

16  city.  Of these, 38,000 are considered dangerous buildings.

17  The city experiences 11 to 12,000 fires each year for the

18  past decade.  Approximately 60 percent of these were in

19  blighted or unoccupied buildings.  In 2012 the average

20  priority one response time for the police department was 30

21  minutes.  In 2013 it was 58 minutes.  The national average is

22  11 minutes.  The police department staffing has been reduced

23  by approximately 40 percent over the last ten years.  It has

24  not invested in or maintained its facility infrastructure for

25  many years and has closed or consolidated many precincts.  It

1  operates with a fleet of 1,291 vehicles, most of which have
2  reached the replacement age of three years and lack modern
3  information technology.  The average age of the city's 35
4  fire stations is 80 years.  The fire department's fleet has
5  many mechanical issues, contains no reserve vehicles, and
6  lacks equipment ordinarily considered standard.  During the
7  first quarter of 2013, frequently only ten to fourteen of the
8  city's 36 ambulances were in service.  The city's information
9  technology infrastructure and software is obsolete and is not
10 integrated between departments or even within departments.
11 The city has reduced the number of its employees by about
12 2,700 since 2011.  As of May 31st, 2013, it has approximately
13 9,560 employees.

14       The city's union employees are represented by 47 or
15 48 discrete bargaining units.  The collective bargaining
16 agreements covering all of these bargaining units expired
17 before the case was filed.  The city has implemented revised
18 employment terms called City Employment Terms for
19 nonunionized employees and for unionized employees under
20 expired collective bargaining agreements.

21       It has also increased revenues and reduced expenses
22 in other ways.  It estimates that these measures have
23 resulted in annual savings of $200 million.  The city cannot
24 legally increase its tax revenues nor can it reduce its
25 employee expenses without further endangering public health

1   and safety.

2           Before reviewing the events leading to the filing of

3   this case, a brief review of the winding history of the

4   Michigan statutes on point is necessary. In 1990 the

5   Michigan legislature enacted Public Act 72 of 1990, the Local

6   Government Fiscal Responsibility Act. This act empowered the

7   state to intervene with respect to municipalities that faced

8   financial crisis through the appointment of an emergency

9   financial manager, who would assume many of the powers

10   ordinarily held by local public officials. Effective March

11   16, 2011, PA 72 was repealed and replaced with Public Act 4

12   of 2011, the Local Government and School District Fiscal

13   Accountability Act. On November 5th, 2012, however, the

14   Michigan voters rejected PA 4 by referendum. In <u>Davis</u> v.

15   <u>Roberts</u>, the Michigan Court of Appeals held that this

16   rejection revived Public Act 72. Public Act 72 remained in

17   effect until March 28, 2013, when Public Act 436, the Local

18   Financial Stability and Choice Act, became effective. The

19   legislature had enacted that law on December 13, 2012, and

20   the governor had signed it on December 26, 2012.

21           On February 19, 2013, a financial review team

22   appointed by the governor submitted its report regarding the

23   city. That report concluded that a local government

24   financial emergency exists within the City of Detroit because

25   no satisfactory plan exists to resolve a serious financial

1    problem.  On March 1st, 2013, after receiving that report,

2    the governor announced his determination that a financial

3    emergency existed within the city.  On March 12, 2013,

4    Governor Snyder conducted a public hearing to consider the

5    City Council's appeal of his determination.  On March 14,

6    2013, the governor confirmed his determination of a financial

7    emergency within the city and requested that the Local

8    Emergency Financial Assistance Loan Board appoint an

9    emergency financial manager under PA 72.  On March 15, 2013,

10    the Loan Board appointed Kevyn Orr as the emergency financial

11    manager for the City of Detroit.  On March 15, Mr. Orr took

12    office formally.  On March 18, which was the effective date

13    of PA 436, PA 72 was repealed, and Mr. Orr became the

14    emergency manager of the city under PA 436.

15         Under law, the emergency manager acts for and in the

16    place and stead of the governing body and the office of the

17    chief administrator -- administrative officer of the local

18    government.  He has broad powers in receivership to rectify

19    the financial emergency and to assure the fiscal

20    accountability of the local government and the local

21    government's capacity to provide or cause to be provided

22    necessary government services essential to the public health,

23    safety, and welfare.

24         On June 14, 2013, Mr. Orr organized a meeting with

25    approximately 150 representatives of the city's creditors.

1    Mr. Orr presented the June 14 creditor proposal, Exhibit 43,

2    and answered questions.  At the conclusion of the meeting,

3    Mr. Orr invited creditor representatives to provide feedback

4    to the city regarding the proposal.  This proposal described

5    the economic circumstances that resulted in Detroit's

6    financial condition.  It also offered a restructuring of the

7    city's operations, financing, and capital structure.  It also

8    offered recoveries for each creditor group.

9          Regarding creditor recoveries, the city proposed,

10   (a) treatment of secured debt adequate to the value of the

11   collateral; (b) the pro rata distribution of $2 billion in

12   principal amount of interest only limited recourse

13   participation notes to holders of unsecured claims -- that

14   is, the unsecured bondholders, the COP's, the pension

15   systems, retirees, and other unsecured claims -- and (c) a

16   Dutch auction process for the city to purchase or pay the

17   notes.

18         Following the June 14, 2013, meeting at which the

19   proposal to creditors was presented, Mr. Orr and his staff

20   had several other meetings.  On June 3, 2013, two lawsuits

21   were filed against the governor and the treasurer in state

22   court.  These suits sought a declaratory judgment that PA 436

23   violated the Michigan Constitution to the extent that the law

24   purported to authorize bankruptcy proceedings in which vested

25   pension benefits might be impaired.  The suits also sought an

1   injunction preventing the governor from authorizing a
2   bankruptcy proceeding for the City of Detroit in which
3   pension -- vested pension benefits might be impaired.  The
4   two cases were <u>Flowers</u> v. <u>Snyder</u> and <u>Webster</u> v. <u>Snyder</u>.  On
5   July 17, 2013, the GRS commenced a similar lawsuit, <u>General</u>
6   <u>Retirement System of the City of Detroit</u> v. <u>Orr</u>.  On the day
7   before, July 16, 2013, Mr. Orr had recommended to the
8   governor and the treasurer that the city file for Chapter 9
9   relief.  On July 18, Governor Snyder authorized the City of
10  Detroit to file a Chapter 9 bankruptcy case.  At 4:06 p.m. on
11  July 18, 2013, the City of Detroit filed this Chapter 9
12  bankruptcy case.
13          Before turning to the filed objections in this case,
14  it is necessary to point out that the city bears the burden
15  to establish by a preponderance of the evidence each of the
16  elements of eligibility under Section 109(c).  As the Court
17  commented at the conclusion of the hearing on September 19,
18  2013, the individuals' presentations on that day were moving,
19  passionate, thoughtful, compelling, and well-articulated.
20  These presentations demonstrated an extraordinary depth of
21  concern for the City of Detroit, for the adequate level of
22  services that their city government provides, and for the
23  personal hardships that that creates, and most clearly for
24  the pensions of the city retirees and employees.  These
25  individuals expressed another deeply held concern and even

1  anger that became a major theme of the hearing, the concern

2  and anger that the state's appointment of an emergency

3  manager over the City of Detroit violated their fundamental

4  democratic right to self-governance.

5         The Court's role here is to evaluate how these

6  concerns might impact the city's eligibility for bankruptcy.

7  In making that evaluation, of course, the Court can only

8  consider the specific requirements of applicable law.  The

9  popularity of the decision to appoint an emergency manager is

10  not a matter of eligibility under the federal bankruptcy

11  laws.  The Court has carefully considered the concerns of the

12  individuals that filed eligibility objections, including

13  those that addressed the Court on September 19 of this year.

14  Those concerns are addressed throughout the Court's opinion

15  but are primarily addressed in the context of whether this

16  case was filed in good faith.

17         The Court will now begin its findings and

18  conclusions.  The City of Detroit is a municipality as

19  defined in the Bankruptcy Code.  The parties agree to that.

20  Several objecting parties challenge the constitutionality of

21  Chapter 9 of the Bankruptcy Code under the United States

22  Constitution.  Citing the United States Supreme Court's

23  decision in Stern versus Marshall, these parties also assert

24  that this Court does not have the authority to determine the

25  constitutionality of Chapter 9.  Several objecting parties

1   also challenge the constitutionality of Public Act 436 under

2   the Michigan Constitution.  Some of these parties also assert

3   that this Court does not have the authority to determine the

4   constitutionality of PA 436.

5         The Official Committee of Retirees previously filed

6   a motion to withdraw the reference to the District Court on

7   the grounds that this Court does not have the authority to

8   determine the constitutionality of either Chapter 9 or PA

9   436.  It also filed a motion for stay of the eligibility

10   proceedings pending the District Court's resolution of that

11   motion.  In this Court's denial of the stay motion, it

12   concluded that the committee was unlikely to succeed on its

13   arguments regarding this Court's lack of authority under

14   Stern.  For the reasons stated in that opinion, the Court

15   concludes that it has the authority to determine the

16   constitutionality of Chapter 9 and PA 436.

17         The objecting parties argue that Chapter 9 of the

18   Bankruptcy Code violates several provisions of the United

19   States Constitution both on its face and as applied in this

20   bankruptcy case.  Article I, Section 8, of the United States

21   Constitution provides the Congress shall have the power to

22   establish uniform laws on the subject of bankruptcies

23   throughout the United States.  The objecting parties assert

24   that Chapter 9 violates the uniformity requirement of the

25   United States Constitution because Chapter 9 cedes to each

1    state the ability to define its own qualifications for a

2    municipality to declare bankruptcy, and, therefore, Chapter 9

3    permits the promulgation of nonuniform bankruptcies within

4    the states.  The Supreme Court has addressed the uniformity

5    requirement in several cases.  Most notably, in Hanover

6    National Bank v. Moyses in 1902 the Supreme Court held that

7    the incorporation into the bankruptcy law of state laws that

8    relate to exemptions did not violate the uniformity

9    requirement of the Constitution.  The Court stated, "The

10   general operation of the law is uniform although it may

11   result in certain peculiars differently in different

12   States" -- I'm sorry -- "certain particulars differently in

13   different States."

14          The Court concludes that Chapter 9 does exactly what

15   the Supreme Court cases require to meet the uniformity

16   requirement.  The defined class of debtors to which Chapter 9

17   applies is the class of entities that meet the eligibility

18   requirements.  One such class qualification is that the

19   entity is specifically authorized to be a debtor under

20   Chapter 9 by state law.  As Moyses held, it is of no

21   consequence in the uniformity analysis that this requirement

22   of state authorization to file a Chapter 9 case may lead to

23   different results in different states.  Accordingly, the

24   Court concludes that Chapter 9 satisfies the uniformity

25   requirement of the bankruptcy clause of the United States

1    Constitution.

2            The contracts clause of the United States

3    Constitution provides, quote, "No State shall pass any law

4    impairing the Obligation of Contracts," close quote.  It is

5    argued that Chapter 9 violates the contracts clause.  This

6    argument is rejected.  Chapter 9 is a federal law, not a

7    state law.  Article I, Section 10, does not prohibit Congress

8    from enacting a law impairing the obligation of contracts.

9            The Tenth Amendment challenge to Chapter 9 is the

10   most strenuously argued here.  That amendment provides,

11   quote, "The powers not delegated to the United States by the

12   Constitution, nor prohibited by it to the States are reserved

13   to the States respectively, or to the people," close quote.

14   The objecting parties argue that Chapter 9 of the Bankruptcy

15   Code violates the principles of federalism that are reflected

16   in this amendment.  The argument is that through Chapter 9,

17   Congress has established rules that control state fiscal

18   self-management, which is an area of exclusive state

19   sovereignty.  This argument is a facial challenge to the

20   constitutionality of Chapter 9.  The as applied challenge is

21   that if the State of Michigan can properly authorize the City

22   of Detroit to file for Chapter 9 relief without the explicit

23   protection of pension rights for retired city employees, then

24   Chapter 9 is unconstitutional because that would violate

25   Michigan's sovereignty.

1     Before addressing the merits of these arguments,

2  however, the Court must first address two preliminary issues

3  that the United States raised, standing and ripeness.  First,

4  the Court concludes that the objecting parties do have

5  standing.  Section 1109(b) of the Bankruptcy Code provides,

6  quote, "A party in interest, including a creditor, may raise

7  and appear and be heard on any issue in a case under this

8  chapter," close quote.  Section 901(a) makes this provision

9  applicable in a Chapter 9 case.  Accordingly, the objecting

10  parties who are creditors with pension claims against the

11  city have standing to assert their constitutional challenges

12  as part of their objections to this bankruptcy case.

13     The United States further argues that the issue of

14  whether Chapter 9 is constitutional as applied in this case

15  is not ripe for determination at this time.  The city joins

16  in this argument.  Early on in this case, the Court expressed

17  its own doubts about this thinking that the issue of whether

18  pension rights can be impaired in bankruptcy applied more to

19  confirmation than to eligibility.  The Court finds now that

20  these issues are ripe for decision.  At the request of the

21  objecting parties, the Court, therefore -- excuse me --

22  reconsidered that position and now agrees that the issue is

23  ripe at this point.

24     The premise of the argument that the United States

25  makes is that the filing of the case did not result in the

1  impairment of any pensions, thus the United States argues

2  that this issue will be ripe only when the city proposes a

3  plan that would impair pensions if it were confirmed.  Until

4  then, it argues their injury is speculative.  Although the

5  argument of the United States has some appeal, as the Court

6  itself initially concluded, the Court must now reject it.

7          The ultimate issue before the Court at this time is

8  whether the city is eligible to be a debtor in Chapter 9.

9  This dispute arises in the concrete factual context of the

10  City of Detroit's filing this bankruptcy case under Chapter 9

11  of the Bankruptcy Code and the objecting parties challenging

12  the constitutionality of that very law.  This dispute is not

13  an abstract disagreement that is ungrounded in the here and

14  now.  It is here, and it is now.  The Court further concludes

15  that as a matter of judicial prudence resolving this issue

16  now will likely expedite the resolution of this bankruptcy

17  case.  The parties have fully briefed and argued the merits.

18  Further, if the Tenth Amendment challenge to Chapter 9 is

19  resolved now, the parties and the Court can then focus on

20  whether the Court -- whether the city's plan will meet the

21  confirmation requirements of the Bankruptcy Code.

22  Accordingly, the Court concludes that the objecting parties'

23  challenge to Chapter 9 of the Bankruptcy Code as applied in

24  this case is ripe for determination at this time.

25          The Court concludes that the United States Supreme

1  Court has already decided the question of whether a federal

2  municipal bankruptcy act can be administered consistent with

3  the principles of federalism reflected in the Tenth

4  Amendment.  In United States versus Bekins, the Supreme Court

5  specifically upheld the Municipal Corporation Bankruptcy Act

6  of 1937 over the objections that the statute violated the

7  Tenth Amendment.  It is well-settled that this Court is bound

8  by the decisions of the United States Supreme Court.

9          Nevertheless, the objecting parties assert that

10  Bekins is no longer good law because of amendments to the

11  municipal bankruptcy statute after Bekins was decided and

12  because of two more recent Supreme Court decisions regarding

13  the Tenth Amendment.  However, the Court concludes first that

14  changes to the municipal bankruptcy law since 1937 have been

15  minor and do not undermine the continuing validity of Bekins.

16  Second, changes to the Supreme Court's Tenth Amendment law do

17  not undermine the continuing validity of Bekins.  In its

18  recent cases deciding issues under the Tenth Amendment, New

19  York versus United States and Printz versus United States,

20  the Supreme Court has upheld laws that encourage states to

21  regulate according to federal policies so long as the states

22  consent.  On the other hand, laws that compel or commandeer

23  state resources do violate the Tenth Amendment.  The key is

24  state consent.  Chapter 9 simply does not raise a consent

25  issue.  As the Supreme Court emphasized in Bekins, Chapter 9

1  is limited to voluntary proceedings.  The federal government

2  cannot and does not compel states to authorize municipalities

3  to file for Chapter 9 relief, and municipalities are not

4  permitted to seek Chapter 9 relief without specific state

5  authorization.  There is simply no commandeering or

6  compulsion involved.  Therefore, the Court concludes that

7  Chapter 9 is not facially unconstitutional under the Tenth

8  Amendment of the United States Constitution.

9       Several of the objecting parties also raise as

10  applied challenges to the constitutionality of Chapter 9

11  under the Tenth Amendment.  The primary point of these

12  arguments is that if Chapter 9 permits the State of Michigan

13  to authorize a city to file a petition for Chapter 9 relief

14  without explicitly providing for protection of

15  constitutionally protected pension rights, then the Tenth

16  Amendment is violated.  The State of Michigan itself cannot

17  legally provide for the adjustment of pension debts or any

18  debts of the City of Detroit.  That is so because the United

19  States Constitution and the Michigan Constitution both

20  prohibit the State of Michigan from impairing contracts.  It

21  is also because the Michigan Constitution prohibits the

22  impairing of the -- of accrued pension benefits.  These

23  prohibitions, however, do not apply in the federal Bankruptcy

24  Court.  As the Bankruptcy Court in the City of Stockton

25  Chapter 9 case said, the bankruptcy clause of the United

1　States Constitution necessarily authorizes Congress to make
2　laws that would impair contracts, so it has long been
3　understood that bankruptcy law entails impairment of
4　contracts.  For purposes of the Tenth Amendment and state
5　sovereignty, nothing distinguishes pension debt in a
6　municipal bankruptcy case from any other debt.  If the Tenth
7　Amendment prohibits the impairment of pension benefits in
8　this case, then it would also prohibit the adjustment of any
9　other debt in the case like bond debt.  Bekins makes it
10　clear, however, that with state consent the adjustment of
11　municipal debts does not impermissibly intrude on state
12　sovereignty.  This Court is bound to follow that Supreme
13　Court holding.

14　　　　The plans and other objecting parties counter that
15　result by asserting that under the Michigan Constitution
16　pension debt has greater protection than ordinary contract
17　debt.  The argument is premised on the slim read that in the
18　Michigan Constitution the pension clause provides that
19　pension rights may not be, quote, "impaired or diminished"
20　whereas the contracts clause in the Michigan Constitution
21　only prohibits impairing contract rights.  There are several
22　reasons why the slight difference between the language that
23　protects contracts, no impairment, and the language that
24　protects pensions, no impairment or diminishment, does not
25　demonstrate that pensions are entitled to any extraordinary

1  protection.  At common law, before the adoption of the
2  Michigan Constitution in 1963, public pensions in Michigan
3  were viewed as gratuitous allowances that could be revoked at
4  will because a retiree lacked any vested right in their
5  continuation.  In 1963, this new provision enhancing the
6  protection for pensions was included, quote, "The accrued
7  financial benefits of each pension plan and retirement system
8  of the state and its political subdivisions shall be a
9  contractual obligation thereof which shall not be diminished
10  or impaired thereby," close quote.  That's Article IX,
11  Section 24, of the Michigan Constitution of 1963.

12         So here are the reasons why pension rights are
13  contract rights under the Michigan Constitution.  First, as
14  noted, the language of Article IX, Section 24, gives pension
15  benefits the status of a, quote, "contractual obligation,"
16  close quote.  That's the language that it uses.

17         Second, if the Michigan Constitution were meant to
18  give the kind of higher or even absolute protection for which
19  the plans argue here, that language simply would not have
20  referred to pension benefits as a, quote, "contractual
21  obligation," close quote.

22         Third, linguistically there is no functional
23  difference in meaning between "impair" and "impair or
24  diminish."  Now, there certainly is a preference, if not a
25  mandate, to give every -- to give meaning to every word in

1 written law.  At the same time, however, we give undefined
2 statutory terms their plain and ordinary meanings.  If this
3 Court gives these terms, "diminish" and "impair," their plain
4 and ordinary meanings, those meanings would not be
5 substantially different from each other.  The terms are not
6 synonyms, but they cannot honestly be given meanings so
7 different as to compel the result that the plans now seek,
8 the protection of pension rights in bankruptcy.  "Diminish"
9 adds nothing material to "impair."  All diminishment is
10 impairment, and "impair" includes "diminish."

11 Fourth, the argument for a greater protection is
12 inconsistent with the Michigan Supreme Court's interpretation
13 of this constitutional language in two cases, Kosa versus
14 Treasury -- Treasurer of the State of Michigan and In re.
15 Constitutionality of 2011 PA 38.  In Kosa in 1980 the
16 Michigan Supreme Court quoted the history from the
17 Constitutional Convention regarding Article IX, Section 24.
18 Several times that history refers to pension rights as
19 contractual rights.  The Court in Kosa also itself used
20 contractual language when referring to pension rights.  More
21 recently in In re. Constitutionality of 2011 PA 38 in 2011,
22 the Michigan Supreme Court stated, quote, "The obvious intent
23 of Section 24, however, was to ensure that public pensions be
24 treated as contractual obligations that, once earned, could
25 not be diminished," close quote.

1          Fifth, an even greater narrative must be considered

2    here focusing on 1963.  At that time, Michigan law allowed

3    municipalities to file a bankruptcy, and <u>Bekins</u> had long

4    since held that that was constitutional, so when the new

5    Michigan Constitution was negotiated and proposed and

6    ratified in 1963, it explicitly gave accrued pension benefits

7    only the status of contractual obligations.  That new

8    Constitution could have given pensions protection from

9    impairment in bankruptcy in several ways, but it did not.  It

10   could have simply prohibited Michigan municipalities from

11   filing bankruptcy.  It could have somehow created a property

12   interest that bankruptcy would be required to respect, or it

13   could have established some sort of a secured interest in the

14   municipality's property.  It could have even required the

15   state to guarantee pension benefits, but it did none of

16   those.  Instead, both the history from the Constitutional

17   Convention and the very language of the pension provision

18   itself, it is made clear municipal pension rights are

19   contract rights.  Because under the Michigan Constitution

20   pension rights are contractual rights, they are subject to

21   impairment in a federal bankruptcy proceeding.  Moreover,

22   where, as here, the state consents, that impairment does not

23   violate the Tenth Amendment.  Therefore, as applied in this

24   case, Chapter 9 is Constitutional.

25          Nevertheless, the Court is compelled to comment.  No

1    one should interpret this holding that pension rights are

2    contract rights and subject to impairment in this bankruptcy

3    case to mean that this Court necessarily will confirm any

4    plan of adjustment that impairs pensions.  The Court

5    emphasizes that it will not lightly or casually exercise the

6    power under federal bankruptcy law to impair pensions.

7    Before the Court confirms any plan that the city submits, the

8    Court must find that the plan fully meets the requirements of

9    Section 943(b) of the Bankruptcy Code and the other

10   applicable provisions of the Bankruptcy Code.  Together these

11   provisions of law demand this Court's judicious, legal, and

12   equitable consideration of the interests of the city and the

13   interests of all of its creditors, including retirees, as

14   well as the laws of the State of Michigan.

15           Section 109(c)(2) of the Bankruptcy Code requires

16   that a municipality be specifically authorized to be a debtor

17   under such chapter.  The evidence establishes that the city

18   was authorized to file this case.  The issue is whether that

19   authorization was proper under the Michigan Constitution.

20   Several objectors argue that the authorization is not valid

21   because Public Act 436, the statute establishing the

22   underlying procedure for a municipality to obtain

23   authorization, is unconstitutional.  The validity of Public

24   Act 436 under the Michigan Constitution is a question of

25   state law.  The Michigan Supreme Court has not ruled on the

1   validity of Public Act 436.  As a result, this Court must
2   attempt to ascertain how that Court would rule if it were
3   faced with this issue.

4            As discussed earlier, on March 16th, 2011, the
5   governor signed Public Act 4 into law, but Public Act 4 was
6   repealed by Public Act 72.  However, the voters rejected
7   Public Act 4 by referendum in the November 6, 2012, election.
8   Shortly after that election on December 26th, 2012, the
9   governor signed PA 436 into law, and it took effect on March
10  28th, 2013.  It is argued here that Public Act 436 is
11  unconstitutional because it is essentially a reenactment of
12  the rejected Public Act 4 in violation of the people's
13  referendum rights.  The city and the State of Michigan assert
14  that there are several differences between Public Act 436 and
15  Public Act 4 such that they are not the same law.  In
16  Reynolds versus Bureau of State Lottery in 2000, the Michigan
17  Court of Appeals held that nothing in the Michigan
18  Constitution suggests that a referendum has any broader
19  effect than the nullification of the rejected act.  This
20  Michigan Court of Appeals decision strongly suggests that the
21  referendum rejection of Public Act 4 did not prohibit the
22  Michigan legislature from enacting Public Act 436 even though
23  Public Act 436 addressed the same subject matter as Public
24  Act 4 and did contain very few changes.  Accordingly, the
25  challenge on this ground must be rejected.

1       It is also contended that Public Act 436 is

2   unconstitutional because the Michigan legislature included

3   appropriations provisions in Public Act 436 for the sole

4   purpose of shielding the act from referendum.  There

5   certainly was some credible evidence in support of the

6   assertion that the appropriations provision in Public Act 436

7   were intended to immunize it from referendum.  For example,

8   Howard Ryan, the legislative assistant in the Michigan

9   Department of Treasury, so testified in his deposition.  The

10  Court must conclude, however, that if faced with this issue,

11  the Michigan Supreme Court would not hold Public Act 436

12  unconstitutional on this grounds.  In Michigan United

13  Conservation Clubs versus Secretary of State in 2001, the

14  Court concisely held that a public act with an appropriations

15  provision is not subject to referendum regardless of the

16  motive of the appropriation.  To the same effect was Houston

17  v. Governor decided by the Michigan Supreme Court in 2012.

18  Accordingly, the Court concludes that PA 436 is not

19  unconstitutional on the grounds that the appropriations

20  provisions of it improperly shielded it from the people's

21  right of referendum.

22      Certain objectors also argue that Public Act 436

23  violates the home rule provision of the Michigan

24  Constitution, which recognizes the right of the electors to

25  adopt and amend the city charter and the city's right to

1   adopt ordinances.  The argument is that the appointment of an
2   emergency manager for a municipality under PA 436 is
3   inconsistent with those rights.  This argument fails for the
4   simple reason that this authority that the Michigan
5   Constitution grants to municipalities is subject to state
6   laws enacted by the legislature.  The constitutional
7   provision specifically says so.  It states, quote, "Each city
8   and village shall have the power to adopt resolutions and
9   ordinances relating to its municipal concerns, property and
10  government, subject to the constitution and law," close
11  quote.  Indeed, Section 1-102 of the city -- excuse me -- of
12  the charter of the City of Detroit states, quote, "The City
13  has the comprehensive home rule power conferred upon it by
14  the Michigan Constitution, subject only to the limitations on
15  the exercise of that power contained in the Constitution or
16  this Charter or imposed by statute," close quote.
17  Accordingly, the Court finds that PA 436 does not violate the
18  home rule provisions of the Michigan Constitution.
19          Many objectors argue that the bankruptcy
20  authorization section of PA 436 itself does not comply with
21  the heightened requirements for protecting pensions in the
22  Michigan Constitution and, therefore, that PA 436 is
23  unconstitutional.  Accordingly, the objectors argue that PA
24  436 cannot provide a valid basis for authorization to file a
25  bankruptcy.  The Court has already explained that pension

benefits are a contractual obligation of the municipality and
not entitled to any heightened protection in bankruptcy.  It
follows that if a state consents to a municipal bankruptcy,
no state law can protect pension rights that are merely
contractual rights from impairment in bankruptcy just as no
law could protect any other type of contract rights like
bonds.  Accordingly, the failure of PA 436 to protect pension
rights in a municipal bankruptcy does not make that law
inconsistent with the pension clause of the Michigan
Constitution any more than the failure of PA 436 to protect,
for example, bond debt in bankruptcy is inconsistent with the
contracts clause of Michigan Constitution.  For this purpose,
the parallel is perfect.  For these reasons, the Court
concludes that PA 436 does not violate the pension clause of
the Michigan Constitution.

PA 436 permits the governor to place contingencies
on a local government in order to proceed under Chapter 9.
The governor chose not to impose a contingency requiring the
City of Detroit to protect pensions in bankruptcy.  Several
objectors argue that the pension clause of the Michigan
Constitution obligated the governor to include such a
condition in his authorization.  The Court concluded earlier
that any such condition in PA 436 itself would be ineffective
and potentially invalid under federal law.  For the same
reason, any such contingency in the governor's authorization

1    letter would have been invalid and may have rendered the

2    authorization itself invalid under Section 109(c).

3    Accordingly, this objection is overruled.  The Court

4    concludes that the governor's authorization to file this

5    bankruptcy case under PA 436 was valid under the Michigan

6    Constitution.

7            On July 3, 2013, Gracie Webster and Veronica Thomas

8    filed a complaint against the State of Michigan, Governor

9    Snyder, and Treasurer Dillon in the Ingham County Circuit

10   Court.  They sought a declaratory judgment that PA 436 is

11   unconstitutional because it permits accrued pension benefits

12   to be diminished or impaired in violation of Article IX,

13   Section 24, of the Michigan Constitution.  The complaint also

14   sought a preliminary and permanent injunction enjoining the

15   governor and the treasurer from authorizing the Detroit

16   emergency manager to commence proceedings under Chapter 9 of

17   the Bankruptcy Code.

18           On Thursday, July 18th, 2013, just minutes after the

19   city filed its bankruptcy petition, the state court held a

20   hearing.  During that hearing, the state court confirmed that

21   the bankruptcy case had been filed.  Nevertheless, the state

22   court granted the relief enjoining the governor and the

23   emergency manager -- excuse me -- enjoining the governor from

24   taking any further action in the bankruptcy proceeding.

25           A further hearing was held the next day on the

1    plaintiff's request to amend the order of the previous

2    afternoon.  At the conclusion of that hearing, the judge then

3    stated her decision to grant the declaratory relief that the

4    plaintiffs had requested.  Later that day on July 19th, 2013,

5    the court entered a declaratory -- an order of declaratory

6    relief.  It states that PA 436 is unconstitutional and in

7    violation of Article IX, Section 24, of the Michigan

8    Constitution.  It also states that PA 436 is to that extent

9    of no force and effect.  In their objections in this case,

10   several of the objectors assert that this judgment precludes

11   or prevents the city from asserting that PA 436 is

12   constitutional or that the governor properly authorized this

13   bankruptcy filing.

14          There are, however, two main reasons why this Court

15   is not required to honor the Webster judgment in this

16   bankruptcy case.  First, upon the city's bankruptcy filing,

17   federal law gave this Court exclusive jurisdiction to

18   determine all issues relating to the city's eligibility to be

19   a Chapter 9 debtor.  At that moment, the state court no

20   longer had jurisdiction.  Accordingly, the state court's

21   order of declaratory judgment on which the objectors rely is

22   void and of no effect.  It does not preclude the city from

23   asserting its eligibility to file bankruptcy in this case.

24          Second, bankruptcy law provides that when a

25   bankruptcy petition is filed, it operates as a stay of any

1   act to exercise control over property of the estate.  The

2   main objectives of the plaintiff's case in <u>Webster</u> v.

3   <u>Michigan</u> was to protect the plaintiff's pension rights by

4   prohibiting a bankruptcy case which might allow the city to

5   use its property in a way that might impair pensions.  It

6   does not matter that neither the city nor its officers were

7   defendants.  The suit was clearly an act to exercise control

8   over the city's property.  Accordingly, it was stayed under

9   the bankruptcy law.  The state court's order of declaratory

10   relief was entered in violation of the stay.  For those two

11   reasons, the Court concludes that the judgment in <u>Webster</u> is

12   void, and this objection to the city's eligibility is

13   rejected.

14        To be eligible for relief under Chapter 9, the city

15   must establish that it is insolvent.  A few objectors contest

16   this requirement of eligibility under Section 109(c)(3).  For

17   a municipality, the Bankruptcy Code defines insolvent as,

18   quote, "a financial condition such that the municipality is:

19   (i) generally not paying its debts as they become due unless

20   such debts are the subject of a bona fide dispute; or (ii) is

21   unable to pay its debts as they become due."  The Court finds

22   that the City of Detroit was and is insolvent under both

23   definitions.  The Court has already detailed the enormous

24   financial distress that the city faced as of July 18th, 2013,

25   and will not repeat it here.  The Court finds that the city

1  was generally not paying its debts as they became due.

2      In May 2013 the city deferred payments on $54

3  million in pension contributions.  On July 30th it deferred

4  an additional $5 million fiscal year-end payment.  The city

5  also did not make a scheduled $39.7 million payment on its

6  COP's on June 14th.  It was also spending more money than it

7  was receiving and only making up the difference through

8  expensive and even catastrophic borrowings.  These facts

9  establish that the city was generally not paying its debts as

10  they became due as of the time of filing.

11      The evidence also overwhelmingly establishes that

12  the city is unable to pay its debts as they become due.  The

13  evidence established that as a result of the city's financial

14  state, there are many, many services in the city which do not

15  function properly.  The facts found earlier firmly support

16  this conclusion.

17      Most powerfully, however, the testimony of Chief

18  Craig established that the city is in a state of service

19  delivery insolvency as of July 18th and will continue to be

20  for the foreseeable future.  He testified that the conditions

21  in the local precincts were deplorable.  He said, quote, "if

22  I just might summarize it in a very short way, that

23  everything is broken, deplorable conditions, crime is high --

24  extremely high, morale is low, the absence of leadership,"

25  close quote.  He described the city as, quote, "extremely

violent," close quote, based on the high rate of violent
crime and the low rate of clearance of violent crimes. He
stated that their facilities, equipment, and vehicles were in
various states of disrepair and obsolescence. Service
delivery insolvency focuses on the municipality's inability
to pay for all costs of providing services at the level and
quality that are required for the health, safety, and welfare
of the community.

The objecting parties assert that the city could
have and should have monetized a number of its assets in
order to make up for its severe cash flow insolvency. Most
directly, this objection targets the city's valuable art
collection. However, the city's witnesses credibly
established that sales of city assets would not address the
long-term operational structural financial imbalance facing
the city, and this makes sense. When the expenses of an
enterprise exceed its revenue, a one-time infusion of cash,
whether from an asset sale or from a borrowing, only delays
the inevitable financial failure unless, in the meantime, the
enterprise sufficiently reduces its expenses or enhances its
income. The City of Detroit itself has proven the reality of
this many, many times. In any event, when considering
selling an asset, the enterprise must take extreme care that
the asset is truly unnecessary in pursuing its mission and
unnecessary in enhancing its operational revenue. For these

1    reasons, the Court finds that the city has established that

2    it is insolvent.

3          The city must also establish that it desires to

4    effect a plan to adjust its debts under Section 109(c)(4).

5    In the City of Stockton case, the Bankruptcy Court explained

6    the cases equate desire with intent and make clear that this

7    element is highly subjective.  At the first level, the

8    question is whether the Chapter 9 case was filed for some

9    ulterior motive such as to buy time or to evade creditors

10   rather than to restructure the city's finances.  Several

11   objectors assert that the city does not desire to effect a

12   plan to adjust its debts.  The Court concludes that the

13   evidence overwhelmingly establishes that the city does desire

14   to effect a plan in this case.  Mr. Orr so testified.  More

15   importantly, before filing this case, Mr. Orr did submit to

16   creditors a plan to adjust the city's debts.  Plainly, that

17   plan was not acceptable to any of the city's creditors.  It

18   may not have even been confirmable under the Bankruptcy Code,

19   although that is not necessary to resolve at this time.

20   Still, it was evidence of the city's desire and intent to

21   effectuate a plan.  There is simply no evidence that the city

22   has an ulterior motive in pursuing Chapter 9 such as to buy

23   time or to evade creditors.  Indeed, the objecting creditors

24   do not really contend that there was any such ulterior

25   motive.  Rather, their argument is that the plan that the

emergency manager has stated he intends to propose in this
case is not a confirmable plan.  It is not confirmable, they
argue, because it will impair pensions in violation of the
Michigan Constitution.  Certainly the evidence does
establish -- certainly the evidence does establish that the
emergency manager intends to propose a plan that impairs
pensions.  The Court has already so found.  Nevertheless, the
objectors' argument must be rejected.  As established
earlier, a Chapter 9 plan may impair pension rights.  The
emergency manager's stated intent to propose a plan that
impairs pensions is, therefore, not inconsistent with a
desire to effect a plan.  Accordingly, the Court finds that
the city does desire to effect a plan.

The fifth element for eligibility is found in
Section 109(c)(5).  Under that section an entity may be a
debtor under Chapter 9 if such entity has either negotiated
in good faith with creditors or is unable to negotiate with
creditors because such negotiation is impracticable.  In the
present case, the City of Detroit argues that the June 14,
2013, proposal to creditors along with its follow-up meetings
was a good faith effort to begin negotiations to which
creditors refused to respond.  The Court concludes, however,
that the June 14 proposal to creditors and the follow-up
meetings were not sufficient to satisfy the requirements of
good faith negotiations under law.  The proposal to creditors

did not provide creditors with sufficient information to make
meaningful counterproposals, especially in the very short
amount of time that the city allowed for the, quote,
"discussion," close quote, period.  Charitably stated, the
proposal is very summary in nature.  There was simply not
enough information for creditors to start meaningful
negotiations.  For example, Brad Robins of Greenhill &
Company, the financial advisor for the Retirement Systems,
testified, quote, "The note itself I thought was not really a
serious proposal but may be a placeholder, no maturity, no
obligation for the city to pay," close quote.  The city
asserts that it provided supporting data in an electronic
data room.  However, several witnesses testified that the
data room did not contain the necessary data to make a
meaningful evaluation of the proposal to creditors.
Moreover, the city conditioned access to the data room on the
signing of a confidentiality and release agreement.  This
created an unnecessary hurdle for creditors.  The creditors
simply cannot be faulted for failing to offer
counterproposals when they did not have the necessary
information to evaluate the city's vague initial proposal.
The proposal for creditors provided a calendar.  It allotted
one week, June 17 to 24, for requests for additional
information.  The initial rounds of discussions were
scheduled for July 17 -- sorry -- June 17 to July 12, and the

1  evaluation period was scheduled to be July 15 to July 19.

2  This calendar was very tight and did not request

3  counterproposals or even provide a deadline for submitting

4  them.  The total time available under this schedule for

5  creditor negotiations was approximately 30 days.  Given the

6  extraordinary complexities of the case and the 100,000

7  creditors, that amount of time is simply far too short to

8  conclude that such a vague proposal to creditors rises to the

9  level required to shift the burden to objectors to make

10  counterproposals.

11        In addition, the city affirmatively stated that the

12  meetings were not negotiations.  The city asserts that this

13  was to clarify that the city was not waiving the suspension

14  of collective bargaining under Public Act 436, but the city

15  cannot announce to creditors that the meetings were not

16  negotiations and then assert to this Court that those same

17  meetings amounted to good faith negotiations.

18        Finally, the format of the meetings were primarily

19  presentational, informational, to different groups of

20  creditors with different issues and gave little opportunity

21  for creditor input or substantive discussion.

22        Accordingly, the Court concludes that the city has

23  not established by a preponderance of the evidence that it

24  has satisfied the requirements for good faith negotiations.

25        Congress adopted Section 109(c)(5)(C) specifically

1   to cover situations in which a very large body of creditors

2   would render pre-filing negotiations impracticable. Several

3   cases suggest that the impracticability requirement must be

4   satisfied based -- or excuse me -- may be satisfied based on

5   the sheer number of creditors involved. The list of

6   creditors of the City of Detroit is over 3,500 pages. It

7   lists over 100,000 creditors. The city estimates over 20,000

8   individual retirees are owed pension funds. The Court is

9   satisfied that when Congress enacted the impracticability

10  section, it foresaw precisely a situation like that which

11  faces the City of Detroit. The sheer size of the debt and

12  the number of individual creditors made pre-bankruptcy

13  negotiation impracticable, impossible really.

14          There are, however, several other circumstances that

15  also support a finding of impracticability. First, although

16  several unions have now come forward that they are the

17  natural representatives of the retirees, these same unions

18  asserted in response to the city's pre-filing inquiries that

19  they could not and did not represent retirees. These

20  responses sent a clear message to the city that the unions

21  would not negotiate on behalf of retirees.

22          Several voluntary associations of retirees also

23  assert that they are the natural representatives of retirees.

24  However, none assert that they can bind individual retirees

25  absent some sort of cumbersome class action litigation. As

1  Donald Taylor testified, ultimately it would be up to the

2  individual members of the association to decide if they would

3  accept or reject an offer.

4        Further, several witnesses who testified on behalf

5  of the retiree associations made their positions clear that

6  they would not have negotiated a reduction in accrued pension

7  benefits because they consider them to be fully protected by

8  state law.  It is impracticable to negotiate with a group

9  that asserts that their position is immutable.  As the Court

10  stated in Stockton, "It is impracticable to negotiate with a

11  stone wall."

12        Finally, the city has demonstrated that time was

13  quickly running out on its liquidity.  Accordingly, the Court

14  finds that pre-filing negotiations were impracticable.

15        The last requirement for eligibility is set forth in

16  Bankruptcy Code Section 921(c).  That section provides,

17  quote, "After any objection to the petition, the court, after

18  notice and a hearing, may dismiss the petition if the debtor

19  did not file the petition in bad faith -- excuse me -- in

20  good faith," close quote.  The city's alleged bad faith in

21  filing its Chapter 9 petition was a central issue in the

22  eligibility trial.  Indeed, in one form or another all of the

23  objecting parties have taken the position that the city did

24  not file its Chapter 9 petition in good faith and that this

25  Court should exercise its discretion to dismiss this case.

1   As will be explained, the Court finds that the totality of

2   circumstances coupled with the presumption of good faith

3   which arises because the city has proven each of the elements

4   of eligibility under Section 109(c) establishes that the city

5   filed its petition in good faith under 921(c).

6         In a moment, the Court will review the factors upon

7   which it relies in finding that the city filed this case in

8   bad -- in good faith.  First, however, the Court considers it

9   crucial to this process to give voice to what it understands

10   is the narrative supporting the objecting parties' argument

11   that the City of Detroit did not file this case in good

12   faith.  The Court will then explain why there is some support

13   in the record for this narrative.  After that, the Court will

14   then explain why it still finds that the city filed this

15   petition in good faith.  It must be recognized that the

16   narrative that the Court describes here is a composite of the

17   objecting parties' presentation on this issue.  No single

18   objecting party neatly laid out this precise version with all

19   of its features described here.  Moreover, it includes the

20   perceptions of not only several of the objecting parties

21   whose objections were filed by attorneys, but also many of

22   the individual objecting parties.  This description does not

23   contain the Court's findings.  It is only the Court's

24   perception of a compositive narrative -- excuse me --

25   composite narrative that appears to ground the objectors'

1   various bad faith arguments.

2         According to this composite narrative of the lead-up

3   to the bankruptcy filing on July 18, 2013, the City of

4   Detroit's bankruptcy was the intended consequence of a long-

5   term strategic plan.  The goal of this bankruptcy, according

6   to this narrative, was the impairment of pension rights

7   through a bankruptcy filing by the city.  Its genesis, the

8   narrative goes, was hatched in a <u>Law Review</u> article that two

9   Jones Day attorneys wrote.  This is significant because Jones

10  Day later became not only the city's attorneys in the case

11  but the law firm from which the city's emergency manager was

12  hired.  The article laid out in detail the legal road map for

13  using bankruptcy to impair municipal pensions.  The objectors

14  believe that the plan was executed by the top officials of

15  the State of Michigan and the state's legal and financial

16  consultants.  The goals of the plan included also lining the

17  professionals' pockets while extending the power of the state

18  government at the expense of the people of the City of

19  Detroit.  In this narrative, there may even be a racial

20  element to the plan.  The plan participants foresaw the

21  rejection of PA 4, according to this narrative, coming in the

22  November 2012 election, and so work began on PA 436 even

23  before that.  As a result, it only took 14 days to enact PA

24  436 after it was introduced in the legislature's post-

25  election lame duck session.  PA 436 was also enacted contrary

1    to the will of the people of the State of Michigan, as just

2    expressed in their rejection of PA 4.  The plan included

3    inserting into PA 436 two very minor appropriations

4    provisions so that the law would not be subject to the

5    people's right of referendum and would not risk the same fate

6    as PA 4 had just experienced.  The plan also saw the value in

7    enticing a bankruptcy attorney to become the emergency

8    manager even though he did not have the qualifications

9    required by PA 436.  Another important part of the plan,

10    according to this narrative, was for the state government to

11    starve the city of cash by reducing its revenue sharing, by

12    refusing to pay the city millions of promised dollars, and by

13    imposing on the city a heavy financial burden of expensive

14    professionals.  It also included suppressing information

15    about the value of the city's assets.  The narrative

16    continues that this plan also required active concealment and

17    even deception.  One purpose was to deny creditors,

18    especially those whose retirement benefits would be at risk

19    from such a filing, from effectively acting to protect those

20    interests.  This concealment and deception were accomplished,

21    the narrative goes, through a public relations campaign that

22    deliberately misstated the ultimate objective of PA 436,

23    downplayed the likelihood of bankruptcy, asserted an unfunded

24    pension liability amount that was based on misleading and

25    incomplete data and analysis, understated the city's ability

to meet that liability, and obscured the vulnerability of
pensions in bankruptcy.  It also included imposing an
improper requirement to sign a confidentiality and release
agreement as a condition of accessing financial information
in the data room.  As the bankruptcy filing approached, the
narrative states that a necessary part of the plan became to
engage with creditors only the minimum necessary so that the
Court could later assert in -- so that the city could later
assert in Bankruptcy Court that it attempted to negotiate in
good faith.  The plan, however, was not to engage in
meaningful pre-petition negotiations with the creditors
because successful negotiation might thwart the plan to file
a bankruptcy.  "Check a box" was the phrase that some
objecting parties used for this.

      The penultimate moment that represented the
successful culmination of the plan was the bankruptcy filing
itself.  In this narrative, this was accomplished in secrecy
and a day before the planned date in order to prevent the
retirees who were at that moment in state court pursuing
their available state law remedies to protect their
constitutional pension rights.  "In the dark of the night"
was the phrase used to describe the actual timing of the
filing.  The phrase refers to the secrecy surrounding the
filing and captures in shorthand the assertion that the
petition was filed to avoid an imminent adverse ruling in the

1  Webster case in state court.

2       The oft repeated phrase that was important to the

3  objectors' theory of the city's bad faith was "foregone

4  conclusion."  This was used in the assertion that Detroit's

5  bankruptcy case was a foregone conclusion perhaps as early as

6  January 2013, perhaps even earlier.

7       Finally, post-petition the plan also necessitated

8  the assertion of the common interest privilege to protect it

9  and its participants from disclosure.  The Court must

10  emphasize again now that what the Court just summarized is

11  what it believes is the viewpoint of the objecting parties.

12  Those were not the Court's findings.

13       The Court will now, however, turn to its evaluation

14  of this viewpoint of bad faith on the city's part in filing

15  this case.  The Court acknowledges that many people in

16  Detroit hold to this narrative or at least to substantial

17  parts of it.  The Court further recognizes, on the other

18  hand, that state and city officials vehemently deny any such

19  improper motives or tactics as this theory attributes to

20  them.  They contend that this case was filed for the proper

21  desire and necessary purpose of restructuring the city's

22  debts, including its pension debt, through a plan of

23  adjustment.  Indeed, the Court has already found that the

24  city does desire to effect a plan of adjustment.  The Court

25  finds, however, that in some particulars the record does

support the objectors' view of the reality that led to this
bankruptcy filing.  It is, however, not nearly supported
enough -- in enough particulars for this Court to find that
the filing was in bad faith.  For example, Howard Ryan
testified that the appropriations provision of PA 436 was
added to evade a referendum.  An e-mail from Kevyn Orr was to
the same effect.  The Jones Day pitch book from January 2013
laid out the scenario for this bankruptcy case, and Mr. Orr
was, after all, a bankruptcy lawyer, and his associates at
Jones Day did write the legal road map for this back in 2011.
And at the June 10 public meeting, Mr. Orr did mislead the
public about the status of pensions in bankruptcy as well as
about the chances of filing bankruptcy.  The issue that such
evidence presents, however, is how to evaluate it in the
context of the good faith issue.  One important question
raised, for example, is during the lead-up, was the City of
Detroit's bankruptcy filing a foregone conclusion as the
objecting parties assert.  The answer is, yes, of course it
was, for a long time.  Even if it was a foregone conclusion,
experience with both individuals and businesses in financial
distress establish that they often wait longer to file a
bankruptcy than is in their interests.  Detroit was no
exception.  Its financial crisis had been worsening for
decades, and it could have and should have filed bankruptcy
long before it did, perhaps even years before.  Certainly the

1   Court must conclude that the bankruptcy -- that the

2   bankruptcy filing by the City of Detroit was a foregone

3   conclusion during all of 2013, but waiting too long does not

4   suggest bad faith.

5         Perhaps it would have been more consistent with our

6   democratic ideals and with the economic and social needs of

7   the city if its officials and state officials had openly and

8   forthrightly recognized the need for filing bankruptcy when

9   that need first arose.  It is, after all, not bad faith to

10   file bankruptcy when it is needed, and city officials could

11   also avoided the appearances of pretext negotiations and the

12   resulting mistrust by simply announcing honestly that the

13   city is insolvent, that it needs to file bankruptcy, and that

14   negotiations would not even be attempted because it would be

15   impracticable.  The law clearly permits that and for good

16   reason.  It avoids the very delay and worse the very

17   suspicion and bad feeling that resulted here.  The Court must

18   acknowledge some truth in the factual basis of the objectors'

19   claim that this case was not filed in good faith.

20   Nevertheless, for strong reasons that the Court will state

21   next, it finds that this case was filed in good faith and

22   should not be dismissed.

23         Number one, the Court finds that the city's

24   financial problems are of a type contemplated for Chapter 9

25   relief.  The Court's finding here is based on its finding

1    that the city is insolvent and that the city was unable to

2    negotiate with creditors because that negotiation was

3    impracticable.

4           Number two, the city's filings are consistent with

5    the remedial purpose of Chapter 9.  The Court's analysis on

6    this factor is based on its finding that the city desires to

7    effect a plan to adjust its debts.  To show bad faith on this

8    factor, the evidence must establish that the purpose of the

9    filing of the Chapter 9 was not simply to buy time or --

10   excuse me -- to show good faith on this factor, the evidence

11   must establish that the purpose of the filing was not simply

12   to buy time or evade creditors.  Notably, this argument was

13   not raised by the objectors in any pleadings or at trial, and

14   there's no evidence.  The objectors do assert that the city

15   filed this petition to avoid a bad state court ruling in the

16   Webster litigation.  They argue this is indicative of bad

17   faith.  This argument is also rejected.  It is quite common

18   for creditor lawsuits to precipitate bankruptcy filings.

19   That the lawsuits were in vindication of an important right

20   under the state Constitution does not change this result.

21   They were still suits to enforce creditors' claims against a

22   debtor that could not pay those claims.  The objectors also

23   argue that the city filed the petition so that its pension

24   obligations could be impaired, and this is inconsistent with

25   the remedial purpose of bankruptcy.  Again, discharging debt

1  is what motivates every debtor that files bankruptcy, and
2  that motivation does not suggest bad faith.

3       Three, the city made efforts to improve the state of
4  its finances prior to filing to no avail.  Although the Court
5  finds that the city did not engage in good faith negotiations
6  with its creditors, the Court does find that the city did
7  make some efforts to improve its financial condition before
8  filing its Chapter 9 petition, which resulted in some
9  savings, as stated earlier.  No objecting parties have
10 suggested any other measure that the city could have taken to
11 relieve its financial stress other than selling assets, but,
12 as stated earlier, that would not have solved any long-term
13 financial problems.  The fact that the city did not consider
14 any alternatives to Chapter 9 in the period leading up to the
15 filing does not indicate bad faith either.  By that time, all
16 of the measures that the city had attempted had largely
17 failed to resolve the problem of the city's cash flow
18 insolvency.

19       Four, the residents of the City of Detroit will be
20 severely prejudiced if this case is dismissed.  The Court
21 concludes that this factor is of paramount importance in this
22 case.  The city's debt and cash flow insolvency is causing
23 its nearly 700,000 residents to suffer hardship.  As already
24 discussed at length, the city is service delivery insolvent.
25 Without the protection of Chapter 9, the city will be forced

1   to continue on the path that it was on until it filed this

2   case.  In order to free up cash for day-to-day operations,

3   the city would have to continue to borrow money, defer

4   capital investments, and shrink its workforce.  This solution

5   has proven unworkable.  It is also dangerous for its

6   residents.  This factor weighs heavily in favor of finding

7   good faith.

8         Accordingly, the Court concludes that the city's

9   petition was filed in good faith and the petition is not

10   subject to dismissal under Section 921(c).  The Court

11   accordingly concludes that under Section 109(c) the City of

12   Detroit may be a debtor under Chapter 9 of the Bankruptcy

13   Code.  The Court will enter an order for relief forthwith as

14   required by Section 921(d).  The Court reminds all interested

15   parties that this eligibility determination is merely a

16   preliminary matter in this bankruptcy case.  The city's

17   ultimate objective is the confirmation of a plan of

18   adjustment.  It has stated on the record its intent to

19   achieve that objective with all deliberate speed and to file

20   a plan shortly.  Accordingly, the Court strongly encourages

21   the parties to begin to negotiate or, if they have already

22   begun, to continue to negotiate with a view toward a

23   consensual plan.

24         The Court recognizes and understands, to the extent

25   it can, the widespread anguish and distress that this

1  decision to permit the city's bankruptcy to proceed may cause

2  to the city's employees and retirees as well as their

3  families.  The Court, therefore, implores with all urgency

4  those who administer our social safety net, our governor who

5  authorized this case, our state government leaders, our civic

6  and business leaders, our religious and charitable

7  organizations, to focus yet greater attention on the real

8  human needs that will arise because of the city's bankruptcy.

9          The message of this bankruptcy is that the city does

10  not have enough money to properly care for its residents let

11  alone to pay its debts, and, unfortunately, that economic

12  fact would be true even if pensions did have the legal

13  protection that the city's employees and retirees seek here,

14  and that's the very wisdom of the bankruptcy law.  It

15  recognizes that people, businesses, and even municipalities

16  can't print money, and it tries to provide an equitable and

17  hopeful solution.

18          It is, indeed, a momentous day.  We have here a

19  judicial finding that this once proud and prosperous city

20  can't pay its debts.  It's insolvent.  It's eligible for

21  bankruptcy.  At the same time, it also has an opportunity for

22  a fresh start.  I hope that everyone associated with the city

23  will embrace that opportunity.

24          Under Section 921(e) of the Bankruptcy Code, there

25  is no stay of this finding.  The Court understands that one

1   or more parties may seek an appeal of this directly to the

2   Court of Appeals.  The Court would ask that any such request

3   be made promptly by motion.

4           Is it still the city's intent to file a plan by

5   year-end?

6           MR. HEIMAN:  Your Honor, we're not quite certain.

7   I'm sorry.  David Heiman for the city.  We're still working

8   on our timeline but obviously mindful of your prior request

9   that we file before March 1, so we hope to be well within

10  that request.

11          THE COURT:  All right.  Thank you, sir.

12          MR. HEIMAN:  Thank you.

13          THE COURT:  Is there anything else that anyone would

14  like to raise at this time?  No.  We'll be in recess.

15          THE CLERK:  All rise.  Court is in recess.

16      (Proceedings concluded at 11:33 a.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


        I certify that the foregoing is a correct transcript
from the sound recording of the proceedings in the above-
entitled matter.


/s/ Lois Garrett                    December 5, 2013
_____    _____
Lois Garrett