## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-----------------------------------------------------x
                                           :
In re                                      :   Chapter 9
                                           :
CITY OF DETROIT, MICHIGAN,                 :   Case No. 13-53846
                                           :
                            Debtor.        :   Hon. Steven W. Rhodes
                                           :
-----------------------------------------------------x
```

## BRIEF IN OPPOSITION TO MOTION OF CREDITORS FOR ENTRY OF AN ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE APPOINTING AND DIRECTING THE DEBTOR TO COOPERATE WITH A COMMITTEE OF CREDITORS AND INTERESTED PERSONS TO ASSESS THE ART COLLECTION OF THE DETROIT INSTITUTE OF ARTS BASED ON ARMS-LENGTH MARKET TRANSACTIONS TO ESTABLISH A BENCHMARK VALUATION [Docket No. 1833][1]

By the Art Committee Motion, the Creditors (i) seek a judicial

appointment of an "Art Committee" without any reference to the statutes and

standards governing such appointments, (ii) present premature objections to an

unfiled plan of adjustment as the pretext for relief ostensibly intended to address

---

[1] Capitalized terms used but not defined herein have the meaning given to them in the Motion of Creditors for Entry of an Order Pursuant to Section 105(a) of the Bankruptcy Code Appointing and Directing the Debtor to Cooperate with a Committee of Creditors and Interested Persons to Assess the Art Collection of the Detroit Institute of Arts Based on Arms-Length Market Transactions to Establish a Benchmark Valuation (Docket No. 1833) (the "Art Committee Motion"), filed by certain creditors on November 26, 2013.

hypothetical deficiencies in that hypothetical plan, (iii) improperly seek control over the terms of the City's ultimate plan of adjustment in violation of sections 904(1), 904(2) and 941 of the Bankruptcy Code, (iv) seek relief that is redundant and unnecessary in light of the City's recent valuation efforts and (v) repeatedly leverage the threat of "unending litigation" as justification for the relief requested while ignoring the fact that litigation will be an inevitable consequence of such relief.  For all of these reasons, and as discussed in further detail below, the Art Committee Motion should be denied.

## BACKGROUND

1.    The Detroit Institute of Arts (the "DIA") is a major cultural asset of the City and an important cultural institution nationally, having been referred to as the fifth-best art museum in the United States.[2]  The museum, and the collection housed therein (the "Collection"), contributes to the quality of life for Detroit residents and may indirectly generate revenue for the City.

2.    The factual background underlying the relief requested in the Art Committee Motion is far more complex than the Creditors suggest.  Although

---

[2]    Michael H. Hodges, DIA's Collection Has National Luster, The Detroit News, Nov. 6, 2007, available at http://www.detroitnews.com/article/ 20071106/ENT05/711060394 (noting that by the "two standard measures of 'encyclopedic' art museums – square footage and annual operating budget," the DIA "has long ranked fifth or sixth" among U.S. art museums).

the City owns all or substantially all of the Collection,[3] at least some items within the Collection are subject to restrictions imposed by donors that restrict the use of donated works. Moreover, numerous interested parties have indicated their intention to challenge any attempt by the City to use any portion of the Collection for any purpose other than to maintain and enhance the Collection itself. For example, on June 13, 2013, Attorney General Bill Schuette issued his opinion (the "AG Opinion") that the entire Collection is held in charitable trust and thus may not be used to satisfy claims in this chapter 9 proceeding. DIA Corp. has also (a) repeatedly asserted that the Collection cannot be used for any purpose other than to provide for the maintenance and development of the Collection itself and (b) indicated its intention to prevent any attempt by the City to sell any portion of the Collection.

3. It is not at all clear that, outside of bankruptcy, any creditor could levy upon any works in the Collection or compel the disposition thereof. Moreover, to the best of the City's knowledge, neither the Collection nor the value thereof has been included in (a) any financial information provided to bondholders or insurers in connection with the sale of debt instruments by the City or (b) the City's periodic financial reports.

---

[3] Some items in the Collection may be owned by the non-profit corporation that operates the DIA ("DIA Corp.")

4. Further, the Art Committee Motion downplays the City's continuous efforts to investigate the facts and circumstances surrounding the Collection. Among other things, these efforts have included securing an appraisal of the fair market value of the part of the Collection that was acquired using funds provided by the City (i.e., a small part of the Collection that contains a disproportionate number of the most valuable works contained therein). The City expects to receive a more detailed report on the value of the Collection's more valuable items acquired using City property later this month, which report will be made public.

5. Although the City has not announced how the DIA and the Collection will be dealt with in its forthcoming plan of adjustment, this does not mean that the City's efforts with respect to this facet of its restructuring are inadequate or anything other than entirely appropriate. It remains the City's exclusive right to file a plan of adjustment addressing, among a host of other issues, its proposed treatment of the Collection. No other party has a right to file a plan of adjustment in this case or to control the content of any part of any such plan.

# ARGUMENT

### *Section 105 of the Bankruptcy Code is an*
### *Improper Basis for the Relief Requested*

6.    Although the primary relief sought by the Creditors is the appointment by the Court of a "committee of creditors and interested parties," the Art Committee Motion breathes not one word about the standards governing such judicial appointments.  The Creditors simply ignore section 1102(a)(2) of the Bankruptcy Code,[4] which (a) authorizes the Court to appoint additional committees of creditors under specific circumstances and (b) applies in this chapter 9 case pursuant to section 901(a) of the Bankruptcy Code.

7.    The Creditors' conspicuous avoidance of section 1102(a)(2) of the Bankruptcy Code is understandable, as it simply does not empower the Court to appoint a committee for the purposes set forth in the Art Committee Motion.  Rather, the Court is empowered to appoint committees in chapter 9 cases only "if necessary to assure adequate representation of creditors…."  11 U.S.C. § 1102(a)(2).  There is no suggestion in the Art Committee Motion that an Art Committee is necessary to ensure the adequate representation of the Creditors, much less any attempt to demonstrate the satisfaction of the various factors to

---

[4]    Section 1102(a)(2) of the Bankruptcy Code provides that "[o]n request of a party in interest, the court may order the appointment of additional committees of creditors … if necessary to assure adequate representation of creditors …. "  11 U.S.C. § 1102(a)(2).

which bankruptcy courts commonly refer in assessing the need for such representation.[5]

8.      Having found the provisions of the Bankruptcy Code that expressly govern committee appointments inconvenient, the Creditors seek refuge in section 105(a) of the Bankruptcy Code.  Yet, the entirety of the Creditors' attempt to demonstrate that section 105(a) of the Bankruptcy Code provides a sufficient basis for the relief requested consists of (a) the bare assertion that such relief is "necessary and appropriate" "in light of the unique circumstances and expedited nature of the Chapter 9 Case" (Art Committee Motion, at ¶ 13) and (b) the invocation of the Court's "broad authority" under section 105(a) (id. at ¶ 23).  The Creditors' thin argument does not support granting the relief requested in the Art Committee Motion pursuant to section 105(a) of the Bankruptcy Code.

---

[5]      See In re Dow Corning Corp., 194 B.R. 121, 143 (Bankr. E.D. Mich. 1996) (identifying factors that should guide a bankruptcy court's exercise of discretion to appoint an additional committee as "(a) the cost associated with appointment; (b) the time of the application; (c) the potential for added complexity; and (d) the presence of other avenues for creditor participation"), rev'd on other grounds, 212 B.R. 258 (E.D. Mich. 1997).  Indeed, with the exception of the Retiree Committee (the appointment of which was sought by the City), the City does not believe that appointment of any additional committees in this chapter 9 case is necessary or warranted, as each of the City's substantial creditor constituencies is adequately represented (and, indeed, is actively participating).

9.    "Although [section] 105(a) of the Bankruptcy Code authorizes bankruptcy courts to fashion such orders as are necessary to further the substantive provisions of the Code, that provision does not … empower bankruptcy courts … to act as roving commissions to do equity." Chase Manhattan Mortg. Corp. v. Shapiro (In re Lee), 530 F.3d 458, 473 (6th Cir. 2008) (quoting Southmark Corp. v. Grosz (In re Southmark Corp.), 49 F.3d 1111, 1116 (5th Cir. 1995)). Section 105(a) of the Bankruptcy Code does not offer bankruptcy courts license to issue any order deemed simply "necessary and appropriate"; rather, it authorizes orders that are "necessary and appropriate *to carry out the provisions of this title*." 11 U.S.C. § 105(a) (emphasis added).  "Section 105 uses the term 'provisions' and not the term 'purposes' in describing the bankruptcy court's power to effect the mandate of the Bankruptcy Code.  The statutory language thus suggests that an exercise of section 105 power be tied to another Bankruptcy Code section and not merely to a general bankruptcy concept or objective." 2 Collier on Bankruptcy ¶ 105.01[1] (Alan N. Resnick & Henry J. Sommer eds., 16th ed. 2013).  This restrictive view of the application of section 105(a) – that it exists to complement and implement other provisions of the Bankruptcy Code – has been confirmed by the United States Supreme Court.  See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988) ("[W]hatever equitable powers remain in the bankruptcy

courts must and can only be exercised within the confines of the Bankruptcy Code.").

10. Certainly, section 105(a) of the Bankruptcy Code may not be employed as a substitute for – or to altogether bypass – other provisions of the Bankruptcy Code that expressly address the relevant subject matter.  See Michel v. Eagle–Picher Indus., Inc. (In re Eagle–Picher Indus., Inc.), 999 F.2d 969, 972 n.5 (6th Cir. 1993) (stating that "bankruptcy courts 'cannot use equitable principles to disregard unambiguous statutory language'") (quoting Childress v. Middleton Arms, L.P. (In re Middleton Arms, L.P.), 934 F.2d 723, 725 (6th Cir. 1991)). Moreover, bankruptcy courts should not "rewrite bankruptcy statutes in order to reach a result deemed 'equitable.'"  Lee, 530 F.3d at 473; 2 Collier ¶ 105.01[2] ("Section 105 does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code…."). The Creditors' proposed appointment of an Art Committee pursuant to section 105(a) of the Bankruptcy Code to the exclusion – and contrary to the express language – of section 1102(a)(2) of the Bankruptcy Code is thus facially improper.

11. Accordingly, the Art Committee Motion should be denied because (a) the Creditors have failed (indeed, have not even attempted) to carry their burden of demonstrating that an Art Committee is necessary to ensure adequate representation of creditors within the meaning of section 1102(a)(2) of

the Bankruptcy Code and (b) even if section 105(a) of the Bankruptcy Code were an appropriate basis for the appointment of a committee in chapter 9 (which it is not), that section may not be employed to achieve purposes contrary to those provisions of the Bankruptcy Code that expressly govern committee appointments.

### *The Art Committee Motion is a Premature Plan Objection*

12.     The Art Committee Motion labors to assure the Court that the Creditors "are not seeking to lodge a premature confirmation objection" (Art Committee Motion, at ¶ 4) and that they "recognize that the City has not yet filed its plan and now is not the time to file objections to confirmation" (id. at ¶ 22). The Creditors' protests are belied, however, by the fact that the Art Committee Motion is littered with references to the confirmation standards of section 943(b) of the Bankruptcy Code and allegations that the City's ultimate plan of adjustment will not satisfy them.  See id. at ¶¶ 1, 2, 4, 11, 13, 15-22.  Indeed, the *sine qua non* of the Creditors' request for relief is their assumption that the City's plan of adjustment will be unconfirmable.

13.     The Court should not grant the concrete relief sought in the Art Committee Motion based solely on the Creditors' naked speculation that the City's plan – which has not even been filed and the terms of which are currently being negotiated with the City's various creditor constituencies (including many of the Creditors) – will be statutorily infirm.  If the City ultimately proposes a plan of

adjustment that fails to satisfy section 943 of the Bankruptcy Code (for whatever reason), the Federal Rules of Bankruptcy Procedure ensure that all parties – including the Creditors – will have the opportunity to object *at that time*. See Fed. R. Bankr. P. 2002(b) (providing parties in interest with 28 days to object to confirmation of a chapter 9 plan of adjustment).

14. Even when a plan has been filed, courts commonly refuse to engage arguments related to the confirmability of that plan prior to a confirmation hearing. See In re Am. Capital Equip., LLC, 688 F.3d 145, 153 (3d Cir. 2012) ("Ordinarily, confirmation issues are reserved for the confirmation hearing….") (citation and quotation marks omitted); In re EBP, Inc., 172 B.R. 241, 246 (Bankr. N.D. Ohio 1994) (refusing to adjudicate an objection to a chapter 11 debtor's liquidation analysis at a disclosure statement hearing; stating that "[i]t is at plan confirmation that the plan does or does not live up to [confirmation] requirements"). In the absence of evidence that a debtor cannot file *any* confirmable plan (which is not the case here and is not alleged by the Creditors), granting relief based on the alleged inability to confirm an *unfiled* plan is simply foreign to the case law. The Creditors cite to no authority (and the City can locate none) wherein a bankruptcy court granted a creditor prophylactic relief (such as that sought in the Art Committee Motion) prior to the filing of a plan to ensure a debtor's ultimate compliance with applicable confirmation standards. The Court

should deny the Creditors' request to force feed the City such preventative

medicine.[6]

---

[6]     Even if consideration of chapter 9 confirmation standards were appropriate at this time (which it is not), the Creditors have entirely misrepresented the standards governing compliance with section 943(b)(7) of the Bankruptcy Code. No court has interpreted the "best interests of creditors" test of section 943(b)(7) to mean that a chapter 9 debtor is required to maximize the value of its assets to satisfy creditors, much less to monetize such assets as certain parties in interest might desire. Rather, the best interests of creditors test "simply requires the Court to make a determination of whether or not the plan as proposed is better than the alternatives." In re Sanitary & Improvement Dist., No. 7, 98 B.R. 970, 974 (Bankr. D. Neb. 1989); see also In re Pierce Cnty. Hous. Auth., 414 B.R. 702, 718 (Bankr. W.D. Wash. 2009) ("The 'best interest of creditors' requirement of § 943(b)(7) is generally regarded as requiring that a proposed plan provide a better alternative for creditors than what they already have.") (quotation marks and citation omitted). The best interests of creditors test "is often easy to establish" because, in chapter 9, the "only alternative to a debtor's plan is dismissal" and "[o]utside of bankruptcy, general unsecured creditors often have little possibility of being repaid, especially where the municipality's debt burden is too high to be retired by taxes." In re Mount Carbon Metro. Dist., 242 B.R. 18, 34 (Bankr. D. Colo. 1999). Consequently, a chapter 9 debtor "may obtain confirmation of a plan, over objection, which does not utilize all of the assets of the estate to retire its obligations." Sanitary & Improvement Dist., 98 B.R. at 974. As the Sanitary & Improvement District court explained, if a chapter 9 debtor were required to maximize creditor recoveries by any available means in order to satisfy the best interests of creditors test, "the whole purpose and structure of Chapter 9 would be of little value." Id.

***The Relief Requested Violates the City's***
***Exclusive Right to File a Plan of Adjustment***

15.     Indeed, the preventative relief sought by the Creditors – i.e., an order compelling the City to "work with" the Art Committee in a "collaborative process" to "develop a strategy that considers potential viable options to monetize the Art" (Art Committee Motion, at ¶¶ 3, 12) – would (a) undermine the City's exclusive right to file a plan of adjustment and, thus, (b) violate section 941 of the Bankruptcy Code.

16.     Section 941 of the Bankruptcy Code provides that "[t]he debtor shall file a plan for the adjustment of the debtor's debts." 11 U.S.C. § 941. Relevant law is clear that section 941 of the Bankruptcy Code functions to ensure that *only* the debtor may file a plan of adjustment. E.g., Ass'n of Retired Emps. v. City of Stockton (In re City of Stockton), 478 B.R. 8, 20 (Bankr. E.D. Cal. 2012) ("… only the municipality can propose a plan of adjustment"); In re New York City Off-Track Betting Corp., No. 09-17121, 2011 WL 309594, at *5 (Bankr. S.D.N.Y. Jan. 25, 2011) ("… only the debtor may file a plan of debt adjustment").

17.     Infringements of a chapter 9 debtor's exclusive right to file a plan are forbidden by the same constitutional considerations underlying section 904 of the Bankruptcy Code.

> Under section 941, as under all earlier versions of chapter 9, the debtor has the exclusive right to propose a plan of adjustment. No other entity is granted authority

to file a plan. This rule is required by <u>Ashton v. Cameron County Water Improvement District No. 1</u> [298 U.S. 513 (1936)] and <u>United States v. Bekins</u> [304 U.S. 27 (1938)], which construed the Tenth Amendment to the Constitution as requiring that a municipality be left in complete control of its political and governmental affairs, even during a municipal bankruptcy case. Creditors or the court may not control the affairs of a municipality directly, and may not do so indirectly by proposing a plan of adjustment of the municipality's debts, which would *per force* govern the municipality's future taxes and expenditures.

6 <u>Collier</u> ¶ 941.02; <u>Pierce Cnty.</u>, 414 B.R. at 715 ("Neither creditors nor the court may control expenditures for municipal services or otherwise control the affairs of a municipality indirectly through the mechanism of proposing a plan of adjustment….").

18.     The manifest purpose of the Art Committee Motion is to allow the Creditors to direct the City's treatment of its assets pursuant to its plan of adjustment. The Creditors cloak this purpose in euphemism, arguing that they merely seek to establish a "collaborative process" to "develop [the City's] strategy" with respect to the Collection. Because the imposition of such "collaboration" would violate section 941 of the Bankruptcy Code, however, the Art Committee Motion must be denied.

### *The Relief Requested Violates*
### <u>*Sections 904(1) and 904(2) of the Bankruptcy Code*</u>

19.     Section 904 of the Bankruptcy Code provides that "[n]otwithstanding any power of the court, unless the debtor consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with – (1) any of the political or governmental powers of the debtor … [or] (2) any of the property or revenues of the debtor."  11 U.S.C. § 904. Because the relief requested would interfere with both the City's political and governmental powers and its property, the Art Committee Motion must be denied.

20.     The Creditors argue that the relief requested in the Art Committee Motion would not violate section 904(1) of the Bankruptcy Code because "the Creditors are not trying to dictate what strategy the City must pursue with respect to the Art."  Art Committee Motion, at ¶ 23.[7]  This is plainly disingenuous and offered solely for the Creditors' temporary convenience.  The Creditors cannot file a motion that (a) seeks to compel the City to "cooperate with" the Creditors to "develop a strategy" "consistent with a monetization process

---

[7]     At paragraph 23 of the Art Committee Motion, the Creditors conflate the reservation of State power set forth at section 903 of the Bankruptcy Code, which acknowledges the power of the State to control a municipality in the exercise of its political or governmental powers (and which is not at issue here), with the prohibition against bankruptcy court interference with such powers set forth at section 904(1) of the Bankruptcy Code (which is the issue raised by the Motion).

designed to maximize the Art's value" and (b) repeatedly threatens the City with "unending litigation" if their demands are not met (see Art Committee Motion, at ¶¶ 1, 4, 13, 14, 21, 22 and 24), yet simultaneously disavow the notion that they intend to dictate the City's strategy with respect to the Collection.[8]  The Creditors' attempt to dictate the terms of the City's plan of adjustment is exactly the type of interference with the City's political and governmental powers that sections 904(1) and 941 of the Bankruptcy Code operate to prevent.

21.     The relief requested would likewise violate section 904(2) of the Bankruptcy Code's prohibition on bankruptcy court interference with a chapter 9 debtor's property.  At the very least, the Motion suggests that requests to compel the City to expend money and other resources developing a "valuation report that reflects the value of the Art based on arms-length market transactions and is consistent with a monetization process designed to maximize the Art's value, as developed with the Art Committee in consultation with Christie's or other leading Art intermediaries" will be forthcoming.  Art Committee Motion, at ¶ 12.

---

[8]     Indeed, if the City would be free to disregard the Art Committee's input, the relief requested would be both unnecessary and wasteful, especially in light of the efforts already undertaken by the City to value the Collection (as described below).  Court intervention and the appointment of an official committee is not required for the Creditors to provide the City with what would be indistinguishable from informal counsel.

This alone is sufficient grounds to deny the Art Committee Motion as seeking an order violative of section 904(2) of the Bankruptcy Code.[9]

22.     Moreover, as set forth above (and as is manifest from the Art Committee Motion), the Creditors seek to leverage any order granting the relief requested to direct the City's treatment of the Collection under a plan of adjustment – an obvious violation of section 904(2) of the Bankruptcy Code.  The Creditors argue that, because the "City will retain the discretion to determine how to structure any transaction that realizes the value of the Art, and how its plan of adjustment treats the Art or the proceeds thereof" (Art Committee Motion, at ¶ 24), the relief requested would not interfere with the City's property.  Put differently, Movants argue that restrictions requiring that the *substance* of the City's plan of adjustment (a) value the Collection as the Creditors would have it valued and (b) implement a transaction that "realizes the value of the Art" for the Creditors' benefit should not be regarded as interference with the City's right to file a plan of adjustment because the Creditors purportedly remain indifferent to the *form* of that transaction.  This is sophistry, and should be rejected by the Court.

_____

[9]     Although the Art Committee Motion stops short of suggesting that the City should bear or defray the expenses incurred by any Art Committee, the City (a) anticipates that such a request may be forthcoming and (b) can conceive of no circumstances under which it would be willing to fund an Art Committee's activities.

23.     Even the Creditors recognize that the Art Committee Motion champions form over substance on this point, as they feel forced to argue that, even if the relief requested would inevitably result in interference with the City's property (which it would), "it does not violate section 904 because the Art is not a core asset of the City."  Art Committee Motion, at ¶ 25.  This thoroughly invented, *sui generis* distinction between "core" and "non-core" assets, however, is both foreign to the plain language of the statute and heretofore unknown to the cases that have interpreted it.  The Creditors offer no citation in support of the proposition that section 904(2) of the Bankruptcy Code's prohibition against interference with "property" applies only to "core" assets beyond a snippet of legislative history that actually undermines their position.[10]  Indeed, if there were such a distinction between "core" and "non-core" assets that limited the application of section 904(2), one might expect a wealth of cases distinguishing between, and

---

[10]     The Creditors cite to House Report No. 95-595, at 398 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6354, which states that section 904 was intended "to make[ ] clear that the court may not interfere with the choices a municipality makes as to what services and benefits it will provide to its inhabitants."  Art Committee Motion, at ¶ 25.  Even if the City were to concede that (a) the plain language of section 904(2) of the Bankruptcy Code is sufficiently vague and  ambiguous to justify resort to legislative history as an interpretive aid (it is not) and (b) the availability of the Collection to Detroit residents does not constitute a "service" (which the City does not concede), there can be no serious argument that the Collection does not provide Detroit residents with a "benefit" as the term is employed in the legislative history.

attempting to delimit, the two categories. No such cases exist. Moreover, even if such a distinction did exist, the Creditors improperly assume that the Collection – which the Art Committee Motion itself characterizes as "one of the City's most valuable assets" – would not qualify as a "core" asset. As set forth in detail below, many parties in interest would beg to differ.

24. Accordingly, because (a) the Creditors' intention to dictate the terms of the City's ultimate plan of adjustment violates sections 904(1) and 904(2) of the Bankruptcy Code, (b) the requirement that the City spend money and resources developing a redundant valuation of the Collection violates section 904(2) of the Bankruptcy Code and (c) section 904(2) of the Bankruptcy Code makes no distinction between "core" and "non-core" assets, the Art Committee Motion must be denied.

### *The Relief Requested Is Unnecessary in Light of the City's Valuation Efforts*

25. In addition to the foregoing independently dispositive grounds for denying the Art Committee Motion, the relief requested therein should be denied as unnecessary and wasteful in light of the City's ongoing efforts to value the Collection and formulate its own plan of adjustment.

26. On December 4, 2013, a letter (the "Preliminary Appraisal") from Douglas Woodham, President of Christie's America ("Christie's"), to Kevyn Orr, the emergency manager for the City, that, among other things, offered

Christie's preliminary aggregate valuation for certain portions of the Collection was made public.[11]  In the Preliminary Appraisal, Christie's explains that it conducted a fair market value appraisal of works purchased either entirely by the City or in part with City funds (the "Appraised Art"), with "fair market value" defined as "the price at which a work would change hands between a willing buyer and a willing seller in the relevant marketplace … determined by using the market data approach which compares the subject work to similar works sold in the marketplace, makes appropriate adjustments to allow for any differences between the subject work and the comparables, and reflects the current market place." Preliminary Appraisal, at 1.  Based on this fair market value analysis, Christie's estimates that the aggregate value of the Appraised Art is within a range of $452 million to $866 million, with the lower number representing a conservative price and the higher number representing the highest price the City could expect to obtain.  Id. at 2.

27.     In addition to providing the City with a valuation of the Appraised Art, the Preliminary Appraisal also presented the City with a range of alternatives to sale that might allow the City to realize revenue from the Collection while allowing it to remain intact, including:  (a) the use of City-owned works as

_____

[11]     A copy of the Preliminary Appraisal is attached hereto as Exhibit 1.

collateral for a long-term loan or line of credit, (b) the potential identification of a partner museum or museums to which certain masterpieces might be leased on a long term basis, (c) the creation of a "masterpiece trust" that could be accessed by members of a newly-created museum consortium (and the sale of minority interests in such a trust), (d) a sale and permanent loan arrangement and (e) traveling exhibitions of selected works.  Id. at 3-5.

28.     In light of the City's efforts to obtain (a) a fair market valuation of the Appraised Art and (b) advice with respect to non-sale monetization alternatives, the relief requested by the Creditors – the appointment of an Art Committee for the purpose of obtaining a valuation of the Collection "that reflects the value of the Art based on arms-length market transactions and is consistent with a monetization process designed to maximize the Art's value" (Art Committee Motion, at ¶ 12) – is at least partially redundant of the work already performed by Christie's (as reflected in the Preliminary Appraisal).  Having already obtained a valuation of an important part of the Collection from a world-renowned appraiser (as well as non-sale monetization alternatives), the City does not need, and should not be compelled to obtain, a second opinion.  Moreover, the Preliminary Appraisal demonstrates that the Creditors' concerns that "Christie's appraisal … could result in an inappropriately low assessment, substantially below the market value of the Art" (Art Committee Motion, at ¶ 7) are unfounded.  The relief

requested in the Art Committee Motion promises only to waste the City's time and money, with no appreciable benefit for its creditor constituency beyond the value of the Preliminary Appraisal.

### *Granting the Relief Requested Would Not Eliminate the Potential for Litigation*

29.     Finally, although the Art Committee Motion suggests that the relief requested is necessary to avoid "unending" or "protracted, expensive litigation" over the Collection (e.g., id. at ¶¶ 4, 13) – litigation which the City presumes would be brought by the Creditors themselves in the absence of the relief requested – granting the relief requested does nothing to eliminate the City's risk of such litigation.  As the Creditors themselves acknowledge (Art Committee Motion, at ¶10, n.3), various parties conspicuously absent from the proposed membership of the Art Committee have taken the position that the City cannot sell any portion of the Collection to satisfy claims in this chapter 9 case and have made public their intention to prevent any monetization effort by the City.

30.     For example, the AG Opinion argues that the City cannot sell the [Collection] because it is "guard[ed] zealously" by the people of Michigan as a charitable trust.  AG Opinion, at 22.  Moreover, as recently as December 3, 2013, DIA Corp. issued a statement (the "Museum Statement")[12] reaffirming its support

---

[12]     A copy of the Museum Statement is attached hereto as Exhibit 2.

for the City's attempts to restructure but objecting to the formation of the Art Committee and reiterating that "[i]f the art is placed in jeopardy, [DIA Corp.] remains committed to take action to preserve this cultural birthright for future generations."  Museum Statement, at 1; see also Mark Johanson, Detroit Institute Of Arts Vows To Prevent City From Auctioning Its Collection To Pay Creditors, International Business Times, Dec. 4, 2013;[13] Mark Caro, Detroit Institute of Arts Urges City Not To Sell Art, Chicago Tribune, Dec. 3, 2013.[14]

31.     Accordingly, some approaches to the monetization of the Collection may provoke more litigation than they avoid, and the appointment of an Art Committee to precipitate that end is unwarranted.  Accordingly, the Art Committee Motion should be denied.

WHEREFORE, for the foregoing reasons, the City respectfully requests that this Court: (a) deny the Art Committee Motion; and (b) grant such other and further relief to the City as the Court may deem proper.

---

[13]     Available at http://www.ibtimes.com/detroit-institute-arts-vows-prevent-city-auctioning-its-collection-pay-creditors-1496106.

[14]     Available at http://www.chicagotribune.com/entertainment/chi-detroit-bankruptcy-institute-of-arts-20131203,0,7564245.story.

Dated: December 10, 2013          Respectfully submitted,

/s/ Bruce Bennett
Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio 44114
Telephone: (216) 586-3939
Facsimile: (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
   STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

# EXHIBIT 1

# CHRISTIE'S

December 3, 2013

Mr. Kevyn Orr
Office of the Emergency Manager
1126 Coleman A. Young Municipal Center
Detroit, Michigan 48226

Dear Kevyn:

    Consistent with our mandate from your office, Christie's is in the final phases of its work appraising the City-purchased art that forms part of the Detroit Institute of Arts' (DIA) collection. The art we have appraised accounts for approximately 5% of the objects in the DIA's total collection and excludes all major gifts.

    The purpose of this letter is to summarize the scope of our work, our process for conducting the appraisal, and, at your request, provide a preliminary aggregate valuation range. A final range will be presented the week of December 16th. In addition, Christie's is recommending options for alternatives to sale that would allow the City to gain value from the collection while keeping it intact. A summary of the proposed alternatives to sale is also presented here.

## Scope of Work

    Christie's remit from your office was to conduct a Fair Market Value ("FMV") appraisal of only those works that are classified as City of Detroit purchases ("COD"). COD works were either purchased entirely by the City, or in part with City funds. The total number of COD purchases in the Museum's collection of approximately 66,000 works was anticipated to be about 3,300 works at the start of the appraisal, based on lists of COD purchases provided to Christie's by the Museum. This number has since been adjusted downward to 2,781 works, after adjusting for multi-part objects, objects unavailable for inspection, and works deaccessioned by the museum over the years

    FMV is the price at which a work would change hands between a willing buyer and a willing seller in the relevant marketplace. It is determined by using the market data approach which compares the subject work to similar works sold in the marketplace, makes appropriate adjustments to allow for any differences between the subject work and the comparables, and reflects the current market place. Christie's has provided both a low and high range for FMV for each appraised work and for the aggregate total. The lower number represents a conservative price, and the higher number represents the most advantageous price at which the property would change hands.

Christie's
20 Rockefeller Plaza, New York, NY 10020
*phone* 212.636.2060

For the purposes of clarity, it should be underscored that the individual values provided are not auction estimates. Auction estimates are the price ranges that Christie's and other auction houses assign to a work at the point of sale in order to attract maximum bidding interest. As such, auction estimates are not necessarily a reflection of fair market value.

Pursuant to our contract with the City, our work was conducted in three phases, with timelines assigned to each phase. All phases are being delivered within the agreed timelines. As noted in the scope of work, Phase I includes all COD purchases on view in Museum galleries (319 works total); Phase Two includes all COD purchases in storage with perceived values of $50,000 or greater; and Phase Three includes all COD purchases in storage with perceived values under $50,000.

As discussed, we will provide a final written appraisal during the week of December 16. Though the preliminary figure provided below is not final and inclusive, we do not believe these figures will change significantly at the conclusion of our remaining work. Per our contract, with the receipt of our final appraisal document, we will have completed all our work for the Emergency Manager. At this time, we have no plan or agreement in place for additional work with the Emergency Manager.

## Aggregate Valuation Estimate

Based on an FMV analysis, the aggregate estimated value of the COD purchases appraised by Christie's is **$452 - $866 million.** As noted previously, the lower number represents a conservative price, and the higher number represents the most advantageous price at which the property would likely change hands. Note that eleven "Phase One" works on display in the galleries account for 75% of the total value of the COD purchased objects.

## Appraisal Process

Christie's prioritized its visits and assigned relevant specialists to each work by starting with the categories of works with the highest potential values. We were accompanied on our site visits by two art handlers employed by the museum.

In order to limit disruption in the galleries, a decision was taken at the outset not to physically remove the works from the gallery walls or inspect objects out of their cases. This limitation did not inhibit Christie's ability to provide the requisite values for the works. Further examination of the condition of each work could reveal issues that would reduce the value slightly or, alternatively, confirmation of unlined canvasses may adjust the values upward slightly. These potential variations have been accounted for in the estimates provided. Phase Two and Phase Three works were located in storage, allowing Christie's specialists to examine the artworks in greater detail.

At this date, Phases One and Two of the appraisal are complete, and Phase Three is underway. As agreed with you, we have not gone in person to review the following Phase Three items due to their low commercial value, and thus have not included them in the aggregate figure presented:

- 350 photographs by the art historian and photographer Clarence Kennedy
- 375 textile fragments
- 12 photostats by local architect W.G. Malcomson,
- 105 drawings and prints by artists who command only very low prices
- 35 pieces of furniture
- 50 coins
- 35 architectural fragments
- 40 single folio leaves
- 135 pieces of sculpture and utilitarian objects (i.e. jewelry boxes, mortars)

Based on information and cataloguing provided by the Museum, Christie's believes there are no major COD pieces left in storage that would increase the aggregate value of the appraised group by more than 1% of the total noted above.

## Alternatives to a Sale

Christie's also agreed to assist the City by helping conceive alternatives to sale that could potentially allow the collection to remain intact. We would like to highlight five potential alternatives: (1) the use of art as collateral for a loan; (2) leasing the art to a partnership museum; (3) creation of a "masterpiece trust"; (4) sale and permanent loan or gift to DIA; and (5) a traveling exhibition. We very briefly summarize each of these alternatives below. These five alternatives are not mutually exclusive - some could be exercised in tandem.

It is clear that the success of these alternatives depends heavily on cooperation between the City and the Museum, along with supporting third parties in certain cases. All require further exploration to make practical assessments of their feasibility and to approximate the amount of revenue they could generate. Certain alternatives have more revenue than others, and while some of these ideas have precedent in the museum community, others remain untested. Regardless, their ultimate viability will be determined by the Emergency Manager and others involved with the bankruptcy process who will decide how much, if any, revenue must be derived from the City-purchased art within the larger DIA collection.

### 1. Use City-Owned Works as Collateral for Loan or Line of Credit

City-owned works of art could be pledged as collateral for a long-term loan or line of credit. The current robust global art market coupled with the fact that the city-owned collection contains some high-quality and valuable works, suggest this could be an effective financing arrangement. The debt could be financed by city-generated revenue, or by revenue from other sources.

2. **Identify a Partner Museum for Long-Term Lease of City-Owned Works of Art**

Revenue could be generated from a partnership agreement with another museum or museums whereby masterpieces from the DIA would be leased on a long-term basis. A likely partner would be a museum with significant financial resources and a collection that lacks works of art matching the quality of a number of works owned by the City.

Variations on such partnerships have been successfully negotiated in the U.S. in the past. Museums in this country have agreed to lend works of art or pre-packaged exhibitions for an extended period of time to a partner museum in exchange for a fee. The most fruitful museum partners would likely be found in emerging markets where high levels of government funding and significant private wealth may be available to underwrite the partnerships.

The partnership could include rotating loan arrangements for masterpieces over the term of the lease, which could be as long as 10-15 years. This would guarantee an ongoing revenue stream that would be paid to the City. Beyond the financial benefits, other aspects of the partnership may benefit both institutions. It may create opportunities to develop future patronage among leaders in the business and philanthropic communities in the host city and allow for other cultural exchanges. In addition, the DIA could offer professional and curatorial training for a fee.

3. **Create a "Masterpiece Trust" to be Accessed by Members of a Museum Consortium**

The City might consider establishing a "Masterpiece Trust" that could be accessed by members of a newly-created museum consortium. Unprecedented in the art world, such an entity could generate revenue for the city and provide an ongoing lending structure for museums in the U.S. to essentially rent museum-quality works of art.

City-owned art would be transferred into the Trust and minority interests would be sold to individual museums, making them a member of a larger consortium of institutions. Revenue generated by the sale of shares in the Trust would be paid to the City. Ownership of shares in the Trust would entitle members to borrow works for predetermined periods of time.

In order to boost revenue from the Trust, City-owned works could be purchased by a consortium of U.S. philanthropists on the condition that they be on permanent loan to the Trust, or to the DIA if the Trust dissolved.

4. **Sale and Permanent Loan or Gift**

A sale and permanent loan arrangement could also be considered as a way of monetizing City-owned art while still maintaining the asset in the public domain in Detroit. The City might consider the sale of a single, or several, City-owned works of the highest quality to a philanthropist or consortium of philanthropists on the condition that they agree to permanently lend them to the museum.

Permanent loans, also known as "Permanent Deposit" arrangements are not uncommon in the museum world. The recipient institution takes responsibility for the curatorial care and stewardship of the works of art as if they were part of the permanent collection, but the title is retained by the individual or entity placing the work/s on deposit. Although such an arrangement would include an outright sale, the transaction would be negotiated with restrictions stipulating that the work/s remain on permanent loan and display. The City would receive the revenue from the sale and the DIA would benefit from the permanent loan arrangement.

5. **Traveling Exhibition of Select Works**

The DIA's prior experience with traveling exhibits suggests that they are not a substantial revenue generator. They are very costly to mount, and it is unlikely that any tour would raise more than $1 million. Of the five, this option may be viewed by the decision-makers as the least viable in terms of generating a revenue stream for the City. However, there may be other reasons that justify a traveling exhibit or exhibits; including, raising the DIA's profile, and thereby generating interest in, and support for, the DIA.

DIA's encyclopedic collection lends itself to the mounting of exhibitions that could travel nationally, and possibly, internationally. For example, a high-profile selection of works across collecting fields could be mounted, such as "Masterpieces from the Detroit Institute of Arts."

The media attention the DIA has received in connection with Detroit's bankruptcy filing and the accompanying outpouring of public support for the City's artworks could help to generate interest, and thereby revenue, from tour sponsors and patrons. Exhibitions of this type would also provide opportunities to raise DIA's profile even higher.

In closing, Christie's is honored to have been approached by the City's representatives to assist Detroit in its restructuring efforts, and to support you by employing Christie's broad expertise and experience in providing both a fair market value appraisal of COD purchased works and recommendations for alternatives to sale. We sincerely appreciate the opportunity to play a productive and constructive role in this process.

Sincerely,

Douglas Woodham

Doug Woodham
President, Christie's Americas

Cc: Bruce Bennett
    Ken Buckfire

# **EXHIBIT 2**

CLI-2166148v4



## Detroit Institute of Arts Statement Regarding City of Detroit's Eligibility to File for Bankruptcy

TUESDAY, DECEMBER 03, 2013

The DIA supports the Emergency Manager's efforts to address the City's current financial crisis. The DIA hopes that Judge Rhodes' ruling today, which confirms that the City is eligible to proceed in its Chapter 9 bankruptcy case, will lead to a quicker and more effective resolution of the crisis.

As it has since the beginning of this matter, the DIA will continue to support the City and all responsible attempts to develop and implement a plan that will contribute to the revitalization of Detroit. Through the support of museum donors and the residents of Macomb, Oakland, and Wayne counties, the DIA will continue to operate the museum without City financial support, saving Detroit $350 million in expenses over the next 10 years and giving the people of Michigan ready access to world-class artistic and educational experiences. The DIA will maintain its position as a cornerstone of the vibrant economic and social community that continues to take shape in Midtown Detroit, and will continue to work with local, regional, and national foundations and businesses to help raise funds to address the City's financial crisis without dismantling the museum.

The DIA art collection is a cultural resource of the people of Detroit, the tri-county area and the entire State of Michigan. The museum's collection is the result of more than a century of public and private charitable contributions for the benefit of the public. Protected by a charitable and public trust, the collection has survived several municipal fiscal crises and financial downturns, including the Great Depression, free from threats to its existence.

The DIA therefore opposes the motion filed last week by certain City creditors to allow them to form a committee to oversee the valuation and sale or "monetization" of the museum art collection to satisfy municipal obligations. The DIA remains hopeful that the Emergency Manager will recognize the City's fiduciary duty to protect the museum art collection for future generations and that he will abide by the Michigan Attorney General's opinion that the City holds the art collection in trust and cannot use it to satisfy City obligations. If the art is placed in jeopardy, the DIA remains committed to take action to preserve this cultural birthright for future generations.

Contact:   Pamela Marcil   313-833-7899   pmarcil@dia.org



**Detroit Institute of Arts**
5200 Woodward Avenue
Detroit, Michigan 48202
**Contact Us**

**313.833.7900**

**Hours**
Tuesdays, Wednesdays & Thursdays 9 a.m. – 4 p.m.
Fridays 9 a.m. – 10 p.m.
Saturdays and Sundays 10 a.m. – 5 p.m.
*Mondays Closed*