# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| In re | : | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | : | |
| Debtor, | : | Case No. 13-53846 |
|  | : | Hon. Steven W. Rhodes |

## OMNIBUS REPLY OF THE DEBTOR TO OBJECTIONS TO DEBTOR'S MOTION FOR APPROVAL OF POSTPETITION FINANCING

CHI-1912664v7

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................... 1

SUMMARY OF OBJECTIONS ............................................. 6

REPLY ................................................................................. 7

    A.    The Broad Review Advanced By The Objectors Is Not Justified ....... 7

        1.    The Quality Of Life Initiatives Are An Exercise Of The City's Political Judgment About How Best To Fulfill Its Governmental Obligations ........................................................ 8

        2.    Section 904 Prohibits Efforts By Creditors To Second-Guess the City's Political Judgments ..................................... 9

        3.    The City's Effort To Obtain Approval Of Liens And Superpriority Claims Under Section 364(c) Is Not Consent To The Broad Review Advanced By The Objectors ................................................................. 11

    B.    Appropriate Standard of Review For the Relief Sought in the Motion ................................................................ 13

        1.    Applicability of the *Farmland* Factors ................................... 13

        2.    The Financing Should be Approved Even Under *Farmland* Factors ................................................................ 16

            a.    The Financing is a Sound Exercise of the City's Judgment ................................................................ 16

            b.    The Financing Satisfies Any Appropriate "Best Interests" Analysis ...................................................... 21

            c.    The Terms of Financing are Fair and Reasonable and There Were No Better Alternative Financing Options Available ................................................... 28

            d.    A Section 364(e) Finding is Appropriate ..................... 32

    C.    Key Investments in the City Must Begin Now ........................... 37

        1.    The City is Not Required to Wait Until Plan Confirmation to Begin Critical Investments .......................... 37

        2.    The Financing is Not a *Sub Rosa* Plan ................................ 39

    D.    The Super-Priority Claim Objections Are Specious .................... 41

CONCLUSION .................................................................................................42

CHI-1912664v7

# TABLE OF AUTHORITIES

**Page**

CASES

Anchor Sav. Bank FSB v. Sky Valley, Inc.,
99 B.R. 117 (N.D. Ga. 1989)...................................................................22

Fano v. Newport Heights Irr. Dist.,
114 F.2d 563 (9th Cir. 1940) ...........................................................24, 25

In re 495 Cent. Park Ave. Corp.,
136 B.R. 626 (Bankr. S.D.N.Y. 1992).................................................22

In re Addison Cmty. Hosp. Auth.,
175 B.R. 646 (Bankr. E.D. Mich. 1994)...........................9, 10, 27, 38

In re Ames Dep't Stores, Inc.,
115 B.R. 34 (Bankr. S.D.N.Y. 1990)...................................................15

In re Babcock & Wilcox Co.,
250 F.3d 955 (5th Cir. 2001) ...............................................................22

In re Barnwell Cnty. Hosp.,
471 B.R. 849 (Bankr. D.S.C. 2012).....................................................26

In re Braniff Airways, Inc.,
25 B.R. 216 (Bankr. N.D. Tex. 1982)..................................................38

In re Braniff Airways Inc.,
700 F.2d 935 (5th Cir. 1983) ...............................................................40

In re City of Columbia Falls, Mont., Special Imp. Dists.,
143 B.R. 750 (Bankr. D. Mont. 1992) .................................................26

In re City of Stockton,
478 B.R. 8 (Bankr. E.D. Cal. 2012).....................................................10

In re City of Stockton,
486 B.R. 194 (Bankr. E.D. Cal. 2013).............................................10, 11

In re Connector 2000 Ass'n, Inc.,
447 B.R. 752 (Bankr. D.S.C. 2011).....................................................26

*In re Ellingsen MacLean Oil Co., Inc.,*
    834 F.2d 599 (6th Cir. 1987) ...............................................................32

*In re Farmland Indus.,*
    294 B.R. 855 (Bankr. W.D. Mo. 2003) ……………………...……........13, 14

*In re Flight Transportation Corp. Securities Litigation,*
    730 F.2d 1128 (8th Cir. 1984) ...........................................................40

*In re Mid-State Raceway,*
    323 B.R. 40 (Bankr. S.D.N.Y. 2005)...................................................15

*In re Mount Carbon Metro. Dist.,*
    242 B.R. 18 (Bankr. D. Colo. 1999)…………………………………….23, 24

*In re New York City Off-Track Betting Corp.,*
    434 B.R. 131 (Bankr. S.D.N.Y. 2010)...................................................12

*In re Northwest Airlines Corp.,*
    366 B.R. 270 (Bankr. S.D.N.Y. 2007)...................................................38

*In re Pan Am Corp.,*
    1992 WL 154200 (S.D.N.Y. June 18, 1992) .......................................33

*In re Richmond Unified Sch. Dist.,*
    133 B.R. 221 (Bankr. N.D. Cal. 1991) ...............................................23

*In re White Crane Trading Co., Inc.,*
    170 B.R. 694 (Bankr. E.D. Cal. 1994).................................................33

*In re YL W. 87th Holdings I LLC,*
    423 B.R. 421 (Bankr. S.D.N.Y. 2010).................................................15

*Leco Properties v. R.E. Crummer & Co.,*
    128 F.2d 110 (5th Cir. 1942) ........................................................11, 12

*Lorber v. Vista Irr. Dist.,*
    143 F.2d 628 (9th Cir. 1944) ...........................................................24

*Matter of Cajun Elec. Power Co-op., Inc.,*
    119 F.3d 349 (5th Cir. 1997)……......................................................40

Matter of EDC Holding Co.,
  676 F.2d 945 (7th Cir. 1982) ...............................................................33

Matter of Sanitary & Imp. Dist. No. 7,
  98 B.R. 970 (Bankr. D. Neb. 1989)…………………………………………...26

Moody v. James Irr. Dist.,
  114 F.2d 685 (9th Cir. 1940) ...............................................25, 26, 38

Newhouse v. Corcoran Irr. Dist.,
  114 F.2d 690 (9th Cir. 1940) ...............................................................25

United States v. Bekins,
  304 U.S. 27 (1938)................................................................................9

W. Coast Life Ins. Co. v. Merced Irr. Dist.,
  114 F.2d 654 (9th Cir. 1940) ...............................................................25

**STATUTES**

11 U.S.C. § 901 ......................................................................................12

11 U.S.C. § 943(b)(7)............................................................................. 21

Act of Apr. 8, 1976, 90 Stat. 316 ..........................................................10

Bankruptcy Act § 83(c), Act of Aug. 16, 1937, 50 Stat. 657 .................10

§ 12(3)(a) Michigan Gaming Control and Revenue Act, M.C.L.A. 432.212….......20

§ 364 of the Bankruptcy Code ...............................................14, 15, 38

§ 364(c) of the Bankruptcy Code………………………………………….passim

§ 364(e) of the Bankruptcy Code...........................................7, 32, 33 ,37

§ 904 of the Bankruptcy Code………………………………….............passim

§ 943 of the Bankruptcy Code ...............................................21, 25

Uniform Commercial Code......................................................................30

**OTHER AUTHORITIES**

H.R. Rep. No. 94-686, 94th ...................................................................12

H.R. Rep. No. 595-394, 95th……………………………………………...……12

Tenth Amendment...................................................................................................9

9 Collier on Bankruptcy ¶ 943.03[7][b]…………………………………………..24

The City of Detroit (the "City" or the "Debtor") hereby files this omnibus reply (the "Reply") to the objections (the "Objections") filed in opposition to the Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay [Docket No. 1520] (the "Motion").[1] In support of its Reply, the Debtor respectfully represents as follows:

## INTRODUCTION

1. The Objections comprise 15 individual responses to the Motion, reaching into the hundreds of pages.[2] The Objections are directed primarily at the propriety of the Quality of Life Financing, while also taking aim at the substance of the Forbearance Agreement. While voluminous, and ostensibly raising a host of factual and legal issues, the key theme throughout the Objections rests, primarily, on the flawed legal premise that the City's citizens — for whom the City exists and operates in the first instance, and whose future is most dependent upon the outcome of this proceeding — should have little or no voice in this process.

---

[1]     Capitalized terms used but not defined herein are accorded the meanings given to them in the Motion.

[2]     The Official Committee of Retirees filed a response in support of the Financing Motion [Docket No. 1868].

2.      If the objecting parties are correct, the City's ability to borrow pursuant to section 364(c) of the Bankruptcy Code, and to make expenditures on behalf of its citizens, would be curtailed to that which is deemed "essential" by this Court to operate the City, while every penny beyond that would go to creditor recoveries.

3.      Meanwhile, any true investment in the City would wait — lights would remain unlit, emergency calls to police and fire would go unanswered, crumbling infrastructure would continue its formidable decay, basic notions of public health, safety and welfare would go on being ignored — until a plan of adjustment is ultimately approved in this case, and, presumably, the appellate process has run its course. The City respectfully submits that Detroit's citizens can no longer be asked to wait. Any suggestion that the woefully inadequate status quo should continue any longer is simply unacceptable.

4.      Much ado has been made about the proper scope of review for the present Motion. The fact is, by any standard, the relief sought by the City is appropriate and should be approved. As set forth below, in a chapter 9 proceeding a municipal debtor is generally free to pursue its political and governmental prerogatives without interference from the judiciary. That is no different here. It is simply not the purview of this Court to rule upon the wisdom of each and every expenditure contemplated by the City with respect to the Quality of Life Financing,

which would not only place rigorous, unnecessary demands on this Court, but also clearly present an improper encroachment on the powers of a municipality reserved under section 904 of the Bankruptcy Code.

5.     What is required of the Court with respect to the Motion is a finding that the City was unable to obtain credit on an unsecured basis and that the terms of the financing are fair and reasonable, the best available under the circumstances and were reached based upon good faith, arm's length negotiations. In that regard, there can be little doubt that the Quality of Life Financing is appropriate and should be approved.

6.     As to need, the City's deterioration over the last half-century is well documented and need not be repeated here. Suffice it to say, however, that the City highlighted in the Motion but a few of the most pressing issues it faces in rebuilding itself. The challenges for the City going forward are extensive and will require a long-term, sustained commitment over years, costing in excess of a billion dollars to begin returning the City to a semblance of what it once was and providing its citizens with the level of services to which they are entitled. That process must begin now.

7.     What also is clear, based on the representations of the City and its advisors in the Motion (and as will be presented at the hearing on the Motion), is that the Postpetition Financing was subject to significant market testing, was

heavily negotiated between the City and Barclays — at arm's length and in good faith — and is the best financing available to the City under the circumstances.

8.     Even under the exacting scrutiny proposed by the objecting parties, the City's decision to borrow the Quality of Life Financing is sound.  The City has not, by any stretch of the imagination, proposed extravagant or frivolous expenditures in connection with the Quality of Life Financing.  As this Court has already found, years of neglect and fiscal mismanagement have rendered the City "service delivery insolvent."

9.     The Quality of Life Financing is designed to be a responsible step into the long and difficult process of modernizing the City's operational processes and information technology infrastructure, making critically needed investments in the City's police and fire departments to enhance public safety and reduce crime, and to continue the City's on-going efforts to reformulate its post-apocalyptic urban landscape.  Hardly gratuitous, the Quality of Life Financing will allow the City to *begin* restoring City services to that of an ordinarily functioning metropolis, capable of providing the most basic of services to its residents so that it can retain its current population and attract new lifeblood to the City's tax rolls.

10.     In the absence of any directly applicable law, the objecting parties spin inapposite analogies to chapter 11, arguing that the recoveries to unsecured creditors should be this Court's singular focus.  In chapter 11, unsecured

creditors are typically the fulcrum constituency and the bankruptcy process in that regard is primarily designed to maximize returns for these parties. Indeed, in most chapter 11 cases, equity is out of the money entirely, and thus, the focus of chapter 11 proceedings is appropriately trained on the recoveries of unsecured creditors, a majority of the time.

11.    Here, however, the City's citizens are not shareholders. They have a voice and a stake in the outcome of this case that stretches well beyond that of any creditor objecting to the Motion. The zero-sum approach suggested by the objecting parties, whereby the "best interests of creditors" should be the singular and controlling consideration for every transaction put before this Court is groundless, when the epic failure of one of the great American cities has left nearly 700,000 people to weather the City's economic storm. While creditors in this case may be perfectly sanguine about allowing the City and its residents to "tread water" while the bones are picked clean, there are far larger implications at play, and contrary to what the objecting parties would have this Court believe, the future viability of the City *does matter*.

12.    As set forth in detail below, and as will be established at the hearing on the Motion, there is little question that the Quality of Life Financing is an appropriate and proper exercise of the City's judgment and should be approved.

13. With respect to the Objections directed at the Swap Termination Financing, such Objections are really aimed at the merits of the Forbearance Agreement. The City addresses these Objections in the Omnibus Reply of the City of Detroit to Objections to the Motion for Assumption and Approval of the Forbearance and Optional Termination Agreement filed contemporaneously herewith (the "Assumption Reply"). Should this Court approve the Forbearance Agreement Approval Motion, there is little question that the Swap Termination Financing is appropriate.

14. Based on the arguments below, and the evidence that will presented at the hearing on the Motion, the Objections should be overruled, and the relief in the Motion granted in all respects.

## SUMMARY OF OBJECTIONS

15. The substance of the Objections is summarized below. The Debtor is hopeful that it can resolve certain of the Objections in advance of the hearing on the Motion and the Debtor intends to file, in advance thereof, a revised proposed form of order.

16. The key issues raised in the Objections generally can be categorized as follows: [3]

---

[3]     This summary is not exhaustive of all the Objections.

— Section 904 of the Bankruptcy Code does not prevent an exhaustive review by the Court of the intended uses of the Quality of Life Financing because the City has sought approval from this Court of the Postpetition Financing.

— The proper standard of review for the relief sought by the City in the Motion is set forth in the <u>Farmland</u> factors. This issue encompasses the following assertions:

   ○ The City has failed to sufficiently disclose the need for financing, how the Quality of Life Financing will be spent and on what timeframe, thus establishing the City's business judgment.

   ○ The City has failed to establish that the Postpetition Financing is necessary to provide only essential services to citizens and that the Postpetition Financing will enhance recoveries to creditors.

   ○ There is insufficient factual basis to make a finding of "good faith" pursuant to section 364(e) of the Bankruptcy Code.

— The Postpetition Financing constitutes an impermissible *sub rosa* plan of adjustment.

— Reinvestment initiatives of the kind contemplated in the Motion should be done as part of a comprehensive plan of adjustment and not on a "piece-meal basis."

— The Postpetition Financing imposes unreasonably high costs on the City.

— Super-priority claims granted pursuant to the Motion, if at all, should not "apply" to certain *ad valorem* tax revenue of the City in which certain bondholders (and bond insurers) allege they have an interest.

   17.   As set forth in greater detail below, the Objections are legally deficient and cannot be sustained.

## <u>REPLY</u>

### A.   *The Broad Review Advanced By The Objectors Is Not Justified*

**1. The Quality Of Life Initiatives Are An Exercise Of The City's Political Judgment About How Best To Fulfill Its Governmental Obligations**

18.     A municipality has an overriding governmental responsibility to provide public services that promote the health, safety and welfare of its citizens. The City's inability to fulfill this governmental responsibility, however, has been well documented. For several years, the City has lacked the resources to maintain adequate police, fire, or emergency medical services. The City's work force is understaffed, its equipment is outdated and its infrastructure is crumbling. Blighted properties throughout the City are a haven for crime and a target for arsonists. The City's information technology infrastructure cannot handle the needs of a modern City. Conditions in the City have been described as deplorable. See, e.g., Opinion Regarding Eligibility, p. 107-08 [Docket No. 1945] (December 5, 2013).

19.     Through its Quality of Life spending, the City is taking an important step toward raising the public services it provides to the level its citizens deserve. As detailed in its prior filings, the City intends to use the proceeds from the proposed Postpetition Financing to, among other things, increase staffing at the Detroit Police Department to a level adequate to protect the public, transition certain administrative positions from police officers to civilians, purchase new police, fire and emergency medical vehicles, demolish dangerously blighted

structures and better integrate the City's outdated information technology systems. See Moore Decl. at ¶¶ 14, 16, 17, 20. The Quality of Life spending represents the City's considered political judgment about how best to satisfy its governmental obligation to its citizens.

### 2. Section 904 Prohibits Efforts By Creditors To Second-Guess the City's Political Judgments

20. The objecting parties take issue with the City's exercise of its political judgment and urge a broad court review of the planned expenditures to determine whether the money is being spent as efficiently as possible for only essential government services. The objecting parties' efforts to second-guess the City's governmental decision making, however, are not justified.

21. Section 904 of the Bankruptcy Code provides that "unless the debtor consents or the plan so provides, the court may not . . . interfere with — (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the debtor's use or enjoyment of any income-producing property." 11 U.S.C. § 904. This provision reflects a recognition of the special solicitude that must be given to municipal debtors within a chapter 9 case resulting from concerns of independence and sovereignty embodied in the Tenth Amendment. See United States v. Bekins, 304 U.S. 27, 50-52 (1938) (relying in part on the presence of the predecessor to section 904 in upholding the constitutionality of the municipal bankruptcy statute); In re Addison Cmty. Hosp.

Auth., 175 B.R. 646, 648 (Bankr. E.D. Mich. 1994) ("A primary distinction between chapter 11 and chapter 9 proceedings is that in the latter, the law must be sensitive to the issue of the sovereignty of the states.").

22.     Section 904 ensures that a municipal debtor is free to manage its own affairs during the bankruptcy case.  This provision, on its face, prohibits review of a municipal debtor's political judgments about how best to expend its revenues to satisfy its governmental obligations.  See Addison Hosp., 175 B.R. at 649 ("[Section 904] makes clear that the court may not interfere with the choices a municipality makes as to what services and benefits it will provide" (quoting H.R.Rep. No. 595, at 398)).  Perhaps even more tellingly, however, the history of Section 904 makes clear that this limitation is designed to avoid precisely the kind of inquiry the objecting parties now urge.

23.     Until 1976, the predecessor to section 904 required a court to determine whether spending by the debtor was "necessary for essential government purposes."  See Bankruptcy Act § 83(c), Act of Aug. 16, 1937, 50 Stat. 657.  However, that requirement was removed in the 1976 amendments to the Bankruptcy Act in order to enhance the independence of municipal debtors during the bankruptcy case.  See Act of Apr. 8, 1976, 90 Stat. 316; In re City of Stockton, 478 B.R. 8, 18 (detailing the history of section 904); In re City of Stockton, 486 B.R. 194, 198 (Bankr. E.D. Cal. 2013) (same).  The review proposed by the

objecting parties disregards this history and attempts to revive the "necessary for essential government purposes" test long ago rejected by Congress. See, e.g., Ambac Objection at 18-19 ("[T]he City has the burden . . . to show that the funding sought is to maintain essential services."); Id. at 21 ("[T]he Court will be required to determine whether the Post-Petition Financing is necessary to maintain essential services for the citizens of Detroit during the case . . . .").

> **3.** **The City's Effort To Obtain Approval Of Liens And Superpriority Claims Under Section 364(c) Is Not Consent To The Broad Review Advanced By The Objectors**

24. Recognizing that the plain terms of section 904 prohibit the type of review they seek, certain of the objecting parties argue instead that the City's effort to obtain approval of its Motion should be interpreted as a waiver of section 904 and consent to a broad review of its Quality of Life expenditures. Such a conclusion is unjustified. It is true that a municipality provides limited consent to bankruptcy court involvement with its governmental decisions when it seeks to use the tools of the Bankruptcy Code to accomplish something it could not do without court involvement. See Stockton, 486 B.R. at 199. That consent, however, extends only so far as necessary to accomplish the proposed transaction. See id.; Leco Properties v. R.E. Crummer & Co., 128 F.2d 110, 113 (5th Cir. 1942) ("[W]hile the jurisdiction conferred by the statute depending, as it does, upon the city's volition, [it] may not be extended by the court beyond that volition . . . .");

see also H.R. Rep. No. 94-686, 94th Cong., 1st Sess, at 18 (explaining that section 904's consent requirement codifies the result of <u>Leco Properties</u>); <u>In re New York City Off-Track Betting Corp.</u>, 434 B.R. 131, 141 (Bankr. S.D.N.Y. 2010) (confining the court's review to the issues to which the municipal debtor had consented).

25.    In this case, the City neither needs nor seeks court approval for its governmental decision to spend money on the Quality of Life initiatives.  <u>See</u> 11 U.S.C. § 904.  Moreover, because section 364(b) does not apply to a chapter 9 case,[4] the City also does not need or seek this Court's authorization to borrow funds to pay for these initiatives.  <u>See</u> 11 U.S.C. § 901.  Rather, the City seeks this Court's authorization only for its decision to grant liens on certain revenue streams and superpriority claim status to Barclays and this Court's finding of good faith.  It is for this limited aspect of the transaction that the City's financial transaction is subject to Court review.

---

[4]    Indeed, as noted in the legislative history to chapter 9, "if a municipality could borrow money outside of the bankruptcy court, then it should have the same authority in bankruptcy court, under the doctrine of <u>Ashton v. Cameron Water District No. 1</u>, 298 U.S. 513, 56 S. Ct. 892, 80 L. Ed. 1309 (1936) and <u>National League of Cities v. Usery</u>, 426 U.S. 833, 96 S. Ct. 2465, 49 L. Ed. 2d 245 (1976).   Only when the municipality needs special authority, such as subordination of existing liens, or special priority for the borrowed funds, will the court become involved in the authorization."  <u>See</u> H.R. Rep. No. 595, 95th Cong. 1st Sess. 394 (1977).

26.     Evaluating the City's Motion thus requires a consideration of whether the City could obtain credit unencumbered or without superpriority status and that the terms of the financing are fair and reasonable, the best available under the circumstances and were reached based upon good faith, arm's length negotiations.    This review does not require an assessment of the City's determination that the money is necessary to meet its obligations to its citizens or an analysis of all of the individual items on which the City is planning to spend the money.    Those political and governmental decisions have been committed by section 904 solely to the discretion of the City's legally authorized decision makers.  Such judgments are beyond the scope of review under section 364(c).

27.     For the foregoing reasons, the City submits that a broad and intensive review of the need and use of the Quality of Life Financing is not appropriate and should not be undertaken by the Court in connection with deciding the Motion.  Nevertheless, as detailed below, the City is confident that under any standard of review, the appropriateness of the Postpetition Financing is beyond any serious dispute.

**B.     *Appropriate Standard of Review For the Relief Sought in the Motion***

**1.     Applicability of the *Farmland* Factors**

28.     In addition to, and in conjunction with, the objecting parties' urging of a broad scope of review of the Debtor's use of loan proceeds, the

objecting parties have also argued that the relief sought in the Motion should be judged using the factors set forth in the chapter 11 case of <u>In re Farmland Indus., Inc.</u>, which consist of the following:

— That the proposed financing is an exercise of sound business judgment;

— That no alternative financing is available on any other basis;

— That the financing is in the best interests of the estate and its creditors;

— Whether there are any better offers, bids, or timely proposals before the court;

— That the financing is necessary to preserve assets of the estate;

— That the terms of the financing are fair, reasonable, and adequate given the circumstances; and

— The financing was negotiated in good faith and at arm's length.

294 B.R. 855, 879-880 (Bankr. W.D. Mo. 2003).

29. Nevertheless, it is hardly clear that these factors apply in a chapter 9 case, as asserted by many of the objecting parties. While certain courts certainly have cited <u>Farmland</u> favorably in chapter 11, the City is not aware of a single case applying these or similar factors in a chapter 9 proceeding.[5] Moreover,

---

[5] While post-petition borrowings may be rare in chapter 9, contrary to common belief (and at least one of the Objections) a sizable post-petition borrowing has occurred before in chapter 9 in the case of <u>In re County of Orange</u>, where the debtor borrowed in excess of $400 million during its chapter 9 proceeding and used the proceeds to make distributions to certain prepetition creditors, and in particular, certain school districts.

it is not clear that bankruptcy courts in the Eastern District of Michigan apply Farmland even in the chapter 11 context.

30. Instead, in determining whether a debtor is entitled to financing in chapter 11 under section 364(c) of the Bankruptcy Code, courts generally have articulated a three-part test, including whether:

(a) the debtor is unable to obtain unsecured credit;

(b) the credit transaction is necessary to preserve the assets of the estate; and

(c) the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor and the proposed lender

In re Ames Dep't Stores, Inc., 115 B.R. 34, 37-39 (Bankr. S.D.N.Y. 1990).

31. Moreover, courts generally defer to the debtor's business judgment in granting post-petition financing under section 364 of the Bankruptcy Code. See In re YL W. 87th Holdings I LLC, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) ("Courts have generally deferred to a debtor's business judgment in granting section 364 financing."); In re Mid-State Raceway, 323 B.R. 40, 58 (Bankr. S.D.N.Y. 2005) (holding that "to overcome the business judgment rule, the entity opposing the decision by the directors must establish that they acted in bad faith or with fraudulent intent.").

32. Nevertheless, even under the more exacting standard of the Farmland factors, the Postpetition Financing should be approved.

**2. The Financing Should be Approved Even Under The _Farmland_ Factors**

   **a. The Financing is a Sound Exercise of the City's Judgment**

*Swap Termination Financing*

33. There seems to be little dispute that the Swap Termination Financing is an appropriate and necessary transaction if the Forbearance Agreement is approved by this Court. While many Objections have been leveled at the Forbearance Agreement itself, that debate is reserved for the Assumption Reply. If the Forbearance Agreement is approved, the City will likely require between $200 million and $230 million in connection with the termination of the Swap Agreements. Terminating the Swap Agreements early in accordance with the Forbearance Agreement will save the City millions of dollars in almost immediately recognized savings and will significantly reduce the costs of carrying the debt associated with the Swap Agreements. There can is no credible dispute that in this circumstance the Swap Termination Financing is a sound exercise of the City's judgment.

*Quality of Life Financing*

34. The objecting parties argue that the Quality of Life Financing is not an appropriate exercise of the City's judgment because the City (i) has sufficient resources available, without any borrowing, to make near-term investments, and (ii) does not have a sufficiently detailed plan for utilizing the

proceeds of the Quality of Life Funds. The objecting parties' arguments fail on both fronts.

35. First, the City does not have the available resources to meaningfully fund investment initiatives in the near-term. Citing recent cash-flow statements provided by the City, many of the objecting parties argue that the City has $128.5 million of net cash (which is more than the $93.5 million of cash that had been projected by the City). The objecting parties also argue that the City is "awash" in federal funding. Each of these sources of funding can be used to fund investment initiatives without any additional borrowing, so the argument goes.

36. As of December 1, 2013, the City has approximately $107 million of net operating cash and investments in the City's general fund. This balance is largely reflective of the City's collection of summer property taxes. As has historically been the case, the City's "high water" mark for net cash in its general fund is August and September — when the City collects the bulk of its property tax revenue. Cash decreases in time as the fiscal year progresses. The City's current cash balance is also a result of the fact that the City has been receiving approximately $11 million per month in wagering tax revenue for the last 6 months in connection with the Forbearance Agreement that, absent the Forbearance Agreement, may not have flowed into City coffers.

37.     The objecting parties are correct in that the City's projected spend for the fiscal year 2014 with respect to reinvestment initiatives is approximately $170 million — a sum that the City determined would provide a meaningful investment in necessary projects for the year.  To actually effectuate those projects, however, it was *assumed* that the City would have access to the Quality of Life Financing.  Because the City has yet to procure post-petition financing, the City has committed to very few reinvestment projects so as to avoid any risk of it committing to projects it could not then afford to fund.  Without access to post-petition financing, if the City sought to fund reinvestment initiatives at the rate projected for the fiscal year 2014, the City would run out of money by May, 2014.[6]

38.     As will be established at the hearing on the Motion, the City's projected cash balances are subject to significant downside risks or threats, including:

—     Additional cash potentially needed to settle accounts payable invoices;

—     The potential need to transfer funds currently held in the City's general fund into other special purposes accounts;

—     Current litigation seeking to cause the City to segregate revenues from certain *ad valorem* taxes, resulting in an immediate loss to the general

---

[6]     Financial Guaranty Insurance Company "FGIC") seems to recognize this fact, see FGIC Objection ¶ 19, but nevertheless *still* suggests that the Postpetition Financing is unnecessary.

fund of $30 million and an annual cost of as much as $50 million in revenues on a go-forward basis; [7]

— The loss of wagering tax revenues in the amount of approximately $11 million per month if the Forbearance Agreement, and the assumption thereof, is not approved by this Court; and

— Needs in connection with any agreement to continue making OPEB payments beyond the current agreement which expires in February, 2014, at a cost of $12 to $15 million per month.

39. Thus, the reality is that the City's current cash is critically necessary to simply fund the City's operations and cannot be responsibly diverted to fund any meaningful investment in the City, even in the short-term, particularly in light of these potential down-side risks.

40. Moreover, as will also be established at the hearing on the Motion, of the $350 million of cited federal funds that supposedly may be used for City revitalization, only approximately $50 million of such funds cited by the objecting parties is not already budgeted and would act as a substitute for the City's already contemplated reinvestment spending. In any event, the City's needs with respect to reinvestment far outstrip available funds.

41. Finally, assertions that the City has "no immediate plans" for spending the proceeds of the Quality of Life Financing is also of no persuasion.

---

[7] The City vigorously denies that it has any obligation in this regard. Nevertheless, one of the objecting parties seeking to have the City segregate tax revenues is also arguing that the Quality of Life Financing is unnecessary because the City has sufficient cash on hand to fund any reinvestment initiatives. The two positions cannot be squared.

While the City continues to examine the most effective use of the funds, it is without dispute that there is no shortage of immediate and urgent needs within the City, the most pressing of which were set forth in the Motion. If that were not enough, the Proposal for Creditors presented on June 14, 2013 set forth, in extensive detail, the initiatives the City intends to embark upon in the coming years, many of which can be commenced in the very near-term.[8] Additionally, on November 11 and 12, 2013, the City and its representatives held two days of meetings with representatives of many of the objecting parties, during which it outlined the City's planned operational restructuring initiatives, and where nearly 130 pages of information was shared by the City on the very topics covered in the Motion, among many others. The City has also conducted various due diligence sessions with advisors of certain creditors and have supplemented both the Proposal for Creditors and the post-petition financing cash flows with supporting detail to give greater clarity in respect of the reinvestment initiatives.

42. To suggest that the City "has no plan" for the use of Quality of Life funds therefore is disingenuous.[9] The City's operational restructuring

---

[8]    See City of Detroit Proposal for Creditors dated June 14, 2013 at pp. 9-22; 61-78.

[9]    Certain objecting parties have also argued that the proposed pledge of the wagering tax revenues is not in compliance with applicable Michigan law that authorizes the levy of wagering taxes in the first instance. Section 12(3)(a) of the Michigan Gaming Control and Revenue Act, M.C.L.A 432.312, provides that the

roadmap is well laid out, has been extensively shared with creditors and parties in interest and is ready, in the near-term, for the City to pursue, at least in part, once the necessary funds become available.

**b.**     **The Financing Satisfies Any Appropriate "Best Interests" Analysis**

43.     The objecting parties have almost uniformly argued, in one form or another, that the key element in analyzing the Postpetition Financing is whether the financing is in the best interest of creditors.  The collective argument in this regard is that the City is not authorized to borrow under section 364(c) of the Bankruptcy Code unless the proceeds of the borrowing are used to fund only "essential" services that cannot otherwise be funded through tax receipts *and* the use of funds maximizes returns to creditors in some quantifiable manner.

44.     In the absence of any binding authority as support for their novel interpretation of the law, the objecting parties argue that the confirmation standards under section 943 of the Bankruptcy Code should be the benchmark, and, in particular, the requirement that a plan of adjustment be "in the best interests of creditors."  See 11 U.S.C. §943(b)(7).

---

City may use its percentage of wagering tax revenues for any number of enumerated purposes, including programs "designed to contribute to the improvement of the quality of life in the city."  That is precisely the stated use of the Quality of Life Financing proceeds and, thus, that aspect of the Postpetition Financing complies with Michigan law.

45.     As an initial matter, there is <u>no</u> support for the proposition that confirmation standards are at all relevant to a court's inquiry into the merits of a post-petition borrowing under section 364(c) of the Bankruptcy Code.  <u>See, e.g.</u>, <u>Anchor Sav. Bank FSB v. Sky Valley, Inc.</u>, 99 B.R. 117, 123 (N.D. Ga. 1989) ("[I]t is not necessary to test the lien proposal against the confirmation requirements of § 1129"); <u>In re 495 Cent. Park Ave. Corp.</u>, 136 B.R. 626, 632 (Bankr. S.D.N.Y. 1992) ("The absolute priority rule is a confirmation standard which does not apply to a preconfirmation contested matter involving a debtor's request to obtain senior credit"); <u>In re Babcock & Wilcox Co.</u>, 250 F.3d 955, 960-61 (5th Cir. 2001) (same).

46.     If Congress intended confirmation standards to be applied in this context, it would have clearly made that cross reference.  But it did not.  Instead, Congress incorporated section 364(c) into chapter 9, to be applied as written.  This Court should not read into section 364(c) a standard that is simply not there.

47.     Moreover, even if reference to section 943(b)(7) were appropriate to inform the inquiry here, the objecting parties badly misstate the law with respect to how courts in chapter 9 have long viewed the "best interest of creditors" requirement.

48.     Instead of expressing an absolute preference for creditors, as suggested, the best interest requirement simply requires that creditors under a plan of adjustment collectively do at least as well as they would if the chapter 9 case were dismissed.  See Mount Carbon Metro. Dist., 242 B.R. 18, 34 (Bankr. D. Colo. 1999) (stating the best interests test in a chapter 9 is "often easy to establish" but nevertheless denying confirmation because *creditors were receiving too much* under the proposed plan at the expense of the municipality's services to residents).

49.     Thus, the best interest test cannot be read to stand for the proposition that creditor recoveries are paramount to a municipality's efforts to improve infrastructure and the services it provides to its residents.  Quite to the contrary, in considering confirmation of a plan of adjustment, a court "does not attempt to balance the rights of the debtor and its creditors, but rather, [attempts] to meet the special needs of a municipal debtor."  In re Richmond Unified Sch. Dist., 133 B.R. 221, 225 (Bankr. N.D. Cal. 1991); see also Mount Carbon Metro. Dist., 242 B.R. at 41 (holding that the purpose of chapter 9 is to adjust debts in order "to continue to provide public services.").  In that regard, chapter 9 confirmation standards are not focused solely on the "repayment of pre-petition debt," but rather are focused on the "repayment of debt in conjunction with [the] provision of continued government services."  Id. at 34-35.  In other words, safeguarding a municipal debtor's unique role with respect to its citizens is a central focus of a

chapter 9 proceeding. Id. ("[T]here is no purpose in confirming a Chapter 9 plan if the municipality will be unable to provide future governmental services.").

50. Thus, for example, section 943(b)(7) specifically requires that a plan be "feasible," which has been interpreted to mean that the debtor is able "to make the payments required under the plan *and still maintain its operations at the level that it selects as necessary to [the] continued viability of the municipality*." 9 Collier on Bankruptcy ¶ 943.03[7][b] (emphasis added); Mount Carbon, 242 B.R. at 37 ("The question of feasibility is whether the Plan is a suitable vehicle for the District to repay its pre-petition debts and to provide future public services.").

51. And even the "fair and equitable" standard of section 1129(b), as applied in chapter 9, incorporates the notion that the debtor's return to viability is of first importance, requiring that the debtor provide a dissenting class of creditors no more than it "can reasonably expect in the circumstances." Lorber v. Vista Irrigation Dist., 127 F.2d 628, 639 (9th Cir. 1944).

52. Nothing cited by the objecting parties is to the contrary. The chief case cited by many of the objecting parties in support of their misguided standard of review is Fano v. Newport Heights Irr. Dist., 114 F.2d 563 (9th Cir. 1940), a case involving a bankrupt irrigation district. Fano, in the first instance, arose in the context of plan confirmation, not a financing motion and should

therefore have no bearing on a motion under section 364(c) of the Bankruptcy Code.

53.     Moreover, in <u>Fano</u> the court reversed a lower court order confirming the debtor's plan after holding that the debtor was grossly solvent, had spent extravagantly prior to its bankruptcy filing to improve its infrastructure and, thus, had sufficient wherewithal to increase taxes to cover its debt service.   114 F.2d at 565-66.  As a consequence, the court held that the proposed impairment of bondholders under the debtor's plan was not appropriate.  <u>id</u>.  Thus, <u>Fano</u> stands for the uncontroversial proposition that a debtor in chapter 9 may need to access its taxing power in connection with a plan of adjustment to the extent that is possible under applicable law and the circumstances of the case.[10]

54.     More importantly, however, in no event can <u>Fano</u> be read to say — whether under section 364 *or* 943 of the Bankruptcy Code — that a city in chapter 9 is prohibited from making improvements to its infrastructure and the services it provides to citizens unless there is a quantifiable enhancement to the

---

[10]     On the same day that <u>Fano</u> was decided, the Ninth Circuit issued three other chapter IX decisions: <u>Newhouse v. Corcoran Irr. Dist.</u>, 114 F.2d 690 (9th Cir. 1940), <u>W. Coast Life Ins. Co. v. Merced Irr. Dist.</u>, 114 F.2d 654 (9th Cir. 1940) and <u>Moody v. James Irr. Dist.</u>, 114 F.2d 685 (9th Cir. 1940).  All of these decisions were authored by Circuit Judge Stephens.  In each of <u>Newhouse</u>, <u>West Coast</u> and <u>Moody</u>, the Court determined that the Districts could not increase taxes to pay creditors and affirmed the confirmation of their plans of adjustment.

recoveries of creditors.[11]  See, e.g., In re City of Columbia Falls, Mont., Special

Imp. Dists., 143 B.R. 750, 759 (Bankr. D. Mont. 1992) (stating that "[h]ad the

Montana legislature sought to require municipalities to pay all of their debts in full,

regardless of the cost to city services, it could have merely refused to permit

municipalities to file Chapter 9 petitions …."); Matter of Sanitary & Imp. Dist. No.

7, 98 B.R. 970, 974 (Bankr. D. Neb. 1989) ("[T]he debtor may obtain confirmation

of a plan, over objection, which does not utilize all of the assets of the estate to

retire its obligations."); Moody v. James Irr. Dist., 114 F.2d 685, 689 (9th Cir.

1940) ("To afford the plan of payment proposed the District must be in a position

to proceed as a going District and for this reason its cash in hand cannot be too

greatly depleted.").  Indeed, "[b]ecause the purpose of municipalities (i.e. police

protection, fire protection, sewage, garbage removal, schools, hospitals) is to

---

[11]      Certain of the other "confirmation" cases cited by the objecting parties
also do not advance the argument that the Postpetition Financing somehow violates
the "best interests" test.   Instead, in those cases, the courts found that the "best
interest" test was met and reinforces the proposition that the continued ability of a
municipality to provide services to its residents in a chapter 9 case is of paramount
concern.  See In re Connector 2000 Ass'n, Inc., 447 B.R. 752 (Bankr. D.S.C. 2011)
(confirming plan and providing that best interests of creditors was served by
debtor's plan); In re Barnwell Cnty. Hosp., 471 B.R. 849 (Bankr. D.S.C. 2012)
(confirming plan and noting that "of particular importance to the Court" was the
fact that the proposed plan "preserves the availability of healthcare services to
citizens and patients in the County.").  In re Pierce Cnty. Hous. Auth., 414 B.R.
702 (Bankr. W.D. Wash. 2009), the other case cited by the objecting parties, is also
of no moment here, as that case involved the issue of whether a debtor should
abandon certain assets as part of a plan.

provide essential services to residents, it is crucial that chapter 9 relief allow these entities enough flexibility to remain viable." Addison Cmty. Hosp., 175 B.R. at 648.

55. The Court has already found that as of the Petition Date, the City was "in a state of 'service delivery insolvency' … and will continue to be for the foreseeable future." See Opinion Regarding Eligibility, p. 107 [Docket No. 1945] (December 5, 2013). Indeed, the City is not providing "services at the level and quality that are required for the health, safety, and welfare of the community." id. at 108. The deterioration in the City's basic operating functions has been so complete that it can hardly be said that the City is providing even some of the most basic of City services to its nearly 700,000 residents.

56. While ostensibly recognizing the City's dire circumstances, the objecting parties nevertheless assert that this Court should give short shrift to such concerns, focusing instead solely on the interests of creditors and how the Postpetition Financing will enhance their recoveries. Such an approach is misguided and is not the law. Indeed, City residents did not assume the risk of the City's failure or insolvency. They did not agree that their access to public services, including police, fire and emergency services, would be subordinate to the repayment of the City's creditors. Nor did they agree to live with blight and darkness until the City's debts are satisfied.

57. While the City believes that its revitalization will ultimately have a positive impact on the economic interests of many of the objecting parties, the City respectfully submits that the Court must also consider the interests of the City's residents, which will be greatly served by the Postpetition Financing, and in particular, the Quality of Life Financing.

### c. The Terms of Financing are Fair and Reasonable and There Were No Better Alternative Financing Options Available

58. As will be established at the hearing on the Motion, and which is not subject to any serious dispute, the Postpetition Financing is the product of a robust process run by Miller Buckfire, the City's investment bank, which involved the solicitation of over 50 lending institutions and resulted in more than a dozen lending proposals. These proposals were further distilled to approximately four serious contending lenders until, ultimately, Barclays emerged as the successful lender.

59. The terms of the Postpetition Financing are highly favorable to an entity in bankruptcy and were the best available among the numerous proposals the City received from prospective lenders. Indeed, Barclays' terms were thoroughly market tested and no better options materialized.

60. The interest rate is 3.5%, and, even with full market flex, is not likely to exceed 6.5%. Financings for entities in bankruptcy frequently feature

interest rates into the double digits. The secured nature of the loan was key for purposes of keeping the cost of the loan low. Additionally, unsecured debt has not been available to the City for years given its highly distressed circumstances, and, thus, was not effectively available to the City in this chapter 9 case, particularly with the City's eligibility subject to heavy litigation.

61. The collateral package, far from being overreaching, as suggested by some, is quite favorable, in the sense that while the Postpetition Financing will be "secured" by a pledge of the City's wagering and income tax revenues, Barclays only has secured recourse to tax revenue limited to the payment of $4 million per month from each source of tax revenue to pay down the principal and interest owing on the bonds in due course. See Indenture §902(c). During that time, the City remains in control of the remainder of the pledged tax revenue, subject to a requirement that the City hold $5 million in each tax revenue deposit account. See Commitment Letter dated October 6, 2013, Terms & Conditions §4; Indenture §708(a). Thus, unlike most secured financings where a lender can foreclose on its collateral to repay itself promptly, it would take Barclays over three years to do so under the terms of the Postpetition Financing.

62. With respect to Asset Proceeds Collateral, the City is not obligated to engage in any transactions to monetize any City-owned assets (even following an event of default), and Barclays' right to receive proceeds is only

triggered in connection with a large monetization transaction, which is not anticipated by the City at this time. Additionally, the super-priority claim granted to Barclays is very typical for a transaction of this type and was a common feature in all of the proposals the City received (including proposals by parties now objecting to this super-priority claim). Moreover, the Postpetition Financing does not include many of the typical "lender control" features typically seen in post-petition financings, such as case milestones and financial covenants. Thus, while many of the objecting parties stated, in conclusory fashion, that the Postpetition Financing "gives Barclays too much control" over the City, such allegations are way off the mark.

63. What's more is that many of those objecting parties — namely, Syncora, FGIC, Ambac, Assured and National — all submitted financing proposals that were significantly *less favorable* to the City than the terms of the Postpetition Financing, while at the same time inappropriately seeking some favorable treatment for their prepetition claims. And while each of these objecting parties vigorously object to the City's proposed use of the proceeds of the Postpetition Financing, each of their respective lending proposals would have allowed the City to do precisely what these parties so loudly object to now: to pay-off the Swap Agreements and make quality of life improvements. Their Objections, accordingly, should be dismissed as disingenuous subterfuge.

64. Syncora also argues that the City had a "better" financing option available to it than the Barclays deal based on a two-page PowerPoint presentation Syncora gave to City Council (rather than the City itself) on October 25, 2013[12] — weeks after the City had selected Barclays as its lender.

65. Syncora's "rough outline" of a lending proposal could hardly be considered a commitment to lend. But even if Syncora was serious about providing the City post-petition financing, the City had serious reservations about whether Syncora could be a suitable lender, given that Syncora is an insurance company, with no track record of lending (in bankruptcy or otherwise), whose parent company's stock trades at less than a dollar and whose entire publicly traded equity market cap is under $50 million. In short, Syncora's financial wherewithal to actually follow through on any lending commitment was, and remains, very uncertain.

66. Moreover, by the end of October, time was of the essence for the City to move forward so that funding could be obtained and put to use by the end of 2013, or the beginning of 2014 at the very latest. The City had run a thorough and lengthy process, in which Syncora was invited to participate, and the City had chosen its preferred lender. To the extent Syncora was serious about

---

[12] Syncora's October 25, 2013 financing proposal was in addition to a far less favorable proposal extended to the City in early October, 2013 referenced in paragraph 63 hereof.

making a new and legitimate proposal to the City, it could have approached the City with a fully documented deal, as the terms of the Barclays proposal were then fully known.  Given Syncora's prior self-serving financing proposals, past tactics and its exceedingly adversarial conduct to date in this case, it was clear to the City that Syncora's "financing proposal" to City Council was not serious and was likely another futile attempt to manipulate the process towards its own ends.

67.     All rhetoric aside, the fact is the Postpetition Financing is the best financing available to the City at this time.  It is the product of an extensive process, involving dozens of prospective lenders.  The terms were heavily negotiated, in good faith and at arm's length and are fair and reasonable under the circumstances.

### d.     A Section 364(e) Finding is Appropriate

68.     Certain of the objecting parties have argued that the City has not proposed the financing in good faith and that a finding under section 364(e) of the Bankruptcy Code is not appropriate.  The allegations in this regard take a myriad of forms — all of which fall flat.

69.     The basic purpose of section 364(e) of the Bankruptcy Code is "to encourage postpetition financing by ... giving the lender priority.... [and] protect[ing] the authorization for priority on a lien from reversal or modification on appeal, as long as the order has not been stayed pending appeal and the creditor

extended credit in good faith." In re Ellingsen MacLean Oil Co., Inc., 834 F.2d 599, 603 (6th Cir. 1987). While the Bankruptcy Code fails to define the term "good faith," the Sixth Circuit has acknowledged courts look to the definition found in the Uniform Commercial Code: "Good faith means honesty in fact in the conduct or transaction concerned." id. at 604-05; see also In re Pan Am Corp., 1992 WL 154200 at *4 (S.D.N.Y. June 18, 1992) (examining whether factors such as fraud or collusion existed in determining whether a lender acted in "good faith" under section 364(e) of the Bankruptcy Code).

70.     Courts have found a lack of good faith when parties fail to disclose ulterior motives or material facts to the bankruptcy court and those motives or facts may impact a court's reasoning. In re White Crane Trading Co., Inc., 170 B.R. 694, 705 (Bankr. E.D. Cal. 1994). A lack of "good faith" also may exist when it is "evident from the loan agreement itself that the transaction has an intended effect that is improper under the Bankruptcy Code." Matter of EDC Holding Co., 676 F.2d 945, 948 (7th Cir. 1982) (deciding that a lender lacked good faith with respect to a portion of its loan agreement that required the debtor to utilize $77,000 of the loan proceeds to pay the attorney's fees of an unsecured creditor group).

71.     Good faith is present in this case. The negotiations between the City and Barclays proceeded at arm's length. Moreover, the City has fully

complied with P.A. 436, contrary to certain assertions in the Objections. The transaction was made public and submitted to City Council in a timely manner and City Council was afforded the statutory period to consider and review the proposed terms.

72.     Counsel for the City fully engaged City Council during its consideration period with regard to any questions and concerns regarding the proposal. The City's cooperation included attending a closed door question and answer period with the full City Council, as well as participating in conference calls with City Council's staff. Additionally, the City shared relevant documents relating to the transaction with City Council and its staff and provided written answers to more than 20 questions from City Council regarding the transaction and other related issues.

73.     Although the Fee Letter was not provided to City Council, the commitment fee was not an element of the proposal that required City Council approval, and in any event, this has no bearing on the process at this point given that City Council did not ultimately approve the transaction (and thus, any omission of the Fee Letter could not have prejudiced the process).

74.     The ELB is also considering the City's request for approval of the transaction, and ELB approval is a condition to closing the financing.

Consequently, the City submits that prior to any closing of the transaction, the ELB will have approved the financing.

75.     Additionally, certain parties have alleged bad faith, asserting that the City failed to disclose that the commitment fee owing to Barclays had been paid, in part, before the Motion was filed.  As an initial matter, the City disclosed to the Court in the Motion that 50% of the commitment fee was paid prior to the filing of the Motion. See Motion ¶ 39.   Moreover, the City was contractually obligated to Barclays to keep the commitment fee confidential (pending an order of this Court) and to seek permission to file the Fee Letter under seal, which the City promptly did on the same date the Motion was filed.   The existence of the commitment fee, and the early payment thereof, has never been hidden by the City.

76.     Other objecting parties have argued that the City has provided insufficient disclosure regarding the use of proceeds to give an adequate basis for the Court to find that the Postpetition Financing is proposed in good faith.  Aside from the lengthy discussion of the anticipated use of proceeds set forth in the Motion, as previously noted, the Proposal for Creditors dated June 14, 2013 contains a substantial presentation of many of the investment initiatives the City intends to undertake.  Additionally, as noted, on November 11 and 12, 2013, the City and its representatives convened all-day meetings with representatives of many of the objecting parties that disingenuously complain of a lack of

transparency on this topic. These meetings were devoted to an in-depth discussion of the City's planned operational restructuring initiatives, where nearly 130 pages of information was shared by the City on the very topics covered in the Motion, among many others.

77.     Others argue more generally that the Debtor has not been transparent in this case. The City would note that the objecting parties constitute a large, disparate group of highly litigious parties. Coordinating negotiations on any particular initiative of the City on an individual basis typically is not practical. Nevertheless, the City has been communicating with its creditors collectively and in good faith, including participating in the various Court-ordered mediations, some of which are designed to tackle the issue of information sharing. The City has been engaged with most of the objecting parties — in formal mediation, and in meetings and on conference calls — on a wide variety of issues, including the plan of adjustment and the Forbearance Agreement. It will continue to do so.

78.     Additionally, in connection with mediation, reams of information have been shared with the objecting parties, and the City has held numerous less formal calls and meetings with many of the objecting parties on a number of issues. Indeed, the data room arranged by the City, to which new information is being consistently added and to which many if not all of the objecting parties have access, contains literally thousands of pages of information

regarding the City's cash flows and reinvestment and restructuring plans, among many other topics.

79.    To say the City has not been transparent on its restructuring plans or any other matter at this point is just not accurate.  The City and Barclays have operated in good faith in connection with the Postpetition Financing and a finding under 364(e) is appropriate in this case.

C.    *Key Investments in the City Must Begin Now*

1.    **The City is Not Required to Wait Until Plan Confirmation to Begin Critical Investments**

80.    Delay.    That is the message from the objecting parties. Although they claim to recognize the severe challenges facing the City and its citizens — how could they not? — they nevertheless request from this Court further delay.    As this Court has noted, there is simply "no justification for imposing [inept City services] upon [the residents] for another day."  Hearing Tr., November 14, 2013 (2:36 p.m.), p. 39, 12-21.

81.    If Congress had intended for a proposed borrowing to be conducted only as part of a plan of adjustment, it could have very easily made that restriction clear, but that is not the case.    Large transactions are frequently conducted in bankruptcy proceedings in advance of a plan of reorganization or adjustment, including financings, assets sales (including sales of substantially all of

a debtor's assets), litigation and claim settlements, and other restructuring initiatives.

82.     The objecting parties' argument is functionally similar to arguing that assumption or rejection of a contract should await confirmation of a plan. Such arguments have been made in chapter 11 cases based upon the possibility that the debtor may not be able to confirm a plan. Those arguments, however, are commonly rejected by courts because section 365 — much like section 364 — does not first require plan confirmation. See e.g., In re Northwest Airlines Corp., 366 B.R. 270, 272 (Bankr. S.D.N.Y. 2007) (debtor rejected collective bargaining agreement prior to proposing a plan; "although the possibility always exists that a debtor's financial condition may change, neither § 1113 nor § 365 requires a debtor to wait until the end of a Chapter 11 case to move to assume or reject"); In re Braniff Airways, Inc., 25 B.R. 216, 220-221 (Bankr. N.D. Tex. 1982) (rejection of collective bargaining agreement approved prior to consideration of chapter 11 plan).

83.     There is no requirement that a municipality wait until plan confirmation to begin making key investments on behalf of its citizens. Quite the contrary; a municipality must be in a position to provide basic services to its citizens at all times, and having cash on hand is necessary to meet those obligations. Addison Cmty. Hosp., 175 B.R. at 648; Moody, 114 F.2d at 689

("[T]he District must be in a position to proceed as a going District, and for this reason its cash in hand cannot be too greatly depleted."). Waiting further to make these investments will only cause the City's problems to compound and, thus, increase the cost of fixing them later.

84. Additionally, while parties have strenuously argued that the reinvestment initiatives should only be done as part of a plan of adjustment, such a position neglects the fact that a significant portion of the Postpetition Financing will be used to fund termination of the Swap Agreements, which will need to be effectuated at this time and well in advance of confirmation of any plan of adjustment in this case.

85. Based on the foregoing, there is no justification to find that the Postpetition Financing should be deferred to a plan of adjustment.

## 2. The Financing is Not a *Sub Rosa* Plan

86. Additionally, there is no basis for the allegation that the Postpetition Financing constitutes a *sub rosa* plan. The Objections in this regard are really, in essence, objections to the Forbearance Agreement as they rest on the assertion that paying prepetition claims outside of a plan of adjustment is inappropriate. That issue, however, will be decided in connection with the Forbearance Agreement Assumption Motion, and has little bearing on the terms of the Postpetition Financing, which contains no elements of a plan of adjustment.

Indeed, courts, historically, have taken a strict approach to the "*sub rosa*" doctrine, and have applied it only in extreme cases where the proposed transaction dictates the specific terms of a future plan.

87.     For instance, in <u>Braniff</u>, the seminal case on the issue, the court denied approval of a transaction that would have transferred the debtor's cash, aircraft and equipment, and terminal leases to another airline in exchange for certain consideration from the purchaser.  <u>In re Braniff Airways Inc.</u>, 700 F.2d 935 (5th Cir. 1983).  The court found that the agreement (i) had the effect of dictating how, and to which creditors, certain valuable assets of the debtor would be distributed under a plan, (ii) required the debtor's secured creditors to vote in favor of any future reorganization plan and (iii) provided for the release of all parties against the debtor, the debtor's secured creditors and the debtor's officers and directors.  <u>Id.</u> at 940.

88.     Following the <u>Braniff</u> decision, courts have refused to find that a transaction violates the *sub rosa* principle absent extreme facts similar to those present in <u>Braniff</u>.  <u>See In re Flight Transportation Corp. Securities Litigation</u>, 730 F.2d 1128 (8th Cir. 1984) (approving settlement agreement over *sub rosa* objection by finding that there were no plan terms dictated and no rights to vote on a plan compromised); <u>Cajun Electric Power Co-op., Inc.</u>, 119 F.3d 349, 354 (5th Cir.

Indeed, courts, historically, have taken a strict approach to the "*sub rosa*" doctrine, and have applied it only in extreme cases where the proposed transaction dictates the specific terms of a future plan.

87.     For instance, in <u>Braniff</u>, the seminal case on the issue, the court denied approval of a transaction that would have transferred the debtor's cash, aircraft and equipment, and terminal leases to another airline in exchange for certain consideration from the purchaser.  <u>In re Braniff Airways Inc.</u>, 700 F.2d 935 (5th Cir. 1983).  The court found that the agreement (i) had the effect of dictating how, and to which creditors, certain valuable assets of the debtor would be distributed under a plan, (ii) required the debtor's secured creditors to vote in favor of any future reorganization plan and (iii) provided for the release of all parties against the debtor, the debtor's secured creditors and the debtor's officers and directors.  <u>Id.</u> at 940.

88.     Following the <u>Braniff</u> decision, courts have refused to find that a transaction violates the *sub rosa* principle absent extreme facts similar to those present in <u>Braniff</u>.  <u>See In re Flight Transportation Corp. Securities Litigation</u>, 730 F.2d 1128 (8th Cir. 1984) (approving settlement agreement over *sub rosa* objection by finding that there were no plan terms dictated and no rights to vote on a plan compromised); <u>Cajun Electric Power Co-op., Inc.</u>, 119 F.3d 349, 354 (5th Cir.

Indeed, courts, historically, have taken a strict approach to the "*sub rosa*" doctrine, and have applied it only in extreme cases where the proposed transaction dictates the specific terms of a future plan.

87.     For instance, in <u>Braniff</u>, the seminal case on the issue, the court denied approval of a transaction that would have transferred the debtor's cash, aircraft and equipment, and terminal leases to another airline in exchange for certain consideration from the purchaser.  <u>In re Braniff Airways Inc.</u>, 700 F.2d 935 (5th Cir. 1983).  The court found that the agreement (i) had the effect of dictating how, and to which creditors, certain valuable assets of the debtor would be distributed under a plan, (ii) required the debtor's secured creditors to vote in favor of any future reorganization plan and (iii) provided for the release of all parties against the debtor, the debtor's secured creditors and the debtor's officers and directors.  <u>Id.</u> at 940.

88.     Following the <u>Braniff</u> decision, courts have refused to find that a transaction violates the *sub rosa* principle absent extreme facts similar to those present in <u>Braniff</u>.  <u>See In re Flight Transportation Corp. Securities Litigation</u>, 730 F.2d 1128 (8th Cir. 1984) (approving settlement agreement over *sub rosa* objection by finding that there were no plan terms dictated and no rights to vote on a plan compromised); <u>Cajun Electric Power Co-op., Inc.</u>, 119 F.3d 349, 354 (5th Cir.

1997) (giving strict interpretation of *sub rosa* standards and approving settlement agreement because none of the <u>Braniff</u> factors were present).

89.    In this case, it is clear that the key facts necessary to justify a finding that the Proposed Financing constitutes a *sub rosa* plan are not even remotely present:  terms of a plan of adjustment are not being dictated, there is no commitment by any party to vote in favor of any future plan and no assets are being distributed to creditors on account of prepetition claims that will not have been approved by this Court.  Accordingly, the Proposed Financing is not a *sub rosa* plan.

### D.    *The Super-Priority Claim Objections Are Specious*

90.    Ambac, Assured and National (the "<u>Bond Insurers</u>") each allege that Michigan law affords them, in connection with certain bonds they insure, some form of special interest in certain *ad valorem* taxes (the "<u>Taxes</u>") collected by the City.  In particular, these parties argue that the Taxes should be "carved out" of any super-priority administrative expense claim granted to Barclays under the Proposed Financing Order.  As this Court is aware, the Bond Insurers have each filed adversary complaints against the City asserting a special right to the Taxes and seeking, effectively, injunctive relief forcing the City to hold the Taxes in trust for them pending the outcome of this case.

91.     As with many of the pleadings filed before this Court by the Bond Insurers, including their adversary complaints, these parties fail to allege affirmatively one critical element to their assertions — the existence of a valid and enforceable lien in the Taxes.  If the bonds were in fact secured, then their Objections to Barclay's super-priority claim would be moot given that any administrative claim would be *unsecured* and *subordinate* to any security interests of the bondholders.

92.     But even in the absence of a lien, the Bond Insurers' Objections miss the point.  A super-priority administrative claim is not a claim *against* or *in* any particular asset, unlike a lien or a security interest.  A super-priority administrative claim is simply a claim payable from whatever assets are available for distribution to unsecured creditors, except that, the holder of such a claim has priority in recovery over all other unsecured creditors.  Thus, to the extent the Bond Insurers are correct in their presentation of the law with respect to their claims — a proposition the City vigorously disputes — then the Taxes would not be available for distribution to Barclays on account of any super-priority administrative claim.  Thus, the Bond Insurers' Objections in this regard ring hollow and should be overruled.

## <u>CONCLUSION</u>

For each of the forgoing reasons, the City submits that the Objections

should be overruled and the Motion approved in all respects.

Dated: December 10, 2013        Respectfully submitted,

/s/ David G. Heiman
David G. Heiman (OH 0038271)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Brad B. Erens
JONES DAY
77 W. Wacker Dr.
Chicago, IL 60601
Telephone:  (312) 269-3939
Facsimile:  (312) 782-8585
bberens@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
  STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone: (313) 963-6420
Facsimile: (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

## CERTIFICATE OF SERVICE

I, David G. Heiman, hereby certify that the foregoing Omnibus Reply of the Debtor to Objections to Debtor's Motion for Approval of Postpetition Financing was filed and served via the Court's electronic case filing and noticing system on this 10th day of December, 2013.

/s/ David G. Heiman