# EXHIBIT 5

***Deposition Transcript of Kevyn Orr from August 30, 2013***

***(Objectors' designations highlighted in yellow;
City's counter-designations highlighted in blue)***

**In The Matter Of:**

*City of Detroit*

---

*Kevyn Orr*

*August 30, 2013*

---

BIENENSTOCK
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

**Bingham Farms/Southfield • Grand Rapids**

Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

*Original File ORR_KEVYN.txt*

*Min-U-Script® with Word Index*

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In Re:

City OF DETROIT, MICHIGAN — Chapter 9
Case No.13-53846
Debtor. — Hon. Steven Rhodes
/

The Videotaped Deposition of KEVYN ORR,
Taken at 1114 Washington Boulevard,
Detroit, Michigan,
Commencing at 8:32 a.m.,
Friday, August 30, 2013,
Before Cindy Mendenhall, RPR, CSR-5220.

APPEARANCES:

GREGORY M. SHUMAKER
DAN T. MOSS
Jones Day
51 Louisiana Avenue N.W.
Washington, D.C. 20001
202.879.3939
Appearing on behalf of the City of Detroit.

ROBERT S. HERTZBERG
Pepper Hamilton LLP
4000 Town Center, Suite 1800
Southfield, Michigan 48075
248.359.7300
Appearing on behalf of the City of Detroit.

MATTHEW G. SUMMERS
Ballard Spahr, LLP
919 North Market Street, 11th floor
Wilmington, Delaware 19801
302.252.4465
Appearing on behalf of EEPK.

VINCENT J. MARRIOTT III
Ballard Spahr LLP
1735 Market Street
51st Floor
Philadelphia, Pennsylvania 19103
215.665.8500
Appearing on behalf of EEPK.

STEPHEN HACKNEY
LALLY GARTEL
Kirkland & Ellis, LLP
300 North LaSalle
Chicago, Illinois 60654
312.862.2157
Appearing on behalf of Syncora.

JENNIFER GREEN
FRANK GUADAGNINO
Clark Hill, P.L.C.
500 Woodward Avenue, Suite 3500
Detroit, Michigan 48226
313.965.8300
Appearing on behalf of Police and Fire Retirement System and Police and Fire General Retirement System.

FRANK J. GUADAGNINO
Clark Hill Thorp Reed
One Oxford Centre
301 Grant Street, 14th Floor
Pittsburgh, PA 15219
412.394.2329
Appearing on behalf of Police and Fire Retirement System and Police and Fire General Retirement System.

KELLY DIBLASI
Weil, Gotshal & Manges, LLP
767 Fifth Avenue
New York, New York 10153
212.310.8032
Appearing on behalf of Financial Guaranty Insurance Company.

ERNEST J. ESSAD, JR.
Williams, Williams, Rattner & Plunkett, P.C.
380 North Old Woodward, Suite 300
Birmingham, Michigan 48009
248.642.0333
Appearing on behalf of Financial Guaranty Insurance Company.

KAREN NEWBURY
RICK L. FRIMMER
Schiff Hardin, LLP
233 South Wacker Drive, Suite 6600
Chicago, Illinois 60606
312.258.5522
Appearing on behalf of Depfa Bank, PLC, as agent for DFS WertManagement.

CAROLINE TURNER ENGLISH
Arent Fox, LLP
1717 K Street, NW
Washington, D.C. 20036
202.857.6000
Appearing on behalf of Ambac.

BIANCA FORDE
Winston & Strawn, LLP
200 Park Avenue
New York, New York 10166
212.294.4733
Appearing on behalf of Assured Municipal Guaranty Corp.

JASON JURGENS
Cadwalader, Wickersham & Taft, LLP
One World Financial Center
New York, New York 10281
212.504.6102
Appearing on behalf of Merrill Lynch Capital Services.

GUY S. NEAL
Sidley Austin, LLP
1501 K. Street, N.W.
Washington, D.C. 20005
202.736.8041
Appearing on behalf of National Public Finance Guarantee Corp.

STEVEN WILAMOWSKY
Bingham McCutchen, LLP
399 Park Avenue
New York, New York 10022
212.705.7960
Appearing on behalf of UBS.

CLAUDE D. MONTGOMERY
Dentons
620 Fifth Avenue
New York, New York 10020
212.632.8390
Appearing on behalf of Official Committee of Retirees.

JEROME D. GOLDBERG
Jerome D. Goldberg, PLLC
2921 East Jefferson, Suite 205
Detroit, Michigan 48207
313.393.6001
Appearing on behalf of David Sole, Party in Interest.

**ALSO PRESENT:**
Bailey Wellman - Video Technician

TABLE OF CONTENTS

| WITNESS | PAGE |
|---|---|
| KEVYN ORR | |
| **EXAMINATION** BY MR. HACKNEY | 10 |
| **EXAMINATION** BY MS. DiBLASI | 241 |
| **EXAMINATION** BY MR. MARRIOTT | 253 |
| **EXAMINATION** BY MS. ENGLISH | 262 |
| **EXAMINATION** BY MS. GREEN | 297 |
| **EXAMINATION** BY MR. GOLDBERG | 311 |

EXHIBITS

| EXHIBIT | PAGE |
|---|---|
| (Exhibits 1-7, 9 attached to transcript.) | |
| (Exhibits 8 and 10 retained by Mr. Goldberg.) | |
| DEPOSITION EXHIBIT 1 | 53 |

DEPOSITION EXHIBIT 2 130
DEPOSITION EXHIBIT 4 178
DEPOSITION EXHIBIT 3 217
DEPOSITION EXHIBIT 5 247
DEPOSITION EXHIBIT 6 290
DEPOSITION EXHIBIT 7 310
DEPOSITION EXHIBIT 8 317
DEPOSITION EXHIBIT 9 323
DEPOSITION EXHIBIT 10 329

Detroit, Michigan
Friday, August 30, 2013
8:32 a.m.

**VIDEO TECHNICIAN:** We are now on the record. This is the videotaped deposition of Kevyn Orr being taken on Friday, August 30th, 2013. The time is now 8:32 a.m. We are located at 1114 Washington Boulevard, Detroit, Michigan. We are here in the matter of In Re: City of Detroit, Michigan, case number 13-53846 in the United States Bankruptcy Court of the Eastern District of Michigan.

My name is Bailey Wellman, video technician. Will the court reporter swear in the witness.

KEVYN ORR,
was thereupon called as a witness herein, and after having first been duly sworn to testify to the truth, the whole truth and nothing but the truth, was examined and testified as follows:

**EXAMINATION**
**BY MR. HACKNEY:**

Q. Mr. Orr, good morning.
**A. Good morning.**

Q. My name is Steve Hackney. I'm an attorney at Kirkland & Ellis and I represent Syncora Capital Assurance and Syncora Guarantee. It's Nice to meet you.
**A. Nice to meet you.**
Q. Could you state your name for the record?
**A. Sure. Kevyn Dwayne Orr.**
Q. Mr. Orr, you understand the way a deposition works, right?
**A. I think I do.**
Q. In fact, you have taken depositions in your career; isn't that correct?
**A. I have.**
Q. If I ask a question that isn't clear, will you ask me to rephrase it?
**A. Yes.**
Q. And if I ask a question and you answer it, I'm going to assume that you understood it; is that fair?
**A. Yes.**
Q. Mr. Orr, in the course of negotiating and executing the forbearance agreement, did you receive legal advice?
**A. Yes. The forbearance and the optional payment agreement?**
Q. That's right.
**A. And we'll refer to that as forbearance agreement going forward?**

Q. I was going to call it that because it's shorter, if that's okay.
**A. Sure. That's fine.**
Q. But you're right. That's what I mean.
**A. Yes. Yes, I did receive legal advice.**
Q. And did you receive legal advice from the City's law department on the subject?
**A. I don't recall. I don't think so.**
Q. Did you receive legal advice from Jones Day on the subject?
**A. Yes, among others.**
Q. And I take it that you relied on the legal advice you received in making the decision to execute the forbearance agreement?
**A. Legal advice and business advice from our consultants, yes.**
Q. Who were the others that you obtained legal advice from?
**A. May have obtained legal advice from our local counsel.**
Q. Ah, yes.
**A. And in fact I said I don't recall if I obtained any legal advice from the corporation counsel's office. I just don't recall, so I'm not going to speculate.**
Q. Three possible. You know you got legal advice from

Jones Day.
A. Absolutely.
Q. You may have or did from local counsel.
A. Yes.
Q. And you can't recall whether you did from the City's law department.
A. Yes.
Q. Are you waiving the attorney-client privilege in connection with the motion to assume the forbearance agreement?
MR. SHUMAKER: Objection, could call for the revelation of attorney-client communication.
You can answer the question, but yes or no.
A. No.
BY MR. HACKNEY:
Q. If I ask you questions regarding the legal advice rendered to you in connection with the forbearance agreement's negotiation or execution, you will refuse to answer those questions on the grounds of the attorney-client privilege; is that correct?
MR. SHUMAKER: If you're asking what the advice is, certainly. The communications between counsel and what he was -- what he was advised on, certainly.
THE WITNESS: Right.

BY MR. HACKNEY:
Q. Okay. That's correct?
A. Yes. That is correct.
Q. So if I ask you what your view is on the likelihood that the City's Swap and validity arguments will prevail, you will assert the attorney-client privilege; is that correct?
A. Yes, more than likely.
Q. If I ask you your view on the likelihood that the pledge of the gaming revenues under the Michigan Gaming Act is an invalid pledge, you'll assert the attorney-client privilege, correct?
A. Yes, more than likely.
Q. If I ask you questions regarding the likelihood that the City would prevail on a claim or defense against the Swap counterparties, you'll assert the attorney-client privilege, correct?
A. Yes, more than likely.
Q. And I guess I gotta clarify. When you say more than likely, I mean are you asserting the privilege with respect to those types of questions? I'm trying to save having to --
A. Sure.
MR. SHUMAKER: Let me state for the record you can ask questions as to whether those -- those

factors were considered by Mr. Orr, but obviously if you're going to ask what he was -- what he was advised by counsel, then I'm going to instruct him not to answer.
A. When I say more than likely, that's -- that's exactly the distinction that I'm trying to make. Did I have discussions with my counsel? Yes. Did those discussions take into consideration some of those factors? Yes. Am I going to tell you what those discussions were and what, if any, conclusions were made? No.
BY MR. HACKNEY:
Q. Okay. Fair enough.
On July 15, 2013, the City entered into what we're going to call the forbearance agreement with the Swap counterparties and the service corporations; is that correct?
A. Yes.
Q. When did negotiations around that agreement with the Swap counterparties begin after your appointment?
A. I think there were discussions about negotiations almost immediately after my appointment. My specific knowledge -- when you say negotiations, what do you mean?
Q. Well, let me -- let me ask it a different way, which

is isn't it true that Mr. Buckfire was the lead negotiator for the City on the business terms of what became the forbearance agreement?
A. Yes.
Q. And Mr. Buckfire has testified that the negotiations in earnest regarding what became the forbearance agreement were conducted between June 4th and June 11th of 2013?
A. I don't recall those specific dates, but I think that's the right time frame. Let me -- let me try to be as clear as I can so we can move on. We began talking, discussing ways with my advisors, without discussing what we discussed, to provide the City with liquidity almost immediately upon my appointment. The negotiations that you're referring to I believe did occur within that time frame.
Q. Okay. So you don't have a basis as you sit here today to contradict Mr. Buckfire's recollection of when the key negotiations over the business terms of the forbearance agreement were conducted?
A. No. It might be earlier, but that's the approximate time frame.
Q. And as he was the lead negotiator, he's probably the guy who would know, right?
A. Sure, absolutely.

Page 17

Q. Okay. And you did not participate directly in those negotiations; isn't that correct?
A. No. No. I did participate at some point in June with -- I had no face-to-face meetings, but there were several phone calls with a principal on the other side.
Q. Do you remember when those phone calls took place?
A. I do not remember the exact date. I believe those calls took place in the first and second week of June prior to the June 14th creditor's meeting.
Q. Okay. And what was the substance of those calls?
A. The nature of the proposed settlement and the amount of the discount.
Q. And who were you talking to?
A. I don't remember. A Mr. Kuderic (phonetic)? There was one individual, and perhaps others on a conference call that Ken and I -- Ken and I had, Ken Buckfire and I had. One or two conference calls the first week of June and then perhaps another couple of conference calls the second week of June.
Q. And this was prior to an agreement in principle being struck?
A. Yes. Yes. Yes.
Q. Okay. And tell me what was said on these conference calls if you can divide them in your mind.

Page 18

A. Generally speaking, without violating confidential settlement negotiations, we were talking about the amount of the discount for the optional termination payment. At several points discussions broke down and the parties pledged to keep the lines of communication open, but felt that there may not be a settlement.
I actually, several times, came away believing there was not going to be a settlement. I think there was a -- without running on, I think a weekend transpired, and then negotiations began anew the second week. Those negotiations broke down a time or two, and then eventually I believe an agreement in principle was reached at some point that week.
Q. If Mr. Buckfire testified there was an agreement in principle by June 11th of 2013, does that sound correct to you?
A. Yes, the second -- yes. Yes, it does.
Q. Now, you prefaced your answer without divulging confidential settlement communications, and I'll tell you that Rule 408 doesn't actually make your settlement communications privileged, and I mean from discovery it may have implications for admissibility at trial.
A. Yes.
Q. So I want to make sure that you're not leaving

Page 19

anything out from these conversations.
A. No. I'm -- I'm trying to relay to you that there were -- there were some very difficult discussions the first week on a series of conference calls. Negotiations broke down and that first week we walked away believing that the concept of the settlement wasn't going to work. I came away with a very sincere feeling that it wasn't going to work.
Those negotiations started again. It may have even started over the weekend, but they started the second week. They broke down again. There was a conference call where we -- the parties hung up without having reached an agreement. Then I believe later -- the afternoon, and it may have been the 11th -- I said it was the second week -- there were a series of calls going back and forth where the actual terms of the discount and the framework for the settlement was finally hammered out.
Q. Okay. Can you dial in with any more specificity the dates that these calls took place?
A. Like I said, the first of -- it is consistent with my memory that, yes, we started around the June 4th time frame. As I said, there was a weekend. June 10th was my public meeting, so June 11th is entirely reasonable as the date that we finally reached an agreement.

Page 20

Q. Okay. Do you maintain a calendar that would reflect any of these calls or dates?
A. No. Because they were very much off the cuff and ad hoc and they were not -- my calendar is more of a formal process where it has to go through my administrative assistant and it's put in, and then I either accept or deny it, and I don't have any of these calls basically because it was very quick and it was very dynamic and as I said, they actually broke down several times.
Q. Would you agree that, notwithstanding your involvement in these calls with the Swap counterparties, it's still fair to characterize Mr. Buckfire --
A. Yes.
Q. -- as the lead negotiator for the City?
A. Yes.
Q. Using Mr. Buckfire's recollection of June 4th as kind of the kickoff of these negotiations which you don't have a basis to --
A. No.
Q. -- contradict --
A. Not at all.
Q. -- I'd like to kind of level set where you were at going in to June 4th. Okay?
Your assumption prior to June 4th was that

the Swap counterparties could unilaterally --
unilaterally terminate the Swap, correct?
MR. SHUMAKER: Objection, form.
A. Well, my understanding was the City -- there were a series of events which put the City in default. The consent agreement prior to my appointment, the consent agreement, the declaration of a financial emergency, my appointment was an event of default. My understanding was that due to those multiple events of default, the counterparties had the ability to exercise their rights and deprive the City of much needed casino revenue.
BY MR. HACKNEY:
Q. We'll get to the casino revenue in a moment which is something that's trapped under -- potentially trapped under the collateral agreement, right?
A. Right.
Q. I want to talk about the Swap agreement which can lead to a large termination payment --
A. Yes.
Q. -- that the service corporations might owe.
A. Yes.
Q. And you understand the distinction between those two documents --
A. Yes.

Q. -- right?
A. Um-hm.
Q. And your assumptions prior to the June 4th meeting were that as a result of these events of default under the Swap that occurred, some of them, prior to your appointment --
A. Yes.
Q. -- that the Swap counterparties could unilaterally terminate the Swap and demand a sizable payment from the service corporations, correct?
MR. SHUMAKER: Objection, form, foundation.
A. Yeah, my assumption was, my understanding was that, yes, they could terminate and demand a sizable payment, whether from the service corporations or eventually from the City. It would hit our bottom line, yes.
BY MR. HACKNEY:
Q. That's right because it ripples --
A. Yes.
Q. -- through the service corporations to the City by the service agreements, right?
A. Yeah.
MR. SHUMAKER: Objection, form.
A. If that is in fact the process, yes.
BY MR. HACKNEY:

Q. Now, another one of your assumptions prior to June 4 was that the Swap counterparties could also unilaterally trap cash under the collateral agreement, right?
MR. SHUMAKER: Objection, form, calls for a legal conclusion.
A. My understanding was that the Swap counterparties could instruct the custodian to exercise their rights to trap cash.
BY MR. HACKNEY:
Q. And that was one of the rights that they had as you were going into the negotiations with them, correct?
MR. SHUMAKER: Objection, form, calls for a legal conclusion.
A. My understanding -- yes. My understanding was that they had that right.
BY MR. HACKNEY:
Q. That's why you were negotiating with them, right?
A. My -- we were negotiating with them to make sure that the City had access to the revenue that it needed quite badly and that the City would not suffer the imposition of a fairly significant termination payment.
Q. Now, another one of your assumptions prior to June 4 was that no other party could stop the Swap

counterparties from either terminating the Swaps or trapping cash, correct?
MR. SHUMAKER: Objection, form, foundation.
A. Yeah, my assumption was -- or, rather, my understanding was that the Swap counterparties had certain rights and that they had the ability to exercise those rights and remedies. Whether another party could, quote-unquote, stop them could depend on a number of different factors.
BY MR. HACKNEY:
Q. So was that something -- that was not something that you had considered then as of June 4th?
A. Yes.
MR. SHUMAKER: Objection, form.
A. Yeah. We had considered whether or not there were perhaps other risks involved. What I'm saying to you is I had not, as you phrased the question, reached a conclusion as to whether or not someone would have the ability to stop them from exercising those rights.
BY MR. HACKNEY:
Q. Okay. So you considered the question, but you hadn't answered, in your money mind, whether or not there was a party out there that could stop the Swap counterparties from acting.
MR. SHUMAKER: Objection, form.

Page 25

A. We believe that the Swap counterparties could act. I think there's a series of letters subsequently with discussion with your client about their lack of ability to stop the Swap counterparties from acting, but I'm -- what I'm trying to relay to you is we had to assess whether they were risks to that, and my understanding was that they had the right to exercise their remedies.

BY MR. HACKNEY:

Q. Okay. Now, I want to also get a level set on your objectives going into the negotiations, and I understand that when I say you, I mean the City, Mr. Buckfire, there are multiple parts --

A. My -- my team --

Q. That's right.

A. -- consultants.

Q. I may be a little euphemistic, but I'll try to be precise at the right times.

A. That's fine.

Q. Okay.

MR. SHUMAKER: Steve, if I could just object. If you could just define what you mean by level set, I would appreciate that.

MR. HACKNEY: I want to go back in time --

MR. SHUMAKER: Okay.

Page 26

MR. HACKNEY: -- to prior to the June 4 commencement of negotiations.

MR. SHUMAKER: Okay.

MR. HACKNEY: That's what I mean by level set.

MR. SHUMAKER: Okay. Thank you.

BY MR. HACKNEY:

Q. Now, I'd like to ask about your objectives as you go into the negotiation. Okay?

A. Um-hm.

Q. You understand that when you go into a negotiation it's important to have an understanding of both the financial realities that your party is -- is facing as well as the legal realities that your party's facing, correct?

A. Yes.

Q. That informs the negotiation, right?

A. In making an informed decision, I would say you want to have an understanding of those factors.

Q. And you also want to understand what your counterparty in the negotiation needs and wants are as well as their potential legal rights, right?

A. What your counterparty negotiations perceived needs and rights are.

Q. That's right. That's right.

Page 27

Now, I'm going to ask about the City's objectives in entering into the negotiations. Okay? Objective one of the City was to get the counterparties to waive their cash trap at least on an interim basis to allow the City access to casino revenues, correct?

A. I don't know if I would characterize it as objective one. It wasn't as if we were trying to prioritize one objective over the other. It was an objective to make sure that the cash did not get trapped.

Q. Okay. So that was one of the objectives.

A. Yes.

Q. A second objective was that you wanted to modify the Swap to get a discount on the termination amount, correct?

A. Yes. That was certainly an objective, yes.

Q. Okay.

MR. SHUMAKER: Objection there to the extent that it calls for a legal conclusion.

BY MR. HACKNEY:

Q. And the third was that you wanted to obtain an option about when you could direct the termination of the Swap, correct?

MR. SHUMAKER: Objection, calls for a legal conclusion.

Page 28

A. Here again, I understand your characterization. I'm going to say that that -- that is a fair characterization without trying to quantify as one objective is more important than the others, and let me explain my answer.

The City was at risk of significant reduction in cash flow at that period. I think at one point there were various projections that showed as us having as little as four or nine million dollars of cash on hand in mid-June. In fact, sometime around that period I heard that an employee of the City had gone to cash their paycheck and the paycheck had bounced. They came back in later that afternoon and it cashed, but we were -- we were that precarious in terms of our cash.

We knew we were at risk with regard to the Swap agreement both for trapping casino revenue as well as the termination payment. We also knew that we would need to analyze what the right were -- rights were and to have time to resolve that issue. So to the extent your characterization of three objectives encompasses those concepts, then that's a fair characterization.

BY MR. HACKNEY:

Q. And I don't mean to order them, but -- so I won't

focus on it. I just gave you them in an --
A. Sure.
Q. -- order.
A. Right.
Q. But those were three objectives of your negotiations, correct?
A. I think it's fair to say that.
Q. And you achieved those three objectives in the forbearance agreement, correct?
A. We believe so.
Q. Tell me what you and Mr. Buckfire discussed as he's going into the June 4 meeting. So what was his mission?
A. Well, I'm trying to -- generally speaking, because some of these conversations may have occurred on phone calls where my attorneys were present, but generally speaking, the characterization of what you just talked about, getting a discount of the termination payment, making sure that the casino revenue wasn't trapped, getting time to find an alternative source of funding, making sure that the City had sufficient cash to commence some immediate reinvestment and public health, safety and welfare initiatives that we were focused on, all of those concepts were caught up in these discussions.

Q. Okay. So the way we described your objectives is a fair way to describe the marching orders that Mr. Buckfire had going in to the June 4 meeting.
MR. SHUMAKER: Objection to form.
A. Yeah, you know, marching orders -- I think that Mr. Buckfire, myself, our attorneys, the consultants and accountants reached a consensus.
BY MR. HACKNEY:
Q. About what the City should do?
A. About what the City needed to do.
Q. And what -- and that consensus was to try and achieve the three objectives we talked about earlier.
MR. SHUMAKER: Objection to form.
A. Here again, I'll stay by the concept that, you know -- I understand for your purposes you're trying to characterize the three objectives, but the objectives, in my opinion, were quite broader. The efforts to try to achieve the objectives, as you call them, were necessary for some of the things, priorities the City needed to do.
BY MR. HACKNEY:
Q. Did you have any conversations with anyone else in advance of June 4 about the anticipated negotiations?
A. Oh, sure. We -- we -- my -- my team and I have conversations from the time my appointment became

effective on the 25th to date regularly, daily, sure.
Q. On this subject.
A. Oh, sure. On the subject of freeing up cash, on the subject of alternatives, on the subject of relieving us from our obligations under the Swaps, we -- we -- we have conversations regularly.
Q. So going -- using the June 4th date, Mr. Buckfire goes into a negotiation in New York with the Swap counterparties, correct?
A. As to the best of my knowledge -- I'll stick with June 4th, because you have told me that's what Ken said, and so I assume that's the date -- yes.
Q. And whenever the date was, there was a first meeting that he took in person with the Swap counterparties, correct?
A. Yes. To the best of my recollection, I believe it was a meeting.
Q. What offer was he authorized to make in that meeting, if any?
A. I don't recall if there was a specific offer in that meeting. I think our discussions centered around getting the best deal we could. We may have discussed trying to even have the potential termination -- optional termination payment or more, so I don't think we had it as strict as, you know, your marching orders

are to say do this and go in.
It was to go in and have a discussion with the representatives of the counterparty about what we needed to get so that the City could function first with cash flow, not any priority, but also to get a discount over that termination payment.
Q. So did Mr. Buckfire have authorization to make a formal proposal in the first meeting?
A. Yes.
Q. And to your knowledge did he make one?
A. I believe so.
Q. What was the proposal?
A. I don't remember what the exact number was, but I believe the concepts were consistent throughout.
Q. And what were the concepts?
A. Same thing that we just said, to -- to try to get a discount over the termination payment, to try to make sure that the cash wasn't trapped, make sure we had some time to find a way to pay even the discounted amount.
Q. Did Mr. Buckfire report back to you after the June 4th meeting about what had transpired?
A. Yes.
Q. What did he tell you transpired?
A. Had a discussion. I don't have notes, but my general

recollection is had a discussion with the counterparties, discussed a range of alternatives, our first overture was rejected, but we would have further discussions.
Q. And do you remember whether they countered?
A. I don't remember specifically. I believe they may have.
Q. Okay. Do you know the terms of their counter?
A. Generally in the same concept I said. If you're looking for a number, for instance, we said 50 percent and they came back with 98. I don't recall those specifics.
Q. So you can't give me the bid and the ask --
A. Yeah.
Q. -- on what the Swap would be modified as far as the termination?
A. Yes, that's correct.
(Discussion off the record at 8:56 a.m.)
(Back on the record at 8:56 a.m.)
BY MR. HACKNEY:
Q. Did the City enter into a nondisclosure agreement in connection with these negotiations?
A. Yes, I believe so.
Q. With the Swap counterparties?
A. Yes.

MR. HACKNEY: I think we would ask to see if that could be produced. I know that there's not formal written discovery, but the Court has also indicated that all documents relating to the debtors are effectively discoverable in bankruptcy, so I'd ask that you consider that and we can address it later.
MR. SHUMAKER: We'll look into it.
BY MR. HACKNEY:
Q. Now the -- I know that -- I've established already that you -- you don't have an independent recollection of the specific dates any of this occurred. I'm making representations to you as an officer who was here yesterday.
A. Right.
Q. So subject to my representations being accurate, Mr. Buckfire's recollection was that the next meeting in person with the Swap counterparties was June 8th.
A. That's sou -- as I said, there was a first week and there was a second week and that sounds about accurate. I believe June 8th may have been a weekend, so as I said before some of these discussions may have occurred over the weekend.
Q. Okay. So discussions had not broken down at this point, correct?
A. No. They may have. I think they broke down at some

point during the first week, but they -- they resumed. My interpretation was that they broke down, and then they recommenced a second week.
Q. Okay. So on -- if there -- to the extent Mr. Buckfire's right that there was an in-person June 8th meeting --
A. Yeah.
Q. -- do you remember what his -- what your marching orders to him were as he went into that meeting?
A. Here again, the concept of marching orders, we were trying to get to an agreement generally, and I believe the instructions were to continue to move towards that process, whatever that was. And so the specific bid/ask that were going on throughout that time, I don't -- I don't recall, but the general concept was to continue to try to move to a point to get to a discount number or a discount process.
Q. Is it fair to say that if I ask you for the specific ebb and flow of the negotiations between the Swap counterparties in terms of the precise business deal --
A. Right.
Q. -- you would have to defer to Mr. Buckfire's recollection because he was more intimately involved?
A. That's fair. Because Ken was -- Ken would have the

direct meetings and then call me back. We'd go back and forth, and I didn't keep notes and I didn't keep a calendar, so --
Q. I asked you about nondisclosure agreements, but did the City execute any other agreements of any kind with the Swap counterparties during this period that you were negotiating the forbearance agreement?
A. No, not that I know of.
(Discussion off the record at 8:59 a.m.)
(Back on the record at 8:59 a.m.)
MR. HACKNEY: No. Problem. Let's go off the record.
VIDEO TECHNICIAN: The time is 8:59 a.m. We are off the record.
(Recess taken at 8:59 a.m.)
(Back on the record at 9:08 a.m.)
VIDEO TECHNICIAN: We are back on the record at 9:08 a.m.
BY MR. HACKNEY:
Q. Mr. Orr, I want to clear something up. Maybe I've been saying it the wrong way. I've been using the term "marching orders" with the respect to the way that you and Mr. Buckfire operated.
A. Right.
Q. And is a better way to say it that you authorized

Page 37

Mr. Buckfire to negotiate the best possible deal he could with the Swap counterparties and that's what he did?
A. That's a fair characterization, sure.
Q. And at some point did he come out of a meeting and say, Mr. Orr, this is the best deal that I'm able to get out of these Swap counterparties and it's my advice that we take it?
A. Yes.
Q. And was that on or about June 11th, 2013, which is the date he recalls the agreement in principle being reached?
A. Yes.
MR. SHUMAKER: Objection to form.
BY MR. HACKNEY:
Q. And what was the agreement in principle that was reached as you understood it?
A. The agreement was essentially that in exchange for a reduced optional termination payment -- we'll just call it the payment under the forbearance agreement -- the Swap counterparties would agree not to trap the cash, they would agree to release their liens, and also release their claims, I believe, against your client, Syncora, and we would have access to that cash going forward provided we made the discounted payment

Page 38

at some point in the future. I believe at that point it was in the next 60, 90 days.
Q. Isn't the -- wasn't the agreement in principle that you'd have an option to direct the termination of the Swap?
MR. SHUMAKER: Objection, calls for a legal conclusion.
A. Yeah. I believe the way it works is we would have an option to request the counterparties exercise their rights at a discounted level.
BY MR. HACKNEY:
Q. And I'm not asking about the forbearance agreement. I'm asking about the agreement in principle.
A. Yeah, I think those were the general confines of the agreement in principle.
Q. Okay. Now, you did not invite anyone else to the negotiations with the Swap counterparties; isn't that correct?
A. I did not invite anyone else. I don't know if Ken invited anyone else or anyone else on my behalf invited anyone else.
Q. And you did not direct anyone such as Mr. Buckfire or others to invite any other parties into the negotiation, correct?
A. Correct.

Page 39

Q. And you did not invite Syncora to participate in these negotiations, correct?
A. Correct.
Q. And you did not inform Syncora of the existence of these negotiations, correct?
A. The reason I'm hesitating is at some point clearly Syncora became aware, so I don't know how they were informed, but I did not do it, correct.
Q. You didn't do it.
A. Correct.
Q. And you did not invite FGIC to attend these negotiations, correct?
A. I believe that's correct.
Q. And you didn't direct anyone acting on your behalf to invite FGIC, correct?
A. Correct.
Q. Nor did you inform FGIC of the existence of these negotiations, correct?
A. Me personally, no.
Q. You didn't invite U.S. Bank as trustee to the funding trust or as custodian or contract administrator to attend any negotiations, correct?
A. Me personally, no.
Q. And you didn't direct anyone else acting on your behalf to do so, correct?

Page 40

A. Correct.
Q. Now, why didn't you invite Syncora into these negotiations with the Swap counterparties?
A. After consultations with my, you know, team, we didn't think Syncora had any right to be involved in the negotiations.
Q. And that's because Syncora had no rights under the relevant documents?
A. That was my understanding, yes.
Q. Now, at any time during these negotiations -- and by these negotiations, I mean through the June 11th agreement in principle.
A. Um-hm.
Q. Okay? I understand that there are legal negotiations of the scrivening of the document --
A. Sure.
Q. -- between June 11 and July 15. I going to ask you about them, but when I say these negotiations, I'm talking about the ones that we're talking about right now --
A. Um-hm.
Q. -- that led to the agreement in principle.
A. Okay.
Q. At any time prior to June 11th, did the Swap counterparties send a notice of a default under the

Page 41

Swap?
A. I don't recall, but I don't think so.
Q. At any time prior to June 11th, did the Swap counterparties designate an early termination date?
A. I don't recall, but I don't think so.
Q. Did they ever threaten to?
A. They didn't threaten me.
Q. They never threatened you personally.
A. Right.
Q. Did they threaten other people who reported the threats to you?
A. Not that I know of.
Q. At any time during these negotiations, did the Swap counterparties designate an optional early termination?
A. Not that I know of.
Q. Did they ever threaten to do that?
A. Not me.
Q. And did they ever threaten anyone else who reported the threat to you?
A. Not to my knowledge, no.
Q. At any time during these negotiations, did the Swap counterparties contend that the City was in breach of the collateral agreement?
A. Which collateral agreement are you talking about?

Page 42

Q. The collateral agreement with respect to the casino revenues.
A. The 2009 agreement?
Q. Yes.
A. Okay. Not that I recall.
Q. In fact, the City was endeavoring to make the monthly Swap payments into the holdback account throughout this period, correct?
A. Yes. They were being paid in the ordinary course.
Q. And to the best of your knowledge, the City has complied with all of its obligations under the collateral agreement vis-à-vis the Swap counterparties.
A. No.
Q. That's not correct?
A. No, I mean I think we were -- as I said previously today, we were in default.
Q. Of the collateral agreement?
A. Right. You mean in terms of making the payments due under the agreement?
Q. Well, the collateral agreement I know so -- the collateral agreement and the Swap are -- they are two different agreements --
A. Yes.
Q. -- that certainly relate to one another.

Page 43

A. Right.
Q. I'll say that.
A. Okay.
Q. I've talked about events of default under the Swap that could lead to the big termination payment.
A. Right.
Q. We talked about that earlier, right?
A. Right.
Q. I'm talking specifically now about whether there were events of default under the collateral agreement. Had you breached any of the provisions of the collateral agreement?
MR. SHUMAKER: Objection, calls for a legal conclusion.
A. Yeah. That's why I'm being a little -- a little careful here. There may be conduct under the Swaps that could be conceivably a breach under collateral agreement. I don't know what they are, so I'm being hesitant. But to get to your question, were we making the payments due under the Swaps? Yes.
BY MR. HACKNEY:
Q. What was -- what was the conduct under the Swap that might be --
A. I'm not sure.
Q. As you sit here today, are you aware of any breaches

Page 44

of the collateral agreement by the City?
MR. SHUMAKER: Objection, calls for a legal conclusion.
A. None from my perspective, but there might be. What I don't want to do is sit here today and try to draw a conclusion as to what might be a breach of the collateral agreement vis-a-vis the Swap agreement. I'm trying to answer your question that we were making the payments that were due.
BY MR. HACKNEY:
Q. Yeah, I appreciate that. I mean, I guess your answer is there may be breaches of the collateral agreement, there may not be, you don't know.
A. I don't know, that's right.
Q. Now, this June 11th agreement in principle that we were talking about earlier --
A. Right.
Q. -- was there a term sheet?
A. No. To the best of my recollection, I did not see a term sheet at that time.
Q. And just to be clear, do you know whether there was a term sheet that you just didn't see?
A. Yeah. There might have been a term sheet that I didn't see. I think Ken and I and some of the other attorneys at Jones Day, Corinne, David Heiman and

Page 45

others would have a -- I'm trying to relay to you a sense that we'd have calls, but sometimes I don't recall seeing a specific term sheet at that time.
Q. I'm going to distinguish this from when you get into the definitive document negotiation that's going to become the forbearance agreement.
A. Right.
Q. You're familiar with the idea that sometimes parties hash out a non-binding term sheet --
A. Yes.
Q. -- to get an understanding on the business terms, and then they progress from the term sheet to the definitive document. You're familiar with that concept.
A. Yes.
Q. So I want to put the definitive documents over here.
A. Okay.
Q. Do you remember whether there was a term sheet?
A. There eventually was a term sheet. I just don't remember whether or not it was on June 11th.
Q. That's fine. So do you think it went agreement in principle, non-binding term sheet, and then negotiation of definitive documents?
A. Yes.
MR. SHUMAKER: You're talking about in

Page 46

time?
MR. HACKNEY: Yes.
MR. SHUMAKER: Chronologically?
MR. HACKNEY: Yes.
BY MR. HACKNEY:
Q. And so at some point you did see a non-binding term sheet that embodied the agreement in principle Mr. Buckfire had negotiated, correct?
A. Yes. Oh, yes.
Q. Okay.
MR. HACKNEY: Is that something that the City's willing to produce?
MR. SHUMAKER: We'll look into it. I don't -- I don't see that one as being an issue.
MR. HACKNEY: Okay.
MR. SHUMAKER: To the extent we have it.
BY MR. HACKNEY:
Q. And the term sheet was consistent with the agreement in principle that we discussed earlier that Mr. Buckfire negotiated?
A. Yes. It had obviously, as terms do, have more information, but it was consistent.
Q. So between July 11 -- I'm sorry.
Between June 11th --
A. Okay.

Page 47

Q. -- and July 15th, which is the execution date of the forbearance agreement --
A. Yes.
Q. -- you pivot from negotiating this agreement in principle that Mr. Buckfire has struck to now documenting it, correct?
A. Yes.
Q. Now, Mr. Buckfire has testified that those -- that those negotiations proceeded without interruption from June 11th to Ju -- July 15th. Is that consistent with your recollection?
A. The negotiations continued. I think there were other events related to the agreement, some of them by your client in that time frame, but yes, we continued negotiating.
Q. Okay. And there were no serious interruptions in those negotiations, correct?
MR. SHUMAKER: Objection to form.
A. There was an agreement reached. I'm going to take your time frame, June 11th. Ken and I had a discussion about the amount. It was somewhere south of 25 percent. I believe in the same second week I said we can't do this deal for less than a 25 percent discount. I believe the negotiations broke down, then the next day they came back without changing the

Page 48

framework of the agreement, just the number changed, the discount went up, and then I believe that -- yes, I believe negotiations continued continually throughout that time.
BY MR. HACKNEY:
Q. And they -- they continued from June 11 to July 15 without serious interruption, correct?
MR. SHUMAKER: Objection to form.
A. Yeah, here again, your characterization of serious interruption and to July 15th, I don't want to testify to your characterization. What I can say is it was my understanding that negotiations continued from that second week of June to that date, if that's the date that you're relaying to me based upon Mr. Buckfire's testimony.
BY MR. HACKNEY:
Q. Were there any serious interruptions in the negotiations between June 11 and July 15?
MR. SHUMAKER: Same objection.
A. You keep saying serious, and to the best of my knowledge there were no material or significant interruptions. I don't want to try to characterize what serious means. I think negotiations continued unabated.
BY MR. HACKNEY:

Q. There were little -- there may have been points of contention between the parties, but they continued steadily from June 11 to July 15, true statement?
A. Here again, I believe June 14th was the creditor's meeting, and I don't have a document to refresh my recollection in front of me, but I believe your client sent a letter at some point during that time which I think had an impact on negotiations, so I'm being careful with the concept that they continued without serious interruption because I think there may have been interruptions.
Q. So there may have been a serious interruption in the negotiations.
A. Yeah. I just don't remember the time frame. I mean you probably recall there were a series of letters between Mr. LeBlanc and your client at first to the custodian and then to me and then I wrote back to him. I'm just not recalling the specific dates of those letters, but I believe they were during this time.
Q. And those caused a serious interruption in the negotiations, right?
A. Here again, you say -- you say serious, and I'm saying it caused an interruption. There was -- there were -- I recall there were letters that I was sending back and forth, and so whether or not it was serious, I

believe they're interruptions, if this is the time frame I'm thinking of. If they came after the June 14th date and it was July 17th, for instance, that's when that -- those events occurred.
Q. Okay.
A. I just don't recall the times.
Q. I'll represent to you, and I'm going to show it to you in a moment, but Syncora's letter was June 17th.
A. Okay. Then that -- yeah, then that -- that caused some disruption.
Q. It caused some disruption, but did it cause a serious interruption in the negotiations?
A. Yeah, because the benefit that we -- we were supposed to get which was -- actually as I recall, your client sent a letter to UBS. UBS expressed some concern. The negotiations that we were going through were impacted by those concerns and, here again, recalling off the top of my head, there were discussions then. Mr. LeBlanc sent me a letter, I sent him one, I think he sent me another one, I think we exchanged two or three letters, and those all had an impact on the negotiations, yes.
Q. Did they stall the negotiations?
A. To some degree I believe they did.
Q. And did you inform Mr. Buckfire that these important

negotiations had been stalled by Syncora?
A. Well, I think there were discussions about Syncora's behavior that was reflected in my letters.
Q. That wasn't my question. My question was did you tell Mr. Buckfire that there had been -- that the negotiations had been stalled as a result -- as a resort of Syncora's conduct?
A. Sir, that's your phrase, "stalled." What I said was I think they did have an impact on the negotiations because there were communications going back and forth, I think we discussed them, and I think I sent a series of letters back and forth to your client as a consequence of that behavior.
Q. You wouldn't use the -- you wouldn't use the word stalled to describe the negotiations impact -- Syncora's impact on the negotiations, correct?
A. Yeah, I'm not going to use any adjectives -- specifically what I said is they had an impact.
Q. But you can't say that they stalled?
A. I don't know if they did or they didn't. I said they had an impact.
Q. Okay. And did you inform Mr. Buckfire that there had been a serious interruption in the negotiations with the Swap counterparties?
MR. SHUMAKER: Objection, asked and

answered.
A. Yeah, here again, I don't think I had to inform him. We were all of the opinion that after announcing, I believe -- after reaching, rather, we thought was agreement in principle, I believe that following Monday, if it's the 17th, your client sent a letter and interjected itself into this process and --
BY MR. HACKNEY:
Q. So Mr. --
A. -- that had an impact.
Q. Sorry to interrupt you.
A. You're okay.
Q. Mr. Buckfire was well aware of the serious interruption in the negotiation process, correct?
MR. SHUMAKER: Objection, foundation, form.
A. Here again, you keep saying serious interruption. I said it had an impact. Whether or not that stopped us from having discussions with the Swap counterparties and going forward, it certainly had an impact on the process.
BY MR. HACKNEY:
Q. It didn't stop the process, though, did it?
A. It had an impact on it. We were -- we were trying to continue going forward in figuring out what your client's intent was and whether or not it should have

an impact on the Swap counterparties or the custodian.
Q. But did you inform Mr. Buckfire that Syncora's letter -- Mr. Buckfire, the lead negotiator of the business terms of the deal, that Syncora's letter had disrupted the negotiations of this important agreement?
A. I don't know if I --
MR. SHUMAKER: Objection, form.
A. I don't know if I had to inform Mr. Buckfire. He saw the letters that were going back and forth and I'm sure he was aware that they had an impact on what we were trying to achieve.
MR. HACKNEY: Let me hand you a document I've marked for purposes of identification as Orr Exhibit 1.
MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBIT 1
9:24 a.m.
BY MR. HACKNEY:
Q. Is this a copy of Syncora's June 17th, 2013 letter?
A. Um-hm.
Okay. I've read the letter.
Q. Have you had a chance to read it?
A. Yes.
Q. First question, are there any statements you consider

to be false in this letter?
A. I think there was a discussion that some of the statements regarding the cross-default provision -- this is -- this is what I understood of this letter after -- without going into specific discussions with my attorneys, that I had with my attorneys, that my understanding was Syncora was attempting to tell U.S. Bank, as custodian, that the default on the COP payment on June 14 constituted some form of a cross-default and therefore it impacted the settlement we were teaching -- attempting to reach under the Swap agreement.
We did not believe that those two events had a relationship in that position it appeared Syncora was taking, trying to tell U.S. Bank not to release any of the casino revenue to us, was appropriate.
Q. Other than the letter characterizing the missed payment as a cross-default, other than the sentence, are there any other sentences in this letter that you think are false?
A. Well, the first paragraph is an introductory paragraph, so I don't think that's relevant. The second paragraph -- the last paragraph is someone reserving their rights, and that's fine. Generally

the tenor, without parsing through the entire letter, we believed that the tenor of the letter was inappropriate.
Q. But there were -- are there any other statements that were false in this letter other than the sentence you identified on the cross-default?
MR. SHUMAKER: I want you to go through it sentence by sentence.
A. We write in reference to the General Receipts Subaccount under the cap --
COURT REPORTER: I'm sorry.
A. Okay. The first sentence of the first paragraph is a reference in it, so I don't believe that would fall into whether or not it's true or false. It's what they purport to be writing to. I suppose someone could take an interpretation that to the extent they're trying to reference the cross collateralization is false, but I'm not trying to be insincere, so I'm just going to go through the letter.
The second sentence of the first paragraph is a general business nomenclature, so that's a throw away. June 14th service corporations failed to -- the first sentence of the second paragraph I believe we did fail to make the June 14th payment.
BY MR. HACKNEY:

Q. The second sentence we've discussed.
A. Which is the substantive sentence I believe is -- is the one that we had issues with, we felt was inappropriate.
The third paragraph, first sentence, I don't know whether that was false or not because I wasn't privileged to -- privy to that conversation. The second sentence is a request of the third paragraph. That consent is required for any release, I think that was another -- the last sentence of the third paragraph I think we had a problem with that, and as I said before, the final paragraph sentence I don't think is germane to discussion that we're having. It's a standard business sentence.
Q. And the last sentence of the third paragraph you had a problem with because you don't think Syncora has consent rights, correct?
A. Yes, that's correct, yeah.
Q. Now, how did this letter disrupt negotiations with the Swap counterparties?
A. Well, my -- my understanding is it raised concerns as far as what Syncora thought their rights were and what they were going to do. I think people have to understand this was a very sensitive and urgent situation. As I said before, the week before we had

Page 57

checks bounce, we were running about four or nine million dollars, we needed urgent access to the -- to the revenue, and I think it caused all parties to take a step back.
Q. And how long did they step back?
A. I don't -- to be perfectly honest with you, I don't -- I don't really recall. I remember, as I said before, after this letter there were a series of letters that went back and forth, and I recall that there was some concern by the counterparties as to their potential exposure based upon Syncora's behavior and whether or not they would be free to give us access to the casino revenue.
Q. They were concerned that Syncora might be right, correct?
A. No. That's your characterization. I think my general understanding was that everyone felt Syncora was quite wrong.
Q. Didn't you just say that they were worried about their exposure?
A. Well, their exposure in terms of -- not that they were right, their exposure in terms of potential litigation and having to parse through a position which they thought was unfounded.
Q. So they were worried about having to engage in a

Page 58

litigation with Syncora over a frivolous legal position that Syncora was taking?
MR. SHUMAKER: Objection to form.
BY MR. HACKNEY:
Q. That's your understanding?
A. Well, no. You're characterizing it as frivolous. I think any prudent business people when they receive letters like this, if they don't believe they are well founded are certainly justified in being concerned about potential litigation.
Q. Were there any out-of-the-ordinary emergencies in the City of Detroit on July 5th that demanded your attention?
A. There are always out-of-the-ordinary emergencies in the City of Detroit.
Q. What were the ones on July 5th?
A. I don't -- I don't remember the ones on July 5th, but I'm sure you can check. We can -- you know, you can check the press reports as far as -- so there are shootings daily, there are fires, there are unfunded mandates within the City.
Q. Anything that stands out in your mind?
A. There are always -- there are always emergencies. Nothing that stands out in my mind, but on any given weekend, we get 30 shootings a weekend.

Page 59

Q. Was there anything that you can recall today that happened on July 5th that was so urgent it couldn't wait six hours?
A. Every -- every day -- let me be clear about this, so we can just get by it. Every day that the City does not make reinvestment in the City that has tens of thousands of abandoned structures, that has four of the most dangerous neighborhoods in the country, that has police cars with over 250,000 miles on them, that has police officers I believe during this time, one of whom got shot in the head by a perpetrator that nine cars had surrounded and remains in the hospital today, every day that this City does not make reinvestment is a dangerous day.
Q. Were there any negotiations scheduled for July 5th, 2013, the day after July 4?
A. I don't -- I don't recall. If there's something you can refresh my recollection. I believe there was -- there was something on July 5th. I'm just not recalling what it was.
Q. Did this letter cause the negotiations to cease between June 17th and when you're able to obtain the TRO on July 5th?
A. I wouldn't say whether it caused them to cease. As I said before, it had an impact and it was disruptive.

Page 60

Q. Okay. So it had an impact, but it didn't cause them to stop, correct?
A. To some degree the parties -- you know, to some degree my recollection is -- here again, understanding that I'm the client and I'm relying on my team, my understanding was it had an impact and it was disruptive.
Q. Did negotiations stop between June 17th and July 5th?
A. I don't know if they completely stopped because your characterization of negotiations could include discussions about what to do with Syncora's interruption.
Q. So the answer to my question is no, they did not stop?
A. No. The answer to your question is just what I said. The characterization of the interruption could include this letter.
Q. Okay. But it's a simple question, and you were the person that was involved for the City in making the ultimate decision. Did the negotiations of the forbearance agreement's final terms stop between June 17th and July 5th when you're able to get a TRO?
MR. SHUMAKER: Objection, asked and answered.
A. Sir, I'm going to stick with my answer. It was disruptive and it was -- had an impact.

Page 61

BY MR. HACKNEY:
Q. Can you answer the question as to whether they stopped?
A. Your characterization --
MR. SHUMAKER: Objection, asked and answered.
A. On any given day they may have. I'm going to stick with my answer.
BY MR. HACKNEY:
Q. Were there any negotiations with the Swap counterparties between June 17th and July 5th?
A. There probably were.
Q. After Syncora -- let me -- let me stop.
So after you obtained the TRO, did that facilitate the resumption of the negotiations?
A. When did we obtain the TRO?
Q. July 5th.
A. That was the event I was talking about. I think it certainly facilitated the parties continuing to discuss, yes.
Q. It didn't resolve any of Syncora's rights, correct?
A. Well, we didn't -- we didn't --
MR. SHUMAKER: Objection to the extent it calls for a legal conclusion.
A. We didn't think Syncora had rights in this regard, but

Page 62

my understanding of the TRO was to cause Syncora to cease and desist from its behavior.
BY MR. HACKNEY:
Q. But you understand that whatever Syncora's rights were before the TRO, they were after the TRO. The TRO doesn't resolve Syncora's rights. It's just an interim measure. You understand that as a lawyer, right?
A. Well --
MR. SHUMAKER: Same objection, form.
A. And let's get by this, sir. Yes, I am an attorney, but I do not have a license in the state of Michigan and I'm not practicing law now nor do I have malpractice insurance, so I think it's fair for me to act as a -- act as a client, a business person, and not draw a legal conclusion as far as what your client's rights are.
BY MR. HACKNEY:
Q. And the TRO was very important because it stopped Syncora from doing what it was doing, correct?
A. Yes. My understanding is it did, sure.
Q. And that was critical, right?
A. I thought it was appropriate, yes.
Q. And then you were willing to dissolve the TRO one week later, correct?

Page 63

A. I don't recall if it was one week later or not. I believe it was dissolved a week or so ago. I don't recall whether or not we were willing to resolve it one week later -- dissolve it one week later.
Q. If I told you that your counsel represented to me on July 12th, one week after the TRO was entered, that you were willing to dissolve the TRO, do you have a basis to contradict that?
MR. SHUMAKER: Objection, form, foundation.
A. Yeah, if my counsel was telling you that in the context of potential settlement negotiations, I'm -- I'm a little hesitant to characterize what he said, but I have no basis -- if my counsel represented that to you, I have no basis to object to that.
BY MR. HACKNEY:
Q. And if they represented it in pleadings to the Court, you don't have a basis to dispute that either?
A. No.
Q. Okay. So this critical TRO that you had obtained, your counsel was willing to dissolve ten days after it was entered, correct?
MR. SHUMAKER: Objection. Counsel, this is discovery about the assumption motion, correct? I mean this is not discovery for the City's lawsuit against Syncora.

Page 64

MR. HACKNEY: Syncora -- Syncora's alleged conduct is included in Mr. Orr's affidavit. It's described in the assumption motion. I mean, come on, this is right up Main Street.
A. Well, sir, I understand you're trying to get me to characterize what we were doing for purposes in the litigation. If you want to stick to the facts as far as what happened, I'm happy to talk to you about those, but you asked me a question before as to whether or not I would have any reason to object on what my counsel represented to you and I said no.
BY MR. HACKNEY:
Q. If Syncora's letter represented such a threat to the City, why were you willing to dissolve the TRO that stopped the impact of Syncora's letter?
MR. SHUMAKER: Objection, form, foundation.
A. Here again, there. There -- part of your question is calling for a little bit of speculation. Clearly, you were having discussions with my counsel potentially about what could be done to resolve this issue. Your question may not include the context of all of those discussions.
BY MR. HACKNEY:
Q. I'm referring to statements you made in pleadings.
A. Well, I'm trying to respond to your question. There

may be other reasons why they made those representations. What I will say to you is what I said before. If my counsel represented to you that we were willing to dissolve it, I have no reason to contradict that.

Q. And they would have done that at your behest, right?

MR. SHUMAKER: Objection, form, foundation.

A. They -- we would have the -- they would have had the authority to do that, yeah.

BY MR. HACKNEY:

Q. During the course of your negotiations back to the agreement in principle of what became the forbearance agreement, did you ever solicit the views of any of the other monoline insurers, such as Ambac or Assured or National about what they thought the City should do?

A. Not that I recall.

Q. Did you ever solicit the views of any COP holders about what they thought the City should do with respect to the --

A. I didn't solicit their views, no.

Q. Did you direct anyone acting on your behalf to solicit the views of any of those parties?

A. Not that I recall.

Q. Isn't it true that getting the forbearance agreement

was a life or death issue for the City of Detroit?

A. Yes, getting the forbearance agreement was very important to the City of Detroit.

Q. Is it a life or death issue?

MR. SHUMAKER: Object to form.

A. When you say life or death, you know, here again I'm trying to be responsive, but I want (sic) to characterize it. The City needs the casino revenue badly. It was cash poor at that time. It would have facilitated without access, and it continues to be relatively cash poor without access. It could have facilitated a cash crisis. Life or death suggests to me it was critical and it might have been life or death, but what it does mean is that we could not have made the investment and cannot make the investment that is so crucial for the City.

BY MR. HACKNEY:

Q. In fact, isn't it your position that without access to the casino revenues that people in the City of Detroit may die?

A. Yes.

Q. Okay.

A. People -- you know, you may think of that as hyperbole, but this is a City where between car jackings, crime -- just last week, there was a woman

who had a gun pointed at her three times in her front yard by people who were stripping a car in front of her -- that's a very serious threat in the City, and I don't want anyone to undermine the concept that this revenue is necessary to make this City a safer place.

Q. So it's fair to say that when it comes to the City's access to casino revenues, lives of the people of the City of Detroit are at stake?

A. Lives of the people of the City of Detroit are at stake every day.

Q. I know that's true. I'm aware of the fact people that live and die, but I'm asking with respect to access to the casino revenues. Access to the casino revenues is something that lives are at stake regarding, correct?

A. Health, safety and welfare of the citizens are crucial and this casino revenue allows us to enhance that.

Q. And lives are at stake, right?

A. Health, safety and welfare of the City is crucial and this casino revenue allows us to enhance that.

Q. Can you agree with me that lives are at stake?

MR. SHUMAKER: Objection, asked and answered.

A. I've answered the question.

BY MR. HACKNEY:

Q. That's not something you can agree with?

A. I told you, lives are at stake in the City every day.

Q. Are they at stake with respect to access to the --

A. Every day --

Q. -- casino revenues?

A. I will say again, every day that we don't have access to casino revenue, we cannot make the necessary reinvestment in this City to provide for the health, safety and welfare of the citizens, and that's a true statement.

Q. If I said that lives are at stake with respect to the casino revenues, can you agree with that statement?

MR. SHUMAKER: Objection, asked and answered.

A. I've answered your question.

BY MR. HACKNEY:

Q. Can you -- can you agree with my statement?

A. I've answered your question.

Q. I disagree that you've answered my question. We'll take the objection up at the -- with the Court, but are lives at stake with respect to access to the casino revenues?

A. I've answered your question.

(Whereupon Rick Frimmer left the deposition at 9:41 a.m.)

MR. HACKNEY: Well, we're going to have to

Page 69

take a motion to compel then on this one, Greg. I've not gotten an answer to that question.

MR. SHUMAKER: I disagree.

BY MR. HACKNEY:

Q. We can agree that access to the casino revenues was an issue of extreme importance to the City, right?

A. Yes.

Q. There was no guarantee going into the negotiations with the Swap counterparties that they were going to grant you that access, correct?

A. That is true.

Q. Given the importance of this issue, what was your backup plan?

A. We had discussed a number of alternatives, but quite frankly, there were none that made any sense.

Q. So what -- so you had no backup plan?

A. No. Sir, this City had reduced FTEs by over 20 percent before I got here. The police department had lost hundreds, I believe, before I got here under the point -- this year, from January 1, we've lost in excess of 300 employees.

Even if you did an analysis of the City of $40,000, the salary per FTE, and the City benefits account for 108 percent of FTE, so let's say 80,000 times 300 lost employees. That's only 24 million

Page 70

dollars. So even if we reduced the City -- tried to reduce it by more employees beyond the roughly 9,700 that we have, you wouldn't have a way to stem the loss of almost 132 to 180 million dollars in casino revenue. So when you say what other alternatives we had, this was a crucial component of any plan that we would have.

Q. Do you have any --

A. This is the third largest source of income for the City.

Q. And I -- I have a limited time with you today, Mr. Orr, and I'd appreciate it if you answered my questions directly to the extent you're able.

Did you have a backup plan if you couldn't get the Swap counterparties to waive their cash trapping rights?

A. We discussed alternatives. When you say plan, that suggests to me that we were going to say we were going to do this if we can't do that. We had discussed alternatives.

Q. But you can't say that you had a plan?

A. No. This was crucial.

Q. And if Mr. Buckfire testified that you'd just started developing your backup plan recently, do you have a basis to contradict that?

Page 71

A. No. That's what I was just saying. We had discussed alternatives, but this was crucial.

Q. Given the importance of this issue, I assume that you had made requests from the State of Michigan to provide the City with liquidity prior to June 4th; isn't that correct?

A. Sir, you can assume whatever you want. The reality is under my contract I have an obligation to report and coordinate with the State. We had had discussions, I believe, with the State about potential liquidity, and we were told that that would be unavailable.

Q. And you conveyed to the State the seriousness of the City's situation, correct?

A. I don't think I had to convey to the State the seriousness of the City's situation. I think the State's well aware.

Q. So the State understood that getting liquidity was a life or death issue for the City of Detroit, correct?

MR. SHUMAKER: Objection, form, foundation, calls for speculation.

A. Whatever the State understood, what I'm trying to tell you is I conveyed to them what our needs are.

BY MR. HACKNEY:

Q. You conveyed the extreme seriousness of the situation to the State, correct?

Page 72

A. As I said, I don't think I had to convey it to the State. The State had just been through almost two years of determining a financial emergency existed.

Q. And the State did not provide the City with any liquidity prior to June 4th, correct?

A. No.

Q. I am correct that they didn't?

(Whereupon Jerome Goldberg entered the deposition at 9:44 a.m.)

A. You are correct, they did not.

BY MR. HACKNEY:

Q. Now, given that seriousness of the liquidity crisis and the life or death issues that were facing the City, I assume you also evaluated the value of the City's non-core assets for possible sale, correct?

MR. SHUMAKER: Object to the form, mischaracterizes his testimony.

A. Is that a compound question?

I think in our June 14 proposal and the run up to the June 14 proposal, we had listed in our proposal for creditors a number of assets of the City, and we had also said that we were in the process of evaluating what to do.

BY MR. HACKNEY:

Q. And the City owns a fine art collection; isn't that

correct?
A. The City owns the Detroit Institute of Arts in its collection.
Q. And did you attempt to value the art collection with an eye towards selling pieces of the art collection to relieve the City's life or death liquidity crisis?
MR. SHUMAKER: Object to the form.
A. Prior to June 14th?
BY MR. HACKNEY:
Q. Prior to June 11th, which is the date of the agreement in principle.
A. No. We've entered into an agreement with Sotheby's to begin that process now, not related to relieving the liquidity crisis, just as a matter of prudence to determine the value of assets.
Q. Your expectation is that the -- that the City's art collection is very valuable; isn't that correct?
A. I've been told that, yes.
Q. Isn't it possible it may be worth billions of dollars?
A. That would be speculation. I've been told it is valuable.
Q. Could it be worth hundreds of millions of dollars?
A. That would be speculation. I've been told that it's valuable.
Q. Okay. So as of June 4th, you didn't know whether or

not the City might have billions of dollars of art sitting in its art institute; is that your testimony?
A. No. My testimony is that I understand it as valuable. The exact value of it is to be determined.
Q. And you made no effort to sell any of that art prior to engaging in the negotiations with the Swap counterparties, correct?
A. No. That's true.
Q. What about federal aid? Did you attempt -- did you attempt to obtain federal aid prior to the June 4 commencement of negotiations with the Swap counterparties?
A. I don't know if it was prior to or around that time. It may have been. We may have sought federal aid prior to that.
Q. And you conveyed the seriousness of the situation to whomever you spoke to at the federal government?
A. Yes, I believe the federal government was aware of the seriousness of the situation.
Q. And the federal government was also unwilling to provide aid to the City of Detroit; is that your testimony?
A. Yes, direct aid.
Q. Let me ask you some questions about the service corporations. The service corporations are two

entities that have long names that I'll only say to you if you want -- really want me to.
A. We'll stipulate I know what you mean by the service corporations.
Q. And there are two of them?
A. There are two.
Q. Okay.
A. Police and Fire General Services.
Q. There you go. So you already know them and you said the names. So the two service corporations are parties to the forbearance agreement, correct?
A. Yes.
Q. And Mr. Buckfire testified yesterday, I'll represent to you, that his understanding is that you directed the service corporations to execute the forbearance agreement and they did so; is that correct?
A. No.
Q. Okay. Were there arms' length negotiations with the service corporations?
A. To the best of my knowledge, there was.
Q. And who led those?
A. I'm not quite sure. I know that -- in response to your question, I did not direct a service corporation. They were organized by the City. And they are managed by City employees, but I had no direct -- I gave no

direct instruction to either of the service corporations.
Q. Okay. So my question was about negotiations with the service corporations.
A. Right.
Q. Who conducted the arms' length negotiations with the service corporations on behalf of the City?
A. I'm not sure.
Q. Well, you know it wasn't you?
A. Yes, it wasn't me.
Q. And did you ever direct Mr. Buckfire to engage in direct negotiations with the service corporations?
A. No. I directed Mr. Buckfire to do whatever needed to get done to get the agreement in principle resolved and signed. That's what I did, but I did -- said nothing specific. Just to be responsive to your question, said oh, go talk to the service corporations, there was nothing that specific.
Q. So to the extent there was a negotiation that needed to be had, it was his job to go have it?
A. It was his or someone else on my -- on my reorganization team's job, yeah, sure.
Q. Well, did you direct anyone else on your team to go negotiate with the service corporations?
A. No. Once we reached an agreement in principle, I

directed my team to more or less go forth and get it documented and get it done.
Q. And the service corporations are legally separate from the City, correct?
A. Yes, they are.
Q. Your powers as emergency financial manager do not extend to the service corporations, correct?
A. I haven't examined that question, so I can't answer you yes or no.
Q. Can you direct their actions under PA 436?
A. I'm not sure.
Q. Do you have any firsthand knowledge that the service corporations engaged in arms' length negotiations with the Swap counterparties?
A. No.
Q. If they had, do you think that's something you would have likely heard about?
MR. SHUMAKER: Objection, calls for speculation.
A. I may have. As emergency manager, there are a number of things that occur, as you might imagine, on a daily basis that I may or may not hear of. I might have.
BY MR. HACKNEY:
Q. As you sit here today, though, can you recall hearing that there were ongoing negotiations between the

service corporations and the Swap counterparties?
A. No.
Q. Isn't it true that the City's obligation to the service corporations under the service contracts with respect to the hedge-related payments were secured by the collateral agreement?
MR. SHUMAKER: Objection, calls for a legal conclusion, foundation.
If you understand it, you can answer it.
A. I'm trying not to draw a legal conclusion. Repeat your question; let me see if I can answer it.
BY MR. HACKNEY:
Q. I was just asking whether -- you understand that the service corporations have service contracts with the City?
A. Yes.
Q. And you understand that the City has hedge-related payments that it has to make to the service corporations --
A. Yes.
Q. -- that they then can use to make to the Swap counterparties under the Swap?
A. Yes.
MR. SHUMAKER: Objection, calls for a legal conclusion.

BY MR. HACKNEY:
Q. Do you understand that the collateral agreement secures the City's obligation to the service corporations and the service corporations' obligation to the Swap counterparties?
A. That's the legal conclusion. It might. That's -- I'm going to stay away from relaying my understanding because, frankly, I haven't -- I'm going to be careful, frankly. It might.
Q. Okay. You don't know as you sit here today?
A. I have an impression of something along those lines, yes.
Q. And what is it?
A. That it does -- it may well secure it. It's just that it's a legal conclusion that I don't want to make.
Q. Okay.
A. Okay.
Q. Isn't it fair to say, though, that the collateral agreement's existence meant that the service corporations could rely on the City to make its quarterly Swap-related interest payments?
A. Yeah, my understanding is that the casino revenue comes in daily. It's put into an account. Monthly there are payments that are put into the custodial account and those payments are disbursed orally.

Q. Now, if the City's able to perform under the forbearance agreement and exercises the option, the effect of this is that the hedge will be terminated, correct?
MR. SHUMAKER: Object to the form, calls for a legal conclusion.
A. I believe there will no longer be a need for the hedge, yes.
BY MR. HACKNEY:
Q. And the collateral agreement will also be terminated in that event, correct?
A. If we -- if the City performs?
Q. Right.
A. Yes.
Q. And that will free up the casino revenues to be used by the City, correct?
A. Yes.
Q. Okay. How does that benefit the service corporations?
A. I don't know if it does or doesn't. I know it benefits the City.
Q. Can you think of a way that it benefits the service corporations as you sit here today?
A. No. That would be speculation.
Q. And you understand that the service corporations depend on the City to make the payments of their

Page 81

various obligations both under the COPs and the Swap?
A. I believe that's true.
Q. They don't have any independent sources of income?
A. To the best of my knowledge, they do not.
Q. And your view today is that the City of Detroit is insolvent, correct?
A. Yes, yes.
Q. And fair to assume that by extension the service corporations are also insolvent, too?
MR. SHUMAKER: Objection, calls for speculation.
A. I don't know if that's true or not.
BY MR. HACKNEY:
Q. Now, isn't it true that the composition of the service corporations' boards of directors includes three City officers and at least one City Council member?
A. Yes. I think I said before there are City employees and City representatives on the boards.
Q. And in fact the person who signed the forbearance agreement on behalf of the service corporations was the president of both service corporations, correct?
A. Yes, I believe so.
Q. And her name is Cheryl Johnson, right?
A. Yes.
Q. And she is also the City's finance director, correct?

Page 82

A. Yes.
Q. Okay. Portia Roberson --
A. Um-hm.
Q. -- is the City's corporation counsel, right?
A. Yes.
Q. And she's also on the board of both service corporations, correct?
A. To the best of my knowledge, that's true.
Q. Do you know who made the decision at the service corporations to enter into the forbearance agreement?
A. I do not.
Q. Did you have any conversations with either Ms. Johnson or Ms. Roberson about the service corporations entering into the forbearance agreement?
A. No.
Q. Isn't it true that the policy of the City is to indemnify the service corporation directors for actions they take in their capacity as City employees?
A. I don't know that.
Q. You don't know if that's the policy of the City?
A. I do not. I know the City has an indemnification policy. I don't know if it applies to the service corporations.
Q. Okay, but does it apply to the City employees?
A. It applies to City employees acting within their

Page 83

course and scope of their employment as employees of the City.
Q. Okay. So as you sit here today, you can't say that that indemnification policy would extend to City employee actions taken in their capacity as service corporations --
A. Correct.
MR. SHUMAKER: Objection, calls for a legal conclusion.
BY MR. HACKNEY:
Q. I will -- I'm sorry.
A. Okay.
Q. As emergency financial manager, you control the salary of all City employees; isn't that correct?
A. As emergency manager.
Q. As emergency manager, right.
A. Right.
Q. Sorry. Is that the proper --
A. It changed with Public Act 436. Public Act 72 was EFM and now I'm an EM.
Q. Okay. Got to get my lingo.
A. Yeah.
Q. And you do, as emergency manager, control the salary of all City employees, correct?
A. I have the authority to control the salary of all City

Page 84

employees. I have not exercised that authority for all City employees.
Q. Okay. And you have the power to reduce those City employee salaries to zero if you choose, correct?
A. I think I do, yes.
Q. And you have done that on at least one prior occasion, I believe, correct?
A. Yes, I did do that.
Q. Okay. Now, are you aware that the insurers, the Swap insurers, like Syncora and FGIC, contend that the hedges cannot be terminated without their consent where there are termination events or events of default?
A. I have heard that. I m -- I have no independent awareness of that.
Q. So when did you first hear that?
A. I think it was all caught up in this time frame of the -- of the discussion after the agreement in principle, before the forbearance agreement was reached.
Q. Your best recollection is that you heard that prior to the execution of the forbearance agreement?
A. I believe it may have been prior to execution.
Q. But you have taken -- you have taken no steps to evaluate whether the City concurs with the insurers'

construction on this point?
A. No. I don't think that's exactly true. I think there were -- as I said before, there were a series of letters and discussions that went on from the second week of June throughout some point in July where I believe there may have been discussions in that regard, validity of that point.
Q. Okay. But if I ask you to express the City's view on the legal merits of the insurers' contention that they have the right to consent, you'll decline to answer those questions because it tends to reveal the attorney-client privilege.
MR. SHUMAKER: That's right and also calls for a legal conclusion, yes.
MR. HACKNEY: But you'll -- I want to save a big string of questions, so if I want to ask him what are the pros and cons of the argument, who's likely to win, how will it all come out --
BY MR. HACKNEY:
Q. You won't answer those questions on the grounds of the -- because it would tend to reveal attorney-client advice, correct?
MR. SHUMAKER: Well, I don't want to prevent you from asking any questions and I don't -- but if he has an understanding independent of advice

he's given -- but clearly to the extent it's going to reveal attorney-client communication, I will tell him not to answer.
MR. HACKNEY: Okay. I'll ask him that.
BY MR. HACKNEY:
Q. Does the City concur in the insurers' view?
MR. SHUMAKER: Objection, calls for a legal conclusion and could ask for attorney-client communications.
MR. HACKNEY: Are you instructing him not to answer?
MR. SHUMAKER: To the extent that the question goes to that, yes.
A. Maybe I can help out in this line of questioning. Any -- I have not acted as an attorney on this job for the aforementioned reasons, so any opinion that I would express on behalf of the City in this regard would be solely as a result of communications with counsel and discussions.
BY MR. HACKNEY:
Q. That was my expectation. So if I ask you if the City concurred, that's going to get into what your lawyer thinks.
A. That's exactly right.
Q. So you -- you will assert the privilege.

A. I will assert the privilege.
Q. And if I ask you what are the arguments for and against this point, you'll assert the privilege.
A. I will assert the privilege, but I am aware there are a number of objections that have been filed in the case that have addressed those issues and none of them have caused me any surprise.
Q. If I said that the City -- if I asked you what the City's view is on -- well, let me take a step back.
Do you agree that the insurers can block an early termination of the Swap, that this would be important to assessing whether the City was in danger of owing a termination payment?
MR. SHUMAKER: Objection, calls for a legal conclusion.
A. Yes, same thing. I'd only have a response to that based upon discussions I've had with counsel.
BY MR. HACKNEY:
Q. Do you agree that the insurers can block a termination, that it would make sense to negotiate with the insurers to determine whether you can secure their agreement not to consent to any termination?
MR. JURGENS: Objection, form.
MR. SHUMAKER: Same objection.
A. Same response. It would only be based upon

discussions I've had with counsel.
BY MR. HACKNEY:
Q. Are you aware that the insurers contend that they have the right to control all actions that may be taken by the Swap counterparties in connection with the -- with the Swaps?
A. I am aware of that, yes.
Q. When did you first develop that awareness?
A. During some course of the correspondence that occurred during this time frame that we previously discussed today.
Q. And have you taken steps to evaluate whether the City concurs with the insurers' construction of the operative documents on this point?
A. Have we taken steps? Yes.
Q. Yeah. And what is the City's position?
MR. SHUMAKER: Objection, calls for the provision of attorney-client communications, and I will instruct him not to answer.
BY MR. HACKNEY:
Q. Yeah, I'm just going -- I'm making a record here. Okay? I don't want to have -- I tried to --
A. I'm with you. I'm with you.
Q. And if I ask you what the arguments are on both sides of this point, you'll also refuse to answer on the

grounds of the privilege.
A. Here again, there are objections in the case that make some of those arguments, but I will not specifically answer.
Q. Because of the privilege.
A. Because of the attorney-client privilege and it calls for a legal conclusion.
Q. And if I ask you who had the better side of the argument, you would say the same thing?
A. Same thing.
MR. SHUMAKER: Same objection, same instruction.
A. I would say the same thing. I would say the same thing.
BY MR. HACKNEY:
Q. Do you agree that the insurers can control all actions of the Swap counterparties in connection with the Swaps, that this would be important in terms of assessing whether the City should negotiate with the insurers?
MR. SHUMAKER: Objection, foundation, calls for a legal conclusion.
You can answer to the extent you have an understanding.
A. It's also a little speculative because it's a

hypothetical. If then is usually a hypothetical, so I would -- for the same reasons as we discussed before, I would say that to the extent it calls for a legal conclusion, I'll refuse to answer.
I would say as a rational person, if you were put in a corner, then you might want to consider your alternatives, including negotiations.
BY MR. HACKNEY:
Q. With the insurers?
A. With whoever, yes, whoever's --
Q. I mean it's just a simple point. We have five minutes left. I'm going to milk them.
A. Okay.
Q. But it's a simple point, which is if the insurers can potentially direct, like a marionette, the actions of the Swap counterparties, and I understand --
A. Right.
Q. -- that you're not agreeing with that --
A. Right.
Q. -- okay, but if they can --
A. Um-hm.
Q. -- they're a potential party that you can go negotiate with to play off against the Swap counterparties, correct?
MR. SHUMAKER: Objection, calls for

speculation.
A. Yeah, here again, I mean if that happened, possibly, but that's a speculative question, so I'm going stay away from it.
BY MR. HACKNEY:
Q. It is speculation, but it's logical --
A. As I said in my answer, a rational person would make that --
Q. Yeah.
A. If you were put in a corner, you'd have to find some way out, and negotiation might be one of those sources, but to the extent your question is also speculation, I'm going to defer from answering.
Q. Do you agree that the insurers are entitled to control all of the actions of the Swap counterparties; it raises the risk that the deal negotiated in the forbearance agreement may be for naught?
MR. SHUMAKER: Objection, calls for speculation.
A. Yeah, here again, maybe not.
BY MR. HACKNEY:
Q. Those are things you haven't -- you haven't considered prior to today, fair statement?
A. That's a fair statement.
Q. Okay. Have you ever heard the phrase "play both ends

against the middle"?
A. Oh, have I ever heard the phrase?
Q. Yes.
A. Yes.
Q. You're a bankruptcy lawyer, right?
A. Yes.
Q. You were, I should say.
A. I was.
Q. And that's one of the time-honored tricks of bankruptcy negotiation, right, is to play parties off against one another to try and get the best deal?
A. I'm not going to call it a trick.
Q. Tools.
A. Tools, tactics. You know, there -- lawyer, as a negotiator, getting a yes, discussing a number of different alternatives.
Q. And one of them is playing off both ends against the middle?
A. Could be. People do that all -- outside of legal issues, they do that in negotiation.
Q. Isn't it true that prior to July 17 the City never engaged in substantive negotiations with Syncora?
A. I don't know if that's true. You said July 17th?
Q. Yeah. That's the date of the execution of the forbearance agreement.

Page 93

A. Right. I don't know if that's true. I believe there were discussions that may have been, but you characterize it as substantive negotiations, so I don't know if that's true.
Q. You certainly didn't participate in any substantive negotiations with Syncora, correct?
A. Well, I -- you know, you say negotiations. I know there were a series of letters going back and forth and I know that there was a letter -- I just don't recall when I sent it -- to Mr. LeBlanc that said if you want to have serious negotiations, then let's have a discussion, but let's stop sending these letters back and forth.
Q. But isn't it your position that there were no serious negotiations with Syncora because Syncora would not make a proposal?
A. I believe in one of those letters I expressed that concern, yes.
Q. And to your knowledge Syncora never made a proposal to the City of Detroit prior to July 17th, correct?
A. Yeah, I believe there was a discussion -- well, there was discussion about an exchange of NDAs, and Syncora said they wanted to make a proposal, but they first wanted to see the proposal from the Swap counterparties, and I believe in one of my letters to

Page 94

Mr. LeBlanc, I said well, the parties need to sign a NDA, and my understanding was Syncora declined to do that.

**MR. HACKNEY:** Let's actually take a break right now in light of the videotape and maybe we can use it as a chance to stretch our legs and use the restroom.

**VIDEO TECHNICIAN:** The time is 10:04 a.m. This marks the end of tape number 1. We are off the record.

(Recess taken at 10:04 a.m.)

(Back on the record at 10:14 a.m.)

**VIDEO TECHNICIAN:** We are back on the record at 10:14 a.m. This marks the beginning of tape number 2.

**BY MR. HACKNEY:**

Q. Mr. Orr, I kind of want to cut through this with Syncora. I understand that there were letters back and forth between you and Syncora.
A. Yes.
Q. But I just want to make clear for the record that there were not substantive negotiations of the type that you engaged in with the Swap counterparties with Syncora about an alternative proposal to the forbearance agreement prior to its execution on

Page 95

July 17th, correct?
A. I believe -- July 17th?
Q. (Nods head).
A. I believe that's true. As I said, I think there was some discussion about a potential offer from Syncora, but I believe that got caught up in the NDA issue and that went away, so yes, I believe that's true.
Q. And your recollection in the NDA issue is that the City wanted an NDA, but Syncora wouldn't sign it?
A. My recollection -- no. My recollection was the City needed an NDA because we were asking all parties -- nondisclosure agreement, we were asking all parties to sign them. There was some discussion -- I put in a letter, I seem to recall, that Syncora sign one, but I don't want to speculate or mischaracterize. There were some discussion about a NDA before Syncora would show us their proposal and something about they wanted to see the Swap counterparties' proposal before signing an NDA first or something along those lines.
Q. You're not aware of any situation where the City refused to sign an NDA with Syncora, correct?
A. No, not that I'm aware of.
Q. In fact, it was the City that wanted an NDA with Syncora?
A. Yes. I believe that's true.

Page 96

Q. And it's also true that you did not engage in substantive negotiations with FGIC about an alternative to the forbearance agreement prior to July 17th, correct?
A. Yeah, with regard to the issue of substantive, I'll -- I'll, you know, caution that I'm not -- I'm not necessarily characterizing, but to the best of my knowledge, that's a fair characterization.
Q. You didn't make a proposal about an alternative to FIGC and FIGC didn't make one to you.
A. Yes, to the best of my knowledge, that's true.
Q. And that's also true with respect to Syncora, correct?
A. Yes, that's true.
Q. Now, I think you've testified previously that no proposal was forthcoming from Syncora in connection with the TRO proceedings.
A. Okay.
Q. I'll just represent that to you --
A. Okay.
Q. -- as a way of --
A. Yeah. In one of my affidavits --
Q. That's right.
A. -- or something, yeah.
Q. Were you aware that Mr. Buckfire had had a conversation with Todd Snyder of Syncora?

A. As I said, there were -- you know, during this -- there were many conversations that were going back and forth and I wasn't necessarily aware of all of them. I knew they were -- they were going back and forth, but it is -- if that's true, it wouldn't surprise me.
Q. So you don't remember it as you sit here today?
A. No, I do not.
Q. Okay. Because this was in the -- this was in the period of where the cash was being trapped.
A. Right. But, sir, here again, there were so many -- so many discussions going back and forth about so many things. I mean in this period we were dealing with the June 10th meeting, the June 14th creditor's presentation, trying to do the Swap settlement, the run up to my quarterly report. There were just -- there were a lot of conversations about a lot of things. I simply don't remember.
Q. Okay. And I take it you don't recall that Mr. -- whether Mr. Buckfire told you that Syncora had described to him the general structure of a proposal it wanted to make?
A. He may have. I just don't recall it.
Q. Okay. It's true, isn't it, that as of the date of the execution of the forbearance agreement, your office had received multiple calls from Claude LeBlanc at

Syncora, correct?
A. I'm not aware of that. There may have been multiple calls, but I'm not aware -- I received no calls.
Q. Okay. So you don't -- I take it your secretary --
A. My office may have. Yeah, my secretary may have, but I didn't.
Q. So you don't know whether he called you or not?
A. If you're representing to me that he did, I have no reason to believe that that's untrue.
Q. Okay. And I take it you have never called personally Mr. LeBlanc --
A. No.
Q. -- isn't that correct?
A. No, I don't think so.
Q. So you didn't return those calls if they were made?
A. No.
Q. I just want -- I guess I -- the City has entered into numerous nondisclosure agreements --
A. Right.
Q. -- in these cases, correct?
A. Yes.
Q. I mean has it entered into hundreds?
A. I don't know. I don't -- I don't operate the data room or any others, but I suspect there's certainly many.

Q. We can say that there are lots.
A. There are lots.
Q. Okay.
A. Okay.
Q. And there's no reason you can think of today that the City wouldn't enter into one with Syncora.
A. No.
Q. Were you aware that Syncora wanted a nondisclosure agreement so that it could make a proposal that would be an alternative to the Swap counterparties?
A. As I said, I believe I have a letter that discusses the NDA issue, but it was caught up in something related to Syncora -- as I understood it, Syncora wanting to see the Swap counterparty proposal first prior to entering an NDA.
Q. Did you ever hear that Syncora had gotten over that issue and was now willing to just make a proposal to the City?
A. No.
Q. So no one ever told you that?
A. No, I don't recall ever hearing that.
Q. Okay. Would that have been significant to you if you heard that?
MR. SHUMAKER: Objection, calls for speculation.

A. Yeah. Here again, it depends upon what point in time, if we were already bound by the definitive term sheet and then -- or the agreement, I believe the forbearance agreement has an obligation we cooperate with Swap counterparties, so it wouldn't have mat -- no, it would not have mattered at that time, so it depends on when that would have occurred.
BY MR. HACKNEY:
Q. But if it was prior to July 17th, if there were any parties that were out there that thought they had a good deal for the City, that would have been something you wanted to know?
A. We are always willing to listen to parties that think they have a good deal for the City.
Q. Isn't it true that the City's decision to enter into the forbearance agreement was made by you, in your role as emergency manager?
A. Yes, after consultation with my -- with my employees, staff and consultants, yes.
Q. And when did you make that decision?
A. To enter into the actual agreement?
Q. Yes.
A. The day I signed it.
Q. July 15th, 2013?
A. I believe so, yes.

Page 101

Q. And what advisors did you rely upon in making this decision?
A. My attorneys, Mill -- my investment banker, Miller Buckfire; our accountants, Ernst & Young; virtually -- virtually -- Conway McKenzie, our operational advisor, virtually all of them.
Q. All of your third party advisors?
A. Yes, yes.
Q. And anyone else that you relied upon in making the decision?
A. Oh, probably members of my immediate staff such as my senior advisor, chief of staff, but less so. More of my outside third party advisors.
Q. What documents did you rely upon in making the decision, if any?
A. We looked at a number of -- the term sheet, the actual draft of the forbearance agreement. There may have been some e-mails. I just recall a lot of telephone calls. There may have been some forecast, cash forecast, and actuals, and some of the public reports I had issued regarding our cash position.
Q. Any other documents you can remember considering as part of this decision to enter into the forbearance agreement?
A. There may have been correspondence. As I said, there

Page 102

were letters that were exchanged between Mr. LeBlanc and myself, and others, the letter you showed me today. I'm just trying to capture the universe of what would have been included, but any -- any and all documents related to this that I would have seen would probably fall under that characterization.
Q. Any legal memoranda from Jones Day that you considered in making this decision?
A. Yes, probably.
Q. Okay. Written legal memoranda that you reviewed?
A. Yeah, including e-mails. Yeah.
Q. Now, did you take time to familiarize -- to familiarize yourself with any of the legal documents relating to the COPs Swap structure in connection with your decision to execute the forbearance agreement?
A. I relied -- I may have seen them, but I relied upon consultation with my counsel and investment bankers.
Q. The documents I'm referring to are -- can we agree they're relatively complicated legal documents?
A. Yeah, I'd say they're not simple documents. It's not a -- you know, an auto purchase contract, yeah.
Q. Right. So can I fairly characterize that -- that you may have looked at the documents, but you didn't attempt to master -- master them in terms of their legal ins and outs?

Page 103

A. Yeah. That's a --
MR. SHUMAKER: Object to form.
A. That's a fair characterization. As I said, I'm trying to stay away from acting as an attorney in this job.
BY MR. HACKNEY:
Q. Okay.
A. For a number of reasons.
Q. So you relied on your advisors to explain to you how the COP Swap agreements worked?
A. Yes.
Q. And you also relied on them to explain to you how the COP Swap agreements worked in conjunction with the forbearance agreement that you were about to execute?
MR. JURGENS: Object to form.
A. Yes.
BY MR. HACKNEY:
Q. So what is the relationship between the forbearance agreement and the COPs Swap structure?
A. Well, my understanding is that the forbearance agreement is related to the Swaps structure, but that the COPs structure is unrelated.
Q. Okay. So the forbearance agreement is part of the same subject matter as the collateral agreement and the Swaps agreement, but not the COPs part of the structure?

Page 104

A. That's my understanding.
Q. Okay. In your legal career, have you come across the concept of the idea that two different contracts can be part of one integrated transaction?
A. Sure. Yes.
Q. You're familiar with that as an idea?
A. Oh, yeah, sure.
Q. Okay. What do you understand that to mean?
MR. SHUMAKER: Objection, form.
A. There are a number of ways that two different documents were -- may refer to the other, as simple as attachments, exhibits, the master -- the master service agreement on a loan, for instance. There are a number of ways that one document can relate to another as explicitly expressed and intended.
BY MR. HACKNEY:
Q. Yeah, and I know this is a -- you know, we're not talking about was the stoplight red or green here, but you are also a lawyer with a relatively --
A. I was.
Q. -- sophisticated clientele and experience?
A. Well --
Q. You understand the idea that two different contracts can form part of one larger agreement?
A. Oh, sure. Yeah.

Q. Is the forbearance agreement part of an integrated transaction with the amended Swap agreements?
MR. SHUMAKER: Objection, calls for a legal conclusion.
A. Yeah, I'm going to stay away from characterizing it as an integrated transaction. That may have legal consequence. I know they are related.
BY MR. HACKNEY:
Q. Okay. They are related, but you can't answer today whether they're part of an integrated transaction as the person who executed it on behalf of the City?
A. Yeah.
MR. SHUMAKER: Same objection.
A. Yeah, because -- because of legal implications of using that nomenclature.
BY MR. HACKNEY:
Q. Okay. So it may be, it may not be, you just don't know?
A. Precisely. I'll rely on the attorneys to characterize that.
Q. Is the forbearance agreement part of an integrated transaction with the collateral agreement?
MR. SHUMAKER: Same objection.
A. Same answer. I'll rely on the attorneys to characterize it as integrated. I know I signed the

forbearance agreement.
BY MR. HACKNEY:
Q. You did?
A. Yes.
Q. So it may be, it may not be, you don't know?
A. Correct.
Q. And did you consider any of those questions when you entered into the forbearance agreement?
A. We may have had some discussions. The question such as whether they're integrated or supersede or are related may have been discussed.
Q. But as you sit here today, you can't answer my question about whether it is integrated into other agreements or not?
A. True. I'm going to re -- because of the possible legal implications of anything I say, I'm going to rely on our counsel.
Q. Okay. Well, I guess there are legal implications of all of the testimony that you give today --
A. Yeah.
Q. -- both good and bad.
A. Right.
Q. So I guess are you saying that you can't reveal attorney-client communications or are you saying that you just don't know the answer to this particular

legal question?
A. I'm saying I can't reveal attorney-client communications, and based upon the characterization, I have formed no independent decision outside of discussions with my attorney as to whether or not they're integrated.
Q. Okay. Let me ask you the reverse question, which is, is the forbearance agreement a separate agreement from the collateral agreement?
A. Is it a separate agreement?
Q. Yeah.
A. I believe it's related to it, but yeah, it was a separate agreement, sure. It wasn't entered into contemporaneously.
Q. Meaning one that does not form part of a common agreement with the collateral agreement?
A. Here again, you're using a characterization as common agreement or integrated. I'm going to stay away because those may have legal connotations. What I know is the forbearance agreement was entered into in 2009, and the collateral agreement attempts to resolve issues of default that are raised by the forbearance agreement and also including obligations of the City.
Q. Isn't it -- I'd like to shift and ask you a question about the service agreements between the City and the

service corporations.
A. Okay.
Q. Isn't it true that the City is in default of its obligations under the service agreements because it missed the --
A. June 14th payment?
Q. That's right.
A. We're in default.
Q. Okay. And isn't it also true that the City is not proposing to cure those defaults in connection with the assumption of the forbearance agreement?
A. I believe that's true.
Q. And you would agree that the City is not going to provide assurances that it will perform with the service agreements in the future, correct, as part of the assumption motion?
A. I'm going to be careful here because we're -- we're trying to have discussions about what we're going to do with regard to the proposal, so I don't want to say now something that may or may not occur in the future, but there is no present intent -- in response to your question, no present intent to do that.
Q. You certainly haven't represented that you will as part of the assumption motion?
A. Yes.

Page 109

Q. We talked about this earlier. I don't want to reask the question, but I want to tie it up in connection with the assumption motion, which is, there are also events of default existing under the Swaps.
A. Yes.
Q. Those are the cause of all the problems, right?
A. Yes.
Q. The City is not proposing to cure those defaults in connection with the assumption agreement, correct?
A. I'm going to be careful with the characterization of a cure because, as you know, and -- I have formed no independent decision as to whether or not that nomenclature's true. What I will say is that pursuant to the forbearance agreement we are attempting to resolve any and all defaults that may have occurred under the collateral agreement.
Q. Under -- and I was asking about the Swaps.
A. And the Swaps.
Q. And the Swaps.
So the forbearance agreement is an effort to resolve any defaults that exist under the collateral agreement and amended Swaps?
A. Yes.
Q. Okay. And in your view it does that?
A. Yes.

Page 110

Q. Okay.
A. Yes.
Q. So I'll say it this way. In your assumption motion, isn't it true the City doesn't promise to cure any defaults under the collateral agreement or the Swap agreement; isn't it that correct?
A. Here again, and I'm not trying to be evasive. I just -- you know, there are concepts of cure in the bankruptcy code, for instance, with regard to the assumptions of contracts so on and so forth, and I want to make sure that I don't testify as to a legal conclusion. So what I will say is we are trying -- by the assumption agreement and forbearance agreement, we are trying to resolve all defaults under those documents, both the collateral agreement and the Swaps.
Q. Okay. And how does it achieve that resolution?
A. Well, the documents speaks for itself, but generally speaking, it imposes obligations upon us to perform a certain ways within certain time frames with regard to the potential termination payment. It therefore gives us a discount for that payment. It releases the casino revenue and imposes obligations, and this is my language, upon the Swap counterparties not to trap that revenue upon performance of certain obligations,

Page 111

in addition, obligates those parties to release liens and potential claims as a result of the transaction.
Q. Okay. So the practical impact of it -- put aside the legal beagle words.
A. Right.
Q. The practical impact of it is during the optional termination period, the Swap counterparties waive whatever rights they have under the Swaps and the collateral agreement to either demand cash or to terminate the Swap?
A. Yeah, here --
MR. JURGENS: Object to form.
MR. SHUMAKER: Objection, calls for legal conclusion and form.
A. Here again, I'm going to stay away from whether or not they waive. What it says is forbearance, and my understanding is that they forebear from exercising any of those rights during the operative terms of the agreement.
BY MR. HACKNEY:
Q. We talked about the benefits of the forbearance agreement before. I'm going to try and summarize your prior testimony to try and move us along, but you should listen to my summary and see if I'm correct.
A. Okay.

Page 112

Q. But the benefits of the forbearance agreement are access to the casino revenues during the option period, a workable unwind of the Swaps, and a discounted termination payment?
A. And a release of liens and potential claims against the insured, yes.
Q. Correct. Those are kind of some of the key elements of the forbearance agreement.
A. Yes.
Q. I want to start with the casino gaming revenues.
A. Um-hm.
Q. How does the forbearance agreement provide the City with better access to gaming revenues than it has right now?
A. Well, as -- I think as we discussed earlier today, there's always the risk that because there are events of default under the Swaps, that those revenues could -- that default could be declared and those revenues could be trapped, so it removes that level of uncertainty, which is crucial for the City. Cash is critical for the City.
So once you remove that level of uncertainty and the City has certainty, as we've seen in some of our proposals that we made for creditors, the City can then reasonably count on having access to

that cash in terms of going forward.
Q. Now, if the collateral agreement operates the trapped cash automatically upon an event of default under the Swap --
A. Um-hm.
Q. -- is there anything in the forbearance agreement that alters that mechanism?
MR. SHUMAKER: Objection, calls for legal conclusion.
A. Yeah, here again, your conclusion if it acts to trap automatically, I don't know if I would characterize it that way. I know that the agreements work that money comes in on a daily basis. That money is put into I think one account. At the end of each month, some portion of that money is sent out to another account, and every quarter that money is disbursed. I'm not going to characterize as to whether or not it would -- it would change that mechanism automatically.
BY MR. HACKNEY:
Q. Okay. You can't say if it does or it doesn't?
A. Correct.
Q. And can you say here today whether the collateral agreement operates automatically or does not?
A. The collateral agreement, it's my understanding, using your words automatically, operates to trap cash, but

maybe not in the way that is detrimental to the City. It has two accounts, a subrecipient holding account --
COURT REPORTER: Subrecipient?
THE WITNESS: Subrecipient.
A. -- two accounts, an initial general account and then a subrecipient account. We'll just call them that.
Those monies come in -- so when you use automatic, those monies come in daily, but they're disbursed according to the terms, and have been disbursed according to their terms.
Q. I'm not talking about interim trapping that --
A. Right.
Q. -- happens in the first part of the month until the whole bank account builds up.
A. Right.
Q. I'm talking about what I'll call big time cash trapping upon an event of default --
A. Right.
Q. -- or termination event.
A. Right.
Q. So let me go back. I guess my question is, like, do you have a view on whether that big time cash trapping is supposed to happen automatically under the collateral agreement?
A. My understanding is that it does not happen

automatically.
Q. Okay. And is that based on conversations you've had with counsel?
A. Yes.
Q. And if I ask you for the pros and cons of that argument as to who's likely to win and how the City came to its view, you would refuse to answer those questions on the basis of the attorney-client privilege, correct?
A. Yes, sir.
Q. Now, you also mentioned that the forbearance agreement -- or we talked about the idea that the forbearance agreement provides for a workable unwind of the Swap, correct?
A. Right.
MR. JURGENS: Objection to form.
BY MR. HACKNEY:
Q. How does it do that?
A. Well, my understanding, as I said before, in the forbearance agreement, the parties agree to certain -- certain events that we will pay -- meaning the City -- will pay a discount, an optional termination payment or cause that payment to be made; that in consideration for that payment, the parties to the agreement will release any claims they have to

trapping the casino revenue; and, here again, the parties will release their liens and any potential claims they have against the insured.
Q. The discount that you obtained through the negotiations that Mr. Buckfire led --
A. Right.
Q. -- is a discount to the so-called early termination of the Swap.
A. Yes.
Q. Correct?
A. Yes.
Q. So if you just read the Swap agreement, it would -- it implies a termination value, correct?
MR. JURGENS: Objection, form.
MR. SHUMAKER: Objection, Calls for --
BY MR. HACKNEY:
Q. It implies an early termination value?
MR. JURGENS: Objection to form.
A. We'll use a nomenclature. It implies a value for termination fee that I understand represents the loss expectation of the counterparties.
BY MR. HACKNEY:
Q. That's exactly right.
And the discount you negotiated in the forbearance agreement is a discount to that amount in

Page 117

the Swap?
MR. JURGENS: Objection to form.
MR. SHUMAKER: Objection to form.
A. It is a discount to that, yes. It is a discount to that expected amount.
BY MR. HACKNEY:
Q. Yeah. It is a discount to what would otherwise be owing under the Swap in the absence of the forbearance agreement if the Swap counterparties designated an early termination.
A. I believe that's correct.
MR. JURGENS: Objection to form.
BY MR. HACKNEY:
Q. Okay. Now, you know that there's a different concept which is an optional early termination under the Swap, correct?
A. Um-hm.
Q. Is that correct?
A. Well, the way the agreement is worded, forbearance and optional termination --
Q. I'm not talking about the forbearance agreement.
A. Okay.
Q. I'm sorry if that wasn't clear --
A. Oh.
Q. -- and I don't mean to interrupt you.

Page 118

A. Okay.
Q. Under the Swap --
A. Right.
Q. -- there is a different type of termination that's called an optional early termination. Are you aware of that?
A. I am aware of that.
Q. Okay. That's one where the insured -- the Swap counterparties contend that they can terminate the Swap and walk away with no payment.
A. Any understanding I would have about what the Swap counterparties can do would be based upon consultations with counsel, but suffice it to say I have heard of that concept.
Q. Okay. So if I ask you about the pros and cons of that argument and who would likely to win, you would assert the attorney-client privilege; is that correct?
MR. SHUMAKER: We would.
A. Yes.
BY MR. HACKNEY:
Q. Okay. But I do want to say that you understand that the Swap counterparties are substantially in the money under prevailing interest rates, correct?
A. There is a lot of money that the City's going to owe, yes.

Page 119

Q. I'm just talking about with respect to the Swap. Interest rates are favorable for the Swap counterparties.
A. On -- and I'm going to be careful here because on any given day interest rates might swing and be favorable to us based upon what we might owe, but generally speaking, if you're saying -- what do you mean by in the money?
Q. Yeah. So what I mean is if the Swap was terminated today --
A. Right.
Q. -- it's the service corporations that would owe money to the Swap counterparties, not the Swap counterparties that would owe money to the service corporations.
MR. JURGENS: Objection.
MR. SHUMAKER: To be clear, the Swap counterparties are UBS and Merrill Lynch.
A. Yeah.
BY MR. HACKNEY:
Q. That's what I mean by in the money.
A. Yeah, I -- I think that's true.
Q. Okay. I mean that's -- I'm not trying to be flip, but that is the reason that you negotiated the discount?
A. That's the mechanism, yes. Yeah.

Page 120

Q. Okay. I want to make an obvious point, which is the Swap counterparties have never come to the City and said hey, we're going to exercise that optional early termination rights that has us walking away and being paid nothing, correct?
MR. JURGENS: Form.
MR. SHUMAKER: Objection form, too.
A. To the best of my knowledge, I've never heard that.
BY MR. HACKNEY:
Q. Obviously if they had, you would have been --
COURT REPORTER: I'm sorry.
BY MR. HACKNEY:
Q. Let me -- if you had heard them threaten that, it would have made Mr. Buckfire's negotiation a lot easier.
A. I think it would have made the entire situation a lot easier, but I've never heard that.
Q. They've never offered to walk away without any payment.
A. I've never heard them offer to walk away without a payment.
Q. Okay. Too bad.
A. I'm more than willing to accept that offer.
Q. I was going to say we're all open, right?
A. Right.

Q. I want to go back to the forbearance agreement. We were talking about the things that it does in terms of providing access to casino revenues, allowing for an unwind of the Swap. These were my descriptions of it --
A. Right.
Q. -- candidly, from your motion --
A. Right.
Q. -- but we were talking generally about these things. The valuable consideration that the City gets under the forbearance agreement are all things that it can exercise without any consent from any other party, correct?
MR. SHUMAKER: Objection, calls for a legal conclusion.
You can answer.
A. That's my understanding of the way it works, yeah.
BY MR. HACKNEY:
Q. Do you agree that the effect of the forbearance agreement, if the option is exercised, is to modify the amount of the termination payment owed under the Swaps down to whatever percentage is applicable as of that date?
MR. JURGENS: Objection to form.
MR. SHUMAKER: Objection, form, calls for a

legal conclusion.
A. If you're talking about the forbearance agreement and the formula that's involved for the percentage change depending upon -- as linked to time, as well as the requirement that we get approval of the agreement at a certain time period, yes, that's true.
BY MR. HACKNEY:
Q. Okay. I mean the effect of the forbearance agreement is that instead of owing what the City would owe under the Swap, which is the hundred percent of the termination value, it now owes -- only owes the discounted amount?
A. Yes.
Q. So the effect is that it modifies that provision in the Swap in a way that's favorable for the City?
MR. JURGENS: Objection to form.
A. That's a fair characterization.
THE WITNESS: Sorry.
BY MR. HACKNEY:
Q. Now, the forbearance agreement, another part of it, that it allows the City to direct the Swap counterparties to terminate the Swap, correct?
MR. SHUMAKER: Objection, calls for a legal conclusion.
MR. JURGENS: Objection.

MR. HACKNEY: I understand you want to preserve objections. This is the individual who signed the agreement --
A. Yeah, the --
MR. HACKNEY: -- so I'm asking him for his understanding.
MR. SHUMAKER: Okay. That's fine.
A. Yeah, the mechanism is such that it's not our termination, that it's the parties -- it's the counterparties' termination.
BY MR. HACKNEY:
Q. That's right. It's their termination right, but the City gets to direct them to exercise it.
A. Correct.
Q. Okay. Is that a right that the City currently possesses under any of the other agreements to the best of your knowledge?
A. To the best of my knowledge, no.
Q. That's a right it obtained as a result of the forbearance agreement, correct?
A. Correct.
Q. And the City's able to exercise that right to direct the actions of the Swap counterparties without the consent of any third party, correct?
A. To the best of my knowledge, that's true.

Q. Now, if Syncora has the right to control all actions of the Swap counterparties under the contract administration agreement, your position is that the forbearance agreement overrides that provision in the contract administration agreement; is that correct?
MR. SHUMAKER: Objection, calls for speculation.
A. I think it calls for speculation and it also essentially implies a legal analysis. I will defer to my counsel as to what our position would be. What I do know is that forbearance agreement gives us certain rights.
BY MR. HACKNEY:
Q. Okay. What if I said that when it comes to the interaction between Syncora's alleged control rights under the contract administration agreement and the City's alleged control right under the forbearance and optional termination agreement, you would refuse to answer those questions on the grounds that it would get into attorney-client advice that you've received from your counsel, correct?
A. That is correct.
MR. SHUMAKER: It most likely would, depending upon how you phrased the question.
MR. HACKNEY: I'm asking.

Page 125

A. Yeah, no. These issues I have discussed with my counsel. We have discussed pros and cons as I said earlier today, and as you notice, although I'm not an attorney here, I've practiced before, none of this surprises me. Some of these issues are expressed in the objections. It's just that I want to be very careful about relaying to you any of my perceptions about these issues based upon discussions I've had with counsel.
Suffice it to say we think that I have the right -- the City has the right under forbearance agreement to exercise its rights under that agreement.
BY MR. HACKNEY:
Q. Okay. So -- but you -- you can't give me your understanding of how Syncora's alleged rights under the contract administration agreement interact with the City's alleged rights under the forbearance agreement.
A. I can't do that without implicating conversations I've had with my counsel.
Q. And just for the record, you won't?
A. And I won't.
Q. That's right.
A. And I won't, yes.
Q. What are the downsides of the forbearance agreement to

Page 126

the City?
A. From my perspective?
Q. Yeah.
A. None.
Q. So this agreement that Mr. Buckfire negotiated is one of those happy agreements. It's all upside and no downside.
A. It's not happy. I mean, I'm not going to characterize it as happy. There's a significant sum of money that the City has got to pay, but it does remove a certain amount of uncertainty and allows the City to be able to plan to make the reinvestment that's crucial for it to go forward. So I wouldn't characterize it as happy by any means, but it's an obligation that the City entered into a long time ago -- several years ago -- that we have to resolve so we can have unfettered access to the casino revenue.
Q. I want to go back to the subject of cash trapping really quick because we had just moments ago talked about whether it worked automatically --
A. Right.
Q. -- or whether it worked upon notice.
A. Right.
Q. But prior to the forbearance agreement, it was your view that the Swap counterparties had the right to

Page 127

direct U.S. Bank to trap the casino revenues; isn't that correct?
A. I think if there were events of default, and here they are, yes.
Q. Yeah. That was a driver of the negotiation --
A. Yes.
Q. -- correct?
A. Certainly is, yes.
Q. And your understanding is that as part of the forbearance agreement during the -- during the -- during the forbearance period, the Swap counterparties have temporarily relinquished that right to direct cash trapping so long as the optional termination period is pending.
A. Yes, they are forebearing from exercising their right.
Q. Okay. Now, you understand that cash passes through the general receipts subaccount on a monthly basis. We talked about that earlier.
A. Right.
Q. It's trapped until a certain point and then the City makes the holdback account, and when they get -- become equal, there's a discharge of payment to the City from the general receipts subaccount, and then for the remainder of the month, the City gets access to the casino revenues, correct?

Page 128

A. Yes. My understanding is about $500,000 a day are paid into those accounts and the mechanism is very similar to what you said --
Q. Okay.
A. -- how it operates.
Q. Can we agree that the way the forbearance agreement works is that certainly between July 17th and now and from now to whenever the forbearance, the option is either exercised or expires, there's going to be cash that passes through this account, already passed through the account, that goes to the City?
A. Yes. There should be.
Q. If the option expires without the City's exercise of the option, isn't it true that under the forbearance agreement, the City has no obligation to put that cash back into the -- into the general receipts subaccount?
MR. SHUMAKER: Objection, calls for a legal conclusion.
A. I --
BY MR. HACKNEY:
Q. Just asking for your understanding of how the agreement works.
A. Sure. And my understanding of how the agreement works, without having it in front of me and consulting counsel, is the parties revert back to the status quo

ante as where they were, and I do not recall that there's an obligation for remittor (sic) --
Q. Yeah.
A. -- of monies that were paid during the forbearance period.
Q. And the agreement does speak for itself. I'm just asking for your understanding of the agreement.
A. That's my understanding.
Q. I have read the agreement, and my reading of Section 1.2(c) of the agreement is that when the option expires without being exercised, that it's just as you said, everyone is restored to the status quo ante, but the City doesn't have to put the money it received back in the -- in the interim back into the account.
A. Right, which is status quo because we would have received that money in any event.
Q. Okay. But what I just said is also your understanding?
A. Yes.
Q. Can we agree that -- we talked about waiver and forbearance and they are two different concepts, but can we agree that the Swap counterparties have certainly waived their right to obtain the cash that passes through the account during the option period?

MR. SHUMAKER: Objection, calls for a legal conclusion.
MR. JURGENS: Objection to form.
A. I'm going to stay away from characterizing what consequences are if we don't exercise the option under the agreement.
BY MR. HACKNEY:
Q. Let me hand you this forbearance agreement.
A. Okay.
Q. I've marked it as Orr Exhibit 2.
A. Okay.
MARKED FOR IDENTIFICATION:
DEPOSITION EXHIBIT 2
10:48 a.m.
A. Okay.
BY MR. HACKNEY:
Q. Do you have it in front of you?
A. Yes.
Q. And is that, to the best of your knowledge, a true and accurate copy of the forbearance agreement?
A. Yes, it appears to be.
Q. Now, if you look at the -- on page 2 of the second full recital?
A. Uh-hm.
Q. You'll see that it says, "Whereas, pursuant to the

terms of each Swap agreement, it is the view of the Swap counterparties that one or more events of default and/or additional termination events has occurred, with the service corporations" -- "with the service corporation as the defaulting party or sole affected party, and therefore each of SBS and UBS has the right to designate an early termination date for the related Swap agreements."
Do you see that?
A. Yes, I do.
Q. I have a long set of questions here that I would like to collapse if I could, which is, this just says it's the view of the Swap counterparties. The fact of the matter is it's also the City's view that there are termination events and events of default existing under the Swap.
A. Yes, I think that's fair.
Q. And that as a result of those termination and events of default in the absence of this agreement, the Swap counterparties would have the right to designate an early termination date.
A. Yes.
Q. If I asked you to catalog all of the termination events and events of default under the Swap, would you be able to do that?

A. No, I wouldn't, not without a consulting client and a long compendium of events that occurred before I was appointed.
Q. You do know some of them offhand.
A. Sure, like the consent agreement, the declaration of financial emergency, the appointment of the financial advisory board, the failure to make some of the -- there are a bunch of them, but I couldn't catalog them all.
Q. Yeah. Your appointment?
A. My appointment. I'm an event of default.
Q. You are -- you are an embodiment of default.
A. I'm an embodiment of default.
Q. So at some point we will have to cure you.
A. You will have to talk to my wife about that.
Q. Okay. The -- okay. So that is helpful. I was going to go through some of these things, but it doesn't sound like there's an actual dispute between the City and the Swap counterparties on this point, correct?
A. No.
Q. Now, I want to ask you a different question, though.
A. Sure.
Q. This is different from what I was just asking, so --
A. Okay.
Q. As of July 17th, had you evaluated where there were

any termination events where the Swap counterparty was the sole affected party?
MR. SHUMAKER: Objection, calls for a legal conclusion.
A. Yeah.
BY MR. HACKNEY:
Q. I'm not asking for the advice. I'm asking had you evaluated that.
A. We had evaluated a number of issues and suffice it to say that was probably one of them.
Q. You can't remember whether it was or it wasn't?
A. I can't remember if --
Q. Pretty technical question?
A. Yeah. As I said before, I'm not trying to be evasive. It's just that the conversations I have with my counsel, investment banker, you know, on a daily basis, are -- there are days when there are dozens.
Q. Now, if I asked you whether you had evaluated whether there were any events of default under the Swap where the Swap counterparties were the defaulting party --
A. Sure.
Q. -- can you answer that question?
A. Whether I personally or whether it had been done on the payoff of the team?
Q. Either.

A. I personally don't recall doing that. I do recall that members of the team and I may have had those discussions, yes.
Q. Is it fair to say that if I ask you to describe to me what potential events of default or termination events where the Swap counterparties were the sole affected party or the defaulting party --
A. Right.
Q. -- you would decline to answer those questions on the basis of the attorney-client privilege?
MR. SHUMAKER: To the extent they would reveal those communications, of course.
MR. HACKNEY: Well, I mean --
A. Yes, I would.
BY MR. HACKNEY:
Q. Okay. Even if I ask you about your understanding of the position, your position is that you don't have one independent of your legal advisors.
A. I -- on this question, I don't have one independent of my legal advisors.
Q. So I can't ask you what your understanding is --
A. Right.
Q. -- because it will necessarily reveal the legal advice you got.
A. I'm trying to see if there's a way I can answer your

question without implicating discussions. No. It might -- it might implicate some discussions I had with counsel.
Q. Okay. Mr. Orr, is the forbearance agreement a settlement?
MR. SHUMAKER: Objection, calls for a legal conclusion.
A. Let me say this. I'm aware that the motion pending in front of the Court is both for -- we call in bankruptcy, what I used to call in bankruptcy, both an assumption of an agreement and a ^ 9019 settlement.
BY MR. HACKNEY:
Q. So it's been held out by the City as a settlement, correct?
A. Yeah. I think there's a debate as to whether or not you need to seek settlement approval in a Chapter 9 case, but we are.
Q. Okay. Does the forbearance agreement settle any claims on a final basis?
A. I think it does.
Q. Isn't it true, though, that if the City doesn't exercise the option, everyone goes back to the status quo ante?
A. Yes. That's the contingency, yes.
Q. Okay. So if that were to happen, everyone's claims

would still be in play.
A. I'm going to be careful with the word claims, but everyone would revert back to the status quo ante.
Q. Okay. So whatever claims they had at the status quo ante they'd have again?
A. Yeah, whatever claims -- technically, whatever claims, colloquially, whatever they had would, revert back to the status quo ante.
Q. Can we agree that in that eventuality no claims of any of the parties of the forbearance agreement would have been finally resolved by the forbearance agreement?
A. To the best of my knowledge, yes.
Q. Now, put aside the threat of declaring an early termination under the Swap --
A. Right.
Q. -- which we've discussed extensively today as a right the Swap counterparties have under the Swap --
A. Okay.
Q. -- put that aside. Have you evaluated, separate and apart from that, whether there are other tort or contract claims that the Swap counterparties may have against the City?
A. I think there were discussions, but, here again, those would be wrapped up in attorney-client communications.
Q. So if I asked you to reveal the assessment of whether

there were other claims that the Swap counterparties have against the City, you would decline to answer those questions on the grounds of attorney-client privilege?
A. I think I would have to. I do recall discussions, but I think I'd have to decline on the basis of attorney-client privilege.
Q. Have the Swap counterparties threatened to bring any claims against the City?
A. Well, here again, being careful with the word claims, you mean unrelated to the defaults such as tort claims?
Q. I guess I would say the Swap agreement is one you understand that's between the Swap counterparties and the service corporations.
A. Right.
Q. Okay. So I'm trying to put that in a box for now.
A. Right.
Q. And we've talked about that extensively.
A. Right.
Q. So other than any claims they may have against the service corporations --
A. Right.
Q. -- that could absolutely have implications for the City, but other than that, have the Swap

counterparties threatened to bring any other claims directly against the City?
A. None that I'm aware of.
Q. I may have asked you this earlier, but I just -- I want to make sure that I didn't miss it and so if it's asked and answered I apologize, but did the City evaluate whether it is in breach of the collateral agreement?
A. Did we evaluate it?
Q. Yeah.
A. Yes, I and my consultants evaluated it.
Q. Is this one where if I asked you the results of those evaluations you'd decline to answer?
A. Yes.
Q. It is true that prior to the forbearance agreement, the only direct contractual agreement under which both the City and the Swap counterparties had signed was the collateral agreement, correct?
A. To the best of my knowledge, that's correct.
Q. Now, have the service corporations threatened to bring any claims against the City?
A. None that I'm aware of.
Q. And have you undertaken an assessment of the likelihood of the service corporations to the extent they were to assert claims against the City?

A. No. I don't recall doing that.
Q. So you haven't assessed that?
A. Not me independently, no.
Q. Okay. And it's not something you took into account as part of this agreement?
A. No. We -- there was a discussion about the interest of all the parties. I, independently, did not handicap whether the service corporations might bring a claim against the City. I think there were discussions about it. Many of those discussions would have been caught up in the general discussions that I was having with counsel and my other advisors.
Q. And you wouldn't be able to discuss them?
A. No.
Q. But the service corporations' claims against the City, those are not resolved by the forbearance agreement, correct?
A. If they have any. I don't think they are.
Q. Let me cut to it. Is it fair to say you haven't given this any real consideration?
A. Yeah. We -- it is fair to say that it was -- there was no real deep consideration of it. We did consider it.
Q. Now, as the City evaluated whether it has claims against the Swap counterparties --

A. Um-hm.
Q. -- okay?
A. Um-hm.
Q. And if I ask you to tell me what claims you have, will you tell me them or will you assert the privilege?
MR. SHUMAKER: I would instruct the witness that may implicate attorney-client communications.
A. I would have no independent knowledge of what claims may have other than discussions I've had with counsel so I wouldn't answer.
BY MR. HACKNEY:
Q. Okay. If I ask you what's the likelihood that you'll win on the claims?
A. Same answer.
Q. You would follow the advice --
A. Yeah.
Q. -- and assert the privilege?
A. Yeah.
Q. Okay.
A. In my prior life, as an attorney, likely would be a hundred percent.
Q. Okay.
A. But I can't say that.
Q. Well, let me ask you -- let me ask you just a -- sort of this is your understanding of the forbearance

Page 141

agreement.
A. Right.
Q. What claims are you asking the Court to approve the settlement of?
A. In claims that might be had by the parties vis-à-vis each other.
Q. So any and all claims that they have under the Swaps or the collateral agreement or the service contracts or any other contracts --
A. Yes.
Q. -- those claims are being resolved by the forbearance agreement?
A. To the best of my knowledge, that is true.
Q. Okay. And the result of the forbearance agreement is that the City will be able to perform under the forbearance agreement without being subject to any liability to any third party?
A. That is my understanding.
Q. And so will the Swap counterparties, correct?
A. That is my understanding.
Q. It will give you what I'll call a clean closing?
A. As I said earlier this week, it will bring us to closure and certainty, yes. Earlier today.
Q. That is also one of the values of this agreement to both and you the Swap counterparties, you the City?

Page 142

A. Right.
Q. Which is that it absolves you for any liability in connection with the relevant agreements?
MR. SHUMAKER: Objection to form.
BY MR. HACKNEY:
Q. As a result of performance under the forbearance agreement, correct?
MR. SHUMAKER: Objection calls for speculation.
A. My understanding is that it provides us with closure and finality regarding any claims and relationships that the parties have.
BY MR. HACKNEY:
Q. Okay. And there's no trailing liability?
A. That is correct.
Q. And just for the record, if I asked to you assess the likelihood of success of all of the different claims that are being resolved by the forbearance agreement, you would assert the attorney-client privilege and refuse to answer?
A. That is correct. I have made no independent assessment outside of any conversation I would have had with counsel and my advisors.
Q. Now, Mr. Orr, I'm going to speculate you may have negotiated a settlement or two in your life as a

Page 143

lawyer.
A. That's a fair statement.
Q. And isn't it also fair -- I will tell you I have as well, but --
A. Right.
Q. Isn't it common that settlement agreements typically involve releases of liability by the parties against one another?
A. It is not uncommon for there to be releases in settlement agreements.
Q. And I will tell you I actually was racking my brain to see whether I ever entered into a settlement agreement that didn't have a release. I couldn't think of one. Have you ever entered into a settlement agreement that didn't have a release?
A. Yes.
Q. Okay. You have?
A. Yes, I have.
Q. Okay. Do you know whether the forbearance agreement contains a release of claims by the parties against one another?
MR. SHUMAKER: Objection, calls for legal conclusion.
You can answer.
A. Okay. I'd have to read through it and consult with my

Page 144

counsel to make sure. I know the agreement speaks for itself.
BY MR. HACKNEY:
Q. It does, but as you sit here today, I take it you reviewed the forbearance agreement in connection with the preparation for your deposition?
A. Maybe not as in depth as you might think.
Q. Okay. I know you have a lot on your plate.
A. I have a lot on my plate.
Q. But I guess I'm saying are you seriously unaware as to whether there's a release in the forbearance agreement?
A. Seriously or not, I think the forbearance agreement resolved all claims between the parties. Sitting here today without examining it, I'm not aware as to whether or not it specifically has a release.
Q. Okay. So the -- whether it's in the forbearance agreement or in the effect of its approval, it operates as a release for everyone involved?
A. Yeah. The reality is -- when you asked me the question before as to whether or not it has a release, the reality is that to the extent you asked -- I believe in the motion you asked for assumptions and 9019 settlement that the order might well contain a release so -- I wasn't trying to be truculent with

you. I'm just saying that, yes, the effect of the approval of the agreement should have that impact.
Q. I'm not going to try to go claim by claim because your understanding is it releases all claims of the Swap counterparties, the service corporations, and the City against one another?
A. Yes.
Q. Now, the Swap insurers, as part of the forbearance agreement, they get a release of their insurance obligations under the Swap in the event the City directs an optional termination, correct?
A. Yes, I believe that's true.
Q. And this was one of the things that the City has touted, which is to say, hey, Swap insurers, pipe down this is good for you, right?
MR. SHUMAKER: Objection to form.
A. Yeah, without characterizing, you know, the colloquial characterization, yes, we think that's a benefit.
BY MR. HACKNEY:
Q. That's a concept that you've argued in your papers --
A. Yes.
Q. -- as to why the Swap insurers should be happy?
A. Yes.
Q. Now, do you understand you -- you have argued that this is a benefit to the Swap insurers under the

forbearance agreement, correct?
A. Yes, I believe so.
Q. Are the swap insurers third party beneficiaries as you understand it as the signatories to the agreement -- of the agreement?
MR. SHUMAKER: Objection, calls for a legal conclusion.
A. Here, I'm not acting as a lawyer as I understand it. I'll have to decline from answering whether or not they're third party beneficiaries. As you know, they're intended beneficiaries, incidental beneficiaries. A lot of these questions are questions of fact, so that would draw me into a legal analysis and I'll stay away from that.
BY MR. HACKNEY:
Q. Let me -- let me -- let me -- what I'll do then is I'll ask you your understanding as a layperson --
A. Okay.
Q. -- because you are -- you can say that you're acting as a layperson --
A. I am.
Q. -- so to speak.
A. Yes.
Q. Okay. As a layperson person, do you have a view one way as to whether Syncora is a third party beneficiary

under the agreement?
A. As a layperson, I really haven't examined it.
Q. So don't know one way or the other?
A. Don't know one way or the other.
Q. Do you have a view as to whether Syncora or FGIC, for that matter, can sue to enforce the agreement?
A. I don't have one way or the other.
Q. They may have, they may not have?
A. Yeah. I'd probably weigh on the side of they don't, but I -- I don't have a view one way or the other.
Q. And have you considered the possibility that if they don't have the right to sue to enforce the agreement, that they also would not have the right to sue to enforce the release that's in the agreement?
MR. SHUMAKER: Objection --
A. They might or they might --
MR. SHUMAKER: -- calls for a legal conclusion.
A. They might or they might not.
BY MR. HACKNEY:
Q. And let's be frank. That's not your concern, right?
A. Well, to be honest with you, you know, without getting into whether or not there may be equitable rights, estoppel, third party intended, unintended beneficiary rights, things along those lines, what I do know --

incidental benefits -- what I do know is the agreement, and what we've said is it provides a benefit to the insured.
Q. That's right, but you obviously don't represent the insured, you represent the City?
A. I am employed by the governor on behalf of the City, that is correct.
Q. And so if the insurer can't enforce the agreement to take advantage of the release, that's the insurer's problem, correct?
A. Well, without characterizing whether or not it's their problem or so, my fiduciary duty runs to the City in its interest; it does not necessarily run to Syncora.
Q. Yeah. Can we agree that you certainly didn't negotiate into the agreement any specific provision granting the insurers the right to sue to enforce that provision?
A. I made no instruction to my team to negotiate such a provision.
Q. In entering into the forbearance agreement, did you consider whether or not the automatic stay would apply to cash trapping if the City filed for bankruptcy?
MR. SHUMAKER: Objection, calls for a legal conclusion.
A. Without getting -- here again, there were discussions

because, quite frankly, at the time we were in negotiating this agreement in June, we were hoping that this agreement and its announcement was for other creditors to -- and other stakeholders, including the labor side, to come in and negotiate additional agreements. So we may have had discussion about what the impact, if we filed bankruptcy, would have been, but, frankly, at this time we were hoping we were going to get a round of agreements in place.

BY MR. HACKNEY:

Q. You knew that as of July 15th, when you executed the forbearance agreement, that bankruptcy was possible?

A. Oh, sure. We knew it was possible, yeah.

Q. Fair to say that by July 15th, given all the work that was going on, you were of the view that it was likely?

A. No, not really. We had been sued -- the governor and the treasurer had been sued a few weeks before that. The following week I believe one union had joined in that suit and the Monday of the week after that, the governor and I were sued, and I believe July -- I don't have a calendar. I believe July 15th was that Monday.

Q. It was.

A. Yes. So we signed this agreement and, frankly, even at that time, because there was a whole lot of things

going on, there was litigation, there were stays in place, there were appeals to the state court, it certainly was possible and we were with doing contingency planning given the paper, but we have not made any determination at that point as to whether or not, excuse me, we were going to file.

Q. It was certainly possible enough that it behooved you to analyze whether the automatic stay might be a way to get access to the casino revenues, correct?

A. Yeah, I don't recall whether or not we did it then or before or just during that week, but -- but we -- there was some discussion about the impact of the automatic stay, yes.

Q. So is it possible that you did not evaluate the applicability of the automatic stay in the event of a bankruptcy prior to executing the forbearance agreement?

MR. SHUMAKER: Objection --

A. No.

MR. SHUMAKER: -- asked and answered.

A. No. What I said is at some point during that time or even prior we had to have those discussions.

BY MR. HACKNEY:

Q. You may have had them in advance of July 15th, you may not have, you just can't remember?

A. No. I -- let's be clear. I think we had them before. I think we had them around that time because in that week, when I was sued that Monday, there were discussions about what they may be and we were signing this agreement at the time.

Q. If I ask you about the specifics of the conversations you had about whether the automatic stay applied and the likelihood that it would or wouldn't, you'll decline to answer those questions on the basis of the attorney-client privilege, correct?

A. Yes, again, today I would have to do that.

Q. The one thing I will say that we can agree on, though, is that if the automatic stay did bar cash trapping, that would be valuable to the City because at least during the pendency of the bankruptcy it would then have access to the casino revenues, correct?

A. Well, it's -- here again, it's a hypothetical and contingent question, but I take your meaning, and what I would say is I think certainly one of the benefits of the automatic stay is that you maintain the status quo and access to cash. There are also provisions however in the bankruptcy code -- I'm not acting as an attorney, but I am aware -- of Safe Harbor provisions related to certain financial instruments and you have to factor that in as well.

Q. And those are?

COURT REPORTER: Can you please slow down?

THE WITNESS: I'm sorry.

BY MR. HACKNEY:

Q. Those are risk factors that might make the automatic stay not applicable?

A. That's correct.

MR. SHUMAKER: Objection, calls for a legal conclusion.

A. I was informed without telling specific --

BY MR. HACKNEY:

Q. Right.

A. -- conversations that those are issues you have to take into consideration.

Q. And so let me try and collapse this if I can. If I ask you about whether the casino revenues are special revenues being applied to indebtedness, you will refuse to answer?

MR. SHUMAKER: You can ask him whether he considered them, but in terms of likelihood of success or communication between --

BY MR. HACKNEY:

Q. I'll do it that way.

Did you consider whether there were special revenues that were accepted from the automatic stay

under 922(d)?
A. We considered all of these issues including the interaction 922(d) with 362 and I considered them in the context with my counsel.
Q. Okay. You considered whether 362(b)(17) exception for Swap collateral applied?
A. Yes.
Q. Did you consider whether the collateral account -- rather, the gaming revenues were even property of the estate at all?
A. Yes.
Q. So you considered all those questions.
A. Um-hm.
Q. Your counsel rendered advice to you about the likelihood, the pros and cons of the arguments, and you're not at liberty to provide that advice to us because it would invade the attorney-client privilege?
A. Yes, I believe that's correct.
Q. But I do want to get -- I do want to just get your agreement that the question is important to at least one of the benefits of the forbearance agreement which was the interim access to cash during the optional termination period.
A. I think the question is relevant.
Q. Yeah.

A. Yes.
Q. In fact the optional termination period, it could end as soon as on September 16th; at the latest it goes to June 30, 2014, right?
A. Correct.
MR. SHUMAKER: Objection, document speaks for itself.
A. Yeah, the document --
BY MR. HACKNEY:
Q. Whatever it says --
A. Yeah.
Q. -- that's your understanding?
A. Yes.
Q. So that -- the forbearance agreement -- let's put it this way, Mr. Orr. The forbearance agreement gets you access to cash during the optional termination period.
A. Yes, I believe that's true.
Q. If the automatic stay applied, it might get access to the casino revenue during the whole bankruptcy, correct?
A. It might.
Q. Yeah. We're talking about different things that you consider as you're analyzing your options, right?
A. Yeah, correct.
Q. And this is -- this is a potentially important one

because you might be able to get longer access to cash from the automatic stay than you were getting from the forbearance agreement, correct?
A. Here again, that's a contingent it might, but that has to be drawn up also in discussion of potential risk that Safe Harbor provision would allow the counterparties to exercise their rights and therefore obviate any benefits the City could receive from the automatic stay.
Q. That's right.
A. So we considered all of those.
Q. So just to be clear, if I ask you about the specific ins and outs of all those potential arguments, likelihoods of success and so forth, you will not answer those questions on the basis of the attorney-client privilege, correct?
A. That is correct.
Q. Oh, I know. The City recently argued in court against yours truly that the automatic stay bars the cash trapping provisions of the collateral agreement. Are you aware of that?
A. I believe I am, yes.
Q. Yeah. In fact, I think that your spokesman, Mr. Nowling, may have made statements in the press about the impact of the judge's rulings. Are you

familiar with those statements?
A. I am.
Q. Did the Swap counterparties give their consent to the City to make those arguments in court?
A. I don't know.
Q. And -- so you don't know whether they did or they didn't?
A. That is correct.
Q. You understand that as originally designed the Swaps were designed to hedge against interest rate risk on the floating COPs?
MR. SHUMAKER: Objection, calls for a legal conclusion.
MR. JURGENS: Objection to form as well.
A. That is my understanding.
BY MR. HACKNEY:
Q. And I can unpack it if you want. I know we get into the --
A. That's my understanding.
Q. Yeah, okay. Let's just do basics of interest rate risk, which is if the interest rates go above the hedge rate, then now the Swap counterparties have to pay the difference to the service corporations so that they can pay the difference to the floating rate COPs, correct?

MR. SHUMAKER: Objection, form.
A. That is my understanding.
BY MR. HACKNEY:
Q. That's how the hedge works.
Now, interest rates do not favor the City in the Swaps -- we asked that earlier.
A. Right.
Q. I will strike that.
But more basics of interest rate hedging, so as the interest rates go up and start to approach the hedge, the amount the City owes under the Swap via service corporations goes down?
A. That -- that is my understanding.
Q. And as it crosses over the hedge line, the service corporation could actually be in the money?
MR. JURGENS: Objection to form.
A. Yeah, here again, we had the discussion about in the money or not, but to the extent your point is saying that they would benefit more from the hedge than the counterparties would, that is my understanding.
BY MR. HACKNEY:
Q. When the interest rates get above the hedge line?
A. (Nods head).
Q. That's right.
Okay. Now, when you were entering into the

forbearance agreement on July 17th, what steps did you take personally to evaluate future -- I'm sorry. I misspoke, didn't I?
A. Yeah.
Q. When you entered into the forbearance agreement on July 15th --
A. Right.
Q. -- what steps did you take prior to that time to evaluate future interest rate moves?
A. Any discussions in those -- that regard would have been with our investment bankers and generally with our attorneys. What I'm trying to think of is were there any discussions that I had with Miller Buckfire which would not have been confidential in that regard. I don't think that there were. What I can say is that we evaluated the potentiality of the -- of the interest rate fluctuation as indexed to LIBOR going up or down, but I think most of those, if not all of them, were in communications with one or more of my attorneys.
Q. And when you say we evaluated the interest rate fluctuations, that would have been tasked to Miller Buckfire to do?
A. Yes, Miller Buckfire in conjunction with folks from Jones Day. Yeah, sure.

Q. Okay. No disrespect to the fine lawyers at Jones Day. I don't know if I can calculate future interest rates as a lawyer.
It was in Miller Buckfire's province to do it. They may have done it in conjunction with Jones Day?
A. Yes, yes.
Q. Okay. And any review of forward curves or different interest rate implications currently existing in the market would have been done by Miller Buckfire?
A. Yes.
Q. And your recollection is that it was done and it was something that you considered as part of the decision entering into this agreement?
A. I believe so.
Q. You're aware, for example, that the Federal Reserve has indicated intent to scale back its monthly bond purchases?
A. I heard that.
Q. And --
A. Quantitative reasoning --
Q. Yeah.
A. Yeah.
Q. And you're aware that many people believe that that may lead interest rates to rise; isn't that right?

A. Yes.
Q. Okay. Did you analyze the likelihood that the interest rates would rise or was that also tasked to Miller Buckfire?
A. I didn't do it independently. That would have been tasked to Miller Buckfire.
Q. And if I asked what that analysis showed, I would have to ask Mr. Buckfire that?
A. Yes, you would.
Q. Okay.
A. Yes, you would.
Q. Let me ask you about -- in the motion to assume the forbearance agreement, the City states that it has examined whether there are viable actions to challenge the Swap contracts. Do you recall that?
A. Yes.
Q. Under what theory could the City challenge the validity of the Swap contracts?
A. Any theories that we discussed -- I'll give you two answers. One, many of the theories, my understanding is and somebody -- I haven't read all of the objections, but I've read some of them. Some of the objections in this case have discussed some of those theories.
Two, any theories which we would have