1 examined, either independently or in the context of
2 reviewing and handicapping the probability of success
3 of some of the objections, would have been done with
4 counsel.
5 Q. And so you'll refuse to describe both the theories and
6 their likelihood of success because it would invade
7 the attorney-client privilege; is that correct?
8 A. Yes. Unfortunately, yes.
9 Q. If I asked you what likelihood of success the City
10 attributes to an action seeking to declare the Swaps
11 invalid, you'll decline to answer that on the
12 attorney-client privilege?
13 A. Yes.
14 Q. Can we agree that if the Swaps are not valid, it
15 wouldn't make sense for you to enter into the
16 forbearance agreement?
17 A. No, not necessarily. There may be other prudential
18 reasons that the City might want to be bring closure
19 and certainty is access to its cash flow irrespective
20 of the probability that the Swaps are valid or not
21 valid,
22 Q. In your proposal for creditors on June 14, 2013, you
23 said that the City has identified certain issues
24 related to the validity and/or enforceability of the
25 COPs —

1 A. Yes.
2 Q. -- that may warrant further investigation.
3 A. Yes.
4 Q. Do you remember that?
5 A. Yes.
6 Q. I'm saving us from having to go through that --
7 A. Yeah, yeah. No. I remember.
8 Q. What issues has the City identified?
9   MR. SHUMAKER: Again, I'm going to caution
10 the witness --
11 A. Yeah.
12   MR. SHUMAKER: -- if this is going to
13 reveal attorney-client communications to not answer.
14   Subject to that, you can answer.
15 A. Here again, there would be no issues that -- and I
16 hate to keep saying this. There'd be no issues that I
17 independently would have identified because I'm trying
18 very hard not to act as a lawyer. I would have only
19 identified those issues and had discussions of them in
20 consultations with my attorneys. So whether there are
21 issues such as void ab initio, fraud, any of the other
22 issues that typically go to contracts, I would only
23 have had those discussions with counsel, so
24 consequently I can't speak to this.
25   BY MR. HACKNEY:

1 Q. Okay. And you'll assert the attorney-client privilege
2 as a protection against describing the invalidity of
3 the COPs analysis?
4 A. Yes, because I did no independent analysis.
5 Q. Has the City completed its investigation into this
6 issue?
7 A. No. The City's investigation into a number of things
8 are ongoing.
9 Q. Okay. And this is one of them?
10 A. This is one of them, yeah.
11 Q. Okay. So the City hasn't reached a conclusion on this
12 subject because it hasn't concluded its investigation
13 into the subject, correct?
14 A. It -- I think that's fair, yes.
15 Q. And has the City considered whether the service
16 agreements between the service corporations and the
17 City are lawful?
18 A. I don't recall if we looked into that.
19 Q. So that's one that you --
20 A. I just don't recall if that was one.
21 Q. You may have investigated, you may have not?
22 A. Correct. I don't recall that one.
23 Q. If you have investigated, do you know if the
24 investigation has concluded or do you not know?
25 A. No. If we had investigated or are investigating it,

1 my understanding it would not have been concluded.
2 Q. Okay. So much like with the COPs, generally the
3 validity of the service contracts with the City is a
4 subject of ongoing investigation that has not yet
5 concluded.
6 A. It may be the subject of ongoing investigation which
7 has not yet concluded.
8 Q. Okay. If I asked you how either of those two
9 investigations, the one into the COPs validity or the
10 one into the service contracts validity, impacted your
11 decision to enter into the forbearance agreement, you
12 will decline to answer because it would tend to reveal
13 attorney-client communications?
14 A. For all the reasons we discussed today, the -- yes, I
15 would have to.
16 Q. Mr. Orr, let me ask you about under section 803 of the
17 service contracts --
18 A. Yeah.
19 Q. -- I'm going to save us both from having to go through
20 them --
21 A. Yeah.
22 Q. -- so I'll represent to you what it relates to and see
23 if you've heard of it.
24 A. Okay.
25 Q. Okay?

13-53846-tjt   Doc 2024-4   Filed 12/10/13   Entered 12/10/13 17:34:52   Page 1 of 45

1     Under section 803 of the service contracts
2 payments by the City to the service corporations are
3 classified according to a waterfall.
4 A.  Um-hm.
5 Q.  Have you heard of this waterfall?
6 A.  Yes.
7 Q.  Okay. Did you evaluate whether there were any claims
8 that any parties to the structure might have against
9 one another if the forbearance agreement leads to the
10 payment of monies outside of the waterfall?
11 A.  I assume you're alluding to prioritization or
12 subordination in claims along those regards, and the
13 answer: I think there probably was, but, here again,
14 I would -- I did not do it independently. It would
15 have been done by my counsel.
16 Q.  Okay. So you can't tell me the fruits of the analysis
17 or the City's position on the likelihood of success on
18 the issue because it's protected by the
19 attorney-client --
20 A.  That is --
21 Q.  -- privilege?
22 A.  -- correct.
23 Q.  If I ask you how it impacted your decision to enter
24 into the forbearance agreement, you'd also not be able
25 to answer that on the basis of the attorney-client

1 privilege?
2 A.  That is correct. In addition, that's part of the
3 deliberative process.
4 Q.  Have you analyzed whether or not COP holders might
5 have claims against the Swap counterparties if the
6 City exercises the optional termination right?
7 A.  There -- have we analyzed it? The answer is yes, I
8 believe so.
9 Q.  Okay. What's the result of that analysis?
10 A.  Here again, any discussion would have been caught up
11 in discussions I would have had with my counsel in
12 that regard, so I decline to answer the question.
13 Q.  Okay. Have you analyzed whether those potential
14 claims may have an impact on whether the Swap
15 counterparties go forward with the optional
16 termination amount -- optional termination?
17 A.  I don't recall if we did that specific analysis. I --
18 I think that was probably caught up in the whole
19 universe of analyses of potential claims, pros and
20 cons analyses, but I don't recall that one
21 specifically.
22 Q.  We've just been talking now about the COPs. We've
23 talked about the Swaps a lot. I'm going to for a
24 moment reference the 2006 COPs Swap transaction
25 documents.

1 A.  Okay.
2 Q.  Do you know generally what I mean when I say that?
3 A.  Yes. The original documents by which the City
4 borrowed money, 1.4 billion, for the unfunded
5 actuarial liability --
6 COURT REPORTER: For the --
7 A.  For the unfunded actuarial liability involve -- the
8 organic documents.
9 BY MR. HACKNEY:
10 Q.  That is exactly correct. And, to name a few, there
11 are the service contracts, the contract administration
12 agreement, the trust agreement, and the master and --
13 and amended Swap agreements, correct?
14 A.  Yes.
15 Q.  You've heard of all of those?
16 A.  Yes.
17 Q.  And there are multiple versions of them?
18 A.  There are multiple versions of them.
19 Q.  For example, there are two service contracts --
20 A.  That's right.
21 Q.  -- because there are two service corporations.
22 A.  That's right.
23 Q.  Now, your understanding is that some of these
24 documents were amended in 2009 in connection with the
25 addition of the collateral agreement to the package,

1 correct?
2 A.  Yes. I'm going to take your meaning -- the amendment
3 to mean that's the -- yes, the net effect of what
4 happened in 2009.
5 Q.  Okay. Did you know, for example, that the service
6 contracts were also literally amended --
7 A.  Yes.
8 Q.  -- as part of that?
9 A.  Yes. We're talking generally about all the documents
10 without specifically going into each one.
11 Q.  Although I did -- I did in that last one.
12 A.  Yeah, you did, and so I'm following your lead on what
13 we're talking about.
14 Q.  Okay.
15 A.  Okay.
16 Q.  The Swaps were also themselves amended in addition to
17 the collateral agreement being created?
18 A.  I believe so.
19 Q.  Now, you're aware that these contracts that form the
20 2006 COPs Swap transaction documents were entered into
21 that were entered into the same day back in 2006? I
22 know you weren't there.
23 A.  Yeah, I wasn't there, and I have seen them. I just
24 don't recall sitting here today if they're the same
25 day. If you're representing to me that is a fact, I

Page 169

1 have no reason to believe otherwise.
2 Q. I believe the City ordinance describes this as all one
3 transaction.
4 A. Right.
5 Q. Do you have a basis to dispute it?
6 MR. SHUMAKER: Objection, calls for
7 speculation --
8 A. Yeah.
9 MR. SHUMAKER: -- foundation.
10 A. Yeah, I have no basis to dispute it. Yeah.
11 BY MR. HACKNEY:
12 Q. You also know -- I know that you haven't familiarized
13 yourself with the documents.
14 A. Right.
15 Q. We talked about that earlier.
16 A. Right.
17 Q. You took a look at them. You know that they all refer
18 to one other and relate to one another.
19 MR. SHUMAKER: Objection to the extent it
20 calls for a legal conclusion.
21 MR. JURGENS: Object to form.
22 A. Yeah, if -- without drawing any legal meaning to the
23 concept that they all refer to one another, I believe
24 that they do.
25 BY MR. HACKNEY:

Page 170

1 Q. Now, the forbearance agreement that you just signed on
2 July 15th, that also references the 2006 transaction
3 documents, correct?
4 A. I believe so.
5 Q. Okay. In fact, doesn't it borrow certain terms from
6 some of those documents?
7 A. Without -- yeah, without reviewing the 2005 and 2006
8 documents or spending time here today reading through
9 this agreement, I believe that's accurate.
10 Q. Okay. I will represent to you that I have reviewed it
11 and that it does --
12 A. Right.
13 Q. -- but I take your answer.
14 A. Right.
15 Q. The -- do you know that one of the things that the
16 City agreed to do under the forbearance agreement is
17 that during the optional termination period --
18 A. Right.
19 Q. -- the City won't try to seek to invalidate any of the
20 2006 transaction documents?
21 A. I believe that's true.
22 Q. Okay. That's one piece that's big enough that you're
23 familiar with?
24 A. Yeah, I believe that's true.
25 Q. So is it fair to say that the 2006 transaction

Page 171

1 documents, the collateral agreement from 2009, and the
2 forbearance agreement are all documents that relate to
3 the same subject matter?
4 A. Without drawing a legal conclusion, I believe in a
5 broad sense it's fair to say that they relate to the
6 same subject matter, meaning the Swaps.
7 Q. Does the forbearance agreement amend any of the
8 provisions in the 2006 COPs or Swap transaction
9 documents?
10 MR. SHUMAKER: Objection, document speaks
11 for itself.
12 A. Yeah. I want to be very careful here. In addition to
13 the document speaks for itself, I don't want to draw a
14 relationship between the COPs document, which is
15 separate, to the Swaps document.
16 When I said they relate broadly to the
17 subject, to the extent COPs were money borrowed to try
18 to fund a pension obligation, and the Swaps were in
19 place as a hedge against the interest rate
20 fluctuations in those documents, and the collateral
21 agreement 2009 was a document that was meant to
22 address defaults that had occurred in relation to the
23 Swaps document, and this document was meant to address
24 the Swaps, they relate to that same subject area, but
25 I don't want to have my testimony suggest that there's

Page 172

1 a legal relationship between the COPs and the Swaps
2 document as relates to this agreement, forbearance and
3 optional termination agreement.
4 BY MR. HACKNEY:
5 Q. So as you sit here today, is your answer that you
6 don't know if the forbearance agreement amends any of
7 the 2006 COPs Swap transaction documents? It may, it
8 may not, you don't know?
9 A. That is -- that is correct. I'm not going to draw a
10 legal conclusion.
11 Q. Yeah, and I'm not going to try to drive you to one.
12 A. Okay.
13 Q. I am asking questions as in your role as a layperson
14 who did execute the document.
15 A. Right.
16 Q. I understand the lawyers are going to do what they do,
17 okay, but there is as a aspect of this where it's --
18 your understanding as the guy who signs on it --
19 A. Right.
20 Q. -- can also be relevant?
21 A. That's right. My understanding is what this agreement
22 does -- it's a forbearance agreement, and to the
23 extent it has a provision in it that reverts back to
24 the status quo ante if -- if the deal's not done, I
25 don't want to draw any legal conclusion if there's an

1   amendment that exists after that process.
2   Q.   Okay.
3   A.   That's why I'm being hesitant.
4   Q.   So you just don't know one way or the other as you sit
5   here today the impact the forbearance agreement has on
6   the other agreements?
7   A.   With regard to an amendment, that's correct.
8   Q.   Okay.  Is it your understanding that the 2006 COPs
9   Swap transaction documents retain their vitality as
10  legal agreements to the -- of the parties thereto?
11  A.   It's my understanding that they have whatever vitality
12  they have according to their terms.
13  Q.   Okay.  So all the rights that all the parties to the
14  COPs Swap transaction documents had before the
15  forbearance agreement, they still have today?
16  A.   No.  Here again, you're -- I just want to be careful.
17  It seems that you're trying to conflate COPs with
18  Swaps, and I want to be careful.
19  Q.   Well, I want to say all of them, but if you say no,
20  it's different on these, some rights have changed, but
21  on these everyone's rights are preserved, that's okay.
22  A.   Yeah, I want to be careful as far as saying what their
23  rights are because I do believe those are legal
24  questions, and in fact some of them are being
25  litigated in the various piece of litigation that are

1   going on.
2   Q.   Hence this deposition?
3   A.   Hence this deposition.  So I want to be very careful
4   that I not give any testimony that would implicate a
5   legal conclusion with regard to those documents.
6   Q.   And I'm not asking for a legal conclusion.  I'm just
7   asking for your understanding as the signatory --
8   A.   Right.
9   Q.   -- as to whether the COPs Swap transaction documents,
10  whether all the parties preserved their rights under
11  those documents, not withstanding the forbearance
12  agreement, or whether the forbearance agreement
13  changes the parties' rights under those documents.
14  A.   And that's why I'm being careful because my
15  understanding of the forbearance agreement is that it
16  imposed upon the City, service corporations and the
17  counterparties certain obligations to forebear.  I'm
18  not going to draw a legal conclusion as to whether or
19  not that amended any rights or changed any rights
20  under the original documents.
21  Q.   It may have, it may not have?
22  A.   It may.  It may have not.  I'll leave that to the
23  attorneys.
24  Q.   It may constitute a waiver, it may not constitute a
25  waiver, you'll leave that to the attorneys.

1   A.   I'll leave that to the attorneys.
2   Q.   At the time that you entered into the forbearance
3   agreement, were you aware that the Swap insurers had
4   the right to consent to waivers, modifications or
5   amendments of the Swap agreement and the collateral
6   agreement?
7        MR. JURGENS: Objection to form.
8   A.   I was aware that some of the Swap insurers had
9   asserted they had those rights.  I had drawn no
10  independent legal conclusion as to whether or not they
11  did.
12       BY MR. HACKNEY:
13  Q.   Okay.  So you didn't know whether they were right or
14  they were wrong --
15  A.   Correct.
16  Q.   -- at the time you executed the agreement?
17  A.   I had had discussions with my attorneys about whether
18  they were right or they were wrong, but I had no
19  independent conclusions.
20  Q.   And you won't disclose the subject of your counsel's
21  communications?
22  A.   I cannot disclose that subject because that's an
23  attorney-client communication.
24  Q.   Did you evaluate when you entered into the forbearance
25  agreement, whether the act of entering into it would

1   multiply the amount of litigation that the City might
2   face?
3   A.   I think it's fair to say that we considered whether it
4   might.  Any time you're in a transaction I think you
5   consider whether it might suborn litigation, yes.
6   Q.   And what were your conclusions on this subject?
7   A.   Here again, any conclusions we would have had would
8   have been in this whole air of discussions with my
9   counsel.  What I can say, without saying what my
10  conclusions specifically were of the probability that
11  it might create additional litigation, is I thought
12  that overall it was in the best interest of the City
13  to enter into agreement.
14  Q.   But you won't disclose to me your communications with
15  your counsel about whether this might multiply the
16  amount of litigation?
17  A.   That is correct.  Multiply, increase, whatever.
18  Q.   And have you -- did you evaluate whether performing
19  under the forbearance agreement, performing -- and by
20  that I mean exercising the option.
21  A.   Right.
22  Q.   Whether -- let me say it again.
23       Have you evaluated whether exercising the
24  option under the forbearance agreement might subject
25  the City to additional liability?

1  A.  Here again, all of these issues regarding potential of
2  contingent claims, additional litigation, the
3  advisability of entering into the agreement,
4  considering that we were in litigation, and as I said
5  before there may have been litigation threats made
6  additionally, were taken into consideration in
7  consultation with my counsel.
8  Q.  But you can't disclose those communications?
9  A.  They are attorney-client communications.
10  Q.  All right.  Let me ask you some questions about the
11  proposed order which I've marked.
12  A.  Okay.
13      MR. HACKNEY:  You know what?  We've got a
14  five-minute tape coming up and maybe since we're about
15  to move to a new section, I'll propose a restroom
16  break.
17      THE WITNESS:  Okay.  That's fine.
18      VIDEO TECHNICIAN:  The time is 11:35 a.m.
19  This marks the end of tape number 2.  We are off the
20  record.
21      (Recess taken at 11:35 a.m.)
22      (Back on the record at 11:51 a.m.)
23      VIDEO TECHNICIAN:  We are back on the
24  record at 11:51 a.m.  This marks the beginning of tape
25  number 3.

1      MARKED FOR IDENTIFICATION:
2      DEPOSITION EXHIBIT 4
3      11:51 a.m.
4  BY MR. HACKNEY:
5  Q.  Let me hand you what I've marked as Orr Exhibit 4.
6      MR. SHUMAKER:  Are we going out of order?
7      MR. HACKNEY:  Yes.  These were pre-marked
8  and I must have dropped an exhibit here or there.
9  BY MR. HACKNEY:
10  Q.  Do you have Orr Exhibit 4 in front of you, sir?
11  A.  Yes, I do.
12  Q.  So, Mr. Orr, I'll represent to you that this is the
13  proposed order that your counsel submitted along with
14  the motion.
15      MR. HACKNEY:  Oh, sorry.
16  BY MR. HACKNEY:
17  Q.  Do you understand that?
18  A.  Yes.  Yes, I do.
19  Q.  Did you review this order prior to its being submitted
20  along with the motion?
21  A.  I don't think I did.
22  Q.  Okay.  Let me tell you that this order is actually of
23  some importance to the forbearance agreement.
24  A.  Um-hm.
25  Q.  And that's because if you don't get an order that is

1  in a form that's satisfactory --
2  A.  Yes.
3  Q.  -- to the Swap counterparties --
4  A.  I understand.
5  Q.  Yeah.
6  A.  I need to be clear.  Obviously I've reviewed and read
7  and signed the forbearance agreement.  I reviewed the
8  motion.  I just don't recall whether or not I reviewed
9  the order.
10  Q.  Okay.
11  A.  I may have because it was probably attached to the
12  motion.  I just don't have an independent recollection
13  of it.
14  Q.  Let's try and make sure we understand the potential
15  significance of the order --
16  A.  Sure.
17  Q.  -- and then we're going to go through it --
18  A.  Sure.
19  Q.  -- even though you haven't read it.
20      Do you understand the Swap counterparties
21  and the City and the service corporations -- there's a
22  provision in the forbearance agreement that talks
23  about the fact that you need to get an order
24  entered --
25  A.  Sixty days.

1  Q.  -- that's mutually agreeable.
2  A.  Yes.
3  Q.  And that was the 60-day time period.
4  A.  Yes.
5  Q.  And we can find the specific provision, but --
6  A.  Yes.
7  Q.  -- you know what I'm talking about.
8  A.  Yes, I do.
9  Q.  Okay.  So the form of the order is important.
10  A.  Um-hm.
11  Q.  Is that a yes?
12  A.  Yes.
13  Q.  And it's important because if the order changes
14  materially, it might arguably give the Swap
15  counterparties the right to declare an end to the
16  termination period.
17      MR. SHUMAKER:  Objection to the form, calls
18  for a legal conclusion.
19  A.  Here again, without making a legal assessment, I
20  understand your meaning that we -- we have an
21  obligation in the City to make sure the order is in a
22  form that is mutually agreeable to the parties.
23  BY MR. HACKNEY:
24  Q.  And this is it, right?
25  A.  That is the proposed order.

Page 181

1  Q.  And this one, you know, is mutually agreeable to the
2  parties.
3  A.  I believe that it is, yes.
4  Q.  I mean, you may not have negotiated it --
5  A.  Correct.
6  Q.  -- personally, but it's your expectation that people
7  acting on your behalf then went to make sure that the
8  proposed order was mutually agreeable to the Swap
9  counterparties?
10 A.  That is correct.
11 Q.  Okay.  Now, if the Court -- you understand that in
12 bankruptcy sometimes the Court enters an order that's
13 different from the one that was proposed.
14 A.  Yes.  I think the judge has done that on many
15 occasions in this case.
16 Q.  Yes.  And so you understand the judge is the one who
17 ultimately decides what the order says.
18 A.  The judge wears the robe.
19 Q.  That's right.  Now, the judge, it's possible he may
20 materially change some of the provisions of this
21 order.  Do you understand that?
22 A.  Yes.  It is possible that the judge may change the
23 order.
24 Q.  And I'm not going to ask you to commit to a position
25 as to whether you would lose your rights, but it at

Page 182

1  least raises the risk that if there's a material
2  change to the proposed order, the Swap counterparties
3  might be able to say that's not the order that we
4  mutually negotiated in advance of the motion so in my
5  view you haven't obtained the mutually negotiated
6  order.
7     MR. SHUMAKER: Objection, form, foundation.
8     BY MR. HACKNEY:
9  Q.  That's a risk?
10    MR. SHUMAKER: Sorry.  Objection to form,
11 foundation, calls for speculation.
12 A.  Yeah.  It is somewhat speculative, and I'd have to say
13 that risk has to be mitigated by the fact that I would
14 hope and anticipate that any proposed revisions to the
15 order would be discussed with the Court under the
16 guise of the obligations that the parties have to
17 reach a mutually agreeable order.
18    BY MR. HACKNEY:
19 Q.  Okay.  But if the Court enters an order that is not
20 mutually agreeable to the City and the Swap
21 counterparties, that could give the Swap
22 counterparties the right to terminate the optional
23 forbearance period?
24    MR. SHUMAKER: Objection, calls for
25 speculation.

Page 183

1  A.  Yes.  Here again, it's speculative, in my -- but I
2  don't anticipate that experience.  In my experience
3  most judges are -- my experience is that many judges
4  are very careful not to undermine the underlying
5  agreement by the order that's entered.
6     BY MR. HACKNEY:
7  Q.  So we can agree, though, that this order is an
8  important part of the forbearance agreement, correct?
9  A.  Yes.  I think the order is relevant to the forbearance
10 agreement.
11    MR. JURGENS: Objection, form.
12    BY MR. HACKNEY:
13 Q.  And it's important to it?
14    MR. SHUMAKER: Objection to form.
15 A.  I think it's a -- yes.
16    BY MR. HACKNEY:
17 Q.  Let me ask you about some of the specific provisions
18 in the order.
19 A.  Okay.
20 Q.  Let me just say real quick, do you know who negotiated
21 this order with the Swap counterparties?
22    MR. JURGENS: Objection, form.
23 A.  I assume it was my counsel.  I don't know who in
24 particular.
25    BY MR. HACKNEY:

Page 184

1  Q.  Did you -- but did -- did you approve the form of this
2  order before it was submitted for the City?
3  A.  As I said, I looked at the motion and the order was
4  probably attached to the motion.  I just don't
5  remember looking at the order specifically.  What I
6  remember is, after we reached the agreement in
7  principle and signed the forbearance agreement, having
8  discussions without speaking to them, my counsel,
9  okay, was -- let's document the agreement and get the
10 motion filed.
11 Q.  Do you know who -- do you know whether anyone
12 approached the service corporations to get their views
13 on the order?
14 A.  I do not.
15 Q.  You certainly didn't?
16 A.  No.
17 Q.  And let me just tie this up for a record because I was
18 asking it colloquially, but it's under section 1.3(j)
19 of the forbearance agreement.  The City needs to
20 obtain a final and non-appealable order on its motion
21 before September 16th, 2013 or else the Swap
22 counterparties have the right to terminate the
23 forbearance agreement; isn't that correct?
24 A.  Yeah.
25    MR. SHUMAKER: Objection to the summary.

1 A. Yeah. The agreement speaks for itself and there are
2 other provisions in there, but the net effect is that
3 you have to do -- obtain the order within 60 days
4 and --
5    BY MR. HACKNEY:
6 Q. Yeah.
7 A. -- I believe that's -- if you represent that's the
8 correct date, then I have no reason to disagree.
9 Q. And there are actually two elements to this here. One
10 of them is that, whatever the order says, it has to be
11 final and unappealable by September 16, correct?
12    MR. SHUMAKER: Objection, document speaks
13 for itself.
14 A. I'll have to rely on the documents speaking to itself
15 because without going through the whole -- I do recall
16 that there was an obligation that the order be a final
17 order. I don't recall specifically the -- the
18 unappealable aspect of it. I do -- I do see in J that
19 there's a 60-day provision going forward.
20    BY MR. HACKNEY:
21 Q. And do you see it says final and unappealable in J?
22 A. I'm sorry, I'm looking through it.
23 Q. No, that's okay. You what, the court order
24 definition?
25 A. Yeah. It doesn't say it in J as defined in 2.1(d),

1 and that's what I was looking. Unfortunately I -- I
2 remembered it was in 2. It's D. It's 2.1(d).
3 Q. And you --
4 A. It says obtain entry of a final and unappealable
5 order, yep.
6 Q. Are you aware that that's actually not possible as we
7 stand here today under the rules of the bankruptcy
8 code?
9    MR. SHUMAKER: Objection, calls for
10 speculation and a legal conclusion.
11 A. Yeah, here again, since I'm not acting as an attorney,
12 I'm going to defer from asking (sic) that question. I
13 do understand that there are time frames involved
14 under the bankruptcy code and under the rules as to
15 whether or not they can occur.
16    BY MR. HACKNEY:
17 Q. So you don't know whether or not it's -- it's
18 potentially impossible for the City to comply with
19 this --
20 A. Yeah, I would --
21    MR. SHUMAKER: Same objection.
22 A. I would not opine as to whether or not it's possible.
23    BY MR. HACKNEY:
24 Q. Have you or your representatives had any
25 communications with the Swap counterparties regarding

1 whether they will extend that 60-day deadline we were
2 just discussing?
3 A. I have not had any discussions. I am unaware as to
4 whether or not any of my representatives have.
5 Q. You haven't directed them to have any, correct?
6 A. No, not directly.
7 Q. It's correct that you have not directed them?
8 A. It is correct -- it is correct that I have not
9 directed them, but generally, just so we have an
10 understanding here, once the forbearance agreement was
11 reached, my counsel and representatives have all the
12 authority necessary to do what's required to get the
13 order entered.
14 Q. Okay. Well, let me ask it this way, which is, there
15 are a number of provisions that are in this order that
16 I -- I guess I'm maybe having the sense that you're
17 not intimately familiar with as you sit here today; is
18 that correct?
19 A. Yes, I know generally what the provisions of the order
20 are. I know that the motion speaks to both the
21 assumption and the 9019 agreement and their different
22 principles, but the specific inner workings of the
23 order, I will defer to my counsel on those.
24 Q. Let me ask you about some of them then. Look on the
25 page 3 at E which is entitled Consent to Use of Casino

1 Revenues.
2 A. Um-hm. Um-hm.
3 Q. And it contains a finding that says, "Pursuant to
4 section 1.2 of the forbearance agreement, UBS AG and
5 MLCS consent to the City's use of the casino revenue
6 as set forth in the forbearance agreement."
7    Do you see that?
8 A. Yes, I do.
9 Q. And then it says, "The consent of the UBS AG and MLCS
10 will allow the City immediate access to its casino
11 revenue as set forth in forbearance agreement and no
12 other or further consents are required."
13    Do you see that?
14 A. Yes, I do.
15 Q. Okay. Is this an important part of the proposed
16 order?
17    MR. SHUMAKER: Objection to form.
18 A. Well, first, the document speaks for itself. Two --
19    BY MR. HACKNEY:
20 Q. It doesn't speak for itself in terms of whether it's
21 important.
22 A. Well, let me respond. Two, to the extent this is an
23 order into a motion, it -- as we had discussed earlier
24 today, it's important that we have unfettered access
25 to the casino revenue; and, three, I do think this is

Page 189

1  a central aspect of the forbearance agreement.
2  Q.   Okay.  If the Court refuses to grant the relief
3  specified here, will the Swap counterparties have the
4  right to terminate the forbearance agreement in your
5  view?
6      MR. SHUMAKER: Objection, calls for a legal
7  conclusion.
8      You can answer.
9  A.   Yeah, they'll have whatever rights they have under the
10  forbearance agreement which might include termination.
11     BY MR. HACKNEY:
12  Q.   Take a look at paragraph G, arms' length agreement.
13  The forbearance agreement was negotiated at arms'
14  length and in good faith by all parties, and it goes
15  on to say, "UBS AG and MLCS are not insiders of the
16  City as that term is defined in bankruptcy code
17  section 10131?
18  A.   Um-hm.
19  Q.   And this is the important part I want to you focus on,
20  "The parties entry into and performance under the
21  forbearance agreement does not violate any law,
22  including the bankruptcy code, and does not give rise
23  to any claim or remedy against the parties thereto
24  except as may be expressly set forth in this order or
25  in such agreement."

Page 190

1      Do you see that?
2  A.   Yes.
3  Q.   Do you remember earlier we talked about whether if the
4  City performed under the forbearance agreement it
5  would be able to do so without the fear of liability
6  to other parties?
7  A.   Yes.
8  Q.   And your understanding was it could do so, correct?
9  A.   Yes.
10  Q.   And that so could the Swap counterparties, correct?
11  A.   Yes.
12  Q.   And isn't this provision one part of the basis for
13  your -- for that view?
14  A.   Well, you know, as I said, this provision draws a
15  legal conclusion and I have not independently or as an
16  attorney done an analysis of what this provision will
17  provide, but that's my understanding, yes.
18  Q.   Are you just reading this provision for the first
19  time?
20  A.   No.  I think I -- as I said, I think I saw the order
21  attached to the motion.  I just didn't recall it
22  immediately or as terms by itself.  I was more
23  familiar with the motion because I read that in
24  conjunction with my affidavit that was attached to the
25  motion, but I think that's the effect of what this

Page 191

1  provision does.
2  Q.   Is this an important part of the order --
3      MR. SHUMAKER: Objection.
4      BY MR. HACKNEY:
5  Q.   -- from the City's perspective?
6      MR. SHUMAKER: Objection, form.
7  A.   Yes, without giving rise to the nomenclature
8  important.  As I said before, it's important that we
9  have certainty and -- regarding the use of the casino
10  revenue, and this term certainly looks like it would
11  provide that.
12     BY MR. HACKNEY:
13  Q.   Okay.  And not only does it provide you the certainty
14  about the casino revenue, it provides you with the
15  certainty that you will not be -- the City will not be
16  subject to any liability as a result of performing
17  under the forbearance agreement, correct?
18  A.   Yes, I believe so.
19  Q.   And it does the same thing for the Swap
20  counterparties, correct?
21  A.   Yes, I believe so.
22  Q.   Take a look at paragraph 4 on the bottom of page 4.
23  A.   Um-hm.
24  Q.   It says, "The forbearance agreement is approved in its
25  entirety.  The City is authorized to perform its

Page 192

1  obligations that arise from the forbearance agreement
2  pursuant to Bankruptcy Rule 9019, and any actions
3  taken heretofore in furtherance of these obligations
4  are hereby ratified."
5      Do you see that?
6  A.   Yes, I do.
7  Q.   You understand that to be a provision by which the
8  Court provides a judicial authorization to the City
9  and the Swap counterparties to perform under the
10  forbearance agreement, correct?
11     MR. SHUMAKER: Objection, calls for a legal
12  conclusion.
13     MR. HACKNEY: I'm just asking for his
14  assumption.
15  A.   My understanding --
16     MR. SHUMAKER: Just to make that clear.
17  A.   My understanding is that is the practical effect of
18  this provision.
19     BY MR. HACKNEY:
20  Q.   Okay.  Is this an important part of this order?
21     MR. SHUMAKER: Objection to form.
22  A.   I think approval of the forbearance agreement is an
23  important part of this order, yes.
24     BY MR. HACKNEY:
25  Q.   But also the judicial authorization to perform.

Page 193

1  A.  Yes, I believe so.
2  Q.  Let me -- let me cut through some of these provisions,
3  which is, what the parties really want the Court to do
4  here, both the City and Swap counterparties, is to
5  tell them you are allowed to perform this forbearance
6  agreement without fear of reprisal from any third
7  party, correct?
8      MR. JURGENS: Objection to form.
9      MR. SHUMAKER: Objection to form.
10 A.  Yeah, and I also think it calls for a legal
11 conclusion, but let me see if I can answer the
12 question.  The motion sets forth what I believe are
13 the conditions necessary for approval of the
14 forbearance agreement.  This order seeks to approve
15 that motion, so to the extent it does that, yes, I
16 believe it authorizes the parties to perform and gives
17 them the authority to go forward to a motion according
18 to its terms which incorporates by definition the
19 forbearance agreement, so yeah.
20     BY MR. HACKNEY:
21 Q.  And they can do so without fear of liability to third
22 parties.
23 A.  You know, that -- that impacts upon -- I believe that
24 may impact upon the question is not atypical in some
25 orders as far as -- as we discussed earlier today,

Page 194

1  releases, third party liability, exculpation, those
2  are legal conclusions.  My understanding is that the
3  way the order is -- is worded that, yes, it allows the
4  parties to go forward.
5      COURT REPORTER: To --
6      THE WITNESS: To go forward.
7      MR. HACKNEY: Without liability to third
8  parties.
9      BY MR. HACKNEY:
10 Q.  I think we're going over ground we've gone over
11 before.
12 A.  Yeah.  I believe that's the intent of the order, yes.
13 Q.  Okay.  So one of the benefits of the order to the City
14 and the Swap counterparties is that to the extent
15 there are third party claims -- and I know you're not
16 conceding that there are any --
17 A.  Right.
18 Q.  -- it clears them away.
19 A.  I believe that's accurate, which is one of the -- yes.
20 I believe that's accurate.
21 Q.  And I take it the City is not willing to agree to an
22 order which ensures the protection of third party
23 claims?
24     MR. SHUMAKER: Calls for speculation,
25 objection.

Page 195

1  A.  Yeah, that's -- you know, there are so many -- there
2  are -- there's a possibility there may be conditions
3  under which the City could agree, so I don't want to
4  be misleading in saying that there are no
5  circumstances when -- but generally speaking, this
6  order, the motion and forbearance agreement, are the
7  expectations of the parties.
8  Q.  Are you aware of the possibility that if third party
9  claims are preserved, that that could be a
10 sufficiently material change in this order for the
11 Swap counterparties to be able to terminate?
12 A.  It might be.
13 Q.  Have you had any conversations with them about that
14 subject?
15 A.  I have not personally had any conversations with them
16 about that subject.
17 Q.  Have you directed folks that report to you to do so,
18 either advisors or personal --
19 A.  As I've said earlier, I've given the authority to my
20 counsel and team to have all discussions that are
21 necessary to address any contingencies that could
22 arise, and they may well have had those discussions.
23 I'm just not aware of any with specificity.
24 Q.  Okay.  But you gave a general direction.
25 A.  Right.

Page 196

1  Q.  You didn't give someone a specific direction to hey,
2  go find out what the Swap counterparties think if
3  third party rights are preserved, what are they going
4  to do, do we have a problem?  You never gave that
5  specific direction.
6  A.  No, I didn't, and let's -- you know, let's make sure
7  we're clear on this.  As I said, once we reached the
8  agreement, you know, my direction was okay, let's get
9  it done and let's document and do whatever's necessary
10 to do that, so I did not give a specific direction in
11 that regard.
12 Q.  Let me ask you real quickly.  One of the other
13 benefits of the forbearance agreement to the City is
14 that it resolves litigation that the City's currently
15 in with Syncora, correct?
16 A.  I would like to think so.  To the extent it draws a
17 legal conclusion, I'd have to defer to my counsel, but
18 I like to think it does that, yes.
19 Q.  So you think that the Court's order that we're looking
20 at here will actually moot pending litigations
21 involving the City and Syncora?
22 A.  Perhaps not.  For instance, and I haven't -- you know,
23 I haven't drawn a legal conclusion on this, but there
24 may be claims by the City against Syncora that survive
25 this order.  I just don't know.

Page 197

1 Q. Okay. As the City's litigation against Syncora stands
2 currently, will the Court's order moot out that
3 litigation?
4 A. I don't know.
5 MR. SHUMAKER: Objection, calls for a legal
6 conclusion.
7 A. Yeah, I was going to say I don't know. That -- that
8 calls for a legal conclusion and I have not
9 independently done that analysis.
10 BY MR. HACKNEY:
11 Q. Okay. So it may, it may not, you don't know?
12 A. It may, it may not. I don't know.
13 Q. The -- I want to talk about the source of proceeds for
14 any potential termination payment down the road. This
15 is a subject I discussed with Mr. Buckfire yesterday.
16 A. Um-hm.
17 Q. The optional termination amount fluctuates over time
18 and is ultimately pegged on the day that you exercise
19 the option; isn't that correct?
20 A. Yes, I believe that's correct.
21 MR. JURGENS: Objection to form.
22 BY MR. HACKNEY:
23 Q. So when we talk about these amounts, Mr. Orr, it's a
24 little bit difficult because we don't -- I can't tell
25 you you're going to have X amount of money to exercise

Page 198

1 it, but you understand that there is a distinct
2 possibility that the amount of the optional
3 termination payment will be a very sizable sum.
4 MR. JURGENS: Objection to form.
5 A. I think that it's fair to say that although the
6 interest rates may fluctuate, they are not going to
7 fluctuate so greatly that it will reduce the
8 probability that that will be a sizable sum. You're
9 not going to go from zero points or two points to
10 36 percent at the Fed discount window.
11 Q. Hopefully not or something's horrible happened.
12 A. Yeah, or we're all in trouble, yeah. So you may
13 fluctuate, but the range of fluctuation is generally
14 within a fairly finite bandwidth, we hope.
15 Q. And I'm going to give you some notional amounts that
16 are based on comments your counsel has made in court,
17 just to try and get general agreement.
18 A. Sure.
19 Q. But it's very possible that the amount of the
20 termination payment could be between 180 and 220
21 million dollars?
22 MR. JURGENS: Objection to form.
23 A. I think that's fair. We certainly hope it's on the
24 lower end or lower of that scale, but that depends
25 what the rates are at any given day.

Page 199

1 BY MR. HACKNEY:
2 Q. Okay. Now, let's link up the potential sizeable
3 termination payment that the City may have to marshall
4 if it wants to exercise the option with the City's
5 current financial capabilities.
6 A. Yes.
7 Q. Okay. Isn't it true that the City does not currently
8 have enough cash on hand to be able to fund a
9 termination payment that was in the range of 200
10 million dollars?
11 A. That is true.
12 Q. That's part of the problem that you're working
13 on as emergency manager, right?
14 A. That is certainly true.
15 Q. Do you know how much cash the City has today?
16 A. On any given day, we fluctuate approximately in the
17 neighborhood of I want to say 30 to 40 million
18 dollars. Right now that number may be a little bit
19 higher because we just went through one of our tax
20 collection periods in August.
21 Q. I'm going to guess and ask you do you stay in almost
22 daily contact with your -- with your cash flow
23 forecast?
24 A. Almost daily, yeah.
25 Q. Yeah. That's probably an important aspect of running

Page 200

1 the City.
2 A. It's an important aspect of the City.
3 Q. Do you still project that you're going to run out of
4 cash by the end of the year?
5 A. If we don't have this agreement, there's a very real
6 chance, yes, in a steady state, we will run out of
7 cash.
8 Q. And by -- what do you mean by a steady state?
9 A. If we don't do anything such as secure this casino
10 revenue, if we don't go to the capital markets and
11 borrow additional funds, which appears unlikely which
12 the City has done every other year since 2008 to make
13 up the difference, yes, the projections show that by
14 December of this year, we will run out of cash.
15 Q. Are those the pre-bankruptcy projections?
16 A. Yes. I believe so.
17 Q. Those are the projections that we'll get into in a
18 moment that -- but that assumes that the City's paying
19 its legacy expenditures on a current basis, right?
20 A. Yes. As we have -- as we have represented, we intend
21 to continue doing that throughout the year.
22 Q. The legacy expenditures?
23 A. Well, certainly with regard to healthcare and other
24 employees, if we get this agreement, that may change
25 our risk for the termination payment.

1 Q.   Your view of those legacy expenditures in the
2 bankruptcy is that they are unsecured claims, correct?
3 A.   Yes.  Many of them are, yes.  There are some
4 expenditures that are secured with regard to the water
5 department and parking and some miscellaneous, but the
6 roughly 11 and a half, 12 billion dollars that we put
7 out there we view as unsecured.
8 Q.   So let's go back to sourcing this termination payment.
9 A.   Yes.
10 Q.   It was my understanding of his testimony that
11 Mr. Buckfire who, by the way, is the individual tasked
12 with obtaining the City's post petition financing,
13 correct?
14 A.   Yes.
15 Q.   And is presumably the individual that's most
16 knowledgeable about that effort?
17 A.   Yes.
18 Q.   It was -- I'll represent to you that his testimony was
19 that the proceeds for the optional termination payment
20 would likely come from the post -- the proceeds of the
21 post petition financing?
22 A.   Yes.
23      MR. JURGENS: Objection to form.
24      BY MR. HACKNEY:
25 Q.   Is that also your understanding?

1 A.   Yes.
2 Q.   Okay.  Now, isn't it also true that the City hopes to
3 pledge the casino revenues as part of the collateral
4 package for the post petition financing?
5      MR. SHUMAKER: I'm going to object here.
6 We're getting into an area where it is incredibly
7 commercially sensitive as to what sort of post
8 petition financing that the City is seeking.
9      MR. HACKNEY: Let me not be rude.  I will
10 tell you I'm just going to ask him questions that
11 Buckfire asked yesterday -- answered.  So I'm not
12 going to try and play the whole thing, but there were
13 absolutely areas where Buckfire answered.  I think
14 there were a lot of other people in the room that were
15 there.  I think any of your colleagues --
16      MR. SHUMAKER: Okay, that's fine.
17      MR. HACKNEY: Any of your colleagues.
18      MR. SHUMAKER: I just want to caution you.
19      MR. HACKNEY: I understand.  I understand
20 the sensitivity.  There were absolutely areas, though,
21 that Buckfire talked about.  This was one of them.  I
22 mean can I get an Amen or --
23      (Consensus Amen.)
24 A.   Okay.
25      BY MR. HACKNEY:

1 Q.   Okay.  So I think there -- if I'm not mistaken, your
2 father was an amen minister.
3 A.   Great grandfather, grandfather and father.
4 Q.   So maybe --
5 A.   Yeah, took me back to -- over in the corner with the
6 deacons, yeah, took me back.
7 Q.   Okay.  I won't compare myself to your father,
8 grandfather and great grandfather, but I can aspire.
9 A.   Yeah.
10 Q.   So I do want to talk about -- this is important.
11 Okay.  This is -- isn't it true that one aspect of the
12 DIP -- I'm not going to get into the others -- is that
13 the casino revenues will be pledged or anticipated to
14 be pledged as collateral for the post petition
15 financing?
16 A.   Let me say this.  That is certainly under
17 consideration.
18 Q.   Okay.  Now, isn't it also true, though, that the
19 casino revenues have not currently been freed up on a
20 permanent basis because the City has not currently
21 exercised the option, correct?
22 A.   The certainty that we hope to get out of the
23 forbearance agreement has not been approved yet,
24 correct.
25 Q.   Well, even if it is approved by the Court, you still

1 won't have exercised the option.
2 A.   That is true with regard to the optional termination
3 payment.
4 Q.   Right.
5 A.   Yes.
6 Q.   And you need to exercise the option to terminate the
7 hedge, right?
8 A.   Yes.
9 Q.   You need to terminate the hedge to terminate the
10 collateral agreement.
11 A.   I think that's --
12      MR. SHUMAKER: Object to form, to the
13 extent calls for a legal conclusion.
14 A.   Yeah, without getting into legal conclusions --
15      COURT REPORTER: I'm sorry.  This is --
16      BY MR. HACKNEY:
17 Q.   You think it's a fair characterization that you need
18 to get the hedge terminated to get the collateral
19 agreement terminated?
20 A.   Yes.
21 Q.   And the good part for the City, if those things
22 happen, is that now you have unchanneled access to the
23 casino revenues going into the future?
24 A.   Yes, as we've said today, that certainty is one of the
25 motivations to enter into the agreement.

Page 205

1  Q.  But do you also understand that you can't currently
2  pledge the casino revenues to a post petition lender
3  in a -- prior to having exercised the option under the
4  forbearance agreement?
5  A.  Well, let's be careful without drawing legal
6  conclusions.  You can always enter into agreements
7  that have contingencies attached to them and the
8  parties will wait for those contingencies to occur.
9  That certainly has happened with a number of different
10  negotiations, not just in this case, but happens all
11  the time.
12  Q.  That's fair that you absolutely -- you make a pledge
13  that's contingent on something else.  But isn't it
14  true that, as a general matter, post petition lenders
15  typically like to make sure that they have clean
16  collateral before they make a loan that's secured by
17  that collateral?
18  MR. SHUMAKER: Objection, calls for
19  speculation.
20  A.  I think that's generally a fair characterization;
21  however, there have been cases that I've been involved
22  with outside of this one where post petition lenders
23  have been willing to make pledges or commitments
24  subject to certain contingencies.
25  BY MR. HACKNEY:

Page 206

1  Q.  Isn't it your expectation today, though -- is it -- is
2  it your expectation today that any post petition
3  lender will want clear -- a clear lien on the casino
4  revenues before it's willing to lend?  Is that your
5  current expectation?
6  A.  Well, my current expectation is it might well want
7  clear lien before it's willing to fund.  I would think
8  in many of the bankruptcy cases that I've been
9  involved in, post petition lenders, for instance, are
10  willing to make commitments subject to the Court
11  approving their super priority liens, and then once
12  that approval is granted, they fund the loan, so
13  that's fairly common.
14  Q.  I'm going to confirm for the record that conversations
15  with the State of Michigan about providing DIP
16  financing or with the federal government about
17  providing DIP financing are still questions that you
18  will refuse to answer on the grounds of commercial
19  sensitivity?
20  MR. SHUMAKER: I think you can ask Mr. Orr
21  those questions.  I don't want to -- I don't want to
22  categorically exclude you from doing that.
23  BY MR. HACKNEY:
24  Q.  Are they commercially sensitive?
25  A.  They are commercially sensitive, but I don't want to

Page 207

1  mislead you.  It is my assumption that, while they're
2  commercially sensitive, that's not going to be
3  forthcoming.
4  Q.  Oh, really?
5  A.  Yes.
6  Q.  So just to tie it up, you tried to get a -- whether
7  it's credit enhancement or liquidity from the State
8  and the Feds, and your expectation is that you won't
9  be able to?
10  A.  My understanding at the State level is that there's
11  certain prohibitions of the State law on the ability
12  of the State to lend to the City, and at the Federal
13  level my understanding is that it's not going to be
14  forthcoming, direct aid.
15  Q.  Interesting.  And what about credit enhancement by the
16  State?
17  A.  Here again, it's highly commercially insensitive --
18  sensitive.  I don't want to say anything that
19  forecloses it, but we -- let me answer it this way.
20  We are operating on the assumption that that will not
21  come -- be forthcoming.
22  Q.  The casino revenues are about 170 million dollars a
23  year; isn't that correct?
24  A.  Yeah, 170, 180 somewhere in there.
25  Q.  Yeah.  In fact, that -- it's interesting because the

Page 208

1  DIP proceeds you're seeking are up to 350; is that
2  correct?
3  A.  Here again, those are commercially sensitive, but I
4  think that's fair.  Yes, I think that's fair.
5  Q.  Okay.  And that's the equivalent of two years' worth
6  of casino revenues, correct?
7  A.  Yes.
8  Q.  Okay.  And that's something that you think you may be
9  able to get without having to pledge a clear lien on
10  the casino revenues, right?
11  A.  No.  What I'm trying to say is you can certainly enter
12  into commitments.  I'm drawing commitments different
13  from funding.  You can certainly have a lender which
14  is quite common in bankruptcy cases to make a
15  commitment subject to approval of its security
16  interest or priorities to actually fund.
17  Q.  Okay.
18  A.  So that can occur.
19  Q.  So the fact that that can occur means that there can
20  be uncertainty in connection with the casino revenues
21  and it won't hamstring your DIP process, correct?
22  A.  Yeah, it's not so much -- well, to a degree what
23  you're saying is correct.  It's not so much
24  uncertainty with casino revenues because that's math.
25  It may be some uncertainty with regard to the ability

1  of the City to pledge those revenues to pay off any
2  post petition lending, and, here again, a lender might
3  well be willing to enter into an agreement subject to
4  having that insecurity removed to fund that --
5  Q.  The fact of the matter is the DIP process is just
6  getting off the ground, correct?
7  A.  I think that's fair to say.
8  Q.  I think it's literally in the last couple days, right?
9  A.  I think that's fair.
10  Q.  So you don't know as you sit here today, and you
11  probably wouldn't tell me if you did --
12  A.  Right.
13  Q.  -- what the current appetite of the lenders is for
14  uncertainty around the casino revenues, correct?
15  A.  That -- that I think is part of the process.  Yeah.
16  Q.  Now, have you attempted to borrow money -- has the
17  City attempted to borrow money and secure those
18  borrowings with a lien on something other than the
19  casino revenues?
20  A.  No.
21  Q.  Is the -- is the City considering pledging art as
22  collateral?
23      MR. SHUMAKER:  Again, I'm going to get into
24  now the -- this is a very commercially sensitive
25  subject.

1      MR. HACKNEY:  I'm just asking the
2  questions.  You guys got to decide --
3      MR. SHUMAKER:  I'm just stating my
4  objection, and the fact of the matter is, as was
5  stated yesterday with -- with Mr. Buckfire, is that
6  when we get into the -- as you said, the RFP, the DIP
7  RFP process is just started.  We're not going to go
8  into strategy or what the terms are or what the
9  specifics are, because we do not believe that this is
10  something that would be down to the City's benefit.
11  If it's negotiated, gets public, and bidders' --
12      MR. HACKNEY:  Sure.
13      MR. SHUMAKER:  -- identities are revealed
14  and all these things --
15      MR. HACKNEY:  I don't mean to be rude, and
16  I totally respect the speech.  I'm just interested in
17  time, and for me the upshot is are you going to let
18  him answer or not?
19      MR. SHUMAKER:  Well, if will you repeat the
20  question, I'll tell you.
21      MR. HACKNEY:  I can't remember the question
22  anymore.
23  A.  Have you considered --
24      MR. HACKNEY:  Are you going to pledge the
25  art --

1  A.  Yeah.
2      MR. SHUMAKER:  I'm going to say that's --
3  we're drawing a line.  We're getting into specifics,
4  and I'm going to instruct him not to answer.
5      MR. HACKNEY:  I -- okay.  That's just all I
6  need to know for the record.
7      BY MR. HACKNEY:
8  Q.  Okay.  Now, I want to talk about revenue streams other
9  than casino revenues.
10  A.  Right.
11  Q.  The City does have other revenue streams; isn't that
12  correct?
13  A.  Yes.
14  Q.  In fact, on an annual basis, the City's revenues are
15  in the neighborhood of a billion to a billion 1,
16  correct?
17  A.  Yes, I think that's fair.
18  Q.  And on an annual basis, the casino revenues are in the
19  range of 170 to 180 million?
20  A.  Yes.
21  Q.  Roughly a little less than 20 percent of the City's
22  annual revenues.
23  A.  17 and a half, 18 percent.
24  Q.  Now, there's somebody who studied.  Okay.
25      So have you engaged the possibility of

1  pledging other revenue streams as security for the
2  DIP?
3  A.  This is a commercially sensitive area.  In addition,
4  there are potentially legal issues that must be
5  resolved.  Suffice it to say we have examined a number
6  of different possibilities, looking at what options we
7  might have given the City's various ordinary revenue
8  streams.
9  Q.  And are there other revenue streams that could be
10  pledged?  I'm not going to ask you whether you are
11  going to pledge them, whether you will, whether you
12  plan to, but are there other revenue streams that
13  could be pledged?
14  A.  There might be.  There might be, but there's -- here
15  again, there's certain legal issues regarding any
16  revenue streams that have to be resolved.
17  Q.  Let me ask you about the -- the use of the casino
18  revenues if you're able to obtain them.
19  A.  Right.
20  Q.  So just in terms of level setting --
21  A.  Right.
22  Q.  -- the casino revenues are approximately 15 million a
23  month.
24  A.  Yes, I think that's fair.
25  Q.  Net of the Swap payment which is still made on a

1 monthly basis under the forbearance agreement --
2 A. Yes.
3 Q. -- you net about 11 million?
4 A. I think that's correct.
5 Q. Okay. Your claim is that these revenues are necessary
6 to the operation of the City. I think we discussed
7 that earlier.
8 A. Yes.
9 Q. And in fact it's your expectation that you will use
10 these revenues to fund the reinvestment program that
11 you have planned with respect to the 1.25 billion
12 dollars of reinvestment in the City over the next ten
13 years?
14 A. Yes, that's correct. An average of 125 million a year
15 which a big component of it is this revenue.
16 Q. Okay. So fair statement, you're going to take the
17 casino revenues and you're going to plow them into the
18 City, correct?
19 A. More -- I mean, money goes into a bathtub, but yes.
20 The casino -- we don't have the casino revenue. We
21 have no other source to make reinvestment in the City.
22 Q. And that's what you want to do?
23 A. Yes.
24 Q. And so as a creditor, I'm going to make the obvious
25 point that you don't plan to take the casino revenues

1 and give them to the unsecured creditors, correct?
2 A. I think that's generally a fair characterization.
3 Q. So isn't it fair that other than perhaps certainly
4 benefitting the people of Detroit if you reinvested in
5 the City, the creditors themselves will not see their
6 recoveries enhanced by the fact that the City has
7 gained access to these casino revenues, correct?
8 MR. SHUMAKER: Objection, calls for
9 speculation.
10 A. Yeah, I'm going to be careful here because one of the
11 things we've offered in our proposal, June 14th
12 proposal, is a 2 billion dollar note that has some
13 capacity to fluctuate. Generally speaking, your
14 statement is true, but there's another concept that
15 without this reinvestment there's a very real chance
16 that the City will have no chance to stabilize and
17 grow and the creditors will see no opportunity for any
18 benefit because the City would have an inability of --
19 continue to decline, quality of life will continue to
20 decline, revenue from other streams will continue to
21 decline, and the City's ability to satisfy its
22 obligations to the creditors will continue to decline.
23 Q. Now, I understand that distinction, and we're talking
24 now about the proposal you've made to creditors that
25 you would give all of the unsecureds --

1 A. Yes.
2 Q. -- effectively a pot of 2 billion dollars of bonds.
3 A. Correct.
4 Q. And I want to distinguish between two concepts and
5 make sure that we're on the same page because I think
6 that we are.
7 A. Right.
8 Q. The first point is that you do agree that you're not
9 going to take the casino revenues and put it on top of
10 the 2 billion pot to make a larger recovery for
11 creditors.
12 A. Yes, that's fair.
13 Q. But you are saying that there could be some value to
14 the creditors of a revitalized Detroit because that
15 Detroit will be more able to perform under the
16 2 billion dollars in bonds that you're going to give
17 them as part of your proposal?
18 A. That's correct.
19 Q. Okay. Did I summarize accurately the distinction you
20 were trying to draw there?
21 A. Yes. Yes. There's a broader concept about the need
22 to revitalize the City and grow beyond just the
23 interest of the creditors. It's also for the citizens
24 and residents and future of the City.
25 Q. Oh, absolutely. I understand that.

1 A. But, yes, that's generally -- no direct benefit from
2 the casino revenue.
3 Q. Consistent with what we've just discussed then, you
4 haven't undertaken an analysis to show how much
5 creditor -- unsecured creditor recoveries will be
6 enhanced if the forbearance agreement is approved,
7 because you intend to use the money to reinvest in the
8 City.
9 A. No. I'm not sure that's true. I mean, that's why I
10 was saying before, part of it is enhancing the
11 stability of the City and its ability to meet or
12 actually to provide for that 2 billion dollar note.
13 It depends on large part on the ability to stabilize
14 the City.
15 Q. I understand that as a general concept, but I meant
16 have you undertaken actually any actual analysis of
17 the potential Delta 2 creditor recovery?
18 A. Oh, from the 120 -- from the casino revenue?
19 Q. Right.
20 A. Yes, I believe we have.
21 Q. And what does it show?
22 A. Here again, that's -- it's sensitive and, in addition,
23 I believe those discussions were caught up in
24 discussions I had with counsel, so I'm going to have
25 to decline.

Page 217

1    Q.   Those are privileged communications?
2    A.   I believe so.
3    Q.   So the analysis of how my client Syncora, as an
4    unsecured creditor, would do if the assumption motion
5    is denied versus how it will do if its granted, that's
6    something that you cannot speak to?
7    A.   Right, because it goes into the analysis, as we said
8    earlier today, what would happen if it were denied,
9    what the options would be to the City, what litigation
10   risk would happen, what would be caught up in the
11   existing litigation, all those issues.
12   Q.   Let me hand you Orr Exhibit Number 3.
13        MARKED FOR IDENTIFICATION:
14        DEPOSITION EXHIBIT 3
15        12:30 p.m.
16        BY MR. HACKNEY:
17   Q.   It's even in color.  One large view for you.  I don't
18   mean that di --
19   A.   Okay.
20   Q.   Sorry.
21   A.   I know you didn't.  Okay.
22   Q.   Yeah, okay.  Cringeworthy, awkward.  I apologize.
23        THE WITNESS: Can we go off the record for
24   a second?
25        MR. HACKNEY: Yeah.

Page 218

1        VIDEO TECHNICIAN: The time is 12:30 p.m.
2    (Discussion off the record at 12:30 p.m.)
3    (Back on the record at 12:31 p.m.)
4        VIDEO TECHNICIAN: We are back on the
5    record the time is 12:32 p.m.
6        BY MR. HACKNEY:
7    Q.   Mr. Orr, I am going to play it by the book --
8    A.   Okay.
9    Q.   -- from here on out, just to be safe.
10   A.   Sure.
11   Q.   And to the extent any of that was on the record, I do
12   want to offer a fulsome apology.  That was an
13   inadvertent reference.
14   A.   No apology necessary.  To the extent anybody thinks
15   there was an apology necessary, it's not.
16   Q.   Okay.  Well, I appreciate that.  Very gracious of you.
17        So in the motion to assume the forbearance
18   agreement, the City makes the claim that the City is
19   currently in a liquidity crisis; isn't that correct?
20   A.   Yes.
21   Q.   And that's something that you obviously agree with,
22   right?
23   A.   Yes.
24   Q.   Now, you prepared this proposal for creditors that
25   I've marked as Orr Exhibit 3 in anticipation of your

Page 219

1    June 14, 2013 meeting with creditors, correct?
2    A.   Yes, I and my team put this together.
3    Q.   And the best of your knowledge, this is a --
4    A.   True and correct copy.
5    Q.   -- true and correct copy?
6    A.   Yes.  I have no reason to believe this is not a true
7    and correct copy, in color.
8    Q.   Great.  Please don't --
9    A.   Okay.  This is --
10   Q.   And obviously -- we haven't talked about this, but
11   Ernst & Young was retained to -- by the City to
12   undertake efforts to understand the City's cash flow
13   forecast, among other things, correct?
14   A.   Yes, in addition -- yes.
15   Q.   And I know that you're involved in all aspects of the
16   City's operation as emergency manager, but isn't it
17   true that Ernst & Young is the entity responsible for
18   preparing the City's cash flow forecasts?
19   A.   Yes.  I am not an account; they are.  Yes.
20   Q.   Okay.  So while I'm certain that you have reviewed
21   their work product --
22   A.   Yes.
23   Q.   -- when it comes to actually compiling the forecast
24   itself, if I wanted to ask about how was this number
25   arrived at or this projection, I would have to ask

Page 220

1    Ernst & Young.
2    A.   You would -- yes, they'd be the best evidence of how
3    that was done.
4    Q.   Okay.  You might have knowledge about one number here
5    one number there because someone specifically
6    discussed it with you, but you don't have
7    comprehensive knowledge of how all the numbers in the
8    cash flow forecast were arrived at.
9    A.   No.  Usually the process is the financial advisor and
10   the -- Ernst & Young, for instance, would do the deep
11   dive and then present me with a report and analyses,
12   but they would have the in-depth knowledge.
13   Q.   Fair enough.  Fair enough.
14        You see their work product and you go over
15   with it with them.  You're not the one that compiles
16   their work product.
17   A.   That is correct.
18   Q.   Obviously, in compiling this report, you, Ernst &
19   Young, your other advisors endeavored to be as
20   accurate as you could in assembling the information
21   contained in this report?
22   A.   Yes.
23   Q.   And that also would apply to forecasts that you were
24   making.  You tried to be as accurate as possible about
25   making forecasts.

1 A.  Yes.

2 Q.  So let me draw your attention, if I could, to page 38

3 of this report.

4 A.  Yes.

5 Q.  Now, this is -- this is titled A Look At the Future in

6 the Absence of Restructuring Initiatives.  Do you see

7 that?

8 A.  Yes.

9 Q.  Okay.  So what this table is doing is it's saying here

10 is where the City of Detroit is headed without any

11 increases in expenditures necessary to restore City

12 services to adequate levels; without additional

13 investments by the City and services assets or

14 infrastructure; and, last, without any changes to

15 legacy liabilities, correct?

16 A.  Yes, that's correct.

17 Q.  Now, we're going to talk about each of these three

18 things in a moment, but the fact of the matter is each

19 of those three things have changed during the

20 bankruptcy process in terms of what legacy liabilities

21 are getting paid or what reinvestments are being made,

22 correct?

23 A.  To some degree they have and to some degree they

24 haven't.  We are still in a steady state with, for

25 instance, salary, overtime, fringe, health benefits,

1 operating expenses, with regard to secure debt

2 service, pension contributions which remain

3 underfunded, health benefits are still in a steady

4 state.  We are hopefully in a steady state on a

5 revenue side as well.

6 Q.  I was just making --

7 A.  But, yes.

8 Q.  I was making a simpler point, which is, for example --

9 we'll go into this, but like you're not paying the

10 service payments related to the COPs during the

11 bankruptcy?

12 A.  I believe that's correct.

13 Q.  Okay.  And I think you're deferring pension

14 contributions.

15 A.  A portion of the pension contributions.  For instance,

16 this year I think we had an obligation of

17 approximately 131 million dollars.  I think we paid 31

18 million of it.

19 Q.  Okay.  So a portion.

20 A.  But that is the steady state.  The City regularly

21 defers pension contributions.

22 Q.  True, true.  We'll get into this in a moment here,

23 but --

24 A.  Right.

25 Q.  -- now, the fiscal year of the City runs from June 30

1 to June 30, right?

2 A.  Yeah, July 1 to June 30.

3 Q.  Right.  Yeah.  Okay.

4    And the years that are listed here, it's

5 your understanding these are the fiscal years,

6 correct?

7 A.  2008 to 2012 are fiscal year actuals.  2013 were

8 preliminary forecasts, at this time forward.

9 Q.  That's right.  This was back in June, so you had a

10 little -- there was a stub period on June 2013?

11 A.  Yes.

12 Q.  When I talked to Mr. Buckfire yesterday, he indicated

13 that it was his understanding that these years are

14 July 1, 2013 through June 30, 2014 --

15 A.  That's correct.

16 Q.  -- 2014 here?

17 A.  That is correct.

18 Q.  Now, the forecast that the City indicates when it

19 comes to total revenues for the fiscal year that we're

20 currently in is about 1,082,800,000 in total revenue,

21 correct?

22 A.  That is correct.  That's down about 30-some-odd

23 million dollars from the prior year.

24 Q.  Right.  And if you look at the operating expenditures,

25 that shows that you anticipate 685.7 million in

1 operating expenditures during that -- this fiscal year

2 that we're currently in, correct?

3 A.  That is correct.

4 Q.  Now, if you just viewed these things in isolation, you

5 are representing here a net operating surplus of just

6 under $400,000,000, correct?

7 A.  That's roughly, correct, yes.

8 Q.  Now, the -- and the operating expenditures are the

9 amount of money that you forecast needing to operate

10 the City as you found it with its current level of

11 services when you were appointed, correct?

12 A.  That is correct.

13 Q.  Okay.  So that's the point of the caveat at the top,

14 which is you have the aim of improving services in the

15 City, but when you compiled this expenditures

16 analysis, this was based on here is how we currently

17 do things in the City of Detroit, providing the level

18 of services we currently provide, and here is how much

19 it costs?

20 A.  That is correct.

21 Q.  Now, isn't it true that -- we've talked about the fact

22 that while the casino revenues fluctuate between 170

23 and 180 million, even if you took them out of this

24 forecast, you would still have a net operating surplus

25 of $227,000,000, correct?

Page 225

1  A.  Well --
2  Q.  Put aside --
3  A.  Yeah, put aside --
4  Q.  I understand.
5  A.  -- debt service and pension contributions, healthcare,
6  but just looking at operating expenses, that would be
7  correct.
8  Q.  And -- that's right.  I'm emphatically doing that.
9  I'm referring to --
10  A.  Right.
11  Q.  -- this line.  Okay?
12  A.  Right.
13  MR. SHUMAKER: Which line, Steve?
14  MR. HACKNEY: The line that says net
15  operating surplus.
16  A.  It's in bold.  It's the 1, 2, 3, 4th line down.
17  BY MR. HACKNEY:
18  Q.  And, I mean, can we agree it wasn't an accident that
19  whoever compiled this broke the legacy expenditures
20  down below the operating expenditures, correct?
21  A.  Yes.  I'm sure that was intentional.
22  Q.  Right.  And that's because, for example, while
23  payments to the COPs are likely very important to the
24  COP holders --
25  A.  Right.

Page 226

1  Q.  -- they're not something that you actually use to run
2  the City.
3  A.  Well, yes, it's not an operating expense.
4  Q.  Right.
5  A.  It's a debt service.
6  Q.  Right.
7  A payment to a police officer for their
8  time or for their benefits, that is an operating
9  expense?
10  A.  Absolutely.
11  Q.  And that's all covered in the operating expenditures.
12  A.  Yeah.  Salary over time and fringe benefits, yes.
13  Q.  Okay.  So if you follow along in my hypothetical and
14  we took out what we'll call a hundred -- we'll split
15  the difference.  We'll say it's 175,000,000.
16  A.  Sure.
17  Q.  I'll tell you in here it's projected to be 170 -- why
18  don't we use the number here.  If we took the 170 out,
19  you'll still have 227.2 million dollars to work with
20  from the standpoint of a net operating surplus,
21  correct?
22  A.  Yes, roughly $230,000,000.
23  Q.  Okay.  Your reinvestment plan I believe calls for a
24  billion and a quarter over ten years and it's commonly
25  described as being about $125,000,000 a year.

Page 227

1  A.  Yes.  There's one caveat to that.  It is front end
2  loaded that almost 500,000,000 of that will be spent
3  in the first six years going forward, but that's the
4  average over ten years.
5  Q.  Okay.  So if -- there's some element of lumpiness to
6  it.
7  A.  Yes.
8  Q.  It was 500,000,000 over the first --
9  A.  Over the first six years.
10  Q.  Oh, so that's less than 125 a year.
11  A.  No, it's more.  It's 500,000,000 over the first six
12  years -- I believe it's on page 47 -- maybe on page 47
13  or 48.  If you look on page 47, not to go out of
14  sign -- but if you look at the second to the last bold
15  line, it says reinvestment in the City.  Starting in
16  2014 you'll see, for instance, the total reinvestment
17  in the City will be $188.5 million dollars.
18  Q.  I'm sorry, I blanked on you.  What page are you on?
19  A.  Oh, I'm sorry.  Page 47, the second to the last bold
20  line, you will see that in the first year of the
21  preliminary forecast -- this is in a steady state, so
22  we're comparing steady state to steady state --
23  without any adjustments that that reinvestment
24  expense, total reinvestment in the City will be 188.5
25  million dollars and --

Page 228

1  Q.  Oh, I see it.  Okay.
2  A.  Third line up from the bottom.
3  But if you wanted to average it, it would
4  be 125 over ten years.
5  Q.  Oh, I see.  And it drops off quite a bit in --
6  A.  Right.  After the six years, it drops off to $32.8
7  million.
8  Q.  And if I recall, what I had said to you earlier is
9  that even if we take out the casino revenues, you will
10  have $227,000,000 in net operating surplus to work
11  with.  That's where we were before we broke.
12  A.  Right.  Operating, but that still does not adjust for
13  other expenditures, legacy expenditures we call them.
14  Q.  That's true.  All of which -- the large majority of
15  which are unsecured claims in the bankruptcy, correct?
16  A.  Well, if you look on page -- go back to page 38 where
17  it says net operating surplus, you'll see the first
18  line below net operating surplus is debt service and a
19  portion of that one -- portion of that 141.4 for year
20  2013 or 135.9 for year 2014 is secured debt service.
21  Q.  Some portion of the gold bonds is secure?
22  A.  Some portion is secured, roughly -- roughly
23  30,000,000.
24  Q.  That's a very appropriate caveat.  I will say with
25  that caveat and with the caveat of the Swaps, the

Page 229

1 remainder of the claims under legacy expenditures are
2 ones that you consider unsecure.
3 A. Yes. That's how we treated them in our proposal.
4 Q. And by the way, even with respect to the Swaps, I've
5 been giving you full credit for the 170 of the casino
6 revenues, but you actually have to not -- you have to
7 net the swap payments out against it, at least until
8 you exercise the --
9 A. Yes. Yes. Yes, that's correct.
10 Q. So with respect to the 188, we can agree that the 227
11 net operating surplus you have, as a matter of math
12 and subject to your qualifications about certain
13 secured legacy obligations, is larger than 188?
14 A. Yes. The surplus is assuming that we make no pension
15 contributions, we do not service -- you have to back
16 out of that -- you call it 227. I call it 230. You
17 have to back out of there approximately $30,000,000 in
18 debt service under the LTGO and UTGO --
19     COURT REPORTER: I'm sorry, under the?
20     THE WITNESS: I'm sorry.
21 A. Under the LTGO and UTGO cat -- the bonds category debt
22 service, so that would leave you with a net of roughly
23 200,000,000, and then if you look on the 2014 column,
24 you would see that if -- if some portion of pension
25 contributions were made and some portion of healthcare

Page 230

1 benefits were made, that would essentially wipe out
2 the 200,000,000, and that's not dealing with the COPs
3 or the Swaps payment.
4 Q. It is however your expectation that substantial
5 portions of retiree health and benefits will be
6 deferred at a minimum?
7 A. They essentially have to be because we won't have the
8 money.
9 Q. That's right. And also pension contributions,
10 substantial parts of those are being deferred at a
11 minimum?
12 A. This year we deferred some and we are anticipating
13 deferring more, and again -- but that creates a
14 deferred pension obligation. There are two things
15 that's missing from this analysis. One is we have a
16 general operating deficit going forth this year, about
17 $387,000,000, for which there's no provision made in
18 the cash flow analysis, and we have an aggregate
19 deferred pension contribution number close to
20 200,000,000.
21     So while I under -- take your point that if
22 you were to take out from 1.1 billion, deduct the
23 roughly 700 million in operating expenses, would leave
24 you with a net of 400 million, if you were to back out
25 the 170 million or so in wagering expenditures, you

Page 231

1 get the 230. If you take out the 30 million in
2 secured bonds, you'd have 200 million, there's so much
3 significant debt that it's not adjusted, we wouldn't
4 have that 200 million.
5 Q. Let me ask you about something I read in the
6 newspapers.
7 A. Okay.
8 Q. So I want to ask whether it's true or not. Isn't it
9 true that two days before the City filed for
10 bankruptcy you held a meeting with community leaders?
11 A. I had a public meeting with the public as well as
12 community leaders --
13 Q. Did you have a closed door meeting with community
14 leaders two days before --
15 A. I'm sorry.
16 Q. -- the bankruptcy?
17 A. Let me correct that. I'm sorry. I was thinking
18 about -- we're looking at this document, so I was
19 thinking about the meeting with creditors.
20     The bankruptcy was July 18th.
21 Q. Yes.
22 A. I believe I did have a meeting with leaders roughly
23 July 16th, is it?
24 Q. And was it a closed door meeting?
25 A. I don't recall, but it may been.

Page 232

1 Q. Now, it's been reported in the press that during that
2 meeting one of the things that you said to these
3 community leaders was that the first thing to be done
4 to help the City with the City's bankruptcy was to,
5 "Deal with these Huns on Wall Street."
6     Did you say that, Mr. Orr?
7 A. I may have said that.
8 Q. Okay.
9 A. Some people make misstatements, as witnessed today.
10 So I may well have said that.
11 Q. I will -- I will suggest to you, earlier, and I want
12 to reiterate that was truly unintentional.
13 A. Steve, as I said, some people may make misstatements,
14 and as I said today it happens.
15     I may have said that.
16 Q. When you said that about the Huns of Wall Street, I
17 take it wasn't like a slip of the tongue. Did you
18 mean to say hey, the first thing I mean to do is deal
19 with the Huns of Wall Street?
20 A. No. Let me explain that. What I meant to say by that
21 is look, we've got to deal with adjusting our debt to
22 the creditors as well as our obligations to the
23 laborers, and I used -- I used I think the
24 nomenclature Huns. It was probably too colloquial,
25 too slip of the tongue.

Page 233

1 I wasn't meaning to impugn anyone's
2 character. That was an allusion to a statement that
3 I've seen used before, you've got to keep the Huns out
4 of the portals, and that's all I meant.
5 Q. When you talk about the Huns of Wall Street, you mean
6 banks, bond holders, bond insurers, Swap insurers,
7 Swap counterparties, etcetera, correct?
8 A. Whatever's on Wall Street, yes.
9 Q. Yeah.
10 A. Largely speaking.
11 Q. You mean the clients of the folks in this room, in the
12 main?
13 A. Well, some of whom were my ex-clients, who probably
14 will no longer be, but yeah.
15 Q. I understand. But wouldn't you agree, Mr. Orr, that
16 while the last, you know -- going back to 2006, when
17 they had that COPs transaction, I know that it's been
18 a challenging time in Detroit, but the Huns of Wall
19 Street were some of the people that kept the City's
20 lights on by providing credit to the City?
21 A. Let me say this, and I'm not going to use the word Hun
22 anymore.
23 Q. Okay.
24 A. I've since learned to be very careful with my words.
25 The capital markets have assisted the City in many,

Page 234

1 many ways over the years, and as I said before earlier
2 today, in addition to providing funding in 2008, 2010,
3 2012 when the City was in very dire straits, so I do
4 not mean to impugn in any way the help that the
5 capital markets have provided to the Cities -- to the
6 City.
7 What I do mean to say is given the dire
8 straights that the City is in, and the fact that under
9 any set of circumstances, it can no longer afford to
10 pay this debt, there has to be adjustment of this
11 debt, particularly the unsecured debt portion, and
12 that's both for the capital market community,
13 including banks, private equity, as well as for the
14 obligations we owe to our labor counterparts,
15 including health and pension funds.
16 Q. In fact, bond holders, the so-called COP holders, as
17 part of the 2006 transaction, they contributed a
18 billion four that ultimately went into the pension
19 funds, correct?
20 A. I believe that was the number, yes.
21 Q. And if that hadn't happened back then, all things
22 being equal you'd have an even larger unfunded pension
23 liability than you currently do, right?
24 A. Well, I'm going to be careful about what would have
25 happened because it may have -- you know, it's

Page 235

1 speculative as far as what happened. In fact, before
2 I took this job, I read several articles that advised
3 the City to file bankruptcy in 2005. So I'm going to
4 be careful about what would have happened if the City
5 had not received that 1.4, because at that time, my
6 understanding -- I wasn't here, but from what I read
7 that was to supposed to secure the unfunded portion of
8 the pension liability at that time, and it didn't work
9 out so well, but there was provision of credit to the
10 City.
11 Q. In your mind, when you made the statement, were you
12 trying to convey to people that you view the
13 pensioners' claims or the retirees' claims or the
14 current employees' claims for pension benefits or --
15 or health benefits as more important than the claims
16 of unsecured creditors like Wall Street participants
17 such as my client?
18 A. No. I was not trying to make any value judgments
19 about the claims. What we had done -- here again, as
20 I said, it was a colloquialism that I made in a closed
21 door meeting, but I was not trying to convey to anyone
22 that we were treating any class of creditors --
23 unsecured creditors differently than the others. As
24 provided for in our proposal, we were treating them
25 all equally.

Page 236

1 Q. We're coming up on the one o'clock hour, which is
2 almost the end of my time, and I think I'm going to
3 just ask you a couple questions to tie up and then --
4 A. Sure.
5 Q. -- I'll allow you to go get a well-deserved lunch.
6 A. Thank you.
7 Q. I've asked you earlier about selling the art and I
8 asked you about it as considering it as a potential
9 backup plan to the negotiations with the Swap
10 counterparties.
11 A. Right.
12 Q. Do you remember that testimony?
13 A. Yes, I do.
14 Q. We went back and forth.
15 A. Yes.
16 Q. I'd like to bring it forward to the future, to the
17 present.
18 A. Yes.
19 Q. Which is, are you under active consideration now of
20 using the art to alleviate the liquidity crisis and to
21 do all of the things that you say you want to do in
22 this proposal?
23 A. No. There are no plans to use the art or any other
24 asset in particular to liquidate it to
25 relieve liquidity issues in the City. What I have

Page 237

1  said when I first took this job, and continue to say,
2  all options are on the table. We are currently
3  beginning the process of appraising approximately
4  3,500 pieces of art in the City of the 66,000 that are
5  there at the DIA, and once we go through that process,
6  we will have to decide what, if anything, we need to
7  do, but I have no plans to use art to relieve the
8  liquidity crisis that the City is in now.
9  Q.  So let me offer an observation for you to react to,
10  which is, earlier on when I was asking you questions,
11  you were telling me about the terrible things
12  happening in the City, people dying, being shot, the
13  seriousness of the problems with which you're
14  grappling.
15  A.  Yes.
16  Q.  You've also identified the assumption motion as
17  something that needs to be moved along quickly because
18  of its importance to the issues that we discussed,
19  right?
20  A.  Right.
21  Q.  Why isn't the art equally important to allowing you to
22  fix Detroit?
23  A.  I haven't said that it's not important. What I've
24  said is there are no plans to liquidate it to address
25  those concerns. I think it is fair to say that there

Page 238

1  has been much debate as to the value of art versus
2  alleviating a number of other concerns, and I've heard
3  that debate and I've listened to it, but our first
4  order of business is to assess what we're talking
5  about and then we'll decide what, if anything, we need
6  to do.
7  Q.  Isn't it fair to say that you certainly haven't put
8  the art time line, in terms of your decision-making
9  process, you haven't given it the same sort of speed
10  you've given to the forbearance agreement time line?
11  MR. SHUMAKER:  Object to the form.
12  A.  Yeah. I think it's fair to say that in our proposal I
13  think we included roughly 15 buckets of assets, and
14  none of them have been given the same priority that we
15  deem the forbearance agreement principally because
16  we're not in default with regard to art. We're in
17  default with regard to the Swap agreement.
18  Q.  Well, that was actually going to be my point, which
19  is, you own the art.
20  A.  Yes.
21  Q.  So you don't have to negotiate with anybody in order
22  to sell it, right?
23  A.  No, but a prudent thing to do, and we've said this
24  before, is to find out what we're talking about first,
25  and that's why we're going through an appraisal

Page 239

1  process.
2  Q.  Just a few more questions and I'll pass the baton.
3  A.  Sure.
4  Q.  I take it that when you were appointed as emergency
5  fin -- emergency manager, you familiarized yourself
6  with some of the prior negotiations that had gone on
7  around efforts to resolve the Swap that I believe were
8  referenced in the 2012 CAFR of the City of Detroit.
9  A.  Consolidated report, yes.
10  Q.  You at least made inquiry as to what happened last
11  year when you tried to work this out.
12  A.  Yes.
13  Q.  And it's also your understanding that the potential
14  right of the Swap counterparties to terminate the Swap
15  and demand a large termination payment goes back all
16  the way to March of 2012; isn't that correct?
17  A.  At least, yes.
18  Q.  Thinking that's consistent with your report here --
19  A.  Yes.
20  Q.  -- you say that.
21  A.  Yes.
22  Q.  So isn't it true that from March 2012 all the way to
23  June 4, when Mr. Buckfire went into the negotiating
24  room for the first time with the Swap counterparties,
25  during that entire time, the Swap counterparties had

Page 240

1  never trapped cash?
2  A.  To the best of my knowledge, that's true.
3  Q.  And they had never declared a termination event?
4  A.  To the best of my knowledge -- to the best of my
5  knowledge, that's true.
6  MR. HACKNEY:  Mr. Orr, I'd like to thank
7  you for your time. We have -- as I mentioned, we have
8  divided up our examination. There are a number of
9  different objectors here. I have attempted to
10  coordinate some of the common subjects so that we
11  could have --
12  THE WITNESS:  Sure.
13  MR. HACKNEY:  -- one 4-hour period that we
14  have come nearly to the end of, and I'm going to pass
15  the baton to my other objectors. I may review my
16  notes to see if I have follow-up.
17  THE WITNESS:  Sure.
18  MR. HACKNEY:  And so I'll reserve my time
19  technically, but I want to get out of the way of the
20  other folks so they can start asking questions. And
21  consistent with what we discussed earlier, I thought
22  we might take a short lunch break.
23  THE WITNESS:  Sure.
24  MR. HACKNEY:  Off the record.
25  VIDEO TECHNICIAN:  The time is 12:57 p.m.

1  this marks the end of tape Number 3. We are off the
2  record.
3     (Recess taken at 12:57 p.m.)
4     (Back on the record at 1:48 p.m.)
5     VIDEO TECHNICIAN: We are back on the
6  record at 1:49 p.m. This marks the beginning of tape
7  number 4.
8     EXAMINATION
9  BY MS. DiBLASI:
10 Q.  Good afternoon, Mr. Orr. My name is Kelly DiBlasi.
11 I'm an attorney at Weil, Gotshal & Manges. We
12 represent Financial Guaranty Insurance Company, which
13 people generally refer to as FGIC.
14 A.  FGIC.
15 Q.  As I go through my questions with you this afternoon,
16 if you could please assume that the same ground rules
17 that Mr. Hackney discussed with you earlier today
18 still apply.
19 A.  Yes.
20 Q.  You spoke to Mr. Hackney earlier today about the Swap
21 contract and the fact that they hedge against the
22 interest rate risks that's associated with the series
23 2006-B COPs, correct?
24 A.  Yes.
25 Q.  And what is your understanding of how this hedge is

1  accomplished?
2  A.  As we discussed earlier today, depending upon the
3  interest rate fluctuations, they're supposed to
4  convert the fix rate that was in the original
5  documents -- variable rates some people say -- to a
6  fixed rate based upon whether interest rates go up or
7  down. And since the parties have essentially bet
8  against each other, depending upon which way the rates
9  go, one party may owe an obligation to the other.
10 Q.  So based on that understanding that you just
11 articulated, is it fair to say that from the City's
12 perspective, it's as if the series 2006-B COPs have a
13 fixed rate of interest?
14 A.  That was the intent. That's my understanding.
15 Q.  Have you ever heard of a structure like this being
16 referred to as creating a synthetic fixed rate of
17 interest?
18 A.  Yes. I may have heard that. There are
19 other phrase -- I think I've read that somewhere.
20 Q.  Prior to executing the forbearance agreement, did you
21 do anything to inform yourself about the structure of
22 the COPs and the Swap contracts and in particular why
23 they were structured the way that they were?
24 A.  If I can address your question in two ways, yes, I did
25 something to inform myself about the structure, and

1  yes, I did some -- I had some discussions and analyses
2  about why they were structured the way they are.
3  Depending upon how far back your question is asking
4  about that analyses, it may or may not be true.
5  Q.  So -- so let's in particular go back to 2005 --
6  A.  Right.
7  Q.  -- which is really when the structure initially was
8  put in place, correct?
9  A.  Yes, I believe so.
10 Q.  And what is your understanding as to why in 2005 the
11 transaction was structured so that the COPs -- the
12 series 2005-B COPs had a variable interest rate hedged
13 with the Swap contracts?
14    MR. SHUMAKER: Objection to form,
15 foundation.
16 A.  Yeah. Let me say I only know what I've read, and it
17 seemed to say that that was the nature of the
18 transaction based upon the certificates of
19 participation to lend the City ultimately the 1.4
20 billion dollars, and that I don't know the intent of
21 why they did not at that point provide for a fixed
22 rate, but I know that the Swap contract was entered
23 into the hedge against the variable rate that was in
24 the original document.
25    BY MS. DiBLASI:

1  Q.  Would you answer the same if I asked you as to why it
2  was structured that way in 2006?
3  A.  Yes.
4     MR. SHUMAKER: Same objection.
5  A.  Yes. I don't know the intent behind the parties at
6  that time.
7     BY MS. DiBLASI:
8  Q.  Do you know who designed the structure either in 2005
9  or 2006?
10 A.  Other than the parties that appear on the documents,
11 no, I do not know who designed the structure. I don't
12 know if it was their counsel or the principals. No, I
13 don't know.
14 Q.  Is there any benefit to the City from having
15 the 2000 -- series 2006-B COPs have a floating rate of
16 interest hedged by the Swap contract as opposed to
17 just issuing them with a fixed rate of interest?
18 A.  I don't -- as I just said, I don't know what the
19 parties were thinking back in 2005 and 2006, as
20 opposed to -- as to why they wanted that structure,
21 and so any statement I would have would either be a
22 derivative based on what I read or speculative on what
23 I think was going on in the capital markets at that
24 time.
25 Q.  Understood. Today can you -- are you aware of any

13-53846-tjt  Doc 2024-4  Filed 12/10/13  Entered 12/10/13 17:34:52  Page 21 of 45

Page 245

1  benefit from that structure that I described?
2  A.  Well, the -- yes.
3  Q.  What benefits are you aware of?
4  A.  The benefit currently is, given the debt that was
5  taken out and the Swap contract, the interest rates
6  could actually make the optional termination payment
7  decrease.
8  Q.  Are there any other benefits that you're aware of?
9  A.  Not principally, no.
10  Q.  Would the City have had to pay higher interest rates
11  if the COPs were issued with fixed rates?
12  A.  I don't know.
13  Q.  Would the City have agreed to a structure where the
14  2006-B COPs were issued with a floating interest rate
15  without having a Swap contract in place?
16  A.  I don't know.
17  Q.  And you're aware of the fact that FGIC and Syncora
18  each insured portions of the payment of principal and
19  interest to the series 2006-B COPs, correct?
20  A.  That is my understanding.
21  Q.  Are you aware of any benefit to FGIC and Syncora
22  insurers of these variable rate certificates to having
23  the interest rate hedge in place?
24      MR. SHUMAKER: Objection to form.
25  A.  None, other than the fact that they might be able to

Page 246

1  benefit based upon interest rate fluctuations, but not
2  aware of any other benefit or what the intent of the
3  parties were.
4      BY MS. DiBLASI:
5  Q.  Are you aware of any harm or risk that FGIC or Syncora
6  might insure if the Swap contracts are terminated?
7  A.  I think there are some risks that they insured as a
8  basis of an insurer, yes.
9  Q.  What risk might that be?
10  A.  There -- in terms of the Swaps?  There may be some
11  risk that a claim could be made to the extent payments
12  weren't made.
13  Q.  And would there be any risk to FGIC and Syncora with
14  respect to the insurance policies on the COPs
15  themselves if the Swap contracts are terminated?
16      MR. SHUMAKER: Objection, calls for
17  speculation.
18  A.  Yeah.  I mean, you say there may be, but I'm -- I'm
19  not aware of any specific certain risks, no.
20      BY MS. DiBLASI:
21  Q.  Are you aware of the fact that FGIC and Syncora -- and
22  I think you alluded to this just a minute ago -- that
23  FGIC and Syncora also insured the obligations to the
24  Swap counterparties under the Swap contracts, correct?
25  A.  Yes.

Page 247

1  Q.  Are you aware that when FGIC issued the policies in
2  2006 insuring the Swap contracts, FGIC did not charge
3  a premium in addition to the premium charged for the
4  2006 COPs policy?
5  A.  No.
6      MR. SHUMAKER: Objection, form, foundation.
7  A.  Yeah.  No.
8      MARKED FOR IDENTIFICATION:
9      DEPOSITION EXHIBIT 5
10      1:56 p.m.
11      BY MS. DiBLASI:
12  Q.  Mr. Orr, I'm going to hand you what I've marked as Orr
13  Exhibit 5.
14  A.  Yes.
15  Q.  The documentation is entitled Presentation to FGIC.
16  It's dated April 26, 2005.  If you'd please take a
17  moment to look at it and tell me when you've had an
18  opportunity to do so.
19  A.  Okay.
20  Q.  Mr. Orr, have you seen this Exhibit Number 5 before?
21  A.  I may have, but I don't recall doing so.
22  Q.  What is your sense for what this document is?
23  A.  I think the document speaks for itself, but it seems
24  to be a SlideDeck regarding -- Presentation to FGIC is
25  what it's titled regarding the series 2005

Page 248

1  certificates of participation.
2  Q.  In looking at it, does that refresh your recollection
3  of whether you may have seen it before?
4  A.  No.
5  Q.  Does it appear to you that this presentation was
6  prepared by the City of Detroit?
7      MR. SHUMAKER: Objection, foundation.
8  A.  No.  I can't say that.  It has the City of Detroit
9  logo.  It's a green giant on it, but that doesn't mean
10  it was prepared by the City of Detroit.
11      BY MS. DiBLASI:
12  Q.  Let's turn now, Mr. Orr, to the topic of the consent
13  rights or -- of FGIC and Syncora topic that you were
14  discussing with Mr. Hackney earlier.
15  A.  Yes.
16  Q.  And actually, let's focus specifically on the
17  negotiations that the City engaged in with the Swap
18  counterparties leading up to the execution of the
19  forbearance agreement.
20  A.  Okay.
21  Q.  And when you were speaking with Mr. Hackney, you
22  testified that you yourself did not invite either FGIC
23  or Syncora to those negotiations, correct?
24  A.  Yes.  To the best of my knowledge, that's true.
25  Q.  And I believe you said you also didn't suggest to

1 anyone else that they should invite FGIC or Syncora to
2 those negotiations, correct?
3 A. Yes. I believe I testified I did not instruct anybody
4 to invite them.
5 Q. To your knowledge, did anyone else suggest inviting
6 either FGIC or Syncora to the negotiations?
7 A. As I testified earlier today, there were a series of
8 letters that were exchanged, and at some point there
9 was some discussion about Syncora submitting a
10 proposal. That discussion was wrapped up into whether
11 or not it would sign a reciprocal nondisclosure
12 agreement. To the best of my knowledge, that never
13 happened.
14 Q. But I think we established that the letter exchanged
15 with Syncora occurred at some point after June 11th,
16 when there had been an agreement in principle on the
17 economic terms of the forbearance agreement; is that
18 correct?
19 A. Yes. I believe we -- we testified that June 11th we
20 reached agreement and principally documented,
21 June 14th we had the presentation for creditors, and
22 the letter I saw earlier today I think was dated
23 June 17th.
24 Q. That's right. So prior to June 11th, did anyone else
25 to your knowledge suggest inviting either FGIC or

1 Syncora to the negotiations?
2 A. Not to my knowledge, no.
3 Q. And you mentioned just a minute ago that there had
4 been some discussion with Syncora or representatives
5 of Syncora about an alternative proposal to the
6 forbearance agreement, and I think you said to
7 Mr. Hackney that there had been no negotiations with
8 FGIC about an alternative proposal; is that correct?
9     MR. SHUMAKER: Objection to form.
10 A. Yeah, it's a compound question, but I think the way I
11 would answer it, yes, we would talk about whether or
12 not someone had been invited. And I think what I said
13 is to the best of my knowledge I did not invite FGIC
14 and I did not know if anybody else did.
15     BY MS. DiBLASI:
16 Q. To your knowledge, was there any negotiations by the
17 City with FGIC about the forbearance agreement prior
18 to the City executing the forbearance agreement?
19 A. There may have been. I seem to recall one of our
20 attorneys -- you used the word negotiation and, here
21 again, as I said earlier today, without getting caught
22 up in the nomenclature, I don't want to characterize
23 what was going on, but I think there was -- I remember
24 hearing something about some discussions with FGIC,
25 but I don't recall who. Whether or not there were

1 negotiations would have to be determined.
2 Q. So I think you said you -- you thought maybe it was
3 someone from your -- Jones Day who had initiated or
4 who had participated in -- in this discussion?
5 A. Yes. I believe someone on the finance side at Jones
6 Day, yes. They may have. I seem to recall some
7 discussion about they had had discussions with FGIC.
8 Q. Do you have any recollection as to when that took
9 place?
10 A. I do not. It may be prior to the July -- June 11th
11 agreement in principle after, but I don't have a
12 specific recollection.
13 Q. When you were speaking with Mr. Hackney about the
14 negotiations with the Swap counterparties that you
15 personally took part in, I believe you said that you
16 had participated in a number of conference calls; is
17 that correct?
18 A. Yes.
19 Q. Was FGIC or a representative of FGIC on any of those
20 conference calls?
21 A. No. The conference calls I was referring were
22 conference calls between me and my attorneys. There
23 were conference calls that I had with Mr. Buckfire and
24 a principal on behalf of Syncora, but to the best of
25 my knowledge, there weren't FGIC representatives on

1 those calls.
2 Q. So you were not on any conference calls with the Swap
3 counterparties negotiating the terms of the
4 forbearance agreement?
5 A. Yes. Yeah, I -- let me correct myself.
6 Q. Sure.
7 A. I said -- I just said Syncora. I think I meant the
8 Swap counterparties.
9 Q. Okay.
10 A. There were no conference calls. There were letters
11 with Syncora, not conference calls with Syncora.
12 Q. Just so I'm clear in my understanding, did you
13 participate in conference calls with the Swap
14 counterparties negotiating the terms of the
15 forbearance agreement?
16 A. Yes.
17 Q. Was FGIC or a representative of FGIC on any of those
18 conference calls?
19 A. No. To the best of my knowledge, no.
20     MS. DiBLASI: Thank you for your time,
21 Mr. Orr. That's all I have.
22     THE WITNESS: Sure. Thank you very much,
23 Mrs. DiBlasi.
24     MR. HACKNEY: I was worried that I missed a
25 pretty significant area of inquiry there.

Page 253

1  THE WITNESS: I was looking at this letter
2  and Syncora popped into my head, so that's -- long
3  day.
4  EXAMINATION
5  BY MR. MARRIOTT:
6  Q.  Good afternoon, Mr. Orr.
7  A.  Good afternoon.
8  Q.  I'm Vince Marriott. I'm with Ballard Spahr, and I
9  represent a holder of 152 million dollars in the 2006
10  COPs. We refer to it by agreement as EEPK, and I hope
11  we can stipulate that I will have to pronounce the
12  entire name for you.
13  MR. SHUMAKER: Stipulated.
14  A.  Mr. Marriott, we will stipulate as such.
15  BY MR. MARRIOTT:
16  Q.  Ironically enough it's German.
17  A.  We wouldn't try.
18  Q.  Mr. Hackney was very comprehensive and I don't have a
19  lot.
20  A.  Okay. Yes, he was.
21  Q.  One of the things you -- one of the things Mr. Hackney
22  asked you about was if in the course of the
23  negotiation of the forbearance agreement, you had what
24  he referred to as a plan B. Do --
25  A.  Right.

Page 254

1  Q.  -- you recall him asking that question?
2  A.  Yes, I recall that discussion. Yes.
3  Q.  And you responded by saying, without specifically
4  having a plan B, you had considered alternative to the
5  forbearance agreement structure, correct?
6  A.  Correct.
7  Q.  Can you tell me what alternatives to the forbearance
8  agreement you considered at the time?
9  A.  Without getting into the discussions with my counsel
10  or with commercially sensitive information with the
11  investment banker and/or both, the alternatives
12  generally centered on the need for reinvestment in the
13  City and what we would do if we could not secure the
14  funds to have that reinvestment and what kind of
15  reinvestment proposal, if any, we could put together.
16  Q.  And are you able to articulate more specifically
17  whether you consider -- or what specifically
18  considered as alternative source of the funding for
19  reinvestment?
20  A.  I think as I said with Mr. Hackney just before the
21  break, I have said fairly consistently since I've been
22  here that everything's on the table, but we had not
23  specifically looked at liquidation of any particular
24  bucket of assets in relation to this. All we had
25  considered was if we could not secure the critical

Page 255

1  need for the casino revenue, which was urgent and
2  critical and would not in our opinion at that point be
3  able to make a reinvestment of the City, what would
4  the City look like going forward.
5  Q.  Let me ask you the question this way. Did you
6  consider what I'll describe -- and if you want me to
7  be more specific I can try to be.
8  A.  Um-hm.
9  Q.  Did you consider capital market alternatives to the
10  forbearance agreement?
11  A.  We did, but to be perfectly honest with you, the City
12  had borrowed so much money from the capital markets
13  without the probability of being able to pay it back
14  on any reasonable or rational time frame that that
15  wasn't a serious consideration was taking on more
16  debt.
17  Q.  Okay. So you didn't really believe that had you a
18  what we -- what I just described as a capital market
19  alternative to the forbearance agreement?
20  A.  The City has no -- what I've said at the June 10th --
21  public meeting on June 14th we were addicted to debt
22  and we had no ability to take on additional debt.
23  Q.  Okay. All right. And this may re-plow some ground
24  and I apologize to the extent it does, but in the
25  context of your negotiation of the forbearance

Page 256

1  agreement, and by yours I mean the City's --
2  A.  Yes.
3  Q.  -- it was with the understanding that the Swap
4  counterparties asserted a lien in the casino revenues,
5  right?
6  A.  Yes.
7  Q.  Would the City have entered into the forbearance
8  agreement with the Swap counterparties if they did not
9  assert a lien in the casino revenues?
10  MR. SHUMAKER: Objection, calls for
11  speculation.
12  A.  Yeah. I was going to say that's a hypothetical, and
13  it would depend on a number of different issues, so
14  I'm not quite sure I can answer you. All I can say is
15  that our need for that cash was so significant that we
16  might well have considered anything.
17  BY MR. MARRIOTT:
18  Q.  All right. Let me ask the question this way then. Is
19  it fair to say that the optional termination amount of
20  pay will be paid by the City to obtain clear title to
21  the casino revenues?
22  MR. JURGENS: Objection to form.
23  MR. SHUMAKER: Objection, form and calls
24  for legal conclusion.
25  A.  Without getting into the concept of title, what I will

13-53846-tjt    Doc 2024-4    Filed 12/10/13    Entered 12/10/13 17:34:52    Page 24 of 45

Page 257

1   say, and what I've said today, is the forbearance
2   agreement is designed to remove uncertainty with
3   regard to the City's access to the casino revenue
4   which is essential.
5       BY MR. MARRIOTT:
6   Q.  All right.  Let me ask the question this way.  Is it
7   your understanding that the Swap counterparties will
8   no longer assert a lien in the casino revenues if paid
9   the optional termination amount?
10      MR. JURGENS: Objection --
11  A.  Yes.
12      MR. JURGENS: -- to form.
13  A.  It's my understanding that it's going to resolve all
14  those issues, and as I said earlier today, including a
15  release of liens to the extent they have any.
16      BY MR. MARRIOTT:
17  Q.  Okay.  Now, I understand your description of the
18  City's current operational needs --
19  A.  Right.
20  Q.  -- for access to the casino revenues.
21  A.  Yes.
22  Q.  If those casino revenues were otherwise available to
23  the City, for current operation's purposes, would
24  removal of the lien be necessary -- or removal of the
25  asserted lien be necessary?

Page 258

1       MR. SHUMAKER: Objection, calls for
2   speculation.
3   A.  Yeah, this again is a hypothetical question, but I
4   believe you may be alluding to the discussion I had
5   with Mr. Hackney regarding whether the stay would
6   provide us unfettered access, and I think what I said
7   there is that's something we'd have to examine, but
8   the whole concept of the forbearance agreement was to
9   deal with removing any uncertainty regarding our
10  access to the casino revenues so that we could put in
11  place a reinvestment plan.
12      BY MR. MARRIOTT:
13  Q.  Okay.  I wasn't clear, I don't think --
14  A.  Okay.
15  Q.  -- in what I'm trying to get at.
16  A.  Sure.
17  Q.  I'm not asking you whether or not there was an
18  alternative to releasing -- I'm just asking whether
19  you believe there was a legitimate alternative to
20  release of the lien to get access to those funds.
21      What I'm asking you is that assuming you
22  had access to those funds on some basis, without the
23  need to release the lien --
24  A.  Um-hm.
25  Q.  -- is a release of the lien today --

Page 259

1   A.  Um-hm.
2   Q.  -- necessary for the City to currently operate?
3   A.  To currently operate?
4   Q.  Yes.
5       MR. SHUMAKER: Object to the hypothetical.
6       Go ahead.
7   A.  If you're drawing a distinction between currently
8   operating and the reinvestment plan that we have, what
9   I would say is we are currently operating in the
10  status quo.  So the answer to your question would be
11  to the extent the Swap counterparties have a lien
12  interest in the casino revenue, it would not be
13  necessary because that's where we are now.
14      BY MR. MARRIOTT:
15  Q.  Okay.  And so what do you view release of the lien as
16  necessary to?
17  A.  The release of the lien is essential so that the City
18  has certainty in terms of going forward so that we can
19  plan, as is required both under Chapter 9, but more
20  importantly, in my perspective, under Chapter -- under
21  Public Act 436.
22      436 imposes an obligation on me within
23  18 months to come up with a plan to put the City on a
24  sustainable footing going forward before the
25  expiration of my term, and even if you could come up

Page 260

1   with a plan without release of those liens, that would
2   leave some uncertainty and would be, in my opinion, a
3   violation of my duty as emergency manager to provide
4   that certainty for the City to move forward in a
5   sustainable fashion.
6   Q.  Okay.  So and if I'm paraphrasing your answer
7   incorrectly --
8   A.  Right.
9   Q.  -- tell me.
10      Release of the lien is necessary to a
11  viable exit strategy from the Chapter 9 proceeding?
12  A.  That's part of it.  Not just the Chapter 9 proceeding.
13  As I said, I think what's missing in some of the
14  discussion is the fact that I have an independent duty
15  under Public Act 436 to put the City on a sustainable
16  footing.  That is my obligation.  And leaving liens in
17  place in a City that has defaulted, as we discussed
18  earlier today, under multiple different factors would
19  be irresponsible.
20  Q.  One of the other things that Mr. Hackney and you
21  discussed was whether or not the Swaps and the COPs
22  and the insurance associated with the Swaps and the
23  cops --
24  A.  Right.
25  Q.  -- were what Mr. Hackney described as an integrated

Page 261

1 transaction.
2 A. Um-hm.
3 Q. Do you recall that discussion?
4 A. Yes, I do recall that discussion.
5 Q. Your counsel in a hearing on August 21st -- and I'll
6 represent this to you --
7 A. Okay.
8 Q. -- whether you're aware of it or not. It described
9 the 2009 transaction with respect to the COPs and the
10 Swaps as severing the tie --
11 A. Um-hm.
12 Q. -- Between the COPs and the Swaps. Do you have an
13 understanding of what that means?
14    MR. SHUMAKER: Objection to form.
15 A. I have not consulted with my counsel regarding what
16 was meant by that statement, so I'm going to qualify
17 my answer by saying to the extent it calls for a legal
18 conclusion or an analysis, that this is my
19 understanding in a layman's sense.
20    But what I think -- and your question began
21 with the concept of the insurance for the COPs and
22 Swaps, so I also want to say my understanding there
23 may be different insurance obligations related to the
24 COPs that in our view are unrelated to the obligations
25 under the Swaps. I don't want to conflate the two.

Page 262

1    And further, anything I can say in that
2 regard, because I have not talked to my counsel, would
3 be speculative as far as what they meant. Okay? But
4 what my understanding is, is that that would relieve
5 us under the agreement, forbearance agreement, of any
6 of the obligations that are necessary under the Swaps.
7 I sincerely don't know what that statement means with
8 regard to the COPs.
9    BY MR. MARRIOTT: That's all I have. Thank
10 you.
11    THE WITNESS: Thank you, sir.
12    EXAMINATION
13    BY MS. ENGLISH:
14 Q. Hi, there.
15 A. Hi. How are you?
16 Q. Good. How are you?
17 A. I am well. Thank you.
18 Q. I'm Caroline English.
19 A. Hi, Caroline.
20 Q. We met before in the Chrysler case and I don't know if
21 you recall.
22 A. Oh, you know --
23 Q. We can talk later. It's all right.
24 A. Yeah. We will talk later. I was going to say I
25 recognized you over there.

Page 263

1 Q. Yeah. So I'm from Arent Fox?
2 A. Okay.
3 Q. And this time I reco -- I represent Ambac.
4 A. Okay.
5 Q. Okay?
6 A. Okay.
7 Q. I'm going to apologize in advance in advance if I jump
8 around a little bit or seem to jump around because I'm
9 going to try to plug some holes from your earlier four
10 and a half hours of testimony that you've given
11 already.
12 A. Thank you.
13 Q. Okay. Same rules apply, right?
14 A. Yes.
15 Q. Okay. This is a small question. Earlier in response
16 to Mr. Hackney, his questioning, he asked you a
17 question about the collateral agreement and your
18 response was which collateral agreement.
19 A. Um-hm.
20 Q. I want to make sure. Is there any other collateral
21 agreement other than the 2009 collateral agreement
22 we've spoken about?
23 A. No. I just think that was earlier on in my deposition
24 by Mr. Hackney, and I just wanted to make sure we were
25 being specific about the terms. I wasn't meaning to

Page 264

1 allude to another collateral agreement.
2 Q. That's fine. I just wanted to make sure I --
3 A. Sure.
4 Q. -- didn't miss a large transactional document here.
5 Okay?
6 A. Sure.
7 Q. Mr. Hackney also asked you some questions about the
8 service corporations and about whether there were any
9 negotiations on behalf of the City with the service.
10 Corporations?
11 A. Yes.
12 Q. Okay. I believe you answered that negotiating with
13 service corporations would not have been your job. It
14 would have been Ken Buckfire's or someone else's job
15 to do that.
16 A. Yes. I believe that's right.
17 Q. Okay. If it wasn't Ken Buckfire's job, who else's job
18 would it have been?
19 A. It might have been someone else on his team or at
20 Miller Buckfire or someone else on behalf of the other
21 counsel for the emergency manager or the City.
22 Q. Someone else in your office you mean?
23 A. No. No. Other consultants and attorneys on behalf of
24 the City.
25 Q. Okay. But am I correct that no one has reported to

Page 265

1  you that they had negotiations with the service
2  corporations; is that correct?
3  A.  Yeah, reported.  I'm going to be careful.  My
4  understanding was we had an agreement, I signed it,
5  and it was sent to the service corporations.  I
6  personally had no negotiations with them, but my
7  understanding, based upon the fact it was executed,
8  that whoever needed to procure and secure those
9  signatures did so.
10 Q.  You don't know who got those signatures from the
11 service corporations?
12 A.  No.  Sitting here today I do not.
13 Q.  You also testified earlier -- Mr. Hackney's helping me
14 out here.
15    Do you -- are you assuming then that there
16 were some negotiations between the City and the
17 service corporations?
18 A.  Yeah.  Here again, I'm going to say whenever you -- as
19 I said to Mr. Hackney, whenever you talk about
20 negotiations, you know, so we don't get bogged down in
21 nomenclature, I'm assuming that something happened
22 that had the service corporations aware of the
23 agreement, that they agreed to and they signed off on
24 it.  So if those constitute negotiations, that's what
25 I'm assuming, but I'm saying to you that I had no

Page 266

1  independent negotiations and I don't know who did
2  that.
3  Q.  And you don't have any idea sitting here today about
4  what those negotiations would have involved, how they
5  happened, when they happened, how long they took,
6  anything like that; is that right?
7  A.  That's right.
8  Q.  You testified earlier about state aid and federal aid,
9  the possibilities of getting aid from other government
10 sources.
11 A.  Yes.
12 Q.  With respect to state aid, when did the City make a
13 request of any kind to the State for aid?
14    MR. SHUMAKER:  Objection, foundation.
15 A.  Assuming the predicate that some request was made,
16 which I don't think is true, what became clear from
17 various discussions with the State was that this was a
18 hole that the City had dug for itself and it needed to
19 find its way out of it on its own.
20    I think at some point we were also informed
21 that there are State prohibitions against the State
22 lending money to the City, either state ordinances --
23 State statutes or constitutional prohibitions, so that
24 would not have been a possibility in any event.
25    BY MS. ENGLISH:

Page 267

1  Q.  Let me back you up to the start of your answer, which
2  was that my predicate you did not believe to be true.
3  A.  Yes.
4  Q.  So let me ask you a question.  To your knowledge was
5  any request of any kind ever made to the State for
6  aid?
7  A.  Here's -- I'm not trying to be evasive, but here's the
8  issue I'm having with your question.  It's not so much
9  if there was ever a request.  As I said earlier today,
10 I have regular discussions with the governor and other
11 officers on behalf of the State, and it became clear
12 to us in terms of whether or not it was made -- a
13 request seems to suggest that we asked the State for
14 money and they said no, and what I'm saying to you is
15 we had a discussion that even if that was an
16 alternative in some fashion, me or a representatives
17 on my behalf -- I don't remember -- that the State
18 couldn't do that in any event, so I'm not sure there
19 was a request made.  What I'm trying to say is that it
20 became clear that that was not an option.
21 Q.  In other words, it became clear to you that making any
22 such requests would have been futile.
23 A.  Yeah, I'm staying away from request.  It just became
24 clear that the State couldn't do that, yes, one way or
25 the other.

Page 268

1  Q.  All right.  I have the same questions about federal
2  aid, and let me start again with the predicate.  Was a
3  request ever made of any kind for federal government
4  aid?
5  A.  Not by me.  Not for -- well, let me correct that.  Not
6  for direct federal government aid in the terms of
7  either a loan or a grant, meaning money.  I did have a
8  meeting with Senator Levin where he informed me and
9  actually gave me a list of a number of different grant
10 programs, ordinary grant programs, that are available
11 to the City, as well as other cities, by which we
12 could apply for additional grants and we're reviewing
13 those now.
14    So I want to be clear when people say
15 federal aid, it became clear to us that no one was
16 going to give us, for lack of a better word -- people
17 use the word bailout, which I don't like -- but a
18 direct grant of money, but there are other programs
19 that the City can apply for to get federal assistance.
20 Q.  Okay.  With respect to the federal grant programs you
21 just mentioned, at this point in time, have any
22 applications been submitted for any of these grant
23 programs?
24 A.  At this point in time, there may -- there may be.  We
25 received that a couple weeks ago and I know two things

1  as has been reported. We're currently doing an
2  analysis of our grants administration and application
3  process to make it better, and I think we're also
4  reviewing it for making specific grant requests, I
5  think some specifically related to public safety.
6      So I don't know if -- sitting here today if
7  actual documents have been submitted, but I know we
8  are mining the federal programs with an eye toward
9  making applications and some have been made or some
10  are near to being made.
11 Q.  Are there specific grants you're targeting in this
12  application process?
13 A.  That's handled by the folks in the City bureaucracy
14  and consultants, so I -- as I said, health, safety and
15  welfare, meaning police, fire, EMT, City grants
16  meaning blight, HUD grants and others, yes, but
17  sitting here today, I don't know which specific ones
18  have been submitted.
19 Q.  And who was handling that process?
20 A.  Ultimately, in my office, it would be a combination of
21  the existing -- hopefully in the City as well --
22  existing grant procurers, you know, whether they're at
23  different departments in planning and development,
24  police and fire. It would be at that level, at a line
25  level, would be applying for grants.

1  Q.  Is that going to happen under your supervision?
2  A.  I certainly hope so, yes.
3  Q.  Do you have any idea of how much money in grant
4  programs might be available to the City?
5  A.  Well, the City has already applied for somewhere in the
6  neighborhood of 300 million in 71 programs. We have
7  been told that none of those 71 programs are in
8  compliance. Some of those programs we're receiving
9  technical assistance from HUD --
10     COURT REPORTER: I need you to slow down.
11     THE WITNESS: I'm sorry.
12 A.  Some of those programs we're receiving technical
13  assistance, for instance, from HUD, and our intent is
14  to get our grants administration and application
15  process more up to date and streamlined so we can
16  apply for as many grants as we can possibly get our
17  hands on.
18     BY MS. ENGLISH:
19 Q.  Okay. You confused me there for a minute because
20  you've said you've got a bunch of grant applications
21  already in with respect to programs that are
22  noncompliant, but I thought you said earlier you don't
23  have any grant applications in.
24 A.  No, no, no.
25 Q.  Okay.

1  A.  You asked me if there were any new ones going in.
2  Q.  Okay.
3  A.  We -- the City has received, in past years and
4  currently, almost 300 million dollars in federal
5  grants.
6  Q.  Okay.
7  A.  Okay. We hoped -- and they're being administered
8  through 71 different programs in the City. I think
9  that's been publicly discussed before. We hope to
10  apply for even more grants. So I can be clear, what
11  we are trying to do is to get some assistance so that
12  we can get better at this process, this administration
13  application process, so we would be eligible for more
14  federal assistance that's already existing.
15 Q.  And how much do you estimate that more federal
16  assistance to be?
17 A.  I have no idea. Whatever -- whatever we can get. If
18  it's several millions more, if it's several hundreds
19  millions more, we're going to apply for it.
20 Q.  Do you think it's a possibility it could be hundreds
21  of millions more?
22 A.  Possibility it could be.
23 Q.  Earlier in your testimony you were asked a lot of
24  questions about legal analyses or legal claims that
25  might have been made, and on those questions you

1  claimed attorney-client privilege --
2  A.  Yes.
3  Q.  -- and said that you didn't have an independent view
4  that didn't come from attorney-client communications.
5  A.  Yes.
6  Q.  Okay. I want to ask, without divulging what the
7  advice was of your counsel, can you just list for me
8  what the topics were on which you got advice, or would
9  you claim the privilege as to just the topics as well?
10 A.  Maybe I can do it this way. I think I've said before
11  that in this case, for instance, your client has filed
12  an objection.
13 Q.  Yes, it has.
14 A.  And in this case many objections have been filed and
15  many of the topics listed in those objections, and I
16  think I said with Mr. Hackney, whether it was
17  subordination, prioritization, equitable estoppel,
18  tort, invalidation of liens ab initio, whatever they
19  were, none of those analyses or claims came as a
20  surprise to me and that in some fashion -- without
21  divulging what I had spoken with my counsel, in
22  some fashion issues such as those had been discussed
23  and analyzed my counsel, attorneys and advisors.
24 Q.  So, for example, if -- as you know, Ambac filed an
25  objection, and --

1 A. Yes.

2 Q. -- one of the arguments raised was whether the Swap

3 obligations themselves were void ab initio because

4 they did not comply with Act 34.

5 A. Yes.

6 Q. You're familiar with that argument that we raised?

7 A. Yeah.

8 Q. Can you -- and again without asking -- I'm not asking

9 you to divulge what the advice was or what the

10 analysis was you got from your counsel, but can you

11 tell me what issues, just by naming the topics, you

12 sought advice on with respect to that argument?

13     MR. SHUMAKER: Well, the seeking of advice

14 somewhat implicates communications. If you were to

15 look at topics perhaps as to whether he regarding your

16 objection whether he -- they were raised, without

17 going into the communications, I think he could

18 respond to that.

19     BY MS. ENGLISH:

20 Q. That's exactly what I'm asking.

21 A. Okay. Well, for instance, whether or not arguments

22 such as that would erase the obligation in toto or

23 subordinate it to a lower level, whether or not an

24 obligation like that would raise defenses on behalf of

25 the obligor of equitable estoppel to the City, whether

1 or not there are facts surrounding those documents and

2 liens that would equitably raise issues as far as

3 their validity beyond void ab initio, whether or not

4 the law in the district and the circuit supported a

5 clean remedy that could be easily obtained, and

6 whether or not it would be expensive and extensive

7 litigation and appeals over a period of time, things

8 such as those were discussed and examined.

9 Q. When you say whether there were equitable issues, what

10 do you mean by that?

11 A. Here again, without going into discussion, any of the

12 concern -- equity is -- implicates action such as

13 clean hands. Whether there were issues surrounding

14 the City's conduct and issues along those lines, that

15 would be factually intensive and lead to, for

16 instance, increased litigation costs which I think is

17 mentioned in our motion or some of the papers we

18 filed, things along those lines, general equitable

19 concerns.

20 Q. When you just listed for me the types of concerns and

21 topics you were exploring with counsel, you didn't

22 mention Act 34.

23 A. Well, as I said, I said for instance. I didn't mean

24 for it to be an exhaustive list, and that's why

25 without sitting here today, counsel, memos that were

1 prepared, analyses, I can't give you a compendium or

2 an exhaustive list of things that were considered, so

3 I don't want to leave you with the misimpression that

4 somehow the analysis wasn't complete or we didn't

5 consider more issues than the one I did. We did.

6 Those are just the ones that came, sitting here

7 today -- you asked me a question -- off the top of my

8 head that I remembered for instance.

9 Q. Did you have legal analysis done on whether the Swaps

10 transactions complied with Act 34?

11 A. As I said, without getting into discussions with my

12 counsel, a whole panoply of issues, some of which are

13 contained in the objections filed, including those

14 filed by your client, were examined.

15 Q. Okay. Now can you answer my question? Did you have

16 legal analysis done on whether the Swap transactions

17 complied with Act 34?

18 A. As I said --

19     MR. SHUMAKER: Objection, asked and

20 answered.

21 A. As I said --

22     MR. SHUMAKER: If you want to share with

23 him the argument, that might help.

24 A. There are a whole panoply of issues, some of them

25 contained in the objections such as the one filed by

1 your client which were examined and reviewed.

2     BY MS. ENGLISH:

3 Q. Was Act 34 one of them?

4 A. More than likely, yes.

5 Q. More than likely? You don't know?

6 A. No. Sitting here today, I just said to you, for

7 instance, that many of the issues, without being a

8 compendium or being exhaustive, were examined. Act 34

9 was probably one of them. I did not mean for my

10 testimony to be exhaustive because I don't have the

11 analyses or the benefit of discussing them with my

12 client prior to your question today.

13 Q. I do understand the answers that you're giving me.

14 They're just not quite answers to the questions I'm

15 asking.

16 A. Okay.

17 Q. So let me -- in your answer right now when I was

18 trying to hone in on was Act 34 --

19 A. Um-hm.

20 Q. -- examined, right?

21 A. Yes.

22 Q. You said probably.

23 A. Yes.

24 Q. So you're not sure?

25 A. No. I said --

**Page 277**

1    MR. SHUMAKER: Objection, asked and
2  answered.
3  A.  I'll say it again.  Probably means that it was, but I
4  don't want my answer to represent to you that it was a
5  compendium.  If you want to keep asking me about Act
6  34, that's fine, but I said more likely than not it
7  was examined.  I -- just sitting here right now, I
8  don't have an independent recollection of all the
9  things we examined.  Act 34 was more than likely one
10  of them.
11    BY MS. ENGLISH:
12  Q.  Okay.  But sitting here today you don't have an
13  independent recollection for sure that Act 34 was
14  looked at; is that correct?
15  A.  I just said --
16    MR. SHUMAKER: Objection, asked and
17  answered.
18  A.  I just said it's more likely than not.
19    BY MS. ENGLISH:
20  Q.  Sitting here today do you have a recollection as to
21  whether there was legal analysis done as to the
22  validity of the pledge of casino revenues under the
23  gaming act?
24  A.  I thought you just asked -- well, suffice it to say I
25  believe so.

**Page 278**

1  Q.  You believe so?
2  A.  Yes.
3  Q.  Are you sure?
4  A.  I believe so.
5  Q.  Are you sure?
6  A.  I believe so.
7    MR. SHUMAKER: Objection, asked and
8  answered.
9    BY MS. ENGLISH:
10  Q.  Do you recall seeing a legal analysis or memo that was
11  prepared with respect to the validity of the pledge of
12  casino revenues under the gaming act?
13  A.  Ms. English, I see -- I see a lot of memos.  As I said
14  before this line of questioning, it's more likely than
15  not that I did, but sitting here today, in an effort
16  to be accurate, I don't specifically recall all of the
17  issues we examined.  More likely than not, it included
18  Act 34, it included validity of liens.
19    COURT REPORTER: It included validity --
20    THE WITNESS: Validity of liens.
21    COURT REPORTER: Thank you.
22    BY MS. ENGLISH:
23  Q.  Did you make an independent assessment apart from
24  advice of counsel as to the strengths -- strengths or
25  weaknesses of the City's claims against the Swap

**Page 279**

1  counterparties?
2  A.  Not without the advice of counsel, no.
3  Q.  Why didn't the City just sue the Swap counterparties
4  and then negotiate from there?
5  A.  You know, one of the things that we have, both in
6  bankruptcy and in Public Act 436, is that in the
7  deliberative process the emergency manager has
8  discretion to make decisions, business judgment
9  decisions, within that discretion, irrespective of
10  third parties, the decisions as to how that should
11  have occurred.
12    We made a decision in consultation with
13  counsel that this was the best way to proceed.
14  Commencing litigation might well have created a
15  cascade of other events such as the very event we are
16  trying to avoid which is trapping the casino revenue
17  for time and a number of months and/or years which
18  would have made the probability of me completing my
19  mission within the time frame of the statute
20  difficult.
21  Q.  If the City couldn't get a deal such as the
22  forbearance agreement, was the City prepared to sue
23  the Swap counterparties then?
24    MR. SHUMAKER: Objection to the extent that
25  question is asking for attorney-client privileged

**Page 280**

1  communication.  I'll object.
2    If you have some independent understanding,
3  you can answer.
4  A.  Mrs. English, I'll say this.  Without getting into
5  communications with my counsel, we examined all
6  alternatives, and as I said earlier with Mr. Hackney,
7  including potential litigation.
8    BY MS. ENGLISH:
9  Q.  If you hadn't gotten a deal, were you prepared to sue
10  them then?
11    MR. SHUMAKER: Objection, calls for
12  speculation.
13  A.  Yeah, I was going to say.  I don't know.  We'd have to
14  examine the situation on the ground at that time.
15    BY MS. ENGLISH:
16  Q.  Okay.  Let me ask you this.  If the forbearance
17  agreement is not approved by the bankruptcy court,
18  will the City then sue the Swap counterparties?
19    MR. SHUMAKER: Objection, calls for
20  speculation.
21  A.  Here again, it's a different version of the prior
22  question which it calls me to speculate as to what we
23  would do if the Court does not approve the agreement.
24    BY MS. ENGLISH:
25  Q.  If there were to be litigation with the Swap

Page 281

1 counterparties, do you have some sense as to what
2 claims might be asserted against the Swap
3 counterparties?
4 MR. SHUMAKER: Objection, asked and
5 answered.
6 A. Yeah, as we said before, those are discussions that
7 I've had with my counsel. I would consult with them
8 as to our possible -- I can't tell you in direct
9 response to your question and this line of questioning
10 what we would do. What I can tell you is that we
11 would engage in a process of examining what our
12 alternatives were and try to make an informed and
13 reasonable decision based upon the information we had
14 at that time.
15 BY MS. ENGLISH:
16 Q. Okay. So sitting here today you are not able to tell
17 me even a single claim that the City might assert
18 against the Swap counterparties?
19 A. There are a number of claims that the City might
20 assert. As I said earlier today, some of them might
21 be framed in some of the objections. Whether or not
22 we would ultimately assert those, depends upon a
23 number of different factors that we would have to
24 examine at that point.
25 Q. Well, in the forbearance agreement, the City is giving

Page 282

1 up the right to assert claims against the Swap
2 counterparties, correct?
3 A. If the forbearance agreement is approved and we
4 ultimately execute on the agreement, then yes, the
5 parties would forebear and would not sue each other.
6 Q. Right. So all I'm asking is give me one example of
7 one claim you're giving up in the forbearance
8 agreement.
9 A. I suppose any of the claims that have been implicated
10 in some of the objections that have been filed and, as
11 I said earlier today, some of those claims which is
12 the ones we discussed a few minutes ago, such as
13 estoppel, ab initio and those others.
14 Q. Did any of your legal counsel ever prepare a memo or a
15 written analysis for the City that outlined a
16 litigation strategy against the Swap counterparties?
17 I'm not asking what would have been in it, if there
18 was one. I just want to know if there was any written
19 analysis ever prepared that outlined a litigation
20 strategy.
21 A. Well, without, here again, drawing into the
22 nomenclature of a litigation strategy, because that
23 can mean a number of different things, including up --
24 up to and through attaching a proposed complaint, for
25 instance, without getting into the nomenclature, I

Page 283

1 would say that, as I said before this afternoon, there
2 was analysis of the potential claims, strengths and
3 weaknesses and options available to the City.
4 Those -- some of those were prepared in writing, yes.
5 Q. You just mentioned a draft complaint. Was there ever
6 a draft complaint prepared?
7 MR. SHUMAKER: I think you mischaracterized
8 what he said. That's my objection.
9 A. Yeah, as I said, some of those types of things could
10 include a draft complaint. I don't recall seeing a
11 draft complaint.
12 BY MS. ENGLISH:
13 Q. Do you recall seeing a memo that outlined strengths
14 and weaknesses of claims that could be asserted in a
15 complaint?
16 A. As I said before, I think there were memorandum and
17 advice that was given regarding the various claims,
18 defenses and alternatives available to the City which
19 could have included a memorandum of the nature you're
20 talking about.
21 Q. It could have included it --
22 A. It could.
23 Q. -- but you're not sure whether it did or not?
24 A. Sitting here today I don't specifically remember all
25 the memos that would fit the description that you're

Page 284

1 making. There were memos discussing the various
2 strengths and weaknesses of the positions.
3 Q. Did you have any analysis done as to the cost of a
4 litigation with the Swap counterparties?
5 A. No. I don't recall if any of the documents included
6 costs. We -- there were discussions about the
7 potential costs and the timing, but I don't recall if
8 any of the documents did.
9 Q. Okay. What was your best estimate as to how much a
10 litigation with Swap counterparties would cost the
11 City?
12 A. I don't -- I don't remember what the best estimates
13 were. They -- they ranged from --
14 MR. SHUMAKER: Object. I just want to make
15 sure you're not going to be revealing any
16 attorney-client communications with your answer.
17 THE WITNESS: Okay.
18 MR. SHUMAKER: I'll interject that. I'll
19 let you answer the question as to whether that was
20 addressed. I don't want you to go --
21 THE WITNESS: Okay.
22 MR. SHUMAKER: -- into anything --
23 THE WITNESS: Okay.
24 MR. SHUMAKER: -- beyond that.
25 A. It was addressed, and suffice it to say I think it's

1 fair to assume that in litigation in the nature you're
2 discussing that it could go into millions of dollars.
3 BY MS. ENGLISH:
4 Q. How about the time it would take to litigate the Swap
5 counterparties? Did you estimate how long it would
6 take?
7 MR. SHUMAKER: Same admonition.
8 A. Let's -- let's do it this way. I think it's fair to
9 say that there were discussions regarding the time for
10 litigation and/or appeals and the costs that were
11 involved if that tack was taken.
12 BY MS. ENGLISH:
13 Q. How long did you estimate it would take to litigate
14 with Swap counterparties?
15 A. I'm not sure the predicate is there that I estimated
16 the length of time.
17 Q. Okay. If you didn't estimate the length of time,
18 that's an okay answer to give.
19 A. Yeah. I'm trying to be as clear as I can for you and
20 say that there were discussions, but there's nothing
21 as specific as the lodestar method of analysis which
22 you understand is time times hours billed, so on and
23 so forth. There were discussions and there were
24 analyses about what it could be.
25 Q. Now, I have to unpack that a little bit because you

1 mentioned the lodestar analysis, one of my favorite
2 friends. Did you have a lodestar analysis done for
3 litigation with the Swap counterparties?
4 MR. SHUMAKER: Objection, this is getting
5 into the -- the specific communications between
6 Mr. Orr and his counsel when you start to go through
7 what -- what are the particulars of the advice that
8 was being given. I allowed you to go forward with
9 whether he considered the length of litigation in his
10 answer, but I don't want him to go into the specifics
11 of any sort of analysis that was done by counsel.
12 With that admonition, you can answer.
13 A. Again, without going to the specifics of discussion
14 I've had with counsel, there were discussions about
15 potential length of litigation and appeals and the
16 potential cost. Those discussions included time that
17 may have impaired my ability to complete my obligation
18 within the time frame provided by Public Act 436, as
19 well as significant costs, litigation cost being
20 incurred by the City.
21 BY MS. ENGLISH:
22 Q. Okay. Here is my question again, because in your
23 answer you mentioned lodestar analysis, so I'm just
24 asking -- it's a yes or no question.
25 A. Um-hm.

1 Q. Did you have a lodestar analysis performed with
2 respect to a litigation with the Swap counterparties?
3 MR. SHUMAKER: Again, I'm going to object.
4 I believe that that question asks the -- asks Mr. Orr
5 to reveal privileged attorney-client communications
6 when you get into specific lodestar analysis.
7 BY MS. ENGLISH:
8 Q. I don't want the analysis. I just want to know
9 whether had you one done because you mentioned it.
10 A. I did mention it, but, here again, I think my response
11 was that there was an analysis that was done. I'm not
12 sure. I don't recall if it was as specific as the
13 type of lodestar analysis to give you an example, and
14 without going into conversation between me and my
15 counsel, I say again, we did an analysis and had
16 discussions regarding potential claims and defenses
17 that could be asserted, the potential length of time
18 it would take and the significant cost that might be
19 incurred by the City.
20 Q. I'm going to move on.
21 A. Okay. Sure.
22 Q. Did the City obtain approval from the Michigan
23 Department of Treasury for the COPs or the Swap
24 obligations, do you know?
25 A. You mean initially?

1 Q. Yeah.
2 A. I don't know. Well, wait a minute. Wait a minute.
3 I recall seeing a letter some time ago on
4 official Michigan State letterhead -- well, I recall
5 seeing a letter. It may have been some form related
6 to the COPs. I just don't remember specifically, but
7 I do recall seeing a letter on Michigan letterhead
8 related to the transaction.
9 Q. Okay. So I'm going to put in a request to your
10 counsel.
11 MS. ENGLISH: If there is an approval or a
12 letter from the Michigan Department of Treasury with
13 respect to the COPs or the Swaps, we'd like to request
14 a copy of that.
15 MR. SHUMAKER: We'll look into it.
16 MS. ENGLISH: Thanks.
17 BY MS. ENGLISH:
18 Q. Here's another one I don't know if you know the answer
19 to this.
20 A. Right.
21 Q. Do you know if the City approved the offering circular
22 that went out with respect to the COPs?
23 A. I do not.
24 Q. You mentioned earlier that you were on conference
25 calls with Ken Buckfire and the principals of the Swap

13-53846-tjt   Doc 2024-4   Filed 12/10/13   Entered 12/10/13 17:34:52   Page 32 of 45

1 counterparties?
2 A. Yes.
3 Q. Did you -- on any of those calls, did you ever take
4 the position that the Swaps were invalid or void?
5 A. I don't recall if we had any discussions of that
6 nature on any of those calls.
7 Q. Do you recall whether you ever took the position that
8 the liens were invalid or not secured?
9 A. Likewise, I don't recall if we had discussions of that
10 nature on those calls.
11 Q. Do you recall whether you ever discussed with any of
12 the Swap counterparties the City's potential legal
13 arguments as against the Swap counterparties?
14 A. Did I?
15 Q. Yeah.
16 (Whereupon Robert Hertzberg left the
17 deposition at 2:49 p.m.)
18 A. No, I don't think I had though those discussions. No.
19 BY MS. ENGLISH:
20 Q. Did you ever debate the validity of the Swap
21 counterparties secured position with anyone from the
22 Swap counterparties?
23 A. Did I personally?
24 Q. Yes.
25 A. No.

1 Q. I want to show you a document you're very familiar
2 with.
3 A. Um-hm.
4 Q. So what exhibit are we up to now? Exhibit 6?
5 A. Yeah.
6 Q. Orr 6?
7 A. Yes.
8 MS. ENGLISH: Lally, can you pass me my
9 binder?
10 MARKED FOR IDENTIFICATION:
11 DEPOSITION EXHIBIT 6
12 2:50 p.m.
13 BY MS. ENGLISH:
14 Q. Okay. You recognize this document, don't you,
15 Mr. Orr?
16 A. Yes. I assume it's an accurate representation of my
17 June 14th proposal to creditors.
18 Q. Okay. And this is a document that you put together
19 largely, with help I'm sure, but you were responsible
20 for putting this together, right?
21 A. This is a document that I and my team put together.
22 Q. Okay. I'd like you to turn to pages 97 and 98 of the
23 document.
24 A. Yes.
25 Q. Okay. These are -- there's two forecast tables here

1 which is really just one table on two pages, right?
2 A. Right.
3 Q. And --
4 A. Well, let me make sure. Yes.
5 Q. You know what, so there's ECF numbers at the bottom --
6 A. Yes.
7 Q. -- but there's also numbers in the -- that were part
8 of the original document and it's the original numbers
9 that I'm looking for, page 97 and 98.
10 A. Okay.
11 Q. On the top it says restructuring scenario.
12 A. Okay. I'm sorry, I was looking at the electronic case
13 number. .
14 Q. Yeah, my bad.
15 A. 97 and 98. Here we go. Okay.
16 Q. Okay. Now, if I understand this table that spans
17 pages 97 and 98 correctly, this is the City's
18 restructuring proposal, if you will; is that correct?
19 A. Yes.
20 (Whereupon Robert Hertzberg entered the
21 deposition at 2:51 p.m.)
22 BY MS. ENGLISH:
23 Q. Okay. And if we just look down say the column for
24 2014, we've got total revenues, net operating surplus,
25 readjustment expenses. And then if you go to page 98,

1 we get down to a list of secured claims of the City.
2 A. Yes.
3 Q. Okay.
4 (Whereupon Kelly DiBlasi left the
5 deposition at 2:52 p.m.)
6 BY MS. ENGLISH:
7 Q. And there's a line item there for POC Swaps. Do you
8 see that?
9 A. Yes.
10 Q. And that line item is actually the Swaps we're talking
11 about today that you proposed to settle through the
12 forbearance agreement, correct?
13 A. Yes.
14 Q. Okay. And that line item, if you go right straight
15 across, shows roughly 50 million dollars a year being
16 paid; is that right?
17 A. Yes.
18 Q. So this restructuring proposal, if I'm reading this
19 correctly, is assuming that the City is going to
20 continue to pay its monthly Swap payments; is that
21 correct?
22 A. Yes. I think there's a footnote there at the top that
23 says -- at the bottom, it says, "Assumes continued
24 payments as scheduled. Treatment to be determined."
25 Q. Okay. So this restructuring proposal then -- well,

13-53846-tjt   Doc 2024-4   Filed 12/10/13   Entered 12/10/13 17:34:52   Page 33 of 45

1  let me stay with this for just one more minute.
2  A.  Um-hm.
3  Q.  Then fur -- further down you've got an estimate of
4  total unsecured claims of the City, about 11 and a
5  half billion dollars, correct?
6  A.  Yes.
7  Q.  All right.  Now, flip to page 106.  I'm sorry, 105.
8  There again, we've got secured -- a section on secured
9  payments, and we're showing the City's still making
10  the Swap payments, correct?
11  A.  Um-hm.
12  Q.  All right.  And then we flip to 107.  We've got your
13  proposal for the 2 billion dollar note that's going to
14  go to pay unsecured.
15  A.  Yes.
16  Q.  Have I read all that correctly?
17  A.  Yes.  I think --
18  Q.  Okay.
19  A.  -- the document speaks for itself.
20  Q.  So if I've understood this correctly, then your -- the
21  City's restructuring proposal is based on the notion
22  that the Swaps payments will continue, correct?
23  A.  Yes, for some period of time.
24  Q.  And in fact, this proposal does not show the -- any
25  effect of the forbearance agreement or indicate the

1  forbearance agreement coming into play here at all,
2  correct?
3  A.  That is correct.
4  Q.  All right.  So if I were to tell you that Mr. Buckfire
5  yesterday testified that the City's restructuring plan
6  was based on an assumption that the forbearance
7  agreement was approved, that would be incorrect,
8  correct?
9  A.  No, not necessarily.  I think the footnote at 1,
10  "assumes payments as scheduled.  Treatment to be
11  determined," suggests that we're going to assume it.
12  I think what you're trying to say is based upon these
13  numbers, that at some point they should be taking
14  (sic) out because we would assume that the payments
15  would cease to the Swap counterparties, is what I
16  think you're saying.
17  I think what Mr. Buckfire was saying is
18  that at some point, based upon these notes, whether
19  it's this data or others -- I don't know what he was
20  saying, but my interpretation would be based upon
21  estimated unsecured claims that they would be -- and I
22  don't -- I don't want to mischaracterize his testimony
23  and I don't know the context in which it was taken, so
24  I don't want to misstate my understanding of what his
25  testimony was.

1  But when you look at the note on page 107,
2  that -- the 2 billion dollar note -- that assumes that
3  the Swaps are -- the forbearance agreement is going to
4  include that all this unsecured debt is somehow paid
5  out of this note.  Now, I understand what you're
6  trying to say is that the cash flow forecast here
7  doesn't take into account the Swap payment.  I don't
8  know what he was saying in that regard.
9  Q.  Well, I guess all I'm trying to figure out is --
10  the -- the 2 billion dollar note that's in your
11  plan --
12  A.  Yes.
13  Q.  -- as evidenced in this document, seems to me to be
14  based on continuing to pay the Swap payments because
15  that's what's listed here, both on page 105 and on
16  page 98.
17  A.  Right.
18  Q.  Are you telling me that that's not correct, that the 2
19  billion dollars was formulated based on the assumption
20  that you'd get the forbearance agreement?
21  A.  What I'm telling you is that at the time this report
22  went out -- well, I'm telling you two things.  One, at
23  the time this report went out, we did not have the
24  forbearance agreement, but we were having discussions
25  about it; and, two, what I'm telling you it's probably

1  the best thing to do is ask Mr. Buckfire what he meant
2  by his testimony 'cause -- rather than trying to use
3  me to somehow contradict his testimony regarding the
4  Swap payment cash flow that's shown at page 98, you
5  should ask him what he meant.
6  Q.  Well, let me ask you this.  Has -- based on this
7  document, the City's plan is to allocate a 2 billion
8  dollar note to the unsecureds, and this plan is -- it
9  has a line item for continuing to pay the Swaps?
10  A.  Yes.
11  Q.  Does the 2 billion dollar number change if the Swap
12  payments change?
13  A.  To the best of my knowledge, no.  I don't assume that.
14  MS. ENGLISH:  I don't think I have anything
15  else.
16  A.  Okay.
17  MS. ENGLISH:  Thank you for your patience.
18  THE WITNESS:  No, thank you.  Sure.
19  MR. SHUMAKER:  Take a quick five-minute
20  break and then we'll switch.
21  VIDEO TECHNICIAN:  Okay.  The time is
22  2:57 p.m.  This marks the end of tape number 4.  We
23  are off the record.
24  (Recess taken at 2:57 p.m.)
25  (Back on the record at 3:06 p.m.)

1    **VIDEO TECHNICIAN:** We are back on the
2  record at 3:06 p.m. This marks the beginning of tape
3  number 5.
4    **EXAMINATION**
5    **BY MS. GREEN:**
6  Q.  Good afternoon, Mr. Orr.
7  A.  **Good afternoon.**
8  Q.  I'm Jennifer Green.
9  A.  **Hi, Jennifer.**
10 Q.  I'm from Clark Hill and I represent the Police and
11 Fire Retirement System and the General Retirement
12 System.
13 A.  **Um-hm.**
14 Q.  If I refer to the 2009 collateral agreement -- we've
15 been doing it all day, but it has not yet been marked
16 as an exhibit -- you know what I'm referring to,
17 though, correct?
18 A.  **Yes.**
19 Q.  It's attached as Exhibit B to your assumption motion?
20 A.  **Yes.**
21 Q.  You know, are you familiar with the attachments to the
22 collateral agreement?
23 A.  **Yes. I'm somewhat familiar with them, yes.**
24 Q.  I have an extra copy here.
25 A.  **Okay.**

1  Q.  I will give them to you if you want to follow along.
2  A.  **Okay.**
3  Q.  If you can flip to page 186. At the bottom it's
4  listed. It's the first yellow tab.
5    (Sneezing)
6    **THE WITNESS:** Bless you. Gesundheit.
7    **BY MS. GREEN:**
8  Q.  Do you recognize that letter?
9  A.  **I've seen it before, but obviously I have no**
10 **contemporaneous recollection when it was written.**
11 Q.  And that's the letter from the City to the Motor City
12 Casino, correct?
13 A.  **Yes.**
14 Q.  It's dated June 23rd, 2009?
15 A.  **Yes.**
16 Q.  It's attached to the collateral agreement?
17 A.  **Yes.**
18 Q.  If I can direct your attention to paragraphs 4 and
19 5 --
20 A.  **Um-hm.**
21 Q.  -- that letter appears to instruct the casino, the
22 Motor City Casino, to direct certain payments to U.S.
23 Bank?
24 A.  **Yes. Paragraph 4 seems to mention payment**
25 **instructions and paragraph 5 seems to discuss who they**

1  are to be made to.
2  Q.  Okay. Then the following letter appears to be a
3  written receipt from the Motor City Casino back to the
4  City simply acknowledging receipt of the instructional
5  letter?
6  A.  **Well, I -- the following letter is a June 23rd, 2009**
7  **letter from the City of Detroit back to Greektown**
8  **Casino.**
9  Q.  Is it a letter acknowledging that they received, I'm
10 sorry, the instructional letter?
11   **MR. SHUMAKER:** What page are you on,
12 Counsel?
13   **MS. GREEN:** It's the page he was --
14   **THE WITNESS:** 190 of 247?
15   **MS. GREEN:** Um-hm.
16 A.  **Yeah, what it -- the document speaks for itself, but**
17 **your first letter at page 186 is from Motor City**
18 **Casino appearing to go -- it's from the City of**
19 **Detroit to Motor City Casino; the second letter is**
20 **from the City of Detroit to Greektown Casino.**
21   **BY MS. GREEN:**
22 Q.  Is that 191?
23 A.  **That's 191.**
24 Q.  Okay.
25 A.  **Okay. 191.**

1  Q.  Okay.
2  A.  **Okay.**
3  Q.  And so that's another instructional letter, correct,
4  kind of doing the same thing, just laying out that
5  certain payments are supposed to be made?
6    **MR. SHUMAKER:** Just for clarification, when
7  you say that, are you talking about the irrevocable
8  instructions on page 191 through 193?
9    **MS. GREEN:** Yes, exactly what he's looking
10 at right now.
11 A.  **Okay. So I -- in order to expedite this, I assume you**
12 **will represent to me the letters are essentially**
13 **similar and the first one was to Motor City and the**
14 **second was to Greektown Casino.**
15   **BY MS. GREEN:**
16 Q.  Exactly.
17 A.  **Is that correct?**
18   **Yes.**
19 Q.  And if you keep going there's another one I believe to
20 MGM.
21 A.  **I would assume there's a similar letter from Norma**
22 **White, following up with a receipt, following up with**
23 **a similar -- what appears to have been -- maybe have**
24 **been a cover letter, and then there's a**
25 **June 23rd, 2009 letter to MGM Grand.**

Page 301

1 Q. So you'd agree with me, there's a series of
2 instructional letters from the City to the casinos,
3 and then each of those are followed by a letter from
4 the casino back to the City acknowledging receipt.
5 I'm just summarizing what you just said.
6 A. Yes. I don't -- I don't mean to be difficult. I
7 don't know if this receipt regarding irrevocable
8 instructions was a letter or was attached to the
9 document, but there appear to be those that are
10 comparable to the three letters you discussed from
11 each of the hotels back to Norma White.
12 Q. Okay. Earlier when you were being examined by
13 Ms. English, you referenced that you relied on a
14 formal approval letter from the Michigan Gaming
15 Control Board?
16 MR. SHUMAKER: Objection, mischaracterizes
17 his testimony.
18 A. Yeah, my testimony was I thought I had seen a letter
19 from the -- from the State on State letterhead which
20 might have qualified on the question of Ms. English
21 as to whether or not I'd seen anything approving the
22 agreement.
23 BY MS. GREEN:
24 Q. Okay.
25 A. Okay.

Page 302

1 Q. From the State of Michigan or from the Michigan Gaming
2 Control Board?
3 A. I thought from the -- I think I said on State
4 letterhead. I don't recall if I said Michigan Gaming
5 Control Board, but I said State I believe.
6 Q. Okay. What was your understanding of this approval
7 letter?
8 A. Well, you call it an approval letter.
9 Q. I was using your language, I thought.
10 A. Yeah, I said -- what I said was -- the question was
11 had you seen an approval letter, and what I said I
12 don't know. I said at first, no. I said wait a
13 minute. I seem to have recalled seeing a letter on
14 State letterhead related to this issue, and I couldn't
15 recall whether or not it was a formal, quote, unquote,
16 approval.
17 Q. Do you recall if you relied upon this letter in
18 evaluating the validity of the lien on the casino
19 revenue?
20 A. I recall having seen this letter, and this I think is
21 the letter that I recall having seen. Your question
22 is did I rely on it -- in evaluating potential claims,
23 did I personally rely on it. My response to you is I
24 made no independent analysis, as I said to
25 Ms. English, outside of discussions that I had with

Page 303

1 counsel.
2 There were a number of analyses and
3 memoranda that were prepared regarding potential
4 strengths and weaknesses and a proposal for the deal,
5 and -- and the reason I recall this letter is because,
6 yes, I believe that this was one of the documents that
7 I may have reviewed in that process.
8 Q. Do you know if anyone else on your team at the City
9 would have reviewed and analyzed this letter in
10 connection with evaluating the validity of the lien?
11 A. I believe my -- my team, including my counsel -- I
12 don't know if they're at the City. It may have been
13 my restructuring and outside counsel.
14 Q. And just for the record, we're referring to a letter
15 dated June 18th, 2009. The letterhead is from the
16 Michigan Gaming Control Board and it does say State of
17 Michigan.
18 A. Yes, page 200 of 247.
19 Q. If you read the first paragraph of the letter --
20 A. Yes.
21 Q. -- and if you need to reacquaint yourself with it now,
22 that's fine.
23 A. I did. Here again, these documents are legacy
24 documents that occurred in 2009, well before I was
25 here, so I've only seen them. I have no

Page 304

1 contemporaneous recollection.
2 Q. I understand.
3 A. The document speak for themselves, but I'd be
4 certainly happy to read it and give you my
5 understanding.
6 Okay. I've read the letter.
7 Q. This letter acknowledges that the three Detroit-based
8 casinos have been directed to, quote, electronically
9 transfer a portion of the City's money that would be
10 due under the gaming act to U.S. Bank, correct?
11 A. Yes.
12 Q. And after that it acknowledges that there was a
13 letter, quote, advising the board that the City
14 Council of the City of Detroit has enacted an
15 ordinance and taken all related action necessary to
16 direct the three licensed Detroit casinos to make the
17 transfer to the account.
18 MR. SHUMAKER: Objection, the document
19 speaks for itself.
20 A. Yes.
21 BY MS. GREEN:
22 Q. Did I -- did I correctly relate the letter on the
23 record?
24 A. Well, the document speaks for itself, but romanette II
25 says that, yes.

Page 305

1 Q. Okay. Thank you.
2   So this letter at the bottom, page -- of
3 the same page --
4 A. Right.
5 Q. -- paragraph 2 --
6 A. Yes.
7 Q. -- there is some sort of analysis as to this
8 electronic transfer, correct?
9   MR. SHUMAKER: Object to the form.
10 A. Yeah, I don't know if I'd call it an analysis, but --
11   BY MS. GREEN:
12 Q. A reference?
13 A. Yeah, the paragraph speaks for itself. The single
14 sentence paragraph speaks for itself.
15 Q. And it's referring to the transfer of the funds
16 that -- mentioned in paragraph 1, correct?
17 A. Yes.
18 Q. Okay. So fair to say this letter is really just
19 confirming that the Michigan Gaming Board received a
20 letter directing it to transfer those funds, and this
21 letter is relating to the mere transfer of those
22 funds, correct?
23   MR. SHUMAKER: Object to the form, document
24 speaks for itself.
25 A. Yeah, the document speaks for itself, and I'm -- your

Page 306

1 question seems to suggest that the prior letters we
2 looked at were to the gaming control board directing
3 them to transfer funds. As I read this letter, it
4 says that the gaming control board has seen the
5 letters, that they're giving -- advising the board of
6 certain irrevocable instructions, not instructing them
7 to do it, for certain the three licensed Detroit
8 casinos, and it goes on to speak for itself.
9   And then it says at the end, upon review of
10 this matter, I do not find --
11   COURT REPORTER: I'm sorry. You're going
12 to have to slow down.
13   THE WITNESS: Okay. I'm sorry.
14   COURT REPORTER: Speaks for itself and it
15 goes on.
16 A. Speaks for itself, and goes on to say, "Upon review of
17 this matter, I do not find any compliance issues at
18 this time, and since no goods or service are being
19 provided to the casino, no licensing is required."
20   BY MS. GREEN:
21 Q. That's a fair point. As we said before, the letter
22 was reflecting on the fact that certain instructional
23 letters had been sent --
24 A. Yes.
25 Q. -- to the casinos and signing off on that process

Page 307

1 under which certain funds would be transferred to U.S.
2 Bank.
3 A. Right. The letter, here again, speaks for itself, but
4 it appears to be the State gaming commission saying
5 there are no compliance issues and you don't need any
6 licensing.
7 Q. Well, let's do it this way. The Michigan Gaming Board
8 in this letter has not said that it has reviewed the
9 validity of the City's pledge of certain casino
10 revenues for purposes of securing its financial
11 obligations under the 2009 collateral agreement under
12 the Swap contracts, right?
13 A. Yes.
14 Q. It doesn't say that?
15 A. Yes.
16 Q. And it does not say that it hereby authorizes the City
17 to pledge the casino revenues under the Michigan
18 Gaming Act, correct?
19 A. That is correct.
20 Q. And it does not confirm the transaction or say that
21 the transaction fully complies with the Michigan
22 Gaming Act, does it?
23 A. No. The letter speaks for itself, but I don't see
24 that anywhere in the letter.
25 Q. And nowhere in this letter does it mention that the

Page 308

1 transaction is approved under section 12 of the
2 Michigan Gaming Act, right?
3 A. That is not -- that is not in the letter.
4 Q. Okay. And speaking of the lien on the casino revenue,
5 what is your understanding of how the lien on casino
6 revenue arose? It arose from the agreement that we
7 just looked at, correct?
8   MR. JURGENS: Objection to form.
9   MR. SHUMAKER: Objection to form.
10 A. My understanding is that the 2009 collateral agreement
11 was entered into to address a default under the 2005
12 and 2006 Swaps, and that as a consequence of that,
13 there were allegedly liens based upon the casino
14 revenue.
15   BY MS. GREEN:
16 Q. Okay. But was there a lien prior to the collateral
17 agreement that was entered into in 2009?
18   MR. JURGENS: Objection to form.
19   MR. SHUMAKER: Objection to foundation.
20 A. Without getting into legal conclusion as to whether or
21 not there was a lien, to the best of my knowledge, the
22 answer is no.
23   BY MS. GREEN:
24 Q. Okay. So suffice it to say that the lien would not
25 exist but for the 2009 collateral agreement that was

1 entered into, correct?
2     MR. JURGENS: Objection to form.
3     MR. SHUMAKER: Objection, form.
4 A.  Here again, as I've said a couple of times today, I'm
5 going to stay away from legal conclusions as to
6 whether or not a lien would or would not have existed.
7 There are equitable liens that arise ex contractu
8 outside of law.  There are other issues, but suffice
9 it to say this agreement seemed to impose a lien as a
10 matter of the agreement on the casino revenue.
11     BY MS. GREEN:
12 Q.  Okay.  You're not claiming any equitable lien?
13     MR. JURGENS: Objection.
14 A.  We're not claiming a lien.  We've done an analysis,
15 and there have been several memos that have gone back
16 and forth from counsel analyzing a number of different
17 issues at law and at equity.  We -- there's -- me,
18 personally, under our agreement, there's no -- been no
19 assertion of an equitable lien.
20     MS. GREEN: I have nothing further then.
21     THE WITNESS: Sure.
22     Do you need -- you need this, don't you?
23 Is this -- did you -- excuse me.  Did you mark this?
24     MS. GREEN: We can mark it as an exhibit.
25 I don't know that anyone has marked it yet.  We can

1 mark it as Exhibit 7.
2     MARKED FOR IDENTIFICATION:
3     DEPOSITION EXHIBIT 7
4     3:20 p.m.
5     (Discussion off the record at 3:20 p.m.)
6     (Back on the record at 3:20 p.m.)
7     MS. GREEN: I thought maybe it was earlier
8 and I just didn't know.
9     THE WITNESS: No, I don't think it was.
10     MS. GREEN: It's hard to hear down there.
11     THE WITNESS: We talked about the
12 collateral agreement.
13     MS. GREEN: We did.  Okay.
14     VIDEO TECHNICIAN: Do we need to go off the
15 record for the second or are we staying on?  Are you
16 asking questions?
17     MS. GREEN: Oh, were we on?
18     THE WITNESS: We can shut up.
19     MR. SHUMAKER: Why don't we go off for one
20 minute to get ourselves together.
21     VIDEO TECHNICIAN: All right.  Thank you.
22     The time is 3:20 p.m.  We are off the
23 record.
24     (Recess taken at 3:20 p.m.)
25     (Whereupon Lally Gartel and Stephen Hackney

1     left the deposition at 3:21 p.m.)
2     (Back on the record at 3:22 p.m.)
3     VIDEO TECHNICIAN: We are back on the
4 record at 3:22 p.m.
5     EXAMINATION
6     BY MR. GOLDBERG:
7 Q.  How are you doing, Mr. Orr?
8 A.  Hello, Mr. Goldberg.  How are you?
9 Q.  We met before.  I'm Jerome Goldberg.  I represent
10 David Sole, who's an interested party, he's a retiree,
11 along with his wife, who's also a retiree.
12     MR. GOLDBERG: First of all, I want to just
13 go on the record and thank Kirkland & Ellis and the
14 other attorneys for their patience and their working
15 with other attorneys in this case, and especially
16 someone like me who represents a very different point
17 of view and that they were objective and fair their --
18 in accommodating all the objectives here.
19     BY MR. GOLDBERG:
20 Q.  Let me begin by asking just a few questions just so we
21 can put some of this into perspective.  I want to call
22 your attention to Exhibit 3.
23 A.  Yes.  Okay.
24 Q.  On page 34 of Exhibit 3, there's a chart here that
25 references expenditures from the years 2008 to 2012?

1 A.  Yes.
2 Q.  And it indicates -- first of all, I just had a
3 question.  Under the POCs, it has POC Swap GF, I
4 assume that means general fund?
5     MR. SHUMAKER: Counsel, I think you may be
6 pointing to a different page than the witness has in
7 front of him.
8     BY MR. GOLDBERG:
9 Q.  It's page 34 in mine.  Which one did I give you?  I'm
10 talking about the June 14th, 2013.
11     MR. SHUMAKER: Yeah, there's an executive
12 summary and then there's a bigger one.  Are you
13 looking at the bigger one?
14     MR. GOLDBERG: I have copies of what I'm
15 looking at.
16 A.  These are the executive summaries.
17     MR. GOLDBERG: Why don't I mark these and
18 that will make it easier.
19     THE WITNESS: And the larger one is this
20 one.
21     MR. SHUMAKER: The larger one is Orr
22 Number 6.  Take a look at that.
23     MR. GOLDBERG: Sure.  Yeah, this is the one
24 I'm looking at.
25     THE WITNESS: That's the one, the larger

1    one.
2        **BY MR. GOLDBERG:**
3    Q.   Okay.  So Exhibit Number 6.
4    **A.   Okay.  Mr. Goldberg, which page were you at?**
5    Q.   Page 34.
6    **A.   Of the original document?**
7    Q.   Yes.
8    **A.   Okay.**
9    Q.   Here we go, that chart, 34.  And it's a chart that
10   says study that -- lists for fiscal years ended actual
11   expenditures for 2008 to 2012; is that correct?
12   **A.   Yes.**
13   Q.   I just want to be clear.  It has under POC Swaps GF.
14   That means general fund?
15   **A.   Yes.**
16   Q.   EF, is that enterprise fund?
17   **A.   Enterprise fund excluding department of**
18   **transportation.**
19   Q.   And I'm trying to understand, does that mean that part
20   of the POC Swaps are paid -- a small part is paid from
21   the enterprise fund?
22   **A.   Yes.  You'll see the corresponding numbers show for**
23   **those categories.**
24   Q.   Okay.  And I totaled up the years from 2008, 2012.  It
25   appears that $247.5 million was paid on for the POC

1    Swaps during those years.
2    **A.   I don't have that total in front of me, but I'm going**
3    **to take it that that's the accurate number.**
4    Q.   It appears that it's usually about between 45 to 50
5    million a year.
6    **A.   Right, if you average 5, 10, 15, 20.**
7    Q.   Just so we're clear, I mean, that 247 million, none of
8    that went to turn on any lights in the City of
9    Detroit, did it?
10       **MR. SHUMAKER:** Object to the form.
11   **A.   It was legacy expenditures, debt service.**
12       **BY MR. GOLDBERG:**
13   Q.   It basically went to UBS and to Bank of America.  It
14   was their reward for betting correctly on a hedge bet,
15   right?
16       **MR. JURGENS:** Objection to form.
17       **MR. SHUMAKER:** Objection to form.
18   **A.   Yeah, I'm going to stay away from characterizing it as**
19   **a reward.  There were payments made pursuant to**
20   **existing certificates of participation at that time.**
21       **BY MR. GOLDBERG:**
22   Q.   And it was based on, as we talked about before, that
23   the difference between the interest rate on the
24   floating rate Swaps -- on the floating rate COPs and
25   the fixed rate that the -- that the City was obligated

1    to pay the Swap counterparties, correct?
2    **A.   Yes --**
3        **MR. SHUMAKER:** Objection to form.
4    **A.   -- as we discussed earlier today.**
5        **BY MR. GOLDBERG:**
6    Q.   Just so I'm clear, the -- what we're talking about
7    with the optional termination event.  The exhibit --
8    the same exhibit you're referencing -- let's just get
9    this -- I want to call your attention to page 28.
10   **A.   Of the same exhibit?**
11   Q.   Same exhibit.
12   **A.   Okay.**
13   Q.   Am I correct in the -- that that reflects that as of
14   May 31, 2013, according to your proposal for
15   creditors, the negative fair value of the Swaps was
16   $343.6 million?
17   **A.   That's what it says.  Recent valuations established**
18   **the negative fair value --**
19       **COURT REPORTER:** I'm sorry.  You're reading
20   way too fast.
21       **THE WITNESS:** I'm sorry.
22   **A.   Recent valuations established.  The negative fair**
23   **value of the Swaps at approximately 343.6 million as**
24   **of May 31st.**
25       **BY MR. GOLDBERG:**

1    Q.   So in the optional termination policy that's part of
2    the forbearance agreement, if the City was to pay the
3    initial payment, the City would still owe 264 -- we'd
4    be paying 264 million approximately on the Swaps?
5        **MR. SHUMAKER:** Objection to form.
6        **BY MR. GOLDBERG:**
7    Q.   We'd be paying 75 percent of whatever the termination
8    amount is at that point?
9    **A.   Well, it's 75 percent of termination amount at that**
10   **point, which I believe has since declined from**
11   **May 31st.**
12   Q.   Why do you say it's declined?
13   **A.   Because interest rates have shifted, and so at any**
14   **given time we'd have to value the interest rate**
15   **formula at the time you choose to exercise the**
16   **optional termination provision of the forbearance**
17   **agreement.**
18   Q.   The interest rate that we're talking about on the Swap
19   is linked to the LIBOR; isn't that correct?
20   **A.   Yes.**
21   Q.   The three-month LIBOR?
22   **A.   Yes.  I believe so.**
23   Q.   I pulled the three-month LIBOR historical index.  It
24   indicated that as of -- might as well as mark this as
25   an exhibit.

## Page 317

1    MR. GOLDBERG: Can you mark this as an
2    exhibit?
3    **MARKED FOR IDENTIFICATION:**
4    DEPOSITION EXHIBIT 8
5    3:29 p.m.
6    **BY MR. GOLDBERG:**
7 Q.  It appears that as of August of 2013, the three-month
8    LIBOR rate was .2655 percent?
9    MR. SHUMAKER: Objection, foundation.
10 **A.  Is there -- if you're talking about --**
11   **BY MR. GOLDBERG:**
12 Q.  Under 2013.
13 **A.  2013, a specific category in August which reads**
14   **0.26550.**
15 Q.  Right.  So it's actually gone down since July of 2013
16   according to this chart.
17 **A.  Yes.  Did I say up before?**
18 Q.  You had indicated that the interest rates -- right,
19   that the -- I mean, if it goes down, the City owes
20   more; isn't that correct?
21 **A.  Right.**
22 Q.  Just so we're clear again, that 200 -- whatever --
23   whether the figure is 247 million or 200 million, the
24   optional termination payment is not going to be -- the
25   City gets no direct benefit from that payment?

## Page 318

1    **MR. JURGENS:** Objection.
2    **MR. SHUMAKER:** Objection to form.
3 **A.  Well --**
4    **BY MR. HACKNEY:**
5 Q.  Let me be -- strike that question.
6    No lights get turned on from that money.
7    That's money that comes out of the City budget.
8    **MR. SHUMAKER:** Same objection.
9 **A.  Well, it's money -- yeah, I would say that it's money**
10   **that the City is obligated to pay in some fashion, but**
11   **to the extent we get a discount, the City benefits.**
12   **BY MR. GOLDBERG:**
13 Q.  I heard before the testimony, and I think it's pretty
14   obvious, that the City does not have the money on hand
15   to pay that termination amount, correct?
16   **MR. JURGENS:** Objection to form.
17 **A.  Yes, I'm told that is correct.**
18   **BY MR. GOLDBERG:**
19 Q.  And to do so it's going to have to float another bond
20   or some kind of loan?
21 **A.  Well, it would have to in some fashion derive some**
22   **funding from the capital markets, yes.**
23 Q.  Okay.  I read something, and I heard the same figures
24   floated here.  I read an article in the Detroit News
25   and I heard the same -- I wasn't able to come

## Page 319

1    yesterday due to an illness of my wife, but --
2 **A.  Oh, I'm sorry.**
3 Q.  -- they were talking about a $350 million bond of some
4    kind that is being looked into being floated, correct?
5 **A.  Here again, I want to be careful.  It's unclear**
6    **whether or not it is a bond.**
7 Q.  Okay.
8 **A.  What is clear is there's some post petition financing**
9    **proposal which are quite sensitive, but that number is**
10   **not an unreasonable number and it has been mentioned**
11   **about in the press.**
12 Q.  And is it reasonable to say that that 2 -- 350 million
13   is not going to come free to the City?
14 **A.  No.  The City will have to finance it in some fashion.**
15 Q.  I mean, I did a little research myself and looked up a
16   bond in Ann Arbor that was recently financed for
17   340 million at 4 percent which is, I would think we
18   both agree, was a good interest rate --
19 **A.  Um-hm.**
20 Q.  -- and the -- Ann Arbor would be paying 230 million in
21   interest on that bond over a 25-year period.
22 **A.  Here again, Mr. Goldberg, I want to be very careful.**
23   **Without representing or agreeing that the post**
24   **petition financing that's being discussed will take**
25   **the characteristic of a bond.**

## Page 320

1 Q.  No problem.  But either way, we are in agreement that
2    that financing -- we don't have -- the City does not
3    have a source for -- it doesn't have a relationship
4    with the Fed that the banks have where it gets a zero
5    qualitative easing and zero percent loans, does it?
6 **A.  The City does not -- is not a qualified financial**
7    **institution to go to the Fed discount window nor does**
8    **it have an extra several hundred million dollars in**
9    **its funds.**
10 Q.  Let me ask another question.  I want to call your
11   attention to the forbearance agreement.
12 **A.  Yes.**
13 Q.  Which exhibit is that?
14 **A.  That's Exhibit 2.**
15 Q.  Let me call your attention to page 14.
16 **A.  Yes.**
17 Q.  And it indicates under mid-market amount --
18 **A.  Yes.**
19 Q.  -- am I reading it correctly to say that the -- when
20   the optional termination goes into effect, assuming it
21   goes into effect, that the calculation on what's owed
22   on the Swap that's the basis for the termination is
23   based on the ISDA fix 3?
24   **MR. SHUMAKER:** Objection to form.  The
25   document speaks for itself.

1    BY MR. GOLDBERG:
2  Q.  Okay.
3  A.  Yeah, here again, the document speaks to itself and it
4     says methodology that is agreed to by the City and
5     based upon the present value as it speaks to the rest
6     of the document, yes.
7  Q.  Have you looked into the fact that there's a lot of
8     literature out now that's exposing a pretty large
9     scandal with reg -- regard to the ISDA fix that
10    involves and implicates both Bank of America and UBS?
11    MR. JURGENS: Object to form.
12 A.  Without characterizing the nature of the literature, I
13    think it's safe to say that I am aware of some issues
14    that have been discussed regarding ISDA, fixed.
15    BY MR. GOLDBERG:
16 Q.  Are you aware also of issues that have come out with
17    regard to the LIBOR, specifically with regard to UBS
18    and Bank of America in the setting of using the LIBOR
19    as a standard?
20    MR. JURGENS: Objection to form.
21 A.  I am aware that in the past years there have been some
22    questions raised regarding the LIBOR for certain
23    financial institutions, yes.
24    BY MR. GOLDBERG:
25 Q.  Has that affected your analysis of how to deal with

1     the Swap counterparties in terms of the -- the
2     forbearance agreement?
3  A.  No.
4  Q.  The fact that it's potential fraud was involved in the
5     setting of these --
6     MR. JURGENS: Objection to form.
7     MR. SHUMAKER: Objection to form.
8  A.  Mr. Goldberg, I'm going to defer from accepting the
9     characterization of potential fraud.  It is -- it is
10    as reported.
11    BY MR. GOLDBERG:
12 Q.  Okay.  That's fine.
13    Are you also aware that the -- that UBS
14    was -- let me find that.
15    Are you aware that UBS has been sued by the
16    Securities and Exchange Commission for rigging in
17    regard to municipal bonds?
18 A.  In past years?
19 Q.  That there was a final judgment -- yes, in past years.
20 A.  Yes.
21 Q.  Are you aware of the final judgment that was -- there
22    was a final judgment on a case that was filed on --
23    it's 112539 -- that -- and that one of the bonds that
24    actually was involved in that case was the Detroit
25    water and sewage bond case?

1  A.  I had heard that.  I have not read the final judgment.
2  Q.  Well, I'd be glad to pass you down a copy.
3     MR. GOLDBERG: Why don't we mark this.
4     MARKED FOR IDENTIFICATION:
5     DEPOSITION EXHIBIT 9
6     3:36 p.m.
7     BY MR. GOLDBERG:
8  Q.  Are you also aware that Bank of America has been
9     investigated for potential rigging with regard to the
10    municipal bond market?
11    MR. JURGENS: Objection to form.
12 A.  I am aware that Bank of America has been investigated.
13    The exact specifics of the investigation I am not
14    aware of.
15    BY MR. GOLDBERG:
16 Q.  In light of these investigations that deal with
17    rigging of the municipal bond market, was that taken
18    into consideration by the City in how to approach the
19    question of this forbearance agreement and potential
20    action on these Swaps?
21 A.  Perhaps you could be more specific in what way you're
22    asking whether that was taken into consideration.
23 Q.  I mean, if there, in fact, was fraud -- based on the
24    fact there's at least an indication of fraudulent
25    activity by both Bank of America and UBS within the

1     municipal bond market, has there been any
2     investigation as to whether or not that was the case
3     with -- with regard to the Swaps associated with the
4     POCs?
5     MR. JURGENS: Objection to form.
6     MR. SHUMAKER: Objection to form,
7     foundation.
8  A.  Yeah, first, it's not clear that there was fraud with
9     respect to POCs.  I think your prior question
10    concerning Bank of America concerned bonds at DWSD
11    that as my understanding are not implicated by this
12    process, meaning the forbearance agreement, but have
13    we calculated and analyzed the possibility that there
14    may be issues surrounding potential concerns in
15    connection with the Swap agreement, the answer is yes.
16    BY MR. GOLDBERG:
17 Q.  And who was -- who were those discussions with in
18    terms of whether or not to pursue that?
19 A.  I would have had discussions with my counsel.
20 Q.  When you say your counsel, who do you mean?
21 A.  My attorneys.
22 Q.  Jones Day, is that --
23 A.  Well, Jones Day.  We also have local counsel that's
24    involved that's sitting here, Pepper Hamilton, and
25    others.

1 Q. I mean, isn't Jones Day -- doesn't Jones Day represent
2 this Bank of America as one of its clients on its Web
3 site?
4 A. Yes, Jones Day does represent Bank of America.
5 Q. How could Jones Day investigate one of its own clients
6 for potential fraud?
7     MR. SHUMAKER: Objection, form.
8     MR. JURGENS: Objection, form.
9 A. I am today, Mr. Goldberg, a client of Jones Day. The
10 specific practices of Jones Day regarding its
11 investigations, I would suggest that you refer to
12 them.
13     BY MR. GOLDBERG:
14 Q. Okay. I'm just saying you utilize them --
15 A. Yes, I do.
16 Q. -- for their -- for their advice on whether or not to
17 conduct such an investigation. I'm trying to ask you
18 as your -- in your independent position as emergency
19 manager, wouldn't you think that a law firm that
20 represents the precise person you're asking to
21 investigate for fraud could not give you an
22 objective appraisal?
23 A. No.
24     MR. JURGENS: Objection to form.
25     MR. SHUMAKER: Objection to form.

1 financial crisis in Detroit?
2 A. Yes. To be clear, under 436 I have no independent
3 prosecutorial authority, but I do have the authority
4 to make criminal referrals to appropriate
5 prosecutorial authorities.
6 Q. In light of the cost to the City of the Swaps and the
7 continuing costs, which we all acknowledge will be
8 substantial even in light of the forbearance
9 agreement, have you made any referral to at least do
10 a -- conduct an investigation based on the evidence
11 that, that -- I'm not accusing them of criminal
12 activity in these activities. I have no basis for
13 doing that, but on the other hand that fact that
14 their -- some of their top executives in this area
15 have been convicted would at least lead me to want to
16 take a look at that in light of Detroit's situation.
17     MR. JURGENS: Objection to form.
18     MR. SHUMAKER: Objection, form.
19 A. Yeah, it is a run-on question, Mr. Goldberg, but let
20 me say this. We are -- we have an -- analyzed to the
21 degree and looked at everything significantly related
22 to this transaction. Any --
23     BY MR. GOLDBERG:
24 Q. Have or have not? I'm sorry.
25 A. We have. We have.

1 A. No. In my experience, having worked now at three
2 different law firms, I have seen situations where law
3 firms are fully capable of investigating clients, yes.
4     BY MR. GOLDBERG:
5 Q. Are you aware that three executives of UBS were in --
6 recently jailed that -- who were involved in municipal
7 bond division were recently jailed?
8 A. I'm aware that there were prosecutions related to UBS.
9 I wasn't aware of the exact number or who they are.
10 Q. Okay. I do have -- now, I'm not privy to much on that
11 either, but I do have articles that do cite that.
12 A. Okay.
13 Q. And they cited three people who were just convicted in
14 July of this year.
15 A. Okay.
16 Q. Are you aware that Bank of -- an executive of Bank of
17 America in its municipal bond division was indicted in
18 2012?
19 A. I don't recall if I was aware of that.
20 Q. Okay. Let me just ask under -- pursuant to the Public
21 Act 436 section 13 -- section 16, aren't you mandated
22 to conduct a criminal investigation, or at least to
23 refer potential suspicion of criminal investigation to
24 the Attorney General in connection with -- if there's
25 any kind of criminal activity associated with the

1 Q. Okay.
2 A. If there appears to be a basis for making a criminal
3 referral of any kind related to anything that falls
4 under my purview of 436, I will do that.
5 Q. But at this point nothing -- there hasn't even been a
6 request for such an investigation?
7 A. I would be careful about -- I -- I have asked -- there
8 are matters that are under investigation that may or
9 may not implicate the subject matters you're talking
10 about. I'm going to defer to speak about them
11 further.
12 Q. Okay. Are you familiar with the circumstances that
13 led to the 2005 Swap?
14 A. I'm familiar with what I've read. I wasn't here in
15 the City at the time.
16 Q. Do you know why Moody's -- not Moody's -- Fitch and
17 Standard & Poor's would have been at the table along
18 with UBS when this -- when this was discussed?
19 A. First, I don't know that they were at the table and,
20 secondly, if they were, I do not know why they would
21 have been.
22 Q. Well, I do have a photograph of them at the table
23 which I'd be glad to share with you --
24 A. Okay.
25 Q. -- from the Michigan Citizen. It was taken at that

13-53846-tjt   Doc 2024-4   Filed 12/10/13   Entered 12/10/13 17:34:52   Page 42 of 45

1  time.  Let me see if I can find that.
2      MR. GOLDBERG: Here, I can mark this.
3      MARKED FOR IDENTIFICATION:
4      DEPOSITION EXHIBIT 10
5      3:43 p.m.
6      BY MR. GOLDBERG:
7  Q.  This is a photograph taken by the -- it was in the
8  Michigan Citizen July 31st, 2005, it reflects a
9  picture of Sha -- Sean Werdlow, Stephen Murphy of
10 Standard & Poor -- Poor's, Joe Keefe -- Joe O'Keefe of
11 Fitch, the Deputy Mayor, Anthony Adams, and the -- and
12 the -- and -- and the representative of SBS at the
13 table.
14     MR. SHUMAKER: Is there a question?
15     BY MR. GOLDBERG:
16 Q.  Sure.  I was asking why would Moody -- why would
17 Standard & Poor and Fitch be at the table?
18     MR. SHUMAKER: Objection, foundation, form,
19 document speaks for itself.
20 A.  Yeah, Mr. Goldberg, this purports to be a document
21 showing some of these members at counsel table.  I
22 have no idea -- I wasn't here, and I have no idea what
23 the discussions were and whether or not it's
24 accurately represented to be something related to
25 this.  This document speaks for itself.

1      BY MR. GOLDBERG:
2  Q.  So you haven't done really any substantive
3  investigation on what the circumstances were that --
4  that why -- that put the City into the pension
5  obligations with certificates and Swap --
6      MR. SHUMAKER: Objection to form.
7      BY MR. GOLDBERG:
8  Q.  -- when they first were initiated in 2005?
9  A.  Yeah, all I can say is this -- this picture appears to
10 be what it purports to be and speaks for itself.  I
11 don't know if it's accurate or not.
12 Q.  Let me just ask one quick -- that I was kind of
13 curious about, personally.  It appears that there
14 was -- the first COP and Swap was in 2005.  Then they
15 were terminated and a new one -- new COPs and Swaps
16 were placed in 2006.  Is that your understanding?
17 A.  I don't know if that's my understanding.  I know there
18 were -- there were two series that went on.  I'm going
19 to be careful with the question of replacing them, but
20 let's go with your question.
21 Q.  Okay.  I guess my curiosity is why the banks would pay
22 a termination fee of 2.7 million, according to those
23 documents, to the City to then have them
24 renegotiate -- replaced?
25 A.  Mr. Goldberg --

1      MR. SHUMAKER: Object to form, foundation.
2  A.  I wasn't here in the City at the time.  I have no
3  idea.
4      BY MR. GOLDBERG:
5  Q.  Okay.  That's fine.
6      Have you approached the Securities and
7  Exchange Commission to conduct any kind of
8  investigation of the Swaps in light of their extensive
9  investigations of UBS and Bank of America?
10     MR. JURGENS: Objection to form.
11 A.  Yeah, here again, any -- your question is have I?  I
12 think I can answer your question.  I think the answer
13 is no.
14     BY MR. GOLDBERG:
15 Q.  Okay.  And you haven't approached them to intervene in
16 the bankruptcy which they have a right to do as we
17 both know under the bankruptcy code?
18 A.  I would hazard a guess that the Security and Exchange
19 Commission is aware of Detroit's bankruptcy.
20 Q.  But you have not approached them to aid you in doing a
21 proper investigation of the Swaps?
22 A.  No.  I -- I think they're fully capable of determining
23 what they should do within their mission.
24 Q.  Have you looked into the mortgage practices of Bank of
25 America that -- in light of the financial crisis of

1  Detroit?
2      MR. JURGENS: Objection to form.
3      MR. SHUMAKER: Objection to form.
4      MR. ESSAD: Objection to relevance.
5  A.  I don't think my duties under 436 would specify to
6  look into the mortgage crisis, so the answer is no.
7      BY MR. GOLDBERG:
8  Q.  But you would agree with me that the mortgage crisis
9  and the subprime lending crisis is a major contributor
10 to Detroit's financial crisis, would you not?
11     MR. SHUMAKER: Objection to form,
12 foundation.
13 A.  Mr. Goldberg, I don't know if it was or wasn't.
14     BY MR. GOLDBERG:
15 Q.  You don't know if it was or it wasn't?
16 A.  No.  I've -- I've heard reports that there was
17 disproportionate mortgage foreclosures and so on and
18 so forth, but I've made no conclusion as to whether or
19 not that was a major contributor to Detroit's
20 financial crisis.
21 Q.  I've got you.  Well, let me -- let me run this --
22     (Whereupon Vincent Marriott and Matthew
23 Summers left the Deposition at 3:47 p.m.)
24     MS. ENGLISH: Can we go off the record for
25 one second, please?

Page 333

1    **VIDEO TECHNICIAN:** We are off the record.
2  The time is 3:47.
3    (Recess taken at 3:47 p.m.)
4    (Back on the record at 3:48 p.m.)
5    **VIDEO TECHNICIAN:** Back on the record at
6  3:48 p.m.
7  **BY MR. GOLDBERG:**
8  Q.   I'm sorry, I didn't bring that report with me.
9    So your public -- your statement to me is
10  you're not clear whether the subprime mortgage crisis
11  in Detroit was a factor in Detroit's financial crisis?
12  A.   No.   My statement --
13    **MR. SHUMAKER:** Objection to form.
14  A.   My statement to you -- I believe your question was,
15  **was it a major factor, and I said I understand there**
16  **have been reports, allegations, and stories that there**
17  **was disproportionate mortgage foreclosure in the City**
18  **of Detroit.   I don't know if that was a major factor**
19  **in its financial crisis.**
20  **BY MR. GOLDBERG:**
21  Q.   And you haven't looked into that issue independently?
22  A.   No, I've not looked into it independently.
23  Q.   Even though the banks -- the same banks that are
24  claiming all these Swaps were directly involved in the
25  subprime mortgage crisis?

Page 334

1    **MR. JURGENS:** Objection to form.
2  A.   **Here again, your characterization was directly**
3  **involved.   My mission in this forbearance agreement is**
4  **look at whether or not this is in the best interest of**
5  **the City at the time.**
6  **BY MR. GOLDBERG:**
7  Q.   Sure.
8  A.   **It seems to be as you and I have discussed before,**
9  **several times now, that you have expressed concerns**
10  **about a broader issue regarding banks involvement with**
11  **the mortgage foreclosure crisis in the City of**
12  **Detroit.   In my opinion, that's not directly related**
13  **to the issue that we have at hand in the forbearance**
14  **agreement.**
15  Q.   Let me just ask you one other question.   We've been
16  talking about alternative sources of financing.
17  You're familiar with the last CAFR?
18  A.   Yes.
19  Q.   Are you familiar with the -- what the 82 million in
20  chargebacks means in this CAFR that the City is
21  paying?
22  A.   Yes, I think I have some understanding.
23  Q.   What is your understanding of it, sir?
24  A.   That there's a certain obligation on the City to pay
25  some money out based upon an analysis of either

Page 335

1  overcharges or obligations that it has to other --
2  other organizations and entities.
3  Q.   Are you aware that chargebacks specifically deal with
4  chargebacks to the County that the County buys -- pays
5  the City for foreclosed tax -- foreclosed properties,
6  then sells them, and the City is responsible for the
7  difference between what they're sold for and what
8  the -- what originally was paid to the City?
9  A.   Yes, as I said --
10    **MR. SHUMAKER:** Objection, form, foundation.
11  A.   **As I said, it's a process by which the City has**
12  **obligations to other organizations and entities.**
13  **BY MR. GOLDBERG:**
14  Q.   Are you aware that the state has hundreds of -- at
15  least 200 million dollars available in the Hardest --
16  Helping Hardest Hit funds that could be used to pay
17  off delinquent property taxes?
18  A.   **I've heard that representation before in terms of the**
19  **Hardest Hit funds.   What I am aware of is that the**
20  **City is entitled to get 52 million dollars of the**
21  **late -- latest one hundred million dollar transfer of**
22  **the Hardest Hit funds for blight remediation.**
23  Q.   That's true.   Which affects -- affects your general
24  proposal in terms of the cost of blight, correct?
25  A.   Well, it helps us in terms of getting at the cost of

Page 336

1  blight as quickly as possible.
2  Q.   But my question was a little different on that.
3  A.   Um-hm.
4  Q.   Have you intervened with Governor Snyder who you --
5  who you're -- your appointor --
6  A.   Right.
7  Q.   -- to secure the release of these Hardest Hit funds to
8  pay off property taxes which would both stabilize
9  communities to keep people in their homes and
10  stabilize the City budget by avoiding the need to pay
11  80 million in chargebacks?
12    **MR. SHUMAKER:** Objection, foundation.
13  A.   **It is not -- it is not -- it has been made clear to me**
14  **that it is not clear to me that, one, we'd have access**
15  **to those funds and that those funds can be**
16  **appropriately used for that purpose.**
17  **BY MR. GOLDBERG:**
18  Q.   It's not?
19  A.   **It's -- it's not clear.   That's --**
20  Q.   Well, I'll send you some literature on that so you can
21  clarify that.
22  A.   Okay.
23    **MR. GOLDBERG:** Okay.   Okay.   Thank you very
24  much.
25    **THE WITNESS:** Thank you very much.

13-53846-tjt   Doc 2024-4   Filed 12/10/13   Entered 12/10/13 17:34:52   Page 44 of 45

Page 337

1    **VIDEO TECHNICIAN:** All set?
2    **THE WITNESS:** All done? Okay. Thank you
3    very much.
4    **VIDEO TECHNICIAN:** This concludes today's
5    deposition. The time is 3:52 p.m. We are off the
6    record.
7    (The deposition was concluded at 3:52 p.m.
8    Signature of the witness was not requested by
9    counsel for the respective parties hereto.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 338

1                    CERTIFICATE OF NOTARY
2    STATE OF MICHIGAN )
3                    ) SS
4    COUNTY OF OAKLAND)
5
6         I, CYNTHIA C. MENDENHALL, certify that this
7         deposition was taken before me on the date
8         hereinbefore set forth; that the foregoing questions
9         and answers were recorded by me stenographically and
10        reduced to computer transcription; that this is a
11        true, full and correct transcript of my stenographic
12        notes so taken; and that I am not related to, nor of
13        counsel to, either party nor interested in the event
14        of this cause.
15
16
17
18
19
20
21
22             CYNTHIA C. MENDENHALL, CSR 5220
23                  Notary Public,
24                  Oakland County, Michigan.
25    My Commission expires: April 5, 2017

13-53846-tjt   Doc 2024-4   Filed 12/10/13   Entered 12/10/13 17:34:52   Page 45 of 45