# EXHIBIT 6

*Deposition Transcript of Kenneth Buckfire from August 29, 2013.*

*(Objectors' designations highlighted in yellow;*
*City's counter-designations highlighted in blue)*

# In The Matter Of:

*City of Detroit*

---

*Kenneth Buckfire*
*August 29, 2013*

---



**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

**Bingham Farms/Southfield ● Grand Rapids**
Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File BUCKFIRE_KENNETH.txt*
*Min-U-Script® with Word Index*

## Page 1

1    UNITED STATES BANKRUPTCY COURT

2    FOR THE EASTERN DISTRICT OF MICHIGAN

3    SOUTHERN DIVISION

4

5    In Re:

6

7    CITY OF DETROIT, MICHIGAN    Chapter 9

8    Case No.13-53846

9    Debtor.    Hon. Steven Rhodes

10    /

11

12

13    The Video Deposition of KENNETH BUCKFIRE,

14    Taken at 1114 Washington Boulevard,

15    Detroit, Michigan,

16    Commencing at 9:31 a.m.,

17    Thursday, August 29, 2013,

18    Before  Nora Morrissy, RMR, CRR, CSR-2642.

19

20

21

22

23

24

25

## Page 2

1    APPEARANCES:

2

3    THOMAS CULLEN, JR.

4    BENJAMIN ROSENBLUM

5    Jones Day

6    51 Louisiana Avenue N.W.

7    Washington, D.C. 20001

8    202.879.3939

9        Appearing on behalf of the City of Detroit.

10

11    MATTHEW G. SUMMERS

12    Ballard Spahr, LLP

13    919 North Market Street, 11th floor

14    Wilmington, Delaware 19801

15    302.252.4465

16        Appearing on behalf of EEPK.

17

18    STEPHEN HACKNEY

19    LALLY GARTEL

20    Kirkland & Ellis, LLP

21    300 North LaSalle

22    Chicago, Illinois 60654

23    312.862.2157

24        Appearing on behalf of Syncora.

25

## Page 3

1    JENNIFER GREEN

2    FRANK GUADAGNINO

3    Clark Hill, P.L.C.

4    500 Woodward Avenue, Suite 3500

5    Detroit, Michigan  48226-3435

6    313.965.8300

7        Appearing on behalf of Police and Fire Retirement

8    System and Police and Fire General Retirement System.

9

10    KELLY DIBLASI

11    Weil, Gotshal & Manges, LLP

12    767 Fifth Avenue

13    New York, New York 10153

14    212.310.8032

15        Appearing on behalf of Financial Guaranty Insurance

16    Company.

17

18    ERNEST J. ESSAD, JR.

19    Williams, Williams, Rattner & Plunkett, P.C.

20    380 North Old Woodward, Suite 300

21    Birmingham, Michigan  48009

22    248.642.0333

23        Appearing on behalf of Financial Guaranty Insurance

24    Company.

25

## Page 4

1    KAREN NEWBURY

2    Schiff Hardin, LLP

3    233 South Wacker Drive, Suite 6600

4    Chicago, Illinois 60606

5    312.258.5522

6        Appearing on behalf of Depfa Bank, PLC, as agent for

7    DFS WertManagement.

8

9    CAROLINE TURNER ENGLISH

10    Arent Fox, LLP

11    1717 K Street, NW

12    Washington, D.C. 20036

13    202.857.6000

14        Appearing on behalf of Ambac.

15

16    BIANCA FORDE

17    Winston & Strawn, LLP

18    200 Park Avenue

19    New York, New York 10166

20    212.294.4733

21        Appearing on behalf of Assured Municipal Guaranty

22    Corp.

23

24

25

Page 5

1 JASON JURGENS
2 Cadwalader, Wickersham & Taft, LLP
3 One World Financial Center
4 New York, New York 10281
5 212.504.6102
6 Appearing on behalf of Merrill Lynch Capital Services.
7
8
9 GUY S. NEAL
10 Sidley Austin, LLP
11 1501 K. Street, N.W.
12 Washington, D.C. 20005
13 202.736.8041
14 Appearing on behalf of National Public Finance
15 Guarantee Corp.
16
17 STEVEN WILAMOWSKY
18 Bingham McCutchen, LLP
19 399 Park Avenue
20 New York, New York 10022
21 212.705.7960
22 Appearing on behalf of UBS.
23
24 **ALSO PRESENT:**
25 Bailey Wellman, Video Technician

Page 7

1 DEPOSITION EXHIBIT 1        8
2 DEPOSITION EXHIBIT 2        21
3 DEPOSITION EXHIBIT 3        43
4 DEPOSITION EXHIBIT 4        80
5 DEPOSITION EXHIBIT 5        170
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

1    TABLE OF CONTENTS
2
3 Witness                    Page
4 KENNETH BUCKFIRE
5
6 **EXAMINATION**
7   **BY MR. SUMMERS:** 8
8 **EXAMINATION**
9   **BY MR. HACKNEY:** 108
10 **EXAMINATION**
11   **BY MS. DIBLASI:** 165
12 **EXAMINATION**
13   **BY MS. ENGLISH:** 171
14 **EXAMINATION**
15   **BY MS. FORDE:** 189
16 **EXAMINATION**
17   **BY MS. GREEN:** 202
18 **EXAMINATION**
19   **BY MS. NEWBURY:** 204
20
21   EXHIBITS
22
23 Exhibit                    Page
24 (Exhibits retained by counsel.)
25

Page 8

1 Detroit, Michigan
2 Thursday, August 29, 2013
3    9:31 a.m.
4
5    **MARKED FOR IDENTIFICATION:**
6    DEPOSITION EXHIBIT 1
7    9:21 a.m.
8    **VIDEO TECHNICIAN:** We are now on the
9 record.  This is the videotaped deposition of Kenneth
10 Buckfire being taken on Thursday, August 29th, 2013.
11 The time is now 9:31 a.m.  We are located at 1114
12 Washington Boulevard, Detroit, Michigan.
13    We are here in the matter of In Re: City of
14 Detroit, Michigan case number 13-53846 in the United
15 States Bankruptcy Court, Eastern District of Michigan.
16    My name is Bailey Wellman, video
17 technician.  Will the court reporter please swear in
18 the witness.
19    KENNETH BUCKFIRE,
20 was thereupon called as a witness herein, and after
21 having first been duly sworn to testify to the truth,
22 the whole truth and nothing but the truth, was
23 examined and testified as follows:
24    **MR. SUMMERS:** Good morning.
25    **EXAMINATION**

**Page 9**

BY MR. SUMMERS:

1  
2 Q. Mr. Buckfire, would you please state your name and
3 business address for the record?
4 A. Kenneth Buckfire. 601 Lexington Avenue, New York, New
5 York.
6 Q. For the record my name is Matthew Summers. I'm an
7 attorney at Ballard Spahr in Wilmington, Delaware and
8 we represent the entity that's caused people a little
9 trouble with the name but we've been referring to it
10 as EEPK.
11 Mr. Buckfire, you understand the way a
12 deposition process works, correct?
13 A. I believe so.
14 Q. And you've been deposed on numerous occasions
15 previously, correct?
16 A. Yes.
17 Q. Because of that experience I just provide a few basic
18 ground rules that I will ask you to abide by today.
19 First if the question that I ask is not clear, please
20 let me know and I will attempt to rephrase it and if I
21 ask a question and you don't understand it but answer
22 it anyway, I would ask you not to do that but to ask
23 me to clarify and if you give me an answer, I will
24 assume you understood the question.
25 Second, because we are on the record and

**Page 10**

1 sometimes you will anticipate probably where I'm going
2 with the question or think that you anticipate, I
3 would ask that you to make the transcript clearer, I
4 will ask that you wait until I complete the question
5 before you begin your answer.
6 A. Thank you.
7 Q. Before you is what's been premarked as Deposition
8 Exhibit 1, and I assume you have seen this document
9 before, is that correct?
10 A. No.
11 Q. No. Okay. And it is the notice of deposition that
12 was issued that we are proceeding under today. I'd
13 like to discuss initially with you the topics about
14 which you plan to testify at the hearing on the motion
15 to assume the forbearance and optional termination
16 agreement and prove the settlement therein.
17 Do you have in mind the topics that you
18 intend to testify at the hearing?
19 A. Yes.
20 Q. And can you provide those to me?
21 A. The reason and purpose of the negotiation with the
22 Swap counterparties and the results thereof as
23 determined in the forbearance agreement itself, the
24 financial condition of the City that led us to believe
25 that this agreement was necessary to rehabilitate the

**Page 11**

1 City. Prepared to testify to the general condition of
2 the City's financials leading up to the execution of
3 the forbearance agreement.
4 Q. Are there any other topics that you intend to testify
5 at the hearing concerning the forbearance agreement?
6 A. I'll testify at that point to the status of the DIP
7 form process that will provide the financing to
8 execute the City's option under the forbearance
9 agreement to retire the Swaps.
10 Q. Are there any other topics that you have not mentioned
11 in your answers that you intend to testify about?
12 A. I'm sure there will be other things but I can't recall
13 at this time what they might be.
14 Q. Mr. Buckfire, what is your position with Miller
15 Buckfire?
16 A. Co-founder and co-president of Miller
17 Buckfire & Company.
18 Q. Miller Buckfire currently is employed as the financial
19 advisor to the City of Detroit, correct?
20 A. As the investment banker to the City, that's correct.
21 Q. And when was Miller Buckfire first engaged by the City
22 as investment banker?
23 A. We were first engaged in July of 2012 for a 60-day
24 review of the City's financial condition. We were
25 re-engaged on January 8th of this year to continue to

**Page 12**

1 advise the City on its financial condition and
2 financial alternatives. Both were -- were hired
3 pursuant to an RFP process to which we submitted a
4 proposal.
5 Q. When were hired in July 2012, can you describe the
6 scope of services that Miller Buckfire was engaged to
7 provide?
8 A. As I mentioned earlier, we were engaged to do a
9 general financial review of the City's financial
10 condition particularly with respect to its ability to
11 service its debt obligations.
12 Q. Were there specific tasks that you were asked to
13 perform in connection with doing a general financial
14 review of the debt obligations?
15 A. No, we were engaged to do a general financial review
16 and advise the mayor and the chief financial officer
17 as to what those financial conditions implied for the
18 City's ability to operate in the ordinary course.
19 Q. That engagement began in July 2012 is what you
20 testified to, is that correct?
21 A. Correct, and ended on August 31st.
22 Q. Very good. I would point out that I would ask you to
23 wait until I ask the question, though.
24 Miller Buckfire was then re-engaged on
25 January 8th of 2013, is that correct?

1  A.  Yes.

2  Q.  Okay.  And can you give a list of the specific items

3  that you were asked or specific actions you were asked

4  to undertake for the City when you were re-engaged on

5  January 8th?

6  A.  Well, it was a general financial advisory assignment

7  in some way similar to the assignment we had already

8  been hired for the previous year.

9      The scope was expanded at the mayor's

10  request and at the request of the CFO to review its

11  liquidity position in greater detail particularly

12  because of the continuation of the defaults the City

13  suffered under the Swap collateral agreement which put

14  the City's liquidity at risk if the Swap

15  counterparties were to exercise their remedies.  They

16  were very concerned about that and asked us to take

17  that into account.

18  Q.  Were you at the time of your engagement expected to be

19  negotiating with creditors of the City?

20  A.  Not at that time.

21  Q.  Was there a time after January 2013 where the scope of

22  your engagement changed?

23  A.  Yes.

24  Q.  And at what time did the scope of engagement change?

25  A.  Early May.

1  Q.  And who directed that the scope of the engagement

2  change?

3  A.  The emergency manager, Mr. Orr.

4  Q.  And can you explain how the scope of the engagement by

5  the City of Detroit changed?

6  A.  Immediately after our re-retention by the City we

7  advised the mayor that in order to properly assess the

8  condition of the City and its options in order to deal

9  with that balance sheet, the City should engage other

10  professionals that could assist in developing a

11  reliable and long-term cash flow and financial

12  forecast.

13      Upon a recommendation E & Y, Ernst & Young,

14  which in working with the City in other activities for

15  several years was requested to begin developing that

16  forecast.

17      At the same time the City engaged the firm

18  of Conway MacKenzie, not exactly that time, to

19  assist with operational analysis.

20      Ernst & Young was tasked with the

21  responsibility of developing a relatively short-term

22  cash flow forecast and a long-term ten-year forecast

23  that would allow us to have the evidence and the facts

24  on which to advise the City as to what its financial

25  options would be.

1      That initial forecast was presented to us

2  and to the City I believe on May the 2nd or 3rd of

3  this year.  Upon receipt of that forecast it was clear

4  that the financial condition of the City was more dire

5  than I had expected and that, therefore, was

6  immediately necessary to begin planning for the

7  preservation of the City's cash flow given the

8  incredible risk the City was running during this year

9  of 2013.  And the forecast is what triggered the

10  expansion of the scope of our assignment.

11  Q.  And did the scope of your assignment expand to include

12  negotiations with creditors of the City?

13  A.  At that time it did but we did not initially engage in

14  negotiations with creditors at that time but it was

15  clearly anticipated given the results of the forecast

16  that attempting to achieve stability with our key

17  creditors and particularly Swap counterparties was

18  going to be a crucial element to the City's ability to

19  continue to operate in the ordinary course.

20  Q.  And is it a fair statement that the scope of

21  engagement has expanded to include developing a plan

22  of adjustment for the City of Detroit?

23  A.  Well,  it did after that point, yes.

24  Q.  And are you -- is Miller Buckfire engaged at this

25  point to work on developing or analyzing the potential

1  for asset sales by the City?

2  A.  Yes.

3  Q.  And is Miller Buckfire also engaged at this point to

4  analyze financing options for the City?

5  A.  Yes.

6  Q.  When you were -- when Miller Buckfire was initially

7  retained in January of 2013, second time, who was

8  Miller Buckfire principally reporting to at the City?

9  A.  Initially it was to Jack Martin, chief financial

10  officer, and Mayor Bing.

11  Q.  And when Miller Buckfire was engaged in July of 2012,

12  who was Miller Buckfire principally reporting to?

13  A.  Chris Anders (phonetic) and Mayor Bing.

14  Q.  What is Mr. Anders position?

15  A.  I believe he was chief of staff.

16  Q.  Chief of staff --

17  A.  Chief restructuring officer.

18  Q.  Chief restructuring officer?

19  A.  I believe that was his title.

20  Q.  And did he work directly -- strike that.

21      Did he report directly to the mayor?

22  A.  That's my understanding.

23  Q.  Who in addition to you at Miller Buckfire is

24  performing services for the City?

25  A.  Well, we have a very large team.  So, if you don't

1  mind I'll restrict myself to the senior members --
2  Q.  The senior members at Miller Buckfire?
3  **A.  Yes, there's a long list.  Norma Corio, co-president**
4  **of Miller Buckfire, C O R I O; James Doak, D O A K;**
5  **Kevin Haggard, H A double G A R D; and Kyle Herman.**
6  Q.  Is anyone other than those four individuals and
7  yourself employed by Miller Buckfire and engaging or
8  providing services to the City?
9  **A.  Yes.**
10  MR. CULLEN: Objection.  He just --
11  **A.  I just told you.**
12  BY MR. SUMMERS:
13  Q.  That that is the complete list?
14  **A.  No, those are the senior members --**
15  Q.  Those are the senior members.  Approximately how many
16  other persons at Miller Buckfire are working on the
17  engagement for the City, if you can just give me a
18  number?
19  **A.  Probably between six and eight.**
20  Q.  What is Mr. Herman primarily responsible for in the
21  engagement with the City?
22  **A.  Mr. Herman is responsible for overall management of**
23  **the -- what I would call the plan of adjustment**
24  **process and analyzing the financial forecasts,**
25  **determining what the implications of those forecasts**

1  **are for the sustainable balance sheet of the City.**
2  Q.  Is Mr. Herman primarily responsible for doing any
3  other work for the engagement by the City?
4  **A.  He's involved in almost every aspect of this**
5  **engagement.**
6  Q.  What is Mr. Haggard's principal responsibility in the
7  engagement of Miller Buckfire by the City?
8  **A.  He's engaged on both the financing elements and the**
9  **asset sale alternative evaluation elements of this**
10  **assignment.**
11  Q.  Same question for Mr. Doak, what is his principal
12  responsibility in the engagement for the City?
13  **A.  Overall management of the engagement.**
14  Q.  And what does overall -- what task does overall
15  management of the engagement include?
16  **A.  Everything I don't have time for.**
17  Q.  Can you give an example?
18  **A.  Discussions with potential parties to buy individual**
19  **assets, discussions with other consultants involved**
20  **with the process, discussions with potential parties**
21  **involving financing.**
22  Q.  How much of Mr. Doak's time is devoted to the
23  engagement by the City of Detroit?
24  **A.  Well, it's impossible to give a precise answer because**
25  **we don't keep time records, and the involvement**

1  someone has varies from day to day and week to week.
2  I would say at the moment our team is
3  almost entirely committed to Detroit but we have other
4  assignments.
5  Q.  And then the other individual that you mentioned I
6  believe was Mr. McCore, is that correct?
7  **A.  No, Norma Corio, she's co-president of Miller**
8  **Buckfire.**
9  Q.  And what are her responsibilities in the engagement
10  with the City?
11  **A.  Managing the financing process for the City.**
12  Q.  And by managing the financing process, does that mean
13  looking for or attempting to find DIP financing?
14  **A.  Yes.**
15  Q.  Does it involve any other tasks?
16  **A.  Not at the moment.**
17  Q.  How much of your time is devoted to the engagement by
18  the City?
19  **A.  It's impossible to give a precise answer.  I would say**
20  **going back to January it's been 60 to 70 percent of my**
21  **time.**
22  Q.  Now, is it fair to say that you have principal
23  responsibility for the engagement of the City and the
24  work that's being performed by the members of your
25  team?

1  **A.  Yes.**
2  Q.  And so all the individuals we just discussed report
3  directly to you, is that correct?
4  **A.  Yes.**
5  Q.  And you at this point report directly to Mr. Orr, is
6  that correct?
7  **A.  Our firm is responsible to Mr. Orr for the tasks that**
8  **we've been hired to perform.**
9  Q.  How often do you speak with Mr. Orr?
10  **A.  On average once or twice a day.**
11  Q.  Has the frequency of communications with Mr. Orr
12  changed over the life of the engagement since Mr. Orr
13  was appointed?
14  **A.  Depending on the topic it can be more or less.**
15  Q.  When Miller Buckfire was engaged in 2012, what steps
16  did Miller Buckfire undertake to become familiar with
17  the City and its financial affairs?
18  **A.  We reviewed all publicly available financial**
19  **information.  We did interviews with certain members**
20  **of the finance staff to make sure we understood the**
21  **financial condition of the City.**
22  Q.  In 2012 did you do anything else to become familiar
23  with the City and its financial status?
24  **A.  No.**
25  Q.  When Miller Buckfire was re-engaged in January 2013,

1  what steps did you undertake with respect to the City,
2  its financial status and your engagement?
3  A.  As I testified earlier we recommended the City
4  immediately expand Ernst & Young's engagement to do a
5  full and thoughtful review of the City's financial
6  condition for the purpose of developing a short-term
7  cash flow forecast and a ten-year financial forecast
8  because we needed better information on which to base
9  our financial recommendations to the mayor and later
10  to the emergency manager.
11      MR. SUMMERS: If we could mark this as
12  Deposition Exhibit 2, please.
13      MARKED FOR IDENTIFICATION:
14      DEPOSITION EXHIBIT 2
15      9:48 a.m.
16  BY MR. SUMMERS:
17  Q.   Mr. Buckfire, do you recognize this document?
18  A.  I do.
19  Q.   And it is the forbearance and optional termination
20  agreement that was executed by Mr. Orr among others on
21  or about July 15th, 2013, is that correct?
22  A.   Yes.
23  Q.   And this is the agreement that's the subject of the
24  pending motion in the bankruptcy court which brings us
25  here today, correct?

1  A.   Yes.
2  Q.   Okay.  And was the City's decision to enter into the
3  forbearance agreement made by Mr. Orr?
4  A.   Yes, it was.
5  Q.   When did Mr. Orr make the decision to enter into the
6  forbearance agreement?
7  A.  On July 15, 2013.
8  Q.  So, up until July 15th, 2013 Mr. Orr was -- had not
9  made up his mind whether to execute this document?
10      MR. CULLEN: Objection.  Foundation.  Form.
11  A.  It was being negotiated.
12      BY MR. SUMMERS:
13  Q.   What role did you have in the negotiation of the
14  forbearance agreement?
15  A.   On behalf of the City of Detroit I had responsibility
16  for negotiating the business terms of this agreement.
17  Q.   And what specific tasks were included in the -- that
18  responsibility?
19  A.  Well, leading up to the decision to commence
20  negotiations, as I mentioned earlier, once we received
21  the early projections from Ernst & Young as to the
22  true condition of the City in early May, it became
23  clear to us as the City's bankers and to the other
24  financial advisors to the City that the City was
25  bearing an increasingly high level of risk that if the

1  Swap counterparties were to exercise their rights and
2  stop access to the gaming revenues going into the
3  collateral accounts, that the City's ability to
4  operate would be in severe jeopardy and it became a
5  life or death issue for the City.
6      We began therefore in early May determining
7  what our best course of action would be to protect the
8  City's access to this cash, and by the end of May it
9  became clear to the advisors including Miller Buckfire
10  that to enter in a negotiation with the Swap
11  counterparties was in the City's best interest.
12      My responsibility was to initiate those
13  discussions with the business people of the Swap
14  counterparties and try to arrange an understanding
15  with them that would ensure the City had continued
16  access to cash and that we had an overall resolution
17  of the Swap including the right to terminate it and
18  buy it out, that was advantageous to do so.
19  Q.  Did Miller Buckfire perform any analysis in connection
20  with the decision to enter into negotiations?
21      MR. CULLEN: Other than he's already
22  stated, Counsel?
23      MR. SUMMERS: I think --
24      BY MR. SUMMERS:
25  Q.  Was the analysis that you just described performed by

1  Miller Buckfire or was it performed by Ernst & Young
2  or someone else?
3      MR. CULLEN: Objection.  Foundation.  Form.
4  You can address it if you can unpack it.
5  A.  We understood the implications of their using their
6  rights to stop the cash from the City's ability to
7  operate, that we understood.
8      BY MR. SUMMERS:
9  Q.  And how did you come to understand that?
10  A.  By analyzing the projections that was produced by
11  Ernst & Young.
12  Q.  Is that the only -- were the projections produced by
13  Ernst & Young the only item you analyzed?
14      MR. CULLEN: Objection.  Foundation.  Form.
15  A.  Well, it's a cash flow issue.  The City was expected
16  to receive 175 to 185 million of year of gaming
17  revenues which had been pledged to the Swap
18  counterparties pursuant to the amendment of 2009.
19      Of that 175 million the City was obligated
20  to pay them 50 million dollars as long as they did not
21  exercise their rights.  So, we needed the other money
22  to operate the City.  If they were to block our access
23  to that cash, it would be a devastating consequence to
24  the City leading to a reduction in public services and
25  that was unacceptable.  So, that's our analysis.

BY MR. SUMMERS:

1 Q. How was the decision made as to who would participate
in the negotiations about the Swap agreements and
access to casino revenues?

5 A. I don't understand that question.

6 Q. Were you involved in the decision as to the entities
the City would approach about negotiations?

8 MR. CULLEN: Objection. Foundation. Form.

9 A. Yes, I was.

10 BY MR. SUMMERS:

11 Q. And how did you decide who to bring -- who you wanted
at the negotiating table?

13 A. Together with counsel I made a recommendation to
Mr. Orr on how we should handle the negotiations.

15 Q. And what was that recommendation?

16 A. That as the City's investment banker together with the
City's lead restructuring counsel Jones Day we contact
the Swap counterparties, invite them to a meeting
which was held on June 4th at which time we also had
Mr. Jack Martin, CFO of the City and Mr. Tom Saxton,
chief deputy treasurer of the State of Michigan in
attendance.

23 Q. And did you review any documents other than the
Ernst & Young cash flow analysis in determining what
advice to give Mr. Orr?

1 MR. CULLEN: Objection. Foundation. Form.

2 A. I read the collateral amendment that had been executed
by the City in 2009.

4 BY MR. SUMMERS:

5 Q. Did you read anything else?

6 A. No.

7 Q. Was Mr. Orr present at the meeting on June 4th, 2013?

8 A. No.

9 Q. But you were present, correct?

10 A. Yes.

11 Q. What transpired at the June 4th meeting?

12 A. Well, we began by explaining to the banks, Bank
America Merrill Lynch and UBS that the City's
financial condition was dire, that we were very
concerned about the City's ability to operate without
liquidity and even though they had been to that point
standing fast on their rights to seize the City's
cash, that would be in everyone's best interest to
arrive at a permanent solution to this problem.

20 I explained to them that we were
economically motivated to do so but recognizing that
there at least were some arguments, that their
position was not a strong one legally, we would expect
them to allow us to buy back their Swaps at a
significant discount.

1 Q. And who communicated to the Swap counterparties that
the City wanted or was interested in buying back the
Swaps at a significant discount?

4 A. I did.

5 Q. Mr. Orr was aware prior to the June 4th meeting that
you were going to make that sort of proposal to the
Swap counterparties?

8 A. He had authorized it.

9 Q. And what was the reaction at the meeting of the Swap
counterparties?

11 A. Well, they were expecting us to pay them. They were
very unhappy. It was a very tense and difficult
meeting. They were -- expressed high confidence in
their position with respect to their collateral. They
were not willing to consider at least initially any
arrangement in which we had the right to buy back
their position at a discount and they highlighted for
my benefit several times that we didn't even have the
money to do it so why did I care about the option.

20 Q. How did you respond to that last part that the City
did not have the money to buy back the Swaps?

22 A. I told them that we were highly confident that if we
had an enforceable termination agreement with them,
that I would be able to find the money.

25 Q. Did you give them any specifics at that time as to how

1 you thought you would be able to obtain the money?

2 A. No.

3 Q. What did you have in mind at that point as to how you
would obtain the money to buy back the Swaps?

5 A. Well, at the time we thought we might be able to use
the same gaming revenues to secure new debt which of
course was the basis of the collateral agreement
itself. We also took notice of the fact the City had
other potential assets that could be pledged to raise
capital but we also recognized that it was meant to be
and is still intended to be an option so that even if
the City cannot take care of the Swap, we still have
achieved our primary objective which is preserving our
access to gaming revenues.

15 Q. It's preserving access to gaming revenues until June
2014, is that correct?

17 A. That's correct.

18 Q. And if the City is unable to pay the termination,
discounted termination by that time --

20 A. We'll renegotiate. At the time we negotiated this,
bankruptcy was not inevitable or really contemplated
as an inevitable factor. We did the best we could
getting the best deal we could at the time with the
Swap counterparties.

25 I actually originally asked until the end

1  of next year, 12-31-2014, but it was rejected. It was
2  a very, very difficult negotiation.
3  Q. What individuals were present at the June 4th meeting?
4  A. Well, the business people present were Ed Curland and
5  James Nacos from Bank of America Merrill Lynch and
6  Bill Chandler from UBS. Their counsels were there and
7  I apologize if I can't recall all their names.
8      MR. CULLEN: Lawyers tend to run together.
9      MR. JURGENS: They all appear to be the
10  same.
11      THE WITNESS: I would never say that.
12      BY MR. SUMMERS:
13  Q. Do you recall any of the attorneys that were present?
14  A. Larry Larose is the only one I can really recall being
15  particularly chatty.
16  Q. Which firm is Mr. Larose at?
17  A. Cadwalader.
18  Q. Approximately how long did the June 4th meeting last?
19  A. Lasted about an hour and a half. As I said it was a
20  very difficult meeting. They were extremely
21  aggressive toward the City. They brought up several
22  times the fact that the City had been in default since
23  2012, that we continue to add defaults to our pile of
24  defaults, most recently the appointment of Mr. Orr as
25  an emergency manager was in and of itself a default

1  under the collateral agreement and they made it very
2  clear to me at least and to the other members
3  representing the City that their patience was wearing
4  thin, that they wanted a resolution and there were
5  many attempts to get us to sign another standstill
6  agreement beforehand from their point in view had been
7  done, made in good faith.
8      They were unhappy that the City had
9  rejected those overtures and they were putting us on
10  notice from a business point of view that patience was
11  not infinite.
12  Q. Was there a particular individual that took the lead
13  for the Swap counterparties at the June 4th meeting?
14  A. Mr. Curland, C U R L A N D.
15  Q. How did you -- when the June 4th meeting concluded,
16  was there an agreement to meet again at some point?
17  A. Not specifically, but I had to agree with Mr. Curland
18  that we would chat again in a few days to attempt to
19  find a middle ground.
20  Q. And what in your mind when the June 4th meeting
21  concluded did you think would be the next step?
22  A. Well, as soon as the meeting concluded, we discussed
23  amongst ourselves the appropriate next step. One of
24  the things that made them particularly upset was our
25  original bid to terminate the Swaps was 50 cents on

1  the dollar.
2      As I mentioned earlier we had asked for a
3  forbearance period that would go through the end of
4  2014, and that we wanted to have that 50 cent option,
5  you know, really to the end of the forbearance period.
6      They viewed that as very aggressive, but I
7  spoke with Mr. Curland a few days later and at that
8  point we agreed to meet again which we did. I believe
9  it was on the 8th, and at that meeting Bank America
10  Merrill Lynch indicated that although they were not
11  conceding at all, that their collateral position was
12  in any jeopardy, that they recognized they had a book
13  reserve issue against their Swaps, not an economic
14  loss but a book loss caused by Dodd-Frank rules that
15  led them to perhaps consider a termination payment of
16  85.
17      I viewed that as progress and in response I
18  was told, Ed, that the City was willing to move our
19  initial option payments up to 72. He laughed at me
20  and told me that was still too low and that frankly
21  over the next couple of days and I can't recall
22  exactly when we had other meetings and other phone
23  calls where we ended up with the structure now
24  embodied in the forbearance agreement which was an
25  attempt to bridge the gap.

1      One might ask the question why did we have
2  a progressively higher option termination payment
3  scheduled built in, and the answer is we agreed that
4  we would have the benefit of the lowest possible price
5  but have the least amount of time to exercise it and
6  that they would have the benefit of their higher price
7  at the end of that period through the end of the
8  forbearance period, and that's how we ended up with a
9  price of 75, 77 and then 82.
10  Q. How did you describe the negotiations that led to the
11  discounted termination availability ending in March of
12  2014?
13  A. Well, as I mentioned our original request was
14  termination right at a discount through December 31 of
15  2014. They wouldn't grant us that.
16      So, we agreed that if the final date was in
17  June, then the outside date would be March 15th which
18  happens to be the date on which they received their
19  quarterly Swap payments anyway so it was a convenience
20  factor to say March 15th or March 14th.
21      Likewise how we arrived at the
22  November 15th date at which the price was 77 and then
23  the inside date was the shortest one, 75. Originally
24  we agreed to September 15th but eventually during the
25  next month because this all happened before June 11th

1 I believe, we were able to extend that to October 31
2 which is how we got from September 15th to October 31.
3 We did not move the other dates.
4 Q. You said all this happened before June 11th, 2013?
5 A. Yes, the reason for that it was clear to us in early
6 June as a result of the forecasting E & Y had done
7 that the City's financial condition was frankly even
8 worse than we had feared, and, therefore, it might
9 become necessary to not make the payment to the COPs
10 bond holders on I believe it was June the 15th and
11 once that occurred, we would bear a very high risk of
12 the Swap counterparties despite their purported
13 patience with the City might have no choice but to
14 exercise their remedies, and therefore we felt
15 compelled to complete a business agreement with them
16 prior to that date in order to protect the City at all
17 costs, and the primary motivation for that, of course,
18 was the Swap counterparties needed to send a letter to
19 US Bank, I believe it was on June 11th instructing
20 them to release the City's share of gaming revenues in
21 the ordinary course and we felt imperative to have
22 that protection in hand so the City could make a
23 decision about whether or not to make the payment on
24 the COPs bonds on June 15th.
25 Q. At any point -- well, let's stick with the time line.

1 What's been marked as Exhibit 2, when was the first
2 time you saw a draft of this forbearance agreement?
3 A. I believe it was after June 15th.
4 Q. Do you recall which party to these negotiations
5 provided the initial draft of the forbearance
6 agreement?
7 A. I don't.
8 Q. Is it fair -- let's draw down in detail a little bit
9 on the June 8th meeting. Who was -- what individuals
10 were present at the June 8th meeting?
11 A. It was the same attendees as at the June 4th meeting
12 except that Mr. Saxton and Mr. Martin did not attend.
13 Q. Were the service corporations present at the June 8th
14 meeting?
15 A. Not to my recollection.
16 Q. Were the service corporations present at the June 4th
17 meeting?
18 A. No.
19 Q. What point was information about the proposed
20 forbearance agreement communicated to the service
21 corporations?
22 A. I don't know.
23 Q. Do you know who was communicating with the service
24 corporations?
25 A. No.

1 Q. Was anybody communicating with the service
2 corporations?
3 A. I don't know.
4 Q. Did Mr. Orr know?
5 MR. CULLEN: Objection. Foundation.
6 A. I don't know.
7 BY MR. SUMMERS:
8 Q. But you never spoke with a representative of a service
9 corporation about the forbearance agreement?
10 MR. CULLEN: Objection. Foundation. Form.
11 A. I already testified to that.
12 BY MR. SUMMERS:
13 Q. At any point during the negotiation of the forbearance
14 agreement did the Swap counterparties threaten to
15 terminate?
16 A. I've already testified that our June 4th meeting they
17 made it very clear that their patience was running out
18 with the City's unwillingness to sign a standstill
19 agreement in the form of which they had previously
20 been trying to get the City to sign it. You may call
21 it a threat. I would interpret it as a threat. It
22 was a direct risk on the City's survival which in my
23 judgment and I advised Mr. Orr was unacceptable for
24 the City to continue to bear.
25 Q. Did the Swap counterparties ever say to the City that

1 if a resolution is not reached by a certain date, they
2 will terminate?
3 A. Not to my knowledge.
4 Q. And you said that the first defaults occurred in your
5 view in March 2012, is that correct?
6 A. There was a credit rating downgrade which triggered
7 termination event under the collateral agreement which
8 had not been cured, and then after that the City
9 emergency manager was appointed, that in itself was an
10 event of default under the agreement. So, we had
11 several defaults.
12 Q. At any point from the current -- first default in
13 March 2012 until the date just prior to the time, just
14 prior to the June 4th meeting, did any of the Swap
15 counterparties threaten the City that they would
16 terminate the Swap contracts?
17 MR. CULLEN: Objection. Foundation.
18 A. I've already testified that they were making numerous
19 attempts to get the City to sign a standstill
20 agreement and they were letting everyone know
21 including myself that their patience was running out.
22 BY MR. SUMMERS:
23 Q. Do you recall what specifically they said that made
24 you think their patience was running out?
25 A. They said so.

1  Q.  What do you believe to be the benefits to the City of
2  entering into the forbearance agreement?
3  A.  Well, there are three.  Most important is continued
4  and reliable access to the City's net share of the
5  gaming revenues.  By that I mean the amount remaining
6  after paying off the fixed Swap payments.  That's a
7  critical element to the City's ability to operate in
8  the ordinary course and invest in its reinvestment
9  program.
10     Second, obviously the opportunity to
11  terminate the Swaps and eliminate this class of
12  creditors from a plan of adjustment at a discount
13  particularly since it's a secured party is of economic
14  value to the City, it saves real cash.
15     Lastly, by freeing up the gaming revenues,
16  it will give the City financing options as part of the
17  plan of adjustment that it otherwise might not have.
18  Q.  With respect to -- with respect to freeing up the
19  gaming revenues, how in your view does the forbearance
20  agreement provide the City with better access to those
21  revenues?
22  A.  Well, by the action of the collateral agreement today
23  the City receives the net revenues after paying the
24  Swap payments on a monthly basis.
25  Q.  The City -- the City today has access to the casino

1  revenues, is that correct?
2  A.  Pursuant to the forbearance agreement, yes.
3  Q.  So, the forbearance agreement has not been approved by
4  the court?
5  A.  That's correct.
6  Q.  But you believe the Swap counterparties are refraining
7  from terminating because of the forbearance agreement?
8  A.  Until the court rules, they are.
9  Q.  Under the forbearance agreement the City will have the
10  ability to direct the termination of the Swap
11  agreements, is that correct?
12     MR. JURGENS: Objection to form.
13  A.  I'm not quite sure I understand that question.
14     BY MR. SUMMERS:
15  Q.  Under the forbearance agreement the City obtains the
16  right to determine if and when the Swap contracts will
17  be terminated?
18     MR. CULLEN: Objection.  Foundation.  Form.
19     MR. HACKNEY: I'd like to put something on
20  the record which is that the Swap counterparties'
21  counsel are not parties to the deposition nor are they
22  objectors or movements to the motion and under the
23  court's order, a strict instruction of the court's
24  order I think there's a question as to whether they
25  are even supposed to be in the room.

1     So we certainly would not want to be
2  entertaining objections from the Swap counterparties.
3  I think that seems reasonable.
4     MR. JURGENS: Well, I think  we disagree
5  with that.  We didn't consider ourselves to be the
6  public as described by the court yesterday.
7     As you know the forbearance agreement that
8  is the subject of this deposition and the subject of
9  the motion is something that we are a party to or at
10  least Cadwalalder's client Merrill Lynch Capital
11  serves as a party to.  I'm happy to continue to object
12  and you can reserve on whether or not the objections
13  are appropriate at some point if it's necessary, you
14  can bring that to the attention to the judge down the
15  road but at this point I don't think it makes sense
16  for us to belabor the point.
17     MR. HACKNEY: Let's go off the record for a
18  second if we could.
19     VIDEO TECHNICIAN: The time is 10:16 a.m.
20  We are off the record.
21     (Discussion held off the record at
22  10:16 a.m.)
23     (Back on the record at 10:19 a.m.)
24     VIDEO TECHNICIAN: We are back on the
25  record at 10:19 a.m.

1     BY MR. SUMMERS:
2  Q.  Mr. Buckfire, the forbearance agreement in the City's
3  view allows the City to direct the termination of the
4  Swap agreements, is that correct?
5     MR. CULLEN: Objection.  Foundation.  Form.
6     BY MR. SUMMERS:
7  Q.  You may answer.
8  A.  Well, we negotiated for the right to do so if we can
9  deliver the Swap termination payment.
10  Q.  Is that a right that the City currently possesses
11  under any other agreement?
12  A.  This is the only agreement of which I'm aware.
13  Q.  And it is the City's view that under the forbearance
14  agreement the City is able to direct the termination
15  of the Swap agreements without the consent of any
16  other party, is that correct?
17     MR. CULLEN: Objection.  Foundation.  Form.
18  Mischaracterizes his answer.
19     BY MR. SUMMERS:
20  Q.  You may answer.
21  A.  Can you repeat your question?
22  Q.  Sure.  Under the forbearance agreement the City is
23  able to direct the termination of the Swap agreements
24  without the consent of any other party, is that
25  correct?

Page 41

1     **MR. CULLEN:** Objection. Foundation. Form.
2  Mischaracterizes his answer.
3 **A. I don't know what I'm supposed to answer to. It's our**
4 **view that this is an agreement the City can perform it**
5 **has rights under.**
6     BY MR. SUMMERS:
7 Q. What are the down sides of the forbearance agreement
8 to the City?
9 **A. That's catchy. Financially, none.**
10 Q. What about other than financially are there down sides
11 to the forbearance agreement?
12 **A. Yes, it would be clearly another claim that would have**
13 **to be disputed in front of the judge. It would**
14 **require -- could be a delay factor. It exposes the**
15 **City to increased cost of litigation, uncertainties as**
16 **to access to cash which is a critical element of its**
17 **ability to survive. Those are the financial down**
18 **sides.**
19 Q. The financial down sides of having entered into the
20 forbearance agreement?
21 **A. No, not having the forbearance agreement.**
22 Q. Those are the financial -- what I am asking is what
23 are the financial -- what are the down sides, if any,
24 to the City of having entered into the forbearance
25 agreement?

Page 42

1 **A. There aren't any.**
2 Q. None. Did the City consider alternatives to the
3 forbearance agreement in paying a discounted
4 termination fee?
5 **A. We reviewed all possible alternatives and there really**
6 **weren't any.**
7 Q. What possible alternatives did you review?
8 **A. We reviewed novation, possibly getting some other Swap**
9 **party to come in and provide the same Swap to the 2006**
10 **COPs payments and not have a collateral contract to**
11 **protect it. We did consider that, we looked at it, we**
12 **talked to a few people. There was no interest**
13 **whatsoever in the idea. There was no appetite on**
14 **anybody's part to provide unsecured credit to the City**
15 **at that juncture which I remind you was May of this**
16 **year.**
17 Q. Who did you talk to about what you described as the
18 novation?
19 **A. We talked to the state which has a lot of expertise in**
20 **this area. We spoke with people inside other banks**
21 **who are not involved here just to get their general**
22 **views on how this might be done. Can't recall exactly**
23 **who it was but it was clear that without security**
24 **there was no interest in providing any kind of credit**
25 **to the City that would release the current Swap**

Page 43

1 counterparties from their obligations.
2 Q. In the settlement motion that the City has filed, the
3 City asserts that the City is currently in a liquidity
4 crisis, is that correct?
5 **A. Yes.**
6 Q. And you agree that the City is in a liquidity crisis,
7 correct?
8 **A. Yes.**
9     **MR. SUMMERS:** Let me have this marked as
10 Exhibit 3.
11     **MARKED FOR IDENTIFICATION:**
12     DEPOSITION EXHIBIT 3
13     10:24 a.m.
14     **MR. CULLEN:** At one point, Counsel, just as
15 we go through these depositions are we going to mark
16 them sequentially for each witness or are we going to
17 mark them sequentially throughout? If we don't end up
18 double tracking that will be hard. So, I don't care
19 --
20     **MR. HACKNEY:** We'll do our best.
21     **MR. CULLEN:** Let's just for today on the
22 record let's just call these Buckfire 3 just in case
23 we go the other way because we can be cumulative if we
24 want to but it will be hard to disinter Buckfire 2, 3,
25 4, 5 and 7 if we just have them by numbers that will

Page 44

1 be the same as Orrs.
2     **MR. SUMMERS:** I think the reporter has been
3 marking them as Buckfire 3.
4     **MR. CULLEN:** All right.
5     BY MR. SUMMERS:
6 Q. This document has been marked as Exhibit Number 3 is
7 the proposal to creditors, executive summary of the
8 proposal to creditors that was made on June 14th,
9 2013, is that correct?
10 **A. Yes.**
11 Q. And this was prepared in connection with a meeting
12 with creditors that was held at the Detroit Airport
13 Westin on June 14th, 2013, is that correct?
14 **A. That's correct.**
15 Q. And did you participate in creating this executive
16 summary?
17 **A. I did.**
18 Q. And you participated in the information that is --
19 gathering the information that is disclosed in this
20 executive summary, is that right?
21 **A. Well, I reviewed drafts of it to make sure that it**
22 **made sense, that it was consistent, that it was**
23 **accurate, but I did not prepare the information**
24 **myself.**
25 Q. You prepared -- leave it there. You're familiar with

1    the contents of this document, correct?
2 A.   Yes.
3 Q.   If you turn to Page 35.  And Page 35 contains a
4    summary of the current financial status of the City as
5    of June 14th, 2013, is that correct?
6 A.   No, actually this is just one way of looking at it.
7    Page 8 and 9 are actually more relevant for the
8    discussion we've been having today.
9 Q.   If you stay with -- what then do you think is
10    contained on Page 35?
11 A.   This is a review of the City's reported historical
12    financials.
13 Q.   If you look at the column at the very far right side
14    of the page it says prelim 2013.  Do you know what
15    that column contains?
16 A.   It contains a preliminary estimate of revenues,
17    operating expenses and legacy expenses for 2013.
18 Q.   And if you look down here line labeled total revenues
19    which indicates 1.121.9 billion dollars, is that
20    correct?
21 A.   Yes.
22 Q.   And that is the total revenue that was projected as of
23    the date this executive summary was prepared for 2013?
24 A.   Yes.
25 Q.   Now, if you go down the next subsection of Page 35 is

1    labeled operating expenditures, correct?
2 A.   Yes.
3 Q.   And operating expenditures preliminary 2013 column
4    indicates 692 million dollars, correct?
5 A.   Yes.
6 Q.   Now -- and the operating expenditures include --
7    included in this section include the essential
8    services that the City has to provide, is that
9    correct?
10 A.   Yes.
11 Q.   And then when you get to the legacy expenditures, is
12    it correct that the City is not currently making debt
13    payment, debt service payments to general obligation
14    bonds, is that correct?
15 A.   Yes.
16 Q.   And the City is not -- is currently deferring payments
17    for retiree health benefits, isn't that correct?
18 A.   Yes.
19 Q.   So, without making service or making payments on the
20    legacy expenditures for 2013, is it correct to say
21    that the City would have operated at a surplus for
22    fiscal year 2013?
23 A.   Well, clearly if we're not making our fixed
24    obligations, we'd have more cash than if we did.
25 Q.   And are you currently making payments on any of the

1    items that are categorized under the legacy
2    expenditures part of Page 35?
3 A.   Yes.
4 Q.   What portions are you making?
5 A.   Well, we're making payments on the POC Swaps because
6    they are a secured obligation.  I'm not sure looking
7    at this whether the 141 million of debt service for
8    LTGO and UTGO incorporates payments made on the
9    secured state revenue share bonds which we have three
10    series.  I have to go back and check, but clearly the
11    City is paying its obligations on secured, that is,
12    revenue protected debt and not paying on unsecured
13    debt.
14 Q.   And the City is not at this point making its pension
15    contributions, correct?
16 A.   Correct.
17 Q.   The City at this point is not paying the health
18    benefits for retirees, correct?
19 A.   Yes, that's correct.
20 Q.   And the City is not making principal interest payments
21    to the service corporations, correct?
22 A.   That's correct.
23 Q.   Then turn to Page 38 of the executive summary.  In
24    this document among other things or this page among
25    other things contains a preliminary forecast for

1    fiscal -- for the City for fiscal year 2014, is that
2    correct?
3 A.   Yes.
4 Q.   And you see the column that's labeled 2014?
5 A.   I do.
6 Q.   The column labeled for 2014 indicates the total
7    revenues for the City for 2014 are projected to be 1
8    billion 108 -- so, it's 1 billion 82 million point  8,
9    is that correct?
10 A.   Yes, a decline from 2013.
11 Q.   And expenditures, the expenditures column indicates
12    that expenditures that the City will incur for
13    essential services will total 397.2 million dollars
14    for 2014, is that correct?
15 A.   That's the projected net operating surplus, correct.
16 Q.   Yeah, I'm sorry, it's 685.7 million in expenditures
17    for fiscal year 2014, correct?
18 A.   Yes.
19 Q.   And that results in a surplus of 397.2 million
20    dollars, correct?
21 A.   Before debt service.
22 Q.   Before debt service.  But you're not making -- the
23    City is not making a significant portion of the debt
24    service, correct, in 2014?
25 A.   That's correct.

1    Q.   So, for example, the City does not actually project
2    paying pension -- making pension contributions for
3    fiscal year 2014, isn't that true?
4         MR. CULLEN:  Objection.  Foundation.  Form.
5         BY MR. SUMMERS:
6    Q.   You may answer.
7    A.   That's correct.
8    Q.   And the City does not currently plan to pay the health
9    benefits for retirees in fiscal year 2014, correct?
10        MR. CULLEN:  Objection.  Foundation.  Form.
11        BY MR. SUMMERS:
12   Q.   You may answer.
13   A.   Can you repeat the question, please?
14   Q.   The City does not currently intend to pay the line
15   item for health benefits for retirees in fiscal year
16   2014?
17   A.   That's correct.
18   Q.   And the City does I guess intend to continue paying
19   the monthly payment to the Swaps, is that correct,
20   which is represented by the 50.6 million?
21   A.   Yes, but again you have to look at the caption of this
22   page.  This is not the City's plan.
23   Q.   This is the City's projection, however?
24   A.   This is the City's projection in the absence of the
25   reinvestment plan that the City manager has already

1    said he is going to put in place and is putting  in
2    place.
3         So, this is interesting but not relevant to
4    this discussion because it does not include as the
5    caption indicates clearly at the top the increased in
6    expenditures necessary to restore services to adequate
7    levels for the residents.
8    Q.   But if you look at this -- and the revenues for fiscal
9    year 2014 include 170 million in wage earning
10   revenues, is that correct?
11   A.   Yes.
12   Q.   So, if the City is operating, understanding your
13   qualification, but if the City is under this
14   projection showing a 397.2 million dollar surplus, if
15   it did not have access to the casino revenues during
16   fiscal year 2014, there still would be a surplus, is
17   that correct?
18   A.   But it's not the City's plan.  This is academic.
19   Q.   Whether it's academic or not, that's what this
20   indicates, is that correct?
21        MR. CULLEN:  Objection.  Foundation.  Form.
22   A.   Yes.
23        MR. CULLEN:  And asked and answered.
24        BY MR. SUMMERS:
25   Q.   And in fact if the City pays the termination fee, it's

1    no longer going to be paying the Swaps' monthly
2    payment, correct?
3    A.   Yes, but this is not the City's plan.
4    Q.   If the City did not have access to casino revenues
5    from now until December 2013, does the City believe
6    there will be any point where it would run out of
7    cash?
8    A.   You have to look at Page 8.  It answers that question.
9    On Page 8 which is clearly presented to the creditors
10   on June the 8th -- June 14th rather, and also on Page
11   9 which forecasts out to June of '14 we clearly show
12   on a monthly basis what we believe the City's cash
13   position to be in the absence of any transaction and
14   you can see that business as usual results in the City
15   having 14 million of cash by the end of June of '13 in
16   the absence of any intermediary action and that that
17   number would not incorporate any cash being spent on
18   the reinvestment program because it hasn't started
19   yet.  This indicates quite clearly the dire position
20   the City would be in if we lost access to the 170
21   million of gaming revenue because that would
22   immediately translate into a net cash loss of 160
23   million on this page alone.
24   Q.   This cash flow page on Page 8 indicates or assumes the
25   City will be making certain legacy payments that it is

1    in fact not currently making, is that correct?
2    A.   Yes, it does.
3    Q.   For example, it assumes that the City will make
4    pension contributions, correct?
5    A.   No, I think we are assuming here we continue to defer
6    those pension contributions and that's why if you look
7    at the bottom and you see accumulated deferrals, you
8    see the number grows every month, that's the pension
9    contribution we weren't making.
10   Q.   If you look at -- this assumes that the City will
11   continue to payments on general obligation bonds?
12   A.   That's right.  This is the status quo.  In the absence
13   of any restructuring or preservation of cash plan or
14   reinvestment of the City, this will be the financial
15   condition of the City in the absence of any action.
16   Q.   Right.  But as a result in part of filing the Chapter
17   9 bankruptcy proceeding, there are significant legacy
18   obligations that are not being paid?
19   A.   This clearly shows if you look at the far right column
20   June of '13 that trying to operate a City of this
21   scale with 14 million of cash bearing in mind that
22   that could be zero or negative on any given day
23   depending on collections made it almost impossible to
24   prudently operate the City and that was the proximate
25   reason why it became necessary to defer the payment on

1 the COPs on June 15th. And that was discussed with
2 the creditors on June 14th.
3 Q. Correct, but this analysis on Pages 8 and 9 does not
4 actually show the cash position of the City with the
5 deferral of the payments to the service corporations
6 for the pension obligation?
7     MR. CULLEN: Objection. Foundation. Form.
8 You can address the question.
9 A. Not this page but this shows you the condition of the
10 City.
11     BY MR. SUMMERS:
12 Q. Condition of the City on June 14th of prebankruptcy,
13 correct?
14 A. Correct.
15 Q. So, do you believe that the City would be out of cash
16 without access to the casino revenues?
17     MR. CULLEN: Objection. Foundation. Form.
18     BY MR. SUMMERS:
19 Q. As of December 2013?
20 A. If nothing else was done, yes.
21 Q. And has there been an analysis performed by
22 Ernst & Young as to what the cash flow from the City
23 would look like in bankruptcy without access to the
24 casino revenues?
25 A. I believe so.

1 Q. And when was that performed?
2 A. I've seen multiple iterations of forecasts produced by
3 E & Y. I can't remember when I first saw that one but
4 I've seen it.
5 Q. Now, you've previously discussed the Swap
6 counterparties entered the negotiations with the view
7 that events of default had occurred under the Swap
8 contracts, correct?
9 A. It was a fact.
10 Q. And so the City had the same view that there were
11 events of default that had occurred under the Swap
12 contracts prior to the bankruptcy?
13 A. It wasn't a view, it was a fact. We had at least two
14 defaults.
15 Q. And can you tell us what the two defaults were?
16 A. The ratings downgrade default which had occurred in
17 2012 and the appointment of the emergency manager in I
18 believe it was March of 2013.
19 Q. And were there any other defaults other than those two
20 in the City's view?
21     MR. CULLEN: Objection. Foundation. Form.
22 A. There may well have been but those are the two that I
23 recollect.
24     BY MR. SUMMERS:
25 Q. Is the forbearance agreement a compromise of claims?

1     MR. CULLEN: Objection. Asks for a legal
2 conclusion.
3     BY MR. SUMMERS:
4 Q. You may answer.
5 A. It's a compromise.
6 Q. What claims does the forbearance agreement compromise?
7     MR. CULLEN: Objection. Foundation. Form.
8 A. I don't know what you mean by a claim. They had an
9 agreement entered into by the City in 2009 which gave
10 them certain rights which were a direct threat to the
11 City's survival. We agreed on an economic termination
12 arrangement that was satisfactory to both the City and
13 the Swap counterparties. I call that a compromise.
14     BY MR. SUMMERS:
15 Q. To your knowledge had the Swap counterparties ever
16 threatened to bring litigation claims against the
17 City?
18 A. No.
19 Q. Has the City considered whether the Swap
20 counterparties have claims against the City other than
21 those arising out of the defaults under the Swap
22 agreements?
23     MR. CULLEN: Objection. Foundation. Form.
24 A. I don't know.
25     BY MR. SUMMERS:

1 Q. Has the City evaluated whether it is in breach of the
2 collateral agreement?
3     MR. CULLEN: Objection. Foundation. Form.
4 May call for privileged information.
5 A. Am I supposed to answer this question then with all
6 those objections?
7     MR. CULLEN: Why don't you try the question
8 again. Why don't you tie it to what he's done.
9     BY MR. SUMMERS:
10 Q. In your view have you engaged in any analysis of
11 whether the City has breached the collateral
12 agreement?
13 A. No.
14 Q. To your knowledge has anyone else associated with the
15 City analyzed whether the City is in breach of the
16 collateral agreement?
17 A. I don't know.
18     MR. CULLEN: I want you to know I let that
19 one go because I knew that was the answer.
20     THE WITNESS: You're such a mensch.
21     BY MR. SUMMERS:
22 Q. Have the service corporations ever threatened to your
23 knowledge claims against the City?
24     MR. CULLEN: Objection. Foundation. Form.
25 Asked and answered.

1   A.  I don't know.
2       BY MR. SUMMERS:
3   Q.  Have you ever analyzed whether these service
4   corporations may have claims against the City?
5   A.  No.
6   Q.  Have you analyzed whether or evaluated -- strike that.
7   Let me start again.
8       Have you evaluated whether the City has
9   claims against the Swap counterparties?
10      MR. CULLEN: Has he personally?
11      BY MR. SUMMERS:
12  Q.  Has Miller Buckfire evaluated whether the City has
13  claims against the Swap counterparties?
14  A.  No.
15  Q.  Has anyone else working for the City analyzed whether
16  the City has claims against the Swap counterparties?
17      MR. CULLEN: Answer yes or no if you can.
18  A.  No.
19      BY MR. SUMMERS:
20  Q.  No, you don't know --
21  A.  I don't know.
22  Q.  So, Miller Buckfire performed no investigation into
23  whether the City has claims against the Swap
24  counterparties in connection with this forbearance
25  agreement, correct?

1       MR. CULLEN: Objection.  Foundation.  Form.
2   A.  No.
3       BY MR. SUMMERS:
4   Q.  The forbearance -- you testified earlier that you
5   believe the forbearance agreement is a release of
6   claims, correct?
7       MR. CULLEN: Objection.  Foundation.  Form.
8   I don't believe he testified to that.
9       BY MR. SUMMERS:
10  Q.  Do you have a view as to what claims the forbearance
11  agreement releases?
12  A.  No.  The answer was no at end of the table.  I'll
13  speak up.  I apologize.
14  Q.  Does the forbearance agreement operate to release any
15  claims that might be held against the City?
16      MR. CULLEN: Objection.  Foundation.  Form.
17  A.  I don't know.
18      BY MR. SUMMERS:
19  Q.  Do you have an understanding of how interest rate
20  movements may affect the termination payment that
21  would become due under the Swap agreements?
22  A.  Yes.
23      MR. JURGENS: Objection to form.
24      BY MR. SUMMERS:
25  Q.  And what is that understanding?

1   A.  Well, as interest rates come down, the Swap
2   termination liability goes up.
3   Q.  And if interest rates go up, what happens to the Swap
4   termination liability?
5   A.  Comes down.
6   Q.  And there would come a point if interest rates
7   increased enough where the City could actually become
8   in the money on the Swaps, is that correct?
9   A.  It would except that the Swap counterparties in 2009
10  negotiated for the right to terminate the Swaps so
11  they would never actually be in a net liability
12  position against the City if that were to occur.
13  Q.  What is your basis for stating that the Swap
14  counterparties negotiated the right to terminate the
15  Swaps in 2009?
16  A.  Well, I've already testified that I reviewed the
17  collateral amendment entered into in 2009 and
18  discussed it with counsel to the City.  In their
19  review of the contract, and I can't remember exactly
20  the provision now but that was their interpretation of
21  the contract right.
22  Q.  Have you reviewed any of the other 2009 documents
23  related to the Swaps?
24  A.  No.
25  Q.  Has the City undertaken any analysis to evaluate

1   future interest rate moves?
2   A.  We have reviewed the forward LIBOR curve.
3   Q.  And who performed that review?
4   A.  That review was performed by Mr. Sanjay Marken, one of
5   our associates.  M A R K E N, first name S A N J A Y.
6   Q.  And when did he perform that review?
7   A.  The most recent one was performed a few days ago.
8   Q.  What did that review show?
9   A.  It showed that the current forward LIBOR curve does
10  not show that the interest rate that's relevant to
11  this Swap would ever rise above six-and-three-quarters
12  percent which is the fixed rate on the Swap, and,
13  therefore, the market is telling us that the
14  probability of the Swap ever going in the money for
15  the benefit of the City is very low.
16  Q.  Does the analysis address whether interest rates are
17  generally rising or decreasing?
18  A.  The LIBOR curve is an observable market fact.  I'm not
19  going to speculate on when rates are going up or down.
20  They will fluctuate.
21  Q.  Have interest rates increased since the forbearance
22  agreement was executed?
23  A.  Yes.
24  Q.  And what effect has that increase on -- in interest
25  rates had on the estimated termination payment under

---

Page 61

1 the forbearance agreement?

2    MR. JURGENS: Objection.

3 A. Well, the assumption in June of this year when we

4 began to negotiate with the Swap counterparties was

5 the termination payment was around four hundred

6 million dollars. The rise in rates since that time

7 and it's now almost August probably has reduced that

8 termination payment to around three hundred million

9 dollars or even lower.

10    So, yes, the rise in rates has resulted in

11 a reduction of the termination payment.

12 Q. And is that analysis of the reduction to the

13 termination payment something that Miller Buckfire has

14 prepared?

15    MR. JURGENS: Objection.

16 A. Well, there is a procedure embodied in the collateral

17 agreement that lets you determine the termination

18 payment if one is to occur. We've simply analyzed the

19 net value of the assumed LIBOR payments and Swap

20 payments and come up with our own estimate.

21    BY MR. SUMMERS:

22 Q. And that analysis was performed by Mr. Marken?

23 A. That's right.

24 Q. If interest rates continue to rise, and the

25 termination payment that would have to be made

---

Page 62

1 continues to decrease, that has the net effect of

2 reducing the value of the forbearance agreement to the

3 City?

4    MR. CULLEN: Objection. Foundation. Form.

5    BY MR. SUMMERS:

6 Q. Do you agree?

7 A. No.

8 Q. And why not?

9 A. I already testified to the three principal benefits

10 that we attempted to achieve in this forbearance

11 agreement. The ability to terminate the Swap at a

12 discount is only one of the elements of the

13 forbearance agreement and its value to the City.

14    MR. SUMMERS: The reporter has said we have

15 about five minutes left on the tape. Do we want to

16 take a break now and change that?

17    MR. CULLEN: Seems sensible.

18    MR. SUMMERS: I think that makes sense.

19    VIDEO TECHNICIAN: The time is 10:53 a.m.

20 This marks the end of tape number one. We are off the

21 record.

22    (Recess taken at 10:53 a.m.)

23    (Back on the record at 11:05 a.m.)

24    VIDEO TECHNICIAN: We are back on the

25 record at 11:05 a.m. This marks the beginning of tape

---

Page 63

1 number two.

2    BY MR. SUMMERS:

3 Q. Mr. Buckfire, did Mr. Marken perform any analysis

4 related to the interest rates' effect on the Swaps

5 prior to the analysis he performed a few days ago?

6 A. No.

7 Q. At the June 4th meeting the Swap counterparties, were

8 there specific arguments that the City articulated to

9 the Swap counterparties concerning why it would be in

10 their interest to settle?

11 A. I made the general point to them several times that we

12 were willing to litigate aggressively to protect the

13 City's access to cash. That any attempt by them to

14 exercise their rights and terminate our access to

15 gaming revenues would be vigorously rejected. We

16 would marshall every argument we could to protect the

17 City's cash flow and that we would not accept any

18 action by them as a fete accompli.

19 Q. Did you describe what claims you would litigate

20 aggressively to the Swap counterparties?

21 A. No.

22 Q. Did you make any assertions to the Swap counterparties

23 concerning the validity of their liens at the June 4th

24 meeting?

25 A. No.

---

Page 64

1 Q. Was the potential of the City challenging the liens

2 held by the Swap counterparties ever a matter

3 discussed during the negotiation of the forbearance

4 agreement?

5    MR. CULLEN: Discussed between --

6    BY MR. SUMMERS:

7 Q. Discussed with the Swap counterparties.

8 A. Yes.

9 Q. When was that discussed?

10 A. It was a very hectic period. I did really almost

11 nothing between June 4th and the 11th but try to

12 negotiate this deal. I know at several points in my

13 conversations with the business people I let them know

14 that if there were issues with the collateral, we

15 would raise them if necessary to protect the City.

16 Q. Did you articulate what those issues might be?

17 A. No.

18 Q. What did you understand those issues to be?

19 A. Well, there were some concerns that the original

20 granting of the collateral was not appropriate which

21 would seem odd because in the collateral agreement

22 there's a letter attached to the Michigan Gaming

23 Control Board saying that it was fine, but I was

24 trying to cut a deal and I was looking for any

25 leverage I had over the Swap counterparties to get

---

1  them to a deal.
2      The reality is that if they were to
3  exercise their rights, we would have vigorously
4  litigated that and tried to get a stay of their
5  getting the cash and that was all I was concerned
6  about.  I wasn't particularly concerned about the
7  merits of those claims.
8  Q.   So, you never performed an analysis of the merits of
9  those claims?
10  A.   No.
11  Q.   Did the Swap counterparties have a reaction to your
12  assertion that you may aggressively litigate against
13  them?
14  A.   Well, it got a little heated at one point and they
15  said well, if you want to litigate, we'll respond
16  aggressively as well, but let's try and avoid that
17  unnecessary expense and cut a deal which is what we
18  did.
19  Q.   Did you assert any arguments or potential litigation
20  claims other than the issues surrounding the granting
21  of the liens in your negotiations with the Swap
22  counterparties?
23  A.   No.
24  Q.   Did you articulate to the Swap counterparties why in
25  the City's view the liens may or may not be valid?

1  A.   Not directly, no.
2  Q.   And did you consider asserting any other claims or
3  potential claims of the City to help you get leverage
4  in the negotiations with the Swap counterparties?
5  A.   I'm not sure I understand that question.
6  Q.   Other than the granting of the liens and the issues
7  surrounding them, did you consider asserting any other
8  types of claims in the negotiations to help you get
9  leverage with the Swap counterparties?
10      MR. CULLEN: Objection.  Foundation.  Form.
11  A.   I was at all times just trying to make them understand
12  that the City would be as aggressive as possible to
13  defend its access to gaming revenues including
14  litigation whatever that turned out to be.
15      BY MR. SUMMERS:
16  Q.   You met with the Swap counterparties or at least
17  negotiations on June 11th, is that correct?
18  A.   No, we reached a final agreement with them on the
19  economic terms by June 11th.
20  Q.   So, there was no meeting on June 11th?
21  A.   Not that I recall but it's possible I'm mistaken.  We
22  were very busy during that period.
23  Q.   Were there any meetings with the Swap counterparties,
24  in-person meetings with the Swap counterparties other
25  than the June 4th meeting?

1  A.   Yes.
2  Q.   And when were those?
3  A.   I believe there was one on June the 8th which I've
4  already testified to earlier and I believe we had
5  another one but I can't recall the exact date.
6  Q.   Do you remember whether that other meeting was in June
7  or July?
8  A.   No, they were all in June, prior to June 11th.
9  Q.   Did you communicate with Mr. Orr between the June 4th
10  and June 8th meeting?
11  A.   Yes.
12  Q.   And what did you communicate?
13  A.   The status of our negotiations.
14  Q.   And what specifically did you report to him about the
15  negotiations?
16  A.   What we had offered, what they had responded, what we
17  should do as our next move with respect to the Swap
18  counterparties.
19  Q.   Between the June 4th and the June 8th meeting how
20  frequently were you in contact with Mr. Orr concerning
21  the forbearance agreement negotiations?
22  A.   Every day.  It was a matter of life or death for the
23  City.
24  Q.   Multiple times a day?
25  A.   Some days probably.

1  Q.   And then between June 8th, the June 8th meeting and
2  reaching an agreement sometime prior to June 11th, how
3  frequently were you in contact with Mr. Orr?
4  A.   Probably every day.
5  Q.   Now, you testified earlier that Ernst & Young has
6  performed an analysis of the City's cash flow without
7  access to the casino revenues.  Is that analysis
8  something that's been posted to the data room?
9  A.   I don't know, but if you took the company's
10  projections even the ones on June 14th and simply
11  whited out the gaming revenues, you'll get the cash
12  flows.  It's not hard to do.
13  Q.   Miller Buckfire is in charge of what gets posted to
14  the data room, correct?
15      MR. CULLEN: Objection.  Foundation.  Form.
16      BY MR. SUMMERS:
17  Q.   Miller Buckfire maintains the data room?
18  A.   I believe so.
19  Q.   So, who at Miller Buckfire would know whether the
20  Ernst & Young analysis without casino revenues has
21  been posted to the data room?
22  A.   Mr. Kyle Herman.
23  Q.   If something has not been posted to the data room,
24  would the City be willing to provide that to us?
25      MR. CULLEN: Don't see any reason why not.

1   A.  I would recommend it.

2   BY MR. SUMMERS:

3   Q.  Okay.

4       MR. SUMMERS: Let's mark that for follow-up

5   after the deposition.

6   BY MR. SUMMERS:

7   Q.  You testified that as of the last analysis your

8   understanding is the estimated amount of the

9   termination payment that would be due is roughly three

10  hundred million dollars, is that correct?

11  A.  Well, it clearly moves around as the interest rate

12  curve moves around.  I think the most recent number is

13  somewhere reaching 275 and 300 million dollars.

14  That's before the application of the applicable

15  discount that we had provided for in the termination

16  agreement.

17  Q.  And that last analysis, when was that performed?

18  A.  A few days ago.

19  Q.  How does the City plan to get the cash necessary to

20  make the termination payment?

21      MR. CULLEN: Objection.  Foundation.  Form.

22  BY MR. SUMMERS:

23  Q.  Does the City have a plan at this point for how it

24  will obtain the cash necessary to pay the termination

25  payment?

1       MR. CULLEN: Objection, foundation, form,

2   but you can address the question.

3   A.  Yes, the City has a plan.

4   BY MR. SUMMERS:

5   Q.  And what is that plan?

6   A.  The City intends to secure a debtor in possession

7   financing of sufficient proceeds to fund the

8   termination payment as well as provide sufficient cash

9   for the City to execute on its reinvestment program

10  during the bankruptcy.

11  Q.  And what is -- what actions, if any, has the City

12  taken toward obtaining debtor in possession financing?

13  A.  We have contacted a large universe of potentially

14  interested investors, many of whom have signed

15  nondisclosure agreements, NDAs, pursuant to which they

16  have received the request for proposal, the RFP which

17  went out yesterday.

18  Q.  And is Miller Buckfire leading the effort to obtain

19  debtor in possession financing?

20  A.  Yes.

21  Q.  And when you say a large universe of potential

22  investors, do you know approximately how many have

23  been talked to?

24  A.  At the moment it's in excess of 30.

25  Q.  And how many have -- how many have signed

1   nondisclosure agreements?

2   A.  That's the universe I'm discussing, approximately 30

3   or more.

4   Q.  So, everybody you've talked to signed?

5   A.  No, some people didn't want to participate.  I can't

6   tell you how many we called.  I can tell you how many

7   we sent NDAs to which have been returned to us, it's

8   in excess of 30.

9   Q.  Are some of the people or some of the potential

10  sources of financing that Miller Buckfire have spoken

11  to said no, we're not interested?

12  A.  Yes.

13  Q.  And approximately how many have said no?

14  A.  Hasn't been that many, maybe ten.  Would your client

15  like one?

16  Q.  And do you know who those ten entities are that have

17  said they are not interested?

18  A.  I do, yes.

19  Q.  And who are they?

20  A.  I'm not going to tell you that.

21  Q.  On what basis?

22  A.  It's commercially sensitive information.

23      MR. CULLEN: Counsel, maybe it will help,

24  and I don't know whether you want this on the record

25  or not, but the position we are going to take with

1   respect to this is that this is a competitive process

2   and the best result in that process is achieved by us

3   being able to negotiate with the individual parties

4   who are out there, and not to litigate the negotiating

5   strategy before we have something to bring back to the

6   court to approve.

7       So, we're not going to answer questions

8   about individual parties, we're not going to answer

9   questions about the strategy of negotiating with those

10  parties and we're not at liberty to give out the

11  information with respect to the people who responded

12  to the NDAs because they understandably don't want to

13  be shopped, don't want to take up a lot of your time.

14  We can fight this through a lot of objections and so

15  forth, and if we want to fight about that at some

16  later time, perfectly fine.

17      You can ask about his general strategy on

18  this, you can ask about the basis for his confidence

19  or nonconfidence in it.  You can go through those

20  general items, but the actual strategy, the terms of

21  arrangements with individual parties I'm not going to

22  have him go into now.  Hopefully by the time we get to

23  the hearing, we'll have an agreement that you will be

24  on a --

25      MR. SUMMERS: Let's go -- I think let's

1   go -- move through the questions and see how we do.

2       MR. CULLEN: Okay.

3       MR. SUMMERS: I understand the City's

4   position on it.

5       MR. CULLEN: Okay.

6   BY MR. SUMMERS:

7   Q.   You said an RFP went out yesterday?

8   A.   Correct.

9   Q.   Approximately how many people was the RPF sent to

10  yesterday?

11  A.   The 30 plus people who signed the NDA.

12  Q.   How much debtor-in-possession financing does the City

13  hope to obtain?

14  A.   Three hundred fifty million dollars, up to three

15  hundred fifty million dollars.

16  Q.   And does the City have a goal on the interest rate?

17  A.   The lowest possible interest rate.

18  Q.   Does the RFP attempt to define what that lowest

19  possible interest rate is?

20  A.   No.

21  Q.   Does it define whether the interest rate needs to be

22  fixed or variable?

23  A.   No.

24  Q.   What covenants, if any, are included in the RFP as

25  being acceptable or not acceptable?

1   A.   I'm not going to discuss that.  It's commercially

2   sensitive.

3   Q.   How long of maturity on the DIP financing is the City

4   looking to obtain?

5   A.   Through the pendency of the end of the case.

6   Q.   And is the City offering a lien on casino revenues in

7   connection with the DIP financing?

8   A.   In part.

9   Q.   I assume the City does not expect to obtain unsecured

10  financing?

11  A.   I would take it if it was offered.

12  Q.   No doubt.  What other collateral is the City offering

13  to secure the DIP financing loan?

14  A.   I'm not going to answer that question.

15  Q.   Does the RFP define what collateral would be

16  available?

17  A.   Yes, it does.

18  Q.   And that's been sent out to potential investors?

19  A.   Who have signed nondisclosure agreements.

20  Q.   If somebody new came and said I would be interested in

21  providing DIP financing, you would have them sign an

22  NDA and then provide them the RFP?

23  A.   If they wanted to make an unsolicited proposal without

24  the benefit of the RPF, we would be happy to accept

25  it.  Are you suggesting your client is interested in

1   is submitting a proposal?

2   Q.   Is the City offering art work as collateral?

3   A.   I'm not going to discuss the terms of the term sheet,

4   sorry.

5   Q.   Well, we kind of picked and choose what terms in the

6   RFP we are discussing and not discussing.

7       MR. CULLEN: We have in the attempt to

8   accommodate your desire for information and to

9   maintain control of the integrity of this process

10  which we believe is best negotiated as a negotiation

11  and not a litigation.

12      MR. SUMMERS: I guess I struggle with

13  understanding why the collateral that's offered in the

14  RPF that's been sent out when we know the interest

15  rate, the amount of the financing the debtor seeks,

16  why that puts the City at a competitive disadvantage.

17      MR. CULLEN: We didn't say the interest

18  rate.

19      MR. SUMMERS: The lowest possible.

20      MR. CULLEN: This is the beginning of a

21  negotiation.  It's the beginning of a negotiation that

22  isn't at an end yet, that hasn't had any response to

23  the RFPs yet, it's an initial offer, and that's what

24  it is, and he's discussing it as such and willing to

25  testify about it as such, but I'm not going to read

1   the terms of the RFP in the newspaper and our bidders

2   are not going to read the terms of the RFP in the

3   newspaper because that would hamper the process and

4   hamper our ability to get best value.

5       MR. SUMMERS: But we already have in the

6   record that the casino revenues are part of the

7   collateral that's being offered, so, what's wrong with

8   finding out what the rest of the collateral that's

9   being offered?

10      MR. CULLEN: Not going to argue with you,

11  Counsel.  I'm telling you what the position is.  I've

12  tried to be accommodating.  It's as far as I am going

13  to go.

14  BY MR. SUMMERS

15  Q.   Has the City had discussions with the State of

16  Michigan about providing financing?

17  A.   I'm not going to discuss that.

18  Q.   What is the City's view about what has to happen in

19  order to be able to obtain debtor-in-possession

20  financing -- let me put a finer point.

21      Are there certain events that the City

22  believes has to happen in the case for it to be able

23  to realistically obtain debtor-in-possession

24  financing?

25  A.   Yes, there are events in the case.

1 Q. And what is that deal?
2 MR. CULLEN: Objection to the extent it
3 calls for a legal conclusion.
4 A. Well, we have to find a willing lender, that's number
5 one. Number two, we have to have a court order
6 approving the form of the DIP financing, and, number
7 three, we believe we need to have approval of the
8 forbearance and termination agreements we get the
9 benefit of the elimination of the collateral pledge
10 and the benefit of the discount.
11 BY MR. SUMMERS:
12 Q. Do you need a determination on eligibility as well?
13 A. Probably as a condition to closing but not as a
14 condition to getting a loan commitment.
15 Q. And what time line does the City hope to secure
16 debtor-in-possession financing?
17 A. Well, it's a large group of potential lenders, and,
18 therefore, we have requested preliminary indications
19 of interest by September the 6th, next Friday. We
20 want to determine who really has a serious interest
21 and therefore encourage their ability to do due
22 diligence in a rational way because they will all have
23 due diligence requirements.
24 We simply can't handle all 30. If they all
25 decide they want to put in proposals, we'll do the

1 best we can, but I'm assuming a smaller number when
2 they see the RFP will want to proceed to the second
3 stage which is to propose actual terms in response to
4 our RFP. The date for that I believe is September the
5 16th.
6 Q. Has a time line for the DIP financing because the view
7 of what the time line should be for the DIP financing
8 beyond the September 16th deadline?
9 A. Well, we will receive I hope on the 16th multiple
10 serious indications of interest back by term sheets.
11 At that point we will look at how many we have and
12 we'll determine whether there's one that is so
13 superior to the others that we'll negotiate with that
14 party exclusively.
15 If we have a lot that are very competitive,
16 we may decide to negotiate with several of them at the
17 same time.
18 So, I don't have a clear view at this time
19 what date we'll actually select our lender, but it
20 will clearly be something we'll focus on after the
21 16th of September. The goal will be to do it as soon
22 as possible.
23 Q. Based on your experience in other cases do you have a
24 view as to what -- how long the selection of the
25 lender is likely to take?

1 A. Depends on how many proposals I get back.
2 Q. If you get 15 back, do you have a view of how long
3 it's likely to take?
4 A. We should be so lucky. I think that will take several
5 weeks, probably two weeks to come up with a winning
6 bid as it were.
7 Q. And then the intent would be to as quickly as possible
8 present that to the bankruptcy court, is that correct?
9 A. Yes.
10 Q. And if the City obtains a debtor-in-possession
11 financing, what's the intended use of the financing?
12 MR. CULLEN: Asked and answered but you can
13 address it again.
14 A. I've already answered it.
15 BY MR. SUMMERS:
16 Q. Why don't you go ahead, say it again.
17 A. We'll use proceeds to terminate the Swaps at the
18 discount provided for in the forbearance agreement and
19 the balance of the DIP loan will be retained by the
20 City as working capital and to support its
21 reinvestment program.
22 Q. Are there any other intended uses to the DIP financing
23 other than the two you just said?
24 A. Not that I'm aware of.
25 Q. And the amount of the casino revenues that are

1 generated currently are is it correct that it's net
2 the City currently is about 15 million dollars?
3 MR. CULLEN: Objection. Foundation. Form.
4 A. Well, there's 175 million annually of projected casino
5 gaming revenues. That's what the City has on its
6 income statement.
7 MR. SUMMERS: Mark this as Deposition
8 Exhibit 4.
9 MARKED FOR IDENTIFICATION:
10 DEPOSITION EXHIBIT 4
11 11:31 a.m.
12 BY MR. SUMMERS:
13 Q. What's been marked as Deposition Exhibit 4 is a copy
14 of the proposed order that the City has submitted with
15 the settlement motion, correct?
16 A. Well, I haven't seen it before you handed it to me but
17 I'll so stipulate.
18 Q. Was the proposed order or the form of the proposed
19 order something that was negotiated with the Swap
20 counterparties?
21 MR. CULLEN: Objection. Foundation.
22 A. I believe so.
23 BY MR. SUMMERS:
24 Q. Did Miller Buckfire participate in the negotiation of
25 the proposed form of order?

Page 81

1  A.  No.
2  Q.  Who participated in the negotiation of the proposed
3  form of order on behalf of the City?
4     MR. CULLEN: If you know.
5  A.  Counsel from Jones Day.
6     BY MR. SUMMERS:
7  Q.  Prior to today you've never looked at the proposed
8  order, is that correct?
9  A.  Correct.
10 Q.  Do you have a view as to the whether the proposed
11 order is a -- the form of proposed order is an
12 important term to the Swap counterparties?
13    MR. CULLEN: Objection. Foundation. Form.
14 A.  I just told you I haven't seen it before you handed it
15 to me.
16    BY MR. SUMMERS:
17 Q.  That's not what I asked.
18 A.  Well, what did you ask?
19 Q.  Do you have a view as to whether the form of the
20 proposed order is important to the Swap
21 counterparties?
22    MR. CULLEN: Same objection.
23 A.  No.
24    BY MR. SUMMERS:
25 Q.  Have the Swap counterparties ever indicated to the

Page 82

1  City that the form of the proposed order is important?
2  A.  I don't know.
3  Q.  If the court refuses to enter an order in the form
4  that was submitted, have the Swap counterparties ever
5  indicated to you that they would have the right to
6  terminate the forbearance agreement?
7     MR. CULLEN: Objection. Foundation. Form.
8  We've been through this, Counsel.  He hasn't seen the
9  document.
10    MR. SUMMERS: I'm asking what, if anything,
11 the Swap counterparties have said to him.
12    MR. CULLEN: About this document.
13    MR. SUMMERS: About this document.
14 A.  I've never seen it before.
15    BY MR. SUMMERS:
16 Q.  I know you've never seen it before.  Have they ever
17 told you, have the Swap counterparties ever said to
18 you that the form of the proposed order is an
19 important aspect of the settlement to them?
20 A.  No.
21 Q.  Do you have a view as to the effect, if any, of the
22 documents that were executed in 2009, collateral
23 agreement and others, as to the effect that that had
24 on the relationship, if any, between the COPs and the
25 Swap transaction?

Page 83

1     MR. CULLEN: Objection. Foundation. Form.
2  Asks for a legal conclusion.
3  A.  No.
4     BY MR. SUMMERS:
5  Q.  Are you aware that on August 21 counsel for the City
6  suggested that the 2009 documents, quote, severed the
7  tie between the COPs and the Swaps?
8  A.  No.
9  Q.  What is your understanding of the effect of the
10 execution delivery of the collateral agreement in 2009
11 on the Swaps?
12    MR. CULLEN: Objection. Foundation.
13 A.  Well, economically it eliminated the benefit of the
14 Swaps to the point of the City because it was a net
15 liability to the City at that point, but the amendment
16 allowed the bank to terminate if it went into being an
17 asset for the City.
18    So, it eliminated much of the benefit to
19 the City of the original Swap agreements entered into
20 in 2006.
21    BY MR. SUMMERS:
22 Q.  And, so, in your view prior to the execution of the
23 2009 collateral agreement the Swap counterparties did
24 not have the right to terminate?
25    MR. CULLEN: Objection. Foundation. Form.

Page 84

1  A.  I didn't say that.
2     BY MR. SUMMERS:
3  Q.  Prior to the execution of the 2009 documents, in order
4  for the Swap counterparties to consent -- to
5  terminate, was the consent of the insurers required?
6     MR. CULLEN: Objection. Foundation. Form.
7  Calls for -- you're asking the witness to legally
8  resurrect dead documents here.  I don't think it's
9  appropriate.
10    MR. SUMMERS: Well, he's testified that he
11 has a view that the 2009 amendments gave the Swap
12 parties the right to terminate and I'm trying to
13 understand what the basis for that is.
14 A.  If there isn't an event of default, they have the
15 right to terminate.
16    BY MR. SUMMERS:
17 Q.  What's the basis for that view?
18 A.  It's in the collateral agreement.
19 Q.  And is that different than what existed before the
20 2009 documents were executed?
21 A.  I don't know.
22 Q.  Did you review the 2006 documents in connection with
23 your engagement with the City?
24 A.  Only to understand the financial terms.
25 Q.  And what financial terms were you seeking to

1  understand?

2  A.  The fixed rate, the terminal amount, the -- I'm sorry.
3  The notional amount of the Swaps, the fixed rate
4  pursuant to the Swap contract and the base rate
5  calculation.

6  Q.  Go back to the negotiations that occurred in 2013.
7  Did you invite Syncora to participate in those
8  negotiations?

9  A.  No.

10  Q.  Why not?

11  A.  They weren't a party to the collateral agreement.

12  Q.  Did you consult with Mr. Orr as to whether Syncora
13  should be invited to the negotiations?

14  A.  No.

15  Q.  Did you invite Financial Guaranty Insurance Company to
16  participate in the negotiations concerning the
17  forbearance agreement?

18  A.  No.

19  Q.  Did you consult with Mr. Orr with respect to the
20  decision whether Financial Guaranty Insurance Company
21  should be invited to those negotiations?

22  A.  No.

23  Q.  So, you made that decision -- how did you come to the
24  decision not to invite -- we'll call it FGIC?

25  A.  It never came up.  They weren't a party to the

1  agreement.

2  Q.  Did you invite US Bank to participate in the
3  negotiations concerning the forbearance agreement?

4  A.  No.

5  Q.  Why not?

6  A.  Not a party to the agreement.

7  Q.  To the collateral agreement?

8  A.  Correct.

9  Q.  And to your knowledge no one else invited Syncora,
10  FGIC or US Bank to participate in the negotiations on
11  the forbearance agreement?

12  A.  Correct.

13  Q.  Did you and Mr. Orr ever discuss who should
14  participate in the negotiations?

15  A.  Yes.

16  Q.  And when did that discussion occur?

17  A.  I can't recall the exact day.  It was sometime in late
18  May when we recognized the seriousness of the
19  situation and the need to protect the City's access to
20  cash at all costs.  It was then we began to formulate
21  our negotiating position including who should attend
22  the first meeting.

23  Q.  And did you provide Mr. Orr with advice as to who
24  should attend the first meeting?

25  A.  Yes.

1  Q.  And what was your advice?

2  A.  My advice was that the discussion should be led by
3  Miller Buckfire as the City's investment banker
4  assisted by Jones Day, primary restructuring counsel
5  to the City and that and we should include the chief
6  financial officer of the City, Mr. Jack Martin, and
7  also to make sure the Swap counterparties understood
8  how seriously we were taking it, we invited the chief
9  deputy treasurer of the State of Michigan, Mr. Tom
10  Saxton.

11  Q.  Did you ever advise Mr. Orr that you thought Syncora
12  should be a party to the negotiations?

13  A.  No.

14  Q.  Did Mr. Orr prior to receiving your advice express a
15  view as to who should participate in the negotiations?

16  A.  We had a short discussion about whether or not we
17  should include the state.  It wasn't required, they're
18  not a party to it but we felt unbalanced because the
19  state's overall support for the restructuring was
20  important that including the chief deputy treasurer
21  would be a good idea, so we invited him.

22  Q.  But he did not attend, is that correct?

23  A.  He did.

24  Q.  Oh, he did attend.  Did you ever seek input from the
25  Swap counterparties as to who should be present at the

1  negotiations?

2  A.  No.

3  Q.  Did the Swap counterparties ever volunteer their view
4  as to whether there should be other parties involved
5  in the negotiations?

6  A.  Not to me.

7  Q.  Did they do so to someone else?

8  A.  I don't know.

9  Q.  Not to your knowledge?

10  A.  Not to my knowledge.

11  Q.  At any time during the negotiations in 2013 did the
12  Swap counterparties send a notice of an event of
13  default?

14  A.  I don't recall if we ever received an official notice
15  but we certainly were aware of the fact they could
16  send one at any time.

17  Q.  And at any time during the negotiations in 2013 did
18  the Swap counterparties formally designate an early
19  termination date?

20  A.  No.

21  Q.  Did the Swap counterparties at any point propose,
22  formally propose to the City a structure that would
23  not involve an early termination of the Swaps?

24      MR. JURGENS: Objection.

25      MR. CULLEN: Objection.  Foundation.  Form.

1  A.  Not after we began our discussions on June 4th, no.
2      BY MR. SUMMERS:
3  Q.  Now, you've indicated there was I guess an agreement
4      -- is it fair to say there was an agreement at least
5      in principle on the terms of the forbearance agreement
6      on or before June 11th, is that correct?
7      MR. CULLEN: Objection.  Foundation.
8  A.  There was an economic understanding, yes.
9      BY MR. SUMMERS:
10 Q.  What happened after June 11th with respect to the
11     negotiations?
12 A.  Well, the attorneys for the City and for the Swap
13     counterparties began to negotiate the forbearance
14     agreement.  I was not directly involved in that
15     because it was primarily in fact solely with respect
16     to the nonfinancial terms of it.
17         That took several weeks of very intensive
18     work amongst the lawyers for all the parties to arrive
19     at an agreement that could be executed which it turned
20     out not before July 15th.
21         So, it took about a month to complete the
22     negotiations for the agreement, so --
23 Q.  Other than attorneys working to document I guess the
24     legal terms -- well, document the whole thing, was
25     there anything else that caused a month, approximately

1  a month to elapse between agreement on the financial
2  terms and execution of the forbearance agreement?
3  A.  No, it was a very, very active negotiation amongst the
4      parties to the arrive at the final document.
5  Q.  Let's turn to the 2012 negotiations, turn to 2012.  Is
6      it correct that in March 2012 the City suffered a
7      ratings downgrade with respect to its general
8      obligation bonds?
9  A.  Well, that is a fact, yes.
10 Q.  Okay.  And that downgrade could have constituted an
11     event of default under the Swap agreements at that
12     point, correct?
13 A.  Correct.
14 Q.  As a result of the downgrade, did the City in 2012
15     commence any negotiations with the Swap counterparties
16     to resolve the potentially event of default?
17     MR. CULLEN: Objection.  Foundation.
18 A.  I believe they did but we were not involved in it, we
19     weren't retained to do so.
20     BY MR. SUMMERS:
21 Q.  So, Miller Buckfire had no involvement in any
22     negotiations that happened in 2012?
23 A.  That's correct, we were only engaged in July for a
24     two-month period to do a financial review.
25 Q.  Have you as part of your diligence and in connection

1  with the forbearance agreement that's ultimately been
2  executed, have you reviewed or familiarized yourself
3  with what happened during the 2012 negotiations?
4  A.  Yes.
5  Q.  Who participated for the City in the negotiations with
6      the Swap counterparties in 2012?
7  A.  I believe it was Jack Martin, to some extent the prior
8      CFO whose name is Chris Brown.  Those negotiations
9      were inconclusive.
10 Q.  Was the City represented by counsel during the 2012
11     negotiations?
12 A.  I'm sure they were, but I can't tell you who it was.
13 Q.  Did the City have a financial advisor in connection
14     with the 2012 negotiations?
15 A.  Not retained as far as I know.
16 Q.  And do you know who participated in the 2012
17     negotiations for the Swap counterparties?
18 A.  No.
19 Q.  And do you know who the counterparties' lawyers were
20     in the 2012 negotiations?
21 A.  No.
22 Q.  Do you know how long the negotiations in 2012 lasted?
23 A.  No.
24 Q.  Do you know whether the service corporations
25     participated in the 2012 negotiations?

1  A.  I don't know.
2  Q.  And at the time you were engaged the second time, what
3      was your understanding of the status of the
4      negotiations with the Swap counterparties that had
5      started in 2012?
6  A.  My understanding was that they were inconclusive and
7      that they were at the moment of our retention on
8      January 8th in suspension that there were no
9      discussions ongoing.
10 Q.  Do you know if the City had ever made a proposal to
11     the Swap counterparties in connection with the 2012
12     negotiations?
13 A.  I don't know.
14 Q.  Do you know if Swap counterparties had ever made a
15     proposal to the City during the 2012 negotiations?
16 A.  No, I testified to that earlier, they had proposed a
17     standstill agreement which would require the City to I
18     guess give up some rights or some litigation positions
19     in exchange for the Swap counterparties agreeing to
20     not exercise their remedies but that it could be
21     terminated at any time.  I believe that was their
22     proposal.
23 Q.  And to your knowledge is that the only proposal that
24     the Swap counterparties made?
25 A.  Yes.

1  Q.  Is that proposed standstill agreement a document
2  that's available in the data room?
3  A.  I don't know.
4  Q.  Is that a document the City would make available if
5  it's not in the data room?
6     MR. CULLEN: No reason why not.
7     BY MR. SUMMERS:
8  Q.  To your knowledge at no point in 2012 did the Swap
9  counterparties send a notice of an event of default to
10  the City?
11     MR. CULLEN: Objection.  Asked and
12  answered.
13  A.  Not to my knowledge.
14     BY MR. SUMMERS:
15  Q.  During the June 2013 negotiations, if the Swap
16  counterparties had sent a notice of termination to the
17  City, would the City have had any way to pay the
18  termination amount?
19     MR. CULLEN: Objection.  Calls for
20  speculation, but you can address it.
21  A.  Well, the City had no cash.  And it would have
22  potentially been a four hundred million dollar claim
23  would have had to be paid in order to retain access to
24  gaming revenues.  I don't see how we could have done
25  that.

1     BY MR. SUMMERS:
2  Q.  So, did you consider it likely that they would send a
3  termination notice rather than negotiate in light of
4  the City's lack of cash to pay the termination fee?
5  A.  We weren't prepared to gamble with the survival of the
6  City by taking that risk.
7  Q.  And can you explain why you viewed it as a gamble for
8  the City?
9  A.  To assume the City would have continued access to
10  gaming revenues in the face of increasing levels of
11  default and assuming that the Swap counterparties
12  would continue to forbear exercising their remedies
13  and depending on their good will and intentions, when
14  they have their own fiduciary duties would be an
15  unacceptable risk.  I so recommended to Mr. Orr that
16  we not take that risk.
17  Q.  You're familiar with the Detroit General Retirement
18  System Service Corporation and the Detroit Police and
19  Fire Retirement System Service Corporation?
20  A.  I know they exist.
21  Q.  Do you have an understanding -- just for the record
22  I'll refer to them as the service corporations, do you
23  have an understanding what the service corporations
24  are?
25  A.  Yes.

1  Q.  And what is that understanding?
2  A.  They were created for the purpose of the City
3  borrowing 1.4 billion dollars in 2005 and 2006 and
4  making a contributions of the like amount to the
5  pension funds.
6  Q.  Do you understand the service corporations to be
7  controlled by the City?
8  A.  Yes.
9  Q.  And do you understand the service corporations to be
10  controlled by the emergency manager?
11  A.  I assume that's the case but I don't know for a fact.
12  Q.  And the service corporations are in fact parties to
13  the forbearance agreement, correct?
14  A.  Yes, they are.
15  Q.  Who acted on behalf of the service corporations in
16  connection with the forbearance agreement?
17  A.  The City did.
18  Q.  And by the City can you identify the individuals that
19  you are referring to when you say the City?
20  A.  Mr. Orr.
21  Q.  To your knowledge did any members of the Board of
22  Directors of the service corporations consult with
23  Mr. Orr about the forbearance agreement?
24  A.  I don't know.
25  Q.  Did Mr. Orr -- let's ask it the other way.  Did

1  Mr. Orr consult with any members of the Board of
2  Directors of the service corporations in connection
3  with the forbearance agreement?
4  A.  I don't know.
5  Q.  Did anyone at Miller Buckfire have any contact with
6  anyone, any -- any member of the Board of Directors of
7  the service corporations in connection with the
8  negotiations?
9  A.  I don't think so.
10  Q.  And do you know who presented the forbearance
11  agreement to the service corporations for execution?
12  A.  No.
13  Q.  Would Mr. Orr know that?
14  A.  I don't know.
15  Q.  Do you know who would know that?
16  A.  I don't know.
17  Q.  The person who signed the forbearance agreement on
18  behalf of the service corporations, a woman named
19  Cheryl Johnson, is that correct?
20  A.  Yes.
21  Q.  Do you know Miss Johnson?
22  A.  No.
23  Q.  Do you know what position Miss Johnson holds, if any,
24  on the service corporations?
25  A.  Well, the signature page indicates that she's the

1  president.
2  Q.  You've never spoken to Miss Johnson about the
3  forbearance agreement?
4  A.  No.
5  Q.  Have you ever spoken with Portia Roberson about the
6  forbearance agreement?
7  A.  No.
8  Q.  Do you know Miss Roberson?
9  A.  No.
10  Q.  Has anyone from Miller Buckfire ever spoken with
11  Miss Roberson?
12  A.  I don't know.
13  Q.  Are you aware that the insurers contend that the Swap
14  agreements cannot be terminated without their consent?
15  A.  Yes.
16  Q.  And when did you first become aware of that
17  contention?
18  A.  Well, last week in court I heard Mr. Hackney describe
19  those arguments to the judge.
20  Q.  Have you taken any steps to evaluate whether the City
21  agrees with the insurer's construction of the
22  operative documents on this point?
23  A.  No.
24  Q.  Do you know whether the City agrees with the insurer's
25  interpretation of the operative documents on this

1  point?
2  A.  I don't know.  Hackney, H A C K N E Y.  That's him.
3      MR. HACKNEY:  Mr. Buckfire is looking out
4  for me.
5      THE WITNESS:  Only where I can.
6      BY MR. SUMMERS:
7  Q.  Do you agree that if the insurers can block a
8  termination, that this would be important for the City
9  to assess whether it is in danger -- whether it was in
10  danger in June 2013 of owing the termination payment?
11      MR. CULLEN:  Objection.  Foundation.  Form.
12  A.  I'm sorry.  I don't understand the question.
13      BY MR. SUMMERS:
14  Q.  If the insurers are correct that they contend they can
15  block the termination, would that have been important
16  to assess whether the City was in real danger in June
17  2013 of owing a termination payment under the Swaps?
18      MR. JURGENS:  Objection to form.
19  A.  The issue for the City primarily is maintaining
20  uninterrupted access to its gaming revenues.  Any
21  litigation by any party which would threaten that
22  access would be a very serious problem for the City of
23  Detroit.
24      BY MR. SUMMERS:
25  Q.  Are you aware that the insurers contend they have the

1  right to control essentially all actions to be taken
2  by the Swap counterparties in connection with the Swap
3  agreements?
4      MR. CULLEN:  Objection.  Foundation.  Form.
5  A.  Yes, I am.
6      BY MR. SUMMERS:
7  Q.  And when did you develop that awareness?
8  A.  When I was in court last week listening to
9  Mr. Hackney's description of those issues to the
10  judge.
11  Q.  And have you taken any steps to evaluate whether the
12  City concurs with the insurer's construction of the
13  documents on this point?
14  A.  No.
15  Q.  Are you aware the City states in its motion to approve
16  the forbearance agreement that it is not required to
17  seek judicial approval under bankruptcy Rule 9019?
18      MR. CULLEN:  Objection.  Foundation.  Form,
19  but you can address it.
20  A.  I'm not aware --
21      BY MR. SUMMERS:
22  Q.  I'm asking if you're aware.
23  A.  I'm not aware.
24  Q.  If the court does not approve the forbearance
25  agreement, will the City still consider the

1  forbearance agreement a valid contract?
2      MR. CULLEN:  Objection.  Asks for a legal
3  conclusion.
4  A.  I can't answer that.  It calls for a legal conclusion.
5      BY MR. SUMMERS:
6  Q.  If the court doesn't approve the forbearance
7  agreement, will the City still attempt to perform
8  under the forbearance agreement?
9      MR. CULLEN:  Objection.  Calls for
10  speculation.
11  A.  I can't answer that question.  I don't understand it.
12      BY MR. SUMMERS:
13  Q.  Have you ever discussed with Mr. Orr what the City
14  will do with respect to the Swaps if the forbearance
15  agreement is not approved?
16  A.  The financial consequences of not having the
17  forbearance agreement approved would be very dire for
18  the City of Detroit.  We could no longer count on our
19  access to gaming revenues, we would no longer be able
20  to execute on the reinvestment plan which has been
21  described to the public and on June
22  14th.  We might be required to in fact reduce existing
23  City services in order to live within our cash
24  resources.  I'm only identifying some of the concerns
25  we would immediately have to review in order to come

1 up with a new plan.
2 Q. That presumes that the City would not continue to view
3 the forbearance agreement as binding?
4 A. I'm only speaking to the question of access to gaming
5 revenues. If the forbearance agreement is not
6 approved and we don't have access to gaming revenues,
7 the consequences to the City are extremely serious.
8 Q. In determining whether to enter into the settlement
9 agreement, did the City consider whether the casino
10 revenues constituted special revenues under the
11 bankruptcy code?
12 MR. CULLEN: Objection. Calls for a legal
13 conclusion.
14 MR. SUMMERS: It doesn't. I'm asking
15 whether the City considered it.
16 A. No.
17 BY MR. SUMMERS:
18 Q. So, you didn't consider it or you don't know?
19 A. I said we didn't consider it.
20 Q. In entering into the forbearance agreement, did the
21 City consider whether or not the automatic stay
22 applied to prevent the casino revenue from being
23 trapped under the collateral agreement?
24 A. Well, we hoped it would, but again it's pursuant to a
25 Swap agreement and there are special provisions in the

1 code that give Swap parties special rights.
2 Q. And, so, how was that consideration relevant to the
3 decision of the City to enter into the forbearance
4 agreement?
5 A. Well, having been involved in other situations where
6 we had Swaps and Swap counterparties, we are able to
7 take their collateral, even after a bankruptcy filing
8 was created, again it was an element of risk we were
9 not willing to accept on the City's behalf that the
10 Swap counterparties even after a bankruptcy filing
11 might be able to take advantage of those rights and
12 seize gaming revenues against their termination
13 amounts.
14 Q. In connection with the decision to enter into the
15 forbearance agreement, did the City consider whether
16 the casino revenues are property of the estate?
17 MR. CULLEN: Objection. Calls for a legal
18 conclusion.
19 A. They are property of the City.
20 BY MR. SUMMERS:
21 Q. So, the City took the view when these negotiations
22 that they are property of the estate, correct?
23 A. Yes.
24 Q. Has the City undertaken any analysis as to what impact
25 the forbearance agreement may have on unsecured

1 creditor recoveries?
2 A. We've considered that, yes.
3 Q. And what is the City's view as to the impact of the
4 forbearance agreement on unsecured creditor
5 recoveries?
6 A. Well, the elimination of litigation risk, the
7 preservation of the City's ability to operate in the
8 ordinary course and reinvest in the City pursuant to
9 access to gaming revenues would provide the City the
10 ability to enhance its overall credit and solvency
11 which would lead in theory to a higher recovery for
12 our unsecured creditors.
13 Q. If the court refuses to approve the forbearance
14 agreement, what is your view of the impact that will
15 have on unsecured creditors?
16 A. I think it will reduce their chance of recovery to a
17 very low number.
18 Q. And why do you think that?
19 A. Because the City will not be able to execute its
20 reinvestment plan, will not be able to emerge from
21 bankruptcy on the schedule that we have promised the
22 court. We would not be able to deliver the two
23 billion dollar limited recourse participation note to
24 our unsecured creditors.
25 Q. Why do you think you will not be able to do that?

1 A. Our June 14th plan and proposal to creditors pursuant
2 to which we proposed a two billion dollar note be
3 given out to all of our unsecured creditors assumes
4 that the City is able to execute its reinvestment
5 program over the next ten years which assumes that we
6 have access to the cash flows embodied in that plan
7 including the gaming revenues.
8 Q. It's not -- it's access to the gaming revenues to
9 grant a lien on them again?
10 A. Not necessarily. But the point is if we don't have
11 the gaming revenues because the actions of the Swap
12 counterparties, we can't even start the reinvestment
13 plan.
14 Q. The City intends, correct me if I'm wrong, but I
15 thought that the City intends to enter into DIP
16 financing and grant a lien on the casino revenues as
17 the next step after approval of the forbearance
18 agreement?
19 MR. CULLEN: Objection. Foundation.
20 Form.
21 A. If we have no forbearance agreement and we have to
22 live with the current Swap termination rights and the
23 Swap counterparties were to terminate officially and
24 require the City to pay three hundred million dollars
25 to them, by action of the agreement they would seize

1 all of the gaming revenues until that claim has been
2 fully satisfied.
3     Now, simple math will tell you if we have
4 170 million of gaming revenues and we have a three
5 hundred million dollar termination payment and we have
6 an implied interest rate on that termination payment
7 it will probably take somewhere between two and three
8 years to pay it off in full.
9 Q. That presumes that the lien held by the Swap
10 counterparties against the casino revenues is a valid
11 and enforceable lien, correct?
12 A. That's what the agreement specifies.
13 Q. Well --
14 A. The 2009 agreement specifies.
15 Q. Right, but --
16 A. That's the agreement the City is bound by if the
17 forbearance agreement is not approved.
18 Q. Unless there's a litigation claim that exists that
19 might invalidate the liens?
20 A. In which case who knows what the Swap counterparties
21 might do and what we might have access to in terms of
22 gaming revenue.
23 Q. So, the legal analysis is important to informing --
24 A. Any risk the City is being asked to take that doesn't
25 have access to gaming revenues is an unacceptable risk

1 from the point of view of the City's ability to
2 rehabilitate itself.
3 Q. Have you evaluated noncore assets as a source of funds
4 for the City?
5     MR. CULLEN: Objection. Foundation. Form.
6 A. Yes.
7     BY MR. SUMMERS:
8 Q. And what evaluation have you performed?
9 A. As we've identified in the June 14th plan we did
10 identify for the benefit of the public and the
11 creditors all potential noncore assets that might have
12 value that could be used pursuant to the plan of
13 adjustment.
14 Q. And on August 5th you announced the City had hired
15 Christie's to appraise the collection at the Detroit
16 Institute of Art, correct?
17 A. I didn't announce that.
18 Q. The City announced it.
19 A. The City announced it.
20 Q. That they hired Christie's, correct? Do you have an
21 understanding of the approximate value of the City's
22 art collection?
23 A. No.
24 Q. Do you have an understanding as to when the City
25 expects to receive the appraisal from Christie's?

1 A. Yes, by the end of October 2013.
2 Q. What is the City's intention with respect to analyzing
3 the appraisal and making a determination as to the art
4 work once it receives the appraisal?
5     MR. CULLEN: Objection. Foundation. Form.
6 A. I can't even speculate as to what we'll do until we
7 have some facts as to what value we're dealing with.
8 That's why they were retained.
9     BY MR. SUMMERS:
10 Q. Has the City considered selling or leasing Belle Isle?
11 A. Not to my knowledge.
12 Q. Has the City looked into possible sources of funding
13 from the State of Michigan?
14 A. I'm not going to discuss that.
15 Q. Has the City looked into possible sources of funding
16 from the federal government?
17 A. I'm not going to discuss that either.
18 Q. On what basis?
19 A. Commercially sensitive information.
20     MR. SUMMERS: I'm going to propose we take
21 maybe -- why don't we stop the tape for a minute.
22     VIDEO TECHNICIAN: The time is 12:18 p.m.
23 we are off the record.
24     (Recess taken at 12:18 p.m.)
25     (Back on the record at 1:21 p.m.)

1     VIDEO TECHNICIAN: We are back on the
2 record at 1:21 p.m. This marks the beginning of tape
3 number three.
4     EXAMINATION
5     BY MR. HACKNEY:
6 Q. Mr. Buckfire, good afternoon. My name is Steve
7 Hackney. I'm an attorney at Kirkland & Ellis, and I
8 represent Syncora Capital Assurance and Syncora
9 Guaranty. Nice to meet you.
10 A. Likewise.
11 Q. I think we had a brief conversation which you
12 suggested there might have been something you'd like
13 to correct with respect to a name from the morning's
14 testimony.
15 A. Yes, thank you, Mr. Hackney. I incorrectly identified
16 the attorney from Cadwalader who was present at the
17 June 4th meeting. His correct name is Larry
18 Stromfeld, S T R O M F E L D. That's his correct name
19 and that's who attended the meeting.
20 Q. If you think of any other corrections, don't hesitate
21 to stop me and let me know and we'll give you an
22 opportunity to make them.
23 A. Thank you.
24 Q. So, I've been listening to your testimony. It's not
25 my intention to re-ask you all the questions that were

1 asked today. I am just here principally to follow up
2 on certain items and ask about certain other areas
3 that may be germane to Syncora.
4 So, as I understood your testimony, you
5 were the lead negotiator for the City when it came to
6 negotiating the business deal, is that correct?
7 A. Yes.
8 Q. Other people were going to paper the business deal in
9 terms of the legal terms that would embody it,
10 correct?
11 A. Yes.
12 Q. Let me ask you a question. The kickoff of the
13 negotiations that led to the forbearance agreement I
14 understood you to say began on June 4th, correct?
15 A. Yes.
16 Q. Who called that meeting?
17 A. Counsel to Jones Day called counsel for BAML and
18 invited them to the meeting.
19 Q. Fair to say that the meeting was held at the behest of
20 the City of Detroit?
21 A. Yes.
22 Q. Did you take legal advice, you personally as the lead
23 negotiator for the City, did you take legal advice
24 from Jones Day in advance of the June 4 meeting?
25 A. Yes.

1 Q. Would you disclose to me the legal advice you obtained
2 from them?
3 MR. CULLEN: I'll instruct him not to
4 answer.
5 MR. HACKNEY: So, if I ask questions about
6 the legal advice you had been given about the COPs
7 Swap structure or various parties' rights thereunder,
8 you would instruct the witness not to answer those
9 questions?
10 MR. CULLEN: Right.
11 MR. HACKNEY: And I take it, Mr. Cullen,
12 that instruction would remain true both from -- at any
13 time?
14 MR. CULLEN: Right.
15 MR. HACKNEY: Not just with respect to the
16 June 4 meeting?
17 MR. CULLEN: Precisely.
18 BY MR. HACKNEY:
19 Q. Okay. Let me ask you, Mr. Buckfire, I'm going to
20 speculate, perhaps not wildly, that you've negotiated
21 a few deals in your lifetime.
22 A. Yes.
23 Q. Isn't it fair to say as a negotiator, you have to have
24 an understanding of the financial needs and desires of
25 your client as well as the counterparty with whom you

1 are negotiating?
2 A. Yes.
3 Q. You also have to have at least some understanding of
4 the legal framework in order to negotiate effectively,
5 correct?
6 A. Yes.
7 Q. You don't have to go to law school, right, but you do
8 have to understand some of the ins and outs of the
9 various legal documents that you're negotiating over,
10 correct?
11 A. As well as any layman can be expected to do so.
12 Q. Now, I'd like to get a level set as to where you were
13 on June 4th, 2013 as you're going into this meeting
14 with BAML.
15 A. And UBS.
16 Q. And UBS. So, they were there too?
17 A. Yes.
18 Q. Okay. I want to make sure I have a level set under
19 the operating assumptions that you had in your mind as
20 you were going into the meeting to negotiate with the
21 Swap counterparties, okay?
22 One of your operating assumptions was that
23 there were termination events existing under the
24 Swaps, correct?
25 A. There were events of default existing under the Swaps,

1 the collateral agreement.
2 Q. Okay. So, let's take a step back and let me be more
3 precise.
4 A. Okay.
5 Q. So, there is a Swap agreement that the Swap
6 counterparties are parties to with the service
7 corporations?
8 A. Correct.
9 Q. You are aware of that?
10 A. I am.
11 Q. You are also aware that there is a collateral
12 agreement that is between among other parties the
13 City, the service corporations and the Swap
14 counterparties, correct?
15 A. Yes.
16 Q. Now, at the time you're going into the June 4 meeting,
17 one of your operating assumptions was that there were
18 termination events under the Swap that would give the
19 Swap counterparties the right to terminate?
20 MR. CULLEN: Objection. Foundation. I
21 think he said default events.
22 MR. HACKNEY: He said default events under
23 the collateral agreement. I'm trying to be precise
24 about --
25 A. No, I was focused on the cash issue that would be at

1   risk under the collateral agreement.

2     BY MR. HACKNEY:

3   Q.  And let me tie it up a little bit to see if this jogs

4   your memory.  The collateral agreement certainly

5   relates to the Swaps that was entered into in 2009,

6   correct?

7   A.  Correct.

8   Q.  The collateral agreement cash trap arguably slams shut

9   upon the occurrence of termination events or events of

10  default under the Swap, is that your understanding?

11     MR. CULLEN:  Objection.  Foundation.  Form.

12  You can address the question if you understand it.

13  A.  I don't understand the question.  I'm sorry.

14     BY MR. HACKNEY:

15  Q.  Okay.

16  A.  Want to try again.

17  Q.  Did you understand that the collateral agreement and

18  the cash trapping were securitizing the City's

19  obligations to the service corporations and the

20  service corporations' obligations to the Swap

21  counterparties under the Swap?

22  A.  No.

23  Q.  Did you understand that the collateral agreement what

24  it was ultimately securing was the termination payment

25  that might be made under the Swaps?

1     MR. CULLEN:  Objection.  Foundation.  Form.

2  A.  No.

3     BY MR. HACKNEY:

4   Q.  Did you believe that the collateral agreement had

5   created like a new obligation by the City to pay the

6   Swap counterparties?

7   A.  It created a collateralized obligation to pay the Swap

8   counterparties.

9   Q.  Okay.  So, going back to the June 4 meeting, let me

10  put it in vernacular that I hope is more correct about

11  what you were assuming.  Okay?

12     You were assuming that there had been

13  events of default under the collateral agreement that

14  would allow the Swap counterparties to trap cash,

15  correct?

16  A.  I wasn't assuming anything.  I knew there were two

17  events of default.

18  Q.  Let me --

19  A.  But they had not been asserted by the Swap

20  counterparties but they existed.

21  Q.  Let me restate it.  As of June 4 you knew that there

22  were events of default under the collateral agreement

23  that would allow the Swap counterparties to trap cash,

24  fair statement?

25  A.  If they chose to do so, yes.

1   Q.  If they chose to do so.

2   A.  Correct.

3   Q.  And you also -- let me make sure I get this right.

4   You also believed that they would be able to declare

5   termination event and potentially be paid four hundred

6   million dollars, correct?

7   A.  Yes.

8   Q.  And that was also one of your operating assumptions as

9   you're going into the negotiation, correct?

10  A.  Yes.

11  Q.  And your understanding that they could do so was that

12  they could do so unilaterally, correct?

13  A.  Correct.

14  Q.  And your understanding with both with respect to

15  declaring termination of the Swaps and getting a

16  termination payment and trapping cash was that there

17  was no other party that could direct their actions,

18  correct?

19  A.  That's correct.

20  Q.  And your understanding of these operating assumptions

21  remain consistent between June 4 and June 11 when you

22  struck the agreement in principle, correct?

23  A.  Correct.

24  Q.  And in fact it remained consistent for you all the way

25  through the execution on July 15th of the forbearance

1   agreement, correct?

2   A.  Correct.

3   Q.  And the forbearance agreement itself did not

4   materially change the business terms of the deal that

5   you had struck on June 11th, correct?

6   A.  No, except for the small negotiation we had around the

7   date of the first option.  It was the only material

8   business term that changed.

9   Q.  Okay.  So, there was some changes of timing in terms

10  of when the percentages stepped up?

11  A.  Yes, because the agreement took a long time to

12  negotiate.  We had originally assumed we would

13  complete a forbearance in June.  It took until July so

14  we asked for and were granted an additional month on

15  the first option payment.

16  Q.  Fair point.  Thank you for that correction.  Other

17  than that change to what I'll describe as the business

18  terms that you negotiated on June 11th, there were no

19  other material changes to the deal that you struck,

20  correct?

21  A.  No.

22  Q.  It was just legal beagles doing what they do, correct?

23  A.  I would never call them legal beagles, but yes, the

24  lawyers were doing what they were supposed to do.

25  Q.  Okay.  All right.  Now, I want to clarify at the June

1 4 meeting other than saying that the City would
2 vigorously litigate attempts to trap cash, you did not
3 express the City's views on the merits of that
4 litigation, correct?
5 A. Correct.
6 Q. You just said we're going to fight like hell to stop
7 you from trapping cash or words to that effect?
8 A. That's correct.
9 Q. And you didn't say by the way here's why we are going
10 to win because we have this great argument and you're
11 going to lose, right?
12 A. I never said that.
13 Q. Never said words to that effect, correct?
14 A. No.
15 Q. Never attempted to argue the merits of why the Swap
16 counterparties wouldn't be able to trap cash, fair
17 statement?
18 A. Correct.
19 Q. And no one else on the City side did either, correct?
20 MR. JURGENS: Objection to form.
21 A. Not to my recollection.
22 BY MR. HACKNEY:
23 Q. And you never attempted to argue the merits of the
24 City's case to the Swap counterparties at any time
25 between June 4 and June 11 when you reached the

1 agreement in principle, correct?
2 A. Correct.
3 Q. And you never witnessed anyone else do so on behalf of
4 the City either, correct?
5 A. Not that I recall.
6 Q. You said that the June 4 meeting was about an hour and
7 a half long, is that right?
8 A. Approximately.
9 Q. How much additional time did you spend in actual
10 negotiation with the Swap counterparties between the
11 end of that June 4 meeting and the reaching agreement
12 in principle on June 11?
13 A. It's hard to put an hour on that. I only can tell you
14 that from the 4th until the 11th it was my exclusive
15 focus because it was a do-or-die issue for the City we
16 knew we had to get an agreement with them by the 11th
17 otherwise the consequences would be unbearable.
18 So, I would have to say that for my team
19 and myself it was a 24-hour dedication and I think for
20 the banks as well on their side it was probably
21 equally intense.
22 Q. Absolutely understand that can understand that there
23 was a lot of work going on behind the scenes and in
24 anticipation of meetings, so on and so forth, but my
25 question is driving on, how much time you actually

1 spent either on the phone with a Swap counterparty
2 principal or lawyer or whomever you were dealing with
3 this or in a meeting with them talking turkey about
4 the deal?
5 A. Oh, hours.
6 Q. Okay. So, the first one was an hour and a half on
7 June 4.
8 A. Introductory meeting.
9 Q. Okay. Let me go -- I'll go by meetings. Okay. How
10 long was June 8?
11 A. That was about three hours.
12 Q. Okay. That was a three-hour negotiation?
13 A. Yeah.
14 Q. And did you meet again on June 11th?
15 A. I think we did.
16 Q. Okay.
17 A. For perhaps two hours.
18 Q. So, June 11 two hours. And did you do any negotiating
19 over the phone in between June 4 and June 8 or June 8
20 and June 11?
21 A. Yes.
22 Q. And can you estimate the amount of time on the phone?
23 A. I can't. We were on the phone a lot.
24 Q. Okay. You know, I have six-and-a-half hours of
25 in-person negotiation. Can you ballpark it in

1 reference to that, were you doing more than that on
2 the phone?
3 A. It was probably an equal amount.
4 Q. Okay.
5 A. But that was just the negotiations that I was involved
6 in. I'm sure that counsel was having separate
7 conversations on their issues.
8 Q. Yeah, and I'm not trying to address the -- any
9 wrangling about the legal terms that I understand was
10 not in your bailiwick. You were the guy cutting the
11 business deal, correct?
12 A. Right.
13 Q. Now, at the time of the June 4 meeting you were aware
14 that a bankruptcy filing for the City of Detroit was
15 at least a possibility, correct?
16 A. Yes.
17 Q. Had you reached the view at that time that it was a
18 likelihood?
19 A. It was a possibility.
20 Q. But you can't say more than that that it was a
21 likelihood?
22 A. No.
23 Q. As of June 4?
24 A. Correct.
25 Q. And you also understood that the automatic stay is

Page 121

1  part of any bankruptcy proceeding as a restructuring
2  professional, isn't that correct?
3  A.  Correct.
4  Q.  And if I ask you at the time -- well, let me ask a
5  general question.  I'm not asking you to disclose the
6  subject of communication -- the communications
7  themselves, but I want to ask whether you had taken
8  legal advice on the subject of the automatic stay.
9  Don't tell me what the legal advice was.
10    Had you taken legal advice on the subject
11  of the automatic stay at any time between June 4 and
12  June 11?
13    MR. CULLEN: You can answer that.
14  A.  Yes, I did.
15    BY MR. HACKNEY:
16  Q.  So, you had taken legal advice from Jones Day, is that
17  correct?
18  A.  Correct.
19  Q.  But if I ask you what the advice was, you'll follow
20  your counsel's instruction and not answer, correct?
21  A.  Correct.
22  Q.  You were asked questions about interest rates and
23  LIBOR and the questions I think focused on a gentleman
24  at your firm who has done some analysis whose name I
25  can't recall --

Page 122

1  A.  Mr. Marken.
2  Q.  Mr. Marken.
3  A.  M A R K E N.
4  Q.  I have a broader question which is at any time prior
5  to June 11th did you or anyone else at Miller Buckfire
6  to your knowledge perform an analysis of what interest
7  rates were likely to do in the future?
8  A.  No.
9  Q.  Did anyone study any LIBOR curves prior to June 11?
10  A.  I don't recall.
11  Q.  You certainly didn't?
12  A.  I did not.
13  Q.  Okay.  When you testified about Mr. Marken, you
14  testified about something I think he had done a couple
15  days ago and we're in August.  So, I'm going to ask
16  the same question now about July 15th which is the
17  execution date.
18    As of the execution date of the forbearance
19  agreement, had you or anyone else at Miller Buckfire
20  undertaken an assessment of what interest rates were
21  likely to do?
22  A.  No.
23  Q.  Prior to engaging in these negotiations between June 4
24  and June 11, did the City and the Swap counterparties
25  to your knowledge execute a nondisclosure agreement?

Page 123

1  A.  I don't know.
2  Q.  Is it a you definitely don't recall one being executed
3  but you don't know whether someone else might have or
4  you just can't remember?
5  A.  I just don't remember.
6  Q.  You were asked a lot of questions about the service
7  corporations.  I think we established that you don't
8  know their directors and haven't met them, but I want
9  to make a point clear about the negotiations which is
10  you never engaged in arm's length negotiations with
11  the service corporations, correct?
12  A.  Correct.
13  Q.  And you never witnessed anyone else do so either,
14  correct?
15  A.  Correct.
16  Q.  And it's your understanding that Mr. Orr directed the
17  service corporations to execute the agreement and they
18  did, correct?
19  A.  Correct.
20  Q.  Now, you referenced a standstill agreement that was
21  something that had been proposed by the Swap
22  counterparties prior to June 4, 2013.
23    Do you recall that testimony?
24  A.  I do.
25  Q.  Your understanding of the standstill agreement, I

Page 124

1  understand we are going to get it but we don't have it
2  today so I have to tell you what I understand from
3  your testimony.
4    Your understanding of it was that it
5  allowed the cash to flow out of the -- it allowed the
6  casino revenues to flow in exchange for the City
7  agreeing to waive arguments about the invalidity of
8  the Swaps but was terminable at any time?
9  A.  By the Swap counterparties.
10  Q.  By the Swap counterparties, correct?
11  A.  Correct.
12  Q.  And that was unacceptable because that meant at any
13  time they could change their mind and trap the cash,
14  correct?
15  A.  By those terms, yes.
16  Q.  Now, under the forbearance agreement I understand that
17  you're not an attorney but you are a sophisticated
18  businessman who deals with legal documents on a
19  regular basis, true statement?
20  A.  Regrettably.
21  Q.  More than he wants to?  But under the forbearance
22  agreement isn't it true that your understanding is
23  that the City has agreed during the forbearance period
24  that it won't seek to declare the Swaps invalid,
25  correct?

1  A.  Correct.

2  Q.  And during the forbearance period the Swap

3  counterparties are allowing the cash to flow through

4  the collateral account, right?

5  A.  Yes.

6  Q.  So, they waive their argument to trap the cash in

7  exchange for other things that they got, correct?

8  A.  Correct.

9  Q.  Now -- so, there are other elements of the forbearance

10  agreement, I understand that including the discount

11  and so on and so forth, but at least these two

12  elements bear some similarity to elements that were in

13  the standstill agreement, right?

14  A.  Yes.

15  Q.  The big difference is that the standstill agreement

16  which was terminable solely by the Swap counterparties

17  is different from the forbearance agreement because

18  the forbearance agreement creates a window of time for

19  the City to evaluate what it wants to do, correct?

20  MR. CULLEN:  Objection.  Foundation.  Form.

21  You can answer if you can unpack it.

22  A.  Would you -- would you mind asking me again.

23  BY MR. HACKNEY:

24  Q.  I don't mind at all.  One of the big differences about

25  the forbearance agreement that makes it acceptable to

1  you in comparison to the standstill agreement is the

2  forbearance agreement is not terminable at any time by

3  the Swap counterparties, correct?

4  A.  It's one element, yes.

5  Q.  Did you ever see whether you could attempt to cut a

6  more limited deal with the Swap counterparties that

7  was along the lines of the standstill agreement but

8  which simply extended a period of time in which the

9  City could have some assurance that the agreement

10  wouldn't be terminated?

11  A.  We considered all possibilities, but the proposal we

12  made to the banks on the 4th was the one that we made

13  because it was the one that was in the best interest

14  of the City.

15  Q.  You never proposed what I'll call a smaller deal that

16  would have attempted to maintain the status quo for

17  some period of time without trying to achieve a

18  potential termination of a Swap at a discount so on

19  and so forth, true statement?

20  A.  True.

21  Q.  Now, I know that you weren't engaged with the City at

22  every time between March 2012 and today.  I know your

23  retention was 60 days in 2012?

24  A.  It was very limited scope.

25  Q.  I take it that when you would re-engage with

1  something, you would undertake some efforts to find

2  out what had transpired while you were gone, correct?

3  A.  Correct.

4  Q.  Kind of catch up on the state of play?

5  A.  Yes.

6  Q.  Isn't it true that between March 12th of -- between

7  March of 2012 and June 4th, 2013, the Swap

8  counterparties had never terminated the Swaps,

9  correct?

10  A.  That's true.

11  Q.  Despite the fact that in your view they had the right

12  to do so, right?

13  A.  That's correct.

14  Q.  And during that entire time period which is 14 months

15  they had never demanded that cash be trapped, correct?

16  A.  No, they hadn't.

17  Q.  And your understanding of the state of play as you

18  came into the negotiations on June 4 was that the

19  prior negotiations were dormant and had been

20  unproductive, correct?

21  A.  True, but recall that the Swap counterparties were

22  through the various channels letting the City know

23  they were getting increasingly impatient.  Their

24  impatience was not permanent.  That we had had other

25  events of default that were causing them increasing

1  concern and they really wanted to sit down with us as

2  soon as possible to cut a deal.

3  Q.  Okay.  So, that's an important thing that --

4  A.  Which I did testify to in the morning.

5  Q.  I may have just missed it.  I heard you say that in

6  the meetings that they expressed their wearing

7  thinness of their patience.

8  A.  Yes.

9  Q.  I didn't understand that they had -- that they had

10  expressed that prior to June 4.

11  A.  Yes.

12  Q.  So, I may have misheard.  If I did, I apologize.

13  Can you tell me more about what precisely

14  you understood prior to when you set up the June 4

15  meeting you're downloading information from people

16  about what these Swap counterparties are saying to the

17  City, what download are you getting?

18  A.  We were re-engaged on January the 8th.  Of course we

19  did go back and bring ourselves up to speed on all the

20  relevant issues including the state of play on the

21  Swap termination issue.

22  We heard from people in the City, we heard

23  from counsel, we heard from others that they were

24  unhappy with the fact there was no deal.  They really

25  wanted to sit down with us and discuss something, and

Page 129

1  it was a very calculated risk on our part to hold them
2  off until we really knew what our true financial
3  position was, and, therefore, and particularly after
4  Mr. Orr became the emergency manager in March which
5  was another event of default, we recognized we didn't
6  have a lot of time to engage with them.
7      We asked them indirectly through counsel to
8  be patient, that we recognize we would get to them
9  soon, but we didn't want to proceed on a piecemeal
10  basis with our creditors.  We needed to understand the
11  true financial of the City before we decided what to
12  do.
13 Q.  Understood.  That's very helpful.  So, let me try and
14  summarize it which is when you re-engaged in January
15  of 2013, you were made aware of a -- of the general
16  desire of the Swap counterparties to for lack of a
17  better term figure out what the City and the Swap
18  counterparties were going to do about the Swap,
19  correct?
20 A.  Yes.
21 Q.  And you then held them off between that time and June
22  4 as you tried to buy time for Ernst & Young to get
23  its arms around the financial position of the City,
24  correct?
25 A.  Yes, and our other advisors.

Page 130

1 Q.  And your other advisors, absolutely.  And it was only
2  after you had gotten that analysis done that you felt
3  you were now ready to initiate a meeting with the Swap
4  counterparties to speak meaningfully about what should
5  be done with the Swap?
6 A.  In the context of an overall recommendation to Mr. Orr
7  about how to protect the City and its liquidity.
8 Q.  And so during that time period which was from January
9  of 2013 to June of 2013, despite these growing signs
10  of impatience by the Swap counterparties, they still
11  didn't trap cash, did they?
12 A.  They were being paid in the ordinary course.  There
13  was no economic consequence that they had to worry
14  about.  They didn't know the financial condition of
15  the City.  There was no economic reason for them to do
16  anything, but clearly as the condition of the City
17  became more desperate and everyone became more aware
18  of it, the risk they would do something became
19  greater.
20 Q.  I see.  So, it was the disclosure of information by
21  Mr. Orr on June 14th, was that a factor that drove you
22  to negotiate in advance of that?
23 A.  No.  Recall that his earlier disclosure was I believe
24  in April.
25 Q.  Oh, that's right.

Page 131

1 A.  And that was the first time that the public and the
2  capital markets really became aware of the true
3  financial condition of Detroit.
4 Q.  So, in April Mr. Orr made a disclosure that basically
5  said if I could summarize that things are not well in
6  Detroit, correct?
7 A.  That's accurate.
8 Q.  But despite that disclosure and subsequent to the
9  report in April and May, Swap counterparties didn't
10  demand cash be trapped, correct?
11 A.  Correct.
12 Q.  They didn't terminate the Swap, correct?
13 A.  Correct.
14 Q.  After June 11, after you've cut the business deal and
15  here come the lawyers to write it down, fair to say
16  that you're on the sidelines now as the lawyers work
17  out the legal language, but you're still monitoring
18  the course of the legal negotiations given the
19  importance of what's at stake?
20      MR. CULLEN:  Objection.  Foundation.  Form.
21  You can address it.
22 A.  I was generally aware of what was going on.
23      BY MR. HACKNEY:
24 Q.  I'm trying to get on the idea that you're not on the
25  phone with all these lawyers like directly

Page 132

1  participating and listening to the negotiations of the
2  forbearance agreement itself but you're keeping tabs
3  on how it's progressing and when it's hoped to be
4  executed, correct?
5 A.  Correct.
6 Q.  Put another way, you are aware of the legal
7  negotiation process as it goes along even though
8  you're not personally involved in it, correct?
9 A.  Correct.
10 Q.  And that's because this was such an important
11  agreement that you as an important advisor to the City
12  needed to be up to speed on what was going on with the
13  forbearance agreement?
14 A.  Correct, but recall that on June 11th the Swap
15  counterparties did issue a letter to US Bank
16  authorizing them to release the tranche of cash due to
17  us on June 15th and therefore we knew we had until
18  July 15th to get to the next tranche.
19      So, from a financial perspective I was
20  comfortable with where we were with the Swap
21  counterparties.
22 Q.  Because after that discharge of cash, then it goes
23  back to just slowly building up, you get it for the
24  rest of the month and then it slowly builds up in the
25  first part of July?

Page 133

1  A.  Correct.
2  Q.  So, you felt like we had some time to negotiate?
3  A.  That's correct.
4  Q.  Yeah.  Your understanding is that the legal
5  negotiations of the forbearance agreement were
6  complicated but that they proceeded uninterrupted from
7  June 11th to July 15th, correct?
8  A.  Correct.
9  Q.  And if there had been a serious interruption in these
10  negotiations, you would have likely known about this
11  as an important advisor to the City, correct?
12  A.  Yes.
13  Q.  And you are aware of no serious interruption, correct?
14  A.  No.
15  Q.  That's not correct?
16  A.  I'm not aware of any serious interruptions.
17  Q.  In late June of 2013 you learned that Syncora wanted
18  to make a proposal to the City, isn't that correct?
19  A.  Yes.
20  Q.  And you had a conversation with Todd Snyder on the
21  subject of Syncora's potential proposal on Saturday,
22  June 29th, isn't that correct?
23  A.  That's correct.
24  Q.  Mr. Snyder you understood is a banker at Rothschild's,
25  correct?

Page 134

1  A.  Correct.
2  Q.  And you also understood that he was representing
3  Syncora, correct?
4  A.  Yes.
5  Q.  And you also understood that at the time that he was
6  calling you, that there had been previous
7  communications between counsel to Syncora and counsel
8  to the City, correct?
9  A.  I had heard about it but I wasn't aware of the
10  specifics.
11  Q.  Okay.  So, you knew Jones Day and Kirkland and maybe
12  others had met and talked about something but you
13  didn't know what it was?
14  A.  I knew they were talking about the issues raised by
15  Syncora.
16  Q.  Okay.  Now, tell me -- so, in terms of Syncora's
17  potential proposal, your first percipient knowledge of
18  it as a witness happens on that Saturday when you have
19  your conversation with Mr. Snyder, is that a fair
20  statement?
21  A.  Correct.
22  Q.  Tell me everything you can recall about that
23  conversation.
24  A.  It was quite brief.  Todd told me he had been retained
25  by Syncora and that they wanted to propose something

Page 135

1  that would be of benefit to the City in resolving the
2  Swap matter.  I told him that we were always willing
3  to listen to anything anyone had to say and I asked
4  him to tell me what he had in mind.  He never did.
5  Q.  Have you told me everything you can recall about that
6  conversation?
7  A.  Yes.
8  Q.  During that conversation didn't Mr. Snyder describe
9  the general structure of a proposal Syncora wanted to
10  make?
11  A.  No.
12  Q.  So, if Mr. Snyder says he did, he's lying or mistaken?
13  A.  He never made a specific proposal to me.
14  Q.  I'm not saying a specific proposal, I'm saying a
15  general structure of a proposal, that's what he
16  testified to in his affidavit.
17    Did he provide to you the general structure
18  of a proposal that Syncora wanted to make?
19  A.  Not that I recall.
20  Q.  Possible he did, possible he didn't, you just can't
21  remember?
22  A.  I can't remember.
23  Q.  Did he tell you that we'd be able to put specifics
24  into the general structure of the proposal if we could
25  execute an NDA that would allow us to learn about the

Page 136

1  negotiations with the Swap counterparties?
2  A.  Yes, he did.
3  Q.  What did you tell him in response to that?
4  A.  I said he should send us an NDA and we'll take a look
5  at it.
6  Q.  And you understood that at least as he expressed to
7  you that he wanted an NDA as a precursor in order to
8  make a specific proposal, correct?
9  A.  Correct.
10  Q.  Isn't it true that after that time you understood that
11  an NDA was proposed to the City, correct?
12  A.  Yes.
13  Q.  And the City refused to execute that NDA, isn't that
14  correct?
15  A.  That's correct.
16  Q.  Do you have information about why the City refused to
17  execute it?
18  A.  Well, as I recall the NDA was not with the City, it
19  was meant to be with Miller Buckfire and Jones Day and
20  we would not be able to disclose whatever they told us
21  to the City which made no sense, and that was the
22  reason we couldn't sign that NDA and that's why I
23  testified earlier he didn't really tell me a proposal,
24  he said I'd like to make a proposal.  He said I'll
25  tell you the proposal if you sign the NDA.  So we

1   never got a proposal.
2  Q.  I want to make that clear that's subject to you saying
3   you don't remember whether he provided the general
4   outlines of the structure or not, correct?
5  A.  No.
6      MR. CULLEN: Objection.  Foundation.  I
7   don't know what general --
8      MR. HACKNEY: Foundation?
9      MR. CULLEN: Yeah, general outline is my
10  objection.
11  A.  I can't recall him telling me anything about what he
12   was going to propose and certainly wasn't specific.
13   If he had been specific, I probably would remember it.
14      BY MR. HACKNEY:
15  Q.  And that's because -- but you do remember him telling
16   you the specifics would come after we sign an NDA?
17  A.  I do.
18  Q.  Yeah.  And then your understanding is that there was a
19   problem with the NDA that you couldn't discuss the
20   proposal with the EFM?
21  A.  That's correct.
22  Q.  And that was something that the parties couldn't get
23   over?
24  A.  I asked Jones Day to go back to Kirkland Ellis and try
25   to fix the problems we had in the NDA and then I moved

1   on to other issues.
2  Q.  And your understanding was that to the extent those
3   problems didn't get fixed it was because Kirkland
4   Ellis was being obstinate with respect to the terms of
5   NDA?
6  A.  I don't know why we never resolved it.
7  Q.  So, to this day you don't know whether or not an NDA
8   could have been struck that would have allowed Syncora
9   to make a rival proposal, correct?
10  A.  All I can tell you is that no NDA was entered into
11   because the terms were unacceptable.
12  Q.  And you don't know why one wasn't entered into
13   ultimately after that?
14  A.  I don't think we could ever resolve the issues.
15  Q.  And this was in advance of your having executed the
16   forbearance agreement, correct?
17  A.  Yes.
18  Q.  As a negotiator, don't you agree that it's nice
19   whenever you can play two parties off against each
20   other?
21  A.  I didn't have two parties.  I had one party.  I had the
22   Swap counterparties.
23  Q.  And I'm not asking about in this case, I'm asking
24   about as a general principle, isn't it nice when you
25   can play two parties off against each other?

1  A.  Sometimes.
2  Q.  Isn't that something that you'll do in the DIP
3   financing which is you'll get all these offers in and
4   then you'll make these guys compete with each other in
5   order to drive best possible deal for the City,
6   correct?
7  A.  Only if you assume a level playing field which this
8   negotiation was not.
9  Q.  I'm just asking generally about the idea of trying to
10   drive the best deal possible through competition
11   amongst different negotiating parties.  Can be
12   valuable, right?
13  A.  Can be under the right circumstances.  This was not
14   one of them.
15  Q.  And what was wrong about the circumstances?
16  A.  Because we had only two parties to the table, the Swap
17   counterparties who had signed the collateral
18   agreement.  There was nobody else to negotiate with.
19  Q.  That's right, that's right, because your understanding
20   was that Syncora had no rights whatsoever under the
21   collateral agreement, correct?
22  A.  Correct.
23  Q.  And your understanding was they had no ability to
24   direct the actions of the Swap counterparties,
25   correct?

1  A.  I testified earlier that my understanding, I was
2   advised, the only parties of interest here are the
3   Swap counterparties.
4  Q.  And it was also your understanding that Syncora didn't
5   have any rights under the Swaps that would be
6   terminated, correct?
7  A.  Only talking about the collateral agreement.
8  Q.  We talked about the fact that there might be a
9   termination event for four hundred million dollars.
10   That's not under the collateral agreement, right?
11  A.  True.
12  Q.  So, we are talking about the Swaps, right?
13  A.  Yes.
14  Q.  Now, let's put aside what you've been told about who
15   the relevant parties were.  You did know that Syncora
16   was a Swap insurer, right?
17  A.  Yes.
18  Q.  And you understood as a layperson but a sophisticated
19   one that if an insurer makes a payment to the insured
20   it becomes subrogated to the rights of the insured
21   with respect to that payment, correct?
22  A.  Yes.
23  Q.  And isn't it true that if the Swap counterparties had
24   terminated, they wouldn't have waited around for two
25   years to collect the casino revenues, right, they

1  would have demanded Syncora made good on its Swap
2  insurance and let Syncora try and stick around and
3  collect the casino revenues, correct?
4      MR. CULLEN:  Objection.  Foundation.  Form.
5  Calls for speculation.
6  A.  It wasn't an issue for the City.
7      BY MR. HACKNEY:
8  Q.  I'm asking whether you thought that was a possibility
9  back at the time you were negotiating the forbearance
10  agreement?
11  A.  It wasn't an issue for the City.  Had no impact on the
12  City's access to cash.
13  Q.  But if Syncora was a party that might come in in lieu
14  of the Swap counterparties, didn't you want to find
15  out whether you might be able to cut a better deal
16  with Syncora?
17      MR. CULLEN:  Objection.  Foundation.  Form.
18  Calls for speculation.
19  A.  I can't speculate to that.
20      BY MR. HACKNEY:
21  Q.  All you can say is that you never did, correct?
22  A.  Correct.
23  Q.  And in fact between June 29th when you spoke to
24  Mr. Snyder and today, there have never been
25  substantive negotiations between the City and Syncora

1  to your knowledge, isn't that correct?
2  A.  Not on this, no.
3  Q.  I wanted to clarify something that you said about the
4  DIP earlier and it was mainly that -- you used the
5  phrase I didn't understand with respect to the casino
6  revenues, you said -- you either said that the casino
7  revenues would be a part of the collateral package or
8  that part of the casino revenues would be in the
9  collateral package, and I wanted to clarify that.
10      MR. CULLEN:  Objection.  Foundation.  Form.
11  I don't think he said either.
12  A.  I didn't.
13      BY MR. HACKNEY:
14  Q.  Oh, okay.  Well, I thought for sure you had said one
15  of those two, but let me understand what you
16  anticipate -- this is subject to counsel's concern,
17  but I think there has been testimony about the casino
18  revenues as part of the collateral package.
19      As the banker who is leading the DIP,
20  what's your understanding of the role the casino
21  revenues will play in the collateral package offered
22  in connection with the DIP?
23  A.  They will be part of the collateral package.
24  Q.  So, they will be part, and when you say they, do you
25  mean a specific period of time of the casino revenues

1  or do you mean casino revenues projecting into the
2  future?
3  A.  It's commercially sensitive so I'm going to decline to
4  answer it.
5      MR. HACKNEY:  Okay.  I'll just reserve on
6  that.  I obviously don't think there's a bunch of
7  value we have going back and forth.  I understand your
8  position about this.  On some of the other ones, we
9  may come to those briefly and talk about it, but I get
10  the DIP one.
11      BY MR. HACKNEY:
12  Q.  You agree that the goal of the forbearance agreement
13  is to get the collateral agreement to terminate so
14  that the City can get access to the casino revenues,
15  correct?
16      MR. CULLEN:  Objection.  Foundation.  Form.
17  A.  That is one of the goals.
18      BY MR. HACKNEY:
19  Q.  That is one of the goals.  And isn't it true that your
20  current expectation is that you need the postpetition
21  financing, the DIP loan to close in order to be able
22  to exercise the option under the forbearance
23  agreement, correct?
24  A.  Correct.
25  Q.  And there was testimony on that today because you

1  don't have the money otherwise, right, Mr. Buckfire?
2  A.  That is part of the collateral package, yes.
3  Q.  I'm talking about the use of proceeds of the DIP just
4  so we're clear.  Part of the use of proceeds of the
5  DIP will be to exercise the option under the
6  forbearance agreement, correct?
7  A.  Correct.
8  Q.  You understand that you won't have unfettered access
9  to the casino revenues until you exercise the option
10  that leads to the termination of a Swap in the
11  collateral agreement, correct?
12  A.  Yes.
13  Q.  Isn't this a bit circular?
14  A.  Regrettably.
15  Q.  How did you factor that consideration into the
16  determination as to whether to engage in the
17  forbearance agreement?
18  A.  Well, this is why the Swap collateral agreement is
19  such a problem for the City.  Unless we can eliminate
20  the collateral and regain control over gaming revenues
21  without risk of loss because of defaults that would
22  trap it, we need to rationalize and clean this up in
23  order to put the City on a sound financial basis.
24  Q.  So, there are two parts -- there are -- there may be
25  many parts but two of the important parts of the

Page 145

1  forbearance agreement are getting the Swap
2  counterparties to waive their right to trap cash and
3  then taking out the Swap at a discounted value,
4  correct?
5  A.  Well, if we take out the Swap at a discounted value
6  and we pay off the Swap, then there is no need for the
7  collateral agreement.
8  Q.  That's true but that may be something that happens
9  down the road.  So, in the interim between then it's
10  the waiver of the cash trapping rights and the
11  discounted potential value of the termination,
12  correct?
13  A.  Which is a short-term agreement.  It only goes to next
14  June.  There are termination events along the way and
15  in any case as I am aware as a sophisticated layman,
16  there is risk under the bankruptcy code that the Swap
17  counterparties could avail themselves of relief under
18  the provisions for Swaps and irrespective of the
19  automatic state, still take the money.
20  Q.  Okay.  But they've waived those rights under the
21  forbearance agreement?
22  A.  So long as the forbearance agreement exists.
23  Q.  And they waive their rights under the collateral
24  agreement to trap crash, correct?
25  A.  For now.

Page 146

1  Q.  I'd like to ask you about the court's approval of the
2  forbearance agreement.  You've testified earlier that
3  if the court does not approve the forbearance
4  agreement, that will be of dire consequence to the
5  City of Detroit, correct?
6  A.  If it leads to the consequence that we do not have
7  access to gaming revenues, correct.
8  Q.  Okay.  Now, conversely you testified earlier that if
9  the court approves the forbearance agreement, I'll say
10  this to you, you can decide whether you agree, you
11  almost testified that that was synonymous with then
12  there being a closing under the option?
13  A.  One is a condition that allows for the other.
14  Q.  That's right.  So, you understand that the court
15  granting the assumption agreement does not mean that
16  the City will exercise the option, correct?
17  A.  You're assuming the Swap counterparties would allow us
18  to have one without the other.
19  Q.  No, I'm actually saying the granting of the assumption
20  motion in your view is absolutely a necessary
21  precondition to the City even being able to exercise
22  the option, correct?
23  A.  Yes.
24  Q.  It doesn't mean that it will if the court grants the
25  assumption motion, it just means that it potentially

Page 147

1  can?
2  A.  That's correct.
3  Q.  But do you also understand that if the court grants
4  the assumption motion and enters an order that's
5  significantly different from the one that's been
6  proposed, that the Swap counterparties have the
7  arguable right to terminate the forbearance period, do
8  you know that?
9  MR. CULLEN:  Objection.  Foundation.  Form.
10  A.  I don't know that.
11  BY MR. HACKNEY:
12  Q.  So, I'd like to ask you about the concept of what I
13  call a clean closing, okay, and a clean closing is one
14  where you engage in a transaction with someone and
15  both parties walk away from the transaction with an
16  expectation that neither of them will have liability
17  arising from the closing.  That's what I mean when I
18  say a clean closing.
19  Isn't it true that it's your understanding
20  that it is important to the Swap counterparties that
21  they get a clean closing with the City if the City
22  exercises its option?
23  A.  Yes.
24  Q.  And isn't it a fact that as large banks if there is
25  substantial risk that they will be sued by Syncora or

Page 148

1  the COPs holders or FGIC or others surrounding the
2  City's exercise of the optional termination payment,
3  they may not close?
4  A.  I don't know --
5  MR. CULLEN:  Objection.  Foundation.  Form.
6  Speculation.
7  A.  I don't know that.
8  BY MR. HACKNEY:
9  Q.  And I'm not asking -- I should have rephrased.  I'm
10  asking about your expectation of what they'll do if
11  there is substantial risk of litigation.
12  A.  I think they'll honor the terms of the agreement and
13  close.
14  Q.  Obviously as you sit here today I think you've had the
15  pleasure of being in court from time to time and
16  watching the festivities?
17  A.  I saw you last week.
18  Q.  Yes, that was an exciting time for me as I think
19  you've probably read in the newspapers.
20  Are you aware that -- I think it's safe to
21  say that you are aware now that there are parties like
22  Syncora and others that say that they will have claims
23  against the Swap counterparties because of the
24  forbearance agreement, isn't that true?
25  A.  I've heard you say that.

1 Q. Okay. If the court in granting its order about the
2 assumption agreement preserves those claims, do you
3 have a view as a banker as to whether the Swap
4 counterparties will close over those claims?
5    MR. CULLEN: Objection. Foundation. Form.
6 Asked and answered.
7 A. No.
8    BY MR. HACKNEY:
9 Q. You don't have a view?
10 A. No.
11 Q. Mr. Buckfire, you've been around a lot of deals,
12 right, nobody buys a lawsuit, right?
13    MR. CULLEN: Objection. Foundation.
14 A. I don't have a view on this one.
15    BY MR. HACKNEY:
16 Q. All right. Do you remember we talked about -- do you
17 remember that you talked about the concept that the
18 Swap counterparties could walk away from the Swaps if
19 interest rates ever look like they were going into
20 territory that was positive for the service
21 corporations?
22 A. Yes.
23 Q. And that was a right that you understood they had
24 received as part of the 2009 restructuring that led to
25 the collateral agreement, correct?

1 A. Yes.
2 Q. Do you understand that that's called an optional early
3 termination?
4 A. Yes.
5 Q. And you understand that under -- when they exercise an
6 optional early termination, the Swap counterparties
7 take nothing from the service corporations, correct?
8 A. That's correct.
9 Q. That's the point of the walkaway which is they get to
10 walk away but they don't get paid anything?
11 A. That's because the Swaps not in the money anymore.
12 Q. Well, even if it is or is it isn't, right?
13 A. Right.
14 Q. In fact today the Swaps are very much in the money,
15 correct?
16 A. Correct.
17 Q. And obviously the Swap counterparties have never
18 threatened to exercise an optional early termination,
19 correct?
20    MR. JURGENS: Objection to form.
21    MR. CULLEN: Objection to form.
22    BY MR. HACKNEY:
23 Q. To you?
24 A. No.
25 Q. That wouldn't make sense, would it?

1 A. Not as long as you're being paid on time.
2 Q. And also why would you terminate a Swap on an optional
3 early basis and be paid nothing when it is worth by
4 your testimony approximately three hundred million
5 dollars, correct?
6    MR. CULLEN: Objection. Foundation. Form.
7 A. It wouldn't be economically rational.
8    BY MR. HACKNEY:
9 Q. That would not be economically rational. And your
10 understanding under the forbearance agreement is
11 what's happening is that in exchange for all the
12 consideration, the Swap counterparties' termination
13 rights are being discounted to somewhere between 75
14 and 82 percent, correct?
15 A. Correct.
16 Q. We talked a lot about cash flow forecasts earlier.
17 The cash flow forecasts that are contained in the
18 proposal that you discussed with Mr. Summers, do you
19 remember those?
20 A. Yes, uh-huh.
21 Q. E & Y prepared those, correct?
22 A. Yes.
23 Q. And you have certainly reviewed them and familiarized
24 yourself with them, correct?
25 A. Yes.

1 Q. But you are not someone who can answer specific
2 questions about how they were created, correct?
3 A. No, that's correct.
4 Q. If I wanted to ask about any particular line item how
5 did they get this number, the person to ask that would
6 be Ernst & Young?
7 A. Correct.
8 Q. I'd like to go back and talk briefly about the art and
9 I don't want to talk about the art as part of the DIP
10 or anything like that or what you're going to do with
11 it.
12    I want to go back to June 4 and ask as of
13 June 4, had you made an assessment of the value of the
14 City's art collection?
15 A. No.
16 Q. Have you made even a rough approximation of its worth?
17 A. No.
18 Q. And why hadn't you done that?
19 A. We're not qualified to do so.
20 Q. Why hadn't you retained someone, gosh, back in
21 January, February that was qualified to do so to come
22 in and see whether these assets were valuable?
23 A. We identified early on as an issue. We got to it as
24 we could, but it was not a significant crisis for the
25 City because we were focused on cash and preserving

1  cash.
2  Q.  Well, sometimes art can be turned into cash I think,
3  isn't that right?
4  A.  Some people would think so.
5  Q.  In fact there are art sales of significant amount
6  every year in this country, isn't that right?
7  A.  So I'm told.
8  Q.  And you've read about them in the paper from time to
9  time when you read the Wall Street Journal, correct?
10  A.  Yes.
11  Q.  And this is art that the City owns, right?
12      MR. CULLEN: Objection.  Foundation.  Form.
13      BY MR. HACKNEY:
14  Q.  Correct?
15  A.  That's correct.
16  Q.  But you understood took no effort to see whether the
17  City could obtain cash out of assets that were hanging
18  in the Detroit Art Institute as a substitute for going
19  in and engaging in this negotiation with the Swap
20  counterparties, correct?
21  A.  Correct.
22  Q.  We talked earlier about creditor recoveries and I want
23  to make sure that I understood your testimony on that
24  point.
25      You understand that Mr. Orr made a proposal

1  to creditors that's called proposal for creditors back
2  in June of 2013, correct?
3  A.  Correct.
4  Q.  You helped him formulate that proposal, isn't that
5  right?
6  A.  Yes.
7  Q.  The proposal -- I'm going to summarize it but you
8  should feel free to correct me as somebody who knows
9  it better and can say it better than I, but basically
10  put the proposal suggests that unsecured creditors
11  will share in two billion dollars of bonds that are
12  issued by the City upon emergence, correct?
13  A.  Correct.
14  Q.  And the proposal assumes that the City will have
15  unfettered access to casino revenues because that's
16  what its projections show, correct?
17  A.  Yes.
18  Q.  So, even if the City has unfettered access to the
19  casino revenues, its current proposal is still that
20  the unsecured creditors will just share in this two
21  billion dollar pot, correct?
22  A.  That's correct.
23  Q.  So, is it fair to say that getting access to this
24  money will not by itself increase creditor recoveries?
25  A.  No, it's part of the base case plan that we presented

1  which is the base case recovery we presented on June
2  14th.
3  Q.  Right.  So, if the court grants the motion and you get
4  access to it, that will be consistent with the base
5  case which is consistent with the two billion dollar
6  offer, right?
7  A.  Correct.
8  Q.  So, it won't go up if the court grants you the access
9  that you're assuming you'll get?
10  A.  But it will go down if the court does not.
11  Q.  That's a different question.  I'll get to that in a
12  moment.
13      It  won't go up if the court grants the
14  motion, correct?
15  A.  Correct.
16  Q.  Your argument if I understood it was that the
17  casino revenues will be used to invest in the City,
18  correct?
19  A.  Revenues of the City are fungible.  All I'm saying if
20  you don't have access to those revenues, then you
21  don't have the billion dollar plus of revenues that
22  you thought you had which is supporting not only
23  current operations but the reinvestment plan.
24  Q.  And I will say that I had understood you earlier to
25  say if you didn't have access to casino revenues, that

1  City services would suffer?
2  A.  In the short-term, yes.
3  Q.  Yeah.  But it's fair to say that you're not proposing
4  to obtain the casino revenues, access to them and
5  throw them on to the pot of the two billion dollars
6  that's already being proposed to unsecured creditors,
7  correct?
8      MR. CULLEN: Objection.  Foundation.  Form.
9  If you can make any sense of that question, you can
10  answer it.
11  A.  I've already testified that the access to gaming
12  revenues is part of the plan which supports the two
13  billion dollar anticipated issuance of notes.
14      BY MR. HACKNEY:
15  Q.  And you mean that from a feasibility standpoint,
16  right?
17  A.  Yes.
18  Q.  You mean it will strengthen the City and that will
19  make the City more able to perform under the notes and
20  that will make the notes more valuable to the
21  creditors, right?
22  A.  That would be one result.
23  Q.  Let me ask you by how much will creditor recoveries go
24  down if the court declines to approve the forbearance
25  agreement?

1  A.   We haven't calculated that plan yet.  It would
2  certainly be a significant reduction and it would be
3  borne primarily by the unsecured creditors as a
4  group.
5  Q.   Prior to July 15th you had not attempted a detailed
6  calculation to understand the impact to unsecured
7  creditor recoveries if the casino revenues were not
8  unfreed, correct?
9  A.   That's correct.
10  Q.   So, you don't know whether it's pennies on the dollar
11  or dimes on the dollar, correct?
12  A.   We are already at dimes on the dollar in this --
13  There's only pennies left.
14  A.   We hope there's pennies left.
15  Q.   There was some -- there was a lot of questioning
16  about the financial forecasts, and I'm not going to
17  try and reinvent the wheel, but I would ask you to go
18  back to that Page 35 that you were discussing
19  earlier.
20  Do you remember, Mr. Buckfire, being asked
21  questions about this page?
22  A.   I do.
23  Q.   And I guess I want to be clear that -- I know we're
24  coming to the end of 2013, so, we'll move to this
25  other page in a second, but at least with respect to

1  2013 if you put legacy expenditures aside,
2  Ernst & Young forecast is of a substantial net
3  operating surplus in excess of four hundred million
4  dollars, correct?
5  A.   But how can you put legacy expenditures aside in 2013
6  because we were doing all this through the end of
7  June.
8  Q.   Fair enough.
9  A.   So, these are the numbers.
10  Q.   Well, these are -- 2013 includes probably a full year
11  projection, so --
12  A.   Fiscal year ends June 30th.
13  Q.   Oh, so, fiscal year 2013 ends on June?
14  A.   That's correct.
15  Q.   Let's go to 38 then.
16  A.   Okay.
17  Q.   Good correction there.  We'll see if it's a big
18  difference in 2014.  So, this is the next fiscal year,
19  right?
20  A.   Correct.
21  Q.   And this is again a financial forecast prepared by
22  Ernst & Young, correct?
23  A.   Yes.
24  Q.   Now, I understand your point about the fact that this
25  doesn't reflect the different initiatives that Mr. Orr

1  wants to implement, okay, so let me bracket that, I
2  heard you say that earlier, but if you hold those to
3  one side and if you also hold legacy expenditures to
4  one side, what the City's numbers reveals is that it
5  has a nearly four hundred million dollar net operating
6  surplus, correct?
7  A.   One could look at it that way.
8  Q.   And all of the cops and the fire department and the
9  ambulance drivers, their payroll, that's all included
10  in these numbers, correct?
11  MR. CULLEN:  Objection.  Foundation.  Form.
12  A.   Yes.
13  BY MR. HACKNEY:
14  Q.   And so are their health benefits, correct?
15  A.   Yes.
16  Q.   Okay.  So, if I understood it correctly, Mr. Orr wants
17  to do a billion and a quarter of reinvestment in the
18  City over the next ten years, correct?
19  A.   That's right.
20  Q.   And that's about 125 million a year, correct?
21  A.   That's correct.
22  Q.   And, so, even if we took the 397 down by his
23  initiatives by 125 million, you'd still have
24  approximately 272 million dollars left, correct, in
25  net operating surplus?

1  A.   Yes.
2  Q.   And that's even with him being able to do all the
3  wonderful things that he wants to do for the City,
4  right?
5  A.   That's correct.
6  Q.   So, we're now going to go to the area where I begin to
7  do complex math which means adding things twice in a
8  row where I often fall down.  But I said it was about
9  272 and the casino revenues are only about 170 in this
10  forecast, right?
11  A.   That's correct.
12  Q.   So, even if you didn't have those and even if Mr. Orr
13  did all his improvements, you'd still have a hundred
14  million dollar net operating surplus, correct?
15  A.   No, that's actually not the case, and this is not
16  meant to be the City's plan, it's not the City's plan.
17  If you are proposing a different plan where the City
18  plans to liquidates itself, then yes, I guess you
19  could look at it this way.
20  Q.   I'm just referring to the preliminary forecast that
21  you all put together in this proposal and gave to us.
22  A.   This is not the City's plan and it's not the City's
23  forecast.  This is an illustration of what happens if
24  you don't do anything.
25  Q.   And the key differences between this and what the

1 City's plan is are the investments that Mr. Orr wants
2 to make, right?
3 A. Right.
4 Q. And the cost reductions he wants to make, right?
5 A. And the increase in staffing levels across services to
6 provide higher level services to the City.
7 Q. But that's in the reinvestment, right?
8 A. No, it's actually hard to break out that way because a
9 lot of it is actually in the salaries line and the HR
10 lines.
11 So, you have to go back to the numbers and
12 ask me a lot of those questions.
13 Q. The proposed investments that he wants to make, that
14 he proposes to make that I'm so ruthlessly omitting,
15 they are in this document, right?
16 A. Not in this projection.
17 Q. They're not in this projection, but they are in this
18 proposal?
19 A. That's right.
20 Q. He laid them all out in gory detail?
21 A. Yes, he did.
22 Q. He also lays out a number of cost cutting initiatives,
23 isn't that correct?
24 A. Yes, he does.
25 Q. And one of his goals is also to make the City more

1 efficient, correct?
2 A. Yes.
3 Q. At the same time he also wants to make it operate
4 better, correct?
5 A. Correct.
6 Q. Those two things from a net operating standpoint work
7 in tension with one another, right?
8 A. They do over time, but you have to consider the
9 timetable and when these things are done.
10 Q. I want to ask you a question about state and federal
11 aid but I don't want to mix it up into the DIP which I
12 understand -- which I took to mean earlier was one of
13 the sensitivities there. I want to go back to June 4,
14 2011.
15 Prior to June 4, 2011 had you undertaken
16 any effort to evaluate whether there was either state
17 aid or federal aid that you could use in lieu of
18 having to negotiate this deal with the Swap
19 counterparties?
20 A. We are assuming there is no aid available to the City.
21 Q. You were assuming that there was none, but had you
22 undertaken an effort to determine whether there could
23 be some?
24 A. I've already testified that I'm not going to discuss
25 that.

1 Q. And why aren't you going to tell me about that?
2 A. It's commercially sensitive information.
3 Q. Why?
4 A. That's my answer.
5 Q. Well, I can understand why if you are seeking estate
6 guarantee of a DIP or other things today, I get that,
7 and I'm not going to ask you about that, but I am
8 going to say that I think I deserve an answer on what
9 happened prior to June 4 in terms of finding
10 alternative ways to address the City's liquidity
11 crisis because after all what's been presented to us
12 was if we didn't do this deal, the City would die, and
13 I do think we are entitled to ask well, what had you
14 tried to do with other actors, so, can we get over it
15 or --
16 MR. CULLEN: You could certainly ask if he
17 had received any assurance of the availability of any
18 other funding from any other source during that time
19 period.
20 MR. HACKNEY: Well, I do appreciate that
21 but I often tend to ask my own questions. Let me
22 try and ask it in a way that hopefully serves your
23 concerns.
24 BY MR. HACKNEY:
25 Q. And let me first ask you, Mr. Buckfire, had your firm,

1 you or your firm undertaken any analysis of this
2 question? You don't have to tell me what it was.
3 Let's go in stages.
4 Had you analyzed the problem?
5 A. Yes, we did.
6 Q. You had analyzed the problem. And is it your
7 testimony that divulging the results of that analysis
8 would be commercially sensitive?
9 A. Yes.
10 Q. Is part of the reason for that because of the way any
11 potential aid from the City or from the state or the
12 feds might interplay with the DIP process, is it the
13 way they knit up, is that the problem?
14 A. Yes.
15 Q. All right.
16 MR. HACKNEY: Let me suggest a short break.
17 I think that it may be time for me to pass the baton.
18 MR. CULLEN: Okay.
19 VIDEO TECHNICIAN: The time is 2:19 p.m.
20 This marks the end of tape number three. We are off
21 the record.
22 (Recess taken at 2:19 p.m.)
23 (Back on the record at 2:30 p.m.)
24 VIDEO TECHNICIAN: We are back on the
25 record at 2:30 p.m. This marks the beginning of tape

Page 165

1  number four.
2      **EXAMINATION**
3  **BY MS. DIBLASI:**
4  Q.  Good afternoon, Mr. Buckfire, my name is Kelly
5  DiBlasi. I'm an attorney at Weil, Gotshal & Manges.
6  We represent Financial Guaranty Insurance Company
7  which others have referred to and I will refer to as
8  FGIC or FGIC.
9      I'm going to ask you a few questions about
10  some of the topics that have been addressed today. I
11  will do my best not to repeat any questions.
12      I would ask that you assume that the ground
13  rules that Mr. Hackney and Mr. Summers previously
14  discussed with you still apply in terms of if you
15  don't understand a question that I've asked, ask me to
16  repeat it, etcetera.
17  A.  Thank you.
18  Q.  Is it your understanding that the Series 2006-B COPs
19  were issued with a floating interest rate?
20  A.  Yes.
21  Q.  And is it your understanding that the Swap contracts
22  were entered into to hedge against the interest rate
23  risk associated with the Series 2006-B COPs?
24  A.  Yes.
25  Q.  And the Swap contracts accomplish this hedge by

Page 166

1  effectively limiting the City's payment obligations
2  under the service contracts with respect to the Series
3  2006-B COPs to the fixed rate that's set forth in the
4  Swap contracts, is that correct?
5  A.  Correct, which was amended in 2009.
6  Q.  What was amended?
7  A.  The original fixed rate was lower in 2006 and it was
8  increased slightly in 2009 as part of the amendment.
9  Q.  The Swap contracts were amended in 2009 --
10  A.  The rate, the rate was.
11  Q.  The rate on the Series 2006-B --
12  A.  That's my understanding.
13  Q.  Okay. And with the amendment in 2009 the Swap
14  contracts still remained in place, correct?
15  A.  That's my understanding.
16  Q.  And those Swap contracts are still in place today and,
17  therefore, still hedging the interest rate risk today?
18      MR. CULLEN: Objection. Foundation. Form.
19  A.  Except as modified by the 2009 amendment.
20      BY MS. DIBLASI:
21  Q.  So, do you agree that from the perspective of the City
22  with the Swap contracts in place it's as if the
23  Series 2006-B COPs have a fixed interest rate?
24  A.  Yes.
25  Q.  Have you heard of structures like this being referred

Page 167

1  to as a synthetic fixed rate of interest?
2  A.  Yes.
3  Q.  Is it fair to say that from the perspective of the
4  City, the issuance of the 2006-B COPs and the
5  execution of the Swap contracts were part of an
6  integrated transaction?
7      MR. CULLEN: Objection. Asks for a legal
8  conclusion.
9  A.  No.
10      BY MS. DIBLASI:
11  Q.  Were they executed at the same time?
12  A.  I don't know.
13  Q.  Why was the transaction structured with a Series
14  2006-B COPs having a floating interest rate hedged by
15  the Swap contracts as opposed to merely issuing the
16  2006-B COPs with a fixed rate?
17      MR. CULLEN: Objection. Foundation. Form.
18  A.  I don't know.
19      BY MS. DIBLASI:
20  Q.  Do you know who designed this structure?
21  A.  No.
22  Q.  Is there any benefit to the City from having this
23  structure with the 2006-B COPs having a floating rate
24  hedged by the Swap contracts as opposed to merely
25  issuing those COPs with a traditional fixed rate?

Page 168

1      MR. CULLEN: Objection. Foundation. Form.
2  A.  All their debt is now fixed. I mean they are not
3  taking any interest rate risk as a result of the Swap
4  that was put on top of the floating rate COPs. That
5  is the benefit to the City.
6      BY MS. DIBLASI:
7  Q.  The benefit to the City from the structure is that
8  it's a comparable interest rate risk exposure for the
9  City?
10  A.  They have eliminated the floating rate exposure and
11  now they have a fixed rate on this debt similar to the
12  rate exposure they have on the 2005 COPs which are
13  fixed rate. So, it's all fixed now.
14  Q.  So, why not just issue it with fixed to begin with?
15      MR. CULLEN: Objection. Foundation. Form.
16  A.  I don't know why they did it this way.
17      BY MS. DIBLASI:
18  Q.  Would the City have had to pay higher interest rates
19  if the COPs were all issued with fixed rates?
20      MR. CULLEN: Objection. Foundation. Form.
21  A.  It was 2006. I don't know.
22      BY MS. DIBLASI:
23  Q.  Would the City have agreed to restructure where the
24  2006-B COPs were issued with a floating rate of
25  interest without having an interest rate hedge in

1  place?
2  **MR. CULLEN:** Objection. Foundation. Form.
3  **A.** I don't know.
4  **BY MS. DIBLASI:**
5  Q. You stated previously that the City benefits from
6  having the hedge that's created by the Swap contracts
7  in place.
8  Do you have a view as to whether FGIC and
9  Syncora who insured the Series 2006-B COPs also
10  benefit from this hedge?
11  **MR. CULLEN:** Objection. Foundation and
12  form.
13  **A.** Well, the Swap was -- in general interest rate Swaps
14  **are done for the benefit of the borrower to eliminate**
15  **exposure to higher interest rates. That's the benefit**
16  **of a Swap contract.**
17  **BY MS. DIBLASI:**
18  Q. Are you aware of the fact that FGIC and Syncora
19  insured the Series 2006-B COPs?
20  **A.** Yes.
21  Q. As insurers of those certificates, is there any
22  benefit to the payment obligations of the City with
23  respect to those certificates being hedged by the Swap
24  contracts?
25  **MR. CULLEN:** Objection. Foundation. Form.

1  **A.** Well, if there is, there is only the indirect benefit
2  **that if you believe there was a risk at the time you**
3  **are entering into a Swap that floating rates might go**
4  **to 20 percent and that might bankrupt the City and,**
5  **therefore, could not pay the underlying debt, I**
6  **suppose it's a benefit.**
7  **BY MS. DIBLASI:**
8  Q. And are you aware of the fact that FGIC also insured
9  certain obligations to the Swap counterparties under
10  the Swap contracts?
11  **A.** Yes.
12  Q. Are you aware of the fact that when FGIC issued the
13  policies in 2006 insuring the Swap contracts, it did
14  not charge any additional premium for those policies?
15  **A.** I'm not aware of that.
16  **MS. DIBLASI:** I'd like to have this marked
17  as Exhibit 5, please.
18  **MARKED FOR IDENTIFICATION:**
19  DEPOSITION EXHIBIT 5
20  2:37 p.m.
21  **BY MS. DIBLASI:**
22  Q. So, the document that was just marked as Deposition
23  Exhibit 5 is entitled presentation to FGIC, City of
24  Detroit dated April 26th, 2005.
25  Mr. Buckfire, have you ever seen this

1  document before?
2  **A.** No.
3  Q. Does it appear to you that this presentation was
4  prepared or given by the City?
5  **MR. CULLEN:** Objection. Foundation. Form.
6  **A.** That's what it says.
7  **BY MS. DIBLASI:**
8  Q. So, prior to today did you have any awareness of the
9  existence of this document?
10  **A.** No.
11  Q. Just going to shift gears and have one final question
12  for you, Mr. Buckfire. You testified previously that
13  Miller Buckfire distributed a request for proposal to
14  parties who may be interested in providing the City
15  with DIP financing, correct?
16  **A.** Yes.
17  Q. Is the City of Detroit in possession of a copy of that
18  request for proposal?
19  **A.** Yes.
20  **MS. DIBLASI:** I have nothing further.
21  (Discussion off the record at
22  2:39 p.m.)
23  (Back on the record at 2:39 p.m.)
24  **EXAMINATION**
25  **BY MS. ENGLISH:**

1  Q. Hi. I'm Caroline English. We met earlier. I'm from
2  Arent Fox. I represent Ambac.
3  I am going to ask you some questions based
4  on testimony you've already given, nothing new really,
5  I just want to back up and clarify a few things and
6  ask a couple of follow-ups. So, I apologize if it
7  seems like I'm bouncing around. I'm just going
8  through my notes of what you said earlier today.
9  Okay?
10  **A.** Thank you.
11  Q. I want to start by asking you whether you discussed
12  any legal arguments that the City might have had
13  against the Swap counterparties with Mr. Orr?
14  **MR. CULLEN:** That's a yes or no question.
15  **A.** Would you remind repeating it?
16  **BY MS. ENGLISH:**
17  Q. Did you discuss any legal arguments that the City
18  might have had against the Swap counterparties with
19  Mr. Orr?
20  **A.** No.
21  Q. Did you discuss any legal arguments the City might
22  have had against the Swap counterparties with anyone
23  from Jones Day?
24  **A.** Yes.
25  Q. Who would those conversations have been with?

1 A. Corinne Ball, B A L L, Joel Telpner, T E L P N E R,
2  Benjamin Rosenblum.
3 Q. Anyone else?
4 A. Not that I can recall.
5 Q. When would those discussions have taken place?
6 A. Probably beginning in May.
7 Q. May of 2013?
8 A. Correct.
9 Q. And Mr. Orr was not involved in those conversations?
10 A. Not to my knowledge. These are conversations I had.
11 Q. Was anyone else involved in those conversations other
12  than you and the attorneys from Jones Day?
13 A. Some of my colleagues from Miller Buckfire from time
14  to time but primarily it was myself.
15 Q. Other than Miller Buckfire representatives and Jones
16  Day representatives, was there anyone else on those
17  conversations?
18 A. No.
19 Q. Were they phone calls?
20 A. Meetings and phone calls.
21 Q. Meetings and phone calls?  In-person meetings?
22 A. Yes.
23 Q. About how many meetings and phone calls were there?
24 A. With Jones Day?
25 Q. Uh-huh.

1   MR. CULLEN: Or about this subject matter?
2   BY MS. ENGLISH:
3 Q. Yes, about legal arguments that the City could assert
4  against the Swap counterparties.
5 A. We had many conversations about this topic among
6  others.  I couldn't tell you with specificity which
7  ones we did on which call.
8 Q. Well, right now I'm just asking how many conversations
9  do you think you had?
10 A. Many.
11 Q. Many?  More than a dozen?
12 A. No.
13 Q. More than a half a dozen?
14 A. Somewhere around there.
15 Q. Somewhere around a half a dozen.  And were they all in
16  May of 2013?
17 A. As I recollect, yes.
18 Q. As you began negotiating with the Swap counterparties
19  starting in, say -- starting with the June 4th
20  meeting, did you continue to have conversations with
21  Jones Day about legal arguments that the City could
22  raise?
23 A. No.
24 Q. You want to give a minute here for your counsel maybe
25  to object, maybe not, what legal arguments did you

1 discuss that the City might be able to raise against
2  the Swap counterparties?
3   MR. CULLEN: I'm going to object and direct
4  him not to answer.
5 A. I wouldn't have answered anyway, but thank you.
6   MR. CULLEN: Quite all right.
7 BY MS. ENGLISH:
8 Q. Do you like that I gave you the warning --
9 A. It was very polite.
10 Q. Here it comes, right?
11 A. Big flag, now --
12   MR. CULLEN: It's after lunch, anything
13  could happen.
14   MS. ENGLISH: Can I get you some to go in
15  that coffee?
16   BY MS. ENGLISH:
17 Q. All right.  May I assume that any questions I ask you
18  about what legal arguments or issues you might have
19  discussed that the City would have had to assert
20  against the Swap counterparties, conversations you
21  would have had with Jones Day people your counsel is
22  going to object and instruct you not to answer?
23   MR. CULLEN: You can assume that.
24   BY MS. ENGLISH:
25 Q. Slightly different question.  Did you have any

1 discussions with Mr. Orr regarding the probability of
2  success on legal arguments the City could raise
3  against the Swap counterparties?
4 A. Yes.
5 Q. When did those discussions take place?
6 A. During May.
7 Q. Can you tell me about those discussions with Mr. Orr?
8   MR. CULLEN: Direct him not to answer.
9   BY MS. ENGLISH:
10 Q. Okay.  Did you -- how many discussions would you have
11  had about the probability of success on the City's
12  legal arguments?
13 A. A few.
14 Q. A few?  Are we talking now less than a half a dozen?
15 A. A few.
16 Q. A few.  Were they all in May 2013 or did they continue
17  beyond that?
18 A. It's possible they continued in June but I don't
19  recall.
20 Q. Did you have any discussions with Jones Day about the
21  probability of success of the City's legal arguments?
22   MR. CULLEN: Subject but --
23 A. Yes.
24   BY MS. ENGLISH:
25 Q. When did those discussions take place?

1 A. May.

2 Q. How many of those discussions were there?

3 A. Call it half a dozen.

4 Q. Half a dozen.

5 MS. ENGLISH: And if I ask him to tell me

6 about those conversations, will you direct him not to

7 answer?

8 MR. CULLEN: I will indeed.

9 BY MS. ENGLISH:

10 Q. Did you discuss with anyone else the probability of

11 success that the City might have had on legal

12 arguments against the Swap counterparties?

13 A. No.

14 Q. Were there any written documents or memos that

15 evaluated the City's legal arguments against the Swap

16 counterparties?

17 MR. CULLEN: That he saw.

18 BY MS. ENGLISH:

19 Q. Yes, that you saw.

20 A. No.

21 Q. Are you aware of any written analyses that were done

22 about the legal arguments the City might assert?

23 A. No.

24 Q. Going into the June 4th -- starting on June 4th the

25 negotiations with the Swap counterparties, did you

1 assume that the Swap counterparties' liens were valid?

2 MR. CULLEN: Objection. Foundation. Form.

3 BY MS. ENGLISH:

4 Q. I'm sorry, your answer?

5 A. Can you repeat the question?

6 Q. Going into the start of the negotiations with the Swap

7 counterparties on June 4th, did you assume that the

8 Swap counterparties' liens were valid?

9 A. I did.

10 Q. Earlier in your testimony you indicated that you had

11 reviewed all possible alternatives to doing a deal

12 with the Swap counterparties, and you gave two

13 examples, one was a novation and one was getting

14 another Swap counterparty involved with no collateral.

15 Do I have that right?

16 A. No, a novation would be another Swap party coming in

17 to assume the position of the Swap party here and if

18 one could do that and get them to do it without

19 collateral, then that would be a benefit.

20 Q. Okay.

21 A. That would have to mean unsecured credit. However,

22 the last refinancings the City did were on a secured

23 basis as is public record and the City's ability to

24 access unsecured credit of any kind is effectively

25 zero and it was zero then as well.

1 So, even though we considered it, we

2 realized it was impractical.

3 Q. Okay. So, this novation and sort of redoing this Swap

4 contract with no collateral was an option you looked

5 at but was not feasible, is that correct?

6 A. That was our judgment, it was not feasible.

7 Q. All right. Now, you said you had reviewed all

8 possible alternatives. Is that the only alternative

9 you looked at or were there others?

10 A. Well, there were other theoretical alternatives but

11 none of them were practical.

12 Q. Can you tell me what the other alternatives were that

13 you considered?

14 A. Well, we considered finding another lender to fund the

15 termination of the Swaps. This is back in May when we

16 knew the financial condition of the City was dire. We

17 did not think we could attract a lender to come in to

18 take out the Swap termination payment at a hundred

19 cents or even at a discount under the tight time frame

20 that we had to work with nor did we think we could do

21 that at a rate of interest that could ever be

22 acceptable to the City.

23 Q. Let me stop you right there and ask did you try?

24 A. No.

25 Q. Were there any other alternatives that you considered

1 other than we've got now the novation idea and finding

2 another lender to fund the termination of the Swaps.

3 A. Those are the two principal alternatives.

4 Q. Principal alternatives. Were there other not

5 principal alternatives but still alternatives?

6 A. We reviewed the noncore assets of the City to

7 determine whether there was any source of ready cash

8 that we could access to use to fund the termination

9 payment. We considered alternate source of funding,

10 for example, state and federal aid as I already

11 testified I'm not going to address. We considered

12 everything.

13 Q. Prior to June 4th, did you submit a request to the

14 state for aid on behalf of the City?

15 A. I'm not going to answer that question.

16 Q. You will not answer even whether the City made a

17 request for state aid prior to June 4th?

18 A. It's commercially sensitive information. I

19 respectfully cannot answer that question.

20 Q. Was there a request for state aid that was rejected

21 prior to June 4th?

22 A. I'm not going to answer that question.

23 Q. On what basis won't you answer whether there was one

24 that was rejected?

25 A. Commercially sensitive information.

1  Q.  How is it commercially sensitive?  If there was a
2  state aid request that was rejected, how is that
3  sensitive now?
4  A.  You're asking me to speculate.
5  Q.  I'm asking me why you're not answering.
6  A.  It's commercially sensitive information.
7  Q.  Tell me why it's commercially sensitive in your view.
8  A.  It would have an impact on our ability to prosecute a
9  successful DIP financing process for the City at this
10  point.
11  Q.  It would jeopardize your DIP financing if the public
12  knew that a state aid request had been rejected prior
13  to June 4th?
14  A.  You're saying that.  I didn't say that.
15  Q.  I'm trying to understand why you won't give us the
16  information.
17  A.  It's commercially sensitive.
18  Q.  How is it commercially sensitive?
19     MR. CULLEN:  Asked and answered.
20  A.  I'm not going to answer it.
21     BY MS. ENGLISH:
22  Q.  Just for kicks let's do the same line of questioning
23  for federal aid, okay?  Was there a request made by
24  the City for federal aid prior to June 4th?
25  A.  I decline to answer that question.

1  Q.  On what grounds do you decline to answer?
2  A.  It's commercially sensitive information.
3  Q.  And why do you feel it's commercially sensitive?
4  A.  Because it would have an impact on our DIP financing
5  process.
6  Q.  Was there a request for federal aid that was rejected
7  prior to June 4th?
8  A.  I decline to answer that question.
9  Q.  And do you decline on the exact same grounds you've
10  just given me?
11  A.  Yes.
12  Q.  Earlier in your testimony, and I think this was by
13  Mr. Summers, he asked you a question did you
14  articulate to the Swap counterparties why the liens
15  may or may not have been valid, and your answer that I
16  wrote down was not directly, no.
17     Was this articulated to the Swap
18  counterparties indirectly to your knowledge?
19  A.  That was a complicated question.  Do you mind
20  repeating it?
21  Q.  Sure, sure.  As I understand your earlier testimony,
22  you said that you did not directly articulate to the
23  Swap counterparties a belief that their liens were or
24  were not valid.  Was that issue indirectly
25  communicated?

1  A.  Well, it was and what I said to the Swap
2  counterparties was in the concert of getting them to
3  the table to negotiate a discount, I told them on June
4  4th that the City would vigorously contest every
5  aspect of these transactions if they dared to
6  terminate our ability to gain access to the gaming
7  revenues, and I said even though I'm not a lawyer if I
8  were them, I would be worried about that, that's what
9  I meant by indirect.
10  Q.  What was their response to that?
11  A.  They told me they were very comfortable with their
12  lien and collateral position that I could not bring
13  this up again.
14  Q.  And did you ever bring it up again?
15  A.  Every time I talked to them.
16  Q.  And was their response the same every time you brought
17  it up?
18  A.  Yes, but then we were in the context of trying to
19  construct a compromise, that's where this went, but
20  they recognized that the City would vigorously defend
21  itself if they did not compromise with us.  On that
22  basis --
23  Q.  I didn't mean to interrupt you.  Are you finished?
24  A.  I'm done.
25  Q.  Did you have any substantive conversations with the

1  Swap counterparties about whether or not their liens
2  were valid other than, you know, we threaten to
3  litigate, we threaten to defend, did you actually get
4  into a discussion about the validity of their liens
5  with them?
6  A.  No, I had no other cards to play so I just kept
7  reminding them we would be aggressive.
8  Q.  Okay.  You've talked about the importance of having --
9  getting the wager and tax revenues unencumbered was a
10  motivation for doing this deal, correct?
11  A.  Correct.
12  Q.  What other unencumbered revenue streams or assets does
13  the City have?
14  A.  Well, we have income tax revenues, we have property
15  tax revenues.  I'm speaking now in the Chapter 9
16  context.  The state revenues are pledged to three
17  series of bonds that were issued historically by the
18  City.  So, there really is no other source of revenue
19  that's available to the City that could be pledged or
20  used aside from these.
21     There are, of course, a list of noncore
22  assets we identified on June 14th that we are
23  evaluating for potential value but we have reached no
24  conclusion yet as to how much is available there.
25  Q.  I just want to make sure.  You were talking about

1  state shared revenues are pledged, right, did I get
2  that correct?
3  A.  They are securing three different series of bonds that
4  have a pledge of those revenues and that's already
5  been used.
6  Q.  So, the remaining unencumbered City assets or revenues
7  are the noncore assets that were listed?
8  A.  Right.
9  Q.  Income tax and property tax?
10  A.  Correct.
11  Q.  Is that all?
12  A.  Well, the gaming revenues if we can eliminate the
13  collateral agreement.
14  Q.  Is there any reason that the noncore assets, income
15  tax or property tax could not be pledged as collateral
16  to secure DIP financing?
17  A.  They could be.
18  Q.  You testified earlier that if the forbearance
19  agreement was not approved, it would have dire
20  consequences for the City, is that correct?
21  A.  Yes.
22  Q.  Does the City have a backup plan if the forbearance
23  agreement is not approved?
24  A.  Well, we're developing one now.  We are proceeding on
25  the assumption the court will grant relief on this

1  transaction and let us proceed with it and if they
2  tell us they won't, we'll have a backup plan.
3  Q.  What is the backup plan you're currently considering?
4  A.  It's being developed right now.  It would be not the
5  plan currently proposed.
6  Q.  Are you refusing to answer my question?
7  A.  No, it's being developed.  I mean I don't want to give
8  you the answer piecemeal because it's not a simple
9  answer.  We don't have the cash resources we believe
10  we need to rehabilitate the City and we will have to
11  evaluate which elements of the reinvestment plan we'll
12  have to cancel or defer, we'll have to re-evaluate
13  whether the City can continue its current  level of
14  service as inadequate as it is or have further cuts.
15      It requires a complete rethink of the
16  City's call it operating plan for the next few years.
17  Q.  Is it correct then that the City's backup plan if the
18  forbearance agreement doesn't go through is basically
19  to cut either the re -- cut all or a portion of the
20  reinvestment program or to cut essential services?
21  A.  Well, that's the worst case scenario.  Are there
22  intermediate positions, of course.
23  Q.  What are those?
24  A.  Well, I would hope that we could renegotiate with the
25  Swap counterparties to continue having access to the

1  net share of the gaming revenues not being used to
2  fund the Swap, that would be useful.
3      I would hope that we could find some other
4  way of permanently resolving the collateral agreement
5  to free up gaming revenues for use as part of the plan
6  of adjustment, but you asked me what our contingency
7  plan is and our contingency plan does not assume
8  anything except we have no agreement with anybody and
9  we therefore have to plan for the worst case.
10  Q.  You said one possible option here would be to go back
11  to the Swap counterparties if the forbearance
12  agreement was not approved, go back to the Swap
13  counterparties and try to renegotiate something with
14  them, right?
15  A.  Correct.
16  Q.  May I assume then that the Swap counterparties have
17  not told the City it's this deal or nothing, we won't
18  talk to you further if you don't get this?
19      MR. CULLEN: Objection.  Foundation and
20  form but you can address the question.
21  A.  We have an agreement with the Swap counterparties
22  pending approval by the court.  That's our current
23  agreement with the Swap counterparties.
24      BY MS. ENGLISH:
25  Q.  Small point of clarification.  In the morning I wrote

1  down that you said you didn't think there was a June
2  11th meeting, you thought you just signed or agreed --
3  got the final deal on the economic terms and then in
4  the afternoon with Mr. Hackney you said you thought
5  there might have been a two-hour meeting on June 11th.
6      I just wanted to ask,  see if you can rack
7  your brain a little bit and be sure whether there was
8  or was not a meeting on June 11th.
9  A.  I believe there was a meeting on the 11th but it was a
10  short meeting.  It was not a long meeting.
11  Q.  Do you think it was a two-hour meeting?
12  A.  Two hours is fairly short.
13  Q.  Well, some people maybe, maybe not.  You said you
14  considered all possibilities for a deal with the Swap
15  counterparties, is that correct?
16  A.  We did.
17  Q.  Were there any other deal structures with the Swap
18  counterparties that you considered other than the one
19  we've got before us in the forbearance agreement?
20  A.  None that would meet all of our requirements, no.
21  Q.  What were the other deal structures that were
22  considered?
23  A.  Well, they didn't meet our requirements so, therefore,
24  we didn't propose them.  They weren't optimal for the
25  City.

1 Q. So, this is the only real -- in your view and in the
2 City's view, this is the only realistic deal structure
3 there could be with the Swap counterparties?
4 A. If you are solving for the three objectives that the
5 City had, this is the only transaction that achieves
6 all three objectives. If you want to eliminate
7 objectives, you could have a different deal structure.
8 That is not what our mission was.
9 MS. ENGLISH: That's all I have. Thanks
10 very much.
11 MS. FORDE: Hello, Mr. Buckfire. My name
12 is Bianca Forde.
13 THE WITNESS: You're not wired up yet.
14 Now you've got to say it all again.
15 MS. FORDE: Good afternoon. My name is
16 Bianca Forde. I represent Assured Guaranty Municipal
17 Corporation. I'm an attorney at Winston & Strawn.
18 I just have a few questions for you today
19 mostly pertaining to the forbearance agreement and
20 your understanding of the termination provisions.
21 EXAMINATION
22 BY MS. FORDE:
23 Q. So, sitting here today do you have an understanding of
24 what would cause the forbearance period to end under
25 the forbearance agreement?

1 A. Well, I have to go back and read it. I didn't pay
2 that much attention to it because I didn't draft it
3 but it would terminate obviously by June 30 or June 15
4 of 2014 if we hadn't otherwise executed our option,
5 that's one. And if you want to go to Page 4 of
6 Section 1.3 all of the forbearance period termination
7 events are listed.
8 Q. Right. Do you have an understanding of the different
9 impact on the City's rights depending on how the
10 agreement is terminated?
11 A. Not specifically, no.
12 Q. Okay. You testified earlier you don't view the
13 agreement as being a release of claims by the City, is
14 that right?
15 MR. CULLEN: Objection. Foundation. Form.
16 BY MS. FORDE:
17 Q. Okay. Do you understand that under certain
18 circumstances the agreement prohibits the City from
19 taking action that's inconsistent with the position of
20 the counterparties in litigation, for instance?
21 A. That's my understanding.
22 Q. Do you also agree that the agreement requires the City
23 to file a motion to have the agreement assumed by the
24 court in bankruptcy?
25 A. Yes.

1 Q. Do you see a relationship between a release of claims
2 in certain instances and those provisions?
3 MR. CULLEN: Objection. Foundation. Form.
4 A. I'm not sure I can answer that question.
5 BY MS. FORDE:
6 Q. Okay. Would you agree that an agreement to release
7 claims would be a downside to the forbearance
8 agreement in relation to the City?
9 A. No, it's part of the overall transaction. The City is
10 getting very real benefits from this transaction and
11 it's making certain concessions that were value to the
12 other side.
13 Q. Sitting here today do you see there are people who
14 have arguments as to whether or not the liens in the
15 forbearance agreement are valid, is that right?
16 A. I've heard people say that.
17 Q. Okay. Would you agree that if those arguments are
18 valid and they are not made by the City, that
19 forfeiting those claims would be a down side under the
20 agreement whether or not there are up sides to the
21 agreement?
22 MR. CULLEN: Objection. Foundation and
23 form. If you can address the question.
24 A. The City is getting the benefits it bargained for as
25 part of this agreement. I think that's the way you

1 have to look at it.
2 BY MS. FORDE:
3 Q. You mentioned earlier that forfeiting any access to
4 revenues, casino revenues under any agreement would be
5 an unacceptable risk?
6 A. Correct.
7 Q. Is there any parallel between forfeiting an argument
8 that the liens are invalid?
9 A. Well, forfeiting an argument is not a life-threatening
10 event for the City. Forfeiting cash is.
11 Q. How are they not the same thing?
12 A. As long as we have cash we're not dead. If we
13 forfeit an argument, we're still alive.
14 Q. Are you aware that under the scheduling order the
15 City's plan of Chapter 9 plan is to be filed by March
16 1st, 2014?
17 A. Yes.
18 Q. Under this forbearance agreement do you understand
19 that the City can't take a position in that plan
20 that's inconsistent with that of the counterparties?
21 MR. CULLEN: Objection. Foundation. Form.
22 A. I'm not generally aware of that, no.
23 BY MS. FORDE:
24 Q. If that were the case, would that be a downside to the
25 forbearance agreement?

Page 193

1  MR. CULLEN: Do you have something to point
2  the witness at, Counsel?
3  BY MS. FORDE:
4 Q.  Sure, if you could turn to Exhibit 2, the forbearance
5  agreement.
6 A.  Okay.  What section, Counselor?
7 Q.  If you turn to Page 14, we can talk about the exercise
8  period ending.
9 A.  Uh-huh.
10 Q.  What in your understanding is the impact of not having
11  submitted a payment under this agreement by March
12  14th, 2014?
13 A.  We have the benefit of this agreement through June
14  15th, 2014.
15 Q.  What is your understanding of this provision, the
16  definition exercise period end date?
17  MR. CULLEN: I think I'm going to object.
18  It's a little hard to read him a defined term that
19  probably appears in a number of different places and
20  say what is his understanding of where else -- where
21  else it appears as a part of an active sentence.
22  I don't mean to restrict your latitude to
23  examine, Counsel, but it's a definition, it doesn't
24  have a verb attached to it yet.
25  BY MS. FORDE:

Page 194

1 Q.  What's your -- what is the basis for your
2  understanding that you have the benefit of the
3  agreement until June 2014?
4 A.  Well, let's go back to Section 1.3.  -- wrong section
5  to myself.
6 Q.  Are you by any chance looking for 1.3A on Page 4?
7 A.  Oh, thank you.
8 Q.  So, I'm going to direct your attention now to Section
9  1.4A on Page 6 which applies if there's a termination
10  event under 1.3A amongst other provisions, is that
11  right?
12 A.  Yes.
13 Q.  And if you go to the end of that section, the very
14  last sentence, and I'll just read it --
15  MR. CULLEN: Is the last sentence the same
16  as the first sentence?
17  MS. FORDE: No, it's not.
18  BY MS. FORDE:
19 Q.  But if we start at the bottom of Page 6 at the end of
20  this paragraph says giving effect to Section 2 of this
21  agreement.
22  What is your understanding of that phrase,
23  giving effect to Section 2?
24  MR. CULLEN: I think you are asking a lay
25  witness to construe a legal document leading him back

Page 195

1  and forth through a number of sections.  I don't know
2  whether he feels -- if he has an existing
3  understanding --
4  MS. FORDE: Well, that's not really a
5  legal question.  The question is what does giving
6  effect to Section 2 mean.
7  MR. CULLEN: Well, that is a legal question
8  actually --
9  MS. FORDE: I'm not asking for the effect
10  of Section 2, I'm just asking for a meaning of the
11  phrase.
12  MR. CULLEN: You can ask him for his
13  understanding if he has one.  You can't --
14  MS. FORDE: Which is what I said and he
15  hasn't answered it yet, so, I'm just going to ask him
16  if he has an understanding of it.
17  MR. CULLEN: Fine.
18 A.  I don't have an understanding.
19  BY MS. FORDE:
20 Q.  Okay.  I'm going to see if I can go through this and
21  make it a little clear.  So my understanding of
22  Section 2 is that if it applies there are certain
23  restrictions on the City's ability to take positions
24  inconsistent with that of the counterparties, and I'm
25  going to tell you why I think that.  If you look at

Page 196

1  Section 2.1A, it basically says the City and the
2  service corporations cannot commence litigation,
3  assert any defense in litigation or essentially take
4  any action that sets aside, avoids, rejects, modifies
5  or otherwise renders invalid the forbearance
6  agreement.
7  Would you agree that if Section 2 is valid
8  and is given effect as per 1.3, then this restricts
9  the City's rights with respect to litigation and
10  taking positions inconsistent with the counterparties?
11  MR. CULLEN: Objection. Foundation. Form.
12  You may ask if you have any understanding -- answer if
13  you have any understanding.
14 A.  I don't.
15  BY MS. FORDE:
16 Q.  Okay.  If you look at 1.4B at the very end of the
17  sentence without giving effect to Section 2, would you
18  agree with me then that that simply just means that
19  Section 2 does not apply, Section 2 would not be valid
20  if the agreement was terminated under Section 1.4B?
21  MR. CULLEN: Objection.  Asking for a legal
22  conclusion.
23 A.  I don't have that understanding.
24  BY MS. FORDE:
25 Q.  Okay.

Page 197

1    **MR. CULLEN:** Just would note for the record
2  that I do think that A and B are each one horrendous
3  sentence.
4    **MS. FORDE:** I'd agree.
5    **THE WITNESS:** Who drafted this, I'd like to
6  know.
7    **MR. HACKNEY:** So stipulated.
8    **THE WITNESS:** They must have studied German
9  in a prior life.
10   **BY MS. FORDE:**
11 Q.  If the City cannot challenge or take a position
12 inconsistent with the counterparties under this
13 agreement, and you say this agreement applies until
14 June 2014, we can say that for purposes of my question
15 --
16 **A.  We did want a longer period of time and I encourage**
17 **you to speak with Cadwalader to get it from their**
18 **clients on our behalf.**
19 Q.  Okay,  but if the agreement is in effect we'll say at
20 least until that point and the City's Chapter 9 plan
21 is due March 2014, correct?
22 **A.  Uh-huh.**
23 Q.  Then under this agreement the City cannot take a
24 position inconsistent with the counterparties in their
25 Chapter 9 plan, is that right?

Page 198

1    **MR. CULLEN:** Objection.  Foundation.  Form.
2    **BY MS. FORDE:**
3  Q.  Do you understand the question?
4    **MR. CULLEN:** Is the question with respect
5  to the subject matter of this agreement?
6    **MS. FORDE:** Yes.
7    **MR. CULLEN:** Okay.  That's a little bit
8  different.
9  **A.  Well, we have until March 15th to retire the Swaps**
10 **pursuant to this option.**
11   **BY MS. FORDE:**
12 Q.  You have until March 15th to retire --
13 **A.  Eighty-two is the price.**
14 Q.  That's right.  So, if we get to March 15th and the
15 Swaps have not been retired, what percentage is owed
16 under this agreement to the Swap?
17 **A.  One hundred percent.**
18 Q.  And that number I think we talked about a little
19 earlier is that number, the hundred percent that would
20 be owed, do you have a dollar figure?
21 **A.  Today, what's today, the 29th of August, it's**
22 **somewhere between 275 and 300 million dollars would be**
23 **the termination value today.**
24 Q.  So, if the City can't challenge any -- take any
25 position that's inconsistent with the counterparties,

Page 199

1  the City is then left with an obligation to pay --
2  **A.  Only if they exercise their remedies and present us**
3  **with an event of default and assert a termination**
4  **payment.  But this agreement is clear that if it**
5  **expires, everybody goes back to their original**
6  **positions.**
7  Q.  That's right.  And --
8  **A.  You want to take a minute?**
9  Q.  Yeah.  Can I just have a couple minutes?
10   **MR. CULLEN:** Sure.  Off the record.
11   **VIDEO TECHNICIAN:** The time is 3:13 p.m.
12 We are off the record.
13   (Discussion held off the record at
14   3:13 p.m.)
15   (Back on the record at 3:15 p.m.)
16   **VIDEO TECHNICIAN:** Back on the record at
17   3:15 p.m.
18   **BY MS. FORDE:**
19 Q.  Mr. Buckfire, you just mentioned that if the agreement
20 terminates under certain circumstances, that the
21 parties go back to their original positions, is that
22 right?
23 **A.  That's my understanding.**
24 Q.  Okay.  Now, if you turn with me -- I'm going to try to
25 be as simplistic as possible, but it's a complicated

Page 200

1  agreement.  To Page 6 at Section 1.4 again.  And it
2  lists a series of provision under which if the
3  forbearance period comes to an end under those
4  provisions, the parties are restored to their original
5  position and in one section the parties are restored
6  to their original position giving effect to Section 2
7  and in another situation the parties are restored
8  without giving effect to Section 2.
9    Can we agree on that?
10 **A.  That's what it says.**
11 Q.  Okay.  Now, when Section 2 is in effect -- scratch
12 that.
13   You mentioned earlier it would be
14 irrational economically for the Swaps to walk away
15 from this agreement prior to June.
16 **A.  No, I didn't say that.  I said that prior to the**
17 **Chapter 9 filing in answer to the question why they**
18 **did not pursue their termination rights, recognizing**
19 **the City could not pay the termination payment that**
20 **allowing the City to continue to pay them their**
21 **quarterly payments when due was a rational decision**
22 **for them, they were not harmed by not pursuing their**
23 **rights economically.  That's what I said.**
24 Q.  If the City -- if the parties are restored to their
25 original position and Section 2 is given effect and

1 the City is precluded from taking any position
2 inconsistent with the Swap counterparties and this
3 applies from March 1st, 2014 when the Chapter 9
4 plan is filed --
5 A. Yes.
6 Q. Is there going to be another time where the City can
7 challenge the liens as invalid once the Chapter 9 plan
8 is filed?
9 MR. CULLEN: I object to the form of the
10 question but you can answer if you can --
11 BY MS. FORDE:
12 Q. Do you see that this agreement forfeits the City's
13 right to challenge any liens after the Chapter 9 plan
14 is filed?
15 A. I don't see that.
16 Q. Can you tell me why you don't see it that way?
17 A. Well, I didn't write this agreement.
18 Q. Is it your understanding that after March 1st the City
19 has another opportunity to challenge anything related
20 to this agreement?
21 A. It's not my understanding.
22 Q. Okay.
23 A. I don't know.
24 Q. Okay. Do you recognize there's a possibility then
25 that the City could be stuck with paying a very large

1 figure after the Chapter 9 plan and have no ability to
2 challenge it if -- at some certain stage regardless of
3 the validity of those liens?
4 A. That's a possibility.
5 Q. Okay.
6 MS. FORDE: Thank you. No further
7 questions.
8 MS. GREEN: Good afternoon, my name is
9 Jennifer Green. I just have a few questions.
10 THE WITNESS: May I ask who you represent,
11 Counsel?
12 MS. GREEN: Police and Fire Retirement
13 System and the General Retirement System.
14 THE WITNESS: And you are with what law
15 firm?
16 MS. GREEN: Clark Hill.
17 EXAMINATION
18 BY MS. GREEN:
19 Q. I had a hard time hearing down there. I may have
20 written this down wrong. I thought I heard you say
21 that you had received a letter from or the City had
22 received a letter from the Michigan Gaming Control
23 Board saying that it was okay to pledge the casino
24 funds.
25 A. Well, if you look at the original collateral

1 agreement, I believe it was dated June 18th of 2009,
2 there is attached as an exhibit to that a letter from
3 the Michigan Gaming Control Board saying that they
4 were okay with the arrangements embodied in the
5 collateral agreement.
6 Q. Do you know the date of the letter?
7 A. I believe it was the same date as the agreement.
8 Q. My next question I believe someone may have alluded to
9 but I don't know that we got that far. You said that
10 you assumed that the liens were valid in your
11 negotiations, correct?
12 A. Yes.
13 Q. Did you also understand that the lien arose solely
14 from the collateral agreement itself?
15 A. That's my understanding.
16 Q. Okay. And as far as the lien -- look at my last page
17 of notes here -- did you discuss with anyone whether
18 pledging the casino revenue was permissible under the
19 Michigan Gaming Act or was the letter the only thing
20 that was relied upon?
21 MR. CULLEN: Objection to the extent that
22 it calls for privileged conversations, where we have
23 directed no inquiry between himself and Jones Day.
24 MS. GREEN: And that is my question so is
25 he not going to answer that?

1 MR. CULLEN: If he can find in his memory a
2 nonprivileged conversation that affects --
3 THE WITNESS: With Jones Day, impossible.
4 MR. CULLEN: Not with Jones Day but with
5 somebody else, a nonprivileged conversation, you can
6 answer with respect to that.
7 BY MS. GREEN:
8 Q. Do you have a nonprivileged conversation that you can
9 recall regarding whether or not you discussed with
10 anyone whether pledging the casino revenue was
11 permissible under the Michigan Gaming Act?
12 A. No.
13 MS. GREEN: Thanks. That's my only
14 question. Thank you.
15 MS. NEWBURY: Good afternoon, Mr. Buckfire.
16 My name is Karen Newbury. I'm with Schiff Hardin, and
17 I represent DepfaBank as agent for DFS WertManagement.
18 THE WITNESS: Can you say that really fast
19 twice?
20 MS. NEWBURY: I said it really fast once.
21 So, that will be enough.
22 THE WITNESS: Thank you.
23 EXAMINATION
24 BY MS. NEWBURY:
25 Q. You've testified earlier today that you were the

1 individual largely responsible for the negotiation of
2 the business terms of the forbearance agreement,
3 correct?
4 A. Yes.
5 Q. So, you are familiar with and perhaps even designed
6 the optional termination provisions?
7 A. Yes.
8 Q. So, if I ask you to explain to me the way that the
9 termination amount will be calculated with all the
10 accompanying definitions such as optional termination
11 notice on Page 11 of the agreement, then mid-market
12 amount and optional termination amount on Page 14, you
13 could walk me through this in plain English without
14 any trouble, right?
15 A. That's a bold statement. I'll do my best.
16 Q. Would you please try?
17 A. Okay. Well, the calculation of the termination amount
18 is not an easy quantitative exercise because pursuant
19 to the underlying agreement which is not in front of
20 me today so I can't refer you to it, you're supposed
21 to go and seek bids in the market from dealers to find
22 out what the value of the Swap is, and then you figure
23 out from that what the termination amount is.
24      So, it's not a simple calculation that you
25 can just do mathematically on Bloomberg. You could

1 get to a pretty good answer because everyone looks at
2 the same LIBOR curves but it is a matter of market
3 checking.
4 Q. So, it's your understanding that the optional
5 termination amount is to be determined on the optional
6 termination date which is the date that the City gives
7 notice, is that correct?
8 A. That's my understanding.
9      MS. NEWBURY: Thank you, that's all.
10      (Discussion held off the record at
11      3:24 p.m.)
12      (Back on the record at 3:24 p.m.)
13      MR. HACKNEY: I think we are done.
14      VIDEO TECHNICIAN: This concludes today's
15 deposition. The time is 3:24 p.m. We are off the
16 record.
17      (The deposition was concluded at 3:24 p.m.
18      Signature of the witness was not requested by
19      counsel for the respective parties hereto.)
20
21
22
23
24
25

1           CERTIFICATE OF NOTARY
2 STATE OF MICHIGAN )
3                  ) SS
4 COUNTY OF WAYNE )
5
6           I, NORA MORRISSY, certify that this
7      deposition was taken before me on the date
8      hereinbefore set forth; that the foregoing questions
9      and answers were recorded by me stenographically and
10     reduced to computer transcription; that this is a
11     true, full and correct transcript of my stenographic
12     notes so taken; and that I am not related to, nor of
13     counsel to, either party nor interested in the event
14     of this cause.
15
16
17
18
19
20
21
22           NORA MORRISSY, CSR-2642
23           Notary Public,
24           Wayne, County, Michigan.
25 My Commission expires: 9-13-13