# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-----------------------------------------------------x
                                                     :
In re                                                : Chapter 9
                                                     :
CITY OF DETROIT, MICHIGAN,                            : Case No. 13-53846
                                                     :
                    Debtor.                           : Hon. Steven W. Rhodes
                                                     :
                                                     :
-----------------------------------------------------x
```

## OMNIBUS REPLY OF THE CITY OF DETROIT TO OBJECTIONS TO THE MOTION FOR ASSUMPTION AND APPROVAL OF THE FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT

# TABLE OF CONTENTS

**Page**

I.   PRELIMINARY STATEMENT ....................................................................1

II.  THE COURT HAS JURISDICTION AND AUTHORITY TO
     DETERMINE THE ASSUMPTION AND APPROVAL OF THE
     FORBEARANCE AGREEMENT ................................................................5

III. THE CITY HAS SATISFIED THE REQUIREMENTS OF SECTION
     365 OF THE BANKRUPTCY CODE ........................................................8

     A.   THE FORBEARANCE AGREEMENT IS A VALID
          CONTRACT CAPABLE OF ASSUMPTION UNDER
          SECTION 365 OF THE BANKRUPTCY CODE.............................9

          1.   The Forbearance Agreement is Not an "Amendment" and
               Does Not Require Insurer Consent ..........................................10

          2.   The Forbearance Agreement is Supported by Valid
               Consideration ..........................................................................13

     B.   THE FORBEARANCE AGREEMENT IS AN EXECUTORY
          CONTRACT ...................................................................................19

     C.   THE FORBEARANCE AGREEMENT IS BEING ASSUMED
          *CUM ONERE* AND NO DEFAULTS EXIST THEREUNDER.......20

     D.   THE CITY'S ASSUMPTION OF THE AGREEMENT IS A
          VALID EXERCISE OF ITS BUSINESS JUDGMENT....................23

IV.  THE CITY HAS SATISFIED THE REQUIREMENTS OF
     BANKRUPTCY RULE 9019...................................................................29

     A.   PROBABILITY OF SUCCESS IN LITIGATION...........................31

     B.   MATTERS OF COLLECTION......................................................36

     C.   COMPLEXITY, EXPENSE, DELAY AND
          INCONVENIENCE .......................................................................37

     D.   INTEREST OF CREDITORS.........................................................38

V.   OTHER ARGUMENTS ................................................................................42

     A.   THE FORBEARANCE AGREEMENT DOES NOT HARM
          THE SWAP INSURERS, IT HELPS THEM. ...................................42

     B.   APPROVAL OF THE FORBEARANCE AGREEMENT AT
          THIS JUNCTURE IS APPROPRIATE ............................................45

     C.   INFORMATIONAL OBJECTIONS ................................................46

     D.   RESERVATIONS OF RIGHTS – PLAN PROCESS ......................46

     E.   RIGHTS OF INSURERS AND COPS HOLDERS AGAINST
          SWAP COUNTERPARTIES...........................................................48

VI.  RESERVATION OF RIGHTS ....................................................................48

VII. CONCLUSION..........................................................................................49

# TABLE OF AUTHORITIES

**Page**

CASES

In re AbitibiBowater Inc.,
  418 B.R. 815 (Bankr. D. Del. 2009) ...........................................................22, 23

Ames v. Rabin,
  No. 10-02595, 2011 WL 1630139 (N.D. Ohio Apr. 29, 2011) .........................45

In re AmFin Fin. Corp.,
  No.09-21323, 2012 WL 893263 (Bankr. N.D. Ohio Mar. 14, 2012)...................7

Arciniaga v. Gen. Motors Corp.,
  460 F.3d 231 (2d Cir. 2006) ..............................................................................21

Ass'n of Retired Employees of the City of Stockton v. City of Stockton, Ca.
  (In re City of Stockton, Cal.), 486 B.R. 194 (Bankr. E.D. Cal. 2013) ..............47

In re Bard,
  49 Fed. Appx. 528 (6th Cir. 2002)................................................................30, 36

Beal Sav. Bank v. Sommer,
  8 N.Y.3d 318 (2007) ..........................................................................................11

Brown v. Brown,
  No. 12-110-Art, 2013 WL 2338233 (E.D. Ky. May 28, 2013)............................6

Byrd v. Gardinier, Inc. (In re Gardinier, Inc.),
  831 F.2d 974 (11th Cir. 1987) ...........................................................................22

In re Carbon Beach Partners, LLC,
  No. 09-24657, 2012 WL 3262837 (Bankr. C.D. Cal. Aug. 9, 2012) .................44

In re Charter Commc'ns,
  419 B.R. 221 (Bankr. S.D.N.Y. 2009)........................................................... 25-26

In re City of Detroit, Mich.,
  498 B.R. 776 (Bankr. E.D. Mich. 2013)..............................................................8

Cory v. Leasure,
    491 B.R. 476 (W.D. Ky. 2013) ...........................................................................44

In re Dewey & LeBoeuf LLP,
    478 B.R. 627 (Bankr. S.D.N.Y. 2012) ..............................................................25

In re Drexel Burnham Lambert Grp., Inc.,
    134 B.R. 499 (Bankr. S.D.N.Y. 1991) ..............................................................36

In re Enron Corp.,
    No. 01 B 16034, 2005 WL 3874285 (Bankr. S.D.N.Y. Oct. 5, 2005) ..............40

In re Enron Corp.,
    323 B.R. 857 (Bankr. S.D.N.Y. 2005) ..............................................................32

In re Fodale,
    10-69502, 2013 WL 663729 (Bankr. E.D. Mich. Feb. 21, 2013) ....................36

In re Greektown Holdings, LLC,
    728 F.3d 567 (6th Cir. 2013) .............................................................................30

In re Hechinger Inv. Co. of Delaware,
    274 B.R. 71 (D. Del. 2002) ................................................................................32

In re III Enters., Inc. V,
    163 B.R. 453 (Bankr. E.D. Pa. 1994) ..................................................................9

In re Innkeepers USA Trust,
    442 B.R. 227 (Bankr. S.D.N.Y. 2010) ........................................................24, 25

Matter of Interco Inc.,
    135 B.R. 634 (Bankr. E.D. Mo. 1992) .................................................................9

In re ISE Corp.,
    No. 10-14198, 2012 WL 1377085 (Bankr. S.D. Cal. Apr. 13, 2012) .................7

In re Jolly,
    574 F.2d 349 (6th Cir. 1978) .............................................................................20

In re Lakewood Eng'g & Mfg. Co., Inc.,
    459 B.R. 306 (Bankr. N.D. Ill. 2011) ..................................................................7

NYI-4559795v3

In re Lancelot Investors Fund, L.P.,
  467 B.R. 643 (Bankr. N.D. Ill. 2012) ....................................................33

In re Lazy Days' RV Ctr. Inc.,
  724 F.3d 418 (3rd Cir. 2013) ...................................................................6

In re MQVP, Inc.,
  477 Fed. Appx. 310 (6th Cir. 2012)...................................................30, 35

In re New Century TRS Holdings, Inc.,
  13-2220, 2013 WL 5944049, *2 (3d Cir. Nov. 7, 2013) .........................7

In re Nicole Energy Servs., Inc.,
  385 B.R. 201 (Bankr. S.D. Ohio 2008) .................................................37

NLRB v. Bildisco & Bildisco,
  465 U.S. 513 (1984)..........................................................................20, 24

In re Plitt Amusement Co. of Washington, Inc.,
  233 B.R. 837 (Bankr. C.D. Cal. 1999) ..................................................22

Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v.
  Anderson,
  390 U.S. 414 (1968)................................................................................36

Pueblo Chem., Inc. v. III Enters. Inc. V,
  169 B.R. 551 (E.D. Pa. 1994) ..................................................................9

In re Residential Capital, LLC,
  12-12020, 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013)...........25

In re RNI Wind Down Corp.,
  348 B.R. 286 (Bankr. D. Del. 2006) ........................................................6

In re Scott T. Walton,
  104 B.R. 861 (Bankr. S.D. Ohio 1988) ...................................................6

Stern v. Marshall,
  131 S. Ct. 2594 (2011)....................................................................5, 6, 7

In re Velo Holdings Inc.,
  475 B.R. 367 (Bankr. S.D.N.Y. 2012).....................................................6

-v-

<u>In re W.F. Martin Co.</u>,
    66 B.R. 409 (Bankr. E.D. Tenn. 1986) ................................................................9

<u>Whyte v. Barclays Bank PLC</u>,
    494 B.R. 196 (S.D.N.Y. 2013) ...........................................................................32

## STATUTES

11 U.S.C. § 101(31) ..................................................................................................26

11 U.S.C. § 362(b)(17) .............................................................................................28

11 U.S.C. § 362(o) ....................................................................................................28

11 U.S.C. § 365 ...................................................................................................passim

11 U.S.C. § 365(a) ..............................................................................................1, 23

11 U.S.C. § 365(b) ....................................................................................................20

11 U.S.C. § 546 .........................................................................................................32

11 U.S.C. § 552 .........................................................................................................34

11 U.S.C. § 560 .........................................................................................................28

11 U.S.C. § 902(2)(b)................................................................................................35

11 U.S.C. § 922(d) ....................................................................................................28

11 U.S.C. § 928 .........................................................................................................34

11 U.S.C. § 1125(g) ..................................................................................................25

28 U.S.C. § 157(b) ......................................................................................................5

28 U.S.C. § 157(b)(2).................................................................................................6

28 U.S.C. § 157(b)(2)(A)...........................................................................................7

28 U.S.C. § 157(b)(2)(B)...........................................................................................7

28 U.S.C. § 157(b)(2)(O)...........................................................................................7

28 U.S.C. § 157(o) ...................................................................................6

28 U.S.C. § 1334 ......................................................................................5

**RULES**

Fed. R. Bankr. P. 9019 .....................................................................passim

**OTHER AUTHORITIES**

Countryman, Executory Contracts in Bankruptcy: Part I,
   57 Minn.L.Rev. 439 (1973) .........................................................19, 20

Home Rule Charter § 1-102 ....................................................................32

Detroit City Code, § 18-16-4(k)..............................................................33

Detroit City Code, § 18-14-3 ..................................................................35

Mich. Comp. Laws Ann. § 117.1 et seq. .................................................32

Mich. Comp. Laws Ann. § 141.2101 et seq. ...........................................31

Mich. Comp. Laws Ann. § 432.212..........................................................35

NYI-4559795v3

The City of Detroit (the "City" or the "Debtor") respectfully submits this consolidated reply to the objections (each, an "Objection") to the Motion of Debtor for Entry of an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant Rule 9019, and (III) Granting Related Relief (the "Motion").[1]

## I.    PRELIMINARY STATEMENT

1.    There are several factual predicates for the Motion:

(a)  Defaults exist under the swap documents.  This gives the Swap Counterparties the right to demand a large termination fee from the Service Corporations—currently estimated to be approximately $270 million—whenever they wish.

(b)   The City does not have the financial ability to pay its obligations related to the termination fee and the Swap Counterparties have the right to trap the City's crucial Casino Revenues until they have collected their money.   These Casino Revenues are about $170 million annually, comprising about 15% of the City's total annual revenues.  If the Swap Counterparties stand on their rights, the Casino Revenues could be trapped indefinitely due to the application of the

---

[1]    Capitalized terms not otherwise defined herein have the meanings given to them in the Motion.

Bankruptcy Code safe harbors. And, once trapped, the Casino Revenues could not be used as security for post-petition financing or for reinvestment in the City.

(c) The swaps no longer hedge anything. As part of the 2009 restructuring of the swaps, the Swap Counterparties—with the express written consent of the swap insurers, Syncora and FGIC—were given the unilateral right to terminate the swaps whenever they wished and without cost. Thus, whenever interest rate increase or other factors reduce the economic benefits of the swaps to the Swap Counterparties, they can simply walk away. They will certainly do so before the swaps will ever operate as any sort of hedge for the City, the Service Corporations or the swap insurers.

(d) The Forbearance Agreement, if approved, would allow the City to buy out its obligations related to the termination of the swaps with the Service Corporations at a discount of 18-25%,[2] eliminate the Swap Counterparties' security interest in the Casino Revenues, assist the City in obtaining post-petition financing, and allow the City to move forward. The alternative is almost certainly loss of access to the Casino Revenues and protracted litigation with the Swap Counterparties with an uncertain outcome.

---

[2]  The Forbearance Agreement provides for a discount between 18-25% depending upon timing. The City has requested that the Swap Counterparties agree to amend the Forbearance Agreement to afford the City the full 25% discount.

(e)  The required payments under the swaps are excessive and completely out of line with current economic conditions.  The Forbearance Agreement also is cash-flow positive for the City.  In the foreseeable future, the difference between the City's payments to service its obligations in connection with the swaps and the City's likely costs of financing the buy-out of its obligations upon termination under the Forbearance Agreement is expected to represent a substantial savings.

2.      To obtain access to the Casino Revenues on a temporary and permanent basis, and to further ameliorate the City's cash flow needs, the City compromised its litigation claims and entered into the July 15, 2013 Forbearance and Optional Termination Agreement (the "Forbearance Agreement") with certain Swap Counterparties.  The compromise allows the City access to its pledged cash and removes the Swap Counterparties as antagonists who otherwise would have (a) demanded a termination fee equal to hundreds of millions of dollars, (b) asserted a contractual entitlement as secured creditors to seek to freeze the Casino Revenues and (c) argued that such entitlement was not stayed due the application of the Bankruptcy Code safe harbors.  In exchange, the Swap Counterparties are receiving continued payment of the swap obligations and certain covenants that, among other things, prohibit the City from challenging the validity of the swaps or

the pledge of the Casino Revenues. The Motion represents the City's request for approval of this important compromise.

3. In response to the City's entry into, and request for approval of, the Forbearance Agreement, the City has received fourteen objections or reservations of rights with respect to the Motion.[3] These oppositions come in three flavors: (1) assertions by creditors and insurance companies that the Forbearance Agreement is a "bad deal" for the City and that the Swap Counterparties are receiving treatment that is too rich, (2) assertions that the entry into the Forbearance Agreement interferes with the contractual rights of the swap insurers—Syncora Guarantee Inc. and FGIC, and (3) reservations of rights and other objections filed by COPs holders or their representatives.

4. The City has complete responses to each of these Objections as set forth herein and in the Motion. But the City's most basic response is this—it must have certain access to the Casino Revenues in the short-term and in the long-term if it is to move forward with its restructuring. Also, if the City succeeds, as it believes it will, in borrowing sufficient funds to take advantage of the discount price, it can substantially improve its cash flows. The Forbearance Agreement accomplishes this by (a) obtaining agreement from the Swap Counterparties that

---

[3] The Official Committee of Retirees supports the Motion and has withdrawn its Objection to the Motion. [ECF Docs. 1869, 1871].

they will not seek to terminate the swap transactions and that they will assist the City in accessing its cash, and (b) providing an option to the City to unwind the swap transactions at a discount between 18-25%. Upon exercise of this unwind, the Casino Revenues—one of the City's largest and, perhaps, most stable revenue streams—will become unencumbered and free to use for reinvestment in the City or other purposes.

5.    For the reasons set forth in the Motion and herein, the City respectfully requests that the Court authorize the assumption of the Forbearance Agreement as a valid exercise of the City's business judgment and also approve it as a compromise that is fair, equitable and in the City's best interests.

## II.    THE COURT HAS JURISDICTION AND AUTHORITY TO DETERMINE THE ASSUMPTION AND APPROVAL OF THE FORBEARANCE AGREEMENT

6.    The Court has the ability to hear and determine the Motion consistent with 28 U.S.C. § 157(b) and <u>Stern v. Marshall</u>, 131 S. Ct. 2594 (2011). A bankruptcy judge may "hear and determine" all cases under the Bankruptcy Code and all core proceedings arising under the Bankruptcy Code, or arising in a case under the Bankruptcy Code.   <u>See</u> 28 U.S.C. § 157(b) and 1334.   Both a motion to assume an executory contract under section 365 of the Bankruptcy Code and a motion for approval of a compromise pursuant to Bankruptcy Rule 9019 are "core" proceedings and, thus, may be determined by this Court.  <u>See</u> 28 U.S.C.

§ 157(b)(2) and (o); <u>see</u>, <u>e.g.</u>, <u>In re Velo Holdings Inc.</u>, 475 B.R. 367, 387 (Bankr. S.D.N.Y. 2012) ("[D]etermining whether a contract may be assumed or rejected, . . . is likewise a determination within the 'core' jurisdiction of the bankruptcy court."); <u>In re Scott T. Walton</u>, 104 B.R. 861, 864 (Bankr. S.D. Ohio 1988) ("The trustee's original Motions concerning the assumption of these land contracts . . . are clearly an example of the core proceeding"); <u>Brown v. Brown</u>, No. 12-110-Art, 2013 WL 2338233, at *4 n.5 (E.D. Ky. May 28, 2013) ("[T]he Bankruptcy Court's approval of the Settlement was a core bankruptcy proceeding. And there is no constitutional problem with bankruptcy courts entering final judgment in core proceedings."); <u>In re RNI Wind Down Corp.</u>, 348 B.R. 286, 292, 294 (Bankr. D. Del. 2006) (determining, as part of a settlement approval, that objector was ***not*** a necessary party to amend the agreement and that consideration of the Rule 9019 motion was a "core" proceeding), <u>aff'd</u>, 359 Fed.Appx. 352 (3d Cir. 2009).

7.      Further, this Court's ability to adjudicate such matters is consistent with the Supreme Court's "narrow" decision in <u>Stern v. Marshall</u> and Article III of the United States Constitution.   Since <u>Stern</u>, courts have uniformly reaffirmed the Bankruptcy Court's ability to enter final orders with respect to the assumption of contracts.  <u>See</u>, <u>e.g.</u>, <u>In re Lazy Days' RV Ctr. Inc.</u>, 724 F.3d 418, 423 (3d Cir. 2013) (analysis of section 365 "was based on a federal bankruptcy law provision with no common law analogue, so the <u>Stern</u> line of cases is plainly

inapposite."); <u>In re Lakewood Eng'g & Mfg. Co., Inc.</u>, 459 B.R. 306, 312 (Bankr. N.D. Ill. 2011) (holding Bankruptcy Court had ability to enter final judgment under <u>Stern</u> on issues, including state law issues, arising from rejection under section 365 of the Bankruptcy Code), <u>aff'd</u>, 686 F.3d 372 (7th Cir. 2012).

8.        Similarly, courts have uniformly held that the Bankruptcy Court has the ability to approve settlements pursuant to Bankruptcy Rule 9019.  <u>See</u>, <u>e.g.</u>, <u>In re New Century TRS Holdings, Inc</u>, 13-2220, 2013 WL 5944049, at *2 (3d Cir. Nov. 7, 2013) (holding a 9019 settlement and "resolution of any disputes over the settlement," including state law claims, were "core" and could be constitutionally determined by a Bankruptcy Court under <u>Stern</u>);  <u>In re ISE Corp.</u>, No. 10-14198, 2012 WL 1377085, at *4 (Bankr. S.D. Cal. Apr. 13, 2012) (holding the Court had "constitutional authority to enter findings of fact and conclusions of law in this motion for settlement brought pursuant to Fed. R. Bankr. P. 9019" based upon <u>Stern v. Marshall</u>); <u>In re AmFin Fin. Corp.</u>, No.09-21323, 2012 WL 893263, at *1 (Bankr. N.D. Ohio Mar. 14, 2012) (approving compromise pursuant to Rule 9019 and noting that "[t]his is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B), and (O), and it is within the court's constitutional authority as analyzed by the United States Supreme Court in <u>Stern v. Marshall</u>, 131 S.Ct. 2594 (2011).").

9.        This Court has previously observed on two occasions in this case that it may, under <u>Stern</u> and applicable Sixth Circuit precedent, decide "any

and all of the legal arguments that the parties present concerning an issue that is otherwise properly before it."   [See Opinion Regarding Eligibility, ECF Doc. 1945, at p.42]; see also In re City of Detroit, Mich., 498 B.R. 776, 783 (Bankr. E.D. Mich. 2013).   The Motion, which seeks relief pursuant to section 365 of the Bankruptcy Code and Bankruptcy Rule 9019, is properly before this Court.   To resolve the Motion, this Court may therefore consider all of the legal arguments presented by the Objectors, whether arising under state law or otherwise.

10.   With the exception of one Objection, which fails to cite a single supporting case or offer anything more than two conclusory paragraphs, [see ECF Doc. 366, at ¶¶ 46, 69], no objector has questioned this Court's ability to finally determine these matters.

## III.   THE CITY HAS SATISFIED THE REQUIREMENTS OF SECTION 365 OF THE BANKRUPTCY CODE

11.   The City has satisfied the requirements of assumption pursuant to section 365 of the Bankruptcy Code.   In order to be assumed pursuant to section 365 of the Bankruptcy Code, the Forbearance Agreement must be a valid, executory contract.   The City must assume this contract with all of its accompanying benefits and burdens, i.e., "*cum onere*", and the contract must either not be in default or the City must cure or provide adequate assurances that it will promptly cure any defaults.   In addition, the City's assumption of the Forbearance

-8-

Agreement must constitute a valid exercise of its "business judgment." Each of these requirements is easily satisfied here.

**A. THE FORBEARANCE AGREEMENT IS A VALID CONTRACT CAPABLE OF ASSUMPTION UNDER SECTION 365 OF THE BANKRUPTCY CODE**

12. Syncora asserts—and the City agrees—that in order to assume an agreement pursuant to section 365 of the Bankruptcy Code, the Court must first determine that a valid contract exists. See, e.g., In re III Enters., Inc. V, 163 B.R. 453, 459 (Bankr. E.D. Pa. 1994) ("The issue of the existence and enforceability of the underlying contract are threshold issues the resolution of which is absolutely essential to the adjudication of the Motion"), aff'd sub nom., Pueblo Chem., Inc. v. III Enters. Inc. V, 169 B.R. 551 (E.D. Pa. 1994) (cited by Syncora in ECF Doc. 366, at ¶ 126]);[4] In re W.F. Martin Co., 66 B.R. 409, 413 (Bankr. E.D. Tenn. 1986) (debtor cannot assume invalid contract); see also Matter of Interco Inc., 135 B.R. 634, 635 (Bankr. E.D. Mo. 1992) ("For Section 365 to apply, the contract must be in existence.").

---

[4] Orion Pictures does not bar examination by a Bankruptcy Court of whether or not a contract is valid and, therefore, assumable for purposes of section 365 of the Bankruptcy Court. In re III Enters., 163 B.R. at 459. Unlike the situation in Orion where the issue could be deferred, a determination of whether or not a contract exists and therefore is capable of assumption *has* to be determined at the time of the assumption. Id.

NYI-4559795v3

13.     The parties disagree, however, over whether this requirement is satisfied here.  Specifically, Syncora asserts that the Forbearance Agreement is invalid for two reasons:

- First, Syncora asserts that it and FGIC have a right to consent to any amendment of the Collateral Agreement and other documents, and that the City's failure to obtain their consent renders the Forbearance Agreement invalid; and

- Second, Syncora asserts that the Forbearance Agreement is invalid for lack of consideration because the Swap Counterparties have no right to confer to the City the consideration contemplated by the Forbearance Agreement (i.e., the unwind of the swap and the access to the Casino Revenues).

[See ECF Doc. 366, at ¶¶126-134.]   The City agrees for the present purposes that, to the extent insurer consent was required to enter into the Forbearance Agreement or that the Forbearance Agreement lacks consideration, the contract would be incapable of assumption pursuant to section 365 of the Bankruptcy Code.   But this is not the case.

## 1.     The Forbearance Agreement is Not an "Amendment" and Does Not Require Insurer Consent

14.     The insurers do not have a right to consent to the Forbearance Agreement because, most fundamentally, the Forbearance Agreement is not an "amendment" of anything, let alone the Collateral Agreement.  Under New York law, which is applicable here, forbearance and amendment are distinct concepts. Indeed, New York's highest court has made clear the distinction between

"forbearance" on the one hand and "amendment, modification or waiver" on the other, rejecting a lender's argument that its rights had been "constructively waived" without its consent when a majority of the lenders entered into a settlement that required forbearance with respect to contractual remedies. See Beal Sav. Bank v. Sommer, 8 N.Y.3d 318, 330 (2007). The court explained that even if the settlement had a "similar effect," the lenders' forbearance was not an "amendment, modification or waiver" of the contract. Id.

15. Similarly, the Bankruptcy Court for the Southern District of New York determined that an administrative agent under a post-petition lending facility could enter into an agreement to forbear from exercising remedies even after the maturity date of the DIP loan without unanimous lender consent. In that case, certain non-consenting lenders argued that a forbearance after maturity effectively constituted an amendment of the maturity date of the loan, which required unanimous lender consent under the documents. Applying Beal, the Court rejected the argument, pointing out that forbearance was not the same as an amendment, even if that forbearance had a "similar effect." See In re Delphi Corp., No. 05-44481, slip op. at 155 (Bankr. S.D.N.Y. Dec. 1, 2008) (following Beal).

16. Moreover, it is beyond argument that, under the plain terms of the documents, forbearing from exercising rights or remedies is different than

amending a contract or waiving rights thereunder.   Section 14.7 of the Collateral Agreement, for example, expressly provides that "[n]o failure on the part of any party hereto to exercise, and no delay in exercising, any right hereunder shall be a waiver thereof."   Thus, any delay in exercising a right, i.e., "forbearance," is not a waiver of that right.

17.     Further, both the Collateral Agreement and the Swap Agreements use the words "forbearance" and "forbear" elsewhere, revealing that the documents themselves make a clear distinction between forbearance and "amendment, modification or waiver."  [See Collateral Agreement § 11.3 (providing that the swap counterparties "shall forbear … from exercising any remedies as a secured party" under certain qualified defaults); Amended Schedules (UBS), Part 1(k) (same); Amended Schedules (SBS), Part 1(k) (same)]. Obviously, the drafters of these documents knew, if they so desired, how to give the insurers consent rights with respect to forbearance.   That they did not do so is telling.

18.     Because both the plain terms of the documents and controlling New York law demonstrate that the Forbearance Agreement does not constitute an "amendment" of anything, the insurers do not have "consent" or other rights over the entry into the Forbearance Agreement.

## 2. The Forbearance Agreement is Supported by Valid Consideration

19.     Syncora also asserts that the Forbearance Agreement is invalid

because the Swap Counterparties are not providing any consideration to the City in

exchange for the City's compromise of its claims.  To support this argument,

Syncora asserts that the Swap Counterparties are not providing any value to the

City by agreeing to terminate the swap transactions with the Service Corporations

because the Swap Counterparties are actually prohibited from carrying out this

promise under the applicable swap documents.   Specifically, Syncora argues that

the Swap Counterparties cannot exercise the optional termination provision

contained in the swap agreements because a termination under this provision

requires insurer consent and that Syncora can control the Swap Counterparties

through the Contract Administration Agreement.  However, Syncora's arguments

crumble under the plain language of the agreements.

20.     As a result of the 2009 renegotiation of the swaps—to which

the insurers provided express written consent— the Schedule to the Master

Agreement provides Merrill Lynch and UBS with an "Optional Early Termination"

right, as follows:

> ***Optional Early Termination.***   [The Swap Counterparty]
> shall have the right to terminate one or more Transactions
> hereunder, either in whole or in part, on any Business
> Day; *provided* that no Event of Default or Termination
> Event is then occurring with respect to which [the Swap

-13-

Counterparty] is the Defaulting Party or sole Affected Party, by providing at least five (5) Business Days' prior written notice to [Service Corporation] of its election to terminate and its designation of the effective date of termination (the "Party A Optional Early Termination Date"). On the Party A Optional Early Termination Date, [Swap Counterparty] shall determine the amount payable in connection with such termination as the greater of (i) zero and (ii) the amount calculated in accordance with Section 6(e) of the Agreement, as if (A) the Party A Optional Early Termination Date were the Early Termination Date with respect to the terminated Transaction(s) or portion thereof, (B) the terminated Transaction(s) were the sole Affected Transaction(s), (C) [Service Corporation] were the sole Affected Party and (D) Second Method and Loss applied. For the avoidance of doubt, in no event will [Service Corporation] owe any amount to [Swap Counterparty] in connection with an election by [Swap Counterparty] to exercise its option under this Part 5(t), other than any Unpaid Amounts.

[See SBS Amended Schedules at Part 5(t); see also UBS Amended Schedules at Part 5(xx)]. No place in this provision is the insurer granted a consent right. This absence of a consent right stands in sharp contrast to the Service Corporation's optional termination right, which clearly spells out the consent right ot the insurer:

"*With the prior consent of the Insurer*, [the Service Corporation] shall have the right to terminate this Transaction …." [Swap Confirmation, at p.3]. The drafters of these documents clearly knew how to give the insurers a consent right and chose to do so only when the Service Corporation was optionally terminating the

agreement and not when the Swap Counterparty was optionally terminating the agreement.[5]

21.    Syncora, however, ignores the Swap Counterparties' "Optional Early Termination" right, looking instead to its consent rights under Part 5(i) of the Schedule to the Master Agreement.  But that part of the Schedule, by its terms, (1) only applies to a termination ***pursuant to Section 6 of the Master Agreement*** (i.e., on account of an Event of Default or Termination Event), not a termination pursuant to the optional termination provision, and (2) in any event, does not apply once an insurer is downgraded, such as the case with both insurers here.[6]

22.    Part 5(i) of the Schedule, which is Syncora's alleged source for a consent right, ***only applies to a termination under Section 6 of the Master Agreement***:  "neither Party A nor Party B shall designate an Early Termination Date ***pursuant to Section 6*** of this Agreement in respect of any such Insured Rate

---

[5]    This is not surprising since the reason the Swap Agreements were amended in 2009 was because there had been a ratings downgrade of not only the 2006 COPs, but also a downgrade of the insurers, see Detroit City Code, § 18-16-4, and the Swap Counterparties were negotiating from a position of obvious strength.  Moreover, unlike the Service Corporation's optional termination right, the optional termination right of the Swap Counterparties cannot result in liability to the insurers.  Thus, no reason would have existed to give the insurers a consent right over such a termination.

[6]    To be precise, under Part 5(i) of the Schedule, in order to terminate under Section 6 of the Master Agreement, the Swap Counterparty requires both a termination event, and insurer consent.   Under Part 5(ii) of the Schedule, in order to terminate under Section 6 of the Master Agreement, the Swap Counterparty requires a termination event, and an insurer ***downgrade***.  Thus, upon an insurer downgrade, it is not that Part 5(i) of the Schedule disappears, rather it is that it becomes completely irrelevant.

-15-

Swap Transaction without the prior written consent of the Swap Insurer." The Optional Early Termination provision at play in the Forbearance Agreement is a termination "under" Part 5(t) or Part 5(xx) of the Schedule, *not* Section 6 of the Master Agreement. [See SBS Amended Schedules at Part 5(t) (referring to the exercise of the "option under this Part 5(t)"); see also UBS Amended Schedules at Part 5(xx) (same)].

23.     The Optional Early Termination provision refers to the amount payable in connection with such a termination shall be the greater of zero and the amount calculated "*as if* (A) the Party A Optional Early Termination Date were the Early Termination Date…." Id. (emphasis added). The fact that the Optional Early Termination Date is treated "as if" if it were the "Early Termination Date" for one specified purpose makes clear that the two concepts are not the same and should be treated differently for all other purposes.[7]

24.     Tellingly, Syncora's ally, FGIC—an insurer under identical documentation—argues exactly the opposite of Syncora. Specifically, FGIC

---

[7]     The City notes that Syncora repeatedly mischaracterizes the Forbearance Agreement in its objection. For example, Syncora on multiple occasions refers to the designation of an "Early Termination Date" pursuant to the Forbearance Agreement. [See ECF Doc. 366, ¶¶ 39, 63, 68]. However, an "'Early Termination Date' means the date determined in accordance with Section 6(a) or 6(b)(iii)." [Master Agreement, § 14.] As set forth above, the optional termination provision at issue is not a termination pursuant to Section 6 of the Master Agreement, but rather is a separate termination right provided to the Swap Counterparties in the Schedules.

asserts that the insurers *do not* have consent rights over an optional termination, but do have consent rights over a termination under Section 6 of the Master Agreement. FGIC asserts that the fact that the optional termination provision being utilized in the Forbearance Agreement does *not* require insurer consent reflects an attempted end-run around the insurer consent provisions that modify other termination rights. [ECF Doc. 360, ¶¶ 9, 23]. In other words, even FGIC, an insurer with identical documentation, who has attempted to act jointly with Syncora, will not even subscribe to Syncora's interpretation of the contract. The reason is clear—it knows Syncora's twisted reading of the documents must fail.

25. FGIC's "end-run" argument, though, fares no better than Syncora's contractual argument. Both FGIC and Syncora have had their ratings downgraded below certain levels set forth in the Swap Agreements.[8] These downgrades have stripped them of their right to consent to a termination even under Section 6 of the Master Agreement. This is not strictly relevant to Syncora's argument because the optional termination provision is *not* a termination under Section 6 of the Master Agreement and the insurers never had a consent right with respect to such provision. But this point undercuts any complaints by FGIC. In

---

[8]       See, e.g., 2009 Moody's and Standard & Poor's Ratings of Syncora obtained from Syncora's website (http://syncora.com/?page_id=78).

NYI-4559795v3

sum, neither insurer has any right to consent over the termination of the swap transactions.

26.     Similarly, contrary to Syncora's assertions, Section 6.9.2 of the Contract Administration Agreement does not give Syncora a superior position to that of the Swap Counterparties.   That provision applies to certain actions under the Contract Administration Agreement, not the specific provisions of the Collateral Agreement and Swap Agreements.  The Collateral Agreement was entered into years after the Contract Administration Agreement, and the earlier Contract Administration Agreement was expressly made subordinate to it. [Collateral Agreement, § 14.14].

27.     Further, Syncora's interpretation of that provision of the Contract Administration Agreement's scope is nonsensical.  For example, under Syncora's interpretation of the Contract Administration Agreement, the Swap Counterparties would be required to seek Syncora's consent in order to terminate the swaps based on Syncora's *own* ratings downgrade or insolvency.  [See, e.g., UBS Amended Schedules, Part 5(ii)(c)].  That position defies commonsense and it is not what the documents say.

28.     Accordingly, because the Swap Counterparties are free to terminate the swap transactions under the Optional Early Termination right as contemplated by the Forbearance Agreement, they are providing real value to the

-18-

City.  This value constitutes "consideration" and, thus, the Forbearance Agreement represents a valid contract capable of assumption under section 365 of the Bankruptcy Code.

## B.  THE FORBEARANCE AGREEMENT IS AN EXECUTORY CONTRACT

29.  The Forbearance Agreement constitutes an executory contract for purposes of section 365 of the Bankruptcy Code.   A single party has "question[ed,]" in a footnote, "what obligations the Swap Counterparties are required to 'perform' under the Forbearance Agreement."  [ECF Doc. 370, p.4 n.2].  The answer is simple.

30.  Pursuant to Section 1.2 of the Forbearance Agreement, entitled "***Affirmative Obligations During Forbearance Period***," the Swap Counterparties are obligated to take affirmative steps to assist the City in accessing its Casino Revenues.  In addition, Section 3 of the Forbearance Agreement requires the Swap Counterparties to terminate the swap transactions.   Moreover, the forbearance obligations of the Swap Counterparties to refrain from acting are independently sufficient to establish the executory nature of the contract.  Under the Countryman test, an executory contract is one that is capable of material breach by either party. Countryman, Executory Contracts in Bankruptcy: Part I, 57 Minn.L.Rev. 439, 460 (1973).  A promise to refrain from acting is capable of breach and, therefore, a contract that contains only negative covenants may be executory.  Moreover, the

-19-

Sixth Circuit Court of Appeals has adopted the "functional" approach to executory contracts, which is even more permissive than the <u>Countryman</u> test.  <u>See</u> <u>In re Jolly</u>, 574 F.2d 349, 350 (6th Cir. 1978).

31.    Accordingly, the City respectfully submits that the Forbearance Agreement constitutes an executory contract as that term is used in section 365 of the Bankruptcy Code.

## C.    THE FORBEARANCE AGREEMENT IS BEING ASSUMED *CUM ONERE* AND NO DEFAULTS EXIST THEREUNDER

32.    In order to assume an executory contract, a debtor must assume it "*cum onere*," i.e., with all of its accompanying benefits and burdens.  <u>See</u>, <u>e.g.</u>, <u>NLRB v. Bildisco & Bildisco</u>, 465 U.S. 531-32 (1984).  In addition, as a precondition to assumption of an executory contract, such contract must either (a) not be in default, or (b) the debtor must "cure[], or provide[] adequate assurance that the trustee will promptly cure, such default …."  11 U.S.C. § 365(b).  The City submits that both of these requirements are satisfied.

33.    Syncora is the only party that takes issue with these points and does so only by repackaging its erroneous assertions that the Forbearance Agreement constitutes an "amendment" of the other contracts and that, since the City is not assuming the other contracts (including, paradoxically, contracts to which the City is not a party), the City cannot assume the Forbearance Agreement under section 365 of the Bankruptcy Code.

-20-

34.     As set forth above, the Forbearance Agreement does not constitute an amendment of the Collateral Agreement or any other contract under New York law.  The Forbearance Agreement also is not somehow otherwise a part of the Collateral Agreement and Swap Agreements.  The various agreements that Syncora asserts form one single, unified contract are between different parties, were entered into at different times, and serve different purposes.[9]  There is no basis for treating them as a single agreement.

35.     Further, contrary to Syncora's assertions, the fact that the Forbearance Agreement references the Collateral Agreement does not meld them into one contract.  Contracts routinely reference each other, but that does not make them the same agreement.  No cases cited by any Objectors support that absurd proposition, and an examination of the case law, in fact, demonstrates the opposite.

---

[9]     For example, in <u>Arciniaga v. Gen. Motors Corp.</u>, 460 F.3d 231, 237 (2d Cir. 2006) cited in ECF Doc 366, ¶ 111, the Court expressly found that the agreements at issue were ***not one*** agreement.  As part of its analysis, the Court examined whether the agreements involved formally different parties. Here, the parties to the Forbearance Agreement, the Collateral Agreement and the Swap Agreements are not the same.  The parties to the Forbearance Agreement are the Emergency Manager, the City, the Service Corporations, Merrill Lynch Capital Services, Inc., and UBS AG.  In contrast, the City is not a party to the Swap Agreements—the only parties to the Swap Agreements are one of the two Service Corporations and one of the two Swap Counterparties.  That is, the other Service Corporation, the other Swap Counterparty, the City and the Emergency Manager are not parties to the Swap Agreements.  With respect to the Collateral Agreement, the parties are the City of Detroit, U.S. Bank National Association, the Service Corporations, UBS AG, SBS Financial Products Company, LLC and Merrill Lynch Capital Services, Inc.  In its Objection, Syncora wrongly says the agreements are between the same parties, then recites certain of the parties and selectively omits the parties that do not overlap between the agreements.

NYI-4559795v3

See, e.g., In re AbitibiBowater Inc., 418 B.R. 815, 825 (Bankr. D. Del. 2009) (holding the fact that two agreements are "related" and "include[] references to each other, including incorporation of definitions for common terms," does not establish the parties' "intent that the separate documents [would] embod[y] only one agreement."); Byrd v. Gardinier, Inc. (In re Gardinier, Inc.), 831 F.2d 974, 975-76 (11th Cir. 1987) ("Contracts are often conditioned upon the completion of totally separate agreements.").

36.     In addition, Syncora's argument that the integration clause in the Collateral Agreement somehow advances its claim that various contracts — between different parties—are really one agreement is erroneous.  While both the Forbearance Agreement and the Collateral Agreement contain integration clauses, it is debatable whether an integration clause is relevant at all in this context.  See In re Plitt Amusement Co. of Washington, Inc., 233 B.R. 837, 845 (Bankr. C.D. Cal. 1999) (purpose of integration clause is "to prevent the introduction of parol evidence," which is "a wholly separate issue from whether the various instruments constitute a single agreement for the purposes of assumption or rejection").  However, even if integration clauses were relevant for purposes of determining whether or not the Forbearance Agreement and the Collateral Agreement were the "same agreement," such clauses would conclusively demonstrate that the Forbearance Agreement and Collateral Agreement are distinct contracts because

-22-

neither integration clause includes the other document. [See FOTA, § 13; Collateral Agreement, § 14.14]; see also In re AbitibiBowater, Inc., 418 B.R. 815, 826 (Bankr. D. Del. 2009) (explaining that, under New York law, "the presence of an integration clause undermines the argument that two separate agreements are one.").

37.     In short, for the reasons set forth above, including the plain terms of the documents and the clear holding of New York's highest court, the Forbearance Agreement is plainly not an amendment to the Collateral Agreement or Swap Agreements and the Forbearance Agreement is not the same agreement as the Collateral Agreement or Swap Agreements.   As such, the City is assuming the Forbearance Agreement in its entirety, as required by section 365 of the Bankruptcy Code, and there are no defaults that exist under the Forbearance Agreement.

## D.     THE CITY'S ASSUMPTION OF THE AGREEMENT IS A VALID EXERCISE OF ITS BUSINESS JUDGMENT

38.     The City has satisfied the statutory requirements for assumption of the Forbearance Agreement pursuant to section 365(a) of the Bankruptcy Code. In addition, and as set forth in the Motion, the City has also satisfied the "business judgment" test applicable to assumption of an executory contract.

39.     The standards governing both assumption under section 365 of the Bankruptcy Code and approval under Bankruptcy Rule 9019 are set forth in the

Motion and are not repeated here. The Objections generally, either explicitly or implicitly, accept that the highly-deferential "business judgment" test applies to the City's determination to assume the Forbearance Agreement. See, e.g., NLRB v. Bildisco & Bildisco, 465 U.S. 513, 523 (1984) (stating that the traditional standard applied by courts under section 365 is that of "business judgment").

40. One Objection takes issue with the City's articulation of the relevant standard and submits that the City's assumption of the Forbearance Agreement should be governed by the "entire fairness" standard, rather than the business judgment test. According to the Objection, the Service Corporations, which are parties to the Forbearance Agreement, have directors that are City officers or council members and that fact requires application of heightened scrutiny. This argument is incorrect as a matter of law.[10]

41. First, the Objection does not cite a single case—not one— in which a Bankruptcy Court has actually applied "entire fairness" review to either the assumption of an executory contract or the approval of a settlement. Instead, the Objector relies on In re Innkeepers USA Trust, 442 B.R. 227 (Bankr. S.D.N.Y. 2010), where the Court observed, in passing, that "entire fairness" review *may*

---

[10]     Another objection questions in passing the applicability of the business judgment test because the Forbearance Agreement is complicated and in the nature of a settlement. [ECF Doc 370, p.4]. The City submits that the complexity of the agreement is irrelevant and, if anything, reinforces the need for deference to the City's business judgment.

apply, expressly stating that it did not reach the issue.  Id. at 231 (stating "I need

not … decide which standard is applicable…."); see also In re Residential Capital,

LLC, 12-12020, 2013 WL 3286198 (Bankr. S.D.N.Y. June 27, 2013) (observing

Innkeepers "did not need to decide which standard was applicable because the

Debtors failed to meet their burden under the business judgment test" and rejecting

the argument of Syncora, and others, that the "entire fairness" standard applied to

the transaction at issue).

> 42.     Indeed, Innkeepers arose in the context of the assumption of a

prepetition plan support agreement.  Subsequent cases explain the Innkeepers

court's reference to the "entire fairness" standard as being motivated by the

application of section 1125(g) of the Bankruptcy Code, which expressly

incorporates applicable nonbankruptcy law to prepetition vote solicitation.  See In

re Dewey & LeBoeuf LLP, 478 B.R. 627, 641 (Bankr. S.D.N.Y. 2012).   In

contrast, in the absence of an express reference to applicable nonbankruptcy law,

there is no reason to believe that a Court should look to state law concepts for a

determination as to the appropriateness of assuming an executory contract or

approving a settlement, both of which are bankruptcy law concepts.  See id.

(explaining that 9019 approval is a matter of bankruptcy law and not subject to

"entire fairness" review); see also In re Charter Commc'ns, 419 B.R. 221, 261

(Bankr. S.D.N.Y. 2009) (refusing to import "entire fairness" into plan confirmation

context because it was not required by the plain language of the Bankruptcy Code), aff'g dismissal of app., 691 F.3d 476 (2d Cir. 2013).

43.    Second, even if this Court were to look to non-bankruptcy law for guidance in determining the appropriate standard for bankruptcy matters, it is difficult to imagine "entire fairness" review applying to a municipality, such as the City.  While the "entire fairness" doctrine is a familiar standard in the general corporate context, it does not apply to the City, whose actions are either authorized or unauthorized by statute or ordinance.

44.    Third, even if entire fairness concepts could be applied to a City in bankruptcy, such application is not warranted under the facts here.   The Service Corporations are not "insiders" of the Debtor under the Bankruptcy Code.   Section 101(31) provides "if the debtor is a municipality," an insider includes an "elected official of the debtor or relative of an elected official of the debtor."   Even if certain elected officials sit on the board of directors of the Service Corporations, the Service Corporations themselves are, of course, not elected officials. Moreover, the Service Corporations are not in a position to either "control" the City or receive favored treatment from the City based on the City's "affinity" for them.

45.    The Emergency Manager is a disinterested person, whose objective is to rehabilitate the City and restructure its affairs.  While the Service

Corporations are parties to the Forbearance Agreement, nobody has actually suggested that the Service Corporations control the City or that they are receiving too good a deal at the expense of the City. Rather, the focus of the Objections generally relate to the treatment of the Swap Counterparties, who are plainly not insiders of the City. Thus, the lone assertion that the "entire fairness" standard should apply here is meritless. That standard has no applicability to the actions of the City, the facts surrounding this transaction, or the specific relief sought by the Motion.

46. Here, the City has clearly satisfied the highly deferential business judgment standard. The Emergency Manager and his advisors worked diligently to get the best deal possible. He did not have any incentive or intention to favor the Swap Counterparties over other creditors. Rather, the practical reality is that the Swap Counterparties have asserted liens on one of the City's most significant and important revenue streams. In the absence of a settlement, the documents plainly indicate that the Swap Counterparties had the right to trap the Casino Revenues. Because of the City's liquidity needs, the situation is and was dire and exigent. Through the Forbearance Agreement, the City will achieve continued access to these revenues.

47. Further, with the consummation of this transaction and the approval of the post-petition financing, the City can take advantage of the

-27-

substantial discount with respect to the swap-related obligations. The alternative here is litigation, which as set forth in more detail below, would likely be protracted, costly and uncertain. Moreover, the substantial risk that the Casino Revenues would be trapped during such protracted litigation was and is an intolerable one for the City and its residents.

48. To be sure, if litigation ensues, the Swap Counterparties will assert that, pursuant to sections 362(b)(17) and 560 of the Bankruptcy Code, they are immediately entitled to trap the City's Casino Revenues, notwithstanding the automatic stay. See 11 U.S.C. §§ 362(b)(17) , 560. The City believes that the Swap Counterparties will further assert that this Court is powerless to stop them. See 11 U.S.C. § 362(o) (limiting a court's powers to issue section 105 injunctions in connection with swap contracts); § 560 (providing that the rights afforded a swap counterparty under this safe harbor may not be limited "by operation of any provision of this title or by order of a court or administrative agency in any proceeding in this title."). Further, as discussed elsewhere, the Swap Counterparties may also assert that the City's Casino Revenues are "special revenues" that, upon termination of the swaps, may be immediately applied to their claims pursuant to section 922(d) of the Bankruptcy Code. While the City does not concede that the Swap Counterparties would be successful in these

efforts,[11] the City believes a substantial risk exists that, if litigation ensued, the

sorely needed Casino Revenues would be trapped for a protracted period of time.

49.     For these reasons and the reasons set forth in the Motion and

elsewhere herein, the assumption of the Forbearance Agreement represents a valid

exercise of the City's business judgment,  and further, even if a heightened

standard applied, the City's assumption of the Forbearance Agreement would

satisfy that standard as well.

## IV.     THE CITY HAS SATISFIED THE REQUIREMENTS OF BANKRUPTCY RULE 9019

50.     While not required to under chapter 9 of the Bankruptcy Code,

the City has also met the standards for approval of the Forbearance Agreement

pursuant to Bankruptcy Rule 9019.    The Objections do not appear to dispute that,

for purposes of Bankruptcy Rule 9019, the relevant test is whether the settlement is

fair and equitable and in the best interests of the debtor.

51.     In evaluating whether this test is satisfied, both the City, and

several of the Objectors, rely on four factors that are commonly considered in this

Circuit:  (a) the probability of success in the litigation; (b) the difficulties, if any, to

be encountered in the matter of collection; (c) the complexity of the litigation

---

[11]     This Court has previously held that the automatic stay applies to prevent Syncora from trapping the Casino Revenues because, among other reasons, Syncora is not a party to the Collateral Agreement and, since nothing is owed to Syncora, there is no way to "apply" the Casino Revenues.  [ECF Doc. 670].

NYI-4559795v3

involved, and the expense, inconvenience and delay necessarily attending it; and

(d) the paramount interest of the creditors and a proper deference to their

reasonable views in the premises.  See, e.g., In re Bard, 49 Fed. Appx. 528, 530

(6th Cir. 2002); see also In re Greektown Holdings, LLC, 728 F.3d 567, 576 n.6

(6th Cir. 2013) (reciting Bard factors); In re MQVP, Inc., 477 Fed. Appx. 310, 313

(6th Cir. 2012) (applying Bard factors).

52.     Certain Objections to the assumption and approval of the

Forbearance Agreement that the City has labeled the "bad deal" Objections assert

that the City has not met these applicable standards, in essence, because the deal is

bad for the City and too good for the Swap Counterparties.  These Objections—

exemplified by the objection of Ambac Assurance Corporation—generally take the

position that the City would have good arguments in litigation for invalidating the

swaps and Casino Revenue pledge and/or that the pledge of the Casino Revenues

cannot continue post-bankruptcy because the Casino Revenues are, among other

things, not "special revenues" under chapter 9 of the Bankruptcy Code.  There are

also certain Objections that argue that the Forbearance Agreement is a bad deal for

financial reasons.   The City respectfully submits that both of these Objections are

misguided.

53.     Before its bankruptcy, the City had carefully examined each of

the arguments raised by the "bad deal" Objections.  Based on its own examination,

the City concluded (a) there were litigable issues regarding the validity of the swaps and Collateral Agreement and the characterization of the Casino Revenues as "special revenues," (b) even though the issues were "litigable," the ultimate outcome of such litigation was uncertain, (c) any such litigation would likely be lengthy and costly, (d) the Swap Counterparties were well-advised, had the financial wherewithal, and motivation to engage in protracted and costly litigation, and (e) there was a significant risk that the City's access to the Casino Revenues during such litigation would be impaired.

## A.    PROBABILITY OF SUCCESS IN LITIGATION

54.    The City anticipates that the Swap Counterparties will respond in greater detail to the assertions in the Objections regarding the validity of the swaps and the Collateral Agreement and the characterization of the Casino Revenues as "special revenues."  The City will note, however, that there are arguments on both sides and that, while each party can draw their own conclusions regarding the probability of success, the results of such litigation will likely be time-consuming and uncertain.

55.    <u>Validity of the Swap Agreements</u>.   The Objectors argue that the swap obligations are invalid under The Michigan Revised Municipal Finance Act ("<u>Act 34</u>"), Mich. Comp. Laws Ann. § 141.2101 et seq.  A necessary underpinning of this argument, however, is that the Service Corporations, which

-31-

are not subject to Act 34, should be disregarded. The Service Corporations are authorized by statute and City Ordinance and it is far from clear that a conclusory proclamation that they should be disregarded would be successful in litigation. Further, the City has extensive powers under the Home Rule City Act, Mich. Comp. Laws Ann. § 117.1 et seq., which, arguably, could independently justify the transactions.[12]  In a litigation, the Swap Counterparties might also assert that the City is estopped from challenging the swap obligations and/or that the Bankruptcy Code safe harbors preventing the avoidance of transfers made in connection with swap agreements preempt any challenge to such agreements here.   See 11 U.S.C. § 546; see also Whyte v. Barclays Bank PLC, 494 B.R. 196, 200 (S.D.N.Y. 2013) (preempting state law claims and noting "[b]oth the facial breadth of these provisions, and the corresponding legislative history, make plain that Congress intended to place swap transactions totally beyond the inherently destabilizing effects of a bankruptcy and its attendant litigation.");  In re Hechinger Inv. Co. of Delaware, 274 B.R. 71, 95-97 (D. Del. 2002) (holding bankruptcy safe harbors preempted state law unjust enrichment claim). [13]

---

[12]    See Home Rule Charter, § 1-102 ("The City has the comprehensive home rule power conferred upon it by the Michigan Constitution, subject only to the limitations on the exercise of that power contained in the Constitution or this Charter or imposed by statute.").

[13]    Relying on In re Enron Corp., 323 B.R. 857 (Bankr. S.D.N.Y. 2005), certain of the Objectors argue that the Bankruptcy Code safe harbors should not protect transactions

56.     <u>Validity of the Pledge of the Casino Revenues</u>.  Similar arguments would arise in connection with a litigation concerning the validity of a pledge of the Casino Revenues.  The Swap Counterparties, for example, would likely argue that the Casino Revenues were incurred for permitted purposes.  Specifically, at the time of the transaction, the City Ordinance expressly stated that the use of the Casino Revenues would result in the "improve[ment] of the quality of life in the city" and the "reduc[tion of] taxes levied or imposed by the city or to be levied or imposed by the city."  Detroit City Code, § 18-16-4(k).   Indeed, in the absence of a restructuring of the swap obligations in 2009, the City would have faced a several hundred million dollar termination payment—that, arguably, could have significantly impacted both the quality of life in the City and the City's need to raise taxes.  <u>Id.</u>  Further, the Swap Counterparties, again, may point to the City's extensive Home Rule City powers and also argue estoppel and/or the protections of the Bankruptcy Code safe harbors for swap contracts.

57.     <u>Status of Casino Revenues as "Special Revenues"</u>.  Finally, several of the Objectors argue that the lien should not attach to the Casino

---

that are "void" under state law.   [<u>See</u>, <u>e.g.</u>, ECF Doc. 348, p.26, n.6].   While the City agrees that <u>Enron</u> would be helpful in any litigation involving the Swap Counterparties, the City submits that the results of any safe harbor litigation are uncertain.  <u>See</u> <u>In re Lancelot Investors Fund, L.P.</u>, 467 B.R. 643, 653 (Bankr. N.D. Ill. 2012) (noting that the <u>Enron</u> case "ruling may not be strong precedent given the Second Circuit's recent broad interpretation of the safe harbor provision in Enron v. Alfa…."), <u>aff'd</u>, 729 F.3d 741 (7th Cir. 2013).

Revenues generated on a post-petition basis. Generally speaking, section 552 of the Bankruptcy Code provides that property acquired by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case. 11 U.S.C. § 552.[14] However, pursuant to section 928 of the Bankruptcy Code, "[n]otwithstanding section 552(a) …, special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 928. Put differently, if the Casino Revenues constitute "special revenue," then the Casino Revenues will likely remain subject to the Swap Counterparties' lien. Various Objectors argue that the Casino Revenues should not constitute "special revenues" for purposes of chapter 9 of the Bankruptcy Code. But this is not free from doubt. For example, Syncora argues that the Casino Revenues are plainly "special revenues". [See Statement of Syncora, ECF Doc. 524, ¶¶ 17-24]. The reality is that there are arguments on both sides. While the Objectors urge that Congress did not intend to include the Casino Revenues as special revenues in this context, they do not cite to any cases that actually so hold.

---

[14] One Objector argues for the application of section 552 of the Bankruptcy Code and why various exceptions to section 552 of the Bankruptcy Code should not apply. [ECF Doc. 370, pp.6-9]. These efforts only underscore that there are litigable issues. For purposes of this Motion, the City has assumed that section 552 of the Bankruptcy Code would apply, absent the "special revenue" issue discussed above.

Further, the Swap Counterparties will likely argue that the statutory text is clear. Specifically, the wagering tax statute and the Detroit City Code say that the Casino Revenues are "excise taxes"[15] and section 902(2)(b) of the Bankruptcy Code defines "special revenues" to expressly include "special excise taxes...."

58.     While the Forbearance Agreement reflects, among other things, an 18-25% discount on secured swap claims, certain of the City's constituents seem to misunderstand the discount level as solely reflective of the City's chances of success in litigation.  It isn't.  The discount levels do include the City's appraisal of its chances for success in litigation.  But they also factor in the risk that in the context of a litigation the City could lose access to its Casino Revenues for an extended period of time.

59.     The "bad deal" Objectors assert that there are potential litigable issues here.  [See, e.g., ECF Doc. 370.]  The City agrees.  However, the City and the Objectors do not have to agree on the precise probability of the litigation. Rather, that exercise would defeat the point of entering into a compromise.  See In re MQVP, Inc., 477 F. Appx 310, 314 (6th Cir. 2012) (holding the Court "'need not make a precise determination of the outcome ... since an exact judicial

---

[15]     Mich. Comp. Laws Ann. § 432.212; Detroit City Code, § 18-14-3.

determination of the values in issue would defeat the purpose of compromising the claim.'" (citation omitted; alterations in original)).

60.     Instead, the Court is to make an objective assessment of the probability of success in litigation.  <u>See</u> <u>Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson</u>, 390 U.S. 414, 424-25 (1968) (court must form "intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated")).   And the Court need only reach the conclusion that the City's proposed settlement represents the lowest-point in the range of reasonableness.  <u>See</u>, <u>e.g.</u>, <u>In re Fodale</u>, 10-69502, 2013 WL 663729 (Bankr. E.D. Mich. Feb. 21, 2013).  Indeed, "the law favors compromise" and "a Court may approve a settlement even if it believes that the trustee or debtor-in-possession ultimately would be successful at trial."  <u>In re Drexel Burnham Lambert Grp., Inc.</u>, 134 B.R. 499, 505 (Bankr. S.D.N.Y. 1991).  The City has clearly met its minimal burden here.

### B.     MATTERS OF COLLECTION

61.     Because the nature of the causes of action that the City is compromising are essentially theories limiting or disallowing creditors' claims or liens, it is unclear whether the "matter of collection" prong of the <u>Bard</u> test is strictly relevant.  To the extent this factor is relevant, courts have found that collection would be difficult where the defendant could frustrate the debtor's

-36-

ability to collect any judgment by pursuing their appellate rights in a manner that would "delay the process significantly and make it harder for the creditors to realize any immediate benefit from the judgment." See In re Nicole Energy Servs., Inc., 385 B.R. 201, 254 (Bankr. S.D. Ohio 2008). Here, the City believes that the Swap Counterparties have the financial wherewithal, willingness, and ability to pursue this strategy.

### C. COMPLEXITY, EXPENSE, DELAY AND INCONVENIENCE

62. The City believes the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it weigh strongly in favor of approval of the Forbearance Agreement. The issues being compromised are plainly complicated. Among other things, they involve the interpretation of complex derivatives agreements,[16] questions concerning arcane, highly technical principles of Michigan municipal law, chapter 9 of the Bankruptcy Code, and the Bankruptcy Code's safe harbors for derivatives contracts. No party seriously argues to the contrary.

63. Such litigation would likely be extremely lengthy and, therefore, costly. Many of the questions implicated are novel and would involve either certification to state courts, several layers of appellate review or both. The

---

[16] This Court has already observed in connection with its eligibility determination that the COPs and swap transactions "are complex and confusing" and [t]he resulting litigation is as well." [Opinion Regarding Eligibility, ECF 1945, at p.11].

NYI-4559795v3

City would also anticipate skirmishes over the appropriate forum or fora to determine these issues as well as disputes in connection with the protracted discovery, including electronic discovery, that would certainly accompany such litigation. While one Objector asserts that the issues here are predominantly legal rather than factual, [ECF Doc 348, ¶ 70], that is not necessarily the case regarding all the claims that might be brought. Moreover, while legal questions sound neat in the abstract, they lend themselves well to protracted appellate review. Put simply, any litigation will likely be extremely complicated, long and costly.[17]

### D.   INTEREST OF CREDITORS

64.    As set forth in the Motion, the interests of creditors and the City's residents strongly favor approval of the Forbearance Agreement. The compromise allows the City to access much needed cash flows, provides for a workable unwind of the swap obligations at a discounted price, and avoids potentially protracted litigation involving the swap transactions. In the absence of a compromise, the City runs the risk of being deprived access to the Casino Revenues during the course of the protracted litigation that would likely ensue. The Casino Revenues are one of the City's largest and most stable revenue streams. The City is in dire need of liquidity. And if the Casino Revenues were

---

[17]    The City anticipates that the Swap Counterparties would assert that the City is required to pay the Swap Counterparties' attorneys fees and costs in connection with any litigation against them pursuant to, among other things, Section 11.5 of the Collateral Agreement.

inaccessible to the City on a prolonged (or even short term basis), the results could be disastrous.

65.     The Official Committee of Retirees, which represents a substantial portion of the City's creditors, supports the Motion. [ECF Docs. 1869]. Nonetheless, various Objections argue that, as a financial matter, the Forbearance Agreement is a bad deal. Some Objectors argue that the City has plenty of cash, and therefore, the liquidity benefits of the Forbearance Agreement are not significant. Others argue that the City does not have enough cash such that the City cannot take advantage of the optional termination discount contained in the Forbearance Agreement. Finally, there are also a couple of Objectors that argue the deal is bad because the City might benefit by speculating on interest rate movements in the future.

66.     The reality here is that the City is suffering from a severe liquidity crisis. The City's Casino Revenues amount to approximately $170 million per year. These monies, which amount to approximately 15% of the City's total annual revenues, are absolutely critical to the City's near term and long term liquidity needs. If they were rendered inaccessible to the City, even for a short-period of time, the City and its residents would begin to immediately suffer. The City has offered more than ample support for these facts, including the extensive data contained in or accompanying the Orr Declaration and Malhotra Declaration.

No Objector challenges any of this with any competent evidence. Indeed, the Objections offer little more than conclusory statements that the City doesn't really need access to its Casino Revenues.[18] Those statements are, at best, misguided.

67.    Further the Objectors' arguments ignore the substantial positive cash flow impact of the FOTA if the City exercises its right to cause the Swap Counterparties to exercise their optional termination of the swaps. At the projected swap cost of $45 million per year, when the obligation can be terminated for a payment of an estimated $200 million, the City can substantially improve its cash position by terminating the swaps. The City's requested post-petition financing

---

[18]    One Objector states that, even absent the Forbearance Agreement, the Swap Counterparties might not seek to trap the cash. First, the Swap Counterparties have already expressed their belief that they have the right to immediately terminate the swaps and "lock down" on the City's Casino Revenues. Simply because the Swap Counterparties did not do this prior to bankruptcy—when the City was negotiating a settlement with them—is no indication that the Swap Counterparties will not seek to take these steps if the Forbearance Agreement is denied. Indeed, there is reason to believe that the Swap Counterparties may feel compelled to terminate or else risk losing the protections of the Bankruptcy Code safe harbors. See, e.g., In re Enron Corp., No. 01 B 16034(AJG), 2005 WL 3874285, *4 (Bankr. S.D.N.Y. Oct. 5, 2005) (holding that, in order to avail itself of the safe harbors, the swap counterparty must terminate the swap transactions promptly). Second, in the absence of a compromise, litigation is a near-certainty. It is quite apparent to all parties—as evidenced by Syncora's tactics to date—that the way to apply maximum pressure on the City is to try to choke off its cash flows. If litigation ensues, there is a substantial risk that the Swap Counterparties' very first move would be to attempt to trap the Casino Revenues. Indeed, Syncora, who does not have rights under the documents and is not even a party to the Collateral Agreement, has repeatedly attempted to exert pressure on the City by doing exactly this. Third, even if there were a possibility that the Swap Counterparties might decide not to act in their own self-interest and not seek to trap the cash if the Forbearance Agreement is denied, the City cannot take that chance. The Casino Revenues amount to approximately 15% of the City's total annual revenues. The City cannot gamble that such monies will be inaccessible to it.

-40-

bears interest at a rate of 3.5-6.5%, whereas the swap costs to the City represent effectively a 22.5% interest rate.[19]   The cash flow advantages of the FOTA will, therefore, provide substantial and immediate benefits.  More importantly, if the Swap Counterparties resort to their remedies, the City does not have the ability to pay the termination value and the Casino Revenues would be trapped.

68.     Several Objectors argued that the City did not have the money to exercise the optional termination rights provided to it in the Forbearance Agreement.   Those Objections have been rendered moot by the City's requested post-petition financing.

69.     Finally, certain Objectors suggest that the Forbearance Agreement is a bad deal because interest rates are on the rise and, therefore, the City should not "lock in" a loss.  According to these Objectors, the City should speculate on interest rate movements.   As an initial matter, in the absence of the Forbearance Agreement, the City anticipates the Swap Counterparties would seek to terminate the transactions and, therefore, fix the termination amount.  In that scenario, the City will have crystallized its loss and would not receive the benefit of any discount.   In other words, the City would not have the opportunity to take advantage of any rise in interest rates.

---

[19]     The 22.5% interest rate reflects that the City is paying approximately $45 million per year for an obligation it can extinguish for approxmatiely $200 million.

70.     Further, even if the Swap Counterparties were content to "ride" the interest-rate market, the City is not.  That simply would be irresponsible.  Nobody knows with precision the future of interest rates.   Indeed, this uncertainty is the whole point of entering into an interest rate swap agreement.  As such, the suggestion  that the City should speculate on interest rates is wrongheaded.  Moreover, once presented with a cost effective alternative to an obligation that costs the City in excess of 22.5% per year, the City should act to improve its cash flow and finances as soon as practicable.

71.     Moreover, even if one were to speculate on interest rates today, no party contests  that the swap transactions significantly favor the Swap Counterparties on a "mark-to-market" basis today.  This "mark-to-market" calculation is a reflection of a  "LIBOR-curve." That "LIBOR-curve" suggests that the swap transactions will remain "out of the money" for the life of the transactions.   Accordingly, no responsible banker can suggest to a municipality that it should "roll the dice" on future interest rate movements, particularly whereas here, the Swap Counterparties may threaten to end the game at any time.

## V.     OTHER ARGUMENTS

### A.     THE FORBEARANCE AGREEMENT DOES NOT HARM THE SWAP INSURERS, IT HELPS THEM.

72.     FGIC and Syncora assert that the Forbearance Agreement should not be approved because the collateral consequences of the Forbearance

-42-

Agreement harm them. That is not so, and frankly, they know it. Even if it were the case, it is legally irrelevant.

73. The joke here is that the approval of the Forbearance Agreement is economically beneficial for FGIC and Syncora, who are sureties on the swaps. Under the Forbearance Agreement, the City is ensuring that payments on the swaps remain current. Moreover, upon the exercise of the optional termination right, all claims on the swap insurance policies will be waived. [See FOTA, § 3.2(c)]. Consequently, the Forbearance Agreement results in the swap insurers being relieved of their obligations under the swap policies. Nonetheless, Syncora, and to a lesser extent FGIC, fight vigorously to remain liable on their swap insurance policies. This represents a naked litigation tactic.

74. The economic realities of the situation belie any assertions that the Forbearance Agreement harms the swap insurers and instead reveal what FGIC and Syncora are up to. Even if interest rates radically changed, the swaps would never constitute an asset of the Service Corporations. Under the documents, the Swap Counterparties have a right to terminate the swaps at any time, without anyone's consent, both pursuant to the optional termination provision in the Schedules and pursuant to Section 6 of the Master Agreement. See supra ¶¶ 19-24. There is no reason for the Swap Counterparties to sit around and wait for their right to payment to reverse itself. If interest rates change in such a drastic fashion

that the Swap Counterparties will have to pay money to the Service Corporations, they will simply terminate. There is no realistic scenario where the Swap Counterparties will end up owing money to the Service Corporations. Therefore, the suggestion that the swaps hedge the COPs for the benefit of the swap insurer is not only unrealistic in today's interest rate environment but also wrong under the documents.

75. Moreover, Syncora and FGIC's argument assumes that, in the absence of this compromise, the Swap Agreements would remain in place throughout the duration of the debtor's chapter 9 case and, further, would survive confirmation of the debtor's plan of adjustment. That assumption is false. As far as the City is aware, no debtor, chapter 9 or otherwise, has ever let an unhedged secured interest rate swap "ride through" its plan. That is simply inconceivable.

76. To the extent the swap insurers were somehow collaterally harmed by the termination of the swaps (which is not the case), that harm is legally irrelevant for purposes of Rule 9019 approval. See Cory v. Leasure, 491 B.R. 476, 486-87 (W.D. Ky. 2013) (affirming conclusion of bankruptcy court "that the potential collateral effect on [a creditor] individually was not an appropriate basis to deny approval of the Settlement Agreement," rather 9019 approval looks to the benefit of the creditor body as a whole); In re Carbon Beach Partners, LLC, No. 09-24657, 2012 WL 3262837, at *6 (Bankr. C.D. Cal. Aug. 9, 2012) ("Debtor's

duty is to pursue the best interests of the estate, not whatever interests individual creditors may independently have. . . . As the Settlement Agreement is in the best interests of the estate; any disadvantage to [third party] resulting from the settlement should not weigh in the court's decision to authorize Debtor to enter into it, absent a violation of SoCal's legal rights."); Ames v. Rabin, No. 10-02595, 2011 WL 1630139, at *2 (N.D. Ohio Apr. 29, 2011) (collateral consequences under state law resulting from settlement were not of concern in the context of 9019 approval).

## B. APPROVAL OF THE FORBEARANCE AGREEMENT AT THIS JUNCTURE IS APPROPRIATE

77.     Approval of the Forbearance Agreement is not premature.  One Objector suggested that approval of the compromise is premature because the Court had at the time of the filing of the Objection not yet rendered a decision on eligibility.   The Court now, of course, has entered an order for relief with respect to the City.  [ECF Doc. 1946].  Accordingly, this objection is now moot.  See 11 U.S.C. § 921(e) ("The court may not, on account of an appeal from an order for relief, delay any proceeding under this chapter in the case in which the appeal is being taken; nor shall any court order a stay of such proceeding pending such appeal.").

NYI-4559795v3

## C. INFORMATIONAL OBJECTIONS

78. Other Objectors asserted that the Motion was premature because they did not have enough information regarding the arguments being compromised. These assertions have similarly been rendered moot by, among other things, (a) the Court-ordered mediation, (b) the statements made in pleadings filed by other Objectors, (c) the discovery process, and (d) this Reply.

## D. RESERVATIONS OF RIGHTS – PLAN PROCESS

79. Certain Objectors seeks to preserve their rights to object to any plan of adjustment that the City files in this case. The Forbearance Agreement, of course, does not limit any parties' rights to object to a later-filed plan of adjustment. However, the Objectors may not revisit ***this settlement*** in the context of the City's plan of adjustment. If the Court approves the compromise, it is approved because it is fair and equitable and in the best interests of the Debtor. The Objectors may not, later, come back again and complain about it.

80. Most of the Objectors do not cite any support for the assertion that they are entitled to multiple bites at the apple. One Objector, however, cites a pair of recent rulings in the City of Stockton's chapter 9 case in support of this misguided proposition. Even a cursory review of the <u>Stockton</u> case demonstrates that it, in fact, stands for the exact ***opposite*** proposition advanced by the Objectors

here.[20]  In <u>Stockton</u>, the debtor-City did not seek Rule 9019 approval.  And the

Court explained that was acceptable—a chapter 9 debtor may, but is not required

to, seek Rule 9019 approval from Court.  However, the Court cautioned, if the

debtor ***does not*** seek Rule 9019 approval, the unapproved settlement may later

implicate the requirements necessary for confirmation of a plan of adjustment.

Indeed, the <u>Stockton</u> Court expressly stated that a chapter 9 debtor may wish to

consent to Rule 9019 approval in order to avoid this very result:  "The municipality

may wish to obtain judicial approval as part of a strategy of transparency designed

to forestall later challenges to plan confirmation."  <u>Ass'n of Retired Employees of

the City of Stockton v. City of Stockton, Ca. (In re City of Stockton, Cal.)</u>, 486

B.R. 194, 199 (Bankr. E.D. Cal. 2013).

      81.    Creditors are, thus, entitled to raise any Objections to the

proposed settlement at this time— and, as evidenced by these Objections, certain

creditors have opted to file such Objections.  But they are not entitled to do so, fail,

and then seek to derail confirmation at a later date.[21]

---

[20]    Indeed, one of the objectors summarized the <u>Stockton</u> decision as follows:  "As the court
in City of Stockton stated, if there is ***not*** effective Rule 9019 review of a municipality's
settlement of a matter, it may need 'to account for prior compromises during the plan
confirmation proceedings." [ECF 370 p.13 n.4] (emphasis added).  Here, of course, the
City is seeking Rule 9019 review and, thus, the compromise cannot be revisited in the
plan context.  That defeats the very point of Rule 9019 review in this context.

[21]    Assured also erroneously cites to a transcript in the <u>Stockton</u> proceeding for the same
proposition.  There, the unopposed settlement was approved pursuant to Bankruptcy Rule
9019, but it was acknowledged that "[t]he settlement provide[d] that this agreement

-47-

### E.    RIGHTS OF INSURERS AND COPS HOLDERS AGAINST SWAP COUNTERPARTIES

82.    Neither the Forbearance Agreement nor proposed order granting assumption and approval seeks to enjoin third parties from pursuing rights against other third parties.   Those rights will be left intact.   However, the assertions of certain Objectors that the findings and conclusions of law made in connection with these proceedings can simply be ignored at a later date is incorrect.   There are certain findings that the City believes are necessary to make in connection with the approval of the Forbearance Agreement.   For example, Syncora has asserted in an adversary proceeding pending before this Court (Adv. No. 13-05395) that the Forbearance Agreement is void *ab initio*.   The City respectfully submits that since the Forbearance Agreement is capable of approval and assumption, third parties are necessarily precluded from collaterally attacking the Forbearance Agreement or the parties' performance thereunder elsewhere.

## VI.    RESERVATION OF RIGHTS

83.    The City  hereby reserves its right to further supplement this Reply.

---

would be baked into a Plan of Adjustment[,]"[Case No. 12-32118-C-9, ECF 931, at p.7, ll. 22-23], and the Court considered it to be  "a building block in a Plan," [id. at p.9, l.15]. Thus, as with a settlement made in connection with a chapter 11 plan, the Court expressly noted that it would look at the settlement in the context of plan confirmation.  [Id. at p.9, ll 11-19.].

NYI-4559795v3

## VII.  CONCLUSION

WHEREFORE, the City respectfully requests that this Court: (a) enter an order substantially in the form attached to the Motion granting the relief sought herein; and (b) grant such other and further relief to the City as the Court may deem proper.

Dated: December 10, 2013       Respectfully submitted,

/s/ David G. Heiman_____
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

-49-

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
Pepper Hamilton LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
(248) 359-7300  -  Telephone
(248) 359-7700  -  Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY

NYI-4559795v3