**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

-----------------------------------------------------x
                    :

In re:                    :       Chapter 9
                    :

CITY OF DETROIT, MICHIGAN,  :       Case No. 13-53846
                    :

          Debtor.     :       Hon. Steven W. Rhodes
                    :

                    :
-----------------------------------------------------x

**OPPOSITION OF DEBTOR THE CITY OF DETROIT, MICHIGAN TO OBJECTORS' MOTION *IN LIMINE* TO PRECLUDE DEBTOR FROM OFFERING EVIDENCE REGARDING THE CITY'S NEED TO OBTAIN CASINO REVENUES IN CONNECTION WITH ITS DEBTOR-IN-POSSESSION FINANCING EFFORTS**

Objectors[1] move to preclude the introduction of evidence and argument by

the City of Detroit, Michigan (the "City"), debtor in the above-captioned case,

regarding the City's intent to leverage Casino Revenues in connection with its

post-petition financing efforts in support of its Motion of the Debtor for Entry of

---

[1] The Objectors who have joined the Motion *In Limine* to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection with Its Debtor-in-Possession Financing Efforts are Syncora Capital Assurance and Syncora Guarantee Inc. ("Syncora"), Erste Europäische Pfandbriefund Kommunalkreditbank Aktiengesellschaft in Luxembourg S.A., DEPFA Bank PLC, the Retiree Association Parties, Retired Detroit Police Members Association, Ambac Assurance Corporation, National Pubic Finance Guarantee Corporation, Assured Guaranty Municipal Corporation, Financial Guaranty Insurance Company, the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit, and the Official Committee of Retirees.

an Order (I) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (II) Approving Such Agreement Pursuant to Rule 9019, and (III) Granting Related Relief (the "Assumption Motion") [Dkt. 17].  Objectors seek to preclude such evidence and argument on the grounds that (1) the ability to collateralize the Casino Revenues supposedly represents a surprising and undisclosed justification for the Forbearance and Optional Termination Agreement (the "Settlement") and (2) the City has allegedly barred inquiry into "key aspects" of the City's post-petition financing efforts.

These contentions are baseless.  The City has long indicated that access to cash is critical here, and its ability to leverage the Casino Revenues for any post-petition financing it requires is an obvious use of such funds.  To the extent the City kept any information confidential regarding its post-petition financing efforts – months ago when that competitive bidding process was still underway – that information was irrelevant, appropriately withheld, and, regardless, has since been provided to Objectors through post-petition financing discovery and the City's dataroom.  Objectors' Motion should therefore be denied.

### Objectors' Motion

Objectors argue in their motion that, because it has blocked all inquiry by Objectors into its post-petition financing efforts and collateral package, the City

2

should be precluded from offering any evidence regarding its intent to leverage Casino Revenues in connection with post-petition financing as a business justification in support of the Settlement.

First, Objectors attempt to characterize this use of the Casino Revenues as a *post hoc* rationalization for the Settlement. Objectors' Motion *in Limine* to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenue in Connection with its Debtor-in-Possession Financing Efforts (the "Motion *in Limine*") [Dkt. 935] at 3. Objectors concede that the City cites and discusses at length three reasons supporting that Settlement as a sound exercise of business judgment and that it is fair and equitable – namely, (1) it allows the City access to cash flow; (2) it offers a workable unwind of the City's swap obligations; and (3) it avoids litigation with Swap Counterparties. Mot. *in Limine* at 3. Objectors assert, however, that the City's papers do not explicitly discuss post-petition financing or the City's need to leverage its Casino Revenues as part of the post-petition financing package. According to Objectors, the City's intent to leverage its Casino Revenues in support of post-petition financing arose for the first time during the depositions of Kevyn Orr, the Emergency Manager, and Kenneth Buckfire of Miller Buckfire, the lead negotiator for the Settlement.

Second, Objectors contend that the City blocked Objectors from inquiring into the City post-petition financing efforts and the planned post-petition collateral

3

package on the grounds that information was "commercially sensitive." Mot. *in Limine* at 3-4. Specifically, Objectors contend that the City precluded questions during the deposition of Mr. Buckfire regarding the covenants in the term sheet, the collateral package (aside from the Casino Revenues) or its operation, the identity of parties potentially involved in the financing, and whether the City had considered alternate sources of funding from the State of Michigan or federal government. Mot. *in Limine* at 4-6. Objectors further contend that the City similarly invoked a commercial sensitivity bar to certain questions during the deposition of Mr. Orr regarding elements of the City's post-petition financing efforts. Mot. *in Limine* at 6-7.

According to Objectors the City should be precluded from offering any evidence regarding its intent to collateralize the Casino Revenues in support of its post-petition financing.

**Argument**

## I.      Objectors' Motion is Moot.

Since Objectors filed their motion on September 18, 2013, the City has disclosed extensive information regarding its post-petition financing efforts, through its dataroom and discovery, and as a result, Objectors motion is now moot. *See Powell v. McCormack*, 395 U.S. 486, 497 (1969) (holding a matter is moot when the issues presented are no longer "live"). Mootness is found only after

determining if an actual controversy between the parties exists in light of intervening circumstances. *In re Asmar, Inc.*, Case Nos. 12-15053, 12-15064, 2013 WL 628581 (E.D. Mich. 2013) (*citing Fleet Aerospace Corp. v. Holderman*, 848 F.2d 720, 723 (6th Cir. 1988)).

Objectors' motion is premised on the City's refusal to provide information in response to a few deposition questions related to its efforts to obtain post-petition financing. Specifically, Objectors sought information regarding the covenants in the post-petition financing term sheet, the potential and final collateral package, the identity of parties involved in the financing, efforts to obtain alternate sources of funding, including funding from the State of Michigan and/or the federal government, and the operation of the collateral package.

In the months since Objectors filed their motion, however, the City has provided substantial information regarding its post-petition financing efforts. On November 5, 2013, the City filed a motion seeking the Court's approval for post-petitioning which described at length the City's post-petition loan solicitation process. *See* Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superiority Claim Status and (III) Modifying Automatic Stay (the "Post-Petition Financing Motion") [Dkt. 1520]. In support of the Post-Petition Financing Motion, the City

5

included a Declaration from James Doak, which further described the post-petition financing solicitation process and provided additional details specifically requested by Objectors during the depositions of Mr. Orr and Mr. Buckfire. Declaration of James Doak in Support of Motion of Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superiority Claim Status and (III) Modifying Automatic Stay (the "Doak Declaration") [Dkt. 1520, Ex. 5B]. Notably, Mr. Doak stated that the negotiation process involved soliciting over 50 potential financing sources, including 13 traditional lending institutions and 37 alternative financing sources. Doak Decl. ¶ 5. Doak further stated in his declaration that the City settled on Barclay's bid as the best financing package available under the circumstances based, in part on its pricing, which with an effective interest rate of 3.5% was extremely favorable, and debt service obligations, which, assuming no events of default, were limited to interest payments that annually amounted to nearly $38 million less than the City's current debt service obligations under the Swap Agreements. *See* Doak Decl. ¶¶ 9-11. The Post-Petition Financing Motion and Doak Declaration together already significantly address the information Objectors sought.

In connection with the Post-Petition Financing Motion, Syncora issued a 2004 request seeking materials related to the City's post-petition financing and the

City used that request as a guide for its document production.  *See* Motion of

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. for Authority to Issue

Document and Deposition Subpoenas to the Debtor, the Emergency Manager, and

Certain of the Debtor's Advisors Pursuant to Federal Rule of Bankruptcy

Procedure 2004 [Dkt. 1342].  As a result of that exercise, the City produced

approximately 20,000 pages of documents to objectors.  The City has also

continued to update its dataroom as information on its post-petition financing

becomes available and might be appropriately disclosed, including information

regarding its efforts to seek funding from the State of Michigan and the federal

government.

Moreover, Objectors have had the opportunity to depose, among others,

James Doak of Miller Buckfire, who was the City's lead negotiator in its post-

petition financing efforts.  Objectors have already, or will, depose Mr. Orr and Mr.

Buckfire this week in connection to the Post-Petition Financing Motion.  Objectors

have therefore had ample opportunity to obtain the very information at issue and

no longer have a basis for the relief which they seek.

## II.     Objectors' Motion Fails on the Merits.

Mootness aside, Objectors' motion fails on the merits.  First, leveraging the

City's revenue streams is not a new and distinct rationale for assumption of the

Settlement but, instead, a foreseeable and reasonable application of the Casino

Revenues to accomplish the City's well-articulated plans. Second, even prior to discovery on the Post-Petition Financing Motion, the City had provided Objectors with appropriate information regarding its post-petition financing efforts. The City only denied Objectors answers to a limited number of deposition questions, and the specific information sought by Objectors is not relevant to the Assumption Motion before the Court. Finally, even if the information Objectors sought were relevant, it was properly withheld at the time under the business strategy privilege, and, as noted above, has been subsequently disclosed, once it was no longer commercially sensitive.

### A. The Use of Additional Cash as Collateral for Post-Petition Financing is an Obvious Benefit from Free Access to the Casino Revenues.

Objectors miscast the City's plan to employ the Casino Revenues unencumbered by the Settlement as collateral for its post-petition financing as a separate and *post hoc* justification for assumption of the Settlement. Rather, collateralizing these cash flows is merely a natural and logical consequence of unencumbering the Casino Revenues and a means to accomplishing the City's stated objectives.

As the Objector's note, the City has cited three core reasons that the Settlement constitutes a sound exercise of business judgment and is fair and equitable, including that it "allows the City access to much needed cash flows."

8

Assumption Mot. ¶¶ 41-42; *see* Mot. *in Limine* at 3.  The City has consistently

justified assumption of the Settlement in order to "provide [it] with crucial

liquidity and cash flow going forward," on the grounds that these funds – namely

the Casino Revenues – are critical not only to the City's ability to finance its

operations but also to its ability to engage in crucial reinvestment that will allow it

to emerge from bankruptcy.  Assumption Mot. ¶¶ 43-44; Deposition of Kenneth

Buckfire ( the "Buckfire Deposition") Tr. at 37:3-9, 15-17; 155:19-23 (August 29,

2013).

First, given the cash-starved and insolvent state of the City, access to the

Casino Revenues is critical to the ongoing operations of the City.  Assumption Mot.

¶ 42; Deposition of Kevyn Orr (the "Orr Deposition") Tr. at 213:5-8 (August 30,

2013); Buckfire Depos. 37:3-9.  As Mr. Orr testified, if, among other things, the

City does not free the Casino Revenues, the City is projected to run out of cash by

the end of the year.  Orr Depos. 200:9-14.  Further, if the Casino Revenues are

trapped by the Swap Counterparties, a possible outcome if they remain

encumbered, it might be necessary to reduce existing City services.  Buckfire

Depos. 100:22-23.

Second, access to the Casino Revenues is crucial to enable the degree of

reinvestment necessary "to improve Detroit residents' quality of life" which "is an

essential touchstone of any restructuring plan."  Assumption Mot. ¶ 44; *see*

9

Buckfire Depos. 37:3-9, 15-17 ("[B]y freeing up the gaming revenues, it will give the City financing options as part of a plan of adjustment that it otherwise might not have."). As Mr. Orr has asserted, every day that the City does not begin to reinvest in itself "is a dangerous day." Orr Depos. 59:13-14. And, "every day that we don't have access to casino revenue, we cannot make the necessary reinvestment in this City to provide for the health, safety and welfare of the citizens." Orr Depos. 68:5-8.

The Casino Revenues are a necessary component to the City's reinvestment and restructuring plans. Orr Depos. 213:9-21. Without reinvestment, and access to the Casino Revenues, "there's a very real chance that the City will have no chance to stabilize and grow and the creditors will see no opportunity for any benefit because the City would . . . continue to decline, revenue from other streams would continue to decline, and the City's ability to satisfy its obligations to the creditors will continue to decline." Orr Depos. 214:14-22; Buckfire Depos. 100:19-20; 104:10-13 ("[i]f we don't have the gaming revenues . . ., we can't even start the reinvestment plan.").

Employing the Casino Revenues as collateral for post-petition financing is merely a tool to accomplish these objectives. Mr. Buckfire testified to that very point. Buckfire Depos. 70:6-10 ("The City intends to secure a debtor in possession financing of sufficient proceeds to fund the termination payment [for the

10

Settlement] as well as provide sufficient cash for the City to execute on its reinvestment program during the bankruptcy."); 79:17-21 ("We'll use the proceeds to terminate the Swaps at the discount provided for in [the Settlement] and the balance of the DIP loan will be retained by the City as working capital and to support its reinvestment program.").

Objectors offer no substantive basis to preclude evidence of the City's intent to use the Casino Revenues in this fashion. Instead, Objectors' motion rests on the City's purported failure to expressly state that it planned to leverage the Casino Revenues for post-petition financing in its opening motion. Absent such an explicit statement, Objectors feign surprise to hear deposition testimony regarding the City's plans. Use of regular or fixed municipal cash flows as leverage for immediate access to funds, however, is hardly a new or novel idea. Doing so is, in fact, standard practice and might be reasonably anticipated where, as here, a city is in dire and immediate need of cash. Nowhere do Objectors explain why collateralizing the Casino Revenues is an unreasonable or unforeseeable use of such revenue streams.

In fact, the City made no secret of its intent to apply cash flows unencumbered by the Settlement for its daily operations as well as for substantial reinvestment. On June 14, 2013, Mr. Orr outlined a restructuring plan that contemplated investing $1.25 billion over the next 10 years, including $500 million

11

in the next 6 years, to address blight, increase property values, and improve the City's infrastructure and services. Assumption Mot. ¶ 22. Moreover, the Emergency Manager and the City's advisors have consistently indicated the need for that reinvestment to begin immediately. *See e.g.*, Orr Depos. 59:13-14. Objectors cannot, therefore, be surprised that the City might use the Casino Revenues, once freed, to obtain more extensive, immediate funding. Regardless, the City has articulated its need for unencumbered cash flows and the purposes for which they are required.

      **B.**    **Objectors Were Provided With Appropriate Information Regarding the City's Post-Petition Financing Efforts and Were Denied Only Limited and Irrelevant Information.**

Objectors also misconstrue the extent to which they were denied discovery into the collateral package offered by the City as part of its post-petition financing and the relevance of the limited details that City witnesses would not disclose. Objectors protest that the City denied them discovery regarding the covenants in the term sheet, the collateral package (aside from the Casino Revenues) or its operation, the identity of parties potentially involved in the financing, and whether the City had considered alternate sources of funding from the State of Michigan or federal government. The City's refusals to comply with these requests were entirely justified. First, limiting a small number of deposition questions into these areas hardly constitutes wholesale preclusion. The City, in fact, provided

12

significant information regarding its post-petition financing plans and only withheld information that would impact the integrity of the bidding process. Second, the granular level of information regarding the City's post-petition financing sought by Objectors is not relevant to the issues before the Court.

### 1. To the Extent Objectors Inquired, the City Provided Ample Information Regarding Its Post-Petition Financing Efforts.

Objectors portray the City's refusal to divulge information regarding its post-petition financing efforts as nearly universal whereas, in fact, the City withheld only limited and specific details that were still subject to negotiation with potential investors. The City otherwise provided substantial testimony regarding its post-petition financing plans and efforts.

As an initial matter, with the exception of a few isolated questions about the collateral package and state and federal aid, to which Mr. Orr's responses mirrored those of Mr. Buckfire, Objectors asked Mr. Orr no questions regarding the City's post-petition financing efforts. Objectors, therefore, cannot now claim their inquiry was precluded. In any event, Mr. Buckfire provided sufficient testimony regarding the parameters of the City's plans and efforts.

While Mr. Buckfire did not provide testimony regarding specific covenants in the post-petition financing term sheet on the grounds that they were commercially sensitive, Buckfire Depos. 73:24-74:2, he provided testimony regarding numerous other terms. Mr. Buckfire, for instance, provided substantial

13

testimony regarding the City's interest rate objectives – that it be the "lowest possible interest rate," and that the request for proposals did not define that possible interest rate or require whether it must be fixed or variable. Buckfire Depos. 73:16-23. He further testified that the maturity of the financing would be "the pendency of the end of the case." Buckfire Depos. 74:3-5. He also testified to the City's anticipated timeline to obtain post-petition financing. Buckfire Depos. 77:15-79:6. Objectors did not ask any other questions about the term sheet.

Although he refused to delve into commercially sensitive specifics of the collateral package, which remained subject to an active request for proposals, Mr. Buckfire provided testimony on its general parameters. For instance, he testified that the City anticipated offering a lien on the Casino Revenues, in part. Buckfire Depos. 74:6-8; 142:20-23. Mr. Buckfire only declined to provide further details as to the extent to which the Casino Revenues would be offered as collateral or other forms of collateral, such as the City's art collection, which may be negotiated with the potential investors.

Mr. Buckfire testified that the City had spoken with "in excess of 30" potential investors regarding post-petition financing, Buckfire Depos. 70:24, of whom ten already appeared to have no interest. Buckfire Depos. 71:14. Mr. Buckfire would not, however, disclose the identities of the potentially uninterested

investors.  Buckfire Depos. 71:16-22.  Objectors never asked about the identities of any interested investors.

Finally, while neither Mr. Orr nor Mr. Buckfire testified to the specifics of the City's discussions with the State of Michigan or the federal government regarding the provision of alternate sources of funding, both testified to having considered such funding.  Objectors concede that Mr. Orr stated in his deposition that, although the information was commercially sensitive, he understood that neither liquidity nor credit enhancement would be provided by the State of Michigan or the federal government in connection with post-petition financing.  Mot. *in Limine* at 5, fn 4; *see* Orr Depos. 207:6-21; 201:10-17.  Although Objectors contend Mr. Buckfire refused to answer question on this topic, he, in fact testified that the City "considered, for example state and federal aid" in connection with post-petition financing, and merely declined to discuss any further specifics.  Buckfire Depos. 180:9-10.  Notably, Objectors appeared to understand the sensitivities involved with disclosing that information.  Buckfire Depos. 163:5-7 ("Well, I can understand why [its commercially sensitive] if you are seeking estate guarantee of a DIP or other things today, I get that and I'm not going to ask you about that ….") (Mr. Hackney).

15

## 2. The Discovery Sought by Objectors Is Not Relevant to the Assumption Motion.

The specific information sought by Objectors is not relevant to the Court's consideration of the Settlement. In order to approve the Settlement, the Court must determine whether it constitutes a sound exercise of business judgment, is fair and equitable and in the best interests of the City. *See* Assumption Mot. ¶ 41.

The City has justified assumption of the Settlement on the grounds that it "allows the City to access much needed cash flows, provides for a workable unwind of its swap obligations at a discounted price, and avoids potentially protracted litigation involving the swap transactions." *Id.* At least in connection with the Assumption Motion, which was the motion under consideration when the depositions at issue took place, information regarding the covenants in the post-petition financing term sheet, the potential collateral package, operation of the collateral package, the parties involved in the post-petition financing, and efforts to obtain alternate sources of post-petition funding, including funding from the State of Michigan and/or the federal government is simply not relevant to the Court's consideration of the Settlement's justifications.[2] The City's need for free access to the Casino Revenues, as discussed above, extends beyond its use as collateral for post-petition financing, and has no bearing on the importance of ridding the City of its swap obligations or the associated risk of litigation.

---

[2] Of course, such information is relevant to the now-pending Post-Petition Financing Motion, and therefore, has been provided to Objectors.

16

Accordingly, while discovery may be broad, the information sought by Objectors undoubtedly falls outside the bounds of relevant evidence to the Court.

### C. Even if Relevant, the City Properly Withheld the Discovery Sought by Objectors Under the Business Strategy Privilege.

Even if the information denied to Objectors was relevant, it was appropriately withheld as commercially sensitive and protected by the business strategy privilege. Courts routinely recognize a "business strategy privilege" that, while limited in scope and duration, provides a qualified immunity to discovery similar to the attorney work product doctrine under Federal Rule of Civil Procedure Rule 26(c) that protects from disclosure "the strategic business plans, proposals, or alternatives under consideration" by a party from whom discovery is sought where disclosure "would irreparably harm and prejudice" the party. *See Parsons v. Jefferson-Pilot Corp.*, 141 F.R.D. 408, 418 (M.D.N.C. 1992); *Grand Metro. PLC v. Pillsbury Co.*, Fed. Sec. L. Rep. P. 94,096; 14 Del. J. Corp. L. 1045, 1050 (Del. Ch. Nov. 21, 1988).

While this privilege has most commonly been asserted in contests for corporate control, it is not limited to that context. *See e.g.*, *Gioia v. Texas Air Corp.*, Case No. 9500, 1988 Del. Ch. LEXIS 30 (Del. Ch. Mar. 3, 1988) (applying the privilege in a shareholder suit to preclude discovery of corporate plans to deal with possible labor strikes by its work force); *In re Heizer Corp.*, Case No. 7949, slip op. (Del. Ch. Nov. 9, 1987) (applying the privilege to preclude the disclosure

17

of ongoing negotiations with third parties in a suit by a trustee related to the disbursement of trust assets); *Dedde v. Orrox*, Case No. 6409, slip op. (Del. Ch. Apr. 8, 1981) (applying the privilege to protect a dissident shareholder from discovery in a proxy fight). The principles underlying the privilege similarly justify its application here because the privilege recognizes and protects a responding party's ongoing responsibility to manage its affairs in the best interests of its constituents even in the face of challenges to those efforts. *Parsons*, 141 F.R.D. at 418-19. In essence, the privilege seeks to balance "inconsistent yet valid interests … on the one hand, the requesting party's need for information in order to fairly prepare for trial; and on the other, the responding party's need to be able to carry out an ongoing strategy." *Id.* at 419.

In the interests of balance, the business strategy privilege is limited in scope and precludes only "information concerning options still being actively considered" where disclosure would harm the responding party's interests. *Grand Metro.*, 14 Del. J. Corp. L. at 1051. Even within that limitation, the privilege typically precludes disclosure of the categories of information sought by Objectors. *See e.g.*, *id.* at 1051-54 (precluding the identity of and subject of discussions with any potential alternate investors with "a still lively interest" and materials related to a contemplated recapitalization). Here, disclosure of the covenants in the post-petition financing term sheet, the potential collateral package, operation of the

18

collateral package, the identity of parties involved in the post-petition financing, and efforts to obtain alternate sources of post-petition funding, including funding from the State of Michigan and/or the federal government, would have necessarily injured the City's post-petition financing negotiating position.

At the very least, disclosure would have revealed the City's baseline acceptable provisions to which all of its possible investors would have flocked. This result would almost certainly have ensured the City might only obtain post-petition financing on its worst possible terms. Such a result is quintessentially what the business strategy privilege is designed to prevent, and the information sought by Objectors accordingly warrants protection under the privilege. Indeed, Syncora has refused to disclosure similar information on the grounds that it is commercially sensitive and, presumably, protected by the business strategy privilege. Schwarzman Depos. 80:1-25.

Finally, while the business strategy privilege is further limited by its duration, that limitation is no longer at issue in the instant matter. "[O]nce a decision has been made," the requesting party may test its validity and inquire into its underlying basis. *Parsons*, 141 F.R.D. at 419; *see also Plaza Securities Co. v. Office*, Del. Ch., C.A. No. 8737, 1986 WL 14417 (Dec. 15, 1986). As a result, a requesting party will not be denied discovery forever. *Parsons*, 141 F.R.D. at 419 (citations omitted).

Here, as explained earlier, Objectors have not been indefinitely denied discovery into the City's post-petition financing efforts, plans, and proposed collateral package. Now that the City has completed its post-petition financing negotiations, it has provided – through discovery in connection with the Post-Petition Financing Motion and its dataroom – extensive information regarding the City's post-petition financing efforts. In particular, the City has provided Objectors with the very information they sought during discovery related to the Settlement – namely, the covenants in the post-petition financing term sheet, the potential and final collateral package, the identity of parties involved in the financing, efforts to obtain alternate sources of funding, including funding from the State of Michigan and/or the federal government, and the operation of the collateral package. Accordingly, Objectors can no longer argue that they have been prejudiced by lack of access to the information they sought during discovery related to the Settlement.

## Conclusion

For the foregoing reasons, the City respectfully requests that this Court deny Objectors' Motion *in Limine* to Preclude Debtor from Offering Evidence Regarding the City's Need to Obtain Casino Revenues in Connection with Its Debtor-in-Possession Financing Efforts.

20

Dated:  December 10, 2013              Respectfully submitted,


           /s/ David G. Heiman                  
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap
PEPPER HAMILTON LLP
4000 Town Center

21

Suite 1800
Southfield, MI 48075
Telephone:  (248) 359-7300
Facsimile:   (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK
AND STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan 48226
Telephone:  (313) 963-6420
Facsimile:   (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

*Counsel for the City of Detroit*

## SUMMARY OF ATTACHMENTS

| Exhibit 1 | Excerpts from the Deposition of Kevyn Orr |
|-----------|-------------------------------------------|
| Exhibit 2 | Excerpts from the Deposition of Kenneth Buckfire |

# EXHIBIT 1

***Excerpts from the Deposition of Kevyn Orr***

# In The Matter Of:

*City of Detroit*

---

*Kevyn Orr*
*August 30, 2013*

---



**Bingham Farms/Southfield ● Grand Rapids**
Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File ORR_KEVYN.txt*
*Min-U-Script® with Word Index*

1          UNITED STATES BANKRUPTCY COURT

2          FOR THE EASTERN DISTRICT OF MICHIGAN

3                 SOUTHERN DIVISION

4

5    In Re:

6

7    City OF DETROIT, MICHIGAN        Chapter 9

8                                     Case No.13-53846

9              Debtor.          Hon. Steven Rhodes

10                                     /

11

12

13        The Videotaped Deposition of KEVYN ORR,

14        Taken at 1114 Washington Boulevard,

15        Detroit, Michigan,

16        Commencing at 8:32 a.m.,

17        Friday, August 30, 2013,

18        Before Cindy Mendenhall, RPR, CSR-5220.

19

20

21

22

23

24

25

```
1    APPEARANCES:

2

3    GREGORY M. SHUMAKER

4    DAN T. MOSS

5    Jones Day

6    51 Louisiana Avenue N.W.

7    Washington, D.C. 20001

8    202.879.3939

9         Appearing on behalf of the City of Detroit.

10

11   ROBERT S. HERTZBERG

12   Pepper Hamilton LLP

13   4000 Town Center, Suite 1800

14   Southfield, Michigan 48075

15   248.359.7300

16        Appearing on behalf of the City of Detroit.

17

18   MATTHEW G. SUMMERS

19   Ballard Spahr, LLP

20   919 North Market Street, 11th floor

21   Wilmington, Delaware 19801

22   302.252.4465

23        Appearing on behalf of EEPK.

24

25
```

```
 1    VINCENT J. MARRIOTT III

 2    Ballard Spahr LLP

 3    1735 Market Street

 4    51st Floor

 5    Philadelphia, Pennsylvania 19103

 6    215.665.8500

 7         Appearing on behalf of EEPK.

 8

 9    STEPHEN HACKNEY

10    LALLY GARTEL

11    Kirkland & Ellis, LLP

12    300 North LaSalle

13    Chicago, Illinois 60654

14    312.862.2157

15         Appearing on behalf of Syncora.

16

17    JENNIFER GREEN

18    FRANK GUADAGNINO

19    Clark Hill, P.L.C.

20    500 Woodward Avenue, Suite 3500

21    Detroit, Michigan 48226

22    313.965.8300

23         Appearing on behalf of Police and Fire Retirement

24         System and Police and Fire General Retirement System.

25
```

```
 1  FRANK J. GUADAGNINO
 2  Clark Hill Thorp Reed
 3  One Oxford Centre
 4  301 Grant Street, 14th Floor
 5  Pittsburgh, PA 15219
 6  412.394.2329
 7       Appearing on behalf of Police and Fire Retirement
 8       System and Police and Fire General Retirement
 9       System.
10
11  KELLY DIBLASI
12  Weil, Gotshal & Manges, LLP
13  767 Fifth Avenue
14  New York, New York 10153
15  212.310.8032
16       Appearing on behalf of Financial Guaranty Insurance
17       Company.
18
19  ERNEST J. ESSAD, JR.
20  Williams, Williams, Rattner & Plunkett, P.C.
21  380 North Old Woodward, Suite 300
22  Birmingham, Michigan 48009
23  248.642.0333
24       Appearing on behalf of Financial Guaranty Insurance
25       Company.
```

```
 1   KAREN NEWBURY
 2   RICK L. FRIMMER
 3   Schiff Hardin, LLP
 4   233 South Wacker Drive, Suite 6600
 5   Chicago, Illinois 60606
 6   312.258.5522
 7       Appearing on behalf of Depfa Bank, PLC, as agent for
 8       DFS WertManagement.
 9
10   CAROLINE TURNER ENGLISH
11   Arent Fox, LLP
12   1717 K Street, NW
13   Washington, D.C. 20036
14   202.857.6000
15       Appearing on behalf of Ambac.
16
17   BIANCA FORDE
18   Winston & Strawn, LLP
19   200 Park Avenue
20   New York, New York 10166
21   212.294.4733
22       Appearing on behalf of Assured Municipal Guaranty
23       Corp.
24
25
```

```
 1   JASON JURGENS
 2   Cadwalader, Wickersham & Taft, LLP
 3   One World Financial Center
 4   New York, New York 10281
 5   212.504.6102
 6        Appearing on behalf of Merrill Lynch Capital Services.
 7
 8   GUY S. NEAL
 9   Sidley Austin, LLP
10   1501 K. Street, N.W.
11   Washington, D.C. 20005
12   202.736.8041
13        Appearing on behalf of National Public Finance
14        Guarantee Corp.
15
16   STEVEN WILAMOWSKY
17   Bingham McCutchen, LLP
18   399 Park Avenue
19   New York, New York 10022
20   212.705.7960
21        Appearing on behalf of UBS.
22
23
24
25
```

```
 1   CLAUDE D. MONTGOMERY

 2   Dentons

 3   620 Fifth Avenue

 4   New York, New York 10020

 5   212.632.8390

 6       Appearing on behalf of Official Committee of Retirees.

 7

 8   JEROME D. GOLDBERG

 9   Jerome D. Goldberg, PLLC

10   2921 East Jefferson, Suite 205

11   Detroit, Michigan 48207

12   313.393.6001

13       Appearing on behalf of David Sole, Party in Interest.

14

15

16   ALSO PRESENT:

17   Bailey Wellman - Video Technician

18

19

20

21

22

23

24

25
```

1   Q.   Was there anything that you can recall today that

2        happened on July 5th that was so urgent it couldn't

3        wait six hours?

4   A.   Every -- every day -- let me be clear about this, so

5        we can just get by it.  Every day that the City does

6        not make reinvestment in the City that has tens of

7        thousands of abandoned structures, that has four of

8        the most dangerous neighborhoods in the country, that

9        has police cars with over 250,000 miles on them, that

10       has police officers I believe during this time, one of

11       whom got shot in the head by a perpetrator that nine

12       cars had surrounded and remains in the hospital today,

13       every day that this City does not make reinvestment is

14       a dangerous day.

15   Q.   Were there any negotiations scheduled for July 5th,

16       2013, the day after July 4?

17   A.   I don't -- I don't recall.  If there's something you

18       can refresh my recollection.  I believe there was --

19       there was something on July 5th.  I'm just not

20       recalling what it was.

21   Q.   Did this letter cause the negotiations to cease

22       between June 17th and when you're able to obtain the

23       TRO on July 5th?

24   A.   I wouldn't say whether it caused them to cease.  As I

25       said before, it had an impact and it was disruptive.

1    A.    I told you, lives are at stake in the City every day.

2    Q.    Are they at stake with respect to access to the --

3    A.    Every day --

4    Q.    -- casino revenues?

5    A.    I will say again, every day that we don't have access

6          to casino revenue, we cannot make the necessary

7          reinvestment in this City to provide for the health,

8          safety and welfare of the citizens, and that's a true

9          statement.

10   Q.    If I said that lives are at stake with respect to the

11         casino revenues, can you agree with that statement?

12                   MR. SHUMAKER:   Objection, asked and

13         answered.

14   A.    I've answered your question.

15   BY MR. HACKNEY:

16   Q.    Can you -- can you agree with my statement?

17   A.    I've answered your question.

18   Q.    I disagree that you've answered my question.  We'll

19         take the objection up at the -- with the Court, but

20         are lives at stake with respect to access to the

21         casino revenues?

22   A.    I've answered your question.

23                   (Whereupon Rick Frimmer left the

24                   deposition at 9:41 a.m.)

25                   MR. HACKNEY:   Well, we're going to have to

1      the City.

2  A.   It's an important aspect of the City.

3  Q.   Do you still project that you're going to run out of

4       cash by the end of the year?

5  A.   If we don't have this agreement, there's a very real

6       chance, yes, in a steady state, we will run out of

7       cash.

8  Q.   And by -- what do you mean by a steady state?

9  A.   If we don't do anything such as secure this casino

10      revenue, if we don't go to the capital markets and

11      borrow additional funds, which appears unlikely which

12      the City has done every other year since 2008 to make

13      up the difference, yes, the projections show that by

14      December of this year, we will run out of cash.

15 Q.   Are those the pre-bankruptcy projections?

16 A.   Yes.  I believe so.

17 Q.   Those are the projections that we'll get into in a

18      moment that -- but that assumes that the City's paying

19      its legacy expenditures on a current basis, right?

20 A.   Yes.  As we have -- as we have represented, we intend

21      to continue doing that throughout the year.

22 Q.   The legacy expenditures?

23 A.   Well, certainly with regard to healthcare and other

24      employees, if we get this agreement, that may change

25      our risk for the termination payment.

1    Q.    Your view of those legacy expenditures in the

2          bankruptcy is that they are unsecured claims, correct?

3    A.    Yes.  Many of them are, yes.  There are some

4          expenditures that are secured with regard to the water

5          department and parking and some miscellaneous, but the

6          roughly 11 and a half, 12 billion dollars that we put

7          out there we view as unsecured.

8    Q.    So let's go back to sourcing this termination payment.

9    A.    Yes.

10   Q.    It was my understanding of his testimony that

11         Mr. Buckfire who, by the way, is the individual tasked

12         with obtaining the City's post petition financing,

13         correct?

14   A.    Yes.

15   Q.    And is presumably the individual that's most

16         knowledgeable about that effort?

17   A.    Yes.

18   Q.    It was -- I'll represent to you that his testimony was

19         that the proceeds for the optional termination payment

20         would likely come from the post -- the proceeds of the

21         post petition financing?

22   A.    Yes.

23                     MR. JURGENS:  Objection to form.

24   BY MR. HACKNEY:

25   Q.    Is that also your understanding?

```
 1        mislead you.  It is my assumption that, while they're
 2        commercially sensitive, that's not going to be
 3        forthcoming.
 4   Q.   Oh, really?
 5   A.   Yes.
 6   Q.   So just to tie it up, you tried to get a -- whether
 7        it's credit enhancement or liquidity from the State
 8        and the Feds, and your expectation is that you won't
 9        be able to?
10   A.   My understanding at the State level is that there's
11        certain prohibitions of the State law on the ability
12        of the State to lend to the City, and at the Federal
13        level my understanding is that it's not going to be
14        forthcoming, direct aid.
15   Q.   Interesting.  And what about credit enhancement by the
16        State?
17   A.   Here again, it's highly commercially insensitive --
18        sensitive.  I don't want to say anything that
19        forecloses it, but we -- let me answer it this way.
20        We are operating on the assumption that that will not
21        come -- be forthcoming.
22   Q.   The casino revenues are about 170 million dollars a
23        year; isn't that correct?
24   A.   Yeah, 170, 180 somewhere in there.
25   Q.   Yeah.  In fact, that -- it's interesting because the
```

1      monthly basis under the forbearance agreement --

2  A.   Yes.

3  Q.   -- you net about 11 million?

4  A.   I think that's correct.

5  Q.   Okay.  Your claim is that these revenues are necessary

6       to the operation of the City.  I think we discussed

7       that earlier.

8  A.   Yes.

9  Q.   And in fact it's your expectation that you will use

10      these revenues to fund the reinvestment program that

11      you have planned with respect to the 1.25 billion

12      dollars of reinvestment in the City over the next ten

13      years?

14 A.   Yes, that's correct.  An average of 125 million a year

15      which a big component of it is this revenue.

16 Q.   Okay.  So fair statement, you're going to take the

17      casino revenues and you're going to plow them into the

18      City, correct?

19 A.   More -- I mean, money goes into a bathtub, but yes.

20      The casino -- we don't have the casino revenue.  We

21      have no other source to make reinvestment in the City.

22 Q.   And that's what you want to do?

23 A.   Yes.

24 Q.   And so as a creditor, I'm going to make the obvious

25      point that you don't plan to take the casino revenues

```
 1          and give them to the unsecured creditors, correct?
 2   A.     I think that's generally a fair characterization.
 3   Q.     So isn't it fair that other than perhaps certainly
 4          benefitting the people of Detroit if you reinvested in
 5          the City, the creditors themselves will not see their
 6          recoveries enhanced by the fact that the City has
 7          gained access to these casino revenues, correct?
 8                    MR. SHUMAKER:  Objection, calls for
 9          speculation.
10   A.     Yeah, I'm going to be careful here because one of the
11          things we've offered in our proposal, June 14th
12          proposal, is a 2 billion dollar note that has some
13          capacity to fluctuate.  Generally speaking, your
14          statement is true, but there's another concept that
15          without this reinvestment there's a very real chance
16          that the City will have no chance to stabilize and
17          grow and the creditors will see no opportunity for any
18          benefit because the City would have an inability of --
19          continue to decline, quality of life will continue to
20          decline, revenue from other streams will continue to
21          decline, and the City's ability to satisfy its
22          obligations to the creditors will continue to decline.
23   Q.     Now, I understand that distinction, and we're talking
24          now about the proposal you've made to creditors that
25          you would give all of the unsecureds --
```

# EXHIBIT 2

***Excerpts from the Deposition of Kenneth Buckfire***

# In The Matter Of:

*City of Detroit*

---

*Kenneth Buckfire*
*August 29, 2013*

---



**BIENENSTOCK**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

**Bingham Farms/Southfield ● Grand Rapids**
Ann Arbor ● Detroit ● Flint ● Jackson ● Lansing ● Mt. Clemens ● Saginaw

*Original File BUCKFIRE_KENNETH.txt*
*Min-U-Script® with Word Index*

1            UNITED STATES BANKRUPTCY COURT

2          FOR THE EASTERN DISTRICT OF MICHIGAN

3                   SOUTHERN DIVISION

4

5    In Re:

6

7    CITY OF DETROIT, MICHIGAN   Chapter 9

8                              Case No.13-53846

9            Debtor.            Hon. Steven Rhodes

10                                    /

11

12

13        The Video Deposition of KENNETH BUCKFIRE,

14        Taken at 1114 Washington Boulevard,

15        Detroit, Michigan,

16        Commencing at 9:31 a.m.,

17        Thursday, August 29, 2013,

18        Before  Nora Morrissy, RMR, CRR, CSR-2642.

19

20

21

22

23

24

25

```
 1   APPEARANCES:

 2

 3   THOMAS CULLEN, JR.

 4   BENJAMIN ROSENBLUM

 5   Jones Day

 6   51 Louisiana Avenue N.W.

 7   Washington, D.C. 20001

 8   202.879.3939

 9       Appearing on behalf of the City of Detroit.

10

11   MATTHEW G. SUMMERS

12   Ballard Spahr, LLP

13   919 North Market Street, 11th floor

14   Wilmington, Delaware 19801

15   302.252.4465

16       Appearing on behalf of EEPK.

17

18   STEPHEN HACKNEY

19   LALLY GARTEL

20   Kirkland & Ellis, LLP

21   300 North LaSalle

22   Chicago, Illinois 60654

23   312.862.2157

24       Appearing on behalf of Syncora.

25
```

```
 1   JENNIFER GREEN
 2   FRANK GUADAGNINO
 3   Clark Hill, P.L.C.
 4   500 Woodward Avenue, Suite 3500
 5   Detroit, Michigan  48226-3435
 6   313.965.8300
 7       Appearing on behalf of Police and Fire Retirement
 8   System and Police and Fire General Retirement System.
 9
10   KELLY DIBLASI
11   Weil, Gotshal & Manges, LLP
12   767 Fifth Avenue
13   New York, New York 10153
14   212.310.8032
15       Appearing on behalf of Financial Guaranty Insurance
16   Company.
17
18   ERNEST J. ESSAD, JR.
19   Williams, Williams, Rattner & Plunkett, P.C.
20   380 North Old Woodward, Suite 300
21   Birmingham, Michigan  48009
22   248.642.0333
23       Appearing on behalf of Financial Guaranty Insurance
24   Company.
25
```

1  KAREN NEWBURY

2  Schiff Hardin, LLP

3  233 South Wacker Drive, Suite 6600

4  Chicago, Illinois 60606

5  312.258.5522

6      Appearing on behalf of Depfa Bank, PLC, as agent for

7  DFS WertManagement.

8

9  CAROLINE TURNER ENGLISH

10  Arent Fox, LLP

11  1717 K Street, NW

12  Washington, D.C. 20036

13  202.857.6000

14      Appearing on behalf of Ambac.

15

16  BIANCA FORDE

17  Winston & Strawn, LLP

18  200 Park Avenue

19  New York, New York 10166

20  212.294.4733

21      Appearing on behalf of Assured Municipal Guaranty

22  Corp.

23

24

25

1   JASON JURGENS

2   Cadwalader, Wickersham & Taft, LLP

3   One World Financial Center

4   New York, New York 10281

5   212.504.6102

6       Appearing on behalf of Merrill Lynch Capital Services.

7

8

9   GUY S. NEAL

10  Sidley Austin, LLP

11  1501 K. Street, N.W.

12  Washington, D.C. 20005

13  202.736.8041

14      Appearing on behalf of National Public Finance

15  Guarantee Corp.

16

17  STEVEN WILAMOWSKY

18  Bingham McCutchen, LLP

19  399 Park Avenue

20  New York, New York  10022

21  212.705.7960

22      Appearing on behalf of UBS.

23

24  ALSO PRESENT:

25  Bailey Wellman, Video Technician

1  Q.   What do you believe to be the benefits to the City of

2        entering into the forbearance agreement?

3  A.   Well, there are three.  Most important is continued

4        and reliable access to the City's net share of the

5        gaming revenues.  By that I mean the amount remaining

6        after paying off the fixed Swap payments.  That's a

7        critical element to the City's ability to operate in

8        the ordinary course and invest in its reinvestment

9        program.

10          Second, obviously the opportunity to

11        terminate the Swaps and eliminate this class of

12        creditors from a plan of adjustment at a discount

13        particularly since it's a secured party is of economic

14        value to the City, it saves real cash.

15          Lastly, by freeing up the gaming revenues,

16        it will give the City financing options as part of the

17        plan of adjustment that it otherwise might not have.

18  Q.   With respect to -- with respect to freeing up the

19        gaming revenues, how in your view does the forbearance

20        agreement provide the City with better access to those

21        revenues?

22  A.   Well, by the action of the collateral agreement today

23        the City receives the net revenues after paying the

24        Swap payments on a monthly basis.

25  Q.   The City -- the City today has access to the casino

```
 1              MR. CULLEN:  Objection, foundation, form,
 2        but you can address the question.
 3   A.    Yes, the City has a plan.
 4   BY MR. SUMMERS:
 5   Q.    And what is that plan?
 6   A.    The City intends to secure a debtor in possession
 7        financing of sufficient proceeds to fund the
 8        termination payment as well as provide sufficient cash
 9        for the City to execute on its reinvestment program
10        during the bankruptcy.
11   Q.    And what is -- what actions, if any, has the City
12        taken toward obtaining debtor in possession financing?
13   A.    We have contacted a large universe of potentially
14        interested investors, many of whom have signed
15        nondisclosure agreements, NDAs, pursuant to which they
16        have received the request for proposal, the RFP which
17        went out yesterday.
18   Q.    And is Miller Buckfire leading the effort to obtain
19        debtor in possession financing?
20   A.    Yes.
21   Q.    And when you say a large universe of potential
22        investors, do you know approximately how many have
23        been talked to?
24   A.    At the moment it's in excess of 30.
25   Q.    And how many have -- how many have signed
```

```
1        nondisclosure agreements?
2   A.   That's the universe I'm discussing, approximately 30
3        or more.
4   Q.   So, everybody you've talked to signed?
5   A.   No, some people didn't want to participate.  I can't
6        tell you how many we called.  I can tell you how many
7        we sent NDAs to which have been returned to us, it's
8        in excess of 30.
9   Q.   Are some of the people or some of the potential
10       sources of financing that Miller Buckfire have spoken
11       to said no, we're not interested?
12  A.   Yes.
13  Q.   And approximately how many have said no?
14  A.   Hasn't been that many, maybe ten.  Would your client
15       like one?
16  Q.   And do you know who those ten entities are that have
17       said they are not interested?
18  A.   I do, yes.
19  Q.   And who are they?
20  A.   I'm not going to tell you that.
21  Q.   On what basis?
22  A.   It's commercially sensitive information.
23            MR. CULLEN:  Counsel, maybe it will help,
24       and I don't know whether you want this on the record
25       or not, but the position we are going to take with
```

```
 1        go -- move through the questions and see how we do.
 2                    MR. CULLEN:  Okay.
 3                    MR. SUMMERS:  I understand the City's
 4        position on it.
 5                    MR. CULLEN:  Okay.
 6   BY MR. SUMMERS:
 7   Q.   You said an RFP went out yesterday?
 8   A.   Correct.
 9   Q.   Approximately how many people was the RPF sent to
10        yesterday?
11   A.   The 30 plus people who signed the NDA.
12   Q.   How much debtor-in-possession financing does the City
13        hope to obtain?
14   A.   Three hundred fifty million dollars, up to three
15        hundred fifty million dollars.
16   Q.   And does the City have a goal on the interest rate?
17   A.   The lowest possible interest rate.
18   Q.   Does the RFP attempt to define what that lowest
19        possible interest rate is?
20   A.   No.
21   Q.   Does it define whether the interest rate needs to be
22        fixed or variable?
23   A.   No.
24   Q.   What covenants, if any, are included in the RFP as
25        being acceptable or not acceptable?
```

```
1    A.   I'm not going to discuss that.  It's commercially
2         sensitive.
3    Q.   How long of maturity on the DIP financing is the City
4         looking to obtain?
5    A.   Through the pendency of the end of the case.
6    Q.   And is the City offering a lien on casino revenues in
7         connection with the DIP financing?
8    A.   In part.
9    Q.   I assume the City does not expect to obtain unsecured
10        financing?
11   A.   I would take it if it was offered.
12   Q.   No doubt.  What other collateral is the City offering
13        to secure the DIP financing loan?
14   A.   I'm not going to answer that question.
15   Q.   Does the RFP define what collateral would be
16        available?
17   A.   Yes, it does.
18   Q.   And that's been sent out to potential investors?
19   A.   Who have signed nondisclosure agreements.
20   Q.   If somebody new came and said I would be interested in
21        providing DIP financing, you would have them sign an
22        NDA and then provide them the RFP?
23   A.   If they wanted to make an unsolicited proposal without
24        the benefit of the RPF, we would be happy to accept
25        it.  Are you suggesting your client is interested in
```

1  Q.   And what is that deal?

2            MR. CULLEN:  Objection to the extent it

3       calls for a legal conclusion.

4  A.   Well, we have to find a willing lender, that's number

5       one.  Number two, we have to have a court order

6       approving the form of the DIP financing, and, number

7       three, we believe we need to have approval of the

8       forbearance and termination agreements we get the

9       benefit of the elimination of the collateral pledge

10      and the benefit of the discount.

11 BY MR. SUMMERS:

12 Q.   Do you need a determination on eligibility as well?

13 A.   Probably as a condition to closing but not as a

14      condition to getting a loan commitment.

15 Q.   And what time line does the City hope to secure

16      debtor-in-possession financing?

17 A.   Well, it's a large group of potential lenders, and,

18      therefore, we have requested preliminary indications

19      of interest by September the 6th, next Friday.  We

20      want to determine who really has a serious interest

21      and therefore encourage their ability to do due

22      diligence in a rational way because they will all have

23      due diligence requirements.

24           We simply can't handle all 30.  If they all

25      decide they want to put in proposals, we'll do the

1    best we can, but I'm assuming a smaller number when

2    they see the RFP will want to proceed to the second

3    stage which is to propose actual terms in response to

4    our RFP.  The date for that I believe is September the

5    16th.

6  Q.  Has a time line for the DIP financing because the view

7    of what the time line should be for the DIP financing

8    beyond the September 16th deadline?

9  A.  Well, we will receive I hope on the 16th multiple

10    serious indications of interest back by term sheets.

11    At that point we will look at how many we have and

12    we'll determine whether there's one that is so

13    superior to the others that we'll negotiate with that

14    party exclusively.

15            If we have a lot that are very competitive,

16    we may decide to negotiate with several of them at the

17    same time.

18            So, I don't have a clear view at this time

19    what date we'll actually select our lender, but it

20    will clearly be something we'll focus on after the

21    16th of September.  The goal will be to do it as soon

22    as possible.

23  Q.  Based on your experience in other cases do you have a

24    view as to what -- how long the selection of the

25    lender is likely to take?

1  A.   Depends on how many proposals I get back.

2  Q.   If you get 15 back, do you have a view of how long

3       it's likely to take?

4  A.   We should be so lucky.  I think that will take several

5       weeks, probably two weeks to come up with a winning

6       bid as it were.

7  Q.   And then the intent would be to as quickly as possible

8       present that to the bankruptcy court, is that correct?

9  A.   Yes.

10  Q.  And if the City obtains a debtor-in-possession

11      financing, what's the intended use of the financing?

12              MR. CULLEN:  Asked and answered but you can

13      address it again.

14  A.  I've already answered it.

15  BY MR. SUMMERS:

16  Q.  Why don't you go ahead, say it again.

17  A.  We'll use proceeds to terminate the Swaps at the

18      discount provided for in the forbearance agreement and

19      the balance of the DIP loan will be retained by the

20      City as working capital and to support its

21      reinvestment program.

22  Q.  Are there any other intended uses to the DIP financing

23      other than the two you just said?

24  A.  Not that I'm aware of.

25  Q.  And the amount of the casino revenues that are

1        forbearance agreement a valid contract?

2                    MR. CULLEN:  Objection.  Asks for a legal

3        conclusion.

4    A.   I can't answer that.  It calls for a legal conclusion.

5    BY MR. SUMMERS:

6    Q.   If the court doesn't approve the forbearance

7        agreement, will the City still attempt to perform

8        under the forbearance agreement?

9                    MR. CULLEN:  Objection.  Calls for

10       speculation.

11   A.   I can't answer that question.  I don't understand it.

12   BY MR. SUMMERS:

13   Q.   Have you ever discussed with Mr. Orr what the City

14       will do with respect to the Swaps if the forbearance

15       agreement is not approved?

16   A.   The financial consequences of not having the

17       forbearance agreement approved would be very dire for

18       the City of Detroit.  We could no longer count on our

19       access to gaming revenues, we would no longer be able

20       to execute on the reinvestment plan which has been

21       described to the public and to the creditors on June

22       14th.  We might be required to in fact reduce existing

23       City services in order to live within our cash

24       resources.  I'm only identifying some of the concerns

25       we would immediately have to review in order to come

 1  A.   Our June 14th plan and proposal to creditors pursuant
 2       to which we proposed a two billion dollar note be
 3       given out to all of our unsecured creditors assumes
 4       that the City is able to execute its reinvestment
 5       program over the next ten years which assumes that we
 6       have access to the cash flows embodied in that plan
 7       including the gaming revenues.
 8  Q.   It's not -- it's access to the gaming revenues to
 9       grant a lien on them again?
10  A.   Not necessarily.  But the point is if we don't have
11       the gaming revenues because the actions of the Swap
12       counterparties, we can't even start the reinvestment
13       plan.
14  Q.   The City intends, correct me if I'm wrong, but I
15       thought that the City intends to enter into DIP
16       financing and grant a lien on the casino revenues as
17       the next step after approval of the forbearance
18       agreement?
19            MR. CULLEN:   Objection.  Foundation.
20       Form.
21  A.   If we have no forbearance agreement and we have to
22       live with the current Swap termination rights and the
23       Swap counterparties were to terminate officially and
24       require the City to pay three hundred million dollars
25       to them, by action of the agreement they would seize

```
 1        to your knowledge, isn't that correct?
 2   A.   Not on this, no.
 3   Q.   I wanted to clarify something that you said about the
 4        DIP earlier and it was mainly that -- you used the
 5        phrase I didn't understand with respect to the casino
 6        revenues, you said -- you either said that the casino
 7        revenues would be a part of the collateral package or
 8        that part of the casino revenues would be in the
 9        collateral package, and I wanted to clarify that.
10                   MR. CULLEN:  Objection.  Foundation.  Form.
11        I don't think he said either.
12   A.   I didn't.
13   BY MR. HACKNEY:
14   Q.   Oh, okay.  Well, I thought for sure you had said one
15        of those two, but let me understand what you
16        anticipate -- this is subject to counsel's concern,
17        but I think there has been testimony about the casino
18        revenues as part of the collateral package.
19                   As the banker who is leading the DIP,
20        what's your understanding of the role the casino
21        revenues will play in the collateral package offered
22        in connection with the DIP?
23   A.   They will be part of the collateral package.
24   Q.   So, they will be part, and when you say they, do you
25        mean a specific period of time of the casino revenues
```

1    which is the base case recovery we presented on June

2    14th.

3 Q.  Right.  So, if the court grants the motion and you get

4    access to it, that will be consistent with the base

5    case which is consistent with the two billion dollar

6    offer, right?

7 A.  Correct.

8 Q.  So, it won't go up if the court grants you the access

9    that you're assuming you'll get?

10 A.  But it will go down if the court does not.

11 Q.  That's a different question.  I'll get to that in a

12    moment.

13           It  won't go up if the court grants the

14    motion, correct?

15 A.  Correct.

16 Q.  Your argument if I understood it was that the

17    casino revenues will be used to invest in the City,

18    correct?

19 A.  Revenues of the City are fungible.  All I'm saying if

20    you don't have access to those revenues, then you

21    don't have the billion dollar plus of revenues that

22    you thought you had which is supporting not only

23    current operations but the reinvestment plan.

24 Q.  And I will say that I had understood you earlier to

25    say if you didn't have access to casino revenues, that

1   Q.   And why aren't you going to tell me about that?

2   A.   It's commercially sensitive information.

3   Q.   Why?

4   A.   That's my answer.

5   Q.   Well, I can understand why if you are seeking estate

6        guarantee of a DIP or other things today, I get that,

7        and I'm not going to ask you about that, but I am

8        going to say that I think I deserve an answer on what

9        happened prior to June 4 in terms of finding

10       alternative ways to address the City's liquidity

11       crisis because after all what's been presented to us

12       was if we didn't do this deal, the City would die, and

13       I do think we are entitled to ask well, what had you

14       tried to do with other actors, so, can we get over it

15       or --

16             MR. CULLEN:  You could certainly ask if he

17       had received any assurance of the availability of any

18       other funding from any other source during that time

19       period.

20             MR. HACKNEY:  Well, I do appreciate that

21       but I often tend to ask my own questions.    Let me

22       try and ask it in a way that hopefully serves your

23       concerns.

24   BY MR. HACKNEY:

25   Q.   And let me first ask you, Mr. Buckfire, had your firm,

1     other than we've got now the novation idea and finding

2     another lender to fund the termination of the Swaps.

3  A.  Those are the two principal alternatives.

4  Q.  Principal alternatives.  Were there other not

5     principal alternatives but still alternatives?

6  A.  We reviewed the noncore assets of the City to

7     determine whether there was any source of ready cash

8     that we could access to use to fund the termination

9     payment.  We considered alternate source of funding,

10    for example, state and federal aid as I already

11    testified I'm not going to address.  We considered

12    everything.

13 Q.  Prior to June 4th, did you submit a request to the

14    state for aid on behalf of the City?

15 A.  I'm not going to answer that question.

16 Q.  You will not answer even whether the City made a

17    request for state aid prior to June 4th?

18 A.  It's commercially sensitive information.  I

19    respectfully cannot answer that question.

20 Q.  Was there a request for state aid that was rejected

21    prior to June 4th?

22 A.  I'm not going to answer that question.

23 Q.  On what basis won't you answer whether there was one

24    that was rejected?

25 A.  Commercially sensitive information.