```
-------------------------------------------------x
                                                 :
In re                                            :     Chapter 9
                                                 :
CITY OF DETROIT, MICHIGAN,                       :     Case No. 13-53846
                                                 :
                    Debtor.                      :     Hon. Steven W. Rhodes
                                                 :
                                                 :
-------------------------------------------------x
```

# OPPOSITION TO THE OBJECTORS' MOTION *IN LIMINE* TO PRECLUDE DEBTOR FROM OFFERING EVIDENCE REGARDING THE LIKELIHOOD OF SUCCESS, COMPLEXITY, AND EXPENSE OF CLAIMS THE CITY SEEKS TO SETTLE WITH THE FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT

The City of Detroit (the "City"), debtor in the above captioned case, opposes the Objectors' motion *in limine* to preclude debtor from offering evidence regarding the complexity, expense, inconvenience, delay, or probability of success of claims the City seeks to settle with the Forbearance and Optional Termination Agreement, (Dkt. No. 933). The Objectors claim the City has asserted "attorney-client privilege over all aspects of their evaluation of the potential claims" resolved by the Forbearance and Optional Termination Agreement ("the Forbearance Agreement"). (Mot. in Limine at 2.) The Objectors assert that because the City "shielded its analysis of the merits, complexity, and related cost of litigation" of the claims being settled during discovery, "it should be precluded from introducing

such evidence at the hearing on the Assumption Motion." (*Id*.) The Objectors also argue that the City cannot meet its burden under Rule 9019 without waiving its attorney-client privilege over its legal analysis. (*Id*. at 11-15.)

The Objectors' motion should be denied. That the City properly asserted attorney-client privilege over its legal analysis in response to the Objectors' deposition questions aimed at revealing privileged information provides no basis for precluding the City from offering non-privileged evidence about the fair and equitable nature of the Forbearance Agreement at the Assumption Hearing. And, the Objectors' claim that the City cannot meet its burden under Federal Rule of Bankruptcy Procedure 9019 without waiving its attorney-client privilege is premature and meritless. Whether the City has met its burden under Rule 9019 is the question to be resolved by the Court following the Assumption Hearing, not through a motion *in limine*.

## BACKGROUND

1. The factual background of the swap agreements and the Forbearance Agreement is explained in detail in several filings before the Court including, among others, the City's response in opposition to Syncora's motion to dismiss filed in Adversary Proceeding No. 13-04942-swr, Dkt. No. 64 at 1-8, and this Court's Opinion Regarding Eligibility, Dkt. No. 1945 at III(A)(5).

2.  In sum, in 2005 and 2006, the City set out to raise $1.4 billion for its underfunded pension funds, the General Retirement System and Police and Fire Retirement System. The City created a non-profit service corporation for each pension fund and then entered into service contracts with the corporations. The service corporations created funding trusts that issued debt obligations called "Pension Obligation Certificates of Participation"—sometimes referred to as "COPs." Some of the COPs paid floating interest rates. Pursuant to the service contracts, the City made regular payments to the service corporations, which, in turn, had assigned certain of their rights to the funding trusts. Each COP represented an undivided proportionate interest in the payments that the City would make to the service corporations under the service contracts. To make these investments more attractive, the City purchased insurance from two monoline insurers to protect against default by the funding trusts in the event the City failed to make a payment to the service corporation. Today, Syncora and FGIC are those insurers.

3.  To convert the floating interest rates attached to the COPs to a fixed rate, the service corporations entered into interest rate swap agreements with UBS and SBS, who later assigned its swap to Merrill Lynch (collectively, with UBS, the "Swap Counterparties"). Simply stated, the service corporations and Swap Counterparties agreed that if the floating interest rate exceeded a certain rate,

the Swap Counterparties would be responsible for the payment above the "fixed" rate. If, however, the floating interest rate fell below a certain rate, the Swap Counterparties would receive a payment. Like the COPs, the City purchased insurance—separate from the COPs—to insure the swap payments. Syncora and FGIC insured the payments due under the swap agreements.

4. A few years later, in early 2009, the service corporations defaulted under the terms of the swap agreements. To avoid a termination of the swap agreements, which would have required a termination payment of several hundred million dollars to the Swap Counterparties, the City and the Swap Counterparties negotiated a settlement in June of 2009. This settlement resulted in a Collateral Agreement, under which the City pledged revenues from the casinos operating in the City as security for its obligations relating to the swap payments. These revenues were a combination of taxes the City imposed upon the casinos' wagering revenues and periodic payments the casino developers were required to pay the City (collectively, the "Casino Revenues"). The Collateral Agreement established a lockbox system to assure payment to the Swap Counterparties, while also providing the City access to the Casino Revenues. U.S. Bank was appointed as custodian of the lockbox system.

5. In the event the swap payments were not made, the Collateral Agreement permitted the Swap Counterparties to instruct U.S. Bank to withhold—

or "trap"—the Casino Revenues that otherwise would flow to the City under the lockbox arrangement. Since 2009, the City has made all payments required under the Collateral Agreement and swap agreements in a timely manner. Accordingly, since June of 2009, the City has had uninterrupted access to the Casino Revenues.

6. In June of 2013, however, after the Emergency Manager announced that the City would not make any further payments on the COPs— another set of payment obligations insured by Syncora—Syncora sent letters to U.S. Bank demanding that U.S. Bank withhold the Casino Revenues from the City. The City believed that Syncora had no grounds for doing so and sought a temporary restraining order from Wayne County Circuit Court to enjoin Syncora from interfering with the City's Casino Revenues. (*See* Dkt. No. 2-3 at 13-14, Adv. Proc. No. 13-04942-swr (Verified Complaint).) The City believes Syncora contacted U.S. Bank to gain leverage on the City and obtain concessions on its distinct obligations relating to the COPs. (*Id*. at 14.) The Swap Counterparties, meanwhile, for whose benefit the collateral arrangement was set up, gave no such withholding instructions to U.S. Bank. Instead, the Swap Counterparties affirmed that the City was entitled to continue receiving the flow of its Casino Revenues. Nonetheless, the conflicting instructions given to U.S. Bank led it to trap the Casino Revenues and withhold them from the City.

-5-
13-53846-tjt    Doc 2031    Filed 12/10/13    Entered 12/10/13 19:52:36    Page 5 of 20

7. Meanwhile, new events of default in 2012 and 2013, along with the appointment of Mr. Orr as the Emergency Manager for the City of Detroit on March 14, 2013, raised the possibility that the Swap Counterparties could terminate the swaps and once again demand an enormous termination payment. To avoid this, the City negotiated the Forbearance Agreement which was executed on July 15, 2013. Among other things, the Forbearance Agreement will give the City the right to buy out the swaps at an attractive discount, which will extinguish the Swap Counterparties' lien on the Casino Revenues and assure the City uninterrupted access to the Casino Revenues. The Forbearance Agreement also relieves insurers—including Syncora and FGIC—of any payment obligations under the swap agreements.

## ARGUMENT

8. In addition to seeking authorization to assume the Forbearance Agreement pursuant to Section 365 of the Bankruptcy Code, the City has sought court approval of the Forbearance Agreement under Federal Rule of Bankruptcy Procedure 9019. (*See* Dkt. No. 157). A court may approve a settlement under Rule 9019 if an objective analysis shows that the compromise "is fair and equitable." *In re Bard*, 49 F. App'x 528, 530 (6th Cir. 2002) (per curiam); *see In re Fishell*, 47 F.3d 1168, *3 (6th Cir. 1995) (per curiam) (unpub. decision) (*citing Protective Comm. for Indep. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*,

390 U.S. 414, 424-25 (1968) (court must form "intelligent and objective opinion of the probabilities of ultimate success should the claim be litigated")). To determine whether a settlement is "fair and equitable," courts look to factors including: (a) "[t]he probability of success in the litigation"; (b) "the difficulties, if any, to be encountered in the matter of collection"; (c) "the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it"; and (d) "the paramount interest of the creditors and proper deference to their reasonable views." *In re Bard*, 49 F. App'x at 530; *see also In re MQVP, Inc.*, 477 F. App'x 310, 313 (6th Cir. 2012) (applying Bard factors). Courts also consider "all other factors relevant to a full and fair assessment of the wisdom of the proposed compromise." *TMT Trailer Ferry*, 390 U.S. at 424.

9. It is well-established that, in evaluating whether a settlement is "fair and equitable," the court "need not hold a mini-trial." *In re Fishell*, 47 F.3d 1168, at *3 (citing *In re Am. Corp.*, 841 F.2d 159, 163 (7th Cir. 1987)). Nor must the court "decide the numerous questions of law and fact" at issue in the settled claims. *In re ServiSense.com, Inc.*, 382 F.3d 68, 71 (1st Cir. 2004) (citation omitted). Rather, the "obligation of the court is to 'canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'" *In re Dow Corning Corp.*, 192 B.R. 415, 421 (Bankr. E.D. Mich. 1996) (citations omitted). Thus, the court's task is "to apprise itself of all

facts necessary to evaluate the settlement and make an informed and independent judgment as to whether the compromise is fair and equitable," *In re Bard*, 49 Fed. App'x at 530, taking into consideration that "[t]he law favors compromise," *In re MQVP*, 477 Fed. App'x at 312.

> **A. Preclusion of Evidence is Not Warranted Because the City Has Not and Will Not Use its Attorney-Client Privilege as a Sword and a Shield.**

10. The Objectors argue that the City should not be permitted to introduce any evidence at the Assumption Hearing on element (a) of the *Bard* test—probability of success in litigation—or on element (c)—the complexity, expense, and delay of litigation—because the City did not disclose its counsels' privileged legal analysis of the risks and benefits of Settlement during the deposition of Mr. Orr. (Mot. in Limine at 15.) The Objectors broadly contend that presenting *any* evidence (apparently including *non-privileged* evidence) at the hearing that these elements support a finding that the Forbearance Agreement is fair and equitable would "use the attorney-client privilege as both a sword and a shield." (*Id.*)[1]

---

[1] The Objectors also assert that the "City's [Assumption] motion never even identifies what claims are being settled by the Forbearance Agreement." (Mot. in Limine at 4.) The Forbearance Agreement itself makes clear what claims it compromises. By entering the Forbearance Agreement, the City compromised all claims that the swap agreements were invalid. (*See* Forbearance Agreement 3.4 (Dkt. No. 17 at p. 229).) In exchange, the Swap Counterparties compromised their

11.     The Objectors are wrong. The rule against using the attorney-client privilege as a "sword and shield" means that a party cannot "hide behind [attorney-client] privilege if [it is] relying upon privileged communications to make [its] case," *In re Lott*, 139 F. App'x 658, 660 (6th Cir. 2005) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)), for example, by "disclos[ing] some selected communications for self-serving purposes," *Bilzerian*, 926 F.2d at 1292.

12.     Here, however, the sword and shield doctrine reference is inapplicable because the City is not relying on privileged communications to make its case and is not selectively waiving its attorney-client privilege in connection with its Rule 9019 motion. Specifically, the City will not introduce testimony at the Assumption Hearing about the substance of its privileged legal analysis or rely on advice of counsel to show that element (a)—probability of success in litigation—or on element (c)—the complexity, expense, and delay of litigation—support approval of the Forbearance Agreement.

13.     As an initial matter, the Objectors misrepresent what transpired at the Orr and Buckfire depositions. The Objectors were not "blocked" from

---

rights under the swap agreements and released their lien against the Casino Revenues. (*Id*. at 3.4(a) (discussing termination of rights and discharge of obligations related to "the City Pledge, the Service Corporation Security Interest and the Service Corporation Pledge shall be satisfied and discharged")).

obtaining discovery from Mr. Orr and Mr. Buckfire. Far from it. When the Objectors asked questions regarding the justification for the Forbearance Agreement that did not invade the City's attorney-client privilege, they were answered. Only when the Objectors decided to venture into areas they knew or should have known were protected by the privilege were their efforts properly denied.

14. During Mr. Orr's deposition, the City asserted attorney-client privilege only in response to questions about the substance of its counsels' legal analysis and advice. In fact, the Objectors acknowledge in their motion *in limine* that they repeatedly sought disclosure of privileged *legal advice* including, along with other topics, the "legal advice rendered to Mr. Orr in connection with the Forbearance Agreement's negotiation and execution" and the "likelihood of success of all claims being resolved by the Forbearance Agreement." (*See* Mot. in Limine at 9-10.) There is no question that these inquiries sought to invade the City's attorney-client privilege. At the instruction of the City's counsel, Mr. Orr properly refused to waive the City's attorney-client privilege and did not respond to these questions. (*Id*.)[2]

---

[2] Mr. Buckfire too declined to respond to questions that invaded on the attorney-client privilege. (*See* Mot. in Limine at 7 n.3). As discussed below, there is no support for Objectors' sweeping contention that the proper assertion of privilege bars a witness from later testifying regarding non-privileged matters.

-10-
13-53846-tjt    Doc 2031    Filed 12/10/13    Entered 12/10/13 19:52:36    Page 10 of 20

15. Contrary to the Objectors' contention, (Mot. in Limine at 10), the City's counsel *did* permit inquiry of Mr. Orr into whether the City's attorneys performed an analysis of the "litigation factors" at issue and what factors Mr. Orr considered in entering the Forbearance Agreement. When Mr. Orr was asked about the likelihood of success of the City's possible claims and defenses, the City's counsel cautioned the Objectors' counsel that he was not entitled to the legal advice Mr. Orr received, but allowed that he "can ask questions as to whether those factors were considered by Mr. Orr." (Orr. Dep. Tr. at 14-15 (Aug. 30, 2013).)[3] The City's counsel was very clear that only privileged communications were off limits: "If you were to look at topics perhaps as to whether . . . they were raised,

---

[3]In full:

> MR. HACKNEY: If I ask you questions regarding the likelihood that the City would prevail on a claim or defense against the Swap counterparties, you'll assert the attorney-client privilege, correct?
> . . .
> MR. SHUMAKER: Let me state for the record you can ask questions as to whether those – those factors were considered by Mr. Orr, but obviously if you're going to ask what he was advised by counsel, then I'm going to instruct him not to answer."

(Orr. Dep. Tr. at 14-15). The entire deposition transcripts of Mr. Orr and Mr. Buckfire are attached to the Debtor's opposition to Objectors' motion to admit certain deposition testimony of Kevyn Orr and Kenneth Buckfire as exhibits 5 (Orr) and 6 (Buckfire).

without going into the communications, I think he could respond to that." (*Id*. at 273.) Mr. Orr then testified,

> [W]hether it was subordination, prioritization, equitable estoppel, tort, invalidation of liens *ab initio*, whatever they were, none of [the Objectors'] analyses or claims came as a surprise to me and that in some fashion—without divulging what I had spoken with to my counsel, in some fashion issues such as those had been discussed and analyzed with my counsel, attorneys and advisors . . . I don't want to leave you with the misimpression that somehow the analysis wasn't complete . . .Those are just the ones that came, sitting here today . . . that I remembered for instance.

(Orr. Dep. Tr. at 273-75.) In other questioning, Mr. Orr also testified that "[t]here were memos [from counsel] discussing the various strengths and weaknesses of the positions," (*id*. at 284), that he considered legal memoranda from Jones Day "including emails," (*id*. at 102), and that "there were discussions [with counsel] about potential length of litigation and appeals and the potential cost," (*id*. at 286).[4]

16. *In re Residential Capital*, 491 B.R. 63 (Bankr. S.D.N.Y. 2013)—which the Objectors rely on at length (Mot. in Limine at 16-17)—provides no support for Objectors' argument that preclusion of evidence is warranted here. In that case, the debtor broadly asserted "attorney-client privilege to all document

---

[4] This testimony did not waive attorney-client privilege because the fact that counsel performed legal analysis on an issue is not protected by the privilege. *See, e.g.*, *In re Walsh*, 623 F.2d 489, 494 (7th Cir. 1980) ("fact of communication between a known client and his attorney is not a privileged communication"); *Burton v. R.J. Reynolds Tobacco Co.*, 170 F.R.D. 481 (D. Kan. 1997) (same).

-12-
13-53846-tjt    Doc 2031    Filed 12/10/13    Entered 12/10/13 19:52:36    Page 12 of 20

production requests and deposition testimony concerning advice of counsel" during discovery and "affirmatively represented to [the objectors] and the Court that the Debtors would not offer evidence of the advice of counsel." *In re Residential Capital*, 491 B.R. at 65. Then, the debtor changed course and sought to introduce evidence including outside counsel's analysis "concerning the litigation risks and potential benefits of further litigation to show that the proposed settlement strikes the proper balance of risk and reward" and advice at the debtor's board meeting. *Id*. at 65, 68. Unsurprisingly, given this about face, the court concluded that the sword and shield doctrine prevented the debtor from waiving privilege over this evidence while continuing to "assert attorney-client privilege to bar discovery of documents or deposition testimony on the same subject matter." *Id*. at 70.

17. The City is not doing that here. The City has no intention of introducing the substance of its counsel's legal analysis in written or oral form at the Assumption Hearing because, as discussed below, it is not required to do so to meet its burden under Rule 9019. Thus, *In re Residential Capital* has no bearing on the evidence to be adduced at the Assumption Hearing.

18. In sum, the Objectors' motion *in limine* should be denied because the sword and shield doctrine does not apply here. The City does not plan to introduce the substance of its counsel's legal analysis or rely on advice of counsel at the Assumption Hearing. There is simply no support for the Objectors'

contention that the proper assertion of privilege during discovery later bars introduction of non-privileged evidence.

### B. The City Need Not Waive its Attorney-Client Privilege to Establish that the Forbearance Agreement is Fair and Equitable under Rule 9019.

19. Moreover, contrary to what the Objectors are suggesting, there is no requirement that a debtor waive attorney-client privilege and discuss counsel's settlement analysis and advice in order to meet its burden under Rule 9019. The Rule 9019 analysis is not a subjective test of the debtor's motive in settling the legal claims. Rather, as discussed above, it is an *objective* test of whether the settlement is "fair and equitable" to the estate. *In re Fishell*, 47 F.3d 1168, at *3 (citing *TMT Trailer Ferry*, 390 U.S. at 424-25); *In re Wash. Mut., Inc.*, 442 B.R. at 330 (holding that "Court itself" must "determine whether the settlement is reasonable" based on "objective evidence"). As explained in *See In re Wash. Mut., Inc.*:

> It is not necessary for the Debtors to waive the attorney/client privilege by presenting testimony regarding what counsel felt was the likelihood they would win on the claims being settled . . . It is sufficient to present the Court with legal positions asserted by each side and the facts relevant to those issues. The Court itself can then evaluate the likelihood of the parties' prevailing in that litigation to determine whether the settlement is reasonable.

*Id.*, 442 B.R. at 330.

20. *In re Washington Mutual Inc.* directly rejected the argument the Objectors make here. In that case, the objectors claimed that the Debtor could not meet its burden of proof because it had raised attorney-client privilege "regarding anything that counsel discussed" with the witnesses which "essentially precluded any testimony regarding the likelihood of success on any of the Debtors' positions with respect to the disputed claims." *Id*. at 329. The court concluded that the Debtor did not need to introduce its counsel's legal analysis. It held that factual testimony together with "objective evidence" including "the legal positions of both sides (which are contained in the pleadings filed by them)" was sufficient to allow the court to assess whether the settlement was reasonable. *Id*. at 330.

21. And, the Sixth Circuit too has held that a debtor *need not* provide sworn testimony as to the "probabilities of success and the range of recoveries" to demonstrate a settlement is fair and equitable under Rule 9019. *In re MQVP*, 477 F. App'x at 316. In *In re MQVP*, the Sixth Circuit concluded that approval of a settlement under Rule 9019 was appropriate even though the "trustee did not offer, and the bankruptcy court did not require, any [sworn] evidence regarding the propriety of the proposed settlement." *Id*. at 312. It held that filings in the public record, the trustee's unsworn statement that an adverse verdict could be large, and counsel's statement that the litigation was prohibitively expensive

13-53846-tjt    Doc 2031    Filed 12/10/13    Entered 12/10/13 19:52:36    Page 15 of 20

provided the court with sufficient information to conclude that a settlement was fair and equitable. *Id*. at 316.

22. Similarly here, after the Assumption Hearing concludes, the Court will have ample non-privileged evidence to assess whether the Forbearance Agreement is fair and equitable, including whether element (a) of the *Bard* test—probability of success in litigation—and element (c)—the complexity, expense, and delay of litigation—support the Forbearance Agreement. For example, as it stands now, there are numerous filings on the public record that the Court may review to evaluate these elements. *See, e.g.*, *In re Wash. Mut., Inc.*, 442 B.R. at 329-30 (relying on filings in the public record to evaluate settlement). As to element (a), the Objectors have put forth detailed analysis of the merits of the City's potential legal claims that the Court may consider in evaluating the probability of success in litigation. *See, e.g.*, Obj. of AMBAC to Assumption Mot. (Adv. Proc. No. 13-53846-swr, Dkt. No. 348); Obj. of FGIC (Dkt. No. 360); Obj. of Syncora (Dkt. No. 366).)[5] The City has directly addressed the Objectors'

---

[5] Mr. Orr testified in his deposition that he considered all of these potential claims when deciding whether to compromise them in the Forbearance Agreement:

> MS. ENGLISH: [C]an you just list for me what the topics were on which you got advice, or would you claim the privilege as to just the topics as well?

arguments in its response to the Objections, filed contemporaneously herewith. And, as to element (c), the Objectors' filings again may be considered to determine whether litigation would be complex, expensive, and time consuming.

23. The Objectors do not cite—nor could they—any contrary authority holding that a debtor *must* waive attorney-client privilege and disclose its legal analysis of its claims to establish that a settlement is "fair and equitable" under Rule 9019. The Objectors' reliance on *In re Spansion, Inc.*, 2009 WL 1531788 (Bankr. D. Del. June 2, 2009), (Mot. in Limine at 13), is misplaced. The court in *In re Spansion* declined to approve a settlement because the debtor had failed to provide *any* background facts—privileged or otherwise—that would allow the court to evaluate whether its patent infringement action had any merit.

---

> MR. ORR: Maybe I can do it this way. I think I've said before that in this case, for instance, your client [Ambac] has filed an objection.
>
> MS. ENGLISH: Yes, it has.
>
> MR. ORR: And in this case many objections have been filed and many of the topics listed in those objections . . . whether it was subordination, prioritization, equitable estoppel, tort, invalidation of liens *ab initio*, whatever they were, none of those analyses or claims came as a surprise to me and that in some fashion – without divulging what I had spoken with to my counsel, in some fashion issues such as those had been discussed and analyzed with my counsel, attorneys and advisors.

(Orr. Dep. Tr. at 272.)

2009 WL 1531788, at *1, *5-7 (noting that record lacked information regarding companies' financial status and the availability of substitute products necessary to assess the merits). It did not address whether the debtor had to waive attorney-client privilege to establish these facts and obtain the court's approval under Rule 9019. *See id*. at *5-7.[6]

WHEREFORE, the City respectfully requests that this Court deny the Objectors' motion *in limine*.

---

[6] Moreover, *In re Haven, Inc.*, 326 B.R. 901 (BAP 6th Cir. 2005), and *In re West Pointe Properties*, 249 B.R. 273, 285 (Bankr. E.D. Tenn. 2000), are similarly inapposite. (*See* Mot. in Limine at 12.) *In re Haven* concluded that the bankruptcy court's approval of a settlement was an abuse of discretion because the court failed to make any findings of fact at all in support of its decision. 326 B.R. 901, at *4. And, *In re West Pointe Properties*, 249 B.R. at 285, declined to approve a settlement not because the debtor failed to waive its attorney-client privilege, but because the evidence established that the debtor's claims likely would succeed and result in substantial damages.

Dated: December 10, 2013           Respectfully submitted,

 /s/ David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Thomas F. Cullen, Jr. (DC 224733)
Gregory M. Shumaker (DC 416537)
Geoffrey S. Stewart (DC 287979)
JONES DAY
51 Louisiana Ave., N.W.
Washington, D.C. 20001
Telephone: (202) 879-3939
Facsimile: (202) 626-1700
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
PEPPER HAMILTON LLP
4000 Town Center, Suite 1800
Southfield, MI 48075
Telephone: (248) 359-7300
Facsimile: (248) 359-7700
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY OF DETROIT