# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

**STATEMENT OF MERRILL LYNCH CAPITAL SERVICES, INC. AND UBS AG IN SUPPORT OF DEBTOR'S MOTIONS FOR AN ORDER PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE AND RULE 9019, AND IN REPLY TO THE OBJECTIONS TO THE MOTION**

BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, New York  10022
Telephone:  (212) 705-7000
Facsimile:  (212) 702-5378

*Attorneys for UBS AG*

WARNER NORCROSS & JUDD LLP
900 Fifth Third Center
111 Lyon Street NW
Grand Rapids, Michigan  49503
Telephone: (616) 752-2000
Facsimile:  (616) 752-2500

*Attorneys for Merrill Lynch Capital Services, Inc. and UBS AG*

CADWALADER, WICKERSHAM & TAFT LLP
One World Financial Center
New York, New York  10281
Telephone:  (212) 504-6000
Facsimile:  (212) 504-6666

*Attorneys for Merrill Lynch Capital Services, Inc.*

# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................1

ARGUMENT ....................................................................................5

I.    THE SWAP INSURERS HAVE NO "CONSENT RIGHTS" UNDER
      THE RELEVANT PROVISIONS OF THE SWAP AGREEMENTS ..........7

      A.    The Swap Counterparties Hold A Clear And
            Unambiguous "Optional Early Termination" Right That
            They Intend To Invoke In Connection With The FOTA ............7

      B.    The Swap Insurers' Objections Are Without Merit .................10

            1.    The FOTA Relies On The Optional Early
                  Termination Provisions, Not The Early
                  Termination Date Provisions .........................................10

            2.    The Swap Insurers Lost Any Purported "Consent
                  Rights" When They Were Downgraded ........................13

            3.    The 2006 CAA Does Not Give The Swap Insurers
                  "Consent Rights" ...........................................................14

            4.    The FOTA Does Not Amend Or Modify The
                  Swaps .............................................................................17

            5.    The FOTA Does Not Constitute A Sale,
                  Assignment, Transfer Or Delegation Of Rights .............21

            6.    The Swap Insurers And The COPs Holders Have
                  Not Been Harmed By The FOTA ..................................23

      C.    The Swap Insurers Purported "Consent Rights" Should
            Be Adjudicated In Connection With The Assumption
            Motion, The Rule 9019 Motion And The Financing
            Motion ......................................................................................26

13-53846-tjt   Doc 2033   Filed 12/10/13   Entered 12/10/13 23:10:48   Page 2 of 59

II.    THE SWAP AGREEMENTS ARE VALID AND ENFORCEABLE .........26

III.   THE LIEN ON THE CASINO REVENUES IS VALID UNDER THE
       MICHIGAN GAMING CONTROL AND REVENUE ACT .......................31

IV.    THE FIRST PRIORITY LIEN ON THE CASINO REVENUES
       EXTENDS TO CASINO REVENUES ACQUIRED POST-
       PETITION ..........................................................................................................32

       A.    The Swap Counterparties' Lien Is A Statutory Lien ................33

       B.    The Swap Counterparties' Lien Is A Protected Security
             Interest And The Casino Revenues Qualify As "Special
             Revenues" ..............................................................................................34

CONCLUSION ....................................................................................................37

# TABLE OF AUTHORITIES:

**PAGE(S)**

## CASES:

Adams Outdoor Adver., Inc. v. City of Holland,
   600 N.W.2d 339 (Mich. Ct. App. 1999), aff'd,
   625 N.W.2d 377 (Mich. 2001)..........................................................27

Aramony v. United Way of Am.,
   254 F.3d 403 (2d Cir. 2001) ............................................................15

Ashwood Capital, Inc. v. OTG Mgmt., Inc.,
   948 N.Y.S.2d 292 (App. Div. 1st Dep't 2012)..................................10

Bacon v. City of Detroit,
   275 N.W. 800 (Mich. 1937)..............................................................28

Beal Sav. Bank v. Sommer,
   865 N.E.2d 1210 (N.Y. 2007)........................................8, 12, 14, 19

Breed v. Ins. Co. of N. Am.,
   385 N.E.2d 1280 (N.Y. 1978)............................................................8

Cable Sci. Corp. v. Rochdale Vill., Inc.,
   920 F.2d 147 (2d Cir. 1990) ....................................................... 35-36

Capital Ventures Int'l v. Republic of Arg.,
   652 F.3d 266 (2d Cir. 2011) ............................................................15

City of N.Y. v. Feiring,
   313 U.S. 283 (1941)..........................................................................35

Coastal Commercial Corp. v. Samuel Kosoff & Sons, Inc.,
   199 N.Y.S.2d 852 (N.Y. App. Div. 4th Dep't 1960)........................22

Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v.
   Brookville CDO I Ltd.,
   2008 WL 5170178 (S.D.N.Y. Dec. 10, 2008) ....................................................19

Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A.,
   680 F. Supp. 2d 625 (S.D.N.Y. 2010),
   aff'd in part, remanded in part, 381 F. App'x 117 (2d Cir. 2010)......................18

Ferrari v. Iona Coll.,
   943 N.Y.S.2d 526 (App. Div. 1st Dep't 2012)...................................................12

Greenfield v. Philles Records, Inc.,
   780 N.E.2d 166 (N.Y. 2002)................................................................................8

In re Allegiance Telecom, Inc.,
   356 B.R. 93 (Bankr. S.D.N.Y. 2006)..................................................................19

In re Bard,
   49 F. App'x 528 (6th Cir. 2002) ...........................................................................6

In re Bell & Beckwith,
   87 B.R. 476 (N.D. Ohio 1988)..............................................................................6

In re Cty. of Orange,
   179 B.R. 185 (Bankr. C.D. Cal.), aff'd & remand,
   189 B.R. 499 (C.D. Cal. 1995) ..........................................................................36

In re Cty. of Orange,
   189 B.R. 499 (C.D. Cal. 1995) .....................................................................33, 34

In re Coudert Bros.,
   487 B.R. 375 (S.D.N.Y. 2013) .............................................................................9

In re Delta Air Lines, Inc.,
  374 B.R. 516 (S.D.N.Y. 2007), aff'd,
  309 F. App'x 455 (2d Cir. 2009) (Summary Order) ...........................................6

In re Diamond Mfg. Co.,
  164 B.R. 189 (Bankr. S.D. Ga. 1994).................................................................5

In re Greektown Holdings, LLC,
  2009 WL 1653461 (Bankr. E.D. Mich. May 13, 2009) .....................................5

In re High Tech Pkg'g, Inc.,
  397 B.R. 369 (Bankr. N.D. Ohio 2008)..............................................................6

In re Jefferson Cty., Ala.,
  474 B.R. 228 (Bankr. N.D. Ala.), aff'd,
  2012 WL 3775758 (N.D. Ala. Aug. 28, 2012)..................................................36

In re Jefferson Cty., Ala.,
  482 B.R. 404 (Bankr. N.D. Ala. 2012)..............................................................37

In re Jefferson Cty., Ala.,
  484 B.R. 427 (Bankr. N.D. Ala. 2012)..............................................................27

In re Lorax Corp.,
  307 B.R. 560 (Bankr. N.D. Tex. 2004)...............................................................5

In re Madoff,
  848 F. Supp. 2d 469 (S.D.N.Y. 2012) .................................................................6

In re Mirant Corp.,
  314 B.R. 347 (Bankr. N.D. Tex. 2004).............................................................29

In re Nat'l Gas Distribs., LLC,
  556 F.3d 247 (4th Cir. 2009) ............................................................................29

In re Orion Pictures Corp.,
   4 F.3d 1095 (2d Cir. 1993) ...................................................................5

In re Residential Cap. LLC,
   497 B.R. 720, 753 (Bankr. S.D.N.Y. 2013)........................................6

In re W.T. Grant Co.,
   699 F.2d 599 (2d Cir. 1983) ...............................................................6

Klager v. Robert Meyer Co.,
   329 N.W.2d 721 (Mich. 1982)...........................................................28

MBIA Ins. Corp. v. Cooperatieve Centrale Raiffeisen-Boerenleenbank B.A.,
   2011 WL 1197634 (S.D.N.Y. Mar. 25, 2011)....................................18

Merrill Lynch Capital Servs. v. USIA & Itamarati,
   2012 WL 120203 (S.D.N.Y. Apr. 10, 2012) ......................................36

Miller v. Wells Fargo Bank Int'l Corp.,
   540 F.2d 548 (2d Cir. 1976) ..............................................................22

Muzak Corp. v. Hotel Taft Corp.,
   133 N.E.2d 688 (N.Y. 1956)..............................................................15

People v. Llewellyn,
   257 N.W.2d 902 (Mich. 1977)...........................................................29

People v. Sell,
   17 N.W.2d 193 (Mich. 1945)..............................................................27

Quiroz v. Mich. Dep't of Treasury,
   472 B.R. 434 (E.D. Mich. 2012)........................................................35

Triple Z Postal Servs., Inc. v. United Parcel Serv., Inc.,
  831 N.Y.S.2d 357 (TABLE), 2006 WL 3393259 (TEXT IN WESTLAW)
  (Sup. Ct. N.Y. Co. Nov. 24, 2006) ....................................................................10

United States Fid. & Guar. Co. v. Annunziata,
  492 N.E.2d 1206 (N.Y. 1986)...........................................................................13

United Va. Bank v. Slab Fork Coal Co.,
  784 F.2d 1188 (4th Cir. 1986) ....................................................................10, 35

Vt. Teddy Bear Co. v. 538 Madison Realty Co.,
  807 N.E.2d 876 (N.Y. 2004)...........................................................................9, 13

Walsh Constr. Co. of Ill. v. City of Detroit,
  257 F. Supp. 2d 935 (E.D. Mich. 2003) ...........................................................33

## **STATUTES & OTHER AUTHORITIES:**

11 U.S.C.:
  § 101(50).................................................................................................34
  § 101(51).................................................................................................34
  § 101(53).................................................................................................33
  § 101(53C)...............................................................................................30
  § 101(22A)...............................................................................................30
  § 362(b)(17) ............................................................................................30
  § 552(b)(1) ..............................................................................................35
  § 560........................................................................................................30
  § 902(2)(B)...............................................................................................35
  § 928(a) ..............................................................................................34, 36

MCL:
    § 117.4j(3)............................................................................................27
    § 117.4o..............................................................................................27
    § 141.422b(5)(b) ................................................................................29
    § 141.424............................................................................................29
    § 141.2317..........................................................................................29
    § 432.212(3)(a) ..................................................................................31
    § 600.6093..........................................................................................31

Mich. Const. art. VII, § 22 ..................................................................27

Detroit City Code:
    § 18-14-3(a) .......................................................................................35
    § 18-16-8............................................................................................33
    § 18-16-8(a) .......................................................................................33
    § 18-16-14(a) .....................................................................................33

Detroit Ordinance 05-09 .......................................................................32

The Compact Edition of the Oxford English Dictionary 157 (1971) .....................23

The Free Dictionary, at http://www.thefreedictionary.com/delegate .....................23

The Law Dictionary, at http://thelawdictionary.org/delegation/ ...........................23

Oxford American Dictionary, Heald College Ed. (1980)........................................23

City of Grand Rapids, Comprehensive Annual Financial Report iv (2012),
    http://grcity.us/city-
    comptroller/Documents/CAFR%202012%20PDF%20FINAL.pdf ..................28

City of Flint, Comprehensive Annual Financial Report 3, 36 (2012),
    http://www.cityofflint.com/finance/CAFR/2012/CoFCAFR2012.pdf...............28

Official Statement for City of Detroit Downtown Development Authority
Tax Increment Refunding Bonds, Series 1998 (bonds insured by MBIA),
http://emma.msrb.org/MS148205-MS123513-MD239453.pdf .........................28

Official Statement for Municipal Building Authority of Dearborn Heights,
Building Authority Bonds, Series 2003 (bonds insured by Ambac),
http://emma.msrb.org/MS215925-MS191233-MD371327.pdf. ........................28

Merrill Lynch Capital Services, Inc. ("Merrill Lynch") and UBS AG ("UBS" and, together with Merrill Lynch, the "Swap Counterparties"), respectfully submit this Statement in support of the motion of the City of Detroit (the "City"), dated July 24, 2013 (Dkt. No. 157), seeking entry of an Order: (i) authorizing the assumption of the Forbearance and Optional Termination Agreement pursuant to section 365(a) of the Bankruptcy Code (the "Assumption Motion") and (ii) approving the Forbearance and Optional Termination Agreement pursuant to Rule 9019 of the Federal Bankruptcy Rules of Procedure (the "Rule 9019 Motion" and, together with the Assumption Motion, the "Motions"), and in response to arguments made by the Objectors[1] to the Motions.

## PRELIMINARY STATEMENT

On July 15, 2013, the Swap Counterparties and the City entered into a Forbearance and Optional Termination Agreement (as amended, the "FOTA")[2] which is the subject of the Motions. The FOTA arises from interest rate swap agreements (as amended in 2009, the "Swap Agreements" or the "Swaps")

---

[1]  "Objectors" refers to parties that filed objections (the "Objections") to the Motions, including Syncora Guarantee, Inc. ("Syncora"), Financial Guaranty Insurance Co. ("FGIC"), Ambac Assurance Corp. ("Ambac"), EEPK Bank, DEPFA Bank PLC, Ad Hoc COP Holders, National Public Finance Guarantee Corp. ("NPFGC"), Assured Guaranty Municipal Corp. ("Assured"), the Detroit Police and Fire Retirement Systems ("PFRS"), Detroit General Retirement Systems ("GRS"), David Sole ("Sole"), the Retired Detroit Police & Fire Fighters Association, Detroit Retired City Employees Association and the Retired Detroit Police Members Association.

[2]  Since signing the FOTA on July 15, 2013, the Swap Counterparties have agreed to multiple extensions of the date on which the City could terminate the FOTA under Section 1.3(l) thereof.

executed in 2006 to protect the City from the risk that interest rates would rise, thereby increasing the City's costs, under certain floating rate instruments issued to fund pension obligations.[3]

If the Swap Counterparties exercise their right under the safe harbor provisions of the Bankruptcy Code to terminate the Swap Agreements, they would be owed over $250 million. The Swap Counterparties' financial interests in the Swaps are secured by certain wagering taxes and developer payments periodically due to the City (the "Casino Revenues"), against which the Swap Counterparties currently hold a lien (the "Lien") pursuant to a City Ordinance and a written collateral agreement (the "Collateral Agreement") entered in 2009. As the Court has recognized, only the Swap Counterparties hold the Lien. See Aug. 28, 2013 Hr'g Tr. at 9:10-11, attached as Exhibit E. The Swap Counterparties received the Lien in 2009 in lieu of terminating the Swap Agreements, which, if terminated at the time, would have entitled the Swap Counterparties to a $300 to $400 million termination payment.

The FOTA provides the City with a pathway for unwinding the Swap Agreements and removing the Swap Counterparties' Lien, allowing the City access to the Casino Revenues which are essential to the City's post-petition financing and its continuing operations and rehabilitation. See City Mot. (Dkt. No. 157), Ex. 6 at 2-3, 11 (§§ 1.1-1.2, 3). If and when the termination occurs, the City will

---

[3]     The original counterparties to the Swap Agreements were UBS and SBS Financial Products Company ("SBS"). Merrill Lynch served as credit support provider to SBS. On July 19, 2013, SBS assigned its rights and obligations under the Swap Agreements to Merrill Lynch.

no longer have any financial exposure arising from the Swap Agreements.  See id. at 11 (§ 3.2).  The FOTA also provides for the elimination of the Swap Insurers' future payment obligations under their policies insuring the Swaps.

In exchange for these benefits, the City agreed to forgo whatever challenges it could bring against the legality of the Swaps and validity of the Lien. Such claims—if litigated—would be meritless.  The City's own lawyers—Lewis & Munday and Orrick Herrington & Sutcliffe—separately provided legal opinions confirming (i) the validity of the Lien (see Ex. F), and (ii) that the wagering taxes payable to the City constitute "special revenues."  See Ex. G.  The City also passed Detroit City Code § 18-16-8 (the "City Ordinance"), expressly granting the Lien on the Casino Revenues to secure the payments on the Swap Agreements.  And the Michigan Gaming Control Board issued a letter finding no compliance issue with the pledge of the Casino Revenues.  See City Mot., Ex. 5 at 200.  Given the foregoing, there should be no question that the City's decision to enter the FOTA was a sound exercise of business judgment, and reflects a compromise of claims that falls well within the range of reasonableness.

The parties who have elected to object are simply using the pending Motions as a pretext for voicing global grievances with the City about the ultimate resolution of this case.  This is perhaps best illustrated by Syncora and FGIC (together, the "Swap Insurers"), who provided financial guaranty insurance policies for the benefit of the Swap Counterparties.[4]  The FOTA provides for the

---

[4]     In addition to its objection, Syncora also filed an action in New York State Court against the Swap Counterparties on July 24, 2013, where it made many of the same arguments as in its objection.  That action was removed from state court

complete elimination of the Swap Insurers' future payment obligations under their policies insuring the Swap Agreements, because the Swap Counterparties have expressly agreed not to make a claim against the Swap Insurers under the insurance policies. <u>See</u> City Mot., Ex. 6 at 12 (§ 3.2(c)). Insurers generally have to pay for a commutation, but the FOTA effectively commutes the Swap Insurers' obligations at no cost to them.

Notwithstanding this clear benefit, the Swap Insurers have filed objections based upon an alleged—but plainly non-existent—contractual "consent right" over any termination of the Swap Agreements. The Swap Insurers also purport to be harmed by the elimination of the hedge against rising interest rates that could increase their exposure on their COPs-related insurance policies, which Syncora admits, and this Court has ruled, are "separate" from its Swaps insurance policies. <u>See</u> Dkt. No. 1945 (Opinion Regarding Eligibility) at 12; Syncora Obj. ¶¶ 5, 13; Adv. Dkt. No. 20 at 4 n.1; <u>see also</u> FGIC Obj. (Dkt. No. 360) ¶¶ 4, 7. In its 52-page objection, Syncora fails to cite a single contractual provision that links the policy insuring the Swaps to the policy insuring the COPs. There are none. Rather than taking the benefit conferred on them by the FOTA and addressing any hedging concerns through the market, the Swap Insurers would apparently prefer to hold the Casino Revenues hostage.

The remaining Objectors hold claims against the City that are entirely unrelated to the Swap Agreements. They view the Casino Revenues—in which the

_____

to federal court and was recently transferred to this Court. <u>See</u> <u>Syncora Guarantee, Inc. v. UBS AG, et al.</u>, Adv. Proc. No. 13-05395 (the "Swap Counterparty Adversary").

Swap Counterparties, and only the Swap Counterparties, hold a lien—as a valuable asset that can improve their own recoveries at the expense of the Swap Counterparties and, ironically, at the expense of the Swap Insurers (who, but for the FOTA, would be obligated to pay the Swap Counterparties insurance on what they do not receive under the Swap Agreements). Each of the Objections lacks legal merit and, in any event, fails to provide any basis for this Court to deny either the Assumption Motion or the Rule 9019 Motion. Indeed, the conflicting positions taken by the Objectors on the validity of the Swaps and the Liens confirms the business judgment of the City to reach a global settlement.

## ARGUMENT

A motion to assume an executory contract pursuant to section 365(a) of the Bankruptcy Code should be granted upon a showing that the debtor's decision to assume the contract reflects an exercise of sound business judgment. See In re Greektown Holdings, LLC, 2009 WL 1653461, at *1 (Bankr. E.D. Mich. May 13, 2009). In the context of objections to an assumption motion, the bankruptcy court has the power to adjudicate underlying contractual disputes, including whether a contract is enforceable. See, e.g., In re Diamond Mfg. Co., 164 B.R. 189, 202, 204 (Bankr. S.D. Ga. 1994); see also In re Lorax Corp., 307 B.R. 560, 566 n.13 (Bankr. N.D. Tex. 2004) (rejecting broad interpretation of In re Orion Pictures Corp., 4 F.3d 1095 (2d Cir. 1993), advocated by Objectors here as inconsistent with U.S. Supreme Court precedent).

Bankruptcy Rule 9019(a) permits a debtor to compromise and settle claims subject to approval by the bankruptcy court. A settlement should be

approved if it is fair and reasonable and in the best interests of the debtor's estate. See In re Bard, 49 F. App'x 528, 529 (6th Cir. 2002). In making this determination, the court should "canvass the issues and see whether the settlement 'fall[s] below the lowest point in the range of reasonableness.'" In re Bell & Beckwith, 87 B.R. 476, 479 (N.D. Ohio 1988) (quoting In re W.T. Grant Co., 699 F.2d 599, 608 (2d Cir. 1983)). Such an analysis involves estimating the objective value of the claims being compromised while accounting for the risk that the debtor would not be successful if it chose to litigate such claims. See In re High Tech Pkg'g, Inc., 397 B.R. 369, 371-73 (Bankr. N.D. Ohio 2008). Courts should approve settlements when they satisfy this standard even if the terms of the settlement adversely affect the interests of third parties. See In re Residential Cap. LLC, 497 B.R. 720, 735 (Bankr. S.D.N.Y. 2013) (approving settlement when securities investors' ability to sue trustees would be impaired); In re Madoff, 848 F. Supp. 2d 469, 489-91 (S.D.N.Y. 2012); In re Delta Air Lines, Inc., 374 B.R. 516, 527 (S.D.N.Y. 2007), aff'd, 309 F. App'x 455 (2d Cir. 2009) (Summary Order).

None of the Objectors' arguments should deter the Court from granting the Motions. Before entering the FOTA, the City considered each of these issues and, in a sound exercise of its business judgment, decided to enter the FOTA. See Declaration of Kevyn Orr, dated July 18, 2013 (Dkt. No. 11) ¶¶ 87-103, 111; Deposition Transcript of Kevyn Orr, dated Aug. 30, 2013, at 22:3-25:8, 36:20-37:13, attached as Exhibit M; see also City Mot. ¶ 47. The City determined that the FOTA represented a fair and reasonable compromise of any claims that it

may hold against the Swap Counterparties arising out of the Swaps and the Collateral Agreement.

## I. THE SWAP INSURERS HAVE NO "CONSENT RIGHTS" UNDER THE RELEVANT PROVISIONS OF THE SWAP AGREEMENTS

The Swap Insurers assert that they hold the right to consent to any early termination of the Swap Agreements. <u>See</u> Syncora Obj. (Dkt. No. 366) ¶¶ 2, 79, 102-05, 129-34; FGIC Obj. ¶ 23. They also assert that they will not consent to the early termination of the Swaps, and argue that allowing the City to assume the FOTA will, therefore, not provide the City with the ability to obtain a termination of the Swaps and release the lien on the Casino Revenues. Finally, the Swap Insurers contend that the FOTA constitutes an unauthorized amendment of the Swaps and Collateral Agreement. <u>See</u> Syncora Obj. ¶¶ 2, 5, 21, 27, 104; FGIC Obj. ¶ 23. The Swap Insurers' arguments are contrary to the plain language of the Swap Agreements.

### A. The Swap Counterparties Hold A Clear And Unambiguous "Optional Early Termination" Right That They Intend To Invoke In Connection With The FOTA

On their face, the Swap Agreements flatly contradict Syncora's claim that it possesses the unconditional right, in all circumstances, to consent to an early termination. Part 5(xx) (in the case of UBS) and Part 5(t) (in the case of Merrill Lynch) of the Amended Schedules[5] provided the Swap Counterparties—and only

---

[5]     The Swaps are each comprised of a Master ISDA Agreement and an Amended Schedule. <u>See</u> Exs. A-D. The Swaps pertaining to UBS and the Swaps pertaining to Merrill Lynch are identical in all respects material to the Motions. For instance, Parts 5(i), (ii), (iv), (v), and (xx) of the UBS Amended Schedules are materially identical to Parts 5(a), (b), (f), (g), and (t), respectively, of the Merrill

the Swap Counterparties—with a unilateral "Optional Early Termination" right that can be exercised without the consent of the Swap Insurers:

> **Optional Early Termination.** [The Swap Counterparty] shall have the right to terminate one or more Transactions hereunder, either in whole or in part, on any Business Day . . . by providing at least five (5) Business Days' prior written notice to [the Service Corporation] of its election to terminate and its designation of the effective date of termination . . . . *For the avoidance of doubt, in no event will [the Service Corporation] owe any amount to [the Swap Counterparty] in connection with an election by [the Swap Counterparty] to exercise its option under this Part 5(xx)*, other than any Unpaid Amounts

Ex. B at 24-25 (Part 5(xx)) (emphasis added).[6]  The FOTA contemplates the Swap Counterparties invoking these Optional Early Termination rights that they bargained for when the Swaps were amended in 2009 with the approval of the Swap Insurers.

The Optional Early Termination provisions of the Swap Agreements are clear and unambiguous.[7]  Nowhere do the Optional Early Termination

---

Lynch Amended Schedules.  Compare Exs. B, D.  For simplicity, this statement will cite only to the Swaps pertaining to UBS, but incorporates the corresponding provisions in the Swaps pertaining to Merrill Lynch as if fully cited herein.  The relevant provisions of the Swaps, the FOTA, and the Collateral Agreement are set forth in the attached Appendix.

[6]  Hereafter, such provisions are referred to as the "Optional Early Termination" provisions of the Swap Agreements.

[7]  See Beal Sav. Bank v. Sommer, 865 N.E.2d 1210, 1213-14 (N.Y. 2007); Greenfield v. Philles Records, Inc., 780 N.E.2d 166, 170-71 (N.Y. 2002); Breed v. Ins. Co. of N. Am., 385 N.E.2d 1280, 1282 (N.Y. 1978) (contract is unambiguous if its language has "a definite and precise meaning, unattended by danger of

provisions mention Swap Insurer consent. This is in contrast to other termination mechanisms found in the Swaps (hereafter, the "Remedy Provisions"), which, unlike the Optional Early Termination provisions, require an event of default to exist before the Swap Counterparties can elect to terminate the Swaps early. See, e.g., Ex. A at 6 (§ 6(a)); Ex. C at 6 (§ 6(a)). Indeed, when the Swaps were amended in 2009, eleven specific termination events were added to the Remedy Provisions of the Swap Agreements and expressly made subject to Swap Insurer consent. See, e.g., Ex. B at 3-5 (Part 1(i)(ii)). Similarly, the parties made the consent of the Swap Insurers a requirement if the Service Corporations elect to replace or terminate the Swaps. See, e.g., Ex. H at Exs. E-H; Ex. I at Exs. E-H.[8]

Accordingly, the parties plainly knew how to provide for Swap Insurer consent when they wanted to. The omission of any Swap Insurer consent right in the Optional Termination Provisions is dispositive. See In re Coudert Bros., 487 B.R. 375, 389 (S.D.N.Y. 2013) ("court[s] should accord contractual language its plain meaning giving due consideration to the surrounding circumstances and apparent purpose which the parties sought to accomplish") (internal quotations omitted); Vt. Teddy Bear Co. v. 538 Madison Realty Co., 807 N.E.2d 876, 879 (N.Y. 2004) ("'courts should be extremely reluctant to interpret

---

misconception . . . and concerning which there is no reasonable basis for a difference of opinion").

[8] FGIC asserts that because the City informs the Swap Counterparties when it is ready for them to exercise their optional termination, this constitutes a termination by the Service Corporations, requiring insurer consent. See FGIC Obj. ¶¶ 21-23. Not only are the terminating parties clearly the Swap Counterparties, but the Service Corporations are not involved at all—they send no notices and make no payments.

an agreement as impliedly stating something which the parties have neglected to specifically include'") (citation omitted); United States Fid. & Guar. Co. v. Annunziata, 492 N.E.2d 1206, 1208 (N.Y. 1986) (holding that where a specific right is included in one provision but omitted from another provision in the same contract, such omission "must be assumed to have been intentional under accepted canons of contract construction"); Triple Z Postal Servs., Inc. v. United Parcel Serv., Inc., 2006 WL 3393259, at *7 (Sup. Ct. N.Y. Co. Nov. 24, 2006) (same). "[W]hen parties set down their agreement in a clear, complete document, their writing should as a rule be enforced according to its terms." Ashwood Capital, Inc. v. OTG Mgmt., Inc., 948 N.Y.S.2d 292, 297 (App. Div. 1st Dep't 2012) (citation omitted). This rule applies "with even greater force in commercial contracts negotiated at arm's length by sophisticated, counseled businesspeople." Id.

## B. The Swap Insurers' Objections Are Without Merit

The Swap Insurers have not offered an alternative reading of the Optional Early Termination provisions of the Amended Schedule. Instead, they erroneously argue that, notwithstanding the Optional Early Termination provisions' plain language to the contrary, the Swap Counterparties cannot invoke those provisions unilaterally.

### 1. The FOTA Relies On The Optional Early Termination Provisions, Not The Early Termination Date Provisions

Syncora asserts that Part 5(i) of the Amended Schedule provides the Swap Insurers with the right to consent to **any** early termination, including a termination under the Optional Early Termination provisions, if an uncured event

of default exists under the Swaps.  See Syncora Obj. ¶¶ 5, 29, 104.  This ignores material differences between the Optional Early Termination provisions and the Remedy Provisions.  Part 5(i), which provides for Syncora's consent in certain circumstances, applies only to a termination resulting from the Swap Counterparties declaring an Early Termination Date pursuant to the Remedy Provisions based on an Event of Default or Termination Event.  See, e.g., Ex. B at 19 (Part 5(i)); Ex. A at 6 (§ 6).  Although such events exist, including the filing of the chapter 9 petition by the City, the FOTA does **not** provide for the declaration of an Early Termination Date.  The FOTA relies instead on the Optional Early Termination provisions, which establish a totally distinct path to termination.

This conclusion is confirmed by the text of the Optional Early Termination provisions, which clearly distinguish between an Optional Early Termination and an Early Termination Date set in accordance with the Remedy Provisions.  The Optional Early Termination provisions discuss how to calculate "the amount payable" in the event that the Swap Counterparties owe the City a payment upon exercising their rights thereunder.  In doing so, the Optional Early Termination provisions refer to calculating a termination payment in accordance with the Remedy Provisions "**as if**" the "Optional Early Termination Date" was an "Early Termination Date."  See Ex. B at 24 (Part 5(xx)) (emphasis added).  The words "as if" and, indeed, the entire cross-reference to the Remedy Provisions would be superfluous if, as the Swap Insurers argue, the parties did not intend Optional Early Termination to be different from Early Termination.  However, a correct reading of a contract should not render any of its terms meaningless.

See <u>Beal Sav. Bank</u>, 865 N.E.2d at 1213-14; <u>Ferrari v. Iona Coll.</u>, 943 N.Y.S.2d 526, 527 (App. Div. 1st Dep't 2012).

In the face of the plain language of the Swaps, Syncora attempts to import a "consent right" by arguing that an "Optional Early Termination Date" and an "Early Termination Date" should be treated the same for all purposes. <u>See</u> Syncora Obj. ¶ 104; Adv. Dkt. No. 32-3 at 20-21. In particular, Syncora argues that "as if" reflects the parties' intention to equate the two separately defined terms and treat them identically. <u>See</u> Adv. Dkt. No. 32-3 at 20-21. From this premise, Syncora argues that it should have a "consent right" with respect to the setting of Optional Early Termination Dates just as it was given the conditional right to consent to setting Early Termination Dates.

Syncora's argument is hopelessly flawed for several reasons. First, as set forth above, there would be no need for the parties to have two separately defined terms—Optional Early Termination Date and Early Termination Date—if, as Syncora argues, they are the same thing. Second, the phrase "as if" in Part 5(xx) plainly does not apply to the entirety of Part 5(xx), but only modifies the method for calculating "Unpaid Amounts" that could be owed by the Swap Counterparties (<u>i.e.</u>, "Party A" under the Swaps), to the Service Corporations (<u>i.e.</u>, "Party B" under the Swaps).

Third, Syncora's interpretation of Part 5(xx) cannot be reconciled with Part 5(i). Part 5(i) provides the Swap Counterparties and Service Corporations with termination rights upon the occurrence of Events of Default and certain Termination Events. <u>See</u> Ex. B at 19 (Part 5(i)). However, Part 5(i) clearly limits any "consent rights" that the Swap Insurers may have to situations where the Swap

Counterparties or the Service Corporations "designate an Early Termination Date pursuant to Section 6 of this Agreement." Id. The parties did not include the designation of an Optional Early Termination Date as one of the events requiring insurer consent in Part 5(i). They surely could have. The omission of such a reference must be given effect. See Vt. Teddy Bear, 807 N.E.2d at 879 ("'courts should be extremely reluctant to interpret an agreement as impliedly stating something which the parties have neglected to specifically include'"); United States Fid. & Guar., 492 N.E.2d at 1208 (holding that where a specific right is included in one provision but omitted from another provision in the same contract, such omission "must be assumed to have been intentional under accepted canons of contract construction").

### 2. The Swap Insurers Lost Any Purported "Consent Rights" When They Were Downgraded

Apart from the fact that the Swap Insurers have no "consent rights" in an Optional Early Termination under Part 5(xx), the Swap Insurers lost their "consent rights" when they failed to maintain required minimum credit ratings. See Ex. B at 19 (Part 5(ii)(b)). The Swap Insurers do not argue that they have maintained the requisite credit rating. See Ex. L at 7 n.4; FGIC Obj. ¶ 8.[9] Rather, in the Swap Counterparty Adversary, Syncora, without citing any applicable provisions, has claimed that such downgrade is immaterial. See Adv. Dkt. No. 20 at 16-17; Adv. Dkt. No. 32-3 at 23-25. This interpretation, put forward without

---

[9] In March 2009, Moody's downgraded Syncora's ratings to Ca and FGIC's ratings to Caa3. See Moody's Downgrades Syncora Guarantee To Ca; Outlook Is Developing (Mar. 9, 2009), attached as Exhibit J; Moody's Downgrades FGIC To Caa3 And Will Withdraw Ratings (Mar. 24, 2009), attached as Exhibit K.

any citation of the actual contract language, contradicts both the plain language and the purpose of Parts 5(ii)(b) and (c), the credit downgrade provisions.

The clear purpose of these provisions are for the Swap Insurers' "consent rights" to be lost when a Swap Insurer loses its rating. Thus, Part 5(i) provides that the Swap Insurer has a "consent right" over a Section 6 termination based upon an Event of Default or Termination Event "other than the Additional Termination Events set forth in Part 5(ii) below." See Ex. B at 19 (Part 5(i)). One of the Additional Termination Events in Part 5(ii) occurs when "the Swap Insurer [i.e., Syncora] fails to have a claims paying ability of at least 'A-' from Moody's" **and** either an Event of Default or a Termination Event with respect to the Service Corporation has also occurred. Id. at 19 (Part 5(ii)).

Syncora's assertion that it retains its "consent rights" any time that an Event of Default with respect to the Service Corporation occurs, regardless of whether it has lost its rating, is simply incompatible with Parts 5(ii)(b) and (c), which expressly include an Event of Default with respect to the Service Corporations as an event over which Syncora has no right of consent after its downgrade. Basic principles of contract interpretation require each provision in a contract to be given effect—as these must be. See Beal Sav. Bank, 865 N.E.2d at 1213-14.

### 3. The 2006 CAA Does Not Give The Swap Insurers "Consent Rights"

Syncora also asserts that Section 6.9.2 of the 2006 Contract Administration Agreement (the "2006 CAA") trumps the Optional Early Termination provisions of the Amended Schedule by providing the Swap Insurers

with the right to issue directions to the Swap Counterparties concerning various things, including whether to terminate the Swaps early. See Syncora Obj. ¶ 103.

As an initial matter, Syncora's argument fails to account for the fact that Part 5(xx) was added to the Swaps in 2009. New York law follows the "common (and commonsensical) rule that a specific provision . . . governs the circumstance to which it is directed, even in the face of a more general provision." Capital Ventures Int'l v. Republic of Arg., 652 F.3d 266, 271 (2d Cir. 2011). Indeed, courts have found that "it is a fundamental rule of contract construction that 'specific terms and exact terms are given greater weight than general language.'" Aramony v. United Way of Am., 254 F.3d 403, 413 (2d Cir. 2001) (citation omitted). When, as here, a specific contractual right is added as part of an amendment or modification, it controls over any general provision in the modified contract that may be inconsistent. See Muzak Corp. v. Hotel Taft Corp., 133 N.E.2d 688, 690 (N.Y. 1956) (new provision "which is made a part of the modification agreement controls over the general termination provision" in the preexisting agreement). Thus, a specific provision, like Part 5(xx), governs over a general provision, especially when the specific contractual provision is added later as part of an amendment.

Consistent with this well-settled contract construction principle, the parties made clear in the 2009 Collateral Agreement (which was entered contemporaneously with the 2009 amendment to the Swaps) that they were expressly amending all prior transactional documents, including the 2006 CAA. See Syncora Obj., Ex. 6 at 42 (§ 14.14). Syncora ignores all of this now. But, in 2009, the Swap Insurers expressly consented to the amendments. See Exs. H, I.

Syncora's reading of Section 6.9.2 also cannot be reconciled with Section 6.1 of the 2006 CAA, which provides: "For the avoidance of doubt, all parties to this Agreement shall be entitled to enforce their respective rights except as otherwise provided in Section 6.9 and Article VIII." <u>See</u> Syncora Obj., Ex. 4 at 14 (§ 6.1). This provision demonstrates that the parties intended to allow the Swap Counterparties to enforce their rights. Yet, under Syncora's reading of Section 6.9.2, the Swap Counterparties would have no rights or powers whatsoever, thereby impermissibly rendering Section 6.1 meaningless.

In addition, Syncora's incorrect reading of Section 6.9.2 improperly renders the various express consent provisions in the Swaps superfluous. Likewise, Syncora's incorrect reading of Section 6.9.2 impermissibly negates multiple provisions of the Collateral Agreement that provide both the Swap Counterparties and the City with numerous rights over the Casino Revenues that are **not** subject to Syncora's "consent."[10]

That the Swap Insurers did not intend to secure or retain broad "consent rights" in the 2009 amendments is confirmed by the Collateral Agreement. The Collateral Agreement integrates and expressly amends certain provisions of the Swaps, the Service Contracts, and the 2006 CAA. <u>See</u> Syncora

_____

[10] In the Swap Counterparty Adversary and in its objection to the Assumption Motion, Syncora also misstates what Section 6.9.2(2) says. Purporting to quote and paraphrase Section 6.9.2, Syncora states that it has "the right to 'control all actions that may be taken' by the Banks in connection with the Swap Agreements." <u>See</u> Syncora Obj. ¶¶ 5, 21, 39, 63, 79, 103, 132; Adv. Dkt. No. 20 at 19; Adv. Dkt. No. 32-3 at 26. But Section 6.9.2(2) does not mention the Swaps. Instead it refers to actions to be taken "under this Agreement," <u>i.e.</u>, under the 2006 CAA. Syncora Obj., Ex. 4 at 16 (§ 6.9.2).

Obj., Ex. 6 at 42 (§ 14.14). In doing so, the Collateral Agreement created a broad array of new rights, none of which, by their terms, require Syncora's consent. The City may, with the consent of the Swap Counterparties, but without the consent of Syncora:

- Modify the casino instructions (see Syncora Obj., Ex. 6 at 14 (§ 3.4)),

- Direct the Casino Revenues (id. at 16 (§ 5.1)),

- Approve junior liens (id. at 26 (§ 9.2)), and

- Consent to changes to the Development Agreement (id. at 27 (§ 9.6)).

The Swap Counterparties may, without the consent of Syncora:

- Approve agreements for payment of alternative taxes (id. at 28 (§ 10.4)),

- Exercise remedies as secured parties (id. at 29 (§ 11.2)),

- Seek mandamus to cure the City's failure to make sufficient appropriations (id. at 30 (§ 11.4)), and

- Replace and remove the Custodian (id. at 37 (§ 12.13)).

Thus, the Swap Insurers' reliance on the 2006 CAA is completely misplaced.[11]

### 4. The FOTA Does Not Amend Or Modify The Swaps

Next, Syncora asserts that the FOTA constitutes an unauthorized amendment of the Swaps, the 2006 CAA and the 2009 Collateral Agreement.

---

[11] FGIC, the other Swap Insurer, is unable to rely on Section 6.9.2, as it provides that "any Insurer **not then in default**" may control certain actions of a Swap Counterparty. See Syncora Obj., Ex. 4 at 16 (§ 6.9.2) (emphasis added). FGIC forfeited any control rights under Section 6.9.2 when it failed to make insurance payments under its COPs insurance policies in June 2013.

See, e.g., Syncora Obj. ¶¶ 5, 21, 27, 38-40.[12]  The Swap Insurers further argue that Part 5(xx) forbids the Swap Counterparties from being paid "termination amounts when they terminate the Swap Agreements pursuant to that section."  Adv. Dkt. No. 20 at 21-22; see also Syncora Obj. ¶¶ 2, 38, 105; FGIC Obj. ¶¶ 21-23.  From this flawed premise, the Swap Insurers reason that the FOTA must be an amendment that they had to approve pursuant to Part 5(iv) because the FOTA contemplates the Swap Counterparties receiving a payment that Part 5(xx) prevents.[13]  Adv. Dkt. No. 20 at 21-22; see also FGIC Obj. ¶ 23.  The Swap Insurers are wrong.[14]

---

[12]  Syncora also cites to provisions in the GRS Service Contract 2006 and the PFRS Service Contract 2006 (together, the "Service Contracts") as purported evidence that their consent is required before termination.  See Syncora Obj. ¶¶ 19, 132-33.  However, even if those provisions were applicable—which they are not—the Swap Counterparties are not parties to these Service Contracts.  Thus, the Swap Insurers have no "consent rights" against the Swap Counterparties arising from the Service Contracts.  See Ambac Obj. (Dkt. No. 348), Exs. 4, 5.

[13]  In its motion for summary judgment, Syncora argues that Kevyn Orr, the City's Emergency Manager, "admitted" that the FOTA "modified" the Swaps without Syncora's consent in violation of Part 5(iv).  See Adv. Dkt. No. 32-3 at 17.  Mr. Orr made no such admissions; he merely confirmed that consummation of the settlement under the FOTA would have the "effect" of reducing the termination value of the Swaps.  He clearly did not testify that the Swaps were amended or modified in the legal sense contemplated by Part 5(iv).

[14]  Syncora relies on Empresas Cablevision, S.A.B. de C.V. v. JPMorgan Chase Bank, N.A., 680 F. Supp. 2d 625, 632 (S.D.N.Y. 2010), aff'd in part, remanded in part, 381 F. App'x 117 (2d Cir. 2010), a case where defendants sold a loan "outright" in violation of a prohibition on "assignments."  See Adv. Dkt. No. 20 at 22.  Here, the FOTA does not result in a prohibited outcome as it does not provide for a payment by the Service Corporations.  The FOTA is fully consistent with the Swaps, which must be enforced strictly according to their terms.  See MBIA Ins. Corp. v. Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A., No. 09 Civ. 10093 (RJS), 2011 WL 1197634, at *12 (S.D.N.Y. Mar. 25, 2011) ("As recognized

The FOTA, like any forbearance agreement, does not amend or modify the Swap Agreements, the 2006 CAA or the Collateral Agreement in any way.  See Beal Sav. Bank, 865 N.E.2d at 1217-18 (distinguishing a forbearance agreement from an amendment).  Moreover, the FOTA expressly states that it is not amending or modifying the Swap Agreements.  See City Mot., Ex. 6  at 7, 17 (§§ 2.1(a), 5).

It is true that the FOTA contemplates the City receiving a discount against the termination payment that the Service Corporations would owe if the Swap Counterparties terminated the Swaps on account of the commencement of the chapter 9 case.  It is also true that the FOTA contemplates the Swap Counterparties releasing the lien they acquired pursuant to the Collateral Agreement and accompanying legislation.  But neither the Swaps nor the Collateral Agreement had to be amended for the Swap Counterparties and the City to reach those agreements.  To the contrary, all the Swap Counterparties and the City are doing through the FOTA is effecting a global settlement of issues relating

---

by a court in this District in rejecting an interpretation hinging on an 'opaquely' buried consequence, '[t]hese are carefully structured documents with intricately interwoven and balanced duties and rights. They spell out the parties' obligations in exquisite detail.") (quoting Coöperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Brookville CDO I Ltd., 2008 WL 5170178, at *12 (S.D.N.Y. Dec. 10, 2008)); In re Allegiance Telecom, Inc., 356 B.R. 93, 102 (Bankr. S.D.N.Y. 2006) ("Adherence to the plain language . . . . of the APA, and the refusal to modify it to correct what might have been [plaintiff's] bad bargain or unilateral mistake is particularly appropriate given the parties' general commercial sophistication.").

to the Swap Agreements through the mechanism of an Optional Early Termination under the Optional Early Termination provisions.[15]

Syncora's entire amendment/modification argument is based on the manifestly incorrect premise that the Swap Agreements prohibit the Swap Counterparties from receiving a settlement payment from the City when Part 5(xx) termination rights are exercised. What the agreements actually say is that, in the event the Swap Counterparties send a notice of termination under Part 5(xx), the Service Corporations will not owe a termination payment.[16] The FOTA is completely consistent with this provision. The Swap Counterparties will neither demand nor receive a payment from the Service Corporations. The payment to be made will be by the City, as part of a global settlement of all outstanding issues between the City and the Swap Counterparties.[17]

---

[15] Certain of the Objectors also raise concerns related to the time in which the City can exercise its rights under the FOTA. See Assured Obj. (Dkt. No. 357) ¶¶ 5-6. These objections have effectively been mooted by the Motion of the Debtor for a Final Order Pursuant to 11 U.S.C. §§ 105, 362, 364(c)(1), 364(c)(2), 364(e), 364(f), 503, 507(a)(2), 904, 921 and 922 (I) Approving Post-Petition Financing, (II) Granting Liens and Providing Superpriority Claim Status and (III) Modifying Automatic Stay (the "Financing Motion"). See Dkt. No. 1520.

[16] Part 5(xx) provides, in relevant part: "[f]or the avoidance of doubt, in no event will Party B [i.e., the Service Corporations] owe any amount to Party A in connection with an election by Party A to exercise its option under this Part 5(xx), other than any Unpaid Amounts[.]" See Ex. B at 25 (Part 5(xx)).

[17] In the Swap Counterparty Adversary, Syncora also quotes a statement by counsel for Merrill Lynch that the FOTA was intended to allow the City to obtain benefits and avoid the demands of Syncora by making payments to the Swap Counterparties. See Adv. Dkt. No. 32-3 at 18. However, this statement does not support Syncora's argument that the FOTA modifies the Swaps; rather, it merely described the nature of the global settlement of the Swaps.

Apart from the technical flaws in its amendment/modification argument, Syncora's position is without merit for another reason. Syncora's right to consent to an amendment or modification of the Swap Agreements protects Syncora from an amendment or modification over its objection when the change would adversely affect Syncora's liability as insurer of the Swap Agreements. Consummation of the FOTA, though, will actually result in the release of all Syncora (and FGIC) obligations under their Swap insurance policies. That result is totally consistent with the operation of Part 5(xx). The exercise by the Swap Counterparties of the termination rights under Part 5(xx) would eliminate any termination payments by the Service Corporations and, hence, any liability of the Swap Insurers under the Swap insurance policies.

That Syncora nevertheless argues that its consent is required for the exercise by the Swap Counterparties of Part 5(xx) terminations when its liability as insurer of the Swap Agreements would be eliminated indicates that Syncora's real motivation here is to serve its broader agenda. That broader agenda has no bearing on any of the rights and obligations that it bargained for as insurer of the Swap Agreements.

### 5. The FOTA Does Not Constitute A Sale, Assignment, Transfer Or Delegation Of Rights

The FOTA also does not constitute a sale, assignment, transfer or delegation of rights in violation of Part 5(v) of the Amended Schedule. Instead, the FOTA embodies a simple economic agreement: the Swap Counterparties are prepared to voluntarily terminate the Swap Agreements (and, thus forgo their current "in the money" position) in exchange for an agreed settlement payment

from the City. With the Swap Counterparties still facing the Service Corporations under the Swaps, the FOTA is neither an "assignment" nor a "transfer." <u>See</u> City Mot., Ex. 6 at 11, 13 (§§ 3.1, 3.5). Indeed, the City is only empowered to exercise its rights under the FOTA on a single occasion for a limited time-period, defined as the "Forbearance Period." <u>See</u> <u>id.</u> at 2, 6, 11 (§§ 1.1, 1.4, 3.2(a)).

That arrangement could have been put into effect earlier but for the City's need to raise the necessary funds. The FOTA provides the City with time to raise funds, and the Swap Counterparties agree, during this fund-raising period, to forbear from terminating the Swap Agreements, as they otherwise could have done. None of this involves a sale, assignment, transfer or delegation of any kind.

Thus, the Swap Counterparties have not "sold" any rights to the City pursuant to the FOTA. Under the FOTA, the Swap Counterparties expressly reserved all of their rights under the Swaps; the terms of the Swaps are unchanged, as are the parties to the Swaps. An assignment requires that the assignor transfer "the entire interest of the assignor in the particular subject of assignment" and the assignor must be "divested of all control over the thing assigned." <u>Miller v. Wells Fargo Bank Int'l Corp.</u>, 540 F.2d 548, 558 (2d Cir. 1976) (<u>quoting</u> <u>Coastal Commercial Corp. v. Samuel Kosoff & Sons, Inc.</u>, 199 N.Y.S.2d 852, 855 (N.Y. App. Div. 4th Dep't 1960)). That certainly did not happen here. The FOTA simply locks in, for a certain period of time, a decision that the Swap Counterparties are entitled to make under the Swap Agreements.

Similarly, there has been no delegation. A delegation enables the delegatee to perform an obligation or duty of the delegator for the benefit of the

delegator as his agent or representative.[18]  The FOTA does not make the City an agent or representative of the Swap Counterparties, nor does it enable the City to perform any obligation or duty of the Swap Counterparties.

In the Swap Counterparty Adversary and the chapter 9 case, to support their assertion that a sale, assignment or delegation has occurred, the Swap Insurers seize upon the FOTA provision permitting the City to "direct" the Swap Counterparties to terminate.  See Syncora Obj. ¶¶ 38, 39, 63; Adv. Dkt. No. 20 at 20; FGIC Obj. ¶¶ 21-23.  The Swap Insurers thus confuse simple mechanics with the basic economic agreement.  The "direction" is just a means for the City to signal that it has obtained the necessary funds and is ready to close.  It has nothing to do with the substantive decision to effect a termination.  The terminations of the Swap Agreements under Part 5(xx) remain terminations by the Swap Counterparties themselves.

### 6.  The Swap Insurers And The COPs Holders Have Not Been Harmed By The FOTA

Syncora also asserts that the FOTA harms the Swap Insurers' economic interests by disrupting their hedging strategies related to the COPs. See Syncora Obj. ¶ 40.  This assertion is highly dubious; if the Swaps are

---

[18]    See The Compact Edition of the Oxford English Dictionary 157 (1971) ("to send or commission (a person) as a deputy or representative with power to transact business for another" or "[t]o entrust, commit or deliver (authority, a function, etc.) to another as an agent or deputy"); Oxford American Dictionary, Heald College Ed. (1980) (delegate: "to entrust (a task, power, or responsibility) to an agent"); The Law Dictionary, at http://thelawdictionary.org/delegation/ ("the intrusting another with a general power to act for the good of those who depute him"); The Free Dictionary, at http://www.thefreedictionary.com/delegate ("To authorize and send (another person) as one's representative").

terminated, Syncora can obtain a replacement hedge in the market. But whether or not Syncora will become unhedged is of no moment. If the Swap Insurers signed up to an agreement that left them exposed to the risk of their hedge being disrupted by an Optional Early Termination, then they have accepted the risk. They have to live with the documents they signed.

What is more, Syncora fails to cite a single contractual provision that links the policy insuring the Swaps to the policy insuring the COPs. There are none. To the contrary, each insurance policy is expressly limited to the separate indebtedness that it covers. See, e.g., FGIC Obj., Exs. J, P.[19] Neither policy contains any contractual right or right of subrogation whatsoever based on the other insurance policy or any other obligation or indebtedness. That is why the Collateral Agreement does not provide any benefit whatsoever to the COPs' holders, or to the Swap Insurers with respect to the COPs insurance policies.

Syncora also asserts that the FOTA contravenes the COPs holders' rights under the priority scheme established by certain Service Contracts to receive interest and principal payments ahead of swap termination payments. See Syncora Obj. ¶¶ 17, 39, 125. In its capacity as a COPs holder, Syncora argues that "Swaps termination payments are junior to the payment of the outstanding principal and interest on the COPs." Syncora Obj. ¶ 17 (emphasis in original); see also id. ¶ 125 (citing Section 8.03 of the Service Contracts). This is a red herring. Section 8.03, which is incorporated into the 2006 CAA by Section 4.8.1 only provides the

---

[19]     Exhibits to the Declaration of Alfredo R. Pérez in Support of the Limited Objection of FGIC (Dkt. No. 360-1) are referred to as exhibits to the FGIC Objection.

priority scheme, or "waterfall," for the Service Payments prior to default. See Syncora Obj., Ex. 4 at 12 (§ 4.8.1). Section 4.8.2 of the 2006 CAA provides the post-default mechanism, which displaces the pre-default Section 8.03 "waterfall" incorporated into Section 4.8.1. See id. (§ 4.8.2) (applying "upon the occurrence of a payment default"). Because the Service Corporations have failed to pay the COPs, Section 4.8.2 of the 2006 CAA is the governing provision—not Section 8.03 of the Service Contracts—and it contains no analogous priority scheme.

Even if Section 8.03 of the Service Contracts did apply, this section subordinates "hedge termination payables," which is defined in relevant part as a "termination payment owing by the [service] corporation." Ambac Obj. (Dkt. No. 348), Ex. 4 § 1.01 (GRS); id. Ex. 5 § 1.01 (PFRS). Since the Counterparties are exercising their Optional Early Termination rights under the FOTA, the Service Corporations will not owe any amount to the Swap Counterparty. There will be no "termination payment owing by the [service] corporations" or Hedge Termination Payable to subordinate under Section 8.03. Rather, the payment that is contemplated by the FOTA is a settlement payment by the City (not the Service Corporations), which provides incentive to the Swap Counterparties to exercise their Optional Early Termination rights under the Optional Early Termination provisions of the Amended Schedule.

Last, but hardly least, the FOTA expressly provides that, upon the Swap Counterparties receiving the settlement payment from the City, the Service Corporations are discharged from all obligations under the Swaps. Thus, there can never be any termination payment—or any other payment—owing by the Service

Corporations. As a result, Section 8.03 is clearly not applicable to the settlement payment under the FOTA.

### C. The Swap Insurers Purported "Consent Rights" Should Be Adjudicated In Connection With The Assumption Motion, The Rule 9019 Motion And The Financing Motion

As demonstrated above, the Swap Insurers' objections are without merit as they do not have any "consent rights." However, if the Assumption Motion, the Rule 9019 Motion and the Financing Motion go forward without an adjudication of the Swap Insurers' purported "consent rights," there can be no certainty that the City will be able to obtain the termination of the Swaps, since the Swap Insurers will have preserved their claim that any termination absent its consent is "of no force or effect." Indeed, Syncora itself has argued to this Court that "<u>before</u> determining whether approval and assumption of the Forbearance Agreement is proper" this Court "<u>must</u> determine whether the Swap Counterparties have the right to designate an Early Termination Date for the Swaps without Syncora's consent, as the Forbearance Agreement provides." Syncora Obj. ¶¶ 66, 68 (emphasis added). The fact remains that all relevant parties have taken the position that the consent issue should be decided when the other motions are adjudicated. Most importantly, this is appropriate as a matter of common sense and judicial economy.

## II.    THE SWAP AGREEMENTS ARE VALID AND ENFORCEABLE

Ambac and other Objectors challenge the legality and enforceability of the Swap Agreements. They argue (erroneously) that the City—not the Service Corporations—is party to the Swaps, and that the City itself was not authorized by

Michigan law to enter into the Swap Agreements. See Ambac Obj. ¶¶ 17-26; NPFGC Obj. (Dkt. No. 353) ¶ 2. These arguments border on the frivolous.

The City is a "home rule city." Detroit, Mich., Home Rule Charter § 1-102. Under the Michigan Constitution and the Michigan Home Rule City Act, a home rule city has all powers not expressly prohibited. Mich. Const. art. VII, § 22; MCL § 117.4j(3); People v. Sell, 17 N.W.2d 193, 194-95 (Mich. 1945). No law prohibits the City from creating the Service Corporations, or using them in connection with the Swaps.

To the contrary, the Michigan Home Rule City Act expressly authorizes home rule cities like Detroit to form Michigan nonprofit corporations like the Service Corporations. See MCL § 117.4o. By ordinance, the City Council exercised that broad home rule authority and formed the Service Corporations. Detroit Ordinance 05-05 and Article II (2) of the Articles of Incorporation for each of the Service Corporations state expressly that "the Corporation shall be a legal entity separate and distinct from the City . . . ."[20] See, e.g., FGIC Obj., Ex. C; Ambac Obj., Ex. 2.

The Objectors suggest that the Court should simply ignore the Service Corporations as "mere creations" of the City. See Ambac Obj. ¶¶ 19-21. However, the Objectors have failed to allege any facts that would justify such extreme action. Under longstanding Michigan Supreme Court precedent,

---

[20]    The City's exercise of its home rule powers is presumed valid and entitled to great deference. Adams Outdoor Adver., Inc. v. City of Holland, 600 N.W.2d 339, 344-45 (Mich. Ct. App. 1999), aff'd, 625 N.W.2d 377 (Mich. 2001); see also In re Jefferson Cty., Ala., 484 B.R. 427, 462 (Bankr. N.D. Ala. 2012).

Michigan courts will respect formal legal structures unless presented with evidence of fraud.  See Klager v. Robert Meyer Co., 329 N.W.2d 721, 725 (Mich. 1982); Bacon v. City of Detroit, 275 N.W. 800, 803 (Mich. 1937).  Accordingly, the Service Corporations must be respected as separate corporate entities properly formed under the City's broad home rule power.[21]  Indeed, we are not aware of a single case disregarding the separate corporate status of a corporation formed by a municipality, and the Objectors have cited none.

Even if the Swap Agreements had been entered into directly by the City, the Swap Agreements still would be valid.  The Objectors claim that the City is not authorized to enter into the Swap Agreements because (i) the Swap Agreements are not specifically authorized by the Revised Municipal Finance Act ("RMFA") and (ii) the Swap Agreements cannot be authorized under any other Michigan law.  However, a home rule city has all powers not expressly prohibited

---

[21]  Disregarding the Service Corporations would have far-reaching consequences for the City and other Michigan municipalities.  The City alone controls nearly a dozen similar corporations, and other Michigan municipalities also routinely form and use corporations.  See, e.g., City of Grand Rapids, Comprehensive Annual Financial Report iv (2012), http://grcity.us/city-comptroller/Documents/CAFR%202012%20PDF%20FINAL.pdf; City of Flint, Comprehensive Annual Financial Report 3, 36 (2012), http://www.cityofflint.com/finance/CAFR/2012/CoFCAFR2012.pdf.  Many other cities across the United States do the same.  In fact, financial guaranty insurers, including Ambac, routinely issue insurance policies on securities issued by the very entities Ambac now claims are illegal.  See, e.g., Official Statement for City of Detroit Downtown Development Authority Tax Increment Refunding Bonds, Series 1998 (bonds insured by MBIA), http://emma.msrb.org/MS148205-MS123513-MD239453.pdf; Official Statement for Municipal Building Authority of Dearborn Heights, Building Authority Bonds, Series 2003 (bonds insured by Ambac), http://emma.msrb.org/MS215925-MS191233-MD371327.pdf.

by the state legislature or the Constitution. No statute, including the RMFA, prohibits the City from entering into swaps.[22]

Moreover, the Swap Agreements and the Collateral Agreement are fully enforceable at this time due to the applicable safe harbor provisions in the Bankruptcy Code that permit counterparties to enforce contractual rights in connection with a swap agreement without violating the automatic stay. See In re Mirant Corp., 314 B.R. 347, 353 (Bankr. N.D. Tex. 2004) (authorizing swap participant's actions under sections 362(b)(17) and 560 of the Bankruptcy Code); see also In re Nat'l Gas Distribs., LLC, 556 F.3d 247 (4th Cir. 2009). Specifically, section 362(b)(17) provides:

> (b) The filing of a petition . . . **does not operate as a stay**—
>
> . . . of the exercise by a swap participant or financial participant of any contractual right (as defined in section 560) under any security agreement or arrangement or other credit enhancement forming a part of or related to any swap agreement, or of any contractual right (as defined in section 560) to offset or net out any termination value, payment amount, or other transfer obligation arising under or in connection with 1 or more such agreements, including any master agreement for such agreements . . .

---

[22] The Objectors argue that the RMFA is a statute of general applicability that "occupies the field" of interest rate swaps. See, e.g., Ambac Obj. ¶¶ 29-36. They are simply wrong. The RMFA does not expressly occupy the field, and no legislative history supports such a position. See People v. Llewellyn, 257 N.W.2d 902, 904-05 (Mich. 1977). Only one isolated section of the RMFA addresses interest rate swaps at all (see MCL § 141.2317) and other Michigan law regulates such instruments. See id. §§ 141.422b(5)(b), 141.424.

11 U.S.C. § 362(b)(17) (emphasis added). In addition, section 560 of the Bankruptcy Code provides:

> The exercise of any contractual right of any swap participant or financial participant to cause the liquidation, termination, or acceleration of one or more swap agreements . . . or to offset or net out any termination values or payment amounts arising under or in connection with the termination, liquidation, or acceleration of one or more swap agreements **shall not be stayed, avoided, or otherwise limited** by operation of any provision of this title or by order of a court or administrative agency in any proceeding under this title.

11 U.S.C. § 560 (emphasis added).

Here, a termination by the Swap Counterparties clearly falls within the protections of these safe harbor provisions as they are both swap participants and financial participants to the Swap Agreements. See 11 U.S.C. §§ 101(22A), (53C).[23] Thus, the Swap Counterparties have the right to terminate the Swaps, demand a termination payment and enforce their liens on the Casino Revenues. Instead of enforcing their clear contractual rights, which would trap an essential revenue stream of the City, the Swap Counterparties agreed to enter into the FOTA. The FOTA will release the Swap Counterparties' lien on the Casino Revenues and will give the City access to the Casino Revenues, free and clear of any liens created by the Collateral Agreement.

---

[23] In contrast, as this Court has already found, Syncora is not a swap participant and cannot avail itself of the protections under sections 362(b)(17) or 560. See Aug. 28, 2013 Hr'g Tr., Ex. E at 7-8 ("Syncora is not a swap participant as that term is defined by the Bankruptcy Code, and the Court concludes, therefore, that it cannot rely on Section 362(b)(17).").

## III. THE LIEN ON THE CASINO REVENUES IS VALID UNDER THE MICHIGAN GAMING CONTROL AND REVENUE ACT

The Objectors next argue that the Lien on the Casino Revenues is invalid under the Michigan Gaming Control and Revenue Act (the "Gaming Act"). See, e.g., Ambac Obj. ¶¶ 40-46; Assured Obj. ¶ 1. The City's pledge of casino tax revenues, however, fits squarely within several of the uses permitted under the Gaming Act. Section 12 of the Gaming Act provides that the City may use casino tax revenues "in connection with . . . (v) Other programs that are designed to contribute to the improvement of the quality of life in the city, [or] (vi) Relief to the taxpayers of the city from 1 or more taxes or fees imposed by the city." MCL § 432.212(3)(a).[24]

The pledge contributed to the improvement of the quality of life and provided taxpayer relief. In 2009, the credit rating on the COPs was downgraded, causing an Additional Termination Event under the Swap Agreements and triggering the rights of the Swap Counterparties to terminate and demand termination payments in excess of $300 million. This chain of events could have exposed the City to massive liability and a judgment that would have been immediately placed on the City's tax roll. MCL § 600.6093. The unavoidable tax burden on City residents would have been extraordinary. It would have destroyed the quality of life in Detroit by diverting revenue from social and safety programs

---

[24] Various parties have referred to the Swap Counterparty's lien on the Casino Revenues. That reference is adopted here. The lien actually was granted by the City to the Service Corporations and secures the City's obligations to make payments to the Service Corporations under the Service Contracts relating to the Swaps. The Swap Counterparties have a lien on those obligations secured by the lien on the Casino Revenues.

to satisfy the judgment. The City Council in its contemporaneous judgment confirmed this as part of its legislative findings. <u>See</u> Detroit Ordinance 05-09 (FGIC Obj., Ex. Q).

The Objectors offer no support for their position, other than conclusory and self-serving assertions made four years after the City Council's contemporaneous findings. Indeed, the Objectors' position is undone by their very own arguments. In short, they contend that the City can use the Casino Revenues to pay unsecured creditors. If using the Casino Revenues to pay unsecured creditors is a permitted purpose under the Gaming Act, then the Casino Revenues certainly could be used to secure payments to creditors. In any event, restricting the City's use of Casino Revenues is contrary to the City's historical and planned use of the Casino Revenues as a critical revenue source, and one that is essential to the City's plan of adjustment. <u>See</u> City Mot. ¶¶ 22, 44.

## IV. THE FIRST PRIORITY LIEN ON THE CASINO REVENUES EXTENDS TO CASINO REVENUES ACQUIRED POST-PETITION

Certain objectors argue that even if the City otherwise granted a valid lien on the Casino Revenues, the lien does not extend to Casino Revenues generated and acquired by the City post-petition, by virtue of Bankruptcy Code section 552(a). <u>See</u> Ambac Obj. ¶¶ 48-61; PFRS/GRS Obj. at 6-12; Sole Obj. (Dkt. No. 361) at 16-18. The lien, however, manifestly extends to the Casino Revenues acquired post-petition, both as a statutory lien (which are not subject to section 552(a)) **and** as a protected security interest.

## A. The Swap Counterparties' Lien Is A Statutory Lien

Ambac claims that the Swap Counterparties' Lien on the Casino Revenues arises "solely as a result of an agreement between the parties," and therefore does not qualify as a statutory lien. See Ambac Obj. ¶ 49 n.7. This is incorrect. Section 101(53) of the Bankruptcy Code defines a "statutory lien" as a "lien arising solely by force of a statute on specified circumstances or conditions." 11 U.S.C. § 101(53); see also In re Cty. of Orange, 189 B.R. 499, 503 (C.D. Cal. 1995) (statute expressly created a first priority lien on certain taxes).

The Lien on the Casino Revenues is a statutory lien by virtue of a City ordinance and therefore extends to the Casino Revenues acquired post-petition. On May 26, 2009, the City passed an ordinance (the "City Ordinance") expressly granting the lien on the Casino Revenues to secure the payments on the Swap Agreements. Detroit City Code § 18-16-8.[25] A valid City ordinance has the force of a statute under Michigan law. See, e.g., Walsh Constr. Co. of Ill. v. City of Detroit, 257 F. Supp. 2d 935, 938 (E.D. Mich. 2003). As the Objectors concede, no provision of the Bankruptcy Code cuts off a statutory lien on collateral acquired by a debtor post-petition. See In re Cty. of Orange, 189 B.R. at 502-03; Ambac

---

[25] Section 18-16-8(a) provides "[t]he city pledges to the service corporations and creates a first priority lien upon all of the city's right, title and interest in, to and under the pledged property, whether received or to be received, in order to secure the payment of all city hedge payables related obligations (the city pledge)." Id. § 18-16-8(a). Section 18-16-14(a) provides "[e]ach service corporation pledges to the counterparties and creates a first priority lien upon all of the service corporation's right, title and interest in, to and under the city hedge payables related Obligations and the city pledge, in order to secure the payment of the hedge payables as the same may now or hereafter become due and payable by such service corporation under its respective hedge (collective, the service corporation pledge)." Id. § 18-16-14(a).

Obj. ¶ 49 n.7; PFRS/GRS Obj. at 7. Because the City Ordinance by itself suffices to create a valid statutory lien on the Casino Revenues, section 552 does nothing to affect this lien. In re Cty. of Orange, 189 B.R. at 503 ("The statutory nature of the lien is not changed by the fact there was an agreement between the parties . . . . [T]he *creation of the lien* is not dependent upon the agreement") (emphasis in original).

**B.      The Swap Counterparties' Lien Is A Protected Security Interest And The Casino Revenues Qualify As "Special Revenues"**

Even if the Lien on the Casino Revenues acquired post-petition were not a statutory lien, a lien exists on the Casino Revenues acquired post-petition by virtue of the Collateral Agreement. Section 928 of the Bankruptcy Code creates an exception from section 552 and protects a lien on "special revenues" acquired post-petition. It provides that "special revenues acquired by the debtor after the commencement of the case shall remain subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case." 11 U.S.C. § 928(a).

The Collateral Agreement is clearly a security agreement, and the Objectors do not argue otherwise.[26] Instead, they claim that section 902 does not apply because the Casino Revenues are not "special revenues." That argument is meritless. "Special revenues" are statutorily defined to include "special excise

---

[26]      Section 101(50) of the Bankruptcy Code defines "security agreement" as an "agreement that creates or provides for a security interest." 11 U.S.C. § 101(50). A "security interest" is a "lien created by an agreement." 11 U.S.C. § 101(51). The Collateral Agreement by its terms creates a consensual lien on the Casino Revenues and is therefore a "security agreement" under the Bankruptcy Code.

taxes imposed on particular activities or transactions." 11 U.S.C. § 902(2)(B); see also Quiroz v. Mich. Dep't of Treasury, 472 B.R. 434, 442 (E.D. Mich. 2012) (affirming decision by this Court that certain taxes were "excise taxes" under section 507 because they were levied upon particular business activities). An excise tax is defined as a "'tax imposed on the performance of an act . . . or the enjoyment of a privilege.'" Quiroz, 472 B.R. at 437 (citation omitted); see also City of N.Y. v. Feiring, 313 U.S. 283, 285 (1941).

The wagering tax revenues qualify as excise taxes because they consist of taxes imposed on a particular activity (gaming), as well as on the enjoyment of a privilege (operating under a casino license). As a result, the wagering tax revenues qualify as "special revenues" under section 902(2)(B). In fact, the City has expressly codified the legal status of the wagering tax revenues. See Detroit City Code § 18-14-3(a) (imposing an "excise tax upon the adjusted gross receipts of the casino licensee").[27]

Moreover, the opinion letters from the City's counsel, issued contemporaneously with the Collateral Agreement, affirm that the Lien is valid and the Casino Revenues constitute "special revenues." See Exs. F, G. These opinions by the City's own lawyers constitute an important factor that the Court should consider in assessing the validity of the Lien. Cable Sci. Corp. v. Rochdale Vill.,

_____

[27] A small portion of the Casino Revenues include rights to payments under so-called "developer agreements." The developer agreements were entered into before the Collateral Agreement was entered into. Payments thereunder are proceeds of pre-petition collateral consisting of those rights and are not cut off by the commencement of the City's chapter 9 case. See 11 U.S.C. § 552(b)(1); United Va. Bank v. Slab Fork Coal Co., 784 F.2d 1188, 1190 (4th Cir. 1986).

Inc., 920 F.2d 147, 151-52 (2d Cir. 1990). Non-parties and third party beneficiaries to a contact should not be heard to argue that a contract was legally unsound when the City's own lawyers issued such opinion letters as part of the execution of the contract. See Merrill Lynch Capital Servs. v. USIA & Itamarati, 2012 WL 1202034, at *5 (S.D.N.Y. Apr. 10, 2012), aff'd, 2013 WL 4610024 (2d Cir. Aug. 30, 2013).

In an attempt to overcome section 928's exceptions, the Objectors argue that they apply only to special revenues that secure special revenue bonds, as opposed to other instruments used in municipal finance (such as warrants and swaps). See Ambac Obj. ¶¶ 55-61. The plain language of the statute defeats this argument. Section 928 contains no such limitation. Instead, it expressly protects liens on special revenues granted under "any security agreement." 11 U.S.C. § 928(a). Accordingly, courts have applied section 928 to special revenues securing financial instruments other than bonds. See In re Jefferson Cty., Ala., 474 B.R. 228, 236-38 (Bankr. N.D. Ala.) (applying the special revenues exception to warrants and differentiating bonds from warrants in the municipal finance market), aff'd, 2012 WL 3775758 (N.D. Ala. Aug. 28, 2012).[28] This interpretation is not

_____

[28] Ambac and PFRS/GRS's reliance on In re Cty. of Orange, 179 B.R. 185 (Bankr. C.D. Cal. 1995), aff'd & remanded, 189 B.R. 499 (C.D. Cal. 1995), for the proposition that section 928 applies only to special revenue bonds is misplaced. The financial instruments discussed in Cty. of Orange were bonds secured by general revenues of the municipality, as opposed to special revenues. Thus, the court in that case was simply emphasizing that these general revenue bonds did not have the protection of section 928, not that the special revenues had to secure special revenue bonds for section 928 to apply. See id. at 192 ("Congress could have made § 928 applicable to all municipal bonds, but it chose to limit its

only supported by the plain meaning of section 928 but is also consistent with the policy objective of providing a municipality with the flexibility to use special revenues as collateral for a variety of financing devices. See In re Jefferson Cty., Ala., 482 B.R. 404, 432-35 (Bankr. N.D. Ala. 2012).

PFRS/GRS argue that the term "special excise taxes" in Bankruptcy Code section 902(2)(B) means only excise taxes levied to finance a particular project or program that will subsequently generate the referenced excise taxes. PFRS/GRS Suppl. Obj. (Dkt. No. 973) ¶¶ 10-12. But that scenario is already covered by section 902(2)(E) of the Bankruptcy Code ("taxes specifically levied to finance one or more projects or systems . . . ."). Contrary to the PFRS/GRS argument, "special" is meant to distinguish from "general." Here, the excise taxes are "special" because, as revenues from gaming, they relate to a particular activity.

## CONCLUSION

For the foregoing reasons, the Court should grant the City's Motions and issue an order (i) authorizing the assumption of the FOTA pursuant to section 365(a) of the Bankruptcy Code and (ii) approving the FOTA pursuant to Rule 9019 of the Federal Bankruptcy Rules of Procedure.

---

application. Section 552(a) is, therefore, still applicable to general revenue bonds . . . .").

Dated:  December 10, 2013

BINGHAM McCUTCHEN LLP

By: /s/ *Jared R. Clark*
    Jared R. Clark
    Mark M. Elliott
    Edwin E. Smith
    Steven Wilamowsky
    399 Park Avenue
    New York, New York  10022
    Telephone:  (212) 705-7000
    Facsimile:  (212) 702-5378
    jared.clark@bingham.com
    mark.elliott@bingham.com
    edwin.smith@bingham.com
    steven.wilamowsky@bingham.com

*Attorneys for UBS AG*

WARNER NORCROSS & JUDD LLP

By: /s/ *Stephen B. Grow*
    Stephen B. Grow
    Charles Ash, Jr.
    900 Fifth Third Center
    111 Lyon Street NW
    Grand Rapids, Michigan  49503
    Telephone: (616) 752-2000
    Facsimile:  (616) 752-2500
    sgrow@wnj.com
    cash@wnj.com

*Attorneys for Merrill Lynch Capital
Services, Inc. and UBS AG*

CADWALADER, WICKERSHAM &
TAFT LLP

By: /s/ *Howard R. Hawkins, Jr.*
    Howard R. Hawkins, Jr.
    Jason Jurgens
    Ellen M. Halstead
    One World Financial Center
    New York, New York  10281
    Telephone:  (212) 504-6000
    Facsimile:  (212) 504-6666
    howard.hawkins@cwt.com
    jason.jurgens@cwt.com
    ellen.halstead@cwt.com

    Mark C. Ellenberg
    700 Sixth Street, N.W.
    Washington, DC 20001
    Telephone:  (202) 862-2200
    Facsimile:  (202) 862-2400
    mark.ellenberg@cwt.com

*Attorneys for Merrill Lynch Capital
Services, Inc.*

# APPENDIX

## APPENDIX OF RELEVANT CONTRACTUAL PROVISIONS

## Exhibit 6 to the City's Motions: Forbearance and Optional Termination Agreement

**Recitals** – WHEREAS, pursuant to the terms of each Swap Agreement, it is the view of the Swap Counterparties that one or more Events of Default and/or Additional Termination Events has occurred, with the Service Corporation as the Defaulting Party or sole Affected Party, and therefore each of SBS and UBS has the right to designate an Early Termination Date for the related Swap Agreements;

**Section 1.1 –** *Forbearance.* During the period (the "**Forbearance Period**") commencing on the date hereof and terminating upon the occurrence of a Forbearance Period Termination Event (as defined in Section 1.3 below), each Swap Counterparty shall, subject to the terms and conditions hereof, forbear from:

(a)     issuing any notice designating an Early Termination Date with respect to any Swap Agreement; and

(b)     (i) instructing the Collateral Agreement Custodian to cease making payments to the City from the General Receipts Subaccount in accordance with Section 5.4 of the Collateral Agreement and (ii) giving notice to the Collateral Agreement Custodian pursuant to the Collateral Agreement of its obligation to cease making such payments.

**Section 3.1 –** *Optional Termination Right.* Subject to the terms and conditions of this Agreement:

(a)     UBS and the City hereby agree that the City shall have the right, but not the obligation, exercisable on any Business Day during the Exercise Period, to direct UBS to exercise its Optional Termination Right, under all (but not less than all) of the UBS Swap Agreements (the "**UBS Termination Right**").

(b)     MLCS and the City hereby agree that the City shall have the right, but not the obligation, exercisable on any Business Day during the Exercise Period, to direct MLCS to exercise or cause to be exercised the Optional

Termination Right under all (but not less than all) of the MLCS/SBS Swap Agreements (the "**MLCS Termination Right**" and together with the UBS Termination Right, the "**Termination Rights**"). MLCS hereby acknowledges that MLCS has the right to direct SBS to exercise the Optional Termination Right.

**Section 3.2 –** *Exercise of Termination Rights.*

. . . .

(c) If the City exercises the Termination Rights and complies with all the terms of this Agreement, (i) no Swap Counterparty will present any payment notice, notice of nonpayment, or other presentation of claim under a Swap Insurance Policy to a Swap Insurer as a result of the exercise of the Termination Rights and (ii) each Swap Counterparty will irrevocably waive all future rights to do so. . . .

**Section 3.4 –** *Effect of Payment of Optional Termination Amount.*

Upon payment in full by the City of the Optional Termination Amount to each of the Swap Counterparties:

(a) each of the Swap Counterparties and the Service Corporations shall be released and discharged from further obligations to each other under the Swap Agreements and their respective rights against each other thereunder shall be terminated;

(b) the City Pledge, the Service Corporation Security Interest and the Service Corporation Pledge shall be satisfied and discharged; . . . .

**Section 3.5 –** *Definitions Related to the Optional Termination Right.*

. . . .

"**Optional Termination Provision**" shall mean (i) with respect to the MLCS/SBS Swap Agreements, Part 5(t) of the Schedule to such Swap Agreements and (ii) with respect to the UBS Swap Agreements, Part 5(xx) of the Schedule to such Swap Agreements.

A-2

"**Optional Termination Right**" shall mean a Swap Counterparty's right to optionally terminate all transactions, in whole, pursuant to the applicable Optional Termination Provision.

**Section 5** – **<u>Forbearance not a waiver</u>**. Except as expressly provided herein, each party hereby expressly reserves the right to exercise at any time any rights and/or remedies such party has and/or to which such party is entitled under the Transaction Documents. The parties acknowledge and agree that one or more Event(s) of Default, Potential Event(s) of Default and/or Termination Event(s) may have occurred under the Transaction Documents, and may occur from time to time after the date hereof, and this Agreement (except to the limited extent expressly provided herein) preserves, and does not constitute a waiver of any right, power or privilege that the parties to this Agreement are entitled to exercise as a result of any such Event of Default, Potential Event of Default or Termination Event under the Transaction Documents. The failure of a party to exercise at any time any rights and/or remedies it has and/or to which it is entitled under the Transaction Documents, including any right to designate an Early Termination Date or to give notice under, or to insist on the strict performance of the Transaction Documents by any other party to, such Transaction Document (including, without limitation, the Collateral Agreement Custodian) will not be construed as an estoppel, waiver, modification or limitation on any right (including, without limitation, any right to designate in the future an Early Termination Date based upon the occurrence of any Event of Default or Termination Event).

**Exhibit A: 1992 ISDA Master Agreement, Dated June 7, 2006 between Detroit General Retirement System Service Corporation And UBS AG**

**Section 8(b)** – *Amendments*. No amendment, modification or waiver in respect of this Agreement will be effective unless in writing (including a writing evidenced by a facsimile transmission) and executed by each of the parties or confirmed by an exchange of telexes or electronic messages on an electronic messaging system.

**Exhibit B: 2009 Amended And Restated Schedule Between UBS AG And Detroit General Retirement System Service Corporation**

**Section 5(i) – *Designation of Early Termination Date.*** Notwithstanding anything to the contrary in Section 6 of this Agreement, if any:

> (a) Event of Default in respect of any Insured Rate Swap Transaction under this Agreement occurs; or

> (b) Termination Event (other than the Additional Termination Events set forth in Part 5(ii) below) in respect of any Insured Rate Swap Transaction under this Agreement occurs;

then, in either such case, neither Party A nor Party B shall designate an Early Termination Date pursuant to Section 6 of this Agreement in respect of any such Insured Rate Swap Transaction without the prior written consent of the Swap Insurer.

**Section 5(ii) – *Party B Additional Termination Events.*** The following shall each constitute an Additional Termination Event:

> (a) the Swap Insurer fails to meet its payment obligations under the Swap Insurance Policy and such failure is continuing with respect to the Swap Insurer under the Swap Insurance Policy; or

> (b) the Swap Insurer fails to have a claims-paying ability rating of at least "A-" from S&P or a financial strength rating of at least "A3" from Moody's; provided, however, that additionally:

>> (X) an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party; or

>> (Y) a Termination Event has occurred or is continuing with respect to Party B as the Affected Party; or

> (c) An Insurer Event has occurred and is continuing provided, however, that additionally:

>> (X) an Event of Default has occurred or is continuing with respect to Party B as the Defaulting Party: or

A-5

(Y) a Termination Event has occurred or is continuing with respect to Party B as the Affected Party.

**Section 5(xx) – *Optional Early Termination.*** Party A shall have the right to terminate one or more Transactions hereunder, either in whole or in part, on any Business Day; *provided* that no Event of Default or Termination Event is then occurring with respect to which Party A is the Defaulting Party or sole Affected Party, by providing at least five (5) Business Days' prior written notice to Party B of its election to terminate and its designation of the effective date of termination (the "Party A Optional Early Termination Date").  On the Party A Optional Early Termination Date, Party A shall determine the amount payable in connection with such termination as the greater of (i) zero and (ii) the amount calculated in accordance with Section 6(e) of the Agreement, as if (A) the Party A Optional Early Termination Date were the Early Termination Date with respect to the terminated Transaction(s) or portion thereof, (B) the terminated Transaction(s) were the sole Affected Transaction(s), (C) Party B were the sole Affected Party and (D) Second Method and Loss applied.  For the avoidance of doubt, in no event will Party B owe any amount to Party A in connection with an election by Party A to exercise its option under this Part 5(xx), other than any Unpaid Amounts

**Section 3.4 – Irrevocable Instructions**

(a)    The City shall give effect to its obligations contained in **Section 5.1(a)** by means of the Irrevocable Instructions in the form attached hereto as **Exhibit 3.4** as modified with the consent of the Counterparties to take into account whether the addressee is a Casino Licensee, Developer or Obligor (the *Irrevocable Instructions*).

(b)    The City shall deliver an Irrevocable Instruction to each Casino Licensee and each Existing Developer on or before the Closing Date. *If* a Casino Licensee and a Developer are the same Person *then* the Irrevocable Instruction as to Wagering Tax Property and Developer Payments may be combined in a single Irrevocable Instruction.

**Section 4.1 – City Pledge**

(a)    The City Pledge as set forth in the Authorizing Ordinance, as in effect on the Closing Date, and as set forth below is an essential term of this Agreement.

(b)    The City pledges to the Service Corporations and creates a first priority lien upon all of the City's right, title and interest in, to and under the Pledged Property, whether received or to be received, in order to secure the payment of all City Hedge Payables Related Obligations (the *City Pledge*).

**Section 9.2 – Junior Pledges or Liens**

The City may pledge or otherwise grant a lien on, or security interest in the Pledged Property that is junior to the pledge and lien granted by this Agreement *if, but only if*, (i) such pledge, lien or security interest is authorized by ordinance or resolution of the City Council and (ii) as a condition to the grant, be subject to intercreditor arrangements satisfactory to the Counterparties (*Permitted Liens*).

**Section 10.4 – Alternative Taxes**

(a)     *If and when* Alternative Taxes become payable, the City shall, effective on or before the date of first payment, enter into an agreement with the State of Michigan providing for the payment of Alternative Taxes to the Custodian for deposit to the General Receipts Subaccount.

(b)     Such agreement shall be in form and substance acceptable to the Counterparties.


**Section 11.2 – Remedies as Secured Party**

(a)     In addition to a Counterparty's remedies under a Hedge, following the occurrence of a Termination Event or Event of Default under a Hedge where the Counterparty is not the sole Affected Party or Defaulting Party thereunder, each Counterparty has the remedies available to it as a secured party to enforce the Service Corporation Pledge, the Service Corporation Security Interest and the City Pledge.  Such remedies of the Counterparties as secured parties under the Service Corporation Pledge and Service Corporation Security Interest shall include the exercise of all rights and remedies otherwise available to the Service Corporations as secured parties under the City Pledge, including the right to cause the Pledged Property to be applied to the obligations owing to the Counterparties under the Hedges up to the amounts then appropriated.

(b)     Such remedies include the right to cause the Pledged Property to be applied to the obligations owing to the Counterparties under the Hedges up to the amounts then appropriated and, to the extent that not all amounts for all obligations owing to the Counterparties have been appropriated, the right to use judicial process to obtain appropriations and to exercise any other equitable remedies available to the Counterparties against the Service Corporations and the City, as a Michigan home rule city, in respect of such unappropriated amounts.

(c)     *Subject* to such appropriation as may be required, judicial remedies shall be available to the extent necessary for the Counterparties to recognize all the rights and benefits of a first priority secured party with respect to the Service Corporation Property and the Pledged Property, including, as appropriate, by writ of mandamus or other equitable remedy that would result in release of funds from

the Accounts to be applied to the obligations owing to the Counterparties under the Hedges and this Agreement.

(d)    In exercising remedies the Counterparties may act jointly or independently of each other.


## Section 11.4 – Failure to Appropriate

In the event that the City fails to make an appropriation in the City's final annual budget adopted by the City Council pursuant to and in compliance with the City Charter for any Fiscal Year, and to maintain such provision without limitation, transfer or reduction throughout such Fiscal Year, on a line item basis and as a "first budget" obligation, an amount that is sufficient to pay in full, and which may be used exclusively for payment of, the City Payments for a particular Fiscal Year, mandamus may be an appropriate remedy for the Counterparties.


## Section 12.13 – Replacement of Custodian.

(c)    <u>Removal by Counterparties</u>

(1)    The Counterparties acting together may remove the Custodian by so notifying the Custodian.

(2)    If the Custodian becomes ineligible under **Section 12.12**, any Counterparty may petition a court of competent jurisdiction for the appointment of a successor.

## CERTIFICATE OF SERVICE

I hereby certify that on December 10, 2013, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system, which will send notice of filing to all ECF participant indicated on the Electronic Notice List.


 /s/ *Stephen B. Grow*