# EXHIBIT I

## WAIVER AND CONSENT OF INSURER

June 26, 2009

Reference is hereby made to (i) that certain ISDA Master Agreement (including the Schedule as amended and restated as of June 26, 2009) and any annexes thereto and the Confirmation as revised as of June 26, 2009), dated as of May 25, 2005, between SBS Financial Products Company, LLC ("SBS") and Detroit General Retirement System Service Corporation ("GRS"); (ii) that certain ISDA Master Agreement (including the Schedule as amended and restated as of June 26, 2009 and the Confirmation as revised as of June 26, 2009) and any annexes thereto), dated as of May 25, 2005, between SBS and Detroit Police and Fire Retirement System Service Corporation ("PFRS" and, together with GRS, the "Service Corporations"); (iii) that certain ISDA Master Agreement (including the Schedule as amended and restated as of June 26, 2009 and the Confirmation as revised as of June 26, 2009) and any annexes thereto), dated as of May 25, 2005, between UBS AG ("UBS" and, together with SBS, the "Swap Counterparties") and GRS; (iv) that certain ISDA Master Agreement (including the Schedule as amended and restated as of June 26, 2009 and the Confirmation as revised as of June 26, 2009) and any annexes thereto), dated as of May 25, 2005, between UBS and PFRS, in each case, with Financial Guaranty Insurance Company (the "Swap Insurer") as insurer of certain of the obligations of the Service Corporations (collectively, the "Swap Agreements"); (v) that certain Detroit General Retirement System Service Contract as amended as of June 26, 2009 (the "GRS Service Contract"), originally entered into on June 7, 2006, between The City of Detroit (the "City") and GRS; and (vi) that certain Detroit Police and Fire Retirement System Service Contract as amended as of June 26, 2009 (the "SBS Service Contract" and together with the GRS Service Contract, the "Service Contracts"), originally entered into on June 7, 2006, between the City and SBS. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Swap Agreements.

The Service Corporations and the Swap Counterparties have engaged in negotiations relating to the occurrence of an Additional Termination Event (the "Relevant Event"), as set forth, prior to the Amendment Effective Date, in Part 5(ii)(b)(Z) (with respect to the Swap Agreements to which UBS is party) and Part 5(b)(ii)(3) (with respect to the Swap Agreements to which SBS is party) of the Schedules to the Swap Agreements. As a result of these negotiations, the Swap Counterparties have agreed, among other things, to (i) amend the terms of each of the Swap Agreements, as reflected in the Schedules thereto, as amended and restated as of the Amendment Effective Date (together, the "Amended and Restated Schedules") and (ii) cause the terms of each of the Service Contracts to be amended. For purposes of this Waiver and Consent, "Amendment Effective Date" means June 26, 2009.

The Swap Insurer hereby (i) waives its right to declare an Early Termination Date, and hereby rescinds any previously declared notice of Termination Event and/or designation of Early Termination Date, in connection with the Relevant Event under each of the Swap Agreements; (ii) consents to the amendment of the Swap Agreements, as reflected in the Amended and Restated Schedules attached hereto as Exhibits A through D and the Revised Confirmations attached hereto as Exhibits E through H; and (iii) consents to the amendment of the Service Contracts attached hereto as Exhibits I and J.

After giving effect to this Waiver and Consent, the obligations of the Swap Insurer under the Swap Insurance Policy as endorsed on the date hereof are in full force and effect.

[SIGNATURE PAGE FOLLOWS]

IN WITNESS WHEREOF, the undersigned hereto has caused this Waiver and Consent to be duly executed as of the date first written above.

**FINANCIAL GUARANTY INSURANCE COMPANY**

By: _____

Name: Thea OKir

Title: Authorized Representative

**EXHIBIT E**

Revised Confirmation between SBS and GRS

**REVISED CONFIRMATION**
(General Retirement System/FGIC)

To:    Detroit General Retirement System Service Corporation
Detroit, Michigan
Attention: Norman L. White

Date:   June 26, 2009

Our Reference No. SBSFPC-0009

      The purpose of this letter agreement (the "Revised Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between us on the Trade Date specified below. This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below. This Revised Confirmation shall replace and supersede all previous Confirmations relating to the Transaction documented herein.

      The definitions and provisions contained in the 2000 ISDA Definitions (the "Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Revised Confirmation. In the event of any inconsistency between the Definitions and this Revised Confirmation, this Revised Confirmation will govern. Each party represents and warrants to the other that (i) it is duly authorized to enter into this Transaction and to perform its obligations hereunder, (ii) the Transaction and the performance of its obligations hereunder do not violate any material obligation of such party, and (iii) the person executing this Revised Confirmation is duly authorized to execute and deliver it.

      **1.**    This Revised Confirmation supplements, forms part of, and is subject to, the 1992 ISDA Master Agreement between us, dated May 25, 2005, as amended and supplemented from time to time (the "Agreement"). All provisions contained in the Agreement govern this Revised Confirmation except as expressly modified below.

      **2.**    The terms of the particular Transaction to which this Revised Confirmation relates are as follows:

| | |
|---|---|
| Party A: | SBS Financial Products Company, LLC |
| Party B: | Detroit General Retirement System Service Corporation |
| Insurer | Financial Guaranty Insurance Company ("Insurer") |
| Notional Amount: | Initially $96,621,000, thereafter amortizing as set forth on Exhibit A hereto. |
| Trade Date: | June 7, 2006 |
| Effective Date: | June 12, 2006 |

OHS East:160571617.4

| Termination Date: | June 15, 2034, or such earlier date upon which the Agreement terminates. |
|---|---|
| Business Days | New York and London |

FIXED AMOUNTS:

| Fixed Rate Payer: | Party B |
|---|---|
| Fixed Rate Payer Payment Dates: | Each March 14, June 14, September 14 and December 14, from and including September 14, 2006 up to and including the June 14, 2032, subject to adjustment in accordance with the Business Day Convention specified below. |
| Period End Dates: | March 15, June 15, September 15 and December 15, from and including September 15, 2006 up to and including the Termination Date, with No Adjustment. |
| Fixed Rate: | In accordance with the following schedule: |

| From and Including | To and Excluding | Rate (per annum) |
|---|---|---|
| Effective Date | June 15, 2007 | 4.991% |
| June 15, 2007 | June 15, 2008 | 5.666% |
| June 15, 2008 | July 1, 2010 | 6.256% |
| July 1, 2010 | Termination Date | 6.356% |

| Fixed Rate Day Count Fraction: | 30/360 |
|---|---|
| Business Day Convention: | Preceding. |

FLOATING AMOUNTS:

| Floating Rate Payer: | Party A |
|---|---|
| Floating Rate Payer Payment Dates: | Each March 14, June 14, September 14 and December 14, from and including September 14, |

2

2006 up to and including the June 14, 2032, subject to adjustment in accordance with the Preceding Business Day Convention.

| | |
|---|---|
| Floating Rate Option: | USD – LIBOR – BBA. |
| Period End Dates: | Each March 15, June 15, September 15 and December 15, from and including September 15, 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Floating Rate Day Count Fraction: | Actual/360 |
| Designated Maturity: | Three Months, except that in respect to the initial Calculation Period, Linear Interpolation shall apply |
| Method of Averaging: | Inapplicable. |
| Spread: | 0.340 percent per annum. |
| Reset Date: | Initially, the Effective Date and thereafter, on each March 15, June 15, September 15 and December 15, from and including the September 15, 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention. |
| Compounding: | Inapplicable. |

### 3. Swap Advisor Fees

| | |
|---|---|
| Swap Advisor: | Scott Balice Strategies LLC |
| Swap Advisor Fee: | On behalf of Party B, a fee of USD 84,631.30 is being paid by Party A in respect of this Transaction to the Swap Advisor. Such fee is equal to the present value of 0.65 basis points per annum on the Notional Amount of this Transaction taking into account the amortization schedule set forth herein, to the Termination Date, discounted to the Trade Date using the LIBOR swap curve. This fee is reflected in, and has increased, the Fixed Rate payable by Party B hereunder. |

Swap Advisor Fee Payment Date:          Upon closing of the 2006 Pension Funding
Securities

4. **Account Details**

**Payments to Party A:**
Account for payments in USD:
Favour: Deutsche Bank, NY
ABA/Bank No.: 021-001-033
Account No.: 01419647
Reference: SBS Swap
Attention: Safet Kalabovic

**Payments to Party B:**
ABA=U.S. BANK, Minneapolis
(091000022)
FBO=FOR FURTHER CREDIT
TO U.S. BANK, N.A.
AC=180121167365
REF: Detroit COPS GRS
Trust #: 794367001
Contact: Jill Ling 651-495-3712

5. **Optional Termination.** With the prior consent of the Insurer, Party B shall have the right to terminate this Transaction (provided that no Event of Default or Termination Event has occurred) by providing (i) at least five (5) Business Days' prior written notice to Party A of its election to terminate this Transaction and (ii) evidence reasonably satisfactory to Party A that any and all amounts owed to Party A in connection with such early termination shall be paid on the due date thereof. On the Optional Termination Date set forth in such notice, an amount, determined by Party A, shall be payable by Party A or the Party B, as the case may be, in respect of such termination. If such amount is not acceptable to Party B, then Party A shall determine such amount in accordance with Section 6 of the Agreement, assuming Market Quotation and Second Method apply and Party B is the sole Affected Party. For purposes of the Transaction Transfer Agreement by and between Party A, Party B and Merrill Lynch Capital Services, Inc., as Credit Support Provider of Party A, dated as of May 25, 2005 (the "Transaction Transfer Agreement"), any partial optional termination pursuant to this Paragraph 5 shall not constitute an Event of Default or a Termination Event or result in the designation of an Early Termination Date with respect to this Transaction.

6. **Adjustment Event** If on the Effective Date or any date thereafter (an "Adjustment Event Date") the Notional Amount of this Transaction is greater than the Related Principal Amount, an Adjustment Event shall occur and the Notional Amount shall be reduced to the extent necessary to make such Notional Amount as of the Adjustment Event Date equal to the Related Principal Amount. As used herein:

(a)     the term "Related Principal Amount" means Party A's Swap Percentage of Party B's Allocable Share of the aggregate principal amount of the outstanding FGIC-Insured Floating Rate Certificates;

(b)     the term "Party A's Swap Percentage" means at any time 50 percent;

(c)     the term "Party B's Allocable Share" means (1) the outstanding Regular Scheduled Payments to be made by Party B in respect of FGIC-Insured Floating Rate Certificates divided by (2) the sum of such Regular Scheduled Payments to be made by Party B and the outstanding Regular Scheduled Payments to be made by Detroit General Retirement System Service Corporation in respect of FGIC-Insured Floating Rate Certificates, in each case after giving effect to any prepayments of Regular Scheduled Payments in connection with the circumstances of the Adjustment Event; and

(d)     the term "FGIC-Insured Floating Rate Certificates" means any 2006 Funding Trust 2006 Pension Funding Securities that bear interest at a floating rate and the scheduled principal of and interest on which are insured under a financial guaranty insurance policy issued by Financial Guaranty Insurance Company.

(e)     Upon an adjustment to the Notional Amount, a payment (an "Adjustment Payment") will be due and owing by one party to the other equal to the Market Quotation for this Transaction determined by Party A as if (i) a Termination Event occurred in respect of Party B, (ii) Party B was the only Affected Party with respect to such Termination Event, Party A was the party entitled to calculate the Market Quotation, and the Transaction is the Affected Transaction, (iii) the relevant Adjustment Event Date was designated as the Early Termination Date, (iv) the Notional Amount of the Transaction was an amount equal to the difference between (X) the Notional Amount and (Y) the Related Principal Amount on the Adjustment Event Date, and (v) the requirement set forth in the definition of Market Quotation that quotations be obtained from four Reference Market-makers was met by having Party A provide a single quotation, provided, however, if Party B disputes such quotation, Party A shall seek bids from Reference Market-makers consistent with the provisions of Section 6 of the Agreement. If an Adjustment Payment is a positive number, Party B will pay an amount equal to such Adjustment Payment to Party A; if an Adjustment Payment is a negative number, Party A will pay an amount equal to the absolute value of such Adjustment Payment to Party B. An Adjustment Payment shall be paid by the relevant party on the date on which the Adjustment Event occurs.

(f)     Notwithstanding anything to the contrary in this Agreement, Party B will not optionally cause an Adjustment Event if, in connection with such Adjustment Event, an Adjustment Payment would be payable by Party B to Party A unless Party B provides evidence reasonably satisfactory to Party A and the Swap Insurer that (i) such Adjustment Payment will be made by Party B on the Adjustment Event Date and (ii) such Adjustment Payment will not cause Party B to be in violation of, or in default under the documentation relating to the 2006 Pension Funding Securities (as defined below).

(g)     For purposes of the Transaction Transfer Agreement, an Adjustment Event pursuant to this Paragraph 6 shall not constitute an Event of Default or a Termination Event or result in the designation of an Early Termination Date with respect to this Transaction.

7.      **Relationship between Parties** Each party will be deemed to represent to the other party on the date on which it enters into this Transaction that (in the absence of a written

OHS East:160571617.4

Agreement between the parties which expressly imposes affirmative obligations to the contrary for this Transaction):

(a) Non-Reliance. Each party is acting for its own account, and has made its own independent decisions to enter into this Transaction and this Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. Each party is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanation relating to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(b) Assessment and Understanding. Each party is capable of assessing the merits of and understands (on its own behalf or through independent professional advice), and accepts, the terms, conditions and risks of this Transaction. Each party is also capable of assuming and assumes, the risks of this Transaction.

(c) Status of the Parties. Neither party is acting as a fiduciary for or as an adviser to the other in respect of this Transaction.

### 8. Agreement to Deliver Documents

For the purpose of Sections 3(d) and 4(a) of the Agreement and in addition to the documents to be delivered pursuant to Part 2 of the Schedule, each party agrees to deliver the following documents:

### 9. Risk Considerations.

Party B acknowledges receipt from Party A, at or prior to the time of Party B's final approval of the Transaction evidenced by this Revised Confirmation, of a document entitled "Risk Considerations".

### 10. Custodian.

At least two (2) Local Business Days prior to each Payment Date for the Transaction to which this Confirmation relates, Party A, as Calculation Agent, shall notify the Collateral Agreement Custodian of the net amount payable and the Party owing such payment as of the immediately following Payment Date.

[SIGNATURE PAGE FOLLOWS]

OHS East:160571617.4

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Revised Confirmation enclosed for that purpose and returning it to us or by sending to us a letter substantially similar to this letter, which letter sets forth the material terms of the Transaction to which this Revised Confirmation relates and indicates agreement to those terms.

Yours sincerely,

**SBS FINANCIAL PRODUCTS COMPANY, LLC**, a Delaware limited liability company

By: _____
    Name: John Carter
    Title: President

Accepted and Confirmed as of the
date first above written:

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

By:_____
    Name: Norman L. White
    Title: President

Detroit General (FGIC)/Revised Confirmation Letter

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Revised Confirmation enclosed for that purpose and returning it to us or by sending to us a letter substantially similar to this letter, which letter sets forth the material terms of the Transaction to which this Revised Confirmation relates and indicates agreement to those terms.

Yours sincerely,

**SBS FINANCIAL PRODUCTS COMPANY, LLC**, a Delaware limited liability company

By:_____
    Name:
    Title:

Accepted and Confirmed as of the
date first above written:

**DETROIT GENERAL RETIREMENT SYSTEM SERVICE CORPORATION**

By:_____
    Name: Norman L. White
    Title: President

## Exhibit A

| Period Start Date (From and Including) | Period End Date (Unadjusted, to and Excluding) | Outstanding Notional During Period |
|---|---|---|
| Effective Date | June 15, 2029 | 96,621,000 |
| June 15, 2029 | June 15, 2030 | 83,804,000 |
| June 15, 2030 | June 15, 2031 | 66,954,500 |
| June 15, 2031 | June 15, 2032 | 49,049,500 |
| June 15, 2032 | June 15, 2033 | 30,023,500 |
| June 15, 2033 | Termination Date | 9,806,000 |

A-1

OHS East:160571617.4

**EXHIBIT F**

Revised Confirmation between SBS and PFRS

**REVISED CONFIRMATION**
(Police and Fire Retirement System/FGIC)

To:     Detroit Police and Fire Retirement System Service Corporation
        Detroit, Michigan
        Attention: Norman L. White

Date:   June 26, 2009

Our Reference No. SBSFPC-0010

The purpose of this letter agreement (the "Revised Confirmation") is to confirm the terms and conditions of the transaction (the "Transaction") entered into between us on the Trade Date specified below. This letter agreement constitutes a "Confirmation" as referred to in the Master Agreement specified below. This Revised Confirmation shall replace and supersede all previous Confirmations relating to the Transaction documented herein.

The definitions and provisions contained in the 2000 ISDA Definitions (the "Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Revised Confirmation. In the event of any inconsistency between the Definitions and this Revised Confirmation, this Revised Confirmation will govern. Each party represents and warrants to the other that (i) it is duly authorized to enter into this Transaction and to perform its obligations hereunder, (ii) the Transaction and the performance of its obligations hereunder do not violate any material obligation of such party, and (iii) the person executing this Revised Confirmation is duly authorized to execute and deliver it.

1.      This Revised Confirmation supplements, forms part of, and is subject to, the 1992 ISDA Master Agreement between us, dated May 25, 2005, as amended and supplemented from time to time (the "Agreement"). All provisions contained in the Agreement govern this Revised Confirmation except as expressly modified below.

2.      The terms of the particular Transaction to which this Revised Confirmation relates are as follows:

| | |
|---|---|
| Party A: | SBS Financial Products Company, LLC |
| Party B: | Detroit Police and Fire Retirement System Service Corporation |
| Insurer | Financial Guaranty Insurance Company ("Insurer") |
| Notional Amount: | Initially $153,801,500 thereafter amortizing as set forth on Exhibit A hereto. |
| Trade Date: | June 7, 2006 |
| Effective Date: | June 12, 2006 |

OHS East:160571640.5

| | |
|---|---|
| Termination Date: | June 15, 2034, or such earlier date upon which the Agreement terminates. |
| Business Days | New York and London |
| FIXED AMOUNTS: | |
| Fixed Rate Payer: | Party B |
| Fixed Rate Payer Payment Dates: | Each March 14, June 14, September 14 and December 14, from and including September 14, 2006 up to and including the June 14, 2032, subject to adjustment in accordance with the Business Day Convention specified below. |
| Period End Dates: | March 15, June 15, September 15 and December 15, from and including September 15, 2006 up to and including the Termination Date, with No Adjustment. |

Fixed Rate:

| From and Including | To and Excluding | Rate (per annum) |
|---|---|---|
| Effective Date | June 15, 2007 | 4.991% |
| June 15, 2007 | June 15, 2008 | 5.666% |
| June 15, 2008 | July 1, 2010 | 6.252% |
| July 1, 2010 | Termination Date | 6.352% |

| | |
|---|---|
| Fixed Rate Day Count Fraction: | 30/360 |
| Business Day Convention: | Preceding. |
| FLOATING AMOUNTS: | |
| Floating Rate Payer: | Party A |
| Floating Rate Payer Payment Dates: | Each March 14, June 14, September 14 and December 14, from and including September 14, 2006 up to and including the June 14, 2032, subject to adjustment in accordance with the |

2

|                                    | Preceding Business Day Convention. |
|------------------------------------|-------------------------------------|

Floating Rate Option:          USD – LIBOR – BBA.

Period End Dates:          Each March 15, June 15, September 15 and December 15, from and including September 15, 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

Floating Rate Day Count Fraction:          Actual/360

Designated Maturity:          Three Months, except that in respect to the initial Calculation Period, Linear Interpolation shall apply

Method of Averaging:          Inapplicable.

Spread:          0.340% percent per annum.

Reset Date:          Initially, the Effective Date and thereafter, on each March 15, June 15, September 15 and December 15, from and including the September 15, 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

Compounding:          Inapplicable.

### 3.    Swap Advisor Fees

Swap Advisor:          Scott Balice Strategies LLC

Swap Advisor Fee:          On behalf of Party B, a fee of USD 135,029.05 is being paid by Party A in respect of this Transaction to the Swap Advisor. Such fee is equal to the present value of 0.65 basis points per annum on the Notional Amount of this Transaction taking into account the amortization schedule set forth herein, to the Termination Date, discounted to the Trade Date using the LIBOR swap curve. This fee is reflected in, and has increased, the Fixed Rate payable by Party B hereunder.

Swap Advisor Fee Payment Date:          Upon closing of the 2006 Pension Funding Securities

OHS East:160571640.5

4. **Account Details**

**Payments to Party A:**
Account for payments in USD:
Favour: Deutsche Bank, NY
ABA/Bank No.: 021-001-033
Account No.: 01419647
Reference: SBS Swap
Attention: Safet Kalabovic

**Payments to Party B:**
ABA=U.S. BANK, Minneapolis
(091000022)
FBO=FOR FURTHER CREDIT
TO U.S. BANK, N.A.
AC=180121167365
REF: Detroit COPS GRS
Trust #: 794367002
Contact: Jill Ling 651-495-3712

5.   **Optional Termination.** With the prior consent of the Insurer, Party B shall have the right to terminate this Transaction (provided that no Event of Default or Termination Event has occurred) by providing (i) at least five (5) Business Days' prior written notice to Party A of its election to terminate this Transaction and (ii) evidence reasonably satisfactory to Party A that any and all amounts owed to Party A in connection with such early termination shall be paid on the due date thereof. On the Optional Termination Date set forth in such notice, an amount, determined by Party A, shall be payable by Party A or the Party B, as the case may be, in respect of such termination. If such amount is not acceptable to Party B, then Party A shall determine such amount in accordance with Section 6 of the Agreement, assuming Market Quotation and Second Method apply and Party B is the sole Affected Party. For purposes of the Transaction Transfer Agreement by and between Party A, Party B and Merrill Lynch Capital Services, Inc., as the Credit Support Provider of Party A, dated as of May 25, 2005 (the "Transaction Transfer Agreement"), any partial optional termination pursuant to this Paragraph 5 shall not constitute an Event of Default or a Termination Event or result in the designation of an Early Termination Date with respect to this Transaction.

6.   **Adjustment Event** If on the Effective Date or any date thereafter (an "Adjustment Event Date") the Notional Amount of this Transaction is greater than the Related Principal Amount, an Adjustment Event shall occur and the Notional Amount shall be reduced to the extent necessary to make such Notional Amount as of the Adjustment Event Date equal to the Related Principal Amount. As used herein:

(a)   the term "Related Principal Amount" means Party A's Swap Percentage of Party B's Allocable Share of the aggregate principal amount of the outstanding FGIC-Insured Floating Rate Certificates;

4

(b)     the term "Party A's Swap Percentage" means at any time 50 percent;

(c)     the term "Party B's Allocable Share" means (1) the outstanding Regular Scheduled Payments to be made by Party B in respect of FGIC-Insured Floating Rate Certificates divided by (2) the sum of such Regular Scheduled Payments to be made by Party B and the outstanding Regular Scheduled Payments to be made by Detroit Police and Fire Retirement Service Corporation in respect of FGIC-Insured Floating Rate Certificates, in each case after giving effect to any prepayments of Regular Scheduled Payments in connection with the circumstances of the Adjustment Event; and

(d)     the term "FGIC-Insured Floating Rate Certificates" means any 2006 Funding Trust 2006 Pension Funding Securities that bear interest at a floating rate and the scheduled principal of and interest on which are insured under a financial guaranty insurance policy issued by Financial Guaranty Insurance Company.

(e)     Upon an adjustment to the Notional Amount, a payment (an "Adjustment Payment") will be due and owing by one party to the other equal to the Market Quotation for this Transaction determined by Party A as if (i) a Termination Event occurred in respect of Party B, (ii) Party B was the only Affected Party with respect to such Termination Event, Party A was the party entitled to calculate the Market Quotation, and the Transaction is the Affected Transaction, (iii) the relevant Adjustment Event Date was designated as the Early Termination Date, (iv) the Notional Amount of the Transaction was an amount equal to the difference between (X) the Notional Amount and (Y) the Related Principal Amount on the Adjustment Event Date, and (v) the requirement set forth in the definition of Market Quotation that quotations be obtained from four Reference Market-makers was met by having Party A provide a single quotation, provided, however, if Party B disputes such quotation, Party A shall seek bids from Reference Market-makers consistent with the provisions of Section 6 of the Agreement. If an Adjustment Payment is a positive number, Party B will pay an amount equal to such Adjustment Payment to Party A; if an Adjustment Payment is a negative number, Party A will pay an amount equal to the absolute value of such Adjustment Payment to Party B. An Adjustment Payment shall be paid by the relevant party on the date on which the Adjustment Event occurs.

(f)     Notwithstanding anything to the contrary in this Agreement, Party B will not optionally cause an Adjustment Event if, in connection with such Adjustment Event, an Adjustment Payment would be payable by Party B to Party A unless Party B provides evidence reasonably satisfactory to Party A and the Swap Insurer that (i) such Adjustment Payment will be made by Party B on the Adjustment Event Date and (ii) such Adjustment Payment will not cause Party B to be in violation of, or in default under the documentation relating to the 2006 Pension Funding Securities (as defined below).

(g)     For purposes of the Transaction Transfer Agreement, an Adjustment Event pursuant to this Paragraph 6 shall not constitute an Event of Default or a Termination Event or result in the designation of an Early Termination Date with respect to this Transaction.

7.     **Relationship between Parties** Each party will be deemed to represent to the other party on the date on which it enters into this Transaction that (in the absence of a written Agreement between the parties which expressly imposes affirmative obligations to the contrary for this Transaction):

(a)     Non-Reliance. Each party is acting for its own account, and has made its own

5

OHS East:160571640.5

independent decisions to enter into this Transaction and this Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. Each party is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanation relating to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(b) Assessment and Understanding. Each party is capable of assessing the merits of and understands (on its own behalf or through independent professional advice), and accepts, the terms, conditions and risks of this Transaction. Each party is also capable of assuming and assumes, the risks of this Transaction.

(c) Status of the Parties. Neither party is acting as a fiduciary for or as an adviser to the other in respect of this Transaction.

8. **Risk Considerations**.

Party B acknowledges receipt from Party A, at or prior to the time of Party B's final approval of the Transaction evidenced by this Revised Confirmation, of a document entitled "Risk Considerations".

9. **Custodian**.

At least two (2) Local Business Days prior to each Payment Date for the Transaction to which this Confirmation relates, Party A, as Calculation Agent, shall notify the Collateral Agreement Custodian of the net amount payable and the Party owing such payment as of the immediately following Payment Date.

[SIGNATURE PAGE FOLLOWS]

6

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Revised Confirmation enclosed for that purpose and returning it to us or by sending to us a letter substantially similar to this letter, which letter sets forth the material terms of the Transaction to which this Revised Confirmation relates and indicates agreement to those terms.

Yours sincerely,

**SBS FINANCIAL PRODUCTS COMPANY, LLC**, a Delaware limited liability company

By: _____

    Name: *John Carter*

    Title: *President*

Accepted and Confirmed as of the
date first above written:

**DETROIT POLICE AND FIRE
RETIREMENT SYSTEM SERVICE CORPORATION**

By: _____

    Name: Norman L. White

    Title: President

Detroit Police (FGIC)/RevisedConfirmation Letter

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Revised Confirmation enclosed for that purpose and returning it to us or by sending to us a letter substantially similar to this letter, which letter sets forth the material terms of the Transaction to which this Revised Confirmation relates and indicates agreement to those terms.

Yours sincerely,

**SBS FINANCIAL PRODUCTS COMPANY, LLC**, a Delaware limited liability company

By:_____
    Name:
    Title:

Accepted and Confirmed as of the
date first above written:

**DETROIT POLICE AND FIRE
RETIREMENT SYSTEM SERVICE CORPORATION**

By:_____
    Name:  Norman L. White
    Title:   President

**Exhibit A**

| Period Start Date (From and Including) | Period End Date (Unadjusted, to and Excluding) | Outstanding Notional During Period |
|---|---|---|
| Effective Date | June 15, 2029 | 153,801,500 |
| June 15, 2029 | June 15, 2030 | 133,095,500 |
| June 15, 2030 | June 15, 2031 | 108,470,000 |
| June 15, 2031 | June 15, 2032 | 82,303,000 |
| June 15, 2032 | June 15, 2033 | 54,497,000 |
| June 15, 2033 | Termination Date | 24,950,000 |

OHS East:160571640.5

**EXHIBIT G**

Revised Confirmation between UBS and GRS

 **UBS**

| | |
|---|---|
| Date: | 26 June 2009 |
| To: | Detroit General Retirement System Service Corporation ("Counterparty") |
| Attn: | Norman L. White, President |
| Fax No: | 313-224-4466 |
| From: | UBS AG, Stamford Branch ("UBS AG") |
| Subject: | Swap Transaction |
| | UBS AG Ref: 37380341 |
| | Counterparty Ref: GRS - FGIC |

Dear Mr. White:

The purpose of this communication is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below. This Revised Confirmation constitutes a "Confirmation" as referred to in the Master Agreement or Agreement specified below. This Revised Confirmation shall replace and supersede all previous Confirmations relating to the Transaction documented herein.

UBS AG and the Counterparty have entered into a Master Agreement, dated as of 25 May 2005, which sets forth the general terms and conditions, as well as amendments, applicable to this Transaction (together with any future Schedule and any other future Confirmation, the "Agreement"). This Revised Confirmation supplements, forms part of and is subject to the Agreement. All provisions contained in, or incorporated by reference to, such Agreement shall govern this Revised Confirmation except as expressly modified below. In the event of any inconsistency between the provisions of the Agreement and this Revised Confirmation, this Revised Confirmation will prevail for purposes of this Transaction.

The definitions contained in the 2000 ISDA Definitions (the "2000 Definitions"), (the "Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Revised Confirmation. In the event of any inconsistency between of the definitions listed above and this Revised Confirmation, this Revised Confirmation will govern.

The terms of the particular Swap Transaction to which this Revised Confirmation relates are as follows:

**General Terms**

| | |
|---|---|
| Insurer: | Financial Guaranty Insurance Company |
| Trade Date: | 07 June 2006 |
| Effective Date: | 12 June 2006 |
| Termination Date: | 15 June 2034 |
| Notional Amount: | Initially USD 96,621,000 thereafter amortizing per the Amortization Schedule below. |
| Calculation Agent: | UBS AG |
| Business Days: | New York and London |

**Fixed Amounts**

OHS East:160571736.5

| Fixed Rate Payer: | Counterparty |
| Fixed Rate: | In accordance with the following schedule: |

| From (and including) | To (but excluding) | Fixed Rate |
|---|---|---|
| Effective Date | 15 June 2007 | 4.991 |
| 15 June 2007 | 15 June 2008 | 5.666 |
| 15 June 2008 | 1 July 2010 | 6.256 |
| 1 July 2010 | Termination Date | 6.356 |

Fixed Rate Day Count Fraction: 30/360

Fixed Rate Payer Payment Dates: Quarterly, on each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2034, subject to adjustment in accordance with the Preceding Business Day Convention.

Period End Dates: Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention, with No Adjustment.

**Floating Amounts**

Floating Rate Payer: UBS AG

Floating Rate Option: USD-LIBOR-BBA

Designated Maturity: Three months, except that in respect to the initial Calculation Period, Linear Interpolation shall apply

Spread: Plus 34 Basis Points

Floating Rate Day Count Fraction: Actual/360

Floating Rate Payer Payment Dates: Each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2034, subject to adjustment in accordance with the Preceding Business Day Convention.

Period End Dates: Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

Reset Dates: Initially, the Effective Date and thereafter on each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to but excluding the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

---

UBS AG Ref 37380341
C/P Ref: GRS -FGIC

OHS East:160571736.5

| Compounding: | Inapplicable |
|---|---|

**Amortization Schedule**

| Period From (and including) | Period To (but excluding) | Notional Amount (USD) |
|---|---|---|
| Effective Date | 15-Jun-2029 | 96,621,000 |
| 15-Jun-2029 | 15-Jun-2030 | 83,804,000 |
| 15-Jun-2030 | 15-Jun-2031 | 66,954,500 |
| 15-Jun-2031 | 15-Jun-2032 | 49,049,500 |
| 15-Jun-2032 | 15-Jun-2033 | 30,023,500 |
| 15-Jun-2033 | Termination Date | 9,806,000 |

**Optional Termination by Counterparty**

With the prior consent of the Insurer, Counterparty shall have the right to terminate this Transaction (provided that no Event of Default or Termination Event has occurred) by providing (i) at least five (5) Business Days' prior written notice to UBS AG of its election to terminate this Transaction and (ii) evidence reasonably satisfactory to UBS AG that any and all amounts owed to UBS AG in connection with such early termination shall be paid on the due date thereof. On the Optional Termination Date set forth in such notice, an amount, determined by UBS AG, shall be payable by UBS AG or the Counterparty, as the case may be, in respect of such termination. If such amount is not acceptable to Counterparty, then UBS AG shall determine such amount in accordance with Section 6 of the Agreement, assuming Market Quotation and Second Method apply and Counterparty is the sole Affected Party.

**Adjustment Event**

If on the Effective Date or any date thereafter (an "Adjustment Event Date") the Notional Amount of this Transaction is greater than the Related Principal Amount, an Adjustment Event shall occur and the Notional Amount shall be reduced to the extent necessary to make such Notional Amount as of the Adjustment Event Date equal to the Related Principal Amount. As used herein:

(a)     the term "Related Principal Amount" means UBS AG's Swap Percentage of Counterparty's Allocable Share of the aggregate principal amount of the outstanding FGIC-insured Floating Rate Certificates;

(b)     the term "UBS AG's Swap Percentage" means at any time **50 percent;**

(c)     the term "Counterparty's Allocable Share" means (1) the total Regular Scheduled Payments to be made by Counterparty in respect of FGIC-Insured Floating Rate Certificates divided by (2) the total Regular Scheduled Payments to be made by Counterparty and Detroit Police and Fire Retirement System Service Corporation in respect of FGIC-Insured Floating Rate Certificates, in each case after giving effect to any prepayments of Regular Scheduled Payments in connection with the circumstances of the Adjustment Event; and

(d)     the term "FGIC-Insured Floating Rate Certificates" means any 2006 Funding Trust 2006 Pension Funding Securities (the "Related Certificates") that bear interest at a floating rate and the scheduled principal of and interest on which are insured under a financial guaranty insurance policy issued by Financial Guaranty Insurance Company.

(e)     Upon an adjustment to the Notional Amount, a payment (an "Adjustment Payment") will be due and owing by one party to the other equal to the Market Quotation for this Transaction determined

UBS AG Ref     37380341
C/P Ref:        GRS -FGIC

OHS East:160571736.5

by UBS AG as if (i) a Termination Event occurred in respect of Counterparty, (ii) Counterparty was the only Affected Party with respect to such Termination Event, UBS AG was the party entitled to calculate the Market Quotation, and the Transaction is the Affected Transaction, (iii) the relevant Adjustment Event Date was designated as the Early Termination Date, (iv) the Notional Amount of the Transaction was an amount equal to the difference between (X) the Notional Amount and (Y) the outstanding principal amount of the Related Certificates on the Adjustment Event Date, and (v) the requirement set forth in the definition of Market Quotation that quotations be obtained from four Reference Market-makers was met by having UBS AG provide a single quotation, provided, however, if Counterparty disputes such quotation, UBS AG shall seek bids from Reference Market-makers consistent with the provisions of Section 6 of the Agreement. If an Adjustment Payment is a positive number, Counterparty will pay an amount equal to such Adjustment Payment to UBS AG; if an Adjustment Payment is a negative number, UBS AG will pay an amount equal to the absolute value of such Adjustment Payment to Counterparty. An Adjustment Payment shall be paid by the relevant party on the date on which the Adjustment Event occurs.

(f)     Notwithstanding anything to the contrary in this Agreement, Counterparty will not optionally cause an Adjustment Event if, in connection with such Adjustment Event, an Adjustment Payment would be payable by Counterparty to UBS AG unless Counterparty provides evidence reasonably satisfactory to UBS AG and the Swap Insurer that (i) such Adjustment Payment will be made by Counterparty on the Adjustment Event Date and (ii) such Adjustment Payment will not cause Counterparty to be in violation of, or in default under the documentation relating to the Related Certificates.

## Swap Advisor Fee

| | |
|---|---|
| Swap Advisor: | Scott Balice Strategies LLC |
| Swap Advisor Fee: | On behalf of the Counterparty, a fee of USD 84,696.30 is being paid by UBS AG in respect of this Transaction to the Swap Advisor. Such fee is equal to the present value of 0.65 basis points per annum on the Notional Amount of this Transaction taking into account the amortization schedule set forth herein, to the Termination Date, discounted to the Trade Date using the LIBOR swap curve. This fee is reflected in, and has increased, the Fixed Rate payable by the Counterparty hereunder. |
| Swap Advisor Fee Payment Date: | Upon closing of the Related Certificates |

## Relationship between Parties

Each party will be deemed to represent to the other party on the date on which it enters into this Transaction that (in the absence of a written Agreement between the parties which expressly imposes affirmative obligations to the contrary for this Transaction):

(a) Non-Reliance. Each party is acting for its own account, and has made its own independent decisions to enter into this Transaction and this Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. Each party is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanation relating to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or

UBS AG Ref    37380341
C/P Ref:       GRS -FGIC

OHS East:160571736.5

oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(b) Assessment and Understanding. Each party is capable of assessing the merits of and understands (on its own behalf or through independent professional advice), and accepts, the terms, conditions and risks of this Transaction. Each party is also capable of assuming and assumes, the risks of this Transaction.

(c) Status of the Parties. Neither party is acting as a fiduciary for or as an adviser to the other in respect of this Transaction.

References in this clause to "a party" shall, in the case of UBS AG and where the context so allows, include references to any affiliate of UBS AG.

## Risk Considerations

The Counterparty acknowledges receipt from UBS, at or prior to the time of Counterparty's final approval of the Transaction evidenced by this Revised Confirmation, of a document entitled "Risk Considerations".

## Custodian

At least two (2) Local Business Days prior to each Payment Date for the Transaction to which this Confirmation relates, Party A, as Calculation Agent, shall notify the Collateral Agreement Custodian of the net amount payable and the Party owing such payment as of the immediately following Payment Date.

## Account Details

UBS Account Details

Account for payments in USD:
| | |
|---|---|
| Bank: | UBS AG, Stamford |
| ABA/Bank No.: | 026-007-993 |
| Account No.: | 101-WA-860050-025 |

Counterparty Account Details

| | |
|---|---|
| Bank: | U.S. Bank, Minneapolis |
| FBO: | For further credit to U.S. Bank, N.A. |
| ABA/Bank No.: | 091000022 |
| Account No.: | 180121167365 |
| Ref: | Detroit COPS GRS |
| Trust #: | 789710000 |
| Contact: | Jill Ling 651-495-3712 |

## Offices

The office of UBS AG for the Swap Transaction is Stamford, CT; and the office of the Counterparty for the Swap Transaction is Detroit, MI.

## Contact Names at UBS AG

| | | |
|---|---|---|
| Settlements: | Hotline: | (203) 719 1110 |
| Confirmation Queries: | Jennifer McCandless | (212) 713 1212 |

Page 5

| | |
|---|---|
| UBS AG Ref | 37380341 |
| C/P Ref: | GRS -FGIC |

OHS East:160571736.5

| ISDA Documentation: | Legal Department – Documentation: | (203) 719 6249 |
|---|---|---|
| Swift: | UBSWUS33 | |
| Fax: | (203) 719-5771 | |
| Address: | UBS AG | |
| | 677 Washington Boulevard | |
| | Stamford, CT 06901 | |

[Intentionally left blank.  Signature page follows.]

UBS AG Ref      37380341
C/P Ref:        GRS -FGIC

OHS East:160571736.5

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by executing a copy of this Revised Confirmation and returning it to us by facsimile to **(212) 373-6491**.

Yours Faithfully
For and on Behalf of
UBS AG, Stamford Branch

By        *Marie-Anne Clarke*        By

Name:          Marie-Anne Clarke                    Name:
Title:          Executive Director and Counsel       Title:
                Region Americas Legal
                Fixed Income Section

James B. Fuqua
Managing Director and Counsel
Region Americas Legal

Acknowledged and agreed by the Detroit General Retirement System Service Corporation as of the Trade Date specified above:

By:


Name:    Norman L. White
Title:    President

Page 7

UBS AG Ref    37380341
C/P Ref:      GRS -FGIC

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by executing a copy of this Revised Confirmation and returning it to us by facsimile to **(212) 373-6491**.

Yours Faithfully
For and on Behalf of
UBS AG, Stamford Branch

By                                                    By




Name:                                              Name:
Title:                                               Title:

Acknowledged and agreed by the Detroit General Retirement System Service Corporation as of the Trade Date specified above:

By:

Name:    Norman L. White
Title:     President

---

UBS AG Ref    37380341
C/P Ref:       GRS -FGIC

OHS East:160571736.5

**EXHIBIT H**

Revised Confirmation between UBS and PFRS



| Date: | 26 June 2009 |
|---|---|

| To: | Detroit Police and Fire Retirement System Service Corporation ("Counterparty") |
|---|---|

| Attn: | Norman L. White, President |
|---|---|

| Fax No: | 313-224-4466 |
|---|---|

| From: | UBS AG, Stamford Branch ("UBS AG") |
|---|---|

| Subject: | Swap Transaction |
|---|---|
|  | UBS AG Ref:       37380313 |
|  | Counterparty Ref:  PFRS – FGIC |

Dear Mr. White:

The purpose of this communication is to confirm the terms and conditions of the Transaction entered into between us on the Trade Date specified below. This Revised Confirmation constitutes a "Confirmation" as referred to in the Master Agreement or Agreement specified below. This Revised Confirmation shall replace and supersede all previous Confirmations relating to the Transaction documented herein.

UBS AG and the Counterparty have entered into a Master Agreement, dated as of 25 May 2005, which sets forth the general terms and conditions, as well as amendments, applicable to this Transaction (together with any future Schedule and any other future Confirmation, the "Agreement"). This Revised Confirmation supplements, forms part of and is subject to the Agreement. All provisions contained in, or incorporated by reference to, such Agreement shall govern this Revised Confirmation except as expressly modified below. In the event of any inconsistency between the provisions of the Agreement and this Revised Confirmation, this Revised Confirmation will prevail for purposes of this Transaction.

The definitions contained in the 2000 ISDA Definitions (the "2000 Definitions"), (the "Definitions"), as published by the International Swaps and Derivatives Association, Inc., are incorporated into this Revised Confirmation. In the event of any inconsistency between of the definitions listed above and this Revised Confirmation, this Revised Confirmation will govern.

The terms of the particular Swap Transaction to which this Revised Confirmation relates are as follows:

**General Terms**

| Insurer: | Financial Guaranty Insurance Company |
|---|---|

| Trade Date: | 07 June 2006 |
|---|---|

| Effective Date: | 12 June 2006 |
|---|---|

| Termination Date: | 15 June 2034 |
|---|---|

| Notional Amount: | Initially USD 153,801,500 thereafter amortizing per the Amortization Schedule below. |
|---|---|

| Calculation Agent: | UBS AG |
|---|---|

| Business Days: | New York and London |
|---|---|

**Fixed Amounts**

OHS East:160571705.5

| | Fixed Rate Payer: | Counterparty |
|---|---|---|

Fixed Rate Payer:                      Counterparty

Fixed Rate:                               In accordance with the following schedule:

| From (and including) | To (but excluding) | Fixed Rate |
|---|---|---|
| Effective Date | 15 June 2007 | 4.991 |
| 15 June 2007 | 15 June 2008 | 5.666 |
| 15 June 2008 | 1 July 2010 | 6.252 |
| 1 July 2010 | Termination Date | 6.352 |

Fixed Rate Day Count Fraction:      30/360

Fixed Rate Payer Payment Dates:     Quarterly, on each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2034, subject to adjustment in accordance with the Preceding Business Day Convention.

Period End Dates:                Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention, with No Adjustment.

**Floating Amounts**

Floating Rate Payer:              UBS AG

Floating Rate Option:            USD-LIBOR-BBA

Designated Maturity:              Three months, except that in respect to the initial Calculation Period, Linear Interpolation shall apply.

Spread:                              Plus 34 Basis Points

Floating Rate Day Count Fraction:     Actual/360

Floating Rate Payer Payment Dates:    Each 14 March, 14 June, 14 September and 14 December, from and including 14 September 2006 up to and including the 14 June 2034, subject to adjustment in accordance with the Preceding Business Day Convention.

Period End Dates:                Each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to and including the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

Reset Dates:                     Initially, the Effective Date and thereafter on each 15 March, 15 June, 15 September and 15 December, from and including 15 September 2006 up to but excluding the Termination Date, subject to adjustment in accordance with the Modified Following Business Day Convention.

Compounding:                   Inapplicable

OHS East:160571705.5

## Amortization Schedule

| Period From (and including) | Period to (but excluding) | National Amount (USD) |
|---|---|---|
| Effective Date | 15-Jun-2029 | 153,801,500 |
| 15-Jun-2029 | 15-Jun-2030 | 133,095,500 |
| 15-Jun-2030 | 15-Jun-2031 | 108,470,000 |
| 15-Jun-2031 | 15-Jun-2032 | 82,303,000 |
| 15-Jun-2032 | 15-Jun-2033 | 54,497,000 |
| 15-Jun-2033 | Termination Date | 24,950,000 |

## Optional Termination by Counterparty

With the prior consent of the Insurer, Counterparty shall have the right to terminate this Transaction (provided that no Event of Default or Termination Event has occurred) by providing (i) at least five (5) Business Days' prior written notice to UBS AG of its election to terminate this Transaction and (ii) evidence reasonably satisfactory to UBS AG that any and all amounts owed to UBS AG in connection with such early termination shall be paid on the due date thereof. On the Optional Termination Date set forth in such notice, an amount, determined by UBS AG, shall be payable by UBS AG or the Counterparty, as the case may be, in respect of such termination. If such amount is not acceptable to Counterparty, then UBS AG shall determine such amount in accordance with Section 6 of the Agreement, assuming Market Quotation and Second Method apply and Counterparty is the sole Affected Party.

## Adjustment Event

If on the Effective Date or any date thereafter (an "Adjustment Event Date") the Notional Amount of this Transaction is greater than the Related Principal Amount, an Adjustment Event shall occur and the Notional Amount shall be reduced to the extent necessary to make such Notional Amount as of the Adjustment Event Date equal to the Related Principal Amount. As used herein:

(a)     the term "Related Principal Amount" means UBS AG's Swap Percentage of Counterparty's Allocable Share of the aggregate principal amount of the outstanding FGIC-Insured Floating Rate Certificates;

(b)     the term "UBS AG's Swap Percentage" means at any time **50 percent**;

(c)     the term "Counterparty's Allocable Share" means (1) the total Regular Scheduled Payments to be made by Counterparty in respect of FGIC-Insured Floating Rate Certificates divided by (2) the total Regular Scheduled Payments to be made by Counterparty and Detroit General Retirement System Service Corporation in respect of FGIC-Insured Floating Rate Certificates, in each case after giving effect to any prepayments of Regular Scheduled Payments in connection with the circumstances of the Adjustment Event; and

(d)     the term "FG1C-Insured Floating Rate Certificates" means any 2006 Funding Trust 2006 Pension Funding Securities (the "Related Certificates") that bear interest at a floating rate and the scheduled principal of and interest on which are insured under a financial guaranty insurance policy issued by Financial Guaranty Insurance Company.

(e)     Upon an adjustment to the Notional Amount, a payment (an "Adjustment Payment") will be due and owing by one party to the other equal to the Market Quotation for this Transaction determined by UBS AG as if (i) a Termination Event occurred in respect of Counterparty, (ii) Counterparty was the only Affected Party with respect to such Termination Event, UBS AG was the party entitled to calculate the Market Quotation, and the Transaction is the Affected Transaction, (iii) the

OHS East:160571705.5

relevant Adjustment Event Date was designated as the Early Termination Date, (iv) the Notional Amount of the Transaction was an amount equal to the difference between (X) the Notional Amount and (Y) the outstanding principal amount of the Related Certificates on the Adjustment Event Date, and (v) the requirement set forth in the definition of Market Quotation that quotations be obtained from four Reference Market-makers was met by having UBS AG provide a single quotation, provided, however, if Counterparty disputes such quotation, UBS AG shall seek bids from Reference Market-makers consistent with the provisions of Section 6 of the Agreement. If an Adjustment Payment is a positive number, Counterparty will pay an amount equal to such Adjustment Payment to UBS AG; if an Adjustment Payment is a negative number, UBS AG will pay an amount equal to the absolute value of such Adjustment Payment to Counterparty. An Adjustment Payment shall be paid by the relevant party on the date on which the Adjustment Event occurs.

(f)     Notwithstanding anything to the contrary in this Agreement, Counterparty will not optionally cause an Adjustment Event if, in connection with such Adjustment Event, an Adjustment Payment would be payable by Counterparty to UBS AG unless Counterparty provides evidence reasonably satisfactory to UBS AG and the Swap Insurer that (i) such Adjustment Payment will be made by Counterparty on the Adjustment Event Date and (ii) such Adjustment Payment will not cause Counterparty/ to be in violation of, or in default under the documentation relating to the Related Certificates.

**Swap Advisor Fee**

Swap Advisor:                        Scott Balice Strategies LLC

Swap Advisor Fee:                    On behalf of the Counterparty, a fee of USD 135,029.05 is being paid by UBS AG in respect of this Transaction to the Swap Advisor. Such fee is equal to the present value of 0.65 basis points per annum on the Notional Amount of this Transaction taking into account the amortization schedule set forth herein, to the Termination Date, discounted to the Trade Date using the LIBOR swap curve. This fee is reflected in, and has increased, the Fixed Rate payable by the Counterparty), hereunder.

Swap Advisor Fee Payment Date:       Upon closing of the Related Certificates

**Relationship between Parties**

Each party will be deemed to represent to the other party on the date on which it enters into this Transaction that (in the absence of a written Agreement between the parties which expressly imposes affirmative obligations to the contrary for this Transaction):

(a)  Non-Reliance. Each party is acting for its own account, and has made its own independent decisions to enter into this Transaction and this Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. Each party is not relying on any communication (written or oral) of the other party as investment advice or as a recommendation to enter into this Transaction; it being understood that information and explanation relating to the terms and conditions of this Transaction shall not be considered investment advice or a recommendation to enter into this Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(b) Assessment and Understanding. Each party is capable of assessing the merits of and understands (on its own behalf or through independent professional advice), and accepts, the terms, conditions and risks of this Transaction. Each party is also capable of assuming and assumes, the risks of this Transaction.

(c) Status of the Parties. Neither party is acting as a fiduciary for or as an adviser to the other in respect of this Transaction.

References in this clause to "a party" shall, in the case of UBS AG and where the context so allows, include references to any affiliate of UBS AG.

## Agreement to Deliver Documents

For the purpose of Sections 3(d) and 4(a) of the Agreement and in addition to the documents to be delivered pursuant to Part 2 of the Schedule, each party agrees to deliver the following documents:

## Risk Considerations

The Counterparty acknowledges receipt from UBS, at or prior to the time of Counterparty's final approval of the Transaction evidenced by this Revised Confirmation, of a document entitled "Risk Considerations".

## Custodian

At least two (2) Local Business Days prior to each Payment Date for the Transaction to which this Confirmation relates, Party A, as Calculation Agent, shall notify the Collateral Agreement Custodian of the net amount payable and the Party owing such payment as of the immediately following Payment Date.

## Account Details

UBS Account Details

Account for payments in USD:

| | |
|---|---|
| *Bank*: | *UBS AG, Stamford* |
| ABA/Bank No.: | 026-007-993 |
| Account No.: | 101-WA-860050-025 |

Counterparty Account Details

| | |
|---|---|
| Bank: | U.S. Bank, Minneapolis |
| FBO: | For further credit to U.S. Bank, N.A. |
| ABA/Bank No.: | 091000022 |
| Account No.: | 180121167365 |
| Ref: | Detroit COPS PFRS |
| Trust #: | 789710000 |
| Contact: | Jill Ling 651-495-3712 |

## Offices

The office of UBS AG for the Swap Transaction is Stamford, CT; and the office of the Counterparty for the Swap Transaction is Detroit, MI.

Contact Names at UBS AG

OHS East:160571705.5

UBS AG Ref 37380351
C/P Ref: PFRS - FGIC

Page 5

| Settlements: | Hotline: | (203) 719 1110 |
| Confirmation Queries: | Jennifer McCandless | (212) 713 1212 |
| ISDA Documentation: | Legal Department – Documentation: | (203) 719 6249 |
| Swift: | UBSWUS33 | |
| Fax: | (203) 719-5771 | |
| Address: | UBS AG | |
| | 677 Washington Boulevard | |
| | Stamford, CT 06901 | |

[Intentionally left blank. Signature page follows.]

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by executing a copy of this Revised Confirmation and returning it to us by facsimile to **(212) 373-6491**.

Yours Faithfully
For and on Behalf of
UBS AG, Stamford Branch

By *Marie-Anne Clarke*　　　By

Name :　Marie-Anne Clarke　　　　　　Name :　James B. Fuqua
Title:　Executive Director and Counsel　Title :　Managing Director and Counsel
　　　　Region Americas Legal　　　　　　　　　Region Americas Legal
　　　　Fixed Income Section

Acknowledged and agreed by the Detroit Police and Fire Retirement System Service Corporation as of the Trade Date specified above:

By:

Name　Norman L. White
Title :　President

Please confirm that the foregoing correctly sets forth the terms and conditions of our agreement by executing a copy of this Revised Confirmation and returning it to us by facsimile to **(212) 373-6491**.

Yours Faithfully
For and on Behalf of
UBS AG, Stamford Branch

By                                              By



Name :                                         Name :
Title:                                          Title :


Acknowledged and agreed by the Detroit Police and Fire Retirement System Service Corporation as of the Trade Date specified above:


By:

Name            Norman L. White
Title :         President