# EXHIBIT M

# In The Matter Of:

*City of Detroit*

*Kevyn Orr*
*August 30, 2013*



**Bienenstock**
NATIONWIDE COURT REPORTING & VIDEO
www.bienenstock.com

**Bingham Farms/Southfield • Grand Rapids**
Ann Arbor • Detroit • Flint • Jackson • Lansing • Mt. Clemens • Saginaw

*Original File ORR_KEVYN.txt*
*Min-U-Script® with Word Index*

Page 21

1 the Swap counterparties could unilaterally --
2 unilaterally terminate the Swap, correct?
3     MR. SHUMAKER: Objection, form.
4 A. Well, my understanding was the City -- there were a
5 series of events which put the City in default. The
6 consent agreement prior to my appointment, the consent
7 agreement, the declaration of a financial emergency,
8 my appointment was an event of default. My
9 understanding was that due to those multiple events of
10 default, the counterparties had the ability to
11 exercise their rights and deprive the City of much
12 needed casino revenue.
13     BY MR. HACKNEY:
14 Q. We'll get to the casino revenue in a moment which is
15 something that's trapped under -- potentially trapped
16 under the collateral agreement, right?
17 A. Right.
18 Q. I want to talk about the Swap agreement which can lead
19 to a large termination payment --
20 A. Yes.
21 Q. -- that the service corporations might owe.
22 A. Yes.
23 Q. And you understand the distinction between those two
24 documents --
25 A. Yes.

Page 22

1 Q. -- right?
2 A. Um-hm.
3 Q. And your assumptions prior to the June 4th meeting
4 were that as a result of these events of default under
5 the Swap that occurred, some of them, prior to your
6 appointment --
7 A. Yes.
8 Q. -- that the Swap counterparties could unilaterally
9 terminate the Swap and demand a sizable payment from
10 the service corporations, correct?
11     MR. SHUMAKER: Objection, form, foundation.
12 A. Yeah, my assumption was, my understanding was that,
13 yes, they could terminate and demand a sizable
14 payment, whether from the service corporations or
15 eventually from the City. It would hit our bottom
16 line, yes.
17     BY MR. HACKNEY:
18 Q. That's right because it ripples --
19 A. Yes.
20 Q. -- through the service corporations to the City by the
21 service agreements, right?
22 A. Yeah.
23     MR. SHUMAKER: Objection, form.
24 A. If that is in fact the process, yes.
25     BY MR. HACKNEY:

Page 23

1 Q. Now, another one of your assumptions prior to June 4
2 was that the Swap counterparties could also
3 unilaterally trap cash under the collateral agreement,
4 right?
5     MR. SHUMAKER: Objection, form, calls for a
6 legal conclusion.
7 A. My understanding was that the Swap counterparties
8 could instruct the custodian to exercise their rights
9 to trap cash.
10     BY MR. HACKNEY:
11 Q. And that was one of the rights that they had as you
12 were going into the negotiations with them, correct?
13     MR. SHUMAKER: Objection, form, calls for a
14 legal conclusion.
15 A. My understanding -- yes. My understanding was that
16 they had that right.
17     BY MR. HACKNEY:
18 Q. That's why you were negotiating with them, right?
19 A. My -- we were negotiating with them to make sure that
20 the City had access to the revenue that it needed
21 quite badly and that the City would not suffer the
22 imposition of a fairly significant termination
23 payment.
24 Q. Now, another one of your assumptions prior to June 4
25 was that no other party could stop the Swap

Page 24

1 counterparties from either terminating the Swaps or
2 trapping cash, correct?
3     MR. SHUMAKER: Objection, form, foundation.
4 A. Yeah, my assumption was -- or, rather, my
5 understanding was that the Swap counterparties had
6 certain rights and that they had the ability to
7 exercise those rights and remedies. Whether another
8 party could, quote-unquote, stop them could depend on
9 a number of different factors.
10     BY MR. HACKNEY:
11 Q. So was that something -- that was not something that
12 you had considered then as of June 4th?
13 A. Yes.
14     MR. SHUMAKER: Objection, form.
15 A. Yeah. We had considered whether or not there were
16 perhaps other risks involved. What I'm saying to you
17 is I had not, as you phrased the question, reached a
18 conclusion as to whether or not someone would have the
19 ability to stop them from exercising those rights.
20     BY MR. HACKNEY:
21 Q. Okay. So you considered the question, but you hadn't
22 answered, in your money mind, whether or not there was
23 a party out there that could stop the Swap
24 counterparties from acting.
25     MR. SHUMAKER: Objection, form.

1 A. We believe that the Swap counterparties could act. I
2 think there's a series of letters subsequently with
3 discussion with your client about their lack of
4 ability to stop the Swap counterparties from acting,
5 but I'm -- what I'm trying to relay to you is we had
6 to assess whether they were risks to that, and my
7 understanding was that they had the right to exercise
8 their remedies.
9     BY MR. HACKNEY:
10 Q. Okay. Now, I want to also get a level set on your
11 objectives going into the negotiations, and I
12 understand that when I say you, I mean the City,
13 Mr. Buckfire, there are multiple parts --
14 A. My -- my team --
15 Q. That's right.
16 A. -- consultants.
17 Q. I may be a little euphemistic, but I'll try to be
18 precise at the right times.
19 A. That's fine.
20 Q. Okay.
21     MR. SHUMAKER: Steve, if I could just
22 object. If you could just define what you mean by
23 level set, I would appreciate that.
24     MR. HACKNEY: I want to go back in time --
25     MR. SHUMAKER: Okay.

1     MR. HACKNEY: -- to prior to the June 4
2 commencement of negotiations.
3     MR. SHUMAKER: Okay.
4     MR. HACKNEY: That's what I mean by level
5 set.
6     MR. SHUMAKER: Okay. Thank you.
7     BY MR. HACKNEY:
8 Q. Now, I'd like to ask about your objectives as you go
9 into the negotiation. Okay?
10 A. Um-hm.
11 Q. You understand that when you go into a negotiation
12 it's important to have an understanding of both the
13 financial realities that your party is -- is facing as
14 well as the legal realities that your party's facing,
15 correct?
16 A. Yes.
17 Q. That informs the negotiation, right?
18 A. In making an informed decision, I would say you want
19 to have an understanding of those factors.
20 Q. And you also want to understand what your counterparty
21 in the negotiation needs and wants are as well as
22 their potential legal rights, right?
23 A. What your counterparty negotiations perceived needs
24 and rights are.
25 Q. That's right. That's right.

1     Now, I'm going to ask about the City's
2 objectives in entering into the negotiations. Okay?
3 Objective one of the City was to get the
4 counterparties to waive their cash trap at least on an
5 interim basis to allow the City access to casino
6 revenues, correct?
7 A. I don't know if I would characterize it as objective
8 one. It wasn't as if we were trying to prioritize one
9 objective over the other. It was an objective to make
10 sure that the cash did not get trapped.
11 Q. Okay. So that was one of the objectives.
12 A. Yes.
13 Q. A second objective was that you wanted to modify the
14 Swap to get a discount on the termination amount,
15 correct?
16 A. Yes. That was certainly an objective, yes.
17 Q. Okay.
18     MR. SHUMAKER: Objection there to the
19 extent that it calls for a legal conclusion.
20     BY MR. HACKNEY:
21 Q. And the third was that you wanted to obtain an option
22 about when you could direct the termination of the
23 Swap, correct?
24     MR. SHUMAKER: Objection, calls for a legal
25 conclusion.

1 A. Here again, I understand your characterization. I'm
2 going to say that that -- that is a fair
3 characterization without trying to quantify as one
4 objective is more important than the others, and let
5 me explain my answer.
6     The City was at risk of significant
7 reduction in cash flow at that period. I think at one
8 point there were various projections that showed as us
9 having as little as four or nine million dollars of
10 cash on hand in mid-June. In fact, sometime around
11 that period I heard that an employee of the City had
12 gone to cash their paycheck and the paycheck had
13 bounced. They came back in later that afternoon and
14 it cashed, but we were -- we were that precarious in
15 terms of our cash.
16     We knew we were at risk with regard to the
17 Swap agreement both for trapping casino revenue as
18 well as the termination payment. We also knew that we
19 would need to analyze what the right were -- rights
20 were and to have time to resolve that issue. So to
21 the extent your characterization of three objectives
22 encompasses those concepts, then that's a fair
23 characterization.
24     BY MR. HACKNEY:
25 Q. And I don't mean to order them, but -- so I won't

Page 33

1  recollection is had a discussion with the
2  counterparties, discussed a range of alternatives, our
3  first overture was rejected, but we would have further
4  discussions.
5  Q. And do you remember whether they countered?
6  A. I don't remember specifically. I believe they may
7  have.
8  Q. Okay. Do you know the terms of their counter?
9  A. Generally in the same concept I said. If you're
10 looking for a number, for instance, we said 50 percent
11 and they came back with 98. I don't recall those
12 specifics.
13 Q. So you can't give me the bid and the ask --
14 A. Yeah.
15 Q. -- on what the Swap would be modified as far as the
16 termination?
17 A. Yes, that's correct.
18    (Discussion off the record at 8:56 a.m.)
19    (Back on the record at 8:56 a.m.)
20    BY MR. HACKNEY:
21 Q. Did the City enter into a nondisclosure agreement in
22 connection with these negotiations?
23 A. Yes, I believe so.
24 Q. With the Swap counterparties?
25 A. Yes.

Page 34

1     MR. HACKNEY: I think we would ask to see
2  if that could be produced. I know that there's not
3  formal written discovery, but the Court has also
4  indicated that all documents relating to the debtors
5  are effectively discoverable in bankruptcy, so I'd ask
6  that you consider that and we can address it later.
7     MR. SHUMAKER: We'll look into it.
8     BY MR. HACKNEY:
9  Q. Now the -- I know that -- I've established already
10 that you -- you don't have an independent recollection
11 of the specific dates any of this occurred. I'm
12 making representations to you as an officer who was
13 here yesterday.
14 A. Right.
15 Q. So subject to my representations being accurate,
16 Mr. Buckfire's recollection was that the next meeting
17 in person with the Swap counterparties was June 8th.
18 A. That's sou -- as I said, there was a first week and
19 there was a second week and that sounds about
20 accurate. I believe June 8th may have been a weekend,
21 so as I said before some of these discussions may have
22 occurred over the weekend.
23 Q. Okay. So discussions had not broken down at this
24 point, correct?
25 A. No. They may have. I think they broke down at some

Page 35

1  point during the first week, but they -- they resumed.
2  My interpretation was that they broke down, and then
3  they recommenced a second week.
4  Q. Okay. So on -- if there -- to the extent
5  Mr. Buckfire's right that there was an in-person
6  June 8th meeting --
7  A. Yeah.
8  Q. -- do you remember what his -- what your marching
9  orders to him were as he went into that meeting?
10 A. Here again, the concept of marching orders, we were
11 trying to get to an agreement generally, and I believe
12 the instructions were to continue to move towards that
13 process, whatever that was. And so the specific
14 bid/ask that were going on throughout that time, I
15 don't -- I don't recall, but the general concept was
16 to continue to try to move to a point to get to a
17 discount number or a discount process.
18 Q. Is it fair to say that if I ask you for the specific
19 ebb and flow of the negotiations between the Swap
20 counterparties in terms of the precise business
21 deal --
22 A. Right.
23 Q. -- you would have to defer to Mr. Buckfire's
24 recollection because he was more intimately involved?
25 A. That's fair. Because Ken was -- Ken would have the

Page 36

1  direct meetings and then call me back. We'd go back
2  and forth, and I didn't keep notes and I didn't keep a
3  calendar, so --
4  Q. I asked you about nondisclosure agreements, but did
5  the City execute any other agreements of any kind with
6  the Swap counterparties during this period that you
7  were negotiating the forbearance agreement?
8  A. No, not that I know of.
9     (Discussion off the record at 8:59 a.m.)
10    (Back on the record at 8:59 a.m.)
11    MR. HACKNEY: No. Problem. Let's go off
12 the record.
13    VIDEO TECHNICIAN: The time is 8:59 a.m.
14 We are off the record.
15    (Recess taken at 8:59 a.m.)
16    (Back on the record at 9:08 a.m.)
17    VIDEO TECHNICIAN: We are back on the
18 record at 9:08 a.m.
19    BY MR. HACKNEY:
20 Q. Mr. Orr, I want to clear something up. Maybe I've
21 been saying it the wrong way. I've been using the
22 term "marching orders" with the respect to the way
23 that you and Mr. Buckfire operated.
24 A. Right.
25 Q. And is a better way to say it that you authorized

Page 37

1 Mr. Buckfire to negotiate the best possible deal he
2 could with the Swap counterparties and that's what he
3 did?
4 **A. That's a fair characterization, sure.**
5 Q. And at some point did he come out of a meeting and
6 say, Mr. Orr, this is the best deal that I'm able to
7 get out of these Swap counterparties and it's my
8 advice that we take it?
9 **A. Yes.**
10 Q. And was that on or about June 11th, 2013, which is the
11 date he recalls the agreement in principle being
12 reached?
13 **A. Yes.**
14     MR. SHUMAKER: Objection to form.
15     BY MR. HACKNEY:
16 Q. And what was the agreement in principle that was
17 reached as you understood it?
18 **A. The agreement was essentially that in exchange for a**
19 **reduced optional termination payment -- we'll just**
20 **call it the payment under the forbearance agreement --**
21 **the Swap counterparties would agree not to trap the**
22 **cash, they would agree to release their liens, and**
23 **also release their claims, I believe, against your**
24 **client, Syncora, and we would have access to that cash**
25 **going forward provided we made the discounted payment**

Page 38

1 **at some point in the future. I believe at that point**
2 **it was in the next 60, 90 days.**
3 Q. Isn't the -- wasn't the agreement in principle that
4 you'd have an option to direct the termination of the
5 Swap?
6     MR. SHUMAKER: Objection, calls for a legal
7 conclusion.
8 **A. Yeah. I believe the way it works is we would have an**
9 **option to request the counterparties exercise their**
10 **rights at a discounted level.**
11     BY MR. HACKNEY:
12 Q. And I'm not asking about the forbearance agreement.
13 I'm asking about the agreement in principle.
14 **A. Yeah, I think those were the general confines of the**
15 **agreement in principle.**
16 Q. Okay. Now, you did not invite anyone else to the
17 negotiations with the Swap counterparties; isn't that
18 correct?
19 **A. I did not invite anyone else. I don't know if Ken**
20 **invited anyone else or anyone else on my behalf**
21 **invited anyone else.**
22 Q. And you did not direct anyone such as Mr. Buckfire or
23 others to invite any other parties into the
24 negotiation, correct?
25 **A. Correct.**

Page 39

1 Q. And you did not invite Syncora to participate in these
2 negotiations, correct?
3 **A. Correct.**
4 Q. And you did not inform Syncora of the existence of
5 these negotiations, correct?
6 **A. The reason I'm hesitating is at some point clearly**
7 **Syncora became aware, so I don't know how they were**
8 **informed, but I did not do it, correct.**
9 Q. You didn't do it.
10 **A. Correct.**
11 Q. And you did not invite FGIC to attend these
12 negotiations, correct?
13 **A. I believe that's correct.**
14 Q. And you didn't direct anyone acting on your behalf to
15 invite FGIC, correct?
16 **A. Correct.**
17 Q. Nor did you inform FGIC of the existence of these
18 negotiations, correct?
19 **A. Me personally, no.**
20 Q. You didn't invite U.S. Bank as trustee to the funding
21 trust or as custodian or contract administrator to
22 attend any negotiations, correct?
23 **A. Me personally, no.**
24 Q. And you didn't direct anyone else acting on your
25 behalf to do so, correct?

Page 40

1 **A. Correct.**
2 Q. Now, why didn't you invite Syncora into these
3 negotiations with the Swap counterparties?
4 **A. After consultations with my, you know, team, we didn't**
5 **think Syncora had any right to be involved in the**
6 **negotiations.**
7 Q. And that's because Syncora had no rights under the
8 relevant documents?
9 **A. That was my understanding, yes.**
10 Q. Now, at any time during these negotiations -- and by
11 these negotiations, I mean through the June 11th
12 agreement in principle.
13 **A. Um-hm.**
14 Q. Okay? I understand that there are legal negotiations
15 of the scrivening of the document --
16 **A. Sure.**
17 Q. -- between June 11 and July 15. I going to ask you
18 about them, but when I say these negotiations, I'm
19 talking about the ones that we're talking about right
20 now --
21 **A. Um-hm.**
22 Q. -- that led to the agreement in principle.
23 **A. Okay.**
24 Q. At any time prior to June 11th, did the Swap
25 counterparties send a notice of a default under the

Page 337

1  **VIDEO TECHNICIAN:** All set?
2  **THE WITNESS:** All done? Okay. Thank you
3  very much.
4  **VIDEO TECHNICIAN:** This concludes today's
5  deposition. The time is 3:52 p.m. We are off the
6  record.
7  (The deposition was concluded at 3:52 p.m.
8  Signature of the witness was not requested by
9  counsel for the respective parties hereto.)

Page 338

1                CERTIFICATE OF NOTARY
2  STATE OF MICHIGAN )
3                    ) SS
4  COUNTY OF OAKLAND)
5
6           I, CYNTHIA C. MENDENHALL, certify that this
7      deposition was taken before me on the date
8      hereinbefore set forth; that the foregoing questions
9      and answers were recorded by me stenographically and
10     reduced to computer transcription; that this is a
11     true, full and correct transcript of my stenographic
12     notes so taken; and that I am not related to, nor of
13     counsel to, either party nor interested in the event
14     of this cause.
15
16
17
18
19
20           *Cynthia C. Mendenhall* (signature)
21
22           CYNTHIA C. MENDENHALL, CSR 5220
23               Notary Public,
24               Oakland County, Michigan.
25  My Commission expires: April 5, 2017