<u>**Exhibit 6B**</u>

**Objectors' Designations From December 5, 2013 Deposition of James Doak**

**Pg: 12 Ln: 15 - 17**

**Designation:**

```
12:15   Q.   Mr. Doak, would you please state your name for the

  16          record?

  17   A.   Sure.  James Leland Doak, D-o-a-k.
```

**Pg: 13 Ln: 3 - 10**

**Designation:**

```
13: 3              I want to start with your declaration that

   4          was filed in support of the proposed

   5          debtor-in-possession financing.  I'd like to, as the

   6          deposition goes on, just refer to it as the proposed

   7          DIP with the understanding that I'm referring to the

   8          financing requested by motion filed on November 5th of

   9          2013 by the City.  Can we agree that that -- for that

  10          shorthand?
```

**Pg: 13 Ln: 18 - 21**

**Designation:**

```
13:18   Q.   Mr. Doak, am I correct that this is your declaration

  19          filed in connection with and as an exhibit to the DIP

  20          motion filed by the City?

  21   A.   It appears that it is, yes.
```

# Objectors' Designations From
## December 5, 2013 Deposition of James Doak

**Pg: 14 Ln: 2 - Pg: 18 Ln: 15**

**Designation:**

```
14: 2   Q.   Can you help me out with the title structure at Miller
      3        Buckfire, what the various titles are and how they
      4        rank in the hierarchy?
      5   A.   Yes.  We have a -- we have copresidents at Miller
      6        Buckfire.  There are two of them right now, Mr. Ken
      7        Buckfire and Mrs. Norma Corio.  They are both managing
      8        directors and copresidents.  We then have a managing
      9        director title.  Below that level, we have a director
     10        title.  Below that level, we have a vice president
     11        title.  Below that level, we have an associate title,
     12        and below that level, we have an analyst title.
     13   Q.   Okay.  And is the organizational chart such that
     14        reporting is a straight line up and down through these
     15        titles or is it some other reporting scheme?
     16   A.   Well, just going generally off what you may mean by
     17        reporting, the hierarchy generally moves from the
     18        lowest level of analyst up through the managing
     19        director level.  Individual assignments or tasks may
     20        be led by a lower-level individual occasionally and
     21        sometimes a project does not have an individual at
     22        each level.
     23   Q.   Okay.  That makes sense.
     24                    In terms of the Detroit engagement
```

|   |   |   |
|---|---|---|
| 25 | | specifically, are each of the copresidents involved in |
| 15: 1 | | the Detroit engagement? |
| 2 | A. | Yes. |
| 3 | Q. | To the same degree? |
| 4 | A. | No. |
| 5 | Q. | Which has greater involvement? |
| 6 | A. | Mr. Ken Buckfire has greater involvement. |
| 7 | Q. | And, I'm sorry.  How do you spell Ms. Corio?  Is it |
| 8 | | C-a-r-i-o? |
| 9 | A. | C-o-r-i-o. |
| 10 | Q. | Pronounced Corio? |
| 11 | A. | Yes. |
| 12 | Q. | What is the degree of her involvement in that Detroit |
| 13 | | proceeding? |
| 14 | A. | Mrs. Corio is involved in several specific tasks and |
| 15 | | work streams that favor or cater to her long-standing |
| 16 | | experience in restructuring and restructuring finance |
| 17 | | related matters.  Those matters are the -- providing |
| 18 | | advice to the team on the post-petition financing and |
| 19 | | also assisting in portions of the negotiations with |
| 20 | | funded creditors of the City of Detroit, including |
| 21 | | proposals surrounding commutation of monoline |
| 22 | | insurance policies. |
| 23 | Q. | Okay.  And I gather that Mr. Buckfire's role is |
| 24 | | broader than that? |
| 25 | A. | Yes. |
| 16: 1 | Q. | Is it fair to say that he leads the Detroit engagement |

2       for the Miller Buckfire team?

3    A.    Yes.

4    Q.    Now, you mentioned that Mrs. Corio was involved to

5          some extent -- and we can get to what extent later --

6          in the DIP financing.  Was Mr. Buckfire also involved

7          in the DIP financing?

8    A.    Yes.

9    Q.    All right.  You're a managing director, correct?

10   A.    That's correct.

11   Q.    Are there other managing directors at Miller Buckfire

12         involved with the Detroit engagement?

13   A.    Yes.

14   Q.    Okay.  And who were they?

15   A.    The other managing directors at Miller Buckfire

16         involved in the Detroit engagement include

17         Mr. Buckfire, Mrs. Corio, Mr. John McKenna, M-c,

18         capital K-e-n-n-a, and at this time, that's the extent

19         of our upper managing director involvement.

20   Q.    What is John McKenna's role?

21   A.    He's a managing director at Miller Buckfire.

22   Q.    No, I know what his position is.  I'm sorry.  Let me

23         be more clear.  What is his role in the Detroit

24         engagement?

25   A.    Mr. McKenna's role involves assisting the team,

17: 1      primarily me, in exploring the financial situation and

2          strategic alternatives surrounding the Coleman A.

3          Young Municipal Airport.

4     Q.    So to make sure I understood your answer, is it fair

5           to say that his, Mr. McKenna's, involvement with the

6           Detroit engagement is focused on the Coleman A. Young

7           Airport?

8     A.    Yes.

9     Q.    Is there a reason that his involvement has that focus?

10    A.    Yes.

11    Q.    What is the reason?

12    A.    Mr. McKenna's involvement on that particular portion

13          of the assignment relates to his significant

14          experience in aviation, commercial aviation, and

15          airline matters, including participation in the

16          restructuring of US Air and subsequent positions on --

17          a subsequent position on the board of directors of US

18          Air post restructuring.

19                He was also involved in the Gate Gourmet

20          restructuring and his general understanding of

21          aviation economics and the related sectors around that

22          industry are helpful background when thinking through,

23          you know, the -- the economics and current situation

24          at the airport.

25    Q.    Was he involved at all in the DIP financing?

18: 1   A.  No.

2     Q.    Which, if any, directors of Miller Buckfire are

3           involved in the Detroit engagement?

4     A.    The directors involved in the Detroit engagement

5           include Mr. Kevin Haggard, H-a-g-g-a-r-d, and Mr. B.

```
6          Kyle Herman, H-e-r-m-a-n.

7    Q.    And what's Mr. Haggard's role?

8    A.    Mr. Haggard's role extends to two primary areas, one

9          which take -- which has taken up the majority of his

10         time associated with this assignment, is exploring

11         financial and strategic alternatives with regards to

12         the Detroit Water and Sewage Department.  His second

13         responsibility has been assisting on aspects of the

14         post-petition financing.  Was I supposed to tell you

15         what Kyle was doing, too?
```

**Pg: 19 Ln: 1 - Pg: 21 Ln: 14**

**Designation:**

```
19: 1                 Before we go to Mr. Herman, let me ask

2          another question about Mr. Haggard.  You said that he

3          had some responsibilities with respect to the DIP

4          financing.  What were those responsibilities?

5    A.    He assisted my efforts and the team's efforts in

6          regards to creating some of the presentation materials

7          that we presented to key decision makers as the

8          process unveiled and, also, he assisted in getting

9          documents out to parties that were involved in the --

10         that we were soliciting proposals from, as well as

11         other, you know, general -- general matters.

12   Q.    I mean, would you describe his role as sort of

13         facilitative rather than substantive?
```

14  A.  I would describe his role as supportive to our efforts

15      and supportive to my efforts.  I would not describe

16      them as nonsubstantive because he was providing key

17      documents to parties we listed for proposals and I

18      believe he participated in several, but not many, due

19      diligence -- small due diligence calls that I may not

20      have been able to participate in, and in such a

21      function, you know, was providing substantive guidance

22      to potential parties.

23  Q.  Did he have anything to do with structuring or

24      negotiating the principle terms of the DIP financing?

25  A.  He was a -- Mr. Haggard was a participant in those

20: 1      discussions.

2  Q.  Did he lead any of them?

3  A.  No.

4  Q.  Okay.  Mr. Herman, what's his role in the Detroit

5      engagement?

6  A.  Mr. Herman's role in the Detroit engagement is wide

7      ranging.  It includes responsibility for creditor due

8      diligence as well as exploring strategic alternatives

9      for the City's noncore assets beyond the Detroit Water

10      and Sewage Department and includes the work stream

11      associated with the -- with the general restructuring

12      process.

13  Q.  Did he have any involvement in the DIP financing?

14  A.  Yes.

15  Q.  And what was the nature of his involvement?

16   A.   Kyle's involvement, Mr. Herman's involvement in the

17         financing process was primarily related to

18         facilitating due diligence for some of the potential

19         financing parties.  Because of his familiarity with

20         the wealth of materials we had created and collected

21         in the creditor due diligence process, it was a

22         natural decision when we were experiencing crunches to

23         focus on him coordinating delivery of some of that

24         information.

25   Q.   Okay.  Did he do anything other than facilitate due

21: 1       diligence by prospective lenders?

2   A.   Not that I can recall in a material manner.

3   Q.   Okay.  Okay.  Any vice presidents with Miller Buckfire

4         involved in the Detroit engagement?

5   A.   No, I don't believe there are any vice presidents

6         involved at this time.

7   Q.   Okay.  Any associates involved from Miller Buckfire in

8         the Detroit engagement?

9   A.   Yes.

10   Q.   And who were they?

11   A.   The associates involved in the engagement are

12         Mr. Sanjay Marken, M-a-r-k-e-n; Mr. Vladimir

13         Moshinsky -- sorry.  I'm not going to spell it -- and

14         Mr. Vincent Fea, F-e-a.

**Pg: 21 Ln: 20 - Pg: 23 Ln: 8**

# Objectors' Designations From
## December 5, 2013 Deposition of James Doak

**Designation:**

```
21:20   Q.   All right.  We have Sanjay Vladimir and Vincent.  Any
   21        other associates?
   22   A.   No.
   23   Q.   Okay.  What is Sanjay's role?
   24   A.   Sanjay's role is very wide ranging.  He assists the
   25        team on the DWSD work stream as well as the creditor
22: 1        and restructuring work stream and he has also been
    2        responsible for a portion of our -- creating some of
    3        our modeling analytics and our analytics related to
    4        the swaps and the Forbearance and Optional Termination
    5        Agreement.
    6   Q.   Did he have any involvement in the DIP financing?
    7   A.   Yes.
    8   Q.   What is the nature of his involvement in the DIP?
    9   A.   Sanjay assisted in producing financial analyses that
   10        calculated the expected required sizing of the payment
   11        that would be required for the Forbearance and
   12        Optional Termination Agreement and also ran some
   13        scenarios for us on what the -- what the financing
   14        context would be for that on a go-forward basis.
   15   Q.   Not sure I understand what you just said.  Scenarios
   16        on what the financing context would be on a go-forward
   17        basis, can you maybe say that a different way?
   18   A.   Sure.  He -- taking a look at what estimated
   19        financing -- post-petition financing sizes would be.
   20        He took a look at interest rate and amortization
```

```
 21        assumptions and produced pro forma cash flows.  So he

 22        did the -- he did the modeling analytics associated

 23        with some of our early thinking on the post-petition

 24        financing, modeling analytics outside of the City of

 25        Detroit's financing and modeling, just on a standalone

23: 1      basis, what would the post-petition financing look

  2        like as far as cash demands.

  3   Q.   Okay.  Now I'm right that Ernst & Young was doing some

  4        of that, as well, weren't they?

  5   A.   Eventually as the financing took greater form, Ernst &

  6        Young started to do those analytics and incorporated

  7        those analytics into their larger models of the City's

  8        financials.
```

**Pg: 23 Ln: 25 - Pg: 28 Ln: 15**

**Designation:**

```
23:25  Q.   So if I were to see a piece of his work product from

24: 1       one of these scenarios, I mean, what would I be

  2         looking at?

  3    A.   You would be looking at a first page that provided

  4         some assumptions over what the swap termination

  5         payment looked like, what a potential interest rate

  6         for any loan taken out to make that payment would look

  7         like, and what the amortization would look like for

  8         that -- for that financing, and then you would see a

  9         series of columns across the bottom that charted out
```

10      over a series of months and years what the interest

11      would be in each given month, what the amortization

12      would look like throughout the period, and what the

13      remaining balance would be across the period.

14  Q.  So he was basically doing amortization schedules?  I

15      mean, that would show -- he wasn't doing a full-blown

16      cash flow that would show the impact on the City, you

17      know, cash beginning period, cash end of period?  He

18      was simply doing on a month-to-month basis based upon

19      various loan amounts and interest rates what the

20      financing cost to the City would be in terms of

21      amortization of principal and interest?

22  A.  That's correct.  Occasionally -- well, those analyses

23      in some versions compared the cash flows -- those

24      amortization schedules, to the status quo case of how

25      much the City was paying annually, so the 50 million

25: 1   per year as a reference point, right.

2           So, for instance, we looked at assumption

3       saying, okay, we have 50 -- let's say we still have 50

4       million.  Let's take a look at interest rates.  Let's

5       say everything that doesn't go to interest pays

6       amortization.  What would that payoff look like.  What

7       would that amortization schedule look like if we were

8       applying the same resources towards paying off a

9       post-petition financing.

10  Q.  So some of what he did was not just running scenarios

11      in a vacuum.  Some of what he did was running

12      scenarios in what the various deltas of cash usage

13      would be, various loan scenarios versus the status

14      quo?

15  A.   You know what, I would say it's probably running

16      scenarios in a vacuum.  However, I only wanted to

17      point out, to provide a complete answer, that some of

18      the inputs were based not just on, you know, raw

19      numbers made up in a table, but some of the contextual

20      factors associated with the City's financing right now

21      such as what the swap was costing us on an ongoing

22      basis.

23  Q.   And when he included the swap cost on an ongoing basis

24      in these scenarios, did he keep it level based on

25      current interest rates or did he model changes in

26: 1    interest rates versus the -- and the affect that might

2      have on the swap payment?

3  A.   With regards to this exercise, I do not recall whether

4      he adopted a flat assumption on what the swap payments

5      would be.  In other analyses, we have utilized the

6      forward LIBOR curve, which, in effect, does what

7      you're suggesting.

8  Q.   And in terms of the forward LIBOR curve, who created

9      the curve?

10  A.   You'll have to be more specific.

11  Q.   Who did the analysis that went into the forward LIBOR

12      curve?  Was that something publicly available or was

13      that something generated by Mr. Marken or someone

14       else?

15    A.   The data underlying the forward LIBOR curve is

16       information that we access through our Bloomberg --

17       Terminal and Bloomberg subscription.  So the forward

18       LIBOR curve is created by the market makers, in

19       effect, right, as far as gathering that -- those

20       numbers which are in the Bloomberg information system

21       and placing them into an Excel file which generates

22       outputs.  That is a process that Mr. Marken would do.

23    Q.   Okay.  And do you know when most recently he's -- he's

24       done that to have an updated forward LIBOR curve?

25    A.   Yes.

27: 1   Q.   And how recently has he done that?

2    A.   Yesterday.

3    Q.   Has he done an analysis on what prospective payments

4       under the swaps would be based upon his most recent

5       forward LIBOR curve?

6    A.   Yes, he has.

7    Q.   Do you know what that analysis reflects in terms of

8       prospective swap payments?

9    A.   No, I don't.

10    Q.   Okay.  Prior to his most recent analysis, when was the

11       last time he did a calculation of the forward LIBOR

12       curve?

13    A.   The best of my recollection, in -- he performed the

14       analysis in September.

15    Q.   And did he do an analysis based upon that curve of

16       what prospective swap payments would be?

17   A.   Yes.  However, I don't know whether you're referring

18       to a -- you know, particular -- what particular

19       scenario you're referring to.  He's produced a -- a

20       piece of analysis that I believe has been discussed in

21       prior depositions of Mr. Buckfire, which is a

22       multipage set of financial analytics associated with

23       the negotiations of the Forbearance and Optional

24       Termination Agreement and some of the calculations

25       that aid the -- the City in assessing its decisions in

28: 1     negotiating that agreement.

2   Q.   Okay.  And I understand that there are two different

3       things you can use this forward curve for with respect

4       to the swaps.  One is to calculate or recalculate a

5       termination payment, but you can also use it to

6       project what the net amount due under the swaps would

7       be from the City, correct?

8   A.   Yes.

9   Q.   Okay.  And my understanding is that the working

10      assumption for purposes of comparing the relative

11      obligations of the City as between the DIP and the

12      swap has assumed that the swap payment on an

13      annualized basis is $50 million, correct?

14   A.   That is the assumption that's in the City's model, and

15      I need to go off record for one second.

**Pg: 28 Ln: 19 - Pg: 29 Ln: 11**

# Objectors' Designations From
# December 5, 2013 Deposition of James Doak

**Designation:**

```
28:19                    THE WITNESS:  So, I -- just to correct

   20          something I said earlier --

   21   BY MR. MARRIOTT:

   22   Q.   Yes?

   23   A.   -- it -- in addition to looking at the forward LIBOR

   24          curve yesterday to produce an update of some

   25          analytical that also factored into our -- some

29: 1          September materials, Mr. Marken has been looking at a

    2          forward LIBOR curve in regards to estimated future

    3          payments by the City and potentially by the monoline

    4          insurers for various discussions with parties and that

    5          has occurred in the in-between period.

    6   Q.   Okay.  Based upon the most recent forward LIBOR curve

    7          information that you're aware of, does $50 million

    8          remain the -- a reasonable estimate of what would be

    9          payable on a go-forward basis under the swaps on an

   10          annualized basis or should the number be different

   11          than that?
```

**Pg: 29 Ln: 17 - Pg: 32 Ln: 15**

**Designation:**

```
29:17                    Q.  Okay.  Based upon the most recent

   18                forward LIBOR curve information, does $50

   19                million remain the -- a reasonable estimate
```

20          of what would be payable on a go-forward

21          basis under the swaps on an annualized

22          basis or should the number be different

23          than that?)

24          THE WITNESS:  We need to discuss what the

25          underlying assumptions are that you want me to use to

30: 1       answer that question because we -- the swaps are

2           currently in default and if we move forward with the

3           assumption agreement, it's only a one-year agreement.

4           So if -- so if one was to make an assumption that the

5           City was in compliance, which it's not --

6       BY MR. MARRIOTT:

7       Q.   Maybe I can --

8       A.   -- for the long term, than the 50 million per annum

9            payment is based on an assumption that LIBOR remains

10           at the relatively historical low levels that it has

11           been for the recent -- for recent history.

12      Q.   Okay.  Let me ask it -- maybe try the question a

13           different way.  When the $50 million number was

14           arrived at for purposes of comparing the costs to the

15           City of continuing with the swap versus borrowing

16           under the DIP and terminating the swap, am I correct

17           that there was a LIBOR rate assumption built into the

18           calculation of that 50 million?

19      A.   Yes.

20      Q.   Okay.  If that number were to be calculated, the same

21           50 million, keeping all of the assumptions the same

22      except LIBOR, if that number were to be recalculated

23      today using the most recent LIBOR forward curve, what

24      would it be?

25  A.  The current annualized payment amount remains -- in

31: 1      the near term, remains 50 per annum.

2  Q.  Regardless of what LIBOR is?

3  A.  No.  If LIBOR changes, if we all woke up tomorrow and

4      LIBOR was at the level that it was in 2006, the

5      payment would be significantly less than 50 million.

6  Q.  Okay.  And --

7  A.  The curve does not suggest that will happen.

8  Q.  Okay.  Does the curve suggest that number will come

9      down some?

10  A.  The curve suggests that sometime in the future LIBOR

11      will return to levels above its historic lows.

12  Q.  Okay.  Has any calculation been done of -- on a

13      look-forward basis of what the swap payment will be if

14      LIBOR rates, in fact, follow the current forward

15      curve?

16  A.  Yes.

17  Q.  Okay.  And what does that calculation reflect happens

18      to the $50 million?

19  A.  I don't recall.

20  Q.  Okay.  Who generated that -- the analysis we've just

21      described?

22  A.  Sanjay Marken generated that analysis.

23  Q.  And you've seen it but you don't recall what it

24      reflects; is that a fair statement?

25  A.  I've seen the analysis that involves the calculation

32: 1     you are discussing and the analysis is associated with

2     the other dialogue associated with the City's

3     monolines.  It is not associated with this particular

4     post-petition inquiry because we are primarily focused

5     on the fact that we are currently in default under the

6     swaps and they could be terminated at any point.

7  Q.  But --

8  A.  And --

9  Q.  I'm sorry.  Go ahead.  I don't want to cut you off.

10  A.  And, alternatively, if we enter into the Forbearance

11     and Optional Termination Agreement, then we have a

12     one-year period of status quo, and through that

13     period, market data suggests the payments will be

14     approximately 50 million, and at the end of that, we

15     would have to renegotiate whatever comes next.

**Pg: 33 Ln: 6 - 20**

**Designation:**

33: 6          Mr. Fea, what's his role in the Detroit

7     engagement?

8  A.  Mr. Fea has assisted the team on aspects of the DWSD

9     transaction and on aspects of the post-petition

10     financing.

11  Q.  Okay.  And what has been his involvement with the DIP

```
12      financing?

13  A.  His involvement has largely been a facilitating role

14      and he has assisted in creating presentations and

15      communicating with potential financing parties.

16  Q.  Okay.  When you say facilitating role, are you using

17      it in the sense that I used earlier; in other words,

18      he hasn't had a substantive role in the DIP financing

19      process?

20  A.  Yes.
```

**Pg: 33 Ln: 21 - Pg: 36 Ln: 24**

**Designation:**

```
33:21  Q.  Okay.  Before we go on, you referenced the DWSD work

    22      stream, the creditor restructuring work stream.  Is

    23      that how Miller Buckfire organizes projects around

    24      work streams?

    25  A.  It's one of the ways we do it, yes.  Because of the

34: 1      amount work and efforts across a broad range of issues

     2      associated with the Detroit restructuring, at some

     3      point we have asked our junior bankers to focus on

     4      some projects more so than others.  Several of us

     5      are -- you know, have more broad focus -- more -- a

     6      broader focus across all or substantially all the

     7      issues.

     8  Q.  Do you have identified work streams other than DWSD

     9      and creditor restructuring?
```

```
10    A.    Yes.

11    Q.    What are the other work streams associated with the

12          Detroit engagement?

13    A.    In addition to DWSD and creditor restructuring, there

14          are work streams associated with just creditor due

15          diligence, swaps, noncore assets.  Separate from that,

16          airport, and those are all the work streams I can

17          recall at this particular point.

18    Q.    All right.  The creditor restructuring work stream,

19          does that work stream include formulation of a plan of

20          adjustment?

21    A.    Yes.

22    Q.    Okay.  And which of these --

23    A.    Well, it would include a formulation of a plan of

24          adjustment.

25    Q.    Okay.

35: 1  A.    Yes.

2    Q.    And which of these work streams -- under which of

3          these work streams did the DIP financing process fall?

4    A.    The DIP financing is its own work stream.

5    Q.    So I've got a DWSD work stream, a creditor

6          restructuring work stream, creditor due diligence work

7          stream, swaps work stream, noncore assets work stream,

8          airport work stream, and a DIP financing work stream.

9          Are there any others?

10    A.    Not to my recollection.  Those are -- those are the

11          work -- those are the identified work streams that I
```

12       recall that we've used to organize our efforts.

13  Q.  Okay.

14  A.  There are other points of work that are going on, but

15       they may not be ones where we have taken the time to

16       write out on a piece of paper who exactly is

17       responsible for the given effort at the given level in

18       our hierarchy.

19  Q.  Okay.  Do the work streams have identified -- within

20       Miller Buckfire, do they have identified individuals

21       who bear principle responsibility for managing that

22       work stream?

23  A.  Yes.

24  Q.  Okay.  Who bears principle responsibility for managing

25       the DWSD work stream?

36: 1  A.  Ken Buckfire.

2  Q.  Who has principle responsibility for managing the

3       creditor restructuring work stream?

4  A.  That's Ken Buckfire and myself.

5  Q.  Who has principle responsibility for managing the DIP

6       financing work stream?

7  A.  I do.  I mean, more particularly, the piece of paper

8       that I'm thinking of has, you know, who are the -- who

9       are the managing directors working on each one of

10       these particular items.  We don't necessarily get into

11       who is the single individual lead on something in

12       particular.  So -- but on financing, it would be

13       myself.

```
14    Q.    What about swaps?

15    A.    Mr. Buckfire, and he's there; I'm there.

16    Q.    What about noncore assets?

17    A.    I'm there.

18    Q.    All right.  And I guess just to be complete, creditor

19          due diligence?

20    A.    I'm there.

21    Q.    Okay.  And airport?

22    A.    Well, I'm there and McKenna's there.

23    Q.    He's the airport guy basically?

24    A.    Yeah.
```

**Pg: 36 Ln: 25 - Pg: 38 Ln: 19**

**Designation:**

```
36:25   Q.    Okay.  All right.  So you lead the DIP financing work

37: 1         stream.  What was the role of Ken Buckfire in

   2          connection with the DIP financing process?

   3    A.    Ken has participated in many discussions associated

   4          with the, you know, overall strategy and restructuring

   5          behind the post-petition financing and presented with

   6          me results of the process at various stages to

   7          decision makers and others involved in the process and

   8          has acted as a resource and sounding board for me and

   9          other members of the team in regards to strategy and

   10         communications.

   11   Q.    What about Mrs. Corio?
```

12   A.   Mrs. Corio has also participated in strategy and

13        structuring discussions through the design and

14        solicitation process and has acted as a sounding board

15        for -- for me and others on the team in regards to

16        strategy and messaging.

17             She was also the formal addressee of the

18        solicitation process, probably the formal invitor as

19        well, too, when it comes to the correspondence.

20   Q.   All right.  So she was the name on the solicitation of

21        proposals and the recipient of those proposals?

22   A.   Amongst other points of participation, yes.

23   Q.   Okay.  But that's what you meant by addressee of --

24   A.   Yeah.

25   Q.   Okay.  That's what I was asking.  How would you

38: 1     describe your role in connection with the DIP

2        financing?

3    A.   My role has been a multifaceted one, taking a lead and

4        coordinating position from some of our initial

5        dialogue about the post-petition financing through the

6        original restructuring processes -- sorry -- original

7        design processes, producing presentations for key

8        decision makers about the potential process.  I've

9        also, then, led the efforts at Miller Buckfire to

10       structure the proposed financing, create the list of

11       potential contact parties, originate contacts with

12       many of those parties, coordinate our communications,

13       the majority of our communications with Jones Day and

    14          the City, coordinate and lead dialogue and due

    15          diligence efforts with potential parties, select

    16          parties to continue in the process and participate in

    17          negotiations as required to get to the commitment.

    18          It's a very large, comprehensive, you know, leadership

    19          role insomuch as the banker's to have one.


**Pg: 38 Ln: 23 - Pg: 42 Ln: 4**


**Designation:**

  38:23   BY MR. MARRIOTT:

    24     Q.   Mr. Doak, let me know when you've had a chance to flip

    25          through what's been marked as Exhibit 2.  Do you

  39: 1          recognize this document?

     2     A.   Yes.

     3     Q.   Am I correct that this letter, together with the

     4          attached term sheet, was the material used to solicit

     5          DIP proposals from prospective lenders?

     6     A.   This is a portion of the initial materials.

     7     Q.   But it also included a liquidity analysis.  Was that

     8          the other piece?

     9     A.   It also included a copy of the Forbearance and

    10          Optional Termination Agreement --

    11     Q.   Okay.

    12     A.   -- and it included the liquidity forecast.

    13     Q.   Now, the liquidity forecast -- and I was a little

    14          confused by some of the production on this point.  Was

15       the liquidity forecast ready to go when the term

16       sheet, the forbearance agreement, and this letter

17       first went to prospective lenders or was that a

18       follow-up item?

19  A.   It was not ready to go.  So for parties that received

20       the materials when they first went out, the cash flow

21       forecast was a follow-up item.

22  Q.   Okay.  If you would turn to the third page of the

23       exhibit, which is the first page of a -- what I think

24       has been referred to as an indicative term sheet.  Do

25       you see that?

40: 1  A.   Yes.

2  Q.   Now, my understanding is this was prepared by the City

3       as a proposed structure for the DIP financing,

4       correct?

5  A.   That's accurate.

6  Q.   Okay.

7  A.   The City and it's advisors.

8  Q.   Okay.

9  A.   I don't think there's anyone in the City that would

10       draft this.

11  Q.   Fair point.  Let me ask this question:  Did you draft

12       this term sheet?

13  A.   I participated in its creation, but it was not drafted

14       on Miller Buckfire's system.

15  Q.   By that, I assume you mean it was on Jones Day's

16       system?

17    A.    Yes.

18    Q.    Okay.  Let me ask the question differently because I

19          did create an ambiguity there.  The business terms

20          that are set forth in the term sheet circulated to

21          prospective lenders by the City, did you structure

22          those business terms?

23    A.    Yes, I was a participant in the structuring of those

24          business terms.

25    Q.    Okay.  Who else participated in the structuring of

41: 1        those business terms?

2     A.    I'm going to need more clarity on how you want me to

3           think about participation.

4     Q.    All right.  Well, let's try this.  I'm assuming -- and

5           if I'm wrong, tell me -- that there is a person who

6           initially sat down and crafted a proposed structure

7           for the DIP loan; is that correct?

8     A.    I would suppose by definition there would have to be,

9           right.  There has to be an inception date.

10    Q.    And was that person you?

11    A.    Most likely, it was.

12    Q.    Okay.  And then having come up with a possible

13          structure for DIP financing, who would you have -- or

14          let me rephrase it.  Who did you then discuss the

15          proposed economic terms with at Miller Buckfire?

16    A.    The terms then at Miller Buckfire would have been

17          discussed with Mr. Ken Buckfire, Mrs. Corio,

18          Mr. Haggard, Mr. Fea, Mr. Marken, as well as

```
19        potentially other team members.

20  Q.    Were there earlier iterations of proposed business

21        terms for the DIP prior to those business terms

22        memorialized in the term sheet that were sent to

23        prospective lenders?

24  A.    Yes.

25  Q.    Do -- were any of those earlier iterations committed

42: 1     to paper?

 2  A.    I -- to the best of my recollection, yes.

 3  Q.    Do those earlier iterations still exist?

 4  A.    I would presume they're somewhere in people's systems.
```

**Pg: 42 Ln: 5 - 9**

**Designation:**

```
42: 5  Q.    How many Chapter 9 proceedings at any point in your

 6           career have you been involved with?

 7  A.       One.

 8  Q.       Is that one the City of Detroit?

 9  A.       Yes.
```

**Pg: 42 Ln: 17 - Pg: 44 Ln: 7**

**Designation:**

```
42:17              How many distressed municipal situations at

18        any point in your career have you been involved in

19        outside of Chapter 9?
```

```
20   A.   Two.

21   Q.   And what are those two?

22   A.   City of Detroit before it filed for Chapter 9.

23   Q.   Fair.

24   A.   And the Mashantucket (Western) Pequot Tribal Nation.

25        Tell you what, why don't we -- Foxwoods.

43: 1 Q.  Okay.  Foxwoods.  And who were you employed by at the

2         time when you worked on Foxwoods?

3    A.   Foxwoods.

4    Q.   You were engaged by Foxwoods?

5    A.   Yes.

6    Q.   And you personally or were you with a firm?

7    A.   Miller Buckfire was.

8    Q.   Oh, it was Miller Buckfire.  Okay.  And what was the

9         nature of Miller Buckfire's engagement for Foxwoods?

10   A.   Restructuring services and advisory.

11   Q.   Now, I understand Foxwoods or a tribe is not a private

12        entity.  Did you interpret my question about municipal

13        restructurings to include what I'll call governmental

14        restructurings generally or is Foxwoods a

15        municipality?

16   A.   I interpreted your question to refer to the

17        restructuring of municipal finance market obligations,

18        so tax free obligations that have monoline insurers

19        and others associated with them, and that was a

20        significant and material portion of the Foxwoods

21        capital structure, and as a result, I spent a
```

```
22        considerable amount of time engaged in restructuring

23        negotiations with municipal bondholders and to

24        monoline insurers.

25   Q.   Okay.  So Foxwoods had tax exempt debt?

44: 1  A.   That's correct.

2    Q.   Okay.  But it's fair to say that the DIP loan here is

3         your first attempt at structuring municipal debt in

4         the context of a Chapter 9; is that correct?

5    A.   I think it's anyone's first attempt, honestly, but,

6         yes.  This is my first post-petition finance facility

7         under Chapter 9.
```

**Pg: 44 Ln: 8 - Pg: 45 Ln: 2**

**Designation:**

```
44: 8  Q.   And tell me what you did with Foxwoods.  Did you --

9         did you advise and assist Foxwoods in going into the

10        municipal markets for placement of tax exempt debt?

11   A.   No.

12   Q.   Did you assist Foxwoods into going into the municipal

13        markets to obtain taxable debt?

14   A.   No.

15   Q.   Does -- well, let me ask the question differently.

16             What is Miller Buckfire's experience in

17        whoever -- we can find out who it is later.  What is

18        Miller Buckfire's, as a firm, experience in the

19        municipal debt markets?
```

```
20    A.    I need assistance in understanding what you mean by

21          municipal debt markets.

22    Q.    Well, I mean, how many engagements has Miller Buckfire

23          had by an issuer of municipal debt seeking their

24          services as a banker to structure and solicit debt in

25          the municipal markets?

45: 1 A.    This -- the answer to that question would be one,

2           would just be working with the City of Detroit --
```

**Pg: 46 Ln: 18 - 22**

**Designation:**

```
46:18 Q.    What documents did you review to prepare your

19          declaration?

20    A.    I don't know how to answer that question.

21    Q.    Okay.  Do you remember any documents you looked at in

22          connection with preparing your declaration?
```

**Pg: 46 Ln: 25 - Pg: 47 Ln: 4**

**Designation:**

```
46:25              THE WITNESS:  Well, I read the declaration

47: 1       and it appropriately reflected my professional

2           background, the process that we -- that was run, and

3           the conclusions and recommendations that Miller

4           Buckfire had been prepared to make at various points.
```

# Objectors' Designations From
# December 5, 2013 Deposition of James Doak

**Pg: 47 Ln: 5 - 18**

**Designation:**

```
47: 5    BY MR. MARRIOTT:

     6    Q.   Okay.

     7    A.   And --

     8    Q.   Did you review the Barclays' term sheets?

     9    A.   Yes.

    10    Q.   Did you review the Barclays' fee letter?

    11    A.   Yes.

    12    Q.   Did you review the -- what I gather to be the

    13         definitive bond purchase agreement and indenture that

    14         were attached to the motion?

    15    A.   Yes.

    16    Q.   Did you review any documentation prepared by Conway

    17         McKenzie?

    18    A.   I reviewed materials prepared by Conway McKenzie.
```

**Pg: 48 Ln: 3 - 11**

**Designation:**

```
48: 3                    Have you ever been qualified as an expert

     4         to give testimony in a court proceeding?

     5    A.   Yes.

     6    Q.   How many times?

     7    A.   Twice to my recollection.

     8    Q.   Okay.
```

```
 9   A.   Well, three times in two situations --

10   Q.   Okay.

11   A.   -- to the best of my recollection.
```

**Pg: 50 Ln: 18 - Pg: 51 Ln: 6**

**Designation:**

```
50:18   Q.   Okay.  Let's go back to Doak 2.  And, again, let's

   19        just flip to the term sheet.  Now the term sheet

   20        contemplates two loans, a swap termination loan and

   21        what's called a quality of life loan, right?

   22   A.   Yes.

   23   Q.   Aggregating $350,000, right?

   24   A.   $350 million.

   25   Q.   I'm sorry.  350 -- if only it was 350,000.

51: 1   A.   Well, it wouldn't do us much good, right, if it was

    2        only 350 --

    3   Q.   It would be gone.  Now, notwithstanding the two pieces

    4        of this, I'm correct, am I not, that the principle

    5        purpose of the DIP financing is the swap termination

    6        loan?
```

**Pg: 51 Ln: 9 - 11**

**Designation:**

```
51: 9             THE WITNESS:  The largest use of proceeds

   10        is to finance the terms under the Forbearance and
```

```
11          Optional Termination Agreement.
```

**Pg: 52 Ln: 3 - 24**

**Designation:**

```
52: 3   Q.   Do you recognize what's been marked as Doak 3?

     4   A.   Yes.

     5   Q.   Am I correct that this was a package that was given to

     6        City Council for purposes of its deliberation on

     7        whether to approve the DIP financing?

     8   A.   Yes.  That's -- that's accurate.

     9   Q.   If you would look at the page that's Bates stamped

    10        12998, background of the transaction.  You see where I

    11        am?

    12   A.   Yes.

    13   Q.   There's a bullet point after extensive negotiation and

    14        then there are a series of points beneath that.  The

    15        third one, the City can elect to terminate the swaps

    16        at a discount to the Mark-to-Market value if it can

    17        raise the required cash to fund the payment.  Do you

    18        see where I am?

    19   A.   Yes.

    20   Q.   This is the primary reason the City began the process

    21        of soliciting finance and the largest single use of

    22        financing proceeds.  So do you agree with this

    23        statement made to the City Council that the primary

    24        reason for the DIP financing was the swap termination?
```

# Objectors' Designations From
# December 5, 2013 Deposition of James Doak

**Pg: 53 Ln: 6 - 9**

**Designation:**

```
53: 6   BY MR. MARRIOTT:

    7   Q.   Well, let's start with do you agree with this

    8        sentence?

    9   A.   Yes.
```

**Pg: 53 Ln: 18 - Pg: 54 Ln: 2**

**Designation:**

```
53:18               This sentence says the primary reason the

   19        City began the process of soliciting financing was to

   20        terminate the swaps, correct?

   21   A.   The primary reason the City began the process of

   22        soliciting the financing was to raise the necessary

   23        proceeds to make the payment required under the

   24        Forbearance and Optional Termination Agreement.

   25   Q.   Okay.  Who -- who suggested that the City seek an

54: 1        amount in excess of what it would take to terminate

    2        the swaps?
```

**Pg: 54 Ln: 13 - 25**

**Designation:**

```
54:13               THE WITNESS:  The thought process
```

14        surrounding what a post-petition financing could be

15        utilized for for the benefit of the City and its

16        stakeholders has included reasons or motivations or

17        ideas beyond the termination of the swaps for quite

18        some time.  The initial reference that I can recall to

19        using a post-petition financing for a purpose other

20        than the Forbearance and Optional Termination

21        Agreement would most likely be a moment where Ken

22        Buckfire and I were dialoguing with members of the

23        root cause committee associated with the department

24        water and sewage long-standing litigation about their

25        refinancing needs and cost of capital.

**Pg: 55 Ln: 1 - Pg: 56 Ln: 5**

**Designation:**

55: 1    BY MR. MARRIOTT:

2    Q.   Okay.  I'm not sure I understand that answer.  Let's

3        start with who is the root -- what is the root cause

4        committee?

5    A.   The root cause committee was a committee created by

6        Judge Cox to bring about the conclusion of the

7        long-standing litigation amongst and between the City,

8        the State, the Environmental Protection Agency, and

9        the surrounding counties to the City of Detroit in

10       regards to the inability of the City to operate the

11       water and sewage functions within environmental

```
12          guidelines.

13    Q.    And when did this meeting with the root cause

14          committee that you've just referenced happen?

15    A.    To the best of my recollection, that was in February.

16    Q.    Pre-petition?

17    A.    Yes.

18    Q.    And how does what happened at that meeting

19          pre-petition with the root cause committee relate to

20          seeking DIP financing in excess of what would be

21          required to terminate the swaps?

22    A.    At the time, Mr. Buckfire and I thought that a

23          post-petition financing could be a way to refinance

24          some of the department -- the department's water fund

25          and sewer fund debt with substantial interest rate

56: 1       savings to the department and the City.

2     Q.    Well, but correct me if I'm wrong.  There's no

3           intention of using the -- what's called the quality of

4           life loan to refinance DWSD debt, is there?

5     A.    No, there's not.
```

**Pg: 56 Ln: 6 - 12**

**Designation:**

```
56: 6    Q.    Okay.  So I understand that in February there may have

7              been discussions about the benefits of refinancing

8              certain of the City's debt, but what I'm trying to

9              understand is the genesis of borrowing money in the
```

**Objectors' Designations From
December 5, 2013 Deposition of James Doak**

```
10          proceeding under the DIP in excess of the amount

11          needed to terminate the swap.  Where did that idea

12          originate?
```

**Pg: 57 Ln: 3 - 10**

**Designation:**

```
57: 3                THE WITNESS:  That idea would have

 4          originated in the late spring/early summer time frame

 5          where we were focused on post-petition financing as

 6          being a potential opportunity for the City in several

 7          avenues, including financing to the general fund,

 8          which would include payment of the -- payment required

 9          under the Forbearance and Optional Termination

10          Agreement.
```

**Pg: 57 Ln: 19 - 21**

**Designation:**

```
57:19  Q.  That wouldn't be good.  You indicated that there were

20          discussions in, I believe, you said May and June time

21          frame.
```

**Pg: 57 Ln: 25 - Pg: 59 Ln: 13**

**Designation:**

```
57:25  Q.  In some time frame commencing pre-petition, correct?
```

58: 1   A.   Uh-huh.

2   Q.   Okay.  About borrowing money for deposit into the

3        general fund.  Is that a -- am I correct so far?

4   A.   Yes.

5   Q.   Okay.  With the purpose -- I'm asking you -- with the

6        purpose of depositing it in the general fund at the

7        time you were first contemplating this, whenever it

8        was, spring, to, you know, provide a supplement to the

9        City's working capital during the proceeding?

10   A.   Yes.  That would be in the May/June time frame,

11        this -- that concept that the general fund may need

12        additional financial resources to proceed with a

13        potential, but in no way inevitable, filing at an

14        indeterminate date in the future.  Like, that's when

15        we were thinking about that idea --

16   Q.   Okay.

17   A.   -- amongst others.

18   Q.   All right.  So then the petition is filed.  Given that

19        you had considered the potential need to supplement

20        the City's general fund, is there a reason for the --

21        that the City waited until August to begin soliciting

22        financing proposals?

23   A.   Yes.

24   Q.   What is that reason?

25   A.   Amongst the reasons that the -- I'm going to answer

59: 1        the question what -- what are some of the -- well,

2        there's many reasons why it -- we started the

```
 3        solicitation process in late August, chief of which is
 4        we had not yet concluded our discussion amongst key
 5        decision makers about the nature of the solicitation
 6        documents and the -- what did we call this, the term
 7        sheet -- the indicative term sheet.
 8   Q.   So if I understand your answer, it took a while to
 9        generate -- to reach consensus on the business terms
10        that would be reflected in the indicative term sheet
11        that was sent to proposed lenders.  Is that a fair
12        summary of --
13   A.   Yes, that's a fair summary.
```

**Pg: 59 Ln: 14 - Pg: 62 Ln: 8**

**Designation:**

```
59:14 Q.   When did the process of formulating what eventually
   15        became the economic terms of -- sent to prospective
   16        lenders, when did that process begin?
   17   A.   I don't recall a particular date, but most -- I
   18        believe it was in the late July/early August time
   19        frame.
   20   Q.   Late July or early August?
   21   A.   Yes.
   22   Q.   Okay.  And do you recall who initiated that process?
   23   A.   Are you looking for a person --
   24   Q.   Yeah, a person.
   25   A.   -- or an institution?
```

# Objectors' Designations From
## December 5, 2013 Deposition of James Doak

60: 1   Q.   No, a person.

2   A.   Myself and Mr. Buckfire.

3   Q.   Okay.  All right.  Now, as I understand it, the City

4        went out and the term sheet reflects that the City

5        anticipated that of the $350 million for which

6        financing was sought, roughly 230 million would be

7        necessary for the swap termination loan, correct?

8   A.   Yes.

9   Q.   Okay.  Leaving $120 million for other purposes,

10       correct?

11  A.   Yes.

12  Q.   Why $120 million?  Where does that number come from?

13  A.   That number is -- that number is a result of the

14       iterative dialogue that various decision makers and

15       advisors had about a wide range of factors, including

16       the desired overall size of the facility and the

17       likely amounts required for the swap termination loan

18       portion, as well as the interest rate of the overall

19       facility, the potential required amortization and

20       desired proposed remedies and indicative cash flow

21       forecasts that were provided by Ernst & Young

22       incorporating those amounts of overall proceeds and,

23       also, quality of life loan size proceeds, which were

24       also -- and that analysis was also informed by work

25       that the City and Conway McKenzie had performed in

61: 1        regards to prospective spending on required

2        reorganization -- operational reorganization and

```
 3          reinvestment initiatives.

 4    Q.    Okay.  You said that that was -- I'm going to drill

 5          down a little bit.  You said it was --

 6    A.    Well, I would -- amongst other factors, including, you

 7          know, appropriate liquidity cushion, and state of the

 8          City's overall finances.

 9    Q.    Okay.  You said there was an iterative dialogue among

10          various City representatives, advisors.  Who

11          participated by organization?  Let's start with that.

12          Who participated by organization?

13    A.    The City of Detroit, both the Office of the Chief

14          Financial Officer and the Office of the Emergency

15          Manager; the City of Detroit's advisors, including

16          Miller Buckfire, Conway McKenzie, and Ernst & Young;

17          as well as the City's counsel, Jones Day and Miller

18          Canfield; the Michigan Finance Authority,

19          representatives of the Michigan Finance Authority; the

20          representatives of the State Treasurer's Office; and I

21          think I'd need to -- I think I need to know with

22          regards to what items we're discussing to formulate

23          whether various of their advisors were participating

24          in the process.

25    Q.    All right.  Well, that's a pretty good list.  The

62: 1          State Treasurer's Office and the Michigan Finance

 2          Authority --

 3    A.    Yeah.

 4    Q.    -- is it Finance?
```

```
 5              Was their involvement -- were they involved
 6       in the -- what I'll call the sizing of the DIP loan or
 7       were they involved separately ultimately in approving
 8       the DIP loan?
```

**Pg: 62 Ln: 11 - Pg: 64 Ln: 15**

**Designation:**

```
62:11            THE WITNESS:  Representatives of both of
   12       those groups participated in the structuring
   13       discussions that we had over the post-petition
   14       facility in the August time frame.
   15  BY MR. MARRIOTT:
   16  Q.  Had the State Treasurer's Office and the Authority
   17       signed off on the formal term sheet that was sent to
   18       respective lenders?
   19  A.  They saw it.  They saw the materials.  I don't know --
   20       I can't speak to what the verb signoff would kind of
   21       mean in an official capacity, but they had reviewed
   22       the package.
   23  Q.  Had either of them lodged any objection to the --
   24       either the concept of DIP financing or the terms
   25       reflected in the term sheet sent to prospective
63: 1       lenders?
    2  A.  Neither institution lodged it, had any standing
    3       objections, as it would be, to the package that we
    4       went out with.
```

5   Q.   Did they, either of them, at any point in the process

6        express any concerns or objections at all?

7   A.   Yes.

8   Q.   Okay.  Was it the Authority or the State Treasurer's

9        Office that expressed concerns or objections?

10  A.   The particular event that I'm thinking of, which I

11       can't say is the only one, came from the Finance

12       Authority.

13  Q.   Okay.  And what was their concern or objection?

14  A.   They wanted the solicitation to reflect the City's

15       willingness to think as creatively as -- and

16       comprehensibly as possible in regards to financing

17       alternatives and requested that we incorporate

18       language in the cover letter as well as the term sheet

19       indicating that we would consider financing proposals

20       other than a debtor-in-possession financing facility,

21       including but not limited to novation concepts of the

22       City swap agreements.

23  Q.   Do you have understanding of why that issue was

24       important to them?

25  A.   They had indicated that some potential financing or

64: 1    liquidity providing parties had mentioned to them that

2        novation of the City's swap agreements could be

3        another method to produce the liquidity that the City

4        required and they did not want to discourage those

5        parties from participating in the process.

6   Q.   And their concerns were addressed by including in the

```
 7              letter an invitation for prospective lenders to

 8              propose a structure different than that set forth in

 9              the term sheet that they were sent; is that correct?

10     A.       The resulting change was incorporated into the first

11              sentence -- or, sorry -- the last sentence of the

12              first paragraph of the cover letter --

13     Q.       Okay.

14     A.       -- as well as the first page of the term sheet under

15              the provision 2, type and amount.
```

**Pg: 64 Ln: 16 - Pg: 65 Ln: 9**

**Designation:**

```
64:16  Q.       Okay.  Now, let's go back to the genesis of $350

   17           million.  The first factor that you gave, and I don't

   18           know whether it's the first, most important, but I'll

   19           ask.  The first factor you gave is a consideration

   20           of -- based upon principal amortization schedule,

   21           interest expense, and the like was could the City

   22           afford the loan; is that correct?

   23  A.       I need a -- you need to reask the question.

   24  Q.       All right.  In determining how much to borrow --

   25  A.       Right.

65: 1  Q.       -- was the first consideration what the City from a

    2           cash flow standpoint could afford?

    3  A.       One of the considerations was whether the City could

    4           tolerate from a liquidity standpoint a -- a hard
```

```
5        amortization scenario where the lender would be

6        collecting under a default interest rate, as well as

7        the contractual mandatory amortization provisions.

8   Q.   Okay.  So the City was concerned about not borrowing

9        more than it could service or repay; is that fair?
```

**Pg: 65 Ln: 12 - Pg: 66 Ln: 7**

**Designation:**

```
65:12                    THE WITNESS:  I -- not the City.  I'm not

13       the City, but I think that that appropriately reflects

14       one of the concerns that the City decision makers had.

15   BY MR. MARRIOTT:

16   Q.   Let me try asking the question this way, and if I'm

17        not clear, we'll try again.  The total amount the City

18        borrowed or proposes to borrow and proposed to borrow

19        when it went out to lenders was $350 million, right?

20   A.   Yes.

21   Q.   It was an assumption that approximately $230 million

22        of that would be used for the swap termination,

23        correct?

24   A.   That's correct.

25   Q.   That left $120 million for other uses, correct?

66: 1   A.   Yes.

2   Q.   Was that $120 million a number that was built up from

3        particular uses that the City had in mind that

4        aggregated to $120 million or was that $120 million
```

```
5          simply the balance of a total loan that the City felt
6          it was appropriate to borrow?  Do you understand the
7          question I'm asking?
```

**Pg: 66 Ln: 10 - 22**

**Designation:**

```
66:10                THE WITNESS:  I do understand the question.
11         You're asking, in essence, this is a which-came-first
12         type concept, and I don't believe that that's an
13         appropriate characterization because the process, in
14         the end, was, as I said, highly iterative and the --
15         the City and its stakeholders had an opportunity to
16         take a look at this particular loan sizing and what
17         the implications were for the City's liquidity as the
18         City proceeded down a revised restructuring and
19         reinvestment path and had the opportunity to determine
20         whether that was acceptable, both in terms of the loan
21         size and also what the initiatives -- the revised form
22         of the initiatives.
```

**Pg: 66 Ln: 24 - Pg: 67 Ln: 12**

**Designation:**

```
66:24  Q.  In coming up with the $120 million, roughly, for the
25         quality of the life loan, was -- were you working from
67: 1         sort of wish list of purposes to which the money would
```

    2       be devoted?

    3   A.  No.  That's not how I've characterized how the process

    4       the City engaged in worked and Miller Buckfire was not

    5       focused on a -- any sort of City wish list.

    6   Q.  Would it be fair to say that from Miller Buckfire's

    7       perspective, you were approaching this similar to the

    8       way you were thinking about it back in the spring

    9       before the case was filed; in other words, looking at

   10       cash flow projections out of the general fund and

   11       making a judgment as to what amount would be necessary

   12       to maintain appropriate liquidity during the case?


**Pg: 67 Ln: 15 - Pg: 68 Ln: 17**


**Designation:**

  67:15               THE WITNESS:  No, I don't believe that

    16       that's -- that's accurate.  Our thinking considerably

    17       evolved, because in the spring, we did not have any

    18       anticipated, you know, time and conclusions on how

    19       exactly a Chapter 9 proceeding would look liquidity

    20       wise and when it would occur.

    21               So in the spring, there was a general

    22       concept that one purpose of providing liquidity to the

    23       general fund would be working capital, in addition to

    24       the payment under the Forbearance and Optional

    25       Termination Agreement.  The process that we went

  68: 1       through in late summer was much more reality and data

```
 2      based because we actually had a filing and we had, you

 3      know, actual and forecasted cash flow balances and we

 4      had an understanding of what the -- some of the

 5      operational and reorganization initiatives would be on

 6      a -- on a grandular level and also how they would

 7      potentially have to be revised considering in their

 8      initial formulation, they were supposed to begin mid

 9      summer.

10              Similarly, we -- in addition to having an

11      actual filing date and resulting working out --

12      working capital implications from that filing, we had

13      revised actual performance and prospective assumptions

14      about obligations the City was continuing to pay on

15      and the City's cash flows.  So we had a better sense

16      of -- in a revised sense, of where the City's

17      liquidity would be.
```

**Pg: 69 Ln: 13 - Pg: 70 Ln: 2**

**Designation:**

```
69:13   Q.   First of all, let me just confirm this.  I believe

   14        that you sent two packages to -- by the way, that

   15        reminds me of a question.  Back when you did your list

   16        of people who were involved in the iterative dialogue

   17        regarding the structure and economics of the proposed

   18        DIP, you didn't mention the City Council.  Was the

   19        City Council or any of its representatives or advisors
```

```
20        involved in that iterative dialogue?

21    A.   No.

22    Q.   But, ultimately, you advised them by advising them I

23        think first of the status and then of outcome; is that

24        correct?

25    A.   Yes.

70: 1  Q.   Let me --

  2    A.   Yeah.  I think that's fair.
```

**Pg: 70 Ln: 16 - Pg: 72 Ln: 24**

**Designation:**

```
70:16  Q.   Mr. Doak, take a second to look at what's Doak 4 and

  17        let me know when you've had a chance to do that.

  18   A.   I'm set.

  19   Q.   Okay.  This is dated, I think, 10 days before Doak 3?

  20   A.   Yes.

  21   Q.   And I read it as a staff -- as a status update rather

  22        than transmission of final terms?

  23   A.   That's correct.

  24   Q.   Was this, in fact, transmitted to City Council, this

  25        document?

71: 1  A.   This was provided to each member of City Council in

  2        six one-on-one meetings that I had with each one of

  3        the members, and in one instance that I can recall,

  4        with a staff member.  So this was physically handed to

  5        the council member.
```

6    Q.    Okay.  And then you met with each of them

7          individually, not with City Council as a group, in

8          discussing this Doak 4?

9    A.    Yes.

10   Q.    Okay.

11   A.    Subsequently, later on, one council member requested

12         this in an electronic form and I believe I provided it

13         to him.

14   Q.    Now, if you would flip to what's Bates stamped 20043.

15         This has this financing process, progression, which is

16         what I suspect you were flipping through Doak 3 to

17         find.

18   A.    Yes.

19   Q.    So number of parties contacted is 50.  That contacted

20         does not mean they were sent a package, correct?

21   A.    That's correct.

22   Q.    Okay.  Who identified the 50 to contact?

23   A.    Multiple parties identified the 50.  Miller Buckfire

24         prepared an initial list and parties -- parties

25         involved were able to add themselves and, also, some

72: 1      parties contacted the City and Miller Buckfire.

2    Q.    Okay.  So parties contacted could mean either Miller

3          Buckfire out or somebody in?

4    A.    Yes.

5    Q.    Okay.  And then the next line item is number of

6          parties that executed nondisclosure agreements.  Would

7          those -- all of those 40 have gotten the proposal

```
 8        package?

 9   A.   Yes.

10   Q.   Okay.  So all of those 40 would have gotten the Doak

11        2, the associated term sheet, the forbearance

12        agreement, and subsequently the liquidity analysis?

13   A.   Yeah.

14   Q.   Okay.  And then 16 submitted letters of intent, which

15        took what form in your process, a proposed term sheet?

16        Is that -- what did the letter of intent have to look

17        like?

18   A.   A letter of intent had to -- it had to be a -- some

19        form of structured response in regards to a financing

20        commitment or other structure.  It had to be -- it

21        could be two pages back, indicating general interest

22        in participating with an indication as to which of the

23        facilities and the size and generate conversations or

24        it could be a fully marked-up term sheet.
```

**Pg: 73 Ln: 11 - 17**

**Designation:**

```
73:11   Q.   No, no.  I probably asked the question incorrectly.

   12        Do you know how many of the 16 either marked up your

   13        term sheet or submitted a term sheet of comparable

   14        detail?

   15   A.   I can't recollect a specific number, but I would say

   16        to the best of my recollection, maybe eight, seven or
```

```
17        eight.
```

**Pg: 74 Ln: 3 - Pg: 75 Ln: 3**

**Designation:**

```
74: 3    Q.    If you would take a look at what's been marked Doak 5

     4          and turn to Bates stamped 20218.

     5    A.    Yeah.

     6    Q.    It says at the top Post-Petition Financing All-In Cost

     7          Analysis?

     8    A.    Yes.

     9    Q.    There are, in fact, eight parties listed here.  Are

    10          these the eight that provided either a mark up of the

    11          term sheet or something in comparable detail?

    12    A.    These are the eight at that particular time.  I would

    13          say your total number ends up being nine.

    14    Q.    Okay.  And was another version of this comparison done

    15          that added the ninth?

    16    A.    No.

    17    Q.    Okay.  And one more question, and then we'll break for

    18          lunch.

    19                Looking back at Doak 4, it indicates that

    20          four parties ultimately submitted a commitment letter.

    21    A.    Yes.

    22    Q.    Which of these four were the four parties that

    23          submitted a commitment letter?

    24    A.    The four parties referenced by this presentation were
```

```
    25        Bank of America, Merrill Lynch, Barclays, Goldman, and
75: 1         CarVal.
     2   Q.   Those are the four that are referenced in the --
     3   A.   Yes.
```

**Pg: 77 Ln: 3 - 15**

**Designation:**

```
77: 3   Q.   And just to confirm my notes, the four that delivered
     4        commitments at your request and that will be reflected
     5        on an update to Doak 5 were Bank of America, Merrill
     6        Lynch, BANL, right?
     7   A.   Yes.
     8   Q.   Barclays, Goldman Sachs, and CarVal?
     9   A.   CarVal, yeah.
    10   Q.   What is CarVal?
    11   A.   CarVal is a multi-billion dollar institutional
    12        investor, effectively a hedge fund from Minneapolis
    13        that is loosely affiliated with Cargill and they had a
    14        group of investors that came together to offer the
    15        City this particular proposal.
```

**Pg: 77 Ln: 16 - Pg: 78 Ln: 7**

**Designation:**

```
77:16   Q.   If you could grab Doak 2.
    17   A.   And to clarify on the record, yes, there is a further
```

```
18              version of Doak 5 and we are -- you know, we are

19              getting that.

20      Q.      Okay.

21      A.      And I'm back to Doak 2.

22      Q.      Let's turn to page 2 of the term sheet, which is Bates

23              number 16685, and I'm looking at collateral.  Now, as

24              I understand, the collateral that was proposed to

25              prospective lenders it was somewhat different for the

78: 1           swap termination loan and the quality of life loan.

2               If I understand this, the swap termination loan would

3               be secured by a first lien on income tax revenues of

4               the City, and a pari-passu lien with the quality of

5               life loan first on what's called the asset proceeds

6               collateral, correct?  And then the -- can you answer?

7       A.      Yes.  Yes.
```

**Pg: 78 Ln: 14 - Pg: 80 Ln: 8**

**Designation:**

```
78:14   Q.      Quality of life loan has a first lien on the wage and

15              tax revenues, the casino revenues?

16      A.      Yes.

17      Q.      A second lien on the income tax revenues behind the

18              swap note --

19      A.      Yes.

20      Q.      -- right?

21                      And then the shared first lien with the
```

22    swap note on the asset proceeds collateral, correct?

23  A.   Yes, that's correct.

24  Q.   The swap termination loan has -- under your proposal,

25       had no lien on the wage and tax revenues; is that

79: 1       correct?

2  A.   That's correct.

3  Q.   Okay.  Now, if I read the Barclays' commitment and

4       proposed definitive loan documentation correctly, this

5       is precisely the collateral structure that is

6       contemplated for the DIP; is that correct?

7  A.   Yes.  The -- Barclays' collateral structure largely

8       materially accepts what was in the indicative term

9       sheet.

10  Q.   When you say materially, are their differences that

11       you're aware of?

12  A.   Well, there may be more details and legalese, but

13       basically it's the same --

14  Q.   All right.  So the economic --

15  A.   -- structure.

16  Q.   -- terms are the same, although the words may be

17       different?

18  A.   Actually, there's modest changes on the economics.

19       For instance, in one point where one of the loans is

20       paid off, the amount that can be drawn from income tax

21       goes to 8.

22  Q.   Under the Barclays' deal?

23  A.   Yeah.

```
24    Q.   And under your proposal here, the $4 million per month

25         that was applied to this swap termination loan would

80: 1      simply move over to the -- well, it doesn't matter.

 2         We'll get to the precise Barclays' deal in a minute.

 3               But in any event, I'm correct that the

 4         proposal that went from the City to prospective

 5         lenders contemplated the collateral including income

 6         tax revenue, asset proceeds, and the casino revenues,

 7         correct?

 8    A.   Yes.
```

**Pg: 80 Ln: 9 - Pg: 84 Ln: 15**

**Designation:**

```
80: 9    Q.   And if I understand it, the asset proceeds collateral

10         constitutes any proceeds from the sale or series of

11         sales of City assets that exceeds $10 million; is that

12         correct?  And I'm looking at what's called mandatory

13         prepayments on page 2 of the term sheet.

14    A.   Yes.  This is the -- this is the provision that you're

15         referring to on page 2 of the term sheet is the

16         provision that we provided to the lenders.

17    Q.   Right.  Okay.  Wouldn't you agree with me that if a

18         borrower goes out to lenders and proposes to give

19         collateral, it's unlikely that prospective lenders

20         would say, no, thanks, I'll lend you the money without

21         collateral?
```

22   A.   It would be unlikely that a potential lender would

23        remove or -- you know, remove protections from their

24        proposal that were at -- that we went out to with --

25        in the initial form.

81: 1   Q.   So why did you concede that this loan would have to be

2        collateralized right out of the box rather than first

3        seeking either unsecured credit or credit with less

4        collateral?

5   A.   We went to market with this proposed term sheet

6        recognizing we had a limited amount of time to educate

7        an extremely knowledgeable and sophisticated

8        investment community on a financing that they would be

9        considering in the midst of many other competing

10        investment opportunities.  This investor community

11        would also be very familiar with market and -- market

12        terms and conventional and customary provisions

13        associated with post-petition financing, and given the

14        fact that we had a limited amount of time and we were

15        operating in a very competitive environment and also

16        one that was -- one in which there was substantial

17        litigation from stakeholders, we recognized that the

18        financing -- we believed that the financing would most

19        likely have to have these particular provisions in

20        order to receive solic -- receive indications back

21        from parties.

22   Q.   Is another way of saying that that you assumed that

23        you would need a collateral package of this type to

```
 24        generate interest?

 25    A.  Based on the -- a -- I don't know how you want to talk

82: 1       about or how you consider the term assumed because we

  2        came to these -- we came to the conclusion that the

  3        package would require these provisions based on a

  4        variety of factors including the ones I've already

  5        specified and including, you know, preliminary

  6        dialogue with -- with would-be financing parties.

  7    Q.  So did you seek unsecured financing for the City for

  8        the DIP at all?

  9    A.  We should discuss what you think about the concept of

 10        seek, but we did not produce a solicitation document

 11        that asked parties to return bids for unsecured

 12        financing.

 13    Q.  Did you pick up the phone and call anybody and ask

 14        what their interest would be in providing unsecured

 15        financing to the City?

 16    A.  Yes.

 17    Q.  Who?

 18    A.  The topic of conversation came up in a number of

 19        conversations with -- with potential parties.

 20    Q.  All right.  Let's parse that.  Who was asked if they

 21        would provide unsecured financing to the City for this

 22        facility?

 23    A.  I can recall it coming up in a -- the best of my

 24        recollection, a conversation with CarVal, and I

 25        believe it came up in some of Mr. Buckfire's
```

83: 1   conversations with -- with other potential lenders.

  2  Q. Do you know which ones?

  3  A. No.

  4  Q. The conversation with CarVal, you had that?

  5  A. Yeah.

  6  Q. Did you have it before or after the solicitation

  7    package went out?

  8  A. Before.

  9  Q. And when was the conversation?

 10  A. I don't recall the particular date.

 11  Q. What was the --

 12  A. It would be in -- it would be in August.

 13  Q. And what was the substance?

 14  A. Substance of the conversation would be them dialoguing

 15    with us about how they think -- thought a deal could

 16    get done and a -- a question from -- from me, you

 17    know, broadly as to whether the financing could be

 18    done without these particular provisions and -- and an

 19    indication on their part that they didn't see it

 20    happening.

 21  Q. All right.  Let's push that a little bit.  This

 22    conversation with CarVal, was it -- were you asking

 23    for their views of the market generally or were you

 24    asking for their views about what would be of interest

 25    to them specifically?

84: 1  A. They were presenting their thoughts on the market and

  2    how they were thinking about structuring the

```
 3        financing.

 4   Q.   All right.  Who called whom?

 5   A.   Most of the conversations with the CarVal

 6        representative.  I -- the CarVal representative was

 7        calling me and checking on the status of the process.

 8   Q.   And you said to him would you be interested in making

 9        a loan to us on an unsecured basis.  Did you ask that

10        question?

11   A.   No, I did not.

12   Q.   So what you're saying, if I understand you correctly,

13        is you would be -- the conversations that CarVal had

14        with you took as a presumption that there would be

15        collateral?
```

**Pg: 84 Ln: 18 - Pg: 85 Ln: 10**

**Designation:**

```
84:18              THE WITNESS:  Well, I think CarVal

  19        certainly presumed there would be -- there would be a

  20        security interest.

  21   BY MR. MARRIOTT:

  22   Q.   Okay.  Did you personally ask any prospective lender

  23        if they would make an unsecured loan, make the DIP

  24        loan to Detroit on an unsecured basis?

  25   A.   Aside from the conversation we just discussed, no.

85: 1   Q.   And I understood -- at least I thought I understood

   2        your answer with respect to CarVal that you didn't
```

3      specifically ask them?

4   A.   That's correct.

5   Q.   Do you know if Mr. Buckfire in his conversations with

6      potential lenders specifically asked any of them if

7      they would be willing to make an unsecured -- make the

8      DIP facility available to the City on an unsecured

9      basis?

10  A.   I don't know.

**Pg: 85 Ln: 11 - Pg: 86 Ln: 11**

**Designation:**

85:11  Q.   When constructing the collateral package for the DIP

12      facility that the City incorporated into its

13      solicitation package, did you consider the effect that

14      that collateral package might have on recoveries for

15      unsecured creditors in the case?

16  A.   We -- we considered the over -- the implications of

17      getting the overall financing accomplished.

18  Q.   Okay.  Tell me -- tell me what you considered.

19  A.   We considered the importance of the City having

20      adequate liquidity throughout the restructuring case

21      so that we could continue to maintain operations.  We

22      considered the importance of initiating the

23      operational initiatives and spending that were

24      targeted in the revised Conway McKenzie documentation.

25      We considered the importance of resolving the ongoing

```
86: 1        default condition with the swap counterparties, and we

     2        considered the savings -- effective savings available

     3        to the City associated with paying the optional

     4        termination and resolving the swaps and what that

     5        would provide the City in regards to its liquidity and

     6        overall ability to operate and at some point in the

     7        future, you know, return value to the creditors.

     8   Q.   Let me come at that from two different angles.  Did

     9        you have projections that reflected that creditor --

    10        that amounts available for distribution to creditors

    11        would be enhanced if the DIP facility was borrowed?
```

**Pg: 86 Ln: 14 - 15**

**Designation:**

```
86:14                    THE WITNESS:  We did not have comparative

    15        projections.
```

**Pg: 86 Ln: 17 - Pg: 87 Ln: 14**

**Designation:**

```
86:17   Q.   So you didn't know whether, in fact, the DIP loan

    18        would enhance creditor recoveries; is that correct?

    19   A.   No, that's not correct.

    20   Q.   Well, how would you have known it without projections

    21        that demonstrated?

    22   A.   The City's projections are based on a number of
```

```
23          assumptions, including its ability to restore basic

24          municipal services from a present status quo position

25          of service insolvency, and in doing that, produce the

87: 1       revenues and costs that the City currently

2           incorporates into its forecasts.  So it is important

3           for the City to engage in those operational

4           initiatives and reorganization initiatives in order to

5           stabilize the operations of the City, improve the

6           operations of the City to an acceptable level that

7           will eventually allow the City to return value to its

8           creditors.

9                   If the City doesn't have the DIP or the

10          post-petition financing, we do not ask -- we do not

11          forecast having sufficient liquidity to proceed

12          forward with the operating initiatives at this time

13          and it's a -- it's my belief that that will be

14          detrimental to the recovery of creditors.
```

**Pg: 87 Ln: 25 - Pg: 90 Ln: 5**

**Designation:**

```
87:25   Q.  All right.  Let me ask the question differently.

88: 1       What's the importance of doing a DIP now versus

2           borrowing the same amount of money in connection with

3           a plan of adjustment and an exit from the case?

4       A.  There is a pressing, immediate need both to resolve

5           our default with the swap counterparties and to
```

6       immediately improve the state of municipal services in

7       the City of Detroit.  The City is under-policed,

8       under-lit, and under-protected today and people are

9       leaving the City and revenue opportunities are being

10      lost today.  The longer the City waits, the longer

11      those opportunities, those revenues are lost, the more

12      expensive the deferred maintenance becomes and the

13      greater risk is incurred by the City and all its

14      stakeholders in regards to the City's ability to

15      stabilize and revitalize itself.

16  Q.  What's the balance of the general fund today?

17  A.  The balance of the general fund today, or the end

18      of -- I thought it was the end of October, based on my

19      conversation with ENY was approximately $100 million

20      in the account.

21  Q.  And you -- but you don't know what it was as of

22      November 30th?

23  A.  I thought -- that was the best of my recollection that

24      it might be the $100 million figure.

25  Q.  As of November 30?

89: 1  A.  I --

2  Q.  The number you remember is 100 million.  You're not --

3  A.  Yeah.

4  Q.  -- real sure when it's from?

5           Are there projections that show when the

6      City runs out of money, if it relies solely on the

7      general fund and no supplemental financing?

```
 8   A.   There have been, yes.

 9   Q.   Well, when you say there have been, are there any

10        current such projections?

11   A.   There was a -- there was a cash flow put together for

12        the benefit of a dialogue with the stakeholder that

13        showed a general -- where the City continued to

14        operate on the general fund and at the same time made

15        the spending associated with the operational

16        restructuring initiatives and that particular forecast

17        showed the general fund at a negative cash balance

18        in -- beginning in April or May of 2014.

19   Q.   Okay.  And has an analysis been done which adds 120

20        million to the general fund and project how much

21        further the general fund would maintain a positive

22        balance?

23   A.   Well, that -- yes.  That would actually just be the

24        liquidity forecast associated with the DIP financing

25        effectively, right?  Because that forecast assumes the

90: 1     DIP financing occurs.  In that forecast, additional

 2        amount, roughly 120 million, the balance of the

 3        post-petition financing is added to the general fund

 4        and -- and then we run out the City's prospective

 5        liquidity.
```

**Pg: 90 Ln: 10 - 17**

**Designation:**

# Objectors' Designations From
# December 5, 2013 Deposition of James Doak

```
90:10   Q.   Mr. Doak, just let me know when you get a chance to

    11        look at Doak 6.

    12   A.   Okay.

    13   Q.   Is Doak 6 the liquidity analysis that was contemplated

    14        by the package sent to the prospective lenders and

    15        that was eventually sent to them?

    16   A.   Yes, it appears to be that forecast that you

    17        referenced.
```

**Pg: 91 Ln: 2 - 15**

**Designation:**

```
91: 2   Q.   Do you understand creditor proposal in that context to

    3         be the June 14th proposal for the quality emergency

    4         manager?

    5    A.   Yes.

    6    Q.   Top line of the spreadsheet there refers to funds

    7         available for unsecured claims per creditor proposal.

    8         Do you see that?

    9    A.   Yes.

    10   Q.   What do you understand the numbers under fiscal year

    11        2014 through fiscal year 2017 for that line item to

    12        reflect?

    13   A.   That reflects a residual balance of liquidity in each

    14        one of those years coming from the forecast that was

    15        in the creditor proposal.
```

# Objectors' Designations From
# December 5, 2013 Deposition of James Doak

**Pg: 91 Ln: 16 - Pg: 92 Ln: 14**

**Designation:**

```
91:16   Q.   Okay.  And my understanding is that forecast did not

    17        include any sort of DIP financing, correct?

    18   A.   That's correct.  That forecast did not include a

    19        Chapter 9 filing.

    20   Q.   No.  I understand that.  All right.  Let me ask it a

    21        different way.  Did that forecast contemplate

    22        financing of any kind?

    23   A.   It did not contemplate any further financing, right.

    24        It has the financing existing at the time in the form

    25        of the BSA-backed bonds and parking bonds.

92: 1   Q.   Right.  But it didn't contemplate any incremental

     2        finance?

     3   A.   That's correct.

     4   Q.   Okay.  Then, if you would look further down at the

     5        line that says net cash flow per DIP financing

     6        scenario.  Do you see that?

     7   A.   Yes.

     8   Q.   What is your understanding of what those numbers

     9        reflect?

    10   A.   That reflects the net cash flow for each one of the

    11        years after taking into account the -- the various

    12        changes in the forecast associated with the passage of

    13        time, the Chapter 9 filing, and the assumed DIP

    14        financing terms.
```

**Pg: 94 Ln: 1 - Pg: 95 Ln: 1**

**Designation:**

```
94: 1    Q.   I'm looking at the top line that says $31.9 million

     2         available for unsecured claims in fiscal year 2015.

     3         Do you see that?

     4    A.   Yes.

     5    Q.   How is that a flow and not a balance?

     6    A.   That is a -- that is the cash flow, positive cash flow

     7         that occurs in the forecast in that particular year.

     8    Q.   Okay.

     9    A.   It's a -- it is a residual -- it is a residual for

    10         that year.

    11    Q.   All right.  And if I understand --

    12    A.   But there's a flow amount.  It's like something you

    13         would see in an income statement or a statement of

    14         cash flows.

    15    Q.   No, I understand that, but the creditor proposal, as I

    16         understand it, contemplates making distributions to

    17         creditors from positive cash flow, correct?

    18    A.   I -- the proposal to creditors, it is -- has many

    19         different facets in regards to what it's paying or

    20         what is available for the various unsecured creditors.

    21    Q.   No, I understand that.  But funds available for

    22         unsecured claims, what does it mean if it doesn't mean

    23         money that could be distributed to unsecured creditors
```

```
24          under the creditor proposal?

25   A.     It does mean cash flows in the given period that would

95: 1       be available for distribution to creditors.
```

**Pg: 100 Ln: 1 - Pg: 101 Ln: 7**

**Designation:**

```
100: 1   Q.   All right.  Let's talk a little bit about these two

     2        forecasts.  We have the forecast that begins on the

     3        third page of this exhibit, which reflects net -- cash

     4        net of distributions is positive all the way through

     5        the forecasting, correct?

     6             The cash flow that begins on page -- if I

     7        am reading it correctly, reflects positive fund

     8        balance.  It looks like the forecast -- throughout the

     9        forecast period.

    10   A.   Yes.

    11   Q.   Correct?

    12   A.   Uh-huh.

    13   Q.   Okay.

    14   A.   That's correct.

    15   Q.   Then we get to Appendix A, which is reinvestment

    16        adjustments summary.  How does the readjustments

    17        summary relate to the first cash flow forecast that

    18        you just discussed?  Is it built into it or is it --

    19        is Appendix A layering on the expenses associated with

    20        reinvestment?  Do you understand my question?
```

```
21   A.   Yes.  It is built into it.

22   Q.   So that the cash flow on pages 4 and 5 incorporate the

23        reinvestment expenses reflected on pages 7 through 9?

24   A.   Yeah, 3, 4, 5 --

25   Q.   Right --

101: 1   A.   -- incorporate 7, 8, 9.

2   Q.   Okay.  What 7, 8, and 9 do is simply reflect on a

3        standalone basis the impact on cash flows of

4        reinvestment and then you take that impact, roll it

5        into the other components of generation of the cash

6        flow, and you get what's on 4, 5, and 6?

7   A.   Yes.
```

**Pg: 101 Ln: 11**

**Designation:**

```
101:11                   MR. MARRIOTT:  I do mean 3, 4, and 5.
```

**Pg: 101 Ln: 14 - Pg: 102 Ln: 6**

**Designation:**

```
101:14   Q.   If you turn back to the first page -- or the second

15        page.  I'm sorry.  Page 2 of Doak 6.  Okay.  We have

16        memo 2 at the bottom, DIP financing related activity.

17        Do you see that?

18   A.   That's correct.

19   Q.   And there are certain assumptions built into this
```

```
20        financing related activity, including interest rate
21        and the amount of the swap settlement.  Do you see
22        that?
23   A.   Yes.
24   Q.   All right.  And the interest rate assumed for this
25        purpose was 5 percent.  Let me just first ask you why
102: 1    5 percent?
  2  A.   The 5 percent was a product of a number of
  3        conversations and we -- coming to the conclusion that
  4        using an indicative rate of 5 percent would be the
  5        least prejudicial interest rate to use in our model in
  6        presenting it to would-be investors.
```

**Pg: 102 Ln: 7 - Pg: 103 Ln: 6**

**Designation:**

```
102: 7   Q.   So if I understand your answer, it's a little bit like
  8          going out with collateral and expecting lenders to
  9          come back saying we don't need it.  You were concerned
 10          about going out with a number that was credible, but
 11          which didn't invite high interest rate proposals on
 12          the way back in; is that what you mean by prejudicial?
 13   A.     No.  I think you're close, but I -- first, I think
 14          it's very different when soliciting lenders and
 15          thinking about terms of collateral and protection
 16          versus terms of interest rate.  So I -- I don't feel
 17          comfortable suggesting that there's, you know, a
```

```
18          strong amount of similarity between the two.

19                  What I indicated, said again but maybe

20          slightly differently, is that placing 5 percent in

21          this model seemed to approximate a good starting point

22          and also the rounded number would indicate to parties

23          both that they may have to flex up or -- they may flex

24          up in what they were asking for or the pricing may be

25          actually lower than 5 percent.

103: 1  Q.  All right.  I guess the word that got me thinking

     2      along the lines I expressed was prejudicial in your

     3      answer.  What did you mean when you say it was a

     4      number that -- and I believe the formulation you said

     5      was something along the lines of least prejudicial?

     6  A.  Least likely to influence the feedback.
```

**Pg: 105 Ln: 16 - Pg: 106 Ln: 12**

**Designation:**

```
105:16  Q.  Mr. Doak, if you would take Doak 5 back and turn to

    17      the page starting Bates stamp 20226 and this, I

    18      gather, is what we were talking about and searching

    19      for earlier, which is the comparison of the actual

    20      commitment letters received, correct?

    21  A.  Yes.

    22  Q.  Were there further negotiations with any of these four

    23      parties after receipt of the commitment letter?

    24  A.  Yes.
```

```
    25   Q.   Which of the four were there further negotiations
106: 1        with?

     2   A.   Barclays, CarVal, Bank America, Merrill Lynch, and

     3        there was a further conversation with Goldman Sachs.

     4        So we remained in -- we had further conversations with

     5        all four parties.

     6   Q.   Okay.  And did any of them, following those

     7        conversations, amend the terms of their commitments?

     8   A.   Yes.

     9   Q.   Okay.  Were those amendments informal or were they --

    10        were they accompanied by a revised commitment letter?

    11   A.   They were accompanied by revised drafts of their

    12        commitment documentation.
```

**Pg: 106 Ln: 21 - Pg: 108 Ln: 2**


**Designation:**

```
106:21   BY MR. MARRIOTT:

    22   Q.   Looking at this chart, starting on Bates 20227 and

    23        starting with Barclays, can you tell me which of the

    24        terms reflected on this exhibit were changed and to

    25        what they were changed?

107: 1   A.   First, to begin to answer the question, it's important

     2        to note that this document was created on the 3rd.

     3   Q.   Okay.

     4   A.   So the first final drafts of the commitment letters

     5        that we received from these parties was before the 3rd
```

```
 6        and this document incorporates negotiations in

 7        progress.

 8    Q.  Okay.  So -- all right.  Were there changes to the

 9        proposed terms after generation of this document?

10    A.  Yes.

11    Q.  Okay.  Can you tell me, starting with Barclays, what

12        the changes were to the proposed terms after

13        generation of this document?

14    A.  What I can do to my -- the best of my ability is tell

15        you the -- my recollection of which terms here

16        changed.

17    Q.  That's perfectly fine.

18    A.  Because all of the terms that are here didn't -- terms

19        that are not here, finer legal points may have

20        continued to be negotiated and changed and the like.

21    Q.  I understand.  But I'm assuming that these terms were

22        listed because those were the ones that at least from

23        an economic basis were considered the most

24        significant.  So why don't you tell me --

25    A.  They're ones that at the time Miller Buckfire felt

108: 1        that it was material to point out to the economic

   2        decision makers.
```

**Pg: 108 Ln: 9 - Pg: 112 Ln: 15**


**Designation:**

```
108: 9    Q.  Yes?
```

```
10   A.   -- which is the 20228, the minimum revenue levels were

11        negotiated.

12                  The --

13   Q.   I am not seeing this.  Hold on.

14   A.   I'm on 20228.

15   Q.   Right.

16   A.   Barclays' column, top row, selected covenants, first

17        bullet, minimum wage and income tax levels to be

18        agreed upon.

19   Q.   And they were ultimately agreed upon, correct?

20   A.   Yes.

21   Q.   And my recollection is it's $30 million a month for

22        each?

23   A.   No.  Every three months.

24   Q.   Every 90 days.

25   A.   It's a rolling covenant.

109: 1   Q.   Okay.

2    A.   We also further negotiated the second bullet point,

3         which is the provision associated with the cessation

4         of control of the City by an emergency manager.

5    Q.   Okay.

6    A.   Or in this case an emergency manger, which may be

7         appropriate for the holiday season, but that period

8         was lengthened and several other potential acceptable

9         governance conditions were added.

10                  Under collateral, the terms were further

11        amended to provide -- provide for a condition where
```

12    the -- let's see -- where the swap termination loan

13    was paid off and the quality of life loan wasn't,

14    although that's extremely unlikely, and in that

15    condition -- nope.  Sorry.  It's the reverse.

16          In a situation where the quality of life

17    loan has been retired and so there is no longer a 4

18    million a month pull on wage earning taxes, then the

19    swap termination loan can go up to 8 a month on income

20    tax.

21    Q.   Okay.

22    A.   On the mandatory prepayments, further terms and

23    details were negotiated in regards to how to think

24    about asset sale proceeds, in regards to how to think

25    about aggregation of sales.  I do not recall any

110: 1  further adjustments from these particular terms, not

2    to suggest that there -- that there weren't.

3    Q.   Okay.  Any changes to the CarVal terms?

4    A.   I do -- I do not recall with sufficient clarity the

5    various changes that were being suggested in regards

6    to the CarVal facility.

7    Q.   Okay.  Bank of America, Merrill Lynch.

8    A.   Given the timing of this particular presentation,

9    there were no -- there were no further revisions to

10   the Bank of America, Merrill Lynch, or Goldman Sachs

11   terms because we had terminated our negotiations or

12   suspended our negotiations with these parties.

13   Q.   Okay.  So it's fair to say that the last two horses in

14       the race were Barclays and CarVal?

15  A.   That's correct.

16  Q.   Okay.  And what were the factors that led to the

17       selection of Barclays over CarVal?

18  A.   There were a number of factors that led to the

19       selection of Barclays over the CarVal group, including

20       pricing, institutional reputation, commitment by a

21       single institution versus a syndicate, and also,

22       acceptable negotiated provisions on other elements of

23       the financing including required opinions, terms of --

24       potential terms of the court order, and other

25       provisions.

111: 1  Q.   Okay.  Just looking at the CarVal column starting on

2       20227, which is the first substantive page, it shows a

3       six-month delay draw on the quality of life loan.  Am

4       I reading that correctly, that the draw on that loan

5       would not be a closing but a six-month post-loan

6       closing?

7  A.   At the option of the City, there was a delay draw

8       option that was a component of the carveout proposal.

9  Q.   And I see that there was an unused fee that was half

10      of regular rates.  So this was a cost saving feature

11      of the CarVal facility?

12  A.   This -- yeah.  This was a -- this was an expense

13      reducing provision of the CarVal facility.

14  Q.   Did the City consider that to be an attractive feature

15      of the CarVal offer?

16    A.    Yes.

17    Q.    One of the other CarVal options is for an exit

18          facility.  Do you see that?

19    A.    Yes.

20    Q.    Would that have been a committed exit facility?  I

21          mean, were the terms in place?

22    A.    Yes.

23    Q.    Okay.  Was there a cost associated with exercising the

24          option?

25    A.    There would have been.

112: 1    Q.    Do you know what it was?

2    A.    I'd have to refer to the CarVal documentation.

3    Q.    Okay.  Do you know the -- the length of the exit

4          facility?

5    A.    I'd have to refer to the documentation.  I could be --

6          it could be a five to seven-year.

7    Q.    Okay.  So just --

8    A.    Sorry.  Yeah.  I mean, the -- we should just look at

9          that document if we want to figure out what the

10          pricing is, but the -- it was similar to the pricing.

11          It was not -- it was not a cheap option.

12    Q.    The pricing for the exit facility was similar to the

13          pricing for the debt?

14    A.    No.  The pricing was -- the pricing provision was

15          complex.

**Pg: 112 Ln: 18 - Pg: 113 Ln: 5**

## Objectors' Designations From
## December 5, 2013 Deposition of James Doak

**Designation:**

```
112:18                    Going back to Doak 2, I asked you a
     19       question about the extent to which consideration was
     20       given to the effect on distributions to creditors
     21       arising from the DIP and its structure and we got onto
     22       a discussion at that point about cash flow impact.
     23       Was consideration given to the effect on distributions
     24       to creditors and the potential terms of a plan of
     25       adjustment by granting a lien on asset proceeds,
113: 1       collateral, in excess of $10 million?
      2   A.   I'd have to say yes, in that the DIP financing, per
      3       the terms herein, the post-petition financing would
      4       have a priority interest in the net proceeds from
      5       asset monetizations.
```

**Pg: 113 Ln: 6 - 9**

**Designation:**

```
113: 6   Q.   Well, was there any concern that putting $350 million
      7       ahead of unsecured creditors on the value of the
      8       City's assets would make those assets a significantly
      9       less attractive feature of any plan of adjustment?
```

**Pg: 114 Ln: 3 - 9**

**Designation:**

# Objectors' Designations From
## December 5, 2013 Deposition of James Doak

```
114: 3                 THE WITNESS:  We were -- at the time, we
       4       were focused on the $280 million swap termination
       5       liability that the City was potentially facing
       6       immediately and the impact that that would have on the
       7       City's overall ability to operate, as well as our
       8       ability to engage in any sort of activities to improve
       9       the operations and revitalization of the City.
```

**Pg: 114 Ln: 25 - Pg: 115 Ln: 3**

**Designation:**

```
114:25  A.    The City has a current Mark-to-Market swap liability
115: 1        of $277 million as of the end of November.  The City
       2        is currently under default on that swap derivative and
       3        we are in bankruptcy court.  The derivatives have
```

**Pg: 115 Ln: 25 - Pg: 116 Ln: 18**

**Designation:**

```
115:25  Q.    Have the swap kind of parties threatened to terminate?
116: 1  A.    I don't know.
       2  Q.    Are you aware that Syncora and FGIC have taken a
       3        position that they cannot terminate without the
       4        consent of Syncora and FGIC?
       5  A.    I am not aware of the -- every detail of the swap
       6        assumption litigation, however, the City's ongoing
       7        concern in regards to this matter has been that no
```

```
 8        matter who's right or wrong or whose cash the court

 9        eventually decides the gaming revenues would be, there

10        is a possibility that in the interim, the revenues

11        would not be available to the City and available to

12        nobody, and in that environment, you'd have the strong

13        probability of a liquidity crisis at the City.  That

14        has been our historic concern.

15   Q.   But I am correct, am I not, that the only collateral

16        claimed by the swap counterparties are the wage tax

17        earning revenues, right?

18   A.   That's correct.
```

**Pg: 117 Ln: 5 - 10**

**Designation:**

```
117: 5   Q.   Mr. Doak, do you recognize what we've marked as

  6        Doak 7?

  7   A.   Yes, I do.

  8   Q.   Okay.  Am I correct that this is the bond purchase

  9        agreement proposed to be executed between the City and

 10        Barclays with respect to the swap termination bond?
```

**Pg: 117 Ln: 19 - Pg: 118 Ln: 3**

**Designation:**

```
117:19                MR. MARRIOTT:  I'm not trying to trick the

 20        witness and they're both stapled together.  They're
```

```
21        both here.  Let's start by separating them.  Split

22        them up.

23               And swap termination is Doak 7, and why

24        don't we mark the bond purchase agreement for the

25        quality of life loan as Doak 8.

118: 1               MARKED BY THE REPORTER:

  2               DEPOSITION EXHIBIT 8

  3               3:04 p.m.
```

**Pg: 118 Ln: 4 - 21**

**Designation:**

```
118: 4    BY MR. MARRIOTT:

  5    Q.   Back on now that we, thanks to Mr. Hamilton, figured

  6         out what we now have.  We now have Doak 7 and Doak 8.

  7         And am I correct that Doak 7 is the proposed bond

  8         purchase agreement for the swap termination bond?

  9    A.   I believe so.

 10    Q.   Okay.  And am I correct that Doak 8 is the proposed

 11         bond purchase agreement for the quality of life bond?

 12    A.   I believe it is.

 13    Q.   Okay.  And I know that we've gone back and forth about

 14         what the total termination amount will be and it will

 15         be something different or may be something different

 16         at -- if the loan closes at closing, correct?

 17    A.   The payment -- yes.

 18    Q.   Okay.
```

```
19   A.   The amount will be calculated at close.

20   Q.   Right.

21   A.   At or around close.
```

**Pg: 119 Ln: 1 - 10**

**Designation:**

```
119: 1   Q.   I'm sorry.  Let me ask that again.  The bond for the

       2        swap termination will be in whatever amount is

       3        necessary to satisfy the then obligation of the City

       4        swap counterparty under the governing agreements,

       5        including the forbearance agreement; is that correct?

       6   A.   I think that's accurate, yes.

       7   Q.   And then the quality of life note will be in an amount

       8        calculated to simply be the difference between the

       9        bond, the swap termination bond and $350 million?

      10   A.   Yes.
```

**Pg: 120 Ln: 3 - 8**

**Designation:**

```
120: 3   Q.   Then I'll simply say, if for whatever reason the City

       4        does not pay to the swap counterparties, the

       5        contemplated termination payment, is the amount that

       6        was otherwise intended for that purpose available to

       7        the City for any other purpose?

       8   A.   I don't believe so.
```

# Objectors' Designations From
## December 5, 2013 Deposition of James Doak

**Pg: 121 Ln: 16 - Pg: 123 Ln: 7**

**Designation:**

```
121:16   Q.   Mr. Doak, sorry to have so much paper in front of you,

    17        but let me ask the question again and you can refer to

    18        whatever you need to to answer.  If, for whatever

    19        reason, the City determines it is not going to make a

    20        payment to the swap counterparties, are the loan

    21        proceeds otherwise intended for that purpose under the

    22        Barclays' credit available to the City for another

    23        purpose?

    24   A.   No.

    25   Q.   How would the amount of the quality of life note be

122: 1        termed in the context of -- well, let me ask the

     2        question differently.  Would the City, as you

     3        understand it, still be able to borrow the amounts

     4        contemplated by the quality of life note?

     5   A.   No.

     6   Q.   So your understanding of the arrangement is borrowing

     7        any of this money is conditioned upon the City making

     8        the payment to the swap counterparties?

     9   A.   Yes.

    10   Q.   Is there a provision in particular that you are

    11        looking at in one of these exhibits that leads you to

    12        that conclusion?

    13   A.   Yes.  The -- the provisions, and there may certainly
```

```
14        be others that could be referenced that I've -- that

15        I've turned to in these exhibits, include in Doak 11,

16        a page that is marked page 142 of 264, conditions

17        precedent, and that provision -- so this is the terms

18        of the swap termination note at the bottom of this

19        paragraph, termination in whole of certain existing

20        swap transactions previously entered into between the

21        various -- between Detroit Police and Fire, et cetera,

22        et cetera.

23              In addition, in Doak 8, I went to page 178

24        of 264 and went to closing -- condition to close

25        provision i, which is evidence of termination and

123: 1    whole of all existing swap transactions, onward and so

2         forth.

3               A similar provision is included in Doak 7.

4         One can find it at page 156 of 264.  Once again, it is

5         a condition to close provision i, evidence in

6         termination in whole of all existing swap

7         transactions.
```

**Pg: 123 Ln: 14 - Pg: 125 Ln: 1**

**Designation:**

```
123:14   Q.   Now, if I -- let me just make a statement and see if

15        you agree with me.  Other than use of proceeds and the

16        specific collateral and ultimately the amount, are the

17        terms of the bond purchase agreements for the swap
```

18      termination note and the quality of life note

19      otherwise substantially identical?

20  A.  For the most part, the documents are very similar.

21      There is a potential for the quality of life note or

22      bond to be a -- a tax exempt issuance.

23  Q.  Okay.  On a sort of a to-be-determined basis?

24  A.  I believe it most likely will be tax exempt.  There

25      are some options and decisions that we will make --

124: 1      have to make subsequently in regards to whether any

2      refinancing of the quality of life will be tax exempt.

3  Q.  Okay.  And in terms of use of proceeds, we know that

4      the swap termination note is intended for making a

5      payment to the swap counterparties.  Am I correct in

6      understanding that the documents provide that the

7      proceeds of the quality of life note can be used by

8      the City for any lawful purpose?

9  A.  I don't believe there is a -- there are any

10      restrictions in regards to the use of proceeds in the

11      bond purchase agreement for the quality of life loan.

12  Q.  Okay.  In terms of the interest rate on both notes, my

13      understanding is that what I'll call base case is

14      LIBOR plus 2.5 percent, with a LIBOR floor of 1,

15      correct?

16  A.  That's the -- that's the pricing, the documentation.

17  Q.  And I believe I'm -- it's also the case that both of

18      those numbers, the LIBOR floor and the spread over

19      LIBOR, are subject to something called market flex,

```
20          correct?

21   A.     That's correct.

22   Q.     And -- and I'm sorry to do this to you.  That

23          agreement regarding market flex is contained in a

24          separate document, which is a fee agreement with

25          Barclays; is that correct?

125: 1  A.  A fee letter, yes.
```

**Pg: 125 Ln: 8 - Pg: 128 Ln: 4**

**Designation:**

```
125: 8  Q.  Mr. Doak, is what's been marked as Doak 12 the fee

9           letter?

10   A.     Yeah.  I have two copies.

11   Q.     Here.  I'll take one.  Okay.  And the market flex

12          provision is section 3 on page 2, right?

13   A.     Yes.

14   Q.     And first, to talk about the parameters of market

15          flex, as I understand the fee letter, the LIBOR floor

16          can flex up to an additional 1 percent to 2 percent

17          and the spread over LIBOR can flex from 2 percent -- 2

18          and 1/2 percent up to an additional to 2 percent to

19          4.5 percent, correct?

20   A.     That's correct.

21   Q.     So that the interest rate on the DIP facility,

22          depending upon as and to the extent the market flex is

23          triggered, and we'll talk about that in a minute,
```

24        could go as high as 6.5 percent, correct?

25  A.   That's correct.

126: 1  Q.   Now, I'm going to give you my understanding of market

2       flex and then you can tell me whether I've got this

3       right.  The purpose of market flex is to provide to,

4       in this instance, Barclays, the ability, if necessary,

5       to sell down on a syndicated basis pieces of this

6       loan.  It gives them the ability to increase the

7       interest rate to make it attractive to buyers in the

8       event that 3 and 1/2 percent is not sufficiently

9       attractive; is that correct?

10  A.   You predicated the whole concept on -- the whole

11      question on the concept of purpose, which I think

12      is -- you may want to rephrase it all because

13      effectively the remain -- the remainder of your point

14      explain -- basically covered the mechanics adequately.

15      Purpose for who?

16  Q.   As I understand the fee letter, Barclays has what's

17      defined to be a successful syndication target,

18      correct?

19  A.   Yes.

20  Q.   And that successful syndication target is that they

21      hold no more than half of the $350 million?

22  A.   That's correct.

23  Q.   Okay.  Market flex, if necessary, to allow them to

24      reach their successful syndication target allows them

25      to reset the interest rate on the loan within the

127: 1        market flex parameters that we just discussed,

2        correct?

3  A.   That's correct.

4  Q.   Now, I want to run a couple hypotheticals by you.  If

5        Barclays discovers that there are no interested takers

6        at less than 5 percent, so that the interest rate on

7        the loan is reset to 5 percent, does the -- that

8        portion of the loan retained by Barclays and not

9        syndicated also reset to 5 percent?

10  A.   Yes.

11  Q.   And the fact that they've received a 1.25 percent

12        commitment fee, they're, nevertheless, entitled to the

13        market flex interest, right?  In other words, the

14        commitment fee was not -- no purpose -- there was no

15        purpose in the commitment fee to covering their

16        interest rate risk so that they would have to stay at

17        3.5 percent?

18  A.   Their commitment fee is based on the terms of the

19        commitment, right.  So they have not -- they have not

20        committed to hell or high water finance half of the

21        deal at 3.5 percent.

22  Q.   Now, the commitment fee is due regardless of whether

23        or not this deal ever closes, right?

24  A.   That's correct.

25  Q.   And you've already paid them half, correct?

128: 1  A.   Yes.

2  Q.   Is that typical for a commitment fee to be fully

3          earned in the debtor-in-possession context prior to

4          the loan being approved?


**Pg: 128 Ln: 9 - Pg: 129 Ln: 20**


**Designation:**

128: 9    Q.    Is it typical with a DIP loan that the commitment fee

10          would be fully earned prior to the court approval of

11          the facility?

12    A.    I don't know about fully earned.

13    Q.    I mean, have you -- have you personally sourced DIP

14          financing in other contexts, obviously not in Chapter

15          9, in which the commitment fee was fully earned prior

16          to obtaining bankruptcy court approval for the loan?

17    A.    I don't know about the concept of fully earned.

18    Q.    Well, by fully earned, I mean payable -- I mean, as I

19          understand the commitment fee provision in the fee, if

20          the bankruptcy court decides that if the City is --

21          decides not to approve the DIP, as I read the fee

22          letter, you still owe them 1.25 percent.

23    A.    That's correct.

24    Q.    Is that -- that's what I mean by fully earned, fully

25          earned regardless of whether or not the court ever

129: 1          approves the transaction.  So my question is is that

2          typical in the context of debtor-in-possession

3          financing, that the commitment fee will be fully

4          earned prior to obtaining court approval?

```
5    A.    In Chapter 11 proceedings, the debtor's ability to pay

6          a commitment fee in my experience is limited by its

7          need to obtain court approval.  As to whether the fee

8          is earned, I -- I don't know exactly how the parties

9          would structure the concept of what would be earned.

10         To the extent something can't be earned until the

11         debtor's signature is on it and the debtor's signature

12         can't be on it until the judge says the debtor's

13         signature could be on it, then I think that that would

14         be correct.

15   Q.    All right.  So --

16   A.    But if --

17   Q.    You would agree with me that in the typical Chapter 11

18         context, a condition to a lender's entitlement to

19         payment of the commitment fee is that the court

20         approves it?
```

**Pg: 130 Ln: 13 - 17**

**Designation:**

```
130:13                   THE WITNESS:  I'm trying to recall what

14         would happen in a scenario where a commitment fee for

15         a debtor-in-possession loan was paid pre-petition, and

16         in that context, I think you could have something

17         earned and paid.
```

**Pg: 131 Ln: 9 - Pg: 133 Ln: 14**

# Objectors' Designations From
# December 5, 2013 Deposition of James Doak

**Designation:**

131: 9    BY MR. MARRIOTT:

   10    Q.    Why does the fee letter not make court approval of the

   11        transaction contemplated with Barclays a condition for

   12        payment of the commitment?

   13    A.    It's a negotiated term of the financing.

   14    Q.    Were there proposals made that did not require the

   15        commitment fee to be paid unless the court approved

   16        the transaction?

   17    A.    You must be -- you have to be more specific.

   18    Q.    Well, I guess, did -- I mean, obviously Barclays

   19        wanted you to agree to pay the commitment fee

   20        regardless of whether the transaction was ever

   21        approved, correct?

   22    A.    Yes.

   23    Q.    Was that true of all of the proposals made?

   24    A.    All of what proposals made?

   25    Q.    Let's start with the four commitments you received.

132: 1    A.    Okay.  Thank you.

   2    Q.    Did all four commitments --

   3    A.    So now we're going to all of the proposals, so --

   4    Q.    Did all four commitments require the fee to be paid in

   5        the absence -- whether or not court approval for the

   6        transaction was obtained?

   7    A.    No.

   8    Q.    Which ones, in addition to Barclays', required the

9       commitment to be paid regardless -- the commitment fee

10      to be paid regardless of court approval?

11  A.    The -- I mean, which of the final four?

12  Q.    Yes.

13  A.    Okay.  Thank you.  The Goldman commitment had a fee

14      and the Bank of America had a fee.

15  Q.    And in addition to having those fees, did they -- did

16      the commitment letters require that they be paid

17      regardless of whether the transaction was ever

18      approved by the court?

19  A.    To the best of my recollection, they did require a

20      payment whether or not the transaction was approved.

21  Q.    Okay.  Let's go back to market flex.  Well, let me ask

22      you this:  Did -- I take it that since three of the

23      four did and the only one you didn't name was CarVal,

24      CarVal did not have a requirement that a fee be paid

25      regardless of whether the transaction was approved by

133: 1      the court?

2  A.    CarVal would have required that the City reimburse it

3      for expenses if the transaction was not approved.

4  Q.    Okay.  But --

5  A.    But they did not have a commitment fee that was

6      required immediately upon signing the commitment.

7      However, they had other fees if the City took other

8      directions and they took their effective commitment

9      fee in the form of OID should their loan have

10     proceeded ahead.

```
11    Q.    Right.  But you don't earn original discount -- issue

12          discount unless you've actually closed the deal,

13          right?

14    A.    That's correct.
```

**Pg: 133 Ln: 15 - 21**

**Designation:**

```
133:15    Q.    All right.  Back to market flex.  So the first

16              question I asked you was -- before we leave the fee,

17              the commitment fee, did the City ask Barclays to take

18              out the requirement that the commitment fee be paid

19              regardless of whether or not the court approved the

20              transaction?

21        A.    I don't recall us asking Barclays that.
```

**Pg: 133 Ln: 22 - Pg: 137 Ln: 1**

**Designation:**

```
133:22    Q.    All right.  Market flex.  We talked about what would

23              happen if Barclays found interest in the -- found

24              others willing to purchase a portion of the facility

25              but only at, for purposes of example, 5 percent, and I

134: 1          asked you whether that would boost Barclays1 return on

2               its retained portion to 5 percent and you said, yes,

3               correct?

4         A.    That's correct.
```

5   Q.   Looking, again, at section 3, it indicates that, I

6        think, in the event that at any price Barclays is

7        unsuccessful in achieving a successful syndication,

8        that the interest rate on the DIP financing will go to

9        6.5 percent.  Am I reading that correctly?  I'm

10       looking at two little i's.  There's an awful lot of

11       little I's in this, but the two little I's at the

12       bottom of the first full paragraph of section 3.

13  A.   I believe that's accurate, yes.

14  Q.   Okay.  Does that not concern you about whether

15       Barclays is properly incentivized to try to sell down

16       the loan when they can hold it for 90 days and the

17       interest rate will jump to 6.5 percent?

18  A.   This form of market flex provision is common and this

19       particular concept with regards to pricing and holding

20       a portion is one that's encountered in all market flex

21       situations.  We will certainly know if we're in that

22       position that it was, true to our understanding, an

23       absolute waste of time to go out with the concept of

24       an uncollateralized facility and we may certainly have

25       that concern more now that everybody was very

135: 1       effective in publishing what the flex provisions are.

2        However, the City is going to have an ongoing

3        relationship with Barclays as a lender, as many

4        issuers do with their lenders, and Barclays has

5        reputational concerns and sort of a pressure upon it

6        reputationally to achieve the best for its clients

```
 7          consistent with all market flex situations, and so we

 8          recognize that there's some -- there's some balance

 9          there.

10    Q.    What does the City plan to do to be sure that Barclays

11          is acting on good faith to achieve a successful

12          syndication?

13    A.    Well, the provisions of the various agreements that

14          the City has prepared with Barclays obligate the City

15          to act in its best interest to cooperate with Barclays

16          as much as possible to facilitate a successful

17          syndication that will most likely involve during that

18          syndication time frame assisting in preparation of

19          marketing documents associated with syndication and

20          perhaps visits to rating agencies.  It is also quite

21          typical in these situations for a syndicator to

22          provide and an issuer to receive iterative feedback on

23          the state of the syndication and the demand that the

24          syndicator is receiving in its order book, and it's

25          quite normal for the issuer to monitor closely and

136: 1      press as much as they can the importance of achieving

 2          the lowest cost and work the syndicator to see if

 3          anything can be done.

 4    Q.    So you say all of that's typical of an issuer.  Is the

 5          City going to do all of that?

 6    A.    It is -- I don't -- we -- I think Miller Buckfire, as

 7          investment banker to the City, will assist the City to

 8          the best of our ability to do all of those things.
```

```
 9   Q.   Do you know -- know is the wrong word.  Do you have a
10        view on the likelihood that Barclays, in this market,
11        will be able to achieve the successful syndication at
12        3.5 percent?
13   A.   Yes, I have a view.
14   Q.   What is the -- what is that view?
15   A.   My view is that -- Barclays' ability to complete a
16        successful syndication is relatively less likely than
17        in the environment where the market flex was not
18        published.
19   Q.   Do you have a view at this point as to what the likely
20        interest rate would be to achieve successful
21        syndication by Barclays?
22   A.   No.
23   Q.   But you think the 3.5 percent is at risk for, among
24        other reasons, because of disclosure of the fee
25        letter?
137: 1   A.   Yes.
```

**Pg: 137 Ln: 2 - Pg: 138 Ln: 3**

**Designation:**

```
137: 2   Q.   Prior to its disclosure generally, was the fee letter
 3        disclosed to City Council?
 4   A.   I don't believe the fee letter was disclosed to City
 5        Council.
 6   Q.   In connection with providing information to the City
```

```
 7        Council to assist it in its deliberation regarding the
 8        DIP financing proposal, was the substance of the
 9        market flex provision shared with them?
10   A.   I don't believe the substance of the market flex
11        provision was shared with them.  The observation or
12        fact that there was market flex was discussed with
13        them.
14   Q.   But the -- the parameters of that market flex was not
15        shared with them; is that correct?
16   A.   That's correct.
17   Q.   Would you agree with me that pricing with respect to a
18        $350 million loan is an important factor in evaluating
19        that loan?
20   A.   Yes.
21   Q.   Would you agree with me that the pricing of a $350
22        million loan is important information with respect to
23        attempting to determine whether there is an
24        alternative available or appropriate in connection
25        with the $350 million loan?
138: 1 A. I think one can determine whether there is an
 2        alternative with the amount of information that was
 3        provided to the council.
```

**Pg: 138 Ln: 25 - Pg: 139 Ln: 20**

**Designation:**

```
138:25  Q.   Well, let me ask you this.  When you laid out, for
```

```
139: 1         purposes of comparison, the various proposals that

     2         were received, one of the line items for that purpose

     3         was interest rate, correct?

     4    A.   That's correct.

     5    Q.   So obviously interest rate is a factor in determining

     6         the attractiveness of a particular loan, correct?

     7    A.   That's correct.

     8    Q.   And on $350 million, the difference between interest

     9         at 3 and 1/2 percent and interest at 6 and 1/2 percent

    10         is a significant amount of money, is it not?

    11    A.   It is -- they're materially -- it's not the same

    12         number.

    13    Q.   And it's materially different, correct?

    14    A.   The amount of -- the amount of interest would be

    15         different, yes.

    16    Q.   Very different, correct?

    17    A.   The amount's different.

    18    Q.   Almost twice as much?

    19    A.   The amount of interest that would be paid on an annual

    20         basis is almost twice as much.
```

**Pg: 141 Ln: 3 - 25**


**Designation:**

```
141: 3    Q.   If you were my investment banker, Mr. Doak, and I came

      4         to you with a $350 million facility and -- which had a

      5         market flex provision but I didn't disclose to you
```

```
 6          what the market flex provision was and I said to you

 7          go out and get me a better deal, how would you be able

 8          to do that if you didn't know what the market flex

 9          provisions were?

10    A.    I think it would be -- wait.  We're the guys who got

11          the deal or we're the guys who got to go get the deal?

12    Q.    You're the guys that have to go out and do better than

13          the deal I just handed you, which is for $350 million

14          with a nominal interest of 3.5 percent but a market

15          flex provision that I don't tell you what it is, and I

16          say go get me a better deal.  How would you be able to

17          do that?

18    A.    Well, I -- frankly, one would -- one would begin a

19          process by -- by soliciting for proposals, you know,

20          at or better or near the stated proposal.

21    Q.    How would that -- how would you possibly know based

22          only on nominal interest rates whether you had found a

23          better deal or not if there was a market flex

24          provision in there that might kick the rate up almost

25          double, but you don't know about it?
```

**Pg: 142 Ln: 2 - 13**


**Designation:**

```
142: 2                  THE WITNESS:  That -- you've -- you changed

      3          the question.  You're asking how we're going to go

      4          beat it and the point of the matter is you have -- we
```

```
5        have sufficient terms to go to the market and look for

6        a proposal that has pricing at or better or around the

7        proposal as it stands.  And then, if we find something

8        that is better, well, then we found something that's

9        better.  If we found something that's at without flex,

10       then we found something that's at without flex.

11              If we found something that is near or

12       something that we feel is approximate to near, then we

13       have to engage in a further dialogue.
```

**Pg: 142 Ln: 15 - 20**

**Designation:**

```
142:15   Q.  You're using a very narrow definition of better here,

16           Mr. Doak.  I'm not asking you whether you would be

17           able to go out and try to find a proposal that was

18           better than the nominal rate.  I'm asking how you

19           would go out and know that you were finding a proposal

20           better than what was likely to be the effective rate.
```

**Pg: 143 Ln: 15 - Pg: 144 Ln: 1**

**Designation:**

```
143:15   BY MR. MARRIOTT:

16       Q.  How would you know -- so you're presented a proposal

17           for $350 million with a nominal rate of 3 and 1/2

18           percent and a market flex the terms of which you don't
```

```
19        know.  So you don't know what the actual rate of
20        interest on the loan will be.  Under those
21        circumstances, how would you know whether you had
22        found something better?
23    A.  Well, you would need to source something proximate and
24        then bring it to the parties that do know and engage
25        in a dialogue as to whether the competing proposal was
144: 1    competitive.
```

**Pg: 145 Ln: 11 - 22**

**Designation:**

```
145:11    Q.  No.  I'm asking you for you to know, you to know
12        whether the proposal you have found is better than the
13        proposal you were handed, for you to know that or for
14        anyone to know it, that anyone, be it you or someone
15        else, would have to know what the market flex
16        provisions are, correct?
17    A.  Well, someone has to know them.  It doesn't have to be
18        me.  It can be -- it could be -- it could be a judge.
19        It could be another decision maker.  It could be -- it
20        could be any -- you know, it doesn't necessarily have
21        to be me, a party in interest, or me, the party in
22        interest's banker.
```

**Pg: 145 Ln: 25 - Pg: 146 Ln: 10**

# Objectors' Designations From
# December 5, 2013 Deposition of James Doak

**Designation:**

145:25   Q.   Let's take a look at Doak 7, page 152 of 264.  I'm

146: 1        looking at 6(h), which is -- and section 6 is

       2      representations of the City.  Do you see where I am?

       3   A.   Yes.

       4   Q.   It says all legislation necessary to fulfill the terms

       5        and conditions of and carry out the transactions

       6        contemplated by this bond purchase agreement and the

       7        ST bond documents is in full force and effect.  Do you

       8        see that?

       9   A.   Yes.

       10  Q.   Can the City make that representation as of today?

**Pg: 146 Ln: 14**

**Designation:**

146:14                    THE WITNESS:  I don't know.

**Pg: 146 Ln: 16 - Pg: 148 Ln: 14**

**Designation:**

146:16   Q.   Do you have an understanding of what governmental

       17       action, either by ordinance, regulation, or

       18       legislation is necessary for the City to perform its

       19       obligations and grant its collateral under the DIP

       20       facility?

       21  A.   Yes.

22    Q.    Okay.  What's necessary for that to happen?

23    A.    There are a six-page closing checklist full of things

24          that need to occur for the closing of the financing.

25          Two particular ones that I believe need to happen are,

147: 1      one, relevant ordinances need to be put into effect in

2           regards to how the related revenue streams are

3           channelled into the appropriate bank accounts, and

4           another very important thing that needs to occur

5           before closing is an emergency loan board order

6           authorizing the financing.

7     Q.    Do you know the status of the deliberations of the

8           emergency loan board?

9     A.    I know the financing is -- has been put before the

10          emergency loan board.  I am not aware of the state of

11          deliberations.

12    Q.    Are you aware of a deadline by which they're required

13          to act?

14    A.    I believe they do have a deadline.  I think it may be

15          60 days from when they're presented with the package.

16    Q.    Okay.  And I believe that was November 6th?

17    A.    Yes.

18    Q.    Okay.  The relevant ordinances vectoring the revenue

19          streams into particular accounts, are these ordinances

20          that require action by the City Council or is this

21          something the emergency manager is empowered to do on

22          his own?

23    A.    My understanding is that that is an ordinance that the

```
 24        emergency manager is empowered to do.

 25    Q.  Are there any -- is Barclays' requesting any

148: 1     ordinances or legislation with respect to the grant of

  2        a lien on the wage earning revenues?

  3    A.  I -- I don't recall whether they are requiring any

  4        additional ordinances.  At this point, no one is

  5        requesting any additional legislation as in state

  6        legislation.

  7    Q.  Is the same -- is your answer the same with respect to

  8        the proposed lien on the income tax?

  9    A.  Yes.

 10    Q.  So as far as you know, other than ordinances, the

 11        ordinances regarding revenue streams and the order

 12        from the emergency loan board, no other governmental

 13        action is required in order for the City to consummate

 14        the transactions contemplated by the DIP financing?
```

**Pg: 148 Ln: 18 - 19**

**Designation:**

```
148:18             THE WITNESS:  I believe that statement's

 19        accurate.
```

**Pg: 148 Ln: 25 - Pg: 150 Ln: 18**

**Designation:**

```
148:25  Q.  Okay.  Speaking of the bank account, as I understand
```

149: 1       it, an account will be established for the wage

     2       earning tax revenues and an account will be

     3       established for the income tax revenues into which

     4       those funds will be deposited, correct?

     5  A.   Generally correct.  I believe we may use a preexisting

     6       but currently unutilized account for the gaming tax

     7       revenues.

     8  Q.   Okay.  But there will be dedicated segregated accounts

     9       for each revenue stream?

   10  A.   Yes.  There will be the necessary cash flow provisions

   11       and accounts as required under the loan documents.

   12  Q.   Okay.  And my understanding is, from the loan

   13       documents, that Barclays is -- has asked for control

   14       agreements over -- with respect to both those

   15       accounts; is that correct?

   16  A.   I don't know.  I -- it would not surprise me.

   17  Q.   Okay.  And do you know why they would be asking for

   18       control of that?

   19  A.   Presumably to allow them to pursue their remedies as

   20       provided by the documentation of the financing should

   21       it ever come to that.

   22  Q.   Do the swap counterparties have control agreements in

   23       respect to the accounts in which the wage earning

   24       revenues are currently being deposited?

   25  A.   I don't know.

150: 1  Q.   Now, my understanding is that these loans mature,

     2       among other -- among other reasons, they mature upon

```
 3        effective date of any plan of adjustment; is that

 4        correct?

 5   A.   Yes.

 6   Q.   How do you -- how does the City plan on refinancing

 7        the DIP financing at that time?

 8   A.   The City has not yet made a determination as to how it

 9        will refinance or retire the post-petition facility.

10   Q.   It has an agreement with Barclays, though, doesn't it,

11        regarding sourcing to exit financing?

12   A.   Yes, it does.

13   Q.   And it will owe Barclays a fee if it determines to

14        refinance the DIP financing at exit, other than via

15        Barclays; is that correct?

16   A.   I believe that's an accurate interpretation of a --

17        the engagement letter.

18   Q.   Okay.
```

**Pg: 150 Ln: 22 - Pg: 152 Ln: 6**

**Designation:**

```
150:22    BY MR. MARRIOTT:

   23   Q.   Okay.  Mr. Doak, what's been marked as Doak 13 is the

   24        Barclays' engagement letter for exit financing.

   25   A.   Was there a question?

151: 1   Q.   I just asked am I correct that this exhibit is the

    2        agreement between the City and Barclays for exit

    3        financing.
```

4  A.  I believe it is.

5  Q.  Okay.  And so you don't have to guess, if you would

6     confirm that a fee is owed to Barclays under this

7     agreement if the City pursues an exit financing

8     strategy that does not include Barclays.  If it's any

9     help, look at page 6, subsection 6(c).

10  A.  Yes, but I think you -- why don't you rephrase the

11     question.

12  Q.  Do I correctly interpret 6(c) to entitle Barclays to a

13     fee in the event that the City pursues Ernst & Young

14     on a basis outside of this agreement with Barclays?

15  A.  No.  You have to -- you're using the wrong word.

16  Q.  Help me out.

17  A.  You're using pursuing when you should be using

18     closing.

19  Q.  But with the substitute of closing for pursuing, am I

20     accurately understanding what this provision says?

21  A.  If the City closes on an alternative financing, then,

22     at that time, Barclays would be owed a fee equal to

23     3/4 of a percent of the aggregate outstanding amount

24     of its facility immediately prior to the exit time,

25     which will be made and paid from the proceeds of the

152: 1     alternative financing.  So the alternative financing

2     has to close and fund.

3  Q.  And there is no principal amortization of the DIP

4     facility with Barclays, is there?

5  A.  There is no scheduled amortization of the Barclays'

        6           facility in advance of maturity.


**Pg: 152 Ln: 7 - Pg: 154 Ln: 8**


**Designation:**

152: 7    Q.    Okay.  Now, you indicated in answer to my earlier

      8           question that the City does not know what it wants to

      9           do regarding alternative -- or exit financing or

     10           refinancing of the DIP facility.  Why would the City

     11           commit itself to Barclays in this fashion?  What was

     12           the thinking?

     13    A.    The -- among other reasons, the City felt that the

     14           opportunity to continue its relationship with Barclays

     15           beyond the lender/borrower relationship and focus on

     16           whatever was next in addition to or having the

     17           Barclays at hand to discuss concepts such as the DWSD

     18           transaction made incorporating this letter into the

     19           overall decision at the moment a prudent one.

     20    Q.    Did Barclays make the City's entry into this

     21           engagement letter for exit financing a condition of

     22           committing to the DIP facility?

     23    A.    It was part of their overall proposal.

     24    Q.    Does that mean it was a condition?

     25    A.    I do not believe they would have an executed a

153: 1           commitment letter unless we were in a position to

      2           execute the engagement letter.

      3    Q.    The City Council declined to approve the proposed DIP

```
 4        financing, correct?

 5   A.   That's correct.

 6   Q.   Give your understanding of the reason behind their

 7        refusal to approve it.

 8   A.   The council published a resolution with regards to

 9        their decision to not approve the financing, which

10        would be the -- the best summarization, I guess, we

11        could refer to.  Absent that, we would be speculating

12        as to their mindset.

13   Q.   Other than that resolution, did the City -- City

14        Council have any discussions with the emergency

15        manager or any of his professionals regarding their

16        reasons?

17   A.   I don't know.

18   Q.   Okay.  No discussions were had with you; is that

19        correct?  Nobody from City Council picked up the phone

20        and called you?

21   A.   Yeah, no one from City Council picked up the phone and

22        called me.

23   Q.   And I just want to go back and briefly cover what

24        communication was had with City Council leading up to

25        the DIP facility.  And as I understand it, there were

154: 1    two packages delivered to them, the one -- the October

 2        7th, and the other, the October 17th, correct?  Those

 3        are Doak --

 4   A.   There were two materials prepared by Miller Buckfire.

 5   Q.   Right.  That's my question.  Were any others prepared
```

```
  6        by Miller Buckfire?

  7   A.   No.

  8   Q.   Are you aware of any?
```

**Pg: 154 Ln: 12**

**Designation:**

```
154:12                   THE WITNESS:  Yes.
```

**Pg: 154 Ln: 13 - 22**

**Designation:**

```
154:13   BY MR. MARRIOTT:

   14   Q.   Okay.  What?

   15   A.   Well, there was a package that was formally delivered

   16        by the emergency manager's office to the City Council

   17        saying here's the financing that we -- you know, that

   18        we approved.  Please begin your deliberation process

   19        under 436.

   20   Q.   Okay.  You indicated that you had met with all six

   21        individual City Council members to discuss the loan or

   22        the potential loan with them, correct?
```

**Pg: 155 Ln: 2 - Pg: 156 Ln: 5**

**Designation:**

```
155: 2                   THE WITNESS:  There were two Miller
```

 3        Buckfire presentations.  There was the package that

 4        was delivered to council to have them begin their

 5        deliberation process, and council and council's

 6        staff --

 7  BY MR. MARRIOTT:

 8  Q.   If I could just ask you, when you say there was a

 9        package delivered to them to begin the deliberation

10        process, was that Doak 3 or Doak 4 you're referring

11        to?

12  A.   That's Doak none of the above.  That's the official

13        package.

14  Q.   Oh, this is the one from the emergency manager?

15  A.   Right, yes.

16  Q.   Okay.

17  A.   And there was also a -- an electronic document that

18        was provided by Jones Day to council where some of the

19        elements of that document were pro -- were -- Miller

20        Buckfire contributed to elements of that document.

21  Q.   There was a document provided by Jones Day to City

22        Council, which included input by Miller Buckfire?

23  A.   That's correct.

24  Q.   This is separate from the emergency manager's package;

25        is that right?

156: 1  A.   That's correct.

 2  Q.   Okay.  Do you know about when that package was

 3        provided to City Council?

 4  A.   That document would have gone to City Council on

          5        October 20th or 21st.


**Pg: 156 Ln: 11 - Pg: 157 Ln: 22**


**Designation:**

156:11    BY MR. MARRIOTT:

    12    Q.    If you could look at Doak 4 for a moment.  My

    13          understanding is that this document was provided to

    14          City Council before the City had selected Barclays as

    15          the provider of DIP financing, correct?

    16    A.    Don't mean to be cagey, but you've got to be very

    17          specific about -- I think by the time we were going --

    18          by the time I was going individually --

    19    Q.    Yes?

    20    A.    -- to members of City Council, we pretty much knew who

    21          we were going to choose, okay, and we were going

    22          through the process.

    23                As you can see from the dates, you've got a

    24          date of the 6th and a date of the 7th, but we still

    25          had to go through the process of -- of covering off

157: 1          with various sort of decision makers to make the

     2          commitment letter effective, which included the

     3          payment of the commitment fee.

     4    Q.    Okay.  But Doak 4 is the package that was used by you

     5          in connection with your individual meetings with

     6          members of the City Council?

     7    A.    Yes.

8   Q.   Okay.  And did any of them react to the terms of the

9        proposed financing in those one-on-one meetings with

10       you?

11  A.   Yes.

12  Q.   Can you characterize those reactions?

13  A.   There are six individual members of the City Council

14       and they -- they're all, to the best of my

15       understanding or to the best of my understanding at

16       the time, they were all very hospitable and

17       deliberative and genteel in regards to listening to

18       the materials that we presented.  They all -- each has

19       their own particular mindset in regards to everything

20       from the emergency manager and the bankruptcy to the

21       ethical and moral character of about everybody in this

22       room except for Jerry.

**Pg: 158 Ln: 2 - 17**

**Designation:**

158: 2   BY MR. MARRIOTT:

3    Q.   Let me ask you this question.  When City Council

4         ultimately rejected the Barclays' DIP financing

5         proposal, were you surprised?

6    A.   I was -- I was disappointed but not surprised because

7         I knew that that would be a very real possibility

8         given the overall environment.

9    Q.   And was that expectation reinforced by your meetings

```
10        with the individual City Council members?

11   A.   What expectation?

12   Q.   You indicated that you were disappointed but I think

13        not surprised by the actions City Council took.  I

14        guess what I'm asking you is whether your lack of

15        surprise resulted from the meetings you had with them

16        or whether you suspected even before those meetings

17        that the City Council would not approve a loan.
```

**Pg: 158 Ln: 20 - Pg: 161 Ln: 18**

**Designation:**

```
158:20              THE WITNESS:  There's a lot of embedded

21        questions in there.  I mean, the meeting -- as I said,

22        meetings were very hospitable.  In my opinion, people

23        listened and understood the underlying logic.  There's

24        a -- a fair amount of -- of concern at the council

25        level and at the individual council member's level in

159: 1    regards to this transaction and as well as the

2         precedent transactions that beget this one, and many

3         of their concerns were, I think, accurately reflected

4         in the elements of the ordinance that they passed.

5    BY MR. MARRIOTT:

6    Q.   You mean the resolution that they passed?

7    A.   Sorry.  The resolution that they passed, yes.

8    Q.   Doak 3, the October 17th submission, my understanding

9         is this -- these briefing materials were prepared for
```

10       the meeting at which the City Council decided on its

11       position with respect to the Barclays' financing; is

12       that right?

13  A.   No.  These materials were prepared for a briefing of

14       City Council in closed session in regards to the

15       financing.

16  Q.   Okay.

17  A.   I don't know if they wanted to make the decision at

18       that point.  I don't know if they made the decision at

19       that point.  We were not present for the entire

20       session, and that's all I know.

21  Q.   Okay.  So you made a presentation in this closed

22       session, then you exited and the next thing you knew,

23       when the ordinance -- or when the resolution was

24       passed?

25  A.   Well, their -- Jones Day provided, as I said, a

160: 1       follow-up piece of material.

2  Q.   So the Jones Day material was after Doak 3?

3  A.   That's right.

4  Q.   Did you have any contact with City Council or its

5       members after the October 17th closed session?

6  A.   Yes.

7  Q.   Okay.  And what was the nature of that content?

8  A.   I presume you mean with regards to deliberation on the

9       financing --

10  Q.   I do.

11  A.   -- because I still see them.

12  Q.  I do, with respect to the DIP financing.

13  A.  Yeah.  With regards to the DIP financing, I had a

14      conversation with Erv Corley, who is a financial

15      analyst or has, you know, financial analytical

16      responsibilities as part of the staff of council.

17  Q.  How long after the October 17th closed session did you

18      have that conversation?

19  A.  That conversation was on the 25th.

20  Q.  And what was the substance of that conversation?

21  A.  That conversation was in regards to a -- a document

22      that was provided to council by Syncora and Syncora's

23      investment banker.

24  Q.  Was -- I'm sorry.  Erv Crowley did you say?

25  A.  Corley.

161: 1  Q.  Corley?

2  A.  C-o-r-l-e-y.

3  Q.  Was he describing to you the substance of what had

4      been submitted to City Council by Syncora or merely

5      telling you that they provided something?

6  A.  I -- the document had already been forwarded to me via

7      Erv and perhaps via Sonya Maze, senior advisor to the

8      senior manager.

9  Q.  And did Mr. Corley ask you to take any action with

10     respect to the Syncora materials?

11  A.  No.

12  Q.  After that conversation with respect to the DIP

13      financing, did you have discussions with City Council

14          or any of its members or any of its advisors prior to

15          the resolution rejecting the Barclays' financing?

16    A.    No.

17    Q.    So that was the last one?

18    A.    Yes.


**Pg: 162 Ln: 12 - Pg: 166 Ln: 12**


**Designation:**

162:12  Q.    Mr. Doak, good afternoon.

13    A.    Good afternoon.

14    Q.    My name is Steve Hackney.  I represent Syncora in the

15          City of Detroit's bankruptcy case.  Could you take a

16          look at Doak Exhibit 5 for me, at the second page of

17          that exhibit?  Do you have that in front of you, sir?

18    A.    Yes, I do.

19    Q.    Before I ask you questions about this exhibit, let me

20          ask you a preparatory question, which is do you

21          understand that it's common in the course of retaining

22          a financing proposal that the prospective lenders want

23          to do what's called due diligence with respect to the

24          borrower?

25    A.    Yes.

163: 1  Q.    And the process of due diligence involves the process

2          of obtaining information about the borrower, correct?

3    A.    That's correct.

4    Q.    And in connection with the post-petition financing,

5       the prospective lenders also were given access to due

6       diligence materials; isn't that correct?

7  A.   That is correct.

8  Q.   I'm going to ask you some questions that are aimed at

9       understanding what due diligence materials they were

10      given access to.  Do you see on the second page of

11      Exhibit 5 that in the table there, there is a column

12      that says data room at the top of the column and some

13      of the prospective lenders have checkmarks next to

14      their name and some don't and some have not

15      applicable?

16  A.   Yes.

17  Q.   Is that data room the same data room that has been

18      made available to the creditors in this case?

19  A.   Yes.

20  Q.   Do you know whether additional due diligence

21      information was given to prospective lenders above and

22      beyond the data room that's been made available to the

23      creditors?

24  A.   There is -- there is not a second data room or a

25      portion of the data room that is accessed only by the

164: 1     prospective lenders.

2  Q.   Okay.  That's a fair answer to the question.  I guess

3      I want to close you out, though, and say was there any

4      additional information that was provided to

5      prospective lenders that -- as part of due diligence,

6      that has not been provided to the creditors in these

```
 7        cases?

 8   A.   Yes.

 9   Q.   What type of information was that?

10   A.   We had -- we had, you know, ongoing dialogues with

11        regards to the structure and strategy of the

12        post-petition financing itself that we wouldn't

13        necessarily have or necessarily replicate with the --

14        with the creditors.

15   Q.   And when you say ongoing dialogue with respect to the

16        post-petition financing itself, do you mean analytical

17        relating to the post-petition financing or are you

18        referring to the negotiations of the terms of the post

19        petition?

20   A.   Well, more the negotiations of the terms and how we

21        came up with the overall structure.  I mean, they

22        were -- they were -- they were asking questions about,

23        you know, how the -- what they could get in the

24        financing and what they couldn't get in the financing

25        and how we would feel about certain provisions of the

165: 1        financing.

 2   Q.   Okay.

 3   A.   I think if we -- I think -- I think, to some extent,

 4        some of those topics, you know, there's no intent to

 5        not have those discussions with the creditors.  It's

 6        just these were lenders asking questions about

 7        extending credit, so they had all sorts of ranges of

 8        questions.
```

9   Q.   I think I understand that question [sic].  So, for

10       example, are you saying that it's possible

11       Mr. Buckfire may have said something to a prospective

12       lender that constituted information about the borrower

13       that that specific statement by Mr. Buckfire may not

14       have been made available to creditors; is that an

15       example of what we're talking about?

16   A.   That would be an example.  However, it would be

17       unlikely that Mr. Buckfire would have been in that

18       position.

19   Q.   Let me try to cut to what I'm trying to ask about,

20       which is I'm trying to ask about what I think any

21       industry professional would consider to be due

22       diligence materials, and I'd like to focus my question

23       on written materials.  So were additional written due

24       diligence materials provided to prospective lenders

25       that have not been provided to the creditors in these

166: 1   cases?

2   A.   No.  No.  To the extent we were going to provide

3       anything to a -- a potential provider of financing, it

4       was pretty clear that we were going to end up putting

5       in into the data room so all the creditors could see

6       it at the same time, amongst other reasons, because so

7       many of the creditors were thinking about the

8       financing, right?  And then we were able to answer

9       most of the questions, if not all the questions,

10       that potential financing providers had based on the,

```
11          you know, copious and ever growing amount of materials

12          that are in the data room that the creditors have.
```

**Pg: 166 Ln: 14 - Pg: 167 Ln: 2**

**Designation:**

```
166:14              Do you remember that you testified earlier

   15          that Mr. Marken, Sanjay Marken did certain cash flow

   16          modeling that was at least preliminary independent of

   17          the cash flow modeling that was done by Ernst & Young;

   18          do you remember that subject matter of your testimony?

   19   A.    Yes.

   20   Q.    Do you know if his cash flow modeling has been

   21          produced as part of the DIP objection process?

   22   A.    I don't know.

   23              MR. HACKNEY:  Okay.  And that's something I

   24          would say I think is fairly within what we expected

   25          would be produced.  Whether you agree with that or

167: 1          not, please consider this a request for that

    2          production.
```

**Pg: 168 Ln: 3 - Pg: 170 Ln: 4**

**Designation:**

```
168: 3   Q.    You and Mr. Marriott had a colloquy about the impact

    4          of the DIP loan on creditor recoveries.  Do you recall

    5          that line of questioning?
```

6   A.   Yes.

7   Q.   At one point in that line of questioning, you said

8        something to the effect of -- and I may not get this

9        verbatim, so listen to the spirit of the words and see

10       if it refreshes your recollection about your

11       testimony.  You said something like I haven't seen a

12       side-by-side comparison.  Do you remember that

13       testimony?

14  A.   I think so.

15  Q.   I think, if I recall, he was asking you about the

16       impact on creditor recoveries with the DIP loan versus

17       creditor recoveries without the DIP loan, and we had a

18       relatively lengthy colloquy on that, but at the

19       beginning, I thought you said that you had not seen a

20       side-by-side comparison?

21  A.   Right.

22  Q.   What did you mean by that?

23  A.   We don't -- the City does not have a set of

24       projections that contemplates not spending the -- on

25       the operational revitalization initiatives, and one of

169: 1   the outputs of those -- of that -- of the current

2        provision, as well as any other projection, would

3        be -- would be that line of, okay, what are the

4        residual cash flows in this particular proposal.  And

5        so my comment was one -- was lengthy to the effect

6        that we have a substantially worse-off City, right,

7        with more risk of further decline, and as a result,

```
 8          less available value for creditor recovery as far as

 9          the organic cash flows of the City, but, you know,

10          that countercase of a show-me status quo continued

11          municipal service insolvency for another, you know, X

12          period, what does that do.  You know, we haven't -- I

13          haven't seen that case run.

14     Q.   And to your knowledge, it has not been run by any of

15          the professionals to the City, correct?

16     A.   That's correct.

17     Q.   I think this follows from what you said, but I want to

18          confirm it, which is the -- the ten-year forecasts

19          that have been run, for example, ten-year forecasts

20          that were included in the proposal for creditors are

21          ones that assumed the reinvestment and restructuring

22          initiatives would be undertaken and have their

23          attendant positive effect on the City, correct?

24     A.   That's correct.

25     Q.   What has not been run is a ten-year forecast that does

170: 1       not assume the restructuring and reinvestment

 2          initiatives in order to see what that world looks like

 3          to your knowledge?

 4     A.   To my knowledge.
```

**Pg: 170 Ln: 9 - Pg: 171 Ln: 20**

**Designation:**

```
170: 9                     In the -- I will find it if you like, but I
```

10      saw a note in the comparison chart that was comparing

11      the different proposals, that Barclays was also

12      amenable to doing a swap replacement. Let me know if

13      you'd like to check that. I could be wrong. Take a

14      look at Doak Exhibit 5 at Bates stamp 2221.

15  A.    Yep. Yes.

16  Q.    It's in the middle, down at the bottom.

17  A.    Uh-huh.

18  Q.    Do you see that?

19  A.    Yes.

20  Q.    So, Mr. Doak, my first question is did they propose

21      this additional replacement swap transaction during

22      this time frame of sourcing the debt? Not did they

23      propose a transaction. Did they propose the idea that

24      that could be an alternative during this process?

25  A.    Yes. That was part of their -- their submission on

171: 1      September 16th.

2  Q.    So it was here's the $350 million post-petition

3      financing and an alternative idea was a swap

4      replacement plus a smaller note or what did it look

5      like?

6  A.    I think I'd have to -- I'd have to go to it to see

7      exactly what -- you know, how they phrased it.

8  Q.    Okay. That's fine. Do you remember off the top of

9      your head -- obviously, the swap replacement addresses

10      issues that relate to the swap. It may not relate --

11      it doesn't address the other issues that are part of

```
12          the financing related to the quality of life note.  Do

13          you remember off the top of your head whether they

14          proposed to do the quality of life no matter what and

15          the swap termination note and the swap replacement

16          were interchangeable to each other?

17     A.   I -- I -- I don't recall a -- I don't recall.  I

18          believe they were prepared to structure a replacement

19          swap and then additional, you know, proceeds from a

20          loan if required.
```

**Pg: 172 Ln: 5 - 24**

**Designation:**

```
172: 5  Q.   Let me ask a similar way.  Did you ever learn that

     6        Barclays had previously, back in history before the

     7        cases were filed, proposed a replacement swap to the

     8        City of Detroit?

     9  A.   Yes.  They had presented transaction concepts to the

    10        City prefiling where the -- a replacement swap was one

    11        component of a series of transactions.

    12  Q.   Do you remember the proximity of that presentation to

    13        the filing date?

    14  A.   Now, here, the -- I've seen -- I've seen a -- I've

    15        seen presentations that they developed, but I don't

    16        have full knowledge of who they presented them to and

    17        when they presented them exactly.  I know that they

    18        presented materials to the treasurer of the state and
```

```
19        I know they've presented materials to, you know,

20        certain Jones Day attorneys.

21   Q.   And I agree.  It's -- since you weren't there, you

22        can't personally know when it actually happened.  Can

23        you tell me your understanding of when it happened?

24   A.   Late 2012 and early 2013.
```

**Pg: 173 Ln: 14 - 24**

**Designation:**

```
173:14   Q.   Okay.  Irrespective of who the idea was proposed to,

15        I'm talking about a proposal relating to the swaps in

16        this case being replaced.  And by a proposal, I mean

17        something that had enough numbers in it that you could

18        actually theoretically compare it to the existing swap

19        and decide whether it was something that you wanted to

20        advance, because we know that it didn't, obviously

21        akin to the Barclays' proposal we were just

22        discussing.

23   A.   I've seen -- I'm not aware of any other institution

24        that produced materials like what I saw from Barclays.
```

**Pg: 174 Ln: 17 - Pg: 175 Ln: 22**

**Designation:**

```
174:17   Q.   Which is, to the extent your testimony is

18        characterized by lawyers or judges as opinion
```

```
19        testimony, can I find your opinions in your

20        declaration?

21   A.   You can -- yeah, I think.  I mean, I may be asked --

22        other people may ask me other things, right?

23   Q.   Well --

24   A.   But these guys probably can't, right?  But you guys

25        can, right?

175: 1   Q.   And I want to follow up a little bit.  Isn't it true

2         that Miller Buckfire has not been tasked with

3         undertaking the operational restructuring of the City?

4    A.   That is true.  We have not been tasked with that task.

5    Q.   And you haven't, correct?  You haven't endeavored to

6         restructure the operations of the City, correct?

7    A.   We -- we're providing general restructuring advice to

8         the City, but that -- and some of that advice relates

9         to aspects of the operation but we are not operational

10        restructuring experts.  That's not our profession.

11   Q.   You're not telling the City how it should restructure

12        its operations when you advise them, correct?  That's

13        what Conway McKenzie is doing.

14   A.   That's correct.

15   Q.   Okay.

16   A.   We may inform the City in regards to how particular

17        creditors perceive the -- the issues surrounding

18        operational restructuring and assist in communications

19        with them, because that's our area of expertise, but

20        insofar as providing, you know, primary operational
```

```
21        restructuring advice and execution, that's not our

22        mandate.
```

**Pg: 177 Ln: 8 - Pg: 178 Ln: 10**

**Designation:**

```
177: 8   Q.   You know, what I'm getting at is there's a distinction

      9        working on the Detroit case and being aware of the

     10        problems of Detroit and the fact that there are

     11        challenges, and so on and so forth, and the idea about

     12        how you might fix them.  There's also the idea of

     13        being the person who has been tasked with

     14        understanding those problems and specifically coming

     15        up with remedies for those problems in order to fix

     16        them, and I'm trying to confirm that your job duties

     17        have not involved what I just described because that's

     18        Conway McKenzie's job.

     19   A.   I understand what you're saying.  I would -- I would

     20        only suggest that, you know, sometimes in their

     21        responsibilities, investment bankers are tasked with,

     22        required to, and capable of making statements and

     23        judgments in regards to companies' business plans,

     24        while they're not the individuals that are necessarily

     25        the ones that are executing the business plans or have

178: 1        executed -- or are designing the operational

      2        initiatives on the ground.

      3   Q.   And have you done that here?
```

```
 4    A.    Not at -- well, I think your question is in regards to

 5          what am I about to testify to.

 6    Q.    No, I'm asking about what you have done.  Have you

 7          checked the work of Conway McKenzie to determine

 8          whether you independently agree with it?

 9    A.    We -- we are not engaged in that -- I have not engaged

10          in that activity.
```

**Pg: 178 Ln: 12 - Pg: 179 Ln: 11**

**Designation:**

```
178:12                    Can I ask you to take a look at Doak

   13          Exhibit 6.  Mr. Doak -- sorry.  We'll come back to

   14          that in a second just given the time.

   15    A.    Okay.

   16    Q.    You were asked a number of questions with respect to

   17          information that was submitted to the City Council by

   18          Mr. Marriott.  Do you recall that testimony?

   19    A.    Yes.

   20    Q.    Do you agree that the City -- you are aware that the

   21          City sought to keep the Barclays' fee level

   22          confidential and under seal; isn't that correct?

   23    A.    Yes.

   24    Q.    And the reason the City sought to do that was because

   25          the -- was because Barclays wanted it to, correct?

179: 1    A.    That's one of the reasons.

    2    Q.    Okay.  In addition, it's your understanding that the
```

```
3        reason Barclays wanted its fee level kept confidential

4        was because it contains commercially sensitive

5        information, correct?

6   A.   That's the argument that I heard them make.

7   Q.   Right.  And the commercially sensitive information

8        that's in the fee letter as you understand it relates

9        both to the amount of the market flex and also the

10       amount of fees that are contained in the fee letter,

11       correct?
```

**Pg: 179 Ln: 17 - Pg: 181 Ln: 11**

**Designation:**

```
179:17              THE WITNESS:  It is my understanding that

18       what they thought is what they argued and they argued

19       that both the commitment fee amount and also the

20       particulars of the market flex terminology and other

21       language were commercially sensitive.

22   BY MR. HACKNEY:

23   Q.   And as an investment banker who's an experienced

24        individual in the field, do you agree with the view

25        Barclays expressed that those two types of information

180: 1   are, in fact, commercially sensitive?

2    A.   I believe they can be, yes.

3    Q.   And did you believe that they were in this case?

4    A.   I believe that it would be helpful to the overall

5         pricing for the City if the document remained under
```

```
 6        seal and the commitment fee and the market flex

 7        provisions were not filed publicly.  There was already

 8        some chatter about the commitment fee size, and in the

 9        end of the day, it probably would have been

10        challenging, considering the various reporting

11        requirements under the emergency manager law to cloak

12        the actual commitment fee payments.

13              So it would have been helpful.  But of the

14        two terms, I viewed the market flex as more

15        commercially sensitive.  I viewed the sealing

16        generally of the fee letter as being also commercially

17        sensitive, because sometimes what's as important as,

18        like, what is in the market flex is what's not there,

19        right, when a syndicator is stepping up to the market

20        and trying to do whatever it's trying to do.

21   Q.   Do you agree that two of the most important aspects of

22        any potential financing are the fees that are involved

23        and the interest rate?

24   A.   Those are -- those are two very important aspects of

25        evaluating the economics of the financing.

181: 1   Q.   And I don't know.  Just to streamline it, do you

 2        recall there was some testimony at the motion to seal

 3        hearing about how different lenders have different

 4        strategies and may put more into the interest rate

 5        versus more into the fee?

 6   A.   Sure.

 7   Q.   And so that's part of what you're evaluating when
```

```
 8        you're looking at the economics of the different

 9        proposals that are made, correct?

10   A.   That is correct.  Those are important economic

11        elements when comparing proposals.
```

**Pg: 182 Ln: 4 - Pg: 183 Ln: 3**

**Designation:**

```
182: 4   Q.   Do you understand that it is -- when it comes to

      5        sourcing financing, it is customary for investment

      6        bankers such as yourself to provide confidentiality

      7        agreements that allow the prospective lenders to know

      8        that certain aspects of their offers won't be shared

      9        with others?

     10   A.   That's normally an element and an expectation --

     11        that's normally an element of -- of letters and it's

     12        frequently an expectation of individuals who are

     13        proposing financing and it's important when it can be

     14        achieved in the context of the individuals firms

     15        soliciting financing so as to achieve the best overall

     16        results.

     17   Q.   Right.  Because you're trying to get the best deal for

     18        your client.  As the person that's sourcing the loan,

     19        you think about what the prospective lenders might

     20        want as you structure the process, right?

     21   A.   That's correct.

     22   Q.   And you know one of the things that they want is they
```

```
23          don't want their specific economic terms shared with

24          the other prospective lenders, correct?

25     A.   Yes.  At various states in the -- yeah, at most stages

183: 1      in the process, everybody wants their bid to remain --

2           everybody wants their bid to remain competitive --

3           confidential.
```

**Pg: 183 Ln: 10 - Pg: 184 Ln: 8**

**Designation:**

```
183:10      BY MR. ASHLEY:

11     Q.   Good evening, Mr. Doak.  My name is Marc Ashley from

12          Chadbourne & Parke.  We represent Assured Guarantee

13          Municipal Corp. in these proceedings.  I'm hoping to

14          address some fairly circumscribed areas and to get

15          through it fairly quickly.

16                    Are you familiar with the City's unlimited

17          tax general obligation bonds?

18     A.   Yes.

19     Q.   If I refer to them in shorthand as the unlimited tax

20          bonds, would that be okay?

21     A.   Sure.

22     Q.   Okay.  Are you also familiar with the ad velorum taxes

23          that the City levied to repay those unlimited tax

24          bonds?

25     A.   Yes.

184: 1  Q.   Those ad velorum taxes are not part of the collateral
```

```
 2          pool for the proposed DIP financing, are they?

 3     A.   They are -- no, they're not part of the collateral

 4          provisions in the post-petition financing.

 5     Q.   Okay.  Are you aware of any discussions with Barclays

 6          about those ad velorum taxes being included within the

 7          collateral for the financing?

 8     A.   I'm not aware of any dialogue on that front.
```

**Pg: 184 Ln: 9 - Pg: 185 Ln: 2**

**Designation:**

```
184: 9     Q.   The -- this may have been touched on previously, but

    10          one of the terms of the proposed financing is that the

    11          DIP loans, those bonds will have super priority claim

    12          status with respect to all pre-petition unsecured

    13          claims; is that correct?

    14     A.   I believe that's accurate.

    15     Q.   Did Barclays ever specifically request super priority

    16          claim status with respect to the ad velorum taxes that

    17          relate to the unlimited tax bonds?

    18     A.   I cannot recall them doing that in a -- with -- I

    19          can't recall them ever doing that.

    20     Q.   Okay.  Do you recall that ever coming up in discussion

    21          with them?

    22     A.   I can't recall that coming up in a discussion.

    23     Q.   In your view, could the City have secured the proposed

    24          financing if those ad velorum taxes were excluded --
```

```
        25          or, I'm sorry -- if the unlimited tax bondholder
185: 1          claims were excluded from the super priority claim
         2          status provision?
```

**Pg: 185 Ln: 6 - 10**

**Designation:**

```
185: 6                    THE WITNESS:  I don't have a view on that.
         7      BY MR. ASHLEY:
         8      Q.   Do you have a view as to whether Barclays would have
         9           provided the proposed financing if that exclusion were
        10           part of the supper priority provision?
```

**Pg: 185 Ln: 13 - 14**

**Designation:**

```
185:13                    THE WITNESS:  No, I don't have a view on
        14      that.
```

**Pg: 185 Ln: 15 - Pg: 186 Ln: 14**

**Designation:**

```
185:15      BY MR. ASHLEY:
        16      Q.   We also touched on earlier in your testimony the issue
        17           of exit financing.  What are generally the City's
        18           expectations about securing exit financing?
        19      A.   At this point, the City's forecast is -- has a very
```

20      conservative assumption that the financing is retired

21      at the default terms with the higher interest rate and

22      the default provisions in regards to amortization.

23      The -- I think there is a -- I would believe there

24      will be an opportunity to achieve substantially better

25      terms for the City in regards to a lower interest rate

186: 1      and/or extended amortization but that will depend on

2      the City's overall capitalization post restructuring.

3   Q.   So in your view, what impact does the proposed DIP

4      financing have on the City's prospects to secure exit

5      financing?

6   A.   In -- amongst other impacts, it does -- it does

7      potentially have some positive impacts on the City's

8      ability to obtain financing upon emergence, including

9      maintaining access in the capital markets and also

10      maintaining a position in front of the rating agencies

11      on a -- sort of on a pro forma basis.  The opportunity

12      to refinance under Home Rule Act 36(a) has been out

13      there to finance on a secured basis.  I would -- I

14      think that's some of the point of interest.

**Pg: 186 Ln: 17 - Pg: 188 Ln: 5**

**Designation:**

186:17   BY MS. MONTESANO:

18   Q.   Hi.  My name is Leah Montesano.  I represent Ambac

19      Corporation, and I as well think that I have just a

```
20        few discrete questions and I will probably be able to

21        go fairly quickly.

22               Mr. Doak, if the post-petition financing is

23        approved, is my understanding correct that the City

24        will receive the proceeds as a part of one-lump sum?

25   A.   Yes, that's correct.

187: 1   Q.   Both the swap termination aspect will be one-lump sum

2        and the quality of life portion will be one-lump sum,

3        right?

4   A.   That's correct.

5   Q.   Okay.  And the swap portion of the loan will then

6        shortly be -- thereafter be paid as part of the swap

7        termination fee; is that --

8   A.   Well, pretty much instantaneously or else we, you

9        know, have an issue kind of.  That's --

10   Q.   Okay.  What is your understanding of what will happen

11        to the remainder of those funds, the aspect that is

12        the quality of life note, what will happen to that

13        lump sum?

14   A.   That will be deposited in the City's general fund.

15   Q.   And do you have an understanding of how the City plans

16        to use those proceeds?

17   A.   Yes.

18   Q.   And what is that understanding?

19   A.   My understanding of how the City will, in effect, use

20        its -- I have an understanding in regards to how the

21        City will use its liquidity and cash that's in the
```

```
22          general fund, and my understanding is that it will use

23          it consistent with the DIP cash flow forecast and the

24          schedules provided by Conway McKenzie to the City and

25          the other advisors in regards to particular

188: 1      operational initiatives and revitalization

2           initiatives.

3    Q.     So as part of the general funds, is it fair to say

4           that those quality of life proceeds are not earmarked

5           for any particular purpose?
```

**Pg: 188 Ln: 8 - 12**

**Designation:**

```
188: 8              THE WITNESS:  They will -- the proceeds

9           will not be placed, to the best of my knowledge, in a

10          segregated account and the spending that will occur,

11          as I understand it, is not going to be from a

12          segregated account.
```

**Pg: 188 Ln: 13 - 20**

**Designation:**

```
188:13   BY MS. MONTESANO:

14   Q.     Okay.  I'd like to direct your attention to Exhibit 2,

15          which is the indicative term sheet that was -- that

16          was sent to potential lenders.

17   A.     Okay.
```

```
18   Q.   The third page, 16684.  At the very bottom, you talk

19        about the quality of life loan.

20   A.   Yep.  Yes.
```

**Pg: 189 Ln: 6 - 10**

**Designation:**

```
189: 6   Q.   Do you know who came up with the term quality of life?

     7   A.   Yes.

     8   Q.   Who is that?

     9   A.   The -- that terminology came from an attorney at Jones

    10        Day.
```

**Pg: 190 Ln: 20 - Pg: 192 Ln: 22**

**Designation:**

```
190:20   Q.   When you were working with the City to develop this

    21        indicative term sheet, did you discuss what use for

    22        the quality of life loans would be permissible?

    23   A.   Yes.

    24   Q.   And what was the nature of those discussions?

    25   A.   Those discussions incorporated discussions about the

191: 1        Conway McKenzie operating initiatives and incorporated

     2        conversations about provisions of the Michigan Gaming

     3        Revenue Control Act.

     4   Q.   Okay.  And for the Conway McKenzie operating

     5        initiatives, what initiative in particular are you
```

6       referring to?

7   A.   I'm referring to the initiatives that are described in

8       various forms in the DIP cash flow forecast, as well

9       as additional schedules that -- that Conway McKenzie

10      provided that outlined some of the initiatives by --

11      by spending amount, and in some cases, individual

12      expenditures.

13  Q.   Is it your understanding that the funds obtained

14      through the quality of life loan will go to the

15      general fund and then not be put to immediate use?

16  A.   It's my understanding that the funds will go to the

17      general fund, and the City will begin to deploy the

18      capital, you know, as projected as has to be revised

19      given the fact that this is now December, in the

20      various schedules that have been prepared by Conway

21      McKenzie, and to the extent that -- you know, that --

22      well, I mean, that and -- but to the extent that other

23      opportunities present themselves, the -- the funds are

24      in the general fund.

25  Q.   Did you consider structuring the transaction rather

192: 1    than a payment as a lump sum as -- instead of as a

2      line of credit?

3  A.   Yes.

4  Q.   And why did you opt not to structure the quality of

5      life portion as a line of credit?

6  A.   The proposal -- the -- the City could only consider

7      the proposals that it received.  It is frequently

```
8         challenging to receive a line of credit from

9         commercial lenders giving the economics of extending

10        lines of credit and commitment capital.  In addition,

11        the City was mindful that any decision to defer or

12        delay proceeds from a financing process meant making a

13        balancing decision between the negative carry of

14        having the cash on the balance sheet and the risk both

15        that the City could be in default of other sort of

16        conditions precedent to further draws, as well as

17        funding risk from a would-be financing party and

18        their -- I'm sorry -- credit risk from a would-be

19        financing party and further had to add to that

20        balancing decision the positive impact and assurance

21        that the City would have in knowing that the funds

22        were in the general fund.
```

**Pg: 193 Ln: 1 - Pg: 194 Ln: 2**

**Designation:**

```
193: 1    BY MS. MONTESANO:

2    Q.    Exhibit 13 [sic] is a November 4th, 2013,

3          presentation.  It appears to be from Miller Buckfire

4          briefing material from the Financial Advisory Board.

5          Are you familiar with this document?

6    A.    Yes.

7    Q.    And I'd like to direct your attention to the third

8          slide, which is Bates labeled 1962.  This slide, I'll
```

```
 9          represent to you, is actually the same slide that is

10          part of Exhibit 3 if you wanted to compare.

11   A.    Yes.

12   Q.    And you can see the first bullet point, the fourth

13          dash down, reads as the court approval process for the

14          forbearance agreement has been delayed, the City and

15          the swap counterparties have agreed to push back the

16          deadline dates associated with the discounted payoff,

17          and then there's a footnote there.  Terms herein are

18          currently under discussion with the swap

19          counterparties.

20                  Are you involved in those discussions with

21          the swap counterparties?

22   A.    I am involved.  I am not the primary banker involved.

23   Q.    Who is the primary banker involved?

24   A.    Mr. Buckfire.

25   Q.    Do you know the current status of those negotiations?

194: 1 A.  Yes.

  2  Q.    And what is it?
```

**Pg: 194 Ln: 15 - 19**

**Designation:**

```
194:15              THE WITNESS:  Okay.  You know, it's my

 16          understanding that the -- and as you know from the

 17          data room, the first five amendments to the

 18          forbearance agreement have been executed and that the
```

```
19        sixth has not.  So the --
```

**Pg: 195 Ln: 1 - 6**

**Designation:**

```
195: 1  BY MS. GREEN:

     2  Q.   Mr. Doak, I'm Jennifer Green on behalf of the

     3       Retirement System for the City of Detroit.  Following

     4       up with a question that was just asked of you

     5       regarding the term quality of life, which attorney

     6       came up with that term?
```

**Pg: 195 Ln: 14 - 20**

**Designation:**

```
195:14              THE WITNESS:  Chris Bennett.

    15  BY MS. GREEN:

    16  Q.   Did you have email correspondence relating to this

    17       term with Mr. Bennett?

    18  A.   What -- I mean, I have emails in regards to

    19       post-petition financing and the loan is labeled the

    20       quality of life loan.
```

**Pg: 196 Ln: 10 - 13**

**Designation:**

```
196:10  BY MS. GREEN:
```

```
11   Q.   Let me ask it this way:  When was that term -- quality

12        of life, when was that term originated?

13   A.   Sometime in mid-to-late August.
```

**Pg: 196 Ln: 14 - Pg: 197 Ln: 12**

**Designation:**

```
196:14   Q.   You were asked a few moments ago about working on

     15        developing the term sheet and you mentioned the

     16        Michigan Gaming Control Act.

     17   A.   That's correct.

     18   Q.   At what point in time did you become aware of the

     19        Michigan Gaming Revenue Control Act?

     20   A.   To the best of my recollection, probably sometime in

     21        early summer.

     22   Q.   Early summer meaning pre -- do you consider that

     23        prepetition, so we're talking, like, June?

     24   A.   I consider that to be prepetition.

     25   Q.   And who made you aware of this act?

197: 1   A.   I don't recall.

      2   Q.   Do you know what context this act came up in?

      3   A.   The act came up in context of dialogue with the swap

      4        counterparties.

      5   Q.   Do you recall if it was in relation to the

      6        negotiations in early June surrounding the forbearance

      7        agreement?

      8   A.   It would be around that time.
```

```
 9   Q.   And I understand that you helped develop the terms for

10        the DIP financing.  Why was it that the swap note did

11        not have casino revenue as a source of collateral; why

12        was it structured that way?
```

**Pg: 197 Ln: 14 - Pg: 198 Ln: 12**

**Designation:**

```
197:14             THE WITNESS:  As with many provisions in

15        the indicative term sheet, we -- the term sheet, I

16        recall thinking that the term sheet should be

17        constructed to avoid, if wherever possible, as much

18        controversy as possible.

19   BY MS. GREEN:

20   Q.   And why did you think that it was less controversial

21        to attach the casino revenue to only the quality of

22        life note?

23   A.   My belief at the time was that the argumentation that

24        we'd heard people represent around the swaps and their

25        collateral interest and the validity of the interests

198: 1    of the swaps' collateral interest in the gaming --

 2        gaming revenues was out in the market and part of how

 3        potential investors would quickly sort of due

 4        diligence themselves about what is -- what is

 5        controversial and what is not controversial.  So given

 6        that that was part of the public -- publicly reported

 7        controversy associated with the -- the swaps and their
```

```
 8          collateral, it was my thinking that the best way to

 9          steer clear of further controversy was to have the

10          swap termination loan more focused on the -- a form of

11          the City's revenues that were not the gaming tax

12          revenues, and that's what we did.
```

**Pg: 198 Ln: 23 - Pg: 201 Ln: 24**

**Designation:**

```
198:23  Q.   Well, do you recall any particular lender off the top

    24       of your head that had a concern about the casino

    25       revenue being used as a source of the collateral?

199: 1  A.   Yes.

     2  Q.   And who was that?

     3  A.   The ones that particularly come to mind was a joint

     4       proposal from Ambac, Assured, and NBIA.

     5  Q.   Was this also a concern that was raised by any of the

     6       City Council members in your one-on-one conversations

     7       with them regarding the DIP financing in general?

     8  A.   Several council members expressed, you know, ongoing

     9       both historical and present concerns with regards to

    10       the validity of the entirety of the cops and swaps

    11       transaction including the collateral arrangement.

    12       Others signed the document as they were mayor at the

    13       time.

    14  Q.   I just asked you about the City Council members.

    15            You also mentioned that you had a
```

16          one-on-one meeting with a staff member from City

17          Council.  Is that Erv Corley?

18     A.   I had a one-on-one -- yes, I did.

19     Q.   Were there any other staff members that you had

20          conversations with relating to the DIP financing?

21     A.   Yes.

22     Q.   And who are they?

23     A.   Marcel Hurt joined the meeting that I had with council

24          member -- with council chair, with the council

25          president.

200: 1   Q.   Is he the only one?

2      A.   He was the only one along with the council president.

3      Q.   Do you know an Ann Langan?

4      A.   I recall the name.

5      Q.   Did you have a one-on-one meeting with her relating to

6           the DIP financing or the swap transaction?

7      A.   I -- no, I don't believe I did.

8      Q.   Do you recall the name because maybe her name came up

9           in your conversation with Erv Corley?

10     A.   No, I recall the name because she is in an email

11          correspondence between her and Todd Snyder of

12          Rothschild in the Syncora objection and I -- I

13          believe, but I can't specifically recall, that she was

14          most likely a member of the staff that was in the room

15          when we had the closed-council session.

16     Q.   Do you know if any other members of Miller Buckfire

17          met with Ms. Langan before the City Council meeting,

18      if you know?

19  A.  I don't -- I don't know.

20  Q.  When you met with Erv Corley, did you discuss the

21      casino revenue pledge specifically with him?

22  A.  Yes.

23  Q.  And what was the substance of that conversation?

24  A.  The conversation used the briefing document that's

25      marked as one of the -- the exhibits here, Doak 4, and

201: 1      the dialogue was both about the structure of the

2      financing, the post-petition financing, as well as the

3      history of the cops and swaps transactions.

4  Q.  Did he have any questions about the fee letter or the

5      market flex provision during your meeting?

6  A.  No.

7  Q.  You were asked extensively about the fee letter and

8      the market flex provision.  I don't think at any point

9      you were asked whether in your capacity as the

10      investment banker for the City of Detroit if you were

11      unaware of the market flex provision personally, would

12      you be able to recommend a $350 million loan if you

13      did not know what the market flex provision could

14      yield as far as interest rates.

15  A.  I would not be in a position to recommend the

16      transaction to Kevin Orr if I was not aware of the

17      market flex provision.

18  Q.  And similarly, if you were unaware of the fees

19      associated with the $350 million loan, would you, as

```
20        the investment manager for the City of Detroit, be

21        able to recommend that transaction to the City?

22   A.   I -- in order to recommend the transaction to Kevin

23        Orr, it was important to me to have the

24        understanding of the commitment fee.
```

**Pg: 205 Ln: 2 - 6**

**Designation:**

```
205: 2    BY MS. GREEN:

     3    Q.   You were asked earlier about what I believe was

     4         Exhibit 3, but it might be Exhibit 4 because I think

     5         we split it.  It's the term sheet.  It was the one

     6         that was misstapled, so I am unclear as to which.
```

**Pg: 205 Ln: 10 - 12**

**Designation:**

```
205:10    Q.   Yeah.  If you flip -- mine is Bates numbered

     11        differently.  Section 5 is what I am looking at,

     12        paragraph 5.
```

**Pg: 206 Ln: 1 - Pg: 208 Ln: 7**

**Designation:**

```
206: 1    BY MS. GREEN:

     2    Q.   Certain other provisions, paragraph 5.
```

3   A.   Yes.

4   Q.   The third bullet point down, it says state law

5        validity opinion for the note.  With appropriate

6        carveout in respect to pledging priority.  Do you see

7        that part?

8   A.   Yes.

9   Q.   You helped prepare the term sheet, correct, the

10       original term sheet?

11   A.   Yes.

12   Q.   Was this portion part of the original term sheet or

13       did Barclays change this?

14   A.   This was a negotiated provision of the Barclays' term

15       sheet.

16   Q.   And why was it negotiated?

17   A.   Because they wanted a state law validity opinion.

18   Q.   And why were the pledge and priority issues

19       specifically carved out of that legal opinion

20       requirement?

21   A.   The attorneys spent a substantial amount of time

22       dialoguing on the opinions that would be delivered in

23       context of the closing of the financing and what was

24       an opinionable matter both in regards to -- in regards

25       to the world of municipal finance, in regards to the

207: 1     world of restructuring finance, and what one could

2       deliver as a law firm when the two worlds collided

3       and -- and to the best of my recollection, that is

4       a -- that reflects, you know, some form of meeting of

5   the minds that the law firms had in regards to the

6   form that opinion would take and what it would

7   reference and what it would not reference.

8 Q. And what would it not reference?

9 A. Well, I think what this would -- I think the point

10   here is you have a state law validity opinion and it

11   would be a valid opinion under state law but it would

12   have an appropriate carveout in respect to the pledge

13   and priority which were provisions of Federal

14   Bankruptcy Code and so could possibly be beyond an

15   area at which someone would be expected to deliver a

16   state law opinion.  But that's said by someone who is

17   not a practicing attorney.

18 Q. Were the concerns about the casino revenue being used

19   as a pledge part of the reasoning behind not requiring

20   legal opinions with respect to the pledge itself?

21 A. I don't -- I don't know or I can't recall.  Part of

22   this discussion, as I recall, all involved the concept

23   of, like, what a particular institution such as Miller

24   Canfield, which knew the provisions of state law,

25   could opine on or not opine on and should opine on and

208: 1  not opine on given that in the federal context and in

2   the federal restructuring context, it's relatively

3   unusual to have validity opinion in regards to

4   pledging and priority based on a post-petition

5   financing with the federal court order.  But, once

6   again, this is a banker trying to recall a

```
 7          conversation amongst four law firms.
```

**Pg: 210 Ln: 6 - 7**

**Designation:**

```
210: 6                  THE WITNESS:  Exhibit 11 has that language
     7          that you were going to, I believe.
```

**Pg: 210 Ln: 8 - 25**

**Designation:**

```
210: 8   BY MS. GREEN:
     9   Q.   The version I have does have the page and the language
     10       appears to be delivery of legal opinions in form and
     11       substance consistent with the documentation
     12       requirements set forth in section 5 hereof.
     13  A.   Yep.
     14  Q.   My only question for you then to follow up is if there
     15       is not a legal opinion listed in the documentation of
     16       paragraph 5, is it your understanding that there is no
     17       other legal opinion required under the note?
     18           To make it easier, is there, like, a side
     19       agreement that we don't know about --
     20  A.   No, no.  I --
     21  Q.   -- that has a legal opinion that has not been
     22       produced?
     23  A.   No, there's not a side --
```

```
24    Q.    Okay.

25    A.    There's not a side agreement.
```

**Pg: 211 Ln: 4 - 5**

**Designation:**

```
211: 4                    MARKED BY THE REPORTER:

      5                    DEPOSITION EXHIBIT 15
```

**Pg: 211 Ln: 9 - Pg: 212 Ln: 9**

**Designation:**

```
211: 9    BY MS. GREEN:

    10    Q.    Mr. Doak, who is Thomas Gavin?

    11    A.    Thomas Gavin is an investment banker at R. W. Baird.

    12    Q.    And how is R. W. Baird involved in the City's

    13          finances?

    14    A.    R. W. Baird is a -- it has an engagement with the City

    15          with regards to the water fund and sewer fund and DWSD

    16          financings.

    17    Q.    And do you know if Thomas Gavin personally is working

    18          on that matter?

    19    A.    He's the -- he's been the individual present at some

    20          meetings with DWSD executives and introduced as the R.

    21          W. Baird banking team representative.

    22    Q.    And in Exhibit 15, at the bottom, it appears to be an

    23          email dated August 29th, 2013.  Do you recognize that
```

```
24        email?

25    A.  Yes.

212: 1    Q.  It states, Tom, great to meet you at DWSD.  Is that

     2        referring to one of the meetings that you just spoke

     3        of?

     4    A.  Okay.  I'm on the second page.  Yes.

     5    Q.  Okay.  You further state we're working on sourcing 350

     6        million post-petition financing use of proceeds as to

     7        financing the swap termination and provide general

     8        fund liquidity through the Chapter 9 case, correct?

     9    A.  Yes.
```

**Pg: 212 Ln: 10 - Pg: 213 Ln: 5**

**Designation:**

```
212:10    Q.  Did you speak with him about this post-petition

    11        financing earlier when you met him in person or was

    12        this the first he heard of it, this financing?

    13    A.  You got to ask that question again because it's a

    14        double question.

    15    Q.  Because it's what?

    16    A.  It's a double question.

    17    Q.  Okay.  Did you speak to Mr. Gavin about the

    18        post-petition financing when you met him in person?

    19    A.  No.

    20    Q.  So this email was the first time you had approached R.

    21        W. Baird regarding post-petition financing?
```

```
22   A.   Yes.

23   Q.   Okay.  And did you later speak with Mr. Gavin

24        regarding that post-petition financing?

25   A.   Yes.

213: 1   Q.   And when was that conversation?

   2   A.   I don't recall.

   3   Q.   Would it have been shortly after this email or was it

   4        recently?

   5   A.   Shortly after the email.
```

**Pg: 213 Ln: 6 - 21**

**Designation:**

```
213: 6   Q.   Okay.  What was the substance of your conversation

   7        with Mr. Gavin relating to the post-petition

   8        financing?

   9   A.   He indicated that R. W. Baird would be declining the

  10        opportunity to arrange the post-petition financing and

  11        that it was, you know, a little outside their business

  12        model and, you know, given their ongoing engagement

  13        with DWSD, he thought that it would potentially, you

  14        know, create confusion or conflicts and so they were

  15        going to pass.

  16   Q.   Does R. W. Baird also represent the swap

  17        counterparties or, I guess, not represent but do they

  18        also have consulting or financial advisory services

  19        that they provide to the swap counterparties to your
```

```
20        knowledge?

21   A.   I don't know.
```

**Pg: 213 Ln: 22 - Pg: 216 Ln: 5**

**Designation:**

```
213:22   Q.   If you look at the email from Thomas Gavin that's

     23        above the one that we just spoke of, there's an email

     24        to you.

     25   A.   Yes.

214: 1   Q.   It says when we spoke, I said that the counterparties

      2        didn't get a bankruptcy opinion from Lewis and Munday.

      3        I neglected to say that they did get an opinion from

      4        Orrick, attached.  Are you familiar with the Orrick

      5        legal opinion?

      6   A.   No.

      7   Q.   Do you recall when he sent the email, did you review

      8        the Orrick legal opinion that was attached?

      9   A.   No.

     10   Q.   When you read this email, did you miss that there was

     11        an opinion attached?

     12   A.   No.

     13   Q.   So you knew it was attached but you didn't open it?

     14   A.   I don't remember whether I opened it.

     15   Q.   Okay.  Further down in that paragraph, it says as I

     16        said on the phone, the counterparties' attorneys did

     17        not believe that the pledge survived but they did get
```

18       what they could from Orrick -- did get what they could

19       from Orrick.  Did you know what he meant when he said

20       the counterparties' attorneys did not believe that the

21       pledge survived?

22   A.   Yes.

23   Q.   And is it because, as the lead into the sentence says,

24       as I said on the phone?  Was he repeating something he

25       had previously told you?

215: 1  A.   Yes.

2   Q.   Okay.  How did he explain it to you on the telephone?

3   A.   He had a recollection or at least a narrative in

4       regards to the negotiations that had occurred amongst

5       parties in 2009 and he was informing me of a dialogue

6       that he indicated had occurred in the negotiations

7       between the City and its advisors and the swap

8       counterparties and their advisors in regards to

9       structuring the collateral agreement and amendment to

10      the swaps.

11  Q.   And when you say the collateral agreement, you mean

12      the collateral agreement that secured -- or -- I'm

13      sorry -- that pledged the casino revenue, correct?

14  A.   Yes.

15  Q.   Okay.

16  A.   That did whatever it did to the casino revenue.

17  Q.   Well, right.  So, on the phone, you discussed that the

18      counterparties themselves did not believe that the

19      pledge of the casino revenue survived.  When you

```
20        say -- when the word here survived is used, do you

21        have an understanding as to what he's referring to?

22        Does he mean the bankruptcy filing?

23    A.  He -- in his narrative, he was suggesting that back in

24        2009, the City -- City's advisors were of the opinion

25        that the protection could be conveyed to the swap

216: 1    counterparties and the swap counterparties' attorneys

   2      were of the opinion that the protection that was being

   3      provided in the collateral agreement wouldn't work.

   4      That is what I recall from the telephone conversation

   5      with him.
```