# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                         Chapter 9
                                               Case No. 13-53846

City of Detroit, Michigan,

      Debtor.
-------------------------------------------------------------------------------------------------------/

## EXPERT REPORT FOR WALLACE C. TURBEVILLE

### I.    OPINIONS TO BE OFFERED AND BASIS AND REASONS FOR THEM

1. I was a Vice President of Goldman Sachs & Co. from 1985-1997, where I worked in the Municipal Bond Department on financing numerous projects and enterprises for governments and companies.

2. From 2002-2009 I was the Chief Executive Officer and Founder of VMAC LLC. In that position I provided post-trade position and credit management structures for over the counter trade derivatives.

3. I currently am the Senior Fellow for Demos where I do research and writing on financial markets.

4. In my position as Senior Fellow for Demos, I studied the Detroit financial situation, including the pension obligation certificates and interest rate swaps that are the subject of this hearing and will be the subject of my testimony. In November, 2013, I authored the Demos Report on the Detroit bankruptcy.

5. In 2005-2006, the City of Detroit entered into certificates of participation carrying a floating interest that was immediately converted synthetically to fixed interest rates using derivatives (the interest rate swaps).

6. This was done because the city believed, presumably based on advice, that the overall result of issuing long-term debt would be better than straightforwardly issuing long-term fixed-rate debt. The city was probably told that the market for the floating rate debt was relatively more favorable than the market for fixed rated debt.

7. The pension swaps were subject to termination if the city suffered a credit rating downgrade from its then current level or if an emergency manager was appointed, and if the city missed a payment, all of which happened. In that event, the counterparties

were entitled to an immediate payment of projected future profits (i.e., the excess of the fixed payments by the city over the reduction in floating payments by the counterparties since the inception of the swap, with the floating rate assumed to continue at the floating rate applicable at the time of the termination, "present-valued" based on a discount rate).

8. When the termination was claimed, this termination amount was very large. That was because (a) lower short-term interest rates relative to long term rates mathematically increased project profits, and (b) short-term rates had been kept extraordinarily low by the Federal Reserve to counteract the recession. One of the factors for the recession of the mid-2000's that led to this extraordinary lowering of interest rates, was the sub-prime and predatory mortgage-lending crisis of the mid-2000's that especially hit cities like Detroit with extraordinary foreclosures.

9. In Detroit, a termination payment was avoided in 2009 through restructuring by increasing the city payments to the banks and providing more collateral for the interest rate swaps (casino tax dollars).

10. The second termination event occurred in 2013, as a result of the emergency manager appointment and the insolvency. The City is reported to require an immediate payment of up to $350 million to UBS and Bank of America under the Swap documents. This is in addition to the approximately $250 million in profits that the banks netted on the city's swaps tied to the pension obligation certificates from 2008-2012.

11. Many tens of billions of taxable pension fund debt transactions tied with swaps have been entered into by states and municipalities in the last 20 years. They have been severely criticized as vehicles for price gouging by banks that underwrite the bond debt and provide the swaps. It has been asserted that the long-term use of long-term floating rate debt and floating to fixed rate swaps (the structure used in Detroit and in other state and municipal pension financings) is extremely rare in the corporate taxable market.

12. Even more concerning is the objective imprudence of the Detroit swap transaction. The banks and insurance companies involved in this transaction had a moral and possibly legal obligation to explain its imbedded risks to the city and to make certain that the city and the public understood those risks. And even if they did explain the risks, they also had an overriding moral obligation to refuse to do the transaction since it was so imprudent.

13. The circumstances of the Detroit pension swap transactions were so extreme that they amounted to unconscionable behavior. A court can determine whether the moral obligation was also a legal one.

2

14. Detroit's position was particularly precarious in light of this city's financial difficulties over the past few decades. The banks, who are far more sophisticated than city officials when it comes to financial matters like hedging derivatives, had a duty to warn the city of the risk of a catastrophic termination event (which now has occurred on at least two occasions), and to avoid placing the city and its residents in that position.

15. If allowed to testify, I will offer the opinion the banks through the issuance of the swaps may have breached their ethical and possibly legal obligations to the city in executing these deals.

16. The emergency manager's plan to pay the swap termination fees outside of the bankruptcy process should be abandoned. It amounts to paying 82 cents for every dollar owed under the termination fees, funded by the Barclays loan which commits the city to paying approximately 20% to 40% of its income tax revenues to pay off the swaps for four to five years after the bankruptcy is concluded.

17. The bank counterparties should be made to bear the consequences of the original swap transaction, and they should be pushed to forego their projected profit (the measure of the termination payment), given the large profits they have already earned as a result of the unusually low interest rates that resulted from the financial crash.

18. It is in the interest of the people of the Court to reject the City of Detroit's Motion to Approve the Forbearance/Assumption Motions and the Barclay's loan to pay off the swap termination fees.

19. The alternative is to litigate these matters in the bankruptcy proceeding where they could be subject to being subordinated or disallowed because of the banks' (swap counterparties) unclean hands.

## II.  DATA OR OTHER INFORMATION CONSIDERED BY WITNESS IN FORMING OPINIONS

The data is summarized in the report that I authored entitled the Detroit Bankruptcy, November 2013 (Demos report). The sections of the report that specifically deal with the issue of the Detroit pension obligation certificates and associated interest rate swaps are primarily located in pages 5,7 (introductory opinions), 11 (chart on liabilities), p 13, pp 15, 16, charts on Detroit's financial situation, p 24, 25, 26-32, 35-36, 38-39, 54.

Articles and documents referenced in the Endnotes to the Demos Report, including but not limited to: City of Detroit bankruptcy filing, Seibert Bradford Shank & Co., LLC website

[www.sbsco.com/firmPage/firm/bankingteam/seanwerdlow/seanwerdlow.aspx](www.sbsco.com/firmPage/firm/bankingteam/seanwerdlow/seanwerdlow.aspx), City of Detroit Comprehensive Annual Report (CAFR) 2012

Buckfire deposition August 29, 2013

Gavin email, Sole Exhibit 28.

Forbearance Agreement

Barclay loan

Barclay fee letter

## III.     EXHIBITS THAT WILL BE USED TO SUMMARIZE OR SUPPORT OPINIONS

Demos Report

2006 Swap agreements – Sole Exhibit 13

2009 Swap agreements – Sole Exhibit 1

Articles and documents referenced in Section II

## IV.    QUALIFICATIONS

1.  **See CV attached –See also the Demos Website --** [http://www.demos.org/wallace-c-turbeville](http://www.demos.org/wallace-c-turbeville)

2. **All publications authored in previous 10 years**

Because this list would be voluminous and due to short time for preparation, I am attaching a list of recent publications.  There are links to all of them on the Demos website, at [http://www.demos.org/wallace-c-turbeville](http://www.demos.org/wallace-c-turbeville).

Here is the list:

- [What is the Volcker Rule?](What is the Volcker Rule?)

  December 9, 2013

- [The Detroit Bankruptcy](The Detroit Bankruptcy)

  November 20, 2013

4

- [The Third Anniversary of the Dodd-Frank Act: Taking Stock of Financial Reform](#)

  July 21, 2013

- [The Regulator Who Can Stop the Next AIG](#)

  June 14, 2013

- [Derivatives: Innovation In The Era of Financial Deregulation](#)

  June 13, 2013

- [JP Morgan Chase Whale Trades: A Case History of Derivatives Risks and Abuses](#)

  March 19, 2013

- [Examining Legislative Improvements to Title VII of the Dodd-Frank Act](#)

  March 14, 2013

- [Cracks in the Pipeline Part Two: High Frequency Trading](#)

  March 8, 2013

- [Cracks In The Pipeline Part One: Restoring Efficiency To Wall Street And Value To Main Street](#)

  December 5, 2012

- [A LIBOR Scandal Primer](#)

  July 17, 2012


## V.      STATEMENT OF COMPENSATION TO BE PAID

None.

Report Signed by Wallace C. Turbeville

/s/*Wallace C. Turbeville*

Respectfully Submitted,
JEROME D. GOLDBERG, PLLC

By: ___/s/ Jerome D. Goldberg_____
Jerome D. Goldberg (P61678)
Attorney for David Sole, Party in Interest
2921 East Jefferson, Suite 205
Detroit, MI 48207
Phone: 313-393-6001
Fax: 313-393-6007
Email: apclawyer@sbcglobal.net

DATED:  December 10, 2013