## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-----------------------------------------------------x
:
In re                        : Chapter 9
:
CITY OF DETROIT, MICHIGAN,    : Case No. 13-53846
:
           Debtor.        : Hon. Steven W. Rhodes
:
:
-----------------------------------------------------x

## STATEMENT OF STIPULATED FACTS REGARDING MOTION OF DEBTOR FOR ENTRY OF AN ORDER (I) AUTHORIZING THE ASSUMPTION OF THAT CERTAIN FORBEARANCE AND OPTIONAL TERMINATION AGREEMENT PURSUANT TO SECTION 365(a) OF THE BANKRUPTCY CODE, (II) APPROVING SUCH AGREEMENT PURSUANT TO RULE 9019, AND (III) GRANTING RELATED RELIEF

For purposes of the Court's consideration of the *Motion of Debtor for Entry of an Order (i) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (ii) Approving Such Agreement Pursuant to Rule 9019, and (iii) Granting Related Relief* [Docket No. 17] filed by the City of Detroit on July 18, 2013 and corrected on July 24, 2013 [Docket No. 157] (the "Forbearance Agreement and Approval Motion"), the City of Detroit and (a) Financial Guaranty Insurance Company, (b) Syncora Guarantee Inc. and Syncora Capital Assurance Inc., (c) Ambac Assurance Corporation, (d) National Public Finance Guarantee

NYI-4560933v1

Corporation, (e) Assured Guaranty Municipal Corp., (f) the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit, (g) Hypothekenbank Frankfurt AG, Hypothekenbank Frankfurt International S.A., and Erste Europäische Pfandbrief- und Kommunalkreditbank Aktiengesellschaft in Luxemburg S.A., (h) FMS Wertmanagement Service GmbH as servicer to FMS Wertmanagement, and (i) the Retired Detroit Police & Fire Fighters Association ("RDPFFA"), Donald Taylor, individually, and as President of RDPFFA, and the Detroit Retired City Employees Association ("DRCEA") and Shirley V. Lightsey, individually, and as President of the DRCEA, submit the attached Joint Statement as a stipulation of facts aimed at facilitating the Court's understanding of the COPs/Swaps (each as defined below) structure.

The City has attempted and been unable to obtain the concurrence of the remaining objectors.


Dated: December 11, 2013          Respectfully submitted,

David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California 90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

/s/ Deborah Kovsky-Apap
Robert S. Hertzberg (P30261)
Deborah Kovsky-Apap (P68258)
Pepper Hamilton LLP
4000 Town Center, Suite 1800
Southfield, MI  48075
(248) 359-7300  -  Telephone
(248) 359-7700  -  Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

ATTORNEYS FOR THE CITY

# **EXHIBIT A**

NYI-4560933v1

2

<u>**Joint Statement of Stipulated Facts**</u>

For purposes of the Court's consideration of the *Motion of Debtor for Entry of an Order (i) Authorizing the Assumption of that Certain Forbearance and Optional Termination Agreement Pursuant to Section 365(a) of the Bankruptcy Code, (ii) Approving Such Agreement Pursuant to Rule 9019, and (iii) Granting Related Relief* [Docket No. 17] filed by the City of Detroit on July 18, 2013 and corrected on July 24, 2013 [Docket No. 157] (the "<u>Forbearance Agreement and Approval Motion</u>"), the parties submit this Joint Statement as a stipulation of facts aimed at facilitating the Court's understanding of the COPs/Swaps (each as defined below) structure.

## I.     The Issuance of the COPs and the Service Contracts

1.      In 2005, the annual reports of the boards of trustees for the two retirement systems of the City of Detroit (the "<u>City</u>"), the General Retirement System (the "<u>GRS</u>") and the Police and Fire Retirement System (the "<u>PFRS</u>" and, together with the GRS, the "<u>Retirement Systems</u>"), indicated that the pension funds of the Retirement Systems had an unfunded accrued actuarial liability ("<u>UAAL</u>") of approximately $1.7 billion.[1]  To address this UAAL of the GRS and PFRS, pursuant to City Ordinances No. 03-05 and 04-05 (Exs. 3, 4), the City provided an alternative funding mechanism by initiating transactions that resulted in the issuance to investors

---

[1] As of June 30, 2004, the Annual Report of the Board of Trustees of the GRS For the Year Ended June 20, 2004 indicated that the GRS had estimated UAAL of $913,683,200 (*see* Actuarial & Statistical Section, available at http://www.rscd.org/gc_annrpt_actstats2004.pdf at 22 (Ex. 1)), and the Annual Report of the Board of Trustees of the PFRS For the Year Ended June 20, 2004 indicated that the PFRS had estimated UAAL of $782,976,693 (*see* Actuarial & Statistical Section, available at http://www.pfrsdetroit.org/images/pdf/pf_annrpt_actstats2004.pdf at 13, 17 (Ex. 2)), for a total UAAL of $1,686,659,895.  Certain parties contest the accuracy of the UAAL figures reflected in these reports.

of approximately $1.4 billion of instruments known as certificates of participation (the "2005 COPs").[2] *See* Ordinance No. 05-05 at § 18-5-120(d) (Ex. 7).

2. First, the City in 2005 created two nonprofit corporations, the Detroit General Retirement System Service Corporation (the "GRS Service Corporation") and the Detroit Police and Fire Retirement System Service Corporation (the "PFRS Service Corporation" and, together with the GRS Service Corporation, the "Service Corporations") to provide certain services, including funding the UAAL of the GRS and the PFRS by facilitating the financing of the 2005 COPs. *Id.* at § 18-5-125 (Ex. 7). By ordinance, the Service Corporations' boards of directors must have three City officers and two Detroit City Council members. *Id.* at § 18-5-126(a)(5) (Ex. 7). The Service Corporations in turn created a funding trust (the "2005 Funding Trust") to issue and sell the 2005 COPs. *Id.* at §§ 18-5-120(k), 18-5-129 (Ex. 7). In 2005, the 2005 Funding Trust issued the 2005 COPs. Ordinance No. 05-09 at § 18-16-2(c) (Ex. 8).

3. In 2006, the Service Corporations established another funding trust (the "2006 Funding Trust" and, together with the 2005 Funding Trust, the "Trusts"). *Id.* at § 18-16-3(b) (Ex. 8). Pursuant to that certain Trust Agreement, dated June 12, 2006, by and among the Service Corporations and Wilmington Trust Company National Association as Trustee (the "Trust Indenture"),[3] the 2006 Funding Trust issued two new series of certificates of participation (the "2006 COPs," and, together with the 2005 COPs, the "COPs") — one with a fixed interest rate in the original aggregate principal amount of $148,540,000 (the "Fixed-Rate COPs") and

---

[2] The 2005 COPs funded $739,793,898 of the GRS UAAL and $630,829,189 of the PFRS UAAL, for a total funding of $1,370,623,087. *See* GRS Service Contract 2005 dated May 25, 2005 between the Detroit General Retirement System Service Corporation and the City (the "GRS Service Contract 2005") at Schedule 1 (Ex.12); PFRS Service Contract 2005 dated May 25, 2005 between the Detroit Police and Fire Retirement System Service Corporation and the City (the "PFRS Service Contract 2005") at Schedule 1 (Ex. 13).

[3] Wilmington Trust Company National Association is the successor trustee. The original trustee was U.S. Bank National Association.

-2-

US_ACTIVE\44383859\3\45259.0007
NYI-4560736v2

one with a floating interest rate in the original aggregate principal amount of $800,000,000 (the "Floating-Rate COPs"). Trust Indenture §§ 4, 6.4 (Ex. 9). The proceeds of the 2006 COPs were used, in large part, to fund the optional redemption and cancellation of certain of the 2005 COPs. Ordinance No. 05-09 at § 18-16-3(b)(10) (Ex. 8). Currently there remains outstanding $480,260,000 in principal amount of certain series of the 2005 COPs.

4.       The City and the Service Corporations in 2006 arranged for insurance policies on the 2006 COPs with Financial Guaranty Insurance Company ("FGIC") and Syncora Guarantee Inc., f/k/a XL Capital Assurance (collectively, "Syncora" and, together with FGIC, the "Insurers"). (See XL Capital Assurance Municipal Bond Insurance Policy CA03049A, dated June 12, 2006 (Ex. 10), FGIC Municipal Bond New Issue Insurance Policy Number 06010249, dated June 12, 2006 (Ex. 11) and FGIC Municipal Bond New Issue Insurance Policy Number 06010250, dated June 12, 2006 (Ex. 12). The 2006 COPs insurance policies insured against the risk that the 2006 Funding Trust might fail to make scheduled principal and interest payments on the 2006 COPs. (Id.).[4] Each of the policies is unconditional and irrevocable, and may not be cancelled for any reason. (Id.).

5.       In 2005, the City and the Service Corporations entered into the GRS Service Contract 2005 (Ex. 5) and the PFRS Service Contract 2005 (Ex. 6). In 2006, the City and the

---

[4] FGIC's two insurance policies guaranteed the scheduled payment of principal and interest when due on $148,540,000 in aggregate principal amount of the 2006 Fixed-Rate COPs and $500,845,000 in aggregate principal amount of the 2006 Floating-Rate COPs, to the extent not paid by the 2006 Funding Trust. See FGIC Municipal Bond New Issue Insurance Policy Number 06010249, dated June 12, 2006 (Ex. 11); FGIC Municipal Bond New Issue Insurance Policy Number 06010250, dated June 12, 2006 (Ex. 12). Syncora's insurance policy guaranteed the scheduled payment of principal and interest when due on $299,155,000 in aggregate principal amount of the 2006 Floating-Rate COPs to the extent not paid by the 2006 Funding Trust. See XL Capital Assurance Municipal Bond Insurance Policy CA03049A, dated June 12, 2006 (Ex. 13). FGIC and Syncora issued similar insurance policies with respect to the 2005 COPs, guarantying the scheduled payment of principal and interest when due, to the extent not paid by the 2005 Funding Trust; FGIC and Syncora assert that FGIC's 2005 policy covers $450,615,000 of the $480,260,000 in principal amount of the outstanding 2005 COPs, and Syncora's 2005 policy covers the remaining $29,645,000.

US_ACTIVE:\44383859\3\45259.0007
NYI-4560736v2

Service Corporations entered into that certain GRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (the "GRS Service Contract 2006") (Ex. 13) and that certain PFRS Service Contract 2006 dated June 7, 2006, as amended on June 15, 2009 (the "PFRS Service Contract 2006" (Ex. 14) and, together with the GRS Service Contract 2006, the GRS Service Contract 2005 and the PFRS Service Contract 2005, the "Service Contracts"). The Service Contracts establish and govern the City's obligation to, among other things, make payments to the Service Corporations in amounts equal to the amounts due under the COPs. The Service Corporations assigned their respective rights to receive certain payments under the Service Contracts to the Trusts, and each of the COPs evidences an individual, undivided proportionate interest in the right to receive such payments. *See* Ordinance No. 05-09 at § 18 16-2(d) and 18-16-3-(b)(2) (Ex. 8); Trust Indenture § 201 (Ex. 9). As discussed in greater detail below, Section 7.02 of each of the Service Contracts also establish the City's obligation to make payments to the Service Corporations in amounts equal to payments owed by the Service Corporations to the Swap Counterparties (defined below) under the Swap Agreements (defined below). The Service Corporations purported to grant the Swap Counterparties a security interest in and lien upon their rights to receive such amounts pursuant to Section 2.4 of the CAA (defined below). (Ex. 15). Certain parties contest the validity of this lien.

6. The Service Contracts establish (among others) the Trusts, the Trustee, the Swap Counterparties, and the Insurers each as third-party beneficiaries of the Service Contracts (*see* Service Contracts § 9.12(a)), each with consent rights over any amendment of the Service Contracts. *Id.* at § 9.05 (Exs. 13, 14, 5, 6).

7. On June 12, 2006, an agreement (the "Contract Administration Agreement" or "CAA") regarding the administration of the 2006 Service Contracts was entered into to govern

US_ACTIVE:\44383859\3\45259.0007
NYI-4560736v2

the relationship between the parties, and the collection of amounts due under the Service Contracts and Swaps. (Ex. 15.) The Service Corporations, the Swap Counterparties and Wilmington Trust Company National Association as contract administrator (the "Contract Administrator"),[5] are all parties to the Contract Administration Agreement. *See* CAA Preamble, at 1 (Ex. 15). The Insurers are "parties in interest" to the CAA and have the right of consent over any amendments thereto (provided they are not in default of their respective insurance obligations), but were not signatories to the CAA. *See id.* §§10.1, 10.2, 10.3 (Ex. 15).

## II. Interest Rate Swaps

8.     To protect against the risk of rising interest rates on the Floating-Rate COPs, such COPs were structured to have a "synthetic" fixed rate. In order to avoid betting on the future direction of interest rates, and to lock in a fixed, predictable interest cost, in 2006, the Service Corporations entered into certain pay-fixed/receive-variable interest rate swap contracts (the "Swap Agreements" or the "Swaps") with UBS AG ("UBS") and SBS Financial Products Company, LLC ("SBS" and together with UBS and with Merrill Lynch Capital Services, Inc., as credit support provider to SBS, the "Swap Counterparties").[6] *See* Ordinance No. 05-09 at§ 18-16-3(b)(3) (Ex. 8).[7] Certain parties contest the validity of the Swap Agreements.

---

[5] Wilmington Trust Company National Association is the successor Contract Administrator. The original Contract Administrator was U.S. Bank National Association. Wilmington Trust's role as Contract Administrator under the CAA is distinct from its role as Trustee of each of the Trusts.

[6] Merrill Lynch Capital Services ("Merrill Lynch") served as a credit support provider for SBS in connection with the Swaps. *See* CAA at 1 (Ex. 15). On or about July 19, 2013, SBS assigned its rights and obligations under the Swap Agreements to Merrill Lynch. (*See* Assignment of Swap Transactions with PFRS Service Corporation, dated July 19, 2013; Assignment of Swap Transactions with GRS Service Corporation, dated July 19, 2013 (Ex. 16).

[7] *See also* GRS Service Contract 2006 at Schedule 5 and PFRS Service Contract 2006 at Schedule 5 (listing the Swap Contracts) (Exs. 13, 14); 1992 ISDA Master Agreement Local Currency Single Jurisdiction, dated as of May 25, 2005 between UBS and the GRS Service Corporation (the "ISDA") (Ex. 17); Amended and Restated Schedule, dated as of June 26, 2009, to the ISDA between UBS and the GRS Service Corporation (the "Amended Schedule") (Ex. 18); and Revised Confirmation to the GRS Service

-5-

9.      More specifically, pursuant to the Swap Agreements, the Service Corporations are required to make quarterly payments to the Swap Counterparties, in exchange for the Swap Counterparties' obligation to make floating-rate payments to the Service Corporations in amounts equal to the floating rate interest payments due on the Floating-Rate COPs (the "Swap Payments").  *See* Revised Confirmation (Ex. 17).  In practice, if the interest rate on the Floating Rate COPs exceeds the fixed rate set forth in the Revised Confirmation, the Swap Counterparties pay the Service Corporations an amount equal to the difference between the higher floating rate and the lower fixed rate on the notional amount (*see* ISDA § 2(c) (Ex. 19)).  Conversely, if the interest rate on the Floating Rate COPs falls below the fixed rate specified in the Revised Confirmation, the Service Corporations pay the Swap Counterparties the difference between the lower floating rate and the higher fixed rate on the notional amount.  *See* ISDA § 2(c) (Ex. 19).  Prior to 2009, the Service Corporations' sole source of funding for payments owed under the Swap Agreements was payments owed by the City under the Service Contracts.  *See* 2006 Service Contracts § 7.02(b) (Exs. 13, 14, 5, 6).

10.     The Swap Agreements also provide for a termination payment when a non-defaulting or affected party designates an "Early Termination Date" pursuant to Section 6 of the ISDA.  ISDA § 6 (Ex. 17)  An "Early Termination Date" may only be designated pursuant to Section 6 of the ISDA upon the occurrence of certain specified events, known as "Events of Default" or "Termination Events."  *Id.* (Ex. 17).

---

Corporation from UBS, dated June 26, 2009 (the "Revised Confirmation") (Ex. 19).  Each of the Swap Contracts consists of an ISDA Master Agreement, an amended and restated schedule and a revised confirmation thereto, each of which are substantially identical to the ISDA, the Amended Schedule and the Revised Confirmation attached to the Pérez Declaration.  (Pérez Decl. ¶¶ 16-18).  Accordingly, unless otherwise indicated, all citations in this Joint Statement to the ISDA, the Amended Schedule and the Revised Confirmation refer to identical provisions in the other Swap Agreements.

US_ACTIVE:\44383859\3\45259.0007
NYI-4560736v2

11.     In the event an Early Termination Date is designated, the Swap Agreements provide that the party that is "out of the money"[8] is obligated to pay the other party a termination payment designed to reflect the value of the swap under then-current market conditions.  *Id.* at §6(e) (Ex. 17).  The Swap Counterparties who receive the fixed rate under the Swaps are currently "in the money."  As of June 28, 2013, the City calculated that the amount the Service Corporations would owe to the Swap Counterparties (and, in turn, the City would owe the Service Corporations) upon termination of the Swap Agreements was approximately $296.5 million.  (Motion at ¶ 23.)  As of November 29, 2013, the City calculated that the amount the Service Corporations would owe to the Swap Counterparties (and, in turn, the City would owe the Service Corporations) upon termination of the Swap Agreements was approximately $277.6 million.

12.     The City, the Service Corporations and the Swap Counterparties in 2006 arranged for insurance policies with the Insurers on the Swaps.  *See, e.g.,* FGIC Swap Surety Policy Number 0602052 dated June 12, 2006 (Ex. 20).[9]  The Swaps insurance policies insure against the risk that the Service Corporations might fail to make net payments due under the Swap Agreements.  *Id.* (Ex. 20).  Specifically, the policies insure the quarterly payments owed under the Swaps as well as a certain portion of the termination payments that may be owed thereunder.

---

[8] A party is said to be "out of the money" if the then-current interest rate conditions make the swap transaction economically unfavorable to it.  Conversely, a party is "in the money" if it is on favorable side of the transaction.  For example, the party paying the floating rate will be "in the money" if the floating rate is less than the fixed rate.  In that scenario, the party paying the fixed rate obligation will be "out of the money" because it is obligated to pay more than it receives.

[9] Each of the Insurer's policies insuring payments under the Swaps is substantially identical to the FGIC Swap Surety Policy attached as Exhibit 17, except that each policy has a different cap on the amount the Insurer would owe with respect to a claim based on a termination payment owed by a Service Corporation to a Swap Counterparty under a Swap Agreement.

-7-

13.     In certain circumstances (e.g., when the Insurer directs termination), there is no cap on the amount the Insurer would owe with respect to a claim based on a termination payment.  In the event the Swap Counterparties terminate the Swaps, unless they release the Insurers as per the Forbearance and Optional Termination Agreement (Mot., Ex. 6), Syncora's maximum exposure is $27 million[10] and FGIC's maximum exposure is $50 million, under their respective Swap insurance policies.[11]  Each of the policies is unconditional and irrevocable, and may not be cancelled for any reason.  *See, e.g.*, *id.*, at 1 (Ex. 20).

14.     Under the Swap Agreements, the parties agreed that the Insurers would have certain consent rights with respect to the designation of an Early Termination Date under Section 6 of the ISDA.  *See* Amended and Restated Schedule, dated as of June 26, 2009, to the ISDA between SBS and the PFRS Service Corporation (the "SBS Amended Schedule") Part 5(a) (Ex. 23)[12] and Amended Schedule Part 5(i) (Ex. 18).  However, the City and the Swap Counterparties contend that the Insurers lose their consent rights if they fail to maintain certain credit ratings. See SBS Amended Schedule Part 5(a)(ii) (Ex. 23); Amended Schedule, Part 5(i)(b) (Ex. 18). The Insurers dispute this contention.  In addition, each of the Swap Agreements provides that no amendment, modification or waiver with respect to such Swap Agreement or any Credit Support Document (as defined in the Swap Agreements) will be effective unless in writing executed by each of the Swap Counterparties and the Insurers.  ISDA § 8(b) (Ex. 17) and SBS Amended

---

[10] *See* XL Capital Assurance Swap Insurance Policy Numbers CA03049E, CA03049D, CA03049C and CA03049B, dated June 12, 2006 at pg. 2 of the Attachment to each, definition of "Scheduled Payments" (Ex. 21).

[11] *See* FGIC Swap Surety Policy Numbers 06010252, 06010253, 06010254 and 06010255, dated June 12, 2006 at pg. 2 of each, definition of "Insured Payment" (Exs. 20, 22).

[12] Although the substance of Part 5 is identical in each of the Amended Schedules, the numbering in Part 5 of the SBS Amended Schedules is different from the numbering in Part 5 of the UBS Amended Schedules.  Accordingly, citations to Part 5 of the Amended Schedules will reference both the SBS Amended Schedule (Ex. 23) and the Amended Schedule (Ex. 18).

Schedule Part 5(d) (Ex. 23); Amended Schedule Part 5(iv) (Ex. 18). The City and the Swap Counterparties contend that an "Additional Termination Event" occurs if, among other things, the Swap Insurer "fails to have a claims paying ability of at least 'A-' from S&P, or a financial strength rating of at least 'A3' from Moody's. The Insurers dispute this contention. Neither of the Insurers has maintained these required credit ratings since 2009.

## III.    The 2009 Amendments and the Collateral Agreement

15.    In or around January 2009, an "Additional Termination Event" under the Swap Agreements had occurred, resulting from the 2006 COPs' debt rating being reduced below investment grade and the Insurers' ratings being reduced below certain levels, which provided the Swap Counterparties the right to designate an "Early Termination Date" for the transactions under the Swap Agreements. Ordinance No. 05-09 §§ 18-16-3(b)(8); 18-16-4(a) (Ex. 8). Given the low prevailing interest rates in 2009, a termination of the Swaps at that time on the basis of that Additional Termination Event would have resulted in a lump-sum payment owed to the Swap Counterparties of between $300 million and $400 million. *Id.* at § 18-16-4(b) (Ex. 8).

16.    To avoid a significant termination payment, the City, the Service Corporations, and the Swap Counterparties amended the Swap Agreements, and entered into a collateral agreement, dated June 15, 2009, which included a collateral pledge (the "Collateral Agreement" or "CA"). CA Preamble, at 1 (Ex. 24); Ordinance No. 05-09 at § 18-16-4(f), (g); (Ex. 8). Under the Collateral Agreement, the City and the Service Corporations agreed to a "lockbox" arrangement to effectively fund the Swap Payments. The City also purported to grant a first priority lien on and pledge of certain wagering taxes and certain developer payments (collectively, the "Casino Revenues") as collateral to secure the City's obligation under the 2006 Service Contracts to make the service payments relating to the Swap Agreements to the Service

US_ACTIVE:\44383859\3\45259.0007
NYI-4560736v2

Corporations (the "City Pledge"). *See* CA.§§ 4.1, 4.2, 4.3 (Ex. 24). Certain parties contest the validity of the City Pledge.[13] The Service Corporations, in turn, purported to grant to the Swap Counterparties a security interest in and, alternatively, a first priority lien on and pledge of, the City Pledge. Certain parties contest the validity of this security arrangement and the status of the Swap Counterparties as secured creditors of the Service Corporations and, through the City Pledge, of the City. In addition, in 2009 Part 5 of each of the Amended Schedules to the Swap Agreements was amended to add an "Optional Early Termination" provision, which is described below. The Insurers consented to the 2009 amendments to the Swap Agreements and to the Collateral Agreement. *See* Waiver and Consent of FGIC, dated June 26, 2009 (Ex. 25); Waiver and Consent of Syncora, dated June 26, 2009 (Ex. 26).

17.     As party to the Collateral Agreement, the City provided irrevocable instructions (the "Irrevocable Instructions") to three Detroit casinos that require the casinos to deposit the Casino Revenues into a specified account (the "General Receipts Subaccount") maintained by U.S. Bank National Association as custodian under the Collateral Agreement (the "Custodian"). CA § 3.4 (Ex. 24). At the start of each month, Casino Revenues accumulate in the General Receipts Subaccount until the City deposits service payments in an amount equal to one-third of the quarterly Swap Payments owed to the Swap Counterparties pursuant to the Swap Agreements (without giving effect to netting) into a custodial account (the "Holdback Account"). *Id*. § 5 (Ex. 24). Once the City deposits funds in that amount into the Holdback Account, the Custodian then pays to the City the Casino Revenues deposited in the General Receipts Subaccount as well deposits made during the remainder of the month, except as provided by section 5.4 of the CA.

---

[13] Prior to the execution of the Collateral Agreement on June 15, 2009, the City of Detroit passed an ordinance pursuant to the Home Rule Act, which granted a first priority lien and pledge on (i) wagering taxes and (ii) certain development payments to secure payments on the Swaps. (*See* Detroit, Mich., Code § 18-16-8 (2009)). Certain parties contest the validity of this pledge.

US_ACTIVE:\44383859\3\45259.0007
NYI-4560736v2

*Id.* (Ex. 24). Section 5.4 of the CA provides, in part: "No payment shall be made to the City from the General Receipts Subaccount (i) on and after the Term Period End Date or (ii) on or after the occurrence of a Termination Event under a Hedge where the related Counterparty is not the sole Affected Party . . . ." *Id.* § 5.4(a) (Ex. 24) [14] The (i) downgrade by Moody's of the 2006 COPs on March 20, 2012, (ii) Governor declaring a financial emergency in the City on March 1, 2013, (iii) appointment of the Emergency Manager on March 14, 2013, (iv) City's failure to pay certain amounts due under the Service Contracts on June 14, 2013, and (v) commencement of the chapter 9 case on July 18, 2013 each constituted a "Termination Event" for which the Service Corporations are the sole Affected Parties (as defined in the Swap Agreements). *See* ISDA §§ 5(b)(iii), 12 (definition of "Termination Event") (Ex. 17), Amended Schedule Part 1(i)(ii)(4), (8), (11) (Ex. 18). [15] The City also concedes that Events of Default and/or Termination Events exist under the Swaps. The Swap Counterparties have not taken any action to enforce Section 5.4 of the Collateral Agreement and, pursuant to the Forbearance and Optional Termination Agreement (Mot. Ex. 6), they have agreed to forbear from doing so during the Forbearance Period (as defined therein). The Custodian "may rely upon the written notice delivered by either Counterparty as to the occurrence of any…event affecting the determination of the amount or timing of payment" under Article V of the Collateral Agreement. *See* CA §5.8(a) (Ex. 24). Furthermore, under the Collateral Agreement, the Custodian is not (i) "required to make any investigation into the existence or occurrence of any facts referred to" in the Collateral

---

[14] Certain parties assert that the "trapping" of the Casino Revenues occurs automatically, without further action of the Swap Counterparties.

[15] In addition, each of the events described in clauses (ii) through (v) constitutes the "Term Period End Date" under the Collateral Agreement. *See* CA §§ 1.1 (Definitions of "Term Period End Date" Qualified Hedge Event," and "Specified Additional Termination Event"), 11.6(7), (11)(12), Amended Schedule Part 4(i) (Definition of Specified Additional Termination Event"), Part 1(1)(ii)(4).

US_ACTIVE:\44383859\3\45259.0007
NYI-4560736v2

Agreement or (ii) "obligated to make any investigation into the facts or matters stated in any . . . notice" delivered in connection with the Collateral Agreement. *See* CA §§12.3(e), (f) (Ex. 24).

18.　　Following the execution of the Collateral Agreement, all quarterly swap payments have been made to the Swap Counterparties. On average, approximately $15 million of Casino Revenues has been deposited by the Casinos into the General Receipts Subaccount each month. Deducting the approximately $4 million of monthly Swap payments, this provides the City, on average, with a net cash source of approximately $11 million per month to fund obligations.

19.　　The Collateral Agreement provides that the City cannot take any action to divert or redirect the payment of the Casino Revenues without the consent of the Swap Counterparties. CA § 5.1 (Ex. 24). In addition to the new Optional Early Termination provision added to the Amended Schedules (discussed below), the Collateral Agreement gave the Swap Counterparties a variety of new rights the exercise of which, the Swap Counterparties contend, do not by their terms require the Insurers' consent. (*See, e.g., id.* §§ 3.4 (casino instructions), 9.2 (control over junior liens), 9.6 (changes to the Development Agreement), 10.4 (payment of alternative taxes), 11.2 (remedies as secured parties), 11.4 (City's failure to appropriate), and 12.13 (right to remove the Custodian) (Ex. 24). The Collateral Agreement and all the security interests granted to the Swap Counterparties (certain parties contest that any valid security interests were granted to the Swap Counterparties) terminate upon termination of the Swaps and each Swap Counterparty's delivery of confirmation to the Custodian of the payment in full of all obligations of the Service Corporations and the City to each Swap Counterparty under the Swaps and the Collateral Agreement. *Id.* § 14.4 (Ex. 24).

20.　　Concurrently with the execution of the Collateral Agreement, the Swaps and Service Contracts were expressly amended. The Collateral Agreement provides that it, the 2009

amendments and the Irrevocable Instructions (collectively, the "Definitive Documents"), the

Swaps, the 2006 Service Contracts and the Contract Administration Agreement, as modified by

the Definitive Documents, contain the entire agreement of the parties. *Id*. § 14.14 (Ex. 24). In

addition, the Collateral Agreement provides, "[a]ll of the terms and conditions of the Definitive

Documents and of the Hedges [i.e., Swaps], the [2006] Service Contracts and the Contract

Administration Agreement, as modified by the Definitive Documents, shall remain in full force

and effect." *Id*. § 14.14(c) (Ex. 24).

21.     The Collateral Agreement defines "Insurer" as FGIC or Syncora, as the context

may require, "or any successor of either of them to the insurance obligations of its predecessor

with respect to the insurance of the payment obligations of a Service Corporation under a

Hedge." *Id*. § 1.1 (Ex. 24). An "Insurer" has the right to consent to any amendment of the

Collateral Agreement, but "only…to the extent the amendment affects the rights, remedies, or

obligations of such Insurer." *Id*. § 14.5 (Ex. 24). To date, the Swap Insurers have made no

payments on the Swap insurance policies.

22.     At the same time they entered the Collateral Agreement, the Swap Counterparties

renegotiated the schedules to the Swap Agreements (the "Amended Schedules"). Among other

things, certain new provisions were added to the Swap Agreements through the Amended

Schedules. *See e.g.* Amended Schedule Part 1(i) (Ex. 18). Specifically, eleven specific

"Additional Termination Events" based on events of default or similar events were added and

made applicable to Part 5(a) of the SBS Amended Schedules and Part 5(i) of the UBS Amended

Schedules.[16] *See* Amended Schedule, Parts 1(i)(ii), 5(i) (Ex. 23); SBS Amended Schedule Part

---

[16] Part 5(a) of the SBS Amended Schedules and Part 5(i) of the Amended Schedules apply only when
there is a designation of an "Early Termination Date pursuant to Section 6" of the ISDA Master

US_ACTIVE\44383859\3\45259.0007
NYI-4560736v2

5(a) (Ex. 18). Termination of the Swaps based upon any of these eleven new events, like other Events of Default and Termination Events under the Swap Agreements that were not amended, is subject to the purported consent rights of the Insurers. *See* SBS Amended Schedule Part 5(a)(ii) (Ex. 23); Amended Schedule Part 5(i)(b) (Ex. 18). The City contends that the Insurers lost their right of consent pursuant to Section 5(b) of the Amended Schedules; however, the Insurers dispute this interpretation of the Swap documents. In addition, the fixed rate owed by the Service Corporations to the Swap Counterparties under the Swap Agreements was raised from 6.256% to 6.356% for Swaps related to the GRS, and from 6.252% to 6.352% for Swaps related to the PFRS. *See* Revised Confirmation at 2 (Ex. 19) (for Swaps related to the GRS); PFRS Revised Confirmation (Ex. 27) (for Swaps related to the PFRS).

23. The Swap Agreements were also amended in 2009 to add an Optional Early Termination provision, which gives the Swap Counterparties the right and option to terminate the Swaps, <u>provided</u> that the Service Corporations will not owe any amount on the Swaps upon the exercise of such option (except for prior unpaid amounts). SBS Amended Schedule Part 5(t) (Ex. 23); Amended Schedule Part 5(xx) (Ex. 18). The express terms of the Optional Early Termination provision do not require the Swap Insurer's consent. *Id*.

24. The Insurers provided their consent to the Collateral Agreement and the Amended Schedules by Waiver and Consent dated June 26, 2009. *See* Waiver and Consent of FGIC, dated June 26, 2009 (Ex. 25); Waiver and Consent of Syncora, dated June 26, 2009 (Ex. 26). The Insurers to date have not made any payments on the Swaps and therefore have no current losses or claim or rights of subrogation under the Swap insurance policies (although they assert they may have contingent subrogation rights). When, in June 2013, the City failed to make $39.7

---

Agreement, which is based upon an exercise of remedies following certain specific events. (See, e.g. SBS Amended Schedules at Part 5(a) (Ex. 23); Amended Schedules at Part 5(i) (Ex. 18)).

US_ACTIVE:\44383859\3\45259.0007
NYI-4560736v2

million of payments owed under the Service Contracts related to payments owed on the COPs, Syncora paid the claims subsequently submitted under its COPs insurance policies. Based on the Order of Rehabilitation that was in place at the time, and the Rehabilitation Plan that went effective on August 19, 2013, FGIC has not yet made any payments on the claims submitted under its COPs insurance policies.

No party to this Stipulation objects to the admission of the following documents, and all parties to this Stipulation agree to their authenticity and admissibility:

**Exhibits**

Exhibit 1 - Annual Report of the Board of Trustees of the GRS For the Year Ended June 20, 2004

Exhibit 2 - Annual Report of the Board of Trustees of the PFRS For the Year Ended June 20, 2004

Exhibit 3 - City Ordinances No. 03-05

Exhibit 4 - City Ordinances No. 04-05

Exhibit 5 - GRS Service Contract 2005

Exhibit 6 - PFRS Service Contract 2005

Exhibit 7 - Ordinance No. 05-05

Exhibit 8 - Ordinance No. 05-09

Exhibit 9 - Trust Agreement, dated June 12, 2006, by and among the Service Corporations and U.S. Bank National Association as Trustee

Exhibit 10 - XL Capital Assurance Municipal Bond Insurance Policy CA03049A, dated June 12, 2006

Exhibit 11 - FGIC Municipal Bond New Issue Insurance Policy Number 06010249, dated June 12, 2006

Exhibit 12 - FGIC Municipal Bond New Issue Insurance Policy Number 06010250, dated June 12, 2006

-15-

Exhibit 13 - GRS Service Contract 2006

Exhibit 14 - PFRS Service Contract 2006

Exhibit 15 - Contract Administration Agreement

Exhibit 16 - Assignment of Swap Transactions with PFRS Service Corporation, dated July 19, 2013; Assignment of Swap Transactions with GRS Service Corporation, dated July 19, 2013

Exhibit 17 - 1992 ISDA Master Agreement Local Currency Single Jurisdiction, dated as of May 25, 2005 between UBS and the GRS Service Corporation

Exhibit 18 - Amended and Restated Schedule, dated as of June 26, 2009, to the ISDA between UBS and the GRS Service Corporation

Exhibit 19 - Revised Confirmation to the GRS Service Corporation from UBS, dated June 26, 2009

Exhibit 20 - FGIC Swap Surety Policy Number 0602052 dated June 12, 2006

Exhibit 21 - XL Capital Assurance Swap Insurance Policy Numbers CA03049E, CA03049D, CA03049C and CA03049B, dated June 12, 2006

Exhibit 22 - FGIC Swap Surety Policy Numbers 06010253, 06010254 and 06010255, dated June 12, 2006

Exhibit 23 - SBS Amended Schedules

Exhibit 24 - Collateral Agreement, dated June 15, 2009

Exhibit 25 - Waiver and Consent of FGIC, dated June 26, 2009

Exhibit 26 - Waiver and Consent of Syncora, dated June 26, 2009

Exhibit 27 - PFRS Revised Confirmation

US_ACTIVE:\44383859\3\45259.0007
NYI-4560736v2

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

-----------------------------------------------------x
:
In re                                                : Chapter 9
                                                     :
CITY OF DETROIT, MICHIGAN,                           : Case No. 13-53846
                                                     :
                            Debtor.                  : Hon. Steven W. Rhodes
                                                     :
                                                     :
-----------------------------------------------------x

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2013, I electronically filed the foregoing Statement Of Stipulated Facts Regarding Motion Of Debtor For Entry Of An Order (I) Authorizing The Assumption Of That Certain Forbearance And Optional Termination Agreement Pursuant To Section 365(a) Of The Bankruptcy Code, (II) Approving Such Agreement Pursuant To Rule 9019, And (III) Granting Related Relief with the Clerk of the Court which sends notice by operation of the Court's electronic filing service to all ECF participants registered to receive notice in this adversary proceeding.

Dated: December 11, 2013

/s/ Deborah Kovsky-Apap
Deborah Kovsky-Apap (P68258)