EXHIBIT 1

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

-------------------------------------------------------

| | |
|---|---|
| In re | Chapter 9 |
| CITY OF DETROIT, MICHIGAN, | Case No. 13-53846 |
| Debtor. | Hon. Steven W. Rhodes |

-------------------------------------------------------

**PETITIONER WALTER SWIFT'S OBJECTIONS TO THE MOTION OF THE DEBTOR FOR AN ORDER APPROVING ADR PROCEDURES**

NOW COMES WALTER SWIFT and objects to the "*Motion of Debtor, Pursuant to Sections 105 and 502 of the Bankruptcy Code, for Entry of an Order Approving Alternative Dispute Resolution Procedures to Promote the Liquidation of Certain Prepetition Claims.*" [Dkt # 1665] In support of those objections, the aforementioned interested party states the following:

1. Walter Swift (hereafter "Petitioner") is a Creditor and an interested party, due to his life having been profoundly and adversely affected by the unconstitutional acts of the Debtor City and its police officers. As a result, he filed a complaint pursuant to the Civil Rights Act of 1871, 42 U.S.C. §§ 1983 and 28

1

U.S.C. §1343 (*Walter Swift v. City of Detroit, et al.*, E.D. Mich. Case No. 10-cv-12911)

2. The story behind Petitioner Swift's claims is tragic, and the history regarding the litigation of his case is lengthy. Petitioner provides the following overview for the Court's convenience:

   A. In September 1982, Petitioner Swift was wrongfully convicted of First Degree Criminal Sexual Conduct.

   B. That conviction was based on two significant pieces of evidence:

   - the photo array and line up identification of Mr. Swift by the victim of the crime; and

   - evidence of semen (of an unidentified person) was found on two items where the victim testified that she was raped – her bathrobe and her bed sheet.

   C. Finally, in 2008, more than 26 years later, that conviction was set aside, based upon two innocence factors that had been concealed for decades:

   - A Detroit Police officer showed the victim an array of 550 photographs. The victim identified eight persons as resembling the perpetrator. As a result, the police officer impulsively, impatiently and arbitrarily, held a lineup for suspect number eight alone. Unfortunately, suspect number eight was Walter Swift and the identification of Mr. Swift during the photo array was no more precise or certain than were the previous seven. Further, the victim was told that suspect number eight would be in that lineup. After the lineup, the victim tentatively identified Walter Swift as her

2

assailant and he was charged with First Degree CSC. Detroit Police concealed the seven previous identifications from both the prosecutor and the defense throughout trial. Indeed, the prosecutor explicitly argued to the jury at trial that, of the 550 photos the victim was shown, she identified *only* one[1], Walter Swift; and

- Two blood tests (pre-DNA) were done on the semen samples that were discovered after the rapes. The second test conclusively *excluded* Walter Swift as the rapist. Detroit Police concealed this critical second test was concealed from both the prosecutor and the defense throughout trial.

D. Notably, Detroit Police Officer Paavola (now Nobliski) recognized that Mr. Swift was innocent and, as a consequence, released him after he had been "identified" in the line-up, telling him that when she (Paavola) returned from vacation she would administer a polygraph test and drop all charges against him at that time. Instead, when she got back from vacation, she learned that the case had been taken away from her by her sergeant, Elizabeth Lewandowski, who admitted to Paavola that, Walter Swift "may not have done this crime but she was sure that he had dome some crime before and had gotten away with (it)." Consequently, Lewandowski

---

[1] "[The victim] went through over five hundred pictures. We don't have any misidentification, do we? We don't have [the victim] picking out ten pictures…. You sit there and you flip and flip – five hundred and fifty times and not identify anyone incorrectly. And don't say, "I think it's this guy." Keep flipping, but, "I think it might be him." We don't have that. What we've got is five hundred and fifty and an identification, Walter Swift's picture, and that's how he's picked out. That is better than any live show-up that you could ever hold. That's like putting five hundred in a room and having [the victim] look at five hundred fifty."

proceeded with the prosecution, for which he was ultimately wrongfully imprisoned for over twenty six years.

E.  On July 23, 2010, shortly after his release from prison, Plaintiff Swift filed his case against the City of Detroit and three former Detroit police officers, Janice Paavola-Nobliski, Elizabeth Lewandowski, and Ronald Badaczewski (*Walter Swift v. City of Detroit, et al.*, E.D. Mich. Case No. 10-cv-12911)[2].

F.  From the very outset of this litigation, the Defendants stalled and delayed several aspects of the litigation, for example:

- The City of Detroit's formal initial disclosures, which were due April 26, 2011, were not served until May 7, 2012 (more than one year overdue), after being so ordered by the Court;

- Indeed, the City engaged in such a multitude of inexcusable and extraordinary discovery violations that Judge Friedman eventually ordered the City of Detroit to deposit fifteen thousand dollars ($15,000), to pay for the services of a Discovery Coordinator, in order to unravel the multitude of obstacles created by the Defendants' misconduct.

- The City also intentionally disregarded multiple court orders to obtain outside counsel for Defendants Paavola and Lewandowski. Indeed, it was not until 5 months after the initial order by Magistrate Judge Steven Whalen that substitutions were ultimately entered by new counsel.

---

[2] Wayne County was also originally named as a Defendant, but was dismissed by stipulation. All references to "Defendants" herein refer to the City of Detroit and its officers.

- These delays, which demonstrated grave disrespect for the court, brought the case to a prolonged halt in terms of commencing and completing discovery.

G. By the summer of 2013, the parties were at last in a position to commence depositions on this case, which has languished for three years. Petitioner Swift noticed the deposition of Defendant Paavola-Nobliski, the very first to be scheduled in the case, for August 2, 2013.

3. On July 18, 2013, the Debtor filed for an adjudication of bankruptcy, pursuant to Chapter 9 of the Bankruptcy Code [Dkt. #113].

4. On July 25, 2013, this Court entered both automatic and extended Stays of Proceedings [Dkt #166 ].

4. On September 11, 2013, Deborah Ryan filed a Motion [Dkt. #819] for Relief from these Stays on several bases, including the assertion that this Court's Automatic Stay, as well as its Extended Stay, were in violation of the Fourteenth to the United States Constitution in that they infringed upon and diminished rights secured for her benefit by the Fourteenth Amendment; and, in addition, that the Stays also violate principles of judicial economy.[3]

5. On October 18, 2013, in lieu of lifting the stay in that case, this Court entered an Order [Dkt #1114] that required the Debtor to file, within 35 days, a "motion for approval of an efficient process for liquidating all of the tort claims"

---

[3] While Petitioner Walter Swift does not seek such relief at this time, he does not waive his right to do so.

against the City of Detroit and/or agents of the City of Detroit. Notably, this Court did not rule, and has not ruled, on Ryan's constitutional challenge to the Stays (nor on her judicial economy challenge).

6. On November 12, 2013, the Debtor filed a *Motion for an Order Approving Alternative Dispute Resolution Procedures* [Dkt #1665].

7. The Debtor's proposed ADR procedures do not meet this Court's requirement of "an efficient process for liquidating all of the tort claims" [Dkt #1114] insofar as the proposal gives the Debtor unilateral control of the process itself and would impose substantial and significant adverse consequences to "all" potential claimants, and especially to the Petitioner and other civil rights claimants. For example:

    a. "The City and its professionals" [Dkt #1665, p. 6, ¶15] apparently crafted the proposed plan without the slightest input from any persons, law firms or other entities representing alternative and competing interests and perspectives on behalf of potential claimants. Early settlement is an obviously "efficient" means of liquidating claims; however, the Debtor's unilateral and structurally biased plan will not promote early settlement, because settlement negotiations must be entered into with equanimity and good faith.

    b. At the outset of the proposed plan, the Debtor would have "sole discretion" to determine whether "the ADR Procedures would promote the resolution of such claim and serve the intended objectives of the ADR

6

Procedures." [Dkt #1665, p. 50] The Debtor proposes no clear standards[4] by which that determination would be made and potential claimants would have no mechanism by which to initiate or invite participation.

    c. Likewise, the Debtor insists that "(e)ven where the City has designated certain claims already as candidates for the ADR Procedures, the City in its *sole discretion* may pursue the litigation of any particular claim outside of the ADR Procedures where it deems it more appropriate." [Dkt #1665, p. 7, fn. 6; emphasis added]. Again, the Debtor sets forth no standards for this decision and provides no similarly equal right of a potential claimant to opt to litigate its claim.

    d. The Debtor would also wield tremendous, unilateral and unprecedented power to preemptively bar any and all claimants from seeking relief from the stays by serving an ADR Notice, at its sole discretion. The Debtor asserts that "the City requires sufficient time to initiate the ADR Procedures in a rational manner… without repeated interruptions in the form of Lift Stay Motions…" [Dkt. #1665, p. 10, ¶20]

---

[4] In Paragraph 19 of its Motion [Dkt #1665, pp. 9-10], the Debtor suggests a priority for claims based upon several factors: a) the difference between previous settlement offers, b) the nature and complexity of the claim, c) the "status" of an underlying lawsuit, d) whether the claimant previously "actively" participated in settlement discussions, and e) "any other considerations that the City deems relevant or appropriate in its sole discretion."

    First, these purported factors lack clarity; for example, how close must the previous offers be? Claims of what particular nature would be given priority? Does complexity of claims weigh in favor ADR priority (to avoid complex litigation) or would simpler matters be given priority?

    Second, and perhaps more significantly, these factors are to be evaluated by the unilateral and self-interested determinations of the City Law Department. This lack of objectivity and fairness is infused throughout this system.

7

13-53846-tjt   Doc 2140-1   Filed 12/16/13   Entered 12/16/13 08:30:33   Page 7 of 10

This argument however is belied by the Debtor's proposal that "the City Law Department will be the primary group responsible to implementing the ADR Procedures for the City" [Dkt #1665, p. 9, fn 7]; whereas, the Debtor's bankruptcy counsel, as opposed to the City Law Department, has been the entity primarily responsible for responding to these motions seeking relief from the stay.

    e.  The Debtor's plan would submit all claims that are not settled, through a series of offer exchanges, to the Wayne County Mediation Tribunal Association ("MTA"). For this purpose, the Debtor contemplates and commingles a wide variety of different cases, including cases based on auto negligence/"no fault", 1st party benefits for automobile accidents, slips and falls, highway/sidewalk/public building defects, employment discrimination and wrongful discharge. Into this mixture, it adds complex 42 U.S.C. §1983 cases (and other federal civil rights claims). However, the MTA is primarily soldiered by attorneys who are not experienced in constitutional and civil rights litigation and therefore, they are not likely to possess the skill, experience and judgment to adequately evaluate claims brought under the federal civil rights statutes.

    f.  Further, since the MTA is designed to perform its assembly line operation in 15–20 minutes for each case, these cases, in particular cases involving complex and nuanced questions of constitutional law, are not appropriate for this kind of Procrustean procedure.

    g.  The plan also unilaterally, and without any justification or analysis, proclaims that an Arbitration Award may not "award the Designated Claimant with: (i) punitive damages … (and) … attorneys' fees or other fees and costs…." [Dkt #1665, p. 64] In so announcing, this "plan" thus

demonstrates hostility toward the Constitution, despite the fact that all of these elements of damage are compelled by 42 U.S.C. §§1983, 1988, the Fourteenth Amendment and specifically Section 5, thereof. See *Smith v. Wade*, 461 U.S. 30 (1982); *Fitzpatrick v. Bitzer,* 427 U.S. 445 (1975).[5] this aspect of the plan also provides a massive disincentive for civil rights claimants to submit to the binding arbitration process, thereby making the proposed plan not only antagonistic to civil rights claims, but also far less "efficient" in liquidating such claims.

**WHEREFORE,** for the reasons stated above, the Petitioner requests that this Court provide the following relief:

A. Determine that the plan proposed by the Debtor [Dkt #1665] is essentially unfair to all claimants and potential claimants, in that it was promulgated with no input from interested parties;

B. Determine that the plan proposed by the Debtor [Dkt #1665] is essentially unconstitutional and unfair to all persons asserting claims against the Debtor, pursuant to 42 U.S.C. § 1983 and the Unites States Constitution, in that it does not distinguish between persons claiming

---

[5] It is to be noted that the policy behind the award of punitive damages is the "deterrence of constitutional violations…." *Smith v. Wade, supra,* at 35, fn 5. Further, the policy that underscores the award of attorney fees in §1983 cases is that of "encouraging private citizens to act as private attorneys general and serve the public interest by bringing suits to vindicate civil rights." *Kay v. Ehrler,* 900 F. 2nd 967, 970 (6th Cir. 1990).

9

under the Constitution and those asserting claims pursuant to Michigan statutory and common law;

C. Issue an Order:

1. Denying the relief sought by the Debtor;

2. Appoint a Creditors Committee consisting of civil rights claimants to participate in appropriate proceedings before this Court to protect the rights and interests of this unique class of claimants; and

3. Set a hearing date for all interested parties (or, in the alternative, the appropriate Creditors Committee(s)) to come before the Court and present reasons why the Debtor's proposed plan is deficient, unconstitutional, unfair and/or not in the best interests of justice and, therefore, in violation of this Court's Order [Dkt #1114] and to propose formulate a more equitable and more efficient plan for liquidating claims.

Respectfully submitted,

*/s/William H. Goodman*
William H. Goodman   P14173
Goodman & Hurwitz, P.C.
*Attorneys for Plaintiff*
1394 E. Jefferson Ave.
Detroit, MI 48207
313-567-6170
bgoodman@goodmanhurwitz.com

Dated: December 16, 2013