# SUPPLEMENTAL EXHIBIT
## Part 1

**Order for Relief dated December 5, 2013 [Docket No. 1946]**

**Opinion Regarding Eligibility dated December 5, 2013 [Docket No. 1945]**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:
City of Detroit, Michigan,
Debtor.

_____/

Chapter 9
Case No. 13-53846
Hon. Steven W. Rhodes

### Order for Relief Under Chapter 9 of the Bankruptcy Code

The Court has determined that the City of Detroit, Michigan has met all of the applicable requirements and is eligible to be a debtor under chapter 9 of the bankruptcy code. The Court has further determined that the City of Detroit, Michigan filed its chapter 9 petition in good faith.

Accordingly, the Court hereby enters this Order for Relief and grants relief to the City of Detroit, Michigan under chapter 9 of the bankruptcy code.

**Signed on December 05, 2013**

/s/ Steven Rhodes
**Steven Rhodes**
**United States Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                        Chapter 9
City of Detroit, Michigan,                    Case No. 13-53846
        Debtor.                               Hon. Steven W. Rhodes
_____/


## Opinion Regarding Eligibility


The Congress shall have Power To . . . establish . . . uniform Laws on the subject of Bankruptcies throughout the United States. . . .

> Article I, Section 8, United States Constitution


No . . . law impairing the obligation of contract shall be enacted.

> Article I, Section 10, Michigan Constitution


The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby.

> Article IX, Section 24, Michigan Constitution

## Table of Contents

I. Summary of Opinion ............................................................................................ 1

II. Introduction to the Eligibility Objections ......................................................... 1

    A. The Process ................................................................................................... 1

    B. Objections Filed by Individuals Without an Attorney .................................. 3

    C. Objections That Raise Only Legal Issues ..................................................... 3

    D. Objections That Require the Resolution of Genuine Issues of Material Fact ............... 4

III. Introduction to the Facts Leading up to the Bankruptcy Filing ........................ 5

    A. The City's Financial Distress ........................................................................ 7

        1. The City's Debt .......................................................................................... 7

        2. Pension Liabilities ..................................................................................... 8

        3. OPEB Liabilities ....................................................................................... 10

        4. Legacy Expenditures - Pensions and OPEB ............................................. 11

        5. The Certificates of Participation .............................................................. 11

            a. The COPs and Swaps Transaction ..................................................... 11

            b. The Result ........................................................................................... 13

            c. The Collateral Agreement ................................................................... 13

            d. The City's Defaults Under the Collateral Agreement.......................... 14

            e. The Forbearance and Optional Termination Agreement ..................... 14

            f. The Resulting Litigation Involving Syncora ....................................... 15

            g. The COPs Debt .................................................................................... 16

        6. Debt Service .............................................................................................. 16

        7. Revenues .................................................................................................... 17

        8. Operating Deficits ..................................................................................... 17

        9. Payment Deferrals ..................................................................................... 18

B. The Causes and Consequences of the City's Financial Distress ................................. 19

    1. Population Losses .................................................................................. 19

    2. Employment Losses ............................................................................... 19

    3. Credit Rating ......................................................................................... 19

    4. The Water and Sewerage Department ..................................................... 20

    5. The Crime Rate ...................................................................................... 20

    6. Streetlights ............................................................................................ 20

    7. Blight .................................................................................................... 20

    8. The Police Department .......................................................................... 21

    9. The Fire Department .............................................................................. 21

    10. Parks and Recreation ........................................................................... 22

    11. Information Technology ....................................................................... 22

C. The City's Efforts to Address Its Financial Distress ................................................. 23

D. A Brief History of Michigan's Emergency Manager Laws ......................................... 23

E. The Events Leading to the Appointment of the City's Emergency Manager .............. 24

    1. The State Treasurer's Report of December 21, 2011 ................................. 25

    2. The Financial Review Team's Report of March 26, 2012 ............................ 26

    3. The Consent Agreement ......................................................................... 27

    4. The State Treasurer's Report of December 14, 2012 ................................. 28

    5. The Financial Review Team's Report of February 19, 2013 ........................ 29

    6. The Appointment of an Emergency Manager for the City of Detroit .............. 30

F. The Emergency Manager's Activities ....................................................................... 31

    1. The June 14, 2013 Meeting and Proposal to Creditors ............................... 31

    2. Subsequent Discussions with Creditor Representatives .............................. 34

G. The Prepetition Litigation ...................................................................................... 36

H. The Bankruptcy Filing ...................................................................................... 36

**IV. The City Bears the Burden of Proof.** ..................................................................... 37

**V. The Objections of the Individuals Who Filed Objections Without an Attorney** ............. 37

**VI. The City of Detroit Is a "Municipality" Under 11 U.S.C. § 109(c)(1).** ........................... 38

**VII. The Bankruptcy Court Has the Authority to Determine the Constitutionality of Chapter 9 of the Bankruptcy Code and Public Act 436.** ............................................... 39

    A. The Parties' Objections to the Court's Authority Under *Stern v. Marshall* ............... 39

    B. *Stern*, *Waldman*, and *Global Technovations* ................................................................ 39

    C. Applying *Stern*, *Waldman*, and *Global Technovations* in This Case ........................... 41

    D. Applying *Stern* in Similar Procedural Contexts .......................................................... 43

    E. The Objectors Overstate the Scope of *Stern* ............................................................... 44

        1. *Stern* Does Not Preclude This Court from Determining Constitutional Issues. 44

        2. Federalism Issues Are Not Relevant to a *Stern* Analysis. ............................... 47

    F. Conclusion Regarding the *Stern* Issue ......................................................................... 49

**VIII. Chapter 9 Does Not Violate the United States Constitution.** ......................................... 49

    A. Chapter 9 Does Not Violate the Uniformity Requirement of the Bankruptcy Clause of the United States Constitution. ................................................................................ 49

        1. The Applicable Law ........................................................................................... 50

        2. Discussion .......................................................................................................... 51

    B. Chapter 9 Does Not Violate the Contracts Clause of the United States Constitution.. 52

    C. Chapter 9 Does Not Violate the Tenth Amendment to the United States Constitution. ............................................................................................................................... 53

        1. The Tenth Amendment Challenges to Chapter 9 Are Ripe for Decision and the Objecting Parties Have Standing. ....................................................................... 54

            a. Standing ...................................................................................................... 55

            b. Ripeness ...................................................................................................... 57

2. The Supreme Court Has Already Determined That Chapter 9 Is Constitutional. ............................................................................................ 59

3. Changes to Municipal Bankruptcy Law Since 1937 Do Not Undermine the Continuing Validity of *Bekins*. .................................................. 62

    a. The Contracts Clause of the United States Constitution Prohibits States from Enacting Municipal Bankruptcy Laws. ....................................... 63

    b. *Asbury Park* Is Limited to Its Own Facts ............................................. 64

4. Changes to the Supreme Court's Tenth Amendment Jurisprudence Do Not Undermine the Continuing Validity of *Bekins* ................................. 65

    a. *New York v. United States* ..................................................................... 65

    b. *Printz v. United States* ........................................................................... 68

    c. *New York* and *Printz* Do Not Undermine *Bekins*. ................................. 69

    d. Explaining Some Puzzling Language in *New York* ............................... 71

5. Chapter 9 Is Constitutional As Applied in This Case. .................................... 73

    a. When the State Consents to a Chapter 9 Bankruptcy, the Tenth Amendment Does Not Prohibit the Impairment of Contract Rights That Are Otherwise Protected by the State Constitution. ............................. 73

    b. Under the Michigan Constitution, Pension Rights Are Contractual Rights. ........................................................................................................ 75

**IX. Public Act 436 Does Not Violate the Michigan Constitution.** .......................................... 81

    A. The Michigan Case Law on Evaluating the Constitutionality of a State Statute. ......... 82

    B. The Voters' Rejection of Public Act 4 Did Not Constitutionally Prohibit the Michigan Legislature from Enacting Public Act 436 ........................................... 84

    C. Even If the Michigan Legislature Did Include Appropriations Provisions in Public Act 436 to Evade the Constitutional Right of Referendum, It Is Not Unconstitutional. .... 86

    D. Public Act 436 Does Not Violate the Home Rule Provisions of the Michigan Constitution. ............................................................................................... 88

    E. Public Act 436 Does Not Violate the Pension Clause of the Michigan Constitution. . 92

**X. Detroit's Emergency Manager Had Valid Authority to File This Bankruptcy Case Even Though He Is Not an Elected Official.** ........................................................... 93

XI. **The Governor's Authorization to File This Bankruptcy Case Was Valid Under the Michigan Constitution Even Though the Authorization Did Not Prohibit the City from Impairing Pension Rights.** ................................................................. 94

XII. **The Judgment in *Webster v. Michigan* Does Not Preclude the City from Asserting That the Governor's Authorization to File This Bankruptcy Case Was Valid.** ................ 95

    A. The Circumstances Leading to the Judgment ........................................... 95

    B. The Judgment Is Void Because It Was Entered After the City Filed Its Petition. ....... 99

    C. The Judgment Is Also Void Because It Violated the Automatic Stay. ..................... 101

    D. Other Issues ................................................................................ 103

XIII. **The City Was "Insolvent."** ........................................................................ 104

    A. The Applicable Law ...................................................................... 104

    B. Discussion ................................................................................. 106

        1. The City Was "Generally Not Paying Its Debts As They Become Due." ...... 106

        2. The City Is Also "Unable to Pay Its Debts As They Become Due." .............. 107

        3. The City's "Lay" Witnesses ................................................................. 108

        4. The City's Failure to Monetize Assets ................................................. 109

XIV. **The City Desires to Effect a Plan to Adjust Its Debts.** ..................................... 110

    A. The Applicable Law ...................................................................... 110

    B. Discussion ................................................................................. 111

XV. **The City Did Not Negotiate with Its Creditors in Good Faith.** ........................... 112

    A. The Applicable Law ...................................................................... 112

    B. Discussion ................................................................................. 116

XVI. **The City Was Unable to Negotiate with Creditors Because Such Negotiation Was Impracticable.** ...................................................................................... 119

    A. The Applicable Law ...................................................................... 119

    B. Discussion ................................................................................. 121

XVII. **The City Filed Its Bankruptcy Petition in Good Faith.** .................................... 125

A. The Applicable Law ................................................................................ 126

B. Discussion ............................................................................................. 127

    1. The Objectors' Theory of Bad Faith ............................................... 127

    2. The Court's Conclusions Regarding the Objectors' Theory of Bad Faith...... 130

    3. The City Filed This Bankruptcy Case in Good Faith. .................................. 135

        a. The City's Financial Problems Are of a Type Contemplated for Chapter 9 Relief. ............................................................................................ 136

        b. The City's Reasons for Filing Are Consistent with the Remedial Purpose of Chapter 9. ................................................................... 137

        c. The City Made Efforts to Improve the State of Its Finances Prior to Filing, to No Avail........................................................................... 138

        d. The Residents of Detroit Will Be Severely Prejudiced If This Case Is Dismissed. ...................................................................................... 139

C. Conclusion Regarding the City's Good Faith ........................................... 140

**XVIII. Other Miscellaneous Arguments**......................................................... 140

A. *Midlantic* Does Not Apply in This Case.................................................... 140

B. There Was No Gap in Mr. Orr's Service as Emergency Manager............................. 141

**XIX. Conclusion: The City is Eligible and the Court Will Enter an Order for Relief.**...... 142

# I. Summary of Opinion

For the reason stated herein, the Court finds that the City of Detroit has established that it meets the requirements of 11 U.S.C. § 109(c). Accordingly, the Court finds that the City may be a debtor under chapter 9 of the bankruptcy code. The Court will enter an order for relief under chapter 9.

Specifically, the Court finds that:

- The City of Detroit is a "municipality" as defined in 11 U.S.C. § 101(40).
- The City was specifically authorized to be a debtor under chapter 9 by a governmental officer empowered by State law to authorize the City to be a debtor under chapter 9.
- The City is "insolvent" as defined in 11 U.S.C. § 101(32)(C).
- The City desires to effect a plan to adjust its debts.
- The City did not negotiate in good faith with creditors but was not required to because such negotiation was impracticable.

The Court further finds that the City filed the petition in good faith and that therefore the petition is not subject to dismissal under 11 U.S.C. § 921(c).

The Court concludes that it has jurisdiction over this matter under 28 U.S.C. § 1334(a), and that the matter is a core proceeding under 28 U.S.C. § 157(b)(2).

# II. Introduction to the Eligibility Objections

The matter is before the Court on the parties' objections to the eligibility of the City of Detroit to be a debtor in this chapter 9 case under 11 U.S.C. § 109(c).

## A. The Process

By order dated August 2, 2013, the Court set a deadline of August 19, 2013 for parties to file objections to eligibility. (Dkt. #280) That order also allowed the Official Committee of Retirees, then in formation, to file eligibility objections 14 days after it retained counsel.

1

One hundred nine parties filed timely objections to the City's eligibility to file this bankruptcy case under § 109 of the bankruptcy code. In addition, two individuals, Hassan Aleem and Carl Williams, filed an untimely joint objection, but upon motion, the Court determined that these objections should be considered timely. (Dkt. #821, ¶ VIII, at 7) Accordingly, the total number of objections to be considered is 110.

In pursuing their eligibility objections, the parties represented by attorneys filed over 50 briefs through several rounds.

Because the constitutionality of chapter 9 was drawn into question, the Court certified the matter to the Attorney General of the United States under 28 U.S.C. § 2403(a), and permitted the United States to intervene. (Dkt. #642 at 7) The United States then filed a brief in support of the constitutionality of chapter 9 (Dkt. #1149) and a supplemental brief (Dkt. #1560).

Also, because the constitutionality of a state statute was drawn into question, the Court certified the matter to the Michigan Attorney General under 28 U.S.C. § 2403(b), and permitted the State of Michigan to intervene. The Michigan Attorney General filed a "Statement Regarding The Michigan Constitution And The Bankruptcy Of The City Of Detroit." (Dkt. #481) He also filed a brief regarding eligibility (Dkt. #756) and a supplemental response (Dkt. #1085).

In an effort to organize and expedite its consideration of these objections, the Court entered an "Order Regarding Eligibility Objections" on August 26, 2013 (Dkt. #642) and a "First Amended Order Regarding Eligibility Objections" on September 12, 2013 (Dkt. #821). Those orders divided the objections into two groups - those filed by parties with an attorney, which were, generally, organized groups (group A), and those filed by individuals, mostly without an attorney (group B). Individuals without an attorney (group B) filed 93 objections. The

2

remaining 17 objections were filed by parties with an attorney. The objections filed by attorneys were then further divided between objections raising only legal issues and objections that require the resolution of genuine issues of material fact.[1]

The Second Amended Final Pre-Trial Order concisely identifies which parties assert which objections. (Dkt. #1647 at 4-11) This opinion will not repeat that recitation.

### B. Objections Filed by Individuals Without an Attorney

On September 19, 2013, the Court held a hearing at which the individuals who filed timely objections without an attorney had an opportunity to address the Court. At that hearing, 45 individuals addressed the Court. These objections are discussed in Part V, below.

### C. Objections That Raise Only Legal Issues

On October 15 and 16, 2013, the Court heard arguments on the objections that raised only legal issues. These objections are addressed in Parts VII-XII, below. Summarily stated, these objections are:

1. Chapter 9 of the bankruptcy code violates the United States Constitution.

2. The bankruptcy court does not have the authority to determine the constitutionality of chapter 9 of the bankruptcy code.

---

[1] In their many briefs, some parties narrowly focused their arguments in support of their objections. Other parties, however, asserted an expansive range and number of more creative arguments in support of their objections. This opinion may not address every argument made in every brief. Nevertheless, the Court is satisfied that this opinion does address every argument that is worthy of serious consideration. To the extent an argument is not addressed in this opinion, it is overruled.

3

3. Public Act 436 of 2012 violates the Michigan Constitution and therefore the City was not validly authorized to file this bankruptcy case as required for eligibility by 11 U.S.C. § 109(c)(2).

4. The bankruptcy court does not have the authority to determine the constitutionality of P.A. 436.

5. Detroit's emergency manager is not an elected official and therefore did not have valid authority to file this bankruptcy case, as required for eligibility by 11 U.S.C. § 109(c)(2).

6. Because the governor's authorization to file this bankruptcy case did not prohibit the City from impairing the pension rights of its employees and retirees, the authorization was not valid under the Michigan Constitution, as required for eligibility by 11 U.S.C. § 109(c)(2).

7. Because of the proceedings and judgment in *Webster v. The State of Michigan*, Case No. 13-734-CZ (Ingham County Circuit Court), the City is precluded by law from claiming that the governor's authorization to file this bankruptcy case was valid, as required for eligibility by 11 U.S.C. § 109(c)(2).

### D. Objections That Require the Resolution of Genuine Issues of Material Fact

Beginning on October 23, 2013, the Court conducted a trial on the objections filed by attorneys that require the resolution of genuine issues of material fact. These objections are addressed in Parts XIII-XVII, below. Summarily stated, these objections are:

8. The City was not "insolvent," as required for eligibility by 11 U.S.C. § 109(c)(3) and as defined in 11 U.S.C. § 101(32)(C).

9. The City does not desire "to effect a plan to adjust such debts," as required for eligibility by 11 U.S.C. § 109(c)(4).

4

10. The City did not negotiate in good faith with creditors, as required (in the alternative) for eligibility by 11 U.S.C. § 109(c)(5)(B).

11. The City was not "unable to negotiate with creditors because such negotiation [was] impracticable," as required (in the alternative) for eligibility by 11 U.S.C. § 109(c)(5)(C).

12. The City's bankruptcy petition should be dismissed under 11 U.S.C. § 921(c) because it was filed in bad faith.

In addition, in the course of the briefing, parties asserted certain new and untimely objections. These are addressed in Part XVIII, below.

### III. Introduction to the Facts
### Leading up to the Bankruptcy Filing

The City of Detroit was once a hardworking, diverse, vital city, the home of the automobile industry, proud of its nickname - the "Motor City." It was rightfully known as the birthplace of the American automobile industry. In 1952, at the height of its prosperity and prestige, it had a population of approximately 1,850,000 residents. In 1950, Detroit was building half of the world's cars.

The evidence before the Court establishes that for decades, however, the City of Detroit has experienced dwindling population, employment, and revenues. This has led to decaying infrastructure, excessive borrowing, mounting crime rates, spreading blight, and a deteriorating quality of life.

The City no longer has the resources to provide its residents with the basic police, fire and emergency medical services that its residents need for their basic health and safety.

Moreover, the City's governmental operations are wasteful and inefficient. Its equipment, especially its streetlights and its technology, and much of its fire and police equipment, is obsolete.

5

To reverse this decline in basic services, to attract new residents and businesses, and to revitalize and reinvigorate itself, the City needs help.

The following sections of this Part of the opinion detail the basic facts regarding the City's fiscal decline, and the causes and consequences of it. Section A will address the City's financial distress. Section B will address the causes and consequences of that distress. Section C will address the City's efforts to address its financial distress. Part D will address the facts and events that resulted in the appointment of an emergency manager for the City. Finally, Parts E-G will address the facts and events that culminated in this bankruptcy filing.

The evidence supporting these factual findings consists largely of the following admitted exhibits:

Exhibit 6 - the City's "Comprehensive Annual Financial Report" for the fiscal year ended June 30, 2012.

Exhibit 21 - "Preliminary Review of the City of Detroit," from Andy Dillon, State Treasurer, to Rick Snyder, Governor, December 21, 2011;

Exhibit 22 - "Report of the Detroit Financial Review Team," from the Detroit Financial Review Team to Governor Snyder, March 26, 2012;

Exhibit 24 - "Preliminary Review of the City of Detroit," from Andy Dillon, State Treasurer, to Rick Snyder, Governor, December 14, 2012;

Exhibit 25 - "Report of the Detroit Financial Review Team," from the Detroit Financial Review Team to Governor Snyder, February 19, 2013;

Exhibit 26 - Letter from Governor Rick Snyder to Mayor Dave Bing and Detroit City Council, March 1, 2013;

6

Exhibit 28 - Letter from Kevyn D. Orr, Emergency Manager, to Governor Richard Snyder and State Treasurer Andrew Dillon, July 16, 2013;

Exhibit 29 - "Authorization to Commence Chapter 9 Bankruptcy Proceeding," from Governor Richard Snyder to Emergency Manager Kevyn Orr and State Treasurer Andrew Dillon.

Exhibit 38 - Graph, "FY14 monthly cash forecast absent restructuring"

Exhibit 41 - "Financial and Operating Plan," Kevyn D. Orr, Emergency Manager, June 10, 2013;

Exhibit 43 - "Proposal for Creditors," City of Detroit, June 14, 2013;

Exhibit 44 - "Proposal for Creditors, Executive Summary," City of Detroit, June 14, 2013;

Exhibit 75 - "Financial and Operating Plan," Kevyn D. Orr, Emergency Manager, May 12, 2013;

Exhibit 414 - Declaration of Kevyn Orr in Support of Eligibility. (Dkt. #11)

The Court notes that the objecting creditors offered no substantial evidence contradicting the facts found in this Part of the opinion, except as noted below relating to the City's unfunded pension liability.

## A. The City's Financial Distress

### 1. The City's Debt

The City estimates its debt to be $18,000,000,000. This consists of $11,900,000,000 in unsecured debt and $6,400,000,000 in secured debt. It has more than 100,000 creditors.

According to the City, the unsecured debt includes:

$5,700,000,000 for "OPEB" through June 2011, which is the most recent actuarial data available. "OPEB" is "other post-employment benefits," and refers to the Health and Life Insurance Benefit Plan and the Supplemental Death Benefit Plan for retirees;

$3,500,000,000 in unfunded pension obligations;

$651,000,000 in general obligation bonds;

$1,430,000,000 for certificates of participation ("COPs") related to pensions;

$346,600,000 for swap contract liabilities related to the COPs; and

$300,000,000 of other liabilities, including $101,200,000 in accrued compensated absences, including unpaid, accumulated vacation and sick leave balances; $86,500,000 in accrued workers' compensation for which the City is self-insured; $63,900,000 in claims and judgments, including lawsuits and claims other than workers' compensation claims; and $13,000,000 in capital leases and accrued pollution remediation.

As noted, the objecting parties do not seriously challenge the City's estimates of its debt, except for its estimates of its unfunded pension liability. The plans and others have suggested a much lower pension underfunding amount, perhaps even below $1,000,000,000. However, they submitted no proof of that. The Court concludes that it is unnecessary to resolve the issue at this time, because the City would be found eligible regardless of any specific finding on the pension liability that would be in the range between the parties' estimates. Otherwise, the Court is satisfied that the City's estimates of its other liabilities are accurate enough for purposes of determining eligibility, and so finds.

### 2. Pension Liabilities

The City's General Retirement System ("GRS") administers the pension plan for its non-uniformed personnel. The average annual benefit received by retired pensioners or their

beneficiaries is about $18,000. AFSCME Br. at 3 (citing June 30, 2012 General Retirement System of City of Detroit pension valuation report). (Dkt. #505) Generally these retirees are eligible for Social Security retirement or disability benefits.

The City's Police and Fire Retirement System ("PFRS") administers the pension plan for its uniformed personnel. The average annual benefit received by retired pensioners or their beneficiaries is about $30,000. Generally, these retirees are not eligible for Social Security retirement or disability benefits. Retirement Systems Br. at 5 (citing 20 C.F.R. § 404.1206(a)(8), 20 C.F.R. § 404.1212). (Dkt. #519)

The Pension Benefit Guaranty Corporation does not insure pension benefits under either plan.

For the five years ending with FY 2012, pension payments exceeded contributions and investment income by approximately $1,700,000,000 for the GRS and $1,600,000,000 for the PFRS. This resulted in the liquidation of pension trust principal.

As noted, the two pension plans and the City disagree about the level of underfunding in the plans. Gabriel Roeder Smith & Company is the funds' actuary. In its reports for the two pension plans as of June 30, 2012, it found an unfunded actuarial accrued liability ("UAAL") of $829,760,482 for the GRS. Ex. 69 at 3. It found UAAL of $147,216,398 for the PFRS. Ex. 70 at 3.

The City asserts that the actuarial assumptions underlying these estimates are aggressive. Most significantly, the City believes that the two plans project unrealistic annual rates of return on investments net of expenses - 7.9% by GRS and 8.0% by PFRS, and that therefore their estimates are substantially understated. As stated above, the City estimates the underfunding to be $3,500,000,000.

9

Using current actuarial assumptions, the City's required pension contributions, as a percentage of eligible payroll expenses, are projected to grow from 25% for GRS and 30% for PFRS in 2012 to 30% for GRS and 60% for PFRS by 2017. Changes in actuarial assumptions would result in further increases to the City's required pension contributions.

### 3. OPEB Liabilities

The OPEB plans consist of the Health and Life Insurance Benefit Plan and the Supplemental Death Benefit Plan. The City's OPEB obligations arise under 22 different plans, including 15 different plans alone for medical and prescription drugs. These plans have varying structures and terms. The plan is a defined benefit plan providing hospitalization, dental care, vision care and life insurance to current employees and substantially all retirees. The City generally pays for 80% to 100% of health care coverage for eligible retirees. The Health and Life Insurance Plan is totally unfunded; it is financed entirely on a current basis.

As of June 30, 2011, 19,389 retirees were eligible to receive benefits under the City's OPEB plans. The number of retirees receiving benefits from the City is expected to increase over time.

The Supplemental Death Benefit Plan is a pre-funded single-employer defined benefit plan providing death benefits based upon years of creditable service. It has $34,564,960 in actuarially accrued liabilities as of June 30, 2011 and is 74.3% funded with UAAL of $8,900,000.

Of the City's $5,700,000,000 OPEB liability, 99.6% is unfunded.

10

### 4. Legacy Expenditures -
### Pensions and OPEB

During 2012, 38.6% of the City's revenue was consumed servicing legacy liabilities. The forecasts for subsequent years, assuming no restructuring, are 42.5% for 2013, 54.3% for 2014, 59.5% for 2015, 63% for 2016, and 64.5% for 2017.

### 5. The Certificates of Participation

The transactions described here are complex and confusing. The resulting litigation is as well. Nevertheless, a fairly complete explanation of them is necessary to an understanding of the City's severe financial distress.

### a. The COPs and Swaps Transaction

In 2005 and 2006, the City set out to raise $1.4 billion for its underfunded pension funds, the GRS and PFRS. The City created a non-profit Service Corporation for each of the two pension funds, to act as an intermediary in the financing. The City then entered into Service Contracts with each of the Service Corporations. The City would make payments to the Service Corporations, which had created Funding Trusts and assigned their rights to those Funding Trusts. The Funding Trusts issued debt obligations to investors called "Pension Obligation Certificates of Participation. ("COPs").[2] Each COP represented an undivided proportionate interest in the payments that the City would make to the Service Corporations under the Service Contracts.

The City arranged for the purchase of insurance from two monoline insurers to protect against defaults by the funding trusts that would result if the City failed to make payments to the

---

[2] Confusingly, in some of the exhibits, these COPs are referred to as "POCs." See, for example, Financial and Operating Plan, June 10, 2013. Ex. 41 at 15.

11

Service Corporations under the Service Contracts. This was intended to make the investments more attractive to potential investors. One insurer was XL Capital Assurance, Inc., now known as Syncora. The other was the Financial Guaranty Insurance Company.

Some of the COPs paid a floating interest rate. To protect the Service Corporations from the risk of increasing interest rates, they entered into hedge arrangements with UBS A.G. and SBS Financial (the "Swap Counterparties"). Under the hedges, also known as "swaps" (bets, really), the Service Corporations and the Swap Counterparties agreed to convert the floating interest rates into a fixed payment. Under the swaps, if the floating interest rates exceeded a certain rate, the Swap Counterparties would make payments to the Service Corporations. But if the floating interest rates sank below a certain rate, the Service Corporations would make payments to the Swap Counterparties. Specifically, there were eight pay-fixed, receive-variable interest rate swap contracts, effective as of June 12, 2006, with a total amount of $800,000,000.

Under the swaps, the City was also at risk if there was an "event of default" or a "termination event." In such an event, the Swap Counterparties could terminate the swaps and demand a potentially enormous termination payment.

The Swap Counterparties also obtained protection against the risk that the Service Corporations would default on their quarterly swap payments. The parties purchased additional insurance against that risk from Syncora and the Financial Guaranty Insurance Company. Syncora's liability for swap defaults is capped at $50,000,000, even though the Swap Counterparties' claims may be significantly greater. This insurance is separate from the insurance purchased to protect against a default under the COPs.

### b. The Result

In 2008, interest rates dropped dramatically. As a result, the City lost on the swaps bet. Actually, it lost catastrophically on the swaps bet. The bet could cost the City hundreds of millions of dollars. The City estimates that the damage will be approximately $45,000,000 per year for the next ten years.

### c. The Collateral Agreement

As the City's financial condition worsened, the City, the Service Corporations and the Swap Counterparties sought to restructure the swap contracts. In June 2009, they negotiated and entered into a Collateral Agreement that amended the swap agreements. The Collateral Agreement eliminated the "Additional Termination Event" and the potential for an immediate demand for a termination payment. The City agreed to make the swap payments through a "lockbox" arrangement and to pledge certain gaming tax revenues as collateral. The City also agreed to increase the interest rate of the swap agreements by 10 basis points effective July 1, 2010. It also agreed to new termination events, including any downgrading of the credit ratings for the COPs.

Two accounts were set up: 1) a "Holdback Account" and 2) a "General Receipts Subaccount." U.S. Bank was appointed custodian of the accounts. The casinos would pay developer payments and gaming tax payments to the General Receipts Subaccount daily. The City would make monthly deposits into the Holdback Account equal to one-third of the quarterly payment that the Service Corporations owed to the Swap Counterparties. When the City made that monthly payment, U.S. Bank would release to the City the accumulated funds in the General Receipts Subaccount. If the City defaulted, the Swap Counterparties could serve notice on U.S.

13

Bank, which would then hold or "trap" the money in the General Receipts Subaccount and not disburse it to the City.

Syncora was not a party to the Collateral Agreement.

#### d. The City's Defaults Under the Collateral Agreement

In March, 2012, the COPs were downgraded, which triggered a termination event. The Swap Counterparties did not, however, declare a default.

In March, 2013, the appointment of the emergency manager for the City was another event of default. Again however, the Swap Counterparties did not declare a default.

As of June 28, 2013, the City estimated that if an event of default were declared and the Swap Counterparties chose to exercise their right to terminate, it faced a termination obligation to the Swap Counterparties of $296,500,000. This was the approximate negative fair value of the swaps at that time.

On June 14, 2013, the City failed to make a required payment of approximately $40,000,000 on the COPs. This default triggered Syncora's liability as insurer on the COPs and it has apparently made the required payments. However, the City has made all of its required payments to the Swap Counterparties through the Holdback Account. The City contends that as a result, Syncora has no liability to the Swap Counterparties on its guaranty to them.

#### e. The Forbearance and Optional Termination Agreement

Following the City's defaults on the Collateral Agreement, the parties negotiated. On July 15, 2013 (three days before this bankruptcy filing), the City and the Swap Counterparties entered into a "Forbearance and Optional Termination Agreement." Under this agreement, the Swap Counterparties would forebear from terminating the swaps and from instructing U.S. Bank to trap the funds in the General Receipts Subaccount. The City may buy out the swaps at an 18-

14

25% discount, depending on when the payment is made. That buy-out would terminate the pledge of the gaming revenues. Syncora was not a party to this agreement.

When the City filed this bankruptcy case, it also filed a motion to assume the "Forbearance and Optional Termination Agreement." (Dkt. #17) Syncora and many other parties have filed objections to the City's motion. However, because there are serious and substantial defenses to the claims made against the City under the COPs, these objections assert that the agreement should not be approved. After several adjournments, it is scheduled for hearing on December 17, 2013.

### f. The Resulting Litigation Involving Syncora

Meanwhile, back on June 17, 2013, Syncora sent a letter to U.S. Bank declaring an event of default, triggering U.S. Bank's obligation to trap all of the money in the General Receipts Subaccount. The City responded, taking the position that because it had not defaulted in its swap payments and because Syncora has no rights under the Collateral Agreement, Syncora had no right to instruct U.S. Bank to trap the funds.

U.S. Bank did trap approximately $15,000,000. This represented a significant percentage of the City's monthly revenue.

As a result, on July 5, 2013, the City filed a lawsuit against Syncora in the Wayne County Circuit Court. It sought and obtained a temporary restraining order that resulted in U.S. Bank's release of the trapped funds to the City. On July 11, 2013, Syncora removed the action to the district court in Detroit and filed a motion to dissolve the temporary restraining order. On July 31, 2013, Syncora filed a motion to dismiss the complaint. On August 9, 2013, the district referred the matter to this Court. It is now Adversary Proceeding #13-04942. On August 28, 2013, this Court ruled that the gaming revenues are property of the City and therefore protected

by the automatic stay. Tr. 9:17-21, August 28, 2013. (Dkt. #692) As a result, on September 10, 2013, the temporary restraining order was dissolved with the City's stipulation. Syncora's motion to dismiss the adversary proceeding remains pending. It has been adjourned due to a tolling agreement between the parties.

Adding to this drama, on July 24, 2013, Syncora filed a lawsuit against the Swap Counterparties in a state court in New York, seeking an injunction to prevent the Swap Counterparties from performing their obligations under the Forbearance and Optional Termination Agreement. The Swap Counterparties then removed the action to the United States District Court for the Southern District of New York. That court, at the request of the Swap Counterparties, transferred the case to the federal district court in Detroit, which then referred it to this Court. It is Adversary Proceeding No. 13-05395.

### g. The COPs Debt

Returning, finally, to the underlying obligations - the COPS, the City estimates that as of June 30, 2013, the following amounts were outstanding:

$480,300,000 in outstanding principal amount of $640,000,000 Certificates of Participation Series 2005 A maturing June 15, 2013 through 2025; and

$948,540,000 in outstanding principal amount of $948,540,000 Certificates of Participation Series 2006 A and B maturing June 15, 2019 through 2035.

### 6. Debt Service

Debt service from the City's general fund related to limited tax and unlimited tax GO debt and the COPs was $225,300,000 for 2012, and is projected to exceed $247,000,000 in

2013.[3]  The City estimates that 38% of its tax revenue goes to debt service rather than to city services.  It further estimates that without changes, this will increase to 65% within 5 years.

### 7. Revenues

Income tax revenues have decreased by $91,000,000 since 2002 (30%) and by $44,000,000 (15%) since 2008.  Municipal income tax revenue was $276,500,000 in 2008 and $233,000,000 in 2012.

Property tax revenues for 2013 were $135,000,000.  This is a reduction of $13,000,000 (10%) from 2012.

Revenues from the City's utility users' tax have declined from approximately $55,300,000 in 2003 to approximately $39,800,000 in 2012 (28%).

Wagering taxes receipts are about $170–$180,000,000 annually.  However, the City projects that these receipts will decrease through 2015 due to the expected loss of gaming revenue to casinos opening in nearby Toledo, Ohio.

State revenue sharing has decreased by $161,000,000 since 2002 (48%) and by $76,000,000 (30.6%) since 2008, due to the City's declining population and significant reductions in statutory revenue sharing by the State.

### 8. Operating Deficits

The City has experienced operating deficits for each of the past seven years.  Through 2013, it has had an accumulated general fund deficit of $237,000,000.  However, this includes the effect of recent debt issuances - $75,000,000 in 2008; $250,000,000 in 2010; and

---

[3] References to a specific year in the financial sections of this Part are to the City's fiscal year, July 1 to June 30.