# SUPPLEMENTAL EXHIBIT
## Part 4

**Order for Relief dated December 5, 2013 [Docket No. 1946]**

**Opinion Regarding Eligibility dated December 5, 2013 [Docket No. 1945]**

### c. *New York* and *Printz*
### Do Not Undermine *Bekins.*

*Printz* acknowledged that states could volunteer to carry out federal law. *Id.* at 910-11, 916-17 (describing the history of state officers carrying out federal law as involving "voluntary" action on the part of the states). Concurring, Justice O'Connor added, "Our holding, of course, does not spell the end of the objectives of the Brady Act. States and chief law enforcement officers may voluntarily continue to participate in the federal program." *Id.* at 936.

By the same token, *New York* acknowledged that states can and do enter into voluntary contracts with the federal government whereby states agree to legislate according to federal terms in exchange for some federal benefit or forbearance. *New York*, 505 U.S. at 166-67.

What makes those federal programs constitutionally permissible, and the commandeering at issue in *New York* and *Printz* impermissible, is consent, and nothing more. If the state is acting voluntarily, it is free to engage with the federal government across a broad range of subject areas. The Tenth Amendment to the United States Constitution is violated only when the state does not consent.

Chapter 9 simply does not implicate the concerns of *New York* and *Printz*. As *Bekins* emphasized, chapter 9 "is limited to *voluntary* proceedings for the composition of debts." *Bekins*, 304 U.S. at 47 (emphasis added). The *Bekins* Court explained:

> The bankruptcy power is competent to give relief to debtors in such a plight and, if there is any obstacle to its exercise in the case of the districts organized under state law it lies in the right of the State to oppose federal interference. The State steps in to remove that obstacle. The State acts in aid, and not in derogation, of its sovereign powers. It invites the intervention of the bankruptcy power to save its agency which the State itself is powerless to rescue. Through its cooperation with the national government the needed relief is given. We see no ground for the conclusion that the Federal Constitution, in the interest of state sovereignty, has reduced both sovereigns to helplessness in such a case.

*Id.*, 304 U.S. at 54.

The federal government cannot and does not compel states to authorize municipalities to file for chapter 9 relief, and municipalities are not permitted to seek chapter 9 relief without specific state authorization. 11 U.S.C. § 109(c)(2). There is simply no "commandeering" involved. *New York*, 505 U.S. at 161. Chapter 9 does not compel a state to enact a specific regulatory program, as in *New York*. Nor does chapter 9 press state officers into federal service, as in *Printz*. Instead, as *Bekins* held, valid state authorization is required for a municipality to proceed in chapter 9.

Moreover, during the pendency of the chapter 9 case, § 904 of the bankruptcy code mandates that the bankruptcy court "may not . . . interfere with (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the debtor's use or employment of any income-producing property." 11 U.S.C. § 904. At the same time, bankruptcy code § 903 mandates, "This chapter does not limit or impair the power of a State to control . . . a municipality of or in such State in the exercise of the political or governmental powers of such municipality[.]"

Because the state and local officials must authorize the filing of a chapter 9 petition, 11 U.S.C. § 109(c)(2), and because they retain control over "the political or governmental powers" of the municipality, these state officials remain fully politically accountable to the citizens of the state and municipality. *See New York*, 505 U.S. at 186 ("The States thereby retain the ability to set their legislative agendas; state government officials remain accountable to the local electorate.").

70

#### d. Explaining Some Puzzling
#### Language in *New York*

To be sure, some language in *New York* (not repeated in *Printz*) lends support to the argument that state consent cannot cure a federal law that would otherwise violate the Tenth Amendment. In *New York*, Justice O'Connor's opinion for the Court explained that federalism does not exist for the benefit of states, as such, but rather is a part of the constitutional structure whose purpose is to benefit individuals. 505 U.S. at 182. Justice O'Connor continued:

> Where Congress exceeds its authority relative to the States, . . . the departure from the constitutional plan cannot be ratified by the "consent" of state officials. . . . The constitutional authority of Congress cannot be expanded by the "consent" of the governmental unit whose domain is thereby narrowed, whether that unit is the Executive Branch or the States."

*Id.*

Some of the parties in this case have seized upon this language to argue that "the Supreme Court has weakened if not rejected *Bekins'* foundation – that a State's consent can remedy any violation of the Tenth Amendment and principles of federalism as they affect individual citizens." Retiree Committee Objection to Eligibility, ¶ 37 at 19. (Dkt. #805)

The difficulty with this argument is that it proves too much. If this language from *New York* has the sweeping force that the objecting parties ascribe to it, then a state's consent could never "cure" what would otherwise be a Tenth Amendment violation. The two incentives in *New York* that were constitutionally sustained would instead have been struck down like the "take title" provision. As the Court emphasized in *New York*, "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts." *New York*, 505 U.S. at 166.

13-53846-swr    Doc 1945    Filed 12/05/13    Entered 12/05/13 14:11:05    Page 78 of 150

13-53846-tjt    Doc 2163-4    Filed 12/16/13    Entered 12/16/13 16:43:38    Page 4 of 26

Yet, despite Congress' inability to compel states to regulate according to federal standards, it may unquestionably invite, encourage, or entice the states to do so. *New York* specifically held that Congress may "encourage a State to regulate in a particular way," or "hold out incentives to the States as a method of influencing a State's policy choices." *Id.* The key is consent. *New York* further held, "Our cases have identified a variety of methods, short of outright coercion, by which Congress may urge a State to adopt a legislative program consistent with federal interests." *Id.* Consent to what would otherwise be an unlawful commandeering of state governments was the very basis for upholding two of the regulatory programs at issue in *New York*. *Id.* at 173-74.

It is not entirely clear, therefore, what Justice O'Connor meant when she wrote that states "cannot consent to the enlargement of the powers of Congress beyond those enumerated in the Constitution." *Id.* at 182. In a very real sense, the holding of *New York* rests on the premise that states can do just that. Congress cannot require the states to legislate with respect to the problem of radioactive waste, but it can unquestionably hold out incentives that induce the states to consent to do so. More broadly put, states can "consent to the enlargement of the powers of Congress beyond those enumerated in the Constitution." *Id.*

The Court can only conclude that Justice O'Connor meant something else - that a state cannot consent to be compelled. As the Court saw the "choice" in *New York*, it was a choice between two unconstitutional alternatives - regulating according to federal standards or taking title to all of the low level radioactive waste produced by private parties in the state. Justice O'Connor likely concluded that the latter alternative was so unpalatable that it was really no choice at all. After all, here is where the Court found that "Congress had crossed the line distinguishing encouragement from coercion." *Id.* at 175. Understood this way, Justice

O'Connor may have been saying nothing more than that one cannot consent to have a gun held to one's head. The idea of "consent" in such a scenario is meaningless.

If this understanding is correct, it would be incumbent upon the objecting parties to identify some way in which federal authority has compelled state action here. They have not.

Whatever the intended meaning of this language, it cannot be that state consent can never "cure" what would otherwise violate the Tenth Amendment. That meaning would sweep aside the holding of *New York* itself. Nor does this language undo the holding in *Bekins*, which, as stated before, this Court must apply until the Supreme Court overrules it.

Accordingly, the Court concludes that chapter 9 is not facially unconstitutional under the Tenth Amendment.

### 5. Chapter 9 Is Constitutional As Applied in This Case.

Several of the objecting parties also raise "as-applied" challenges to the constitutionality of chapter 9 under the Tenth Amendment to United States Constitution. Although variously cast, the primary thrust of these arguments is that if chapter 9 permits the State of Michigan to authorize a city to file a petition for chapter 9 relief without explicitly providing for the protection of accrued pension benefits, the Tenth Amendment is violated.

The Court concludes that these arguments must be rejected.

### a. When the State Consents to a Chapter 9 Bankruptcy, the Tenth Amendment Does Not Prohibit the Impairment of Contract Rights That Are Otherwise Protected by the State Constitution.

The basis for this result begins with the recognition that the State of Michigan cannot legally provide for the adjustment of the pension debts of the City of Detroit. This is a direct result of the prohibition against the State of Michigan impairing contracts in both the United

73

States Constitution and Michigan Constitution, as well as the prohibition against impairing the contractual obligations relating to accrued pension benefits in the Michigan Constitution.

The federal bankruptcy court, however, is not so constrained. As noted in Part VIII B, above, "The Bankruptcy Clause necessarily authorizes Congress to make laws that would impair contracts. It long has been understood that bankruptcy law entails impairment of contracts." *Stockton*, 478 B.R. at 15 (citing *Sturges v. Crowninshield*, 17 U.S. 122, 191 (1819)).

The state constitutional provisions prohibiting the impairment of contracts and pensions impose no constraint on the bankruptcy process. The Bankruptcy Clause of the United States Constitution, and the bankruptcy code enacted pursuant thereto, explicitly empower the bankruptcy court to impair contracts and to impair contractual rights relating to accrued vested pension benefits. Impairing contracts is what the bankruptcy process does.

The constitutional foundation for municipal bankruptcy was well-articulated in *Stockton*:

> In other words, while a state cannot make a law impairing the obligation of contract, Congress can do so. The goal of the Bankruptcy Code is adjusting the debtor-creditor relationship. Every discharge impairs contracts. While bankruptcy law endeavors to provide a system of orderly, predictable rules for treatment of parties whose contracts are impaired, that does not change the starring role of contract impairment in bankruptcy.
>
> It follows, then, that contracts may be impaired in this chapter 9 case without offending the Constitution. The Bankruptcy Clause gives Congress express power to legislate uniform laws of bankruptcy that result in impairment of contract; and Congress is not subject to the restriction that the Contracts Clause places on states. Compare U.S. Const. art. I, § 8, cl. 4, with § 10, cl. 1.

478 B.R. at 16.

For Tenth Amendment and state sovereignty purposes, nothing distinguishes pension debt in a municipal bankruptcy case from any other debt. If the Tenth Amendment prohibits the impairment of pension benefits in this case, then it would also prohibit the adjustment any other debt in this case. *Bekins* makes it clear, however, that with state consent, the adjustment of

municipal debts does not impermissibly intrude on state sovereignty. *Bekins*, 304 U.S. at 52. This Court is bound to follow that holding.

### b. Under the Michigan Constitution, Pension Rights Are Contractual Rights.

The Plans seek escape from this result by asserting that under the Michigan Constitution, pension debt has greater protection than ordinary contract debt. The argument is premised on the slim reed that in the Michigan Constitution, pension rights may not be "impaired or diminished," whereas only laws "impairing" contract rights are prohibited.

There are several reasons why the slight difference between the language that protects contracts (no "impairment") and the language that protects pensions (no "impairment" or "diminishment") does not demonstrate that pensions were given any extraordinary protection.

Before reviewing those reasons, however, a brief review of the history of the legal status of pension benefits in Michigan is necessary.

At common law, before the adoption of the Michigan Constitution in 1963, public pensions in Michigan were viewed as gratuitous allowances that could be revoked at will, because a retiree lacked any vested right in their continuation. In *Brown v. Highland Park*, 320 Mich. 108, 114, 30 N.W.2d 798, 800 (Mich. 1948), the Michigan Supreme Court stated:

> We are convinced that the majority of cases in other jurisdictions establishes the rule that a pension granted by public authorities is not a contractual obligation, that the pensioner has no vested right, and that a pension is terminable at the will of a municipality, at least while acting within reasonable limits. At best plaintiffs in this case have an expectancy based upon continuance of existing charter provisions.

Similarly, in *Kosa v. Treasurer of State of Mich.*, 408 Mich. 356, 368-69, 292 N.W.2d 452, 459 (1980), the court observed this about the status of pension benefits before the 1963 Constitution was adopted:

Until the adoption of Const. 1963, art. 9, s 24, legislative appropriation for retirement fund reserves was considered to be an ex gratia action. Consequently, the most that could be said about "pre-con" legislative appropriations for retirees was that there was some kind of implied commitment to fund pension reserves.

*Id.* (footnote omitted).

In the 1963 Constitution, this provision enhancing the protection for pensions was included: "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Mich. Const. art. IX, § 24.

In *Kosa*, 408 Mich. at 370 n.21, 292 N.W.2d at 459, the Michigan Supreme Court quoted the following history from the constitutional convention regarding article 9, section 24:

"MR. VAN DUSEN: Mr. Chairman, if I may elaborate briefly on Mr. Brake's answer to Mr. Downs' question, I would like to indicate that the words 'accrued financial benefits' were used designedly, so that the *contractual right of the employee* would be limited to the deferred compensation embodied in any pension plan, and that we hope to avoid thereby a proliferation of litigation by individual participants in retirement systems talking about the general benefits structure, or something other than his specific right to receive benefits. It is not intended that an individual employee should, as a result of this language, be given the right to sue the employing unit to require the actuarial funding of past service benefits, or anything of that nature. *What it is designed to do is to say that when his benefits come due, he's got a contractual right to receive them.* "And, in answer to your second question, *he has the contractual right to sue for them.* So that he has no particular interest in the funding of somebody else's benefits as long as *he has the contractual right to sue for his.*

"MR. DOWNS: I appreciate Mr. Van Dusen's comments. Again, I want to see if I understand this. Then he would not have a remedy of legally forcing the legislative body each year to set aside the appropriate amount, but when the money did come due this would be a *contractual right* for which he could sue a ministerial officer that could be mandamused or enjoined; is that correct?

"MR. VAN DUSEN: Thats my understanding, Mr. Downs."

1 Official Record, Constitutional Convention 1961, pp. 773-774.

*Id.* (emphasis added).

*Kosa* also offered an explanation for the origin of the provision. "To gain protection of their pension rights, Michigan teachers effectively lobbied for a constitutional amendment granting *contractual status* to retirement benefits." 408 Mich. at 360, 292 N.W.2d at 455 (emphasis added).

The *Kosa* court summarized the provision, again using contract language, as follows:

> To sum up, while the Legislature's constitutional *contractual obligation* is not to impair "accrued financial benefits", even if that obligation also related to the funding system, there would be no impairment of the *contractual obligation* because the substituted "entry age normal" system supports the benefit structure as strongly as the replaced "attained age" system.

*Id.*, 408 Mich. at 373, 292 N.W.2d at 461(emphasis added).

> While counting such blessings as have come to them, public school employees are understandably still concerned about their pension security. In that regard, this opinion reminds the Legislature that the constitutional provision adopted by the people of this state is indeed a *solemn contractual obligation* between public employees and the Legislature guaranteeing that pension benefit payments cannot be constitutionally impaired.

*Id.*, 408 Mich. at 382, 292 N.W.2d at 465 (emphasis added).

More recently, in *In re Constitutionality of 2011 PA 38*, 490 Mich. 295, 806 N.W.2d 683 (2011), the Michigan Supreme Court unequivocally stated, "The obvious intent of § 24, however, was to ensure that public pensions be treated as *contractual obligations* that, once earned, could not be diminished." *Id.* at 311, 806 NW.2d at 693 (emphasis added).

That historical review begins to demonstrate the several reasons why the slight difference in the language that protects contracts and the language that protects pensions does not suggest that pensions were given any extraordinary protection:

**First**, the language of article IX, section 24, gives pension benefits the status of a "contractual obligation." The natural meaning of the words "contractual obligation" is certainly inconsistent with the greater protection for which the Plans now argue.

**Second**, if the Michigan Constitution were meant to give the kind of absolute protection for which the Plans argue, the language in the article IX, section 24 simply would not have referred to pension benefits as a "contractual obligation." It also would not have been constructed by simply copying the verb from the contracts clause - "impair" - and then adding a lesser verb -"diminish" in the disjunctive.

**Third**, linguistically, there is no functional difference in meaning between "impair" and "impair or diminish." There certainly is a preference, if not a mandate, to give meaning to every word in written law. In *Koontz v. Ameritech Servs., Inc.*, 466 Mich. 304, 312, 645 N.W.2d 34, 39 (2002), the Michigan Supreme Court summarized the familiar command, "Courts must give effect to every word, phrase, and clause in a statute, and must avoid an interpretation that would render any part of the statute surplusage or nugatory." The court went on to state, however, "we give undefined statutory terms their plain and ordinary meanings." *Id.*

Under *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999), discussed in more detail in Part IX A, below, this Court is bound by these commands of statutory interpretation that the Michigan Supreme Court embraced in *Koontz*. But if this Court gives these terms - "diminish" and "impair" - their plain and ordinary meanings, as *Koontz* requires, those meanings would not be substantively different from each other. The terms are not

synonyms, but they cannot honestly be given meanings so different as to compel the result that the Plans now seek. "Diminish" adds nothing material to "impair." All "diminishment" is "impairment." And, "impair" includes "diminish."

**Fourth**, the Plans' argument for a greater protection is inconsistent with the Michigan Supreme Court's interpretation of the constitutional language in *Kosa* and in *In re Constitutionality of 2011 PA 38*. Those cases also used contract language to describe the status of pensions. This is important because the Sixth Circuit has held that on questions of state law, this Court is bound to apply the holdings of the Michigan Supreme Court. *See Kirk v. Hanes Corp. of North Carolina*, 16 F.3d 705, 706 (6th Cir. 1994).

**Fifth**, an even greater narrative must be considered here, focusing on 1963. *Bekins* had long since determined that municipal bankruptcy was constitutional. That of course meant that even though states could not impair municipal contracts, federal courts could do that in a bankruptcy case. Indeed, Michigan law then allowed municipalities to file bankruptcy.[24]

It was within that framework of rights, expectations, scenarios and possibilities that the newly negotiated, proposed and ratified Michigan Constitution of 1963 explicitly gave accrued pension benefits the status of contractual obligations. That new constitution could have given pensions protection from impairment in bankruptcy in several ways. It could have simply prohibited Michigan municipalities from filing bankruptcy. It could have somehow created a

---

[24] See Public Act 72 of 1939, MCL § 141.201(1) (repealed by P.A. 70 of 1982) ("Any . . . instrumentality in this state as defined in [the Bankruptcy Act of 1898 and amendments thereto] . . . may proceed under the terms and conditions of such acts to secure a composition of its debts. . . . The governing authority of any such . . . instrumentality, or the officer, board or body having authority to levy taxes to meet the obligations to be affected by the plan of composition may file the petition and agree upon any plan of composition authorized by said act of congress[.]").

property interest that bankruptcy would be required to respect under *Butner v. United States*, 440 U.S. 48, 99 S. Ct. 914 (1979) (holding that property issues in bankruptcy are determined according to state law). Or, it could have established some sort of a secured interest in the municipality's property. It could even have explicitly required the State to guaranty pension benefits. But it did none of those.

Instead, both the history from the constitutional convention, quoted above, and the language of the pension provision itself, make it clear that the only remedy for impairment of pensions is a claim for breach of contract.

Because under the Michigan Constitution, pension rights are contractual rights, they are subject to impairment in a federal bankruptcy proceeding. Moreover, when, as here, the state consents, that impairment does not violate the Tenth Amendment. Therefore, as applied in this case, chapter 9 is not unconstitutional.

Nevertheless, the Court is compelled to comment. No one should interpret this holding that pension rights are subject to impairment in this bankruptcy case to mean that the Court will necessarily confirm any plan of adjustment that impairs pensions. The Court emphasizes that it will not lightly or casually exercise the power under federal bankruptcy law to impair pensions. Before the Court confirms any plan that the City submits, the Court must find that the plan fully meets the requirements of 11 U.S.C. § 943(b) and the other applicable provisions of the bankruptcy code. Together, these provisions of law demand this Court's judicious legal and equitable consideration of the interests of the City and all of its creditors, as well as the laws of the State of Michigan.

## IX. Public Act 436 Does Not
## Violate the Michigan Constitution.

Section 109(c)(2) of the bankruptcy code requires that a municipality be "specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter." 11 U.S.C. § 109(c)(2). The evidence establishes that the City was authorized to file this case. The issue is whether that authorization was proper under the Michigan Constitution.

Section 18 of P.A. 436, M.C.L. § 141.1558, establishes the process for authorizing a municipality to file a case under chapter 9 of the bankruptcy code:

> (1) If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and the state treasurer that the local government be authorized to proceed under chapter 9. If the governor approves of the recommendation, the governor shall inform the state treasurer and the emergency manager in writing of the decision . . . . The governor may place contingencies on a local government in order to proceed under chapter 9. Upon receipt of written approval, the emergency manager is authorized to proceed under chapter 9. This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101 to 1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.

M.C.L. § 141.1558(1).

On July 16, 2013, Mr. Orr gave the governor and the treasurer his written recommendation that the City be authorized to file for chapter 9 relief. Ex. 28. On July 18, 2013, the governor approved this recommendation in writing. Ex. 29. Later that day, Mr. Orr

issued a written order directing the City to file this chapter 9 case. Ex. 30. Thus the City of Detroit's bankruptcy filing was authorized under state law.

Nevertheless, several objectors assert various arguments that the City of Detroit is not authorized to file this case.

First, several objectors argue that the authorization is not valid because P.A. 436, the statute establishing the underlying procedure for a municipality to obtain authority for filing, is unconstitutional. Broadly stated, these are the challenges to P.A. 436:

The Retired Detroit Police Members Association ("RDPMA") challenges the constitutionality of P.A. 436 on the grounds that it was enacted immediately after the referendum rejection of a similar statute, P.A. 4.

The RDPMA also asserts that P.A. 436 is unconstitutional on the grounds that the Michigan Legislature added an appropriation provision for the purpose of evading the peoples' constitutional right to referendum.

Several objectors argue that P.A. 436 is unconstitutional because it fails to protect pensions from impairment in bankruptcy.

AFSCME asserts that P.A. 436 is unconstitutional because it violates the "Strong Home Rule" provisions in the Michigan Constitution.

### A. The Michigan Case Law on Evaluating the Constitutionality of a State Statute.

The validity of P.A. 436 under the Michigan Constitution is a question of state law. Determining the several constitutional challenges to P.A. 436 requires this Court to apply state law. In *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999), the Sixth Circuit provided this guidance on determining state law:

In construing questions of state law, the federal court must apply state law in accordance with the controlling decisions of the highest court of the state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938). If the state's highest court has not addressed the issue, the federal court must attempt to ascertain how that court would rule if it were faced with the issue. The Court may use the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the "majority" rule in making this determination. *Grantham & Mann v. American Safety Prods.*, 831 F.2d 596, 608 (6th Cir.1987). A federal court should not disregard the decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S. Ct. 1776, 1782, 18 L.Ed.2d 886 (1967).

Similarly, in *Demczyk v. Mut. Life Ins. Co. of N.Y. (In re Graham Square, Inc.)*, 126 F.3d 823, 827 (6th Cir. 1997), the court stated, "Where the relevant state law is unsettled, we determine how we think the highest state court would rule if faced with the same case."

The Michigan Supreme Court has not ruled directly on the validity P.A. 436. As a result, this Court must attempt to ascertain how that court would rule if it were faced with the issue.

In *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich. 295, 307-8, 806 N.W.2d 683, 692 (2011), the Michigan Supreme Court summarized its decisions on evaluating a constitutional challenge to a state law:

"Statutes are presumed to be constitutional, and courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Taylor v. Gate Pharm.*, 468 Mich. 1, 6, 658 N.W.2d 127 (2003). "We exercise the power to declare a law unconstitutional with extreme caution, and we never exercise it where serious doubt exists with regard to the conflict." *Phillips v. Mirac, Inc.*, 470 Mich. 415, 422, 685 N.W.2d 174 (2004). "'Every reasonable presumption or intendment must be indulged in favor of the validity of an act, and it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity.'" *Id.* at 423, 685 N.W.2d 174, quoting *Cady v. Detroit*, 289 Mich. 499, 505, 286 N.W. 805 (1939). Therefore, "the burden of proving that a statute is unconstitutional rests with

the party challenging it[.]" *In re Request for Advisory Opinion Regarding Constitutionality of 2005 Pa. 71*, 479 Mich. 1, 11, 740 N.W.2d 444 (2007)[.]

This guidance, as well as the decisions of the Michigan Supreme Court on issues relating to the right to referendum, home rule, and the pension clause, will inform this Court's determinations on the objectors' challenges to P.A. 436.

### B. The Voters' Rejection of Public Act 4 Did Not Constitutionally Prohibit the Michigan Legislature from Enacting Public Act 436.

On March 16, 2011, the governor signed P.A. 4 into law. P.A. 4 repealed P.A. 72. However, the voters rejected P.A. 4 by referendum in the November 6, 2012 election. Shortly after that election, on December 26, 2012, the governor signed P.A. 436 into law. It took effect on March 28, 2013.

The RDPMA argues that P.A. 436 is unconstitutional because it is essentially a reenactment of P.A. 4. The City and the State of Michigan assert that there are several differences between P.A. 436 and P.A. 4, such that they are not the same law.

The right of referendum is established in article 2, section 9 of the Michigan Constitution, which provides:

> Sec. 9. The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum. The power of initiative extends only to laws which the legislature may enact under this constitution. The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

84

Referendum, approval

> No law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election.

Mich. Const. art. II, § 9.

In *Reynolds v. Bureau of State Lottery*, 240 Mich. App. 84, 610 N.W.2d 597 (2000), the Michigan Court of Appeals considered the power of the legislature to reenact a law while a referendum process regarding that law was pending. The court explained:

> [N]othing in the Michigan Constitution suggests that the referendum had a broader effect than nullification of [the 1994 act]. We cannot read into our constitution a general "preemption of the field" that would prevent further legislative action on the issues raised by the referendum. The Legislature remained in full possession of all its other ordinary constitutional powers, including legislative power over the subject matter addressed in [the 1994 act].

*Reynolds*, 240 Mich. App. at 97, 610 N.W.2d at 604-05.

This Michigan Court of Appeals decision strongly suggests that the referendum rejection of P.A. 4 did not prohibit the Michigan legislature from enacting P.A. 436, even though P.A. 436 addressed the same subject matter as P.A. 4 and contained very few changes.

As noted above, the Sixth Circuit has instructed, "A federal court should not disregard the decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Meridian Mut. Ins. Co.*, 197 F.3d at 1181. No data, let alone any persuasive data, suggests that the Michigan Supreme Court would decide this issue otherwise. Accordingly, the RDPMA's challenge on this ground must be rejected.

### C. Even If the Michigan Legislature Did Include Appropriations Provisions in Public Act 436 to Evade the Constitutional Right of Referendum, It Is Not Unconstitutional.

The RDPMA also contends that P.A. 436 is unconstitutional because the Michigan legislature included appropriations provisions in P.A. 436 for the sole purpose of shielding the Act from referendum. Section 34 of P.A. 436 appropriates $780,000 for 2013 to pay the salaries of emergency managers. Section 35 of P.A. 436 appropriates $5,000,000 for 2013 to pay professionals hired to assist emergency managers.

There certainly was some credible evidence in support of the RDPMA's assertion that the appropriations provisions in P.A. 436 were motivated by a desire to immunize it from referendum. For example, Howard Ryan testified in his deposition on October 14, 2013:

> Q. I'd just like to ask a follow-up to a question counsel asked you. You said that the appropriation language was put in the - early on in the process; is that correct?
> A. Yes.
> Q. Based on your conversations with the people at the time, was it your understanding that one or more of the reasons to put the appropriation language in there was to make sure that it could not - the new act could not be defeated by a referendum?
> A. Yes.
> Q. And where did you get that knowledge from?
> A. Well, having watched the entire process unfold over the past two years.
> Q. The Governor's office knew that that was the point of it?
> A. Yes.
> Q. That your department knew that that was the point of it?
> A. Yes.
> Q. The legislators you were dealing with knew that that was the point of it?
> A. Yes.

Howard Dep. Tr. 46:1-23, Oc. 14, 2013.[25]

Other evidence in support includes: a January 31, 2013 e-mail addressed from Mr. Orr to partners at Jones Day, in which he observed that P.A. 436 "is a clear end-around the prior initiative" to repeal the previous Emergency Manager statute, Public Act 4, "that was rejected by the voters in November." Ex. 403 (Dkt. #509-3) According to Mr. Orr "although the new law provides the thin veneer of a revsion (sic) it is essentially a redo of the prior rejected law and appears to merely adopt the conditions necessary for a chapter 9 filing." Ex. 403. (Dkt. #509-3)

There are, however, several difficulties with the RDPMA's argument.

The Court must conclude that the Michigan Supreme Court would not, if faced with this issue, hold that P.A. 436 is unconstitutional. In *Michigan United Conservation Clubs v. Secretary of State*, 464 Mich. 359, 367, 630 N.W.2d 297, 298 (2001), that court concisely held that a public act with an appropriations provision is not subject to referendum, regardless of motive. Concurring, Chief Justice Corrigan added that even if the motive of a legislative body could be discerned as opposed to the motives of individual legislators, "This Court has repeatedly held that courts must not be concerned with the alleged motives of a legislative body in enacting a law, but only with the end result—the actual language of the legislation." *Id.* at 367.

Similarly, in *Houston v. Governor*, 491 Mich. 876, 877, 810 N.W.2d 255, 256 (2012), the Michigan Supreme Court stated, "[T]his Court possesses no special capacity, and there are no legal standards, by which to assess the political propriety of actions undertaken by the legislative

---

[25] The parties agreed to use Ryan's deposition testimony in lieu of live testimony. However, in the pre-trial order the City had objected to this portion of testimony on the grounds of speculation, hearsay, format and foundation. (Dkt. #1647 at 118) Those objections are overruled.

branch. Instead, it is the responsibility of the democratic, and representative, processes of government to check what the people may view as political or partisan excess by their Legislature."

In *People v. Gibbs*, 186 Mich. 127, 134-35, 152 N.W. 1053, 1055 (1915), the Michigan Supreme Court stated, "Courts are not concerned with the motives which actuate the members of the legislative body in enacting a law, but in the results of their action. Bad motives might inspire a law which appeared on its face and proved valid and beneficial, while a bad and invalid law might be, and sometimes is, passed with good intent and the best of motives." *See also Kuhn v. Dep't of Treasury*, 384 Mich. 378, 383-84, 183 N.W.2d 796, 799 (1971).

Finally, it must also be noted that on November 8, 2013, the Sixth Circuit vacated pending rehearing *en banc* the decision on which the RDPMA heavily relies. *City of Pontiac Retired Employees Assoc. v. Schimmel*, 726 F.3d 767 (6th Cir. 2013).

Accordingly, the Court concludes that P.A. 436 is not unconstitutional as a violation of the right to referendum in article II, section 9 of the Michigan Constitution.

## D. Public Act 436 Does Not Violate the Home Rule Provisions of the Michigan Constitution.

Certain objectors argue that P.A. 436 violates Article VII, Section 22 of the Michigan Constitution, which states:

> Under general laws the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or enacted by the legislature for the government of the city or village. Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, subject to the constitution and law. No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of authority conferred by this section.

The argument is that the appointment of an emergency manager for a municipality under P.A. 436 is inconsistent with the right of the electors to adopt and amend the City charter and the city's right to adopt ordinances. AFSCME asserts that "Michigan is strongly committed to the concept of home rule[.]" AFSCME Amended Objection at 75-91. (Dkt. #1156) "This 'strong home rule' regime reflects a bedrock principle of state law, . . . all officers of cities are to 'be elected by the electors thereof, or appointed by such authorities thereof' not by the central State Government." *Id.* (citing *Brouwer v. Bronkema*, 377 Mich. 616, 141 N.W.2d 98 (1966)). AFSCME further asserts that in authorizing the appointment of an emergency manager with broad powers that usurp the powers of elected officials, "PA 436 offends the 'strong home rule' of Detroit and that the Emergency Manager is not lawfully authorized to file for bankruptcy on behalf of the City or to act as its representative during chapter 9 proceedings." AFSCME Amended Objection at 75-91. (Dkt. #1156)

AFSCME's argument fails for the simple reason that the broad authority the Michigan Constitution grants to municipalities is subject to constitutional and statutory limits. This constitutional provision itself embodies that principle. It states, "Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, *subject to the constitution and law*." Mich. Const. art. VII, § 22 (emphasis added).

State law recognizes the same limitation on local government authority:

> Each city may in its charter provide:
>
> (3) Municipal powers. For the exercise of all municipal powers in the management and control of municipal property and in the administration of the municipal government, whether such powers be expressly enumerated or not; for any act to advance the interests of the city, the good government and prosperity of the municipality and its inhabitants and through its regularly constituted authority to pass all laws and ordinances relating to its municipal concerns *subject to the constitution and general laws of this state.*

M.C.L. § 117.4j(3) (emphasis added).

Similarly, M.C.L. § 117.36, states, "No provision of any city charter shall conflict with or contravene the provisions of any general law of the state."

Indeed, § 1-102 of the Charter of the City of Detroit states: "The City has the comprehensive home rule power conferred upon it by the Michigan Constitution, *subject only to the limitations on the exercise of that power contained in the Constitution or this Charter or imposed by statute.*" *Id.* (emphasis added). *See Detroit City Council v. Mayor of Detroit*, 283 Mich. App. 442, 453, 770 N.W.2d 117, 124 (Mich. Ct. App. 2009) ("The charter itself thus recognizes that it is subject to limitations imposed by statute.").

"Municipal corporations have no inherent power. They are created by the state and derive their authority from the state." *Bivens v. Grand Rapids*, 443 Mich. 391, 397, 505 N.W.2d 239, 241 (1993).

The Michigan case law establishes that the powers granted to municipalities by the "home rule" sections of the Michigan Constitution are subject to the limits of the power and authority of the State to create laws of general concern. *Brimmer v. Village of Elk Rapids*, 365 Mich. 6, 13, 112 N.W.2d 222, 225 (1961).

> "Municipal corporations are state agencies, and, subject to constitutional restrictions, the Legislature may modify the corporate charters of municipal corporations at will. 12 C.J. [p.] 1031. Powers are granted to them as state agencies to carry on local government. The state still has authority to amend their charters and enlarge or diminish their powers." [1] Cooley, Const. Lim. (8th Ed.), [p.] 393. * * * Its powers are plenary.

*City of Hazel Park v. Mun. Fin. Comm'n*, 317 Mich. 582, 599-600, 27 N.W.2d 106, 113-14 (1947).

> The Home Rule provision of the constitution does not deprive the legislature of its power to enact laws affecting municipalities operation under that provision except as to matters of purely local

90

concern. . . . *The right to pass general laws is still reserved to the l[e]gislature of the state,* and consequently it is still competent for the state through the law making body to enact measures pursuant to the police power or pursuant to other general powers inherent in the state and to require municipalities to observe the same.

*Local Union No. 876, Int'l Bhd. of Elec. Workers v. State of Mich. Labor Mediation Bd.,* 294 Mich. 629, 635-36, 293 N.W. 809, 811 (1940) (emphasis added). *See also Mack v. City of Detroit,* 467 Mich. 186, 194, 649 N.W.2d 47, 52 (2002); *American Axle & Mfg., Inc. v. City of Hamtramck,* 461 Mich. 352, 377, 604 N.W.2d 330, 342 (2000) (In *Harsha we held that* "the legislature might modify the charters of municipal corporations at will and that the State still retained authority to amend charters and enlarge and diminish their powers."); *Board of Trustees of Policemen & Firemen Retirement System v. City of Detroit,* 143 Mich. App. 651, 655, 373 N.W.2d 173, 175 (Mich. Ct. App. 1985) ("Where a city charter provision conflicts with general statutory law, the statute controls in all matters which are not of purely local character."); *Oakland Cnty. Board of Cnty. Road Comm'rs v. Mich. Prop. & Cas. Guar. Ass'n,* 456 Mich. 590, 609, 575 N.W.2d 751, 760 (1998) ("Like a municipal corporation, the road commission's existence is entirely dependent on the legislation that created it, and the Legislature that may also destroy it.").

AFSCME asserts that P.A. 436 is a "local law" because it gives the emergency manager broad authority to pass local legislation, and that therefore it violates article IV, section 29 of the Michigan Constitution. That section provides, in pertinent part, "The legislature shall pass no local or special act in any case where a general act can be made applicable[.]"

One plain difficulty with this argument is that this provision of the Michigan Constitution constrains the Michigan Legislature, not the emergency manager.

In defining a general law, the Michigan Supreme Court has stated, "'A general law is one which includes all persons, classes and property similarly situated and which come within its

91

limitations.'" *Am. Axle & Mfg., Inc. v. City of Hamtramck*, 461 Mich. 352, 359 n.5, 604 N.W.2d 330, 334 (2000) (citing *Tribbett v. Village of Marcellus*, 294 Mich. 607, 618, 293 N.W. 872 (1940), quoting *Punke v. Village of Elliott*, 364 Ill. 604, 608-9, 5 N.E.2d 389, 393 (1936)).

Clearly, P.A. 436 is a general law, potentially applicable to all municipalities similarly situated within the State of Michigan. According to its preamble, its purposes are: "to safeguard and assure the financial accountability of local units of government and school districts; to preserve the capacity of local units of government and school districts to provide or cause to be provided necessary services essential to the public health, safety and welfare[.]"

Accordingly, the Court finds that P.A. 436 does not violate the home rule provisions of the Michigan Constitution.

### E. Public Act 436 Does Not Violate the Pension Clause of the Michigan Constitution.

Many objectors argue that the bankruptcy authorization section of P.A. 436, M.C.L. § 141.1558, does not conform to the requirements of the pension clause of the Michigan Constitution and is therefore unconstitutional. Accordingly, the objectors argue that P.A. 436 cannot provide the basis for authorization as required by 11 U.S.C. § 109(c)(2).

As noted, the premise of this argument is that under the Michigan constitution, pension benefits are entitled to greater protection than contract claims. That premise, however, is, the same as the premise of the argument that chapter 9 is unconstitutional as applied in this case.

In Part VIII C 5 b, above, the Court rejected this argument, concluding that pension benefits are a contractual obligation of the municipality.

It follows that if a state consents to a municipal bankruptcy, no state law can protect contractual pension rights from impairment in bankruptcy, just as no law could protect any other types of contract rights. Accordingly, the failure of P.A. 436 to protect pension rights in a

municipal bankruptcy does not make that law inconsistent with the pension clause of the Michigan Constitution any more than the failure of P.A. 436 to protect, for example, bond debt in bankruptcy is inconsistent with the contracts clause of the Michigan Constitution. For this purpose, the parallel is perfect.

Stated another way, state law cannot reorder the distributional priorities of the bankruptcy code. If the state consents to a municipal bankruptcy, it consents to the application of chapter 9 of the bankruptcy code. This point was driven home in the *Stockton* case:

> A state cannot rely on the § 903 reservation of state power to condition or to qualify, i.e. to "cherry pick," the application of the Bankruptcy Code provisions that apply in chapter 9 cases after such a case has been filed. *Mission Indep. School Dist. v. Texas*, 116 F.2d 175, 176–78 (5th Cir. 1940) (chapter IX); *Vallejo*, 403 B.R. at 75–76; *In re City of Stockton*, 475 B.R. 720, 727–29 (Bankr. E.D. Cal. 2012) ("*Stockton I*"); *In re Cnty. of Orange*, 191 B.R. 1005, 1021 (Bankr. C.D. Cal. 1996).

> While a state may control prerequisites for consenting to permit one of its municipalities (which is an arm of the state cloaked in the state's sovereignty) to file a chapter 9 case, it cannot revise chapter 9. *Stockton I*, 475 B.R. at 727–29. *For example, it cannot immunize bond debt held by the state from impairment. Mission Indep. School Dist.*, 116 F.2d at 176–78.

478 B.R. at 16-17 (emphasis added).

For these reasons, the Court concludes that P.A. 436 does not violate the pension clause of the Michigan Constitution.

## X. Detroit's Emergency Manager Had Valid Authority to File This Bankruptcy Case Even Though He Is Not an Elected Official.

AFSCME and most of the individual objectors argue that the emergency manager did not have valid authority to file this bankruptcy case because he is not an elected official. The Court concludes that this argument is similar to, or the same as, the argument that AFSCME made that P.A. 436 violates the home rule provisions of the Michigan Constitution. See Part IX D above.