**U.S. Bankruptcy Court**
**Eastern District of Michigan (Detroit)**
**Bankruptcy Petition #: 13–53846–swr**

*Date filed:* 07/18/2013

*Assigned to:* Judge Steven W. Rhodes
Chapter 9
Voluntary
No asset

| | | |
|---|---|---|
| ***Debtor In Possession*** | represented by | **Bruce Bennett** |
| **City of Detroit, Michigan** | | 555 S. Flower Street |
| 2 Woodward Avenue | | 50th Floor |
| Suite 1126 | | Los Angeles, CA 90071 |
| Detroit, MI 48226 | | (213) 489–3939 |
| WAYNE–MI | | Email: bbennett@jonesday.com |
| Tax ID / EIN: 38–6004606 | | |

**Judy B. Calton**
Honigman Miller Schwartz &Cohn LLP
2290 First National Building
Detroit, MI 48226
(313) 465–7344
Fax : (313) 465–7345
Email: jcalton@honigman.com

**Eric D. Carlson**
150 West Jefferson
Suite 2500
Detroit, MI 48226
313–496–7567
Email: carlson@millercanfield.com

**Timothy A. Fusco**
150 West Jefferson
Suite 2500
Detroit, MI 48226–4415
(313) 496–8435
Email: fusco@millercanfield.com

**Jonathan S. Green**
150 W. Jefferson
Ste. 2500
Detroit, MI 48226
(313) 963–6420
Email: green@millercanfield.com

**David Gilbert Heiman**
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586–7175
Email: dgheiman@jonesday.com

**Robert S. Hertzberg**
4000 Town Center
Suite 1800

Southfield, MI 48075–1505
248–359–7300
Fax : 248–359–7700
Email: hertzbergr@pepperlaw.com

**Deborah Kovsky–Apap**
Pepper Hamilton LLP
4000 Town Center
Suite 1800
Southfield, MI 48075
(248) 359–7300
Fax : (248) 359–7700
Email: kovskyd@pepperlaw.com

**Kay Standridge Kress**
4000 Town Center
Southfield, MI 48075–1505
(248) 359–7300
Fax : (248) 359–7700
Email: kressk@pepperlaw.com

**Stephen S. LaPlante**
150 W. Jefferson Ave.
Suite 2500
Detroit, MI 48226
(313) 496–8478
Email: laplante@millercanfield.com

**Heather Lennox**
222 East 41st Street
New York, NY 10017
212–326–3939
Email: hlennox@jonesday.com

**Marc N. Swanson**
Miller Canfield Paddock and Stone, P.L.C
150 W. Jefferson
Suite 2500
Detroit, MI 48226
(313) 496–7591
Email: swansonm@millercanfield.com

*U.S. Trustee*            represented by **Sean M. Cowley (UST)**
**Daniel M. McDermott**                  United States Trustee
                                         211 West Fort Street
                                         Suite 700
                                         Detroit, MI 48226
                                         (313) 226–3432
                                         Email: Sean.cowley@usdoj.gov

*Retiree Committee*       represented by **Sam J. Alberts**
**Official Committee of Retirees**        1301 K Street, NW
                                         Suite 600, East Tower
                                         Washington, DC 20005–3364
                                         (202) 408–7004
                                         Email: sam.alberts@dentons.com

                          **Paula A. Hall**
                          401 S. Old Woodward Ave.
                          Suite 400
                          Birmingham, MI 48009
                          (248) 971–1800

Email: hall@bwst−law.com

**Claude D. Montgomery**
620 Fifth Avenue
New York, NY 10020
(212) 632−8390
Email: claude.montgomery@dentons.com,docketny@dentons.com

**Carole Neville**
1221 Avenue of the Americas
25th Floor
New York, NY 10020
(212) 768−6889
Email: carole.neville@dentons.com

**Matthew Wilkins**
401 S. Old Woodward Ave.
Suite 400
Birmingham, MI 48009
(248) 971−1800
Email: wilkins@bwst−law.com

| Filing Date | # | | Docket Text |
|---|---|---|---|
| 07/22/2013 | | 63 | Objection to (related document(s): 58 Motion to Expedite Hearing (related documents 18 Generic Motion, 19 Generic Motion, 39 Generic Motion, 53 Generic Motion, 56 Generic Motion) /*Ex Parte Motion of the Debtor for the Entry of an Order (A) Scheduling an Expedited Hearing on C) Filed by Creditors General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit (Gordon, Robert) (Entered: 07/22/2013)* |
| 07/22/2013 | | 84 | Objection to (related document(s): 18 Motion *of Debtor for Entry of an Order (A) Directing and Approving Form of Notice of Commencement of Case and Manner of Service and Publication of Notice and (B) Establishing a Deadline for Objections to Eligibility and a Schedule for Their Conside,* 39 Motion *of Debtor, Pursuant to Sections 102(1)(A) and 105(a) of the Bankruptcy Code and Rules 2002(m) and 9007 of the Federal Rules of Bankruptcy Procedure, for Entry of an Order Establishing Case Management and Scheduling Procedures,* 53 Motion *of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code,* 56 Motion *of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order, Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non−Officer Employees and (C) Agents and Representatives of the Debtor) Filed by Creditor Michigan Council 25 of the American Federation of State, County &Municipal Employees, AFL−CIO (Levine, Sharon) (Entered: 07/22/2013)* |
| 07/23/2013 | | 122 | Objection to (related document(s): 53 Motion *of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code,* 56 Motion *of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order, Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non−Officer Employees and (C) Agents and Representatives of the Debtor)* Filed by Interested Parties Syncora Capital Assurance Inc., Syncora Guarantee Inc. (Bennett, Ryan) (Entered: 07/23/2013) |

| | | | |
|---|---|---|---|
| 07/23/2013 | | 125 | Objection to (related document(s): 56 Motion *of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order, Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non−Officer Employees and (C) Agents and Representatives of the Debtor*) Filed by Creditor International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (Attachments: # 1 Declaration of William Wertheimer # 2 Certificate of Service) (Ganatra, Niraj) (Entered: 07/23/2013) |
| 07/23/2013 | | 128 | Reply to (related document(s): 53 Generic Motion filed by Debtor In Possession City of Detroit, Michigan, 56 Generic Motion filed by Debtor In Possession City of Detroit, Michigan) */ Debtor's Reply in Support of: (I) Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order, Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non−Officer Employees and (C) Agents and Representatives of the Debtor; and (II) Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code* Filed by Debtor In Possession City of Detroit, Michigan (Heiman, David) (Entered: 07/23/2013) |
| 07/23/2013 | | 138 | Concurrence *in and Limited Objection to* Filed by Creditors Detroit Fire Fighters Association, I.A.F.F. Local 344, Detroit Police Command Officers Association, Detroit Police Lieutenants and Sergeants Association, Detroit Police Officers Association (RE: related document(s)53 Motion *of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code*, 56 Motion *of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order, Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non−Officer Employees and (C) Agents and Representatives of the Debtor*). (Patek, Barbara) (Entered: 07/23/2013) |
| 07/23/2013 | | 141 | Objection to (related document(s): 53 Motion *of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code*, 56 Motion *of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order, Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non−Officer Employees and (C) Agents and Representatives of the Debtor*) *Objection of the Retirement Systems to Motions of Debtor for Entry of Orders (I) Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code, and (II) Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non−Officer Employees and (C) Agents and Representatives of the Debtor* Filed by Creditors General Retirement System of the City of Detroit, Police and Fire Retirement System of the City of Detroit (Gordon, Robert) (Entered: 07/23/2013) |
| 07/24/2013 | | 146 | Corrected Objection to (related document(s): 56 Motion *of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order, Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non−Officer Employees and (C) Agents and Representatives of the Debtor*) Filed by Creditor International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (Ganatra, Niraj) (Entered: 07/24/2013) |
| 07/29/2013 | | 188 | |

| | | | |
|---|---|---|---|
| | | | Transcript regarding Hearing Held 07/24/13 RE: Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code (Docket #53) and Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non–Officer Employees and (C) Agents and Representatives of the Debtor (Docket #56). THIS TRANSCRIPT WILL BE MADE ELECTRONICALLY AVAILABLE TO THE GENERAL PUBLIC 91 DAYS AFTER THE DATE OF FILING, TRANSCRIPT RELEASE DATE IS 10/28/2013. Until that time, the transcript may be viewed at the Clerk's Office by parties who do not receive electronic notice and participated in the proceeding. A copy of the transcript may be purchased from the official court transcriber Lois Garrett at 517.676.5092. (RE: related document(s) 147 Transcript Request, 161 Transcript Request, 169 Transcript Request). Redaction Request Due By 08/19/2013. Redacted Transcript Submission Due By 08/26/2013. Transcript access will be restricted through 10/28/2013. (Garrett, Lois) (Entered: 07/29/2013) |
| 09/26/2013 | | 1039 | Opinion And Order Denying Motion To Stay Proceedings Pending Determination Of Motion To Withdraw The Reference (RE: related document(s)837 Motion To Stay filed by Retiree Committee Official Committee of Retirees). (ckata) (Entered: 09/26/2013) |
| 12/05/2013 | | 1945 | Opinion Regarding Eligibility (RE: related document(s)821 First Amended Order Regarding Eligibility Objections). (ckata) (Entered: 12/05/2013) |
| 12/05/2013 | | 1946 | Order for Relief Under Chapter 9 of the Bankruptcy Code (Related Document 1945 Opinion Regarding Eligibility) (ckata) (Entered: 12/05/2013) |
| 12/12/2013 | | 2074 | Reply to (related document(s): 1888 Response filed by Creditor Catherine W. Phillips) Filed by Interested Party State of Michigan (Schneider, Matthew) (Entered: 12/12/2013) |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                       )        Chapter 9

)

CITY OF DETROIT, MICHIGAN,  )        Case No. 13-53846

)

     Debtor.            )

)

---

# OBJECTION TO *EX PARTE* MOTION OF DEBTOR FOR THE ENTRY OF AN ORDER (A) SCHEDULING AN EXPEDITED HEARING ON CERTAIN INITIAL MOTIONS FILED BY DEBTOR, (B) LIMITING NOTICE OF HEARING AND (C) APPROVING FORM AND MANNER OF NOTICE

The Police and Fire Retirement System of the City of Detroit ("PFRS") and the General Retirement System of the City of Detroit ("GRS," and together with PFRS, the "Pension Systems") object to the Ex Parte Motion of Debtor for the Entry of an Order (A) Scheduling an Expedited Hearing on Certain Initial Motions Filed by Debtor, (B) Limiting Notice of Hearing and (C) Approving Form and Manner of Notice [Docket No. 58] (the "Expedited Hearing Motion")[1] and state as follows:

1.      On July 19, 2013, the Circuit Court for Ingham County, Michigan, in the case entitled *Gracie Webster, et al. v. The State of Michigan, et al.*, Case No. 13-734-CZ (Hon. Rosemarie Aquilina) entered its Order of Declaratory Judgment (the "Declaratory Judgment"), a copy of which is attached hereto as Exhibit A. In the Declaratory Judgment, it is determined, among other things, that the State of Michigan's authorization of the commencement of this

---

[1]  This Objection is filed subject to the reservations of rights in the Appearance filed by the undersigned counsel in this case, including the Pension Systems' right to argue that the matters involved in the *Webster* case referenced herein and the pending related cases should be determined in the state courts and not in this Court and that this Court lacks subject matter jurisdiction.

Chapter 9 case was violative of the State Constitution and was therefore given without power or authority. As such, the authorization of the commencement of this case was void.

2.  It is anticipated that the Defendants will appeal from the Declaratory Judgment. Pending such appeal process, however, per the Declaratory Judgment, the Pension Systems respectfully submit that this Court does not have subject matter jurisdiction to proceed with this case.

3.  Nonetheless, the City of Detroit, Michigan, the debtor herein (the "Debtor"), has filed the Expedited Hearing Motion, seeking a hearing on a number of matters.

4.  As an initial matter, the Pension Systems submit that no such matters should proceed at this time pending the completion of any appeal process with respect to the Declaratory Judgment. To do otherwise would ignore the threshold issue that this Court does not have any jurisdiction to proceed with such matters.

5.  In addition, without waiver of the foregoing argument, even if the Court were inclined to consider the matters that are the subject of the Expedited Hearing Motion, they should not be heard on roughly one business day's notice. The Expedited Hearing Motion encompasses matters requesting substantive relief - - including seeking relief on the seminal issue of application of the automatic stay to various parties. This proverbially puts the cart before the horse inasmuch as there is no automatic stay arising in this case if the filing of the petition itself was invalid. Moreover, to ask for relief on such short notice clearly violates the Pension Systems' due process rights. Setting an expedited hearing on these matters will deprive the Pension Systems and other parties in interest of a meaningful opportunity to file briefs on the relevant legal issues.

6.     The Pension Systems intend to subsequently file a supplement to this Objection and reserve the right to do so.

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Evan J. Feldman (P73437)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

Dated:  July 22, 2013                      *Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

# EXHIBIT A

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

GRACIE WEBSTER and
VERONICA THOMAS,

        Plaintiffs,

vs                                 Case No. 13-734-CZ
                                    Hon.  Rosemarie Aquilina

THE STATE OF MICHIGAN;
RICHARD SNYDER, as Governor
of the State of Michigan; and
ANDY DILLON, as Treasurer of
the State of Michigan,

        Defendants.

_____/

ORDER OF DECLARATORY JUDGMENT

At a session of said Court held in Ingham County Circuit Court,
State of Michigan, this 19th day of July, 2013.

PRESENT: *Rosemarie E Aquilina*
                Circuit Court Judge

Plaintiffs request declaratory relief pursuant to MCR 2.605 concerning (1) the

constitutionality under Article IX Section 24 of the Michigan Constitution of the Local Financial

Stability and Choice Act, 2012 PA 436, MCL 141.1541, *et seq.* ("PA 436"), insofar as PA 436

permits the Governor to authorize an emergency manager to proceed under chapter 9 of the

bankruptcy code, chapter 9 of title 11 of the United States Code, 29 USC 901 to 946 ("Chapter

9") in a manner which threatens to diminish or impair accrued pension benefits; and (2) the

authority of the Governor and/or State Treasurer to authorize an emergency manager to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits.

Plaintiffs have requested, and Defendants have agreed in their Response, that the hearing in this matter may be advanced pursuant to MCR 2.605(D) and the court finds that expedited treatment is appropriate and that final declaratory relief is proper at this time.

The Court having reviewed the parties filings and submissions, and having heard oral argument by counsel for the parties, and being otherwise fully advised in the premises, and for the reasons stated on the record,

IT IS HEREBY ORDERED:

PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; and PA 436 is to that extent of no force or effect;

The Governor is prohibited by Article IX Section 24 of the Michigan Constitution from authorizing an emergency manager under PA 436 to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and any such action by the Governor is without authority and in violation of Article IX Section 24 of the Michigan Constitution.

On July 16, 2013, City of Detroit Emergency Manager Kevyn Orr submitted a recommendation to Defendant Governor Snyder and Defendant Treasurer Dillon pursuant to Section 18(1) of PA 436 to proceed under Chapter 9, which together with the facts presented in Plaintiffs' filings, reflect that Emergency Manager Orr intended to diminish or impair accrued pension benefits if he were authorized to proceed under Chapter 9.   On July 18, 2013, Defendant

Governor Snyder approved the Emergency Manager's recommendation without placing any contingencies on a Chapter 9 filing by the Emergency Manager; and the Emergency Manager filed a Chapter 9 petition shortly thereafter. By authorizing the Emergency Manager to proceed under Chapter 9 to diminish or impair accrued pension benefits, Defendant Snyder acted without authority under Michigan law and in violation of Article IX Section 24 of the Michigan Constitution.

In order to rectify his unauthorized and unconstitutional actions described above, the Governor must (1) direct the Emergency Manager to immediately withdraw the Chapter 9 petition filed on July 18, and (2) not authorize any further Chapter 9 filing which threatens to diminish or impair accrued pension benefits.

*A copy of this Order shall be transmitted to President Obama.*

*It is so Ordered.*

Rosemarie E. Aquilina

P37670

Circuit Court Judge

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |

**(I) THE MICHIGAN COUNCIL 25 OF THE AMERICAN FEDERATION OF STATE, COUNTY & MUNICIAL EMPLOYEES, AFL-CIO'S OBJECTION TO THE DEBTOR'S (A) MOTION TO EXTEND THE AUTOMATIC STAY; (B) MOTION CONFIRMING THE PROTECTIONS OF SECTIONS 362, 365 AND 922 OF THE BANKRUPTCY CODE; AND (C) MOTION FOR ENTRY OF AN ORDER DIRECTING AND APPROVING FORM OF NOTICE OF COMMENCEMENT OF CASE AND MANNER OF SERVICE AND PUBLICATION OF NOTICE AND ESTABLISHING A DEADLINE FOR OBJECTIONS TO ELIGIBILITY AND A SCHEDULE FOR THEIR CONSIDERATION AND (II) RESPONSE TO DEBTOR'S MOTION, PURSUANT TO SECTIONS 102(1)(A) AND 105(a) OF THE BANKRUPTCY CODE AND RULES 2002(m) AND 9007 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE, FOR ENTRY OF AN ORDER ESTABLISHING <u>CASE MANAGEMENT AND SCHEDULING PROCEDURES</u>**

The Michigan Council 25 of the American Federation of State, County & Municipal Employees, AFL-CIO ("**AFSCME**") -- the representative of the interests of between at least forty and fifty percent (40-50%) of the about 11,943 retired City of Detroit (the "**City**" or "**Debtor**") non-uniformed  retired employees (the "**Retired AFSCME Employees**"), and about 2,523 active City employees (the "**Active AFSCME Employee**", or about seventy percent (70%) of the active non-uniformed union-represented employees, and together with the Retired AFSCME Employees, collectively, the "**AFSCME Detroit Employees**") -- through its counsel submits this (I) opposition (the "**Objection**") to the (A) *Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order, Extending the Chapter 9 Stay to Certain (A)*

- 1 -

13-53846-tjt  Doc 22157  Filed 12/12/13  Entered 12/12/13 16:06:24  Page 14 of 462
13-53846-swr  Doc 54  Filed 07/22/13  Entered 07/22/13 16:22:27  Page 14 of 30

13

State Entities, (B) *Non-Officer Employees and (C) Agents and Representatives of the Debtor* [Docket No. 56] (the "**Stay Extension Motion**"); (B) *Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code* [Docket No. 53] (the "**Stay Confirmation Motion**"); and (C) *Motion of Debtor for Entry of an Order (A) Directing and Approving Form of Notice of Commencement of Case and Manner of Service and Publication of Notice and (B) Establishing a Deadline for Objections to Eligibility and a Schedule for Their Consideration* [Docket No. 18] (the "**Eligibility Scheduling Motion**"); and (II) response to the *Motion of Debtor, Pursuant to Sections 102(1)(A) and 105(a) of the Bankruptcy Code and Rules 2002(m) and 9007 of the Federal Rules of Bankruptcy Procedure, for Entry of an Order Establishing Case Management and Scheduling Procedures* [Docket No. 39] (the "**Case Management Motion**").  In support of its Objection, AFSCME respectfully states as follows:

## I. PRELIMINARY STATEMENT

1.     Through the Stay Extension Motion, the City seeks procedurally improper, unprecedented and inappropriate relief purportedly extending the automatic stay imposed under sections 362 and 922 of title 11 of the United States Code (the "**Bankruptcy Code**") and allegedly enjoining, pursuant to section 105(a) of the Bankruptcy Code, actions against non-debtors including against the Michigan Governor, Richard Snyder (the "**Governor**") which would permit the non-debtors to continue to engage in conduct which is unconstitutional under the Michigan Constitution, unauthorized or, at a minimum, outside the scope of chapter 9.

2.     The AFSCME Retirees and AFSCME Active Employees look to their government pension and City-provided medical benefits for retiree benefits. Unlike

- 2 -

13-53846-tjt  Doc 2217  Filed 12/18/13  Entered 12/18/13 16:06:24  Page 15 of 462
13-53846-swr  Doc 64  Filed 07/22/13  Entered 07/22/13 16:22:27  Page 15 of 30          14

private sector employees and retirees with defined benefit pension benefits whose pension benefits are protected even in bankruptcy by government insurance through the Pension Benefit Guaranty Corporation or those with multiemployer pension benefits, where even if one employer withdraws or goes bankrupt, the vested pension benefits to the retirees continue unchanged by that withdrawal, the AFSCME Retirees and AFSCME Active Employees' pensions are not backstopped.

3.      Here, if the pension or other retiree benefits are lost, they are lost without a safety net.

4.      To protect against this, a retiree and an active employee with accrued and vested benefits, filed suit (the "**Webster Litigation**") (which was not filed against the City, the City's Emergency Manager ("**EM**") Kevyn D. Orr ("**Orr**"), or any other City employees). This and other similar litigation brought by other plaintiffs against other non-debtors was referenced in the Stay Extension Motion with a tone that implies these litigations are improper.

5.      It is important to remember that this is against the backdrop of the average non-uniformed employee pension currently at an average of slightly less than $18,000 per year (according to a June 30, 2012 pension valuation report).

6.      These employees' pension benefits were reduced by approximately forty percent (40%) in 2012. Previously, a thirty-year employee would receive a pension of fifty-five percent (55%) of final average pay and the pension would be increased by 2.25 percent of the original pension amount each year as inflation protection. (This is not a very generous COLA. Social Security is increased by the inflation rate as measured by the CPI and the increase is compounded each year.) Under the new, lower benefit structure, a thirty-year employee would receive a pension of forty-five percent (45%) of final pay and there is no COLA.

7.      Further, an employee must work at least thirty years to be eligible to retire, or be at least 60 years old with 8 years of service. The average active employee

- 3 -

13-53846-tjt-swr Doc 2217 Filed 12/18/13 Entered 12/18/13 16:06:24 Page 16 of 30
13-53846-swr Doc 134 Filed 07/22/13 Entered 07/22/13 16:22:27 Page 16 of 462   15

is 48.3 years old and has 15.4 years of service. Therefore, on average, a non-uniformed employee would be 63 years old upon achievement of thirty years of service.

8. Average non-uniformed employee pay is $41,385 per year and AFSCME Active Employee pay was reduced by 10% during fiscal year 2012.

9. State shared revenues with the City have dropped by $160 million (almost 50%) since 2002. Under the Governor's current administration, state shared revenues with the City dropped by $66 million from fiscal year 2011 to fiscal year ("**FY**") 2012; from $239 million to $173 million. In FY 2002, state shared revenues with the City were $333 million, in FY 2011 state shared revenues were $239 million and in FY 2012 state shared revenues were $173 million.

10. In reality, it is the Stay Extension Motion, and indeed this entire chapter 9 proceeding, including the purported authorization by the Governor permitting the chapter 9 filing by the EM, that was and remains (i) an overt act by the Governor and others in violation of state court orders and the Michigan Constitution; and (ii) in violation of an explicit, unstayed state court declaratory judgment ordering the withdrawal of the Governor's authorization to file this chapter 9 case and prohibiting other filings, including the filing of the Stay Extension Motion, which seeks to impair or diminish the AFSCME Detroit Employees' pension benefits.

11. If the City were acting properly without the relief sought in the extraordinary Stay Extension Motion, it would not need the Stay Extension Motion.

12. The continued authorization by the Governor for the filing and prosecution of this chapter 9 proceeding where the City now seeks to diminish or impair vested pension rights is illegal and unconstitutional under Michigan law and should not be countenanced by this Court using its equitable powers under section 105(a) of the Bankruptcy Code. Section 105 powers only permit the Court to implement already existing substantive rights under the Bankruptcy Code, and should not be used by the City as a sword to create for itself new and unconstitutional rights in violation of the

- 4 -

13-53846-tjt-swr Doc 22157 Filed 12/18/13 Entered 12/18/13 16:06:24 Page 17 of 162
13-53846-swr Doc 34 Filed 07/22/13 Entered 07/22/13 16:22:27 Page 17 of 30    16

federalism principles contained in the Tenth Amendment of the United States Constitution.

13.     If the Court grants the Stay Extension Motion and permits the Governor to continue to ignore the court-ordered, state law and constitutional obligations he is bound to uphold, the EM will seek (i) to unconstitutionally and illegally abridge pension and other AFSCME Detroit Employee benefits; (ii) to proceed under section 365 of the Bankruptcy Code and illegally seek to reject vested pension and other retiree benefits; and/or ultimately (iii) to propose a chapter 9 plan of adjustment that reduces pension and other benefits but that cannot possibly be better for creditors like AFSCME Detroit Employees than the alternative of staying out of chapter 9 - a clear breach of the chapter 9 "best interests test."   This Court should not allow the City to use section 105(a) of the Bankruptcy Code to stay non-debtors from complying with applicable non-bankruptcy law or to create new bankruptcy law not provided for under the Bankruptcy Code.

14.     This Court should deny the Stay Extension Motion.

15.     Additionally, consistent with the infirmities of the City's chapter 9 filing discussed above and at length below, including the unconstitutional or otherwise improper actions in violation of Michigan state law raised in this Objection, the Court should withhold ruling on the Stay Confirmation Motion until ruling on the issues raised herein.

16.     Given the myriad issues that need to be addressed, there is little reason to rush through a highly expedited, non-negotiated schedule given the unique state and federal constitutional issues here.

17.     Finally, with regard to the Case Management Motion, AFSCME seeks to clarify (and to the extent necessary, request) that AFSCME will be considered one of the unions on the "Special Service List" that are "representing certain of the City's

- 5 -

13-53846-tjt-swr   Doc 2217   Filed 07/12/13   Entered 07/12/13 16:06:24   Page 18 of 462
13-53846-swr   Doc 734   Filed 07/22/13   Entered 07/22/13 16:22:27   Page 18 of 30          17

employees and retirees or their counsel where known" and that the below-identified counsel for AFSCME will be served all pleadings filed in this proceeding.

## I.  RELEVANT BACKGROUND

18.     Orr currently serves as the EM of the City under Michigan Public Act 436 of 2012, the Local Financial Stability and Choice Act, MCL § 141.1541, et seq. ("**PA 436**").

19.     Orr was appointed as EM for the City on March 14, 2013 at the request of the Governor, effective as of March 25, 2013.  On March 28, 2013, upon the purported effectiveness of PA 436, Orr became, and continues to act as, EM for the City under PA 436.

20.     Under section 18 of PA 436, the Governor was empowered to authorize Orr to file for chapter 9 bankruptcy on behalf of the City if the Governor approved the EM's recommendation to do so.

21.     On June 14, 2013, Orr issued a "Proposal for Creditors" which expressly stated that "there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons."  The same day, Orr publicly threatened, in an interview with the Detroit Free Press Editorial Board,[1] that vested pension benefits would not be protected in a chapter 9 proceeding authorized by the Governor pursuant to PA 436, and that any state laws protecting vested pension benefits would "not . . . protect" retirees in bankruptcy court.  The EM stated as follows in the interview:

> Q   You said in this report that you don't believe there is an
> obligation under our state constitution to pay pensions if the city
> can't afford it?

---

[1] *See Q&A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, Detroit Free Press (June 16, 2013), *available at* http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-detroit-emergency-manager-creditors-fiscal-crisis.

A. The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law. Which the Ninth Circuit agrees with for now.

A. It is what it is - so we said that in a soft way of saying, "Don't make us go into bankruptcy." **If you think your state-vested pension rights, either as an employee or a retiree - that's not going to protect you. If we don't reach an agreement one way or the other, we feel fairly confident that the state federal law, federalism, will trump state law or negotiate**. The irony of the situation is we might reach a deal with creditors quicker because employees and retirees think there is some benefit and that might force our hand. That might force a bankruptcy.

(Emphasis added). The City has since filed with this Court its *Motion for the Entry of an Order Directing the Appointment of a Committee of Retired Employees* [Docket No. 20], the plain intent of which is to seek to negotiate a reduction or impairment of accrued pension benefits.

(A)     The Webster Litigation

22.     On July 3, 2013, against the backdrop of the threatening statements being made by Orr regarding Michigan state law and protected pension benefits, plaintiffs (the "**Webster Plaintiffs**") Gracie Webster (a City retiree) and Veronica Thomas (a current employee of the City) commenced a lawsuit against the State of Michigan, the Governor and the State Treasurer seeking: (a) a declaratory judgment that PA 436 violated the Constitution of the State of Michigan to the extent that it purported to authorize chapter 9 cases within which vested pension benefits might be sought to be compromised; and (b) an injunction preventing the defendants from authorizing any chapter 9 case for the City within which vested pension benefits might be sought to be

reduced. *See Webster v. State of Mich.*, No. 13-734-CZ (Ingham County Cir. Ct. July 3, 2013) (the "**Webster Litigation**").[2]

23.    In briefing submitted in support of a preliminary injunction and declaratory order against the Governor, the Webster Plaintiffs explained that Article IX, Section 24 of the Michigan Constitution provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby," that there could not be a more clear and plain constitutional mandate and that Article IX, Section 24 means what it says: accrued pension benefits "shall not be diminished or impaired." (citing *AFT Michigan v State of Michigan*, 297 Mich App 597, 610; 825 NW2d 595 (2012); *Mt Clemens Firefighters Union, Local 838, IAFF v City of Mt Clemens*, 58 Mich App 635, 644; 228 NW2d 500 (1975)).

24.    Further, as the Webster Plaintiffs noted, the Official Record of the 1963 Michigan Constitutional Convention makes clear that no governmental entity or its officials can do anything to diminish or impair vested pension benefits:  "This is a new section that requires that accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions be a contractual obligation which cannot diminished or impaired by the action of its officials or governing body."  2 Official Record, Constitutional Convention 1961, p. 3402.

25.    The Webster Plaintiffs also noted that PA 436 explicitly recognizes that accrued pension benefits shall not be diminished or impaired outside the bankruptcy context.[3]  But, in violation of Article IX, Section 24 of the Michigan Constitution, PA

---

[2] Two additional lawsuits were also filed raising similar issues in addition to the Webster Litigation.

[3] For example:
- Section 11 of PA 436 requires that an emergency manager develop a written financial and operating plan for the local government and that such plan "shall provide" for "the timely deposit of required payments to the pension fund for the local government."
- Section 13 of PA 436 authorizes the emergency manager to eliminate the salary, wages or other compensation  and benefits of the chief administrative officer and members of the governing body

436 fails to similarly prevent the Governor from authorizing a chapter 9 bankruptcy filing if accrued pension benefits may be diminished or impaired as a consequence of that filing.[4]  In other words, if accrued pension benefits may be diminished or impaired, in violation of Article IX Section 24 of the Michigan Constitution, that section must be unconstitutional.

26.    On July 18, 2013, the same date this chapter 9 case was commenced, the Ingham County Circuit Court for the State of Michigan (the "**State Court**") entered a temporary restraining order (the "**TRO**", a copy of which was attached to the Stay Extension Motion as Exhibit 6.2) enjoining the Governor, the State Treasurer and the other defendants in the Webster Litigation from  authorizing a chapter 9 filing and taking any further action "with respect to any filing which has already occurred" including the authorizing of an "unconditional" chapter 9 filing (*i.e.* one in which the EM would represent himself as having authority to modify and/or terminate pension obligations without limit in derogation of the Michigan Constitution).[5]

27.    Despite the issuance of the TRO and the State Court's clear directive to the Governor regarding not authorizing any further filings by the City, the Governor did not seek to prevent the City from filing all of its "first day pleadings," including the eventual filing of the Stay Extension Motion on July 19.

---

of the local government, but expressly provides that "[t]his section does not authorize the impairment of vested pension benefits."
- Section 12(m) of PA 436 authorizes an emergency manager under certain circumstances to be appointed as the sole trustee of a local pension board and to replace the existing trustees, and requires that "the emergency manager shall fully comply with . . . Section 24 of Article IX of the state constitution . . ." when acting as the sole trustee.

[4] Section 18 of PA 436, which empowers the Governor to authorize a municipality to file for bankruptcy under chapter 9, no where  prohibits the Governor  from authorizing such a filing if accrued pension benefits may be diminished or impaired. Clearly, the Legislature understood and honored the Michigan constitutional mandate not to diminish or impair accrued pension benefits outside of bankruptcy. Just as clearly, the Legislature omitted any constitutional protection against the impairment or diminishment of accrued pension benefits when the Governor authorizes a chapter 9 bankruptcy filing under Section 18 of PA 436.

[5] The Stay Extension Motion incorrectly implies that the TROs in *Webster* and the related cases were entered *ex parte*.  They were not.

28.     On July 19, 2013, the State Court held a further hearing on the Webster Litigation and entered an Order of Declaratory Judgment (the "**Declaratory Judgment**", a copy of which was attached to the Stay Extension Motion as Exhibit 6.4). The Declaratory Judgment (a) finds PA 436 unconstitutional and of no force and effect to the extent it permits the Governor to authorize the EM to proceed under chapter 9 in any manner that threatens to diminish or impair pension benefits and (b) rules that the Governor must direct the EM "to immediately withdraw the Chapter 9 petition … and … not authorize any further Chapter 9 filing which threatens to diminish or impair accrued pension benefits." *See* Declaratory Judgment at 3.[6]

29.     To the extent there was any authorization for the chapter 9 filing, the State Court clearly ordered that the Governor revoke it to the extent it was intended to lead to the diminishment or impairment of accrued pension benefits.  As a matter of federalism and *res judicata*, this Court should abide by the prior rulings of the State Court.

30.     Even if this Court is not persuaded by the unconstitutional and illegal nature of this chapter 9 filing, in light of the unstayed and binding orders and rulings issued by the State Court in the form of the TRO and subsequent Declaratory Judgment (which vacated the TRO that preceded it), this Court should find that it cannot rule on the Stay Extension Motion and the Stay Extension Motion must be denied.

## II. ARGUMENT

31.     The Stay Extension Motion must be denied because (i) it is procedurally improper; (ii) it seeks unprecedented and inappropriate relief extending the automatic stay pursuant to section 105(a) of Bankruptcy Code to the Governor and other non-debtor parties despite the clear TRO and Declaratory Judgment negating the

---

[6] The Declaratory Judgment does not, contrary to the City's assertion at ¶ 27 in the Stay Extension Motion, purport to bind the EM's "agents and representatives."  The Declaratory Judgment does not use either "agent" or "representative" even once.

- 10 -

13-53846-swr   Doc 2237   Filed 07/18/13   Entered 07/18/13 16:00:46   Page 23 of 462
13-53846-tjt   Doc 84   Filed 07/22/13   Entered 07/22/13 16:22:27   Page 23 of 30      22

Governor's authorization to continue with this proceeding (including the Stay Extension Motion); (iii) given that the State Court has already ruled on the constitutional issues, the Bankruptcy Court should abstain from interfering and allow the state courts to fully and finally adjudicate the state law issues; (iv) the chapter 9 filing itself violates the United States Constitution; (v) at minimum, PA 436 or any alleged authorization from the Governor allowing for a chapter 9 filing by the City pursuant to PA 436 without limiting the disturbing of accrued pension rights cannot be permitted under the U.S. Constitution in view of the State Court rulings and Michigan law; and (vi) the end result of the granting of the Stay Extension Motion would be the City seeking to unconstitutionally wipe out guaranteed vested pension benefits, either couched as a motion to reject pursuant to section 365 of the Bankruptcy Code or under a plan of adjustment, both impermissible.

32. Additionally, consistent with the infirmities of the City's chapter 9 filing discussed below, (i) the Court should withhold ruling on the Stay Confirmation Motion until ruling on the issues raised herein; and (ii) the Court should not enter the Eligibility Scheduling Motion scheduling a briefing schedule until the Court decides whether it will rule at this juncture whether the City is even properly in chapter 9, and even once the Court does rule, the major parties should at least have the opportunity to meet and confer regarding a reasonable schedule as to eligibility.

33. Finally, with regard to the Case Management Motion, AFSCME requests that it be considered and listed as one of the unions on the "Special Service List" that are "representing certain of the City's employees and retirees or their counsel where known" and that the below-identified counsel for AFSCME should be served all pleadings filed in this proceeding.

- 11 -

13-53846-tjt Doc 2217 Filed 12/18/13 Entered 12/18/13 16:00:46 Page 24 of 462
13-53846-swr Doc 84 Filed 07/22/13 Entered 07/22/13 16:22:27 Page 11 of 30    23

# I.    The Stay Extension Motion Is Procedurally Flawed.

34.    The Stay Extension Motion is procedurally improper.  Although captioned as seeking an order extending the automatic stay, the Debtors actually seek an injunction pursuant to section 105(a) of the Bankruptcy Code.  The automatic stay and section 362 do not apply to actions against non-debtors.  *See* 11 U.S.C. § 362(a) ("a petition filed …. operates as a stay, applicable to all entities, of … the commencement or continuation…. of a[n] … action or proceeding against the debtor"); *Teachers Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65 (2d. Cir. 1986) ("It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt defendants").  Thus, the automatic stay does not apply to, in part, the Webster Litigation and/or the Governor, a non-debtor.  *See, e.g., United Steelworkers of Am. v. Retirement Income Plan for Hourly-Rated Employees of ASARCO*, 512 F.3d 555 (9th Cir. 2008) (affirming district court decision, issued after employer filed for bankruptcy, ordering an ERISA plan to pay over $140,000 in attorney's fees); *In re Motors Liquidation Co.*, 2010 WL 4966018, at *5 (S.D.N.Y. Nov 17, 2010) ("the automatic stay would not apply to a suit against the Pension Plan alone"); *Buchanan v. Golden Casting Corp. Hourly Health Benefit Plan*, 2003 WL 22951936, at *3 (S.D. Ind. Oct. 10, 2003) ("an automatic stay of suits against an employer during its bankruptcy does not affect claims against its employee benefit plan").

35.    Instead, the City must seek an injunction by way of adversary proceeding pursuant to § 105(a).  As the Sixth Circuit has explained, "although referred to as extensions of the automatic stay, [orders extending the automatic stay to cover non-debtors] in fact [are] injunctions issued by the bankruptcy court after [a] hearing and the establishment of unusual need to take this action to protect the administration of the bankruptcy estate."  *Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993); *see also In re Chugach Forest Prods., Inc.*, 23 F.3d 241, 247 n. 6 (9th Cir. 1994).  Because an "extension" of the automatic stay to cover non-debtors is in fact an injunction, "[a]

- 12 -

13-53846-tjt  Doc 2217  Filed 12/18/13  Entered 12/18/13 16:00:46  Page 25 of 40
13-53846-swr  Doc 84  Filed 07/22/13  Entered 07/22/13 16:22:47  Page 12 of 30    24

request for such an extension must be made by adversary proceeding." *In re Richard B.* *Vance and Co.,* 289 B.R. 692, 697 (Bankr. C.D. Il. 2003); *see also In re Hillsborough* *Holdings Corp.,* 130 B.R. 603, 606 (Bankr. M.D. Fla.1991) ("the debtor must commence an adversary proceeding" to seek an injunction against non-debtors).

36.     At a minimum, this type of extraordinary relief in this sensitive and unusual case should not be granted where, as here, the City failed to follow the Federal Rules designed to provide the very basic statutorily required safeguards for those in harms way.  The current procedural posture created by the EM (*i.e.* the filing of the Stay Extension Motion instead of properly commencing an adversary proceeding as required by the Federal Rules for a party seeking injunctive relief) forecloses the Court from ordering the relief sought by the City in the Stay Extension Motion, in essence steam rolling quickly over the AFSCME Employees, regardless of the merits of the Stay Extension Motion.

## II.     <u>Bankruptcy Code § 105 Cannot Be Used To Create Rights That Do Not Exist Elsewhere In the Law.</u>

37.     A bankruptcy court's equitable powers are derived from section 105(a) of the Bankruptcy Code, which provides, "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a); *see also In re Stinson*, 221 B.R. 726, 729 (Bankr. E.D.Mich. 1998) (invoking section 105 power to deny chapter 7 debtor's claim of exemption in unauthorized settlement or proceeds thereof and requiring turnover of such proceeds to chapter 7 trustee).

38.     The plain meaning of section 105(a) authorizes a bankruptcy court to enter only those orders necessary to carry out the other provisions of the Bankruptcy Code.  The Sixth Circuit Court of Appeals has made clear on a number of occasions that section 105(a) may be used only to implement powers already expressed in the provisions of the Bankruptcy Code, not to add to those powers or create rights that Congress did not

- 13 -

13-53846-tjt  Doc 2217  Filed 12/18/13  Entered 12/18/13 16:00:46  Page 16 of 40
13-53846-swr  Doc 84  Filed 07/22/13  Entered 07/22/13 16:22:27  Page 26 of 30   25

expressly confer.  *See In re Middleton Arms, Ltd. Partnership*, 934 F.2d 723, 725 (6th Cir.1991) (citing *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)); *In re Granger Garage, Inc.*, 921 F.2d 74, 77 (6th Cir. 1990) ("[a] bankruptcy court does not have unfettered equity powers."); *In re Glenn*, 760 F.2d 1428, 1440–41 (6th Cir.1985), cert. denied, 474 U.S. 849, 106 S.Ct. 144 (1985) (section 105 should not be construed to allow a bankruptcy court to use its equitable powers to create rights that do not exist under state law; section 105 was intended to affect parties' actions rather than undermine state statutes); *see also In re Dow Corning Corp.*, 244 B.R. 721, 742 (Bankr. E.D. Mich. 1999) (section 105(a) does not authorize bankruptcy courts to create substantive rights that are otherwise unavailable under applicable law, or constitute roving commission to do equity) (citations and quotations omitted), *rev'd on other grounds*, 255 B.R. 445 (E.D. Mich. 2000), *aff'd and remanded*, 280 F.3d 648 (6th Cir. 2002).  To allow a bankruptcy court, through principles of equity, to grant any more or less than what the clear language of a statute mandates would be tantamount to judicial legislation and is something that should be left to Congress, not the courts.  *In re Scrivner*, 535 F.3d 1258, 1263 (10th Cir. 2008).

39.     Here, however, the City seeks a section 105(a) injunction not to carry out any provisions of the Bankruptcy Code and not to shield it from interference with the existing protections of the Bankruptcy Code, but rather as a sword that creates substantive and unconstitutional rights not otherwise provided for under the Bankruptcy Code generally or chapter 9 specifically.

40.     Indeed, the Bankruptcy Code contains no provision that would permit the City to extend the automatic stay to the requested non-debtor parties (nor does the City cite to any such provision).  Lacking the appropriate authority, the City seeks to expand the powers created in the Bankruptcy Code to create substantive and unconstitutional rights not otherwise provided.  This would allow the continuance of this chapter 9 proceeding, in which the City seeks to diminish or impair vested accrued

- 14 -

13-53846-tjt  Doc 2287  Filed 12/28/13  Entered 12/28/13 16:00:46  Page 27 of 462
13-53846-swr  Doc 84  Filed 07/22/13  Entered 07/22/13 16:22:29  Page 14 of 30        26

pension rights in violation of the Michigan State Constitution and in violation of an explicit, unstayed state court declaratory judgment.

41.     Moreover, the Michigan Constitution is clear and unambiguous in its declaration that accrued pension rights may not be diminished or impaired.  As such, "[a] bankruptcy court may not use its equitable powers 'to defeat clear statutory language, nor to reach results inconsistent with the statutory scheme established by the Code.'" *In re Reinertson*, 241 B.R. 451, 455 (9th Cir. BAP. 1999) (quoting *In re Powerline Oil Co.,* 59 F.3d 969, 973 (9th Cir.1995)).  *See also In re C-L Cartage Co., Inc.*, 899 F.2d 1490, 1494 (6th Cir. 1990) (bankruptcy courts cannot use equitable principles to disregard unambiguous statutory language.).  To allow a bankruptcy court, through principles of equity, to grant any more or less than what the clear language of a statute mandates – here, the Michigan Constitution -- would be tantamount to judicial legislation.  *In re Scrivner*, 535 F.3d 1258, 1263 (10th Cir. 2008).

42.     Section 105(a) cannot be used to alter rights established under state law in a manner not expressly authorized by the Bankruptcy Code.  *See In re Amatex Corp.*, 97 B.R. 220, 221 (Bankr. E.D. Pa. 1989) (holding that the court was not authorized, pursuant to section 105(a), or any other authority, to disregard established state law principles in providing relief to the debtor).  Accordingly, the City's attempt to circumvent the Michigan Constitution through the requested application of the Court's section 105 equitable powers is impermissible and the Stay Extension Motion should be denied.

43.      In support of its position, the City cites to *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 861 (6th Cir. 1992).  But *Eagle-Picher* addresses a bankruptcy court's power to issue a preliminary injunction pursuant to section 105(a), not a court's power to extend the automatic stay to non-debtors.

44.     In *Eagle-Picher*, the Sixth Circuit made clear that the granting of a section 105(a) injunction is a radical measure to be granted only in "unusual

- 15 -

13-53846-tjt  Doc 2217  Filed 12/18/13  Entered 12/18/13 16:00:46  Page 28 of 462
13-53846-swr  Doc 84  Filed 07/22/13  Entered 07/22/13 16:22:27  Page 28 of 30     27

circumstances." *Id.* at 861. What constitutes "unusual circumstances" is described as an identity of interests between the debtor and the third party such that a judgment against the third party will in effect be a judgment against the debtor. *Id.* (adopting the standard in *In re A.H. Robins Co., Inc,* 788 F.2d 994, 999 (4th Cir.1986). An example is given as a case in which a third-party defendant is entitled to absolute indemnity by the debtor on account of any judgment that might result. *Id.*; *see also In re Dow Corning Corp.,* 280 at 658 (setting forth a detailed list of the factors that must be present to support including a permanent injunction or release benefiting non-debtor third parties in a Chapter 11 plan of reorganization if the injunction is to be enforced against non-consenting creditors).

45.    Relying on *Eagle-Picher*, the City claims that the Court is authorized to employ its section 105(a) powers to extend the automatic stay given the "unusual circumstances" of the case. *See* Stay Extension Motion at ¶ 19. The City goes on to imply that there is an identity between it and the State Entities because "[t]he State Entities are closely connected to the City and the Emergency Manager", the EM "serves at the pleasure of the Governor", and the State Entities "all have ongoing roles with respect to the Emergency Manager's management of the City…."[7] *Id.* at ¶ 21.

46.    However, the City has not shown that a mere "close relationship" or the alleged authority that the State Entities may have over the EM automatically makes the State Entities' interests identical to those of the City such that the Court should treat them as one and the same for purposes of extending the automatic stay.  The idea that the State and City would have identical interests in all instances seems illogical, and the City and State's interests have already diverged with respect to the State's decision to share decreased revenues with the City as discussed above, paragraph 9.  In fact, given the extreme nature of the injunctive remedy that the City seeks through application of section

---

[7] Note that the City does not offer any argument for how it and the Non-Officer Employees and the City's Agents and Representatives are identical such that a judgment against the City would operate like a judgment against those individuals and entities.

- 16 -

13-53846-tjt  Doc 2217  Filed 12/18/13  Entered 12/18/13 16:00:46  Page 28 of 40
13-53846-swr  Doc 34  Filed 07/22/13  Entered 07/22/13 16:22:47  Page 28 of 30    28

105(a), this Court should not use section 105(a) to extend the stay in contravention of the Bankruptcy Code and in clear violation of the Michigan Constitution. *See In re Saleh*, 427 B.R. 415, 420-421 (Bankr. S.D. Ohio 2010) ("[T]he court cannot emphasize enough that the imposition of an injunction benefitting a non-debtor third party is an extreme remedy and one that appears to contravene the Bankruptcy Code… It not only deprives a creditor of the benefits of its bargain, but also permits the nondebtor party to receive a major benefit of the bankruptcy process without having to be subject to any of its burdens and safeguards.") (citations and quotations omitted).

47.     The use of section 105 in this context is therefore fatally flawed and the Stay Extension Motion must be denied.

### III.     Given that the State Court has Already Ruled on the Michigan Constitutional Issues, the Bankruptcy Court Should Abstain from Interfering and Allow the State Courts to Fully and Finally Adjudicate the Michigan Constitutional Issues.

48.     Where state courts have previously rendered rulings (and particularly on internal state constitutional issues), the Court should be particularly careful extending the automatic stay to an action and actor such as the Governor already determined by the State Court to be in derogation of the Michigan Constitution. *See, e.g.*, *Go West Entm't v. N.Y. State Liquor Auth. (In re Go West Entm't)*, 387 B.R. 435, 442-43 (Bankr. S.D.N.Y. 2008).

49.     A bankruptcy court has no power to review or overturn a final state determination. *Id*. at 442 (citing *Locurto v. Giuliani*, 447 F.3d 159, 170–71 (2d Cir. 2006) (federal courts give State administrative proceedings the "same preclusive effect to which it would be entitled in the State's courts," and New York "give[s] quasi-judicial administrative fact-finding preclusive effect where there has been a full and fair opportunity to litigate."), citing Univ. of Tennessee v. Elliott, 478 U.S. 788, 799, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986) and *Burkybile v. Bd. of Educ.*, 411 F.3d 306, 310 (2d Cir.2005); *Ryan v. New York Tel. Co.*, 62 N.Y.2d 494, 499, 478 N.Y.S.2d 823, 826, 467

N.E.2d 487, 489 (1984); see also *Kelleran v. Andrijevic*, 825 F.2d 692 (2d Cir.1987), cert. denied, 484 U.S. 1007, 108 S.Ct. 701, 98 L.Ed.2d 652 (1988) (default judgment in State Court binding in bankruptcy case)).

50.     Here, the State Court has issued a declaratory judgment, which is now pending appeal. "'[T]he rule in Michigan is that a judgment pending on appeal is deemed res judicata.'" *Farmers Ins. Exchange v. Young*, 2010 WL 3021860, at *6 (Mich. App. 2010) (concluding, "for purposes of collateral estoppel or res judicata" that a declaratory judgment, despite pending appeal, was a "final judgment") (citing, in part, *City of Troy Building Inspector v. Hershberger*, 27 Mich. App. 123, 127, 183 N.W.2d 430) (1970) (emphasis in original); *Temple v. Kelel Distributing Co., Inc.*, 183 Mich. App. 326, 328, 454 N.W.2d 610 (1990) ("Although defendant has appealed an adverse ruling that plaintiff's decedent was not an employee at the time of the accident, the decision nevertheless has res judicata effect."); *Roskam Baking Co. v. Lanham Machinery Co.*, 105 F. Supp. 2d 751, 755 (W.D. Mich. 2000) ("Michigan and federal courts hold that appeal of a judgment does not alter the judgment's preclusive effect"); *Robinson v. Fiedler*, 91 F.3d 144 (6th Cir. 1996) (decision of lower court is res judicata, regardless of pending appeal).

51.     *Go West,* 387 B.R. 435, is directly on point.  There, the debtor sought to have the bankruptcy court use its equitable powers to extend the automatic stay for the duration of a pending state court appeal, where the state appellate court had twice denied the same relief (staying the action pending appeal). 387 B.R. at 442-43.  The bankruptcy court explained that such an order

> would directly violate the principle of comity and avoidance of needless friction between Federal and State courts that has been incorporated in several abstention doctrines. The most relevant for present purposes is so-called *Younger* abstention, which instructs that 'Federal courts should generally refrain from enjoining or otherwise interfering in ongoing state proceedings.'  . . .  'This principle of abstention is grounded in interrelated principles of

- 18 -

13-53846-tjt swr Doc 2237 Doc 84   Filed 02/19/13 07/22/13   Entered 02/19/13 07/22/13 16:00:46 16:22:27   Page 31 of 462 Page 18 of 30     30

comity and federalism.' . . . The same comity principles apply with respect to State administrative proceedings . . . 'in which important state interests are vindicated.' . . . *Younger* abstention has been deemed applicable in bankruptcy cases. *See In re Franceschi*, 268 B.R. 219 (9th Cir. BAP 2001), *aff'd*, 43 Fed.Appx. 87, 2002 WL 1763749 (9th Cir.2002) (on abstention grounds only).

*Go West*, 387 B.R. at 442-43 (omitting some internal citations). The bankruptcy court also relied on the case of *Pennzoil Co. v. Texaco Inc.*, 481 U.S. 1, 107 S.Ct. 1519, 95 L.Ed.2d 1 (1987), where the Supreme Court reversed a federal court ruling that prohibited enforcement of Texas law, asserting "'that the States have important interests in administering certain aspects of their judicial systems.'. . . The State's interest in *Pennzoil v. Texaco* was in the manner in which private litigants could enforce or obtain a stay of a judgment." 387 B.R. at 443.

52.     Here, as in *Go West*, given the final Declaratory Judgment issued by the State Court, this Court should abstain from extending the automatic stay and allow the state court appellate process to fully and finally resolve the issue of whether the authorization for this chapter 9 filing conflicted with Article IX, Section 24 of the Michigan Constitution.

## IV.     The Chapter 9 Petition For The City Violates The Federalism Principles Embodied By The Tenth Amendment Of The United States Constitution.

53.     In 1936, the Supreme Court declared the first municipal bankruptcy statute unconstitutional, holding that Congress' bankruptcy power under Article III, like its Article III power to tax, does not include the power to "materially restrict" a state's "fiscal affairs" – including those of its political subdivisions, whose "fiscal affairs are those of the State." *Ashton v. Cameron County Water Improvement District Number One,* 298 U.S. 513, 528-30 (1936). Moreover, the Court held, to the extent that a state is, pursuant to the Contracts Clause of the U.S. Constitution, constrained from impairing a contract, that state cannot simply "accomplish the same end by granting any permission necessary to enable Congress to do so." *Id.* at 531.

- 19 -

54.     The Supreme Court has never reversed *Ashton.*  Instead, when the Court, only two years later, declined to strike down a revised (but nearly identical) municipal bankruptcy statute, it emphasized that the successor statute was "carefully drawn so as not to impinge upon the sovereignty of the State" under the Tenth Amendment, because the "State retains control of its fiscal affairs" insofar as, *inter alia,* a municipal bankruptcy proceeding "is authorized by state law."  *United States v. Bekins,* 304 U.S. 27, 51-52 (1938).[8]

55.     Keenly aware of the Tenth Amendment problems recognized by both *Ashton* and *Bekins,* Congress amended the municipal bankruptcy statute numerous times, gradually requiring more rigorous state-law authorization.  *See, e.g.,* H. Rep. 95-595, 95th Cong., 1st Sess. 319 (1977) (recognizing that *Ashton* and *Bekins* require state authorization of municipal bankruptcy to protect state sovereignty).  Most recently, the Bankruptcy Reform Act of 1994, Pub. L. 103-394, has provided that state law must "specifically," rather than generally, authorize any municipal bankruptcy petition.  *See In re City of Harrisburg,* 465 B.R. 744, 754 (Bankr. M.D. Pa. 2011) ("Because the term 'generally' was interpreted too broadly by some courts and narrowly by others, Congress amended § 109(c)(2) to clarify that a state must provide 'specific' authorization to comply with Tenth Amendment constraints.").

56.     The Supreme Court has not revisited the constitutionality of municipal bankruptcy since 1938, but since then the Court's federalism jurisprudence has clarified that, contrary to *Bekins,* Tenth Amendment rights are not reserved solely to state governments that may waive them, but rather belong simultaneously to the citizens of the states as individual constitutional liberties.  Just two years ago, the Court held that an individual plaintiff has standing to challenge a federal statute on grounds that Congress,

---

[8]  Notably, *Bekins* was decided only one year after the Supreme Court effected a jurisprudential about-face in favor of expansive federal power under the commerce clause in *NLRB v. Jones & Laughlin Steel Corp.,* 301 U.S. 1 (1937).  The contemporary Supreme Court has begun scaling back commerce clause powers on federalism grounds, beginning with *United States v. Lopez,* 514 U.S. 549 (1995).

by enacting it, has exceeded its powers and thus violated the Tenth Amendment by "intruding upon the sovereignty and authority of the States" – even if the State is not a party and has lodged no objection to the federal law. *Bond v. United States,* 131 S. Ct. 2355, 2360 (2011). This is because federalism under the Tenth Amendment "has more than [just] one dynamic" of delimiting "the prerogatives of the State and National Government vis-à-vis one another":

> Federalism is more than an exercise in setting the boundary between different institutions of government for their own integrity. State sovereignty is not just an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power. . . .
>
> . . . Federalism secures the freedom of the individual. It allows States to respond, through the enactment of positive law, to the initiative of those who seek a voice in shaping the destiny of their own times without having to rely solely upon the political processes that control a remote central power. True, of course, these objects cannot be vindicated by the Judiciary in the absence of a proper case or controversy; ***but the individual liberty secured by federalism is not simply derivative of the rights of the States***.
>
> Federalism also protects the liberty of all persons within a State by ensuring that laws enacted in excess of delegated governmental power cannot direct or control their actions. By denying any one government complete jurisdiction over all the concerns of public life, federalism protects the liberty of the individual from arbitrary power. When government acts in excess of its lawful powers, that liberty is at stake.
>
> The limitations that federalism entails are not therefore a matter of rights belonging only to the States. States are not the sole intended beneficiaries of federalism. [*Id.* at 2364 (citations omitted) (emphasis added).]

57.     In light of *Bond,* any individual whose rights – here, creditors' rights to have contractual obligations honored – are threatened by the federal government's regulation of an area reserved by the Constitution to the sovereign power of the states – here, fiscal self-management – has standing to protect those rights by

challenging the federal statute impairing those rights, irrespective of any waiver or authorization of that impairment by the state. And the Supreme Court has made increasingly and abundantly clear since 1938 that Tenth Amendment federalism is no longer to be ignored. *See, e.g., Printz v. United States,* 521 U.S. 898, 935 (1997); *United States v. Windsor,* 133 S. Ct. 2675, 2697 (2013) (Roberts, C.J., dissenting) ("[I]t is undeniable that [the majority's] judgment is based on federalism.").

58.     Accordingly, contrary to the repeated assertions of Congress, "authorization" of municipal bankruptcy by a State cannot save a chapter 9 petition from the Tenth Amendment, and *Bekins* is no longer good law. Thus, because (i) the City's bankruptcy petition is aimed at impairing its creditors' rights using federal law to an extent not currently available under state law and (ii) the City's fiscal self-management is an area of state sovereign concern, it therefore follows that the chapter 9 petition violates the Tenth Amendment. As a corollary, relief under Bankruptcy Code § 105 is not permitted and must be denied.

## V.     The City's Bankruptcy Petition Further Contravenes The Tenth Amendment Of The United States Constitution Because The Petition Violates Article IX, Section 24 Of The Michigan State Constitution

59.     Because, as the State Court judge has already held, Michigan law does not authorize the City's bankruptcy petition insofar as it seeks to impair or reduce accrued pension benefits, the City is not only ineligible to proceed with its petition under the statutory terms of chapter 9 itself, but allowing the City to persist with its petition would violate the Tenth Amendment rights possessed by city retirees and employees with accrued pension benefits to be free from federal interference with their pension rights.

60.     As explained above*,* the core feature of chapter 9 purporting to save it from violating the federalism principles embodied by the Tenth Amendment is the presence of the eligibility requirements found at 11 U.S.C. § 109(c), especially including the requirement that the municipal debtor be "specifically authorized . . . by State law" to

file for bankruptcy. It is black-letter law that these eligibility requirements are mandatory. "If the petitioner is unable to demonstrate that all elements have been satisfied, the petition must be dismissed." *In re City of Harrisburg,* 465 B.R. at 752 (collecting cases). As Chief Judge France observed when dismissing the City of Harrisburg's chapter 9 petition for want of state-law authorization:

> The allegation that the City has sought bankruptcy relief in defiance of [state law] raises important concerns of federalism and respect for the power of states to manage their internal affairs. Primary among these concerns is the Tenth Amendment to the U.S. Constitution . . . . [W]here federal bankruptcy law intersects with the rights of states to regulate the activities of political subdivisions created by the state, principles of dual sovereignty as defined by the Tenth Amendment must be considered. Congress has made bankruptcy available to municipalities, but states retain their concomitant rights to limit access by their political subdivisions to bankruptcy relief.

*Id.* at 753 (citations omitted).

61. A Michigan State Court has already considered the state-law question of authorization. It correctly concluded, in a binding Declaratory Judgment, that the state statute relied upon by the City as authorizing its chapter 9 petition, Michigan PA 436, directly violates the Michigan Constitution. Indeed, the judge could not have held otherwise. Article IX, Section 24 of the Michigan Constitution unambiguously prohibits the diminution or impairment of accrued pension benefits. Yet a central purpose of the City's petition, as its EM has himself admitted "*ad nauseam*" in numerous public fora*,* is to reduce accrued pension benefits. While such a reduction may at first blush appear to be permitted by the language of PA 436 – for example, by virtue of the fact that Section 18, which allows the Governor to approve a request by a municipality to file for bankruptcy under chapter 9, nowhere prohibits the Governor from authorizing such a filing if accrued pension benefits may be unconstitutionally diminished or impaired --

- 23 -

13-53846-tjt-swr Doc 2237 Filed 12/18/13 Entered 12/18/13 16:00:46 Page 36 of 40
13-53846-swr Doc 84 Filed 07/22/13 Entered 07/22/13 16:22:46 Page 36 of 462        35

certainly it cannot be disputed that statutes in Michigan are in fact constrained by the Michigan Constitution, which trumps Section 18 of PA 436.[9]

62.     Article IX, Section 24 of the Michigan Constitution provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby."  There could not be a more clear and plain constitutional mandate.  Article IX, Section 24 means what it says:  accrued pension benefits "shall not be diminished or impaired."  *See AFT Michigan v State of Michigan*, 297 Mich App 597, 610; 825 NW2d 595 (2012); *Mt Clemens Firefighters Union, Local 838, IAFF v City of Mt Clemens*, 58 Mich App 635, 644; 228 NW2d 500 (1975).  And thus, as the State Court has already declared:

> PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; and PA 436 is to that extent of no force or effect.

> The Governor is prohibited by Article IX Section 24 of the Michigan Constitution from authorizing an emergency manager under PA 436 to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and any such action by the Governor is without authority and in violation of Article IX Section 24 of the Michigan Constitution.

63.     The state court's conclusions are self-evident, and thus this Court may justifiably wish to dismiss the Debtor's petition at this early juncture for want of authorization.   But cardinal principles of abstention and constitutional avoidance caution instead in favor of abstaining from this question of state constitutional law, which the Michigan Courts should be left to finish deciding through the appellate process,[10] because

---

[9]  PA 436 violates the Michigan and Federal Constitution for additional reasons beyond those presented to, and found by, the state court in the Webster Litigation, and AFSCME reserves all of its rights.

[10]  Because a state court has already ruled that the City's petition was not properly authorized under state law, the instant case differs from other municipal bankruptcies in which bankruptcy judges considered

it has the potential to obviate the need for this court to encroach on tender Tenth Amendment territory. *See generally Arizonans for Official English v. Arizona,* 520 U.S. 43, 75-80 (1997) (discussing the advantages of certifying state-law questions to state courts before reaching federal constitutional questions, as well as the related doctrine of *Pullman* abstention); *Go West*, 387 B.R. at 442-43 (holding that *Younger* abstention applies to bankruptcy courts). Bankruptcy judges, of course, derive their authority from Article I of the U.S. Constitution and therefore are not vested with the authority to decide contested questions of federal constitutional law. *See Stern v. Marshall,* 131 S. Ct. 2594, 2609 (2011) (citation omitted).

64.    In the alternative, and at the very least, the Tenth Amendment requires that even if this Court were to find the instant petition authorized under PA 436, that authorization cannot have been made in violation of the Michigan Constitution, and therefore the Debtor lacks authority to diminish or impair pension rights in any eventual plan of adjustment. Indeed, the Tenth Amendment's limiting principle is further embodied in 11 U.S.C. § 903, which provides that chapter 9 "does not limit or impair the power of a State to control, by legislation or otherwise, a municipality . . . in the exercise of the political or governmental powers of such municipality." Article IX, Section 24 is, of course, precisely such an instance of "control" exercised by the people of Michigan. *See, e.g., In re Sanitary & Improvement Dist., No. 7,* 98 B.R. 970 (Bankr. D. Neb. 1989) (holding that chapter 9 plan which did not provide that bondholders would be paid in full prior to payment to warrant holder, as required by Nebraska law decided by state Supreme Court, could not be confirmed.

---

questions of state constitutional law bearing on whether the debtor's petition was appropriately authorized by state law. *Compare, e.g., Harrisburg,* 465 B.R. 744 at 756-64 (considering state constitutional law issue apparently not addressed by any state court, and ultimately avoiding any Tenth Amendment quandary by dismissing petition).

- 25 -

13-53846-tjt  Doc 2237  Filed 12/28/13  Entered 12/28/13 16:00:46  Page 38 of 462
13-53846-swr  Doc 84  Filed 07/22/13  Entered 07/22/13 16:22:27  Page 38 of 30    37

## VI.    The Use Of Chapter 9 To "Modify" Pension And Other Retiree Benefits Is Not Permitted Under Bankruptcy Code § 365.

65.    While the City may argue that it will not completely be wiping out benefits, a debtor cannot retain the beneficial aspects of a contract while rejecting the contract's burdens under section 365 of the Bankruptcy Code.  *See In re Ritchey*, 84 B.R. 474, 476 (Bankr. N.D. Ohio 1988) (citing *In re Tirenational Corp.*, 47 B.R. 647, 650 (Bankr.N.D.Ohio 1985); *In re Texstone Venture, Ltd.*, 54 B.R. 54, 56 (Bankr. S.D.Tex. 1985); *In re LHD Realty Corp.*, 20 B.R. 717, 719 (Bankr. S.D. Ind. 1982)).

66.    Consequently, if a debtor must assume or reject an entire agreement, including pension and benefits agreements, as it appears it must, then there is no option for a small modification to these contracts by the Governor or EM under section 365.  The only way to modify pensions or benefits provided for under for executory contracts would be to illegally or unconstitutionally reject (terminate) them under Bankruptcy Code § 365.

67.    The chapter 9 case for the County of Orange is instructive and cautionary.  There, the County of Orange (the "**County**") filed for chapter 9 bankruptcy protection and, about two weeks later, adopted a series of resolutions to address a severe shortfall in its general fund. *County of Orange*, 179 B.R. at 179.   Through these resolutions, the County unilaterally suspended certain provisions of its employee agreements, which effectively eliminated employee security and grievance rights.  *Id.* at 179-80.  The bankruptcy court considered relief filed by a coalition of ten County employee organizations (the "**Coalition**") and enjoined the County from treating any of the employees as permanently laid off.  *Id*. at 185.

68.    The bankruptcy court held that although the *Bildisco* standard applied to the rejection of the collective bargaining agreements, application of that standard required the debtor to satisfy certain of California labor law standards "if not as a legal matter, certainly from an equitable standpoint."  *Id*. at 184.  The court agreed with

- 26 -

13-53846-tjt  Doc 2217    Filed 12/28/13    Entered 12/28/13 16:00:46    Page 38 of 40
13-53846-swr  Doc 84    Filed 07/22/13    Entered 07/22/13 16:22:27    Page 38 of 30    38

the Coalition that chapter 9 recognized the delicate balance between state and federal interests and enjoined the debtor from conducting permanent layoffs in breach of labor contracts and in violation of California law.

69.    Here too, the Court should recognize the constitutional and other inherent federalism impediments in abridging pension and other benefits and deny the Stay Extension Motion.

## VII.    The Use Of Chapter 9 To "Modify" Pension And Other Retiree Benefits In Any Plan of Adjustment Would Violate the Best Interest of Creditors.

70.    In addition to utilizing the tools of section 365 of the Bankruptcy Code, if the Court grants the Stay Extension Motion and allows the stay to be extended, the end result could further be the City seeking to unconstitutionally wipe out guaranteed vested pension benefits pursuant to a plan of adjustment that would presumably be crammed down on creditors, including those City retirees and employees that participate in the various pension and other retirement benefit plans.  Given that creditors owed pension obligations have absolute rights to such obligations under Michigan law as set forth above, and the main goal of this proceeding is to modify vested pension and other retiree benefits, the City has no ability to confirm any plan of adjustment modifying such rights.

71.    As the Court is well aware, under chapter 11 of the Bankruptcy Code, the best interest of creditors test is designed to measure whether creditors will receive under a plan at least as much as would be received in a liquidation under Chapter 7 of the Code.  See 11 U.S.C. § 1129(a)(7).  However, this analysis is not applicable in the context of a chapter 9 case, where the municipal debtor cannot be liquidated.  The best interest of creditors test in the context of a Chapter 9 case does not compare treatment under the plan of liquidation, but rather to other alternatives to creditors to the plan.  *See In re Sanitary & Improvement Dist., #7*, 98 B.R. 970, 974 (Bankr. D. Neb. 1989); ("Section 943(b)(7) [with respect to the best interest of creditor's provision] ...

simply requires the court to make a determination of whether or not the plan as proposed is better than the alternatives."); *In re Mount Carbon Metropolitan Dist.*, 242 B.R. 18, 34 n.50 (Bankr. D. Colo. 1999) ("The "best interest" requirement of § 943(b)(7) is generally regarded as requiring that a proposed plan provide a better alternative for creditors than what they already have.") (citing 4 collier on Bankruptcy, ¶ 943.03[7] (Lawrence P. King, ed., 15th ed.1999)).

72.     Had there been no chapter 9 filing, pension creditors could not be impaired under the Michigan Constitution, and thus any impairment of such rights would violate Michigan law and be patently non-confirmable.

73.     Accordingly, using extraordinary equitable relief to extend the automatic stay to permit unconstitutional, illegal actions or a plan that would be patently unconfirmable is not permissible and, frankly, makes no sense.

74.     The Stay Extension Motion should be denied.

**VIII.   The Stay Confirmation Motion Should Not Be Entered at this Time.**

75.     Additionally, consistent with the infirmities of the City's chapter 9 filing discussed above, including the unconstitutional or otherwise improper actions in violation of Michigan state law raised in this Objection, the Court should withhold ruling on the Stay Confirmation Motion until these issues are resolved.

76.     The Stay Confirmation Motion is not appropriate where, as here, the chapter 9 filing is improper.

**IX.   The Eligibility Scheduling Motion Should Not Be Granted and at Minimum, Should Await the Parties Meeting and Conferring at the Appropriate Time.**

77.     Furthermore, the Court should not enter the Eligibility Scheduling Motion scheduling a briefing schedule until the Court decides the issue of whether this case results from, at least in part, an inappropriate filing.  Given the myriad issues that need to be addressed, the Court need not approve in shotgun fashion a highly compressed, non-negotiated schedule before these issues are resolved and, at a minimum,

- 28 -

13-53846-tjt Doc 2217 Filed 12/28/13 Entered 12/28/13 16:00:46 Page 28 of 30
13-53846-swr Doc 84 Filed 07/22/13 Entered 07/22/13 16:22:27 Page 41 of 462     40

before the major parties have the opportunity to meet and confer regarding a reasonable schedule, particularly given the unique state and federal constitutional issues here.

**X.     AFSCME and Its Counsel Should be Automatically Included in the Special Service List Pursuant to the Case Management Motion.**

78.     Finally, with regard to the Case Management Motion, AFSCME seeks to clarify (and to the extent necessary, request) that AFSCME will be considered one of the unions on the "Special Service List" that are "representing certain of the City's employees and retirees or their counsel where known" and that the below-identified counsel for AFSCME will be served with all pleadings filed in this proceeding.

<div align="center"><u>CONCLUSION</u></div>

For the reasons set forth herein, AFSCME respectfully requests that this Court deny the Stay Extension Motion, the Stay Confirmation Motion and Eligibility Scheduling Motion as set forth above, provide for the inclusion of AFSCME and its counsel listed below on the Special Service List established under the Case Management Motion, and grant such other and further relief as may be just and proper under the circumstances.

Dated: July 22, 2013

> **LOWENSTEIN SANDLER LLP**
> By: /s/  Sharon L. Levine_____
> Sharon L. Levine, Esq.
> Philip J. Gross, Esq.
> 65 Livingston Avenue
> Roseland, New Jersey 07068
> (973) 597-2500 (Telephone)
> (973) 597-6247 (Facsimile)
> slevine@lowenstein.com
> pgross@lowenstein.com
>
> -and-
>
> **MCKNIGHT, MCCLOW, CANZANO, SMITH & RADTKE, P.C.**
> John R. Canzano, Esq.

- 29 -

13-53846-tjt  Doc 2217  Filed 07/22/13  Entered 07/22/13 16:00:46  Page 42 of 30    41
13-53846-swr  Doc 84  Filed 07/22/13  Entered 07/22/13 16:22:27  Page 42 of 462

400 Galleria Officentre, #117
Southfield, MI 48034
(248) 354-9650 (Telephone)
(248) 354-9656 (Facsimile)
jcanzano@michworklaw.com

-and-

Herbert A. Sander, Esq.
THE SANDERS LAW FIRM PC
615 Griswold St., Suite 913
Detroit, MI 48226
(313) 962-0099 (Telephone)
(313) 962-0044 (Facsimile)
hsanders@miafscme.org

*Counsel to Michigan Council 25 of the American
Federation of State, County and Municipal
Employees (AFSCME), AFL-CIO*

- 30 -

13-53846-tjt wr Doc 2217 Filed 12/18/13 Entered 12/18/13 16:00:46 Page 43 of 462
13-53846-swr Doc 34 Filed 07/22/13 Entered 07/22/13 16:22:27 Page 30 of 30    42

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN

|  |  |
|---|---|
| In re | ) Chapter 9 |
|  | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
|  | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
|  | ) |

## LIMITED OBJECTION AND RESERVATION
## OF RIGHTS REGARDING (1) MOTION OF DEBTOR, PURSUANT TO
## SECTION 105(A) OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER
## CONFIRMING THE PROTECTIONS OF SECTIONS 362, 365 AND 922 OF THE
## BANKRUPTCY CODE AND (2) MOTION OF DEBTOR, PURSUANT TO SECTION
## 105(A) OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER EXTENDING
## THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON-OFFICER
## EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR

TO THE HONORABLE STEVEN RHODES
UNITED STATES BANKRUPTCY JUDGE:

Syncora Guarantee Inc. and Syncora Capital Assurance Inc. (collectively, "*Syncora*") file this limited objection and reservation of rights (this "*Limited Objection*") in response to: (1) *Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code* [ECF No. 53] (the "*Stay Confirmation Motion*") and (2) *Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor* [ECF No. 56] (the "*Stay Extension Motion*," and together with the Stay Confirmation Motion, the "*Motions*"),[1] filed by the above-captioned debtor (the "*Debtor*" or the "*City*") on July 19, 2013. In support of this Limited Objection, Syncora respectfully states as follows:

---

[1] Capitalized terms used but not defined herein have the meanings provided in the Motions and the *Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code* [ECF No. 11] (the "*Orr Declaration*"), as applicable.

## Preliminary Statement

1.       Syncora files this Limited Objection to the Motions to the extent the City seeks to extend the automatic stay to City employees, including officers, in their respective capacities other than as employees of the City (the "*Employees*"), and to Swap Counterparties, Service Corporations, and certain other non-debtor parties (collectively, the "*Non-Debtor Parties*") in connection with the Pension Systems and associated Swap Contracts. Any such extension would prejudice Swap Insurers' rights, as well as the rights of COP holders, relating to the Swap Contracts and COPs, and the City has shown no factual and legal bases to extend the automatic stay to the Employees or the Non-Debtor Parties. Syncora preserves all of its rights as against such parties.

## Background

2.       As explained in the Orr Declaration,[2] in 2005 and 2006, the City engaged in a series of funding transactions to remedy certain underfunded, accrued, actuarial liabilities. *See* Orr Decl. ¶ 45. The City arranged for the creation of two entities: the General Retirement System Service Corporation and the Police and Fire Retirement System Service Corporation, each a Michigan nonprofit corporation incorporated by the City. *Id.* The Service Corporations, in turn, entered into contracts with the City (each a "*Service Contract*,"), whereby the Service Corporations covenanted to facilitate the funding transactions in exchange for the City's promise to pay for ongoing obligations in connection therewith. *Id.* The Service Corporations then created certain trusts (the "*Funding Trusts*"), which issued the COPs that were then sold to investors. *Id.* at ¶¶ 45–47. In 2005 and 2006, Syncora entered into insurance policies with the

---

[2]     Mr. Kevyn D. Orr is the City's Emergency Manager (the "*Emergency Manager*") appointed pursuant to Public Act 436 of 2012 of the State of Michigan, codified at Mich. Comp. Laws §§ 141.1201–141.1291. Orr Decl. ¶ 1.

Funding Trusts with respect to certain of the COPs and, as of July 23, 2013, has exposure thereon in the amount of approximately $352 million.

3.      To hedge the interest rate exposure in respect of the floating-rate COPs that were issued in 2006, the Service Corporations entered into the several Swap Contracts with the Swap Counterparties.  Orr Decl. ¶ 47.  The City then arranged for monoline insurance polices with the Swap Insurers, which guaranteed certain payments to the Swap Counterparties.  *Id.* ¶ 48. Syncora insures four of the Swap Contracts and, as of July 23, 2013, Syncora's current exposure on the Swap Contracts is approximately $100 million.

4.      In January 2009, the Swap Counterparties notified the City and the Service Corporations that a termination event had occurred under the Swap Contracts that would have allowed the Swap Counterparties to terminate the Swap Contracts.  If they had, it would have imposed on the Service Corporations an immediate obligation of approximately $300 million to $400 million.  Instead of terminating, however, the Swap Counterparties sought and obtained additional assurance that the Service Corporations would be able to meet their obligations under the Swap Contracts.  *Id.* at ¶ 49.

5.      Specifically, the parties entered into the Collateral Agreement pursuant to which the City agreed to pledge (and subject to a lock-box arrangement) millions of dollars in receivables it was owed from various casinos (the "*Wagering Tax Revenues*") operating in the City as security for its payment obligations to the Service Corporations for amounts due under the Swap Contracts.  *Id.*  The City granted a lien on its Wagering Tax Revenues in favor of the Service Corporations to secure those payments.  *Id.*  In turn, the Service Corporations granted a security interest over those Wagering Tax Revenues.  *Id.*

6.      On June 14, 2013, at a meeting among certain of the City's creditors and advisors (the "*June 14 Meeting*"), the Emergency Manager stated that the City would not make $39.7 million in payments due and owing to the Service Corporations on account of the City's obligations thereto. *See id.* at ¶ 56.

7.      On June 17, 2013, Syncora sent a letter to U.S. Bank, as Custodian under the Collateral Agreement, memorializing a prior conversation between Syncora and U.S. Bank in which U.S. Bank expressed its independent view that the Service Corporation's default in not making a $40 million payment to the COP holders—which flowed from the City's failure to make the above-mentioned payment to the Service Corporations—triggered a cross-default under the Swap Contracts that led to *automatic* cash trapping under the Collateral Agreement. *See Decl. of Todd R. Snyder* filed in *City of Detroit v. Syncora Guarantee Inc.*, Case No. 13-cv-12987 (LPZ) (E.D. Mich. July 12, 2013) [ECF No. 10-3] and attached hereto at **Exhibit 1** (the "*Snyder Declaration*").   Thus, as a result of the cross-default, approximately $15 million in Wagering Tax Revenue was trapped in the General Receipts Subaccount.

8.      Over the course of the last two weeks in June and first week in July, Syncora attempted to engage the City in good-faith negotiations in an effort to reach a consensual resolution regarding the trapped cash.   Snyder Decl. ¶¶ 4–11.   These negotiations failed to progress, however, because the City was unwilling to agree to an industry-standard term of a vanilla non-disclosure agreement.   *Id*.   And, without any formal or informal notice, on July 5, 2013, the City filed a civil complaint in the Circuit Court for the County of Wayne against Syncora, U.S. Bank, and three casinos (the "*State Court Action*") seeking, among other things, a temporary restraining order to obtain the release of the trapped cash.   *Id*. at ¶ 12.   That same afternoon, the City requested an immediate *ex parte* hearing for its temporary restraining order.

4

13-53846-tjw Doc 2217 Filed 12/18/13 Entered 12/18/13 16:00:45 Page 47 of 462
13-53846-swr Doc 122 Filed 07/23/13 Entered 07/23/13 15:42:25 Page 4 of 20      46

The City claimed that it did not have time to notify Syncora, a known party in interest with which the City was negotiating, of the hearing. *See Ex Parte Restraining Order and Order to Show Cause Why A Preliminary Injunction Should Not Issue* ¶ 6, attached hereto at **Exhibit 2** (the "*Ex Parte Restraining Order*").

9. Thereafter, Syncora filed a notice of removal to remove the State Court Action to the United States District Court for the Eastern District of Michigan on July 11, 2013. And on the following day, Syncora filed a motion to dissolve the *Ex Parte* Restraining Order—an order that allowed the approximately $15 million of Wagering Tax Revenue held in the General Receipts Subaccount to escape. After Syncora filed its motion to dissolve, the City agreed to a dissolution of the *Ex Parte* Restraining Order; however, the City refused to return $15 million into the General Receipts Subaccount.

10. On July 18, 2013, the City commenced this case under chapter 9 of the Bankruptcy Code (the "*Chapter 9 Case*").

## Limited Objection

### I. The Stay Confirmation Motion Must be Denied to the Extent the City Seeks to Expand the Scope of the Automatic Stay.

11. The City seeks in the Stay Confirmation Motion an order confirming that the automatic stay applies to "any action or proceeding against a City Officer that seeks to enforce a claim against the City, in whatever capacity the applicable City Officer is serving." Stay Confirmation Mot. ¶ 26. This request goes beyond the text of section 922(a), which extends the protections afforded under section 362 to "an officer or inhabitant of the debtor," 11 U.S.C. § 922(a), because it applies to City Officers "in whatever capacity the applicable City Officer is serving." Stay Confirmation Mot. ¶ 26. Thus, the City's request covers Employees acting in a capacity other than for the City. In fact, certain City Officers and members of the City Council

are directors of the non-debtor Service Corporations and, in such capacity, owe fiduciary duties to such corporations and their stakeholders. As described above, the Service Corporations play a critical roll in the funding structure related to the COPs, Swap Contracts, and Collateral Agreement (the "*Funding Structure*").

12.    Section 922(a) does not stay actions against officers or inhabitants of the debtor that do not seek to enforce a claim against the debtor. *See* 11 U.S.C. § 922(a); *see also In re Jefferson Cnty., Ala.*, 484 B.R. 427, 447 (Bankr. N.D. Ala. 2012) (stating that the stay of section 922(a) only applies to actions brought to enforce a claim against the debtor). And the City has shown no cause to extend the automatic stay to Employees in their respective capacities other than as employees of the City and on account of claims against the City. Accordingly, to the extent the City seeks impermissibly to expand the automatic stay to Employees and Non-Debtor Parties, Syncora objects and the Stay Confirmation Motion should be denied. Syncora further objects to any attempt by the City to extend the automatic stay to actions against the Service Corporations, Swap Counterparties, or any Non-Debtor Parties and Employees for which the City has not shown the requisite factual and legal bases.

## II.    The Stay Extension Motion Must be Denied to the Extent the City Seeks to Expand the Scope of the Automatic Stay as to the Employees and Non-Debtor Parties.

13.    The City has also sought an order extending the automatic stay to certain non-debtor State Entities, Non-Officer Employees, and the City's Agents and Representatives pursuant to section 105(a) of the Bankruptcy Code and this Court's equitable powers. Stay Extension Mot. ¶¶ 19, 20–27. Understandably, the City is concerned that "certain parties [] are, or are likely to become, the targets of claims, lawsuits and other enforcement actions prosecuted by parties in interest that have the direct or practical effect of denying the City the protections of the automatic stay . . . ." Stay Extension Mot. ¶ 15. As discussed above, however, section

922(a)(1) only applies to actions or proceedings that seek "to enforce a claim *against the debtor*." 11 U.S.C. § 922(a)(1) (emphasis added). To the extent the City seeks to expand the scope of the automatic stay in addition to merely extending the automatic stay, Syncora objects and the Court should deny the Stay Extension Motion.

14. Further, extend-stay motions pursuant to section 105(a) are commonly treated as requests for preliminary injunctions, as modified for the bankruptcy context. *See In re Eagle-Picher*, 963 F.2d at 858 ("When issuing a preliminary injunction pursuant to its powers set forth in section 105(a), a bankruptcy court must consider the traditional factors governing preliminary injunctions . . . ."); *see also In re Storozhenko*, 459 B.R. 697, 708 *reconsideration denied,* 458 B.R. 905 (Bankr. E.D. Mich. 2011) (denying a request to extend the automatic stay pursuant to section 105(a) where, among other things, the debtor failed to address traditional preliminary injunction factors); *Collins & Aikman Corp. v. Eglesston* (*In re Collins & Aikman Corp.*), Adversary Case No. 06-4211(SWR), Hr'g Tr. 61–65, May 4, 2006 (Bankr. E.D. Mich. 2005) (denying a request to extend the automatic stay where the debtor failed to satisfy its burden under the preliminary injunction factors); *accord In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007) (applying preliminary injunction factors). The City did not even attempt to satisfy the preliminary injunction factors in either the Stay Extension Motion or in those portions of the Stay Confirmation Motion that seek relief pursuant to section 105(a). *See* Stay Extension Mot. ¶ 19; Stay Confirmation Mot. nn. 5, 6.

15. In fact, the City has only made a cursory attempt—at best—to satisfy its burden under applicable case law. *See* Stay Extension Mot. ¶ 19 (citing *Eagle-Picher* for the proposition that the City must only show "unusual circumstances" to extend the stay to non-debtor persons or entities). Also, as the court observed in *Storozhenko*, Federal Rule of Bankruptcy Procedure

7

13-53846-tjt Doc 2217 Filed 12/18/13 Entered 12/18/13 16:50:45 Page 50 of 462
13-53846-swr Doc 122 Filed 07/23/13 Entered 07/23/13 15:42:25 Page 7 of 20    49

(the "*Bankruptcy Rules*") 7001(7) provides that a debtor must initiate an adversary proceeding "to obtain an injunction or other equitable relief . . . ." Fed. R. Bankr. P. 7001(7); *see also Storozhenko*, 459 B.R. at 708. The City has failed to initiate an adversary proceeding here. In sum, the City has ignored procedure and a vast amount of bankruptcy case law regarding extension of the automatic stay under section 105(a).[3] That case law weighs heavily against the City. Therefore, because the City has not supported the relief sought with law and facts, and because the City has not complied with the Bankruptcy Rules, the Court should deny the Stay Extension Motion.

### **Reservation of Rights**

16.     Syncora respectfully reserves its rights to (a) amend, supplement, or otherwise modify this Limited Objection, (b) assert or raise such other and further objections or responses to the Motions based on additional information received from the Debtor or other sources, and (c) assert all rights and remedies under the Bankruptcy Code and applicable non-bankruptcy state and federal law against the Service Corporations, Swap Counterparties, Funding Trusts, Employees, Non-Debtor Parties, and any other party in connection with, or under, agreements governing the Funding Structure.

*[Remainder of page intentionally left blank.]*

---

[3]     *See, e.g.*, *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 315 (6th Cir. 2000) (holding that a contractual agency relationship was not an unusual circumstance that warranted extending the automatic stay); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 861 (6th Cir. 1992) (holding that a debtor must show unusual circumstances before a injunction pursuant to section 105(a) may issue); *Saginaw Prop., LLC v. Value City Dep't Stores*, LLC, 08-13782-BC, 2009 WL 189963 (E.D. Mich. Jan. 27, 2009) (declining to extend the stay where a judgment against the non-debtor would not have an effect on the property of the bankruptcy estate); *see also In re Calpine Corp.*, No. 05-60200 (BRL), 2007 WL 1302604, at *2 (Bankr. S.D.N.Y. Apr. 30, 2007) ("The debtor bears the burden of demonstrating that circumstances warrant extending the stay.").

8

13-53846-tjt  Doc 2217  Filed 12/18/13  Entered 12/18/13 16:50:46  Page 51 of 462
13-53846-swr  Doc 122  Filed 07/23/13  Entered 07/23/13 15:42:25  Page 8 of 20

50

WHEREFORE, Syncora respectfully requests that the Court deny the Stay Motions to the extent set forth in this Limited Objection and grant to Syncora such other and further relief as may be just and proper.

Dated: July 23, 2013

/s/ *Ryan Blaine Bennett*

James H.M. Sprayregen, P.C.
Ryan Blaine Bennett
Stephen C. Hackney
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200

- and -

Stephen M. Gross
David A. Agay
Joshua Gadharf
**MCDONALD HOPKINS PLC**
39533 Woodward Ave.
Suite 318
Bloomfield Hills, Michigan 48304
Telephone:    (248) 646-5070
Facsimile:    (248) 646-5075

*Counsel to Syncora Guarantee Inc. and Syncora Capital Assurance Inc.*

**Exhibit 1**
**Snyder Declaration**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

**CITY OF DETROIT, a Municipal Corporation Organized and Existing Under the Laws of the State of Michigan,**

        **Plaintiff,**

    **v.**

**SYNCORA GUARANTEE INC., a New York Corporation**

**and**

**U.S. BANK, N.A.,**

**and**

**MGM GRAND DETROIT, LLC,**

**and**

**DETROIT ENTERTAINMENT, LLC, d/b/a MOTORCITY CASINO HOTEL,**

**and**

**GREEKTOWN CASINO, LLC,**

        **Defendants.**

**Case No.: 2:13-cv-12987-LPZ-MKM**

**Hon. Lawrence P. Zatkoff**

## DECLARATION OF TODD R. SNYDER

I, Todd R. Snyder, hereby declare that I am an adult and have personal knowledge of the following:

1.    I am the Executive Vice Chairman of Rothschild Inc. and Co-Chair of its North American Debt Advisory and Restructuring Group.

2.    I was involved in the discussions between Syncora Guarantee Inc. ("Syncora") and the City of Detroit (the "City") regarding U.S. Bank's decision to trap the funds in the

General Receipts Subaccount. My declaration describes these discussions and the events surrounding them.

3.      On June 17, 2013, Syncora sent U.S. Bank a letter memorializing a prior conversation between Syncora and U.S. Bank in which U.S. Bank expressed the view that it would not make any payment to the City from the General Receipts Subaccount while an Event of Default is continuing under a Hedge. (*See* Ex. D to Orr. Aff., 6/17/13 letter from C. LeBlanc to S. Brown.) I was personally a party to the referenced conversation, which took place in Detroit on June 14, 2013, and involved myself, William Smith (counsel to U.S. Bank N.A.), and Ryan Bennett (counsel to Syncora). During that conversation, which was witnessed by a number of individuals, including representatives of U.S. Bank, Mr. Bennett expressed his understanding that the City's failure to make the $40 million payment to the Service Corporations, would cause the Service Corporation's to default on their interest payment to the Certificates of Participation and would also constitute a cross-default under the Swap Agreement, triggering automatic cash trapping under the Collateral Agreement. Neither Mr. Smith nor his client disagreed with Mr. Bennett, and Mr. Smith added words to the effect of "The cash ain't going anywhere until there is resolution."

4.      After several communications between Syncora, the City, and U.S. Bank regarding the propriety of trapping the cash under the Collateral Agreement, representatives from Syncora and the City held an in-person meeting on June 27, 2013. We understood that the primary purpose of this meeting was to discuss the statements made by the City's Emergency Manager during his June 14, 2013 creditors' meeting. It soon became clear, however, that the City's representatives were most interested in discussing U.S. Bank's recent decision to trap the funds in the General Receipts Subaccount.

2

5.      Initially, the City maintained that Syncora was solely responsible for the U.S. Bank's decision.  While Syncora explained that the City was mistaken in its view, given the automatic aspects of the cash trapping provisions in the Collateral Agreement, Syncora stated that it was willing to work with the City to craft a mutually satisfactory resolution to the issues surrounding the funds in the General Receipts Subaccount.  As the parties continued to discuss this issue, we reiterated our desire to engage in constructive discussions surrounding a potential settlement — a point that I personally communicated to City representatives during a break in the meeting.

6.      During the meeting, the City representatives seemed amenable to such discussions and asked Syncora to provide the City with a proposal.  The City further explained that this issue presented immediate concerns and asked us to put together our proposal as quickly as possible.

7.      The next morning I contacted one of the City's representatives and informed him that we had started to create a settlement proposal.  I explained, however, that we could not provide the City with anything more than a rough outline of our proposal unless we better understood what the City and the Swap Counterparties had been discussing about a discounted payoff of the termination liability for the Collateral Agreement.  As we had only recently discovered, the City had been negotiating with the Swap Counterparties, who, it appears, were secretly purporting to waive the cash trapping requirements of section 5.4 of the Collateral Agreement.  However, the City had never notified us of these negotiations or explained what the parties had been discussing.  The City representative stated that he understood why we needed that information but would need to speak with Ken Buckfire, the individual conducting the negotiations with the Swap Counterparties on behalf of the City.

3

8.     At that time, we tried calling Mr. Buckfire but were unable to reach him. He was unavailable for the rest of the business day. As a result, we set up a conference call for the following day.

9.     During my June 29, 2013 conference call with Mr. Buckfire, I explained that we needed one or two data inputs from the City in order to complete our proposal. Mr. Buckfire stated that he was not willing to share the data I requested and instead requested details of our proposal. I described, at a high level, the structure of our proposal. In response, he asked for greater financial detail regarding our proposal. I explained, though, that it was impossible to provide greater financial detail unless we first received some limited data from the City — which is exactly why we had made such a request.

10.    Despite this explanation, Mr. Buckfire remained unwilling to provide the requested information. He stated, however, that he would consider providing the requested data after the parties executed a non-disclosure agreement ("NDA").

11.    Accordingly, that day, attorneys for Syncora and the City began negotiating the terms of this NDA. My understanding is that over the next few days Syncora and the City exchanged a draft of a proposed NDA and held numerous discussions regarding its terms.

12.    While these discussions were still ongoing, on July 5, 2013, the City filed its Motion for an *Ex Parte* Temporary Restraining Order and an Order to Show Cause Why a Preliminary Injunction Should Not Issue (the "Motion"). Though representatives for the City and Syncora had been talking almost daily, the City never notified Syncora that it intended to file a Motion. Instead, Syncora first learned of the Motion when the City emailed Syncora the temporary restraining order minutes after it was entered.

4

Todd R. Snyder

Executed this 12 day of July, 2013.

5

**Exhibit 2**
*Ex Parte* **Restraining Order**

## STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE
## COUNTY OF WAYNE

CITY OF DETROIT, a Municipal
Corporation Organized and Existing
Under the Laws of the State of Michigan,

Case No.: 13-008858-CZ
Honorable: Jeanne Stempien

     Plaintiffs,

v.

SYNCORA GUARANTEE INC., a New
York Corporation; U.S. BANK, N.A.;
MGM GRAND DETROIT, LLC; DETROIT
ENTERTAINMENT, LLC d/b/a
MOTORCITY CASINO HOTEL; and
GREEKTOWN CASINO, LLC,

     Defendants.

13-008858-CZ

FILED IN MY OFFICE
WAYNE COUNTY CLERK
7/5/2013 2:46:52 PM
CATHY M. GARRETT
/s/ Unique Thomas

_____/

ROBERT S. HERTZBERG (P30261)
DEBORAH KOVSKY-APAP (P68258)
4000 Town Center, Suite 1800
Southfield, MI 48075
(248) 359-7300 - Telephone
(248) 359-7700 - Fax
hertzbergr@pepperlaw.com
kovskyd@pepperlaw.com

THOMAS F. CULLEN, JR. (*pro hac vice* pending)
GREGORY M. SHUMAKER (*pro hac vice* pending)
GEOFFREY S. STEWART (*pro hac vice* pending)
Jones Day
51 Louisiana Ave., N.W.
Washington, D.C. 20001
(202) 879-3939
tfcullen@jonesday.com
gshumaker@jonesday.com
gstewart@jonesday.com

*Attorneys for Plaintiff*

_____/

## EX PARTE TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE WHY A PRELIMINARY INJUNCTION SHOULD NOT ISSUE

At a session of said Court, held in the
County of Wayne, State of Michigan on
7/5/2013

PRESENT: Annette J. Berry a/f Jeanne Stempien

Wayne County Circuit Court Judge

This matter came before the Court on Plaintiff's Verified Complaint and Motion for an Ex Parte Temporary Restraining Order and Order to Show Cause Why A Preliminary Injunction Should Not Issue (the "Motion").

Upon review of the Motion, the allegations set forth in the Verified Complaint, and the Affidavit of Kevyn D. Orr (the "Affidavit") the Court has determined the following:

1.    Pursuant to MCR 3.310(A) and (B), it clearly appears from the specific facts shown by Plaintiff's Verified Complaint that immediate and irreparable injury, loss or damage will result to Plaintiff from the delay required to effect notice. Defendant Syncora has demanded that Defendant U.S. Bank, as custodian under a collateral agreement, trap certain casino revenues owing to Plaintiff under the collateral agreement. Plaintiff alleges that if it cannot gain immediate access to these revenues, it will be unable to successfully negotiate with its stakeholders during a critical timeframe in its efforts to effect a financial restructuring, that an existing cash crisis will be exacerbated, and that this cash crisis will lead to the further deterioration of police, fire, emergency medical, and other important city services, endangering the health and welfare of its citizens. The Verified Complaint and the Affidavit establish these specific facts.

2.    Plaintiff has shown a likelihood of success on the merits of the claims asserted in the Verified Complaint.

3.     Plaintiff will suffer greater injury from the denial of temporary injunctive relief than Defendants will suffer from the granting of such relief.

4.     The granting of this Order will further the public interest.

5.     Immediate relief is required to preserve Plaintiff's ability to access needed funds at a critical time in its financial restructuring, and to avoid substantial irreparable harm that would result in the absence of injunctive relief.

6.     Plaintiff's attorney has certified to the Court in writing that the delay required to give notice of the request for a temporary restraining order would cause plaintiff immediate and irreparable harm.

Upon review of the Verified Complaint, the Affidavit, and the Motion, the Court being otherwise fully advised in the premises:

**IT IS ORDERED** that Defendants, and anyone acting in concert or cooperation with Defendants who receives actual notice of this Order, are enjoined from and shall immediately cease and desist from taking any action to limit the City's access to casino revenues or the funds in the General Receipts Subaccount.

**IT IS FURTHER ORDERED** that Defendant U.S. Bank is enjoined from refusing to make payments to the City from the General Receipts Subaccount, unless instructed to do otherwise by the Counterparties to the Collateral Agreement, attached as Exhibit B to the Affidavit of Kevyn D. Orr, pursuant to its terms, without regard to any assertion of rights by Defendant Syncora.  This Order shall remain in full force and effect until this Court specifically orders otherwise.

**IT IS FURTHER ORDERED** that Defendants shall appear before this Court for a hearing on July 26, 2013 at 9:00 o'clock a .m. to show cause why a preliminary injunction should not be issued upon the terms set forth above.

**IT IS FURTHER ORDERED** that no security is required of Plaintiff at this time, pursuant to MCR 3.301(D)(2), as Plaintiff is a municipal corporation organized and existing under the laws of the State of Michigan.

/s/ Annette J. Berry
_____
Wayne County Circuit Court Judge

Date and time of issuance:
July 5, 2013 at 1:30 p.m o'clock

-4-

13-53846-tjt   Doc 2217   Filed 12/28/13   Entered 12/28/13 16:06:46   Page 62 of 462
13-53846-swr   Doc 122   Filed 07/26/13   Entered 07/26/13 15:42:25   Page 20 of 23      62

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION - DETROIT

In re:

CITY OF DETROIT, MICHIGAN,          Chapter 9

          Debtor.          Case No. 13-53846
          Honorable Steven W. Rhodes

---

OBJECTION OF ROBBIE FLOWERS, MICHAEL WELLS, JANET WHITSON, MARY WASHINGTON, BRUCE GOLDMAN AND INTERNATIONAL UNION, UAW TO MOTION OF DEBTOR, PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON-OFFICER EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR (Docket No. 56)

---

Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman (the "*Flowers* plaintiffs") plaintiffs in a Michigan civil action ("*Flowers v. Snyder")* against Michigan Governor Snyder, Michigan Treasurer Dillon and the State of Michigan under Article 9, Section 24 of the Michigan Constitution, join with International Union, UAW, the collective bargaining representative of Robbie Flowers and Bruce Goldman, in objection to the Motion Of Debtor, Pursuant To Section 105(A) Of The Bankruptcy Code, For Entry Of An Order Extending The Chapter 9 Stay To Certain (A) State Entities, (B) Non-Officer Employees And (C) Agents And Representatives Of The Debtor (Docket No. 56) (the "Motion"), and state:

1.      The *Flowers* plaintiffs are an employee of a Michigan municipal corporation named the Detroit Library Commission (Robbie Flowers), two retirees from the Detroit Library Commission (Michael Wells and Janet Whitson), a City of Detroit employee (Bruce Goldman), and a City of Detroit retiree (Mary Washington). Each has earned vested pension benefits from

the City of Detroit General Retirement System ("GRS"), and the three retiree plaintiffs are currently receiving pension benefits from GRS. International Union, UAW is the collective bargaining representative of Robbie Flowers and Bruce Goldman, and was the collective bargaining representative of the remaining *Flowers* plaintiffs when they were employed by the Detroit Library Commission or the City of Detroit.

2.      The *Flowers* plaintiffs' vested pension benefits are protected by Article 9, Section 24 of the Michigan Constitution, which provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation whereof which shall not be diminished or impaired thereby."

3.      The *Flowers* plaintiffs filed suit in state court against the State of Michigan and two of its constitutional officers because those officers had been abrogating and were threatening to abrogate plaintiffs' state constitutional rights, as more fully set forth in their amended verified complaint (Exhibit 6.1 to the Motion) and in their reply brief in support their motion for preliminary injunction in *Flowers v. Snyder* (attached as Exhibit 1 to the Declaration of William Wertheimer filed herewith).

4.      At no point have the *Flowers* plaintiffs sued the debtor or the Detroit Emergency Manager, the City of Detroit or any City of Detroit official or employee. Nor have they sought any relief against any of these persons or entities.

5.      The debtor at paragraph 11 of its Motion asserts that the *Flowers* plaintiffs sought *ex parte* injunctive orders. That is untrue. See the attached declaration of William Wertheimer filed herewith. At no point did the *Flowers* plaintiffs ever seek *ex parte* relief. To the contrary,

2

the *Flowers* defendants sought to delay as long as possible (for a now obvious reason) a fully briefed hearing on the merits of a motion for preliminary injunction seeking to preclude Governor Snyder from authorizing the filing of a Chapter 9 bankruptcy petition in violation of the Michigan Constitution. See Declaration of William Wertheimer, filed herewith.

6.     The *Flowers* plaintiffs' Michigan state law claim against Michigan Governor Snyder, Michigan Treasurer and the State of Michigan is well-grounded in the Michigan Constitution, as indicated by the debates concerning the adoption of what is now Article 9, Section 24 of the Michigan Constitution:

> MR. VAN DUSEN: An employee who continued in the service of the public employer in reliance upon the benefits which the plan says he would receive would have the contractual right to receive those benefits, and **would have the entire assets of the employer at his disposal from which to realize those benefits**.

1 Official Record, Constitutional Convention 1961, p. 774 (emphasis added).

7.     *Flowers v. Snyder* was filed once it became abundantly clear that Governor Snyder intended to unconstitutionally authorize the Emergency Manager to use federal bankruptcy law to override the protections of the Michigan State Constitution prohibiting the impairment of accrued pension benefits.[1]  The City blindly and dismissively treats these suits as

---

[1] The Emergency Manager's radical proposal to cut funding to the retirement system using a new pension valuation prepared for the City that (apparently through the use of a new mix of assumptions) purports to significantly increase the level of underfunding, to offer pennies on the dollar for retirement system funding and then declare that accrued benefits must be cut, raised legitimate and serious concerns that state law, as well as federal bankruptcy law, was being used, or about to be used to eviscerate pension benefits that are fundamental in human terms and importance to pensioners and protected under the Michigan Constitution. See Declaration of Charles M. Moore in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code, par. 11-16 (describing new valuation report and assumptions).

3

13-53846-tjt  Doc 2217  Filed 12/18/13  Entered 12/18/13 16:06:48  Page 66 of 462
13-53846-swr  Doc 1175  Filed 07/23/13  Entered 07/23/13 10:02:48  Page 63 of 45

65

mere collection actions designed to find end-runs around its Chapter 9 bankruptcy case, as if the lawsuits were the work of enterprising creditors looking every which way to avoid the bankruptcy case. See e.g., Motion at ¶23. But as the Court is well aware, Chapter 9 reflects our system of dual sovereignty and its reach is limited accordingly. A municipality is eligible to be a debtor "*if and only if*" it "is specifically authorized, in its capacity as a municipality or by name to be a debtor under [chapter 9] by State law, or by a governmental officer. . . ." 11 U.S.C. § 109(c) (2) (emphasis added). *Flowers* and the other lawsuits were commenced precisely to contest the authority of the Governor to issue such an authorization under state law where a purpose of the chapter 9 would be to impair constitutionally protected pension benefits.

8. Rather than enjoin *Flowers v. Snyder*, and the other lawsuits, they must proceed in the state courts. Otherwise, whether and to what extent this bankruptcy case is lawful under the Michigan Constitution is a cloud that will overhang even the most routine orders issued by this Court should the bankruptcy case continue without a resolution of these suits through the state court system and notwithstanding the orders already by the state court. The City's Motion is utterly blind to the fundamental role of these suits in defining the extent to which the bankruptcy can proceed to issue any orders at all. Or else the City hopes that the Court will not notice at all.

9. For the foregoing reasons, as well the grounds set forth in the Objection of The Michigan Counsel 25 of the American Federation State, County and Municipal Workers (Docket 84), specifically, that the City is not entitled to a stay under the automatic stay or Section 105 of the Bankruptcy Code, as well as under long-standing principles of federal court abstention and federalism principles embodied in the Tenth Amendment to the U.S. Constitution which the

4

*Flowers plaintiffs* and International Union, UAW join in, the *Flowers* Plaintiffs and the UAW

respectfully submit that the Motion should be denied.

<div align="center">

Respectfully submitted,

</div>

s/William A. Wertheimer
William A. Wertheimer (P26275)
30515 Timberbrook Lane
Bingham Farms, MI 48025
248-644-9200
billwertheimer@gmail.com

*Attorney for Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman*

s/Niraj Ganatra
Niraj Ganatra (P63150)
Michael Nicholson (P33421)
International Union, UAW
8000 East Jefferson Avenue
Detroit, Michigan 48214
313-926-5216
mnicholson@uaw.net

and

s/Babette Ceccotti
Babette Ceccotti
Cohen, Weiss and Simon LLP
330 West 42d Street
New York, NY 10036-6979
212-356-0227
bceccotti@cwsny.com

*Attorneys for International Union, UAW*

Dated: 23 July 2013

<div align="center">

5

</div>

In re:

CITY OF DETROIT, MICHIGAN,           Chapter 9

                   Debtor,          Case No. 13-53846

     v.

                               Honorable Steven W. Rhodes

# DECLARATION OF WILLIAM WERTHEIMER

1.       I am the lead attorney for plaintiffs in *Flowers, et al. v. Snyder, et al.,* No. 13-734-CZ (Ingham County Circuit Court July 3, 2013), one of the three "Prepetition Lawsuits" that the City is seeking to stay in its motion at Docket No. 56.

2.       In that motion the City states at paragraph 11 that plaintiffs in *Flowers* (and the other two "Prepetition Lawsuits") sought "*ex parte* orders" for temporary or preliminary injunctive relief. That is untrue. At no point did the *Flowers* plaintiffs (or the *Webster* plaintiffs) ever seek *ex parte* relief.

3.       I filed our suit on July 3, 2013 and drew Judge Rosemarie Aquilina. I had notified the Attorney General's office before filing that I would be going to chambers seeking an order to show cause for a hearing on a preliminary injunction precluding the Governor from authorizing a Detroit bankruptcy. I met up with Tom Quasarano and Michael Murphy of the Attorney General's office at court. The three of us went into Judge Aquilina's chambers where we met with Morgan Cole, the court officer/law clerk. Ms. Cole stated that Judge Aquilina could hear the

matter on July 15. I urged that the matter be set for July 15. The Attorney General's office objected and asked for a delay until July 22 because the earlier date would interfere with chemotherapy treatment that Mike Murphy (who would according to them be writing the response brief) had previously scheduled. I then agreed to the July 22 hearing date, with the defendants' responsive pleading to be filed July 15. Judge Aquilina subsequently issued the order to show cause for July 22 at 9 a.m.

4.      Later the day of July 3, John Canzano filed suit on behalf of the *Webster* plaintiffs. He subsequently obtained an order to show cause for his hearing for declaratory relief before Judge Aquilina on July 22 at 9 a.m.

5.      The Attorney General's office filed response briefs in the *Flowers* and the *Webster* cases on July 15.

6.      Michael Murphy's name was not on either brief defendants filed on July 15 and he has had no involvement in the case to my knowledge beyond his role in obtaining the July 22 hearing date described above

7.      On July 17 the Clark Hill law firm filed suit on behalf of the two Pension Systems and moved for an expedited briefing schedule and hearing pursuant to MCR 2.605(D).

8.      On July 18 Mike Pattwell, a Clark Hill attorney, advised me by phone that the *Pension System* plaintiffs would be seeking injunctive relief from Judge Aquilina that afternoon as they had received word that the City was planning on filing for bankruptcy on July 19. (The reply brief with the affidavit of Michael Nicholson was filed on July 18 and is attached as Exhibit 1.) I was planning on filing our reply brief for the July 22 hearing that afternoon, so I

2

decided to also appear before Judge Aquilina to seek immediate injunctive relief. I advised John Canzano of what I had heard and he decided similarly.

9.      At approximately 3:35 p.m. on July 18, I telephonically advised Tom Quasarano that I would be appearing in Judge Aquilina's courtroom shortly after 4 p.m. to seek an injunction. He said that he would meet me there and did.

10.     The City filed for bankruptcy at 4:06 p.m. We began our hearing at 4:15 p.m. A transcript of the hearing is attached.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

<div style="text-align: right;">

s/William Wertheimer
William Wertheimer

Dated: July 23, 2013

</div>

<div style="text-align: center;">3</div>

# EXHIBIT 1

4

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

ROBBIE FLOWERS, MICHAEL WELLS,
JANET WHITSON, MARY WASHINGTON and
BRUCE GOLDMAN

                  Plaintiffs,

vs.

                                     Case No. 13-729-CZ
                                     Hon. Rosemarie Aquilina

RICK SNYDER, as the Governor of the State
of Michigan; ANDY DILLON, as the Treasurer of
the State of Michigan; and the STATE OF MICHIGAN,

                  Defendants.

                                                            /

William A. Wertheimer (P26275)
Attorney for plaintiffs
30515 Timberbrook Lane
Bingham Farms, MI 48025
248-644-9200
billwertheimer@gmail.com

Andrew Nickeloff (P37990)
Marshall J. Widick (P53942)
James A. Britton (P71157)
Attorneys for plaintiffs
Sachs Waldman
1000 Farmer
Detroit, MI 48226
313-496-9429
anickelhoff@sachswaldman.com
mwidick@sachswaldman.com
jabritton@sachswaldman.com

Thomas Quasarano (P27982)
Brian Devlin (P34685)
Assistant Attorneys General
PO Box 30754
Lansing, MI 48909
quasaranot@michigan.gov

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION[1]

---

[1]     This brief is in reply to defendants' response to plaintiffs' motion. It is not in response to defendants' motion for summary disposition. Plaintiffs will respond to that motion as provided for under MCR 2.116(G)(1)(a)(i) once defendants properly notice same. Plaintiffs do not agree to defendants' request that this Court (apparently at the hearing and after the fact) waive or adjust the response time provided in the court rules. State's brief, page 16.

Defendants' brief ignores (but does not dispute) the basic facts that plaintiffs allege and grossly mischaracterizes the nature of plaintiffs' claim. In Parts A and B below, we address these two defects in defendants' response. Then, in Parts C through G, we respond to the remainder of defendants' arguments in response to our request for a preliminary injunction.

**A. Undisputed Facts.** Plaintiffs' complaint is based on the undisputed fact that the Detroit Emergency Manager has publicly stated that Detroit retirees, employees and their unions must agree to significant cuts to their vested pension benefits outside of a Chapter 9 federal bankruptcy proceeding, and that if they fail to agree he will cut those benefits through operation of the federal bankruptcy code, based on the supremacy of the federal bankruptcy code over Article 9, Section 24 of the Michigan Constitution, which provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Since under Public Act 436 such a federal bankruptcy proceeding cannot be initiated by the Emergency Manager without authorization by Governor Snyder, plaintiffs have sued the Governor to stop such an authorization and the diminishment and impairment of vested Detroit pension benefits which will necessarily follow from it. In short, this litigation seeks to stop action by Governor Snyder that the plaintiffs allege to be unconstitutional under Article 9, Section 24, and does not seek a declaration that Public Act 436 is itself unconstitutional.

Since this litigation was commenced on 3 July 2013, the City of Detroit has again refused to accept or address the strictures of Article 9, Section 24. Thus, on 9 July 2013,

the General Counsel of the UAW – which is the collective bargaining representative of plaintiffs Robbie Flowers and Bruce Goldman – wrote the City's lawyers, asking them:

> please cite the basis for any claim that the UAW has the authority to compromise the vested benefits of active and/or retired UAW or former UAW members employed or formerly employed by the City of Detroit and its affiliates. As I presume you know, Article 9, Section 24 of the Michigan Constitution provides in pertinent part that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Please tell me what authority your firm and/or Mr. Orr believe gives the UAW the right to compromise vested pension benefits, despite the contrary provisions of Article 9, Section 24. Please also tell us whether Mr. Orr and/or your firm take the position that Article 9, Section 24 of the Michigan Constitution is not or may not be binding on the City of Detroit, the State of Michigan, Governor Snyder, Mr. Orr or the UAW and state, if that is the case, under what circumstances you believe that Article 9, Section 24 would not bind some or all of these persons or entities.

Affidavit of Michael Nicholson, Exhibit B. Mr. Nicholson wrote this email in part to accept an invitation sent to UAW and other unions and retiree groups to attend a meeting on 10 July 2013 with representatives of both the City of Detroit and the Detroit General Retirement System. Id., Ex. A.

Since this litigation was filed on July 3, the Detroit Emergency Manager has also continued to publicly take the position that vested pensions must be cut without regard to Article 9, Section 24 of the Michigan Constitution. See the video of his 5 July 2013 interview with Detroit Public Television's MiWeek program beginning at 14 minutes, www.youtube.com/watch?v=TspCsrXmkZA.

In addition, it is clear that the Detroit Emergency Manager is moving closer to a bankruptcy filing and that the Governor is directly involved. In an article this past Monday headlined "Detroit Bankruptcy Clock Ticking" Daniel Howes reported in the Detroit News: "The governor and Emergency Manager Kevyn Orr met Monday to

discuss the situation. Additional meetings with creditors, legal teams and the Snyder administration are scheduled this week to determine whether Orr and his team are making enough meaningful progress in their talks with creditors, unions and pension funds to delay a bankruptcy filing." See Exhibit A attached and available online at www.detroitnews.com/article/20130716/BIZ/307160025.

As these new facts show, the Emergency Manager continues to demand that unless unions and retiree groups agree to significant cuts in retiree benefits outside of bankruptcy, he will impose such cuts in bankruptcy, following the Governor's authorization to commence a Chapter 9 proceeding, in derogation of the constitutional rights guaranteed by Article 9, Section 24. See Amended Verified Complaint, ¶ 21-25. The factual basis for plaintiffs' complaint in this litigation is thus undisputed, and stands against defendants' claim that – contrary to the unchallenged facts – their concerns about their pensions and their rights are merely hypothetical and unripe because nothing is being done to harm them. To the contrary, real harm continues to take place now: the plaintiffs continue to be told that unless they agree to cuts in their vested pension benefits now, they will be imminently be imposed through a Chapter 9 bankruptcy proceeding authorized by the Governor.

**B.** **Mischaracterization of Plaintiffs' Complaint.** Defendants' claim that plaintiffs "bring a facial constitutional challenge" to Public Act 436. State's brief, page 1. Not so. Plaintiffs begin their complaint by stating that their constitutional right to vested pension benefits "are being violated [present tense] in the emergency financial management proceedings that the State has implemented in response to Detroit's fiscal crisis and whose rights will be threatened [future tense] with abrogation if Governor

Snyder authorizes the Detroit Emergency Manager to proceed under Chapter 9 in bankruptcy." Amended verified complaint, ¶ 1. Nowhere in their complaint do plaintiffs allege that Public Act 436 is unconstitutional on its face or otherwise. (Nor do they seek relief consistent with a facial challenge.) Mischaracterizing plaintiffs' allegations has three tactical advantages for defendants. First, it allows defendants to ignore the facts on the ground, facts upon which this civil action is based. Second, it allows defendants to make their arguments without acknowledging that plaintiffs' constitutional rights under Article 9, Section 24 are being threatened now. Third, it allows defendants to argue that they can protect these constitutional rights in bankruptcy, even though Detroit's Emergency Manager has flatly and uncategorically opined to the contrary. We address these points in what follows below.

C. **Plaintiff's Request for Injunctive Relief is Neither Premature, Overbroad nor Constitutionally Infirm.** Defendants here make four arguments against injunctive relief. None has merit.

1. First, defendants argue that no prohibitory injunction can be issued because declaratory relief has not as yet failed, citing dictum from *Strauss v Governor*, 459 Mich 526, 532; 592 NW2d 53 (1999). State brief, pages 4-5. The Court's dictum from *Strauss* is inapplicable here for at least three reasons. First, *Strauss* involved a fight between the Governor and the State Board of Education over which constitutional provision took precedence, Article 5, Section 2 or Article 8, Section 3. This case involves the State in the person of the Governor abrogating the constitutional rights of its citizens. That is a distinction that should make a difference. Second, this case involves a very public fight in which the Governor knows very well that his Emergency Manager is

5

refusing to recognize the Article 9, Section 24 rights of plaintiffs and thousands of other retirees. To require this Court to first issue declaratory relief in these circumstances elevates form over substance. Third, the bankruptcy filing may be imminent, such that there may be no time for the courtesy contemplated by *Strauss.* See, e.g., www.freep.com/article/20130718/news01/307180107/detroit-prepares-file-bankruptcy-soon-friday ("Detroit prepares to file for bankruptcy as soon as Friday") and www.youtube.com/watch?v=TspCsrXmkZA, beginning at 10 minute mark. With all that said, plaintiffs would have no objection if this Court fashioned the requested preliminary relief in the form of a declaration, but only if the Governor agrees not to act contrary to the declaration before the plaintiffs have the opportunity to return to this Court and seek a prohibitory injunction.

  2. Defendants next argue that injunctive relief is premature given the opportunity for relief in bankruptcy court. State brief, page 5. They cite two Bankruptcy Code provisions: 11 USC §109(c) and 11 USC § 943(4). Neither protects against an impairment of pension benefits in violation of Article 9, Section 24. First, none of the disjunctive criteria in 109(c) for eligibility to proceed under Chapter 9 contain a basis for a challenge based on Article 9, Section 24. Second, the requirement in 11 USC § 943(4) that "the debtor is not prohibited by law from taking any action necessary to carry out the plan" may not protect Article 9, Section 24 rights because of the principle that "federal law trumps state law," which the Detroit Emergency Manager has indicated will be applied. To support this concern, we cited in our opening brief the bankruptcy court decisions in *In re City of Stockton, California,* 478 BR 8 (Bankr ED Cal 2012); and *In re City of Vallejo,* 403 BR 72 (Bankr ED Cal 2009), which we expect will be cited in a

Chapter 9 proceeding in support of the proposition that federal bankruptcy law supersedes Article 9, Section 24 of the Michigan Constitution.

3.     Defendants also argue that the injunction request is overbroad because "[t]his Court cannot determine, based on the record Plaintiffs present, how any bankruptcy proceeding for the City of Detroit, if filed, may impact their pension benefits or if it will at all, until the bankruptcy plan is filed with the bankruptcy court and ultimately confirmed." State brief, page 6. But this claim that plaintiffs' concerns are only hypothetical ignores the Detroit Emergency Manager's stated intent and the terms of his proposal to creditors. And it also ignores the fact that if no relief is granted now, it will likely be too late after a bankruptcy filing to protect plaintiffs' rights under Article 9, Section 24. In other words, the result, if defendants' argument is accepted, is that by the time the harm comes the citizens of the State of Michigan who are Detroit pensioners will be unable to sustain their State constitutional rights. That is precisely the plan to violate Article 9, Section 24 of the Michigan Constitution that we believe the Governor will facilitate at the request of the Emergency Manager, absent the relief we request.[2]

4.     Defendants further argue that the plaintiffs' injunction request is mandatory. State brief, page 6. It is not. As defendants recognize in making other of their arguments, the relief sought by plaintiffs' pending motion is, by its terms, clearly prohibitory.

---

[2]     The motion before the Court is a motion for preliminary injunction, not a request for final relief. While we recognize the sensitivity of this issue and this litigation, the Court should consider the appropriateness of limited discovery on the issue of communications between the Governor, the defendant State Treasurer and the Emergency Manager (and their staff and other agents) with respect to City of Detroit vested pension benefits. Thus, even it plaintiffs are found to lack standing to seek injunction, this civil action may still proceed on the claim in Complaint for declaratory relief.

**D.** **Plaintiffs Have Standing to Bring This Action.** Defendants recognize

that the Michigan Supreme Court restored Michigan's limited, prudential approach to

standing in *Lansing School Education Ass'n v Lansing Board of Education,* 487 Mich

349, 372; 792 NW2d 686 (2010). State's brief, page 7.[3] This means that citizens have

standing if they have some individual interest in the subject matter of the complaint that

is not common to all the citizens of the state. 487 Mich at 356. Plaintiff retirees and

vested employees meet such a test. Their pension benefits are in danger of being reduced

or eliminated if the Governor is allowed to authorize a Chapter 9 bankruptcy filing. The

Detroit Emergency Manager is threatening precisely that now, in an effort to coerce the

plaintiffs' agreement to "significant cuts" in their vested retirement benefits. Other

citizens of the state do not have such an interest. Plaintiffs have standing to seek

injunctive relief.[4]

Defendants also argue that Public Act 436 expressly states (at MCL 141.1572)

that it provides no cause of action. State's brief, pages 7-8. But plaintiffs are not suing for

a violation of Public Act 436; they are suing over an abridgement of their constitutional

---

[3] Despite the dissent in *Lansing School Education Ass'n* and the changing composition of the Court, the Court has given no indication that it intends to retreat from this position. To the contrary. See, *Ader v Delta College Bd of Trustees,* 493 Mich 887; 822 NW2d 221 (2012) (vacating order that had granted leave to appeal from a decision of the Court of Appeals applying *Lansing School Education Ass'n* and denying application for leave) (J. Markman dissenting).

[4] Additionally, although not at issue with respect to plaintiffs' pending motion for preliminary injunction, this Court clearly has jurisdiction to issue a declaratory judgment under MCR 2.605. An "actual controversy" under that court rule exists when a judgment is necessary to guide a parties' future conduct in order to preserve legal rights. *UAW v Central Michigan University,* 295 Mich App 486, 495; 815 NW2d 132 (2012). In granting such relief "courts are not precluded from reaching issues before actual injuries or losses have occurred." *Id.* Accord, *Huntington Woods v Detroit,* 279 Mich App 603, 616; 761 NW2d 127 (2008); *Lake Angelus v Aeronautics Comm,* 260 Mich App 371, 376-77; 676 W2d 642 (2004).

rights.[5] A Michigan court of general jurisdiction is the proper forum for a citizen of Michigan to bring a claim of a state constitutional violation. And the relief plaintiffs seek is available through this Court. MCR 3.310 and 2.605.

    **E.    Plaintiffs' Constitutional Claims Are Ripe for Review.**  Defendants argue that plaintiffs' constitutional claims are not ripe because the bankruptcy filing has not yet occurred. State's brief, pages 11-12.  Incredibly, they argue this knowing that the Emergency Manager has announced that he will seek to extinguish plaintiffs' Article 9, Section 24 rights should he file a Chapter 9 in response to their failure to agree now to "significant cuts" in their pensions.

    One short, practical answer is that a bankruptcy filing may well ring a bell that cannot be unrung: the trumping of plaintiffs' constitutional rights by federal law, after the sovereign has waived – through the Governor's authorization for a Chapter 9 – whatever rights the State has under the Tenth Amendment to the federal Constitution to insist on the supremacy of the State Constitution.  See, *In re City of Vallejo, supra,* 403 BR 72 (Bankr ED Cal 2009)(copy attached).  That is the legal opinion of the Detroit Emergency Manager (an opinion that plaintiffs have little reason to doubt for purposes of this motion[6] and that defendants do not dispute in their brief): that federal law will trump

---

[5]    The plaintiffs' pension plan gives them a right to bring such a suit. See Section 47-3-11(i)(1) of the General Retirement System Pension Plan which is also Ord. No. 29-01, § 1, 11-30-01 and is available on-line at www.rscd.org.
[6]    Plaintiffs, of course, reserve the right in bankruptcy court to argue to the contrary. But we note, for example, the holding of federal bankruptcy court in *Vallejo*: "Therefore, "by authorizing the use of chapter 9 by its municipalities, California must accept chapter 9 in its totality; it cannot cherry pick what it likes while disregarding the rest." *In re County of Orange*, 191 B.R. 1005, 1021 (Bankr. CD Cal 1996) … Since the state must consent to a bankruptcy filing under Section 109(c)(2) [of the Bankruptcy Code], the state consents to the displacement of its own law in order to obtain the benefits uniquely available under the Bankruptcy Code." 403 BR at 76.

9

Article 9, Section 24 of the Michigan Constitution. See the Detroit Emergency Manager's 14 June 2013 statement to the Detroit Free Press Editorial Board quoted at ¶ 22 of the amended verified complaint. ("If we don't reach an agreement one way or the other, we feel fairly confident that the state federal law, federalism, will trump state law or negotiate.") Or put in plain terms, the constitutional rights plaintiffs are relying on here will then be a nullity.

A second short, practical answer is that the threats to ignore Article 9, Section 24 are ongoing and are being used to browbeat plaintiffs (and others) into a deal that would avoid bankruptcy but ignore their constitutional rights. Defendants admit as much at the conclusion of their brief when they urge this Court to grant their motion to dismiss now "to avoid adversely impacting the City of Detroit Emergency Manager's current efforts to reach a consensus that could achieve some financial stability for the City without recourse to bankruptcy. " State brief, page 16. We know from the verified and unrebutted complaint that the "consensus" will be reached, if at all, in violation of plaintiffs' rights. Defendants would then undoubtedly argue that any attack on that "consensus" agreement would be moot or in some other way immune to attack. The time for this issue to be decided is now.

And the law supports such a common sense finding that this case is ripe for decision now. All that is required is that "a genuine controversy exist between the parties." *Michigan Chiropractic Council v Comm'r of Ins,* 475 Mich 363, 381; 716 NW2d 561 (2006). A claim lacks ripeness only where "the harm asserted has [not] matured sufficiently to warrant judicial intervention …" *Id.,* quoting from *Warth v Seldin,* 422 US 490, 499 n 10. A genuine controversy exists here and now. Plaintiffs are fighting

for their future financial well-being. And that fight will be over before it begins absent judicial intervention now.

**F. Plaintiffs Have Stated a Claim.** Defendants' argument that plaintiffs have failed to state a claim is entirely based on the mistaken premise that plaintiffs are bringing a facial challenge to Public Act 436. State brief, page 12. Plaintiffs' claim is that the receivership under which the City of Detroit is currently operating is currently ignoring the Article 9, Section 24 rights of the City's' retirees (this is supported with multiple and direct statements from the Detroit Emergency Manager) and that in these circumstances (and this part of the complaint is in caps, bolded and underlined at the top of page 4) "it would be unconstitutional for the governor to authorize the Detroit Emergency Manager to proceed under Chapter 9." This states a claim.

**G. Plaintiffs Have Met the Prerequisites for Injunctive Relief.** Defendants argue first that plaintiffs will not suffer irreparable harm if an injunction is not issued. State's brief, page 13. Defendants do not even attempt to argue that the loss or in the words of the Detroit Emergency Manager the "significant cuts" in plaintiffs' vested pension benefits would not constitute irreparable harm. Rather they argue that plaintiffs will have a remedy in bankruptcy. Not according to the Detroit Emergency Manager. And he would be speaking for the debtor in bankruptcy.

Second, defendants argue that the balance of harms favors them by using a claim of urgency, all as part of an argument that completely fails to account for the derogation of Michigan Constitutional rights that they intend to cause. State's brief, pages 13-14. Put another way, the defendants claim that our State Constitution can be ignored if the Governor and his agents decide that following it would complicate matters in a municipal

11

receivership. This would surprise the framers of our State Constitution, one of whom stated that the then new Article 9, Section 24 meant that a public employee with vested pension benefits, "would have the entire assets of the employer at his disposal from which to realize those benefits." 1 Official Record, Constitutional Convention 1961, p 774.

Third, defendants argue the public interest. State's brief, pages 14-15. Certainly, the public interest would be served if the Governor were to be precluded from authorizing a bankruptcy that would threaten the abrogation of constitutional rights. The people, in adopting their Constitution, including Article 9, Section 24, have spoken in that regard. And just as certainly, the public interest would not be served if the Detroit Emergency Manager were to be allowed to continue down his path all the while ignoring those constitutional rights.

## CONCLUSION

Plaintiffs are entitled to know whether their Article 9, Section 24 constitutional rights have any meaning in the current Detroit financial emergency. And they are entitled to know that now, and to have those rights protected. The plaintiffs' motion for preliminary injunction should be granted.

Respectfully submitted,

s/William A. Wertheimer
William A. Wertheimer (P26275)
Attorney for plaintiffs
30515 Timberbrook Lane
Bingham Farms, MI 48025
248-644-9200

Andrew Nickeloff (P37990)
Marshall J. Widick (P53942)
James A. Britton (P71157)

12

Attorneys for plaintiffs
Sachs Waldman
1000 Farmer
Detroit, MI 48226
313-496-9429
anickelhoff@sachswaldman.com

mwidick@sachswaldman.com
jabritton@sachswaldman.com

Dated: 18 July 2013

### PROOF OF SERVICE

THE UNDERSIGNED CERTIFIES THAT ON 18 JULY 2013 THE FOREGOING
INSTRUMENT WAS SERVED UPON THE FOLLOWING:

1. Thomas Quasarano
2. Brian Devlin
3.

BY:

X___ U.S. MAIL                    _____ FAX

_____ HAND DELIVERY          _____ U.S.EXPRESS MAIL
_____ UPS                       X___ OTHER: email
BY:
SIGNATURE: _____

13

# STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

ROBBIE FLOWERS, MICHAEL WELLS,
JANET WHITSON, MARY WASHINGTON and
BRUCE GOLDMAN

               Plaintiffs,

vs.

                                  Case No. 13-729-CZ
                                  Hon. Rosemarie Aquilina

RICK SNYDER, as the Governor of the State
of Michigan; ANDY DILLON, as the Treasurer of
the State of Michigan; and the STATE OF MICHIGAN,

               Defendants.

_____ /

| | |
|---|---|
| William A. Wertheimer (P26275)<br>Attorney for plaintiffs<br>30515 Timberbrook Lane<br>Bingham Farms, MI 48025<br>248-644-9200<br>billwertheimer@gmail.com | Thomas Quasarano (P27982)<br>Brian Devlin(P34685)<br>Assistant Attorneys General<br>PO Box 30754<br>Lansing, MI 48909<br>quasaranot@michigan.gov |

Andrew Nickeloff (P37990)
Marshall J. Widick (P53942)
James A. Britton (P71157)
Attorneys for plaintiffs
Sachs Waldman
1000 Farmer
Detroit, MI 48226
313-496-9429
anickelhoff@sachswaldman.com
mwidick@sachswaldman.com
jabritton@sachswaldman.com

---

## AFFIDAVIT OF MICHAEL NICHOLSON

State of Michigan

County of Wayne

    Michael Nicholson, being first duly sworn, states as follows:

1. My name is Michael Nicholson. I am a citizen of the State of Michigan. I am employed as General Counsel by International Union, UAW. I make this affidavit based on personal knowledge.

2. On June 28, 2013, I received the email message attached hereto as Exhibit A from David Birnbaum, a lawyer with the Jones Day law firm, which is lead counsel to the Emergency Manager for the City of Detroit.

3. On July 9, 2013, I sent the email message attached hereto as Exhibit B to Mr. Birnbaum and his colleague at Jones Day, Dan Merrett.

4. Since July 9, 2013 until the time that I signed this affidavit today, I have received no response from anyone at Jones Day to the questions that I raised in Exhibit B with respect to pension benefits and Article 9, Section 24 of the Michigan Constitution.

Further Affiant sayeth not.

_____
Michael Nicholson

Subscribed and sworn to before me this 18th day of July 2013.

_Nancy S. Dennis_

Nancy S. Dennis, Notary Public
County of Macomb
State of Michigan
Acting in Wayne County
My commission expires February 10, 2017

NANCY S DENNIS
Notary Public - Michigan
Macomb County
My Commission Expires Feb 10, 2017
Acting in the County of _Wayne_

2

**From:** David Birnbaum <dbirnbaum@jonesday.com> 📎
**Subject:** City of Detroit -- Pension Restructuring Discussions (GRS)
**Date:** June 28, 2013 4:42:56 PM EDT
**To:** MNicholson@uaw.net
**Cc:** Evan Miller <emiller@JonesDay.com>, Brian Easley <beasley@JonesDay.com>, "David G. Heiman" <dgheiman@JonesDay.com>, Heather Lennox <hlennox@JonesDay.com>

_____
2 Attachments, 4 KB

Dear Mr. Nicholson:

Following the presentations made on June 20th, outside counsel for GRS reached out to the City of Detroit for more information on, and to discuss, a pension restructuring proposal. GRS and the City of Detroit have tentatively scheduled a meeting on pension restructuring for Wednesday, July 10th (location to be determined). The City will be prepared to provide more information on its developing pension restructuring proposal. Because the City expects that the proposal will impact the pension benefits of active participants of GRS, who include your members, the City would like to invite you to this meeting on July 10th, at 1 pm to participate in the discussion. We expect the meeting will last approximately 2 hours. GRS will be sending an advisor-only team (attorneys and financial advisors), and the City believes this is a good way to proceed. Please let us know at your earliest convenience if you will attend and the names of the attendees. We will contact you as soon as practicable to provide details about the meeting location.

Regards,

David



**David S. Birnbaum**
_____
77 West Wacker Drive, Suite 3500 • Chicago, IL 60601
DIRECT 312.269.4005 • FAX 312.782.8585 • EMAIL dbirnbaum@jonesday.com

==========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
==========

**Exhibit A**



---

Dear Messrs. Merrett and Birnbaum:

UAW has requested access to the City of Detroit data room maintained by your firm. You have responded by proffering a proposed nondisclosure agreement and release, and have made UAW's execution of such documents a condition of our access to the data room.

Please explain the legal basis for conditioning UAW's access to whatever information is obtainable through the City of Detroit data room upon our execution of the confidentiality agreement and release that you have proferred. As you know, UAW has often signed confidentiality agreement with private corporations going through financial restructurings. However, in this instance, we are dealing with a public entity, the City of Detroit. I would like to understand the basis for withholding data room information with respect to the City of Detroit based on claims of confidentiality.

As to the meetings concerning pensions and OPEB that your firm, on behalf of Mr. Orr, is conducting on July 10 and 11, 2012, we wish to attend the meetings, but reserve all rights with respect to the meetings and to such position(s) that Mr. Orr and/or your firm may seek to take with respect to such meetings.

Further to that reservation of rights, UAW continues to seek an answer from Mr. Orr and your firm to the following: please cite the basis for any claim that the UAW has the authority to compromise the vested benefits of active and/or retired UAW or former UAW members employed or formerly employed by the City of Detroit and its affiliates. As I presume you know, Article IX, Section 24 of the Michigan Constitution provides in pertinent part that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Please tell me what authority your firm and/or Mr. Orr believe gives the UAW the right to compromise vested pension benefits, despite the contrary provisions of Article IX, Section 24. Please also tell us whether Mr. Orr and/or your firm take the position that Article IX, Section 24 of the Michigan Constitution is not or may not be binding on the City of Detroit, the State of Michigan, Governor Snyder, Mr. Orr or the UAW and state, if that is the case, under what circumstances you believe that Article IX, Section 24 would not bind some or all of these persons or entities. We also seek an answer to the same questions with regard to vested post-retirement insurance benefits, but as to such the question is posed with the additional need to consider, inter alia, the holding of the United States Supreme Court in *Chemical Workers v. Pittsburgh Plate Glass*, 404 U.S. 157 (1971), which states at its footnote 20 that "[u]nder established contract principles, vested retirement rights may not be altered without the pensioner's consent."

We do not understand the July 10 and 11 multiple stakeholder meetings to which we have been invited to be a forum for negotiation of your proposed pension and retiree health care changes, but are willing to attend to obtain for our union whatever information may be provided at those meetings. Your full answers to the questions posed in the foregoing paragraphs of this message will help the UAW determine the scope of any such negotiations and the UAW's decisions regarding its representative capacity in them, about which your firm has inquired.

Please provide me with the exact location of the July 10 and 11 meetings.

Thank you.

Michael Nicholson
General Counsel - International Union, UAW
Solidarity House - 8000 East Jefferson Avenue
Detroit, Michigan 48214
UAW Office Phone: 313.926.5216
Cell Phone: 734.719.0850
Email: mnicholson@uaw.net

**Exhibit B**

*********************************************
*This e-mail message from Michael Nicholson is for the sole use of*
*the intended recipient(s) and may contain confidential and privileged*
*information. Any unauthorized review, use, disclosure or distribution is*

UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION – DETROIT

------------------------------------------------------------- x
                                              :
In re:                                        :    Chapter 9
                                              :
CITY OF DETROIT, MICHIGAN,                     :    Case No.: 13-53846
                                              :
                                              :    Hon. Steven W. Rhodes
                    Debtor.                     :
                                              :
------------------------------------------------------------- x

## PROOF OF SERVICE

The undersigned certifies that on July 23, 2013, a copy of Objection Of Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington, Bruce Goldman and International Union, UAW To Motion of Debtor, Pursuant to Section 105(a) Of The Bankruptcy Code, For Entry Of An Order Extending The Chapter 9 Stay To Certain (A) State Entiries, (B) Non-Officer Employees and (C) Agents and Representatives Of The Debtor (Docket No. 56) was served upon parties via the Court's electronic court filing service.

I declare that the foregoing statement is true to the best of my information, knowledge and belief.

/s/  Niraj R. Ganatra
Niraj R. Ganatra (P63150)
International Union, UAW
8000 E. Jefferson Avenue
Detroit, Michigan 48214
(313) 926-5216
nganatra@uaw.net

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

```
-----------------------------------------------------x
                                        :
In re                                   :    Chapter 9
                                        :
CITY OF DETROIT, MICHIGAN,              :    Case No. 13-53846
                                        :
                        Debtor.         :    Hon. Steven W. Rhodes
                                        :
                                        :
-----------------------------------------------------x
```

### DEBTOR'S REPLY IN SUPPORT OF: (I) MOTION OF DEBTOR, PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON-OFFICER EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR; AND (II) MOTION OF DEBTOR, PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER  CONFIRMING THE PROTECTIONS OF SECTIONS 362, 365 AND 922 OF THE BANKRUPTCY CODE

The City of Detroit, Michigan (the "Debtor" or the "City") hereby files this

reply in support of the (i) Motion of Debtor, Pursuant to Section 105(a) of the

Bankruptcy Code, for Entry of an Order Extending the Chapter 9 Stay to Certain

(A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives

of the Debtor (Docket No. 56) (the "Stay Extension Motion") and (ii) Motion of

Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order

Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code

(Docket No. 53) (the "Stay Confirmation Motion" and, together with the Stay

Extension Motion, the "Stay Motions").[1]  The Stay Extension Motion seeks the

entry of an order extending the Chapter 9 Stay to (i) the State Entities,

(ii) the Non-Officer Employees and (iii) the City Agents and Representatives.  The

Stay Confirmation Motion seeks the entry of a "comfort order" confirming the

application of the Chapter 9 Stay and the Contract Protections.  The Michigan

Council 25 of the American Federation of State, County and Municipal

Employees, AFL-CIO ("AFSCME") has filed an objection (Docket No. 84)

(the "AFSCME Objection") to, among other motions filed by the Debtor,[2] the Stay

Motions.  For the reasons set forth below, the AFSCME Objection should be

overruled, and the Stay Motions should be granted.

---

[1]  Capitalized terms used but not defined herein shall have the meaning given
to them in the Stay Motions.

[2]  In addition to objecting to the Stay Motions, AFSCME also objects to
certain relief sought by the City in its:  (a) Motion of Debtor for Entry of an
Order (A) Directing and Approving Form of Notice of Commencement of
Case and Manner of Service and Publication of Notice and (B) Establishing
a Deadline for Objections to Eligibility and a Schedule for Their
Consideration (Docket No. 18) (the "Case Commencement Motion") and
(b) Motion of Debtor, Pursuant to Sections 102(1)(A) and 105(a) of the
Bankruptcy Code and Rules 2002(m) and 9007 of the Federal Rules of
Bankruptcy Procedure, for Entry of an Order Establishing Case Management
and Scheduling Procedures (Docket No. 39) (the "Case Management
Motion").  As neither the Case Commencement Motion nor the Case
Management Motion are scheduled to be heard by the Court at the hearing
scheduled for July 24, 2013 (at which hearing the Stay Motions will be
heard), the City intends – and hereby reserves its right – to respond to
AFSCME's objections to such motions at a later date.

CLI-2127590v8
-2-
13-53846-tjtswr  Doc 2217  Filed 12/10/13  Entered 12/10/13 16:06:43  Page 92 of 462
13-53846-swr  Doc 128  Filed 07/23/13  Entered 07/23/13 10:17:39  Page 2 of 16
91

## Preliminary Statement

1.      The AFSCME Objection spends the majority of its 30 pages addressing matters essentially unrelated to the Stay Motions; thus, it is worth noting what is <u>not</u> now before the Court.  The question of the City's eligibility to be a debtor under chapter 9 of the Bankruptcy Code and any related Tenth Amendment arguments are not currently before the Court.  Whether the City can modify its pension liabilities by means of the rejection of contracts pursuant to section 365 of the Bankruptcy Code is not before the Court.  Whether the City can confirm a plan of adjustment that contemplates the compromise of pension benefits is not before the Court.  AFSCME and other parties in interest will have the opportunity to contest those issues before this Court in due course; indeed, the City already has proposed a schedule for the Court's expeditious determination of any eligibility challenges.  The AFSCME Objection's extended discussions of each of these questions serve only to distract from the relatively narrow, and common, relief sought by the Stay Motions.

2.      That actual relief sought by the Stay Motions is straightforward. The City seeks an extension of the Chapter 9 Stay, not to protect non-debtor parties from inconvenience or to grant them unwarranted protections, but to protect <u>itself</u> from the adverse impact of litigation that, directly or indirectly, denies the City the protections of the Chapter 9 Stay.  The Prepetition Lawsuits – which AFSCME

CLI-2127590v8
-3-
13-53846-tjt  Doc 22178  Filed 12/10/13  Entered 12/10/13 16:06:49  Page 93 of 462
13-53846-swr  Doc 128  Filed 07/23/13  Entered 07/23/13 16:17:39  Page 3 of 16          92

concedes purport not only to deny the City the protections under the Chapter 9 Stay but *of chapter 9 altogether* – embody precisely this sort of litigation. What cannot be contested now is that proceedings such as the Prepetition Lawsuits – despite two of them being commenced against solely non-debtors – threaten to impede the efficient administration of this chapter 9 case, deny the City its breathing spell to focus on a plan of adjustment of its debts and undermine the exclusive jurisdiction of this Court that arose upon the filing of the City's petition. Accordingly, the AFSCME Objection should be overruled and the Stay Motions granted.[3]

### *Postpetition State Court Rulings Do Not*
### *Divest This Court of Its Exclusive Jurisdiction Over This Case*

3.     The AFSCME Objection repeatedly returns to the same refrain in support of its various arguments:  because the State Court entered the Declaratory Judgment in the Webster Lawsuit – *after the filing of the City's chapter 9 petition* – finding PA 436 unconstitutional and taking the extraordinary

---

[3]     By the Stay Confirmation Motion, the City seeks what is essentially a "comfort order" confirming the application of the Chapter 9 Stay and the Contract Protections in non-controversial contexts.  Although it objects to the Stay Confirmation Motion, AFSCME does not contest the substance thereof and offers no specific argument why the relief requested therein should not be granted.  Accordingly, the Stay Confirmation Motion should be granted for the uncontroverted reasons set forth therein.

CLI-2127590v8
-4-
13-53846-tjt   Doc 2217   Filed 12/18/13   Entered 12/18/13 16:06:49   Page 94 of 462
13-53846-swr   Doc 128   Filed 07/23/13   Entered 07/23/13 16:17:39   Page 4 of 16

93

step of requiring the Governor to direct the Emergency Manager to "withdraw the chapter 9 petition," this Court must essentially ignore its exclusive jurisdiction over this chapter 9 case and refrain from adjudicating the Stay Motions (or, indeed, any other matters). However, a state court's postpetition entry of an order purporting to settle matters within the exclusive jurisdiction of a bankruptcy court (such as the State Court's Declaratory Judgment purporting to dispose of questions directly related to the City's eligibility to be a debtor under section 109(c) of the Bankruptcy Code and the *de facto* dismissal of this case) cannot and does not divest this Court of such jurisdiction and does not limit its ability to decide matters squarely within that jurisdiction.

4. When the City filed its chapter 9 petition, this Court became vested with exclusive jurisdiction over this case pursuant to 28 U.S.C. § 1334(a) and with jurisdiction over all proceedings within this case pursuant to 28 U.S.C. § 1334(b). This grant of jurisdiction works in tandem with sections 362 and 922 of the Bankruptcy Code, which: (a) halt, among other things, "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate" (section 362(a)(3)) and "any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title" (section 362(a)(6)); and (b) are effective ***immediately upon the filing of a chapter 9 petition*** (<u>see</u> 11 U.S.C. § 362(a) ("a petition filed

CLI-2127590v8
-5-
13-53846-tjtswr  Doc 22178  Filed 12/12/13  Entered 12/12/13 16:06:49  Page 95 of 462
13-53846-swr  Doc 128  Filed 07/23/13  Entered 07/23/13 16:17:39  Page 5 of 16    94

under section 301 … of this title … operates as a stay, applicable to all entities…."); 11 U.S.C. § 922(a) ("A petition filed under this chapter operates as a stay….")). These provisions confirm that the filing of a petition divests all other courts (other than the district court for the Eastern District of Michigan) of jurisdiction over a debtor's property and affairs. Once a debtor files for chapter 9, creditors cannot make an end-run around the bankruptcy court by bringing actions against the debtor or third parties in other tribunals seeking to enforce claims against the debtor or otherwise to influence the administration of the case. That principle has direct application here.

5. The Court's jurisdiction plainly encompasses the application of the provisions of the Bankruptcy Code and the determination of fundamental questions in this chapter 9 case (e.g., whether the City is eligible to proceed as a debtor under chapter 9 in accordance with 11 U.S.C. § 109(c)). See, e.g., 11 U.S.C. § 921(c) (reserving the decision on a chapter 9 debtor's eligibility to the bankruptcy court). Indeed, the application of section 109(c) of the Bankruptcy Court to the facts of this case is a paradigmatic exercise of that jurisdiction. The Chapter 9 Stay leaves no room for parallel state court proceedings, especially where such questions are federal issues concerning application of a federal statute the determination of which is assigned to a federal court. Indeed, the questions of eligibility and authorization to file a chapter 9 case are not state law questions at

all, and no state law refers or depends on them.  By attacking the City's authority to file under chapter 9, the continuation of the Prepetition Lawsuits is a blatant invasion of this Court's jurisdiction wherein the plaintiffs and AFSCME seek to make the State Court, rather than this Court, the arbiter of core bankruptcy issues. The Court should reject this attempt to undermine fundamental bankruptcy policy and jurisdiction – and any other similar attempts to come – by extending the Chapter 9 Stay, as requested in the Stay Extension Motion.

### *Extension of the Stay is Appropriate Under the Present Circumstances*

6.     The AFSCME Objection's argument that the Court may not extend the Chapter 9 Stay to non-debtors pursuant to section 105 of the Bankruptcy Code is incorrect and contradicted by relevant case law.  Courts – including the Sixth Circuit in a case cited by AFSCME – commonly recognize that section 105 of the Bankruptcy Code empowers a court to extend the automatic stay to, or otherwise enjoin proceedings against, non-debtor parties.  See, e.g., Patton v. Bearden, 8 F.3d 343, 349 (6th Cir. 1993) (noting that, if the court were to apply the "unusual circumstances" test to a debtor's request to extend the automatic stay (a question it ultimately did not need to reach), "the bankruptcy court would first need to extend the automatic stay under its equity jurisdiction pursuant to 11 U.S.C. § 105"); Badalament, Inc. v. Mel-O-Ripe Banana Brands, Ltd., 265 B.R. 732, 738 (E.D. Mich. 2001) (noting that "[c]ourts have stayed proceedings against

non-debtor co-defendants in unusual circumstances and pursuant to 11 U.S.C.

§ 105(a)…."); Archambault v. Hershman (In re Archambault), 174 B.R. 923, 929

(Bankr. W.D. Mich. 1994) (observing that a number of cases have "employed

Section 105 to issue injunctions on behalf of nondebtors under a variety of

circumstances….").[4]

       7.       Accordingly, the only question before the Court is not whether

it possesses the power to extend the Chapter 9 Stay (it plainly does), but whether

that power should be exercised under the present unusual circumstances.  The

answer to that question is yes.  Courts have found an extension of the automatic

stay to closely related non-debtor parties (or similar injunctive relief) warranted

where such relief is necessary to prevent interference with the debtor's bankruptcy

case, preserve basic bankruptcy protections for the debtor or otherwise promote the

---

[4]    AFSCME's recitation of the principle that courts may employ section 105 of the Bankruptcy Code only within the confines of the Bankruptcy Code (e.g., AFSCME Objection, at 13-14) carries little weight in a context where the requested relief encompasses the protections of sections 362 and 922 of the Bankruptcy Code and neither conflicts with nor disregards the provisions of the Bankruptcy Code.  See, e.g., Archambault, 174 B.R. at 928 (recognizing limitations on a court's power pursuant to section 105 of the Bankruptcy Code, but finding that a debtor seeking to enjoin lawsuits against non-debtor parties "does not seek relief which either conflicts with or is in disregard of unambiguous statutory language…. [but] [r]ather seeks preliminary injunctive relief which will give him the ability to benefit … from the 'fresh start' afforded by filing for bankruptcy.").

purposes of the Bankruptcy Code.  See, e.g., Patton, 8 F.3d at 349 (noting that "unusual circumstances" warranting extension of the automatic stay to non-debtors "usually include when the debtor and the non-bankrupt party are closely related or the stay contributes to the debtor's reorganization"); Archambault, 174 B.R. at 929, 935 (enjoining lawsuit against a non-debtor party where "the failure to grant such relief would effectively deny the Debtor the 'fresh start' afforded by [its bankruptcy case] by allowing the movant an end-run around the automatic stay"; observing that the issuance of an injunction may be appropriate "where the relationship between the nondebtor and the debtor is such that a finding of liability against the nondebtor would effectively be imputed to the debtor, to the detriment of the estate"; treating requests for section 105 injunctions and requests to extend the automatic stay interchangeably); Sudbury, Inc. v. Escott (In re Sudbury, Inc.), 140 B.R. 461, 464 (Bankr. N.D. Ohio 1992) (enjoining suits against non-debtors, where "[t]he need for … a breathing spell is particularly pronounced" and the debtor was "inextricably involved" in the actions sought to be enjoined).

8.     Here, there can be no question – and the AFSCME Objection concedes – that (a) the Prepetition Lawsuits will adversely affect the City's ability to adjust its debts in chapter 9, (b) failure to extend the Chapter 9 Stay would effectively deny the City the "fresh start" promised by bankruptcy and (c) extension of the Chapter 9 Stay would preserve the protections of the

-9-
CLI-2127590v8

13-53846-tjt  Doc 2217  Filed 12/18/13  Entered 12/18/13 16:06:49  Page 99 of 462
13-53846-swr  Doc 128  Filed 07/23/13  Entered 07/23/13 16:17:39  Page 9 of 16     98

Bankruptcy Code for the City and avoid interference with this Court's administration of this case. AFSCME's allegation that "the City seeks a section 105(a) injunction not to carry out any provisions of the Bankruptcy Code and not to shield it from interference with the existing protections of the Bankruptcy Code, but rather as a sword" (AFSCME Objection, at 14) is curious. Shielding the City from interference with the existing protections of the Bankruptcy Code and effecting the purpose of the Chapter 9 Stay is *precisely* the intent of the Stay Extension Motion, which intent is repeatedly expressed therein.[5]

---

[5] Moreover, the City hereby reserves its right to argue that the Prepetition Lawsuits in which the Emergency Manager is not named, which are designed to preserve the claims of the plaintiffs (and those similarly situated) for pension benefits and interfere with the administration of this chapter 9 case, are <u>direct</u> violations of the Chapter 9 Stay subject to enforcement by the City. <u>See</u>, <u>e.g.</u>, <u>Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc. (In re Nat'l Century Financial Enters., Inc.)</u>, 423 F.3d 567, 5677-78 (6th Cir. 2005) (finding that "[t]he fact that [a state court] action did not name [the debtor] as a defendant does not render enforcement of the automatic stay improper.... [A]n action taken against a nondebtor which inevitably would have an adverse impact upon the property of the estate must be barred by the [section 362(a)(3)] automatic stay provision."); <u>Lewis v. Negri Bossi USA, Inc. (In re Mathson Indus., Inc.)</u>, 423 B.R. 643, 648 (E.D. Mich. 2010) ("the statutory language of [section] 362(a)(6) actually prohibits 'any act to collect, assess, or recover' a pre-petition debt, not just acts directed *against the bankruptcy debtor*.") (emphasis in original).

## *The Stay Extension Motion is Procedurally Proper*

9.      Finally, the AFSCME Objection's complaint that the Stay

Extension Motion is procedurally improper not only is incorrect, as demonstrated

above, but ultimately fails because AFSCME has not demonstrated – nor has

attempted to demonstrate – that it has been prejudiced by the form of the City's

request for relief.  Courts routinely hold that objections to the form of a request for

relief do not triumph over its substance in the absence of any showing of prejudice

to the complaining party.  See, e.g., Hines v. Hines (In re Hines), 193 Fed. App'x

391, 397 (6th Cir. 2006) (rejecting argument that the lower court erred in

determining dischargeability in the context of plan confirmation rather than by

adversary proceeding; holding that "[i]n the absence of any demonstrable

prejudice, there is no error resulting from the lack of a formal adversary

proceeding."); Tully Constr. Co. v. Cannonsburg Envtl. Assocs., Ltd. (In re

Cannonsburg Envtl. Assocs., Ltd.), 72 F.3d 1260, 1264-65 (6th Cir. 1996)

(affirming bankruptcy court order even though request for relief technically

"should have been filed" as an adversary proceeding rather than as a contested

matter where the appellant "has not and cannot demonstrate that it has been

prejudiced by the Trustee's failure to file an adversary proceeding"; characterizing

procedural posture as harmless error); Lernout & Hauspie Speech Prods., N.V. v.

Baker (In re Lernout & Hauspie Speech Prods., N.V.), 264 B.R. 336, 340 (Bankr.

-11-

CLI-2127590v8

13-53846-tjt   Doc 22178   Filed 12/18/13   Entered 12/18/13 16:06:48   Page 101 of 462
13-53846-swr   Doc 1128   Filed 07/23/13   Entered 07/23/13 16:07:39   Page 11 of 16     100

D. Del. 2001) ("As many other courts in similar circumstances have said, I will decline to elevate the form of the proceeding … if the substance of the hearing on that issue is such that the objecting party has been afforded due process. Courts have routinely allowed matters to proceed that have been filed as contested matters when they should have been filed as adversary complaints, where no prejudice has been found.") (quotation marks and internal citation omitted); In re Serv. Merch. Co., 256 B.R. 755, 765-66 (Bankr. M.D. Tenn. 2000) (stating that "[d]espite the fact that an adversary proceeding is required for the injunctive relief sought by the debtors, courts in many instances have found that judicial economy permits the courts to look beyond [Bankruptcy] Rule 7001 to the merits of the dispute provided no prejudice will result…. [U]nless the party is able to demonstrate prejudice by the failure to file an adversary proceeding, a court will find the error constitutes harmless error"; finding that dismissal would "place[ ]form over substance and would serve only to delay [the] proceedings.") (internal citations omitted); cf. In re Hostess Brands, Inc., Case No. 12-22052 (Bankr. S.D.N.Y. Feb. 23, 2012) (Docket No. 390) (order granting motion seeking to extend the automatic stay to certain employees pursuant to sections 105 and 362 of the Bankruptcy Code).

10.    Here, AFSCME makes no showing that it will be prejudiced by the extension of the Chapter 9 Stay sought by the City beyond the unsupported allegation that employees represented by AFSCME will be "steamrolled."

-12-
CLI-2127590v8
13-53846-tjt   Doc 22178   Filed 12/18/13   Entered 12/18/13 16:06:49   Page 102 of 462
13-53846-swr   Doc 128   Filed 07/23/13   Entered 07/23/13 16:07:39   Page 12 of 16      101

AFSCME Objection, at 13. Precisely how such employees will be steamrolled or prejudiced by the Stay Extension Motion is left unexplained. Certainly, AFSCME's employees will not be prejudiced by the Court's exercise of its exclusive jurisdiction over this case and its hearing and determining questions fundamental to the administration of the City's chapter 9 case (e.g., the City's eligibility to be a debtor). Nor was AFSCME – which was provided proper notice of the Stay Motions and filed a 30-page objection thereto – left without the ability to protect its interests and have its voice heard by the form of the City's request for relief.

11.     Indeed, where the failure to extend the Chapter 9 Stay will allow harassing lawsuits – lawsuits designed either to materially interfere with the administration of this case or to collect claims against the City – to proceed against the State Entities (among others), *the party at risk of prejudice is the City*. Accordingly, because (a) the form of the Stay Extension Motion has neither prejudiced AFSCME nor deprived it of due process and (b) the failure to extend the Chapter 9 Stay as requested will impede the administration of this case, the Court should grant the Stay Motions and overrule the AFSCME Objection.

CLI-2127590v8
-13-
13-53846-tjt   Doc 2217   Filed 12/18/13   Entered 12/18/13 16:06:39   Page 103 of 462
13-53846-swr   Doc 128   Filed 07/23/13   Entered 07/23/13 16:07:39   Page 103 of 162        102

## Conclusion

For all of the foregoing reasons, the City respectfully submits that the Stay Motions should be granted and the AFSCME Objection should be overruled.

Dated: July 23, 2013        Respectfully submitted,


 /s/  David G. Heiman
David G. Heiman (OH 0038271)
Heather Lennox (OH 0059649)
JONES DAY
North Point
901 Lakeside Avenue
Cleveland, Ohio  44114
Telephone:  (216) 586-3939
Facsimile:  (216) 579-0212
dgheiman@jonesday.com
hlennox@jonesday.com

Bruce Bennett (CA 105430)
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, California  90071
Telephone:  (213) 243-2382
Facsimile:  (213) 243-2539
bbennett@jonesday.com

Jonathan S. Green (MI P33140)
Stephen S. LaPlante (MI P48063)
MILLER, CANFIELD, PADDOCK AND
    STONE, P.L.C.
150 West Jefferson
Suite 2500
Detroit, Michigan  48226
Telephone:  (313) 963-6420
Facsimile:  (313) 496-7500
green@millercanfield.com
laplante@millercanfield.com

ATTORNEYS FOR THE CITY

CLI-2127590v8
-15-
13-53846-tjt  Doc 2217  Filed 12/18/13  Entered 12/18/13 16:06:43  Page 105 of 462
13-53846-swr  Doc 128  Filed 07/23/13  Entered 07/23/13 10:37:39  Page 15 of 16
104

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

IN RE:                                                        Chapter 9

City of Detroit, Michigan,                                   Case No. 13-53846

        Debtor.

_____/

**JOINT CONCURRENCE IN
MOTION OF DEBTOR, PURSUANT TO SECTION 105(a) OF THE
BANKRUPTCY CODE, FOR ENTRY OF AN ORDER CONFIRMING THE
PROTECTIONS OF SECTIONS 362, 365 AND 922 OF THE BANKRUPTCY CODE
AND CONCURRENCE IN AND LIMITED OBJECTION TO
MOTION OF DEBTOR, PURSUANT TO SECTION 105(a) OF THE
BANKRUPTCY CODE, FOR ENTRY OF AN ORDER EXTENDING THE
CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON-OFFICER
EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR**

The Detroit Fire Fighters Association (the "DFFA"), the Detroit Police Officers

Association (the "DPOA"), the Detroit Police Lieutenants & Sergeants Association (the

"DPLSA") and the Detroit Police Command Officers Association (the "DPCOA") (collectively,

the "Detroit Public Safety Unions"), through their counsel, Erman, Teicher, Miller, Zucker &

Freedman, P.C., submit the following Joint Concurrence in the Motion of Debtor, Pursuant to

Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of

Sections 362, 365, and 922 of the Bankruptcy Code (the "Stay Order Motion") [Docket No. 53]

and Concurrence in and Limited Objection to Motion of Debtor, Pursuant to Section 105(a) of

the Bankruptcy Code, for Entry of an Order Extending the Chapter 9 Stay to Certain (A) State

Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (the

"Stay Extension Motion")[1] [Docket No. 56]:

---

[1] Together, the Stay Order Motion and Stay Extension Motion are referred to herein as the "Motions."

## BACKGROUND

1.      The Public Safety Unions, whose collective members provide police and fire protection to the City[2] on a daily basis under extremely difficult conditions, acknowledge that the City faces serious and severe financial challenges that must be addressed, and the Public Safety Unions have been and are prepared to work with the City to tackle those challenges.

2.      As a result of the severe economic challenges facing the city, the members of the Public Safety Unions must do more with fewer active members and less resources under increasingly difficult conditions.

3.      At the same time, the active members of each of the Public Safety Unions have seen their wages and benefits, including their future pension benefits, reduced.

4.      Contrary to statements made by the City in the papers filed with this Court and other statements made to the public by the Emergency Manager and the Governor, the Emergency Manager has made no serious effort to negotiate with the Public Safety Unions.  In the weeks leading up to the City's Chapter 9 filing, there were no negotiations.  Rather, the City of Detroit and the Emergency Manager held two publicly trumpeted "informational meetings" with the Public Safety Unions.  Both occurred within a week of the filing of the Chapter 9 petition.

5.      Furthermore, under both the former Emergency Manager Law, PA 4, MCL 141.1501, *et seq*, (which was overwhelming repealed by Michigan voters in 2012) and since the Emergency Manager's appointment under Public Act 436, MCL 141.1541, *et seq*,  the City and the Emergency Manager have consistently refused to negotiate with the Public Safety Unions over terms and conditions of employment.

---

[2] Unless otherwise defined, all capitalized terms are as defined in the Motions.

6.     Contrary to its claimed efforts to negotiate in good faith, at least with regard to the Public Safety Unions, the City has consistently sought to block the Public Safety Unions' efforts to negotiate terms and conditions of employment and has yet to provide them with a concrete restructuring proposal.

7.     At the direction of the Emergency Manager, the City instead successfully convinced the Michigan Employment Relations Commission to dismiss petitions filed by some of the Public Safety Unions seeking arbitration under Public Act 312, MCL 423.231, *et seq* ("Act 312")[3], on the basis that the City has no duty to bargain with the Public Safety Unions. Subsequent to the successful dismissals, the City unilaterally imposed less favorable terms and conditions of employment that include reduced pay, increased health care premiums, deductibles and co-pays and reduced future pension benefits.

8.     While the Public Safety Unions and the City have fundamental, substantial and serious disagreements about their respective legal rights, the protections afforded the parties to these proceedings and the relevant facts applicable to these proceedings, the Public Safety Unions, subject to the modifications and limitations set forth herein, concur in the relief sought by the City's Motions.

## RESPONSE TO THE RELIEF REQUESTED BY THE MOTIONS

9.     The City's Chapter 9 filing faces significant legal obstacles that implicate the intersection of and interrelationship among Article IX, Sec. 24 of the Michigan constitution; the 10th Amendment of the United States Constitution, U.S. Const., Am. X; Chapter 9 of the

---

[3] Act 312 is based on ". . . the public policy of this state . . .," which recognizes, ". . . that in public police and fire departments, where the right of employees to strike is by law prohibited, it is requisite to the high morale of such employees and the efficient operation of such departments to afford an alternative, expeditious, effective and binding procedure for the resolution of disputes."

3

Bankruptcy Code, 11 USC §901, *et seq* (and Bankruptcy Code sections incorporated thereby) and Public Act 436, MCL 141.1541 *et seq.*

10.    The Public Safety Unions strongly believe that the Chapter 9 bankruptcy petition filed by the City is premature, that the City will be unable to meet its burden of establishing that it is eligible to be a debtor as required by 11 U.S.C. §109(c), and that the Emergency Manager's stated intention to use Chapter 9 to significantly impair the vested pension rights and benefits of City employees and retirees is limited by state and federal constitutional principles, fundamental issues of federalism, and how those principles and issues apply to protect the rights of debtors and creditors when Chapter 9 bankruptcy protection is sought.

11.    While sympathetic (and in many aspects in agreement with) the arguments raised in the Pre-Petition Lawsuits, the Public Safety Unions agree that the automatic stay set forth in 11 U.S.C. §362(a), made applicable by Section 901 of the Bankruptcy Code and supplemented by Section 922(a), is self-executing and applies to stay actions against the City, including the Pre-Petition Lawsuits. As such, the Public Safety Unions concur in the relief sought by the Stay Motion and ask that this Court issue an order staying all actions in the Pre-Petition Lawsuits, including the pending application for leave to appeal.[4]

12.    Furthermore, precisely because this Court is accustomed, on a daily basis, to addressing the interplay between the Bankruptcy Code and other provisions of state and federal law and because of the complexity and novelty of the issues raised by these proceedings, the

---

[4] The Michigan Court of Appeals today issued an order setting briefing schedules on the Attorney General's applications for leave to appeal.  Copies of those orders will be available at the hearing.  In order to avoid any further confusion or unnecessary expense to any party, this Court's Order should clarify that those applications are stayed as well, since the automatic stay set forth in 11 U.S.C. § 362(a) stays <u>all</u> proceedings, including the prosecution of debtor's pending appeals, where the underlying actions are, effectively, actions against the debtor, as they are here. *Cathey v. Johns-Manville Sales Corporation, et al,* 711 F.2d 60 (6ᵗʰ Cir. 1983).

Public Safety Unions urge that, as requested by the Stay Extension Motion and modified as set for the below, that the stay be extended to allow those issues to be addressed by this Court without distraction.

13.     The Public Safety Unions concur in the Stay Extension Motion's request that the automatic stay be extended to the Governor and certain other agents or employees of the City as defined by the Stay Extension Motion (the "Included Additional Employees") for their pre-petition conduct in authorizing or facilitating the filing of the Chapter 9 petition and in the City's request that the stay be extended to non-officer employees who are not inhabitants of the City. The Public Safety Unions further respectfully request that the Order extending the stay include not just current non-officer and non-inhabitant City employees, as requested by the City, but that the Order extend the stay to any action or claim for damages brought against any current or former Public Safety Union member, including any retiree, which arises out of his or her City employment (including collection on any judgment resulting therefrom). Some of those current and former employees and retirees,  may, in addition to the City's threats to reduce their vested pension benefits, be subject to legal actions for damages arising out of their City employment for which their only source of indemnification is the City.

14.     The Public Safety Unions further urge that the Order granting the Stay Extension Motion provide that (a) the Stay Extension Motion does not and shall not reduce, impair or otherwise affect any substantive rights that any party may have against the Included Additional Parties and (b) the extension set forth in section 108(c) of the Bankruptcy Code applies to any matter stayed by the Order.

## **RELIEF REQUESTED**

WHEREFORE, the Public Safety Unions respectfully request that this honorable Court:

5

13-53846-tjt  Doc 33138  Filed 07/23/13  Entered 07/23/13 20:54:48  Page 6 of 7
13-53846-swr  Doc 138  Filed 07/23/13  Entered 07/23/13 16:26:46  Page 110 of 462     109

(a) Issue an Order (i) granting the Stay Order Motion and (ii) stating therein that the automatic stay set for the in Sections 362(a) and 922(a) operates to stay all further proceedings in the Pre-Petition Lawsuit, including the pending state court appeals;

(b) Issue an Order (i) granting the Stay Extension Motion; (ii) extending the protections of the automatic stay set forth in Sections 362(a) and 922(a) to any action or claim for damages brought against any current or former Public Safety Union member, including any retiree, which arises out of his or her City employment (including collection on any judgment resulting therefrom); (iii) specifying that the Order does not and shall not reduce, impair or otherwise affect any substantive rights that any party may have against any of the Included Additional Parties, and (iv) specifying that the extension set forth in Section 108(c) of the Bankruptcy Code applies to any matter stayed by the Order.

ERMAN, TEICHER, MILLER,
ZUCKER & FREEDMAN, P.C.

By: _/s/ Barbara A. Patek_
Earle I. Erman  (P24296)
Craig E. Zucker  (P39907)
Barbara A. Patek (P34666)
Counsel for the Detroit Public Safety Unions
400 Galleria Officentre, Suite 444
Southfield, MI  48034
Telephone: (248) 827-4100
Facsimile:  (248) 827-4106
E-mail:  bpatek@ermanteicher.com

DATED:   July 23, 2013

F:\OTHERINS\Detroit, CIty of\joint concurrence.FINAL.docx

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:                                          Chapter 9

City of Detroit, Michigan,                      Case No. 13-53846

                    Debtor.
_____/

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 23, 2013, the Joint Concurrence and Limited Objection to the Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of Sections 362, 365, and 922 of the Bankruptcy Code (the "Stay Order Motion") [Docket No. ] and Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for Entry of an Order Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor (the "Stay Extension Motion") and Certificate of Service were electronically filed with the Clerk of the Court for the United States Bankruptcy Court, Eastern District of Michigan, Southern Division using the CM/ECF System, which will send notification of such filing to all attorneys and parties of record registered electronically.

ERMAN, TEICHER, MILLER,
ZUCKER & FREEDMAN, P.C.

By: ___/s/ Barbara A. Patek_____
          Earle I. Erman  (P24296)
          Craig E. Zucker  (P39907)
          Barbara A. Patek (P34666)
          Counsel for the Detroit Public Safety Unions
          400 Galleria Officentre, Suite 444
          Southfield, MI  48034
          Telephone: (248) 827-4100
          Facsimile:  (248) 827-4106
          E-mail:  bpatek@ermanteicher.com

DATED:  July 23, 2013

| | | |
|---|---|---|
| In re: | ) | Chapter 9 |
| | ) | |
| CITY OF DETROIT, MICHIGAN, | ) | Case No. 13-53846 |
| | ) | |
| Debtor. | ) | Hon. Steven W. Rhodes |
| | ) | |

**OBJECTION OF THE RETIREMENT SYSTEMS TO MOTIONS OF DEBTOR
FOR ENTRY OF ORDERS (I) CONFIRMING THE PROTECTIONS OF SECTIONS
362, 365 AND 922 OF THE BANKRUPTCY CODE, AND (II) EXTENDING THE
CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON-OFFICER
EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR**

The Police and Fire Retirement System of the City of Detroit ("PFRS") and the General

Retirement System of the City of Detroit ("GRS," and together with PFRS, the "Retirement

Systems") hereby submit this objection (the "Objection") to the (i) *Motion of Debtor, Pursuant*

*to Section 105(a) of the Bankruptcy Code, for Entry of an Order Confirming the Protections of*

*Sections 362, 365 and 922 of the Bankruptcy Code* [Docket No. 53] (the "Stay Confirmation

Motion"), and (ii) *Motion of Debtor, Pursuant to Section 105(a) of the Bankruptcy Code, for*

*Entry of an Order Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer*

*Employees and (C) Agents and Representatives of the Debtor* [Docket No. 56] (the "Stay

Extension Motion," and together with the Stay Confirmation Motion, the "Stay Motions"). [1]

---

[1] This Objection is filed subject to the reservations of rights in the Appearances filed by the undersigned counsel in this case, including the Retirement Systems' right to argue that the matters involved in the *Webster* case referenced herein and the pending related cases should be determined in the state courts, and not in this Court, and that this Court lacks subject-matter jurisdiction.

## Preliminary Statement

The Stay Motions are based upon a false premise - - that there is a validly-existing bankruptcy case before this Court from which an automatic stay may arise. However, the Governor's authorization of the commencement of this case was an act that was void *ab initio*. As such, it is to be treated as if the Governor's authorization and the acts that flowed from it never occurred. Unlike the other requirements of the Bankruptcy Code for establishing the eligibility of a municipality to be a debtor under chapter 9, the determination of whether valid state authorization exists for a chapter 9 filing under Bankruptcy Code section 109(c)(2) is purely a creature of state law. Accordingly, a proper application of the principles of federalism and the 10th Amendment of the U.S. Constitution mandates that deference be given to the state courts of the sovereign state to determine this issue. Here, the Declaratory Judgment (defined below) entered by the state court in the *Webster* case referenced herein properly determined precisely this - - that the Governor's authorization of the commencement of this case violated the State Constitution and was therefore null and void. Even if this Court were to find that it has jurisdiction over certain matters, the Declaratory Judgment constitutes a final order against an act of the Governor - - a non-debtor entity to whom no stay applied at the time the Declaratory Judgment was entered. Respectfully, this Court has no authority to essentially sit as an appellate court and vacate the Declaratory Judgment by trying to stay its effect. Accordingly, pending any further disposition of the Declaratory Judgment on appeal in the state courts, this bankruptcy case is null and void, and the Court lacks jurisdiction in these matters. Without waiver of the foregoing, if this Court nonetheless determines that it has jurisdiction to consider substantive matters, the Retirement Systems submit that the Court should allow an opportunity for parties to

2

9221704.7 14893/161046

13-53846-swr Doc 221 Filed 07/29/13 Entered 07/29/13 22:49:42 Page 1 of 16
13-53846-tjt Doc 1741 Filed 11/18/13 Entered 11/18/13 16:06:46 Page 114 of 462    113

fully brief and argue the issue of whether section 109(c)(2) has been satisfied, before any consideration of the premature Stay Motions.

## **Factual and Procedural Background**

### A.     **The Retirement Systems**

1.      As authorized by Article VII, section 22 of the Michigan Constitution and sections 4i, 4j, and 21 of the Home Rule City Act, 1909 PA 267 (as amended), M.C.L. §117.1 *et seq.* (the "Home Rule City Act"), the residents of the City established the Retirement Systems through amendments to the City's Charter of 1918, effective July 1, 1938, and effective July 1, 1941, respectively. Among other reasons, the residents of the City created the Retirement Systems to: (i) administer retirement, disability, and survivor benefits to eligible uniformed and non-uniformed City employees and their beneficiaries (*i.e.,* the participants); (ii) ensure that the City actually honors its collective bargaining agreements by tendering to the Retirement Systems the City's annual and obligatory pension contributions; and (iii) protect the vested pension benefits (*i.e.,* "accrued financial benefits") of the Retirement Systems and their participants.

2.      There are more than 32,000 active and retired employees of the City, who are participants in the Retirement Systems and whose "accrued financial benefits" the Retirement Systems must protect.

### B.     **The Governor**

3.      On November 2, 2010, the people of the State of Michigan elected Richard D. Snyder to serve as their Governor (the "Governor"). On December 30, 2010, and as mandated by Article XI, section 1 of the Michigan Constitution and section 64 of the Michigan Election Law, 1954 P.A. 116, M.C.L. §168.1 *et seq.*, ("PA 116"), the Governor swore the following oath, which was later filed with the Michigan Secretary of State: "*I do solemnly swear that I will*

3

9221704.7 14893/161046

13-53846-tjt  Doc 2217  Filed 12/27/13  Entered 12/27/13 16:06:46  Page 15 of 162
13-53846-swr  Doc 1741  Filed 07/23/13  Entered 07/23/13 22:49:42  Page 3 of 15    114

*support the Constitution of the United States and the Constitution of this State, and that I will*

*faithfully discharge the duties of the office of Governor according to the best of my ability.*"

## C.    The Michigan Constitution

4.    Article IX, section 24 of the Michigan Constitution states:  "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Mich. Const. art. IX, §24.

## D.    The Emergency Manager

5.    On March 26, 2013, the Governor and the State Treasurer caused Kevyn Orr to be appointed as the emergency financial manager of the City pursuant to Public Act 72 of 1990, the Local Government Fiscal Responsibility Act, M.C.L. §141.1201, *et seq.* ("PA 72").  On March 28, 2013, upon the effectiveness of Public Act 436, the Local Financial Stability and Choice Act, M.C.L. §141.1541, *et seq.* ("PA 436"), Mr. Orr became, and continues to act as, the emergency manager with respect to the City under PA 436 (the "Emergency Manager").

6.    On June 14, 2013, the Emergency Manager issued his Proposal for Creditors (the "Restructuring Proposal") wherein he took the position that: (i) pension debts are "unsecured claims" that may be, and must be, impaired in any prospective Chapter 9 bankruptcy proceeding; and (ii) the City's alleged approximate $3.5 billion underfunding liability would be placed in a pool of unsecured claims comprising approximately $11.5 billion in claims, and exchanged for a *pro rata* share of an unsecured note in the face amount of $2.0 billion.  The Restructuring Proposal is attached as Exhibit A to the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code. [Docket No. 11] (the "Orr Declaration").

4

7.    In a June 13, 2013 interview with The Detroit Free Press[2], the Emergency Manager acknowledged that Article IX, section 24 of the Michigan Constitution prohibits the impairment Plaintiffs' vested pension benefits, but nevertheless expressed his intention to evade the Michigan Constitution through a federal Chapter 9 bankruptcy proceeding:

> Q:    You said in this report that you don't believe there is an obligation under our state constitution to pay pensions if the city can't afford it?
>
> A:    The reason we said it that way is to quantify the bankruptcy question. We think federal supremacy trumps state law.
>
> Q:    Which the 9th Circuit agrees for now.
>
> A:    It is what it is – so we said that in a soft way of saying, "Don't make us go into bankruptcy." **If you think your state-vested pension rights, either as an employee or retiree – that's not going to protect you. If we don't reach an agreement one way or the other, we feel fairly confident that the state federal law, federalism, will trump state law** or negotiate. The irony of the situation is we might reach a deal with creditors quicker because employees and retirees think there is some benefit and that might force our hand. That might force a bankruptcy.

## E.    The Pre-Petition Lawsuits

8.    On July 3, 2013, four participants of GRS filed two separate suits against the Governor and the State Treasurer in the Ingham County Circuit Court, both seeking: (i) a declaration that PA 436 violates Article IX, section 24 of the Michigan Constitution by purporting to permit the impairment of accrued financial benefits in a Chapter 9 bankruptcy proceeding; and (ii) a temporary restraining order or preliminary injunction precluding the Governor and Treasurer from authorizing a Chapter 9 bankruptcy proceeding. See *Flowers v.*

---

[2]  *See Q & A with Kevyn Orr: Detroit's Emergency Manager Talks About City's Future*, Detroit Free Press (June 16, 2013), *available at* http://www.freep.com/article/20130616/OPINION05/306160052/kevyn-orr-detroit-emergency-manager-creditors-fiscal-crisis.

9221704.7 14893/161046

13-53846-tjt  Doc 221-1  Filed 12/19/13  Entered 12/19/13 16:06:46  Page 17 of 162
13-53846-swr  Doc 1741  Filed 11/19/13  Entered 11/19/13 22:49:42  Page 5 of 46
116

*Snyder*, Case No. 13-729-CZ; *Webster v. Snyder*, Case No. 13-734-CZ (the "Companion Cases").

9.      On July 17, 2013, the Retirement Systems filed a Complaint for Declaratory Relief against the Governor and the Emergency Manager in the Ingham County Circuit Court, Case No. 13-768-CZ (the "State Court Lawsuit" and, together with the Companion Cases, the "Pre-petition Lawsuits") whereby the Retirement Systems requested that this Court issue an Order:

(a)      declaring that PA 436 does not expressly grant to the Governor the authority to authorize the Emergency Manager to take actions that will result in the impairment of the City of Detroit's pension debts, but rather, when read in conjunction with Article IX, section 24 and Article I, section 10 of the Michigan Constitution, requires that the Governor refrain from authorizing the Emergency Manager to take any action that causes the City's pension debts to be subject to impairment under Chapter 9 or, alternatively, that, if PA 436 implicitly grants to the Governor the authority to authorize the Emergency Manager to take actions that impair the City of Detroit's pension debts, then PA 436 contravenes Article IX, section 24 and Article I, section 10 of the Michigan Constitution and is of no force or effect;

(b)      declaring that PA 436 does not expressly grant to the Emergency Manager the authority to take actions that will result in the impairment of the City of Detroit's pension debts, but rather, when read together with Article IX, section 24 and Article I, section 10 of the Michigan Constitution, precludes the Emergency Manager from taking any action that causes the City's pension debts to be subject to impairment under Chapter 9 or, alternatively, that, if PA 436 implicitly grants to the Emergency Manager the authority to take actions that impair the City of Detroit's pension debts, then PA 436 contravenes Article IX, section 24 and Article I, section 10 of the Michigan Constitution and is of no force or effect;

(c)      enjoining the Emergency Manager, if necessary, from acting pursuant to any future unconstitutional Chapter 9 authorization of the Governor; and

(d)      granting to Plaintiffs any further such relief this Court deems equitable and just.

6

The Complaint for Declaratory Relief is attached as Exhibit 6.1 to the Stay Extension Motion [Docket No. 56].

10.     The Retirement Systems also filed a motion for expedited briefing schedule. At 4:55 p.m. on July 17, 2013, the Retirement Systems served the Governor's Office with their complaint for declaratory relief and motion for expedited briefing. At 10:25 a.m. on July 18, 2013, the Retirement Systems served the Emergency Manager's Office with their complaint for declaratory relief and motion for expedited briefing.

11.     On July 19, 2013 hearing, the Court granted the Retirement Systems' motion for expedited briefing schedule and ordered that the Retirement Systems file their motion for declaratory judgment by July 23, 2013; Defendants file their response brief(s) by July 26, 2013; and a hearing be held on July 29, 2013 at 9:00 a.m.  The Order Setting Expedited Briefing Schedule in the State Court Lawsuit is attached as Exhibit 6.3 to the Stay Extension Motion [Docket No. 56].

12.     On July 19, 2013, the Circuit Court for Ingham County, Michigan, in the case entitled *Gracie Webster, et al. v. The State of Michigan, et al.*, Case No. 13-734-CZ (Hon. Rosemarie Aquilina) also entered its Order of Declaratory Judgment (the "Declaratory Judgment"), a copy of which is attached as Exhibit 6.4 to the Stay Extension Motion [Docket No. 56].  In the Declaratory Judgment, it is determined, among other things, that the State of Michigan's authorization of the commencement of this chapter 9 case was violative of the State Constitution and was therefore given without power or authority.  As such, the authorization of the commencement of this case was void.

13.     It is anticipated that the Defendants will appeal from the Declaratory Judgment. Pending such appeal process, however, per the Declaratory Judgment, the Retirement Systems

9221704.7 14893/161046
13-53846-tjt  Doc 221-1  Filed 07/23/13  Entered 07/23/13 22:49:42  Page 17 of 162
13-53846-swr  Doc 1741  Filed 12/12/13  Entered 12/12/13 16:06:46  Page 119 of 462          118

respectfully submit that this Court does not have subject-matter jurisdiction to proceed with this case.

**F.      The City's Bankruptcy Case**

14.      On July 18, 2013 (the "Petition Date"), the City filed its Voluntary Petition under chapter 9 of title 11 of the United States Code, 11 U.S.C. §101 *et seq.* (the "Bankruptcy Code").

15.      On July 19, 2013, in response to the Pre-Petition Lawsuits, the City filed the Stay Motions.  The Stay Confirmation Motion requests entry of an order "confirming" the protections of sections 362 and 922(a)(1) of the Bankruptcy Code, applying the protections of section 922(a)(1) to the Emergency Manager and City Officers (as defined in the motion) and "confirming" the protections afforded by section 365 of the Bankruptcy Code with respect to executory contracts and unexpired leases.

16.      The Stay Extension Motion requests that the Court use its powers under section 105(a) of the Bankruptcy Code to extend the automatic stay provisions in sections 362 and 922 of the Bankruptcy Code to the Governor, the State Treasurer, the Local Emergency Financial Assistance Loan Board of the State of Michigan, City employees that are not officers or inhabitants of the City, and agents and representatives of the Governor and the Emergency Manager.

<u>**Argument**</u>

**I.      The City's Requests for Confirmation and Extension of the Automatic Stay Must Be Denied Because No Valid Bankruptcy Case Is Pending Before this Court.**

In order to consider the application of the automatic stay under section 362 and/or section 922(a) of the Bankruptcy Code, there must first be a valid underlying bankruptcy case from which the stay may arise.  As discussed below, however, there is not a valid bankruptcy case in existence here.  Pursuant to 28 U.S.C. § 1334 (a) and (b), there is neither a "case under title 11"

8

nor any proceeding arising under title 11 or arising in or related to a case under title 11. Neither the United States District Court for the Eastern District of Michigan nor this Court has jurisdiction over the City's putative case under 28 U.S.C. § 1334(a) and (b) and, therefore, lack authority to hear and determine the City's Stay Motions pursuant to 28 U.S.C. § 157(a) and (b).

The Bankruptcy Code is explicit as to who may be a debtor under chapter 9. Pursuant to Bankruptcy Code section 109(c)(2), "[a]n entity may be a debtor under chapter 9 of [the Bankruptcy Code] *if and only if* such entity . . . is *specifically authorized*, in its capacity as a municipality or by name, to be a debtor under such chapter *by State law*, or by a governmental officer or organization *empowered by State law* to authorize such entity to be a debtor under such chapter." 11 U.S.C. § 109(c)(2) (emphasis added).

Here, no valid authorization exists under State law for the City to be a chapter 9 debtor. The Governor is bound to uphold the State Constitution, including the provisions of Article IX, section 24. He does not have the authority to unilaterally abrogate provisions of the State Constitution. Similarly, he cannot delegate authority that he does not have and cannot delegate to a third party (i.e., the Emergency Manager) authority to take actions that would result in an abrogation of constitutional provisions. In essence, the Governor cannot do indirectly what he cannot do directly.

Under PA 436, authorization to commence a petition for relief under chapter 9 of the Bankruptcy Code rests with the Governor. *See* M.C.L. § 141.1556(1)-(2) and M.C.L. §141.1558. However, PA 436 does not authorize the Governor to authorize a chapter 9 filing if such filing would be in breach of the Michigan Constitution - - indeed, the statute could not do so inasmuch as the state legislature does not have the authority to simply legislate amendments to the Michigan Constitution.

Under the Michigan Constitution, "all political power is inherent in the people," and it "remains there, except as delegated by Constitution or statute." *Public Schools of Battle Creek v. Kennedy*, 245 Mich. 585, 587 (1929) (quoting Mich. Const. art. I, § 1). "Public officers have and can exercise only such powers as are conferred on them by law[.]" *Roxborough v. Michigan Unemployment Compensation Comm.*, 309 Mich. 505, 510 (1944). Accordingly, the Governor can only exercise the power granted to him by law, and he is unable to act in violation of the Constitution. *See also Straus v. Governor*, 459 Mich. 526, 534 (1999) ("The Governor's power is limited only by constitutional provisions that would inhibit the Legislature itself."). It is thus clear that the Michigan Constitution provides clear limitations on actions that may be taken by each branch of government, and no branch has the authority to eradicate constitutional guarantees. *See Oshtemo Charter Twp. v. Kalamazoo County Rd. Comm'n*, 2013 Mich. App. LEXIS 1163, 19 (Mich. Ct. App. June 25, 2013) ("The Legislature's authority does not extend to eradicating constitutional guarantees.").

Michigan courts have long held that a Governor's actions outside the confines of the Michigan Constitution are "null and void." In the early Michigan Supreme Court case of *Dullam v. Willson*, the court found unconstitutional the Governor's action in attempting to remove a state school trustee from his post without a hearing. *Dullam v. Willson*, 53 Mich. 392 (1884). In *Dullam*, Justice Cooley noted:

> Courts, in determining whether rights exist, or whether vested rights have ceased to exist, do not act necessarily or usually as appellate tribunals, whose judgments operate on the tribunals or persons whose invasions of right are complained of. They may or may not do so. *But in a constitutional government the action of all persons, official or private, which is in violation of constitutional rights, is simply null and void, and usually needs no reversal. And the action of any department of government, whether legislative, executive or judicial, beyond its jurisdiction, or against the constitutional limitations of its authority, is in law the same as if*

10

9221704.7 14893/161046

13-53846-swr Doc 2171 Filed 12/18/13 Entered 12/18/13 16:26:42 Page 122 of 462
13-53846-swr Doc 141 Filed 07/23/13 Entered 07/23/13 22:43:42 Page 10 of 16    121

> *there had been no action, and cannot be recognized as having legal effect.*

*Id.* at 409-10 (Cooley, J., concurring) (emphasis added).

Given this legal framework, it is clear that Governor Snyder lacks the power to act if his actions violate the Michigan Constitution. Actions taken by Governor Snyder that are outside of his constitutional power are *ultra vires*. "The term 'ultra vires' means outside the scope of authority." *McCartney v Attorney General*, 231 Mich. App. 722, 726 (1998) (internal citation omitted). "Thus, if the Governor acts outside the scope of his authority, his actions are considered ultra vires." *McCartney* at 726.

*Ultra vires* acts are void *ab initio*. *See, e.g.,McKane v. City of Lansing*, 1998 U.S. App. LEXIS 649 (6th Cir. Jan. 14, 1998) (city council's *ultra vires* adoption of an early retirement plan was void *ab initio* when it was improperly adopted via a resolution instead of an ordinance); *Utica State Sav. Bank v. Oak Park*, 279 Mich. 568, 577 (1937) ("Surely no one, in view of the constitutional, statutory and charter provisions noted herein, could successfully assert that the legislature had the power to make a contract of this character in behalf of the defendant village. It follows that notwithstanding the remedial act of the legislature, the contract under which plaintiffs assert their rights was void in its inception and still remains so.").

If an act is void *ab initio*, it is as though the act never occurred in the first place. *See Kim v. JPMorgan Chase Bank, N.A.*, 493 Mich. 98, 102 (2012) (relying upon Black's Law Dictionary (9th ed.) and defining void *ab initio* as "[n]ull from the beginning, as from the first moment. . ."). "In short, it has become recognized as a truism that what a municipality has no power to do, it has not done merely because it tried to do it." *Sommers v. Flint*, 355 Mich. 655, 668 (1959) (citation omitted). The *Sommers* court found an *ultra vires* act by a municipal corporation void

9221704.7 14893/161046

and noted that "the Constitution itself is made to define, limit and apportion the powers of the government it creates or controls." *Id.* at 673.

Governor Snyder exceeded the confines of his authority under the Michigan Constitution by unlawfully authorizing the Emergency Manager to file a chapter 9 petition that will impair constitutional rights guaranteed to the State's citizens, and his action is therefore void *ab initio*. Because Governor Snyder's action was void *ab initio*, the Emergency Manager had no authority to file a chapter 9 petition under PA 436, and his actions in doing so were similarly void *ab initio*. As a result, the filing of the petition for relief under chapter 9 was void, of no force and effect, a legal nullity that must be treated as though it never occurred. This is precisely what was determined and held by the State court in the Declaratory Judgment.

Therefore, since no valid chapter 9 case is pending, this Court has no jurisdiction to hear or determine the Stay Motions, and no relief requested by the City may be granted.

## II. The Determination of Whether the City Is Authorized to Be a Chapter 9 Debtor is Purely a Matter of State Law and that Determination Has Been Properly Made by a State Court.

Michigan state courts are the most appropriate forum to determine the state-law issue of whether the City received valid authorization from the Governor to file a petition for relief under chapter 9. As stated above, the eligibility determination under section 109(c)(2) presents a *question purely of state law*. *In re City of Stockton*, 475 B.R. 720, 721 (Bankr. E.D. Cal. 2012) (all chapter 9 eligibility issues *except* § 109(c)(2) are creatures of federal law, and federal law provides the rule of decision) (emphasis added); *In re City of Stockton*, 2013 Bankr. LEXIS 2416, 21 (Bankr. E.D. Cal. June 12, 2013) ("California law governs the question whether the [City of Stockton] is authorized to be a chapter 9 debtor."). As one bankruptcy court has observed, states "act as gatekeepers to their municipalities' access to relief under the Bankruptcy

Code." *In re City of Vallejo*, 403 B.R. 72, 76 (Bankr. E.D. Cal. 2009), *aff'd IBEW, Local 2376 v. City of Vallejo (In re City of Vallejo)*, 432 B.R. 262 (E.D. Cal. 2010).

If states serve as the gatekeepers of access to chapter 9, and if the satisfaction of the eligibility requirement under Bankruptcy Code section 109(c)(2) is a matter purely of state law, then it stands to reason that the state courts (which are a co-equal branch with the executive branch of the sovereign entity) are the appropriate forum for the determination of whether valid authorization of a chapter 9 filing has been granted under state law. Put another way, it is simply not the province of a bankruptcy court to determine if it has jurisdiction under section 109(c)(2). This is also logically sound because if the bankruptcy court does not have jurisdiction, its determinations are null and void in any event.

Bankruptcy Code sections 109, 903, and 904, and indeed the entire structure of chapter 9 evince an abiding sensitivity to the contours of federalism and the protections of the 10th Amendment to the U.S. Constitution. To that end, the sovereignty of the state - - including its judiciary - - should be given proper deference and respect. Accordingly, the Declaratory Judgment should be respected, and any appeal process that ensues should proceed in the state courts.

## III. The City's Requests For Relief Inappropriately Ask this Court to Review the State Court's Declaratory Judgment In Violation of the *Rooker-Feldman* Doctrine.

The City's continuation of its unauthorized chapter 9 case and the relief it requests in the Stay Motions amount to a collateral attack that seeks to vacate the Declaratory Judgment. This Court is an Article I court. Congress has neither conferred any authority on this Court to review state court judgments, nor is such appellate review permissible under the United States Constitution. Under the Rooker-Feldman doctrine, the City's case and the Stay Motions must be dismissed.

13

The Rooker-Feldman doctrine is confined to cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments. *See Kapla v. Fannie Mae (In re Kapla)*, 485 B.R. 136, 143 (Bankr. E.D. Mich. 2012) (internal citations omitted). For Rooker-Feldman to apply, the party asserting claims in federal court must have first lost in state court. *Id.* Appellate jurisdiction to reverse or modify a state-court judgment is lodged exclusively in the United States Supreme Court, and federal district courts are empowered to exercise original, not appellate, jurisdiction. *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 283-84 (2005).

As stated, the Declaratory Judgment is dispositive on the issue of whether the Governor had authority to authorize the chapter 9 petition. The continuation of the case by the City and the relief requested in the Stay Motions seeks to undermine and undo the Declaratory Judgment. The Stay Extension Motion seeks to stay actions against the Governor (the losing party in the *Webster* action) and stop all litigation in the Pre-Petition Lawsuits. Extending the automatic stay to the Governor will enable the Governor to use this Court as a forum for review and re-litigation of issues already determined by the *Webster* court in violation of the Rooker-Feldman doctrine. The Stay Extension Motion must be denied for this reason.

IV.     **Even if this Court Determines that It Has Subject Matter Jurisdiction, No Basis Exists to Extend the Automatic Stay to Non-Debtor Parties.**

If the Court determines that it has subject matter jurisdiction over this case, the Stay Motions must still be denied because the City has failed to satisfy the requirements for extending the automatic stay to non-debtor parties. The filing of a voluntary petition "operates as a stay, applicable to all entities, of – (1) the commencement or continuation, …, of a judicial … proceeding *against the debtor* that was or could have commenced before the commencement of

14

9221704.7 14893/161046

13-53846-swr   Doc 2171   Filed 12/18/13   Entered 12/18/13 16:20:42   Page 20 of 462
13-53846-swr   Doc 141   Filed 07/23/13   Entered 07/23/13 22:43:42   Page 14 of 19      125

the case … ." 11 U.S.C. §362(a)(1) (emphasis added).  The City, not the Emergency Manager or the Governor, is the putative debtor in this case and only the City would receive the protections of the automatic stay imposed by section 362(a)(1).  Section 922(a)(1) of the Bankruptcy Code expands the scope of the section 362 automatic stay and stays "the commencement or continuation … of a judicial, administrative, or other action or proceeding against an officer or inhabitant of the debtor that *seeks to enforce a claim* against the debtor."  11 U.S.C. §922(a)(1) (emphasis added).  The Pre-petition Lawsuits do not seek to enforce *claims* against the City; they seek to preserve constitutional rights.  Thus, section 922(a)(1) of the Bankruptcy Code cannot be used as a basis for extending the automatic stay to non-debtor parties, such as the Emergency Manager[3] or the Governor.

Extending the automatic stay to non-debtor parties is justified only in "unusual circumstances."  *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 861 (6th Cir. 1992).  Before the Court may use its equitable powers under section 105(a) of the Bankruptcy Code to issue an injunction extending the automatic stay to protect non-debtor parties such as the Governor, the City must demonstrate that unusual circumstances exist which justify granting such extraordinary relief <u>and</u> must prove by clear and convincing evidence that an injunction is warranted based on the following four factors: (i)  whether the movant has shown a reasonable probability of success on the merits; (ii) whether the movant will be irreparably injured by denial of the relief; (iii) whether granting preliminary relief will result in even greater harm to the nonmoving party; and (iv) whether granting the preliminary relief will be in the public interest.  *See Amedisys, Inc. v. Nat'l Century Fin. Enters. (In re Nat'l Century Fin. Enters.)*, 423 F.3d 567,

---

[3]  Although the Emergency Manager arguably acts as an officer or agent of the City, section 922(a)(1) does not stay the Pre-petition Lawsuits against the Debtor because they do not seek to enforce *claims* against the City or the Emergency Manager.

577-579 (6th Cir. 2005); *Mcternan v. City of New York*, 577 F.3d 521, 527 (3d Cir. 2009) (internal quotations omitted). The Stay Extension Motion is procedurally defective, the City has not demonstrated that unusual circumstances exist for extending the automatic stay, the City failed to meet its burden of proof for obtaining an injunction, and the Stay Extension Motion must be denied.

Procedurally, the City was required to initiate an adversary proceeding to obtain an injunction extending the automatic stay. *See Amer. Imaging Servs. v. Eagle-Pitcher Indus., Inc. (In re Eagle-Picher Indus., Inc.)*, 963 F.2d 855, 857-59 (6th Cir. 1992) (normally a debtor initiates an adversary proceeding in order to request a § 105(a) preliminary injunction); *cf. In re LTV Steel Co., Inc.*, 264 B.R. 455, 462-63 (Bankr. N.D. Ohio 2001) (a debtor is not required to initiate an adversary proceeding in order to move the bankruptcy court to enforce the automatic stay based on 362(a)(3) since the stay is self-executing with respect to actions against property of the estate and no injunction is needed.) The City has not done so, and the Stay Extension Motion must be denied because it is procedurally defective.

The City also has not demonstrated "unusual circumstances" sufficient to warrant extending the automatic stay to non-debtor parties. *Eagle-Picher* is clearly inapposite. "Unusual circumstances" exist where there is an "identity between the third party and the debtor such that a judgment against the third party would, in effect, be a judgment against the debtor." *Id.* There is no identity of interests between the City and the non-debtor parties (*e.g.,* the Governor or the State Treasurer) that it seeks to protect. A judgment obtained in any one of the Pre-petition Lawsuits will not be a judgment against the City, and the City has failed to proffer any cognizable reason to justify another conclusion. The City has failed to demonstrate unusual

9221704.7 14893/161046
13-53846-tjt Doc 2171 Filed 12/18/13 Entered 12/18/13 16:26:42 Page 128 of 462
13-53846-swr Doc 141 Filed 07/23/13 Entered 07/23/13 22:43:42 Page 16 of 102     127

circumstances sufficient to warrant extending the automatic stay, and the relief requested must be denied.

Moreover, the City has not proffered any evidence, let alone clear and convincing evidence, that an injunction is warranted in this case. The Court, therefore, cannot find that the City has satisfied its burden of proof and its request for an injunction under section 105(a) of the Bankruptcy Code must be denied.

## V. Reservation of Rights to Raise Additional Arguments and Joinder in Arguments Asserted by Other Parties.

In addition to the arguments made in this Objection, the Retirement Systems submit that the relief requested in the Stay Motions must be denied because such relief is prohibited by: (i) *res judicata,* (ii) collateral estoppel, and (iii) the Anti-Injunction Act, 28 U.S.C. §2283; and (iv) principles of abstention. The Retirement Systems reserve their rights to supplement this Objection and request the opportunity to submit additional briefing on these arguments and any others, as needed.

The Retirement Systems join in and concur with the Objections filed by:

- The Michigan Council of the American Federation of State, County & Municipal Employees, AFL-CIO [Docket No. 84]; and,

- Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington, Bruce Goldman and the International Union, UAW [Docket No. 125];

<u>Conclusion</u>

For the reasons set forth herein, the Retirement Systems respectfully request that this Court deny the Stay Motions. If this Court nonetheless determines that it has jurisdiction to consider substantive matters, the Retirement Systems submit that the Court should allow an

17

9221704.7 14893/161046

13-53846-tjt Doc 22171 Filed 12/18/13 Entered 12/18/13 16:20:42 Page 19 of 402
13-53846-swr Doc 141 Filed 07/23/13 Entered 07/23/13 22:49:42 Page 17 of 19 128

opportunity for parties to fully brief and argue the issue of whether section 109(c)(2) has been satisfied, before any consideration of the premature Stay Motions.

<div style="margin-left: 40%;">

Respectfully submitted,

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Evan J. Feldman (P73437)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

</div>

Dated:  July 23, 2013                     *Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

9221704.7 14893/161046

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                    )        Chapter 9
                                          )
CITY OF DETROIT, MICHIGAN,                )        Case No. 13-53846
                                          )
            Debtor.                       )        Hon. Steven W. Rhodes
                                          )

_____

## CERTIFICATE OF SERVICE

The undersigned certifies that on July 23, 2013, the Objection of the Retirement Systems to Motions of Debtor for Entry of Orders (I) Confirming the Protections of Sections 362, 365 and 922 of the Bankruptcy Code, and (II) Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor was filed using the Court's CM/ECF system, which CM/ECF system will send notification of such filing to all parties of record.

CLARK HILL PLC

/s/ Robert D. Gordon
Robert D. Gordon (P48627)
Shannon L. Deeby (P60242)
Evan J. Feldman (P73437)
151 South Old Woodward Avenue
Suite 200
Birmingham, Michigan 48009
Telephone: (248) 988-5882
Facsimile: (248) 988-2502
rgordon@clarkhill.com

Dated: July 23, 2013                      *Counsel to the Police and Fire Retirement System of the City of Detroit and the General Retirement System of the City of Detroit*

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION - DETROIT

In re:

CITY OF DETROIT, MICHIGAN,                    Chapter 9

                  Debtor.                    Case No. 13-53846
                                  Honorable Steven W. Rhodes

OBJECTION OF ROBBIE FLOWERS, MICHAEL WELLS, JANET WHITSON, MARY WASHINGTON, BRUCE GOLDMAN AND INTERNATIONAL UNION, UAW TO MOTION OF DEBTOR, PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON-OFFICER EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR (Docket No. 56)

       Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington and Bruce Goldman (the "*Flowers* plaintiffs") plaintiffs in a Michigan civil action ("*Flowers v. Snyder")* against Michigan Governor Snyder, Michigan Treasurer Dillon and the State of Michigan under Article 9, Section 24 of the Michigan Constitution, join with International Union, UAW, the collective bargaining representative of Robbie Flowers and Bruce Goldman, in objection to the Motion Of Debtor, Pursuant To Section 105(A) Of The Bankruptcy Code, For Entry Of An Order Extending The Chapter 9 Stay To Certain (A) State Entities, (B) Non-Officer Employees And (C) Agents And Representatives Of The Debtor (Docket No. 56) (the "Motion"), and state:

       1.      The *Flowers* plaintiffs are an employee of a Michigan municipal corporation named the Detroit Library Commission (Robbie Flowers), two retirees from the Detroit Library Commission (Michael Wells and Janet Whitson), a City of Detroit employee (Bruce Goldman), and a City of Detroit retiree (Mary Washington). Each has earned vested pension benefits from

the City of Detroit General Retirement System ("GRS"), and the three retiree plaintiffs are currently receiving pension benefits from GRS.  International Union, UAW is the collective bargaining representative of Robbie Flowers and Bruce Goldman, and was the collective bargaining representative of the remaining *Flowers* plaintiffs when they were employed by the Detroit Library Commission or the City of Detroit.

2.      The *Flowers* plaintiffs' vested pension benefits are protected by Article 9, Section 24 of the Michigan Constitution, which provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation whereof which shall not be diminished or impaired thereby."

3.      The *Flowers* plaintiffs filed suit in state court against the State of Michigan and two of its constitutional officers because those officers had been abrogating and were threatening to abrogate plaintiffs' state constitutional rights, as more fully set forth  in their amended verified complaint (Exhibit 6.1 to the Motion) and in their reply brief in support their motion for preliminary injunction in *Flowers v. Snyder* (attached as Exhibit 1 to the Declaration of William Wertheimer filed herewith).

4.      At no point have the *Flowers* plaintiffs sued the debtor or the Detroit Emergency Manager, the City of Detroit or any City of Detroit official or employee. Nor have they sought any relief against any of these persons or entities.

5.      The debtor at paragraph 11 of its Motion asserts that the *Flowers* plaintiffs sought *ex parte* injunctive orders. That is untrue. See the attached declaration of William Wertheimer filed herewith. At no point did the *Flowers* plaintiffs ever seek *ex parte* relief. To the contrary,

2

the *Flowers* defendants sought to delay as long as possible (for a now obvious reason) a fully briefed hearing on the merits of a motion for preliminary injunction seeking to preclude Governor Snyder from authorizing the filing of a Chapter 9 bankruptcy petition in violation of the Michigan Constitution.  See Declaration of William Wertheimer, filed herewith.

6.  The *Flowers* plaintiffs' Michigan state law claim against Michigan Governor Snyder, Michigan Treasurer and the State of Michigan is well-grounded in the Michigan Constitution, as indicated by the debates concerning the adoption of what is now Article 9, Section 24 of the Michigan Constitution:

> MR. VAN DUSEN: An employee who continued in the service of the public employer in reliance upon the benefits which the plan says he would receive would have the contractual right to receive those benefits, and **would have the entire assets of the employer at his disposal from which to realize those benefits**.

1 Official Record, Constitutional Convention 1961, p. 774 (emphasis added).

7.  *Flowers v. Snyder* was filed once it became abundantly clear that Governor Snyder intended to unconstitutionally authorize the Emergency Manager to use federal bankruptcy law to override the protections of the Michigan State Constitution prohibiting the impairment of accrued pension benefits.[1]  The City blindly and dismissively treats these suits as

---

[1] The Emergency Manager's radical proposal to cut funding to the retirement system using a new pension valuation prepared for the City that (apparently through the use of a new mix of assumptions) purports to significantly increase the level of underfunding, to offer pennies on the dollar for retirement system funding and then declare that accrued benefits must be cut, raised legitimate and serious concerns that state law, as well as federal bankruptcy law, was being used, or about to be used to eviscerate pension benefits that are fundamental in human terms and importance to pensioners and protected under the Michigan Constitution.  See Declaration of Charles M. Moore in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code, par. 11-16 (describing new valuation report and assumptions).

3

mere collection actions designed to find end-runs around its Chapter 9 bankruptcy case, as if the lawsuits were the work of enterprising creditors looking every which way to avoid the bankruptcy case. See e.g., Motion at ¶23. But as the Court is well aware, Chapter 9 reflects our system of dual sovereignty and its reach is limited accordingly. A municipality is eligible to be a debtor "*if and only if*" it "is specifically authorized, in its capacity as a municipality or by name to be a debtor under [chapter 9] by State law, or by a governmental officer. . . ." 11 U.S.C. § 109(c) (2) (emphasis added). *Flowers* and the other lawsuits were commenced precisely to contest the authority of the Governor to issue such an authorization under state law where a purpose of the chapter 9 would be to impair constitutionally protected pension benefits.

8. Rather than enjoin *Flowers v. Snyder*, and the other lawsuits, they must proceed in the state courts. Otherwise, whether and to what extent this bankruptcy case is lawful under the Michigan Constitution is a cloud that will overhang even the most routine orders issued by this Court should the bankruptcy case continue without a resolution of these suits through the state court system and notwithstanding the orders already by the state court. The City's Motion is utterly blind to the fundamental role of these suits in defining the extent to which the bankruptcy can proceed to issue any orders at all. Or else the City hopes that the Court will not notice at all.

9. For the foregoing reasons, as well the grounds set forth in the Objection of The Michigan Counsel 25 of the American Federation State, County and Municipal Workers (Docket 84), specifically, that the City is not entitled to a stay under the automatic stay or Section 105 of the Bankruptcy Code, as well as under long-standing principles of federal court abstention and federalism principles embodied in the Tenth Amendment to the U.S. Constitution which the

4

*Flowers plaintiffs* and International Union, UAW join in, the *Flowers* Plaintiffs and the UAW

respectfully submit that the Motion should be denied.

Respectfully submitted,

/s/William A. Wertheimer
William A. Wertheimer (P26275)
30515 Timberbrook Lane
Bingham Farms, MI 48025
248-644-9200
billwertheimer@gmail.com

*Attorney for Robbie Flowers, Michael Wells, Janet*
*Whitson, Mary Washington and Bruce Goldman*

/s/Niraj Ganatra
Niraj Ganatra (P63150)
Michael Nicholson (P33421)
General Counsel
International Union, UAW
8000 East Jefferson Avenue
Detroit, Michigan 48214
313-926-5216
mnicholson@uaw.net

and

/s/Babette Ceccotti
Babette Ceccotti
Cohen, Weiss and Simon LLP
330 West 42d Street
New York, NY 10036-6979
212-356-0227
bceccotti@cwsny.com

*Attorneys for International Union, UAW*

Dated: 24 July 2013

5

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION - DETROIT

In re:

CITY OF DETROIT, MICHIGAN,           Chapter 9

               Debtor,          Case No. 13-53846

     v.                       Honorable Steven W. Rhodes

# AMENDED DECLARATION OF WILLIAM WERTHEIMER

1.      I am the lead attorney for plaintiffs in *Flowers, et al. v. Snyder, et al.,* No. 13-734-CZ (Ingham County Circuit Court July 3, 2013), one of the three "Prepetition Lawsuits" that the City is seeking to stay in its motion at Docket No. 56. This Amended Declaration supplements my Declaration filed in this matter on July 23, 2013.

2.      In that motion the City states at paragraph 11 that plaintiffs in *Flowers* (and the other two "Prepetition Lawsuits") sought "*ex parte* orders" for temporary or preliminary injunctive relief. That is untrue. At no point did the *Flowers* plaintiffs (or the *Webster* plaintiffs) ever seek *ex parte* relief.

3.      I filed our suit on July 3, 2013 and drew Judge Rosemarie Aquilina. I had notified the Attorney General's office before filing that I would be going to chambers seeking an order to show cause for a hearing on a preliminary injunction precluding the Governor from authorizing a Detroit bankruptcy. I met up with Tom Quasarano and Michael Murphy of the Attorney General's office at court. The three of us went into Judge Aquilina's chambers where we met

with Morgan Cole, the court officer/law clerk. Ms. Cole stated that Judge Aquilina could hear the matter on July 15. I urged that the matter be set for July 15. The Attorney General's office objected and asked for a delay until July 22 because the earlier date would interfere with chemotherapy treatment that Mike Murphy (who would according to them be writing the response brief) had previously scheduled. I then agreed to the July 22 hearing date, with the defendants' responsive pleading to be filed July 15. Judge Aquilina subsequently issued the order to show cause for July 22 at 9 a.m.

4.     Later the day of July 3, John Canzano filed suit on behalf of the *Webster* plaintiffs. He subsequently obtained an order to show cause for his hearing for declaratory relief before Judge Aquilina on July 22 at 9 a.m.

5.     The Attorney General's office filed response briefs in the *Flowers* and the *Webster* cases on July 15.

6.     Michael Murphy's name was not on either brief defendants filed on July 15 and he has had no involvement in the case to my knowledge beyond his role in obtaining the July 22 hearing date described above

7.     On July 17 the Clark Hill law firm filed suit on behalf of the two Pension Systems and moved for an expedited briefing schedule and hearing pursuant to MCR 2.605(D).

8.     On July 18 Mike Pattwell, a Clark Hill attorney, advised me by phone that the *Pension System* plaintiffs would be seeking injunctive relief from Judge Aquilina that afternoon as they had received word that the City was planning on filing for bankruptcy on July 19. (The reply brief with the affidavit of Michael Nicholson was filed on July 18 and is attached as Exhibit 1.) I was planning on filing our reply brief for the July 22 hearing that afternoon, so I

2

decided to also appear before Judge Aquilina to seek immediate injunctive relief. I advised John Canzano of what I had heard and he decided similarly.

9.      At approximately 3:35 p.m. on July 18, I telephonically advised Tom Quasarano that I would be appearing in Judge Aquilina's courtroom shortly after 4 p.m. to seek an injunction. He said that he would meet me there and did.

10.     The City filed for bankruptcy at 4:06 p.m. We began our hearing at 4:15 p.m. A transcript of the hearing is attached hereto as Exhibit 2.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on July 24, 2013.

<div align="right">/s/William Wertheimer</div>

<div align="center">3</div>

# EXHIBIT 1

4

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

ROBBIE FLOWERS, MICHAEL WELLS,
JANET WHITSON, MARY WASHINGTON and
BRUCE GOLDMAN

Plaintiffs,

vs.

Case No. 13-729-CZ
Hon. Rosemarie Aquilina

RICK SNYDER, as the Governor of the State
of Michigan; ANDY DILLON, as the Treasurer of
the State of Michigan; and the STATE OF MICHIGAN,

Defendants.

_____/

William A. Wertheimer (P26275)
Attorney for plaintiffs
30515 Timberbrook Lane
Bingham Farms, MI 48025
248-644-9200
billwertheimer@gmail.com

Andrew Nickeloff (P37990)
Marshall J. Widick (P53942)
James A. Britton (P71157)
Attorneys for plaintiffs
Sachs Waldman
1000 Farmer
Detroit, MI 48226
313-496-9429
anickelhoff@sachswaldman.com
mwidick@sachswaldman.com
jabritton@sachswaldman.com

Thomas Quasarano (P27982)
Brian Devlin (P34685)
Assistant Attorneys General
PO Box 30754
Lansing, MI 48909
quasaranot@michigan.gov

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION[1]

---

[1]     This brief is in reply to defendants' response to plaintiffs' motion. It is not in response to defendants' motion for summary disposition. Plaintiffs will respond to that motion as provided for under MCR 2.116(G)(1)(a)(i) once defendants properly notice same. Plaintiffs do not agree to defendants' request that this Court (apparently at the hearing and after the fact) waive or adjust the response time provided in the court rules. State's brief, page 16.

Defendants' brief ignores (but does not dispute) the basic facts that plaintiffs allege and grossly mischaracterizes the nature of plaintiffs' claim. In Parts A and B below, we address these two defects in defendants' response. Then, in Parts C through G, we respond to the remainder of defendants' arguments in response to our request for a preliminary injunction.

**A. Undisputed Facts**. Plaintiffs' complaint is based on the undisputed fact that the Detroit Emergency Manager has publicly stated that Detroit retirees, employees and their unions must agree to significant cuts to their vested pension benefits outside of a Chapter 9 federal bankruptcy proceeding, and that if they fail to agree he will cut those benefits through operation of the federal bankruptcy code, based on the supremacy of the federal bankruptcy code over Article 9, Section 24 of the Michigan Constitution, which provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Since under Public Act 436 such a federal bankruptcy proceeding cannot be initiated by the Emergency Manager without authorization by Governor Snyder, plaintiffs have sued the Governor to stop such an authorization and the diminishment and impairment of vested Detroit pension benefits which will necessarily follow from it. In short, this litigation seeks to stop action by Governor Snyder that the plaintiffs allege to be unconstitutional under Article 9, Section 24, and does not seek a declaration that Public Act 436 is itself unconstitutional.

Since this litigation was commenced on 3 July 2013, the City of Detroit has again refused to accept or address the strictures of Article 9, Section 24. Thus, on 9 July 2013,

the General Counsel of the UAW – which is the collective bargaining representative of plaintiffs Robbie Flowers and Bruce Goldman – wrote the City's lawyers, asking them:

> please cite the basis for any claim that the UAW has the authority to compromise the vested benefits of active and/or retired UAW or former UAW members employed or formerly employed by the City of Detroit and its affiliates. As I presume you know, Article 9, Section 24 of the Michigan Constitution provides in pertinent part that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Please tell me what authority your firm and/or Mr. Orr believe gives the UAW the right to compromise vested pension benefits, despite the contrary provisions of Article 9, Section 24. Please also tell us whether Mr. Orr and/or your firm take the position that Article 9, Section 24 of the Michigan Constitution is not or may not be binding on the City of Detroit, the State of Michigan, Governor Snyder, Mr. Orr or the UAW and state, if that is the case, under what circumstances you believe that Article 9, Section 24 would not bind some or all of these persons or entities.

Affidavit of Michael Nicholson, Exhibit B. Mr. Nicholson wrote this email in part to accept an invitation sent to UAW and other unions and retiree groups to attend a meeting on 10 July 2013 with representatives of both the City of Detroit and the Detroit General Retirement System. Id., Ex. A.

Since this litigation was filed on July 3, the Detroit Emergency Manager has also continued to publicly take the position that vested pensions must be cut without regard to Article 9, Section 24 of the Michigan Constitution. See the video of his 5 July 2013 interview with Detroit Public Television's MiWeek program beginning at 14 minutes, www.youtube.com/watch?v=TspCsrXmkZA.

In addition, it is clear that the Detroit Emergency Manager is moving closer to a bankruptcy filing and that the Governor is directly involved. In an article this past Monday headlined "Detroit Bankruptcy Clock Ticking" Daniel Howes reported in the Detroit News: "The governor and Emergency Manager Kevyn Orr met Monday to

discuss the situation. Additional meetings with creditors, legal teams and the Snyder administration are scheduled this week to determine whether Orr and his team are making enough meaningful progress in their talks with creditors, unions and pension funds to delay a bankruptcy filing." See Exhibit A attached and available online at www.detroitnews.com/article/20130716/BIZ/307160025.

As these new facts show, the Emergency Manager continues to demand that unless unions and retiree groups agree to significant cuts in retiree benefits outside of bankruptcy, he will impose such cuts in bankruptcy, following the Governor's authorization to commence a Chapter 9 proceeding, in derogation of the constitutional rights guaranteed by Article 9, Section 24. See Amended Verified Complaint, ¶ 21-25. The factual basis for plaintiffs' complaint in this litigation is thus undisputed, and stands against defendants' claim that – contrary to the unchallenged facts – their concerns about their pensions and their rights are merely hypothetical and unripe because nothing is being done to harm them. To the contrary, real harm continues to take place now: the plaintiffs continue to be told that unless they agree to cuts in their vested pension benefits now, they will be imminently be imposed through a Chapter 9 bankruptcy proceeding authorized by the Governor.

**B.** **Mischaracterization of Plaintiffs' Complaint.** Defendants' claim that plaintiffs "bring a facial constitutional challenge" to Public Act 436. State's brief, page 1. Not so. Plaintiffs begin their complaint by stating that their constitutional right to vested pension benefits "are being violated [present tense] in the emergency financial management proceedings that the State has implemented in response to Detroit's fiscal crisis and whose rights will be threatened [future tense] with abrogation if Governor

4

Snyder authorizes the Detroit Emergency Manager to proceed under Chapter 9 in bankruptcy." Amended verified complaint, ¶ 1. Nowhere in their complaint do plaintiffs allege that Public Act 436 is unconstitutional on its face or otherwise. (Nor do they seek relief consistent with a facial challenge.) Mischaracterizing plaintiffs' allegations has three tactical advantages for defendants. First, it allows defendants to ignore the facts on the ground, facts upon which this civil action is based. Second, it allows defendants to make their arguments without acknowledging that plaintiffs' constitutional rights under Article 9, Section 24 are being threatened now. Third, it allows defendants to argue that they can protect these constitutional rights in bankruptcy, even though Detroit's Emergency Manager has flatly and uncategorically opined to the contrary. We address these points in what follows below.

C.     **Plaintiff's Request for Injunctive Relief is Neither Premature, Overbroad nor Constitutionally Infirm.** Defendants here make four arguments against injunctive relief. None has merit.

1.     First, defendants argue that no prohibitory injunction can be issued because declaratory relief has not as yet failed, citing dictum from *Strauss v Governor*, 459 Mich 526, 532; 592 NW2d 53 (1999). State brief, pages 4-5. The Court's dictum from *Strauss* is inapplicable here for at least three reasons. First, *Strauss* involved a fight between the Governor and the State Board of Education over which constitutional provision took precedence, Article 5, Section 2 or Article 8, Section 3. This case involves the State in the person of the Governor abrogating the constitutional rights of its citizens. That is a distinction that should make a difference. Second, this case involves a very public fight in which the Governor knows very well that his Emergency Manager is

refusing to recognize the Article 9, Section 24 rights of plaintiffs and thousands of other

retirees. To require this Court to first issue declaratory relief in these circumstances

elevates form over substance. Third, the bankruptcy filing may be imminent, such that

there may be no time for the courtesy contemplated by *Strauss*. See, e.g.,

www.freep.com/article/20130718/news01/307180107/detroit-prepares-file-bankruptcy-

soon-friday ("Detroit prepares to file for bankruptcy as soon as Friday") and

www.youtube.com/watch?v=TspCsrXmkZA, beginning at 10 minute mark. With all that

said, plaintiffs would have no objection if this Court fashioned the requested preliminary

relief in the form of a declaration, but only if the Governor agrees not to act contrary to

the declaration before the plaintiffs have the opportunity to return to this Court and seek a

prohibitory injunction.

      2.     Defendants next argue that injunctive relief is premature given the

opportunity for relief in bankruptcy court. State brief, page 5. They cite two Bankruptcy

Code provisions: 11 USC §109(c) and 11 USC § 943(4). Neither protects against an

impairment of pension benefits in violation of Article 9, Section 24. First, none of the

disjunctive criteria in 109(c) for eligibility to proceed under Chapter 9 contain a basis for

a challenge based on Article 9, Section 24. Second, the requirement in 11 USC § 943(4)

that "the debtor is not prohibited by law from taking any action necessary to carry out the

plan" may not protect Article 9, Section 24 rights because of the principle that "federal

law trumps state law," which the Detroit Emergency Manager has indicated will be

applied. To support this concern, we cited in our opening brief the bankruptcy court

decisions in *In re City of Stockton, California,* 478 BR 8 (Bankr ED Cal 2012); and *In re

City of Vallejo,* 403 BR 72 (Bankr ED Cal 2009), which we expect will be cited in a

Chapter 9 proceeding in support of the proposition that federal bankruptcy law supersedes Article 9, Section 24 of the Michigan Constitution.

3.      Defendants also argue that the injunction request is overbroad because "[t]his Court cannot determine, based on the record Plaintiffs present, how any bankruptcy proceeding for the City of Detroit, if filed, may impact their pension benefits or if it will at all, until the bankruptcy plan is filed with the bankruptcy court and ultimately confirmed." State brief, page 6. But this claim that plaintiffs' concerns are only hypothetical ignores the Detroit Emergency Manager's stated intent and the terms of his proposal to creditors. And it also ignores the fact that if no relief is granted now, it will likely be too late after a bankruptcy filing to protect plaintiffs' rights under Article 9, Section 24. In other words, the result, if defendants' argument is accepted, is that by the time the harm comes the citizens of the State of Michigan who are Detroit pensioners will be unable to sustain their State constitutional rights. That is precisely the plan to violate Article 9, Section 24 of the Michigan Constitution that we believe the Governor will facilitate at the request of the Emergency Manager, absent the relief we request.[2]

4.      Defendants further argue that the plaintiffs' injunction request is mandatory. State brief, page 6. It is not. As defendants recognize in making other of their arguments, the relief sought by plaintiffs' pending motion is, by its terms, clearly prohibitory.

---

[2]      The motion before the Court is a motion for preliminary injunction, not a request for final relief. While we recognize the sensitivity of this issue and this litigation, the Court should consider the appropriateness of limited discovery on the issue of communications between the Governor, the defendant State Treasurer and the Emergency Manager (and their staff and other agents) with respect to City of Detroit vested pension benefits. Thus, even it plaintiffs are found to lack standing to seek injunction, this civil action may still proceed on the claim in Complaint for declaratory relief.

7

**D.** **Plaintiffs Have Standing to Bring This Action.** Defendants recognize

that the Michigan Supreme Court restored Michigan's limited, prudential approach to

standing in *Lansing School Education Ass'n v Lansing Board of Education,* 487 Mich

349, 372; 792 NW2d 686 (2010). State's brief, page 7.[3] This means that citizens have

standing if they have some individual interest in the subject matter of the complaint that

is not common to all the citizens of the state. 487 Mich at 356. Plaintiff retirees and

vested employees meet such a test. Their pension benefits are in danger of being reduced

or eliminated if the Governor is allowed to authorize a Chapter 9 bankruptcy filing. The

Detroit Emergency Manager is threatening precisely that now, in an effort to coerce the

plaintiffs' agreement to "significant cuts" in their vested retirement benefits. Other

citizens of the state do not have such an interest. Plaintiffs have standing to seek

injunctive relief.[4]

Defendants also argue that Public Act 436 expressly states (at MCL 141.1572)

that it provides no cause of action. State's brief, pages 7-8. But plaintiffs are not suing for

a violation of Public Act 436; they are suing over an abridgement of their constitutional

---

[3]     Despite the dissent in *Lansing School Education Ass'n* and the changing composition of the Court, the Court has given no indication that it intends to retreat from this position. To the contrary. See, *Ader v Delta College Bd of Trustees,* 493 Mich 887; 822 NW2d 221 (2012) (vacating order that had granted leave to appeal from a decision of the Court of Appeals applying *Lansing School Education Ass'n* and denying application for leave) (J. Markman dissenting).

[4]     Additionally, although not at issue with respect to plaintiffs' pending motion for preliminary injunction, this Court clearly has jurisdiction to issue a declaratory judgment under MCR 2.605. An "actual controversy" under that court rule exists when a judgment is necessary to guide a parties' future conduct in order to preserve legal rights. *UAW v Central Michigan University,* 295 Mich App 486, 495; 815 NW2d 132 (2012). In granting such relief "courts are not precluded from reaching issues before actual injuries or losses have occurred." *Id.* Accord, *Huntington Woods v Detroit,* 279 Mich App 603, 616; 761 NW2d 127 (2008); *Lake Angelus v Aeronautics Comm,* 260 Mich App 371, 376-77; 676 W2d 642 (2004).

rights.[5] A Michigan court of general jurisdiction is the proper forum for a citizen of Michigan to bring a claim of a state constitutional violation. And the relief plaintiffs seek is available through this Court. MCR 3.310 and 2.605.

E. **Plaintiffs' Constitutional Claims Are Ripe for Review.** Defendants argue that plaintiffs' constitutional claims are not ripe because the bankruptcy filing has not yet occurred. State's brief, pages 11-12. Incredibly, they argue this knowing that the Emergency Manager has announced that he will seek to extinguish plaintiffs' Article 9, Section 24 rights should he file a Chapter 9 in response to their failure to agree now to "significant cuts" in their pensions.

One short, practical answer is that a bankruptcy filing may well ring a bell that cannot be unrung: the trumping of plaintiffs' constitutional rights by federal law, after the sovereign has waived – through the Governor's authorization for a Chapter 9 – whatever rights the State has under the Tenth Amendment to the federal Constitution to insist on the supremacy of the State Constitution. See, *In re City of Vallejo, supra,* 403 BR 72 (Bankr ED Cal 2009)(copy attached). That is the legal opinion of the Detroit Emergency Manager (an opinion that plaintiffs have little reason to doubt for purposes of this motion[6] and that defendants do not dispute in their brief): that federal law will trump

---

[5] The plaintiffs' pension plan gives them a right to bring such a suit. See Section 47-3-11(i)(1) of the General Retirement System Pension Plan which is also Ord. No. 29-01, § 1, 11-30-01 and is available on-line at www.rscd.org.

[6] Plaintiffs, of course, reserve the right in bankruptcy court to argue to the contrary. But we note, for example, the holding of federal bankruptcy court in *Vallejo*: "Therefore, "by authorizing the use of chapter 9 by its municipalities, California must accept chapter 9 in its totality; it cannot cherry pick what it likes while disregarding the rest." *In re County of Orange,* 191 B.R. 1005, 1021 (Bankr. CD Cal 1996) ... Since the state must consent to a bankruptcy filing under Section 109(c)(2) [of the Bankruptcy Code], the state consents to the displacement of its own law in order to obtain the benefits uniquely available under the Bankruptcy Code." 403 BR at 76.

9

Article 9, Section 24 of the Michigan Constitution. See the Detroit Emergency Manager's 14 June 2013 statement to the Detroit Free Press Editorial Board quoted at ¶ 22 of the amended verified complaint. ("If we don't reach an agreement one way or the other, we feel fairly confident that the state federal law, federalism, will trump state law or negotiate.") Or put in plain terms, the constitutional rights plaintiffs are relying on here will then be a nullity.

A second short, practical answer is that the threats to ignore Article 9, Section 24 are ongoing and are being used to browbeat plaintiffs (and others) into a deal that would avoid bankruptcy but ignore their constitutional rights. Defendants admit as much at the conclusion of their brief when they urge this Court to grant their motion to dismiss now "to avoid adversely impacting the City of Detroit Emergency Manager's current efforts to reach a consensus that could achieve some financial stability for the City without recourse to bankruptcy. " State brief, page 16. We know from the verified and unrebutted complaint that the "consensus" will be reached, if at all, in violation of plaintiffs' rights. Defendants would then undoubtedly argue that any attack on that "consensus" agreement would be moot or in some other way immune to attack. The time for this issue to be decided is now.

And the law supports such a common sense finding that this case is ripe for decision now. All that is required is that "a genuine controversy exist between the parties." *Michigan Chiropractic Council v Comm'r of Ins,* 475 Mich 363, 381; 716 NW2d 561 (2006). A claim lacks ripeness only where "the harm asserted has [not] matured sufficiently to warrant judicial intervention …" *Id.,* quoting from *Warth v Seldin,* 422 US 490, 499 n 10. A genuine controversy exists here and now. Plaintiffs are fighting

10

13-53846-tjt Doc 2146 Filed 12/18/13 Entered 12/18/13 16:02:07 Page 150 of 462   149

for their future financial well-being. And that fight will be over before it begins absent judicial intervention now.

   **F.   Plaintiffs Have Stated a Claim**.  Defendants' argument that plaintiffs have failed to state a claim is entirely based on the mistaken premise that plaintiffs are bringing a facial challenge to Public Act 436. State brief, page 12. Plaintiffs' claim is that the receivership under which the City of Detroit is currently operating is currently ignoring the Article 9, Section 24 rights of the City's' retirees (this is supported with multiple and direct statements from the Detroit Emergency Manager) and that in these circumstances (and this part of the complaint is in caps, bolded and underlined at the top of page 4) "it would be unconstitutional for the governor to authorize the Detroit Emergency Manager to proceed under Chapter 9." This states a claim.

   **G.   Plaintiffs Have Met the Prerequisites for Injunctive Relief**. Defendants argue first that plaintiffs will not suffer irreparable harm if an injunction is not issued. State's brief, page 13. Defendants do not even attempt to argue that the loss or in the words of the Detroit Emergency Manager the "significant cuts" in plaintiffs' vested pension benefits would not constitute irreparable harm. Rather they argue that plaintiffs will have a remedy in bankruptcy. Not according to the Detroit Emergency Manager. And he would be speaking for the debtor in bankruptcy.

   Second, defendants argue that the balance of harms favors them by using a claim of urgency, all as part of an argument that completely fails to account for the derogation of Michigan Constitutional rights that they intend to cause. State's brief, pages 13-14. Put another way, the defendants claim that our State Constitution can be ignored if the Governor and his agents decide that following it would complicate matters in a municipal

11

receivership. This would surprise the framers of our State Constitution, one of whom stated that the then new Article 9, Section 24 meant that a public employee with vested pension benefits, "would have the entire assets of the employer at his disposal from which to realize those benefits." 1 Official Record, Constitutional Convention 1961, p 774.

Third, defendants argue the public interest. State's brief, pages 14-15. Certainly, the public interest would be served if the Governor were to be precluded from authorizing a bankruptcy that would threaten the abrogation of constitutional rights. The people, in adopting their Constitution, including Article 9, Section 24, have spoken in that regard. And just as certainly, the public interest would not be served if the Detroit Emergency Manager were to be allowed to continue down his path all the while ignoring those constitutional rights.

## CONCLUSION

Plaintiffs are entitled to know whether their Article 9, Section 24 constitutional rights have any meaning in the current Detroit financial emergency. And they are entitled to know that now, and to have those rights protected. The plaintiffs' motion for preliminary injunction should be granted.

Respectfully submitted,

s/William A. Wertheimer
William A. Wertheimer (P26275)
Attorney for plaintiffs
30515 Timberbrook Lane
Bingham Farms, MI 48025
248-644-9200

Andrew Nickeloff (P37990)
Marshall J. Widick (P53942)
James A. Britton (P71157)

12

Attorneys for plaintiffs
Sachs Waldman
1000 Farmer
Detroit, MI 48226
313-496-9429
anickelhoff@sachswaldman.com


mwidick@sachswaldman.com
jabritton@sachswaldman.com

Dated: 18 July 2013

<table>
<tr><td colspan="2" align="center">PROOF OF SERVICE</td></tr>
<tr><td colspan="2">THE UNDERSIGNED CERTIFIES THAT ON 18 JULY 2013 THE FOREGOING INSTRUMENT WAS SERVED UPON THE FOLLOWING:</td></tr>
</table>

1. Thomas Quasarano
2. Brian Devlin
3.

BY:

| X | U.S. MAIL | | | FAX |
|---|-----------|---|---|-----|
| | HAND DELIVERY | | | U.S.EXPRESS MAIL |
| | UPS | | X | OTHER: email |

BY:
SIGNATURE: _W.W.Petitt_

# STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

ROBBIE FLOWERS, MICHAEL WELLS,
JANET WHITSON, MARY WASHINGTON and
BRUCE GOLDMAN

<center>Plaintiffs,</center>

vs.

Case No. 13-729-CZ
Hon. Rosemarie Aquilina

RICK SNYDER, as the Governor of the State
of Michigan; ANDY DILLON, as the Treasurer of
the State of Michigan; and the STATE OF MICHIGAN,

<center>Defendants.</center>

_____/

William A. Wertheimer (P26275)
Attorney for plaintiffs
30515 Timberbrook Lane
Bingham Farms, MI 48025
248-644-9200
billwertheimer@gmail.com

Andrew Nickeloff (P37990)
Marshall J. Widick (P53942)
James A. Britton (P71157)
Attorneys for plaintiffs
Sachs Waldman
1000 Farmer
Detroit, MI 48226
313-496-9429
anickelhoff@sachswaldman.com
mwidick@sachswaldman.com
jabritton@sachswaldman.com

Thomas Quasarano (P27982)
Brian Devlin(P34685)
Assistant Attorneys General
PO Box 30754
Lansing, MI 48909
quasaranot@michigan.gov

_____

## AFFIDAVIT OF MICHAEL NICHOLSON

State of Michigan

County of Wayne

Michael Nicholson, being first duly sworn, states as follows:

1. My name is Michael Nicholson. I am a citizen of the State of Michigan. I am employed as General Counsel by International Union, UAW. I make this affidavit based on personal knowledge.

2. On June 28, 2013, I received the email message attached hereto as Exhibit A from David Birnbaum, a lawyer with the Jones Day law firm, which is lead counsel to the Emergency Manager for the City of Detroit.

3. On July 9, 2013, I sent the email message attached hereto as Exhibit B to Mr. Birnbaum and his colleague at Jones Day, Dan Merrett.

4. Since July 9, 2013 until the time that I signed this affidavit today, I have received no response from anyone at Jones Day to the questions that I raised in Exhibit B with respect to pension benefits and Article 9, Section 24 of the Michigan Constitution.

Further Affiant sayeth not.

_____
Michael Nicholson

Subscribed and sworn to before me this 18th day of July 2013.

_Nancy S. Dennis_
Nancy S. Dennis, Notary Public
County of Macomb
State of Michigan
Acting in Wayne County
My commission expires February 10, 2017

NANCY S DENNIS
Notary Public - Michigan
Macomb County
My Commission Expires Feb 10, 2017
Acting in the County of _Wayne_

2

**From:** David Birnbaum <dbirnbaum@jonesday.com>
**Subject:** City of Detroit -- Pension Restructuring Discussions (GRS)
**Date:** June 28, 2013 4:42:56 PM EDT
**To:** MNicholson@uaw.net
**Cc:** Evan Miller <emiller@JonesDay.com>, Brian Easley <beasley@JonesDay.com>, "David G. Heiman" <dgheiman@JonesDay.com>, Heather Lennox <hlennox@JonesDay.com>

_____

2 Attachments, 4 KB

Dear Mr. Nicholson:

Following the presentations made on June 20th, outside counsel for GRS reached out to the City of Detroit for more information on, and to discuss, a pension restructuring proposal. GRS and the City of Detroit have tentatively scheduled a meeting on pension restructuring for Wednesday, July 10th, at 1 pm (location to be determined). The City will be prepared to provide more information on its developing pension restructuring proposal. Because the City expects that the proposal will impact the pension benefits of active participants of GRS, who include your members, the City would like to invite you to this meeting on July 10th, at 1 pm to participate in the discussion. We expect the meeting will last approximately 2 hours. GRS will be sending an advisor-only team (attorneys and financial advisors), and the City believes this is a good way to proceed. Please let us know at your earliest convenience if you will attend and the names of the attendees. We will contact you as soon as practicable to provide details about the meeting location.

Regards,

David



**David S. Birnbaum**
_____
77 West Wacker Drive, Suite 3500 • Chicago, IL 60601
**DIRECT** 312.269.4005 • **FAX** 312.782.8585 • **EMAIL** dbirnbaum@jonesday.com

=========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
=========

# Exhibit A



From: Michael Nicholson <mnicholson@uaw.net>
Subject: Re: Detroit - Data room access/ July 10 and 11 meetings
Date: July 9, 2013 1:57:49 PM EDT
To: Dan Merrett <dmerrett@JonesDay.com>, "David S. Birnbaum" <dbirnbaum@jonesday.com>
Cc: Marshall Widick <mwidick@sachswaldman.com>, Andrew Nickelhoff <anickelhoff@sachswaldman.com>

---

Dear Messrs. Merrett and Birnbaum:

UAW has requested access to the City of Detroit data room maintained by your firm. You have responded by proffering a proposed nondisclosure agreement and release, and have made UAW's execution of such documents a condition of our access to the data room.

Please explain the legal basis for conditioning UAW's access to whatever information is obtainable through the City of Detroit data room upon our execution of the confidentiality agreement and release that you have proferred. As you know, UAW has often signed confidentiality agreement with private corporations going through financial restructurings. However, in this instance, we are dealing with a public entity, the City of Detroit. I would like to understand the basis for withholding data room information with respect to the City of Detroit based on claims of confidentiality.

As to the meetings concerning pensions and OPEB that your firm, on behalf of Mr. Orr, is conducting on July 10 and 11, 2012, we wish to attend the meetings, but reserve all rights with respect to the meetings and to such position(s) that Mr. Orr and/or your firm may seek to take with respect to such meetings.

Further to that reservation of rights, UAW continues to seek an answer from Mr. Orr and your firm to the following: please cite the basis for any claim that the UAW has the authority to compromise the vested benefits of active and/or retired UAW or former UAW members employed or formerly employed by the City of Detroit and its affiliates. As I presume you know, Article IX, Section 24 of the Michigan Constitution provides in pertinent part that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Please tell me what authority your firm and/or Mr. Orr believe gives the UAW the right to compromise vested pension benefits, despite the contrary provisions of Article IX, Section 24. Please also tell us whether Mr. Orr and/or your firm take the position that Article IX, Section 24 of the Michigan Constitution is not or may not be binding on the City of Detroit, the State of Michigan, Governor Snyder, Mr. Orr or the UAW and state, if that is the case, under what circumstances you believe that Article IX, Section 24 would not bind some or all of these persons or entities. We also seek an answer to the same questions with regard to vested post-retirement insurance benefits, but as to such the question is posed with the additional need to consider, inter alia, the holding of the United States Supreme Court in *Chemical Workers v. Pittsburgh Plate Glass*, 404 U.S. 157 (1971), which states at its footnote 20 that "[u]nder established contract principles, vested retirement rights may not be altered without the pensioner's consent."

We do not understand the July 10 and 11 multiple stakeholder meetings to which we have been invited to be a forum for negotiation of your proposed pension and retiree health care changes, but are willing to attend to obtain for our union whatever information may be provided at those meetings. Your full answers to the questions posed in the foregoing paragraphs of this message will help the UAW determine the scope of any such negotiations and the UAW's decisions regarding its representative capacity in them, about which your firm has inquired.

Please provide me with the exact location of the July 10 and 11 meetings.

Thank you.

Michael Nicholson
General Counsel - International Union, UAW
Solidarity House - 8000 East Jefferson Avenue
Detroit, Michigan 48214
UAW Office Phone: 313.926.5216
Cell Phone: 734.719.0850
Email: mnicholson@uaw.net

**Exhibit B**

*****************************************
*This e-mail message from Michael Nicholson is for the sole use of
the intended recipient(s) and may contain confidential and privileged
information. Any unauthorized review, use, disclosure or distribution is*

# EXHIBIT 2

```
 1                        STATE OF MICHIGAN
           30TH JUDICIAL CIRCUIT COURT FOR THE COUNTY OF INGHAM
 2                          CIVIL DIVISION

 3    THE GENERAL RETIREMENT SYSTEM
      OF THE CITY OF DETROIT, and THE
 4    POLICE AND FIRE RETIREMENT SYSTEM
      OF THE CITY OF DETROIT,
 5
                          Plaintiffs,
 6    v                                   Case No. 13-768-CZ
                                          Hon. Rosemarie Aquilina
 7    KEVYN D. ORR, in his official capacity
      as the EMERGENCY MANAGER OF THE CITY OF
 8    DETROIT, and RICHARD SNYDER, in his
      official capacity as the GOVERNOR OF THE
 9    STATE OF MICHIGAN,

10                        Defendants.
      _____/
11    GRACIE WEBSTER and
      VERONICA THOMAS,
12
                          Plaintiffs,
13    v                                   Case No. 13-734-CZ
                                          Hon. Rosemarie Aquilina
14    THE STATE OF MICHIGAN; RICHARD
      SNYDER, as Governor of the State
15    of Michigan; and ANDY DILLON,
      as Treasurer of the State of
16    Michigan,
                          Defendants.
17    _____/
      ROBBIE FLOWERS, MICHAEL WELLS,
18    JANET WHITSON, MARY WASHINGTON,
      and BRUCE GOLDMAN,
19
                          Plaintiffs,
20    v                                   Case No. 13-734-CZ
                                          Hon. Rosemarie Aquilina
21    RICK SNYDER, as the Governor of the
      State of Michigan; ANDY DILLON, as
22    the Treasurer of the State of Michigan;
      and the STATE OF MICHIGAN,
23
                          Defendants.
24    _____/

25                 MOTION FOR PRELIMINARY INJUNCTION
```

                                                                    1

```
 1              BEFORE THE HON. ROSEMARIE AQUILINA, CIRCUIT JUDGE

 2              Ingham County, Michigan - Thursday, July 18, 2013

 3

 4         APPEARANCES:

 5         For Plaintiffs Retirement Systems:
                              RONALD A. KING (P45088)
 6                            MICHAEL J. PATTWELL (P72419)
                              CLARK HILL PLC
 7                            212 East Grand River Ave.
                              Lansing, MI 48906
 8         For Plaintiffs Webster, et al.:
                              JOHN R. CANZANO (P30417)
 9                            Smith & Radtke, PC
                              400 Galleria Officentre, Ste. 117
10                            Southfield, MI  48034

11         For Plaintiffs Flowers, et al.:
                              WILLIAM A. WERTHEIMER (P26275)
12                            Attorney at Law
                              30515 Timberbrook Lane
13                            Bingham Farms, MI  48025

14         For the Defendants:   THOMAS QUASARANO (P27982)
                              Assistant Attorney General
15                            State Operations Division
                              P.O. Box 30754
16                            Lansing, MI 48909

17

18

19         REPORTED BY:         Melinda I. Dexter, RMR, RPR, CSR-4629
                              Official Court Reporter
20                            313 W. Kalamazoo
                              Post Office Box 40771
21                            Lansing, MI  48901-7971

22

23

24

25
```

```
 1                    T A B L E    O F    C O N T E N T S

 2

 3

 4

 5        WITNESSES:

 6              None

 7

 8

 9

10

11        EXHIBITS:

12              None

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1 Ingham County, Michigan
2 Thursday, July 18, 2013 - At 4:15 p.m.
3 MR. KING: Good afternoon.
4 THE COURT: Good afternoon. We have everybody
5 here?
6 MR. KING: They are.
7 THE COURT: All right. This is Docket
8 13-768-CZ, the General Retirement System of the City of
9 Detroit and the Police and Fire Retirement System of the
10 City of Detroit versus Kevin D. Orr, in his official
11 capacity as the Emergency Manager of the City of Detroit,
12 and Richard Snyder, in his official capacity as the
13 Governor of the State of Michigan.
14 Counsel, your appearances for the record.
15 MR. KING: Good afternoon, your Honor. Ron
16 King with Clark Hill on behalf of the Plaintiffs, the
17 General Retirement System of the City of Detroit and the
18 Police and Fire Retirement System of the City of Detroit.
19 THE COURT: Welcome.
20 MR. KING: Thank you.
21 MR. QUASARANO: Your Honor, if I may, Thomas
22 Quasarano, Assistant Attorney General, that will be
23 appearing in this case on behalf of the Defendant. I
24 believe the Defendant was served yesterday. We have not
25 received a request for representation, but I'm very

4

1 likely going to be asked to represent the Governor.
2 THE COURT: Sir?
3 MR. WERTHEIMER: Excuse me, your Honor,
4 William Wertheimer. I apologize for my dress.
5 THE COURT: No problem. I know it's last
6 minute. I don't care how people are dressed. It's more
7 important that you are here.
8 MR. WERTHEIMER: Thank you, your Honor. I was
9 here to file my reply brief today for the Monday hearing.
10 I am now here knowing that this motion has been filed,
11 and I wanted to enter my appearance.
12 THE COURT: All right. You may have a seat.
13 There is plenty of room for all.
14 MR. WERTHEIMER: Thank you.
15 MR. CANZANO: Your Honor, excuse me, John
16 Canzano, Plaintiffs' attorney in the Webster case. Same
17 as Mr. Wertheimer, we just found out about this. I'm
18 here. My reply brief is being filed. I have a judge's
19 copy here somewhere.
20 THE COURT: All right. Have a seat.
21 MR. KING: Your Honor --
22 THE COURT: Anybody else?
23 MR. PATTWELL: Your Honor, Michael Pattwell
24 from Clark Hill on behalf of Plaintiffs, as well.
25 THE COURT: Thank you.

5

1 Counsel?
2 MR. KING: Your Honor, Ron King again on behalf
3 of the Plaintiffs, the Detroit Retirement Systems. We
4 might need to beg the Court's indulgence. While we
5 appreciate that you have seen us on very short notice,
6 we've been advised that the City has filed, and we're
7 pulling it up on the electronic filing system, so we
8 might need a few minutes here to figure out our very next
9 step.
10 THE COURT: Okay.
11 MR. KING: Because the effect of a bankruptcy
12 filing, if, in fact, that's -- we're trying to conform
13 that. We think, in fact, it has been filed here within
14 the last half hour. So we probably need about a
15 ten-minute recess here, if the Court would indulge us. I
16 know you have another matter.
17 THE COURT: Do we want to make a phone call?
18 MR. KING: Yeah. We can, but we're pretty --
19 THE COURT: Well, here's the thing: If they
20 haven't filed, we need to hurry up and proceed. If they
21 have filed --
22 MR. KING: We're pretty confident that they
23 filed.
24 Right?
25 I mean, we're pulling it up. Yeah. It's been

6

1 confirmed. So I'm not sure where that leaves us with
2 this proceeding because it's going to be pretty hard to
3 undue. It's been done.
4 MR. WERTHEIMER: There is no automatic stay in
5 this.
6 MR. KING: Yeah. What we're here for -- the
7 really --
8 What counsel is saying is there is no automatic
9 stay with respect to this proceeding. So in our
10 judgment, this matter will proceed. What you have before
11 you, however, is a motion for temporary restraining order
12 to enjoin certain conduct that's already occurred. So
13 I'm not sure that we really have a lot of business in
14 front of the Court at this moment, but I would like to
15 just confer for about ten minutes on that issue because
16 we will proceed in the case. And if we're here and you
17 want to take the time to set some sort of expedited
18 briefing schedule, we could do that also.
19 It's quite likely that you, your Honor, will be
20 able to make a ruling on the merits of this case in
21 advance of whatever occurs in the context of a Chapter 9
22 filing.
23 THE COURT: I plan on making a ruling on
24 Monday. I could make a ruling tomorrow, if push came to
25 shove, but Monday would probably be soon enough. I am

7

confident that the bankruptcy court won't act as quickly

1 confident that the bankruptcy court won't act as quickly
2 as I will.
3     MR. KING: Yeah. I'm not sure, but we'll see.
4 I mean, there might -- but, nevertheless, so we should --
5     If you're prepared to rule on the merits on
6 Monday, again I'm not sure what -- if there is much
7 business for us left to do before the Court today.
8     THE COURT: Unless some kind of -- I don't
9 really have any authority over them, so.
10     MR. KING: Right.
11     THE COURT: I don't think anything --
12 Counsel?
13     MR. WERTHEIMER: Your Honor, the motion that's
14 up for Monday, our motion at least that's up for Monday,
15 is a request for a preliminary injunction to enjoin the
16 Governor. We have no evidence the Governor has
17 authorized any bankruptcy, and we would not only want to
18 go forward on Monday but ask that the motion for
19 preliminary injunction be moved up to now, hopefully, to
20 tomorrow morning if the Court will not hear it now. But
21 I don't think there is any reason why the Court cannot
22 hear our motion for preliminary injunction.
23     I'm not talking about in terms of the Court's
24 preparedness but in terms of the apparent filing. They
25 may have filed. But nobody -- I asked the Governor's

8

1 Office before we came in here -- er, the Attorney General
2 whether they could make any representations to me that
3 would obviate the need for me going forward, and they
4 could not.
5     So we've got a written, fully briefed request/
6 motion for preliminary injunction. The Attorney
7 General's Office has briefed it. Time is obviously of
8 the essence. I would suggest that the Court hear our
9 motion to preliminarily enjoin the Governor authorizing a
10 bankruptcy now.
11     MR. CANZANO: Your Honor, I would make
12 essentially the same request except that our motion,
13 although it seeks preliminary injunctive relief in the
14 alternative, it primarily seeks a final declaratory
15 judgment that what has just happened, apparently, is
16 unconstitutional, and that is ready for a final decision
17 we were saying on Monday. We have a reply brief that has
18 just been filed, and we would -- we could -- this Court
19 could issue that order immediately, and I don't know what
20 the consequences for the bankruptcy court would be,
21 necessarily, but I think it would -- it might make a
22 difference.
23     MR. WERTHEIMER: I'm sorry, and I think that at
24 a minimum, your Honor, I think we should -- I think the
25 Court should decide the preliminary injunction now, but

9

1 we should find out from the Office of the Attorney
2 General whether the Governor has authorized a bankruptcy
3 that has done the act that we were attempting to enjoin
4 and that they knew we were attempting to enjoin and that
5 they've known for the last two weeks and that they're
6 filing briefs on saying that it's not ripe. The
7 attorneys for the Government have represented to this
8 Court that our motion is not ripe.
9     THE COURT: I just received a note from my law
10 clerk that says the bankruptcy was filed at 4:06.
11     MR. KING: Right. Your Honor, so what we'd
12 like to do here is amend our emergency motion for
13 temporary restraining order and get it and request from
14 this Court an order enjoining the Governor and the
15 Emergency Manager from taking any further action in the
16 bankruptcy proceeding, and we'll modify our order to that
17 effect.
18     MR. WERTHEIMER: I would join that as to the
19 Governor. We have not sued the Detroit Emergency
20 Manager, but I would orally join in that motion as to the
21 Governor and the Secretary of the Treasury.
22     MR. CANZANO: I would say the same in our case.
23 We're not joining their motion but we're making a motion
24 in our case that would be the same as theirs only against
25 the Governor.

10

1     THE COURT: Granted, as to all of your
2 requests.
3     How soon are you going to present me with an
4 order?
5     MR. KING: Right now.
6     THE COURT: All right.
7     MR. KING: We just need to mark up the order
8 that we have for the Court.
9     THE COURT: Absolutely.
10     MR. QUASARANO: Your Honor, if I may, we would
11 ask that the Court stays enforcement of the order, and
12 your ruling on that would be appreciated at this time.
13     THE COURT: Denied.
14     MR. QUASARANO: Thank you. We'll present an
15 order as soon as possible.
16     THE COURT: Thank you.
17     MR. QUASARANO: Thank you, Judge.
18     MR. WERTHEIMER: Your Honor, we will need a few
19 minutes to prepare a written order, but if we can --
20     THE COURT: Well, sir, would you like to copy
21 that and modify what they're doing? My law clerk will be
22 happy to help you.
23     MR. WERTHEIMER: Thank you, your Honor.
24     THE COURT: As to your stay, you'll be getting
25 that to me in --

11

1 MR. QUASARANO: Maybe I can just make a call
2 and get an order over to you right yet today.
3 THE COURT: Sure. You can even handwrite it.
4 I don't care how we do it. You can run it over here, fax
5 it over here; whatever gets you the job done. Time is of
6 the essence.
7 MR. QUASARANO: I appreciate that.
8 MR. KING: (Approaching the bench.)
9 Your Honor, Ron King again on behalf of the
10 Plaintiffs. If we could go back on the record.
11 THE COURT: Excuse me.
12 MR. KING: We'd like to set the sequence of
13 events in terms of how things have transpired in the last
14 hour, if you will. Just for the record, our motion for
15 emergency temporary restraining order was filed at
16 3:37 p.m.; that is, today, July 18th. We promptly, well
17 in advance of 4 o'clock and probably within -- well,
18 actually, we had delivered prior to the filing time at
19 3:37 judge's copies to chambers for your review.
20 Then we waited for the Attorney General, who
21 doesn't feel compelled to make an appearance here in this
22 case because he hasn't actually been officially retained
23 yet, but, nevertheless, as a courtesy we waited for him
24 to appear, which he came upstairs sometime around 4:10.
25 We understand the bankruptcy filing was at 4:05?

12

1 THE COURT: 4:06.
2 MR. KING: 4:06. The Court took the bench at
3 approximately 4:20. And to the extent your Honor has had
4 an opportunity to read the papers and was inclined to
5 make a ruling, if you'd be willing to put that on the
6 record, then in the -- when we do seek dismissal of the
7 bankruptcy proceeding, we'll have some clear record of
8 the sequence of events here.
9 MR. WERTHEIMER: Just to add, in terms of the
10 sequence of events, I did advise by telephone
11 Mr. Quasarano of the fact that I would be in court and
12 that it was my understanding that Clark Hill was going to
13 be in court seeking a temporary restraining order. I
14 talked to him by phone before 4 this afternoon, sometime
15 between 3:30 and 4.
16 MR. QUASARANO: And I could confirm that
17 Mr. Wertheimer gave me the professional curtesy of
18 letting me know that there was a hearing being planned.
19 I had no -- we have no personal knowledge in our division
20 of a bankruptcy being filed any certain time or date, so
21 there is nothing we could provide in terms of a response
22 that there is going to be a bankruptcy filed. So we
23 learned it as everyone else learned.
24 THE COURT: All right. And obviously I heard
25 this was happening. I had another hearing that was

13

1 supposed to take place at 4 o'clock, and I understood
2 this was a very important issue, and we obviously have a
3 hearing scheduled, another hearing scheduled, at
4 9 o'clock on Monday.
5 So I advised my law clerk that we had a
6 4 o'clock hearing that wasn't going to take very long,
7 and whenever you all got here and that we would wait for
8 all of the attorneys, we would then have a hearing and to
9 let me know when everybody was in place and then I would
10 come out.
11 So that's exactly what happened. She let me
12 know everybody was in place, gave me the paperwork to look
13 over, and, of course, I did just that. And we got out of
14 here as quickly as we could, obviously not in time
15 because 4:06 occurred and they did what they were going
16 to do, which I know you all raised here.
17 I did have an opportunity to -- with review of
18 what was filed, and you're asking me what I would have
19 done, and it was my intention, after reviewing what you
20 had filed, in addition to other research that my capable
21 externs from Cooley and from Michigan State, as well as
22 my very capable law clerk pulled for me, I reviewed
23 constitutional provisions, I reviewed legislative intent,
24 I reviewed what you all provided me, I reviewed a lot of
25 information in the last few hours, and it was my

14

1 intention to grant you your request completely.
2 MR. KING: Thank you, your Honor. Appreciate
3 your clarifying the record.
4 MR. WERTHEIMER: Thank you, your Honor.
5 Your Honor, we have a proposed order.
6 THE COURT: You may approach. Thank you.
7 MR. WERTHEIMER: Thank you. It is handwritten.
8 (Approaching the bench.)
9 THE COURT: No problem.
10 MR. WERTHEIMER: And for caption, it just says,
11 at this point, Flowers Caption.
12 THE COURT: Okay.
13 MR. WERTHEIMER: I had some help in drafting
14 too if you can't read the --
15 THE COURT: We'll make it work.
16 MR. WERTHEIMER: Okay. Thank you, Judge.
17 MR. KING: We may be back tomorrow, your Honor.
18 MR. WERTHEIMER: We may be back too,
19 your Honor. And if we are, I will be in a suit.
20 THE COURT: It's okay. As long as your body is
21 covered, I don't care what's it's covered with.
22 MR. KING: I think with respect to the present
23 motion before you, we have an order in place and
24 appreciate you making the accomodation and time for us
25 today. Thank you.

15

```
 1            THE COURT:  No problem.
 2            Now, if you're back tomorrow, what is it going
 3   to be for?
 4            MR. KING:  We might file a mandamus action
 5   requiring the EM to withdraw the Chapter 9 filing.
 6            THE COURT:  Will this require time on the
 7   record?
 8            MR. KING:  Yes.
 9            THE COURT:  Okay.  My time restriction is that
10   I have my morning free until about 1:30.  Can you get it
11   here before 1:30?
12            MR. PATTWELL:  Yes.
13            MR. KING:  Absolutely.
14            THE COURT:  I'll make myself available all
15   morning until 1:30.
16            MR. KING:  Thank you, your Honor.
17            THE COURT:  Okay.
18            MR. CANZANO:  May I approach, your Honor?  I
19   have an order drafted also.
20            THE COURT:  You may.
21            MR. CANZANO:  (Approaching the bench.)
22            THE COURT:  Okay.  We'll make you copies, and
23   this is our copy.
24            Anything else for the record?
25            MR. KING:  No, your Honor.  Thank you.
```
                                16

```
 1            MR. WERTHEIMER:  No, your Honor.  Thank you.
 2            THE COURT:  That's all for the record.  Thank
 3   you.
 4                (At 4:38 p.m., the matter is
 5                concluded.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```
                                17

```
1        STATE OF MICHIGAN)
                          ) SS.
2         COUNTY OF INGHAM)

3

4                        CERTIFICATE OF REPORTER

5

6               I, Melinda I. Dexter, Certified Shorthand

7        Reporter, do hereby certify that the foregoing

8        17 pages comprise an accurate, true, and complete

9        transcript of the proceedings and testimony taken in the

10       case of The General Retirement System of the City of

11       Detroit, et al., versus Kevyn D. Orr, et al., Case

12       No. 13-768-CZ, and Gracie Webster, et al., versus the

13       State of Michigan, et al., Case No. 13-734-CZ, and

14       Robbie Flowers, et al., versus Rick Snyder, et al., Case

15       No. 13-729-CZ, on Thursday, July 18, 2013.

16              I further certify that this transcript of the

17       record of the proceedings and testimony truly and

18       correctly reflects the exhibits, if any, offered by the

19       respective parties.  WITNESS my hand this the eighteenth

20       day of July, 2013.

21

22       _____
                         Melinda I. Dexter, RMR, RPR, CSR-4629
23                       Official Court Reporter
                         313 West Kalamazoo
24                       Post Office Box 40771
                         Lansing, Michigan 48901-7971
25
```

18

13-53846-tjt  Doc 2217  Filed 12/18/13  Entered 12/18/13 16:00:40  Page 166 of 462
13-53846-swr  Doc 146  Filed 07/24/13  Entered 07/24/13 13:22:47  Page 66 of 62      165

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

ROBBIE FLOWERS, MICHAEL WELLS,
JANET WHITSON, MARY WASHINGTON and
BRUCE GOLDMAN

           Plaintiffs,

vs.

           Case No. 13-729-CZ
           Hon. Rosemarie Aquilina

RICK SNYDER, as the Governor of the State
of Michigan; ANDY DILLON, as the Treasurer of
the State of Michigan; and the STATE OF MICHIGAN,

           Defendants.

_____/

William A. Wertheimer (P26275)
Attorney for plaintiffs
30515 Timberbrook Lane
Bingham Farms, MI 48025
248-644-9200
billwertheimer@gmail.com

Andrew Nickeloff (P37990)
Marshall J. Widick (P53942)
James A. Britton (P71157)
Attorneys for plaintiffs
Sachs Waldman
1000 Farmer
Detroit, MI 48226
313-496-9429
anickelhoff@sachswaldman.com
mwidick@sachswaldman.com
jabritton@sachswaldman.com

Thomas Quasarano (P27982)
Brian Devlin (P34685)
Assistant Attorneys General
PO Box 30754
Lansing, MI 48909
quasaranot@michigan.gov

## **PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION**[1]

---

[1]     This brief is in reply to defendants' response to plaintiffs' motion. It is not in response to defendants' motion for summary disposition. Plaintiffs will respond to that motion as provided for under MCR 2.116(G)(1)(a)(i) once defendants properly notice same. Plaintiffs do not agree to defendants' request that this Court (apparently at the hearing and after the fact) waive or adjust the response time provided in the court rules. State's brief, page 16.

Defendants' brief ignores (but does not dispute) the basic facts that plaintiffs allege and grossly mischaracterizes the nature of plaintiffs' claim. In Parts A and B below, we address these two defects in defendants' response. Then, in Parts C through G, we respond to the remainder of defendants' arguments in response to our request for a preliminary injunction.

**A. Undisputed Facts.** Plaintiffs' complaint is based on the undisputed fact that the Detroit Emergency Manager has publicly stated that Detroit retirees, employees and their unions must agree to significant cuts to their vested pension benefits outside of a Chapter 9 federal bankruptcy proceeding, and that if they fail to agree he will cut those benefits through operation of the federal bankruptcy code, based on the supremacy of the federal bankruptcy code over Article 9, Section 24 of the Michigan Constitution, which provides that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Since under Public Act 436 such a federal bankruptcy proceeding cannot be initiated by the Emergency Manager without authorization by Governor Snyder, plaintiffs have sued the Governor to stop such an authorization and the diminishment and impairment of vested Detroit pension benefits which will necessarily follow from it. In short, this litigation seeks to stop action by Governor Snyder that the plaintiffs allege to be unconstitutional under Article 9, Section 24, and does not seek a declaration that Public Act 436 is itself unconstitutional.

Since this litigation was commenced on 3 July 2013, the City of Detroit has again refused to accept or address the strictures of Article 9, Section 24. Thus, on 9 July 2013,

the General Counsel of the UAW – which is the collective bargaining representative of plaintiffs Robbie Flowers and Bruce Goldman – wrote the City's lawyers, asking them:

> please cite the basis for any claim that the UAW has the authority to compromise the vested benefits of active and/or retired UAW or former UAW members employed or formerly employed by the City of Detroit and its affiliates. As I presume you know, Article 9, Section 24 of the Michigan Constitution provides in pertinent part that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Please tell me what authority your firm and/or Mr. Orr believe gives the UAW the right to compromise vested pension benefits, despite the contrary provisions of Article 9, Section 24. Please also tell us whether Mr. Orr and/or your firm take the position that Article 9, Section 24 of the Michigan Constitution is not or may not be binding on the City of Detroit, the State of Michigan, Governor Snyder, Mr. Orr or the UAW and state, if that is the case, under what circumstances you believe that Article 9, Section 24 would not bind some or all of these persons or entities.

Affidavit of Michael Nicholson, Exhibit B. Mr. Nicholson wrote this email in part to accept an invitation sent to UAW and other unions and retiree groups to attend a meeting on 10 July 2013 with representatives of both the City of Detroit and the Detroit General Retirement System. Id., Ex. A.

Since this litigation was filed on July 3, the Detroit Emergency Manager has also continued to publicly take the position that vested pensions must be cut without regard to Article 9, Section 24 of the Michigan Constitution. See the video of his 5 July 2013 interview with Detroit Public Television's MiWeek program beginning at 14 minutes, www.youtube.com/watch?v=TspCsrXmkZA.

In addition, it is clear that the Detroit Emergency Manager is moving closer to a bankruptcy filing and that the Governor is directly involved. In an article this past Monday headlined "Detroit Bankruptcy Clock Ticking" Daniel Howes reported in the Detroit News: "The governor and Emergency Manager Kevyn Orr met Monday to

3

discuss the situation. Additional meetings with creditors, legal teams and the Snyder administration are scheduled this week to determine whether Orr and his team are making enough meaningful progress in their talks with creditors, unions and pension funds to delay a bankruptcy filing." See Exhibit A attached and available online at www.detroitnews.com/article/20130716/BIZ/307160025.

As these new facts show, the Emergency Manager continues to demand that unless unions and retiree groups agree to significant cuts in retiree benefits outside of bankruptcy, he will impose such cuts in bankruptcy, following the Governor's authorization to commence a Chapter 9 proceeding, in derogation of the constitutional rights guaranteed by Article 9, Section 24. See Amended Verified Complaint, ¶ 21-25. The factual basis for plaintiffs' complaint in this litigation is thus undisputed, and stands against defendants' claim that – contrary to the unchallenged facts – their concerns about their pensions and their rights are merely hypothetical and unripe because nothing is being done to harm them. To the contrary, real harm continues to take place now: the plaintiffs continue to be told that unless they agree to cuts in their vested pension benefits now, they will be imminently be imposed through a Chapter 9 bankruptcy proceeding authorized by the Governor.

**B.** **Mischaracterization of Plaintiffs' Complaint.** Defendants' claim that plaintiffs "bring a facial constitutional challenge" to Public Act 436. State's brief, page 1. Not so. Plaintiffs begin their complaint by stating that their constitutional right to vested pension benefits "are being violated [present tense] in the emergency financial management proceedings that the State has implemented in response to Detroit's fiscal crisis and whose rights will be threatened [future tense] with abrogation if Governor

4

13-53846-tjt Doc 22176 Filed 07/24/13 Entered 07/24/13 16:02:07 Page 30 of 462    169

Snyder authorizes the Detroit Emergency Manager to proceed under Chapter 9 in bankruptcy." Amended verified complaint, ¶ 1. Nowhere in their complaint do plaintiffs allege that Public Act 436 is unconstitutional on its face or otherwise. (Nor do they seek relief consistent with a facial challenge.) Mischaracterizing plaintiffs' allegations has three tactical advantages for defendants. First, it allows defendants to ignore the facts on the ground, facts upon which this civil action is based. Second, it allows defendants to make their arguments without acknowledging that plaintiffs' constitutional rights under Article 9, Section 24 are being threatened now. Third, it allows defendants to argue that they can protect these constitutional rights in bankruptcy, even though Detroit's Emergency Manager has flatly and uncategorically opined to the contrary. We address these points in what follows below.

**C.** **Plaintiff's Request for Injunctive Relief is Neither Premature, Overbroad nor Constitutionally Infirm.** Defendants here make four arguments against injunctive relief. None has merit.

1. First, defendants argue that no prohibitory injunction can be issued because declaratory relief has not as yet failed, citing dictum from *Strauss v Governor,* 459 Mich 526, 532; 592 NW2d 53 (1999). State brief, pages 4-5. The Court's dictum from *Strauss* is inapplicable here for at least three reasons. First, *Strauss* involved a fight between the Governor and the State Board of Education over which constitutional provision took precedence, Article 5, Section 2 or Article 8, Section 3. This case involves the State in the person of the Governor abrogating the constitutional rights of its citizens. That is a distinction that should make a difference. Second, this case involves a very public fight in which the Governor knows very well that his Emergency Manager is

refusing to recognize the Article 9, Section 24 rights of plaintiffs and thousands of other retirees. To require this Court to first issue declaratory relief in these circumstances elevates form over substance. Third, the bankruptcy filing may be imminent, such that there may be no time for the courtesy contemplated by *Strauss*. See, e.g., www.freep.com/article/20130718/news01/307180107/detroit-prepares-file-bankruptcy-soon-friday ("Detroit prepares to file for bankruptcy as soon as Friday") and www.youtube.com/watch?v=TspCsrXmkZA, beginning at 10 minute mark. With all that said, plaintiffs would have no objection if this Court fashioned the requested preliminary relief in the form of a declaration, but only if the Governor agrees not to act contrary to the declaration before the plaintiffs have the opportunity to return to this Court and seek a prohibitory injunction.

2. Defendants next argue that injunctive relief is premature given the opportunity for relief in bankruptcy court. State brief, page 5. They cite two Bankruptcy Code provisions: 11 USC §109(c) and 11 USC § 943(4). Neither protects against an impairment of pension benefits in violation of Article 9, Section 24. First, none of the disjunctive criteria in 109(c) for eligibility to proceed under Chapter 9 contain a basis for a challenge based on Article 9, Section 24. Second, the requirement in 11 USC § 943(4) that "the debtor is not prohibited by law from taking any action necessary to carry out the plan" may not protect Article 9, Section 24 rights because of the principle that "federal law trumps state law," which the Detroit Emergency Manager has indicated will be applied. To support this concern, we cited in our opening brief the bankruptcy court decisions in *In re City of Stockton, California,* 478 BR 8 (Bankr ED Cal 2012); and *In re City of Vallejo,* 403 BR 72 (Bankr ED Cal 2009), which we expect will be cited in a

Chapter 9 proceeding in support of the proposition that federal bankruptcy law supersedes Article 9, Section 24 of the Michigan Constitution.

3.    Defendants also argue that the injunction request is overbroad because "[t]his Court cannot determine, based on the record Plaintiffs present, how any bankruptcy proceeding for the City of Detroit, if filed, may impact their pension benefits or if it will at all, until the bankruptcy plan is filed with the bankruptcy court and ultimately confirmed." State brief, page 6. But this claim that plaintiffs' concerns are only hypothetical ignores the Detroit Emergency Manager's stated intent and the terms of his proposal to creditors. And it also ignores the fact that if no relief is granted now, it will likely be too late after a bankruptcy filing to protect plaintiffs' rights under Article 9, Section 24. In other words, the result, if defendants' argument is accepted, is that by the time the harm comes the citizens of the State of Michigan who are Detroit pensioners will be unable to sustain their State constitutional rights. That is precisely the plan to violate Article 9, Section 24 of the Michigan Constitution that we believe the Governor will facilitate at the request of the Emergency Manager, absent the relief we request.[2]

4.    Defendants further argue that the plaintiffs' injunction request is mandatory. State brief, page 6. It is not. As defendants recognize in making other of their arguments, the relief sought by plaintiffs' pending motion is, by its terms, clearly prohibitory.

---

[2]    The motion before the Court is a motion for preliminary injunction, not a request for final relief. While we recognize the sensitivity of this issue and this litigation, the Court should consider the appropriateness of limited discovery on the issue of communications between the Governor, the defendant State Treasurer and the Emergency Manager (and their staff and other agents) with respect to City of Detroit vested pension benefits. Thus, even it plaintiffs are found to lack standing to seek injunction, this civil action may still proceed on the claim in Complaint for declaratory relief.

7

**D.** **Plaintiffs Have Standing to Bring This Action.** Defendants recognize that the Michigan Supreme Court restored Michigan's limited, prudential approach to standing in *Lansing School Education Ass'n v Lansing Board of Education,* 487 Mich 349, 372; 792 NW2d 686 (2010). State's brief, page 7.[3] This means that citizens have standing if they have some individual interest in the subject matter of the complaint that is not common to all the citizens of the state. 487 Mich at 356. Plaintiff retirees and vested employees meet such a test. Their pension benefits are in danger of being reduced or eliminated if the Governor is allowed to authorize a Chapter 9 bankruptcy filing. The Detroit Emergency Manager is threatening precisely that now, in an effort to coerce the plaintiffs' agreement to "significant cuts" in their vested retirement benefits. Other citizens of the state do not have such an interest. Plaintiffs have standing to seek injunctive relief.[4]

Defendants also argue that Public Act 436 expressly states (at MCL 141.1572) that it provides no cause of action. State's brief, pages 7-8. But plaintiffs are not suing for a violation of Public Act 436; they are suing over an abridgement of their constitutional

---

[3]     Despite the dissent in *Lansing School Education Ass'n* and the changing composition of the Court, the Court has given no indication that it intends to retreat from this position. To the contrary. See, *Ader v Delta College Bd of Trustees,* 493 Mich 887; 822 NW2d 221 (2012) (vacating order that had granted leave to appeal from a decision of the Court of Appeals applying *Lansing School Education Ass'n* and denying application for leave) (J. Markman dissenting).

[4]     Additionally, although not at issue with respect to plaintiffs' pending motion for preliminary injunction, this Court clearly has jurisdiction to issue a declaratory judgment under MCR 2.605. An "actual controversy" under that court rule exists when a judgment is necessary to guide a parties' future conduct in order to preserve legal rights. *UAW v Central Michigan University,* 295 Mich App 486, 495; 815 NW2d 132 (2012). In granting such relief "courts are not precluded from reaching issues before actual injuries or losses have occurred." *Id.* Accord, *Huntington Woods v Detroit,* 279 Mich App 603, 616; 761 NW2d 127 (2008); *Lake Angelus v Aeronautics Comm,* 260 Mich App 371, 376-77; 676 W2d 642 (2004).

rights.[5] A Michigan court of general jurisdiction is the proper forum for a citizen of Michigan to bring a claim of a state constitutional violation. And the relief plaintiffs seek is available through this Court. MCR 3.310 and 2.605.

E. **Plaintiffs' Constitutional Claims Are Ripe for Review.** Defendants argue that plaintiffs' constitutional claims are not ripe because the bankruptcy filing has not yet occurred. State's brief, pages 11-12. Incredibly, they argue this knowing that the Emergency Manager has announced that he will seek to extinguish plaintiffs' Article 9, Section 24 rights should he file a Chapter 9 in response to their failure to agree now to "significant cuts" in their pensions.

One short, practical answer is that a bankruptcy filing may well ring a bell that cannot be unrung: the trumping of plaintiffs' constitutional rights by federal law, after the sovereign has waived – through the Governor's authorization for a Chapter 9 – whatever rights the State has under the Tenth Amendment to the federal Constitution to insist on the supremacy of the State Constitution. See, *In re City of Vallejo, supra,* 403 BR 72 (Bankr ED Cal 2009)(copy attached). That is the legal opinion of the Detroit Emergency Manager (an opinion that plaintiffs have little reason to doubt for purposes of this motion[6] and that defendants do not dispute in their brief): that federal law will trump

---

[5]    The plaintiffs' pension plan gives them a right to bring such a suit. See Section 47-3-11(i)(1) of the General Retirement System Pension Plan which is also Ord. No. 29-01, § 1, 11-30-01 and is available on-line at www.rscd.org.

[6]    Plaintiffs, of course, reserve the right in bankruptcy court to argue to the contrary. But we note, for example, the holding of federal bankruptcy court in *Vallejo*: "Therefore, "by authorizing the use of chapter 9 by its municipalities, California must accept chapter 9 in its totality; it cannot cherry pick what it likes while disregarding the rest." *In re County of Orange*, 191 B.R. 1005, 1021 (Bankr. CD Cal 1996) ... Since the state must consent to a bankruptcy filing under Section 109(c)(2) [of the Bankruptcy Code], the state consents to the displacement of its own law in order to obtain the benefits uniquely available under the Bankruptcy Code." 403 BR at 76.

Article 9, Section 24 of the Michigan Constitution. See the Detroit Emergency Manager's 14 June 2013 statement to the Detroit Free Press Editorial Board quoted at ¶ 22 of the amended verified complaint. ("If we don't reach an agreement one way or the other, we feel fairly confident that the state federal law, federalism, will trump state law or negotiate.") Or put in plain terms, the constitutional rights plaintiffs are relying on here will then be a nullity.

A second short, practical answer is that the threats to ignore Article 9, Section 24 are ongoing and are being used to browbeat plaintiffs (and others) into a deal that would avoid bankruptcy but ignore their constitutional rights. Defendants admit as much at the conclusion of their brief when they urge this Court to grant their motion to dismiss now "to avoid adversely impacting the City of Detroit Emergency Manager's current efforts to reach a consensus that could achieve some financial stability for the City without recourse to bankruptcy. " State brief, page 16. We know from the verified and unrebutted complaint that the "consensus" will be reached, if at all, in violation of plaintiffs' rights. Defendants would then undoubtedly argue that any attack on that "consensus" agreement would be moot or in some other way immune to attack. The time for this issue to be decided is now.

And the law supports such a common sense finding that this case is ripe for decision now. All that is required is that "a genuine controversy exist between the parties." *Michigan Chiropractic Council v Comm'r of Ins,* 475 Mich 363, 381; 716 NW2d 561 (2006). A claim lacks ripeness only where "the harm asserted has [not] matured sufficiently to warrant judicial intervention …" *Id.,* quoting from *Warth v Seldin,* 422 US 490, 499 n 10. A genuine controversy exists here and now. Plaintiffs are fighting

10

13-53846-tjt Doc 22-16 Filed 07/24/13 Entered 07/24/13 16:02:47 Page 46 of 62    175

for their future financial well-being. And that fight will be over before it begins absent judicial intervention now.

**F.    Plaintiffs Have Stated a Claim.** Defendants' argument that plaintiffs have failed to state a claim is entirely based on the mistaken premise that plaintiffs are bringing a facial challenge to Public Act 436. State brief, page 12. Plaintiffs' claim is that the receivership under which the City of Detroit is currently operating is currently ignoring the Article 9, Section 24 rights of the City's' retirees (this is supported with multiple and direct statements from the Detroit Emergency Manager) and that in these circumstances (and this part of the complaint is in caps, bolded and underlined at the top of page 4) "it would be unconstitutional for the governor to authorize the Detroit Emergency Manager to proceed under Chapter 9." This states a claim.

**G.    Plaintiffs Have Met the Prerequisites for Injunctive Relief.** Defendants argue first that plaintiffs will not suffer irreparable harm if an injunction is not issued. State's brief, page 13. Defendants do not even attempt to argue that the loss or in the words of the Detroit Emergency Manager the "significant cuts" in plaintiffs' vested pension benefits would not constitute irreparable harm. Rather they argue that plaintiffs will have a remedy in bankruptcy. Not according to the Detroit Emergency Manager. And he would be speaking for the debtor in bankruptcy.

Second, defendants argue that the balance of harms favors them by using a claim of urgency, all as part of an argument that completely fails to account for the derogation of Michigan Constitutional rights that they intend to cause. State's brief, pages 13-14. Put another way, the defendants claim that our State Constitution can be ignored if the Governor and his agents decide that following it would complicate matters in a municipal

11

receivership. This would surprise the framers of our State Constitution, one of whom stated that the then new Article 9, Section 24 meant that a public employee with vested pension benefits, "would have the entire assets of the employer at his disposal from which to realize those benefits." 1 Official Record, Constitutional Convention 1961, p 774.

Third, defendants argue the public interest. State's brief, pages 14-15. Certainly, the public interest would be served if the Governor were to be precluded from authorizing a bankruptcy that would threaten the abrogation of constitutional rights. The people, in adopting their Constitution, including Article 9, Section 24, have spoken in that regard. And just as certainly, the public interest would not be served if the Detroit Emergency Manager were to be allowed to continue down his path all the while ignoring those constitutional rights.

## CONCLUSION

Plaintiffs are entitled to know whether their Article 9, Section 24 constitutional rights have any meaning in the current Detroit financial emergency. And they are entitled to know that now, and to have those rights protected. The plaintiffs' motion for preliminary injunction should be granted.

Respectfully submitted,

s/William A. Wertheimer
William A. Wertheimer (P26275)
Attorney for plaintiffs
30515 Timberbrook Lane
Bingham Farms, MI 48025
248-644-9200

Andrew Nickeloff (P37990)
Marshall J. Widick (P53942)
James A. Britton (P71157)

12

Attorneys for plaintiffs
Sachs Waldman
1000 Farmer
Detroit, MI 48226
313-496-9429
anickelhoff@sachswaldman.com


mwidick@sachswaldman.com
jabritton@sachswaldman.com

Dated: 18 July 2013

### PROOF OF SERVICE

THE UNDERSIGNED CERTIFIES THAT ON 18 JULY 2013 THE FOREGOING
INSTRUMENT WAS SERVED UPON THE FOLLOWING:

1. Thomas Quasarano
2. Brian Devlin
3.

BY:

X    U.S. MAIL                    _____  FAX

_____  HAND DELIVERY          _____  U.S.EXPRESS MAIL
_____  UPS                      X    OTHER: email
BY:
SIGNATURE: _____

13

# STATE OF MICHIGAN
## IN THE CIRCUIT COURT FOR THE COUNTY OF INGHAM

ROBBIE FLOWERS, MICHAEL WELLS,
JANET WHITSON, MARY WASHINGTON and
BRUCE GOLDMAN

            Plaintiffs,

vs.

            Case No. 13-729-CZ
            Hon. Rosemarie Aquilina

RICK SNYDER, as the Governor of the State
of Michigan; ANDY DILLON, as the Treasurer of
the State of Michigan; and the STATE OF MICHIGAN,

            Defendants.

_____/

| | |
|---|---|
| William A. Wertheimer (P26275)<br>Attorney for plaintiffs<br>30515 Timberbrook Lane<br>Bingham Farms, MI 48025<br>248-644-9200<br>billwertheimer@gmail.com | Thomas Quasarano (P27982)<br>Brian Devlin(P34685)<br>Assistant Attorneys General<br>PO Box 30754<br>Lansing, MI 48909<br>quasaranot@michigan.gov |

Andrew Nickeloff (P37990)
Marshall J. Widick (P53942)
James A. Britton (P71157)
Attorneys for plaintiffs
Sachs Waldman
1000 Farmer
Detroit, MI 48226
313-496-9429
anickelhoff@sachswaldman.com
mwidick@sachswaldman.com
jabritton@sachswaldman.com

_____

## AFFIDAVIT OF MICHAEL NICHOLSON

State of Michigan

County of Wayne

    Michael Nicholson, being first duly sworn, states as follows:

1

1. My name is Michael Nicholson. I am a citizen of the State of Michigan. I am employed as General Counsel by International Union, UAW. I make this affidavit based on personal knowledge.

2. On June 28, 2013, I received the email message attached hereto as Exhibit A from David Birnbaum, a lawyer with the Jones Day law firm, which is lead counsel to the Emergency Manager for the City of Detroit.

3. On July 9, 2013, I sent the email message attached hereto as Exhibit B to Mr. Birnbaum and his colleague at Jones Day, Dan Merrett.

4. Since July 9, 2013 until the time that I signed this affidavit today, I have received no response from anyone at Jones Day to the questions that I raised in Exhibit B with respect to pension benefits and Article 9, Section 24 of the Michigan Constitution.

Further Affiant sayeth not.

_____
Michael Nicholson

Subscribed and sworn to before me this 18th day of July 2013.

_Nancy S. Dennis_

**NANCY S DENNIS**
**Notary Public - Michigan**
**Macomb County**
**My Commission Expires Feb 10, 2017**
**Acting in the County of** _Wayne_

Nancy S. Dennis, Notary Public
County of Macomb
State of Michigan
Acting in Wayne County
My commission expires February 10, 2017

**From:** David Birnbaum <dbirnbaum@jonesday.com> ✏️
**Subject:** City of Detroit -- Pension Restructuring Discussions (GRS)
**Date:** June 28, 2013 4:42:56 PM EDT
**To:** MNicholson@uaw.net
**Cc:** Evan Miller <emiller@JonesDay.com>, Brian Easley <beasley@JonesDay.com>, "David G. Heiman"
<dgheiman@JonesDay.com>, Heather Lennox <hlennox@JonesDay.com>

_____

2 Attachments, 4 KB

Dear Mr. Nicholson:

Following the presentations made on June 20th, outside counsel for GRS reached out to the City of Detroit for more information on, and to discuss, a pension restructuring proposal. GRS and the City of Detroit have tentatively scheduled a meeting on pension restructuring for Wednesday, July 10th, at 1 pm (location to be determined). The City will be prepared to provide more information on its developing pension restructuring proposal. Because the City expects that the proposal will impact the pension benefits of active participants of GRS, who include your members, the City would like to invite you to this meeting on July 10th, at 1 pm to participate in the discussion. We expect the meeting will last approximately 2 hours. GRS will be sending an advisor-only team (attorneys and financial advisors), and the City believes this is a good way to proceed. Please let us know at your earliest convenience if you will attend and the names of the attendees. We will contact you as soon as practicable to provide details about the meeting location.

Regards,

David



**David S. Birnbaum**
_____

77 West Wacker Drive, Suite 3500 · Chicago, IL 60601
**DIRECT** 312.269.4005 · **FAX** 312.782.8585 · **EMAIL** dbirnbaum@jonesday.com

=========
This e-mail (including any attachments) may contain information that is private, confidential, or protected by attorney-client or other privilege. If you received this e-mail in error, please delete it from your system without copying it and notify sender by reply e-mail, so that our records can be corrected.
=========

**Exhibit A**



**From:** Michael Nicholson <mnicholson@uaw.net>
**Subject:** Re: Detroit - Data room access/ July 10 and 11 meetings
**Date:** July 9, 2013 1:57:49 PM EDT
**To:** Dan Merrett <dmerrett@JonesDay.com>, "David S. Birnbaum" <dbirnbaum@jonesday.com>
**Cc:** Marshall Widick <mwidick@sachswaldman.com>, Andrew Nickelhoff <anickelhoff@sachswaldman.com>

---

Dear Messrs. Merrett and Birnbaum:

UAW has requested access to the City of Detroit data room maintained by your firm. You have responded by proffering a proposed nondisclosure agreement and release, and have made UAW's execution of such documents a condition of our access to the data room.

Please explain the legal basis for conditioning UAW's access to whatever information is obtainable through the City of Detroit data room upon our execution of the confidentiality agreement and release that you have proferred. As you know, UAW has often signed confidentiality agreement with private corporations going through financial restructurings. However, in this instance, we are dealing with a public entity, the City of Detroit. I would like to understand the basis for withholding data room information with respect to the City of Detroit based on claims of confidentiality.

As to the meetings concerning pensions and OPEB that your firm, on behalf of Mr. Orr, is conducting on July 10 and 11, 2012, we wish to attend the meetings, but reserve all rights with respect to the meetings and to such position(s) that Mr. Orr and/or your firm may seek to take with respect to such meetings.

Further to that reservation of rights, UAW continues to seek an answer from Mr. Orr and your firm to the following: please cite the basis for any claim that the UAW has the authority to compromise the vested benefits of active and/or retired UAW or former UAW members employed or formerly employed by the City of Detroit and its affiliates. As I presume you know, Article IX, Section 24 of the Michigan Constitution provides in pertinent part that "[t]he accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Please tell me what authority your firm and/or Mr. Orr believe gives the UAW the right to compromise vested pension benefits, despite the contrary provisions of Article IX, Section 24. Please also tell us whether Mr. Orr and/or your firm take the position that Article IX, Section 24 of the Michigan Constitution is not or may not be binding on the City of Detroit, the State of Michigan, Governor Snyder, Mr. Orr or the UAW and state, if that is the case, under what circumstances you believe that Article IX, Section 24 would not bind some or all of these persons or entities. We also seek an answer to the same questions with regard to vested post-retirement insurance benefits, but as to such the question is posed with the additional need to consider, inter alia, the holding of the United States Supreme Court in *Chemical Workers v. Pittsburgh Plate Glass*, 404 U.S. 157 (1971), which states at its footnote 20 that "[u]nder established contract principles, vested retirement rights may not be altered without the pensioner's consent."

We do not understand the July 10 and 11 multiple stakeholder meetings to which we have been invited to be a forum for negotiation of your proposed pension and retiree health care changes, but are willing to attend to obtain for our union whatever information may be provided at those meetings. Your full answers to the questions posed in the foregoing paragraphs of this message will help the UAW determine the scope of any such negotiations and the UAW's decisions regarding its representative capacity in them, about which your firm has inquired.

Please provide me with the exact location of the July 10 and 11 meetings.

Thank you.

Michael Nicholson
General Counsel - International Union, UAW
Solidarity House - 8000 East Jefferson Avenue
Detroit, Michigan 48214
UAW Office Phone: 313.926.5216
Cell Phone: 734.719.0850
Email: mnicholson@uaw.net

**Exhibit B**

*************************************
*This e-mail message from Michael Nicholson is for the sole use of*
*the intended recipient(s) and may contain confidential and privileged*
*information. Any unauthorized review, use, disclosure or distribution is*

# EXHIBIT 2

```
 1                          STATE OF MICHIGAN
           30TH JUDICIAL CIRCUIT COURT FOR THE COUNTY OF INGHAM
 2                           CIVIL DIVISION

 3    THE GENERAL RETIREMENT SYSTEM
      OF THE CITY OF DETROIT, and THE
 4    POLICE AND FIRE RETIREMENT SYSTEM
      OF THE CITY OF DETROIT,
 5
                          Plaintiffs,
 6    v                                      Case No. 13-768-CZ
                                             Hon. Rosemarie Aquilina
 7    KEVYN D. ORR, in his official capacity
      as the EMERGENCY MANAGER OF THE CITY OF
 8    DETROIT, and RICHARD SNYDER, in his
      official capacity as the GOVERNOR OF THE
 9    STATE OF MICHIGAN,

10                       Defendants.
      _____/
11    GRACIE WEBSTER and
      VERONICA THOMAS,
12
                          Plaintiffs,
13    v                                      Case No. 13-734-CZ
                                             Hon. Rosemarie Aquilina
14    THE STATE OF MICHIGAN; RICHARD
      SNYDER, as Governor of the State
15    of Michigan; and ANDY DILLON,
      as Treasurer of the State of
16    Michigan,
                          Defendants.
17    _____/
      ROBBIE FLOWERS, MICHAEL WELLS,
18    JANET WHITSON, MARY WASHINGTON,
      and BRUCE GOLDMAN,
19
                          Plaintiffs,
20    v                                      Case No. 13-734-CZ
                                             Hon. Rosemarie Aquilina
21    RICK SNYDER, as the Governor of the
      State of Michigan; ANDY DILLON, as
22    the Treasurer of the State of Michigan;
      and the STATE OF MICHIGAN,
23
                          Defendants.
24    _____/

25                   MOTION FOR PRELIMINARY INJUNCTION
```

```
 1              BEFORE THE HON. ROSEMARIE AQUILINA, CIRCUIT JUDGE

 2              Ingham County, Michigan - Thursday, July 18, 2013

 3

 4         APPEARANCES:

 5         For Plaintiffs Retirement Systems:
                                RONALD A. KING (P45088)
 6                              MICHAEL J. PATTWELL (P72419)
                                CLARK HILL PLC
 7                              212 East Grand River Ave.
                                Lansing, MI 48906
 8         For Plaintiffs Webster, et al.:
                                JOHN R. CANZANO (P30417)
 9                              Smith & Radtke, PC
                                400 Galleria Officentre, Ste. 117
10                              Southfield, MI  48034

11         For Plaintiffs Flowers, et al.:
                                WILLIAM A. WERTHEIMER (P26275)
12                              Attorney at Law
                                30515 Timberbrook Lane
13                              Bingham Farms, MI  48025

14         For the Defendants:   THOMAS QUASARANO (P27982)
                                Assistant Attorney General
15                              State Operations Division
                                P.O. Box 30754
16                              Lansing, MI 48909

17

18

19         REPORTED BY:          Melinda I. Dexter, RMR, RPR, CSR-4629
                                Official Court Reporter
20                              313 W. Kalamazoo
                                Post Office Box 40771
21                              Lansing, MI  48901-7971

22

23

24

25
```

2

1                    T A B L E   O F   C O N T E N T S

2

3

4

5        WITNESSES:

6              None

7

8

9

10

11       EXHIBITS:

12             None

13

14

15

16

17

18

19

20

21

22

23

24

25

3

**4**

1  Ingham County, Michigan
2  Thursday, July 18, 2013 - At 4:15 p.m.
3  MR. KING: Good afternoon.
4  THE COURT: Good afternoon. We have everybody
5  here?
6  MR. KING: They are.
7  THE COURT: All right. This is Docket
8  13-768-CZ, the General Retirement System of the City of
9  Detroit and the Police and Fire Retirement System of the
10  City of Detroit versus Kevin D. Orr, in his official
11  capacity as the Emergency Manager of the City of Detroit,
12  and Richard Snyder, in his official capacity as the
13  Governor of the State of Michigan.
14  Counsel, your appearances for the record.
15  MR. KING: Good afternoon, your Honor. Ron
16  King with Clark Hill on behalf of the Plaintiffs, the
17  General Retirement System of the City of Detroit and the
18  Police and Fire Retirement System of the City of Detroit.
19  THE COURT: Welcome.
20  MR. KING: Thank you.
21  MR. QUASARANO: Your Honor, if I may, Thomas
22  Quasarano, Assistant Attorney General, that will be
23  appearing in this case on behalf of the Defendant. I
24  believe the Defendant was served yesterday. We have not
25  received a request for representation, but I'm very

**5**

1  likely going to be asked to represent the Governor.
2  THE COURT: Sir?
3  MR. WERTHEIMER: Excuse me, your Honor,
4  William Wertheimer. I apologize for my dress.
5  THE COURT: No problem. I know it's last
6  minute. I don't care how people are dressed. It's more
7  important that you are here.
8  MR. WERTHEIMER: Thank you, your Honor. I was
9  here to file my reply brief today for the Monday hearing.
10  I am now here knowing that this motion has been filed,
11  and I wanted to enter my appearance.
12  THE COURT: All right. You may have a seat.
13  There is plenty of room for all.
14  MR. WERTHEIMER: Thank you.
15  MR. CANZANO: Your Honor, excuse me, John
16  Canzano, Plaintiffs' attorney in the Webster case. Same
17  as Mr. Wertheimer, we just found out about this. I'm
18  here. My reply brief is being filed. I have a judge's
19  copy here somewhere.
20  THE COURT: All right. Have a seat.
21  MR. KING: Your Honor --
22  THE COURT: Anybody else?
23  MR. PATTWELL: Your Honor, Michael Pattwell
24  from Clark Hill on behalf of Plaintiffs, as well. I am
25  THE COURT: Thank you.

**6**

1  Counsel?
2  MR. KING: Your Honor, Ron King again on behalf
3  of the Plaintiffs, the Detroit Retirement Systems. We
4  might need to beg the Court's indulgence. While we
5  appreciate that you have seen us on very short notice,
6  we've been advised that the City has filed, and we're
7  pulling it up on the electronic filing system, so we
8  might need a few minutes here to figure out our very next
9  step.
10  THE COURT: Okay.
11  MR. KING: Because the effect of a bankruptcy
12  filing, if, in fact, that's -- we're trying to conform
13  that. We think, in fact, it has been filed here within
14  the last half hour. So we probably need about a
15  ten-minute recess here, if the Court would indulge us. I
16  know you have another matter.
17  THE COURT: Do we want to make a phone call?
18  MR. KING: Yeah. We can, but we're pretty --
19  THE COURT: Well, here's the thing: If they
20  haven't filed, we need to hurry up and proceed. If they
21  have filed --
22  MR. KING: We're pretty confident that they
23  filed.
24  Right?
25  I mean, we're pulling it up. Yeah. It's been

**7**

1  confirmed. So I'm not sure where that leaves us with
2  this proceeding because it's going to be pretty hard to
3  undue. It's been done.
4  MR. WERTHEIMER: There is no automatic stay in
5  this.
6  MR. KING: Yeah. What we're here for -- the
7  really --
8  What counsel is saying is there is no automatic
9  stay with respect to this proceeding. So in our
10  judgment, this matter will proceed. What you have before
11  you, however, is a motion for temporary restraining order
12  to enjoin certain conduct that's already occurred. So
13  I'm not sure that we really have a lot of business in
14  front of the Court at this moment, but I would like to
15  just confer for about ten minutes on that issue because
16  we will proceed in the case. And if we're here and you
17  want to take the time to set some sort of expedited
18  briefing schedule, we could do that also.
19  It's quite likely that you, your Honor, will be
20  able to make a ruling on the merits of this case in
21  advance of whatever occurs in the context of a Chapter 9
22  filing.
23  THE COURT: I plan on making a ruling on
24  Monday. I could make a ruling tomorrow, if push came to
25  shove, but Monday would probably be soon enough. I am

1 confident that the bankruptcy court won't act as quickly
2 as I will.
3 MR. KING: Yeah. I'm not sure, but we'll see.
4 I mean, there might -- but, nevertheless, so we should --
5 If you're prepared to rule on the merits on
6 Monday, again I'm not sure what -- if there is much
7 business for us left to do before the Court today.
8 THE COURT: Unless some kind of -- I don't
9 really have any authority over them, so.
10 MR. KING: Right.
11 THE COURT: I don't think anything --
12 Counsel?
13 MR. WERTHEIMER: Your Honor, the motion that's
14 up for Monday, our motion at least that's up for Monday,
15 is a request for a preliminary injunction to enjoin the
16 Governor. We have no evidence the Governor has
17 authorized any bankruptcy, and we would not only want to
18 go forward on Monday but ask that the motion for
19 preliminary injunction be moved up to now, hopefully, to
20 tomorrow morning if the Court will not hear it now. But
21 I don't think there is any reason why the Court cannot
22 hear our motion for preliminary injunction.
23 I'm not talking about in terms of the Court's
24 preparedness but in terms of the apparent filing. They
25 may have filed. But nobody -- I asked the Governor's

---

1 Office before we came in here -- er, the Attorney General
2 whether they could make any representations to me that
3 would obviate the need for me going forward, and they
4 could not.
5 So we've got a written, fully briefed request/
6 motion for preliminary injunction. The Attorney
7 General's Office has briefed it. Time is obviously of
8 the essence. I would suggest that the Court hear our
9 motion to preliminarily enjoin the Governor authorizing a
10 bankruptcy now.
11 MR. CANZANO: Your Honor, I would make
12 essentially the same request except that our motion,
13 although it seeks preliminary injunctive relief in the
14 alternative, it primarily seeks a final declaratory
15 judgment that what has just happened, apparently, is
16 unconstitutional, and that is ready for a final decision
17 we were saying on Monday. We have a reply brief that has
18 just been filed, and we would -- we could -- this Court
19 could issue that order immediately, and I don't know what
20 the consequences for the bankruptcy court would be,
21 necessarily, but I think it would -- it might make a
22 difference.
23 MR. WERTHEIMER: I'm sorry, and I think that at
24 a minimum, your Honor, I think we should -- I think the
25 Court should decide the preliminary injunction now, but

---

1 we should find out from the Office of the Attorney
2 General whether the Governor has authorized a bankruptcy
3 that has done the act that we were attempting to enjoin
4 and that they knew we were attempting to enjoin and that
5 they've known for the last two weeks and that they're
6 filing briefs on saying that it's not ripe. The
7 attorneys for the Government have represented to this
8 Court that our motion is not ripe.
9 THE COURT: I just received a note from my law
10 clerk that says the bankruptcy was filed at 4:06.
11 MR. KING: Right. Your Honor, so what we'd
12 like to do here is amend our emergency motion for
13 temporary restraining order and get it and request from
14 this Court an order enjoining the Governor and the
15 Emergency Manager from taking any further action in the
16 bankruptcy proceeding, and we'll modify our order to that
17 effect.
18 MR. WERTHEIMER: I would join that as to the
19 Governor. We have not sued the Detroit Emergency
20 Manager, but I would orally join in that motion as to the
21 Governor and the Secretary of the Treasury.
22 MR. CANZANO: I would say the same in our case.
23 We're not joining their motion but we're making a motion
24 in our case that would be the same as theirs only against
25 the Governor.

---

1 THE COURT: Granted, as to all of your
2 requests.
3 How soon are you going to present me with an
4 order?
5 MR. KING: Right now.
6 THE COURT: All right.
7 MR. KING: We just need to mark up the order
8 that we have for the Court.
9 THE COURT: Absolutely.
10 MR. QUASARANO: Your Honor, if I may, we would
11 ask that the Court stays enforcement of the order, and
12 your ruling on that would be appreciated at this time.
13 THE COURT: Denied.
14 MR. QUASARANO: Thank you. We'll present an
15 order as soon as possible.
16 THE COURT: Thank you.
17 MR. QUASARANO: Thank you, Judge.
18 MR. WERTHEIMER: Your Honor, we will need a few
19 minutes to prepare a written order, but if we can --
20 THE COURT: Well, sir, would you like to copy
21 that and modify what they're doing? My law clerk will be
22 happy to help you.
23 MR. WERTHEIMER: Thank you, your Honor.
24 THE COURT: As to your stay, you'll be getting
25 that to me in --

1      MR. QUASARANO: Maybe I can just make a call
2 and get an order over to you right yet today.
3      THE COURT: Sure. You can even handwrite it.
4 I don't care how we do it. You can run it over here, fax
5 it over here; whatever gets you the job done. Time is of
6 the essence.
7      MR. QUASARANO: I appreciate that.
8      MR. KING: (Approaching the bench.)
9      Your Honor, Ron King again on behalf of the
10 Plaintiffs. If we could go back on the record.
11      THE COURT: Excuse me.
12      MR. KING: We'd like to set the sequence of
13 events in terms of how things have transpired in the last
14 hour, if you will. Just for the record, our motion for
15 emergency temporary restraining order was filed at
16 3:37 p.m.; that is, today, July 18th. We promptly, well
17 in advance of 4 o'clock and probably within -- well,
18 actually, we had delivered prior to the filing time at
19 3:37 judge's copies to chambers for your review.
20      Then we waited for the Attorney General, who
21 doesn't feel compelled to make an appearance here in this
22 case because he hasn't actually been officially retained
23 yet, but, nevertheless, as a courtesy we waited for him
24 to appear, which he came upstairs sometime around 4:10.
25 We understand the bankruptcy filing was at 4:05?

1      THE COURT: 4:06.
2      MR. KING: 4:06. The Court took the bench at
3 approximately 4:20. And to the extent your Honor has had
4 an opportunity to read the papers and was inclined to
5 make a ruling, if you'd be willing to put that on the
6 record, then in the -- when we do seek dismissal of the
7 bankruptcy proceeding, we'll have some clear record of
8 the sequence of events here.
9      MR. WERTHEIMER: Just to add, in terms of the
10 sequence of events, I did advise by telephone
11 Mr. Quasarano of the fact that I would be in court and
12 that it was my understanding that Clark Hill was going to
13 be in court seeking a temporary restraining order. I
14 talked to him by phone before 4 this afternoon, sometime
15 between 3:30 and 4.
16      MR. QUASARANO: And I could confirm that
17 Mr. Wertheimer gave me the professional curtesy of
18 letting me know that there was a hearing being planned.
19 I had no -- we have no personal knowledge in our division
20 of a bankruptcy being filed any certain time or date, so
21 there is nothing we could provide in terms of a response
22 that there is going to be a bankruptcy filed. So we
23 learned it as everyone else learned.
24      THE COURT: All right. And obviously I heard
25 this was happening. I had another hearing that was

1 supposed to take place at 4 o'clock, and I understood
2 this was a very important issue, and we obviously have a
3 hearing scheduled, another hearing scheduled, at
4 9 o'clock on Monday.
5      So I advised my law clerk that we had a
6 4 o'clock hearing that wasn't going to take very long,
7 and whenever you all got here and that we would wait for
8 all of the attorneys, we would then have a hearing and to
9 let me know when everybody was in place and then I would
10 come out.
11      So that's exactly what happened. She let me
12 know everybody was here, gave me the paperwork to look
13 over, and, of course, I did just that. And we got out of
14 here as quickly as we could, obviously not in time
15 because 4:06 occurred and they did what they were going
16 to do, which I know you all raised here.
17      I did have an opportunity to -- with review of
18 what was filed, and you're asking me what I would have
19 done, and it was my intention, after reviewing what you
20 had filed, in addition to other research that my capable
21 externs from Cooley and from Michigan State, as well as
22 my very capable law clerk pulled for me, I reviewed
23 constitutional provisions, I reviewed legislative intent,
24 I reviewed what you all provided me, I reviewed a lot of
25 information in the last few hours, and it was my

1 intention to grant you your request completely.
2      MR. KING: Thank you, your Honor. Appreciate
3 your clarifying the record.
4      MR. WERTHEIMER: Thank you, your Honor.
5 Your Honor, we have a proposed order.
6      THE COURT: You may approach. Thank you.
7      MR. WERTHEIMER: Thank you. It is handwritten.
8 (Approaching the bench.)
9      THE COURT: No problem.
10      MR. WERTHEIMER: And for caption, it just says,
11 at this point, Flowers Caption.
12      THE COURT: Okay.
13      MR. WERTHEIMER: I had some help in drafting
14 too if you can't read the --
15      THE COURT: We'll make it work.
16      MR. WERTHEIMER: Okay. Thank you, Judge.
17      MR. KING: We may be back tomorrow, your Honor.
18      MR. WERTHEIMER: We may be back too,
19 your Honor. And if we are, I will be in a suit.
20      THE COURT: It's okay. As long as your body is
21 covered, I don't care what's it's covered with.
22      MR. KING: I think with respect to the present
23 motion before you, we have an order in place and
24 appreciate you making the accomodation and time for us
25 today. Thank you.

```
 1              THE COURT:  No problem.
 2              Now, if you're back tomorrow, what is it going
 3    to be for?
 4              MR. KING:  We might file a mandamus action
 5    requiring the EM to withdraw the Chapter 9 filing.
 6              THE COURT:  Will this require time on the
 7    record?
 8              MR. KING:  Yes.
 9              THE COURT:  Okay.  My time restriction is that
10    I have my morning free until about 1:30.  Can you get it
11    here before 1:30?
12              MR. PATTWELL:  Yes.
13              MR. KING:  Absolutely.
14              THE COURT:  I'll make myself available all
15    morning until 1:30.
16              MR. KING:  Thank you, your Honor.
17              THE COURT:  Okay.
18              MR. CANZANO:  May I approach, your Honor?  I
19    have an order drafted also.
20              THE COURT:  You may.
21              MR. CANZANO:  (Approaching the bench.)
22              THE COURT:  Okay.  We'll make you copies, and
23    this is our copy.
24              Anything else for the record?
25              MR. KING:  No, your Honor.  Thank you.
                                                            16
```

```
 1              MR. WERTHEIMER:  No, your Honor.  Thank you.
 2              THE COURT:  That's all for the record.  Thank
 3    you.
 4              (At 4:38 p.m., the matter is
 5              concluded.)
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
                                                            17
```

```
 1      STATE OF MICHIGAN)
                         ) SS.
 2       COUNTY OF INGHAM)

 3

 4                     CERTIFICATE OF REPORTER

 5

 6              I, Melinda I. Dexter, Certified Shorthand

 7      Reporter, do hereby certify that the foregoing

 8      17 pages comprise an accurate, true, and complete

 9      transcript of the proceedings and testimony taken in the

10      case of The General Retirement System of the City of

11      Detroit, et al., versus Kevyn D. Orr, et al., Case

12      No. 13-768-CZ, and Gracie Webster, et al., versus the

13      State of Michigan, et al., Case No. 13-734-CZ, and

14      Robbie Flowers, et al., versus Rick Snyder, et al., Case

15      No. 13-729-CZ, on Thursday, July 18, 2013.

16              I further certify that this transcript of the

17      record of the proceedings and testimony truly and

18      correctly reflects the exhibits, if any, offered by the

19      respective parties.  WITNESS my hand this the eighteenth

20      day of July, 2013.

21

22      _____
                                Melinda I. Dexter, RMR, RPR, CSR-4629
23                              Official Court Reporter
                                313 West Kalamazoo
24                              Post Office Box 40771
                                Lansing, Michigan 48901-7971
25
```

18

# UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION – DETROIT

---------------------------------------------------------------- x

In re:

CITY OF DETROIT, MICHIGAN,                           Chapter 9

Debtor.                                              Case No. 13-53846

                                                     Hon. Steven W.

Rhodes

---------------------------------------------------------------- x

## PROOF OF SERVICE

      The undersigned certifies that on July 24, 2013, a copy of Objection Of Robbie Flowers, Michael Wells, Janet Whitson, Mary Washington, Bruce Goldman and International Union, UAW To Motion of Debtor, Pursuant to Section 105(a) Of The Bankruptcy Code, For Entry Of An Order Extending The Chapter 9 Stay To Certain (A) State Entiries, (B) Non-Officer Employees and (C) Agents and Representatives Of The Debtor (Docket No. 56), and the accompanying Amended Declaration of William Wertheimer, were served upon parties via the Court's electronic court filing service.

I declare that the foregoing statement is true to the best of my information, knowledge and belief.

<div align="right">

/s/ Niraj R. Ganatra
Niraj R. Ganatra (P63150)
International Union, UAW
8000 E. Jefferson Avenue
Detroit, Michigan 48214
(313) 926-5216
nganatra@uaw.net

</div>

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE:  CITY OF DETROIT,          .          Docket No. 13-53846
        MICHIGAN,                 .
                                  .          Detroit, Michigan
                                  .          July 24, 2013
                   Debtor.        .          10:02 a.m.
. . . . . . . . . . . . . . . .

     HEARING RE. MOTION OF DEBTOR, PURSUANT TO SECTION 105(a)
   OF THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER CONFIRMING
     THE PROTECTIONS OF SECTIONS 362, 365 AND 922 OF THE
   BANKRUPTCY CODE (DOCKET #53) AND MOTION OF DEBTOR, PURSUANT
   TO SECTION 105(a) OF THE BANKRUPTCY CODE, FOR ENTRY OF AN
   ORDER EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE
     ENTITIES, (B) NON-OFFICER EMPLOYEES AND (C) AGENTS AND
        REPRESENTATIVES OF THE DEBTOR (DOCKET #56)
          BEFORE THE HONORABLE STEVEN W. RHODES
          UNITED STATES BANKRUPTCY COURT JUDGE


APPEARANCES:

For the Debtor:        Jones Day
                       By:  HEATHER LENNOX
                       North Point
                       901 Lakeside Avenue
                       Cleveland, OH  44114-1190
                       (216) 586-3939

For AFSCME:            Lowenstein Sandler, LLP
                       By:  SHARON L. LEVINE
                       65 Livingston Avenue
                       Roseland, NJ  07068
                       (973) 597-2374

For Syncora            Kirkland & Ellis, LLP
Guarantee and          By:  RYAN BENNETT
Syncora Capital        300 North LaSalle
Assurance:             Chicago, IL  60654
                       (312) 862-2074

For Public Safety      Erman, Teicher, Miller, Zucker &
Unions:                   Freedman, PC
                       By:  BARBARA PATEK
                       400 Galleria Officentre, Suite 444
                       Southfield, MI  48034
                       (248) 827-4100

APPEARANCES (continued):


For Police and          Clark Hill, PLC
Fire Retirement         By:  ROBERT GORDON
System and              151 South Old Woodward, Suite 200
General Retirement      Birmingham, MI   48009
System of the City      (248) 988-5882
of Detroit:

For the UAW:            Cohen, Weiss & Simon, LLP
                        By:  BABETTE CECCOTTI
                        330 West 42nd Street, 25th Floor
                        New York, NY   10036
                        (212) 356-0227

For the Flowers         Law Offices of William A. Wertheimer
Plaintiffs:             By:  WILLIAM WERTHEIMER
                        30515 Timberbrook Lane
                        Bingham Farms, MI   48025
                        (248) 644-9200

For Nathaniel           In pro per
Brent:                  NATHANIEL BRENT
                        538 South Livernois
                        Detroit, MI   48209

For the Phillips        The Sanders Law Firm, PC
Plaintiffs:             By:  HERBERT A. SANDERS
                        615 Griswold, Suite 913
                        Detroit, MI   48226
                        (313) 962-0099

For the State of        Michigan Department of Attorney General
Michigan:               By:  MATTHEW SCHNEIDER
                        525 West Ottawa Street, Fl. 7
                        P.O. Box 30212
                        Lansing, MI   48909
                        (517) 241-8403

For the Webster         McKnight, McClow, Canzano, Smith &
Plaintiffs:               Radtke, PC
                        By:  JOHN R. CANZANO
                        400 Galleria Officentre, Suite 117
                        Southfield, MI   48034
                        (248) 354-9650

Court Recorder:        Letrice Calloway
                       United States Bankruptcy Court
                       211 West Fort Street
                       21st Floor
                       Detroit, MI  48226-3211
                       (313) 234-0068

Transcribed By:        Lois Garrett
                       1290 West Barnes Road
                       Leslie, MI  49251
                       (517) 676-5092

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1          THE CLERK:  Case Number 13-53846, City of Detroit,

2     Michigan.

3          THE COURT:  Good morning.  Stand by one moment for

4     me, please, sir.  I'd like to begin by reviewing with

5     everyone the order of proceedings here, and then we'll get

6     right to the arguments.  The first thing I'd like to do is

7     administer the oath to attorneys who seek to become members

8     of the Bar of this Court, and then I will give a brief

9     opening statement, and then we will proceed with the

10    arguments.  It is my intent to allow the city, who is the

11    movant here, 15 minutes for its initial argument and then to

12    allow each of those creditors who have filed objections to

13    the motion 15 minutes each as well and then a 15-minute

14    rebuttal for the city.  Oh, actually, before that rebuttal I

15    want to give any attorneys who would like to be heard on the

16    record but who did not file objections to be heard as well

17    and then a rebuttal by the city.  And then we'll take a break

18    so that I can deliberate on the motions and then after a

19    period of time come back out and give you my decision.

20         So let's begin with the administration of the oath

21    to those attorneys who need admission.  Would those of you

22    who do seek admission to the Bar of the Court step forward,

23    please?  You can actually just stand right there in front of

24    the bench and tell me who you are.

25         MR. LEMKE:  I'm David Lemke, your Honor, from

 1   Nashville, Tennessee.

 2        MR. SMITH:  Bill Smith, your Honor, from Chicago.

 3        MR. BENNETT:  Ryan Bennett, your Honor, from

 4   Chicago.

 5        THE COURT:  Okay.  One second, please.  Here we go.

 6   And raise your right hands.  Do you affirm that you will

 7   conduct yourselves as attorneys and counselors of this Court

 8   with integrity and respect for the law, that you have read

 9   and will abide by the civility principles approved by the

10   Court, and that you will support and defend the Constitution

11   and laws of the United States?

12        ATTORNEYS:  I do (collectively).

13        THE COURT:  All right.  Welcome to the Bar of our

14   Court.  Counsel, we will take care of filing your papers for

15   you.

16        ATTORNEYS:  Thank you, your Honor (collectively).

17        THE COURT:  One more moment, please.  Okay.  I'd

18   like to begin by describing for those who may be watching or

19   listening in what the matters are before the Court today.

20   There are two motions before the Court today.  The parties

21   refer to one of the motions as the stay confirmation motion,

22   and they refer to the second motion as the stay extension

23   motion.

24        When anyone files bankruptcy, all of the legal

25   proceedings against that person are stopped.  We call that a

1   stay, a stay of proceedings.  When a municipality like the

2   City of Detroit files bankruptcy, all of the legal

3   proceedings against the city and its officers to collect on a

4   claim against the city are also stopped.  The stay

5   confirmation motion simply requests an order confirming these

6   stays under the United States Bankruptcy Code are in effect.

7   The stay extension motion requests that the Court extend or

8   expand those statutory stays by entering an injunction to

9   stop proceedings against other employees of the city and

10  against the governor and the treasurer of the state.  Those

11  are the only two motions before the Court here today.  Not

12  before the Court is whether the city is eligible to file

13  bankruptcy or whether any plan that the debtor might propose

14  in the case is confirmable under the Bankruptcy Code.  Those

15  issues will be, I expect, fully litigated in due course in

16  this case.

17       So now we are ready for arguments on these two

18  motions first by the city, and, counsel, I need to remind you

19  because of our equipment in this room, when you address the

20  Court, you do need to stand at the lectern and speak into the

21  microphone there.

22       MS. LENNOX:  Good morning, your Honor.  Heather

23  Lennox of Jones Day on behalf of the city.

24       THE COURT:  You may proceed.

25       MS. LENNOX:  Thank you, your Honor.  With respect to

1    the stay confirmation motion, your Honor, I think your Honor

2    summarized exactly what we're looking for quite cogently and

3    concisely.  The reason we filed the motion, your Honor, as

4    has been evident by some activity we've seen in the last week

5    or so, is that not all people understand the concept of the

6    stay or, frankly, how it works in Chapter 9.  We have had

7    state court orders issued against the city after the petition

8    date.  We've had some other Circuit Court judges express --

9    in other city litigation express some uncertainty about

10   whether the stay applies.  We've had vendors with contracts

11   seek to stop shipping, and we have a new officer.  We have an

12   emergency manager, and we want to make it clear that the

13   protections of the stay do apply to the emergency manager

14   because, as your Honor indicated, under Section 922(a), the

15   stay does apply to officers of the city for collections of

16   claims against the city.

17            So I would like to address in particular, your

18   Honor, the emergency manager.  Under Section 922(a), the

19   stay -- we believe the stay applies to the emergency manager.

20   Under Section 9.2 of PA 436, on appointment, the emergency

21   manager assumed all of the powers and acts for and in the

22   place of and in the stead of the mayor and the city council,

23   meaning the governing bodies of the city.  And during the

24   pendency of the emergency manager's appointment, the other

25   governing bodies shall not exercise any of the powers of

1  their officers except as may be specifically authorized in

2  writing by the emergency manager.

3        Furthermore, your Honor, Section 18(1) of PA 436

4  empowers the emergency manager to act exclusively on the

5  city's behalf in this case, so we do believe that he is an

6  officer entitled to the protections of the Chapter 9 stays.

7        We have also requested a clarification, your Honor,

8  because the Code does just simply reference officers of the

9  city, that it would be officers of the city serving in any

10  capacity.  Some city officers do serve in other roles on

11  behalf of or at the request of or pursuant to ordinance in

12  other manners in the performance of their duties as officers

13  of the city.  For example, Mr. Brown, who is the chief

14  compliance officer, sits on the root cause committee.  We do

15  have a finance --

16        THE COURT:  Sorry.  Sits on what committee?

17        MS. LENNOX:  The root cause committee, your Honor.

18  We do have the finance director, the budget director, and

19  corporation counsel of the city that are directors of the

20  service corporations that are formed in connection with the

21  pension certificates.  They sit as directors of that

22  corporation through Ordinance Number 03-05 of the City Code,

23  so they are performing their official duties.

24        Finally, with respect to this motion, your Honor,

25  the State of Michigan has asked me to confirm on the record,

1   which I now do, that by this motion the city does not seek to

2   abrogate the exceptions to the stay identified in Section

3   362(b) of the Bankruptcy Code nor do we seek to vitiate the

4   state's powers under Section 903 of the Bankruptcy Code.

5           I think this motion, your Honor, is not uncommon, is

6   fairly straightforward, and merely seeks to confirm the

7   protections that are already granted by the Bankruptcy Code.

8   So with your Court's permission, unless you have questions, I

9   would move to the motion to extend.

10          THE COURT:  Please.

11          MS. LENNOX:  In this motion, your Honor -- and this

12  is a little more complicated -- the city seeks to extend the

13  stay provisions of Section 362 and 922 of the Bankruptcy Code

14  to certain parties that are or are likely to become targets

15  of claims or lawsuits or other enforcement actions that would

16  have the direct or practical effect of denying the city the

17  protections of the automatic stay imposed by the Code or

18  seeking to collect or enforce a claim against the city.  Your

19  Honor, as you may be aware, we have had several pre-petition

20  lawsuits that have attempted these actions.  We do describe

21  them in the papers.  Some of the objectors describe further

22  developments in their papers.  If it would aid the Court, I

23  do have a short summary as a demonstrative exhibit that I

24  could hand the Court that would show the Court the state of

25  play in each of these actions.  Would that be helpful to the

1    Court?

2            THE COURT:  That's fine.  You should assume and all

3    of you should assume in your presentations that I have

4    thoroughly read and reviewed all of your papers, even those

5    that were filed last night.

6            MS. LENNOX:  Certainly, your Honor.  If your Honor

7    does -- perhaps if your Honor would like to see it --

8            THE COURT:  Okay.

9            MS. LENNOX:  -- I'll hand it up.  Thank you.  May I

10   approach, your Honor?

11           THE COURT:  Please.

12           MS. LENNOX:  Thank you, your Honor.  We do have

13   three lawsuits that attempt to prevent either the filing of

14   this case or the conduct of the city's actions within this

15   case.  One of the suits has been filed against the governor

16   and the emergency manager.  That case -- we don't need a stay

17   extension for the emergency manager.  That case is stayed as

18   to the emergency manager.  Two other cases have been filed

19   solely against the governor and the state treasurer that seek

20   to prevent the authorization of the filing and to

21   circumscribe the emergency manager's powers within this case.

22   Those are the kinds of things, your Honor -- there's been a

23   flurry of activity.  Most of the orders entered in those

24   three cases were entered after -- the TRO's were initially

25   entered after this petition was filed.  There were further

orders entered by the state court on the 19th of July that
amended the two temporary restraining orders, and in the
Webster case, which is the one case that involves only the
state treasurer and the governor, there was a declaratory
judgment action or a declaratory judgment that was filed
declaring PA 436 unconstitutional because it could affect the
city's rights within this case.  Those actions have all been
appealed by the state attorney general.  The state court has
ordered a briefing to go forward in one of the cases and had
ordered that the morning of the 22nd, and yesterday the
appellate court issued stays in all three of the cases.

        THE COURT:  If the Court grants your relief, what
would be the impact on that appeal?

        MS. LENNOX:  We believe, your Honor, that the -- we
believe that those cases should be permanently stayed, and
the issues that are addressed in those cases regarding the
constitutionality of PA 436, because they seek to -- the
arguments about constitutionality on PA 436 aren't straight
constitutionality issues.  They say it's unconstitutional
because of what can happen and because of the powers that may
be granted under the Bankruptcy Code, and under this Court's
jurisdiction and under the emergency manager's rights under
Chapter 9, because that is the basis for the challenge to
unconstitutionality, we believe those decisions must be made
and can only be made by this Court in an action brought

1  before this Court under the supremacy clause and the

2  bankruptcy clause of the United States, so we would expect

3  those actions to be stayed, and any issues that the litigants

4  would have, they would have to bring before this Court for a

5  determination by a court of competent jurisdiction.

6        Unless your Honor has any other questions with

7  respect to the procedural posture of some of these cases, I

8  will move on.  It's as a result of these cases -- and these

9  are all certainly public pleadings for which your Honor may

10 take judicial notice under Federal Rule of Evidence 201(c).

11 It's because of these proceedings that we sought to file this

12 motion, and I'd like to explain the -- first of all, I'd like

13 to articulate the standard under which we're proceeding, and

14 then I would like to explain in more detail about why and the

15 three categories of extensions we are seeking.

16       First of all, the standard for a case for extending

17 the stay is that unusual circumstances may exist, and they

18 can exist when there is an identity between the third party

19 and the debtor such that a judgment against the third party

20 would, in effect, be a judgment against the debtor or that

21 the actions taken by the third party would pose a substantial

22 risk to the reorganization of the case.  Some courts also say

23 that such actions would significantly impair the

24 administration of this case.  So based on the backdrop of

25 that standard, we have asked for the stay to be extended

under certain circumstances to three different categories of
persons.  The first, as your Honor indicated, are the state
entities.  We are asking the Chapter 9 stay to be extended to
the governor, the state treasurer, and the members of the
local Emergency Financial Assistance Loan Board for
actions -- excuse me -- that seek to enforce claims against
the city to interfere with the city's activities in this
Chapter 9 case or otherwise deny the city the protections of
the Chapter 9 stay and interfere with this Court's
jurisdiction over these matters.  To be clear, your Honor,
because I think there was some confusion about this on the
part of some parties, we are seeking to extend the stay
protections that the city currently enjoys to the state
officials that I identified in the context of lawsuits like
the three already filed against state officials that, in
substance, seek to interfere with the city's rights as a
Chapter 9 debtor and that seriously jeopardize the city's
rehabilitation or seek to, in a back-door way, preserve
collect, and enforce claims against the city.  This motion
does not seek to stay state officials' actions.  Rather, it
seeks to stay third-party actions against state officials.
The reasons and the evidence for this, your Honor, I think
are well-documented in all of the flurry of activity that has
taken place in the last week, and there -- that kind of
activity needs to stop.  This Court has jurisdiction over

1  this case, this Court has jurisdiction of all federal matters

2  arising in this case, and only this Court has jurisdiction to

3  determine them.  Having widespread litigation in various

4  state tribunals that can come to different decisions when

5  it's doubtful that they have jurisdiction to do that can only

6  confuse the parties, confuse the case, and create serious

7  barriers to an efficient administration of this case.

8       The second request that we make for an extension,

9  your Honor, is to extend this Chapter 9 stay to actions or

10  proceedings against employees of the city's that are neither

11  city officers nor inhabitants of the city because Section

12  922(a) refers to inhabitants.  Many of our nonofficer

13  employees are inhabitants of the city and could be covered,

14  but many are not, and so we are seeking this extension.

15       Your Honor should know that by virtue of city

16  ordinance 13-11-1, the city does indemnify its employees for

17  lawsuits that arise from the good faith performance of their

18  duties.  The city is also self-insured for all of these

19  actions, so the --

20       THE COURT:  So this extension seeks -- or would only

21  apply to claims against employees for which the city might be

22  obligated to indemnify?

23       MS. LENNOX:  Correct, your Honor.  Because the city

24  would be responsible for indemnification because the city is

25  self-insured, we believe that these actions are an action to

1    collect from the city, and we would ask the stay to be
2    extended in this instance.
3            The third request, your Honor, is tied to some of
4    the language in Judge Aquilina's orders, and it's a little
5    unusual, but under the circumstances, we believe it's
6    warranted.
7            THE COURT:  Excuse me one second.  Before you move
8    on to that, this ordinance that you mentioned --
9            MS. LENNOX:  Yes, sir.
10           THE COURT:  -- was that in your brief or in your
11   motion?
12           MS. LENNOX:  That was not in the brief and the
13   motion, your Honor.
14           THE COURT:  Would you give us the number again?
15           MS. LENNOX:  Yes, sir.  It is Section 13-11-1 et
16   seq.
17           THE COURT:  Does anyone have a copy of that?
18           MS. LENNOX:  I do not have a copy with me, your
19   Honor, but we can endeavor to get the Court one
20   expeditiously.  Actually, your Honor, may I check my
21   materials?  I might have a copy of it, if you'd like.
22           THE COURT:  Why don't you do that while the
23   creditors are arguing, and you can present it to the Court
24   later, or actually do you know if the City of Detroit
25   ordinances are on Westlaw?

1    MS. LENNOX:  I do not know that, your Honor.

2    THE COURT:  Anybody know?  Somebody says no.  All

3 right.  I'll need a copy then.

4    MS. LENNOX:  Moving on to the third category, your

5 Honor -- and, again, this is a little unusual, and it arises

6 directly out of some of the orders that have been entered in

7 the state court litigation.  We request to extend the Chapter

8 9 stay to, quote, "city's" -- "the city's agents and

9 representatives," which are the terms used in the state court

10 orders.  That would directly or indirectly seek to enforce

11 claims against the city or, again, to interfere with the

12 city's activities and this Court's jurisdiction in this

13 Chapter 9 case or otherwise deny the city the protections of

14 the Chapter 9 stay.  Again, your Honor, it's unusual, but

15 under the circumstances and what's been going on in the past

16 week, we believe it's warranted under the circumstances and

17 does meet the standard that I articulated earlier.

18    That's the extent of the relief that we seek, your

19 Honor.  If your Honor has no further questions, then I would

20 reserve remarks for rebuttal.

21    THE COURT:  I do have a couple of questions for you.

22    MS. LENNOX:  Yes.

23    THE COURT:  Can you summarize how you deal with the

24 adversary proceeding issue, the argument that the request to

25 extend the stay under Section 105 of the Bankruptcy Code

1   should have been in the form of an adversary proceeding?

2           MS. LENNOX:  Um-hmm.  Yes, your Honor.  I actually

3   don't -- first of all, in many cases, including cases before

4   this Court in the Collins & Aikman case, the requests for

5   extension of a stay are made by motion.  The Sixth Circuit

6   case law that we cite in our brief also suggests that

7   extensions can be made under 105 by motion.  In practice,

8   they are often made by motion.  I think it is important to

9   make it by motion here, and it is completely impractical to

10  try to file an adversary proceeding with respect to this

11  because of the nature of what we are asking for.  For

12  example, with respect to the state entities, we know of three

13  lawsuits that have been filed.  We have plaintiffs that we

14  could name in an adversary proceeding, but what we're asking

15  for goes beyond that.  We want the stay to apply to these

16  actions or any actions somebody might think to bring in the

17  future.  I don't know how to name, you know, unknown

18  plaintiffs in the future.  The scope of what we're asking for

19  is broader than that, which is why it makes sense when you're

20  proceeding under Section 362 to move by motion.  There's

21  motions to lift stay even though ostensibly that would be an

22  injunctive action, but the motions to lift and motions to

23  extend and motions to enforce are done by motion.  Certainly

24  people have done it by the method of preliminary injunction.

25  I don't dispute that, but usually when that happens there is

1    one specific lawsuit that they seek to stay, and that is the

2    sole extension that they're asking for.  We are asking for

3    something much broader here, and I think an adversary

4    proceeding procedurally would be improper.

5         We have also cited -- and we believe it to be

6    true -- in our papers that courts often will say -- will not

7    elevate form over substance, and there are cases that we cite

8    in our reply, including the In re. Cannonsburg Environmental

9    Associates case from the Sixth Circuit that says -- where

10   very clearly the action in that case should have been filed

11   as an adversary proceeding, and the judge said, "Look, you've

12   had due process.  You've had notice.  You have an opportunity

13   to respond.  We have had a full hearing of all the views.

14   You have not been prejudiced."  That exists in this case as

15   well, your Honor, as evidenced by the long and lengthy

16   objections that have been filed to the motion that we ask as

17   it stands.

18        THE COURT:  My second question related to the

19   requirement that the defendants -- that the creditors say

20   apply that to issue the kind of order that you seek, the

21   traditional four factors of a preliminary injunction need to

22   be considered, but in light of the fact that you're over

23   time, I will ask you to address that when you come back

24   after.

25        MS. LENNOX:  Thank you, your Honor.

1    THE COURT:  All right.  So I will allow 15 minutes

2    for each of the creditors that have filed objections.  These

3    are the Michigan Council 25 of AFSCME, Syncora, the UAW

4    together with Creditors Robbie Flowers, Michael Wells, Janet

5    Whitson, Mary Washington, and Bruce Goldman, the Detroit

6    public safety unions, if I can refer them -- refer to them by

7    that, and the General Retirement System of the City of

8    Detroit and the Police and Fire Retirement System of the

9    city.  It doesn't matter to me, counsel, the order in which

10   you proceed, so I will leave that to you to work out.

11        MS. LEVINE:  I'm going to go with alphabetical.

12        THE COURT:  Okay.

13        MS. LEVINE:  Good morning, your Honor.  Sharon

14   Levine, Lowenstein Sandler, for Michigan Council 25 of the

15   American Federation of State, County, and Municipal Employees

16   or AFSCME, as it's been referred to here today.

17        Your Honor, very briefly, it's clear that your Honor

18   has read all the papers, and we very much appreciate that

19   given the short time frame that we've been before this Court.

20   Bankruptcy Code Section 105 is extraordinary relief,

21   extraordinary in that it's only used to enforce rights that

22   already exist under the Bankruptcy Code, so it's not there to

23   create new rights that don't currently exist under the Code.

24   What we have here in a Chapter 9 case, which is more

25   restrictive than, for example, a Chapter 11 case, is the

20

situation where if, in fact, the state has not properly
authorized the Chapter 9 filing, there are rights that don't
exist under the Bankruptcy Code.  If Chapter 9, as has
historically been seen through the unconstitutional finding
of predecessors to Chapter 9, is really being used here to
avoid state constitutional rights, then Chapter 9 in and of
itself is potentially unconstitutional.  If not, it has to be
construed narrowly in order to read it constitutionally.  We
would respectfully submit that using 105 to find rights that
don't otherwise exist, particularly of a constitutional
nature, is an extremely broad use of 105.  This isn't a
situation where we're saying to the controller or the
governor or Mr. Orr, you know, don't respond to discovery
requests in a state court action in a foreign jurisdiction
because we need your attention here.  We're taking away very
fundamental constitutional rights.

          Secondly, your Honor, if, in fact --

          THE COURT:  So your argument about the narrow
application of Section 105 in this case is really a result of
the fact that it's a Chapter 9.

          MS. LEVINE:  Yes, your Honor.

          THE COURT:  It's not an argument that's based on
Section 105, per se.

          MS. LEVINE:  Yes, your Honor.  In a Chapter 11
you'll have circumstances, for example, where even in the

1   broader case of a Chapter 11, you won't use Article -- you

2   won't use Section 105 to grant a casino license or a liquor

3   license or tell a utility board they can't change rates, but

4   we have an even narrower situation here because we're in

5   Chapter 9.

6          Two, Chapter 9 can't be used if, in fact, the state

7   has not authorized under its constitution and its laws the

8   Chapter 9 filing.  The Chapter 9 filing here is arguably

9   flawed because it intends to go after the pensions.  If it

10  goes after the pensions, it arguably violates the state

11  constitution and can't be before this Court, so, again, the

12  issue with regard to whether or not we have an appropriate

13  state constitutional flaw -- sorry.  The issue with regard to

14  whether or not we have an appropriate filing is necessarily

15  limited by whether or not we have an appropriate state -- we

16  have an inappropriate state constitutional authorization.  If

17  we have an inappropriate state constitutional authorization,

18  that is not simply an implementation tool under 105.  That

19  is, in essence, a substantive right that's being creative --

20  created under 105 that does not exist in the state court.

21         In addition to that, your Honor, and also

22  importantly, three, individual citizens of the City of

23  Detroit have the absolute right to protect their own

24  constitutional rights.  If we say to them they can't go to

25  the state courts that are there for the protection of their

1   constitutional rights in part, then we are -- then we're

2   using 105 again way more broadly than it gets used in the

3   ordinary course as simply an implementation tool.  We're

4   creating more substantive rights.  And while this Court

5   has --

6           THE COURT:  Well, but why isn't the extended stay

7   that the city seeks here simply a procedural mechanism to

8   funnel such challenges to the Bankruptcy Court and,

9   therefore, does not have the effect of denying citizens or

10  other creditors of their rights to have their constitutional

11  claims heard?

12          MS. LEVINE:  Your Honor, if this Court is a court of

13  secondary jurisdiction, no disrespect, with -- but if you

14  look at federalism, comity, abstention, and the state courts

15  are the courts of primary jurisdiction, we would respectfully

16  submit that unlike, for example, determining in a Chapter 11

17  case that there's a validly perfected security interest

18  because you've looked at state law and the UCC is properly

19  filed, we have a very fundamental right here that this Court

20  is being asked to address, so what we're saying is instead of

21  going to the court that's primarily responsible, we're going

22  to come into this Court instead, and it's not as if there's

23  delay or uncertainty with regard to the fact that those

24  matters are going to get heard and considered quickly.  We

25  already have state court litigation pending, and the state

appellate courts are poised and ready to rule, so there's no
reason to divest them of that appropriate jurisdiction under
concepts of federalism, comity, and abstention and move that
here to a court of secondary jurisdiction on those issues.

Your Honor, fourth, with regard to the form over
substance, the procedural arguments with regard to 105, in
certain circumstances where 105 is being used for things like
stopping discovery or minimal things like that, that's one
set, but the Federal Rules of Civil Procedure are put in
place in order to protect parties and provide due process.
There can't be a more fundamental situation where you need to
enforce those types of rights than when you're dealing with
basic fundamental constitutional rights, and we respectfully
submit that even though there are circumstances where
expediency mandates the use of 105 quickly, this is not one
of those circumstances.

Your Honor, the breathing spell under 105 -- the
breathing spell under the Bankruptcy Code and the use of 105
to extend the breathing spell is only appropriate if, in
fact, the underlying bankruptcy is an appropriate bankruptcy.
The idea that there's a breathing spell to continue what is
potentially an unconstitutional or illegal -- not
intentionally, no motive or anything, your Honor, but --
proceeding is clearly not anything that 105 was designed to
implement.

1        Your Honor, we would respectfully submit that these

2   are very, very fundamental rights, and unlike a Chapter 11

3   case where you have a defined benefit plan where if, in fact,

4   it is terminated, there's federal insurance under the PBGC up

5   to $57,000, or if you have a multi-employer plan, even if an

6   employer withdraws, the beneficiaries themselves are

7   protected, here our members who participate at most are at or

8   below $19,000 a year.  Clearly there's no safety net.  These

9   issues are hard issues.  The collateral advantage to sending

10  this back to the state court for an appropriate decision is

11  that the conversations which we believe should have been

12  happening more robustly before the filing could happen now.

13  We respectfully -- we thank your Honor for the time, and we

14  appreciate your Honor's consideration.

15        THE COURT:  Thank you.  Sir.

16        MR. BENNETT:  Good morning, your Honor.  Ryan

17  Bennett of Kirkland & Ellis on behalf of Syncora Guarantee

18  and Syncora Capital Assurance.  Your Honor, as we attempted

19  to describe in our papers, my client insures, in some cases

20  owns certain securities called the certificates of

21  participation, which were taken out in 2006 to fund some of

22  the city's pension liabilities.  We also insure a swap --

23  four swaps related to those securities that are tied to the

24  interest rate, the floating interest rate associated with

25  them.

1        We object to the debtor's stay motions to the extent

2   they contain broad and unqualified language that we feel will

3   impair our client's rights against a number of nondebtor

4   third parties under our various transactional documents, as

5   your Honor could probably tell from --

6        THE COURT:  Can you identify some of those parties

7   for us?

8        MR. BENNETT:  Yes, your Honor.  So under the

9   transactional documents, which we attempted to describe in

10  the papers, there are parties called service corporations,

11  which are separate stand-alone entities with their own

12  directors to whom we believe they owe us fiduciary duties in

13  our role as stakeholders.  At very least they owe a duty to

14  the corporations themselves, and our rights are derivative

15  from them.  We also have swap counterparties who are parties

16  to a swap agreement and a swap insurance agreement where

17  we've got third-party beneficiary rights to those

18  arrangements, and the city is not even a party.

19       THE COURT:  Well, let me ask you this question --

20       MR. BENNETT:  Yes, sir.

21       THE COURT:  -- about those parties.

22       MR. BENNETT:  Um-hmm.

23       THE COURT:  To the extent the Court agrees with you

24  and then your client pursues those parties, to what extent,

25  if any, would your client's success on those claims impact

1   claims against the city?

2          MR. BENNETT:  Your Honor, that's unclear to us from

3   this vantage.  I mean we're still developing our litigation

4   strategy and our claim strategy, and --

5          THE COURT:  This is not a question of your strategy.

6   This assumes your strategy is successful.

7          MR. BENNETT:  Right.

8          THE COURT:  The question then remains, though, if

9   you are successful in your claims after being allowed to

10  pursue them --

11         MR. BENNETT:  Um-hmm.

12         THE COURT:  -- to what extent would that impact

13  claims against the city perhaps by those parties?

14         MR. BENNETT:  Um-hmm.  Yeah.  That's unclear to us.

15  I mean perhaps in the case of service corporation directors,

16  to the extent that there's an indemnity, as Ms. Lennox

17  pointed out -- I think that's where your Honor is going --

18  there may be an impact there, but, again, I haven't looked at

19  the ordinance.  I don't know if it applies to these

20  individuals, so I'm not sure, but that could be the case.

21         With respect to other parties, swap counterparties,

22  for example, I mean they're not party -- the debtor is not a

23  party to the swap agreement.  While there may be some ripple

24  effect down the road that I'm sure counsel may try to

25  explain -- debtor counsel may try to explain, I mean that's

1   unclear to us how we'd ultimately get there, sir.

2           THE COURT:  Okay.

3           MR. BENNETT:  Yeah.  As I said, you know, really

4   putting aside the procedural issue, which I do believe the

5   debtor failed to comply with, you know, your Honor did --

6   there was discourse from the bench to the podium in Collins &

7   Aikman where I believe my firm actually brought forward that

8   motion, and we agreed to drop it because we did not bring it

9   forward in the proper procedural way.  We think the city

10  should also be obligated to do that, particularly where in

11  circumstances like this with respect to our client, you

12  know -- and we just found this out, your Honor, when we got

13  handed this little handout at the start of the hearing that

14  it looks like they're trying to enjoin with -- you know, to

15  the same standards of a preliminary injunction the suit that

16  they brought against us prior to the petition date with

17  probably the same amount of notice that we got here today.

18  This suit, which is listed on here -- and, again, oddly

19  enough it's a suit brought by Detroit against us, not like

20  everybody else where they brought the suit against Detroit or

21  one of the extended defendants, you know, we're just not sure

22  what that means, and I'm sure they'll come and tell us, but,

23  in any event, we feel like we've not received notice of this,

24  and we're entitled to some process there to the extent

25  they're trying to impair our rights, which I'm sure they are.

1        And, your Honor, that really sums it up from our

2    point.  I mean largely our filing was a reservation of

3    rights.  We wanted to make clear that to the extent this is

4    trying to be used at some later point to prejudice my client

5    in whatever strategies that we -- strategies we employ to

6    exercise our property and contractual rights, we do not want

7    to be impaired.

8        One final point, your Honor, is that the city has

9    filed that motion for the investment -- or the forbearance

10   agreement that your Honor posted up for a hearing on August

11   2nd.  We just wanted to get a little clarity from your Honor

12   because that does impact some rights of ours.

13       THE COURT:  I saw your motion, and I will enter an

14   order clarifying that for you later today or tomorrow.

15       MR. BENNETT:  Great.  Thank you, sir.  Nothing

16   further.

17       MS. PATEK:  Good morning, your Honor.  Barbara Patek

18   appearing on behalf of the public safety unions that are

19   comprised of the Detroit Fire Fighters Association, the

20   Detroit Police Command Officers Association, the Detroit

21   Police Lieutenants and Sergeants Association, and the Detroit

22   Police Officers Association.  We have filed a concurrence and

23   a limited objection in the two motions before the Court, and

24   I will address them serially.  With respect to the stay

25   motion, we agree that the stay applies, and we agree in

1   concept with the issuance of the stay order as requested by
2   the city.  We want to clarify -- and I believe the Court
3   asked the question of the city's counsel -- that that stays
4   all further proceedings in the state court action, including
5   the pending application for leave to appeal that has been
6   filed by the attorney general.  And I believe the city,
7   having submitted itself or consented to the application of
8   362 and 922, that the Sixth Circuit law on that issue should
9   control.

10          With respect to the extension of the stay, we concur
11  in that as well, and we have, in fact, asked for some
12  affirmative relief, and I want to at the outset of my
13  argument address the question raised by the Court with
14  respect to the preliminary injunction standard.  I think in
15  this case -- I mean there obviously is some flexibility in
16  Section 105 that the Court has, but if you look at those four
17  factors that govern preliminary injunctions, this is a case
18  where the public interest trumps all of them, and we, on
19  behalf of public safety unions, strongly believe that that --
20  that the public interest is at stake and that the stay
21  provided by this Court will give the parties the breathing
22  space to perhaps have that robust discussion that was
23  mentioned by -- in one of the earlier arguments.

24          We do want to make it clear that in concurring in
25  the relief requested, the public safety unions are not

1    conceding that the city is eligible to be a debtor in this

2    case.  We believe there are very, very serious constitutional

3    arguments on that issue as set forth in our papers.  We

4    simply believe that this Court is the proper forum because of

5    the intersection of state and federal constitutional law and

6    Bankruptcy Code issues, some of which are novel and

7    uncharted.

8          The other issue that we want to address with regard

9    to the stay extension deals -- there are three points.  One,

10   we're asking for the affirmative relief of broadening the

11   stay to include particularly the employees and retirees of

12   the public safety unions and some former employees who may be

13   the subject now or in the future of lawsuits and whose only

14   source of indemnification would be the city.

15         Second, we want it clarified because we do not

16   believe that anybody is giving up any claim by coming before

17   this Court that all claims against any nondebtor parties are

18   preserved and, third, that to the extent that those actions

19   are stayed, that the protections of 108(c) apply.  Those are

20   essentially the relief that we're requesting.

21         THE COURT:  Let me ask you to go back to number one

22   for a second.  You mentioned former employees, so there are

23   lawsuits against former employees for which the city might be

24   liable for indemnification?

25         MS. PATEK:  And to clarify, your Honor, I don't know

1    about -- I don't have a list of lawsuits, but I'm concerned

2    with the situation, and we're really tailoring this narrowly

3    to -- that the lawsuit relates to their employment by the

4    city and acting, you know, within the scope of their

5    employment with the city and --

6              THE COURT:  Well, is it your position that under the

7    ordinance that Ms. Lennox identified, former employees are

8    also entitled to indemnification?

9              MS. PATEK:  Your Honor, I'm going to be candid with

10   you.  As I have not seen that ordinance, I don't know the

11   answer to that question, and I'd be happy --

12             THE COURT:  All right.  Well, perhaps Ms. Lennox can

13   address that.  Thank you.

14             MS. PATEK:  Thank you, your Honor.

15             MR. GORDON:  Good morning, your Honor.  Robert

16   Gordon of Clark Hill on behalf of the Police and Fire

17   Retirement System and the General Retirement System of the

18   City of Detroit.

19             THE COURT:  Yes, sir.

20             MR. GORDON:  Thank you, your Honor.

21             THE COURT:  Your Honor, while many of the arguments

22   that have been made, particularly by counsel for AFSCME, are

23   positions that we have concurred in, the thrust of our papers

24   I think focuses on a slightly different issue to some extent,

25   and for purposes of this argument I'd like to focus on those

1     for your Honor.

2          It's our position that the stay motions presume

3     facts that are not in evidence.  There is a threshold issue

4     here under Section 109(c)(2) of the Bankruptcy Code that

5     needs to be dealt with first, 109(c)(2) requiring that in

6     order for a municipality to avail itself of the protections

7     of Chapter 9, it must have received valid state authorization

8     to do so.  The situation here I believe is unique.  I'm not

9     aware of any other case really on point.  We have a situation

10    where there is Michigan state constitutional protection for

11    accrued pension benefits.  We have in this state a statutory

12    framework in which the governor is required to provide the

13    authorization for the filing of a Chapter 9.  The governor is

14    also sworn to uphold the state constitution.  So our position

15    is, as we've indicated in our papers, that if the governor

16    cannot directly abrogate -- unilaterally abrogate

17    constitutional rights under Michigan's constitution, he also

18    respectfully cannot do indirectly what he cannot do directly,

19    so, in other words, he cannot authorize a Chapter 9

20    bankruptcy filing that has as an explicit stated goal, among

21    others, to impair and diminish accrued pension benefits which

22    are protected by the state constitution.  Since he doesn't

23    have that authority, the issue isn't one of whether there's

24    an action that's voidable here.  It is void, void ab initio,

25    and it is as if it never occurred.  So our argument is that

1    there isn't -- to talk about the stay and talk about the

2    Court's jurisdiction presumes that there has been a valid

3    state authorization, and there hasn't been any valid state

4    authorization.

5            Now, as to that issue, a state court has ruled on

6    that issue.  Judge Aquilina in the Ingham County Circuit

7    Court in the case of Webster v. Snyder ruled and issued a

8    declaratory judgment, not an injunction, a declaratory

9    judgment against the governor, who is a nondebtor party, and

10   at the time and as of today there is no stay and was no stay

11   against declaratory judgment against the governor, and the

12   Court entered a declaratory judgment ruling along the lines

13   of what I just argued and declaring that the governor did not

14   have authority to authorize this Chapter 9 bankruptcy filing.

15   To be clear, that matter has not been stayed by the Court of

16   Appeals.  The Court of Appeals stayed certain TRO orders that

17   have been entered by Judge Aquilina, but the declaratory

18   judgment is a final order that has not been stayed.  So the

19   question becomes where should the 109(c)(2) issue be

20   addressed, and we have submitted that it ought to be

21   addressed by the state courts because unlike the other

22   eligibility requirements under Section 109(c) for determining

23   whether a debtor is eligible to proceed under Chapter 9,

24   Section 109(c)(2) is specifically a creature of state law,

25   and the Bankruptcy Code and Chapter 9 evinces a deep and

1    abiding respect for federalism and Tenth Amendment concerns,

2    and in that light we think it is appropriate to allow the

3    state judiciary, which is a co-equal partner of the executive

4    branch and of the legislative branch in this state --

5        THE COURT:  Okay.  So how do you deal with the

6    city's argument that 28 U.S.C., Section 1334, gives this

7    Court exclusive jurisdiction over the bankruptcy petition

8    and, therefore, over the eligibility issues under Chapter 9?

9        MR. GORDON:  Again, your Honor, our position would

10   be that it presumes something that is not in evidence here.

11   It presumes that there has been a valid petition filed, and

12   there simply has not been a valid petition.  That's our

13   argument.  Our argument as to supremacy clause --

14       THE COURT:  But Chapter 9 makes -- Chapter 9 makes

15   that issue an eligibility question, doesn't it?

16       MR. GORDON:  I guess it depends on how you look at

17   it, but from our point of view, if an action has been void ab

18   initio, it's a circular issue to some extent.  I understand

19   your point, your Honor.  It's a bit of a circular issue, but

20   from our position, we think that to assume in the first

21   instance that there's been valid action by the governor and

22   that this Court should determine it presumes something that

23   hasn't yet been established.  If, however, of course, this

24   Court feels that it has jurisdiction to address that issue,

25   we would submit that -- again, without waiving the argument

 1   that this really should be addressed in the state court, we

 2   would submit that the 109(c)(2) issue of whether there's been

 3   valid state authorization is the first issue this Court

 4   should address and not the stay motions and that that issue

 5   ought to be addressed upon full briefing in the context of a

 6   Section 921(c) motion to dismiss.  I think that that comports

 7   with the process.

 8           THE COURT:  Let's talk about that.  What's the

 9   prejudice to your client or the interest that your client

10   seeks to vindicate by having this issue resolved before any

11   other issue?

12           MR. GORDON:  Having which issue resolved, your

13   Honor?

14           THE COURT:  This issue of whether the governor

15   constitutionally authorized the filing.  Why does your client

16   need that to be resolved before anything else?

17           MR. GORDON:  Well, I think as a matter of just

18   jurisprudence to be proceeding with issues regarding a stay

19   when there's a fundamental issue of subject matter

20   jurisdiction, to me it would make sense to address the issue

21   of whether there is subject matter jurisdiction before we

22   proceed with all sorts of matters that may be of no effect.

23   They may be completely void, so I think that we --

24           THE COURT:  Okay.  So you're not representing to the

25   Court, for example -- and I don't mean to suggest this --

 1   that your clients were intending to file a lawsuit against

 2   the city to enforce this constitutional right imminently, are

 3   you, or are you?

 4          MR. GORDON:  I'm sorry.  Can you repeat the

 5   question, your Honor?

 6          THE COURT:  I asked you how your clients would be

 7   prejudiced by dealing with this issue of the

 8   constitutionality of this filing later in the context of

 9   eligibility, and you talked about issues of jurisprudence,

10   just prudence, so I asked you are you, therefore, not

11   suggesting to the Court that your client had a lawsuit

12   against the city in mind to file imminently to enforce this

13   constitutional right, which would be stayed if the Court

14   granted the motion?

15          MR. GORDON:  Understood, your Honor.  No, we do not.

16          THE COURT:  Okay.

17          MR. GORDON:  No, we do not.  So, your Honor, again,

18   we think that this is a threshold issue that ought to be

19   dealt with not on the fourth business day of the case but

20   through a little bit more of a robust process if this Court

21   is inclined to --

22          THE COURT:  Well, let's talk about that even.  If

23   the Court grants this motion, it would be, wouldn't it,

24   without prejudice to your right to seek relief from the stay

25   and/or abstention?

1    MR. GORDON:  Yes, but, again, the question is

2   whether there's a stay at all because there's a question of

3   the validity of the ongoing bankruptcy, so --

4        THE COURT:  Well, but if those rights are preserved,

5   the prejudice of which you speak is reduced, not eliminated,

6   but reduced.

7        MR. GORDON:  Possibly, although abstention is not

8   as -- certainly is not the same argument, of course.

9        THE COURT:  But I'm just asking.

10        MR. GORDON:  Yes.

11        THE COURT:  Yes.

12        MR. GORDON:  I understand.  Your Honor, so that is

13   our position on that.  As far as the actual request for stay

14   relief, our papers speak for themselves to a great extent.  I

15   won't repeat what's been said here.  I would say this,

16   though.  As to the stay confirmation order, I think it ought

17   be explicit that if all they're asking -- all the city is

18   asking for is confirmation, then it should be clear that it's

19   not expanding anything.  If it's just the confirmation, then

20   we don't object to it because they're not doing -- by

21   claiming that they're confirming the stay, they're stating

22   that they are not expanding and exceeding the --

23        THE COURT:  Right.

24        MR. GORDON:  -- scope of the Bankruptcy Code --

25        THE COURT:  Okay.

1          MR. GORDON:  -- so that would be our comment on
2     that.  As far as the request to extend the stay, you know,
3     again, on day four it's very unclear to know how far they're
4     intending to stay this.  There has been no discussion between
5     the parties.  I've now heard from another counsel, who just
6     preceded me, that she would like to see the stay extended to
7     other people as well.  Again, I would submit that there ought
8     to be an opportunity to discuss that.  The argument has been
9     made that an adversary proceeding is necessary to enforce a
10    105 stay.  The arguments that say that a 105 -- that you
11    don't need to have an adversary proceeding, that form should
12    not rule over substance, we understand those arguments, but
13    nothing should overrule due process, and I think it's really
14    an issue of due process.  We don't know the contours of
15    really at the end of the day -- the papers are not clear as
16    to what the contours are, what they're seeking to extend to,
17    and, quite frankly, they haven't -- the papers do not
18    establish unusual circumstances here.  The Eagle-Picher case
19    is inapposite to what is at issue here.  All that's been
20    alleged is a sort of murky mere closeness of relationship
21    between the governor and the city, which we submit is
22    insufficient.  The declaratory judgment that was entered by
23    Judge Aquilina has not been stayed, but this motion for stay
24    extension is seeking to do just that, and to stay a
25    declaratory judgment is really to essentially eviscerate the

declaratory judgment.  There's no action to be taken, so to

stay it is to basically vacate it.  We submit that that's not

appropriate under the circumstances here.  And we've raised

issues about Rooker-Feldman and so forth, and, again, we

would submit that if the Court were going to discuss the

extension of the stay, it should not extend to affect the

rights of parties relative to the declaratory judgment and

its winding its way through the state court system.

THE COURT:  Thank you, sir.

MR. GORDON:  Thank you, your Honor.

MS. CECCOTTI:  Good morning, Judge Rhodes.  Babette

Ceccotti, Cohen, Weiss & Simon, LLP, for the UAW, and with me

is Mr. Wertheimer, counsel to the Flowers plaintiffs.  As

your Honor is hopefully aware, the Flowers plaintiffs and the

UAW filed a joint objection, and Mr. Wertheimer is here in

case the Court has any questions regarding the Flowers

lawsuit, and I will state the objection of the UAW from the

U -- representing the UAW.  Excuse me, your Honor.

As is evident from our objection, we have largely

joined -- in the interest of brevity and not overwhelming the

Court with duplicative papers, we have largely joined in the

arguments already briefed and addressed by Ms. Levine on

behalf of AFSCME.  I do have a couple of other points that I

would like to make but, in particular, perhaps revisit some

of the ground already covered in part by other counsel in

1    response to Ms. Lennox's presentation on a couple of matters

2    that I found quite extraordinary and think that it is worth

3    focusing on again.

4         First, the notion that this Court could permanently,

5    permanently stay the state court lawsuits is I would submit

6    well beyond any power of this Court under 105 or 362 or any

7    other ground being suggested to you by the city.  These are

8    not -- as Ms. Levine stated, we're not here about an

9    implementation tool to keep others from diverting the city's

10   attention and running around and trying to collect on claims.

11   As you've heard this morning already, the issues raised by

12   the state -- by the state court lawsuits go to -- they not

13   only go to the eligibility of the city to file, they -- it

14   is -- it's actually -- it's more fundamental than that.

15   These are issues that arise under state law.

16        Chapter 9, of course, reflects dual sovereignty and

17   in part reflects that most significantly in the eligibility

18   criteria, which requires that the municipality be authorized

19   under state law or by a governmental officer.  The key here

20   is under state law.  The pre-petition lawsuits address the

21   state law issues as to whether the state law bases under

22   which the governor issued his authorization for the filing

23   violate the Michigan state constitution to the extent that

24   the authorization does not except out the pension benefits.

25   These are totally state court issues.  So if we look at 1334,

 1   just to take that point, while this Court may have original

 2   and exclusive jurisdiction of all cases under Title 11, the

 3   use of the word "cases" must be read specific to the case

 4   that we have, and the case that we have here is a Chapter 9

 5   case with all of the dual sovereignty attributes of that,

 6   including the eligibility criteria, which fundamentally are

 7   grounded on an authorization under state law, so I do not

 8   believe that 1334(a) can be read to simply write out of the

 9   statute the unique character, if you will, of Chapter 9 vis-

10   a-vis the other chapters of the Bankruptcy Code, which is so

11   dependent on the state court authorization to --

12           THE COURT:  So is it your argument that this Court

13   doesn't have the jurisdiction to decide this constitutional

14   issue or that it is concurrent?

15           MS. CECCOTTI:  Your Honor, I was getting to that

16   when I was going to move on to 1334(b).

17           THE COURT:  Okay.

18           MS. CECCOTTI:  To the extent that anybody would

19   argue or perhaps decide or say that the eligibility features

20   and the ability to file a motion to dismiss based on those

21   features would be a proceeding under a case, then 1334(b)

22   makes clear that the District Courts have original but not

23   exclusive jurisdiction on those questions so that while this

24   Court arguably would have jurisdiction in the context of a

25   motion under 109(c), it is not exclusive, and the state -- to

 1   the extent the issue of the state's authorization and whether

 2   that authorization should have excepted the pensions

 3   consistent with or under -- directly covered under -- the

 4   prohibition under the Michigan state constitution, at a

 5   minimum, if we're talking about a proceeding, the state

 6   courts -- the state courts and this Court would both consider

 7   that issue, and now here we do get into important and serious

 8   questions of federalism and abstention.  The state courts

 9   already have the authorization issue teed up in the three

10   lawsuits in slightly different fashions, but the gravamen of

11   all of them, if you boil it down, is the scope of the

12   authorization issued by the governor and whether the failure

13   to except the pensions -- the accrued pensions from the

14   authorization to use Chapter 9 violated the state

15   constitution.  Therefore, the Court's prudential or juris --

16   the Court's prudential or discretion perhaps to take that

17   issue up would be guided, as it is in other matters where a

18   party comes in to lift the stay to have a state court proceed

19   with a lawsuit perhaps of the type that Ms. Levine mentioned,

20   perhaps a pre-petition state lawsuit having to do with a

21   particular piece of property or a lien, those issues all come

22   into play and, in fact, weighing the factors that apply in

23   those cases, it is not always the case that the Bankruptcy

24   Court keeps those matters.  It depends on the issues.  It

25   depends on five or six or seven factors, depending on which

1    court you're in.

2         THE COURT:  Okay.  Well, let's focus on this issue

3    and ask whether there are any cases that have addressed the

4    argument that you make that this specific element of

5    eligibility should be resolved in the state court rather than

6    in the Bankruptcy Court.

7         MS. CECCOTTI:  Your Honor, I cannot standing here

8    today cite to a case, but I'm very confident that there are

9    such cases, perhaps not in the -- necessarily in the Chapter

10   9 context given the relative paucity of jurisprudence under

11   Chapter 9, but there are myriad cases that have arisen, for

12   example, under Chapter 11 where by balancing the various

13   factors, including the importance of respecting federalism

14   and noninterference with the state court's ability to

15   determine matters under their own laws --

16        THE COURT:  Well, but isn't it the case that every

17   Chapter 9 case which has been dismissed for lack of proper

18   authorization -- and there have been a few -- have been

19   dismissed by the Bankruptcy Court based on the Bankruptcy

20   Court's determination of authorization.

21        MS. CECCOTTI:  That's correct, but how many of those

22   cases -- and we'd have to look, but I'm going to place a

23   small bet here and say none, involved --

24        THE COURT:  We don't permit that here.

25        MS. CECCOTTI:  -- three lawsuits, three lawsuits

1    filed on -- against slightly different but all -- but

2    theories that -- the gravamen of which are the same? So in

3    those cases, I'm not sure they're instructive because they

4    wouldn't say -- they wouldn't tell us that the Bankruptcy

5    Court versus those prefiling lawsuits was the only -- the

6    appropriate --

7            THE COURT: Well, but to what extent is --

8            MS. CECCOTTI: -- or certainly not the only place.

9            THE COURT: To what extent is your argument -- would

10    your argument be diminished if there weren't such lawsuits,

11    if the --

12            MS. CECCOTTI: I think -- I think --

13            THE COURT: -- individuals here simply requested

14    this Court to permit the state court --

15            MS. CECCOTTI: Your Honor, the essence of the

16    objection is, in fact, that these lawsuits exist and what

17    they are based in. If the lawsuits did not exist, we would

18    have a different argument before you today.

19            THE COURT: Okay.

20            MS. CECCOTTI: But they do exist, and the fact that

21    they exist we think is simply -- must be the primary

22    consideration by this Court in determining the relief and we

23    respectfully submit denying the relief requested by the city.

24            I would like to make two other points, one of which

25    I regret we didn't raise in our papers, but it struck me

1   reading -- when I listened to Ms. Lennox this morning

2   articulate for the Court the relief that they are seeking

3   with respect to matters that haven't been lodged as lawsuits.

4   I believe she read that the -- paragraph 20 of her papers in

5   looking for prospective relief or -- against entity -- people

6   or entities that might become targets.  I did notice that the

7   proposed form of order merely states that the motion is

8   granted, and I would submit to the Court that if any type of

9   injunction is issued -- and we strongly urge the Court not to

10  grant the motion, but to any extent any -- the Court deems

11  any type of stay possible, any such relief should provide

12  fair notice to parties who have not yet done anything as to

13  the conduct that is potentially going to be covered by the

14  order, and we submit that, at least based on the filings

15  here, your Honor does not have sufficiently specific language

16  to issue such an order.

17        Finally, the proposed relief is overly broad even

18  with respect to the pre-petition lawsuits to the extent that

19  they ask this Court to simply rule that those lawsuits are

20  stayed.  I wish to -- we do want to point out to the Court

21  that the lawsuits -- the Flowers lawsuit certainly and

22  perhaps some of the others have named the State of Michigan

23  as defendants.  We don't understand the city's request for

24  relief in terms of a stay extension to extend to the State of

25  Michigan; therefore, the stay -- a stay is not -- has not

```
 1   been -- such a stay has not appropriately been sought and if
 2   the Court again were to grant a stay, that, again, the relief
 3   is --
 4              THE COURT:  Let's assume there --
 5              MS. CECCOTTI:  -- would be overly broad.
 6              THE COURT:  Let's assume there's no order staying a
 7   lawsuit against the state.  What does that do for your
 8   clients?
 9              MS. CECCOTTI:  The State of Michigan is a defendant,
10   and --
11              THE COURT:  What relief can the Court order against
12   the state that would help your clients?
13              MS. CECCOTTI:  To permit -- the lawsuits would be
14   able to proceed against the state.
15              THE COURT:  Right, but what ultimate relief could
16   the state court grant against the state that would help your
17   clients?
18              MS. CECCOTTI:  There I would need to ask the counsel
19   for the Flowers plaintiffs --
20              THE COURT:  Okay.  Okay.
21              MS. CECCOTTI:  -- if you don't mind, just because my
22   familiarity is not primarily with those cases.
23              THE COURT:  No, not at all.
24              MS. CECCOTTI:  Those were my points, your Honor.
25              THE COURT:  Thank you.  Would you like to try to
```

1  address that for me, sir?

2      MR. WERTHEIMER:  Yes, your Honor.  William

3  Wertheimer, your Honor, appearing on behalf of the Flowers

4  plaintiffs.  In answer to that last question, first of all,

5  it is correct that the Flowers case, the state is a defendant

6  as an entity, and the same is true of the Webster and the

7  pension systems case.  All three cases seek declaratory

8  judgments, and a declaratory judgment can issue against the

9  state because --

10      THE COURT:  Right.  But what does that do --

11      MR. WERTHEIMER:  -- it's a declaratory judgment --

12      THE COURT:  What does that do for your clients?

13      MR. WERTHEIMER:  It depends upon what effect that

14  judgment would have with this Court as a practical matter.

15      THE COURT:  Oh, so you're thinking it may have some

16  res judicata or Rooker-Feldman effect?

17      MR. WERTHEIMER:  Well, you know, your Honor, your

18  Honor, our basic point is that this is a state law issue that

19  we brought to the state courts before this proceeding was

20  brought in good faith attempting to get an order and a ruling

21  from the state courts, and we would want to continue to do

22  that, and we think we can do that even under the motion they

23  filed, if it's granted, given the fact that the state as an

24  entity remains as a defendant in the three cases.

25      THE COURT:  All right.  Thank you.

1    MR. WERTHEIMER:  I would also reiterate that -- a

2    point previously made, that the stays that were issued

3    yesterday by the Court of Appeals did not cover at all the

4    declaratory judgment, which was a final judgment, which

5    entered in the <u>Webster</u> case as --

6         THE COURT:  Someone mentioned that.

7         MR. WERTHEIMER:  The state has not yet taken an

8    appeal, but the activities at the Court of Appeals all have

9    to do with the applications for leave of the nonfinal orders.

10        THE COURT:  Thank you for clarifying that, sir.

11        MR. WERTHEIMER:  Yes, your Honor.  I have one point.

12   We filed yesterday a brief along with a declaration from me,

13   and that declaration dealt principally with one issue, and

14   that is the debtor in its initial pleadings and in its motion

15   specifically indicated that the orders issued in state court

16   were -- all three orders were ex parte, and that is

17   consistent with the debtor's statements today talking about

18   target, et cetera.  In other words, we're the bad guys out

19   there as they would characterize the bad guys in a typical

20   Chapter 11 case.  We are not the bad guys.  We did not do

21   anything ex parte.

22        THE COURT:  I have to -- I have to stop you.  I

23   didn't read anything in the city's papers that suggested your

24   clients were the bad guys.

25        MR. WERTHEIMER:  Well, they -- your Honor, the

1  city's papers stated that in all three cases we obtained ex
2  parte injunctive relief.  In none of those three cases did we
3  obtain ex parte injunctive relief.  In fact, we gave the
4  state and its officers notice of everything we did, and the
5  matter was fully briefed.  Nothing happened ex parte.  Let me
6  leave it at that.
7            THE COURT:  Okay.
8            MR. WERTHEIMER:  And, finally, consistent with that,
9  in my declaration I indicated that I was attaching the
10  transcript from the proceedings of July 18.  I neglected to
11  do that electronically.  We provided copies to everybody last
12  night by e-mail.  We will make sure that that's also done
13  electronically, and I'd like to, if I may, approach the bench
14  and provide a copy to the Court.
15            THE COURT:  Yes, sir.  That's fine.  Thank you.
16            THE CLERK:  Thank you.
17            MR. WERTHEIMER:  That's all I have, your Honor.
18  Thank you.
19            THE COURT:  Thank you.  And before we proceed with
20  the city's rebuttal, I'd like to ask if there's anyone in the
21  courtroom who would also like to address the Court.  And
22  briefly, please, sir.
23            MR. BRENT:  Good morning, your Honor.  My name is
24  Nathaniel Brent.  I represent myself pro se in a current
25  lawsuit against the City of Detroit in this Eastern District

1 of Michigan in front of Julian Cook.  One thing that I'm
2 surprised at with all of these learned attorneys here is
3 nobody has mentioned the issue of this declaratory judgment
4 actually collaterally estops the City of Detroit from
5 relitigating the issue of whether they had authority to even
6 file this petition.
7           THE COURT:  Actually, that is mentioned in the
8 briefs.  It's more than mentioned.  It's argued forcefully in
9 the briefs.
10          MR. BRENT:  That's not my primary argument here,
11 your Honor.  My primary argument is regarding the stay that's
12 been in place and the extensions they're seeking to grant a
13 blanket stay for any Detroit employee, present or --
14          THE COURT:  Let me ask you what is your claim and
15 who is it against?
16          MR. BRENT:  My claim is against the City of Detroit
17 police officers and two police officers in both their
18 individual and official capacity for violations of my Fourth
19 Amendment rights.  The issue here, your Honor, is this case
20 has been pending for the last two and a half years.
21          THE COURT:  Um-hmm.
22          MR. BRENT:  And now that the stay is in effect and
23 they're trying to extend this even further, the issue
24 cannot -- of liability cannot even be litigated in order to
25 bring it in front of this Court.

1          THE COURT:  Um-hmm.

2          MR. BRENT:  Granted, as for the execution of any

3     orders to enforce any judgment entered would clearly be

4     within the jurisdiction of this Court.  I don't contest that

5     at all.  The issue of whether or not they are liable and

6     committed the violations of the Fourth Amendment, those are

7     issues that should be allowed to be continued to be

8     litigated.

9          THE COURT:  Um-hmm.

10          MR. BRENT:  On that issue, even if an award is

11     granted, it would not be part of the reorganization of the

12     City of Detroit in the first place.  The City of Detroit's

13     charter -- in Chapter 9 of the City of Detroit's charter they

14     have what is called a risk management fund, which is a

15     dedicated fund which is required to have a minimum of $20

16     million in it to pay for civil lawsuits and workmen

17     compensation claims.  This isn't part of the reorganization.

18     This is going to exist regardless.

19          As for their claim regarding the indemnifying

20     employees under Chapter 13-11-1, that gives the City of

21     Detroit the option to indemnify.  It does not require that

22     they indemnify these employees.

23          THE COURT:  Um-hmm.

24          MR. BRENT:  And, now, in my present case, City

25     Council did vote to elect to indemnify the employees.

1          THE COURT:  Um-hmm.

2          MR. BRENT:  However, this is the city's option.

3     This isn't a requirement of law that they indemnify these --

4          THE COURT:  Um-hmm.

5          MR. BRENT:  -- just as -- my lawsuit is also against

6     various state actors within the State of Michigan, which --

7     but, again, their wanting to extend this to them would

8     prevent me from litigating my claims against the state

9     officials that have already been denied immunity, and it is

10    currently pending.  Those portions they've appealed to the

11    Circuit Court.  So now that they're trying to extend this

12    stay, now the Sixth Circuit Court of Appeals case of <u>Brent</u>

13    <u>versus Wayne County, et al.</u> will be stayed as well where the

14    different state defendants -- state employees have uphill

15    decision to deny their qualified and absolute immunity.

16         THE COURT:  The defendants in your particular suit

17    are both city employees and other defendants are state

18    employees?

19         MR. BRENT:  Yes, and there's also state contractors

20    involved in the lawsuit.

21         THE COURT:  Contractors also.  Thank you, sir.

22    Would anyone else like to be heard?

23         MR. SANDERS:  Good morning, your Honor.  My name is

24    Herb Sanders, and I represent the plaintiffs in the case of

25    <u>Phillips</u> versus <u>Snyder</u> pending before this Court, Case Number

2:13-CV-11370, before Judge Steeh.  That is a case that
challenges the constitutionality of PA 436.  Motions for
summary -- for at least one summary disposition or summary
judgment argument have been scheduled.  As I initially read
the request for stay extension motion filed by the city, it
appeared that the city was seeking an extension of stay
concerning financial matters that were being litigated, but
pursuant to the oral presentation of the city's attorney, it
concerns me when she has indicated -- and I paraphrase --
that she seeks relief concerning any litigation that might
interfere with the city's rights as a Chapter 9 debtor.  And
I would suggest to the Court to the extent that it might be
proposed or suggested that the litigation which I have
referenced in which the constitutionality of PA 436 is to be
determined by another judge in this court interferes with the
rights of the city as a Chapter 9 debtor, that that case not
be included as part of the stay order that this Court would
issue.  I believe it's imperative to this community, to this
state that those issues be determined and, in fact, should
probably be determined before the bankruptcy proceeds, but I
would encourage the Court to not give a broad order if any
order were to issue that would be inclusive of matters that
are not financial matters such as there are other matters
that I know that the union, AFSCME, and others are a part of
seeking FOIA requests from the city, injunctive relief as it

1   relates to these types of matters, and I would ask the Court

2   to consider not giving such a broad order --

3           THE COURT:  Um-hmm.

4           MR. SANDERS:  -- that that type of information could

5   not be obtained and we could not have a determination as to

6   the constitutionality of PA 436 by this Court.

7           THE COURT:  Um-hmm.

8           MR. SANDERS:  Thank you, your Honor.

9           THE COURT:  Thank you.  Sir, can you just give me

10  your name again, please?

11          MR. SANDERS:  Herb Sanders.

12          THE COURT:  Mr. Sanders.  Thank you, sir.

13          MR. SCHNEIDER:  May it please the Court, Matthew

14  Schneider, chief legal counsel to the Attorney General.  I'm

15  here on behalf of the State of Michigan.  Your Honor, I'm

16  here for a very, very limited purpose.  As counsel to the

17  debtor has indicated, they are not seeking to abrogate the

18  exceptions in Section 362(b), and I know that this is a

19  motion regarding Section 362, so our position is is that if

20  the Court is, indeed, inclined to grant the motion regarding

21  the stay, that the Court's order reflect that nothing in the

22  Court -- nothing what the Court is doing will actually

23  abrogate the exceptions afforded under 362(b).

24          THE COURT:  Is there a specific exception you're

25  concerned about?

1    MR. SCHNEIDER:  Well, your Honor, the state has a
2  great interest in ensuring that our departments and agencies
3  can continue their administrative functions, which is really
4  not unusual, and we just want to be sure that that's the
5  case, and that's all I have, your Honor.
6    THE COURT:  Well, but which provision in Section
7  362(b) --
8    MR. SCHNEIDER:  It's subsection (4).
9    THE COURT:  -- is implicated?  Oh, (4).  Okay.
10    MR. SCHNEIDER:  Subsection (4) --
11    THE COURT:  Of course.
12    MR. SCHNEIDER:  -- which indicates that, you know,
13  commencement or continuation of an action or proceeding by a
14  governmental unit isn't going to -- isn't going to impair a
15  governmental unit to have its regulatory power in --
16    THE COURT:  It's the police powers exception.
17    MR. SCHNEIDER:  Correct.
18    THE COURT:  Thank you, sir.
19    MR. SCHNEIDER:  Thank you.
20    THE COURT:  Would anyone else like to be heard?  All
21  right.  Ms. Lennox.
22    MS. LENNOX:  Thank you, your Honor.
23    THE COURT:  And by the way, my very efficient staff
24  provided me by computer here a copy of the ordinance.
25    MS. LENNOX:  Oh, thank you, your Honor.  I have one,

1  too, so that --

2         THE COURT:  I'm all set.

3         MS. LENNOX:  Great.

4         THE COURT:  And it does raise a question.  The

5  language appears to be discretionary as concerns indemnity.

6  Yes?

7         MS. LENNOX:  It is discretionary, but it's the

8  city's policy that if the employee is performing its duties

9  in good faith in the scope of its employment that indemnity

10 will issue, and that discretion now is the discretion of the

11 emergency managers, your Honor, which I would point out I was

12 very --

13        THE COURT:  Well, what impact does the fact that

14 it's discretionary rather than mandatory have on your

15 argument that the stay should be extended to employees who

16 might not otherwise be covered?

17        MS. LENNOX:  I think, your Honor, it doesn't have

18 much of an impact at all because, as I said, it's a matter of

19 city policy that if the employee was performing his or her

20 duties in good faith and the conduct that gave rise to the

21 action occurred in the performance of those duties, then the

22 indemnity will issue.

23        THE COURT:  Is that a policy in writing that we can

24 refer to, or is it just a matter of --

25        MS. LENNOX:  I would have --

1          THE COURT:  -- this is what the city always does?

2          MS. LENNOX:  I would have -- I would have to check

3     with corporation counsel on that, your Honor, but regardless,

4     the extension should certainly apply to the employees for

5     whom the city has agreed to indemnify for the reasons that I

6     stated earlier.

7          I would like, your Honor, just at the outset -- I

8     was very remiss because we didn't make opening statements to

9     neglect to introduce to you the emergency manager, who is

10    here in the courtroom today.  Mr. Orr is here.  Obviously he

11    has a great interest in these proceedings.  Okay.  Thank you,

12    your Honor.

13         Perhaps a couple of housekeeping matters before I

14    get into argument.  First, your Honor, I do have a copy of

15    the order that was issued by the Court of Appeals in the

16    State of Michigan in the Webster case in which the

17    declaratory judgment was entered, and perhaps that order --

18    the declaratory judgment has been appealed, and perhaps we

19    were misreading the order, but the order does say that the

20    motion for stay pending appeal is granted, and the Circuit

21    Court's July 18th, 2013, temporary restraining order and all

22    further proceedings are stayed, so that's where we got that

23    understanding, your Honor.  I have a copy if your Honor would

24    like to see it.

25         THE COURT:  Please.

1        MS. LENNOX:  May I approach?

2        THE COURT:  Yes.

3        MR. CANZANO:  Judge, I know it's a little bit

4   unorthodox here, but I --

5        THE COURT:  I have to ask you to stand by the

6   microphone because of the limitations of our equipment here,

7   sir.  Sir, actually this microphone, and my apologies to you

8   for that inconvenience.

9        MR. CANZANO:  I'm the attorney that got the

10  declaratory judgment, John Canzano, representing the --

11       THE COURT:  Canzano?

12       MR. CANZANO:  -- Webster plaintiffs.  I can speak

13  very briefly to why the declaratory judgment is not stayed.

14       THE COURT:  Okay.  Let me ask you --

15       MR. CANZANO:  There's four appeals.

16       THE COURT:  Let me ask you -- let me ask you to do

17  that after Ms. Lennox speaks.

18       MS. LENNOX:  As another housekeeping matter, your

19  Honor, I believe when Mr. Bennett was speaking, he indicated

20  that his firm in the Collins & Aikman case had filed a motion

21  to extend the stay but then they withdrew it because it was

22  procedurally improper.  Respectfully, I would beg to differ.

23  I have the transcript of that motion.  That motion was heard.

24  It was argued before your Honor, and it was denied.  If your

25  Honor would care to see the transcript, I do have it with me.

1          THE COURT:  No, thanks.

2          MS. LENNOX:  Thank you.  In our colloquy, your

3    Honor, as an initial matter, you had asked what if the

4    preliminary injunction standards applied, and, as I

5    indicated, if you're going to apply preliminary injunctions,

6    you sort of have to have a matter to --

7          THE COURT:  That wasn't exactly my question.  My

8    question was how do you deal with the argument that they

9    should apply?

10         MS. LENNOX:  I think, your Honor, under the Section

11   105 extension case law that exists out there where you extend

12   by motion, the courts have created a standard that is

13   different than the preliminary injunction four-part standard,

14   and, in fact, in cases in which this is presented by motion,

15   the preliminary injunction standards aren't even discussed,

16   and that standard is the standard that I --

17         THE COURT:  Well, but didn't Eagle-Picher address

18   them?

19         MS. LENNOX:  Eagle-Picher was brought by a

20   preliminary injunction.  That was a preliminary injunction

21   case.  It noted in dicta that many courts permit extensions

22   of the stay by motion, but that particular case they had

23   brought by preliminary injunction, so, therefore, they went

24   through the standards.  If we had to go through the standards

25   here, I think we meet them, and if your Honor is interested,

1    I can articulate that for you.

2              THE COURT:  Go ahead.

3              MS. LENNOX:  But in any event, I don't think we need

4    to go through them under the circumstances, but if we had to

5    meet the preliminary injunction standards, I believe that

6    there would be -- at least with respect to the three lawsuits

7    that we have out there, I think there would be a great chance

8    of success on the merits because by the plaintiffs attempting

9    to condition the authorization to file a municipal bankruptcy

10   on that municipal -- that municipality's foregoing rights

11   under Chapter 9 once in Chapter 9 is a violation of the

12   bankruptcy clause and the supremacy clause.  I think we'd win

13   on that, your Honor.

14             Secondly, with respect to irreparable harm, if these

15   actions are not stopped, the city would be irreparably

16   harmed.  We would be preventing -- we would be prevented from

17   accessing necessary protections that we are otherwise wholly

18   entitled to access under Chapter 9 and under applicable law,

19   and it would be harmed by our inability to have the

20   appropriate forum, this forum, to decide the matter because

21   the matter presents federal issues for federal jurisdiction.

22   The issues that are presented have to do with can the

23   authorization be conditioned upon limiting a municipality's

24   rights in Chapter 9.  That clearly and squarely presents

25   federal issues of this Court's jurisdiction that can only be

1    decided by this Court under the supremacy and the bankruptcy

2    clauses, so without -- an inability for us to pursue that

3    would be irreparable harm to the city.  A state court simply

4    does not have jurisdiction to decide those.

5         Third, your Honor, the injunction, if one would call

6    this an injunction, is not going to harm others because, as

7    your Honor pointed out, they do have a forum, indeed the only

8    appropriate forum, in which to decide the issues that can

9    arise only in a bankruptcy case, issues like eligibility,

10   contract rejections, what should go in a plan of adjustment,

11   all of which are addressed by the three lawsuits that are

12   filed.  As your Honor pointed out, these litigants will have

13   due process.  They will have their day in court.  They will

14   have these issues decided, but they will have them decided in

15   the tribunal with proper jurisdiction.

16        And then fourth, your Honor, public policy clearly

17   favors the resolution of issues that exist only under the

18   Bankruptcy Code in the Bankruptcy Courts.  Any attempts to

19   have courts that are not of competent jurisdiction determine

20   these issues actually, your Honor, would offend public

21   policy, so while I don't think that we need to go through the

22   preliminary injunction standards in this case and by virtue

23   of the relief that we asked for, if we had to, we would meet

24   them.

25        Now, your Honor, I think I would like to, if it

1    please the Court, address sort of collectively the arguments

2    that were made about should the state courts determine this

3    or should the federal courts determine this, and

4    ultimately -- certainly at least what Ms. Levine was arguing

5    down to, they're arguing the merits of eligibility, and, as

6    your Honor pointed out, that's not before the Court today.

7    Nothing prevents -- as your Honor also pointed out, nothing

8    prevents anybody from seeking to lift the stay in any

9    particular case in any particular matter, and that's a

10   question that can be addressed to this Court.

11          More particularly -- and I'd like to go into this in

12   some detail -- the Court has jurisdiction to hear and

13   consider state court matters in this court.  Since the days

14   of Erie versus Tompkins back in 1938, federal courts have

15   applied state law when required to to determine the matters

16   before them.  It's very clear that now that this case is

17   filed, this Court -- under Section 921 of the Bankruptcy Code

18   and under its jurisdiction granted by 28 U.S.C. 1334(a) and

19   (b), this Court is the only court that is authorized to

20   determine eligibility issues.  As part of the eligibility

21   issues, Section 109(c)(2) necessitates the interpretation of

22   state law, and Bankruptcy Courts have done that in virtually

23   every Chapter 9 case that has been filed.  In Jefferson

24   County they went through the Alabama statutes for authorizing

25   the case.  In the New York City Off-Track Betting Corp. in

1    New York in 2010, the Bankruptcy Court found that the

2    governor had adequate power under the state constitution to

3    issue the order authorizing the filing.  In the Suffolk

4    County Regional Off-Track Betting Corporation case, an

5    Eastern District of New York in 2011, the Court, interpreting

6    state law, found that the debtor did not comply because the

7    county resolution violated the -- Suffolk's County's

8    authority and was unconstitutional and dismissed the

9    petition.  In the Barnwell County Hospital case in the

10   District of South Carolina in 2012, they examined state law

11   to determine whether the County Hospital Board had

12   authorization to file Chapter 9, and they determined -- they

13   did the inquiry as to whether the authorization was void in

14   light of the state constitutional prohibition against dual

15   office holding, and they concluded it was not.  That case,

16   along with other cases, absolutely involved an interpretation

17   of state constitutional issues.

18          So given that the Bankruptcy Court's authority

19   includes the authority to decide state law issues when

20   required in exercising its jurisdiction under the Bankruptcy

21   Code and it is competent to do so, there is absolutely no

22   reason to disrupt the efficient resolution of this bankruptcy

23   case by having the state court cases go forward.

24          Your Honor, if you look at PA 436, Section 18.1,

25   nothing in that authorization statute mentions pensions.  It

1   simply mentions a process by which the city had to go through

2   to -- for the governor to make a determination whether we

3   were authorized to file nor, if your Honor would read it, is

4   anything in the governor's authorization letter conditioning

5   the filing on taking any action, not taking any action, or it

6   does not even mention what might happen to pensions in this

7   case, so this Court clearly has jurisdiction to determine the

8   state constitutionality issues.

9        On the other hand and respectfully, the state courts

10  have no jurisdiction to determine the issues of authorization

11  or eligibility under Section 109(c)(2) of the Bankruptcy

12  Code.  They have no jurisdiction to determine whether this

13  city had the right to file this case or, more importantly,

14  the rights that this city can exercise now that it is in

15  bankruptcy, and that, your Honor, is exactly what the

16  plaintiffs seek to do in their constitutionality challenges

17  in the three actions that are pending in state court.  This

18  is not a secondary jurisdiction matter.  This is a matter of

19  primary jurisdiction under Section 1334(a), (b), and Section

20  921 of the Bankruptcy Code for this Court.  This is the only

21  Court competent to make those determinations.

22       Mr. Gordon suggested that we don't need to decide

23  the stay issues today because the -- because we should wait

24  to determine eligibility first.  First of all, I would say

25  that there's no prejudice to pensioners in this case because

pensions are continuing to be paid.  There's no change to
that, so the delay shouldn't be a factor.  Secondly,
eligibility has nothing to do with the fact that the
automatic stay is in effect.  It arose by operation of law on
the day that we filed the petition on July 18th, and it is in
effect.  The only motions before this Court today have to do
with that stay that's already in effect, so there's nothing
improper about determining those matters today.

It has been suggested that Judge Aquilina's
declaratory judgment in the Webster case -- remember, your
Honor, the Webster case is the case in which the city is not
named.  The city is not a defendant.  It is a case only
against the governor and the state treasurer, so the city is
not a party.  The city didn't litigate any of the issues.
Collateral estoppel, therefore, cannot apply to the city in
the declaratory judgment in the Webster case.  We're not
bound by that.  Moreover, I would suggest to your Honor that
that is one trial court's view -- trial court's view -- that
was issued without briefing, without argument, without
reasoning, and in haste.  That decision is not even binding
on any other trial court in the State of Michigan let alone
any courts of higher jurisdiction, and it is certainly not
binding on this Court.

One other procedural issue that I would like to
point out that Mr. Gordon and none of the other objectors did

point out, but it is noted on the summary sheet that I

gave -- the demonstrative that I gave to your Honor earlier

today.  The pension funding case, the GRS and PFRS case that

Mr. Gordon's firm -- in which Mr. Gordon's firm represents

the plaintiffs, has been removed to federal court.  The city

removed it because that is the one case in which the city is

the defendant.  That case was removed to federal court on

July 21st, and so it was removed to the Western District of

Michigan, the United States District Court for the Western

District of Michigan.  State courts don't even have

jurisdiction over this case anymore.  And in that case the

city moved to transfer venue to the District Court in this

district so that it will eventually be moved down to your

Honor.

         With respect to a concern that Ms. Ceccotti raised,

we are not seeking to stay the courts.  We are seeking to

stay the litigation by extending the stay protections to the

defendants without -- the effect of that -- that that would

have, your Honor, is to prevent the parties from acting.  We

are not seeking to do anything extraordinary under court's

jurisprudence.

         Finally, your Honor, with respect to the arguments

that Mr. Bennett made on behalf of Syncora, I think there may

be some confusion on Syncora's part.  Neither of the motions

seek to assert or to extend the stay in favor of the swap

counterparties, which are banks that have nothing -- no
relationship with the city, or the service corporations
themselves or any other party related to those entities other
than a couple of city officers that serve as directors of the
service corporations, and they do that because they're
required to do that in the performance of their duties as
city officers pursuant to a city ordinance, which is
Ordinance Number 0305.  We are not seeking to protect the
corporations themselves.  We are not seeking to protect any
swap counterparties, so I want to make that clear.  Syncora
offers no evidence about how it will be prejudiced,
particularly because, again, nothing in the motions prevents
Syncora from coming in and seeking to lift the stay if one is
imposed.

    We also don't seek in the stay confirmation motion
to seek relief behind actions to enforce a claim against the
debtor.  Paragraph 4 of the proposed order makes that very
clear.  It simply parrots the statute, and that's in the stay
confirmation motion.  Because the city is a party to the
Syncora suit, the only stay issue that would apply to that
would be the stay confirmation issue.  We're not seeking any
extension with respect to that lawsuit, and, frankly,
counterclaims may be asserted in that case, which would be
stayed, and the case started, your Honor, because Syncora was
illegally attempting to trap some of the city's revenues, so,

 1    you know, if that kind of behavior would continue, that

 2    absolutely is a stay violation.

 3         Let me just check my notes quickly, your Honor.  All

 4    right.  I believe, your Honor, that that's all I wanted to

 5    address.

 6         THE COURT:  I have to ask you one additional

 7    question.  How do you deal with the argument made that if

 8    your motions are granted as you have requested, lawsuits

 9    against the State of Michigan or to the extent the lawsuits

10    are against the State of Michigan, they would not be stayed?

11         MS. LENNOX:  The State of Michigan, your Honor, acts

12    through its officials.  The State of Michigan -- well, with

13    respect to the three lawsuits that we are talking about right

14    now -- and I can't talk in the -- you know, I'd have to know

15    the facts for the other ones, but we -- again, when we

16    tailored this relief, we tailored it narrowly to what we knew

17    was out there and what we could anticipate coming out there.

18    We believe and we reserve the rights in our reply to argue

19    that the lawsuits themselves, including the ones in which the

20    city is not a named defendant, are direct violations of the

21    automatic stay, direct violations under 362(a)(3) and (6),

22    and if that's the case, then those cases and any actions

23    taken within those cases are void ab initio.  So to the

24    extent that the named parties in there are the governor and

25    the treasurer, the state acts through those officials.  Those

1  are the officials that were sued.  That is what we're

2  addressing.  Again, we are only seeking to extend the stay to

3  lawsuits that affect this case, not to any other actions

4  against state entities.  The State of Michigan can only act

5  though its officials, and we believe that the relevant

6  officials are identified in our pleading.

7       THE COURT:  Another sort of scope question was

8  raised by Mr. Sanders.  If your motions are granted here,

9  what impact would you argue that would have or should have on

10 the lawsuit in which he represents parties who assert the

11 unconstitutionality of PA 436?

12      MS. LENNOX:  Your Honor, I don't have, as we stand

13 here, enough facts about what Mr. Sanders' lawsuit says, the

14 arguments that it makes, or the defendants in that case,

15 whether the city or any city officials are defendants in that

16 case, so I would have to reserve judgment until I knew the

17 facts about his lawsuit.

18      THE COURT:  He's also concerned, perhaps a bit more

19 hypothetically, that lawsuits, for example, to seek

20 disclosure under the Freedom of Information Act and other

21 sorts of administrative matters should not be stayed.  What's

22 your position on that?

23      MS. LENNOX:  Well, if I understood what Mr. Sanders

24 said, he said those were lawsuits against the city.  If

25 they're lawsuits against the city, they're already stayed.  I

1     don't have to extend the stay to do that.  It exists.  If

2     they want to seek relief from the stay with respect to their

3     lawsuits, they can certainly come before the Court and do it.

4                THE COURT:  All right.  Thank you.

5                MS. LENNOX:  Thank you, your Honor.

6                THE COURT:  All right.  At this time -- oh, I want

7     to hear from you, sir.  Yes.  Thank you.

8                MR. CANZANO:  Thank you.  Just a very brief point of

9     clarification.  In the -- the three orders that were entered

10    by the Court of Appeals yesterday are in three different

11    cases, 317286, which is Webster; 317285, which is Flowers;

12    and 317284, which is the General Retirement System case.

13    Each of those were emergency appeals of TRO's that were

14    issued on last Thursday, the 18th.  There was another case

15    where there was a straight claim of appeal of the final

16    declaratory judgment, which is 317292.  There is no order in

17    that case at all.  That claim of appeal is going forward as a

18    normal claim of appeal.

19                THE COURT:  Um-hmm.

20                MR. CANZANO:  So -- and if you look at the three

21    orders, you can see that the Webster refers only to July

22    18th.  The other two refer to July 18th and 19th actions, and

23    the declaratory judgment was issued in Webster on the 19th.

24    The transcript of the 19th reflects that the TRO in Webster

25    was vacated when the declaratory judgment was entered.

1    THE COURT:  All right.  The Court -- was there

2  something you wanted to add, sir?

3    UNIDENTIFIED SPEAKER:  Your Honor, I would just add

4  that counsel in her reply indicated that the state judge

5  issued her orders with no briefing.  They were fully briefed.

6    THE COURT:  All right.  The Court would propose to

7  take a recess at this time to consider these motions and

8  reconvene at two o'clock for a decision, so that is what

9  we'll do, and we'll be in recess for now.

10    THE CLERK:  All rise.  Court is in recess.

11    (Recess at 11:47 a.m., until 2:11 p.m.)

12    THE CLERK:  All rise.  Court is in session.  Please

13  be seated.  Recalling Case Number 13-53846, City of Detroit,

14  Michigan.

15    THE COURT:  Counsel appear to be present.  As the

16  Court explained earlier, there are two motions before it

17  today, the stay confirmation motion and the stay extension

18  motion.  As to both motions, several creditors object and

19  contend that the motions should be denied on the grounds that

20  this bankruptcy case is not properly before the Court because

21  the governor did not authorize the bankruptcy consistent with

22  state law and the state constitution.  The Court concludes

23  that this objection to both of these motions must be

24  overruled.

25    The Court concludes that the issue of eligibility

1    and each of the elements relating to eligibility are within

2    this Court's exclusive jurisdiction under 28 U.S.C., Section

3    1334(a).  Under that statute, United States District Courts

4    have original and exclusive jurisdiction of all cases under

5    Title 11, that original and exclusive jurisdiction referred

6    to the Bankruptcy Courts of each jurisdiction under 28

7    U.S.C., Section 157.  Our District Court has referred all

8    matters relating to bankruptcy jurisdiction to the Bankruptcy

9    Court under Local Rule 83.30.  This is not a proceeding

10   within 28 U.S.C., Section 1334, over which Bankruptcy Courts

11   would have concurrent jurisdiction with the state courts.

12           I was just advised that my microphone wasn't

13   working, but now it is; right?

14           THE CLERK:  Yes.

15           THE COURT:  Did we have a record of the first part

16   of that, Letrice?  I can't hear you.

17           THE CLERK:  No.

18           THE COURT:  We don't?

19           THE CLERK:  No.

20           THE COURT:  Okay.  So we'll start over.

21   Fortunately, we didn't get too far in it, and hopefully I can

22   say the same thing twice.  Okay.

23           So there are two motions before the Court, the stay

24   confirmation motion and the stay extension motion.  Certain

25   creditors object to both motions on the grounds that this

1  bankruptcy case is not properly before the Court because the

2  governor's authorization to file this bankruptcy case was not

3  consistent with state law and the state constitution.  The

4  Court concludes that this objection to both motions must be

5  overruled.

6      The issue of eligibility and the elements that the

7  debtor needs to establish in order for the Court to find its

8  eligibility are within this Court's exclusive jurisdiction

9  under 28 U.S.C., Section 1334(a).  Under that section, the

10  District Courts have, quote, "original and exclusive

11  jurisdiction of all cases under Title 11," close quote.  The

12  District Court's jurisdiction in bankruptcy cases can, in the

13  District Court's discretion, be referred to the Bankruptcy

14  Court within its jurisdiction under 28 U.S.C., Section 157,

15  and our District Court has referred cases in its bankruptcy

16  jurisdiction to the Bankruptcy Court under Local Rule 83.30.

17      The Court further concludes that this issue of

18  eligibility would be determined in the case and not in a

19  proceeding within Section 1134(b) of Title 28 and over which

20  the state courts and the Bankruptcy Courts would have

21  concurrent jurisdiction.  The reference in Section 1334(b) to

22  a proceeding is a technical reference and refers to adversary

23  proceedings such as preference actions, fraudulent transfer

24  actions, lien avoidance actions, et cetera.  The effect of

25  Section 1334(a) of Title 28, therefore, is that all of the

1  elements of eligibility in a Chapter 9 case must be decided
2  by the Bankruptcy Court exclusively.  In this regard, the
3  Court would note that there is no case law that holds
4  otherwise.

5       It has been argued here today that perhaps this
6  exclusive grant of jurisdiction to the Bankruptcy Court to
7  determine eligibility in the context of a Chapter 9 case is
8  unconstitutional.  However, the Court finds nothing in the
9  Tenth Amendment or in the more ambiguous concept of
10 federalism to support that argument, and there is no case law
11 that holds that.  Accordingly, the Court rejects that
12 argument as well.  In this regard, the Court would note, for
13 what it's worth, that in all of the other recent Chapter 9
14 cases with which we are all familiar, it was the Bankruptcy
15 Court that determined all of the eligibility issues raised by
16 the parties there.

17      The Court concludes that the Congressional grant of
18 jurisdiction to the Bankruptcy Court to determine the issue
19 of eligibility of a municipal debtor is entirely consistent
20 with the bankruptcy clause of the Constitution and the
21 supremacy clause as well.  In this regard, the Court would
22 further note that there is nothing in the jurisdictional
23 provisions of Title 28 or elsewhere that suggests that
24 Congress intended for the state courts to have concurrent
25 jurisdiction on the issue of eligibility to file a Chapter 9

1  case, so these arguments by the creditors to both motions are

2  overruled.

3        Turning then to the stay confirmation order, it

4  appears to the Court that the only potential issue -- the

5  only other potential issue here is whether the emergency

6  manager, Kevyn Orr, is an officer within the meaning of 11

7  U.S.C., Section 922, because if he is, then the stay already

8  applies to him, and it is appropriate for the stay

9  confirmation order to say that.  If he's not an officer, then

10  stays of action against him would be appropriate, if at all,

11  only in the context of the stay extension motion.

12        The record fully establishes that Kevyn Orr is the

13  emergency financial manager of the City of Detroit pursuant

14  to Public Act 436 of 2012, Michigan Compiled Laws, Section

15  141.1541 and following.  Pursuant to Section 141.159(2),

16  quote, "Upon appointment, an emergency manager shall act for

17  and in the place and stead of the governing body and the

18  office of chief administrative officer of the local

19  government.  The emergency manager shall have broad powers in

20  the receivership to rectify the financial emergency and to

21  assure the fiscal accountability of the local government and

22  the local government's capacity to provide or cause to be

23  provided necessary governmental services essential to the

24  public health, safety, and welfare," close quote.  It goes on

25  to say, quote, "Following the appointment of an emergency

1   manager and during the pendency of the receivership, the

2   governing body and the chief administrative officer of the

3   local government shall not exercise any of the powers of

4   those offices except as may be specifically authorized in

5   writing by the emergency manager or as otherwise provided by

6   this act and are subject to any conditions required by the

7   emergency manager," close quote.

8           Therefore, according to Michigan law, the emergency

9   manager steps into the shoes of the governing body and its

10  chief administrative officer.  Accordingly, the Court readily

11  finds that the emergency manager is an officer within the

12  definition and scope of Section 922.

13          It does not appear that there are any other

14  substantive objections -- I should say any substantive

15  objections to this finding, and, accordingly, the Court

16  concludes that it is appropriate to grant the stay

17  confirmation motion and to have it state explicitly that the

18  emergency manager, Mr. Orr, is an officer covered by the

19  Section 922 stay.

20          The other motion is the stay extension motion.  This

21  motion is filed pursuant to Section 105 of the Bankruptcy

22  Code, and it seeks an extension of the stay otherwise

23  effective as to acts against the city under Section 362 and

24  as to acts against the city, its officers and inhabitants,

25  under Section 922, and it seeks the extension to the

1   governor, the treasurer, the loan board, and their agents and

2   representatives.  As to this motion, it is initially argued

3   that principles of federalism, as embodied in the Tenth

4   Amendment, require a more stringent analysis of a request for

5   a Section 105 injunction in a Chapter 9 case compared to a

6   Chapter 11 case.  Again, the Court overrules this argument

7   and finds nothing in either the Tenth Amendment or principles

8   of federalism that suggests that any different or more

9   stringent analysis should be invoked.  The Court concludes,

10   rather, that in either event, whether Chapter 9 or Chapter

11   11, the Court has the authority to extend the scope of the

12   stay when necessary and appropriate.  Section 105(a) of the

13   Bankruptcy Code provides that the Bankruptcy Court may,

14   quote, "issue any order, process, or judgment that is

15   necessary or appropriate to carry out the provisions of this

16   title," close quote, and the Sixth Circuit has held that a

17   court may utilize its equitable power under Section 105(a) to

18   extend the automatic stay to nondebtor entities in unusual

19   circumstances, Parry versus Mohawk Motors of Michigan, 236

20   F.3d 299, Sixth Circuit, 2000, and American Imaging Services,

21   Inc. versus Eagle-Picher Industries, Inc., In re. Eagle-

22   Picher Industries, Inc., 963 F.2d 855, Sixth Circuit, 1992.

23   The Court also so held in Patton versus Bearden, 8 F.3d 343,

24   Sixth Circuit, 1993.

25         The case law is ambiguous on the standard that the

1    Court should apply in evaluating a request to extend the stay

2    under Section 105.  Is it this unusual circumstances test, or

3    is it the more traditional preliminary injunction four-factor

4    test?  The Court concludes that it is unnecessary to resolve

5    that ambiguity in this case.  Rather, the Court concludes

6    that under either of those standards, it is appropriate to

7    find that the stay extension motion requested by the debtor

8    should be granted.

9          The case law applying the unusual circumstances test

10   has noted that it should be and has been rare for a court to

11   find unusual circumstances.  Some courts say that the

12   automatic stay may be extended if the unusual circumstances

13   make the interests of the debtor and the nondebtor defendant

14   inextricably interwoven.  In this case, the Court readily

15   finds that the debtor -- the interests of the debtor and the

16   interests of those potential defendants to whom the debtor

17   seeks to extend the automatic stay are so intertwined that

18   the unusual circumstances test is met.  Any attempt by really

19   anyone to litigate the issues that the creditors have raised

20   or might raise regarding this bankruptcy case or the debtor's

21   eligibility to file this bankruptcy case against other

22   nondebtor parties such as the governor or the treasurer or

23   others may well have an ability on the debtor's -- may well

24   have an impact -- excuse me -- on the debtor's ability to

25   reorganize, so the Court finds that the unusual circumstances

1 test is met.

2       The Court further concludes that, to the extent it's

3 applicable, the traditional four-factor preliminary

4 injunction test is met as well.  Traditionally those four

5 factors are the likelihood of success on the merits of the

6 plaintiff's claim, the extent to which the moving party will

7 be prejudiced if the motion is denied, the extent to which

8 the party opposing the motion will be prejudiced if the

9 motion is granted, and any public interest considerations.

10 The case law firmly establishes that these are not each

11 elements that must be met.  They are, rather, factors and

12 considerations that the Court should take into account in

13 weighing its discretion on whether to grant the requested

14 relief.

15       Addressing first, therefore, the issue of the

16 debtor's likelihood of success on the merits, in the

17 circumstances of this case, the Court finds that it would be

18 entirely inappropriate to comment on the likelihood of the

19 debtor's success on the merits of any of the substantive

20 issues relating to eligibility or plan confirmation except to

21 say that the issues raised are very serious questions and

22 that these questions should be addressed, to the extent that

23 they are raised, in the context of eligibility to file this

24 case or perhaps in the plan confirmation context.  In any

25 event, the state court proceedings that the city of court --

1    specifically seeks to stay and enjoin are proceedings which

2    could conceivably have and may well have an impact on the

3    bankruptcy case here and the administration of this case or

4    on the debtor's assets.  As the Sixth Circuit noted in Eagle-

5    Picher, it is enough for this Court to find that there are

6    serious questions going to the merits, and the Court

7    certainly so finds here.

8           The Court further noted in that case, interestingly,

9    the following, quote, "The bankruptcy court's primary

10   emphasis on the last three factors," parenthetically not

11   including the likelihood of success on the merits, "for

12   granting a preliminary injunction was not error, especially

13   when considering the source of its authority to grant such an

14   injunction emanates from section 105 whose purpose is to

15   assist the court in carrying out the provisions of the

16   Bankruptcy Code, one of which is to oversee the

17   reorganization of a debtor's business.  In addition, as we

18   stated in Friendship Materials, a court may, in its

19   discretion, grant a preliminary injunction even when the

20   plaintiff fails to show a strong or substantial probability

21   of ultimate success on the merits of his claim, but where he

22   at least shows serious questions going to the merits and

23   irreparable harm which decidedly outweighs any potential harm

24   to the defendant if an injunction is issued."  As noted, the

25   second question -- oh, first, before concluding the first

1   element, the Court is -- the Court would find readily that

2   this factor, therefore, weighs in favor of granting the

3   requested stay and injunction.

4          The second factor, as noted, is the extent to which

5   the city will suffer prejudice if the requested injunction is

6   denied.  The Court readily finds that the city will suffer

7   substantial prejudice if this stay is denied.  The record

8   reflects that the creditors have already obtained temporary

9   restraining orders and a declaratory judgment and that the

10  city has felt compelled to appeal those.  Clearly, addressing

11  these issues both in the state court and in this Bankruptcy

12  Court is costly, expensive, and inefficient, and really

13  causes prejudice not only to the debtor but to the other

14  parties as well.  There is also, of course, a danger of

15  potentially inconsistent results.  So, accordingly, again,

16  the Court concludes that this favor -- does weigh in favor of

17  granting the requested injunction.

18         The third factor is the harm to others, which will

19  or may occur if the requested injunction is granted.  Again,

20  the Court readily finds that the creditors who have opposed

21  this extension will not really be harmed at all if this

22  motion is granted.  There is no prejudice to the substantive

23  rights of any party if this stay is extended, as the city has

24  requested.  All of the arguments, issues, and claims that

25  they could and might seek to make they can raise in this

1    court.  None of their procedural and substantive rights to
2    make their claims and arguments in this course -- in this
3    court in the course of this case are foreclosed by granting
4    this motion.  Further, the Court will fully retain the
5    opportunity and right of any creditor to seek relief from
6    this stay on an individual case-by-case basis, which, of
7    course, if granted, will permit that creditor to litigate
8    whatever their issues are in the appropriate court.  So,
9    again, the Court concludes that this factor weighs in favor
10   of granting the requested injunction.

11          The fourth consideration is whether granting the
12   requested injunction would serve the public interest.  In
13   normal two-party litigation or even in many bankruptcy cases,
14   this is not a significant consideration, but in the context
15   of a Chapter 9 case and especially this Chapter 9 case, the
16   Court concludes that it is probably the most important factor
17   of all.  Granting this motion will, the Court readily
18   concludes, enhance the debtor's likelihood of reorganization.
19   It will also create efficiency.  It will also assist in
20   expediting this reorganization, and it will reduce the city's
21   costs as well as those of other parties.  Accordingly, the
22   Court finds that this injunction is in the public interest,
23   and for all of these reasons, the Court readily concludes in
24   its discretion that the requested extension of the stay under
25   Section 105 should be granted.

1    Now, several creditors have objected on the grounds
2    that the debtor should have filed an adversary proceeding to
3    obtain this relief.  The Court concludes that this objection,
4    too, should be overruled.  The Court is satisfied that there
5    was sufficient notice and opportunity to be heard, and the
6    Court further observes that the imposition of this stay will
7    only have the effect of requiring those parties who seek
8    relief from it to file a motion for relief from it.  And in
9    rejecting this objection, the Court notes that there is
10   substantial merit in the city's concern that it would be
11   impossible for it to file an adversary proceeding naming as
12   defendants all of the parties that might be impacted by this
13   injunction.  Indeed, it would be a procedural and
14   administrative nightmare.

15   Finally, the Court rejects the argument that Section
16   105 cannot serve as the basis for an extended stay because it
17   creates new rights.  The Court finds that this injunction
18   does not create any new rights.  It simply assists the Court
19   in making the bankruptcy process more efficient and gives the
20   Court control over all of the issues that will have to be
21   resolved through the course of the bankruptcy.  In this
22   regard, the Court would further note that no cases have
23   rejected a Section 105 stay extension on this ground.

24   Before concluding, the Court would like to review
25   and state on the record what is not being decided here today.

1    Perhaps this is just as important for the record to reflect
2    as what is being decided here today.

3           The Court is making no ruling whatsoever on whether
4    the City of Detroit is eligible to be a debtor in Chapter 9.
5    The Court is making no ruling on whether the state
6    constitution prohibited the emergency manager's appointment
7    or prohibited the emergency -- excuse me -- prohibited the
8    governor from authorizing this Chapter 9 filing without
9    excepting from it the constitutionally protected pension
10   rights of its citizens.  The Court is not ruling on whether
11   the state court orders that were entered either pre- or post-
12   bankruptcy should be given preclusive effect under principles
13   of res judicata, collateral estoppel, Rooker-Feldman, or any
14   other preclusive doctrine.  The Court is not ruling on
15   whether any orders entered by the state court after this
16   bankruptcy case was filed violated the automatic stay.  The
17   Court is not ruling on whether the City of Detroit can
18   propose a feasible or confirmable plan in light of the state
19   constitution or any other consideration, for that matter.

20          All of these issues on which the Court is not ruling
21   today are fully preserved.  Of course, when and if these
22   issues are raised in an appropriate way, the Court will rule
23   on them in due course with adequate notice and opportunity to
24   be heard, and, of course, we will address the procedure for
25   dealing with some of these issues in our status conference on

1    August 2nd.

2            The Court will, therefore, grant both of these

3    motions.  The Court wants the opportunity to review the

4    proposed orders that were attached to the debtor's motions.

5    In the event the Court wants to tweak or edit any of them, I

6    would ask debtor's counsel to submit those orders in Word or

7    WordPerfect form through the Court's order processing

8    program.  I know for sure that one of the things I want the

9    stay extension order to do is to be sure it explicitly

10   preserves the opportunity for parties to file motions for

11   relief from it under Section 362(d), but we'll take care of

12   that, so just submit the orders in the order processing

13   program as they were attached to the motion.

14           That's all I have.  Is there anything that anyone

15   else would like to raise at this time?

16           MS. PATEK:  Your Honor, on behalf of the public

17   safety unions, we did ask to broaden --

18           THE COURT:  You should identify yourself for the

19   record.

20           MS. PATEK:  I'm sorry.  Barbara Patek on behalf of

21   the public safety unions.  We did make a request for

22   affirmative relief, which was not listed among the items that

23   your Honor did not rule on with respect --

24           THE COURT:  Yes.  Thank you for reminding me of

25   that.  In the interest of due process, the Court must

```
 1  conclude that it is necessary for you to file a specific
 2  motion requesting that relief.  If you think that expedited
 3  consideration is appropriate, you can request that.
 4          MS. PATEK:  Thank you, your Honor.
 5          THE COURT:  Would anyone else like to raise
 6  anything?  Yes, ma'am.
 7          MS. LENNOX:  Thank you, your Honor.  For the record,
 8  Heather Lennox of Jones Day on behalf of the City of Detroit.
 9  A procedural question, your Honor, about the matters that
10  you've set for hearing on August 2nd.  There was no objection
11  deadline set for the four motions.  Would your Honor wish to
12  set one?
13          THE COURT:  I didn't set one in light of the
14  expedited consideration of them, so I'm really not inclined
15  to.  If a party wants me to consider a written objection,
16  they should get it to me in time for me to consider it.
17  There was more specifically a question about a response time
18  on the 365 assumption motion, and we got a request -- a
19  motion for clarification as to that.  I think that was
20  mentioned earlier today.
21          MS. LENNOX:  Yes.
22          THE COURT:  And I will deal with that separately in
23  a separate order that I will enter later today or tomorrow.
24          MS. LENNOX:  Thank you, your Honor.
25          THE COURT:  All right.  Anything further?  Mr.
```

1    Gordon.

2         MR. GORDON:  Thank you, your Honor.  For the record,

3    Robert Gordon on behalf of the Detroit pension systems.  I

4    just want one more item of clarification, if I could.

5         THE COURT:  Sir.

6         MR. GORDON:  You've referenced for the August 2

7    hearings that there's going to be a status conference, and I

8    know that there's some procedural motions that are to be

9    considered.  I believe there's also a motion seeking to

10   assume a forbearance agreement.

11        THE COURT:  That's the Syncora motion that we were

12   just talking about.

13        MR. GORDON:  I'm sorry.  I missed that.  I couldn't

14   hear her well.  Is that going to be a status conference then

15   or an actual --

16        THE COURT:  No.  I'm going to clarify that in my

17   order that I'm going to enter this afternoon.

18        MR. GORDON:  Very good.  Thank you, your Honor.

19   Sorry.

20        THE COURT:  Yeah.  Okay.  We'll be in recess.

21        THE CLERK:  All rise.  Court is adjourned.

22      (Proceedings concluded at 2:48 p.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett            July 29, 2013
_____      _____
Lois Garrett

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                          Chapter 9
                                                Case No. 13-53846
City of Detroit, Michigan,                      Hon. Steven W. Rhodes

      Debtor.
_____/

## Opinion and Order Denying Motion to Stay Proceedings
## Pending Determination of Motion to Withdraw the Reference

On September 11, 2013, the Official Committee of Retirees filed a motion to withdraw the reference on its objection to eligibility. (Dkt. #806) On September 13, 2013, the Committee filed a motion to stay this Court's deadlines and hearings concerning the determination of eligibility, pending the district court's decision on the motion to withdraw the reference. (Dkt. #837) Several parties, including Detroit Retired City Employees and Retired Detroit Police and Fire Fighters Association, filed a joint concurrence. (Dkt. #922)

On September 18, 2013, the City filed an objection to the motion for stay. (Dkt. #925)

The Court heard argument on the motion on September 19, 2013, and took the matter under advisement.

## I. Summary of Decision

The Court finds that none of the four factors to be considered on the Committee's motion for stay weigh in favor of granting the motion. Specifically, the Court finds that:

1. The Committee is not likely to succeed on the merits of its motion to withdraw the reference.

2. The Committee will not suffer any harm, let alone irreparable harm, if the stay is denied.

3. The City will suffer substantial harm if the stay is granted.

4. The public interest would not be served by granting the stay.

For these reasons, the motion for stay is denied.

## II. The Law Applicable to the Committee's Motion for Stay

Bankruptcy Rule 5011(c) governs a motion for a stay of proceedings pending the determination of a motion to withdraw the reference.

> The filing of a motion for withdrawal of a case or proceeding or for abstention pursuant to 28 U.S.C. § 1334(c) shall not stay the administration of the case or any proceeding therein before the bankruptcy judge except that the bankruptcy judge may stay, on such terms and conditions as are proper, proceedings pending disposition of the motion.

Fed. R. Bankr. P. 5011(c).

"Although BR 5011(c) provides little guidance as to the circumstances under which a bankruptcy court should stay a proceeding, it is clear from the plain language of the Rule that the granting of a stay should be the exception—not the general rule." *In re The Antioch Co.*, 435 B.R. 493, 496 (Bankr. S.D. Ohio 2010). The *Antioch* court further observed:

> While the term "may" in the Rule appears to grant the bankruptcy court broad discretion in determining such a motion, the case law applying the Rule has limited the circumstances under which a stay may be granted to essentially the circumstances under which a preliminary injunction would be appropriate under Federal Rule of Civil Procedure 65.

*Id.* at 497.

Accordingly, when considering the Committee's motion for a stay, the Court considers whether "(1) [the Committee] is likely to prevail on the merits of the withdrawal motion; (2) [the Committee] is likely to suffer irreparable harm if the motion is denied; (3) the debtor [or other parties] will not be harmed by a stay; and (4) the public interest will be served by granting a

2

stay." *F.D.I.C. v. Imperial Capital Bancorp, Inc.*, 2011 WL 5600542, at *1 (S.D. Cal. Nov. 17, 2011).[1] The parties agree that these are the factors to be considered.

This statement of the factors to consider on the Committee's motion for stay is consistent with the factors that the Sixth Circuit has approved when considering a motion for a preliminary injunction. *See, e.g.*, *Moltan Co. v. Eagle–Picher Indus.*, *Inc.*, 55 F.3d 1171, 1175 (6th Cir. 1995). "These factors are to be balanced against one another and should not be considered prerequisites to the grant of a preliminary injunction." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

The Committee bears the burden of establishing that a stay is appropriate. *See, e.g.*, *In re New Energy Corp.*, 2013 WL 1192774, at *10 (Bankr. N.D. Ind. Mar. 14, 2013).[2]

Ultimately, the issue of whether to grant a stay is left to the court's discretion. *See, e.g.*, *In re Chrysler LLC*, 2009 WL 7386569, at *1 (Bankr. S.D.N.Y. May 20, 2009).[3]

---

[1] *See also Beach First Nat'l Bancshares, Inc. v. Anderson* (*In re Beach First Nat'l Bancshares, Inc.*), 2011 WL 2441501, at *1 (Bankr. D.S.C. Jan. 21, 2011); *Hecny Transp. Ltd. v. Summit Global Logistics, Inc.* (*In re Summit Global Logistics, Inc.*), 2008 WL 5953690, at *2 (Bankr. D.N.J. Dec. 1, 2008); *Env't Litig. Grp., P.C. v. Crawford* (*In re Price*), 2007 WL 1125639, at *7 (Bankr. N.D. Ala. Apr. 16, 2007); *Miller v. Vigilant Ins. Co.* (*In re Eagle Enters. Inc.*), 259 B.R. 83, 86 (Bankr. E.D. Pa. 2001); *Northwestern Inst. of Psychiatry, Inc. v. Travelers Indem. Co.* (*In re Northwestern Inst. of Psychiatry, Inc.*), 268 B.R. 79, 83 (Bankr. E.D. Pa. 2001).

[2] *See also In re Dana Corp.*, 2007 WL 2908221, at *1 (Bankr. S.D.N.Y. Oct. 3, 2007); *In re Eagle Enters. Inc.*, 259 B.R. at 86; *In re Matterhorn Grp., Inc.*, 2010 WL 4628119, at *2 (E.D. Cal. Nov. 5, 2010); *TJN, Inc. v. Superior Container Corp.* (*In re TJN, Inc.*), 207 B.R. 499, 500 (Bankr. D.S.C. 1996).

[3] *In re Ionosphere Clubs, Inc.*, 1996 WL 361531, at *1 (S.D.N.Y. June 28, 1996); *Antioch*, 435 B.R. at 497, 502; *Finger v. County of Sullivan Indus. Dev. Agency* (*In re Paramount Hotel Corp.*), 319 B.R. 350, 357 (Bankr. S.D.N.Y. 2005).

3

### III. Whether the Committee Is Likely to Succeed
### on Its Motion to Withdraw the Reference

The parties agree, and the Court concurs, that the issue here is the Committee's likelihood of success on the motion to withdraw the reference, not the likelihood of success on the Committee's eligibility objections.

The Committee's motion to withdraw the reference asserts three grounds:[4]

> A. *Stern v. Marshall* requires withdrawal of the reference of the eligibility objection independently of 28 U.S.C. § 157(d).
>
> B. Withdrawal of the reference is mandatory under 28 U.S.C. § 157(d).
>
> C. Withdrawal for "cause" is warranted under 28 U.S.C. § 157(d).

The Court will review the likelihood of success of each of these three grounds.[5]

### A. *Stern v. Marshall*

The Committee's eligibility objection challenges the constitutionality of both chapter 9 of the bankruptcy code under the Federal Constitution and Michigan PA 436 (2012) under the Michigan Constitution. It asserts that therefore the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), requires the district court to withdraw the reference.[6]

---

[4] For convenience, this statement of the Committee's grounds for withdrawal of the reference is quoted and adapted from the table of contents in its memorandum in support of its motion to withdraw the reference filed September 11, 2013. (Dkt. #806)

[5] In its opposition to the motion for stay and at the oral argument on the motion for stay, the City made clear its opposition to the motion to withdraw the reference and the grounds for it.

[6] Specifically, the Committee's objection to eligibility under 11 U.S.C. § 109(c) asserts:
> I. Acceptance of the city's authorization to file its petition would render chapter 9 unconstitutional.
> A. If chapter 9 permits the city to ignore the pension clause, chapter 9 grants authorization not available under the Michigan Constitution.

4

In *Stern v. Marshall*, the Supreme Court held that the "judicial power of the United States" can only be exercised by an Article III court and "that in general, Congress may not withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." 131 S. Ct. at 2608-12. The Court held that a bankruptcy court therefore lacks the constitutional authority to enter a final judgment on a debtor's counterclaim that is based on a private right when resolution of the counterclaim is not

---

B. If chapter 9 permits Michigan's executive branch to consent to a limitation on its sovereignty not authorized by its people, the federal statute is unconstitutional.

II. It is not necessary for the court to review the constitutionality of chapter 9 because the emergency manager's petition for the City of Detroit does not meet the bankruptcy code requirements for eligibility.

A. The burden is on the debtors to show compliance with sections 109(c) and 921(c).

B. The authorizations relied upon by the emergency manager were flawed under the Michigan Constitution.

1. PA 436 is squarely at odds with the pension clause of Michigan's constitution and therefore unconstitutional.

2. The conflict between PA 436 and the pension clause of the Michigan Constitution cannot be reconciled.

a. The Attorney General's position should not be adopted.

b. The City of Detroit cannot rescue the unconditional authorizations.

c. The governor's authorization pursuant to PA 436 is not valid and void *ab initio* under Michigan's Constitution, and so is that of the emergency manager.

d. The City cannot satisfy bankruptcy code 109(c)(5) and is subject to dismissal under bankruptcy code 921(c).

For convenience, this expanded statement of the Committee's arguments in support of its objection to eligibility is quoted and adapted from its table of contents in its objection to eligibility filed September 10, 2013. (Dkt. #805)

5

necessary to fix the creditor's claim. 131 S. Ct. at 2611-19. The Court described the issue before it as "narrow."[7] 131 S. Ct. at 2620.

The Sixth Circuit has adhered to a narrow reading of *Stern* in the two cases that have addressed the issue: *Onkyo Europe Elect. GMBH v. Global Technovations Inc.* (*In re Global Technovations Inc.*), 694 F.3d 705 (6th Cir. 2012), and *Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012).

In *Global Technovations*, the Sixth Circuit summarized *Stern* as follows:

> *Stern's* limited holding stated the following: When a claim is "a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy," the bankruptcy court cannot enter final judgment. *Id*. at 2611. In those cases, the bankruptcy court may only enter proposed findings of fact and conclusions of law. *Ibid*.

694 F.3d at 722. Based on this view of *Stern*, the *Global Technovations* court held that the bankruptcy court did have the authority to rule on the debtor's fraudulent transfer counterclaim against a creditor that had filed a proof of claim. *Id*.

In *Waldman*, the Sixth Circuit summarized the holding of *Stern* as follows:

> When a debtor pleads an action under federal bankruptcy law and seeks disallowance of a creditor's proof of claim against the estate—as in *Katchen* [*v. Landy*, 382 U.S. 323, 86 S. Ct. 467 (1966)]—the bankruptcy court's authority is at its constitutional maximum. 131 S. Ct. at 2617–18. But when a debtor pleads an action arising only under state-law, as in *Northern Pipeline* [*v.*

---

[7] Outside of the Sixth Circuit, the scope of *Stern* has been somewhat controversial. *See generally* Joshua D. Talicska, *Jurisdictional Game Changer or Narrow Holding? Discussing the Potential Effects of Stern v. Marshall and Offering a Roadmap Through the Milieu*, 9 SETON HALL CIRCUIT REV. 31 (Spring 2013); Michael Fillingame, *Through a Glass, Darkly: Predicting Bankruptcy Jurisdiction Post-Stern*, 50 HOUS. L. REV. 1189 (Symposium 2013); Tyson A. Crist, *Stern v. Marshall: Application of the Supreme Court's Landmark Decision in the Lower Courts*, 86 AM. BANKR. L.J. 627 (Fall 2012); Hon. Joan N. Feeney, *Statement to the House of Representatives Judiciary Committee on the Impact of Stern v. Marshall*, 86 AM. BANKR. L.J. 357 (Summer 2012).

6

> *Marathon Pipe Line Co.* 458 U.S. 50, 102 S. Ct. 2858 (1982)]; or
> when the debtor pleads an action that would augment the bankrupt
> estate, but not "necessarily be resolved in the claims allowance
> process[,]" 131 S. Ct. at 2618; then the bankruptcy court is
> constitutionally prohibited from entering final judgment. *Id*. at
> 2614.

698 F.3d at 919. Based on this view of *Stern*, the *Waldman* court held that the bankruptcy court

lacked authority to enter a final judgment on the debtor's prepetition fraud claim against a

creditor that was not necessary to resolve in adjudicating the creditor's claim.

These cases recognize the crucial difference to which *Stern* adhered. A bankruptcy court

may determine matters that arise directly under the bankruptcy code, such as fixing a creditor's

claim in the claims allowance process. However, a bankruptcy court may not determine more

tangential matters, such as a state law claim for relief asserted by a debtor or the estate that arises

outside of the bankruptcy process, unless it is necessary to resolve that claim as part of the claims

allowance process. *See City of Cent. Falls, R.I. v. Central Falls Teachers' Union* (*In re City of

Cent. Falls*)*, R.I.*, 468 B.R. 36, 52 (Bankr. D.R.I. 2012) ("[A]lthough the counterclaim at issue in

*Stern* arose under state law, the determinative feature of that counterclaim was that it did not

arise under the Bankruptcy Code.").

The matter on which the Committee has moved for withdrawal of the reference is the

debtor's eligibility to file this chapter 9 case. A debtor's eligibility to file bankruptcy stems

directly from rights established by the bankruptcy code. As quoted above, *Waldman* expressly

held, "When a debtor pleads an action under federal bankruptcy law," the bankruptcy court's

authority is constitutional. 698 F.3d at 919. In this case, the debtor has done precisely that. In

seeking relief under chapter 9, it has pled "an action under federal bankruptcy law."

The Committee's federal and state constitutional challenges are simply legal arguments

in support of its objection to the debtor's request for bankruptcy relief. Nothing in *Stern*,

7

*Waldman*, or *Global Technovations* suggests any limitation on the authority of a bankruptcy court to consider and decide any and all of the legal arguments that the parties present concerning an issue that is otherwise properly before it.  More specifically, those cases explicitly state that a bankruptcy court can constitutionally determine all of the issues that are raised in the context of resolving an objection to a proof of claim, even those involving state law.[8]  For the

<hr/>

[8] The Supreme Court has never squarely held that claims allowance, which is at the heart of the bankruptcy process, falls within the permissible scope of authority for a non-Article III court as a "public right" or any other long-standing historical exception to the requirement of Article III adjudication.  *Stern*, 131 S. Ct. at 2614 n.7; *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56, n.11, 109 S. Ct. 2782 (1989).  However, in *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71, 102 S. Ct. 2858, 2871 (1982) (plurality opinion), the Court came tantalizingly close when it stated, "the restructuring of debtor-creditor relations . . . is at the core of the federal bankruptcy power . . . [and] may well be a 'public right'[.]"

No court has ever held otherwise.  On the contrary, the cases have uniformly concluded that the public rights doctrine is the basis of a bankruptcy court's authority to adjudicate issues that arise under the bankruptcy code.  For example, in *Carpenters Pension Trust Fund for Northern California v. Moxley*, 2013 WL 4417594, at *4 (9th Cir. Aug. 20, 2013), the Ninth Circuit held:

> [T]he dischargeability determination is central to federal bankruptcy proceedings.  *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363–64, 126 S. Ct. 990, 163 L.Ed.2d 945 (2006).  The dischargeability determination is necessarily resolved during the process of allowing or disallowing claims against the estate, and therefore constitutes a public rights dispute that the bankruptcy court may decide.

Similarly, in *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 196 n.11 (3d Cir. 1999), the Third Circuit held, "The protections afforded a debtor under the Bankruptcy Code are congressionally created public rights."

In *Kirschner v. Agoglia*, 476 B.R. 75, 79 (S.D.N.Y. 2012), the court stated, "[After *Stern*,] bankruptcy courts still have the ability to finally decide so-called 'public rights' claims that assert rights derived from a federal regulatory scheme and are therefore not the 'stuff of traditional actions,' as well as claims that are necessarily resolved in ruling on a creditor's proof of claim (e.g., a voidable preference claim)[.]"

Other cases also conclude that various matters arising within a bankruptcy case are within the public rights doctrine.  *See., e.g.*, *In re Bataa/Kierland LLC*, 2013 WL 3805143, at *3 (D. Ariz. July 22, 2013) (scope of Chapter 11 debtor's rights under easement); *Hamilton v. Try Us, LLC*, 491 B.R. 561 (W.D. Mo. 2013) (validity and amount of common law claim against Chapter 7 debtor); *In re Prosser*, 2013 WL 996367 (D.V.I. 2013) (trustee's claim for turnover of property); *White v. Kubotek Corp.*, 2012 WL 4753310 (D. Mass. Oct. 2, 2012) (creditor's successor liability claim against purchaser of assets from bankruptcy estate); *United States v.*

same reasons, a bankruptcy court can also constitutionally determine all issues that are raised in the context of resolving an objection to eligibility.

No cases address *Stern* in the context of eligibility for bankruptcy. Nevertheless, several cases do address *Stern* in the context of similar matters - conversion and dismissal of a case. Each readily concludes that *Stern's* limitation on the authority of a bankruptcy court is inapplicable. For example, in *In re USA Baby, Inc.*, 674 F.3d 882, 884 (7th Cir. 2012), the Seventh Circuit held that nothing in *Stern* precludes a bankruptcy court from converting a chapter 11 case to chapter 7, stating, "we cannot fathom what bearing that principle might have on the present case."[9] In *Mahanna v. Bynum*, 465 B.R. 436 (W.D. Tex. 2011), the court held that *Stern* does not prohibit the bankruptcy court from dismissing the debtors' chapter 11 case. The court concluded, "[T]his appeal is entirely frivolous, and constitutes an unjustifiable waste of judicial resources[.]" *Id.* at 442. In *In re Thalmann*, 469 B.R. 677, 680 (Bankr. S.D. Tex. 2012), the court held that *Stern* does not prohibit a bankruptcy court from determining a motion to

---

*Bond*, 2012 WL 4089648 (E.D.N.Y. Sept. 17, 2012) (trustee's claims for tax refund); *Turner v. First Cmty. Credit Union (In re Turner)*, 462 B.R. 214 (Bankr. S.D. Tex. 2011) (violation of the automatic stay); *In re Whitley*, 2011 WL 5855242 (Bankr. S.D. Tex. Nov. 21, 2011) (reasonableness of fees of debtor's attorney); *In re Carlew*, 469 B.R. 666 (Bankr. S.D. Tex. 2012) (homestead exemption objection); *West v. Freedom Med., Inc. (In re Apex Long Term Acute Care-Katy, L.P.)*, 465 B.R. 452, 458 (Bankr. S.D. Tex. 2011) (addressing preference actions, stating, "This Court concludes that the resolution of certain fundamental bankruptcy issues falls within the public rights doctrine."); *Sigillito v. Hollander (In re Hollander)*, 2011 WL 6819022 (Bankr. E.D. La. Dec. 28, 2011) (nondischargeability for fraud).

In light of the unanimous holdings of these cases, the Court must conclude that its determination regarding the City's eligibility will likely be found to be within the public rights doctrine and therefore that the Court does have the authority to decide the issue, including all of the arguments that the Committee makes in its objection.

[9] *See also In re Gow Ming Chao*, 2011 WL 5855276 (Bankr. S.D. Tex. Nov. 21, 2011).

dismiss a case on the grounds of bad faith.[10]  This line of cases strongly suggests that *Stern* likewise does not preclude a bankruptcy court from determining eligibility.

Implicitly recognizing how far its motion to withdraw the reference stretches *Stern*, the Committee argues that two aspects of its objection alter the analysis of *Stern* and its application here.  The first is that its objection raises important issues under both the Federal and Michigan Constitutions.  The second is that strong federalism considerations warrant resolution of its objection by an Article III court.  Neither consideration, however, is sufficient to justify the expansion of *Stern* that the Committee argues.

First, since *Stern* was decided, non-Article III courts have considered constitutional issues, always without objection.

Both bankruptcy courts and bankruptcy appellate panels have done so.[11]  More specifically, and perhaps more on point, in two recent chapter 9 cases, bankruptcy courts

---

[10] *See also In re McMahan*, 2012 WL 5267017 (Bankr. S.D. Tex. Oct. 25, 2012); *In re Watts*, 2012 WL 3400820 (Bankr. S.D. Tex. Aug. 9, 2012).

[11] *See, e.g.*, *Williams v. Westby* (*In re Westby*), 486 B.R. 509 (10th Cir. BAP 2013) (upholding the constitutionality of the Kansas bankruptcy-only state law exemptions); *Res. Funding, Inc. v. Pacific Continental Bank* (*In re Washington Coast I, L.L.C.*), 485 B.R. 393 (9th Cir. BAP 2012) (upholding the constitutionality of the final order entered by the bankruptcy court); *Richardson v. Schafer* (*In re Schafer*), 455 B.R. 590 (6th Cir. BAP 2011), *rev'd on other grounds*, 689 F.3d 601 (6th Cir. 2012) (addressing the constitutionality of the Michigan bankruptcy-only state law exemptions); *Old Cutters, Inc. v. City of Hailey* (*In re Old Cutters, Inc.*), 488 B.R. 130 (Bankr. D. Idaho 2012) (invalidating a city's annexation fee and community housing requirements; *In re Washington Mut., Inc.*, 485 B.R. 510 (Bankr. D. Del. 2012) (holding Oregon's corporate excise tax unconstitutional under the Commerce Clause); *In re McFarland*, 481 B.R. 242 (Bankr. S.D. Ga. 2012) (upholding Georgia's bankruptcy-specific exemption scheme); *In re Fowler*, 493 B.R. 148 (Bankr. E.D. Cal. 2012) (upholding the constitutionality of California's statute fixing the interest rate on tax claims); *In re Meyer*, 467 B.R. 451 (Bankr. E.D. Wis. 2012) (upholding the constitutionality of 11 U.S.C. § 707(b)); *Zazzali v. Swenson* (*In re DBSI, Inc.*), 463 B.R. 709, 717 (Bankr. D. Del. 2012) (upholding the constitutionality of 11 U.S.C. § 106(a)); *Proudfoot Consulting Co. v. Gordon* (*In re Gordon*), 465 B.R. 683 (Bankr. N.D. Ga. 2012) (upholding the constitutionality of 11 U.S.C. § 706(a)); *South Bay Expressway, L.P. v. County of San Diego* (*In re South Bay Expressway, L.P.*), 455

addressed constitutional issues without objection. *Association of Retired Employees v. City of Stockton, Cal.* (*In re City of Stockton, Cal.*), 478 B.R. 8 (Bankr. E.D. Cal. 2012) (holding that retirees' contracts could be impaired in the chapter 9 case without offending the constitution); *In re City of Harrisburg, PA*, 465 B.R. 744 (Bankr. M.D. Pa. 2011) (upholding the constitutionality of a Pennsylvania statute barring financially distressed third class cities from filing bankruptcy).

In addition, the Tax Court, a non-Article III court, has also examined constitutional issues, without objection.[12] Likewise, the Court of Federal Claims, also a non-Article III court, has considered constitutional claims, without objection. This was done perhaps most famously in *Beer v. United States*, 111 Fed. Cl. 592 (Fed. Cl. 2013), which is a suit by Article III judges under the Compensation Clause of the Constitution.

*Stern* does not change this status quo, and nothing about the constitutional dimension of the Committee's eligibility objection warrants the expansion of *Stern* that the Committee asserts. As *Stern* itself reaffirmed, "We do not think the removal of counterclaims such as [the debtor's] from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute[.]" 131 S. Ct. at 2620. Expanding *Stern* to the point where it would prohibit bankruptcy

---

B.R. 732 (Bankr. S.D. Cal. 2011) (holding unconstitutional California's public property tax exemption for privately-owned leases of public transportation demonstration facilities).

[12] *See, e.g.*, *Field v. C.I.R.*, 2013 WL 1688028 (Tax Ct. 2013) (holding that the tax classification on the basis of marital status that was imposed by requirement that taxpayer file joint income-tax return in order to be eligible for tax credit for adoption expenses did not violate Equal Protection clause); *Begay v. C.I.R.*, 2013 WL 173362 (Tax Ct. 2013) (holding that the relationship classification for child tax credit did not violate Free Exercise Clause); *Byers v. C.I.R.*, 2012 WL 265883 (Tax Ct. 2012) (rejecting the taxpayer's challenge to the authority of an IRS office under the Appointments Clause).

courts from considering issues of state or federal constitutional law would certainly significantly change the division of labor between the bankruptcy courts and the district courts.[13]

The Committee's federalism argument is even more perplexing and troubling. Certainly the Committee is correct that a ruling on whether the City was properly authorized to file this bankruptcy case, as required for eligibility under 11 U.S.C. § 109(c)(2), will require the interpretation of state law, including the Michigan Constitution.

However, ruling on state law issues is required in addressing many issues in bankruptcy cases. As the Supreme Court has observed, "[B]ankruptcy courts [] consult state law in determining the validity of most claims." *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 444, 127 S. Ct. 1199, 1201 (2007). Concisely summarizing the reality

---

[13] Only one case, cited extensively by the Committee, suggests otherwise. *Picard v. Flinn Invs., LLC*, 463 B.R. 280 (S.D.N.Y. 2011). (Committee's Motion to Stay, ¶12, p. 6) That case did state in dicta in a footnote, "If mandatory withdrawal protects litigants' constitutional interest in having Article III courts interpret federal statutes that implicate the regulation of interstate commerce, then it should also protect, *a fortiori*, litigants' interest in having the Article III courts interpret the Constitution." *Id.* at 288 n.3.

This single sentence cannot be given much weight. First, it is only dicta. Second, it is against the manifest weight of the case authorities. Third, the quote assumes, without analysis, that the litigants do have an interest in having Article III courts interpret the Constitution, and thus bootstraps its own conclusion. Fourth, nothing in the *Flinn Investments* case states or even suggests that *Stern* itself prohibits a bankruptcy court from ruling on a constitutional issue where it otherwise has the authority to rule on the claim before it. Finally, the district court that issued *Flinn Investments* has now entered an amended standing order of reference in bankruptcy cases to provide that its bankruptcy court should first consider objections to its authority that parties raise under *Stern v. Marshall*. Apparently, that district court's position now is that *Stern* does not preclude the bankruptcy court from determining constitutional issues, including the constitutional issue of its own authority. The order is available at http://www.nysd.uscourts.gov/rules/StandingOrder_OrderReference_12mc32.pdf.

The Committee cited two other cases in support of its position that only an Article III court can determine a constitutional issue: *TTOD Liquidation, Inc. v. Lim* (*In re Dott Acquisition, LLC*), 2012 WL 3257882 (E.D. Mich. July 25, 2012), and *Picard v. Schneiderman* (*In re Madoff Secs.*), 492 B.R. 133 (S.D.N.Y. 2013). Both are irrelevant to the issue. *Dott Acquisition* did discuss *Stern* but only in the unremarkable context of withdrawing the reference on a fraudulent transfer action. *Schneiderman* did not address a *Stern* issue at all, or even cite the case.

12

of the bankruptcy process and the impact of *Stern* on it, the court in *In re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 698 (Bankr. N.D. Ill. 2011), concluded:

> [*Stern*] certainly did not hold that a Bankruptcy Judge cannot ever decide a state law issue. Indeed, a large portion of the work of a Bankruptcy Judge involves actions in which non-bankruptcy issues must be decided and that 'stem from the bankruptcy itself or would necessarily be resolved in the claims allowance process,' [131 S. Ct.] at 2618, for example, claims disputes, actions to bar dischargeability, motions for stay relief, and others. Those issues are likely within the 'public rights' exception as defined in *Stern*.

Other cases also illustrate the point.[14]

The distinction is clear. While in some narrow circumstances *Stern* prohibits a non-Article III court from adjudicating a state law claim for relief, a non-Article III court may consider and apply state law as necessary to resolve claims over which it does have authority under *Stern*. The mere fact that state law must be applied does not by itself mean that *Stern* prohibits a non-Article III court from determining the matter.

Moreover, nothing about a chapter 9 case suggests a different result. In *City of Cent. Falls, R.I.*, 468 B.R. at 52, the court stated, "Nor did [*Stern*] address concerns of federalism; although the counterclaim at issue in *Stern* arose under state law, the determinative feature of that counterclaim was that it did not arise under the Bankruptcy Code. The operative dichotomy was not federal versus state, but bankruptcy versus nonbankruptcy."

---

[14] *See, e.g.*, *Picard v. Estate of Madoff*, 464 B.R. 578, 586 (S.D.N.Y. 2011) (quoting *In re Salander O'Reilly Galleries*, 453 B.R. 106, 118 (Bankr. S.D.N.Y. 2011)) ("It is clear" from *Stern v. Marshall* and other Supreme Court precedent that "the Bankruptcy Court is empowered to apply state law when doing so would finally resolve a claim."); *Anderson v. Bleckner* (*In re Batt*), 2012 WL 4324930, at *2 (W.D. Ky. Sept. 20, 2012) ("*Stern* does not bar the exercise of the Bankruptcy Court's jurisdiction in any and all circumstances where a party to an adversary proceeding has not filed a proof of claim, or where the issue in an adversary proceeding is a matter of state law.").

13

The troubling aspect of the Committee's federalism argument is that it does not attempt to define, even vaguely, what interest of federalism is at stake here or how that interest requires withdrawal of the reference to the district court. Its motion does little more than just drop the word in here and there, and argue that federalism requires this or that.

In *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012), the Supreme Court stated, "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." Accordingly, federalism is about the federal and state governments respecting each other's sovereignty. It has nothing to do with the requirements of Article III or, to use the phraseology of *Stern*¸ with the "division of labor" between the district courts and the bankruptcy courts.[15] 131 S. Ct. at 2620. *See also City of Cent. Falls, R.I.*, 468 B.R. at 52, quoted above.

Beyond that, the Committee's motion does not address why principles of federalism suggest that the district court rather than the bankruptcy court should first review the constitutional issues, especially since any decision by this Court is subject to *de novo* review by the district court on appeal.

For these reasons, the Court concludes that the Committee is not likely to prevail on the merits of its withdrawal motion as it pertains to its *Stern* argument.

### B. Mandatory Withdrawal Under 28 U.S.C. § 157(d)

The Committee also asserts that it is likely to succeed on the merits of its withdrawal motion because withdrawal of the reference is mandatory under 28 U.S.C. § 157(d). Under this statute, withdrawal of the reference is mandatory if the "resolution of the proceeding requires

---

[15] Genuine federalism concerns are fully respected in bankruptcy through the process of permissive abstention under 28 U.S.C. § 1334(c)(1).

consideration of both title 11 and other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).

Most courts agree that "[mandatory] withdrawal should be granted only if the current proceeding could not be resolved without 'substantial and material consideration'" of the federal law regulating interstate commerce.[16] *In re Vicars Ins. Agency, Inc.*, 96 F.3d 949, 952 (7th Cir. 1996) (citations omitted).

Mandatory withdrawal of the reference is granted only when "resolution of the proceeding must require consideration of non-bankruptcy federal statutes regulating interstate

---

[16] "This 'substantial and material' gloss has been accepted as an appropriate reading of the statute and effectuation of Congress' intent by most courts[.]" *Vicars Ins. Agency, Inc.*, 96 F.3d at 952 (citations omitted). *See also Security Farms v. Int'l Bhd. of Teamsters, Chauffers, Warehousemen & Helpers*, 124 F.3d 999, 1008 (9th Cir. 1997) (holding that 28 U.S.C. § 157(d) "mandates withdrawal in cases requiring material consideration of non-bankruptcy federal law."); *City of New York v. Exxon Corp.*, 932 F.2d 1020, 1026 (2d Cir. 1991) ("This mandatory withdrawal provision has been interpreted to require withdrawal to the district court of cases or issues that would otherwise require a bankruptcy court judge to engage in significant interpretation, as opposed to simple application, of federal laws apart from the bankruptcy statutes."); *Sweet v. Chambers* (*In re Chambers*), 2012 WL 933199, at *1 (E.D. Mich. Mar. 20, 2012) (Hood, J.) ("Two prongs must be met for requiring mandatory withdrawal of the reference: 1) consideration of the Bankruptcy Code; and 2) substantial and material consideration of a nonbankruptcy federal law affecting interstate commerce."); *Stevenson v. Polymerica, Ltd, d/b/a Global Enters. Inc. & Fabribond, LLC.,* (*In re Snooks*), 2009 WL 230598, at *2-3 (E.D. Mich. Jan. 29, 2009) (Fiekens, J.) ("The 'substantial and material consideration' standard is the one adopted by the latest court in this district to consider the question. This standard is also the one gaining most acceptance by courts of late. Therefore, this Court will follow this standard.").

A small minority of courts reject the "substantial and material consideration" test in favor of applying the literal language of 28 U.S.C. § 157(d). *See, e.g.*, *Laborers' Pension Trust Fund – Det. & Vicinity v. Kiefer* (*In re Kiefer*), 276 B.R. 196, 200 (E.D. Mich. 2002) (Gadola, J.) ("Instead, literal interpretation of § 157(d) would preclude bankruptcy court jurisdiction only when (1) consideration of a federal law that regulates commerce and is outside of the Bankruptcy Code were required to resolve the case and (2) a party moved for withdrawal of the proceeding.").

It does not matter which approach is applied here. As noted in the text, the Committee's objections to eligibility do not require consideration of any federal statute other than the bankruptcy code, let alone "substantial and material" consideration.

commerce."[17] *In re Texaco Inc.*, 84 B.R. 911, 919 (S.D.N.Y. 1988). These laws are "rooted in the commerce clause."[18] *In re Ziviello-Howell*, 2011 WL 2144417, at *2 (E.D. Cal. May 31, 2011) (collecting cases).

"[Section 157(d)] has been construed narrowly." *Shugrue v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.)*, 922 F.2d 984, 995 (2d Cir. 1990). "By misinterpreting the mandatory withdrawal provision, courts risk encouraging delay tactics, forum shopping, and ultimately, dissipation of the bankrupt's estate through costly litigation by the parties." Erich D. Andersen, *Closing the Escape Hatch in the Mandatory Withdrawal Provision of 28 U.S.C. § 157(d)*, 36 UCLA L. REV. 417, 418 (December 1988) (footnotes omitted).

This basis for withdrawal of the reference that the Committee asserts is likely to fail for one simple reason. Resolution of the Committee's eligibility objection does not require consideration of any "laws of the United States regulating organizations or activities affecting interstate commerce." The Committee has not cited any such laws to be considered in connection with its eligibility objection and the Court sees none.

Instead, the Committee argues that restructuring the fiscal activities among a state and its employees affects interstate commerce. It cites *United States v. Darby*, 312 U.S. 100, 61 S. Ct 451 (1941), for the proposition that the regulation of employees affects interstate commerce.

---

[17] It must be noted that some cases loosely state that this section applies when consideration of a "non-bankruptcy federal law" is required. *See., e.g.*, *Vicars Ins. Agency, Inc.*, 96 F.3d at 952. Given the specificity of the statute, this shorthand language should be understood to refer to "other laws of the United States regulating organizations or activities affecting interstate commerce." 28 U.S.C. § 157(d).

[18] The reference in *Texaco* to "federal statutes regulating interstate commerce" includes, for example, the federal antitrust laws, securities laws, environmental laws, labor laws, RICO, truth in lending laws, the Federal Aviation Act, and the Occupational Safety and Health Act. *See generally*, *Hatzel & Buehler, Inc. v. Orange & Rockland Utilities, Inc.*, 107 B.R. 34, 38 (D. Del. 1989).

This is weak. The question here is not whether the bankruptcy filing of the City of Detroit will affect interstate commerce. It probably will, but the Committee cites no cases holding that 28 U.S.C. § 157(d) requires withdrawal of the reference whenever a debtor's bankruptcy affects interstate commerce. It would stretch § 157(d) beyond recognition to reach that result.

It would also stretch 28 U.S.C. § 157(d) beyond recognition to conclude that it covers all federal laws, including the Constitution, as the Committee apparently contends. Although the Commerce Clause of the Constitution, Art. 1, § 8, cl. 3, gives Congress the power to enact laws "to regulate Commerce . . . among the several States," the Constitution itself is simply not a law "regulating organizations or activities affecting interstate commerce," as required for mandatory withdrawal of the reference under 28 U.S.C. § 157(d). Beyond that, if Congress had intended for mandatory withdrawal of the reference to apply to matters that involve constitutional issues, it could easily have so provided. It did not.

Simply stated, the Committee's objections to eligibility do not require any consideration of a federal law "regulating organizations or activities affecting interstate commerce," let alone any "substantial and material" consideration of such a law. For that reason, the Court concludes that the Committee has not established that it is likely to prevail on the merits of the withdrawal motion as it pertains to its mandatory withdrawal argument.

### C. Permissive Withdrawal Under 28 U.S.C. § 157(d)

In its motion to withdraw the reference, the Committee also argues for permissive withdrawal under § 157(d). This ground allows the district court to withdraw the reference whenever it concludes that there is "cause shown." 28 U.S.C. § 157(d).

Curiously however, the Committee did not assert in its motion for stay that it is likely to succeed on its claim for permissive withdrawal of the reference. As noted in Part II above, the

17

13-53846-tjt   Doc 2217   Filed 12/18/13   Entered 12/18/13 16:06:46   Page 298 of 462
13-53846-swr   Doc 1039   Filed 09/26/13   Entered 09/26/13 10:56:43   Page 17 of 23   297

Committee has the burden to establish that it is likely to succeed on its motion. In these circumstances, it is hard to find that the Committee has met its burden.

Nevertheless, in the interest of justice, the Court will review the specific grounds for permissive withdrawal that the Committee argued in its motion to withdraw the reference. In summary, the Committee asserts cause for withdrawal of the reference based on the following factors:

1. "Post-*Stern*, the most relevant factor is whether a bankruptcy court can enter final judgment on the matter." Committee's Motion to Withdraw the Reference at ¶45, p. 26. (Dkt. #806)

2. "Withdrawal will promote judicial and party efficiency." Committee's Motion to Withdraw the Reference at ¶46, p. 27. (Dkt. #806)

3. "The federalism concerns implicated by the Committee's constitutional challenges to Chapter 9 also counsel in favor of resolution in an Article III court." Committee's Motion to Withdraw the Reference at ¶47, p. 27-8. (Dkt. #806)

4. "Finally, the Bankruptcy Court has no special legal expertise to determine the Eligibility Objection based on novel issues of state and federal constitutional law and related to a newly-enacted state statute." Committee's Motion to Withdraw the Reference at ¶48, p. 28. (Dkt. #806)

"[I]n determining whether cause exist[s] a district court should consider such goals as advancing uniformity in bankruptcy administration, decreasing forum shopping and confusion, promoting the economical use of the parties' resources, and facilitating the bankruptcy process." *Dionne v. Simmons* (*In re Simmons*), 200 F.3d 738, 742 (11th Cir. 2000) (citing *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 998 (5th Cir. 1985)).[19]

---

[19] *See also Sec. Farms v. Int'l Bhd. of Teamsters, Chauffers, Warehousemen & Helpers*, 124 F.3d 999, 1008 (9th Cir. 1997) ("In determining whether cause exists, a district court should consider the efficient use of judicial resources, delay and costs to the parties, uniformity of bankruptcy administration, the prevention of forum shopping, and other related factors."); *Orion Pictures Corp. v. Showtime Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1101 (2d Cir. 1993).

The factors argued in the Committee's motion to withdraw the reference that are summarized in paragraphs 1, 3 and 4 above are not among the factors suggested in *Simmons* or in other cases on point. Still, the district court has wide discretion and may consider them.

The Committee argues that the most relevant factor is its *Stern* argument. The Court has already explained why that argument is not likely to succeed.

The Committee also asserts that withdrawal of the reference on its eligibility objection will promote efficiency. This too is unlikely to succeed. If the motion to withdraw the reference is granted, then one of the eligibility objections that have been filed in the case will be in the district court (the Committee's objections) and all of the others will be in the bankruptcy court, including the other parties' constitutional objections. This leaves the City litigating eligibility, and to some extent the same issues on eligibility, in two different courts, simultaneously. This does not promote judicial or party efficiency; it is its antithesis. The most efficient way to litigate eligibility in this case is in one court - the bankruptcy court - and then on appeal in the next.

The Committee also argues that considerations of federalism suggest that constitutional issues should be resolved in the district court. However, as demonstrated above in connection with the Committee's *Stern* argument, there is nothing about principles of federalism that suggest that the Committee's constitutional challenge to chapter 9 of the bankruptcy code or to PA 436 should be determined in the district court.

Finally, the Committee argues that this Court has no special legal expertise to determine novel issues of state and federal constitutional law. The self-contradiction of this argument makes it the most puzzling of all. Almost by definition, no court will have "special legal expertise" to review an issue of law that is "novel." Still, both this Court and the district court do

have the *necessary* legal expertise to deal with all of the legal arguments raised in the eligibility objections, even if that expertise is not "special."

The Court concludes that each of the factors in the appellate decisions cited above - advancing uniformity in bankruptcy administration, decreasing forum shopping and confusion, promoting the economical use of the parties' resources, and facilitating the bankruptcy process - weigh against withdrawing the reference. Accordingly, the Court finds that the Committee is not likely to succeed on its motion to withdraw the reference.

### IV. Whether the Committee Will Suffer
### Irreparable Injury If the Stay Is Not Granted

The second consideration in the determination of whether to grant the request for a stay is whether the moving party will suffer irreparable injury if the stay is not granted. The Committee argues that even a threat to a constitutional right mandates a finding of irreparable injury. The Committee cites *Hillside Prods., Inc. v. Duchane*, 249 F. Supp. 2d 880, 900 (E.D. Mich. 2003), for the proposition, "[W]hen reviewing a motion for a preliminary injunction, if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Id*. (quoting *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001) (citing *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673 (1976))).

The difficulty with the Committee's argument here is that in *Hillside Productions*, the court had already found a substantial likelihood of success on the merits of the plaintiffs' constitutional claims. Specifically, the court found, "Based on the evidence presented, this Court finds that Plaintiffs are likely to succeed on the merits of the selective enforcement and First Amendment retaliation claims. Rarely does one hear such compelling and unrebutted evidence of the vindictive retaliatory action such as that taken[.]" 249 F. Supp. 2d at 898.

However, the mere argument that a constitutional right might be impaired is not sufficient for a finding of irreparable injury in the absence of a substantial showing of likelihood of success on the merits of the underlying claim. As determined in Part III above, the Committee has not established a likelihood of success on the merits of its argument that *Stern* requires withdrawal of the reference.

As the court stated in *In re The Antioch Co.*, 435 B.R. 493, 502 (Bankr. S.D. Ohio 2010):

> Finally, a decision to stay this litigation cannot be premised on the mere possibility this court might interpret its jurisdiction in too broad a fashion. If Congress intended for the bankruptcy courts to stay proceedings upon the filing of a motion to withdraw the reference or to abstain, it would have so provided. Movants' argument regarding the risk of the Bankruptcy Court overstepping its jurisdictional and constitutional authority would not only remove the discretion accorded the bankruptcy courts under BR 5011(c), but also would flip the apparent presumption in favor of not staying such proceedings that arises out of the plain language of the Rule.

The Committee also asserts that its constituency will suffer a loss of constitutional rights if the stay is not granted because their pensions will be diminished. Its brief states, "Ultimately, the risk is the loss of life-preserving or even life-enhancing retirement compensation[.]" Committee's Motion to Stay at ¶23, p. 12. (Dkt.#837)

At this point, however, the retirees have not suffered a loss of any retirement benefits, and more importantly, nothing suggests that denying the motion for stay would create *any* risk to their retirement benefits pending the district court's determination of whether to withdraw the reference.

The City argues, with merit, that even in the Committee's worst-case scenario, its right to have the district court determine its constitutional challenges will still not be lost. Even if the stay is denied, *and* the motion to withdraw the reference is denied, *and* this Court determines that *Stern* does not preclude this Court from entering a final judgment on the Committee's

21

constitutional objections to eligibility, the Committee can still have both its *Stern* objection and its constitutional challenges to eligibility heard by the district court, *de novo*, on appeal.

Accordingly, the Court concludes that the Committee has not established any harm, let alone irreparable harm, if the stay is denied.

## V. Whether the City Will Be Harmed If a Stay Is Granted

In this motion, the Committee requests a stay of this Court's consideration of all of the one hundred ten objections to eligibility, pending the district court's determination of its motion to withdraw the reference on its one eligibility objection.

The Committee argues that the City will only suffer "minimal inconvenience" if the stay is granted. Committee's Motion to Stay at p. 13. (Dkt. #837) It argues that the only injury to the City would be the loss of its choice of forum to decide issues. Committee's Motion to Stay at ¶27, p. 13. (Dkt. #837)

In response, the City states, "The sooner the City can demonstrate its eligibility for chapter 9, the sooner it can complete other restructuring steps and ultimately confirm and implement a plan of adjustment. A prompt exit from chapter 9 will facilitate the long process of rebuilding the City." City's Brief in Opposition to Motion to Stay at ¶1, p. 1. (Dkt. #925)

It further states, "[E]very day of delay in the administration of this case inflicts injury on the City and its residents through continuation of intolerably low levels of municipal services and public health and safety and the deferral of any opportunity that the City may have to revitalize itself." City's Brief in Opposition to Motion to Stay at ¶35, p. 20. (Dkt. #925)

Finally, the City relies on the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code, filed on July 18, 2013, which states that the City is (a) currently unable to make investments critical to

22

13-53846-tjt  Doc 2217  Filed 12/08/13  Entered 12/08/13 16:06:46  Page 303 of 462
13-53846-swr  Doc 1039  Filed 09/26/13  Entered 09/26/13 19:56:43  Page 22 of 23    302

the health and safety of its residents, (b) plagued by shockingly high crime rates and low police response times, (c) struggling to keep the lights on (with 40% of the City's street lights inoperative as of April 2013), (d) ravaged by extensive and intractable urban blight and (e) saddled with obsolete and decaying infrastructure and equipment. Orr Declaration at ¶¶ 31-44, pp. 21-5. (Dkt. #11)

The Court agrees with the City that the real injury to it if a stay is granted will be the consequences resulting from the inevitable delay in resolving the case. The record in this case firmly establishes the necessity that this case move promptly through the process of determining the City's eligibility for chapter 9 relief. If the City is found to be eligible, it will then need to move promptly through the process of plan negotiation and confirmation. If the City is found not to be eligible, it will then need to promptly evaluate its post-bankruptcy options. In the meantime, however, the creditors' many eligibility objections create substantial uncertainty regarding the City's ability to achieve its goal of adjusting its debt through chapter 9. Until that uncertainty is removed, the City's progress in recovering its financial, civic, commercial, and cultural life and in revitalizing itself will likely be slowed, if not stalled entirely.

Orr's declaration further establishes that also at stake in this motion is the City's ability to provide basic services to its residents and to remediate a host of unsafe living conditions. At the hearing on the individual objecting parties' objections to eligibility on September 19, 2013, the Court heard truly disturbing accounts of the consequences of the City's inability to provide basic services. These accounts were undoubtedly just a microscopic sample of the full truth regarding the inadequacy of basic services in the City of Detroit.

In these circumstances, the consequences of extending the eligibility process by granting the requested stay are not a "minimal inconvenience." They are much more than that. They are truly beyond irreparable and bordering on the incomprehensible.

## VI. Whether the Public Interest
## Will be Served by Granting the Stay

The Committee asserts that "the public interest is best served by preventing [a] prohibited act." Committee's Motion to Stay at ¶27, p. 13. (Dkt. #837) It further asserts that the prohibited act is the impairment of pensions. However, whatever the merits of that claim, granting a stay pending the determination of the motion to withdraw the reference does not preserve pension rights any more than denying the stay impairs them.

The Committee also asserts that the public interest is served by granting the stay because it would avoid the constitutional violation that would occur under *Stern* if this Court were to rule on the Committee's constitutional challenges to the City's eligibility. However, as the Court concluded in Part III above, the Committee is unlikely to succeed on its argument that *Stern* prohibits this Court from ruling on the City's eligibility.

The Committee has not stated any other public interest in support of granting the stay.

There is, however, a strong public interest in denying it, because to a great extent, the public's interest and the City's interest in the prompt resolution of this case coalesce. Accordingly, for the same reasons and to the same extent that granting the stay would harm the City, it would also harm the public interest.

## VII. Conclusion

The Court concludes that the Committee has failed to establish any of the factors to be considered in connection with its request for a stay. Accordingly, it is hereby ordered that the

Committee's motion for a stay pending the district court's determination of the motion to withdraw the reference is denied.

For Publication

.

**Signed on September 26, 2013**

_____/s/ Steven Rhodes_____
                    **Steven Rhodes**
                    **United States Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                                    Chapter 9
City of Detroit, Michigan,                    Case No. 13-53846
     Debtor.                                        Hon. Steven W. Rhodes
_____/


### <u>Opinion Regarding Eligibility</u>


> The Congress shall have Power To . . . establish . . . uniform Laws
> on the subject of Bankruptcies throughout the United States. . . .
>
> > Article I, Section 8, United States Constitution


> No . . . law impairing the obligation of contract shall be enacted.
>
> > Article I, Section 10, Michigan Constitution


> The accrued financial benefits of each pension plan and retirement
> system of the state and its political subdivisions shall be a
> contractual obligation thereof which shall not be diminished or
> impaired thereby.
>
> > Article IX, Section 24, Michigan Constitution

<u>**Table of Contents**</u>

**I. Summary of Opinion** ................................................................................................. 1

**II. Introduction to the Eligibility Objections** ................................................................. 1

    A. The Process .................................................................................................... 1

    B. Objections Filed by Individuals Without an Attorney .................................... 3

    C. Objections That Raise Only Legal Issues ...................................................... 3

    D. Objections That Require the Resolution of Genuine Issues of Material Fact ............... 4

**III. Introduction to the Facts Leading up to the Bankruptcy Filing** ........................... 5

    A. The City's Financial Distress ........................................................................ 7

        1. The City's Debt ........................................................................................ 7

        2. Pension Liabilities .................................................................................... 8

        3. OPEB Liabilities ...................................................................................... 10

        4. Legacy Expenditures - Pensions and OPEB .......................................... 11

        5. The Certificates of Participation ............................................................. 11

            a. The COPs and Swaps Transaction .................................................. 11

            b. The Result ........................................................................................ 13

            c. The Collateral Agreement ............................................................... 13

            d. The City's Defaults Under the Collateral Agreement ...................... 14

            e. The Forbearance and Optional Termination Agreement .................. 14

            f. The Resulting Litigation Involving Syncora ................................... 15

            g. The COPs Debt ................................................................................ 16

        6. Debt Service ............................................................................................ 16

        7. Revenues .................................................................................................. 17

        8. Operating Deficits .................................................................................... 17

        9. Payment Deferrals .................................................................................... 18

B. The Causes and Consequences of the City's Financial Distress ................................ 19

    1. Population Losses ......................................................... 19

    2. Employment Losses ....................................................... 19

    3. Credit Rating ............................................................ 19

    4. The Water and Sewerage Department .......................................... 20

    5. The Crime Rate .......................................................... 20

    6. Streetlights ............................................................. 20

    7. Blight................................................................. 20

    8. The Police Department .................................................... 21

    9. The Fire Department ...................................................... 21

    10. Parks and Recreation..................................................... 22

    11. Information Technology ................................................... 22

C. The City's Efforts to Address Its Financial Distress ................................... 23

D. A Brief History of Michigan's Emergency Manager Laws ......................... 23

E. The Events Leading to the Appointment of the City's Emergency Manager ............. 24

    1. The State Treasurer's Report of December 21, 2011 ......................... 25

    2. The Financial Review Team's Report of March 26, 2012............................ 26

    3. The Consent Agreement ................................................... 27

    4. The State Treasurer's Report of December 14, 2012 ......................... 28

    5. The Financial Review Team's Report of February 19, 2013.......................... 29

    6. The Appointment of an Emergency Manager for the City of Detroit............... 30

F. The Emergency Manager's Activities ....................................... 31

    1. The June 14, 2013 Meeting and Proposal to Creditors................................ 31

    2. Subsequent Discussions with Creditor Representatives ................................ 34

G. The Prepetition Litigation ......................................... 36

H. The Bankruptcy Filing ................................................................ 36

**IV. The City Bears the Burden of Proof.** ................................................ 37

**V. The Objections of the Individuals Who Filed Objections Without an Attorney** ............ 37

**VI. The City of Detroit Is a "Municipality" Under 11 U.S.C. § 109(c)(1).** ........................... 38

**VII. The Bankruptcy Court Has the Authority to Determine the Constitutionality of Chapter 9 of the Bankruptcy Code and Public Act 436.** ................................. 39

    A. The Parties' Objections to the Court's Authority Under *Stern v. Marshall* ............... 39

    B. *Stern*, *Waldman*, and *Global Technovations* ................................................ 39

    C. Applying *Stern*, *Waldman*, and *Global Technovations* in This Case .......................... 41

    D. Applying *Stern* in Similar Procedural Contexts ............................................. 43

    E. The Objectors Overstate the Scope of *Stern* ............................................... 44

        1. *Stern* Does Not Preclude This Court from Determining Constitutional Issues. 44

        2. Federalism Issues Are Not Relevant to a *Stern* Analysis. ................................. 47

    F. Conclusion Regarding the *Stern* Issue .................................................... 49

**VIII. Chapter 9 Does Not Violate the United States Constitution.** ............................ 49

    A. Chapter 9 Does Not Violate the Uniformity Requirement of the Bankruptcy Clause of the United States Constitution. ................................................. 49

        1. The Applicable Law ................................................................ 50

        2. Discussion ........................................................................ 51

    B. Chapter 9 Does Not Violate the Contracts Clause of the United States Constitution.. 52

    C. Chapter 9 Does Not Violate the Tenth Amendment to the United States Constitution. ................................................................................ 53

        1. The Tenth Amendment Challenges to Chapter 9 Are Ripe for Decision and the Objecting Parties Have Standing. ................................................. 54

            a. Standing ................................................................... 55

            b. Ripeness .................................................................. 57

2. The Supreme Court Has Already Determined That Chapter 9 Is Constitutional. ..................................................................................................... 59

3. Changes to Municipal Bankruptcy Law Since 1937 Do Not Undermine the Continuing Validity of *Bekins*. ...................................................... 62

    a. The Contracts Clause of the United States Constitution Prohibits States from Enacting Municipal Bankruptcy Laws. ....................................... 63

    b. *Asbury Park* Is Limited to Its Own Facts............................................ 64

4. Changes to the Supreme Court's Tenth Amendment Jurisprudence Do Not Undermine the Continuing Validity of *Bekins*................................ 65

    a. *New York v. United States* .................................................................. 65

    b. *Printz v. United States*....................................................................... 68

    c. *New York* and *Printz* Do Not Undermine *Bekins*. ............................... 69

    d. Explaining Some Puzzling Language in *New York* ............................ 71

5. Chapter 9 Is Constitutional As Applied in This Case. ..................................... 73

    a. When the State Consents to a Chapter 9 Bankruptcy, the Tenth Amendment Does Not Prohibit the Impairment of Contract Rights That Are Otherwise Protected by the State Constitution............................... 73

    b. Under the Michigan Constitution, Pension Rights Are Contractual Rights................................................................................................... 75

**IX. Public Act 436 Does Not Violate the Michigan Constitution.**........................................... 81

    A. The Michigan Case Law on Evaluating the Constitutionality of a State Statute......... 82

    B. The Voters' Rejection of Public Act 4 Did Not Constitutionally Prohibit the Michigan Legislature from Enacting Public Act 436................................................................. 84

    C. Even If the Michigan Legislature Did Include Appropriations Provisions in Public Act 436 to Evade the Constitutional Right of Referendum, It Is Not Unconstitutional.... 86

    D. Public Act 436 Does Not Violate the Home Rule Provisions of the Michigan Constitution.................................................................................................... 88

    E. Public Act 436 Does Not Violate the Pension Clause of the Michigan Constitution. . 92

**X. Detroit's Emergency Manager Had Valid Authority to File This Bankruptcy Case Even Though He Is Not an Elected Official.** ........................................................................... 93

**XI. The Governor's Authorization to File This Bankruptcy Case Was Valid Under the Michigan Constitution Even Though the Authorization Did Not Prohibit the City from Impairing Pension Rights.** ................................................................................... 94

**XII. The Judgment in *Webster v. Michigan* Does Not Preclude the City from Asserting That the Governor's Authorization to File This Bankruptcy Case Was Valid.** ................... 95

    A. The Circumstances Leading to the Judgment ............................................. 95

    B. The Judgment Is Void Because It Was Entered After the City Filed Its Petition. ....... 99

    C. The Judgment Is Also Void Because It Violated the Automatic Stay. ..................... 101

    D. Other Issues ........................................................................... 103

**XIII. The City Was "Insolvent."** ................................................................. 104

    A. The Applicable Law .................................................................... 104

    B. Discussion ............................................................................. 106

        1. The City Was "Generally Not Paying Its Debts As They Become Due." ...... 106

        2. The City Is Also "Unable to Pay Its Debts As They Become Due." .............. 107

        3. The City's "Lay" Witnesses ...................................................... 108

        4. The City's Failure to Monetize Assets ........................................ 109

**XIV. The City Desires to Effect a Plan to Adjust Its Debts.** .................................. 110

    A. The Applicable Law .................................................................... 110

    B. Discussion ............................................................................. 111

**XV. The City Did Not Negotiate with Its Creditors in Good Faith.** ........................... 112

    A. The Applicable Law .................................................................... 112

    B. Discussion ............................................................................. 116

**XVI. The City Was Unable to Negotiate with Creditors Because Such Negotiation Was Impracticable.** ...................................................................................... 119

    A. The Applicable Law .................................................................... 119

    B. Discussion ............................................................................. 121

**XVII. The City Filed Its Bankruptcy Petition in Good Faith.** ................................. 125

A. The Applicable Law .................................................................................... 126

B. Discussion .................................................................................................... 127

    1. The Objectors' Theory of Bad Faith .................................................... 127

    2. The Court's Conclusions Regarding the Objectors' Theory of Bad Faith ...... 130

    3. The City Filed This Bankruptcy Case in Good Faith. ..................................... 135

        a. The City's Financial Problems Are of a Type Contemplated for Chapter 9 Relief. ........................................................................................... 136

        b. The City's Reasons for Filing Are Consistent with the Remedial Purpose of Chapter 9. ....................................................................... 137

        c. The City Made Efforts to Improve the State of Its Finances Prior to Filing, to No Avail. ............................................................................. 138

        d. The Residents of Detroit Will Be Severely Prejudiced If This Case Is Dismissed. ......................................................................................... 139

C. Conclusion Regarding the City's Good Faith ............................................. 140

**XVIII. Other Miscellaneous Arguments** ......................................................... 140

A. *Midlantic* Does Not Apply in This Case .................................................... 140

B. There Was No Gap in Mr. Orr's Service as Emergency Manager ............. 141

**XIX. Conclusion: The City is Eligible and the Court Will Enter an Order for Relief.** ...... 142

# I. Summary of Opinion

For the reason stated herein, the Court finds that the City of Detroit has established that it meets the requirements of 11 U.S.C. § 109(c).  Accordingly, the Court finds that the City may be a debtor under chapter 9 of the bankruptcy code.  The Court will enter an order for relief under chapter 9.

Specifically, the Court finds that:

- The City of Detroit is a "municipality" as defined in 11 U.S.C. § 101(40).

- The City was specifically authorized to be a debtor under chapter 9 by a governmental officer empowered by State law to authorize the City to be a debtor under chapter 9.

- The City is "insolvent" as defined in 11 U.S.C. § 101(32)(C).

- The City desires to effect a plan to adjust its debts.

- The City did not negotiate in good faith with creditors but was not required to because such negotiation was impracticable.

The Court further finds that the City filed the petition in good faith and that therefore the petition is not subject to dismissal under 11 U.S.C. § 921(c).

The Court concludes that it has jurisdiction over this matter under 28 U.S.C. § 1334(a), and that the matter is a core proceeding under 28 U.S.C. § 157(b)(2).

# II. Introduction to the Eligibility Objections

The matter is before the Court on the parties' objections to the eligibility of the City of Detroit to be a debtor in this chapter 9 case under 11 U.S.C. § 109(c).

## A. The Process

By order dated August 2, 2013, the Court set a deadline of August 19, 2013 for parties to file objections to eligibility.  (Dkt. #280)  That order also allowed the Official Committee of Retirees, then in formation, to file eligibility objections 14 days after it retained counsel.

1

One hundred nine parties filed timely objections to the City's eligibility to file this bankruptcy case under § 109 of the bankruptcy code. In addition, two individuals, Hassan Aleem and Carl Williams, filed an untimely joint objection, but upon motion, the Court determined that these objections should be considered timely. (Dkt. #821, ¶ VIII, at 7) Accordingly, the total number of objections to be considered is 110.

In pursuing their eligibility objections, the parties represented by attorneys filed over 50 briefs through several rounds.

Because the constitutionality of chapter 9 was drawn into question, the Court certified the matter to the Attorney General of the United States under 28 U.S.C. § 2403(a), and permitted the United States to intervene. (Dkt. #642 at 7) The United States then filed a brief in support of the constitutionality of chapter 9 (Dkt. #1149) and a supplemental brief (Dkt. #1560).

Also, because the constitutionality of a state statute was drawn into question, the Court certified the matter to the Michigan Attorney General under 28 U.S.C. § 2403(b), and permitted the State of Michigan to intervene. The Michigan Attorney General filed a "Statement Regarding The Michigan Constitution And The Bankruptcy Of The City Of Detroit." (Dkt. #481) He also filed a brief regarding eligibility (Dkt. #756) and a supplemental response (Dkt. #1085).

In an effort to organize and expedite its consideration of these objections, the Court entered an "Order Regarding Eligibility Objections" on August 26, 2013 (Dkt. #642) and a "First Amended Order Regarding Eligibility Objections" on September 12, 2013 (Dkt. #821). Those orders divided the objections into two groups - those filed by parties with an attorney, which were, generally, organized groups (group A), and those filed by individuals, mostly without an attorney (group B). Individuals without an attorney (group B) filed 93 objections. The

2

13-53846-tjt Doc 2215 Filed 12/19/13 Entered 12/19/13 16:06:46 Page 315 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 10:41:05 Page 5 of 150    314

remaining 17 objections were filed by parties with an attorney. The objections filed by attorneys were then further divided between objections raising only legal issues and objections that require the resolution of genuine issues of material fact.[1]

The Second Amended Final Pre-Trial Order concisely identifies which parties assert which objections. (Dkt. #1647 at 4-11) This opinion will not repeat that recitation.

## B. Objections Filed by Individuals Without an Attorney

On September 19, 2013, the Court held a hearing at which the individuals who filed timely objections without an attorney had an opportunity to address the Court. At that hearing, 45 individuals addressed the Court. These objections are discussed in Part V, below.

## C. Objections That Raise Only Legal Issues

On October 15 and 16, 2013, the Court heard arguments on the objections that raised only legal issues. These objections are addressed in Parts VII-XII, below. Summarily stated, these objections are:

1. Chapter 9 of the bankruptcy code violates the United States Constitution.

2. The bankruptcy court does not have the authority to determine the constitutionality of chapter 9 of the bankruptcy code.

---

[1] In their many briefs, some parties narrowly focused their arguments in support of their objections. Other parties, however, asserted an expansive range and number of more creative arguments in support of their objections. This opinion may not address every argument made in every brief. Nevertheless, the Court is satisfied that this opinion does address every argument that is worthy of serious consideration. To the extent an argument is not addressed in this opinion, it is overruled.

3

13-53846-tjt Doc 2337 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 10 of 162
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 10 of 162 315

3. Public Act 436 of 2012 violates the Michigan Constitution and therefore the City was not validly authorized to file this bankruptcy case as required for eligibility by 11 U.S.C. § 109(c)(2).

4. The bankruptcy court does not have the authority to determine the constitutionality of P.A. 436.

5. Detroit's emergency manager is not an elected official and therefore did not have valid authority to file this bankruptcy case, as required for eligibility by 11 U.S.C. § 109(c)(2).

6. Because the governor's authorization to file this bankruptcy case did not prohibit the City from impairing the pension rights of its employees and retirees, the authorization was not valid under the Michigan Constitution, as required for eligibility by 11 U.S.C. § 109(c)(2).

7. Because of the proceedings and judgment in *Webster v. The State of Michigan*, Case No. 13-734-CZ (Ingham County Circuit Court), the City is precluded by law from claiming that the governor's authorization to file this bankruptcy case was valid, as required for eligibility by 11 U.S.C. § 109(c)(2).

### D. Objections That Require the Resolution of Genuine Issues of Material Fact

Beginning on October 23, 2013, the Court conducted a trial on the objections filed by attorneys that require the resolution of genuine issues of material fact. These objections are addressed in Parts XIII-XVII, below. Summarily stated, these objections are:

8. The City was not "insolvent," as required for eligibility by 11 U.S.C. § 109(c)(3) and as defined in 11 U.S.C. § 101(32)(C).

9. The City does not desire "to effect a plan to adjust such debts," as required for eligibility by 11 U.S.C. § 109(c)(4).

4

13-53846-tjt Doc 2337 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 317 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 317 of 462    316

10. The City did not negotiate in good faith with creditors, as required (in the alternative) for eligibility by 11 U.S.C. § 109(c)(5)(B).

11. The City was not "unable to negotiate with creditors because such negotiation [was] impracticable," as required (in the alternative) for eligibility by 11 U.S.C. § 109(c)(5)(C).

12. The City's bankruptcy petition should be dismissed under 11 U.S.C. § 921(c) because it was filed in bad faith.

In addition, in the course of the briefing, parties asserted certain new and untimely objections. These are addressed in Part XVIII, below.

### III. Introduction to the Facts
### Leading up to the Bankruptcy Filing

The City of Detroit was once a hardworking, diverse, vital city, the home of the automobile industry, proud of its nickname - the "Motor City." It was rightfully known as the birthplace of the American automobile industry. In 1952, at the height of its prosperity and prestige, it had a population of approximately 1,850,000 residents. In 1950, Detroit was building half of the world's cars.

The evidence before the Court establishes that for decades, however, the City of Detroit has experienced dwindling population, employment, and revenues. This has led to decaying infrastructure, excessive borrowing, mounting crime rates, spreading blight, and a deteriorating quality of life.

The City no longer has the resources to provide its residents with the basic police, fire and emergency medical services that its residents need for their basic health and safety.

Moreover, the City's governmental operations are wasteful and inefficient. Its equipment, especially its streetlights and its technology, and much of its fire and police equipment, is obsolete.

5

13-53846-tjt Doc 2337 Filed 12/10/13 Entered 12/10/13 06:16:05 Page 318 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:11:05 Page 12 of 150     317

To reverse this decline in basic services, to attract new residents and businesses, and to revitalize and reinvigorate itself, the City needs help.

The following sections of this Part of the opinion detail the basic facts regarding the City's fiscal decline, and the causes and consequences of it. Section A will address the City's financial distress. Section B will address the causes and consequences of that distress. Section C will address the City's efforts to address its financial distress. Part D will address the facts and events that resulted in the appointment of an emergency manager for the City. Finally, Parts E-G will address the facts and events that culminated in this bankruptcy filing.

The evidence supporting these factual findings consists largely of the following admitted exhibits:

Exhibit 6 - the City's "Comprehensive Annual Financial Report" for the fiscal year ended June 30, 2012.

Exhibit 21 - "Preliminary Review of the City of Detroit," from Andy Dillon, State Treasurer, to Rick Snyder, Governor, December 21, 2011;

Exhibit 22 - "Report of the Detroit Financial Review Team," from the Detroit Financial Review Team to Governor Snyder, March 26, 2012;

Exhibit 24 - "Preliminary Review of the City of Detroit," from Andy Dillon, State Treasurer, to Rick Snyder, Governor, December 14, 2012;

Exhibit 25 - "Report of the Detroit Financial Review Team," from the Detroit Financial Review Team to Governor Snyder, February 19, 2013;

Exhibit 26 - Letter from Governor Rick Snyder to Mayor Dave Bing and Detroit City Council, March 1, 2013;

Exhibit 28 - Letter from Kevyn D. Orr, Emergency Manager, to Governor Richard Snyder and State Treasurer Andrew Dillon, July 16, 2013;

Exhibit 29 - "Authorization to Commence Chapter 9 Bankruptcy Proceeding," from Governor Richard Snyder to Emergency Manager Kevyn Orr and State Treasurer Andrew Dillon.

Exhibit 38 - Graph, "FY14 monthly cash forecast absent restructuring"

Exhibit 41 - "Financial and Operating Plan," Kevyn D. Orr, Emergency Manager, June 10, 2013;

Exhibit 43 - "Proposal for Creditors," City of Detroit, June 14, 2013;

Exhibit 44 - "Proposal for Creditors, Executive Summary," City of Detroit, June 14, 2013;

Exhibit 75 - "Financial and Operating Plan," Kevyn D. Orr, Emergency Manager, May 12, 2013;

Exhibit 414 - Declaration of Kevyn Orr in Support of Eligibility. (Dkt. #11)

The Court notes that the objecting creditors offered no substantial evidence contradicting the facts found in this Part of the opinion, except as noted below relating to the City's unfunded pension liability.

## A. The City's Financial Distress

### 1. The City's Debt

The City estimates its debt to be $18,000,000,000. This consists of $11,900,000,000 in unsecured debt and $6,400,000,000 in secured debt. It has more than 100,000 creditors.

According to the City, the unsecured debt includes:

$5,700,000,000 for "OPEB" through June 2011, which is the most recent actuarial data available. "OPEB" is "other post-employment benefits," and refers to the Health and Life Insurance Benefit Plan and the Supplemental Death Benefit Plan for retirees;

$3,500,000,000 in unfunded pension obligations;

$651,000,000 in general obligation bonds;

$1,430,000,000 for certificates of participation ("COPs") related to pensions;

$346,600,000 for swap contract liabilities related to the COPs; and

$300,000,000 of other liabilities, including $101,200,000 in accrued compensated absences, including unpaid, accumulated vacation and sick leave balances; $86,500,000 in accrued workers' compensation for which the City is self-insured; $63,900,000 in claims and judgments, including lawsuits and claims other than workers' compensation claims; and $13,000,000 in capital leases and accrued pollution remediation.

As noted, the objecting parties do not seriously challenge the City's estimates of its debt, except for its estimates of its unfunded pension liability. The plans and others have suggested a much lower pension underfunding amount, perhaps even below $1,000,000,000. However, they submitted no proof of that. The Court concludes that it is unnecessary to resolve the issue at this time, because the City would be found eligible regardless of any specific finding on the pension liability that would be in the range between the parties' estimates. Otherwise, the Court is satisfied that the City's estimates of its other liabilities are accurate enough for purposes of determining eligibility, and so finds.

## 2. Pension Liabilities

The City's General Retirement System ("GRS") administers the pension plan for its non-uniformed personnel. The average annual benefit received by retired pensioners or their

8

13-53846-tjt   Doc 2307   Filed 12/10/13   Entered 12/10/13 16:06:05   Page 321 of 462
13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:31:05   Page 15 of 152   320

beneficiaries is about $18,000. AFSCME Br. at 3 (citing June 30, 2012 General Retirement System of City of Detroit pension valuation report). (Dkt. #505) Generally these retirees are eligible for Social Security retirement or disability benefits.

The City's Police and Fire Retirement System ("PFRS") administers the pension plan for its uniformed personnel. The average annual benefit received by retired pensioners or their beneficiaries is about $30,000. Generally, these retirees are not eligible for Social Security retirement or disability benefits. Retirement Systems Br. at 5 (citing 20 C.F.R. § 404.1206(a)(8), 20 C.F.R. § 404.1212). (Dkt. #519)

The Pension Benefit Guaranty Corporation does not insure pension benefits under either plan.

For the five years ending with FY 2012, pension payments exceeded contributions and investment income by approximately $1,700,000,000 for the GRS and $1,600,000,000 for the PFRS. This resulted in the liquidation of pension trust principal.

As noted, the two pension plans and the City disagree about the level of underfunding in the plans. Gabriel Roeder Smith & Company is the funds' actuary. In its reports for the two pension plans as of June 30, 2012, it found an unfunded actuarial accrued liability ("UAAL") of $829,760,482 for the GRS. Ex. 69 at 3. It found UAAL of $147,216,398 for the PFRS. Ex. 70 at 3.

The City asserts that the actuarial assumptions underlying these estimates are aggressive. Most significantly, the City believes that the two plans project unrealistic annual rates of return on investments net of expenses - 7.9% by GRS and 8.0% by PFRS, and that therefore their estimates are substantially understated. As stated above, the City estimates the underfunding to be $3,500,000,000.

9

13-53846-swr Doc 2337 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 322 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 16 of 156    321

Using current actuarial assumptions, the City's required pension contributions, as a percentage of eligible payroll expenses, are projected to grow from 25% for GRS and 30% for PFRS in 2012 to 30% for GRS and 60% for PFRS by 2017. Changes in actuarial assumptions would result in further increases to the City's required pension contributions.

### 3. OPEB Liabilities

The OPEB plans consist of the Health and Life Insurance Benefit Plan and the Supplemental Death Benefit Plan. The City's OPEB obligations arise under 22 different plans, including 15 different plans alone for medical and prescription drugs. These plans have varying structures and terms. The plan is a defined benefit plan providing hospitalization, dental care, vision care and life insurance to current employees and substantially all retirees. The City generally pays for 80% to 100% of health care coverage for eligible retirees. The Health and Life Insurance Plan is totally unfunded; it is financed entirely on a current basis.

As of June 30, 2011, 19,389 retirees were eligible to receive benefits under the City's OPEB plans. The number of retirees receiving benefits from the City is expected to increase over time.

The Supplemental Death Benefit Plan is a pre-funded single-employer defined benefit plan providing death benefits based upon years of creditable service. It has $34,564,960 in actuarially accrued liabilities as of June 30, 2011 and is 74.3% funded with UAAL of $8,900,000.

Of the City's $5,700,000,000 OPEB liability, 99.6% is unfunded.

## 4. Legacy Expenditures -
## Pensions and OPEB

During 2012, 38.6% of the City's revenue was consumed servicing legacy liabilities. The forecasts for subsequent years, assuming no restructuring, are 42.5% for 2013, 54.3% for 2014, 59.5% for 2015, 63% for 2016, and 64.5% for 2017.

## 5. The Certificates of Participation

The transactions described here are complex and confusing. The resulting litigation is as well. Nevertheless, a fairly complete explanation of them is necessary to an understanding of the City's severe financial distress.

### a. The COPs and Swaps Transaction

In 2005 and 2006, the City set out to raise $1.4 billion for its underfunded pension funds, the GRS and PFRS. The City created a non-profit Service Corporation for each of the two pension funds, to act as an intermediary in the financing. The City then entered into Service Contracts with each of the Service Corporations. The City would make payments to the Service Corporations, which had created Funding Trusts and assigned their rights to those Funding Trusts. The Funding Trusts issued debt obligations to investors called "Pension Obligation Certificates of Participation. ("COPs").[2] Each COP represented an undivided proportionate interest in the payments that the City would make to the Service Corporations under the Service Contracts.

The City arranged for the purchase of insurance from two monoline insurers to protect against defaults by the funding trusts that would result if the City failed to make payments to the

_____

[2] Confusingly, in some of the exhibits, these COPs are referred to as "POCs." See, for example, Financial and Operating Plan, June 10, 2013. Ex. 41 at 15.

11

13-53846-tjt Doc 2307 Filed 12/10/13 Entered 12/10/13 16:06:15 Page 324 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 18 of 156   323

Service Corporations under the Service Contracts. This was intended to make the investments more attractive to potential investors. One insurer was XL Capital Assurance, Inc., now known as Syncora. The other was the Financial Guaranty Insurance Company.

Some of the COPs paid a floating interest rate. To protect the Service Corporations from the risk of increasing interest rates, they entered into hedge arrangements with UBS A.G. and SBS Financial (the "Swap Counterparties"). Under the hedges, also known as "swaps" (bets, really), the Service Corporations and the Swap Counterparties agreed to convert the floating interest rates into a fixed payment. Under the swaps, if the floating interest rates exceeded a certain rate, the Swap Counterparties would make payments to the Service Corporations. But if the floating interest rates sank below a certain rate, the Service Corporations would make payments to the Swap Counterparties. Specifically, there were eight pay-fixed, receive-variable interest rate swap contracts, effective as of June 12, 2006, with a total amount of $800,000,000.

Under the swaps, the City was also at risk if there was an "event of default" or a "termination event." In such an event, the Swap Counterparties could terminate the swaps and demand a potentially enormous termination payment.

The Swap Counterparties also obtained protection against the risk that the Service Corporations would default on their quarterly swap payments. The parties purchased additional insurance against that risk from Syncora and the Financial Guaranty Insurance Company. Syncora's liability for swap defaults is capped at $50,000,000, even though the Swap Counterparties' claims may be significantly greater. This insurance is separate from the insurance purchased to protect against a default under the COPs.

12

13-53846-tjt   Doc 2337   Filed 12/30/13   Entered 12/30/13 16:06:45   Page 325 of 462
13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:31:05   Page 15 of 152   324

### b. The Result

In 2008, interest rates dropped dramatically. As a result, the City lost on the swaps bet. Actually, it lost catastrophically on the swaps bet. The bet could cost the City hundreds of millions of dollars. The City estimates that the damage will be approximately $45,000,000 per year for the next ten years.

### c. The Collateral Agreement

As the City's financial condition worsened, the City, the Service Corporations and the Swap Counterparties sought to restructure the swap contracts. In June 2009, they negotiated and entered into a Collateral Agreement that amended the swap agreements. The Collateral Agreement eliminated the "Additional Termination Event" and the potential for an immediate demand for a termination payment. The City agreed to make the swap payments through a "lockbox" arrangement and to pledge certain gaming tax revenues as collateral. The City also agreed to increase the interest rate of the swap agreements by 10 basis points effective July 1, 2010. It also agreed to new termination events, including any downgrading of the credit ratings for the COPs.

Two accounts were set up: 1) a "Holdback Account" and 2) a "General Receipts Subaccount." U.S. Bank was appointed custodian of the accounts. The casinos would pay developer payments and gaming tax payments to the General Receipts Subaccount daily. The City would make monthly deposits into the Holdback Account equal to one-third of the quarterly payment that the Service Corporations owed to the Swap Counterparties. When the City made that monthly payment, U.S. Bank would release to the City the accumulated funds in the General Receipts Subaccount. If the City defaulted, the Swap Counterparties could serve notice on U.S.

13

13-53846-tjt   Doc 2197   Filed 12/05/13   Entered 12/05/13 16:06:05   Page 20 of 462
13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:31:05   Page 20 of 150      325

Bank, which would then hold or "trap" the money in the General Receipts Subaccount and not disburse it to the City.

Syncora was not a party to the Collateral Agreement.

### d. The City's Defaults Under the Collateral Agreement

In March, 2012, the COPs were downgraded, which triggered a termination event. The Swap Counterparties did not, however, declare a default.

In March, 2013, the appointment of the emergency manager for the City was another event of default. Again however, the Swap Counterparties did not declare a default.

As of June 28, 2013, the City estimated that if an event of default were declared and the Swap Counterparties chose to exercise their right to terminate, it faced a termination obligation to the Swap Counterparties of $296,500,000. This was the approximate negative fair value of the swaps at that time.

On June 14, 2013, the City failed to make a required payment of approximately $40,000,000 on the COPs. This default triggered Syncora's liability as insurer on the COPs and it has apparently made the required payments. However, the City has made all of its required payments to the Swap Counterparties through the Holdback Account. The City contends that as a result, Syncora has no liability to the Swap Counterparties on its guaranty to them.

### e. The Forbearance and Optional Termination Agreement

Following the City's defaults on the Collateral Agreement, the parties negotiated. On July 15, 2013 (three days before this bankruptcy filing), the City and the Swap Counterparties entered into a "Forbearance and Optional Termination Agreement." Under this agreement, the Swap Counterparties would forebear from terminating the swaps and from instructing U.S. Bank to trap the funds in the General Receipts Subaccount. The City may buy out the swaps at an 18-

25% discount, depending on when the payment is made. That buy-out would terminate the pledge of the gaming revenues. Syncora was not a party to this agreement.

When the City filed this bankruptcy case, it also filed a motion to assume the "Forbearance and Optional Termination Agreement." (Dkt. #17) Syncora and many other parties have filed objections to the City's motion. However, because there are serious and substantial defenses to the claims made against the City under the COPs, these objections assert that the agreement should not be approved. After several adjournments, it is scheduled for hearing on December 17, 2013.

### f. The Resulting Litigation Involving Syncora

Meanwhile, back on June 17, 2013, Syncora sent a letter to U.S. Bank declaring an event of default, triggering U.S. Bank's obligation to trap all of the money in the General Receipts Subaccount. The City responded, taking the position that because it had not defaulted in its swap payments and because Syncora has no rights under the Collateral Agreement, Syncora had no right to instruct U.S. Bank to trap the funds.

U.S. Bank did trap approximately $15,000,000. This represented a significant percentage of the City's monthly revenue.

As a result, on July 5, 2013, the City filed a lawsuit against Syncora in the Wayne County Circuit Court. It sought and obtained a temporary restraining order that resulted in U.S. Bank's release of the trapped funds to the City. On July 11, 2013, Syncora removed the action to the district court in Detroit and filed a motion to dissolve the temporary restraining order. On July 31, 2013, Syncora filed a motion to dismiss the complaint. On August 9, 2013, the district referred the matter to this Court. It is now Adversary Proceeding #13-04942. On August 28, 2013, this Court ruled that the gaming revenues are property of the City and therefore protected

by the automatic stay.  Tr. 9:17-21, August 28, 2013.  (Dkt. #692)  As a result, on September 10, 2013, the temporary restraining order was dissolved with the City's stipulation.  Syncora's motion to dismiss the adversary proceeding remains pending.  It has been adjourned due to a tolling agreement between the parties.

Adding to this drama, on July 24, 2013, Syncora filed a lawsuit against the Swap Counterparties in a state court in New York, seeking an injunction to prevent the Swap Counterparties from performing their obligations under the Forbearance and Optional Termination Agreement.  The Swap Counterparties then removed the action to the United States District Court for the Southern District of New York.  That court, at the request of the Swap Counterparties, transferred the case to the federal district court in Detroit, which then referred it to this Court.  It is Adversary Proceeding No. 13-05395.

### g. The COPs Debt

Returning, finally, to the underlying obligations - the COPS, the City estimates that as of June 30, 2013, the following amounts were outstanding:

$480,300,000 in outstanding principal amount of $640,000,000 Certificates of Participation Series 2005 A maturing June 15, 2013 through 2025; and

$948,540,000 in outstanding principal amount of $948,540,000 Certificates of Participation Series 2006 A and B maturing June 15, 2019 through 2035.

### 6. Debt Service

Debt service from the City's general fund related to limited tax and unlimited tax GO debt and the COPs was $225,300,000 for 2012, and is projected to exceed $247,000,000 in

2013.[3]  The City estimates that 38% of its tax revenue goes to debt service rather than to city services.  It further estimates that without changes, this will increase to 65% within 5 years.

### 7. Revenues

Income tax revenues have decreased by $91,000,000 since 2002 (30%) and by $44,000,000 (15%) since 2008.  Municipal income tax revenue was $276,500,000 in 2008 and $233,000,000 in 2012.

Property tax revenues for 2013 were $135,000,000.  This is a reduction of $13,000,000 (10%) from 2012.

Revenues from the City's utility users' tax have declined from approximately $55,300,000 in 2003 to approximately $39,800,000 in 2012 (28%).

Wagering taxes receipts are about $170–$180,000,000 annually.  However, the City projects that these receipts will decrease through 2015 due to the expected loss of gaming revenue to casinos opening in nearby Toledo, Ohio.

State revenue sharing has decreased by $161,000,000 since 2002 (48%) and by $76,000,000 (30.6%) since 2008, due to the City's declining population and significant reductions in statutory revenue sharing by the State.

### 8. Operating Deficits

The City has experienced operating deficits for each of the past seven years.  Through 2013, it has had an accumulated general fund deficit of $237,000,000.  However, this includes the effect of recent debt issuances - $75,000,000 in 2008; $250,000,000 in 2010; and

---

[3] References to a specific year in the financial sections of this Part are to the City's fiscal year, July 1 to June 30.

$129,500,000 in 2013. If these debt issuances are excluded, the City's accumulated general fund deficit would have been $700,000,000 through 2013.

In 2012, the City had a negative cash flow of $115,500,000, excluding the impact of proceeds from short-term borrowings. In March 2012, to avoid running out of cash, the City borrowed $80,000,000 on a secured basis. The City spent $50,000,000 of that borrowing in 2012.

In 2013, the City deferred payments on certain of its obligations, totaling approximately $120,000,000. As set forth in the next section, these deferrals were for current and prior year pension contributions and other payments. With those deferrals, the City projects a positive cash flow of $4,000,000 for 2013.

If the City had not deferred these payments, it would have run out of cash by June 30, 2013.

Absent restructuring, the City projects that it will have negative cash flows of $190,500,000 for 2014; $260,400,000 for 2015; $314,100,000 for 2016; and $346,000,000 for 2017. The City further estimates that by 2017, its accumulated deficit could grow to approximately $1,350,000,000.

### 9. Payment Deferrals

The City is not making its pension contributions as they come due. It has deferred payment of its year-end Police and Fire Retirement System contributions. As of May 2013, the City had deferred approximately $54,000,000 in pension contributions related to current and prior periods and approximately $50,000,000 on June 30, 2013 for current year PFRS pension contributions. Therefore, the City will have deferred $104,000,000 of pension contributions.

18

13-53846-tjt   Doc 2307   Filed 12/30/13   Entered 12/30/13 16:06:05   Page 331 of 462
13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:31:05   Page 25 of 152   330

Also, the City did not make the scheduled $39,700,000 payments on its COPs that were due on June 14, 2013.

## B. The Causes and Consequences
## of the City's Financial Distress

A full discussion of the causes and consequences of the City's financial distress is well beyond the scope of this opinion. Still, the evidence presented at the eligibility trial did shed some important and relevant light on the issues that are before the Court. These "causes" and "consequences" are addressed together here because it is often difficult to distinguish one from the other.

### 1. Population Losses

Detroit's population declined to just over 1,000,000 as of June 1990. In December 2012, the population was 684,799. This is a 63% decline in population from its peak in 1950.

### 2. Employment Losses

From 1972 to 2007, the City lost approximately 80% of its manufacturing establishments and 78% of its retail establishments. The number of jobs in Detroit declined from 735,104 in 1970 to 346,545 in 2012.

Detroit's unemployment rate was 6.3% in June 2000; 23.4% in June 2010; and 18.3% in June 2012. The number of employed Detroit residents fell from approximately 353,000 in 2000 to 279,960 in 2012.

### 3. Credit Rating

The City's credit ratings are below investment grade. As of June 17, 2013, S&P and Moody's had lowered Detroit's credit ratings to CC and Caa3, respectively. Ex. 75 at 3.

19

13-53846-tjt  Doc 2197  Filed 12/10/13  Entered 12/10/13 16:06:05  Page 332 of 462
13-53846-swr  Doc 1945  Filed 12/05/13  Entered 12/05/13 14:31:05  Page 26 of 156    331

### 4. The Water and Sewerage Department

The Detroit Water and Sewerage Department ("DWSD") provides water and wastewater services to the City and many suburban communities in an eight-county area, covering 1,079 square miles. DWSD's cost of capital is inflated due to its association with the City. This increased cost of capital, coupled with the inability to raise rates and other factors, has resulted in significant under-spending on capital expenditures.

### 5. The Crime Rate

During calendar year 2011, 136,000 crimes were reported in the City. Of these, 15,245 were violent crimes. In 2012, the City's violent crime rate was five times the national average and the highest of any city with a population in excess of 200,000.

The City's case clearance rate for violent crimes is 18.6%. The clearance rate for all crimes is 8.7%. These rates are substantially below those of comparable municipalities nationally and surrounding local municipalities.

### 6. Streetlights

As of April 2013, about 40% of the approximately 88,000 streetlights operated and maintained by the City's Public Lighting Department were not working.

### 7. Blight

There are approximately 78,000 abandoned and blighted structures in the City. Of these, 38,000 are considered dangerous buildings. The City has experienced 11,000 – 12,000 fires each year for the past decade. Approximately 60% of these occur in blighted or unoccupied buildings.

The average cost to demolish a residential structure is approximately $8,500.

The City also has 66,000 blighted vacant lots.

20

13-53846-tjt   Doc 2307   Filed 12/30/13   Entered 12/30/13 16:06:10   Page 333 of 462
13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:31:05   Page 27 of 156   332

### 8. The Police Department

In 2012, the average priority one response time for the police department was 30 minutes. In 2013, it was 58 minutes. The national average is 11 minutes.

The department's manpower has been reduced by approximately 40% over the last 10 years.

The department has not invested in or maintained its facility infrastructure for many years, and has closed or consolidated many precincts.

The department operates with a fleet of 1,291 vehicles, most of which have reached the replacement age of three years and lack modern information technology.

### 9. The Fire Department

The average age of the City's 35 fire stations is 80 years, and maintenance costs often exceed $1,000,000 annually. The fire department's fleet has many mechanical issues, contains no reserve vehicles and lacks equipment ordinarily considered standard. The department's apparatus division now has 26 employees, resulting in a mechanic to vehicle ratio of 1 to 39 and an inability to complete preventative maintenance on schedule.

In February 2013, Detroit Fire Commissioner Donald Austin ordered firefighters not to use hydraulic ladders on ladder trucks except in cases involving an "immediate threat to life" because the ladders had not received safety inspections "for years."

During the first quarter of 2013, frequently only 10 to 14 of the City's 36 ambulances were in service. Some of the City's EMS vehicles have been driven 250,000 to 300,000 miles and break down frequently.

## 10. Parks and Recreation

The City closed 210 parks during fiscal year 2009, reducing its total from 317 to 107 (66%). It has also announced that 50 of its remaining 107 parks would be closed and that another 38 would be provided with limited maintenance.

## 11. Information Technology

The City's information technology infrastructure and software is obsolete and is not integrated between departments, or even within departments. Its information technology needs to be upgraded or replaced in the following areas: payroll; financial; budget development; property information and assessment; income tax; and the police department operating system.

**Payroll.** The City currently uses multiple, non-integrated payroll systems. A majority of the City's employees are on an archaic payroll system that has limited reporting capabilities and no way to clearly track, monitor or report expenditures by category. The current cost to process payroll is $62 per check ($19,200,000 per year). This is more than four times the general average of $15 per paycheck. The payroll process involves 149 full-time employees, 51 of which are uniformed officers. This means that high cost personnel are performing clerical duties.

**Income Tax.** The City's highly manual income tax collection and data management systems were purchased in the mid-1990s and are outdated, with little to no automation capability. An IRS audit completed in July 2012, characterized these systems as "catastrophic."

**Financial Reporting.** The City's financial reporting system ("DRMS") was implemented in 1999 and is no longer supported. Its budget development system is 10 years old and requires a manual interface with DRMS. 70% of journal entries are booked manually. The systems also lack reliable fail-over and back-up systems.

22

13-53846-swr Doc 2197 Filed 12/05/13 Entered 12/05/13 16:06:45 Page 335 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 29 of 160    334

## C. The City's Efforts to
## Address Its Financial Distress

The City has reduced the number of its employees by about 2,700 since 2011. As of May 31, 2013, it had approximately 9,560 employees.

The City's unionized employees are represented by 47 discrete bargaining units.[4] The collective bargaining agreements covering all of those bargaining units expired before this case was filed.[5]

The City has implemented revised employment terms, called "City Employment Terms" ("CET"), for nonunionized employees and for unionized employees under expired collective bargaining agreements. It has also increased revenues and reduced expenses in other ways. It estimates that these measures have resulted in annual savings of $200,000,000.

The City cannot legally increase its tax revenues. Nor can it reduce its employee expenses without further endangering public health and safety.

## D. A Brief History of Michigan's Emergency Manager Laws

Before reviewing the events leading to the appointment of the City's emergency manager, a brief review of the winding history of the Michigan statutes on point is necessary.

In 1990, the Michigan Legislature enacted Public Act 72 of 1990, the "Local Government Fiscal Responsibility Act." ("P.A. 72") This Act empowered the State to intervene with respect

---

[4] One of the units, Police Officers Labor Council (Health Department), has one represented employee. Two of the units have two employees. Three of the units have four employees. One of the units, the Detroit License Investigators Association, has no represented employees.

[5] The Financial and Operating Plan reports 48 collective bargaining agreements. Ex. 75 at 13. The discrepancy is not explained but is not material.

to municipalities facing financial crisis through the appointment of an emergency financial manager who would assume many of the powers ordinarily held by local elected officials.

Effective March 16, 2011, P.A. 72 was repealed and replaced with Public Act 4 of 2011, the "Local Government and School District Fiscal Accountability Act." ("P.A. 4")

On November 5, 2012, Michigan voters rejected P.A. 4 by referendum. This rejection revived P.A. 72. *See* Order, *Davis v. Roberts*, No. 313297 (Mich. Ct. App. Nov. 16, 2012):[6]

> Petitioner's reliance on the anti-revival statute, MCL 8.4, is unavailing. The plain language of MCL 8.4 includes no reference to statutes that have been rejected by referendum. The statutory language refers only to statutes subject to repeal. Judicial construction is not permitted when the language is unambiguous. *Driver v Naini*, 490 Mich 239, 247; 802 NW2d 311 (2011). Accordingly, under the clear terms of the statute, MCL 8.4 does not apply to the voters' rejection, by referendum, of P A 4.

*See also Davis v. Weatherspoon*, 2013 WL 2076478, at *2 (E.D. Mich. May 15, 2013); Mich. Op. Att'y Gen No. 7267 (Aug. 6, 2012), 2012 WL 3544658.

P.A. 72 remained in effect until March 28, 2013, when the "Local Financial Stability and Choice Act," Public Act 436 of 2012, became effective. ("P.A. 436") That Legislature enacted that law on December 13, 2012, and the governor signed it on December 26, 2012.

### E. The Events Leading to the Appointment of the City's Emergency Manager

The following subsections review the events leading to the appointment of the City's emergency manager.

---

[6] This order is available on the Michigan Court of Appeals website at: http://publicdocs.courts.mi.gov:81/COA/PUBLIC/ORDERS/2012/313297(9)_order.PDF

24

13-53846-tjt Doc 2397 Filed 12/05/13 Entered 12/05/13 16:06:05 Page 31 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 31 of 152     336

### 1. The State Treasurer's Report
### of December 21, 2011

On December 6, 2011, the Michigan Department of the Treasury began a preliminary review of the City's financial condition pursuant to P.A. 4.

On December 21, 2011, Andy Dillon, the state treasurer, reported to the governor that "probable financial stress" existed in Detroit and recommended the appointment of a "financial review team" pursuant to P.A. 4. Ex. 503 at 3. (Dkt. #11-3) In making this finding, Dillon's report cited:

> the inability of the City to avoid fund deficits, recurrent accumulated deficit spending, severe projected cash flow shortages resulting in an improper reliance on inter-fund and external borrowing, the lack of funding of the City's other post-retirement benefits, and the increasing debt of the City[.]

More specifically, his report found:

**(a)** The City had violated § 17 of the Uniform Budget and Accounting Act (Public Act 2 of 1968) by failing to amend the City's general appropriations act when it became apparent that various line items in the City's budget for fiscal year 2010 exceeded appropriations by an aggregate of nearly $58,000,000, and that unaudited fiscal year 2011 figures indicated that expenditures would exceed appropriations by $97,000,000.

**(b)** The City did not file an adequate or approved "deficit elimination plan" with the Treasury for fiscal year 2010. The Treasury found that the City's recent efforts at deficit reduction had been "unrealistic" and that "City officials either are incapable or unwilling to manage its own finances."

**(c)** The City had a "mounting debt problem" with debt service requirements exceeding $597,000,000 in 2010 and long term debt exceeding $8,000,000,000 as of June 2011, excluding the City's then-estimated $615,000,000 in unfunded actuarial pension liabilities and

25

13-53846-tjt Doc 2197 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 338 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 32 of 156    337

$4,900,000,000 in OPEB liability.  The ratio of the City's total long term debt to total net assets for 2010 was 32.64 to 1, which was far greater than other identified cites.

**(d)** The City was at risk of a termination payment, estimated at the time to be in the range of $280,000,000 to $400,000,000, under its swap contracts.

**(e)** The City's long term bond rating had fallen below the BBB category and was considered "junk" - speculative or highly speculative.

**(f)** The City was experiencing significant cash flow shortages.  The City projected a cash balance of $96,100,000 as of October 28, 2011.  This was nearly $20,000,000 lower than the City's previous estimates.  It would be quickly eroded and the City would experience a cash shortage of $1,600,000 in April 2012 and would end 2012 with a cash shortfall of $44,100,000 absent remedial action.

**(g)** The City had difficulty making its required payments to its pension plans.  In June of 2005, the City issued $1,440,000,000 of new debt in the form of Pension Obligation Certificates ("COPs") to fund its two retirement systems with a renegotiated repayment schedule of 30 years.

## 2. The Financial Review Team's Report of March 26, 2012

Under P.A. 4, upon a finding of "probable financial stress," the governor was required to appoint a financial review team to undertake a more extensive financial management review of the City.  On December 27, 2011, the governor announced the appointment of a ten member Financial Review Team.  The Financial Review Team was then required to report its findings to the governor within 60-90 days.

On March 26, 2012, the Financial Review Team submitted its report to the governor. This report found that "the City of Detroit is in a condition of severe financial stress[.]"  Ex. 22. This finding of "severe financial stress" was based upon the following considerations:

26

13-53846-tjt   Doc 2197   Filed 12/10/13   Entered 12/10/13 16:06:05   Page 339 of 462
13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 33 of 162   338

**(a)** The City's cumulative general fund deficit had increased from $91,000,000 for 2010 to $148,000,000 for 2011 and the City had not experienced a positive year-end fund balance since 2004.

**(b)** Audits for the City's previous nine fiscal years reflected significant variances between budgeted and actual revenues and expenditures, primarily due to the City's admitted practice of knowingly overestimating revenues and underestimating expenditures.

**(c)** The City was continuing to experience significant cash depletion. The City had proposed adjustments to collective bargaining agreements to save $102,000,000 in 2012 and $258,000,000 in 2013, but the tentative collective bargaining agreements negotiated as of the date of the report were projected to yield savings of only $219,000,000 for both years.

**(d)** The City's existing debt had suffered significant downgrades. Among the reasons cited by Moody's Investor Service for the downgrade were the City's "weakened financial position, as evidenced by its narrow cash position, its reliance upon debt financing, and ongoing negotiations with its labor unions regarding contract concessions." Ex. 22 at 10.

### 3. The Consent Agreement

In early 2012, the City and the State of Michigan negotiated a 47 page "Financial Stability Agreement," more commonly called the "Consent Agreement." Ex. 23. The Consent Agreement states that its purpose is to achieve financial stability for the City and a stable platform for the City's future growth. It was executed as of April 5, 2012. Under § 15 of P.A. 4, because a consent agreement within the meaning of P.A. 4 was negotiated and executed, no emergency manager was appointed for the City, despite the finding by the Financial Review Team that the City was in "severe financial stress."

27

13-53846-tjt Doc 2297 Filed 12/04/13 Entered 12/05/13 06:01:05 Page 340 of 462
13-53846-swr Doc 1945 Filed 12/03/13 Entered 12/03/13 14:31:05 Page 34 of 156    339

The Consent Agreement created a "Financial Advisory Board" ("FAB") of nine members selected by the governor, the treasurer, the mayor and the city council. The Consent Agreement granted the FAB an oversight role and limited powers over certain City reform and budget activities. The FAB has held, and continues to hold, regular public meetings and to exercise its oversight functions set forth in the Consent Agreement.

### 4. The State Treasurer's Report
### of December 14, 2012

On December 11, 2012, the Department of Treasury commenced a preliminary review of the City's financial condition under P.A. 72. On December 14, 2012, Andy Dillon, State Treasurer sent to Rick Snyder, Governor a memorandum entitled "Preliminary Review of the City of Detroit." Ex. 24. This was after the voters had rejected P.A. 4 and P.A. 72 was revived.

Treasurer Dillon reported to the governor that, based on his preliminary review, a "serious financial problem" existed within the City. Ex. 24 at 1. This conclusion was based on many of the same findings as his earlier report of December 21, 2011. Ex. 21. In addition he reported that:

**(a)** City officials had violated the proscriptions in sections 18 and 19 of P.A. 2 of 1968 in applying the City's money for purposes inconsistent with the City's appropriations.

**(b)** The City had projected possibly depleting its cash prior to June 30, 2013. However because of problems in the financial reporting functions of the City, the projections continued to change from month to month. This made it difficult to make informed decisions regarding the City's fiscal health. The City would not be experiencing significant cash flow challenges if City officials had complied with statutory requirements to monitor and amend adopted budgets as needed. In sum, such compliance requires the ability to produce timely and accurate financial information, which City officials have not been able to produce.

28

13-53846-tjt Doc 2197 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 341 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:11:05 Page 35 of 150 340

**(c)** The City incurred overall deficits in various funds including the General Fund. The General Fund's unrestricted deficit increased by almost $41,000,000 from $155,000,000 on June 30, 2010 to $196,000,000 on June 30, 2011, and is projected to increase even further for 2012. This would not have happened if the City had complied with its budgets.

### 5. The Financial Review Team's
### Report of February 19, 2013

Upon receipt of Treasurer Dillon's report, the governor appointed another Financial Review Team to review the City's financial condition on December 18, 2012. This was also done under P.A. 72.

On February 19, 2013, the Financial Review Team submitted its report to the governor, concluding, "in accordance with [P.A. 72], that a local government financial emergency exists within the City of Detroit because no satisfactory plan exists to resolve a serious financial problem."[7] Ex. 25.

This finding by the Financial Review Team of a "local government financial emergency" was based primarily upon the following considerations:

**(a)** The City continued to experience a significant depletion of its cash, with a projected $100,000,000 cumulative cash deficit as of June 30, 2013. Cost-cutting measures undertaken by the mayor and city council were too heavily weighted to one-time savings and non-union personnel.

---

[7] The Financial Review Team also submitted a "Supplemental Documentation of the Detroit Financial Review Team." Ex. 25. This supplement was "intended to constitute competent, material, and substantial evidence upon the whole record in support of the conclusion that a financial emergency exists within the City of Detroit." *Id.*

29

13-53846-tjt Doc 2307 Filed 12/04/13 Entered 12/04/13 16:06:05 Page 342 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 36 of 150     341

**(b)** The City's cumulative general fund deficit had not experienced a positive year-end fund balance since 2004 and stood at $326,600,000 as of 2012. If the City had not issued substantial debt, the accumulated general fund deficit would have been $936,800,000 by 2012.

**(c)** The City's long-term liabilities exceeded $14,000,000,000 as of June 30, 2013. Approximately $1,900,000,000 would come due over the next five years. The City had not devised a satisfactory plan to address these liabilities.

**(d)** The City Charter contains numerous restrictions and structural details that make it extremely difficult to restructure the City's operations in a meaningful or timely manner.

**(e)** The management letter accompanying the City's fiscal year 2012 financial audit report identified numerous material weaknesses and significant deficiencies in the City's financial and accounting operations.

**(f)** Audits for the City's last six fiscal years reflected significant variances between budgeted and actual revenues and expenditures, owing primarily to the City's admitted practice of knowingly overestimating revenues and underestimating expenditures.

### 6. The Appointment of an Emergency Manager for the City of Detroit

On March 1, 2013, after receiving the Financial Review Team Report of February 19, 2013, the governor announced his determination under P.A. 72 that a "financial emergency" existed within the City. Ex. 26. By that point, P.A. 436 had been enacted but it was not yet effective.

On March 12, 2013, the governor conducted a public hearing to consider the city council's appeal of his determination.

On March 14, 2013, the governor confirmed his determination of a "financial emergency" within the City and requested that the Local Emergency Financial Assistance Loan Board ("LEFALB ") appoint an emergency financial manager under P.A. 72.

On March 15, 2013, the LEFALB appointed Kevyn Orr as the emergency financial manager for the City of Detroit. Second Amended Final Pre-Trial Order, ¶ 42 at 11. (Dkt. #1647)

On March 25, 2013, Mr. Orr formally took office. Second Amended Final Pre-Trial Order, ¶ 43 at 11. (Dkt. #1647)

On March 28, 2013, the effective date of P.A. 436, P.A. 72 was repealed, and Mr. Orr became the emergency manager of the City under §§ 2(e) and 31 of P.A. 436. M.C.L. §§ 141.1542(e) and 141.1571.

The emergency manager acts "for and in the place and stead of the governing body and the office of chief administrative officer of the local government." M.C.L. § 141.1549(2). He has "broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare." M.C.L. § 141.1549(2).

### F. The Emergency Manager's Activities

#### 1. The June 14, 2013 Meeting and Proposal to Creditors

On June 14, 2013, Mr. Orr organized a meeting with approximately 150 representatives of the City's creditors, including representatives of: (a) the City's debt holders; (b) the insurers of this debt; (c) the City's unions; (d) certain retiree associations; (e) the Pension Systems; and (f) many individual bondholders. At the meeting, Mr. Orr presented the June 14 Creditor Proposal,

31

13-53846-tjt  Doc 2307  Filed 12/10/13  Entered 12/10/13 16:06:05  Page 344 of 462
13-53846-swr  Doc 1945  Filed 12/05/13  Entered 12/05/13 14:31:05  Page 38 of 150   343

Ex. 43, and answered questions. At the conclusion of the meeting, Mr. Orr invited creditor representatives to meet and engage in a dialogue with City representatives regarding the proposal.

This proposal described the economic circumstances that resulted in Detroit's financial condition. It also offered a thorough overhaul and restructuring of the City's operations, finances and capital structure, as well as proposed recoveries for each creditor group. More specifically, the June 14, 2013 Creditor Proposal set forth:

**(a)** The City's plans to achieve a sustainable restructuring by investing over $1,250,000,000 over ten years to improve basic and essential City services, including: (1) substantial investment in, and the restructuring of, various City departments, including the Police Department; the Fire Department; Emergency Medical Services; the Department of Transportation; the Assessor's Office and property tax division; the Building, Safety, Engineering & Environment Department; and the 36th District Court; (2) substantial investment in the City's blight removal efforts; (3) the transition of the City's electricity transmission business to an alternative provider; (4) the implementation of a population-based streetlight footprint and the outsourcing of lighting operations to the newly-created Public Lighting Authority; (5) substantial investments in upgraded information technology for police, fire, EMS, transportation, payroll, grant management, tax collection, budgeting and accounting and the City's court system; (6) a comprehensive review of the City's leases and contracts; and (7) a proposed overhaul of the City's labor costs and related work rules. Ex. 43 at 61-78.

**(b)** The City's intention to expand its income and property tax bases, rationalize and adjust its nominal tax rates, and various initiatives to improve and enhance its tax and fee collection efforts. Ex. 43 at 79-82.

32

13-53846-tjt Doc 2397 Filed 12/10/13 Entered 12/10/13 06:10:05 Page 345 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 39 of 150   344

**(c)** The City's intention to potentially realize value from the Detroit Water and Sewerage Department ("DWSD") through the creation of a new metropolitan area water and sewer authority. This authority would conduct the operations under the City's concession or lease of the DWSD's assets in exchange for payments in lieu of taxes, lease payments, or some other form of payment. Ex. 43 at 83-86.

Regarding creditor recoveries, the City proposed:

**(a)** Treatment of secured debt commensurate with the value of the collateral securing such debt, including the repayment or refinancing of its revenue bonds, secured unlimited and limited tax general obligation bonds, secured installment notes and liabilities arising in connection with the swap obligations. Ex. 43 at 101-109.

**(b)** The pro rata distribution of $2,000,000,000 in principal amount of interest-only, limited recourse participation notes to holders of unsecured claims (i.e., holders of unsecured unlimited and limited tax general obligation bonds; the Service Corporations (on account of the COPs); the pension systems (on account of pension underfunding); retirees (on account of OPEB benefits); and miscellaneous other unsecured claimants. The plan also disclosed the potential for amortization of the principal of such notes in the event that, for example, future City revenues exceeded certain thresholds, certain assets were monetized or certain grants were received. Ex. 43 at 101-109.

**(c)** A "Dutch Auction" process for the City to purchase the notes. Ex. 43 at 108.

At this meeting, Mr. Orr also announced his decision not to make the scheduled $39,700,000 payments due on the COPs and swaps transactions and to impose a moratorium on principal and interest payments related to unsecured debt.

## 2. Subsequent Discussions
## with Creditor Representatives

Following the June 14, 2013 meeting at which the proposal to creditors was presented.

Mr. Orr and his staff had several other meetings.[8]

On June 20, 2013, Mr. Orr's advisors met with representatives of the City's unions and four retiree associations. In the morning they met with representatives of "non-uniformed" employees and retirees. In the afternoon they met with "uniformed" employees and retirees. In these meetings, his advisors discussed retiree health and pension obligations. Approximately 100 union and retiree representatives attended the two-hour morning session. It included time for questions and answers. Approximately 35 union and retiree representatives attended the afternoon session, which lasted approximately 90 minutes.

On June 25, 2013, Mr. Orr's advisors and his senior advisor staff members held meetings in New York for representatives and advisors with all six of the insurers of the City's funded bond debt; the pension systems; and U.S. Bank, the trustee or paying agent on all of the City's bond issuances. Approximately 70 individuals attended this meeting. At this five-hour meeting, the City's advisors discussed the 10-year financial projections and cash flows presented in the June 14 Creditor Proposal, together with the assumptions and detail underlying those projections and cash flows; the City's contemplated reinvestment initiatives and related costs; and the retiree benefit and pension information and proposals that had been presented to the City's unions and pension representatives on June 20, 2013.

---

[8] The findings in this section are based on the Declaration of Kevyn D. Orr in Support of City of Detroit, Michigan's Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code, (Dkt. #11) as well as his testimony and the testimony of the witnesses who attended the meetings. Mr. Orr's declaration was admitted into evidence as part of the stipulated exhibits in the pre-trial order. It was the objectors' "Common" Ex. 414.

34

13-53846-tjt Doc 2975 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 347 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 41 of 162 346

Also on June 25, 2013, the City's advisors held a separate meeting with U.S. Bank and its advisors to discuss the City's intentions with respect to the DWSD, and the special revenue bond debt related thereto; the City's proposed treatment of its general obligation debt, including the COPs; and various other issues raised by U.S. Bank.

On June 26 and 27, 2013, Mr. Orr's advisors held individual follow-up meetings with each of several bond insurers. On June 26, 2013, the City team met with business people, lawyers and financial advisors from NPFGC in a two-hour meeting and Ambac Assurance Corporation in a 90-minute meeting. Financial Guaranty Insurance Corporation had originally requested a meeting for June 26, 2013 but subsequently cancelled. On June 27, 2013, the City team met with business people, lawyers and financial advisors from Syncora in a 90-minute meeting and Assured Guaranty Municipal Corporation in a 90-minute meeting.

On July 10, 2013, the City and certain of its advisors held meetings with representatives and advisors of the GRS, as well as representatives and counsel for certain non-uniformed unions and retiree associations and representatives and advisors of the PFRS, as well as representatives and counsel for certain uniformed unions and retiree associations. Each meeting lasted approximately two hours. The purposes of each meeting were to provide additional information on the City's pension restructuring proposal and to discuss a process for reaching a consensual agreement on pension underfunding issues and the treatment of any related claims.

On July 11, 2013, the City and its advisors held separate follow-up meetings with representatives and advisors for select non-uniform unions and retiree associations, the GRS, certain uniformed unions and retiree associations, and the PFRS to discuss retiree health issues.

## G. The Prepetition Litigation

On July 3, 2013, two lawsuits were filed against the governor and the treasurer in the Ingham County Circuit Court. These suits sought a declaratory judgment that P.A. 436 violated the Michigan Constitution to the extent that it purported to authorize chapter 9 proceedings in which vested pension benefits might be impaired. They also sought an injunction preventing the defendants from authorizing any chapter 9 proceeding for the City in which vested pension benefits might be impaired. *Flowers v. Snyder*, No. 13-729-CZ July 3, 2013; *Webster v. Snyder*, No. 13-734-CZ July 3, 2013.

On July 17, 2013, the Pension Systems commenced a similar lawsuit. *General Retirement System of the City of Detroit v. Orr*, No. 13-768-CZ July 17, 2013.

## H. The Bankruptcy Filing

On July 16, 2013, Mr. Orr recommended to the governor and the treasurer in writing that the City file for chapter 9 relief. Ex. 28. (Dkt. #11-10) An emergency manager may recommend a chapter 9 filing if, in his judgment, "no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists." M.C.L. § 141.1566(1).

On July 18, 2013, Governor Snyder authorized the City of Detroit to file a chapter 9 bankruptcy case. Ex. 29. (Dkt. #11-11) M.C.L. § 141.1558(1) permits the governor to "place contingencies on a local government in order to proceed under chapter 9." However, the governor's authorization letter stated, "I am choosing not to impose any such contingencies today. Federal law already contains the most important contingency - a requirement that the plan be legally executable, 11 USC 943(b)(4)." Ex. 29. at 4. Accordingly, his authorization did not include a condition prohibiting the City from seeking to impair pensions in a plan.

36

13-53846-tjt Doc 2307 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 349 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 43 of 152    348

At 4:06 p.m. on July 18, 2013, the City filed this chapter 9 bankruptcy case.[9] (Voluntary Petition, Dkt. #1)

### IV. The City Bears the Burden of Proof.

Before turning to the filed objections, it is necessary to point out that the City bears the burden to establish by a preponderance of the evidence each of the elements of eligibility under 11 U.S.C. § 109(c). *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo* (*In re City of Vallejo*), 408 B.R. 280, 289 (B.A.P. 9th Cir. 2009); *In re City of Stockton, Cal.*, 493 B.R. 772, 794 (Bankr. E.D. Cal. 2013).

### V. The Objections of the Individuals
### Who Filed Objections Without an Attorney

As the Court commented at the conclusion of the hearing on September 19, 2013, the individuals' presentations were moving, passionate, thoughtful, compelling and well-articulated. These presentations demonstrated an extraordinary depth of concern for the City of Detroit, for the inadequate level of services that their city government provides and the personal hardships that creates, and, most clearly, for the pensions of City retirees and employees. These individuals expressed another deeply held concern, and even anger, that became a major theme of the hearing - the concern and anger that the State's appointment of an emergency manager over the City of Detroit violated their fundamental democratic right to self-governance.

The Court's role here is to evaluate how these concerns might impact the City's eligibility for bankruptcy. In making that evaluation, the Court can only consider the specific requirements of applicable law - 11 U.S.C. §§ 109(c) and 921(c). It is not the Court's role to

---

[9] The exact time of the filing becomes significant in Part XII, below.

37

13-53846-tjt Doc 2337 Filed 12/30/13 Entered 12/30/13 16:06:05 Page 350 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 44 of 156   349

examine this bankruptcy or these objections to this bankruptcy from any other perspective or on any other basis. For example, neither the popularity of the decision to appoint an emergency manager nor the popularity of the decision to file this bankruptcy case are matters of eligibility under the federal bankruptcy laws.

To the extent that individual objections raised arguments that do raise eligibility concerns, they are addressed through this opinion. It appears to the Court that these individuals' concerns should mostly be addressed in the context of whether the case was filed in good faith, as 11 U.S.C. § 921(c) requires. To a lesser extent, they should also be considered in the context of the specific requirement that the City was "insolvent." 11 U.S.C. § 109(c)(3). Accordingly, the Court will address these concerns in those Parts of this opinion. *See* Part XIII (insolvency) and Part XVII (good faith), below.

### VI. The City of Detroit Is a "Municipality" Under 11 U.S.C. § 109(c)(1).

With its petition, the City filed a "Memorandum in Support of Statement of Qualifications Pursuant to Section 109(c) of the Bankruptcy Code," asserting that the City is a "municipality" as defined in 11 U.S.C. § 101(40) and as required by 11 U.S.C. § 109(c)(1). (Dkt. #14 at 8-9) In the "Second Amended Final Pre-Trial Order," the parties so stipulated. (Dkt. #1647 at 11) Accordingly, the Court finds that the City has established this element of eligibility and will not discuss it further.

38

13-53846-tjt Doc 2337 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 351 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 45 of 160    350

### VII. The Bankruptcy Court Has the Authority
### to Determine the Constitutionality of Chapter 9
### of the Bankruptcy Code and Public Act 436.

#### A. The Parties' Objections to the Court's
#### Authority Under *Stern v. Marshall*

Several objecting parties challenge the constitutionality of chapter 9 of the bankruptcy code under the United States Constitution. Citing the Supreme Court's decision in *Stern v. Marshall*, 131 S. Ct. 2594 (2011), these parties also assert that this Court does not have the authority to determine the constitutionality of chapter 9.

Several objecting parties also challenge the constitutionality of P.A. 436 under the Michigan Constitution. Some of these parties also assert that this Court does not have the authority to determine the constitutionality of P.A. 436.

The Official Committee of Retirees filed a motion to withdraw the reference on the grounds that this Court does not have the authority to determine the constitutionality of chapter 9 or P.A. 436. It also filed a motion for stay of the eligibility proceedings pending the district court's resolution of that motion. In this Court's denial of the stay motion, it concluded that the Committee was unlikely to succeed on its arguments regarding this Court's lack of authority under Stern. *In re City of Detroit, Mich.*, 498 B.R. 776, 781-87 (Bankr. E.D. Mich. 2013). The following discussion is taken from that decision.

#### B. *Stern*, *Waldman*, and *Global Technovations*

In *Stern v. Marshall*, the Supreme Court held that the "judicial power of the United States" can only be exercised by an Article III court and "that in general, Congress may not withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." 131 S. Ct. at 2608-12. The Supreme Court held that a bankruptcy court therefore lacks the constitutional authority to enter a final judgment on a

39

13-53846-tjt  Doc 2197  Filed 12/10/13  Entered 12/10/13 16:06:05  Page 252 of 462
13-53846-swr  Doc 1945  Filed 12/05/13  Entered 12/05/13 14:31:05  Page 46 of 160    351

debtor's counterclaim that is based on a private right when resolution of the counterclaim is not necessary to fix the creditor's claim. 131 S. Ct. at 2611-19. The Court described the issue before it as "narrow."[10] 131 S. Ct. at 2620.

The Sixth Circuit has adhered to a narrow reading of *Stern* in the two cases that have addressed the issue: *Onkyo Europe Elect. GMBH v. Global Technovations Inc.* (*In re Global Technovations Inc.*), 694 F.3d 705 (6th Cir. 2012), and *Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012).

In *Global Technovations*, the Sixth Circuit summarized *Stern* as follows:

> *Stern's* limited holding stated the following: When a claim is "a state law action independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy," the bankruptcy court cannot enter final judgment. *Id.* at 2611. In those cases, the bankruptcy court may only enter proposed findings of fact and conclusions of law. *Ibid.*

694 F.3d at 722. Based on this view of *Stern*, the *Global Technovations* court held that the bankruptcy court did have the authority to rule on the debtor's fraudulent transfer counterclaim against a creditor that had filed a proof of claim. *Id.*

In *Waldman*, the Sixth Circuit summarized the holding of *Stern* as follows:

> When a debtor pleads an action under federal bankruptcy law and seeks disallowance of a creditor's proof of claim against the estate—as in *Katchen* [*v. Landy*, 382 U.S. 323, 86 S. Ct. 467

---

[10] Outside of the Sixth Circuit, the scope of *Stern* has been somewhat controversial. *See generally* Joshua D. Talicska, *Jurisdictional Game Changer or Narrow Holding? Discussing the Potential Effects of Stern v. Marshall and Offering a Roadmap Through the Milieu*, 9 SETON HALL CIRCUIT REV. 31 (Spring 2013); Michael Fillingame, *Through a Glass, Darkly: Predicting Bankruptcy Jurisdiction Post-Stern*, 50 HOUS. L. REV. 1189 (Symposium 2013); Tyson A. Crist, *Stern v. Marshall: Application of the Supreme Court's Landmark Decision in the Lower Courts*, 86 AM. BANKR. L.J. 627 (Fall 2012); Hon. Joan N. Feeney, *Statement to the House of Representatives Judiciary Committee on the Impact of Stern v. Marshall*, 86 AM. BANKR. L.J. 357 (Summer 2012).

(1966)]—the bankruptcy court's authority is at its constitutional maximum. 131 S. Ct. at 2617–18. But when a debtor pleads an action arising only under state-law, as in *Northern Pipeline* [*v. Marathon Pipe Line Co.* 458 U.S. 50, 102 S. Ct. 2858 (1982)]; or when the debtor pleads an action that would augment the bankrupt estate, but not "necessarily be resolved in the claims allowance process[,]" 131 S. Ct. at 2618; then the bankruptcy court is constitutionally prohibited from entering final judgment. *Id*. at 2614.

698 F.3d at 919. Based on this view of *Stern*, the *Waldman* court held that the bankruptcy court lacked authority to enter a final judgment on the debtor's prepetition fraud claim against a creditor that was not necessary to resolve in adjudicating the creditor's claim against the debtor.

These cases recognize the crucial difference to which *Stern* adhered. A bankruptcy court may determine matters that arise directly under the bankruptcy code, such as fixing a creditor's claim in the claims allowance process. However, a bankruptcy court may not determine more tangential matters, such as a state law claim for relief asserted by a debtor or the estate that arises outside of the bankruptcy process, unless it is necessary to resolve that claim as part of the claims allowance process. *See City of Cent. Falls, R.I. v. Central Falls Teachers' Union* (*In re City of Cent. Falls*)*, R.I.*, 468 B.R. 36, 52 (Bankr. D.R.I. 2012) ("[A]lthough the counterclaim at issue in *Stern* arose under state law, the determinative feature of that counterclaim was that it did not arise under the Bankruptcy Code.").

### C. Applying *Stern*, *Waldman*, and *Global Technovations* in This Case

The issue presently before the Court is the debtor's eligibility to file this chapter 9 case. A debtor's eligibility to file bankruptcy stems directly from rights established by the bankruptcy code. As quoted above, *Waldman* expressly held, "When a debtor pleads an action under federal bankruptcy law," the bankruptcy court's authority is constitutional. 698 F.3d at 919. In this

41

13-53846-tjt Doc 2207 Filed 12/05/13 Entered 12/05/13 06:01:05 Page 354 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 48 of 160    353

case, the debtor has done precisely that. In seeking relief under chapter 9, it has pled "an action under federal bankruptcy law."

The parties' federal and state constitutional challenges are simply legal arguments in support of their objection to the City's request for bankruptcy relief. Nothing in *Stern*, *Waldman*, or *Global Technovations* suggests any limitation on the authority of a bankruptcy court to consider and decide any and all of the legal arguments that the parties present concerning an issue that is otherwise properly before it.

More specifically, those cases explicitly state that a bankruptcy court can constitutionally determine all of the issues that are raised in the context of resolving an objection to a proof of claim, even those involving state law.[11] For the same reasons, a bankruptcy court can also

---

[11] The Supreme Court has never squarely held that claims allowance, which is at the heart of the bankruptcy process, falls within the permissible scope of authority for a non-Article III court as a "public right" or any other long-standing historical exception to the requirement of Article III adjudication. *Stern*, 131 S. Ct. at 2614 n.7; *Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33, 56, n.11, 109 S. Ct. 2782 (1989). However, in *Northern Pipeline Const. Co. v. Marathon Pipe Line Co.*, 458 U.S. 50, 71, 102 S. Ct. 2858, 2871 (1982) (plurality opinion), the Court came tantalizingly close when it stated, "the restructuring of debtor-creditor relations . . . is at the core of the federal bankruptcy power . . . [and] may well be a 'public right'[.]"

No court has ever held otherwise. On the contrary, the cases have uniformly concluded that the public rights doctrine is the basis of a bankruptcy court's authority to adjudicate issues that arise under the bankruptcy code. For example, in *Carpenters Pension Trust Fund for Northern California v. Moxley*, 2013 WL 4417594, at *4 (9th Cir. Aug. 20, 2013), the Ninth Circuit held:

> [T]he dischargeability determination is central to federal bankruptcy proceedings. *Cent. Va. Cmty. Coll. v. Katz*, 546 U.S. 356, 363–64, 126 S. Ct. 990, 163 L.Ed.2d 945 (2006). The dischargeability determination is necessarily resolved during the process of allowing or disallowing claims against the estate, and therefore constitutes a public rights dispute that the bankruptcy court may decide.

Similarly, in *CoreStates Bank, N.A. v. Huls Am., Inc.*, 176 F.3d 187, 196 n.11 (3d Cir. 1999), the Third Circuit held, "The protections afforded a debtor under the Bankruptcy Code are congressionally created public rights."

*Footnote continued . . .*

constitutionally determine all issues that are raised in the context of resolving an objection to eligibility.

## D. Applying *Stern* in Similar Procedural Contexts

No cases address *Stern* in the context of eligibility for bankruptcy. Nevertheless, several cases do address *Stern* in the context of similar contested matters - conversion and dismissal of a case. Each case readily concludes that *Stern's* limitation on the authority of a bankruptcy court is inapplicable. For example, in *In re USA Baby, Inc.*, 674 F.3d 882, 884 (7th Cir. 2012), the Seventh Circuit held that nothing in *Stern* precludes a bankruptcy court from converting a chapter 11 case to chapter 7, stating, "we cannot fathom what bearing that principle might have

---

In *Kirschner v. Agoglia*, 476 B.R. 75, 79 (S.D.N.Y. 2012), the court stated, "[After *Stern*,] bankruptcy courts still have the ability to finally decide so-called 'public rights' claims that assert rights derived from a federal regulatory scheme and are therefore not the 'stuff of traditional actions,' as well as claims that are necessarily resolved in ruling on a creditor's proof of claim (e.g., a voidable preference claim)[.]"

Other cases also conclude that various matters arising within a bankruptcy case are within the public rights doctrine. *See., e.g.*, *In re Bataa/Kierland LLC*, 2013 WL 3805143, at *3 (D. Ariz. July 22, 2013) (scope of Chapter 11 debtor's rights under easement); *Hamilton v. Try Us, LLC*, 491 B.R. 561 (W.D. Mo. 2013) (validity and amount of common law claim against Chapter 7 debtor); *In re Prosser*, 2013 WL 996367 (D.V.I. 2013) (trustee's claim for turnover of property); *White v. Kubotek Corp.*, 2012 WL 4753310 (D. Mass. Oct. 2, 2012) (creditor's successor liability claim against purchaser of assets from bankruptcy estate); *United States v. Bond*, 2012 WL 4089648 (E.D.N.Y. Sept. 17, 2012) (trustee's claims for tax refund); *Turner v. First Cmty. Credit Union* (*In re Turner*), 462 B.R. 214 (Bankr. S.D. Tex. 2011) (violation of the automatic stay); *In re Whitley*, 2011 WL 5855242 (Bankr. S.D. Tex. Nov. 21, 2011) (reasonableness of fees of debtor's attorney); *In re Carlew*, 469 B.R. 666 (Bankr. S.D. Tex. 2012) (homestead exemption objection); *West v. Freedom Med., Inc.* (*In re Apex Long Term Acute Care-Katy, L.P.*), 465 B.R. 452, 458 (Bankr. S.D. Tex. 2011) (addressing preference actions, stating, "This Court concludes that the resolution of certain fundamental bankruptcy issues falls within the public rights doctrine."); *Sigillito v. Hollander* (*In re Hollander*), 2011 WL 6819022 (Bankr. E.D. La. Dec. 28, 2011) (nondischargeability for fraud).

In light of the unanimous holdings of these cases, the Court must conclude that its determination regarding the City's eligibility is within the public rights doctrine and therefore that the Court does have the authority to decide the issue, including all of the arguments that the objectors make in their objections.

on the present case."[12]  In *Mahanna v. Bynum*, 465 B.R. 436 (W.D. Tex. 2011), the court held

that *Stern* does not prohibit the bankruptcy court from dismissing the debtors' chapter 11 case.

The court concluded, "[T]his appeal is entirely frivolous, and constitutes an unjustifiable waste

of judicial resources[.]"  *Id.* at 442.  In *In re Thalmann*, 469 B.R. 677, 680 (Bankr. S.D. Tex.

2012), the court held that *Stern* does not prohibit a bankruptcy court from determining a motion

to dismiss a case on the grounds of bad faith.[13]  This line of cases strongly suggests that *Stern*

likewise does not preclude a bankruptcy court from determining eligibility.

### E. The Objectors Overstate
### the Scope of *Stern*.

Implicitly recognizing how far its objection to this Court's authority stretches *Stern*, the

objectors argue that two aspects of their objection alter the analysis of *Stern* and its application

here.  The first is that their objections raise important issues under both the United States

Constitution and the Michigan Constitution.  The second is that strong federalism considerations

warrant resolution of its objection by an Article III court.  Neither consideration, however, is

sufficient to justify the expansion of *Stern* that the objectors argue.

### 1. *Stern* Does Not Preclude This Court
### from Determining Constitutional Issues.

First, since *Stern* was decided, non-Article III courts have considered constitutional

issues, always without objection.

---

[12] *See also In re Gow Ming Chao*, 2011 WL 5855276 (Bankr. S.D. Tex. Nov. 21, 2011).
[13] *See also In re McMahan*, 2012 WL 5267017 (Bankr. S.D. Tex. Oct. 25, 2012); *In re Watts*, 2012 WL 3400820 (Bankr. S.D. Tex. Aug. 9, 2012).

Both bankruptcy courts and bankruptcy appellate panels have done so.[14] More specifically, and perhaps more on point, in two recent chapter 9 cases, bankruptcy courts addressed constitutional issues without objection. *Association of Retired Employees v. City of Stockton, Cal.* (*In re City of Stockton, Cal.*), 478 B.R. 8 (Bankr. E.D. Cal. 2012) (holding that retirees' contracts could be impaired in the chapter 9 case without offending the constitution); *In re City of Harrisburg, PA*, 465 B.R. 744 (Bankr. M.D. Pa. 2011) (upholding the constitutionality of a Pennsylvania statute barring financially distressed third class cities from filing bankruptcy).

In addition, the Tax Court, a non-Article III court, has also examined constitutional issues, without objection.[15] Likewise, the Court of Federal Claims, also a non-Article III court,

___

[14] *See, e.g.*, *Williams v. Westby* (*In re Westby*), 486 B.R. 509 (10th Cir. BAP 2013) (upholding the constitutionality of the Kansas bankruptcy-only state law exemptions); *Res. Funding, Inc. v. Pacific Continental Bank* (*In re Washington Coast I, L.L.C.*), 485 B.R. 393 (9th Cir. BAP 2012) (upholding the constitutionality of the final order entered by the bankruptcy court); *Richardson v. Schafer* (*In re Schafer*), 455 B.R. 590 (6th Cir. BAP 2011), *rev'd on other grounds*, 689 F.3d 601 (6th Cir. 2012) (addressing the constitutionality of the Michigan bankruptcy-only state law exemptions); *Old Cutters, Inc. v. City of Hailey* (*In re Old Cutters, Inc.*), 488 B.R. 130 (Bankr. D. Idaho 2012) (invalidating a city's annexation fee and community housing requirements); *In re Washington Mut., Inc.*, 485 B.R. 510 (Bankr. D. Del. 2012) (holding Oregon's corporate excise tax unconstitutional under the Commerce Clause); *In re McFarland*, 481 B.R. 242 (Bankr. S.D. Ga. 2012) (upholding Georgia's bankruptcy-specific exemption scheme); *In re Fowler*, 493 B.R. 148 (Bankr. E.D. Cal. 2012) (upholding the constitutionality of California's statute fixing the interest rate on tax claims); *In re Meyer*, 467 B.R. 451 (Bankr. E.D. Wis. 2012) (upholding the constitutionality of 11 U.S.C. § 707(b)); *Zazzali v. Swenson* (*In re DBSI, Inc.*), 463 B.R. 709, 717 (Bankr. D. Del. 2012) (upholding the constitutionality of 11 U.S.C. § 106(a)); *Proudfoot Consulting Co. v. Gordon* (*In re Gordon*), 465 B.R. 683 (Bankr. N.D. Ga. 2012) (upholding the constitutionality of 11 U.S.C. § 706(a)); *South Bay Expressway, L.P. v. County of San Diego* (*In re South Bay Expressway, L.P.*), 455 B.R. 732 (Bankr. S.D. Cal. 2011) (holding unconstitutional California's public property tax exemption for privately-owned leases of public transportation demonstration facilities).

[15] *See, e.g.*, *Field v. C.I.R.*, 2013 WL 1688028 (Tax Ct. 2013) (holding that the tax classification on the basis of marital status that was imposed by requirement that taxpayer file joint income-tax return in order to be eligible for tax credit for adoption expenses did not violate Equal Protection clause); *Begay v. C.I.R.*, 2013 WL 173362 (Tax Ct. 2013) (holding that the relationship classification for child tax credit did not violate Free Exercise Clause); *Byers v.*

*Footnote continued . . .*

45

13-53846-tjt Doc 2307 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 352 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 52 of 160    357

has considered constitutional claims, without objection. This was done perhaps most famously in *Beer v. United States*, 111 Fed. Cl. 592 (Fed. Cl. 2013), which is a suit by Article III judges under the Compensation Clause of the United States Constitution.

*Stern* does not change this status quo, and nothing about the constitutional dimension of the objectors' eligibility objections warrants the expansion of *Stern* that they assert. As *Stern* itself reaffirmed, "We do not think removal of counterclaims such as [the debtor's] from core bankruptcy jurisdiction meaningfully changes the division of labor in the current statute[.]" 131 S. Ct. at 2620. Expanding *Stern* to the point where it would prohibit bankruptcy courts from considering issues of state or federal constitutional law would certainly significantly change the division of labor between the bankruptcy courts and the district courts.[16]

---

*C.I.R.*, 2012 WL 265883 (Tax Ct. 2012) (rejecting the taxpayer's challenge to the authority of an IRS office under the Appointments Clause).

[16] Only one case suggests otherwise. *Picard v. Flinn Invs., LLC*, 463 B.R. 280 (S.D.N.Y. 2011). That case did state in dicta in a footnote, "If mandatory withdrawal protects litigants' constitutional interest in having Article III courts interpret federal statutes that implicate the regulation of interstate commerce, then it should also protect, *a fortiori*, litigants' interest in having the Article III courts interpret the Constitution." *Id.* at 288 n.3.

This single sentence cannot be given much weight. First, it is only dicta. Second, it is against the manifest weight of the case authorities. Third, the quote assumes, without analysis, that the litigants do have an interest in having Article III courts interpret the Constitution, and thus bootstraps its own conclusion. Fourth, nothing in the *Flinn Investments* case states or even suggests that *Stern* itself prohibits a bankruptcy court from ruling on a constitutional issue where it otherwise has the authority to rule on the claim before it. Finally, the district court that issued *Flinn Investments* has now entered an amended standing order of reference in bankruptcy cases to provide that its bankruptcy court should first consider objections to its authority that parties raise under *Stern v. Marshall*. Apparently, that district court's position now is that *Stern* does not preclude the bankruptcy court from determining constitutional issues, including the constitutional issue of its own authority. The order is available at http://www.nysd.uscourts.gov/rules/StandingOrder_OrderReference_12mc32.pdf.

Two other cases are cited in support of the position that only an Article III court can determine a constitutional issue: *TTOD Liquidation, Inc. v. Lim* (*In re Dott Acquisition, LLC*), 2012 WL 3257882 (E.D. Mich. July 25, 2012), and *Picard v. Schneiderman* (*In re Madoff Secs.*), 492 B.R. 133 (S.D.N.Y. 2013). Both are irrelevant to the issue. *Dott Acquisition* did discuss

*Footnote continued . . .*

46

13-53846-tjt Doc 2197 Filed 12/05/13 Entered 12/05/13 16:06:05 Page 359 of 462
13-53846-swr Doc 1975 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 53 of 150    358

## 2. Federalism Issues Are Not
## Relevant to a *Stern* Analysis.

The objectors' federalism argument is even more perplexing and troubling. Certainly the objectors are correct that a ruling on whether the City was properly authorized to file this bankruptcy case, as required for eligibility under 11 U.S.C. § 109(c)(2), will require the interpretation of state law, including the Michigan Constitution.

However, ruling on state law issues is required in addressing many issues in bankruptcy cases. As the Supreme Court has observed, "[B]ankruptcy courts [] consult state law in determining the validity of most claims." *Travelers Cas. & Sur. Co. of Am. v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 444, 127 S. Ct. 1199, 1201 (2007). Concisely summarizing the reality of the bankruptcy process and the impact of *Stern* on it, the court in *In re Olde Prairie Block Owner, LLC*, 457 B.R. 692, 698 (Bankr. N.D. Ill. 2011), concluded:

> [*Stern*] certainly did not hold that a Bankruptcy Judge cannot ever decide a state law issue. Indeed, a large portion of the work of a Bankruptcy Judge involves actions in which non-bankruptcy issues must be decided and that 'stem from the bankruptcy itself or would necessarily be resolved in the claims allowance process,' [131 S. Ct.] at 2618, for example, claims disputes, actions to bar dischargeability, motions for stay relief, and others. Those issues are likely within the 'public rights' exception as defined in *Stern*.

Other cases also illustrate the point.[17]

---

*Stern* but only in the unremarkable context of withdrawing the reference on a fraudulent transfer action. *Schneiderman* did not address a *Stern* issue at all, or even cite the case.

[17] *See, e.g.*, *Picard v. Estate of Madoff*, 464 B.R. 578, 586 (S.D.N.Y. 2011) (quoting *In re Salander O'Reilly Galleries*, 453 B.R. 106, 118 (Bankr. S.D.N.Y. 2011)) ("It is clear" from *Stern v. Marshall* and other Supreme Court precedent that "the Bankruptcy Court is empowered to apply state law when doing so would finally resolve a claim."); *Anderson v. Bleckner* (*In re Batt*), 2012 WL 4324930, at *2 (W.D. Ky. Sept. 20, 2012) ("*Stern* does not bar the exercise of the Bankruptcy Court's jurisdiction in any and all circumstances where a party to an adversary

*Footnote continued . . .*

47

13-53846-tjt Doc 2275 Filed 12/04/13 Entered 12/05/13 16:06:05 Page 360 of 462
13-53846-swr Doc 1945 Filed 12/03/13 Entered 12/03/13 14:31:05 Page 64 of 162   359

The distinction is clear. While in some narrow circumstances *Stern* prohibits a non-Article III court from adjudicating a state law claim for relief, a non-Article III court may consider and apply state law as necessary to resolve claims over which it does have authority under *Stern*. The mere fact that state law must be applied does not by itself mean that *Stern* prohibits a non-Article III court from determining the matter.

Moreover, nothing about a chapter 9 case suggests a different result. In *City of Cent. Falls, R.I.*, 468 B.R. at 52, the court stated, "Nor did [*Stern*] address concerns of federalism; although the counterclaim at issue in *Stern* arose under state law, the determinative feature of that counterclaim was that it did not arise under the Bankruptcy Code. The operative dichotomy was not federal versus state, but bankruptcy versus nonbankruptcy."

The troubling aspect of the objectors' federalism argument is that it does not attempt to define, even vaguely, what interest of federalism is at stake here.

In *Arizona v. United States*, 132 S. Ct. 2492, 2500 (2012), the Supreme Court stated, "Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect." Accordingly, federalism is about the federal and state governments respecting each other's sovereignty. It has nothing to do with the requirements of Article III or, to use the phraseology of *Stern*, with the "division of labor" between the district courts and the bankruptcy courts.[18] 131 S. Ct. at 2620. *See also City of Cent. Falls, R.I.*, 468 B.R. at 52, quoted above.

---

proceeding has not filed a proof of claim, or where the issue in an adversary proceeding is a matter of state law.").

[18] Genuine federalism concerns are fully respected in bankruptcy through the process of permissive abstention under 28 U.S.C. § 1334(c)(1).

48

13-53846-tjt Doc 2197 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 361 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 65 of 162   360

## F. Conclusion Regarding the *Stern* Issue

For these reasons, the Court concludes that it does have the authority to determine the constitutionality of chapter 9 under the United States Constitution and the constitutionality of P.A. 436 under the Michigan Constitution.

## VIII. Chapter 9 Does Not Violate
## the United States Constitution.

The objecting parties argue that chapter 9 of the bankruptcy code violates several provisions of the United States Constitution, both on its face and as applied in this case. The Court will first address the arguments that chapter 9 is facially unconstitutional under the Bankruptcy Clause of Article I, Section 8, and the Contracts Clause of Article I, Section 10 of the United States Constitution. The Court will then address the argument that chapter 9, on its face and as applied, violates the Tenth Amendment to the United States Constitution and the principles of federalism embodied therein.

## A. Chapter 9 Does Not Violate the Uniformity Requirement
## of the Bankruptcy Clause of the United States Constitution.

Article I, Section 8 of the United States Constitution provides: "The Congress shall have Power To . . . establish . . . uniform Laws on the subject of Bankruptcies throughout the United States."

The objecting parties, principally AFSCME, assert chapter 9 violates the uniformity requirement of the United States Constitution because chapter 9 "ced[es] to each state the ability to define its own qualifications for a municipality to declare bankruptcy, chapter 9 permits the promulgation of non-uniform bankruptcies within states." AFSCME's Corrected Objection to Eligibility, ¶ 58 at 25 (citing M.C.L. § 141.1558). (Dkt. #505) AFSCME argues that this is particularly so in Michigan, where P.A. 436 allows the governor to exercise discretion when

determining whether to authorize a municipality to seek chapter 9 relief, and also allows the governor to "attach whichever contingencies he wishes." *Id.*

## 1. The Applicable Law

The Supreme Court has addressed the uniformity requirement in several cases. In *Hanover Nat'l Bank v. Moyses*, 186 U.S. 181, 22 S. Ct. 857 (1902), the Court held that the incorporation into the bankruptcy law of state laws relating to exemptions did not violate the uniformity requirement of the United States Constitution. The Court stated, "The general operation of the law is uniform although it may result in certain particulars differently in different states." *Id.* at 190.

In *Stellwagen v. Clum*, 245 U.S. 605, 38 S. Ct. 215 (1918), the Court upheld the Bankruptcy Act's incorporation of varying state fraudulent conveyance statutes, despite the fact that the laws "may lead to different results in different states." *Id.* at 613.

In *Blanchette v. Connecticut General Ins. Corps.*, 419 U.S. 102, 159, 95 S. Ct. 335 (1974), the Court held, "The uniformity provision does not deny Congress power to take into account differences that exist between different parts of the country, and to fashion legislation to resolve geographically isolated problems."

The Supreme Court has struck down a bankruptcy statute as non-uniform only once. In *Railway Labor Executives' Ass'n v. Gibbons*, 455 U.S. 457, 102 S. Ct. 1169 (1982), the Court struck down a private bankruptcy law that affected only the employees of a single company. The Court concluded, "The uniformity requirement, however, prohibits Congress from enacting a bankruptcy law that, by definition, applies only to one regional debtor. To survive scrutiny under the Bankruptcy Clause, a law must at least apply uniformly to a defined class of debtors." *Id.* at 473.

50

13-53846-tjt Doc 2197 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 363 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:11:05 Page 57 of 156   362

More recently, the Sixth Circuit has addressed the uniformity requirement in two cases. In *Schultz v. United States*, 529 F.3d 343, 351 (6th Cir. 2008), the court concluded, "Over the last century, the Supreme Court has wrestled with the notion of geographic uniformity, ultimately concluding that it allows different effects in various states due to dissimilarities in state law, so long as the federal law applies uniformly among classes of debtors." Summarizing the Supreme Court's decisions in *Moyses*, *Stellwagen*, and *Blanchette*, the court stated, "Congress does not exceed its constitutional powers in enacting a bankruptcy law that permits variations based on state law or to solve geographically isolated problems." *Id*. at 353.

In *Richardson v. Schafer* (*In re Schafer*), 689 F.3d 601 (6th Cir. 2012), the court stated, "the Bankruptcy Clause shall act as 'no limitation upon congress as to the classification of persons who are to be affected by such laws, provided only the laws shall have uniform operation throughout the United States.'" *Id*. at 611 (quoting *Leidigh Carriage Co. v. Stengel*, 95 F. 637, 646 (6th Cir. 1899)). It added, "*Schultz* clarified that it is not the *outcome* that determines the uniformity, but the uniform *process* by which creditors and debtors in a certain place are treated." *Id*.

## 2. Discussion

Chapter 9 does exactly what these cases require to meet the uniformity requirement of the Bankruptcy Clause of the United States Constitution. The "defined class of debtors" to which chapter 9 applies is the class of entities that meet the eligibility requirements of 11 U.S.C. § 109(c). One such qualification is that the entity is "specifically authorized . . . to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter[.]" § 109(c)(2). As *Moyses* and *Stellwagen* specifically held, it is of no consequence in the uniformity analysis that this

51

13-53846-tjt Doc 2197 Filed 12/04/13 Entered 12/05/13 16:06:05 Page 364 of 462
13-53846-swr Doc 1945 Filed 12/03/13 Entered 12/03/13 14:31:05 Page 63 of 150    363

requirement of state authorization to file a chapter 9 case may lead to different results in different states.

It appears that AFSCME objects to the lack of uniformity that may arise from the differing circumstances of municipalities that the governor might authorize to file a chapter 9 petition. That it not the test. Rather, the test is whether chapter 9 applies uniformly to all chapter 9 debtors. It does.

Accordingly, the Court concludes that chapter 9 satisfies the uniformity requirement of the Bankruptcy Clause of the United States Constitution.

## B. Chapter 9 Does Not Violate the Contracts Clause of the United States Constitution.

The Contracts Clause of the United States Constitution, which is Article I, Section 10, provides, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts, . . ." AFSCME argues that chapter 9 violates the Contracts Clause. This argument is frivolous. Chapter 9 is a federal law. Article I, Section 10 does not prohibit Congress from enacting a "Law impairing the Obligation of Contracts." *Id.*

As the court stated in *In re Sanitary & Imp. Dist., No. 7*, 98 B.R. 970 (Bankr. D. Neb. 1989):

> The Court further concludes that the Bankruptcy Code adopted pursuant to the United States Constitution Article 1, Section 8 permits the federal courts through confirmation of a Chapter 9 plan to impair contract rights of bondholders and that such impairment is not a violation by the state or the municipality of Article 1, Section 10 of the United States Constitution which prohibits a state from impairing such contract rights.

*Id.* at 973.

Or, more succinctly stated, "The Bankruptcy Clause necessarily authorizes Congress to make laws that would impair contracts. It long has been understood that bankruptcy law entails

52

13-53846-tjt   Doc 2307   Filed 12/10/13   Entered 12/10/13 16:06:45   Page 365 of 462
13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:31:05   Page 65 of 162   364

impairment of contracts." *Stockton*, 478 B.R. at 15 (citing *Sturges v. Crowninshield*, 17 U.S. 122, 191 (1819)).

### C. Chapter 9 Does Not Violate the Tenth Amendment to the United States Constitution.

The Tenth Amendment provides, "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

This Amendment reflects the concept that the United States Constitution "created a Federal Government of limited powers." *Gregory v. Ashcroft*, 501 U.S. 452, 457, 111 S. Ct. 2395 (1991); *see also United States v. Darby*, 312 U.S. 100, 124, 61 S. Ct. 451 (1941) (The Tenth Amendment "states but a truism that all is retained which has not been surrendered.").

The Supreme Court's "consistent understanding" of the Tenth Amendment has been that "[t]he States unquestionably do retain a significant measure of sovereign authority . . . to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." *New York v. United States*, 505 U.S. 144, 156, 112 S. Ct. 2408 (1992) (quoting *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528, 549, 105 S.Ct. 1005 (1985) (quotation marks omitted); *see also South Carolina v. Baker*, 485 U.S. 505, 511 n.5, 108 S. Ct. 1355 (1988) ("We use 'the Tenth Amendment' to encompass any implied constitutional limitation on Congress' authority to regulate state activities, whether grounded in the Tenth Amendment itself or in principles of federalism derived generally from the Constitution."); *United States v. Sprague*, 282 U.S. 716, 733, 51 S. Ct. 220 (1931) ("The Tenth Amendment was intended to confirm the understanding of the people at the time the Constitution was adopted, that powers not granted to the United States were reserved to the states or to the people.").

53

13-53846-tjt Doc 2397 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 360 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 60 of 152    365

The objecting parties argue that chapter 9 violates these principles of federalism because, in the words of AFSCME, it "allows Congress to set the rules controlling State fiscal self-management—an area of exclusive state sovereignty." AFSCME's Corrected Objection to Eligibility, ¶ 40 at 15-16. (Dkt. #505) The Court interprets this argument as a facial challenge to the constitutionality of chapter 9. The as-applied challenge, as stated by the Retiree Committee and other objecting parties, is that *if* the State of Michigan can properly authorize the City of Detroit to file for chapter 9 relief without the explicit protection of accrued pension rights for individual retired city employees, then chapter 9 "must be found to be unconstitutional as permitting acts in derogation of Michigan's sovereignty." Retiree Committee Objection to Eligibility, ¶ 3 at 1-2. (Dkt. #805)

Before addressing the merits of these arguments, however, the Court must first address two preliminary issues that the United States raised in its "Memorandum in Support of Constitutionality of Chapter 9 of Title 11 of the United States Code" – standing and ripeness. (Dkt. #1149)

### 1. The Tenth Amendment Challenges to Chapter 9 Are Ripe for Decision and the Objecting Parties Have Standing.

The United States argues that the creditors who assert that chapter 9 violates the Tenth Amendment as applied in this case lack standing and that this challenge is not ripe for adjudication at this stage in the case. [19] The Court concludes that the objecting parties do have standing and that their challenge is now ripe for determination.

---

[19] The standing and ripeness issues are discussed here because the United States and the City framed this issue in the context of the Tenth Amendment challenge to chapter 9 of the

*Footnote continued . . .*

### a. Standing

"As a rule, a party must have a 'personal stake in the outcome of the controversy' to satisfy Article III." *Stevenson v. J.C. Bradford & Co.* (*In re Cannon*), 277 F.3d 838, 852 (6th Cir. 2002) (citing *Warth v. Seldin*, 422 U.S. 490, 498, 95 S. Ct. 2197 (1975), quoting *Baker v. Carr*, 369 U.S. 186, 204, 82 S. Ct. 691, 703 (1962)).

In a bankruptcy case, the standing of a party requesting to be heard turns on whether the party is a "party in interest." *See In re Global Indus. Techs., Inc.*, 645 F.3d 201, 210 (3rd Cir. 2011). A party in interest is one who "has a sufficient stake in the proceeding so as to require representation." *In re Amatex Corp.*, 755 F.2d 1034, 1042 (3d Cir. 1985).

11 U.S.C. § 1109(b), provides, "A party in interest, including . . . a creditor . . . may raise and may appear and be heard on any issue in a case under this chapter." 11 U.S.C. § 901(a) makes this provision applicable in a chapter 9 case.

In the chapter 9 case of *In re Barnwell County Hosp.*, 459 B.R. 903, 906 (Bankr. D.S.C. 2011), the court stated, "'Party in interest' is a term of art in bankruptcy. Although not defined in the Bankruptcy Code, it reflects the unique nature of a bankruptcy case, where the global financial circumstances of a debtor are resolved with respect to all of debtor's creditors and other affected parties."

In a chapter 9 case on point, *In re Suffolk Regional Off-Track Betting Corp.*, 462 B.R. 397, 403 (Bankr. E.D.N.Y. 2011), the court held that a party to an executory contract with a municipal debtor has standing to object to the debtor's eligibility.

---

bankruptcy code. To the extent that the argument might also be made to the other constitutional challenges to chapter 9, the same considerations would apply and would lead to the same conclusion.

55

13-53846-tjt Doc 2257 Filed 12/05/13 Entered 12/05/13 16:06:10 Page 362 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 62 of 162    367

Similarly, in *In re Wolf Creek Valley Metro. Dist. No. IV*, 138 B.R. 610 (D .Colo. 1992), also a chapter 9 case, the court stated, "[M]any courts have concluded that the party requesting standing must either be a creditor of a debtor . . . or be able to assert an equitable claim against the estate." *Id.* at 616 (citation and quotation marks omitted). *See also In re Addison Community Hospital Authority*, 175 B.R. 646 (Bankr. E.D. Mich. 1994) (holding that creditors are parties in interest and have standing to be heard).

Under 11 U.S.C. § 1109(b) and these cases, it is abundantly clear that the objecting parties, who are creditors with pension claims against the City, have standing to assert their constitutional claim as part of their challenge to this bankruptcy case.

Nevertheless, the United States asserts that *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S. Ct. 2130 (1992), precludes standing here. In that case, the Supreme Court adopted this test to determine whether a party has standing under Article III of the constitution:

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'". Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id*. at 560-61 (internal citations omitted). The United States asserts that the objecting parties do not meet this standard because their injury is not "imminent" at this stage of the proceedings.

The Court concludes that the contours of standing under 11 U.S.C. § 1109(b) are entirely consistent with the constitutional test for standing that the Supreme Court adopted in *Lujan*. A creditor has a direct, personal stake in the outcome of a bankruptcy case and thus has standing to

56

13-53846-tjt   Doc 2197   Filed 12/20/13   Entered 12/20/13 16:06:40   Page 363 of 462
13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:31:05   Page 63 of 162   368

challenge the bankruptcy filing. Accordingly, the Court concludes that every creditor of the City of Detroit has standing to object to its eligibility to be a debtor under chapter 9.

### b. Ripeness

The United States argues that the issue of whether chapter 9 is constitutional as applied in this case is not ripe for determination at this time. The City joins in this argument. City's Reply to Retiree Committee's Objection to Eligibility at 3-5. (Dkt. #918)

The premise of the argument is that the filing of the case did not result in the impairment of any pension claims. Thus the United States argues that this issue will be ripe only when the City proposes a plan that would impair pensions if confirmed. Until then, it argues, their injury is speculative.[20]

In *Miles Christi Religious Order v. Township of Northville*, 629 F.3d 533 (6th Cir. 2010), the Sixth Circuit summarized the case law on the ripeness doctrine:

> The ripeness doctrine encompasses "Article III limitations on judicial power" and "prudential reasons" that lead federal courts to "refus[e] to exercise jurisdiction" in certain cases. *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808, 123 S. Ct. 2026, 155 L.Ed.2d 1017 (2003). The "judicial Power" extends only to "Cases" and "Controversies," U.S. Const. art. III, § 2, not to "any legal question, wherever and however presented," without regard to its present amenability to judicial resolution. *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc). And the federal courts will not "entangl[e]" themselves "in abstract disagreements" ungrounded in the here and now. *Abbott Labs. v. Gardner*, 387 U.S. 136, 148, 87 S. Ct. 1507, 18 L.Ed.2d 681 (1967); see *Warshak*, 532 F.3d at 525. Haste makes waste, and the "premature adjudication" of legal questions compels courts to resolve matters, even constitutional matters, that may with time be

---

[20] The United States agrees that the objecting parties' facial challenge to chapter 9 is appropriate for consideration at this time. Memorandum in Support of Constitutionality at 3. (Dkt. #1149)

57

13-53846-tjt Doc 2197 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 370 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 64 of 156    369

satisfactorily resolved at the local level, *Nat'l Park Hospitality Ass'n*, 538 U.S. at 807, 123 S .Ct. 2026; *Grace Cmty. Church v. Lenox Twp.*, 544 F.3d 609, 617 (6th Cir. 2008), and that "may turn out differently in different settings," *Warshak*, 532 F.3d at 525.

To decide whether a dispute has ripened into an action amenable to and appropriate for judicial resolution, we ask two questions: (1) is the dispute "fit" for a court decision in the sense that it arises in "a concrete factual context" and involves "a dispute that is likely to come to pass"? and (2) what are the risks to the claimant if the federal courts stay their hand? *Warshak*, 532 F.3d at 525; *see Abbott Labs.*, 387 U.S. at 149, 87 S. Ct. 1507.

*Id*. at 537.

Although the argument of the United States has some appeal,[21] the Court must reject it, largely for the same reasons that it found that the objecting parties have standing. The ultimate issue before the Court at this time is whether the City is eligible to be a debtor in chapter 9. This dispute arises in the concrete factual context of the City of Detroit filing this bankruptcy case under chapter 9 of the bankruptcy code and the objecting parties challenging the constitutionality of that very law. This dispute is not an "abstract disagreement ungrounded in the here and now." It is here and it is now.

The Court further concludes that as a matter of judicial prudence, resolving this issue now will likely expedite the resolution of this bankruptcy case. The Court notes that the parties have fully briefed and argued the merits. Further, if the Tenth Amendment challenge to chapter 9 is resolved now, the parties and the Court can then focus on whether the City's plan (to be filed shortly, it states) meets the confirmation requirements of the bankruptcy code.

---

[21]  Early in the case, the Court expressed its doubts about the ripeness of this constitutional issue in the eligibility context. The Court was concerned that the issue of whether pension rights can be impaired in bankruptcy would be more appropriately considered a confirmation issue, as the United States argues now. At the request of the objecting parties, however, the Court reconsidered that position and now agrees that the issue is ripe at this point.

58

13-53846-tjt  Doc 2307  Filed 12/10/13  Entered 12/10/13 16:06:45  Page 371 of 462
13-53846-swr  Doc 1945  Filed 12/05/13  Entered 12/05/13 14:31:05  Page 65 of 152       370

Accordingly, the Court concludes that the objecting parties' challenge to chapter 9 of the bankruptcy code as applied in this case is ripe for determination at this time.

## 2. The Supreme Court Has Already Determined That Chapter 9 Is Constitutional.

The question of whether a federal municipal bankruptcy act can be administered consistent with the principles of federalism reflected in the Tenth Amendment has already been decided. In *United States v. Bekins*, 304 U.S. 27, 58 S. Ct. 811 (1938), the United States Supreme Court specifically upheld the Municipal Corporation Bankruptcy Act, 50 Stat. 653 (1937), over objections that the statute violated the Tenth Amendment. *Bekins*, 304 U.S. at 53-54.

In upholding the 1937 Act, the *Bekins* court found:

> The statute is carefully drawn so as not to impinge upon the sovereignty of the State. The State retains control of its fiscal affairs. The bankruptcy power is exercised in relation to a matter normally within its province and only in a case where the action of the taxing agency in carrying out a plan of composition approved by the bankruptcy court is authorized by state law. It is of the essence of sovereignty to be able to make contracts and give consents bearing upon the exertion of governmental power. . . . The reservation to the States by the Tenth Amendment protected, and did not destroy, their right to make contracts and give consents where that action would not contravene the provisions of the Federal Constitution.

*Bekins*, 304 U.S. at 51-2.

The Court further noted that two years earlier, it had struck down a previous version of the federal municipal bankruptcy law for violating the Tenth Amendment. *Ashton v. Cameron*

59

13-53846-tjt Doc 2397 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 372 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 66 of 150    371

*County Water Improvement Dist. No. 1*, 298 U.S. 513, 56 S. Ct. 892 (1936).[22]   The Court found,

however, that in the 1937 Act, Congress had "carefully" amended the law "to afford no ground

for [the Tenth Amendment] objection."   *Bekins*, 304 U.S. at 50.   The Court quoted approvingly,

and at length, from a House of Representatives Committee report on the 1937 Act:

---

[22] It is interesting that Justice Cardozo did not participate in the *Bekins* decision.   304 U.S. at 54.   In his dissent in *Ashton* two years before, he made this astute observation about the economic realities of municipal bankruptcies:

> If voluntary bankruptcies are anathema for governmental units, municipalities and creditors have been caught in a vise from which it is impossible to let them out.   Experience makes it certain that generally there will be at least a small minority of creditors who will resist a composition, however fair and reasonable, if the law does not subject them to a pressure to obey the general will.   This is the impasse from which the statute gives relief. . . .   *To hold that this purpose must be thwarted by the courts because of a supposed affront to the dignity of a state, though the state disclaims the affront and is doing all it can to keep the law alive, is to make dignity a doubtful blessing.*   Not by arguments so divorced from the realities of life has the bankruptcy power been brought to the present state of its development during the century and a half of our national existence.

298 U.S. at 541 (emphasis added).   He then made this argument regarding the constitutional foundation for municipal bankruptcy law, which, arguably, the Court in *Bekins* adopted:

> The act does not authorize the states to impair through their own laws the obligation of existing contracts.   Any interference by the states is remote and indirect.   At most what they do is to waive a personal privilege that they would be at liberty to claim.   *If contracts are impaired, the tie is cut or loosened through the action of the court of bankruptcy approving a plan of composition under the authority of federal law.   There, and not beyond in an ascending train of antecedents, is the cause of the impairment to which the law will have regard.*   Impairment by the central government through laws concerning bankruptcies is not forbidden by the Constitution.   Impairment is not forbidden unless effected by the states themselves.   No change in obligation results from the filing of a petition by one seeking a discharge, whether a public or a private corporation invokes the jurisdiction.   *The court, not the petitioner, is the efficient cause of the release.*

*Id*. at 541-42 (citations omitted) (emphasis added).

---

60

13-53846-tjr   Doc 2197   Filed 12/10/13   Entered 12/10/13 16:06:05   Page 373 of 462
13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:31:05   Page 67 of 156   372

There is no hope for relief through statutes enacted by the States, because the Constitution forbids the passing of State laws impairing the obligations of existing contracts. Therefore, relief must come from Congress, if at all. The committee are not prepared to admit that the situation presents a legislative no-man's land. It is the opinion of the committee that the present bill removes the objections to the unconstitutional statute, and gives a forum to enable those distressed taxing agencies which desire to adjust their obligations and which are capable of reorganization, to meet their creditors under necessary judicial control and guidance and free from coercion, and to affect such adjustment on a plan determined to be mutually advantageous.

*Id.* at 51 (quotation marks omitted).

*Bekins* thus squarely rejects the challenges that the objecting parties assert to chapter 9 in this case and it has not been overruled.

It is well-settled that this Court is bound by the decisions of the Supreme Court. In *Agostini v. Felton*, 521 U.S. 203, 117 S. Ct. 1997 (1997), the Court stated, "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Id*. at 237 (quoting *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484, 109 S. Ct. 1917 (1989) (quotation marks omitted)). *See also Grutter v. Bollinger*, 288 F.3d 732, 744 (6th Cir. 2002).

Nevertheless, the objecting parties assert that subsequent amendments to the municipal bankruptcy statute and subsequent Supreme Court decisions regarding the Tenth Amendment compel the conclusion that *Bekins* is no longer good law, or at least that it is inapplicable in this case. Specifically, in its objection, AFSCME argues that since *Bekins* was decided, "intervening Supreme Court precedent holds that states can fashion their own municipal reorganization statutes, but cannot consent to any derogation of their sovereign powers." AFSCME's

Corrected Objection to Eligibility, ¶ 44 at 17. (Dkt. #505)  Although the Court concludes that *Bekins* remains good law and is controlling here, the Court will address these arguments.

<div align="center">

**3. Changes to Municipal Bankruptcy Law Since 1937
Do Not Undermine the Continuing Validity of *Bekins*.**

</div>

The only relevant change to municipal bankruptcy law that AFSCME identifies is the addition of § 903 to the bankruptcy code, the substance of which was added in 1946 as § 83(i) of the 1937 Act.  That section provided, "[N]o State law prescribing a method of composition of indebtedness of such agencies shall be binding upon any creditor who does not consent to such composition, and no judgment shall be entered under such State law which would bind a creditor to such composition without his consent."

In slightly different form, § 903 of the bankruptcy code now provides:

> This chapter does not limit or impair the power of a State to control, by legislation or otherwise, a municipality of or in such State in the exercise of the political or governmental powers of such municipality, including expenditures for such exercise, but—
> (1) a State law prescribing a method of composition of indebtedness of such municipality may not bind any creditor that does not consent to such composition; and
> (2) a judgment entered under such a law may not bind a creditor that does not consent to such composition.

11 U.S.C. § 903.

AFSCME argues that this provision created a new exclusivity in chapter 9 that forces the states to adopt the federal scheme for adjusting municipal debts.  This exclusivity, the argument goes, deprives the states of the ability to enact state legislation providing for municipal debt adjustment, which is inconsistent with the principles of federalism set forth in *New York v. United States*, 505 U.S. 144, 112 S. Ct. 2408 (1992), and *Printz v. United States*, 521 U.S. 898, 117 S. Ct. 2365 (1997).

62

13-53846-tjt  Doc 2197  Filed 12/20/13  Entered 12/20/13 16:06:05  Page 375 of 462
13-53846-swr  Doc 1945  Filed 12/05/13  Entered 12/05/13 14:31:05  Page 69 of 156   374

This argument fails on two levels. First, other than in one limited instance, *Faitoute Iron & Steel Co. v. City of Asbury Park, N.J.*, 316 U.S. 502, 62 S. Ct. 1129 (1942), courts have always interpreted the Contracts Clause of the United States Constitution to prohibit the states from enacting legislation providing for municipal bankruptcies. The 1946 amendment that added the provision that is now § 903 did not change this law.

Second, neither *New York* nor *Printz* undermine *Bekins*. As developed above, at its core, *Bekins* rests on state consent. As will be developed below, like *Bekins*, both *New York* and *Printz* are also built on the concept of state consent. Indeed, it was the lack of state consent to the federal programs in those cases that caused the Supreme Court to find them unconstitutional.

### a. The Contracts Clause of the United States Constitution Prohibits States from Enacting Municipal Bankruptcy Laws.

The Contracts Clause of the United States Constitution, Article I, Section 10, states, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts[.]"

Applying this clause, the Supreme Court has stated, "When a State itself enters into a contract, it cannot simply walk away from its financial obligations." *Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 412 n.14, 103 S. Ct. 697 (1983). "It long has been established that the Contracts Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties." *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 17, 97 S. Ct. 1505 (1977) (citing *Dartmough College v. Woodward*, 4 L. Ed. 629 (1819); *Fletcher v. Peck*, 3 L. Ed. 162 (1810)). Section 903 simply restates this principle.

Moreover, contrary to AFSCME's assertion, it is clear that *Bekins* fully considered this issue. It found, "The natural and reasonable remedy through [bankruptcy] was not available under state law by reason of the restriction imposed by the Federal Constitution upon the impairment of contracts by state legislation." *Bekins*, 304 U.S. at 54.

63

13-53846-tjt Doc 2197 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 370 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 70 of 162 375

### b. *Asbury Park* Is Limited to Its Own Facts.

As noted above, only one case, *Asbury Park*, is to the contrary. The Court concludes, however, that this case represents a very narrow departure from these principles and its holding is limited to the unique facts of that case. Indeed, the Court itself stated, "We do not go beyond the case before us." 316 U.S. at 516.

The adjustment plan at issue in *Asbury Park* was "authorized" by the New Jersey state court on July 21, 1937. This was after the federal municipal bankruptcy law was struck down in *Ashton* and before the enactment of the municipal bankruptcy act that *Bekins* approved. Moreover, in *Asbury Park*, the bonds affected by the plan of adjustment, which the Court found were worthless prior to the adjustment, were reissued without a reduction in the principal obligation and became significantly more valuable as a result of the adjustment. *Asbury Park*, 316 U.S. at 507-08, 512-13.

The limited application of *Asbury Park* to its own facts has been repeatedly recognized. The cases now firmly establish that the Contracts Clause of the United States Constitution bars a state from enacting municipal bankruptcy legislation. In U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 27, 97 S. Ct. 1505 (1977), the Supreme Court observed, "The only time in this century that alteration of a municipal bond contract has been sustained by this Court was in [*Asbury Park*]."[23]

---

[23] Interestingly, in *U.S. Trust Co.*, the Court further observed that when a State seeks to impair its own contracts, "complete deference to a legislative assessment of [the] reasonableness and necessity [of the impairment] is not appropriate because the State's self-interest is at stake." *Id*. 431 U.S. at 26. For that reason, "a state is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives." *Id*. at 30-31. The Constitution astutely recognizes that a federal court brings no such self-interest to a municipal bankruptcy case.

64

13-53846-tjt Doc 2197 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 371 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 71 of 162   376

In *In re Jefferson Cnty., Ala.*, 474 B.R. 228, 279 (Bankr. N.D. Ala. 2012), *aff'd sub nom. Mosley v. Jefferson Cnty. (In re Jefferson Cnty.)*, 2012 WL 3775758 (N.D. Ala. Aug. 28, 2012), the court stated, "A financially prostrate municipal government has one viable option to resolve debts in a non-consensual manner. It is a bankruptcy case. Outside of bankruptcy, non-consensual alteration of contracted debt is, at the very least, severely restricted, if not impossible." The court added, "There has been only one instance in this and the last century when the Supreme Court of the United States has sustained the alteration of a municipal bond contract outside a bankruptcy case." *Id*. at 279 n.21. It further observed that *Asbury Park* has since been "distinguished and its precedent status, if any, is dubious." *Id*.

Accordingly, the Court concludes that the addition of § 903 to our municipal bankruptcy law does not undermine the continuing validity of *Bekins*.

### 4. Changes to the Supreme Court's Tenth Amendment Jurisprudence Do Not Undermine the Continuing Validity of *Bekins*.

#### a. *New York v. United States*

In *New York v. United States*, 505 U.S. 144, 112 S. Ct. 2408 (1992), the Supreme Court considered a Tenth Amendment objection to the Low-Level Radioactive Waste Policy Amendments Act of 1985, 42 U.S.C. § 2021b, *et seq*. Congress enacted that law to address the problem of identifying storage sites for low-level radioactive waste. 505 U.S. at 152-54. The Act provided three different incentives for each state to take responsibility over the nuclear waste generated within its borders. *Id.*

The first was a monetary incentive to share in the proceeds of a surcharge on radioactive waste received from other states, based on a series of milestones. 505 U.S. at 171. The Court found this program constitutional because it was, in fact, nothing more than an incentive to the

65

13-53846-tjt  Doc 2197  Filed 12/10/13  Entered 12/10/13 16:06:05  Page 372 of 462
13-53846-swr  Doc 1945  Filed 12/05/13  Entered 12/05/13 14:31:05  Page 72 of 162        377

state to regulate. Congress had "placed conditions—the achievement of the milestones—on the receipt of federal funds." *Id*. at 171. The states could choose to achieve these milestones, and receive the federal funds, or not. *Id*. at 173. "[T]he location of such choice in the States is an inherent element in any conditional exercise of Congress' spending power." *Id*.

The Court then stated, "In the second set of incentives, Congress has authorized States and regional compacts with disposal sites gradually to increase the cost of access to the sites, and then to deny access altogether, to radioactive waste generated in States that do not meet federal deadlines." *Id*. The Court held that this provision was also constitutional, again because the states retained the choice to participate in the federal program or not.

The Court explained, "Where federal regulation of private activity is within the scope of the Commerce Clause, we have recognized the ability of Congress to offer States the *choice* of regulating that activity according to federal standards or having state law pre-empted by federal regulation." *Id*. at 173-74 (emphasis added). "[T]he choice remains at all times with the residents of the State, not with Congress. The State need not expend any funds, or participate in any federal program, if local residents do not view such expenditures or participation as worthwhile." *Id*. at 174.

These two provisions of the Act passed constitutional muster precisely because states could consent to participation in the federal program or withhold their consent as they saw fit. The Court held that these two programs:

> represent permissible conditional exercises of Congress' authority under the Spending and Commerce Clauses respectively, in forms that have now grown commonplace. Under each, Congress offers the States a legitimate choice rather than issuing an unavoidable command. The States thereby retain the ability to set their legislative agendas; state government officials remain accountable to the local electorate.

*Id*. at 185.

66

13-53846-tjt Doc 2197 Filed 12/05/13 Entered 12/05/13 16:06:05 Page 379 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 73 of 156 378

In contrast, the third of these provisions - the "take title" provision" - forced the states to choose between either regulating the disposal of radioactive waste according to Congress's standards or "taking title" to that waste, thereby assuming all the liabilities of its producers. *Id*. at 174-75. The Court held that this provision violated the Tenth Amendment, because it offered the states no choice but to do the bidding of the federal government. This provision, the Court determined, did not ask for state "consent" but instead "commandeered" the states.

The Court's precedent is clear that the federal government may not require the states to regulate according to federal terms. "[T]he Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *Id*. at 162. "Congress may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program.'" *Id*. at 161 (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.*, 452 U.S. 264, 288, 101 S. Ct. 2352 (1981)).

The "take title" provision did just that. Although guised as a "so-called incentive" scheme, the Court found that the "take title" provisions offered the states no real choice at all.

> Because an instruction to state governments to take title to waste, standing alone, would be beyond the authority of Congress, and because a direct order to regulate, standing alone, would also be beyond the authority of Congress, it follows that Congress lacks the power to offer the States a choice between the two.

*Id*. at 176. The "take title" provisions did not give the states what the Court deemed the constitutionally "critical alternative[.]" *Id*. at 176. "A State may not decline to administer the federal program. No matter which path the State chooses, it must follow the direction of Congress." *Id*. at 177.

67

13-53846-tjt Doc 2307 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 380 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 74 of 156   379

The cornerstone of *United States v. New York*, then, is state consent. The federal government may constitutionally encourage, incentivize, or even entice, states to do the federal government's bidding. It may not command them to do so.

### b. *Printz v. United States*

The Supreme Court reiterated these principles in *Printz v. United States*, 521 U.S. 898, 117 S. Ct. 2365 (1997), and extended them to Congressional efforts to compel state officers to act. At issue in *Printz* were provisions of the Brady Handgun Violence Prevention Act, 18 U.S.C. § 922, that required state and local law enforcement officers to carry out background checks for firearms dealers in connection with proposed sales of firearms. It also required that the background checks be performed in accordance with the federal law. *Printz*, 521 U.S. at 903-04.

The Court concluded that while state and local governments remained free to voluntarily participate in the background check program, the "mandatory obligation imposed on [law enforcement officers] to perform background checks on prospective handgun purchasers plainly runs afoul [of the Constitution]." *Id.* at 933. Again, the stumbling block was a lack of state consent:

> We held in *New York* that Congress cannot compel the States to enact or enforce a federal regulatory program. Today we hold that Congress cannot circumvent that prohibition by conscripting the State's officers directly. The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program.

521 U.S. at 935.

## c. *New York* and *Printz*
## Do Not Undermine *Bekins.*

*Printz* acknowledged that states could volunteer to carry out federal law. *Id*. at 910-11, 916-17 (describing the history of state officers carrying out federal law as involving "voluntary" action on the part of the states). Concurring, Justice O'Connor added, "Our holding, of course, does not spell the end of the objectives of the Brady Act. States and chief law enforcement officers may voluntarily continue to participate in the federal program." *Id*. at 936.

By the same token, *New York* acknowledged that states can and do enter into voluntary contracts with the federal government whereby states agree to legislate according to federal terms in exchange for some federal benefit or forbearance. *New York*, 505 U.S. at 166-67.

What makes those federal programs constitutionally permissible, and the commandeering at issue in *New York* and *Printz* impermissible, is consent, and nothing more. If the state is acting voluntarily, it is free to engage with the federal government across a broad range of subject areas. The Tenth Amendment to the United States Constitution is violated only when the state does not consent.

Chapter 9 simply does not implicate the concerns of *New York* and *Printz*. As *Bekins* emphasized, chapter 9 "is limited to *voluntary* proceedings for the composition of debts." *Bekins*, 304 U.S. at 47 (emphasis added). The *Bekins* Court explained:

> The bankruptcy power is competent to give relief to debtors in such a plight and, if there is any obstacle to its exercise in the case of the districts organized under state law it lies in the right of the State to oppose federal interference. The State steps in to remove that obstacle. The State acts in aid, and not in derogation, of its sovereign powers. It invites the intervention of the bankruptcy power to save its agency which the State itself is powerless to rescue. Through its cooperation with the national government the needed relief is given. We see no ground for the conclusion that the Federal Constitution, in the interest of state sovereignty, has reduced both sovereigns to helplessness in such a case.

69

13-53846-tjt Doc 2197 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 382 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 76 of 156 381

*Id.*, 304 U.S. at 54.

The federal government cannot and does not compel states to authorize municipalities to file for chapter 9 relief, and municipalities are not permitted to seek chapter 9 relief without specific state authorization. 11 U.S.C. § 109(c)(2). There is simply no "commandeering" involved. *New York*, 505 U.S. at 161. Chapter 9 does not compel a state to enact a specific regulatory program, as in *New York*. Nor does chapter 9 press state officers into federal service, as in *Printz*. Instead, as *Bekins* held, valid state authorization is required for a municipality to proceed in chapter 9.

Moreover, during the pendency of the chapter 9 case, § 904 of the bankruptcy code mandates that the bankruptcy court "may not . . . interfere with (1) any of the political or governmental powers of the debtor; (2) any of the property or revenues of the debtor; or (3) the debtor's use or employment of any income-producing property." 11 U.S.C. § 904. At the same time, bankruptcy code § 903 mandates, "This chapter does not limit or impair the power of a State to control . . . a municipality of or in such State in the exercise of the political or governmental powers of such municipality[.]"

Because the state and local officials must authorize the filing of a chapter 9 petition, 11 U.S.C. § 109(c)(2), and because they retain control over "the political or governmental powers" of the municipality, these state officials remain fully politically accountable to the citizens of the state and municipality. *See New York*, 505 U.S. at 186 ("The States thereby retain the ability to set their legislative agendas; state government officials remain accountable to the local electorate.").

## d. Explaining Some Puzzling
## Language in *New York*

To be sure, some language in *New York* (not repeated in *Printz*) lends support to the argument that state consent cannot cure a federal law that would otherwise violate the Tenth Amendment.  In *New York*, Justice O'Connor's opinion for the Court explained that federalism does not exist for the benefit of states, as such, but rather is a part of the constitutional structure whose purpose is to benefit individuals.  505 U.S. at 182.  Justice O'Connor continued:

> Where Congress exceeds its authority relative to the States, . . . the departure from the constitutional plan cannot be ratified by the "consent" of state officials. . . .   The constitutional authority of Congress cannot be expanded by the "consent" of the governmental unit whose domain is thereby narrowed, whether that unit is the Executive Branch or the States."

*Id*.

Some of the parties in this case have seized upon this language to argue that "the Supreme Court has weakened if not rejected *Bekins'* foundation – that a State's consent can remedy any violation of the Tenth Amendment and principles of federalism as they affect individual citizens."  Retiree Committee Objection to Eligibility, ¶ 37 at 19.  (Dkt. #805)

The difficulty with this argument is that it proves too much.  If this language from *New York* has the sweeping force that the objecting parties ascribe to it, then a state's consent could never "cure" what would otherwise be a Tenth Amendment violation.  The two incentives in *New York* that were constitutionally sustained would instead have been struck down like the "take title" provision.  As the Court emphasized in *New York*, "even where Congress has the authority under the Constitution to pass laws requiring or prohibiting certain acts, it lacks the power directly to compel the States to require or prohibit those acts."  *New York*, 505 U.S. at 166.

71

13-53846-tjt  Doc 2197  Filed 12/10/13  Entered 12/10/13 16:06:15  Page 384 of 462
13-53846-swr  Doc 1945  Filed 12/05/13  Entered 12/05/13 14:11:05  Page 73 of 152   383

Yet, despite Congress' inability to compel states to regulate according to federal standards, it may unquestionably invite, encourage, or entice the states to do so. *New York* specifically held that Congress may "encourage a State to regulate in a particular way," or "hold out incentives to the States as a method of influencing a State's policy choices." *Id*. The key is consent. *New York* further held, "Our cases have identified a variety of methods, short of outright coercion, by which Congress may urge a State to adopt a legislative program consistent with federal interests." *Id*. Consent to what would otherwise be an unlawful commandeering of state governments was the very basis for upholding two of the regulatory programs at issue in *New York*. *Id*. at 173-74.

It is not entirely clear, therefore, what Justice O'Connor meant when she wrote that states "cannot consent to the enlargement of the powers of Congress beyond those enumerated in the Constitution." *Id*. at 182. In a very real sense, the holding of *New York* rests on the premise that states can do just that. Congress cannot require the states to legislate with respect to the problem of radioactive waste, but it can unquestionably hold out incentives that induce the states to consent to do so. More broadly put, states can "consent to the enlargement of the powers of Congress beyond those enumerated in the Constitution." *Id*.

The Court can only conclude that Justice O'Connor meant something else - that a state cannot consent to be compelled. As the Court saw the "choice" in *New York*, it was a choice between two unconstitutional alternatives - regulating according to federal standards or taking title to all of the low level radioactive waste produced by private parties in the state. Justice O'Connor likely concluded that the latter alternative was so unpalatable that it was really no choice at all. After all, here is where the Court found that "Congress had crossed the line distinguishing encouragement from coercion." *Id*. at 175. Understood this way, Justice

72

13-53846-tjt Doc 2197 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 385 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 79 of 160    384

O'Connor may have been saying nothing more than that one cannot consent to have a gun held to one's head.  The idea of "consent" in such a scenario is meaningless.

If this understanding is correct, it would be incumbent upon the objecting parties to identify some way in which federal authority has compelled state action here.  They have not.

Whatever the intended meaning of this language, it cannot be that state consent can never "cure" what would otherwise violate the Tenth Amendment.  That meaning would sweep aside the holding of *New York* itself.  Nor does this language undo the holding in *Bekins*, which, as stated before, this Court must apply until the Supreme Court overrules it.

Accordingly, the Court concludes that chapter 9 is not facially unconstitutional under the Tenth Amendment.

### 5. Chapter 9 Is Constitutional As Applied in This Case.

Several of the objecting parties also raise "as-applied" challenges to the constitutionality of chapter 9 under the Tenth Amendment to United States Constitution.  Although variously cast, the primary thrust of these arguments is that if chapter 9 permits the State of Michigan to authorize a city to file a petition for chapter 9 relief without explicitly providing for the protection of accrued pension benefits, the Tenth Amendment is violated.

The Court concludes that these arguments must be rejected.

### a. When the State Consents to a Chapter 9 Bankruptcy, the Tenth Amendment Does Not Prohibit the Impairment of Contract Rights That Are Otherwise Protected by the State Constitution.

The basis for this result begins with the recognition that the State of Michigan cannot legally provide for the adjustment of the pension debts of the City of Detroit.  This is a direct result of the prohibition against the State of Michigan impairing contracts in both the United

73

13-53846-tjt  Doc 2207  Filed 12/20/13  Entered 12/20/13 16:06:05  Page 380 of 462
13-53846-swr  Doc 1945  Filed 12/05/13  Entered 12/05/13 14:11:05  Page 80 of 162     385

States Constitution and Michigan Constitution, as well as the prohibition against impairing the contractual obligations relating to accrued pension benefits in the Michigan Constitution.

The federal bankruptcy court, however, is not so constrained. As noted in Part VIII B, above, "The Bankruptcy Clause necessarily authorizes Congress to make laws that would impair contracts. It long has been understood that bankruptcy law entails impairment of contracts." *Stockton*, 478 B.R. at 15 (citing *Sturges v. Crowninshield*, 17 U.S. 122, 191 (1819)).

The state constitutional provisions prohibiting the impairment of contracts and pensions impose no constraint on the bankruptcy process. The Bankruptcy Clause of the United States Constitution, and the bankruptcy code enacted pursuant thereto, explicitly empower the bankruptcy court to impair contracts and to impair contractual rights relating to accrued vested pension benefits. Impairing contracts is what the bankruptcy process does.

The constitutional foundation for municipal bankruptcy was well-articulated in *Stockton*:

> In other words, while a state cannot make a law impairing the obligation of contract, Congress can do so. The goal of the Bankruptcy Code is adjusting the debtor-creditor relationship. Every discharge impairs contracts. While bankruptcy law endeavors to provide a system of orderly, predictable rules for treatment of parties whose contracts are impaired, that does not change the starring role of contract impairment in bankruptcy.
>
> It follows, then, that contracts may be impaired in this chapter 9 case without offending the Constitution. The Bankruptcy Clause gives Congress express power to legislate uniform laws of bankruptcy that result in impairment of contract; and Congress is not subject to the restriction that the Contracts Clause places on states. Compare U.S. Const. art. I, § 8, cl. 4, with § 10, cl. 1.

478 B.R. at 16.

For Tenth Amendment and state sovereignty purposes, nothing distinguishes pension debt in a municipal bankruptcy case from any other debt. If the Tenth Amendment prohibits the impairment of pension benefits in this case, then it would also prohibit the adjustment any other debt in this case. *Bekins* makes it clear, however, that with state consent, the adjustment of

municipal debts does not impermissibly intrude on state sovereignty. *Bekins*, 304 U.S. at 52. This Court is bound to follow that holding.

### b. Under the Michigan Constitution, Pension Rights Are Contractual Rights.

The Plans seek escape from this result by asserting that under the Michigan Constitution, pension debt has greater protection than ordinary contract debt. The argument is premised on the slim reed that in the Michigan Constitution, pension rights may not be "impaired or diminished," whereas only laws "impairing" contract rights are prohibited.

There are several reasons why the slight difference between the language that protects contracts (no "impairment") and the language that protects pensions (no "impairment" or "diminishment") does not demonstrate that pensions were given any extraordinary protection.

Before reviewing those reasons, however, a brief review of the history of the legal status of pension benefits in Michigan is necessary.

At common law, before the adoption of the Michigan Constitution in 1963, public pensions in Michigan were viewed as gratuitous allowances that could be revoked at will, because a retiree lacked any vested right in their continuation. In *Brown v. Highland Park*, 320 Mich. 108, 114, 30 N.W.2d 798, 800 (Mich. 1948), the Michigan Supreme Court stated:

> We are convinced that the majority of cases in other jurisdictions establishes the rule that a pension granted by public authorities is not a contractual obligation, that the pensioner has no vested right, and that a pension is terminable at the will of a municipality, at least while acting within reasonable limits. At best plaintiffs in this case have an expectancy based upon continuance of existing charter provisions.

Similarly, in *Kosa v. Treasurer of State of Mich.*, 408 Mich. 356, 368-69, 292 N.W.2d 452, 459 (1980), the court observed this about the status of pension benefits before the 1963 Constitution was adopted:

75

13-53846-tjt Doc 2197 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 382 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 82 of 162    387

> Until the adoption of Const. 1963, art. 9, s 24, legislative appropriation for retirement fund reserves was considered to be an ex gratia action. Consequently, the most that could be said about "pre-con" legislative appropriations for retirees was that there was some kind of implied commitment to fund pension reserves.

*Id*. (footnote omitted).

In the 1963 Constitution, this provision enhancing the protection for pensions was included: "The accrued financial benefits of each pension plan and retirement system of the state and its political subdivisions shall be a contractual obligation thereof which shall not be diminished or impaired thereby." Mich. Const. art. IX, § 24.

In *Kosa*, 408 Mich. at 370 n.21, 292 N.W.2d at 459, the Michigan Supreme Court quoted the following history from the constitutional convention regarding article 9, section 24:

> "MR. VAN DUSEN: Mr. Chairman, if I may elaborate briefly on Mr. Brake's answer to Mr. Downs' question, I would like to indicate that the words 'accrued financial benefits' were used designedly, so that the *contractual right of the employee* would be limited to the deferred compensation embodied in any pension plan, and that we hope to avoid thereby a proliferation of litigation by individual participants in retirement systems talking about the general benefits structure, or something other than his specific right to receive benefits. It is not intended that an individual employee should, as a result of this language, be given the right to sue the employing unit to require the actuarial funding of past service benefits, or anything of that nature. *What it is designed to do is to say that when his benefits come due, he's got a contractual right to receive them.* "And, in answer to your second question, *he has the contractual right to sue for them.* So that he has no particular interest in the funding of somebody else's benefits as long as *he has the contractual right to sue for his.*

> "MR. DOWNS: I appreciate Mr. Van Dusen's comments. Again, I want to see if I understand this. Then he would not have a remedy of legally forcing the legislative body each year to set aside the appropriate amount, but when the money did come due this would be a *contractual right* for which he could sue a ministerial officer that could be mandamused or enjoined; is that correct?

> "MR. VAN DUSEN: Thats my understanding, Mr. Downs."

76

13-53846-tjt Doc 2257 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 389 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 83 of 156        388

1 Official Record, Constitutional Convention 1961, pp. 773-774.

*Id*. (emphasis added).

*Kosa* also offered an explanation for the origin of the provision. "To gain protection of their pension rights, Michigan teachers effectively lobbied for a constitutional amendment granting *contractual status* to retirement benefits." 408 Mich. at 360, 292 N.W.2d at 455 (emphasis added).

The *Kosa* court summarized the provision, again using contract language, as follows:

> To sum up, while the Legislature's constitutional *contractual obligation* is not to impair "accrued financial benefits", even if that obligation also related to the funding system, there would be no impairment of the *contractual obligation* because the substituted "entry age normal" system supports the benefit structure as strongly as the replaced "attained age" system.

*Id*., 408 Mich. at 373, 292 N.W.2d at 461(emphasis added).

> While counting such blessings as have come to them, public school employees are understandably still concerned about their pension security. In that regard, this opinion reminds the Legislature that the constitutional provision adopted by the people of this state is indeed a *solemn contractual obligation* between public employees and the Legislature guaranteeing that pension benefit payments cannot be constitutionally impaired.

*Id*., 408 Mich. at 382, 292 N.W.2d at 465 (emphasis added).

More recently, in *In re Constitutionality of 2011 PA 38*, 490 Mich. 295, 806 N.W.2d 683 (2011), the Michigan Supreme Court unequivocally stated, "The obvious intent of § 24, however, was to ensure that public pensions be treated as *contractual obligations* that, once earned, could not be diminished." *Id*. at 311, 806 NW.2d at 693 (emphasis added).

77

13-53846-tjt Doc 2267 Filed 12/05/13 Entered 12/05/13 16:06:05 Page 390 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:11:05 Page 34 of 152   389

That historical review begins to demonstrate the several reasons why the slight difference in the language that protects contracts and the language that protects pensions does not suggest that pensions were given any extraordinary protection:

**First**, the language of article IX, section 24, gives pension benefits the status of a "contractual obligation." The natural meaning of the words "contractual obligation" is certainly inconsistent with the greater protection for which the Plans now argue.

**Second**, if the Michigan Constitution were meant to give the kind of absolute protection for which the Plans argue, the language in the article IX, section 24 simply would not have referred to pension benefits as a "contractual obligation." It also would not have been constructed by simply copying the verb from the contracts clause - "impair" - and then adding a lesser verb -"diminish" in the disjunctive.

**Third**, linguistically, there is no functional difference in meaning between "impair" and "impair or diminish." There certainly is a preference, if not a mandate, to give meaning to every word in written law. In *Koontz v. Ameritech Servs., Inc.*, 466 Mich. 304, 312, 645 N.W.2d 34, 39 (2002), the Michigan Supreme Court summarized the familiar command, "Courts must give effect to every word, phrase, and clause in a statute, and must avoid an interpretation that would render any part of the statute surplusage or nugatory." The court went on to state, however, "we give undefined statutory terms their plain and ordinary meanings." *Id*.

Under *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999), discussed in more detail in Part IX A, below, this Court is bound by these commands of statutory interpretation that the Michigan Supreme Court embraced in *Koontz*. But if this Court gives these terms - "diminish" and "impair" - their plain and ordinary meanings, as *Koontz* requires, those meanings would not be substantively different from each other. The terms are not

synonyms, but they cannot honestly be given meanings so different as to compel the result that the Plans now seek. "Diminish" adds nothing material to "impair." All "diminishment" is "impairment." And, "impair" includes "diminish."

**Fourth**, the Plans' argument for a greater protection is inconsistent with the Michigan Supreme Court's interpretation of the constitutional language in *Kosa* and in *In re Constitutionality of 2011 PA 38*. Those cases also used contract language to describe the status of pensions. This is important because the Sixth Circuit has held that on questions of state law, this Court is bound to apply the holdings of the Michigan Supreme Court. *See Kirk v. Hanes Corp. of North Carolina*, 16 F.3d 705, 706 (6th Cir. 1994).

**Fifth**, an even greater narrative must be considered here, focusing on 1963. *Bekins* had long since determined that municipal bankruptcy was constitutional. That of course meant that even though states could not impair municipal contracts, federal courts could do that in a bankruptcy case. Indeed, Michigan law then allowed municipalities to file bankruptcy.[24]

It was within that framework of rights, expectations, scenarios and possibilities that the newly negotiated, proposed and ratified Michigan Constitution of 1963 explicitly gave accrued pension benefits the status of contractual obligations. That new constitution could have given pensions protection from impairment in bankruptcy in several ways. It could have simply prohibited Michigan municipalities from filing bankruptcy. It could have somehow created a

---

[24] See Public Act 72 of 1939, MCL § 141.201(1) (repealed by P.A. 70 of 1982) ("Any . . . instrumentality in this state as defined in [the Bankruptcy Act of 1898 and amendments thereto] . . . may proceed under the terms and conditions of such acts to secure a composition of its debts. . . . The governing authority of any such . . . instrumentality, or the officer, board or body having authority to levy taxes to meet the obligations to be affected by the plan of composition may file the petition and agree upon any plan of composition authorized by said act of congress[.]").

79

13-53846-tjr Doc 2197 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 392 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 86 of 156    391

property interest that bankruptcy would be required to respect under *Butner v. United States*, 440 U.S. 48, 99 S. Ct. 914 (1979) (holding that property issues in bankruptcy are determined according to state law). Or, it could have established some sort of a secured interest in the municipality's property. It could even have explicitly required the State to guaranty pension benefits. But it did none of those.

Instead, both the history from the constitutional convention, quoted above, and the language of the pension provision itself, make it clear that the only remedy for impairment of pensions is a claim for breach of contract.

Because under the Michigan Constitution, pension rights are contractual rights, they are subject to impairment in a federal bankruptcy proceeding. Moreover, when, as here, the state consents, that impairment does not violate the Tenth Amendment. Therefore, as applied in this case, chapter 9 is not unconstitutional.

Nevertheless, the Court is compelled to comment. No one should interpret this holding that pension rights are subject to impairment in this bankruptcy case to mean that the Court will necessarily confirm any plan of adjustment that impairs pensions. The Court emphasizes that it will not lightly or casually exercise the power under federal bankruptcy law to impair pensions. Before the Court confirms any plan that the City submits, the Court must find that the plan fully meets the requirements of 11 U.S.C. § 943(b) and the other applicable provisions of the bankruptcy code. Together, these provisions of law demand this Court's judicious legal and equitable consideration of the interests of the City and all of its creditors, as well as the laws of the State of Michigan.

## IX. Public Act 436 Does Not
## Violate the Michigan Constitution.

Section 109(c)(2) of the bankruptcy code requires that a municipality be "specifically authorized, in its capacity as a municipality or by name, to be a debtor under such chapter by State law, or by a governmental officer or organization empowered by State law to authorize such entity to be a debtor under such chapter." 11 U.S.C. § 109(c)(2). The evidence establishes that the City was authorized to file this case. The issue is whether that authorization was proper under the Michigan Constitution.

Section 18 of P.A. 436, M.C.L. § 141.1558, establishes the process for authorizing a municipality to file a case under chapter 9 of the bankruptcy code:

> (1) If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and the state treasurer that the local government be authorized to proceed under chapter 9. If the governor approves of the recommendation, the governor shall inform the state treasurer and the emergency manager in writing of the decision . . . . The governor may place contingencies on a local government in order to proceed under chapter 9. Upon receipt of written approval, the emergency manager is authorized to proceed under chapter 9. This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101 to 1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.

M.C.L. § 141.1558(1).

On July 16, 2013, Mr. Orr gave the governor and the treasurer his written recommendation that the City be authorized to file for chapter 9 relief. Ex. 28. On July 18, 2013, the governor approved this recommendation in writing. Ex. 29. Later that day, Mr. Orr

issued a written order directing the City to file this chapter 9 case. Ex. 30. Thus the City of Detroit's bankruptcy filing was authorized under state law.

Nevertheless, several objectors assert various arguments that the City of Detroit is not authorized to file this case.

First, several objectors argue that the authorization is not valid because P.A. 436, the statute establishing the underlying procedure for a municipality to obtain authority for filing, is unconstitutional. Broadly stated, these are the challenges to P.A. 436:

The Retired Detroit Police Members Association ("RDPMA") challenges the constitutionality of P.A. 436 on the grounds that it was enacted immediately after the referendum rejection of a similar statute, P.A. 4.

The RDPMA also asserts that P.A. 436 is unconstitutional on the grounds that the Michigan Legislature added an appropriation provision for the purpose of evading the peoples' constitutional right to referendum.

Several objectors argue that P.A. 436 is unconstitutional because it fails to protect pensions from impairment in bankruptcy.

AFSCME asserts that P.A. 436 is unconstitutional because it violates the "Strong Home Rule" provisions in the Michigan Constitution.

### A. The Michigan Case Law on Evaluating the Constitutionality of a State Statute.

The validity of P.A. 436 under the Michigan Constitution is a question of state law. Determining the several constitutional challenges to P.A. 436 requires this Court to apply state law. In *Meridian Mut. Ins. Co. v. Kellman*, 197 F.3d 1178, 1181 (6th Cir. 1999), the Sixth Circuit provided this guidance on determining state law:

82

13-53846-tjt   Doc 2307   Filed 12/10/13   Entered 12/10/13 16:06:05   Page 395 of 462
13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:11:05   Page 85 of 152   394

In construing questions of state law, the federal court must apply state law in accordance with the controlling decisions of the highest court of the state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 1188 (1938). If the state's highest court has not addressed the issue, the federal court must attempt to ascertain how that court would rule if it were faced with the issue. The Court may use the decisional law of the state's lower courts, other federal courts construing state law, restatements of law, law review commentaries, and other jurisdictions on the "majority" rule in making this determination. *Grantham & Mann v. American Safety Prods.*, 831 F.2d 596, 608 (6th Cir.1987). A federal court should not disregard the decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise. *Commissioner v. Estate of Bosch*, 387 U.S. 456, 465, 87 S. Ct. 1776, 1782, 18 L.Ed.2d 886 (1967).

Similarly, in *Demczyk v. Mut. Life Ins. Co. of N.Y.* (*In re Graham Square, Inc.*), 126 F.3d 823, 827 (6th Cir. 1997), the court stated, "Where the relevant state law is unsettled, we determine how we think the highest state court would rule if faced with the same case."

The Michigan Supreme Court has not ruled directly on the validity P.A. 436. As a result, this Court must attempt to ascertain how that court would rule if it were faced with the issue.

In *In re Request for Advisory Opinion Regarding Constitutionality of 2011 PA 38*, 490 Mich. 295, 307-8, 806 N.W.2d 683, 692 (2011), the Michigan Supreme Court summarized its decisions on evaluating a constitutional challenge to a state law:

"Statutes are presumed to be constitutional, and courts have a duty to construe a statute as constitutional unless its unconstitutionality is clearly apparent." *Taylor v. Gate Pharm.*, 468 Mich. 1, 6, 658 N.W.2d 127 (2003). "We exercise the power to declare a law unconstitutional with extreme caution, and we never exercise it where serious doubt exists with regard to the conflict." *Phillips v. Mirac, Inc.*, 470 Mich. 415, 422, 685 N.W.2d 174 (2004). "'Every reasonable presumption or intendment must be indulged in favor of the validity of an act, and it is only when invalidity appears so clearly as to leave no room for reasonable doubt that it violates some provision of the Constitution that a court will refuse to sustain its validity.'" *Id.* at 423, 685 N.W.2d 174, quoting *Cady v. Detroit*, 289 Mich. 499, 505, 286 N.W. 805 (1939). Therefore, "the burden of proving that a statute is unconstitutional rests with

83

13-53846-tjt Doc 2197 Filed 12/10/13 Entered 12/10/13 16:06:15 Page 90 of 162
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 90 of 162    395

the party challenging it[.]" *In re Request for Advisory Opinion Regarding Constitutionality of 2005 Pa. 71*, 479 Mich. 1, 11, 740 N.W.2d 444 (2007)[.]

This guidance, as well as the decisions of the Michigan Supreme Court on issues relating to the right to referendum, home rule, and the pension clause, will inform this Court's determinations on the objectors' challenges to P.A. 436.

### B. The Voters' Rejection of Public Act 4 Did Not Constitutionally Prohibit the Michigan Legislature from Enacting Public Act 436.

On March 16, 2011, the governor signed P.A. 4 into law. P.A. 4 repealed P.A. 72. However, the voters rejected P.A. 4 by referendum in the November 6, 2012 election. Shortly after that election, on December 26, 2012, the governor signed P.A. 436 into law. It took effect on March 28, 2013.

The RDPMA argues that P.A. 436 is unconstitutional because it is essentially a reenactment of P.A. 4. The City and the State of Michigan assert that there are several differences between P.A. 436 and P.A. 4, such that they are not the same law.

The right of referendum is established in article 2, section 9 of the Michigan Constitution, which provides:

> Sec. 9. The people reserve to themselves the power to propose laws and to enact and reject laws, called the initiative, and the power to approve or reject laws enacted by the legislature, called the referendum. The power of initiative extends only to laws which the legislature may enact under this constitution. The power of referendum does not extend to acts making appropriations for state institutions or to meet deficiencies in state funds and must be invoked in the manner prescribed by law within 90 days following the final adjournment of the legislative session at which the law was enacted. To invoke the initiative or referendum, petitions signed by a number of registered electors, not less than eight percent for initiative and five percent for referendum of the total vote cast for all candidates for governor at the last preceding general election at which a governor was elected shall be required.

84

13-53846-tjt Doc 2337 Filed 12/10/13 Entered 12/10/13 06:16:05 Page 397 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 91 of 152    396

Referendum, approval

No law as to which the power of referendum properly has been invoked shall be effective thereafter unless approved by a majority of the electors voting thereon at the next general election.

Mich. Const. art. II, § 9.

In *Reynolds v. Bureau of State Lottery*, 240 Mich. App. 84, 610 N.W.2d 597 (2000), the Michigan Court of Appeals considered the power of the legislature to reenact a law while a referendum process regarding that law was pending. The court explained:

[N]othing in the Michigan Constitution suggests that the referendum had a broader effect than nullification of [the 1994 act]. We cannot read into our constitution a general "preemption of the field" that would prevent further legislative action on the issues raised by the referendum. The Legislature remained in full possession of all its other ordinary constitutional powers, including legislative power over the subject matter addressed in [the 1994 act].

*Reynolds*, 240 Mich. App. at 97, 610 N.W.2d at 604-05.

This Michigan Court of Appeals decision strongly suggests that the referendum rejection of P.A. 4 did not prohibit the Michigan legislature from enacting P.A. 436, even though P.A. 436 addressed the same subject matter as P.A. 4 and contained very few changes.

As noted above, the Sixth Circuit has instructed, "A federal court should not disregard the decisions of intermediate appellate state courts unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Meridian Mut. Ins. Co.*, 197 F.3d at 1181. No data, let alone any persuasive data, suggests that the Michigan Supreme Court would decide this issue otherwise. Accordingly, the RDPMA's challenge on this ground must be rejected.

85

13-53846-tjt Doc 2257 Filed 12/10/13 Entered 12/10/13 16:06:10 Page 392 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 92 of 162    397

### C. Even If the Michigan Legislature Did Include Appropriations Provisions in Public Act 436 to Evade the Constitutional Right of Referendum, It Is Not Unconstitutional.

The RDPMA also contends that P.A. 436 is unconstitutional because the Michigan legislature included appropriations provisions in P.A. 436 for the sole purpose of shielding the Act from referendum. Section 34 of P.A. 436 appropriates $780,000 for 2013 to pay the salaries of emergency managers. Section 35 of P.A. 436 appropriates $5,000,000 for 2013 to pay professionals hired to assist emergency managers.

There certainly was some credible evidence in support of the RDPMA's assertion that the appropriations provisions in P.A. 436 were motivated by a desire to immunize it from referendum. For example, Howard Ryan testified in his deposition on October 14, 2013:

> Q. I'd just like to ask a follow-up to a question counsel asked you. You said that the appropriation language was put in the - early on in the process; is that correct?
> A. Yes.
> Q. Based on your conversations with the people at the time, was it your understanding that one or more of the reasons to put the appropriation language in there was to make sure that it could not - the new act could not be defeated by a referendum?
> A. Yes.
> Q. And where did you get that knowledge from?
> A. Well, having watched the entire process unfold over the past two years.
> Q. The Governor's office knew that that was the point of it?
> A. Yes.
> Q. That your department knew that that was the point of it?
> A. Yes.
> Q. The legislators you were dealing with knew that that was the point of it?
> A. Yes.

86

13-53846-tjt   Doc 2307   Filed 12/10/13   Entered 12/10/13 16:06:40   Page 399 of 462
13-53846-swr   Doc 1945   Filed 12/05/13   Entered 12/05/13 14:31:05   Page 93 of 150          398

Howard Dep. Tr. 46:1-23, Oc. 14, 2013.[25]

Other evidence in support includes: a January 31, 2013 e-mail addressed from Mr. Orr to partners at Jones Day, in which he observed that P.A. 436 "is a clear end-around the prior initiative" to repeal the previous Emergency Manager statute, Public Act 4, "that was rejected by the voters in November." Ex. 403 (Dkt. #509-3) According to Mr. Orr "although the new law provides the thin veneer of a revsion (sic) it is essentially a redo of the prior rejected law and appears to merely adopt the conditions necessary for a chapter 9 filing." Ex. 403. (Dkt. #509-3)

There are, however, several difficulties with the RDPMA's argument.

The Court must conclude that the Michigan Supreme Court would not, if faced with this issue, hold that P.A. 436 is unconstitutional. In *Michigan United Conservation Clubs v. Secretary of State*, 464 Mich. 359, 367, 630 N.W.2d 297, 298 (2001), that court concisely held that a public act with an appropriations provision is not subject to referendum, regardless of motive. Concurring, Chief Justice Corrigan added that even if the motive of a legislative body could be discerned as opposed to the motives of individual legislators, "This Court has repeatedly held that courts must not be concerned with the alleged motives of a legislative body in enacting a law, but only with the end result—the actual language of the legislation." *Id*. at 367.

Similarly, in *Houston v. Governor*, 491 Mich. 876, 877, 810 N.W.2d 255, 256 (2012), the Michigan Supreme Court stated, "[T]his Court possesses no special capacity, and there are no legal standards, by which to assess the political propriety of actions undertaken by the legislative

---

[25] The parties agreed to use Ryan's deposition testimony in lieu of live testimony. However, in the pre-trial order the City had objected to this portion of testimony on the grounds of speculation, hearsay, format and foundation. (Dkt. #1647 at 118) Those objections are overruled.

87

13-53846-tjt Doc 2337 Filed 12/05/13 Entered 12/05/13 06:16:05 Page 400 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 94 of 156    399

branch. Instead, it is the responsibility of the democratic, and representative, processes of government to check what the people may view as political or partisan excess by their Legislature."

In *People v. Gibbs*, 186 Mich. 127, 134-35, 152 N.W. 1053, 1055 (1915), the Michigan Supreme Court stated, "Courts are not concerned with the motives which actuate the members of the legislative body in enacting a law, but in the results of their action. Bad motives might inspire a law which appeared on its face and proved valid and beneficial, while a bad and invalid law might be, and sometimes is, passed with good intent and the best of motives." S*ee also Kuhn v. Dep't of Treasury*, 384 Mich. 378, 383-84, 183 N.W.2d 796, 799 (1971).

Finally, it must also be noted that on November 8, 2013, the Sixth Circuit vacated pending rehearing *en banc* the decision on which the RDPMA heavily relies. *City of Pontiac Retired Employees Assoc. v. Schimmel*, 726 F.3d 767 (6th Cir. 2013).

Accordingly, the Court concludes that P.A. 436 is not unconstitutional as a violation of the right to referendum in article II, section 9 of the Michigan Constitution.

### D. Public Act 436 Does Not Violate the Home Rule Provisions of the Michigan Constitution.

Certain objectors argue that P.A. 436 violates Article VII, Section 22 of the Michigan Constitution, which states:

> Under general laws the electors of each city and village shall have the power and authority to frame, adopt and amend its charter, and to amend an existing charter of the city or village heretofore granted or enacted by the legislature for the government of the city or village. Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, subject to the constitution and law. No enumeration of powers granted to cities and villages in this constitution shall limit or restrict the general grant of authority conferred by this section.

88

13-53846-tjt Doc 2307 Filed 12/04/13 Entered 12/05/13 06:16:05 Page 401 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 95 of 152     400

The argument is that the appointment of an emergency manager for a municipality under P.A. 436 is inconsistent with the right of the electors to adopt and amend the City charter and the city's right to adopt ordinances. AFSCME asserts that "Michigan is strongly committed to the concept of home rule[.]" AFSCME Amended Objection at 75-91. (Dkt. #1156) "This 'strong home rule' regime reflects a bedrock principle of state law, . . . all officers of cities are to 'be elected by the electors thereof, or appointed by such authorities thereof' not by the central State Government." *Id.* (citing *Brouwer v. Bronkema*, 377 Mich. 616, 141 N.W.2d 98 (1966)). AFSCME further asserts that in authorizing the appointment of an emergency manager with broad powers that usurp the powers of elected officials, "PA 436 offends the 'strong home rule' of Detroit and that the Emergency Manager is not lawfully authorized to file for bankruptcy on behalf of the City or to act as its representative during chapter 9 proceedings." AFSCME Amended Objection at 75-91. (Dkt. #1156)

AFSCME's argument fails for the simple reason that the broad authority the Michigan Constitution grants to municipalities is subject to constitutional and statutory limits. This constitutional provision itself embodies that principle. It states, "Each such city and village shall have power to adopt resolutions and ordinances relating to its municipal concerns, property and government, *subject to the constitution and law*." Mich. Const. art. VII, § 22 (emphasis added).

State law recognizes the same limitation on local government authority:

> Each city may in its charter provide:
>
> (3) Municipal powers. For the exercise of all municipal powers in the management and control of municipal property and in the administration of the municipal government, whether such powers be expressly enumerated or not; for any act to advance the interests of the city, the good government and prosperity of the municipality and its inhabitants and through its regularly constituted authority to pass all laws and ordinances relating to its municipal concerns *subject to the constitution and general laws of this state*.

89

13-53846-tjt Doc 2307 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 402 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 96 of 156    401

M.C.L. § 117.4j(3) (emphasis added).

Similarly, M.C.L. § 117.36, states, "No provision of any city charter shall conflict with or contravene the provisions of any general law of the state."

Indeed, § 1-102 of the Charter of the City of Detroit states: "The City has the comprehensive home rule power conferred upon it by the Michigan Constitution, *subject only to the limitations on the exercise of that power contained in the Constitution or this Charter or imposed by statute.*" *Id.* (emphasis added). *See Detroit City Council v. Mayor of Detroit*, 283 Mich. App. 442, 453, 770 N.W.2d 117, 124 (Mich. Ct. App. 2009) ("The charter itself thus recognizes that it is subject to limitations imposed by statute.").

"Municipal corporations have no inherent power. They are created by the state and derive their authority from the state." *Bivens v. Grand Rapids*, 443 Mich. 391, 397, 505 N.W.2d 239, 241 (1993).

The Michigan case law establishes that the powers granted to municipalities by the "home rule" sections of the Michigan Constitution are subject to the limits of the power and authority of the State to create laws of general concern. *Brimmer v. Village of Elk Rapids*, 365 Mich. 6, 13, 112 N.W.2d 222, 225 (1961).

> "Municipal corporations are state agencies, and, subject to constitutional restrictions, the Legislature may modify the corporate charters of municipal corporations at will. 12 C.J. [p.] 1031. Powers are granted to them as state agencies to carry on local government. The state still has authority to amend their charters and enlarge or diminish their powers." [1] Cooley, Const. Lim. (8th Ed.), [p.] 393. * * * Its powers are plenary.

*City of Hazel Park v. Mun. Fin. Comm'n*, 317 Mich. 582, 599-600, 27 N.W.2d 106, 113-14 (1947).

> The Home Rule provision of the constitution does not deprive the legislature of its power to enact laws affecting municipalities operation under that provision except as to matters of purely local

concern. . . . *The right to pass general laws is still reserved to the l[e]gislature of the state*, and consequently it is still competent for the state through the law making body to enact measures pursuant to the police power or pursuant to other general powers inherent in the state and to require municipalities to observe the same.

*Local Union No. 876, Int'l Bhd. of Elec. Workers v. State of Mich. Labor Mediation Bd.*, 294 Mich. 629, 635-36, 293 N.W. 809, 811 (1940) (emphasis added). *See also Mack v. City of Detroit*, 467 Mich. 186, 194, 649 N.W.2d 47, 52 (2002); *American Axle & Mfg., Inc. v. City of Hamtramck*, 461 Mich. 352, 377, 604 N.W.2d 330, 342 (2000) (In *Harsha we held that* "the legislature might modify the charters of municipal corporations at will and that the State still retained authority to amend charters and enlarge and diminish their powers."); *Board of Trustees of Policemen & Firemen Retirement System v. City of Detroit*, 143 Mich. App. 651, 655, 373 N.W.2d 173, 175 (Mich. Ct. App. 1985) ("Where a city charter provision conflicts with general statutory law, the statute controls in all matters which are not of purely local character."); *Oakland Cnty. Board of Cnty. Road Comm'rs v. Mich. Prop. & Cas. Guar. Ass'n*, 456 Mich. 590, 609, 575 N.W.2d 751, 760 (1998) ("Like a municipal corporation, the road commission's existence is entirely dependent on the legislation that created it, and the Legislature that may also destroy it.").

AFSCME asserts that P.A. 436 is a "local law" because it gives the emergency manager broad authority to pass local legislation, and that therefore it violates article IV, section 29 of the Michigan Constitution. That section provides, in pertinent part, "The legislature shall pass no local or special act in any case where a general act can be made applicable[.]"

One plain difficulty with this argument is that this provision of the Michigan Constitution constrains the Michigan Legislature, not the emergency manager.

In defining a general law, the Michigan Supreme Court has stated, "'A general law is one which includes all persons, classes and property similarly situated and which come within its

91

13-53846-tjt Doc 2297 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 404 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 93 of 152    403

limitations.'" *Am. Axle & Mfg., Inc. v. City of Hamtramck*, 461 Mich. 352, 359 n.5, 604 N.W.2d 330, 334 (2000) (citing *Tribbett v. Village of Marcellus*, 294 Mich. 607, 618, 293 N.W. 872 (1940), quoting *Punke v. Village of Elliott*, 364 Ill. 604, 608-9, 5 N.E.2d 389, 393 (1936)).

Clearly, P.A. 436 is a general law, potentially applicable to all municipalities similarly situated within the State of Michigan. According to its preamble, its purposes are: "to safeguard and assure the financial accountability of local units of government and school districts; to preserve the capacity of local units of government and school districts to provide or cause to be provided necessary services essential to the public health, safety and welfare[.]"

Accordingly, the Court finds that P.A. 436 does not violate the home rule provisions of the Michigan Constitution.

### E. Public Act 436 Does Not Violate the Pension Clause of the Michigan Constitution.

Many objectors argue that the bankruptcy authorization section of P.A. 436, M.C.L. § 141.1558, does not conform to the requirements of the pension clause of the Michigan Constitution and is therefore unconstitutional. Accordingly, the objectors argue that P.A. 436 cannot provide the basis for authorization as required by 11 U.S.C. § 109(c)(2).

As noted, the premise of this argument is that under the Michigan constitution, pension benefits are entitled to greater protection than contract claims. That premise, however, is, the same as the premise of the argument that chapter 9 is unconstitutional as applied in this case.

In Part VIII C 5 b, above, the Court rejected this argument, concluding that pension benefits are a contractual obligation of the municipality.

It follows that if a state consents to a municipal bankruptcy, no state law can protect contractual pension rights from impairment in bankruptcy, just as no law could protect any other types of contract rights. Accordingly, the failure of P.A. 436 to protect pension rights in a

92

13-53846-tjt Doc 2197 Filed 12/10/13 Entered 12/10/13 16:06:05 Page 405 of 462
13-53846-swr Doc 1945 Filed 12/05/13 Entered 12/05/13 14:31:05 Page 95 of 152     404

municipal bankruptcy does not make that law inconsistent with the pension clause of the Michigan Constitution any more than the failure of P.A. 436 to protect, for example, bond debt in bankruptcy is inconsistent with the contracts clause of the Michigan Constitution. For this purpose, the parallel is perfect.

Stated another way, state law cannot reorder the distributional priorities of the bankruptcy code. If the state consents to a municipal bankruptcy, it consents to the application of chapter 9 of the bankruptcy code. This point was driven home in the *Stockton* case:

> A state cannot rely on the § 903 reservation of state power to condition or to qualify, i.e. to "cherry pick," the application of the Bankruptcy Code provisions that apply in chapter 9 cases after such a case has been filed. *Mission Indep. School Dist. v. Texas*, 116 F.2d 175, 176–78 (5th Cir. 1940) (chapter IX); *Vallejo*, 403 B.R. at 75–76; *In re City of Stockton*, 475 B.R. 720, 727–29 (Bankr. E.D. Cal. 2012) ("*Stockton I*"); *In re Cnty. of Orange*, 191 B.R. 1005, 1021 (Bankr. C.D. Cal. 1996).

> While a state may control prerequisites for consenting to permit one of its municipalities (which is an arm of the state cloaked in the state's sovereignty) to file a chapter 9 case, it cannot revise chapter 9. *Stockton I*, 475 B.R. at 727–29. *For example, it cannot immunize bond debt held by the state from impairment. Mission Indep. School Dist.*, 116 F.2d at 176–78.

478 B.R. at 16-17 (emphasis added).

For these reasons, the Court concludes that P.A. 436 does not violate the pension clause of the Michigan Constitution.

## X. Detroit's Emergency Manager Had Valid Authority to File This Bankruptcy Case Even Though He Is Not an Elected Official.

AFSCME and most of the individual objectors argue that the emergency manager did not have valid authority to file this bankruptcy case because he is not an elected official. The Court concludes that this argument is similar to, or the same as, the argument that AFSCME made that P.A. 436 violates the home rule provisions of the Michigan Constitution. See Part IX D above.

Accordingly, for the reasons stated in that Part, AFSCME's argument on this point is rejected. The Court concludes that the emergency manager's authorization to file this bankruptcy case under P.A. 436 was valid under the Michigan Constitution, even though he was not an elected official.

## XI. The Governor's Authorization to File This Bankruptcy Case Was Valid Under the Michigan Constitution Even Though the Authorization Did Not Prohibit the City from Impairing Pension Rights.

P.A. 436 permits the governor to "place contingencies on a local government in order to proceed under chapter 9." M.C.L. § 141.1558(1). The governor did not place any contingencies on the bankruptcy filing in this case. Ex. 29 at 4. The governor's letter did, however, state "Federal law already contains the most important contingency – a requirement that the plan be legally executable." Ex. 29 at 4.

Several of the objectors argue that the pension clause of the Michigan Constitution, article IX, section 24, obligated the governor to include a condition in his authorization that would prohibit the City from impairing pension benefits in this bankruptcy case.

In Part IX E, above, the Court concluded that any such contingency in the law itself would be ineffective and potentially invalid. For the same reason, any such contingency in the governor's authorization letter would have been invalid, and may have rendered the authorization itself invalid under 11 U.S.C. § 109(c).

Accordingly, this objection is overruled. The Court concludes that the governor's authorization to file this bankruptcy case under P.A. 436 was valid under the Michigan Constitution.

94

13-53846-swr   Doc 2975   Filed 12/10/13   Entered 12/10/13 16:06:14   Page 407 of 462
13-53846-tjt   Doc 2975   Filed 12/05/13   Entered 12/05/13 14:01:05   Page 101 of 130   406

### XII. The Judgment in *Webster v. Michigan* Does Not Preclude the City from Asserting That the Governor's Authorization to File This Bankruptcy Case Was Valid.

#### A. The Circumstances Leading to the Judgment

On July 3, 2013, Gracie Webster and Veronica Thomas filed a complaint against the State of Michigan, Governor Snyder and Treasurer Dillon in the Ingham County Circuit Court. They sought a declaratory judgment that P.A. 436 is unconstitutional because it permits accrued pension benefits to be diminished or impaired in violation of article IX, section 24 of the Michigan Constitution. (Dkt. #1219) The complaint also sought a preliminary and permanent injunction enjoining Governor Snyder and State Treasurer Dillon from authorizing the Detroit emergency manager to commence proceedings under chapter 9 of the bankruptcy code.

On Thursday, July 18, 2013, the state court held a hearing, apparently jointly on a similar complaint filed by the General Retirement System of the City of Detroit. According to the transcript of the hearing, it began at 4:15 p.m. Case No.13-734-CZ, Hrg Tr. 4:2, July 18, 2013. (Dkt. #1219-9) Almost immediately, counsel for the plaintiffs advised the court that the City had already filed its bankruptcy case. Hrg Tr. 6:2-9. (It was filed at 4:06 p.m. on that day.) As a result, counsel asked for an expedited process. Hrg Tr. 7:8-18. The court responded, "I plan on making a ruling Monday. I could make a ruling tomorrow, if push came to shove, but Monday probably would be soon enough. I am confident that the bankruptcy court won't act as quickly as I will." Hrg Tr. 7:23-8:2.

The plaintiff's attorneys then asked that the hearing on their request for a preliminary injunction be advanced from the following Monday, which is when it had been set. Hrg Tr. 8:13-22. Counsel observed that it had been briefed by both sides. Hrg Tr. 9:1-10. After the Court confirmed through its law clerk that in fact the bankruptcy case had been filed, Hrg Tr.10:9-10, counsel asked to amend its requested relief so that the governor and the emergency

manager would be enjoined from taking any further action in the bankruptcy proceeding. Hrg Tr. 10:11-17. The court responded, "Granted, as to all your requests. How soon are you going to present me with an order?" Case No.13-734-CZ, Hrg Tr. 11:1-4, July 18, 2013. (Dkt. #1219-9).

At this point, it must be observed that the judge granted this extraordinary relief with no findings and without giving the state's representative any opportunity to be heard.

In any event, the plaintiffs' counsel then used a previously prepared proposed order in the case that the General Retirement System filed and modified it extensively in handwriting, most of which was legible, to change the parties, the case number, and the ordering provisions. Case No.13-734-CZ, Hrg Tr.15:7-15, July 18, 2013. (Dkt. #1219-9) It states that it was signed at 4:25 p.m., which was 10 minutes after the hearing began. Case No.13-734-CZ, Hrg Tr. 17:4-5, July 18, 2013. (Dkt. #1219-9)

A further hearing was held the next day, beginning at 11:25 a.m., on the plaintiffs' request to amend the order of the previous afternoon. Case No.13-734-CZ, Hrg Tr. 4:2, July 19, 2013. (Dkt. #1219-10) The plaintiffs' counsel had also filed a motion that morning for a declaratory judgment and asked the court to consider it. Hrg Tr.8:2-13 The state's attorney then agreed to allow the court to consider it. Hrg Tr. 8:24-25. The judge then addressed the parties. This portion of the transcript is quoted at length here because it is necessary to demonstrate an important point in section B, below, concerning Congress' purpose in granting exclusive jurisdiction to the bankruptcy court over all issues that concern the validity of a bankruptcy filing:

> You know what we're doing? We are under siege here. Well, we aren't; I'm not. Technically I am through paper, but all of you are. Detroit is. The State is. So I'm not going to go through the usual court rules and the time and all of that. You are all going to

spend your weekend doing what lawyers do, and that's a lot of homework because we're going to have that hearing Monday unless you're asking me to do it now.

I'm going to hear everything because we're not going to piecemeal this. You all know the case. I know the case: I've done the homework. I don't think myself or my staff got any sleep last night. We've been doing research. I bet if I called all of your wives and asked if you got any sleep, they'd be saying, "No. When is my husband going to get some sleep," right? So we're going to have a hearing, and I don't care if it's today or Monday. I'll come here Saturday, if you would like. I don't care. Let's get some answers, let's get a bottom line, and let's get this moving to the Court of Appeals because that's where you all are headed. I don't care what side you're on. Someone is going up, right? So I have answers for you. Tell me your story. I've got the solution. You might not like it.

Can we move on?

Case No.13-734-CZ, Hrg Tr. 11:7-12:5, July 19, 2013. (Dkt. #1219-10)

The attorneys then agreed and argued the merits. The judge then stated her decision to grant the declaratory relief that the plaintiffs requested. Case No.13-734-CZ, Hrg Tr.33:18-35:19, July 19, 2013. (Dkt. #1219-10)

Later that day, the court entered an "Order of Declaratory Relief." This is the judgment on which the objecting parties rely in asserting their preclusion argument. The judgment is quoted at length here to demonstrate both its scope and its intended impact on this bankruptcy case:

IT IS HEREBY ORDERED:

PA 436 is unconstitutional and in violation of Article IX Section 24 of the Michigan Constitution to the extent that it permits the Governor to authorize an emergency manager to proceed under Chapter 9 in any manner which threatens to diminish or impair accrued pension benefits; and PA 436 is to that extent of no force or effect;

The Governor is prohibited by Article IX Section 24 of the Michigan Constitution from authorizing an emergency manager

under PA 436 to proceed under Chapter 9 in a manner which threatens to diminish or impair accrued pension benefits, and any such action by the Governor is without authority and in violation of Article IX Section 24 of the Michigan Constitution.

On July 16, 2013, City of Detroit Emergency Manager Kevyn Orr submitted a recommendation to Defendant Governor Snyder and Defendant Treasurer Dillon pursuant to Section 18(1) of PA 436 to proceed under Chapter 9, which together with the facts presented in Plaintiffs' filings, reflect that Emergency Manager Orr intended to diminish or impair accrued pension benefits if he were authorized to proceed under Chapter 9. On July 18, 2013, Defendant Governor Snyder approved the Emergency Manager's recommendation without placing any contingencies on a Chapter 9 filing by the Emergency Manager; and the Emergency Manager filed a Chapter 9 petition shortly thereafter. By authorizing the Emergency Manager to proceed under Chapter 9 to diminish or impair accrued pension benefits, Defendant Snyder acted without authority under Michigan law and in violation of Article IX Section 24 of the Michigan Constitution.

In order to rectify his unauthorized and unconstitutional actions described above, the Governor must (1) direct the Emergency Manager to immediately withdraw the Chapter 9 petition filed on July 18, and (2) not authorize any further Chapter 9 filing which threatens to diminish or impair accrued pension benefits.

A copy of this Order shall be transmitted to President Obama.[26]

Order of Declaratory Judgment, *Webster v. State of Michigan*, No. 13-734-CZ (July 19, 2013).

(Dkt. #1219-8)

In their eligibility objections in this case, several of the objectors assert that this judgment

is binding upon the City under the principles of *res judicata* or collateral estoppel. Specifically,

they contend that this judgment precludes the City from asserting that P.A. 436 is constitutional

and that the governor properly authorized this bankruptcy filing. In the alternative, these parties

---

[26] The order had been prepared by plaintiffs' counsel before the hearing and was provided to the judge at its conclusion. However, this last sentence of the judgment was handwritten, apparently by the judge herself.

assert that the judgment is at least a persuasive indication of what the Michigan Supreme Court would hold on the issue of the constitutionality of P.A. 436.

The Court concludes that it is neither.

### B. The Judgment Is Void Because It Was Entered After the City Filed Its Petition.

There is a fundamental reason to deny the declaratory judgment any preclusive effect in this bankruptcy case.

Upon the City's bankruptcy filing, federal law - specifically, 28 U.S.C. § 1334(a) - gave this Court exclusive jurisdiction to determine all issues relating to the City's eligibility to be a chapter 9 debtor. That provision states, "[T]he district courts shall have original and exclusive jurisdiction of all cases under title 11." 28 U.S.C. § 1334(a). The Sixth Circuit has explained:

> Several factors highlight the exclusively federal nature of bankruptcy proceedings. The Constitution grants Congress the authority to establish "uniform Laws on the subject of Bankruptcies." U.S. Const. art. I, § 8. Congress has wielded this power by creating comprehensive regulations on the subject and by vesting exclusive jurisdiction over bankruptcy matters in the federal district courts.

*Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 425 (6th Cir. 2000). The court went on to quote this from *MSR Exploration, Ltd. v. Meridian Oil, Inc.*, 74 F.3d 910, 914 (9th Cir.1996):

> [A] mere browse through the complex, detailed, and comprehensive provisions of the lengthy Bankruptcy Code, 11 U.S.C. §§ 101 et seq., demonstrates Congress's intent to create a whole system under federal control which is designed to bring together and adjust all of the rights and duties of creditors and embarrassed debtors alike.

*Pertuso*, 233 F.3d at 417.

The wisdom of this grant of exclusive jurisdiction lies in the absolute necessity that any bankruptcy petition be filed, considered, and adjudicated in one court. Foreclosing the

opportunity for parties to litigate a bankruptcy petition in multiple courts eliminates the likely consequence of a confused and chaotic race to judgment, and of the associated multiplication of expenses. It also eliminates the potential for inconsistent outcomes.

Indeed, the necessity to prohibit such collateral attacks on a bankruptcy petition is grounded in the uniformity requirement of Article 1, Section 8 of the United States Constitution, as the Ninth Circuit has observed:

> Filings of bankruptcy petitions are a matter of exclusive federal jurisdiction. State courts are not authorized to determine whether a person's claim for relief under a federal law, in a federal court, and within that court's exclusive jurisdiction, is an appropriate one. Such an exercise of authority would be inconsistent with and subvert the exclusive jurisdiction of the federal courts by allowing state courts to create their own standards as to when persons may properly seek relief in cases Congress has specifically precluded those courts from adjudicating. . . . *The ability collaterally to attack bankruptcy petitions in the state courts would also threaten the uniformity of federal bankruptcy law, a uniformity required by the Constitution.*

*Gonzales v. Parks*, 830 F.2d 1033, 1035 (9th Cir. 1987) (emphasis added). The Ninth Circuit continued, "A Congressional grant of exclusive jurisdiction to the federal courts includes the implied power to protect that grant." *Id.* at 1036. "A state court judgment entered in a case that falls within the federal courts' exclusive jurisdiction is subject to collateral attack in the federal courts." *Id.*

The Court recognizes that Congress has granted to other courts concurrent jurisdiction over certain proceedings related to the bankruptcy case. 28 U.S.C. § 1334(b) provides, "[T]he district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." However, it is not argued that this subsection applies here, and for good reason. It does not. Referring to 28 U.S.C. § 1334(b), the Ninth Circuit stated in *Gruntz v. Cnty. of Los Angeles* (*In re Gruntz*) 202 F.3d 1074, 1083 (9th

Cir. 2000) (en banc), "[N]othing in that section vests the states with any jurisdiction over a core bankruptcy proceeding[.]"

Indeed, 28 U.S.C. § 1334(b) only demonstrates that Congress knew precisely how to draw the line between those matters that should be within the exclusive jurisdiction of the federal bankruptcy court and those matters over which the jurisdiction could be shared. By denying effect to the Ingham County Circuit Court judgment in this case, this Court is enforcing that line.

The Court therefore concludes that upon the filing of this case at 4:06 p.m. on July 18, 2013, the Ingham County Circuit Court lost the jurisdiction to enter any order or to determine any issue pertaining to the City's eligibility to be a chapter 9 debtor.

The Sixth Circuit has held that a state court judgment entered without jurisdiction is void *ab initio*. *Twin City Fire Ins. Co. v. Adkins*, 400 F.3d 293, 299 (6th Cir. 2005) ("Where a federal court finds that a state-court decision was rendered in the absence of subject matter jurisdiction or tainted by due process violations, it may declare the state court's judgment void *ab initio* and refuse to give the decision effect in the federal proceeding.")

Accordingly, the state court's "Order of Declaratory Judgment" on which the objectors rely here is therefore void and of no effect, and does not preclude the City from asserting its eligibility in this Court in this case.

## C. The Judgment Is Also Void Because It Violated the Automatic Stay.

11 U.S.C. § 362(a)(3) provides that "a petition filed under section 301 . . . operates as a stay, applicable to all entities, of . . . any act . . . to exercise control over property of the estate[.]" 11 U.S.C. § 902(1) states, "In this chapter 'property of the estate', when used in a section that is made applicable in a case under this chapter by section 103(e) or 901 of this title, means property of the debtor[.]"

101

13-53846-swr   Doc 2047   Filed 12/10/13   Entered 12/10/13 14:01:05   Page 414 of 462
13-53846-tjt   Doc 2975   Filed 12/05/13   Entered 12/05/13 16:06:46   Page 104 of 403   413

The Sixth Circuit has held, "[A]n action taken against a nondebtor which would inevitably have an adverse impact upon the property of the estate must be barred by the [§ 362(a)(3)] automatic stay provision." *Amedisys, Inc. v. Nat'l Century Fin. Enters., Inc.* (*In re Nat'l Century Fin. Enters., Inc.*), 423 F.3d 567, 578 (6th Cir. 2005) (quoting *Licensing by Paolo, Inc. v. Sinatra* (*In re Gucci*), 126 F.3d 380, 392 (2d Cir. 1997). *See also Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993).

The thrust of the plaintiffs' case in *Webster v. Michigan* was to protect the plaintiffs' pension rights by prohibiting a bankruptcy case which might allow the City to use its property in a way that might impair pensions. It does not matter that neither the City nor its officers were defendants. The suit was clearly an act to exercise control over the City's property. Accordingly, it was stayed under 11 U.S.C. § 362(a)(3) and the state court's "Order of Declaratory Relief" was entered in violation of the stay. [27]

In *Easley v. Pettibone Mich. Corp.*, 990 F.2d 905, 911 (6th Cir. 1993), the court stated, "In summary, we hold that actions taken in violation of the stay are invalid and voidable and shall be voided absent limited equitable circumstances."

---

[27] The Retirement Systems argue that there was no bankruptcy stay applicable to the state court litigation until July 25, 2013 when this Court entered an order extending the automatic stay to certain state officers. That order specifically included these state court cases as examples of cases that were included in the extended stay. Retirement Systems Br. at 51. (Dkt. #519)

That order, however, did not preclude the City from arguing later that the stay of 11 U.S.C. § 362(a)(3) applied as of the bankruptcy filing. Indeed, at the hearing on the motions that resulted in these orders, the Court expressly stated: "The Court is not ruling on whether any orders entered by the state court after this bankruptcy case was filed violated the automatic stay." Hrg. Tr. 84:10-16, July 24, 2013. (Dkt. #188)

That issue is now squarely before the Court. For the reasons stated in the text, the Court concludes that the automatic stay of § 362(a)(3) was applicable to the Flowers, Webster and General Retirement Systems state court cases from the moment the City filed its bankruptcy petition.

In this case, no equitable circumstances suggest any reason to find that the state court's order should not be voided. Instead, equitable circumstances suggest that it should be voided. When the plaintiffs' counsel appeared in the state court on July 18 and 19, 2013, they knew that the City had filed its bankruptcy petition, as did the judge. The record of those proceedings establishes beyond doubt that the proceedings were rushed in order to achieve a prompt dismissal of the bankruptcy case. The protection that the stay of 11 U.S.C. § 362(a) affords is for the benefit of both the debtor and all creditors. *St. Paul Fire & Marine Ins. Co. v. Labuzan*, 579 F.3d 533, 541 (5th Cir. 2009); *Johnson v. Smith* (*In re Johnson*), 575 F.3d 1079, 1083 (10th Cir. 2009). Condoning the actions that the plaintiffs took in this case would open the floodgates to similar actions by creditors in other bankruptcy cases and thereby vitiate that important protection.

Accordingly, the Court concludes that the judgment in *Webster* is void because its entry violated the automatic stay of 11 U.S.C. § 362(a)(3) and no equitable circumstances suggest that it should not be voided. For this additional reason, that judgment does not preclude the City from asserting its eligibility in this Court in this case.

### D. Other Issues

The City disputes the application of *res judicata* and collateral estoppel on several other grounds. Specifically, it contends that the two hearings that resulted in the *Webster* judgment were confused and hurried. It also disputes whether the State was given a full and fair opportunity to be heard, and whether the judgment is binding on it, as it was not a party to the suit.

The Court concludes that in light of its conclusions that the state court lacked jurisdiction and that its judgment is void, it is unnecessary to decide these issues.

103

13-53846-swr   Doc 2975   Filed 12/10/13   Entered 12/10/13 16:06:46   Page 416 of 462
13-53846-swr   Doc 2975   Filed 12/05/13   Entered 12/05/13 14:01:05   Page 416 of 463   415

Nevertheless, the Court does comment that the transcripts of the two post-petition state court hearings on July 18 and 19, 2013 reflect a very chaotic and disorderly "race to judgment." (Dkt. #1219-9; Dkt. #1219-10)  Those proceedings are perfect examples of the very kind of litigation the Congressional grant of exclusive jurisdiction in bankruptcy to one court was designed to control and eliminate.  Moreover, respect for the extraordinary gravity of the issues presented, as well as for the defendants in the case, would certainly have mandated a much more considered and deliberative judicial process.  Actually, so does respect for the plaintiffs, and for the City's other 100,000 creditors.

Finally, for the reasons stated in Part IX, above, the reasoning in the *Webster* declaratory judgment is neither persuasive nor at all indicative of how the Michigan Supreme Court would rule.

This objection to the City's eligibility is rejected.

### XIII. The City Was "Insolvent."

To be eligible for relief under chapter 9, the City must establish that it is "insolvent."  11 U.S.C. § 109(c)(3).  Several individual objectors and AFSCME challenge the City's assertion that it is insolvent.

### A. The Applicable Law

For a municipality, the bankruptcy code defines "insolvent" as a "financial condition such that the municipality is-- (i) generally not paying its debts as they become due unless such debts are the subject of a bona fide dispute; or (ii) is unable to pay its debts as they become due." 11 U.S.C. § 101(32)(C).

The test under the first prong "looks to current, general non-payment."  The test under the second prong "is an equitable, prospective test looking to future inability to pay."  *Hamilton*

*Creek Metro. Dist. v. Bondholders Colo. Bondshares* (*In re Hamilton Creek Metro. Dist.*), 143 F.3d 1381, 1384 (10th Cir. 1998); *see also In re City of Stockton*, 493 B.R. 772, 788 (Bankr. E.D. Cal. 2013) ("Statutory construction rules likewise point to a temporal aspect as the § 101(32)(C)(ii) phrase 'as they become due' must mean something different than its § 101(32)(C)(i) partner 'generally not paying its debts.'").

A payment is "due" under the first prong if it is "presently, unconditionally owing and presently enforceable." *Hamilton Creek*, 143 F.3d at 1385. When a municipality is unable to meet its presently enforceable debts, it is said to be "cash insolvent." *See Stockton*, 493 B.R. at 789.

When considering the second prong, courts take into account broader concerns, such as longer term budget imbalances and whether the City has sufficient resources to maintain services for the health, safety, and welfare of the community. *Id.*; *see also In re Boise Cnty.*, 465 B.R. 156, 172 (Bankr. D. Idaho 2011) ("The test under § 101(32)(C)(ii) is a prospective one, which requires the petitioner to prove as of the petition date an inability to pay its debts as they become due in its current fiscal year, or, based on an adopted budget, in its next fiscal year.")

Although each test focuses on the City's ability to meet its financial obligations at different points in time, both are to be applied as of the time of the chapter 9 filing. *Hamilton Creek*, 143 F.3d at 1384-85 (citing *In re Town of Westlake*, 211 B.R. 860, 866 (Bank. N.D. Tex. 1997)).

Finally, the Court notes that "the theme underlying the two alternative definitions of municipal insolvency in § 101(32)(C) is that a municipality must be in bona fide financial distress that is not likely to be resolved without use of the federal exclusive bankruptcy power to impair contracts." *Stockton*, 493 B.R. at 788.

## B. Discussion

The Court finds that the City of Detroit was, and is, insolvent under both definitions in 11 U.S.C. § 101(32)(C). The Court has already detailed the enormous financial distress that the City faced as of July 18, 2013 and will not repeat that here. See Part III A, above.

### 1. The City Was "Generally Not Paying Its Debts As They Become Due."

Specifically, in May 2013, the City deferred payment on approximately $54,000,000 in pension contributions. On June 30, 2013, it deferred an additional $5,000,000 fiscal year-end payment. Ex. 43 at 8. The City also did not make a scheduled $39,700,000 payment on its COPs on June 14, 2013. Ex. 43 at 8. It was also spending much more money than it was receiving, and only making up the difference through expensive and even catastrophic borrowings. See Part III A 5, 8 and 9, above.

These facts establish that the City was "generally not paying its debts as they become due," as of the time of the filing. 11 U.S.C. § 101(32)(C)(i).

AFSCME asserts that this was "[t]he purposeful refusal to make a few payments comprising a relatively small part of the City's budget." AFSCME Pre-Trial Br. at 51. (Dkt. #1227)

The Court must reject this assertion. The evidence established that the nearly $40,000,000 pension-related COPs default was particularly serious because it put in jeopardy the City's access to its casino tax revenue, which was one of the City's few reliable sources of income. Eligibility Trial Tr. 185:16-186:23, Oct. 24, 2013. (Dkt. #1490)

Moreover, the City was operating on a "razor's edge" for several months prior to June 2013. Eligibility Trial Tr. 189:9-10, Oct. 24, 2013. (Dkt. #1490)

As of May 2013, the City stopped paying its trade creditors to avoid running out of cash. Eligibility Trial Tr. 189:14-15, Oct. 24, 2013. (Dkt. #1490) But for these and other deferments, the City would have completely run out of cash by the end of 2013. Ex. 75 at 2.

### 2. The City Is Also "Unable to Pay Its Debts As They Become Due."

The evidence was overwhelming that the City is unable to pay its debts as they become due.

The evidence established that there are many, many services in the City which do not function properly as a result of the City's financial state. The facts found in Parts III B 6-12, above, further firmly support this conclusion.

Most powerfully, however, the testimony of Chief Craig established that the City was in a state of "service delivery insolvency" as of July 18, 2013, and will continue to be for the foreseeable future. He testified that the conditions in the local precincts were "deplorable." Eligibility Trial Tr. 189:4-6, Oct. 25, 2013. (Dkt. #1501) "If I just might summarize it in a very short way, that everything is broken, deplorable conditions, crime is extremely high, morale is low, the absence of leadership." Tr. 188:5-7 He described the City as "extremely violent," based on the high rate of violent crime and the low rate of "clearance" of violent crimes. Tr. 190:11-191:25. He stated that the officers' low morale is due, at least in part, to "the fact that they had lost ten percent pay; that they were forced into a 12-hour work schedule," and because there was an inadequate number of patrolling officers, and their facilities, equipment and vehicles were in various states of disrepair and obsolescence. Eligibility Trial Tr. 192:20-193:3, 197:21-23, 198:10-199:18, Oct. 25, 2013. (Dkt. #1501)

In *Stockton*, the Court observed:

> While cash insolvency—the opposite of paying debts as they
> become due—is the controlling chapter 9 criterion under
> § 101(32)(C), longer-term budget imbalances [budget insolvency]
> and the degree of inability to fund essential government services
> [service delivery insolvency] also inform the trier of fact's
> assessment of the relative degree and likely duration of cash
> insolvency.

478 B.R. at 789.

Service delivery insolvency "focuses on the municipality's ability to pay for all costs of providing services at the level and quality that are required for the health, safety, and welfare of the community." *Id. at* 789. Indeed, while the City's tumbling credit rating, its utter lack of liquidity, and the disastrous COPs and swaps deal might more neatly establish the City's "insolvency" under 11 U.S.C. § 101(32)(C), it is the City's service delivery insolvency that the Court finds most strikingly disturbing in this case.

### 3. The City's "Lay" Witnesses

The objecting parties argue the City failed to establish its insolvency because it failed to present expert proof on this issue. *See* AFSCME Pre-Trial Br. at 52. (Dkt. # 1227) ("Courts in the non-chapter 9 context note that 'it is generally accepted that whenever possible, a determination of insolvency should be based on . . . expert testimony . . .'" (citing *Brandt v. Samuel, Son & Co., Ltd. (In re Longview Aluminum, L.L.C.)*, No. 03B12184, 2005 WL 3021173, at *6 (Bankr. N.D. Ill. July 14, 2005)). This argument arises from the fact that the City mysteriously declined to qualify its financial analysts as expert witnesses.

At trial, upon the request of the City, the Court determined that under Rule 701, F.R.E., these witnesses - Charles Moore, Ken Buckfire and Gaurav Malhotra - could testify as lay witnesses regarding the City's finances and their projections of the City's finances in the future. Eligibility Trial Tr. 39:20-49:8, Oct. 25, 2013. (Dkt. #1501) The Court also admitted extensive

documentary evidence of the analysts' observations and projections. Tr. 49:5-8. These determinations were based upon the Court's finding that the financial consultants "had extensive personal knowledge of the City's affairs that they acquired during . . . the course of their consulting work with the city." Eligibility Trial Tr. 48:14-19, Oct. 25, 2013. (Dkt. #1501); *see, e.g., JGR, Inc. v. Thomasville Furniture Indus., Inc.*, 370 F.3d 519, 525-26 (6th Cir. 2004); *DIJO, Inc. v. Hilton Hotels Corp.*, 351 F.3d 679, 685-87 (5th Cir. 2003) (discussing *In re Merritt Logan, Inc.*, 901 F.2d 349 (3rd Cir. 1990) and *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399 (3rd Cir. 1980)). While the Court questions the City's strategy here, it is clear from these cases that there is nothing improper about the City's decision not to qualify these witnesses as experts, even though it likely could have.

The witnesses testified reliably and credibly regarding their personal knowledge of the City's finances and the basis for their knowledge. In these circumstances, the Court must reject AFSCME's argument that expert testimony is essential for a finding of insolvency under 11 U.S.C. §§ 109(c)(3) and 101(32)(C).

### 4. The City's Failure to Monetize Assets

Finally, the objecting parties assert that the City could have, and should have, monetized a number of its assets in order to make up for its severe cash flow insolvency. *See e.g., AFSCME* Pre-Trial Br. at 53. (Dkt. #1227)

However, Malhotra credibly established that sales of City assets would not address the operational, structural financial imbalance facing the City. Eligibility Trial Tr. 85:2-86:12, Oct. 25, 2013. (Dkt. #1501) Buckfire also testified similarly. Tr. 197:19-204:14. The undisputed evidence establishes that the "City's expenditures have exceeded its revenues from fiscal year 2008 to fiscal year 2012 by an average of $100 million annually." Ex. 75 at 2.

When the expenses of an enterprise exceed its revenue, a one-time infusion of cash, whether from an asset sale or a borrowing, only delays the inevitable failure, unless in the meantime the enterprise sufficiently reduces its expenses and enhances its income. The City of Detroit has proven this reality many times.

In any event, when considering selling an asset, the enterprise must take extreme care that the asset is truly unnecessary in enhancing its operational revenue.

For these reasons, the Court finds that the City has established that it is insolvent as 11 U.S.C. § 109(c)(3) requires and as 11 U.S.C. § 101(32)(C) defines that term.

## XIV. The City Desires to Effect a Plan to Adjust Its Debts.

To establish its eligibility for relief under chapter 9, the City must establish that it desires to effect a plan to adjust its debts. 11 U.S.C. § 109(c)(4).

### A. The Applicable Law

In *Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo* (*In re City of Vallejo*), 408 B.R. 280 (B.A.P. 9th Cir. 2009), the Bankruptcy Appellate Panel surveyed the case law under § 109(c)(4):

> Few published cases address the requirement that a chapter 9 petitioner "desires to effect" a plan of adjustment. Those cases that have considered the issue demonstrate that no bright-line test exists for determining whether a debtor desires to effect a plan because of the highly subjective nature of the inquiry under § 109(c)(4). *Compare In re County of Orange*, 183 B.R. 594, 607 (Bankr. C.D. Cal. 1995) (proposal of a comprehensive settlement agreement among other steps taken demonstrated efforts to resolve claims which satisfied § 109(c)(4)) *with In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 76 (Bankr. D.N.H. 1994) (post-petition submission of a draft plan of adjustment met § 109(c)(4)).

Petitioners may satisfy the subjective requirement with direct and circumstantial evidence. They may prove their desire by attempting to resolve claims as in *County of Orange*; by submitting a draft plan of adjustment as in *Sullivan County*; or by other evidence customarily submitted to show intent. *See Slatkin*, 525 F.3d at 812. The evidence needs to show that the "purpose of the filing of the chapter 9 petition not simply be to buy time or evade creditors." *See Collier* ¶ 109.04[3][d], at 109–32.

*Local 1186*, 408 B.R. at 295.

In *Stockton*, the court expanded:

The cases equate "desire" with "intent" and make clear that this element is highly subjective. *E.g.*, *In re City of Vallejo*, 408 B.R. 280, 295 (9th Cir. BAP 2009).

At the first level, the question is whether the chapter 9 case was filed for some ulterior motive, such as to buy time or evade creditors, rather than to restructure the City's finances. *Vallejo*, 408 B.R. at 295; 2 Collier on Bankruptcy ¶ 109.04[3][d], at p. 109–32 (Henry J. Sommer & Alan N. Resnick eds. 16th ed. 2011) (hereafter "Collier").

Evidence probative of intent includes attempts to resolve claims, submitting a draft plan, and other circumstantial evidence. *Vallejo*, 408 B.R. at 295.

493 B.R. at 791. *See also City of San Bernardino, Cal.*, 2013 WL 5645560, at *8-12 (Bankr. C.D. Cal. 2013); *In re Boise County*, 465 B.R. 156, 168 (Bankr. D. Idaho 2011); *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 272 (Bankr. S.D.N.Y. 2010).

"Since that 'plan' is to be effected by an entity seeking relief under Chapter 9, it is logical to conclude that the 'plan' referred to in section 109(c)(4) is a 'plan for adjustment of the debtor's debts' within the meaning of section 941 of the Bankruptcy Code." *In re Cottonwood Water and Sanitation Dist., Douglas County, Colo.*, 138 B.R. 973, 975 (Bankr. D. Colo. 1992).

**B. Discussion**

Several objectors asserted that the City does not desire to effect a plan to adjust its debts.

The Court concludes that the evidence overwhelmingly established that the City does desire to effectuate a plan in this case. Mr. Orr so testified. Eligibility Trial Tr. 43:1-47:13, October 28, 2013. (Dkt. #1502) More importantly, before filing this case, Mr. Orr did submit to creditors a plan to adjust the City's debts. Ex. 43. Plainly, that plan was not acceptable to any of the City's creditors. It may not have been confirmable under 11 U.S.C. § 943, although it is not necessary to resolve that question at this time. Still, it was evidence of the City's desire and intent to effect a plan. There is simply no evidence that the City has an ulterior motive in pursuing chapter 9, such as to buy time or to evade creditors.

Indeed, the objecting creditors do not contend that there was any such ulterior motive. They assert no desire on the part of the City or its emergency manager to buy time or evade creditors. Rather, their argument is that the plan that the emergency manager has stated he intends to propose in this case is not a confirmable plan. It is not confirmable, they argue, because it will impair pensions in violation of the Michigan Constitution.

Certainly the evidence does establish that the emergency manager intends to propose a plan that impairs pensions. The Court has already so found. See Part VIII C 1, above. Nevertheless, the objectors' argument must be rejected. As established in Part VIII C 5, above, a chapter 9 plan may impair pension rights. The emergency manager's stated intent to propose a plan that impairs pensions is therefore not inconsistent with a desire to effect a plan.

Accordingly, the Court finds that the City does desire to effect a plan, as 11 U.S.C. § 109(c)(4) requires.

## XV. The City Did Not Negotiate with Its Creditors in Good Faith.

### A. The Applicable Law

The fifth requirement for eligibility is found in § 109(c)(5).

An entity may be a debtor under chapter 9 of this title if and only if such entity—

. . .

(5)(A) has obtained the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(B) has negotiated in good faith with creditors and has failed to obtain the agreement of creditors holding at least a majority in amount of the claims of each class that such entity intends to impair under a plan in a case under such chapter;

(C) is unable to negotiate with creditors because such negotiation is impracticable; or

(D) reasonably believes that a creditor may attempt to obtain a transfer that is avoidable under section 547 of this title.

11 U.S.C. § 109(c)(5).

This section was enacted because Congress recognized that municipal bankruptcy is a drastic step and should only be taken as a last resort. *In re Sullivan Cnty. Reg'l Refuse Disposal Dist.*, 165 B.R. 60, 78 (Bankr. D.N.H. 1994); 5 Norton Bankr. L. & Prac. 3d § 90:25 ("It is the policy of the Bankruptcy Code that a Chapter 9 filing should be considered only as a last resort, after an out-of-court attempt to avoid bankruptcy has failed.") Therefore, it added a requirement for pre-bankruptcy negotiation to attempt to resolve disputes.

Because § 109(c)(5) is written in the disjunctive, a debtor has four options to satisfy the requirement for negotiation: "[1] it may obtain the agreement of creditors holding a majority in amount of claims in each class [; (2)] it may show that it has negotiated with its creditors in good faith but has failed to obtain their agreement [; (3)] it may show that it is unable to negotiate with creditors because negotiation is impracticable [; or (4)] it may demonstrate that it reasonably believe[s] that a creditor may attempt to obtain a preferential transfer." *In re Ellicott Sch. Bldg. Auth.*, 150 B.R. 261, 265–66 (Bankr. D. Colo.1992).

*In re Valley Health Sys.*, 383 B.R. 156, 162-63 (Bankr. C.D. Cal. 2008).

The City of Detroit asserts that it has met the requirements of § 109(c)(5)(B) or, in the alternative, § 109(c)(5)(C). City's Reply to Objections at 45-49; (Dkt. #765) City's Pre-trial Br. at 49-67. (Dkt. #1240)

The Court finds the recent case, *In re Mendocino Coast Recreation & Park Dist.*, 12-CV-02591-JST, 2013 WL 5423788 (N.D. Cal. Sept. 27, 2013), persuasive on this issue. In that case, the district court for the Northern District of California noted:

> [T]he Bankruptcy Court identified two lines of authority about 109(c)(5)(B)'s requirements. The less restrictive view, adopted by the editors of Collier, is that the debtor need not attempt to negotiate any specific plan of adjustment. *Id.* (citing 2–109 Collier on Bankruptcy ("Collier "), ¶ 109.04[3][e][ii] (16th ed.)). As the Bankruptcy Court saw the more restrictive view, adopted by *In re Cottonwood Water and Sanitation Dist.* ("Cottonwood"), 138 B.R. 973, 975 (Bankr. D. Colo.1992) and by dicta in *Vallejo*, 408 B.R. at 297, the debtor must negotiate over "the possible terms of a plan," "at least in concept."

*Mendocino Coast*, 2013 WL 5423788 at *2. After a thorough analysis of the legislative history of § 109(c)(5)(B), the court was "persuaded by the *Cottonwood* view that Section 109(c)(5)(B) requires municipalities not just to negotiate generally in good faith with their creditors, but also to negotiate in good faith with creditors over a proposed plan, at least in concept, for bankruptcy under Chapter 9." *Mendocino Coast*, 2013 WL 5423788 at *5. This Court is also persuaded by that analysis.

*Mendocino Coast* also considered how the § 109(c)(5)(B) process compares to analogous provisions in other chapters of the bankruptcy code. The court looked to 11 U.S.C. §§ 1113(b) & (c) and 1114(f)(1), which require debtors to negotiate regarding the post-petition rejection of collective bargaining agreements and pension plans in chapter 11 proceedings. The court stated:

> [T]he appropriate standard to apply [under Section 109(c)(5) ] is one that is "at least as stringent as those under §§ 1113 and 1114." 1 Norton Bankr. L. & Prac. 3d § 17:8, n.19. Those statutes require courts to, inter alia, determine whether the parties "[met] to confer in good faith in attempting to reach mutually satisfactory modifications," determine whether unions have rejected proposals "without good cause," and "balance . . . the equities." 11 U.S.C. § 1113(b)(2) & (c). In doing so, courts commonly assess both parties' conduct in negotiations.

*Mendocino Coast*, 2013 WL 5423788 at *7.   The Court reached two conclusions regarding § 109(c)(5)(B):

> First, courts may consider, based on the unique circumstances of each case and applying their best judgment, whether a debtor has satisfied an obligation to have "negotiated in good faith."  Second, while the Bankruptcy Code places the overwhelming weight of its burdens on petitioners, the provisions that call for negotiation contemplate that at least some very minimal burden of reciprocity be placed on parties with whom a debtor must negotiate.

*Mendocino Coast*, 2013 WL 5423788 at *7.

*Mendocino Coast* recognized that its case did not present the issue "of what must occur in a negotiation that satisfies 109(c)(5)(B).  It presents the issue of what information, if missing from the debtor's first attempt to negotiate, bars a municipality from filing Chapter 9 even if a creditor rejects the overture and declines to negotiate."  *Id.* at *8.

This Court faces the same question, and therefore finds *Mendocino Coast*'s analysis very useful, although on the facts of this case the Court ultimately reaches the opposite conclusion.

While recognizing that a determination of what qualifies as a good-faith effort to begin negotiation can depend on several factors, *Mendocino Coast* was able to make its determination upon consideration of three factors.

> First, the greater the disclosure about the proposed bankruptcy plan, the stronger the debtor's claim to have attempted to negotiate in good faith.  A creditor might be justified in rejecting the overture of a debtor proposing a frivolous or unclearly described adjustment plan, but a creditor is less justified in ignoring a substantive proposal.
> . . .
> Second, the municipality's need to immediately disclose classes of creditors and their treatment in the first communication will depend upon how material that information would be to the creditor's decision about whether to negotiate.
> . . .
> Third, the creditor's response, and the amount of time the creditor has had to respond, may also be factors.  If a creditor has had a relatively short time to respond to the municipality's offer to

negotiate, a lack of detail in the opening communication might weigh against a municipality rushing to file. On the other hand, where a creditor has been apprised of the possibility of a debt adjustment and declined to respond after a reasonable period of time, or where the creditor has explicitly responded with a refusal to negotiate, its position as an objector is significantly weakened.

*Mendocino Coast*, 2013 WL 5423788 at *8-9.

## B. Discussion

In the present case, the City of Detroit argues that the June 14, 2013 proposal to creditors, along with its follow up meetings, was a good-faith effort to begin negotiations, and that the creditors refused to respond. It asserts, therefore, it has satisfied 11 U.S.C. § 109(c)(5)(B). City's Reply to Objections at 54-58. (Dkt. # 765)

The Court concludes, however, that the June 14 Proposal to Creditors and the follow up meetings were not sufficient to satisfy the requirements of 11 U.S.C. § 109(c)(5)(B). The first and third factors cited by *Mendocino Coast* weigh heavily against finding that the City's initial efforts satisfied the requirement of good faith negotiation. The Proposal to Creditors did not provide creditors with sufficient information to make meaningful counter-proposals, especially in the very short amount of time that the City allowed for the "discussion" period.

The City's proposal to creditors is a 128 page document. Ex. 43. The City invited many creditors or "stakeholders" to the meeting on June 14, 2013, when it presented the proposal. Its presentation was a 120 deck powerpoint presentation, providing information regarding the financial condition of the City and proposing across the board reductions in creditor obligations.

The restructuring proposal began on page 101. Addressed on page 109 are the proposed treatment of the unsecured general obligation bonds, the claims of service corporations on account of the COPs, the claims for unfunded OPEB liabilities, the claims for unfunded pension

liabilities and the claims on account of other liabilities. Ex. 43. Charitably stated, the proposal is very summary in nature.

For example, the proposed treatment for underfunded pension liabilities is three bullet points in length. The first bullet point states that the underfunding is approximately $3.5B. The second bullet point states, "Claims for the underfunding will be exchanged for a pro rata (relative to all unsecured claims) principal amount of new Notes." The third bullet point states, "Because the amounts realized on the underfunding claims will be substantially less than the underfunding amount, there must be significant cuts in accrued, vested pension amounts for both active and currently retired persons." Ex. 43 at 109.

This is simply not enough information for creditors to start meaningful negotiations. Brad Robins, of Greenhill & Co. LLC, financial advisor to the Retirement Systems, testified, "The note, itself, I thought was not really a serious proposal but maybe a place holder, [because it had] no maturity, no obligation for the City to pay." Eligibility Trial Tr. 129:1-11, Nov. 7, 2013. (Dkt. #1681)

The City asserts that it provided supporting data in an "electronic data room." However, several witnesses testified that the data room did not contain all the necessary data to make a meaningful evaluation of the proposal to creditors. Brad Robins testified that the data room was missing "lots of information: value of assets, different projections and build-ups." Eligibility Trial Tr. 133:7-10, Nov. 7, 2013. (Dkt. #1681) He felt that prior to the filing date, Greenhill was not given complete information to fully evaluate what was laid out in the June 14, 2013 proposal. Eligibility Trial Tr. 135:17-20, Nov. 7, 2013. (Dkt. #1681) Mark Diaz testified that he made a request to the City for additional information and did not receive a response. Eligibility Trial Tr. 192:1-5, Nov. 7, 2013. (Dkt. #1681)

Moreover, the City conditioned access to the data room on the signing of a confidentiality and release agreement. This created an unnecessary hurdle for creditors.

The creditors simply cannot be faulted for failing to offer counter-proposals when they did not have the necessary information to evaluate the City's vague initial proposal.

The proposal for creditors provided a calendar on page 113. Ex. 43. It allotted one week, June 17, 2013 through June 24, 2013, for requests for additional information. Initial rounds of discussions with stakeholders were scheduled for June 17, 2013 through July 12, 2013. The evaluation period was scheduled to be July 15, 2013 through July 19, 2013. This calendar was very tight and it did not request counter-proposals or provide a deadline for submitting them.

The City filed its bankruptcy on July 18, 2013, the day before the end of the evaluation period. Although the objecting creditors argue that in hindsight the bankruptcy filing was a forgone conclusion, they argue that the initial proposal did not make clear the City's intention to file. Regardless, the time available for creditor negotiations was approximately thirty days. Given the extraordinary complexities of the case, that amount of time is simply far too short to conclude that such a vague proposal to creditors rises to the level required to shift the burden to objectors to make counter-proposals.

In addition to the lack of detail in the initial proposal and the short response time, the Court notes that two additional factors support its conclusion.

First, the City affirmatively stated that the meetings were not negotiations. Eligibility Trial Tr. 188:22-24, 189:1-3, Nov. 7, 2013; (Dkt. #1681) Orr Dep. Tr. 129:14-18, 262:1-25, Sept. 16, 2013. The City asserts this was to clarify that the City was not waiving the suspension of collective bargaining under P.A. 436. Orr Dep. Tr. 264:23-265:7, Sept. 16, 2013 (Dkt. #1159-B); Orr Dep. Tr. 63:21-64.20, Oct. 28, 2013. (Dkt. # 1502) This explanation is inadequate,

118

13-53846-swr   Doc 2975   Filed 12/05/13   Entered 12/05/13 16:06:14   Page 431 of 462
13-53846-tjt   Doc 2975   Filed 12/05/13   Entered 12/05/13 14:01:05   Page 125 of 130   430

bordering on disingenuous. The City simply cannot announce to creditors that meetings are not negotiations and then assert to the Court that those same meetings amounted to good faith negotiations.

Second, the format of the meetings was primarily presentational, to different groups of creditors with different issues, and gave little opportunity for creditor input or substantive discussion. Eligibility Trial Tr. 145:7-146:3, Nov. 4, 2013. (Dkt. #1683) For example, at the end of the June 14, 2013 meeting, creditors were permitted to submit questions via notecard. Shirley Lightsey attended the June 20, 2013, July 10, 2013 and July 11, 2013 meetings and testified that there was no opportunity to meet in smaller groups to discuss retiree-specific issues. Eligibility Trial Tr.108:19-20, 109:22-23, 111:1-3, Nov. 4, 2013. (Dkt. #1683) Mark Diaz, President of the Detroit Police Officers Association, testified there was no back and forth discussion. Eligibility Trial Tr. 187:22-25, 189:1-3, Nov. 7, 2013. (Dkt. #1681)

The City argues that these meetings were intended to start negotiations and that they expected counter-proposals from the creditors. Even as a first step, these meetings failed to reach a level that would justify a finding that negotiations had occurred, let alone good faith negotiations. Moreover, the Court finds that the lack of negotiations were not due to creditor recalcitrance. Accordingly, the Court concludes that the City has not established by a preponderance of the evidence that it has satisfied the requirement of 11 U.S.C. § 109(c)(5)(B).

## XVI. The City Was Unable to Negotiate with Creditors Because Such Negotiation Was Impracticable.

### A. The Applicable Law

Nevertheless, the Court finds that negotiations were in fact, impracticable, even if the City had attempted good faith negotiations. "[I]mpracticability of negotiations is a fact-sensitive inquiry that 'depends upon the circumstances of the case.'" *In re New York City Off-Track*

*Betting Corp.*, 427 B.R. 256, 276-77 (Bankr. S.D.N.Y. 2010) (quoting *In re City of Vallejo*, 408 B.R. at 298); *In re Valley Health Sys.*, 383 B.R. 156, 162-63 (Bankr. C.D. Cal. 2008) ("There is nothing in the language of section 109(c)(5)(C) that requires a debtor to either engage in good faith pre-petition negotiations with its creditors to an impasse or to satisfy a numerosity requirement before determining that negotiation is impracticable under the specific facts and circumstances of a case."). *See also In re Hos. Auth. Pierce County*, 414 B.R. 702, 713 (Bankr. W.D. Wash. 2009) ("Whether negotiations with creditors is impracticable depends on the circumstances of the case.").

> "Impracticable" means "not practicable; incapable of being performed or accomplished by the means employed or at command; infeasible." Webster's New International Dictionary 1136 (3d ed. 2002). In the legal context, "impracticability" is defined as "a fact or circumstance that excuses a party from performing an act, esp. a contractual duty, because (though possible) it would cause extreme and unreasonable difficulty." Black's Law Dictionary 772 (8th ed. 2004).

*In re Valley Health Sys.*, 383 B.R. at 163.

Congress adopted § 109(c)(5)(C) specifically "to cover situations in which a very large body of creditors would render prefiling negotiations impracticable." *In re Cnty. of Orange*, 183 B.R. 594, 607 (Bankr. C.D. Cal. 1995) (*quoting In re Sullivan County Reg'l Refuse Disposal Dist.*, 165 B.R. at 79 n. 55.) *See also In re New York City Off-Track Betting Corp.*, 427 B.R. at 276-77; 2 Collier on Bankruptcy ¶ 109.04[3][e][iii]. "The impracticality requirement may be satisfied based on the sheer number of creditors involved." *Cnty. of Orange*, 183 B.R. at 607. *See In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. 76, 85 (Bankr. D. Colo. 1990) ("It certainly was impracticable for [debtor] to have included several hundred Series D Bondholders in these conceptual discussions."); *Valley Health Sys.*, 383 B.R. at 165 (finding that the requirement of § 109(c)(5)(C) was met where the debtor's petition disclosed not more than 5,000

creditors holding claims in excess of $100,000,000); *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 714 (Bankr. W.D. Wash. 2009) (over 7,000 creditors and parties in interest were set forth on the mailing matrix).

## B. Discussion

The list of creditors for the City of Detroit is over 3500 pages. Ex. 64 (Dkt. #1059) It lists over 100,000 creditors. It is divided into fifteen schedules including the following classifications: Long-Term Debt; Trade Debt, Employee Benefits; Pension Obligations, Non-Pension Retiree Obligations; Active Employee Obligations; Workers' Compensation; Litigation and Similar Claims; Real Estate Lease Obligations; Deposits; Grants; Pass-Through Obligations, Obligations to Component Units of the City; Property Tax-Related Obligations; Income Tax-Related Obligations. Ex. 64 at 2-3. (Dkt. #1059) The summary of schedules provided with the list estimates the amount of claims and percent total for each schedule where sufficient information is available to determine those amounts. (Dkt. #1059-1) Some schedules such as Workers' Compensation and Litigation and Similar Claims do not have amounts listed because they are unliquidated, contingent and often disputed claims.

Long term debt, including bonds, notes and loans, capital lease, and obligations arising under the COPs and swaps, is listed at over $8,700,000,000 or approximately 48.52% of the City's total debt. Within this category are several series of bonds where individual bondholders are not identified. Many of these bondholders are not represented by any organization. Ex. 28 at 10.

As noted above, pension obligations are estimated at almost $3,500,000,000 or 19.33% of the City's total debt. The City estimates over 20,000 individual retirees are owed pension funds.

Ex. 28 at 9.  OPEB amounts are estimated at approximately $5,700,000,000 or 31.81% of the City's total debt.

The Court is satisfied that when Congress enacted the impracticability section, it foresaw precisely the situation facing the City of Detroit.  It has been widely reported that Detroit is the largest municipality ever to file bankruptcy.  Indeed, one of the objectors stated that it is "by far the largest and most economically significant city ever to file for chapter 9 bankruptcy." AFSCME's Supplemental Br. on Good Faith Negotiations at 7.  (Dkt. #1695)  The sheer size of the debt and number of individual creditors made pre-bankruptcy negotiation impracticable – impossible, really.

There are, however, several other circumstances that also support a finding of impracticability.

First, although several unions have now come forward to argue that they are the "natural representatives of the retirees," those same unions asserted in response to the City's pre-filing inquires that they did not represent retirees.  Ex. 32.  For example, in a May 22, 2013 letter, Robyn Brooks, the President of UAW Local 2211, stated, "This union does not, however, represent current retirees and has no authority to negotiate on their behalf."  John Cunningham sent the same response on behalf of UAW Locals 412 and 212.  In a May 27, 2013 letter, Delia Enright, President of AFSCME Local 1023, stated, "Please be advised that in accordance with Michigan law, I have no authority in which to renegotiate the Pension or Medical Benefits that retired members of our union currently receive."  Several other union representatives sent similar responses.

These responses sent a clear message to the City that the unions would not negotiate on behalf of the retirees. *See Stockton*, 493 B.R. at 794 ("it is impracticable to negotiate with 2,400 retirees for whom there is no natural representative capable of bargaining on their behalf.").

Several voluntary associations, including the RDPMA, the Detroit Retired City Employees ("DRCEA"), and the Retired Detroit Police and Fire Fighters Association ("RDPFFA"), assert that they are the natural representatives of retirees. However, none assert that they can bind individual retirees absent some sort of complex class action litigation. Ex. 301 at ¶ 6; (Dkt. # 497-2) Eligibility Trial Tr. 115:15-22, Nov. 4, 2013; (Dkt. #1683) Ex. 302 at ¶6; (Dkt. #497-3) Eligibility Trial Tr.164:1-8, Nov. 4, 2013. (Dkt. #1683) Ultimately "it would be up to the individual members of the association to decide if they would accept or reject" an offer. Eligibility Trial Tr. 157:1-4, Nov. 4, 2013. (Dkt. #1683)

Further, several witnesses who testified on behalf of the retiree associations made it clear that they would not have negotiated a reduction in accrued pension benefits because they consider them to be fully protected by state law. As Shirley Lightsey testified, "The DRCEA would not take any action to solicit authority from its membership to reduce pension benefits because they're protected by the Michigan Constitution." Eligibility Trial Tr. 125:3-7, Nov. 4, 2013. (Dkt. #1683)

The answers to interrogatories from both organizations reveal a similar inflexibility. "[T]he purpose of the RDPFFA has always been and remains to protect and preserve benefits of retirees, not to reduce such benefits." Ex. 83, Answers to Interrogatories No. 4. See also Answer to Interrogatories No. 6 for similar statement by DRCEA.

Indeed, as noted above, within two weeks of the June 14, 2013 meeting, some retirees had filed lawsuits attempting to block this bankruptcy based on their state law position. (*Flowers v. Synder*, No. 13-729-CZ July 3, 2013; *Webster v. Synder* No. 13-734-CZ July 3, 2013)

It is impracticable to negotiate with a group that asserts that their position is immutable. *See Stockton*, 493 B.R. at 794 (Bankr. E.D. Cal. 2013) ("it is impracticable to negotiate with a stone wall.").

The Court concludes that the position of the several retiree associations that they would never negotiate a reduction in accrued pension benefits made negotiations with them impracticable.

Finally, the City has sufficiently demonstrated that time was quickly running out on its liquidity. Ex. 9. (Dkt. #12) The Court therefore rejects the objectors' assertions that the City manufactured any time constraints in an attempt to create impracticability. Throughout the pertinent time periods, the City was in a financial emergency.

> Courts also frequently find that negotiations are impracticable where pausing to negotiate before filing for chapter 9 protection would put the debtor's assets at risk. *See, e.g.*, *In re Valley Health Sys.*, 383 B.R. at 163 ("Negotiations may also be impracticable when a municipality must act to preserve its assets and a delay in filing to negotiate with creditors risks a significant loss of those assets."); 2 Collier on Bankruptcy ¶ 109.04[3][e][iii] ("[W]here it is necessary to file a chapter 9 case to preserve the assets of a municipality, delaying the filing to negotiate with creditors and risking, in the process, the assets of the municipality makes such negotiations impracticable.").

*In re New York City Off-Track Betting Corp.*, 427 B.R. at 276-77.

The majority of the City's debt is bond debt and legacy debt. Neither the pension debt nor the bond debt are adjustable except through consent or bankruptcy. Negotiations with retirees and bondholders were impracticable due to the sheer number of creditors, and because many of the retirees and bondholders have no formal representatives who could bind them, or

even truly negotiate on their behalf.  Additionally, the Court finds that the City's fiscal crisis was not self-imposed and also made negotiations impracticable.

Accordingly, the Court finds that prefiling negotiations were impracticable.  The City has established by a preponderance of the evidence that it meets the requirements of 11 U.S.C. § 109(c)(5)(C).

## XVII. The City Filed Its
## Bankruptcy Petition in Good Faith.

The last requirement for eligibility is set forth in 11 U.S.C. § 921(c), which provides, "After any objection to the petition, the court, after notice and a hearing, may dismiss the petition if the debtor did not file the petition in good faith or if the petition does not meet the requirements of this title."

Unlike the eligibility requirements in § 109(c), "the court's power to dismiss a petition under § 921(c) is permissive, not mandatory."  *In re Pierce Cnty. Hous. Auth.*, 414 B.R. 702, 714 (Bankr. W.D. Wash. 2009) (citing 6 Collier on Bankruptcy ¶ 921.04[4], at 921-7); *In re Cnty. of Orange*, 183 B.R. 594, 608 (Bankr. C.D. Cal. 1995) (citing *In re Sullivan Cnty. Reg. Refuse Disposal Dist.*, 165 B.R. 60, 79 (Bankr. D.N.H. 1994)) ("the court has discretion to dismiss a petition if it finds that the petition was not filed in good faith").

The City's alleged bad faith in filing its chapter 9 petition was a central issue in the eligibility trial.  Indeed, in one form or another, all of the objecting parties have taken the position that the City did not file its chapter 9 petition in good faith and that this Court should exercise its discretion under 11 U.S.C. § 921(c) to dismiss the case.

125

13-53846-swr  Doc 2975  Filed 12/05/13  Entered 12/05/13 16:06:46  Page 438 of 462
13-53846-tjt  Doc 1945  Filed 12/05/13  Entered 12/05/13 14:01:05  Page 132 of 150    437

## A. The Applicable Law

"Good faith in the chapter 9 context is not defined in the Code and the legislative history of [section] 921(c) sheds no light on Congress' intent behind the requirement." *In re New York City Off-Track Betting Corp.*, 427 B.R. 256, 278-79 (Bankr. S.D.N.Y. 2010) (quoting *In re Cnty. of Orange*, 183 B.R. at 608) (quotation marks omitted).

In *Stockton*, the Court found:

> Relevant considerations in the comprehensive analysis for § 921 good faith include whether the City's financial problems are of a nature contemplated by chapter 9, whether the reasons for filing are consistent with chapter 9, the extent of the City's prepetition efforts to address the issues, the extent that alternatives to chapter 9 were considered, and whether the City's residents would be prejudiced by denying chapter 9 relief.

*Stockton*, 493 B.R. at 794.

Similarly, the court in *New York City Off-Track Betting Corp.*, 427 B.R. at 279 (quoting 6 Collier on Bankruptcy ¶ 921.04[2]), stated:

> The leading treatise lists six different factors that the courts may examine when determining whether a petition under chapter 9 was filed in good faith: (i) the debtor's subjective beliefs; (ii) whether the debtor's financial problems fall within the situations contemplated by chapter 9; (iii) whether the debtor filed its chapter 9 petition for reasons consistent with the purposes of chapter 9; (iv) the extent of the debtor's prepetition negotiations, if practical; (v) the extent that alternatives to chapter 9 were considered; and (vi) the scope and nature of the debtor's financial problems.

The essence of this good faith requirement is to prevent abuse of the bankruptcy process. *In re Villages at Castle Rock Metro. Dist. No. 4*, 145 B.R. at 81.

In conducting its good faith analysis, the Court must consider the broad remedial purpose of the bankruptcy code. *See, e.g., Stockton*, 493 B.R. at 794; *see also In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 32 (Bankr. D. Colo. 1999) ("The purpose of reorganization under

Chapter 9 is to allow municipalities created by state law to adjust their debts through a plan voted on by creditors and approved by the bankruptcy court.").

Indeed, "if all of the eligibility criteria set forth in § 109(c) as described above are satisfied, it follows that there should be a strong presumption in favor of chapter 9 relief." *Stockton*, 493 B.R. at 794. This Court agrees with the analysis set forth in the *Stockton* case on the issue of good faith under § 921(c):

> The quantum of evidence that must be produced to rebut the § 921(c) good faith presumption is appropriately evaluated in light of, first, the policy favoring the remedial purpose of chapter 9 for those entities that meet the eligibility requirements of § 109(c) and, second, the risk that City residents will be prejudiced if relief nevertheless is denied.

*Stockton*, 493 B.R. at 795.

### B. Discussion

As explained below, the Court finds that the totality of the circumstances, coupled with the presumption of good faith that arises because the City has proven each of the elements of eligibility under § 109(c)(3), establishes that the City filed its petition in good faith under § 921(c).

### 1. The Objectors' Theory of Bad Faith

In section 3, below, the Court will review the factors upon which it relies in finding that the City filed this case in good faith. First, however, it is crucial to this process for the Court to give voice to what it understands is the narrative giving rise to the objecting parties' argument that the City of Detroit did not file this case in good faith. The Court will then, in section 2, explain that there is some support in the record for that narrative.

It must be recognized that the narrative that the Court describes here is a composite of the objecting parties' positions and presentations on this issue. No single objecting party neatly laid out this precise version with all of the features described here. Moreover, it includes the perceptions of the objecting parties whose objections were filed by attorneys, as well as the many objecting parties who filed their objections without counsel. Naturally, these views on this subject were numerous, diverse, and at times inconsistent.

The Court will use an italics font for its description of this narrative, not to give it emphasis, but as a reminder that these are **not** the Court's findings. As noted, this is only the Court's perception of a composite narrative that appears to ground the objectors' various bad faith arguments:

*According to this composite narrative of the lead-up to the City of Detroit's bankruptcy filing on July 18, 2013, the bankruptcy was the intended consequence of a years-long, strategic plan.*

*The goal of this plan was the impairment of pension rights through a bankruptcy filing by the City.*

*Its genesis was hatched in a law review article that two Jones Day attorneys wrote. This is significant because Jones Day later became not only the City's attorneys in the case, but is also the law firm from which the City's emergency manager was hired. The article is* Jeffrey B. Ellman; Daniel J. Merrett, Pensions and Chapter 9: Can Municipalities Use Bankruptcy to Solve Their Pension Woes?, 27 EMORY BANKR. DEV. J. 365 (2011). *It laid out in detail the legal roadmap for using bankruptcy to impair municipal pensions.*

*The plan was executed by the top officials of the State of Michigan, including Governor Snyder and others in his administration, assisted by the state's legal and financial consultants - the Jones Day law firm and the Miller Buckfire investment banking firm. The goals of the plan also included lining the professionals' pockets while extending the power of state government at the expense of the people of Detroit.*

*Always conscious of the hard-fought and continuing struggle to obtain equal voting rights in this country and an equal opportunity to partake of the country's abundance, some who hold to this narrative also suspect a racial element to the plan.*

The plan foresaw the rejection of P.A. 4 coming in the November 2102 election, and so work began on P.A. 436 beforehand. As a result, it only took 14 days to enact it after it was introduced in the legislature's post-election, lame-duck session.

It was also enacted in derogation of the will of the people of Michigan as just expressed in their rejection of P.A. 4.

The plan also included inserting into P.A. 436 two very minor appropriations provisions so that the law would not be subject to the people's right of referendum and would not risk the same fate as P.A. 4 had just experienced.

The plan also called for P.A. 436 to be drafted so that the Detroit emergency manager would be in office under the revived P.A. 72 on the effective date of P.A. 436. This was done so that he would continue in office under P.A. 436, M.C.L. § 141.1572, and no consideration could be given to the other options that P.A. 436 appeared to offer for resolving municipal financial crises. See M.C.L. § 141.1549(10) ("An emergency financial manager appointed under former 1988 PA 101 or former 1990 PA 72, and serving immediately prior to the effective date of this act, shall be considered an emergency manager under this act and shall continue under this act to fulfill his or her powers and duties."); see also id. § 141.1547 (titled, "Local government options . . .").

The plan also saw the value in enticing a bankruptcy attorney to become the emergency manager, even though he did not have the qualifications required by P.A. 436. M.C.L. § 141.1549(3)(a).

Another important part of the plan was for the state government to starve the City of cash by reducing its revenue sharing, by refusing to pay the City millions of promised dollars, and by imposing on the City the heavy financial burden of expensive professionals.

The plan also included suppressing information about the value of the City's assets and refusing to investigate the value of its assets - the art at the Detroit Institute of the Arts; Belle Isle; City Airport; the Detroit Zoo; the Department of Water and Sewerage; the Detroit Windsor Tunnel; parking operations; Joe Louis Arena, and City-owned land.

The narrative continues that this plan also required active concealment and even deception, despite both the great public importance of resolving the City's problems and the democratic mandate of transparency and honesty in government. The purposes of this concealment and deception were to provide political cover for the governor and his administration when the City would ultimately file for bankruptcy and to advance their further political aspirations. Another purpose was to deny creditors, especially those whose retirement benefits would be at risk from such a filing, from effectively acting to protect those interests.

This concealment and deception were accomplished through a public relations campaign that deliberately misstated the ultimate objective of P.A. 436 – the filing of this case. It also downplayed the likelihood of bankruptcy, asserted an unfunded pension liability amount that was based on misleading and incomplete data and analysis, understated the City's ability to meet that liability, and obscured the vulnerability of pensions in bankruptcy. It also included imposing an improper requirement to sign a confidentiality and release agreement as a condition of accessing the City's financial information in the "data room."

As the bankruptcy filing approached, a necessary part of the plan became to engage with the creditors only the minimum necessary so that the City could later assert in bankruptcy court that it attempted to negotiate in good faith. The plan, however, was not to engage in meaningful pre-petition negotiations with the creditors because successful negotiations might thwart the plan to file bankruptcy. "Check-a-box" was the phrase that some objecting parties used for this.

The penultimate moment that represented the successful culmination of the plan was the bankruptcy filing. It was accomplished in secrecy and a day before the planned date, in order to thwart the creditors who were, at that very moment, in a state court pursuing their available state law remedies to protect their constitutional pension rights. "In the dark of the night" was the phrase used to describe the actual timing of the filing. The phrase refers to the secrecy surrounding the filing and is also intended to capture in shorthand the assertion that the petition was filed to avoid an imminent adverse ruling in state court.

Another oft-repeated phrase that was important to the objectors' theory of the City's bad faith was "foregone conclusion." This was used in the assertion that Detroit's bankruptcy case was a "foregone conclusion," as early as January 2013, perhaps even earlier.

Finally, post-petition, the plan also necessitated the assertion of the common interest privilege to protect it and its participants from disclosure.

The Court will now turn to its evaluation of this narrative of bad faith on the City's part in filing this case.

## 2. The Court's Conclusions Regarding the Objectors' Theory of Bad Faith

The Court acknowledges that many people in Detroit hold to this narrative, or at least to substantial parts of it.

The Court further recognizes, on the other hand, that State and City officials vehemently deny any such improper motives or tactics as this theory attributed to them. They contend that the case was filed for the proper desired and necessary purpose of restructuring the City's debt, including its pension debt, through a plan of adjustment. Indeed, in Part XIV, above, the Court has already found that the City does desire to effect a plan of adjustment.

The Court finds, however, that in some particulars, the record does support the objectors' view of the reality that led to this bankruptcy filing. It is, however, not nearly supported in enough particulars for the Court to find that the filing was in bad faith.

The evidence in support of the objectors' theory is as follows:

- The testimony of Howard Ryan, the legislative assistant for the Michigan Department of Treasury who shepherded P.A. 436 through the legislative process. He testified that the appropriations provisions in P.A. 436 were inserted to eliminate the possibility of a referendum vote on the law, and everyone knew that. Ryan Dep. Tr. 46:1-23, Oct. 14, 2013. To the same effect is Exhibit 403, a January 31, 2013 email from Mr. Orr to fellow Jones Day attorneys, stating, "By contrast Michigan's new EM law is a clear end-around the prior initiative that was rejected by the voters in November. . . . The news reports state that opponents of the prior law are already lining up to challenge this law. Nonetheless, I'm going to speak with Baird in a few minutes to see what his thinking is. I'll let you know how it turns out. Thanks." Ex. 403.

- Email exchanges between other attorneys at the Jones Day law firm during the time period leading up Mr. Orr's appointment as Emergency Manager and the retention of the Jones Day law firm to represent the City. For example, Exhibit 402 contains an email dated January 31, 2013 from Corinne Ball of Jones Day to Mr. Orr, which states:

> Food for thought for your conversation with Baird and us - I understand that the Bloomberg Foundation has a keen interest in this area. I was thinking about whether we should talk to Baird about financial support for this project and in particular the EM. Harry Wilson-from the auto task force-told me about the foundation and its interest. I can ask Harry for contact info-this kind of support in ways 'nationalizes' the issue and the project.

Ex. 402 at 2. Exhibit 402 also contains an email dated January 31, 2013, from Dan T. Moss at Jones Day to Mr. Orr, which states:

Making this a national issue is not a bad idea. It provides political cover for the state politicians. Indeed, this gives them an even greater incentive to do this right because, if it succeeds, there will be more than enough patronage to allow either Bing or Snyder to look for higher callings-whether Cabinet, Senate, or corporate. Further, this would give you cover and options on the back end.

Ex. 402 at 2.

- Exhibit 403, containing an email dated February 20, 2013, from Richard Baird, a consultant to the governor to Mr. Orr, stating: "Told [Mayor Bing] there were certain things I would not think we could agree to without your review, assessment and determination (such as keeping the executive team in its entirety). *Will broker a meeting via note between you and the Mayor's personal assistant who is not FOIA ble.*" Ex. 403 (emphasis added). The Court finds that "FOIA" is a reference to the Freedom of Information Act. Generally, FOIA provides citizens with access to documents controlled by state or local governments. *See* M.C.L. § 15.231.

- The Jones Day Pitch Book. As part of its "Pitch Presentation," the Jones Day law firm presented, in part, the following playbook for the City's road to chapter 9:

    (i) the difficulty of achieving an out of court settlement and steps to bolster the City's ability to qualify for chapter 9 by establishing a good faith record of negotiations, Ex. 833 at 13; 16-18; 22-23; 28;

    (ii) the EM could be used as "political cover" for difficult decisions such as an ultimate chapter 9 filing, Ex. 833 at 16;

    (iii) warning that pre-chapter 9 asset monetization could implicate the chapter 9 eligibility requirement regarding insolvency, thus effectively advising the City against raising money in order to will itself into insolvency, Ex. 833 at 17; and

    (iv) describing protections under state law for retiree benefits and accrued pension obligations and how chapter 9 could be used as means to further cut back or compromise accrued pension obligations otherwise protected by the Michigan Constitution, Ex. 833 at 39; 41.

- The State's selection of a distinguished bankruptcy lawyer to be the emergency manager for Detroit. Orr Dep. Tr. 18:12-21:20, Sept. 16, 2013 (discussing how Mr. Orr came with the Law Firm in late January to pitch for the City's restructuring work before a "restructuring team [of] advisors"); Baird Dep.Tr. 13:11-15:10, Oct. 10, 2013. During that pitch, Mr. Orr (among other lawyers that would be working on the proposed engagement) was presented primarily as a "bankruptcy and restructuring attorney." Orr Dep. Tr. 21:3-6, Sept. 16, 2013; see also Bing Dep.Tr. 12:7-13:7, Oct. 14, 2013 (indicating that Baird explained to Mayor Bing that Baird was "impressed with him [Mr. Orr], that he had been part of the bankruptcy team representing

Chrysler" and that Mr. Orr primarily had restructuring experience in the context of bankruptcy).

- Jones Day provided 1,000 hours of service without charge to the City or the State to position itself for this retention. Ex. 860 at 1 (Email dated January 28, 2013, from Corinne Ball to Jeffrey Ellman, both of Jones Day, stating: "Just heard from Buckfire. . . . Strong advice not to mention 1000 hours except to say we don't have major learning curve"). *See also* Eligibility Trial Tr. 103:23-109:17, November 5, 2013; (Dkt. #1584) Ex. 844.

  Exhibit 844 provides a list of memos that attorneys at Jones Day prepared prior to June 2012, "in connection with the Detroit matter." Heather Lennox of Jones Day requested copies of these memos for a June 6, 2012, meeting with Ken Buckfire, of Miller Buckfire, and Governor Snyder. Some of the memos include:

  (1) "Summary and Comparison of Public Act 4 and Chapter 9"
  (2) "Memoranda on Constitutional Protections for Pension and OPEB Liabilities"
  (3) "The ability of a city or state to force the decertification of a public union"
  (4) "The sources of, and the ability of the State to withdraw, the City's municipal budgetary authority."
  (5) "Analysis of filing requirements of section 109(c)(5) of the Bankruptcy Code ("Negotiation is Impracticable" and "Negotiated in Good Faith")

- Exhibit 846, an email dated March 2, 2012, from Jeffrey Ellman to Corinne Ball, both of Jones Day, with two other Jones Day attorneys copied. The subject line is, "Consent Agreement," and the body of the email states:

  > We spoke to a person from Andy's office and a lawyer to get their thoughts on some of the issues. I though MB was also going to try to follow up with Andy directly about the process for getting this to the Governor, but I am not sure if that happened.
  > . . . .
  > The cleanest way to do all of this probably is new legislation that establishes the board and its powers, AND includes an appropriation for a state institution. If an appropriation is attached to (included in) the statute to fund a state institution (which is broadly defined), then the statute is not subject to repeal by the referendum process.
  >
  > Tom is revisiting the document and should have a new version shortly, with the idea of getting this to at least M[iller]B[uckfire]/Huron [Consulting] by lunchtime.

- Exhibits 201 & 202, showing that Jones Day and Miller Buckfire consulted with state officials on the drafting of the failed consent agreement with the City. They

continued to work on a "proposed new statute to replace Public Act 4" thereafter. Ex. 847, Ex. 851. *See also* Ex. 846.

- The testimony of Donald Taylor, President of the Retired Detroit Police and Fire Fighters Association. He testified about a meeting that he had with Mr. Orr on April 18, 2013: "I asked him if he was - - about the pensions of retirees. He said that he was fully aware that the pensions were protected by the state Constitution, and he had no intention of trying to modify or set aside . . . or change the state Constitution." Eligibility Trial Tr. 140:9-13, November 4, 2013. (Dkt. #1605)

- At the June 10, 2013 community meeting, Mr. Orr was asked a direct question - what is going to happen to the City employee's pensions? Mr. Orr responded that pension rights are "sacrosanct" under the state constitution and state case law, misleadingly not stating that upon the City's bankruptcy filing, his position would be quite the opposite. In response to another question about whether Mr. Orr had a "ball park estimation" of the City's chances of avoiding bankruptcy, Mr. Orr responded that, as of June 10, there was a "50/50" chance that the City could avoid bankruptcy, knowing that in fact there was no chance of that.

- State Treasurer Andy Dillon expressed concern that giving up too soon on negotiations made the filing "look[] premeditated" Ex. 626 at 2.

- The City allotted only thirty four days to negotiate with creditors after the June 14 Proposal to Creditors. Ex. 43 at 113.

The issue that this evidence presents is how to evaluate it in the context of the good faith requirement. For example, during the orchestrated lead-up to the filing, was the City of Detroit's bankruptcy filing a "foregone conclusion" as the objecting parties assert? Of course it was, and for a long time.

Even if it was a foregone conclusion, however, experience with both individuals and businesses in financial distress establishes that they often wait longer to file bankruptcy than is in their interests. Detroit was no exception. Its financial crisis has been worsening for decades and it could have, and probably should have, filed for bankruptcy relief long before it did, perhaps even years before. At what point in Detroit's financial slide did it lose the ability, without bankruptcy help, to restructure its debt in a way that would firmly ground its economic and

social revitalization?  Was it after the disastrous COPs and swaps deal in 2005?  Or even sometime before?

The record here does not permit an answer to that question.  Whatever the answer, however, the Court must conclude that Detroit's bankruptcy filing was certainly a "foregone conclusion" during all of 2013.

For purposes of determining the City's good faith, however, it hardly matters.  As noted, many in financial difficulty, Detroit included, wait too long to file bankruptcy.

Then the issue becomes what impact does it have on the good faith analysis that Detroit probably waited too long.  Perhaps it would have been more consistent with our democratic ideals and with the economic and social needs of the City if its officials and State officials had openly and forthrightly recognized the need for filing bankruptcy when that need first arose.  It is, after all, not bad faith to file bankruptcy when it is needed.

City officials also could have avoided the appearance of pretext negotiations, and the resulting mistrust, by simply announcing honestly that because negotiating with so many diverse creditors was impracticable, negotiations would not even be attempted.  The law clearly permits that, and for good reason.  It avoids the very delay, and, worse, the very suspicion that resulted here.

The Court must acknowledge some substantial truth in the factual basis for the objectors' claim that this case was not filed in good faith.  Nevertheless, for the strong reasons stated in the next section, the Court finds that this case was filed in good faith and should not be dismissed.

### 3. The City Filed This Bankruptcy Case in Good Faith.

Based on *Stockton* and *New York City Off-Track Betting Corp.*, reviewed above, the Court concludes that the following factors are most relevant in establishing the City's good faith:

a. The City's financial problems are of a type contemplated for chapter 9 relief.

b. The reasons for filing are consistent with the remedial purpose of chapter 9,

c. The City made efforts to improve the state of its finances prior to filing, to no avail.

d. The City's residents will be severely prejudiced if the case is dismissed.

### a. The City's Financial Problems Are of a Type Contemplated for Chapter 9 Relief.

The Court's analysis of this factor is based on its findings that the City is "insolvent" in Part XIII, above, and that the City was "unable to negotiate with creditors because such negotiation [was] impracticable" in Part XVI, above.  11 U.S.C. §§ 109(c)(3) and 109(c)(5)(C).

The City has over $18,000,000,000 in debt and it is increasing.  In the months before the filing, it was consistently at risk of running out of cash.  It has over 100,000 creditors.

"Profound" is the best way to describe the City's insolvency, and it simply could not negotiate with its numerous and varied creditors.  *See In re Town of Westlake, Tex.*, 211 B.R. 860, 868 (Bankr. N.D. Tex. 1997) (finding the debtor filed in good faith because it faced "frozen funds, multiple litigation, and the disannexation of a substantial portion of its tax base").

It is true that the City does not have a clear picture of its assets, income, cash flow, and liabilities, likely because its bookkeeping and accounting systems are obsolete.  But this only suggests the need for relief.  It does not suggest bad faith.  Moreover, as the City's financial analysts' subsequent months of work have sharpened the focus on the City's finances, the resulting picture has only become worse.  Eligibility Trial Tr. 118:4-119:5, Nov. 5, 2013. (Dkt. #1584)

The Court finds that this factor weighs in favor of finding good faith.

### b. The City's Reasons for Filing Are Consistent
### with the Remedial Purpose of Chapter 9.

One of the purposes of chapter 9 is to give the debtor a "breathing spell" so that it may establish a plan of adjustment. *In re Cnty. of Orange*, 183 B.R. 594, 607 (Bankr. C.D. Cal. 1995).

The Court's analysis on this factor is based on its finding that the City "desires to effect a plan to adjust such debts." 11 U.S.C. § 109(c)(4). To show good faith on this factor, "the evidence must demonstrate that 'the purpose of the filing of the chapter 9 petition [was] not simply . . . to buy time or evade creditors.'" *In re New York City Off-Track Betting Corp.*, 427 B.R. at 272 (quoting *In re City of Vallejo*, 408 B.R. at 295). Notably, this argument was not raised by the objectors in any pleadings or at trial, nor was any evidence presented to support it.

The objectors do assert that the City filed the petition to avoid "a bad state court ruling" in the *Webster* litigation. They argue this is indicative of bad faith. *See, e.g.*, Second Amended Final Pre-Trial Order, ¶ 107 at 30. (Dkt. #1647) This argument is rejected. Creditor lawsuits commonly precipitate bankruptcy filings. That the suits were in vindication of an important right under the state constitution does not change this result. They were suits to enforce creditors' monetary claims against a debtor that could not pay those claims.

The objectors also argue that the City filed the petition so that its pension obligations could be impaired and that this is inconsistent with the remedial purpose of bankruptcy. *See, e.g.*, Second Amended Final Pre-Trial Order, ¶ 86 at 24. (Dkt. #1647) Again, discharging debt is the primary motive behind the filing of most bankruptcy petitions. That motivation does not suggest any bad faith. That the City "chose to avail itself of a legal remedy afforded it by federal law is not proof of bad faith." *In re Chilhowee R-IV School Dist.*, 145 B.R. 981, 983 (Bankr.

W.D. Mo. 1992). This is especially true here. The evidence demonstrated that attempting to negotiate a voluntary impairment of pensions would have been futile.

Accordingly, the Court finds that this factor also weighs in favor of finding good faith.

### c. The City Made Efforts to Improve the State of Its Finances Prior to Filing, to No Avail.

Although the Court finds that the City did not engage in good faith negotiations with its creditors, Part XV, above, the Court does find the City did make some efforts to improve its financial condition before filing its chapter 9 petition. See Part III C, above.

The City's efforts are detailed in Mr. Orr's declaration filed in support of the petition. Ex. 414 at 36-49. (Dkt. #11) Those efforts include reducing the number of City employees, reducing labor costs through implementation of the City Employment Terms, increasing the City's corporate tax rate, working to improve the City's ability to collect taxes, increasing lighting rates, deferring capital expenditures, reducing vendor costs, and reducing subsidies to the Detroit Department of Transportation. Ex. 414 at 36-49. (Dkt. #11); Eligibility Trial Tr. 231:15-233:7, October 28, 2013. (Dkt. #1502) Despite those efforts, the City remains insolvent.

The fact that the City did not seriously consider any alternatives to chapter 9 in the period leading up to the filing of the petition does not indicate bad faith. By this time, all of the measures described in Mr. Orr's declaration had largely failed to resolve the problem of the City's cash flow insolvency. Ex. 414 at 36-49. (Dkt. #11); Eligibility Trial Tr. 231:15-233:7, October 28, 2013. (Dkt. #1502). In *In re City of San Bernadino, Cal.*, 499 B.R. 776, 791 (Bankr. C.D. Cal. 2013), the Court observed:

> Was there an alternative available to the City when it was faced with a $45.9 million cash deficit in the upcoming fiscal year and inevitably was going to default on its obligations as they came due? The Court answers this question 'no.' To deny the opportunity to reorganize in chapter 9 based on lack of good faith

would be to ignore fiscal reality and the general purposes of the Bankruptcy Code.

The Court finds this factor also weighs in favor of finding good faith.

### d. The Residents of Detroit Will Be Severely Prejudiced If This Case Is Dismissed.

The Court concludes that this factor is of paramount importance in this case. The City's debt and cash flow insolvency is causing its nearly 700,000 residents to suffer hardship. As already discussed at length in this opinion, the City is "service delivery insolvent." See Parts III B 6-11 and XIII B, above. Its services do not function properly due to inadequate funding. The City has an extraordinarily high crime rate; too many street lights do not function; EMS does not timely respond; the City's parks are neglected and disappearing; and the equipment for police, EMS and fire services are outdated and inadequate.

Over 38% of the City's revenues were consumed by servicing debt in 2012, and that figure is projected to increase to nearly 65% of the budget by 2017 if the debt is not restructured. Ex. 414 at 39 (Dkt. #11) Without revitalization, revenues will continue to plummet as residents leave Detroit for municipalities with lower tax rates and acceptable services.

Without the protection of chapter 9, the City will be forced to continue on the path that it was on until it filed this case. In order to free up cash for day-to-day operations, the City would continue to borrow money, defer capital investments, and shrink its workforce. This solution has proven unworkable. It is also dangerous for its residents.

If the City were to continue to default on its financial obligations, as it would outside of bankruptcy, creditor lawsuits would further deplete the City's resources. On the other hand, in seeking chapter 9 relief, the City not only reorganizes its debt and enhances City services, but it

also creates an opportunity for investments in its revitalization efforts for the good of the residents of Detroit. Ex. 43 at 61.

This factor weighs heavily in favor of finding good faith.

<h2 style="text-align:center">C. Conclusion Regarding<br>the City's Good Faith</h2>

While acknowledging some merit to the objectors' serious concerns about how City and State officials managed the lead-up to this filing, the Court finds that the factors relevant to the good faith issue weigh strongly in favor of finding good faith. Accordingly, the Court concludes the City's petition was filed in good faith and that the petition is not subject to dismissal under 11 U.S.C. § 921(c).

<h2 style="text-align:center">XVIII. Other Miscellaneous Arguments</h2>

The objections addressed here were asserted in briefs after the deadline to object had passed. Accordingly, these objections are untimely and denied on that ground. In the interest of justice, however, the Court will briefly address their merits.

<h3 style="text-align:center">A. <i>Midlantic</i> Does Not Apply in This Case</h3>

In its supplemental brief filed October 30, 2013, AFSCME asserts, "The rights created by the Pensions Clause should survive bankruptcy because the Pensions Clause is an exercise of the right to enact 'state or local laws designed to protect public health or safety' which cannot be disregarded by the debtor." AFSCME's Supplemental Br. at 3-4. (Dkt. #1467) In support of this argument, AFSCME relies on the United States Supreme Court decision in *Midlantic Nat'l Bank v. New Jersey Dep't of Env. Protection*, 474 U.S. 494, 106 S. Ct. 755 (1986).

In *Midlantic*, the Supreme Court held that "a trustee in bankruptcy does not have the power to authorize an abandonment without formulating conditions that will adequately protect

the public's health and safety." 474 U.S. at 507, 106 S. Ct at 762. At issue in that case was whether a trustee in bankruptcy could abandon real property pursuant to 11 U.S.C. § 544(a), when the property was contaminated with 400,000 gallons of oil containing PCB, "a highly toxic carcinogen." *Id*. at 497, 106 S. Ct. at 757.

The case is simply not applicable on AFSCME's point. The City has not "abandoned" its property. Moreover, AFSCME has failed to identify how the pensions clause is a "state or local law designed to protect public health or safety." *Id*. at 502, 106 S. Ct. at 760.

Accordingly, this objection is overruled.

### B. There Was No Gap in Mr. Orr's Service as Emergency Manager

In an objection filed on October 17, 2013 (Dkt. # 1222), Krystal Crittendon asserted that Mr. Orr was not validly appointed because the rejection of P.A. 4 did not revive P.A. 72. This argument is rejected for the reasons stated in Part III D, above.

In this objection, Crittendon also contended that Mr. Orr was not validly appointed because his initial emergency manager contract expired before P.A. 436 took effect.

P.A. 436 contains a grandfathering provision which states:

> An emergency manager or emergency financial manager appointed and serving under state law immediately prior to the effective date of this act shall continue under this act as an emergency manager for the local government.

M.C.L. § 141.1571.

Mr. Orr's initial emergency manager contract under P.A. 72 stated that it "shall terminate at midnight on Wednesday, March 27, 2013." Crittendon contends that therefore the contract terminated the morning of Wednesday, March 27, and that therefore he was not in office on that day. She asserts that because Mr. Orr's current emergency manager contract became effective

on Thursday, March 28, 2013, there was no emergency manager serving immediately prior to the March 28 effective date of P.A. 436, and the grandfathering clause does not apply.

The City contends that the parties intended for Mr. Orr's initial contract to expire at the end of the day on March 27th and that there was no gap in his service.

In *Hallock v. Income Guar. Co.*, 270 Mich. 448, 452, 259 N.W. 133, 134 (1935), the court assumed "midnight" meant the end of the day. Courts in other jurisdictions, however, have found that the term is ambiguous. *See Amer. Transit Ins. Co. v. Wilfred*, 745 N.Y.S.2d 171, 172, 296 A.D.2d 360, 361 (N.Y. 2002); *Mumuni v. Eagle Ins. Co.*, 668 N.Y.S.2d 464, 247 A.D.2d 315 (N.Y.A.D. 1998).

In *Klapp v. United Insurance Group Agency, Inc*., 468 Mich. 459, 663 N.W.2d 447 (2003), the Michigan Supreme Court noted, "'The law is clear that where the language of the contract is ambiguous, the court can look to such extrinsic evidence as the parties' conduct, the statements of its representatives, and past practice to aid in interpretation.'" *Id*. at 470, 663 N.W.2d at 454 (quoting *Penzien v. Dielectric Prod. Engineering Co., Inc.*, 374 Mich. 444, 449, 132 N.W.2d 130, 132 (1965)).

The Court finds that the parties to the contracts clearly intended that there would be no gap in Mr. Orr's contracts or in his appointment. Accordingly, Mr. Orr was validly appointed under M.C.L. § 141.1572. The objection is rejected.

## XIX. Conclusion:
## The City is Eligible and the Court
## Will Enter an Order for Relief.

The Court concludes that under 11 U.S.C. § 109(c), the City of Detroit may be a debtor under chapter 9 of the bankruptcy code. The Court will enter an order for relief forthwith, as required by 11 U.S.C. § 921(d).

The Court reminds all interested parties that this eligibility determination is merely a preliminary matter in this bankruptcy case. The City's ultimate objective is confirmation of a plan of adjustment. It has stated on the record its intent to achieve that objective with all deliberate speed and to file its plan shortly. Accordingly, the Court strongly encourages the parties to begin to negotiate, or if they have already begun, to continue to negotiate, with a view toward a consensual plan.

For publication

.

**Signed on December 05, 2013**

                                        **/s/ Steven Rhodes**
                                      **Steven Rhodes**
                                      **United States Bankruptcy Judge**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                                          Chapter 9
City of Detroit, Michigan,                          Case No. 13-53846
Debtor.                                                      Hon. Steven W. Rhodes
_____/


### Order for Relief Under Chapter 9 of the Bankruptcy Code

The Court has determined that the City of Detroit, Michigan has met all of the applicable

requirements and is eligible to be a debtor under chapter 9 of the bankruptcy code.  The Court

has further determined that the City of Detroit, Michigan filed its chapter 9 petition in good faith.

Accordingly, the Court hereby enters this Order for Relief and grants relief to the City of

Detroit, Michigan under chapter 9 of the bankruptcy code.

.

**Signed on December 05, 2013**

                                                    _____
                                                         **/s/ Steven Rhodes**
                                                         **Steven Rhodes**
                                                         **United States Bankruptcy Judge**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:

CITY OF DETROIT, MICHIGAN,

Chapter 9
Case No. 13-53846

Debtor.

Hon. Steven W. Rhodes

_____

## RESPONDENTS' REPLY TO PETITIONERS' RESPONSE TO MOTION FOR RECONSIDERATION OF OPINION AND ORDER DENYING NAACP'S MOTION FOR RELIEF FROM STAY (DKT. #740) AND GRANTING PHILLIPS' <u>MOTION FOR RELIEF FROM STAY (DKT. #1004)</u>

## INTRODUCTION

On December 2, 2013, Petitioners, Plaintiffs in the *Phillips, et al. v. Snyder, et al.* lawsuit, responded to Respondents' motion for reconsideration of this Court's order granting Petitioners' motion for relief from stay. (Resp. to Mot. for Reconsideration of Opinion and Order Denying NAACP's Mot. for Relief from Stay and Granting Phillips' Mot. for Relief from Stay, Dkt. #1888.) For the reasons that follow, Petitioners' arguments are factually inaccurate, without legal support, and do not provide a basis for denying Respondents' motion.

# ARGUMENT

## I. The Debtor concurs and joins in Respondents' motion.

As a threshold issue, Petitioners' response brief incorrectly asserts that "Debtor City of Detroit does not seek reconsideration of this Court's Order." (*Id.* at 4.)

In fact, the Debtor concurred and joined in Respondents' motion on November 20, 2013—ten days before Petitioners' filed their response brief. (Debtor's Concurrence with and Joinder in the State's Mot. for Reconsideration, Dkt. #1777.) The Debtor asks this Court to reconsider its order because, among other things, a finding that PA 436 is unconstitutional "could remove the City's emergency manager leaving no other authorized person to prosecute [its] chapter 9 case . . . ." (*Id.* at 4.) Like Respondents, the Debtor submits that since this Court's stay-extension order applies to "any suits against the governor and the treasurer that might [have the potential to directly impact] the City's bankruptcy case," *any* iteration of Petitioners' complaint that includes a facial challenge to PA 436 or an as-applied challenge to PA 436 in Detroit must be stayed. (*Id.* at 2.)

## II. Petitioners' request for declaratory relief, if granted, would pose substantial questions as to Detroit's ability to proceed in bankruptcy.

Petitioners' response is also legally inaccurate. Notably, Petitioners admit "[i]t is true that a finding that PA 436 is unconstitutional might raise some 'serious questions' regarding the validity of actions taken by emergency managers appointed pursuant to PA 436 throughout the State of Michigan." (Dkt. #1888-4, at 8.) Yet rather than conceding that a stay is therefore appropriate, Petitioners now claim that even if PA 436 is declared unconstitutional, a separate legal action would be required to divest Detroit's EM of any power granted by the statute. (*Id.* at 7.)

Case law contradicts this assertion. The Sixth Circuit has plainly held that without a separate lawsuit seeking injunctive relief, "[a]n unconstitutional application of a statute *and* the passage of a statute that is unconstitutional in all of its applications may each be equally void from the outset." *Village of Mainville, Oh. v. Hamilton Tp. Bd. of Trustees*, 726 F.3d 762, 766 (6th Cir. 2013) (emphasis in original). Since a statute that is declared unconstitutional could be considered void *ab initio*, Petitioners' admission that even their gratuitously amended

3

complaint still seeks a declaration that PA 436 is unconstitutional demonstrates that Petitioners' lawsuit should be stayed. (Dkt. #1888-4, at 7.) Indeed, as this Court concluded when it denied NAACP's motion for relief from stay, "[i]f P.A. 436 were found to be unconstitutional, as the plaintiffs' lawsuit claims, then the City's emergency manager would be removed from office . . . . The impact in this bankruptcy case of the potential removal of the Detroit emergency manager by the plaintiffs' lawsuit cannot be overstated." (Opinion and Order Denying NAACP's Mot. for Relief from Stay and Granting Phillips' Mot. for Relief from Stay, Dkt. #1536, at 7-8.)

## CONCLUSION AND RELIEF REQUESTED

For the reasons stated herein and more fully in Respondents' principal motion, Respondents respectfully request that this Court reconsider its order granting Petitioners' motion for relief from stay.

Respectfully submitted,

*/s/ Matthew Schneider*
Matthew Schneider
Chief Legal Counsel
Attorney for State of Michigan
P.O. Box 30754, Lansing, MI 48909
(517) 373-3203
SchneiderM7@michigan.gov [P62190]

4

Nicole A. Grimm (P74407)
Assistant Attorney General

Steven G. Howell
Special Assistant Attorney General
Dickinson Wright PLLC
500 Woodward Avenue, Suite 4000
Detroit, Michigan 48226-3425

Attorneys for the State of Michigan
Michigan Department of
Attorney General

Dated: December 12, 2013