UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

IN RE: CITY OF DETROIT,   .      Docket No. 13-53846
        MICHIGAN,          .
                           .      Detroit, Michigan
                           .      December 16, 2013
                Debtor.    .      10:02 a.m.
. . . . . . . . . . . . . . . .

HEARING RE. APPLICATION TO EMPLOY LAZARD FRERES & CO., LLC,
      AS FINANCIAL ADVISOR FILED BY RETIREE COMMITTEE
                OFFICIAL COMMITTEE OF RETIREES

    MOTION OF THE DETROIT RETIREMENT SYSTEMS TO CERTIFY THIS
   COURT'S ELIGIBILITY RULING FOR DIRECT APPEAL TO THE SIXTH
  CIRCUIT COURT OF APPEALS; MOTION REQUEST FOR CERTIFICATION
       FILED BY CREDITOR MICHIGAN COUNCIL 25 OF THE AMERICAN
    FEDERATION OF STATE, COUNTY & MUNICIPAL EMPLOYEES, AFL-CIO
   AND SUB-CHAPTER 98, CITY OF DETROIT RETIREES; MOTION OF THE
   RETIREE ASSOCIATION PARTIES TO CERTIFY "OPINION REGARDING
     ELIGIBILITY" AND "ORDER FOR RELIEF UNDER CHAPTER 9 OF
    THE BANKRUPTCY CODE" FOR DIRECT APPEAL TO THE COURT OF
      APPEALS FILED BY INTERESTED PARTIES DETROIT RETIRED
     CITY EMPLOYEES ASSOCIATION, SHIRLEY V. LIGHTSEY, RETIRED
      DETROIT POLICE AND FIRE FIGHTERS ASSOCIATION, DONALD
      TAYLOR, CREDITORS SHIRLEY V. LIGHTSEY, DONALD TAYLOR;
    MOTION OF THE OFFICIAL COMMITTEE OF RETIREES REQUEST FOR
   CERTIFICATION OF THE ELIGIBILITY DETERMINATION FOR DIRECT
     APPEAL TO THE UNITED STATES COURT OF APPEALS FOR THE
    SIXTH CIRCUIT PURSUANT TO 28 U.S.C. SECTION 158(D)(2) AND
  FEDERAL RULE OF BANKRUPTCY PROCEDURE RULE 8001(F) FILED BY
        RETIREE COMMITTEE OFFICIAL COMMITTEE OF RETIREES

   MOTION OF THE DEBTOR, PURSUANT TO SECTIONS 105 AND 502 OF
     THE BANKRUPTCY CODE, FOR ENTRY OF AN ORDER APPROVING
  ALTERNATIVE DISPUTE RESOLUTION PROCEDURES TO PROMOTE THE
    LIQUIDATION OF CERTAIN PRE-PETITION CLAIMS FILED BY
       DEBTOR IN POSSESSION, CITY OF DETROIT, MICHIGAN

          BEFORE THE HONORABLE STEVEN W. RHODES
          UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For the Debtor:        Jones Day
                       By:  JEFFREY B. ELLMAN
                       1420 Peachtree Street, N.E., Suite 800
                       Atlanta, GA  30309-3053
                       (404) 581-8309

                       Jones Day
                       By:  CORINNE BALL
                       222 East 41st
                       New York, NY  10017-6702
                       (212) 326-7844

For the Official       Dentons US, LLP
Committee of           By:  CLAUDE MONTGOMERY
Retirees:              1221 Avenue of the Americas
                       New York, NY  10020-1089
                       (312) 632-8390

For Retirement         Arnold & Porter, LLP
Systems (General       By:  LISA HILL FENNING
Retirement System      44th Floor
of the City of         777 South Figueroa Street, #4400
Detroit and Police     Los Angeles, CA  90017-5844
and Fire Retire-       (213) 243-4019
ment System of the
City of Detroit:

For Michigan           Lowenstein Sandler, LLP
Council 25 of the      By:  SHARON L. LEVINE
American Federation         PHILLIP J. GROSS
of State, County       65 Livingston Avenue
and Municipal          Roseland, NJ  07068
Employees (AFSCME),    (973) 597-2374
AFL-CIO and Sub-
Chapter 98, City
of Detroit Retirees:

For the Detroit        Erman, Teicher, Miller, Zucker &
Fire Fighters            Freedman, P.C.
Association, the       By:  BARBARA A. PATEK
Detroit Police         400 Galleria Officentre, Suite 444
Officers Associa-      Southfield, MI  48034
tion and the           (248) 827-4100
Detroit Police
Lieutenants &
Sergeants
Association:

APPEARANCES (continued):

```
For Deborah Ryan:    Goodman & Hurwitz, PC
                     By:  WILLIAM GOODMAN
                     1394 East Jefferson Avenue
                     Detroit, MI  48207
                     (313) 567-6170

For Various          Romano Law, PLLC
Plaintiffs:          By:  DANIEL G. ROMANO
                     23800 Woodward Avenue
                     Pleasant Ridge, MI  48069
                     (248) 750-0270

In pro per:          JEFFREY SANDERS, Creditor
                     16599 Hubbell Street
                     Detroit, MI  48235-4030

Also Present:        ANDREW YEARLEY
                     Lazard Freres & Co., LLC
                     30 Rockefeller Plaza
                     New York, NY  10020

                     ROBERT M. FISHMAN, Fee Examiner
                     Shaw, Fishman, Glantz & Towbin, LLC
                     321 North Clark Street, Suite 800
                     Chicago, IL  60654

                     EDWARD V. KEELEAN
                     11th Floor Buhl Building
                     Detroit, MI  48226

Court Recorder:      Letrice Calloway
                     United States Bankruptcy Court
                     211 West Fort Street
                     21st Floor
                     Detroit, MI  48226-3211
                     (313) 234-0068

Transcribed By:      Lois Garrett
                     1290 West Barnes Road
                     Leslie, MI  49251
                     (517) 676-5092
```

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1　　　　THE CLERK:　All rise.　Court is in session.　Please

2　be seated.　Case Number 13-53846, City of Detroit, Michigan.

3　　　　THE COURT:　One moment, please.　Good morning.　Is

4　there any objection to hearing the Lazard application to

5　employ first?

6　　　　MR. ELLMAN:　No objection, your Honor.

7　　　　THE COURT:　All right.　Then let's begin with that.

8　　　　MR. MONTGOMERY:　Good morning, your Honor.　Claude

9　Montgomery, Dentons US, LLP, for the Official Committee of

10　Retirees.　Per your request on an order dated November 27 at

11　Docket Number 1854, you requested that a representative of

12　Lazard be here, and Mr. Andrew Yearley is in the courtroom,

13　your Honor.

14　　　　THE COURT:　Okay.　Would you ask him to step

15　forward?

16　　　　MR. MONTGOMERY:　Mr. Yearley, come forward.　He is

17　not an attorney, so if you would like to put him in the

18　box --

19　　　　THE COURT:　Oh, no.　That's all right.　He can stand

20　right there at the lectern with you.　What is your name, sir?

21　　　　MR. YEARLEY:　Andrew Yearley.

22　　　　THE COURT:　Would you spell that last name for us,

23　please?

24　　　　MR. YEARLEY:　Sure.　Y-e-a-r-l-e-y.

25　　　　THE COURT:　And what is your position?

1          MR. YEARLEY:  I am a managing director in the

2    restructuring practice at Lazard.

3          THE COURT:  Okay.  And what is your assignment in

4    connection with the City of Detroit case?

5          MR. YEARLEY:  So myself and a team that works with

6    me represent the Official Committee of Retirees as their

7    financial advisor and investment banker.

8          THE COURT:  Are you the head of this group?

9          MR. YEARLEY:  I share the engagement with another

10   senior partner, Ron Bloom, but, yes, the two of us are

11   managing the assignment.

12         THE COURT:  Okay.  What's your fee?

13         MR. YEARLEY:  It's a fixed monthly fee of $175,000 a

14   month plus reimbursable expenses.

15         THE COURT:  So what will you and the other members

16   of the firm assigned to this case do for $175,000 a month?

17         MR. YEARLEY:  So we've been working since early

18   September and essentially focused on four or five areas.  The

19   first would be diligencing and analyzing the city's ten-year

20   financial forecast that reflects the cash flows that could

21   come out of the city over the next ten years.  We obviously

22   are also looking at some of the key assets in the case,

23   whether that be Detroit Water and Sewer, Detroit art, land,

24   any other asset that potentially could be of value to the

25   creditors.

1          THE COURT:  What does "looking at" mean?

2          MR. YEARLEY:  So as an example, on Detroit Water and

3    Sewer, we have a group of professionals that work alongside

4    us at Lazard who are specialists in infrastructure assets,

5    and so we've been taking the city's forecasts and numbers

6    working across from Conway MacKenzie, E&Y, Miller Buckfire to

7    sort of understand, as an example, that asset, its cash

8    flows, its value, et cetera, so that would be one example,

9    digging into the numbers, understanding the business model,

10   understanding the various alternatives that could come out of

11   Water and Sewer.

12          Similar sort of function on the city's cash flows,

13   so looking in as much detail as possible into the operating

14   forecasts of the city, its revenues, its expense base, its

15   prospects going forward.  Inclusive in that because it's

16   included in the city's ten-year forecast is the reinvestment

17   program, so how does the city intend to spend money and

18   reinvest in the city, whether that be blight or otherwise, so

19   understanding the basis of all that and giving our committee

20   a view and an opinion on those forecasts.

21          THE COURT:  And what are your qualifications to do

22   this work?

23          MR. YEARLEY:  So I've been at Lazard for 13 years in

24   the restructuring practice.  I have been in the restructuring

25   world for over 20 years advising in both in-court and out-of-

1　court restructuring assignments.  I lead our team in our New

2　York office on the restructuring side and, again, have a long

3　history with the folks that make up our team of representing

4　distressed companies, creditors, et cetera.

5　　　　　THE COURT:  Is this your first municipal case?

6　　　　　MR. YEARLEY:  It is.

7　　　　　THE COURT:  Are we paying for your learning curve?

8　　　　　MR. YEARLEY:  No.

9　　　　　THE COURT:  How can you assure us of that?

10　　　　　MR. YEARLEY:  I think many of the issues that the

11　city faces are fundamentally issues that we see in the

12　private sector, and so whether it's analyzing cash flows,

13　business plans, assets -- there's obviously a municipal

14　overlay here that makes this somewhat different, including

15　the Chapter 9 filing.  I also work with folks --

16　　　　　THE COURT:  Well, I'll grant you that on the Detroit

17　water side.

18　　　　　MR. YEARLEY:  Um-hmm.

19　　　　　THE COURT:  But the art issue is certainly unique to

20　municipalities.  Yes?

21　　　　　MR. YEARLEY:  It is.

22　　　　　THE COURT:  The quality of life issues that you say

23　you're going to analyze are unique to municipalities.  Yes?

24　　　　　MR. YEARLEY:  They are.

25　　　　　THE COURT:  What were you going to say when I

1  interrupted you?

2        MR. YEARLEY:  So we have other professionals on the

3  team as well who have worked extensively in sort of

4  infrastructure assets or municipal-type work, so, as an

5  example, we're currently doing work for the City of

6  Philadelphia around their analysis around budgeting,

7  privatization of assets, et cetera.  Ron Bloom, who is my co-

8  partner on this, has a long history in dealing with both

9  government and union matters.  He's worked extensively with

10  the steelworkers union, worked within the TARP program in

11  government for the last four to five years before rejoining

12  the firm, so we do have a wealth of knowledge within the team

13  of these aspects of the case as well.

14        THE COURT:  What cities has he worked on or with?

15        MR. YEARLEY:  Well, he actually touched on Detroit

16  fairly extensively because, as the car czar, as he was so

17  named, in working with the restructurings of GM and Ford and

18  Chrysler, it was much --

19        THE COURT:  I asked what municipalities he'd worked

20  on.

21        MR. YEARLEY:  He has not worked on a municipality.

22        THE COURT:  How many hours a month does your

23  engagement involve?

24        MR. YEARLEY:  I can speak to the work we've done to

25  date in terms of the hours, so in September and October we

1 billed a little short of a thousand hours.  The month of
2 November is probably in the 400-hour neighborhood, so that's
3 the order of magnitude.
4         THE COURT:  I asked you earlier about your fee.  You
5 told me 175,000 a month.
6         MR. YEARLEY:  Correct.
7         THE COURT:  Wasn't there some other aspect of your
8 fee?  Help me recall.
9         MR. MONTGOMERY:  You're talking about the
10 transaction fee?
11         THE COURT:  Yes.  What is that fee?
12         MR. YEARLEY:  So it's not determined.  What we've
13 included in our letter is the opportunity in the event
14 there's an agreement between ourselves, the committee, and
15 the city to pay a final transaction fee based on the outcome
16 of the case.
17         THE COURT:  Mr. Montgomery, given Sections 903 and
18 904 of the Bankruptcy Code, why is it appropriate for your
19 experts to be looking into the city's decisions regarding its
20 budgeting?
21         MR. MONTGOMERY:  Your Honor, to the extent that that
22 budgeting will form the basis of a plan which the city hopes
23 to be consensual, our committee will have a view as to how
24 that budgeting matches what they have learned from Lazard
25 with respect to what is possible, and, therefore, it will

1  know what choices the city is making and proposes to bargain

2  with the city over those choices.  Obviously if the city

3  crams a plan down without the consent of the Retiree

4  Committee, it will do so based upon whatever cash flow

5  forecasts and other asset utilizations it will describe to

6  the Court, but ultimately I think it is the notion, certainly

7  not the prediction, but the notion that the committee will be

8  a participant in a negotiated solution to the City of

9  Detroit's plan of arrangement.

10        THE COURT:  I think our fee examiner, Mr. Fishman,

11  may be on the line.  Mr. Fishman, are you there?

12        MR. FISHMAN:  Yes, your Honor, I'm here.

13        THE COURT:  Hold on.  We're going to crank up your

14  volume a little bit.  Can you hear me okay?

15        MR. FISHMAN:  I hear you just fine.

16        THE COURT:  Do you have any questions for Mr.

17  Yearley?

18        MR. FISHMAN:  I do not.  I have reviewed the order

19  that the parties negotiated, and I understand it, and it does

20  not, in my mind, pose any unique problems.  And most of the

21  rest of what they're talking about are really substantive

22  issues as to which I'm not sure my opinion matters.

23        THE COURT:  And the record reflect that the -- the

24  terms of the employment have been agreed to by the city?

25        MR. MONTGOMERY:  They have, your Honor, and

1   specifically there is a stipulation that appears at Docket

2   1832 that reflects that, including the doubly expressed

3   caveat that the city has not consented to the transaction

4   fee.

5           THE COURT:  Okay.  All right.  If you have not

6   already, I will authorize you to submit an order granting

7   this motion through our order processing program.  Chris, do

8   we have that already, or do we need it again?  I'm sorry?

9           THE CLERK:  I don't see it here.

10          THE COURT:  Okay.  Will you do that for us?

11          MR. MONTGOMERY:  We will resubmit the stipulation

12  and formal order.

13          THE COURT:  Okay.

14          MR. MONTGOMERY:  Thank you, your Honor.

15          THE COURT:  Thank you for coming today, sir.

16          MR. YEARLEY:  Thank you.

17          THE COURT:  Okay.  One more moment, please.  Okay.

18  So it doesn't really matter to me which we do next.  The next

19  one on the list is the certification motion, and then we have

20  the issue regarding the ADR procedures.  Does anyone have any

21  preference as to which order we proceed?  No?  All right.

22  Well, then let's do certification first.

23          I guess my question for everyone who has a stake in

24  the outcome of this is whether anyone objects to the Court's

25  certification of the appeals of the eligibility order to the

1    Court of Appeals.  No objection?  Let me just ask you what
2    procedural issues any of you see, if any, that might arise
3    from the question about whether an eligibility order is a
4    final order or not.  I'm not asking you what your position is
5    on the question of whether eligibility is a final order or
6    not.  I'm asking you what procedural issues might arise from
7    that question arising.
8            MS. FENNING:  If I may, your Honor, Lisa Fenning of
9    Arnold & Porter appearing on behalf of the Retirement
10   Systems.  Since we filed the first motion, the other moving
11   parties have agreed that I will respond first.
12           THE COURT:  Okay.
13           MS. FENNING:  This may be a short hearing, based on
14   your comment, but as far as the procedural issues are
15   concerned, Rule 8003(d) should take care of any procedural
16   question relating to whether it's final order or
17   interlocutory order.  As part of the amendments to two
18   thousand -- enacted in 2005, the rule was intended to
19   facilitate exactly this kind of a proceeding to jump over
20   some of the procedural hoops to smooth the pathway, so in
21   theory you do not have to file motion for leave to appeal to
22   cover the base if it might be deemed interlocutory.  The
23   Court of Appeals has the jurisdiction under the amendments to
24   158 and this rule to decide that for itself.  It can either
25   deem it to be a motion for leave to appeal and grant the

1   certification as it chooses or it can treat it as a final

2   order, so the procedural next step would be the motion to

3   certify -- for leave to certify to the appellate court, and

4   then they grant or they don't.

5           THE COURT:  So you say "the next step."  You mean

6   the next step after this Court enters a certification?

7           MS. FENNING:  Absolutely, your Honor, but you're

8   talking about the procedural next step and whether there are

9   any obstacles.  There should not be.  As to the scope of

10  exactly what the Court of Appeals wants to hear, it will

11  decide.  The issue that goes up is the order.  The order is

12  two paragraphs, simple, straightforward, except for all the

13  imbedded issues which resulted in the 143-page order, but the

14  Court will determine that, and the Court can decide whether

15  it's interlocutory or final, and it can choose to hear it

16  regardless of which one it is.

17          THE COURT:  Okay.  In connection with a

18  certification that this Court would enter, what kinds of

19  supporting statements under the rule do I need to make, if

20  any, or is it just simply a certification?  I think I need to

21  find that one of the statutory grounds is met; right?

22          MS. FENNING:  Yes, your Honor, but it's --

23          THE COURT:  What else?

24          MS. FENNING:  It's been stipulated this is a matter

25  of great public importance, which is --

1          THE COURT:  Right.

2          MS. FENNING:  -- one of the grounds.  It would be

3    helpful if you would determine that this is a discrete issue

4    that is -- that warrants expedited treatment on appeal

5    because it could help resolve the issues in this case.  We

6    are going to be seeking expedited treatment in the Court of

7    Appeals.  If they are willing to go along with us, we would

8    be seeking a briefing schedule that could conceivably, if

9    everything fell into place, lead to a hearing and a decision

10   as early as March or April.  We would like to have a decision

11   before confirmation.

12         THE COURT:  What if I don't think that's in the best

13   interest of the case?

14         MS. FENNING:  I'm sorry.

15         THE COURT:  What if I don't think that's in the best

16   interest of the case?

17         MS. FENNING:  You don't think that's in the best

18   interest of the case to clarify the standards that should be

19   applicable?

20         THE COURT:  I'm only asking what if.

21         MS. FENNING:  What if?  The certification rule is a

22   mandatory rule.

23         THE COURT:  Um-hmm.

24         MS. FENNING:  If you do not think it's in the best

25   interest of the case, the Court of Appeals or the District

1   Court could disagree and authorize that to proceed in any

2   event.  I mean I'm here as appellate counsel.

3           THE COURT:  No, no.  Don't misunderstand my

4   question.  It's clear enough I have to certify, so that part

5   is beyond discussion or question here.

6           MS. FENNING:  All right.

7           THE COURT:  You raised the issue of me making a

8   recommendation or a statement regarding expediting the

9   appeal --

10          MS. FENNING:  All right.

11          THE COURT:  -- as if I agreed with that, and so my

12  question was what if I don't agree that expediting the appeal

13  is in the best interest of the case?

14          MS. FENNING:  That would be a bit surprising to me

15  in light of your handling of this matter.  I mean it is

16  ironic in some respects we've now caught up with San

17  Bernardino even though it started more than a year earlier

18  since they just granted certification last Friday.  The

19  hearings in this case have stressed the importance of

20  expediting the decision.  Your opinion stressed the

21  importance of reaching this decision early, getting it

22  resolved early.  To be consistent with all of that, urging an

23  expedited resolution to the Court of Appeals would be

24  entirely in line with the handling of this case.

25          THE COURT:  Well, but, again, we can talk about

1  whether it's appropriate to request an expedited hearing or

2  not.  That's not really my question at this moment.  My

3  question was if I don't agree that expediting the appeal is

4  in the best interest of the case, should I say that in the

5  certification?

6  MS. FENNING:  Well, I suppose you could.  I would

7  ask that you not take that position, of course, but we would

8  ask --

9  THE COURT:  Well, let me just ask then the direct

10  question.  Why is expediting the appeal in the best interest

11  of the case?

12  MS. FENNING:  Because if we were able to get a

13  decision from the Court of Appeal and if the Court of Appeals

14  agreed with the objections to eligibility, particularly if

15  the Court of Appeals agreed with the Retirement Systems' view

16  that even if the case has -- case should go forward, it could

17  not properly impair pensions, that directive would be

18  available to inform the parties and the Court in the process

19  of the confirmation of the plan and would avoid unnecessary

20  proceedings in this Court going forward with a confirmation

21  that could be reversed on appeal going back to the original

22  eligibility finding.  That would be my argument.

23  THE COURT:  Well, the Court would either affirm or

24  reverse the eligibility order; right?

25  MS. FENNING:  The Court could do three things, in

1  our view.  They could affirm, they could affirm with

2  directions, or they could -- they could reverse with

3  directions, or they could just flat out reverse.  From the

4  Retirement Systems' viewpoint, it is possible -- the middle

5  ground would be allowing the case to proceed as eligible but

6  directing that the pensions not be impaired, and if that

7  directive came down because the Court of Appeals agreed with

8  our position, then that would inform the process of

9  negotiating and confirming a plan.  If the Court of Appeals

10 reversed, we've been retained to take it all the way to the

11 Supreme Court, if necessary.  I doubt we would get an answer

12 from the Supreme Court within that time period, but we would

13 hope that the Sixth Circuit would clarify the law.

14        THE COURT:  To what extent should the Court inquire

15 of you and/or the mediator regarding the status of mediation

16 and take that into account in determining whether to suggest

17 expedition to the Court of Appeals?

18        MS. FENNING:  The Retirement Systems are

19 participating actively in the mediation process and will

20 continue to do so.  This is a dual track process.  Robert

21 Gordon and Clark Hill will be continuing to move forward on

22 the bankruptcy level.  We'll be parallel tracking at the

23 appellate level.  We are not trying to slow down the

24 confirmation process.  We think the two things have to go in

25 tandem.  And I don't think it will adversely impact the

1    retirement -- the mediation process.  The fact that the issue

2    is undecided on appeal means that the parties can disagree

3    about what the ultimate outcome will be, but that exists

4    whether the appeal is fast or slow.

5         THE COURT:  Thank you.  Would anyone else like to be

6    heard on any of the questions that I've asked?

7         MS. LEVINE:  Good morning, your Honor.  Sharon

8    Levine, and I'm here with Phil Gross, Lowenstein Sandler.

9    Thank you.

10        THE COURT:  Mr. Gross.

11        MS. LEVINE:  Your Honor, just addressing briefly the

12   issue of expediting and whether or not it's in the best

13   interest of the case or not, our view is slightly different

14   than that previously expressed.  From AFSCME's perspective,

15   this is an issue of national importance.  We're already

16   seeing across the country the impact that the issue,

17   especially with regard to the pensions, is having as we are

18   having dialogues in other jurisdictions in Michigan and

19   throughout the country.  In addition to that, equally

20   important, perhaps maybe even more important, is your Honor's

21   ruling with regard to the need to engage in good faith

22   negotiations before approaching a Chapter 9 setting, and so

23   for us having those two issues on appeal and decided quickly

24   could be useful.  That is separate and apart from what's

25   happening in Detroit, which is also important.  As your Honor

1    may recall, we tried to negotiate prior to the bankruptcy.

2    We actually didn't oppose the appointment of the Retiree

3    Committee.  Our response was directed towards actually

4    getting a seat at that table and participating through that

5    process.  We gave your Honor comments with regard to the

6    mediation order, which hopefully you found constructive, some

7    of which we think you adopted.  We've been actively

8    participating in mediation.  We hope to actively participate

9    in negotiating a plan of adjustment.  We're not saying that

10   we should wait or stall because of an appeal, whether it goes

11   fast or slow.  Detroit has serious issues.  We intend to

12   fully engage to try and work through those problems, but we

13   do think that having these issues certified and having them

14   decided quickly here and more broadly would be constructive

15   for everybody.  Thank you.

16          THE COURT:  So your view is interesting.  It holds

17   that in deciding whether to expedite the Court of Appeals'

18   consideration of these issues, the Court should take into

19   account not just what's in the best interest of the case but

20   also the public importance of the issues themselves.

21          MS. LEVINE:  Yes, your Honor.  And we think that

22   that's imbedded in Chapter 9 itself, which recognizes in an

23   eligibility decision there's not going to be a stay, but

24   there is likely going to be an appeal, which is probably why

25   they specifically addressed the fact that you're not going to

1   have a stay.

2           THE COURT:  Um-hmm.  Thank you.

3           MS. LEVINE:  Thank you.

4           MR. MONTGOMERY:  Your Honor, in response to your

5   inquiry regarding expedition, we would -- the Retiree

6   Committee would support it because, as you said on page 38 of

7   your opinion, resolution of the pension question is of utmost

8   importance to confirmation or confirmability of a plan, and

9   regardless of how the parties negotiate from now until the

10  conclusion, we think that both the likelihood that the Sixth

11  Circuit will make a decision soon and the reality, whichever

12  it does, will help the resolution process.  Our clients are

13  narrowly focused on the harm done to them.  There is public

14  importance, but that's not really what worries them.  They're

15  really worried about the direct harm, and so they would urge,

16  your Honor, that to the extent you're debating the question

17  of whether or not expedition is helpful, they would request

18  that you expedite.

19          THE COURT:  You're not telling me that your position

20  is to suspend mediation pending the appeal?

21          MR. MONTGOMERY:  Absolutely not, your Honor.

22          THE COURT:  Your client committed to proceeding full

23  steam ahead on the mediation pending the appeal?

24          MR. MONTGOMERY:  Absolutely.  As you might expect,

25  we have --

1        THE COURT:  I accept your representation.

2        MR. MONTGOMERY:  We have a different perspective on,

3    you know, what's achievable and why, but, yes, your Honor.

4        THE COURT:  Well, okay.

5        MR. MONTGOMERY:  Thank you.

6        MS. BALL:  Good morning, your Honor.  Corinne Ball

7    of Jones Day for the city.  Your Honor, I rise to address the

8    question that you asked about procedure.  We think it's clear

9    that the order is interlocutory, so, your Honor, we think

10   that places a burden on the Court to make a finding as to

11   which it's a controlling question of law, there's substantial

12   ground for difference of opinion, or that, third, which is an

13   immediate appeal will materially advance the case clearly

14   addressed to your discretion.

15       We also think that in terms of having the dual

16   burden of certifying -- in addition to certifying an

17   interlocutory order, that your Honor has to find and should

18   find in order to do that that this case involves a matter of

19   public importance and that, therefore, should go directly to

20   the circuit.

21       We note, your Honor, that under the statute, under

22   158(d)(2)(D), proceedings before your Honor will continue

23   during the pendency of the appeal even if you do certify,

24   which I think answers some of the questions that you were

25   discussing with Mr. Montgomery.  While the city believes

1    proceeding with this appeal in the ordinary course is the

2    right answer, if the Court wishes to certify because it is a

3    matter of public importance, the city will consent to that

4    certification, your Honor.  If you have any questions, I

5    would be happy to answer them.

6              THE COURT:  What's the city's position on whether

7    the Court should recommend an expedited appeal or

8    consideration by the Sixth Circuit?

9              MS. BALL:   Your Honor, we are focused on proceeding

10   with the case before you.  If your Honor were to find that

11   resolution of this appeal would materially advance the case,

12   then expedition might be in order.  On the other hand, your

13   Honor, we are hopeful that we will continue discussing the

14   issues that separate the movants this morning from the city

15   throughout this period.  As you know, the city is dedicated

16   to proceeding as rapidly as possible with its plan moving

17   towards a plan of adjustment that will hopefully have broad

18   creditor support.  That is our objective.  Anything that

19   detracts from that is not necessarily something we would

20   support.  However, your Honor, we understand the significance

21   of the decision that your Honor rendered, the importance to

22   the parties, and perhaps the law itself, so if your Honor

23   were to certify, we would consent.

24             As to expedition, your Honor, we understand that --

25   we have looked into the rules before the Sixth Circuit.

1    They, unlike other circuits, do not have a weekly scheduled

2    motion day to hear certification petitions like some other

3    circuits.  I think my colleague, Judge Fenning, has shared

4    with your Honor that the time frame, even expedition, looks

5    to us to be two to three months, in any event, longer if you

6    don't, so perhaps expedition is -- expedition would be the

7    only way to accomplish the movant's objective, but rest

8    assured, your Honor, we will be moving ahead on pursuing

9    restoring the city's viability and its plan.

10            THE COURT:  Thank you.  All right.  The Court will

11   enter an appropriate order certifying this matter to the

12   Court of Appeals.  I want to think a bit more on the issue of

13   whether to say anything about whether the appeal should be

14   expedited, but I'll do something in the next day or so.

15            And so now let's turn our attention to the other

16   matter, which is the ADR procedures.

17            MR. ELLMAN:  Thank you, your Honor.  Jeffrey Ellman

18   from Jones Day on behalf of the city.  We have filed our ADR

19   procedures motion in the spirit of, as we're talking about,

20   moving the case along, and we are very anxious to begin this

21   process.  We filed the motion under 105 -- Sections 105 and

22   502.  I'd be happy to provide some background and context to

23   the process and a little bit of an overview of what we're

24   trying to accomplish, not very lengthy, or we can just talk

25   about the objections if the Court prefers.

1          THE COURT:  Well, I've read everything, including
2     your amended proposed order --
3          MR. ELLMAN:  Okay.
4          THE COURT:  -- so I'm much less interested in the
5     history than I am in what discussions, if any, you've had
6     since then and what objections are still outstanding.
7          MR. ELLMAN:  That would be fine, your Honor.  I can
8     do that.  I can report that we had six or I guess maybe seven
9     filed objections, depending on how you count them, and four
10    informal objections.  I'd say the majority of them are
11    resolved.  We have four or five, depending on how you count
12    them, that may be open and that may require the objecting
13    parties to state where we stand.  And I say six or seven
14    filed objections or four or five resolved because there was a
15    motion filed this morning.  I don't know if your Honor has
16    seen it.
17         THE COURT:  I have.
18         MR. ELLMAN:  I had not seen it before I got here
19    before it was filed, and it was handed to me while you
20    were -- when we were in court, so I know kind of what it
21    says, but that hasn't obviously been addressed in any way, so
22    let me tell you what we have resolved.  Then we can talk
23    about what's open.
24         THE COURT:  Mr. Goodman, I will give you every
25    opportunity to be heard, sir.

1     MR. GOODMAN:  My only problem, your Honor, is that I

2  can't hear very well.  I can't hear Mr. Ellman.

3     THE COURT:  Oh, well, then you may have a seat right

4  there in the jury box and perhaps hear best.

5     MR. GOODMAN:  Thank you, your Honor.  I apologize.

6     MR. ELLMAN:  Am I speaking well enough into the

7  microphone?

8     THE COURT:  For my purposes, yes.

9     MR. ELLMAN:  Okay.  Thank you.  All right.  Well, as

10  far as the objections, your Honor, we --

11     THE COURT:  Let's get Mr. Goodman situated, and then

12  you can proceed.  Okay.  Let us know if we need to make any

13  other adjustments here.

14     MR. GOODMAN:  That's fine.  This is fine.  I just --

15     THE COURT:  Okay.  Go ahead, sir.

16     MR. GOODMAN:  -- have a bad ear, so to speak.

17     MR. ELLMAN:  Well, your Honor, as you know from

18  reading the procedures and certainly in light of the Court's

19  concerns in this case, we designed the procedures primarily

20  to address the tort and litigation claims, and we used the

21  process that you've seen in the papers with the Wayne County

22  Mediation Tribunal, which is a well-recognized process, to

23  adopt into what is I think otherwise sort of a typical -- at

24  least in our experience, typical kind of ADR process we've

25  used, so it was never really intended to be used for every

1   kind of claim in the case.  We did reserve the right, which

2   we thought was appropriate, in our discretion and have some

3   flexibility to use it if -- this process for other kinds of

4   claims, but we had a number of objections from people saying,

5   "My claim doesn't really fit in this.  Can you confirm it

6   doesn't fit in this?"  And so we have in the revised form of

7   order -- and we revised it one time since what your Honor has

8   seen -- excluded the pension claims, the post-employment

9   benefit claims, the retiree healthcare, for example, labor-

10   related grievances, workers' compensation claims, the

11   certificate of participation-related claims.  The one we've

12   added is the general obligation bond debt, and the U.S.

13   government asked us if we'd exclude their claims, which we

14   have.  Obviously we were never intending to put in claims

15   that were already in mediation and other procedures, so that

16   series of exclusions resolves the -- my understanding, the

17   Retirement Systems' objection, AFSCME's objection, U.S.

18   government's objection, FGIC, ATU, and Ambac, so that puts

19   aside -- one, two, three, four, five -- six right there.

20         Then it gets a little more complicated, I would say,

21   because we have agreements in principle to resolve Mr.

22   Goodman's objection for Ryan, to the extent it's still

23   pending because he's moved to substitute a different party,

24   and the public safety unions' objections.  We have had

25   trouble getting the language in a place where people all

1    agreed to it, but let me explain to you what we tried to
2    achieve, which we'd be willing to do based on an order of the
3    Court, whether anyone else agreed to it, as long as your
4    Honor agreed to it, but the public safety unions' concern,
5    your Honor, is about the types of claims that are filed that
6    involve their members, what we called multi-party claims, I
7    think, in the procedures order.  And often the city is sued,
8    and the members are sued as co-defendants.  If we put in the
9    claim that's been asserted against the city into ADR, what
10   happens to their indemnification claim, their defense and all
11   that?  And we said it's a very fair point.  Really these
12   should go together into the process.  Everyone who's involved
13   is in the process, so we designed a revision to the
14   procedures to make sure they got to be in the process.  They
15   would get ADR notices at the same time.  Hopefully everything
16   would be resolved together.  If it doesn't get resolved and
17   people don't agree to go to arbitration, then it'll get
18   litigated presumably.  And if that happens, you know, the
19   union members are subject to your Honor's extended stay, so
20   we gave them the right at the end of ADR if there's no
21   resolution to come in and argue the stay should stay in place
22   even though the ADR procedures might say it would go away.
23   That seemed fair to us.  And we think in principle that
24   resolves the union's concerns, and I think on that issue it
25   probably does, and Ms. Patek can explain if it does or not.

1        The more complicated issue was the Ryan matter,

2    which your Honor I know is familiar with because it's been

3    before the Court before.  And there was an actual -- there

4    was litigation over preventing the stay from being lifted,

5    and you'll see in our proposal what we're asking the Court to

6    do is, in fact, lift the stay on this matter, which is a

7    somewhat dramatic change of position, but it's consistent

8    with paragraph 9 of the ADR procedures which allows the city

9    to look at claims and in unique or appropriate circumstances

10   decide this is not a case that's going to settle likely and

11   it won't benefit from ADR.  We're going to take it right --

12   just lift the stay and let it go be litigated.

13       And for Ryan, although we had litigated about

14   lifting the stay previously, in the context of having a

15   program in place where the city understands how it can manage

16   the cases going through the system, it does feel comfortable

17   lifting the stay for this matter.  I was very concerned when

18   it didn't have a program, but now it -- you know, we've

19   talked about it quite a bit, and we've worked very closely

20   with the city's law department, and Ed Keelean, the deputy

21   corporation counsel, is here today as well, and so we've

22   talked about how this would work, and they're very

23   comfortable with this in this context.  So I think that's

24   sort of easy.  We would stipulate to lift the stay, and it's

25   consistent with the procedures if your Honor approves the

procedures. The complicated part and the resolution of it
was that there are two members of the public safety union who
are codefendants, so we had to work out something with the
union about that. And what we did is effectively agree
that -- which is already in our procedures anyway -- we
agreed to confirm specifically that lifting the stay is only
to liquidate the claims. It's not about collection. And
that's true for the public service union members as well
because they're subject to a stay, so if there was a desire
to collect at the end of a judgment having been achieved,
they would have to come back -- the plaintiff would come back
here and ask your Honor to lift the stay as we confirm that
lifting the stay for now is only to liquidate the amounts,
and otherwise the stay would be in place. We confirm that.
We also confirm that the city will continue to defend the two
members of the union who are in this lawsuit with only a
couple of caveats. One is that the defense is conditioned on
the cooperation of these defendants. That's part of the way
this works. They have to -- if they don't cooperate, they
don't show up, they don't necessarily get defended. And the
same thing with indemnification. They will have a right to
seek an indemnification claim but, again, only if they
cooperate, and I guess for both defense and indemnity only if
they don't testify in a way that demonstrates that they were
not acting in the good faith performance of their duties.

1   This is just the standard that applies to these kinds of

2   cases, so -- but we did give some, I think, significant

3   assurances that absent those things where defense and

4   indemnity go away by their nature, we will defend and they

5   will have an indemnity claim.  How the claim gets treated --

6            THE COURT:  Suppose there's a dispute as between the

7   individual employee and the city about whether there was that

8   kind of cooperation.

9            MR. ELLMAN:  Well, that would have to be

10  adjudicated.  I don't know where that would be adjudicated.

11  That may be something that --

12           THE COURT:  Where would it be adjudicated if it

13  weren't for the bankruptcy?

14           MR. ELLMAN:  If I could ask Mr. Keelean that

15  question, I would appreciate it, your Honor.

16           MR. KEELEAN:  It would be resolved by grievance

17  through arbitration.

18           MR. ELLMAN:  Grievance in arbitration.

19           THE COURT:  So does this agreement change that?

20           MR. ELLMAN:  Absolutely nothing --

21           THE COURT:  For example, does it put me in charge of

22  that decision?

23           MR. ELLMAN:  We're not intending to change anything

24  about that process whatsoever, your Honor.

25           THE COURT:  Are you willing to specify that in the

1 order?

2        MR. ELLMAN: I would certainly be. I presume that

3 that's okay with my client, and he says yes.

4        THE COURT: All right.

5        MR. ELLMAN: Yes, we would be perfectly fine with

6 that. We were not intending to change any of that. And also

7 it says in our draft stipulation we put together lifting the

8 stay the individual members have the right to hire their own

9 counsel as well if they would like to. Obviously true. So

10 that's where we stand, so we have sort of an agreement in

11 principle between the unions and Ryan on that, but getting

12 the details, especially on the union piece of this, has been

13 challenging. Now, of course, this morning the Ryan objection

14 was -- there's a motion to replace Ryan and have a different

15 party than the objecting party, which we obviously -- maybe

16 it's not obvious, but we disagree with that motion. We would

17 oppose that motion. We would not -- I think the plaintiff in

18 the other matter that Mr. Goodman has is named Swift. I

19 don't know anything really about this case, but I talked

20 briefly with Mr. Keelean in advance of the hearing, and

21 although it may have some similarities to Ryan in the nature

22 of the kinds of relief being sought, we would not agree that

23 this is a -- that was an appropriate case to go right into

24 litigation without the ADR procedure, so we'd oppose the

25 motion to substitute on whatever grounds it really states,

1  which I haven't really studied, and on the merits we would

2  oppose, you know, whatever it says about the ADR process for

3  all the same reasons we were defending the process for

4  everyone else, so that's where we stand with Ryan, this new

5  party, Swift, and with the public safety unions, and then

6  there are two --

7       THE COURT:  Well, but in regard to your concession

8  regarding Ryan --

9       MR. ELLMAN:  Um-hmm.

10      THE COURT:  -- why agree to allow that case to

11  bypass ADR, if I can phrase it that way, and not all the

12  other 1983 actions pending in this District Court?

13      MR. ELLMAN:  Well, I mean I think the answer, your

14  Honor, is the city will look at these on their merits and

15  determine which of these causes of action will benefit from

16  the ADR process based on our discussions with Mr. Goodman and

17  his client to date, based on evaluating the type of action,

18  the facts, the likelihood of settlement.  You know, it's a --

19  it's like a business judgment-type test.

20      THE COURT:  So you want the opportunity to do that

21  for all the other 1983 actions.  Is that what you're saying?

22      MR. ELLMAN:  Yes, because they're all unique, and

23  the way the process was put in place is that everyone -- and

24  we've committed all the tort -- personal injury tort, all

25  these kinds of litigation cases go into ADR.  We will

1    designate them all into it, but we gave ourselves an escape

2    hatch because we know that we don't want to waste our time

3    and everyone else's time.  If it looks to us like it's not

4    really going to be beneficial, we will not do that.  And, of

5    course, the procedures are very flexible.  If we start the

6    process and we begin the first offer exchange procedure and

7    it looks like this is going nowhere, we have the ability by

8    agreement to just move this off into litigation, so we want a

9    process that's efficient.  We believe -- I know the city very

10   much believes that this -- the offer exchange and the Wayne

11   County MTA process will be very successful in resolving a

12   number of claims, and they've been doing this for a long

13   time.  And Mr. Keelean and his team have a very good sense of

14   what makes sense, and they're going to be managing this in

15   the legal department for the most part, so the process needs

16   to be a procedure that's going to deal with a lot of claims

17   that they have to feel comfortable with their staff that they

18   can deal with, and they're going to make sure that they feel

19   comfortable that what they do is going to be in the best

20   interest of the process.

21        THE COURT:  Your proposal includes a bar against

22   filing motions for relief from the stay.

23        MR. ELLMAN:  During a period of time, yes, it does.

24        THE COURT:  That has the effect of giving the city

25   the first and really only call on whether ADR will work or

1  not; right?

2       MR. ELLMAN:  That is correct, and the idea is that

3  the debtor is responsible for managing this process, and the

4  debtor is the focal point of what we project to be certainly

5  over a thousand claims that we've committed will go into ADR.

6  And we've given ourselves --

7       THE COURT:  Well, but if a particular plaintiff and

8  obviously their lawyer believes that ADR won't work, why not

9  give them an opportunity to try to persuade the Court that

10  that's the case?

11       MR. ELLMAN:  Well, we certainly -- there's no reason

12  you couldn't do that, but our view is that that would be

13  extremely inefficient.  It would be a burden.  That would

14  eliminate or mitigate a lot of the benefit we see in this

15  program to take some of the relief from the docket off of the

16  Court and to push people into a process that we think can be

17  managed.  If we're still coming into court every day talking

18  about whether people should be in ADR, I think it's

19  problematic, and we really didn't have that many objections.

20  We did serve every party we know who has sued us and everyone

21  who's made a demand on us who might sue us or indicated they

22  might sue us.  It's about 1,800.  They may not be unique

23  names.  There may be a lot of overlap, but 1,800 people on

24  the list, and we did not get a lot of responses at the end of

25  the day, and certainly most the responses were people like

1     the, you know, Retirement Systems --

2           THE COURT:  Right.

3           MR. ELLMAN:  -- and unions dealing with other

4     issues.  We understand -- and I don't practice in this

5     jurisdiction for these types of cases, but the Wayne County

6     MTA process works pretty well is my understanding, and people

7     understand it and have used it, and so even if we didn't do

8     this, you know, a court could just send -- your Honor or a

9     District Court judge could send someone to this process, so

10    it doesn't seem to us to be an unfair thing to do, and

11    that -- you know, that could happen in any case, so we think

12    this is the best way to manage it.

13          Now, there are two other objections I didn't mention

14    just very briefly.  One was by a gentleman, Jeffrey Sanders,

15    who's a pro se party, filed a case in 2007 having to do

16    with -- he was arrested for domestic violence charges, and he

17    asserts some constitutional violations based on that arrest

18    is my understanding.  I couldn't perceive in his filing

19    really a basis to challenge the ADR procedure, so we would

20    ask for that to be overruled, which we note in our papers.

21          And then we have Lasalle Town Houses Cooperative

22    Association, and there are some -- a couple of other

23    plaintiffs we've called the cooperatives.  That one --

24    there's some indication, based on discussions before the

25    hearing, that perhaps this is -- our proposal may be

1    acceptable to the cooperatives, and counsel can address that.
2    This is a punitive class action dealing with the rates that
3    the water department charges to these residential units,
4    which they treat as commercial buildings because they're
5    multi-unit facilities.  Just to cut to the chase as to what
6    we're proposing, they filed also a lift stay motion to
7    proceed to get a judgment on pre-petition claims, post-
8    petition claims, and an injunction about the way rates are
9    charged in the future.  The ADR process is not set up to deal
10   with injunctive relief.  It wasn't for that purpose.  But
11   this is a case that's largely about money damages or at least
12   substantially about money damages, and we believe the ADR
13   process would be useful.  And, of course, in the context of
14   discussions in an ADR process, the city and the plaintiffs
15   can agree to other kinds of relief as well, and we think
16   sitting down and having that discussion would be useful.  So
17   we have proposed that this would go into the ADR process.
18   We're prepared to put it in, you know, early in the process,
19   we said within 30 days of the bar date, get the process
20   started quickly.  At the end of that process, we have
21   committed that the stay will be lifted if there's no
22   resolution and if it doesn't go to arbitration, which I don't
23   think it will, and the stay will be lifted.  They will get
24   their stay relief.  The only thing we're asking in exchange
25   for that is that they do attempt to talk to us about

1    resolution to this process.  From talking to counsel just

2    before the hearing, it sounds like perhaps that might be

3    acceptable.  They were thinking about it still.  That's where

4    we are with that objection.  That covers all the objections,

5    your Honor.

6              THE COURT:  Thank you.

7              MR. ELLMAN:  And if you have any other questions,

8    I'd be happy to answer them.

9              THE COURT:  No.

10             MR. ELLMAN:  Thank you.

11             MS. PATEK:  Good morning, your Honor.  Barbara Patek

12   on behalf of the Detroit public safety unions.  Much of what

13   Mr. Ellman said is correct.  We have -- but we do have some

14   unresolved issues.  A big one, I think, was addressed by the

15   Court, that as long as the order suggests that if there is a

16   dispute on indemnification that the ordinary course grievance

17   arbitration procedure would kick in would resolve a lot of

18   our issues.

19             We have the following that we raised in our

20   objection.  One is since we filed and sought an extension of

21   the stay to former public safety union members, we've been

22   trying to get from the city -- and we understand the

23   difficulties the city has sometimes with compiling this

24   information -- a list of the known claims in which current or

25   former public safety union members have been named as the

1  defendants, and we -- to the extent that the Court is
2  overruling any part of our objection, we want it clear that
3  it's not overruling our right to seek that information and to
4  continue to seek that information because it'll be important
5  not only to the ADR process but to our ability to file claims
6  on behalf of those individuals.
7          The indemnification claims -- and this is where I
8  think there may need and we -- I was working over the weekend
9  with the city, and we just didn't quite get there.  There are
10 a couple of different buckets.  First of all, throughout the
11 order, it should indicate where it says "public safety union
12 members," it should be "current or former public safety union
13 members" because some of these folks are no longer employed,
14 and, in fact, some of them are leaving their city employment
15 just because of the difficulty of the circumstances of
16 continuing to work there.
17         We've got cases -- and I believe, as I read their
18 order, the only cases that are going to be submitted to ADR
19 are cases in which the city is a co-defendant.  There are
20 some cases where the city is not named as a defendant.  For
21 example, there's a lift stay motion on the Fulgenzi,
22 Headapohl case, and so we want it clear that those cases, as
23 I understand it, will not be going through these ADR
24 procedures but will be dealt with in the ordinary course.
25         There are also, to my understanding, a category of

1  Section 19 --

2          THE COURT:  When you say "dealt with in the ordinary

3  course," they're stayed until the Court grants relief from

4  the stay.

5          MS. PATEK:  Correct, and through the labor --

6          THE COURT:  That's what you mean.

7          MS. PATEK:  And they are -- and Mr. Moore, who is

8  the DPOA's labor counsel, is here in the courtroom today

9  because I'm not intimately familiar with that process, but my

10  understanding is through the mediation and in the ordinary

11  course, labor grievances are proceeding, and these

12  indemnification claims -- it's a little bit tricky because

13  they're carving out grievances, but these kind of will fall

14  into two buckets here, and we just want to --

15          THE COURT:  Right.

16          MS. PATEK:  -- make sure nothing happens that

17  prejudices us.  Also, to the extent -- and this was raised,

18  and my understanding is I'm not -- I think the city is

19  opposing this, but to the extent that any of these --

20          THE COURT:  Wait.  Let's wind the clock back a

21  little bit here because I want to be sure I get this right

22  with you.  If there's a dispute between an individual and the

23  city in a case where the city is not a codefendant --

24          MS. PATEK:  Correct.

25          THE COURT:  -- about whether the city will indemnify

1  and defend that individual in that case, the stay prohibits

2  any legal action by the individual against the city to get

3  that issue resolved.  Yes?

4         MS. PATEK:  You're talking about the individual

5  public safety union member.

6         THE COURT:  Yes.

7         MS. PATEK:  Except to the extent that -- and, again,

8  I will let Mr. Moore, if the Court would allow it, address

9  that.  I believe that a mechanism is being worked out either

10  through the mediation process or otherwise where these issues

11  are being addressed, and I think the city has proposed to

12  address them in the ordinary course.

13         THE COURT:  Okay.  And will that resolution be a

14  part of this order?  Is that what you're contemplating, or

15  something else?

16         MS. PATEK:  That resolution will not be a part of

17  this order, but we want to make it clear that this order is

18  not addressing the merits of that.  We want to carve it out

19  so that our -- what we're seeking to --

20         THE COURT:  Okay.

21         MS. PATEK:  -- do is to preserve our rights here.

22         THE COURT:  Okay.

23         MS. PATEK:  And the way these indemnification claims

24  arise, sometimes right out the door the city knows -- and I

25  think there may be only a small handful of these --

1          THE COURT:  Right.

2          MS. PATEK:  We don't think we have a defense and

3    indemnification obligation, and there's a grievance.

4    Sometimes as the case proceeds and through the process, the

5    city may determine we think we may not have an obligation to

6    indemnify, so we don't know when that --

7          THE COURT:  Um-hmm.

8          MS. PATEK:  -- is going to arise.  And so that's

9    why --

10          THE COURT:  Um-hmm, of course.

11          MS. PATEK:  -- we're trying to get our arms around

12   what's out there and work with the city to try to figure out

13   a resolution for that.

14          And the last thing is to the extent because as the

15   collective bargaining agreements have provided and as has

16   historically, to my understanding, been the case, it has been

17   the city's obligation to provide a defense to the extent any

18   of these claims is peeled off and put into ADR.  If there is

19   not going to be a unified defense in that case, we would ask

20   that the city through the ADR procedures pay the cost of

21   defense for the current or former public safety union member

22   who is part of that process, so --

23          THE COURT:  And that's something that's done in the

24   ordinary course outside of bankruptcy?

25          MS. PATEK:  In the ordinary course -- and, again, I

1  will let Mr. Moore or perhaps Mr. Goodman, who is on the

2  other side of these cases, address it, but my understanding

3  is in the ordinary course, the city is defending these cases

4  generally through corporation counsel, on occasion through

5  outside counsel.  There is generally a unified defense that's

6  provided, and then at some point, either after judgment or

7  along the process, a determination is made, and once the case

8  is resolved, typically, in the absence of some kind of

9  final -- in the absence of a final adjudication, that there's

10  no indemnification obligation, these individuals are

11  indemnified, and so that's --

12          THE COURT:  Okay.

13          MS. PATEK:  That's my understanding of how that

14  works.

15          THE COURT:  So you want to preserve those issues.

16          MS. PATEK:  Correct; correct.  And we're prepared --

17  and we've been working with the city to continue to work with

18  the city, and I understand, you know, the concerns about

19  pace.  With the Ryan motion, I think that we are generally in

20  agreement, especially with the -- you know, on the issue of

21  good faith, the indemnification obligation, as long as our

22  rights are preserved to protect that and that we're not

23  handing the decision on whether or not there's an

24  indemnification obligation over to the city, I think we are

25  comfortable --

1          THE COURT:  Okay.

2          MS. PATEK:  -- with that case proceeding.  And the

3    last little -- on the Ryan motion, there was an order.  They

4    talked about collection.  We would like no kind of proceeding

5    supplementary to judgment at all until further order of this

6    Court against the particular public safety union member who

7    might be affected.

8          THE COURT:  So by that you mean not even like a

9    creditors' examination?

10          MS. PATEK:  Correct.  I think these folks have

11    enough to deal with at this point.

12          MR. GOODMAN:  Good morning, your Honor.  Much of

13    what has been said does not address the interests or concerns

14    of Deborah Ryan.  However, I would just like to clarify

15    something that Mr. Ellman said that I think was somewhat

16    confusing, which is that this morning we filed a motion.  We

17    did, indeed, file a motion, but it was not a motion to

18    substitute Walter Swift, another action, in the underlying

19    Ryan motion to set aside the stay.  It was a motion to

20    substitute Mr. Swift as an objector to the city's --

21          THE COURT:  Right.

22          MR. GOODMAN:  -- ADR plan.  I don't know if the

23    Court has had a chance to see that motion.

24          THE COURT:  Would you put your appearance on the

25    record?

1          MR. GOODMAN:  William Goodman on behalf of Deborah

2    Ryan.  I apologize, your Honor.  So, as I said, I do not know

3    whether the Court has had an opportunity to see --

4          THE COURT:  I did.  I read it.

5          MR. GOODMAN:  Oh, good.  And I did not know that Mr.

6    Keelean would be here.  I served counsel with paper copies of

7    the motion and the exhibit, and I will give Mr. Keelean a

8    copy at the end of this motion this morning.  But at any

9    rate, the main point there is that while we are in agreement

10   in principle with the proposed order that -- with regard to

11   the Ryan case that was presented this morning to the Court,

12   we do want to urge the Court to consider that -- the systemic

13   issues that were raised in Ms. Ryan's objections and for that

14   specifically with regard to the ADR process, and paragraphs

15   7(a) through 7(g) of the proposed Swift objections identify

16   those as well.  And the reason that this is being brought

17   belatedly -- and I concede that -- is because the issue of

18   the debtor -- the City of Detroit has done a 180 essentially

19   on the question of whether or not they were going to

20   stipulate to our motion to set aside, and both Ms. Ryan and

21   other -- Mr. Swift, for example, who was relying upon those

22   objections as they might relate to his case and so many

23   others, was somewhat taken by surprise by that, so that's by

24   way of an apologia.  Now, you know --

25         THE COURT:  Well, but Mr. Swift, through counsel,

1   did have an opportunity to timely object.  Yes?

2       MR. GOODMAN:  I concede that, and he did not timely

3   object.  I concede that as well.  However, as I said, the

4   issues which he would have raised and does raise had already

5   been raised by Ms. Ryan, and there was no reason to

6   anticipate or expect that that would -- that essentially that

7   rug would be pulled out from under him, and -- but I concede

8   that it's late.  Other than that, I have nothing to say.

9   I'll answer any questions that the Court may wish to pose at

10  this time.

11      THE COURT:  Well, I guess I'm interested in your

12  response to the city's concern that to carve out a class of

13  cases that assert constitutional claims from the ADR

14  procedure denies it and, therefore, the other creditors in

15  the case the benefit of the efficiency that's built into it,

16  and there are, of course, also other administrative issues.

17  How does one decide whether one -- whether a particular case

18  is one that should be carved out if we were to create an

19  exception as opposed to one that shouldn't be carved out if

20  there is such an exception?

21      MR. GOODMAN:  Understood.  Keep -- I would like to

22  emphasize for the Court and for counsel in this matter that

23  Ms. Ryan's objections and now Mr. Swift's objections to the

24  proceedings, as it relates to them, are essentially

25  objections with regard to the fine-tuning of the plan and not

1  necessarily an objection with regard to the applicability of

2  any ADR process to any Section 1983 case.

3          THE COURT:  Okay.  So what fine-tuning would you

4  propose?

5          MR. GOODMAN:  I would propose that there be a

6  separate form of mediative or facilitative process with

7  regard to Section 1983 cases involving persons with some more

8  direct experience, knowledge, and skill in these areas than

9  one finds routinely over at the Wayne County Mediation

10  Tribunal with which I'm also quite familiar.

11          THE COURT:  So who or what would that be?

12          MR. GOODMAN:  I'm sorry.

13          THE COURT:  Who or what would that be?

14          MR. GOODMAN:  That would be subject to a process of

15  identification, selection of skillful practitioners, defense

16  and plaintiff's practitioners in this area.  I am sure --

17  confident I could sit down with Mr. Keelean and -- over a

18  process of a couple days and provide a list of 50 to a

19  hundred such lawyers for the Court --

20          THE COURT:  Um-hmm.

21          MR. GOODMAN:  -- and others as well.  They don't

22  have to be lawyers, by the way.

23          THE COURT:  So your primary objection is that the

24  personnel and the procedures of the ADR system in the Wayne

25  County Mediation Tribunal are not suited to these kinds of

1  claims?

2        MR. GOODMAN:  That's one of the objections.  Another

3  objection goes to the availability of both attorneys' fees

4  and punitive damages, which are excluded from the current

5  proposed ADR plan, and which are built into the

6  constitutional protection, as I understand the law on

7  jurisprudence in this area, and to deprive it is a

8  constitutional violation, I would say, and, therefore, that

9  would have to be readjusted and modified to some degree.

10        THE COURT:  Those two?

11        MR. GOODMAN:  Those are the two that I can think of.

12  There may be others --

13        THE COURT:  Okay.

14        MR. GOODMAN:  -- spelled out in the objections as

15  well that have --

16        THE COURT:  Thank you.

17        MR. GOODMAN:  -- slipped my mind.

18        THE COURT:  Anyone else want to be heard on this?

19        MR. ROMANO:  Your Honor, we'd like to be heard.

20        THE COURT:  Step forward, sir.

21        MR. ROMANO:  Good morning, your Honor.  Dan Romano

22  on behalf of a whole host of plaintiffs.  We filed an

23  objection with the Court listing about 91 plaintiffs we

24  represent in different causes of action.  Some of the

25  plaintiffs are in 1983 actions, and some of the concerns we

 1    have have been raised by Mr. Goodman.  However, we see there

 2    being an inherent problem with the process for a number of

 3    other reasons.  The list of litigants that we were given by

 4    the city includes people that are -- this could be cleared

 5    up -- includes people that have already been dismissed and

 6    settled like a year, two years ago.  It also includes lists

 7    of people that have already been through ADR processes and

 8    are actually either in the process, were in the process of

 9    setting hearings, actually having hearings at arbitrations,

10    and then those were stayed.  They also involve people that

11    have settled their claims and are waiting for distributions

12    after exchanging releases.  They also include the people

13    that --

14            THE COURT:  What's the problem with all this?

15            MR. ROMANO:  Well, the problem with all that is how

16    can -- are those going to all go through again the process?

17            THE COURT:  Why do you think they would?

18            MR. ROMANO:  Because there's no clarification in the

19    process in the order that was submitted by the city that

20    those are treated differently, and when they gave the list of

21    people that were included in this process, it didn't say that

22    those people were excluded from it.  And I don't know how

23    those people are going to be dealt with either, your Honor,

24    because there's issues also with when -- as Mr. Goodman

25    talked about, the difference between individual claims and

1   claims against the city.  At the end of the day when there's
2   a number put on that claim for an individual person, if
3   there's a discharge for the city, will there be a discharge
4   for the individual?  I mean I --
5           THE COURT:  Why does that matter?
6           MR. ROMANO:  -- don't know because the process --
7           THE COURT:  Why does that matter?
8           MR. ROMANO:  Because -- it matters a lot, your
9   Honor, because if there's a discharge for the city, then we
10  can -- and there's not a discharge for the individual, we can
11  go after the individual claims still so my clients will be
12  compensated.
13          THE COURT:  Only after the stay is lifted.
14          MR. ROMANO:  Correct.  But it doesn't indicate
15  that -- I think the language in the order that was presented
16  by the --
17          THE COURT:  That's a plan question, not an ADR
18  question, isn't it?
19          MR. ROMANO:  Well, not really because I think the
20  ADR -- the order that was presented was that the final
21  findings of any of these processes was to put a -- set a
22  value for discharge, so if it's setting a value for discharge
23  for even individuals that may then ultimately be collectible,
24  that's sort of an unnecessary process.  Also, it seems to
25  include -- it seems to include us in a process that incurs

1 much more expense for things that have already transpired in

2 many cases, and also what's the difference between this

3 process for individual claimants and the process for filing a

4 proof of claim when either is subject to discharge?  We have

5 to consider the expenses to our clients and to ourselves for

6 going through this process.

7        THE COURT:  The proof of claim is required

8 regardless; right?

9        MR. ROMANO:  Yes, but the proof of claim preserves

10 the right just like this process would have.  It's just about

11 getting a value for discharge.  And all that does is make my

12 clients put a lot more money forward for no reason.

13        THE COURT:  Why?

14        MR. ROMANO:  Because we have to go through a process

15 in some cases where we've already been through it, and,

16 secondly, when we have to go through a process to get a

17 value --

18        THE COURT:  Oh, that's what you were talking about

19 before.

20        MR. ROMANO:  Yes.

21        THE COURT:  But the proof of claim is something the

22 Bankruptcy Code requires.  There's nothing I can do about

23 that.

24        MR. ROMANO:  No.  I'm not asking you to do that,

25 your Honor.  I'm saying that this is redundant to the proof

1   of claim by the way the order says the relief given is.  The

2   relief is to discharge the claims, to set a value for

3   discharge.  What's the difference other than extra cost to

4   the plaintiffs versus filing a proof of claim?

5           THE COURT:  Well, but isn't the answer to that

6   simply that under the Bankruptcy Code this Court doesn't have

7   the jurisdiction to fix the claims for personal injury or

8   wrongful death, so they've got to be tried somewhere else

9   regardless?

10          MR. ROMANO:  Well, your Honor, in these particular

11  claims, there's issues again with not just -- we talked about

12  the 1983 claims, but there's also the issues with the

13  individual claims versus the city for motor vehicle ownership

14  as well, a number of issues.  Number one is the city is a

15  self-insured entity.  There's PIP claims, which if they reach

16  an end and they're discharged, what -- it doesn't talk about

17  in the ADR whether those are going to be taken over by

18  another entity, whether they're collectible through the

19  Michigan Property Guaranty Association, whether there's

20  discharge for the individuals in those cases, too, like if

21  they're driving a city-owned vehicle.

22          THE COURT:  So you're raising discharge issues that

23  I can't deal with now.  These are plan questions.

24          MR. ROMANO:  Well, they're also -- this process,

25  though --

1          THE COURT:  Just to give you a number.

2          MR. ROMANO:  Well, why is that any different than

3   the number that we would place in a proof of claim without

4   this process?

5          THE COURT:  It's not.

6          MR. ROMANO:  So why should the plaintiff incur extra

7   expense?

8          THE COURT:  It's a way to fix the amount of the

9   claim.

10          MR. ROMANO:  Right.

11          THE COURT:  What the consequence of that amount is

12   either for the city or for other parties is a plan question,

13   and I think the order is crystal clear about that.

14          MR. ROMANO:  Well, what about fixing the problem

15   with these claims that have already been through the process

16   or are waiting in different steps in the process --

17          THE COURT:  That's a good question.  That's a good

18   question.

19          MR. ROMANO:  -- and the claims that have already

20   been settled?  Are those supposed to --

21          THE COURT:  Right.

22          MR. ROMANO:  -- be going through this process?

23          THE COURT:  That's another good question.

24          MR. ROMANO:  There's a --

25          THE COURT:  Any other good questions?

1   MR. ROMANO:  I don't think so, not according to the

2   Court.

3   THE COURT:  Let's see what the answers are, you

4   know, because those are --

5   MR. ROMANO:  Right.

6   THE COURT:  You know, we don't -- I'm sure nobody

7   wants to, you know, duplicate effort, so let's just get it

8   clarified.

9   MR. ROMANO:  Okay.  Thanks, your Honor.

10   THE COURT:  Anyone else want to speak?  Step

11   forward, please, sir.

12   MR. SANDERS:  Good morning, Judge.  My name is

13   Jeffrey Sanders.  I've been a designated creditor in this

14   particular case, and I'd just like to represent that I

15   believe that approving this motion for this alternative

16   dispute resolution basically condones criminal oversight in

17   and of itself insofar as I guess the City of Detroit would

18   aspire to basically depart from the mandates of the law

19   itself and employ some other process or method, which

20   basically violates, I guess, the mandates of, you know, due

21   process and equal protection of law and so on and so forth.

22   THE COURT:  You know, that's such an interesting

23   issue that's -- you know, it's been debated for as long as

24   we've had alternative dispute resolution.  Ultimately,

25   however, if any particular party like yourself wants the

1  legal process invoked for a trial with a jury and all of
2  that, to the extent the party is entitled to it, they get it.
3  They get it.  Is that what you want?

4         MR. SANDERS:  Actually, what I want -- I believe
5  what I want -- personally, I want this thing to be addressed
6  and resolved and adjudicated in a lawful manner --

7         THE COURT:  Yeah.

8         MR. SANDERS:  -- and -- as opposed to --

9         THE COURT:  Well, you're entitled to that, and
10 there's nothing in this that will deprive you of that.

11        MR. SANDERS:  An alternative dispute resolution?

12        THE COURT:  It's just a way to see if the case can
13 be settled.  If it can't be settled, you get your full legal
14 rights.

15        MR. SANDERS:  Okay.  So in the event that the City
16 of Detroit, they just refuse to settle, they refuse to
17 acknowledge a claim, they refuse to refute it, they just
18 refuse overall to resolve it --

19        THE COURT:  They're entitled to do that just like
20 you're entitled to pursue your claim.

21        MR. SANDERS:  And so if it has criminal implications
22 that are made known to the Court, then what?

23        THE COURT:  That's not a question I can answer
24 because this is not a criminal court.  This is a Bankruptcy
25 Court.

1          MR. SANDERS:  Okay.

2          THE COURT:  Criminal issues get resolved somewhere

3     else, thank you.  Anyone else want to be heard?  Sir?

4          MR. ELLMAN:  Your Honor, Jeffrey Ellman from Jones

5     Day on behalf of the city again.  I'd be happy to answer --

6     address a couple of the points that were raised if that's

7     helpful to the Court.

8          THE COURT:  Yes.

9          MR. ELLMAN:  The last -- the person prior to the

10    last objector in the red tie -- I don't know his name.

11         THE COURT:  Mr. Romano?

12         MR. ELLMAN:  What's that?

13         THE COURT:  Mr. Romano?

14         MR. ELLMAN:  Mr. Romano.  Thank you.  I'm not sure

15    which party he represents, but he raised a couple points.  I

16    just wanted to answer how they would be addressed.  As far as

17    parties who have been through the process before, we tried to

18    address this to some extent, and it's in a footnote in our

19    procedures.  If you've been through case evaluation before,

20    you've been through this mediation process, case evaluation

21    process, it's not going to happen again unless the parties

22    agree that it's a good idea to try it again, so in that case

23    what would happen is you'd have offer exchange.  We'd make an

24    offer.  It could be as fast as the party says no, and it's

25    over, or there could be a discussion and a -- and a

1    settlement discussion out of that offer exchange process, but

2    we would not do the case evaluation again if it's been done

3    unless the parties both agreed that it was a useful thing to

4    do.  As far as -- I guess that was maybe the main --

5              THE COURT:  What footnote is that?

6              MR. ELLMAN:  It's Footnote 6, and I have an updated

7    draft.  I think it's probably Footnote 6 in what you have as

8    well, and it's in Section -- it's at Roman numeral II,

9    capital B, case evaluation.  It's the first footnote in that

10   section that refers to that.  We certainly don't want to

11   waste people's time doing something that's been done,

12   although we don't believe this is a highly expensive process.

13             Mr. Goodman raised a couple of points I can address,

14   and I'll do them in reverse order.  He made a point about no

15   attorneys' fees being permitted and certain other kinds of

16   claims not being permitted in this process.  That is in our

17   order -- or in our procedures but only as to arbitration,

18   binding arbitration, which is totally voluntary.  If he

19   doesn't like those procedures, he doesn't have to agree to

20   them.  We have updated the order -- or excuse me -- the

21   procedures to make clear that the parties can agree to

22   include all those things if they want to, so it's -- make it

23   a flexible process.  The parties could agree to include

24   everything, have a fight about attorney' fees and everything

25   else, but --

1    THE COURT:  So a party that's seeking punitive

2  damages need only opt out of arbitration?

3    MR. ELLMAN:  Well, just not agree to it.  Everyone

4  has opted out until they agree to be in, so there's no

5  automatic way into arbitration.  You have to agree to it.

6  Both parties have --

7    THE COURT:  If they opt in, they waive their

8  punitive damage claim.

9    MR. ELLMAN:  Or we will have to agree to some other

10  approach to it because we could agree with them that we will

11  include that in the process, so it's a streamlined process.

12  That's by agreement, so -- and that includes the city.  The

13  city doesn't have to agree to arbitration either.  The city

14  can say, no, thank you, to arbitration, so that's that point.

15    As far as having a separate process separate and

16  apart from the MTA process for certain kinds of claims, we

17  really tried to avoid that because we're going for simplicity

18  here, something that's easy to administer and user friendly.

19  My understanding is that these types of constitutional claims

20  do go to the MTA and that they have skilled practitioners.

21  Not every one of the courts necessarily sends every one of

22  these claims to that process, but they have been sent to that

23  process and have been dealt with successfully.

24    THE COURT:  Well, but simplicity has to be balanced

25  against effectiveness.

1          MR. ELLMAN:  It does, but my understanding, as I

2     said before, the city's view is that this process has been

3     extremely effective in reaching settlements, including of

4     these types of claims.  That's their experience in this

5     process.  The very high majority of cases that go to the

6     Wayne County Tribunal get settled, and so they see no

7     reason --

8          THE COURT:  Including 1983 actions?

9          MR. ELLMAN:  That is my understanding, yes.

10         THE COURT:  Do you have any objection if I check

11    with my chief district judge on that point?

12         MR. ELLMAN:  I certainly have no objection to that

13    whatsoever.

14         THE COURT:  Do you have any objection to that?

15         MR. GOODMAN:  I'd just like to say that I'm going --

16    Mr. Romano has a much larger caseload of 1983 cases than we

17    do.  We're a small law firm.  However, my experience has been

18    I've never served in that capacity in the Wayne County

19    Mediation Tribunal, and I've never been before it because

20    routinely when one asserts a Section 1983 claim and brings it

21    in Wayne County Circuit Court, the City of Detroit removes

22    that claim to federal court, and while some federal cases get

23    sent to the Wayne County Mediation Tribunal, very few do.  My

24    experience is that none of ours have ever had that happen.

25         THE COURT:  My question to you, Mr. Goodman, was do

1  you have any objection if I check with my chief district

2  judge regarding the effectiveness of the Wayne County

3  Mediation Tribunal in 1983 actions?

4       MR. GOODMAN:  I not only have no objection, I would

5  highly recommend and urge the Court to do so.

6       THE COURT:  Mr. Romano, do you have any objection if

7  I do that?

8       MR. ROMANO:  No, your Honor, but I think the Court

9  has to understand that in 1983 it's only -- we only go to

10 case evaluations by agreement -- it's not mandatory if it's

11 filed in federal court -- and also, your Honor, that as far

12 as other cases, you can check with the tribunal, but any

13 other tort cases I think the success rate of Michigan

14 mediation or case evaluation as it's called now is about 16

15 percent of mutual acceptance, and that's high, the higher

16 counties.  Wayne might be lower, so I don't think that's

17 really accurate as far as its effectiveness.

18      MR. ELLMAN:  Well, I'd just confirm with my client

19 their view of this being highly effective, and I'll just for

20 one additional -- I don't know how you measure statistics in

21 different ways, but from the city's experience this process

22 has been effective to both settle claims directly through the

23 process or also to establish a basis for a later settlement.

24 Many of these cases settle later.  It's because of what

25 happened in that process.  It may not have settled at the

1    process.

2              THE COURT:  Yeah.  Measuring success of mediation

3    programs is a very tricky and slippery business because if

4    you just look at what settles that day, you're going to get

5    one number, but if you look at what settles a month later

6    because of that process, you're going to get a much bigger

7    number, so -- all right.  Since I have your consent, I will

8    consult with Chief Judge Rosen on the effectiveness of the

9    Michigan Tribunal -- the Mediation Tribunal for 1983 actions.

10   If it doesn't appear to the Court that that is an effective

11   process, I may come back to you to design one from scratch

12   for this case, so that part of this process may have to be

13   delayed a bit.

14             MR. ELLMAN:  We understand, your Honor.

15             THE COURT:  Did you want to address Ms. Patek's

16   concerns?

17             MR. ELLMAN:  Yes.  I have a -- a few of the points

18   that she made I can try to address.  As far as receiving

19   information as one of her concerns, we have provided what I

20   understand is the information we have about the pending cases

21   that involve her members that we know of.  We're certainly

22   happy to continue to provide that information and cooperate

23   with them.  I'm not sure it has anything to do with a

24   provision of the ADR order or procedures, but we certainly

25   have committed to working with her on that.

1          With respect to cases that have been filed only

2     against her members or the union's members and not against

3     the city, I'm not sure exactly what she's asking for.  It

4     sounds like those were outside of the scope of this order as

5     well, and they'll be dealt with in the normal course.

6          THE COURT:  No.  If I understood her correctly, what

7     she wants is a specific understanding, maybe even explicitly

8     in the order, that nothing in the order impacts the

9     substantive or procedural rights of her -- of the individuals

10    to pursue their claim against the city for indemnification or

11    defense in the ordinary course.

12         MR. ELLMAN:  I think all that is fine, your Honor.

13    One thing we don't agree with, and we've traded some

14    language, as Ms. Patek indicated, I don't think this order is

15    a place to say the city will defend these parties or will

16    indemnify them.

17         THE COURT:  And I agree with that.  This is a

18    procedures order.

19         MR. ELLMAN:  One is going to be unique, and I agree

20    that it'll be dealt with in the normal course on their merits

21    and the way they're dealt with, so to that extent, I think

22    we're in agreement.  I personally don't believe and haven't

23    believed it needed to be something stated in the order, but

24    if the Court --

25         THE COURT:  I think it's better --

1          MR. ELLMAN:  -- disagrees --

2          THE COURT:  I think it's better if it is, so I'm

3    going to ask the two of you to consult with each other on

4    some language --

5          MR. ELLMAN:  We'll do that.

6          THE COURT:  -- that addresses Ms. Patek's concerns,

7    and if you can't agree, get me on the phone, and I'll help

8    you.

9          MR. ELLMAN:  Yes.  And I think the last point that I

10   had in my notes that she raised about the no supplemental --

11   supplementary proceedings post-judgment, I assume that's

12   something we can work out --

13         THE COURT:  Please.

14         MR. ELLMAN:  -- as far as language.  That's not a --

15   that's not an issue for us.

16         THE COURT:  Okay.

17         MR. ELLMAN:  I think that covers issues I had

18   written down unless the Court has questions.

19         THE COURT:  No.  That's it.

20         MR. ELLMAN:  Thank you.

21         THE COURT:  All right.  So let me ask you to submit

22   a revised order after you've had a chance to discuss this

23   further with Ms. Patek.  In the meantime, I'm going to

24   consult with Chief Judge Rosen on the issue of the 1983

25   actions, and if I decide that needs to be carved out of this,

 1   I will effectuate that.  If I decided that there's no basis

 2   to carve them out, then I'll consider the city's order.

 3          MR. GOODMAN:  Your Honor, I take it --

 4          THE COURT:  Stand by the microphone for me.

 5          MR. GOODMAN:  William Goodman again.  I take it,

 6   your Honor, that the Court is then going to enter an order

 7   setting aside the stay with regard to Ms. Ryan's case and --

 8          THE COURT:  Yes.  You may submit a stipulation and

 9   order to do that.

10          MR. GOODMAN:  -- and that I may so advise Judge

11   Goldsmith, who is quite interested in that issue.

12          THE COURT:  If you feel like that's something you

13   need to do, you may tell him it is forthcoming.

14          MR. GOODMAN:  Thank you.

15          THE COURT:  Okay.  Anything else on this morning's

16   docket?  Okay.  We'll be in recess until 2:30.

17          THE CLERK:  All rise.  Court is in recess.

18       (Proceedings concluded at 11:24 a.m.)

INDEX


<u>WITNESSES:</u>

    None

<u>EXHIBITS:</u>

    None


       I certify that the foregoing is a correct transcript from the sound recording of the proceedings in the above-entitled matter.


/s/ Lois Garrett            December 18, 2013
_____      _____
Lois Garrett