UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re | No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | Chapter 9 |
| Debtor. | HON. STEVEN W. RHODES |

## APPELLEES' DESIGNATION OF ITEMS

### Item 4

**From *In Re City of Detroit*, Case No. 13-53846**

| | | | |
|---|---|---|---|
| 4. | 9/23/13 | 1004 | Phillips' motion for relief from stay |

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                           Chapter 9

CITY OF DETROIT, MICHIGAN,                        Case No. 13-53846

     Debtor.                                  Hon. Steven W. Rhodes

_____/

### CATHERINE PHILLIPS, et al.'s MOTION FOR RELIEF FROM ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON OFFICER EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR

Now come Petitioners Catherine Phillips, et al. (hereafter "Petitioners") and hereby requests that this Court modify its *Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non Officer Employees and (C) Agents and Representatives of the Debtor* (Dkt. 166), (hereafter "*Extended Stay Order*"), to lift the Extended Stay from the matter entitled *Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon,* Case No. 13-CV-11370, (Exh. 6.1, *Phillips* Complaint). In support of this Motion, Petitioners state as follows:

1.    On March 27, 2013, Petitioners herein filed a Complaint in the United States District Court for the Eastern District of Michigan, naming Michigan Governor Richard D. Snyder and Michigan Treasurer Andrew Dillon (hereafter, "Defendants") as defendants, *Catherine Phillips, et al. v. Snyder and Dillon.* Case No. 13-CV-11370, (Exh. 6.1, *Phillips* Complaint), (hereafter "the *Phillips* case").

2.    In their Complaint, (Exh. 6.1), Petitioners allege that Public Act 436 of 2012, M.C.L.A. §§141.1541 *et. seq.*, (hereafter "PA 436"), violates various federal statutory and

13538461309230000000000009

Constitutional rights. Petitioners sought declaratory and injunctive relief. The City of Detroit (hereafter, "Debtor") is not, and has never been, a party to that action.

3. On July 19, 2013, Debtor filed a motion seeking to extend the Chapter 9 stay to include certain state entities, non-officer employees and agents and representatives of the Debtor. (Dkt. 56, *Motion of Debtor For Entry of Order Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor,* (hereafter *"Motion to Extend Stay"*) Specifically, Debtor requested

> that the Court exercise its equitable power under Section 105(a) of the Bankruptcy Code to extend the Chapter 9 stay to actions or proceedings against the Governor, the State Treasurer and the members of the Loan Board . . . **that, directly or indirectly, seek to enforce claims against the City, interfere with the City's activities in this Chapter 9 case or otherwise deny the City the protections of the Chapter 9 stay.**"

(Dkt 56, *Motion to Extend Stay*, p. 13 at ¶ 20) (emphasis added)

4. In support of its *Motion*, Debtor specifically identified and discussed at length three (3) cases, referred to as the "Prepetition Lawsuits," that had been filed in the Ingham County Circuit Court: a) *Webster v. State of Mich.,* No. 13-734-CZ (Ingham Cnty. Cir. Ct. July 3, 2013, (the *"Webster Lawsuit;"*); b) *Flowers v. Snyder*, No. 13 729-CZ (Ingham Cnty. Cir. Ct. July 3, 2013), (the *"Flowers Lawsuit"*); and c) *Gen. Ret. Sys. of the City of Detroit v. Orr,* No. 13-768-CZ (Ingham Cnty. Cir. Ct. Jul. 17, 2013), (the *"Pension Systems Lawsuit"*); and *ex parte* injunction orders that had issued against the Governor and the State Treasurer in those suits that had the express purpose and effect of enjoining the defendants in those cases from authorizing a Chapter 9 filing, from taking any further action in aid of the same, and from taking any action that might lead to the impairment of pension claims. (Dkt. 56, *Motion to Extend Stay*, pp. 5-7, 14-15, ¶¶ 10-12, 22-23)

5. Debtor's *Motion* clarified that the extension of the Stay applied specifically to the

2

13-53846-tjt-swr Doc 2300-4 Filed 12/28/13 Entered 12/28/13 17:35:37 Page 3 of 112
13-53846-swr Doc 1004 Filed 09/28/13 Entered 09/28/13 17:03:30 Page 3 of 112

"Prepetition Lawsuits" insofar as those lawsuits -- unlike the *Phillips* case herein – sought "…to enforce the plaintiffs' claims against the City or to exercise control over the City's property rights including its powers and rights under Chapter 9." (Dkt. 56, *Motion to Extend Stay,* p. 15, ¶23, fn 4)

6.      Indeed, Debtor's *Motion* was very explicit in limiting the extension of its requested Stay to actions which "…directly or indirectly seek to enforce claims against the City, interfere with the City's activities in this chapter [sic] 9 case or otherwise deny the City the protections of the Chapter 9 Stay." (Dkt. 56, *Motion to Extend Stay,* p. 13, ¶20)

7.      Debtor's *Motion* – clearly in direct response to the aforementioned "Prepetition Lawsuits" — further asked that this Court enter an Order to "provid[e] expressly, for the avoidance of doubt," that each of the identified "Prepetition Lawsuits," be stayed pending further order of the Court.

8.      It is noteworthy that Petitioners' suit herein was not among those identified by Debtor, (Dkt. 56*, pp. 5-6), insofar as the *Phillips* case had been filed on March27, 2013, long before the filing of this Chapter 9 bankruptcy petition, while all three of the "Prepetition Lawsuits" referred to by Debtor in its *Motion* were filed between July 3 and July 17, 2013, literally days before the filing of the Chapter 9 petition herein.

9.      On July 25, 2013, this Court entered the *Extended Stay Order,* (Dkt. 166), broadly extending the Chapter 9 stay to include certain "State Entities (defined as the Governor, the State Treasurer and the members of the Loan Board, collectively with the State Treasurer and the Governor, and together with each entity's staff, agents and representatives), Non-Officer Employees and the City Agents and Representatives," Id. at 2, without  any of the aforementioned qualifying limitations specified by Debtor in its *Motion.*

10.     While the *Extended Stay Order* (Dkt. 166) also expressly provides that "For the avoidance of doubt, each of the Prepetition Lawsuits hereby is stayed…," this Court did not directly incorporate the Debtor's own language, identifying the "Prepetition Lawsuits" in question, specifically, the *Webster*, *Flowers*, and *Pension Systems* lawsuits.

11.     On August 7, 2013, the Michigan Attorney General's office, through Assistant Attorneys General Denise C. Barton, Ann M. Sherman and Michael F. Murphy, filed a *Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay,* (Exh. 6.2, *Phillips* case, Dkt. #29), seeking enforcement of *Extended Stay Order* (Dkt. 166) to the adjudication of the *Phillips* case. This Notice was not filed by, or on behalf of, the Debtor in this case.

12.     On August 22, 2013, the United States District Court, Honorable George Steeh, entered an *Order Regarding Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay*, (Exh. 6.3, *Phillips* case, Dkt. #30) (hereafter "Steeh Order"), staying Petitioners' declaratory/injunctive relief action -- a case which challenges the constitutionality of Public Act 436 as it affects every single municipality in the State of Michigan -- despite the fact that Petitioners' suit herein, *Phillips v. Snyder,* was not one of those specifically identified by Debtor as problematic or one that sought to enforce claims against Debtor, interfere with its activities in the Chapter 9 case or otherwise deprive it of any protections of the Chapter 9 stay. (Exh. 6.3, Steeh Order).

13.     In entering the aforementioned *Order,* (Exh. 6.3), the District Court expressly noted that "it is not apparent that any interests of the City of Detroit bankruptcy proceedings are implicated" in Petitioners' action. Nonetheless, the District Court concluded that it was bound by the terms of the "broadly worded Extension Order issued by the bankruptcy court," and was therefore required to stay the case "unless and until such time as an order issues lifting or

modifying the stay to permit the captioned matter to proceed." (Exh. 6.3, Steeh Order. Pp.1-2)

14.     Petitioners herein, as plaintiffs in the *Phillips* case, seek an adjudication of the constitutionality of PA 436 in general, as applied to the entire State of Michigan, and not specific to any municipality, including the Debtor City of Detroit, or to the propriety or lawfulness of the Chapter 9 bankruptcy proceedings in this action.  The plaintiffs in Petitioners' cause of action are comprised of persons who represent themselves and interested organizations across the State.   In addition to the proposed withdrawing plaintiffs, the cause of action consists of eighteen (18) plaintiffs representing nine (9) groups.  For example, those groups with whom these plaintiffs are affiliated are: the Pontiac City Council, the Benton Harbor City Commission, the Flint City Council, Rainbow Push Coalition, the National Action Network, the Council of Baptist Pastors of Detroit and Vicinity, the Detroit Public Schools, and the Detroit Library Commission.

15.     Petitioners also seek to amend their Complaint, (Exh. 6.1, the *Phillips* case Dkt. #1), to withdraw the plaintiffs Phillips, Valenti and AFSCME Council 25 as plaintiffs from the underlying action and to voluntarily dismiss, without prejudice, Count I  of the Complaint, which was asserted by the withdrawing plaintiffs.

16.     By this *Motion*, therefore, Petitioners herein seek relief from the Extension Order so that they may proceed in their action for declaratory and injunctive relief against Defendants (who are not officers, employees, agents or representatives of Debtor) as to the remaining counts and obtain relief from the ongoing violations of constitutional and statutory rights alleged therein.

## PRELIMINARY STATEMENT

17.     Petitioners' pre-petition suit which is the subject of this Motion --  *Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon,* Case No. 13-CV-11370 --  challenges the validity of PA 436 on a number of grounds, including the following Constitutional violations: the due-process right to elect officials who possess general legislative power (Exh. 6.1, Complaint,

Count II); the right to a republican form of government (Exh. 6.1, Complaint, Count III) ; the right to equal protection under the law with respect to race, wealth and voting rights (Exh. 6.1, Complaint, Counts IV, V and VI); the First Amendment as it pertains to freedom of speech (Exh. 6.1, Complaint, Count VIII) and the right to petition the government for redress of grievances (Exh. 6.1, Complaint, Count IX); the Thirteenth Amendment as it pertains to the vestiges of slavery with regard to voting rights (Exh. 6.1, Complaint, Count XIII) ; and the right to equal protection under the law with respect to the procedure for removing appointed emergency managers (Exh. 6.1, Complaint, Count XI).  The Complaint also alleges violations of the Voting Rights Act of 1965.

18.     Petitioners' suit does not seek money damages for these constitutional and statutory violations, but rather only declaratory relief finding violations of Petitioners' rights as alleged in the Complaint and injunctive relief enjoining the defendants from committing further violations of those rights.  To the extent that the Complaint seeks attorney fees and costs as permitted by statute,42 U.S.C. §1988,  any such award would be paid by the State of Michigan, not Debtor City of Detroit, as neither the Debtor nor any of its agents is a party to the action.

19.     Debtor's only connection to Petitioners' action against the defendants in the *Phillips* case is that Debtor is currently under the control of an emergency manager appointed by the *Phillips* defendant Snyder pursuant to PA 436.  But Debtor is only one of many communities or entities subject to control by a state-appointed emergency manager.  Other communities and entities currently under EM control include the cities of Allen Park, Benton Harbor, Flint, Hamtramck, Pontiac, as well as Detroit Public Schools, Highland Park Public Schools, and Muskegon Heights Public Schools.  Additionally, the cities of Inkster and River Rouge are currently subject to consent agreements under PA 436, and the City of Ecorse is under the

control of a PA 436 transition advisory board.

20.     If not modified to permit the *Phillips* case to be adjudicated, the net effect of this Court's *Extended Stay Order* (Dkt. 166) would be that not only Petitioners, but hundreds of thousands of other individuals throughout the State of Michigan, particularly in those communities identified above currently subject to PA 436, would be deprived of any avenue by which they can vindicate their constitutional and statutory rights at issue.  Instead, under the terms of the *Extended Stay Order* (Dkt. 166) -- pertaining solely to the Debtor City of Detroit -- if not clarified or modified, Petitioners and all those within the other affected communities and entities will be forced to suffer ongoing violations of those rights while waiting for Debtor's bankruptcy proceedings to conclude.

21.     By this Motion, Petitioners seek to clarify, lift or modify the *Extended Stay Order* (Dkt. 166) to the extent that it purports and/or has been interpreted to stay <u>all</u> litigation in which the *Phillips* defendants – Richard Snyder and Andrew Dillon – are named as parties, without regard to whether or *not*  "…any interests of the City of Detroit bankruptcy proceedings are implicated." (Exh. 6.3, Steeh Order, p.2)

22.     Petitioners seek this relief so that Petitioners and Defendants may return to the District Court in order to permit an adjudication of the constitutional issues that have State-wide ramifications.

23.     Petitioners contend that Debtor never asked for or intended so broad a stay as was actually granted.  For that reason, the stay should not cover suits such as Petitioners', which does not "directly or indirectly, seek to enforce claims against the City, interfere with the City's activities in this Chapter 9 case or otherwise deny the City the protections of the Chapter 9 stay." (Dkt.56, *Debtor's Motion to Extend Stay*, p. 13, ¶ 20)

7

24.     Petitioners reemphasize that Debtor is not a party to its suit against the *Phillips* defendants, and that the defendants cannot be party to Debtor's bankruptcy proceedings. Extension of the stay to include all State officials in all cases raises serious issues regarding the validity of the Chapter 9 proceedings, inasmuch as co-mingling the identities of Debtor and the State officials for purposes of the stay casts doubt on the ability of Debtor to satisfy the basic requirement that it be a "municipality" for the purposes of Chapter 9.  This is especially so because Congress intentionally deprived states of the ability to file petitions.  The State Entities should not be allowed the benefits of bankruptcy protections in clear violation of congressional intent that Chapter 9 relief is afforded only to municipalities.

25.     But even if this Court determines that it was proper to issue a stay broader than that requested by Debtor, Petitioners respectfully assert that under the circumstances present here, they satisfy the standard for lifting a stay under both: 1) a simple "balancing-of-the-equities" approach; and 2) a "preliminary-injunction" analysis. (See Exh. 3, Brief in Support of Motion, pp. 8-14)  Specifically, Petitioners will show that the scope of the *Extended Stay Order* (Dkt. 166) was overbroad under sections 105, 362, and 922 of the Bankruptcy Code; that the *Extended Stay Order* as applied to non-debtor defendants in other cases, i.e. the *Phillips* case, does not further the purposes of granting a stay under the Bankruptcy Code; and that where, as here, the pre-petition litigation at issue involves the vindication of Constitutional rights, enforcement of the Constitution necessarily trumps such a stay.

26.     The facts and law outlined herein and in Petitioners' Brief in Support (Exh. 3, Brief in Support) provide compelling support for Petitioners' requested relief from the *Extended Stay Order* (Dkt. 166).

## **JURISDICTION**

27.     Jurisdiction over this motion is conferred upon this Court by 28 U.S.C. §§ 157

and 1334. This motion is brought pursuant to 28 U.S.C. § 157(b)(2)(G).

28.     Venue is proper in this Court, pursuant to 28 U.S.C. §§ 1408 and 1409.

29.     The relief requested in this Motion is predicated upon 11 U.S.C. § 362(d) and Rules 4001-1 and 9014-1 of the United States Bankruptcy Court Eastern District of Michigan Local Rules.

## **RELIEF REQUESTED**
### *Relief From the Extended Stay Order is Warranted Because the Debtor Never Sought a Stay Encompassing All Actions Against Defendants*

30.     In its *Motion to Extend Stay* (Dkt. 56), Debtor specifically identified three lawsuits (which Debtor called the "Prepetition Lawsuits") that it claimed violated the automatic-stay protections of Chapter 9 as applied to <u>Debtor</u> by targeting State officials (the Governor, the State Treasurer, members of the Loan Board) to accomplish indirectly what it could no longer accomplish directly by suing Debtor. (Dkt. 56, pp. 5-8, ¶¶ 10-13; p. 13, ¶ 20; pp. 14-15, ¶¶ 22-23, including fn. 4)

31.     Debtor therefore requested that the Court issue a stay covering actions against Defendants that "directly or indirectly, seek to enforce claims against the City, interfere with the City's activities in this Chapter 9 case or otherwise deny the City the protections of the Chapter 9 stay," (Dkt. 56, p. 13, ¶ 20) and furthermore, to expressly stay the three identified "Prepetition Lawsuits." (Dkt. 56, pp. 14-15, ¶ 23)

32.     Despite the fact that the *Phillips* case has been pending since March, 27 2013 (Exh. 6.1, *Phillips* Complaint), and the Petitioners' claims were well known long before the filing of this bankruptcy action on July 18, 2013, the Debtor herein did not identify Petitioners' suit as one of the "Prepetition Lawsuits" it wished the Court to expressly stay, nor does Petitioners' suit fall within the scope of those contemplated by Debtor in Paragraph 20 of its motion.

9

33.     Given the limiting language of Debtor's *Motion to Extend Stay* (Dkt. 56), it cannot be said that Debtor intended that all suits naming the Governor or the State Treasurer as defendants should be stayed pending the resolution of Debtor's bankruptcy proceedings and regardless of whether staying such suits would further the purposes of Chapter 9 protection as applied to Debtor.  Clearly such a request would be unsupportable.

34.     But the lack of such qualifying or limiting language in this Court's *Extended Stay Order* (Dkt. 166) has precisely that effect, such that the District Court in Petitioners' case indicated that it was bound by the language of the *Extended Stay Order* to stay Petitioners' suit even though it found that "it is not apparent that any interests of the City of Detroit bankruptcy proceedings are implicated." (Exh. 6.3, pp. 1-2)

35.     The broadly worded *Extended Stay Order* is thus constitutionally problematic, inasmuch as Petitioners -- who petition for redresses of grievances on behalf of all citizens of the State of Michigan against the governor and the State Treasurer, in matters wholly outside of Debtor's bankruptcy proceedings -- are denied access to the courts.  This is particularly so where, as here, the grievances involve claims of constitutional violations, because bankruptcy courts do not have any final authority to decide constitutional issues. *Farmer v. First Virginia Bank*, 22 B.R. 488 (E.D. Va. 1982).  Any final decision on constitutional issues must, under the U.S. Constitution, be decided by an Article III court.

36.     Without a modification of this Court's *Extended Stay Order* (Dkt. 166), therefore, Petitioners herein are deprived of a proper judicial review of their constitutional claims in an Article III court.

37.     Further constitutional problems are created by the manner in which the *Extended Stay Order* (Dkt. 166), as currently worded, extends full Chapter 9 protection to state officials,

10

directly contrary to the congressional intent that such protections are not available to the states.

38.     This Court can thus avoid this constitutional crisis by simply modifying its Extension Order to make clear that the stay only applies to claims, whether direct or indirect, against the res of the Debtor.

### *Relief From the Extended Stay Order is Warranted Because the Scope of the Extended Stay Order is Overly BroadWithin the Limitations of the Bankruptcy Code*

39.     The *Extended Stay Order* (Dkt. 166) purports to extend the "Chapter 9 stay" to cover "State Entities," including Defendants.   Although the *Extended Stay Order* does not reference the statutory provisions that constitute a "Chapter 9 stay," upon information and belief, this Court was characterizing the automatic-stay provisions at 11 U.S.C. §§ 362(a) and 922 as a "Chapter 9 stay."

40.     By its own terms, §362(a) of the Bankruptcy Code, 11 U.S.C. §362(a), automatically stays actions against the debtor or the debtor's property.

41.     Similarly, §922 of the Code, 11 U.S.C. §922, automatically stays any action against an officer or inhabitant of the debtor to the extent that such action ultimately seeks to enforce a claim against the debtor.

42.     Neither section provides a basis for staying claims against non-debtors wholly unconnected to the debtor.

43.     To the extent that §105 of the Code, 11 U.S.C. §105 grants a bankruptcy court some latitude in crafting orders, including expanding the scope or duration of automatic-stay orders, such latitude is not without limits.   In cases involving using section 105 to expand the scope of automatic-stay orders to non-debtors, some close nexus of identity must exist between the non-debtor and debtor (such as an agreement to indemnify) that would render an action against the non-debtor a de facto action against the debtor or its property.

13-53846-tjt   Doc 2289-4   Filed 09/23/13   Entered 09/23/13 17:35:30   Page 12 of 16
13-53846-swr   Doc 1004   Filed 09/23/13   Entered 09/23/13 17:35:17   Page 11 of 16
112

44. With respect to Petitioners' District Court action, no such nexus exists or could possibly exist as between Defendants and the Debtor. Therefore, the Extension Order should be lifted as applied to the Defendants in this case.

### *Relief From the Extended Stay Order is Warranted Because the Extended Stay Order Fails to Further the Purposes For Which Stays are Provided in Bankruptcy Cases*

45. It is well settled that the primary purposes for staying litigation against a debtor are: a) to protect all creditors by preventing financial assets or property of the debtor from being diverted to an individual creditor; and, b) to protect the debtor by preventing additional financial obligations from being imposed upon the debtor as it attempts to marshal assets and inventory obligations for the purpose of crafting a reorganization plan.

46. Moreover, such stays have the effect of preventing the debtor's limited assets from being further depleted through the expense of defending numerous suits. [While the above purposes are laudable, they are not furthered by staying Petitioners' action for declaratory and injunctive relief against the underlying non-debtor defendants in the *Phillips* case. Petitioners' action is not against Debtor's assets and does not involve any property of the Debtor. Debtor is not a party to Petitioners' action and therefore will not incur any expense defending against it. Lifting the stay, thereby permitting Petitioners to resume the prosecution of their claims against the *Phillips* defendants, will not interfere with the progression of Debtor's bankruptcy case. Thus, no harm will be suffered by Debtor if the stay is lifted as to this federal Constitutional litigation.

47. On the other hand, the injuries alleged by Petitioners are constitutional in nature and as such, constitute irreparable harm for the duration that they are permitted to continue. See, *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); *Doe v. Duncanville Independent School District*, 994 F.2d 160 (5th Cir. 1993). Moreover, the scale

of the constitutional violations, when extrapolated across all of the individuals who reside within the affected communities and school districts throughout the entire State of Michigan, is simply staggering.

48. Under any of the frameworks used to analyze lift-stay motions, equity requires lifting the stay with respect to the adjudication of the *Phillips* case. Were it otherwise, the constitutional rights of citizens throughout the State -- in communities such as Allen Park, Benton Harbor, Ecorse, Flint, Hamtramck, Highland Park, Inkster, Muskegon Heights, Pontiac and River Rouge – will continue to be held hostage to the Debtor City of Detroit's progression through bankruptcy despite the lack of any connection between those communities and the Debtor. Not only is such a result absurd on its face, but it is unconstitutional and contrary to public policy, particularly where such an order sets the precedent that the constitutionality of PA 436 may never be challenged so long as some community or entity subject to the Act is in the midst of bankruptcy proceedings.

49. Because the *Extended Stay Order* (Dkt. 166), as applied to Petitioners' claims in the *Phillips* case, fails to further the purposes of the automatic stay in these Chapter 9 bankruptcy proceedings as to the Debtor and simultaneously works an irreparable harm upon the Petitioners, the *Order* (Dkt. 166) should be lifted as to the claims against the underlying defendants in the *Phillips* case.

### Relief From the Extended Stay Order is Warranted Because Where the Petitioners Allege Constitutional Violations, Enforcement of the Constitution Must Take Precedence Over Staying Litigation Against the Non-Debtor Defendants

50. Petitioners' Complaint alleges numerous constitutional violations made actionable against the underlying defendants, pursuant to 42 U.S.C. § 1983, in the *Phillips* case.

51. Section 5 of 42 U.S.C. § 1983 guarantees persons the right to enforce the U.S. Constitution against those who act under color of law to deprive or cause a person to be deprived

13-53846-swr   Doc 2239-4   Filed 09/23/13   Entered 09/23/13 17:35:30   Page 14 of 16
13-53846-swr   Doc 1004   Filed 09/23/13   Entered 09/23/13 17:35:30   Page 14 of 16
112

of rights, privileges, or immunities secured by the Constitution.

52.     Section 3 of 28 U.S.C. § 1343 guarantees a person the right to have a federal district court and a jury of one's peers adjudicate claims brought under 42 U.S.C. § 1983.

53.     Congress has clearly demonstrated its intent that 42 U.S.C. § 1983 provides the judicial remedy when a person has suffered a violation of constitutional rights. Likewise, the Supreme Court has repeatedly recognized that the enforcement of federal rights is of the highest priority.

54.     In this case, the application of this Court's *Extended Stay Order* (Dkt. 166) to include <u>all</u> claims against the non-debtor defendants Snyder and Dillon -- regardless of the absence of any relationship to the property rights of Debtor herein or to this bankruptcy proceeding -- contravenes the very purpose and intent of Congress and the Supreme Court. Moreover, by delaying the proceedings in the underlying *Phillips* district court action indefinitely, the *Extended Stay Order* has worked a further constitutional injury to Petitioners, inasmuch as it has operated to deprive Petitioners—without any process—of the right to have their claims of constitutional violations adjudicated by the district court and a jury of their peers.

55.     To whatever extent the Bankruptcy Code in general, and Chapter 9 in particular, could be read to permit the expansion of the automatic-stay provisions to include any and all actions against non-debtors even where, as here, the particular claims against those non-debtors have no relevant connection to the Debtor, such a construction is overbroad and conflicts with 42 U.S.C. § 1983. In such a case, as here, this Honorable Court should construe the Bankruptcy Code narrowly to avoid a constitutional problem or alternatively, lift the stay which avoids the constitutional conflict altogether.

56.     As required by L.B.R. 9014-1(g), Petitioners have sought concurrence in this

Motion from counsel for the Debtor on September 23, 2013, and concurrence was not obtained.

## CONCLUSION

WHEREFORE, Petitioners respectfully request that the *Extended Stay Order* (Dkt. 166) be clarified, modified, or lifted with respect to Petitioners' claims against the underlying defendants in the *Phillips* case, so that: 1) the constitutionality of Public Act 436 may be properly adjudicated pursuant to 42 U.S.C. §1983 by an Article III United States District Court; and 2) Petitioners may amend their Complaint to provide for the voluntary withdrawal of individual plaintiffs Phillips, Valenti, and AFSCME Council 25 and the voluntary dismissal of Count I of their Complaint, without bearing on the Debtor's rights in this bankruptcy proceeding.


Dated: September 23, 2013                    Respectfully Submitted,

                                             By:___/s/William H. Goodman_____
                                             William H. Goodman (P14173)
                                             Julie H. Hurwitz (P34720)
                                             GOODMAN & HURWITZ PC on behalf of the
                                             DETROIT & MICHIGAN NATIONAL
                                             LAWYERS GUILD
                                             1394 E. Jefferson Ave.
                                             Detroit, Michigan 48207
                                             (313) 567-6170/Fax: (313) 567-4827
                                             bgoodman@goodmanhurwitz.com
                                             Attorneys for Creditor Catherine Phillips, et al.

                              -and-

John C. Philo (P52721)                       Herbert A. Sanders (P43031)
Anthony D. Paris (P71525)                    THE SANDERS LAW FIRM PC
SUGAR LAW CENTER                             615 Griswold St. Ste. 913
FOR ECONOMIC & SOCIAL JUSTICE                Detroit, Michigan 48226
4605 Cass Ave., 2nd Floor                    (313) 962-0099/Fax: (313) 962-0044
Detroit, Michigan 48201                      haslawpc@gmail.com
(313) 993-4505/Fax: (313) 887-8470           Attorneys for Creditor Catherine Phillips et al.
jphilo@sugarlaw.org
tparis@sugarlaw.org
Attorneys for Creditor Catherine Phillips et al.

13-53846-swr   Doc 1004   Filed 09/23/13   Entered 09/23/13 17:35:30   Page 15 of 16
13-53846-swr   Doc 1009-4   Filed 09/23/13   Entered 09/23/13 17:50:30   Page 16 of
112

Darius Charney
Ghita Schwarz
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th floor
New York, New York 10012
(212) 614-6464/Fax: (212) 614-6499
dcharney@ccrjustice.org
Attorneys for Creditor Catherine Phillips et al.

Richard G. Mack, Jr. (P58657)
Keith D. Flynn (P74192)
MILLER COHEN, P.L.C.
600 W. Lafayette Blvd., 4th Floor
Detroit, Michigan 48226
(313) 964-4454/Fax: (313) 964-4490
richardmack@millercohen.com
Attorneys for Creditor Catherine Phillips et al.

Cynthia Heenan (P53664)
Hugh M. Davis (P12555)
Attorneys for Plaintiffs
CONSTITUTIONAL LITIGATION
ASSOCIATES, P.C.
450 W. Fort St., Suite 200
Detroit, MI 48226
313-961-2255/Fax: 313-961-5999
Attorneys for Creditor Catherine Phillips et al.

## SUMMARY OF ATTACHED EXHIBITS

The following documents are attached to this Motion, labeled in accordance with Local Rule 9014-1(b).

**Exhibit 1**      Proposed Form of Order

**Exhibit 2**      Notice of Motion and Opportunity to Object

**Exhibit 3**      Brief in Support of Motion For Relief From Order Pursuant To Section 105(A) Of The Bankruptcy Code Extending The Chapter 9 Stay To Certain (A) State Entities, (B) Non Officer Employees And (C) Agents And Representatives Of The Debtor

**Exhibit 4**      Certificate of Service

**Exhibit 5**      None [No Affidavits Filed Specific to This Motion]

**Exhibit 6.1**      Complaint filed in *Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon*, Case No. 13-CV-11370

**Exhibit 6.2**      Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay in *Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon, Case No. 13-CV-11370*

**Exhibit 6.3**      Order Regarding Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay, in *Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon, Case No. 13-CV-11370*

# **EXHIBIT 1**

# **PROPOSED FORM OF ORDER**

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:                                              Chapter 9

CITY OF DETROIT, MICHIGAN,                          Case No. 13-53846

    Debtor.                                       Hon. Steven W. Rhodes

_____/

**ORDER GRANTING THE PETITIONERS'**
**MOTION TO MOTION FOR RELIEF FROM ORDER**
**PURSUANT TO SECTION 105(A) OF THE BANKRUPTCY CODE EXTENDING THE**
**CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON**
**OFFICER <u>EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE</u>**
**<u>DEBTOR</u>**

This matter coming before the Court on the Petitioners *Catherine Phillips, et al.'s Motion For Relief From Order Pursuant To Section 105(A) Of The Bankruptcy Code Extending The Chapter 9 Stay To Certain (A) State Entities, (B) Non Officer Employees And (C) Agents And Representatives Of The Debtor* and the Court having determined that the legal and factual bases set forth in the motion establish just cause for the relief granted herein;

IT IS HEREBY ORDERED THAT:

1.      The Petitioners' motion is GRANTED; and

2.      The Automatic Stay of 11 USC § 362 and the *Order Pursuant To Section 105(A) Of The Bankruptcy Code Extending The Chapter 9 Stay To Certain (A) State Entities, (B) Non Officer Employees And (C) Agents And Representatives Of The Debtor* (Dkt. 166) entered by this Court on July 25, 2013 are found, in their entirety, not to apply to the case of *Catherine Phillips, et al. v. Snyder and Dillon*, Case No. 13-CV-11370, before the U.S. District Court, Eastern District of Michigan, and all stays are otherwise lifted to permit that case to fully proceed

13-53846-swr   Doc 2289-2   Filed 12/28/13   Entered 12/28/13 11:08:30   Page 20 of
13-53846-swr   Doc 1004-2   Filed 09/28/13   Entered 09/28/13 17:35:17   Page 20 of 3
112

without impediment before the U.S. District Court to an adjudication on the merits and to permit the parties to proceed with any concomitant appeals; and

3.     As a result of this Order, Petitioners are permitted to also amend their Complaint in the case of *Catherine Phillips, et al. v. Snyder and Dillon*, Case No. 13-CV-11370 to voluntarily withdraw individual Plaintiffs Phillips, Valenti, and AFSCME Council 25 as Plaintiffs in that case and to voluntary dismiss, all without prejudice, Count I of their Complaint in that case.

Dated:_____     _____
                                   Honorable Steven W. Rhodes
                                   United States Bankruptcy Judge

# **EXHIBIT 2**

# **Notice of Motion and Opportunity to Object**

13-53846-tjr    Doc 2289-3    Filed 12/28/13    Entered 12/28/13 17:03:30    Page 22 of 3
13-53846-swr    Doc 1984-3    Filed 09/28/13    Entered 09/28/13 17:35:17    Page 2 of 3
112

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

In re:                                              Chapter 9

CITY OF DETROIT, MICHIGAN,                           Case No. 13-53846

    Debtor.                                      Hon. Steven W. Rhodes

_____/

## NOTICE UNDER LBR 9014-1 OF MOTION FOR RELIEF FROM THE AUTOMATIC STAY & OPPORTUNITY TO OBJECT

    Petitioners Catherine Phillips, etc. al. have filed papers with the court to clarify order and/or lift stay relating to the case of *Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon*, Case No. 13-CV-11370 pending before the U.S. District Court, Eastern District of Michigan.

    **Your rights may be affected.  You should read these papers carefully and discuss them with your attorney, if you have one in this bankruptcy case.  (If you do not have an attorney, you may wish to consult one.)**

    If you do not want the court to to clarify order and/or lift stay relating to the case of Catherine Phillips, et al.  v. Richard Snyder and Andrew Dillon, Case No. 13-CV-11370 pending before the U.S. District Court, Eastern District of Michigan, or if you want the court to consider your views on the Motion, within <u>fourteen (14)</u> days, you or your attorney must:

    1.    File with the court a written response or an answer, explaining your position at:[1]

            United States Bankruptcy Court
            211 West Fort Detroit, MI 48226

    If you mail your response to the court for filing, you must mail it early enough so the court will **receive** it on or before the date stated above.  All attorneys are required to file pleadings electronically.

---

[1] Response or answer must comply with F. R. Civ. P. 8(b), (c) and (e)

1

13-53846-swr   Doc 2289-3   Filed 12/28/13   Entered 12/28/13 17:08:30   Page 28 of 3
13-53846-swr   Doc 1094-3   Filed 09/28/13   Entered 09/28/13 17:35:17   Page 23 of 3
112

You must also mail a copy to:

> William H. Goodman
> Goodman & Hurwitz, P.C.
> 1394 E Jefferson Ave
> Detroit, MI 48207

2.      If a response or answer is timely filed and served, the clerk will schedule a hearing on the motion and you will be served with a notice of the date, time and location of the hearing.

**If you or your attorney do not take these steps, the court may decide that you do not oppose the relief sought in the motion or objection and may enter an order granting that relief.**

Dated: September 23, 2013      By: _/s/William H. Goodman_
     William H. Goodman (P14173)
     GOODMAN & HURWITZ, P.C., on behalf of the
     DETROIT & MICHIGAN NATIONAL
     LAWYERS GUILD
     1394 E. Jefferson Ave.
     Detroit, Michigan 48207
     (313) 567-6170/Fax: (313) 567-4827
     bgoodman@goodmanhurwitz.com
     *Attorneys for Creditor Catherine Phillips, et al.*

2

13-53846-tjt   Doc 2289-3   Filed 12/28/13   Entered 12/28/13 17:08:30   Page 24 of 3
13-53846-swr   Doc 1604-3   Filed 09/28/13   Entered 09/28/13 17:35:17   Page 24 of 3
112

# EXHIBIT 3

**Brief in Support of Motion For Relief From Order Pursuant To Section 105(A) Of The Bankruptcy Code Extending The Chapter 9 Stay To Certain (A) State Entities, (B) Non Officer Employees And (C) Agents And Representatives Of The Debtor**

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                        Chapter 9

CITY OF DETROIT, MICHIGAN,                     Case No. 13-53846

        Debtor.                              Hon. Steven W. Rhodes

_____/

### BRIEF IN SUPPORT OF CATHERINE PHILLIPS, et al.'S MOTION FOR RELIEF FROM ORDER PURSUANT TO SECTION 105(a) OF THE BANKRUPTCY CODE EXTENDING THE CHAPTER 9 STAY TO CERTAIN (A) STATE ENTITIES, (B) NON OFFICER EMPLOYEES AND (C) AGENTS AND REPRESENTATIVES OF THE DEBTOR

On March 27, 2013, Petitioners Catherine Phillips, et al. (hereafter "Petitioners") filed a civil rights action in the United States District Court for the Eastern District of Michigan, challenging the validity of PA 436 on federal statutory and constitutional grounds, pursuant to 42 U.S.C. §1983. See, *Catherine Phillips, et al.  v. Richard Snyder and Andrew Dillon,* Case No. 13-CV-11370, (Exh. 6.1, *Phillips* Complaint), (hereafter, the "*Phillips* case").    Governor Richard D. Snyder and State Treasurer Andrew Dillon are the only named defendants in the suit, while Petitioners represent a cross-section of citizens from communities across the State of Michigan that are directly affected by the enactment of PA 436.  On July 18, 2013, the Debtor filed for Chapter 9 bankruptcy.  At that time, all litigation against the Debtor or its property was automatically stayed pursuant to 11 U.S.C. §§ 362(a) and 922.  One week later, on July 25, 2013, upon Debtor's motion, (Dkt. 56, *Motion of Debtor For Entry of Order Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non-Officer Employees and (C) Agents and Representatives of the Debtor,* (hereafter *"Motion to Extend Stay"*),  this Court entered an *Order Pursuant to Section 105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State Entities, (B) Non Officer Employees and (C) Agents and Representatives of the Debtor* (Dkt.

1

166), (hereafter "*Extended Stay Order*").

Among those "State Entities" were the two named defendants in the *Phillips* case, Governor Snyder and Treasurer Dillon. At issue in Petitioners' Motion herein is this Court's decision to stay all pre-petition litigation against these defendants, despite the fact that they are not officers, employees, agents, or representatives of the Debtor, and in no way otherwise share some close nexus or special relationship with the Debtor such that a suit against the Defendants would be, in effect, an action against the Debtor. Nor are the substantive issues within the *Phillips* case related in any way to the instant bankruptcy proceeding, to the enforcement of claims against Debtor, or to and of Debtor's activities in this Chapter 9 case. Petitioners seek a lift of the stay as to the *Phillips* case on several grounds: (1) that Debtor never asked for or intended that the stay order would be so broadly worded; (2) that the inclusion of the non-debtor defendants from the *Phillips* case in the *Extended Stay Order* (Dkt. 166) exceeds the permissible scope of such a stay under 11 U.S.C. §§ 105(a), 362(a), and 922; (3) that even if the Bankruptcy Code permitted the extension of automatic stays to non-debtor third parties with no connection to the Debtor, the *Extended Stay Order* (Dkt. 166) fails to further the purposes for which such stays are provided; and (4), of utmost importance, where the Petitioners allege ongoing constitutional violations, enforcement of the Constitution cannot be subjugated by the bankruptcy process.

## STANDARD OF REVIEW

When a bankruptcy petition is filed, most judicial actions against the debtor that were commenced before the filing of the petition are automatically stayed during the pendency of the bankruptcy petition. 11 U.S.C. § 362(a)(1). However, this automatic stay provision was not intended to immutably relegate creditors to a world of limbo or to the resolution of the civil claims within the limitations of a bankruptcy proceeding. Instead, as Congress recognized when enacting the automatic stay provision:

2

> [I]t will often be more appropriate to permit proceedings to continue in their place of origin, when no great prejudice to the bankruptcy estate would result, in order to leave the parties to their chosen forum and to relieve the bankruptcy court from many duties that may be handled elsewhere.

S. Rep. No. 989, 95th Cong., 2d Sess. 50, *reprinted in* 1978 U.S. Code Cong. & Admin. News 5780, 5836.

Recognizing that some actions are better suited to resolution outside the bankruptcy forum, Congress specifically granted—in the same provision establishing the automatic stay— full discretion to the bankruptcy court to lift the stay and allow litigation to go forward in another forum.  Section 362(d) of the Bankruptcy Code provides:

> On request of a party in interest and after notice and a hearing, the court shall *grant relief from the stay* provided under [§ 362(a)], such as by terminating, annulling, modifying, or conditioning such stay—(1) *for cause,* including the lack of adequate protection of an interest in property of such party in interest . . . .

11 U.S.C. § 362(d)(1) (emphasis added).

To determine whether sufficient cause exists to grant relief from the stay in a non-bankruptcy forum, the bankruptcy court must scrutinize the factual circumstances of the case before it.  *Christensen v. Tucson Estates, Inc. (In re Tucson Estates, Inc.)*, 912 F.2d 1162, 1166 (9th Cir. 1990); *Pursifull v. Eakin*, 814 F.2d 1501, 1506 (10th Cir. 1987); *Sumitomo Trust & Banking Co., Ltd. v. Holly's, Inc. (In re Holly's, Inc.)*, 140 B.R. 643, 687 (Bankr. W.D. Mich. 1992).  Among other factors, the Court should consider whether modifying the stay will promote judicial economy.  *See, e.g.*, *Robbins*, 964 F.2d at 344; *In re MacDonald*, 755 F.2d 715, 717 (9th Cir. 1985); *see also* 2 Collier on Bankruptcy ¶ 362.07[3] (15th ed. 1991) (noting that relief may be granted from the automatic stay where "the liquidation of a claim may be more conveniently and speedily determined in another forum").  Another particularly compelling consideration is whether the bankruptcy petition was filed by the debtor "on the eve of the resolution of pending

3

prepetition litigation." *In re Wilson*, 85 B.R. 722, 728 (Bankr. E.D. Pa. 1988) (citing *Matter of Holtkamp*, 669 F.2d 505, 509 (7th Cir. 1982)); *see also, In re Castlerock Props.*, 781 F.2d 159, 163 (9th Cir. 1986); *In re Olmstead,* 608 F.2d 1365, 1368 (10th Cir. 1979); *In re Borbridge,* 81 B.R. 332, 335 (Bankr. E.D. Pa. 1988); *In re Philadelphia Athletic Club*, 9 B.R. 280, 282 (Bankr. E.D. Pa. 1981).

In the most recent large-scale municipal bankruptcy, the question of "cause" to lift a stay was framed thusly:

> To determine whether "cause" exists to lift the stay and allow a suit to proceed in a non-bankruptcy forum, a court typically analyzes whether (1) any great prejudice to either the bankrupt estate or the debtor will result from continuation of a civil suit, (2) the hardship to the non-bankrupt party by maintenance of the stay considerably outweighs the hardship to the debtor, and (3) the creditor has a probability of prevailing on the merits of its lawsuit. *Chizzali v. Gindi (In re Gindi*), 642 F.3d 865, 872 (10th Cir. 2011), *overruled on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011) (emphasis added); Caves, 309 B.R. at 80; *In re Pro Football Weekly, Inc*., 60 B.R. 824, 826 (N.D.Ill.1986).

*In re Jefferson County*, 484 B.R. 427, 465-466 (Bankr. N.D. Ala. 2012).

## ARGUMENT

I.  **DEBTOR NEVER INTENDED OR ASKED FOR A STAY ORDER THAT WOULD ENCOMPASS ALL ACTIONS AGAINST THE "STATE ENTITIES," WITHOUT REFERENCE TO THE NATURE OF THE ACTION.**

The simplest solution to correct the overbreadth of the *Extended Stay Order* (Dkt. 166) is to recognize that Debtor never sought so broad a stay order as that which ultimately issued from this Court; that it was never intended that the *Extended Stay Order* (Dkt. 166) should apply to actions such as Petitioners' *Phillips* case, which do not implicate any of the Debtors' interests that are protected by Chapter 9; and that the *Extended Stay Order* (Dkt. 166) does not and should not, in fact, apply to Petitioners' case.

Such a conclusion is not only supported by the plain language of the Bankruptcy Code

4

and its underlying intent, but also by the language of Debtor's own motion seeking extension of the Chapter 9 stay. Debtor did not ask that <u>all</u> actions against the non-debtor Defendants be stayed, but rather only those actions "that**,** directly or indirectly, seek to enforce claims against the City, interfere with the City's activities in this Chapter 9 case or otherwise deny the City the protections of the Chapter 9 stay." Absent such limiting language, Debtor's motion would rightly have been attacked as seeking relief that was massively overbroad and, in many instances, not even remotely related to the purposes for which Chapter 9 protections exist.

Unfortunately, the absence of such language in the *Extended Stay Order* (Dkt. 166) has created precisely such an impermissibly broad-ranging stay. In its current form and breadth, the *Extended Stay Order* (Dkt. 166) provides that "the Chapter 9 stay hereby is extended to apply **in all respects** (to the extent not otherwise applicable) to the State Entities." (Dkt. 166, *Extended Stay Order*, at p. 2) Without the modification or clarification sought by Petitioners herein, the *Extended Stay Order* therefore not only fails to limit its application in the way requested by Debtor, but instead encourages the broadest possible reading, as evidenced by the words of United States District Court, Honorable George Steeh in his *Order Regarding Notice of Pendency of Bankruptcy Case and Application of the Automatic Stay*, (Exh. 6.3, *Phillips* case, Dkt. #30) (hereafter "Steeh Order*"*), staying Petitioners' declaratory/injunctive relief civil rights action that is the subject of this Motion:

> Although **it is not apparent that any interests of the City of Detroit bankruptcy proceedings are implicated in the case**, the plain language of the stay order would apply to this lawsuit.
>
> **In accordance with the broadly worded Extension Order issued by the bankruptcy court, this court will abide by the stay unless and until such time as an order issues lifting or modifying the stay** to permit the captioned matter to proceed.

(Exh. 6.3, *Phillips* case, Dkt. #30, Steeh Order) (emphasis added).

This was not the relief sought by Debtor in its *Motion to Extend Stay* (Dkt. 56), and it was

not the relief that should have been granted.  Clarifying the *Extended Stay Order* to make clear

that it only applies to actions against the *res* of the Debtor, or even adopting verbatim the

language proposed by the Debtor in its *Motion to Extend Stay* (Dkt. 56), would permit actions

against non-Debtor "State Entities"  to continue in courts across the State where such actions do

not defeat or frustrate the purposes of Debtor's bankruptcy proceedings.

## II.   THE RELEVANT PROVISIONS OF THE BANKRUPTCY CODE DO NOT AUTHORIZE EXTENDING THE AUTOMATIC STAY OF PREPETITION LITIGATION TO ALL ACTIONS AGAINST THE NON-DEBTOR STATE ENTITIES SNYDER AND DILLON.

The relevant provisions of the Bankruptcy Code providing for automatic stays of

litigation in Chapter 9 bankruptcy are 11 U.S.C. §§ 362(a) and 922.  Section 362(a) provides in

pertinent part:

(a) Except as provided in subsection (b) of this section, a petition filed under section 301,302,  or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of—

(**1**) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against **the debtor** that was or could have been commenced before the commencement of the case under this title, or to recover a claim against **the debtor** that arose before the commencement of the case under this title;

(**2**) the enforcement, against **the debtor** or against property of **the estate**, of a judgment obtained before the commencement of the case under this title;

(**3**) any act to obtain possession of property of **the estate** or of property from the estate or to exercise control over property of the estate;

(**4**) any act to create, perfect, or enforce any lien against property of **the estate**;

(**5**) any act to create, perfect, or enforce against property of **the debtor** any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(**6**) any act to collect, assess, or recover a claim against **the debtor** that arose before the commencement of the case under this title;

6

**(7)** the setoff of any debt owing to **the debtor** that arose before the commencement of the case under this title against any claim against **the debtor**; …

11 U.S.C. § 362(a) (emphases added).  Thus on its face, § 362(a) is concerned with preventing the initiation or continuation of any litigation against the debtor or the bankruptcy estate and therefore expressly authorizes staying litigation of claims against the debtor or the estate.

Section 922 makes several other provisions for automatic stays in the Chapter 9 context:

**(a)** A petition filed under this chapter operates as a stay, in addition to the stay provided by section 362 of this title, applicable to all entities, of—

**(1)** the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against an officer or inhabitant of **the debtor** that seeks to enforce a claim against **the debtor**; and

**(2)** the enforcement of a lien on or arising out of taxes or assessments owed to **the debtor**.

11 U.S.C. § 922(a) (emphases added). On its face, §922 is thus also concerned with preventing the initiation or continuation of any litigation *against the debtor*.  Indeed, § 922 seeks to protect the municipal debtor from both direct and indirect actions against the debtor, where a creditor might sue the officers or inhabitants of a municipality in order to reach the assets of the debtor. *In re City of Stockton*, 484 B.R. 372, 378-379 (Bankr. E.D. Cal. 2012).

But there is nothing in the Code that provides for staying actions against non-debtor third parties such as the State defendants in the *Phillips* case.  Indeed, with respect to §362(a), the Sixth Circuit has noted that "said provision facially stays proceedings 'against the debtor' and fails to intimate, even tangentially, that the stay could be interpreted as including any defendant other than the debtor." *Lynch v. Johns-Manville Sales Corp.,* 710 F.2d 1194, 1196 (6th Cir. 1983).  In *Lynch* court further found:

It is universally acknowledged that an automatic stay of proceeding accorded by § 362 may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the . . . debtor…The legislative history of §362 discloses a congressional intent to stay proceedings against the

debtor, and no other.

*Id.*

Even in cases where a broader construction to the automatic-stay provisions of §362 have been applied, the extension of a stay to non-debtor third parties typically only occurs when they are co-defendants of the debtor, and even then, only in the most unusual circumstances:

> [S]omething more than the mere fact that one of the parties to the lawsuit has filed a Chapter 11 bankruptcy must be shown in order that proceedings be stayed against non-bankrupt parties. This "unusual situation," it would seem, arises when there is such identity between the debtor and the third-party defendant that the debtor may be said to be the real party defendant and that a judgment against the third-party defendant will in effect be a judgment or finding against the debtor. An illustration of such a situation would be a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case.

*A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 999 (4th Cir. 1986)

Such unusual circumstances are not present here. Petitioners have not sued Debtor; thus, the underlying defendants in the *Phillips* case -- Snyder and Dillon -- are not co-defendants with Debtor. Nor is there "such identity" between the *Phillips* defendants and Debtor that Debtor would be the real party defendant in the *Phillips* case. Likewise, the *Phillips* defendants are not officers or inhabitants of Debtor, and Petitioners' suit does not seek to enforce any claim against Debtor, rending § 922 inapplicable. As such, authority for inclusion of the *Phillips* case under the scope of the *Extended Stay Order* cannot be found in either §§362(a) or 922(a) of the Bankruptcy Code.

Nor can such authority be found in § 105(a). While it is true that a bankruptcy court is granted additional powers to issue orders that are "necessary or appropriate to carry out the provisions of this title," pursuant to 11 U.S.C. § 105(a), such powers are not without limits. As recognized in *GAF Corp. v. Johns-Manville Corp.* (*In re Johns-Manville Corp.*), 26 B.R. 405 (Bankr. S.D.N.Y. 1983), any extension of a stay made pursuant to § 105 must be carefully

circumscribed to ensure that such an extension is only used to protect the debtor.

The *GAF Corp.* plaintiffs were manufacturers that were named as co-defendants, along with Johns-Manville, in asbestos litigation. When Johns-Manville initiated bankruptcy proceedings, all actions against it were automatically stayed pursuant to §362(a). The *GAF Corp.* plaintiffs moved for an extension of the stay, pursuant to § 105(a), to include all of Johns-Manville's co-defendants in the asbestos litigation. The court rejected this invitation:

> Although Section 105 may be used to extend the stay, Section 105 does not have a life of its own and this extension may only be accomplished within the proper boundaries of Section 362. That is, unless this extension is designed to protect the debtor's interests, it cannot be granted.
>
> *       *       *
>
> Section 105 of the Code was not intended to grant the bankruptcy court powers without bounds, *In re Brada Miller Freight Systems, Inc.,* 16 Bankr. 1002, 6 C.B.C. 2d 375, 389 (N.D. Ala. 1981), and the court's equitable powers thereunder are not unrestricted. *In re Dunckle Associates, Inc.,* 19 Bankr. 481, 6 C.B.C. 2d 600, 605 (Bankr. E.D. Pa. 1982). *See also* 2 Collier on Bankruptcy para. 105.02 at 105-7 (15th ed. 1982). *See also In re Chanticleer Associates, Ltd.,* 592 F.2d 70 (2d Cir. 1979).
>
> The crux of the matter before this Court is whether the injunctive relief sought by the co-defendants under Section 105(a) is "necessary or appropriate" in order to achieve the goals of a Chapter 11 reorganization.

*GAF Corp. v. Johns-Manville Corp.* (In re Johns-Manville Corp.), at 414-415.

The court found that the asbestos litigation plaintiffs would suffer significantly greater harm if the stay was expanded to include the co-defendants than the co-defendants would suffer if the stay was denied, even though the remedy sought by the asbestos plaintiffs was limited to money damages (which meant that such plaintiffs' injuries, however grave, did not constitute "irreparable harm," under a preliminary-injunction standard because an adequate remedy existed at law to compensate the plaintiffs or their survivors):

> The asbestos victims will certainly suffer by the total frustration of their opportunity for a day in court. As Chief Judge Peckham stated in the context of

9

13-53846-swr    Doc 2280-4    Filed 12/19/13    Entered 12/19/13 14:33:30    Page 34 of 22
13-53846-swr    Doc 1004-1    Filed 09/29/13    Entered 09/29/13 14:35:13    Page 34 of
112

asbestos litigation:

> Such delay is not costless to these plaintiffs, many of whom are suffering financial hardships and who seek damages to redress their injuries and some of whom are dying and whose testimony must be perpetuated. The defendants may be inconvenienced by expeditious resumption of the actions against them. However, under *Landis,* the balance of hardship weighs in favor of the injured plaintiffs.

*In re Related Asbestos Cases,* 23 B.R. 523, 531-2 (N.D. Cal. 1982) (citing *Landis v North American Company,* 299 U.S. 248, 81 L. Ed. 153, 57 S. Ct. 163 (1936)). *Accord, Evans v. Johns-Manville Sales Corp.,* C.A. No. 80-2939, slip op. at 4-6 (D.N.J., October 5, 1982).

To the same effect, *see In re Massachusettes Asbestos Cases,* M.B.L. Nos. 1 & 2 (D. Mass. Sept. 28, 1982), in which the court denied a stay against third parties who were co-defendants of a debtor, stating:

> The suppliant for a stay must make out a clear case of hardship or inequity in being required to go forward, if there is even a fair possibility that the stay for which he prays will work damage to someone else . . . .

> Here, it is not a question of a fair possibility. It is certainty that any delay in the continuing efforts to bring these cases to trial will result in continued and increased hardship to the plaintiffs. This is not to ignore the problems of the defendants, but the loss to the plaintiffs far outweighs any possible gain procedural or practical that would inure to them.

Slip Op. at 3.

*GAF Corp. v. Johns-Manville Corp.* (In re Johns-Manville Corp.), at 417.

Unlike the asbestos-litigation plaintiffs, for whom there existed an adequate (if imperfect) remedy at law in the form of money damages, the Petitioners in the instant case are suffering irreparable harm for which there is no adequate remedy at law as long as the violations of their constitutional rights continue. *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986); *Doe v. Duncanville Independent School District*, 994 F.2d 160 (5th Cir. 1993). As such, the equities tilt overwhelmingly against using § 105 to extend the stay to the

non-debtor defendants in the *Phillips* case.

Some courts have found that a bankruptcy court lacks the power under § 105 to issue a stay against a non-debtor party, *In re American Hardwoods, Inc.,* 885 F.2d 621, (9th Cir. 1989), while others have cautiously allowed such stays where the equities clearly favor them:

> Judicial discretion is not unlimited but is to be carefully honed in light of the facts of the case, applicable precedent and appropriate policy. *Fry v. Porter,* 1 Mod. [1607] 300, 307. The issuance of a stay by any court of equity requires a showing of serious, if not irreparable, injury and a tipping of the balance of the equities in favor of the party seeking the stay. *Landis v. North American Co.,* 299 U.S. 248, 254-55, 81 L. Ed. 153, 57 S. Ct. 163 (1936); *Commodity Futures Trading Commission v. Chilcott Portfolio Mgt. Inc.,* 713 F.2d 1477 (10th Cir. 1983).

*Lesser v. A-Z Assocs.* (*In re Lion Capital Group*), 44 B.R. 690, 701 (Bankr. S.D.N.Y. 1984)

In the case at bar, the *Extended Stay Order* (Dkt. 166) is overbroad as applied to the *Phillips* case because there is simply no reason to believe that Debtor would suffer any substantial harm, let alone irreparable injury, if Petitioners' injunctive action against the underlying defendants was permitted to continue. The District Court recognized as much when it noted that "it is not apparent that any interests of the City of Detroit bankruptcy proceedings are implicated" in Petitioners' action, but concluded that it nevertheless was bound by the terms of the "broadly worded Extension Order issued by the bankruptcy court," and was therefore required to stay the case "unless and until such time as an order issues lifting or modifying the stay to permit the captioned matter to proceed." (Exh. 6.3, Steeh Order, *Phillips* case)

Where, as here, Snyder and Dillon, as defendants in the *Phillips* case, are third parties to Debtor's bankruptcy proceedings and there is no close nexus of identity between them and Debtor that would otherwise justify staying litigation against the *Phillips* defendants, the Bankruptcy Code does not authorize staying Petitioners' action. For that reason, the stay as to the *Phillips* case should be lifted.

## III. STAYING PETITIONERS' ACTION AGAINST DEFENDANTS DOES NOT

11

13-53846-swr   Doc 2289-4   Filed 12/19/13   Entered 12/19/13 14:33:30   Page 36 of 22
13-53846-swr   Doc 1604-1   Filed 09/29/13   Entered 09/29/13 14:35:30   Page 36 of 22
112

**FURTHER THE PURPOSES OF THE BANKRUPTCY CODE.**

Even assuming that the Bankruptcy Code could be read as permitting the extension of automatic-stay orders to non-debtor third parties in narrow circumstances (i.e., where an action against a non-debtor is really designed to reach the assets of the debtor/estate), such is not the case here. And in any event, when the circumstances surrounding Petitioners' litigation against the defendants Snyder and Dillon are viewed in their totality, it becomes clear that staying this particular litigation is not "necessary or appropriate to carry out the provisions" of the Code, as required by § 105.

There can be no doubt that the stay provisions of the Code are primarily intended to provide protection to the parties to a bankruptcy proceeding: the debtor and the creditors, as best explained in the legislative history of the Code:

> The automatic stay is one of the fundamental debtor protections provided by the bankruptcy laws. It gives the debtor a breathing spell from his creditors. It stops all collection efforts, all harassment, and all foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy.

H.R. Rep. 95-595, at 340 (1978), reprinted in 1978 U.S.C.C.A.N. 5787, 6296.

The stay of proceedings was also intended to promote an orderly reorganization or liquidation of the debtor's estate thereby benefiting, secondarily, creditors of the estate:

> The automatic stay also provides creditor protection. Without it, certain creditors would be able to pursue their own remedies against the debtor's property. Those who acted first would obtain payment of the claims in preference to and to the detriment of other creditors. Bankruptcy is designed to provide an orderly liquidation procedure under which all creditors are treated equally. A race of diligence by creditors for the debtor's assets prevents that.

*Id.*, reprinted in 1978 U.S.C.C.A.N. 5787, 6297.

Courts have been extremely reluctant to extend this protection to non-debtor third parties, recognizing that "it would distort congressional purpose to hold that a third party solvent co-

defendant should be shielded against his creditors by a device intended for the protection of the insolvent debtor and creditors thereof." *Lynch v. Johns-Manville Sales Corp.,* 710 F.2d at 1197. *See also: In re Related Asbestos Cases*, 23 B.R. 523, 527 (N.D. Cal. 1982); *In re UNR Industries, Inc.*, 23 B.R.144 (Bankr. N.D. Ill. 1982); *Ashworth v. Johns-Manville, et al.*, Nos. C78-470, C81-1545, C77-4088, C79-167 (N.D. Ohio Mar. 21, 1983) at 4.

Asbestos and other mass-tort litigation is instructive on this point, since such cases often involve numerous co-defendants, some of whom are solvent and some of whom are not. In such cases, the solvent defendants are understandably concerned about proceeding without the maximum number of co-defendants and thus prefer to wait until their insolvent co-defendants emerge from bankruptcy. Despite these concerns, where a debtor's solvent co-defendants have moved for an extension of the automatic stay to cover them, they have been routinely denied. When viewed in light of the test that is typically applied by bankruptcy courts to determine whether a stay should be extended to a non-debtor third-party, that result is hardly surprising. In *In re Family Health Servs*., 105 B.R. 937 (Bankr. C.D. Cal. 1989) the court succinctly summarized:

> Courts have applied traditional preliminary injunction tests when determining whether to stay actions against non-debtor parties. It has been held that:
>
>> In order for the Court to enjoin a creditor's action against a co-debtor or guarantor, the debtor must show: 1) irreparable harm to the bankruptcy estate if the injunction does not issue; 2) strong likelihood of success on the merits; and 3) no harm or minimal harm to the other party or parties. *In Re Otero Mills, Inc.,* 25 Bankr. 1018, 1021 (Bankr. N.M. 1982). *In Re Larmar Estates, Inc.,* 5 Bankr. 328, 331 (Bankr. E.D.N.Y. 1980); In *Otero Mills* and *Larmar* the courts determined that "likelihood of success on the merits" equates to the probability of a successful plan of reorganization. *Otero Mills,* 25 Bankr. at 1021;*Larmar,* 5 Bankr. at 331.
>
> The Ninth Circuit has stated the standard test to evaluate claims for preliminary injunctive relief as follows:

13-53846-swr   Doc 12204   Filed 09/19/13   Entered 09/19/13 14:35:30   Page 38 of 22
13-53846-swr   Doc 1084-4   Filed 09/19/13   Entered 09/19/13 14:33:30   Page 38 of 22
112

> Under the first part of this test, the movant must show 1)
> irreparable injury, 2) probable success on the merits, 3) a balance
> of hardships that tips in the movant's favor, and 4) that a
> preliminary injunction is in the public interest. Alternatively, a
> court may issue an injunction if the moving party
> demonstrates *either* a combination of probable success on the
> merits and irreparable injury *or* that serious questions are raised
> and the balance of hardships tips in his favor.

*F.T.C. v. Evans Products Co.,* 775 F.2d 1084, 1088-89 (9th Cir. 1985).  *See also,*
*In re Family Health Servs.*, 105 B.R. 937, 943 (Bankr. C.D. Cal. 1989)

Of course, the cases above all involved co-defendants, co-debtors, or guarantors.  In this
case, the *Phillips* defendants lack even that once-removed connection to the Debtor.  The *Phillips*
case does not name Debtor or any of its agents, employees, officers or representatives as co-
defendants or parties in any capacity.  But even applying the standard applicable to co-
defendants, co-debtors, and guarantors, Defendants are not entitled to a stay.

There is nothing to suggest that Debtor would suffer an irreparable injury to the
bankruptcy estate if Petitioners' litigation regarding the constitutionality of Public Act 426 was
to proceed during the pendency of Debtor's bankruptcy proceedings.  Indeed, there is nothing to
suggest that the bankruptcy estate would be in any way affected, as: (1) Debtor is not a party to
Petitioners' litigation; (2) Petitioners' litigation seeks no money damages; and (3) to whatever
extent Petitioners may be entitled to attorney fees and costs if they prevail in the underlying
matter, such an award will be the responsibility of the State of Michigan, not Debtor, as
Defendants are State officials.

On the other hand, in light of the constitutional violations alleged by Petitioners in their
complaint, Petitioners have suffered and will continue to suffer irreparable harm.  Courts have
held that the mere fact that constitutional rights are being violated is sufficient to demonstrate
irreparable harm. *Doe v. Duncanville Independent School District*, 994 F.2d 160 (5th Cir. 1993).

Even a temporary loss of a constitutional right constitutes irreparable harm which cannot be adequately remedied by an action at law. *Chicago Teachers Union v. Hudson*, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). Thus, not only can Debtor <u>not</u> demonstrate irreparable harm to the bankruptcy state if Petitioners' claim against Defendants is not stayed, but it also cannot demonstrate "no harm or minimal harm" to Petitioners if the litigation is stayed. As a result, whether analyzed under a preliminary-injunction framework or a simple balancing of the equities, the extension of the stay to include the *Phillips* case cannot be upheld.

## IV. WHERE PETITIONERS ALLEGE CONSTITUTIONAL VIOLATIONS, ENFORCEMENT OF THE CONSTITUTION MUST TAKE PRECEDENCE OVER STAYING LITIGATION AGAINST NON-DEBTOR DEFENDANTS

As explained above, it is not "necessary or appropriate" that all litigation against the non-debtor *Phillips* defendants, Snyder and Dillon, be stayed in order to carry out the purposes of the Bankruptcy Code as applied to Debtor. But as written, that is precisely what the *Extended Stay Order* does. No matter what the facts, no matter what the claims against the State, under the broad language of this Court's *Order,* no lawsuit of any kind can proceed against the Governor or the State Treasurer until one community—the City of Detroit—emerges from bankruptcy. Thus, both on its face and as applied, the *Extended Stay Order* (Dkt. 166) operates to deprive all who reside in the entire State of Michigan of their constitutional rights of access to the courts and to petition for a redress of grievances.

A court can hold a statute unconstitutional either because it is facially invalid or unconstitutional as applied in a particular set of circumstances. *See Coleman v. Ann Arbor Transp. Auth.*, 904 F. Supp. 2d 670, 682-83 (E.D. Mich. 2012) (citing *Women's Med. Prof'l Corp. v. Voinovich,* 130 F.3d 187, 193 (6th Cir. 1997)). In an 'as applied' challenge, "the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional." *Women's Med. Prof'l Corp.*, 130 F.3d at

15

193 (internal citations omitted).

The stay of proceedings as applied to Petitioners' underlying case in *Phillips* violates their rights under the United States Constitution and the Civil Rights Act, 42 U.S.C. § 1983, to a full remedy for the deprivation of their constitutional rights. As such, Petitioners ask this Court to modify the stay with respect to the *Phillips* case in order to avoid such constitutional violations under the Fifth and Fourteenth Amendments.

Specifically, it violates Petitioners' right to due process in that they no longer have an avenue to vindicate the deprivation of their constitutional rights, as guaranteed by the enforcement power given to Congress by § 5 of the Fourteenth Amendment through 42 U.S.C. §1983, which provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State . . . subjects, or causes to be subjected thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

42 U.S.C. § 1983.

When Congress adopted the Fourteenth Amendment in 1868, it took steps to ensure that the promise of that amendment—freedom from violations of due process and equal protection by public officials—would be e. Thus, in 1871, the United States Congress first enacted § 1 of the Klu Klux Klan Act, pursuant to § 5 of the Fourteenth Amendment with the express intent to provide for enforcement of that amendment to the United States Constitution, which is specifically entitled, "An Act to enforce the Provisions of the Fourteenth Amendment to the Constitution of the United States, and for other purposes." 17 Stat. 13 (1871).

In 1874, Congress codified the substantive portion of the 1871 Act, passing a separate section identical to the present version of the Civil Rights Act, 42 U.S.C. § 1983. The Supreme Court has broadly described the primary purpose of § 1983 as follows:

16

13-53846-swr   Doc 2239-4   Filed 12/19/13   Entered 12/19/13 14:38:30   Page 41 of 22
13-53846-swr   Doc 1004-4   Filed 09/19/13   Entered 09/19/13 14:35:17   Page 41 of
112

As a result of the new structure of law that emerged in the post-Civil War era—and especially of the Fourteenth Amendment, which was its centerpiece—the role of the Federal Government as the guarantor of basic federal rights against state power was clearly established. **Section 1983 opened the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation** . . . .

The **very purpose of section 1983 was to interpose the federal courts between the States and the people, as guardians of the people's federal rights**—to protect the people from unconstitutional action under color of state law . . . .

*Mitchum v. Foster*, 407 U.S. 225, 238-39, 242 (1972). (emphasis added). Throughout our nation's history, therefore, the right of our citizens to enforce their rights under the U.S. Constitution in a United States District Court has been a bulwark of democratic principles. Taking away that right should not be taken lightly.

Petitioners' federal statutory right to vindicate the deprivation of their constitutional rights includes the right to have the United States District Court and a jury of Petitioners' peers adjudicate their § 1983 cause of action, as guaranteed by 28 U.S.C. § 1343(3). *See* U.S. Const. amend. VII (guaranteeing the right to trial by jury); 28 U.S.C. § 1343(3) (providing that "[t]he district courts shall have original jurisdiction of any civil action . . . [t]o redress the deprivation under color of any State law . . . of any right, privilege or immunity secured by the Constitution of the United States . . . .").

Congress enacted § 1983 with the "goal of compensating the injured" and "preventing official illegality." *Jaco v. Bloechle*, 739 F.2d 239, 244 (6th Cir. 1984) (internal quotations omitted). In doing so, it clearly established the Federal Government as the guarantor of "the basic federal rights of individuals against incursions by state power." *Patsy v. Bd. of Regents of State of Fla.*, 457 U.S. 496, 503 (1981).

The application of the automatic stay herein to Petitioners' case contravenes the very purpose and intent of Congress and the Supreme Court in enacting and enforcing § 1983, to

provide a judicial remedy for the violation of one's rights under the Constitution. *Accord Felder v. Casey*, 487 U.S. 131, 148 (1988) (recognizing that civil rights actions "belong in court") (quoting *Burnett v. Grattan*, 468 U.S. 42, 50 (1984); *Mitchum*, 407 U.S. at 242-43 (noting that the enforcement of federal rights is of the highest priority). By delaying proceedings in the underlying matter indefinitely, the stay has in essence taken from Petitioners—without any process, let alone adequate process—the opportunity to have the deprivations of their civil rights adjudicated by the district court and a jury of their peers. This stay thus precludes Petitioners from any relief for the violations of their constitutional rights wrought by PA 436. *See Felder*, 487 U.S. at 148.

In this regard, *Perez v. Campbell*, 402 U.S. 637 (1971) is noteworthy. In that case, the Court dealt with the conflict between the Bankruptcy Act and a state "financial responsibility" motorist statute. In so doing, it found that the conflicts presented by the state statute violated the Supremacy Clause. The Court also noted that the conflict was created, and the state law invalidated by the Supremacy Clause, because the state law undermined the "declared purpose" of the federal Bankruptcy Act. *Id*. at 654. In that case the court held that there was "no reason why the States should have broader power to nullify federal law." *Id*. at 652.

Here, however, the Supremacy Clause is useless to resolve statutory conflicts with other federal legislation. It is not the federal Bankruptcy Act that is being frustrated and interfered with, but rather the Civil Rights Act – i.e. the protection of individuals' rights under the United States Constitution -- that is being undermined. The exercise of this Court's discretion in staying proceedings in the *Phillips* case – as well as other § 1983 cases -- interferes with the purpose, intent, and effectiveness of the federal Civil Rights Act. As in *Perez*, in the *Phillips* case there is "no reason" justifying this Court's *Extended Stay Order,* (Dkt. 166), to "nullify federal law," (i.e., the Civil Rights Act of 1871) such that it "frustrates" its "full effectiveness." *Id*.

18

13-53846-swr Doc 12080-4 Filed 12/19/13 Entered 12/19/13 14:33:30 Page 43 of 22
13-53846-swr Doc 1664-4 Filed 09/29/13 Entered 09/29/13 17:35:17 Page 43 of 22
112

The constitutional conundrum caused by the application of the automatic stay to the *Phillips* case are well described in a recent opinion from the Eastern District of California, *V.W. ex rel. Barber v. City of Vallejo*, No. 12-1629, 2013 WL 3992403 (E.D. Cal. Aug. 2, 2013). In *Vallejo*, the court makes the following, highly pertinent observation with regard to the issue of a conflict between the purposes of the Bankruptcy Code and the Civil Rights Act:

> [A]larming as it is, as the bankruptcy statute appears to be written, a municipality may erase its own liability to persons whom it and its officers have willfully and maliciously deprived of their civil rights—and even their lives—by filing for bankruptcy. This extraordinary result would appear to exalt the bankruptcy laws over the civil rights laws (even though the civil rights laws, like the bankruptcy laws, are anchored in the constitution).

*Id.* at 4. In *Vallejo*, however, because neither party had actually raised this issue --and indeed the plaintiff had conceded the jurisdiction of the Bankruptcy Court to discharge her claims -- the Court did not decide the merits of this issue. Nonetheless, the *Vallejo* court went out of its way to identify and flag how the Bankruptcy Code, if improperly applied, may well unconstitutionally interfere with rights secured by § 1983 and the Fourteenth Amendment.

Once again, it should be noted that, unlike the *Phillips* case herein, *Vallejo* involved direct claims for money damages against the debtor municipality. In *Phillips,* the application of the stay to the non-debtor defendants is even more contrary to public policy inasmuch as it allows those defendants to perpetuate constitutional violations by attaching themselves to a third-party bankruptcy proceeding.

Rather than "exalt" the Bankruptcy Code over the Civil Rights Acts, the automatic- and equitable-stay provisions of the Code should be construed to be consistent with § 1983, thus avoiding a constitutional conflict. Where a federal statute is overbroad, as the Bankruptcy Code is here, the Court should construe the statute to avoid constitutional problems if the statute is subject to such a limiting construction. *New York v. Ferber*, 458 U.S. 747, 769 (1982).

Here, the automatic- and equitable-stay provisions can be limited through a grant of relief from the stay, which is within this Court's discretion. *In re Atl. Ambulance Assocs., Inc.*, 166 B.R. 613, 615 (Bankr. E.D. Va. 1994) (noting that the bankruptcy "code gives the court a fairly broad discretion to provide appropriate relief from the stay as may fit the facts of the case."); *Capital Commc'ns Fed. Credit Union v. Boodrow*, 197 B.R. 409, 413 (N.D.N.Y. 1996) *aff'd sub nom. In re Boodrow*, 126 F.3d 43 (2d Cir. 1997) ("[A] court has broad discretion to lift the stay in appropriate circumstances." (internal citations omitted)). Petitioners thus ask this Court to lift or modify the Stay as it applies to their case, to allow the Bankruptcy Code to be read consistently with the constitutionally imposed values and principles of § 1983 and, therefore, applied in a constitutional manner.

## **CONCLUSION**

For all of the reasons stated above in their Motion attached hereto, and for good cause shown, Petitioners respectfully request that *Extended Stay Order* (Dkt. 166) be clarified, modified, or lifted with respect to Petitioners' claims against the underlying defendants in the *Phillips* case, so that: 1) the constitutionality of Public Act 436 may be properly adjudicated pursuant to 42 U.S.C. §1983 by an Article III United States District Court; and 2) Petitioners may amend their Complaint to provide for the voluntary withdrawal of individual plaintiffs Phillips, Valenti, and AFSCME Council 25 and the voluntary dismissal of Count I of their Complaint, without bearing on the Debtor's rights in this bankruptcy proceeding.

Dated: September 23, 2013                    Respectfully Submitted,

                                             By:___/s/William H. Goodman_____
                                             William H. Goodman (P14173)
                                             Julie H. Hurwitz (P34720)
                                             GOODMAN & HURWITZ PC on behalf of the
                                             DETROIT & MICHIGAN NATIONAL
                                             LAWYERS GUILD

1394 E. Jefferson Ave.
Detroit, Michigan 48207
(313) 567-6170/Fax: (313) 567-4827
bgoodman@goodmanhurwitz.com
Attorneys for Creditor Catherine Phillips, et al.

-and-

John C. Philo (P52721)
Anthony D. Paris (P71525)
SUGAR LAW CENTER
FOR ECONOMIC & SOCIAL JUSTICE
4605 Cass Ave., 2nd Floor
Detroit, Michigan 48201
(313) 993-4505/Fax: (313) 887-8470
jphilo@sugarlaw.org
tparis@sugarlaw.org
Attorneys for Creditor Catherine Phillips et al.

Herbert A. Sanders (P43031)
THE SANDERS LAW FIRM PC
615 Griswold St. Ste. 913
Detroit, Michigan 48226
(313) 962-0099/Fax: (313) 962-0044
haslawpc@gmail.com
Attorneys for Creditor Catherine Phillips et al.

Darius Charney
Ghita Schwarz
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th floor
New York, New York 10012
(212) 614-6464/Fax: (212) 614-6499
dcharney@ccrjustice.org
Attorneys for Creditor Catherine Phillips et al.

Richard G. Mack, Jr. (P58657)
Keith D. Flynn (P74192)
MILLER COHEN, P.L.C.
600 W. Lafayette Blvd., 4th Floor
Detroit, Michigan 48226
(313) 964-4454/Fax: (313) 964-4490
richardmack@millercohen.com
Attorneys for Creditor Catherine Phillips et al.

Cynthia Heenan (P53664)
Hugh M. Davis (P12555)
Attorneys for Plaintiffs
CONSTITUTIONAL LITIGATION
ASSOCIATES, P.C.
450 W. Fort St., Suite 200
Detroit, MI 48226
313-961-2255/Fax: 313-961-5999
Attorneys for Creditor Catherine Phillips et al.

21

# EXHIBIT 4

## CERTIFICATE OF SERVICE

13-53846-swr   Doc 2289-4   Filed 12/28/13   Entered 12/28/13 17:08:30   Page 47 of 2
13-53846-swr   Doc 1004-5   Filed 09/28/13   Entered 09/28/13 17:35:17   Page 47 of 2
112

# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

In re:                                            Chapter 9

CITY OF DETROIT, MICHIGAN,                         Case No. 13-53846

     Debtor.                                      Hon. Steven W. Rhodes

_____/

## **<u>CERTIFICATE OF SERVICE</u>**

     I, WILLIAM H. GOODMAN, certify that on September 23, 2013, I electronically filed *Catherine Phillips, Et Al.'S Motion For Relief From Order Pursuant To Section 105(A) Of The Bankruptcy Code Extending The Chapter 9 Stay To Certain (A) State Entities, (B) Non Officer Employees And (C) Agents And Representatives Of The Debtor,* along with a *Summary of Attached Exhibits* and *Exhibits 1-6.3* (as listed on the Summary), with the Clerk of the Court using the ECF system which will send notification of such filing to ECF participants in this matter.

                                  */s/William H. Goodman*_____
                                  William H. Goodman (P14173)
                                  GOODMAN & HURWITZ PC on behalf of the
                                  DETROIT & MICHIGAN NATIONAL
                                  LAWYERS GUILD
                                  1394 E. Jefferson Ave.
                                  Detroit, Michigan 48207
                                  (313) 567-6170/Fax: (313) 567-4827
                                  bgoodman@goodmanhurwitz.com
                                  Attorneys for Creditor Catherine Phillips, et al.

# **EXHIBIT 5**

## None

## **[No Affidavits Filed Specific to This Motion]**

# EXHIBIT6.1

**Complaint,**
*Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon*,
**Case No.13-CV-11370**
**[Doc. #1]**

13-53846-swr   Doc 2802-7   Filed 03/29/13   Entered 03/29/13 17:00:30   Page 51 of 52
13-58846-tjt   Doc 1009-4   Filed 09/29/13   Entered 09/29/13 11:05:37   Page 1 of 52
112

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Catherine Phillips, Staff Representative Michigan
AFSCME Council 25, and Chief Negotiator with the          Case No.
City of Detroit; Joseph Valenti, Co-Chief Negotiator       Judge:
with the Coalition of Unions of the City of Detroit;
Michigan AFSCME Council 25; Russ Bellant,
President of the Detroit Library Commission;
Tawanna Simpson, Lamar Lemmons, Elena Herrada,
Detroit Public Schools Board Members; Donald Watkins,
and Kermit Williams, Pontiac City Council Members;
Duane Seats, Dennis Knowles, Juanita Henry, and
Mary Alice Adams, Benton Harbor Commissioners;
William "Scott" Kincaid, Flint City Council President;
Bishop Bernadel Jefferson; Paul Jordan; Rev. Jim Holley,
National Board Member, Rainbow Push Coalition;
Rev. Charles E. Williams II, Michigan Chairman,
 National Action Network; Rev. Dr. Michael A. Owens,
Rev. Lawrence Glass, Rev. Dr. Deedee Coleman,
Bishop Allyson Abrams, Executive Board, Council
of Baptist Pastors of Detroit and Vicinity;

                        Plaintiffs,

vs.

RICHARD D. SNYDER, as Governor of the          ***Complaint for Declaratory***
State of Michigan, and ANDREW DILLON,          ***& Injunctive Relief***
as the Treasurer of the State of Michigan, acting in
their individual and/or official capacities,

                        Defendants.

_____/

Herbert A. Sanders (P43031)
**THE SANDERS LAW FIRM PC**
615 Griswold St. Ste. 913
Detroit, Michigan 48226
(313) 962-0099/Fax: (313) 962-0044
haslawpc@gmail.com
*Attorneys for Plaintiffs*

1

John C. Philo (P52721)
Anthony D. Paris (P71525)
**SUGAR LAW CENTER**
**FOR ECONOMIC & SOCIAL JUSTICE**
4605 Cass Ave., 2nd Floor
Detroit, Michigan 48201
(313) 993-4505/Fax: (313) 887-8470
jphilo@sugarlaw.org
tparis@sugarlaw.org
*Attorneys for Plaintiffs*

Julie H. Hurwitz (P34720)
William H. Goodman (P14173)
**GOODMAN & HURWITZ PC on behalf of**
**the DETROIT & MICHIGAN NATIONAL**
**LAWYERS GUILD**
1394 E. Jefferson Ave.
Detroit, Michigan 48207
(313) 567-6170/Fax: (313) 567-4827
jhurwitz@goodmanhurwitz.com
bgoodman@goodmanhurwitz.com
*Attorneys for Plaintiffs*

Richard G. Mack, Jr. (P58657)
Keith D. Flynn (P74192)
**MILLER COHEN, P.L.C.**
600 W. Lafayette Blvd., 4th Floor
Detroit, Michigan 48226
(313) 964-4454/Fax: (313) 964-4490
richardmack@millercohen.com
*Attorneys for Plaintiffs*

Darius Charney
Ghita Schwarz
**CENTER FOR CONSTITUTIONAL**
**RIGHTS**
666 Broadway, 7th floor
New York, New York 10012
(212) 614-6464/Fax: (212) 614-6499
dcharney@ccrjustice.org
*Attorneys for Plaintiffs*

Cynthia Heenan (P53664)
 Hugh M. Davis, Jr. (P12555)
**CONSTITUTIONAL LITIGATION**
**ASSOCIATES PC**

450 W Fort St Ste 200
Detroit, MI 48226
(313) 961-2255/Fax: (313) 961-5999
conlitpc@sbcglobal.net
*Attorneys for Plaintiffs*

Bertram L. Marks (P47829)
**Litigation Associates PLLC**
30300 Northwestern Hwy Ste 240
Farmington Hills, MI 48334
Phone: (248) 737-4444
Fax: (248) 932-6365
BertramMarks@aol.com
*Attorneys for Plaintiffs*

_____/

**THERE WAS ANOTHER PENDING CIVIL ACTION ARISING OUT OF THE SAME TRANSACTIONS OR OCCURRENCE AS ALLEGED IN THIS COMPLAINT, BEFORE THE HONORABLE JUDGE ARTHUR J TARNOW, THAT CIVIL ACTION BEING CASE NO. 12-11461.**

## COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF

NOW COME Plaintiffs, and by and through their attorneys and for their Complaint, do hereby allege as follows.

### I. NATURE OF PLAINTIFFS' CLAIMS

1.      This is a federal civil rights and voting rights cause of action brought pursuant to 42 USC §1983 for violations of the Plaintiffs' federal and constitutional rights under the United States Constitution, Art. 4, §4; Amend. I; Amend. XIII; Amend. XIV; and pursuant to the *Voting Rights Act of 1965*, 42 U.S.C. §§ 1973 *et. seq.*

2.      The *Local Financial Stability and Choice Act*, Act No. 436, Public Acts of 2012, MCL §§ 141.1541 *et. seq.* (Public Act 436) effectively establishes a new form of government within the State of Michigan. The new form of government allows Michigan cities and other

3

forms of municipal corporations to be ruled by one unelected official, who is vested with broad legislative power and whose orders, appointments, expenditures, and other decisions are not reviewable by local voters.

3.    Plaintiffs' rights under the United States Constitution, include:

   a.  A due process right to engage in collective bargaining.

   b.  A due process right to an elected, republican form of government;

   c.  A right to freedom of speech.

   d.  A right to petition local government.

   e.  A right to equal protection of laws granting Michigan citizens the right to vote in local elections and to remove emergency managers.

Each of these rights is violated by provisions of Public Act 436.

4.    The Voting Rights Act of 1965 protects Plaintiffs from discriminatory laws that disenfranchise voters. Plaintiffs' voting rights are also violated by provisions of Public Act 436.

## II. JURISDICTION AND VENUE

5.    Federal question jurisdiction is conferred by 28 USC §§ 1331, 1343(a)(3), 1343(a)(4), 1344, 2201 and 2202 over Plaintiffs' Constitutional and Voting Rights Act claims.

6.    Venue is proper pursuant to 28 USC §1391, since all Defendants reside or are located in the Eastern District of Michigan and the events giving rise to this action occurred, in part, within this District.

## III. PARTIES

7.    Plaintiff Catherine Phillips is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan. Plaintiff Catherine Phillips is also a Staff Representative for Michigan AFSCME Council 25, and Chief Negotiator with the City of Detroit.

4

8.      Plaintiff Joseph Valenti is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan.   Plaintiff Valenti is also Co-Chief Negotiator for the Coalition of unions of the City of Detroit.

9.      Plaintiff, Michigan AFSCME Council 25 is an unincorporated, voluntary labor association certified by the Michigan Employment Relations Commission, pursuant to the Michigan Public Employee Relations Act, MCLA 432.201 *et seq*. Plaintiff Michigan AFSCME Council 25 has associational standing on behalf of its members as well as its own standing as party to collective bargaining agreements with numerous public entities that will be affected by PA 436, inclusive of, but not limited to the City of Detroit.

10.     Plaintiff Russ Bellant is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan.  Plaintiff Bellant is also President of the Detroit Library Commission.

11.     Plaintiff Tawanna Simpson is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan.  Plaintiff Simpson is also a Detroit Public Schools Board Member.

12.     Plaintiff Lamar Lemmons is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan.  Plaintiff Lemmons is also a Detroit Public Schools Board Member.

13.     Plaintiff Elena Herrada is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan.  Plaintiff Herrada is also a Detroit Public Schools Board Member.

5

14.     Plaintiff Donald Watkins is a citizen of the United States, a resident of the City of Pontiac, County of Wayne, and the State of Michigan. Plaintiff Watkins is also a member of the Pontiac City Council.

15.     Plaintiff Kermit Williams is a citizen of the United States, a resident of the City of Pontiac, County of Wayne, and the State of Michigan. Plaintiff Williams is also a member of the Pontiac City Council.

16.     Plaintiff Duane Seats is a citizen of the United States, a resident of the City of Benton Harbor Michigan, County of Berrien, and the State of Michigan. Plaintiff Seats is also a Benton Harbor Commissioner.

17.     Plaintiff Dennis Knowles is a citizen of the United States, a resident of the City of Benton Harbor Michigan, County of Berrien, and the State of Michigan. Plaintiff Knowles is also a Benton Harbor Commissioner.

18.     Plaintiff Juanita Henry is a citizen of the United States, a resident of the City of Benton Harbor Michigan, County of Berrien, and the State of Michigan. Plaintiff Henry is also a Benton Harbor Commissioner.

19.     Plaintiff Mary Alice Adams is a citizen of the United States, a resident of the City of Benton Harbor Michigan, County of Berrien, and the State of Michigan. Plaintiff Adams is also a Benton Harbor City Commissioner.

20.     Plaintiff William "Scott" Kincaid is a citizen of the United States, a resident of the City of Flint Michigan, County of Genesee, and the State of Michigan. Plaintiff Kincaid is also President of the Flint City Council.

21.     Bishop Bernadel Jefferson is a citizen of the United States, a resident of the City of Flint Michigan, County of Genesee, and the State of Michigan.

6

22.    Plaintiff Paul Jordan is a citizen of the United States and a resident of the City of Flint, County of Genesee, and State of Michigan.

23.    Plaintiff Rev. Jim Holley is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan. Plaintiff Rev. Holley is also a National Board Member of the Rainbow Push Coalition.

24.    Rev. Charles E. Williams II is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan. Plaintiff Rev. Williams is also the Michigan Chairman of the National Action Network.

25.    Plaintiff Rev. Dr. Michael A. Owens is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan. Plaintiff Rev. Dr. Michael A. Owens is also President of the Council of Baptist Pastors of Detroit and Vicinity.

26.    Plaintiff Rev. Lawrence Glass is a citizen of the United States, a resident of the City of Redford, County of Wayne, and the State of Michigan. Plaintiff Rev. Lawrence Glass is also First Vice-President of the Council of Baptist Pastors of Detroit and Vicinity.

27.    Plaintiff Rev. Dr. Deedee Coleman is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan. Plaintiff Rev. Dr. Deedee Coleman is also Second Vice-President of the Council of Baptist Pastors of Detroit and Vicinity.

28.    Plaintiff Bishop Allyson Abrams is a citizen of the United States, a resident of the City of Detroit, County of Wayne, and the State of Michigan. Plaintiff Bishop Allyson Abrams is also Secretary of the Council of Baptist Pastors of Detroit and Vicinity.

29.    Defendant Richard D. Snyder is the Governor of the State of Michigan. Governor Snyder maintains his principal residence in the City of Ann Arbor in Washtenaw County,

7

Michigan, and at all times relevant hereto was acting individually and in his official capacity as State Governor and top policymaker for the State of Michigan.

30.     Defendant Andrew Dillon is the Treasurer of the State of Michigan. Treasurer Dillon maintains his principal residence in Redford Township in Wayne County, Michigan, and at all times relevant hereto was acting individually and in his official capacity as State Treasurer and as a policymaker.

### IV. COMMON FACTS

31.     Through its provisions, Public Act 436 establishes a new form of local government, previously unknown within the United States or the State of Michigan, where the people within local municipalities may be governed by an unelected official who establishes local law by decree.

#### *Legislative Background Of*
#### *Municipal Financial Distress In Michigan*

32.     During the Great Depression in the 1930s, 4,770 cities defaulted on their debt. Among all states, Michigan had the fourth highest number of defaulting municipalities throughout the depression years. At that time, creditors of defaulting cities were commonly required to file a mandamus action in state courts seeking to compel the municipality to raise taxes to pay debt obligations. Courts then appointed receivers to oversee the finances of municipal debtors.

33.     To improve procedures for creditors and municipal debtors, the federal government adopted Chapter 9 of the federal bankruptcy code in 1937. Chapter 9 permits the use of federal bankruptcy procedures for debt-ridden municipalities. Under Chapter 9, elected officials remain in office and retain significant autonomy while bankruptcy procedures oversee

8

the development of a plan to adjust debts and pay creditors. Before a Chapter 9 petition may be filed however, the state must authorize the municipality to file for bankruptcy.

34.     Prior to 1988, unless proceeding through Chapter 9, municipalities were placed into receivership by the courts, not the state legislature or executive branch. Compensation for court-appointed receivers was derived from property that the courts placed within the care of the receiver.

35.     Since 1937, two Michigan cities have defaulted on bond payments or been placed under a court imposed receivership due to insolvency.  Muskegon Township defaulted on revenue bond payments in the early 1960s and the City of Ecorse was placed in receivership by a Wayne County Circuit Court in 1986.

36.     Neither municipality sought the protections of Chapter 9 bankruptcy.  Muskegon Township entered into a settlement agreement with its creditors that resolved their defaults. Ecorse remained under court receivership through 1990 and was subject to further state oversight until the late 1990s.

37.     In response to the troubled insolvency of the City of Ecorse, the state enacted Public Act 101 of 1988 (PA 101).  Public Act 101 allowed the state to intervene when local municipalities were found to be in financial distress.  The statute allowed the state to appoint emergency financial managers over cities experiencing a financial emergency.

38.     In 1990, the legislature replaced PA 101 with the *Local Government Fiscal Responsibility Act*, Act No. 72, Public Acts of 1990 (PA 72).  Public Act 72 authorizes state officials to intervene when local governments face a financial emergency.  Pursuant to PA 72, Michigan's local financial emergency review board can appoint an emergency financial manager (EFM) only after the Governor declares a financial emergency within the local government.

9

39.     Under PA 72, local elected officials are not removed from office and the EFM's powers only extended to matters of municipal finances. Their powers did not extend to purely administrative or policy matters. Furthermore, EFMs had the power to renegotiate, but not unilaterally break contracts.

40.     In the late 1990s, legislation was passed to revise municipal revenue sharing laws, severely reducing the amount of funds shared by the state with local government. Local governments saw further revenue reductions when income and property tax revenues sharply declined during the recession of 2000-2003. As a result, municipalities experienced significant financial stress during the late 1990s and early 2000s.

41.     During this time period, the state local financial emergency review board appointed PA 72 EFMs in the cities of Hamtramck, Highland Park, and Flint.

42.     These original Public Act 72 EFMs remained in place as follows:

    a.   Hamtramck from 2000 until 2007 (7 years)[1];

    b.   Highland Park from 2001 until 2010 (9 years);[2] and

    c.   Flint from 2002 until 2004 (2 years)[3].

43.     With the onset of the historic global recession that began in 2007 and resulted in record foreclosures and steep unemployment, cities and municipal corporations in Michigan saw further sharp reductions to income and property tax revenue. State revenue sharing laws were further amended in recent years to reduce revenue sharing with local governments and thereby balance state budgets. As a result, Michigan municipalities again faced widespread financial stress.

---

[1] In 2010, the City of Hamtramck requested permission from the state to file for Chapter 9 bankruptcy. The state refused.

[2] One year later, DTE Energy repossessed the City of Highland Park's street lights due to the city's inability to pay its bills

[3] The City of Flint was again declared in a financial emergency in 2011.

44.     Again, the state local financial emergency review board appointed PA 72 EFMs in various cities, including Pontiac, Ecorse, and Benton Harbor. Public Act 72 EFMs were also appointed over the Village of Three Oaks (2008) and the Detroit Public Schools and the review board entered into a PA 72 consent agreement with the city of River Rogue.

45.     The second wave of Public Act 72 EFMs were appointed as follows:

    a.  Pontiac from 2009 until the present (4+ years)

    b.  Ecorse from 2009 until the present (4+ years)

    c.  Benton Harbor from 2010 through the present (3+ years);

    d.  Village of Three Oaks from 2008 until 2009 (1 year); and

    e.  Detroit Public Schools from 2009 until the present (4+ years).

The state's consent agreement with the city of River Rouge has also remained in place from 2009 to the present. Notably, since the onset of the global recession in 2007, the Village of Three Oaks is the only municipality that has emerged from a financial emergency following the appointment of an emergency financial manager, appointment of an emergency manager, or the entering of a consent agreement.

46.     Following elections in November of 2010 and the turnover of state offices in January 2011, the Michigan legislature introduced House Bill 4214 (2011) on February 9, 2011. The bill was widely seen as a response to a court ruling finding that the Detroit Public Schools' School Board, and not the EFM, possessed the power under state law to determine what curriculum would be taught and which texts would be used in the city's public schools. The decision provoked elements of the state legislature who then sought greater control over the content of the curriculum taught in Detroit's schools.

11

47.    House Bill 4214 was rushed through the legislature and quickly presented to the Governor for signature. Defendant Governor Richard D. Snyder signed the *Local Government and School District Fiscal Accountability Act*, Act No. 4, Public Acts of 2011 (PA 4) into law on March 16, 2011. Public Act 4 repealed Public Act 72 and was given immediate effect. Public Act 4 automatically converted all EFMs to Public Act 4 Emergency Managers (EM) and greatly expanded the scope of their powers. The Act also brought all existing consent agreements under the new law.

### *Public Act 4's Radical Revision of State Law*

48.    Public Act 4 radically revised state law governing the appointment of EMs over cities and school districts during times of financial stress.

49.    Public Act 4 provided that once the Governor had declared a financial emergency, the Governor could then appoint an individual to be the municipality's emergency manager. The Governor was granted broad discretion to declare a financial emergency and, in fact, a municipality was not actually required to be in a fiscal crisis before an EM could be appointed.

50.    Tellingly, the Act changed the title of municipal "emergency financial managers" to "emergency managers" and expanded the scope of their powers to cover all the conduct of local government.

51.    The PA 4 EM's powers extended not only to financial practices and fiscal policy, but rather permitted such managers to fully act "for and in the place of" the municipality's elected governing body. The grant of powers also included a general grant of legislative power (the power to unilaterally adopt local laws and resolutions) to PA 4 EMs.

12

52.     Public Act 4's grant of legislative power to EMs extended to the full scope of legislative power possessed by local elected officials. In the state of Michigan, local legislative power is of the same scope and nature as the police power possessed by the state - limited only by the jurisdictional limits of the municipality and where preempted by the general laws of the state. Public Act 4's grant of general legislative power to EMs thus extended to a grant of the full of scope of the local government's police power, previously reserved to local government's elected legislative body and elected mayor.

53.     Emergency managers were further granted powers to act in disregard of the local government's local laws – including city charters, ordinances, administrative regulations, school district bylaws, etc.

54.     The Act further granted a state financial review team the power to enter into a consent agreement with local government, again without a finding that a financial emergency existed.

55.     At the time PA 4 became law, reports from the State indicated that, based on their financial conditions, over eighty (80) municipalities and/or school systems were eligible to have emergency managers.

56.     After passage of PA 4, existing EFMs in the cities of Benton Harbor, Ecorse and Pontiac and over the Detroit Public Schools were converted to EMs and vested with PA 4 powers. The state's consent agreement with the city of River Rouge was also converted to a PA 4 agreement.

57.     With the continuing global economic recession and steep declines in state revenue sharing and municipal property tax and income tax revenue collection, PA 4 EMs were newly appointed as follows:

13

a. Flint from 2011 until the present (2+ years);

b. Highland Park Public Schools from 2012 until the present (1+ year); and

c. Muskegon Heights Public Schools until the present (1+ year).

Additionally, the state entered PA 4 consent agreements with the cities of Detroit[4] and Inkster.

58.     After becoming vested with Public Act 4 powers, EMs in Benton Harbor, Ecorse, Flint, and Pontiac have all exercised general legislative power to enact, repeal and suspend local laws and resolutions and have voided various contracts.

### Michigan Citizen's Rejection of Public Act 4
### And the State's Resurrection of Public Act 72

59.     In opposition to Public Act 4, citizens began circulating petitions in May 2011. The petitions were to place a referendum on the ballot that would reject the law. Over 200,000 signatures were gathered and the petitions were submitted to the Secretary of State in February 2012. However to prevent Michigan citizens from having the opportunity to vote on the matter, the petitions were challenged by a lobbying group.

60.     The petitions were challenged on the basis that the title of the petitions were not printed in 14 point font but rather were printed in slightly smaller font of approximately 13.75 or larger.[5]

61.     Along party-line votes, the members of the state Board of Canvassers deadlocked and as a result, the petitions were not certified for the ballot.

62.     The matter was then appealed to the Michigan Court of Appeals. A panel of the Court of Appeals recognized and found that existing law required the referendum to be placed on

---

[4] The state has struggled to identify the state law(s) providing legal authority for the transfer of powers and oversight that was created by the agreement with the city of Detroit. Over time, the state seems to have settled into a belief that PA 4 provided such authority.

[5] No evidence was submitted and it was not argued that signatories of the petitions had been confused or misunderstood what they had signed. In fact, the difference in point size as argued by the challenger was invisible to the naked eye of many.

14

the ballot. However, the panel sought to overturn existing law, and thereby keep the referendum off the ballot. The panel requested that the full Court of Appeals be polled to convene a special panel to reconsider existing law. The full Court of Appeals however declined to convene the special panel.

63.     An appeal was taken to the state Supreme Court. The Michigan Attorney General in his individual capacity and Governor in his individual and/or official capacity joined the challengers as amici at the state Supreme Court.

64.     On August 3, 2012, the Michigan Supreme Court issued an opinion ordering the state Board of Canvassers certify the petitions and place the referendum on the ballot.

65.     However on August 6, 2012, the state Attorney General issued a formal opinion stating that once the petitions were certified[6], PA 72 would spring back into effect and would remain in effect if voters rejected PA 4 at the November 2012 election.

66.     The state Board of Canvassers certified the petitions on August 8, 2012 and by operation of Michigan law, PA 4 was then suspended until the November.

67.     In response, state officials reappointed all existing PA 4EMs as PA 72 EFMs and proclaimed that all existing consent agreements would continue in place as PA 72 consent agreements.

68.     After certification of the referendum, existing PA 4 EMs were converted to EFMs in the cities of:

      a.     Benton Harbor;

      b.     Ecorse;

      c.     Flint; and

---

[6] Pursuant to Michigan law, once the petitions were certified PA 4 was then suspended until the voters could decide the matter at the next general election.

15

      d. Pontiac.

69.    Additionally EMs over the following school districts were converted to Public Act 72 EFMs:

      a. Detroit Public Schools;

      b. Highland Park Public Schools; and

      c. Muskegon Heights Public Schools.

70.    Finally, the state's consent agreements with the cities of Detroit, Inkster and River Rogue were proclaimed converted to PA 72 agreements.

71.    At the general election on November 6, 2012, Michigan voters overwhelmingly elected to reject PA 4.

### Michigan Legislature's Attempt to Overturn Citizen's Vote to Reject Public Act 4 by Enacting Public Act 436

72.    In response to the decision of Michigan voters to reject PA 4, incensed state officials and segments within the state legislature quickly moved to reenact a new law with emergency manager provisions that are substantially identical to the rejected law.

73.    During the lame-duck session, the state legislature moved quickly to reenact the emergency manager provisions of Public Act 4. The new bill passed the state House and Senate on December 13, 2012 and was signed into law as the *Local Financial Stability and Choice Act*, Act No. 436, Public Acts of 2012, on December 26, 2012.

74.    Public Act 436 again changes the title of existing PA 72 "emergency financial managers" to "emergency managers" and again expands the scope of their powers to cover all the conduct of local government.

75.    The PA 436 EM's powers are substantially identical to the powers that had been granted under PA 4. Public Act 436 EMs are empowered to fully act "for and in the place of"

16

the municipality's governing body. The grant of powers again includes a general grant of legislative power to emergency managers.

76.     Along with the general grant of legislative power to emergency managers, Public Act 436 exempts the EM from following existing city charters and local ordinances.

77.     The new law does not provide any process that EMs must follow in the adoption or repeal of local laws, but rather permits the EM to do so by private orders, not subject to open meetings requirements.

78.     Public Act 436 states that EMs appointed under PA 4 and EFMs appointed under PA 72 shall be considered EMs under PA 436 once the new law takes effect.

79.     Additionally, PA 436 permits the Governor to appoint persons appointed as EMs under PA 4 and as EFMs under PA 72 to serve as PA 436 EMs under the new law.

80.     Under PA 436, all EMs serve at the pleasure of the Governor and continue to serve until removed by the Governor or until the Governor finds that the financial emergency has been rectified.

81.     Public Act 436 permits the Governor to delegate his powers and duties to the state treasurer and the state treasurer oversees the activities of emergency managers.

82.     When PA 436 takes effect on March 28, 2013, EMs will be in place over the cities of Allen Park, Benton Harbor, Ecorse, Flint, Pontiac and Detroit and over the Detroit Public Schools, Highland Park Public Schools, and Muskegon Heights Public Schools. Finally, the state's consent agreements with Inkster and River Rouge will again be converted – now to PA 436 agreements.

83.     Under PA 436, elected officials in each of these communities will be displaced and/or be divested of governing and law-making authority and citizens will have effectively lost their right to vote for their local legislative bodies, chief executive officers, and school boards.

84.     Local elected officials are thereby effectively removed from office under PA 436 and this removal occurs without any showing of malfeasance or misfeasance causing or contributing to the financial circumstances faced by their municipality or school district. In so doing, the Act implicitly assumes that these local officials were guilty of corruption or gross incompetence that caused or contributed to the financial circumstances of their municipality or school district. Public Act 436 makes this assumption of guilt and removes elected officials without any finding of fault on the part of local elected officials and without any form of due process.

85.     In each of these communities, citizens will have effectively lost their right to vote for local elected officials or had that right diluted so as to render it an exercise in form without substance.

86.     There is no question that Michigan's emergency manager laws have disproportionately impacted the state's population of citizens from African-American descent.

87.     The Black/African-American population of each of the cities where an emergency manager or consent decree will be in place when PA 436 takes effect, is as follows:

   a.   Benton Harbor: 8,952 persons comprising 89.2% of the city's population;

   b.   Ecorse: 4,315 persons comprising 46.4% of the city's population;

   c.   Pontiac: 30,988 persons comprising 52.1% of the city's population;

   d.   Flint: 57,939 persons comprising 56.6% of the city's population;

   e.   Inkster: 18,569 persons comprising 73.2% of the city's population;

18

    f.   River Rouge: 3,994 persons comprising 50.5% of the city's population;

    g.   Detroit: 590,226 persons comprising 82.7% of the city's population,

    h.   Highland Park: 10,906 persons comprising 93.5% of the city's population;

    i.   Muskegon Heights: 8,501 persons comprising 78.3% of the city's population; and

    j.   Allen Park: 587 persons comprising 2.1% of the city's population.

The Black/African-American population of these cities totals 734,947 persons.

88.    As a result of the Defendants' actions under Public Act 436, fifty two (52%) of the state's Black/African-American population will come under the governance of an emergency manager or consent agreement. In each of these communities, citizens will have either lost or experienced severe restrictions imposed on their right to vote and to participate in public affairs.

89.    There is also no question that each of the aforementioned cities is economically poor communities where significant household wealth has been lost since the onset of the current recession. In these communities, the percentage of persons living below the poverty level is:

    a.   Benton Harbor – 48.7%;

    b.   Ecorse – 32.7%;

    c.   Pontiac- 32%;

    d.   Flint – 36.6%;

    e.   Inkster – 33.2%;

    f.   River Rouge – 40.1%;

    g.   Detroit – 34.5%; and

    h.   Highland Park – 43.7%; and

    i.   Muskegon Heights – 45.6%.

The Michigan average is 15.7%. The City of Allen Park is thus the only city with an EM where

the poverty level is not at least double the state average.

90.     Like PA 4, Public Act 436 reestablishes a new form of local government that is repugnant to the constitutional liberties of all Americans.

91.     Despite a long national history of municipal financial crises following national and global economic depressions and recessions, no other state in the nation has engaged in similar experiments in undemocratic governance as a solution to economic downturns.

92.     Under Public Act 436, the people become subject to government that is composed of one unelected official who wields absolute power over all aspects of local government and whose decisions are without review by either local elected officials or local voters.

### Continued Frustration of Contractual Rights of City of Detroit Employees By Public Act 436 and Its Precursor Public Act 4

93.     The loss of rights suffered by the citizenry and the workforce of the City of Detroit reveals how emergency manager legislation threatens basic civil rights of Michiganders.

94.     In November 2011, the City of Detroit announced a financial crisis and requested that its labor unions offer wage and benefit concessions to alleviate the crisis. At that time, more than thirty of the City of Detroit's forty-eight unions banded together in a "Coalition of Unions" to jointly negotiate concessions with the City of Detroit. This Coalition represented approximately 5,000 City employees.

95.     The Coalition and the City of Detroit reached a Tentative Agreement, resulting in hundreds of millions of dollars in cost savings and revenue to the City, according to accounting estimates. The City encouraged the Coalition of unions to ratify the Tentative Agreement, which they did on March 22, 2012. The City celebrated the ratification, and planned for execution and implementation of this Coalition contract.

96.     Following Coalition ratification of the Tentative Agreement, the State of Michigan and its top-level agents threatened the City of Detroit's elected leadership with the appointment of an EM if City officials continued to bargain collectively with the City unions. The Defendants ordered the City Mayor and City Council not to sign the Coalition contract.

97.     The Defendants' issues with the contract were not financial.   Indeed, the Defendants acknowledged the significant financial concessions made within the Coalition contract.   However, the Defendants wanted unspecified nonfinancial changes made to the agreement.

98.     As a result of the Defendants' actions and interference, Detroit's Mayoral Administration asked the City Council not to finalize and execute the contract.  To date, the Defendants have prevented the execution of the Coalition contract.  Detroit's elected officials acknowledge that the State's threats caused them not to finalize contract.

99.     Under state labor law, the Public Employment Relations Act (MCLA sec 423.210, 215), cities have an obligation to bargain with its unionized workforce over terms and conditions of employment. The statutory obligation to bargain includes the obligation "to execute a written contract, ordinance, or resolution incorporating any agreement reached if requested by either party…" MCLA sec 423.215(1).

100.    At the insistence of the Defendants, the City of Detroit negotiated and signed a Consent Agreement with the state, on April 4, 2012, under Public Act 4.  The consent agreement outlined various employment terms for Coalition employees.

101.    Due to the existence of the consent agreement and citing PA 4, the City of Detroit claimed authority to ignore the obligation to bargain with its unions.  As such, it imposed

21

dramatic wage and benefit concessions on the unionized workforce without bargaining, during the months following the execution of the consent agreement.

102.   Following the Michigan voters' rejection of PA 4 in November 2012, the Defendants still have refused to permit the City of Detroit to execute a contract with the Coalition unions.   Thus, even though the PA 4 has been rejected, the City is enjoying the consequence of this rejected and unconstitutional law by refusing to adjust the wage and benefit concessions it had imposed on the Coalition members.

103.   With its continued refusal to permit the City to execute a contract with the Coalition union, the Defendants are frustrating the substantive and procedural due process of the Coalition members.

104.   Public Act 436 continues Defendants violation of the due process rights through provisions that seek to retroactively validate actions taken pursuant to powers and authority granted by Public Act 4 and consent agreements entered thereunder.

## V. CAUSES OF ACTION

### COUNT I – 42 U.S.C. §1983 - Constitutional Violation
### US Const, Amend. XIV – Substantive & Procedural Due Process –
### Right to Collectively Bargain – City of Detroit

105.   Plaintiffs incorporate by reference paragraphs 1 through 106 above as though fully stated herein.

106.   Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

107.   Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and official capacities, have engaged in conduct that violates Plaintiffs' Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 rights under Amend. XIV of the U.S. Constitution.

22

108.    Amendment XIV of the United States Constitution holds, in pertinent part: "nor shall any state deprive any person of life, liberty, or property without due process of Law."

109.    Under the Due Process Clause, each person has a property interest in their employment, in the terms of employment negotiated pursuant to contract, and in rights granted under state law and these rights may not be taken away without due process of law.

110.    Under state law, Plaintiffs Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 were granted a right to collectively bargain with their employer, the City of Detroit.

111.    State law provides that:

> To bargain collectively is to perform the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or to negotiate an agreement, or any question arising under the agreement, and to execute a written contract, ordinance, or resolution incorporating any agreement reached if requested by either party, but this obligation does not compel either party to agree to a proposal or make a concession.#

MCL§ 423.215(1).

112.    The Defendants Snyder and Dillon, acting in their respective individual and/or official capacities, violated Plaintiff's Due Process rights protected by US Const., Amend. XIV, by acts including but not limited to:

   a.   Issuing threats and ultimatums to the Detroit City Council that if it approved the contract, then the State would appoint an EM to govern in the place of City Council;

   b.   Issuing threats and ultimatums to the Detroit City Council that if it did not approve a consent agreement, before considering the contract, then an EM would be appointed;

   c.   Subjecting the tentative agreement and any amended or renegotiated agreements to the approval of the Financial Advisory Board under the terms

23

    d.  Subjecting the tentative agreement and any amended or renegotiated agreements to the approval of the Project Management director under the terms of the consent agreement; and

    e.  Subjecting future bargaining to the terms of the consent agreement.

113.    On its face, as applied, and in practice, Public Act 436 violates the Due Process Clause of US Const., Amend. XIV and rights of Plaintiffs Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 through provisions of the statute that ratify actions taken by under Public Act 4. See provisions including but not limited to MCL §141.1570.

114.    The provisions of PA 436 and the powers granted thereby, are not necessary, narrowly tailored, rationally, or otherwise lawfully related to achieving the purported government interests of achieving local government financial stability.

115.    As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 have suffered and will continue to suffer a loss of their constitutionally-protected rights.

## COUNT II – 42 U.S.C. §1983 -- Constitutional Violation
## US Const, Amend. XIV – Substantive Due Process –
## Right to a To Elect Officials Who Possess General Legislative Power

116.    Plaintiffs incorporate by reference paragraphs 1 through 115 above as though fully stated herein.

117.    Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

118.    Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities,

24

Defendants have engaged in conduct and adopted laws and policies that violate Plaintiffs' rights under Amend. XIV of the U.S. Constitution.

119.    Amendment XIV of the U. S. Constitution holds, in pertinent part: "nor shall any state deprive any person of life, liberty, or property without due process of Law."

120.    Under the Due Process Clause, each person has a liberty interest in their right to a democratically elected from of local government.

121.    Under the Due Process Clause, each person has a liberty interest in their right to elect officials of any level of government that exercise general legislative powers.

122.    Under state law, Michigan cities possess local legislative power to enact make charters, adopt and repeal local laws, and pass resolutions.

123.    Under state law, Michigan cities' legislative power over matters within their jurisdiction is of the same scope and nature as the police power of the state.

124.    When a state establishes a local government with legislative power, it must be democratic in form and substance.

125.    The right to a democratic form of government is a fundamental right afforded to all citizens in the state of Michigan through the United States Constitution.

126.    The right to a vote for the officials of local government who exercise general legislative powers is a fundamental right afforded to all citizens in the state of Michigan through the United States Constitution. When a state grants general legislative power to a governmental official, the official must be democratically elected.

127.    On its face, as applied, and in practice, Public Act 436 violates the Due Process Clause of US Const., Amend. XIV and disenfranchises citizens from their right to a

25

democratically elected form of local government and their right to elect local officials who possess general legislative power, through provisions that delegate to EMs the power to:

    a. Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

    b. Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

    c. Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

    d. Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances; See provisions including but not limited to MCL §141.1552; and

    e. Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

128.    On its face, as applied, and in practice, Public Act 436 violates the Due Process Clause of US Const., Amend. XIV and disenfranchises citizens from their right to a democratically elected form of local government and their right to elect local officials who possess general legislative power, through provisions of the statute that ratify appointments made and legislative acts taken by EMs acting under Public Act 4. See provisions including but not limited to MCL §141.1570.

129.    The provisions of PA 436 and the powers granted thereby, are not necessary, narrowly tailored, rationally, or otherwise lawfully related to achieving the purported government interests of achieving local government financial stability.

130.    As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their

constitutionally-protected rights.

## COUNT III – 42 U.S.C. §1983 -- Constitutional Violation
## US Const, Art 4, §4 – Republican Form of Government

131.    Plaintiff incorporates by reference paragraphs 1 through 130 above as though fully stated herein.

132.    Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

133.    Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective official capacities, Defendants have engaged in conduct and adopted laws and policies that violate Plaintiffs' rights under Art. 4, §4 of the U.S. Constitution.

134.    Article 4, section 4 of the U.S. Constitution states that the "United States shall guarantee to every state in this union a republican form of government."

135.    Since our nation's founding, federal, state, and local governments throughout the country have been republican forms of government – governments of representatives chosen by the people governed.

136.    In the United States and in Michigan, local governments are traditionally democratically elected and republican in form.

137.    Public Act 436 unconstitutionally strips local voters of their right to a republican form of government by transferring governance, including but not limited to legislative powers, from local elected officials to one unelected emergency manager.

138.    On its face, as applied, and in practice, Public Act 436 violates the US Const., Art. 4, §4 through provisions of the statute that permit EMs to:

    a.  Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

27

    b. Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

    c. Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

    d. Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances; See provisions including but not limited to MCL §141.1552; and

    e. Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

139. On its face, as applied, and in practice, Public Act 436 violates the US Const., Art. 4, §4 through provisions of the statute that ratify the legislative acts taken by EMs acting under Public Act 4. See provisions including but not limited to MCL §141.1570.

140. Defendants have caused injury to the Plaintiffs by exercising the authority granted under Public Act 436 by terminating and/or removing the governing authority and legislative powers of duly elected public officials in affected municipalities throughout the state of Michigan.

141. As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally-protected rights.

### COUNT IV – 42 U.S.C. §1983 -- Constitutional Violation
### US Const, Amend. XIV, § 1 –Equal Protection a Fundamental Right – Voting Rights

142. Plaintiffs incorporate by reference paragraphs 1 through 141 above as though fully stated herein.

143. Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

28

144.   Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities, have engaged in conduct and adopted laws and policies that violated Plaintiffs' rights under Amend. XIV, §1 of the U.S. Constitution

145.   Amendment XIV, § 1 states in pertinent part, "No state shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws."

146.   The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

147.   The right to vote in local elections is a fundamental right afforded to all citizens in the state of Michigan by the United States Constitution, the Michigan Constitution, and the Michigan Home Rule Cities Act.

148.   Public Act 436's EM provisions effectively revoke the right to vote by stripping governing authority from local elected officials and transferring such authority to one unelected EM with no accountability to local citizens.

149.   Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed.   In these municipalities and school districts, the local government – in the person of the EM - is appointed by state officials and the EM is vested with all governing authority over the municipality and school district.   While the some EMs may nominally retain elected officials in office as advisory personnel, elected officials' governing authority is substantially removed, circumscribed, and conditional – to be exercised at the sole discretion of the EM.

150. Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed. In these municipalities and school districts, the local government – in the person of the EM - is appointed by state officials who are elected by citizens across the entire state of Michigan. Through the statewide vote of state officials and their derivative appointments, the state has publicly argued that democratic election of local government is preserved in the affected municipalities and school districts. Thus, the entire state electorate participates in the selection of the local government in the affected municipalities and school districts, while in all other localities across the state, local residents alone directly vote for their local elected officials. The vote of citizens for their local government in affected localities is grossly diluted by the statewide participation of the electorate, while the votes of citizens in localities without an EM are preserved for local residents alone and thereby attains greater weight.

151. On its face, as applied, and in practice, Public Act 436 violates the Equal Protection Clause of US Const., Amend. XIV, § 1 through provisions of the statute that unduly revoke and/or impermissibly dilute the community's right to vote for local officials. Such provisions include those that provide for EMs to:

      a. Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

      b. Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

      c. Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

      d. Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village

30

charters and ordinances; See provisions including but not limited to MCL §141.1552; and

e. Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

152. On its face, as applied, and in practice, Public Act 436 violates the Equal Protection Clause of US Const., Amend. XIV, § 1 through provisions of the statute that unduly revoke the community's right to vote for local officials, through provisions of the statute that ratify appointments made and legislative acts taken by EMs acting under Public Act 4. See provisions including but not limited to MCL §141.1570.

153. Under Public Act 436, Defendants have authority to deprive Plaintiffs of their rights to equal protection by divesting communities of their right to vote for local officials and by removing the authority of duly elected public officials in favor of an unelected EM in such communities.

154. Defendants have caused injury to the Plaintiffs by exercising the authority granted under Public Act 436 by terminating and/or removing the authority of duly elected public officials in various municipalities with disproportionately high poverty rates.

155. The provisions of PA 436 and the powers granted thereby, are not necessary, narrowly tailored, rationally, or otherwise lawfully related to achieving the asserted government interests of achieving local government financial stability.

156. As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally-protected rights.

## COUNT V – 42 U.S.C. §1983 -- Constitutional Violation
## US Const. Amend. XIV, § 1 –Equal Protection based on Race – Voting Rights

31

157.    Plaintiffs incorporate by reference paragraphs 1 through 156 above as though fully stated herein.

158.    Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

159.    Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities, have engaged in conduct and adopted laws and policies that violate Plaintiffs' rights under Amend. XIV, §1 of the U.S. Constitution

160.    Amendment XIV, § 1 states in pertinent part, "No state shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws."

161.    The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

162.    The right to vote in local elections is a fundamental right afforded to all citizens in the state of Michigan by the United States Constitution, the Michigan Constitution, and the Michigan Home Rule Cities Act.

163.    Public Act 436's EM provisions effectively revoke the right to vote by stripping governing authority from local elected officials and transferring such authority to one unelected EM with no accountability to local citizens.

164.    Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed.  In these municipalities and school districts, the local government – in the person of the EM - is appointed by state officials and the EM is vested with all governing authority over the municipality and school district.  While the some EMs may nominally retain elected officials in office as advisory personnel, elected officials' governing

32

authority is substantially removed, circumscribed, and conditional – to be exercised at the sole discretion of the EM.

165.    Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed.   In these municipalities and school districts, the local government – in the person of the EM - is appointed by state officials who are elected by citizens across the entire state of Michigan.   Through the statewide vote of state officials and their derivative appointments, the state has publicly argued that democratic election of local government is preserved in the affected municipalities and school districts.   Thus, the entire state electorate participates in the selection of the local government in the affected municipalities and school districts, while in all other localities across the state, local residents alone directly vote for their local elected officials.   The vote of citizens for their local government in affected localities is grossly diluted by the statewide participation of the electorate, while the votes of citizens in localities without an EM are preserved for local residents alone and thereby attains greater weight.

166.    Under Public Act 436, all stated criteria for appointing an EM are based on a community's wealth and by extension, the wealth of the persons who reside within a community.

167.    On its face, as applied, and in practice, Public Act 436 violates the Equal Protection Clause of US Const., Amend. XIV, § 1 through provisions of the statute that discriminate in the appointment of an EM and revocation of the community's right to vote for local officials based on the racial composition of that community.   Such provisions include those that provide for EMs to:

> a.  Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

33

    b. Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

    c. Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

    d. Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances; See provisions including but not limited to MCL §141.1552; and

    e. Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

168.    On its face, as applied, and in practice, Public Act 436 violates the Equal Protection Clause of US Const., Amend. XIV, § 1 through provisions of the statute that discriminate in the appointment of an EM and revocation of the community's right to vote for local officials based on the racial composition of that community and that ratify appointments made and legislative acts taken by EMs acting under Public Act 4. See provisions including but not limited to MCL §141.1570.

169.    Defendants have caused injury to the Plaintiffs by exercising the authority granted under Public Act 436 by terminating and/or removing the authority of duly elected public officials in various municipalities comprising more than 53% of the state's population of citizens who are of African American descent.

170.    The provisions of PA 436 and the powers granted thereby, are not necessary, narrowly tailored, rationally, or otherwise lawfully related to achieving the asserted government interests of achieving local government financial stability.

171.    As a direct and proximate result of the enactment of Public Act 436 and

Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally protected rights.

### COUNT VI – 42 U.S.C. §1983 -- Constitutional Violation
### US Const, Amend. XIV, § 1 –Equal Protection based on Wealth – Voting Rights

172. Plaintiffs incorporate by reference paragraphs 1 through 171 above as though fully stated herein.

173. Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

174. Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities, have engaged in conduct and adopted laws and policies that violate Plaintiffs' rights under Amend. XIV, §1 of the U.S. Constitution

175. Amendment XIV, § 1 states in pertinent part, "No state shall make or enforce any law which shall … deny to any person within its jurisdiction the equal protection of the laws."

176. The Equal Protection Clause protects laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

177. The right to vote in local elections is a fundamental right afforded to all citizens in the state of Michigan by the United States Constitution, the Michigan Constitution, and the Michigan Home Rule Cities Act.

178. Public Act 436's EM provisions effectively revoke the right to vote by stripping governing authority from local elected officials and transferring such authority to one unelected EM with no accountability to local citizens.

179. Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed. In these municipalities and school districts, the local

government – in the person of the EM - is appointed by state officials and the EM is vested with all governing authority over the municipality and school district. While the some EMs may nominally retain elected officials in office as advisory personnel, elected officials' governing authority is substantially removed, circumscribed, and conditional – to be exercised at the sole discretion of the EM.

180. Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed. In these municipalities and school districts, the local government – in the person of the EM - is appointed by state officials who are elected by citizens across the entire state of Michigan. Through the statewide vote of state officials and their derivative appointments, the state has publicly argued that democratic election of local government is preserved in the affected municipalities and school districts. Thus, the entire state electorate participates in the selection of the local government in the affected municipalities and school districts, while in all other localities across the state, local residents alone directly vote for their local elected officials. The vote of citizens for their local government in affected localities is grossly diluted by the statewide participation of the electorate, while the votes of citizens in localities without an EM are preserved for local residents alone and thereby attains greater weight.

181. Under Public Act 436, all stated criteria for appointing an EM are based on a community's wealth and by extension, the wealth of the persons who reside within a community.

182. On its face, as applied, and in practice, Public Act 436 violates the Equal Protection Clause of US Const., Amend. XIV, § 1 through provisions of the statute that condition the revocation of the community's right to vote for local officials based on the wealth of that

community and the individuals who reside there. Such provisions include those that provide for

EMs to:

      a. Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

      b. Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

      c. Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

      d. Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances; See provisions including but not limited to MCL §141.1552; and

      e. Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

183.    On its face, as applied, and in practice, Public Act 436 violates the Equal

Protection Clause of US Const., Amend. XIV, § 1 through provisions of the statute that unduly

revoke citizen's right to vote for local officials based on the wealth of their community and

themselves, through provisions of the statute that ratify appointments made and legislative acts

taken by EMs acting under Public Act 4. See provisions including but not limited to MCL

§141.1570.

184.    Defendants have caused injury to the Plaintiffs by exercising the authority granted

under Public Act 436 by terminating and/or removing the authority of duly elected public

officials in various municipalities with disproportionately high poverty rates.

185.    The provisions of PA 436 and the powers granted thereby, are not necessary,

narrowly tailored, rationally, or otherwise lawfully related to achieving the asserted government

interests of achieving local government financial stability.

186.    As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally-protected rights.

## COUNT VII– Voting Rights Act of 1965, 42 U.S.C. § 1973 *et. seq.*

187.    Plaintiffs incorporate by reference paragraphs 1 through 186 above as though fully stated herein.

188.    Section 2 of the Voting Rights Act of 1965, as amended, reads:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).
>
> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

189.    Section 2 of the Voting Rights Act, 42 U.S.C. § 1973 prohibits the abridgement or dilution of Black/African-American citizens' right to vote in state and local elections.

190.    Michigan's population is estimated at 9,876,187 persons. The Black/African-American's comprise approximately 14.2% of the state's population (1,400,362 persons).

191.    As a result of the passage of PA 436, once the law comes into effect more than fifty percent of the state's Black/African-American population will have had their voting rights in local elections effectively revoked.

192. Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed. In these municipalities and school districts, the local government – in the person of the EM - is appointed by state officials and the EM is vested with all governing authority over the municipality and school district. While the some EMs may nominally retain elected officials in office as advisory personnel, elected officials' governing authority is substantially removed, circumscribed, and conditional – to be exercised at the sole discretion of the EM.

193. Public Act 436 impermissibly dilutes citizen's right to vote in local elections where EMs have been appointed. In these municipalities and school districts, the local government – in the person of the EM - is appointed by state officials who are elected by citizens across the entire state of Michigan. Through the statewide vote of state officials and their derivative appointments, the state has publicly argued that democratic election of local government is preserved in the affected municipalities and school districts. Thus, the entire state electorate participates in the selection of the local government in the affected municipalities and school districts, while in all other localities across the state, local residents alone directly vote for their local elected officials. The vote of citizens for their local government in affected localities is grossly diluted by the statewide participation of the electorate, while the votes of citizens in localities without an EM are preserved for local residents alone and thereby attains greater weight.

194. On its face, as applied, and in practice, Public Act 436 violates the Voting Rights Act through provisions that provide for the appointment of EMs and entering of consent agreements that abridge and dilute the voting rights of citizens within these localities. Such provisions include those that provide for EMs to:

a. Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

b. Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

c. Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

d. Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances; See provisions including but not limited to MCL §141.1552; and

e. Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

195. On its face, as applied, and in practice, Public Act 436 violates the Voting Rights Act through provisions of the statute that discriminate in the appointment of an EM and revocation of the community's right to vote for local officials based on the racial composition of that community and that ratify appointments made and legislative acts taken by EMs acting under Public Act 4. See provisions including but not limited to MCL §141.1570.

196. Under the totality of the circumstances, the application of Public Act 436 and enforcement has resulted in Black/African American citizens having dramatically less opportunity for self-governance than other members of Michigan's electorate.

197. As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally-protected rights.

## COUNT VIII – 42 U.S.C. §1983 -- Constitutional Violation
## US Const, Amend. I –Freedom of Speech & Right to Petition Government

198.   Plaintiffs incorporate by reference paragraphs 1 through 197 above as though fully stated herein.

199.   Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

200.   Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities, have engaged in conduct and adopted laws and policies that violate Plaintiffs' rights under Amend. I of the U.S. Constitution.

201.   Amendment I of the US Constitution states in pertinent part, "Congress shall make no law ... abridging the freedom of speech ... and to petition the Government for a redress of grievances."

202.   Plaintiffs, as citizens of the State of Michigan, have engaged in constitutionally-protected speech on matters of public concern by voting and electing local government officials to serve as their elected representatives.

203.   Plaintiffs, as citizens of the State of Michigan, have engaged in a Constitutionally protected right to petition their local governments on matters of public concern by interacting with duly elected local officials, expressing their concerns, and having them serve as their elected representatives.

204.   The elected officials chosen by the Plaintiffs to serve as their representatives have been inclusive of, but not limited to, mayors, city councils, and local school board members of various municipalities.

205.   Plaintiffs, as citizens of the State of Michigan, have engaged in their Constitutionally protected right to free speech and to petition their government, by repealing Public Act 4.

41

206. On its face, as applied, and in practice, Public Act 436 is the mirror image of Public Act 4 and its enactment contrary to the expressed will of the people through the referendum process violates the US Const., Amend. I.

207. On its face, as applied, and in practice, Public Act 436 violates the US Const., Amend. I through provisions that empower EMs to:

    a. Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

    b. Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

    c. Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

    d. Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances; See provisions including but not limited to MCL §141.1552; and

    e. Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

208. On its face, as applied, and in practice, Public Act 436 violates the US Const., Amend. I through provisions that provide for the appointment of EMs with powers that strip all authority of local elected officials, through provisions of the statute that ratify appointments made and legislative acts taken by EMs acting under Public Act 4. See provisions including but not limited to MCL §141.1570.

209. The provisions of PA 436 and the powers granted thereby, are not necessary, narrowly tailored, rationally, or otherwise lawfully related to achieving the asserted government interests of achieving local government financial stability.

210. As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally-protected rights.

## COUNT IX – 42 U.S.C. §1983 -- Constitutional Violation
## US Const. Amend. I –Right to Petition Government – City of Detroit

211. Plaintiffs Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 incorporate by reference paragraphs 1 through 210 above as though fully stated herein.

212. Plaintiffs Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 bring this claim pursuant to 42 U.S.C. §1983

213. Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities, have engaged in conduct and adopted laws and policies that violate Plaintiffs' Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 rights under Amend. I of the U.S. Constitution.

214. Amendment I of the US Constitution states in pertinent part, "Congress shall make no law … abridging … [right] to petition the Government for a redress of grievances."

215. Plaintiffs have a clearly established Constitutionally protected right to organize, assemble, and to engage in political, social and economic activities to advance their views and petition their local governments on matters of public concern by interacting with duly elected local officials, expressing their concerns, and having their concerns heard.

216. The state Local Emergency Financial Assistance Loan Board appointed Kevyn Orr as EFM, and by the terms of the new law, he will be made an EM under Public Act 436 on and after March 28, 2013.

217. Kevyn Orr is a partner in the Jones Day law firm and retains a financial interest in

the firm. Alternatively, Kevyn Orr nominally resigned from the Jones Day law firm at or about the time of his appointment as EFM of the City of Detroit.

218. At the same time, the Jones Day law firm has been selected as "restructuring counsel" for the City of Detroit under EM Kevyn Orr as the government of the City of Detroit. As such, the law firm is a contractual creditor to the City of Detroit.

219. Upon information and belief, the Jones Day law firm represents other financial institutions, including but not limited to the Bank of American, who are potential creditors to the City of Detroit.

220. On its face, as applied, and in practice, Public Act 436 and appointment of the City of Detroit's EFM and as EM violates the US Const., Amend. I through provisions that:

c. Permit Kevyn Orr to act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

d. Vest the full powers of the local government of the City of Detroit, legislative, executive, administrative, police power, taxing power, powers to sue and be sued, to sell, lease, or purchase assets, to make governmental decisions regarding economic development, public safety, environmental health and, without limitation, all other powers of local government, would be concentrated and held by a single entity represented by Kevyn Orr and the Jones Day law firm;

e. Concentrate all local government powers in this way in a single entity abridges the rights of people who are citizens and residents of the City of Detroit to engage in core protected First Amendment activities to petition government, to organize, assemble, engage in political, social and economic activities to advance their views and interests;

f. Allow concentration of all local government powers in this way in a single entity offers opportunities to Defendants to exploit, profit, sell, lease, purchase, develop, contract and otherwise use their powers of local government for their own private and political as well as economic benefit, and that of their clients and associates, with no significant check or balance because of the disenfranchisement of Plaintiffs and all other residents of the

44

City of Detroit from participation in any of the decisions of local government, in violation of the First Amendment and the State Constitution;

g.  Plaintiffs have no personal, political, commercial, economic or social connection or access to Defendants, and their fundamental First Amendment Rights to petition government, to organize, assemble, engage in political, social and economic activities to advance their views and interests, among other rights and constitutionally protected interests, are therefore violated by this new and unprecedented unitary form of local government of the City of Detroit.

221.  The provisions of PA 436 and the powers granted thereby and the actions of the Defendants are not necessary, narrowly tailored, rationally or otherwise lawfully related to achieving the asserted government interests of achieving local government financial stability.

222.  As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs Catherine Phillips, Joseph Valenti, and Michigan AFSCME Council 25 have suffered and will continue to suffer a loss of their constitutionally-protected rights.

## COUNT X – 42 U.S.C. §1983 -- Constitutional Violation
## US Const, Amend. XIII, § 1 – Vestiges of Slavery – Voting Rights

223.  Plaintiffs incorporate by reference paragraphs 1 through 222 above as though fully stated herein.

224.  Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

225.  Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities, have engaged in conduct and adopted laws and policies that violate Plaintiffs' rights under Amend. XIII of the U.S. Constitution

226.    Amendment XIII, § 1 bans and form of "slavery or involuntary servitude" within the jurisdiction of the United States of America. The Thirteenth Amendment further bans acts which perpetuate the badges and incidents of servitude.

227.    Systematic denial of voting rights in local elections to Michigan's Black/African-American citizens is a perpetuation of the vestiges of slavery and involuntary servitude.

228.    Public Act 436 effectively revokes the right to vote by intentionally stripping governing authority from local elected officials and transferring such authority to one unelected EM who serves as the overseer of municipalities or school districts, which are overwhelming Black/African American majority communities, with no accountability to local citizens.

229.    On its face, as applied, and in practice, Public Act 436 violates the US Const., Amend. XIII, § 1 through provisions of the statute that perpetuate the vestiges of slavery by discriminatorily and intentionally revoking the community's right to vote for local officials based on the racial composition of that community. Such provisions include those that provide for EMs to:

a.  Be selected and appointed solely at the discretion of the Governor; See provisions including but not limited to MCL §141.1549;

b.  Become vested with Public Act 436 EM powers for persons previously appointed or acting as EFMs under prior laws; See provisions including but not limited to MCL §141.1549;

c.  Act for and in the place and stead of the local governing body of cities and villages and to assume all the powers and authority of the local governing body and local elected officials. See provisions including but not limited to MCL §141.1549, §141.1550, and §141.1552;

d.  Rule by decree over cities and villages through powers that permit the EM to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances; See provisions including but not limited to MCL §141.1552; and

    e. Explicitly repeal, amend, and enact local laws such as city and village ordinances. See provisions including but not limited to MCL §141.1549 and §141.1552.

230.    On its face, as applied, and in practice, Public Act 436 violates the US Const., Amend. XIII, § 1 through provisions of the statute that perpetuate the vestiges of slavery by discriminatorily revoking the community's right to vote for local officials based on the racial composition of the community that ratify appointments made and legislative acts taken by EMs acting under Public Act 4. See provisions including but not limited to MCL §141.1570.

231.    Defendants have caused injury to the Plaintiffs by exercising the authority granted under Public Act 436 by intentionally terminating and/or removing the authority of duly elected public officials in various municipalities comprising more than fifty-two percent (52%) of the state's population of citizens who are of African American descent.

232.    The provisions of PA 436 and the powers granted thereby, are not necessary, narrowly tailored, rationally, or otherwise lawfully related to achieving the asserted government interests of achieving local government financial stability.

233.    As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally-protected rights.

**COUNT XI – 42 U.S.C. §1983 -- Constitutional Violation**
**US Const. Amend. XIV, §1 –Equal Protection – Removal of Emergency Managers**

234.    Plaintiffs incorporate by reference paragraphs 1 through 233 above as though fully stated herein.

235.    Plaintiffs bring this claim pursuant to 42 U.S.C. §1983.

236.    Acting under color of law and pursuant to the customs, policies and practices of the State of Michigan, Defendants, acting in their respective individual and/or official capacities,

have engaged in conduct and adopted laws and policies that violate Plaintiffs' rights under Amend. XIV, §1 of the U.S. Constitution.

237. Amendment XIV, §1 states in pertinent part, "No state shall make or enforce any law which shall ... deny to any person within its jurisdiction the equal protection of the laws."

238. The Equal Protection Clause protects against laws and the application of laws that invidiously discriminate between similarly situated individuals or between groups of persons in the exercise of fundamental rights.

239. The Equal Protection Clause also protects against laws and the application of laws that discriminate among similarly situated individuals or between groups of persons when no rational basis exists for such discrimination.

240. Public Act 436 permits cities and school boards to pass a resolution by a 2/3 vote and with the approval of strong mayors thereby remove their EMs after 18 months in office.

241. At the same time, Public Act 436 converts all existing EFMs to EMs. Many of the existing managers have been in place for months and even years longer than the 18 month time period after which elected officials to pass a resolution by a 2/3 vote and the approval of strong mayors for the removal such managers.

242. Thus, the law discriminates against cities and school districts where EFMs and EM have been and are currently in place. The law discriminates against these municipalities requiring them to suffer an additional 18 months with an EM despite their having had such officials in place much longer than this time period. At the same time, municipalities that newly receive such managers will be permitted to after which elected officials to pass a resolution by a 2/3 vote and the approval of strong mayors for the removal of such officials after they have been in office for 18 months.

48

243.   On its face, as applied, and in practice, Public Act 436 violates the Equal Protection Clause of US Const., Amend. XIV, § 1 through provisions of the statute discriminate between cities and school boards that presently have had EMs for significantly longer than 18 months and those that will receive EMs after March 28, 2013.   Such provisions include but are not limited to MCL §141.1549(11).

244.   The provisions of PA 436 and the powers granted thereby, are not necessary, narrowly tailored, rationally, or otherwise lawfully related to achieving the asserted government interests of achieving local government financial stability.

245.   As a direct and proximate result of the enactment of Public Act 436 and Defendants' actions, Plaintiffs have suffered and will continue to suffer a loss of their constitutionally-protected rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Honorable court enter Judgment against Defendants providing:

a.   For declaratory relief holding that Public Act 436 violates the United States Constitution, Art. 4, §4; Amend I; Amend XIII; and Amend. XIV; and the Voting Rights Act of 1965, 42 U.S.C. §§ 1973 *et. seq.*;

b.   For injunctive relief restraining the Defendants and any present and future EMs from implementing or exercising authority and powers purportedly conveyed Public Act 436;

c.   For declaratory relief finding that Defendants have impaired and are impairing the rights of the Plaintiffs Catherine Phillips, Joseph Valenti, Michigan AFSCME Council 25 and their covered members in violation of their right to due process of law;

d.   For injunctive relief restraining Defendants, and all persons and entities acting in concert with them, from taking any actions to oppose or frustrate the City of Detroit's recognition and ratification of the Coalition-ratified contract or encourage rejection of said contract;

49

e. For injunctive relief invalidating and restraining the terms of present and future consent agreements entered into under Public Act 436 that abridge or diminish powers granted to local elected officials under local charters and ordinances;

f. For liquidated, compensatory, and punitive damages in an amount fair and just under the circumstances;

g. For attorneys' fees and costs; and

h. For such further relief as is just and equitable.


March 27, 2013                           Respectfully Submitted,


                                         By: /S/ Herbert A. Sanders
                                         Herbert A. Sanders (P43031)
                                         THE SANDERS LAW FIRM PC
                                         615 Griswold St. Ste. 913
                                         Detroit, Michigan 48226
                                         (313) 962-0099/Fax: (313) 962-0044
                                         haslawpc@gmail.com
                                         Attorneys for Plaintiffs

                                         John C. Philo (P52721)
                                         Anthony D. Paris (P71525)
                                         SUGAR LAW CENTER
                                         FOR ECONOMIC & SOCIAL JUSTICE
                                         4605 Cass Ave., 2nd Floor
                                         Detroit, Michigan 48201
                                         (313) 993-4505/Fax: (313) 887-8470
                                         jphilo@sugarlaw.org
                                         tparis@sugarlaw.org
                                         Attorneys for Plaintiffs

                                         Julie H. Hurwitz (P34720)
                                         William H. Goodman (P14173)
                                         GOODMAN & HURWITZ PC on behalf of the
                                         DETROIT & MICHIGAN NATIONAL
                                         LAWYERS GUILD
                                         1394 E. Jefferson Ave.
                                         Detroit, Michigan 48207

50

(313) 567-6170/Fax: (313) 567-4827
jhurwitz@goodmanhurwitz.com
bgoodman@goodmanhurwitz.com
Attorneys for Plaintiffs

Richard G. Mack, Jr. (P58657)
Keith D. Flynn (P74192)
MILLER COHEN, P.L.C.
600 W. Lafayette Blvd., 4th Floor
Detroit, Michigan 48226
(313) 964-4454/Fax: (313) 964-4490
richardmack@millercohen.com
Attorneys for Plaintiffs

Darius Charney
Ghita Schwarz
CENTER FOR CONSTITUTIONAL RIGHTS
666 Broadway, 7th floor
New York, New York 10012
(212) 614-6464/Fax: (212) 614-6499
dcharney@ccrjustice.org
Attorneys for Plaintiffs

Cynthia Heenan (P53664)
Hugh M. Davis, Jr. (P12555)
CONSTITUTIONAL LITIGATION ASSOCIATES
PC
450 W Fort St Ste 200
Detroit, MI  48226
(313) 961-2255/Fax: (313) 961-5999
conlitpc@sbcglobal.net
Attorney for Plaintiffs

# EXHIBIT6.2

**Notice of Pendency of Bankruptcy Case and Application of the Stay
in *Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon,*
Case No. 13-CV-11370
[Doc. #29]**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHERINE PHILLIPS, Staff Representative
Michigan AFSCME Council 25, and Chief
Negotiator with the City of Detroit; JOSEPH
VALENTI, Co-Chief Negotiator with the
Coalition of Unions of the City of Detroit;
MICHIGAN AFSCME COUNCIL 25; RUSS
BELLANT, President of the Detroit Library
Commission; TAWANNA SIMPSON, LAMAR
LEMMONS, ELENA HERRADA, Detroit
Public School Board Members; DONALD
WATKINS AND KERMIT WILLIAMS,
Pontiac City Council Members; DUANE
SEATS, DENNIS KNOWLES, JUANITA
HENRY AND MARY ALICE ADAMS, Benton
Harbor Commissioners; WILLIAM "SCOTT"
KINCAID, Flint City Council President;
BISHOP BERNADEL JEFFERSON; PAUL
JORDAN; REV. JIM HOLLEY, National
Board Member, Rainbow Push Coalition; REV.
CHARLES E. WILLIAMS II, Michigan
Chairman, National Action Network; REV.
DR. MICHAEL A. OWENS, REV.
LAWRENCE GLASS, REV. DR. DEEDEE
COLEMAN, BISHOP ALLYSON ABRAMS,
Executive Board, Council of Baptist Pastors of
Detroit and Vicinity,

     Plaintiffs,

v

RICHARD D. SNYDER, as Governor of the
State of Michigan, and ANDREW DILLON, as
the Treasurer of the State of Michigan, acting
in their individual and/or official capacities,

     Defendants.

No. 2:13-cv-11370

HON. GEORGE CARAM STEEH

MAG. R. STEVEN WHALEN

**NOTICE OF PENDENCY OF
BANKRUPTCY CASE AND
APPLICATION OF THE
AUTOMATIC STAY**

Herbert A. Sanders (P43031)
The Sanders Law Firm PC
Attorney for Plaintiffs
615 Griswold Rd, Suite 913
Detroit, Michigan  48226
313.962.0099
haslaw@earthlink.net

Julie H. Hurwitz (P34720)
William H. Goodman (P14173)
Goodman & Hurwitz PC
Attorneys for Plaintiffs
1394 East Jefferson Avenue
Detroit, Michigan  48207
313.567.6170
jhurwitz@goodmanhurwitz.com
bgoodman@goodmanhurwitz.com

Darius Charney
Ghita Schwarz
Center for Constitutional Rights
Attorneys for Plaintiffs
666 Broadway, 7th Floor
New York, New York  10012
212.614.6464
dcharney@ccrjustice.org

Betram L. Marks (P47829)
Litigation Associates PLLC
Attorney for Plaintiffs
30300 Northwestern Hwy, Ste 240
Farmington Hills, Michigan  48334
248.737.4444
bertrammarks@aol.com

Denise C. Barton (P41535)
Ann M. Sherman (P67762)
Michael F. Murphy (P29213)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30736
Lansing, Michigan  48909
517.373.6434

John C. Philo (P52721)
Anthony D. Paris (P71525)
Sugar Law Center
Attorneys for Plaintiffs
4605 Cass Ave., 2nd Floor
Detroit, Michigan  48201
313.993.4505
jphilo@sugarlaw.org
tparis@sugarlaw.org

Richard G. Mack, Jr. (P58657)
Keith D. Flynn (P74192)
Miller Cohen PLC
Attorneys for Plaintiffs
600 West Lafayette Blvd., 4th
Floor
Detroit, Michigan  48226
313.964.4454
richardmack@millercohen.com

Cynthia Heenan (P53664)
Hugh M. Davis, Jr. (P12555)
Constitutional Litigation
Associates PC
Attorneys for Plaintiffs
450 West Fort St, Ste 200
Detroit, Michigan  48226
313.961.2255
conlitpc@sbcglobal.net

_____/

2

## NOTICE OF PENDENCY OF BANKRUPTCY CASE AND
## APPLICATION OF THE AUTOMATIC STAY

On July 18, 2013, the City of Detroit, Michigan filed a petition for relief

under Chapter 9 of Title 11 of the United States Code. (Document 1, *In re City of*

*Detroit, Michigan*, Case No. 13-53846, (Bankr. E.D. Mich.)) In accordance with the

automatic stay imposed by operation of §§ 362 and 922 of the Bankruptcy Code, 11

U.S.C. §362 and 922, no cause of action filed prior to, or relating to the period prior

to, the Petition Date may be continued or commenced against (i) the City and/or its

employees, or (ii) an officer, employee, or inhabitant of the City, in any judicial,

administrative or other court or tribunal to enforce a claim against the City without

the Bankruptcy Court first issuing an order lifting or modifying the Stay for such

specific purpose. Further, no related judgment or order may be entered or enforced

against the City without the Bankruptcy Court first issuing an order lifting or

modifying the State for such specific purpose.

On July 25, 2013, the provisions of this automatic stay were extended in all

respects (to the extent not otherwise applicable) to include certain "State Entities"

defined as "the Governor, the State Treasurer and the members of the Loan Board,

collectively with the State Treasurer and the Governor, and together with each

entity's staff, agents and representatives." (Exhibit 1). Governor Snyder and

Treasurer Dillon are named Defendants in the captioned matter which was filed

prior to the Petition Date and which is subject to this Bankruptcy Court Order

extending the automatic stay.

Actions taken while this Stay is in effect and/or in violation of this Stay, including proceedings in this case, are void and without effect.

The Bankruptcy Court for the Eastern District of Michigan has not issued an order lifting or modifying the Stay for the specific purpose of allowing any party in the captioned case to continue this action against the Governor or Treasurer. Under these circumstance, the above-captioned proceeding may not be prosecuted, and no valid judgment or order may be entered or enforced against these "certain State Entities."

These certain "State Entities" will not defend against, or take any other action with respect to, the above-captioned proceeding while the Stay remains in effect.

These certain "State Entities" hereby expressly reserve all rights with respect to the above-captioned proceeding, including, but not limited to, the right to move to vacate any judgment entered in the above-captioned proceeding as void.

Respectfully submitted,

BILL SCHUETTE
Attorney General

*s/Denise C. Barton*
Denise C. Barton (P41535)
Ann M. Sherman (P67762)
Michael F. Murphy (P29213)
Assistant Attorneys General
Attorneys for Defendants
P.O. Box 30736
Lansing, Michigan 48909
517.373.6434
Email: bartond@michigan.gov
P41535

Dated: August 7, 2013

4

## CERTIFICATE OF SERVICE

I hereby certify that on August 7, 2013, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such. I also mailed the foregoing paper via US Mail to all non-ECF participants.

> *s/Denise C. Barton*
> Denise C. Barton (P41535)
> Assistant Attorney General
> Attorney for Defendants
> P.O. Box 30736
> Lansing, Michigan 48909
> 517.373.6434
> E-mail: bartond@michigan.gov

# EXHIBIT6.3

**Order**
**Regarding Notice of Pendency of Bankruptcy Case and**
**Application of the Automatic Stay, in**
*Catherine Phillips, et al. v. Richard Snyder and Andrew Dillon,*
**Case No.13-CV-11370**
**[Doc. #30]**

13-58846-swr   Doc 2804   Filed 06/06/33   Entered 06/06/33 17:03:07   Page 109 of 4
13-53846-swr   Doc 10049   Filed 04/20/33   Entered 04/20/33 17:35:27   Page 109 of 4
112

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CATHERINE PHILLIPS, et al.,

        Plaintiffs,

Case No. 2:13-CV-11370

v.

HON. GEORGE CARAM STEEH

RICHARD D. SNYDER et al.,

        Defendants.

_____/

## ORDER REGARDING NOTICE OF PENDENCY OF BANKRUPTCY
## CASE AND APPLICATION OF THE AUTOMATIC STAY [DOC. 29]

On August 7, 2013, defendants filed a Notice of Pendency of Bankruptcy Case

and Application of the Automatic Stay. The Notice references the automatic stay

imposed by operation of sections 362 and 922 of the Bankruptcy Code, 11 U.S.C. §§

362 and 922, as well as the order entered by the bankruptcy court on July 25, 2013,

which extended the automatic stay to include certain "State Entities" defined as "the

Governor, the State Treasurer and the members of the Loan Board . . . ." *In re City of*

*Detroit, Michigan*, Case No. 13-53846 (Bankr. E.D. Mich.); Order Pursuant to Section

105(a) of the Bankruptcy Code Extending the Chapter 9 Stay to Certain (A) State

Entities, (B) Non Officer Employees and (C) Agents and Representatives of the Debtor

("Extension Order"). Governor Snyder and Treasurer Dillon are named defendants in

the captioned matter which was filed prior to the petition date and which defendants

contend is subject to the bankruptcy court order extending the automatic stay.

Although it is not apparent that any interests of the City of Detroit bankruptcy

-1-

proceedings are implicated in the case, the plain language of the stay order would apply to this lawsuit.

In accordance with the broadly worded Extension Order issued by the bankruptcy court, this court will abide by the stay unless and until such time as an order issues lifting or modifying the stay to permit the captioned matter to proceed. Accordingly,

IT IS HEREBY ORDERED that proceedings in this case are STAYED until further order of the court.

IT IS HEREBY FURTHER ORDERED that this case is CLOSED for administrative and statistical purposes without prejudice because the defendants are covered by the bankruptcy court Extension Order. This closing does not constitute a decision on the merits.

IT IS FURTHER ORDERED that if the bankruptcy stay is removed, or a party obtains relief from the stay, then the case may be reopened upon the motion of any party.

IT IS FURTHER ORDERED that any party may apply to the bankruptcy court for relief from the automatic stay under 11 U.S.C. § 362 or for relief from the Extension Order.

So ordered.

Dated: August 22, 2013

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

## CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
August 22, 2013, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk

---