UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re | No. 13-53846 |
| CITY OF DETROIT, MICHIGAN, | Chapter 9 |
| Debtor. | HON. STEVEN W. RHODES |

## APPELLEES' DESIGNATION OF ITEMS

## Item 12

### From *NAACP v Snyder*, Case No. 13-12098 (E.D. Mich)

| 12. | 6/6/13 | 16 | Defs' motion to dismiss |
|---|---|---|---|

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


DETROIT BRANCH NAACP, MICHIGAN
STATE CONFERENCE NAACP, DONNELL R.
WHITE, individually and on behalf of Detroit Branch
NAACP and Michigan State Conference NAACP,
THOMAS STALLWORTH III, individually,
RASHIDA TLAIB, individually,
MAUREEN TAYLOR, individually,

        Plaintiffs,


v.                                              Civil Action No. 13-12098
                                              Hon. George C. Steeh

RICK SNYDER, in his Official Capacity as Governor
of the State of Michigan, ANDREW DILLON, in his Official
Capacity as Treasurer of the State of Michigan, and RUTH
JOHNSON, and in her Official Capacity as Michigan Secretary
of State,

        Defendants.
_____/


**PLANTIFFS' FIRST AMENDED VERIFIED COMPLAINT**

**I.**

**NATURE OF THE CASE**

    1.    This is an action brought under the Equal Protection Clause of the Fourteenth

Amendment, the Substantive and Procedural Due Process Clauses of the Fourteenth Amendment

(42 U.S.C. Sec. 1983, U.S. Const. Amend. XIV), and Section 3 of the Voting Rights Act of 1965

(42 U.S.C. Sec. 1973a(c)), to protect the right to vote. This action challenges Michigan's *Local*

*Financial Stability and Choice Act*; Public Acts of 2012; MCL Sections 141.1541, *et.* seq. ("Public

Act 436") [Exhibit 1], which provides that when a state municipality or school district experiences

1

a certain level of financial hardship, the state appoints an un-elected Emergency Manager to "rule by decree" over said jurisdiction, assuming the powers and duties of locally-elected legislative and executive officers. Presently, Emergency Managers have been appointed in the City of Allen Park, the City of Benton Harbor, the City of Detroit, the Detroit Public School System, the City of Ecorse, the City of Flint, the Highland Park School System, the Muskegon Heights School System, and the City of Pontiac.

2.     Emergency Manager appointments in Michigan have, in large part, hinged on money, race, and voter nullification, resulting in an unconstitutional violation of the dignity of each vote.

3.     These sweeping Michigan Emergency Manager powers and duties include, but are not limited to acting "[f]or and *in the place and stead of the governing body, . . . [ruling] by decree* over cities and villages through powers that permit the emergency manager to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances, . . . *explicitly repeal, amend, and enact local laws such as city and village ordinances*, . . . [and] sell, lease, convey, assign, or otherwise *use or transfer the assets, liabilities, functions*, or responsibilities of the local government. . ." (See, MCL 141.1549(9)(2); MCL 141.1549; MCL 141.1552; MCL 141.1552(12)(1)(r), emphasis added).

4.     The Emergency Manager statute has had a disparate impact on Michigan's voters of color. A majority, 50.4%, of the state's 1,413,320 African American residents are now ruled by unelected Emergency Managers.

5.     Furthermore, Public Act 436 has been applied in a discriminatory manner. The state has imposed Emergency Managers on cities with majority or near majority African-American

populations, even though there were non-African-American cities with the same or worse "Fiscal Health Score," as defined by Defendant State Treasurer. In Oakland County, the state imposed an Emergency Manager on the City of Pontiac, which has an African American population of 52.1%, but the state did not impose an Emergency Manager in the Oakland County cities of Hazel Park (9.8% African American population), and Troy (4.0% African American population), even though each of these cities had an identical Fiscal Health Score of "6." (See, http://quickfacts.census.gov; Department of State Treasurer, Fiscal Indicator Scoring Table). This discriminatory pattern in Oakland County was repeated in other counties throughout the state. This violates the Equal Protection and Substantive Due Process Clauses of the Fourteenth Amendment.  (42 U.S.C. Sec. 1983, U.S. Const. Amend. XIV),

6.     On April 11, 2013, the Emergency Manager in Detroit issued Order No. 3, which provides that retroactive to March 28 (the effective date of Public Act 436) the elected Mayor and City Council of the City of Detroit, America's 18th largest city, are *allowed* to meet, but any and all of their actions are deemed invalid unless "[a]pproved by the Emergency Manager or his designee, in writing." [Exhibit 2].

7.     The Detroit Emergency Manager's Order No. 3 made Detroit's executive and legislative branches *advisory* notwithstanding the fact that the voters had given these branches full authority to conduct city business.

8.     On April 23, 2012, Detroit's Emergency Manager issued Order No. 4, which retroactively authorized a legal services contract between the City of Detroit and his former law firm, Jones Day, for $3.35 million.  Specifically, the Order provides that Jones Day "[i]s authorized

3

to work as restructuring counsel to the city on the terms set forth in the Jones Day contract, effective March 15, 2013." [Exhibit 3].

9.      On April 25, 2013, the Emergency Manager in Detroit issued Emergency Order No. 5, which provides that the sale, lease, transfer or disposition of any real property owned by the City of Detroit "[r]equires the approval in writing of the Emergency Manager or his designee." [Exhibit 4].

10.     The actions taken by Detroit's Emergency Manager in Orders 3, 4 and 5 are actions that the voters delegated to their locally-elected executive and legislative branches of city government, pursuant to the Detroit City Charter.

11.     Emergency Managers in Michigan's other jurisdictions have assumed substantially similar powers.

12.     The Michigan Constitution grants to its citizens the right to vote, on equal terms, to all qualified electors in local, state and Federal elections, (Const. 1963, Art. II, § 1), and proscribes an equal framework for local self-governance (Const. 1963, Art. VII, Sec. 22); and it is axiomatic that once the state grants "[t]he right to vote on equal terms, the State may not by later arbitrary and disparate treatment, value one person's vote over that of another." *League of Women Voters v. Brunner*, 548 F. 3d 616 (6th Cir. Ohio 2008)(citing headnote 4, *Bush v. Gore*, 531 U.S. 98 (2000)).

13.     Emergency Managers have exercised powers and duties exclusively reserved for locally-elected branches of Michigan government, thereby degrading the electorate's right to vote, in Emergency Manager jurisdictions, where their elected officials have advisory authority, as compared to the electorate in non-Emergency Manager jurisdictions, where their officials exercise

their full powers and duties.  Accordingly, the ballots cast by citizens in non-Emergency Manager jurisdictions are of a higher value than the ballots cast by citizens ruled by Emergency Managers.

14.     These differing standards, which are the direct and proximate cause of Public Act 436, result in the valuing of one person's vote over that of another, which violates the Fourteenth Amendment's Equal Protection Clause. (42 U.S.C. Sec. 1983, U.S. Const., Amend. XIV; *Bush v. Gore*, 531 U.S. 98 (2000), *supra*).

15.     Moreover, in its haste to approve Public Act 436 during the legislature's 2012 lame duck session, the state, upon information and belief, failed to apply for and obtain either the approval of the Attorney General of the United States, or a declaratory judgment of a panel of the United States District Court for the District of Columbia, "[p]rior to the enactment of any new voting qualification or perquisite to voting, or standard or practice" of voting, such as Public Act 436, which Michigan is required to do since Buena Vista Township and Clyde Township are covered jurisdictions within the state, subject to the preclearance requirements under Section 5 of the 1965 Voting Rights Act. (42 U.S.C. 1973c, and 42 U.S.C. 1973b(a)).

## II.

## JURISDICTION AND VENUE

16.     Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

17.     Plaintiffs invoke the jurisdiction of this Court under 42 U.S.C. Sec. 1983, Equal Protection and Substantive Due Process, under U.S. Const. Amend. XIV, as well as a violation of

the preclearance provision of the 1965 Voting Rights Act under 42 U.S.C. Sec. 1973c, and 42 U.S.C. Sec. 1973b(a).

18.     Venue is proper in this court under 28 U.S.C. Sec. 1392(b) because a substantial number of the events and occurrences giving rise to this action occurred in the Eastern District of Michigan and because a number of the Plaintiffs are located within the Eastern District of Michigan.

## III.

## PARTIES

19.     Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

## A.

### Plaintiffs

20.     The National Association for the Advancement of Colored People ("NAACP"), founded in 1909, is the oldest and largest civil rights organization in the United States, with more than 500,000 members and 1,200 Branches across the country and overseas. Incorporated in 1911, the NAACP Charter provides as follows:

> "To promote equality of rights and to eradicate caste or race prejudice among the citizens of the United States; to advance the interest of colored citizens; *to secure for them impartial suffrage*; and to increase their opportunities for securing justice in the courts, education for the children, employment according to their ability and complete equality before law."
>
> NAACP National Charter (1911, emphasis added).

6

21.     Article I, Section 3 of the NAACP constitution provides that the purpose and aim of the organization is to improve the political, education, social and economic status of minority groups, to eliminate racial prejudice, to keep the public aware of the adverse effects of racial discrimination, and to take lawful action to secure its elimination.  Article IV, Section 4 of the NAACP constitution specifically establishes a Legal Redress Committee to utilize the courts to combat discrimination. Through education, advocacy, direct action, and litigation, the NAACP has been among the leading defenders of voting rights for all people in America.

22.     Plaintiff Detroit Branch NAACP, chartered in 1912, is the NAACP's largest Branch in America.  Plaintiff Detroit Branch NAACP has, throughout its 99 year history, fought, through the democratic process, for the cause of civil rights and equal treatment for all.  Plaintiff Detroit Branch NAACP has fought in the courts to preserve and protect voting rights in the State of Michigan.  See, *NAACP v Austin*, 857 F. Supp. 560 (E.D. Mich. 1994)(challenge to state Redistricting Plan); *NAACP  v Michigan Republican State Committee*, No. 05-74296 (E.D. Mich., 2005)(injunction granted to halt harassment of African American voters at polling sites); *In re: Request for Advisory Opinion*, No. 130589 (Michigan Supreme Court, 2006)(*amicus curiae* opposition to photo identification requirement for voting).

23.     Plaintiff Michigan State Conference NAACP is the umbrella organization for all NAACP units or branches within the State of Michigan.  It is the central authority, responsible for coordinating all local NAACP branches around the State. It has been at the forefront in organizing voter protection activities throughout Michigan, and has fought for equality and access to the voting franchise. Plaintiff state conference was a litigant in the 2004 federal district court action

opposing identification for first time voters, and successfully fought the proposed closure of the Secretary of State Office in Saginaw County because of its impact on voter registration. It strongly opposes Public Act 436, Michigan's Emergency Manager statute, on behalf of all Michigan NAACP branches.

24.     Plaintiff Donnell R. White, individually and on behalf of the Detroit Branch of NAACP and Michigan State Conference NAACP, serves as Executive Director of the Detroit Branch NAACP.  He is a resident of the City of Detroit, a registered voter in the City of Detroit, and he cast a ballot for the offices of Mayor and City Council in the 2009 general election. He is strongly opposed to Public Act 436, and believes that his vote for Mayor and City Council should count equally to the vote of electors in non-Emergency Manager jurisdictions, who cast ballots for their local legislative and executive officials.

25.     Plaintiff Thomas Stallworth, III, individually, is a Member of the Michigan House of Representatives and serves as Chair of the Michigan Legislative Black Caucus.  He is a resident of the City of Detroit, a registered voter in the City of Detroit, and he cast a ballot for the offices of Mayor and City Council in the 2009 general election. He is strongly opposed to Public Act 436, and believes that his vote for Mayor and City Council should count equally to the vote of electors in non-Emergency Manager jurisdictions, who cast ballots for their local legislative and executive officials.

26.     Plaintiff Rashida Tlaib, individually, is a Member of the Michigan House of Representatives.  She is a resident of the City of Detroit, a registered voter in the City of Detroit,

8

and she cast a ballot for the offices of Mayor and City Council in the 2009 general election. She is strongly opposed to Public Act 436, and believes that her vote for Mayor and City Council should count equally to the vote of electors in non-Emergency Manager jurisdictions, who cast ballots for their Mayor and City Council.

27.     Plaintiff Maureen Taylor, individually, Chair of the Michigan Welfare Rights Organization, a registered voter in the City of Detroit, and she cast a ballot for the offices of Mayor and City Council in the 2009 general election. She is strongly opposed to Public Act 436, and believes that her vote for Mayor and City Council should count equally to the vote of electors in non-Emergency Manager jurisdictions, who cast ballots for their Mayor and City Council.

## B.

### Defendants

28.     Defendant Governor Rick Snyder, in his official capacity as Governor of the State of Michigan, is legally charged with defending and enforcing Public Act 436, and is a resident of the City of Ann Arbor, Michigan.

29.     Defendant Andrew Dillon, in his official capacity as Treasurer of the State of Michigan, is central to the enforcement of Public Act 436, and is a resident of Redford Township, Michigan.

30.     Defendant Ruth Johnson, in her official capacity as Michigan Secretary of State, is charged with the responsibility of seeking and obtaining preclearance of any changes in voting procedure under the 1965 Voting Rights Act, and is a resident of Holly, Michigan.

9

## IV.

## FACTUAL ALLEGATIONS

31.     Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

### A.

### Michigan Voters Directly Rejected Emergency Manager Governance at the Polls

32.     Michigan's Emergency Manager law (Public Act 4), was repealed by Michigan voters in the November 6, 2012 general election.  The question squarely on the ballot was whether to repeal Public Act 4, the *Local Government and School District Fiscal Accountability Act ("Public Act 4"),* the emergency manager law which preceded Public Act 436.  Public Act 4 was preceded by Public Act 72, the *Local Government Fiscal Responsibility Act, Act No. 72, Public Acts of 1990 ("Public Act 72").*  Both Public Acts 4 and 72 were forms of governance by Emergency Manager which diminished the authority of local officials upon a state determination of municipal financial distress.

33.     The Michigan legislature passed and the Governor signed into law Public Act 4 which became effective immediately upon passage on March 16, 2011.  Public Act 4 allows the state treasurer or superintendent of public instruction to conduct a financial review of a local government or school district if in his sole discretion he finds facts or circumstances indicative of financial stress.  Public Act 4 allowed non-elected emergency managers to preside over local jurisdictions and to assume the powers and duties of elected officials, upon a finding of financial distress.  (Public Act 4, *supra*).

10

34.     Plaintiff NAACP was heavily engaged in the petition gathering process to repeal Public Act 4 as the NAACP has always stood for protecting the right to vote, and Public Act 4 diluted that right. For the same reasons, Plaintiff NAACP supported the legal challenge to Public Act 4, advanced by the ballot question committee *Stand Up for Democracy*, again because it offends our form of representative democracy, where governance is by the will of the people, expressed through the actions of our elected officials.  Plaintiff NAACP has historically taken the position that in the event the people lose confidence in their elected leaders, the remedy is at the ballot box where voters should be free to un-elect them and elect others in their place.

35.     It is not always so neat a process. But as Winston Churchill once observed, "Many forms of Government have been tried, and will be tried in this world of sin and woe. No one pretends that democracy is perfect or all-wise. Indeed, it has been said that democracy is the worst form of government except all those other forms that have been tried from time to time." (Churchill, W., *Hansard*, Nov. 11, 1947).

36.     Democracies recoil at those dictatorial actions which substitute someone's unelected judgment for the judgment of the people.  This is precisely what emergency manager laws do: substitute the judgment, the powers, of an unelected appointee of the state for the judgment and powers of the people.

37.     In Michigan, the emergency manager issue was not some obscure ballot question in the November 6, 2012 general election.  The issue was highly publicized by the Michigan and

11

national press, and well-known to the state's voters because of the fierce political and legal battle that had been waged in courts of law and in the court of public opinion. The ballot question committee known as *Stand Up for Democracy*, assisted by Plaintiff NAACP, coordinated the circulation of petitions, collecting 226,339 petition signatures and filing same in 50 boxes with the Michigan Secretary of State's Office.

http://www.freep.com/article/20120301/NEWS06/203010473/226-000-petition-signatures-for-repeal-of-emergency-manager-law-land-in-Lansing

38.  The state Board of Canvassers, the body charged with reviewing the petitions, did not accept the petitions, having deadlocked by a vote of 2-2, along a straight party-lines, with the two Republican appointees to the tribunal voting to defy its own staff report, its own expert witness from Michigan State University, and sworn testimony and a printer's affidavit from one of the state's most respected printers, and in defiance of their own eyes, erroneously concluding that the type size of the petition heading was not 14-point bold type as required by statute.

http://www.mlive.com/politics/index.ssf/2012/04/deadlocked_vote_on_petitions_a.html

39.  *Stand Up for Democracy* filed an appeal of the Board of Canvassers' decision via a Writ of Mandamus in the Michigan Court of Appeals. The Court of Appeals heard oral argument regarding same on May 17, 2012. On June 8, 2012 the Court issued a *per curiam* ruling in this matter, stating that "Plaintiff does not have an alternate legal remedy. The elements of mandamus thus have been met and we direct the Board [of Canvassers] to certify plaintiff's petition for the ballot." *Stand Up for Democracy v. Board of State Canvassers*, MI Crt. App., No. 310047 (6/6/12, Opinion, at 18).

12

40.     Challenger *Citizens for Fiscal Responsibility* filed for leave to appeal to the Michigan Supreme Court.  Leave was granted.


41.     After having heard oral argument, the Michigan Supreme Court, on August 3, 2012, in a 4 to 3 ruling, rejected the challengers' position, and held that the petitions were in *actual* compliance with state law and the issue was ordered on the ballot. The Court held, "The Board of State Canvassers shall certify the petition as sufficient because a majority of the Court concludes that plaintiff either actually complied with the law or that the Court of Appeals' original writ of mandamus was not erroneous." *Stand Up for Democracy v. Secretary of State*, Mich. S. Ct. No. 145387, at 28 (Aug. 3, 2012).


42.     The Board of Canvassers thereafter unanimously (4-0) approved the petitions as ordered by the Supreme Court, and its staff developed language, in consultation with both parties, to be presented to the voters.  The agreed-upon language for the state-wide ballot on whether or not to repeal Public Act 4 was as follows:

**"PROPOSAL                                                                                      12-1**
**A REFERENDUM ON PUBLIC ACT 4 OF 2011 – THE EMERGENCY MANAGER LAW**

Public Act 4 of 2011 would:

- Establish criteria to assess the financial condition of local government units, including school districts.

- Authorize Governor to appoint an emergency manager (EM) upon state finding of a financial emergency, and allow the EM to act in place of local government officials.

- Require EM to develop financial and operating plans, which may include modification or termination of contracts, reorganization of government, and determination of expenditures, services, and use of assets until the emergency is resolved.

13

- Alternatively, authorize state-appointed review team to enter into a local government approved consent decree.

Should this law be approved?

**YES__**
**NO ___** "

43.    Press coverage of the legal battle over the petitions ("Fontgate") and the Supreme Court's ultimate ruling to allow voters access to the ballot on the Emergency Manager question was intensive. http://www.freep.com/article/20120803/NEWS06/120803045/Michigan-Supreme-Court-emergency-manager-law-Public-Act-4-ballot. The voters well understood the issue.

**B.**

**Emergency Manager (Public Act 4) is Suspended Upon Supreme Court Certification of Petitions, Public Rejects Emergency Manager Governance at Polls**

44.    Michigan law provides that measures certified for referendum are suspended until the outcome of the election.  MCL Sec. 168.477(2).  The State Attorney General issued an Opinion that while Public Act 4 was suspended pending the results of the election, Public Act 72 would take its place, even though, by its terms, Public Act 4 had expressly repealed Public Act 72.  (Mich. Att'y Gen'l., Opinion No. 7267, August 6, 2012).

45.    Proposal 12-1, the referendum on the emergency manager law, was decisively defeated at the polls by the Michigan electorate, by a margin of 53% (No) to 47% (Yes), with a total of 2,370,601 ballots cast in opposition.  Michiganians made it plain, having been well-informed, and during a Presidential election year, when voter attentiveness and voter turnout were at their highest, that they did not want an emergency manager law.

14

## C.

### State Legislature Overrides Vote of Electorate

46.     And yet, in cavalier defiance of the people, on December 13, 2012, barely five weeks after the general election, during a "lame duck" session of the State Legislature, the Michigan House and Senate passed a replacement to public Act 4.  That legislation was signed into law by Defendant Governor Snyder on December 27.  The new law, Public Act 436, took effect on March 28, 2013.

47.     Public Act 436 provides, in pertinent part, as follows:

"[Emergency Managers are] selected and appointed solely at the discretion of the Governor."

MCL 141.1549

"Upon appointment, an emergency manager shall act for and in the place and stead of the governing body and the office of chief administrative officer of the local government. . . Following appointment of an emergency manager and during the pendency of receivership, the governing body and the chief administrative officer of the local government shall not exercise any of the powers of those offices except as may be specifically authorized in writing by the emergency manager or as otherwise provided by this act and are subject to any conditions required by the emergency manager."

MCL 141.1549(9)(2).

"Explicitly repeal, amend, and enact local laws such as city and village ordinances."

MCL 141.1549 and 141.1552.

"Rule by decree over cities and villages through powers that permit the emergency manager to contravene and thereby implicitly repeal local laws such as city and village charters and ordinances."

MCL 141.1552

15

"Subject to section 19, if provided in the financial and operating plan, or otherwise with the prior written approval of the governor or his or her designee, sell, lease, convey, assign, or otherwise use or transfer the assets, liabilities, functions, or responsibilities of the local government. . ."

MCL 141.1552(12)(1)(r).

"For municipal governments, with approval of the governor, disincorporate or dissolve the municipal government and assign its assets, debts, and liabilities as provided by law. The disincorporation or dissolution of the local government is subject to a vote of the electors of that local government if required by law."

MCL 141.1552(12)(cc).

"Exercise solely, for and on behalf of the local government, all other authority and responsibilities of the chief administrative officer and governing body
concerning the adoption, amendment, and enforcement of ordinances or resolutions of the local government . . ."

MCL 141.1552(12)(dd).

48.    Like Public Act 4 before it, Michigan's new emergency manager law (Public Act 436), which became effective on March 28, 2013, is stunning in its evisceration of voting rights.

## D.

## Emergency Managers Appointed

49.    Once Public Act 436 was enacted, new Emergency Managers were appointed in nine jurisdictions: Benton Harbor, Ecorse, Flint, Pontiac, Highland Park Schools, Muskegon Heights Schools, Detroit Public Schools, Allen Park, and most-recently the City of Detroit. Eight of the Nine Emergency Manager-controlled jurisdictions have majority or near-majority African American populations. The one exception is Allen Park with a 2.1% African American population

(http://quickfacts.census.gov/qfd/states/26/2601380.html). The key difference in Allen Park's case is that Allen Park *requested* an Emergency Manager. It did not have one imposed on it.

**E.**

**Disparate Impact on Voters of Color**

50.     Public Act 436 has a disparate and discriminatory impact on Michigan's African-American voters: 50.4% of the state's 1,413,320 African American residents are now ruled by unelected Emergency Managers, compared to 1.3% of the state's 7,926,454 White residents now ruled by unelected Emergency Managers.

51.     The following is a listing of the percentage of African Americans in Michigan living in jurisdictions ruled by Emergency Managers: Benton Harbor: 89.2%, Detroit (and Detroit Public Schools): 82.7%, Ecorse: 46.4% (the White population in Ecorse is 44%), Flint: 56.6%, Highland Park Schools: 93.5%, Muskegon Heights Schools: 78.3%, Pontiac: 52.1%, and Allen Park: 2.1%. (http://quickfacts.census.gov/qfd/states/26/2601380.html).

52.     The following is a listing of the percentage of Whites in Michigan living in jurisdictions ruled by Emergency Managers: Benton Harbor: 7%, Detroit (and Detroit Public Schools): 10.6%, Ecorse: 44%, Flint: 37.4%, Highland Park Schools: 3.2%, Muskegon Heights Schools: 16%, Pontiac: 34.4%, and Allen Park: 92.9%. (http://quickfacts.census.gov/qfd/states/26/2601380.html).

**F.**

**In its Application, Emergency Manager Law Results in
Voter Inequality with Disparate Impact on Voters of Color**

**1.**

**City of Detroit**

53.     The Home Rule Charter of the City of Detroit sets forth the structure for self-governance and the powers and duties of its legislative and executive branches as follows:

> "We, the people of Detroit, do ordain and establish this Charter for the governance of our City."
>
> (Home Rule Charter, City of Detroit, Preamble)
>
> "Detroit City government is a service institution that recognizes its subordination to the people of Detroit… The people have a right to expect city government to provide for its residents."
>
> (Home Rule Charter, City of Detroit, Declaration of Rights, Sec. 1)
>
> "The people of Detroit, by adoption of this Home Rule Charter, create and provide for their continuing control of the municipal government of the City of Detroit."
>
> (Home Rule Charter, City of Detroit, Art. I, Sec. 1-101)

54.     Article IV of the Charter provides that the City Council has legislative authority, which includes the authority to, for example, confirm department heads, approve property transfers, approve ordinances and resolutions, and approve contracts. (Home Rule Charter, City of Detroit, Art. IV, Sec's 4-101, 4-111-112, 4-114, 4-122).

18

55.     Article V of the Charter provides that "The Mayor is the chief executive of the City and, as provided by this Charter, has control of and is accountable for the executive branch of City government. The Mayor is also directly accountable to the citizens of the City of Detroit." (Home Rule Charter, City of Detroit, Art. V, Sec. 5-101)

56.     Public Act 436 removes legislative and executive authority from Detroit voters' elected representatives.

57.     On April 11, 2013, the Emergency Manager in Detroit issued Emergency Order No. 3, which provides that as of April 11, 2013 and retroactive to March 28 (the effective date of Public Act 436) the elected Mayor and City Council of the City of Detroit, are *allowed* to meet, but any and all of their actions are deemed invalid unless "[a]pproved by the Emergency Manager or his designee, in writing." (Emergency Manager, City of Detroit, Order No. 3).

58.     On April 23, 2013, the Emergency Manager issued Executive Order No. 4, which approved a contract to hire his former law firm, Jones Day for $3.35 million. (Emergency Manager, City            of            Detroit,            Order            No.            4; http://www.freep.com/article/20130416/NEWS01/304160075/kevyn-orr-jones-day-stephen-brogan-contract-detroit-city-council).

59.     On April 25, 2013, the Emergency Manager in Detroit issued Emergency Order No. 5, which provides that the sale, lease, transfer or disposition of any real property owned by the City of Detroit requires the Emergency Manager's written approval. (Emergency Manager, City of Detroit, Order No. 5).

60.     By the above-stated Emergency Manager Orders and actions, the Emergency Manager has assumed and exercised the powers and duties reserved *exclusively* for Detroit's

19

elected legislative and executive branches resulting in an impermissible inequality between the status of Detroit voters and voters in non-Emergency Manager jurisdictions, whose legislative and executive officials have full powers and duties under their respective charters.

**2.**

**Actions Taken by Emergency Managers in Other Jurisdictions Reserved for Locally Elected Representatives by Charter**

61.     In Benton Harbor, the Emergency Manager issued Order No. 11-05, which provides that "1. Absent prior express written authorization and approval by the Emergency Manager, no City Board, Commission or Authority shall take any action for or on behalf of the City whatsoever other than: i) Call a meeting to order, ii) Approve of meeting minutes, iii) Adjourn a meeting." (Emergency Manager, City of Benton Harbor, Order No. 11-05).  The Emergency Manager later removed officials from City Boards, Commissions and Committees involving the Brownfield Redevelopment Authority, the Cemetery Board, the Twin City Area Transportation Authority, the Downtown Development Authority, the Golf Course Oversight Panel, the Housing Commission, the Library Board, the Planning Commission, the Public Safety/Recreation Committee, and the Board of Review. (Emergency Manager, City of Benton Harbor, Order No. 12-6).

62.     In the City of Ecorse, the Emergency Manager developed and published an "Organization Chart for City of Ecorse," which lists the Emergency Manager in a box on the same level as a box for "City of Ecorse Citizens." The city's elected officials are in boxes below that of the Emergency Manager.  The Emergency Manager unilaterally approved her own budget, millage rate, and water and sewerage rate increase." (Emergency Manager, City of Ecorse, Order No. 076).

63.   In the School District of the City of Muskegon Heights, the Emergency Manager issued an order "assum[ing] immediate control over all matters of the School District… [and that] the present Muskegon Heights Board of Education will serve in an *advisory capacity* during the duration of the Emergency Manager's appointment." (Emergency Manager, School District of the City of Muskegon Heights, Order No. 2012-1).   Less than two months later, the Emergency Manager issued a 7-year contract to a private contractor, to operate all of the School District's public schools as charter schools. (Emergency Manager, School District of the City of Muskegon Heights, Order No. 2012-9).

64.   In the School District of the City of Highland Park, the Emergency Manager unilaterally entered into a contract with the Muskegon Heights School District, and transferred funds from the Public School District to the Public School Academy System. (Emergency Manager, School District of the City of Highland Park, Order No's 2012-02, 2012-01).

65.   In the City of Pontiac, the Emergency Manager dissolved the elected city council, outsourced the police department to Oakland County, dissolved the Building Authority, unilaterally enacted Ordinances and rescinded others, merged the fire department with Waterford Township - relinquishing ownership of the city's fire trucks - and sold off city assets such as the Pontiac Silverdome, and the city's wastewater treatment facility. (Emergency Manager, City of Pontiac, Order No's S-122, S-162, S-145).  The Pontiac Emergency Manager sold the former home of the Detroit Lions, which cost Michigan taxpayers $55.7 million to build, at the fire sale price of $583,000, as CNN reported, "[l]ess than the price of a house," and less than a 1% return on the dollar for taxpayers.   http://money.cnn.com/2009/11/17/news/economy/silverdome_buyer/. Respected real estate experts indicated that the value of the property's 127 acres alone was worth over one million dollars. http://www.businessinsider.com/pontiac-silverdome-sells-for-a-paltry-

21

583000-2009-11. After the sale, it was revealed that the Pontiac Emergency Manager stood to personally benefit from the sale of the Silverdome to a Canadian property speculator who is now lobbying to turn the land into a casino. http://www.nbcnews.com/id/26315908/#47395558.

66.    In the City of Flint the Emergency Manager has ordered that the elected City Council has no responsibilities except to listen to public comment and act upon his instructions if called upon to do so, the Mayor given limited duties, terminated department heads, unilaterally proposed and adopted budgets (Emergency Manager, City of Flint, Order No's 1, 9, 10, 17).

67.    In the Detroit Public Schools, the Emergency Manager has ordered that the elected School Board may serve "[i]n solely an advisory capacity," that charter schools are expanded, unilaterally adopted budgets, rescinded existing contracts, and authorized the levy of taxes (Emergency Manager, Detroit Public Schools, Order No's 2009-2, 2010-26, 2011-EMRR5, 2011-EMRR, 14-18).

**3.**

**Legislative and Executive Officials in Non-Emergency Manager Jurisdictions Have Full Powers and Duties**

68.    Conversely, in non-Emergency Manager controlled jurisdictions across the state, voters are allowed to elect local representatives who have full powers and duties.  The Royal Oak Charter contains language, typical of Michigan city charters, regarding local self-governance:

"Section 1

The form of government provided for in this Charter shall be known as the Commission-Manager form. There is hereby created a Commission, consisting of a Mayor and six Commissioners, who shall be qualified

22

electors of said City, and who shall be elected in the manner hereinafter specified, shall have full power and authority, except as herein otherwise provided, to exercise all the powers conferred upon the City.

Section 2

The Commission shall constitute the legislative and governing body of said City, possessing all the powers herein provided for, with power and authority to pass such ordinances and adopt such resolutions as they shall deem proper in order to exercise any or all of these powers possessed by said City."

(City of Royal Oak Charter, Chp. 3, Sec's 1,2)

69.     See, also: City of Grand Rapids, Michigan's second largest city, voters elect a city government with full powers and duties pursuant to its City Charter. (Grand Rapids City Charter, Title II, Executive Branch, Title V. City Commission).   Likewise, in the City of Warren, Michigan's third largest city, its City Charter provides that the City Council has full legislative authority, and its Mayor has full executive authority. (Warren City Charter, Chp. 5, Chp. 7).

**G.**

**State Treasurer Process for Emergency Manager
Selection was Discriminatory in its Application**

70.     Defendant State Treasurer's Office developed a matrix or formula for ranking the fiscal health of Michigan municipalities.  Municipalities were assigned a "Fiscal Health Score" on a scale of 0 to 10, with 0 to 4 being "Fiscally Neutral," 5 to 7 being "Watch List," and 8 to 10 being "Fiscal Stress." (MI Dep't, Treas, Fiscal Indicator Scoring).  The most recent year the scores were ranked on-line (2009), municipalities were broken down by county. (Exhibit 5).

23

71.    In Oakland County, Defendant State Treasurer gave four cities an identical total score of "6:" Hazel Park (9.8% African American population), Pleasant Ridge (1.9% African American population), Troy (4.0% African American population), and Pontiac (52.1% African American population). And notwithstanding the fact that Hazel Park, Pleasant Ridge, and Troy had identical scores of 6, Pontiac, the majority African American city, was the only city of the five with a fiscal score ranking of 6 to be chosen to receive an Emergency Manager. (http://www.michigan.gov/documents/treasury/Oakland_342010_7.pdf).

72.    This discriminatory pattern and practice was repeated in other counties throughout the state as well.  In Wayne County, where Detroit, Detroit Schools, Highland Park Schools, and Ecorse , all majority minority communities, had Emergency Managers imposed, and all had fiscal scores of 7. But so did Riverview (3.1% African American population).  It has a fiscal score of 7 and the state did not install an Emergency Manager there.  Of further relevance is that Van Buren Township (12.03% African American population) and Harper Woods (45.6% African American population) had fiscal scores of 6, the same as Pontiac, but had no Emergency Managers appointed.

http://www.michigan.gov/documents/treasury/Wayne_342037_7.pdf

73.    In Genesee County, the City of Flint has a fiscal score of 8, and an Emergency Manager was appointed.  Of further relevance is that Genesee Township (8.18% African American population) did not receive an Emergency Manager even though it had a fiscal score of 9, a *higher score than Flint*. Argentine (0.23% African American population) did not receive an Emergency Manager even though it had a fiscal score 6, equal to Pontiac's score. Davison (1.8% African American population) did not receive an Emergency Manager even though it had a fiscal score 6, equal to Pontiac's score. Flint Township (16.12% African American population) did not receive

24

an Emergency Manager even though it had a fiscal score 7, a *higher score than Pontiac*. And Thetford Township (2.91% African American population) did not receive an Emergency Manager even though it had a fiscal score of 7, a *higher score than Pontiac*. http://www.michigan.gov/documents/treasury/Genesee_341964_7.pdf.

74.     The Walled Lake Consolidated School District, serves over 15,000 school children (compared to 980 students  in Highland Park Schools and 1,112 students in the Muskegon Heights School District, both of which have Emergency Managers), in a suburban area north of Detroit. Last week, the Walled Lake District cancelled classes, and ended bus service, asking parents to transport                their                children                to                school (http://www.detroitnews.com/article/20130508/SCHOOLS/305080376), as the District confronts expenses that are projected to exceed revenues by $10,042,856, for the 2013-2014 school year. http://www.wlcsd.org/files/filesystem/March%207%202013%20Board%20of%20Ed%20meeting.pdf. This District includes the Cities of Farmington Hills (69.7% White population, 17.4% African American population), Novi, Orchard Lake, Walled Lake, Wixom, and the Townships of Wolverine Lake (95.9% White population, 0.7% African American population), White Lake (96.56% White population, 0.78% African American population), West Bloomfield (84.25% White population, 5.18% African American population), described as an "[a]ffluent charter township in the state of Michigan, within the Detroit metropolitan area. It is known for its large homes and rolling hills. West Bloomfield [Township] was named No. 37 on Money magazine's Top 100 Small Cities in 2012. West Bloomfield is also #6 on the list of 100 highest-income places with a population of at least 50,000 people." (American FactFinder, United States Census Bureau; http://en.wikipedia.org/wiki/West_Bloomfield_Township,_Michigan), and Commerce (96.73% White population, 0.50% African American population).  With a $10 million deficit, class

cancellations, and disruptions in bus service, no Emergency Manager has been appointed by the State to govern the Walled Lake Consolidated School District, which has a total average White population of 85.3%.

## V.

## FIRST CAUSE OF ACTION

## (42 U.S.C. Sec. 1983; Equal Protection, Equal Dignity Owed to Each Vote, U.S. Constitution Amend. XIV)

75.    Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

76.    The locally-elected legislative and executive officials in non-Emergency Manager jurisdictions have full powers and duties as proscribed by their respective charters.  Whereas, the locally-elected legislative and executive officials under the control of Emergency Managers do not.   The more authority exercised by an Emergency Manager, the less the value of the vote that brought them to office.  The Emergency Manager law is a zero sum game.

77.    This valuing of one person's vote over that of another runs afoul of the Equal Protection Clause because:

> "Having once granted the right to vote on equal terms, the state may not by later arbitrary and disparate treatment, value one person's vote over that of another.  It must remember that the right of suffrage can be denied by a debasement or dilution of the weight of a citizens' vote just as effectively as by wholly prohibiting the free exercise of the franchise."

> "[T]he right to vote as the [state] legislature has prescribed is fundamental;

26

and one source of its fundamental nature lies in the *equal weight* accorded
to each vote and the *equal dignity* owed to each voter."

*Bush v. Gore*, 531 U.S. 98, 104 (2000)(emphasis added).

78.    In *Stewart v. Blackwell*, 444 F. 3rd 843 (6th Cir. 2006), citing to *Bush v. Gore*, *supra*,

the Sixth Circuit, which has cited to *Bush* as controlling authority in at least 14 cases (more than

any other Federal Circuit), the court held that:

> "Echoing long-revered principles, the [*Bush*] Court emphasized that
> States, after granting the right to vote on equal terms, 'may not, by
> later arbitrary and disparate treatment, value one person's vote over
> that of another.' *Id*. at 104-105 (citing *Harper v. Virginia Bd. of
> Elections*, 383 U.S. 663, 665 (1966)).  That is, the right to vote
> encompasses 'more than the initial allocation of the franchise. Equal
> protection applies as well to the manner of its exercise."

See also, *Hunter v. Hamilton County Bd. Of Elections*, 635 F.3d 219, 234 (6th Cir. 2011), quoting

*Bush v. Gore*, 531 U.S. 98, *supra* (A state may not arbitrarily impose disparate treatment on

similarly situated voters).

79.    In *Reynolds v. Sims*, 377 U.S. 533, 555 (1964) the Court likewise held that "[t]he

right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as

effectively as by wholly prohibiting the free exercise of the franchise."

80.    This Court should grant an injunction and/or issue a declaratory judgment that

Public Act 436 violates the Equal Protection Clause because it results in equal weight not being

afforded to each vote and equal dignity is not being afforded to each voter in Emergency Manager

jurisdictions.

27

# VI.

## SECOND CAUSE OF ACTION

### (42 U.S.C. Sec. 1983; Equal Protection, Disparate Impact of Statute as Applied, Resulting in Voter Dilution; U.S. Constitution Amend. XIV)

81.     Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

82.     Public Act 436 has had a disparate and discriminatory impact on voters of color in the State of Michigan.  A majority, 50.4%, of the state's 1,413,320 African American residents are now ruled by unelected Emergency Managers, compared to 1.3% of the state's 7,926,454 White residents now ruled by unelected Emergency Managers.

83.     This disparate and discriminatory impact on voters of color has resulted in a dilution of the value of the individual's right to vote for locally-elected officials of their choosing.  The value of the individual's right to vote for locally-elected officials is one hundred percent (100%) higher in non-Emergency Manager jurisdictions, which are predominantly White, than it is in Emergency Manager jurisdictions, which are predominantly African American.

84.     Justice Douglas' dissent in *South v. Peters*, 339 U.S. 276 (1950)(adopted by the majority in *Reynolds v. Sims*, 377 U.S. 533 (1964)) provides that:

> "There is more to the right to vote than the right to mark a piece of paper and drop it in a box or the right to pull a lever in a voting booth.  [I]t also includes the right to have the vote counted at full value without dilution or discount."
>
> *Id*. at 279.

85.     The Sixth Circuit has expressly adopted this Equal Protection voter dilution standard.  *Stewart v. Blackwell*, 444 F. 3rd 843 (6th Cir. 2006), *supra*.

86.     This Court should grant an injunction and/or issue a declaratory judgment that Public Act 436 violates the Equal Protection Clause because it results in voter dilution in Emergency Manager jurisdictions.

## VII.

## THIRD CAUSE OF ACTION

### (42 U.S.C. Sec. 1983, Substantive Due Process, U.S. Constitution Amend. XIV)

87.     Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

88.     In its application, Public Act 436 has had an injuriously disparate impact on the state's African American population. 50.4% of the state's 1,413,320 African American residents are now ruled by unelected Emergency Managers. And the state's process for selecting the jurisdictions for imposition of Emergency Managers has placed Emergency Managers in majority African American jurisdictions when non-African American jurisdictions had the same or worse fiscal indicator score.

89.      In *United States v. Carolene Products Co*., 304 U.S. 144 (1938), the Court held that the liberty interest under the Fourteenth Amendment incorporates three rights under the requirement that no state shall "[d]eprive any person of life, liberty or property without due process of law:"

- the rights enumerated in and derived from the first eight amendments in the Bill of Rights
- *the right to participate in the political process* (*e.g.*, the rights of *voting*, association, and free speech); and
- *the rights of "discrete and insular minorities*."

    *Id.* at f.n. 4 (emphasis added).


90.     This right was upheld by the Sixth Circuit in *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463 (2008)(also citing to the dignity of each vote requirement in *Bush v Gore*, supra) where the right to vote was burdened through the state of Ohio's arbitrary voting standards which differed from "county to county, city to city, and precinct to precinct."

91.     This Court should grant an injunction and/or issue a declaratory judgment that Public Act 436 violates the Due Process Clause because the state's process of selecting jurisdictions for the imposition of Emergency Managers was done in an arbitrary and discriminatory manner, resulting in the denial of the right to participate equally in the voting process.

## VII.

## FOURTH CAUSE OF ACTION

## (42 U.S.C. Sec. 1983, Procedural Due Process, U.S. Constitution Amend. XIV)

92.     Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

93.     The Due Process Clause of the Fourteenth Amendment to the United States prohibits Defendants from "depriving any person of life, liberty, or property without due process of law."

94.     In *United States v. Carolene Products Co*., 304 U.S. 144 (1938), the Court included the right to participate in the political process (*e.g.*, the rights of voting, association, and free speech), as a liberty interest protected by the Fourteenth Amendment.

95.     Plaintiffs have a liberty interest in their right to vote, a right granted under the U.S. Constitution, made applicable by the Fourteenth Amendment to the state.

96.     These rights may not be taken away without due process of law. No such process was given to Plaintiffs. The State has not defined a clear mechanism for how it goes about selecting and enforcing the Emergency Manager law and further has not provided any mechanism for individual citizens that are effected by the implementation of the law to seek recourse to challenge the decision to be under Emergency Manager rule.

97.     Because a grieved party has no recourse or protections or even safe guards to challenge the implementation of Defendants Public Act 436, the individual Plaintiffs have been deprived their due process of law pursuant to the Fourteenth Amendment of the United States Constitution.

98.     This Court should grant an injunction and/or issue a declaratory judgment that Public Act 436 violates the Procedural Due Protection Clause.

## IX.

### FIFTH CAUSE OF ACTION

### (42 U.S.C. § 1973a(c); Request for Implementation of Section 3(c) of Voting Rights Act)

99.     Plaintiffs re-allege and re-plead all the allegations of the preceding paragraphs of this Complaint and incorporate them herein by reference.

31

100.    The purpose of the 1965 Voting Rights Act is to ensure that the right of all citizens to vote, including the right to register to vote and cast meaningful votes, is preserved and protected as guaranteed by the Constitution.

101.    Section 3(c) of the Voting Rights Act authorizes federal courts to place states and political subdivisions that have violated the Fourteenth or Fifteenth Amendments under preclearance, similar to Section 5 of the Act, which requires certain covered jurisdictions to preclear all voting changes with federal authorities.  42 U.S.C.§ 1973a(c) (2006).

102.     Plaintiffs, having pled a violation of the Fourteenth Amendment, are eligible for the Court's implementation of Section 3(c) of the Voting Rights Act. This Court should use its discretion to retain jurisdiction and impose preclearance on the cities and school districts now having Emergency Managers in the state of Michigan.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request of this Court the following relief:

A.      An order declaring that Public Act 436 violates the Equal Protection and/or the Procedural and/or Substantive Due Process Clauses of the United States Constitution;

B.      A preliminary and permanent order prohibiting Defendants, their respective agents, servants, employees, attorneys, successors, and all persons acting in concert with each or any of them, from implementing or enforcing Public Act 436;

C.      A preliminary and permanent order prohibiting any Emergency Managers appointed under Public Act 436 from exercising any authority over any jurisdiction and/or unit of local government, and/or over any locally elected public officials in Michigan;

D.      A preliminary and permanent order that actions exercised by Emergency Managers under Public Act 436 are unenforceable;

32

E.      A preliminary and permanent order granting preclearance of the cities and school districts currently with Emergency Managers, including the City of Benton Harbor, the City of Detroit, the Detroit Public School System, the City of Ecorse, the City of Flint, the City of Hamtramck, the City of Highland Park, the Muskegon Heights School System, and the City of Pontiac under section 3(c) of the 1965 Voting Rights Act;

F.      Attorney fees and costs;

G.      Such other and further relief as this Court may deem necessary or proper.

Respectfully submitted,

/s/ Melvin Butch Hollowell

_____
MELVIN BUTCH HOLLOWELL (P-37834)
General Counsel
Detroit Branch NAACP
8220 Second Avenue
Detroit, Michigan 48221
313-871-2087
butchhollowell@gmail.com

/s/ Nabih H. Ayad

_____
NABIH H. AYAD (P-59518)
General Counsel
Arab-American Civil Rights League
Nabih Ayad & Associates
2200 North Canton Center Road, Suite 220
Canton, Michigan 48187
734-983-0500
nayad@ayadlaw.com

ATTORNEYS FOR PLAINTIFFS

DATED: June 27, 2013

**VERIFICATION OF PLAINTIFF DONNELL R. WHITE**

UNDER OATH, Plaintiff DONNELL R. WHITE hereby states:

1.      That he has reviewed the Complaint,

2.      That regarding the allegations of which Plaintiff White has personal knowledge, he believes them to be true,

3.      That regarding the allegations of which Plaintiff White does not have personal knowledge, he believes them to be true based on specified information, documents, or both.

4.      That I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. (28 U.S.C. Sec. 1746).

 /s/ Donnell R. White
_____
Donnell R. White

Executed on May 10, 2013

**VERIFICATION OF PLAINTIFF THOMAS STALLWORTH, III**

UNDER OATH, Plaintiff THOMAS STALLWORTH, III, hereby states:

1.      That he has reviewed the Complaint,

2.      That regarding the allegations of which Plaintiff Stallworth has personal knowledge, he believes them to be true,

3.      That regarding the allegations of which Plaintiff Stallworth does not have personal knowledge, he believes them to be true based on specified information, documents, or both.

4.      That I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. (28 U.S.C. Sec. 1746).

/s/ Thomas Stallworth, III
_____
Thomas Stallworth, III

Executed on May 10, 2013

## VERIFICATION OF PLAINTIFF RASHIDA TLAIB

UNDER Oath, Plaintiff RASHIDA TLAIB hereby states:

1.      That she has reviewed the Complaint,

2.      That regarding the allegations of which Plaintiff Tlaib has personal knowledge, she believes them to be true,

3.      That regarding the allegations of which Plaintiff Tlaib does not have personal knowledge, she believes them to be true based on specified information, documents, or both.

4.      That I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. (28 U.S.C. Sec. 1746).


 /s/ Rashida Tlaib
_____
Rashida Tlaib

Executed on May 10, 2013

36

## VERIFICATION OF PLAINTIFF MAUREEN TAYLOR

UNDER Oath, Plaintiff MAUREEN TAYLOR hereby states:

1.      That she has reviewed the Complaint,

2.      That regarding the allegations of which Plaintiff Taylor has personal knowledge, she believes them to be true,

3.      That regarding the allegations of which Plaintiff Taylor does not have personal knowledge, she believes them to be true based on specified information, documents, or both.

4.      That I verify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. (28 U.S.C. Sec. 1746).

 /s/ Maureen Taylor
_____
Maureen Taylor

Executed on May 10, 2013

37

# EXHIBIT 1

**LOCAL FINANCIAL STABILITY AND CHOICE ACT**

**Act 436 of 2012**

AN ACT to safeguard and assure the financial accountability of local units of government and school districts; to preserve the capacity of local units of government and school districts to provide or cause to be provided necessary services essential to the public health, safety, and welfare; to provide for review, management, planning, and control of the financial operation of local units of government and school districts and the provision of services by local units of government and school districts; to provide criteria to be used in determining the financial condition of local units of government and school districts; to authorize a declaration of the existence of a financial emergency within a local unit of government or school district; to prescribe remedial measures to address a financial emergency within a local unit of government or school district; to provide for a review and appeal process; to provide for the appointment and to prescribe the powers and duties of an emergency manager for a local unit of government or school district; to provide for the modification or termination of contracts under certain circumstances; to provide for the termination of a financial emergency within a local unit of government or school district; to provide a process by which a local unit of government or school district may file for bankruptcy; to prescribe the powers and duties of certain state agencies and officials and officials within local units of government and school districts; to provide for appropriations; and to repeal acts and parts of acts.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1541 Short title.

Sec. 1.

This act shall be known and may be cited as the "local financial stability and choice act".

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."


## 141.1542 Definitions.

Sec. 2.

As used in this act:

(a) "Chapter 9" means chapter 9 of title 11 of the United States Code, 11 USC 901 to 946.

(b) "Chief administrative officer" means any of the following:

(i) The manager of a village or, if a village does not employ a manager, the president of the village.

(ii) The city manager of a city or, if a city does not employ a city manager, the mayor of the city.

(iii) The manager of a township or the manager or superintendent of a charter township or, if the township does not employ a manager or superintendent, the supervisor of the township.

(iv) The elected county executive or appointed county manager of a county or, if the county has not adopted the provisions of either 1973 PA 139, MCL 45.551 to 45.573, or 1966 PA 293, MCL 45.501 to 45.521, the county's chairperson of the county board of commissioners.

(v) The chief operating officer of an authority or of a public utility owned by a city, village, township, or county.

(vi) The superintendent of a school district.

(c) "Creditor" means either of the following:

(i) An entity that has a noncontingent claim against a local government that arose at the time of or before the commencement of the neutral evaluation process and whose claim represents at least $5,000,000.00 or comprises more than 5% of the local government's debt or obligations, whichever is less.

39

(ii) An entity that would have a noncontingent claim against the local government upon the rejection of an executory contract or unexpired lease in a chapter 9 case and whose claim would represent at least $5,000,000.00 or would comprise more than 5% of the local government's debt or obligations, whichever is less.

(d) "Debtor" means a local government that is authorized to proceed under chapter 9 by this act and that meets the requirements of chapter 9.

(e) "Emergency manager" means an emergency manager appointed under section 9. An emergency manager includes an emergency financial manager appointed under former 1988 PA 101 or former 1990 PA 72 who was acting in that capacity on the effective date of this act.

(f) "Entity" means a partnership, nonprofit or business corporation, limited liability company, labor organization, or any other association, corporation, trust, or other legal entity.

(g) "Financial and operating plan" means a written financial and operating plan for a local government under section 11, including an educational plan for a school district.

(h) "Good faith" means participation by an interested party or a local government representative in the neutral evaluation process with the intent to negotiate a resolution of the issues that are the subject of the neutral evaluation process, including the timely provision of complete and accurate information to provide the relevant participants through the neutral evaluation process with sufficient information, in a confidential manner, to negotiate the readjustment of the local government's debt.

(i) "Interested party" means a trustee, a committee of creditors, an affected creditor, an indenture trustee, a pension fund, a bondholder, a union that under its collective bargaining agreements has standing to initiate contract negotiations with the local government, or a representative selected by an association of retired employees of the public entity who receive income or benefits from the public entity. A local government may invite holders of contingent claims to participate as interested parties in the neutral evaluation process if the local government determines that the contingency is likely to occur and the claim may represent at least $5,000,000.00 or comprise more than 5% of the local government's debt or obligations, whichever is less.

(j) "Local emergency financial assistance loan board" means the local emergency financial assistance loan board created under section 2 of the emergency municipal loan act, 1980 PA 243, MCL 141.932.

(k) "Local government" means a municipal government or a school district.

(l) "Local government representative" means the person or persons designated by the governing body of the local government with authority to make recommendations and to attend the neutral evaluation process on behalf of the governing body of the local government.

(m) "Local inspector" means a certified forensic accountant, certified public accountant, attorney, or similarly credentialed person whose responsibility it is to determine the existence of proper

internal and management controls, fraud, criminal activity, or any other accounting or management deficiencies.

(n) "Municipal government" means a city, a village, a township, a charter township, a county, a department of county government if the county has an elected county executive under 1966 PA 293, MCL 45.501 to 45.521, an authority established by law, or a public utility owned by a city, village, township, or county.

(o) "Neutral evaluation process" means a form of alternative dispute resolution or mediation between a local government and interested parties as provided for in section 25.

(p) "Neutral evaluator" means an impartial, unbiased person or entity, commonly known as a mediator, who assists local governments and interested parties in reaching their own settlement of issues under this act, who is not aligned with any party, and who has no authoritative decision-making power.

(q) "Receivership" means the process under this act by which a financial emergency is addressed through the appointment of an emergency manager. Receivership does not include chapter 9 or any provision under federal bankruptcy law.

(r) "Review team" means a review team appointed under section 4.

(s) "School board" means the governing body of a school district.

(t) "School district" means a school district as that term is defined in section 6 of the revised school code, 1976 PA 451, MCL 380.6, or an intermediate school district as that term is defined in section 4 of the revised school code, 1976 PA 451, MCL 380.4.

(u) "State financial authority" means the following:

(i) For a municipal government, the state treasurer.

(ii) For a school district, the superintendent of public instruction.

(v) "Strong mayor" means a mayor who has been granted veto power for any purpose under the charter of that local government.

(w) "Strong mayor approval" means approval of a resolution under 1 of the following conditions:

(i) The strong mayor approves the resolution.

(ii) The resolution is approved by the governing body with sufficient votes to override a veto by the strong mayor.

(iii) The strong mayor vetoes the resolution and the governing body overrides the veto.

41

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1543 Findings; declarations.

Sec. 3.

The legislature finds and declares all of the following:

(a) That the health, safety, and welfare of the citizens of this state would be materially and adversely affected by the insolvency of local governments and that the fiscal accountability of local governments is vitally necessary to the interests of the citizens of this state to assure the provision of necessary governmental services essential to public health, safety, and welfare.

(b) That it is vitally necessary to protect the credit of this state and its political subdivisions and that it is necessary for the public good and it is a valid public purpose for this state to take action and to assist a local government in a financial emergency so as to remedy the financial emergency by requiring prudent fiscal management and efficient provision of services, permitting the restructuring of contractual obligations, and prescribing the powers and duties of state and local government officials and emergency managers.

(c) That the fiscal stability of local governments is necessary to the health, safety, and welfare of the citizens of this state and it is a valid public purpose for this state to assist a local government in a condition of financial emergency by providing for procedures of alternative dispute resolution between a local government and its creditors to resolve disputes, to determine criteria for establishing the existence of a financial emergency, and to set forth the conditions for a local government to exercise powers under federal bankruptcy law.

(d) That the authority and powers conferred by this act constitute a necessary program and serve a valid public purpose.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall

function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

**141.1544 Determination of probable financial stress; preliminary review; conditions; notification to local government; interim report of findings; final report; finding of probable financial stress; appointment of review team for municipal government; appointment of review team for local school district; staff support; duration of appointment.**

Sec. 4.

(1) The state financial authority may conduct a preliminary review to determine the existence of probable financial stress within a local government if 1 or more of the following occur:

(a) The governing body or the chief administrative officer of a local government requests a preliminary review. The request shall be in writing and shall identify the existing or anticipated financial conditions or events that make the request necessary.

(b) The state financial authority receives a written request from a creditor with an undisputed claim that remains unpaid 6 months after its due date against the local government that exceeds the greater of $10,000.00 or 1% of the annual general fund budget of the local government, provided that the creditor notifies the local government in writing at least 30 days before his or her request to the state financial authority of his or her intention to submit a written request under this subdivision.

(c) The state financial authority receives a petition containing specific allegations of local government financial distress signed by a number of registered electors residing within the local government's jurisdiction equal to not less than 5% of the total vote cast for all candidates for governor within the local government's jurisdiction at the last preceding election at which a governor was elected. Petitions shall not be filed under this subdivision within 60 days before any election of the local government.

(d) The state financial authority receives written notification that a local government has not timely deposited its minimum obligation payment to the local government pension fund as required by law.

(e) The state financial authority receives written notification that the local government has failed for a period of 7 days or more after the scheduled date of payment to pay wages and salaries or other compensation owed to employees or benefits owed to retirees.

(f) The state financial authority receives written notification from a trustee, paying agent, bondholder, or auditor engaged by the local government of a default in a bond or note payment or a violation of 1 or more bond or note covenants.

(g) The state financial authority of a local government receives a resolution from either the senate or the house of representatives requesting a preliminary review.

(h) The local government has violated a requirement of, or a condition of an order issued pursuant to, former 1943 PA 202, the revenue bond act of 1933, 1933 PA 94, MCL 141.101 to 141.140, the revised municipal finance act, 2001 PA 34, MCL 141.2101 to 141.2821, or any other law governing the issuance of bonds or notes.

(i) The municipal government has violated the conditions of an order issued by the local emergency financial assistance loan board pursuant to the emergency municipal loan act, 1980 PA 243, MCL 141.931 to 141.942.

(j) The local government has violated a requirement of sections 17 to 20 of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.437 to 141.440.

(k) The local government fails to timely file an annual financial report or audit that conforms with the minimum procedures and standards of the state financial authority and is required for local governments under the uniform budgeting and accounting act, 1968 PA 2, MCL 141.421 to 141.440a, or 1919 PA 71, MCL 21.41 to 21.55.

(l) If the local government is a school district, the school district fails to provide an annual financial report or audit that conforms with the minimum procedures and standards of the superintendent of public instruction and is required under the revised school code, 1976 PA 451, MCL 380.1 to 380.1852, and the state school aid act of 1979, 1979 PA 94, MCL 388.1601 to 388.1896.

(m) The municipal government is delinquent in the distribution of tax revenues, as required by law, that it has collected for another taxing jurisdiction, and that taxing jurisdiction requests a preliminary review.

(n) The local government is in breach of its obligations under a deficit elimination plan or an agreement entered into pursuant to a deficit elimination plan.

(o) A court has ordered an additional tax levy without the prior approval of the governing body of the local government.

(p) The municipal government has ended a fiscal year in a deficit condition as defined in section 21 of the Glenn Steil state revenue sharing act of 1971, 1971 PA 140, MCL 141.921, or has failed to comply with the requirements of that section for filing or instituting a financial plan to correct the deficit condition.

(q) The school district ended its most recently completed fiscal year with a deficit in 1 or more of its funds and the school district has not submitted a deficit elimination plan to the state financial

authority within 30 days after the district's deadline for submission of its annual financial statement.

(r) The local government has been assigned a long-term debt rating within or below the BBB category or its equivalent by 1 or more nationally recognized credit rating agencies.

(s) The existence of other facts or circumstances that, in the state treasurer's sole discretion for a municipal government, are indicative of probable financial stress or that, in the state treasurer's or superintendent of public instruction's sole discretion for a school district, are indicative of probable financial stress.

(2) Before commencing the preliminary review under subsection (1), the state financial authority shall provide the local government specific written notification that it intends to conduct a preliminary review. Elected and appointed officials of a local government shall promptly and fully provide the assistance and information requested by the state financial authority for that local government in conducting the preliminary review. The state financial authority shall provide an interim report of its findings to the local government within 20 days following the commencement of the preliminary review. In addition, a copy of the interim report shall be provided to each state senator and state representative who represents that local government. The local government may provide comments to the state financial authority concerning the interim report within 5 days after the interim report is provided to the local government. The state financial authority shall prepare and provide a final report detailing its preliminary review to the local emergency financial assistance loan board. In addition, a copy of the final report shall be provided to each state senator and state representative who represents that local government. The final report shall be posted on the department of treasury's website within 7 days after the final report is provided to the local emergency financial assistance loan board. The preliminary review and final report by the state financial authority shall be completed within 30 days following commencement of the preliminary review. Within 20 days after receiving the final report from the state financial authority, the local emergency financial assistance loan board shall determine if probable financial stress exists for the local government.

(3) If a finding of probable financial stress is made for a municipal government by the local emergency financial assistance loan board under subsection (2), the governor shall appoint a review team for that municipal government consisting of the state treasurer or his or her designee, the director of the department of technology, management, and budget or his or her designee, a nominee of the senate majority leader, and a nominee of the speaker of the house of representatives. The governor may appoint other state officials or other persons with relevant professional experience to serve on a review team to undertake a municipal financial management review.

(4) If a finding of probable financial stress is made for a school district by the local emergency financial assistance loan board under subsection (2), the governor shall appoint a review team for that school district consisting of the state treasurer or his or her designee, the superintendent of public instruction or his or her designee, the director of the department of technology, management, and budget or his or her designee, a nominee of the senate majority leader, and a nominee of the speaker of the house of representatives. The governor may appoint other state

45

officials or other persons with relevant professional experience to serve on a review team to undertake a school district financial management review.

(5) The department of treasury shall provide staff support to each review team appointed under this section.

(6) A review team appointed under former 1988 PA 101 or former 1990 PA 72 and serving immediately prior to the effective date of this act shall continue under this act to fulfill its powers and duties. All proceedings and actions taken by the governor, the state treasurer, the superintendent of public instruction, the local emergency financial assistance loan board, or a review team under former 2011 PA 4, former 1988 PA 101, or former 1990 PA 72 before the effective date of this act are ratified and are enforceable as if the proceedings and actions were taken under this act, and a consent agreement entered into under former 2011 PA 4, former 1988 PA 101, or former 1990 PA 72 that was in effect immediately prior to the effective date of this act is ratified and is binding and enforceable under this act.

**History:**      2012,      Act      436,      Eff.      Mar.      28,      2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

**141.1545 Review team; powers; meeting with local government; report; posting on department of treasury's website; contents; appointment of individual or firm to carry out review and submit report.**

Sec. 5.

(1) In conducting its review, the review team may do either or both of the following:

(a) Examine the books and records of the local government.

(b) Utilize the services of other state agencies and employees.

(2) The review team shall meet with the local government as part of its review. At this meeting, the review team shall receive, discuss, and consider information provided by the local government concerning the financial condition of the local government. In addition, the review team shall hold at least 1 public information meeting in the jurisdiction of the local government at which the public may provide comment.

(3) The review team shall submit a written report of its findings to the governor within 60 days following its appointment or earlier if required by the governor. Upon request, the governor may grant one 30-day extension of this 60-day time limit. A copy of the report shall be forwarded by the state treasurer to the chief administrative officer and the governing body of the local government, the speaker of the house of representatives, the senate majority leader, the superintendent of public instruction if the local government is a school district, and each state senator and state representative who represents that local government. The report shall be posted on the department of treasury's website within 7 days after the report is submitted to the governor. The report shall include the existence, or an indication of the likely occurrence, of any of the following:

(a) A default in the payment of principal or interest upon bonded obligations, notes, or other municipal securities for which no funds or insufficient funds are on hand and, if required, segregated in a special trust fund.

(b) Failure for a period of 30 days or more beyond the due date to transfer 1 or more of the following to the appropriate agency:

(i) Taxes withheld on the income of employees.

(ii) For a municipal government, taxes collected by the municipal government as agent for another governmental unit, school district, or other entity or taxing authority.

(iii) Any contribution required by a pension, retirement, or benefit plan.

(c) Failure for a period of 7 days or more after the scheduled date of payment to pay wages and salaries or other compensation owed to employees or benefits owed to retirees.

(d) The total amount of accounts payable for the current fiscal year, as determined by the state financial authority's uniform chart of accounts, is in excess of 10% of the total expenditures of the local government in that fiscal year.

(e) Failure to eliminate an existing deficit in any fund of the local government within the 2-year period preceding the end of the local government's fiscal year during which the review team report is received.

(f) Projection of a deficit in the general fund of the local government for the current fiscal year in excess of 5% of the budgeted revenues for the general fund.

(g) Failure to comply in all material respects with the terms of an approved deficit elimination plan or an agreement entered into pursuant to a deficit elimination plan.

(h) Existence of material loans to the general fund from other local government funds that are not regularly settled between the funds or that are increasing in scope.

47

(i) Existence after the close of the fiscal year of material recurring unbudgeted subsidies from the general fund to other major funds as defined under government accounting standards board principles.

(j) Existence of a structural operating deficit.

(k) Use of restricted revenues for purposes not authorized by law.

(l) The likelihood that the local government is or will be unable to pay its obligations within 60 days after the date of the review team's reporting its findings to the governor.

(m) Any other facts and circumstances indicative of local government financial emergency.

(4) The review team shall include 1 of the following conclusions in its report:

(a) A financial emergency does not exist within the local government.

(b) A financial emergency exists within the local government.

(5) The review team may, with the approval of the state financial authority, appoint an individual or firm to carry out the review and submit a report to the review team for approval. The department of treasury may enter into a contract with the individual or firm respecting the terms and conditions of the appointment.

(6) For purposes of this section:

(a) A financial emergency does not exist within a local government if the report under subsection (3) concludes that none of the factors in subsection (3) exist or are likely to occur within the current or next succeeding fiscal year or, if they occur, do not threaten the local government's capability to provide necessary governmental services essential to public health, safety, and welfare.

(b) A financial emergency exists within a local government if any of the following occur:

(i) The report under subsection (3) concludes that 1 or more of the factors in subsection (3) exist or are likely to occur within the current or next succeeding fiscal year and threaten the local government's current and future capability to provide necessary governmental services essential to the public health, safety, and welfare.

(ii) The local government has failed to provide timely and accurate information enabling the review team to complete its report under subsection (3).

(iii) The local government has failed to comply in all material respects with the terms of an approved deficit elimination plan or an agreement entered into pursuant to a deficit elimination plan.

(iv) The chief administrative officer of the local government concludes that 1 or more of the factors in subsection (3) exist or are likely to occur within the current or next succeeding fiscal year and threaten the local government's current and future capability to provide necessary governmental services essential to the public health, safety, and welfare, and the chief administrative officer recommends that a financial emergency be declared and the state treasurer concurs with the recommendation.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1546 Determination by governor; opportunity for local government to submit statement; determination of financial emergency; notification; hearing; findings of fact by governor; report; resolution by local government to appeal determination.

Sec. 6.

(1) Within 10 days after receipt of the report under section 5, the governor shall make 1 of the following determinations:

(a) A financial emergency does not exist within the local government.

(b) A financial emergency exists within the local government.

(2) Before making a determination under subsection (1), the governor, in his or her sole discretion, may provide officials of the local government an opportunity to submit a written statement concerning their agreement or disagreement with the findings and conclusion of the review team report under section 5. If the governor determines pursuant to subsection (1) that a financial emergency exists, the governor shall provide the governing body and chief administrative officer of the local government with a written notification of the determination, findings of fact utilized as the basis upon which this determination was made, a concise and explicit statement of the underlying facts supporting the factual findings, and notice that the chief administrative officer or the governing body of the local government has 7 days after the date of the notification to request a hearing conducted by the state financial authority or the state financial authority's designee. Following the hearing, or if no hearing is requested following the expiration of the deadline by which a hearing may be requested, the governor, in his or her sole discretion based upon the record, shall either confirm or revoke, in writing, the determination of the existence of a financial emergency. If confirmed, the governor shall provide a written report to the governing body and

49

chief administrative officer of the local government of the findings of fact of the continuing or newly developed conditions or events providing a basis for the confirmation of a financial emergency and a concise and explicit statement of the underlying facts supporting these factual findings. In addition, a copy of the report shall be provided to each state senator and state representative who represents that local government. The report shall be posted on the department of treasury's website within 7 days after the report is provided to the governing body and chief executive officer of the local government.

(3) A local government for which a financial emergency determination under this section has been confirmed to exist may, by resolution adopted by a vote of 2/3 of the members of its governing body elected and serving, appeal this determination within 10 business days to the Michigan court of claims. A local government may, by resolution adopted by a vote of 2/3 of the members of its governing body elected and serving, waive its right to appeal as provided in this subsection. The court shall not set aside a determination of financial emergency by the governor unless it finds that the determination is either of the following:

(a) Not supported by competent, material, and substantial evidence on the whole record.

(b) Arbitrary, capricious, or clearly an abuse or unwarranted exercise of discretion.

**History:**          2012,          Act          436,          Eff.          Mar.          28,          2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

**141.1547 Local government options; approval of resolution by mayor or school board; failure of local governing body to pass resolution; limitation.**

Sec. 7.

(1) Notwithstanding section 6(3), upon the confirmation of a finding of a financial emergency under section 6, the governing body of the local government shall, by resolution within 7 days after the confirmation of a finding of a financial emergency, select 1 of the following local government options to address the financial emergency:

(a) The consent agreement option pursuant to section 8.

(b) The emergency manager option pursuant to section 9.

50

(c) The neutral evaluation process option pursuant to section 25.

(d) The chapter 9 bankruptcy option pursuant to section 26.

(2) Subject to subsection (3), if the local government has a strong mayor, the resolution under subsection (1) requires strong mayor approval. If the local government is a school district, the resolution shall be approved by the school board. The resolution shall be filed with the state treasurer, with a copy to the superintendent of public instruction if the local government is a school district.

(3) If the governing body of the local government does not pass a resolution as required under subsection (1), the local government shall proceed under the neutral evaluation process pursuant to section 25.

(4) Subject to section 9(6)(c) and (11), unless authorized by the governor, a local government shall not utilize 1 of the local options listed in subsection (1)(a) to (d) more than 1 time.

**History:**     2012,     Act     436,     Eff.     Mar.     28,     2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

**141.1548 Consent agreement; negotiation and signature; provisions; continuing operations plan; form; amendment of budget adopted by municipal government or school district; recovery plan; terms and provisions; powers granted to chief administrative officer, chief financial officer, governing body, or other local officers; consultant; release from requirements.**

Sec. 8.

(1) The chief administrative officer of a local government may negotiate and sign a consent agreement with the state treasurer as provided for in this act. If the local government is a school district and the consent agreement contains an educational plan, the consent agreement shall also be signed by the superintendent of public instruction. The consent agreement shall provide for remedial measures considered necessary to address the financial emergency within the local government and provide for the financial stability of the local government. The consent agreement may utilize state financial management and technical assistance as necessary in order to alleviate the financial emergency. The consent agreement shall also provide for periodic financial status

51

reports to the state treasurer, with a copy of each report to each state senator and state representative who represents that local government. The consent agreement may provide for a board appointed by the governor to monitor the local government's compliance with the consent agreement. In order for the consent agreement to go into effect, it shall be approved, by resolution, by the governing body of the local government and shall be approved and executed by the state treasurer. Nothing in the consent agreement shall limit the ability of the state treasurer in his or her sole discretion to declare a material breach of the consent agreement. A consent agreement shall provide that in the event of a material uncured breach of the consent agreement, the governor may place the local government in receivership or in the neutral evaluation process. If within 30 days after a local government selects the consent agreement option under section 7(1)(a) or sooner in the discretion of the state treasurer, a consent agreement cannot be agreed upon, the state treasurer shall require the local government to proceed under 1 of the other local options provided for in section 7.

(2) A consent agreement as provided in subsection (1) may require a continuing operations plan or a recovery plan if required by the state treasurer.

(3) If the state treasurer requires that a consent agreement include a continuing operations plan, the local government shall prepare and file the continuing operations plan with the state treasurer as provided for in the consent agreement. The state treasurer shall approve or reject the initial continuing operations plan within 14 days of receiving it from the local government. If a continuing operations plan is rejected, the local government shall refile an amended plan within 30 days of the rejection, addressing any concerns raised by the state treasurer or the superintendent of public instruction regarding an educational plan. If the amended plan is rejected, then the local government may be considered to be in material breach of the consent agreement. The local government shall file annual updates to its continuing operations plan. The annual updates shall be included with the annual filing of the local government's audit report with the state financial authority as long as the continuing operations plan remains in effect.

(4) The continuing operations plan shall be in a form prescribed by the state treasurer but shall, at a minimum, include all of the following:

(a) A detailed projected budget of revenues and expenditures over not less than 3 fiscal years which demonstrates that the local government's expenditures will not exceed its revenues and that any existing deficits will be eliminated during the projected budget period.

(b) A cash flow projection for the budget period.

(c) An operating plan for the budget period that assures fiscal accountability for the local government.

(d) A plan showing reasonable and necessary maintenance and capital expenditures so as to assure the local government's fiscal accountability.

(e) An evaluation of the costs associated with pension and postemployment health care obligations for which the local government is responsible and a plan for how those costs will be addressed within the budget period.

(f) A provision for submitting quarterly compliance reports to the state treasurer demonstrating compliance with the continuing operations plan, with a copy of each report to each state senator and state representative who represents that local government. Each quarterly compliance report shall be posted on the local government's website within 7 days after the report is submitted to the state treasurer.

(5) If a continuing operations plan is approved for a municipal government, the municipal government shall amend the budget and general appropriations ordinance adopted by the municipal government under the uniform budgeting and accounting act, 1968 PA 2, MCL 141.421 to 141.440a, to the extent necessary or advisable to give full effect to the continuing operations plan. If a continuing operations plan is approved for a school district, the school district shall amend the budget adopted by the school district under the uniform budgeting and accounting act, 1968 PA 2, MCL 141.421 to 141.440a, to the extent necessary or advisable to give full effect to the continuing operations plan. The chief administrative officer, the chief financial officer, the governing body, and other officials of the local government shall take and direct such actions as may be necessary or advisable to maintain the local government's operations in compliance with the continuing operations plan.

(6) If the state treasurer requires that a consent agreement include a recovery plan, the state treasurer, with input from the local government, shall develop and adopt a recovery plan. If a recovery plan is developed and adopted for the local government, the local government shall file annual updates to its recovery plan. The annual updates shall be included with the annual filing of the local government's audit report with the state financial authority as long as the recovery plan remains in effect.

(7) A recovery plan may include terms and provisions as may be approved in the discretion of the state treasurer, including, but not limited to, 1 or more of the following:

(a) A detailed projected budget of revenues and expenditures over not less than 3 fiscal years that demonstrates that the local government's expenditures will not exceed its revenues and that any existing deficits will be eliminated during the projected budget period.

(b) A cash flow projection for the budget period.

(c) An operating plan for the budget period that assures fiscal accountability for the local government.

(d) A plan showing reasonable and necessary maintenance and capital expenditures so as to assure the local government's fiscal accountability.

(e) An evaluation of costs associated with pension and postemployment health care obligations for which the local government is responsible and a plan for how those costs will be addressed to assure that current obligations are met and that steps are taken to reduce future unfunded obligations.

(f) Procedures for cash control and cash management, including, but not limited to, procedures for timely collection, securing, depositing, balancing, and expending of cash. Procedures for cash control and cash management may include the designation of appropriate fiduciaries.

(g) A provision for submitting quarterly compliance reports to the state treasurer and the chief administrative officer of the local government that demonstrate compliance with the recovery plan, with a copy of each report to each state senator and state representative who represents that local government. Each quarterly compliance report shall be posted on the local government's website within 7 days after the report is submitted to the state treasurer.

(8) The recovery plan may include the appointment of a local auditor or local inspector, or both, in accordance with section 12(1)(p).

(9) If a recovery plan is developed and adopted by the state treasurer for a local government, the recovery plan shall supersede the budget and general appropriations ordinance adopted by the local government under the uniform budgeting and accounting act, 1968 PA 2, MCL 141.421 to 141.440a, and the budget and general appropriations ordinance is considered amended to the extent necessary or advisable to give full effect to the recovery plan. In the event of any inconsistency between the recovery plan and the budget or general appropriations ordinance, the recovery plan shall control. The chief administrative officer, the chief financial officer, the governing body, and other officers of the local government shall take and direct actions as may be necessary or advisable to bring and maintain the local government's operations in compliance with the recovery plan.

(10) Except as otherwise provided in this subsection, the consent agreement may include a grant to the chief administrative officer, the chief financial officer, the governing body, or other officers of the local government by the state treasurer of 1 or more of the powers prescribed for emergency managers as otherwise provided in this act for such periods and upon such terms and conditions as the state treasurer considers necessary or convenient, in the state treasurer's discretion to enable the local government to achieve the goals and objectives of the consent agreement. However, the consent agreement shall not include a grant to the chief administrative officer, the chief financial officer, the governing body, or other officers of the local government of the powers prescribed for emergency managers in section 12(1)(k).

(11) Unless the state treasurer determines otherwise, beginning 30 days after the date a local government enters into a consent agreement under this act, that local government is not subject to section 15(1) of 1947 PA 336, MCL 423.215, for the remaining term of the consent agreement.

(12) The consent agreement may provide for the required retention by the local government of a consultant for the purpose of assisting the local government to achieve the goals and objectives of the consent agreement.

(13) A local government is released from the requirements under this section upon compliance with the consent agreement as determined by the state treasurer.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature

54

that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

**141.1549 Emergency manager; appointment by governor; powers; qualifications; compensation; private funds; additional staff and assistance; quarterly reports; service; removal of local government from receivership; delegation of duties from governor to state treasurer; applicable state laws; appointment under former act; removal.**

Sec. 9.

(1) The governor may appoint an emergency manager to address a financial emergency within that local government as provided for in this act.

(2) Upon appointment, an emergency manager shall act for and in the place and stead of the governing body and the office of chief administrative officer of the local government. The emergency manager shall have broad powers in receivership to rectify the financial emergency and to assure the fiscal accountability of the local government and the local government's capacity to provide or cause to be provided necessary governmental services essential to the public health, safety, and welfare. Following appointment of an emergency manager and during the pendency of receivership, the governing body and the chief administrative officer of the local government shall not exercise any of the powers of those offices except as may be specifically authorized in writing by the emergency manager or as otherwise provided by this act and are subject to any conditions required by the emergency manager.

(3) All of the following apply to an emergency manager:

(a) The emergency manager shall have a minimum of 5 years' experience and demonstrable expertise in business, financial, or local or state budgetary matters.

(b) The emergency manager may, but need not, be a resident of the local government.

(c) The emergency manager shall be an individual.

(d) Except as otherwise provided in this subdivision, the emergency manager shall serve at the pleasure of the governor. An emergency manager is subject to impeachment and conviction by the legislature as if he or she were a civil officer under section 7 of article XI of the state constitution

of 1963. A vacancy in the office of emergency manager shall be filled in the same manner as the original appointment.

(e) The emergency manager's compensation shall be paid by this state and shall be set forth in a contract approved by the state treasurer. The contract shall be posted on the department of treasury's website within 7 days after the contract is approved by the state treasurer.

(f) In addition to the salary provided to an emergency manager in a contract approved by the state treasurer under subdivision (e), this state may receive and distribute private funds to an emergency manager. As used in this subdivision, "private funds" means any money the state receives for the purpose of allocating additional salary to an emergency manager. Private funds distributed under this subdivision are subject to section 1 of 1901 PA 145, MCL 21.161, and section 17 of article IX of the state constitution of 1963.

(4) In addition to staff otherwise authorized by law, an emergency manager shall appoint additional staff and secure professional assistance as the emergency manager considers necessary to fulfill his or her appointment.

(5) The emergency manager shall submit quarterly reports to the state treasurer with respect to the financial condition of the local government in receivership, with a copy to the superintendent of public instruction if the local government is a school district and a copy to each state senator and state representative who represents that local government. In addition, each quarterly report shall be posted on the local government's website within 7 days after the report is submitted to the state treasurer.

(6) The emergency manager shall continue in the capacity of an emergency manager as follows:

(a) Until removed by the governor or the legislature as provided in subsection (3)(d). If an emergency manager is removed, the governor shall within 30 days of the removal appoint a new emergency manager.

(b) Until the financial emergency is rectified.

(c) If the emergency manager has served for at least 18 months after his or her appointment under this act, the emergency manager may, by resolution, be removed by a 2/3 vote of the governing body of the local government. If the local government has a strong mayor, the resolution requires strong mayor approval before the emergency manager may be removed. Notwithstanding section 7(4), if the emergency manager is removed under this subsection and the local government has not previously breached a consent agreement under this act, the local government may within 10 days negotiate a consent agreement with the state treasurer. If a consent agreement is not agreed upon within 10 days, the local government shall proceed with the neutral evaluation process pursuant to section 25.

(7) A local government shall be removed from receivership when the financial conditions are corrected in a sustainable fashion as provided in this act. In addition, the local government may be removed from receivership if an emergency manager is removed under subsection (6)(c) and the

governing body of the local government by 2/3 vote approves a resolution for the local government to be removed from receivership. If the local government has a strong mayor, the resolution requires strong mayor approval before the local government is removed from receivership. A local government that is removed from receivership while a financial emergency continues to exist as determined by the governor shall proceed under the neutral evaluation process pursuant to section 25.

(8) The governor may delegate his or her duties under this section to the state treasurer.

(9) Notwithstanding section 3(1) of 1968 PA 317, MCL 15.323, an emergency manager is subject to all of the following:

(a) 1968 PA 317, MCL 15.321 to 15.330, as a public servant.

(b) 1973 PA 196, MCL 15.341 to 15.348, as a public officer.

(c) 1968 PA 318, MCL 15.301 to 15.310, as if he or she were a state officer.

(10) An emergency financial manager appointed under former 1988 PA 101 or former 1990 PA 72, and serving immediately prior to the effective date of this act, shall be considered an emergency manager under this act and shall continue under this act to fulfill his or her powers and duties. Notwithstanding any other provision of this act, the governor may appoint a person who was appointed as an emergency manager under former 2011 PA 4 or an emergency financial manager under former 1988 PA 101 or former 1990 PA 72 to serve as an emergency manager under this act.

(11) Notwithstanding section 7(4) and subject to the requirements of this section, if an emergency manager has served for less than 18 months after his or her appointment under this act, the governing body of the local government may pass a resolution petitioning the governor to remove the emergency manager as provided in this section and allow the local government to proceed under the neutral evaluation process as provided in section 25. If the local government has a strong mayor, the resolution requires strong mayor approval. If the governor accepts the resolution, notwithstanding section 7(4), the local government shall proceed under the neutral evaluation process as provided in section 25.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

57

**141.1550 Orders.**

Sec. 10.

(1) An emergency manager shall issue to the appropriate local elected and appointed officials and employees, agents, and contractors of the local government the orders the emergency manager considers necessary to accomplish the purposes of this act, including, but not limited to, orders for the timely and satisfactory implementation of a financial and operating plan, including an educational plan for a school district, or to take actions, or refrain from taking actions, to enable the orderly accomplishment of the financial and operating plan. An order issued under this section is binding on the local elected and appointed officials and employees, agents, and contractors of the local government to whom it is issued. Local elected and appointed officials and employees, agents, and contractors of the local government shall take and direct those actions that are necessary and advisable to maintain compliance with the financial and operating plan.

(2) If an order of the emergency manager under subsection (1) is not carried out and the failure to carry out an order is disrupting the emergency manager's ability to manage the local government, the emergency manager, in addition to other remedies provided in this act, may prohibit the local elected or appointed official or employee, agent, or contractor of the local government from access to the local government's office facilities, electronic mail, and internal information systems.

**History:**      2012,      Act      436,      Eff.      Mar.      28,      2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

**141.1551 Financial and operating plan for local government; development and amendment by emergency manager; objectives; submission; modification; form; conduct of public informational meeting; effect of plan adopted under former law.**

Sec. 11.

(1) An emergency manager shall develop and may amend a written financial and operating plan for the local government. The plan shall have the objectives of assuring that the local government is able to provide or cause to be provided governmental services essential to the public health, safety, and welfare and assuring the fiscal accountability of the local government. The financial and operating plan shall provide for all of the following:

(a) Conducting all aspects of the operations of the local government within the resources available according to the emergency manager's revenue estimate.

(b) The payment in full of the scheduled debt service requirements on all bonds, notes, and municipal securities of the local government, contract obligations in anticipation of which bonds, notes, and municipal securities are issued, and all other uncontested legal obligations.

(c) The modification, rejection, termination, and renegotiation of contracts pursuant to section 12.

(d) The timely deposit of required payments to the pension fund for the local government or in which the local government participates.

(e) For school districts, an educational plan.

(f) Any other actions considered necessary by the emergency manager in the emergency manager's discretion to achieve the objectives of the financial and operating plan, alleviate the financial emergency, and remove the local government from receivership.

(2) Within 45 days after the emergency manager's appointment, the emergency manager shall submit the financial and operating plan, and an educational plan if the local government is a school district, to the state treasurer, with a copy to the superintendent of public instruction if the local government is a school district, and to the chief administrative officer and governing body of the local government. The plan shall be regularly reexamined by the emergency manager and the state treasurer and may be modified from time to time by the emergency manager with notice to the state treasurer. If the emergency manager reduces his or her revenue estimates, the emergency manager shall modify the plan to conform to the revised revenue estimates.

(3) The financial and operating plan shall be in a form as provided by the state treasurer and shall contain that information for each year during which year the plan is in effect that the emergency manager, in consultation with the state financial authority, specifies. The financial and operating plan may serve as a deficit elimination plan otherwise required by law if so approved by the state financial authority.

(4) The emergency manager, within 30 days of submitting the financial and operating plan to the state financial authority, shall conduct a public informational meeting on the plan and any modifications to the plan. This subsection does not mean that the emergency manager must receive public approval before he or she implements the plan or any modification of the plan.

(5) For a local government in receivership immediately prior to the effective date of this act, a financial and operating plan for that local government adopted under former 2011 PA 4 or a financial plan for that local government adopted under former 1990 PA 72 shall be effective and enforceable as a financial and operating plan for the local government under this act until modified or rescinded under this act.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature

that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

**141.1552 Additional actions by emergency manager; suspension of power of administrative officer and governing body; contracts subject to competitive bidding; sale or transfer of public utility; limitation.**

Sec. 12.

(1) An emergency manager may take 1 or more of the following additional actions with respect to a local government that is in receivership, notwithstanding any charter provision to the contrary:

(a) Analyze factors and circumstances contributing to the financial emergency of the local government and initiate steps to correct the condition.

(b) Amend, revise, approve, or disapprove the budget of the local government, and limit the total amount appropriated or expended.

(c) Receive and disburse on behalf of the local government all federal, state, and local funds earmarked for the local government. These funds may include, but are not limited to, funds for specific programs and the retirement of debt.

(d) Require and approve or disapprove, or amend or revise, a plan for paying all outstanding obligations of the local government.

(e) Require and prescribe the form of special reports to be made by the finance officer of the local government to its governing body, the creditors of the local government, the emergency manager, or the public.

(f) Examine all records and books of account, and require under the procedures of the uniform budgeting and accounting act, 1968 PA 2, MCL 141.421 to 141.440a, or 1919 PA 71, MCL 21.41 to 21.55, or both, the attendance of witnesses and the production of books, papers, contracts, and other documents relevant to an analysis of the financial condition of the local government.

(g) Make, approve, or disapprove any appropriation, contract, expenditure, or loan, the creation of any new position, or the filling of any vacancy in a position by any appointing authority.

(h) Review payrolls or other claims against the local government before payment.

(i) Notwithstanding any minimum staffing level requirement established by charter or contract, establish and implement staffing levels for the local government.

(j) Reject, modify, or terminate 1 or more terms and conditions of an existing contract.

(k) Subject to section 19, after meeting and conferring with the appropriate bargaining representative and, if in the emergency manager's sole discretion and judgment, a prompt and satisfactory resolution is unlikely to be obtained, reject, modify, or terminate 1 or more terms and conditions of an existing collective bargaining agreement. The rejection, modification, or termination of 1 or more terms and conditions of an existing collective bargaining agreement under this subdivision is a legitimate exercise of the state's sovereign powers if the emergency manager and state treasurer determine that all of the following conditions are satisfied:

(i) The financial emergency in the local government has created a circumstance in which it is reasonable and necessary for the state to intercede to serve a significant and legitimate public purpose.

(ii) Any plan involving the rejection, modification, or termination of 1 or more terms and conditions of an existing collective bargaining agreement is reasonable and necessary to deal with a broad, generalized economic problem.

(iii) Any plan involving the rejection, modification, or termination of 1 or more terms and conditions of an existing collective bargaining agreement is directly related to and designed to address the financial emergency for the benefit of the public as a whole.

(iv) Any plan involving the rejection, modification, or termination of 1 or more terms and conditions of an existing collective bargaining agreement is temporary and does not target specific classes of employees.

(l) Act as sole agent of the local government in collective bargaining with employees or representatives and approve any contract or agreement.

(m) If a municipal government's pension fund is not actuarially funded at a level of 80% or more, according to the most recent governmental accounting standards board's applicable standards, at the time the most recent comprehensive annual financial report for the municipal government or its pension fund was due, the emergency manager may remove 1 or more of the serving trustees of the local pension board or, if the state treasurer appoints the emergency manager as the sole trustee of the local pension board, replace all the serving trustees of the local pension board. For the purpose of determining the pension fund level under this subdivision, the valuation shall exclude the net value of pension bonds or evidence of indebtedness. The annual actuarial valuation for the municipal government's pension fund shall use the actuarial accrued liabilities and the actuarial value of assets. If a pension fund uses the aggregate actuarial cost method or a method involving a frozen accrued liability, the retirement system actuary shall use the entry age normal actuarial cost method. If the emergency manager serves as sole trustee of the local pension board, all of the following apply:

(i) The emergency manager shall assume and exercise the authority and fiduciary responsibilities of the local pension board including, to the extent applicable, setting and approval of all actuarial assumptions for pension obligations of a municipal government to the local pension fund.

(ii) The emergency manager shall fully comply with the public employee retirement system investment act, 1965 PA 314, MCL 38.1132 to 38.1140m, and section 24 of article IX of the state constitution of 1963, and any actions taken shall be consistent with the pension fund's qualified plan status under the federal internal revenue code.

(iii) The emergency manager shall not make changes to a local pension fund without identifying the changes and the costs and benefits associated with the changes and receiving the state treasurer's approval for the changes. If a change includes the transfer of funds from 1 pension fund to another pension fund, the valuation of the pension fund receiving the transfer must be actuarially funded at a level of 80% or more, according to the most recent governmental accounting standards board's applicable standards, at the time the most recent comprehensive annual financial report for the municipal government was due.

(iv) The emergency manager's assumption and exercise of the authority and fiduciary responsibilities of the local pension board shall end not later than the termination of the receivership of the municipal government as provided in this act.

(n) Consolidate or eliminate departments of the local government or transfer functions from 1 department to another and appoint, supervise, and, at his or her discretion, remove administrators, including heads of departments other than elected officials.

(o) Employ or contract for, at the expense of the local government and with the approval of the state financial authority, auditors and other technical personnel considered necessary to implement this act.

(p) Retain 1 or more persons or firms, which may be an individual or firm selected from a list approved by the state treasurer, to perform the duties of a local inspector or a local auditor as described in this subdivision. The duties of a local inspector are to assure integrity, economy, efficiency, and effectiveness in the operations of the local government by conducting meaningful and accurate investigations and forensic audits, and to detect and deter waste, fraud, and abuse. At least annually, a report of the local inspector shall be submitted to the emergency manager, the state treasurer, the superintendent of public instruction if the local government is a school district, and each state senator and state representative who represents that local government. The annual report of the local inspector shall be posted on the local government's website within 7 days after the report is submitted. The duties of a local auditor are to assure that internal controls over local government operations are designed and operating effectively to mitigate risks that hamper the achievement of the emergency manager's financial plan, assure that local government operations are effective and efficient, assure that financial information is accurate, reliable, and timely, comply with policies, regulations, and applicable laws, and assure assets are properly managed. At least annually, a report of the local auditor shall be submitted to the emergency manager, the state treasurer, the superintendent of public instruction if the local government is a school district, and each state senator and state representative who represents that local government. The annual

report of the local auditor shall be posted on the local government's website within 7 days after the report is submitted.

(q) An emergency manager may initiate court proceedings in the Michigan court of claims or in the circuit court of the county in which the local government is located in the name of the local government to enforce compliance with any of his or her orders or any constitutional or legislative mandates, or to restrain violations of any constitutional or legislative power or his or her orders.

(r) Subject to section 19, if provided in the financial and operating plan, or otherwise with the prior written approval of the governor or his or her designee, sell, lease, convey, assign, or otherwise use or transfer the assets, liabilities, functions, or responsibilities of the local government, provided the use or transfer of assets, liabilities, functions, or responsibilities for this purpose does not endanger the health, safety, or welfare of residents of the local government or unconstitutionally impair a bond, note, security, or uncontested legal obligation of the local government.

(s) Apply for a loan from the state on behalf of the local government, subject to the conditions of the emergency municipal loan act, 1980 PA 243, MCL 141.931 to 141.942.

(t) Order, as necessary, 1 or more millage elections for the local government consistent with the Michigan election law, 1954 PA 116, MCL 168.1 to 168.992, sections 6 and 25 through 34 of article IX of the state constitution of 1963, and any other applicable state law.

(u) Subject to section 19, authorize the borrowing of money by the local government as provided by law.

(v) Approve or disapprove of the issuance of obligations of the local government on behalf of the local government under this subdivision. An election to approve or disapprove of the issuance of obligations of the local government pursuant to this subdivision shall only be held at the general November election.

(w) Enter into agreements with creditors or other persons or entities for the payment of existing debts, including the settlement of claims by the creditors.

(x) Enter into agreements with creditors or other persons or entities to restructure debt on terms, at rates of interest, and with security as shall be agreed among the parties, subject to approval by the state treasurer.

(y) Enter into agreements with other local governments, public bodies, or entities for the provision of services, the joint exercise of powers, or the transfer of functions and responsibilities.

(z) For municipal governments, enter into agreements with other units of municipal government to transfer property of the municipal government under 1984 PA 425, MCL 124.21 to 124.30, or as otherwise provided by law, subject to approval by the state treasurer.

(aa) Enter into agreements with 1 or more other local governments or public bodies for the consolidation of services.

(bb) For a city, village, or township, the emergency manager may recommend to the state boundary commission that the municipal government consolidate with 1 or more other municipal governments, if the emergency manager determines that consolidation would materially alleviate the financial emergency of the municipal government and would not materially and adversely affect the financial situation of the government or governments with which the municipal government in receivership is consolidated. Consolidation under this subdivision shall proceed as provided by law.

(cc) For municipal governments, with approval of the governor, disincorporate or dissolve the municipal government and assign its assets, debts, and liabilities as provided by law. The disincorporation or dissolution of the local government is subject to a vote of the electors of that local government if required by law.

(dd) Exercise solely, for and on behalf of the local government, all other authority and responsibilities of the chief administrative officer and governing body concerning the adoption, amendment, and enforcement of ordinances or resolutions of the local government as provided in the following acts:

(i) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38.

(ii) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20.

(iii) The charter township act, 1947 PA 359, MCL 42.1 to 42.34.

(iv) 1851 PA 156, MCL 46.1 to 46.32.

(v) 1966 PA 293, MCL 45.501 to 45.521.

(vi) The general law village act, 1895 PA 3, MCL 61.1 to 74.25.

(vii) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28.

(viii) The revised school code, 1976 PA 451, MCL 380.1 to 380.1852.

(ix) The state school aid act of 1979, 1979 PA 94, MCL 388.1601 to 388.1896.

(ee) Take any other action or exercise any power or authority of any officer, employee, department, board, commission, or other similar entity of the local government, whether elected or appointed, relating to the operation of the local government. The power of the emergency manager shall be superior to and supersede the power of any of the foregoing officers or entities.

(ff) Remove, replace, appoint, or confirm the appointments to any office, board, commission, authority, or other entity which is within or is a component unit of the local government.

(2) Except as otherwise provided in this act, during the pendency of the receivership, the authority of the chief administrative officer and governing body to exercise power for and on behalf of the

local government under law, charter, and ordinance shall be suspended and vested in the emergency manager.

(3) Except as otherwise provided in this subsection, any contract involving a cumulative value of $50,000.00 or more is subject to competitive bidding by an emergency manager. However, if a potential contract involves a cumulative value of $50,000.00 or more, the emergency manager may submit the potential contract to the state treasurer for review and the state treasurer may authorize that the potential contract is not subject to competitive bidding.

(4) An emergency manager appointed for a city or village shall not sell or transfer a public utility furnishing light, heat, or power without the approval of a majority of the electors of the city or village voting thereon, or a greater number if the city or village charter provides, as required by section 25 of article VII of the state constitution of 1963. In addition, an emergency manager appointed for a city or village shall not utilize the assets of a public utility furnishing heat, light, or power, the finances of which are separately maintained and accounted for by the city or village, to satisfy the general obligations of the city or village.

**History:**        2012,        Act        436,        Eff.        Mar.        28,        2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1553 Pendency of receivership; compensation of chief administrative officer and members of local governing body.

Sec. 13.

Upon appointment of an emergency manager and during the pendency of the receivership, the salary, wages, or other compensation, including the accrual of postemployment benefits, and other benefits of the chief administrative officer and members of the governing body of the local government shall be eliminated. This section does not authorize the impairment of vested pension benefits. If an emergency manager has reduced, suspended, or eliminated the salary, wages, or other compensation of the chief administrative officer and members of the governing body of a local government before the effective date of this act, the reduction, suspension, or elimination is valid to the same extent had it occurred after the effective date of this act. The emergency manager may restore, in whole or in part, any of the salary, wages, other compensation, or benefits of the chief administrative officer and members of the governing body during the pendency of the receivership, for such time and on such terms as the emergency manager considers appropriate, to

65

the extent that the emergency manager finds that the restoration of salary, wages, compensation, or benefits is consistent with the financial and operating plan.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1554 School district in receivership; additional actions.

Sec. 14.

In addition to the actions otherwise authorized in this act, an emergency manager for a school district may take 1 or more of the following additional actions with respect to a school district that is in receivership:

(a) Negotiate, renegotiate, approve, and enter into contracts on behalf of the school district.

(b) Receive and disburse on behalf of the school district all federal, state, and local funds earmarked for the school district. These funds may include, but are not limited to, funds for specific programs and the retirement of debt.

(c) Seek approval from the superintendent of public instruction for a reduced class schedule in accordance with administrative rules governing the distribution of state school aid.

(d) Subject to section 19, sell, assign, transfer, or otherwise use the assets of the school district to meet past or current obligations or assure the fiscal accountability of the school district, provided the use, assignment, or transfer of assets for this purpose does not impair the education of the pupils of the school district. The power under this subdivision includes the closing of schools or other school buildings in the school district.

(e) Approve or disapprove of the issuance of obligations of the school district.

(f) Exercise solely, for and on behalf of the school district, all other authority and responsibilities affecting the school district that are prescribed by law to the school board and superintendent of the school district.

(g) With the approval of the state treasurer, employ or contract for, at the expense of the school district, school administrators considered necessary to implement this act.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

### 141.1555 Sale of asset worth more than $50,000.00; payment of benefit upon death of police officer or firefighter.

Sec. 15.

(1) Unless the potential sale and value of an asset is included in the emergency manager's financial and operating plan, the emergency manager shall not sell an asset of the local government valued at more than $50,000.00 without the state treasurer's approval.

(2) A provision of an existing collective bargaining agreement that authorizes the payment of a benefit upon the death of a police officer or firefighter that occurs in the line of duty shall not be impaired and is not subject to any provision of this act authorizing an emergency manager to reject, modify, or terminate 1 or more terms of an existing collective bargaining agreement.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

**141.1556 Criminal conduct contributing to receivership status.**

Sec. 16.

An emergency manager shall, on his or her own or upon the advice of the local inspector if a local inspector has been retained, make a determination as to whether possible criminal conduct contributed to the financial situation resulting in the local government's receivership status. If the emergency manager determines that there is reason to believe that criminal conduct has occurred, the manager shall refer the matter to the attorney general and the local prosecuting attorney for investigation.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

**141.1557 Report.**

Sec. 17.

Beginning 6 months after an emergency manager's appointment, and every 3 months thereafter, an emergency manager shall submit to the governor, the state treasurer, the senate majority leader, the speaker of the house of representatives, each state senator and state representative who represents the local government that is in receivership, and the clerk of the local government that is in receivership, and shall post on the internet on the website of the local government, a report that contains all of the following:

(a) A description of each expenditure made, approved, or disapproved during the reporting period that has a cumulative value of $5,000.00 or more and the source of the funds.

(b) A list of each contract that the emergency manager awarded or approved with a cumulative value of $5,000.00 or more, including the purpose of the contract and the identity of the contractor.

(c) A description of each loan sought, approved, or disapproved during the reporting period that has a cumulative value of $5,000.00 or more and the proposed use of the funds.

68

(d) A description of any new position created or any vacancy in a position filled by the appointing authority.

(e) A description of any position that has been eliminated or from which an employee has been laid off.

(f) A copy of the contract with the emergency manager as provided in section 9(3)(e).

(g) The salary and benefits of the emergency manager.

(h) The financial and operating plan.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1558 Recommendation to proceed under chapter 9.

Sec. 18.

(1) If, in the judgment of the emergency manager, no reasonable alternative to rectifying the financial emergency of the local government which is in receivership exists, then the emergency manager may recommend to the governor and the state treasurer that the local government be authorized to proceed under chapter 9. If the governor approves of the recommendation, the governor shall inform the state treasurer and the emergency manager in writing of the decision, with a copy to the superintendent of public instruction if the local government is a school district. The governor may place contingencies on a local government in order to proceed under chapter 9. Upon receipt of the written approval, the emergency manager is authorized to proceed under chapter 9. This section empowers the local government for which an emergency manager has been appointed to become a debtor under title 11 of the United States Code, 11 USC 101 to 1532, as required by section 109 of title 11 of the United States Code, 11 USC 109, and empowers the emergency manager to act exclusively on the local government's behalf in any such case under chapter 9.

(2) The recommendation to the governor and the state treasurer under subsection (1) shall include 1 of the following:

(a) A determination by the emergency manager that no feasible financial plan can be adopted that can satisfactorily rectify the financial emergency of the local government in a timely manner.

(b) A determination by the emergency manager that a plan, in effect for at least 180 days, cannot be implemented as written or as it might be amended in a manner that can satisfactorily rectify the financial emergency in a timely manner.

(3) The emergency manager shall provide a copy of the recommendation as provided under subsection (1) to the superintendent of public instruction if the local government is a school district.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1559 Proposed action; submission to local governing body; approval or disapproval; alternative proposal.

Sec. 19.

(1) Except as otherwise provided in this subsection, before an emergency manager executes an action under section 12(1)(k), (r), or (u) or section 14(d), he or she shall submit his or her proposed action to the governing body of the local government. The governing body of the local government shall have 10 days from the date of submission to approve or disapprove the action proposed by the emergency manager. If the governing body of the local government does not act within 10 days, the proposed action is considered approved by the governing body of the local government and the emergency manager may then execute the proposed action. For an action under section 12(1)(r) or section 14(d), this subsection only applies if the asset, liability, function, or responsibility involves an amount of $50,000.00 or more.

(2) If the governing body of the local government disapproves the proposed action within 10 days, the governing body of the local government shall, within 7 days of its disapproval of the action proposed by the emergency manager, submit to the local emergency financial assistance loan board an alternative proposal that would yield substantially the same financial result as the action proposed by the emergency manager. The local emergency financial assistance loan board shall have 30 days to review both the alternative proposal submitted by the governing body of the local government and the action proposed by the emergency manager and to approve either the alternative proposal submitted by the governing body of the local government or the action proposed by the emergency manager. The local emergency financial assistance loan board shall

approve the proposal that best serves the interest of the public in that local government. The emergency manager shall implement the alternative proposal submitted by the governing body of the local government or the action proposed by the emergency manager, whichever is approved by the local emergency financial assistance loan board.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

**141.1560 Emergency manager; immunity from liability; responsibilities of attorney general; costs; insurance; litigation expenses after conclusion of date of service; failure of municipal government or school district to honor and remit legal expenses.**

Sec. 20.

(1) An emergency manager is immune from liability as provided in section 7(5) of 1964 PA 170, MCL 691.1407. A person employed by an emergency manager is immune from liability as provided in section 7(2) of 1964 PA 170, MCL 691.1407.

(2) The attorney general shall defend any civil claim, demand, or lawsuit which challenges any of the following:

(a) The validity of this act.

(b) The authority of a state official or officer acting under this act.

(c) The authority of an emergency manager if the emergency manager is or was acting within the scope of authority for an emergency manager under this act.

(3) With respect to any aspect of a receivership under this act, the costs incurred by the attorney general in carrying out the responsibilities of subsection (2) for attorneys, experts, court filing fees, and other reasonable and necessary expenses shall be at the expense of the local government that is subject to that receivership and shall be reimbursed to the attorney general by the local government. The failure of a municipal government that is or was in receivership to remit to the attorney general the costs incurred by the attorney general within 30 days after written notice to the municipal government from the attorney general of the costs is a debt owed to this state and shall be recovered by the state treasurer as provided in section 17a(5) of the Glenn Steil state

71

revenue sharing act of 1971, 1971 PA 140, MCL 141.917a. The failure of a school district that is or was in receivership to remit to the attorney general the costs incurred by the attorney general within 30 days after written notice to the school district from the attorney general of the costs is a debt owed to this state and shall be recovered by the state treasurer as provided in the state school aid act of 1979, 1979 PA 94, MCL 388.1601 to 388.1896.

(4) An emergency manager may procure and maintain, at the expense of the local government for which the emergency manager is appointed, worker's compensation, general liability, professional liability, and motor vehicle insurance for the emergency manager and any employee, agent, appointee, or contractor of the emergency manager as may be provided to elected officials, appointed officials, or employees of the local government. The insurance procured and maintained by an emergency manager may extend to any claim, demand, or lawsuit asserted or costs recovered against the emergency manager and any employee, agent, appointee, or contractor of the emergency manager from the date of appointment of the emergency manager to the expiration of the applicable statute of limitation if the claim, demand, or lawsuit asserted or costs recovered against the emergency manager or any employee, agent, appointee, or contractor of the emergency manager resulted from conduct of the emergency manager or any employee, agent, appointee, or contractor of the emergency manager taken in accordance with this act during the emergency manager's term of service.

(5) If, after the date that the service of an emergency manager is concluded, the emergency manager or any employee, agent, appointee, or contractor of the emergency manager is subject to a claim, demand, or lawsuit arising from an action taken during the service of that emergency manager, and not covered by a procured worker's compensation, general liability, professional liability, or motor vehicle insurance, litigation expenses of the emergency manager or any employee, agent, appointee, or contractor of the emergency manager, including attorney fees for civil and criminal proceedings and preparation for reasonably anticipated proceedings, and payments made in settlement of civil proceedings both filed and anticipated, shall be paid out of the funds of the local government that is or was subject to the receivership administered by that emergency manager, provided that the litigation expenses are approved by the state treasurer and that the state treasurer determines that the conduct resulting in actual or threatened legal proceedings that is the basis for the payment is based upon both of the following:

(a) The scope of authority of the person or entity seeking the payment.

(b) The conduct occurred on behalf of a local government while it was in receivership under this act.

(6) The failure of a municipal government to honor and remit the legal expenses of a former emergency manager or any employee, agent, appointee, or contractor of the emergency manager as required by this section is a debt owed to this state and shall be recovered by the state treasurer as provided in section 17a(5) of the Glenn Steil state revenue sharing act of 1971, 1971 PA 140, MCL 141.917a. The failure of a school district to honor and remit the legal expenses of a former emergency manager or any employee, agent, appointee, or contractor of the emergency manager as required by this section is a debt owed to this state and shall be recovered by the state treasurer as provided in the state school aid act of 1979, 1979 PA 94, MCL 388.1601 to 388.1896.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1561 Adoption and implementation of 2-year budget.

Sec. 21.

(1) Before the termination of receivership and the completion of the emergency manager's term, or if a transition advisory board is appointed under section 23, then before the transition advisory board is appointed, the emergency manager shall adopt and implement a 2-year budget, including all contractual and employment agreements, for the local government commencing with the termination of receivership.

(2) After the completion of the emergency manager's term and the termination of receivership, the governing body of the local government shall not amend the 2-year budget adopted under subsection (1) without the approval of the state treasurer, and shall not revise any order or ordinance implemented by the emergency manager during his or her term prior to 1 year after the termination of receivership.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1562 Determination that financial emergency rectified; actions by governor.

Sec. 22.

(1) If an emergency manager determines that the financial emergency that he or she was appointed to manage has been rectified, the emergency manager shall inform the governor and the state treasurer.

(2) If the governor disagrees with the emergency manager's determination that the financial emergency has been rectified, the governor shall inform the emergency manager and the term of the emergency manager shall continue or the governor shall appoint a new emergency manager.

(3) Subject to subsection (4), if the governor agrees that the financial emergency has been rectified, the emergency manager has adopted a 2-year budget as required under section 21, and the financial conditions of the local government have been corrected in a sustainable fashion as required under section 9(7), the governor may do either of the following:

(a) Remove the local government from receivership.

(b) Appoint a receivership transition advisory board as provided in section 23.

(4) Before removing a local government from receivership, the governor may impose 1 or more of the following conditions on the local government:

(a) The implementation of financial best practices within the local government.

(b) The adoption of a model charter or model charter provisions.

(c) Pursue financial or managerial training to ensure that official responsibilities are properly discharged.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1563 Receivership transition advisory board.

Sec. 23.

(1) Before removing a local government from receivership, the governor may appoint a receivership transition advisory board to monitor the affairs of the local government until the receivership is terminated.

(2) A receivership transition advisory board shall consist of the state treasurer or his or her designee, the director of the department of technology, management, and budget or his or her designee, and, if the local government is a school district, the superintendent of public instruction or his or her designee. The governor also may appoint to a receivership transition advisory board 1 or more other individuals with relevant professional experience, including 1 or more residents of the local government.

(3) A receivership transition advisory board serves at the pleasure of the governor.

(4) At its first meeting, a receivership transition advisory board shall adopt rules of procedure to govern its conduct, meetings, and periodic reporting to the governor. Procedural rules required by this section are not subject to the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to 24.328.

(5) A receivership transition advisory board may do all of the following:

(a) Require the local government to annually convene a consensus revenue estimating conference for the purpose of arriving at a consensus estimate of revenues to be available for the ensuing fiscal year of the local government.

(b) Require the local government to provide monthly cash flow projections and a comparison of budgeted revenues and expenditures to actual revenues and expenditures.

(c) Review proposed and amended budgets of the local government. A proposed budget or budget amendment shall not take effect unless approved by the receivership transition advisory board.

(d) Review requests by the local government to issue debt under the revised municipal finance act, 2001 PA 34, MCL 141.2101 to 141.2821, or any other law governing the issuance of bonds or notes.

(e) Review proposed collective bargaining agreements negotiated under section 15(1) of 1947 PA 336, MCL 423.215. A proposed collective bargaining agreement shall not take effect unless approved by the receivership transition advisory board.

(f) Review compliance by the local government with a deficit elimination plan submitted under section 21 of the Glenn Steil state revenue sharing act of 1971, 1971 PA 140, MCL 141.921.

(g) Review proposed judgment levies before submission to a court under section 6093 or 6094 of the revised judicature act of 1961, 1961 PA 236, MCL 600.6093 and 600.6094.

(h) Perform any other duties assigned by the governor at the time the receivership transition advisory board is appointed.

(6) A receivership transition advisory board is a public body as that term is defined in section 2 of the open meetings act, 1976 PA 267, MCL 15.262, and meetings of a receivership transition advisory board are subject to the open meetings act, 1976 PA 267, MCL 15.261 to 15.275. A receivership transition advisory board is also a public body as that term is defined in section 2 of the freedom of information act, 1976 PA 442, MCL 15.232, and a public record in the possession of a receivership transition advisory board is subject to the freedom of information act, 1976 PA 442, MCL 15.231 to 15.246.

**History:**          2012,          Act          436,          Eff.          Mar.          28,          2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1564 Determination that financial conditions not corrected; appointment of new emergency manager.

Sec. 24.

The governor may, upon his or her own initiative or after receiving a recommendation from a receivership transition advisory board, determine that the financial conditions of a local government have not been corrected in a sustainable fashion as required under section 9(7) and appoint a new emergency manager.

**History:**          2012,          Act          436,          Eff.          Mar.          28,          2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1565 Neutral evaluation process.

Sec. 25.

(1) A neutral evaluation process may be utilized as provided for in this act. The state treasurer may, in his or her own discretion, determine that the state monitor the neutral evaluation process initiated by a local government under this section and may identify 1 or more individuals who may attend and observe the neutral evaluation process. A local government shall initiate the neutral evaluation process by providing notice by certified mail of a request for neutral evaluation process to all interested parties. If the local government does not provide notice under this subsection to all interested parties within 7 days after selecting the neutral evaluation process option, the treasurer may require the local government to go into receivership and proceed under section 9.

(2) An interested party shall respond within 10 business days of receipt of notice of the local government's request for neutral evaluation process.

(3) The local government and the interested parties agreeing to participate in the neutral evaluation process shall, through a mutually agreed-upon process, select a neutral evaluator to oversee the neutral evaluation process and facilitate all discussions in an effort to resolve their disputes.

(4) If the local government and interested parties fail to agree on a neutral evaluator within 7 days after the interested parties have responded to the notification sent by the local government, the local government shall, within 7 days, select 5 qualified neutral evaluators and provide their names, references, and backgrounds to the participating interested parties. Within 3 business days, a majority of participating interested parties may disqualify up to 4 names from the list. If a majority of participating interested parties disqualify 4 names from the list, the remaining candidate shall be the neutral evaluator. If the majority of participating parties disqualify fewer than 4 names, the local government shall choose which of the remaining candidates shall be the neutral evaluator.

(5) If an interested party objects to the qualifications of the neutral evaluator after the process for selection in subsection (4) is complete, the interested party may appeal to the state treasurer to determine if the neutral evaluator meets the qualifications under subsection (6). If the state treasurer determines that the qualifications have been met, the neutral evaluation process shall continue. If the state treasurer determines that the qualifications have not been met, the state treasurer shall select the neutral evaluator.

(6) A neutral evaluator shall have experience and training in conflict resolution and alternative dispute resolution and have at least 1 of the following qualifications:

(a) At least 10 years of high-level business or legal experience involving bankruptcy or service as a United States bankruptcy judge.

(b) At least 10 years of combined professional experience or training in municipal finance in 1 or more of the following areas:

(i) Municipal organization.

(ii) Municipal debt restructuring.

77

(iii) Municipal finance dispute resolution.

(iv) Chapter 9 bankruptcy.

(v) Public finance.

(vi) Taxation.

(vii) Michigan constitutional law.

(viii) Michigan labor law.

(ix) Federal labor law.

(7) The neutral evaluator's performance shall be impartial, objective, independent, and free from prejudice. The neutral evaluator shall not act with partiality or prejudice based on any participant's personal characteristics, background, values, or beliefs, or performance during the neutral evaluation process.

(8) The neutral evaluator shall avoid a conflict of interest and the appearance of a conflict of interest during the neutral evaluation process. The neutral evaluator shall make a reasonable inquiry to determine whether there are any facts that a reasonable individual would consider likely to create a potential or actual conflict of interest. Notwithstanding subsection (16), if the neutral evaluator is informed of the existence of any facts that a reasonable individual would consider likely to create a potential or actual conflict of interest, the neutral evaluator shall disclose these facts in writing to the local government and all interested parties involved in the neutral evaluation process. If any participating interested party to the neutral evaluation process objects to the neutral evaluator, that interested party shall notify the local government and all other participating interested parties to the neutral evaluation process, including the neutral evaluator, within 15 days of receipt of the notice from the neutral evaluator. The neutral evaluator shall withdraw, and a new neutral evaluator shall be selected as provided in subsections (3) and (4).

(9) Before commencing a neutral evaluation process, the neutral evaluator shall not establish another fiscal or fiduciary relationship with any of the interested parties or the local government in a manner that would raise questions about the integrity of the neutral evaluation process, except that the neutral evaluator may conduct further neutral evaluation processes regarding other potential local public entities that may involve some of the same or similar constituents to a prior mediation.

(10) The neutral evaluator shall conduct the neutral evaluation process in a manner that promotes voluntary, uncoerced decision making in which each participant makes free and informed choices regarding the neutral evaluation process and outcome.

(11) The neutral evaluator shall not impose a settlement on the participants. The neutral evaluator shall use his or her best efforts to assist the participants to reach a satisfactory resolution of their disputes. Subject to the discretion of the neutral evaluator, the neutral evaluator may make oral or

78

written recommendations for a settlement or plan of readjustment to a participant privately or to all participants jointly.

(12) The neutral evaluator shall inform the local government and all participants of the provisions of chapter 9 relative to other chapters of title 11 of the United States Code, 11 USC 101 to 1532. This instruction shall highlight the limited authority of United States bankruptcy judges in chapter 9, including, but not limited to, the restriction on federal bankruptcy judges' authority to interfere with or force liquidation of a local government's property and the lack of flexibility available to federal bankruptcy judges to reduce or cram down debt repayments and similar efforts not available to reorganize the operations of the local government that may be available to a corporate entity.

(13) The neutral evaluator may request from the participants documentation and other information that the neutral evaluator believes may be helpful in assisting the participants to address the obligations between them. This documentation may include the status of funds of the local government that clearly distinguishes between general funds and special funds and the proposed plan of readjustment prepared by the local government. The participants shall respond to a request from the neutral evaluator in a timely manner.

(14) The neutral evaluator shall provide counsel and guidance to all participants, shall not be a legal representative of any participant, and shall not have a fiduciary duty to any participant.

(15) If a settlement with all interested parties and the local government occurs, the neutral evaluator may assist the participants in negotiating a pre-petitioned, pre-agreed-upon plan of readjustment in connection with a potential chapter 9 filing.

(16) If at any time during the neutral evaluation process the local government and a majority of the representatives of the interested parties participating in the neutral evaluation process wish to remove the neutral evaluator, the local government or any interested party may make a request to the other interested parties to remove the neutral evaluator. If the local government and a majority of the interested parties agree that the neutral evaluator should be removed and agree on who should replace the neutral evaluator, the local government and the interested parties shall select a new neutral evaluator.

(17) The local government and all interested parties participating in the neutral evaluation process shall negotiate in good faith.

(18) The local government and each interested party shall provide a representative to attend all sessions of a neutral evaluation process. Each representative shall have the authority to settle and resolve disputes or shall be in a position to present any proposed settlement or plan of readjustment to the participants in the neutral evaluation process.

(19) The local government and the participating interested parties shall maintain the confidentiality of the neutral evaluation process and shall not at the conclusion of the neutral evaluation process or during any bankruptcy proceeding disclose statements made, information disclosed, or documents prepared or produced unless a judge in a chapter 9 bankruptcy proceeding orders that

the information be disclosed to determine the eligibility of a local government to proceed with a bankruptcy proceeding under chapter 9, or as otherwise required by law.

(20) A neutral evaluation process authorized by this act shall not last for more than 60 days following the date the neutral evaluator is initially selected, unless the local government or a majority of participating interested parties elect to extend the neutral evaluation process for up to 30 additional days. The neutral evaluation process shall not last for more than 90 days following the date the neutral evaluator is initially selected.

(21) The local government shall pay 50% of the costs of a neutral evaluation process, including, but not limited to, the fees of the neutral evaluator, and the interested parties shall pay the balance of the costs of the neutral evaluation process, unless otherwise agreed to by the local government and a majority of the interested parties.

(22) The neutral evaluation process shall end if any of the following occur:

(a) The local government and the participating interested parties execute a settlement agreement. However, if the state treasurer determines that the settlement agreement does not provide sufficient savings to the local government, the state treasurer shall provide notice to the local government that the settlement agreement does not provide sufficient savings to the local government and the local government shall proceed under 1 of the other local government options as provided in section 7.

(b) The local government and the participating interested parties reach an agreement or proposed plan of readjustment that requires the approval of a bankruptcy judge.

(c) The neutral evaluation process has exceeded 60 days following the date the neutral evaluator was selected, the local government and the participating interested parties have not reached an agreement, and neither the local government nor a majority of the interested parties elect to extend the neutral evaluation process past the initial 60-day time period.

(d) The local government initiated the neutral evaluation process under subsection (1) and did not receive a response from any interested party within the time specified in subsection (2).

(e) The fiscal condition of the local government deteriorates to the point that necessitates the need to proceed under the chapter 9 bankruptcy option pursuant to section 26.

(23) If the 60-day time period for a neutral evaluation process expires, including any extension of the neutral evaluation process past the initial 60-day time period under subsection (20), and the neutral evaluation process is complete with differences resolved, the neutral evaluation process shall be concluded. If the neutral evaluation process does not resolve all pending disputes with the local government and the interested parties, or if subsection (22)(b), (c), or (d) applies, the governing body of the local government shall adopt a resolution recommending that the local government proceed under chapter 9 and submit the resolution to the governor and the state treasurer. Except as otherwise provided in this subsection, if the local government has a strong mayor, the resolution requires strong mayor approval before the local government proceeds under

80

chapter 9. The resolution shall include a statement determining that the financial condition of the local government jeopardizes the health, safety, and welfare of the residents who reside within the local government or service area of the local government absent the protections of chapter 9. If the governor approves the resolution for the local government to proceed under chapter 9, the governor shall inform the local government in writing of the decision. The governor may place contingencies on a local government in order to proceed under chapter 9 including, but not limited to, appointing a person to act exclusively on behalf of the local government in the chapter 9 bankruptcy proceedings. If the governing body of the local government fails to adopt a resolution within 7 days after the neutral evaluation process is concluded as provided in this subsection, the governor may appoint a person to act exclusively on behalf of the local government in chapter 9 bankruptcy proceedings. If the governor does not appoint a person to act exclusively on behalf of the local government in chapter 9 bankruptcy proceedings, the chief administrative officer of the local government shall act exclusively on behalf of the local government in chapter 9 bankruptcy proceedings. Upon receiving written approval from the governor under section 26, the local government may file a petition under chapter 9 and exercise powers under federal bankruptcy law.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1566 Chapter 9 proceeding.

Sec. 26.

(1) With the written approval of the governor, a local government may file a petition under chapter 9 and exercise powers pursuant to federal bankruptcy law if the local government adopts a resolution, by a majority vote of the governing body of the local government, that declares a financial emergency in the local government. Except as otherwise provided in this subsection, if the local government has a strong mayor, the resolution requires strong mayor approval. The resolution shall include a statement determining that the financial condition of the local government jeopardizes the health, safety, and welfare of the residents who reside within the local government or service area of the local government absent the protections of chapter 9 and that the local government is or will be unable to pay its obligations within 60 days following the adoption of the resolution.

(2) If the governor approves a local government to proceed under chapter 9, the governor shall inform the local government in writing of the decision. The governor may place contingencies on a local government in order to proceed under chapter 9 including, but not limited to, appointing a

81

person to act exclusively on behalf of the local government in the chapter 9 bankruptcy proceedings. If the governor does not appoint a person to act exclusively on behalf of the local government in chapter 9 bankruptcy proceedings, the chief administrative officer of the local government shall act exclusively on behalf of the local government in chapter 9 bankruptcy proceedings. Upon receipt of the written approval and subject to this subsection, the local government may proceed under chapter 9 and exercise powers under federal bankruptcy law.

(3) If the governor does not approve a local government to proceed under chapter 9, the local government shall within 7 days select 1 of the other local options as provided in section 7.

**History:**      2012,      Act      436,      Eff.      Mar.      28,      2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1567 Duty of local officials and employees to provide assistance and information; failure to abide by act.

Sec. 27.

(1) The local elected and appointed officials and employees, agents, and contractors of a local government shall promptly and fully provide the assistance and information necessary and properly requested by the state financial authority, a review team, or the emergency manager in the effectuation of their duties and powers and of the purposes of this act. If the review team or emergency manager believes that a local elected or appointed official or employee, agent, or contractor of the local government is not answering questions accurately or completely or is not furnishing information requested, the review team or emergency manager may issue subpoenas and administer oaths to the local elected or appointed official or employee, agent, or contractor to furnish answers to questions or to furnish documents or records, or both. If the local elected or appointed official or employee, agent, or contractor refuses, the review team or emergency manager may bring an action in the circuit court in which the local government is located or the Michigan court of claims, as determined by the review team or emergency manager, to compel testimony and furnish records and documents. An action in mandamus may be used to enforce this section.

(2) Failure of a local government official to abide by this act shall be considered gross neglect of duty, which the review team or emergency manager may report to the state financial authority and the attorney general. Following review and a hearing with a local government elected official, the

state financial authority may recommend to the governor that the governor remove the elected official from office. If the governor removes the elected official from office, the resulting vacancy in office shall be filled as prescribed by law.

(3) A local government placed in receivership under this act is not subject to section 15(1) of 1947 PA 336, MCL 423.215, for a period of 5 years from the date the local government is placed in receivership or until the time the receivership is terminated, whichever occurs first.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1568 Imposition of taxes; prohibition.

Sec. 28.

This act does not give the emergency manager or the state financial authority the power to impose taxes, over and above those already authorized by law, without the approval at an election of a majority of the qualified electors voting on the question.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1569 Issuance of bulletins; rules.

Sec. 29.

The state financial authority shall issue bulletins or promulgate rules as necessary to carry out the purposes of this act. Rules shall be promulgated pursuant to the administrative procedures act of 1969, 1969 PA 306, MCL 24.201 to 24.328.

**History:**          2012,          Act          436,          Eff.          Mar.          28,          2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1974 PA 336, MCL 423.201 to 423.217."

## 141.1570 Actions under former law.

Sec. 30.

(1) All of the following actions that occurred under former 2011 PA 4, former 1988 PA 101, or former 1990 PA 72, before the effective date of this act are effective under this act:

(a) A determination by the state treasurer or superintendent of public instruction pursuant to a preliminary review of the existence of probable financial stress or a serious financial problem in a local government.

(b) The appointment of a review team.

(c) The findings and conclusion contained in a review team report submitted to the governor.

(d) A determination by the governor of a financial emergency in a local government.

(e) A confirmation by the governor of a financial emergency in a local government.

(2) An action contained in subsection (1) need not be reenacted or reaffirmed in any manner to be effective under this act.

**History:**          2012,          Act          436,          Eff.          Mar.          28,          2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township

act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1571 Emergency manager serving prior to effective date of act.

Sec. 31.

An emergency manager or emergency financial manager appointed and serving under state law immediately prior to the effective date of this act shall continue under this act as an emergency manager for the local government.

**History:**           2012,           Act           436,           Eff.           Mar.           28,           2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1572 Liability or cause of action.

Sec. 32.

This act does not impose any liability or responsibility in law or equity upon this state, any department, agency, or other entity of this state, or any officer or employee of this state, or any member of a receivership transition advisory board, for any action taken by any local government under this act, for any violation of the provisions of this act by any local government, or for any failure to comply with the provisions of this act by any local government. A cause of action against this state or any department, agency, or entity of this state, or any officer or employee of this state acting in his or her official capacity, or any membership of a receivership transition advisory board acting in his or her official capacity, may not be maintained for any activity authorized by this act, or for the act of a local government filing under chapter 9, including any proceeding following a local government's filing.

**History:**           2012,           Act           436,           Eff.           Mar.           28,           2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall

function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1573 Severability.

Sec. 33.

If any portion of this act or the application of this act to any person or circumstances is found to be invalid by a court, the invalidity shall not affect the remaining portions or applications of this act which can be given effect without the invalid portion or application. The provisions of this act are severable.

**History:**       2012,       Act       436,       Eff.       Mar.       28,       2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1574 Appropriation.

Sec. 34.

For the fiscal year ending September 30, 2013, $780,000.00 is appropriated from the general fund to the department of treasury to administer the provisions of this act and to pay the salaries of emergency managers. The appropriation made and the expenditures authorized to be made by the department of treasury are subject to the management and budget act, 1984 PA 431, MCL 18.1101 to 18.1594.

**History:**       2012,       Act       436,       Eff.       Mar.       28,       2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32.

(d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA 279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

## 141.1575 Appropriation.

Sec. 35.

(1) For the fiscal year ending September 30, 2013, $5,000,000.00 is appropriated from the general fund to the department of treasury to administer the provisions of this act, to secure the services of financial consultants, lawyers, work-out experts, and other professionals to assist in the implementation of this act, and to assist local governments in proceeding under chapter 9.

(2) The appropriation authorized in this section is a work project appropriation, and any unencumbered or unallotted funds are carried forward into the following fiscal year. The following is in compliance with section 451a(1) of the management and budget act, 1984 PA 431, MCL 18.1451a:

(a) The purpose of the project is to provide technical and administrative support for the department of treasury to implement this act. Costs related to this project include, but are not limited to, all of the following:

(i) Staffing-related costs.

(ii) Costs to promote public awareness.

(iii) Any other costs related to implementation and dissolution of the program, including the resolution of accounts.

(b) The work project will be accomplished through the use of interagency agreements, grants, state employees, and contracts.

(c) The total estimated completion cost of the project is $5,000,000.00.

(d) The expected completion date is September 30, 2016.

**History:** 2012, Act 436, Eff. Mar. 28, 2013
**Compiler's Notes:** Enacting section 2 of Act 436 of 2012 provides:"Enacting section 2. It is the intent of the legislature that this act function and be interpreted as a successor statute to former 1988 PA 101, former 1990 PA 72, and former 2011 PA 4, and that whenever possible a reference to former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state or to a function or responsibility of an emergency financial manager or emergency manager under former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, under other laws of this state shall function and be interpreted to reference to this act, with the other laws of this state referencing former 1988 PA 101, former 1990 PA 72, or former 2011 PA 4, including, but not limited to, all of the following: (a) The charter township act, 1947 PA 359, MCL 42.1 to 42.34. (b) 1966 PA 293, MCL 45.501 to 45.521. (c) 1851 PA 156, MCL 46.1 to 46.32. (d) The general law village act, 1895 PA 3, MCL 61.1 to 74.25. (e) The home rule village act, 1909 PA 278, MCL 78.1 to 78.28. (f) The fourth class city act, 1895 PA 215, MCL 81.1 to 113.20. (g) The home rule city act, 1909 PA

279, MCL 117.1 to 117.38. (h) The metropolitan transportation authorities act of 1967, 1967 PA 204, MCL 124.401 to 124.426. (i) 1947 PA 336, MCL 423.201 to 423.217."

# EXHIBIT 2

Detroit Emergency Manager, Order No. 3

http://www.detroitmi.gov/Portals/0/docs/EM/Order%203.pdf

# EXHIBIT 3

Detroit Emergency Manager Order No. 4

http://www.detroitmi.gov/Portals/0/docs/EM/Order%204.pdf

# EXHIBIT 4

Detroit Emergency Manager Order No. 5

http://www.detroitmi.gov/Portals/0/docs/EM/Order%205.pdf

# EXHIBIT 5

State Treasurer's Fiscal Scoring Chart

http://www.michigan.gov/documents/treasury/Oakland_342010_7.pdf

http://www.michigan.gov/documents/treasury/Wayne_342037_7.pdf

http://www.michigan.gov/documents/treasury/Genesee_341964_7.pdf.

## CERTIFICATE OF SERVICE

I hereby certify that on June 27, 2013, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such.

/s/ Nabih H. Ayad

_____

NABIH H. AYAD (P-59518)
General Counsel
Arab-American Civil Rights League
Nabih Ayad & Associates
2200 North Canton Center Road, Suite 220
Canton, Michigan 48187
734-983-0500
nayad@ayadlaw.com