UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| In re: | ) Chapter 9 |
| | ) |
| CITY OF DETROIT, MICHIGAN, | ) Case No. 13-53846 |
| | ) |
| Debtor. | ) Hon. Steven W. Rhodes |
| | ) |

## DECLARATION OF STEVEN KREISBERG

I, Steven Kreisberg, declare under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      I serve as Director of Collective Bargaining and Health Care Policy of the American Federation of State, County & Municipal Employees, AFL-CIO ("**AFSCME**"), and I submit this declaration in support of *The Michigan Council 25 Of The American Federation Of State, County & Municipal Employees, AFL-CIO And Sub-Chapter 98, City Of Detroit Retirees' Amended Objection To The City Of Detroit's Eligibility To Obtain Relief Under Chapter 9 of The Bankruptcy Code* (the "**Objection**"). Unless otherwise stated below, I have knowledge of the matters set forth herein from my own personal knowledge and from my review of records and information kept in AFSCME's ordinary course of business and, if called, could competently testify to the information provided below.

2.      In the ordinary course of business, through my position at AFSCME, I have access to over 8,000 of the collective bargaining agreements (including but not limited to concessionary agreements) to which AFSCME local unions or other local affiliates enter into and submit to AFSCME as is required by the AFSCME Constitution. Depending on the agreements being negotiated and the requests of the local unions, my staff and I at AFSCME have various degrees of involvement in the local's collective bargaining process. Furthermore, for purposes

28579/2
10/11/2013 27057776.5

of future collective bargaining and general data gathering purposes, and as required by the AFSCME Constitution, AFSCME obtains copies of collective bargaining and other relevant agreements negotiated by AFSCME locals.

3.        Additionally, AFSCME and its locals in Detroit have historically negotiated collective bargaining agreements which provide active employees access to, and employer contributions towards, health benefit plans, and upon their retirement, such employees continue to access the same benefit plans provided for under the then-applicable collective bargaining agreement. To the extent that a collective bargaining agreement is later renegotiated, any changes to health benefit plans (which sometimes recently have resulted in reduced benefits) apply to both active employees and retirees that participate in such benefit plans. Thus, AFSCME and its affiliate Michigan Council 25 regularly negotiate concessionary agreements which directly impact retirees.

4.        In this regard, I am familiar with and have specific knowledge regarding (and, indeed, someone from my staff was directly involved in the negotiation of) a certain tentative agreement (the "**Tentative Agreement**") dated February 1, 2012 between the City[1] and a "Coalition of City of Detroit [non-uniform] Unions", including several AFSCME local bargaining units. Attached hereto as **Exhibit A** is a copy of the Tentative Agreement.

5.        I am further aware that the Tentative Agreement was ratified by the Detroit coalition of unions but never implemented. Had such agreement been implemented, the changes therein regarding health benefits would have directly impacted retiree benefits with respect to retirees that participated in the City's health plans governed by the Tentative Agreement.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Objection.

6.     Indeed, based on projections provided to AFSCME by the City in 2012, AFSCME understood that the Tentative Agreement would have saved the City approximately $50 million annually, an amount which included retiree health care changes. Thus, the City has previously effectively put both active and retiree health care savings on the table for negotiations, clearly demonstrating the City's ability to at least negotiate with respect to changes to benefits for active and retired City employees.

7.     I attended a July 10, 2013 meeting between the City and various unions (including AFSCME) and other stakeholders. At that July 10, 2013 meeting, counsel for the City attempted to invoke what he termed "Rule 408" confidentiality provisions, and stated that doing so was a tool used in every bankruptcy, so it should be invoked that day.

8.     Attached hereto as **Exhibit B** is a copy of the Pitch Presentation given to the City by the City's Law Firm dated January 29, 2013.

9.     Attached hereto as **Exhibit C** is a copy of an e-mail dated July 8, 2013 from Bill Nowling in the EM's office to individuals in the Governor's office.

10.     Attached hereto as **Exhibit D** is a copy of an e-mail dated July 9, 2013 from Treasurer Andy Dillon to the Governor and other individuals in the Governor's office.

11.     Attached hereto as **Exhibit E** is a copy of an e-mail dated July 17, 2013 from Ken Buckfire regarding the deal reached between the City and its swap counterparties.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 11th day of October, 2013       */s/ Steven Kreisberg* _____
                                                  Steven Kreisberg

# EXHIBIT A

# TENTATIVE AGREEMENT 2-1-2012
## LETTER OF UNDERSTANDING ("Agreement")
## BETWEEN
## CITY OF DETROIT
## AND
## THE COALITION OF CITY OF DETROIT UNIONS

The Coalition Employees are the members of the bargaining units who have joined this Coalition. The Coalition was created to respond to a fiscal crisis in the City of Detroit. The Coalition is made up of the following unions (evolving list, given as of this date): Michigan AFSCME Council 25 Non-supervisory unit, Supervisory unit, Forestry and Landscape unit, Emergency Service Operators (yet the entirety of this Agreement will not apply to this unit, as outlined below) Amalgamated Transit Unit, Association of City of Detroit Supervisors, I.U.O.E – Operating Engineers Local 324, Building & Construction Trades Council, I.B.E.W. Local 58, S.A.A.A., UAW Local 2211 – PAA, A.M.I., Teamsters Local 214, Supervisors Chapter of the DOT Foreman's Association, Income Tax Investigators, and SEIU Local 517. This Agreement excludes the AFSCME units of crossing guards, and Motor City Seasonals.

## I. GENERAL PRINCIPLES

### A.      Coalition Employees And Their Union Contracts

All Coalition Employees work under various collective bargaining agreements of the Coalition Unions. Except for the specific terms outlined below, the terms of the successor collective bargaining agreements for all Coalition Unions will be executed concurrently with the execution of this Agreement and will remain in full force and effect until three years following the execution of this Agreement. The City will execute successor collective bargaining agreements with each Coalition Union simultaneously with execution of this Agreement, and the terms of the successor bargaining agreements shall be identical to the most recent bargaining agreements, which are incorporated in full, except as modified below and except as to the following Unions wherein the successor bargaining agreements are identical to the attached bargaining proposals: ***. The parties acknowledge that these successor bargaining agreements are not extensions of the previous agreement, as addressed in MCLA sec. 423.215b. Also, for each Coalition Union, the terms of the prior bargaining agreement have been in full force and effect up until the execution of the new bargaining agreement. All new Coalition Union bargaining agreements shall remain in full force and effect until three years from the date of the execution of this Agreement.

The bargaining agreements of the Coalition Unions will be modified as reflected below. All changes below are prospective modifications of all Coalition Union bargaining agreements. In other words, the below changes do not have any impact on the respective bargaining units prior to the date of execution of this Agreement.

For each Union contract of this Coalition, the contract will be renewed and extended year-by-year, following the termination date, unless either the Union or City provides written notice of a desire to modify or amend or terminate the Agreement, by or before six (6) months before

1

DTMI00086926

contract termination. .If either side provides such notice, the contract will extend on a monthly basis unless terminated upon 30 days written notice by either party. Any changes to this Agreement shall be agreed to in writing.

The bargaining agreements of the Coalition Unions will be modified as reflected below. All changes below are prospective modifications of all Coalition Union bargaining agreements. In other words, the below changes do not have any impact on the respective bargaining units prior to the date of execution of this Agreement.

This Agreement does not apply to employees who work within the Detroit Water and Sewage Department, due to the pending opinion of Judge Sean Cox in case number 77-71100.

**B.    "Me Too"**

1)    All concessions described below must apply equally to all City employees, including public officials (including the mayor, city councilpersons, the city clerk, and other persons appointed or elected who are employed by the City), appointees, management, civilians, and exempt and non-exempt employees, with the exception of Public Safety employees in bargaining units eligible for Act 312 arbitration, who are addressed below, employees in the Detroit of Water and Sewerage Department, crossing guards, Motor City Seasonals, and employees working under grants which prohibit the actions taken by this Agreement. Additionally, Emergency Service Operators and their supervisors (who are Coalition Employees) will receive parity with public safety employees, as to their wages, just as in previous bargaining agreements for those units. During the period for which the Coalition Employees are undergoing wage concessions, no Non-Coalition management level employee or appointee shall receive merit pay or step increases (only Coalition Employees receive such). All step or merit pay increases called for in the White Book, or elsewhere for Non-Coalition management/supervisory level employees, shall be frozen during the period of wage concessions for the Coalition Employees. Wage increases due to a bona fide promotion will not violate this provision, provided the base wage for the new position has been reduced by ten percent. The same shall apply for new hires. If any Non-Coalition employee/official receives any concession lower than a Coalition Employee, then all Coalition Employees will receive the concession applicable to the Non-Coalition employee/official.

2)    Notwithstanding the above, if any Non-Coalition employee/official receives an increase in any form of compensation (wages or fringe benefits) from December 20, 2011 and throughout the term of this Agreement, then all Coalition Employees will receive an equivalent amount of an increase in compensation. These "Me Too" changes will take place immediately.

3)    The Union Coalition will have the ability to receive all information, within seven (7) days of request of such, related to all wages and benefits received by any employee/official (Coalition and Non-Coalition employees alike).

2

DTMI00086927

4)  In the event a Non-Coalition Union or non-Union Employee agrees to take economic concessions which are equivalent economically, but not identical to the Wage Concession set forth in this Agreement, such arrangement shall not violate this "Me Too" clause.

5)  All parties acknowledge that the City of Detroit will assure shared sacrifice from all employees in fixing the City's fiscal concerns. At least one week prior to the ratification of this Agreement but following tentative execution of this Agreement, the City will share with the Coalition Unions all concessions to which public safety employees have agreed, along with all available information substantiating the value of said concessions for the next three years. This information shall be shared with the Coalition Union by no later than three days following agreements being reached with public safety employees. If the Coalition Unions are dissatisfied with the concessions of the public safety employees or the information provided concerning them, they may withdraw from any terms of this Agreement at their choosing, and may make alternative proposals to the City concerning any area of this Agreement. If the City has not ratified agreements with the public safety employees by April 1, 2012, the parties will discuss the consequence of the failure to attain public safety agreements, since the Coalition Unions will not have ratified by that point.

6)  Notwithstanding the above, all City employees (including public safety) shall be governed by the same healthcare plan designs, options, and costs, as provided for elsewhere in this Agreement, or else the remedies of this section shall apply. This provision does not apply (a) if the public safety employees have a health care plan which is equal to or less in costs, for the public safety group, than the plan proposed by the Coalition Unions as spelled out below or (b) to the COPS Trust plan – with the understanding that the participation in the COPS Trust plan is being frozen at its current participants, or that the plan's costs and/or benefits are comparable to the plan of the Coalition Unions. Further, if the Coalition Unions are dissatisfied with the public safety agreements concerning the COPS Trust plan, when the Coalition reviews the public safety ratified agreements prior to the ratification of this Agreement (see paragraph 5 above), then the Coalition may resort to the remedies outlined above.

7)  For bargaining units represented by unions who do not sign on as members of the Coalition, or sign the agreement as a separate signatory (except with regard to the employee units excluded from the "Me Too" in Section I.B.1), the City shall have until July 1, 2013 to implement wage and benefits concessions at levels and length similar to that agreed to by the Coalition Unions in this Agreement. If such changes are not implemented by July 1, 2013, the Coalition Employees shall receive an economic adjustment in their wages, at that time, so that the Coalition Employees will receive no greater concession ~~over the life of this Agreement~~ than the non-Coalition Employees. for a three year term

Any of the Coalition Unions shall have the ability to file a grievance for a violation of this Me Too provision, pursuant to the Dispute Resolution section below. This may be a

3

DTMI00086928

joint grievance when filed, or any Coalition Union may join in the grievance. Once a grievance has been filed concerning this Me Too provision, the City shall have twenty-one (21) days to review and cure the violation of the Me Too provision, before any Coalition Employee is entitled to sanctions for violation of such clause.

C.    **Dispute Resolution**

A violation of any provision of this Agreement shall be subject to the following process. Either the City or a Coalition Union may grieve a violation of this Agreement. The grievance may be filed jointly on behalf of any or all Unions within the Coalition. There is no time limit within which to file a grievance concerning the violation of this Agreement. The grievance shall be addressed as normal in the contractual grievance steps. The grievance may be filed at the Labor Relations step (i.e., step 4) of the grievance process, the step immediately prior to the arbitration step. Once the grievance reaches the step of arbitration, the parties shall first submit the grievance to the JBS Committee (described in Section III below). Both the City and the grieving union(s) may have additional representatives involved in the grievance discussions. The Committee shall have its first meeting within 10 days of the grievance being filed, and shall exercise all reasonable efforts to try to resolve the grievance. As necessary, the Committee may meet with any City Department Head, Group Executive, Chief Operating Officer, Chief of Staff, and the Mayor, and those meetings shall take place as soon as possible after request. The Committee shall have 45 days to try to resolve the grievance. If the grievance is not resolved, it shall be submitted to a neutral arbitrator, pursuant to the Grievance Procedure language of the bargaining agreement of the lead Union which filed the grievance. This arbitration shall be expedited to the fullest extent possible, but by no means shall the grievance take longer than six months from the date of filing in order to have an arbitrator issue his/her ruling on the grievance.

If the arbitrator finds a violation of any provision of the Agreement, the arbitrator may order specific performance (ordering the City or Union to take certain action or refrain from certain action to comply with the Agreement). Specific performance shall be the sole remedy for any violation by the City or Union for the commitments made in Section III of this Agreement, "Lean Optimization Commitment and Union Deficit Benchmarks"; except that if an individual employee suffers a wage loss as a result of a violation of Section III, paragraphs 7.g and 10, then the arbitrator may order that the employee be made whole. In addition, in any grievance arbitration in which a grievance claims a violation of Section III of this agreement, the arbitrator shall award costs and reasonable attorneys fees to the prevailing party in such arbitration.      If the arbitrator finds a violation of the provisions of Section I, "General Principles," or Section II, "Employee Concessions," he/she may award financial and other remedies. The arbitrator's remedy is subject to an action to enforce or vacate the arbitration award in Circuit Court. The parties stipulate that such action to enforce or vacate shall be expedited, and placed before the court as quickly as possible.

The foregoing provisions do not preempt the rights of an individual employee or Coalition Union to enforce other provisions of collective bargaining agreements through the contractual grievance procedures, or pursuant to law.

4

DTMI00086929

The Union and City shall have the right to request information from the other party, to be received at least one week prior to the hearing on the arbitration.

The arbitrator shall require the losing party to pay all arbitration fees and costs, unless there is a split decision in which case the costs are evenly split between the parties.

## II. EMPLOYEE CONCESSIONS

1. **Wage Concessions.** The Coalition Employees will incur a reduction in wages of ten (10%) of the base. The concessions will be modified or eliminated as spelled out below. The furlough days being served by the Coalition Employees are terminated. The Wage Concessions hereby terminate at 11:59 pm on the day prior to the termination date of this Agreement, or earlier as outlined otherwise in this Agreement.

   A. Trigger of Reduction of the City Deficit. If the City general fund achieves a $40 million net surplus for fiscal years 2012, 2013 or 2014, regardless of the overall Fund Balance Deficit, then Coalition Employee wages will be adjusted upwards by 2.5% during the next fiscal year starting on the subsequent July 1st. If the City general fund achieves a $40 million net accumulated surplus over a combination of two or more fiscal years during the life of this Agreement, regardless of the overall Fund Balance Deficit, then Coalition Employee wages will be adjusted up by 2.5% during the next fiscal year on the subsequent July 1st. For any subsequent fiscal year, or combination of fiscal years during the life of this Agreement, where the City achieves a surplus of an additional $40 million regardless of the overall Fund Balance Deficit, the wages will be adjusted up by another 2.5%. If the City completely eliminates the Fund Balance Deficit, then wages will go back to their original levels prior to the 10% reduction, during the following fiscal year as of July 1st. See examples below.

   Example A

   Fiscal year 2012 has a surplus of $70 million. Thus, in fiscal year 2013, wages are increased by 2.5%

   Fiscal year 2013 has a surplus of $20 million; therefore accumulated surplus of $90 million. Thus, in fiscal year 2014 wages are increased by an additional 2.5%, equating to a total of a 5% increase in wages and leaving 5% in concession.

   Example B

   Fiscal year 2012 has a surplus of $80 million. Thus, in fiscal year 2013 wages are increased by 2.5%.

   Fiscal year 2013 has a surplus of $120 million and the general fund balance deficit is eliminated. Thus, in fiscal year 2014 the wages are increased by an additional 6%.

   Example C

5

Fiscal year 2012 has a deficit of $50 million. Thus, in fiscal year 2013 there is no change in the wages.

Fiscal year 2013 has a surplus of $80 million ; therefore Accumulated Surplus of $30 million deficit over the combination of fiscal years 2012-2013. Yet, due to the surplus in fiscal year 2013, wages are increased by 2.5%.

A net surplus is defined as the general fund revenues, less expenses, in that one fiscal year, regardless of the overall Fund Balance Deficit at the time, but not including funds received due to new debt issuance, any one-time surplus resulting from a refinancing transaction (however, savings beyond the initial one time revenue increase from the refinance – such as interest rate reduction – will be included in the calculation of the net surplus addressed in this section), asset sales and any debt principal repayment made beyond its scheduled date of maturity. With respect to proceeds from asset sales, the parties will negotiate regarding any portion of the proceeds of such sale to be included in the net surplus. A net accumulated surplus is defined as the general fund revenues, less expenses, in that combination of two or more fiscal years, regardless of the overall Fund Balance Deficit at the time, but not including funds received due to new debt issuance, any one-time surplus resulting from a refinancing transaction (however, savings beyond the initial one time revenue increase from the refinance – such as interest rate reduction – will be included in the calculation of the net surplus addressed in this section), asset sales any debt principal repayment made beyond its scheduled date of maturity. With respect to proceeds from asset sales, the parties will negotiate regarding any portion of the proceeds of such sale to be included in the net surplus. Fund Balance Deficit means the City's accumulated deficit in its general fund, which is $196 million as of June 30, 2011. A fiscal year runs from July 1st through June 30th of the following year.

For every year of this Agreement, the City will receive an assessment of the net surplus in its general fund, and the overall Fund Balance Deficit, by or before January 5th of each year of this Agreement, for that current fiscal year. This information will be conveyed to the Coalition Union also by that date. The Coalition Union may have access to all data pertinent to such an assessment.

2. **Healthcare.**

a. The City has indicated that it needs to attain $60 million in health care savings (excluding the DWSD employees and the Weiler class retirees), annually, either paid by or subsidized by the general fund. While the Coalition Unions do not bargain concerning retirees' healthcare and nothing regarding this Agreement shall be construed as Coalition involvement in such, ~~Yet,~~ the Coalition Unions agree to changes in the benefit plan design for prescription drugs and medical, dental and vision care which will achieve the active employees' share of this savings target. If the City includes the COPS Trust healthcare plan in the package offered to employees, the calculation for the healthcare savings desired by the City will be reduced by the value of savings to the City's healthcare costs by the amount of money which would have been realized in savings had

6

COPS Trust been excluded. The Coalition Unions shall discuss plan design costs with healthcare providers. These cost changes shall be applied to all City employees, including public officials, appointees, management, public safety employees, civilians, and exempt and non-exempt employees, however, this provision shall not be violated if the City maintains the COPS Trust plan. Any changes to the above plan design changes will be agreed upon between the parties. The carriers will include Blue Cross & Blue Shield PPO, Health Alliance Plan, Total Health Care, Golden Dental, Dent-Cap, Blue Cross & Blue Shield Dental, Heritage Vision, and Co-op Optical.

b. By or before February 6, 2012, the Coalition Union will report on health care plan design costs from the carriers and provide the data demonstrating such. If the City is not satisfied that the Coalition Union has demonstrated sufficient savings, then it may seek review of the Coalition Union's package by a third party neutral. She will review the data presented by the Coalition Union, as well as the City's proposed plan option (Option 3), in order to assess each package and offer recommendations of employee design plan change ideas to the parties.

c. The plan design proposed by the Coalition Union members for the duration of this Agreement is as follows. The changes will be implemented as soon as possible: The City shall pay no more than 80% of the cost of healthcare, as required by state law in effect at the time of execution of this Agreement.

**Plan Deductible: $250/$500**

**Insurance maximum: $1000/$2000**
**Office visit/urgent care: $15**

**Prescription Drug co-pay (purchased through CVS Caremark): $5/$15/$30.** **[copayment costs of drugs for generic/brand name/formulary]Elimination of Blue Care Network**

**Elimination of U.S. Health provider**

**Emergency Room visit: $75**

**Hospital visit: no co-pay**

**Dental contribution: 20%**

**Vision contribution: 20%**

d. There were Coalition Employees who were under different healthcare plans, prior to the execution of this Agreement. As of the execution of this Agreement, all Coalition Employees will receive the same healthcare plan options and plan designs as all other Coalition Employees.

7

DTMI00086932

e. The City shall engage in all reasonable efforts to explore a relationship with Detroit-based hospitals to provide healthcare in direct relationship with City employees, as opposed to going through a health insurance company. The success of said efforts shall be explored in the Joint Budgetary Savings and Revenue Initiatives Committee meetings described below.

3.   **Pension Concessions**.  The Coalition Employees will agree to the following Pension Concessions and changes set forth in the attached Exhibit B.  These changes are effective as of February 28, and are applicable prospectively only.  For those employees who have submitted a written application of intent to retire prior to February 28, 2012, those employees shall not be impacted by the changes in the pension benefits, and shall receive pension benefits in effect prior to February 28, 2012.  The City represents that it will seek approval of all retirement benefits by all applicable government agencies, including the Internal Revenue Service.  If any retirement benefit change fails to attain necessary government agency approval, all other benefits shall remain in effect for the duration of this Agreement.

4.   Early Retirement

The Coalition Employees will agree to the below early out program for employees who have between 27 and 29 years of service and are any age, employees who have between 7 and 10 years of service and are at least 60 years old, and employees with between 22 and 25 years of service and intend to retire with the Actuarially Reduced 25 Year Option of the Retirement Plan:  The City will offer such Coalition Employees the ability to retire three (3) years earlier than otherwise eligible under the contract, with benefits, for employees who have more than [1,000] hours of banked time (i.e., sick time, furlough, vacation or compensatory time) and who relinquish all of their banked time.  The City will offer Coalition Employees to retire two years earlier than otherwise eligible under the contract, with benefits, for employees who have between [500] and [1,000] hours of banked time, and who relinquish a maximum of 1000 of banked time.  The City will offer Coalition Employees to retire one (1) year earlier than otherwise eligible under the contract, with benefits, for employees who have less than [500] hours of banked time, and who relinquish a maximum of 500 hours of banked time.  The utilization of banked time, for purposes of the calculation, begins with sick time.

Employees may purchase service time, to retire early, using their annuity.  The City will provide data on the cost of the service time to be purchased by April 1, 2012.

The City will widely advertise the early out program to its employees. The open period for employees to initially apply for the early retirement option shall be no less than 21 days. Upon voluntary retirement, employees will be expected to sign a separation agreement and waiver and release of claims (the terms of which shall be agreed upon by the City and Coalition Unions), and the City will comply with all applicable federal and state laws, and regulations, concerning this early out program.

8

The City will facilitate quick meetings and exit interviews with employees who seek to retire in conformity with this Agreement.

Coalition Employees who are veterans shall have the ability to purchase service time, at the actuarially determines service cost, for all active duty military service.

## III. LEAN OPTIMIZATION COMMITMENT AND UNION DEFICIT BENCHMARKS

### A. General Principles Of Lean Optimization

During the 2011 negotiations, the parties discussed the role of the labor management cooperation and collaboration in providing more efficient delivery of services to the people of Detroit. The parties recognize that the efficient delivery of service to the public should be mindful of the cost effectiveness, quality of delivery, accountability and public interest. The parties agree that all stakeholders must work together in an open dialogue manner to achieve best in class public service.

The parties agreed to approach the issue jointly with the goal of facilitating the development of positive programs relative to the effective use of resources. Such effective use of resources may include self-directed work teams or other empowerment initiatives as agreed by the parties to provide front line workers with the support needed to effectively perform their jobs.

The parties recognize that Lean Optimization can be a valuable tool in achieving the effective use of resources. Lean Optimization has the simple goal of helping city government work better for both its customers and its employees. Lean practices rely on joint participation between employees and management at all levels within the City. World class service cannot occur without such employee involvement.

The Mayor and all levels of his administration, and City Council, agree that the below Deficit Benchmarks and all other aspects of this Agreement are among the necessary tools that must be pursued in order to have the City attain financial stability. By executing this Agreement, they agree to comply with these Deficit Benchmarks and all other aspects of this Agreement.

For the below Committees, coordinated training for the Coalition Unions and the City will take place within (30) days after ratification of this Agreement.

### B. Committee Creation

1. **Joint Budgetary Savings and Revenue Initiatives Committee** - Within twenty (20) days after the effective date of this Agreement, a Joint Budgetary Savings and Revenue Initiatives Committee ("JBS Committee") will be established to explore innovative initiatives to deliver better customer service and pursue better value from those who deliver the services. The parties agree to meet on a monthly basis, and shall be responsible for reporting their progress to the City Administration's Chief Operations Officer and the Coalition Unions. The City Representatives to this Committee shall be decided by the City's Director of Labor Relations and the Chief Operating Officer, and the Coalition Unions may elect up to 6 representatives to be on this Committee, and the City shall have 6 representatives appointed to such Committee.

9

Representatives from the Departments may participate as needed. The Committee will determine the meeting schedule and agenda. The parties agree on the value of utilizing outside independent facilitators trained in business lean practices and will explore funding alternatives to engage mutually agreed upon lean consultants. The any member of the Committee shall have access to all information pertinent to the performance of their duties, from either the Administration or the City Council. Upon request, the information shall be conveyed within seven days of request.

The Committee's responsibility shall also be to monitor the achievement of the Union Deficit Benchmarks spelled out in Section III below, and otherwise to assure compliance with this Agreement.

**2. Joint Healthcare Committee - Healthcare Cost Containment.** During the 2011 negotiations, the parties discussed the mutual goal of designing and implementing healthcare plans, including ancillary plans, that effectively manage costs and that work to keep members healthy. The Coalition Unions may elect up to 6 representatives to be on this Committee, and the City shall have 6 representatives appointed to such Committee, within 30 days of execution of this Agreement. The Committee will be jointly chaired by the designee of the City and Coalition Unions. To that end, the City and the Coalition Unions will convene a Joint Healthcare Committee (the "Committee") whose charges will include, but not be limited to:

a. Analysis of current plan performance identifying opportunities for improvement;

b. Investigate potential savings opportunities from re-contracting pharmacy or other carrier contracts;

c. Review the current specialty pharmacy program and identify best-in-class specialty programs to use as a benchmark;

d. Analyze current HMO plans to determine if they are a cost-effective means of providing high quality healthcare;

e. Investigate impact on outcomes and costs of Value Based Benefit Designs;

f. Identify opportunities for cost-containment programs and carve out programs;

g. Investigate opportunities to save costs by modifying or otherwise limiting medical, professional and pharmacy networks;

h. Review current chronic care management programs to determine effectiveness as well as ongoing member compliance;

i. Investigate workplace health and wellness programs and make recommendations with the goal of educating and motivating employees toward improved health and well-being;

j.    Make recommendations to increase voluntary participation in health and wellness screenings and benefits included in current health plans;

k.    Identify educational opportunities relative to facility and professional provider quality data, as well as designated centers of excellence.

As mutually agreed by the parties, independent subject matter experts and consultants may be called upon to assist the Committee in carrying out their charges.

Monthly meetings of the Committee shall be scheduled with the first being held no later than 45 days following the effective date of the Agreement.

**3. Contracting Out Committee** – In order to attain the 10% reduction from third party contractors (discussed in benchmarks below) and otherwise attain savings and efficient practices in privatization, representatives of the City Administration and Union Coalition will form a Contracting Out Committee ("Committee"), with six persons from each group. The Committee will review all contracts with third party persons or entities, that are paid in some part directly, or indirectly, from the general fund. The Committee will oversee the process of the 10% reduction in the gross contract value being asked of all contractors. The Committee will also make recommendations to the Administration on ways to attain efficiencies and savings in the contract procurement process. In making their assessment, the Contracting Committee may:

*    schedule meetings with the contractor and bidders, to discuss the price being offered for the goods/service;
*    review current and proposed contracts for compliance with the Privatization Ordinance;
•    Seek evaluation of the contracts by an outside expert mutually agreed to by the City and the Coalition Unions;
•    recommend termination of the contract in conformity with its terms and seeking alternative sources of supply for the services;
•    Study and consideration of a plan for the work being performed by City employees rather than outside contractors where an objective, demonstrable cost savings can be established.

The Committee will also review contracts which are paid with dollars from the City's enterprise funds, and recommend similar adjustments to such contracts to the heads of those Departments. The Committee will have access to all data surrounding the contracts of general and enterprise funds.

The Committee will also explore potential savings with insourcing work that is currently being done by a contractor. The Committee will look at objective, and demonstrable savings to be realized by having city employees perform work that contractors now perform. In-sourcing analysis may include the retention of an outside consultant, who shall be mutually acceptable to both the City and the Union Coalition.

11

The Committee will meet once per month, the first meeting being 10 days following execution of this Agreement, and will report to the City Chief Operating Officer and the Union Coalition chief spokesperson. Their reports will include all of the above information.

## C. Deficit Benchmarks

**1. 125k Plan**. The City will implement a Section 125 Plan for flexible spending accounts, dependent care accounts, and medical contribution pre-tax accounts. This plan will permit employees to contribute to these accounts, pre-tax. It will begin April 1, 2012. The provider of this plan will be Colonial Life, assuming that the package offered by Colonial is deemed reasonable by both parties.

2.       **Reducing Contractor Costs.**   The City acknowledges that cost reduction efforts should not be limited to employee concessions in wages and benefits. The City will aggressively seek a ten percent (10%) reduction in the gross value of each and every contract the City has with a contractor. Contractor is defined as any person or entity which receives payment from the City's general fund directly or indirectly (i.e., an enterprise fund which is subsidized by the general fund), and includes contracts let through a City agency (i.e., Detroit Building Department), but excluding contracts let to the federal government.

All City Contractors will be told that they have until February 15, 2012 to indicate that their contract can be amended to provide for a 10% reduction in the gross value of the contract.

By February 15, 2012 or one week following ratification, whichever date is the latter, each City Department using Contractors will prepare a written summary of all Contractors that it utilizes. The list will indicate for each Contractor: the name of the Contractor and the contact person, the value of the contract, the services provided by the contract, the gross amount of invoices submitted by the Contractor within the 2011 calendar year, the total paid to the Contractor within the 2011 calendar year, whether or not the Contractor has been asked for a 10% reduction, and the response of the Contractor. The information shall be forwarded to the Union Coalition.

For all Contractors who agree to a 10% reduction in the gross value of the contract, then the City (including the Purchasing Director and City Council) shall immediately modify the contract and adjust the payments to the Contractor accordingly. For those Contractors who either fail to respond, or respond by agreeing to no reduction or a reduction of less than 10%, upon recommendation of the Committee, the Purchasing Director shall promptly send out the previous request for proposal with scope of services to other persons/entities who the Purchasing Director or the Committee feel may be able to replace the current Contractor.

The Committee will oversee the Purchasing Director's submission of the scope of services and request for proposals to other Contractors, which will take place within two weeks of the Contractor's response, or at the latest by February 24, 2012. The bids are due within thirty (30) days, and the bid price sought should be at 10% less than the current Contractor's cost. The Committee will review the bids once submitted and assess

12

whether the work could be done, or goods can be offered, by any of the bidders for less than the current contractor's cost.

The City and Committee will utilize the services of at least one expert in contract procurement to assist with this evaluation. If the Purchasing Director determines that the work/goods can be offered by another bidder for less than the current Contractor, then the Purchasing Director will terminate the current Contractor's contract, as permitted by law, and initiate the process for securing the contract with the bidder. The Contracting Committee may review the decision of the Purchasing Director, and will have access to all data pertinent to the decision of the Purchasing Director. If any member on the Committee disagrees with the Purchasing Director's decision about whether a bidder should replace the current contractor, then the neutral expert in contract procurement, that the Committee had previously designated to hear such disputes, will make the final determination, after having access to all data pertinent to the current contract and bidders on the contract.

3.   **Elimination of Daily Overtime**. The City will eliminate payment of daily overtime for all City employees, except as required by state or federal law or regulation.

4.   **Elimination of 35 Hour Work Week**. The City will eliminate the 35 hour work week for all City employees, except as required by state or federal law or regulation.

5.   **Quarterly Review of Financials.** The City will conduct a quarterly financial review meeting to which a representative of the Union Coalition will be invited. Each Department Head (or designee) shall appear at the meeting to review all actual expenditures of his/her Department. The Department must demonstrate the amount of all actual expenditures and how actual expenditures track the budgeted spending allotments. If the Department is spending more than allotted, at that point in time, it shall adjust its spending accordingly or seek an amendment of the overall budget, with good cause. The Union Coalition may request pertinent financial information to assist in the departmental financial review.

6.   **Efforts for Increased Revenue Collection**.

The City and the Union Coalition believe that there are serious opportunities for the collection of increased revenue as a vital component in meeting the City's fiscal crisis. Accordingly, the following revenue collection measures will be implemented and supported by the City, the Coalition Unions, and Coalition Employees.

a.   Beginning on or before the date of execution of this Agreement, the City will widely advertise an amnesty plan for past due taxes (income taxes, personal property taxes, corporate taxes, property taxes which have not been transferred to Wayne County via revolving fund arrangement), parking tickets, tickets for ordinance, and other outstanding debts. The debtors will be told that they may enter into a payment plan, and if they pay or begin a payment plan between March 15, 2012 through May 15, 2012, the debtors will be relieved of payment of the accrued penalties. Following the end of the amnesty period, the Administration

13

shall provide to the Union Coalition all data related to the amount of the outstanding debts and the amount of money collected in the amnesty period.

b.    The City shall engage in all reasonable efforts to have state law changed/clarified to require all Employers of City residents to withhold City income taxes via payroll deduction, require Employers within the City to withhold City income taxes via payroll deduction, and to require all Employers to transmit the City withheld income taxes electronically to the City, automatically. Also, the City shall seek all necessary changes in state law to grant it more ability to utilize parking boots on automobiles where owners have past due parking tickets. The Union Coalition will assist in this regard.

c.    As soon as approved by City Council, but certainly no later than February 15, 2012, the Administration and City Council shall increase the corporate tax rate to 2.0% for all applicable entities in the City. This tax rate shall remain at 2.0% for the duration of this three-year Agreement, and certainly as long as Union Coalition members are incurring Wage Concessions.

d.    The City shall continue to take electronic payment for property taxes and will investigate additional areas to set up electronic payments.

e.    The City will engage all reasonable efforts to streamline, and make more efficient and effective, the process and bureaucracy for the use of City services which concern the payment of fees or monies by the public.

f.    The City will continue to actively engage the State of Michigan in seeking a change in state law to permit taxes on non-resident wagering. The Union Coalition will assist in this regard.

g.    Within thirty (30) days of the execution of this Agreement, the JBS Committee will implement and oversee an operational plan for the trial hire of additional employees directly involved in collection of debts owed to the City. The Union Coalition suggested operational plan staffing is outlined below. The JBS Committee will review the below plan and a majority of the Committee may make alterations in the plan. Subject to JBS Committee alteration, the following number of employees will be hired, as soon as they can be successfully recruited by the City, in the following classifications:

        i.      10 – Income Tax Investigator

        ii.     10 – Office Assistant II

        iii.    10 – Senior Clerks

        iv.    10 – lawyers

        v.     8 - legal secretaries

14

vi.      7 - legal assistants

vii.     3 - Parking Meter Collection Assistants

viii.    3 – Meter Repairmen

xi.      15 – Parking Enforcement Officers

x.       10 – Building Inspectors

Any employees hired for this project shall be hired as temporary employees for a period of up to six (6) months. During the period of temporary employment, the employees will receive the salary levels as outlined in the relevant Union Contract and have union representational rights, but will not be eligible for accrued time contractual benefits; will not have seniority accrual rights or healthcare. If the employee hired under this plan, collectively, result in revenue being brought in and collected to the City, in an amount 1.5 times greater than what is paid to the entire group of employees in wages, then the entire group of employees will receive all applicable contract benefits and become a full time, permanent employee. The assessment of the employees' revenue brought to the City will be measured by the last five months of the six month period.

The trial period concludes at the end of the six months. If, following the trial period, the trial plan did not result in the entire group bringing in revenue at least as much as 1.5 times the cost of the wages of the employees in the trial plan, the City shall have the right to discontinue the program and such action will not be opposed by the Union Coalition, except to challenge the finding that the above metric was not met.

During this six month trial period, no employees in the above classifications and in the departments and divisions of the operational plan, shall be laid off by the City.

h.    The City's efforts in collecting outstanding revenue, such as past due debts, may also include the hiring of an outside revenue consultant. Should a consultant be hired, he/she shall be agreed upon mutually by the City and designee(s) of the Coalition Unions.

7.    **Removing City-Owned Residential Parcels and Vacant Lots From Tax Roles**. The City will use its best efforts to have City-owned residential parcels and vacant lots purchased by private owners. The City represents to the Union Coalition, however, that the vast majority of the residential parcels are not in desirable areas and/or may not be habitable, and that there is currently little demand for the purchase of vacant lots.

8.    **Re-Negotiate and Consolidate Leases**. The City shall continue its current efforts to renegotiate its leased property with its landlords, and attain a reduction in the price of all

15

rent paid. The City shall also continue its current efforts to consolidate its office with the objective that it is not spending money on leased space unnecessarily. The City anticipates having a plan in place in January 2012 with the objective of saving the City approximately $1.8 million over the next one to two years.

9. **Supervisory Ratios**. In furtherance of principles of Lean Optimization, the City will evaluate appropriate supervisory/hourly employee ratios in each department or operation. Within thirty (30) days after the execution of this Agreement, the JBS Committee shall provide the City a list of identified departments/operations where it believes an evaluation of supervisory/hourly employee ratios should be performed, and a reduction in the supervisory workforce shall take place. The City shall engage in all reasonable efforts to implement a plan by or before July 1, 2012.

10. **Taxes on Non-Resident Wagering**. The City shall engage all reasonable efforts to have state law changed to permit taxes on non-resident wagering. The Union Coalition will assist in this regard.

11. **Reduction of Expenses**. No City employee or public official will be permitted to utilize City equipment for personal use, unless required by law or by contract. This includes City vehicles.

DTM00086941

**CITY OF DETROIT**

By: _[signature]_

Its: COO  2/1/12

**UNION COALITION**

By: _[signature]_ Edward L McNeil

Its: _Special Asst to President_
2/1/12

_[signature]_ SAAA

_[signature]_ A.M.I.

_[signature]_ IUOE 324

_[signature]_ PAA UAW 2211

_[signature]_ John C. Wallace Mech. Bldg. Trds.

_[signature]_ AFSCME LOCAL 1023

_[signature]_ Joseph Waffin AFSCME 120

_[signature]_ AFSCME 62

_[signature]_ Robert A. Stke AFSCME #2

Richard King ACODS

_[signature]_ Yvonne Ross AFSCME #279

_[signature]_ Thompson AFSCME 120

Dan O'Rourke IUOE 324

_[signature]_ AFSCME LOCAL 229

_[signature]_ Louise Walker AFSCME 457

_[signature]_ Gina M. Thompson-Mitchell Local 167

_[signature]_ D.T.I.

_[signature]_ Jim Valento TEAMSTERS 214

UNION

_[signature]_ AFSCME 836

17

## EXHIBIT B
## PENSION CONCESSIONS

1.  **Reduction of Multiplier.** Effective upon settlement, reduce multiplier to 1.5, per year, for all years of credited service accrued by non-vested Union members after the execution of this Agreement.

2.  **Defined Contribution Plan for New Hires.** All bargaining unit members hired into the City after July 1, 2012, herein will not accrue any benefits under the present defined benefit plan between the parties. Rather, they will receive benefits only pursuant to the defined contribution plan described below:

    **Employee Contribution Account**

    a.  **Basic Employer Contributions.** The employer shall contribute an amount equal to five (5%) percent of the participant's base salary to each participant's employer contribution account each pay period.

    b.  For members on duty disability, the amount contributed shall be equal to five (5%) percent of the participant's base salary on the date of disability.

    c.  **Employee Contribution.** The employee shall contribute an amount equal to five (5%) percent of the participant's base salary to each participant's employee contribution account each pay period.

    d.  Employee contributions shall be made on a pre-tax basis subject to the approval of the Internal Revenue Service.

    **Periods of Absence Due to Non-Duty Disability.** Employees on non-duty disability are no longer active participants in the Plan and may not receive employer contributions or make employee contributions.

    **Vesting.** All account balances are subject to the following vesting schedule:

    a.  **Employee Contribution Account.** A participant shall always be one hundred (100%) percent vested in such participant's employee contribution account.

    b.  **Employer Contribution Account.** A participant shall be vested in the balance of such participant's employer contribution account as follows:

    | Years of Service | Percentage Vested |
    |---|---|
    | 5 or more | 100%] |

3.  **Effective upon settlement, distributions to Participant Annuity Accounts may not exceed actual earnings by the Fund, but shall neither be greater than the assumed rate of return for the plan year, nor less than zero.**

18

Participant annuity accounts shall be ratably adjusted, not less frequently than once a year based upon actual returns experienced by the retirement system during the fiscal year preceding the crediting date, provided that such return shall neither be greater than the assumed rate of return as is expressed in the Plan's valuation for that year, nor less than zero. Any final distribution of the account balance to a participant or beneficiary shall be delayed until the final adjustment has been made.

Other than as provided above, bargaining unit members shall not be entitled to any assets, including but not limited to, interest, dividends, or other income of any kind derived from the investments of the retirement system, gifts and bequests received by the retirement system, and all other assets of the retirement system, which shall be used exclusively to fund pension payments on the basis of service performed, disability benefits and death benefits as provided herein.

**4. Limitation on Unused Accumulated Sick Leave Inclusion in Final Average Compensation.**

a. Any employee with more than 240 hours of unused accumulated sick leave as of the date of ratification of this Agreement may have all such hours included in the employee's final average compensation ("FAC") upon the employee's retirement (unless such hours are subsequently used by the employee for sick time). Any additional unused, accumulated sick leave earned by the employee after the date of ratification of this Agreement may not be included in the employee's FAC upon retirement.

Employees with more than 240 hours of sick time may elect to contribute the full value of all sick time above 240 hours to the employee's participant annuity account. This option is exercised as opposed to the employee receiving a cash payment for the sick time. This sick time contributed to the annuity shall not be withdrawn by the employee, prior to timely distribution upon retirement.

b. Any employee with 240 or less hours of unused, accumulated sick leave as of the date of ratification of this Agreement, and all new City hires after the date of execution of this Agreement, may accumulate a maximum of 240 hours of unused, accumulated sick leave that may be used in determining their FAC upon retirement.

c. If an employee who had more than 240 hours of unused, accumulated sick leave as of the date of ratification of this Agreement, subsequently uses sick leave and falls below the 240 hour level at any time, s/he shall be subject to the maximum 240 hour cap set forth above in determining their FAC upon retirement.

19

DTMI00086944

DTM000086945

# TENTATIVE AGREEMENT 2-1-2012
## LETTER OF UNDERSTANDING ("Agreement")
### BETWEEN
### CITY OF DETROIT
### AND
### THE COALITION OF CITY OF DETROIT UNIONS CONCERNING RETIREE HEALTHCARE

It is hereby agreed between the parties that the Coalition Unions waive their right to grieve and arbitrate, participate as a party or sponsor legal action brought by retirees concerning the changes in their health care which may arise in 2012.

_(document contains numerous handwritten signatures with union affiliations)_

Gina M. Thompson-Mitchell  Local 1642

Edward D. McNeil  2/1/12

DITIA

SAAA

A.M.I.

J M Valenti  Teamsters 214

AFSCME 836

IBOE 324

IAA 2211 UAW

AFSCME LOCAL 1023

Joseph Walter  AFSCME 1227

Robert A. Stokes  AFSCME #23

AFSCME 62

Richard King  ACODS

Yvonne Ross  AFSCME #2799

Gerald Thompson  AFSCME 1220

Dan O'Rourke  IUOE 324

John W. Wallace  Mich. Bldg. Trds.

AFSCME LOCAL 229

Laurie Walker  AFSCME LOCAL 457

## TENTATIVE AGREEMENT TO EXTEND AND MODIFY
## COLLECTIVE BARGAINING AGREEMENT

This Tentative Agreement ("TA") is entered this 9th day of ~~Felaj~~_____, 2012, by and between the City of Detroit ("City") and the Detroit Police Command Officers Association ("Union").

In order to address the City's current fiscal crisis, the City of Detroit ("City") and the Detroit Police Command Officers Association ("Union") hereby agree on the following terms for a new collective bargaining agreement. Unless otherwise stated herein, the provisions of the expired 2004-2009 collective bargaining agreement shall be incorporated into the new Agreement. The Union's acceptance of this TA to extend and modify collective bargaining agreement enumerated below is conditioned upon agreement and execution by the Treasurer of the State of Michigan and/or his agent. Upon execution the DPCOA shall submit the TA below for membership ratification.

1. <u>Terms of Agreement</u>. The new collective bargaining agreement shall be effective from the expiration date of the prior collective bargaining agreement between the parties and shall continue in full force and effect through June 30, 2015.

2. <u>Wages</u>. There shall be no changes in wages after the term of the current agreement and through June 30, 2015. The City agrees to open up wage discussions at the end of the term of this agreement. The applicable law will apply to the negotiation of a subsequent collective bargaining agreement.

3. <u>Performance Bonus</u>. Members shall be entitled to receive an annual bonus calculated as 20% of the annual savings achieved as a result of the implementation of item #6 of this agreement.

4. <u>Suspension of Educational Reimbursement</u>. The provisions of Article 34, "Educational Reimbursement," of the new Agreement shall be suspended until July 1, 2015.

5. <u>Holiday Pay</u>. Article 27 "Holidays," shall be modified in the new Agreement to provide that of the twenty-four (24) hours of compensation paid to members who work on contractual holidays, twelve (12) hours will be paid as cash, and twelve (12) hours will be credited as compensatory leave time to the member's leave bank.

6. <u>Bonus Vacation Days</u>. Bonus vacation days of Union members that are not utilized during the fiscal year will be banked and paid at the rate of pay and rank at time of banking

7. <u>Early Retirement</u>. An Early Retirement Incentive Program ("ERIP") will be offered to a limited number of officers in the Department and the participation will be based on seniority. The total maximum number of early retirements will be 150, to be allocated to members of the DPOA (76%), the DPLSA (23%) and the DPCOA (1%).

000141931\0001\1320201

Employees will be eligible to participate in the ERIP if they (a) are three (3) years or less away from completing 25 years of service, and (b) have sufficient banked time to purchase the remaining service time. Officers participating in the program will retire immediately using their years of service and banked time to get to 20 years of service and their pension will be calculated based on 20 years of service. All banked time will be relinquished in exchange for retirement service credit.

The City will offer members with between 22 and 25 years of service the ability to early retire as follows: The City will offer such members the ability to retire three (3) years earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have more than [1,000] hours of banked time (i.e. sick time, furlough, vacation or compensatory time), and who relinquish all of their banked time. The City will offer members to retire two (2) years earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have at least [500] or more hours of banked time, and who relinquish all of their banked time. The City will offer members to retire one (1) year earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have less than [500] hours of banked time, and who relinquish all of their banked time. The utilization of banked time, for purposes of the calculation, begins with sick time.

8.  Attrition and Members Leaving Through Early Retirement. The Union agrees that it will not grieve or otherwise challenge any decision by the City not to replace members leaving the Department between July 1, 2011 and June 30, 2012, and the elimination of such positions from the 2012-2013 budget. Nothing in this provision shall be interpreted as limiting the right of the City to eliminate positions thereafter.

9.  Elimination of Merit Pay. Members will no longer receive annual merit payments.

10. Separation Payments (not including DROP). All provisions of the collective bargaining agreement relating to separation payments shall be modified to provide that, for future separation payments to members who were already eligible to retire as of the effective date of this TA, a member will have the option of receiving (a) a lump sum payment ninety (90) days after separation, or (b) semi-annual installments for a period of three (3) years after separation, with no interest unless payment is not made on the date it is due. This option shall not be available to members in the ERIP established as part of this TA.

11. Payment of accumulated banked time upon election to participate in the D.R.O.P. The provisions of Article 42, "Retirement 'DROP' Plan," of the collective bargaining agreement shall be modified in accordance with the Memorandum of Understanding attached hereto as **Exhibit B.**

12. Use of Furlough. Article 30 shall be modified to provide as follows: A member shall be able to use furlough time in daily or one week increments as long as their command/assignment is adequately staffed and as long as their absence does not compromise the daily operation of that command. Additionally, the furlough

13-53846-swr   Doc 2262-6   Filed 12/11/13   Entered 12/11/13 15:59:45   Page 27 of 49
149                                                         DTMH00086948

must be used within the furlough period or there must be permission from the Chief of Police to carry over a furlough to next furlough period. All furlough must be exhausted before separation from the Department.

13. Promotions. Article 49 shall be modified as follows: The member must have a minimum of three (3) years in the rank of Lieutenant to be eligible to be promoted to the rank of Inspector. Additionally, any member promoted to the rank of Inspector must have attained a Bachelor's Degree to be eligible for consideration to the rank of Commander. Any member currently holding the rank of Commander who does not have a Bachelor's Degree shall be grandfathered in that rank. All other members will be required to have a minimum of a Bachelor's Degree to be eligible for consideration for promotion to the rank of Commander or above.

14. Promotions – Disciplinary History. Article 49 shall be modified to provide as follows: A member will not be eligible to be considered for promotion to the rank of Inspector or above, if he or she has a significant disciplinary history within the previous five (5) years. The following would be grounds for disqualification for promotion to Inspector or above: (a) having a conviction of a felony or misdemeanor under the laws of any jurisdiction; (b) being on the third step of attendance control; (c) being under a last chance agreement for any reason; (d) having been disciplined for a violation of substance abuse, and (e) harassment or violence in the workplace in the three years preceding the anticipated date of promotion.

15. Medical, Dental and Vision Benefits for Employees. COPS Trust can maintain its current design. The City's maximum contribution for any health plan shall be 80% of the Option 1 Plan offered by BCBSMI/CVS Caremark (Exhibit A).

Initial rates for the BCBSMI/CVS Caremark Option 1 shall be maintained in full force and effect from March 1st, 2012 to June 30th, 2013. These rates may not be implemented until there has been an Open Enrollment after reasonable notice to employees.

The mutually agreed upon methodology establishing illustrative rates on BCBSMI/CVS Caremark Option base plan are attached hereto and marked as Exhibit D.

16. Spousal Medical Coverage. The City will provide coverage for working spouses eligible for insurance coverage through their employer, only under the COPS Trust Plan and subject to the cost sharing arrangement set forth under Item 15.

17. Pension Benefits. Article 41, "Pension Provisions," shall be modified in accordance with the following provisions:

  a. Eliminator of Escalator. Pension benefits earned based on service rendered after the date of settlement would no longer receive a 2.25% per annum escalation.

000141931\0001\1320201

b.     <u>Reduction of Multiplier</u>. Reduce multiplier from 2.5% to 2.1% for the first 25 years of credited service accrued by Association members after the date of settlement. The multiplier would remain at 2.1% for the 26th through 35th years.

c.     <u>Defined Contribution Plan for all Bargaining Unit Members</u>. All bargaining unit members hired into the Department after June 30, 2012 shall not accrue any further benefits under the present defined benefit plan between the parties. Rather, they will receive benefits only pursuant to the defined contribution plan described below:

<u>Employee Contribution Account</u>

    i.     <u>Basic Employer Contributions</u>. The City shall contribute an amount equal to 10% of the participant's base salary to each participant's employer contribution account each pay period.

    ii.     <u>For Members On Duty Disability</u>, the amount contributed shall be equal to 10% of the participant's base salary on the date of disability, or 25 years of credited service, which includes time spent on duty disability. On July 1st each year, the amount contributed shall be increased by adding an additional 2.25% to the initial base salary amount at the time the duty disability began. The amount contributed shall be the product of 10% of both the initial base salary and these yearly increments.

    iii.     <u>Employee Contribution</u>. The employee shall contribute an amount equal to 5% of the participant's base salary to each participant's employee contribution account each pay period.

    iv.     Employee contributions shall be made on a pre-tax basis subject to the approval of the Internal Revenue Service.

<u>Periods of Absence due to Non-Duty Disability</u>. Employees on non-duty disability are no longer active participants in the Plan and may not receive employer contributions or make employee contributions.

<u>Vesting</u>. All account balances are subject to the following vesting schedule:

    i.     <u>Employee Contribution Account</u>. A participant shall always be 100% vested in such participant's employee contribution account.

    ii.     <u>Employer Contribution Account</u>. A participant shall be vested in the balance of such participant's employer contribution account as follows:

| <u>Years of Service</u> | <u>Percentage Vested</u> |
|---|---|
| 5 or more | 100% |

000141931\0001\1320201

d. **Police and Fire Pension Board Composition.** The Mayor of the City of Detroit may appoint an additional Trustee(s) as necessary to maintain an equal number of participant Trustees and non-participant Trustees on the Board as awarded in the matter of *City of Detroit –and- Detroit Police Command Officers Association,* Case No. D07 K-1456.

18. **State Review of Collective Bargaining Agreement.** If, during the term of this TA a consent decree is entered into pursuant to the State Financial Authority Recovery Plan and/or Continuing Operations Plan pursuant to the Local Government and School District Accountability Act, Act Number 4, Public Acts of 2011, MCL 141, 1501 et.seq. the terms of the collective bargaining agreement extended herein and this TA shall be maintained in whole and cannot be terminated, modified and/or changed whatsoever during its terms for any reason except by mutual agreement between the parties. This provision applies and covers a consent decree Recovery Plan and/or Continuing Operations Plan and/or any Plan, however titled and by whatever description. In the event the paragraph herein is breached the contractual modification agreed to in this TA shall automatically revert back to the language that existed prior to this extension and modification agreement.

19. **Grievances.** A violation of any provision of this TA shall be subject to the CBA's grievance/arbitration procedure (Articles 7 and 8 et. al.) with the exception of paragraph 18.

20. **More Favorable DFFA Wage, Healthcare or Pension Provisions.** In the event that the wage, healthcare or pension provisions of any agreement reached with the DFFA to extend and modify their current collective bargaining agreement with the City are more favorable than those stated in this agreement, the terms of this TA, the terms of this TA shall be modified to incorporate the more favorable provisions.

CITY OF DETROIT

By: _____
    COO

DETROIT POLICE COMMAND OFFICERS ASSOCIATION

By: _____ 2/9/12

By: _____ 2/9/12

000141931\0001\1320201

# EXHIBIT A

## OUTLINE OF MEDICAL, DENTAL AND VISION PLANS

| PPO Plan, HAP/BCN plan(s), THC plan | In-Network | Out-of-Network ** |
|---|---|---|
| Participant Premium Contribution | 20% for all plans | 20% for all plans |
| Plan Deductible | $250/$500 | $500/$1000 |
| Co-insurance % | 20% | 40% |
| Co-insurance maximum (OOP Max) | $1,000/$2,000 | $2,000/$4/000 |
| Office visit | $15 | Subject to deductible and coinsurance |
| Urgent care co-pay | $15 | Subject to deductible and coinsurance |
| Emergency room | $75 | $75 |
| Hospital co-pay | $0 | $0 |
| | | |
| **Rx Drug Plan** | | |
| Co-pay (retail, mail 2x for 90 day supply) | $5/$15/$30 | |
| Mandatory mail | After 34 days | |
| Mandatory generic | Required | |
| Traditional generic – step therapy | Required | |
| Exclusion of lifestyle drugs | Required | |
| | | |
| **COPS Trust** | | |
| Deductible | $175/$350 | |
| Coinsurance % | 10% | |
| Co-insurance maximum (OOP Max) | $825/$1650 | |
| Office visit/Urgent Care co-pay | $10 | |
| Emergency Room co-pay | $75 | |
| Hospital co-pay | $0 | |
| | | |
| **COPS Trust Rx Drug Plan** | | |
| Co-pay (retail, mail 2x for 90 day supply) | $5/$15 | |
| Mandatory mail | N/A | |
| Mandatory generic | N/A | |
| Traditional generic – step therapy | N/A | |
| Exclusion of lifestyle drugs | N/A | |
| | | |
| **Other Changes** | | |
| Participants contribute 20% for dental and vision coverage | | |
| Participants may choose any dental benefit currently in force with the City of Detroit including COPS Trust. | | |
| Participants may choose any vision benefit currently in force with the City of Detroit including COPS Trust. Co-op Optical eliminated | | |

000141931\0001\1320201

# EXHIBIT A

## OUTLINE OF MEDICAL, DENTAL AND VISION PLANS

### Vision Plans

|  | BCBSM VSP Plan | Heritage Vision | COPS Trust -Spectera |
|---|---|---|---|
| Eye Exam | Covered | Covered | Covered |
| Frame Allowance | $75* | $100* | Up to $130* |
| Eye Glass Lenses | Covered | Covered | Prism & Oversized Not Covered |
| Contacts in lieu of Glasses | $175 | $90 | Up to $210 |
| Progressive Myopia | Up to Age 19* | Up to Age 19* | Not Covered |
| Dependents | Up to 19 Covered* | Up to 19 Covered* | Up to 19 Covered* |
| Adult Dependents | Not Covered | Not Covered | Covered* |

*some restrictions apply

000141931\0001\1320201

DTMI00086953

# EXHIBIT A

## OUTLINE OF MEDICAL, DENTAL AND VISION PLANS

### Rates

**Initial Dental Rates to 6/30/2013**

| | |
|---|---|
| BCBSM Dental ($1,000 Orthodontia) | $ 3.28 per pay period |
| BCBSM Dental ($3,000 Orthodontia) | $ 15.95 per pay period |
| Golden Dental | $ 2.77 per pay period |
| DenCap | $ 2.77 per pay period |
| COPS Trust Dental | $ 3.28 per pay period |

**Initial Vision Rates to 6/30/2013**

| | |
|---|---|
| Heritage Optical | $ 0.54 per pay period |
| BCBSM –VSP Vision | $ 2.19 per pay period |
| Spectera Optical | $ 0.54 per pay period |
| COPS Trust Vision | $ 0.54 per pay period |

**Initial Medical Rates to 6/30/2013**

BCBSM Option 1
| | |
|---|---|
| Single | $ 43.25 per pay period |
| 2 Person | $ 90.74 per pay period |
| Family | $ 101.48 per pay period |

Total Health Care Option 1
| | |
|---|---|
| Single | $ 32.81 per pay period |
| 2 Person | $ 67.95 per pay period |
| Family | $ 88.59 per pay period |

Blue Care Network Option 1
| | |
|---|---|
| Single | $ 43.72 per pay period |
| 2 Person | $ 97.94 per pay period |
| Family | $ 110.18 per pay period |

COPS Trust
| | |
|---|---|
| Single | $ 50.98 per pay period |
| 2 Person | $ 106.24 per pay period |
| Family | $ 125.54 per pay period |

000141931\0001\1320201

DTMI00086954

## EXHIBIT A

## OUTLINE OF MEDICAL, DENTAL AND VISION PLANS

### Hospitalization Plan Design Changes – Effective April 1st, 2012:
### (Items A&B below apply to all plans with the exception of COPS Trust)

A. **Mandatory Use of Generic Drugs.** Generic drugs required unless pre-determined that brand name drug is medically required or a generic equivalent is not available. If brand drug requested but not medically required or generic is available, employee, retiree, or covered dependent must pay the applicable brand name co-pay amount plus the difference between the cost of the generic drug and brand name drug, even if dispense as written (DAW) is written on the prescription. Appeal procedure for any dispute is available under applicable healthcare plan.

B. **Limitation on Prescription Drugs.** City will not pay for fertility or impotence prescription drugs under the City's prescription drug programs. This provision does not apply to prescription birth control pills.

C. **Medicare Advantage.** Enrollment options for retirees and covered dependents that are Medicare-eligible shall be limited to the Medicare advantage plans offered by the City. In the event such Medicare Advantage plans are no longer offered or not cost effective, enrollment in alternate plans will be permitted as determined by the City.

D. **New Hire.** Eligibility qualifier for hospitalization-medical coverage is the first of the month after new hire completes 91st day of employment.

E. **New Hire.** Optical coverage eligibility qualifier changed from 60 days to 6 months.

F. **Sponsored Dependent coverage eliminated in its entirety.**

G. **Remarriage.** If a retiree marries or remarries after retirement, new spouse and his/her dependents are not eligible for coverage under the City's healthcare plans.

H. **Dependent Health Care Coverage.** The child of a divorced spouse or a new spouse of a retiree who is neither the biological, legally adopted nor legally guardian child of the employee or retiree is ineligible for dependent health care coverage under this Agreement.

I. **Requirement to Obtain Medicare A & B.** Consistent with current practice, all retirees and covered dependents are required to enroll into Medicare Parts A & B. Failure to enroll or maintain Medicare Parts A & B, City hospitalization-medical coverage will be terminated.

Page 9 of 13

000141931\0001\1320201

13-53846-swr    Doc 2262-6  Filed 12/19/13  Entered 12/19/13 15:59:45  Page 34 of 49
149

DTMI00086955

# EXHIBIT B

## Memorandum of Understanding

The City of Detroit ("CITY") and the Detroit Police Officers Association ("DPOA") together with the Detroit Police and Lieutenants and Sergeants' Association ("DPLSA") and the ("DPCOA") Detroit Police Command Officers Association enter into this Memorandum of Understanding ("Agreement") with the intent to bring closure to any and all claims, charges, grievances, civil litigation, appellate procedures, administrative charges, and any other disputes between the respective parties on the issue of the Deferred Retirement Option Plan ("DROP") and the lump sum payouts that members can elect upon their entry into the DROP Plan.

1. All DPOA, DPCOA, & DPLSA members who applied to participate in the DROP on or before the effective date of this agreement will be paid their lump sum amounts not later than sixty (60) days from the execution of this Agreement.

2. All DPOA members paid pursuant to paragraph 1 above will receive interest on their payouts consistent with Umpire George Roumell's Opinion and Award dated April 29, 2011 in Grievance No. 10-082.

3. All DPLSA members paid pursuant to paragraph 1 above will be paid Michigan Judgment Interest if that member does not receive their lump sum DROP payment in accordance with Paragraph 1 of this Agreement. For those DPLSA members who have already elected to participate in the DROP plan prior to the effective date of this Agreement, where as the City failed to make payments of lump sums within the 90 days of their election will receive the Michigan Judgment Interest on the late payments.

4. The City will withdraw its appeal in Detroit v DPOA, Wayne County Circuit Court Case No. 11-006114CA, Court of Appeals Case No. 306474.

5. DPOA and the DPLSA agree to the voluntary dismissal with prejudice of the following administrative charges and civil litigation: DPOA v DETROIT Wayne County Cir. Ct. C. A. No. 10-007575 CL; DPLSA v CITY OF DETROIT, WCCC Case NO. 11-014543-CL; & DPLSA v CITY OF DETROIT, MERC Case NO. C10 J-250.

6. DPOA, DPLSA, & DPCOA members who elect to participate in the DROP Plan after the effective date of this agreement will receive payment as follows:
   a. In semi-annual installments, over a period of three (3) years, after approval of their DROP Plan application, submission of appropriate documentation, and verification of all documentation by police payroll, on the following dates: August 1, and February 1, with no interest due unless the semi-annual payments are not made by the date they are due.

7. If a member elects to enter into the DROP Plan but suffers an injury or illness (not a casual or intermittent condition and one that lasts for two weeks or more) prior to that member receiving their lump sum payment for accumulated banked time, it is agreed that notwithstanding the absence of sick leave, the member will be paid sick leave, which will result in a reduction in the final installment payment or payments equivalent to the amount of sick leave paid out. (For example, if a member receives $5,000 in sick leave under these circumstances the final installment will be reduced by $5,000.) This provision only applies if the member has sick leave time available under the DROP Plan.

000141931\0001\1320201

8. In the event that a member who has elected to participate in the DROP Plan and has submitted the appropriate documentation retires or otherwise leaves active employment (before any Drop Plan payment becomes due under Paragraph 5 of this Agreement), any lump sum payment owed shall be paid within sixty (60) days of the termination of employment with no interest due unless the payout is not paid within the sixty (60) day period.

9. Effective January 15, 2012, members, who receive lump sum payouts from sick leave and/or other banks, will be allowed to have a portion of that payout, up to maximum permitted by the Internal Revenue Service Rules, placed into their 457 accounts.

10. The City will pay to DPOA and DPLSA attorney fees in the following amounts; DPOA - $14,397.50, DPLSA $8,000.00* (*Amount subject to change pending final Transcript cost). Payment will be made within 90 days after ratification of this Agreement and after all required documentation has been received and approved by the City.

11. This Agreement shall remain in effect even if a Consent Agreement is implemented pursuant to Public Act 4 or if an Emergency Manager is appointed.

12. The signatories for the City of Detroit, DPLSA, DPOA, and the DPCOA state explicitly and unequivocally that they have the authority to make the foregoing representations on behalf of their respective organizations and that they have the authority to bind their organizations to this Agreement.

| | |
|---|---|
| June Wynn, President of the DPLSA | 2/9/2012 7:36 pm Date |
| Joseph Duncan, President of the DPOA | 2/9/12 Date |
| Steven Dolunt, President of the DPCOA | 2/9/12 Date |
| Patrick Aquart, HR Director, City of Detroit | 2/9/12 Date |
| Chris Brown, COO, City of Detroit | 2/9/12 Date |

000141931\0001\1320201

## EXHIBIT C

### Targeted Savings Goals for Payment of Performance Bonus
### Bonus is dependent upon total savings
### Items - #6
### DPCOA

| | | | |
|---|---|---|---|
| #6 | Bonus Vacation Days | $ | 21,790.00 |
| | Total | $ | 21,790.00 |

000141931\0001\1320201

DTMI00086958

# EXHIBIT D

## ILLUSTRATIVE RATES METHODOLOGY

- Each year beginning April 1st illustrative rates will be developed and utilized for the purpose of determining the employees and employer share of plan costs for the plan year that begins on July 1 and ends June 30th of the following year. The parties agree that the accuracy of the illustrative rates used to determine the cost sharing formula is critical to each party and therefore recognize the need to use actuarial best practices to develop the illustrative rates to address the financial cost passed on the bargaining unit that may result from an inaccurate illustrative rate. The calculation of net cost shall include, for example, amounts recouped for RX rebates, part D subsidies and stop loss recoveries.

- It is acceptable to the Union that actuarial standard practices will be used to develop illustrative rates per rate category for each plan for the calendar year.

- For the purpose of rate setting it is acceptable to the Union that BCBSMI "Option 1", pricing be the same for all bargaining units offered that plan.

- For the purpose of establishing the employee contribution for COPS Trust enrollees, the City will calculate "BCBSMI Option1" illustrative rates. The City will determine its contribution based upon the 80% of the budgeted cost on or about April 1st. The illustrative rates will be based upon the most recent 12 months of costs for the plan year adjusted to an incurred basis, trended forward for the plan year, and with the inclusion of administrative expenses and/or other plans fees. The new rates and employee contributions will be effective beginning each July 1st. The City will deduct its Option 1 contribution amount from the rates offered by COPS Trust to determine the employees' contribution for the COPS Trust plan.

- The City will annually identify the actual plan cost variance by comparing the budgeted plan cost for the calendar year to the actual plan cost incurred for the same calendar year. If the actual plan cost exceeds the budgeted plan cost by more than 2.5% then the plan participants enrolled in COPS Trust will receive a credit equal to 20% of the actual cost variance over 2.5% which shall be applied towards their next year employee contribution credited equally in each pay period. If the actual plan cost is less than the budgeted plan cost by 2.5% or more then the plan participants enrolled in BCBS Option 1 will receive a credit equal to 20% of the actual cost variance under 2.5% which shall be applied towards their next year employee contribution credited equally in each pay period.

- All employee bi-weekly contributions will be determined by calculating the monthly employee contribution amount as described and multiplying that monthly amount by 12 and dividing by 26.

- The illustrative rates for the self-funded plan(s) will be developed independently from the rates for any fully-insured plans. The City will provide and, upon request, review with the union all rates for the new rating period (self-funded and fully-insured) at the same time. The rates will remain unchanged throughout the rating period unless mutually agreed upon.

000141931\0001\1320201

# TENTATIVE AGREEMENT TO EXTEND AND MODIFY
## COLLECTIVE BARGAINING AGREEMENT

This Tentative Agreement ("TA") is entered this 9th day of Feb_____, 2012, by and between the City of Detroit ("City") and the Detroit Police Officers Association ("Union").

In order to address the City's current fiscal crisis, the City and the Union agree to extend the term of the current collective bargaining agreement as set forth herein, with the following modifications. All modifications to the collective bargaining agreement shall be effective after ratification of this TA by the Union's membership and its approval by the Detroit City Council. The Union's acceptance of this TA to extend and modify collective bargaining agreement enumerated below is conditioned upon agreement and execution by the Treasurer of the State of Michigan and/or his agent. Upon execution the DPOA shall submit the TA below for membership ratification.

1. <u>Extension of the Current Collective Bargaining Agreement</u>. The current collective bargaining agreement between the City and the Union shall be extended until June 30, 2015.

2. <u>Wages</u>. There shall be no changes in wages after the term of the current agreement and through June 30, 2015. The City agrees to open up wage discussions at the end of the term of this agreement. The applicable law will apply to the negotiation of a subsequent collective bargaining agreement.

3. <u>Performance Bonus</u>. Members shall be entitled to receive an annual bonus calculated as 20% of the annual savings achieved as a result of the implementation of items #4 through #9 of this agreement, provided that the mutually agreed upon savings goals attach hereto as **Exhibit C** are met.

4. <u>Off-Duty Court Appearances</u>. Article 13, "Off Duty Court Appearances," of the collective bargaining agreement shall be modified through June 30, 2015 to provide as follows:

   a. The minimum period of compensation for an off-duty court appearance shall be reduced from three (3) to two (2) hours.

   b. Unless otherwise compelled by the Fair Labor Standards Act, all time worked by any member in any off-duty court appearance shall be compensated on a straight-time basis and not time and a half.

   c. Each fiscal year, the first sixty (60) hours of off-duty court time for any member shall be compensated through credited compensatory leave time placed in the member's leave bank and not through a cash payment. After the sixty (60) hours of off-duty court time are worked in the fiscal year, the member shall have the option of being paid in cash or being credited with compensatory time as set forth in Article 13, Section D.

13-53846-swit Doc 2262-6 Filed 12/12/13 Entered 12/12/13 15:59:45 Page 39 of 149
DTM000086960

5.  Suspension of Educational Reimbursement.  The provisions of Article 20, "Educational Reimbursement," shall be suspended until July 1, 2015.

6.  Overtime.  Article 14, "Overtime," shall be modified to provide that unless otherwise compelled by the Fair Labor Standards Act, members shall not be eligible for any overtime compensation in any pay period in which the member fails to work at least eighty (80) hours. Sick time shall not be considered as time worked in meeting the 80 hour work requirement, but time off due to furlough, liquidation of compensatory time, and other paid absences shall continue to be considered as time worked.

7.  Holiday Pay.  Article 31, "Holidays," shall be modified to provide that of the twenty-four (24) hours of compensation paid to members who work on contractual holidays, twelve (12) hours will be paid as cash, and twelve (12) hours will be credited as compensatory leave time to the member's leave bank.

8.  Suspension of Wage Differential.  The 2% wage differential paid to members on a promotional roster shall be suspended until July 1, 2015.

9.  Bonus Vacation Days.  Article 37, "Bonus Vacation Days," shall be modified to provide that bonus vacation days that are not utilized during the fiscal year will be banked and paid at the rate of pay and rank at time of banking.

10. Early Retirement.  An Early Retirement Incentive Program ("ERIP") will be offered to a limited number of officers in the Department and the participation will be based on seniority. The total maximum number of early retirements will be 150, to be allocated to members of the DPOA (76%), the DPLSA (23%) and the DPCOA (1%).

    Employees will be eligible to participate in the ERIP if they (a) are three (3) years or less away from completing either 20 or 25 years of service, and (b) have sufficient banked time to purchase the remaining service time.  Officers participating in the program will retire immediately using their years of service and banked time to get to 20 years of service and their pension will be calculated based on 20 years of service.  All banked time will be relinquished in exchange for retirement service credit.

    The City will offer members with between 17 and 20 years of service the ability to early retire as follows, as well as between 22 and 25 years: The City will offer such members the ability to retire three (3) years earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have more than [1,000] hours of banked time (i.e. sick time, furlough, vacation or compensatory time), and who relinquish all of their banked time. The City will offer members to retire two (2) years earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have at least [500] or more hours of banked time, and who relinquish all of their banked time. The City will offer members to retire one (1) year earlier than otherwise eligible under the contract, with benefits to the extent otherwise

eligible, for employees who have less than [500] hours of banked time, and who relinquish all of their banked time. The utilization of banked time, for purposes of the calculation, begins with sick time.

DROP participants with 22 years of service who have not received their lump sum payout from their banks may use such banked time to participate in the ERIP in accordance with the above.

11. <u>Separation Payments (not including DROP)</u>. All provisions of the collective bargaining agreement relating to separation payments shall be modified to provide that, for future separation payments to members who were already eligible to retire as of the effective date of this TA, a member will have the option of receiving (a) a lump sum payment ninety (90) days after separation, or (b) semi-annual installments for a period of three (3) years after separation, with no interest unless payment is not made on the date it is due. This option shall not be available to members in the ERIP established as part of this TA.

12. <u>Payment of accumulated banked time upon election to participate in the D.R.O.P.</u> The provisions of Article 33, "Pension Provisions," pertaining to 'DROP' payments shall be modified in accordance with the Memorandum of Understanding attached hereto as **Exhibit B**.

13. <u>Medical, Dental and Vision Benefits for Employees</u>. COPS Trust can maintain its current design. The City's maximum contribution for any health plan shall be 80% of the Option 1 Plan offered by BCBSMI/CVS Caremark (**Exhibit A**).

Initial rates for the BCBSMI/CVS Caremark Option 1 shall be maintained in full force and effect from March 1st, 2012 to June 30th, 2013. These rates may not be implemented until there has been an Open Enrollment after reasonable notice to employees.

The mutually agreed upon methodology establishing illustrative rates on BCBSMI/CVS Caremark Option base plan are attached hereto and marked as **Exhibit D**.

14. <u>Spousal Medical Coverage</u>. The City will provide coverage for working spouses eligible for insurance coverage through their employer, only under the COPS Trust Plan and subject to the cost sharing arrangement set forth under Item 13.

15. <u>4/10 Work Schedule.</u> After the implementation of the terms of this TA there will be a collaborative effort between the Detroit Police Department (DPD), the City and all Associations within the DPD to develop a pilot program for the implementation of a 4/10 work schedule that will be cost neutral to the City and the DPD.

16. <u>State Review of Collective Bargaining Agreement</u>. If, during the term of this TA a consent decree is entered into pursuant to the State Financial Authority Recovery Plan and/or Continuing Operations Plan pursuant to the Local Government and School District Accountability Act, Act Number 4, Public Acts

000141931\0001\1320199

of 2011, MCL 141, 1501 et.seq. the terms of the collective bargaining agreement extended herein and the TA shall be maintained in whole and cannot be terminated, modified and/or changed whatsoever during its terms for any reason except by mutual agreement between the parties. This provision applies and covers a consent decree Recovery Plan and/or Continuing Operations Plan and/or any Plan, however titled and by whatever description. In the event the paragraph herein is breached the contractual modification agreed to in this TA shall automatically revert back to the language that existed prior to this extension and modification agreement.

17. <u>Grievances</u>. A violation of any provision of this TA shall be subject to the CBA's grievance/arbitration procedure (Articles 7 and 8 et. al.) with the exception of paragraph 16.

18. <u>More Favorable DFFA Wage, Healthcare or Pension Provisions</u>. In the event that the wage, healthcare or pension provisions of any agreement reached with the DFFA to extend and modify their current collective bargaining agreement with the City are more favorable than those stated in this TA, the terms of this TA shall be modified to incorporate the more favorable provisions.

CITY OF DETROIT

By: _____
   COO

DETROIT POLICE OFFICERS ASSOCIATION

By: _____

By: _____

By: _____

By: _____

000141931\0001\1320199

## EXHIBIT A

## OUTLINE OF MEDICAL, DENTAL AND VISION PLANS

| PPO Plan, HAP/BCN plan(s), THC plan | In-Network | Out-of-Network ** |
|---|---|---|
| Participant Premium Contribution | 20% for all plans | 20% for all plans |
| Plan Deductible | $250/$500 | $500/$1000 |
| Co-insurance % | 20% | 40% |
| Co-insurance maximum (OOP Max) | $1,000/$2,000 | $2,000/$4/000 |
| Office visit | $15 | Subject to deductible and coinsurance |
| Urgent care co-pay | $15 | Subject to deductible and coinsurance |
| Emergency room | $75 | $75 |
| Hospital co-pay | $0 | $0 |
| | | |
| **Rx Drug Plan** | | |
| Co-pay (retail, mail 2x for 90 day supply) | $5/$15/$30 | |
| Mandatory mail | After 34 days | |
| Mandatory generic | Required | |
| Traditional generic – step therapy | Required | |
| Exclusion of lifestyle drugs | Required | |
| | | |
| **COPS Trust** | | |
| Deductible | $175/$350 | |
| Coinsurance % | 10% | |
| Co-insurance maximum (OOP Max) | $825/$1650 | |
| Office visit/Urgent Care co-pay | $10 | |
| Emergency Room co-pay | $75 | |
| Hospital co-pay | $0 | |
| | | |
| **COPS Trust Rx Drug Plan** | | |
| Co-pay (retail, mail 2x for 90 day supply) | $5/$15 | |
| Mandatory mail | N/A | |
| Mandatory generic | N/A | |
| Traditional generic – step therapy | N/A | |
| Exclusion of lifestyle drugs | N/A | |
| | | |
| **Other Changes** | | |
| Participants contribute 20% for dental and vision coverage | | |
| Participants may choose any dental benefit currently in force with the City of Detroit including COPS Trust. | | |
| Participants may choose any vision benefit currently in force with the City of Detroit including COPS Trust. Co-op Optical eliminated | | |

000141931\0001\1320199

# EXHIBIT A

## OUTLINE OF MEDICAL, DENTAL AND VISION PLANS

### Vision Plans

| | BCBSM VSP Plan | Heritage Vision | COPS Trust -Spectera |
|---|---|---|---|
| Eye Exam | Covered | Covered | Covered |
| Frame Allowance | $75* | $100* | Up to $130* |
| Eye Glass Lenses | Covered | Covered | Prism & Oversized Not Covered |
| Contacts in lieu of Glasses | $175 | $90 | Up to $210 |
| Progressive Myopia | Up to Age 19* | Up to Age 19* | Not Covered |
| Dependents | Up to 19 Covered* | Up to 19 Covered* | Up to 19 Covered* |
| Adult Dependents | Not Covered | Not Covered | Covered* |

*some restrictions apply

000141931\0001\1320199

## EXHIBIT A

## OUTLINE OF MEDICAL, DENTAL AND VISION PLANS

### Rates

#### Initial Dental Rates to 6/30/2013

| | |
|---|---|
| BCBSM Dental ($1,000 Orthodontia) | $ 3.28 per pay period |
| BCBSM Dental ($3,000 Orthodontia) | $ 15.95 per pay period |
| Golden Dental | $ 2.77 per pay period |
| DenCap | $ 2.77 per pay period |
| COPS Trust Dental | $ 3.28 per pay period |

#### Initial Vision Rates to 6/30/2013

| | |
|---|---|
| Heritage Optical | $ 0.54 per pay period |
| BCBSM –VSP Vision | $ 2.19 per pay period |
| Spectera Optical | $ 0.54 per pay period |
| COPS Trust Vision | $ 0.54 per pay period |

#### Initial Medical Rates to 6/30/2013

**BCBSM Option 1**

| | |
|---|---|
| Single | $ 43.25 per pay period |
| 2 Person | $ 90.74 per pay period |
| Family | $ 101.48 per pay period |

**Total Health Care Option 1**

| | |
|---|---|
| Single | $ 32.81 per pay period |
| 2 Person | $ 67.95 per pay period |
| Family | $ 88.59 per pay period |

**Blue Care Network Option 1**

| | |
|---|---|
| Single | $ 43.72 per pay period |
| 2 Person | $ 97.94 per pay period |
| Family | $ 110.18 per pay period |

**COPS Trust**

| | |
|---|---|
| Single | $ 50.98 per pay period |
| 2 Person | $ 106.24 per pay period |
| Family | $ 125.54 per pay period |

000141931\0001\1320199

**EXHIBIT A**

**OUTLINE OF MEDICAL, DENTAL AND VISION PLANS**

**Hospitalization Plan Design Changes – Effective April 1st, 2012:**
**(Items A&B below apply to all plans with the exception of COPS Trust)**

A.  **Mandatory Use of Generic Drugs.** Generic drugs required unless pre-determined that brand name drug is medically required or a generic equivalent is not available. If brand drug requested but not medically required or generic is available, employee, retiree, or covered dependent must pay the applicable brand name co-pay amount plus the difference between the cost of the generic drug and brand name drug, even if dispense as written (DAW) is written on the prescription. Appeal procedure for any dispute is available under applicable healthcare plan.

B.  **Limitation on Prescription Drugs.** City will not pay for fertility or impotence prescription drugs under the City's prescription drug programs. This provision does not apply to prescription birth control pills.

C.  **Medicare Advantage.** Enrollment options for retirees and covered dependents that are Medicare-eligible shall be limited to the Medicare advantage plans offered by the City. In the event such Medicare Advantage plans are no longer offered or not cost effective, enrollment in alternate plans will be permitted as determined by the City.

D.  **New Hire.** Eligibility qualifier for hospitalization-medical coverage is the first of the month after new hire completes 91st day of employment.

E.  **New Hire.** Optical coverage eligibility qualifier changed from 60 days to 6 months.

F.  **Sponsored Dependent coverage eliminated in its entirety.**

G.  **Remarriage.** If a retiree marries or remarries after retirement, new spouse and his/her dependents are not eligible for coverage under the City's healthcare plans.

H.  **Dependent Health Care Coverage.** The child of a divorced spouse or a new spouse of a retiree who is neither the biological, legally adopted nor legally guardian child of the employee or retiree is ineligible for dependent health care coverage under this Agreement.

I.  **Requirement to Obtain Medicare A & B.** Consistent with current practice, all retirees and covered dependents are required to enroll into Medicare Parts A & B. Failure to enroll or maintain Medicare Parts A & B, City hospitalization-medical coverage will be terminated.

13-53846-swr    Doc 2262-6   Filed 12/19/13   Entered 12/19/13 13:59:45   Page 46 of 149
DTM000086967

## EXHIBIT B

### Memorandum of Understanding

The City of Detroit ("CITY") and the Detroit Police Officers Association ("DPOA") together with the Detroit Police and Lieutenants and Sergeants' Association ("DPLSA") and the ("DPCOA") Detroit Police Command Officers Association enter into this Memorandum of Understanding ("Agreement") with the intent to bring closure to any and all claims, charges, grievances, civil litigation, appellate procedures, administrative charges, and any other disputes between the respective parties on the issue of the Deferred Retirement Option Plan ("DROP") and the lump sum payouts that members can elect upon their entry into the DROP Plan.

1. All DPOA, DPCOA, & DPLSA members who applied to participate in the DROP on or before the effective date of this agreement will be paid their lump sum amounts not later than sixty (60) days from the execution of this Agreement.

2. All DPOA members paid pursuant to paragraph 1 above will receive interest on their payouts consistent with Umpire George Roumell's Opinion and Award dated April 29, 2011 in Grievance No. 10-082.

3. All DPLSA members paid pursuant to paragraph 1 above will be paid Michigan Judgment Interest if that member does not receive their lump sum DROP payment in accordance with Paragraph 1 of this Agreement. For those DPLSA members who have already elected to participate in the DROP plan prior to the effective date of this Agreement, where as the City failed to make payments of lump sums within the 90 days of their election will receive the Michigan Judgment Interest on the late payments.

4. The City will withdraw its appeal in Detroit v DPOA, Wayne County Circuit Court Case No. 11-006114CA, Court of Appeals Case No. 306474.

5. DPOA and the DPLSA agree to the voluntary dismissal with prejudice of the following administrative charges and civil litigation: DPOA v DETROIT Wayne County Cir. Ct. C. A. No. 10-007575 CL; DPLSA v CITY OF DETROIT, WCCC Case NO. 11-014543-CL; & DPLSA v CITY OF DETROIT, MERC Case NO. C10 J-250.

6. DPOA, DPLSA, & DPCOA members who elect to participate in the DROP Plan after the effective date of this agreement will receive payment as follows:
   a. In semi-annual installments, over a period of three (3) years, after approval of their DROP Plan application, submission of appropriate documentation, and verification of all documentation by police payroll, on the following dates: August 1, and February 1, with no interest due unless the semi-annual payments are not made by the date they are due.

7. If a member elects to enter into the DROP Plan but suffers an injury or illness (not a casual or intermittent condition and one that lasts for two weeks or more) prior to that member receiving their lump sum payment for accumulated banked time, it is agreed that notwithstanding the absence of sick leave, the member will be paid sick leave, which will result in a reduction in the final installment payment or payments equivalent to the amount of sick leave paid out. (For example, if a member receives $5,000 in sick leave under these circumstances the final installment will be reduced by $5,000.) This provision only applies if the member has sick leave time available under the DROP Plan.

13-53846-swr    Doc 2262-6  Filed 12/11/13  Entered 12/11/13 15:59:45  Page 47 of 49
149
DTMI00086968

8. In the event that a member who has elected to participate in the DROP Plan and has submitted the appropriate documentation retires or otherwise leaves active employment (before any Drop Plan payment becomes due under Paragraph 5 of this Agreement), any lump sum payment owed shall be paid within sixty (60) days of the termination of employment with no interest due unless the payout is not paid within the sixty (60) day period.

9. Effective January 15, 2012, members, who receive lump sum payouts from sick leave and/or other banks, will be allowed to have a portion of that payout, up to maximum permitted by the Internal Revenue Service Rules, placed into their 457 accounts.

10. The City will pay to DPOA and DPLSA attorney fees in the following amounts; DPOA - $14,397.50, DPLSA $8,000.00* (*Amount subject to change pending final Transcript cost). Payment will be made within 90 days after ratification of this Agreement and after all required documentation has been received and approved by the City.

11. This Agreement shall remain in effect even if a Consent Agreement is implemented pursuant to Public Act 4 or if an Emergency Manager is appointed.

12. The signatories for the City of Detroit, DPLSA, DPOA, and the DPCOA state explicitly and unequivocally that they have the authority to make the foregoing representations on behalf of their respective organizations and that they have the authority to bind their organizations to this Agreement.

Mark Young, President of the DPLSA     Date 2/9/2012

Joseph Duncan, President of the DPOA     Date 2/9/12

Steven Dolunt, President of the DPCOA     Date 2/9/12

Patrick Aquart, HR Director, City of Detroit     Date 2/9/12

Chris Brown, COO, City of Detroit     Date 2/9/12

000141931\0001\1320199

## EXHIBIT C

### Targeted Savings Goals for Payment of Performance Bonus
### Bonus is dependent upon total savings
### Items #4 - #9
### DPOA

| | | |
|---|---|---|
| #4 | Off Duty Court Appearance | $ 850,543.00 |
| #5 | Suspension of Educational Reimbursement | $ 24,500.00 |
| #6 | Overtime | $ 598,884.00 |
| #7 | Holiday Pay | $ 2,933,808.00 |
| #8 | Suspension of Wage Differential | $ 332,147.00 |
| #9 | Bonus Vacation Days | $ 1,457,402.00 |
| | Total | $ 6,197,284.00 |

000141931\0001\1320199

**EXHIBIT D**

**ILLUSTRATIVE RATES METHODOLOGY**

- Each year beginning April 1st illustrative rates will be developed and utilized for the purpose of determining the employees and employer share of plan costs for the plan year that begins on July 1 and ends June 30th of the following year. The parties agree that the accuracy of the illustrative rates used to determine the cost sharing formula is critical to each party and therefore recognize the need to use actuarial best practices to develop the illustrative rates to address the financial cost passed on the bargaining unit that may result from an inaccurate illustrative rate. The calculation of net cost shall include, for example, amounts recouped for RX rebates, part D subsidies and stop loss recoveries.

- It is acceptable to the Union that actuarial standard practices will be used to develop illustrative rates per rate category for each plan for the calendar year.

- For the purpose of rate setting it is acceptable to the Union that BCBSM1 "Option 1", pricing be the same for all bargaining units offered that plan.

- For the purpose of establishing the employee contribution for COPS Trust enrollees, the City will calculate "BCBSM1 Option1" illustrative rates. The City will determine its contribution based upon the 80% of the budgeted cost on or about April 1st. The illustrative rates will be based upon the most recent 12 months of costs for the plan year adjusted to an incurred basis, trended forward for the plan year, and with the inclusion of administrative expenses and/or other plans fees. The new rates and employee contributions will be effective beginning each July 1st. The City will deduct its Option 1 contribution amount from the rates offered by COPS Trust to determine the employees' contribution for the COPS Trust plan.

- The City will annually identify the actual plan cost variance by comparing the budgeted plan cost for the calendar year to the actual plan cost incurred for the same calendar year. If the actual plan cost exceeds the budgeted plan cost by more than 2.5% then the plan participants enrolled in COPS Trust will receive a credit equal to 20% of the actual cost variance over 2.5% which shall be applied towards their next year employee contribution credited equally in each pay period. If the actual plan cost is less than the budgeted plan cost by 2.5% or more then the plan participants enrolled in BCBS Option 1 will receive a credit equal to 20% of the actual cost variance under 2.5% which shall be applied towards their next year employee contribution credited equally in each pay period.

- All employee bi-weekly contributions will be determined by calculating the monthly employee contribution amount as described and multiplying that monthly amount by 12 and dividing by 26.

- The illustrative rates for the self-funded plan(s) will be developed independently from the rates for any fully-insured plans. The City will provide and, upon request, review with the union all rates for the new rating period (self-funded and fully-insured) at the same time. The rates will remain unchanged throughout the rating period unless mutually agreed upon.

## TENTATIVE AGREEMENT TO EXTEND AND MODIFY
## COLLECTIVE BARGAINING AGREEMENT

This Tentative Agreement ("TA") is entered this 9th day of ____Feb____, 2012, by and between the City of Detroit ("City") and the Detroit Police Lieutenants and Sergeants Association ("Union").

In order to address the City's current fiscal crisis, the City and the Union agree to extend the term of the current collective bargaining agreement as set forth herein, with the following modifications. All modifications to the collective bargaining agreement shall be effective after ratification of this TA by the Union's membership and its approval by the Detroit City Council. If this agreement is not ratified by the Union's membership, the terms of the current collective bargaining agreement (2009-2013) shall remain in effect for its term. The Union's acceptance of this TA to extend and modify collective bargaining agreement enumerated below is conditioned upon agreement and execution by the Treasurer of the State of Michigan and/or his agent. Upon execution the DPLSA shall submit the TA below for membership ratification.

1.  <u>Extension of the Current Collective Bargaining Agreement</u>. The current collective bargaining agreement between the City and the Union shall be extended until June 30, 2015. In the event of Act 312 arbitration after the termination of this agreement, the arbitrator shall take into consideration the concessions given during these negotiations.

2.  <u>Wages</u>. There shall be no changes in wages after the term of the current agreement and through June 30, 2015. The City agrees to open up wage discussions at the end of the term of this agreement. The applicable law will apply to the negotiation of a subsequent collective bargaining agreement.

3.  <u>Performance Bonus</u>. Members shall be entitled to receive an annual bonus calculated as 20% of the annual savings achieved as a result of the implementation of items #4 through #9 of this agreement, provided that the mutually agreed upon savings goals attach hereto as **Exhibit C** are met.

4.  <u>Court Time</u>. Article 26, "Court Time," of the collective bargaining agreement shall be modified to provide as follows:

    a.  The minimum period of compensation for an off-duty court appearance shall be reduced from three (3) to two (2) hours.

    b.  Unless otherwise compelled by the Fair Labor Standards Act, all time worked by any member in any off-duty court appearance shall be compensated on a straight-time basis and not time and a half.

    c.  Each fiscal year, the first sixty (60) hours of off-duty court time for any member shall be compensated through credited compensatory leave time placed in the member's leave bank and not through a cash payment. After the sixty (60) hours of off-duty court time are worked in the fiscal year, the member shall have the option of being paid in cash or being credited with compensatory time as set forth in Article 25.

5. Suspension of Educational Reimbursement. The provisions of Article 42, "Educational Reimbursement," shall be suspended until July 1, 2015.

6. Overtime. Article 25, "Overtime," shall be modified to provide that unless otherwise compelled by the Fair Labor Standards Act, members shall not be eligible for any overtime compensation in any pay period in which the member fails to work at least eighty (80) hours. Sick time shall not be considered as time worked in meeting the 80 hour work, but time off due to furlough, liquidation of compensatory time, and other paid absences shall continue to be considered as time worked.

7. Holiday Pay. Article 37, "Holidays With Excused Time," shall be modified to provide that of the twenty-four (24) hours of compensation paid to members who work on contractual holidays, twelve (12) hours will be paid as cash, and twelve (12) hours will be credited as compensatory leave time to the member's leave bank.

8. Suspension of Wage Differential. The 2% wage differential paid to members on a promotional roster shall be suspended until July 1, 2015.

9. Bonus Vacation Days. Bonus vacation days of Union members that are not utilized during the fiscal year will be banked and paid at the rate of pay and rank at time of banking

10. Early Retirement. An Early Retirement Incentive Program ("ERIP") will be offered to a limited number of officers in the Department and the participation will be based on seniority. The total maximum number of early retirements will be 150, to be allocated to members of the DPOA (76%), the DPLSA (23%) and the DPCOA (1%).

11. Employees will be eligible to participate in the ERIP if they (a) are three (3) years or less away from completing 25 years of service, and (b) have sufficient banked time to purchase the remaining service time. Officers participating in the program will retire immediately using their years of service and banked time to get to 25 years of service and their pension will be calculated based on 25 years of service. All banked time will be relinquished in exchange for retirement service credit.

   The City will offer members with between 22 and 25 years of service the ability to early retire as follows: The City will offer such members the ability to retire three (3) years earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have more than [1,000] hours of banked time (i.e. sick time, furlough, vacation or compensatory time), and who relinquish all of their banked time. The City will offer members to retire two (2) years earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have at least [500] or more hours of banked time, and who relinquish all of their banked time. The City will offer members to retire one (1) year earlier than otherwise eligible under the contract, with benefits to the extent otherwise eligible, for employees who have less than [500] hours of banked time, and who relinquish all of their banked time. The utilization of banked time, for purposes of the calculation, begins with sick time.

000141931\0001\1320200

DROP participants with between 22 and 25 years of service who have not received their lump sum payout from their banks may use such banked time to participate in the ERIP in accordance with the above.

12.    Separation Payments (not including DROP). All provisions of the collective bargaining agreement relating to separation payments shall be modified to provide that, for future separation payments to members who were already eligible to retire as of the effective date of this Agreement, a member will have the option of receiving (a) a lump sum payment ninety (90) days after separation, or (b) semi-annual installments for a period of three (3) years after separation, with no interest unless payment is not made on the date it is due. This option shall not be available to members in the ERIP established as part of this TA.

13.    Payment of accumulated banked time upon election to participate in the D.R.O.P. The provisions of Article 51, "Pension," pertaining to 'DROP' payments shall modified in accordance with the Memorandum of Understanding attached hereto as **Exhibit B.**

14.    20 & Out Program. Members with less than 25 years, but more than 20 years of service, shall have the opportunity to elect early retirement as follows:

    a.    There shall be a period of ten (10) days to elect early retirement the first year.

    b.    The maximum number of members eligible to retire in the first year shall not exceed one hundred (100).

    c.    Retirements will be made available in twenty-five (25) member increments per quarter for one (1) year.

    d.    After the first year, a DPLSA member or participant with 20 years or more of credited service may retire. Upon the members or participant's retirement, the participant will be paid the total balance of the participant's accounts. Only participants with 20 years or more of credited service may participate in the City's group healthcare plans pursuant to the CBA.

    e.    Any DPLSA member who exercises the option to retire between 20 and 25 years of service shall have their retirement benefits calculated at their actual time of service (and not at 25 years).

15.    Medical, Dental and Vision Benefits for Employees. The plan Options shall include BCBSMI/CVS Caremark Option 1, COPS Trust, HAP and Total Healthcare. COPS Trust can maintain its current design. The City's maximum contribution for any health plan shall be 80% of the Option 1 Plan offered by BCBSMI/CVS Caremark (**Exhibit A**).

Initial rates for the BCBSMI/CVS Caremark Option 1 shall be maintained in full force and effect from March 1st, 2012 to June 30th, 2013. These rates may not be implemented until there has been an Open Enrollment after reasonable notice to employees.

The mutually agreed upon methodology establishing illustrative rates on BCBSMI/CVS Caremark Option base plan are attached hereto and marked as **Exhibit D**.

16. <u>Spousal Medical Coverage</u>. The City will provide coverage for working spouses eligible for insurance coverage through their employer, only under the COPS Trust Plan and subject to the cost sharing arrangement set forth under Item 14.

17. <u>4/10 Work Schedule</u>. After the implementation of the terms of this TA there will be a collaborative effort between the Detroit Police Department (DPD), the City and all Associations within the DPD to develop a pilot program for the implementation of a 4/10 work schedule that will be cost neutral to the City and the DPD.

18. <u>State Review of Collective Bargaining Agreement</u>. If, during the term of this TA a consent decree is entered into pursuant to the State Financial Authority Recovery Plan and/or Continuing Operations Plan pursuant to the Local Government and School District Accountability Act, Act Number 4, Public Acts of 2011, MCL 141, 1501 et.seq. the terms of the collective bargaining agreement extended herein and this TA shall be maintained in whole and cannot be terminated, modified and/or changed whatsoever during its terms for any reason except by mutual agreement between the parties. This provision applies and covers a consent decree Recovery Plan and/or Continuing Operations Plan and/or any Plan, however titled and by whatever description. In the event the paragraph herein is breached the contractual modification agreed to in this TA shall automatically revert back to the language that existed prior to this extension and modification agreement.

19. <u>Grievances</u>. A violation of any provision of this TA shall be subject to the CBA's grievance/arbitration procedure (Articles 7 and 8 et. al.) with the exception of paragraph 17.

20. <u>More Favorable DFFA Wage, Healthcare or Pension Provisions</u>. In the event that the wage, healthcare or pension provisions of any agreement reached with the DFFA to extend and modify their current collective bargaining agreement with the City are more favorable than those stated in this agreement, the terms of this TA, the terms of this TA shall be modified to incorporate the more favorable provisions.

CITY OF DETROIT

By: _____

DETROIT POLICE LIEUTENANTS AND SERGEANTS ASSOCIATION

By: _____ 2/9/2012

By: _____ 2012

By: _____ 2/9/12  2:12pm

000141931\0001\1320200

## OUTLINE OF MEDICAL, DENTAL AND VISION PLANS

| PPO Plan, HAP/BCN plan(s), THC plan | In-Network | Out-of-Network ** |
|---|---|---|
| Participant Premium Contribution | 20% for all plans | 20% for all plans |
| Plan Deductible | $250/$500 | $500/$1000 |
| Co-insurance % | 20% | 40% |
| Co-insurance maximum (OOP Max) | $1,000/$2,000 | $2,000/$4/000 |
| Office visit | $15 | Subject to deductible and coinsurance |
| Urgent care co-pay | $15 | Subject to deductible and coinsurance |
| Emergency room | $75 | $75 |
| Hospital co-pay | $0 | $0 |
|  |  |  |
| **Rx Drug Plan** |  |  |
| Co-pay (retail, mail 2x for 90 day supply) | $5/$15/$30 |  |
| Mandatory mail | After 34 days |  |
| Mandatory generic | Required |  |
| Traditional generic – step therapy | Required |  |
| Exclusion of lifestyle drugs | Required |  |
|  |  |  |
| **COPS Trust** |  |  |
| - Deductible | $175/$350 |  |
| - Coinsurance % | 10% |  |
| - Co-insurance maximum (OOP Max) | $825/$1650 |  |
| - Office visit/Urgent Care co-pay | $10 |  |
| - Emergency Room co-pay | $75 |  |
| - Hospital co-pay | $0 |  |
|  |  |  |
| **COPS Trust Rx Drug Plan** |  |  |
| Co-pay (retail, mail 2x for 90 day supply) | $5/$15 |  |
| Mandatory mail | N/A |  |
| Mandatory generic | N/A |  |
| Traditional generic – step therapy | N/A |  |
| Exclusion of lifestyle drugs | N/A |  |
|  |  |  |
| **Other Changes** |  |  |
| Participants contribute 20% for dental and vision coverage |  |  |
| Participants may choose any dental benefit currently in force with the City of Detroit including COPS Trust. |  |  |
| Participants may choose any vision benefit currently in force with the City of Detroit including COPS Trust. Co-op Optical eliminated |  |  |

000141931\0001\1320200

DTMI000086976

# EXHIBIT A

## OUTLINE OF MEDICAL, DENTAL AND VISION PLANS

### Vision Plans

| | BCBSM VSP Plan | Heritage Vision | COPS Trust -Spectera |
|---|---|---|---|
| Eye Exam | Covered | Covered | Covered |
| Frame Allowance | $75* | $100* | Up to $130* |
| Eye Glass Lenses | Covered | Covered | Prism & Oversized Not Covered |
| Contacts in lieu of Glasses | $175 | $90 | Up to $210 |
| Progressive Myopia | Up to Age 19* | Up to Age 19* | Not Covered |
| Dependents | Up to 19 Covered* | Up to 19 Covered* | Up to 19 Covered* |
| Adult Dependents | Not Covered | Not Covered | Covered* |

*some restrictions apply

000141931\0001\1320200

DTMI00086977

## EXHIBIT A

## OUTLINE OF MEDICAL, DENTAL AND VISION PLANS

### Rates

**Initial Dental Rates to 6/30/2013**

| | |
|---|---|
| BCBSM Dental ($1,000 Orthodontia) | $ 3.28 per pay period |
| BCBSM Dental ($3,000 Orthodontia) | $ 15.95 per pay period |
| Golden Dental | $ 2.77 per pay period |
| DenCap | $ 2.77 per pay period |
| COPS Trust Dental | $ 3.28 per pay period |

**Initial Vision Rates to 6/30/2013**

| | |
|---|---|
| Heritage Optical | $ 0.54 per pay period |
| BCBSM –VSP Vision | $ 2.19 per pay period |
| Spectera Optical | $ 0.54 per pay period |
| COPS Trust Vision | $ 0.54 per pay period |

**Initial Medical Rates to 6/30/2013**

BCBSM Option 1
| | |
|---|---|
| Single | $ 43.25 per pay period |
| 2 Person | $ 90.74 per pay period |
| Family | $ 101.48 per pay period |

Total Health Care Option 1
| | |
|---|---|
| Single | $ 32.81 per pay period |
| 2 Person | $ 67.95 per pay period |
| Family | $ 88.59 per pay period |

Blue Care Network Option 1
| | |
|---|---|
| Single | $ 43.72 per pay period |
| 2 Person | $ 97.94 per pay period |
| Family | $ 110.18 per pay period |

COPS Trust
| | |
|---|---|
| Single | $ 50.98 per pay period |
| 2 Person | $ 106.24 per pay period |
| Family | $ 125.54 per pay period |

Page 7 of 12

000141931\0001\1320200

# EXHIBIT A

## OUTLINE OF MEDICAL, DENTAL AND VISION PLANS

### Hospitalization Plan Design Changes – Effective April 1st, 2012:
### (Items A&B below apply to all plans with the exception of COPS Trust)

A.  **Mandatory Use of Generic Drugs.** Generic drugs required unless pre-determined that brand name drug is medically required or a generic equivalent is not available. If brand drug requested but not medically required or generic is available, employee, retiree, or covered dependent must pay the applicable brand name co-pay amount plus the difference between the cost of the generic drug and brand name drug, even if dispense as written (DAW) is written on the prescription. Appeal procedure for any dispute is available under applicable healthcare plan.

B.  **Limitation on Prescription Drugs.** City will not pay for fertility or impotence prescription drugs under the City's prescription drug programs. This provision does not apply to prescription birth control pills.

C.  **Medicare Advantage.** Enrollment options for retirees and covered dependents that are Medicare-eligible shall be limited to the Medicare advantage plans offered by the City. In the event such Medicare Advantage plans are no longer offered or not cost effective, enrollment in alternate plans will be permitted as determined by the City.

D.  **New Hire.** Eligibility qualifier for hospitalization-medical coverage is the first of the month after new hire completes 91st day of employment.

E.  **New Hire.** Optical coverage eligibility qualifier changed from 60 days to 6 months.

F.  **Sponsored Dependent coverage eliminated in its entirety**.

G.  **Remarriage.** If a retiree marries or remarries after retirement, new spouse and his/her dependents are not eligible for coverage under the City's healthcare plans.

H.  **Dependent Health Care Coverage.** The child of a divorced spouse or a new spouse of a retiree who is neither the biological, legally adopted nor legally guardian child of the employee or retiree is ineligible for dependent health care coverage under this Agreement.

I.  **Requirement to Obtain Medicare A & B.** Consistent with current practice, all retirees and covered dependents are required to enroll into Medicare Parts A & B. Failure to enroll or maintain Medicare Parts A & B, City hospitalization-medical coverage will be terminated.

000141931\0001\1320200

**EXHIBIT B**

**Memorandum of Understanding**

The City of Detroit ("CITY") and the Detroit Police Officers Association ("DPOA") together with the Detroit Police and Lieutenants and Sergeants' Association ("DPLSA") and the ("DPCOA") Detroit Police Command Officers Association enter into this Memorandum of Understanding ("Agreement") with the intent to bring closure to any and all claims, charges, grievances, civil litigation, appellate procedures, administrative charges, and any other disputes between the respective parties on the issue of the Deferred Retirement Option Plan ("DROP") and the lump sum payouts that members can elect upon their entry into the DROP Plan.

1. All DPOA, DPCOA, & DPLSA members who applied to participate in the DROP on or before the effective date of this agreement will be paid their lump sum amounts not later than sixty (60) days from the execution of this Agreement.

2. All DPOA members paid pursuant to paragraph 1 above will receive interest on their payouts consistent with Umpire George Roumell's Opinion and Award dated April 29, 2011 in Grievance No. 10-082.

3. All DPLSA members paid pursuant to paragraph 1 above will be paid Michigan Judgment Interest if that member does not receive their lump sum DROP payment in accordance with Paragraph 1 of this Agreement. For those DPLSA members who have already elected to participate in the DROP plan prior to the effective date of this Agreement, where as the City failed to make payments of lump sums within the 90 days of their election will receive the Michigan Judgment Interest on the late payments.

4. The City will withdraw its appeal in Detroit v DPOA, Wayne County Circuit Court Case No. 11-006114CA, Court of Appeals Case No. 306474.

5. DPOA and the DPLSA agree to the voluntary dismissal with prejudice of the following administrative charges and civil litigation: DPOA v DETROIT Wayne County Cir. Ct. C. A. No. 10-007575 CL; DPLSA v CITY OF DETROIT, WCCC Case NO. 11-014543-CL, & DPLSA v CITY OF DETROIT, MERC Case NO. C10 J-250.

6. DPOA, DPLSA, & DPCOA members who elect to participate in the DROP Plan after the effective date of this agreement will receive payment as follows:
   a. In semi-annual installments, over a period of three (3) years, after approval of their DROP Plan application, submission of appropriate documentation, and verification of all documentation by police payroll, on the following dates: August 1, and February 1, with no interest due unless the semi-annual payments are not made by the date they are due.

7. If a member elects to enter into the DROP Plan but suffers an injury or illness (not a casual or intermittent condition and one that lasts for two weeks or more) prior to that member receiving their lump sum payment for accumulated banked time, it is agreed that notwithstanding the absence of sick leave, the member will be paid sick leave, which will result in a reduction in the final installment payment or payments equivalent to the amount of sick leave paid out. (For example, if a member receives $5,000 in sick leave under these circumstances the final installment will be reduced by $5,000.) This provision only applies if the member has sick leave time available under the DROP Plan.

8. In the event that a member who has elected to participate in the DROP Plan and has submitted the appropriate documentation retires or otherwise leaves active employment (before any Drop Plan

000141931\0001\1320200

payment becomes due under Paragraph 5 of this Agreement), any lump sum payment owed shall be paid within sixty (60) days of the termination of employment with no interest due unless the payout is not paid within the sixty (60) day period.

9. Effective January 15, 2012, members, who receive lump sum payouts from sick leave and/or other banks, will be allowed to have a portion of that payout, up to maximum permitted by the Internal Revenue Service Rules, placed into their 457 accounts.

10. The City will pay to DPOA and DPLSA attorney fees in the following amounts; DPOA - $14,397.50, DPLSA $8,000.00* (*Amount subject to change pending final Transcript cost). Payment will be made within 90 days after ratification of this Agreement and after all required documentation has been received and approved by the City.

11. This Agreement shall remain in effect even if a Consent Agreement is implemented pursuant to Public Act 4 or if an Emergency Manager is appointed.

12. The signatories for the City of Detroit, DPLSA, DPOA, and the DPCOA state explicitly and unequivocally that they have the authority to make the foregoing representations on behalf of their respective organizations and that they have the authority to bind their organizations to this Agreement.

_____        2/9/2012 12ᵖᵐ
June Wynn, President of the DPLSA        Date

_____        2/9/12
Joseph Duncan, President of the DPOA        Date

_____        2/9/12
Steven Dolunt, President of the DPCOA        Date

_____        2/9/12
Patrick Aquart, HR Director, City of Detroit        Date

_____        2/9/12
Chris Brown, COO, City of Detroit        Date

000141931\0001\1320200

## EXHIBIT C

### Targeted Savings Goals for Payment of Performance Bonus
### Bonus is dependent upon total savings
### Items #4 - #9
### DPLSA

| #4 | Off Duty Court Appearance | $4,175,349.00 |
|----|---------------------------|---------------|
| #5 | Suspension of Educational Reimbursement | $ 10,500.00 |
| #6 | Overtime | $ 239,803.00 |
| #7 | Holiday Pay | $ 827,485.00 |
| #8 | Suspension of Wage Differential | $ 115,770.00 |
| #9 | Bonus Vacation Days | $ 964,460.00 |
| | Total | $6,333,367.00 |

000141931\0001\1320200

**EXHIBIT D**

**ILLUSTRATIVE RATES METHODOLOGY**

- Each year beginning April 1st illustrative rates will be developed and utilized for the purpose of determining the employees and employer share of plan costs for the plan year that begins on July 1 and ends June 30th of the following year. The parties agree that the accuracy of the illustrative rates used to determine the cost sharing formula is critical to each party and therefore recognize the need to use actuarial best practices to develop the illustrative rates to address the financial cost passed on the bargaining unit that may result from an inaccurate illustrative rate. The calculation of net cost shall include, for example, amounts recouped for RX rebates, part D subsidies and stop loss recoveries.

- It is acceptable to the Union that actuarial standard practices will be used to develop illustrative rates per rate category for each plan for the calendar year.

- For the purpose of rate setting it is acceptable to the Union that BCBSMI "Option 1", pricing be the same for all bargaining units offered that plan.

- For the purpose of establishing the employee contribution for COPS Trust enrollees, the City will calculate "BCBSMI Option1" illustrative rates. The City will determine its contribution based upon the 80% of the budgeted cost on or about April 1st. The illustrative rates will be based upon the most recent 12 months of costs for the plan year adjusted to an incurred basis, trended forward for the plan year, and with the inclusion of administrative expenses and/or other plans fees. The new rates and employee contributions will be effective beginning each July 1st. The City will deduct its Option 1 contribution amount from the rates offered by COPS Trust to determine the employees' contribution for the COPS Trust plan.

- The City will annually identify the actual plan cost variance by comparing the budgeted plan cost for the calendar year to the actual plan cost incurred for the same calendar year. If the actual plan cost exceeds the budgeted plan cost by more than 2.5% then the plan participants enrolled in COPS Trust will receive a credit equal to 20% of the actual cost variance over 2.5% which shall be applied towards their next year employee contribution credited equally in each pay period. If the actual plan cost is less than the budgeted plan cost by 2.5% or more then the plan participants enrolled in BCBS Option 1 will receive a credit equal to 20% of the actual cost variance under 2.5% which shall be applied towards their next year employee contribution credited equally in each pay period.

- All employee bi-weekly contributions will be determined by calculating the monthly employee contribution amount as described and multiplying that monthly amount by 12 and dividing by 26.

- The illustrative rates for the self-funded plan(s) will be developed independently from the rates for any fully-insured plans. The City will provide and, upon request, review with the union all rates for the new rating period (self-funded and fully-insured) at the same time. The rates will remain unchanged throughout the rating period unless mutually agreed upon.

000141931\0001\1320200

# EXHIBIT  B

**One Firm Worldwide**

# Presentation to The City of Detroit

Detroit, Michigan
January 28, 2016

**Confidential**

1

DTM00128731

# PART I – INTRODUCTION

JONES DAY

2

Confidential

DTM00128732

# The Jones Day Team





**Stephen Brogan**



**Corinne Ball**



**Heather Lennox**



**Kevyn Orr**



**Bruce Bennett**

**Aaron Agenbroad**

3

Confidential

DTMI00128733

[Speaker Notes For Slide: 3]

The Jones Day Team:

Stephan Brogan
Corinne Ball
Heather Lennox
Kevyn Orr
Bruce Bennett
Aaron Agenbroad

[Brogan voiceover: Although I will not be heavily involved in the representation, I wanted to (i) provide my personal statement of Jones Day's commitment to this project and (ii) highlight the qualities of the team members that will manage this project on a day-to-day basis. ]

4

**Confidential**

DTM00128734



# Jones Day's
# Qualifications and Commitment

- Midwestern Roots – Continuing Presence and Practice

- Substantial Ties to Michigan and the 6th Circuit

- Belief in the Importance of a Strong Detroit

- Unsurpassed Expertise Where Detroit Needs It

- Historical Focus on Teamwork and Collaboration

- Know and Work Well With City's Other Advisors

- Firm-Wide Commitment to Detroit

5

Confidential

DTMM00128735

[Speaker Notes For Slide: 5]

Jones Day's Commitment to the Detroit Project

Jones Day's roots are in the Midwest and a large part of our practice is centered there.

Many of Jones Day's clients are based in Detroit and in Michigan.
(Over 100 Michigan-based clients in the past 2 years.)
Long-standing representation of GM.
Special benefits counsel to, and good contacts with, Blue Cross of Michigan.
25 lawyers were 6th Circuit Clerks.
27 lawyers were clerks in federal courts in the 6th Circuit (Ohio, Michigan, Tennessee, Kentucky).
28 lawyers were US Supreme Court Clerks.
116 lawyers have one or more degrees from Michigan institutions (including 98 lawyers with 111 degrees from the University of Michigan alone).

We believe that a strong Detroit is vital to the state, the region and the country.

Jones Day has unsurpassed expertise and capabilities in the areas of greatest importance to Detroit and would be honored to be called upon to help.

Jones Day has a longstanding reputation for teamwork and collaboration, both within our own organization and when working with clients, related parties and other professional firms.
This strength will be particularly important in this matter.
We know and can work well with the other advisors retained by the City and it will be critical that everyone pulls together in the same direction.

When a client engages Jones Day, it engages the entire firm, and this would be regarded as an engagement of utmost importance for the firm as a whole.
We are committed to providing whatever resources are needed to advance Detroit's restructuring goals.
The City will have the support of each and every part of the Firm.

6

Confidential



# PART II – GENERAL OBSERVATIONS

Confidential

7

D1M00128737

[Speaker Notes For Slide: 7]

Jones Day's Priority for Today's Meeting

It is much more important that we discuss issues the City, the State and the FAB want to discuss rather than issues that we have identified.

We are prepared to walk through the presentation and invite dialog along the way, but are also prepared to put our presentation to one side and cover topics that interest you and address your questions and concerns.

We have studied Detroit's situation extensively and we have some preliminary views on a path forward.

8

**Confidential**

DTM00128738

# Detroit's Substantial Progress

JONES DAY

- Improved Cash Flows
- Significant Headcount Reduction
- Implementation of CETs
- Planning to Address Pension/OPEB
- Payroll Systems Outsourcing
- Public Lighting Authority
- Regional Transportation Authority
- Initiatives to Drive Revenue/Reduce Expenditures

9

Confidential

13-53846-swr    Doc 2242-6 Filed 12/19/13 Entered 12/19/13 13:44:15 Page 73 of 149
13-53846-swr    Doc 1162 Filed 10/11/13 Entered 10/11/13 15:59:45 Page 73 of 149
149
DTM00128739



[Speaker Notes For Slide: 9]

The City, working with the FAB and the State, already has made substantial progress in addressing its financial challenges.

Improved Cash Flows (Expected improvement of ~$62MM in FY 2013)

Significant Headcount Reduction (from ~12K in Nov. 2011 to ~10K in Nov. 2012)

Implementation of CETs (Despite delays, large majority of CETs are in place)

Planning to Address Pension/OPEB (e.g., recently closed the Police & Fire Retirement System to new employees, retention of Milliman to assist in revamping benefits for retirees and active employees)

Payroll Systems Outsourced

Public Lighting (Public Lighting Authority established: rate increases)

Regional Transportation Authority (authority established; new funding committed)

Initiatives to Drive Revenue or Reduce Expenditures (Belle Isle lease to the state, funding support for new arena and commercial development via Detroit Downtown Development Authority, grant and loan support for Detroit's Eastern Market through the Community Revitalization Program)

10

**Confidential**

# Formidable Challenges Remain

JONES DAY

- Substantial Debt (Bonds, POCs, Swaps)
- Pension/OPEB Liabilities
- Labor Issues (Costs, Work Rules)
- Detroiters' Quality of Life/Redevelopment of the City
- Development of Multi-Year Budget
- Reversing Economic Trends
- Encouraging New Investment in Detroit
- Political Obstacles to Reform
- EPA/Clean Water Act Case
- High Unemployment and Crime Rates

11

Confidential

DTMI00128741

[Speaker Notes For Slide: 11]

Notwithstanding the foregoing, many challenges remain.

Debt and related obligations (e.g., swaps)

Pensions and other retiree benefits (OPEB).

Labor costs, work rules and related issues.

Implementation of strategies to improve Detroiters' quality of life and redevelop the City.

Development of multi-year budget upon which restructuring can be based.

Identification of further options for saving/raising funds and stabilizing revenues (reversing trends) and encouraging new investment in Detroit.

Political obstacles to reform.

EPA and Clean Water Case before Judge Cox.

High unemployment.

High crime rate.

12

**Confidential**

DTMI00128742



# Out of Court Solutions Are Preferred

- Benefits of Well Planned Out-Of-Court Restructuring

  - Less Disruptive
  - Less Publicity
  - Less Expensive
  - Less Reputational Damage
  - Less Political Impact

- Consensus or Near Consensus Necessary for a Successful Out-of-Court Restructuring

  - *Extremely Difficult to Achieve in Practice*

13

Confidential

DTM00128743

[Speaker Notes For Slide: 13]

A well planned and carefully implemented effort to resolve Detroit's difficulties out of court is vitally important for several reasons:

An out-of-court solution is preferable for a number of reasons.
Less disruptive.
Less publicity during process.
Less expensive.
Less damage to City reputation.
Less political impact.

An out of court solution requires consensus or near consensus of affected constituencies.
This is extremely hard to achieve in practice.

Note: Could mention the possibility of a moratorium on payments being negotiated in support of an out of court solution.

14

**Confidential**

DTMI00128744

# Impact of Possible
# Emergency Manager Appointment

- Expansive Power
  - Power of City Government
  - Ability to Reject, Modify or Terminate CBAs
  - Ability to Commence Chapter 9 Filing Quickly, if Warranted
  - *Can Create Negotiating Leverage (Negotiating with the Backdrop of Bankruptcy)*

- Hot-Button Political Issue

- Relationship With Elected Officials Must Be Established

- Possible Legal Challenges (Delay and Risk)

JONES DAY

15

Confidential

13-53846-swr Doc 2242-6 Filed 12/19/13 Entered 12/19/13 13:44:15 Page 78 of 149
13-53846-swr Doc 1162 Filed 10/11/13 Entered 10/11/13 15:59:45 Page 78 of 149
149

DTM00128745

|Speaker Notes For Slide: 15|

Appointment of an Emergency Manager may offer the City greater powers to address some issues.

The appointment of an Emergency Manager could impact the City's restructuring efforts in a number of ways:

Expansive powers over all aspects of City government could be used to promote and expedite restructuring (e.g. budget; procurement; contracts, labor negotiations, ability to adopt ordinances related to financial condition).

Could streamline certain political/bureaucratic/legal requirements to restructuring activities.

Ability to reject, modify or terminate CBAs under certain circumstances.

Ability to commence chapter 9 filing quickly under PA 72 and PA 436 (assuming State approval).

Emergency manager powers can create negotiating leverage (negotiating in the backdrop of bankruptcy).

Hot-button political issue.

Potentially unpopular option with certain segments of the public, unions, other stakeholders.

The Emergency Manager's relationship with elected officials would have to be developed.

Ultimately, the Emergency Manager could be used as political cover for difficult restructuring decisions.

Appointment of an Emergency Manager could result in legal challenges (e.g., federal & state constitutional challenges)

Could delay progress until resolved

Could lead to challenges of the legality and enforceability of any actions taken by the Emergency Manager.

16

Confidential

# Out-of-Court Plan Should Contemplate the Possibility of Chapter 9

- **Simplify and Shorten Any Chapter 9 Case, if Out-of-Court Effort Fails**

  ➢ Out-of-Court Agreements Can Be Used in Chapter 9

- **Creates Leverage in Creditor Negotiations**

  ➢ Negotiating in the Shadow of Chapter 9

  ➢ Motivate Municipal Bond Market Participants

- **Bolster Eligibility for – and Success in – Chapter 9 By Establishing Good-Faith Record of Seeking Creditor Consensus**

17

Confidential

13-53846-swr    Doc 2242-6  Filed 12/19/13  Entered 12/19/13 13:44:15  Page 80 of 149
13-53846-swr    Doc 1162  Filed 10/11/13  Entered 10/11/13 15:59:45  Page 80 of 149
149

DTMI00128747

[Speaker Notes For Slide: 17]

Any restructuring plan should be designed so that it could be implemented in a chapter 9 case, if necessary.

Even if an out-of-court plan cannot be implemented, agreements that are reached can form the basis for a chapter 9 plan of adjustment, thus simplifying and shortening any chapter 9 case.

Creditors understand that a troubled municipality has greater leverage in a chapter 9 case. Accordingly, developing an out-of-court restructuring plan that can later be implemented in chapter 9 if necessary can create leverage in favor of a negotiated deal.

This is particularly the case if an Emergency Manager is appointed because the threat of a chapter 9 filing – including a potential moratorium on payments – will be more tangible, and possibly more imminent.

The combination of an Emergency Manager and a proposal that could be implemented in chapter 9 could be the most effective way to motivate investors in the municipal bond market.

A good-faith effort to pursue an out of court restructuring plan will establish a clear record of seeking creditor consensus before seeking chapter 9 relief.
This will deflect any eligibility complaints based on alleged failure to negotiate or bad faith.

18

Confidential

# If Chapter 9 Needed, Planning Is Key



- Any Bankruptcy Filing Should Be Accompanied By:

  ➢ Fully Developed Plan of Adjustment / Detailed Term Sheet

    -OR-

  ➢ Clearly Articulated, Reasonable Restructuring Plan, Already Shared with Creditors

  *This approach will help demonstrate that Chapter 9 was commenced to facilitate realistic solutions to problems. Chapter 9 is not an additional symptom of those problems.*

19

Confidential

DTMI00128749

[Speaker Notes For Slide: 19]

If a chapter 9 case becomes necessary, the commencement of a bankruptcy should be accompanied by either:

(1) A fully developed Plan of Adjustment or detailed term sheet for a Plan of Adjustment

– or –

(2) A clearly articulated, reasonable plan for resolving the City's financial difficulties – previously discussed with key constituencies – that can quickly be incorporated into a Plan of Adjustment.

~ ~ ~

This approach is intended to allow the City to describe a chapter 9 case as facilitating realistic solutions for the City's problems and not as an additional symptom or symbol of the intractability of those problems.

20

**Confidential**

DTMI00128750



# PART III – INITIAL
# PLANNING CONSIDERATIONS

21

Confidential

DTMI00128751



# Establish Long-Term Goals and Promote Inclusiveness

- Reach Consensus of City Team on Long-Term Goals and Steps to Achieve Them

- Then, Include All Constituents in Planning and Negotiations
  - Obtain – and Seriously Consider – Input From All Sources
  - Defuse Political Opposition Through Listening and Documentation
  - Establish Sub-Teams for Key Issues
  - Coordinated "Hub-and-Spoke" Approach:  Sub-Teams Report to Central Hub
  - Establish a Strong Record of Inclusiveness and Consideration of All Options

- *The City (both the Office of the Mayor and City Council), the State and the FAB should strive to coordinate their efforts in all respects.  Any differences and tensions among these groups can and will be exploited by adversaries.*

22

Confidential

[Speaker Notes For Slide: 22]

Set Long-Term Goals and Build a Strategy of Inclusiveness

A key to a comprehensive restructuring plan will be to reach consensus at the City (in consultation with its advisors, the FAB and the State) on the restructuring steps needed to achieve a durable long-term solution to the City's issues.

Thereafter, as many constituents as possible should be included in planning and negotiations.

Input should be obtained from all sources, documented and treated seriously, even if proposals appear unrealistic. Good listening skills are helpful. This can help defuse political opposition.
Sub-teams can be established by the City and its advisors to address particular issues (labor, pension/benefits, asset sales, redevelopment, capital markets, etc.).
Individual groups can report regularly to central core team of key officials and advisors (i.e., the Hub).
Jones Day often uses this Hub-and spokes approach to manage a complex restructuring efficiently and in a coordinated manner.
Establish a strong record (i.e., for future litigation) of (i) inclusiveness with respect to all constituencies and (ii) consideration of all options and proposals received

The City (both the Office of the Mayor and City Council), the State and the FAB should strive to coordinate their efforts in all respects. Any differences and tensions among these groups can and will be exploited by adversaries.

23

Confidential

# Multi-Year Budget: Set Spending Priorities Within Realistic Revenue Projections



- Basis for Any Restructuring Agreements

  - ➤ Build on Budget Work to Date
  - ➤ Identify All Revenue Sources (Including Future Sources)
  - ➤ Strive for Conservative/Achievable Revenue Estimates
  - ➤ Incorporate Cost Savings from Outsourcing and Other Initiatives

- *The Budget should include funds needed to assure the proper functioning of the City and appropriate investments to revitalize the City over the long term.*

24

Confidential

13-53846-swr   Doc 2242-6   Filed 12/19/13   Entered 12/19/13 13:44:15   Page 87 of 149
13-53846-swr   Doc 1162   Filed 10/11/13   Entered 10/11/13 15:59:45   Page 87 of 149
149
DTMI00128754

[Speaker Notes For Slide: 24]

Set spending priorities within realistic revenue projections.

A multi-year budget that includes revenue and expense projections will be the basis for determining amounts available for distribution to creditors – critical to any restructuring agreements in or out of court.

Jones Day understands that substantial work has been done in this area, and that this is a major challenge.

The City must create credibility in the face of an unsettled revenue picture.

All revenue sources should be identified, including future sources (such as monetizing assets or reallocation of state/county revenue).

At the same time, the City should strive for realistic (conservative) revenue projections to assist in planning and build credibility.

Cost savings through additional outsourcing and other initiatives should be incorporated where reasonable (e.g., exploration of regionally-based options/alternatives).

This Budget should include funds needed to assure the proper functioning of the City and appropriate investments to revitalize the City over the long term.

Projected revenues should be targeted to reinvestment where possible, with a mechanism to cover shortfalls as necessary (e.g., business, state or federal partnerships).

25

**Confidential**

# Prepare to Defend the Budget

- Defend Spending at Levels Needed to Assure Long–Term Viability

  - Focus on "Who Does Detroit Serve?"
  - Establish Case for Reinvestment
  - Defend Against Calls for Expense Reduction and Monetizing Assets to Pay Creditors

- Characterize Detroiters as "Customers"

  - Must Treat Citizens with Respect
  - Attractiveness of City to Residents and Businesses is Key

- Restructuring is About Revitalization, Not Just Creditor Recoveries

JONES DAY

26

Confidential

DTMI00128756

[Speaker Notes For Slide: 26]

Prepare to Defend the Budget.

The Budget will have to be defended against creditor criticism that it provides for excessive expenditures in light of the city's financial circumstances. We are prepared to build this case and address any concerns, including Constitutional or other legal challenges.

Although there is not much law in this area, Jones Day believes that the City can defend a decision to spend revenues at a level necessary to assure that the City functions properly and can attract residents and businesses.
Focus on "Who does Detroit serve?"

The citizens of Michigan benefit from a revitalized Detroit serving as an engine/economic driver for the state economy.
Need to establish a credible case that stability and restoration are key elements of reinvestment in Detroit.
At the same time, need to defend against approaches that focus on expense reduction and monetizing assets to pay creditors.
This will require daily coordinated effort of the City and its advisors, in further collaboration with the State.
We learned this lesson from Orange County – daily collection of information, discussion of core group, documentation of actions taken or considered and communication are key.

City should characterize its residents as "customers," a class of constituents that ordinarily is accorded significant benefits in business reorganizations.

Creditors may attempt to characterize residents as the "owners" or "voters" who should make sacrifices to facilitate payment of creditor claims.
The changes in the population of the City indicates that citizens can "vote with their feet" by leaving. A viable restructuring for a strong and vibrant Detroit must treat its citizens with respect, just as a successful business in the private sector treats its customers.
But also must focus on "absence" customers to obtain City services without contributing sufficiently to the City.

27

Confidential

DTMI00128757



# Explore All Avenues to Pay Creditors

- Creditors (and any Bankruptcy Court) Expect Reasonable Efforts to Minimize Shortfalls to Creditors

- Must Explore Long List of Options for Saving or Raising Money

  - ➢ Raising Taxes and Fees
  - ➢ Non-Core Asset Sales
  - ➢ Reducing Expenses

  - ➢ Borrowing Options
  - ➢ Pay-Per-Use Taxation
  - ➢ Regional Solutions

- Any Savings Must Be Consistent with the City's Revitalization Plans

  *A record should be established that all avenues have been explored to minimize the concessions sought from stakeholders, to bolster the notion of shared sacrifice and to support the City's case for debt reduction if a Chapter 9 ultimately is commenced.*

28

Confidential

13-53846-swit    Doc 2242-6  Filed 12/19/13  Entered 12/19/13-13-59-45  Page 91 of 49
13-53846-swit    Doc 1162  Filed 10/11/13  Entered 10/11/13-13-59-45  Page 91 of 49
149

DTMI00128758

[Speaker Notes For Slide: 28]

Creditors – and ultimately the Bankruptcy Court if a chapter 9 case is filed – will expect that the City exert reasonable efforts to reduce or eliminate any shortfall in amounts available to pay creditors.

Must find the right way to fix the deterioration in the City's balance sheet, including the rate and maturity of debt.
Recent events have driven to too much short term debt (for a municipality).
Must be able to assure both municipal debtholders and legacy creditors that this is not just a process of imposing more undesirable terms.

In practice, the City will be required to develop long lists of options for saving or raising money, evaluate the practicality of each of the options identified and pursue promising approaches.

In past cases, creditors have suggested:
Raising taxes and fees.
Selling assets creditors deemed to be excess or not required.
Reducing expenses.
Borrowing against revenue streams generated by municipal assets.
Borrow surplus amounts in funds administered by the municipality

Revenue enhancement alternatives should be explored, encouraged and defended, even in a chapter 9 setting. For example:
Pay-Per-Use Taxation. Consider implement pay-per-use taxation model as (1) impetus for voluntary compliance with "Core Detroit" infrastructure and service rationalization initiatives and/or (2) means to capture revenue from surrounding suburban communities that have historically expanded as Detroit's city center shrunk.

Regional cooperation/solutions also should be explored.

Any savings ultimately must be consistent with the plans to revitalize Detroit.

A record should be established that all avenues have been explored to minimize the concessions sought from stakeholders, to bolster the notion of shared sacrifice and to support the City's case for debt reduction if a chapter 9 ultimately is commenced.
Even in chapter 9, all pre-bankruptcy efforts should be highlighted to demonstrate the City's good faith efforts to resolve issues.
This also will help drive a model of equitable shared sacrifice of all stakeholders.
Given initiatives underway relating to labor and benefits, it appears that the municipal bondholders, swap participants and monoline insurers likely will be the last contributor and must understand the entire picture of sacrifices obtained over time.



29

**Confidential**



# Exploring Creditor Recoveries:
## Challenges and Lessons Learned

- Raising Taxes: Difficult and Possibly Counterproductive

  ➢ Tax Relief May Be Needed to Promote Investment

- Asset Sales Pose Challenges to Generating Substantial Revenue

  ➢ Sales of Assets to Pay Creditors May Not Promote Revitalization

- Reducing Expenditures Should Not Undermine Restructuring Goals

- Borrowing May Be Limited by Legal Restrictions

*Notwithstanding any challenges, the City will have to demonstrate to interested parties that all of these alternatives, and perhaps others, have been fully and fairly evaluated.*

30

Confidential

13-53846-swr   Doc 2262-6   Filed 12/19/13   Entered 12/19/13 15:44:15   Page 93 of 149
13-53846-swr   Doc 1162   Filed 10/11/13   Entered 10/11/13 15:59:45   Page 93 of 149
149
DTMi00128760

[Speaker Notes For Slide: 30]

In Jones Day's experience:

Raising additional taxes, particularly given the economic hardship in Detroit, may be difficult (if not impossible) and may be counterproductive. In fact, an evaluation of means to increase private investment dollars in Detroit suggest the need for tax relief and incentives.

Efforts by municipalities to sell or monetize asset often pose challenges to generating material value.
Disputes over the use of proceeds can undermine the benefits of an asset sale, while eroding the municipality's asset base.
Notwithstanding the foregoing, there are exceptions and unique and creative structures for asset monetization can and should be explored.
Working with the State to maximize asset revenues and cut costs could be a viable alternative to asset sales.
Regional initiatives also could be explored (joint redevelopment, sharing of services, joint purchasing arrangements).
Note: Asset monetization outside of bankruptcy may implicate eligibility requirement that City be insolvent (e.g., measured by short-term cash).

Troubled municipalities have reduced expenditures repeatedly even before financial difficulties become acute. That is true in Detroit, but additional reductions should be evaluated where feasible without undermining the City's restructuring goals.
Given the recent sacrifices already imposed on employees and legacy creditors, the City should focus prompt attention on municipal debtholders and investors who have in some cases improved their positions.

Borrowing surplus amounts in funds administered by the municipality is complicated by State and/or Federal restrictions encumbering such funds.

Using proceeds of borrowings against revenue streams to pay City obligations is also affected by laws restricting use of the underlying assets and revenue streams.

Notwithstanding any challenges, the City will have to demonstrate to interested parties that all of these alternatives, and perhaps others, have been fully and fairly evaluated.

31

**Confidential**

# Equitable Shared Sacrifice Among Creditor Groups



- Equitable Does Not Mean Equal
  - ➤ Parties Have Different Rights and Protections (Constitutional, Contractual, Legal)

- Tension Between Employees/Retirees and Bondholders/Investors
  - ➤ Employee/Retiree Sacrifices Must Be Sufficient, but Should Not Undermine Ability to Recruit and Retain
  - ➤ Employees and Retirees Already Have Made Sacrifices, While Municipal Debtholders Have Improved Position
  - ➤ Should Look at Entire Restructuring Process: Equality of Sacrifice Cannot Be Measured at a Single Point in Time

- Legal Uncertainty Regarding Sixth Circuit Treatment of Legacy Claims

- Consider Expanding Sacrifices Regionally

*The City will have to develop a proposal for dealing effectively with the issues of equitable sacrifice.*

32

Confidential

[Speaker Notes For Slide: 32]

Allocation of Sacrifice Among Competing Creditor Groups

In general, under United States bankruptcy law, including chapter 9 of the Bankruptcy Code, amounts available for distribution to creditors must be allocated in an equitable manner. "Equitable" generally means equally unless there are meaningful distinctions among the rights of competing creditors.

Recent chapter 9 cases and out of court negotiations involving troubled municipalities have involved significant disputes about whether or not workforce related claims (including claims for pension and other retiree benefits) should have some form of priority over claims for borrowed money and other commercial claims.

Pension and employee benefit commitments often are included in executory contracts. This reality may also permit some kinds of distinctive treatment from other creditor claims. In that regard, cuts in employee benefits and wages should be reasonably calibrated so that Detroit civil service compensation is market appropriate: cuts should not be so severe that the City cannot attract and retain qualified civil servants.

While legacy creditors are already being asked to make sacrifices, and have done so over the past number of months, municipal debt investors have been improving their positions. Municipal bondholders, swap participants and monoline insurers must be asked to make sacrifices compared to legacy creditors over an extended look back period. Equality of sacrifice cannot fairly be measured at a single point in time.

Tensions between statutes that protect the rights of municipal employees and the ability of municipal debtors to impair collective bargaining agreements have led to differing outcomes in bankruptcy court.

Outside of bankruptcy, Michigan employees enjoy certain constitutional protections for benefits (primarily accrued pension benefits). These protections have analogues in Michigan statutes and Detroit regulations, separate and apart from protections that may be included in CBAs, but are nevertheless considered "contractual" promises. Section 365 of the Bankruptcy Code – which is applicable to Chapter 9 proceedings – would provide Detroit with the ability to evaluate all of its "executory contracts" (including CBAs). Moreover, certain stringent restrictions on the rejection of CBAs otherwise applicable in bankruptcy do not apply in chapter 9.

Sections 903 and 904 of the Bankruptcy Code protect the power of a State to control municipalities and prohibit bankruptcy courts from interfering with the governmental power of the debtor. These provisions can be read to limit the ability of bankruptcy courts to disregard state law within chapter 9.

Thus, bankruptcy courts presiding over chapter 9 proceedings have reached differing conclusions with respect to the extent to which state laws protecting employees impact a debtor's ability to address CBA or other contractual benefits issues.

>> For example, in Orange County, certain county employee coalitions successfully prevented the debtor from modifying CBAs in a manner inconsistent with California law in connection with certain seniority rights.

>> On the other hand, in Vallejo, the bankruptcy court held that the filing of a Chapter 9 petition effectively foreclosed the application of state law in the CBA context. The Stockton court generally seconded Vallejo's approach regarding the primacy of federal law in chapter 9 in upholding the debtor's ability to reduce contractual OPEB benefits.

It is unclear whether bankruptcy courts within the Sixth Circuit – perhaps the most pro-union Circuit in the nation – would adopt the Orange County or the Vallejo/Stockton approach to incorporation of state law into chapter 9 proceedings.

The City also could look to expand sacrifices regionally, particularly in connection with shared services and shared benefits. Pursuing regional sacrifice may generate untested legal issues.

The City will have to develop a proposal for dealing effectively with the issues of equitable sacrifice.

13-53846-swr Doc 2242-6 Filed 12/17/13 Entered 12/17/13 13:59:45 Page 96 of 149

149

DTMI00128763



# PART IV – COMPONENTS AND CONSIDERATIONS FOR RESTRUCTURING PLAN

34

Confidential

DTMI00128764



# Key Plan Components

- **Pensions and Benefits**

- **Labor**

- **Municipal Debt**

- **Funds for Reinvestment**

35

Confidential

DTMI00128765

# Contrasting Approaches
# in Recent Chapter 9 Cases



- **Stockton, California**
  - ➤ Continued Pension Contributions to CalPERS as Protected by State Law
  - ➤ Ceased Retiree Health Plan Premiums
  - ➤ Proposed Impairment of Certain Bond Debt, Pensions Unimpaired
  - ➤ Restructuring Opposed by Municipal Bondholders

- **San Bernardino, California**
  - ➤ Ceased Pension Contributions to CalPERS, Seeking Impairment
  - ➤ Restructuring Opposed by CalPERS and Labor, and Supported by Municipal Bondholders

- **Central Falls, Rhode Island**
  - ➤ New State Law Created Lien in Favor of Municipal Debt Service Payments
  - ➤ Bondholders Paid 100%; Pensions/Benefits Sharply Cut
  - ➤ Policy to Favor Investors and Protect Credit Ratings

36

Confidential

13-53846-swr    Doc 2242-6  Filed 12/19/13  Entered 12/19/13 13:44:15  Page 99 of 149
13-53846-swr    Doc 1162  Filed 10/11/13  Entered 10/11/13 15:59:45  Page 99 of 149
149
DTMI00128766

[Speaker Notes For Slide: 36]

Pensions and Benefits in pending California cases

The City of Stockton (population 300,000) and the City of San Bernardino (population 215,000) filed chapter 9 cases within a month of each other in mid-2012.

Like many California municipalities, both cities have very large liabilities in respect of unfunded pension and employee benefit obligations. However, each has a taken a different course of action with respect to those liabilities.

Upon filing for bankruptcy, San Bernardino ceased contributions to the California Public Employee Retirement System (CalPERS) for amounts due in respect of unfunded pension obligations (both pre- and post-bankruptcy filing), and indicated that it intends to impair the claims of CalPERS like any other unsecured claim in the bankruptcy case.

Stockton, on the other hand, has continued making contributions to CalPERS and vowed to leave all CalPERS claims (the largest claims in the case) unimpaired under any plan of adjustment.

Stockton – supported by CalPERS – asserts that its obligations to CalPERS are mandated by state law and cannot be impaired in a chapter 9 case due to the limitations of sections 903 and 904 of the Bankruptcy Code.

Interestingly, Stockton has ceased paying retiree health care premiums reduced to promised health care benefits. Upon motion by the retirees to seek to force the city to resume such payments, the bankruptcy court issued a lengthy and important opinion touching on many questions of state sovereignty and supremacy of bankruptcy law, ultimately holding that section 904 of the Bankruptcy Code prohibited the court from granting the requested injunction against the city. In re City of Stockton, 478 B.R. 8 (Bankr. E.D. Cal. 2012). The effect of the court's opinion was to leave the retirees without a remedy, except for negotiating their treatment under the chapter 9 plan of adjustment.

The Stockton and San Bernardino cases are proceeding along parallel but opposite tracks.

In San Bernardino, due to the city's cessation of contributions to CalPERS, both CalPERS and labor groups have objected to the city's chapter 9 petition and argued, among other things, that the city will be incapable of confirming a plan of adjustment that impairs the CalPERS claims. Bondholders and bond insurers have responded in support of the city and in opposition to the CalPERS and labor objections.

In Stockton, due to the city's statement that it will not seek to impair CalPERS (and instead will seek only to impair bondholders and other unsecured creditors), it is the bondholders and bond insurers who have objected to the city's chapter 9 petition, arguing among other things that the city will be unable to confirm a chapter 9 plan of adjustment that does not impair the CalPERS claim. CalPERS has responded in support of the city and in opposition to the bondholders and bond insurers.

The cases likely will produce one or more decisions that touch upon the role and efficacy of state pension and labor law in a chapter 9 case and, when appeals ensue, ultimately may produce circuit-level authority regarding whether or not federal bankruptcy law governs in this context.

~ ~ ~

In Rhode Falls, a municipality effectively accorded priority to borrowed money creditors.

Central Falls, Rhode Island filed for chapter 9 protection in August 2011, suffering from structural budget deficits and burdensome/unpayable pension and retiree benefit obligations.

# Legacy Creditors – Pensions and OPEB



- Unfunded OPEB and Pension Liabilities Pose Challenges
    - ➢ Unfunded OPEB Liabilities Pose the Greater Challenge
- Pensions Have Substantial Underfunding, but Also Significant Plan Assets
    - ➢ OPEB is Much Larger and Unfunded
    - ➢ Health Premiums Exceed Debt Service on General Obligations
- Equitable Restructuring of Legacy Obligations Possible
    - ➢ Fewer Legal Protections for OPEB Than Pensions
    - ➢ Pensions Constitutionally Protected, but Reasonable Changes Possible
- *Formulation of Unified Labor Negotiation Strategy Critical to Success*

38

**Confidential**

[Speaker Notes For Slide: 38]

Legacy Creditors (Pensions and OPEB)

Detroit has significant OPEB liabilities and unfunded pension liabilities (i.e., unfunded actuarial accrued liabilities reported as approximately $5.7 billion and $643 million, respectively).

Recent work by Milliman suggests that unfunded pension liabilities are substantially greater than $643 million and may exceed $2 billion.

Given the magnitude of these liabilities, sound and long-term restructuring of Detroit's obligations will require across the board sacrifice from legacy creditors.

As between pension and retiree health (OPEB), OPEB poses the greater liability challenge. Pensions have substantial underfunding, but also significant plan assets, by contrast, there is no funding of OPEB and it is a significant cash drain. The City's annual health premiums far exceed principal and interest payments on general obligations.

Tools are available for an equitable restructuring.

OPEB has less legal protections under state law than pensions, providing a greater ability to cut and equitably restructure.

Pensions have certain state constitutional protections, but reasonable pension changes may be made that avoid the legal strategy of having to argue that federal bankruptcy law under chapter 9 overrides state constitutional protections.

Formulating a unified labor negotiation strategy will be critical to success. The benefit structure should be holistically analyzed to determine what changes are appropriate and necessary and can be rationally justified by other retained benefits.

39

Confidential

# Potential Pension Reform Initiatives



- Jones Day Has Significant Public and Private Pension Experience

  ➢ We Know, Respect and Are Prepared to Work with the City's Other Advisors on Benefit Issues

  ➢ Plan Must Be Developed Collaboratively Between City and Its Advisors

- A Framework for Pension Reform Could Include the Following Elements:

  ➢ Require All New Employees to Participate in DCPs, Rather than DBPs

  ➢ Prospectively Eliminate COLAs for active members

  ➢ Raise Retirement Ages, Reduce Early Retirement Subsidies

  ➢ Consider Changes to Secondary/Ancillary Features of DBPs

- *We believe that existing basic pension formulas can be preserved for current active members while saving significant sums for Detroit*

40

**Confidential**

[Speaker Notes For Slide: 40]

Potential Pension Reform Initiatives.

We understand that the City has engaged other pension and benefit experts on these issues.
We know, regularly work with and respect the City's other advisors and would look forward to working with them to refine the recommendations to fit within a restructuring or chapter 9 strategy

We have significant public pension experience, and well know the differences between federally-regulated private sector arrangements and public plans.

We have begun the process of evaluating the pension issues facing the City. Any plan would need to developed based on the collaborative work of the City and its advisors after further review. Based on what we know, and our experience in other matters, we believe a framework for pension could include the following elements.
Require all new employees to participate in defined contribution plans, rather than defined benefit plans.
Prospectively eliminate COLAs for all active members
Raise retirement ages for certain employees, reduce early retirement subsidies.
Additional changes to secondary and ancillary features of defined benefit pension arrangements.

Proposed changes could allow most existing basic pension formulas to be preserved for current active members while saving significant sums for the City. But legislative action – e.g., amendment to the City Charter and Ordinances – may be necessary to achieve certain of these changes.
If needed, chapter 9 could be used as a means to further cut back or compromise "accrued financial benefits" otherwise protected under the Michigan Constitution.

41

**Confidential**

DTMI00128771



# Potential OPEB Reform Initiatives

- Evaluate Benefits of De-linking Retiree Health Plan from Active Employee Health Plan Design and Contribution Structure

- Design of a New Replacement OPEB Plan Could Include the Following:
  - ➤ Increase Retirement Age
  - ➤ Transition Younger Retirees to State-Based Exchanges and Federal Subsidies under Affordable Care Act
  - ➤ Increase Use of the Medicare Programs – Part A, Part B, and Part D
  - ➤ Impose Reasonable Retiree Premiums (For Existing Retirees, Link to COLAs)
  - ➤ Audit Records to Cut Off Funding to Unqualified Dependants
  - ➤ Consider Defined Contribution Model for Future Retirees

- Consider Funding of OPEB through Tax-Exempt Trust

- Evaluate Required Scope of Coverages under City Code

- Be Prepared for Argument that Adverse 6th Circuit Law Applies
  - ➤ 6th Circuit Adverse Cases Involve Private Sector Plans, but Unions Likely Will Argue They Are Applicable Here

42

Confidential

[Speaker Notes For Slide: 42]

Potential OPEB Reform Initiatives.

We have begun the process of evaluating the OPEB issues facing the City. Any plan needs to address both the long-term OPEB liability, and the significant annual cost for coverage. This would need to be developed based on the collaborative work of the City and its advisors after further review. Based on what we know, and our experience in other matters, we believe a framework for OPEB obligations could include some or all of the following elements:

The City Should Evaluate "De-Linking" of Benefits Under Retiree Health Plans from Plan Design and Contribution Structure for Active Employees.
Linking OPEB benefits to plan for active employees generates large inefficiencies and costs. It will be more difficult to address the $5.7 billion underfunding of OPEB benefits without severing this link.

Design New Replacement OPEB Plan
Retiree healthcare currently is provided to many younger individuals who are not objectively recognized as retirees. Modifications could increase retirement age to cover only "true" retirees (as opposed to persons in their 40s), to decrease costs and transition younger retirees to state-based exchanges (based on residence) and available federal subsidies under Affordable Care Act.
Better use of the Medicare programs – Part A, Part B, and Part D (drug benefits) to provide the fundamental coverage to true retirees.
Impose reasonable retiree premiums; link retiree premiums to pension COLAs.
Audit records to cut off funding of benefits to ineligible dependents.
Consider defined contribution model for retirees.

Also Consider Funding of OPEB through a Tax Exempt Trust
Available in the non-ERISA, governmental plan setting based on existing IRS guidance (e.g., Private Letter Ruling 201136007, September 9, 2011).
Provides more flexibility than a VEBA, but still need cash or other assets to fund such a trust, so this may not be a viable approach.

Language in the Detroit City Code establishing the OPEB obligations may allow argument that the scope of currently offered coverages is not required.

Also, unlike accrued pension benefits, OPEB obligations are not constitutionally protected.

Must be aware, and wary, of Sixth Circuit law that is favorable to unions/retirees and adverse to actions the City may wish to take.
Much of the most concerning Sixth Circuit law is predicated on federal ERISA and the Labor Management Relations Act (relating to private sector plans), which are inapplicable to municipal plans.
But we should anticipate an argument that this reasoning should be applied as a matter of state law to municipal plans, and the City should be prepared for that.

Chapter 9 could be used, or threatened, as a means to accomplish a compromise of benefit costs (rejecting contracts or compromising claims).

43

Confidential



# Labor Issues

- Renegotiation of CBAs Must Focus on Economic Stability

- Immediately Conduct Supporting Financial Analysis

  ➢ Establish Necessary Savings

  ➢ Demonstrate Fair Allocation Between Personnel and Non-Personnel Costs

- Demonstrate a Commitment to the Unions That They Are Partners

  ➢ Demonstrate That Near-Term Sacrifices Provide Long-Term Benefits

- Formulate Easy-to-Understand Messages for Membership/Public

- Consider Need to Amend City Charter and Code, or other Legislative Action, for Pension/OPEB Changes

44

Confidential

[Speaker Notes For Slide: 44]

Labor

Renegotiating collective bargaining agreements to terms that provide economic sustainability will be key to the City's recovery.

Financial analysis must be conducted at the outset – and must be unimpeachable – to show the savings needed and how those necessary savings are being allocated between personnel vs. non-personnel related costs.

Will need to demonstrate a commitment to unions that they are partners in this process and the near term sacrifices will provide longer term benefits to their members (preservation of jobs – a return to financial health for Detroit).

In addition to conveying these economic needs at the bargaining table, we must be prepared to provide simple, easy to understand messaging to the membership and the public.

City charter and ordinances governing pensions may provide an additional hurdle that will need to be overcome via legislative amendment. Renegotiating collective bargaining agreements will not automatically supersede ordinances and charter. There appears to be somewhat more flexibility on the retiree medical expenses, but here too there may be a need for legislative action.

45

Confidential

# Municipal Debt – Overview of Approach

- Viable Threat of Chapter 9 is Critical

  ➢ Only Chapter 9 Allows Non-Consensual Impairment of Municipal Debt

- Fair Sacrifice Needed from Municipal Debtholders

  ➢ Employees/Retirees Already Sacrificed (and May Again)

  ➢ Investors Accepted City's Credit and Were Compensated for Risk

  ➢ Investors Have Adjusted Credit Terms to Their Benefit as City's Finances Worsened

- City Should Make Clear That it is Not Prepared to Dedicate Scarce Resources to Prefer Debtholders over Residents, Businesses and Revenue-Driving Activities

- Refinanceable Bond Debt Presents a Unique Opportunity

  ➢ Potential for Advantageous Fixed Rates Over an Extended Term



-16-

Confidential

13-53846-swr    Doc 2242-6  Filed 12/19/13  Entered 12/19/13 15:59:45  Page 109 of 149
13-53846-swr    Doc 1162-6  Filed 10/11/13  Entered 10/11/13 15:44:15  Page 109 of 149
149
DTMI00128776

[Speaker Notes For Slide: 46]

**Municipal Debt** [Emphasize Jones Day's significant expertise/experience with respect to municipal finance, a core competency that may separate Jones Day from other firms.]

Chapter 9 is only real mechanism to impair significant debt without consent, so the viable threat of chapter 9 is critical especially to deal with municipal debtholders. This creates real leverage.

Sacrifice by municipal debtholders is important, especially since employees and retirees have already made real personal sacrifices, and may be asked for more.

Providers and investors in funded debt accepted the City's credit and were compensated for the risk.

We are prepared to deal with these parties as creditors of the City in transparent and fair manner.

It should be made clear that the City is not prepared to dedicate scarce resources to prefer debtholders over residents, businesses and revenue driving activities.

Any effort of General Obligation creditors to obtain the collateral protections of special revenue bonds should be approached with caution.

Different types of debt receive different treatment in municipal bankruptcy cases.

General obligation bonds are treated as general debt in chapter 9. A municipality is not required to make payments of either principal or interest on account of such bonds during the case.

Certain restrictions on how debt may be readjusted in traditional bankruptcy proceedings do not apply in chapter 9. Thus, Detroit would be able to impose favorable terms upon general obligation bonds (e.g., the imposition of non market interest; drastically extended repayment terms; delays in cash payments) pursuant to a Plan of Adjustment, the only caveat being that such terms are consistent with State law.

Chapter 9, however, provides certain protections to creditors holding liens upon special project revenues. This may be of particular importance to Detroit, given the scope of its special project debt (e.g., bonds issued in connection with the construction/overhaul of water and sewer plants, collateralized with the revenues and fees earned by such projects).

Specifically, the "special revenues" from these projects remain subject to the liens of the bondholders in the specific projects and those revenues (1) must be used to fund the "necessary operating expenses" of the special project or to pay back bondholders and (2) may not be diverted to support the general obligations of the municipality. Defining what constitutes the "necessary operating expenses" of a given special project has been the subject of litigation in other chapter 9 cases (most recently, Jefferson County); courts appear inclined to interpret the phrase narrowly. The Jefferson County case is for review by the Eleventh Circuit.

With a credible threat of chapter 9, the City has leverage:

Cramdown in chapter 9 is possible if there is one accepting impaired class, meaning that a non-accepting class of debtholders could be bound by the Plan of Adjustment to compromise their debt.

Amortizations of debt suggest that municipal debt holders have been adjusting their credit terms to their benefit as the City's finances have worsened. This supports a greater sacrifice at this point by debtholders.

This also appears to a readily re-financeable structure, and there is a unique opportunity to obtain advantageous fixed rates for an extended period if the negotiations are conducted properly.

47

Confidential

# Municipal Debt – Other Issues



- Carefully Evaluate POC Debt and Related Swaps
  - ➤ Unique Structure Could Raise Restructuring Issues

- Swap Termination Issues
  - ➤ Termination Rights Generally Protected in Bankruptcy
  - ➤ Recent Grant of Collateral Still Can Be Evaluated for Fraudulent Transfer
  - ➤ Consider Other Market Transactions to Address Swaps

- Engage Monoline Insurers Promptly with Coordinated Message

- Coordinate Funding Solutions with State
  - ➤ State Likely Instrumental in Financing, Revenue-Generating and Cost-Cutting Transactions
  - ➤ Several Recent Examples
  - ➤ Consider Eligibility Ramifications

- Should Pursue Achieving Some Excess Debt Capacity, Flexibility

48

Confidential

DTM00128778

[Speaker Notes For Slide: 48]

Treatment of POC debt and related swaps should be carefully evaluated because the unique structure could raise issues in a restructuring.

Swap counterparties may assert termination rights and must be addressed promptly.
Can build on negotiations that have been ongoing.
Termination rights not impacted by bankruptcy do to safe harbors, but treatment of claims may remain an issue.
Notwithstanding safe harbors, recent granting of collateral on swap debt could be avoidable if there was fraud. LIBOR rate cases may be relevant.
City should consider addressing swaps through market transactions.

For substantial insured debt, the credit insurers will have to be engaged in a meaningful way at the outset.
Jones Day is experienced dealing with monoline insurers with the economic interest relating to insured debt.
Monolines are involved in both bond and POC debt.

Funding solutions should be coordinated with the State, which is expected to be an instrumental party, in any new financing transaction or other revenue generating or cost cutting transactions (e.g. Belle Isle lease, regional transportation authority, funding to support Detroit Downtown Development Authority and possible new arena and commercial developments).
Again, receipt of State funding out-of-court may implicate eligibility concerns.

Debt negotiations should account for need for some excess debt capacity to cover potential shortfalls, provide flexibility and, if needed, fund any legacy debt solutions.

49

Confidential

JONES DAY

# PART V –
## ADDITIONAL PROCESS POINTS

50

Confidential

DTM00128780



# Pay Careful Attention to Political Implications of Restructuring

- All Decisions and Actions Will Have Political Implications and Consequences

- Political Implications of Proposals Should Be Identified and Vetted as Early as Possible

- Ensure that All Statements Are Consistent with Overall Communications Plan

*The Jones Day team has extensive experience in cases of national significance and understands this imperative.*

51

Confidential

|Speaker Notes For Slide: 51|

Every decision and action taken by the City in responding to its financial crises will have political implications and, potentially, political consequences.

Political aspects of all proposed actions have to be identified and vetted as early as possible.

Every statement (including any court filings or arguments in court) must be consistent with an overall communications plan.

Statements made in collective bargaining must be carefully considered. Prospect of negotiation positions and statements being leaked to media outlets is significant.

Must be strong sensitivity to public relations campaigns by various constituencies.

The Jones Day team has extensive experience in cases of national significance and interest and understands these imperatives.

52

Confidential

# Understand and Anticipate Positions of Creditors



- **Employees/Retirees Will Argue:**
  - ➤ Obligations Cannot Be Modified as a Matter of Law
  - ➤ Modifications Make City Less Attractive to Qualified Job Candidates
  - ➤ Continuing Contractual Relationship Should Be Preferred over Debt

- **Debtholders/Monoline Insurers Will Argue:**
  - ➤ Repayment of Debt Essential to Continuing Access to Credit Markets
  - ➤ State Has a Moral/Practical Obligation to Ensure Repayment
  - ➤ Defer – and Provide Security for – Obligations Instead of Impairment

- City Responses Must Be Reasoned and Consistent

- Concessions Will Not Be Made to Give Any Group an Unfair Advantage

- Critically, New Revenues Must Be Preserved for Reinvestment
  - ➤ New Funders Cannot Be Compelled to Accede to Creditor Demands
  - ➤ Earmark New Money for Legally/Politically Sound Revitalization Activities

53

Confidential

DTMI00128783

[Speaker Notes for Slide: 53]

**Anticipated Positions of Creditors:**

Municipal employees and their representatives will contend:
Obligations to them cannot be modified as a matter of law.
Obligations to employees should not be modified because the City has to be able to attract job candidates and cannot fall behind pay and benefit packages provided by either nearby municipalities or other unionized businesses.
Obligations to employees do not have to be impaired to the same extent as borrowed money creditors because their claims are connected to contracts that have to continue in effect.

Debt holders and insurers will contend:
Repayment of borrowed money claims is essential to access to financing markets going forward. This argument is used to justify extreme budget austerity and asset sales, whether or not beneficial on a long term basis.
The State of Michigan has a moral or practical obligation to ensure repayment of City debt. This argument is used to attempt to convince the State to contribute State resources to the satisfaction of City debt and to induce the State to pressure the City to make choices favoring debt repayment over other priorities.
Deferral of obligations, even if ability to pay in the future is uncertain or questionable, is a preferred approach to deal with inability to satisfy obligations. Usually, this approach is coupled with demands for security that will improve the position of borrowed money creditors in any subsequent debt restructuring.

The City must be prepared to respond to these competing points of view in a reasoned and consistent manner.

Concessions should not be made to one group – such as debtholders – to give them an unfair advantage.

Most critically, as the City gains access to new revenues, it must develop an approach that preserves those revenues for reinvestment in the City and not just to pay off preexisting debts.
As seen in the Chrysler case, new funders or buyers cannot be compelled to accede to creditor demands.
New money may be earmarked for revitalization activities as long as the transaction is legally and politically sound.

54

**Confidential**

DTMI00128784

# Plan of Adjustment Issues



- Enabling Legislation May Be Necessary

  - ➤ E.g., Authorization of Financing Techniques
  - ➤ Identify and Draft Necessary Legislation Early to Avoid Delays

- Best Interests Test

  - ➤ Demonstrate Reasonable Efforts to Satisfy Debts to the Extent Possible

- Cram Down: Impose Terms of Plan on Dissenting Creditor Classes

  - ➤ A Municipality Must Raise Taxes to the Extent Possible Without Triggering a "Death Spiral"
  - ➤ Expert Testimony on Tax Burdens May Be Needed

*It is crucial to focus on the plan approval standards throughout the debt adjustment process in case a Chapter 9 case is required.*

55

Confidential

[Speaker Notes For Slide: 55]

**Plan of Adjustment**

The goal of a chapter 9 filing for Detroit would be to emerge with a successful "Plan of Adjustment," in which the City's debts are reduced and/or restructured in a manner that is feasible given its budget and consistent with its long term revitalization strategy.

The Plan of Adjustment is a document that would establish the treatment of the various classes of creditors' claims against Detroit.

**Enabling Legislation May Be Necessary**

Often, transactions contemplated by or specified in a Plan of Adjustment must be also authorized by legislation.

Examples of such legislation include authorization of financing techniques.

Needed legislation should be identified and drafted as early in the process as possible to avoid delays as bills move their way through the legislature.

**Key Confirmation Standards**

**Best Interests Test**

Applicable to all creditors, whether or not the creditor is in a class that has accepted the plan.

As generally applied, requires a troubled municipality to make reasonable efforts under all the circumstances to satisfy its debts to the greatest extent possible. The strategy outlined above should help us support this finding.

**Cram Down**

Confirmation of a non-consensual plan is possible under chapter 9.

Senior classes must be paid before more junior classes can receive any distribution.

Applied to municipalities with unlimited taxing power, a municipality must use its ability to raise taxes the extent possible without triggering a "death spiral" that would ultimately destroy the municipality.

Traditionally, this question has been determined based upon expert testimony.

Tax burdens in other comparable municipalities should be important as well.

It is crucial to focus on these standards through the debt adjustment process and continuing to build the case that if necessary, the City can confirm a Plan of Adjustment that does not provide for payment in full of all indebtedness.

DTMI00128786

# Any Chapter 9 Process Should Be Comprehensive

- **Plans of Adjustment Address Narrow Range of Economic Compromises**

- **Other Fundamental Changes Must Occur Outside the Plan Context**

- **Any Chapter 9 Process Should Pursue as Many Revitalization Initiatives as Possible**

- **Negotiating in Chapter 9 – or Its Shadow – Is a Powerful Tool for Revitalization**

- **The City Should Take Advantage of Its Opportunity for Long-Term, Comprehensive Solutions**

JONES DAY

57

Confidential

[Speaker Notes For Slide: 57]

Any Chapter 9 Process Should Be Comprehensive

A chapter 9 Plan of Adjustment can only accomplish a narrow band of economic compromises.

This type of debt restructuring is critical, but other fundamental changes of great importance can only occur outside of the Plan of Adjustment.

If a chapter 9 case is commenced, the City should use the process to address as many additional items as possible, not just the core debt readjustment issues in a Plan of Adjustment.

Negotiating in the chapter 9 environment – or even in the shadow of chapter 9 – is a powerful tool to pursue the City's revitalization agenda.

58

**Confidential**

DTM00128788

13-53846-swr   Doc 2242-6   Filed 12/19/13   Entered 12/19/13 15:59:45   Page 121 of 149

# Key Restructuring Lessons



- Develop Comprehensive Plan, Supported by Defensible Budget and Assumptions

- Develop Out-of-Court Approach That Translates to Chapter 9

- Set Clear Positions Early

- Be Inclusive and Communicate

- Pursue Shared Sacrifice Without Compromising Long-Term Revitalization Goals

59

Confidential

[Speaker Notes For Slide: 59]

Key Restructuring Lessons

Develop comprehensive plan, supported by defensible budget and assumptions.

Develop out-of-court approach that will work if needed in chapter 9.

Set positions early.

Be inclusive and communicate.

Pursue shared sacrifice without compromising long-term revitalization goals.

60

Confidential



# PART VI – OTHER ISSUES

61

Confidential

# Select Asset Monetization Issues

- Evaluate Impact of Any Asset Sale on Chapter 9 Eligibility

- Water and Sewer
  - Various Legal and Practical Challenges Facing Monetization of DWSD Assets
  - Regional Stakeholders Will Seek Input
  - Consider Collaboration with EPA and Regional Partners to Develop Creative Solutions

- Lease/Operating Agreements
  - Could Evaluate for Airport or Other Assets
  - Recent Collaborations with State Could Be a Model

- Airport Privatization Under FAA Pilot Program

JONES DAY

62

Confidential

DTMI00128792

13-53846-swr   Doc 2242-6   Filed 12/19/13   Entered 12/19/13 13:44:15   Page 125 of 149
13-53846-swr   Doc 1162   Filed 10/11/13   Entered 10/11/13 15:59:45   Page 125 of 149
149

[Speaker Notes For Slide: 62]

Asset Sale/Privatization/Monetization Issues (Select Issues)
Concerns regarding eligibility for Chapter 9 may be implicated by asset monetization.
Any transaction should be reviewed and structured to address any eligibility issues (e.g., earmarking of funds).

Water and Sewer
Detroit Water and Sewer Department services much of southeast Michigan (Wayne, Oakland, Macomb counties).
Much of the DWSD's infrastructure is owned and operated by these surrounding counties (and the communities located therein), complicating efforts at restructuring.
DWSD services nearly 100 "first-tier" and "second-tier" customers (e.g., from the surrounding counties), all of whom would seek input with respect to restructuring.

Monetization of assets could be challenging.
The Detroit City Charter prohibits the sale of "any city-owned public utility furnishing water and sewerage services, unless approved by a majority of city voters voting on the question at a regular or special election."
Statutes/codes/caselaw may require that funds received from disposition be allocated (e.g., to pension/OPEB liabilities) in a fashion that frustrates ability to allocate funds towards restructuring initiatives.
Monetization of assets may trigger consequences under existing debt and derivative documents.
Open question whether limited universe of "purchasers" could assume liabilities.
An emergency manager, a chapter 9 proceeding or changes to law could be required to overcome obstacles.

Consider different rate structures, regional authority.

EPA litigation complicates the circumstances.

Possibly could explore with EPA and other recipients of services how to make this self-sustaining and profitable

Negotiating in the shadow of bankruptcy could provide useful leverage for creative solutions.

Combination Lease/Operating Agreement
Could be used for airport or other assets.
The proposed Belle Isle lease may be a model for this kind of transaction.
With respect to the Coleman Young airport, for example, Detroit could evaluate entering into an arrangement combining a lease of airport property with an airfield operating agreement, with the end result being similar to the transfer of possession and operating responsibility to a private operator while falling short of a full lease of the airport.
Under this model, Detroit would remain responsible for major operating and development decisions, but the burden of operating the airport on a daily basis would be alleviated.
Might be more attractive to airport than FAA pilot program to sell asset that we can discuss (comes with various conditions).

Airport Privatization Under FAA Pilot Program [De-emphasize in light of potential unavailability of program]
Privatization of Detroit airports historically impeded by federal aviation law preventing cities from retaining the proceeds of an airport sale or transfer.
A recent FAA pilot program – adopted by Congress in 1996 – for the privatization of airports, however, may allow Detroit to privatize an airport freed from federal restrictions on the use of proceeds.
Program recently used to sell Midway Airport, with cash value going to the City of Chicago
Under the program, the FAA is authorized to exempt up to ten airports from the relevant federal statutory and regulatory requirements (i.e., to repay Federal grants, return



# Prepare for Legal Challenges

- **In a Chapter 9 Setting, Legal Challenges of Various Actions Are Inevitable**

  ➢ **Jones Day Is Well Positioned to Address These Challenges**

  ➢ Substantial 6th Circuit Experience

  ➢ Knows How to Expedite Review

- **Various Challenges to PA 436/Emergency Manager Authority Possible**

  ➢ **Challenges at Ballot Box: Renewed Referendum Process**

  ➢ **Other Legal Challenges in Court**

  ➢ **Challenges Could Cause Delay, Threaten Progress**

  ➢ **Jones Day Can Work With the City's Current Advisors to Address Efficiently**

64

Confidential

[Speaker Notes For Slide: 64]

Prepare for Legal Challenges

If a chapter 9 case is commenced, it is anticipated that parties will to raise numerous legal challenges to the City's efforts. Jones Day is well prepared and positioned to address these challenges.
We have substantial 6th Circuit experience.
Also know how to expedite proceedings.

The City also should be prepared to address expected challenges to PA 436 and the Authority of any Emergency Manager. These challenges could delay restructuring initiatives or threaten to overturn progress made under these authorities.

Challenges could include:
Challenges at Ballot Box. Critics of PA 436 have already indicated that legal challenges to the law will be forthcoming. Stand Up for Democracy (which led the effort to reject PA 4) has suggested that it will begin a similar referendum process with respect to PA 436 (although appropriation component of PA 436 may insulate it).
Legal Challenges. Critics of PA 436 are likely to challenge the statute on grounds that the powers over contracts granted to emergency managers (including the power to reject, modify or terminate CBAs) violate the Contracts Clause of the U.S. Constitution.
Further challenges could include (1) whether PA 436 can be insulated from the referendum process through inclusion of a minor appropriation, (2) whether the law properly grants unelected emergency managers the power to displace elected officials/disenfranchise the electorate and (3) whether PA 436 was properly enacted in light of the voter rejection of PA 4 (which has been characterized by some as "substantially similar").

65

Confidential

13-53846-swr Doc 2262-6 Filed 12/19/13 Entered 12/19/13 15:39:45 Page 128 of 149
13-53846-swr Doc 2262-6 Filed 10/11/13 Entered 10/11/13 15:59:45 Page 28 of 94
149
DTMI00128795



# EPA Litigation Issues

- Restructuring Strategy Must Account for EPA Litigation and Rulings of Judge Cox

- Consider Approaches to Consolidate Issues with the Rest of the Restructuring Process

- Consider How EPA Litigation Could Impede or Assist Detroit in Chapter 9

66

Confidential

13-53846-swr Doc 2242-6 Filed 12/19/13 Entered 12/19/13 15:44:15 Page 129 of 149
13-53846-swr Doc 1162 Filed 10/11/13 Entered 10/11/13 15:59:45 Page 129 of 149
149
DTM100128796

[Speaker Notes For Slide: 66]

Other EPA Litigation Issues

Need to coordinate strategy with relevant aspects of EPA litigation, including rulings regarding CBAs and bargaining

Consider approaches to consolidate these discrete issue with the rest of the restructuring process.

Consider how EPA case could impede or be used to assist in any chapter 9 case.

67

Confidential



# PART VII – CONCLUSION

68

Confidential



# Jones Day Is the Right Choice for Detroit

- We are committed to this project, which we view as a matter of particular importance given our Midwestern, industrial roots

- We are committed to working with the City and its advisors and stakeholders to find and pursue real solutions that will revitalize the City of Detroit

- We have a wealth of experience, expertise, creativity and energy throughout our firm

- We are here to help, as part of the team, in whatever way we can

69

Confidential

DTM00128799

[Speaker Notes For Slide: 69]

Jones Day Is the Right Choice for Detroit:

We are committed to this project, which we view as a matter of particular importance given our Midwestern, industrial roots.

We are committed to working with the City and its advisors and stakeholders to find and pursue real solutions that will revitalize the City of Detroit.

We have a wealth of experience, expertise, creativity and energy throughout our firm.

We are here to help, as part of the team, in whatever way we can.

70



**Confidential**

DTMI00128800



# ANNEX A:

# THE REST OF THE JONES DAY TEAM



Confidential

71

# The Jones Day Team



**Jeffrey Ellman**
Restructuring



**Evan Miller**
Employee Benefits



**Sarah Heck Griffin**
Public Pensions



**David Kates**
Public Finance



**Brian Sedlak**
Public Projects
& Infrastructure



**Peter Clarke**
Public Projects
& Infrastructure



**Rebecca MacPherson**
Public Projects
& Infrastructure



**Naveen Rao**
Public Projects
& Infrastructure



JONES DAY

72

Confidential

DTMI00128802

# The Jones Day Team



**Robert Louis Ford**
Labor



**Lawrence DiNardo**
Labor



**Wesley Johnson, Jr.**
Mergers & Acquisitions



**Beth Heifetz**
Issues & Appeals



**Richard Deane**
Litigation



**Yvette McGee Brown**
Litigation



**Jayant Tambe**
Litigation



**Chad Readler**
Litigation

JONES DAY

73

Confidential



# Annex B:

# Certain References

74

Confidential



# References

The Honorable John E. Ryan (Retired)
United States Bankruptcy Court for the Central District of California
760-522-6016

Thomas W. Hayes
Former Treasurer and Director of Finance, State of California
916-806-6200

Chris Varelas
Founding Partner, Riverwood Capital
650-618-7377

Confidential

75

# EXHIBIT  C

| From: | Bill Nowling [NowlingB@detroitmi.gov] |
|---|---|
| Sent: | Monday, July 08, 2013 2:28 PM |
| To: | Greg Tedder; Holyfield, Jeff (GOV); Wurfel, Sara (GOV) |
| Cc: | Shani Penn |
| Subject: | DRAFT Comms Planning and Proposed Roll Out |
| Attachments: | Chapter 9 Comms Document Checklist July 1, 2013.docx; Chapter 9 Messages - July 1, 2013.docx; Copy of Ch 9 Comms Rollout July 4, 2013.xlsx |

All,

Attached are three files for your review. These are DRAFT documents and are not ready for review beyond staff level at this time.

Bill

Bill Nowling
Office of Emergency Manager Kevyn Orr
Mayor's Office
2 Woodward Ave., Suite 1126
Detroit, MI 48226
(O) 313-628-0950
(M) 313-310-2484
nowlingb@detroitmi.gov

1

SOM20010097

# Chapter 9 Communications Rollout

| Date | Event | Responsibility |
|---|---|---|
| | **Monday, July 1st, 2013** | |
| | Begin drafting key communications documents (see document checklist for specific materials and related responsibilities) | AMG / BN / JD / GT |
| | Send messages, document checklist and rollout to B. Nowling | AMG |
| | **Tuesday, July 2nd, 2013** | |
| | Circulate messages, document checklist and rollout to JD, MB and GT | AMG / BN |
| | **Wednesday, July 3rd, 2013** | |
| 2:00 pm ET | Working group update conference call - agree responsibilities for communications materials | AMG / BN / MB / JD / GT |
| | Continue drafting key communications documents | AMG / BN / GT / HH / JD / KO / MB |
| | **Friday, July 5th, 2013** | |
| | Continue drafting key communications documents | AMG / BN / GT / HH / JD / KO / MB |
| | **Monday, July 8th, 2013** | |
| | Continue drafting key communications documents | AMG / BN / GT / HH / JD / KO / MB |
| | identify translation needs / capabilities | AMG |
| | **Tuesday, July 9th, 2013** | |
| | Continue drafting key communications documents | AMG / BN / GT / HH / JD / KO / MB |
| | **Wednesday, July 10th, 2013** | |
| | Continue drafting key communications documents | AMG / BN / GT / HH / JD / KO / MB |
| | Pension Advisers meeting | JD |
| | **Thursday, July 11th, 2013** | |
| | Circulate draft materials to communications working group | AMG / BN / GT / HH / JD / KO / MB |
| | Develop media strategy for filing | BN / AMG |
| | **Friday, July 12th, 2013** | |
| 2:00 pm ET | Working group update conference call - finalize communications materials | AMG / BN / JD / MB / GT / others as appropriate |
| | **Monday, July 15th, 2013** | |
| | Circulate final communications materials and media strategy to Governor, Treasury | GT / BN |
| | Engage Bader TV to begin creating B-roll for announcement day press conference and broadcast media use | BN |
| | **Tuesday, July 16th, 2013** | |
| | Finalize all communications materials | AMG / BN / GT / HH / JD / KO / MB |
| | **Wednesday, July 17th, 2013** | |
| | Walk through with Governor | GT / BN / JD / MB |
| | **Thursday, July 18th, 2013** | |
| | Make last-minute revisions to all key documents | AMG / BN / GT / HH / JD / KO / MB |

# Chapter 9 Communications Rollout

6:00 pm ET

Pre-briefing with selected media

BN / KO / JD / MB

# Chapter 9 Communications Rollout

| Date | Event | Responsibility |
|---|---|---|
| | *Friday, July 19th, 2013 - FILING DAY (assumes morning filing)* | |
| 9:00 am ET | Governor's office transmits authorization to Emergency Manager | Governor / GT |
| | Kevyn Orr to meet with DB | KO |
| | Kevyn Orr to call White House | GT |
| | Governor's office to call legislative leaders | GT |
| | Governor's DC office to call Congressional legislation | KO |
| 10:00 am ET | File necessary paperwork with court system | JD |
| | Issue notice of 12 pm ET press conference | BN |
| | Issue press release via PR Newswire | AMG |
| | Send citywide employee email from Kevyn Orr | KO |
| 11:00 am ET | Kevyn Orr to meet with department directors; provides update on filing, FAQ and outlines expectations/dispells rumors (government will continue and employees will still get paid) | KO / BN |
| 12:00 pm ET | Press conference with Governor Snyder and Kevyn Orr at Cadillac Place (Governor to handle additional local / national interviews until 3:00 pm ET, with Kevyn Orr taking over for the remainder of the day) | Governor / KO / BN / GT |
| | FAQs posted to EM/City Website | TBD |
| | Tape interviews and B-roll for networks | Governor / KO (via Bader TV) |
| 1:00 pm ET | Pitch Kevyn Orr for Sunday morning talk shows:<br>- Face the Nation (CBS - 10:30-11:30 am ET)<br>- Meet the Press (NBC - 9:00-10:00 am ET)<br>- This Week with George Stephanopoulos (ABC - 10:30-11:30 am ET)<br>- Fox News Sunday (Fox - 10:00-11:00 am ET) | BN / AMG |
| 1:30 pm ET | Editorial board briefing with the *Detroit News* | KO / BN |
| 2:00 pm ET | Pitch New York editorial board briefings with *The Wall Street Journal, The New York Times, Financial Times* and Bloomberg for week of July 22nd | AMG / BN |
| 2:30 pm ET | Editorial board briefing with the *Detroit Free Press* | KO / BN |
| 3:30 pm ET | Look-Live recorded in-studio interview - WDIV TV (NBC) | KO / BN |
| 5:00 pm ET | Live interview in-studio - WXYZ TV (ABC) | KO / BN |
| 5:30 pm ET | Live interview in-studio - WJBK TV (FOX) | KO / BN |
| | *Saturday July 20th, 2013* | |
| 7:00-9:00 am ET | Kevyn Orr to potentially appear on network news shows (remotely via satellite) | KO / BN |

# Chapter 9 Communications Rollout

| | | |
|---|---|---|
| **Sunday, July 21st, 2013** | | |
| 7:00-11:30 am ET | Kevyn Orr to appear on some combination of CBS, NBC, ABC and Fox morning talk shows | KO / BN |
| **Week of July 22nd, 2013 and Ongoing** | | |
| | Continue to media monitor; correct inaccuracies | AMG / BN |
| | Continue engagement with key audiences | Responsible parties identified in document checklist |
| | Continue engagement with the media, including strategic use of Governor Snyder, Andy Dillon and third-party supporters | BN / KO / Governor / GT / JD / MB /AMG |
| | Continue to keep financial community and other constituencies updated on progress | BN / GT / HH / JD / MB / AMG |
| **Monday, July 22nd, 2013** | | |
| 7:20 am ET | Kevyn Orr on Paul W. Smith Show | KO / BN |
| 7:45 am ET | Kevyn Orr on WWJ AM | KO / BN |
| 8:10 am ET | Kevyn Orr on Frank Beckmann Show (taped) | KO / BN |
| 9:00-3:00 pm ET | HOLD for TBD hearings | KO |
| **Tuesday, July 23rd or Wednesday, July 24th, 2013** | | |
| 10:00-11:00 am ET | Editorial board briefing with *The Wall Street Journal* | KO / BN / AMG (Governor and Treasurer, schedule |
| 11:30-12:30 pm ET | Editorial board briefing with *The New York Times* | KO / BN / AMG (Governor and Treasurer, schedule |
| 1:30-2:30 pm ET | Editorial board briefing with Bloomberg | KO / BN / AMG (Governor and Treasurer, schedule |
| 3:00-4:00 pm ET | Editorial board briefing with the *Financial Times* | KO / BN / AMG (Governor and Treasurer, schedule |

# EXHIBIT  D

| From: | Dillon, Andy (Treasury) |
|---|---|
| Sent: | Tuesday, July 09, 2013 11:35 PM |
| To: | Snyder, Rick (GOV); Muchmore, Dennis (GOV); Baird, Richard (GOV) |
| Cc: | Tedder, Greg (GOV); Saxton, Thomas (Treasury); Stibitz, Brom (Treasury) |
| Subject: | Detroit |

Governor,

Kevyn will meet with the Detroit Pensions tomorrow after all. There will be no exchange of documents. The premise is that what is discussed shall remain confidential, but I don't expect that to happen. The main focus will be to explain how he has come to the underfunded number he reported to the creditors. He will not translate that into an impact on retirees or employees' vested rights or what share of monies available to unsecured creditors would go to the pension plans. Because pensions have such a long life there are a lot of creative options we can explore to address how they will be treated in a restructuring.

On Thursday, we expect to receive financials that will help us better understand the potential negative impact on pensions and what options may be available to us to avoid them.

Tomorrow's meeting could lead to questions directed to you about your view on this topic. In my view, its too early in the process to respond to hypothetical questions. We remain in many ways at the informational stage. I have some thoughts as to how you could address some pointed questions if you are interested in hearing them.

Regards,

Andy


Sent from my iPad

1

SOM20010234

# EXHIBIT E

| To: | Snyder, Rick (GOV)[snyderr11@michigan.gov]; 'emmittb@michigan.gov'[emmittb@michigan.gov]; |
| | 'Dillon, Andy (Treasury)'[DillonA2@michigan.gov]; Tedderg@Michigan.gov[Tedderg@Michigan.gov] |
| Cc: | 'orrk@detroitmi.gov'[orrk@detroitmi.gov]; David G. Heiman[dgheiman@JonesDay.com] |
| From: | Buckfire, Ken |
| Sent: | Wed 7/17/2013 1:14:37 PM |
| Subject: | Forbearance Agreement with Swap Counterparties - City of Detroit |

Gentlemen:


Yesterday, 16 July, The City of Detroit executed a Forbearance Agreement with Bank America Merrill Lynch and UBS, its swap counterparties. This was an important development for the following reasons:


1.    Demonstrates the City's ability to negotiate in good faith with important creditors and achieve a mutually satisfactory result.

2.    The City has been in default to the swap counterparties. This agreement provides that BAML and UBS will forbear from pursuing remedies. These remedies include blocking the City's access to taxes on gaming revenues (approximately $180 million per year) or demanding the immediate payment of the present value of the swaps (between $280 and $340 million).

3.    The City now has the option of redeeming the swaps at 75% of present value until 31 October 2013. This would result in the City saving between $70 and $85 million. Please note that the City stipulated in the 14 June 2013 plan that it is valuing its secured debt (ie., secured by revenue pledges) at 100%. Therefore, redeeming the swaps (secured by gaming tax revenues) at a substantial discount is real savings for the City.

4.    The swaps were intended to hedge interest rate risk associated with the Pension Certificates of Participation. The Forbearance Agreement should reduce the cost (both in dollars and time) of potential litigation associated with these transactions.


Miller Buckfire and Jones Day are available at any time to discuss this Agreement and answer any questions. I hope you find this brief note helpful as you consider the overall situation.


Respectfully,

Ken

**Kenneth A. Buckfire**

President

Miller Buckfire | A Stifel Company

................................................................................

**Direct:** +1.212.895.1803 | **Fax:** +1.212.895.1850

**E-mail:** ken.buckfire@millerbuckfire.com | www.millerbuckfire.com

................................................................................

601 Lexington Avenue, 22nd Floor | New York, NY 10022

---

Disclaimer: The information contained in this email message is intended only for the use of the individual or entity named above. If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us and destroy the original message. Thank you